# <u>EXHIBIT A</u>

**JPMorganChase** ⬡

# *Continuing Agreement*
# *For*
# *Standby Letters of Credit*

*This Agreement is between*

# DELPHI CORPORATION

*and*

# *JPMorgan Chase Bank, N.A.*
# *and its subsidiaries and affiliates*

## CONTINUING AGREEMENT FOR
## STANDBY LETTERS OF CREDIT

To induce JPMorgan Chase Bank, N.A. and/or any of its domestic or foreign subsidiaries or affiliates (individually and collectively, **"Bank"**) (i) to continue all of the outstanding letters of credit or other independent undertakings issued by Bank for the account of the undersigned Applicant (either prior to the undersigned's filing of a case under Chapter 11 of the Federal Bankruptcy Code or as debtor or debtor in possession in a case pending under Chapter 11 of the Federal Bankruptcy Code) that are listed on Appendix B hereto as letters of credit deemed to have been issued hereunder by Bank for the account of the undersigned Applicant (collectively the "Existing Letters of Credit"), and (ii) in its sole discretion, to issue for the account of the undersigned Applicant or for the account of the Account Party named in the applicable Application, one or more standby letters of credit or other independent undertakings to replace any Existing Letter of Credit (each such replacement letter of credit, a "**Replacement Letter of Credit**") from time to time at the request of the undersigned (individually and collectively, **"Applicant"**; jointly and severally, if more than one), Applicant agrees as to each Existing Letter of Credit and as to each Replacement Letter of Credit issued hereunder (each of the Existing Letters of Credit, each of the Replacement Letters of Credit and any replacements, extensions or modifications of any of them, a **"Credit"** and collectively, **"Credits"** ) as follows.

1.   **Applications/Instructions.**  (a) Each application, reimbursement agreement or other agreement executed by the undersigned (whether prior to its filing of a case under Chapter 11 of the Federal Bankruptcy Code or as debtor or debtor in possession in a case pending under Chapter 11 of the Federal Bankruptcy Code) pursuant to which Applicant requested the issuance of, or Bank issued, any Existing Letter of Credit and each request to issue a Replacement Letter of Credit delivered to Bank after the date hereof (each being hereinafter referred to as an **"Application"**) shall be irrevocable and in such form as Bank shall from time to time require or agree to accept (including any type of electronic form or means of communication). Inquiries, communications and instructions (whether oral, telephonic, written, telegraphic, facsimile, electronic or other) regarding a Credit, each Application and this Agreement are each referred to herein as **"Instructions"** (and the term "Application" is subsumed within the term "Instruction"). Bank's records of the content of any Instruction shall be conclusive absent manifest error. Applicant shall be responsible for the final text of a Credit notwithstanding Bank's recommendation, assistance or drafting or Bank's use, non-use or refusal to use text submitted by Applicant. Bank may transmit a Credit and any amendment thereto by S.W.I.F.T. message and thereby bind Applicant directly and as indemnitor to the S.W.I.F.T. rules, including rules obligating Applicant or Bank to pay charges.

(b) Each Existing Letter of Credit is a Letter of Credit under and defined in, and shall continued to be governed in all respects by, the Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of May 9, 2008, among the Applicant, the subsidiaries of the Applicant party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A. (the **"Administrative Agent"**) as administrative agent for the lenders, as modified by the Accommodation Agreement (the **"Accommodation Agreement"**) dated as of December 12, 2008 (as such credit agreement may be amended, modified or supplemented from time to time, the **"Credit Agreement"**). Notwithstanding anything in this Agreement to the contrary, the provisions of this Agreement shall not apply to any Existing Letter of Credit so long as the provisions relating to Letters of Credit contained in the Credit Agreement and the Security and Pledge Agreement (as defined in the Credit Agreement) remain in full force and effect with respect to the Existing Letters of Credit.

(c)  On or prior to any date of issuance of any Replacement Letter of Credit hereunder, Applicant shall deposit into one or more LC Cash Collateral Accounts, an amount equal to 105% of the face amount of such Replacement Letter of Credit, as collateral security for Applicant's reimbursement obligations hereunder.  Moneys in such account may be applied by Bank to reimburse Bank for any payments made by Bank (or with respect to any time draft, any payments to be made to Bank one Business Day prior to the date when such payments are to be made under the applicable draft) pursuant to a Replacement Letter of Credit for which it has not been reimbursed and upon expiration or cancellation of the related Replacement Letter of Credit, such cash shall, at the request of Company, be promptly remitted by Bank to Applicant.  "**LC Cash Collateral Account**" shall mean any Full Control Deposit Account into which cash collateral shall have been deposited, over which Bank shall have sole and exclusive dominion and control, including the exclusive right of withdrawal.  "**Full Control Deposit Account**" shall mean any deposit account of Applicant that is subject to an agreement, in form and substance reasonably satisfactory to Bank, between Applicant and Bank, providing for the exclusive collection and control by Bank of all deposits and balances held in such deposit account.

2. **Payment Terms; Obligations Absolute.** (a) For each Credit, Applicant shall pay Bank: (i) the amount of each drawing paid by Bank under the Credit on demand, if under a sight draft and at least one Business Day prior to the date when payment is to be made under a time draft (or acceptance relating thereto) or deferred payment obligation; (ii) commissions, fees and charges in respect of the Credit (including, commissions and fees for issuance, transfer, assignment of proceeds, amendments and drawings and of any adviser, confirming institution or entity or other nominated person), at such rates, amounts and times as Bank and Applicant shall mutually agree (or if no agreement, the rate then customarily charged by Bank); (iii) interest on each amount under this Agreement for each day from and including the date such payment is due through the date of payment, on demand, at a rate per annum (calculated on the basis of a 360 day year for the actual number of days elapsed) equal to the lesser of (A) 6.00% per annum and (B) the highest rate permitted by applicable law; (iv) Bank's charges, costs and expenses (including reasonable internal and outside counsel fees and expenses) incurred in connection with the protection or enforcement of Bank's rights under this Agreement and any correspondent's charges, with interest from the date paid or incurred by Bank through the date of payment by Applicant, on demand, at a rate per annum equal to 6.00% per annum; and (v) if as a result of any Regulatory Change, the Bank determines that the cost to the Bank of issuing or maintaining any Credit is increased, or any amount received or receivable by the Bank hereunder is reduced, or the Bank is required to make any payment in connection with any transaction contemplated hereby, then the Applicant shall pay to the Bank on demand such additional amount or amounts as the Bank determines will compensate the Bank for such increased cost, reduction or payment. "**Regulatory Change**" means any change after the date hereof in United States federal, state or foreign laws or regulations (including Regulation D of the Board of Governors of the Federal Reserve System as amended or supplemented from time to time) or the adoption or making after such date of any interpretations, directives or requests applying to a class of banks including the Bank or under any United States federal or state, or any foreign, laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof. "**Business Day**" means any day on which commercial banks in New York City, New York are not authorized or required to be closed for business.

