THE DELPHI CORPORATION

SALARIED HEALTH CARE PROGRAM

This edition contains all Program amendments made
effective between January 1, 2006 and January 1, 2009

# TABLE OF CONTENTS

**Page**

| ARTICLE I | Establishment, Financing and Administration of the Salaried Health Care Program ........................................................ | 1 |
|---|---|---|
| Section 1. | Establishment and Effective Date of the Program ........................................... | 1 |
| Section 2. | Corporation Costs and Administrative Items ............................................ | 2 |
| Section 3. | Program in States With Health Insurance Laws ............................................ | 4 |
| Section 4. | Federal Health Care Coverage ........................................... | 5 |
| Section 5. | Treatment of Existing Coverages on Effective Date ........................................ | 6 |
| Section 6. | Named Fiduciary and Appeal Procedure ........................................... | 7 |
| Section 7. | Coordination of Benefits (COB)........................................... | 11 |
| Section 8. | Reimbursement for Third Party Liability ........................................... | 16 |
| Section 9. | Recovery of Benefit Overpayments ........................................... | 17 |
| Section 10. | Compliance with Federal Laws ........................................... | 18 |
| Section 11. | Protected Health Information……………………………………………................... | 18 |
| Section 12. | Miscellaneous Administrative Rules and Procedures…………………………………………................ | 21 |

| ARTICLE II | Health Care Coverages........................................... | 22 |
|---|---|---|
| Section 1. | Establishment of Health Care Coverages ........................................... | 22 |
| Section 2. | Uniform National Health Care Coverages ........................................... | 22 |
| Section 3. | Replacement or Supplementation of Coverages ........................................... | 23 |
| Section 4. | Selection of Option ........................................... | 23 |

| ARTICLE III | Enrollment, Eligibility, Commencement, Contributions and Continuation ........................................... | 35 |
|---|---|---|
| Section 1. | Enrollment ........................................... | 35 |
| Section 2. | Dates of Eligibility, Commencement of Coverages, and Corporation Contributions for Active Employees ........................................... | 37 |
| Section 3. | Continuation of Coverages During Disability Leave of Absence ........................................... | 40 |
| Section 4. | Continuation of Coverages During Other Leaves of Absence ........................................... | 41 |
| Section 5. | Continuation of Coverages Upon Retirement or Termination of Employment at Age 65 or Older ........................................... | 42 |
| Section 6. | Eligibility for Coverages Following Any Termination of Employment Other Than by Retirement or Death ........................................... | 45 |
| Section 7. | Continuation of Coverages for the Survivors of Employees, of Retired Employees or of Certain Former Employees ........................................... | 46 |
| Section 8. | Dependent Eligibility Provisions ........................................... | 52 |
| Section 9. | Conversion Privilege ........................................... | 64 |

Section 10.  Consolidated Omnibus Budget Reconciliation Act (COBRA)
Continuation ........................................................................... 64

**ARTICLE IV   Definitions** .................................................................. 69

**ARTICLE V   Special Benefit** .............................................................. 76

Section 1.  Eligibility for the Special Benefit  ...................................... 76
Section 2.  Amount of the Special Benefit  ......................................... 77
Section 3.  Payment of the Special Benefit  ........................................ 77

**Appendix A  -  Hospital, Surgical, Medical, Prescription Drug
and Hearing Aid Coverages** .......................................... 74

I.    Definitions............................................................................... 74
II.   Terms and Conditions
    A.  Payment of Benefits  ............................................................ 83
    B.  Benefit Period Provisions ...................................................... 83
    C.  Access to Information  .......................................................... 85
    D.  Identification Cards  ............................................................. 85
    E.  Medicare  ........................................................................... 86
    F.  Medical Necessity and Appropriateness ................................. 87
    G.  Legal Action by Enrollee ....................................................... 87
    H.  Changes in the Program......................................................... 88
    I.   Approval of New Services, Technologies and Provider Classes
    J.   Participating, Nonparticipating and Departicipating Hospitals ..... 89
    K.  Utilization Review Requirements ............................................. 91
III.  Description of Coverages  ......................................................... 94
    A.  Hospital Coverage  ............................................................... 94
    B.  Skilled Nursing Facility Coverage  ......................................... 103
    C.  Physical, Functional Occupational and Speech Therapy
        and Cardiac Rehabilitation Coverage ................................... 105
    D.  Home Health Care Coverage  .............................................. 110
    E.  Surgical and Medical Coverage  .......................................... 115
    F.  Ambulance Service Coverage  ............................................. 126
    G.  Prescription Drug Coverage  ............................................... 129
    H.  Hearing Aid Coverage  ....................................................... 137
    I.   Durable Medical Equipment and Prosthetic
        and Orthotic Appliance Coverage ........................................ 143
    J.   Hospice Coverage  ............................................................. 150
    K.  Case Management  ............................................................. 152
    L.  Centers of Excellence ......................................................... 154
    M.  Disease Management .......................................................... 155
IV.  Limitations and Exclusions  ..................................................... 155
    A.  Effective Date  ................................................................... 155
    B.  Termination Date  .............................................................. 156
    C.  Excluded Facilities  ............................................................ 156
    D.  Private Duty Nursing Services  ............................................ 156
    E.  Room Accommodations  ..................................................... 156
    F.  Dental Services  ................................................................. 156
    G.  Temporomandibular Joint (TMJ) Dysfunction  ....................... 156

H. Chemotherapy ................................................................................................. 156
I. Medical Necessity ............................................................................................ 156
J. Research, Investigational or Experimental Services .............................................. 157
K. Personal or Convenience Items ......................................................................... 158
L. Services Not Related to Specific Diagnosed Illness or Injury .................................. 158
M. Unreasonable Charges ..................................................................................... 159
N. Employer Related Services ............................................................................... 159
O. Services Available Without Cost ........................................................................ 159
P. Services Available Through Other Programs ........................................................ 159
Q. Services Provided by Family Members or Relatives ............................................... 159
R. Custodial or Domiciliary Care ............................................................................ 160
S. Inducement of Pregnancy .................................................................................. 160
T. Travel ............................................................................................................ 160
U. Education ....................................................................................................... 160
V. Food and Dietary Supplements ......................................................................... 160
W. Physician Requirements ................................................................................... 160
X. Miscellaneous Services .................................................................................... 160
Y. Provider Administrative Charges ........................................................................ 160
Z. Bone Marrow Transplants ................................................................................. 160
AA. Cochlear Implant ............................................................................................. 164
BB. Services Related to Corrective Eye Surgery ......................................................... 164

**Appendix B - Mental Health and Substance Abuse Coverage** ..................................... 165

I. Definitions ...................................................................................................... 165
II. Terms and Conditions of Coverage ..................................................................... 170
A. Conditions of Benefit Payment .......................................................................... 170
B. Benefit Period ................................................................................................. 172
C. Non-Completion of the Substance Abuse Treatment Plan by an Employee ............. 175
III. Coverages ...................................................................................................... 176
A. Inpatient Care (Mental Health and Substance Abuse) ........................................... 176
B. Skilled Nursing Facility Care (Mental Health Only) .............................................. 177
C. Halfway House Care (Substance Abuse Only) ...................................................... 177
D. Partial Hospitalization (Mental Health and Substance Abuse) ................................ 178
E. Outpatient Care (Mental Health and Substance Abuse) ........................................ 179
IV. Limitations and Exclusions ............................................................................... 181

**Appendix C - Dental Coverage** ................................................................................. 183

I. Enrollment Classifications ................................................................................. 183
II. Description of Benefits ...................................................................................... 183
III. Covered Dental Expenses ................................................................................. 183
IV. Maximum Benefit for Other Than Accidental Dental Injury ..................................... 186
V. Pre-Determination of Benefits ............................................................................ 187
VI. Limitations ..................................................................................................... 187
A. Restorative .................................................................................................... 187
B. Prosthodontics ............................................................................................... 188
C. Orthodontics .................................................................................................. 189
VII. Exclusions ..................................................................................................... 189
VIII. Proof of Claim ................................................................................................ 191
IX. Alternative Dental Coverage ............................................................................. 191

X.      Definitions ........................................................................................................... 191
XI.     Accidental Dental Injury ..................................................................................... 192

**Appendix D - Vision Coverage** ........................................................................... 194

I.      Enrollment Classifications ................................................................................ 194
II.     Description of Benefits ...................................................................................... 194
III.    Definitions ......................................................................................................... 194
IV.     Benefits ............................................................................................................. 195
        A. Vision Examinations ................................................................................... 195
        B. Lenses and Frames .................................................................................... 196
        C. Corrective Eye Surgery…………………………………………................................ 196
        D. Copayments ............................................................................................... 197
V.      Frequency Limitations ....................................................................................... 197
VI.     Exclusions ......................................................................................................... 198
VII.    Vision Network .................................................................................................. 198

**Appendix E - Extended Care Coverage** ............................................................ 200

I.      Definitions ......................................................................................................... 200
II.     Eligibility, Enrollment and Contributions ........................................................ 201
III.    Covered Expenses and Benefits ....................................................................... 202
IV.     Limitations and Exclusions ............................................................................... 204

<u>SALARIED HEALTH CARE PROGRAM</u>

ARTICLE I

ESTABLISHMENT, FINANCING AND
<u>ADMINISTRATION OF THE SALARIED HEALTH CARE PROGRAM</u>


Section 1. <u>Establishment and Effective Date of the Program</u>

    (a)  Establishment of the Program

        Delphi Corporation, on behalf of itself and its
constituent group and as agent for certain of its
directly or indirectly wholly-owned and substantially
wholly-owned domestic subsidiaries, will establish a
Salaried Health Care Program, hereinafter referred to
as the Program or this Program, either through a
self-insured plan or by other arrangement.

    (b)  Reservation of Rights

        (1)  The Corporation reserves the right to amend,
modify, suspend or terminate the Program in
whole or in part, at any time, by action of its
Board of Directors or other committee expressly
authorized by the Board to take such action.  No
enrollee described in this Program may be deemed
to have any vested right to continued coverage
under any or all of the provisions of the
Program.

        (2)  No oral or written statements can change the
terms of this Program.  This Program can only be
amended by an appropriate committee as
designated by the Board of Directors.  Absent an
express delegation of authority from the Board
of Directors, no one has the authority to commit
the Corporation to any benefit or benefit
provision not provided for under the Program or
to change the eligibility criteria or other
provisions of the Program.

        (3)  In the event the initiation of any benefit(s) or
coverage(s) described in the Program does not
prove practicable or if the carriers are unable
to provide such benefit(s) or coverage(s) on the
dates stipulated in such Program, the

SALARIED HEALTH CARE PROGRAM

Art. I

Corporation may provide new, different or no
benefit(s) and/or coverage(s).

(c)   Effective Date

This Program is effective January 1, 2007.  Until
January 1, 2007, the provisions of the prior Program
were in effect unless expressly indicated otherwise.
This Program shall continue in effect until amended,
modified, suspended or terminated by the Corporation
as specified above.


Section 2.  Corporation Costs and Administrative Items

(a)   Net Costs

(1)   The Corporation, or a trust, shall pay the
balance of the net cost of the Program over and
above any enrollee contributions or payments
specified under the Program.  The Corporation,
or a trust, shall receive and retain any
credits, refunds, or reimbursements under
whatever name, arising out of the Program.

(2)   The Corporation, by payment of its contributions
(whether by paying claims through carriers
administering the Program or by any other
manner) shall be relieved of any further
liability with respect to the coverage(s) or
benefit(s) provided under the Program, except as
otherwise may be required by the Employee
Retirement Income Security Act of 1974, as
amended.

(3)   Certain enrollees may be offered choices among
various health care options.  The performance of
options may be evaluated by the Corporation.
Contributions by enrollees may be required to
participate in the Program, or in an option, and
may be based on the status of the primary
enrollee, the number of covered enrollees, the
Medicare status of enrollees and the relative
performance of the options available or elected.
To the extent permitted by law, such required
enrollee contributions shall be by payroll or
other similar deduction.

(4)   Subject to the Corporation's reserved right to
amend, modify or terminate the Program, the
Corporation will share future Program cost
increases with enrollees, on an aggregate basis

Art. I

to be determined by the Corporation.  Such
enrollee cost sharing may be in the form of
monthly contributions, deductibles, copayments,
other design changes or any combination of the
preceding.

(b)   Administration

(1)   Delphi Corporation is the Plan Administrator.
The Plan Administrator has discretionary
authority to construe, interpret, apply and
administer the Program.  The Plan Administrator
may delegate various aspects of Program
administration as it deems appropriate.

(2)   Various aspects of Program administration have
been delegated to carriers.  In carrying out
their delegated responsibilities, the carriers
shall have discretionary authority to construe,
interpret, apply and administer the Program
provisions.  The discretionary authority
delegated to a carrier shall, however, be
limited to Program terms relevant to its
delegated responsibilities, and shall not permit
a carrier to render a determination or make any
representation concerning benefits which are not
provided by the express terms of the Program.
The carriers' actions shall be given full force
and effect unless determined by the Plan
Administrator to be contrary to the Program
provisions or arbitrary and capricious.

(3)   The Employee Benefit Plans Committee (EBPC) of
the Corporation has final discretionary
authority to construe, interpret, apply and
administer the Program, which includes making
factual determinations and serves as the final
step of the Program appeal procedure.  Any
interpretation or determination regarding the
Program made by the EBPC shall be given full
force and effect, unless it is proven that the
interpretation or determination was arbitrary
and capricious.

(c)   Grievance Procedure Not Applicable

It is understood that the grievance procedure of any
collective bargaining agreement between the
Corporation and any union representing salaried
employees of the Corporation shall not apply to this
Program or any contract in connection therewith.

SALARIED HEALTH CARE PROGRAM

Art. I

(d)  Miscellaneous Information Related to the Employee
Retirement Income Security Act of 1974 (ERISA)

(1)  The end of the plan year is December 31.
Records of the Program are kept on a calendar
year basis.

(2)  Delphi Corporation is the sponsoring employer
and Administrator of the Program.  The
Administrator's address is Mail Code 480-410-
104, 5825 Delphi Drive, Troy, Michigan 48098.

(3)  Service of legal process on Delphi Corporation
may be made at any office of the CT Corporation.
The CT Corporation, which maintains offices in
all 50 states, is the statutory agent for
service of legal process on Delphi Corporation.
The procedure for making such service generally
is known to practicing attorneys.  Service of
legal process also may be made upon Delphi
Corporation, at the Service of Process Office,
Mail Code 480-410-254, 5825 Delphi Drive, Troy,
Michigan, 48098.

(e)  Time Limit for Claim Submission

Claims should be filed with the appropriate carrier as
services are rendered and expenses are incurred.
However, claims must be submitted not later than the
end of the calendar year following the year in which
services are rendered.

(f)  Assignment or Alienation of An Enrollee's Interests

Except as expressly authorized by this Program or as
required to comply with the legally applicable
provisions of a Qualified Medical Child Support Order
under the Omnibus Budget Reconciliation Act of 1993,
benefits, claims, coverage or other interests in the
Program may not be assigned, transferred or alienated
by an enrollee.  With the approval of the Corporation
however, a carrier may pay a provider directly for
services rendered, in lieu of payment to an enrollee.

Section 3. Program in States With Health Insurance Laws

(a)  To the extent the Corporation and the Program are not
required, under Federal law, to comply with state-
legislated mandates concerning health insurance
coverages, the provisions of this Program need not be
modified in states having laws which now or hereafter

SALARIED HEALTH CARE PROGRAM

Art. I

may provide health care coverages, under whatever
name, for enrollees who are disabled by non-
occupational sickness or accident, or similar
disability.  If, under Federal law, the Corporation
and the Program are subject to state-legislated
mandates, compliance with such laws shall be deemed
full compliance with the provisions of the Program
with respect to enrollees in such states.  If coverage
under such state-legislated mandates exceeds the
coverage provided under the Program, the Corporation
may require such contributions as it may deem
appropriate from enrollees in such states.  If
appropriate coverage under such state-legislated
mandates is generally lower in level than the
corresponding coverage under the Program, the
Corporation may, at its sole discretion and to the
extent it elects to do so, provide coverage
supplementary to the state plan.

(b)    Not withstanding the provisions of subsection (a)
above, in any state which has a state-legislated plan
of health coverage available to the general population
including Program enrollees (or which would be
available to Program enrollees but for their coverage
under the Program), the Corporation may, at its sole
discretion and to the extent permitted by the
applicable state legislation, amend, modify, suspend,
cancel or otherwise affect the provisions of the
Program as they apply to enrollees in such states, in
order to permit participation in such state plan in
lieu of coverage under the Program.


Section 4.  Federal Health Care Coverage

(a)    Not Applicable to Enrollees Eligible for Such Coverage

The provisions of the Program, separately or in
combination, shall not be applicable to enrollees
eligible for health care coverage under any Federal
health security act or any other Federal law providing
such may be amended or enacted.  Compliance by the
Corporation with such laws shall be deemed full
compliance with the provisions of the Program with
respect to enrollees eligible for coverage under such
laws.  If such coverage exceeds the coverage provided
under the Program and the Corporation's contributions
for such coverage under the Program, the Corporation
may require from such enrollees such contributions as
it may deem appropriate for such excess coverage.  If,
as a result of such laws, the level of coverage
provided for any group of enrollees is generally lower

SALARIED HEALTH CARE PROGRAM

Art. I

than the corresponding level of coverage under the
Program, the Corporation may, at its option and to the
extent it finds it practicable, provide a plan of
coverage supplementary to the Federal coverage to the
extent necessary to make total coverage as nearly
comparable as practicable to the coverage provided
under the Program.

(b)    Substitution of Applicable Provisions of the Program
for Coverage Under Federal Laws

Notwithstanding the provisions of subsection (a)
above, the Corporation may, if Federal laws permit,
substitute a plan of coverage for the coverage
provided by the Federal laws referred to in subsection
(a) above, and modify the provisions of the Program to
the extent and in the respects necessary to secure the
approval of such substitution from the appropriate
governmental authority and may make such plan
available to enrollees.

(c)    Reduction of Health Care Coverage Because of Coverage
Under Federal Law

Health care benefits, separately or in combination,
provided enrollees under the Program may be reduced by
the amount of such coverage provided under any Federal
health security act or any other Federal law which may
be amended or enacted.  In cases where the enrollee
exercises an option under the Federal Social Security
Act or similar law to take cash payments in lieu of
health care coverages, the equivalent of such payments
will be required as a contribution toward the health
care coverages provided under the Program, but not to
exceed the cost to the Corporation of such coverages.
Such contributions may be deducted, in accordance with
any applicable Federal laws, from any monies then
payable to the enrollee in the form of salary or
benefits payable under any Delphi benefit plan or
program.


Section 5. <u>Treatment of Existing Coverages on Effective Date</u>

Protection of enrollees covered under the prior Delphi Salaried
Health Care Program shall be terminated on the effective dates of
the provisions of this Program, and the provisions of this
Program shall be in lieu of and substitute for any and all other
provisions of any such prior Program providing for health care
benefits of any kind or nature, in which the salaried employees
of the Corporation participated

SALARIED HEALTH CARE PROGRAM

Art. I

Section 6. Named Fiduciary and Appeal Procedure

(a)   The Executive Committee of the Corporation's Board of
      Directors shall be the Named Fiduciary with respect to
      the Program.  The Executive Committee may delegate
      authority to carry out such of its responsibilities as
      it deems proper to the extent permitted by the
      Employee Retirement Income Security Act of 1974, as
      amended.

(b)   A mandatory appeal procedure has been established for
      review of denials of eligibility and/or of claims for
      benefits under the Program.  The primary enrollee will
      be given adequate notice by the carrier, in writing,
      of the specific reasons for the denial, will be
      referred to the Program provisions on which the denial
      is based and an explanation of additional information
      required from, or on behalf of the enrollee for
      reconsideration of the claim.  An enrollee will be
      given an opportunity for a full and fair review of a
      decision by the Plan Administrator denying eligibility
      for coverage under the Program or a claim for benefits
      under the Basic Medical Plan (BMP), Enhanced Medical
      Plan (EMP), Comprehensive Health Savings Plan (CHSP),
      or Point of Service Plan (POS) options. If an internal
      rule, guideline, protocol, or other similar criterion
      was relied upon in making the adverse determination,
      the enrollee will be provided either the specific
      rule, guideline, protocol, or other similar criterion;
      or a statement that such a rule, guideline, protocol,
      or other similar criterion was relied upon in making
      the adverse determination and that a copy of such
      rule, guideline, protocol, or other criterion will be
      provided free of charge to the enrollee upon request.
      If the adverse benefit determination is based on a
      medical necessity or experimental treatment or similar
      exclusion or limit, the enrollee will be provided
      either an explanation of the scientific or clinical
      judgment for the determination, applying the terms of
      the plan to the enrollee's medical circumstances, or a
      statement that such explanation will be provided free
      of charge upon request.

      For purposes of deciding appeals, the carrier
      responsible for administering the coverage, or
      responsible for administering Program eligibility, as
      applicable, is the delegate of the Named Fiduciary.
      Such delegates have discretionary authority to
      interpret and apply the Program on behalf of the
      Corporation.  The individual or individuals at the
      carrier who decide the appeal will not be the
      individual who made the adverse benefit determination

SALARIED HEALTH CARE PROGRAM

that is the subject of the appeal, nor the subordinate
of such individual.  The review will not afford
deference to the initial adverse benefit
determination.  In deciding an appeal of any adverse
benefit determination that is based in whole or in
part on a medical judgment, including determinations
with regard to whether a particular treatment, drug,
or other item is experimental, investigational, or not
medically necessary or appropriate, the carrier shall:

(1)   consult with a health care professional who has
      appropriate training and experience in the field
      of medicine involved in the medical judgment;

(2)   provide for the identification of medical or
      vocational experts whose advice was obtained on
      behalf of the carrier in connection with the
      primary enrollee's adverse benefit determination,
      without regard to whether the advice was relied
      upon in making the benefit determination; and,

(3)   provide that the health care professional engaged
      for purposes of the consultation referenced above
      shall be an individual who is neither an
      individual who was consulted in connection with
      the adverse benefit determination that is the
      subject of the appeal, nor the subordinate of any
      such individual.

After the primary enrollee receives notice that a claim
was denied, in whole or in part, the enrollee has at
least 180 days to make a written request to the
applicable carrier to have the claim reviewed.  If a
claim meets the definition for urgent care under
applicable federal regulations, the request may be
submitted by telephone.

As part of the review, the enrollee may submit any
written comments that may support the claim.  A written
decision on the request for review will be furnished to
the primary enrollee as follows:

Urgent Care Claims - In the case of a claim involving
urgent care, as defined by applicable regulations, the
carrier shall notify the primary enrollee of the
benefit determination on review as soon as possible,
taking into account the medical exigencies, but not
later than 72 hours after receipt of the primary
enrollee's request for review of an adverse benefit
determination.

SALARIED HEALTH CARE PROGRAM

Art. I

Pre-service Claims – In the case of a pre-service
claim, as defined by applicable regulations, the
carrier shall notify the primary enrollee of the
benefit determination on review within a reasonable
period of time, appropriate to the medical
circumstances, but not later than 30 days after
receipt by the carrier of the primary enrollee's
request for review of an adverse benefit
determination.  In the case of a carrier that provides
for two appeals of an adverse determination, such
notification shall be provided, with respect to any
one of such two appeals, not later than 15 days after
receipt by the carrier of the primary enrollee's
request for review of the adverse benefit
determination.

Post-service Claims – In the case of a post-service
claim, as defined by the applicable regulations, the
carrier shall notify the primary enrollee of the
benefit determination on review within a reasonable
period of time, but not later than 60 days after
receipt by the carrier of the primary enrollee's
request for review of an adverse benefit
determination.  In the case of a carrier that provides
for two appeals of an adverse determination, such
notification shall be provided, with respect to any
one of such two appeals, not later than 30 days after
receipt by the carrier of the primary enrollee's
request for review of the adverse benefit
determination.

The time periods specified for each category of claims
above may be extended in accordance with applicable
regulations.

The written decision on the review will include the
specific reasons for the decision and will set forth
specific reference to Program provisions upon which
the decision is based.  If the review by the carrier
results in an adverse determination, the primary
enrollee may initiate an action under Section 502(a)
of the Employee Retirement Income Security Act of 1974
(ERISA).

(c)   As an alternative to immediately initiating such civil
action, a primary enrollee receiving a final
determination denying eligibility for coverage under
the Program or a claim for benefits may request
further review by the Plan Administrator under a
voluntary review process.  In connection with an
applicable voluntary review process, the Program:

SALARIED HEALTH CARE PROGRAM

Art. I

    (1)  Waives any right to assert that a primary
        enrollee has failed to exhaust administrative
        remedies because the primary enrollee did not
        elect to submit a benefit dispute to such
        process; and,

    (2)  Agrees that any statute of limitations or other
        defense based on timeliness is tolled during the
        time such review is pending.

(d)  If a claim for benefits in excess of $1,000 under the
    BMP, EMP, CHSP, or POS has not been approved on the
    basis that the Control Plan has determined that a
    service, supply, device or drug therapy is research,
    experimental or investigational in nature, the
    enrollee may request a review by an independent panel
    of three physicians who are recognized experts in the
    specialty at issue.  In the event that such a review
    is conducted, the panel participants will be selected
    by parties independent of the Corporation and the
    carrier.  At the Program's expense, the panel will
    review the case and, applying the standard of
    generally accepted medical practice, will determine
    whether the service, supply, device or drug therapy is
    research, investigational or experimental in nature as
    defined under the Program in the individual case under
    appeal.  If at least two of the three physicians on
    the panel concur on a decision, that shall be the
    determination of the panel.  The panel's decision
    shall be the final determination under the Program for
    the case under review and shall be binding on the
    enrollee and the Corporation.  The panel's decision
    shall not be considered as precedent for any other
    case.

(e)  If the enrollee believes a decision of the Plan
    Administrator is inconsistent with the terms of the
    Program, an appeal may be filed with the Employee
    Benefit Plans Committee (EBPC) of the Corporation,
    which has been delegated final discretionary authority
    to construe, interpret, apply and administer the
    Program, which includes making factual determinations.
    Such an appeal to the EBPC must be filed in writing
    within 60 days from the date of the written decision
    from the Plan Administrator denying a claim for
    benefits or eligibility for coverage under the
    Program.  Such an appeal may be initiated by
    forwarding the request to the Secretary, EBPC, Delphi
    Corporation, Mailcode: 480-410-104, 5825 Delphi Drive,
    Troy, Michigan 48098.  As part of the appeal, the
    enrollee must submit any written comments setting
    forth the basis for the belief that the Plan

2007

SALARIED HEALTH CARE PROGRAM

Art. I

Administrator's decision is inconsistent with the
terms of the Program.  The EBPC shall be the final
review authority with respect to appeals and its
decision shall be final and binding upon the
Corporation and any enrollee.  A written decision on
the request for review will be furnished to the
primary enrollee within 60 days (120 days if special
circumstances require an extension of time) after the
date the written request is received by the EBPC.

(f)   No action or suit at law by an enrollee for
entitlement to benefits under this Program may be
brought more than one year after the exhaustion of the
mandatory or voluntary review process whichever is
later as described in Article I, Section 6.

(g)   If enrollees under the Health Maintenance Organization
(HMO) option or an Alternative Dental Plan (ADP) wish
to appeal a decision with regard to any issue, other
than eligibility for coverage under the Program, they
must follow the HMO's or ADP's exclusive review
procedure.  HMOs and ADPs are responsible for
formulating their own medical policy.  Decisions
resulting from their appeal processes regarding
medical policy are final and binding and will be given
full force by the Plan Administrator.  Such a decision
by an HMO or ADP shall not be considered a
modification to the Program.


Section 7. Coordination of Benefits (COB)

(a)   General Provisions

Health care benefits paid under this Program shall not
duplicate benefits from other sources (e.g., group
plans, comprehensive plans, pre-paid plans,
governmental plans, etc.) nor serve to relieve other
persons or organizations of their liability
(contractual or otherwise).  Consistent with these
objectives, the Corporation may establish systems and
procedures for coordination of benefits, and the
carriers shall implement such systems and procedures.

(b)   Applicability

(1)   The provisions of this Section shall apply to
all coverages provided under the Program.
Unless precluded by law, these provisions apply
whether the coverage is self-funded, or provided
through pre-paid options such as health
maintenance organizations.

SALARIED HEALTH CARE PROGRAM

Art. I

    (2)    This Program shall not coordinate with individual or family policies of insurance purchased by the enrollee or with any group policy covering the enrollee for which the enrollee pays more than one-half the cost.

    (3)    The provisions of this Section shall not apply to expenses for services provided to or for an enrollee in relation to any condition, disease, illness or injury arising out of or in the course of employment, as such expenses are specifically excluded from the Program.

    (4)    The provisions of this Section do not apply to Medicaid.  They also do not apply to Medicare or to any plan, program or policy to which Medicare is secondary by operation of law (including, without limitation, automobile insurance coverage).  Medicare and such plans, programs or policies are governed by App. A, II.E.  These COB provisions do apply to complementary plans, programs or policies (other than those just described) which are carried to supplement benefits available under Medicare and which are secondary to it.

(c)    Enrollee Obligations

    (1)    Primary enrollees shall furnish to the Corporation the social security numbers of all secondary enrollees for whom they are claiming eligibility.  If the secondary enrollee has not been assigned a social security number at the time of enrollment, a social security number shall be obtained promptly and reported to the Corporation.  Failure to do so shall result in cancellation of coverages for such secondary enrollee.

    (2)    Any enrollee claiming benefits under this Program shall furnish the Corporation or the carrier(s) any information the Corporation or carrier deems necessary for the purpose of administering these provisions.  Failure to do so may result in non-payment of benefits.

(d)    Release of Information

    (1)    The Program or carriers may release to other plans or carriers information necessary to

adjudicate claims under these provisions, as
permitted by applicable regulations.

(2)   The Program or carriers under this Program may
participate in and may exchange information
relating to enrollees for such purposes.

Such organizations must agree not to release any
information obtained other than for the purpose
of effectuating COB.

(e)   Determining Priority

(1)   The program which, under the rules of this
subsection, has the first obligation to pay
benefits is termed the "primary" program, and
the coverages it provides are "primary."  The
other program (and the coverages it provides) is
termed "secondary."

(2)   When the other program does not contain a COB
provision, that program is always primary.

(3)   When the other program contains a COB provision
and the order of benefit determination under
each program's COB provisions establishes this
Program as primary, the provisions of this
Program determine this Program's liability,
regardless of any payment the other program may
have made.

(4)   When the other program contains a COB provision,
the following order of benefit determination
will be used.

(i)   The program covering the enrollee as an
employee or retiree will be primary over
the program covering the enrollee as a
dependent; except that, if the enrollee is
also a Medicare beneficiary and as a result
of a rule established by Federal law
Medicare is

(a)   Primary to the program covering the
enrollee as an employee or a retired
employee, but

(b)   Secondary to the plan covering the
enrollee as a dependent, then the
program covering the enrollee as a
dependent shall be primary, Medicare
shall be secondary and the program

covering that enrollee as an employee
or retiree shall determine its
liability last.

(ii) When the enrollee is a dependent child
whose parents are not divorced or
separated, the program covering the
enrollee as a dependent of the parent whose
birthday occurs earlier in the calendar
year will be primary over the program
covering the enrollee as a dependent of the
parent whose birthday occurs later in the
calendar year.  If the two parents'
birthdays fall on the same day, the
program, which has covered the parent for
the longer period of time, will be primary.

(iii) When the enrollee is a dependent child
whose parents are divorced or separated,
and if there is a court order establishing
financial responsibility with respect to
health care expenses of the child, the
program which covers the child as a
dependent of the parent with such
responsibility shall be primary.  If there
is no court order, and the parent having
custody of the child has not remarried, the
program covering the child as a dependent
of the parent with custody shall be
primary.  If there is no court order and if
the parent having custody has remarried,
the program covering the child as a
dependent of the parent having custody
shall be primary, any program covering the
child as a dependent of the stepparent
shall be secondary, and the program
covering the child as a dependent of the
parent without custody shall be last in
responsibility for payment.

(iv) when rules (i), (ii), and (iii) above do
not establish an order of benefit
determination, the program which has
covered the enrollee for the longer period
of time will be primary.

However, if one program covers the enrollee
as an active employee (or dependent of such
employee) and the other covers the enrollee
as a laid-off or retired employee (or
dependent of such employee), the program
covering the enrollee as an active employee

SALARIED HEALTH CARE PROGRAM

Art. I

(or dependent of such employee) shall be
primary.

(f)   Payment of Benefits

(1)   If this Program is primary, a carrier may
reimburse a secondary program for any amounts
paid by such program which should have been
provided by this Program.

(2)   If benefits under this Program are overpaid by a
carrier for any claim involving COB, the carrier
shall have the right to recover such overpayment,
on the Corporation's behalf, from the hospital,
physician, or other provider of service, from the
other program, or from the primary enrollee, as
appropriate.   Alternatively, the Corporation may
recover on its own behalf, under Section 9 below.

(3)   With regard to any claim for which this Program
has secondary liability, benefits provided under
this Program shall not exceed the amount of
benefits payable if this Program had been
primary.

(4)   "Benefits paid or payable" under another program
include the benefits that would have been payable
had a claim been made under the primary program,
or which would have been payable by the primary
program but for the enrollee's failure to comply
with the provisions of such program.   When a
program provides benefits in the form of services
rather than cash payments, the reasonable cash
value of each service rendered will be deemed to
be a benefit payable by such program.

(5)   When this Program is secondary,

(i)   sanctions provided under this Program
(e.g., for failure to obtain
predetermination, for failure to obtain a
required second opinion, for failure to
obtain services from a panel provider,
etc.) will not apply,

(ii)  payment will not exceed the amount which
would have been paid by this Program had it
been primary,

(iii) if the primary program's paid or payable
benefits are equal to or greater than the
maximum amount this Program would have paid

15                                    2007

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 21 of 217
SALARIED HEALTH CARE PROGRAM

Art. I

if primary, then the Program will not pay
an outstanding balance, if any; however,
the enrollee will receive credit toward any
deductible and/or copayment to the extent
such deductible and/or copayment would have
been applied if the Program had been
primary,

(iv)  no payment will be made for services, which
are not covered under this Program,

(v)  the enrollee may be required to provide
information concerning the primary
program's payment or disposition prior to
payment of benefits under this Program, and

(vi)  if the other plan or program does not
follow the same order of benefit
determination rules set forth in subsection
(e), above, and as a result both plans or
programs take a secondary position, the
Program may pay benefits not exceeding the
amount it would have paid had it been the
primary plan or program, but such payment
shall be without prejudice to the secondary
position of the Program, and the Program
shall pursue recovery from the other plan
or program and shall be subrogated to all
rights of the enrollee against the other
plan or program.

Section 8.  Reimbursement for Third Party Liability

(a)  If health care benefits are paid to, or on behalf of,
an enrollee and if the enrollee makes recovery from a
third party, individual or organization for any
covered expenses for which benefits were paid, the
Program shall be entitled to reimbursement in an
amount equal to the benefits paid to, or on behalf of,
the enrollee under this Program.  This shall not apply
to policies of insurance issued to and in the name of
such enrollee.  Carriers administering the Program
shall take such actions as may be necessary to
preserve or assert such right of reimbursement on the
Program's behalf.

(b)  The enrollee shall provide notice to the carriers (on
behalf of the Corporation) of any such recovery (or
effort to recover) from a third party, and shall
perform such acts and execute and deliver to the
Corporation or the carrier such instruments and papers

SALARIED HEALTH CARE PROGRAM

Art. I

as may be necessary or helpful to secure such rights
of reimbursement.  These obligations include the
following:

(1)   The Corporation assumes the enrollee's right to
      recover payment from any third party, up to the
      extent of such third party's liability.

 2)   If an enrollee recovers any monies through
      lawsuit, settlement or other means, the enrollee
      must reimburse the Corporation for benefits paid.

(3)   The enrollee grants the Corporation a lien on any
      monies the enrollee or the enrollee's
      beneficiaries may recover, either through
      settlement or otherwise, whether the recovery is
      designated economic or non-economic damages.

(4)   The enrollee grants the Corporation the right to
      intervene in a lawsuit for the purpose of
      enforcing the Corporation's lien.

(5)   The enrollee grants the Corporation the right to
      recover its legal fees and exceed the
      Corporation's payment of benefits from any
      recovery.

(6)   The enrollee agrees to inform the Corporation
      when the enrollee engages an attorney to pursue a
      claim, and to inform the enrollee's attorney of
      the Corporation's rights under this Program.

(7)   The enrollee agrees not to settle any claim or
      take any would prejudice the Corporation's rights
      or interests.


Section 9. Recovery of Benefit Overpayments

If it is determined that any benefit(s) paid to, or on behalf of,
an enrollee under this Program should not have been paid or
should have been paid in a lesser amount, written notice thereof
shall be given to the applicable primary enrollee and such
primary enrollee shall repay the amount of the overpayment.

If the primary enrollee fails to repay such amount of overpayment
promptly, the Corporation shall arrange to recover the amount of
such overpayment by making an appropriate deduction or deductions
from any monies then payable, or which may become payable, by the
Corporation or on the Corporation's behalf, or otherwise, to the
primary enrollee in the form of salary, benefits or other
compensation.  The Corporation shall have the right, in

SALARIED HEALTH CARE PROGRAM

Art. I

accordance with applicable Federal laws, to make, or to arrange
to have made, deductions for recovering such overpayments from
any such present or future salary, benefits or other compensation
which are or become payable to such primary enrollee.


Section 10. Compliance with Federal Laws

Notwithstanding any provisions of the Program to the contrary,
the Corporation shall modify administration, coverages and other
terms and conditions of the Program, as necessary, to comply with
applicable Federal laws and regulations.


Section 11. Protected Health Information (PHI)

   (a)   The Corporation will comply with the provisions of the
         Health Insurance Portability and Accountability Act of
         1996 (HIPAA) rules for use and disclosure of PHI,
         effective April 14, 2003.  The Corporation will also
         take such actions as may be necessary for continued
         compliance, in the event of subsequent amendment to
         HIPAA and/or implementation of related Federal
         regulations.

   (b)   Permitted uses and disclosures of PHI by the
         Corporation in its Plan Sponsor capacity are limited
         to those associated with sponsorship of the Program.

   (c)   The Program may release PHI to the Corporation in its
         Plan Sponsor capacity, so long as the Plan Sponsor
         certifies to:

         (1)   Not use or further disclose the PHI other than as
               permitted or required by subsection (b) above or
               as required by law;

         (2)   Require any agents, including a subcontractor, to
               whom it provides PHI, to agree, to the same
               restrictions and conditions that apply to the
               Plan Sponsor with respect to such PHI;

         (3)   In the absence of an appropriate authorization,
               not use or disclose the PHI for employment-
               related actions and decisions or in connection
               with any other benefit or employee benefit plan
               of the Corporation, except that use or disclosure
               in connection with workers compensation matters
               will be allowed as permitted by HIPAA;

(4)   Agree to report to the Program any use or
disclosure of PHI that is inconsistent with the
uses or disclosures provided by subsection (b)
above, if and when the Plan Sponsor becomes aware
of such inconsistent use or disclosure;

(5)   Authorize the Program to make PHI available to
enrollees as required by law;

(6)   Authorize the Program to make PHI available to
enrollees for amendment and to incorporate any
such amendments as required by law;

(7)   Authorize the Program to make available to
enrollees an accounting of disclosures of PHI as
required by law;

(8)   Agree to make its internal practices, books, and
records relating to the use and disclosures of
PHI received from the Program available to the
Secretary of the Department of Health and Human
Services for purposes of determining the
Program's compliance with HIPAA; and,

(9)   If feasible, return or destroy all PHI received
from the Program and which is no longer needed
for the purpose for which the disclosure was
made, except that, if such return or destruction
is not feasible, the Plan Sponsor shall limit
further uses and disclosures to those purposes
that make the return or destruction infeasible.

(d)   The Program establishes adequate separations from the
Plan Sponsor as described in (1), (2) and (3), below.

(1)   Delphi Corporation designates specific people,
Authorized Employees, who may use and disclose
PHI on behalf of the Program for purposes of plan
administration functions.  The Authorized
Employees interact with certain Business
Associates to perform these functions.  Plan
administration includes, but is not limited to,
eligibility determinations, claims processing,
precertification or preauthorization, billing,
coordination of benefits, subrogation, business
management, customer service, enrollment, audit
functions, fraud and abuse detection, quality
assurance and disease management.  Plan
administration does not include any employment-
related functions or functions in connection with
any other benefits or benefit plans, and the
Program may not disclose PHI for such purposes

SALARIED HEALTH CARE PROGRAM

Art. I

       absent an authorization from an individual to whom the information pertains, except that use or disclosure in connection with workers compensation matters will be allowed as permitted by HIPAA.

    (2)  Access and use of PHI by Authorized Employees is limited to plan administration functions performed on behalf of the Program.

    (3)  Any issues of non-compliance by Authorized Employees will be investigated. For Delphi employees, non-compliance may result in disciplinary action up to and including termination of employment.  In the case of contract workers or consultants, non-compliance may result in termination of the contract.

(e)  The Program may use and disclose PHI as described in (1), (2), (3) and (4) below.

    (1)  The Program may disclose PHI to the Corporation in its capacity as Plan Administrator, to carry out plan administration functions consistent with subsection (d).

    (2)  The Program may disclose PHI to the Plan Sponsor only if an applicable notice of privacy practices with a provision permitting such disclosure has been provided to enrollees.

    (3)  In the absence of an appropriate authorization, the Program may not disclose PHI to Delphi Corporation for the purpose of employment-related actions or decisions or in connection with any other benefit or employee benefit plan of the Corporation, except that use or disclosure in connection with workers compensation matters will be allowed as permitted by HIPAA.

    (4)  Access to PHI is restricted to persons who need it to carry out their job duties in administering the Program.  Use and disclosure is limited to the amount reasonably necessary to accomplish the intended purpose.

(f)  The Program may disclose Summary Health Information to the Corporation in its Plan Sponsor capacity for the purpose of:

    (1)  Obtaining premium bids from health plans for providing coverage under the program; or

<u>SALARIED HEALTH CARE PROGRAM</u>

Art. I

   (2)   Modifying, amending, or terminating the Program.


Section 12. <u>Miscellaneous Administrative Rules and Procedures</u>

Administration of Deductible, Copayment and Out-of-Pocket Maximum

The Program may include enrollment options as defined in Article
II that require the primary enrollee to share a portion of
covered expense as deductibles, copayments or out-of-pocket
maximums.

   (a)   The application of these deductibles, copayments and
         out-of-pocket maximums shall be based only on the
         expense covered by the Program, regardless of the
         amount which actually may be charged.

   (b)   In the event of a continuous admission that commences
         in one year and continues into the next, the enrollee
         liability for the related facility charges will be
         determined on the basis of the calendar year in which
         the admission commences.  The enrollee liability for
         all other charges will be based on the date services
         are rendered.


   (c)   In the event that, during a calendar year, the primary
         enrollee:

         (1)   moves from one self-insured option to another
               self-insured option pursuant to Article II,
               Section 4 of this Program, or

         (2)   has a carrier change for the option(s) elected,

         any amounts credited toward out-of-pocket maximums for
         the calendar year under prior option(s) will be
         credited toward meeting the deductible, copayment and
         out-of-pocket maximum requirements of the new
         option(s) elected. Any applicable Program maximums
         will be addressed in the same manner.

SALARIED HEALTH CARE PROGRAM

Art. II

ARTICLE II

HEALTH CARE COVERAGES


Section 1. Establishment of Health Care Coverages

Only to the extent and under the terms such benefits continue to
be provided under this Program, as it may be amended from time to
time, the Corporation will make the following available:

(a)   Core Coverages

The Corporation makes available core coverages as set
forth in Appendices A, B and E.

(b)   Non-Core Coverages

The Corporation makes available non-core coverages as
set forth in Appendices C and D.

(c)   Sub-Plans

The Corporation makes available certain sub-plans such
as the International Health Care Plan.


Section 2. Uniform National Health Care Coverages

(a)   The Corporation shall provide health care coverages,
nationwide, as described in this Program, under a
national system by agreement between the Corporation
and Blue Cross and Blue Shield of Michigan,
hereinafter referred to as the Control Plan, or by
agreement with other carriers.

(b)   The Control Plan shall have responsibility for
overseeing the carriers administering the core
coverages described in Appendix A for Basic Medical
Plan, Enhanced Medical Plan, Comprehensive Health
Savings Plan and Point-of-Service option enrollees.

(c)   All carriers agreeing to provide coverages under the
Program shall do so in accordance with the Program
provisions and interpretations and benefit practices
established by the Control Plan, as applicable.

(d)   Under the national system each carrier with a written
agreement with the Control Plan will provide the core
coverages described in Appendix A in the carrier's
respective geographic area.  If in any geographic area

SALARIED HEALTH CARE PROGRAM

Art. II

such a carrier fails to enter into the agreement as
stated above, or fails to perform in accordance with
its agreement, the Control Plan, with the approval of
the Corporation, may arrange for the provision of such
health care coverages in the geographic area through
alternative means.

(e)   Coverage may be provided through the Health
      Maintenance Organization option.  However, the
      coverages provided through this option may vary from
      the coverages described in Appendices A and B.


Section 3.  <u>Replacement or Supplementation of Coverages</u>

If, in its judgment, the Corporation considers it advisable,
another arrangement may be substituted, in any geographic area,
for all or part of the coverages referred to in Section 1 above.


Section 4.  <u>Selection of Option</u>

The Corporation provides an opportunity for primary enrollees
(other than those primary enrollees set forth in subsection (e)
below) to elect coverages through the options available under the
Program.  This includes enrollees residing in Puerto Rico.  Such
election also may include a choice among dental options, where
applicable.  The specific choices offered to a primary enrollee
will depend on the primary enrollee's service date, status, the
availability of approved options in the enrollee's geographic
area, and the Medicare status of the primary and secondary
enrollees.

The medical options offered to primary enrollees may include (a)
Health  Maintenance  Organization  (HMO),  (b)  Basic  Medical  Plan
(BMP),  (c)  Enhanced  Medical  Plan  (EMP)(d)  Point  of  Service  (POS)
and (e)Comprehensive Health Savings Plan options.


(a)   Health Maintenance Organization (HMO) Option

      This option provides core coverages (other than
      Extended Care Coverage) to enrollees through
      physicians, hospitals, and other providers who have
      agreed to provide services under the terms established
      by the health maintenance organization to limit fees,
      assure quality, and control utilization.  Extended
      Care Coverage, under Appendix E, is available to
      enrollees of this option.

      (1)   The types of coverages and the scope and level of
            coverages provided under this option may vary

SALARIED HEALTH CARE PROGRAM

Art. II

>among health maintenance organizations and may be
>different than the coverages set forth in
>Appendices A and B.

(2)   Most health maintenance organizations provide
      health care coverages (including preventive care)
      that generally are managed for the enrollee by a
      primary care physician.  The primary care
      physician is responsible for referring the
      patient to other providers of service.  If such
      referral is not obtained, the enrollee may be
      responsible for charges incurred.

(3)   Under this option, if an enrollee receives
      services from a non-health maintenance
      organization provider, in a non-emergency
      situation or without a referral, such services
      may not be covered.

(b)   Basic Medical Plan (BMP) Option

      This option provides the core coverages described in
      Appendix A through access to a network of providers
      within a defined service area who have agreed to
      provide services under the terms of participation
      established by the Basic Medical Plan carriers.
      Mental health and substance abuse care for enrollees
      of this option are provided under Appendix B. Extended
      Care Coverage, under Appendix E, is available to
      enrollees of this option.  Core coverages (other than
      certain screening and certain diagnostic
      tests/examinations, durable medical equipment and
      prosthetic and orthotic appliances, and prescription
      drug coverage as set forth in Appendix A and those
      core coverages under other appendices) are subject to
      a $900 individual and $1,800 family calendar year
      deductible.  No more than $900 for an individual may
      be counted toward satisfying the family deductible,
      but the family deductible may be met without any
      individual meeting the individual deductible amount.
      After the deductible is satisfied, a 25% copayment is
      required for covered expenses (other than those
      exempted from the deductible above) received in
      network, up to a calendar year combined maximum out-
      of-pocket expense for deductibles and copayments of
      $2,500 for an individual and $5,000 for a family.  For
      covered expenses (other than those exempted from the
      deductible above) received out-of-network, a 40%
      copayment is required after the deductible is
      satisfied, and the combined maximum out-of-pocket
      expense for deductibles and copayments does not apply.

<u>SALARIED HEALTH CARE PROGRAM</u>

Art. II

(1)   The Basic Medical Plan carriers assume
responsibility for conducting utilization
reviews, predetermination of services, or other
reviews necessary to promote quality of care and
control costs where responsibility has not been
assigned by the Corporation to another party.
The carrier may place the participating physician
at financial risk through capitation, withholding
of a percentage of fees, or other mechanisms, or
if not, will have other means to monitor and
control utilization by individual providers on a
continuous basis. (See Appendix A, II.K. for
predetermination and other review requirements,
including provisions that impact benefit
payment.)

(2)   The Basic Medical Plan carriers assume
responsibility for selection and periodic
evaluation of hospitals, physicians,
laboratories, and other providers to ensure
sufficient numbers and types of providers who are
geographically distributed to allow adequate
access for enrollees within a service area as
defined by the carrier.

(3)   The Basic Medical Plan carriers assume
responsibility for providing the scope and level
of benefits set forth in Appendix A, monitoring
the appropriateness of referrals to
nonparticipating providers, taking affirmative
corrective action with respect to providers when
necessary, and implementing and maintaining other
administrative processes as required by the
Corporation.

(4)   Maximum benefits are available only if the
services are rendered by participating providers.


This option contains predetermination and review
procedures required in order to receive maximum
benefits for certain covered services. (See Appendix
A, II.K. for predetermination and other review
requirements, including provisions which impact
benefit payment.)

The prescription drug coverage outlined in Appendix A
will be delivered through a separate pharmacy network
and the co-pay amounts are separate from the other
cost sharing outlined in this Article II.4.(b).  Refer
to Appendix A, III.G.

SALARIED HEALTH CARE PROGRAM

Art. II

(c)   Enhanced Medical Plan (EMP) Option

This option provides the core coverages described in Appendix A through access to a network of providers within a defined service area who have agreed to provide services under the terms of participation established by the Enhanced Medical Plan carriers. Mental health and substance abuse care for enrollees of this option are provided under Appendix B. Extended Care Coverage, under Appendix E, is available to enrollees of this option.  Core coverages (other than certain screening and certain diagnostic tests/examinations, durable medical equipment and prosthetic and orthotic appliances, and prescription drug coverage as set forth in Appendix A and those core coverages under other appendices) are subject to a $450 individual and $900 family calendar year deductible.  No more than $450 for an individual may be counted toward satisfying the family deductible, but the family deductible may be met without any individual meeting the individual deductible amount. After the deductible has been satisfied, a 20% copayment will be required for covered expenses (other than those exempted from the deductible above) received in network, up to a calendar year combined maximum out-of-pocket cost for deductibles and copayments of $2,000 for an individual and $4,000 for a family.  For covered expenses (other than those exempted from the deductible above) received out-of-network, a 40% copayment is required after the deductible is satisfied, and the combined maximum out-of-pocket expense for deductibles and copayments does not apply.

(1)   The Enhanced Medical Plan carriers assume responsibility for conducting utilization reviews, predetermination of services, or other reviews necessary to promote quality of care and control costs where responsibility has not been assigned by the Corporation to another party. The carrier may place the participating physician at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor and control utilization by individual providers on a continuous basis. (See Appendix A, II.K. for predetermination and other review requirements, including provisions that impact benefit payment.)

SALARIED HEALTH CARE PROGRAM

Art. II

(2)   The Enhanced Medical Plan carriers assume
responsibility for selection and periodic
evaluation of hospitals, physicians,
laboratories, and other providers to ensure
sufficient numbers and types of providers who are
geographically distributed to allow adequate
access for enrollees within a service area as
defined by the carrier.

(3)   The Enhanced Medical Plan carriers assume
responsibility for providing the scope and level
of benefits set forth in Appendix A, monitoring
the appropriateness of referrals to
nonparticipating providers, taking affirmative
corrective action with respect to providers when
necessary, and implementing and maintaining other
administrative processes as required by the
Corporation.

(4)   Maximum benefits are available only if the
services are rendered by participating providers.

This option contains predetermination and review
procedures required in order to receive maximum
benefits for certain covered services. (See Appendix
A, II.K. for predetermination and other review
requirements, including provisions which impact
benefit payment.)

The prescription drug coverage outlined in Appendix A
will be delivered through a separate pharmacy network
and the co-pay amounts are separate from the other cost
sharing outlined in this Article II.4.(c).  Refer to
Appendix A, III.G.

(d)   Point of Service (POS) Option

(1)   This option provides core coverages (with the
exception of Extended Care Coverage for enrollees
whose service date is on or after January 1, 2001)
to enrollees through physicians, hospitals, and
other providers who have agreed to provide high
quality, cost-effective services under the terms
established by the POS Plan.

(2)   The covered services outlined in Appendix A and B
will be provided through the various POS plans.  In
some instances, additional covered services, such
as allergy testing and treatment, or a greater
number of home health care visits, may be available

SALARIED HEALTH CARE PROGRAM

Art. II

within the POS network because of favorable
contracts with providers.

(3)   POS plans provide health care coverage
(including preventive care) that is managed for
the enrollee by a primary care physician. The
primary care physician is responsible for
referring the patient to other providers of
service.

(4)   Covered services received in-network have the
following co-pay requirements:

(i)   $25 per office visit to a primary care
physician and $35 per office visit to a
specialist (this includes outpatient
mental health services, as well as
outpatient physical, speech or
occupational therapy);

(ii)  $100 for the use of an emergency room
and $50 for the use of an urgent care
facility (this co-pay is waived if the
enrollee is admitted to the hospital);

(iii) $150 for each outpatient surgical
facility admission; and

(iv)  $350 for each facility admission.

(5)   Covered services, with the exception of mental
health and prescription drug services, received
out-of-network are subject to an out-of-network
deductible and copayment.  The calendar year
deductible is $500 for an individual and $1,000 for
a family.  No more than $350 for an individual may
be counted toward satisfying the family deductible,
but the family deductible may be met without any
individual meeting the individual deductible
amount.  After the deductible is satisfied, a 20%
copayment is required for covered expenses up to a
calendar year combined maximum out-of-pocket
expense for deductibles and copayments of $2,500
for an individual and $5,000 for a family.

(6)   If an enrollee receives a covered service in a non-
emergency situation, without a referral from their
primary care physician or the carrier, the services
will be considered out of network and will be
subject to the cost-sharing provisions contained in
subsection (d)(5) above.  Certain services are only
covered if received in-network and from an approved
provider.  Those services and supplies that are not
covered if received out-of-network include: hearing
aid services, home health care, durable medical

SALARIED HEALTH CARE PROGRAM

Art. II

equipment, prosthetic and orthotic appliances, and substance abuse treatment.  In addition, mental health services received out of network will only be covered when rendered by a qualified physician or facility.

(7)   In order to receive maximum benefits for covered services, such services must be obtained within the POS network of providers through the enrollee's primary care physician.

(8)   Network benefits are available when provided by non-network providers if such services are on referral from the primary care physician and approved by the POS, subject to the conditions below.

  (i)   The primary care physician is responsible for communicating the referral to the carrier and monitoring the progress of the patient.  The primary care physician must make any subsequent referrals.

  (ii)  The carrier is responsible for monitoring referral frequency and patterns, and for ensuring that additional costs are not incurred by the Program or the enrollee.

  (iii) A service, which would not otherwise be a covered service, does not become a covered service by virtue of a referral.

  (iv)  Payment for a covered service received out-of-network (A service is considered out-of-network if it is performed by a provider other than the primary care physician (PCP) without a referral by the PCP or the carrier and the event requiring the service is not an emergency as determined by the carrier.), will be equal to 80% of the POS carrier's network reimbursement for the same service or, if less, 80% of the actual charge, after any remaining deductible is satisfied.  The enrollee will be responsible for the difference between the POS carrier's network reimbursement for the out-of-network service and the provider's charge.  The amount of any charges in excess of the POS network reimbursement will not be applied to the $2,500 individual or $5,000 family out-of-pocket maximum.

SALARIED HEALTH CARE PROGRAM

Art. II

      (v) Mental health services received out-of-network by a physician are only covered at 50% of the POS carrier in-network reimbursement and are not subject to the out-of-network deductible. The amount of any charges in excess of the POS carrier in-network reimbursement will not be applied to the $2,500 individual or $5,000 family out-of-pocket maximum.

(9) The prescription drug coverage outlined in Appendix A will be delivered through a separate pharmacy network and the co-pay amounts are separate from any other cost sharing outlined in Article II.4.(d). Refer to Appendix A, III.G.

(10) A POS carrier assumes responsibility for conducting utilization reviews, predetermination of services, or other reviews necessary to promote quality of care and control costs, where responsibility has not been assigned by the Corporation to another party. A POS carrier may place the primary care physician and other providers at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor and control utilization by individual providers on a continuous basis. (See Appendix A, II.K. for predetermination and other review requirements.)

(11) A POS carrier assumes responsibility for selection and periodic evaluation of hospitals, physicians, laboratories, and other providers to ensure sufficient numbers and types of providers who are geographically distributed to allow adequate access for enrollees.

(12) A POS carrier assumes responsibility for providing the scope and level of benefits set forth in Appendix A and Appendix B, monitoring the appropriateness of referrals to non-panel providers, taking affirmative corrective action with respect to providers when necessary, and implementing and maintaining other administrative processes as required by the Corporation.

(13) A POS carrier may seek Corporation approval to establish special contractual relationships with providers not otherwise included under the Program when it can be shown that doing so will improve quality of care and enhance cost competitiveness.

SALARIED HEALTH CARE PROGRAM

Art. II

(e)   Comprehensive Health Savings Plan (CHSP) Option

This option is intended to satisfy the criteria
established under Federal regulations to be a "high
deductible health plan". This option provides the core
coverages described in Appendix A through access to a
network of providers within a defined service area who
have agreed to provide services under the terms of
participation established by the Comprehensive Health
Savings Plan carrier.  Mental health and substance
abuse care for enrollees of this option are provided
under Appendix B. Extended Care Coverage, under
Appendix E, is available to enrollees of this option.
Core coverages (other than certain screening and
diagnostic tests/examinations and certain prescription
drugs) are subject to a $1,200 individual and $2,400
family calendar year deductible.  The family
deductible may be met without any individual meeting
the individual deductible amount; however, if an
enrollee elects other than "self only" coverage, the
full family deductible must be met before the CHSP
will pay any benefits.  After the deductible is
satisfied, a 20% copayment is required for covered
expenses (other than those exempted from the
deductible above) received in network, up to a
calendar year combined maximum out-of-pocket expense
for deductibles and copayments of $2,500 for an
individual and $5,000 for a family.  For covered
expenses (other than those exempted from the
deductible above) received out-of-network, a 40%
copayment is required after the deductible is
satisfied, and the combined maximum out-of-pocket
expense for deductibles and copayments does not apply.

(5)   The Comprehensive Health Savings Plan carriers
assume responsibility for conducting utilization
reviews, predetermination of services, or other
reviews necessary to promote quality of care and
control costs where responsibility has not been
assigned by the Corporation to another party.
The carrier may place the participating physician
at financial risk through capitation, withholding
of a percentage of fees, or other mechanisms, or
if not, will have other means to monitor and
control utilization by individual providers on a
continuous basis. (See Appendix A, II.K. for
predetermination and other review requirements,
including provisions that impact benefit
payment.)

(6)   The Comprehensive Health Savings Plan carriers
assume responsibility for selection and periodic

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 37 of 217
SALARIED HEALTH CARE PROGRAM

Art. II

evaluation of hospitals, physicians,
laboratories, and other providers to ensure
sufficient numbers and types of providers who are
geographically distributed to allow adequate
access for enrollees within a service area as
defined by the carrier.

(7)  The Comprehensive Health Savings Plan carriers
assume responsibility for providing the scope and
level of benefits set forth in Appendix A,
monitoring the appropriateness of referrals to
nonparticipating providers, taking affirmative
corrective action with respect to providers when
necessary, and implementing and maintaining other
administrative processes as required by the
Corporation.

(8)  Maximum benefits are available only if the
services are rendered by participating providers.

This option contains predetermination and review
procedures required in order to receive maximum
benefits for certain covered services. (See Appendix
A, II.K. for predetermination and other review
requirements, including provisions which impact
benefit payment.)

The prescription drug coverage outlined in Appendix A
will be delivered through a separate pharmacy network
and the co-pay amounts are outlined in Appendix A,
III.G. Such co-pays will apply after the deductible
has been met.

(f)  Options Available to U.S. Expatriates, Certain Foreign
Nationals, Flexible Service Employees, Cooperative
Students, Employees Working in Hawaii and Primary
Enrollees Who Reside in Canada

Unless otherwise noted, employees classified as
Expatriates, or Cooperative Students and employees
working in Hawaii are not eligible to elect the
medical care options described in subsections (a),
(b), (c), (d)or (e) above.  Coverages for such
employees are described below:

(1)  U.S. Expatriates and certain Foreign Nationals

Except for employees assigned to Canada and
continuing to reside in the United States (who

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 38 of 217
SALARIED HEALTH CARE PROGRAM

Art. II

are limited to the coverages and options
applicable to salaried employees of United States
operations who reside in the United States),
employees classified as U.S. Expatriates and
certain foreign nationals are eligible for the
coverage provided under the International Health
Care Plan (IHCP).  The IHCP provides Core and
Non-Core coverages similar, but not necessarily
equivalent to those coverages provided for
eligible U.S. employees. Extended Care Coverage
is not available. (Predetermination and review
requirements set forth in Appendix A, II.K. do
not apply.)

(2)   Flexible Service Employees

Flexible Service Employees are eligible for the
options described in this Section 4 based on
their date of service.

(3)   Cooperative Students

Employees classified as Cooperative Students are
not eligible for coverage under the Program.

(4)   Employees Working in Hawaii

The Corporation will make arrangements for
primary enrollees (who are not retired or a
surviving spouse), who live in Hawaii and are
eligible for Corporation contributions for health
care, for a health care plan that meets the
requirements of Hawaii state law.  The health
care available to Hawaiian employees will provide
Core and Non-Core coverages similar, but not
necessarily equivalent, to those coverages
provided to other eligible U.S. employees. Such
primary enrollees will also be eligible for
Extended Care Coverage.  The provisions of this
sub-section do not apply to retirees or surviving
spouses residing in Hawaii.

(5)   Primary Enrollees Who Reside in Canada

The Corporation may make arrangements for primary
enrollees, who live in Canada and are eligible
for Corporation contributions for health care, to
elect, on an optional basis, a Canadian based
health care plan that provides hospital,
surgical, medical, prescription drug, hearing
aid, dental, vision, mental health and substance
abuse coverages, and/or other coverages similar,

SALARIED HEALTH CARE PROGRAM

Art. II

but not necessarily equivalent to those coverages
provided for eligible U.S. employees.  Extended
Care Coverage is not available. (Predetermination
and review requirements set forth in Appendix A,
II.K. do not apply.)

The Canadian coverages, if elected, will be in
lieu of coverages available at the U.S. location
where employed or from which retired.  Such
election shall remain in effect while the primary
enrollee remains a resident of Canada.

SALARIED HEALTH CARE PROGRAM

Art. III

ARTICLE III

ENROLLMENT, ELIGIBILITY, COMMENCEMENT,
CONTRIBUTIONS AND CONTINUATION

Section 1. Enrollment

(a)   An eligible primary enrollee must complete and sign an
application for the coverages in which the enrollee
elects to participate.  The application or enrollment
form shall include an authorization for payroll or
retirement check deductions for contributions which may
be required.  Once signed, such authorization will
remain in effect until revoked in writing by the
primary enrollee.  A primary enrollee not making an
election, completing an application or authorizing
deductions (enrollee contributions) may be assigned to
an option by the Corporation or may have coverage
suspended pending such election, application or
authorization.

(1)   At the primary enrollee's option such coverage
may include the following enrollment
classifications:  (i) self only, (ii) self and
spouse, (iii) self and child (children), or (iv)
self and family. For primary enrollees whose
coverages cease in accordance with Article III,
Section 5(e), the following enrollment
classifications may be available, depending on
any secondary enrollee's eligibility: (v) spouse
only, (vi) spouse and child(children), or (vii)
child (children) only.  For purposes of enrollee
contributions, family coverage shall include only
spouse and eligible children as defined in
Section 8 of this Article.

(2)   Primary enrollees who are employees eligible for
all coverages under the Program and participate
in the Flexible Benefits Program may elect (i)
core coverages alone, (ii) core coverages plus
any or all non-core coverages, (iii) any or all
non-core coverages without core coverages, (iv)
to "opt out" of some or all coverages and have
"benefit dollars" applied to other benefits or
(v) to waive all coverages to be enrolled as a
dependent of another primary enrollee.  Those who
opt out of or waive coverage may be subject to
restrictions on re-enrollment.

SALARIED HEALTH CARE PROGRAM

Art. III

(3) Primary enrollees who are retirees or surviving
spouses may elect (i) core coverages alone, (ii)
core coverages plus any or all non-core
coverages, (iii) any or all non-core coverages
without core coverages, (iv) to waive coverage to
be covered as a dependent of another primary
enrollee or (v) reject coverages.  Waiving or
rejecting coverage may result in restrictions on
re-enrollment.  Retirees and surviving spouses
must elect Medical Plan coverage in order to have
Extended Care Coverage, but may decline Extended
Care Coverage while retaining Medical Plan
coverage.  However, if they do so, they may be
ineligible to participate in it at a later date.
Also, retirees and surviving spouses who are
eligible to continue participation in the Program
only on a self-paid basis will not be permitted
to enroll/reenroll if they do not elect to enroll
when first eligible or initially enroll, but have
coverage discontinued for failure to make the
required contributions.

(4) The primary enrollee's election shall apply to
all dependents.

(5) When a husband and wife both qualify as primary
enrollees, each may make a separate election.
However, no individual may have coverage as both
a primary and a secondary enrollee, nor as a
secondary enrollee under more than one primary
enrollee.

(6) If a primary enrollee's coverage otherwise
available under this Program is waived or
canceled, and based upon such waiver or
cancellation the primary enrollee receives some
financial consideration from the Corporation
(under this or any other Corporation plan or
program), such primary enrollee shall be
precluded from coverage as a secondary enrollee
under another person's coverage for a period of
time equal to that upon which such consideration
is based.  This provision also applies to
secondary enrollees, if any, included in the
waiver or cancellation on which such
consideration is based.

(7) Retired employees or surviving spouses who are
enrolled for health care coverages as provided in
the Program and who have permanently changed
their residence from the service area of the

carrier with which they are enrolled for such coverages, must transfer their coverages to a local carrier serving the area in which they reside.

Such transfers shall become effective the first day of the month following the receipt of the application for transfer.

(b)   The primary enrollee may be required to make monthly contributions as set forth in the Program, according to the primary enrollee's status, the enrollment classification, the option elected, the Medicare status of enrollees, and the type and number of dependents enrolled.

Section 2. <u>Dates of Eligibility, Commencement of Coverages, and Corporation Contributions for Active Employees</u>

(a)   Eligibility and Commencement of Coverages for Current and New Employees

An employee shall become eligible for certain Program coverages on January 1, 1999 or, if later, on the first day of the third month following the month of hire, provided the employee is in active service on the first working day of such month.  Salaried employees who are hired on or after January 1, 2001, and whose service date is on or after January 1, 2001 shall become eligible as of their date of hire. United States salaried employees hired directly to Expatriate positions (Expatriate-U.S.) are eligible for coverage through the International Health Care Plan upon date of hire.  If an employee is not in active service on the date coverages otherwise would start, coverages will become effective upon the employee's return to work.

However, for purposes of this subsection 2(a), if an employee is scheduled to be at work, but is absent due to disability, and is consequently placed on a disability leave of absence, the employee will be deemed to be in active service and at work.

(b)   Eligibility and Commencement of Coverages for Employees returning to Active Work

If an employee's coverages are discontinued and the employee subsequently returns to active work, eligibility for coverages shall be determined in

SALARIED HEALTH CARE PROGRAM

Art. III

subsection (a) above, except as provided in
subsections (1) through (4) below.

For purposes of this subsection 2(b), if an employee is
scheduled to return to work, but is unable to do so
because of disability, and is consequently placed on a
disability leave of absence, the employee will be
deemed to have returned to work effective with the date
the employee would otherwise have returned to work, but
for the disability leave.

(1)   Returning From Leave of Absence

If an employee's coverages were discontinued
while on leave of absence and the employee
returns to active work with unbroken length of
service, the employee shall be eligible for
health care coverages immediately on the date of
return to active work with the Corporation.

(2)   Returning From Separation From Service Due to a
Quit or Discharge

If separation from service was due to a quit or
discharge but the employee is reemployed within
31 days, the employee shall be eligible for
health care coverages immediately on the date of
return to active work.

(3)   Returning From Separation From Service for Reason
Other Than Quit or Discharge

If separation from service was due to a reason
other than quit or discharge and the employee had
health care coverages in effect before breaking
length of service, and if the employee returns to
active work within a period of 24 consecutive
months, the employee shall be eligible for health
care coverages immediately on the date of return
to active work with the Corporation.

(4)   Returning From Military Leaves of Absence

An employee reporting for work from military
leave of absence in accordance with the terms of
such leave shall be eligible for health care
coverages as of the date the employee reports
available for work.

SALARIED HEALTH CARE PROGRAM

(c)   Eligibility and Commencement of Coverages for
Expatriate Employees Transferring To/From Regular
Active Service From/To Expatriate, or Cooperative
Student Status

If an employee transfers to/from regular full-
time status from/to Expatriate, or Cooperative
Student status, the employee shall be eligible
for health care coverages, based on the new
status, effective with the first day of the
month following the change of status, unless the
change of status is on the first day of the
month in which case the change of coverage is
effective that day.  However, in the case of a
repatriating Expatriate employee, the effective
date may be delayed one month, when appropriate,
to accommodate the transition from one country
and/or assignment to the next.  In any event,
the effective date shall be the first day of the
month.

(d)   Corporation Contributions for Employees in Active
Service

(1)   With respect to any month in which the employee
is in active service with the Corporation and
eligible for coverage as specified in this
Section 2 as of the beginning of the month, the
Corporation shall make contributions for that
month's coverages as specified in the Program.

(2)   With respect to any month in which an employee
does not meet the requirements of subsection
2(d)(1) above by virtue of not being in active
service at the beginning of the month, but in
which an employee returns to work and is eligible
for reinstatement of coverages under subsection
2(b) above, the Corporation shall make
contributions as specified in the Program
effective with the date of return to work.

(e)   Certain Ineligible Individuals

The following classes of individuals are ineligible
to participate in the Program, regardless of any
other Program terms to the contrary, and regardless
of whether the individual is a common-law employee of
Delphi:

(1)   Any worker who provides services to the
Corporation where there is an agreement with a
separate company under which the services are

SALARIED HEALTH CARE PROGRAM

Art. III

provided.  Such individuals are commonly referred to by the Corporation as "contract employees" or "bundled services employees."

(2)   Any worker who has signed an independent contractor agreement, consulting agreement, or other similar personal services contract with the Corporation or who has represented themselves to be an independent contractor, consultant, or other similar personal service provider.

(3)   Any worker that the Corporation, in good faith, classified as an independent contractor, consultant, contract employee, or bundled services employee during the period the individual is so classified by the Corporation.

The purpose of this provision is to exclude from participation in the Program all persons who may actually be common-law employees of the Corporation, but who are not paid as though they were employees of the Corporation, regardless of the reason they are excluded from the payroll, and regardless of whether that exclusion is correct.

Section 3.  Continuation of Coverages During Disability Leave of Absence

(a)   Health care coverages (other than dental for an approved disability leave of absence commencing prior to September 17, 1979) shall be continued for the duration of an approved disability leave of absence for employees with service dates on or before December 31, 2000 provided the employee is totally and continuously disabled and makes any required monthly contributions.

However, for employees with service dates on or after January 1, 2001, health care coverages shall be continued during an approved disability leave for up to a maximum of 29 months, provided the employee is totally and continuously disabled and makes any required monthly contributions, but in no case will health care coverage be continued beyond the end of the month in which the employee's approved disability leave ends.

(b)   If an employee's disability leave is canceled because the period of such leave equaled the length of the employee's service, coverages continued while on disability leave, in accordance with subsection (a)

SALARIED HEALTH CARE PROGRAM

Art. III

above, shall continue to remain in force in any month
in which the employee continues to receive salary
continuation, Sickness and Accident Benefits or
Extended Disability Benefits in accordance with the
Delphi Life and Disability Benefits Program for
Salaried Employees subsequent to such cancellation.
This provision is contingent upon the employee making
any required monthly contribution.  However, receipt
of Supplemental Extended Disability Benefits or Long
Term Disability Benefits subsequent to such
cancellation does not extend the continuation period.

(c)   The Corporation shall make contributions, in
accordance with Program provisions, for health care
coverages continued in accordance with subsections (a)
and (b) above.


Section 4.  Continuation of Coverages During Other Leaves of
Absence

(a)   Employees on leave of absence under the Family and
Medical Leave Act (FMLA) of 1993 shall have coverages
continued in accordance with the FMLA.  Health care
coverages for an employee on any other type of
approved non-disability leave of absence shall be
continued to the end of the month in which the
employee is last in active service.

(b)   An employee who desires to continue coverages beyond
the period specified in subsection (a) above may do
so, provided the employee contributes for coverage as
described in (1), (2) and (3) below.

(1)   Dependent Care Leave commencing on or after
January 1, 1995.  Employees may continue
coverages for up to 24 months (including those
months covered by FMLA), provided the employee
pays 50% of the full monthly cost for the first
12 months and 100% of the full monthly cost
thereafter.  If any portion of a Dependent Care
Leave is also covered by the provisions of the
FMLA, the provisions of that act will apply to
such portion of the leave.

(2)   Educational Leave.  Employees may continue
coverages for the duration of such leave provided
the employee pays 50% of the full monthly cost.

(3)   Other Non-Disability Leaves.  Coverages during
all other non-disability leaves may be continued

41                                    2007

SALARIED HEALTH CARE PROGRAM

Art. III

for up to 12 months provided the employee pays 50% of the full monthly cost.

(c)   As an alternative to the continuation specified in subsection (b)(3) above, employees on military leave of absence may elect to continue all coverages beyond the period specified in subsection (a) above in accordance with the provisions of the Uniformed Services Employment and Reemployment Rights Act of 1994.

(d)   From time to time, the Corporation may establish certain leave programs under which employees may be offered limited continuation privileges provided they make specified monthly contributions.  Such programs may vary in percentage of the full cost of coverage which the employee is required to pay and in the length of the continuation period as stipulated by the leave program.

(e)   If an employee has not broken service and has continued coverages as provided in subsection (b) above during an approved leave of absence other than for disability, granted because of a clinically anticipated disability based on the natural course of the employee's diagnosed condition, and presents medical certification from the employee's personal physician, satisfactory to the Corporation, that the employee is totally disabled, health care coverages shall be provided, as of the date such certification is presented, on the same basis as set forth in Section 3.

(f)   The Corporation shall make contributions for health care coverages continued in accordance with subsection (e) above, on the same basis as set forth in Section 4, as of the date certification of disability is presented.


Section 5.   Continuation of Coverages Upon Retirement or Termination of Employment at Age 65 or Older for Employees or Certain Former Employees

(a)   An employee whose employment status is retirement as determined in accordance with Delphi policy, as may be revised from time to time, (other than a deferred vested retirement) or who terminates employment at age 65 or older (for any reason other than a discharge for cause) may continue health care coverages.

SALARIED HEALTH CARE PROGRAM

Art. III

(b)   Certain former employees may be eligible to enroll for
      health care coverages upon retirement, pursuant to
      specific policies established by the Corporation in
      connection with the acquisition or divestiture of an
      operation.

      (1)   Unless otherwise provided for in the terms of a
            divestiture, employees who are eligible to retire
            with health care in retirement on the date of
            sale of a divested unit are eligible to enroll
            for health care coverages (subject to all terms
            and conditions of the Program then in effect)
            when their employment at the successor company
            ceases.

      (2)   Employees who transferred to Inteva(as part of
            the divestiture of the Interiors business)

            Employees with a continuous length of service
            date on or before December 31, 1992 but who are
            not eligible to retire on the date of the sale
            are eligible to enroll for health care coverages
            (subject to all terms and conditions of the
            Program then in effect)when their employment at
            Inteva ceases provided: (1) their credited
            service on the date of the sale when combined
            with their length of service at Inteva (as of
            their separation date at Inteva) and their age
            (as of their separation date at Inteva) makes
            them eligible for health care in retirement; and
            (2) Inteva has continued to reimburse Delphi for
            the applicable annual service cost associated
            with such employees' health care in retirement.

(c)   An employee who upon retirement is not enrolled for
      the coverages as provided in subsection (a) above may
      enroll for health care coverages to which entitled at
      the time of or subsequent to retirement.  Such
      coverage shall become effective on the first of the
      month following receipt of application from such
      retired employee.

(d)   The Corporation shall make contributions, in
      accordance with Program provisions, for health care
      coverages continued in accordance with subsections
      (a), (b) and (c) above, except for:

      (1)   an employee who retires voluntarily at or after
            age 55 and prior to age 60, when age and credited
            service total less than 85;

43                                          2007

SALARIED HEALTH CARE PROGRAM

Art. III

    (2)  an employee who retires with less than ten years
of credited service under the Delphi Retirement
Program for Salaried Employees; or

    (3)  an employee whose continuous service with the
Corporation (or an adjusted service date
established in accordance with Corporation policy
and procedure) commenced on or after January 1,
1993 and who retires after that date.


Individuals specified in (1), (2) and (3) above must
pay the full cost in order to continue coverages.  If
they decline to continue, or discontinue making the
required contributions, they will not be eligible to
reenroll.

(e)  Primary enrollees whose coverages are continued under
this Section 5 may only continue such coverages until
the first of the month in which they become Medicare
eligible in the normal course. Thereafter, coverages
(other than Dental, Vision and Extended Care Coverage)
for the primary enrollee will cease.

    (1)  Primary enrollees, other than those specified in
subsections (d)(1), (d)(2) and (d)(3) above, will
be eligible for a Retiree Health Reimbursement
Account (RHRA), as follows:

        (i)    The amount of the RHRA will be $20,000
for those primary enrollees who were
classified as retired on or before March
1, 2005 and $10,000 for all other
eligible primary enrollees.

        (ii)   The RHRA has no cash value, does not earn
interest and may not be converted to cash
except to reimburse the primary enrollee
for certain qualified health care
expenses.

        (iii)  Qualified health care expenses are
limited to premiums paid by the primary
enrollee for health care coverages for
themselves and any eligible dependents
(e.g., Medigap, Medicare Part D, etc.

        (iv)   Only a primary enrollee may be eligible
for or may activate a RHRA. Secondary
enrollees are not eligible for and may
not activate a RHRA.

        (v)    Upon the death of the primary enrollee
who is eligible for an RHRA, eligibility
for the RHRA may be transferred to an
eligible surviving spouse, as described
in Section 7 (e)(5). In the event the

2007

SALARIED HEALTH CARE PROGRAM

Art. III

    primary enrollee does not have an
eligible surviving spouse, eligibility
for and RHRA or an RHRA that has been
activated is terminated.

(2)    Primary enrollees whose coverages cease pursuant
to this subsection (e) may continue Dental,
Vision and Extended Care Coverage (if eligible)
for themselves and any eligible dependents by
paying the full cost of any coverages continued.

(3)    Primary enrollees whose coverages cease pursuant
to this subsection (e) may continue core
coverages (described in Appendices A and B) for
any eligible dependent who is not eligible for
Medicare in the normal course by enrolling for
the applicable enrollment classifications
described in Article III, Section 1(a)(1) and
paying the applicable contribution. Coverages for
such dependents will cease when they no longer
meet the dependent eligibility requirements set
forth in Section 8 of this Article or, if
earlier, when they become Medicare eligible in
the normal course.

Section 6.  Eligibility for Coverages Following Any Termination of
Employment Other Than by Retirement or Death

    Except as provided in Section 5, above, and in
subsection (b) of this Section 6, following any
termination other than by retirement or death, any
health care coverages in effect shall cease
automatically as of the last day of the month in which
employment terminates.

(a)    Following termination of employment other than by
retirement or death, the former employee shall be
entitled to self-paid continuation of coverages
provided under applicable Federal laws (see Section
10, below), and/or may be offered a conversion
contract (see Section 9, below).

(b)    From time to time the Corporation may establish
certain separation programs (e.g., Career Transition
Program, External Opportunities Program) under which
employees terminating employment may be offered
limited health care coverage continuation privileges.
In such cases, acceptance of Program continuation
under the separation program shall be an alternative
to self-paid continuation under applicable Federal
laws.  Employees terminating employment under such

programs must choose between Program continuation and
self-paid continuation.


Section 7. <u>Continuation of Coverages for the Survivors of
Employees, of Retired Employees or of Certain Former
Employees</u>

    (a)   General Provisions

        (1)   If a primary enrollee dies after coverages are in
effect under the Program, coverage for any
enrolled dependents (including sponsored
dependents) will cease at the end of the month in
which the primary enrollee dies.  Thereafter, a
surviving spouse may be eligible to enroll in
and/or continue coverages as provided in
subsections (b) through (g), below.

        (2)   When an employee or retiree dies and leaves no
surviving spouse eligible for coverages under
this Section 7, any remaining enrolled dependents
(including a spouse who is ineligible for
surviving spouse coverage under this Section 7
due to having been married to the deceased
employee for less than the one full year
immediately preceding the date of death) whose
coverage terminates at the end of the month in
which the employee or retiree dies, may be
eligible to continue coverages, on a self-paid
basis, under applicable Federal laws (see Section
10, below) or to obtain a conversion contract
(see Section 9, below).

        (3)   For purposes of this Section 7, "surviving
spouse" does not include a former employee's
spouse who is eligible only for a deferred
retirement benefit under the Delphi Retirement
Program for Salaried Employees; a spouse or
former spouse who is receiving, or eligible to
receive, a pre-retirement survivor benefit under
the above referenced retirement program; or a
spouse who is enrolled as a sponsored dependent.
However, under this section, "surviving spouse"
may apply to the spouses of certain former
employees, pursuant to specific policies
established by the Corporation in connection with
the acquisition or divestiture of an operation as
referenced in Article III, Section 5(b) and
Section 6(b).

(4)   Coverage which may be available under this Section 7 to a surviving spouse is available as an alternative to the continuation privilege which may be provided under Federal law (see Section 10, below).  The surviving spouse must make an election no later than 60 days following the later of the end of the month in which the death of the employee or retiree occurs or the date of notice of available options by the Corporation.  A surviving spouse who is ineligible for Corporation contributions and who fails to make a timely election as indicated above will not be permitted to enroll for coverage at a later date.

(5)   Except as provided in Article III, Section 8(c)(2), below, a surviving spouse continuing coverage under this Section 7 may not add dependents to the coverage.  Coverage may be continued for dependent children and sponsored dependents enrolled as of the decedent's date of death, subject to their continued satisfaction of Program eligibility criteria.

(6)   When a surviving spouse is required to make contributions to continue coverages, the contributions shall be paid directly to the Corporation or its agent on or before the first day of the month for which such coverages are to be provided, or such other due date as may be established by the Corporation.  Failure to make the required monthly contributions by the end of the month for which coverage is to be provided will result in cancellation of coverage.

(7)   Once coverage is rejected, or canceled for failure to make required contributions, it may only be reinstated if the surviving spouse was not enrolled as a surviving spouse due to being enrolled as a primary or secondary enrollee under other provisions of the Program.

(b)   Employees Whose Deaths Occur Prior to Becoming Eligible for Coverage Under the Program

(1)   If the surviving spouse was married to the deceased employee for at least the one full year immediately preceding the date of death, and the employee dies prior to becoming eligible for coverages under the Program, the Corporation will permit the surviving spouse to enroll for core coverages on a self-paid basis.

<u>SALARIED HEALTH CARE PROGRAM</u>

Art. III

 (2) If such surviving spouse elects to enroll for
   coverage in accordance with subsection (b)(1)
   above, coverage may be continued for at least 24
   months but in no event beyond the end of the
   month preceding the month in which the surviving
   spouse is eligible for Medicare in the normal
   course.  If, as of the employee's date of death,
   the surviving spouse's age is at least 45 or the
   surviving spouse's age when added to the deceased
   employee's years of credited service totals 55 or
   more, coverage may be continued beyond the 24
   months to the earliest of the surviving spouse's
   remarriage, attainment of age 62 or death.

(c) Employees Whose Deaths Occur After Becoming Eligible
  for Coverage But Prior to Attaining Ten Years of
  Credited Service

 (1) If the surviving spouse was married to the
   deceased employee for at least the one full year
   immediately preceding the date of death, and the
   employee dies after becoming eligible for
   coverage but prior to attaining ten years of
   credited service, the Corporation will make
   contributions to continue core coverages for 12
   months.  Thereafter, the surviving spouse may
   continue coverages for at least an additional 12
   months, on a self-paid basis.

 (2) If, as of the employee's date of death, the
   surviving spouse's age is at least 45 or the
   surviving spouse's age when added to the
   employee's years of credited service totals 55 or
   more, the self-paid coverage may be continued
   beyond the period specified in subsection (1)
   above, to the earliest of the surviving spouse's
   remarriage, attainment of age 62 or death.

 (3) In any event, coverages continued under this
   subsection (c) will cease at the end of the month
   preceding the month the surviving spouse is
   eligible for Medicare in the normal course.

(d) Employees Whose Deaths Occur After Attaining Ten or
  More Years of Credited Service But Prior to Being
  Eligible to Retire Voluntarily

 (1) If an employee dies after becoming eligible for
   health care coverage and after attaining ten
   years of credited service but prior to becoming
   eligible to retire voluntarily under the
   Corporation's salaried policies and procedures,

Art. III

and if the surviving spouse is receiving a Part B
survivor benefit under the Delphi Retirement
Program for Salaried Employees, the Corporation
shall make contributions for the surviving spouse
to continue core and non-core coverages

(i)    until the later of 24 months or the
       surviving spouse's remarriage, if the
       deceased employee had continuous service
       with the Corporation (or an adjusted
       service date established in accordance with
       Corporation policy and procedure)
       commencing prior to January 1, 1993, or

(ii)   for 12 months, if the employee had
       continuous service with the Corporation (or
       an adjusted service established in
       accordance with Corporation policy and
       procedure) on or after January 1, 1993.
       Following this 12-month period the
       surviving spouse may continue coverages on
       a self-paid basis for an additional 12
       months and thereafter, until remarriage.

(2)    If the deceased employee meets the criteria of
       this subsection (d) but the surviving spouse is
       not eligible for a Part B survivor benefit under
       the referenced Retirement Program, the surviving
       spouse will be eligible to continue coverages as
       in subsection (c), above.

(3)    In any event, coverages continued under this
       subsection (d) will cease at the end of the month
       preceding the month the surviving spouse is
       eligible for Medicare in the normal course.

(e)  Employees Whose Deaths Occur After Becoming Eligible
     to Retire Voluntarily

(1)    If an employee dies after becoming eligible to
       retire voluntarily under the Corporation's
       salaried policies and procedures, the Corporation
       shall make contributions for the surviving spouse
       to continue core and non-core coverages until the
       death of the surviving spouse, provided

(i)    the employee had continuous service with
       the Corporation (or an adjusted service
       date established in accordance with
       Corporation policy and procedure)
       commencing prior to January 1, 1988 and has

30 or more years of credited service as of
the date of death,

(ii)  the employee has at least ten years of
credited service and the employee's age
when added to the employee's years of
credited service as of the date of death
total 85 or more, or

(iii) the employee has at least ten years of
credited service and is age 60 or older as
of the date of death and the surviving
spouse is receiving a Part B survivor
benefit under the Salaried Retirement
Program.

(2)  If the employee had continuous service with the
Corporation (or an adjusted service date as
established in accordance with Corporation policy
and procedure) commencing prior to January 1,
1993 but does not meet the criteria of
subsections (1)(i), (ii), or (iii) above, the
Corporation shall make contributions for the
surviving spouse to continue core and non-core
coverages for 12 months.  Thereafter, the
surviving spouse may continue coverage on a self-
paid basis.

However, if the employee has at least ten years
of credited service and the employee's age when
added to the employee's years of credited service
as of the date of death does not total 85 or
more, and if the surviving spouse is receiving a
Part B survivor benefit under the Delphi
Retirement Program for Salaried Employees, the
Corporation shall make contributions for the
surviving spouse to continue core and non-core
coverages in accordance with subsection (d)
above.

(3)  If the employee had such continuous service or an
adjusted service date commencing on or after
January 1, 1993 the Corporation shall make
contributions for the surviving spouse to
continue core and non-core coverages for 12
months.  Thereafter, the surviving spouse may
continue coverage on a self-paid basis.

(4)  In any event, coverages continued under this
subsection (e) will cease at the end of the month
preceding the month the surviving spouse is
eligible for Medicare in the normal course.

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 56 of 217
SALARIED HEALTH CARE PROGRAM

Art. III

     (5)  If the surviving spouse's coverages are continued in accordance with Section 7(e)(1), above, and then cease, in accordance with Section 7(e)(4), above, such surviving spouse will be eligible for a RHRA in the amount of $10,000. Upon the death of the surviving spouse, eligibility for a RHRA is terminated.

(f)  Employees Whose Loss of Life Results From Employment With Delphi Corporation

     (1)  If an employee's loss of life results from accidental bodily injuries caused solely by employment with Delphi Corporation, and results solely from an accident in which the cause and result are unexpected and definite as to time and place, the Corporation will make contributions for the surviving spouse to enroll in and/or continue core and non-core coverages until remarriage.

     (2)  If such surviving spouse remarries and would have been eligible to continue coverages for a longer period under any subsection above, coverages may be continued in accordance with the appropriate subsection, with coverages and Corporation contributions continued under this subsection counted toward the maximum continuation periods specified in the applicable subsection.

     (3)  In any event, coverages continued under this subsection (f) will cease at the end of the month preceding the month the surviving spouse is eligible for Medicare in the normal course.

(g)  Retirees

     (1)  If the surviving spouse is eligible only for sponsored dependent coverage as of the retiree's date of death, and is not enrolled as such, no coverage is available.  If enrolled as a sponsored dependent, only conversion is available (see Section 9, below).

     (2)  If the retiree's coverage in retirement is self-paid, and the surviving spouse is enrolled or eligible to be enrolled as a spouse, the surviving spouse may enroll in and/or continue core and non-core coverages on a self-paid basis until death.  The election and required payments

SALARIED HEALTH CARE PROGRAM

Art. III

must be made in a timely manner [see subsection (a), above].

(3)   If the retiree is receiving or entitled to receive Corporation contributions for coverage in retirement and if the surviving spouse is enrolled or eligible to be enrolled as the retiree's spouse as of the date of death, the surviving spouse is eligible for Corporation contributions for core and non-core coverages until death.

(4)   In any event, coverages continued under this subsection (g) will cease at the end of the month preceding the month the surviving spouse is eligible for Medicare in the normal course.

(5)   If the surviving spouse's coverages are continued in accordance with Section 7(g)(3), above, and then cease, in accordance with Section 7(g)(4), above, such surviving spouse will be eligible for an RHRA as follows:

   (i)    If the surviving spouse is the surviving spouse of a retiree who had not initiated their RHRA, such surviving spouse is eligible for the full RHRA amount, as described in Section 5, (e)(1)(i), based on the retiree's date of retirement.

   (ii)   If the surviving spouse is the surviving spouse of a retiree who had initiated their RHRA, such surviving spouse is eligible for the balance remaining in the retiree's RHRA at the time of the retiree's death.

   (iii)  Upon the death of a surviving spouse who is eligible for an RHRA or has activated an RHRA, eligibility for a RHRA or the activated RHRA is terminated.

Section 8. Dependent Eligibility Provisions

   (a)   General Provisions

      (1)   As used in this Section 8, when reference is made to a person (i.e. - person A) being "dependent upon" another person (i.e. - person B), the term shall mean that person B may legally claim, and does claim, an exemption for person A, under Section 151 of the Internal Revenue Code, for Federal income tax purposes.

SALARIED HEALTH CARE PROGRAM

Art. III

(2)  The provisions of this Section 8 apply with
respect to enrollment of certain dependents as
secondary enrollees under primary enrollees who
elect "self and spouse," "self and child
(children)," or "self and family" enrollment, in
accordance with Article III, Section 1(a)(1) of
the Program and to enrollment of sponsored
dependents under subsection (e) below.  Unless
specifically provided otherwise in the Program,
such a dependent has no individual or personal
right of enrollment, right to select an option
within the Program, or right to continue
coverages under the Program.

(3)  The Corporation shall have the sole right of
determining eligibility of a dependent,
consistent with the provisions of this Program.

(4)  A primary enrollee claiming initial or continuing
eligibility of a dependent shall be responsible
for informing the Corporation of any change in
status of the dependent which may affect
eligibility for coverage under the Program.  The
primary enrollee shall furnish whatever
documentation the Corporation requests or which
may be necessary to substantiate the claimed
eligibility of a dependent and the social
security number of each dependent who is eligible
for one.  Refusal or failure to furnish such
documentation when requested to do so, or to
furnish the social security number within a
reasonable period of time, shall result in denial
or withdrawal of eligibility for such dependent.

(5)  Unless otherwise provided, coverage may be
reinstated for a dependent who loses eligibility
in accordance with the provisions of this
Program, and who once again meets the
requirements for dependent eligibility.

The effective date of coverage will be the first
day of the month following the month in which a
valid enrollment form and any necessary or
requested supporting documentation is received by
the Corporation.  For purposes of establishing an
effective date under this provision only, if the
request for reinstatement of coverage is based on
"full-time" student status as provided in Art.
III, 8(c)(1)(ii), proof of enrollment as a full-
time student for one school term will be accepted

SALARIED HEALTH CARE PROGRAM

Art. III

subject to subsequent submission of proof that
such school term was completed.

(6)   When, as a result of oversight or error, an
eligible primary or secondary enrollee entitled
to coverage is not enrolled in a timely manner,
coverage may be provided retroactive to the date
of eligibility that would have been established
if proper processing had occurred.  However, the
retroactivity will not exceed 12 months from the
month in which the error or omission is
discovered, unless the error or omission is on
the part of the Corporation.

This retroactive enrollment provision shall not
apply to surviving spouses who are not entitled
to Corporation contributions for coverage.  Such
surviving spouses electing to continue coverages
on a self-paid basis must make such election as
stipulated in Article III, Section 7(a).  This
retroactive enrollment provision also shall not
apply to sponsored dependents, as discussed in
subsection (e) below.

(7)   The receipt of a benefit under the Delphi
Retirement Program for Salaried Employees as an
"alternate payee" in accordance with the
Retirement Equity Act of 1984 shall not serve to
entitle such recipient to coverages or
continuation of coverages under this Program.

(8)   Any dependent, including a spouse, acquired by a
retiree after retirement, will be limited to
coverage as a sponsored dependent as set forth in
subsection (e) below.  A dependent is not
"acquired" after retirement if the dependent's
relationship with the primary enrollee was
established prior to the primary enrollee's
retirement and has existed continuously
thereafter.  A child born after the primary
enrollee's retirement will be limited to coverage
as a sponsored dependent, unless such child was
conceived prior to retirement.

(9)   Provisions will be made for the enrollment and
administration of coverage for an individual
determined to qualify for coverage pursuant to a
Qualified Medical Child Support Order (QMCSO)
under the provisions of the Omnibus Budget
Reconciliation Act of 1993 (OBRA '93).

Art. III

(b)   Spouse

    (1)   The spouse of an eligible and enrolled employee
or retiree shall be eligible for coverage except
as stated in subsection (a)(8) above.  A
surviving spouse of an employee or retiree, as
defined in Section 7 above, may not have or add a
new spouse as a dependent.

    (2)   A spouse by common-law marriage shall be eligible
for coverage only to the extent such relationship
is recognized by the laws of the state in which
the employee or retiree is enrolled, and the
employee or retiree has met such requirements for
documentation of the status as may be necessary
by law and required by the Corporation.

    (3)   The effective date of coverage for a spouse shall
be the later of the effective date of coverage
for the employee or retiree, or the date of
marriage.  For a common-law spouse, the effective
date of coverage shall be the date of receipt by
the Corporation of a completed enrollment form
and any necessary or requested supporting
documentation.

    (4)   A spouse's eligibility for coverage shall cease
on the earlier of:

        (i)   the date the primary enrollee's coverage
ceases, except that, in the case of the
primary enrollee's death, coverage shall
cease on the last day of the month in which
the primary enrollee dies, unless the
spouse is eligible for coverage as a
surviving spouse as set forth in Section 7
of this Article, or

        (ii)   the date of the final decree of divorce.

(c)   Children

    (1)   Children of a primary enrollee, or of the spouse
of an eligible and enrolled employee or retiree,
shall be eligible for coverage if, as to each
child, all of the following criteria are met.

        (i)   Relationship.  The child must be the child
of the primary enrollee, or of an
employee's or retiree's spouse, by birth or
legal adoption.

SALARIED HEALTH CARE PROGRAM

Art. III

This requirement will be deemed to have been met for a child who was properly enrolled under the then applicable General Motors Salaried Health Care Program's "guardianship" or "principally supported child" provisions as of October 31, 1992, who has continued to be the primary enrollee's dependent since that time, and who has been continuously enrolled and has continuously satisfied the other eligibility criteria for children.

A child in the process of being adopted by a primary enrollee will be deemed to satisfy the relationship test when the primary enrollee takes physical custody of the child pursuant to the adoption procedure and the child resides with the primary enrollee, or on an earlier date if required under OBRA '93.

(ii) Age.  The child must not have reached the end of the calendar year in which the child becomes age 19, unless such child has been determined to be totally and permanently disabled or is a full-time student, as indicated below.

For the purposes of this subsection, "totally and permanently disabled" means having any medically determinable physical or mental condition which prevents the child from engaging in substantial gainful activity and which can be expected to result in death or be of long-continued or indefinite duration.

In case of dispute over the nature of the condition, the Corporation's Medical Director's decision shall be final.

This total and permanent disability feature is a continuation provision.  It does not apply to a child who is ineligible for coverage before the end of the calendar year in which age 25 is attained (e.g., the primary enrollee is not yet eligible for coverage).  It does not apply to a child who first becomes totally and permanently disabled after the end of the year in which age 25 is attained.  It does not apply to an individual who was eligible for coverage

SALARIED HEALTH CARE PROGRAM

Art. III

as a totally and permanently disabled child, who loses such eligibility (e.g., by marriage, by failing to satisfy the residency requirement or by failing to meet the definition of totally and permanently disabled) and, after the end of the calendar year in which age 25 is attained, again satisfies the criteria (e.g., divorces, returns home, or has a relapse or new disability).

A child who has reached the end of the calendar year in which such child turns age 19, has not reached the end of the calendar year in which such child turns age 25 and has not been identified as totally and permanently disabled, will satisfy this age requirement only if such child is a full-time student for at least one school term during the calendar year.  Coverage may be continued while the child continues to maintain such student status, but in no event beyond the end of the calendar year in which such child turns age 25.

For an otherwise eligible full-time student age 24 or older who has not reached the end of the calendar year in which such student turns 25, the child must be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree, as defined under Section 152 of the Internal Revenue Code, for federal income tax purpose.  This dependency requirement shall be waived with respect to a child (by birth or legal adoption) of a divorced employee or retiree until the end of the calendar year in which such child turns age 25, if the divorce decree, or order of the court of proper jurisdiction, or amendment of such decree or order, stipulates that such employee or retiree is legally responsible for providing health care coverage for such child.

(iii) Marital Status.  The child must be unmarried.

(iv) Residency.  The child must reside with the primary enrollee, as a member of such enrollee's household.  A child temporarily away from home while attending school will

SALARIED HEALTH CARE PROGRAM

Art. III

be deemed to meet this residency requirement.

The residency requirement also will be deemed to be met if the child is not a member of the primary enrollee's household, but the primary enrollee is legally responsible, pursuant to a court order, for the provision of health care for the child. However, if the legal responsibility is established pursuant to a paternity order or any other order which does not meet the requirements for a QMCSO under OBRA '93, the non-resident child must meet the dependency definition in subsection (a)(1), above.

(2)   An eligible surviving spouse may not enroll a child unless the child was eligible to be enrolled prior to the death of the employee or retiree or, in the case of a child born after the death of the employee or retiree, unless such child is the issue of the surviving spouse's marriage to the deceased employee or retiree, and was conceived prior to such employee's or retiree's death.

(3)   The effective date of coverage for a child shall be the later of the effective date of coverage for the primary enrollee, or in the case of:

(i)   A birth - the date of birth;

(ii)  A legal adoption - the date the adoptive parent(s) takes physical custody of the child pursuant to the adoption process, or an earlier date if required under OBRA '93; and

(iii) A stepchild - the date the child becomes a member of the employee's or retiree's household.

(4)   A child, as defined above, shall cease to be eligible for coverage as of:

(i)   the date of marriage of such child;

(ii)  the last day of the month in which the child ceases to meet the residency criteria of subsection (c)(1)(iv) above;

SALARIED HEALTH CARE PROGRAM

Art. III

(iii) the last day of the calendar year in which
the child becomes age 19, except in the
following cases:

Totally and Permanently Disabled Children -
coverage may be provided/continued for
calendar years beyond age 19 for a child
who is totally and permanently disabled, as
defined under subsection 8(c)(1)(ii) above;
however, eligibility shall cease as of the
last day of the month in which the child
ceases to meet such definition or fails to
satisfy other criteria for continuing
coverage (e.g.- the child marries);

Full-time Students Who Have Not Reached the
End of the Calendar Year in Which They Turn
Age 25 - coverage may be provided/continued
for calendar years beyond age 19 (but not
beyond the end of the calendar year in
which age 25 is attained) for a child who
is a full-time student; however,
eligibility shall cease as of the last day
of the month in which the primary enrollee
reasonably should know the child will not
maintain such status for at least one
school term during the calendar year;

(iv)   the date the primary enrollee's coverage
ceases, except that, in the case of the
primary enrollee's death, coverage for such
child shall cease on the last day of the
month in which the primary enrollee dies,
unless such child is eligible for coverage
as a dependent child of the surviving
spouse of such employee or retiree; or

(v)   the last day of the month in which the
child ceases to be dependent upon the
primary enrollee, for children whose
eligibility is being continued under the
"guardianship" or "principally supported
child" provisions of a prior Program.

(d) Same-Sex Domestic Partners and Their Children

(1)   Effective January 1, 2001, the eligible domestic
partner of an employee may be enrolled for
coverage.  To qualify for enrollment, the
employee and domestic partner must:

(i)    Be the same sex;

<u>SALARIED HEALTH CARE PROGRAM</u>

Art. III

> (ii)  Have shared a continuous committed,
> relationship for at least six months,
> intend to do so indefinitely and have no
> such domestic partner relationship with
> any other person;
>
> (iii) Reside in the same household;
>
> (iv)  Share responsibility for each other's
> welfare and financial obligations;
>
> (v)   Not be related by blood to a degree of
> kinship that would prevent marriage from
> being recognized under law;
>
> (vi)  Be over the age of 18, of legal age and
> legally competent to enter into a
> contract;
>
> (vii) Reside in a state where marriage between
> two persons of the same sex is not
> recognized as valid under law;
>
> (viii) Not be married to any other person

(2)  If the enrollee resides in a state that has
formal recognition of domestic partner
relationship, such recognition is required for
enrollment of the domestic partner.

(3)  The employee and the domestic partner will be
required to complete an affidavit attesting to
meeting the eligibility requirements and provide
any additional documentation necessary to support
the claimed eligibility.

(4)  An eligible domestic partner's child may be
enrolled if the child is dependent upon the
primary enrollee as defined in subsection (a)(1)
above and the child meets all of the Program's
eligibility provisions pertaining to children.

(5)  Neither a domestic partner nor his or her
children are eligible to be enrolled following
the primary enrollee's retirement.  However,
coverage for an eligible domestic partner, or his
or her child, enrolled prior to the primary
enrollee's retirement may be continued in
retirement.  Under no circumstances will the
continuation privileges afforded a domestic

partner exceed those of a similarly situated spouse.

(6)   If the primary enrollee and his or her domestic partner terminate the relationship, an opportunity will be provided to continue coverage on a basis comparable to that provided under applicable Federal laws (see Section 10 below).

(7)   In the event of the primary enrollee's death, a surviving domestic partner will be provided continuation opportunities comparable to a similarly situated surviving spouse.  Under no circumstances will the continuation privileges afforded a domestic partner exceed those of a similarly situated spouse.

(e)   Sponsored Dependents

Any dependent, including a spouse, acquired by a retiree after retirement, will be limited to coverage as a sponsored dependent.  A dependent is not "acquired" after retirement if the dependent's legal relationship with the primary enrollee was established prior to the primary enrollee's retirement and has existed continuously thereafter.

(1)   A primary enrollee (other than one classified as a Cooperative Student) may obtain core coverages (other than Extended Care Coverage) for certain dependents other than those specified in subsections (b) and (c) above.  Such dependents shall be limited to:

(i)    unmarried children of the primary enrollee or the primary enrollee's spouse who reside with the primary enrollee but who are ineligible for coverage as dependent children due to age,

(ii)   unmarried children residing with the primary enrollee and who are the children of individuals who themselves are eligible and enrolled for coverage as dependent children of the primary enrollee,

(iii)  unmarried children whose parents are both deceased, who reside with the primary enrollee and for whom the primary enrollee and/or the primary enrollee's spouse is the legal guardian pursuant to a court order,

SALARIED HEALTH CARE PROGRAM

Art. III

(iv) dependent parents of the primary enrollee
or primary enrollee's spouse, and

(v) a spouse or children acquired after
retirement as set forth in subsection
(a)(8) above.

Before becoming eligible for coverage, sponsored
dependents who are not citizens of the United
States must reside in the United States for one
full year, and must be legally entitled to remain
in the United States indefinitely.  Sponsored
dependents must be dependent upon the primary
enrollee as defined in subsection (a)(1) above.
They must be designated as sponsored dependents
on a valid enrollment form signed by the primary
enrollee.  The coverages shall be provided under
the Program option elected by the primary
enrollee.

(2) Coverages provided under this subsection for a
sponsored dependent enrolled at the time of an
employee's or retiree's death may be continued at
the option of the employee's or retiree's
surviving spouse while such surviving spouse is
eligible to continue, and is enrolled for,
coverages as provided in Section 7 of this
Article.  A surviving spouse may not add any new
sponsored dependents or add a previously enrolled
sponsored dependent who was removed from
coverage.

(3) The primary enrollee shall pay the full cost of
coverages under this subsection, and the
Corporation shall not contribute toward the cost
of health care coverages for any sponsored
dependents.

(4) The effective date of coverages for an eligible
sponsored dependent shall be the later of the
effective date of coverages for the primary
enrollee, or the first day of the month following
the month of receipt by the Corporation of a
completed enrollment form and any supporting
documentation as may be required by the
Corporation.  However, the effective date for a
sponsored dependent previously enrolled as such,
and whose coverages as a sponsored dependent were
discontinued, shall be the first day of the sixth
month following the month in which the
application for reinstatement is received.

SALARIED HEALTH CARE PROGRAM

Art. III

    (5)   Each sponsored dependent enrolled under an option
that requires deductibles or copayments shall be
subject to separate deductibles and copayments as
specified in Article II, Section 4.

    (6)   Coverage for a sponsored dependent shall cease on
the earliest of:

        (i)   the last day of the month in which the
person ceases to meet the eligibility
criteria set forth in subsection (e)(1)
above,

        (ii)  the last day of the month preceding the
month for which the required contribution
was due but not paid, and

        (iii) the date the primary enrollee's coverages
cease except that in the case of the
primary enrollee's death, coverage for such
sponsored dependent shall cease on the last
day of the month in which the primary
enrollee dies, unless the sponsored
dependent has coverages continued in
accordance with subsection (e)(2) above.

(f)   Cessation of Coverages for Dependents of Retirees who
attain Medicare Eligibility in the Normal Course

    The foregoing to the contrary notwithstanding,
cessation of coverages for secondary enrollees of a
retiree whose coverages ceased solely as a result of
the retiree attaining Medicare eligibility in the
normal course shall be as follows:

    (1)   A spouse's coverages will cease on the earlier
of:

        (i) the first day of the month during which the
spouse attains Medicare eligibility in the
normal course, or
        (ii) the final date of the divorce decree.

    (2)   A child's coverage will cease on the earlier of:

        (i) the first day of the month during which the
child attains Medicare eligibility in the
normal course, or
        (ii) the dates specified in Section 8,(c)(4)(i),
(ii), (iii) or (v), above.

2007

SALARIED HEALTH CARE PROGRAM

Art. III

(3) Cessation of coverages for a same-sex domestic
partner and their children will be on the same
basis as those of a similarly situated spouse or
similarly situated children.


Section 9. <u>Conversion Privilege</u>

(a)   Any former enrollee who is no longer eligible to
continue coverages under the Program may be offered an
opportunity to obtain other available coverage, on a
self-paid basis, from the carrier with which enrolled
at the time eligibility terminated.  Such conversion
privilege shall not apply to prescription drug,
hearing aid, vision, dental, or Extended Care
Coverages.

(b)   A former enrollee wishing to exercise this privilege
shall make application to the carrier within 30 days
of termination of eligibility under this Program.


Section 10. <u>Consolidated Omnibus Budget Reconciliation Act
(COBRA) Continuation</u>

The Consolidated Omnibus Budget Reconciliation Act of 1985
(COBRA), as amended, was implemented January 1, 1987 for salaried
enrollees.  COBRA provides continuation rights to certain
employees or dependents who would ordinarily lose eligibility for
coverage under this Program.

(a)   For purposes of COBRA, this Program is considered to
be a single plan offering core coverages and non-core
coverages, regardless of the coverage option available
to and/or chosen by the primary enrollee, and
regardless of the entity chosen by the Corporation to
administer such coverages on the Corporation's behalf.

(b)   The Corporation is responsible for providing
notifications, as required under COBRA, to "qualified
beneficiaries," as defined therein.  The Corporation
may delegate the administrative functions associated
with COBRA.  A qualified beneficiary is responsible
for providing notice to the Corporation within 60 days
of

(1)   divorce or legal separation,

(2)   the date an enrolled dependent ceases to qualify
as a "dependent child" as defined under Article
III, Section 8(c) of this Program,

SALARIED HEALTH CARE PROGRAM

Art. III

(3)   a Social Security Act determination of Title II
or XVI disability within 60 days of the
qualifying event, or

(4)   within 30 days of a Social Security
Administration determination that a qualified
beneficiary is no longer disabled.

Failure to comply with the above notification
requirement will result in the loss of eligibility for
the affected individual(s) under COBRA.

(c)   COBRA continuation coverage is available to employees
whose employment is terminated for any reason other
than gross misconduct.  Any employee separated as a
discharge will be considered to have been terminated
for gross misconduct.

(d)   The COBRA continuation privileges are available for up
to 18 months if coverage is lost due to:

(1)   termination of employment (voluntarily or
involuntarily) unless termination is due to gross
misconduct, or

(2)   reduction of hours (including leave of absence).

(e)   In the event a qualified beneficiary is determined by
the Social Security Administration to be disabled
within 60 days of the termination or reduction in
hours under Title II or XVI of the Social Security
Act, the COBRA continuation privileges are available
for up to 29 months if coverage is lost due to:

(1)   termination of employment (voluntary or
involuntary) unless termination is due to gross
misconduct, or

(2)   reduction of hours (including leave of absence).

(f)   COBRA continuation is available for up to 36 months
to:

(1)   spouses who lose coverage because of the
employee's or retiree's death or because of
divorce from the employee/retiree, and

(2)   dependent children who become ineligible under
Article III, Section 8(c) of the Program.

(g)   COBRA continuation is not available to sponsored
dependents, (except spouses or children acquired after

SALARIED HEALTH CARE PROGRAM

Art. III

retirement as referenced in Article III, 8 (e), nor to
individuals after they become covered under another
employer sponsored group health plan, if such coverage
commences after they have elected COBRA coverage
(unless, after December 31, 1989, the other employer
sponsored group health plan precludes coverage for a
pre-existing condition of the qualified beneficiary).
Similarly, COBRA continuation is no longer available
to individuals when they become enrolled in Medicare
under Title XVIII of the Social Security Act after
they have elected COBRA coverage.  In either case,
when COBRA coverage is not elected until after
coverage under the group plan or Medicare commences,
then COBRA coverage continues subject to all other
Program provisions.

(h)   The option to elect continued coverage under this
Program through COBRA provisions requires the enrollee
to self-pay at 102% (150% in certain cases) of the
full cost of elected coverage.

(i)   To the extent the Corporation makes alternative
continuation privileges ("Program Continuation")
available that do not satisfy all the requirements for
COBRA continuation coverage, enrollees shall have the
opportunity to elect either COBRA continuation
coverage or Program Continuation.  An election of
COBRA continuation coverage automatically will
terminate the enrollee's eligibility for Program
Continuation.

(j)   To the extent the Corporation makes Program
continuation privileges available that do satisfy all
of the requirements for COBRA continuation coverage,
such Program Continuation will be integrated with the
COBRA continuation coverage.

(k)   In the event a primary enrollee is entitled to elect
between COBRA continuation coverage and Program
Continuation, coverage will be continued beyond the
point coverage as an active employee or dependent of
an active employee ceases as if the primary enrollee
elected Program Continuation, subject to the
enrollee's fulfillment of all requirements of such
continuation.

If the primary enrollee subsequently elects COBRA
continuation during the election period described in
subsection (m) below, and pays any required
contribution, coverages will be adjusted retroactively
to provide the COBRA continuation.

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 72 of 217
SALARIED HEALTH CARE PROGRAM

Art. III

(l)   Unless advised otherwise by a COBRA qualified
      beneficiary, an election of Program Continuation by
      the primary enrollee shall be presumed to be an
      election for all other enrollees and/or qualified
      beneficiaries covered under such primary enrollee's
      coverage.

(m)   The election period for COBRA continuation begins on
      the date on which coverage would terminate due to a
      qualifying event and must be 60 days in length.
      However, the election period ends the later of 60 days
      from the qualifying event or 60 days from the actual
      notice to the qualified beneficiary.  Nothing in this
      provision relieves a qualified beneficiary from the
      obligations or implications of subsection (b) above.

(n)   In all cases, COBRA continuation coverage commences on
      the first day of the month following the month in
      which the qualifying event occurred.

(o)   COBRA continuation ceases on the earliest of:

      (1)   18 months from the date COBRA continuation
            coverage commences for employees whose employment
            has been terminated or reduced in hours; however,
            this may be extended up to 29 months (i.e., for
            an additional 11 months) for a qualified
            beneficiary who has been determined by the Social
            Security Administration to be disabled with a
            Title II or XVI disability at the time of the
            qualifying event and who remains disabled;

      (2)   36 months from the date COBRA continuation
            coverage commences for any other qualifying
            event;

      (3)   the first of the month for any month in which a
            required contribution is due but not paid;

      (4)   the date a qualified beneficiary becomes covered
            under another employer-based health care plan
            (for qualifying events before January 1, 1990);

      (5)   the date a qualified beneficiary is covered under
            another employer-based health care plan (for
            qualifying events after December 31, 1989) which
            does not preclude coverage for a pre-existing
            condition of the qualified beneficiary;

      (6)   the date a qualified beneficiary becomes eligible
            for Medicare; and

<u>SALARIED HEALTH CARE PROGRAM</u>

Art. III

      (7)  the date coverage is terminated for all
           employees.

(p)  Conversion contracts, as described in Section 9,
     above, are available to COBRA continuation coverage
     enrollees at the time their continuation period is
     exhausted.

SALARIED HEALTH CARE PROGRAM

Art. IV

ARTICLE IV

DEFINITIONS

Unless otherwise indicated, as used in this Program:

1.   "active service" or in "active service" - means at work
and receiving compensation for periods of work
scheduled by the Corporation, or otherwise scheduled to
work but absent due to,

   (a)   attendance at school as a Delphi Fellow, Deferred
Employment Graduate Study Fellow, or as a Delphi
sponsored cooperative student,

   (b)   vacation time authorized in advance,

   (c)   a specified holiday,

   (d)   "compensable disability" leave of absence,

   (e)   short-term casual absence, whether scheduled or
unscheduled, under circumstances where the
employee is entitled to receive full or partial
compensation,

   (f)   bereavement, jury duty, or short-term military
leave of absence under circumstances where the
absence is authorized in advance and the employee
is entitled to receive full or partial
compensation from the Corporation for the day(s)
of absence, or

   (g)   effective January 1, 2002, any disability leave
of absence.

An employee is not in active service if the employee is
absent every scheduled work day during a month, for
reasons other than those specified above, whether or
not such absence is excused, if the employee is not
entitled to receive compensation for such absent time.

An employee is not in active service in any full month
in which such employee is not scheduled to work due to
any leave of absence (other than short-term military
leave referred to in subsection (f) above), regardless
of whether the employee may be entitled to some
compensation for any day(s) during such month.

SALARIED HEALTH CARE PROGRAM

Art. IV

2.    "Authorized Employee"- means a Delphi employee whose
duties require access to PHI for purposes of
administering the Program, including: the Privacy
Official/Director, Health Care; Manager, Health Care;
Analyst, Health Care; Coordinator, Health Care; Staff
Assistant, Health Care; Executive Director, Employee
Benefits; Administrative Assistant, Employee Benefits;
members of the Delphi Employee Benefit Plans Committee
("EBPC"); personnel specifically designated as an
Authorized Employee by the Privacy Official or his
delegate (e.g., finance staff personnel, audit staff
personnel); and in-house counsel to Employee Benefits.

3.    "benefit" - means a payment made, in accordance with
the Program provisions, to an enrollee, or to a
provider on behalf of an enrollee.

4.    "carrier" - means any entity by which Program coverages
are administered or benefits are paid. The term
includes, but is not limited to, the following types of
entities:

(a)    an insurance company,

(b)    a Blue Cross or Blue Shield Plan,

(c)    a dental plan,

(d)    a group practice plan or health maintenance
organization,

(e)    a preferred provider organization,

(f)    Delphi Corporation,

(g)    a non-governmental administrative services
organization.

5.    "cost of coverages" means the Corporation's reasonable
estimate of the monthly amount required to provide
coverages for an individual or group of individuals,
established on an actuarial basis taking into account
such factors as enrollment classification [self only,
self and spouse, self and child (children), self and
family, spouse only, spouse and child (children), child
(children)], health care option (BMP, EMP, CHSP, POS,
or HMO), scope of coverages (what services are
covered), regional cost differences and administrative
costs.  It includes both the Corporation contribution
and any primary enrollee contribution(s), as required
under the Program.  The cost is accrued and reported on

a monthly basis.  In the case of coverages delivered
through certain pre-payment agencies, such as a health
maintenance organization or an alternative dental plan,
it means the total monthly premium required to provide
such coverages.

6.  "coverage" means a specified set of health care
services or expenses (i.e., "covered services or
expenses") which may be incurred by an enrollee, and
for which benefits may be paid under the Program
provisions.  The categories of coverage include "core"
coverages (hospital, surgical, medical, hearing aid,
prescription drug, mental health and substance abuse,
and Extended Care Coverage) and "non-core" coverages
(dental and vision).

Not every health care expense incurred by an enrollee
falls within the Program coverages.

7.  "covered service" means a service that is included
within the range of services identified in the Program,
and that meets all Program requirements to be eligible
for payment of benefits.  A service within the range of
those identified in the Program (e.g., a diagnostic
radiology service) but which does not meet all of the
specifications to be eligible for benefit payment
(e.g., if it is an experimental service or if it is not
medically necessary) is considered a non-covered
service.

8.  "effective date" means the date on which a given
coverage begins for an enrollee, as determined by the
Corporation, consistent with the Program provisions.

9.  "electronic protected health information" or "ePHI"
means electronic Protected Health Information that is
created, received, maintained or transmitted by
electronic media by or on behalf of the Program.

10. "employee" –

(a)  means certain persons employed in the United
States by the Corporation or by a wholly-owned or
substantially wholly-owned domestic subsidiary
thereof, under policies established by the
Corporation and set forth in administrative
manuals addressing such policies, on a salaried
or other basis, herein referred to as "salaried
employees", includes:

(1)  "Salaried full time employee";

SALARIED HEALTH CARE PROGRAM

Art. IV

    (2)    "flexible service" [see Article II, 4(h)(2) for a description of coverages];

    (3)    "Delphi Fellows";

    (4)    "Cooperative Students" - hired prior to January 1, 1999[see Article II, 4(h)(3) for a description of coverages];

    (5)    "U.S. Expatriates" - [see Article II, 4(h)(1) for a description of coverages]; and

    (6)    certain other foreign nationals who are deemed by the Corporation to be employees eligible for benefits under the Program [see Article II, 4(h)(1)for a description of coverages].

(b)    The term "employee" shall not include:

    (1)    employees represented by a labor organization which has not signed an agreement making the Program applicable to such employees;

    (2)    employees of any directly or indirectly wholly-owned or substantially wholly-owned subsidiary of the Corporation unless specifically included by the Delphi Corporation Board of Directors (for example, the Board of Directors has specifically approved the inclusion of Delco Electronics Corporation);

    (3)    "leased employees" as defined under Section 414(n) of the Internal Revenue Code;

    (4)    individuals employed on a "temporary", "part-time", or "per diem" basis;

    (5)    individuals hired as a high school cooperative student, university intern, or university cooperative student hired on or after January 1, 1999;

    (6)    non-employee members of the board of directors; or

    (7)    contract employees, bundled-services employees, consultants, individuals who

SALARIED HEALTH CARE PROGRAM

Art. IV

have represented themselves to be
independent contractors, persons who the
Corporation does not consider to be
employees, or similarly situated
individuals regardless of whether the
individual is a common law employee of the
Corporation.  The purpose of this provision
is to exclude for participation in the
Program all persons who may actually be
common law employees of the Corporation,
but who are not paid as though they were
employees of the Corporation regardless of
whether that exclusion is correct.

(c)   To the extent a labor organization has signed an
agreement with the Corporation, and under such
agreement certain employees represented by such
labor organization are excluded from the Program
in whole or in part, such represented employees
shall be regarded as employees for the purposes
of this Program only to the extent required to
comply with such agreement.

11.   "employer" means Delphi Corporation.

12.   "enrollee" means a person who is eligible for
coverages under the Program and who is enrolled for
such coverages.  Depending upon the context, an
enrollee may be a "primary enrollee" or a "secondary
enrollee."  The determination of eligibility in a
manner consistent with the Program provisions is the
responsibility of the employer.

"primary enrollee" means an employee, retiree or
surviving spouse eligible in such individual's own
right.

"secondary enrollee" means a spouse, child or
sponsored dependent entitled to coverage by virtue of
the individual's relationship to a primary enrollee.

13.   "Medicare" means the Federal program established by
Title XVIII of Public Law 89-97, as amended, which
provides health insurance for the aged and disabled.
It includes Part A (Hospital Insurance Benefit for the
Aged and Disabled), Part B (Supplementary Medical
Insurance Benefit for the Aged and Disabled) and,
effective January 1, 2006, Part D (Prescription Drug
Benefits).

14. "Plan" means a particular coverage or group of
    coverages under the Program; the "Medical Plan" is
    comprised of that portion of the Program providing
    Appendix A (hospital, surgical, medical, prescription
    drug, hearing aid, etc.) and Appendix B (mental health
    and substance abuse) coverages; the "Dental Plan" is
    that portion of the Program providing Appendix C
    coverage; and the "Vision Plan" is that portion of the
    Program providing Appendix D coverage.

15. "Plan Sponsor" – means Delphi Corporation in its
    capacity of sponsoring the Program by engaging in
    activities including, but not limited to,
    establishment, maintenance, modification, and funding
    of the Program.

16. "Protected Health Information" – as defined by the
    Health Insurance Portability and Accountability Act
    of 1996 (HIPAA), means information created or received by
    a health plan, health care provider, or health care
    clearinghouse that relates to the past, present, or
    future physical or mental health condition of an
    individual; the provision of health care to an
    individual; or the past, present or future payment for
    the provision of health care to an individual. In
    addition, the information either identifies the
    individual, or there is a reasonable basis to believe
    the information can be used to identify the
    individual. References to PHI are to be read to refer
    to "ePHI" where appropriate in context.

17. "provider" means a physician, hospital, or other
    approved facility, agency or individual who is
    qualified to render service(s) or furnish materials
    under this Program.

18. "reasonable and customary charge" as it relates to
    covered expenses, unless otherwise specified, means
    the actual amount a provider charges for such services
    rendered or materials furnished, but only to the
    extent that the amount is reasonable, as determined by
    the carrier, taking into consideration, among other
    factors, the following:

    1.  the usual amount which the individual provider
        most frequently charges the majority of patients
        or customers for a similar service rendered or
        materials furnished;

    2.  the prevailing range of charges made in the same
        geographic area by providers with similar

SALARIED HEALTH CARE PROGRAM

Art. IV

training and experience for the service rendered
or materials furnished; and

3.    unusual circumstances or complications requiring
additional time, skill, and experience in
connection with the particular service rendered
or materials furnished.

The carrier is responsible for determining the
appropriate reasonable and customary charge for a
given provider, service or material.  The carriers
shall have discretionary authority to interpret,
apply and construe this provision of the Program.
The determination by the carrier as to the reasonable
and customary charge shall be final and conclusive,
and shall be given full force and effect unless it is
determined by the Program Administrator to have been
contrary to the Program provisions or it is proven
that the determination was arbitrary and capricious.

As used in this Program, reasonable and customary also
refers to the forms and/or amount of payment used by
carriers and preferred provider or similar
organizations to reimburse participating or contracted
providers for covered services.

19.    "service" or "length of service" – means that period
of employment with the Delphi Corporation and General
Motors Corporation which commences with the service
date and is considered unbroken by the Corporation as
determined by its salaried personnel policies and
procedures.  Service date shall include an adjusted
service date determined in accordance with the
Corporation's salaried policies and procedures.

20.    "Summary Health Information" – means information that may
be individually identifiable health information, and
that summarizes the claims history, claims expenses, or
type of claims experienced by individuals for whom a
plan sponsor has provided health benefits under a group
health plan, and which has been de-identified, except
that the geographic information need only be aggregated
to the level of a five-digit zip code, if such
aggregation does not identify an individual.

SALARIED HEALTH CARE PROGRAM

Art. V

ARTICLE V

SPECIAL BENEFIT

Section 1. Eligibility for the Special Benefit

(a) In order to be eligible for a Special Benefit under this Article V, an individual must be eligible for Corporation contributions for health care (in accordance with Article III, 5(d) of the Program) and must be:

(1) an employee eligible for Extended Disability Benefits under the Delphi Life and Disability Benefits Program for Salaried Employees, or

(2) a retired employee (other than a deferred vested retiree) who retired on or after October 1, 1979, or

(3) a surviving spouse (but not the surviving spouse of a former employee eligible for a deferred retirement benefit, or a surviving spouse or surviving divorced spouse eligible for a pre-retirement survivor benefit under Part A, Article I, Section 5(j) of the Delphi Retirement Program for Salaried Employees);

and must be:

(4) age 65 or older, or

(5) if under age 65, enrolled in Medicare Part B;

(6) receiving a monthly retirement benefit under Article 1 of Part A of the Delphi Retirement Program for Salaried Employees, or

(7) receiving a monthly Extended Disability Benefit under the Delphi Life and Disability Benefits Program for Salaried Employees (or eligible for such a benefit but not receiving it due to reductions under that Program).

(b) Neither an employee who retires from the status of a Flexible Service Employee, a Cooperative Student or an Expatriate employee, nor such a person's surviving spouse, is eligible for a Special Benefit.

SALARIED HEALTH CARE PROGRAM

Art. V

Section 2.   Amount of the Special Benefit

(a)   Subject to subsections 2(b) and (c), below, an
individual identified in subsection 1(a) above, shall
be eligible to receive a monthly Special Benefit equal
to the lesser of the generally applicable Medicare Part
B premium in effect as of January 1 of the calendar
year, or $76.20.   Such amount may be adjusted by the
Corporation from time to time.

(b)   Retirees and surviving spouses eligible for Medicare
Part B coverage must be enrolled in Medicare Part B as
a condition for receipt of the Special Benefit.

(c)   Any recipient who is enrolled in Medicare Part B
coverage and discontinues such coverage will have the
Special Benefit discontinued for periods during which
Medicare Part B enrollment is not maintained.

Section 3.   Payment of the Special Benefit

(a)   Payment shall commence on the earlier of:

(1)   the first day of the month following the month
during which age 65 is attained, [subject to the
provision set forth in subsection 2(b) above], or

(2)   the first day of the month in which an otherwise
eligible individual under age 65 becomes enrolled
for Medicare Part B.

Individuals under age 65 must make application to the
Corporation on a form provided for this purpose.

(b)   Payment of the Special Benefit will be made concurrent
with a monthly retirement or Extended Disability
Benefit payment and for the same period.   In the event
an eligible employee receives no monthly Extended
Disability Benefit payment because of reductions under
the Delphi  Life and Disability Benefits Program for
Salaried Employees, a Special Benefit will be paid for
that month.

(c)   Not more than one Special Benefit payment shall be made
to any individual for any one month under this Program.

(d)   No Special Benefit payment shall be made to any
individual under age 65 for any month in which such

SALARIED HEALTH CARE PROGRAM

Art. V

individual is not enrolled for Medicare Part B
coverage.

(e)   In the event the individual does not inform the
Corporation of Medicare enrollment in a timely manner,
retroactive payment of the Special Benefit will be
limited to 12 months.

SALARIED HEALTH CARE PROGRAM

App. A

APPENDIX A

HOSPITAL, SURGICAL, MEDICAL,
PRESCRIPTION DRUG AND HEARING AID COVERAGES

I.   Definitions

As used herein:

A.   "accidental injury" means a bodily injury such as a
     strain, sprain, abrasion, contusion or other condition
     which occurs as the result of a traumatic incident such
     as, but not limited to:  ingestion of poison; overdose
     of medication, whether accidental or intentional;
     allergic reaction resulting from trauma, such as bee
     stings or insect bites; inhalation of smoke, carbon
     monoxide, or fumes; burns, frostbite, sunburn, and
     sunstroke; and attempted suicide.

B.   "ambulance services" means medically necessary
     transportation and life support services furnished
     within the Program provisions to sick, injured or
     incapacitated patients by a licensed ambulance provider
     meeting Program standards, utilizing ambulance vehicles
     and personnel recognized as qualified to perform such
     services at the time and place where rendered.

C.   "approved" - see "participating"

D.   "benefit period" means a period of time during which an
     enrollee is entitled to receive certain covered services
     which are subject to Program maximums (see App. A, II.B.
     and App. B, II.B.).  The services which may be subject
     to maximums include, but are not limited to, inpatient
     hospital services (with special provisions for pulmonary
     tuberculosis treatment under this Appendix, and mental
     health and substance abuse treatment under Appendix B),
     admissions to skilled nursing facilities (whether under
     this Appendix or Appendix B), treatment under
     psychiatric partial hospitalization programs (and
     substance abuse  partial hospitalization programs),
     substance abuse halfway house programs (under Appendix
     B) and hospice care.

E.   "covered expenses" means the reasonable and customary,
     preestablished, or contracted charges incurred for
     covered materials and services, as described in Section
     III of this Appendix, provided or rendered to or for an
     enrollee for treatment of illness or injury, and
     performed by a provider or prescribed by a physician in
     accordance with the provisions of this Program.  Such

SALARIED HEALTH CARE PROGRAM

App. A

covered expenses fall in the following areas of coverage or categories of expenses:

1.   hospital expenses;

2.   skilled nursing facility expenses;

3.   physical, speech and functional occupational therapy and cardiac rehabilitation expenses;

4.   home health care expenses;

5.   medical, surgical expenses;

6.   ambulance service expenses;

7.   prescription drug expenses;

8.   hearing aid expenses;

9.   durable medical equipment and prosthetic or orthotic appliance expenses; and

10.   hospice expenses.

F.   "custodial" or "domiciliary" care or services means the type of care or service which, even if ordered by a physician, is primarily for the purpose of meeting personal needs of the patient or maintaining a level of function (as opposed to specific medical, surgical or psychiatric care or services designed to reduce the disability to the extent necessary to enable the patient to live without such care or services).  Custodial or domiciliary care generally does not require the continuing attention of medically skilled personnel, and usually can be provided by aides or other persons withlimited training, operating without direct medical supervision.  It may include, but is not limited to, help in getting in and out of bed, walking, bathing, dressing, toiletting, meal preparation and eating, taking of medications, ostomy care, bed baths, hygiene or incontinence care, checking of routine vital signs, routine dressing changes and routine skin care.  The determination as to the nature of the care is not a function of the setting (e.g., hospital, skilled nursing facility, nursing home, another institutional setting or the patient's home) or of the professional status of the person (e.g., physician, nurse, therapist or aide) rendering the service, but of the severity of the patient's illness and the intensity of services being performed.  The carriers or Utilization Review Organization, as appropriate shall have discretionary authority to interpret, apply and construe this

SALARIED HEALTH CARE PROGRAM

App. A

provision of the Program.  The carrier's (or Utilization Review Organization's) determination as to the nature of the care being provided shall be given full force and effect unless it is determined by the Plan Administrator that the determination was inconsistent with the Program provisions or arbitrary and capricious.

G.    "domiciliary" - see "custodial"

H.    "drugs, biologicals, and solutions" means medicinal agents which are approved for commercial distribution by the Federal Food and Drug Administration and are legally prescribed for the treatment of an illness or injury.

I.    "durable medical equipment" means equipment which is able to withstand repeated use, is primarily and customarily used to serve a medical purpose, and is not generally useful to an enrollee in the absence of illness or injury.

J.    "freestanding outpatient physical therapy facility" means a facility, separate from a hospital, which provides outpatient physical therapy services.  Such facilities must meet Program standards and be approved by the local carrier.

K.    "functional occupational therapy" - see "physical therapy"

L.    "home health care" means care or services provided in the home for a patient whose condition does not warrant care in an institutional setting (such as a hospital or skilled nursing facility).  The care/services may be skilled or unskilled in nature.

M.    "home health care agency" means a centrally administered agency providing physician-directed nursing and other paramedical services to patients at home.  A home health care agency must meet Program standards and be approved by the local carrier.

N.    "hospice" means a program of medical and non-medical services provided for terminally ill enrollees and their families through agencies which administer and coordinate the services.  A hospice program must meet Program standards and be approved by the local carrier.

O.    "hospital" means a facility which provides diagnostic and therapeutic services on a continuous inpatient basis for the surgical, medical, or psychiatric diagnosis, treatment, and care of injured or acutely sick persons.

SALARIED HEALTH CARE PROGRAM

App. A

These services are provided by, or under the supervision of, a professional staff of licensed physicians and surgeons.  A hospital continuously provides 24 hours-a-day nursing service by registered nurses.  A rehabilitation institution shall be considered to be a hospital if the institution is approved as such under this Program.  A hospital must meet all applicable local and state licensure and certification requirements and be accredited as a hospital by state or national medical or hospital authorities or associations.

A hospital is not, other than incidentally, a place for custodial, convalescent, pulmonary tuberculosis, rest or domiciliary care; an institution for exceptional children; an institution to which enrollees may be remanded by the judicial system; an institution for the treatment of the aged or substance abusers; or a skilled nursing facility or other nursing care facility.  It does not include a health resort, rest home, nursing home, convalescent home, or similar institution.

P.    "medical appropriateness" means that the medically necessary service, care, treatment or supply is the type, level and setting considered the most appropriate based on accepted standards of practice in the United States for the patient's condition.

Q.    "medical emergency" means a permanent health threatening or disabling condition, other than an accidental injury, which requires immediate medical attention and treatment.

The condition must be of such a nature that severe symptoms occur suddenly and unexpectedly and that failure to render treatment immediately could result in significant impairment of bodily function, cause permanent damage to the enrollee's health, or place such enrollee's life in jeopardy.  The enrollee's signs and symptoms verified by the treating physician at the time of treatment, and not the final diagnosis, must confirm the existence of a threat to the enrollee's life or bodily functions.  The carriers shall have authority to construe, interpret and apply this provision of the Program.  The carrier's exercise of this authority shall be given full force and effect unless it is determined by the Plan Administrator to be inconsistent with the Program provisions or arbitrary and capricious.

R.    "medical necessity" means that the need is present for the services, care, treatment or supplies based on accepted standards of medical practice in the United States for the treatment of any injury, illness or pregnancy.  Determinations of the Control Plan or

SALARIED HEALTH CARE PROGRAM

App. A

Utilization Review Organization, as appropriate, as to medical necessity and the accepted standards of medical practice are based on factors which include, but are not limited to:  scientific data (such as reported controlled studies), information from local and national medical, professional and insurance societies, organizations, committees and bodies; and approvals and policies of the Food and Drug Administration, the Department of Health and Human Services and other Federal agencies.  The Control Plan or Utilization Review Organization, as appropriate, shall have discretionary authority to interpret, apply and construe this provision of the Program.  The Control Plan's or the Utilization Review Organization's exercise of this authority shall be given full force and effect unless it is determined by the Plan Administrator to have been inconsistent with the Program provisions or arbitrary and capricious.

S.   "non-physician practitioners" means individuals other than physicians who are legally qualified and licensed to perform certain health care services.  The following categories of non-physician practitioners may be eligible for reimbursement for services within their area of expertise.  To be eligible for reimbursement, they must meet Program standards (including eligibility for reimbursement by Medicare for Medicare-eligible patients) and be approved by the carrier.

1.   "certified registered nurse anesthetist" means a registered nurse trained in the administration of anesthetics.

2.   "physical therapist" means an individual trained in the evaluation and rehabilitation of injured or disabled enrollees through non-medical and non-surgical measures.

3.   "functional occupational therapist" means an individual trained in the restoration of a specified level of function of injured or disabled enrollees through non-medical and non-surgical measures.

4.   "speech therapist" means an individual trained in the correction of speech and language disorders through non-medical and non-surgical measures.

5.   "certified  nurse mid-wife" means a registered nurse trained to provide obstetrical services who is legally qualified and registered, certified and/or licensed.

SALARIED HEALTH CARE PROGRAM

App. A

T.    "orthotic appliance" means an external device intended
to correct any defect of form or function of the human
body.

U.    "participating" or "approved" means any hospital,
skilled nursing facility, outpatient physical therapy
facility, home health care agency, physician, or other
provider of health care services which, at the time an
enrollee receives services included under this Program,
has entered into a contract or agreement with a carrier
to provide those health care services in accordance with
this Program.  Such contract or agreement shall include
a provision that the provider accepts the amount of
covered expense, as determined by the carrier, as
payment in full (unless otherwise provided).  A
physician who is not a participating physician may
participate for individual claims.

V.    "physical therapy" and/or "functional occupational
therapy" mean therapy directed toward improving or
restoring the level of musculoskeletal function lost due
to illness or injury, to the development of new function
attainable following surgery, or, if for a chronic or
congenital condition, to significantly improve the
condition in a reasonable and predictable period of
time. Physical therapy generally pertains to large
muscle use and functional occupational therapy to fine
motor activities.

W.    "physician" means a doctor of medicine (M.D.) or
osteopathy (D.O.) legally qualified and licensed to
practice medicine or osteopathic medicine and/or perform
surgery at the time and place services are rendered or
performed.  As used herein, physician shall also include
the following categories of limited-practice
professionals who are legally qualified and licensed to
practice their specialties at the time and place
services are performed, and who render specified
services which they are legally qualified to perform.

1.    "dentist" means a doctor of dental surgery (D.D.S.)
or a doctor of medical dentistry (D.M.D.) whose
scope of practice is the diagnosis, prevention and
treatment of diseases of the teeth and related
structures.  Such services are provided for under
the dental coverage (see App. C of the Program).
However, certain services of a dentist may be
covered under this Appendix when provided in
accordance with App. A, III.E.3.a.(2), or when
performed in response to a medical diagnosis and
when Program standards are met.  A dentist also may
prescribe medications which may be covered under

SALARIED HEALTH CARE PROGRAM

App. A

the prescription drug coverage (see App. A, III.G.).

2.   "podiatrist" means a doctor of podiatric medicine (D.P.M.) or a doctor of surgical chiropody (D.S.C.) whose scope of practice is the diagnosis, prevention, and treatment of ailments of the feet. Services of podiatrists, relating to the foot (including the ankle), may be covered under the surgical and medical coverages (see App. A, III.E.). A podiatrist also may prescribe medications which may be covered under the prescription drug coverage (see App. A, III.G.).

3.   "chiropractor" means a doctor of chiropractic (D.C.) whose scope of practice is the diagnosis and treatment of subluxations or misalignments of the spinal column and related bones and tissues which produce nerve interference. Services of chiropractors which may be covered are limited to diagnostic radiological services (see App. A, III.E.3.j.) and emergency first aid (as set forth in an administration manual published by the Control Plan), both pertaining to the spine and related bones and tissues.

Under this Program, a chiropractor may not prescribe medications or perform invasive procedures or incisive surgical procedures, provide outpatient physical therapy services, nor perform physical examinations not related to the spine and related bones and tissues.

X.   "private duty nursing" means care or services provided by a nurse pursuant to a contract with a patient and/or a patient's family/personal representative. The services may be skilled or unskilled, therapeutic or custodial in nature and may be provided in any setting. Generally, the care contracted for is in excess of the care provided by an institution (such as a hospital or skilled nursing facility) or the part-time/intermittent/skilled care provided by a home health care agency.

Y.   "private room" means a room containing one bed.

Z.   "Program standards" means criteria established by the Control Plan (and approved by the Corporation) for approval of providers or for benefit payment. At a minimum, providers must meet applicable accreditation, licensing and credentialing requirements and be qualified to render services or furnish materials under this Program. In the case of provider approval,

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 91 of 217
SALARIED HEALTH CARE PROGRAM

App. A

standards also may include, but are not necessarily limited to, such matters as approval for Medicare reimbursement and acceptance of Medicare assignment and/or Program reimbursement as payment in full.  In the case of benefit payment, standards may include, but are not necessarily limited to, such matters as the service or item being approved by Medicare and/or the service or item being delivered or prescribed in response to particular diagnoses.  Local carriers shall be responsible for establishing whether local providers conform to such standards, or for obtaining approval of exceptions through the Control Plan.

AA.   "prosthetic appliance" means an artificial device which replaces an absent part of the body, or which aids the performance of a natural function of the body without replacing a missing part.

BB.   "rehabilitation care" means services within an acute care hospital or skilled nursing facility for intensive rehabilitation through a multidisciplinary, coordinated team approach.  Such care is provided on an inpatient basis for patients found to have significant functional disability resulting from the recent onset of an acute condition (such as a broken hip or a stroke) or exacerbation of a chronic condition (such as rheumatoid arthritis), where there is a reasonable expectation for significantly increased function as a result of aggressive, inpatient, multi-modality rehabilitation services.

CC.   "semiprivate room" means a room containing two beds.

DD.   "service" means any care or procedure, as listed and limited herein, which is provided for diagnosis or treatment of disease, injury or pregnancy and which is based on valid medical need according to accepted standards of medical practice.  Certain types of care or procedures may be excluded as covered services under this Program.

05-44481-rdd    Doc 16424-6    Filed 03/05/09    Entered 03/05/09 20:11:43    Trial
Exhibit 8    Pg 92 of 217
SALARIED HEALTH CARE PROGRAM

App. A

EE.   "skilled nursing care" means care or services which are
      prescribed by a physician and furnished by a licensed
      registered nurse (RN) or licensed practical nurse (LPN).
      The services may be provided on a continuous (as in a
      hospital or skilled nursing facility) or on an
      intermittent/part-time basis.  The patient must be under
      treatment and/or convalescing from an illness or injury
      which requires ongoing evaluation and adjustment of
      care. The nature of the service and skills required for
      safe and effective delivery, rather than the patient's
      medical condition, determine whether the service is
      skilled.

      Examples include, but are not limited to:
      administration of intravenous fluids and medications;
      suctioning; dressing changes for major post-operative
      wounds and dressing changes for infected lesions which
      require irrigation and/or medication and/or sterile
      dressings; catheterizations; ventilator care; cardio-
      pulmonary assessments; and colostomy/cystostomy care.
      The carriers shall have discretionary authority to
      interpret, apply and construe this provision of the
      Program.  The carrier's determination as to the nature
      of care being provided shall be given full force and
      effect unless it is determined by the Plan Administrator
      to have been inconsistent with Program provisions or
      arbitrary and capricious.

FF.   "skilled nursing facility" means a facility providing
      convalescent and long-term illness care with continuous
      nursing and other health care services by, or under the
      supervision of, a physician and a registered nurse.  The
      facility may be operated either independently or as part
      of an accredited general hospital.  A skilled nursing
      facility must meet Program standards and be approved by
      the local carrier.

GG.   "special care unit" means a designated unit within a
      hospital (such as cardiac care, burn care, or intensive
      care unit) that concentrates all necessary types of
      equipment together with skilled nursing and supportive
      services needed for care of critically ill patients and
      is recognized as such by the carrier.

HH.   "speech therapy" means therapy to restore the functional
      loss of speech resulting from an organic medical
      condition.

II.   "therapeutic care" means specific and definitive
      surgical, medical, psychiatric or other care provided to
      a patient whose condition continues to improve due to
      the treatment being received.  It is provided with the
      expectation that the patient's level of disability will

SALARIED HEALTH CARE PROGRAM

App. A

be reduced, within a reasonably predictable period of time, to enable the patient to function without such care. The improvement must be observable and documented by objective measurement. If a patient's condition stabilizes and further improvement is not reasonably predictable, continuing care will be considered maintenance in nature. The carrier's determination as to the nature of the care shall be given full force and effect unless it is determined by the Plan Administrator to have been contrary to the Program provisions or arbitrary and capricious.

JJ. "Utilization Review Organization" means an organization retained to perform certain utilization review and utilization management functions, including but not limited to predetermination, concurrent and retrospective utilization reviews.

II. <u>Terms and Conditions</u>

A. Payment of Benefits

1. Benefits will be payable, subject to the provisions of this Program, when an enrollee incurs a covered expense.

2. Under the Program, benefits for certain covered services are payable only if approved by the carrier and/or if furnished by approved providers, when applicable. If such approval is not obtained, or if such providers are not utilized, benefits for such services may be reduced or eliminated. Examples include, but are not limited to, failure to comply with the predetermination requirements or failure to utilize panel providers.

B. Benefit Period Provisions

1. An enrollee is entitled to a maximum of:

a. 365 days of covered inpatient hospital services for each continuous period of hospital confinement or for successive periods of confinement within a benefit period; however,

(1) the inpatient treatment of pulmonary tuberculosis is limited to 45 days of the benefit period; and

(2) the inpatient treatment of mental disorders and substance abuse (as set

SALARIED HEALTH CARE PROGRAM

App. A

    forth in Appendix B) is limited to 45
days of the benefit period;

b.    210 days (lifetime maximum) of hospice care;
and

c.    two days of inpatient skilled nursing facility
care for each remaining day of inpatient
hospital care within the benefit period, to a
maximum of 730 days for each continuous period
of confinement or for successive periods of
confinement within a benefit period.  Each day
of inpatient hospital care within a benefit
period reduces by two the number of days of
care available for skilled nursing facility
services.  Use of days of care in a skilled
nursing facility does not reduce the number of
days of inpatient hospital care.

2.    Benefit periods for physician services and medical
care related to hospital inpatient admissions and
skilled nursing facility admissions are related to
or may be determined concurrent with the benefit
periods for facility services as noted below:

a.    For conditions other than pulmonary
tuberculosis, an enrollee is entitled to
coverage for medical care for the duration of
a hospital or skilled nursing facility
admission.

b.    Coverage of medical care for pulmonary
tuberculosis is limited to 45 days for the
treatment of tuberculosis for each continuous
period of confinement or for confinements
separated by less than 60 days.

3.    Benefit periods may be renewed, subject to the
following:

a.    To be eligible for further benefits under each
of the subsections, there must be a separation
of 60 days between periods of hospitalization
for any reason.  For example, if an enrollee's
initial inpatient admission for mental health
treatment exhausts the 45-day maximum and is
separated by 60 days from a second admission
for mental health treatment, but the person
had been hospitalized for other reasons during
the intervening period, the second mental
health admission would not be covered.

    2007

SALARIED HEALTH CARE PROGRAM

App. A

b.    A new benefit period begins only when the
enrollee has been out of care (as described
below) for a continuous period of 60 days.
Accordingly, there must be a lapse of at least
60 consecutive days between the date of the
enrollee's last discharge from any hospital,
skilled nursing facility, residential
substance abuse treatment facility, or any
other facility to which the 60-day benefit
renewal period applies and the date of the
next admission, irrespective of the reason for
the last admission and irrespective of whether
or not benefits were paid as a consequence of
such admission.  Further, if subsequent to
such discharge, the enrollee is a patient in a
psychiatric or substance abuse day or night
care program, a substance abuse halfway house,
a hospice program or is receiving home health
care services, the 60-day renewal period is
broken, whether or not benefits were paid as a
consequence of receipt of such services.

C.    Access to Information

In order to ensure proper administration and to
facilitate the ongoing evaluation of this Program:

1.    Enrollees shall authorize providers of services to
furnish to the carrier(s), upon request,
information relating to services to which the
enrollee is, or may be, entitled under this
Program.

Providers of services shall be authorized to permit
the carrier(s) to examine their records with
respect to the services and to submit reports of
the services in the detail requested by the
carrier(s). All information related to treatment of
the enrollee will remain confidential except for
the purpose of determining rights and liabilities
arising under this Program, or as otherwise
required by law or pursuant to a written
authorization by the patient.

2.    A provider claiming payment from the carrier must
furnish a report to the carrier, in the prescribed
form, within 180 days from the date of the last
continuous service listed on the report as having
been rendered to the enrollee.  The provider must
certify upon the report that the provider is
entitled to payment under this Program and that the
service was personally rendered or rendered during
the provider's presence and under the provider's

SALARIED HEALTH CARE PROGRAM

App. A

supervision.  An enrollee's request for service is
authorization to the provider to make the report.

3.    An enrollee seeking payment from a carrier must
furnish, or cause the provider to furnish, a report
to the carrier in the form prescribed by the
carrier.  By filing the report the enrollee
consents that the carrier may have access to the
data disclosed by the records and files of the
provider and of the hospital or other facility
named in this report.

D.    Identification Cards

1.    Enrollees shall be furnished identification cards
by the carrier(s).  Such cards shall contain
toll-free telephone numbers for obtaining
predetermination information or other required
approvals of services.

2.    The identification card must be presented when
service is requested.

3.    An enrollee shall not use an identification card to
obtain benefits to which such enrollee is not
entitled, nor shall the enrollee permit another
person to obtain benefits to which such person is
not entitled.

E.    Medicare

1.    Under current Federal laws, certain enrollees
otherwise eligible to enroll for benefits under
Medicare may defer enrollment in Medicare without
penalty.  If such enrollees elect to enroll in
Medicare, the Program remains the primary source of
benefits, with Medicare supplementing Program
coverage.  For purposes of subsection 2 below,
Medicare enrollment of such enrollees shall be
disregarded.

2.    Coverage under this Program is reduced to the
extent that payment is available under Medicare, or
to the extent that payment would have been
available under Medicare but for the fact that
Medicare payment is secondary to coverage provided
by a source other than this Program.  In the latter
event, the maximum liability of this Program will
be limited to the balance remaining after the
liability of both the primary coverage and Medicare
have been determined and benefits paid.

SALARIED HEALTH CARE PROGRAM

App. A

a.  Enrollees who are eligible to enroll for benefits under Part A of Medicare, whether or not they are enrolled, will have all benefits available under this Program reduced to the extent payment or benefit is available (or would have been available had the eligible enrollee been enrolled for Medicare benefits) under Part A of Medicare.  The hospital coverage under this Program will be reduced during the additional Medicare 60-day lifetime maximum for inpatient hospital benefits, to the extent the benefits are available under Medicare whether or not the enrollee uses the lifetime reserve.

b.  Enrollees who are eligible to enroll for benefits under Part B of Medicare, whether or not they are enrolled, will have all benefits available under this Program reduced to the extent that payment or benefit is available (or would have been available had the eligible enrollee been enrolled for Medicare benefits) under Part B of Medicare.

c.  All benefits furnished under Medicare Part A, or which would have been furnished had the enrollee been enrolled for Medicare Part A benefits, and all benefits furnished under Medicare Part B will be charged against the maximum benefit periods and maximum benefit amounts under this Program.  Reduction of coverage under this provision or charging of Medicare benefits against the maximum benefit periods and maximum benefit amounts of this Program will be limited to the benefits provided by Medicare which would have been provided under this Program in the absence of this subsection.

3.  If an enrollee, while covered under the Program, also enrolls for coverage under Part D of Medicare, such enrollee will be ineligible for coverage under the Program for as long as enrollment in Part D continues.

F.  Medical Necessity and Appropriateness

1.  All covered services under the Program are subject to a requirement of medical necessity (see App. A,I.R.).

2.  The Control Plan will establish criteria, where necessary, to define medical necessity and accepted

SALARIED HEALTH CARE PROGRAM

App. A

uniform standards of medical practice for the purposes of determining covered services (except as set forth in subsection 4, below).  The Control Plan shall propose such criteria to the Corporation, and when such criteria are approved, shall communicate them to the local carriers. Local carriers shall communicate the criteria to providers.

3.   Local carriers, or others, requesting establishment, revision or withdrawal of such criteria shall submit such requests to the Control Plan for consideration. The Control Plan shall advise the Corporation of all such requests and recommended decisions.

4.   Medical necessity and appropriateness criteria will be established by the Utilization Review Organization for those services which require predetermination.

G.   Legal Action by Enrollee

Please refer to Article I, Section 6.

H.   Changes in the Program

1.   From time to time additional coverages may be provided or existing coverages withdrawn by the Corporation by action of its Board of Directors or other committee expressly authorized by the Board to take such action.

2.   Neither the Control Plan nor a local carrier may make a substantive change to the coverages or benefits without prior approval of the Corporation. This includes amending administrative practices, policies or interpretations that in the judgment of the Corporation would materially affect the benefits of the Program.

I.   Approval of New Services, Technologies and Provider Classes

1.   A procedure has been established for implementing the addition of services or items not previously covered under this Program.

2.   A proposal for the inclusion in the Program of a new or revised service or item may be submitted to the Control Plan by a carrier, a physician or physician group, a professional organization, a provider or provider group, or the Corporation.

SALARIED HEALTH CARE PROGRAM

App. A

3.  The Control Plan shall review such proposal and make a written recommendation to the Corporation regarding whether or not the service or item should be added to the Program.  Such recommendation shall include, but not be limited to, the following:

   a.  Any quality of care concerns and proposed steps to ensure quality delivery of the service if approved;

   b.  Any access concerns and proposed actions to resolve such concerns;

   c.  Any concerns over appropriate utilization and proposed actions to resolve such concerns;

   d.  Any service(s) being replaced by the new service, and a plan for discontinuation of coverage for the replaced service; and

   e.  Positive or negative impact on Program costs.

4.  The Corporation shall review and approve or disapprove the Control Plan recommendations.  If approval is given and the service is added, an effective date will be established.  Only services or items provided on or after the effective date will be covered.

5.  The Control Plan will advise local carriers and other affected parties of any approved additions to the Program, the effective dates, and/or limitations or special provisions that apply.  The local carriers will advise providers.

J.  Participating, Nonparticipating and Departicipating Hospitals

1.  When an enrollee's Basic Medical Plan (BMP) or Enhanced Medical Plan (EMP) option is administered by a carrier that has participating agreements with hospital providers, covered services provided to such an enrollee by a nonparticipating hospital (i.e., a hospital with which the carrier does not have a participating agreement), or by a departicipated hospital (i.e., a hospital whose participating agreement ceases, whether at the option of the provider, the carrier or both), are payable in accordance with the provisions set forth, respectively, in J.2. and J.3. below.

2007

SALARIED HEALTH CARE PROGRAM

App. A

2.   Benefits for covered services provided by a
nonparticipating hospital (other than a psychiatric
hospital) shall be payable as follows:

a.   Upon admission for a non-emergency condition,
payment is limited to $230 per day for
inpatient room and board charges and $20 per
day for inpatient ancillary charges.  Benefits
are available for the duration of the
admission, but in no event beyond the number
of days available under the hospital benefit
period.

b.   For an emergency admission (as defined by the
Program):

(1)   Benefits will be payable for the
reasonable charges (as determined by the
carrier) for ground ambulance transfer
to the closest participating hospital
capable of handling the case, upon
approval of the attending physician and
the carrier.  This approval must be
based on the physician's medical
certification that the transfer will not
endanger the enrollee's health and of
carrier certification that the
subsequent stay will be of sufficient
duration to justify the transfer.

(2)   When the enrollee cannot be safely moved
to a participating hospital, the
enrollee is entitled to benefits during
the first five days of the admission,
but in no event beyond the number of
days available under the hospital
benefit period.

(3)   Following the first five days of
admission, payment is limited as
described in 2.a. above.  However, if
transfer to a participating hospital
cannot be arranged, either because such
a transfer would endanger the enrollee's
health or because the subsequent stay
would not be of sufficient duration to
justify transfer, benefits are payable
for the duration of such admission, but
in no event beyond the number of days
available under the hospital benefit
period.

2007

SALARIED HEALTH CARE PROGRAM

App. A

c.  Admissions to psychiatric hospitals are subject to the provisions of Appendix B of the Program.

d.  Payment for outpatient services received at a nonparticipating hospital (other than a psychiatric hospital) is limited to $35 for each condition.  Effective January 1, 1997, certain covered emergency services received in the outpatient department of a nonparticipating hospital will be paid on the same basis as if in a participating hospital. To qualify for payment, the claim must be for services related to a medical emergency or a serious bodily injury that requires immediate medical attention to avoid placing the enrollee's life in jeopardy, permanent damage to the enrollee's health or significant impairment of bodily functions.  Treatment must be provided at the hospital immediately following the medical emergency or the injury. Payment will not exceed the amount that would be paid to a participating hospital, and there can be no assurance that the payment will cover the entire amount billed by the hospital.

3.  The carrier will make efforts to notify enrollees of a hospital's departicipation and of the following payment arrangements:

a.  For an enrollee whose hospital admission commences prior to, or within 30 days following, the date a participating hospital departicipates, benefits will be paid for the duration of such admission, but in no event beyond the number of days available under the hospital benefit period.

b.  For an enrollee whose admission to such hospital commences later than 30 days from the date the hospital departicipates, payment for non-emergency admissions is limited as described in 2.a. above and payment for emergency admissions is limited as described in 2.b. above.

c.  For an enrollee admitted to a departicipated hospital that regains participating status within six months of departicipating, the carrier will make payment toward the balance of the hospital's reasonable charges (as determined by the carrier) for covered

96                                                      2007

SALARIED HEALTH CARE PROGRAM

App. A

services incurred by the enrollee during the period of departicipation.  The carrier shall also arrange that such payment relieves the enrollee of further financial obligation (other than the enrollee's deductible and/or copayment) with respect to covered services received during the departicipation period, and that any portion of such balance previously paid by the enrollee (other than the enrollee's deductible and/or copayment) shall be refunded.

K.   Utilization Review Requirements

Utilization review functions are performed by carriers unless specifically assigned by the Corporation to a Utilization Review Organization.  These review functions may include, but are not limited to, predetermination and concurrent, retrospective and focused utilization reviews.  In some instances, special review processes will be developed and implemented, as necessary and practicable, to address specific utilization concerns.

The utilization review function assesses the medical necessity and medical appropriateness of services for coverage consideration.  The carrier or Utilization Review Organization's determinations shall be given full force and effect unless determined by the Plan Administrator to be contrary to the Program provisions or arbitrary and capricious.

1.   Predetermination is the process by which the medical necessity for a given health care service, appropriateness of the service, or the proposed setting for the services is reviewed, and the proposed treatment plan is either approved or disapproved by a carrier or Utilization Review Organization before performance of such service. The review is performed to examine pertinent medical documentation of the need, appropriateness and setting for such service.  Predetermination is not a guarantee of benefit payment.  To be covered, the service must meet all terms and conditions of the Program.

(a)   For enrollees in the Basic Medical Plan and Enhanced Medical Plan, the services listed below shall be reported by the enrollee (or by the provider on his or her behalf) to the Utilization Review Organization or carrier, as appropriate, for predetermination:

SALARIED HEALTH CARE PROGRAM

App. A

(1)   Hospital admissions except maternity and emergency (Emergency admissions are to be reported to and reviewed by the Utilization Review Organization within 48 hours of inpatient admission.);

The predetermination of inpatient care includes the designation of appropriate lengths of stay based on diagnosis, patient characteristics, and/or appropriate practice patterns;

(2)   Surgical procedures, regardless of place of service (Emergency outpatient surgical procedures are to be reported to and reviewed by the Utilization Review Organization within 48 hours of outpatient surgery.);

(3)   Home health care services; and

(4)   Skilled nursing facility admissions.

Enrollees in the  Comprehensive Health Savings Plan and those receiving out-of-network services through the Point of Service Plan will be required to report the services in (1) and may be required by the carrier to report some or all of the services in (2), (3), and (4) for predetermination. Under the Point of Service Plan, network providers are responsible for obtaining any necessary pre-determinations.

(b)   An appeal procedure will be available through the carrier or the Utilization Review Organization for medical review of disputed decisions prior to receipt of services. Decisions resulting from such an appeal procedure may be further appealed as set forth in Article I, Section 6.

(c)   If services are determined to be not medically necessary, they are not covered under the Program and no benefits are payable.

(d)   Benefits for covered services which require predetermination will be reduced by the lesser of $200 or the reasonable and customary charges prior to the application of deductible and copayment amounts, when necessary predetermination requirements are not met or the services are determined to be not

SALARIED HEALTH CARE PROGRAM

App. A

medically appropriate.  Any such liability
incurred by an enrollee is in addition to the
deductible and copayment amounts (which shall
be determined after applying this provision)
and will not be applied to an enrollee's out-
of-pocket expense for purposes of applying
annual maximums.  This provision is not
applicable to the POS Plan when services are
received in-network upon referral from the
primary care physician, but is applicable if
the services are deemed to be out of the POS
network.

(e)    Benefit reductions referred to in subsection
(d) above shall not be applicable to an
individual enrollee who has incurred three
such reductions in a calendar year.

(f)    Primary and secondary enrollees who have
Medicare or another group health care plan as
their primary coverage are not subject to the
predetermination and review procedures set
forth above.

2.    Concurrent Utilization Review is the process by
which the necessity, appropriateness and setting of
a given health care service are reviewed while the
patient is receiving inpatient care.

3.    Retrospective Utilization Review is the process by
which the necessity, appropriateness and setting of
a given health care service are reviewed following
the performance of the service.  When retrospective
review results in a determination that the
admission or services were not medically necessary,
recovery of any benefits paid for such admission or
service will be made from the provider, subject to
the limitations of the carrier's provider
contracts.  When the retrospective review results
in a determination that the admission or services
were not medically appropriate, a benefit
reduction, as set forth in 1.(d) of this
subsection, will be applied.

4.    Focused Utilization Review is the process by which
certain providers (professionals and facilities),
procedures and/or diagnoses are reviewed to audit
the necessity of a given health care service,
appropriateness of the service, the setting of the
service, the quality of care rendered, and the
financial accuracy of claims submitted for
reimbursement related to such services.

2007

SALARIED HEALTH CARE PROGRAM

App. A

III.  Description of Coverages

A.   Hospital Coverage

1.   Conditions of Benefit Payments

An enrollee is eligible for benefits for covered expenses incurred in a hospital only if the following conditions have been met:

a.   The admission and length of stay have predetermination approval from the Utilization Review Organization or carrier, as appropriate, for non-emergency, non-maternity admissions of enrollees in the Standard Medical Plan, Standard Plus Medical Plan, Point of Service Plan; Basic Medical Plan and Enhanced Medical Plan options, as set forth in Appendix A, II.K (emergency admissions must be reported to the carrier within 48 hours), or

b.   Services are received on or after the enrollee's effective date of coverage under the Program.

c.   For inpatient hospital services, the enrollee is admitted in accordance with the Program provisions, as administered by the carrier, and the hospital's rules and regulations governing admission as a bed patient, and is under the constant care and treatment of a physician during the period of admission.

d.   For inpatient hospital services, the enrollee has benefit days available under the hospital benefit period as set forth in Section II.B. above.

2.   Inpatient Hospital Coverage

Upon admission to a participating hospital, or to any hospital for carriers without participating arrangements, an enrollee is entitled to receive the following services when prescribed by the physician in charge of the case, approved by the Utilization Review Organization or carrier, as appropriate, and provided and billed by the hospital:

a.   Semiprivate room, general nursing services, meals, and special diets.  Private room coverage will be provided only when such

SALARIED HEALTH CARE PROGRAM

App. A

accommodations are medically necessary as set
forth in an administration manual published by
the Control Plan;

b.    Use of operating rooms, other surgical
treatment rooms, and delivery rooms;

c.    Anesthesia services, anesthesia supplies,
gases, and use of equipment;

d.    Laboratory and pathology examinations which
are under the direction of a pathologist
employed by the hospital;

e.    Chemotherapy (chemotherapeutics,
antineoplastic agents and administration) for
the treatment of malignant diseases by
chemical antineoplastic agents except when
treatment is research, investigational or
experimental in nature (See also Appendix
A.III.L. regarding Centers of Excellence for
non-routine cancer care);

f.    Physical, speech, and functional occupational
therapy (see App. A, III.C.);

g.    Oxygen and other gas therapy;

h.    Drugs, biologicals, and solutions used while
the enrollee is in the hospital;

i.    Gauze, cotton, fabrics, solutions, plaster,
splints, and other materials used in dressings
and casts;

j.    Radioactive isotope studies and use of radium
when the radium is owned or rented by the
hospital;

k.    Maternity care and routine nursery care of the
newborn during the hospital stay of the mother
for maternity care, when the mother is an
enrollee.  Coverage will comply with the
Newborns and Mothers Health Protection Act of
1996;

l.    Hospital service in a special care unit;

m.    Blood services, including transfusions of
whole blood and packed red blood cells (if not
replaced), blood derivatives, blood plasma,
supplies and their administration.  Body

SALARIED HEALTH CARE PROGRAM

App. A

      component preservation and storage for future
use are not covered expenses;

n.    Hemodialysis when provided by a hospital
qualified to provide hemodialysis treatment.
The carriers shall have discretionary
authority to interpret, apply and construe
this provision of the Program.  The
determination of the carrier as to whether or
not a hospital is a qualified hospital for
providing hemodialysis shall be given full
force and effect unless it is determined by
the Plan Administrator to have been contrary
to the Program provisions or arbitrary and
capricious;

o.    Durable medical equipment (see App. A,
III.I.);

p.    Prosthetic and orthotic appliances (see App.
A, III.I.);

q.    Hospital services for mastectomy or
sterilization of male or female enrollees,
regardless of  medical necessity;

r.    Hospital services for covered plastic and
reconstructive surgery (see App. A,
III.E.3.a.(1));

s.    Hospital services for abortions regardless of
the medical necessity for the abortion;

t.    Pulmonary function evaluation;

u.    Skin bank, bone bank and other tissue storage
bank costs;

v.    Inhalation therapy; and

w.    Human organ and tissue transplants.  For
medically recognized human organ or tissue
transplants from a living or cadaver donor to
a transplant recipient, hospital services
(including evaluation tests to establish
compatibility and suitability of potential and
actual donors when the tests cannot be done
safely and effectively on an outpatient basis)
are covered as follows:

    (1)    When the transplant recipient and the
donor are both enrollees, benefits are
provided for both;

2007

SALARIED HEALTH CARE PROGRAM

App. A

    (2)    When the transplant recipient is an enrollee, but the living donor is not, benefits are provided for the transplant recipient and, to the extent they are not available under any other health care coverage, for the donor;

    (3)    When the living donor is an enrollee and the transplant recipient is not, benefits are provided only for the donor;

    (4)    When the transplant recipient is an enrollee, expenses incurred in the evaluation and procurement of cadaver organs and tissues are benefits when billed by the hospital.  All such expenses will be charged to the enrollee's coverage to the extent that they are not covered by any other health care coverage of the donor or potential donor;

    (5)    For purposes of this subsection w. and of App. A, III.E.3.a.(3), "medically recognized" human organ or tissue transplants include allogeneic bone marrow for only specified diagnoses, autologous bone marrow for only specified diagnoses, cornea, heart, heart/lung, kidney, liver, lung, pancreas and skin.  The limitations with respect to bone marrow transplants are contained in Section IV.Z. of this Appendix.  See also Appendix A,III.L. regarding Centers of Excellence for human organ transplants.

3.    Outpatient Hospital Coverage

    a.    When an enrollee receives outpatient hospital services in a participating hospital, or any hospital for carriers without participating arrangements, which have been ordered by the attending physician and approved by the carrier (or Utilization Review Organization for services that require predetermination), the enrollee is entitled to the same coverages available on an inpatient basis, except that:

    (1)    Drugs, biologicals, and solutions are covered only to the extent they are used

2007

SALARIED HEALTH CARE PROGRAM

App. A

in the hospital and administered in
connection with the use of operating or
surgical treatment rooms, anesthesia,
laboratory examinations, other
outpatient hospital services, or, as of
October 1, 1999, IV infusion therapy
services.

(2)   Physical, speech and functional
occupational therapy also may be covered
(see App. A, III.C.).

(3)   Chemotherapy (chemotherapeutics,
antineoplastic agents and necessary
ancillary drugs and their
administration) is covered for the
treatment of malignant diseases except
when the treatment is research,
investigational or experimental in
nature.

Chemotherapy is covered for the
following routes of administration:
parenteral, continuous or intermittent
infusion, perfusion, and intracavitary.
Coverage is not available for the oral
administration of chemotherapy.

(4)   Coverage does not include treatment of
chronic conditions which require
repeated visits to the hospital, except
for hemodialysis and, as of October 1,
1999, IV infusion therapy services.

(5)   Services in the emergency room of a
hospital are covered for the initial
examination and treatment of conditions
resulting from accidental injury or
medical emergencies.  A medical
emergency will be considered to exist
only if medical treatment is secured
within 72 hours after the onset of the
condition.  Follow-up care is not
covered, with the exception of follow-up
care for rabies exposure.

If an emergency room patient is placed
under observation care, hospital
services are covered when such services
are reasonable and necessary to evaluate
a patient's condition or determine the
need for possible admission to the
hospital.  Coverage for such services is

104                                    2007

SALARIED HEALTH CARE PROGRAM

App. A

generally limited to 24 hours, unless the medical necessity of additional time is documented in the medical records and approved by the carrier.

(6)   Hyperbaric oxygenation is covered when medically necessary for treatment of disease or injury.  Coverage is not available for treatment of chronic conditions.

(7)   Skin bank, bone bank and other tissue storage bank services are not covered.

b.   Hemodialysis (use of kidney machine) or peritoneal dialysis for the treatment of a chronic, irreversible kidney disease is covered in an enrollee's home when services are provided and billed by a hospital which has a hemodialysis program approved by the carrier.

(1)   Benefits will not be payable unless the following conditions are met:

(a)   treatment must be arranged through the physician attending the enrollee and the physician director or a committee of staff physicians of the training program, and

(b)   the owner of the enrollee's residence must give written permission to the hospital for installation of the equipment prior to its installation.

(2)   The following are covered expenses under this subsection:

(a)   purchase, lease, or rental (as determined by the carrier to be appropriate) of a hemodialysis machine placed in the enrollee's home;

(b)   installation and maintenance or repair of a hemodialysis machine placed in the enrollee's home;

(c)   hospital expenses for training the enrollee and any individual who will be assisting the enrollee in

SALARIED HEALTH CARE PROGRAM

App. A

the home setting in operating the
hemodialysis machine;

(d)     laboratory tests related to the
dialysis procedure;

(e)     consumable and expendable supplies
required during the dialysis
procedure, such as dialysis
membrane, solution, tubing, and
drugs; and

(f)     removal of the dialysis equipment
from the enrollee's home when the
enrollee no longer needs the
equipment.

(3)     The following are not covered expenses
under this subsection:

(a)     services not provided and billed by
a hospital with a hemodialysis
program approved by the carrier;

(b)     reimbursement to individuals
trained and assisting in the
dialysis procedure;

(c)     electricity or water used in
operating the dialyzer;

(d)     installation of electric power, a
water supply, or a sanitary waste
disposal system in conjunction with
installing the dialysis equipment;

(e)     physician's services, except to the
extent the physician is reimbursed
by the hospital for administration
and overall supervision of the
program;

(f)     transfer of the dialyzer to another
location in the enrollee's
residence;

(g)     services performed prior to the
effective date of the home
hemodialysis program; and

(h)     services provided by an agency or
organization providing "back-up"
assistance in home hemodialysis,

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

including the services of hospital
personnel sent to the enrollee's
home, or of other persons under
contract with the hospital.

4.   Limitations and Exclusions

a.   Coverage for hospital admissions and services
is only for the period which is medically
necessary for the proper care and treatment of
the enrollee, subject to the maximum benefit
period and other applicable Program
provisions.  As a condition of continued
hospital coverage, the carrier or Utilization
Review Organization may require written
verification by the physician in charge of the
case of the need for services.  For purposes
of this subsection and subsection 4.b. below,
the carrier or Utilization Review Organization
shall review the severity of the patient's
illness and the nature and intensity of
services required/provided and, based upon
such review, shall have discretionary
authority to interpret, apply and construe
these provisions of the Program.  The
carrier's or Utilization Review Organization's
exercise of this authority shall be given full
force and effect unless it is determined by
the Plan Administrator to have been
inconsistent with the Program provisions or
arbitrary and capricious.

b.   Coverage does not include hospital services
related to domiciliary, custodial,
convalescent, nursing home, or rest care.

c.   Coverage does not include hospital services
consisting principally of dental treatment or
extraction of teeth, as provided in Appendix
A, III. E.3.a.(2).

d.   Coverage does not include inpatient hospital
services when the care received consists
principally of observation or diagnostic
evaluations, inpatient physical, functional
occupational or speech therapy, x-ray
examinations, laboratory examinations,
electrocardiography or basal metabolism tests,
ultrasound studies, nuclear medicine studies,
weight reduction by diet control with or
without medication, or environmental control.

SALARIED HEALTH CARE PROGRAM

App. A

e.   Coverage for hospital services does not
include services of physicians, oral surgeons,
or services covered elsewhere in this
Appendix, such as x-ray examination or
therapy, electrocardiography, cobalt, or
ultrasound studies.

f.   The enrollee must give notice of coverage to
any hospital at the time of admission.  If
notice is not given at that time, the enrollee
may be liable for a portion of charges
incurred.

g.   If an enrollee cannot obtain admission to
participating or nonparticipating hospitals,
the carrier may pay the enrollee an amount not
to exceed $65 for the expense of nursing and
other services and supplies, restricted to the
equivalent of hospital care made necessary by
the illness or injury.  The payment shall be
full satisfaction of all obligations of the
carrier and the participating hospitals to
furnish hospital service for the disability
for which admission was sought; provided,
however, that if the admission is for the care
of contagious or epidemic disease, or injury
due to war, declared or undeclared, the
Corporation, the carriers and the
participating hospitals are under no
obligation or liability under this Program.

h.   Hospital coverage does not include facility
charges for care received in an urgent care
center.

i.   Hospital coverage does not include facility
charges for care received in a freestanding
ambulatory surgery center, unless such center
meets Program standards and is approved by the
carrier.

j.   Hospital coverage does not include facility
charges related to refractive eye surgery
(e.g., radial keratotomy, corneal sculpting or
similar surgical procedures to correct
vision), sterilization reversals or non-
covered plastic, cosmetic, or reconstructive
surgery.

k.   Hospital coverage does not include positron
emission tomography (PET) scanning services.

SALARIED HEALTH CARE PROGRAM

App. A

    l.    Coverage for hospital services is subject to the Terms and Conditions of Section II, and the Limitations and Exclusions of Section IV.

B.    Skilled Nursing Facility Coverage

    1.    Conditions of Benefit Payments

All skilled nursing admissions must be predetermined by the Utilization Organization or carrier, as appropriate.

An enrollee is eligible for benefits for covered expenses incurred in a skilled nursing facility only if the following conditions have been met:

    a.    The services are received on or after the enrollee's effective date of coverage under this Program.

    b.    The admission has been approved by the Utilization Review Organization or carrier, as appropriate, and the enrollee is admitted to the skilled nursing facility by the order of a physician who certifies that the enrollee requires the type of care available at the facility.

    c.    The enrollee has benefit days available under the skilled nursing facility benefit period (see App. A, II.B.).

    d.    The care received by the enrollee consists of definitive medical, nursing, or other paramedical care.

    2.    Coverages

    a.    Upon admission to a skilled nursing facility approved by the carrier, an enrollee is entitled to receive the following services when prescribed by the physician in charge of the case and when provided and billed by the facility:

    (1)    Semiprivate room, general nursing service, meals, and special diets;

    (2)    Use of special treatment rooms;

    (3)    Routine laboratory examinations;

SALARIED HEALTH CARE PROGRAM

App. A

  (4) Physical, speech, or functional
    occupational therapy when medically
    necessary for the treatment of the
    enrollee (see App. A, III.C.);

  (5) Oxygen and other gas therapy;

  (6) Drugs, biologicals, and solutions used
    while the enrollee is in the facility;

  (7) Gauze, cotton, fabrics, solutions,
    plaster, splints and other materials
    used in dressings and casts; and

  (8) Durable medical equipment (see App. A,
    III.I.).

 b. Medical care in skilled nursing facilities:
  Coverage is provided for medical care approved
  by the Utilization Review Organization or
  carrier, as appropriate, in a skilled nursing
  facility by the physician in charge of the
  case.  Care is subject to the 730-day benefit
  period maximum.  Medical care in a skilled
  nursing facility for the treatment of
  tuberculosis or substance abuse is not
  covered.

3. Limitations and Exclusions

 a. Skilled nursing facility admissions and
  services are covered only when the services
  are medically necessary.  As a condition of
  continued skilled nursing facility coverage,
  the Utilization Review Organization or
  carrier, as appropriate, may require written
  verification by the physician in charge of the
  case of the need for services.  For the
  purposes of this subsection and of subsection
  3.b., below, the Utilization Review
  Organization or carrier shall review the
  severity of the patient's illness and the
  nature and intensity of the services
  required/provided and, based upon such review,
  shall have discretionary authority to
  interpret, apply and construe these provisions
  of the Program.  The exercise of this
  authority by the Utilization Review
  Organization or the carrier shall be given
  full force and effect unless it is determined
  by the Plan Administrator to have been
  inconsistent with the Program provisions or
  arbitrary and capricious.

          2007

SALARIED HEALTH CARE PROGRAM

App. A

b.   Coverage is not provided for care which is principally custodial or domiciliary or for care of tuberculosis.

c.   Notwithstanding a. and b. above, for the period of time the Program is secondary to the payment of Medicare benefits for skilled nursing facility services, Medicare's determination of coverage will be deemed to satisfy Program criteria as to medical necessity and maintenance, domiciliary and custodial care.  However, if the carrier or Control Plan become aware of the admission during such period of time, the Control Plan, or another designated party, shall review the admission and advise the enrollee as to ongoing coverage before the exhaustion of Medicare benefits.

d.   Coverage for skilled nursing facility services is subject to the Terms and Conditions of Section II, and the Limitations and Exclusions of Section IV.

C.   Physical, Functional Occupational and Speech Therapy and Cardiac Rehabilitation Coverage

1.   Conditions of Benefit Payments

An enrollee is eligible for benefits for covered physical, functional occupational and speech therapy and cardiac rehabilitation expenses only if the following conditions have been met:

a.   Services are received on or after the enrollee's effective date of coverage in this Program;

b.   Services are approved by the carrier, prescribed by the physician in charge of the case, and provided or supervised by a physician (other than a limited-practice physician) or by a registered and licensed physical, occupational or speech therapist for the specific therapy prescribed;

c.   Services are provided and billed by a physician (other than a limited-practice physician) or a hospital, or a freestanding outpatient physical therapy facility, home health care agency, skilled nursing facility,

SALARIED HEALTH CARE PROGRAM

App. A

or independent therapist approved by the carrier; and

d.  Benefits are available during the benefit period for covered hospital or skilled nursing facility inpatient care.

2.  Coverages

Services are covered as follows:

a.  Physical Therapy and Functional Occupational Therapy

(1)  During a covered admission to a hospital or skilled nursing facility, an enrollee is entitled to receive physical and functional occupational therapy to the extent medically necessary for the treatment of the condition for which the enrollee is admitted.  If rehabilitation care is prescribed and approved, the rehabilitation program is expected to include, at a minimum:

(a)  Medical care and supervision by a physician with specialized training and/or experience in rehabilitation, with 24-hour per day physician availability in addition to physician evaluation of the patient at least three times per week;

(b)  The active involvement in the patient's care of a nurse with specialized training and/or experience in rehabilitation nursing (including 24-hour immediate, on the premises, availability of a registered nurse with specialized training and/or experience in rehabilitation nursing);

(c)  Social work services;

(d)  Physical therapy services;

(e)  Plus one or more of the following:

(i)  occupational therapy;

SALARIED HEALTH CARE PROGRAM

App. A

    (ii)  speech therapy;

    (iii) psychological services;

    (iv)  prosthetic and/or orthotic fabrication and fitting.

(2)  Enrollees are entitled to receive physical therapy and functional occupational therapy provided through an approved home health care agency.  When special equipment not easily made available in the home is required, an enrollee is entitled to coverage for such services in a hospital or freestanding outpatient physical therapy facility participating with the home health care agency when related to the condition for which the enrollee was admitted to the home health care program.

(3)  Physical therapy and/or functional occupational therapy are covered on an outpatient basis when performed to restore or improve musculoskeletal function.

b.  Speech Therapy

(1)  During a covered admission to a hospital or skilled nursing facility, an enrollee is entitled to receive speech therapy on the same basis as described in subsection 2.a.(1) above.

(2)  Enrollees are entitled to receive speech therapy provided through an approved home health care agency.

(3)  Restorative speech therapy (speech pathology) is covered on an outpatient basis when related to the treatment of an organic medical condition or to the immediate post-operative or convalescent state of the enrollee's illness.  Speech therapy is not covered for long-standing, chronic conditions, or inherited speech abnormalities except as set forth in subsection b.(4) below.

(4)  Speech therapy for congenital and severe developmental speech disorders is

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

covered when not available through other
public agencies (e.g., state or school).

(a)   In order to be covered, the
      enrollee must be diagnosed as
      having a severe communicative
      deficit as defined by Program
      standards.

(b)   Speech therapy is not covered for:

      (i)    educational learning
             disabilities (e.g., dyslexia);

      (ii)   deviant swallow or tongue
             thrust;

      (iii)  mild developmental speech or
             language disorders;

      (iv)   congenital deafness;

      (v)    elimination of a lisp, or
             similar defect in
             articulation; or

      (vi)   improving speech that is not
             fully developed.

(c)   Initial and interim patient
      assessment to determine severity of
      condition, potential for
      improvement, progress and/or
      readiness for discharge from
      treatment is considered part of the
      overall treatment program and is a
      covered service when accompanied by
      treatment.

(d)   Steady improvement as a consequence
      of treatment must be documented in
      periodic interim reports.  Such
      documentation must be available to
      the carrier upon request.

SALARIED HEALTH CARE PROGRAM

App. A

 c. Cardiac Rehabilitation

   (1) During a covered admission to a hospital or skilled nursing facility, an enrollee may receive cardiac rehabilitation on the same basis as therapy described in subsection 2.a.(1) above.

   (2) Enrollees may receive cardiac rehabilitation on an outpatient basis provided through a hospital or performed or supervised and billed by a physician. The payment of benefits for cardiac rehabilitation on an outpatient basis is limited to services provided during the six-month period immediately following acute myocardial infarction, initial diagnosis of angina pectoris, or certain heart surgeries.

3. Limitations and Exclusions

 a. Covered expenses will not include and benefits are not payable for:

   (1) physical, functional occupational and/or speech therapy services if:

     (a) such services are provided without expectation that the condition will improve in a reasonable and generally predictable period of time,

     (b) improvement does not occur, as documented in the patient's record on a periodic basis, or

     (c) progress is no longer being made or the previous level of function has been restored;

   (2) physical therapy and/or functional occupational therapy provided solely to maintain musculoskeletal function;

   (3) occupational therapy which is not functional in nature;

   (4) inpatient admissions which are principally for physical, functional

2007

SALARIED HEALTH CARE PROGRAM

App. A

occupational and/or speech therapy or
for cardiac rehabilitation;

(5)    manipulation, adjustment or massage of
the musculoskeletal system;

(6)    vision therapy or training;

(7)    cognitive rehabilitation which includes,
but is not limited to, vocational
rehabilitation, recreational therapy,
learning exercises for retraining in
routine activities of life or aspects of
cognitive functioning such as
concentration, organizational skills,
information processing, memory,
thinking, and problem solving;

(8)    day, night or residential rehabilitation
programs;

(9)    services which could be performed by an
untrained, unlicensed person, by the
enrollee, or by a member of the
enrollee's family;

(10)   isokinetic testing or treatment;

(11)   debridement and cleansing with whirlpool
for first or second degree burns;

(12)   physical and/or functional occupational
therapy for first and second degree
burns.

b.    Coverage for physical, functional occupational
and speech therapy and cardiac rehabilitation
is subject to the Terms and Conditions of
Section II, and the Limitations and Exclusions
of Section IV.

D.    Home Health Care Coverage

1.    Conditions of Benefit Payments

Home health care services are subject to
predetermination by the Utilization Review
Organization or carrier, as appropriate.  An
enrollee is eligible for benefits for covered
expenses incurred for home health care services
only if the following conditions have been met:

SALARIED HEALTH CARE PROGRAM

App. A

a.   The home health care services are received on or after the enrollee's effective date of coverage in this Program;

b.   The enrollee is referred to and accepted by a home health care agency that meets Program standards and is approved by the local carrier;

c.   The services received are approved by the Utilization Review Organization or carrier, as appropriate, prescribed by the physician in charge of the case and provided and billed by an approved provider;

d.   The physician in charge of the case certifies to the carrier that skilled home health care services are medically necessary for the care of the enrollee; and

e.   The enrollee is essentially homebound for medical reasons and physically unable to routinely obtain the needed medical services on an outpatient basis without special assistance.  The homebound requirement does not apply to covered IV infusion therapy services.

2.   Coverages

a.   The following services are covered when provided on a part-time or intermittent basis during a home health care visit and billed by a home health care agency approved by the carrier:

(1)   General nursing services;

(2)   Physical therapy and speech therapy (may be provided and billed by a hospital outpatient department or a carrier-approved physical therapy provider under limited circumstances - see App. A, III.C.2.);

(3)   Social service guidance, dietary guidance, and functional occupational therapy; and

(4)   Services by a home health aide employed by an approved home health care agency.  To be eligible for home health aide service, the enrollee must be receiving

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

one of the services in (1) or (2) above, and it must be determined by the home health care agency and the Utilization Review Organization or carrier, as appropriate, that the enrollee could not be treated under this subsection without the home health aide service.

b.   For the purposes of this subsection III.D.:

(1)   A home health care visit consists of a visit

(a)   to the enrollee's home by any member of the home health care team for the purpose of providing necessary professional service;

(b)   to the enrollee's home by a home health aide for the purpose of providing covered home health aide services as described in subsection 2.a.(4) above; or

(c)   by the enrollee to a hospital or skilled nursing facility or approved physical therapy provider as an outpatient for speech evaluation or physical therapy when required equipment is not easily available for home use;

(2)   "part-time care" means:

(a)   up to and including 28 hours per week of skilled nursing and home health aide services combined, for less than eight hours per day; or

(b)   up to 35 hours per week of skilled nursing and home health aide services combined, for less than eight hours per day, subject to individual review and approval by the Utilization Review Organization or carrier, as appropriate, based on diagnosis, prognosis and documented improvement in the patient's condition; and

SALARIED HEALTH CARE PROGRAM

App. A

  (3) "intermittent care" means:

    (a) part-time care as described in
     subsections (2)(a) and (b) above,
     which is provided on less than a
     daily basis; or

    (b) up to eight hours per day of
     skilled nursing and home health
     aide services combined, delivered
     on a daily basis, for a temporary
     period not to exceed one month,
     subject to review and approval by
     the Utilization Review Organization
     or carrier, as appropriate, based
     on diagnosis, prognosis and
     documented improvement in the
     patient's condition.

c. The following services are covered when
 provided and billed by an approved provider:

  (1) Laboratory tests;

  (2) Drugs, biologicals, and solutions; and

  (3) Medical supplies which are essential in
   order to effectively administer in the
   home the medical regimen ordered by the
   physician.  Supplies include items such
   as bandages, dressings, splints,
   hypodermic needles, catheters, colostomy
   appliances, and oxygen.  When covered
   home health care services are being
   provided, medical supplies used in the
   home for the patient's care will be
   covered under this section, even if used
   during a portion of the day or week when
   nursing services are not covered.

d. IV infusion therapy services in the home are
 covered under home health care coverage.  The
 following provision will apply to such
 services:

  (1) The "homebound" requirement will be
   waived with respect to home infusion
   therapy patients;

  (2) Related nursing services will be
   included;

       2007

SALARIED HEALTH CARE PROGRAM

App. A

    (3)    Applicable prescription drugs will be
included;

    (4)    All services directly related to
infusion therapy, including DME,
parenteral and enteral methods of
hyperalimentation, chemotherapy, and
supplies, will be covered under Home
Health Care coverage;

    (5)    The provision that limits home health
care benefits to three visits for each
remaining inpatient hospital day will be
waived; and

    (6)    Home IV infusion therapy services will
be covered only when delivered by a
provider that is accredited by the Joint
Commission on Accreditation of
Healthcare Organizations.

3.    Limitations and Exclusions

    a.    Coverage for home health care services is
available only when the services are medically
necessary.  As a condition of continued home
health care coverage, the Utilization Review
Organization or carrier, as appropriate, may
require written verification by the physician
in charge of the case of the need for
services.  The Utilization Review Organization
or carrier, as appropriate, shall have
discretionary authority to interpret, apply
and construe this provision of the Program.
The Utilization Review Organization's or
carrier's exercise of this authority shall be
given full force and effect unless it is
determined by the Plan Administrator to have
been inconsistent with the Program provisions
or arbitrary and capricious.

    b.    Coverage under this subsection does not
include supplies such as elastic stockings,
personal comfort or personal hygiene items or
equipment, or supplies and appliances which
may be covered under the durable medical
equipment and prosthetic or orthotic appliance
provisions (such as hospital beds, oxygen
tents, walkers, wheelchairs, or orthotics).

    c.    Coverage under this subsection does not
include physician services, private duty
nursing services or housekeeping services.

2007

App. A

d.   Coverage under this subsection does not
include skilled nursing services and home
health aide visits when the care exceeds the
part-time or intermittent levels.

e.   Coverage under this subsection does not
include home uterine monitoring.

f.   Coverage under this subsection does not
include charges for travel time.

g.   The maximum amount of reimbursable expense for
home health care services under this
subsection is limited to the amount which
would be reimbursable for similar care
rendered in a skilled nursing facility.

h.   Coverage for physical, functional
occupational, and speech therapy provided in
accordance with subsection D.2.a. (2) and (3)
above are subject to the limitations and
exclusions in Appendix A, III.C.3.

i.   Coverage for home health care services is
subject to the Terms and Conditions of Section
II, and the Limitations and Exclusions of
Section IV.

E.   Surgical and Medical Coverage

1.   Conditions of Benefit Payments

An enrollee is eligible for benefits for expenses
incurred for surgical and medical covered services
only when the following conditions have been met:

a.   Services are received on or after the
enrollee's effective date of coverage in this
Program;

b.   Services are approved by the carrier, when
necessary (or the Utilization Review
Organization for services that require
predetermination); and

c.   Services are received prior to the termination
date of the enrollee's coverage, except that
services received during hospital admissions
which commence prior to such termination date
will be covered subject to other provisions of
this Program.

SALARIED HEALTH CARE PROGRAM

App. A

2.    Payment of Services

    a.    The carrier(s) will make payment according to a fee schedule, capitation schedule, or reasonable and customary charges.

    b.    A carrier will make the benefit payments directly to the provider for services performed or materials furnished by such provider, or directly to the enrollee if appropriate.

    c.    The carriers shall have discretionary authority to interpret, apply and construe these reimbursement provisions of the Program. A carrier's exercise of this authority shall be given full force and effect unless it is determined by the Plan Administrator to have been inconsistent with the Program provisions or arbitrary and capricious.  The carrier will defend its determination of the fee, capitation rate or reasonable and customary charge if a provider claims an amount in excess of the carrier's determination from the enrollee and there is no payment or prior written agreement between the patient and the provider regarding the amount of the provider's charges.

    d.    Certain hospital-based physician services billed by a hospital will be paid directly to the hospital by a carrier according to the carrier's agreement with the hospital.

3.    Coverages

    Except as otherwise indicated, the following services are covered:

    a.    Surgery:  Subject to the limitations listed below, surgical services, consisting of generally accepted operating and cutting procedures for the necessary diagnosis and treatment of diseases, injuries, fractures, or dislocations, are covered when performed by the physician in charge of the case.

    Surgical services require predetermination as described in Appendix A.II.K.

    Surgical services include usual, necessary, and related preoperative and postoperative care performed in or out of the hospital.

SALARIED HEALTH CARE PROGRAM

App. A

(1)   Plastic and reconstructive surgery is
limited to the correction of congenital
anomalies and conditions resulting from
accidental injuries or traumatic scars,
to the correction of deformities
resulting from cancer surgery or
following medically necessary
mastectomies (including medically
necessary mastectomies resulting from
cancer or fibrocystic disease), and to
blepharoplasties when there is visual
impairment.

Notwithstanding the above, in compliance
with the Women's Health and Cancer
Rights Act of 1998, in the case of an
enrollee who undergoes a mastectomy and
who elects breast reconstruction in
connection with the mastectomy, coverage
includes:  reconstruction of the breast
on which the mastectomy has been
performed; surgery and reconstruction of
the other breast to produce a
symmetrical appearance; and prostheses
and physical complications of all stages
of mastectomy, including lymphedemas, in
a manner determined in consultation with
the attending physician and the patient.

(2)   Dental surgery is limited to multiple
extractions, removal of one or more
unerupted teeth, alveoloplasty, or
gingivectomy, and is covered only when
performed in a facility setting (i.e.,
hospital inpatient or outpatient or
Freestanding Ambulatory Surgical
Center), when a concurrent hazardous
medical condition exists and when
Program Standards are met.  Surgical
procedures to excise tumors or cysts of
the oral cavity, to correct fractures of
facial or jawbones, dislocations and
disorders of joints, or to correct
accidental injury are not considered
dental surgery and are considered in
accordance with the general surgery
provisions above.

(3)   For medically recognized human organ or
tissue transplants [see App. A,
III.A.2.w.(5)] from a living or cadaver
donor to a transplant recipient which

SALARIED HEALTH CARE PROGRAM

App. A

requires surgical removal of a donated part, benefits for services as listed and limited in this subsection (including laboratory services for evaluation tests to establish a potential donor's compatibility and suitability) will be covered in the same manner as under Section III.A.2.w.

Payments will be reduced by any amount payable from other sources, such as foundations, grants, governmental agencies or programs, research or educational grants and charitable organizations.

Centers of Excellence Facilities, as describe in Appendix A.III.L., may be utilized, where appropriate, for covered human organ or tissue transplants.

(4)    Surgical procedures for mastectomy or for sterilization of male and female enrollees irrespective of medical necessity are covered.  Sterilization reversals are not covered.

(5)    Laser surgery is covered if the alternative cutting procedure is covered. The maximum benefit payable for laser surgery is the reasonable and customary charge for the alternative cutting procedure.

b.    Hemodialysis:  Services are covered only when performed by a physician in a facility meeting Program standards and approved by the local carrier or in the enrollee's home.

c.    Anesthesia:  Services for the administration of anesthetics are covered, when provided by a physician, other than the operating physician, and when required by, and performed in conjunction with, another covered service.

(1)    Anesthesia services provided by a physician for covered services are payable in all settings that are appropriate for the covered surgical or diagnostic service being performed, including inpatient hospital, outpatient hospital, freestanding ambulatory surgical center, and physician's office.

SALARIED HEALTH CARE PROGRAM

App. A

(2)   Anesthesia services include the
administration of anesthesia by a
Certified Registered Nurse Anesthetist
(CRNA) or an Anesthesia Assistant (AA)
working under the medical direction of
an anesthesiologist who is available for
immediate attendance.  CRNA services are
also covered if performed under the
general supervision of a physician who
is not an anesthesiologist and who is
available for immediate attendance.  .

(3)   CRNAs must attain specialty
certification from the Council on
Certification of Nurse Anesthetists and
be state licensed. AAs must be graduates
of an educational program accredited by
the Commission on Accreditation of
Allied Health Education Programs, be
certified by the National Commission for
the Certification of Anesthesiologists
Assistants and the National Board of
Medical Examiners, and work under the
supervision of  a licensed MD or DO who
is responsible for overall provision of
anesthesia to the patient.  Anesthesia
services performed by CRNAs or AAs are
payable in the inpatient hospital,
outpatient hospital or free-standing
ambulatory surgical center settings.

(4)   Administration of local anesthetics is
not covered.  Anesthesia services,
supplies, gases and use of equipement
provided by a hospital are covered only
under Section III.A.2.c.

d.   Technical surgical assistance:  Services by a
physician or a physician assistant who
actively assists the operating physician are
covered when medically necessary and when
related to covered surgical or maternity
services.  In order for the services of the
assistant surgical physician or a physician
assistant to be covered, it must be certified
that the services of interns, residents, or
house officers were not available at the time.
In order for technical surgical assistance
performed by a physician assistant to be
covered, the physician assistant must be
legally qualified and registered, certified

SALARIED HEALTH CARE PROGRAM

App. A

and/or licensed, as applicable, to perform these health care services.  The physician assistant must meet Program standards and be approved by the carrier.  Reimbursement for technical surgical assistance services performed by a physician assistant will be made to the employer of the physician assistant.

e.   Maternity care:  Obstetrical services of a physician or a certified nurse mid-wife, including usual prenatal and postnatal care, are covered.  For each pregnancy, coverage is also provided for routine prenatal laboratory examinations which are performed in connection with normal maternity care. Covered obstetrical services provided by a certified nurse-midwife are limited to basic antepartum care, normal vaginal deliveries, and postpartum care.  For a given uncomplicated pregnancy, reimbursement for such care would be to the physician or the certified nurse-midwife, but not both. Certified nurse-midwives are reimbursed only for deliveries occurring in the inpatient setting or in a birthing center that is hospital affiliated, state licensed and accredited and approved by the carrier.  The certified nurse-midwife must be legally qualified and registered, certified and/or licensed, as applicable, to perform these health care services.  The nurse-midwife must meet Program standards and be approved by the carrier.  Coverage includes:

(1)   the examination of a newborn child by a physician other than the delivering physician, certified nurse mid-wife or the physician administering anesthesia during delivery; and

(2)   obstetrical services of a physician for an abortion.

f.   Consultations:  When requested by the physician in charge of the case, coverage is provided for the assistance of a physician in the diagnosis or treatment of a condition which requires special skill or knowledge. This coverage does not include phone consultations or staff consultations required by a facility.

SALARIED HEALTH CARE PROGRAM

App. A

g.   Chemotherapy:  Coverage for chemotherapy is
provided under App. A, III.A.2.e. for
inpatient care and under App. A, III.A.3.a.(3)
for outpatient care.  Chemotherapy
administered in a physician's office is
covered on the same basis as outpatient and
excludes services which are research,
investigational or experimental in nature.
(See also Appendix A, III.L. regarding Centers
of Excellence for non-routine cancer care.)

h.   Extra-corporeal shock wave lithotripsy (ESWL):
Coverage is provided for services rendered in
a carrier-approved facility meeting Program
standards.

i.   Therapeutic radiology:  Coverage is provided
for treatment of conditions by x-ray, radium,
radon, external radiation, or radioactive
isotopes (e.g., cobalt), and includes the cost
of materials provided which are not supplied
by a hospital.

j.   Diagnostic radiology:  Coverage is provided if
approved by the carrier as required, for
diagnosis of any condition, disease, or injury
by x-ray, ultrasound, isotope examination,
computerized axial tomography (CAT), magnetic
resonance imaging (MRI) and positive emission
tomography (PET) scanning, mammography and
other modalities.  Coverage restictions
include, but are not limited to the following:

   (1)   Computerized axial tomography is covered
for diagnostic examinations of the head
and body when ordered by a physician and
performed on approved equipment in
accordance with Program standards.

   (2)   Digital subtraction angiography is
covered if performed on hospital based
equipment.

   (3)   Magnetic resonance imaging (MRI) and
positive emission tomography (PET)
scanning coverage is provided in
accordance with Program standards, which
include diagnosis restrictions and the
use of carrier-approved facilities.

   (4)   Positron emission tomography (PET) is a
covered procedure when performed in
accordance with Program standards for

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

covered conditions and approved providers.

(5)    The maximum benefit payable for digital mammography is the reasonable and customary charge for the alternative standard film mammogram.

k.    Laboratory, pathology and other services: Coverage is provided if approved by the carrier for laboratory and pathological examinations for the diagnosis of conditions, diseases, or injuries or for performing covered well child care services and physical examinations.  In addition to examinations of blood, tissue, and urine, diagnostic laboratory and pathology coverage includes laboratory procedures such as electrocardiograms, electroencephalograms, electromyograms, and basal metabolism tests.

(1)    Routine laboratory services in connection with normal maternity care are covered according to the provisions of Section III.E.3.e.

(2)    Hearing aid evaluation tests are covered only under Section III.H. of this Appendix.

(3)    Audiometric examinations may be covered, but are subject to the exclusions of Appendix A, III.H.5.a., d., e., g., h., i., j., k., and l.

l.    Physician medical visits:  Coverage is provided for medical visits by a physician when rendered in the physician's office, the home, a hospital, or a skilled nursing facility for the examination, or diagnosis and treatment of any condition, disease or injury subject to the provisions below.

(1)    Inpatient medical care is covered when provided by the physician in charge of the case.  Services of a physician who is treating a condition unrelated to the reason for the admission may also be covered.

(2)    Treatment rendered in or at a hospital is covered only when provided by a

SALARIED HEALTH CARE PROGRAM

App. A

physician who is not an employee of the hospital.

(3)    Well childcare is covered for enrollees six years of age or younger.

(4)    Routine physical examinations are covered for enrollees over six years of age and are limited to one each calendar year.

(5)    Physician medical visit coverage does not include services or separate charges for the following (although some of the items may be covered under other provisions of the Program):

(a)    mental health or substance abuse treatment;

(b)    prenatal and postnatal care;

(c)    immunizations;

(d)    routine eye examinations;

(e)    insurance, employment and premarital examinations;

(f)    manipulation, adjustment or massage of the musculoskeletal system;

(g)    allergy testing, treatment or injections;

(h)    weight control;

(i)    acupuncture; or

(j)    services provided by non-physician practitioners, e.g., Physician Assistants, Christian Science practitioners, etc.

m.    Immunizations and injections:  Coverage is provided for medically recognized immunizations and injections as approved by the carrier.

(1)    Serum is covered only when it is not supplied by a health department or other public agency.

(2)   Vitamin and iron injections are covered only when required and necessary for diagnosed illness.

(3)   Injections for chelation therapy are not covered, unless they meet Program standards as to diagnosis and the nature of the service(s) performed.  Chelation therapy by means other than injection may be covered under other provisions of the Program.

(4)   Allergy injections are not covered.

(5)   Injections covered under another Section of this Appendix (e.g., chemotherapy) are not covered.

n.   Foot care:  Coverage is provided for treatment of injuries and/or infections of the feet. Routine foot care (e.g., cutting, paring, debridement and curettement of nails, corns, calluses and other hyperkeratotic or benign lesions and treatment of mycotic toe nails) is covered only for enrollees with a confirmed diagnosis of diabetes or peripheral vascular disease and is subject to Program standards regarding frequency.

o.   Screening examinations:  Coverage is provided in accordance with the provisions of subsections E.3.j. and k., above, for appropriate examinations and procedures prescribed by a physician and performed solely for early detection of a pathological condition in an otherwise asymptomatic individual.  However, the deductible and copayment provisions otherwise applicable to services performed for enrollees of particular options, under Article II, Section 4 of the Program, do not apply to:

(1)   laboratory and pathological services for one routine Papanicolau (PAP) smear per enrollee per calendar year to detect cancer of the female genital tract,

(2)   one proctoscopic exam without biopsy performed within each three calendar year period after age 40 is attained, or

(3)   one routine screening or diagnostic mammogram per calendar year for

SALARIED HEALTH CARE PROGRAM

App. A

enrollees age 40 and older who meet Program standards.

(4)   one screening or diagnostic prostate specific antigen (PSA) test per calendar year for enrollees age 40 or older who meet Program standards.

(5)   one routine screening or diagnostic sigmoidoscopy or barium enema X-ray every five calendar years or one colonoscopy every 10 calendar years for enrollees age 50 or over.

(6)   one routine screening or diagnostic fecal occult blood test per calendar year for enrollees age 50 or over.

(7)   One routine screening or diagnostice total serum cholesterol test every five calendar years for enrollees age 20 or over.

(8)   When a covered diagnostic test requires injection of a drug, biological or solution in order to perform the test, the drug, biological or solution and the injection of it are covered, subject to carrier billing and reimbursement practices. For purposes of this subsection only, injections of thyrogen are covered in conjunction with covered thyroid scans.

p.   Contraceptive services:  Medical and surgical coverage for contraceptive services is limited to injections of contraceptive medication (professional fees and medication for injection), implantable contraceptives and their insertion or removal, intrauterine devices and their insertion or removal, cervical caps and their fitting, and the fitting of diaphragms.  Coverage under this Section does not include over-the-counter contraceptive devices or diaphragms.  (See Appendix A. III.G. for prescription drug coverage provisions regarding oral contraceptives, injectable contraceptive medication, contraceptive patches and diaphragms.)

4.   Limitations and Exclusions

App. A

a. Dental services, including extraction of teeth, except as provided for in Section III.E.3.a.(2), are not covered under this subsection.

b. Examinations and tests in connection with research studies, paternity determinations, weight control, autopsies, insurance, pre-employment or premarital examinations are not covered.

c. Services of stand-by physicians are not covered.

d. Services relating to refractive eye surgery (e.g., radial keratotomy, corneal sculpting or similar surgical procedures to correct vision) are not covered.

e. Invasive electromagnetic bone growth stimulation is not covered.

f. Growth factor treatment for wound care (e.g., Procuren) is not covered.

g. Thermography services are not covered.

h. Coverage for surgical and medical services is subject to the Terms and Conditions of Section II, and the Limitations and Exclusions of Section IV.

F.   Ambulance Service Coverage

1.   Conditions of Benefit Payments

Ambulance services are covered if the following conditions and requirements are met:

a. Ambulance services must be medically necessary. Ambulance services are not medically necessary if any other means of transportation could be used without endangering the patient's health.

b. The ambulance operation providing the service must be licensed and meet Program standards.

c. A physician must prescribe the services which necessitate the use of ambulance transportation.

2.   Coverages

SALARIED HEALTH CARE PROGRAM

App. A

The reasonable and customary charges for the following services are covered when furnished and billed by an eligible provider (as determined by the carrier):

a.   Charges for basic life support services - a standard charge per trip inclusive of use of vehicle and equipment, supplies and personnel required to perform services classified as basic life support services.  Basic life support consists of services which provide for the initial stabilization and transport of a patient.

b.   Charges for advanced life support services -- a standard charge per trip inclusive of use of vehicle and equipment, supplies and personnel required to perform services classified as advanced life support services.  Advanced life support is acute emergency treatment procedures with physician involvement.

c.   Mileage charges -- a charge per mile for distances traveled while the enrollee occupies the ambulance vehicle.

d.   Waiting time -- a charge for waiting time involved in round-trip transport of an enrollee from a hospital to another treatment site and return to the same hospital.

When services are received from an ambulance operation approved by the carrier, the carrier will reimburse the provider for the reasonable and customary charges as determined by the carrier.  An approved provider must agree to accept, as payment in full, the carrier's determination of the amount payable for covered ambulance services.

When services are received from an otherwise eligible, but non-approved provider, the carrier will pay the enrollee the reasonable and customary charge as determined by the carrier.

3.   Limitations and Exclusions

a.   The following services are not covered as separate charges; such charges are included in the benefit payment for the standard charge per trip:

SALARIED HEALTH CARE PROGRAM

App. A

    (1)  Use of specific equipment or devices;

    (2)  Gases, fluids, medications, dressings, or other supplies;

    (3)  First aid, splinting, or any emergency medical services or personal service procedures; and

    (4)  Vehicle operators, attendants, or other personnel.

        The charges for these services, while not covered as separate charges, are covered as a component of the charge for the basic or advanced life support services.

b.  Coverage is limited to the reasonable and customary charges for transporting the patient to the nearest medical facility qualified to treat the enrollee.

c.  Services of air and boat ambulance are subject to individual review.

    (1)  If the patient is transported to a facility other than the nearest medical facility qualified to treat the enrollee, benefits are allowed in an amount equal to that for transportation to the nearest facility.

    (2)  If transport by air or boat is not medically necessary, benefits are allowed in an amount equal to that for ground transportation for the same transfer.

d.  Coverage does not include the following:

    (1)  Transportation in a vehicle not qualified as an ambulance;

    (2)  Transportation for enrollee, family or physician convenience;

    (3)  Services rendered by fire departments, rescue squads or others whose fee is in the form of a voluntary donation;

    (4)  Transfers not medically necessary;

SALARIED HEALTH CARE PROGRAM

App. A

(5)  Fees, billed by physicians or other independent health care providers, for professional services rendered to enrollees transported by ambulance;

(6)  Fees for services when the enrollee is not actually transported while under care; and

(7)  Services which are payable through an existing arrangement for transfer of patients, where no additional charge is usually made, whether or not such services were immediately available.

e.  Coverage for ambulance services is subject to the Terms and Conditions of Section II, and the Limitations and Exclusions of Section IV.

G.  Prescription Drug Coverage

1.  Definitions

For the purposes of this subsection:

a.  "brand name drug" means a drug which is covered by a patent and for which an equivalent version can not be manufactured or marketed (single source) or a drug which is no longer covered by a patent and for which chemically equivalent versions can be manufactured and marketed (multi-source). "Brand name drugs" may be either "preferred" or "non-preferred" as determined by the carrier.

b.  "copayment" means an amount to be paid by the enrollee for each separate prescription order or refill of a covered drug.

c.  "covered drug or supplies or diaphragm" means insulin or any prescription legend drug (except as excluded under subsection G.5. below) that is dispensed according to a prescription order, provided that:

(1)  the drug or supply is medically necessary for the treatment of an illness or injury or, effective January 1, 2000, is a contraceptive medication or diaphragm;

SALARIED HEALTH CARE PROGRAM

App. A

(2)   the cost of the drug is not included or
includable in the cost of other services
or supplies provided to the enrollee;

(3)   the drug is customarily dispensed
according to a prescription order; and

(4)   the drug is not entirely consumed at the
time and place of the prescription
order.

"supplies" refers to syringes and needles
dispensed with self-administered insulin or
covered self-administered antineoplastic or
chemotherapeutic drugs or agents under the
provisions of this subsection.

"diaphragm" refers to a self-administered
contraceptive device.

d.   "generic drug" means a drug that is chemically
equivalent to a multi-source brand name drug.

e.   "nonparticipating provider" means a provider
who has not entered into a contract with the
carrier.

f.   "participating provider" means a provider who
has entered into a contract with a carrier to
provide a covered drug to an enrollee, in
accordance with the provisions of this Program
and this subsection.  Such contract shall
provide for payment to the provider based on
prescription charges.  In the case of a
preferred provider organization which provides
prescription drug coverage under the Program,
participating providers are the organization's
panel pharmacies.

g.   "pharmacist" means a person licensed to
dispense prescription legend drugs under the
laws of the state where such person practices.

h.   "pharmacy" means a licensed establishment
where prescription legend drugs are dispensed
by a pharmacist.

i.   "prescription charge" means a dispensing fee
plus the lesser of the reasonable and
customary amount paid by the provider for a
covered drug (including insulin and disposable
syringes and needles) or such amount as may be
negotiated by the carrier with participating

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 142 of 217
SALARIED HEALTH CARE PROGRAM

App. A

providers.  The "dispensing fee" is an amount or amounts, including applicable sales tax, predetermined by the carrier to compensate participating providers for dispensing covered drugs.

For covered drugs obtained from a nonparticipating provider or from a provider in an area where the carrier does not provide the coverage, the prescription charge means the reasonable and customary charge as determined by the carrier.

j.   "prescription legend drug" means any medicinal substance which, under the Federal Food, Drug and Cosmetic Act, is required to be labeled "Caution:  Federal law prohibits dispensing without a prescription" or "Rx Only" and includes compounded medications containing at least one prescription legend drug.

k.   "prescription order" means a written or oral request to a provider by a physician for a single prescription legend drug.

l.   "provider" means a pharmacy or any other organization or person licensed to dispense prescription legend drugs.

2.   Reimbursement

a.   The copayment amount for each separate prescription order or refill of a covered drug shall be $5, or the prescription charge, whichever is less, for a generic drug and 25% of the prescription charge for a brand name drug, as defined in 1.a. of this subsection III.G., except that the copayment shall be:

(1)   The prescription charge, if that amount is less than or equal to $15;

(2)   Not less than $15, if the prescription charge exceeds that amount;

(3)   Not more than $35; and

(4)   $12 for generic and $40 for brand prescriptions dispensed through the Mail Order Prescription Drug program.

b.   Except for the amounts indicated above, covered drugs or supplies obtained from a

SALARIED HEALTH CARE PROGRAM

App. A

participating provider are covered subject to the Program provisions.

c.  Upon proof of payment acceptable to the carrier, an enrollee is entitled to reimbursement from the carrier of 75% of the reasonable and customary charge, as determined by the carrier after deduction of the copayment, of covered drugs obtained on a non-emergency basis from a nonparticipating provider located within the area in which the carrier provides coverage.

d.  Upon proof of payment acceptable to the carrier, an enrollee is entitled to reimbursement from the carrier of 100% of the reasonable and customary charge, as determined by the carrier after deduction of the copayment, of covered drugs obtained from a provider located outside the area in which the carrier provides coverage or from an in-area nonparticipating provider in the case of an emergency (as determined by the carrier).

3.  Coverage

a.  Coverage includes up to a 34-day supply of a covered drug

b.  Coverage includes an appropriate supply of disposable syringes and needles when prescribed and dispensed with a supply of self-administered insulin or a covered self-administered antineoplastic or chemotherapeutic agent.

c.  Coverage includes up to a 90-day supply of covered drugs obtained through the Mail Order Prescription Drug program with a corresponding prescription or refill order. Diaphragms are not available through the mail order pharmacy.

4.  Maximum Allowable Cost Programs

Maximum Allowable Cost (mandatory generic substitution) prescription drug programs or alternative generic substitution programs are applicable where in effect.

5.  Prior Authorization Process

Upon the recommendation of the carrier and the approval of the Plan Administrator, certain

SALARIED HEALTH CARE PROGRAM

App. A

prescription legend drugs will require prior
authorization by the carrier to be covered under
the Program.  Prior Authorization is a process
whereby the carrier determines before the
prescription legend drug is dispensed that the drug
is being prescribed appropriately according to FDA
approvals and the manufacturer's recommendations.

Depending on the prescription, prior authorization
may be required before the initial prescription is
filled or it may be required after a certain
quantity of the prescription legend drug has been
dispensed or the prescription legend drug has been
taken for a specified period of time.  The quantity
or time period used to determine if and when prior
authorization will be required will be recommended
by the carrier, in accordance with FDA approvals
and the manufacturer's recommendations, and
approved by the Program Administrator.

Prescription legend drugs requiring
predetermination will be covered under the Program
if the Pre-determination criteria are met.  A
prescription legend drug requiring predetermination
will not be covered under the Program if 1) the
requested clinical information is not provided by
either the enrollee or prescriber to the carrier,
or 2) the information provided by the enrollee or
prescriber to the carrier is insufficient to meet
the clinical requirements determined by the carrier
in accordance with FDA approvals and the
manufacturer's recommendations.

The carrier will periodically make recommendations
to remove or add prescription legend drugs to the
prior authorization process.  A list of those drugs
requiring prior authorization will be made
available to the enrollee by the carrier upon
request.

Adverse determinations made by the carrier under
the predetermination process may be appealed by the
enrollee according to Article I, Section 6.

6.    Limitations and Exclusions

      a.    Transdermal nicotine patches or any other
            medication or prescription legend drug used
            for or in connection with the control or
            cessation of smoking are covered only if
            ordered through the Mail Order Prescription
            Drug program.

SALARIED HEALTH CARE PROGRAM

App. A

Transdermal patches are limited to one continuous 12-week supply, lifetime maximum.

b.    Coverage under this subsection does not include:

(1)    any research or experimental agent including Federal Food and Drug Administration approved drugs which may be prescribed for research or experimental treatments;

(2)    any charge for a prescription legend drug which requires prior authorization by the carrier for initial or continued coverage, unless such authorization is received;

(3)    any charge for a medication being used for a cosmetic purpose, even if the medication is a prescription legend drug;

(4)    any prescription legend drug prescribed for the purpose of attempting to induce pregnancy;

(5)    any charge for a prescription legend drug prescribed for weight control or appetite suppression;

(6)    any charge for devices (other than diaphragms)or appliances (e.g., orthotics, and other non-medical items);

(7)    any vaccine administered for the prevention of infectious diseases;

(8)    any charge for administration of covered drugs;

(9)    any charge for a covered drug in excess of the quantity specified by the physician, or any refill dispensed after one year from the physician's order;

(10)   any charge for more than a 34-day supply of a covered drug provided by a retail pharmacy, or any charge for more than a 90-day supply of a covered drug supplied through the Mail Order Prescription Drug program;

SALARIED HEALTH CARE PROGRAM

App. A

    (11) any charge for medications furnished on an inpatient or outpatient basis covered under any other subsection of this Appendix or under any subsection of Appendix B; and

    (12) any charge for drugs received prior to the effective date of this coverage.

c.    Certain prescription legend drugs are covered at retail, at the applicable 34-day copayment, for an original prescription and two (2) refills; thereafter, they are covered at mail, at the applicable 90-day copayment or at retail subject to a 100% copayment penalty.

    The carrier will periodically make recommendations to remove or add prescription legend drugs that are subject to this restriction.  A list of those drugs requiring prior authorization will be made available to the enrollee by the carrier upon request.

d.    Coverage under this subsection is subject to the Terms and Conditions of Section II, and the Limitations and Exclusions of Section IV.

7.    Pharmacy Network

a.    The carrier will maintain a nationwide limited network of participating retail providers (including local and national pharmacy chains, as appropriate), and a mail order pharmacy. The carrier will select network pharmacies, in part, on access and quality assurance criteria. In contracting with providers, the carrier will assure that the providers fully understand the Program's prescription drug coverage provisions, including eligibility requirements and benefit levels. The carrier will negotiate appropriate fees with participating providers.

b.    The carrier will meet standards of quality, service and accessibility (e.g., availability of participating providers within 5 miles of enrollee's residence or closest facility if greater than 5 miles for 90% of enrollees).

c.    The carrier will establish uniform pharmacy protocols, pharmacy auditing procedures, drug utilization review processes and all quality assurance procedures.

SALARIED HEALTH CARE PROGRAM

App. A

d.   The carrier will monitor network performance and provide aggregate data on a regular basis. Data reports will include, but not be limited to, information such as utilization of services, costs, quality measurements, use of various categories of drugs (e.g., generic, single source, etc.), provider prescribing patterns and patient outcomes.

e.   The carrier will be subject to independent audits to assure that quality, service, professional standards and other express commitments are being met.

f.   The carrier will make benefit payments to the participating providers or, in the case of services received from non-participating providers, the carrier will make benefit payments to the enrollee or non-participating provider, as appropriate.

g.   The carrier will administer Drug Utilization Review (DUR) activities to review whether patients receive appropriate drug therapy as measured against generally accepted pharmaceutical practices. Such DUR incorporates concurrent and retrospective reviews. It also incorporates a voluntary drug formulary and a mandatory program to promote use of generic prescription drugs, where appropriate. In addition, DUR will attempt to identify a variety of critical drug therapy problems such as, but not limited to:

(1)   Drug-disease conflicts;
(2)   Drug-drug interactions;
(3)   Age/gender prescription conflicts;
(4)   Over and under utilization;
(5)   Allergy alerts;
(6)   Therapeutic duplication; and
(7)   Early refills.

h.   The carrier will provide a comprehensive on-line, point-of-service claims processing system with an electronic telecommunication network that facilitates management of enrollee eligibility verification, formulary information, drug prescribing protocols, drug utilization review, pharmacy reimbursement and possibly expanded patient information, to make informed dispensed decisions.

2007

SALARIED HEALTH CARE PROGRAM

App. A

    i.    The carrier will conduct pharmacist profiling, and individual intensive education will be completed as necessary.

    j.    The carrier will conduct physician profiling and will identify physicians who exhibit persistently inappropriate prescribing patterns across their practice. Such physicians will be subject to individual intensive education efforts, as necessary.

    k.    The carrier will prepare appropriate communications regarding the prescription drug coverage for enrollees, network pharmacies and, as necessary, for prescribing physicians.

    l.    The carrier will ensure that quality assurance mechanisms will be administered to identify routinely inappropriate drug prescribing that could result in adverse medical outcomes, including hospitalization, by incorporating components such as:

    (1)    A total quality management (TQM) philosophy;

    (2)    Rigorous pharmacy management and performance monitoring;

    (3)    Prescribing physician reeducation, as necessary;

    (4)    Client specific program performance management;

    (5)    Patient medication compliance monitoring; and

    (6)    Outcomes assessment analyses.

H.   Hearing Aid Coverage

    1.    Definitions

        For the purposes of this subsection:

    a.    "physician" means a participating otologist or otolaryngologist who is board certified or eligible for certification in such specialty in compliance with standards established by the respective professional sanctioning body, who is a licensed doctor of medicine or osteopathy legally qualified to practice medicine and who, within the scope of such license, performs a medical examination of the ear and determines whether the patient has a loss of hearing acuity and whether the loss can be compensated for by a hearing aid;

2007

SALARIED HEALTH CARE PROGRAM

App. A

b.   "audiologist" means any participating person
who (1) possesses a master's or doctorate
degree in audiology or speech pathology from
an accredited university, (2) possesses a
Certificate of Clinical Competence in
Audiology from the American Speech and Hearing
Association and (3) is qualified in the state
in which the service is provided to conduct an
audiometric examination and hearing aid
evaluation test for the purposes of measuring
hearing acuity and determining and prescribing
the type of hearing aid that would best
improve the enrollee's loss of hearing acuity.
A physician performing the foregoing services
shall be deemed an audiologist for purposes of
this subsection;

c.   "dealer" means any participating person or
organization that sells hearing aids
prescribed by a physician or audiologist to
improve hearing acuity in compliance with the
laws or regulations governing such sales, if
any, of the state in which the hearing aids
are sold;

d.   "provider" means a physician, audiologist or
dealer;

e.   "participating" means having a written
agreement with the carrier pursuant to which
services or supplies are provided under this
subsection (if the carrier does not maintain
agreements with such providers,
"participating" shall mean any provider
approved for reimbursement by the carrier);

f.   "hearing aid" means an electronic device worn
on the person for the purpose of amplifying
sound and assisting the physiologic process of
hearing, and includes an ear mold, if
necessary;

g.   "ear mold" means a device of soft rubber,
plastic or a non-allergenic material which may
be vented or nonvented that individually is
fitted to the external auditory canal and
pinna of the enrollee;

h.   "audiometric examination" means a procedure
for measuring hearing acuity that includes
tests relating to air conduction, bone
conduction, speech reception threshold and
speech discrimination;

SALARIED HEALTH CARE PROGRAM

App. A

    i.   "hearing aid evaluation test" means a series of subjective and objective tests by which a physician or audiologist determines which make and model of hearing aid will best compensate for the enrollee's loss of hearing acuity and which make and model will therefore be prescribed, and shall include one visit by the enrollee subsequent to obtaining the hearing aid for an evaluation of its performance and a determination of its conformity to the prescription;

    j.   "dispensing fee" means a fee predetermined by the carrier to be paid to a dealer for dispensing hearing aids, including the cost of providing ear molds, under this subsection;

    k.   "acquisition cost" means the actual cost to the dealer of the hearing aid.

2.   Conditions of Benefit Payments

An enrollee is eligible for benefits for covered hearing aid expenses subject to the provisions below.

    a.   Charges incurred for audiometric examinations are covered to the extent that these charges are reasonable and customary when performed by a physician or audiologist, but only in conjunction with the most recent medical examination of the ear by a physician.

    b.   Hearing aid evaluation tests are covered only when indicated by the most recent covered audiometric examination up to $12 ($126 effective October 1, 2004) per test or, if higher, the adjusted maximum determined under subsection e. below.

       Hearing aid evaluations performed by a physician or audiologist include the trial and testing of various makes and models of hearing aids to determine which one will best compensate for the loss of hearing acuity.

    c.   Standard hearing aids are covered if:

       (1)   they are of the following functional design: in-the-ear, behind-the-ear (including air conduction and bone conduction types) or on-the-body;

SALARIED HEALTH CARE PROGRAM

App. A

(2)    they are prescribed based upon the most recent audiometric examination and most recent hearing aid evaluation; and

(3)    the hearing aid provided by the dealer is the make and model prescribed by the physician or audiologist and is certified as such by the physician or audiologist. Binaural hearing aids will be provided only for children under 19 years of age with a hearing loss in both ears. For children 7 years of age and under, replacement ear molds are covered as of January 1, 2004 for:

(a)    4 ear molds per year for children under the age of 3; and

(b)    2 ear molds per year for children ages 3 through 7.

d.    In order for the charges for services and supplies described in b. and c. immediately above to be covered under this subsection, for an initial hearing aid, an enrollee must first obtain a medical examination of the ear by a physician.  Such examination or such examination in conjunction with the audiometric examination must result in a determination that a hearing aid would compensate for the loss of hearing acuity and, in the case of binaural hearing aids for children, would correct or prevent speech impairment. For enrollees under the age of 18, a medical exam is required each time a hearing aid is covered.

e.    The maximum covered expense for a hearing aid evaluation test shall be adjusted on October 1 of each year, based on the percentage increase as of the July levels in the United States Consumer Price Index for the immediately preceding 12 months.  The result will be rounded to the nearest dollar.

3.    Coverages

The enrollee may obtain audiometric examinations, hearing aid evaluation tests and hearing aids that the provider shall have agreed to furnish enrollees in accordance with the following reimbursement arrangements:

SALARIED HEALTH CARE PROGRAM

App. A

    a.    for an audiometric examination, the reasonable and customary charge;

    b.    for hearing aid evaluation tests, the reasonable and customary charge, but not to exceed the amount as provided in subsections H.2.b. and e.; and

    c.    for covered hearing aids, the acquisition cost and dispensing fee.

If the enrollee requests services or devices from the provider which are not covered under these provisions (e.g., binaural hearing aids for enrollees over 19), the enrollee shall pay the full additional charge.

4.    Frequency Limitations

If an enrollee has received an audiometric examination, a hearing aid evaluation test or a hearing aid for which benefits were payable under this subsection, benefits will be payable for each subsequent audiometric examination, hearing aid evaluation test or hearing aid only if received more than 36 months after receipt of the most recent previous audiometric examination, hearing aid evaluation test and hearing aid, respectively, for which benefits were payable under this subsection.

5.    Exclusions

Covered hearing aid expenses do not include and no benefits are payable under this Section III.H., for:

    a.    audiometric examinations by an audiologist for any condition other than loss of hearing acuity;

    b.    medical or surgical treatment;

    c.    drugs or other medication;

    d.    audiometric examinations, hearing aid evaluation tests and hearing aids provided under any applicable Worker's Compensation law;

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

 e. audiometric examinations and hearing aid evaluation tests performed, and hearing aids ordered:

  (1) before the enrollee became eligible for coverage; or

  (2) after termination of the enrollee's coverage;

 f. hearing aids ordered while covered but delivered more than 60 days after termination of coverage;

 g. audiometric examinations, hearing aid evaluation tests and hearing aids for which no charge is made to the enrollee or for which no charge would be made in the absence of hearing aid coverage;

 h. audiometric examinations, hearing aid evaluation tests and hearing aids which are not necessary, according to professionally accepted standards of practice, or which are not recommended or approved by the physician;

 i. audiometric examinations, hearing aid evaluation tests and hearing aids that do not meet professionally accepted standards of practice, including any such services or supplies that are experimental in nature;

 j. audiometric examinations, hearing aid evaluation tests and hearing aids received as a result of ear disease, defect or injury due to an act of war, declared or undeclared;

 k. audiometric examinations, hearing aid evaluation tests and hearing aids provided by any governmental agency that are obtained by the enrollee without cost by compliance with laws or regulations enacted by any Federal, state, municipal or other governmental body;

 l. audiometric examinations, hearing aid evaluation tests and hearing aids to the extent benefits therefor are payable under any health care program supported in whole or in part by funds of the Federal government or any state or political subdivision thereof;

 m. replacement of hearing aids that are lost or broken unless at the time of such replacement

2007

SALARIED HEALTH CARE PROGRAM

App. A

the enrollee is otherwise eligible under the
frequency limitations set forth herein;

n.    replacement parts for and repairs of hearing
aids;

o.    charges incurred by enrollees of a health
maintenance organization option;

p.    charges for a eyeglass-type hearing aids, to
the extent the charge for such hearing aid
exceeds the covered hearing aid expense for
one standard, conventional hearing aid (See
Subsection H.2.c., above);

q.    binaural hearing aids except as provided in
this subsection for children under 19 years of
age; and

r.    charges for a digital-controlled/programmable
hearing devices, to the extent the charge for
such hearing device exceeds the covered
expense for a standard, conventional hearing
aid (See Subsection H.2.c., above).

I.    Durable Medical Equipment and Prosthetic and Orthotic
Appliance Coverage

1.    Conditions of Benefit Payments

An enrollee is eligible for benefits for the rental
or purchase of durable medical equipment and the
purchase of prosthetic and orthotic appliances only
when the following conditions have been met:

a.    the items rented or purchased are basic
equipment or appliances or are medically
necessary special features which are
prescribed by the attending physician and
approved by the carrier;

b.    the equipment or appliances are prescribed by
a physician and the prescription includes a
description of the equipment and the reason
for use or the diagnosis;

c.    for purchased durable medical equipment or
prosthetic or orthotic appliances, the order
must be placed on or after the effective date
and prior to the termination date of the
enrollee's coverage in this Program; and

SALARIED HEALTH CARE PROGRAM

App. A

d.   for rented durable medical equipment, the rental period is on or after the effective date and prior to the termination date of the enrollee's coverage in this Program.

2.   Payment of Services

a.   The carrier will make payment for the reasonable and customary charge for rental or purchase of durable medical equipment when obtained from a provider other than a hospital or skilled nursing facility.  Benefit payments for rental of durable medical equipment shall not exceed the purchase price of such equipment.

b.   The carrier will make payment for the reasonable and customary charge for external prostheses and orthotic appliances.

c.   Effective January 1, 1998, a nationwide network was established for the administration of coverages for durable medical equipment and prosthetic and orthotic appliances.  No enrollee deductible or copayment is required for covered services received within the national network.  For services received outside the network, the enrollee is responsible for any difference between the provider's charge and the reasonable and customary charge.

3.   Coverages

a.   Process for Updating Coverages

(1)   A procedure has been established for the ongoing periodic update of the durable medical equipment and prosthetic and orthotic appliance coverages.

(2)   Written notification of changes in Medicare Part B durable medical equipment and prosthetic and orthotic appliance coverages, and other recommendations for coverage changes, will be provided to the Corporation by the Control Plan.

The notifications and recommendations shall include, but not be limited to, the following information:

2007

SALARIED HEALTH CARE PROGRAM

App. A

    (a)   Quality of care, access and appropriate utilization concerns and proposed actions to resolve such concerns;

    (b)   Any item(s) being replaced by new item(s), and a plan for discontinuation of coverage for the replaced item(s); and

    (c)   Positive or negative impact on Program costs.

  (3)   The Corporation shall review and approve or disapprove the application of Medicare Part B coverage changes or other Control Plan recommendations.  If approval is given for a coverage change, an effective date will be established.

  (4)   The Control Plan will advise appropriate carriers of any changes that are approved through this procedure, the effective dates, and any applicable administrative rules.  The local carriers will advise providers.

b.   Durable Medical Equipment

  (1)   Unless otherwise indicated below, the equipment must be an item of durable medical equipment, which meets Program standards including being approved for reimbursement under Medicare Part B or adopted in accordance with the process in subsection 3.a., above, and be appropriate for use in the home.

  (2)   Durable medical equipment is covered when used in a hospital or skilled nursing facility, or when used outside the hospital or skilled nursing facility and rented or purchased from such hospital or facility upon discharge.

  (3)   When the equipment is rented and the rental period extends beyond the expiration of the original prescription, the physician must recertify, by another prescription, that the equipment continues to be reasonable and medically necessary for the treatment of the illness or injury or to improve the

SALARIED HEALTH CARE PROGRAM

App. A

functioning of a malformed body member.
 If the recertification is not
submitted, coverage will cease on the
date indicated on the original
prescription for duration of need, or 30
days after the date of death, whichever
is earlier.  Coverage will not be
provided for rental charges in excess of
the purchase price of the equipment.

(4)   When the equipment is purchased,
coverage is provided for repairs
necessary to restore the equipment to a
serviceable condition.  Routine periodic
maintenance is not covered.

(5)   The following equipment is covered,
subject to any stated conditions and to
the other Program standards, although
not Medicare approved:

(a)   neuromuscular stimulators, if
prescribed by an orthopedic or
physiatric specialist;

(b)   positioning transportation chairs
as alternatives to traditional
wheelchairs for children 14 years
of age and under, who suffer from
neuromuscular disorders, closed
head injuries, spinal cord
disorders or congenital
abnormalities;

(c)   external electromagnetic bone
growth stimulators, as an
alternative to bone grafting in
cases of severe physical trauma
involving non-union of long bone
fractures (in excess of 90 days
from the date of fracture), or
failed bone fusion (stimulators
employed in invasive stimulation
are excluded under this subsection
I.);

(d)   pressure gradient supports (also
known as burn pressure garments)
prescribed for circulatory
insufficiency conditions to promote
and restore normal fluid
circulation in the extremity (up to
four times annually for chronic

SALARIED HEALTH CARE PROGRAM

App. A

conditions unless there is a change
in physical conditions such as gain
or loss of weight of the patient),
or when prescribed to enhance
healing and prevent scarring of
burn patients;

(e)    phototherapy (bilirubin) light with
photometer, for patients under the
age of one having a diagnosis of
hyperbilirubinemia;

(f)    special features which, although
not subject to review and approval
under Medicare Part B, are
necessary to adapt otherwise
covered equipment for use by
children; and

(g)    continuous passive motion device
for use after surgery to the elbow
or shoulder (as well as following
total knee replacement, as provided
by Medicare).

(6)    Pronged and standard canes must be
purchased.

c.    Prosthetic and Orthotic Appliances

(1)    Unless otherwise indicated below, the
appliance must be a prosthetic or
orthotic device which meets Program
standards, including being approved for
reimbursement under Medicare Part B or
adopted in accordance with the process
in subsection 3.a., above.

(a)    Coverage for therapeutic shoes
prescribed for diabetic enrollees
not eligible for Medicare shall be
limited to the diagnoses
established by the Control Plan.

(b)    The following items are covered,
subject to any stated conditions
and to other provisions of the
Program and this subsection,
although not Medicare-approved:

(i)    any style of orthopedic shoe,
in addition to a basic oxford,

SALARIED HEALTH CARE PROGRAM

App. A

when the shoe is an integral
part of a covered brace;

(ii) all orthopedic shoe inserts,
arch supports and shoe
modifications used with a shoe
that is attached to a covered
brace; and

(iii) wigs and appropriate related
supplies (stands and tape) are
covered for those enrollees
suffering hair loss from the
effects of chemotherapy,
radiation, or other treatments
for cancer.  For the first
purchase of a wig and
necessary related supplies
coverage will be provided up
to $200.  Thereafter, during
each subsequent calendar year,
coverage will be provided up
to $125 towards the purchase
of a wig and necessary related
supplies.

(2)  Coverage is provided for appliances
furnished by a fully accredited facility
or, with carrier approval, by facilities
conditionally accredited by the American
Board for Certification in Orthotics and
Prosthetics, Inc. as a provider for the
kind of device supplied.  The following
appliances may be provided by facilities
not accredited by the American Board for
Certification in Orthotics and
Prosthetics:  ocular prostheses;
prescription lenses; pacemakers; ostomy
sets and accessories; catheterization
equipment and urinary sets;
prefabricated custom fitted orthotic
appliances; artificial ears, noses, and
larynxes; external breast prostheses;
wigs and related supplies and such other
appliances as the carrier may determine.

(3)  Coverage includes prosthetic appliances
or devices which are surgically
implanted permanently within the body
(except for experimental or research
appliances or devices) or those which
are used externally while in the
hospital as part of regular hospital

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

equipment, as well as external
prosthetic or orthotic appliances
prescribed by a physician for use
outside the hospital.

(4)   Coverage for a prosthetic and orthotic
appliance includes the replacement,
repair, fitting and adjustments of the
appliance.

(5)   Coverage includes only the first set of
prescription lenses (eyeglasses or
contact lenses) following a cataract
operation for any disease of the eye or
to replace the organic lens missing
because of congenital absence, or when
customarily used during convalescence
from eye surgery.

4.   Limitations and Exclusions

a.   Durable medical equipment which is not covered
includes, but is not limited to:

(1)   deluxe equipment such as motor driven
wheelchairs and beds, unless medically
necessary for the treatment of the
enrollee's condition and required in
order for such enrollee to be able to
operate the equipment (for deluxe
equipment or features which are not
medically necessary for the treatment of
the enrollee's condition and required in
order for such enrollee to be able to
operate the equipment, benefits are
limited to the comparable cost of basic,
standard equipment);

(2)   comfort, convenience, self-help and
environmental items not primarily
medical in nature such as, but not
limited to, bedboards, bathtub lifts,
overbed tables, adjust-a-beds, telephone
arms, air conditioners, humidifiers,
sauna baths, paging systems, intercoms
and elevators;

(3)   physician's equipment (such as
sphygmomanometers and stethoscopes);

(4)   exercise and hygienic equipment (such as
exercycles, Moore Wheel, bidet, toilet
seats and bathtub seats);

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

     (5)    experimental, investigational or
           research equipment; and

     (6)    home uterine monitoring equipment.

b.    Coverage for prosthetic and orthotic
     appliances does not include:

     (1)    dental appliances; hearing aids;
           eyeglasses (except as provided in
           subsection 3.b.(5) above); or such
           non-rigid appliances and supplies as
           elastic stockings, garter belts, corsets
           or arch supports and corrective footwear
           unless the footwear is attached to a
           medically necessary brace and covered
           under subsection 3.b.(1), above;

     (2)    foot orthotics or any device used to
           protect the foot from trauma caused by
           gravitational forces or shoe pressure,
           whether functional, supportive,
           accommodative or digital in nature, and
           whether or not custom-molded;

     (3)    hair pieces or wigs, except as specified
           in Section III.I.3.c.(1)(b)(iii); or

     (4)    experimental, investigational or
           research devices.

J.   Hospice Coverage

Hospice coverage, as described below, is available to
Basic Medical Plan, Enhanced Medical Plan, Standard
Medical Plan, Standard Plus Medical Plan and Point-of-
Service option enrollees.  It addresses the needs of
terminally ill patients who do not require the
continuous level of care provided in a hospital or
skilled nursing facility.

1.   Definitions

    For the purposes of this subsection:

a.    "Bereavement counseling" means services
     provided to the patient's family (or other
     person caring for the patient at home) after
     the patient's death.

b.    "Care rendered in a nursing home facility with
     hospice support" means care provided to

          2007

SALARIED HEALTH CARE PROGRAM

App. A

        patients who are medically stable but unable to return home because there is no primary care giver available to care for the patient at home, and the patient cannot self-administer the needed care.

c.    "Respite care" means short-term inpatient care provided only when necessary to give relief to family members or other persons caring for the patient at home.

2.    Conditions of Benefit Payments

An enrollee is eligible for benefits for covered expenses incurred in a hospice program only if the following conditions have been met:

a.    The hospice program services are received on or after the effective date and prior to the termination date of the enrollee's coverage in this Program.

b.    The services are provided and billed by a hospice program which meets Program standards and is approved by the local carrier.

c.    The enrollee is admitted to the hospice program by order of a physician who certifies that the enrollee requires the type of care available through the hospice and that the enrollee has a life expectancy of six months or less.

d.    The enrollee voluntarily elects to participate in the hospice program and agrees to accept the services provided by the hospice program as treatment of the terminal condition.

e.    The enrollee has benefit period days available under the hospice benefit period (see App. A, II.B.).

3.    Coverages

a.    Benefits for hospice services are limited to a maximum aggregate lifetime benefit in accordance with Program standards.

b.    Upon admission to an approved hospice program, an enrollee is entitled to receive the following services when rendered as part of the treatment plan:

2007

SALARIED HEALTH CARE PROGRAM

App. A

    (1)    nursing care provided by or under the supervision of a registered nurse;

    (2)    medical social services provided by a social worker under the direction of a physician;

    (3)    physician services;

    (4)    counseling services provided to the patient, family members and/or other persons caring for the patient at home;

    (5)    general inpatient care provided in a hospice inpatient unit;

    (6)    medical appliances and supplies;

    (7)    physical, occupational and speech therapies;

    (8)    continuous home care provided during periods of crisis as necessary to maintain the patient at home;

    (9)    respite care;

    (10)  bereavement counseling;

    (11)  care rendered in a nursing home with hospice support; and

    (12)  home health aide services.

K.    Case Management Program

    1.    Case Management (CM) is a component which is applicable to Basic Medical Plan, Enhanced Medical Plan, Standard Medical Plan, Standard Plus Medical Plan, and POS Plan option enrollees, and which is intended to provide high quality, cost-effective alternative treatment options for patients with catastrophic, chronic, and long-term treatment needs which may result in exhaustion of benefits or high costs. It focuses on those whose care could be maintained, improved or prolonged by more effective use of existing Program provisions or, in appropriate cases, through Alternative Benefit Plans designed to cost no more than the treatment otherwise planned. The Case Management Program is not a method for approving new procedures or services not otherwise covered under the Program.

SALARIED HEALTH CARE PROGRAM

App. A

2.   The list of conditions used by the carriers or
Utilization Review Organization, as appropriate,
for review for potential CM involvement includes,
but is not limited to, the following:

a.   major head trauma;

b.   spinal cord injury;

c.   coma;

d.   multiple amputations;

e.   traumatic and degenerative
muscular/neurological disorders (e.g.,
muscular dystrophy, "Lou Gehrig's Disease,"
multiple sclerosis);

f.   newborns with high risk complications;

g.   births with multiple congenital anomalies;

h.   cerebrovascular accident (stroke) requiring
long-term rehabilitation;

i.   severe burns;

j.   Acquired Immune Deficiency Syndrome (AIDS);

k.   selected blood abnormalities;

l.   diagnoses involving long-term IV therapy
(e.g., osteomyelitis, pericarditis,
endocarditis);

m.   severe rheumatoid arthritis;

n.   selected osteoarthritis;

o.   Crohn's disease; and

p.   cases involving extended or repeated hospital
stays, as well as cases having multiple
admissions for the same diagnosis.

3.   Once a patient's medical condition is identified by
the carrier or Utilization Review Organization, as
appropriate, as having potential for Case
Management, the case is reviewed confidentially,
and a treatment plan may be developed by the
carrier or Utilization Review Organization, as
appropriate, with the cooperation of the patient,
family, and the physicians/providers.

SALARIED HEALTH CARE PROGRAM

App. A

4. If a decision is made to implement a treatment plan
that incorporates services not otherwise covered
under this Program (an Alternative Benefit Plan),
the remaining days of inpatient care, determined in
accordance with the attending physician's
prognosis, are converted into a dollar pool against
which all benefits paid while the patient is under
the Alternative Benefit Plan are charged.

a. The total cost of Alternative Benefit Plans
involving services not otherwise covered will
be limited by the cost of treatment which
would have occurred otherwise.

b. If the dollar pool is exhausted, the
Alternative Benefit Plan ceases and the
provisions of Appendix A, II.B. will apply
with regard to renewal of a benefit period.

c. Participation in Case Management is voluntary,
and the patient may withdraw from an
Alternative Benefit Plan at any time. In such
event, the remaining dollar pool is
reconverted to equivalent hospital days to
determine the patient's entitlement, if any,
remaining in the benefit period.

L. Centers of Excellence

1. Centers of Excellence Program (COE) is a voluntary
component applicable to Basic Medical Plan and
Enhanced Medical Plan option enrollees who do not
have Medicare or another group health care plan as
their primary coverage. COE is intended to provide
information on and access to high quality
facilities which specialize in certain organ
transplant, cardiac and cancer procedures. It
focuses on certain procedures which have been
demonstrated to result in better clinical outcomes
when performed in higher volume Centers of
Excellence facilities. COE is not a method for
approving new procedures or services not otherwise
covered under the Program.

2. The organ transplant, cardiac and cancer procedures
included in COE will be determined based on their
clinical complexity by the Utilization Review
Organization. The organ transplant, cardiac and
cancer procedures may be updated periodically by
the Utilization Review Organization, as
appropriate.

SALARIED HEALTH CARE PROGRAM

App. A

3.    During the predetermination review of a COE procedure, the Utilization Review Organization will evaluate the case for COE referral.  The Utilization Review Organization will consider the patient's medical condition, and the clinical complexity of the COE procedure to make COE referrals as they deem appropriate.  Participation in COE is voluntary.

4.    If the enrollee is offered and agrees to participate in the COE for covered services, additional coverage may be provided for related travel, meal and lodging expenses of the patient and one caregiver, up to a lifetime maximum of $7,500 per enrollee per condition, in accordance with the following requirements:

   a.    The enrollee is referred to a COE facility located more than 100 miles from the enrollee's place of residence;

   b.    Paid receipts and other documentation are provided by the enrollee as required by the Utilization Review Organization; and

   c.    The reimbursement of travel, meal and lodging expenses is approved by the Utilization Review Organization.

5.    If an enrollee is referred to a COE facility which is not a participating facility with their Basic Medical Plan or Enhanced Medical Plan, the facility will be treated as a participating facility for COE services provided.

6.    In the Point of Service Plan, coverage for organ transplants is only available through network providers.

M.    Disease Management

1.    Disease Management (DM) is a voluntary component which is applicable to Basic Medical Plan, Enhanced Medical Plan and Point of Service plan option enrollees who do not have Medicare or another group health care plan as their primary coverage.  DM is intended to provide education and support for enrollees with asthma, diabetes and cardiac conditions.  It focuses on assisting enrollees to better manage their condition.  Disease Management is not a method for approving new procedures or services not otherwise covered under the Program.

SALARIED HEALTH CARE PROGRAM

App. A

2.   Except for the Point of Service Plan, if an
enrollee is offered and agrees to participate in
DM, coverage may be provided for patient education
and related services not otherwise covered under
this Program in accordance with the following
conditions:

a.   The services are approved in advance by the
carrier or Utilization Review Organization, as
appropriate.

b.   The services are part of a disease management
treatment plan and are focused on the
enrollee's asthma, diabetes or cardiac
condition.

IV.  Limitations and Exclusions

In addition to the limitations and exclusions appearing in
other Sections of this Appendix, the following general
limitations and exclusions apply to all Sections:

A.   Effective date:  For the purposes of this Section,
effective date means the later of the effective date of
this Program or the effective date of the enrollee's
coverage under this Program.  Benefits are not provided
under this Program for:

1.   services, treatment, or care provided to an
enrollee prior to the effective date; or

2.   hospital, skilled nursing facility, or home health
care services for admissions which commenced prior
to the effective date.

B.   Termination date:  Coverage is not provided for services
provided after the date this Program or an enrollee's
coverage under this Program is terminated except that
the coverage continues for physician and hospital,
skilled nursing facility, or residential substance abuse
facility services for continuous predetermined and
approved (see App. A, II.A. and App. B, II.A.) inpatient
admissions which commenced prior to the termination date
of such coverage.

C.   Excluded facilities:  Coverage under this Appendix does
not include services provided by a day or night care
program, a halfway house, group home, adult foster care
facility, health club or the like.

D.   Private duty nursing services:  Coverage under this
Appendix does not include services of private duty
nurses.

SALARIED HEALTH CARE PROGRAM

App. A

E.   Room accommodations:  If accommodations more expensive
     than those specified in Section III.A. are used for any
     reason, the carrier will not pay the difference between
     the charges for the more expensive accommodations and
     those for the covered accommodations.  If, for any
     reason, the enrollee occupies accommodations less
     expensive than those covered by this Appendix, the
     enrollee is not entitled to payment of the difference in
     charges.

F.   Dental services:  Coverage does not include dental
     services except as specifically provided for in this
     Appendix.

G.   Temporomandibular joint (TMJ) dysfunction:  Coverage
     under this Appendix for diagnosis and treatment of TMJ
     dysfunction is limited to diagnostic examinations and
     imaging, surgery to the joint (including related
     facility charges) and medically necessary post-surgical
     physical therapy services.

H.   Chemotherapy:  Coverage does not include chemotherapy
     services or supplies (chemotherapeutic antineoplastic
     agents and their administration) when the treatment is
     research, investigational or experimental in nature or
     when not specifically provided for in this Appendix.

I.   Medical necessity:  Coverage does not include services,
     care, treatment, or supplies which are not medically
     necessary according to accepted standards of medical
     practice in the United States for the diagnosis and/or
     treatment of any condition, injury, disease, or
     pregnancy, except as specifically provided for in this
     Appendix (e.g., physical examinations, immunizations,
     screening tests, contraceptive services and voluntary
     sterilization's, see App. A.I.R.).  Determinations of
     the Control Plan or Utilization Review Organization, as
     appropriate, as to medical necessity and the accepted
     standards of medical practice are based on factors which
     include, but are not limited to:  scientific data (such
     as reported controlled studies); information from local
     and national medical, professional and insurance
     societies, organizations, committees and bodies; and
     approvals and policies of the Food and Drug
     Administration, the Department of Health and Human
     Services and other Federal agencies.  The Control Plan
     or Utilization Review Organization, as appropriate,
     shall have discretionary authority to interpret, apply
     and construe this provision of the Program.  Their
     exercise of this authority shall be given full force and
     effect unless it is determined by the Plan Administrator

SALARIED HEALTH CARE PROGRAM

App. A

to have been inconsistent with the Program provisions or arbitrary and capricious.

J.    Research, investigational or experimental services: Coverage does not include care, services, supplies, or devices ("procedures") which, as determined by the Control Plan, are experimental, research or investigational in nature (i.e., ones, which in the judgment of the Control Plan, have not been demonstrated scientifically to be both effective and safe in the treatment of the patient's condition).  This exclusion applies to facility and professional services directly related to non-covered experimental, research or investigational procedures.  However, if the Control Plan or Utilization Review Organization, as appropriate, determines that hospitalization is medically necessary and appropriate in order for such non-covered procedure to be performed safely, routine hospital and professional services not related directly to such non-covered procedure may be covered.  The Control Plan is responsible for determining whether a procedure is experimental, research or investigational in nature based on factors which include, but are not limited to: the existence of an experimental, research or investigational plan or protocol; the necessity for written informed consent used by the treating physician (which may or may not include a reference to the procedure being research, investigational, experimental or other than conventional in nature); existence of ongoing clinical trials; scientific data such as controlled studies which are reported in medical literature; approvals and policies of Federal agencies; and information from professional groups.  The Control Plan shall have discretionary authority to interpret, construe and apply this provision of the Program.  The Control Plan's exercise of this authority shall be given full force and effect unless it is determined by the Plan Administrator to have been inconsistent with the Program provisions or arbitrary and capricious.  (See Article I, Section 6 (b) for appeal of a determination that a service, supply device or drug therapy is research, experimental, or investigational in nature.)

Procedures, services, supplies, drugs, products, applications of the above and other items which are considered to be experimental, research or investigational are evolutionary in nature.  The Control Plan is responsible for maintaining current information on items which have been so identified for purposes of claims adjudication, and such information is incorporated herein by reference.

SALARIED HEALTH CARE PROGRAM

App. A

The fact that a procedure, service, supply, drug,
product, etc., is not so identified shall not in any way
infer that it is not experimental, research or
investigational in nature.  The information is intended
to be illustrative rather than exhaustive.

Enrollees and/or providers having questions about the
status of items may obtain Control Plan assistance in
resolving the questions.

At the point in time when the Control Plan determines a
procedure previously identified as experimental,
research or investigational has become standard
medically accepted practice in the United States, the
Control Plan will make a recommendation to the
Corporation under the procedure for approval of new
services (see App. A, II.I.).  If the Control Plan's
recommendation is adopted (in its entirety or with
modifications), an effective date will be assigned and
coverage will be provided on and after that date.  If
the Control Plan's recommendation is rejected, the
procedure will be identified as a specific Program
exclusion.

K.    Personal or convenience items:  Coverage does not
      include care, services, supplies, or devices which are
      personal or convenience items.  Examples include, but
      are not limited to, television/telephone rental, guest
      meals and the like.

L.    Services not related to specific diagnosed illness or
      injury:  Coverage does not include services for
      premarital examinations or pre-employment examinations.

M.    Unreasonable charges:  Coverage does not include any
      charges to the extent such charges are determined by the
      carrier to be unreasonable.

N.    Employer related services:  Coverage does not include
      services related to any condition, disease, ailment, or
      injury arising out of or in the course of employment and
      for which the employer furnishes, pays for, or provides
      reimbursement under the provisions of any law of the
      United States or any state or political subdivision
      thereof, or for which the employer makes a settlement
      payment.  Coverage does not include services rendered
      through a medical clinic or other similar facility
      provided or maintained by an employer.

O.    Services available without cost:  Coverage does not
      include services for which a charge would not have been
      made if no coverage existed; services for which the
      enrollee is not legally obligated to pay; or services

SALARIED HEALTH CARE PROGRAM

App. A

which the enrollee received or, upon application, could
receive without cost under the laws or regulations of
the United States of America, Dominion of Canada, any
other country, or any state or political subdivision
thereof.

P.    Services available through other programs:  Coverage
does not include any service to the extent the benefits
are payable:

1.    Under any group health care contract under the
coordination of benefits provision of this Program;

2.    Under Medicare, if the enrollee was or would have
been eligible for Medicare benefits at the time of
service had the enrollee enrolled in Medicare (see
App. A, II.E.); or

3.    Under any health care program supported in whole or
in part by funds of the Federal government or any
state or political subdivision except where by law
this Program is made primary.

Q.    Services provided by family members or relatives:
Coverage does not include services provided to the
enrollee by members of the enrollee's household or
immediate relatives of the enrollee.  For purposes of
this provision, "immediate relative" refers to the
enrollee's spouse, natural or adoptive parents, children
or siblings, step-parents, -children or -siblings,
father-, mother-, son-, daughter-, brother- or sister-
in-law, and grandparents or grandchildren of the
enrollee or the enrollee's spouse.

R.    Custodial or domiciliary care:  Coverage does not
include care, services, supplies or devices related to
custodial or domiciliary care provided in an
institutional setting (e.g., hospital, nursing facility)
except as provided under the home health care and
hospice provisions of this Appendix (App. A, III.D. and
III.J., respectively).

S.    Inducement of pregnancy:  Coverage does not include
care, services, supplies, drugs or devices which are
provided for the purpose of inducing pregnancy.

T.    Travel:  Coverage does not include travel time or
expenses.

U.    Education:  Coverage does not include special education
facilities and tutoring for learning disabilities or
correction of behavioral problems.

SALARIED HEALTH CARE PROGRAM

App. A

V.    Food and dietary supplements:  Coverage does not include
      food/dietary supplements or vitamins.

W.    Physician requirements:  Coverage does not include
      services, supplies or equipment not performed by,
      prescribed by or rendered by a physician.

X.    Miscellaneous services:  Coverage does not include
      charges for acupuncture, massage, Christian Science
      services, hypnotherapy, neurotherapy, or biofeedback
      therapy or services.

Y.    Provider administrative charges:  Coverage does not
      include charges for missed appointments, room or
      facility reservations or the completion of any claim
      forms or record processing.

Z.    Bone marrow transplants:

      1.    Allogeneic bone marrow harvesting/transplants

            a.    Facility and physician services are covered
                  when related to allogeneic bone marrow
                  harvesting and transplants performed to treat
                  the following conditions:

                  (1)   aplastic anemia;

                  (2)   acute lymphocytic and non-lymphocytic
                        leukemia;

                  (3)   chronic myeloid leukemia;

                  (4)   severe combined immune deficiency
                        disease (SCID);

                  (5)   Wiskott-Aldrich syndrome;

                  (6)   osteopetrosis;

                  (7)   beta thalassemia, major;

                  (8)   neuroblastoma (stage III or IV);

                  (9)   Hodgkin's disease (stage III or IV);

                  (10)  non-Hodgkin's lymphoma (intermediate or
                        high grade);

                  (11)  Hurler's syndrome; and

                  (12)  myelodysplastic syndromes.

SALARIED HEALTH CARE PROGRAM

App. A

    (13)  breast cancer (stage IV);

    (14)  sickle cell anemia for selected patients;

    (15)  myelofibrosis;

    (16)  hematologic malignancies; and

    (17)  non-malignant bone marrow disorders.

b.  Bone marrow transplants are covered when the donor is a first degree relative and has either the same genetic (i.e., human leukocyte antigen or HLA) markers (six out of the six important genetic markers) or at least four out of the six important genetic markers as the person receiving the transplant.  When only four or five out of the six genetic markers match, the mixed lymphocyte culture (MLC) must be negative.

c.  Also included as covered services are:

    (1)  bone marrow transplants when the donor is not a first degree relative and has the same five important genetic markers as the person receiving the transplant;

    (2)  blood tests on relatives for evaluation as donors, if the tests are not covered by the potential donor's health care coverage;

    (3)  harvesting of marrow, if not covered by the donor's health care coverage, when the donor is:

        (a)  a first degree relative with no less than four out of the six important genetic markers as the person receiving the transplant; or

        (b)  a person other than a first degree relative with the same five out of six important genetic markers as the person receiving the transplant;

    (4)  search of the National Donor Marrow Program Registry for a donor, and harvesting and transportation of marrow, when the donor is:

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

    (a)   a first degree relative with no less than four out of the six important genetic markers as the person receiving the transplant; or

    (b)   a person other than a first degree relative with the same five out of six important genetic markers as the person receiving the transplant;

provided the Registry's bill must be submitted to the carrier by the bone marrow transplant center.

2.   Autologous bone marrow/peripheral stem cell harvesting/transplants

Facility and physician services are covered when related to autologous bone marrow/peripheral stem cell harvesting and transplants performed for the following conditions:

a.   Hodgkin's disease (stage III or IV);

b.   non-Hodgkin's lymphoma (intermediate or high grade);

c.   neuroblastoma (stage III or IV);

d.   acute lymphocytic and non-lymphocytic leukemia;

e.   germ cell tumors of ovary, testis, mediastinum or retroperitoneum

f.   multiple myeloma; and

g.   AL amyloidosis.

3.   Non-covered expenses

Facility and physician services and other charges directly relating to bone marrow transplants other than those identified in subsections Z.1. and Z.2., above, are excluded.  Excluded services and charges include, but are not limited to:

a.   bone marrow transplants when the donor is a first degree relative and has less than five out of six genetic markers as the person receiving the transplant;

<u>SALARIED HEALTH CARE PROGRAM</u>

App. A

b.   bone marrow transplants when the donor is not
a first degree relative and has less than six
out of six genetic markers as the person
receiving the transplant;

c.   autologous bone marrow and/or peripheral stem
cell and/or allogeneic bone marrow harvest and
transplants for solid tumors other than shown
in 1. and 2. above;

d.   allogeneic bone marrow transplants for
patients with multiple myeloma;

e.   search of the National Donor Marrow Program
Registry for a donor, other than a first
degree relative, with fewer than five out of
six important genetic markers as the person
receiving the transplant;

f.   bone marrow harvesting, storage,
transportation or transplantation from a
person, other than a first degree relative,
with fewer than five out of six important
genetic markers as the person receiving the
transplant;

g.   purging or positive stem cell selection of the
bone marrow or peripheral stem cell
collection; and

h.   travel expenses of patients (other than
ambulance services which may be covered under
App. A, III.F., in appropriate cases) and
family members.

AA.   Cochlear implant:  Coverage under this Appendix, for
services related to the implantation of a cochlear
hearing device, is subject to Program standards
regarding patient selection, covered pre-surgical,
surgical and post-surgical services and covered devices,
as well as to a lifetime maximum of one
device/implantation for each enrollee satisfying the
patient selection criteria.

BB.   Services related to corrective eye surgery:  Coverage
under this Appendix does not include any services,
supplies or charges related to corrective eye surgery, as
defined in Appendix D, III.K. of this Program.  See
Appendix D, IV. C. for Program coverage provisions for
such surgery.

SALARIED HEALTH CARE PROGRAM

App. B

APPENDIX B

MENTAL HEALTH AND SUBSTANCE ABUSE COVERAGE

The provisions of this Appendix B apply to enrollees of the
Comprehensive Health Savings Plan (CHSP), Basic Medical Plan,
Enhanced Medical Plan,  and Point of Service options of the
Program.

I.    Definitions

To the extent they are not in conflict with the following,
definitions in Appendix A are incorporated herein by
reference.  For purposes of this Appendix:

A.    "approved mental health or substance abuse treatment
program and/or provider" means an inpatient or
outpatient program and/or provider which/who provides
medical and other services to enrollees for a mental
health or substance abuse condition, meets all state
licensure and approval requirements, and has entered
into an agreement with the coverage carrier to provide
services as specified in this Appendix.

B.    "assessment" means

1.    determination by an assessment coordinator of the
nature of the enrollee's condition (mental health
and/or substance abuse), the need for treatment,
the type of treatment required and referral to
the most appropriate level of care; and

2.    for a substance abuse patient, the development of
a continuing care treatment plan by the enrollee,
the assessment coordinator, and the attending
physician, if appropriate.

C.    "assessment coordinator" means a qualified employee of
a central diagnostic and referral agency (CDR) which
has been selected and approved to provide assessment
services.  Assessment coordinators must meet Program
standards for selection.

D.    "central diagnostic and referral agency" or "CDR"
means an approved agency which employs assessment
coordinators designated to:  make all contractually-
mandated face-to-face assessments for the development
of substance abuse continuing care treatment plans;

SALARIED HEALTH CARE PROGRAM

App. B

make determinations regarding whether the patient's condition requires mental health and/or substance abuse treatment; make referrals to panel providers; provide short-term counseling (up to two visits per enrollee); and perform aftercare planning and follow-up.  The CDR may provide up to three short-term counseling sessions for employees, and may communicate with Employee Assistance Program representatives about assessment and referral activities relating to an employee (when appropriate and when authorized by the employee).  The CDR will supply necessary information to the carrier about panel provider performance and selection and other utilization data and statistics as required, including evaluations using designated performance data of panel providers with whom the carrier contracts.

Effective January 1, 2001, CDR's will no longer be utilized under this Appendix B.  All the functions and the responsibilities of the CDR will be transferred on January 1, 2001 and performed by the central review organization (CRO) or a qualified designee of the CRO.

E.   "central review organization" or "CRO" means a national organization which has been designated to provide the following functions:

1.   confirm eligibility of the patient for mental health and/or substance abuse coverage under the Program;

2.   authorize and approve inpatient and outpatient mental health treatment, outpatient substance abuse treatment and outpatient psychological testing;

3.   re-credential panel providers;

4.   monitor CDR performance;

5.   exercise managed care protocols, with CDR assistance when appropriate, for those enrollees who require both mental health and substance abuse outpatient visits; and

6.   evaluate panel providers and make contracting recommendations to the carrier, using designated performance standards.

F.   "clinical nurse specialist" means a person who meets all of the following criteria:

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 178 of 217
SALARIED HEALTH CARE PROGRAM

App. B

1.   possesses a Master of Arts (MA), Master of
Science (MS) or Master of Science in Nursing
(MSN) degree from an accredited school of
nursing.  (The master's degree must be in
psychiatric nursing or the individual must be
eligible for listing in the American Nursing
Association Register of Certified Nurses in
Advanced Practice as a clinical specialist in
Adult Psychiatric Mental Health Nursing, or
Child/Adolescent Psychiatric Nursing);

2.   has a minimum of five years post-master's degree
clinical experience in the field of psychiatric
mental health nursing, at least two of which were
supervised by a master's level psychiatric nurse
(or the equivalent);

3.   possesses a license as a Registered Nurse in the
jurisdiction in which the practice is to occur;

4.   possesses a minimum professional liability
coverage of $1 million per occurrence and $1
million aggregate (unless there are state
statutes which modify the malpractice
requirements in such states); and

5.   has signed an agreement with the carrier to
participate as a panel provider.

G.   "continuing care treatment plan" means a document
completed for substance abuse patients by an
assessment coordinator at the conclusion of the
assessment process.  The continuing care treatment
plan includes the recommended provider(s), and the
type(s) and duration of treatment, and may be modified
by the provider and the assessment coordinator in
consultation during the course of treatment.

H.   "detoxification" means treatment for the physiologic
stabilization of an enrollee who is undergoing acute
withdrawal from an intoxicating substance.  To be
covered under this Program, such treatment must be
provided by, or under the supervision of, a physician
and through a facility approved to provide such care.

I.   "detoxification facility" means a hospital or
residential treatment facility which is a provider of
detoxification services.  Such facilities may offer
substance abuse rehabilitation treatment subsequent to
detoxifying an enrollee.

SALARIED HEALTH CARE PROGRAM

App. B

J.      "halfway house treatment" means treatment provided
        under a semi-residential living arrangement to a
        substance abuse patient who requires a more structured
        living environment than outpatient treatment or
        partial hospitalization treatment would provide, but
        who does not require full-time residential treatment
        and care.  It provides a controlled environment during
        the hours of the day the enrollee is not undergoing
        treatment or is not engaged in specific constructive
        activity (e.g., working or attending school).

K.      "inpatient care" means treatment in:

        1.    a hospital;

        2.    a detoxification facility; or

        3.    a residential care facility.

L.      "mental disorder" means any mental, emotional, or
        personality disorder classified as a mental disorder
        in categories 290.0 through 319.0 of the most recent
        edition of the "International Classification of
        Diseases, 9th Revision, Clinical Modification"
        excluding alcohol and drug abuse as classified in
        categories 303.0 through 305.9 (see subsection IV.H.,
        below).

M.      "outpatient facility" means an administratively
        distinct governmental, other public, private, or
        independent unit or part of such unit that provides
        outpatient mental health or substance abuse services.

        The term includes centers for the care of adults or
        children such as hospitals, clinics, and partial
        hospitalization centers.  For mental health services,
        the definition includes Community Mental Health
        Centers as defined in the Federal Community Mental
        Health Centers Act of 1963, as amended.

N.      "outpatient treatment" or "visit" (including intensive
        outpatient treatment) means a therapy session provided
        in an outpatient mental health or substance abuse
        treatment facility or by an individual mental health
        or substance abuse provider.  All sessions between an
        individual patient and a provider in a single day,
        with a total duration of four hours or less, are
        considered to be a single treatment or visit.  If
        outpatient sessions with all providers in a given day

SALARIED HEALTH CARE PROGRAM

App. B

total more than four hours, such treatment shall be
considered partial hospitalization.

O.   "panel provider" means a mental health or substance
abuse provider who has been selected and has agreed to
provide services in accordance with the terms of
participation established by the Program and has
executed an agreement with the carrier.

P.   "partial hospitalization treatment" means a semi-
residential level of care for patients with mental
health or substance abuse disorders who require
coordinated, intensive, comprehensive and
multidisciplinary treatment in a structured setting,
but less than full-time hospitalization.  The patient
undergoes therapy for more than four (4) hours a day,
and may receive additional services (e.g., meals, bed,
recreation);

Q.   "psychiatrist" means a physician who is board eligible
or board certified in psychiatry and licensed to
practice medicine at the time and place services are
rendered or performed.

R.   "psychologist" means a person who possesses a doctor
of philosophy (Ph.D.), doctor of education (Ed.D.),
doctor of mental health (DMH), or doctor of psychology
(PsyD) degree from a regionally accredited university,
has a minimum of five years of post-doctoral clinical
experience (at least two of which were supervised by a
licensed clinical psychologist or by a board-qualified
psychiatrist), possesses a valid license for the
independent practice of psychology at the highest
level recognized by the state in which practice is to
occur, is eligible for listing in the National
Register of Health Care Providers in Psychology, and
participates as a panel provider.

S.   "registration" means contact by the provider with the
CRO to inform the agency that the enrollee is
commencing a course of mental health or substance
abuse treatment, to confirm eligibility under the
Program, and to obtain any necessary approvals or
authorizations.

T.   "residential care facility" means an approved
inpatient facility which operates 24 hours a day,
seven days a week for the provision of residential
mental health and/or substance abuse treatment.

SALARIED HEALTH CARE PROGRAM

App. B

U.   "social worker" means a person who possesses a master
in social work (MSW), master of science in social work
(MSSW), or doctor of social work (DSW) degree from a
graduate school of social work accredited by the
Council on Social Work Education, has a minimum of
five years of post-masters or post-doctoral degree
clinical social work experience (at least two of which
were supervised by a licensed clinical social worker),
possesses a valid license or certificate for the
independent practice of social work at the highest
level recognized by the state in which practice is to
occur, is eligible for listing in the National
Association of Social Work Register of Clinical Social
Workers and/or the National Register of Mental Health
Care Providers in Social Work, and participates as a
panel provider.

V.   "substance abuse" means alcohol or drug dependence as
classified in categories 303.0 through 305.9
(excluding 305.1 and 305.9) of the most current
edition of the "International Classification of
Diseases, 9th Revision, Clinical Modification" (see
subsection IV.H., below).

II.   Terms and Conditions of Coverage

A.   Conditions of Benefit Payment

An enrollee is eligible for benefits for covered
expenses incurred during an approved course of
treatment only if the following conditions or
requirements are met:

1.   Services must be provided on or after the
enrollee's effective date of coverage under the
Program and this Appendix.

2.   Benefits must be available within the benefit
period (see II.B., below).

3.   a.   In order to be covered up to the
benefit maximum under the Program, all
covered services rendered in the care and
treatment of mental health and substance
abuse related disorders must be delivered
by panel providers, except in the case of
emergency which is subject to the
provisions of Section IV.B. of this
Appendix.  The panel may be comprised of
the following types of facilities and
providers:

SALARIED HEALTH CARE PROGRAM

App. B

    (1)  Hospitals

    (2)  Outpatient facilities

    (3)  Detoxification facilities

    (4)  Residential care facilities

    (5)  Partial hospitalization facilities

    (6)  Halfway houses

    (7)  Skilled nursing facilities

    (8)  Psychiatrists

    (9)  Psychologists

    (10) Social workers

    (11) Clinical nurse specialists

    (12) Outpatient clinics

b.    In addition, if due to the unavailability of specialized services, the enrollee must be referred to a non-panel provider, then, in such cases only, non-panel providers will be covered up to the benefit maximum subject to App. B, II.B.4.a. and b., provided the enrollee is referred by the CRO or a panel provider and the services are authorized, in advance, by the CRO.

c.    Services provided in accordance with App. B, IV.B.3. are covered up to the benefit maximum.

4.    Outpatient treatment by clinical nurse specialists, social workers or psychologists as independent practitioners must be rendered by participating panel providers.

5.    In order to be eligible for benefits for residential and/or halfway house substance abuse treatment, the enrollee must be assessed by an assessment coordinator from a designated CDR. Expenses for days of treatment during an admission to a residential treatment facility or halfway house program will not be covered prior

2007

SALARIED HEALTH CARE PROGRAM

App. B

to the time assessment and a treatment plan are obtained from a substance abuse assessment coordinator.  If such coordinator makes a determination of substance abuse and the assessment specifies a level of care which includes residential or halfway house treatment, such treatment will be covered subject to other Program provisions.

6.    Detoxification admissions must be reported to the CRO within 24 hours of admission.  In such cases, the CRO will notify the CDR assigned to that location.  The CDR's assessment coordinator will contact the enrollee during or after the detoxification and develop a plan for treatment subsequent to detoxification (continuing care treatment plan).  Detoxification confinements longer than three days must be approved by the CDR or CRO.

7.    Mental health inpatient services and admissions must be authorized by the CRO within 24 hours of admission.

8.    Partial hospitalization treatment and outpatient mental health and substance abuse treatment must be registered with the CRO.  This procedure does not apply to day, night or outpatient treatment services rendered as part of an authorized substance abuse continuing care treatment plan.

9.    Admission to a skilled nursing facility must be for the treatment of a mental health condition, must be authorized by the CRO and must immediately follow a confinement for the same condition.

10.    Benefits are payable subject to the provisions and limitations of the Program, regardless of the treatment plan developed through assessment.

11.    Benefits payable under this Appendix for an enrollee eligible for Medicare shall be paid in accordance with the terms and conditions pertaining to Medicare as specified in App. A, II.E.

B.    Benefit Period

1.    a.    An enrollee is eligible for a maximum of 45 days of covered inpatient mental health care

SALARIED HEALTH CARE PROGRAM

App. B

within the benefit period set forth in App. A, II.B.1.

b.   An enrollee is eligible for a maximum of 45 days of covered inpatient substance abuse care including detoxification within the benefit period set forth in App. A, II.B.1.

c.   Each day of care utilized for inpatient substance abuse treatment is charged against the unused portion of the 45-day inpatient mental health benefit period. Likewise, each day of inpatient mental health care is charged against the unused portion of the 45-day inpatient substance abuse treatment period.

2.   a.   An enrollee is eligible for a maximum of 90 days of care in a partial hospitalization treatment facility within the benefit period set forth in App. A, II.B.1.

b.   Each day of inpatient care for mental health or substance abuse treatment reduces by two the number of days of care available for mental health or substance abuse partial hospitalization treatment. Each two days of partial hospitalization treatment reduces by one the number of days of care available for inpatient care.

3.   a.   An enrollee is eligible for a maximum of 90 days of mental health care in an approved skilled nursing facility within the benefit period set forth in App. A, II.B.1.

b.   Each day of inpatient care for mental health treatment within the benefit period reduces by two the number of available days for skilled nursing facility care.  Each two days of medical care for the treatment of mental disorders in a skilled nursing facility reduces by one the number of days of inpatient medical care available for the treatment of mental health related disorders in a hospital.

4.   a.   An enrollee is eligible for 20 outpatient mental health visits at 100% coverage and an additional 15 visits at 75% coverage for outpatient mental health treatment for both

2007

SALARIED HEALTH CARE PROGRAM

App. B

facility and professional services per calendar year.

b.  An enrollee is eligible for 35 outpatient substance abuse visits at 100% coverage for both facility and professional services per calendar year.

c.  When an enrollee requires mental health and/or substance abuse outpatient treatment, the CRO and/or CDR (where appropriate) shall exercise managed care protocols after a total of six outpatient visits and shall monitor the treatment plan(s) to assure appropriate coordinated care.

   (1)  Inpatient substance abuse care assessments, referrals and continuing care treatment follow-up by CDRs are mandatory and do not reduce the enrollee's outpatient visit entitlement.

   (2)  Voluntary utilization of the CDR for outpatient mental health or substance abuse assessment and referral does not count as an outpatient visit.

d.  Anorexia nervosa, bulimia and other conditions covered by Appendix B which are appropriate for case management, may be case managed by the CRO utilizing the case management procedures described in App. A, III.K. with any alternative benefit plan being limited to the dollar pool created using the 45-day inpatient benefit described in this section.

e.  Outpatient psychological testing is not considered "treatment" and is not charged against the outpatient visit maximum.

f.  Each visit by one or more members of an enrollee's family for family counseling counts as one visit applicable to the enrollee's annual outpatient treatment maximum.

2007

SALARIED HEALTH CARE PROGRAM

App. B

5.      An enrollee shall be eligible for a lifetime maximum of 90 days of substance abuse treatment in a panel halfway house.

6.      A new benefit period begins only when the enrollee has been out of care (as described below) for a continuous period of 60 days. Accordingly, there must be a lapse of at least 60 consecutive days between the date of the enrollee's last discharge from any hospital, skilled nursing facility, residential care facility or any other facility to which the 60-day benefit renewal period of this Appendix and Appendix A apply (see App. A, II.B.3. for example), and the date of the next admission, irrespective of the reason for the last admission and irrespective of whether or not benefits are paid as a consequence of such admission. Further, if subsequent to such discharge, the enrollee is a patient in a psychiatric or substance abuse partial hospitalization care program, a substance abuse halfway house, a hospice program or is receiving home health care visits, the 60-day renewal period is broken, whether or not benefits are paid as a result of receipt of such services.

C.    Non-Completion of the Substance Abuse Treatment Plan by an Employee

Employees entering detoxification, residential or halfway house treatment facilities are required to receive a continuing care treatment plan from the assessment coordinator as part of the assessment process.  Non-completion of the portions of such treatment plan which are covered services (including outpatient and partial hospitalization programs) will result in the following actions being taken:

1.      The carrier will send a letter to the employee and to the Corporation's Medical Director notifying them of the failure to complete the treatment plan.

2.      The letter will notify the employee that if a second continuing care treatment plan is established and not completed, a maximum of up to a $500 overpayment will have occurred as a result of medical expenses incurred on the employee's behalf.

SALARIED HEALTH CARE PROGRAM

App. B

3.   If the employee fails to complete a second
continuing care treatment plan, the carrier will
notify the employee and the Corporation's Medical
Director of such failure and of any overpayment.
The provisions of Article I, Section 9, of the
Program will apply.

However, if the employee establishes to the
satisfaction of the Corporation's Medical
Director that such employee is motivated towards
recovery and that the treatment plan was
discontinued for a satisfactory reason, then such
overpayment will not have occurred.

4.   For each subsequent non-completion of a treatment
plan, the maximum overpayment amount will
increase in increments of $250, up to a maximum
overpayment amount of $1,000 for each occurrence.

III.   Coverages

A.   Inpatient Care (Mental Health and Substance Abuse)

1.   Inpatient mental health and substance abuse care
is subject to the benefit period set forth in
App. B, II.B.1.

2.   Inpatient services by non-panel providers are
subject to the provisions of Sections IV.B.2.
(for mental health treatment) and IV.B.4. (for
substance abuse treatment) of this Appendix.

3.   Coverage includes the following inpatient
services when provided and billed by the
facility:

a.   semiprivate room, including general nursing
services, meals and special diets;

b.   laboratory and pathology examinations
related to the treatment received in the
facility;

c.   drugs, biologicals, solutions and supplies
related to the treatment received and used
while the enrollee is in the facility;

d.   supplies and use of equipment required in
the care and treatment of the enrollee's
condition;

SALARIED HEALTH CARE PROGRAM

App. B

    e.    professional and ancillary services, including those of other trained staff, necessary for patient care and treatment, including diagnostic examinations;

    f.    individual and group therapy;

    g.    counseling for family members;

    h.    electroshock therapy for a mental health patient, when administered by, or under the supervision of, a physician and anesthesia for electroshock therapy when administered by, or under the supervision of, a physician other than the physician giving the electroshock therapy; and

    i.    supplies and use of equipment required for detoxification or rehabilitation of substance abuse patients.

4.    Psychological testing is covered when administered by a panel psychologist, medically indicated, approved by the CRO and directly related to the organic medical or functional condition or when it has an integral role in rehabilitative or psychiatric treatment programs.

5.    Coverage for medical care for the treatment of mental disorders is limited to (i) individual psychotherapeutic treatment, (ii) family counseling for the enrollee's family, (iii) group psychotherapeutic treatment, (iv) psychological testing when prescribed or performed by a physician, and (v) electroshock therapy and anesthesia for electroshock therapy.

B.    Skilled Nursing Facility Care (Mental Health Only)

1.    Mental health care in a skilled nursing facility is subject to the benefit period set forth in App. B, II.B.3.

2.    Coverage includes services as described in A.3., above, and medical care. Medical care in a skilled nursing facility is limited to a maximum of two physician visits per week.

C.    Halfway House Care (Substance Abuse Only)

SALARIED HEALTH CARE PROGRAM

App. B

1. Substance abuse care in a halfway house is subject to the benefit maximum set forth in App. B, II.B.5.

2. Coverage includes the following halfway house services when provided and billed by the facility:

   a. bed and board;

   b. intake evaluation;

   c. up to one routine drug screen per week;

   d. individual and group therapy or counseling; and

   e. counseling for family members.

D. Partial Hospitalization Care (Mental Health and Substance Abuse)

1. Mental health and substance abuse care in partial hospitalization care treatment facilities is subject to the benefit period set forth in App. B, II.B.2.

2. Inpatient services by non-panel providers are subject to the provisions of Sections IV.B.2. (for mental health treatment) and IV.B.4. (for substance abuse treatment) of this Appendix.

3. Coverage for treatment in a partial hospitalization care treatment facility includes the following services when provided and billed by the facility:

   a. laboratory examinations related to the treatment received in the facility;

   b. prescribed drugs, biologicals, solutions and supplies related to the treatment received, including, for substance abuse, drugs to be taken home;

   c. supplies and use of equipment required in the care of the enrollee's condition;

   d. professional and ancillary services including those of other trained staff, necessary for the treatment of ambulatory

SALARIED HEALTH CARE PROGRAM

App. B

enrollees, including diagnostic examinations;

e.   individual and group therapy;

f.   psychological testing;

g.   counseling for family members;

h.   electroshock therapy for a mental health patient when administered by, or under the supervision of, a physician and anesthesia for electroshock therapy when administered by, or under the supervision of, a physician other than the physician giving the electroshock therapy; and

i.   an enrollee admitted to partial hospitalization treatment also is entitled to a semiprivate room, general nursing services, meals and special diets.

E.   Outpatient Care (Mental Health and Substance Abuse)

1.   Outpatient mental health and substance abuse treatment is subject to the benefit maximums set forth in App. B, II.B.4.a. and b.

2.   Covered outpatient mental health and substance abuse treatment includes the following:

a.   Services provided and billed by facilities

(1)   professional and other staff and ancillary services made available by facilities to ambulatory patients;

(2)   prescribed drugs and medications dispensed by a facility in connection with treatment received at the facility; and

(3)   electroshock therapy for a mental health patient, when administered by, or under the supervision of, a physician and anesthesia for electroshock therapy when administered by, or under the supervision of, a physician other than the physician giving the electroshock therapy.

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 191 of 217
SALARIED HEALTH CARE PROGRAM

App. B

b.   Services provided and billed by facilities or professional providers

(1)   Individual psychotherapeutic treatments of a duration of 20 minutes or more (all sessions with a given provider on a single day, with a total duration of four hours or less, shall constitute a single "visit" and be reimbursed as a single unit of service).

(a)   Benefits will be paid as set forth in App. B, II.B.4.a. for outpatient mental health services at 100% of the panel reimbursement amount for the first 20 outpatient mental health treatments and 75% for the next 15 treatments per calendar year when provided by panel providers.  Services rendered by non-panel providers as provided in App. B, II.A.3.b. and in App. B, IV.B.3. shall be covered up to the benefit maximums. Otherwise, when outpatient mental health services are received from a non-panel provider, without referral by the CRO, such services must be rendered by qualified physicians or qualified facilities, and will be reimbursed at 50% of the amount payable to panel providers for comparable services.  Such reimbursement will be made only to the primary enrollee.

(b)   Benefits will be paid as set forth in App. B, II.B.4.b. for individual outpatient substance abuse treatment at 100% of the panel reimbursement amount for 35 visits per calendar year when provided by panel providers.  No benefits are payable for treatment by non-panel providers, except when services

SALARIED HEALTH CARE PROGRAM

App. B

are rendered by non-panel providers as provided in App. B, II.A.3.b. in which case such treatment shall be covered up to the benefit maximum.

    (2)    Group mental health and substance abuse treatment is covered subject to the payment provisions in subsections (a) or (b) above.

    (3)    Family counseling to members of the patient's family is covered subject to the payment provisions in subsections (a) or (b) above.

3.    Outpatient psychological testing is covered only when preauthorized by the CRO and performed by a panel provider. Such testing is not considered treatment and therefore is not subject to the benefit period maximum.

IV.   <u>Limitations and Exclusions</u>

A.    Panel providers are required to contact the CRO to verify eligibility and receive prior authorization of all non-emergency inpatient and outpatient mental health and substance abuse services.

B.    Coverage will be limited to the following when rendered by or through non-panel providers:

1.    Emergency services. Providers must contact the CRO within 24 hours of the inpatient admission or outpatient treatment for authorization of such services.

2.    Non-emergency services. Benefits for mental health services provided by qualified physicians or facilities who/which are non-panel providers are limited to 50% of the panel reimbursement amount unless the enrollee is referred to the non-panel physician or facility by a panel provider. The carrier will make payment to the primary enrollee. Payment to the provider, including any balance, is the responsibility of the enrollee.

3.    Outpatient services. Services provided by non-panel physicians (e.g., internists or general practitioners) must be registered with the CRO

2007

SALARIED HEALTH CARE PROGRAM

App. B

after the first visit and are limited to a maximum of one visit.

    4.    Substance abuse treatment.  Coverage for substance abuse treatment does not include services provided by non-panel providers except for emergency detoxification.

C.    Coverage is not available for services for treatment of mental disorders which, according to generally accepted medical standards (as determined by the carrier), are not amenable to favorable modification, except that coverage is available for the period necessary to determine that the disorder is not amenable to favorable modification, or for the period necessary for the evaluation and diagnosis of mental deficiency or retardation.

D.    Coverage for substance abuse treatment does not include professional services such as dispensing methadone, testing urine specimens, or performing physical or x-ray examinations or other diagnostic procedures unless therapy, counseling or psychological testing are provided on the same day.

E.    Coverage does not include family counseling which is rendered by a provider other than the provider for the family member in the course of treatment. Furthermore, reimbursement will be provided only in conjunction with services rendered on behalf of enrollees covered under the General Motors Health Care Program.

F.    Coverage does not include diversional therapy.

G.    Coverage does not include psychological testing if used as part of, or in connection with, vocational guidance, training or counseling.

H.    Coverage under this Appendix does not include treatment of tobacco use disorder (ICD-9 Code 305.1) or treatment of non-dependent abuse of substances such as laxatives, patent medicinals, etc. (ICD-9 Code 305.9).

I.    General Limitations and Exclusions under Section IV. and subsections II.C., E., G., and H. of the Terms and Conditions of Appendix A are equally applicable under this Appendix.

SALARIED HEALTH CARE PROGRAM

App. C

APPENDIX C

DENTAL COVERAGE

I.    Enrollment Classifications

Dental coverage for a primary enrollee may include coverage
for eligible secondary enrollees as defined in the Program.

II.   Description of Benefits

Dental benefits will be payable, subject to the conditions
herein, if an enrollee incurs a covered dental expense.

III   Covered Dental Expenses

Covered dental expenses are the usual charges of a dentist
which an enrollee is required to pay for services and
supplies which are necessary for treatment of a dental
condition, but only to the extent that such charges are
reasonable and customary charges, as herein defined, for
services and supplies customarily employed for treatment of
that condition, and only if rendered in accordance with
accepted standards of dental practice.  Such expenses shall
be only those incurred in connection with the following
dental services which are performed, except as otherwise
provided in Section VII.B., by a licensed dentist and which
are received while coverage is in force.

A.   The following covered dental expenses shall be paid at
     100% of the reasonable and customary charge:

     1.   Routine oral examinations and prophylaxes
          (scaling and cleaning of teeth), but not more
          than twice each in any calendar year.  Up to
          three cleanings per calendar year will be allowed
          if there is a documented history of periodontal
          disease.  Up to four cleanings per calendar year
          will be covered for two full calendar years
          following periodontal surgery.

     2.   Topical application of fluoride provided that
          such treatment shall be a covered dental expense
          only for enrollees under 20 years of age, unless
          a specific dental condition makes such treatment
          necessary.

188                                                    2007

SALARIED HEALTH CARE PROGRAM

App. C

3.  Space maintainers that replace prematurely lost teeth for children under 19 years of age.

4.  Emergency palliative treatment.

B.  The following covered dental expenses shall be paid at 80% of the reasonable and customary charge:

1.  Dental x-rays, including full mouth x-rays once in any period of five consecutive calendar years, supplementary bitewing x-rays once in any calendar year and such other dental x-rays including, but not limited to, those specified in this paragraph, as are required in connection with the diagnosis of a specific condition requiring treatment.

2.  Extractions.

3.  Oral surgery.

4.  Amalgam, silicate, acrylic, synthetic porcelain, and composite, or other American Dental Association (ADA)-approved direct restorative materials that meet Program standards and are deemed appropriate by the carrier, to restore diseased or accidentally injured teeth.

5.  General anesthetics and intravenous sedation when medically necessary and administered in connection with oral or dental surgery.

6.  Treatment of periodontal and other diseases of the gums and tissues of the mouth.

7.  Endodontic treatment, including root canal therapy.

8.  Injection of antibiotic drugs by the attending dentist.

9.  Cosmetic bonding of eight front teeth for children 8 through 19 years of age if required because of severe tetracycline staining, severe fluorosis, hereditary opalescent dentin, or amelogenesis imperfecta, but not more frequently than once in any period of three consecutive calendar years.

SALARIED HEALTH CARE PROGRAM

App. C

C.  The following covered dental expenses shall be paid at
50% of the reasonable and customary charge:

1.  Initial installation of fixed bridgework
(including inlays and crowns as abutments).

2.  Initial installation of partial or full removable
dentures (including precision attachments and any
adjustments during the six-month period following
installation).

3.  Replacement of an existing partial or full
removable denture or fixed bridgework by a new
denture or by new bridgework, or the addition of
teeth to an existing partial removable denture or
to bridgework, but only if satisfactory evidence
is presented that:

a.  the replacement or addition of teeth is
required to replace one or more teeth
extracted after the existing denture or
bridgework was installed;

b.  the existing denture or bridgework cannot be
made serviceable and, if it was installed
under this dental coverage, at least five
years have elapsed prior to its replacement;
or

c.  the existing denture is an immediate
temporary denture which cannot be made
permanent and replacement by a permanent
denture takes place within 12 months from
the date of initial installation of the
immediate temporary denture.

Normally, dentures will be replaced by dentures,
but if a professionally adequate result can be
achieved only with bridgework, such bridgework
will be a covered dental expense.

4.  Orthodontic procedures and treatment (including
related oral examinations) consisting of surgical
therapy, appliance therapy, and
functional/myofunctional therapy (when provided
by a dentist in conjunction with appliance
therapy) for enrollees under 19 years of age,
provided, however, that benefits will be paid
after attainment of age 19 for continuous
treatment which began prior to such age.

SALARIED HEALTH CARE PROGRAM

App. C

5. Services and procedures for the conservative diagnosis and treatment of temporomandibular joint (TMJ) dysfunction including, but not limited to, related oral examinations, consultations, x-rays, occlusal equilibration, diagnostic models and casts, temporary splints and orthotic appliances.  Coverage does not include orthodontic treatment except as provided in App. C, III.C.4. above.

6.   Repair or recementing of crowns, inlays, onlays, bridgework, or dentures; or relining or rebasing of dentures more than six months after the installation of an initial or replacement denture, but not more than one relining or rebasing in any period of three consecutive calendar years.

7.   Inlays, onlays, gold fillings, or crown restorations to restore diseased or accidentally injured teeth, but only when the tooth, as a result of extensive caries or fracture, cannot be restored with an amalgam, silicate, acrylic, synthetic porcelain, composite, or other American Dental Association (ADA)-approved materials that meet Program standards and are used for direct filling restoration.

8. Implantology

IV.   <u>Maximum Benefits For Other Than Accidental Dental Injury</u>

The maximum benefit payable for all covered dental expenses incurred during a calendar year commencing January 1 and ending the following December 31 (except for services described in Section III.C.4. and 5. above, and in Section XI below) shall be $1,700 for each enrollee, with a maximum of $1,600 applicable to covered dental expenses provided prior to January 1, 2005.

For covered dental expenses in connection with orthodontics (including related oral examinations), described in Section III.C.4. above, the maximum benefit payable shall be $2,000 during the lifetime of each enrollee, with a maximum of $1,800 applicable to covered expenses for services provided prior to January 1, 2005.

For covered dental expenses in connection with TMJ treatment described in Section III.C.5. above, the maximum benefit payable shall be $2,000 during the lifetime of each enrollee.

SALARIED HEALTH CARE PROGRAM

App. C

V.   Pre-Determination of Benefits

If a course of treatment can reasonably be expected to involve covered dental expenses of $200 or more, a description of the procedures to be performed and an estimate of the dentist's charges must be filed with the carrier prior to the commencement of the course of treatment.

The carrier will notify the enrollee and the dentist of the benefits certified as payable based upon such course of treatment.  In determining the amount of benefits payable, consideration will be given to alternate procedures, services, or courses of treatment that may be performed for the dental condition concerned in order to accomplish the desired result.  The amount included as certified dental expenses will be the appropriate amount as provided in Sections III. and IV., determined in accordance with the limitations set forth in Section VI.

If a description of the procedures to be performed and an estimate of the dentist's charges are not submitted in advance, the carrier reserves the right to make a determination of benefits payable taking into account alternate procedures, services, or courses of treatment, based on accepted standards of dental practice.  To the extent verification of covered dental expenses cannot reasonably be made by the carrier, the benefits for the course of treatment may be for a lesser amount than would otherwise have been payable.

This pre-determination requirement will not apply to courses of treatment under $200 or to emergency treatment, routine oral examinations, x-rays, prophylaxes, and fluoride treatments.

VI.   Limitations

A.   Restorative

1.   Gold, Baked Porcelain Restorations, Crowns and Jackets

If a tooth can be restored with a material such as amalgam, payment of the applicable percentage of the charge for that procedure will be made toward the charge for another type of restoration selected by the enrollee and the dentist.  The balance of the treatment charge remains the responsibility of the enrollee.

SALARIED HEALTH CARE PROGRAM

App. C

2.   Reconstruction

Payment based on the applicable percentage will
be made toward the cost of procedures necessary
to eliminate oral disease and to replace missing
teeth.  Appliances or restorations necessary to
increase vertical dimension or restore the
occlusion are considered optional and their cost
remains the responsibility of the enrollee.

B.   Prosthodontics

1.   Partial Dentures

If a cast chrome or acrylic partial denture will
restore the dental arch satisfactorily, payment
of the applicable percentage of the cost of such
procedure will be made toward a more elaborate or
precision appliance that the enrollee and dentist
may choose to use, and the balance of the cost
remains the responsibility of the enrollee.

2.   Complete Dentures

If, in the provision of complete denture
services, the enrollee and dentist decide on
personalized restorations or specialized
techniques as opposed to standard procedures,
payment of the applicable percentage of the cost
of the standard denture services will be made
toward such treatment and the balance of the cost
remains the responsibility of the enrollee.

3.   Replacement of Existing Dentures

Replacement of an existing denture will be a
covered dental expense only if the existing
denture is unserviceable and cannot be made
serviceable.  Payment based on the applicable
percentage will be made toward the cost of
services which are necessary to render such
appliances serviceable.  Replacement of
prosthodontic appliances will be a covered dental
expense only if at least five years have elapsed
since the date of the initial installation of
that appliance under this dental coverage, except
as provided in Section III.C.3. above.

C.   Orthodontics

SALARIED HEALTH CARE PROGRAM

App. C

1.  If orthodontic treatment is terminated for any reason before completion, the obligation to pay benefits will cease with payment to the date of termination.  If such services are resumed, benefits for the services, to the extent remaining, shall be resumed.

2.  The benefit payment for orthodontic services shall be only for months that coverage is in force.

VII.  <u>Exclusions</u>

Covered dental expenses do not include and no benefits are payable for:

A.  charges for services for which benefits are provided under other health care coverages;

B.  charges for treatment by other than a dentist, except that scaling or cleaning of teeth and topical application of fluoride may be performed by a licensed dental hygienist if the treatment is rendered under the supervision and guidance of the dentist;

C.  charges for veneers or similar properties of crowns and pontics placed on, or replacing teeth, other than the ten upper and lower anterior teeth;

D.  charges for services or supplies that are cosmetic in nature (except as provided in Section III.B.11.), including charges for personalization or characterization dentures;

E.  charges for prosthetic devices (including bridges), crowns, inlays, and onlays, and the fitting thereof which were ordered while the enrollee was not covered for dental coverage or which were ordered while the enrollee was covered for dental coverage but are finally installed or delivered to such enrollee more than 60 days after termination of coverage;

F.  charges for the replacement of a lost, missing, or stolen prosthetic device;

G.  charges for failure to keep a scheduled visit with the dentist;

H.  charges for replacement or repair of an orthodontic appliance;

SALARIED HEALTH CARE PROGRAM

App. C

I.   charges for services or supplies which are compensable
     under a Worker's Compensation or Employer's Liability
     Law;

J.   charges for services rendered through a medical
     department, clinic, or similar facility provided or
     maintained by the enrollee's employer;

K.   charges for services or supplies for which no charge is
     made that the enrollee is legally obligated to pay or
     for which no charge would be made in the absence of
     dental coverage;

L.   charges for services or supplies which are not
     necessary, according to accepted standards of dental
     practice, or which are not recommended or approved by
     the attending dentist;

M.   charges for services or supplies which do not meet
     accepted standards of dental practice, including, but
     not limited to, charges for services or supplies which
     are experimental in nature;

N.   charges for services or supplies received as a result
     of dental disease, defect or injury due to an act of
     war, declared or undeclared;

O.   charges for services or supplies from any governmental
     agency which are obtained by the enrollee without cost
     by compliance with laws or regulations enacted by any
     Federal, state, municipal, or other governmental body;

P.   charges for any duplicate prosthetic device or any
     other duplicate appliance;

Q.   charges for any services to the extent benefits are
     payable under any health care program supported in
     whole or in part by funds of the Federal government or
     any state or political subdivision thereof;

R.   charges for the completion of any insurance forms;

S.   charges for sealants and for oral hygiene and dietary
     instruction;

T.   charges for a plaque control program;
     or

U.   charges for services or supplies related to periodontal
     splinting.

SALARIED HEALTH CARE PROGRAM

App. C

VIII. Proof of Claim

The carrier reserves the right at its discretion to accept,
or to require verification of, any alleged fact or assertion
pertaining to any claim for dental benefits.  As part of the
basis for determining benefits payable, the carrier may
require x-rays and other appropriate diagnostic and
evaluative materials.

IX.   Alternative Dental Coverage

A.   The Corporation may make arrangements for eligible
enrollees to enroll for approved and qualified
alternative dental coverages which may provide for
benefits and/or copayments which are different from
those specified in this Appendix.  The Corporation's
contributions toward coverage under such alternative
dental coverage shall not be greater than the amount
the Corporation would have contributed for dental
coverage herein.

B.   At its option, the Corporation may implement a dental
network under which coverage may be limited to covered
services obtained from network providers and/or
benefits may be reduced or eliminated for covered
services obtained from non-network providers.  At the
Corporation's option, such a network may be substituted
for the standard dental coverage under this Appendix,
for alternative dental coverage, or both.

X.   Definitions

As used in this Appendix, the terms identified below have the
meanings stated.

A.   "dentist" means a legally licensed dentist practicing
within the scope of such dentist's license.  As used
herein, the term "dentist" also includes a legally
licensed physician authorized by license to perform the
particular dental services such physician has rendered.

B.   "reasonable and customary charge" is defined in Article
IV, Section 15 of the Program.  However, for purposes
of this Appendix "area" means a metropolitan area, a
county or such greater area as is necessary to obtain a
representative cross-section of dentists rendering such
services or furnishing such supplies.

C.    "course of treatment" means a planned program of one or
more services or supplies, whether rendered by one or
more dentists, for the treatment of a dental condition
diagnosed by the attending dentist as a result of an
oral examination.  The course of treatment commences on
the date a dentist first renders a service to correct
or treat such diagnosed dental condition.

D.    "orthodontic treatment" means preventive and corrective
treatment of those dental irregularities which result
from the anomalous growth and development of dentition
and its related anatomic structures or as a result of
accidental injury and which require repositioning
(except for preventive treatment) of teeth to establish
normal occlusion.

E.    "ordered" means, in the case of dentures, that
impressions have been taken from which the denture will
be prepared; and, in the case of fixed bridgework,
restorative crowns, inlays, or onlays, that the teeth
which will serve as abutments or support or which are
being restored have been fully prepared to receive, and
impressions have been taken from which will be prepared
the bridgework, crowns, inlays or onlays.

F.    "temporomandibular joint (TMJ) dysfunction/disorder"
refers to a disorder of the supporting and regulating
structures of the jaws including changes in muscles,
ligaments and nerves; these changes are generally
reversible by time and/or treatment.

G.    "accidental dental injury" means an injury to sound
natural teeth caused by external forces which occur as
the result of a traumatic incident which is sudden and
unforeseen and which are not ordinarily associated with
chewing or the reasonable use of teeth in normal
activity which results in the need for repair and/or
replacement of dental structures.

XI.    Accidental Dental Injury

For services obtained as the result of an accidental dental
injury which occurs while the enrollee is eligible for
coverage and enrolled, benefits in excess of the maximums as
described in Section IV. are available for repair and/or care
of sound natural teeth subject to the following conditions.

A.    Benefits are available when:

1.    services are covered under this Appendix (except
for orthodontic treatment or treatment of

05-44481-rdd   Doc 16424-6   Filed 03/05/09   Entered 03/05/09 20:11:43   Trial
Exhibit 8   Pg 204 of 217
SALARIED HEALTH CARE PROGRAM

App. C

temporomandibular joint dysfunction) or would
have been covered under this Appendix in the
absence of the frequency limitations provided in
Sections III. and VI.;

2.   the maximum benefits described in Section IV.
have been exceeded;

3.   the enrollee has sustained a covered accidental
dental injury, which is verifiable and documented
in the record;

4.   services are the direct result of the accidental
dental injury; and

5.   services are provided within one year subsequent
to the date of the accident except:

a.   when acceptable evidence is presented to the
carrier that unusual or special dental
and/or medical needs prevented the provision
of services within that time period; or

b.   when the dental development of the injured
enrollee is incomplete at the time of
injury, in which event services must be
provided no later than two years after full
development is reached.

B.   Benefits for covered services are subject to:

1.   the reasonable and customary charges for repair
and/or care of sound natural teeth;

2.   a 20% copayment; and

3.   a maximum benefit payment per enrollee of $12,000
per qualified occurrence and per lifetime.

C.   Coverage under this Section is not available for
services for injury caused by normal wear and tear on
the teeth or on a prosthetic dental appliance.

SALARIED HEALTH CARE PROGRAM

App. D

APPENDIX D

VISION COVERAGE

I.    Enrollment Classifications

Vision coverage for a primary enrollee may include coverage
for eligible secondary enrollees as defined in the Program.

II.    Description of Benefits

Vision benefits will be payable, subject to the conditions
herein, if an enrollee incurs a covered vision expense.

III.    Definitions

As used herein:

A.    "ophthalmologist" means any licensed doctor of medicine
or osteopathy legally qualified to practice medicine,
including the diagnosis, treatment, and prescribing of
lenses related to conditions of the eye.

B.    "optometrist" means any person legally licensed to
practice optometry as defined by the laws of the state
in which the service is rendered.

C.    "optician" means one who makes or sells eyeglasses
prescribed by an ophthalmologist or optometrist to cure
or correct defects in the eyes, and grinds the lenses
or has them ground according to prescription, fits them
into a frame, and adjusts the frame to fit the face.

D.    "participating provider" means an ophthalmologist,
optometrist, or optician who has signed an agreement
with the carrier covering reimbursement, quality,
service standards and other terms and conditions
connected with providing covered vision services to
enrollees.

E.    "nonparticipating provider" means an ophthalmologist,
optometrist, or optician who has not signed an
agreement with the carrier covering reimbursement,
quality, service standards and other terms and
conditions connected with providing covered vision
services to enrollees.

F.    "contact lenses" means ophthalmic corrective lenses, as
prescribed by an ophthalmologist or optometrist, to be
fitted directly to the enrollee's eyes.

SALARIED HEALTH CARE PROGRAM

App. D

G.   "lenses" means ophthalmic corrective lenses, as
prescribed by an ophthalmologist or optometrist, to be
fitted into a frame.

H.   "frame" means a standard eyeglass frame into which two
lenses are fitted.

I.   "covered vision expense" means the reasonable and
customary charges for vision care services and
materials, as described in Section IV., when provided
by ophthalmologists, optometrists, and opticians for
each enrollee.

J.   "corrective eye surgery" means a surgical procedure
used to alter the cornea or shape/surface of the eye
in order to improve visual acuity, correct vision
conditions such as myopia, hyperopia, or astigmatism
and reduce or eliminate the reliance on eyewear.  Such
surgeries can include, but are not necessarily limited
to, Laser- assisted In-Situ Keratomileusis (LASIK),
PhotoRefractive Keratectomy (PRK) and Radial
Keratotomy (RK).

K.   "reasonable and customary charge" as used in this
Appendix also refers to scheduled or other contracted
amounts of payment used by carriers with participating
provider arrangements.  The carrier is responsible for
determining the appropriate reasonable and customary
charge for a given provider and service or material,
and such determination shall be conclusive.

IV.  Benefits

Benefits will be paid for the covered vision expenses
described in A., B., and C. below, less any copayment as
described in D. below.

A.   Vision Examinations:

1.   Refraction, including case history, coordinating
measurements, and tests;

2.   The prescription of glasses where indicated; and

3.   Examination by an ophthalmologist, upon referral
by an optometrist, within 60 days of a vision
examination by the optometrist.

B.   Lenses and Frames:

SALARIED HEALTH CARE PROGRAM

App. D

When lenses are prescribed by an ophthalmologist or optometrist, the necessary materials and professional services connected with the ordering, preparation, fitting, and adjusting of:

1.  Lenses (single vision, bifocals, trifocals, lenticular).  If the enrollee selects lenses, the size of which results in an additional charge, only the reasonable and customary charge for normal size lenses of the same material and prescription will be considered a covered vision expense.  If the enrollee selects photochromic lenses or lenses with a tint other than Number 1 or Number 2, only the reasonable and customary charge for clear lenses of the same material and prescription will be considered a covered vision expense.

2.  Contact lenses following cataract surgery, or when visual acuity cannot be corrected to 20/70 in the better eye except by their use, or when medically necessary due to keratoconus, irregular astigmatism or irregular corneal curvature.  If contact lenses are prescribed for any other reason, $80 is the maximum amount that will be considered a covered vision expense

3.  Frames.  If frames are obtained from a participating provider, the enrollee may make a selection from the display shown by the participating provider and there will be no out-of-pocket expense to the enrollee other than as described under "copayments".  However, if the selection at the participating provider is not from the display shown, or if the enrollee obtains frames from a nonparticipating provider, $16 is the maximum amount that will be considered a covered vision expense until January 1, 2004 and $24 thereafter.

C.  Corrective Eye Surgery:  Effective January 1, 2004, corrective eye surgery performed by an ophthalmologist will become a covered service.  Coverage includes any related pre and post-surgical professional services, facility expense and medically necessary supplies.  Coverage is subject to the following provisions:

1.  An enrollee may not receive benefits for both corrective eye surgery and for frames and/or lenses (including contact lenses) in the same calendar year;

SALARIED HEALTH CARE PROGRAM

App. D

2.    Upon proof of payment to the corrective eye
surgery provider, the carrier will reimburse the
primary enrollee for covered expense, up to the
lesser of the charges or the maximum benefit of
$295.00 in any four (4) year period; and

3.    An enrollee receiving benefits for corrective eye
surgery in any one calendar year will be
ineligible for lens (including contact lens)
and/or frame benefits for that year and three (3)
subsequent years.  For example, an enrollee
undergoing corrective eye surgery in 2004 would
be eligible for lens and/or frame benefits in
2008.  Such enrollees will be eligible for
benefits for an annual exam, and will have access
to the participating provider fee schedule for
non-covered services and for lenses and/or frames
for which no benefits are payable.

D.   Copayments:

For each enrollee, there is a $7 copayment applicable
to the covered vision expense for each vision
examination and a $10 copayment for the combined
covered vision expenses for lenses, contact lenses, and
frames.  The total copayment for each enrollee, during
a calendar year, will not exceed $17.

V.    Frequency Limitations

For each enrollee, there are the following limitations on the
frequency with which charges for certain services and
materials will be considered covered vision expenses:

Vision Examination     –    Once during a calendar year,
except as provided in Section
IV.A.3.
Lenses                 –    Once during a calendar year,
except as provided in Section
IV.C.
Frames                 –    Once during two consecutive
calendar years, except as
provided in Section IV.C.

The limitations on lenses, contact lenses, and frames apply
whether or not they are a replacement of lost, stolen, or
broken lenses, contact lenses, or frames.

VI.   Exclusions

A.    Any lenses which do not require a prescription;

SALARIED HEALTH CARE PROGRAM

App. D

B. Medical or surgical treatment of the eye, except as provided in Section IV.C.;

C. Drugs or any other medication;

D. Procedures determined by the carrier to be special or unusual, such as, but not limited to, orthoptics, vision training, subnormal vision aids, aniseikonic lenses, and tonography;

E. Vision examinations or materials furnished for any condition, disease, ailment, or injury arising out of or in the course of employment; and

F. Vision examinations performed and lenses and frames ordered:

  1. before the enrollee became covered for this coverage;

  2. after the termination of the enrollee's coverage; or

  3. to the extent that they are obtained without cost to the enrollee.

VII. Vision Network

A. The carrier has implemented a network of participating providers who agree to accept reimbursement according to a schedule for the covered vision services and materials described in Section IV.A. and B. without enrollee copayments.

B. If an enrollee uses a participating provider to obtain covered services, the carrier will reimburse the provider without enrollee copayment as specified below:

  1. the scheduled amount (which shall be payment in full) for eye examinations, normal-size clear, Number 1 or Number 2 tinted lenses; and medically necessary contact lenses (see Section IV.B.1. and 2.);

  2. the scheduled amount (which is payment in full) of $24 for eyeglass frames with a retail value of $80 or less.  If an eyeglass frame with a retail value greater than $80 is selected, the enrollee will be responsible for the discounted price

SALARIED HEALTH CARE PROGRAM

App. D

(participating providers discount frames with the retail cost in excess of $80), less $24; and

3.    the scheduled amount of $65 for contact lenses, which do not meet the criteria in Section IV.B.2. The enrollee will be responsible for any amount greater than $80.

C.    If an enrollee resides 25 miles or less from a participating provider but obtains covered services from a non-participating provider (other than an ophthalmologist), the carrier will reimburse the enrollee the scheduled amounts.  The enrollee will be responsible for paying the provider, including any remaining balance.  Reimbursement to the enrollee for covered services received from non-participating ophthalmologists will be made at the reasonable and customary amount, less the enrollee copayment (see Section IV.D.).

D.    If an enrollee resides more than 25 miles from a participating provider and obtains covered services from a non-participating provider (including an ophthalmologist), the carrier will reimburse the enrollee in accordance with Section IV. above.

SALARIED HEALTH CARE PROGRAM

App. E

APPENDIX E

EXTENDED CARE COVERAGE

I.   Definitions

To the extent they are not in conflict with the following,
the definitions contained in Article IV and in Appendix A of
the Program are incorporated herein by reference.  For the
purposes of this Appendix:

A.   "nurse professional" means a registered nurse (RN), a
     licensed practical nurse (LPN), nurse practitioner, or
     nurse clinician, who is legally qualified and licensed
     to perform nursing services at the time and place
     services are rendered; or other individual who meets
     Program standards, and who is appropriately licensed
     where required;

B.   "nursing home" means a basic or intermediate care
     facility licensed and operated in accordance with the
     laws or other regulations pertaining to nursing homes,
     which provides 24-hour nursing care under medical
     supervision to ill or disabled enrollees who are unable
     to care for themselves, and which meets Program
     standards and is approved by the carrier; and

C.   "Program standards" means for purposes of this Appendix
     E, standards established by the Appendix E carrier; and

D.   "unskilled care" means care which, although prescribed
     by a physician, is typically provided to assist the
     patient with the activities of daily living including,
     but not limited to, bathing, dressing, incontinent
     care, skin care, and meal preparation.  Although such
     care requires only basic skills and training, it may be
     provided in a licensed nursing home, by a home health
     care agency, or by a privately contracted, qualified
     nurse professional.

The Extended Care Coverage (ECC) carrier shall have
discretionary authority to interpret, construe and apply the
above provisions of the Program.  The carrier's exercise of
this authority shall be given full force and effect unless it
is determined by the Plan Administrator to have been
inconsistent with the Program provisions or arbitrary and
capricious.

SALARIED HEALTH CARE PROGRAM

App. E

II.   Eligibility, Enrollment and Contributions

    A.   Extended Care Coverage (ECC) is available to primary
        enrollees eligible for and enrolled in coverage under
        Appendix A of the Program, with the exception of:

        1.   Employees in Hawaii;

        2.   Employees classified as Flexible Service
            Employees, Expatriates or Cooperative Students;

        3.   Primary enrollees who reside in Canada and elect
            the Optional Canadian Health Care Coverage
            (OCHCC); and

        4.   Employees whose service date is on or after
            January 1, 2001.

        5.   Retirees and surviving spouses who have waived,
            discontinued or otherwise terminated ECC in their
            own right and who have not been (a) continuously
            enrolled either in ECC under another primary
            enrollee or in the Comprehensive Medical Expense
            Insurance Program coverage applicable to OCHCC
            enrollees, or (b) included in the coverage
            elections of an employee eligible for coverage
            under this Program.

    B.   With the exception of sponsored dependents, secondary
        enrollees are eligible for ECC if they are eligible and
        enrolled for Appendix A coverage under a primary
        enrollee enrolled in ECC.

C.   An ECC-eligible employee who elects and is enrolled for
        coverage under Appendix A of the program will be
        enrolled automatically in ECC, regardless of the
        enrollment option elected (BMP, EMP, or HMO). If the
        employee's coverage under Appendix A is terminated, or
        if the employee's status changes to one which would not
        entitle the employee to ECC, the ECC is terminated; if
        the employee's coverage under Appendix A is reinstated,
        or if the employee returns to a status which entitles
        the employee to ECC, it will be reinstated. Employee
        contributions for ECC will be included in the
        calculation of contributions for the Medical Plan
        options.

    D.   Retirees and surviving spouses eligible for Medical
        Plan coverage under the Program will make a separate
        contribution for ECC, if it is elected. The

App. E

contribution schedule is subject to periodic
adjustment, at the discretion of the Corporation.

    1.    The enrollment status [self-only, self and
spouse, self and child(ren) or self and family]
for ECC will be the same as that for the Medical
Plan enrollment status chosen by the
retiree/surviving spouse.

2.    A retiree or surviving spouse who does not elect
to enroll in, or to maintain enrollment in ECC
will not be permitted to reenroll in ECC at a
later date unless, during the intervening period,
the retiree or surviving spouse has been enrolled
in ECC under another primary enrollee, included
as a secondary enrollee in the Medical Plan
elections of a salaried employee or enrolled
under the OCHCC. The same prohibition will apply
to an individual who becomes a salaried retiree
or a surviving spouse of a salaried employee or
retiree and elects not to enroll in ECC at the
time of retirement or enrollment as a surviving
spouse, or who initially elects but then
discontinues ECC.

III.  <u>Covered Expenses and Benefits</u>

    A.    ECC coverage applies only to long term and/or
custodial nursing care needs.  Accordingly, the
situations in which ECC benefits may be payable,
subject to the specified maximums, are if:

        (1)    an enrollee exhausts hospital or skilled nursing
facility or home health care coverage under
Appendix A of the Program;

        (2)    home health care services for an enrollee exceed
the requirements for coverage under Appendix A;

        (3)    an enrollee incurs expenses for private duty
nursing services (except while a patient in a
hospital, skilled nursing facility or nursing
home); or

        (4)    an enrollee incurs expenses for custodial care
which is not covered under Appendix A.

    B.    There are no deductibles and copayments applicable to
services covered under this Appendix.

    C.    Determinations made by carriers administering Appendix
A coverages, with regard to the nature of care being

SALARIED HEALTH CARE PROGRAM

App. E

provided to an enrollee will not control benefit determinations for ECC, nor will determinations of the ECC carrier control benefit determinations under other appendices of the Program. To the extent that the ECC benefits payable are a function of the nature of the service being performed (i.e., skilled, unskilled or a combination of the two), the medical necessity of the services, the reasonable and customary charge for such services or the approved status of the provider for ECC purposes, the ECC carrier shall have discretionary authority to interpret, apply and construe the provisions of the Program. The ECC carrier's exercise of this authority shall be given full force and effect unless it is determined by the Plan Administrator to have been inconsistent with the Program provisions or arbitrary and capricious.

D.   The maximum benefit payable under this Appendix for services incurred during any one calendar year (January 1 through December 31) is $50,000 for each enrollee, subject to the provisions below. Claims must be received by the carrier no later than the last day of the calendar year following the calendar year in which the expenses are incurred.

1.   Coverage will be provided at the reasonable and customary daily rate for skilled or mixed skilled and unskilled care for:

a.   Medically necessary non-custodial hospital or skilled nursing facility admissions which exhaust Appendix A limits;

b.   Skilled hospital or skilled nursing facility admissions which are not covered under Appendix A due to the Appendix A carrier's determinations that the admissions are custodial in nature;

c.   Admissions to nursing homes approved by the ECC carrier, for services considered by the ECC carrier to be skilled in nature; and

d.   Skilled care being provided in the home by a qualified home health care agency or by a qualified nurse professional but which does not meet the criteria for coverage under the Appendix A provisions, exceeds the intermittent or part-time criteria or exhausts limits of the option elected.

SALARIED HEALTH CARE PROGRAM

App. E

However, if benefits are denied or reduced, under Appendix A, solely due to failure to use providers approved by the Appendix A carrier, no benefits are payable.

2.     Coverage will be provided at a maximum of $35 per day for unskilled care delivered in a hospital, skilled nursing facility, nursing home or in the patient's home by nurse professionals.

3.     Coverage will be provided for medical supplies not covered under another provision of the Program (e.g., prescription drugs, durable medical equipment) for an enrollee admitted to a hospital or skilled nursing facility for unskilled custodial care, or for an enrollee confined to the home who is receiving benefits under this Appendix but not receiving home health care services under Appendix A.  For enrollees receiving benefits for home health care services under Appendix A, medical supplies are covered (see Section III.D.2.c.(3)).  Supplies covered under this Appendix are in addition to the $35 daily allowance for actual care of the enrollee and are subject to applicable reasonable and customary charge limitations.

IV.   Limitations and Exclusions

Covered expenses will not include, and benefits are not payable for:

A.     deductibles and copayments applied to covered expenses under any option available under another Appendix of this Program or out-of-pocket expenses incurred as sanctions because of failure to satisfy the Program provisions under such appendices;

B.     services in the home in connection with routine nursing care of newborn children;

C.     services not prescribed by a physician;

D.     education or training (including such services when directed toward learning, behavioral or developmental deficiencies);

E.     amounts covered by public programs providing benefits (such as those under laws pertaining to Worker's Compensation, non-occupational disability, old age assistance, veteran's assistance, and any Federal or

SALARIED HEALTH CARE PROGRAM

App. E

state health insurance act providing nursing
benefits);

F.    amounts reimbursed by Medicare;

G.    amounts in excess of the reasonable and customary
      charge or which are not considered to be necessary as
      determined by the carrier;

H.    services available without cost:  Coverage does not
      include services for which a charge would not have
      been made if no coverage existed; services for which
      the enrollee is not legally obligated to pay; or
      services which the enrollee received or, upon
      application, could receive without cost under the laws
      or regulations of the United States of America,
      Dominion of Canada, any other country, or any state or
      political subdivision thereof;

I.    charges which duplicate benefits paid under another
      Appendix of the Program;

J.    services provided by family members or relatives:
      Coverage does not include services provided to the
      enrollee by members of the enrollee's household or
      immediate relatives of the enrollee.  For purposes of
      this provision, "immediate relative" refers to the
      enrollee's spouse, natural or adoptive parents,
      children or siblings, step-parents, -children or -
      siblings, father-, mother-, son-, daughter-, brother-,
      or sister-in-law, and grandparents or grandchildren of
      the enrollee or the enrollee's spouse;

K.    services provided by a halfway house, group home,
      adult foster care facility, assisted living facility,
      rest home, adult day/night care, residential care, and
      the like; (for example, charges including but not
      limited to room, board and nursing care provided by
      such non-covered facilities);

L.    non-medical supplies including, but not limited to,
      personal hygiene products, over-the-counter
      medications and personal items (including
      disablebriefs and diapers);

M.    private duty nursing services for enrollees admitted
      to hospitals, skilled nursing facilities or nursing
      homes;

N.    physical, functional occupational and speech therapy
      services;

SALARIED HEALTH CARE PROGRAM

App. E

O.   charges for admissions, services, supplies and the
     like which are related to treatment of mental health
     and/or substance abuse disorders, whether or not such
     admissions, services, supplies and the like are
     covered under Appendices A and/or B of the Program.
     However, unskilled and/or custodial care provided by
     nurse professionals and meeting all other terms and
     conditions of this Appendix may still be covered; and

P.   charges for services rendered prior to the effective
     date of, or after termination of coverage under this
     Appendix. However if a patient's covered and
     continuous admission to a hospital, skilled nursing
     facility or nursing home commences prior to
     termination of the coverage, benefits may be paid for
     that patient's admission until the earliest of
     discharge from the facility, exhaustion of the
     calendar year maximum and the end of the calendar year
     in which coverage is terminated.

Q.   charges for room or facility reservations or the
     completion of any claim forms or record processing.