United States General Accounting Office

# GAO

## Testimony

Before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, House of Representatives

For Release on Delivery
Expected at 2:30 p.m.
Thursday, November 1, 2001

# RETIREE HEALTH INSURANCE

## Gaps in Coverage and Availability

Statement of William J. Scanlon
Director, Health Care Issues



GAO
Accountability * Integrity * Reliability

GAO-02-178T

DSRA000001

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today as you consider the future financial security of retired Americans, particularly the availability of employer-sponsored health benefits and other sources of insurance coverage to meet the increasing health care and long-term care needs of an aging population. Many retired Americans—about 10 million aged 55 or over—relied on employer-sponsored health benefits in 1999 to provide health coverage until they became eligible for Medicare or as supplemental coverage to pay for out-of-pocket costs not covered by Medicare. However, the number of employers offering these benefits has declined considerably over the past decade. This decline, coupled with the sheer numbers of the aging baby boom population, has raised concerns about whether individuals will continue to have access to employer-sponsored health benefits when they retire and, if not, whether alternative sources of coverage may assist in meeting retirees' health care needs.

In view of these concerns, you asked us to provide information on trends in employer-sponsored retiree health benefits and implications for retirees who may seek alternative sources of coverage. Accordingly, my remarks today will focus on

- recent changes employers have made to the availability and terms of their retiree health benefits and whether these trends are likely to continue, and
- the availability of alternative sources of coverage for retirees whose health care and long-term care needs typically increase as they age.

My comments are based largely on our previously issued reports on trends in employer-sponsored retiree health benefits, and in Medicare, Medicare supplemental insurance (also known as Medigap), and long-term care financing.[1]

In summary, some retirees face gaps in coverage to meet their health care and long-term care needs because the availability of employer-sponsored retiree health benefits is declining and alternative sources of coverage are costly or limited. Despite several years of a sustained strong economy and relatively low increases in health insurance premiums during the late 1990s, the availability of employer-sponsored retiree health benefits has eroded. Two widely cited surveys found that coverage has declined such

---

[1] A list of related GAO products is at the end of this statement.

Page 1

GAO-02-178T

DSRA000002

that about one-third of large employers and less than 10 percent of small employers offer retiree health benefits. Nonetheless, the percentage of retirees with employer-sponsored coverage remained relatively stable between 1994 and 1999, covering about 57 percent of retirees aged 55 to 64 and providing Medicare supplemental coverage to about 32 percent of retirees 65 or older. To some extent, these differing trends may reflect employers' tendency to eliminate coverage for future rather than current retirees. Some employers that continue to offer retiree health benefits, however, have reduced these benefits by increasing the share of premiums that retirees pay, increasing copayments and deductibles, or limiting future commitments for what they will spend for retiree coverage. For example, an increasing share of large employers that offer retiree health benefits—about 40 percent in 2000, about 8 percentage points higher than in 1997—require retirees younger than 65 to pay the entire premium. Increasing cost pressures on employers, such as rising premiums and a weakening economy, suggest that erosion in retiree health benefits may continue.

With the declining availability of employer-sponsored retiree health benefits, alternative sources of health coverage for retirees may be costly, more limited, or unavailable. Retirees not yet 65 may be eligible for coverage from a spouse's employer or from their former employer under the provisions enacted as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). While these provisions allow an individual to purchase temporary continuation coverage from a former employer, such coverage can be quite expensive as the retiree may be required to pay the entire premium. Other retirees in this age group may seek coverage in the individual insurance market, but individual policies can be expensive or offer more limited coverage, especially for those with existing health problems. Although Medicare covers virtually all retirees 65 or older, most Medicare beneficiaries also obtain supplemental insurance to cover Medicare's cost-sharing requirements and some gaps in Medicare's coverage, such as prescription drugs. Nearly one-third of Medicare-eligible retirees have employer-sponsored supplemental coverage, but many others purchase individual private supplemental coverage known as "Medigap." While Medigap coverage is widely available to retirees when they initially enroll in Medicare at 65, it costs an average of $1,300 per year and even more for policies that include prescription drug coverage. Finally, neither Medicare nor private insurance covers a significant share of long-term care services. The potentially catastrophic costs of long-term care are currently paid primarily by Medicaid, the joint federal-state health financing program for certain low-income individuals,

DSRA000003

and by individuals out-of-pocket. Private long-term care insurance plays a small role in financing long-term care services.

