# How Well Do Health Coverage Tax Credits Help Displaced Workers Obtain Health Care?

**Statement of**

**Stan Dorn, J.D.**

**Senior Research Associate**

**The Urban Institute**

**Congress of the United States**

**Committee on Education and Labor**

**U.S. House of Representatives**

**March 26, 2007**

DSRA000022

## Summary of testimony

*Stan Dorn, Senior Research Associate, Urban Institute*
*House Committee on Education and Labor—March 26, 2007*

Despite important accomplishments, Health Coverage Tax Credits (HCTCs) have been generally ineffective in providing health care to displaced workers for several reasons:

- The credits are used by only 11 percent of eligible workers.
- The coverage for which credits may be used often leaves out the health care that workers need. When job loss is followed by a gap in coverage of 63 days or longer, plans can deny treatment of the worker's known health problems. Moreover, many states offer only plans with high deductibles that make care unaffordable for workers with limited incomes. Also, such plans often exclude or severely limit such basic services as prescription drugs, maternity care, and treatment of mental illness.
- In some states, HCTC plans increase their premiums substantially for enrollees who are older, female, or have health problems.
- When a displaced worker turns 65 and qualifies for Medicare, the worker's spouse loses HCTC, even if that spouse is too young for Medicare and has no other coverage.

Fortunately, older health coverage programs like Medicare, Medicaid, and the State Children's Health Insurance Program have already prevented or solved similar problems. This suggests that HCTC's shortcomings can likewise be addressed successfully through program changes like the following:

- Increase the size of HCTCs to pay at least 75 percent of premiums.
- When beneficiaries have low household income, provide supplemental credits that lower worker costs to no more than 10 percent of premiums. For administrative feasibility, certify low income based on prior-year tax data, current-year earnings data, recent income determinations by public assistance programs, or (as a last resort) applications by HCTC beneficiaries to Social Security offices, which already determine income for the Supplemental Security Income (SSI) program.
- Eliminate the requirement that workers must enroll in qualified coverage and pay full monthly premiums before the Internal Revenue Service (IRS) will rule on their eligibility for HCTC.
- Allow workers to apply by filing one form with one agency. Direct the IRS to share information with workers' authorized representatives who are helping with HCTC.
- In determining whether workers experience coverage gaps that permit health plans to deny treatment of known health problems, disregard periods of time during which workers are unable to access HCTC, either because they have not been sent notice of potential eligibility or because they are waiting for the IRS to rule on their application.
- Ask each state to arrange at least one qualified plan offering comprehensive benefits to HCTC beneficiaries, without large premium variations based on age, gender, and health status. If a state does not wish to assume this role, the federal government would arrange such coverage in the state.
- Continue HCTCs for otherwise eligible younger spouses when displaced workers enter Medicare.

1

DSRA000023

Good afternoon Chairman Miller, Representative McKeon, and distinguished members of the Committee. Thank you for the opportunity to speak with you today about health coverage for workers displaced by international trade, with a particular focus on the effectiveness of Health Coverage Tax Credits (HCTC).

I plan to address three topics: health coverage challenges facing displaced workers; the strengths and weaknesses of the HCTC program in helping these workers retain health coverage; and policy options to improve the HCTC program so it can be more effective in meeting the health coverage needs of workers who lose their jobs because of international trade.

I have two preliminary comments. First, I would like to thank the Nathan Cummings Foundation, the California HealthCare Foundation, and, above all, the Commonwealth Fund for generously supporting our several years of research into HCTC. Much of my testimony reflects information and insights gleaned through these philanthropies' investment in learning about this important program.

Second, the views I express today are mine alone and should not be attributed to the Urban Institute, any of its sponsors, or any of the above-described funders of our prior HCTC research.

## Health coverage challenges facing displaced workers

For non-elderly Americans, 74 percent of all health coverage is provided through employment (Urban Institute and the Kaiser Commission on Medicaid and the Uninsured 2006). The loss of employment thus often means a termination of health coverage—in . fact, two-thirds of all uninsurance begins with job loss (Glied 2001).

1

DSRA000024

For companies with more than 20 workers, the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) provides displaced workers and other laid-off employees continued access to employer-sponsored insurance. However, the displaced worker must pay for the coverage, typically at a cost of the full premium plus a 2 percent administrative fee. Not surprisingly, this cost prevents most laid-off workers from taking advantage of COBRA, even if they qualify. In 2006, the cost of worker-only COBRA coverage offered by the average employer was $361 a month, or 31 percent of average unemployment insurance (UI) payments in 2006.[1]

Of course, some displaced workers can supplement their UI checks with spousal income or enroll in health coverage offered by a spouse's employer. Other laid-off workers are fortunate to have assets they can use to pay for insurance. Still others have strong educational backgrounds and quickly find new employment that provides health benefits. But many simply lose health insurance.

