1

EXHIBIT 10.1

EXECUTION COPY

MASTER SEPARATION AGREEMENT

dated as of

December 22, 1998

among

GENERAL MOTORS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS CORPORATION,

DELPHI AUTOMOTIVE SYSTEMS LLC,

DELPHI TECHNOLOGIES, INC.

and

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

4

MASTER SEPARATION AGREEMENT

This Master Separation Agreement ("Agreement") is entered into on December 22, 1998 among General Motors Corporation, a Delaware corporation ("GM"), Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), Delphi Automotive Systems LLC, a Delaware limited liability company and, on the date hereof, a wholly owned subsidiary of GM ("DAS LLC"), Delphi Technologies, Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("DTI", and together with DAS LLC, the "Delphi U.S. Subsidiaries") and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and, on the date hereof, a wholly owned subsidiary of GM ("Delphi International Subsidiary"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article 1 hereof.

RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation, GM currently owns all of the issued and outstanding common stock of Delphi, and Delphi currently conducts no business operations and has no significant assets or liabilities;

WHEREAS, the Boards of Directors of GM and Delphi have each determined that it would be appropriate and desirable for GM to contribute and transfer to Delphi, and for Delphi to receive and assume, directly or indirectly, substantially all of the assets and liabilities currently associated with the Delphi Automotive Systems Business, including those assets and liabilities currently held directly by GM in divisional form and the stock or similar interests currently held by GM in subsidiaries and other entities that conduct such business;

WHEREAS, GM and Delphi intend that the contribution and assumption of assets and liabilities will qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM and Delphi currently contemplate that, following the contribution and assumption of assets and liabilities, Delphi will make an initial public offering of an amount of its common stock that will reduce GM's ownership of Delphi to not less than 80%;

7

Date; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any Asset described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such Asset shall be included in the "Delphi Assets" only if so reflected.

"DELPHI AUTOMOTIVE SYSTEMS BUSINESS" means the business conducted by the Delphi Automotive Systems Sector of GM at any time on or before the Contribution Date, including (i) all business operations whose financial performance is reflected in the Delphi Financial Statements, (ii) all business operations initiated or acquired by the Delphi Automotive Systems Sector of GM after the date of the Delphi Financial Statements and (iii) all business operations that were conducted at any time in the past by the Delphi Automotive Systems Sector of GM or by any predecessor of such Sector (including, without limitation, the GM Automotive Components Group) but were discontinued or disposed of prior to the date of the Delphi Financial Statements other than by transfer or disposition to any other Sector of GM.

"DELPHI COMMON STOCK" means the Common Stock, $0.01 par value per share, of Delphi.

"DELPHI FINANCIAL STATEMENTS" means the financial statements (including the notes thereto) of Delphi for the period ended September 30, 1998 as set forth in the IPO Registration Statement as amended at the date of this Agreement, a copy of which is set forth on Schedule B attached hereto.

"DELPHI LIABILITIES" means all of the Liabilities of GM that (i) (x) are, except as otherwise set forth on Schedule P or as otherwise provided herein or in an Ancillary Agreement, reflected in the Delphi Financial Statements and remain outstanding at the Contribution Date or (y) are to be transferred pursuant to Section 2.01(c) of this Agreement (as and when transferred thereunder), or (ii) arise in connection with the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, or (iii) are expressly provided by this Agreement or any Ancillary Agreement to be transferred to and assumed by Delphi, or (iv) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Assets, or (v) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arise out of or in connection with the Delphi Automotive Systems Business (including but not limited to the covenants not to compete entered into by GM prior to the Contribution Date set forth on Schedule D hereto) whether before or after the date of the Delphi Financial Statements; provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any liabilities described in the preceding clause (v) to be reflected in the Delphi Financial Statements as of the date thereof, then such liabilities shall be considered to be "Delphi Liabilities" only if so reflected.

8

"FINAL DETERMINATION" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INCOME TAX RETURNS" has the meaning set forth in the Amended and Restated Tax Allocation Agreement.

"INFORMATION" means all records, books, contracts, instruments, computer data and other data.

