Neil A. Goteiner (NG 1644)
Dean M. Gloster, *Pro Hac Vice* (pending)
Kelly A. Woodruff, *Pro Hac Vice* (pending)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

Hearing Date and Time
March 11, 2009 at 10:00 a.m.
(prevailing Eastern time)

- and -

Trent P. Cornell, *Pro Hac Vice* (pending)
Jon D. Cohen, *Pro Hac Vice* (pending)
STAHL COWEN CROWLEY ADDIS LLC
55 West Monroe Street, Suite 1200
Chicago, IL 60603
Telephone:  (312) 641-0060
Facsimile:  (312) 641-6959

Attorneys for the Delphi Retiree Committee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x
:
In re:                                          :
:
DELPHI CORPORATION, et. al.,                    :
:
        Debtors.                                :
:
:
-----------------------------------------------x

Chapter 11 Case No. 05-44481 (RDD)

(Jointly Administered)

## SUPPLEMENT AND REPORT IN SUPPORT OF MOTIONS TO APPOINT AN OFFICIAL RETIREE COMMITTEE PURSUANT TO SECTION 1114 OF THE BANKRUPTCY CODE AND IN OPPOSITION TO DEBTORS' MOTION TO <u>TERMINATE SALARIED RETIREE BENEFITS</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     REPORT ON RETIREE COMMITTEE PROGRESS TO PRESERVE RETIREES' TAX
        CREDIT ELIGIBILITY........................................................................................2

III.    SUMMARY OF ARGUMENT ...........................................................................7
        ....................................................................................................................

IV.     APPLICABLE LAW ............................................................................................9

        a.      There is No Choice of Law Issue in This Matter—Second Circuit Law is Binding
                on This Court With Respect to Interpretation of Federal Law ....................9

        b.      This Court Cannot Select Law From Another Circuit Relating to Federal Law
                Issues, Even in Similar Cases .................................................................11

        c.      Applicable Second Circuit Law ................................................................15

        d.      The Decision in *Sprague v. GM* Has No Affect Upon This Case..............19

V.      RELEVANT DOCUMENTS DISCOVERED THUS FAR ILLUSTRATE VESTING
        ..................................................................................................................21

        a.      The 1974 Summary Plan Description Promises Lifetime Benefits Without
                Reservation ............................................................................................21

        b.      The 1980 Summary Plan Description Promises Lifetime Benefits Without
                Reservation ............................................................................................22

        c.      A Reservation of Rights is Inserted in the 1985 Summary Plan Description, Along
                With Continuing Promises of "Lifetime" Benefits....................................24

        d.      Other Official Documents Tendered to the Affected Retirees Promised Lifetime
                Benefits Without Reservation of any Termination Rights.........................25

                i.      Personal Benefit Summaries.........................................................25

                ii.     Memoranda ..................................................................................27

iii.    Life Insurance Letters from Delphi.................................................27

VI.    SUBSETS OF THE AFFECTED RETIREE GROUP HAVE ADDITIONAL VESTING
ARGUMENTS..................................................................................................28

a.    Frigidaire Division Retirees.......................................................28
b.    American Axle & Manufacturing, Inc. .......................................31

VII.    THE AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009 ("ARRA")
..........................................................................................................................32

VIII.    CONCLUSION.................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL STATUTES

11 U.S.C. §1114 .................................................................................................7

26 U.S.C. § 35 (c)(1)(C) .................................................................................2, 3

29 U.S.C. § 1162(2)(A)(iii) ..................................................................................3

### FEDERAL CASES

*Abbruscato v. Empire Blue Cross and Blue Shield*, 2004 U.S. Dist. LEXIS 18286 *21 (S.D.N.Y.
September 10, 2004) ...........................................................................................18

*Aleo v. Keyspan Corp.*, 2006 U.S. Dist. LEXIS 55049 at *18
(E.D.N.Y. Aug. 7, 2006) .....................................................................................19

*American Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp.*,
116 F.3d 983 ......................................................................................................17

*Bidlack v. Wheelabrator Corp.*, 993 F.3d 603, 605-08 (7th Cir. 1993) .............................18

*Bouboulis v. Transport Workers Union of America*, 442 F.3d 55, 60
(2nd Cir. 2006) ...........................................................................................15, 16

*Butner v. United States*, 440 U.S. 48 (1979) ..........................................................13, 14, 15

*Caesar Desiano, et al. v. Warner-Lambert & Co., et al.,* 2006 U.S. App. LEXIS 32377, *14 (2nd
Cir. Oct. 5, 2006) ...........................................................................................10, 11

*Devlin* v. *Empire Blue Cross and Blue Shield,* 274 F.3d 76, 80 & 84
(2nd Cir. 2001) .............................................................................7, 9, 16, 17, 18, 20

*Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638, 642
(4th Cir. 1975) ....................................................................................................12

*Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278 (2d Cir. 1981) .....................................10

*Feifer v. Prudential Insurance Company,* 306 F.3d 1202, 1211 (2nd Cir. 2002) ...18, 25, 31

*Hamlin v. Charter Township of Flint*, 165 F.3d 426, 430 (6th Cir. 1999)..........................12

*In re U.S. Truck Co. Holdings, Inc*., 2000 Bankr. LEXIS 1376, *51
(Bankr. E.D. Mich. 2000) .................................................................................................12

*Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2nd Cir. 1990).............................................16

*Higgins v. Closeout Distributors, Inc.,* 159 B.R. 212, 215 (S.D. Ohio 1993) ..................11

*Kremer v. Chemical Construction Corp.*, 623 F.2d 786, 788 (2d Cir. 1980) ...................12

*Markva v. Haveman*, 168 F. Supp. 2d 695, 708-09 (E.D. Mich. 2001)............................11

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)..............................................................10

*Moore v. Metropolitan Life Ins. Co*., 856 F.2d 488 (2nd Cir. 1988)............................15, 16

*Rodriguez De Quijas Et Al. v. Shearson/American Express, Inc.,* 490 U.S. 477, 484
(1989) ................................................................................................................................12

*Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998) .....................9, 16, 19, 20

*Timmerck v. U.S.A.*, 577 F.2d 372, 374 (6th Cir. 1978) ....................................................12

*Transmatic, Inc. v. Gulton Industries, Inc.*, 601 F.2d 904, 912 (6th Cir. 1979) ................12

*Union Carbide Corp. v. Graver Tank & Mfg. Co.*, 345 F.2d 409, 411
(7th Cir. 1965).....................................................................................................................12

The Committee of Eligible Salaried Retirees (the "Retiree Committee"), pursuant to the Court's Order of February 25, 2009, respectfully submits this supplement and report in support of the Motions to Form an Official Retiree Committee and to otherwise apply Section 1114 of the Bankruptcy Code to this matter and in Opposition to the Debtors' Motion to Terminate Retiree Benefits.  In support thereof, the Retiree Committee states as follows:

## I.    **INTRODUCTION**

The Retiree Committee was established pursuant to Section 1114(d) of the Bankruptcy Code by to the Court's Order of February 25, 2009 (the "Benefits Order").  At the Court's instruction, the United States Trustee for the Southern District of New York expedited the actual formation and selection of the Retiree Committee.  Late in the day on February 26, 2009, the U.S. Trustee selected James R. Frost, James A. Hagenbach, James Sumpter, James R. Conger, W. Ben Gifford, Cathy Carroll and Robert Todd Nicholson as members of the Retiree Committee.  On February 27, 2009, the Retiree Committee met for the first time telephonically and that evening selected the law firms of Farella Braun and Martell LLP and Stahl Cowen Crowley Addis LLC as counsel.[1]

