Paul J. Dobosz
7052 Oakbay Dr
Noblesville, IN  46062
Telephone:  (317) 877-2178

A Delphi salaried retiree submitting  pro se

Hearing Date and Time

March 11, 2009 at 10:00 a.m.

(prevailing Eastern time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

In re:

DELPHI CORPORATION, et. al.,

    Debtors.

-------------------------------------------------x

Chapter 11 Case No. 05-44481 (RDD)

(Jointly Administered)

This statement is submitted to the court by an adversely affected Delphi salaried retiree (not an attorney) who believes that there is significant material information concerning Delphi's motion to terminate OPEB benefits that has not been brought before the court by attorneys representing the Delphi Salaried Employee Association or other attorneys representing groups of salaried retirees.

Here are the issues of fact believed to be of significant relevance concerning the motion:

1) The first issue is the strong similarity between the Varity v. Howe situation and Delphi's situation at the time of separation from GM.

    The conditions under which Delphi separated from GM have a striking similarity to those when Varity Corporation created a separate division, Massey Combines, to separate its profitable businesses from its less profitable ones and consolidate other troublesome liabilities into a new entity.

    GM also desired to restructure by segregating underperforming and unprofitable enterprises into a group of divisions under the umbrella of the ACG (Automotive Components Group).  For a while, this group operated within GM but the ultimate goal was to sell individual businesses or to spin them off as an entire group into a separate company thus insulating GM from its considerable liability.

When it became apparent that a new company composed exclusively of ACG divisions was not overly attractive to investors, the Delco Electronics division was added to other divisions to improve the attractiveness of the ACG and thus forming a GM owned Delphi subsidiary that would soon be spun off as an independent company.

Employees transferred to the new Delphi were assured in all forms of verbal and written communications that their salary, benefits, and pensions would remain identical to GM's as an inducement to remain with the new company over the long term. Employees were also not allowed to return to GM and were told they would have to quit, severing their "vesting" if they wished to return.

Despite these assurances, there were early warning signs that the new company's benefit programs entailed considerably greater risk than those of the parent company. Reading the language of the Employee Matters Agreement (EMA) that was part of the Master Separation Agreement, one could see a carefully detailed a flow back scenario that would allow certain employees to return to GM and its less risky benefit programs without losing credit for time spent employed by Delphi.

An additional part of the EMA detailed transfers of accrued funds for OPEB liabilities that would continue. This action was indicative that GM considered the OPEB a vested benefit that must be funded and continued by Delphi.

Another point of similarity with the Varity case revolves around evidence that Delphi was a troubled entity as of, or closely following its spinoff from GM. Union negotiations failed to provide the relief needed for union wage and benefit alignment with competitors in the automotive component and subsystem market. GM's purchasing policies drove price reductions not consistent with sharing of liabilities transferred.

While it did not surface until much later in 2005, Delphi was engaged in allegedly dubious and fraudulent financial transactions to conceal the true financial condition of the company. These transactions began in 2000 and continued through 2004 when several top officers including the company's Chairman and CEO were charged by the SEC with civil fraud. *(U.S. Securities and Exchange Commission v. Delphi Corporation, et.al.)*

In many cases, transactions in question were between GM and Delphi leading a reasonable person to assume that GM had knowledge of and contributed toDelphi's fragile financial situation through purchasing practices and failed labor negotiations.. This conclusion is further supported by the fact that GM refused to place hundreds of millions of dollars of warranty liabilities on Delphi's balance sheet at the time of separation which further concealed the true financial condition of Delphi from shareholders and employees at the time of separation.

2) A second issue is the question of whether the amendability language added to summary plan documents by GM around 1987 relieves GM or Delphi of earlier and/or subsequent promises of certain lifelong OPEB benefits. This relief is questionable given the consistently conflicting language used in its descriptions of these benefits to employees.

Many examples of plan documents, personal benefit summaries, letters, and summary plan documents have been entered into evidence by attorneys for retirees and the limited § 1114 committee appointed by the US Trustee.

While it is clear that the amendability disclaimer language is in the later documents, Delphi and GM continued to place conflicting language in multiple places and in multiple documents furnished to employees, reiterating the lifetime nature of OPEB benefits that would accrue if age and service requirements were met. This is at best disingenuous and arguably dishonest. If Delphi knew these benefits were amendable, keeping such language in plan documents and other communications was deliberately misleading.

This raises the question, given the claimed amendability of OPEB benefits, why Delphi and GM continue to place lifetime vesting language prominently in literature provided to employees and retirees? The only logical conclusion is that Delphi and GM hoped to derive a benefit from continuing to promulgate conflicting language in communications with employees. The most likely benefit would be increased retention of employees generated by the expectation that the specific promises of lifetime benefits would be honored despite any general disclaimer.

Assuming that Delphi and GM do indeed receive such benefit from maintaining conflicting language in employee communications, it makes a strong case that an implied contract exists, thus making a strong case for relief on the basis of promissory estoppel.

3) A third issue is the inconsistency of the grounds on which Delphi has continued to object to the formation of a conventional § 1114 committee of retirees with a normal scope of responsibility.

In the early days of this bankruptcy, Delphi opposed (and the court rejected) a motion by a group of retirees to form a § 1114 committee to represent the interests of salaried retirees. At the time of the initial rejection, the court relied on Delphi's assurances that there was no risk of cancellation or modification to OPEB benefits thus obviating the need to appoint a § 1114 committee. On February 4, 2009 that was changed when the present motion was filed with the court.

Delphi previously gave the court the (now false) impression that retirees had nothing to worry about. The debtor acted in a deceptive manner to deliberately prevent a group of creditors of modest resources from access to the protection of the § 1114 process thus abusing the process to their advantage.

I respectfully ask the court to consider these important issues of fact as it decides whether to grant Delphi's motion to terminate OPEB benefits for its salaried retirees, current and future.

Dated:    Noblesville, Indiana
          March 9, 2009

                                              By:    _/s/ Paul J. Dobosz_____
                                                     Paul J. Dobosz
                                                     7052 Oakbay Dr
                                                     Noblesville, IN  46062
                                                     Telephone: (317) 877-2178