Hearing Date And Time:  March 11, 2009 at 10:00 a.m. (prevailing Eastern time)
Objection Deadline:  March 10, 2009 at 4:00 p.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
       In re                                                  :    Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :    Case No. 05-44481 (RDD)
                                                              :
                                                              :    (Jointly Administered)
               Debtors.                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' RESPONSE TO RETIREE COMMITTEE REPORT

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby respond

to the Supplement And Report In Support Of Motions To Appoint An Official Retiree

Committee Pursuant To Section 1114 Of The Bankruptcy Code And In Opposition To Debtors' Motion To Terminate Salaried Retiree Benefits (the "Report") filed by the official committee of Eligible Salaried Retirees (the "Retiree Committee") on March 6, 2009 (Docket No. 16426).

Preliminary Statement

Despite its 33-page length, the Report does not proffer any additional evidence that Delphi promised vested benefits to any retirees.  Instead, the Retiree Committee attaches as additional Delphi documents only two additional examples of the half-page form letter from Delphi's third-party life insurance administrator that was part of the record of the February 24, 2009 hearing (the "1114 Hearing") and comprehended within the Court's bench ruling and the Provisional Salaried OPEB Termination Order (the "Provisional Order," Docket No. 16380). (Compare Report at pp. 27-28 & Exh. F with Higgins Obj., Docket No. 14765, at pp. 9-10 & Exh. B.)  The Retiree Committee concedes that informal communications are relevant as "extrinsic evidence" of the meaning of plan terms under applicable Second Circuit law only if there is ambiguity in the plan documents.  (See Report at p. 18).  Moreover, the Retiree Committee does not contend that there is any ambiguity in Delphi's plan documents, and the 1114 Hearing Declaration of Steven Gebbia established that there is not and has never been any such ambiguity.

Relying entirely on its bid to relitigate Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998)(en banc), the Retiree Committee asserts that GM's documents from 1974 through 1985 promised lifetime welfare benefits to salaried retirees.  That precise issue was fully litigated (and the Retiree Committee's position rejected) in Sprague.  Moreover, during the 1114 Hearing this Court already determined that Sprague put all parties on notice of the scope of GM's obligations at the time Delphi created its welfare benefit plans, which plans Delphi has

2

consistently and unambiguously reserved the right to modify or terminate.[1] In addition, as discussed below, Sprague is entitled to preclusive effect under principles of res judicata.

Finally, the Committee purports to identify two "subsets" of Delphi retirees who have additional vesting arguments – Frigidaire Division retirees and American Axle & Manufacturing, Inc. retirees. (Report at pp. 28-32.) Although this section of the Report hews most closely to the Debtors' understanding of the purpose of the Report, it is factually flawed. The Retiree Committee first speculates incorrectly that responsibility for certain retirees of GM's former Frigidaire Division (which division GM divested in 1979) was transferred to Delphi through a "mechanism" that "is not yet apparent." (Report at p. 28.) However, Delphi never assumed responsibility for retirees from GM's former Frigidaire division and the Retiree Committee offers no evidence for its assertion.

The Retiree Committee next incorrectly asserts that further investigation is needed to learn how Delphi acquired retirement obligations for certain retirees of business units GM divested to American Axle in 1994. Delphi agrees that it provides OPEB to certain American Axle retirees, but there is no mystery as to why this is so. Under the Master Separation Agreement (and the Employee Matters Agreement attached thereto), Delphi plainly assumed certain responsibilities for Delphi-related businesses that GM had divested prior to the separation

---

[1] Although the Report does attach a couple of GM documents from the 1970s that were not part of the record at the 1114 Hearing, nothing in these additional documents provides any incremental support for the Retiree Committee's position. (See Report Exh. A (1974 "Your GM Benefits" Handbook), Exh. E (1978 Memorandum), and Exh. G (1979 "Your Benefits Following The Closing Of Operations At Frigidaire Division"). The Debtors addressed the 1980 SPD (Exh. B) and various GM Personal Benefit Summaries (Exh. D) in the Omnibus Reply. (Docket No. 16327, ¶¶ 27-30 & fn. 11.) The 1985 SPD (attached to the Report as Exh. C) contains GM's express reservation of rights. No other documents are submitted with the Report.

of Delphi and GM. The businesses divested to American Axle fall into that category.[2] One such responsibility was for OPEB in connection with employees of divested business units who were still active employees at the time of the separation of Delphi and GM. To the extent such employees had been retirement eligible with GM at the time GM divested their business unit, Delphi agreed with GM to provide them OPEB. As further discussed below (see pp. 6-7), Delphi's agreement with GM under the Employee Matters Agreement was in all respects expressly subject to Delphi's right to modify or terminate such plans.

