1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            March 11, 2009

            10:17 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2  FINAL HEARING re Order Under 11 U.S.C. °° 105, 363(B)(1), 1108,

3  and 1114(D) (i) Provisionally Confirming Debtors' Authority to

4  Terminate Employer-Paid Post-retirement Health Care Benefits

5  and Employer-Paid Postretirement Life Insurance Benefits for

6  Certain (A) Salaried Employees and (B) Retirees and Their

7  Surviving Spouses; (ii) Directing Appointment of Committee of

8  Retired Employees with Limited Scope, and (iii) Setting March

9  11, 2009 Final Hearing

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4          Attorneys for Debtors and Debtors-in-Possession

5          333 West Wacker Drive

6          Chicago, IL 60606

7

8    BY:   JOHN WM. BUTLER, JR.

9          ALBERT L. HOGAN III

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

12         Attorneys for Debtors and Debtors-in-Possession

13         Four Times Square

14         New York, NY 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18   STAHL COWEN CROWLEY ADDIS LLC

19         Attorneys for Retirees' Committee

20         55 West Monroe Street

21         Suite 1200

22         Chicago, IL 60603

23

24   BY:   TRENT P. CORNELL, ESQ.

25

4

1           P R O C E E D I N G S

2        THE COURT:  Okay.  Delphi Corporation.

3        MR. BUTLER:  Your Honor, good morning.  Jack Butler,

4   Kayalyn Marafioti and Al Hogan here on behalf of Delphi

5   Corporation for this continuation of the OPEB termination

6   matter.  This was -- we filed the docket -- we filed, Your

7   Honor, an agenda for today's hearing at docket number 16442.

8   The Court entered a prior order, a provisional order, at docket

9   number 16380 relating to the motion that we filed at docket

10  number 14705.

11        Your Honor, in connection with the provisional order

12  that Your Honor entered, Your Honor appointed a retirees'

13  committee for certain limited purposes as set forth in

14  paragraphs 9 through 12 of that order.  Included in that order

15  was a provision in paragraph 11 that the retirees' committee

16  would file a report on March 6th setting forth the results of

17  the retirees' committee's scope of work.  And to the extent

18  that the report asserts that there was sufficient and competent

19  evidence not presented at the prior hearing to establish

20  consistent with the Court's bench ruling and applicable that

21  salaried OPEB benefits have vested with respect to any eligible

22  salaried employee or group thereof -- retiree or group thereof,

23  the report shall set forth those contentions and the basis

24  therefor with specificity.

25        Today's hearing, Your Honor, under paragraph 12 of

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

5

1    that order, is being held to consider the retirees' committee's

2    report and the debtors' response to that report and including

3    whether any salaried benefits have vested with respect to any

4    eligible salaried employee or group thereof as identified in

5    the retirees' committee's report.

6          And, Your Honor, as I have indicated, the retirees

7    did file a report -- the retirees' committee did file a report

8    and a series of exhibits in connection with that.  We filed --

9    and also filed a response.  In connection with the report, and

10   let me just -- I think probably the efficient way to do this is

11   just deal with the supplemental exhibits that the parties have

12   reviewed together for this hearing.  There are fourteen of

13   those exhibits, supplemental exhibits.  Included in that is the

14   report that was filed and some supplements to the report that

15   were filed by the retirees' committee.

16          The debtors have objected on hearsay grounds to the

17   documents in Exhibits A through G of the retirees' committee

18   report which is proposed Supplemental Exhibit 2.  These

19   exhibits consist of benefit books and plan communications from

20   General Motors or Frigidaire or third party administrators to

21   retirees.  In settlement of that objection, the debtors and the

22   committee have agreed that these documents are properly

23   admissible to show that the communications existed and were

24   sent to certain retirees by General Motors or Frigidaire or

25   third party administrators.  And that settles that objection.

6

1          There are fourteen supplemental exhibits in total to

2    which, I think, there is no objection for their admission.

3    That includes -- and I'll just run through them because we're

4    going to be dealing with them in argument today, I believe.

5    Number one is the provisional order that Your Honor entered at

6    docket number 16380.  Number 2 is the supplement and report in

7    connection with the retirees' committee.  And that is at docket

8    number 16430.  Number 3 is the debtors' response at docket

9    number 16446.  Supplement Exhibit 4 is the U.S. matters --

10   Employees Matters Agreement between General Motors and Delphi

11   dated December 22, 1998.  Exhibit number 5 -- Supplemental

12   Exhibit number 5 is the letter from Delphi Corporation that was

13   sent to Delphi Health and Life program participants on February

14   26th, 2009.  This is the letter that, Your Honor, we indicated

15   at the last hearing we would send.  Supplemental Exhibit number

16   6 is the posting that Delphi Corporation made on its official

17   site for these cases at www.delphidocket.com.  Supplemental

18   Exhibit number 7 is the request the retirees' committee made

19   for production of documents that was received on February 27th.

20   And our response is Supplemental Exhibit number 8.  Our

21   response was presented on March 3rd.  And we have, as Exhibit

22   number 9, the proposed form of salaried OPEB termination order

23   that we've submitted to the Court and the parties.  This is not

24   a consent order; this is the debtors' proposed form of order.

25   When we get to that part of the hearing, Your Honor, I would

7

1    indicate that we also have an additional paragraph regarding

2    claims issues that we've reviewed with the creditors'

3    committee's counsel which I'll address at that point in time.

4    But that's a carryover from the prior hearing.

5            Exhibit numbers 10 and 11 are certain provisions from

6    the plans having to do with the vested companies and the plan

7    acting as a substitute for COBRA and the effect of someone

8    electing COBRA in connection with the plan provisions.  And

9    Exhibits 12 and 13 are portions of the Internal Revenue Code,

10   one dealing with the so-called lifetime COBRA coverage, which

11   is Exhibit 12.  And Exhibit 13 is the relevant portions of the

12   Internal Revenue Code as they were amended by the stimulus bill

13   passed by the current Congress last month which provided

14   certain additional paths and coverages to health care tax

15   credits that are now effective over the last thirty days and

16   which were filed subsequent to the debtors' filing their

17   motion.

18           And finally, Exhibit 14 is an IRS private letter

19   ruling that was referred to in the prior hearing dated April

20   22, 2004.

21           Those are the supplemental exhibits, Your Honor, for

22   today's hearing, 1 through 14.  I'd move their admission.

23           THE COURT:  Okay.  Was that a correct summary?

24           MR. CORNELL:  Yes, Your Honor.

25           THE COURT:  All right.  So they're admitted.

8

1   (Debtors' Supplemental Exhibits 1 through 14 were hereby

2   received into evidence as of this date.)

3          MR. BUTLER:  Your Honor, I think probably the

4   appropriate thing to do now, depending on what Your Honor's

5   preferences are, would be to turn to the retirees' committee

6   and have them present their report.  That's the primary purpose

7   of the hearing.

8          THE COURT:  Okay.

9          MR. CORNELL:  Good morning, Your Honor.  Trent

10  Cornell on behalf of the retiree committee.  As Mr. Butler set

11  out on March 6th, 2009, we did file a supplemental report.  We

12  are still getting information in but in the time period

13  allotted, we did get some new documentation which has been

14  presented to the report and has been tendered into evidence

15  pursuant to the agreement with Skadden Arps.

16         Your Honor, when we had appeared last time, the

17  debtors had accused us of cherry picking documents.  We

18  responded that we really didn't have a lot of documents at that

19  point.  Well, now we've actually come to some conclusions as to

20  plans and what GM was telling people for a period of time.  And

21  what we've established is that from 1974 through 1985, GM

22  promised lifetime benefits at GM's cost without reservation.

23         Those benefits vested in part during that eleven-year

24  period because part of the issue in the '74 document was that

25  there was vesting upon ten years of participation or service.

9

1          One of the issues, Your Honor, that you had raised

2     last time is whether Second Circuit law would apply or whether

3     Your Honor should apply the Sixth Circuit law of the Sprague

4     case.  And, of course, the debtors are now responding saying

5     there's a res judicata issue as well.  We have gone through the

6     cases that show that, first off, it is Second Circuit law that

7     applies and, in fact, the debtor agrees with that.

8          THE COURT:  Yeah.  I agree with that, too.

9          MR. CORNELL:  And the next issue then is, under the

10    Second Circuit law, is there vesting.  And we've cited the

11    Devlin case; we've cited the Pfeiffer case, cases that we had

12    cited previously.  But now we went through and there's a

13    comparison of the language from Devlin to the language that we

14    have in the '74, the 1980, 1985 summary plan descriptions that

15    were tendered to all of the GM employees.  We also have other

16    documents that were sent on an annual basis, again, promising

17    lifetime benefits at GM's cost without reservation.  So at that

18    time period, we have vesting.  It's not sort of vested.  They

19    were vested.  The only issue that the debtors have responded

20    with, of course, is Sprague.  And look at Sprague and there's

21    res judicata.  Well, Sprague is a Sixth Circuit case.  They're

22    talking also about a virtual representative and I'm not sure

23    that that actually even works after the decision that came down

24    from the Supreme Court in Taylor v. Sturgell.  It can be found

25    at 128 Supreme Court 2161 (2008).

10

1          But the real meat of the issue is does Sprague apply.

2     And, Your Honor, Sprague can't apply because we are in the

3     Second Circuit and we're looking at Second Circuit law because

4     the debtors chose to file this case in the Second Circuit.

5          THE COURT:  But I think there are a couple of

6     different issues there, aren't there?  Ultimately, it seems to

7     me now and it seemed to me at the last hearing that while there

8     is language in the Second Circuit cases, starting with

9     Wingspread, that suggest that the Second Circuit on this issue,

10    and I'm leaving aside the promissory estoppel issue that was

11    also addressed in Sprague 'cause I think there is a legitimate

12    standard difference there, but on this issue as actually

13    applied, I don't really see where the Sixth Circuit took an

14    approach that was different than the Second Circuit.

