Hearing Date & Time: February 24, 2009 at 10:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

 - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| Debtors. | : | (Jointly Administered) |

DECLARATION OF ROBERT S. MILLER, JR. IN SUPPORT
OF DEBTORS' SALARIED OPEB TERMINATION MOTION

Robert S. Miller, Jr. Declaration

I, Robert S. Miller, declare as follows:

1.    I submit this declaration in support of the Motion For Order Under 11 U.S.C. §§ 105, 363(b)(1), And 1108 Confirming Debtors' Authority To Terminate Employer-Paid Post-Retirement Health Care Benefits And Employer-Paid Post-Retirement Life Insurance Benefits For Certain (A) Salaried Employees And (B) Retirees And Their Surviving Spouses (the "Motion") filed by Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors").  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

2.    I have been Chairman of the Board of Directors of Delphi since July 1, 2005, and Executive Chairman since January 1, 2007.  I also serve on the Delphi Strategy Board, the company's top policy-making group.  I served as the Chief Executive Officer of Delphi from July 1, 2005 until December 31, 2006, when Rodney O'Neal was promoted from President and Chief Operating Officer to Chief Executive Officer and President.  I am familiar with, and have personal knowledge of, the Debtors' day-to-day operations, as well as their business and financial affairs, including the matters referred to herein.

3.    I earned a degree in economics from Stanford University in 1963 and a law degree from Harvard Law School in 1966.  In 1968, I received an MBA degree in finance from Stanford Business School.  After earning my MBA in 1968, I began my career at Ford Motor Company, and worked for 11 years in a variety of assignments in the United States, Mexico, Australia, and Venezuela.  In 1979, I joined Chrysler Corporation at the request of then-chairman Lee Iacocca and was a principal architect of the Loan Guarantee Act that included negotiations with 400 lenders and the U.S. government to secure the bailout of the troubled

automaker. I remained at Chrysler Corporation for more than a decade, eventually serving as chief financial officer and vice chairman responsible for all staff activities, international automotive operations, and non-automotive operations such as Gulfstream Aerospace.

4. I left Chrysler Corporation in 1992 and became a partner in an investment banking firm, advising Olympia & York, a privately-held real estate firm, as it restructured more than $20 billion in debt. In 1993, I embarked on a career as a professional corporate director.

5. Since that time I have returned to the private sector on multiple occasions to serve as a full-time executive in order to guide the recovery of several companies including Federal-Mogul, Bethlehem Steel, Aetna, Reliance Group Holdings, Waste Management, and Morrison Knudson.

6. I also serve as a member of the board of directors of two other public companies, UAL Corp. and Symantec. I am Symantec's lead independent director. Over the years I have served on the board of directors of numerous other public companies, including those mentioned above.

A.   <u>Salaried Retiree Benefits</u>

7. The Debtors currently maintain employee benefit plans and programs to provide retirement benefits to certain of the Debtors' current active salaried employees, retirees, and their surviving spouses (collectively, the "Eligible Salaried Retirees"). These benefits consist of: (i) employer-paid health benefits, including medical, prescription drug, dental, mental health, vision, extended care, and hearing and (ii) employer-paid life insurance benefits (collectively, "Salaried OPEB"). In total, Delphi currently provides approximately 15,000 Eligible Salaried Retirees with Salaried OPEB.

3

8. Although the Debtors' business judgment in these cases until recently had been to continue to maintain these programs, that judgment was based on the existence of an economic climate in which the total enterprise value associated with the Debtors' go-forward business plan provided a reasonable basis for doing so.  The current economic outlook no longer supports that judgment.  Facing unprecedented, near 50% declines in the volume of North American vehicle production, a global slowdown in vehicle sales, and the ongoing deep economic recession, Delphi has been working and continues to work closely with its advisors and stakeholders to reevaluate its business plan and implement cash-conservation measures wherever it can.  As part of that effort, Delphi has determined to eliminate Salaried OPEB as of April 1, 2009.  (A chart summarizing current retirement benefits and the proposed changes was contained in the Motion and is attached hereto for convenience as <u>Exhibit A</u>.)