(b) If the amount drawn under any Credit is in non-United States currency ("**foreign currency**"), Applicant shall pay under paragraph 2(a)(i) above the United States dollar equivalent of the amount computed at Bank's selling rate, as of the date of Applicant's payment, for cable transfers of such foreign currency to the place of payment; provided, further, that if, for any reason, Bank has no selling rate for cable transfers of that currency to such place on the payment date, Applicant shall pay Bank an amount in United States currency equivalent to Bank's actual cost of settlement of its obligation.

(c) All payments shall be made in immediately available funds, free and clear of and without deduction for any Indemnified Taxes or Other Taxes. Applicant shall pay all withholding, stamp and other similar taxes or duties imposed by any taxing authority on payment under any Credit and this Agreement and shall indemnify Bank against all Indemnified Taxes and Other Taxes paid by Bank on or with respect to any payment by or on account of any obligation of an Applicant hereunder. "**Excluded Taxes**" shall mean, with respect to Bank or any other recipient of any payment to be made by or on account of any obligation of the Applicant hereunder, (a) income, franchise, or similar taxes imposed on (or measured by) its net income as a result of a present or former connection between Bank and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Bank having executed, delivered or performed its obligations or received payment under this Agreement), (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Applicant is located and (c) any withholding tax that would have been imposed had such payment been made to Bank at the date of this Agreement. "**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government. "**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes. "**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority. "**Other Taxes**" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

(d) Bank may (but shall not be required to), without demand for payment or notice to the Applicant, and in addition to any other right of set-off which Bank may have, debit any account or accounts maintained by Applicant with any

office of Bank  (now or in the future), other than the Borrowing Base Cash Collateral Account (as defined in the Credit Agreement) and the Segregated Tranche C Interest Account (as defined in the Credit Agreement), and set-off and apply (X) any balance or deposits (general, special, time, demand, provisional, final, matured, unmatured, contingent or absolute) in such account(s) and (Y) any sums due or payable from Bank hereunder, to the payment of any and all amounts owed by Applicant to Bank; provided that, so long as no Event of Default has occurred and is continuing, Bank shall not debit, set-off or apply any balance or deposits in such account(s) (other than the LC Cash Collateral Accounts) or any sums due or payable from Bank hereunder against any such amounts owed by Applicant to Bank while there are still funds available in the LC Cash Collateral Accounts to satisfy such amounts owed by Applicant to Bank.

(e) Applicant's payment obligations under this paragraph 2 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including, without limitation: (i) any lack of validity, enforceability or legal effect of any Credit or this Agreement, or any term or provision therein or herein; (ii) payment against presentation of any draft, demand or claim for payment under any Credit or other document presented for purposes of drawing under any Credit (**"Drawing Document"**) that does not comply in whole or in part with the terms of the applicable Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person (or a transferee of such Person) purporting to be a successor or transferee of the beneficiary of such Credit; (iii) Bank or any of its branches or affiliates being the beneficiary of any Credit; (iv) Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Credit even if such Drawing Document claims an amount in excess of the amount available under the Credit; (v) the existence of any claim, set-off, defense or other right that Applicant or any other Person may have at any time against any beneficiary, any assignee of proceeds, Bank or any other Person; (vi) Bank or any correspondent having previously paid against fraudulently signed or presented Drawing Documents (whether or not Applicant reimbursed Bank for such drawing); and (vii) any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing, that might, but for this paragraph, constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, Applicant's obligations hereunder (whether against Bank, the beneficiary or any other Person); provided, however, that subject to paragraph 4 hereof, the foregoing shall not exculpate Bank from such liability to Applicant as may, be finally, judicially determined in an independent action or proceeding brought by Applicant against Bank following payment of Applicant's obligations under this Agreement. **"Person"** means any natural Person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

3. **Amendment; Waiver.** Bank shall not be deemed to have amended or modified any term hereof, or waived any of its rights unless Bank consents in writing to such amendment, modification or waiver. No such waiver, unless expressly stated therein, shall be effective as to any transaction which occurs subsequent to such waiver, nor as to any continuance of a breach after such waiver.  Bank's consent to any amendment, waiver, or modification does not mean that Bank shall consent or has consented to any other or subsequent Instruction to amend, modify, or waive a term of this Agreement or any Credit.

4. **Indemnification; Limitation of Liability.** (a) Applicant shall indemnify and hold harmless Bank, its parent, and correspondents and each of their respective directors, officers, employees and agents (each, including Bank, an "**Indemnified Person**") from and against any and all claims, suits, judgments, costs, losses, fines, penalties, damages, liabilities, and expenses, including expert witness fees and legal fees, charges and disbursements of any counsel (including in-house counsel fees and allocated costs) for any Indemnified Person ("**Costs**"), arising out of, in connection with, or as a result of: (i) any Credit or any pre-advice of its issuance; (ii) any transfer, sale, delivery, surrender, or endorsement of any Drawing Document at any time(s) held by any Indemnified Person in connection with any Credit; (iii) any action or proceeding arising out of or in connection with any Credit or this Agreement (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Credit, or for the wrongful dishonor of or honoring a presentation under any Credit; (iv) any independent undertakings issued by the beneficiary of any Credit; (v) any unauthorized Instruction or error in computer transmission; (vi) an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated; (vii) any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of letter of credit proceeds or holder of an instrument or document; (viii) the fraud, forgery or illegal action of parties other than the Indemnified Person; (ix) the enforcement of this Agreement or any rights or remedies under or in connection with this Agreement or any Credit; (x) the Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a

confirmation; (xi) Bank dishonoring any presentation upon or during the continuance of any Event of Default or for which Applicant is unable or unwilling to make any payment to Bank required under paragraph 2 above; (xii) the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of such Indemnified Person; in each case, including that resulting from Bank's own negligence, provided, however, that such indemnity shall not be available to any Person claiming indemnification under (i) through (xii) above to the extent that such Costs are found in a final, non-appealable judgement by a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Indemnified Person claiming indemnity. If and to the extent that the obligations of Applicant under this paragraph are unenforceable for any reason, Applicant shall make the maximum contribution to the Costs permissible under applicable law.