## Background

Since World War II, many employers have voluntarily sponsored health insurance as a benefit to employees for purposes of recruitment and retention, and many have also extended these benefits to their retirees. The federal tax code gives employers incentives to subsidize health benefits because their contributions can be deducted as a business expense, and these contributions are also not considered taxable income for employees. Employer-sponsored health benefits are regulated under the Employee Retirement Income Security Act of 1974 (ERISA), which gives employers considerable flexibility to manage the cost, design, and extent of health care benefits they provide.

Working adults and retirees aged 55 to 64 rely on employer-sponsored coverage as their primary source of health insurance. In 1999, according to the Bureau of the Census' Current Population Survey, employers provided coverage to 78 percent of all working adults aged 55 to 64 and to 57 percent of the 4 million retirees aged 55 to 64. Other retirees in this age group purchased individual (nongroup) health insurance or relied on Medicaid or other public insurance, and a significant portion—17 percent—were uninsured. (See fig. 1.)

Retirees aged 65 or older typically rely on Medicare as their primary source of coverage. However, Medicare, which helps pay for hospital and physician expenses for acute care, has gaps in coverage that leave Medicare beneficiaries facing significant out-of-pocket costs. For example, Medicare does not cover most outpatient prescription drugs nor does it cover potentially catastrophic expenses associated with long-term stays in hospitals or skilled nursing facilities. As a result, most Medicare beneficiaries obtain supplemental insurance to cover some of these out-of-pocket costs. In 1999, according to the Current Population Survey, nearly one-third of the 23 million retirees aged 65 or older had Medicare with employer-sponsored supplemental coverage. Slightly more than one-third had Medicare with other sources of supplemental coverage. Most often, these beneficiaries had individually purchased supplemental coverage, known as Medigap, but some received assistance from Medicaid. The remaining portion of retirees had Medicare without supplemental coverage. However, many of these are enrolled in Medicare+Choice plans,

DSRA000004

which provide beneficiaries an alternative to traditional fee-for-service Medicare and typically have nominal cost-sharing requirements and often cover additional services, such as prescription drugs.[2] Data from the 1998 Medicare Current Beneficiary Survey indicate that half of Medicare beneficiaries with Medicare-only coverage were enrolled in a Medicare+Choice plan.

---

[2] In the Balanced Budget Act of 1997 (P.L. 105-33, Aug. 5, 1997), the Congress established the Medicare+Choice program to expand Medicare beneficiaries' health plan options and to encourage wider availability of health maintenance organizations and other types of health plans, such as preferred provider organizations, as an alternative to traditional fee-for-service Medicare.

DSRA000005



Figure 1: Sources of Health Coverage for Retired Americans Differ by Age Group, 1999

Notes: Percentages do not add to 100 because of rounding.

Of the 23.4 million Americans aged 55 to 64 in 1999, 4.0 million (17 percent) were retired. For these retirees, "public" coverage includes Medicaid, Medicare (for eligible disabled individuals), and health care through the Departments of Defense or Veterans Affairs.

Of the 32.6 million Americans aged 65 or older in 1999, 23.4 million (72 percent) were retired, with the remainder either still working or not working for reasons other than retirement. "Medicare without supplemental coverage" includes both traditional fee-for-service Medicare and Medicare+Choice plans because the Current Population Survey does not distinguish between these types of Medicare coverage. "Medicare with other supplemental coverage" includes those with individually purchased Medigap and Medicaid. "Other" includes those without Medicare but receiving employer-sponsored health insurance, Medicaid, or health care through the Departments of Defense or Veterans Affairs.