For example, a Government Accountability Office (GAO) survey of displaced workers affected by trade-related layoffs in five sites found that the percentage who were either uninsured or who enrolled in HCTC and so may have lacked health coverage without assistance ranged from 38 percent at a fine paper and pulp mill in Longview, Washington, to 63 percent at a baked goods manufacturer in Hazelwood, Missouri (Government Accountability Office 2006). An earlier GAO report found that, at a knit goods manufacturer in Martinsville County, Virginia, most displaced workers lost their health coverage (General Accounting Office 2001b). A survey of displaced textile mill workers in North Carolina found that 68 percent become uninsured following their layoff

---

[1] The cost of COBRA coverage was calculated by the author from Kaiser Family Foundation and the Health Research and Educational Trust (2006); the percentage of UI payments was calculated from Employment and Training Administration (2007).

2

DSRA000025

(Friday 2003). The precise proportion of displaced workers who lack coverage thus varies from layoff to layoff but appears to be significant in many cases.

## The Health Coverage Tax Credit program

After discussing current law, I will describe some of the program's accomplishments as well as its shortcomings.

### *Current law*

As part of 2002 legislation giving the president fast-track authority over trade agreements, lawmakers expanded Trade Adjustment Assistance (TAA) in various ways. One important change was to help displaced workers obtain health coverage. The Trade Act of 2002 created a Health Coverage Tax Credit (HCTC) that pays 65 percent of health insurance premiums for eligible individuals enrolled in qualified coverage, leaving the worker responsible for the remaining 35 percent. The credits are fully refundable, which means that they are paid in full to all who qualify, including those who owe little or no federal income tax. The credits can be advanced directly to health insurers when monthly premiums are due, in advance of filing tax returns. HCTCs can also be claimed at the end of the year on annual income tax forms.

The following is a general discussion of who qualifies for HCTC and what kind of coverage the credits subsidize.

#### Eligibility

Two basic groups qualify for HCTC: workers certified under the Trade Adjustment Assistance (TAA) program as displaced by international trade, and retirees age 55 to 64 receiving payments from the Pension Benefit Guaranty Corporation

3

DSRA000026

(PBGC). To qualify for HCTC as a displaced worker, an individual must either (1) receive Trade Readjustment Allowances (TRA), (2) meet all eligibility requirements for TRAs except exhaustion of unemployment insurance (UI), or (3) receive Alternative Trade Adjustment Assistance (ATAA). Dependents of eligible workers and retirees also qualify for HCTCs.

HCTCs are not available to individuals who receive disqualifying coverage. This includes Medicare as well as employer-sponsored insurance where the employer pays 50 percent or more of the premium.

### Coverage that qualifies for HCTC

Typically, a health plan qualifies for HCTC if it is either COBRA coverage offered by a former employer or a state-qualified health plan. State-qualified plans are not subject to any federal requirements for covered benefits or any limitations on varying premium charges based on age, gender, and health status. Such plans may not, however, participate in either Medicaid or the State Children's Health Insurance Program (SCHIP). The HCTC statute also provides that a non-group plan can be qualified, regardless of state policy decisions, if the worker received the coverage during at least the last 30 days of employment.

The extent of state-qualified health plans' ability to vary premium charges based on individual risk factors was the subject of controversy soon after enactment of the Trade Act. Some in Congress argued that non-group coverage that varied premiums based on each enrollee's individual health history could constitute qualified coverage only for workers who purchased such plans during at least the last 30 days of employment, given the statute's specific language addressing non-group coverage.

4

DSRA000027

However, the Bush Administration ruled that any form of private health coverage arranged by a state can constitute a qualified plan, so long as the coverage meets certain consumer protection requirements of the Trade Act.

These protections apply to individuals who, when they seek to enroll in an HCTC plan, have had at least three months of continuous coverage, without any insurance gaps that exceed 62 days. For such individuals, a state-qualified plan must guarantee issuance of coverage, may not exclude coverage of preexisting conditions, and may not charge more or provide less than to similarly situated enrollees not receiving HCTCs.

## Program accomplishments

Several accomplishments are important to note:

- The Internal Revenue Service (IRS) and the Department of the Treasury have proved effective and nimble in surmounting a number of policy challenges, including the establishment of unprecedented advance payment mechanisms less than 12 months after enactment of HCTC legislation (Dorn and Kutyla 2004).

- Unlike the country's only previous health insurance tax credit (the so-called "Bentsen child health tax credits," which operated briefly during the early 1990s and were repealed in 1993), HCTC implementation has not been accompanied by reports of widespread marketing fraud (House Ways and Means Committee 1993).