"INTELLECTUAL PROPERTY" means any and all domestic and foreign patents and patent applications, together with any continuations, continuations-in-part or divisional applications thereof, and all patents issuing thereon (including reissues, renewals and re-examinations of the foregoing); invention disclosures; mask works; copyrights, and copyright applications and registrations; trademarks, servicemarks, trade names, and trade dress, in each case together with any applications and registrations therefor and all appurtenant goodwill relating thereto; trade secrets, commercial and technical information, know-how, proprietary or confidential information, including engineering, production and other designs, notebooks, processes, drawings, specifications, formulae, and technology; computer and electronic data processing programs and software (object and source code), data bases and documentation thereof; inventions (whether patented or not); and all other intellectual property under the laws of any country throughout the world.

"IPO AND DISTRIBUTION AGREEMENT" means the agreement to be entered into between GM and Delphi on or before the IPO Effective Date, the form of which is attached hereto as Exhibit E-1.

"IPO EFFECTIVE DATE" means the date on which the IPO Registration Statement is declared effective by the Commission.

"IPO REGISTRATION STATEMENT" means the registration statement on Form S-1, Registration No. 333-67333 filed by Delphi with the Securities and Exchange Commission in connection with the initial public offering of the Delphi Common Stock, together with all amendments and supplements thereto.

"LIABILITIES" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including, without limitation, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

10

(d) GM and Delphi additionally shall comply with the terms of the letters from GM to Delphi, copies of which are attached hereto as Schedules G and H, which relate to the extension of eligibility for Delphi employees to participate in the GM Vehicle Purchase Programs.

SECTION 2.02.    Assumption of Liabilities.

(a) General. Effective as of the Contribution Date, each of Delphi and/or the Delphi U.S. Subsidiaries, as directed by Delphi, hereby assumes and on a timely basis shall pay, perform, satisfy and discharge in accordance with their terms the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business in the United States. Delphi International Subsidiary shall, and shall utilize its best efforts to recommend and encourage its respective Subsidiaries and Affiliates to, assume and on a timely basis pay, perform, satisfy and discharge in accordance with their terms, the Delphi Liabilities relating to the operations of the Delphi Automotive Systems Business outside of the United States.

(b) Divested Business. Delphi shall, with respect to the businesses and operations divested by the Delphi Automotive Systems Business, assume all Liabilities of GM related thereto; provided, however, that Delphi shall not assume those Liabilities relating to operations divested by the Delphi Automotive Systems Business to the extent such Liabilities are expressly retained by GM pursuant to the terms of this Agreement or the Ancillary Agreements (including without limitation, the Employee Matters Agreement, the Environmental Matters Agreement and the Real Estate Matters Agreement) and the Liabilities assumed by Delphi shall include, without limitation, the obligation to satisfy all of the obligations of GM under the various agreements pursuant to which the Delphi Automotive Systems Business effected such divestitures (the "Divestiture Agreements"); provided, further, however, that notwithstanding the foregoing or any other provision of this Agreement or any Ancillary Agreement, responsibility for certain obligations relating to certain divestitures shall be allocated between the parties as set forth on Schedule I hereto.

(c) Machinery and Equipment Leases Related to the Delphi Automotive Systems Business. The parties hereto hereby agree that to the extent that GM entered into a lease with a third party dated prior to the Contribution Date pursuant to which GM agreed to lease (i) machinery and/or equipment for use by the Delphi Automotive Systems Business and (ii) machinery and/or equipment for use by GM businesses other than the Delphi Automotive Systems Business, upon identification of any such lease, GM and Delphi will enter into a sublease with terms identical or as similar as possible to such original lease pursuant to which Delphi will sublease from GM that portion of the machinery and/or equipment used by the Delphi Automotive Systems Business covered under such original lease.

(d) Nonrecurring Costs and Expenses. Notwithstanding anything herein to the contrary, any nonrecurring costs and expenses incurred by the parties hereto to effect the transactions contemplated hereby which are not allocated pursuant to the terms of this Agreement or any Ancillary Agreement shall be the

responsibility of the party which incurs such costs and expenses.