In the Benefits Order this Court provisionally granted the debtors' motion to terminate, effective March 31, 2009, all subsidies for the retiree health and life insurance benefits that the debtors had reserved the right to terminate.  In the Benefits Order, the Court charged the Retiree Committee to meet and confer with the debtor (1) to explore the efficacy of preserving

---

[1] Given the expedited timing of this matter and the familiarity of both law firms with this case, the Retiree Committee believed it was prudent to select both law firms to represent it.  To avoid any duplication of effort and to streamline the representation, Dean Gloster, Esq. and Farella Braun & Martell was selected by the Retiree Committee as overall lead counsel and Stahl Cowen Crowley Addis LLC was engaged as trial counsel, with a focus on document collection and assembly.  All legal tasks have been separated by the Retiree Committee to ensure that there is no redundancy between the legal work performed on its behalf by the Farella Braun and Stahl Cowen firms.

applicable federal tax credits available for retirees in connection with the debtors'

implementation of the Court's authorization to modify retiree benefits, and (2) to consider

appropriate modifications to the Court's order in return for waiving, as the representatives of all

retirees, appellate rights with respect to the Benefits Order.  In addition, the Court directed the

Retiree Committee to determine whether there was sufficient and competent evidence that some

or all of the non-pension retiree benefits for former salaried workers were vested and to provide

that evidence to the Court and the debtors.  The Benefits Order required the Retiree Committee

to file this report with the Court setting forth the results of the Retiree Committee's work in

accordance with the responsibilities directed by the Benefits Order.

     The Retiree Committee re-iterates and incorporates herein the Oppositions and Motions

to Form a Retiree Committee (not limited in scope, but an Official Committee pursuant to

Section 1114 of the Bankruptcy Code) filed on February 13 and February 17, 2009 and located at

docket numbers 14765, 14819, 14872, 14882 and 14886 (collectively the "Retiree Briefs").  As

set forth in the Retiree Briefs and at oral argument, the Retiree Committee objects to a final

hearing on the Debtors' Motion to Terminate Benefits without following the dictates of Section

1114.

## II.    REPORT ON RETIREE COMMITTEE PROGRESS TO PRESERVE RETIREES' TAX CREDIT ELIGIBILITY

     The Health Coverage Tax Credit, 26 U.S.C. § 35, ("HCTC") provides that the federal

government will pay 65-80% of the health care premiums for retirees aged 55 through 64

enrolled in "qualified coverage" after their pension is turned over to the PBGC.  26 U.S.C. §

35(c)(1)(C).  (The subsidy was 65% of the benefit cost until recently, but the new stimulus

package legislation signed into law on February 17, 2009 temporarily increased the tax credit

subsidy to 80% of premiums effective May 1, 2009 through December 31, 2010.)  Because the

salaried retirees' pension plan at Delphi is seriously under funded, and because of the extreme

difficulties facing the auto industry generally, there is a high likelihood that the salaried

employees' pension plan will be terminated and turned over to the PBGC in the near future.

That would trigger HCTC eligibility, but only if reasonable efforts are made to preserve that

eligibility now.  The February 17, 2009 Restructuring Plan submitted by General Motors to the

Department of the Treasury, introduced by the debtors as an Exhibit at the hearing on their

motion, discussed this issue in connection with Delphi and conceded that it is "unlikely" that

Delphi will be able to make up the funding deficits, and as a result the pension plan will be

terminated and turned over to the PGGC.  (Hearing Exhibit 51, p. 33.)

Only 40 of the 50 states have state coverage plans available that qualify for the HCTC

subsidy, and many of those state plans involve extremely high deductibles or very limited

coverage.  (Hearing Exhibit 78, p. 9, statement of Stan Dorn, the Urban Institute, to Congress.)

In addition, if there is a gap of more than 63 days after leaving the Delphi plan before enrolling

in a qualifying state plan, the state plan will typically not cover any pre-existing medical

conditions.  (*Id.*, p. 8.)

The other benefit plan eligible for the HCTC subsidy is COBRA continuation coverage

under Delphi's plan.  (id., p. 4; 26 U.S.C. § 35(e)(1)(A).)  Termination or modification of health

benefits in connection with bankruptcy is a "qualifying event" for COBRA continuation

coverage, 29 U.S.C. § 1163(6), and when the qualifying event is bankruptcy-related, COBRA

continuation coverage lasts for the beneficiary's lifetime.  29 U.S.C. § 1162(2)(A)(iii).  *See also*

Final Internal Revenue Service Regulations § 54.4980B-4, Question 1(c) ("_any increase_ in the premium or contribution that must be paid by a covered employee . . . that _results from the occurrence of_" bankruptcy is a qualifying event triggering COBRA eligibility.)  Accordingly, when their health benefit subsidy was lost in this bankruptcy, under applicable law, the salaried retirees should have become entitled to lifetime COBRA continuation coverage and should have received a notice to that effect, allowing them to elect to continue that coverage at their own expense.

Unfortunately, in its notice to retirees of termination of subsidies in connection with the Benefits Order, effective March 31, 2009, Delphi (A) failed to provide notice to the retirees that they were eligible for lifetime COBRA continuation coverage; (B) specifically and incorrectly informed them that if they retired prior to a date in 2007 they were _not_ eligible for COBRA continuation coverage; and (C) did not advise them that their election of COBRA continuation coverage would preserve their rights to the HCTC after the PBGC takeover of the pension plan. In addition, Delphi's notice advised retirees that responding by express or certified mail might not be adequate means to preserve their access to benefits and provided an _incorrect_ fax number for retirees to use to fax back elections to continue existing health benefits on a self-pay basis.

Finally, an IRS private letter ruling provides that a benefit plan for retirees negotiated by a Section 1114 Committee in a bankruptcy, adopted in lieu of COBRA continuation coverage, is a "qualified plan" eligible for the HCTC subsidy.  Private Letter Ruling 200432012 (2004).  The advantages of such an approach include (A) a benefit designed specifically for retirees, with affordable options; and (B) a continuing benefit eligible for the HCTC even if Delphi sells all its

U.S. assets and stops providing a health plan for its workers, which would otherwise terminate

any COBRA continuation coverage.

In compliance with this Court's directive to meet and confer with the debtors to preserve

access to the HCTC, the Retiree Committee (or its subcommittee on HCTC benefits) has met as

a committee by phone at least seven times, and has identified priorities for a negotiated

resolution with Delphi.  The Retiree Committee, through several counsel calls and a call

involving both counsel and committee members as well as Delphi management and counsel, has

shared suggested alternatives and priorities with Delphi for such a resolution and potential

advantages for Delphi in agreeing to a negotiated resolution to settle out any appeal rights of

retirees.  The committee has focused on (a) avoiding lapse of coverage for retirees given the

short notice of the ending of Delphi's subsidies, (b) preserving access to the HCTC, (c) a more

limited short term subsidy or other arrangement that would allow a vendor to offer a program for

under-65 retirees that could be made eligible for the HCTC, and (d) practical protections for

retirees to preserve access and eligibility should Delphi sell its U.S. assets in the future and no

longer offer health plan access.  In particular, the Retiree Committee wants to avoid large

numbers of retirees from having a lapse of "creditable coverage" of more than 63 days, which

would make them ineligible to have a future group health plan cover pre-existing conditions.