Accordingly, there is no new evidence upon which to have an additional hearing. There can be no dispute that the Retiree Committee did not report "sufficient and competent evidence not presented at the Hearing to establish . . . that Salaried OPEB benefits have vested with respect to any [retiree] or group." (See Provisional Order ¶ 9.) As contemplated by the Provisional Order, the Court should finalize its ruling that the Debtors' Salaried OPEB benefits have not vested and that the Debtors are authorized, but not directed, to terminate Salaried OPEB as provided in the Motion. (Id. at ¶¶ 5, 7.) Upon entry of such order, the Debtors' will take the necessary steps to cease paying for Salaried OPEB effective April 1, 2009.

A. <u>The Court Should Not Reconsider Its Ruling That Section 1114 Does Not Apply to Retiree Welfare Benefit Plans That Reserve Modification And Termination Rights</u>

Although the main thrust of the supplemental hearing called for in the Provisional Order was to consider any additional evidentiary materials that may establish whether any

---

[2]  The Retiree Committee incorrectly states that "[a]s of this [March 6, 2009] filing, the Debtors still have not responded to" a March 2, 2009 discovery request regarding the manner in which some American Axle retirees came to be Delphi retirees rather than GM retirees. In fact, on March 3, 2009, the Debtors produced the Master Separation Agreement and the Employee Matters Agreement, which contain the provisions regarding Delphi's responsibility for divested Delphi-related businesses. On March 5, 2009, the Debtors produced the 1994 Asset Purchase Agreement for the divestiture to American Axle and also produced an additional possibly responsive schedule from the Master Separation Agreement on March 5, 2006. In response to a subsequent question from counsel, Debtors' counsel specifically identified those four documents as being responsive to the request.

4

retirees' benefits have vested, the Retiree Committee instead has essentially presented a motion for reconsideration. (See Report at p. 7 (stating that "[t]he threshold issue before the Court is whether the Debtors need to follow . . . Section 1114" and that "a dangerous precedent has been set").) While such a motion may not be procedurally appropriate at this time,[3] the Court should deny the Committee's implicit invitation to reconsider its ruling that the procedures set forth for modification of retiree benefits in section 1114 of the Bankruptcy Code are inapplicable to benefits that have not vested. (See Provisional Order ¶ 4.) The Retiree Committee has not come forward with any new authority to impugn the Court's well-reasoned bench ruling on the proper interpretation of section 1114 of the Bankruptcy Code.

B. <u>The Retiree Committee's Report Presents No New Evidence And The Court Should Finalize Its Provisional Ruling That Delphi's Retiree Welfare Benefits Are Unvested</u>

Based on the record at the February 24, 2009 hearing, the Court provisionally ruled that the Debtors' Salaried OPEB benefits have not vested and that the Debtors have reserved the right to modify or terminate Salaried OPEB benefits. (Provisional Order ¶ 5.) The Court appointed the Retiree Committee pursuant to discretionary authority, however, for the primary purpose of determining whether there is sufficient and competent evidence not presented at the February 24, 2009 hearing to establish, consistent with the Court's bench ruling and applicable law, that Salaried OPEB benefits have vested with respect to any Eligible Salaried Retiree or group thereof. (Id. ¶ 8-9.) To the extent the Retiree Committee asserts that such evidence exists, the order directs that the Report set forth all such contentions and the bases

---

[3] In addition to being beyond the intended scope of the supplemental hearing, that issue is also the subject of a notice of appeal filed by a retiree group (represented by the lead counsel of the Retiree Committee) (see Docket No. 16404) and therefore may not be subject to reconsideration while the appeal is pending. The Debtors take no position here regarding whether the Retiree Committee's appeal of the Provisional Order is an unauthorized interlocutory appeal.