15         MR. CORNELL:  Well --

16         THE COURT:  The Sixth Circuit did quote from Wise v.

17    El Paso Natural Gas that the intent to vest must be found in

18    the plan documents and must be stated in clear and expressed

19    language.  And that is a different phrase than, for example,

20    the Second Circuit in Bouboulis where the standard that we have

21    adopted is whether the plan documents contain specific written

22    language that is reasonably susceptible to interpretation as a

23    promise to vest the benefits although, I guess, the devil is in

24    the details because, frankly, when you look at Bouboulis, one

25    could argue that the language there was ambiguous but it wasn't

11

1    sufficiently specific so that it was reasonably susceptible to

2    interpretation as a promise.

3            But in Sprague, the Second Circuit then went on -- I

4    mean, the Sixth Circuit then went on to say we see no ambiguity

5    and, in fact, was chastised for that by the dissent or Judge

6    Martin said clearly not only was there no ambiguity but there

7    was actual clear language.  So it seemed to me that as far as

8    applying different standards as a fact -- if you read the

9    opinions, they really are applying the same standard.  They're

10   basically saying there was nothing ambiguous, no one was

11   misled, there's nothing ambiguous.  You may agree with Judge

12   Martin, and maybe if one were writing on a clean slate, one

13   might agree with Judge Martin, but the Sixth Circuit ruled.

14   And I find it very hard for me when there's no difference in

15   the standard to say oh, the Sixth Circuit was wrong.  Not that

16   they applied a different standard.  I think I could do that.

17   And that's why I focused on the promissory estoppel point

18   because I think there is a slightly different approach there.

19   More than slightly.  There's a different approach there than

20   the Second Circuit has taken on promissory estoppel, although

21   the Second Circuit is tough on promissory estoppel, because the

22   Sixth Circuit is less willing to look outside the plan

23   documents.

24           But I don't see them -- since their focus -- since

25   they say there's no ambiguity and since Judge Martin very

12

1    clearly pointed out what was wrong with their analysis

2    according to him, I don't see how I can say that they didn't

3    apply essentially the same standard and overruled them.

4           MR. CORNELL:  We're --

5           THE COURT:  I don't see how I can do that.

6           MR. CORNELL:  We're assuming -- first off, the

7    citation at Wise is interesting.  Wise was also cited in

8    Devlin --

9           THE COURT:  I understand.

10          MR. CORNELL:  -- and the Second Circuit said we don't

11   apply that standard.

12          THE COURT:  I understand.  It said there's a circuit

13   split; we don't apply it.  But then, the Sixth Circuit went on

14   to say that this language was not even ambiguous.

15          MR. CORNELL:  Under their definition of ambiguity --

16          THE COURT:  Well, no.  Everyone knows what ambiguity

17   is.

18          MR. CORNELL:  -- that it's clear and convincing.

19          THE COURT:  I don't view it that way.  I think that

20   when you look at the dissent and you look at the opinion, the

21   Sixth Circuit concluded that the promises to the salaried

22   employees were clear in excluding the benefits.  Now, Judge

23   Martin disagreed with that but they didn't disagree on the type

24   of standard to apply.  They disagreed on the reading of the

25   facts, on the record, the documentary record, which they were

13

1    free to examine.

2           MR. CORNELL:  But, of course, they're reading those

3    facts under the law that they're applying.

4           THE COURT:  They're not --

5           MR. CORNELL:  If we look at the --

6           THE COURT:  I don't -- I guess I just don't see that.

7    I don't see them saying that it's unambiguous under the law

8    we're planning.  They go far beyond that.

9           MR. CORNELL:  Well, I don't think --

10          THE COURT:  And one may look at this from the outside

11   and say, in reading the facts, Judge Martin was right and the

12   majority was wrong.  But I'm not going to do that.  I'm not

13   going to overrule the Sixth Circuit on that point when I

14   believe they're applying the same standard.  And that's

15   particularly in a situation where, in Bouboulis, the Court said

16   that even if the Hall letter binds the defendants, it contains

17   no language that affirmatively operates to create a promise to

18   vest benefits notwithstanding the fact that it said that your

19   spouse will have benefits for the remainder of his or her

20   lifetime.

21          MR. CORNELL:  That's right.  It said that there was

22   not retiree benefits.  If you look further in Bouboulis, it

23   talks about the benefits for the surviving spouse.  The issue

24   is the retiree benefits.  That is a separate issue from what

25   we're talking about here.  If we look at the language -- and

14

1    it's also not an issue of a letter.  These are summary plan

2    descriptions.  These are the official documents that are to be

3    relied upon and were relied upon.  That's the vesting standard.

4         THE COURT:  No.  But the Second Circuit said even if

5    the Hall letter binds the defendants.  So --

6         MR. CORNELL:  And the Hall letter was ambiguous at

7    best.  And it certainly didn't say that the retirees got

8    benefits.  It said their surviving spouses got benefits at best

9    which was the issue that was brought up in Bouboulis.

10        THE COURT:  You're right.  It was ambiguous at best

11   and the Sixth Circuit said "there is no ambiguity".  That's a

12   quote:  "There is no ambiguity here."  That's on -- "we have

13   rejected this argument in the past and we reject it again now.

14   We see no ambiguity."

15        MR. CORNELL:  Because to see ambiguity in that

16   standard would be clear and convincing.  It's a matter of --

17        THE COURT:  I don't think they were applying --

18        MR. CORNELL:  -- whether we're going to apply the --

19        THE COURT:  I don't think they were applying the

20   language that close.  I just don't.

21        MR. CORNELL:  I don't think they probably were either

22   because they weren't looking at it from the issues that we're

23   looking at it.  They were applying the law of their circuit.

24   The question is whether this Court is going to apply the law of

25   the Second Circuit.

15

1      THE COURT:  Okay.  You're not going to convince me of

2  that.  You didn't convince me last week.  You're not going to -

3  - or last hearing.  You're not going to convince me of that

4  now.  I considered that point and I just don't see it.  There

5  is a difference, I believe, between the Sprague case standard,

6  the standard they actually applied, and the Second Circuit

7  standard on promissory estoppel.  But I haven't seen in this

8  new batch of evidence enough to satisfy the Second Circuit's

9  promissory estoppel standard.

10     MR. CORNELL:  And that's partially a timing issue

11 because there's --

12     THE COURT:  No.  I understand.

13     MR. CORNELL:  -- documents continue to come in, of

14 course.

15     THE COURT:  Right.

16     MR. CORNELL:  And I appreciate the Court understands

17 that.

18     THE COURT:  Okay.

19     MR. CORNELL:  But there's another issue, too, then.

20 There's the Frigidaire summary plan description --

21     THE COURT:  Right.

22     MR. CORNELL:  -- that the best that I can tell wasn't

23 even considered in Sprague.  So we've got another subset of

24 retirees who are Delphi retirees now.

25     THE COURT:  Right.  And the debtors' response to that

16

1    is that the debtor didn't pick up the Frigidaire retirees.

2         MR. CORNELL:  And --

3         THE COURT:  Have you had a chance to -- I mean, I'm

4    going to ask Mr. Butler to take me through the assumption

5    agreements on that point.  But do you have a response to that?

6         MR. CORNELL:  Not at this point.  I got the documents

7    from one of the Delphi retirees who had been at Frigidaire.

8         THE COURT:  Right.

9         MR. CORNELL:  So that's how it came into our

10   possession.  So I guess the assumption would be, and this is

11   what the retiree has vetted out, that retired -- excuse me, was

12   at Frigidaire, then went back to GM, then became a Delphi

13   retiree.  Now, I don't know how many people fall into that

14   category.  But this is a separate issue than the overall

15   documentation that we have addressed.

16        THE COURT:  Right.  I understand that.

17        MR. CORNELL:  The other issue is there is another

18   division, American Axle, and we don't yet really understand

19   what happened there except that we were getting contacted by

20   retirees who said I never worked a day in my life at Delphi.

21   Why is Delphi terminating my benefits?  And in response, they

22   said -- the debtors gave them the master separation agreement.

23   It doesn't say anything about American Axle.  I can see yet --

24        THE COURT:  I need to have Mr. Butler walk me through

25   that, too, because I looked at -- I don't see any mention of

17

1    that company either.

2         MR. CORNELL:  Okay.

3         THE COURT:  But I guess the issue I have there and it

4    sounds to me that it's your issue, too, is it doesn't seem to

5    me that if GM is still on the hook for those benefits or

6    American Axle is, it wouldn't seem to me that Delphi's

7    modifying those benefits would affect third parties' liability

8    for them.

9         MR. CORNELL:  I guess it depends if those -- if the

10   GM obligations were transferred to Delphi.  And that's

11   certainly the understanding that we have.

12        THE COURT:  Right.

13        MR. CORNELL:  And if that's the case -- but again, I

14   can't really speculate on it because we haven't seen all the

15   documents yet.

16        THE COURT:  Okay.

17        MR. CORNELL:  But I would go back to the threshold

18   issue which is there is undisputably an eleven-year period that

19   these people were told that they had lifetime benefits at GM's

20   cost.

21        THE COURT:  But isn't that exactly what Judge Martin

22   said in his dissent?

23        MR. CORNELL:  It's one of the things that Judge

24   Martin said in his dissent, absolutely.

25        THE COURT:  And he --

18

1         MR. CORNELL:  The question is whether the majority

2    opinion was taken into account, that standard against the

3    standard that they had in the Sixth Circuit and whether that

4    would be different in the Second Circuit.  In the cases that I

5    see certainly indicate, every one of the cases, including

6    Bouboulis and more, that that type of language with that type

7    of a vesting requirement without utilizing without unilateral

8    termination reservation would absolutely vest benefits.  And,

9    in fact, if these people did work during that ten-year period,

10   they became vested.  It can't be taken away.

11        THE COURT:  Okay.

12        MR. CORNELL:  And I look --

13        THE COURT:  I guess where I disagree with you on that

14   is that it seems to me, first, that as actually applied in the

15   Sprague case and in the Bouboulis case, in Devlin, in

16   Wingspread and other cases, the standards are not that

17   different as Sprague applied them.  I think that under the

18   Second Circuit standard, you need something more than

19   ambiguity.  You need specific written language.  I'm not quite

20   sure what that means except they require it to be specific that

21   is reasonably susceptible to interpretation as a promise.