9. The projected cash savings associated with eliminating these programs exceeds $70 million per year. Assuming an April 1, 2009 effective date, it is anticipated that there will be cash savings to the Debtors of approximately $200 million in the aggregate during the business planning period from 2009 through 2011.  The balance sheet liability that would be eliminated from the Debtors' reorganization balance sheet if these programs were eliminated exceeds $1.1 billion.

B.  <u>Debtors' Enterprise Value</u>

10. On January 25, 2008, this Court entered an order confirming the Debtors' chapter 11 Plan, the consummation of which was anticipated to allow the Debtors to complete their transformation plan and emerge from chapter 11.  The total business enterprise value associated with the Plan was $12.8 billion (based on an agreed value negotiated with the Debtors' principal stakeholders).  When the Debtors were precluded from consummating the Confirmed

Plan in April 2008, the Debtors continued to implement their transformation plan while working with their stakeholders to formulate and file the Plan Modification Approval Motion which sought approval of modifications to the Confirmed Plan that would allow the Debtors to move forward with a reaffirmed business plan for 2008-2011 (the "RPOR"). The mid-point of the total enterprise business valuation associated with the RPOR, filed in October 2008, was $7.2 billion.

11. The financial projections set forth in the RPOR, however, were based on, among other factors, then-projected production volumes for the North American light vehicle automotive market of 14.2 million vehicles in 2009 and up to 16.3 million vehicles in 2011, and included forecasts for GM vehicle builds ranging from a low of 3.15 million vehicles in 2009 to a high of 3.61 million vehicles in 2011. During the fourth quarter of 2008, however, the outlook for the global automotive industry took a dramatic turn for the worse, with volumes, both domestic and global, plummeting to the lowest levels in recent history. The Congressional testimony of the CEOs of the "Detroit Three" in November and December 2008 highlighted the dire circumstance of the North American automotive industry, in which the Detroit Three generally assumed a 2009 "base case" of North American light vehicle production of only approximately 12 to 12.5 million vehicles.

12. Thereafter, in the "Restructuring Plan for Long-Term Viability" that GM submitted to the U.S. Congress on December 2, 2008 in support of its request for federal financial assistance, GM forecast 2009 North American vehicle sales to be 12 million units in a baseline scenario and 10.5 million units in a downside scenario. These projections were dramatic and unprecedented declines from the 16.5 million units sold in 2007 and the then-projected 13.7 million unit sales in 2008.

13.     In a further move that underscores the depth of the economic challenges facing the North American automotive industry, GM announced on January 15, 2009 that its forecast for 2009 North American vehicle sales would follow its earlier "downside" scenario of 10.5 million units for North American vehicle sales, which is 3.2 million fewer units than were sold in 2008 and 6 million fewer units than were sold in 2007.  As required under the terms of GM's December 31, 2008 loan agreement with the Treasury Department, on February 17, 2009 GM presented to the Treasury Department its "2009 – 2014 Restructuring Plan."  The 2009 – 2014 Restructuring Plan projects 2009 North American vehicle sales to be 10.5 million units in a baseline scenario, consistent with GM's January 15, 2009 announcement, and also establishes a "downside" scenario of 9.5 million units for 2009 North American vehicle sales.

14.     For the fourth quarter of 2008, GMNA, still Delphi's largest customer, announced that it had produced 823,000 vehicles, a 21% reduction from its fourth quarter 2007 production.  Then, on December 12, 2008, GM reduced projected production for the first quarter of 2009 to 420,000 vehicles, a 53% reduction from the same period in 2008.  On February 3, 2009, GM announced that January sales were down 49% from a year ago and further reduced projected production for the first quarter of 2009 to 380,000 vehicles, down approximately 57% from the same period in 2008.