(b) The liability of Bank (or any other Indemnified Person) under, in connection with and/or arising out of this Agreement or any Credit (or any pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to any direct damages suffered by Applicant that are caused directly by Bank's gross negligence or willful misconduct in (i) honoring a presentation that does not at least substantially comply with a Credit, (ii) failing to honor a presentation that strictly complies with a Credit or (iii) retaining Drawing Documents presented under a Credit.  In no event shall Bank be deemed to have failed to act with due diligence or reasonable care if Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement, including paragraph 4(d) below.  Applicant's aggregate remedies against Bank and any Indemnified Person for wrongfully honoring a presentation under any Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Applicant to Bank in respect of the honored presentation in respect of such Credit under paragraph 2 above, plus interest.  **Notwithstanding anything to the contrary herein, Bank and the other Indemnified Persons shall not, under any circumstances whatsoever, be liable for any punitive, consequential, indirect or special damages or losses regardless of whether Bank or any Indemnified Person shall have been advised of the possibility thereof or of the form of action in which such damages or losses may be claimed.** Applicant shall take action to avoid and mitigate the amount of any damages claimed against Bank or any Indemnified Person, including by enforcing its rights in the underlying transaction.  Any claim by Applicant for damages under or in connection with this Agreement or any Credit shall be reduced by an amount equal to the sum of (i) the amount saved by Applicant as a result of the breach or alleged wrongful conduct and (ii) the amount of the loss that would have been avoided had Applicant mitigated damages. If a Credit is to be governed by a law other than that of the State of New York, Bank shall not be liable for any Costs resulting from any act or omission by Bank in accord with the UCP or the ISP, as applicable, and Applicant shall indemnify Bank for all such Costs in accordance with Section 4(a) above. **"Standard Letter of Credit Practice"** means, for Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Bank issued the applicable Credit or for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Credit, as the case may be. Such practices shall be (i) of banks that regularly issue Credits in the particular city and (ii) required or permitted under the UCP or the ISP, as chosen in the applicable Credit. **"ISP"** means, International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adhered to by Bank on the date such Credit is issued.  **"UCP"** means, Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 500 or No. 600, as applicable to any Credit and any subsequent revision thereof adhered to by Bank on the date such Credit is issued. If a Credit subject to UCP does not specify which revision is applicable, the Credit shall be subject to Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600.

(c) Without limiting any other provision of this Agreement, Bank and each other Indemnified Person (if applicable), shall not be responsible to Applicant for, and Bank's rights and remedies against Applicant and Applicant's obligation to reimburse the Bank shall not be impaired by: (i) honor of a presentation under any Credit which on its face substantially complies with the terms of such Credit; (ii) honor of a presentation of any Drawing Documents which appear on their face to have been signed, presented or issued (X) by any purported successor or transferee of any beneficiary or other party required to sign, present or issue the Drawing Documents or (Y) under a new name of the beneficiary; (iii) acceptance as a draft of any written or electronic demand or request for payment under a Credit, even if nonnegotiable or not in the form of a draft, and may disregard any requirement that such draft, demand or request bear any or adequate reference to the Credit; (iv) the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness, or legal effect of any presentation under any Credit or of any Drawing Documents; (v) disregard of any non-documentary conditions stated in any Credit; (vi) acting upon any Instruction which it, in Good Faith, believes to have been given by a Person or entity authorized to give such Instruction; (vii) any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or

document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation; (viii) any delay in giving or failing to give any notice; (ix) any acts, omissions or fraud by, or the solvency of, any beneficiary, any nominated Person or any other Person; (x) any breach of contract between the beneficiary and Applicant or any of the parties to the underlying transaction; (xi) assertion or waiver of any provision of the UCP or ISP which primarily benefits an issuer of a letter of credit, including, any requirement that any Drawing Document be presented to it at a particular hour or place; (xii) payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under the Standard Letter of Credit Practice applicable to it; (xiii) dishonor of any presentation upon or during any Event of Default or for which Applicant is unable or unwilling to reimburse or indemnify Bank (provided that Applicant acknowledges that if Bank shall later be required to honor the presentation, Applicant shall be liable therefor in accordance with paragraph 2 hereof); and (xiv) acting or failing to act as required or permitted under Standard Letter of Credit Practice (or in the case of other independent undertakings or guarantees, the UN Convention) applicable to where it has issued, confirmed, advised or negotiated such Credit, as the case may be. **"Good Faith"** means honesty in fact in the conduct of the transaction concerned. **"UN Convention"** means the United Nations Convention on Independent Guarantees and Standby Letters of Credit.