Source: GAO analysis of Bureau of the Census' 2000 Current Population Survey, March Supplement.

The health care needs and costs of retired Americans are likely to grow significantly as the baby boom generation nears retirement age. As shown in figure 2, the number of individuals aged 55 to 64 will increase by 75 percent by 2020, and the number of people aged 65 or older will double by 2030. The sheer numbers of baby boomers and greater numbers of people reaching age 85 and beyond are expected to have a dramatic effect on the number of people needing long-term and other health care services

GAO-02-178T

DSRA000006

because the prevalence of disabilities and dependency increases with age. Projections of the number of disabled elderly individuals who will need such care range from 2 to 4 times the current number.



Figure 2: Baby Boom Generation Will Greatly Increase the Populations Aged 55 to 64 and 65 or Older

Source: Bureau of the Census, Projections of the Total Resident Population by 5-Year Age Groups and Sex With Special Age Categories: Middle Series, selected years 2000 to 2030 (Washington, D.C.: Jan. 2000).

Insurance coverage, and access to effective preventive, acute, and long-term care, is particularly important for maintaining the health of older adults. For those individuals needing nursing home or other extensive continuing care, the costs can be substantial. On average, nursing home care costs an individual about $55,000 annually. Individuals needing care and their families pay a significant portion of long-term care costs out-of-pocket.

DSRA000007

| | |
|---|---|
| **Employer-Sponsored Retiree Health Benefits Continue to Erode** | Employer sponsorship of retiree health benefits continues to erode, with about one-third of large employers and few small employers currently offering health benefits to their retirees. Even when employers continue to offer insurance, many have reduced coverage by tightening eligibility requirements, increasing the share of premiums retirees pay for health benefits, or increasing copayments and deductibles. Increasing cost pressures on employers, such as rising premiums and a weakening economy, suggest that erosion in retiree health benefits may continue. |
| **Employer Sponsorship of Retiree Health Benefits Has Declined** | The availability of employer-sponsored retiree health benefits has declined during the last decade. Two widely cited surveys—by William M. Mercer, Incorporated, and the Kaiser Family Foundation and Health Research and Educational Trust (Kaiser/HRET)—indicated that nearly half of large employers offered retiree health benefits in the early 1990s,[3] but their most recent surveys reported that this proportion has declined to about one-third of large employers.[4] (See fig. 3.) The decline in large employers offering retiree health benefits has continued in recent years, despite several years during the latter part of the 1990s experiencing a strong economy and relatively small premium increases. Large employers are less likely to offer these benefits to Medicare-eligible retirees than to retirees under age 65. These surveys also found that large employers are more likely to sponsor health insurance for retirees than are small firms, with fewer than 10 percent of the latter doing so. |

---

[3] During the early 1990s, accounting rules adopted by the Financial Accounting Standards (FAS) Board, combined with rising premiums for health insurance, led many employers to reexamine their sponsorship of retiree health benefits. FAS 106, adopted in 1993, required employers to report annually on the liability represented by the promise to provide retiree health benefits to current and future retirees. While FAS 106 did not affect an employer's cash flow, some companies have said that FAS 106 requirements led to reductions in reported income and shareholder equity and have been a reason for reducing retiree health benefits.

[4] The Mercer survey considers a large employer as one with 500 or more employees. For the Kaiser/HRET survey, a large employer is one with 200 or more employees.

DSRA000008



Figure 3: Decreasing Proportion of Large Employers Offer Retiree Health Benefits

- - - - Kaiser/HRET survey
——— Mercer survey (for retirees under age 65)
——— Mercer survey (for retirees 65 or older)

Notes: The Mercer data represent retiree health benefits offered by employers with at least 500 employees, whereas the Kaiser/HRET data represent employers with at least 200 employees.

The Mercer data represent the combined percentages of employers that reported offering health benefits to most retirees and to selected retirees, which Mercer reports separately; the Kaiser/HRET survey does not distinguish between employers offering insurance to most or selected retirees.