- Consumer protection requirements in the HCTC statute have not stood in the way of significant health plan participation. As of March 2006, 87 percent of potentially eligible individuals lived in the 40 states with participating state-qualified insurers, which collectively offered 280 state-qualified options (Pervez and Dorn 2006).

5

DSRA000028

- In some cases, states and unions have enrolled more than half of potentially eligible workers by providing proactive, intensive application assistance (Dorn 2006).

## *Program shortcomings*

Unfortunately, HCTC has experienced serious problems reaching its goals. I will discuss four of these problems: the failure of the credit to reach most eligible workers; the failure of some HCTC plans to cover necessary health care; some health plans' substantial increase in premium charges to workers who are older, female, or in poor health; and the termination of HCTC coverage for younger spouses when the displaced worker turns 65 and qualifies for Medicare. A fifth major problem—namely, high administrative costs for HCTC advance payment—will be the subject of a new report the Commonwealth Fund plans to release later this week.

### HCTC reaches a small percentage of eligible workers

The best-known problem with HCTC is that very few eligible workers use the benefit. According to the Office of Management and Budget (OMB), during 2004 (the most recent year for which full data are available) only 11 percent of eligible individuals used the credit either in its advanceable form or through claiming the credit on end-of-year returns.[2] From 2005 through 2007, the total volume of subsidies provided by HCTC averaged only 26 percent of the level Congress expected in passing the Trade Act, as reflected in Joint Tax Committee projections (Dorn 2006).

Several surveys of workers and state officials paint a consistent picture of the reasons for such low take-up. First, 35 percent of the premium is more than most displaced workers can afford. Workers earning a paycheck contribute an average of 15

---

[2] Calculated by the author from Office of Management and Budget (2006).

6

DSRA000029

percent of premium costs for worker-only coverage (Kaiser Family Foundation 2006). It is simply not realistic to expect that someone who loses their job and falls on hard times will be able to more than double their spending on health insurance.

Second, to obtain a determination of eligibility for HCTC, individuals must pay premiums in full, without subsidy, before advance payment begins. A number of states operate so-called "gap filler" programs that use Department of Labor (DOL) grants to pay 65 percent of health insurance premiums while workers are waiting for advance payment to start. But in other states, laid-off workers are required to "front" full monthly health insurance premiums in hopes of receiving an HCTC refund paying 65 percent of such costs after the workers file their tax forms at the end of the year. Few displaced workers have enough excess income in household budgets to make such payments.

Third, the application process for HCTC is quite complex. Workers must file applications with between three and five public and private entities, often being required to convey paperwork from one such entity to another. In addition, the underlying TAA program upon which HCTC eligibility is based has considerable complexity, with policy goals that have little to do with health coverage. Individuals can be denied TRAs for such reasons as an inability to obtain a waiver of ordinarily applicable job training requirements, the receipt of certain pension payments, etc. Whether or not such factors affect the justification for TRA receipt, they do not reduce workers' need for help purchasing health coverage, yet they can terminate HCTC eligibility.

7

DSRA000030

**State-qualified insurance often fails to cover necessary health care**

Limited coverage offered by state-qualified plans is both the final, major cause of

low take-up[3] and a serious problem in its own right. Coverage that workers view as not

meeting their needs is obviously less likely to be purchased, even with a subsidy.

Moreover, limits on available coverage can prevent the HCTC program from meeting its

fundamental objective of providing displaced workers with affordable access to essential

health care.

There are several reasons why state-qualified coverage may not meet workers'

health care needs. First, if workers experience a 63-day gap in coverage between job loss

and enrollment in a state-qualified HCTC plan, the plan can exclude all coverage of

preexisting conditions. The vast majority of state-qualified plans do impose such

restrictions, according to a 2003 survey (Dorn and Kutyla 2004).

Gaps in coverage of 63 days or longer can easily arise, through no fault of the

worker. According to OMB, after job loss "it can take as long as six months before [the

names of potentially eligible workers] reach the IRS," and after that information reaches

the IRS and the IRS mails out an enrollment kit, the median interval until the start of

advance payment is 99 days (Office of Management and Budget 2006).

To be clear, with some layoffs, 63-day gaps in coverage have been averted. These

have been large layoffs, such as the bankruptcy of steel mills and the closure of textile

mills, that devastated communities and received the intense attention of state officials and

the media. In such cases, public and private sector leaders have sometimes cooperated to

---

[3] Another important factor involves outreach. Workers losing their jobs are assimilating both the emotional impact of job loss and a tremendous amount of incoming information about coping strategies, including but going far beyond available government benefits. It is very easy for messages about HCTC to get lost in the midst of such a storm (Government Accountability Office 2006). Coping with that kind of outreach environment would require the very best, state-of-the-art outreach and enrollment strategies, which have not yet been applied to HCTC (Dorn, Varon, and Pervez 2005).