SECTION 2.03.    Methods of Transfer and Assumption.

(a) The parties shall enter into the Ancillary Agreements, other than the IPO and Distribution Agreement and the Registration Rights Agreement, on or about the date of this Agreement. To the extent that the transfer of any Delphi Asset or the assumption of any Delphi Liability is expressly provided for by the terms of any Ancillary Agreement, the terms of such Ancillary Agreement shall determine the manner of the transfer or assumption. It is the intent of the parties that pursuant to Section 2.01, the transfer and assumption of all other Delphi Assets and Delphi Liabilities shall be made effective as of the Contribution Date, provided, however, that circumstances in various jurisdictions outside the United States may require the transfer of certain Assets and the assumption of certain Liabilities to occur in such other manner and at such other time as the parties shall agree.

(b) The parties intend to complete the transfer of all Delphi Assets and the assumption of all Delphi Liabilities effective on or prior to the Contribution Date but shall, subject to Section 4.03 hereof, and to the extent

7

11

that any such transfers and assumptions are not completed prior to the Contribution Date, take all actions reasonably necessary or appropriate to complete such transactions as promptly thereafter as possible. In addition to those transfers and assumptions accurately identified and designated by the parties to take place but which the parties are not able to effect prior to the Contribution Date, there may exist (i) Assets that the parties discover were, contrary to the agreements between the parties, by mistake or omission, transferred to Delphi or retained by GM or (ii) Liabilities that the parties discover were, contrary to the agreements between the parties, by mistake or omission, assumed by Delphi or not assumed by Delphi. The parties shall, between the Contribution Date and the earlier of the Distribution Date or six months from the Contribution Date, cooperate in good faith to effect the transfer or re-transfer of such Assets, and/or the assumption or re-assumption of such Liabilities, to or by the appropriate party and shall not use the determination of remedial actions contemplated herein to alter the original intent of the parties hereto with respect to the Assets to be transferred to or Liabilities to be assumed by Delphi. Each party shall reimburse the other or make other financial adjustments (e.g., without limitation, cash reserves) or other adjustments to remedy any mistakes or omissions relating to any of the Assets transferred hereby or any of the Liabilities assumed hereby.

(c)     Each party shall execute and deliver to each other party all such documents, instruments, certificates and agreements in appropriate form, and to make all filings and recordings and to take all such other actions, as shall be necessary or reasonably requested by such other party, whether before or after the Contribution Date, in order to give full effect to and evidence and perfect the transfer and contribution of the Delphi Assets and the Delphi Liabilities as contemplated hereby. However, Delphi acknowledges and agrees that neither GM nor any Subsidiary of GM will comply with the provisions of any bulk transfer law of any jurisdiction in connection with the transfer of any Delphi Asset.

(d)     Any Subsidiary of Delphi that will receive any Delphi Asset or assume any Delphi Liability shall for all purposes be deemed to be a party to this Agreement.

SECTION 2.04. Nonassignable Contracts. Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Asset or Liability if an assignment or attempted assignment of the same without the consent of another Person would constitute a breach thereof or in any way impair the rights of a party thereunder or give to any third party any rights with respect thereto. If any such consent is not obtained or if an attempted assignment would be ineffective or would impair such party's rights under any such Asset or Liability so that the party entitled to the benefits and responsibilities of such purported transfer (the "Intended Transferee") would not receive all such rights and responsibilities, then (x) the party purporting to make such transfer (the "Intended Transferor") shall use commercially reasonable efforts to provide or cause to be provided to the Intended Transferee, to the extent permitted by law, the benefits of any such Asset or Liability and the Intended Transferor shall promptly pay or cause to be paid to the Intended Transferee when received all moneys received by the Intended Transferor with respect to any such Asset and (y) in consideration thereof the Intended Transferee shall pay, perform and discharge on behalf of the Intended Transferor

23

acts or omissions which may give rise to insured losses, or damages which give rise to claims thereunder, must have occurred and notice given to GM prior to expiration of the Insurance Transition Period; (ii) with respect to other types of insurance policies, including those provided on an "occurrence" basis, any events, acts or omissions giving rise to any insured losses or damages must have occurred prior to expiration of the Insurance Transition Period; and (iii) with respect to all claims under all insurance policies, coverage for events, acts or omissions shall be interpreted consistent with the terms of such policies and the intent of subparagraphs (i) and (ii) above.