The committee engaged brokers, Cone Insurance Group, to contact vendors to obtain

"creditable coverage" for the under 65 Delphi retirees that could be used as an in-lieu of COBRA

continuation coverage benefit, and to determine what level of subsidy would be necessary to

permit vendors to offer the program until HCTC eligibility was established upon any turn over of

the pension plans to the PBGC.  Among others, on behalf of the Retiree Committee, the brokers

have already contacted Blue Cross, Aetna, Hartford, United Healthcare, Anthem (Blue Cross)

Kaiser, and CIGNA.  The brokers also identified for the Retiree Committee practical timelines

for implementing replacement benefits, and that has been shared by the Retiree Committee with

Delphi.

Separately from its discovery requests regarding vested benefits, on February 27, 2009,

the Retiree Committee requested the information necessary (enrollment, census, aggregate

claims data, etc.) necessary to permit vendors to offer and price alternate health care benefits for

Delphi retirees that could be deemed "qualified coverage" under the HCTC in accordance with

IRS private letter ruling PLR 20043012.  As of the morning of March 6, 2009, Delphi has not

provided the requested information.

Counsel for the Retiree Committee has analyzed changes to the HCTC (temporary

increase of the premium subsidy from 65% to 80% from May 2009 through December 2010) and

COBRA continuation coverage in the recent stimulus package legislation signed into law

February 17, 2009.  Through counsel, the Retiree Committee has contacted counsel for the

PBGC regarding possible timing and likelihood of a turnover of the salaried retirees' pension

plan to the PBGC, which would trigger eligibility for the HCTC.

Through counsel, the Retiree Committee has engaged in discussions with Delphi over

modifications of the Benefits Order to preserve the retirees' effective access to a plan to preserve

HCTC eligibility in light of the practical realities of the need to have a benefit program that

avoids lapse of coverage and takes into account Delphi's cash flow pressures.

The Retiree Committee has coordinated with the objecting parties at the February 24,

2009 hearing regarding appeal of the Court's order and the Retiree Committee's right, as the

representative of retirees appointed in this case, effectively to settle any appeal timely filed by the objecting parties in return for Delphi concessions for the benefit of retirees.

## III.    SUMMARY OF ARGUMENT

The Retiree Committee again respectfully asserts that the Court is accepting the Debtors' invitation to put the cart before the horse.  The threshold issue before the Court is whether the Debtors need to follow the statutory guidelines set forth by Congress when 11 U.S.C. §1114 ("Section 1114") was added to the Bankruptcy Code.  The Retiree Committee has incorporated the Retiree Briefs and will not reiterate the arguments therein.  Suffice it to say, however, that the exact scenario that Section 1114 was designed to prevent is playing out in this case.  Indeed, the Affected Retirees find themselves in a position where they have to prove the ultimate issue that their benefits are vested before they were able to take any meaningful discovery or otherwise avail themselves of the protections congressionally granted to them pursuant to Section 1114.

This goes far beyond even the *Doskocil* case upon which the Debtors rely in opposition to application of Section 1114 to this case.  In fact, this goes beyond the summary judgment standards set out by the Second Circuit Court of Appeals in *Devlin v. Blue Cross* and other cases that will be cited below.  There can be no doubt that a dangerous precedent has been set by the Court's Provisional Order.  Essentially retirees are being required to prove their case before they are allowed meaningful access to the tools they need to prove their case.  This represents a fundamental abrogation of Section 1114 and a clear blueprint for future Debtors to get around Section 1114.  It also undercuts the Congressional intent of Section 1114 and exposes the most vulnerable group in a bankruptcy, unrepresented retirees, to losing their retirement benefits before they ever have a chance to defend themselves.  This result will show itself most in

smaller, less noteworthy cases than this one; the kind of cases that are more common, and the kind of cases that are unlikely to show up on the radar screen of counsel familiar with Section 1114 and the arguments raised in the Debtors' Motion to Terminate Benefits.

Despite the fact that the Retiree Committee has had less than one full week to locate documents and because it has been hampered by not getting access to the full list of all Affected Retirees (despite request), it has already located documents addressing the issue of vested benefits. It is certain that additional documents will be located after the entire Affected Retiree group is reached through a direct mailing. In particular, the Retiree Committee is concerned that individual retirees have particular circumstances that will never be revealed because there has been no meaningful opportunity to contact them.

Even at this early stage, however, the Retiree Committee has located numerous Summary Plan Descriptions ("SPDs") and other writings that were sent annually to the Affected Retirees promising lifetime healthcare and life insurance benefits for retirees and their surviving spouses that would be paid for by General Motors Corporation, an obligation subsequently taken over by Delphi. As will be set out in this brief, the Court is bound to apply Second Circuit law and that precedent plainly illustrates that the Retiree Committee has established far more than a question of material fact as to whether the Affected Retirees' benefits vested as a result of the SPDs and other documents tendered to them during the course of their employment—or performance of a unilateral contract in the words of the Second Circuit Court of Appeals. The Court will see that there is can be no dispute at all that for at least eleven years, and likely more, GM promised lifetime benefits at the cost of the company with no reservation of rights whatsoever.

There will also be no dispute that the Affected Retirees worked for GM during these eleven years, and certainly a portion of the group started work during this period and performed under that promise without knowledge of any other plans that may or may not have existed before the SPD they were given when they started work.  It was only later that GM tried to change the rules and added unilateral termination language.  A maneuver just like that was tried, but failed, in the *Devlin* case and others.  As will also be discussed below, the majority in the *Sprague v. GM* case simply ignored this gap, a result that could not happen under Second Circuit precedent.

Further, the Retiree Committee has identified specific sub-sets of retirees—including those who retired from other pre-existing companies or who are covered by the retroactive provisions of the February 17, 2009 American Recovery and Reinvestment Act—who have separate claims to vested benefits

## IV.    **APPLICABLE LAW**

### a.   **There is No Choice of Law Issue In This Matter—Second Circuit Law is Binding On This Court With Respect To Interpretation of Federal Law**

At the hearing on February 24, 2009, the Court raised the issue of whether it is bound to follow Second Circuit precedent or whether it can adopt Sixth Circuit ruling in the *Sprague* case.  The answer is quite clear—the Court must follow Second Circuit precedent when dealing with issues of interpretation of Federal law.  This matter, of course, is all about Federal law, either ERISA or the Bankruptcy Code itself.  To hold otherwise in a case like this would lead to untenable, unjust and, ultimately, absurd results.

The Second Circuit has stated that it is "required" to reach its own conclusions with respect to issues of federal law, and the courts of the Second Circuit are bound by that precedent.

*Caesar Desiano, et al. v. Warner-Lambert & Co., et al.,* 2006 U.S. App. LEXIS 32377, *14 (2nd

Cir. Oct. 5, 2006).  In *Caesar*, the District Court for the Southern District of New York

("SDNY") had to decide whether a Michigan state law was preempted by two federal laws—the

Food, Drug and Cosmetic Act (the "FDCA") and the Medical Device Act (the "MDA").  *Id*. at

*9.  The Sixth Circuit had previously issued a published opinion, in which it decided that the

same Michigan state law was preempted by the FDCA and the MDA.  *Id*. at *9-10.  The SDNY

followed the Sixth Circuit opinion, finding that "although it was not 'absolutely bound' by [the

Sixth Circuit case], the Sixth Circuit's reasoning was owed 'quite substantial deference' under

*Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278 (2d Cir. 1981), a decision by a panel of this

circuit which stated that conclusive deference should be given to a federal court of appeals'

interpretation of the law of a *state* within its circuit."  *Id.,* (emphasis supplied)

> On appeal, the Second Circuit reversed, stating:

> … *Factors* instructed us to defer conclusively to another circuit's judgment only
> when that court of appeals' decision addressed questions of *state* law from a state
> within that circuit.  It asserted no obligation to defer to a foreign circuit's views
> on *federal* law.  As to issues of federal law, we are permitted- indeed, required –
> to reach our own conclusions.