5

therefor with specificity. (Id. ¶ 11.) Although the Retiree Committee did file a Report, it contains no new evidence beyond the scope of the evidence considered at the 1114 Hearing.

                (a)       There Is No Evidence That Delphi Created Vested Benefits

As discussed above, the Retiree Committee does not contend that there is any ambiguity in Delphi's plan documents. The only new documents attached to the Report are two additional examples of a half-page form letter that is already in the record. As set forth in the Debtors' Omnibus Reply (see Docket No. 16327, ¶¶ 24-26), this informal communication is not a plan document. Informal communications are relevant as "extrinsic evidence" of plan terms only if the plan documents are ambiguous, and such informal communications cannot amend plan documents "absent a showing tantamount to proof of fraud." See Moore v. Metro. Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988); see also Am. Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp., 116 F.3d 976, 980-81 (2d Cir. 1997).[4] Here, it is uncontested that Delphi's plan documents are unambiguous, and the Retiree Committee alleges no fraud. The retirees' understanding that benefits are not vested under Delphi's welfare benefit plans is further demonstrated by Delphi's implementation of material changes to its health care program in the past. Effective as of January 1, 2007, Delphi ceased providing health care coverage to Medicare eligible retirees pursuant to the same reservation of its right to modify or terminate benefits.

---

[4] The Debtors and the Retiree Committee agree that the law of the Second Circuit governs the Court's determination of whether Delphi's Salaried OPEB Plans provide vested benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 et seq. Lower courts within the Second Circuit are bound by its interpretations of federal law, and cannot defer to a foreign circuit's interpretation of federal law. See Factors Etc. Inc v. Pro Arts, Inc., 652 F.2d 278 (2d Cir. 1981). Although a lower court should defer to a foreign circuit's interpretation of the law of a state within its geographic boundaries (see id. at 283), the issue here does not turn on state law.

6

(b)    GM Documents From The 1970s And 1980s Are Irrelevant

Although essentially conceding that Delphi itself did not promise vested benefits, the Retiree Committee rests on its allegation that "for at least eleven years [i.e., 1974 to 1985], and likely more, GM promised lifetime benefits at the cost of the Company with no reservation of rights whatsoever" (see Report at p. 8) and "Delphi assumed those obligations." (See Report at p. 16.) As discussed in the Omnibus Reply, however, in 1998 the Sixth Circuit in Sprague rejected the contention that GM created vested benefits during this alleged gap in GM's reservation of rights. (Docket No. 16327, ¶¶ 27-29.) Approximately one year after Sprague settled that question, Delphi created the plans at issue here and modeled them so as to be substantially identical to the GM plans – including preserving the express right to modify or terminate benefits thereunder.

The Debtors do not believe that to decide this Motion the Court has to relitigate the facts in Sprague or decide it again under Second Circuit law. The Sprague decision conclusively established the scope of GM's OPEB liability just prior to the creation of Delphi's plans. When Delphi agreed to establish plans "substantially identical" to GM's and to assume liability for Delphi employees under such plans (see Employee Matters Agreement § 6), Sprague represented the parties' understanding regarding the scope of that contractual obligation between GM and Delphi. The Employee Matters Agreement also expressly provided that (except as to certain severance agreements not relevant here) "nothing in this Agreement shall prohibit Delphi from amending, modifying or terminating Delphi Employee Benefit Plans . . . ." (Id.)

The fact that all parties were on notice of Sprague immediately prior to formation of the Delphi plans should dispose of the issue. But in any event, Sprague is entitled to preclusive effect. "When an asserted claim is identical to the one that has been previously

7

litigated," and where "the precluded parties' interests have been represented in the previous lawsuit," a subsequent litigant may be bound by the prior judgment, notwithstanding his non-involvement in the prior litigation. Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345 (2d Cir. 1995).