22        MR. CORNELL:  In the language that the Devlin court -

23   - one of the courts looked at --

24        THE COURT:  Well, I'm looking at the standard as

25   articulated by the Second Circuit in Devlin and requoted from

19

1    Devlin in Bouboulis.  And then even in Wellspring -- I'm sorry,

2    Wingspread -- but which first talks about a circuit split.  And

3    I think the underlying issue on the split is one that the

4    Seventh Circuit identified, and, actually, the First Circuit

5    has since identified as dealing one with presumptions and how

6    to deal with ambiguity and where does the burden fall,

7    etcetera.  And I don't see any discussion ultimately in Sprague

8    on burdens or presumption or the like on this.  The majority en

9    banc says this is not ambiguous.  There wasn't such a promise

10   here.  And they quote the language.  And Judge Martin quotes

11   the language.  But they still say it.  And you may think that

12   they were wrong and agree with Judge Martin on how they

13   analyzed that language but I don't think they're applying a

14   different standard.  They basically just say that wasn't the

15   case here.

16          MR. CORNELL:  But I guess the question then sitting

17   in the Second Circuit when we look at the language that's

18   cited, does that meet the standard under Devlin, Pfeiffer,

19   Bouboulis --

20          THE COURT:  But --

21          MR. CORNELL:  -- any of the cases?

22          THE COURT:  But if they apply the same analysis

23   ultimately and we're just talking about whether that

24   application was, as a factual matter in terms of reading the

25   documents, incorrect, who am I to reverse the Sixth Circuit?

20

1    Their find is the same type of analysis.

2         MR. CORNELL:  You're not reversing the Sixth Circuit.

3    You're addressing the issues that are before the Court today --

4         THE COURT:  Well --

5         MR. CORNELL:  -- for these people and the language

6    that's presented and the question of vesting.  It's not an

7    issue of overruling or going back to the Sixth Circuit.  It's

8    whether that case applies and binds this Court.  And I don't

9    believe it does because this Court would have to take an

10   independent analysis of what's before it now.  The language

11   that we put before you, respectfully --

12        THE COURT:  So I should just ignore what the Sixth

13   Circuit held a year or so before Delphi assumed the legal

14   responsibility of GM to these employees?

15        MR. CORNELL:  I think what you should do is look at

16   the language that's before the Court and apply the Second

17   Circuit standard to see whether or not it's vested.

18        THE COURT:  All right.

19        MR. CORNELL:  I look at it this way, Your Honor.  If

20   I, on my flight back to Chicago today, pull up my laptop --

21   active on the management committee of my law firm.  If I add

22   the exact type of language here, I promise benefits.  If for

23   every year for the next eleven years we reiterate that promise,

24   we benefit in our recruiting and our retention.  Can we do

25   that?  I don't see any of the Second Circuit cases that would

21

1    allow us to do that.  Yet, that's exactly what GM did and

2    that's what Delphi is benefiting from today.

3              THE COURT:  And it's exactly what Sprague said GM

4    could do notwithstanding a very clear dissent and on an

5    analysis of the documents and not relying on presumptions or a

6    doctrine that said I will ignore ambiguities or read out

7    ambiguities.  So I don't know what more we can say on this one.

8    We're just going to disagree about this.

9              MR. CORNELL:  Your Honor, the other issue is we were

10   to report on the health care coverage tax credit --

11             THE COURT:  Right.

12             MR. CORNELL:  -- and advise the Court that we

13   continue to negotiate with the debtors on those issues.

14             THE COURT:  Okay.  And I -- to me, reading the two

15   pleadings, that seems to be a fair summary of it.  I would take

16   the debtors at their word that they want to try to preserve

17   these benefits if they can.  And I guess the one issue I have

18   there is one I'll ask Mr. Butler but you can be thinking about

19   it, which is when you say you're working to try to preserve

20   these things, is there a commitment to do that beyond April

21   1st?

22             MR. CORNELL:  On behalf of the debtors?

23             THE COURT:  Yeah.  On behalf of the debtors.

24             MR. CORNELL:  I believe so.

25             THE COURT:  Okay.

22

1        MR. CORNELL:  Mr. Butler can clarify but that's

2    certainly been my interpretation of it.

3        THE COURT:  Okay.  I wasn't exactly sure of that but

4    I'll ask the debtors to confirm that.

5        MR. CORNELL:  Okay.  Thank you, Your Honor.

6        THE COURT:  Okay.

7    (Pause)

8        MR. BUTLER:  Excuse me one moment, Your Honor.

9    (Pause)

10       MR. BUTLER:  Your Honor, let me address, if I can,

11   the evidentiary matters and then I'll walk through the proposed

12   order and the health care tax credit issues separately.

13       THE COURT:  Okay.

14       MR. BUTLER:  But let me deal with the evidence first.

15   It's the debtors' view, Your Honor, and position, that the

16   retirees' committee did not submit any evidence today that

17   would suggest that or lead to the conclusion based on the

18   standard that Your Honor included in the prior order that would

19   establish that salaried OPEB benefits had vested with respect

20   to any eligible salaried retiree or group thereof.  What's

21   clear from the record here is that there is no additional

22   evidence with respect to Delphi documents.  There are

23   additional documents that have been submitted from the 1974 to

24   1985 period that Your Honor has dealt with previously in oral

25   argument and at the prior hearing.  And even as the Sprague

23

1   case had indicated in its factual findings, there were those

2   documents, those plans had the waivers in and out of them from

3   the early '70s through the late '80s and then they consistently

4   stayed in after the '80s.  So that is what it is.  We've argued

5   that and Your Honor has indicated the Court's view on that

6   subject.

7          There's nothing with respect to Delphi.  There's

8   also, I think important to say, no evidence submitted by the

9   retirees committee that would support the suggestion made in

10  the prior record that somehow people who were disabled were

11  treated differently or specially or there were promises made or

12  any other allegations made on the record about a disabled

13  class.  That was one of the classes that was -- or groups that

14  was identified at the prior hearing.  And the reason nothing

15  was submitted by the retirees' committee is because, as Delphi

16  indicated at the prior hearing, there is no different plan for

17  disabled parties.  They participate in the plans that have the

18  same reservations that everybody else does.

19         In addition, Your Honor, I think that Delphi has done

20  everything that it could do to assist in adducing additional

21  information with respect to this subject that was the subject

22  of the hearing today.  And Supplemental Exhibit 5 shows that on

23  February 26th, we sent out a letter to all of our retirees.  It

24  was a letter Delphi drafted and the content of that letter

25  except for the last sentence of it was Delphi's drafting and

24

1    thought process in which we wanted to make clear to the

2    retirees, among other things, that they should submit the

3    information back in the information package and it would not,

4    for example, to the extent they had objected, affect their

5    appellate rights with respect to the matter.  We put that

6    savings language in to try to encourage people to make sure

7    that they filled out the information and returned it.  And we

8    also pointed out that a retirees' committee had been appointed

9    and that we would post the names on delphidocket.com and that

10   to the extent they believed anyone receiving the letter -- and

11   we sent it to every retiree -- believed they had any evidence

12   that the OPED benefits that they were receiving were vested or

13   contractual benefits, they should contact the retirees'

14   committee.  We sent that notice to everybody; it's set forth in

15   Supplemental Exhibit 5.  And then we posted a lengthy notice,

16   which is reproduced in Supplemental Exhibit 6, that includes

17   the names of the -- the appointment of the retirees' committee

18   with links to the names of the people on the committee, with

19   links to the February 26th letter, Supplemental Exhibit 5, and

20   then contains, as set forth in Supplemental Exhibit 6, again, a

21   request for any retiree, including any employee receiving

22   disability benefits, that have documents in their possession

23   from Delphi or General Motors that include language stating or

24   implying that health insurance or life insurance were vested or

25   lifetime, immediately forward them.

25

1          And so, we made, in addition to the motion that was

2    filed earlier that was served on every single retiree, there

3    were the subsequent communications by the company drafted at

4    the company's own behest not at anyone's own direction or at

5    the -- or as part of negotiation as the company, as we

6    indicated, Your Honor, at the prior hearing, the company is as

7    interested in anybody else in having the truth of this issue

8    determined by this Court.  If, in fact, there are vested

9    benefits, we should all recognize that.  I think Your Honor

10   pointed out to me, I acknowledged the point at the last

11   hearing, that you wanted to have a supplemental hearing and

12   take some additional time because if there was an obvious

13   mistake here, you didn't want the Court or the debtors to make

14   it.  And we had that point and we agree with it and we've

15   solicited.  The fact is that Delphi documents are, as the Court

16   has pointed -- the Delphi documents are entirely unambiguous.

17   Sprague says the GM documents are ambiguous.  But clearly, the

18   Delphi documents are completely unambiguous.  And there's no

19   sustainable allegation that any Delphi document created a

20   promise of any kind under Second Circuit law.

21          So, we've gone forward and we've done that.  And the

22   only -- that leaves only two subgroups that have been

23   potentially raised by the retiree committee.  First, Your

24   Honor, they have suggested that responsibility for certain

25   retirees of GM's former Frigidaire division which was divested

26

1    by General Motors thirty years ago in 1979 was transferred to

2    Delphi through a "mechanism".  That "is not yet apparent" at

3    page 28 of the report.  Just to say it, Your Honor, and I have

4    company representatives here who will affirm it, Delphi never

5    assumed responsibility from GM's former Frigidaire division and

6    the committee offers no evidence regarding that assertion.  And

7    the company will confirm, Your Honor, for you on the record --

8    Mr. Smith is here, Mr. Gebbia is back -- that there is no

9    Frigidaire retiree that's currently in our plans.  They were

10   just never -- they never came over to the company.  Frigidaire

11   employees -- people that retired from Frigidaire are someplace

12   else, whether they're at GM or where they are, I don't know,

13   but they are not at Delphi.