15.     As illustrated in the chart below, the reductions in projections of GMNA production volumes contained in Delphi's business plans since the Debtors filed their Confirmed Plan in September 2007 and Plan Modification Motion on October 3, 2008 have been dramatic:

Robert S. Miller, Jr. Declaration



16.     Although GM remains Delphi's largest single customer, the unprecedented decline in the volume of vehicle production is an industry-wide phenomenon and Delphi has been similarly affected by reductions at Chrysler, Ford, and other automobile manufacturers.  For example, Delphi's North American revenue declined to $908 million for December 2008, which is more than $700 million less than in December 2007 ($1.617 billion) and more than $600 million less than Delphi projected in its August 2008 RPOR ($1.547).

17.     Moreover, subsequent to the filing of the Plan Modification Motion, the global economic environment continued to deteriorate, placing severe pressure on all industries, but especially on automotive manufacturers and their suppliers due to limited consumer credit and lack of financing for both OEMs and suppliers.

18.     The Debtors are currently engaged in discussions with their stakeholders who have a continuing economic interest in the Debtors' reorganization cases to formulate further plan modifications consistent with the timetable agreed to in the Accommodation Agreement entered into with their DIP Lenders in December 2008 (which contemplates the filing of further proposed modifications to the Confirmed Plan on February 27, 2009).  In connection with those discussions, the Debtors are making further revisions to their business plan consistent

Robert S. Miller, Jr. Declaration

with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, Delphi anticipates that the total business enterprise value associated with the revised plan will be substantially below the valuation range contained in the Plan Modification Motion and may be equivalent to, or even less than, the amount of the Debtors' postpetition obligations including the DIP Facility.

C.     Business Judgment

19.     In light of these circumstances, the Debtors' reasonable business judgment no longer permits them to maintain discretionary benefit programs such as Salaried OPEB that would cost approximately $200 million over the business plan period and burden the Debtors' reorganized balance sheet with a liability in excess of $1 billion. The Debtors' short-term liquidity needs require marshaling available cash as quickly as possible. Indeed, the worsening outlook has forced Delphi to negotiate and seek approval of liquidity-enhancing modifications to its liquidity support agreements with GM and to the Accommodation Agreement with its DIP Lenders just two months after those agreements were put in place. Beyond short-term liquidity issues, moreover, it has become clear to the Debtors that it will not be possible to create a fundable reorganized capital structure with a discretionary balance sheet liability in excess of $1 billion.

20.     Delphi acknowledges and recognizes the hardships that terminating Salaried OPEB as proposed in the Motion will impose on the former beneficiaries of these programs. Indeed, recognition of such hardships was a motivating factor in Delphi's effort and success in maintaining these programs throughout Delphi's restructuring while Delphi's go-

forward business plan provided a reasonable basis for doing so.  Regrettably, Delphi can no longer justify maintaining these programs in the current economic climate.

21. Rather than looking solely to retirees for savings, Delphi has implemented numerous cost-cutting actions affecting the active salaried workforce.  In addition to eliminating Salaried OPEB, Delphi is making or has recently implemented a number of changes to the compensation, benefits, and policies applicable to active salaried employees to improve cash flow, including eliminating supplemental executive retirement plan ("SERP") payments to currently retired executives, suspending the 2009 flexible compensation payment of $1,200, suspending certain vacation days, implementing a short-term layoff policy that reduces salary 50%, reducing the severance payment policy for certain salaried employees by 50%, suspending 2009 base pay increases under the merit plan for executive and non-executive employees, suspending 2009 annual incentive payments ("AIP") for executive and non-executive employees, and implementing other reductions and suspensions of various programs affecting vacation vesting, tuition assistance, relocation, adoption assistance, health promotion, and service awards. Management estimates the annualized savings from these other changes to be in excess of $150 million.