(d) Applicant shall notify Bank of (i) any noncompliance with any Instruction, any other irregularity with respect to the text of any Credit or any amendment thereto or any claim of an unauthorized, fraudulent or otherwise improper Instruction, within one (1) Business Day of Applicant's receipt of a copy of such Credit or amendment and (ii) any objection Applicant may have to Bank's honor or dishonor of any presentation under any Credit or any other action or inaction taken or proposed to be taken by Bank under or in connection with this Agreement or any Credit, within three (3) Business Days after Applicant receives notice of the objectionable action or inaction. The failure to so notify the Bank within said times shall discharge Bank from any loss or liability that Bank could have avoided or mitigated had it received such notice, to the extent that Bank could be held liable for damages hereunder; provided, that, if Applicant shall not provide such notice to Bank within three (3) Business Days of the date of receipt in the case of clause (i) or ten (10) Business Days from the date of receipt in the case of clause (ii), Bank shall have no liability whatsoever for such noncompliance, irregularity, action or inaction and Applicant shall be precluded from raising such noncompliance, irregularity or objection as a defense or claim against Bank. Applicant's acceptance or retention of a Drawing Document presented under or in connection with any Credit (whether or not the document is genuine) or of any Released Merchandise shall ratify Bank's honor of the presentation and preclude Applicant from raising a defense, set-off or claim with respect to Bank's honor of such Credit. Bank shall not be required to seek any waiver of discrepancies from Applicant or to grant any waiver of discrepancies which Applicant approves or requests. **"Released Merchandise"** means all Property referred to in or relating to the applicable Credit, released (including pursuant to a forwarders cargo receipt or by any other means whatsoever) or consigned to Applicant or any Person designated by Applicant in connection with such Credit. **"Property"** means all property of any kind whatsoever (now existing or hereafter acquired) including, without limitation, any and all right, title and interest of Applicant in any goods, equipment, inventory, money, documents, letters of credit, warehouse receipts, instruments, securities, security entitlements, financial assets, investment property, precious and base metals, chattel paper, electronic chattel paper, accounts, commercial tort claims, deposit accounts, general intangibles (including any claims for breach of contract, breach of warranty claims and any insurance policies and proceeds), letter of credit rights, choses in action and the proceeds of any and all thereof (including any and all of the aforesaid referred to in any Credit or the Drawing Documents relating thereto).

(e) Applicant will (i) comply with all material foreign and domestic laws, rules and regulations (including the USA Patriot Act, foreign exchange control regulations, foreign asset control regulations and other trade-related regulations) now or hereafter applicable to each Credit or Applicant's execution, delivery and performance of this Agreement, (ii) cause all Released Merchandise to be insured against theft, fire and such other risks usually insured against in connection with the underlying transaction; (iii) permit Bank (or its representatives) to inspect and audit any Property and Applicant's books and records with respect thereto upon reasonable notice; and (iv) to the extent not provided to Bank under other agreements, upon request, furnish Bank with Applicant's most recent year-end, quarterly and monthly (if any), financial statements (as audited) and such other information as Bank shall reasonably request regarding the financial condition, business or operations of Applicant. Further, the undersigned acknowledges and agrees to provide the Bank additional information, records, and documentation as requested by Bank, pursuant to the Bank's programs enacted to comply with Section 326 of the USA Patriot Act, the applicable regulations promulgated thereunder, and the Bank's Customer Identification Program and authorizes Bank to verify information as per the USA Patriot Act Regulation.

(f) Applicant acknowledges that this Agreement and each Credit is entered into (or will be entered into) for commercial purposes. To the extent that Applicant may now or hereafter be entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Agreement or any Credit, to claim for itself or its revenues or properties any immunity from the jurisdiction of any court or from legal process (whether from service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the extent that in any such jurisdiction there may be attributed to the Applicant any such immunity (whether or not claimed), Applicant hereby irrevocably agrees not to claim, and hereby waives, such immunity in respect of its obligations under this Agreement or any Credit.

5.  **Representations and Warranties.**  Applicant hereby represents and warrants as of the date of this Agreement (and with each Instruction for the issuance of a Credit represents and warrants as of the date of the Instruction) that: (a) it has all necessary power and authority to enter into and perform this Agreement; (b) it has obtained all authorizations, consents and approvals required for it to enter into and perform this Agreement in accordance with its terms; (c) this Agreement constitutes the legal, valid and binding obligation of Applicant, enforceable against it in accordance with its terms; (d) the execution, delivery and performance of this Agreement by Applicant does not and will not contravene (i) its charter, by-laws or other organizational documents, (ii) any order or writ binding on or affecting Applicant or its properties, or (iii) any agreement or arrangement to which Applicant is a party or by which it or its properties may otherwise be bound, the contravention of which agreement or arrangement would have a material adverse effect on Applicant; (e) no information now or hereafter furnished by Applicant to Bank in connection with this Agreement or any Credit is or shall be materially false or misleading when furnished; and (f) Applicant is acting for itself and for no other Person or entity in requesting issuance of each Credit.

6.  **Pledge and Assignment of Security.**  (a) All obligations and liabilities of Applicant to Bank in respect of any and all Existing Letters of Credit shall be secured by the Collateral (as defined in the Credit Agreement) to the extent set forth in, and subject to the terms and conditions contained in, the Loan Documents (as defined in the Credit Agreement).

(b) As security for the payment and performance of all obligations and liabilities of Applicant to Bank in respect of any and all Replacement Letters of Credit issued hereunder (if any) and under this Agreement, whether matured or unmatured, absolute or contingent, now existing or hereafter incurred (**"Obligations"**), Applicant hereby grants to Bank a continuing lien and security interest in, and pledges and assigns to Bank all of Applicant's present and future right, title and interest in, to and under all LC Cash Collateral Accounts and all products and proceeds of the foregoing (collectively, the "**Collateral**").

(c) Applicant shall hold all payments of the Obligations and all proceeds of Collateral in trust for Bank. Bank shall be deemed to have possession, custody or control of all Collateral actually in transit to or set apart for it (or any of its agents, correspondents or others acting in its behalf), it being understood that the receipt at any time by Applicant (or any of its agents, correspondents, or others acting in its behalf), of Collateral of whatever nature, including cash, shall not be deemed a waiver of any of Bank's rights or powers.

(d)  If at any time the cash held in the LC Cash Collateral Accounts is less than 105% of the US Dollar equivalent of the aggregate face amount of the issued and outstanding Replacement Letters of Credit, then, Applicant shall, upon Bank's demand, deliver to Bank, as additional security for the Obligations, cash in an amount equal to the difference between 105% of the US Dollar equivalent of the aggregate face amount of the issued and outstanding Replacement Letters of Credit and the cash then held in the LC Cash Collateral Accounts.

 (e) Bank is authorized to file financing statements, naming Applicant as debtor and Bank as secured party, with respect to any or all of the Collateral hereunder. Bank is authorized to take any action necessary to protect its rights in the Collateral.  Applicant will, at its own expense upon request by Bank from time to time, sign any other instrument or document (including any security agreement, or control agreement) and take any other action Bank may reasonably deem necessary or desirable to preserve, perfect, protect or maintain the Collateral and the priority of Bank's security interest therein and to realize upon Bank's rights and remedies as a secured party.  For the avoidance of doubt and not in limitation of the rights of Bank under Sections 9-104(a)(1), 9-106(a) and 8-106(e) of the Code as adopted by the State of New York, Applicant and Bank (acting as a bank with respect to all LC Cash Collateral Accounts) agree that Bank may direct disposition of the funds in any LC Cash Collateral Account without the consent of Applicant.