The narrower dashed lines between 1993 and 1997 for the Kaiser/HRET survey (at that time conducted by KPMG Peat Marwick) indicate that the survey did not report on employer sponsorship of retiree health benefits in 1994 and 1996.

Sources: William M. Mercer, Incorporated and Foster Higgins (which conducted the survey until 1997 when Foster Higgins merged with Mercer) employer benefit surveys, 1994 to 2000; and KPMG Peat Marwick and Kaiser/HRET employer benefit surveys, 1991 to 2001.

While fewer employers sponsor retiree health benefits now, the percentage of retirees obtaining health benefits through an employer has remained relatively stable in recent years. According to our analysis of the

Current Population Survey, over half of retirees aged 55 to 64 and about one-third of retirees 65 or older had employer-sponsored coverage in 1999.[5] (See fig. 4.) Since 1994, the percentage of both retirees aged 55 to 64 and those 65 or older with employer-sponsored coverage has varied from year to year by only 1 or 2 percentage points. This stability in coverage may exist in part because employers tend to reduce coverage for future rather than current retirees.



Figure 4: Percentage of Retirees With Employer-Sponsored Health Benefits Has Remained Relatively Stable

Source: GAO analysis of Current Population Survey, March Supplements 1995 through 2000.

## Employers Are Restricting Eligibility and Increasing Retirees' Costs

Some employers that continue to offer retiree health coverage have adopted several strategies to limit their liability for these costs. These strategies include the following:

- Restricting eligibility. According to Mercer's data, among the 36 percent of large employers sponsoring health benefits for retirees younger than 65 in

---

[5]About one-third of retirees aged 55 to 64 and about 20 percent of retirees 65 or older with employer-sponsored health insurance have coverage through a spouse or other related individual who may be working or retired.

DSRA000010

2000, about 5 percent did so for only selected employees. The remaining 31 percent offered retiree health benefits to most retirees.[6]

- <u>Increasing retirees' share of premiums</u>. The Mercer survey found that as many as one-fourth of employers increased retirees' share of premium contributions within the past 2 years. About 40 percent of large employers that offer health benefits to retirees younger than 65 require those retirees to pay the entire premium—an increase of about 8 percentage points since 1997.
- <u>Increasing retirees' out-of-pocket costs</u>. Both the Mercer and Kaiser/HRET surveys found that more than 10 percent of employers recently increased retirees' potential out-of-pocket costs for deductibles, coinsurance, and copayments. In particular, the Kaiser/HRET survey reported that one-third of employers have increased the amount that retirees pay for prescription drugs within the past 2 years.
- <u>Limiting future commitments</u>. The 1999 Kaiser/HRET survey found that in the previous 2 years 35 percent of large firms offering retiree health benefits limited their future financial commitment by implementing a cap on projected contributions for these benefits. Benefit consultants we interviewed stated that employers typically set their cap prospectively at a level higher than current spending, and if spending approaches the cap, they can either reduce benefits to stay within the cap or raise the cap.

Some employers are considering, but few have implemented, a more fundamental change that would shift retiree health benefits to a defined contribution plan. Under a defined contribution plan, an employer directly provides each retiree with a fixed amount of money to purchase insurance coverage, either in the individual market or through a choice of plans offered by the employer. The individual is then responsible for the difference between the employer's contribution and the selected plan's total premium. Benefit consultants have reported that many employers would prefer to move toward a defined contribution approach. However, several issues, such as retirees' readiness to assume responsibility for managing their own health benefits and contractual bargaining agreements with union plans, could limit employers' ability to make such a fundamental change.

---

[6] The proportion of large employers—those with 500 or more employees—offering retiree health benefits to most retirees declined 8 percentage points between 1997 and 2000. According to Mercer officials, the percentage of firms offering benefits to most retirees represents firms making these benefits available to employees who were retiring at the time of the survey.