8

DSRA000031

expedite the processing of applications and avoid coverage gaps. But such extraordinary

efforts are the exception, not the rule. With more typical layoffs, coverage gaps often

exceed 62 days, which means that HCTC-qualified plans arranged by the state can

exclude the very health care that workers know is needed to treat their medical

problems.[4]

Second, state-qualified plans offer limited benefits in many states. In 12 of 40

states offering state-qualified insurance in March 2006, every plan had an individual

deductible of $1,000 or more (Pervez and Dorn 2006). In 11 of 15 states surveyed in

2003, every state-qualified plan either excluded or imposed severe limits on at least two

of the following: maternity care, mental health care, prescription drugs, or preventive

care (Dorn and Kutyla 2004). Workers do not receive affordable access to necessary care

under these plans if they cannot afford $1,000 out of pocket before coverage begins or if

they need the particular services that available coverage excludes.

### Premiums can vary greatly based on age, gender, and health status

Insurers offering medically underwritten, nongroup coverage can charge more for

enrollees who are expected to generate large health care costs. As of March 2006, such

plans were offered as state-qualified insurance in 9 out of the 40 states with state-

qualified plans. In these nine states, premiums have sometimes increased substantially

based on age, gender, and health history. For example, in June 2004, HCTC

beneficiaries' 35 percent premium share for average state-qualified coverage in North

---

[4] Another implication of these coverage gaps is that COBRA plans, which typically are quite
comprehensive, can become unavailable. Ordinarily, a laid-off worker has an election period of 60 days,
following job loss or notice of available COBRA coverage (whichever occurs last), in which to enroll in the
employer plan. However, the HCTC statute creates a second COBRA election period. This period lasts for
60 days after a displaced worker first receives TRA or would qualify for TRA but for the worker's receipt
of UI. However, this second COBRA election period cannot last beyond six months following the worker's
loss of health coverage. Without intensive effort, more than six months can easily pass between job loss
and first receipt of HCTC, denying the displaced worker access to HCTC-funded COBRA.

9

DSRA000032

Carolina was $357 a year for a healthy 25-year-old man, compared with $4,066 for a 55-year-old woman in the highest risk tier (Dorn, Alteras, and Meyer 2005).

This raises questions of fairness. With medical underwriting, the very people who most need coverage are least able to afford it, based on individual characteristics that are outside their control.

Basing premiums on individual risk-assessment through medical underwriting also raises issues of effectiveness, particularly when displaced workers are over age 40. Medical underwriting for displaced textile mill workers in North Carolina, for example, had a dramatic effect undermining take-up. Among the workers quoted higher premium rates after the underwriting process, fully 69 percent dropped out of the program at that point. If these individuals had instead completed their enrollment, more than 3,900 additional North Carolinians would have received coverage, increasing total national HCTC enrollment by 42 percent (Dorn, Alteras, and Meyer 2005).

### Spouses lose health coverage when eligible workers turn 65

The spouse of a displaced worker or PBGC retiree receives HCTC only while the worker or retiree qualifies for HCTC. If the trade-impacted worker turns 65 and enrolls in Medicare, HCTC eligibility ends for both the worker and the spouse. This makes some sense for the worker, since the worker is receiving Medicare. However, if the spouse is under age 65, Medicare does not provide coverage. Such a spouse may have lost health insurance along with the worker when the layoff occurred. Without HCTC, the spouse may wind up completely uninsured until age 65, potentially suffering seriously impaired access to essential health care. This is a structural gap in HCTC's mechanisms for preventing trade-related job loss from terminating health coverage.

10

DSRA000033

## Policy options to increase HCTC's effectiveness in helping displaced workers

These problems can be overcome through intelligent redesign of HCTC. Similar problems have been prevented or solved with older health subsidy programs, such as Medicaid, Medicare, and SCHIP. This track record provides a measure of confidence that such challenges can likewise be overcome with HCTC.

### Increase the number of displaced workers who receive HCTCs

Three policy changes directed at improving affordability and making the application process more user-friendly would go a long way toward increasing the number of displaced workers who receive help.

#### 1. Raise the percentage of premium paid by HCTC

Based on input from health plan staff in states with extensive populations of displaced workers, I would recommend at least 75 percent of premiums as the basic subsidy level for HCTC, and potentially more.[5] Essential to widespread participation is lowering worker costs to amounts that would not require forgoing or postponing other basic household needs. Medicaid and SCHIP programs have repeatedly found that lowering required premium payments can dramatically increase consumer participation (Dorn, Varon, and Pervez 2005).