(f)    With respect to claims comprehended by the insurance policies, GM and Delphi shall control the investigation, defense and settlement of all claims as provided for in Article 7 of this Agreement; provided, however, that Delphi may not effect any settlement with respect to any such claim without GM's prior written consent (which consent shall not be unreasonably withheld or delayed) unless such settlement (i) will have no direct impact on GM's future insurance recoveries under relevant insurance policies, and (ii) will require that only Delphi or Delphi Covered Parties, and not GM or its insurers, assume financial responsibility for the settlement (under applicable deductibles or self-insured retentions), any related expenses and/or any subsequent premium adjustments.

SECTION 8.02. Delphi Insurance Coverage After The Insurance Transition Period. From and after expiration of the Insurance Transition Period, except as provided herein, Delphi, and Delphi alone, shall be responsible for obtaining and maintaining insurance programs for its risk of loss and such insurance arrangements shall be separate and apart from GM's insurance programs. Notwithstanding the foregoing, (a) GM, upon the request of Delphi, shall use all commercially reasonable efforts to assist Delphi in the transition to its own separate insurance programs from and after the Insurance Transition Period, and shall provide Delphi with any information that is in the possession of GM and is reasonably available and necessary to either obtain insurance coverages for Delphi or to assist Delphi in preventing unintended self-insurance, in whatever form, (b) each of GM and Delphi, at the request of the other, shall cooperate with and use commercially reasonable efforts to assist the other in recoveries from claims made under any insurance policy for the benefit of any insured party; and (c) neither GM nor Delphi, nor any of their Affiliates, shall take any action which would intentionally jeopardize or otherwise interfere with either party's ability to collect any proceeds payable pursuant to any insurance policy.

ARTICLE 9

MISCELLANEOUS

SECTION 9.01. Entire Agreement. This Agreement, including all the Ancillary Agreements and all other Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter hereof, other than with respect to the Cash and Debt Management Agreement, dated as of December 22, 1998, among the Corporate Sector of GM, the Global Automotive Sector

of GM and the Delphi Automotive Systems Sector of GM.

SECTION 9.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

SECTION 9.03. Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 9.04. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by telecopy with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

20

SECTION 9.11. Amendment. No change or amendment will be made to this Agreement or the Ancillary Agreements except by an instrument in writing signed on behalf of each of the parties to such agreement.

SECTION 9.12. Authority. Each of the parties hereto represents to the other that (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement and the Ancillary Agreements, (b) the execution, delivery and performance of this Agreement and the Ancillary Agreements by it have been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this Agreement and the Ancillary Agreements, and (d) this Agreement and each Ancillary Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

SECTION 9.13. Interpretation. The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table or contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any capitalized term used in any Schedule or Exhibit but not

27

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized on the day and year first above written.

GENERAL MOTORS CORPORATION

By: /s/ G. Richard Wagoner
-----------------------------------
    Name:  G. Richard Wagoner
    Title: President and Chief Operating Officer

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: /s/ J.T. Battenberg, III
-----------------------------------
    Name:  J.T. Battenberg, III
    Title: Chairman, Chief Executive Officer and
           President

DELPHI AUTOMOTIVE SYSTEMS LLC

By: /s/ J.T. Battenberg, III
-----------------------------------
    Name:  J.T. Battenberg, III
    Title: Chief Executive Officer and
           President

DELPHI TECHNOLOGIES, INC.

By: /s/ Andrew Brown, Jr
------------------------------------
    Name: Andrew Brown, Jr.
    Title: President

DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC.

By: /s/ John P. Arle
------------------------------------
    Name: John P. Arle
    Title: President