*Id*. at *14 (emphasis in original; citations omitted).

The Second Circuit further stated that, even when a case is transferred to it from another

Circuit, "the court of appeals must develop its own circuit law on federal questions; it cannot

mechanically adopt the reasoning and conclusions of its sister circuits."  *Id*. at *16-17 (citing

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993) (holding that a cause of action filed timely in the

11th Circuit under that Circuit's interpretation of federal statute of limitations could be dismissed

as untimely after being transferred to the Second Circuit, which interprets the statute of

limitations differently)).  Ultimately, the Second Circuit reached the opposite result of the Sixth

Circuit's ruling on the same federal statutes.  *Id*. at *34.

Under *Caesar*, since the statutes at issue here, ERISA and the Bankruptcy Code, are

federal statutes, and because the debtors chose to file their reorganization cases within the

Second Circuit, this Court must follow the precedent of the Second Circuit, not the Sixth Circuit,

regardless of whether the Sixth Circuit has issued a prior opinion on point.

### b.  This Court Cannot Select Law From Another Circuit Relating To Federal Law Issues, Even In Similar Cases

"The judicial Power of the United States, shall be vested in one supreme Court, and in

such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const.,

art. III, §1.  "The United States District Court is one of those 'inferior courts' established by

Congress.  Accordingly, the rules and decisions to be applied by the district court in deciding

cases and controversies include the precedential law established by decisions of the Supreme

Court and the United States Court of Appeals."  *Markva v. Haveman*, 168 F. Supp. 2d 695, 708-

09 (E.D. Mich. 2001).

District Courts are bound by the law of their own Circuits, even when conflicting

authority exists in other jurisdictions.  *Id.; Higgins v. Closeout Distributors, Inc.,* 159 B.R. 212,

215 (S.D. Ohio 1993).  The U.S. Supreme Court addressed this issue:

> We do not suggest that the Court of Appeals on its own authority should have
> taken the step of renouncing *Wilko*.  If a precedent of this Court has direct
> application in a case, yet appears to rest on reasons rejected in some other line of
> decisions, the Court of Appeals should follow the case which directly controls,
> leaving to this Court the prerogative of overruling its own decisions.

11

*Rodriguez De Quijas Et Al. v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989).  A

Second Circuit decision is not only binding upon this Court, but also upon a Second Circuit

Court panel, absent a ruling by the full Court:

> This panel cannot properly entertain the claim that *Sinicropi* was wrongly
> decided…. [A] panel of this court will not overturn a recent decision of another
> panel, rendered after full consideration of the very point at issue.  This is
> something to be done, if at all, only by the full court sitting en banc.

*Kremer v. Chemical Construction Corp.,* 623 F.2d 786, 788 (2d Cir. 1980).

Indeed, District Courts must follow the precedent of their Circuits, even if they find more

persuasive authority in other Circuits.  *Hamlin v. Charter Township of Flint,* 165 F.3d 426, 430

(6th Cir. 1999) (district court properly applied circuit court decision it criticized in great deal);

*Transmatic, Inc. v. Gulton Industries, Inc.,* 601 F.2d 904, 912 (6th Cir. 1979) (district courts

bound by pertinent decisions of circuit court even if they find what they consider more

persuasive authority in other circuits);  *Timmerck v. U.S.A.,* 577 F.2d 372, 374 (6th Cir. 1978)

(rev'd on other grounds) (same) (citing *Doe v. Charleston Area Medical Center, Inc.,* 529 F.2d

638, 642 (4th Cir. 1975) and *Union Carbide Corp. v. Graver Tank & Mfg. Co.,* 345 F.2d 409, 411

(7th Cir. 1965)); *In re U.S. Truck Co. Holdings, Inc.,* 2000 Bankr. LEXIS 1376, *51 (Bankr. E.D.

Mich. 2000) (although district court expressed concerns with circuit court holding and reasoning,

it is nevertheless bound to follow it).

Beyond the binding case law on this subject, there are also very practical reasons why the

law of the Second Circuit should be applied—equity and uniformity.  The Affected Retirees

worked in Delphi facilities in several states, including a very large group in New York.  Delphi

chose to file this action in New York based on the location of a subsidiary in this State.  It would

be patently unfair for the Debtors to now reap a benefit from the interpretation of a federal law

12

by sister circuit because it could be more advantageous then the law of the forum they chose when they filed this action.  Moreover, the Federal law questions at issue in this matter are to be interpreted under the precedent of the Second Circuit.  This relates also to uniformity.  Certainly the Court would not want to open this up to the prevailing laws of the various Circuits where the Affected Retirees worked and/or where the divisions of Delphi they worked for were located and/or incorporated.  Such a result would have parts of the retiree group subject to the Federal law interpretations in at least the Second, Third, Sixth and Seventh Circuit Courts of Appeal.

Progressing down this line leads to absurdity, but it is certainly not "fair" to interpret the rights of retirees who worked and lived in New York under the interpretations of Federal law handed down by the Sixth Circuit Court of Appeals in Detroit from a class action that they were not parties to in any way rather than the law of the Second Circuit where they lived and worked in performance of the unilateral contracts at issue.  All of this speculation, however, is unnecessary.  The Second Circuit Court of Appeals has dealt with this question and it has found that the Courts of this Circuit are bound to apply its interpretation of Federal law.

Finally, at the February 24, 2009, the Court suggested that *Butner v. United States*, 440 U.S. 48 (1979), might be applied to mandate that this Court follow Sixth Circuit precedent, not the precedent of this Circuit.  A close look at *Butner* and the cases that distinguish *Butner* reveals that this case is inapplicable here.

In *Butner*, the Supreme Court was tasked with resolving a circuit split on whether bankruptcy courts should apply state law in determining whether a secured creditor's lien on commercial real property would include rents received during a bankruptcy case or whether a non-statutory "federal rule of equity" should apply to allow the secured creditor a security

13

interest in rent, regardless of whether state law allows it.  *Butner*, 440 U.S. at 53.  The Court held that the

> constitutional authority of Congress to establish 'uniform Laws on the subject of Bankruptcies throughout the United States' would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate.  But Congress has chosen not to exercise its power to fashion such rule.

*Id*. at 54.  The Court later stated that "Property interests are created and defined by state law.

Unless some federal interest requires a different result, there is no reason why such interests

should be analyzed differently simply because an interested party is involved in a bankruptcy

proceeding."  Id. at 55.  The Court gave the following reasons for not upholding a federal rule of

equity, which contradicts with state laws:

> The minority of courts which have rejected state law have not done so because of any congressional command, or because their approach serves any identifiable federal interest.  Rather, they have adopted a uniform federal approach to the question of the mortgagee's interest in rents and profits because of their perception of the demands of equity.

Id. at 55.

This case is completely different.  First, the underlying law at issue is not state

property law, but ERISA- a federal statute, which involves an identifiable federal interest in

protecting retirees.  Second, the retirees do not ask this Court to impose a "federal rule of equity"

which Congress did not address in the Bankruptcy Code; retiree benefits were explicitly

addressed by Congress in Section 1114 of the Bankruptcy Code.  For both of these reasons,

*Butner* is not applicable here, rationale that has been picked up repeatedly when Butner has been

cited for legal provisions beyond state law rights.[2]

### c.    Applicable Second Circuit Law

The law of the Second Circuit plainly sets out that the documents discovered already by

the Retiree Committee are sufficient to reach a trier of fact.  This is certainly more than enough

to trigger the protections that should be afforded the Affected Retirees pursuant to Section 1114.