> Res judicata may bar non-parties to earlier litigation not only when there was a formal arrangement for representation in, or actual control of, the earlier action but also when the interests involved in the prior litigation are virtually identical to those in later litigation. See Allan D. Vestal, Res Judicata/Preclusion V, 125-26 (1969). As Professor Vestal has written, "the key seems to be that [the] interests [of the non-party] have been adequately represented by others who have litigated the matter and have lost . . ." Id. at 128. Federal courts have sometimes called this "virtual representation." See Aerojet General Corp. v. Askew, 511 F.2d 710, 719 (5th Cir.) (person can be bound by prior judgment "if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative"), cert. denied, 423 U.S. 908, 96 S. Ct. 210 46 L. Ed. 2d 137 (1975).

Id. at 345-46. In appropriate circumstances it does not matter whether the former case involved the same parties, or had a class certified. When the interests and involvement of the prior parties are sufficiently similar to those of the current parties, and when "the rights sought to be vindicated remain the same," denying the preclusive effect of the prior judgment "would elevate form over substance." See Jackson v. Hayakawa, 605 F.2d 1121, 1125-26 & fn. 6, 7 (9th Cir. 1979). This doctrine is drawn from considerations of public policy that are fully applicable here, including judicial economy, certainty in the legal system, and the well-founded principle that a prevailing party should be permitted "to enjoy the benefits of its victory and avoid further costs." See Chase, 56 F.3d at 345; see also, e.g., Allen v. McCurry, 449 U.S. 90, 94-95 (1980).

As a review of the several opinions in Sprague reveals, one hundred and fourteen individual plaintiffs filed a putative class action on behalf of approximately 85,000 salaried GM

retirees.[5]  Plaintiffs in that action sought a judgment that GM was obligated to provide them with basic health care coverage at no cost to themselves for their lifetimes, and for the lifetimes of their surviving spouses.  See Sprague v. General Motors Corp., 768 F. Supp. 605, 606-09 (E.D. Mich. 1991) ("Sprague I").  Prior to trial, the district court granted GM's motion for summary judgment on the general retirees' claim that that their post-employment health and welfare benefits had vested, but denied GM's motion to dismiss the early retirees' vesting claims.  The district court permitted all retirees to proceed on a theory that GM was estopped from amending its retiree health care benefits, and certified a class of early retirees to proceed with their claims.  See id. at 611-12; see also Sprague v. General Motors Corp., 843 F. Supp. 266, 270 (E.D. Mich. 1994) ("Sprague II").

In preparation for trial, the Sprague court conducted an extensive analysis of GM's welfare benefit plans for the period between 1964 and 1988, including a review of the historical development of both health care benefits and early retirement at GM.  See Sprague II, 843 F. Supp. at 274-78.  The district judge also considered a voluminous record gleaned from a broad range of sources, including both GM retirees and GM personnel still employed at the company's principal divisions and operating groups.  The record included but was not limited to the following:

- Brochures, booklets, and summary plan descriptions ("SPDs") dated 1965 ("The General Motors Insurance Program"), 1966 ("Your GM Benefits"), 1968 ("The General Motors Insurance Program"), 1971 (same), 1974 ("Highlights of Your GM Benefits:  A Handbook for Salaried Employees in the U.S."), 1977 ("Your

---

[5]  "The putative class included approximately 34,000 general retirees and approximately 50,000 early retirees.  General retirees are individuals who were entitled to retire without General Motors' consent either at age sixty-five or after thirty years' service with the company.  Early retirees are individuals who participated in one of the early retirement programs offered by General Motors between 1974 and 1988 which required that both the company and the employee consent to the retirement."  Sprague v. General Motors Corp., 92 F.3d 1525, 1528 n.1 (6th Cir.), vacated, 102 F.3d 204 (6th Cir. 1996).

9

      GM Benefits" (revised)), 1980 ("Your GM Benefits" and "Your Benefits in Retirement"), 1985 ("Your GM Benefits" (revised) and "Your Benefits in Retirement" (revised)), and 1988 ("Your GM Benefits" (revised) and "Your Benefits in Retirement" (revised)), id. at 298-99; see also Sprague I, 768 F. Supp. at 608-09;

- A "compendium" of documents describing retirement benefits received by members of a sample group of 318 retirees, including documents intended for distribution to retirees, as well as internal staff documents. This compendium consisted of plan documents, personal benefit summaries and statements, letters, booklets, memoranda, and other attachments sent between GM personnel, GM employees contemplating retirement, and GM retirees. Sprague II, 843 F. Supp. at 281-85, 290, 294-95, 297-99; see also Sprague I, 768 F. Supp. at 608-09; and

- Trial testimony from at least twenty members of the plaintiff class (plus the pre-trial testimony of over three hundred witnesses the district judge considered to ensure that documents, communications, testimony, and other evidence would be representative) as well as testimony from GM officers and plan personnel. See Sprague II, 843 F. Supp. at 278-99.