14        THE COURT:  And in the master separation agreement

15   and the U.S. Employee Matters Agreement, how does one see that

16   they're not included?  Or are you relying on other evidence --

17        MR. BUTLER:  Well --

18        THE COURT:  -- on this?

19        MR. BUTLER:  -- Your Honor, first, there's an

20   assertion from some of them that they are included.  I mean,

21   you need to have somebody show up and say I'm included.  I can

22   tell you, and you can ask Mr. Gebbia, there is -- we know in

23   terms of divested units, the company has a headcount of

24   approximately 565 people of the 6000 plus retirees.  You know,

25   we have a headcount of how many retirees in the plan are from

27

1    those divested units.  So, for example, we know there's

2    approximately 184 from the American Axle, and I'll deal with

3    American Axle in a few minutes.  And there are some from the

4    Delco Remedy divestiture and from the EDS divestiture and from

5    The Guide divestiture and from the Hughes Electronics

6    divestiture.  And there are some from the Inteva divestiture

7    Your Honor approved recently.  There are -- which is implicated

8    here.  We have headcounts, we track them, we know who's in

9    them.  There aren't any Frigidaire employees.  Now, the way,

10   you would, I think, track -- deal with it legally is that

11   Frigidaire was spun off, as I said, thirty years ago.  The

12   automotive component group, which was at General Motors, the

13   predecessor to Delphi Automotive Systems, wasn't even in

14   existence at the time that Frigidaire was spun off thirty years

15   ago.  The employee matters agreement gives Delphi obligations

16   for employees whose last employment in GM was in a group of

17   companies that was with Delphi or a Delphi business unit.  If

18   you look at Supplemental Exhibit -- I believe it's number 4,

19   and at the definition, paragraph 1(c) of that document, you'll

20   see the definition.

21        Frigidaire was never a Delphi business unit.  And the

22   retirees' committee can't contradict that.  I mean, that's just

23   a fact.  And its divestiture predated all of this.

24        THE COURT:  Okay.

25        MR. BUTLER:  And, you know, I presume that the

1    Frigidaire employees are wherever they are.  They're just not

2    with us.  And we know that under this agreement and we know

3    that as a matter of fact.  And Mr. Gebbia can confirm that on

4    the record, Your Honor, if you want to ask him.

5           THE COURT:  Okay.  Is he potentially a witness on the

6    second point, too?

7           MR. BUTLER:  I can go through the second point.  I

8    don't know how much evidence is needed.

9           THE COURT:  Well, I just want to know.  Counsel for

10   the committee may want to cross-examine him and I don't want

11   to --

12          MR. BUTLER:  Okay.

13          THE COURT:  -- put him on twice --

14          MR. BUTLER:  Okay.

15          THE COURT:  -- if he's a witness on both points.

16          MR. BUTLER:  Well, let me go through -- I mean, all

17   I'm just saying is I don't that we're required to put evidence

18   on, Your Honor.

19          THE COURT:  Well, contrary to the assertion in the

20   report, I did not in my ruling and I hope I perhaps made this a

21   little clearer in my modified bench ruling that I had filed

22   yesterday -- did not put a kind of summary judgment burden on

23   the claimants.  I actually put a heavy burden on the debtor

24   akin to a summary judgment type of burden to show that there

25   weren't any vested rights.  So I think that while I recognize

29

1    that the report doesn't give a source for any legal liability

2    of Delphi to retirees of Frigidaire, I think the debtors need

3    to -- given the fact that it's been raised as a possibility,

4    need to show me as you've been doing for the last ten minutes

5    that, in fact, Frigidaire wasn't picked up.

6           MR. BUTLER:  I would --

7           THE COURT:  Frigidaire retirees weren't picked up

8    because it was divested in '79 or wasn't separately addressed

9    in these documents.

10          MR. BUTLER:  Okay.  And I'm happy to do whatever the

11   Court wants and meet whatever burden the Court wants.  It's

12   hard to prove a negative.  It's a completely unsubstantiated

13   allegation.

14          THE COURT:  Well, I mean, someone can say that

15   they're not in our plan and they left in '79 and it's not

16   covered by the documents then, you know --

17          MR. BUTLER:  Right.

18          THE COURT:  But that is a proffer of testimony and at

19   least it's the first point.  And I do think that the committee

20   should have the right to cross-examine him on that.

21          MR. BUTLER:  Okay.  Your Honor, let me now then go to

22   American Axle.  The allegation is that when American Axle was

23   divested -- and again, let me just get to the right place.

24   This deals with -- American Axle was dealt with beginning, I

25   think, on page 28 of the report.  And this was a divestiture by

30

1    GM prior to the Delphi spin.  It was a divestiture in 1994.

2    And there is here, unlike with Frigidaire -- there are 184

3    American Axle retirees that are covered by the terms of the

4    Delphi plans.  And again, one can look at the master separation

5    agreement for guidance on this.  And I will -- let me just get

6    my --

7            If you look at -- I think it's, Your Honor, paragraph

8    6 on page 9 of the employee matters --

9            THE COURT:  The employee matters or master --

10           MR. BUTLER:  This is Supplemental Exhibit 4 --

11           THE COURT:  Okay.

12           MR. BUTLER:  -- employees matter agreement.  And this

13   is Supplemental Exhibit number 4.

14           THE COURT:  Paragraph 6 in the employee matters?

15           MR. BUTLER:  Correct.

16           THE COURT:  Okay.

17           MR. BUTLER:  And you can see here that what this says

18   is -- and I'll just -- I'm not going to read the entire

19   paragraph, Your Honor.  It's in the record.  But this talks

20   about the employee -- we'll establish certain employee benefit

21   plans.  Those plans will have terms substantially identical to

22   the GM plans.  And we'll provide service for prior GM service

23   except as otherwise provided.  And that we will assume the

24   liabilities with respect to the Delphi employees under such

25   plans except as provided in Section 3(a) hereof which incurred

31

1    prior to or after the date.

2            Now, paragraph 3(a) on page 2 says that for employees

3    who are or become Delphi employees or Delphi terminated

4    employees as of the effective time, Delphi and/or Delphi

5    benefit plan shall assume those employee-related obligations or

6    liabilities of GM regardless of when incurred except as

7    expressly stated.  And then there's our certain limited

8    exceptions.  And we wouldn't argue those limited exceptions

9    apply to American Axle for purposes of the assumption.

10           THE COURT:  But how would they be Delphi employees or

11   Delphi terminated employees since they wouldn't be active in -

12   they certainly weren't active employees.

13           MR. BUTLER:  Because if you look at what a Delphi

14   terminated employee is --

15           THE COURT:  Right.

16           MR. BUTLER:  -- it is -- this is 1(c) again.

17           THE COURT:  Right.

18           MR. BUTLER:  "Delphi's terminated employee is an

19   individual who is not currently a Delphi employee but whose

20   last employment in the GM control group of corporations --

21           THE COURT:  Oh, okay.

22           MR. BUTLER:  -- was with Delphi, Delphi business

23   unit -- or Delphi business unit.  So you have this legal

24   fiction -- I mean --

25           THE COURT:  And the Delphi business unit was where

32

1   they were last employed?

2           MR. BUTLER:   Correct.   And that was the one that was

3   spun off in 1994.   So the American Axle employee was never a

4   Delphi employee in the sense they never had a badge that said

5   I'm Delphi.

6           THE COURT:   Right.   But they were working in that

7   business unit.

8           MR. BUTLER:   They were working in 1994 in something

9   that was within the control group and that was subsumed within

10  this employee matters agreement --

11          THE COURT:   Okay.

12          MR. BUTLER:   -- subject to the expressed provisions

13  of the agreement --

14          THE COURT:   Contrary to the proffer of Mr. Gebbia's

15  testimony with regard to Frigidaire, those people weren't part

16  of the business unit.

17          MR. BUTLER:   Right because they were thirty years

18  earlier.   There was no business control -- Delphi business

19  group control group back then.

20          THE COURT:   Okay.

21          MR. BUTLER:   But it was subject to the employee

22  matters agreement.   And if you look at the employee matters

23  agreement in paragraph 6, the last -- or Section 6 on page 9,

24  the last sentence, "Except as provided and set forth in Section

25  12(c), nothing in this agreement shall prohibit Delphi from

33

1    amending, modifying or terminating Delphi employee benefit

2    plans and employee arrangements."  And so, the plans that were

3    established here are established subject to the key reservation

4    that's been at the heart of this agreement.  And the only

5    exception under 12(c) was a severance arrangement that was

6    through December 31, 1999.  It's not the material -- it's not

7    relevant to this discussion.

8            I have no idea -- well, that's not accurate.  It's

9    not for me to say what General Motors promised to American Axle

10   employees in 1994 in connection with their purchase agreement.

11   I've looked at it.  I mean, it seems to suggest that General

12   Motors, for itself, made certain commitments to those

13   employees.  But those commitments were never assumed by Delphi.

14   And as Your Honor pointed out earlier in argument, whatever

15   claims those 184 employees might have as it relates to General

16   Motors is between them and General Motors.  Delphi agreed --

17   and just to say it, from 1999, there were no -- in 1999 at the

18   time of the spin, there were no American Axle retirees

19   transferred to Delphi.  The ones that were transferred are the

20   ones who -- the people who transferred -- or the people who are

21   in our retiree plan now, the 184 people, are people who were

22   pre-1994 American Axle folks who retired from American Axle on

23   and after the effective date of the spin in 1999.  Those 184

24   people are in our plans.  They're in our plans subject to the

25   terms of our plans which include the right to terminate.  And

34

1    modify and just to make the point again, in 2005, Delphi

2    materially modified the terms of the plan as it related to all

3    of its participants including the 184 American Axle

4    participants where we eliminated medical and prescription drug

5    coverage from lifetime to instead expire at the time of

6    Medicare eligibility in the normal course.  And that was a 2005

7    modification that was a central part of our original hearing

8    which became effective in 2007.  It applied to everybody

9    including all the American Axle employees.  None of them took

10   issue, sued the company, took any action with respect to that

11   modification because American Axle employees understand that

12   from Delphi what they obtained are benefits that are subject to

13   modification or termination at the discretion of the company.

14   Just as the company made a modification in 2005, the company

15   now seeks authority to make the modification here in 2009, a

16   further modification.

17          And so, I can't comment on and it's not, frankly, my

18   business to comment on whether these 184 employees do or do not

19   have any additional rights vis-a-vis General Motors based on

20   the purchase and sale agreement in 1994.  What is absolutely

21   clear from the record is that Delphi has no obligation to them

22   beyond what was assumed in the employee matters agreement.  And

23   we had administered that obligation appropriately over the last

24   ten years.  And the course of conduct here between the American

25   Axle employees and the company is, I think, preclusive and

35

1   demonstrates that the company has previously maturely modified

2   these benefits and the coverages.