22. Furthermore, during 2005-2008, Delphi eliminated OPEB for all salaried employees at age 65, froze the defined benefit pension plans, eliminated supplemental life insurance in retirement for executives, reduced Delphi Strategy Board salaries 10-20% and eliminated merit increases, froze SERP, and changed its U.S. car policy.  Management estimates the annualized savings from these earlier actions to be close to $50 million.

23. I understand that the terms of the employee benefit plans and programs that provide post-retirement health and life insurance benefits to the Eligible Salaried Retirees

Robert S. Miller, Jr. Declaration

and their surviving spouses reserve to Delphi the right to amend, modify, suspend, or terminate such plans at any time.

24.  I and other members of the Delphi Strategy Board discussed the proposed termination of salaried OPEB at several meetings and received a detailed presentation regarding cost savings to be realized from terminating Salaried OPEB and the impact of such termination on retirees. After due consideration, the Delphi Strategy Board approved the termination of Salaried OPEB on February 3, 2009. Although a formal resolution of the Board of Directors was not required to terminate Salaried OPEB, the Board of Directors also received the presentation and was fully apprised. At a meeting of the Board of Directors on February 3, 2009, the Board unanimously concurred with the decision of the Delphi Strategy Board to terminate Salaried OPEB.

D.  Conclusion

25.  I believe, and Delphi determined in its business judgment, that it is in the Debtors' best interests to terminate Salaried OPEB as set forth in the Motion.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed February 20, 2009.

      /s/ Robert S. Miller, Jr.
    ROBERT S. MILLER, JR.

**Exhibit A**

| Employee Status | Current Retiree Medical and Insurance Benefits | Proposed Treatment |
|---|---|---|
| Active Salaried Employees Hired By GM Prior To 1993 | Eligible for Delphi-paid Medical and Insurance Benefits in retirement | Not eligible for Delphi-paid Medical and Insurance Benefits in retirement<br><br>May purchase Medical Benefits in retirement, provided 100% self-paid. May convert Insurance Benefits to individual policy at retirement |
| | Eligible for RHRA at Medicare eligibility | No RHRA at Medicare eligibility |
| | Eligible for Medicare Special Benefit | No Medicare Special Benefit |
| Active Salaried Employees Hired By GM Or Delphi Between 1993 And 2000 | Not eligible for Delphi-paid Medical or Delphi-paid Insurance Benefits in retirement; may purchase Medical Benefits in retirement, provided 100% self-paid; and may convert Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |
| | Delphi contributes 1% of base into Delphi Salaried Retirement Savings Program | 1% contribution cancelled |
| Active Post-2000 Salaried Employees Hired By Delphi | Not Eligible for Delphi-paid Medical or Delphi-paid Insurance Benefits in retirement; may purchase Medical Benefits in retirement, provided 100% self-paid; and may convert Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |
| Retired Salaried Employees Who Were Hired By GM Prior To 1993 | Delphi subsidizes Medical Benefits until Medicare eligible (i.e., age 65) and Insurance Benefits for life | Subsidies for Medical and Insurance Benefits terminated<br><br>May purchase Medical Benefits in retirement, provided 100% self-paid<br><br>Will be offered one-time ability to enroll in or increase coverage (subject to proof of good health) under Optional Life Plan, provided 100% self-paid. May elect an increase of one times base salary |
| | Eligible for RHRA at Medicare eligibility | Cancelled |
| | Eligible for Medicare Special Benefit | Cancelled |

**Exhibit A**

| | | |
|---|---|---|
| Retired Salaried Employees Hired By GM Or Delphi Between 1993 And 2000 | No subsidy for Medical Benefits; may purchase Medical Benefits in retirement, provided 100% self-paid; and may convert active Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |
| Retired Post-2000 Salaried Employees Hired By Delphi | No subsidy for Medical and Insurance Benefits; may purchase Medical Benefits in retirement provided 100% self-paid; and may convert active Insurance Benefits to individual policy at retirement, provided 100% self-paid | No changes |