(f) To the extent Bank honors a presentation for which Bank remains unpaid, Bank may assert rights of Applicant and Applicant shall cooperate with Bank in its assertion of Applicant's rights against the beneficiary, the beneficiary's rights against Applicant and any other rights that Bank may have by subordination, subrogation, reimbursement, indemnity or assignment.

(g) If Bank shall agree to honor (accept) Drawing Documents under a Credit on a time draft or deferred payment basis, Applicant shall not take possession of the Drawing Documents or the underlying Property except for the purpose of loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with such Property in a manner preliminary to its sale or exchange. An Instruction to release any such Drawing Document or Property shall be deemed a representation by Applicant to Bank that Applicant seeks such release for one of said purposes. In each such case, Applicant immediately shall apply the sale proceeds of such Property to the Obligations relating to the applicable Credit (to the extent that such Obligations have not been reimbursed with proceeds from the LC Cash Collateral Accounts).

7.  **Events of Default; Obligations Due; Remedies.** (a) Each of the following shall be an "Event of Default" under this Agreement: (i) Applicant shall fail to pay any sum payable upon or in respect of any of the Obligations when due and such default shall continue unremedied for more than two Business Days; (ii) Applicant shall fail to perform any agreement contained herein and such default shall continue unremedied for ten days; (iii) the Obligations of Applicant hereunder shall cease to be secured by a first priority lien on and the perfected pledge and security interest in the Collateral; (iv) at any time prior to the emergence of Applicant and its subsidiaries from their respective Chapter 11 bankruptcy cases, the expiration or termination of the Accommodation Agreement (as defined in the Accommodation Agreement) or the Accommodation Period (as defined in the Accommodation Agreement); (v) any other Event of Default under and as defined in the Credit Agreement shall have occurred and be continuing; and (vi) any other Event of Default set forth in Appendix C hereto shall have occurred and be continuing; provided that, in no event shall any Specified Default (as defined in the Accommodation Agreement) constitute an Event of Default under this Agreement for so long as the Accommodation Agreement has not been terminated in accordance with its terms.

(b) Upon an Event of Default, all of the Obligations shall be immediately due and payable without notice or demand (whether or not a drawing or claim had in fact been made or paid) and Bank may, in addition to all other rights and remedies it may have at law or in equity, (i) exercise any remedies of a secured party under applicable law, including under the Code, (ii) charge, debit and/or set-off against any general or special account of Applicant maintained at any office of Bank (whether matured or unmatured) for the amount of the Obligations and all obligations in respect of Existing Letters of Credit, other than the Borrowing Base Cash Collateral Account and the Segregated Tranche C Interest Account, (iii) amend or terminate, or transfer drawing rights or cure one or more discrepancies under, any Credit, and/or (iv) make payment in satisfaction of the Obligations then due and payable and all obligations in respect of Existing Letters of Credit or hold all amounts, proceeds and Collateral as security for each Credit. Upon an Event of Default, Bank shall be authorized to apply the balance of deposits and any sums credited by or due from Bank to Applicant in the LC Cash Collateral Accounts, in the case of the Replacement Letters of Credit, to the payment of any and all of the Obligations in respect of the Replacement Letters of Credit, and in the Letter of Credit Account (as defined under the Credit Agreement), in the case of the Existing Letters of Credit, to the payment of any and all of the obligations in respect of Existing Letters of Credit, in each case all without prejudice to the rights of Bank against Applicant with respect to any and all amounts which may be or remain unpaid.

8.  **Continuing Rights and Obligations.** Bank's rights and liens hereunder shall continue unimpaired, and Applicant shall be and remain obligated in accordance with the terms and provisions hereof, notwithstanding the release and/or substitution of any Property which may be held as security hereunder at any time, or of any rights or interest therein. Applicant waives any defense whatsoever which might constitute a defense available to, or discharge of, a surety or a guarantor. If more than one Person signs this Agreement or an Application hereunder, each of them shall be jointly and severally liable hereunder and thereunder and all the terms and provisions regarding liabilities, obligations and Property of such Persons shall apply to any liabilities, obligations and Property of any and all of them.

9.  **Electronic Transmissions.** Bank is authorized to accept and process any Application and any amendments, transfers, assignments of proceeds, Instructions, consents, waivers and all documents relating to the Credit or the Application which are sent to Bank by electronic transmission, including SWIFT, electronic mail, telex, telecopy,

telefax, courier, mail or other computer generated telecommunications and such electronic communication shall have the same legal effect as if written and shall be binding upon and enforceable against the Applicant. Bank may, but shall not be obligated to, require authentication of such electronic transmission or that Bank receives original documents prior to acting on such electronic transmission. If it is a condition of the Credit that payment may be made upon receipt by Bank of an electronic transmission advising negotiation, Applicant hereby agrees to reimburse Bank on demand for the amount indicated in such electronic transmission advice, and further agrees to hold Bank harmless if the documents fail to arrive, or if, upon the arrival of the documents, Bank should determine that the documents do not comply with the terms and conditions of the Credit.

10.  **Jurisdiction; Waiver of Jury Trial.**  (a) Applicant submits to the nonexclusive jurisdiction of any state or federal court located in the Borough of Manhattan, City of New York, State of New York, for itself and its Property and agrees that any such court shall be a proper forum for any action or suit brought by Bank. Service of process in any legal action or proceeding arising out of or in connection with this Agreement, any Instruction or any Credit may be made upon Applicant by mailing a copy of the summons to Applicant either at the address set forth in the applicable Application or at Applicant's last address appearing in Bank's records. In addition, if Applicant is organized or incorporated in a jurisdiction outside the United States of America, Applicant designates the CT Corporation located at 111 8ᵗʰ Avenue, New York, New York 10011 as the true and lawful agent and attorney-in-fact of Applicant for receipt of the summons, writs and notices in connection with any such action or suit.