DSRA000011

| | |
|---|---|
| **Increasing Cost Pressures May Further Erode Employer-Sponsored Health Coverage** | Increasing economic pressures and evolving demographic trends could lead employers to reevaluate their provision of retiree health benefits and could result in further erosion of benefits. The following are contributing factors: |

- Health insurance premium increases, which were less than the general inflation rate from 1995 to 1997, began to rise faster than general inflation in 1998 and were about 6 or 8 percentage points above the general inflation rate in 2001.
- The weakening economy may lead employers to reevaluate employee salary and benefit levels. Specifically, the nation's gross domestic product increased at an annual rate of 2.4 percent in the second quarter of 2001, slower than the 4.2 percent and 5.0 percent growth in 1999 and 2000. Also, the nation's unemployment rate has gradually but steadily increased to 4.9 percent as of September 2001 after reaching a historic low of 3.9 percent 1 year earlier. Many economists expect a further weakening of the economy, at least in the short term, as a result of the September 11 terrorist attacks.
- The aging of the baby boom generation will increase the proportion and number of Americans of retirement age, leading some employers to have a larger number of retirees for whom they provide coverage but comparatively fewer active workers to subsidize these benefits.

Other factors have increased employers' uncertainty about their future role in providing retiree health benefits, but their implications are less clear. For example, if a proposed outpatient prescription drug benefit was added to Medicare, some employers could redesign their coverage to supplement the Medicare benefit, while others could choose to reduce or eliminate drug coverage. General workforce trends could also affect the availability of retiree health benefits. While some anecdotal information suggests increasing mobility of the workforce with fewer long-term job attachments, the data on this trend are mixed. Nonetheless, the percentage of workers with 20 or more years with a current employer has declined in recent decades and could indicate that fewer employees are likely to be eligible for retiree benefits that are often based on longevity with an employer.[7]

In addition, a March 2001 ruling in the Third U.S. Circuit Court of Appeals found an employer—Erie County, Pennsylvania—in violation of the Age

---

[7] See David Rajnes, "A 21st Century Update on Employee Tenure," *EBRI Notes*, Employee Benefits Research Institute (Mar. 2001).

Discrimination in Employment Act (ADEA)[8] because it offered a benefit for Medicare-eligible retirees that the District Court found to be inferior to the benefit offered retirees not yet eligible for Medicare.[9] To what extent the decision will lead to limitations on employers' flexibility in designing their retiree health benefits, and therefore discourage employers from offering such benefits, remains uncertain. This will depend, in part, on whether other circuit courts adopt similar interpretations of ADEA and which differences in benefits employers provide to non-Medicare-eligible and Medicare-eligible retirees are regarded as potential age-discrimination violations. The Equal Employment Opportunity Commission (EEOC) had initially said it would consider employers' reducing or eliminating retiree health benefits on the basis of a person's age or Medicare eligibility an ADEA violation. However, recognizing concerns raised by employers and unions that this decision could have adverse consequences on the availability of retiree health benefits, EEOC rescinded this policy statement on August 17, 2001. It is considering alternative policies to ensure that health benefits provided to Medicare-eligible retirees are consistent with ADEA without adversely affecting employers' sponsorship of retiree health benefits.

## Alternative Sources of Health and Long-Term Care Coverage May Be Costly and Limited

At an age when their health care needs are likely to grow, retirees who lose access to employer-sponsored coverage may face limited coverage alternatives, and those who are unable to obtain coverage may do without or begin to rely on public programs. Some federal laws guarantee access to alternative sources of coverage to both retirees under 65 and those eligible for Medicare; but these options may be costly or limited, particularly for individuals in poor health. A problem apart from whether employer-provided retiree health coverage is available is the potential financial burden of long-term care. Medicare and the private insurance available to most retirees do not typically cover costs of long-term care services that are increasingly needed as the prevalence of disability grows with advancing age. Thus, paying for these services may present a

---

[8]29 U.S.C. § 621-633a. ADEA prohibits employers from discriminating against individuals aged 40 or older with respect to compensation, terms, conditions, or privileges of employment.