In addition, I would recommend a supplemental credit for eligible workers with low incomes, such as income at or below 200 percent of the federal poverty level.[6] For

---

[5] For example, if the underlying premium for comprehensive coverage is sufficiently high, the HCTC subsidy may need to exceed 75 percent for the remaining cost to be affordable for most displaced workers.
[6] In 2007, the federal poverty level is $17,170 for a family of three; $20,650 for a family of four; etc.

11

low-income workers, a supplemental credit, in combination with the base credit, could pay something like 90 percent of the premium.

Such a means-tested supplemental credit would face several administrative challenges. First, the IRS is ill-equipped to do "real time" means-testing for a supplemental, income-based credit. The IRS is beautifully set up to determine prior year income, not contemporaneous income.

Second, HCTC is already complex. Asking workers to take additional steps to obtain supplemental credits necessarily means that some will not complete the process and obtain those credits.

Given these challenges, if a means-tested supplement is provided, the burden of the application process on workers must be minimized, and the IRS must not be asked to do contemporaneous income determinations. The following is one approach to reaching those goals:

- The IRS could automatically provide supplemental credits when data-matching shows that HCTC-eligible individuals have income that falls below specified levels. Such data-matching would tap into income information contained in prior-year tax records and current-year earnings records in the national New Hires Database administered by the Department of Health and Human Services for purposes of child support enforcement. The latter database includes both quarterly earnings information and new hires information from every state, including public and private sector employers.[7]

---

[7] Several different approaches to analyzing this data are possible. For example, eligibility for supplemental credits could be granted based on prior-year income. That approach is currently taken for purposes of low-income subsidy eligibility under Medicare Part D, where subsidies are provided automatically based on prior-year receipt of Medicaid or SSI. The Bush administration's tax credit proposals for uninsured workers

12

DSRA000035

- The IRS could also provide supplemental credits to any HCTC-eligible individuals who show that they have already been found to have low household income by means-tested public assistance programs like Food Stamps, Low Income Home Energy Assistance Program (LIHEAP), etc.

- Only if these two methods failed to establish eligibility for supplemental credits would a worker need to submit an application showing low income. As mentioned above, however, the IRS would not be the right place to process such an application. Instead, workers could submit these applications to Social Security offices, which already determine current income levels in deciding eligibility for Supplemental Security Income (SSI).

With every pathway to demonstrating low income that goes beyond prior tax records, another agency's certification of low income would establish eligibility for the supplemental credit, without any independent means-testing by the IRS. Other elements of HCTC eligibility already are based on similar certification by agencies outside the IRS. Pursuant to Internal Revenue Code Section 7527(d), status as a TAA-eligible individual or a PBGC recipient is demonstrated by certification from state workforce agencies (SWAs) or PBGC, respectively. The IRS independently investigates other elements of HCTC eligibility, but not receipt of TAA or PBGC benefits. Congress could take a similar approach to the issue of affordability and use other agencies' certification of low income to direct enhanced subsidies to the lowest-income displaced workers

---

without access to employer-sponsored insurance likewise would have means-tested the amount of the credit based on prior-year income. If policymakers take this approach to HCTC supplements, it would be important to leave room for displaced workers to show that their circumstances have worsened since the previous year. For that purpose, access to the National New Hires Database could be important, along with the other enrollment mechanisms I discuss.

13

DSRA000036

without asking the IRS to assume any responsibility for "real time" income
determinations.

### 2. Eliminate the requirement that workers must pay premiums in full while waiting for advance payment to start

Displaced workers cannot realistically be required to pay premiums in full while the IRS is determining their eligibility for advance payment. To eliminate this requirement, eligibility determination could be separated from enrollment in qualified coverage. Currently, the IRS makes one finding in ruling on an application for advance payment, determining simultaneously whether the individual is (a) eligible and (b) enrolled in qualified coverage. The IRS denies advance payment if the worker is either ineligible or not enrolled in a qualified plan. This requires enrollment in a qualified plan, hence payment of premiums, before advance payment can begin.

Medicare, Medicaid, and SCHIP take a very different approach. SCHIP, for example, first determines that a child is eligible. Only then is the child enrolled in a health plan offered by the state, and the family makes payments based on the child's eligibility for subsidies. The family is never required to purchase unsubsidized coverage.