Initially, there are a few red-herrings that need to be dispensed with.  Specifically, the Debtors'

claims that the Second Circuit decisions in *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488

(2nd Cir. 1988) and *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55, 60 (2nd Cir.

2006) have any precedential value to this matter.  Simply put, these case are not applicable to the

case at bar.

In both *Moore* and *Bouboulis* the Second Circuit found that the plaintiff retirees could not

present "specific written language that is reasonably susceptible to interpretation as a promise" to

vest their retirement benefits.  In *Moore*, the retirees proffered some filmstrips and informal

---

[2] Many other courts have refused to follow *Butner* where the underlying issue was not one of state law.  *In re Kenneth Allen Knight Trust*, 303 F.3d 671 (6th Cir. 2002) (federal definition of "business trust" applies to issue of standing to file bankruptcy case, not law of state where trust was created under *Butner*); *In re Bono Development, Inc.*, 8 F.3d 720 (10th Cir. 1993) (rejecting application of *Butner*, in prohibiting a secured creditor to include attorneys fees in its superpriority lien); *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051 (5th Cir. 1986) (unlike *Butner* liens not addressed by code, state law does not apply to attorneys fees addressed by §506); *In re Williams*, 2007 Bankr. LEXIS 2472 (Bankr. E.D. Vir. 2007) (portion of undersecured creditor's unsecured claim is governed by bankruptcy law, not state law under *Butner*); *In re Raynard*, 327 B.R. 623 (Bankr. W.D. Mich. 2005) (*Butner* does not require bankruptcy court to apply state law in interpreting §522 exemptions for property held in the entirety by spouses under state law); *In re LTV Steel Co., Inc.*, 264 B.R. 455 (Bankr. N.D. Ohio 2001) (*Butner* does not apply when court is deciding whether government department falls within the definition of "political subdivision of a State" under Bankruptcy Code); *In re Kar Development Associates, LP*, 180 B.R. 597, 615 (Bankr. D. Kan. 1994) ("*Butner* permits federal courts to reject state law as the rule of decision when it conflicts with an 'identifiable Federal interest' or 'Congressional command.'  When this is done federal common law is being applied by a federal court."); *In re Haber Oil Co., Inc*., 82 B.R. 435 (Bankr. N.D. Tex. 1988) (finding that *Butner* does not address the matter of laws of states affecting attorney's fees); *In re Giles Associates, LTD*, 92 B.R. 695 (Bankr. W.D. Tex. 1988) (*Butner* distinguished because §365 not affected by separate state law doctrine concerning the termination of leases).

presentations and argued that these communications overrode the plain language of the

defendant's Summary Plan Descriptions.  Not surprisingly, the retirees lost.  In *Bouboulis*, the

retirees proffered a Summary Plan Description that was silent as to lifetime benefits and a letter

from a union president that also did not promise lifetime benefits to the retirees.  Not

surprisingly, those retirees lost too.

        The evidence here is nothing like the evidence proffered in either *Moore* or *Bouboulis*.  In

this case, the Retiree Committee is presenting the Court with actual Summary Plan Descriptions

that expressly promised lifetime benefits for the Affected Retirees without reservations of any

kind.  Moreover, even if the Court were to find the SPDs merely ambiguous, the Retiree

Committee is also presenting the Court with other formal writings that were sent annually to the

retirees, again promising lifetime benefits without reservation of any ability to modify or

terminate.  These are not filmstrips or an informal letter from a union president.  This is the

official documentation sent to every employee as part of their consideration for working for GM.

Neither the Debtors nor even the Sixth Circuit in *Sprague* can get away from the undisputed fact

that from (at least) 1974 until (at least) 1987 *every one* of the Affected Retirees was performing

under a unilateral contract whereby they were guaranteed lifetime benefits that would be paid for

by GM.  Delphi assumed those obligations and it cannot ignore them now.

        In the Second Circuit, "[t]he standard that we have adopted is whether the plan

documents contain 'specific written language that is reasonably susceptible to interpretation as a

promise' to vest the benefits."  *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55,

60 (2nd Cir. 2006), citing to *Devlin* v. *Empire Blue Cross and Blue Shield,* 274 F.3d 76, 80 & 84

(2nd Cir. 2001) and quoting *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2nd Cir. 1990).  If there

is a conflict between a summary plan description and the underlying plan documents, "it is the [SPD] that controls." *Id.* at 442 F.3d 61, citing to *American Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp.*, 116 F.3d 983 (2nd Cir. 1997).

The Second Circuit has repeatedly laid out the test that must be applied to determine if benefits are vested: "Under our standard, then, the plaintiffs here must first identify 'specific written language that is reasonably susceptible to interpretation as a promise." *Devlin* at 84. The Retiree Committee has done that with the plain language found in the 1974 and 1980 Summary Plan Descriptions, along with the Personal Benefit Summaries from 1974 to 1987 and the Frigidaire SPD. Specifically, in *Devlin* the Second Circuit noted that the retirees had identified two relevant statements in the defendant's pre-1987 SPDs that they felt promised them vested benefits. The first statement was that "retired employees, after completion of twenty years of full-time permanent service and at least age 55 will be insured." The *Devlin* Court stated the following with respect to that language:

> We believe that this statement can be reasonably read as promising such insurance so long as employees retire after age 55 and have provided full-time permanent service to Empire for at least twenty years. This provision can be construed as an offer that specifies performance as the means of acceptance—sometimes referred to as an offer for a unilateral contract—and promises lifetime life insurance benefits upon performance. Therefore, by 'performing' (that is, working for at least twenty years until attaining the age of 55), the plaintiffs accepted this offer. *Id.* The Second Circuit went on to reject the defendant's contention that the company had

properly asserted a right of unilateral termination by inserting unilateral termination language in its 1987 SPD. The Court summed it up by stating that "[w]e reject Empire's argument because after the plaintiffs began performance, pursuant to the pre-1987 SPDs, Empire was not free to revoke." *Id.*

The second statement the retirees in *Devlin* identified was also from pre-1987 SPDs. The relevant language was that the SPDs stated that life insurance coverage "will remain at [the annual salary level] for the remainder of their lives." *Devlin* at 85. The Second Circuit found that "[s]uch 'lifetime' language, we believe, is sufficient to create a triable issue of fact as to whether Empire promised to vest retiree life insurance benefits at the stated level. *Id*., citing to *Bidlack v. Wheelabrator Corp*., 993 F.3d 603, 605-08 (7th Cir. 1993) (en banc).

The Second Circuit went on to add that "[b]ecause of the ambiguity of the language, the ultimate determination of whether Empire promised lifetime benefits should be left to the trier of fact, likely assisted by extrinsic evidence to clarify the meaning of the ambiguous language." *Id*, citing to *Bidlack* at 609. In a footnote relating to extrinsic evidence, the Court noted that exit letters given to the retirees "arguably reinforces the plaintiffs' interpretation of the relevant plan documents." *Id*., fn 7. To the extent that there is any ambiguity, the Retiree Committee will show the Court several documents sent to all of the Affected Retirees stating that they have lifetime benefits at GM's cost. These documents are not simply letters, they are official documents sent annually by GM.