Following the close of trial, the district court concluded in two separate opinions that GM was not estopped from amending the health care benefits of its general retirees, whose benefits had not vested. Nevertheless, the district court ruled that GM had entered into a bilateral contract with each early retiree to provide lifetime healthcare benefits, and that the early retirees were entitled to relief in connection with their estoppel claims. See id. at 299; see also Sprague v. General Motors Corp., 857 F. Supp. 1182, 1184, 1188-90, 1192-93 (E.D. Mich. 1994) ("Sprague III").

      On appeal, however, the Sixth Circuit, sitting en banc, ultimately affirmed the district court's decision not to certify the class of general retirees, and reversed the district court's decision to certify the class of early retirees. Sprague v. General Motors Corp., 133 F.3d 388, 397-99 (6th Cir. 1998) (en banc). The Sixth Circuit further determined that the district court had erred in concluding that GM was estopped from amending its health plan, holding generally that

10

regardless of whether the original 114 plaintiffs purported to represent a class or whether their claims were considered individually,

- "[T]he plan documents, including the summary plan descriptions, effectively reserved a right on GM's part to amend or terminate" its welfare plan and to change the plan's terms, regardless of the fact that some of the SPDs did not including language expressly reserving GM's right to amend or terminate its plan, id. at 400-02;

- "Neither the GM plan itself nor any of the various summaries of the plan states or even implies that the plaintiffs' benefits were vested," id. at 399, 401-02;

- Neither by its conduct nor its various representations (oral or written) had GM entered into a series of bilateral agreements to modify or amend the original GM plan documents so as to provide lifetime welfare benefits for retirees and their spouses, id. at 402-03; and

- In light of GM's "clearly-stated right to amend – a right contained in the plan to which the plaintiffs had access and in many of the summaries they were given – reliance on statements allegedly suggesting the contrary was not, and could not be, reasonable or justifiable," id. at 404.

Thus, the Retiree Committee cannot credibly suggest that the issues in Sprague are not "virtually identical" to the Retiree Committee's allegations regarding the vesting status of GM's plan documents during the period 1974 through 1985 or that retirees interests were not adequately represented by the retirees who litigated Sprague. And the relevant considerations of judicial efficiency, certainty in the legal system, and fairness to the prevailing party all support giving preclusive effect to Sprague.

(c)    The Debtors Cooperated With Retiree Committee Discovery

The Retiree Committee urges the Court to overlook the paucity of its evidentiary presentation by stating that it has had "no meaningful opportunity to contact retirees" and that "it has been hampered by not getting access to the full list of all Affected Retirees (despite request)." Therefore, it is important to note that the Debtors' efforts to cooperate with the Retiree Committee's search for additional documentary evidence to support its "vesting" claim:

11

- The Debtors provided the Notice of Motion to all Eligible Salaried Retirees;

- The Debtors provided a copy of the Provisional Order to all objectors to the Motion;

- As contemplated in the Court's bench ruling, the Debtors mailed a communication to all Eligible Salaried Retirees informing them of the appointment of the Retiree Committee and instructing them to view delphidocket.com for more information (see Exh. A attached hereto);

- The Debtors posted contact information and a document request drafted by the Retiree Committee on delphidocket.com (see Exh. B attached hereto);

- The Debtors allowed the Retiree Committee to use KCC for mailings within the budget set by the Court; and

- The Debtors produced over 850 additional pages of documents and 2 Excel spreadsheets in response to formal discovery requests from the Retiree Committee, including as requested an excel file with the addresses for all retirees.