3           And there is, I think -- let me just look at one

4   other -- I would just point out, Your Honor, with this

5   Supplemental -- this is Supplemental Exhibit 11.  This is a

6   portion of the salaried health care program plan.  This was

7   originally attached as Exhibit 3 to the Gebbia declaration

8   which has already come into evidence, which was Exhibit 2 in

9   the original trial record.  We've excerpted the page from that

10  which is now Supplemental Exhibit, as I said, 11.  And if Your

11  Honor looks on page 43 and looks at Article 3, Section 5 and

12  looks at (b)(1), you'll see this is the divestiture paragraph

13  that deals with divested employees and the coverage in the plan

14  and makes it clear that employees are eligible to retire -- are

15  eligible to enroll for health care coverages subject to all

16  terms of the condition of the program, meaning Delphi's

17  program, then, in effect, when their employment at the

18  successor company ceases, this is essentially the door that

19  lets someone who was never a Delphi employee per se actually

20  come in to the Delphi plan.  It comes in through this

21  provision, this portal, if you will.  So, Your Honor, that's

22  the explanation with respect to the American Axle employees.

23           THE COURT:  Okay.  Why don't I let you finish up and

24  then give counsel for the committee an opportunity to cross, if

25  he wants to?

36

1          MR. BUTLER:  All right.  Your Honor, in terms of the

2     evidentiary record -- I'm going to talk about the form of the

3     order and the health care and other things -- that's, I think,

4     the only response we have.

5          THE COURT:  Oh, all right.

6          MR. BUTLER:  There was very -- I mean, there was

7     nothing else --

8          THE COURT:  So do you want to cross-examine Mr.

9     Gebbia on those proffers of his testimony about Frigidaire and

10    American Axle?

11         MR. CORNELL:  I would, Your Honor.  I'm not really

12    sure yet what we're seeing or hearing.  There wasn't a

13    declaration of his proffer from Mr. Gebbia with respect to this

14    issue.  So it's --

15         THE COURT:  No.  It's just --

16         MR. BUTLER:  This is rebuttal testimony.

17         THE COURT:  It was just a proffer with regard to

18    Frigidaire that it wouldn't fit within the definition in 3(a).

19         MR. CORNELL:  And at this point, I'm not sure what

20    would be beneficial in doing it but I could ask him a couple

21    questions, I suppose.

22         THE COURT:  Okay.

23         MR. BUTLER:  It actually, I think, would be Mr. Tom

24    Smith from our employee benefits who is also here as -- it's

25    what we want to present.

37

1          THE COURT:  Okay.  So could you come up, Mr. Smith?

2     Yeah.  Take a seat in that chair.

3          (Witness duly sworn)

4          THE COURT:  And it's Tom Smith?

5          THE WITNESS:  Thomas Smith.

6          THE COURT:  Okay.  Let me just ask.  You heard the

7     proffer of your testimony over the last ten minutes or so by

8     Mr. Butler.  If actually asked to testify under oath, would you

9     testify to those statements?

10          THE WITNESS:  Yes, Your Honor, I would.

11          THE COURT:  Okay.

12    CROSS-EXAMINATION

13    BY MR. CORNELL:

14    Q.   Mr. Smith, is it your testimony then that there are no

15    Frigidaire retirees within the Delphi retiree group?

16    A.   Yes.

17    Q.   And how do you know that -- what gives you that knowledge,

18    I guess?

19    A.   I've asked our administrator who keeps track of

20    retirements and where those retirements came from.

21    Q.   So what if it was someone who had, at the time of the

22    divestiture, left Frigidaire obviously, 'cause it was sold to

23    White, and then began work in another unit of GM?  How would

24    you know that person was a former Frigidaire retiree as opposed

25    the unwashed masses of GM employees that were taken on by

38

1    Delphi?

2    A.    We would not know if an individual worked for Frigidaire

3    at one point, came back to General Motors at another point and

4    then became an active employee of Delphi at the spin.  We would

5    not consider them a Frigidaire employee because they had worked

6    for Delphi.

7    Q.    So you don't know if there are people in the Delphi

8    retiree group that we're representing who actually have those

9    benefits or the promises made in the summary plan description

10   that we attached to the filing we made on March 6th of 2009, is

11   that correct?

12   A.    We do not know if there were specific people who worked

13   for Frigidaire back prior to 1979 that transferred over.  We do

14   not keep them separately.  So we don't know those people.  Just

15   like we wouldn't -- if a person worked for Ford prior to coming

16   to GM or to Delphi and then retired.  So it's the same -- same

17   principle here.  They were Delphi employees at the time that

18   they retired.  Consequently, we don't differentiate unlike

19   those people, as mentioned, who never worked for Delphi but

20   came in through the door of the employee matters agreement.

21   Those ones we track.

22   Q.    Okay.  So you don't know whether there are retirees in

23   this group that were given the summary plan description from

24   Frigidaire and then later became GM employees and Delphi

25   employees?

39

1    A.    I do not know whether or not there are people who used to

2    work for Frigidaire --

3    Q.    Okay.

4    A.    -- in our population.

5          MR. CORNELL:   Thank you.

6    REDIRECT EXAMINATION

7    BY MR. BUTLER:

8    Q.    Mr. Smith, do you know -- would you know if someone had

9    retired from Frigidaire whether they were in your population or

10   not?

11   A.    If they were terminated employees in that respect -- in

12   other words, if they never worked for Delphi and were

13   Frigidaire retirees, we would know that, yes.

14   Q.    All right.   So, like the American Axle employees, if they

15   retired from American Axle, retired from Frigidaire, you would

16   keep track of them?

17   A.    Yes, sir.

18   Q.    If they continued to work for General Motors not in the

19   Frigidaire unit and were in the GM programs and then came over

20   to Delphi, you would consider them, as you testified earlier,

21   GM or Delphi employees may be treated in the other ordinary

22   course?

23   A.    Yeah.   We would consider them Delphi retirees because they

24   worked for Delphi at the point in time that they retired, yes,

25   sir.

40

1    Q.   Thank you.

2              MR. BUTLER:  No further questions, Your Honor.

3              THE COURT:  Do you know whether Frigidaire was a

4    business or any part of it that was conducted as part of the

5    so-called Delphi Automotive Systems business or the Delphi

6    Automotive Systems sector of GM before the separation?

7              THE WITNESS:  I do not know the hierarchy or the

8    structure how that business got transferred or where.  No, I do

9    not.

10             THE COURT:  Okay.  All right.  Any more questions?

11             MR. CORNELL:  Nothing further, Your Honor.

12             THE COURT:  Okay.  You can sit down, sir.

13             MR. BUTLER:  Your Honor, Mr. Stipp, who's testified

14   for the company before knows the answer to the question Your

15   Honor just asked if you --

16             THE COURT:  All right.

17             MR. BUTLER:  And we're happy to provide him to the

18   Court so there's a complete record here.

19             THE COURT:  Okay.  Why don't you take a seat up here,

20   sir?

21      (Witness duly sworn)

22             THE COURT:  And could you spell your name for the

23   record?

24             THE WITNESS:  Keith, K-E-I-T-H, Stipp, S-T-I-P-P.

25             THE COURT:  And what is your title?

41

1          THE WITNESS:  I'm the executive director of

2     restructuring for Delphi.

3          THE COURT:  Okay.  And how long have you been an

4     employee of Delphi?

5          THE WITNESS:  Twenty-four years.

6          THE COURT:  So when I say Delphi, since Delphi was

7     actually spun off in 1999 --

8          THE WITNESS:  I worked for General Motors prior to --

9     for the twenty-four years, I worked for GM and Delphi.

10          THE COURT:  Okay.  All right.  In evidence in this

11     proceeding is a document called the employee -- U.S. Employee

12     Matters Agreement.  Are you familiar with that agreement

13     generally?

14          THE WITNESS:  In general.

15          THE COURT:  Okay.  There's a definition in the

16     agreement that says "Delphi business unit".  And it says

17     "Delphi business unit shall have the same meaning as Delphi

18     Automotive Systems business as defined in the master separation

19     agreement."  And "Delphi Automotives Systems business" as

20     defined in the separation agreement means the business

21     conducted by the Delphi Automotives System sector of GM at any

22     time on or before the contribution date.  Do you know whether

23     Frigidaire or any part of it was part of the Delphi Automotives

24     System sector of GM or the Delphi Automotives Systems business

25     before the separation?

1            THE WITNESS:  It was not.

2            THE COURT:  And what's the basis of your statement?

3            THE WITNESS:  The predecessor of Delphi within

4    General Motors was a unit called the Automotive Components

5    Group where units were brought together.  That was something

6    that occurred after I began with General Motors in 1984.

7    Frigidaire was gone in 1979.  So it was not part of that unit.

8    Did not exist at the time that was brought together --

9            THE COURT:  Okay.

10           THE WITNESS:  -- within GM.

11           THE COURT:  Do you want to question Mr. Stipp?

12           MR. CORNELL:  No, Your Honor.

13           THE COURT:  Okay.  Do you want to, Mr. Butler?  Okay.

14   You can step down, sir.  So then, I think you were going to

15   talk about the potential credit and --

16           MR. BUTLER:  Your Honor, and I think I can do that as

17   best as I can by walking through the proposed order that we're

18   asking the Court to consider.

19           THE COURT:  Okay.

20           MR. BUTLER:  And we have actually a supplement to

21   that order that I wanted to address.

22           THE COURT:  Okay.

23           MR. BUTLER:  And again, I would say, this order is

24   not a negotiated order or a consent order.  It's the debtors'

25   proposal as the order that should settle this final hearing.

43

1    And I'll just deal with the numbered paragraphs.

2            We believe, Your Honor, that based on the standard

3    Your Honor set that the evidence needed to be consistent with

4    the Court's prior bench ruling and applicable law.  We believe

5    the retirees' committee has not presented any competent

6    evidence to establish that salaried OPEB benefits have vested

7    with respect to any eligible salaried retiree or group thereof.

8    Accordingly, we'd ask Your Honor to rule as to paragraph number

9    1.

10            Paragraph number 2 would then be the finding that

11   OPEB benefits have not vested and the debtors have reserved the

12   right to modify or terminate them.

13            Paragraph 3 would authorize but not direct the

14   debtors to terminate the OPEB benefits as provided in this

15   motion.  And while it uses the word "terminate", the reason it

16   says is provided in the motion.  It's really taking the actions

17   that are set forth earlier in the order in subparagraphs A

18   through F which are spelled out as to what those actions are

19   and also in the motion.

20            The paragraph 4 asks the Court to reach the legal

21   conclusion that is supported by Supplemental Exhibit number 12

22   that the debtors' termination of their contribution does not

23   constitute a qualifying event under 29 U.S.C. 1163.  That is

24   that there is no lifetime COBRA coverage here.  That is an

25   issue that was raised by the retirees' committee in their

44

1    report and rebutted by the debtors in our response.  And --

2         THE COURT:  Why do we need that?  This wasn't

3    something that was sought as part of the original motion.  I

4    mean, is this really --

5         MR. BUTLER:  Well, Your Honor, the question -- this

6    is all dealing with -- the whole issue of the health care --

7    there's a number of things that I'm about to describe here that

8    are -- to implement -- these are implementation matters

9    associated with the --

10        THE COURT:  Okay.

11        MR. BUTLER:  -- order.  And the reason that we're

12   asking for that finding is, number one, the retirees' committee

13   has clouded the record through that assertion.  They have

14   basically said in their report don't grant the motion because

15   there is lifetime COBRA here.  Their assertion is that we can't

16   do what we want to do in the motion because of lifetime COBRA.

17   And their assertion is that this act of ours is authorized by

18   the Court would not, in fact, relieve the debtors of liability

19   or responsibility which we argue has been an -- liability all

20   along but instead would impose additional economic burdens on

21   the estate.  And our view of that as raised by the retirees'

22   committee which we think we have conclusively rebutted is set

23   forth in the statute.  And if --

24        THE COURT:  And you're relying on the one-year --

25        MR. BUTLER:  I'm relying on the twenty-four month

45

1    window.  I mean, if you look at the reg -- we've provided both

2    the statute and the regs, and they're clear on that point,

3    there's a twenty-four month window, and the retirees' committee

4    hasn't asserted any precedent to the contrary.  But that

5    doesn't end the health care tax credit analysis by the company,

6    because, in fact, what we have done is spent a significant

7    amount of time, as I promised the Court we would do, evaluating

8    what options might be to preserve this health care tax credit

9    to the extent it might otherwise be deemed to be applicable.

10           And the fact is that while the avenue of a lifetime

11   COBRA event is not available to the retirees here, because this

12   was not terminated within the statutory window, there are two

13   other avenues, one that would provide coverage only for a small

14   subset of parties, that would be retirees who've retired within

15   the last eighteen months who received COBRA notices in

16   connection with their retirement, and it would provide some

17   limited protection to them in the event there was a triggering

18   event under the statute.  But that provides relatively limited

19   coverage to a subset, and it also has a fairly limited window,

20   because it's only for the window of their COBRA period, which

21   is generally eighteen months from the time of the separation.

22   And so that window started running for many of them months ago

23   and would provide very little additional coverage.

24           What we have discovered in these discussions and

25   which obviously wasn't apparent at the time we filed our motion

46

1    because Congress hadn't passed it yet, is the fact -- and we

2    have included this in the record as Supplemental Exhibit number

3    13.  It turns out that Congress, when they passed the stimulus

4    bill last month, actually amended this provision of the

5    Bankruptcy Code and provided that debtors in a Chapter 11

6    case -- if the debtors implemented a voluntary employee

7    beneficiaries association under 26 U.S.C. Section 501(c)(9)

8    that as long as the debtors did that in connection with an

9    order of the bankruptcy court in their Chapter 11 case, that

10   provided a separate avenue for the health care tax credit which

11   would provide not a sixty-five percent coverage but an eighty

12   percent tax credit.  And that would run through December 31,

13   2010.

14        That expires currently under the legislation, as it

15   was adopted and enacted by the federal government through

16   December 31, 2010, unless it's subsequently extended by

17   Congress.  For that reason, even though there is no triggering

18   event now, and there may never be a triggering event, so this

19   may be entirely a pedestrian activity here, we believed that it

20   was prudent, and in fact important, that the Court authorize

21   and direct the debtors to make provisions for, as paragraph 5

22   of the proposed order says, and contingent upon the occurrence

23   of a triggering event, that had --

24        THE COURT:  The pension termination.

25        MR. BUTLER:  Which would be, if that occurs, that we

47

1    implement a VEBA which we asked Your Honor to find -- statutes

2    in front of Your Honor, I believe Your Honor can find,

3    qualifies covered employees who have retired or will retire for

4    the tax credit that's available through the American Recovery

5    and Reinvestment Act of 2009, subject to the windows that are

6    contained in there, obviously.  As Congress established them

7    with two key provisions, one, that debtors have no obligations

8    to fund or contribute to any such VEBA.  These contributions

9    would come solely from participants in the VEBA.  Said another

10   way, the debtors aren't prepared to incur financial

11   responsibility they do not have, but they are prepared to take

12   actions which we think we found a conduit here to do to

13   preserve this tax credit.  And also providing that we'd only be

14   required to maintain that VEBA through the later of the month

15   ending January 1, 2011 or such later date as may be provided by

16   any changes to 26 U.S.C. 35 and the subsection thereof, or any

17   substantially similar provision in the Internal Revenue Code as

18   that may be amended from time to time.

19           We think that actually, Your Honor, as a result of

20   the adoption by Congress, during the time this motion was

21   pending before the Court, as the Congress adopted Section

22   1899(g) of the American Recovery and Reinvestment Act of 2009,

23   provides an appropriate resolution of the health care tax

24   credit issue; particularly in light of the fact that it is

25   clearly, in the debtors' view, superior to the COBRA route

48

1   which would apply to only certain employees and would be much

2   more limited.

3           And oh, by the way, under the terms of our plan,

4   which is why we included the -- we included Supplemental

5   Exhibit number 10, which is -- on page 66 of the plan, which

6   just makes it clear that if there is a COBRA election that they

7   have to withdraw from our plans, they have to go find another

8   plan.  Because the continuation plan is an alternative to

9   COBRA.  So it only applies to a small group of people, and it

10  also means they have to go find another plan.  That COBRA path

11  is not, we think, conducive to the tax credit, preserving the

12  tax credit and maximizing it, this, based on Congress' actions

13  last month.

14          In fact, there will be the opportunity, we believe,

15  if Your Honor enters this order as we're proposing it, we will

16  have, I think, preserved an eighty percent tax credit for these

17  retirees, for the period through the time of the tax credit,

18  which ends currently, as I said, December 31 of 2010.

19          THE COURT:  And will there be a fairly plain English

20  notice to people about who would benefit from this and who

21  wouldn't and -- so they can --

22          MR. BUTLER:  Not only that, Your Honor.  Actually, if

23  you look to paragraph 7, we actually believe, and this is

24  something we're prepared -- this is coming at the debtors'

25  suggestion and at our expense -- we actually believe that

49

1   people who might not return the continuation elections by March

2   27th, as they're currently required to do under the authority

3   Your Honor has granted us if you make it final; because what

4   happens is if you don't return your election package and

5   authorize us to deduct contributions from the pensions, then

6   you actually come out of the plan on April 1st.

7          We've talked with the company, and in light of all

8   this, the company is asking Your Honor to include in this order

9   paragraph 7 which authorizes us to mail follow-up notice to

10  anyone who didn't make the election.  So we're actually going

11  to file what I'd call second chance notice to people saying you

12  did not participate.  Here's what happens to you if you don't

13  participate.  And oh, by the way, there is this tax credit out

14  here that's been preserved --

15          THE COURT:  For certain --

16          MR. BUTLER:  -- in this way.

17          THE COURT:  -- which would benefit certain classes of

18  people?

19          MR. BUTLER:  Right.  Well, it actually will

20  benefit -- I mean, as we read the statute, based -- I mean, the

21  Congress had lots of conditions in the code previously.  As we

22  read it, the only two conditions that are really necessary to

23  get this eighty percent tax credit is -- and we provided the

24  statute to the Court -- is that this Bankruptcy Court make a

25  finding that the VEBA is authorized to be and directed to be

50

1     established in the event a triggering event occurs.  Those two

2     things happen, you also have to be in PBGC pay status at the

3     time, but the retirees all would be in that situation.

4          So we actually believe that what we should be doing

5     here is we should send a plain English notice, as Your Honor

6     said, to -- we're going to send a plain English notice to all

7     our retirees explaining the results of this hearing as we send

8     them the order that Your Honor chooses to enter.  But more

9     importantly, we want to say to everybody who decides not to

10    participate, we want to give them another opportunity and say

11    is this what you really want to do?  Think about it.  And here

12    are the implications of it.  And oh, by the way, if they come

13    back and they make the election, we're asking Your Honor to

14    order here, and we believe in working with our carriers, that

15    if they respond by April 15th we will make the cove -- we will

16    reinstate the coverage retroactively to April 1st.  This, in

17    some respects, overrides the plan which doesn't provide for

18    retroactive reinstatement.  But we believe in this

19    circumstance -- limited circumstance -- that it's appropriate

20    to do so.

21         Your Honor, the other thing we've done here in

22    paragraph 8 of the proposed order is we have addressed the

23    issue of the retirees' committee, at least the debtors'

24    proposal to the Court in connection with this.  We don't

25    believe, Your Honor, when you appointed the retirees'

51

1    committee, intended the committee to continue to function

2    throughout the balance of this case.  They were appointed for a

3    limited purpose.  We'd ask Your Honor to find that the purposes

4    that they currently have been appointed for have been satisfied

5    and discharged.

6         But we also thought a great deal about this, and in

7    some respects people may think we're arguing against the

8    debtors' interest.  We don't believe so.  We think that this is

9    appropriate.  And we're proposing to Your Honor that in the

10   interest of justice, that the Court continue the existence of

11   the retirees' committee through a date that's the later of any

12   motion to stay these orders if Your Honor enters them and the

13   date on which the debtors implement the termination actions set

14   forth in this order.  So, said another way, the retirees'

15   committee would continue in existence until we actually

16   implement this order.  And when I say implement, I mean

17   implement the termination actions.

18        And their authority going forward would be limited to

19   participating in any hearing to stay the implementation of

20   these orders.  The debtors believe that if there is a stay

21   hearing, as one is currently scheduled here next Tuesday, on

22   the first order Your Honor entered, that was not filed by the

23   retirees' committee.  They weren't authorized to file appeals,

24   but were -- we believe that in any stay hearing here or in the

25   district court or any other court of competent jurisdiction,

52

1    the retirees' committee ought to be heard.  And we think that's

2    fair.

3            And similarly, Your Honor, we have put a provision in

4    here that would authorize them to meet and confer with us and

5    negotiate any implementation arrangements.  This is different

6    than the prior order where they'd be trying to modify the

7    order.  We're not talking about modifying the order.  We're

8    talking about negotiating any additional actions they would

9    like to negotiate with us regarding implementation of the

10   authority granted under these orders to us in exchange for

11   settling out any appeals.

12           So there provides, at least, an alternative dispute

13   resolution mechanism here which we may or may not be able to

14   make use of.  I don't know whether these actions, when the

15   retirees' committee has a chance to reflect on all of this,

16   will conclude that the affirmative actions taken unilaterally

17   by the debtors to preserve tax credits and take other things

18   are appropriate, or whether they desire to take other actions.

19   But at least it provides the opportunity for us to have that

20   discussion sanctioned by the Court.  And Your Honor would

21   retain jurisdiction to hear anything in connection with them

22   pertaining to this order, including any agreements that might

23   be reached between retirees' committee and the company.

24           The other provision that's not in here which, Your

25   Honor, we would propose to be a new paragraph 4, is to address

53

1    the issue Mr. Rosenberg and I spoke about before the Court,

2    with the Court, at the last hearing, and it dawned on me late

3    last night that we hadn't actually put anything in writing.

4    And I've shared it with counsel for the creditors' committee as

5    to what we would put in here.  And we propose to put a

6    paragraph in that says, "The debtor shall continue to provide

7    benefits for claims incurred by each eligible salaried employee

8    through the cessation date of such retiree's participation in

9    the applicable health care plan, provided that such retiree has

10   timely paid all requisite contributions for the applicable

11   health care plan; and provided further that such retiree shall

12   not be required to file proofs of claims in this Court to

13   implement the terms of this decretal paragraph."  So what that

14   says is they don't have to go through a claims process here.

15   You're ordering us to pay through the coverage dates with

16   respect to these parties, and we will continue to do that as we

17   have.

18            THE COURT:  Okay.

19            MR. BUTLER:  Which was Mr. Rosenberg's concern.  And

20   I think putting it in here and indicating that no one has to

21   file anything, should reduce any burden that a retiree might

22   think they otherwise have and provides that they can file -- if

23   the debtors don't do this, they can come to -- the Court's

24   retained jurisdiction, they can come to Your Honor pursuant to

25   your order to the Court here.

54

1           THE COURT:  Okay.

2           MR. BUTLER:  Which we think solves that issue.  So

3    these are our -- Your Honor, those are the debtors' proposals,

4    the proposed approach in how to implement these matters.  We

5    believe that, as I said earlier, the actions that were taken by

6    Congress last month provided a -- clarified a path for us to

7    address the health care tax coverage in an appropriate manner.

8           THE COURT:  Okay.  Well, let me ask you a question.

9    ON the 29 U.S.C. 1163 point --

10          MR. BUTLER:  Right.

11          THE COURT:  -- is it the debtors' position that the

12   granting of this motion would not constitute a loss of coverage

13   but would rather be a substantial elimination?  It wouldn't be

14   a total loss?

15          MR. BUTLER:  Your Honor, actually the way -- first of

16   all, there's not any loss of coverage here in terms of

17   coverage.  It's who pays for it.  But nonetheless, I think

18   people have -- the employer-paid portion of it is, I think,

19   what people view as substantial loss of coverage.  It's the

20   company's view here that particularly as one reads the regs and

21   reads the statute itself, that there is no difference from

22   Congress' intention with respect to, in a bankruptcy

23   proceeding, loss of coverage or substantial loss of coverage.

24   It is a twenty-four month period window, and that's how it has

25   been certainly set forth in the regs and set forth in the

55

1   statute.

2           In other words, I don't think the retirees' committee

3   can establish any precedent to suggest that outside of that

4   twenty-four month window, that they've been successful in any

5   other case in obtaining a determination that there was a

6   lifetime COBRA coverage.  It's just not what the statute says.

7           THE COURT:  Okay.

8           MR. CORNELL:  May I, Your Honor?

9           THE COURT:  Yes.

10          MR. CORNELL:  Your Honor, with respect to the order

11  itself, I'll just limit to that, we don't believe, nor do we

12  agree that paragraph 4 ought to be in this order.  It's not an

13  issue that right now has been fully vetted.  It may be right,

14  it may be wrong, but right now I don't think it has any place

15  in this particular order.

16          With respect to paragraph 8, I understand and

17  appreciate what's going on.  It is necessary for the committee

18  to maintain representation for the scope of what we're doing,

19  including the negotiation as we continue to move in that front.

20  We did bring up in our brief the American Recovery and

21  Reinvestment Act of 2009, and we are trying to move along those

22  lines and are actively negotiating with the debtors.  So I

23  think there's an appropriate level there.  I also don't know

24  how long it's going to take.  So to say that ends on April 1st

25  or whenever their termination is that they terminate, I don't

56

1    think it's exactly correct.  If the negotiations are ongoing

2    and there's a mutually beneficial way to maximize that tax

3    credit, I don't think we want to have a date certain.

4         And lastly, Your Honor, if this is the form of the

5    order that would be entered, we'd also like a certification

6    under 28 U.S.C. 158(d)(2)(a) to allow an immediate appeal to

7    the Second Circuit Court of Appeals, based on the importance of

8    this issue and the timing of the termination sought by the

9    debtors.  Thank you.

10        THE COURT:  Had you all discussed that last point?

11        MR. BUTLER:  I don't think they can do that.  That's

12   a post BAPCPA -- I don't think they can do that in this -- I

13   mean --

14        THE COURT:  Well, it is a BAPCPA change, I just don't

15   know whether it was deemed to be retroactive or not.

16        MR. BUTLER:  I don't think it was, Your Honor.  I'd

17   have to go back and look.

18        THE COURT:  Why don't you save that for Tuesday?

19        MR. CORNELL:  Yes, Your Honor.

20        THE COURT:  You can raise that Tuesday if, in fact,

21   BAPCPA goes back.  This case filed a few days before the --

22        MR. CORNELL:  Right.  My belief is that this would

23   apply, but we'll raise it on Tuesday.

24        THE COURT:  Okay.  And you all will have a chance to

25   discuss it too.  Maybe you want that, maybe you don't.  I don't

VERITEXT REPORTING COMPANY

57

1    know.

2          MR. BUTLER:  Your Honor, I would just point out in

3    connection with the argument here that the issue of whether our

4    actions created a qualifying event under 29 U.S.C. 1163 was

5    raised by the retirees' committee first by the objectors at the

6    original hearing and then by the retirees' committee in their

7    report.

8          THE COURT:  I think it was raised, and it's something

9    I considered.  And I believe that the debtors' view of the

10   statute and the regs is correct.  But I also think that it's

11   not something I should definitively rule on as if it were a

12   declaratory judgment in a 363(b) proceeding.  Part of my ruling

13   is premised upon my belief that you're correct, but I think

14   it's actually very similar to the Orion facts where the Second

15   Circuit said the Court can't be the guarantor of the logic of

16   the motion by actually ruling on something like this.  I'm not

17   even sure who the other side would be here.  It may be

18   retirees, it may be someone else, so.

19         MR. BUTLER:  Your Honor, the other point that I would

20   indicate here is -- and I think this is important, because this

21   may reflect a slightly different view between the committee and

22   us.  We believe that the committee's prior charge is completed

23   as of today's hearing.  There is nothing left to negotiate in

24   connection with the health care tax coverage, if Your Honor

25   this grants relief, which gives us the right to preserve it

58

1    under the terms of establishing this VEBA.  And similarly, we

2    don't believe the retirees -- while it was our suggestion the

3    retirees' committee continue to operate for a limited period of

4    time, it really is limited, in our view, to the suggested

5    authority here, which is a meet-and-confer authority and the

6    ability to appear at any stay hearing.  Your Honor didn't

7    appoint this committee for the purposes of appealing this

8    decision.  There are 1600 objectors that can do that.  And one

9    of them already has.  The Delphi Salaried Retirees Association,

10   which these counsel represent, or I think they do.

11          THE COURT:  No, I --

12          MR. BUTLER:  They're working together, so.

13          THE COURT:  -- I agree with that.  I made it clear in

14   my ruling that by appointing the committee, I wasn't precluding

15   appellate rights --

16          MR. BUTLER:  Right.

17          THE COURT:  -- of those serving on the committee, but

18   I didn't leave the committee out there forever.  On the other

19   hand, the stay issue may moot that point anyway, so we'll see

20   that then on Tuesday.

21          All right.  I issued an order provisionally approving

22   the debtors' motion for authority to terminate what they refer

23   to as OPEB benefits, employer-paid post retirement health

24   benefits and employer-paid post retirement life insurance

25   benefits for salaried employees on February 25, 2009.  That

59

1    order was provisional in that it contemplated the appointment

2    of a committee of retired employees under my discretionary

3    authority under Section 1114(d), for the limited purposes set

4    forth in that order.

5            The committee was, in fact, promptly appointed and I

6    believe discharged its duties in preparing and filing the

7    report that was contemplated by the order and participating in

8    this hearing with regard to two issues, the first being the

9    further development of the record in respect of whether

10   consistent with my bench ruling, there were any vested salaried

11   OPEB benefits or any evidence suggesting there were any vested

12   salaried OPEB benefits, notwithstanding the debtors' assertion

13   to the contrary and the state of the record at the February

14   hearing.

15           The second purpose was to continue to analyze and

16   discuss with the debtor the possibility of so structuring the

17   termination of OPEB so as to continue to preserve, if possible,

18   a right to any tax credit available, as described in certain of

19   the objections to the original motion.  With regard to the

20   latter point, I believe that such discussions occurred and were

21   productive, and the results of those discussions are properly

22   reflected in the proposed order submitted by the debtors.

23           But for the directive of the Second Circuit in the

24   Orion Pictures case, I would conclude in addition that the

25   termination of the debtors' contribution to the salaried OPEB

60

1    plans, given the time that has passed since the Chapter 11

2    petition date, well over two years in which those benefits were

3    in place, would take it out of the reach of a qualifying event

4    under 29 U.S.C. 1163.  My conclusion, as I said during oral

5    argument to that effect, was one of the factors leading me to

6    agree that the debtors' motion satisfied the business judgment

7    requirement of Section 363(b).  But I don't believe I can enter

8    a declaratory order.  And so that provision of the proposed

9    order will be deleted.

10          With regard to the first charge given to the retirees

11   committee, the retirees submitted a report that essentially

12   made three points.  The first is that notwithstanding the

13   Court's bench ruling after the February hearing, the debtors

14   have not clearly established that the GM plan documents

15   precluded vesting for roughly an eleven-year period from 1974

16   to 1985.  Secondly, the report contends that there may be some

17   responsibility for Delphi to maintain a salaried OPEB for

18   former employees of, and now retirees of, GM's Frigidaire

19   division, and that the basis for my conclusion on the first

20   point would be inapplicable to such employees because their

21   benefit rights vis-a-vis GM were not addressed in the Sixth

22   Circuit's en banc opinion in Sprague v. General Motors

23   Corporation, 133 F.3d 388 (6th Cir. 1998).

24          Finally, third, the committee contends that there is

25   at least some confusion as to the debtors' responsibility for

1    OPEB for another group of employees who were employees of

2    American Axle and Manufacturing Inc., which was spun off from

3    GM in 1994, before the separation of GM and Delphi.  With

4    respect to the first point, as I noted probably too much at

5    length during oral argument, I continue to believe that the

6    Sixth Circuit's Sprague decision is one in which the Sixth

7    Circuit at length determined en banc that there was no

8    ambiguity in respect of GM's reservation of rights to modify at

9    will its welfare plans, including for the period in question,

10   and that were I to conclude otherwise, I would not be doing so

11   by applying a different standard than that which is applied in

12   the Second Circuit under Bouboulis v. Transport Workers Union

13   of America, 442 F.3d. 55 (2nd Cir. 2006), namely that the plan

14   documents contain specific written language that is reasonably

15   susceptible to interpretation as a promise to vest benefits.

16   Language quoted from Devlin v. Empire Blue Cross and Blue

17   Shield 274 F.3d. 76, 84 (2nd Cir. 2001).  Instead, what I would

18   be doing would be, in essence, reversing the majority's

19   conclusion in the en banc Sprague opinion that there was no

20   ambiguity in the relevant documents, and that in fact, it was

21   clearly understood that GM had reserved the right to modify.

22          Based on that analysis of the record, which I believe

23   is one that is clearly pointed out as such by the dissent of

24   Chief Judge Martin in that case, I don't believe there's any

25   difference as far as how the Sprague court and the Second

62

1    Circuit would review the underlying documents.  In any event, I

2    believe that that portion of the report went beyond my charge

3    or my assignment to the committee, since it, in essence, sought

4    to reargue my earlier ruling, and in addition sought to suggest

5    that the assumption by Delphi pursuant to the master separation

6    agreement which appears at Exhibit 90 in the U.S. Employee

7    Matters Agreement, which was referred to therein and appears in

8    here most readily at Supplemental Exhibit 4, provided for the

9    transfer to Delphi and the assumption by Delphi of GM's legal

10   responsibilities for such OPEB claims.

11          My conclusion was in February and is now that in

12   assuming such legal responsibilities at the time, Delphi and GM

13   were both fully aware of the Sprague decision which predated

14   these agreements, which found that GM had no legal

15   responsibilities in respect of these claims.  And in light of

16   the clear evidence that all of Delphi's plans and all of GM's

17   plans, at least since 1985, contained a clear and unambiguous

18   reservation of the right to terminate, or plan documents

19   contain such reservation, that I cannot ignore the context of

20   the Sprague decision as underlying the parameters of what

21   Delphi actually assumed and what GM transferred to it.

22          I have some serious doubts whether the doctrine of

23   virtual representation would apply here given Taylor v.

24   Sturgell 128 S.Ct. 2161 (2008).  However, again, given what

25   Delphi actually agreed to have transferred to it, and the

63

1    factual findings based on their review of the documents made by

2    the Sprague court, I don't see how I can, at this point,

3    (a) second guess the Sprague court's ruling; and (b) impose on

4    Delphi an obligation that I don't believe existed at the time

5    of the master separation agreement.

6          With regard to the second point, I believe the

7    evidence is clear that Frigidaire ceased being a part of GM

8    many years before the GM business segment that was defined as

9    the Delphi Automotive Systems Business in the master separation

10   agreement and the Delphi business unit in the employee matters

11   agreement, came into existence.  Consequently, I don't believe,

12   under the relevant agreements, Delphi would have any obligation

13   to or liability for the salaried OPEB benefits of Frigidaire

14   retirees in that capacity -- in their capacity as Frigidaire

15   retirees.

16         On the third point, I'm satisfied, based on the

17   proffer of testimony and the absence of anything in the record

18   contradicting that proffer, that American Axle, to the

19   contrary, did fall within the definition of Delphi business

20   unit under the U.S. Employee Matters Agreement.  Therefore, it

21   would be part of the assumption of liability under the master

22   separation agreement and paragraph 3 of the U.S. Employee

23   Matters Agreement.  Based on my review of the committee's

24   report, however, I do not see anything to suggest that those

25   employees had any different rights vis-a-vis GM or Delphi than

64

1    the employees dealt with in the Sprague decision.  And so

2    consequently, as regards their rights versus Delphi -- and I

3    want to be clear, only versus Delphi and not as against GM or

4    American Axle, it appears to me that, again, the debtors have

5    met their burden, which as I stated in my modified ruling is

6    substantial, to show that the salaried OPEB benefits for these

7    retirees are also modifiable or terminable at will.

8            So, in light of that and the absence of any other

9    evidence in respect of, for example, potential different rights

10   based on the Second Circuit's jurisprudence on equitable

11   estoppel -- or promissory estoppel, excuse me, in this area, or

12   potentially with respect to, for example, people on disability

13   in the report, I conclude that the relief granted provisionally

14   with respect to the motion should now be granted on a final

15   basis.  So, for those reasons, I will enter, with a couple of

16   modifications, the proposed final order.

17           MR. BUTLER:  Thank you, Your Honor.

18           THE COURT:  Do you have a disk or something for this

19   order?

20           MR. BUTLER:  We'll arrange --

21           THE COURT:  I guess I need the language that you --

22           MR. BUTLER:  Yes.

23           THE COURT:  -- wrote out --

24           MR. BUTLER:  I'll get you the language.  Do you want

25   us to type it in and e-mail it down, or do you want us just to

65

1    read the written out language?  Which do you prefer, Judge?  We

2    have it written out.  We can type it in and send it down.

3          THE COURT:  Why don't you just hand me what you have

4    written out.  Okay.  I'm going to take a couple -- there's

5    nothing else on docket --

6          MR. BUTLER:  That's it, Your Honor.

7          THE COURT:  -- okay.  I'm going to take a couple

8    matters out of order, but maybe people want a five minute

9    break.  But I'll resume in five minutes with Fred Leighton

10   Holding v. Christie's.

11         MR. BUTLER:  Thanks, Judge.

12      (Whereupon these proceedings were concluded at 12:04 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

66

1

2                           I N D E X

3

4                         T E S T I M O N Y

5

6     WITNESS              EXAM BY                  PAGE      LINE

7     Thomas Smith         Mr. Cornell             37        12

8     Thomas Smith         Mr. Butler              39        6

9     Keith Stipp          The Court               40        22

10

11                        E X H I B I T S

12

13    NO.          DESCRIPTION                      ID.      EVID.

14    Supp. 1      Provisional order entered at              7, 25

15                 docket #16380

16    Supp. 2      Supplement and report of retirees'        7, 25

17                 committee

18    Supp. 3      Debtors' response to report of            7, 25

19                 retirees' committee

20    Supp. 4      U.S. Employee Matters Agreement           7, 25

21                 between GM and Delphi dated 12/22/98

22    Supp. 5      Letter from Delphi Corporation            7, 25

23                 that was sent to Delphi Health &

24                 Life program participants on 2/26/09

25

67

```
 1
 2                      I N D E X, cont'd
 3
 4                      E X H I B I T S
 5
 6    NO.         DESCRIPTION                    ID.      EVID.
 7    Supp. 6     Posting that Delphi Corporation        7, 25
 8                made on its website for these
 9                cases
10    Supp. 7     Request of retirees' committee         7, 25
11                for production of documents
12                received on 2/27/09
13    Supp. 8     Debtors' response to request for       7, 25
14                production of documents
15    Supp. 9     Debtors' proposed form of              7, 25
16                salaried OPEB termination order
17    Supp. 10, 11 Certain provisions from the plans     7, 25
18                having to do with vested companies
19                and the plan acting as a substitute
20                for COBRA
21    Supp. 12    Portions of IRS Code dealing with      7, 25
22                lifetime COBRA coverage
23
24
25
```

68

I N D E X, cont'd


E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|---|---|---|---|
| Supp. 13 | Relevant portions of IRS Code | | 7, 25 |
| | as amended by stimulus bill | | |
| | passed by Congress in last thirty | | |
| | days which provided certain | | |
| | coverages to health care tax credits | | |
| Supp. 14 | IRS private letter ruling dated | | 7, 25 |
| | 4/22/04 | | |


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Provision of proposed order re termination | 60 | 8 |
| of debtors' contribution to salaried OPEB plans | | |
| will be deleted | | |
| Debtors' proposed final order entered with | 64 | 15 |
| modifications as stated on the record | | |

69

1

2                        C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  March 13, 2009

16

17

18

19

20

21

22

23

24

25