(b) No legal action or proceeding arising out of or in connection with this Agreement, any Instruction or any Credit may be brought by Applicant against Bank (i) except in a state or federal court located in the Borough of Manhattan, City of New York, State of New York and (ii) unless commenced within one (1) year after (X) the expiration date of the applicable Credit or (Y) the alleged breach shall have purportedly occurred, whichever is earlier.

(c)  **THE PARTIES HERETO WAIVE (I) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION OR PROCEEDING IN WHICH BANK AND APPLICANT ARE PARTIES (WHETHER OR NOT THE ONLY PARTIES) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY INSTRUCTION OR ANY CREDIT AND (II) THE RIGHT TO INTERPOSE ANY CLAIM, SETOFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION.**

11.  **Applicable Law; Severability. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflict of laws.**  The UCP and the ISP are incorporated by reference into this Agreement and are evidence of Standard Letter of Credit Practice with respect to matters covered therein provided, however, that to the extent permitted by applicable law, this Agreement shall prevail in case of a conflict between this Agreement, the Uniform Commercial Code (the "**Code**"), and/or Standard Letter of Credit Practice and the UCP shall prevail in case of conflict between the UCP and the Code or other Standard Letter of Credit Practice, if the Credit is governed by the UCP and the ISP shall prevail in case of a conflict between the ISP and the Code and other Standard Letter of Credit Practice if the Credit is a standby Credit governed by the ISP. Any provisions of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Applicant hereby waives any provision of law, which prohibits or renders unenforceable any provision of this Agreement.

12.  **No Third Party Benefits; Successor; Assignment; Integration; Delivery by Facsimile; Notices.**  This Agreement shall be binding upon and inure to the benefit of Bank and Applicant and their respective successors and permitted assigns. This Agreement shall not confer any right or benefit upon any Person other than the parties to this Agreement, the Indemnified Persons and their respective successors and permitted assigns. Bank may assign or sell participations in all or any part of any Credit or this Agreement to another entity and Bank may disseminate credit information relating to the Applicant in connection with any proposed participation; provided that such entity shall agree to be bound by confidentiality provisions substantially similar to those set forth in Section 10.04 of the Credit Agreement (and Bank, in its capacity as issuer of Replacement Letters of Credit, hereby agrees to be bound by Section 10.04 of the Credit Agreement).  Applicant may not assign this Agreement without the prior written consent of Bank. This Agreement may be signed and delivered by facsimile transmission. Notices to Bank shall be sent to the address of Bank as set forth on the Credit and shall be delivered by hand, overnight courier or certified mail, return receipt requested. Notices to Applicant shall be sent to the address set forth below the signature line hereto. **THIS AGREEMENT CONSTITUTES THE ENTIRE CONTRACT AND FINAL AGREEMENT AMONG THE**

PARTIES RELATING TO THE SUBJECT MATTER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

13.  **Continuing Agreement.**  This Agreement is a continuing agreement and may not be terminated by Applicant except upon (i) thirty (30) days' prior written notice of such termination by Applicant to Bank at the address of Bank set forth on the most recent Credit issued hereunder, (ii) payment of all Obligations and (iii) the expiration or cancellation of all Credits issued hereunder.  Notwithstanding the foregoing sentence, if a Credit is issued in favor of a sovereign or commercial entity, which is to issue a guarantee or undertaking on Applicant's behalf in connection therewith, or is issued as support for such a guarantee, the Applicant shall remain liable with respect to such Credit until Bank is fully released in writing by such entity.

14.  **Limitation of Interest and Other Charges.**  Applicant and Bank intend to conform strictly to the applicable usury laws, if any, now or hereafter in force with respect to this Agreement.  To such end: the aggregate of all interest and other charges constituting interest under such applicable usury laws and contracted for, chargeable or receivable under this Agreement shall never exceed the maximum amount of interest, nor produce a rate in excess of the maximum contract rate of interest, that Bank is authorized to charge Applicant under such applicable usury laws.

15.  **IN THE EVENT STANDBY CREDIT(S) ARE ISSUED UNDER THIS AGREEMENT, THE FOLLOWING TERMS AND PROVISIONS SHALL APPLY:**

**Installments.**  If the Credit is issued subject to UCP 500 or 600, unless otherwise agreed, in the event that any installment of the Credit is not drawn within the period allowed for that installment, the Credit may continue to be available for any subsequent installments in the sole discretion of the Bank, notwithstanding Article 41 of UCP 500 or Article 32 of UCP 600.

**Auto Extend Notice.**  If the Credit provides for automatic extension without amendment, Applicant agrees that it will notify Bank in writing at least sixty (60) days prior to the last day specified in the Credit by which Bank must give notice of nonextension as to whether or not it wishes the Credit to be extended. Any decision to extend or not extend the Credit shall be in Bank's sole discretion and judgment. Applicant hereby acknowledges that in the event Bank notifies the beneficiary of the Credit that it has elected not to extend the Credit and the beneficiary draws on the Credit after receiving the notice of non-extension, Applicant acknowledges and agrees that Applicant shall have no claim or cause of action against Bank or defense against payment under the agreement for Bank's discretionary decision to extend or not extend the Credit.

**Pending Expiry Notice.**  If a Credit's terms and conditions provide that Bank give beneficiary a notice of pending expiration**,** Applicant agrees that it will notify Bank in writing at least sixty (60) days prior to the last day specified in the Credit by which Bank must give such notice of the pending expiration date. In the event Applicant fails to so notify Bank and the Credit is extended, Applicant's Obligations under this Agreement shall continue in effect and be binding on Applicant with regard to the Credit as so extended.

THE UNDERSIGNED HEREBY AGREES TO ALL THE TERMS AND CONDITIONS SET FORTH HEREIN, ALL OF WHICH HAVE BEEN READ AND UNDERSTOOD BY THE UNDERSIGNED.

DELPHI CORPORATION
(Applicant/Obligor)

*JOHN D. SHEEHAN*
*V.P. & CHIEF FINANCIAL OFFICER*

_____
(Authorized Signature/Title)

248.813.2606
_____
(Phone)

248.813.2612
_____
(Fax)

_____
(Date)


JPMORGAN CHASE BANK, N.A.
_____
(Bank)

_____
(Authorized Signature/Title)

_____
(Phone)

_____
(Fax)

_____
(Date)

Without limiting the terms above, you are authorized to debit our account no.
with JPMorgan Chase Bank, N.A. for the amount of each drawing and/or your commissions and charges.

THE UNDERSIGNED HEREBY AGREES TO ALL THE TERMS AND CONDITIONS SET FORTH HEREIN, ALL OF WHICH
HAVE BEEN READ AND UNDERSTOOD BY THE UNDERSIGNED.

DELPHI CORPORATION
_____
(Applicant/Obligor)

_____
(Authorized Signature/Title)

_____
(Phone)

_____
(Fax)

_____
(Date)

JPMORGAN CHASE BANK, N.A.
_____
(Bank)

_____susan E Atkins_____
(Authorized Signature/Title)

_____212-622-4506_____
(Phone)

_____212 622-4556_____
(Fax)

_____12/12/08_____
(Date)

Without limiting the terms above, you are authorized to debit our account no.
with JPMorgan Chase Bank, N.A. for the amount of each drawing and/or your commissions and charges.

**Appendix A**
**To the Continuing Agreement for Standby Letters of Credit**
(To be completed by Account Party/Applicant/Correspondent Bank)

This Appendix will remain in effect until further notice in writing is received by the JPMorgan Chase Bank, N.A. from the Account Party/Applicant/Correspondent Bank.  Changes to this Appendix require a new Appendix A to be executed and delivered to JPMorgan Chase Bank, N.A.

A)  In the event JPMorgan Chase Bank, N.A. issues or amends a Standby Letter of Credit ("Credit"), any one of the following individual(s) shall be authorized to sign on the behalf of:

_____
(Print Name of Account Party/Applicant/Correspondent Bank)

JOHN D. SHEEHAN          V.P. & CHIEF
(Printed Name)           FINANCIAL OFFICER          (Authorized Signature)          (Date)
                         (Title)

JOHN P. ARLE             V.P. &
(Printed Name)           TREASURER                  (Authorized Signature)          (Date)
                         (Title)

B)  In regards to any "Credit", JPMorgan Chase Bank, N.A. may accept and rely on instructions including without limitation, (a) waiving of discrepancies, (b) mailings/returning shipping documents, (c) changing Credit terms and conditions prior to issuance, and amendments to Credits which do not extend, increase or change the tenor of the draft(s) transmitted by the following authorized representatives of:

_____
(Print Name of Account Party/Applicant/Correspondent Bank)

JOHN D. SHEEHAN          V.P. & CHIEF
(Printed Name)           FINANCIAL OFFICER          (Authorized Signature)          (Date)
                         (Title)

JOHN P. ARLE             V.P. &
(Printed Name)           TREASURER                  (Authorized Signature)          (Date)
                         (Title)

TRACY KRAUSE             ASSISTANT
(Printed Name)           TREASURER                  (Authorized Signature)          (Date)
                         (Title)

C)  Signature Verification (**To be completed by "Bank"**):
    The above individual(s) is/are authorized to execute and sign applications, amendments and instructions on behalf of the Account Party/Applicant/Correspondent Bank.

_____
(Print Relationship Manager "RM" Name)     ("RM" Title)     ("RM" Authorized Signature)     (Date)

Rev. 07/01/2007
(NY) 27011/094/ACCOMMODATION.AGT/RA .doc

**Appendix B**
**To the Continuing Agreement for Commercial & Standby Letters of Credit**

EXISTING LETTERS OF CREDIT

(NY) 27011/094/ACCOMMODATION.AGT/RA .doc                                                    12/12/08 4:46 PM

**Appendix C**
**Other Events of Default**

**Appendix C**
**Other Events of Default**

Reference is made to the Continuing Agreement for Standby Letters of Credit between Delphi Corporation, a Delaware corporation, a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "**Company**"), and JPMorgan Chase Bank, N.A. and its subsidiaries and affiliates (individually and collectively, "**Bank**") dated December 12, 2008 (as amended, modified or supplemented from time to time, the "**LC Agreement**").  In this Appendix C, unless expressly provided otherwise in the LC Agreement, capitalized terms used herein and not otherwise defined herein shall have their meaning ascribed thereto under the Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of May 9, 2008, among the Applicant, the subsidiaries of the Applicant party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A. as administrative agent for the lenders, as in effect on December 12, 2008:

 "**Company**" means Delphi Corporation, a Delaware corporation, a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code.

In the case of the happening of any of the following events and the continuance thereof beyond the applicable grace period:

(a)    any material representation or warranty made by the Company in the LC Agreement or in connection with the LC Agreement or the credit extensions thereunder or any material statement or representation made in any report, financial statement, certificate or other document furnished by the Company or any Subsidiary to Bank under or in connection with the LC Agreement, shall prove to have been false or misleading in any material respect when made; or

(b)    any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Company or any Subsidiary shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof, or an application shall be filed by the Company or any Subsidiary for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is pari passu with or senior to the claims of Bank against the Company under the LC Agreement, or there shall arise or be granted any such pari passu or senior Superpriority Claim; or

(c)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Company or any of the Subsidiaries which have a value in excess of $20,000,000 in the aggregate; or

(d)    a Change of Control shall occur; or

(e)    an order of the Bankruptcy Court shall be entered (i) reversing, staying for a period in excess of 10 days, or vacating the Approval Order, the GM Approval Order or the GM Second Amendment Approval Order or (ii) without the written consent of Bank, otherwise amending, supplementing or modifying the Approval Order, the GM Approval Order or the GM Second Amendment Approval Order in a manner that is reasonably determined by Bank adverse Bank, or (iii) terminating the use of cash collateral by the Company or the Subsidiaries pursuant to the Approval Order (for purposes hereof, "GM Approval Order" shall mean "Approval Order" as defined under the GM-Delphi Agreement and "GM Second Amendment Approval Order" shall mean "Approval Order" as defined under the GM-Delphi Agreement Second Amendment); or

(f)    any judgment or order in excess of $20,000,000 as to any post-petition obligation shall be rendered against any Global Entity and the enforcement thereof shall not have been stayed; or

(g)    any non-monetary judgment or order with respect to a post-petition event shall be rendered against any Global Entity which does or would reasonably be expected to have a Material Adverse Effect; or

(h)    except as permitted by the Approval Order, the Company or the Subsidiaries shall make any Pre-Petition Payment other than (i) Pre-Petition Payments authorized by the Bankruptcy Court (v) in accordance with orders reasonably satisfactory to Bank (including not in excess of the amount set forth in the essential supplier order), (w) in connection with the assumption of executory contracts and unexpired leases, (x) payments in respect of reclamation claims authorized by the Bankruptcy Court, (y) in respect of accrued payroll and related expenses and employee benefits as of the Filing Date (excluding any Pre-Petition Payment in respect of or in connection with any Termination Event) and (z) in respect of Remediation Payments, (ii) Pre-Petition Payments of Indebtedness permitted under Section 6.03(ii) made with proceeds of dispositions of assets that secure the Indebtedness so repaid, so long as the Liens securing such repaid Indebtedness are not primed by the liens of the LC Agreement in favor of Bank and (iii) other Pre-Petition Payments

2

(excluding any Pre-Petition Payments that are refunded or otherwise
returned to the Company or the Subsidiaries within fifteen (15) days of
the making of such payments) in an aggregate amount not to exceed
$15,000,000; or

(i)     (i) any Termination Event described in clauses (iii) or (iv) of the
definition of such term shall have occurred and any Lien shall arise as a
result of such Termination Event or (ii) any Lien shall arise under Section
412(n) of the Code, and in each case, (x) such Lien has been perfected or
(y) any Person shall have obtained relief from the automatic stay to
enforce such Lien or any Insufficiency; provided that the perfection of
any Liens described in clauses (i) or (ii) above shall not constitute an
Event of Default so long as such perfected Liens could not, individually
or in the aggregate, reasonably be expected to have a Material Adverse
Effect or an adverse effect on the Liens in favor of Bank (including the
priority of such Liens or the ability of the Bank to exercise remedies in
respect thereof); or

(j)     (i) any ERISA Event shall have occurred with respect to a Plan, (ii) the
Company or any Subsidiary or any ERISA Affiliate shall have been
notified by the sponsor or trustee of a Multiemployer Plan that it has
incurred Withdrawal Liability to such Multiemployer Plan or (iii) the
Company or any Subsidiary or any ERISA Affiliate shall have been
notified by the sponsor or trustee of a Multiemployer Plan that such
Multiemployer Plan is in reorganization or is being terminated, within the
meaning of Title IV of ERISA, and, in any such case, such event does or
would reasonably be expected to have a Material Adverse Effect; or

(k)     it shall be determined (whether by the Bankruptcy Court or by any other
judicial or administrative forum) that the Company or any Subsidiary is
liable for the payment of claims arising out of any failure to comply (or to
have complied) with applicable environmental laws or regulations the
payment of which will have a Material Adverse Effect; or

(l)     the Company shall fail to make any payment required to be made
pursuant to Section 2.09 of the GM-Delphi Agreement, when and as the
same shall become due and payable and such default shall continue
unremedied for more than three (3) Business Days; or

(m)    any event or condition occurs that results in (i) the GM Commitment or
the commitment of GM to provide GM Pull-Forward Payments under the
GM Pull-Forward Agreement, in each case being terminated or reduced
on a date prior to the GM Scheduled Termination Date, (ii) any Advances
(as defined in the GM-Delphi Agreement) not being funded by GM due
to the inability to satisfy any condition to such funding set forth under
Section 4.03 of the GM-Delphi Agreement (a "Funding Default"), which

3

Funding Default shall be continuing for more than 3 (three) Business
Days from the proposed date of any such Advance, and during the
continuance thereafter of such Funding Default, the Required Lenders
shall have declared such Funding Default to be an Event of Default by
written notice to the Company, (iii) any GM Obligations, other than GM
Permitted Prepayments, becoming due prior to the GM Scheduled
Termination Date or (iv) GM exercising any remedy to enforce any GM
Obligations other than GM Permitted Prepayments, including seeking or
receiving payment of any GM Obligations other than GM Permitted
Prepayments; or

(n)     it is or becomes unlawful for either the Company or GM to perform any
        of its material obligations under the GM-Delphi Agreement, any material
        obligation or material obligations of the Company or GM under the GM-
        Delphi Agreement are not or cease to be legal, valid, binding or
        enforceable, the GM-Delphi Agreement ceases to be in full force and
        effect prior to the GM Scheduled Termination Date, or the Company or
        GM rescinds or purports to rescind or repudiates or purports to repudiate
        in each case in writing the GM-Delphi Agreement; or

(o)     GM shall assign any of its rights or obligations under the GM-Delphi
        Agreement except in accordance with Section 8.03 of the GM-Delphi
        Agreement as in effect on the date hereof; or

(p)     the GM Global Settlement Agreement or the GM Master Restructuring
        Agreement is repudiated in writing or terminated by any party thereto, or
        either party shall fail to perform any obligation thereunder, which failure
        shall materially impair the rights of the Company thereunder; or

(q)     during the Accommodation Period, any judgment or order as to any Loan
        shall be rendered against any Global Entity and (i) any Person has
        succeeded in enforcing any aspect of such judgment or order, under or
        consistent with the provisions for the enforcement of judgments under
        Article 52 of the New York Civil Practice Law and Rules or any other
        similar state or federal statute, with respect to any property of the
        Company or the Subsidiaries or (ii) the enforcement of such judgment or
        order shall not have been stayed within five (5) Business Days after entry
        thereof; or

(r)     the Company or any Subsidiary shall obtain approval of the Bankruptcy
        Court for any amendment, waiver, supplement or modification of the GM
        Global Settlement Agreement or the GM Master Restructuring
        Agreement that, taken as a whole, materially impairs the Company's or
        any Subsidiary's rights under either such agreement or materially reduces
        the amount, or decelerates the timing of, any material payments under
        either such agreement, if the Administrative Agent, at the request of the

4

Required Lenders, shall have provided written notice to the Company
prior to the commencement of the hearing before the Bankruptcy Court to
approve such transaction(s), that the Required Lenders object to the
Company's or any Subsidiary's, as applicable, entry into such amendment,
waiver, supplement or modification; or

(s)     any material provision of the LC Agreement shall, for any reason, cease
to be valid and binding on the Company, or the Company shall so assert
in any pleading filed in court.

(NY) 27011/094/ACCOMMODATION.AGT/RA Appendix C.doc