[9]*Erie County Retirees Association v. County of Erie*, 220 F.3d 193 (3d Cir. 2000) cert. denied, 69 U.S.L.W. 3409 (U.S. Mar. 5, 2001) (No. 00-906). The Third Circuit has jurisdiction for Pennsylvania, New Jersey, Delaware, and the Virgin Islands.

DSRA000013

significant and growing financial burden for many individuals and for public health care programs.

### Retirees Aged 55 to 64 May Find Alternative Sources of Coverage Costly

Employers have been the predominant source of health coverage for most working adults. Although more than half of retirees report that they intend to continue working, the jobs they take are often part-time, or they are self-employed, and neither situation is likely to offer health benefits. Some individuals retire because of declining health—more than one-fifth of retirees aged 55 to 64 report being in fair or poor health—which further highlights their need for health insurance coverage. Therefore, even in retirement, over half of those aged 55 to 64 in 1999 continued to rely on health insurance either from their former employer or their spouse's employer. However, retirees without access to employer-sponsored coverage either seek an alternative source of health insurance or become uninsured.

Individuals whose jobs provided health benefits that ended at retirement may continue temporary coverage through their employer for up to 18 months under provisions enacted as part of COBRA.[10] But COBRA coverage may be an expensive alternative because the employer is not required to pay any portion of the premium and may charge the enrollee up to 102 percent of the group rate.

The individual insurance market may be an option for some retirees until they become eligible for Medicare, but this alternative can be costly as well.[11] Unlike the employer-sponsored market, where the price for coverage is based on risk characteristics of the entire group, premium prices in the individual insurance market in most states are based on the characteristics of each applicant, such as age, gender, geographic area,

---

[10] 29 U.S.C. § 1161-1169 and 26 U.S.C. § 4980B. COBRA coverage can be extended for an additional 11 months for most individuals who qualify for disability under the Social Security Act; however, they may be charged up to 150 percent of the group rate. Employers with fewer than 20 employees are not required to offer COBRA coverage.

[11] About 7 percent of the population aged 55 to 64 relied on the individual insurance market for their primary source of coverage in 1999.

tobacco use, and health status.[12] For example, premiums charged a 60-year-old man may be 2-1/2 times to nearly 4 times higher than those charged a 30-year-old man. For eligible individuals leaving group coverage, the Health Insurance Portability and Accountability Act of 1996 (HIPAA) guarantees access to at least two individual insurance policies or an alternative such as a state high-risk pool, regardless of health status and without exclusions.[13] Nevertheless, the premiums faced by retirees eligible for HIPAA protections, as well as by other retirees who must rely on the individual insurance market for coverage, may be substantially higher than those charged to healthier or younger individuals and may be cost-prohibitive. This is because retirees are more likely than working adults of the same age to be in fair or poor health. Unless they are guaranteed coverage by HIPAA, individuals with serious health conditions such as heart disease are virtually always denied coverage, and those with other, non-life-threatening conditions such as chronic back pain also may be excluded from coverage. Under a group plan, these individuals cannot be denied coverage, nor can they be required to pay a higher premium than others in the plan, and specific conditions can only be temporarily excluded from coverage.

## Gaps in Medicare Coverage Lead Many Retirees Aged 65 or Older to Seek Supplemental Coverage, Which Can Be Costly and Limited

Although Medicare is the primary source of coverage for retirees 65 years or older, gaps in Medicare coverage mean this population may have high out-of-pocket costs for health care. For example, Medicare does not typically cover outpatient prescription drugs, and it primarily covers acute care but not long-term hospital and skilled nursing facility stays. Most Medicare-eligible retirees obtain supplemental coverage to pay some of the costs not covered by Medicare. Nearly one-third of Medicare-eligible

---

[12]About 20 states have passed legislation that limits the amount individual market insurers can vary premium rates or the characteristics they may use to vary these rates, but substantial variation exists among these states. A few states, such as New Jersey, use a rating practice known as community rating which does not allow rates to vary for individual characteristics, while other states allow variation for selected characteristics but limit the range in variation.

[13]29 U.S.C. § 1181-1191, 26 U.S.C. § 9801-9803. To be eligible for HIPAA's group-to-individual portability provision, an individual must have had at least 18 months of creditable coverage with no break of more than 63 consecutive days; must have exhausted any COBRA or other continuation coverage available under a similar state program; must not be eligible for any other group coverage, Medicare, or Medicaid; and must not have lost group coverage because of nonpayment of premiums by the individual or because of fraud. Depending on the option states choose to implement this requirement, coverage may be provided by insurance carriers, through state high-risk insurance pool programs, or in other ways.

DSRA000015

retirees obtain this supplemental coverage from an employer, and most other Medicare beneficiaries seek other sources of supplemental coverage, such as Medigap or Medicaid, or participate in Medicare+Choice plans, which typically have low cost-sharing requirements and cover services such as prescription drugs that traditional Medicare does not cover.

Retirees can purchase private individual Medigap coverage, but this coverage may cost more or be less comprehensive than typical employer-sponsored health coverage. Medigap policies are widely available to 65-year-old Medicare beneficiaries during an initial 6-month open-enrollment period guaranteed by federal law.[14] Beneficiaries can select from among 10 standard policy types. Most purchasers buy mid-level policies that cover Medicare's cost-sharing requirements and selected other benefits, but not prescriptions. Relatively few Medigap purchasers (8 percent of those with a standardized Medigap policy) have bought the standardized plans that include prescription drug coverage. Whether they include prescription drug coverage or not, Medigap policies can be expensive—the average annual Medigap premium per covered life was more than $1,300 in 1999—and still leave retirees with significant out-of-pocket costs. Medigap policies that provide prescription drug coverage average more than $1,600 compared with about $1,150 for standardized plans without prescription drug coverage. However, even the standardized coverage for prescription drugs pays less than half of beneficiaries' drug costs, and catastrophic prescription drug expenses are not covered.[15]

Access to Medigap policies may be more limited for beneficiaries who are not in the initial open-enrollment period or otherwise eligible for federally guaranteed access under certain other circumstances. For example, federal law provides certain guarantees to ensure an individual has access to Medigap insurance if an employer eliminates or reduces coverage. In these cases, the individuals are guaranteed access to 4 of the 10

---

[14] 42 U.S.C. § 1395(s)(2)(A).

[15] The standardized Medigap prescription drug benefit pays less than half of beneficiaries' costs and limits payments to $1,250 or $3,000 per year, depending on which plan is purchased. For more information on costs and limits of Medigap policies, see *Medigap Insurance: Plans Are Widely Available but Have Limited Benefits and May Have High Costs* (GAO-01-941, July 31, 2001).

DSRA000016

standardized Medigap policies, regardless of their health status, but none of these 4 guaranteed plans includes prescription drug coverage.[16]

| Retirees' Long-Term Health Care Needs Typically Are Not Covered by Medicare or Private Insurance | Although long-term care is a growing need for the retiree population, Medicare and private insurance (through employers or purchased individually) play a small role in financing this care. Public programs, primarily Medicaid, and individuals' out-of-pocket payments are the primary funding sources for nursing home and home and community-based care for those needing long-term care. In 1999, spending for nursing home and home health care was about $134 billion. Medicaid, which is generally only available after individuals have become nearly impoverished by spending down their assets, paid the largest share of these costs—nearly 44 percent. Individuals needing care and their families paid for almost 25 percent of these expenditures out-of-pocket. Medicare has traditionally primarily covered acute care, but during the 1990s it increasingly covered some long-term home health care services. In 1999, Medicare paid nearly 14 percent of nursing home and home health care. (See fig. 5.) |
|---|---|

---

[16]42 U.S.C. § 1395(S)(3)(C)(i). Federal law also guarantees Medigap coverage for certain other individuals, including those enrolled in a Medicare+Choice plan as an alternative to the traditional Medicare program but whose selected plan withdraws from their area or who decided to disenroll within 1 year. See 42 U.S.C. §§ 1395(S)(3)(B)(ii) and (B)(v).



Figure 5: Percentage of Expenditures for Nursing Home and Home Health Care, by Source of Payment, 1999

- 2.9% — Other public sources
- 4.6% — Other private sources
- 10.3% — Private insurance
- 13.7% — Medicare
- 24.6% — Out-of-pocket
- 43.8% — Medicaid

Notes: Percentages do not add to 100 because of rounding.

This figure also includes Medicaid expenditures for home and community-based services, which are considered as part of "other personal health care" in the Health Care Financing Administration's (HCFA) national health accounts. HCFA is now known as the Centers for Medicare and Medicaid Services.

Source: Department of Health and Human Services, HCFA, Office of the Actuary, National Health Statistics Group, Personal Health Care Expenditures, 2001.

While private long-term care insurance is viewed as a possible way to reduce catastrophic financial risk for the elderly and relieve some of the financing burden now shouldered by public programs, private insurance (through both long-term care insurance and traditional health insurance) accounted for a small share—10 percent in 1999—of long-term care spending. Most long-term care insurance is purchased individually, with premiums depending on the beneficiary's age at purchase. Premiums for a 65-year-old are typically about $1,000 per year and may be much higher for more generous coverage or older buyers.

The private long-term care insurance market remains small, and few employers offer this insurance as a benefit to employees. Less than 10

percent of individuals 65 or older and an even lower percentage of those younger than 65 have purchased long-term care insurance. Most private long-term care insurance is bought by individuals, but some employers offer employees a voluntary group policy option for long-term care insurance. Only about one-fourth of long-term care insurance policies sold as of 2000 were group offerings, according to the American Council of Life Insurers. Even when employers offer long-term care insurance, they usually do not subsidize any of the costs. In 2000, the Congress passed legislation to offer optional group long-term care insurance to federal employees, retirees, and their relatives beginning by fiscal year 2003, with eligible individuals paying the full premium for the insurance.[17] This initiative will likely establish the largest group offering of long-term care insurance and could encourage further expansion of this market.

Mr. Chairman, this concludes my prepared statement. I will be happy to answer any questions that you or Members of the Subcommittee may have.

## Contacts and Acknowledgments

For more information regarding this testimony, please contact Kathryn G. Allen at (202) 512-7118 or John Dicken at (202) 512-7043. Susan Anthony and Carmen Rivera-Lowitt also made key contributions to this statement.

---

[17] P.L. 106-265, "The Long-Term Care Security Act," was enacted on September 19, 2000.

DSRA000019

# Related GAO Products

*Medigap Insurance: Plans Are Widely Available but Have Limited Benefits and May Have High Costs* (GAO-01-941, July 31, 2001).

*Medicare: Cost-Sharing Policies Problematic for Beneficiaries and Program* (GAO-01-713T, May 9, 2001).

*Retiree Health Benefits: Employer-Sponsored Benefits May Be Vulnerable to Further Erosion* (GAO-01-374, May 1, 2001).

*Long-Term Care: Baby-Boom Generation Increases Challenge of Financing Needed Services* (GAO-01-563T, Mar. 27, 2001).

*Medigap: Premiums for Standardized Plans That Cover Prescription Drugs* (GAO/HEHS-00-70R, Mar. 1, 2000).

*Private Health Insurance: Employer Coverage Trends Signal Possible Decline in Access for 55- to 64-Year-Olds* (GAO/T-HEHS-98-199, June 25, 1998).

*Private Health Insurance: Declining Employer Coverage May Affect Access for 55- to 64-Year-Olds* (GAO/HEHS-98-133, June 1, 1998).

*Retiree Health Insurance: Erosion in Retiree Health Benefits Offered by Large Employers* (GAO/T-HEHS-98-110, Mar. 10, 1998).

*Retiree Health Insurance: Erosion in Employer-Based Health Benefits for Early Retirees* (GAO/HEHS-97-150, July 11, 1997).

(290138)