HCTC could be restructured along similar lines. The IRS could make eligibility determinations for workers who are not yet enrolled in qualified plans. To avoid unnecessary administrative costs, such determinations could be limited to individuals who have applied to enroll in a qualified plan and agreed to pay their share of premiums after HCTC advance payment begins. Once the IRS finds the worker eligible and authorizes the start of advance payment, the worker would begin making premium contributions for qualified coverage, contributions that are reduced based on the subsidy

14

DSRA000037

provided by HCTC.[8] (As noted below, this would need to be accompanied by other policy changes that prevent the exclusion of preexisting conditions based on coverage gaps while workers are waiting for advance payment to start.)

### 3. Simplify the application process and let workers receive effective help navigating the system

Three policy changes would make the application process more workable for displaced workers. First, Congress could direct the IRS to develop, in consultation with DOL, PBGC, and representatives of health plans, a single, simple form that workers could use to apply for HCTC advance payment by filing the form with one public or private agency.

Second, Congress could direct the IRS to permit taxpayers to authorize state officials, health plan officials, union officials, or others to act on their behalf and receive otherwise confidential information. Such authorization would be limited to the purpose of establishing HCTC eligibility, commencement and continuation of advance payment, and receipt of health coverage. In the past, the IRS's laudable commitment to preserving taxpayer privacy has been taken to levels that interfere with the receipt of health coverage. For example, officials in state workforce agencies have been unable to diagnose the causes of delayed initiation of advance payment because IRS staff refused to share information about workers' applications. To obtain information needed to provide coverage, state officials sometimes have had to bring workers into state offices, have workers call IRS staff, ask workers to relay state officials' questions to the IRS, ask

---

[8] Some have suggested another approach. Under this alternative, the IRS would rapidly refund 65 percent of full premium payments workers make before the start of advance payment. While useful for some workers, this would not solve the problem for the workers who most need help. HCTC-eligible displaced workers would still be asked to come up with the money needed for full premium payments—money that many workers simply do not have in their household budgets, even for a few months.

15

DSRA000038

workers to relay IRS answers to the state officials, and repeat the process until state officials understood the source of the problem sufficiently to devise a solution.

For a brief period, the IRS addressed this issue by experimenting with a consent report pilot project operated through the HCTC Customer Contact Center. Callers to the HCTC toll-free line were asked if their contact information could be shared with state officials to see if the callers might qualify for extra help. In Virginia, 83 percent of callers consented to such information-sharing. State workforce agency staff then contacted these applicants and shepherded them through the process. More than 90 percent of these displaced workers ultimately enrolled in HCTC (Dorn 2006).

Regrettably, this promising experiment was terminated after several months. Although taxpayer privacy was never breached, generalized worries about confidentiality brought the pilot project to an end. Clear congressional direction that asks the IRS to provide HCTC-related confidentiality waivers would be important in overcoming such worries and permitting displaced workers to get the help they need to navigate through even a simplified HCTC application process.

Third, the relationship between TAA eligibility and HCTC eligibility could be simplified. Instead of making HCTC eligibility depend on receipt of ATAA, TRAs, or eligibility for TRAs but for receipt of UI, HCTCs could go to workers who are certified as displaced because of trade and who either qualify for any component of TAA assistance or would qualify for such a component but for their receipt of UI.

### Give HCTC beneficiaries access to health insurance that covers the health care they need, without large premium variations based on age, gender, or health status

Two policy changes would reach this goal.

16

## 1. Give each beneficiary access to at least one comprehensive plan with little or no premium variation based on individual characteristics

Congress could adjust the HCTC statute to ensure that each HCTC-eligible worker has access to at least one comprehensive health plan that does not vary premiums significantly based on age, gender, and health risk. Comprehensiveness could be defined in terms of actuarial value, an approach the SCHIP program has successfully used to preserve state and private-sector flexibility while ensuring that subsidy recipients can obtain the kind of comprehensive coverage that employers typically offer their workers. For the designated comprehensive plan, premium variation based on individual characteristics could either be limited or forbidden entirely.

Under this approach, each state could choose either (a) to offer HCTC beneficiaries at least one state-qualified comprehensive plan without significant premium variation or (b) to have a federal agency arrange for such a plan to be offered to state residents. If a state failed to arrange such coverage by a certain date, a federally arranged plan would become available to HCTC beneficiaries living in the state. For example, HCTC beneficiaries in such a state could be offered one of the national fee-for-service plans that participates in the Federal Employees Health Benefits Program (FEHBP). To protect current FEHBP enrollees, HCTC beneficiaries would need to have their own group rate, separate from the rate charged for federal employees and retirees.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) took a similar approach to federal–state responsibilities. HIPAA established statutory goals for ensuring that, at the end of COBRA coverage, people could transition satisfactorily into individual coverage. States were given three basic choices for reaching those goals:

17

DSRA000040

(1) pass laws congruent with or stronger than the federal floor specified in HIPAA
and enforce them using state agencies; (2) create an acceptable alternative
mechanism for eligible persons in the individual market and enforce it with state
agencies; or (3) decline to pass new laws or strengthen existing laws and leave
enforcement of the HIPAA provisions directly to the federal government.
(Nichols and Blumberg 1998)

By 2000, just four years after enactment of HIPAA, only three states left it to the
federal government to set and enforce group-to-individual conversion rules; nine states
and the District of Columbia adopted or supplemented the federal rules and assumed
enforcement responsibility; and 38 states were operating full-blown "alternative
mechanisms" for achieving HIPAA's statutory goals (Pollitz et al. 2000). By 2001, only
one state remained that let the federal government enforce group-to-individual conversion
rules (General Accounting Office 2001a).

This history suggests that, given the opportunity, the vast majority of states will
develop their own methods to reach federally specified goals. However, the availability
of a "federal fallback" in the case of HIPAA ensured that vulnerable beneficiaries did not
suffer harm while states were coming up to speed. A similar approach could be taken to
ensuring HCTC beneficiaries access to comprehensive coverage, without large premium
variation based on factors like age, gender, and health status.

If policymakers want to give states an additional incentive to arrange their own
comprehensive coverage rather than leave this task to a federal agency, HHS could
provide grants to cover state administrative costs in establishing such arrangements.
Under this approach, if the federal government assumed the responsibility of arranging

18

DSRA000041

comprehensive coverage for HCTC beneficiaries in a particular state, the state's grant would revert to the federal Treasury. Many states would be loath to surrender both authority and dollars to the federal government.

### 2. When coverage gaps result from factors outside the beneficiary's control, disregard those gaps in determining whether consumer protections apply

Under some circumstances, it is important to give health plans the ability to take such steps as excluding coverage of preexisting conditions. Those measures prevent consumers from waiting to develop health problems before they seek coverage.

Careful policy design can avoid that untoward result while dramatically increasing the number of displaced workers who use their HCTCs to obtain health insurance that covers treatment of known health problems. In determining whether a worker had continuous health coverage, periods of time could be disregarded when the worker was uninsured because factors entirely outside the worker's control delayed the receipt of subsidies. This disregard would encompass two intervals:

- The period between the loss of employer-subsidized health coverage and notice to the worker of potential HCTC eligibility; and

- The period between the worker's application for HCTC advance payment and the start of advance payment.

The first period could be defined as ending a certain number of days after the IRS mails the worker an HCTC Program Kit. The second period could be defined as starting when a worker has done the following:

- Applied for HCTC advance payment;

- Applied to enroll in qualified coverage; and

19

DSRA000042

- Made a binding commitment to pay the worker's share of premiums for such

  qualified coverage after HCTC advance payment begins.

This approach seeks to be fair both to the worker and to the health plan. While the

worker is without any available subsidies for health coverage, this policy would not

unrealistically insist on full payment of health insurance premiums as a condition of later

access to health insurance that meets the worker' known needs for health care. At the

same time, this statutory change would effectively prohibit workers from intentionally

delaying HCTC enrollment until they get sick and need care.[9]

### *Permit younger spouses to retain HCTC after the displaced worker qualifies for Medicare*

Congress could modify HCTC eligibility so that, when a TAA- or PBGC-eligible

worker turns 65 and qualifies for Medicare, HCTC continues to be cover family members

who would otherwise remain eligible for the credit.

## Conclusion

By and large, Health Coverage Tax Credits have been ineffective in providing

displaced workers with affordable access to health coverage and essential health care.

These problems resulted from design choices in the structure of the credit, choices that

Congress could revisit. Subsidy levels could increase to make coverage affordable.

Displaced workers could be spared the need to pay premiums in full while waiting for an

eligibility determination. The application process could be simplified and authorized

---

[9] These periods could also apply to the second COBRA election period, specified in the HCTC statute. That is, in determining whether six months have passed since job loss and whether 60 days have passed since the worker first qualified for TAA, the statute could be revised to disregard the periods of time (a) between the worker's job loss and notice of potential HCTC eligibility and (b) between the worker's application for and receipt of advance payment. As with preexisting condition exclusions, this approach would require workers to move forward with dispatch but would not punish them for delays beyond their control.

20

DSRA000043

representatives empowered to help workers navigate the system and enroll in qualified

coverage. Qualified health insurance could include at least one comprehensive coverage

option in each state, without large premium increases for enrollees who are older, sicker,

or female. And as long as workers are not dilatory in applying for subsidies and enrolling

in coverage, health insurance could cover the services that workers need, without

excluding coverage of preexisting conditions.

HCTCs represent the country's first attempt to cover the uninsured by using tax

credits that are paid monthly to insurers when premiums are due, in advance of filing

annual tax returns.[10] It is not surprising that this novel approach has encountered

problems. However, now that the country has accumulated several years of experience

with HCTCs, Congress has an opportunity to revise the program so it can do a much

better job of accomplishing its basic objective, which surely everyone on this Committee

supports—namely, for those workers who are harmed, rather than helped, by trade

liberalization, ensuring that the Trade Adjustment Assistance program offers affordable

health insurance that provides good access to essential health care.

I would be delighted to answer any questions from the Committee.

---

[10] The so-called "Bentsen child health tax credit," mentioned above, represented the only previous attempt
to use federal income tax credits of any kind to subsidize coverage for the uninsured. This earlier health
insurance tax credit was not advanceable during the year—a critically important feature of HCTC. Instead,
it was claimed at the end of the year, as a supplement to the Earned Income Tax Credit.

21

DSRA000044

## References

Dorn, Stan. 2006. "Take-Up of Health Coverage Tax Credits: Examples of Success in a Program With Low Enrollment." Prepared for the Commonwealth Fund. Washington, DC: The Urban Institute.

Dorn, Stan, and Todd Kutyla. 2004. "Health Coverage Tax Credits under the Trade Act of 2002: A Preliminary Analysis of Program Operations." Prepared for the Commonwealth Fund and the Nathan Cummings Foundation. Washington, DC: Economic and Social Research Institute.

Dorn, Stan, Tanya Alteras, Jack A. Meyer. 2005. "Early Implementation of the Health Coverage Tax Credit in Maryland, Michigan, and North Carolina: A Case Study Summary." Prepared for the Commonwealth Fund and the Nathan Cummings Foundation. Washington, DC: Economic and Social Research Institute.

Dorn, Stan, Janet Varon, and Fouad Pervez. 2005. "Limited Take-Up of Health Coverage Tax Credits: A Challenge to Future Tax Credit Design." Prepared for the Commonwealth Fund. Washington, DC, and Seattle, WA: Economic and Social Research Institute and Northwest Health Law Advocates.

Friday, Paul C. 2003. "Long-Term Needs Assessment, Pillowtex Employees." Prepared for the Cabarrus County Community Development Corp. and the City of Kannapolis. Concord, NC: Research and Training Specialists, Inc.

Glied, Sherry A. 2001. "Challenges and Options for Increasing the Number of Americans with Health Insurance." *Inquiry* 38(2): 90–105.

General Accounting Office. 2001a. "Federal Enforcement of Health Insurance Standards." GAO-01-652R. Washington, DC: General Accounting Office.

———. 2001b. "Trade Adjustment Assistance: Experiences of Six Trade-Impacted Communities." GAO-01-838. Washington, DC: General Accounting Office.

Government Accountability Office. 2006. "Trade Adjustment Assistance: Most Workers in Five Layoffs Received Services, but Better Outreach Needed on New Benefits." GAO-06-43. Washington, DC: Government Accountability Office.

House Ways and Means Committee, Subcommittee on Oversight. "Report on Marketing Abuse and Administrative Problems Involving the Health Insurance Component of the Earned Income Tax Credit." WMCP: 103-14, 103rd Cong., 1st Sess., June 1, 1993. Washington, DC: House Ways and Means Committee.

Kaiser Family Foundation and the Health Research and Educational Trust. 2006. "2006 Employer Health Benefits Survey." Menlo Park, CA: Kaiser Family Foundation.

Nichols, Len, and Linda Blumberg. 1998. "A Different Kind of 'New Federalism'? The Health Insurance Portability and Accountability Act of 1996." *Health Affairs* (May/June).

22

DSRA000045

Office of Management and Budget. 2006. "Detailed Information on the Internal Revenue
Service Health Care Tax Credit Administration Assessment." Washington, DC:
Office of Management and Budget.

Pervez, Fouad, and Stan Dorn. 2006. "Health Plan Options under the Health Coverage
Tax Credit Program." Prepared for the Commonwealth Fund. Washington, DC:
Health Management Associates and the Urban Institute.

Pollitz, Karen, Nicole Tapay, Elizabeth Hadley, and Jalena Specht. 2000. "Early
Experience with 'New Federalism' in Health Insurance Regulation." *Health Affairs*
(July/August).

The Urban Institute and the Kaiser Commission on Medicaid and the Uninsured. 2006.
"Health Insurance Coverage in America: 2005 Data Update." Washington, DC: The
Urban Institute.

Employment and Training Administration, U.S. Department of Labor. 2006. "Monthly
Program and Financial Data, U.S. Total for 2006." Washington, DC: U.S. Department
of Labor.

23

DSRA000046

Nicole Hayes, Compliance Officer
Charitable Trust Bureau
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601-3175