The Second Circuit holding in *Devlin* does not stand alone. See also *Feifer v. Prudential Insurance Company,* 306 F.3d 1202, 1211 (2nd Cir. 2002) (noting that if an employee was promised future benefits that would vest in the future before the introduction of later documents purporting to provide the right of unilateral termination, the later documents *cannot* diminish the rights of the employees who accepted the earlier terms by continuing in the employ of their employer) (emphasis supplied); *Abbruscato v. Empire Blue Cross and Blue Shield*, 2004 U.S. Dist. LEXIS 18286 *21 (S.D.N.Y. September 10, 2004) (language in plan documents pre-1987

reflected vested benefits that could not be un-vested by inclusion in unilateral termination language in subsequent retiree plan documents); *Aleo v. Keyspan Corp.*, 2006 U.S. Dist. LEXIS 55049 at *18 (E.D.N.Y. Aug. 7, 2006) (finding that documents external to retiree plan implying a lifetime or vested benefit made unilateral termination reservation in plan documents inapplicable).

> **d.      The Decision in *Sprague v. GM* Has No Affect Upon This Case**

While not binding on this Court, the Retiree Committee would be remiss if it did not address the Sixth Circuit decision in *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998) that was cited by the Debtors and referenced by the Court at the hearing on February 25, 2009.  Initially, *Sprague* contains a material flaw that is discussed in the dissenting opinions, most particularly in the dissenting opinion of Chief Judge Martin of the Sixth Circuit.  Simply put, the majority ignored that there were many years when GM's Summary Plan Descriptions and supporting documents made promises of lifetime benefits without any reservation of an ability to modify or terminate—and the Affected Retirees, or some large percent of them, performed under these contracts.

The majority opinion reflected, in material part, that GM had long provided summary plan descriptions to its employees, describing retiree benefits as early as 1965. The Court initially noted that *some* of summary plan descriptions provided to its employees reflected a right of unilateral termination. *Id*. at 394.  The majority decision also noted that GM provided summary plan descriptions over many years to its employees promising "lifetime" health care coverage, and that GM would "pay the full cost" of such coverage, without reservation of rights. *Id*.

19

Citing to the undisputed written record, Chief Judge Martin noted that GM had repeatedly promised retirees lifetime health care in a variety of written materials, and "only occasionally" included a reservation of rights to change retiree benefits.  *Id*. at 409. (citing dissent of B. Martin, Jr. Chief Judge).  No effort was made by the *Sprague* court to address why workers who started and/or continued to work for GM from 1974 through 1985 would not be entitled to rely upon the summary plan descriptions that *affirmatively* provided for lifetime benefits paid for by GM and containing *no* asserted right of unilateral termination.

Under Second Circuit precedent and under its interpretation of ERISA, the *Sprague* decision is erroneous.  Employees working during a period during where affirmative promises of vested benefits were provided through SPDs without a stated right of unilateral termination therein are *not* subject to be terminated later.  *See Devlin*.

The Retirees Committee further notes, that in a very limited time, other summary plan documents and other documentary evidence has surfaced that was not reflected as being considered in the *Sprague* case whatsoever.  (See Exhibit G attached hereto reflecting a 1979 summary plan description applicable to Frigidaire employees which promised lifetime retiree benefits, to be paid for my GM as discussed further below).   Accordingly, not only is *Sprague* erroneous under Second Circuit law, it is apparent that some part of the Affected Retiree group have arguments that were not even addressed in *Sprague*.

V.    **Relevant Documents Discovered Thus Far Illustrate Vesting**

    a.    **The 1974 Summary Plan Description Promises Lifetime Benefits Without Reservation**

With the advent of ERISA in 1974, GM issued its first post-ERISA Summary Plan Description and distributed it to all employees (the "1974 SPD").  (A copy of the 1974 SPD is attached hereto and incorporated herein as Exhibit A).  For many Affected Retirees this was the first SPD they saw, for others it was given to them to tout the benefit programs that they were working under and the benefits they were working for as part of their employment consideration.  The 1974 SPD repeatedly promised lifetime benefits at GM's cost for all employees who met the vesting requirements set out in the SPD.  *There was no unilateral termination language in the 1974 SPD*.  Among other things, the 1974 SPD affirmatively set forth that:

- If you have 10 or more 'years of participation'" at age 65 then the final amount "will then remain in force for the rest of your life."  (Exhibit A, p. 19);

- If You Die Before Retirement…If you die attaining eligibility to retire voluntarily, a lifetime monthly Part A benefit may be payable automatically to your surviving spouse. (Exhibit A, p. 22);

- If You Die After Retirement…You may elect to receive reduced monthly Part A or Part B benefits, or both, so that your eligible surviving spouse will receive a portion of your lifetime monthly benefits after your death. (Exhibit A, p. 22);

- Page 28 shows the schedule of Part A lifetime supplements.  (Exhibit A, p. 25);

- A 'Lifetime' Supplement…may be payable to you each month for life after age 65 if you retire at any age with 30 or more years of credited service…This lifetime monthly supplement is reduced by the amount of any monthly Part B supplement benefit payable to you prior to any reduction for any survivor option. (Exhibit A, p. 28);

- An 'Age-Service' Supplement..may be payable to you each month for life if you retire under any type of retirement after age 62 with less than 30 years of credited service.  (Exhibit A, p. 28);

- **SURVIVOR BENEFITS**  In the event of your Death…either before or after you retire, monthly benefits may be provided for the lifetime of your survivor. (Exhibit A, p. 28);

- Hospital-Medical Coverages: Your basic coverages will be provided at Corporate expense for your lifetime (except for voluntary retirement).  (Exhibit A, p. 28).

Based on applicable Second Circuit law these statements equate to a vested right, or at the very least an ambiguity such that the issue should be investigated and presented to a trier of fact with supporting extrinsic evidence.  See, e.g. *Devlin*.

    **b.**      **The 1980 Summary Plan Description Promises Lifetime Benefits Without Reservation**

The next Summary Plan Description issued by GM was distributed to all employees in 1980 (the "1980 SPD").  (A copy of the 1980 SPD is attached hereto and incorporated herein as

Exhibit B).  Like the 1974 SPD, the 1980 SPD also promises lifetime benefits without

reservation of any rights of termination.  Among other things, the 1980 SPD affirmatively states

the following:

- Health Care Coverages- Your Basic Health Care coverages (except vision prior to October 1, 1980) will be provided at GM expense for your lifetime…(Exhibit B, p. 20);

- Life Insurance- Your basic life, extra accident, and survivor income benefit insurance will be continued at GM expense until age 65…(*Id.*);

- Monthly total and permanent disability benefits payable for life under the Retirement Program.  (Exhibit B, p. 33);

- Continuing Insurance After Age 65- If you have over 10 or more years of participation (see page 46) when you reach age 65, your basic life insurance will be continued without cost to you for your lifetime.  (Exhibit B, p. 36);

- If You Die Before Retirement- Part A Automatic Benefit For Your Surviving Spouse- If you die after attaining eligibility to retire voluntarily and have been married at least one year, a lifetime monthly Part A basic benefit may be payable automatically to your surviving spouse.  (Exhibit B, p. 38);

- Part B Optional Benefit For Your Surviving Spouse-  For Example…suppose you have this Part B survivor option in effect and you die in October 1981 at age 50

before you are eligible to retire voluntarily…Your spouse would receive monthly

benefits equal to 60% of your accrued Part B benefits, or, in this case, an

estimated $250 a month for life.  (Exhibit B, p. 38);

- If You Die After Retirement- Part A Basic and Part B Surviving Spouse Benefits-

    When you retire, you have the option to provide lifetime monthly benefits for

    your eligible surviving spouse after your death.  (Exhibit B, p. 39).

c.    **A Reservation of Rights Is Inserted In The 1985 Summary Plan Description, Along With Continuing Promises Of "Lifetime" Benefits**

The next Summary Plan Description distributed to the Affected Retirees came in 1985

(the "1985 SPD").  (A copy of the 1985 SPD is attached hereto and incorporated herein as

Exhibit C).  The 1985 SPD was a jumble of promises of "lifetime" benefits at GM's cost against

GM's newly added reservation of rights to unilaterally terminate benefits.  For example:

- **ARE MY HEALTHCARE COVERAGES CONTINUED WHEN I AM**

    **RETIRED?**  Your basic health care coverages will be provided at GM expense for

    your lifetime…(Exhibit C, p.11).

- **Do I Have Basic Life and Extra Accident Insurance as a Retiree Before Age 65?**

    Depending on when they last worked most retirees have all, or a portion of, their

    basic insurance continued during retirement before age 65 without cost to them.

    (Exhibit C, p. 31);

24

- **For employes [sic] who last worked on or after July 1, 1985**  If you are insured, had 10 or more years of participation at retirement, and

  o You retired other than totally and permanently disabled, your basic life insurance commences to reduce at the earlier of (i) retirement or (ii) attainment of age 65 and is continued without cost to you for your lifetime.

  o You retired totally and permanently disabled, your basic life insurance commences to reduce at age 65 and is continued without cost to you for your lifetime.  (Exhibit C, p. 32);

-  [With respect to Health Care coverage if the Retiree Dies in Retirement]  Coverages will be continued for the lifetime of the surviving spouse of a deceased retiree even if the spouse remarries.  (Exhibit C, p. 38);

- Against that language, GM added that it "reserves the right to amend, change or terminate the plans or programs described in this booklet."  (Exhibit C, pp.1, 42).

At best, the 1985 SPD has both lifetime and unilateral termination language, creating an ambiguity that would confuse the reasonable retiree (as that standard is set out in the Second Circuit).  Again, however, there is no getting around that fact that this dueling language first appeared in 1985; eleven years after GM first promised vested benefits at its cost for the lifetime of the retirees and their surviving spouses, and only after eleven years of performance by the Affected Retirees in furtherance of that unilateral contract.  This late addition of unilateral termination language was exactly what the defendant attempted to do it *Devlin* and in *Feifer*, and

25

both times the Second Circuit rejected the defendant's invitation to decide that issue on summary

judgment.

### d.    Other Official Documents Tendered To The Affected Retirees Promised Lifetime Benefits Without Reservation Of Any Termination Rights

#### i.    Personal Benefit Summaries

As early as 1975, every salaried employee of GM received a Personal Benefit Summary

on a yearly basis.  These were very formal looking documents on GM letterhead and described

each employees' "Health Care Benefits" (major medical coverage), "Retirement Income"

(estimate income to be earned after retirement), "Savings Stock Purchase Program" (reflecting

the number of GM shared purchased by employee), "Disability Income" (reflecting benefits in

the event of injury), and Survivor Benefits (reflecting payments to survivors, life insurance and

provision of health care coverage for survivors).  The documents were individualized to reflect

the various credits earned by the employees, including contributions the employee *him or herself*

voluntarily made to their retirement plans.  Between 1975 and 1987, these Personal Benefit

Summary statements were received by every salaried employee.  None of these statements

contained any reservation of rights reflecting that the benefits described therein could be

modified or terminated.  They did, however, contain *affirmative* statements representing that as

retirees they would each have vested benefits.  For example, from 1977 through 1987, the

Personal Benefit Summaries stated that:

> If you retire from GM (except at employe [sic] option between ages 55 and 60
> when your age and credited service will total less than 85):
>
> - Your health care coverage will be continued for your lifetime.

- A portion of your life insurance and Personal Accident insurance may be continued for your lifetime.

(See Group Exhibit D).  As such, these materials certainly were likely to be understood by the retirees as reflecting vested benefits.

### ii.    Memoranda

In 1978 (and perhaps during other years too), in conjunction with providing Applications for Participating in the General Motors Retirement Plan, a "Memorandum" was tailored to every GM Salaried Employee (on GM letterhead) which describes the "General Motors Employee Retirement Program."  In what can only be interpreted as a direct means to encourage employees to remain with GM, the company stated that "if you have ten or more years of credited service prior to death, Dental, Basic Hospital, Surgical, Medical and Drug Coverage would be continued at Corporation Expense for your souse and eligible dependants, if you Elect this option."  (See Exhibit E).  This benefit was only offered to employees who actually satisfied the required credited service prior to their death.  Given that this benefit also describes vital support for a surviving spouse and children in the event of death, GM offered this as an important *earned* incentive and no doubt this was a factor that kept employees working for GM until they met the referenced service credits.  If a retiree met this criteria and died, GM should not be able to now renege on its express promise of survival retire benefits.

### iii.    Life Insurance Letters from Delphi

Life insurance was presented by GM as a bedrock benefit, that was only be to reduced pursuant to a formula that was introduced and promised to the retirees when they were working in the mid-1970s through the mid-80's.  Consistent with GM's promises, this vested benefit was reflected in letters that were sent out by Delphi's agent in 2001 to all of its salaried retirees.  (See

27

Exhibit F attached hereto).  These letters further serve to reflect several vesting issues.  First, they reflect that the recipients were receiving them because they had met the minimum 10 year of service credits in the applicable retiree benefit program.  Second, this letter reflects and confirms the retirees understanding that Delphi was honoring GM's obligations as it was accepting service credit years earned at GM.  Lastly, and most importantly, the letter reflects, in varying amount for each retirees, that their life insurance "**amount will remain in effect for the rest of your life and is provided by Delphi at no cost to you**." (*Id.*) (Emphasis added.)

**VI.**     **Subsets of the Affected Retiree Group Have Additional Vesting Arguments**

Given the amount of time to conduct discovery, the Retiree Committee is unable to state with any certainty that relevant documents relating to subsets of the overall retiree group have been found.  Indeed, it is a near certainty that many relevant documents have not yet been tendered to the Retiree Committee.  Nevertheless, some subsets of the overall group have emerged, as will be discussed below.

**a.**     **Frigidaire Division Retirees**

There is another subset of the Affected Retirees who had vested benefits as part of their employment, and the subsequent closing, of GM's Frigidaire Division.  The obligations for these retirees were subsequently transferred to Delphi, although the mechanism for this transfer is not yet apparent.  The Retiree Committee, however, knows two things about this group, (1) they were promised lifetime benefits and (2) they are currently classified as Delphi retirees.  Specifically, this group was tendered a document titled "**YOUR BENEFITS** FOLLOWING THE CLOSING OF OPERATIONS AT FRIGIDAIRE DIVISION."  The body of the document was titled the "SUMMARY OF BENEFIT PROGRAMS PROVISIONS AND PERSONNEL

POLICITES APPLICABLE TO SALARIED EMPLOYES [sic] SUBSEQUENT TO CLOSING

OF OPERATIONS AT FRIGIDAIRE DIVISION."  (A copy of this SPD is attached hereto and

incorporated herein as Exhibit G).  In relevant part, this SPD states that

- In addition, basic Health Care coverages (except Vision) will be continued for the lifetime of your surviving spouse with GM paying the related cost if you should die" followed by eligibility/vesting requirements.  (Exhibit G, p. 8);

- If you should die at any age with 10 or more years of credited service with the Part B optional survivor benefit in effect, basic Health Care coverages (except Vision) will be continued for the lifetime of your spouse or until your spouse remarries.  Under these circumstances GM will pay the full cost, provided your spouse is enrolled in Part B of Medicare at and after age 65." (Exhibit G, p. 8);

- With respect to Life Insurance: "Prior to age 65, your Basic Group Life, Extra Accident and Survivor Income Benefit Insurance coverages will be continued. GM pays the full cost…"  (Exhibit G, p. 11);

- With respect to Health Care Coverage: "Basic Health Care Coverages (except Vision) are continued for you and your eligible dependents for your lifetime, with GM paying the full cost…"  (Exhibit G, p. 12);

- With respect to Comprehensive Medical Expense Insurance Program Coverage (CMEIP): "If you are receiving GM Retirement Program benefits and you are enrolled for basic Health Care coverages, you may continue CMEIP coverage for

your self and any eligible dependents during your lifetime by making

contributions applicable to retirees."  (Exhibit G, p. 12);

- If you retire with 30 or more years of credited service within 2 years of your last

   day worked for GM, you may be eligible for a monthly Part A early retirement

   supplement and a lifetime supplement."  This statement is followed by

   eligibility/vesting requirements, such that "[t]he lifetime supplement may be

   payable to you each month after age 65."  (Exhibit G, p. 15);

- If you die after retirement with a survivor option in effect, your designated

   survivor will be eligible for lifetime benefits under the Retirement Program."; "In

   addition, Health Care coverages (except Vision) will be continued for the lifetime

   of your surviving spouse, with GM paying the full cost…"  (Exhibit G, p. 17);

- <u>Deferred Vested Benefits</u>  If your credited service under the GM Retirement

   Program is broken for a reason other than retirement [i.e. the layoff] and if you

   had at least 10 years of credited service at the time credited service was broken,

   you will receive a deferred vested benefit certificate form from the Frigidaire

   Salaried Personnel Office.  Vested benefits can commence as early as age 55 on a

   reduced basis, or at age 65 without reduction."  (Exhibit G, p. 18).

In sum, the laid-off Frigidaire employees (now Affected Retirees) were provided with

clear promises of lifetime benefits based on their credited service as part of the closing of GM's

Frigidaire division.  They were also unequivocally promised that if they continued to perform

services as an employee that they would continue to accrue years of "credited service" that

30

would add to the amount of lifetime benefits they were entitled to, and which their surviving spouses would be entitled to "at GM cost."  There is no ambiguity, nor is there any type of reservation of rights in the Summary of Plan Benefits.  Accordingly, this group of Affected Retirees has benefits that were lifetime and vested based on the eligibility/vesting criteria set out by GM at the time the Frigidaire division was closed and those promises cannot be later revoked after they were made and relied upon.  See, e.g., Devlin, Feifer, supra.

### b.    American Axle & Manufacturing, Inc.

Perhaps the most curious subset of the Affected Retirees are those retirees who retired from American Axle & Manufacturing, Inc. ("AAM").  In 1994, GM sold its Final Drive and Forge business unit to AAM.  As part of the sale, the GM employees subsequently became AAM employees, with GM retaining responsibility for all credited service and the benefits so earned by these employees for the time that they worked for GM.  AAM picked up responsibility for the employees' time at that company in what is commonly referred to as a "wrap-around" policy.  Nevertheless, the former GM employees (now retirees) were still accruing GM credited service even during the time that they worked at AAM so that they could retire under GM's retirement plans.

This group never worked for Delphi in any capacity whatsoever.  They worked for GM for several years, worked for some years at AAM and then retired from AAM.  Nevertheless, at some point GM purported to jettison the retirement obligations for this group to Delphi.[3]  The timing of this purported act is most curious, and potentially problematic.  GM sold the Final Drive and Forge business division to AAM in 1994, yet Delphi was not even created until five

---

[3] Discovery on this point was requested on March 2, 2009 by counsel for the Retiree Committee.  As of this filing, the Debtors' have still not responded to that request.

years later, in 1999.  Accordingly, it appears that GM simply dumped a liability on Delphi even

though Delphi received no consideration for taking on the obligation for retirees who had never

worked a day for Delphi.  It is unclear if this was designed to shed a liability to Delphi that,

collectively with other obligations passed to Delphi, were designed to ensure that Delphi found

itself in bankruptcy (as it did only six years after the spin-off) such that GM could simply acquire

back the pieces of Delphi later on (as it is apparently doing now) while at the same time ridding

itself of its retiree obligations.  Further investigation is required to vet out these issues, and the

affect upon this subset of "Delphi" retirees.

## VII.    The American Recovery and Reinvestment Act of 2009 ("ARRA")

On February 17, 2009 President Obama signed the ARRA into law.  While the ARRA

contains sweeping provisions relating to many issues, there are provisions relating to the

Consolidated Omnibus Budget Reconciliation Act ("COBRA").  Specifically, if an individual is

terminated from employment between September 1, 2008 and December 31, 2009, then the

COBRA premiums are capped at 35% of the premium.  Additionally, if former employees paid

in excess of 35% of the COBRA premium during this time period, then the group plan must

refund the amount the individual (for him or herself and eligible dependents) paid in excess of

the 35% cap.

At present the Retiree Committee does not know how many Affected Retirees are eligible

to (a) reduced premiums pursuant to the ARRA or (b) refunds of premiums paid pursuant to the

ARRA.  It is also not clear whether the Debtors attempted termination of its retirement plans will

trigger protection for the entire group of Affected Retirees under the ARRA.  Simply put, there

has not been enough time to explore these critical issues, but they cannot be swept aside given

the grave consequences for Affected Retirees who will be left without insurance that they can

afford if the Debtors are successful in terminating their benefits.

**VIII.    <u>Conclusion</u>**

There is no doubt that the Affected Retirees were promised lifetime benefits at GM's cost

from at least 1974 until 1985.  GM had no reservation of rights of any kind in its SPDs for those

years and, beyond that, it affirmatively sent yearly Personal Benefit Summaries and other official

documents to the Affected Retirees promising them lifetime benefits at GM's cost without any

reservation of rights.  The legal standard for determining whether a vested promise was made is

how a reasonable retiree would interpret such language.  There is only one way to make such an

interpretation, and that is in favor of the retirees.  This Court must revise its provisional Opinion

and require the Debtors to follow the congressionally mandated process set out by Section 1114

of the Bankruptcy Code.  This does not pre-judge any result, it merely grants the Affected

Retirees the statutory protections entitled to them under Section 1114 and allows them a

meaningful opportunity to present a defense and to negotiate with the Debtors to protect the

retirement benefits they worked for as employees.  At a minimum this would allow the delay

needed to establish a national plan via a VEBA to transition employees from a struggling

companies incompetence to a retiree self managed program.

Dated:        San Francisco, California
              March 6, 2009

                                        The Official Retiree Committee of Salaried Retirees
                                        of Delphi Corporation and its affiliated Debtor
                                        affiliates


                                        By:      ___/s/ Neil A. Goteiner_____
                                                 Neil A. Goteiner

Neil A. Goteiner (NG 1644)
Dean M. Gloster, *Pro Hac Vice* (pending)
Kelly A. Woodruff, *Pro Hac Vice* (pending)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480
ngoteiner@fbm.com

   -and-

Trent P. Cornell, *Pro Hac Vice* (pending)
Jon D. Cohen, *Pro Hac Vice* (pending)
STAHL COWEN CROWLEY LLC
55 West Monroe Street, Suite 1200
Chicago, Illinois 60603
Telephone:  (312) 641-0060
Facsimile:  (312) 641-6959
tcornell@stahlcowen.com