C.   Retiree Committee's Report on Health Care Tax Credit

Although issues relating to the Health Care Tax Credit are not relevant to the Court's determination whether any retirees have vested benefits, the Retiree Committee's scope of authority includes "exploring the efficacy of potentially preserving any applicable federal tax credits for retirees," including the Health Care Coverage Tax Credit (the "HCTC") (See Provisional Order ¶ 9.)  As an initial matter, because Delphi's retirees are not currently receiving payments from the PBGC, they are not presently "eligible individuals" for the purposes of receiving the HCTC.  See  6 U.S.C. § 35(c)(a)(C).  Although Delphi's salaried pension plan is underfunded and such underfunding must be addressed, Delphi has not made a determination to terminate the plan.[6]  The Debtors recognize, however, that creating a structure for ongoing health

---

[6]   Although the Retiree Committee incorrectly paraphrases GM's February 17, 2009 Restructuring Plan to imply that if Delphi does not make up the funding deficits "the pension plan will be terminated and turned over to the PBGC," (Report at p. 3), the document states GM's view that GM "has no obligation" to absorb the plan and that Delphi "may need to terminate" it.  The Debtors are in discussions with their stakeholders regarding options

12

insurance for retirees which would qualify for the HCTC in the event of termination of the pension plan is a desirable outcome.

    To that end, the Debtors have engaged in discussions with counsel for the Retiree Committee regarding avenues for preserving the availability of the HCTC in the event Delphi later must terminate the salaried pension plan.  For example, the Debtors have worked to provide data to the Retiree Committee to enable them to explore alternative health care options that might presumptively qualify for the HCTC and remain committed to doing so.[7]  The Debtors would also support reasonable requests from the Retiree Committee regarding their obtaining a private letter ruling from the IRS that a retiree-created health care plan for retirees satisfies the requirements for a "qualified plan" under the HCTC.  And, as for the concern raised by the Committee that the present termination of Delphi's payment of OPEB benefits will cause lapses in coverage or other administrative problems which might threaten the viability of a follow-on plan, as discussed above, the Debtors have also taken steps to inform retirees of their options to prevent such breaks or lapses in coverage.  (See pp. 11-12.)

    Although sharing the Retiree Committee's goal of preserving the availability of the HCTC if it is possible to do so, the Debtors disagree with some of the legal conclusions set forth in the Report.  Most notably, the Debtors do not believe that their cessation of OPEB triggers lifetime COBRA coverage under the applicable statute and regulations.  The Debtors' position is that provision for lifetime COBRA coverage is limited to the "substantial elimination of coverage" that occurs "within one year before or after the date of commencement of a

---

  to preserve rather than terminate the pension plan but there can be no assurances regarding the outcome of these negotiations.

[7] Since the Retiree Committee made its information requests, the Debtors have been working to provide data to the Retiree Committee and its brokers to enable them to explore market alternatives.  Additional data was provided on March 9, 2009.

bankruptcy proceeding." See 26 U.S.C. § 1163. The Debtors also believe that they are correctly providing COBRA notices to retirees who have retired since November 1, 2007, and are therefore still within the 18-month COBRA period following their retirement. Even if the Retiree Committee were correct in its assertions, however, the time for mailing COBRA notices has not yet run with respect to the changes Delphi contemplates making effective on April 1, 2009.[8]

        Notwithstanding the Debtors' and the Committee's mutual goal with respect to the HCTC structure, the Court should reject any suggestion that any uncertainty over the outcome of those negotiations or the ability to achieve a plan structure that preserves the HCTC is a reason to reconsider its prior ruling.

        WHEREFORE, the Court should enter an order (i) finalizing its ruling that the Debtors' Salaried OPEB benefits have not vested and that the Debtors are authorized, but not directed, to terminate Salaried OPEB as provided in the Motion, and (ii) granting such other further relief as is just.

---

[8] The Debtors are also considering the effect of the American Recovery and Reinvestment Act of 2009 that was signed into law on February 17, 2009 and are willing to discuss that statute with the Retiree Committee. However, the Debtors do not concede that the COBRA provisions are applicable to any of its retirees.

Dated: New York, New York
March 10, 2009

        SKADDEN, ARPS, SLATE, MEAGHER
        &amp; FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti
      Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession