# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, DC 20549-1004

# FORM 10-K

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 1998

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

*Commission file No. 1-14787*

# DELPHI AUTOMOTIVE SYSTEMS CORPORATION

(Exact name of registrant as specified in its charter)

```
        Delaware                         38-3430473
(state or other jurisdiction of         (IRS employer
incorporation or organization)      identification number)

5725 Delphi Drive, Troy, Michigan          48098
(address of principal executive offices)  (zip code)
```

Registrant's telephone number, including area code (248) 813-2000

**Securities registered pursuant to Section 12(b) of the Act:**

```
Title of Each Class            Name of each exchange on which registered
-------------------            -----------------------------------------
Common Stock, $0.01 par        New York Stock Exchange
value per share
```

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes__. No__X__. We became subject to such filing requirements on February 4, 1999 and have filed all required reports since that date.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

As of March 1, 1999, the aggregate market value of the registrant's Common Stock, par value $ 0.01 per share, held by nonaffiliates of the registrant was about $1.9 billion. The closing price of the Common Stock on March 1, 1999 as reported on the New York Stock Exchange was $18.69 per share. As of March 1, 1999, the number of shares outstanding of the registrant's Common Stock was 565 million shares.

1

|  |  | Page |
|---|---|---|
| **Part I** |  |  |
| Item 1. | Business | 3 |
| Item 2. | Properties | 37 |
| Item 3. | Legal Proceedings | 37 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 38 |
| **Part II** |  |  |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 39 |
| Item 6. | Selected Financial Data | 40 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 42 |
| Item 7a. | Quantitative and Qualitative Disclosures About Market Risks | 56 |
| Item 8. | Financial Statements | 57 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 84 |
| **Part III** |  |  |
| Items 10. - 13. | Management: Includes Directors, Executive Officers and Key Employees of Delphi, Executive Compensation, Security Ownership and Certain Relationships and Related Transactions | 84 |
| **Part IV** |  |  |
| Item 14. | Exhibits, Financial Statement Schedule, and Reports on Form 8-K | 100 |

2

# DELPHI AUTOMOTIVE SYSTEMS CORPORATION

## ITEM 1. Business

History of Delphi. Delphi Automotive Systems Corporation ("Delphi") was incorporated in Delaware in late 1998. Before 1991, our business was conducted by many separate automotive parts operations which General Motors Corporation ("GM" or "General Motors") had acquired over time. These operations were generally managed independently from each other within the GM organization. In 1991, General Motors organized its components businesses into the Automotive Components Group. GM's stated objective was to improve the competitiveness of these operations and then, based on this improved competitive position, increase its business through penetration of new markets. Since that time, we have transformed our business from a North America-based, captive component supplier to GM into a global supplier of components, integrated systems and modules for a wide range of customers. In 1995, the group was given the name "Delphi Automotive Systems" in order to establish its separate identity in the automotive parts industry.

In late 1997, in connection with the spin-off by GM of its defense electronics business, GM transferred Delco Electronics Corporation ("Delco Electronics") to us in order to more closely integrate Delco Electronics' expertise in electronics with our capabilities in automotive components and systems. Our Electronics & Mobile Communication product sector consists of the operations of Delco Electronics. From 1986 through 1997, Delco Electronics had been operated by GM's Hughes Electronics Corporation subsidiary. Effective January 1, 1999, General Motors transferred or agreed to transfer the assets used in our business to our company and our subsidiaries, and we and our subsidiaries have assumed, or agreed to assume, pay, perform, satisfy and discharge, the related liabilities.

In February, we completed an initial public offering (the "IPO") of 100 million shares of our $0.01 par value common stock ("Common Stock"), which represents about 17.7% of our outstanding Common Stock. GM currently owns the remaining 82.3% of our outstanding Common Stock. GM has announced that it currently plans to complete its divestiture of Delphi later in 1999 by distributing all of its shares of our Common Stock to the holders of GM's $1-2/3 common stock (the "Distribution"). GM currently expects to accomplish the Distribution through a:

o Split-Off--such as an exchange offer by GM in which holders of GM's $1-2/3 common stock would be invited to tender their shares in exchange for shares of our Common Stock; or

o Spin-Off--a pro rata distribution by GM of its shares of our Common Stock to holders of GM's $1-2/3 common stock; or

o Combined Split-Off/Spin-Off--some combination of the above transactions.

GM has the sole discretion to determine the timing, structure and all terms of the Distribution. We have agreed to cooperate with GM in all respects to complete the divestiture because we believe that our complete separation from GM will enhance our ability to pursue our business strategy. GM has received a private letter ruling from the IRS to the effect that its distribution of its shares of our Common Stock to the holders of its $1-2/3 common stock would be tax-free to GM and its stockholders for U.S. federal income tax purposes. However, GM is not obligated to complete the divestiture and we cannot assure you as to whether or when it will occur.

Overview. Delphi is the world's largest and most diversified supplier of components, integrated systems and modules to the automotive industry, with 1998 net sales of $28.5 billion. We have become a leader in the global automotive parts industry by capitalizing on the extensive experience we have gained as the principal supplier of automotive parts to General Motors, the world's largest manufacturer of automotive vehicles. We are primarily a "Tier 1" supplier, which means that we generally provide our products directly to automotive vehicle manufacturers ("VMs"). We also sell our products to the worldwide aftermarket for replacement parts and to non-VM customers.

Several years ago, we began to transform our company from a North America-based, captive component supplier to GM into a global supplier of components, integrated systems and modules for a wide range of customers. We now sell our products to every major manufacturer of light vehicles in the world. Since 1993, our sales to customers other than GM have grown from 13.3% of our

3

total sales to 21.4% in 1998 (although our sales to GM were reduced as a result of work stoppages at certain GM and Delphi locations in the United States during 1998). For this purpose, our total sales include all sales by entities in which we own a minority interest.

We have also established an expansive global presence, with a network of manufacturing sites, technical centers, sales offices and joint ventures located in every major region of the world. About 60% of our employees and, based on square footage, about 30% of our wholly owned and leased manufacturing sites were located outside the United States and Canada as of December 31, 1998. About 30% of our total 1998 sales were derived from products manufactured at sites located outside the United States and Canada.

Through our experience with General Motors, we have developed a sophisticated understanding of the design, engineering, manufacture and operation of all aspects of the automotive vehicle. We have both extensive technical expertise in a broad range of product lines and strong

systems integration skills, which enable us to provide comprehensive, systems-based solutions for our customers. We believe that we are one of the leading Tier 1 suppliers in each of our focused product areas. We operate our business along three major product sectors which work closely together to coordinate our product development and marketing efforts. Our three product sectors are: Electronics & Mobile Communication, which includes our automotive electronics and audio and communication systems; Safety, Thermal & Electrical Architecture, which includes our interior, thermal and power and signal distribution products; and Dynamics & Propulsion, which includes our energy and engine management, chassis and steering products. See Note 14 to our consolidated financial statements included elsewhere in this report for additional information.

**Industry**

General. Our industry generally provides components, systems, subsystems and modules to VMs for the manufacture of new vehicles, as well as to the aftermarket for use as replacement parts for current production and older vehicles.

Today, suppliers offer their component products to VMs individually as well as in a variety of more fully engineered forms, such as modules and systems:

o "Modules" are groups of component parts arranged in close physical proximity to each other within a vehicle, which are often assembled by the supplier and shipped to the VM for installation in a vehicle as a unit. Modular instrument panels, cockpit modules and door modules are examples.

o "Systems" and "subsystems" are groups of component parts located throughout the vehicle which operate together to provide a specific vehicle function. Braking systems, electrical systems and steering systems are examples.

Historically, many large VMs have operated internal divisions to provide a wide range of component parts for their vehicles. However, vehicle manufacturers have recently moved towards a competitive sourcing process for automotive parts, including increased purchases from independent suppliers, as they seek lower-priced and/or higher-technology products. These independent parts suppliers, which often have lower cost structures than in-house component operations, have become an important part of the automotive parts industry. Many captive suppliers no longer provide their products exclusively to their parent VM.

Our industry is generally divided into several groups or "tiers:"

o "Tier 1" suppliers such as Delphi sell their products principally to VMs directly and often offer a broad range of product capabilities, including design, engineering and assembly services.

o "Tier 2" suppliers sell their products principally to Tier 1 suppliers, who then combine these parts into their own product offerings. Smaller Tier 2 suppliers are sometimes referred to as "Tier 3" suppliers.

Industry Trends. Five key trends have been reshaping the automotive parts industry over the past several years:

o Increased Emphasis on Systems and Modules Sourcing. In order to simplify the vehicle design and assembly processes and reduce their costs, VMs increasingly look to their suppliers to provide fully engineered, pre-assembled combinations of components rather than individual components. By offering sophisticated systems and modules rather than individual components, Tier 1 suppliers have assumed many of the design, engineering, research and development and assembly functions traditionally performed by

4

VMs. In addition, suppliers now often manufacture and ship component parts to the general location of a VM's assembly line and then provide local assembly of systems and modules.

o Globalization of Suppliers. The globalization of VMs, which reflects the broader global market for vehicle sales and the desire of VMs to increase vehicle production in low-cost markets, has driven the globalization of suppliers as they follow their customers. In order to serve multiple markets in a more cost effective manner, many VMs are turning to global vehicle platforms such as "world cars," which typically are designed in one location but produced and sold in many different geographic markets around the world. Suppliers for a specific world car are often required by the VM to provide their services in all global locations where that vehicle is manufactured.

o Increasing Electronic Content. We believe that the electronic content of vehicles has been increasing and will continue to increase in the future. This increase in electronic content is largely driven by continued, and often increasingly stringent, regulatory standards for automotive emissions and safety as well as consumer demand for increased vehicle performance and functionality at lower cost. Electronics integration, which generally refers to replacing mechanical with electronic components and integration of mechanical and electrical functions within the vehicle, allows VMs to achieve substantial reduction in the weight and complexity of automotive vehicles, resulting in easier assembly, enhanced fuel economy, improved emissions control and better vehicle performance. Electronic content varies significantly among vehicle models, with higher-end vehicles having more sophisticated and extensive electronic controls and systems. As consumers, particularly in more developed markets such as North America and Europe, seek more competitively-priced ride and handling performance, safety, security,

communications, convenience, entertainment and environmentally friendly options in vehicles, such as air bags, keyless entry, global positioning systems, audio systems and advanced emission control systems. Delphi believes that electronic content per vehicle will continue to increase but will remain subject to technology-driven price declines and pricing pressures from VMs.

o Ongoing Industry Consolidation. The worldwide automotive parts industry is consolidating as suppliers seek to achieve operating synergies through business combinations, shift production to locations with more flexible local work rules and practices, acquire complementary technologies, build stronger customer relationships and follow their customers as they expand globally. The need for suppliers to provide VMs with single-point sourcing of integrated systems and modules on a global basis has helped fuel industry consolidation. Furthermore, the cost focus of most major VMs has forced suppliers to reduce their prices, both in the initial bidding process and throughout the term of the contract. Consequently, a supplier's viability depends upon its continuing ability to maintain and increase operating margins by reducing costs and improving productivity on an ongoing basis, including by achieving economies of scale through consolidation.

o Shorter Product Development Cycles. Suppliers are under pressure from VMs to respond more quickly with new designs and product innovations in order to support rapidly changing consumer tastes and regulatory requirements. Vehicle demand in North America has shifted from cars to light trucks and vans over the last several years, requiring suppliers to modify their operations to focus on parts for these vehicles. In North America and Europe, consumers have been increasingly seeking vehicles with more lower-cost ride and handling performance, safety, security, communications, convenience and entertainment options, such as global positioning systems, air conditioning, anti-lock brakes, air bags, power steering, keyless entry and advanced emissions control systems. In developing countries, as broad economic improvements are made, demand has increased for smaller, less expensive vehicles that satisfy basic transportation needs. Additionally, increasingly stringent government regulations regarding vehicle safety and environmental standards, such as those mandating the use of airbags in new vehicles and emissions standards, are driving new product development.

**Strategy**

The key elements of our business strategy are to supply our customers with high-quality, innovative components, systems and modules; to exceed existing customers' expectations while building new relationships; to leverage our global presence to meet our customers' needs; to improve our operating performance; and to complete strategic acquisitions, joint ventures and alliances. Each of these elements is discussed more fully below:

Supply High-Quality, Innovative Components, Systems and Modules. We believe that the current industry trend towards increased system and module sourcing by VMs creates a substantial competitive advantage for our company. We believe that our extensive operating history as a vertically integrated supplier to the world's largest VM provides us with the electronics integration and other technical expertise, breadth of product offerings and manufacturing scale needed to compete successfully on a system and module basis while continuing to supply

high-quality components. We have developed significant systems capabilities in a number of key product areas, including power and propulsion systems, ride and handling systems, passenger environment systems, and control and communication systems. We also have substantial in-house electronics integration capabilities. We coordinate our product development and marketing efforts across all of our product groups and sectors.

By building on our electronics integration expertise, our systems capabilities and the breadth of our product offerings, we are working to develop high-quality product offerings which will provide our customers with the ability to offer consumers enhanced vehicle control, superior occupant protection, collision avoidance systems, onboard communications systems, advanced energy and engine management systems, advanced electrical and electronic vehicle architecture and passenger entertainment and convenience features at competitive prices.

Exceed Existing Customers' Expectations while Building New Relationships. We are pursuing increased business with customers other than GM-North America and we believe that our principal opportunity for future earnings growth will be increased sales to these customers. Although we intend to pursue new business with GM and expect to continue to be a principal supplier to GM and its GM-North America operations for a significant period of time, our strategy focuses on growing our business across a more diversified customer base, thereby making us less dependent on the volume of vehicles produced by GM-North America.

Our goal has been and continues to be to increase our total sales to customers other than GM-North America to at least 50% of our total sales by the end of 2002. We caution you, however, that this goal is a "forward-looking statement" that may turn out not to be attainable. We cannot give you any assurance that we will achieve this goal, including within the time period indicated. In establishing and measuring our progress towards achieving this goal, we include in "total sales" all of the sales from minority joint ventures and other investments even though these sales are not reflected in our sales as reported in our consolidated financial statements included elsewhere in this report. On this basis, in 1998, 62.2% of our total sales were to GM-North America and 37.8% of our total sales were to other customers, as compared to 73.7% and 26.3% of our total sales, respectively, in 1993. Excluding these minority joint venture sales, the percentages for GM-North America are higher.

We believe that, as an independent company no longer owned by General Motors, we will have significant opportunities to expand our business with other VMs around the world. We believe that our status as a part of GM has historically been a major impediment to the expansion of our business with customers other than GM, as other VMs have shown varying degrees of reluctance to source extensively from a supplier owned by a major competitor.

Our focus on customer satisfaction, as demonstrated by our technology leadership, product quality, cost control and customer responsiveness, positions us well as we strive to increase our sales to customers other than GM-North America. This focus also enhances our ability to execute our business with GM-North America. In order to better serve our customers, our sales and marketing personnel are organized into 25 dedicated customer service teams, 19 of which work with customers other than GM. Each of our major customers is served by its own team which has responsibility for satisfying that customer's needs. Each team is lead by one of our managers and functions as a single point of contact within the company to represent the interests of the customer throughout our organization. These teams are supported by our network of manufacturing facilities and engineering and technical resources worldwide.

Leverage Global Presence. We can provide significant manufacturing, engineering, technical and other support to our customers in every major market in which they operate. We believe that our geographic presence is one of the broadest in the industry. As of December 31, 1998, we had 168 wholly owned and leased manufacturing sites, 27 technical centers, 51 customer service centers and sales activity offices and 40 joint ventures or other strategic alliances in 36 countries on six continents. We are continuously evaluating and enhancing our engineering and technical resources, which currently include over 15,000 engineers, scientists and technicians, to provide an efficient, customer-focused global network of engineering and technology customer centers that we believe will better serve our customers around the world.

We believe that we are particularly well positioned as VMs turn to global vehicle platforms, such as world cars, that are manufactured and sold in numerous markets around the world. Since we have manufacturing sites located in every major region around the world, we are often able to capitalize on these world car opportunities to gain access to new customers. Delphi currently supplies parts for a number of global vehicle platforms. In addition, we believe that our global presence also provides us opportunities by allowing us to

6

leverage sales to a customer in one location or for one product into sales in other locations and for other products.

From 1992 to 1998, the percentage, based on square footage, of our wholly owned and leased manufacturing sites located outside the United States and Canada has increased from about 20% to about 30%, reflecting the globalization of our VM customers. During the same period, the percentage of our employees located outside the United States and Canada has increased from about 38% to about 60%. About 30% of our total 1998 sales were derived from products manufactured at sites located outside the United States and Canada. See "Item 2. Properties" for additional information on our facilities and capabilities.

We also have a large number of joint ventures and other strategic partnerships in various locations throughout the world, with the largest number located in the Asia/Pacific region, including China and Korea. Our joint ventures and other investments as of December 31, 1998 are shown below by geographic region:

```
United States/Canada...........................   5
Europe/Middle East/Africa......................   8
Mexico/South America...........................   8
Asia/Pacific...................................  19
                                                ---
   Total.......................................  40
                                                ===
```

For financial information regarding the principal geographic areas in which we operate, see Note 14 to the consolidated financial statements included elsewhere in this report.

Improve Operating Performance. We have developed, and are implementing, initiatives to improve our operating performance. Operational improvements have enabled Delphi to achieve significant cost reductions and improve productivity in the face of an increasingly aggressive cost focus by most major VMs. Our continued ability to realize operating performance improvements is important to our ability to achieve our business objective. Although we have made substantial progress in implementing the initiatives described below, we believe that in many cases the full impact of these initiatives has not yet been realized. Our primary initiatives to improve operating performance are:

o Delphi Manufacturing System. In 1997, we developed and began the process of implementing the Delphi Manufacturing System throughout our global operations which involves reorganizing the workplace and improving the production process in order to maximize manufacturing flexibility, reduce total manufacturing costs and achieve lean production. Under the Delphi Manufacturing System, traditional manufacturing production lines are replaced by more flexible manufacturing cells which focus on utilizing one-piece production flow rather than traditional batch processing. These flexible manufacturing cells typically consist of clusters of individual manufacturing operations and efficient work stations, with the operators placed centrally within each cellular configuration to increase operational availability. This cell design provides flexibility by varying the number of operations each operator performs. The Delphi Manufacturing System has allowed us to improve our product quality and be more responsive to the changing needs of our customers. We believe that continued implementation of the Delphi Manufacturing System will allow us to improve our manufacturing productivity, increase our daily inventory turns and reduce our production lead times.

o Structural Cost Reductions. We continuously seek to achieve savings through reducing our structural costs. Structural costs generally consist of our fixed costs, including our selling, general and administrative and other commercial costs, engineering costs and labor and other manufacturing costs. We expect to continue to reduce our structural costs principally through infrastructure improvements, such as combining

operations whenever possible to reduce our overhead, administrative and related costs, and eliminate redundancies. Separately, in connection with the recent integration of Delco Electronics into our operations we expect to realize additional structural cost savings. We also seek to reduce our structural costs by implementing a unified, common approach to operations throughout our global facilities, including a common organizational and management structure, application of the Delphi Manufacturing System at all of our manufacturing plants, common training programs and a common set of key metrics for measuring actual performance in comparison to common standards and goals.

o Global Sourcing. We use global sourcing in order to obtain the best prices for our direct and indirect materials, machinery and equipment and services. Global sourcing is a competitive bidding process among prospective suppliers located throughout the world. Our purchasing process is organized by commodity groups for each major region of the world and focuses on advance, long-term sourcing through long-term or lifetime contracts. In order to ensure a consistent high-quality supply of goods and services, we utilize common systems, policies and procedures across our company, including a common supplier quality improvement process. Due to our size, we believe we have sufficient scale and purchasing leverage to enable us to continue to secure significant volume discounts after our separation from GM. On average, since 1993, we have reduced our materials

7

costs by about 3% to 4% per year based on a year-to-year actual price comparison, excluding Delco Electronics, which was not integrated into our operations until December 1997.

o Labor Relations. We emphasize the sharing of relevant information with our international and local union leadership worldwide and working with the unions to jointly develop local work rules and practices. While we have been a part of GM, the national labor agreements negotiated by GM with the unions have applied to our workforce in the United States and Canada. We believe that, as a fully independent company with control over our own labor relations after the Distribution, we would have the right to negotiate regarding our own national and local labor agreements directly with the unions representing our employees. We believe that our complete separation from General Motors will enable us, over time, to increase our competitiveness by establishing local work rules and practices more consistent with those generally prevailing in the automotive parts industry. However, we cannot assure you as to when or the extent to which we will be able to achieve these benefits.

o Product Portfolio Management. We have implemented a portfolio management process designed to streamline and focus our product portfolio to facilitate our emphasis on comprehensive, integrated systems-based solutions for customers. Under this process, our management regularly evaluates all of our company's product lines in order to analyze how each product supports our overall vision and strategic objectives. Excluding Delco Electronics, we streamlined our portfolio as a result of this process to about 151 product lines in 1998, down from about 210 in 1992. Our current product portfolio includes about 190 product lines and reflects the integration of 30 product lines from Delco Electronics as well as new product development activities. We expect to continue to review and refine our product portfolio in light of industry trends, with an emphasis on integrated systems and modules as well as product featuring electronics integration.

o Fix/Sell/Close Process. We have adopted a "fix/sell/close" process to improve our cost competitiveness. Under this process, we review our global operations and investments, including our joint ventures, on an ongoing basis to identify operations or investments not performing at desired levels. These operations or investments are placed into a category to be fixed, sold or closed. With input from our unions, management then develops a specific plan to deal with each operation in a timely manner. With respect to many of our operations in North America, both our local and international unions have cooperated with management in initiatives to improve the viability of our operations. As operations are improved or eliminated, they are removed from the category. Since 1995, this process, together with the product portfolio process described above, has resulted in the closing, sale or consolidation of over 50 operations worldwide as well as the substantial improvement of many other operations. We will continue to monitor our operations and investments and we believe that this ongoing process will continue to improve our cost competitiveness in the future. However, our ability to eliminate product lines, close plants and divest businesses is subject to certain restrictions in our Supply Agreement with General Motors as described elsewhere in this report.

Complete Strategic Acquisitions, Joint Ventures and Alliances. We intend to participate actively in the industry trend towards consolidation by pursuing strategic acquisitions and alliances in order to complement or fill gaps in our existing product portfolio, enhance our design and manufacturing capabilities, improve our geographic presence in selected areas and increase our access to new customers. We will be restricted from executing certain types of transactions without GM's consent for a period of time following the IPO and the Distribution as a result of covenants arising from our separation from GM as described elsewhere in this report. In addition, we are bound for limited periods of time by certain covenants not to compete which we entered into in connection with some of our past divestitures. We do not believe that these restrictions will materially impair our ability to execute this business strategy.

While we currently believe that we will be able to successfully execute the business strategies outlined above, we cannot assure you in this regard. Our ability to execute each of the business strategies discussed above is subject to numerous risks and uncertainties, including those described elsewhere in this report and in our other filings with the Securities and Exchange Commission, including our registration statement on Form S-1, dated February 4, 1999 (Registration No. 333-67333).

**Research and Development**

We have substantial technical and vehicle integration expertise as a result of our extensive operating history as the in-house supplier to the world's largest VM. We were the first supplier to produce a number of new products, including the first electric self-starter, in-dash radio, turn signal, catalytic converter, airbag, tilt steering column, independent front-wheel suspension, energy-absorbing steering column, electric power sliding door and integrated child safety seat. More recently, we were the first supplier to produce brake-by-wire systems and computer-

controlled engine management systems. As a result, we have developed a comprehensive knowledge of the design, engineering, manufacture and operation of all aspects of the automotive vehicle.

8

We believe that our engineering and technical expertise, together with our emphasis on continuing research and development, allows us to use the latest technologies, materials and processes to solve problems for our customers and to bring new, innovative products to market. Delphi maintains technical engineering centers in every major region of the world to develop and provide advanced products, processes and manufacturing support for all of our manufacturing sites and to provide our customers with local engineering capabilities and design development on a global basis. As of December 31, 1998, we employed more than 15,000 engineers, scientists and technicians around the world. We continuously evaluate and enhance our engineering and technical resources and are currently considering plans to reorganize our worldwide engineering and technical resources into a more efficient, customer-focused global network.

We believe that continued research and development activities are critical to maintaining our leadership position in the industry. Our total expenditures for research, development and engineering activities were $1.4 billion, $1.5 billion and $1.6 billion in 1998, 1997 and 1996, respectively. As a result, we have introduced over 50 new products and processes during each of the last several years.

## Intellectual Property

We have generated a large number of patents and trademarks in the operation of our business. Under our separation arrangements with GM, generally speaking, we own the patents, patent applications and records of invention that are primarily related to components produced or sold by us and any other patents that would be more valuable to us than to GM. Accordingly, GM has transferred to us full or partial ownership of about 2,800 patents, 640 U.S. patent applications and 620 records of invention as well as the corresponding foreign patent and patent applications. In addition, we and GM have agreed to license certain of our existing patents to each other. While we believe that these patents, inventions and licenses are, in the aggregate, important to the conduct of our business, none is individually considered material to our business.

Although we do not rely on material "patent-protected" technology, our ability to continue to generate technological innovations is important to ensure our long-term success as well as the competitiveness of our business. Our focus on innovation is evidenced by the 586 patents relating to our business which have been recorded in recent years. We intend to continue to actively pursue technological innovation.

GM has transferred to us ownership of about 1,170 trademark registrations and applications, including about 70 in the United States, as well as unregistered trademarks. Our trademarks include the following: E-STEER(TM), FOREWARN(TM), Freedom(TM), Gold Dot(TM), INTELLEK(TM), Monsoon(TM), QUADRASTEER(TM) and TRAXXAR(TM).

## Products and Competition

We believe that we have the largest and most diversified portfolio of products in the industry. Our product offerings are organized in three product sectors: Electronics & Mobile Communication; Safety, Thermal & Electrical Architecture; and Dynamics & Propulsion. For more information on our product sectors, see Note 14 to the consolidated financial statements included elsewhere in this report.

We conduct our business in a highly competitive industry. The global automotive parts industry principally involves the supply of components, systems and modules to VMs for the manufacture of new vehicles, to other suppliers for use in their product offerings and to the aftermarket for use as replacement parts for older vehicles. Although the overall number of our competitors has decreased due to ongoing industry consolidation, the automotive parts industry remains extremely competitive. VMs rigorously evaluate suppliers on the basis of product quality, price competitiveness, reliability and timeliness of delivery, product design capability, technical expertise and development capability, new product innovation, leanness of facilities, operational flexibility, customer service and overall management. Some of our competitors have substantial size and scale and some have lower cost structures, particularly lower hourly wage structures, than our company.

Our overall product portfolio is extremely broad by industry standards. Very few other Tier 1 suppliers compete across the full range of our product areas. However, we do face significant competition across all three of our principal product sectors from each of the following major Tier 1 suppliers: Robert Bosch GmbH, Denso Inc. and Visteon Automotive Systems, a unit of Ford Motor Company. Our product sector offerings and principal competitors are summarized below:

9

Electronics & Mobile Communication. Our Electronics & Mobile Communication product sector accounted for $4.6 billion, or 16.1%, of our 1998 net sales, excluding certain inter-sector sales which we eliminate for purposes of determining our total consolidated net sales. This sector is one of the leading global providers of automotive electronics products. The sector also offers a wide variety of audio and communication systems for the vehicle. The automotive electronics capabilities of this sector are utilized in connection with many of the product offerings of our two other product sectors to produce systems, subsystems and modules designed to enhance vehicle safety, comfort, security and efficiency. Our principal competitors in the Electronics & Mobile Communication product sector include the following: Denso Inc., Siemens AG, Robert Bosch GmbH, Mannesman VDO AG and Motorola, Inc. Our principal electronics and mobile communication product lines

include the following:

| Product Line | Description |
| --- | --- |
| Audio Systems | Audio systems and components ranging from AM radios to integrated compact disc players, including the Monsoon(R) Audio System. |
| Communication Systems | Communication and information systems, including the EyeCue(R) head up display system and  mobile multimedia. |

Advanced Controllers Microprocessor-based engine management controllers and anti-lock brake controllers. Powertrain and Engine Modules designed to optimize engine and

| Product Line | Description |
| --- | --- |
| Control Modules | transmission performance. |
| Collision Warning Systems | FOREWARN(R) collision warning systems  are microwave-based forward, rear and side object detection systems which present warning signals to drivers in a wide range of formats and warning levels. |
| Security Systems | Products include sounders, inclination sensors, glass breakage sensors, remote key actuation products and vehicle immobilization products, some of which are sold under the TEXALARM(R) brand. |
| Safety Systems | Products include frontal inside airbag controllers, occupant positioning, adaptive restraints and roll-over sensing. |

Safety, Thermal & Electrical Architecture. Our Safety, Thermal & Electrical Architecture product sector accounted for $11.1 billion, or 39.0%, of our 1998 net sales, excluding inter-sector sales. This sector offers a wide range of products relating to the vehicle interior as well as the expertise to integrate them into individual vehicle designs to simplify manufacturer assembly and enhance vehicle marketability. The sector also offers thermal products, including powertrain cooling systems and climate control systems that meet global mandates for alternative refrigerant capabilities. The sector is also a global leader in the production of wiring harnesses and connectors for electrical power and signal distribution. Our principal competitors in the Safety, Thermal & Electrical Architecture product sector include the following: Yazaki Corp., Valeo SA, Autoliv Inc., Denso Inc. and TRW Inc.

o Interior Products. These products accounted for $3.3 billion, or 29.7%, of the Safety, Thermal & Electrical Architecture product sector's 1998 net sales, excluding inter-sector sales. Our principal interior product lines include the following:

| Product Line | Description |
| --- | --- |
| Safety/Airbag Systems | Airbag systems and modules and adaptive restraint technologies, including driver and passenger airbag modules, side airbag modules and  integral steering wheels. |
| Door Modules | Integrated door hardware systems with various features of power and signal distribution, safety and security, heating, ventilation and air conditioning ("HVAC"), electronic control and interior trim systems. |
| Power Product Systems | Systems include power sliding doors, power liftgates and power decklids. |
| Modular Cockpits | Fully integrated interior systems, featuring electrical/electronic systems, structure and trim systems, steering systems, thermal systems and entertainment and safety systems. |

10

o Thermal Products. These products accounted for $2.7 billion, or 24.3%, of the Safety, Thermal & Electrical Architecture product sector's 1998 net sales, excluding inter-sector sales. Our principal thermal product lines include the following:

| Product Line | Description |
| --- | --- |
| Thermal Management Systems | Systems designed to optimize total vehicle thermal management functions, maintain passenger comfort and  powertrain cooling in all climates and driving conditions. |
| Climate Control Systems | Systems which include HVAC  modules, compressors and condensors and are designed to maintain passenger comfort in all climates and weather conditions. |
| HVAC Systems and | HVAC systems and modules regulate airflow, |

| Modules | temperature, humidity and air direction and include evaporators, lightweight aluminum heater cores, blower motor fans and compressors. |
| Powertrain Cooling Systems | Systems designed to optimize powertrain cooling for various driving conditions, including radiators, fans and hoses. |
| Front End Modules | Modules feature a single-part concept, resulting in reduced product weight and size and higher system performance at lower cost. |

o Power and Signal Distribution Products. These products accounted for $5.1 billion, or 46.0%, of the Safety, Thermal & Electrical Architecture product sector's 1998 net sales, excluding inter-sector sales. Our principal power and signal distribution product lines include the following:

### Product Line Description

Electrical/Electronic Products and services relating to E/E system design

| ("E/E") Systems Centers | and production, including E/E centers designed in a variety of configurations and tailored to meet customer-specific applications. |
| Connection Systems | Wiring connection systems with current-carrying capacity ranging from signal-level to over 300 amps, including the GT Connection System(TM), and a variety of fiberoptic data network and point-to-point connection systems. |
| Electronic Products | Electronic products featuring micro-processor based designs with custom integrated circuits and analog/digital/microcomputer/mixed design capabilities. |
| Advanced Data | Products include an optical star coupler, which |

Communication Systems distributes data in real time via plastic optical fiber throughout an expandable network; and customized multiplex systems and components. Fiber Optic Lighting DELight(TM) fiber optic lighting systems utilize

| Systems | centrally located light sources to provide lighting throughout the vehicle. |
| Ignition Wiring Systems | Ignition wiring systems and components. |
| Sensors | Temperature sensors and multifunction sensors that integrate electronics into the packaging. Some of these sensors are sold under the brand name INTELLEK(TM). |
| Switch Products | Pushbutton switches, elastomer switches incorporating integrated electronics and miscellaneous specialty switches. |

11

Dynamics & Propulsion. Our Dynamics & Propulsion product sector accounted for $12.8 billion, or 44.9%, of our 1998 net sales, excluding inter-sector sales. This sector offers a wide range of energy and engine management systems designed to optimize engine performance and emissions control through management of vehicle air intake, fuel delivery, combustion and exhaust after-treatment. The sector also offers all major chassis control systems--steering, braking, suspension and engine, with a focus on providing superior ride and handling performance, high reliability, reduced mass and improved fuel efficiency. The sector's steering products feature vehicle control and driveline technologies and advanced electronic controls to improve performance. Our principal competitors in the Dynamics & Propulsion product sector include the following:
Robert Bosch GmbH, LucasVarity PLC, NSK Ltd., Siemens AG and TRW Inc.

o Energy and Engine Management Products. These products accounted for $5.8 billion, or 45.3%, of the Dynamics & Propulsion product sector's 1998 net sales, excluding inter-sector sales. Our principal energy and engine management product lines include the following:

| Product Line | Description |
| ------------ | ----------- |
| Air/Fuel Management | Subsystems measure, control, manage and deliver a combustible mixture of fuel and air to the combustion chamber. |
| Energy Storage and Conversion | The generator and battery comprise the principal electrical system in the vehicle. The battery stores energy for transfer to the starter during engine start-up; once the engine is running, the generator supplies the vehicle's electrical power requirements. Among other products, we sell batteries into the aftermarket under the brand, as |

described under 5 Customers --Aftermarket.

| | |
|---|---|
| Valve Train | Systems change engine timing and performance to improve fuel economy, reduce emissions and increase torque and power. |
| Exhaust After-Treatment | Subsystems carry gas away from the engine and removes harmful chemical compounds through catalytic reaction of contaminants. |
| Sensors and Solenoids | Sensors, including our INTELLEK(TM) brand sensors, monitor conditions such as presence, speed and chemical content within the vehicle. Solenoids are actuators that control mechanical movement and the flow of fluids within the vehicle. |
| Ignition | Subsystems provide spark energy for combustion initiation of the air/fuel mixture. Coils, electronics, wires/boots and spark plugs generate and deliver a high voltage charge to the combustion chamber. |
| Fuel Handling | Subsystems contain and deliver fuel to the air/fuel architecture and control evaporative emissions. |
| Controls | Subsystems consist of the electronic control module and related software and algorithms which are customized to meet VM needs. |
| Advanced Propulsion Systems | New propulsion technologies include different vehicle system approaches--from powertrain integration to advanced electro-chemical fuel cell engines. |

12

o Chassis Products. These products accounted for $3.8 billion, or 29.7%, of the Dynamics & Propulsion product sector's 1998 net sales, excluding inter-sector sales. Our principal chassis product lines include the following:

| Product Line | Description |
|---|---|
| Intelligent Chassis Control Systems | TRAXXAR(TM) vehicle stability enhancement system integrates all major chassis control systems--steering, braking, suspension and powertrain. GALILEO(TM)intelligent brake-by-wire control system combines power assist, anti-lock braking functions traction control and tunable pedal feel in a modular design. |
| Advanced Ride Control Suspension Systems | Manual Selectable Ride System is a controlled suspension system designed with two independent driver-selectable levels of damping. Continuously Variable Real-Time Damping System provides full car modal control with continuously variable independent damping control at each corner. |
| Chassis Systems and Modules | Systems and modules include complete wheel-to-wheel modules, chassis corner modules, brake corner modules, damper modules and bearings. |
| Brake Systems | Anti-lock brake systems feature solenoid technology and can accommodate traction control, variable effort steering and other vehicle enhancements. |

Suspension and Brake Components include calipers, rotors, drums, master Components cylinders, boosters, drum brake assemblies, shock absorbers and leveling height sensors.

o Steering Products. These products accounted for $3.2 billion, or 25.0%, of the Dynamics & Propulsion product sector's 1998 net sales, excluding inter-sector sales. Our principal steering product lines include the following:

| Product Line | Description |
|---|---|
| Steering Systems | Steering components and fully integrated systems. Components include hydraulic pumps, steering gears and steering hoses. |
| Columns and Intermediate Shafts | Steering columns, including TILT WHEEL(TM), LUXURY-TILT(TM) power adjustable wheel function and manual tilt and telescope. Intermediate shaft offerings include cardan joint, flexible couplings, pot-style joint, spline shaft and concentric isolator. |
| Driveline Systems | Halfshafts that transmit the power of the vehicle's engine to the wheels. Integrated halfshaft designs in a wide variety of joint types and sizes. |
| Fuel Efficiency and | E-STEER(TM) Electric Power Steering is and |

Performance Steering all-electric, engine independent system featuring systems space efficiency, environmental compatibility and fuel efficiency.

E-H-STEER(TM) Electro-Hydraulic Power Steering features optional variable-assist steering. QUADRASTEER(TM) Four Wheel Steering features a short turning radius, enhanced control and improved handling. MAGNASTEER(TM) Magnetic Variable Assist Steering features variable effort power steering.

13

## Customers

General. We currently sell our products to all of the major VMs. While we expect our business with customers other than GM to increase over time, we also expect that GM will remain our largest customer by far for a significant period of time due to the long-term nature of sales contracts in our industry, our strong customer-supplier relationship with GM and the new supply agreement we entered into with GM in January 1999 in connection with our separation from GM (the "Supply Agreement") (See "--Arrangements between GM and Delphi--Supply Agreement"). We supply parts to each regional sector of GM's Automotive Operations, including its automotive operations in the United States, Canada and Mexico ("GM-North America"), and to GM's automotive operations throughout the rest of the world ("GM-International"). In addition, we sell our products to the worldwide aftermarket for replacement parts. Currently, most of our aftermarket sales are to GM's Service Parts Operations ("GM-SPO") for distribution principally to the North American aftermarket.

The following table shows how our total sales were derived for each of the last three years. The percentages for 1998 were affected by work stoppages at certain GM and Delphi locations in the United States in June and July 1998.

|  | Total Sales Year Ended December 31, | | |
|---|---|---|---|
| Customer | 1998 | 1997 | 1996 |
| GM-North America.......... | 62.2% | 65.4% | 66.6% |
| GM-International.......... | 11.0 | 11.2 | 11.7 |
| GM-SPO................... | 5.4 | 5.1 | 5.2 |
| Total GM............... | 78.6 | 81.7 | 83.5 |
| Other Customers.......... | 21.4 | 18.3 | 16.5 |
|  | 100.0% | 100.0% | 100.0% |

For purposes of the foregoing table, "total sales" include all of the sales from joint ventures and other investments in which we own a minority interest even though these sales are not reflected in our sales as reported in our consolidated financial statements included elsewhere in this report. This is how we have historically tracked our sales by customer for internal purposes. We include our minority joint venture sales for this purpose because, among other things, they principally relate to our joint ventures outside the United States where we frequently have significant influence over product design and technology and customer relationships but do not own more than 50%. If we owned more than 50% of these joint ventures, in most cases, we would include these sales in our consolidated sales. In addition, many of these joint ventures use our technologies. If we did not include these sales, the percentages set forth above for GM would be higher.

Awarded Business. We have a substantial base of awarded business from VMs, including business with GM-North America under arrangements that are governed by the Supply Agreement. We track as "awarded business" the future sales that we have a strong expectation of realizing based on various types of VM awards to us and various assumptions we make regarding, among other things, the timing and volume of vehicle production, option mix and product pricing. On that basis, we believe that we currently have a solid foundation of awarded business upon which to grow our company. We cannot assure you, however, that we will in fact realize any specific amount of awarded business because it remains in all cases subject to a number of important risks and uncertainties. We currently estimate revenues from our existing awarded business to be about $28 billion for 1999 and about $22 billion for 2003. The amount of our awarded business declines over time as the vehicle programs in which we are currently participating mature and eventually terminate. However, particularly in the later years, we expect that we will be awarded additional business from GM and other customers.

Sales to General Motors. In 1992, General Motors launched a major reorganization of its automotive business to streamline its business practices and downsize its North American automotive operations. At that time, GM announced its intention to begin filling its procurement needs on a global basis. GM strives through this global sourcing strategy to leverage its purchasing power by sourcing its products on a global basis and to increase competition for its business among its suppliers on the basis of quality, service, technology and price. Pursuant to this initiative, GM has provided suppliers worldwide with the opportunity to bid for GM-North America business historically sourced with us. As a result, our share of GM-North America's automotive parts requirements has declined since 1992.

14

We believe that we are and will continue to be able to compete effectively for GM-North America business because of the high quality of our products, our ongoing cost reduction efforts and our product and technological innovations. As a principal supplier to GM, we periodically

have discussions with GM relating to its future vehicle programs and on long-term technology and product development. Although we have no commitments to GM in this regard, we expect to continue these discussions for some period of time after our separation from GM based on our strong customer-supplier relationship. However, we do expect the portion of GM-North America's automotive parts requirements which we supply and the prices we charge to GM-North America to continue to decline over the next several years. As a result, we also expect that our total sales to GM will decline over the next several years. Through our strategy of aggressively pursuing increased business with customers other than GM-North America, including additional sales to GM-International, however, we will strive to mitigate these effects and increase our total sales.

We have historically supplied a lower percentage of GM-International's automotive parts requirements than the percentage of parts we have supplied to GM-North America. Until the last several years, we were operated by GM as a captive, North America-based supplier to GM's North American operations. As a result, we did not focus heavily on our global business opportunities, including those with GM-International. We also did not have the global presence to compete effectively for GM-International business. As noted above, we have substantially expanded our global presence over the last several years and intend to continue to compete for additional GM-International business.

Supply Agreement. The Supply Agreement we have entered into with General Motors in connection with our separation provides that all existing contracts between General Motors and our company as of January 1, 1999 will generally remain in effect, including the pricing, duration and purchase order terms and conditions. However, the timing of payments from GM to us under the existing contracts will change. The Supply Agreement provides us with certain rights to provide on competitive terms the first replacement cycle of all product programs in the United States and Canada which we were providing to GM as of January 1, 1999, provided that GM sources such replacement programs prior to January 1, 2002 and we are competitive in terms of design, quality, price, service and technology as these factors relate to all aspects of bid packages that may be submitted by other suppliers. For more information regarding the terms of the Supply Agreement, see "-- Arrangements Between GM and Delphi--Supply Agreement."

Other VMs. Although General Motors is by far our largest customer, we do business with all of the other major VMs worldwide. Our top five VM customers other than GM are DaimslerChrysler, Toyota, Fiat, Volkswagen, and Renault. Our combined sales to these customers accounted for about 8% of our total 1998 net sales, and our top ten VM customers other than GM accounted for about 11% of our total 1998 net sales. In determining these percentages, we have not included sales of entities in which we have a minority interest.

Substantially all of our existing contracts with these non-GM customers, which we entered into while we were a business sector of GM, require the consent of the customer in order to assign or transfer the contract. We have had discussions with all of our major non-GM customers regarding our separation from GM and our intent to continue to perform under these existing contracts. Given the extremely large number of existing contracts with our non-GM customers and the positive feedback received during discussions with our major non-GM customers, we do not currently intend either to seek consents from or to enter into new contracts with these customers in connection with our separation from GM. Based on these discussions, we do not believe that our separation from GM will adversely affect our business with these customers. However, we cannot assure you in this regard.

Aftermarket. We sell products to the worldwide aftermarket as replacement parts for current production and older vehicles. In 1998, our aftermarket revenues of $2.1 billion represented 7.2% of our total net sales. We currently sell most of these products into the North American aftermarket under arrangements with GM-SPO, the principal aftermarket sales organization of GM. GM-SPO distributes replacement parts to the aftermarket primarily through GM automobile dealerships and independent distributors, including warehouse distributors and direct retailers. Outside North America, we principally sell into the aftermarket through independent distributors.

Under the terms of our separation from GM, we and GM have agreed that, subject to certain exceptions, GM-SPO will be the exclusive distributor of our products into the U.S. aftermarket and we will be the exclusive supplier of these products to GM-SPO through at least December 31, 2000. GM-SPO currently markets our products under a number of brand names, including ACDelco(R), Freedom(R) and Voyager(R). In connection with our separation from GM, we have agreed with GM-SPO to split the ownership of these aftermarket brands. GM-SPO owns the ACDelco brand and any AC and Delco derivatives and formatives. However, as described further under "Arrangements Between Delphi and General Motors--Intellectual Property," we have been granted a perpetual, worldwide, royalty-free license to use the trade name "Delco Electronics" and the trademarks "DELCO" and "DELCO ELECTRONICS" in connection with certain of our products as well as a worldwide license to use the trademarks "AC," "DELCO" and "AC Delco" until January 1, 2000. We own the Freedom brand, although we may not use the brand in the United States until the expiration of our arrangement with GM-SPO. GM-SPO will own the Voyager battery brand, but may only use it on batteries it purchases from us. For more information about these arrangements, see "--Arrangements Between GM and Delphi --Aftermarket Sales."

15

We have historically derived our principal aftermarket revenues through our relationship with GM-SPO. We believe that there exist opportunities to increase our revenues from sales in the aftermarket and augment the "Delphi" brand presence in the aftermarket over time by establishing new supply relationships with various participants along the aftermarket distribution channel. We believe that our ability to sell products developed for the VM market to aftermarket customers can reduce the impact of adverse changes in demand for new vehicles. With respect to the aftermarket in the United States, we intend to continue to sell products through GM-SPO until the expiration of the transitional arrangements described above. Outside the United States, we are initially focusing on the aftermarket business in Europe and South America.

We believe that incremental aftermarket sales opportunities will be available to us following our complete separation from GM. However, growth in the highly competitive aftermarket business will take time to achieve in light of the significant investment in an aftermarket

distribution infrastructure that is required.

Non-VM Customers. We are also diversifying by supplying certain of our products, including connection systems, flex-circuits wiring, instrumentation and map sensors, to new customer areas, such as the aerospace, motorcycle and computer industries. Our non-VM customers include Boeing Company, Harley-Davidson Inc. and Silicon Graphics Inc. We are also building relationships with Tandem Computers Inc., Storage Technologies and Lucent Technologies Inc. These non-VM sales accounted for only a nominal amount of our total 1998 net sales. We believe that opportunities exist to increase our sales in this area and we intend to continue to work to expand our sales to non-VM customers.

## Variability in Delphi's Business

There are a number of factors that contribute to variability in our business. The variability can produce significant fluctuations in sales and earnings from quarter to quarter, and in some cases from year to year. The primary factors that affect variability are summarized below.

Automotive Industry. Almost all of our business is directly related to automotive sales and production by our customers, which are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences. Any significant reduction in automotive production and sales by our customers would have a material adverse effect on our business.

Regional. We have substantial operations in every major region of the world and economic conditions in these regions often differ. The recent economic downturn in Asia and in Brazil and other regions of Latin America, including Mexico, has led to reductions in demand for automobiles and component parts in those areas and has had an adverse effect on our financial results in 1998. To the extent that these conditions continue to worsen, or spread to other regions, particularly in the United States, our business will continue to be adversely affected.

Seasonal. Our business is moderately seasonal as our primary North American customers historically halt operations for about two weeks in July and about one week in December. In addition, third quarter automotive production is traditionally lower as new models enter production. Accordingly, third and fourth quarter results may reflect these trends.

## Purchasing

We purchase various raw materials for use in our manufacturing processes. The principal raw materials we purchase include platinum group metals, copper, aluminum, steel, lead and resins. All of these raw materials, except the platinum group metals we use to produce our catalytic converters, are available from numerous sources. Currently, all of the platinum group metals used by Delphi for catalytic converters produced for GM are purchased by GM directly from suppliers of these metals which are located principally in Russia and South Africa. In light of the potential political instability in these areas, Delphi maintains a three to four month inventory of platinum group metals. Delphi purchases the platinum group metals it uses in catalytic converters manufactured for its customers other than GM directly from suppliers.

We have not experienced any shortages of raw materials or other products and normally do not carry inventories of raw materials or finished products in excess of those reasonably required to meet our production and shipping schedules, except for the three to four month supply of platinum group metals.

16

## Environmental Compliance

We are subject to the requirements of federal, state, local and foreign environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge and waste management. We have an environmental management structure designed to facilitate and support our compliance with these requirements. We cannot assure you, however, that we are at all times in compliance with all such requirements. Although we have made and will continue to make capital and other expenditures to comply with environmental requirements, we do not expect capital or other expenditures for environmental compliance to be material in 1999 or 2000. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, we cannot assure you that these requirements will not change or become more stringent in the future in a manner that could have a material adverse effect on our business.

We are also subject to environmental laws requiring the investigation and cleanup of environmental contamination. We are in various stages of investigation and cleanup at our manufacturing sites where contamination has been alleged. As of December 31, 1998, Delphi had recorded a reserve of about $20 million for such environmental investigation and cleanup. We cannot assure you that our environmental cleanup costs and liabilities will not exceed the amount of our current reserve.

We have entered into certain arrangements with General Motors regarding the allocation of environmental liabilities relating to our business as part of our separation from General Motors. For more information, see "--Arrangements Between GM and Delphi --Real Estate and Environmental."

## Arrangements Between GM and Delphi

The separation of Delphi from General Motors and the transactions being undertaken in connection therewith are being effected pursuant to a Master Separation Agreement, dated December 22, 1998, to which Delphi and General Motors are parties (as amended from time to time, the "Separation Agreement"). In addition, we have entered into certain ancillary agreements contemplated by the Separation Agreement (collectively, as amended from time to time, the "Ancillary Agreements") and certain other agreements which govern various interim and ongoing relationships between us and GM. The Ancillary Agreements include, among others, agreements relating to the IPO and the Distribution, our sale of products to GM, employee matters, tax matters, intellectual property, real estate and environmental matters, product liability and the provision of certain interim services. The Ancillary Agreements also require us to cooperate with GM in all respects to complete the Distribution and provide for registration rights for GM in the event the Distribution is not completed or is completed without GM divesting itself of all of its Delphi Common Stock.

Certain international, intellectual property and real property assets relating primarily to the business of Delphi are still held by GM or its affiliates, pending receipt of consents or approvals or satisfaction of other applicable requirements necessary for the transfer of such assets to Delphi. We do not believe that these assets and operations are, individually or in the aggregate, material to our company. However, the information included in this report, including our consolidated financial statements, assumes the completion of all such transactions. See "--International Agreements." In addition, certain information technology assets relating primarily to our business are still held by GM or its affiliates, pending receipt of consents necessary for the transfer of such assets to Delphi, or may be retained by GM if consents to their transfer cannot be obtained. Also, certain assets and liabilities relating to employees working under collective bargaining agreements will be transferred to Delphi in connection with the Distribution. Capitalized terms which we use in this section but do not otherwise define below or elsewhere herein have their respective meanings as set forth in the Separation Agreement.

All of these agreements were made in the context of a parent-subsidiary relationship and were negotiated in the overall context of our separation from GM. The terms of these agreements may be more or less favorable to us than if they had been negotiated with unaffiliated third parties.

We have set forth below a summary description of the Separation Agreement and certain of the Ancillary Agreements. This description, which summarizes the material terms of such agreements, does not purport to be complete and is qualified in its entirety by reference to the full text of such agreements. Certain of these agreements, including the Separation Agreement, the IPO and Distribution Agreement and the Registration Rights Agreement, the Supply Agreement, the Business Relationship Agreement, the U.S. Employee Matters Agreement and certain tax allocation agreements have been filed as exhibits to this report and are incorporated by reference.

17

Separation Agreement. The Separation Agreement, which became effective on January 1, 1999, sets forth our agreements with GM with respect to the principal corporate transactions required to effect the transfers of assets and assumptions of liabilities necessary to separate our company from GM and certain other agreements governing our relationship thereafter.

Transfer of Assets and Assumption of Liabilities. General Motors has transferred, or agreed to transfer, or to cause its subsidiaries and representatives to transfer, the Delphi Assets to our company and our subsidiaries, and we and our subsidiaries have assumed, or agreed to assume, and have agreed to pay, perform, satisfy and discharge on a timely basis the Delphi Liabilities in accordance with their respective terms. Except as expressly set forth in the Separation Agreement or in any Ancillary Agreement, GM has not made any representation or warranty with respect to any Delphi Asset and the Delphi Assets are being transferred on an "as is, where is" basis.

Transition Services. The Separation Agreement provides that if we identify any services that GM, or its affiliates or their suppliers, were providing to us immediately prior to January 1, 1999 and any of such services is not being provided to us pursuant to any of the Ancillary Agreements, GM agrees, upon our written request, to use its reasonable best efforts to provide that service to us until January 1, 2000. GM is not required to provide any service which GM would not be legally permitted to provide to a third party. We must use all commercially reasonable efforts to obtain any transition services provided pursuant to this provision of the Separation Agreement from a source other than GM before January 1, 2000. If we cannot obtain such transition service from a source other than GM and such service is necessary to operate the Delphi Automotive Systems Business in substantially the same manner as it was conducted immediately before January 1, 1999, GM has agreed to provide such transition service to us for an additional period not to exceed six months.

For the majority of the transition services provided to us by GM pursuant to the Separation Agreement and for services provided to us by GM pursuant to the Ancillary Agreements, we must pay GM on or prior to the fifteenth day following receipt of an invoice:

(1)in the case of any transition service provided pursuant to the Separation Agreement or pursuant to an Ancillary Agreement in which a payment amount or formula has not been set forth, an amount equal to the cost historically allocated to our business for such services as of January 1, 1999, adjusted to reflect any changes in the nature, cost or level of services provided; provided that, if no cost has historically been allocated to us for such service, then we shall pay to GM:

(a) that portion of the total costs borne by GM which GM would have allocated to Delphi under its internal allocation formula; plus

(b) any direct user charges provided for in clause (a) above; plus

(c) any other reasonable charges necessary to make GM whole for the provision of such services; or

(2)in the case of any service to be provided pursuant to an Ancillary Agreement in which a payment amount of formula has been set forth, the amount owed pursuant to the terms of such Ancillary Agreement.

If we make payment later than the forty-fifth day after the date we receive an invoice, we must pay interest on the amount due based on the Prime Rate. For any such services that are provided to us directly by third parties, we will pay such third party directly where such direct payment is permissible. These payment provisions do not apply to services provided to us pursuant to any real estate leases, any health care services pursuant to the Employee Matters Agreement, and certain other agreements. In addition, we are responsible for providing certain transitional services to GM with respect to certain businesses retained by GM.

Ancillary Agreements. Except with respect to the provisions regarding payment for transition services described above, to the extent that any Ancillary Agreement expressly addresses any matters addressed by the Separation Agreement, the terms and conditions of the Ancillary Agreement will govern the rights and obligations of the parties regarding such matters. We must use all commercially reasonable efforts to obtain services provided to us by GM under the terms of those Ancillary Agreements relating to

18

transition services from a source other than GM. Certain of the Ancillary Agreements provide that the transition service may be extended beyond the termination of the transition periods provided for therein and we expect that after the Distribution we would negotiate with GM at arm's length the terms of any such extension, including fair market value pricing for all such services.

Indemnification. We have agreed to indemnify, defend and hold harmless General Motors and each of its subsidiaries and their respective successors-in-interest, and each of their respective past and present representatives against any losses, claims, damages, liabilities or actions arising, whether prior to or after the Contribution Date, out of or in connection with the Delphi Liabilities and/or our conduct of our business and affairs after the Contribution Date. Certain of the Ancillary Agreements provide for indemnification between us and GM relating to the substance of such agreements. The Separation Agreement and certain of the Ancillary Agreements specify certain procedures with respect to claims thereunder subject to indemnification and related matters.

Claims and Litigation. The Separation Agreement provides for the allocation of the liability between us and GM for certain claims and litigation relating to or arising out of the Delphi Automotive Systems Business.

o Product Liability. GM has retained responsibility for all product liability actions relating to products we manufactured prior to January 1, 1999 and sold or otherwise supplied to GM either before or after that date. Responsibility for product liability actions relating to products we manufacture on or after January 1, 1999 and sell to GM shall be determined in accordance with the agreements for such sales. We will be responsible for liability relating to all products we sold at any time or sell in the future to customers other than GM. In connection therewith, we will indemnify GM against, and reimburse GM for costs associated with, the claims for which we are liable, and GM will indemnify us against, and reimburse us for costs associated with, the claims for which GM has retained liability.

o General Litigation. With respect to general litigation claims, we have assumed the liability for all new claims related to the Delphi Automotive Systems Business and for certain specified claims. GM has agreed to defend certain other specified claims at our expense and GM has retained the liability for certain other specified claims. In connection therewith, we will indemnify GM against, and reimburse GM for costs associated with, the claims for which we are liable, and GM will indemnify us against, and reimburse us for costs associated with, the claims for which GM has retained liability.

o Employment-Related Claims. We have assumed the liability for certain specified employment-related claims and we will indemnify GM against any such claims and reimburse GM for any legal or other expenses reasonably incurred by GM in connection with such claims. Certain other employment related claims will be jointly defended by us and GM. We have financial responsibility for employment related claims regarding all Delphi Employees and Delphi Terminated Employees whether incurred before or after the Contribution Date. We will mutually determine with GM how new claims shall be treated. However, U.S. claims for pension and welfare benefits from salaried employees who retire on or before the Contribution Date and hourly employees who retire on or before October 1, 1999 will remain the responsibility of GM.

We have agreed with GM to cooperate with each other in the defense of any and all claims covered by these provisions of the Separation Agreement.

Insurance. The Separation Agreement provides that during the period beginning on the Contribution Date and ending on the earlier of the date of the completion of the Distribution or the first anniversary of the Contribution Date (the "Insurance Transition Period"), GM shall, subject to certain conditions and exceptions, maintain policies of insurance, including for the benefit of Delphi or any of its affiliates, directors, officers or other covered parties, which are comparable to those generally maintained by GM. The Separation Agreement sets forth procedures we must follow for asserting claims, reimbursing GM for premium expenses and other insurance related matters during the Insurance Transition Period. Following the expiration of the Insurance Transition Period, except as provided in the Separation Agreement, we will be responsible for obtaining and maintaining our own insurance programs.

Dispute Resolution. The Separation Agreement contains provisions that govern, except as provided in any Ancillary Agreement, the resolution of disputes, controversies or claims that may arise between us and GM. The Separation Agreement provides that the parties will use all commercially reasonable efforts to settle all disputes arising in connection with the Separation Agreement without resorting to mediation,

arbitration or otherwise. If these efforts are not successful, any party may submit the dispute for non-binding mediation by delivering notice to the other party of the dispute and expressly requesting mediation of the dispute. If, after mediation, the parties disagree regarding the mediator's recommendation, the dispute will be submitted to binding arbitration in accordance with the terms

19

of the Separation Agreement. The Separation Agreement contains procedures for the selection of a three-arbitrator panel to act by majority vote and the conduct of the arbitration hearing, including certain limitations on the discovery rights of the parties. We and GM have agreed that all disputes or other matters related to the Supply Agreement and certain of the other Ancillary Agreements are exempt from the dispute resolution procedures established in the Separation Agreement.

Certain Definitions Relating to the Separation Agreement. Set forth below are certain defined terms contained in the Separation Agreement:

"Contribution Date" means January 1, 1999.

"Delphi Assets" means all of GM's right, title and interest in and to all assets, excluding cash and cash equivalents, that:

(1)except as set forth on a schedule to the Separation Agreement or as otherwise provided in the Separation Agreement or in an Ancillary Agreement, are reflected in the Delphi Financial Statements and not disposed of by GM after the date thereof and before the Contribution Date, including assets written off or expensed but still used by Delphi which Delphi can demonstrate to GM's reasonable satisfaction were paid for by the Delphi Automotive Systems Sector of GM; or

(2)are to be transferred pursuant to Section 2.01(c) of the Separation Agreement, which relates to assets relating to certain international operations; or

(3)are acquired by the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in the financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared; or

(4)are expressly provided by the Separation Agreement or any Ancillary Agreement to be transferred to Delphi; or

(5)are listed on the schedule to the Separation Agreement that sets forth the facilities to be transferred to Delphi; or

(6)except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are used exclusively by the Delphi Automotive Systems Business as of the Contribution Date;

provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any asset described in the clause (6) above to be reflected in the Delphi Financial Statements as of the date thereof, then such asset shall be included in the "Delphi Assets" only if so reflected.

"Delphi Automotive Systems Business" means the business conducted by the Delphi Automotive Systems business sector of General Motors at any time on or before the Contribution Date, including:

(1)all business operations whose financial performance is reflected in the Delphi Financial Statements;

(2)all business operations initiated or acquired by the Delphi Automotive Systems business sector of GM after the date of the Delphi Financial Statements; and

(3)all business operations that were conducted at any time in the past by the Delphi Automotive Systems business sector of GM or by any predecessor of such business sector, including, without limitation, the GM Automotive Components Group, but were discontinued or disposed of prior to the date of the Delphi Financial Statements other than by transfer or disposition to any other business sector of GM.

"Delphi Financial Statements" means the consolidated financial statements and the notes thereto of Delphi for the nine months ended September 30, 1998 as set forth in the registration statement relating to our IPO as amended through December 22, 1998, the date of the Separation Agreement. Such financial statements are substantially similar to the financial statements for such period included in the prospectus dated February 4, 1999 related to the IPO, a copy of which is on file with the Commission.

"Delphi Liabilities" means all of the Liabilities of General Motors that:

20

(1)except as otherwise set forth on a schedule to the Separation Agreement or as otherwise provided in the Separation Agreement or in an

Ancillary Agreement, are reflected in the Delphi Financial Statements and remain outstanding at the Contribution Date; or

(2) are to be transferred pursuant to Section 2.01(c) of the Separation Agreement, which relates to assets relating to certain international operations; or

(3) arise in connection with the Delphi Automotive Systems Business after the date of the Delphi Financial Statements and would be reflected in financial statements of Delphi as of the Contribution Date if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared; or

(4) are expressly provided by the Separation Agreement or any Ancillary Agreement to be transferred to and assumed by Delphi; or

(5) except as otherwise provided in an Ancillary Agreement or other express agreement between the parties, are related to or arise out of or in connection with the Delphi Assets; or

(6) except as otherwise provided in an Ancillary Agreement or other express agreement of the parties, are related to or arose out of or in connection with the Delphi Automotive Systems Business, including, but not limited to the covenants not to compete entered into by GM prior to the Contribution Date set forth on a schedule to the Separation Agreement, whether before or after the date of the Delphi Financial Statements;

provided, unless the parties otherwise expressly agree, that if the accounting principles under which the Delphi Financial Statements were prepared would have required any liabilities described in clause (6) above to be reflected in the Delphi Financial Statements as of the date thereof, then such liabilities shall be considered to be "Delphi Liabilities" only if so reflected.

"Liabilities" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising, including, without limitation, whether arising out of any contract or tort based on negligence or strict liability, and whether or not the same would be required by generally accepted accounting principles to be reflected in financial statements or disclosed in the notes thereto.

IPO and Distribution Agreement. We have entered into an Initial Public Offering and Distribution Agreement (as amended from time to time, the "IPO and Distribution Agreement") with GM which governs our respective rights and duties with respect to the IPO and the Distribution, and sets forth certain covenants we have agreed to for various periods following the IPO and the Distribution. Although GM has announced that it currently plans to complete the Distribution, and we have agreed to cooperate with GM in all respects to complete the Distribution, it is not obligated to do so. We cannot assure you as to whether or when the Distribution will occur.

The Distribution. We have agreed that we will cooperate with GM in all respects to accomplish the Distribution and, at GM's direction, promptly take all actions necessary or desirable to effect the Distribution, including the registration under the Securities Act of 1933, as amended (the "Securities Act"), of GM's shares of our capital stock. General Motors has the sole discretion to determine whether to proceed with all or part of the Distribution and all terms of the Distribution, including the form, structure and terms of any transaction(s) and/or offering (s) to effect the Distribution and the timing of and conditions to the consummation of the Distribution. In the event that GM determines that it no longer intends to proceed with or complete the Distribution, GM must provide us notice to such effect. Upon such notification, GM's rights and our obligations under the Registration Rights Agreement described below become immediately effective.

Preservation of the Tax-Free Status of the Distribution. General Motors intends for the Distribution to qualify as a tax-free distribution under Section 355 of the Code to GM and its stockholders. On January 13, 1999, GM received from the IRS a private letter ruling (the "IRS Ruling") to such effect. In connection with GM's request for the IRS Ruling, we made certain representations and warranties to GM regarding our company and our business. We have also agreed to certain covenants in the IPO and Distribution Agreement intended to preserve the tax-free status of the Distribution. We

21

may take any action otherwise prohibited by these covenants only if GM has determined, in its sole and absolute discretion, that such action would not jeopardize the tax-free status of the Distribution. See "--Cooperation on Tax Matters." Certain of these covenants are described in greater detail below:

o Stock Issuance. Prior to the completion of the Distribution, we have agreed not to issue or agree to issue shares of our capital stock in an amount that would result in GM owning less than 80% of the total combined voting power of all outstanding shares of our voting stock and/or less than 80% of any other class and/or series of Delphi capital stock. This covenant will not prohibit us from issuing stock options and restricted stock awards to our employees so long as we repurchase sufficient shares of our capital stock prior to the date when such options and awards become exercisable to ensure that GM's ownership remains at or higher than 80% and GM approves of our procedures to comply with this covenant.

o Certain Acquisition Transactions. Until two years after the completion of the Distribution, or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution, we have agreed not to enter

into or permit any transaction or series of transactions which would result in a person or persons acquiring or having the right to acquire shares of our capital stock that would comprise 50% or more of either the value of all outstanding shares of our capital stock or the total combined voting power of our outstanding voting stock.

o Continuation of Active Trade or Business. Until two years after the completion of the Distribution, or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution, we have agreed to continue to conduct the active trade or business, within the meaning of Section 355 of the Code, of our company as we conduct it immediately prior to the completion of the Distribution. During such time, we have agreed not to:

o liquidate, dispose of or otherwise discontinue the conduct of any portion of our active trade or business with a value in excess of $2.0 billion; or

o dispose of any business or assets that would cause our company to be operated in a manner inconsistent in any material respect with the business purposes for the Distribution as described to the IRS or tax counsel in connection with GM's request for the IRS Ruling.

Also, until two years after the completion of the Distribution, we have agreed not to liquidate, dispose of, or otherwise discontinue the conduct of any portion of the active trade or business of our company if such liquidation, disposition or discontinuance would breach the covenant described below regarding our continuity of business.

o Continuity of Business. Until two years after the completion of the Distribution, or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution, we have agreed that:

o we will not voluntarily dissolve or liquidate; and

o except in the ordinary course of business, neither we nor any of our direct or indirect subsidiaries will sell, transfer, or otherwise dispose of or agree to dispose of assets, including any shares of capital stock of our subsidiaries, that, in the aggregate, constitute more than:

(x) 60% of our gross assets; or

(y) 60% of the consolidated gross assets of us and our subsidiaries.

For this purpose, we are not deemed to directly or indirectly control a subsidiary unless we own, directly or indirectly, shares constituting:

o 80% or more of the total combined voting power of all outstanding shares of voting stock of such subsidiary; and

22

o80% or more of the total number of outstanding shares of each class or series of capital stock of such subsidiary other than voting stock.

oDischarge of Intracompany Debt. Prior to the first date on which GM distributes any Delphi common stock in connection with the Distribution, we have agreed to fully discharge and satisfy all debt that we owe GM. For such purpose, debt does not include payables arising in the ordinary course of business. Until two years after the completion of the Distribution, or, if GM determines not to complete the Distribution, the last date on which GM distributed any Delphi common stock in connection with the Distribution, we will not be able to have any such indebtedness with GM.

In the event that GM notifies us that it no longer intends to proceed with or complete the Distribution and GM has not yet distributed any of its Delphi common stock, these covenants to preserve the tax-free status of the Distribution will terminate.

Other Covenants Regarding Tax Treatment of the Transactions. General Motors intends the transfer of assets and liabilities from GM to our company as contemplated by the Separation Agreement (the "Contribution") to qualify as a reorganization under Section 368(a)(1)(D) of the Code (a "D Reorganization"). Until two years after the completion of the Distribution, we have agreed not to take, or permit any of our subsidiaries to take, any actions or enter into any transaction or series of transactions that would be reasonably likely to jeopardize the tax-free status of the Distribution or the qualification of the Contribution as a D Reorganization, including any action or transaction that would be reasonably likely to be inconsistent with any representation made to the IRS or tax counsel. We may take any action that would otherwise violate this covenant only if GM has determined, in its sole and absolute discretion, that such action or transaction would not jeopardize the tax-free status of the Distribution or the qualification of the Contribution as a D Reorganization.

Cooperation on Tax Matters. We and GM have agreed to certain procedures with respect to the tax-related covenants in the IPO and Distribution Agreement. We are required to notify GM if we desire to take any action prohibited by the tax-related covenants described above. Upon such notification, if GM determines that such action might jeopardize the tax-free status of the Distribution or the qualification of the Contribution as a D Reorganization, GM has agreed to elect either to:

o use all commercially reasonable efforts to obtain a private letter ruling from the IRS or a tax opinion that would permit us to take the desired

action, and we have agreed to cooperate in connection with such efforts or

o provide all reasonable cooperation to us in connection with our obtaining such an IRS ruling or tax opinion.

In either case, GM has agreed to bear its reasonable costs and expenses of obtaining such an IRS ruling or tax opinion.

Indemnification for Tax Liabilities. We have generally agreed to indemnify GM and its affiliates against any and all tax-related losses incurred by GM in connection with any proposed tax assessment or tax controversy with respect to the Distribution or the Contribution to the extent caused by any breach by us of any of our representations, warranties or covenants made in the IPO and Distribution Agreement. This indemnification does not apply to actions which GM permits us to take as a result of a determination under the tax-related covenants as described above.

Other Delphi Covenants. General Motors currently owns a significant portion of our common stock. As a result, GM will continue to include us as a "subsidiary" for various financial reporting, accounting and other purposes. Accordingly, we have agreed to certain covenants in the IPO and Distribution Agreement. Certain of these covenants are described below:

o Covenants Regarding the Incurrence of Debt. So long as GM is a significant stockholder of our company, the amount of our indebtedness for borrowed money will affect GM's financial position. Thus, we have agreed to certain limitations on our ability to incur debt:

o For so long as GM continues to own at least 50% of our outstanding common stock, without GM's prior written consent, which it may withhold in its sole and absolute discretion, we will not, and will not permit any of our subsidiaries to:

o create, incur, assume or suffer to exist any Indebtedness in excess of an aggregate of $5.0 billion outstanding at any time; provided, however, that we may make an acquisition as a result of which our Indebtedness would exceed $5.0 billion so long as both the acquisition target has an FFO to Debt Ratio of at least 20% and our Indebtedness after giving effect to the acquisition, including, without duplication, any Indebtedness incurred in connection with the acquisition and any indebtedness of the acquisition target that will become our Indebtedness as a result of such acquisition, would not be greater than $6.0 billion; and

23

o consummate, or agree to consummate, any acquisition of any acquisition target with an FFO to Debt Ratio less than 20% unless our Adjusted Indebtedness would not exceed $5.0 billion.

For purposes of these covenants, the following terms have the following meanings:

"Adjusted Indebtedness" means, with respect to any proposed acquisition, the sum of:

(1)our Indebtedness immediately after giving effect to such acquisition, including, without duplication, any Indebtedness incurred in connection with the acquisition and any indebtedness of the acquisition target that will become our Indebtedness as a result of such acquisition; and

(2)the amount by which the number described in clause (2) of the definition of "FFO to Debt Ratio" would need to be reduced in order for the acquisition target's FFO to Debt Ratio to be equal to 20%.

"Indebtedness" means the sum of:

(1)the aggregate principal amount of our and our subsidiaries' total long-term and short-term liabilities for borrowed money including capitalized leases, as determined for purposes of our consolidated financial statements; and

(2)the aggregate amount attributable to all factoring or securitization of receivables and other financial assets by us and our subsidiaries in excess of $1.2 billion.

"FFO to Debt Ratio" means, for any acquisition target, as of immediately prior to the proposed acquisition, the percentage determined by dividing:

(1)the sum of such acquisition target's net income plus depreciation and amortization for the last four full fiscal quarters, as determined for purposes of its consolidated financial statements; by

(2)the additional Indebtedness that would be incurred in connection with such proposed acquisition, including any indebtedness of the acquisition target that will become our Indebtedness as a result of such proposed acquisition.

o Other Covenants. For so long as GM continues to own at least 50% of our outstanding common stock, we have agreed that:

owe will not, without GM's prior written consent, which it may withhold in its sole and absolute discretion, take any action which has the effect of limiting GM's ability to freely sell, pledge or otherwise dispose of shares of our common stock or limiting the legal rights of or denying any benefit to GM as a Delphi stockholder in a manner not applicable to Delphi stockholders generally; this means that, among other things, we will not, without GM's prior written consent, which it may withhold in its sole and absolute discretion, alter our Rights Plan, or any successor stockholder rights plan, in a manner that would result in GM's ownership of our common stock causing the rights to detach or become exercisable;

owe will not, without GM's prior written consent, which it may withhold in its sole and absolute discretion, issue any shares of common stock or any rights, warrants or options to acquire our common stock, if after giving effect to such issuance GM would own less than 50% of the then outstanding shares of our common stock; and

oto the extent that GM is a party to, or enters into, any agreements that provide that certain actions of GM's subsidiaries may result in GM being in breach or default under such agreements, and we have been advised of the existence of such agreements, we will not take any actions that may result in GM being in breach or default under any such agreement.

o Financial Information. We have agreed that, for so long as GM is required to consolidate our results of operations and financial position or

24

account for its investment in our company, we will provide GM certain financial information regarding our company and our subsidiaries; provide GM copies of all quarterly and annual financial information and other reports and documents we intend to file with the SEC prior to such filings, as well as final copies upon filing; provide GM with copies of our budgets and financial projections, as well as the opportunity to meet with our management to discuss such budgets and projections; consult with GM regarding the timing and content of earnings releases; and cooperate fully, and cause our accountants to cooperate fully, with GM in connection with any of its public filings. This covenant is subject to appropriate confidentiality provisions to protect the confidentiality commitments we have made to our customers.

o Auditors and Audits; Annual Statements and Accounting. We have agreed that, for so long as GM is required to consolidate our results of operations and financial position or account for its investment in our company, we will not change our auditors without GM's prior written consent, which will not be unreasonably withheld, and will use our best efforts to enable our auditors to complete their audit of our financial statements such that they will date their opinion the same date that they date their opinion on GM's financial statements; provide to GM and its auditors all information required for GM to meet its schedule for the filing and distribution of its financial statements; make available to GM and its auditors work papers related to the annual audit of our company as well as access to the personnel who perform the annual audit and our subsidiaries' books and records so that GM and its auditors may conduct reasonable audits relating to our financial statements; adhere to certain specified accounting standards; and notify and consult with GM regarding any changes to our accounting principles; and make any changes to our accounting estimates and principles requested by GM.

We have generally agreed to indemnify General Motors and its affiliates against all liabilities arising out of any incorrect, inaccurate or incomplete financial and other information we provide to GM pursuant to the terms of the IPO and Distribution Agreement.

Indemnification Relating to the IPO and the Distribution. We have generally agreed to indemnify General Motors and its affiliates against all liabilities arising out of any material untrue statements and omissions in any and all registration statements, information statements and/or other documents filed with the SEC in connection with the IPO and the Distribution. However, our indemnification of GM does not apply to information relating to General Motors, excluding information relating to Delphi. GM has agreed to indemnify us for this information.

Expenses. GM has generally agreed to pay all costs and expenses relating to the IPO and the Distribution. We will, however, pay for the costs and expenses of our financial, legal, accounting and other advisers, if any, incurred in connection with the Distribution. We will also pay for our internal costs and expenses.

Registration Rights Agreement. As noted above, General Motors has announced its current plan to divest itself of ownership of our stock through the Distribution and we have agreed to cooperate with GM in all respects to complete the Distribution. In the event that GM does not divest itself of all of its shares of Delphi common stock in the Distribution, GM could not freely sell all of such shares without registration under the Securities Act. Accordingly, we have entered into a Registration Rights Agreement (as amended from time to time, the "Registration Rights Agreement") with GM to provide it (or any other person to whom GM has transferred our shares) with certain registration rights relating to the shares of our common stock which it holds. These registration rights generally become effective at such time, if any, as GM informs us that it no longer intends to proceed with or complete the Distribution.

Demand Registrations. Under the agreement, GM may request registration (each, a "Demand Registration") under the Securities Act of all or any portion of our shares covered by the Registration Rights Agreement and we will be obligated to register such shares as requested by GM.

oTerms of Each Offering. General Motors will designate the terms of each offering effected pursuant to a Demand Registration, which may take any form, including:

(1) an underwritten public offering;

(2) a shelf registration;

(3) a registration in connection with the distribution of, or exchange of or offer to exchange, shares of our common stock to holders of debt or equity securities of GM, a subsidiary or affiliate thereof or any other person; or

(4) a distribution in connection with the registration by GM or a subsidiary or affiliate thereof of securities convertible into, exercisable for or otherwise related to such shares of our common stock.

25

Except for an offering described in clauses (3) and (4) above, each Demand Registration must meet a certain minimum aggregate expected offering price.

oTiming of Demand Registrations. We are not required to undertake a Demand Registration within 90 days of the effective date of a previous Demand Registration, other than a Demand Registration that was effected as a shelf registration. Also, we have the right to postpone the filing or effectiveness of any Demand Registration for up to 90 days if in the reasonable judgment of our General Counsel such registration would reasonably be expected to have a material adverse effect on any existing proposal or plans by our company to engage in certain material transactions; provided, however, that we may exercise this right only once in any 12-month period.

oPiggyback Registrations. The Registration Rights Agreement also provides for certain "piggyback" registration rights for General Motors. Whenever we propose to register any of our securities under the Securities Act for ourselves or others, subject to certain customary exceptions, we must provide prompt notice to GM and include in such registration all shares of our stock which GM requests to be included (each, a "Piggyback Registration"). In certain circumstances, General Motors has the right to reasonably object to our selection of any investment banker(s) and manager(s) in connection with a Piggyback Registration.

The Registration Rights Agreement sets forth customary registration procedures, including a covenant by us to make available our senior management for road show presentations. All registration expenses incurred in connection with the Registration Rights Agreement, including all filing fees, fees and expenses of compliance with securities and/or blue sky laws, financial printing expenses, fees and disbursements of custodians, transfer agents, exchange agents and/or information agents, and fees and disbursements of counsel for our company and all independent certified public accountants, underwriters, excluding discounts and commissions, and other persons retained by us will be paid by us. In addition, we must reimburse GM for the fees and disbursements of its outside counsel as well as out-of-pocket expenses incurred in connection with any such registration. The Registration Rights Agreement also contains customary indemnification and contribution provisions by us for the benefit of General Motors and any underwriters and by General Motors for the benefit of us and any underwriters with respect to information provided by GM.

Supply Agreement. We have entered into a Component Supply Agreement with GM (as amended from time to time, the "Supply Agreement") which we believe will provide us with a substantial base of future business with GM-North America well into the next decade. GM currently sources a significant amount of its automotive parts requirements from us pursuant to certain existing contractual commitments. Except as described below, the Supply Agreement between GM and Delphi provides that all existing contracts as of January 1, 1999 will generally remain in effect, including the pricing, duration and purchase order terms and conditions. The Supply Agreement also provides that, subject to certain exceptions as described below, we have the right to provide on competitive terms the first replacement cycle of all product programs in the United States and Canada which we were providing to GM as of January 1, 1999, provided that GM sources such replacement cycle business prior to January 1, 2002. We expect these programs will cover specific vehicle models introduced from 1999 well into the next decade. We will also have the opportunity to bid on other new GM business on the same basis as other suppliers.

Our ability to realize revenues on all GM business, including business awarded pursuant to existing contracts, is in all cases subject to a variety of factors, including the volume and option mix of vehicles actually produced by GM. The Supply Agreement provides that General Motors has the right to move its business with us to other suppliers in the event that we are not competitive in terms of quality, service, design and technology. In addition, GM has the right at all times to adopt new technology, whether or not such technology is available through us. If we are unable to provide the new technology or an equivalent technology acceptable to GM on a competitive basis, GM is free to move the business from us to another supplier.

Existing Contracts. Under the terms of the Supply Agreement, except as provided below, all existing contractual commitments between us and GM relating to the purchase and supply of motor vehicle-related components and systems as of January 1, 1999 will generally remain in effect, including the existing pricing, duration and purchase order terms and conditions. This includes existing contracts under which we have not yet begun to supply products. All existing contracts are subject to the volume and option mix of vehicles actually produced by General Motors and other factors.

Under the terms of the Supply Agreement, Delphi and General Motors have agreed to honor all "nomination letters" in place as of January 1, 1999 regardless of whether formal purchase orders or other contractual commitments have been issued with respect to such business. Nomination letters refer to letters from General Motors informing a supplier that it has been awarded specific business to supply a product for a particular vehicle program. In light of the long product development cycles in the automotive industry, General Motors typically issues its nomination letters and other new business

commitments about three years in advance of actual production of the vehicle program. These nomination letters commit GM, subject to certain conditions, to source products for a particular vehicle program from a supplier. However, if GM determines for any reason not to proceed with the vehicle program covered by a nomination letter, it is under no obligation to such supplier. Also, as with other purchase arrangements, nomination letters do not require any minimum purchase and are subject to actual production volumes, supplier competitiveness and other factors.

Payment Terms. Until recently, most of our existing contracts with GM required payment by GM in the month following GM's receipt of our invoice. Except as described below, payment terms on all existing contracts have been modified by the Supply Agreement to generally require payment from GM to us under such contracts on the second day of the second month following the date of shipment by Delphi. For more information regarding the impact of these modified payment terms on our financial condition, see "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources--Extension of Payment Terms." The modified payment terms became effective on January 1, 1999 and also apply to future contracts with GM. These modified payment terms are consistent with the new payment terms that GM is currently in the process of introducing to its other suppliers.

The Supply Agreement also provides that certain contracts relating to purchases of parts for Saturn vehicle models will retain the consumption methodology currently in place, which generally provides that Saturn pays only for the actual amount of product used rather than the amount of product delivered. Also, certain existing contracts relating to purchases by GM's international automotive operations will retain the existing payment terms.

Our Ability to Secure Certain Next Generation Business. The Supply Agreement is intended to provide us the opportunity to capture future GM business that replaces current GM business over the next several years. Through December 31, 2001, we will have the ability to secure under competitive purchase order terms the first replacement cycle of all product programs in the United States and Canada which we were providing to General Motors as of January 1, 1999, and certain other product programs as described below. Thus, we will have the opportunity to match competitive bids from other suppliers on the next generation of the product programs we provided to GM in the United States and Canada as of January 1, 1999, provided those programs are sourced by GM prior to January 1, 2002. However, in order to utilize this ability to secure next generation business, we must be competitive in terms of design, quality, price, service and technology. Other suppliers' bids to provide particular products may include offers of price reductions to GM on other current or future products, and GM may under the Supply Agreement consider the economic effect of such package proposals in assessing our competitiveness.

As noted above, General Motors generally sources its product needs about three years in advance of the start of production for each vehicle program. Since many of these contractual commitments cover a significant period of time due to the duration of many vehicle programs of about five to eight years, depending on the vehicle model, we expect that this ability to secure next generation business, together with our existing contracts and nomination letters, will provide us with the opportunity to maintain substantial business with GM well into the next decade.

Our ability to secure next generation business as described above, which is sometimes referred to as a "right of last refusal," includes production in the United States and Canada of common global vehicle platforms to the extent that we can provide or execute designs that comply with the required form and function specifications determined by GM, as well as production in Mexico of vehicles intended for sale in the United States or Canada; provided that in all cases such programs must meet all of the other necessary criteria, including that such programs were programs in the United States and Canada which we were providing to GM as of January 1, 1999. Other than as described immediately above, our ability to secure next generation business will not apply to any programs of GM's international automotive operations or to GM vehicle production in Mexico.

The Supply Agreement also expressly provides that GM will not be responsible under any circumstances for any supplemental or compensatory payments to us in the event that we fail to exercise our ability to secure any next generation business or if we cannot provide our products on a competitive basis.

New Business. All new business awarded to us by General Motors will be governed by the specific terms of the contracts under which such new business is awarded. Other than with respect to next generation business as described above, if we elect to bid for GM business, we will do so on the same basis as all other suppliers. General Motors will award any such business in its sole discretion.

27

GM's Right to Re-Source. Consistent with GM's contracts with other suppliers, the Supply Agreement provides General Motors the right to re-source its business with us in the event that we are not competitive in terms of quality, service, design and technology. Competitiveness is defined by demonstrable product and performance levels available to GM from other suppliers. The term "re-sourcing" refers to the process of moving existing business from Delphi to another supplier.

In the event that we are non-competitive with respect to a particular product, General Motors is required to notify us of any such non-competitiveness and provide us with a reasonable period of time during which to correct any such non-competitiveness before GM may re-source the business. With respect to non-competitiveness in terms of quality and service, the parties will follow GM's Supplier Quality Improvement Process, which is also known as the "16-Step Process," in order to identify and remedy quality and service problems. With respect to non-competitiveness in terms of design and technology, the parties will work together to identify acceptable solutions and GM will

be permitted to re-source the business only if these efforts are unsuccessful within a reasonable period of time.

**GM's Right to Adopt New Technologies.** The Supply Agreement permits General Motors at all times to adopt new technology, whether or not any such new technology is available through us. In the event that GM wishes to introduce a technological change to a product covered by a then existing contract with us, we have a right of last refusal to implement the new technology or an equivalent technology acceptable to GM and continue production through the remaining term of the existing contractual commitment. If we are unable to provide the new technology or equivalent technology on a competitive basis, General Motors is free to re-source the business to another supplier. Disputes regarding new technology under this process will be resolved by a senior engineer from each of GM and Delphi plus a third-party facilitator mutually acceptable to both sides.

**Technical Information.** Consistent with general practice within our industry, we have agreed under the Supply Agreement to cooperate with GM to share with GM technical information about the products we supply to GM and their manufacture, without restriction as to use.

**Use of GM's Tooling.** We will not use tooling to produce products for other customers if such tooling is used to produce products for GM; provided, however, that we will be allowed to continue the use of such tooling to the extent necessary to satisfy contracts with other customers where the tooling has been used for this purpose before January 1, 1999 and for extensions of such contracts. We have agreed not to use tooling owned by GM to compete against GM-SPO in the aftermarket.

**Delphi Plant Closures and Product Eliminations.** In the event that we propose to close a plant or eliminate a product line, we must keep General Motors informed on a timely basis of our decision-making process and in good faith reasonably consider modifying our plans in order to accommodate GM's timing requirements with respect to re-sourcing the business. Additionally, the Supply Agreement provides that in the event of an extension of production by General Motors of an existing product, which is covered by a contract with a fixed term, beyond the term of the original anticipated program life, General Motors has the right to require us to continue production and sale of that product to GM for a reasonable period of time on commercially reasonable terms to be negotiated between the parties.

**Delphi Divestitures.** In the event that we propose to divest a business, we must keep General Motors informed on a timely basis of our decision-making process and in good faith reasonably consider GM's input and concerns. Upon our selection of a qualified buyer, existing contracts with GM relating to the business being sold may be assigned to the buyer upon GM's prior written consent, which will not be unreasonably withheld. In such cases, General Motors will negotiate a new supply agreement with the buyer which will contain substantially the same terms as our existing arrangements with General Motors with respect to the business being sold. Any deviations from the terms of the existing arrangements, including with respect to price, must be mutually agreed upon by us and GM. During the term of the assigned contract, Delphi and General Motors have agreed to dedicate appropriate resources and efforts to ensure that General Motors receives comparable levels of quality, service, delivery, price and technology.

**Service Parts.** The Supply Agreement also applies to service parts we provide to General Motors for sale to GM-authorized dealers worldwide. In general, unless otherwise provided in our existing contracts with GM, the unit pricing on service parts that are not "past model" will continue at the prices charged to General Motors until three years after such service parts go past model. The term "past model" refers to parts which are used on vehicle models which are no longer in production. Thereafter, unit prices for such service parts will be negotiated between the parties.

<center>28</center>

**Quality Improvement.** In order to facilitate quality improvement, the Supply Agreement provides that we will participate in all GM supplier quality and development programs. General Motors is entitled to require us to achieve reasonable increased quality standards. All increased quality standards established by General Motors must be comparable to then existing industry standards.

**Termination.** Unless terminated in accordance with its terms, the Supply Agreement will remain in effect as long as any existing agreement is in effect, including any extensions of any such existing agreement. Either Delphi or General Motors may terminate the Supply Agreement for:

o material breach by the other party;

o insolvency or bankruptcy of the other party; or

oattachment, embargo or expropriation of a significant portion of the other party's assets necessary in order for that party to perform its obligations under the Supply Agreement.

In addition, General Motors can terminate the Supply Agreement if:

o35% or more of our company becomes owned or controlled, directly or indirectly, by a competitor of General Motors in the business of manufacturing automotive vehicles; or

oall of the underlying contracts governed by the Supply Agreement become subject to termination or cancellation pursuant to their terms.

Underlying contracts become subject to termination or cancellation by GM as the result of a variety of factors, such as our non-

competitiveness, cause, expiration and, in some cases, termination for convenience. Termination for convenience means GM can terminate the contract at any time for any reason. The majority of underlying contracts having termination for convenience provisions are shorter-term purchase orders. This right to terminate for convenience could be exercised by GM in connection with any change in control of Delphi. Certain change in control transactions could also give GM the right to terminate underlying contracts pursuant to the provisions prohibiting us from assigning our contracts to another entity.

In the event that a competitor of GM in the business of manufacturing automotive vehicles acquires, directly or indirectly, a significant interest in our company, we must provide GM with reasonable assurances that we will use our best efforts to preserve the confidentiality of all information relating to products supplied to General Motors and GM vehicle programs.

Termination of the Supply Agreement would be likely to have a material adverse effect on our company.

Dispute Resolution. The Supply Agreement provides that all disputes or other matters related to the Supply Agreement will be exempt from the dispute resolution process set forth in the Separation Agreement or in any other agreement related to the transactions contemplated therein.

Aftermarket Sales. We are currently party to a Business Relationship Agreement (as modified and as amended from time to time, the "Business Relationship Agreement") with GM-SPO regarding aftermarket sales in the United States. This agreement does not, however, cover the service parts provided to General Motors pursuant to the Supply Agreement for sale to GM-authorized dealers and distributors. The Business Relationship Agreement becomes subject to termination by either party on or after December 31, 1999 upon twelve months prior notice to the other party. This means the Business Relationship Agreement cannot be terminated any earlier than December 31, 2000. Until such time, in return for certain royalties and fees it pays to us, GM-SPO generally has the right to act as the exclusive distributor of our aftermarket parts in the United States. The pricing under the Business Relationship Agreement is being benchmarked in an effort to ensure market based pricing with respect to ACDelco(R) branded products. Pursuant to an Aftermarket Agreement dated as of January 1, 1999, the payment terms between us and GM-SPO are being modified so that GM-SPO will pay us on the second day of the second month following our shipment of a product. Under the Business Relationship Agreement, if we can meet the market price for a particular aftermarket product, GM-SPO must buy such aftermarket product from us. Alternatively, we may choose not to meet the market price for a particular aftermarket product and cease supplying such product in the aftermarket in the United States. Until January 1, 2001, we are obligated to offer all new technology with respect to aftermarket products to GM-SPO on a non-exclusive basis, under terms no less favorable than those

<center>29</center>

offered to our other customers. Following the termination of the Business Relationship Agreement, we may begin distributing our own products in the aftermarket in the United States.

Outside the United States, we distribute our own aftermarket products independently of General Motors and, with certain exceptions related to batteries, we are free to seek any aftermarket sales opportunities.

We have agreed with GM-SPO to split the ownership of current aftermarket brands. As a result, we own the Freedom(R) brand, but may not use the brand in the United States until after the expiration of the Business Relationship Agreement; GM-SPO owns the ACDelco(R) brand and any AC and Delco derivatives and formatives; and GM-SPO owns the Voyager(R) battery brand, but may only use it on batteries sourced from us. There will be a transition period for us and our licensees to wind down our use of the brands owned by GM or brands owned by Delphi but currently used by GM.

Purchasing. We have entered into agreements with GM pursuant to which we will continue to purchase productive materials under existing contracts that were entered into by General Motors on our behalf, until those contracts expire. Such agreements provide that we are entitled to continue to use the purchasing systems currently used by GM's purchasing organization until such time as we establish our own purchasing system, which we estimate will not take more than five years. In addition, in certain international operations, we may continue to operate in a shared purchasing arrangement with GM for up to five years.

Employee Matters. We have entered into several agreements (collectively, as amended from time to time, the "Employee Matters Agreements") with GM to allocate responsibility and liability for certain employee related matters. However, GM is obligated to bargain in good faith with the unions representing our hourly employees regarding the effects of the separation of Delphi from GM on their members. As a result, the understandings between us and GM related to the effect of the separation on our hourly employees represented by unions may be affected by negotiations with the unions representing these employees. GM has advised us that it intends to work with such unions in this regard. The Employee Matters Agreements generally provide for the following:

Employee Transfers. As of January 1, 1999, all GM salaried employees, active and inactive, who are employees in our operations were transferred to Delphi. GM U.S. hourly employees, active and inactive, who are employees in our operations were transferred to Delphi as of January 1, 1999 and will remain under the applicable national collective bargaining agreement, and incorporated employee benefit plans, until the Distribution. However, the transfer of salaried and hourly employees at certain of our international operations, and of certain related pension and employee benefits plans, may not take place until the receipt of consents or approvals or the satisfaction of other applicable requirements. For all U.S. salaried employees who retired on or before January 1, 1999, GM is retaining responsibility for pension obligations and for other postretirement employee benefits ("OPEB") obligations, consisting primarily of retiree medical obligations. GM has had discussions with certain of the unions that represent the GM hourly employees transferred to us regarding the effect of the separation on the employees. For information regarding these discussions, "-- Strategy--Improve Operating Performance--Labor Relations." With regard to our

hourly employees and the employees of divested Delphi units, GM generally will retain postretirement benefit obligations for U.S. hourly employees who retire on or before October 1, 1999. We have reached agreements with the UAW and the IUE to this effect. We anticipate that we will assume OPEB obligations and pension obligations for such employees who retire after October 1, 1999.

As between GM and Delphi, the allocation of these obligations has been made based on certain estimated levels of employee retirement prior to October 1, 1999 based on historical experience and conditions surrounding Delphi's separation from GM. We have agreed with GM to recalculate the allocation of these liabilities based on the actual level of retirements on or before October 1, 1999. Accordingly, if and to the extent that greater than the assumed number of employees retire on or before October 1, 1999, we would be required to make a payment to GM. Depending on the amount of such a payment, if any, it could have a material adverse effect on our short-term liquidity. Similarly, if and to the extent that fewer than the assumed number of employees retire on or before October 1, 1999, GM would be required to make a payment to us. The amount of postretirement benefits varies from time to time, depending on factors such as discount rate, asset returns, contributions and other factors. As of December 31, 1998, Delphi's salaried and hourly OPEB obligation was about $4.6 billion and the hourly underfunded pension obligation was about $2.1 billion.

Certain Flow-Back Rights. It is anticipated that the union discussions may result in some of our hourly employees in the United States being provided

30

with certain opportunities to transfer to GM as appropriate job openings become available at GM and GM employees in the United States having similar opportunities to transfer to our company to the extent job openings become available at our company. In general, if an employee transfers from our company to GM and then retires from GM, or transfers from GM to our company and retires from our company, both our company and GM will be responsible for pension payments which in total reflect such employee's entire years of service. Responsibility for such pension payments will generally be allocated between the companies based on such employee's entire pre-transfer or post-transfer service, respectively. In the case of employees transferring from Delphi to GM, pre-transfer service will include service with GM prior to our separation from GM and thus will be reflected in the portion of the pension payments we must bear. It is not currently anticipated that there will be any transfer of pension assets or liabilities between us and GM with respect to such employees that transfer between our companies.

With respect to OPEB obligations for such transferring employees, the company to which an employee transfers will provide the OPEB benefits for such employee. We have entered into an agreement with GM which provides for a mechanism for determining a cash settlement amount for OPEB obligations associated with employees that transfer between our company and GM during any year. Pursuant to this agreement, upon identification of the employees who transferred between GM and our company during the past year, an actuarial analysis will be done to determine an estimated pattern of employment cessation, including from retirement, death, or voluntary termination, of such employees. This estimated pattern of employment cessation will determine the timing of payments due between us and GM for the employees that transferred between our companies in a given year.

Separate actuarial analysis will be done for employees transferring from our company to GM and from GM to our company. The actuarial assumptions to be used in valuing the OPEB obligations associated with transferring employees will be based on those used in conjunction with the receiving company's annual OPEB valuation for the given period. The liability with respect to such transferring employees will be retained by the company from which the employee transferred until the cash settlement with respect thereto has been made, upon which such liability will be recognized by the company to which the employee transferred.

Employee Benefits. We have established or will establish our own pension and employee benefit plans, which generally will be the same as GM's pension and employee benefit plans. Our U.S. salaried employees began participating in these plans on January 1, 1999 and our U.S. hourly employees will begin participating in these plans at the time of the Distribution.

Our plans generally will assume all liabilities under GM's plans to employees assigned to us. Certain pension assets funding pension liabilities will be transferred from trusts and other funding vehicles associated with GM's plans to the corresponding trusts for our plans.

General Motors Stock Awards. In connection with the completion of the Distribution, awards (collectively, "GM Awards") held by our employees as of such date under GM's incentive and variable pay plans will be replaced with awards under our incentive and variable pay plans. With certain exceptions, GM Awards held by individuals employed by General Motors as of the date of the completion of the Distribution and by individuals who have retired prior to replacement of such GM Award, will remain outstanding as GM Awards, with an appropriate revaluation to reflect the Distribution.

In the case of GM Awards consisting of stock options, such awards will be replaced with options to acquire a number of shares of our common stock equal to the number of shares of GM $1-2/3 common stock subject to such GM Award as of the date of the completion of the Distribution, multiplied by the Ratio described below, rounded down to the nearest whole share. The per share exercise price of such converted award will equal the per share exercise price of such GM Award divided by the Ratio.

In the case of awards under the GM Performance Achievement Plan, any unvested installments of final awards which are in the form of GM $1-2/3 common stock or GM Class H common stock, will be converted into shares of Delphi common stock using a ratio similar to the one described below for converting GM Awards consisting of stock options into options to acquire shares of Delphi's common stock.

The "Ratio" means the amount determined by dividing:

othe average of the daily high and low per share prices of the GM $1-2/3 common stock, or the Class H common stock if Class H common stock awards are being converted, as reported in The Wall Street Journal, during the three trading days ending on a date of record established by the GM Board of Directors in connection with the Distribution; by the

31

othe average of the daily high and low per share prices of the Delphi common stock, as reported by The Wall Street Journal, for the three trading days commencing on the day after such date of record.

Shares of Delphi's Common Stock Subject to Substitute Awards. It is not possible at this time to specify how many shares of our common stock will be subject to substitute awards for GM Awards. We expect that some GM Awards consisting of stock options held by our employees will be exercised, other GM Awards will vest and other GM Awards could be granted, prior to the date of the completion of the Distribution. In addition, the remaining balance of unexercised options pursuant to GM Awards will be replaced with options to acquire shares of our common stock by reference to the Ratio, which will not be known until the time of the Distribution. Our stockholders, are, however, likely to experience some dilutive impact from the above-described adjustments.

As of February 2, 1999, our employees held about 4,416,000 shares of GM $1-2/3 common stock subject to options pursuant to GM Awards, about 1,457,000 of which were exercisable as of February 2, 1999. If the Ratio were determined using the $89.44 per share closing price of the GM $1-2/3 common stock on February 2, 1999, as reported in The Wall Street Journal and the offering price of $17.00 per share of our common stock, the foregoing number of shares of GM $1-2/3 common stock subject to GM stock options would be replaced with options on about 23,231,000 shares of our common stock. As of February 2, 1999, there were less than 5,600 shares of GM's Class H common stock subject to GM Awards held by our employees which will be replaced with awards of our common stock.

Tax Matters. We have entered into two income tax allocation agreements with GM to govern the allocation of U.S. income tax liabilities and to set forth agreements with respect to certain other tax matters. The first tax allocation agreement is effective from the Contribution Date until such time as we cease to be a member of the General Motors consolidated group. The second tax allocation agreement, which supersedes and replaces the first agreement, is effective on the day after we cease to be a member of the General Motors consolidated group. Under the Code, we would cease to be a member of the General Motors consolidated group upon the completion of the Distribution or if GM owns less than 80% of our outstanding capital stock. The first tax allocation agreement is only effective from January 1, 1999 until tax deconsolidation. Unless otherwise noted, the provisions described below are contained in both agreements.

GM generally will pay all income taxes attributable to Delphi and its subsidiaries for tax periods before the Contribution Date. For tax periods during which we are a member of the General Motors consolidated group, we will calculate our tax liability as if we were a separate affiliated group of corporations filing a consolidated return, but we will pay our calculated taxes to General Motors, which will then file a consolidated or combined return with the appropriate tax authorities. There may be certain U.S. state or local jurisdictions in which we will file a separate income tax return, not combined or consolidated with GM, for tax periods before tax deconsolidation. In that circumstance, we would file the income tax return with the appropriate tax authorities, and pay the tax directly to the tax authority. Tax benefits generated by our company for tax periods before tax deconsolidation will reduce our tax liability, but not below zero, and we will not be compensated for tax benefits generated by our company and used by the General Motors consolidated group. Except for tax elections, which are defined for purposes of allocating taxes as the treatment of items in tax returns and filings, that may have an adverse impact on the General Motors consolidated group or tax elections that must be made by the parent corporation of a consolidated group, we will determine all tax elections for tax periods during which we are a member of the GM consolidated group. We will prepare and file all tax returns, and pay all income taxes due with respect to all tax returns required to be filed by us for all tax periods after we cease to be a member of the GM consolidated group or for U.S. state or local jurisdictions in which our return is not combined or consolidated with GM's return.

GM is responsible for most U.S. tax adjustments related to Delphi for all periods prior to tax deconsolidation, other than adjustments related to Delco Electronics, which previously had been a separate entity in the General Motors consolidated group, or related to certain tax elections made by Delphi. In addition, we and GM have agreed to cooperate in any tax audits, litigation or appeals that involve, directly or indirectly, periods prior to the time that we cease to be a member of the General Motors consolidated group. We and GM have agreed to indemnify each other for tax liabilities resulting from the failure to cooperate in such audits, litigation or appeals, and for any tax liability resulting from the failure to maintain adequate records. The second tax allocation agreement also provides that with respect to our foreign taxes, we may be required to indemnify General Motors in certain situations where we receive a refund of foreign tax related to a tax period prior to tax deconsolidation and GM's foreign tax credit is reduced as a result of the refund. With a few exceptions, Delphi's subsidiaries outside the United States will generally be responsible for foreign tax adjustments relating to Delphi's businesses for all periods prior to the Contribution Date.

32

Intellectual Property. We have entered into agreements with GM to govern the division and transfer of certain intellectual property. Pursuant to these agreements, General Motors has assigned, or agreed to transfer, to us all patents, patent applications and invention records that are primarily related to components produced or sold by us and any other patents that are more valuable to us than to General Motors. Accordingly, GM has transferred to us full or partial ownership of about 2,800 patents, 640 U.S. patent applications and 620 records of invention as well as the corresponding foreign patent and patent applications. We have agreed with GM to enter into royalty-free cross-licenses for certain intellectual property and we believe that the aggregate values of the cross-licenses are about equal. We have also agreed with GM that each of

us can collect reasonable royalties or damages under certain patents from the other's suppliers with whom the other does not have or extend an existing supply commitment. Also, GM has transferred to us ownership of about 1,170 trademark registrations and applications, about 70 of which are U.S. and the balance of which are foreign, as well as unregistered trademarks. Certain other intellectual property agreements relating to our business have been transferred to us, and with respect to intellectual property agreements entered into for the benefit of both parties, GM will use reasonable efforts to have us made party to such agreements.

We have entered into agreements with GM that place restrictions on the use of certain technologies. For example: GM will have a right of first access and limited exclusivity for certain OnStar-related vehicle information management technology; each party is restricted from disclosing certain powertrain, vehicle control, collision avoidance and other software algorithms to third parties without the consent of the other party; and General Motors will retain ownership of certain fuel cell propulsion system and related technologies, although we will have the right to supply a minimum of 25% of the volume of components for GM's first two major vehicle programs to utilize the fuel cell technology, provided we can meet certain conditions, including competitive benchmarks on quality, service and price.

There are certain restrictions on our use of some of the trademarks that have been assigned to us. In addition, certain trademarks and trade names have been licensed, rather than transferred, to us, and there are restrictions on the geographical territory, duration and/or scope of our use of such licensed trademarks and trade names. Our Delco Electronics subsidiary has a perpetual, worldwide, royalty-free license to use the trade name "Delco Electronics" and the trademarks "DELCO" and "DELCO ELECTRONICS" in connection with several of our business units, but we must wind down our use of that trade name and those trademarks to include only automotive audio products by January 1, 2001. We have a worldwide license to use the trademarks "AC," "DELCO" and "AC Delco," but we must wind down all use of these marks, including such use by our dealers and distributors by January 1, 2000. This license is royalty-free, except that under certain circumstances relating to joint ventures and third-party relationships that have been assigned to us, we may be required to pay GM a royalty.

Real Estate and Environmental. We have entered into agreements with GM and executed certain instruments to assign or sub-lease GM's real estate portfolio related to the Delphi Automotive Systems Business, consisting of both owned and leased property, between our companies as follows:

oWith respect to the facilities that were owned by GM and used only in connection with our business, such facilities have been transferred to our company.

oWith respect to facilities owned by GM and used by both GM and us, GM is leasing to us the portion of such facilities which we use. Such leases are generally for a term of three years and the rent thereunder approximates prevailing market rates.

oWith respect to facilities that were leased by GM and used only in connection with our business, GM has assigned such leases to us. Pursuant to these assignments, we have assumed all of GM's obligations under each assigned lease and agreed to indemnify GM against all obligations arising under such leases after their assignment.

oWith respect to facilities leased by GM and used by both GM and us, GM has sub-leased to us the portion of such facilities which we use. Such sub-leases are generally for the then remaining term of GM's lease for such facilities, less one day, and the rent thereunder shall generally equal the occupancy cost per square foot payable under GM's lease for such facility.

oGM has also assigned to us its interest in the facilities held by joint ventures in which GM was a party and which facilities we utilize or operate.

Under the lease and sub-lease arrangements described above, the lessor will retain responsibility for releases of hazardous materials at the facility before

33

the closing of the real estate transactions and for certain identified environmental non-compliance matters relating to pre-closing operations. The lessee will be responsible for releases of hazardous materials at the facility after the closing and for all other environmental non-compliance matters during the lease term.

With respect to the facilities transferred to us, we have assumed all operating costs thereof and applicable financial and environmental reserves with respect thereto. With respect to facilities that are not transferred to us, including all facilities closed or sold prior to January 1, 1999, General Motors has retained all operating costs thereof and applicable financial and environmental reserves with respect thereto, whether or not such facilities were previously used by Delphi.

Pursuant to the separation arrangements between our company and GM, GM will be responsible for environmental liabilities at the GM facilities that are not transferred to us, including all facilities closed or sold prior to January 1, 1999, except that we will be responsible for any environmental liabilities at such facilities that we cause after January 1, 1999. We will be responsible for environmental liabilities at the facilities that are transferred to us, except that GM will be responsible for any environmental liabilities at such facilities that GM causes after January 1, 1999.

In addition, with respect to liability for offsite waste disposal, GM will retain responsibility for sites where GM's liability is known or alleged

prior to January 1, 1999, except that we will be responsible for any wastes Delphi contributes to these sites after January 1, 1999. We will not, however, be responsible for any contributions to these sites from the facilities transferred to us that occurred prior to January 1, 1999. At other waste disposal sites, GM's and Delphi's respective liability will be allocated based on each party's respective contribution of wastes to such sites. In particular, GM's liability will be based on contributions from the facilities it retains and any other facility owned or operated by GM, except the facilities transferred to us. Delphi's liability will be based on contributions from the facilities transferred to us and any other facility owned or operated by Delphi.

Tooling, Containers and Dunnage. We have entered into agreements with GM to allocate the ownership of tooling, containers and dunnage. GM and Delphi will each own the tooling that was reflected on their respective balance sheets as of January 1, 1999. The term "tooling" refers to all tools, jigs, dies, gauges, fixtures, molds, patterns and similar items necessary for the production of automotive parts. We will not use tooling to produce products for other customers if such tooling is used to produce products for GM; provided, however, that we will be allowed to continue the use of such tooling to the extent necessary to satisfy existing contracts, and extensions of such contracts, where we have previously used such tooling to produce products for other customers. For more information, see "--Supply Agreement--Use of GM's Tooling."

Containers and dunnage used for the transportation of our products from our facilities to GM facilities or other Tier 1 suppliers to GM will be owned by General Motors. The term "dunnage" refers to the materials, such as padding, wrappings and other loose materials, used to protect automotive parts during shipment. We will own containers and dunnage used for the transportation of our products within our facilities. Finally, we will own containers and dunnage used for the transportation of products between us and our suppliers.

Warranty Matters. Our warranty responsibility for products supplied to General Motors under existing contractual arrangements will be governed by the terms and conditions of those contracts. Generally, those terms and conditions provide that Delphi expressly warrants to GM that all goods and services covered by the contract will conform to the specifications, drawings, samples or descriptions furnished to or by General Motors, and will be merchantable, of good material and workmanship and free from defect. In addition, Delphi acknowledges that it knows of GM's intended use for the products and expressly warrants that the products have been selected, designed, manufactured or assembled based on GM's stated use and will be fit and sufficient for the purposes intended by General Motors.

We have agreed with GM pursuant to the Supply Agreement to work together in good faith to reduce warranty costs, including through participation in GM warranty programs. In addition, the Supply Agreement provides that our warranty responsibility for products supplied under new contracts will be governed by the terms and conditions negotiated between the parties in those contracts.

Interim Services. The Ancillary Agreements provide that General Motors will furnish us with a number of interim services, which services will generally be provided to us at cost. In addition to any services discussed above, such services include, among others:

o certain treasury, accounting, which includes accounts payable and receivable, tax, travel, customs and payroll services;

34

o certain information systems services, including financial, engineering, environmental, human resources, manufacturing, communications, legal, logistics, purchasing and warranty and service systems;

o a variety of employee-related administrative support services, including human resource planning and employee placement and medical services;

o certain legal services;

o certain audit services; and

o managed access to proving grounds, test facilities, research and development and engineering centers and the services provided at such sites by General Motors personnel.

These agreements were made in the context of a parent-subsidiary relationship and were negotiated in the overall context of our separation from GM. The prices charged to us under these agreements may be higher or lower than the prices that may be charged by unaffiliated third parties for similar services and the services provided may not be the same, in scope and level, as those provided before our separation from GM.

International Agreements. We have entered into a series of agreements with GM similar to those discussed above with respect to those Delphi Assets located outside the United States. In most countries, GM's vehicle and component businesses are operated by separate legal entities. In such countries, the entities that operate the components business will be transferred to Delphi. Where certain facilities or functions are shared by such separate legal entities, the shared functions or facilities will generally be separated in accordance with the principles set forth in the corresponding Ancillary Agreement in the United States. In those countries in which the vehicle and components businesses are owned by one legal entity, new entities have been or will be formed in order to separate the Delphi business from the GM business.

Agreements have been or will be entered into in each of the countries where operations are to be transferred to Delphi. Although the

agreements for most countries have or will have different terms than the Ancillary Agreements in the United States, in general they are or will be similar in scope to the Ancillary Agreements. Certain international assets relating primarily to our business may still be held by General Motors or its affiliates following the Offering pending receipt of consents or approvals or satisfaction of other applicable requirements necessary for the transfer of such assets to Delphi. These assets and operations are not, individually or in the aggregate, material to our company. For example, certain assets and operations located in Brazil, Germany and Canada are subject to such restrictions. However, the information included in this report regarding our company and our facilities and operations, including the information set forth in the "Item 1. Business" section and our consolidated financial statements presented elsewhere in this report, assumes and gives effect to the completion of these transactions.

35

**Employees; Union Representation**

As of December 31, 1998, excluding our joint ventures and other investments, we employed 197,568 persons, including 32,896 salaried employees and 164,672 hourly employees. Of our hourly employees, about 93% are represented by about 53 unions, including the UAW, the IUE and the USW. The UAW is our largest union, representing about 28% of our unionized employees. Our union representation by major region as of December 31, 1998 is indicated in the table below:

Union Representation

| Region | Number of Unions | Number of Employees |
|--------|------|---------|
| United States | | |
| UAW.......... | 1 | 43,150 |
| IUE.......... | 1 | 15,837 |
| USW.......... | 1 | 1,403 |
| Other unions. | 3 | 250 |
| | - | ------ |
| Total United States. | 6 | 60,640 |
| | | |
| Canada......... | 2 | 957 |
| Mexico......... | 6 | 58,758 |
| Europe......... | 32 | 27,715 |
| South America.. | 5 | 5,265 |
| Asia/Pacific... | 2 | 637 |
| | -- | ------- |
| Total..... | 53 | 153,972 |
| | == | ======= |

The national collective bargaining agreements negotiated by GM with the unions currently apply to our workforce. GM's national agreement with the UAW expires in September 1999, GM's national agreement with the IUE expires in November 1999 and GM's national agreement with the USW expires in September 2002. We will assume the terms of the existing collective bargaining agreements for our employees in connection with the Distribution.

The percentage of our employees located outside the United States and Canada has increased from about 38% in 1992 to about 60% in 1998. We expect that the percentage of our employee population located outside the United States and Canada will continue to increase over time as we continue to expand our operations globally.

36

**ITEM 2. PROPERTIES**

Our world headquarters is located in Troy, Michigan and occupies about 264,000 square feet. We occupy this facility, as well as certain other facilities, under agreements with General Motors. We expect to purchase our headquarters upon expiration of our agreement with GM related thereto.

We also maintain regional headquarters for our Asia/Pacific region in Tokyo, Japan, for our Europe/Middle East/Africa region in Paris, France and for our South America region in Sao Paulo, Brazil. Excluding our joint ventures and other investments, we currently maintain a total of 244 sites in 36 countries throughout the world. The following table, which gives full effect to the international asset transfers contemplated by the Separation Agreement, but excludes our joint ventures and other investments, shows our principal facilities as of December 31, 1998:

| Region | Number of Sites | Total Owned Square Footage | Total Leased Square Footage |
|--------|------|---------------|----------------|
| United States/Canada....... | 78 | 44,837,322 | 13,448,992 |
| Europe/Middle East/Africa.. | 93 | 6,058,025 | 4,942,674 |
| Mexico/South America....... | 47 | 7,919,242 | 3,752,457 |

```
Asia/Pacific.................    28       1,392,901         723,502
                               ----    -----------     -----------
         Total...........      244      60,207,090      22,867,625
                               ===    ============     ===========
```

In some cases, our manufacturing sites, technical centers and/or customer service centers and sales activity offices are located at a single multiple-purpose site. We also have a limited number of miscellaneous facilities. The following table, which gives full effect to the international asset transfers contemplated by the Separation Agreement, but does not reflect our joint ventures and other investments, shows our capabilities as of December 31, 1998:

| Region | Manufacturing Sites | Technical Centers | Customer Centers and Sales Offices |
|--------|-------------------|------------------|------------------------------------|
| United States/Canada.......... | 48 | 14 | 11 |
| Europe/Middle East/Africa..... | 64 | 7 | 20 |
| Mexico/South America.......... | 41 | 4 | 6 |
| Asia/Pacific.................. | 15 | 2 | 14 |
| Total........... | 168 | 27 | 51 |

We are currently evaluating long-term plans to consolidate our worldwide engineering and technical resources, including our technical centers, into a more efficient, customer-focused global engineering support network. While we believe that this consolidation will enhance our ability to provide engineering and technical support to our customers around the world, we also expect that it will have the effect of reducing the overall number of our technical centers.

We believe that our facilities are suitable and adequate, and have sufficient productive capacity, to meet our current and currently anticipated needs.

## ITEM 3. LEGAL PROCEEDINGS

We are involved in routine litigation incidental to the conduct of our business. We do not believe that any of the litigation to which we are currently a party will have a material adverse effect on our business or financial condition.

Although we do not believe any current litigation will have a material adverse effect on our business or financial condition, we face an inherent business risk of exposure to product liability claims in the event that the failure of our products results or is alleged to result in personal injury or death, and we cannot assure you that we will not experience any material product liability losses in the future. In addition, if any Delphi-designed products are or are alleged to be defective, we may be required to participate in a recall involving such products. Each VM has its own policy regarding product recalls and other product liability actions relating to its suppliers. However, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, VMs are increasingly looking to

37

their suppliers for contribution when faced with product liability claims. Because this is a new trend in our industry and we have only limited experience in this regard, we cannot assure you that our costs associated with providing product warranties will not be material.

In connection with our separation from General Motors, GM has agreed to retain responsibility for all product liability actions relating to products we manufactured prior to January 1, 1999 and sold or otherwise supplied to GM either before or after that date. We will be responsible for all product liability actions relating to products we sold at any time to customers other than GM. Responsibility for product liability actions relating to products we manufacture on or after January 1, 1999 and sell to GM will be determined in accordance with the agreements for such sales.

From time to time, in the ordinary course of business, Delphi receives notices from customers that products may not function properly. Our warranty responsibility for our products is generally governed by the terms and conditions of the applicable contract, which vary from contract to contract. Most of our contracts require that we make certain warranties to our customers regarding, among other things, conformity to specifications and freedom from defect. For information regarding our warranty responsibility for products supplied to General Motors, see "Item 1. Business--Arrangements Between GM and Delphi --Warranty Matters."

VMs generally offer warranties to new vehicle purchasers which cover the repair and replacement of defective parts on their vehicles for a specified period of time. Traditionally, VMs have borne the cost associated with such warranty programs, including costs related to the repair and replacement of parts supplied to the vehicle manufacturer by the supplier. VMs are increasingly requiring their outside suppliers to guarantee or warrant their products. Depending on the terms under which Delphi supplies products to a VM, a VM might seek to hold Delphi responsible for some or all of the repair or replacement costs of such products under new vehicle warranties, when the product supplied did not perform as represented. Because this is a new trend in our industry and we have only limited experience in this regard, we cannot assure you

that our costs associated with providing product warranties will not be material.

We believe that we are adequately insured, including with respect to product liability coverage, at levels sufficient to cover the claims described above, subject to commercially reasonable deductible amounts. Delphi is insured under all of GM's property and liability insurance programs worldwide. We will remain insured under those programs, subject to the same limitations and conditions of coverage applicable to all GM operations, until the earlier of the Distribution and January 1, 2000. We expect to purchase product liability insurance to be effective at the time such GM coverage ceases, with reasonable deductibles or self-insured retentions. We have also established reserves in amounts we believe are reasonably adequate to cover any adverse judgments. However, any adverse judgment in excess of our insurance coverage and such reserves could have a material adverse effect on our business.

On December 17, 1998, General Motors entered into a consent order with the New York Department of Environmental Conservation to settle a notice of violation the Department issued to our Lockport, New York facility on November 24, 1998. The notice alleged that the facility had installed thermal degreasers without obtaining an air emission permit or complying with certain requirements for volatile organic compound emissions from new emission sources. The consent order requires payment of a civil penalty of $110,000 to the Department. We have paid the penalty on behalf of GM and will be reimbursed from GM pursuant to the separation arrangements.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On October 27, 1998, the Company's sole stockholder, by written consent in lieu of a meeting, elected as directors Messrs. Battenberg, Losh, Smith, Pearce and Wyman. See Items 10 through 13.

38

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

### Sales of Unregistered Securities

In connection with its incorporation and organization, on September 16, 1998, Delphi issued ten shares of common stock to GM for an aggregate consideration of $1.00. We believe that this issuance was exempt from registration under Section 4(2) of the Securities Act of 1933, as amended, as a transaction not involving any public offering.

### Use of Proceeds From Sales of Registered Securities

In February 1999, Delphi completed an initial public offering of 100 million shares of its $.01 par value Common Stock. Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Donaldson, Lufkin & Jenrette Securities Corporation and Schroeder & Co. Inc., acted as representatives for the U.S. underwriters, and Morgan Stanley & Co. International Limited, Goldman Sachs International, Merrill Lynch International, Donaldson, Lufkin and Jenrette International, and J. Henry Schroeder & Co. Limited acted as international representatives for the international underwriters. The shares of Common Stock sold in the IPO were registered under the Securities Act of 1933, as amended, on a registration statement on Form S-1 (Registration No. 333-67333) that was declared effective by the Securities and Exchange Commission on February 4, 1999. The IPO commenced on February 4, 1999. All 100 million shares of Common Stock registered were sold at a price of $17 per share. The aggregate offering price of the shares of Common Stock registered and sold was $1.7 billion. Delphi paid an aggregate of about $79 million in underwriting discounts and commissions, resulting in net proceeds to Delphi of about $1.6 billion.

The following table sets forth the costs and expenses, other than underwriting discounts and commissions, payable in connection with the sale and distribution of the securities registered in the IPO. All amounts are estimated except the Securities and Exchange Commission registration fee and the NASD registration fee. GM has generally agreed to pay these costs and expenses. The underwriters have agreed to reimburse GM for certain of its expenses incurred in connection with the IPO.

```
Securities and Exchange Commission registration fee.  $   575,460
NASD registration fee..............................       30,500
NYSE original and continued listing fees...........      962,135
Blue Sky qualification fees and expenses...........        5,000
Legal fees and expenses............................    1,650,000
Accounting fees and expenses.......................    2,000,000
Transfer agent and registrar fees..................       60,500
Printing and engraving expenses....................    3,020,000
Miscellaneous expenses.............................    1,696,405
                                                      -----------
    Total..........................................  $10,000,000
                                                      ===========
```

None of the expenses or net proceeds of the IPO were paid directly or indirectly to any director or officer of Delphi or their associates, persons

owing 10% or more of the equity securities of Delphi or an affiliate of Delphi. In managing our cash position, we used the proceeds of the offering to pay down borrowings under our revolving credit facilities and subsequently re-borrowed from our credit facilities to fund our operations. Borrowings under such credit facilities have due dates of January 3, 2000 and January 3, 2004. As of March 1, 1999, the interest rates on our borrowings under these credit facilities ranged between about 5.3% and 5.44%.

Our Common Stock is listed on the New York Stock Exchange under the symbol "DPH." The Transfer Agent and Registrar for our Common Stock is BankBoston, N.A. On February 24, 1999, there were 461 holders of record of our Common Stock.

We currently intend to pay dividends on a quarterly basis, at an initial rate of about $0.07 per share, commencing with the first declaration in June 1999 for payment in July 1999. Our Board is free to change its dividend practices at any time and from time to time and to decrease or increase the dividend paid, or not to pay a dividend, on the Common Stock on the basis of the results of operations, financial condition, cash requirements and future prospects of our company and other factors deemed relevant by our Board.

## ITEM 6. SELECTED FINANCIAL DATA

The following selected financial data of Delphi reflect the historical results of operations and cash flows of the businesses that were considered part of the Delphi Automotive Systems business sector of GM during each respective period. In addition, the data for all periods include amounts relating to Delco Electronics, the electronics and mobile communication business that was transferred by GM from Hughes Electronics to Delphi in December 1997. The historical consolidated statement of operations data set forth below do not reflect many significant changes that will occur in the operations and funding of our company as a result of our separation from GM and the IPO. The historical consolidated balance sheet data set forth below reflect the assets and liabilities transferred to our company in accordance with the Separation Agreement.

The selected financial data of Delphi should be read in conjunction with, and are qualified by reference to "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere in this report. The consolidated statement of operations and cash flow data set forth below for each of the three years in the period ended December 31, 1998, and the consolidated balance sheet data as of December 31, 1998 and 1997 are derived from, and qualified by reference to, the consolidated financial statements included elsewhere in this report, and should be read in conjunction with those consolidated financial statements and the notes thereto. The consolidated statement of operations and cash flow data for the year ended December 31, 1995 and the consolidated balance sheet data as of December 31, 1996 are derived from audited consolidated financial statements not included in this report. The consolidated statement of operations and cash flow data for the year ended December 31, 1994 and the consolidated balance sheet data as of December 31, 1995 and 1994 are derived from unaudited consolidated financial statements not included in this report, which in our opinion, include all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of the results for such periods.

The financial information presented below may not be indicative of our future performance and does not necessarily reflect what our financial position and results of operations would have been had we operated as a separate, stand-alone entity during the periods presented. You should read the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section, which describes a number of factors which have affected our financial results, including significant price reductions as GM implemented its global sourcing initiative, labor disruptions at both GM and Delphi and charges associated with certain competitiveness initiatives.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1998 | 1997 | 1996 | 1995 | 1994(1) |
| | (in millions, except per share amounts) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales.................. | $28,479 | $31,447 | $31,032 | $31,661 | $31,044 |
| | | | | | |
| Operating expenses: | | | | | |
| Cost of sales, excluding items listed below....... | 26,135 | 27,710 | 27,471 | 27,384 | 27,081 |
| Selling, general and administrative........... | 1,463 | 1,415 | 1,445 | 1,366 | 1,157 |
| Depreciation and amortization............. | 1,102 | 1,970 | 843 | 773 | 722 |
| Operating (loss)income..... | (221) | 352 | 1,273 | 2,138 | 2,084 |
| Interest expense........... | (277) | (287) | (276) | (293) | (310) |
| Other income, net.......... | 232 | 194 | 115 | 101 | 103 |
| (Loss)income before income taxes.......... | (266) | 259 | 1,112 | 1,946 | 1,877 |
| Income tax (benefit)expense. | (173) | 44 | 259 | 639 | 644 |
| (Loss) income before | | | | | |

| | | | | |
|---|---|---|---|---|
| cumulative effect of change in accounting principle.... | | 853 | 1,307 | 1,233 |
| Cumulative effect of change in accounting principle, net of tax................... | -- | -- | -- | -- | (258) |
| Net (loss) income.......... | $ (93) | $ 215 | $ 853 | $ 1,307 | $ 975 |
| Basic and diluted (loss) earnings per share | $(0.20) | $ 0.46 | $ 1.83 | $ 2.81 | $ 2.10 |
| **Statement of Cash Flows Data:** | | | | | |
| Cash provided by operating activities............... | $ 849 | $ 2,918 | $ 2,701 | $ 1,370 | n/a |
| Cash used in investing activities............... | (1,216) | (1,320) | (995) | (1,141) | n/a |
| Cash provided by (used in) financing activities...... | 384 | (1,549) | (1,686) | (263) | n/a |
| **Other Financial Data:** | | | | | |
| EBITDA(2)................. | $1,056 | $2,459 | $2,182 | $ 2,959 | $ 2,603 |

| | At December 31, | | | | |
|---|---|---|---|---|---|
| | 1998 | 1997 | 1996 | 1995 | 1994 |
| | | | (in millions) | | |
| **Balance Sheet Data:** | | | | | |
| Total assets.............. | $15,506 | $15,026 | $15,390 | $15,635 | $14,494 |
| Total debt............... | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Equity (deficit).......... | 9 | (413) | 922 | 1,354 | 120 |

(1) Delphi adopted Statement of Financial Accounting Standards ("SFAS") No. 112, "Employers' Accounting for Postemployment Benefits," effective January 1, 1994. The adoption had an unfavorable cumulative effect of $258 million after-tax, which is reflected in 1994 net income. Earnings per share before the unfavorable cumulative effect of the change in accounting principle was $2.65 per share. The unfavorable cumulative effect of the change in accounting principle was $0.55 per share.

(2)"EBITDA" is defined as income before provision for interest expense and interest income, income taxes, depreciation and amortization. EBITDA is not presented as an alternative measure of operating results or cash flow from operations, as determined in accordance with generally accepted accounting principles, but because we believe it is a widely accepted indicator of our ability to incur and service debt. EBITDA does not give effect to cash used for debt service requirements and thus does not reflect funds available for dividends, reinvestment or other discretionary uses. In addition, EBITDA as presented herein may not be comparable to similarly titled measures reported by other companies.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Overview**

### Historical Financial Statements

Our consolidated financial statements, which are discussed below, reflect the historical results of operations and cash flows of the businesses that were considered part of the Delphi business sector of GM during each respective period; however, they do not reflect many significant changes that will occur in the operations and funding of our company as a result of our separation from GM and the IPO. The historical consolidated balance sheets reflect the assets and liabilities transferred to our company in accordance with the transactions contemplated by the Separation Agreement to which we and GM are parties. Delphi and Delco Electronics were under the common control of GM during such periods; therefore, our consolidated financial statements include amounts relating to Delco Electronics for all periods presented, although Delco Electronics was not integrated with our company until December 1997. See Note 1 to our consolidated financial statements included elsewhere in this report for a summary of our organization and significant factors reflected in our historical financial statements. See "--Results of Operations" "--Liquidity and Capital Resources" and Note 17 to our consolidated financial statements included elsewhere in this report for information on changes in our operations and funding that are expected to result from our separation from GM and the IPO.

### Separation

Delphi and General Motors (and, in some cases, their respective affiliates) have entered into certain agreements providing for the separation of our business from General Motors, including a Master Separation Agreement to which GM and Delphi are parties (as amended from time to time, the "Separation Agreement"). For more information regarding the separation terms, including the Supply Agreement between the

companies, see "Item 1. Business--Arrangements Between GM and Delphi"

## Results of Operations

To facilitate analysis, the following table sets forth historical consolidated statement of operations data as a percentage of consolidated net sales for each of the periods presented:

|  | Year Ended December 31, | | |
|  | 1998 | 1997 | 1996 |
|---|---|---|---|
| Net sales................ | 100.0% | 100.0% | 100.0% |
| Operating expenses: | | | |
|   Cost of sales, excluding items listed below..... | 91.8 | 88.1 | 88.5 |
|   Selling, general and administrative......... | 5.1 | 4.5 | 4.7 |
|   Depreciation and amortization........... | 3.9 | 6.3 | 2.7 |
| Operating (loss)income .. | (0.8) | 1.1 | 4.1 |
| Interest expense......... | (0.9) | (0.9) | (0.9) |
| Other income, net........ | 0.8 | 0.6 | 0.4 |
| (Loss) income before income taxes............ | (0.9) | 0.8 | 3.6 |
| Income tax (benefit) expense ................ | (0.6) | 0.1 | 0.8 |
| Net (loss) income ..... | (0.3)% | 0.7% | 2.8% |

In order to more fully understand the fluctuations, you should consider the impact of special items and work stoppages as discussed below.

### Special Items and Work Stoppages

The global automotive components and systems market is increasingly competitive and is undergoing significant restructuring and consolidation activities. All of our major industry competitors continue to increase their

42

focus on efficiency and cost improvements, while facing increasing price pressures from vehicle manufacturer customers. As a result, in 1997, we initiated a study to evaluate the long-term competitiveness of all facets of our businesses ("Competitiveness Study"). As market conditions continued to warrant such review, a Competitiveness Study was again completed in 1998 in conjunction with our annual business planning cycle. Additional information regarding the results of each Competitiveness Study is included below and in Note 3 to our consolidated financial statements included elsewhere in this report.

Our operating results for the periods presented also were impacted by a number of other special items which management views as non-recurring in nature. Such special items included divestitures and plant closing charges as well as work stoppages at certain GM and Delphi locations. Although these items are considered non-recurring, we cannot provide assurance that other special items and/or work stoppages will not occur with greater or lesser effects in future periods.

The following is a summary of the special items that impacted our operating results during the periods presented:

1998

o During 1998, we recorded a $310 million charge, or $192 million after-tax, related to the 1998 Competitiveness Study. Overall, the charge had the effect of increasing cost of sales and depreciation and amortization by $154 million and $156 million, respectively.

o During 1998, we recorded a loss of $430 million, or $271 million after-tax, related to divestitures involving our seating, lighting, and coil spring businesses. The charge had the effect of increasing cost of sales and depreciation and amortization by $382 million and $48 million, respectively.

o Work stoppages at GM and Delphi during 1998 reduced operating income by about $726 million, or $450 million after-tax, after considering partial recovery of lost production in subsequent periods.

1997

o During 1997, we recorded a $1.4 billion charge, or $870 million after-tax, relating to the 1997 Competitiveness Study. Overall, the charge had the effect of increasing 1997 cost of sales and depreciation and amortization by $262 million and $1.1 billion, respectively.

o Work stoppages during 1997 reduced operating income by about $148 million, or $92 million after-tax, after considering partial recovery of lost production in subsequent periods.

o During 1997, we recorded an $80 million plant closing charge, or $50 million after-tax, relating to a facility in Trenton, New Jersey. This charge had the effect of increasing cost of sales by $80 million.

o Other special items included gains aggregating $97 million, or $60 million after-tax. These gains primarily related to the sale of certain businesses and investments, none of which were material on an individual basis.

1996

o During 1996, we sold four facilities located in Flint and Livonia, Michigan and Oshawa and Windsor, Ontario, which resulted in a loss of $247 million, or $153 million after-tax. The loss had the effect of increasing cost of sales and depreciation and amortization by $167 million and $80 million, respectively.

o During 1996, three major work stoppages at various GM and Delphi facilities in the United States and Canada had an unfavorable impact of $453 million, or $281 million after-tax, resulting from lower GM production volumes, after considering partial recovery of lost production in subsequent periods.

o Retiree lump sum benefit payments resulting from U.S. labor negotiations during 1996 resulted in a charge of $86 million, or $53 million after-tax.

o Other special charges totaled $50 million, or $31 million after-tax. These costs primarily reflect the sale of certain business investments, none of which were material on an individual basis.

43

1998 versus 1997

Net Sales. Consolidated net sales and changes in net sales by product sector and in total for the years ended December 31, 1998 and 1997 were:

| Product Sector | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 1998 | 1997 | $ | % |
| | | (dollars in millions) | | |
| Electronics & Mobile Communication............ | $ 4,823 | $ 5,539 | $ (716) | (12.9)% |
| Safety, Thermal & Electrical Architecture. | 11,226 | 12,728 | (1,502) | (11.8) |
| Dynamics & Propulsion.... | 12,862 | 13,733 | (871) | (6.3) |
| Eliminations............. | (432) | (553) | 121 | n/a |
| Consolidated net sales. | $28,479 | $31,447 | $(2,968) | (9.4)% |

The decrease in consolidated net sales for each product sector reflects unfavorable volume associated with work stoppages, after considering partial recovery of lost production, divested businesses (primarily in our Safety, Thermal and Electrical Architecture product sector) and economic conditions in Asia and Latin America. In addition, our net sales continue to be impacted by pricing pressures as vehicle manufacturers reduce their cost structures through competitive sourcing initiatives and global vehicle platforms. Specifically, all of our product sectors were impacted by price reductions required by GM and other customers which totaled $465 million (or 1.6% of net sales). As a percentage of net sales, price reductions declined from 1997 levels to levels which we believe will be more indicative of future pricing pressures from vehicle manufacturers, although we cannot assure you in this regard. Overall, price reductions had the largest impact on our Electronics & Mobile Communication product sector (2.7% of net sales) due to the impact of GM-North America's continued implementation of its global sourcing strategy and reflecting the overall price declines throughout the electronics industry. The unfavorable impact of lower volumes, as discussed above, and price reductions was partially offset by an increase in sales to customers other than GM. Sales to customers other than GM during 1998 increased about $620 million or 11% compared to 1997.

Cost of Sales. Cost of sales represented 91.8% of consolidated net sales for 1998 compared to 88.1% for the 1997 year. The increase reflects the impact of special items and work stoppages along with other factors which are described in greater detail in the operating (loss) income discussion below.

Selling, General and Administrative and Depreciation and Amortization. Selling, general and administrative expenses increased by $48 million during 1998 compared to 1997. Depreciation and amortization increased by $328 million during 1998 excluding the impact of special charges during 1998 and 1997 totaling $204 million and $1.1 billion, respectively, related to divestitures and the Competitiveness Study for each period. The increase in depreciation and amortization, excluding the impact of special charges, reflected incremental depreciation associated with a larger fixed asset base.

Operating (Loss) Income. Our operating loss was $221 million for 1998 compared to operating income of $352 million in 1997. Excluding the impact of special items and work stoppages, operating income totaled $1.2 billion and $1.9 billion for the years ended December 31, 1998 and 1997, respectively. The following information on operating income and changes in operating income and its components excludes the impact of special items and work stoppages. See "--Special Items and Work Stoppages" for additional information.

<div align="center">44</div>

Operating income by product sector and in total, excluding the impact of special items and work stoppages, was:

|  | Year Ended December 31, | |
| --- | --- | --- |
| Product Sector | 1998 | 1997 |
| | (in millions) | |
| Electronics & Mobile Communication........ | $ 511 | $ 612 |
| Safety, Thermal & Electrical Architecture. | 707 | 1,060 |
| Dynamics & Propulsion..................... | 314 | 400 |
| Other..................................... | (287) | (130) |
| Total operating income excluding the impact of special items and work stoppages..... | $1,245 | $1,942 |

Operating income, excluding the impact of special items and work stoppages, was unfavorably impacted by continuing price pressures, the economic downturn in Latin America and unfavorable design costs and product mix. These unfavorable items were significantly offset by our aggressive cost reduction efforts as we have implemented several strategies to reduce our cost structure and maintain our desired level of profitability. Specifically, each of our product sectors achieved material and manufacturing cost savings which totaled about $945 million during 1998, exceeding price reductions and unrecovered design change costs by $110 million. Cost savings achieved primarily reflect the results of our global sourcing initiatives and continued implementation of lean manufacturing strategies. In addition, operating income was favorably impacted by greater sales penetration of non-GM customers during 1998.

Interest Expense. Interest expense totaled $277 million and $287 million for the years ended December 31, 1998 and 1997, respectively. The decrease in interest expense reflects lower interest rates during 1998 in comparison to 1997 rates.

Other Income, Net. Other income, net totaled $232 million for 1998, compared to $194 million in 1997. The increase primarily reflects improved profitability for certain non-consolidated ventures during 1998.

Taxes. The effective income tax rate for 1998 was a 65.0% credit compared to an effective income tax rate of 17.0% for 1997. During 1998, certain deductions and tax credits remained constant while taxable income decreased substantially, resulting in a greater effective tax benefit as a percentage of pretax income.

Net (Loss) Income. Our historical net loss totaled $93 million in 1998 compared to net income of $215 million during 1997. Excluding special items and work stoppages, our income was $820 million and $1.2 billion for the years ended December 31, 1998 and 1997, respectively, reflecting the impact of items discussed above.

Pro forma 1998

Our operating loss and net loss, as reported for 1998, does not reflect the impact of many changes in our operations that are expected to result from our separation from GM. After giving effect to the terms of the Separation Agreement, our operating loss and net loss would have been $110 million and $24 million, respectively, for 1998. Excluding the impact of special items and work stoppages and after giving effect to the terms of the Separation Agreement, operating income and net income would have been $1.4 billion and $889 million, respectively, for 1998. Overall, the terms of the Separation Agreement would have had a favorable impact on our reported operating loss and net loss of $111 million and $69 million, respectively, for the year ended December 31, 1998, reflecting the net effect of lower employee benefit costs and higher other costs associated with operating Delphi as a stand-alone company. For additional information on the impact of the terms of the Separation Agreement, see Note 17 to our consolidated financial statements included elsewhere in this report.

<div align="center">45</div>

Net Sales. Consolidated net sales and changes in net sales by product sector and in total for the years ended December 31, 1997 and 1996 were:

| Product Sector | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 1997 | 1996 | $ | % |
| | | (dollars in millions) | | |
| Electronics & Mobile Communication............ | $5,539 | $5,315 | $224 | 4.2% |
| Safety, Thermal & Electrical Architecture... | 12,728 | 12,942 | (214) | (1.7) |
| Dynamics & Propulsion..... | 13,733 | 13,293 | 440 | 3.3 |
| Eliminations.............. | (553) | (518) | (35) | n/a |
| Consolidated net sales. | $31,447 | $31,032 | $415 | 1.3% |

The increase in consolidated net sales during 1997 reflects a $260 million increase in sales to non-GM customers and improved GM-North America production volumes, after adjusting for the impact of work stoppages. These improved volumes during 1997 were partially offset by the impact of the 1996 sale of four plants by the Safety, Thermal & Electrical Architecture product sector, which had combined historical annual net sales of about $1.0 billion, as well as continued price pressures. Price reductions required by GM and non-GM customers had an unfavorable sales impact on all of our product sectors and totaled about $730 million, or 2.3% of net sales, during 1997. Price reductions for our Electronics & Mobile Communication product sector, representing 3.3% of net sales, exceeded the overall percentage for Delphi on a consolidated basis due to the timing of the implementation of GM-North America's global sourcing as it related to electronics products and the overall price declines throughout the electronics industry.

Cost of Sales. Cost of sales, as a percentage of consolidated net sales, decreased to 88.1% in 1997 from 88.5% in 1996. The decrease as a percentage of net sales reflects a lower impact of work stoppages in 1997 compared to 1996 along with other factors which are described in greater detail in the operating income discussion below.

Selling, General and Administrative and Depreciation and Amortization. Selling, general and administrative expenses remained constant during 1997 and 1996 while depreciation and amortization, excluding the $1.1 billion charge associated with the Competitiveness Study, increased slightly.

Operating Income. Operating income decreased to $352 million in 1997 from $1.3 billion in 1996. Excluding the impact of special items and work stoppages, operating income totaled $1.9 billion in 1997 compared to $2.1 billion in 1996. The following information on operating income and changes in operating income and its components excludes the impact of special items and work stoppages. See "--Special Items and Work Stoppages" for additional information.

Operating income by product sector and in total, excluding the impact of special items and work stoppages was:

| Product Sector | Year Ended December 31, | |
|---|---|---|
| | 1997 | 1996 |
| | (in millions) | |
| Electronics & Mobile Communication | $612 | $810 |
| Safety, Thermal & Electrical Architecture...................... | 1,060 | 955 |
| Dynamics & Propulsion............. | 400 | 321 |
| Other............................ | (130) | (27) |
| Total operating income excluding the impact of special items and work stoppages..... | $1,942 | $2,059 |

As a result of strategies implemented to reduce our cost structure, we realized material and manufacturing cost savings of about $450 million during 1997. Cost savings were realized by all of our product sectors; however, price reductions and unrecovered design change costs, which together totaled about $960 million in 1997, more than offset the cost savings. Unrecovered design change costs had an unfavorable impact on operating income of about $230 million in 1997, primarily affecting our Electronics & Mobile Communication product sector. In addition, operating income was favorably impacted by greater sales penetration of non-GM customers and improved GM-North America production volumes after adjusting for the impact of work stoppages.

Interest Expense. Interest expense totaled $287 million and $276 million in 1997 and 1996, respectively. The increase in interest expense in 1997 primarily reflected slightly higher interest rates during the period.

Other Income, Net. Other income, net totaled $194 million in 1997 compared with $115 million in 1996. The amount reported for 1997 includes a gain of $97 million, or $60 million after-tax, relating to the sale of certain business investments. The gain was partially offset by a decline in earnings of nonconsolidated affiliates, which decreased to $27 million in 1997 compared with $57 million in 1996. The decline reflected lower equity earnings due to the sale of certain minority owned investments and the unfavorable impact of economic volatility on overseas joint ventures.

Taxes. The effective income tax rate for 1997 was 17.0% compared with 23.3% for 1996. The lower 1997 effective income tax rate primarily reflected the favorable impact of state and local income tax rates which were generally lower than in 1996. The favorable impact of state and local tax rates was partially offset by higher foreign tax rates during 1997.

Net Income. Net income totaled $215 million in 1997 and $853 million in 1996. Income, excluding the impact of special items and work stoppages, totaled $1.2 billion in 1997 compared to $1.4 billion in 1996 reflecting the items discussed above.

## Liquidity and Capital Resources

Pursuant to a Cash and Debt Management Agreement with GM and an intracompany note payable to GM, our historical balance sheets reflect cash and marketable securities of $1.0 billion and combined short-term and long-term debt capitalization of $3.5 billion at December 31, 1998 and 1997. The short-term and long-term debt capitalization included a $3.1 billion intracompany note payable to GM and outstanding debt at our international subsidiaries. The $3.1 billion intracompany note payable to GM represented the portion of GM's outstanding debt that was specifically related to our operations.

Our net liquidity was $(2.5) billion at December 31, 1998 and 1997. Our net liquidity consists of cash and marketable securities less the total of short-term and long-term debt. The ratio of total debt to total capital, which consists of total debt plus equity, was 100% at December 31, 1998 compared to 113% at December 31, 1997. The ratio of total debt to total capital was greater than 100% at December 31, 1997, reflecting the impact of a net deficit in stockholder's equity. The ratio of total debt to total capital decreased during 1998, reflecting differences in various separation adjustments required at each date. The IPO and other related transactions resulted in a pro forma total debt to total capital ratio of 52% at December 31, 1998.

### Liquidity Prior to and Upon Our Separation from GM and the IPO

The following table sets forth the changes in our net liquidity, certain of which occurred immediately prior to or in connection with the transfer of assets and liabilities from GM to our company. The extension of payment terms for intracompany accounts receivable and the settlement of intracompany accounts receivable with the intracompany note payable occurred before assets and liabilities were transferred to Delphi Automotive Systems Corporation. Consequently, these transactions were executed by the Delphi businesses, and not by Delphi Automotive Systems Corporation.

|  | Cash and Marketable Securities | Short- and Long-Term Debt | Net Liquidity |
|---|---|---|---|
|  | --------- | -------------- | --------- |
|  | | (in billions) | |
| Net liquidity at December 31, 1998--As reported................. | $ 1.0 | $ 3.5 | $(2.5) |
| Extension of payment terms for intracompany accounts receivable from GM............. | (2.1) | -- | (2.1) |
| Settlement of intracompany note payable to GM................... | -- | (3.1) | 3.1 |
| Increase in accounts receivable, subsequent to settlement of intracompany accounts receivable. | (1.6) | -- | (1.6) |
| Proceeds from third party financing..................... | 3.1 | 3.1 | -- |
| Proceeds from the IPO............. | 1.6 | -- | 1.6 |
|  | ----- | ----- | ----- |
| Pro forma net liquidity......... | $ 2.0 | $ 3.5 | $(1.5) |
|  | ===== | ===== | ===== |

Each of the above changes in our net liquidity is discussed in the sections that follow.

### Extension of Payment Terms

In accordance with the Supply Agreement, which became effective January 1, 1999, payment terms for intracompany accounts receivable from GM have been modified such that payments will generally be due on the second day of the second month following the date of shipment by Delphi. These modified payment terms are consistent with those GM is currently in the process of introducing to all of its suppliers. Previous payment terms generally required GM to make intracompany accounts receivable payments in the month following shipment by Delphi. Overall, Delphi expects this change to increase accounts receivable by about $2.1 billion beginning in 1999. While Delphi intends to seek an extension of payment terms with its suppliers over time, in most cases, it currently pays suppliers on the 25th day of the month following the date a shipment is received. The difference in the payment terms for accounts receivable and accounts payable results in a monthly short-term cash flow gap. Delphi is financing this short-term cash flow gap through short-term borrowings, as discussed below.

### Debt Capitalization and Available Financing Sources

Immediately prior to the transactions contemplated by the Separation Agreement, approximately $1.6 billion of certain intracompany accounts receivable from GM were offset with the $3.1 billion outstanding intracompany note payable to GM, with the difference resulting in an increase in GM's net investment in Delphi. We expect to finance our operations with third party funding of up to $3.1 billion. Such funding will be in the form of draw downs from the available $4.9 billion third party revolving credit facilities and structured financing arrangements. In this regard, borrowings under third party credit facilities were about $2 billion as of February 1, 1999. In addition, during the fourth quarter of 1998, we implemented a $175 million accounts receivable factoring program.

In January 1999, we entered into two financing arrangements with a syndicate of lenders providing for an aggregate of $4.9 billion in available revolving credit facilities. In general, we may borrow up to $4.9 billion under the facilities through January 3, 2000, after which $1.5 billion will be available through January 3, 2004. The $4.9 billion we may borrow will be reduced to the extent of any net cash proceeds from post IPO public offerings and private placements of debt securities, excluding debt securities with a maturity of less than one year. The total reduction arising from issuances of common stock and debt securities will not exceed $2.0 billion. We may borrow under these financing arrangements for general corporate purposes. The credit facilities include certain customary affirmative and negative covenants, including maintenance of a ratio of consolidated total debt to consolidated EBITDA, excluding extraordinary items. The credit facilities also provide for certain events of default, including upon a change in control, which is defined to include the acquisition of more than 20% of the voting power of our Common Stock by any person other than GM. For additional information on revolving credit facilities, see Note 8 to the consolidated financial statements included elsewhere in this report.

We expect the draw downs from the revolving credit facilities to be refinanced with a combination of operating cash flows and the issuance of long-term debt during the first half of 1999. Subsequently, it is expected that the available $4.9 billion revolving credit facilities would be reduced to $3.0 billion in available funds, generally split between 364-day and five-year tranches.

General Motors continues to own about 82.3% of our Common Stock. As a result, GM will continue to include us as a "subsidiary" for various financial reporting, accounting and other purposes. Accordingly, we have agreed to certain covenants regarding the incurrence of debt. Specifically, so long as GM owns at least 50% of our outstanding shares of Common Stock, these covenants limit our maximum indebtedness, including indebtedness incurred in connection with acquisitions.

Delphi's intra-year cash fluctuations are impacted by the volume and timing of worldwide vehicle production. Examples of seasonal effects in the industry include the shut-down of operations of our primary North American customers for about two weeks in July, the subsequent ramp-up of new model production and the additional one-week shut-down in December. We believe that our company has sufficient financial flexibility to fund these fluctuations and to access the global capital markets on terms and in amounts satisfactory to it, although there can be no assurance that will be the case. In addition, we expect cash flows from operations, the establishment of the revolving credit facilities and other short-term sources to be sufficient to satisfy future working capital, capital expenditures, research and development, pension funding requirements and debt service requirements during the next 12 to 18 months. We expect cash flows from operations, the establishment of the revolving credit facilities and access to the short-term and long-term capital markets to satisfy our funding needs during our five-year business planning cycle. See "--Cash Flows--Investing Activities" and "--Our Other Postretirement Employee Benefits and Underfunded Pension Obligations."

### Cash Flows

Operating Activities. Net cash provided by operating activities was $849 million for the year ended December 31, 1998 compared to $2.9 billion in 1997 and $2.7 billion in 1996. The decrease in 1998 cash flows reflects the impact of work stoppages and the related overall net loss for 1998, as well as decreases in accrued and other liabilities. The decrease in accrued and other liabilities in 1998 reflected a reduction in income taxes payable and the timing of settlements for amounts accrued in prior periods. The 1997 increase in cash flows from operating activities primarily reflects increases in accounts payable, accrued liabilities and other liabilities partially offset by increased accounts receivable and cash used for other postretirement benefits as discussed below. The 1997 changes referenced above primarily reflected an increased volume of activity, differences in the timing of settlements, and amounts accrued in connection with the competitiveness studies.

Operating cash flow during 1998 and 1997 reflected contributions to a Voluntary Employees' Beneficiary Association ("VEBA") trust. The contributions, which totaled $677 million in 1998 and $925 million in 1997, were made in connection with GM's pre-funding of a portion of its other postretirement benefit liabilities. In accordance with the terms of the Separation Agreement, GM will retain 100% of the pre-funding and accordingly, Delphi's other postretirement benefit liabilities do not reflect an allocation of the VEBA trust assets.

Investing Activities. Cash flows used in investing activities totaled $1.2 billion, $1.3 billion and $1.0 billion for the years ended December 31, 1998, 1997 and 1996, respectively. Overall, cash flows used in investing activities primarily relate to our capital expenditure program, partially offset by proceeds from asset sales. Our capital expenditure program promotes our growth-oriented business strategy by investing in existing core areas, where efficiencies and profitability can be enhanced, and by targeting funds for new innovative technologies, where long-term growth opportunities can be realized. Capital expenditures by product sector and geographic region for the periods presented were:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (in millions) | | |
| Electronics & Mobile Communication............... | $ 180 | $ 122 | $ 195 |
| Safety, Thermal & Electrical Architecture..... | 449 | 464 | 418 |
| Dynamics & Propulsion....... | 741 | 778 | 548 |
| Other....................... | 11 | 19 | 16 |
| Total Capital Expenditures. | $1,381 | $1,383 | $1,177 |
| United States............... | $ 888 | $ 930 | $ 809 |
| Canada & Mexico............. | 127 | 88 | 65 |
| Other International........ | 366 | 365 | 303 |
| Total Capital Expenditures. | $1,381 | $1,383 | $1,177 |

The increased spending during 1998 and 1997 primarily relates to the timing of the start-up of new product programs, increased penetration with non-GM customers and expansion into new market areas primarily outside the United States.

We expect capital expenditures to total $1.5 billion in 1999. Such expenditures will primarily be utilized for equipment, tooling and other spending associated with new product programs, including increasing sales to non-GM customers. Expenditures will also be used for expansion into new markets outside the United States and the continued implementation of lean manufacturing strategies. About 43% of 1999 capital expenditures are targeted outside the United States. The Electronics & Mobile Communication, Safety, Thermal & Electrical Architecture and the Dynamics & Propulsion product sectors are expected to account for about 18%, 34% and 48%, respectively of 1999 capital expenditures.

Financing Activities. Net cash provided by financing activities was $384 million during 1998 compared to net cash used in financing activities of $1.5 and $1.7 billion in 1997 and 1996, respectively. Cash provided by or used in financing activities primarily related to the transfer or assumption of assets and liabilities to our company from GM under the terms of the Separation Agreement. The period to period changes reflect differences in separation adjustments for various assets and liabilities.

**Our Other Postretirement Employee Benefits and Underfunded Pension Obligations**

In connection with our separation from General Motors, we have entered into several agreements relating to pensions and other postretirement employee benefits for our employees as well as certain employees associated with prior divestitures. Our pension obligations are based on the pension plans' assets, the expected investment return on those assets and the plans' expected liabilities. Under current economic conditions and federal government regulations, our pension obligations would be considered to be "underfunded." The amount of underfunding can vary from time to time, depending on factors such as discount rates, asset returns, contributions and other factors. As of December 31, 1998, Delphi's U.S. salaried and hourly other postretirement employee benefit obligation was about $4.6 billion and the underfunded pension obligation was about $2.2 billion.

Because of the underfunded nature of certain pension plans, federal regulations will require that our contributions over time meet minimum funding requirements. Delphi is responsible for assuming the underfunded hourly pension liability associated with Delphi hourly employees or paying GM for underfunding relating to such employees.

Although we are not required to do so, we have commenced discussions with the Pension Benefit Guaranty Corporation ("PBGC") regarding the underfunded nature of certain pension plans. In connection with these discussions, the PBGC may request that we take actions in excess of federal regulatory minimum requirements. The outcome of these discussions is as yet unknown, but if any actions in excess of federal regulatory minimum requirements are discussed, we intend to seek to maintain sufficient financial flexibility in order to execute our business strategy. We also may determine, as part of our capital planning process, to make voluntary contributions to our pension plans in excess of federal regulatory minimum requirements in order to further address the underfunded status of our pension plans.

In any event, regardless of the outcome of our discussions with the PBGC, we expect these contributions to be material to our results of operations and financial condition. We cannot accurately predict the amount or timing of contributions that will be required in the future or the related impact on our financial results and financial condition. These amounts may be affected by general economic conditions, including

anticipated interest rates, the actual investment return on plan assets, the retirement rate of our employees, the attrition rate of our employees and other factors.

In addition, we and GM have agreed with the UAW and the IUE that any of our hourly employees who are members of such unions and who retire on or before October 1, 1999 will be treated as GM employees for purposes of postretirement benefit obligations. We anticipate that we will assume OPEB obligations and pension obligations for such employees who retire after October 1, 1999. The allocation of pension and other postretirement benefit obligations between us and GM assumes certain levels of employee retirements prior to October 1,1999, based on historical experience and conditions surrounding our separation from GM. We have agreed with GM to recalculate the allocation of those liabilities based on the actual level of retirements on or before October 1, 1999. Accordingly, if and to the extent that greater than the assumed number of our employees retire on or before October 1, 1999, we would be required to make a payment to GM. Depending on the amount of such a payment, if any, it could have a material adverse effect on our short-term liquidity.

**Inflation**

Inflation generally affects Delphi by increasing the cost of labor, equipment and raw materials. We believe that, because rates of inflation in countries where we have significant operations have been moderate during the periods presented, inflation has not had a significant impact on our results of operations.

**Year 2000**

Many computerized systems and microprocessors that are embedded in a variety of products either made or used by Delphi have the potential for operational problems if they lack the ability to handle the transition to the Year 2000. This issue has the potential to cause disruption to our business, our suppliers and the companies we supply. In our capacity as principal supplier to and majority-owned subsidiary of GM, we are part of GM's comprehensive worldwide Year 2000 program. As part of that program, Delphi is identifying and remediating potential Year 2000 problems in its business information systems and other systems embedded in its engineering and manufacturing operations. Delphi, in conjunction with GM's supplier assessment and remediation program, has also initiated communications and site assessments with its suppliers and other third parties in order to assess and reduce the risk that Delphi's operations could be adversely affected by the failure of these third parties to address adequately the Year 2000 issue.

50

One of our first priorities was the analysis of microprocessors used in our automotive components, integrated systems and modules supplied to vehicle manufacturers. Most of the processors reviewed have no date-related functionality, and accordingly have no specific Year 2000 issues. Of the vehicle processors that perform date-related functions, none had any Year 2000 issues. However, one trip computer module supplied by us to another vehicle manufacturer does not recognize 2000 as a leap year but can be reset without affecting performance. This does not affect vehicle operation or occupant safety nor is it expected to result in material cost to Delphi.

Our Year 2000 program teams are responsible for remediating all of our information technology and embedded systems. Information technology principally consists of business information systems, such as mainframe and other shared computers and associated business application software, and infrastructure, such as personal computers, operating systems, networks and devices like switches and routers. Embedded systems include microprocessors used in factory automation and in systems such as elevators, security and facility management. Delphi's Year 2000 program includes assessment and remediation services provided by Electronic Data Systems Corporation ("EDS"), which is a principal supplier of information technology services to Delphi.

The Year 2000 program is being implemented in seven phases, some of which are being conducted concurrently:

o Inventory. This phase involves the identification and validation of an inventory of all systems that could be affected by the Year 2000 issue. The inventory phase commenced in earnest in 1997 and is substantially complete. As a result, we have identified approximately 1,600 business information systems and about 300,000 infrastructure items and embedded systems.

o Assessment. This phase involves the initial testing, code scanning and supplier contacts to determine whether remediation is needed and to develop a remediation plan, if applicable. The assessment of business information systems is substantially complete and included a determination that about one quarter of such systems should be regarded as "critical" based on criteria such as the potential for business disruption. The assessment of infrastructure items and embedded systems was substantially complete by the end of 1998.

o Remediation. This phase involves the design and execution of a remediation plan, followed by testing for adherence to the design. Although we have substantially completed the remediation of our critical systems, we expect to continue to address remediation of these and other systems on a selectively prioritized basis in the future. Unimportant systems have been and will continue to be removed from our Year 2000 inventory and will not be remediated. We believe that we are substantially on track to meet our remediation targets. Based on our ongoing plan to implement new enterprise software incrementally, we will replace rather than remediate certain existing information systems. In this regard, a number of implementations are scheduled to be completed in Europe in the first quarter of 1999. In the United States, implementation of the enterprise software at one of our principal product groups is expected to be completed in July 1999.

o System Test. This phase involves the testing of remediated items to ensure that they function normally after being replaced in their original

operating environment. It is closely related to the remediation phase and follows essentially the same schedule.

o Implementation. This phase involves the return of items to normal operation after satisfactory performance in system testing. It follows essentially the same schedule as remediation and system testing.

o Readiness Testing. This phase involves the planning for and testing of integrated systems in a Year 2000 ready environment, including ongoing auditing and follow-up. Readiness testing is currently underway. This phase commenced in the fourth quarter of 1998 and is expected to be a major focus of the Year 2000 program throughout 1999.

o Contingency Planning. This phase involves the development and execution of plans that narrow the focus on specific areas of significant concern and concentrate resources to address them. We currently believe that the most reasonably likely worst case scenario is that there will be some localized disruptions of systems that will affect individual business processes, facilities or suppliers for a short time rather than systemic or long-term problems affecting our business operations as a whole. Our contingency planning will continue to identify systems or other aspects of our business or that of our suppliers that we believe would be most likely to experience Year 2000 problems as well as those business operations in which a localized disruption could have the potential for causing a wider problem by interrupting the flow of products, materials or data to other operations. Because there is uncertainty as to which activities may be affected and the exact nature of the problems that may arise, our

51

contingency planning will focus on minimizing the scope and duration of any disruptions by having sufficient personnel, inventory and other resources in place to permit a flexible, real-time response to specific problems as they may arise at individual locations around the world. Some of the actions that we may consider include the deployment of emergency response teams on a regional or local basis and the development of plans for the allocation, stockpiling or re-sourcing of components and materials that may be critical to our continued production. Specific contingency plans and resources for permitting the necessary flexibility of response are expected to be identified and put into place commencing in mid-1999.

The assessment and remediation phases described above include communicating with our suppliers as part of a broader supplier assessment program in which we are participating with GM. As part of that program, an industry trade association, the Automotive Industry Action Group ("AIAG"), has distributed Year 2000 compliance questionnaires as well as numerous Year 2000 awareness and assistance mailings to many of the 40,000 supplier sites that supply Delphi throughout the world. We are not relying entirely on assurances contained in those questionnaire responses and we are participating in GM's own further assessment of our suppliers. That further assessment includes GM's own on-site review of suppliers considered to be critical to GM's operations, including Delphi's operations as part of GM. These supplier assessment efforts have been substantially completed with respect to our critical supplier sites. Based on our participation with GM in this assessment activity to date, we believe that a substantial majority of our suppliers are making acceptable progress toward Year 2000 readiness. We are also participating in a program that GM has established to provide further assistance to suppliers that desire more input or that are believed to be at high risk of noncompliance as a result of the foregoing assessment efforts. This supplier assistance program currently includes providing compliance workshops and remediation consultants to work with suppliers on developing and implementing their own remediation programs. We also expect that our contingency planning efforts described above will address any critical suppliers that we still identify as being at high risk of encountering Year 2000 problems upon completion of the supplier assistance program. We intend to enter into appropriate arrangements with GM to provide for continued coordination or our respective supplier assessment and assistance efforts after the Distribution.

In contrast to some Year 2000 programs, we are not relying entirely on the receipt of written assurances from our suppliers with respect to their Year 2000 compliance; rather, together with GM, we are also evaluating certain suppliers on a first-hand basis and are seeking to enhance their likelihood of full Year 2000 readiness by actively assisting them with training and consultation regarding Year 2000 remediation projects. We expect that information from our suppliers, written responses and our interactions with them will provide us with a basis for further contingency planning and risk management.

The cost of our Year 2000 program is being expensed as incurred with the exception of capitalizable replacement hardware and, beginning in 1999, capitalizable computer software costs developed for internal use. Total incremental spending by Delphi is not expected to be material to the company's operations, liquidity or capital resources. We incurred about $40 million and $7 million of Year 2000 expense during 1998 and 1997, respectively. Delphi currently expects its total Year 2000 spending to be about $106 million, which will be funded from operations, with peak spending occurring in late 1998 and early 1999, plus about $9 million of additional costs associated with information technology projects that were already underway or scheduled independently of our Year 2000 program but that have been accelerated due to the Year 2000 issue. This total spending also includes an additional payment of about $13 million, part of GM's overall additional payment to EDS of $75 million at the end of the first quarter of 2000 if systems remediated by EDS under its master information technology services agreement with GM are capable of continued operation before, on and after January 1, 2000 without causing a significant business disruption that results in a material financial loss to "GM" due to the millennium change. For this purpose, "GM" includes Delphi and all other GM units being supported by EDS as of December 31, 1998, taken in the aggregate, including any such GM unit which may subsequently be divested but that continues to be supported by the remediation services of EDS. The estimated value of the services EDS is required to provide to Delphi under its master information technology services agreement with GM that are included in normal fixed price services and other on-going payments to EDS that are attributable to work being performed in connection with Delphi's Year 2000 program is about $73 million, which is part of the estimated $260 million attributable to GM overall. This does not represent incremental spending to Delphi. None of our information technology projects has been delayed due to Year 2000.

In view of the foregoing, we do not currently anticipate that we will experience a significant disruption of our business as a result of the Year 2000 issue. However, there is still uncertainty about the broader scope of the Year 2000 issue as it may affect Delphi and third parties, including our customers, that are critical to Delphi's operations. For example, lack of readiness by electrical and water utilities, financial institutions, governmental agencies or other providers of general infrastructure could, in some geographic areas, pose significant impediments to Delphi's ability to carry on our normal operations in the area or areas so affected. In the event that Delphi is unable to complete our remedial actions as described above and is unable to implement adequate

52

contingency plans in the event that problems are encountered, there could be a material adverse effect on Delphi's business, results of operations or financial condition.

Statements made herein about the implementation of various phases of Delphi's Year 2000 program, the costs expected to be associated with that program and the results that Delphi expects to achieve constitute forward-looking information. As noted above, there are many uncertainties involved in the Year 2000 issue, including the extent to which Delphi will be able to successfully remediate systems and adequately provide for contingencies that may arise, as well as the broader scope of the Year 2000 issue as it may affect third parties that are not controlled by Delphi. Accordingly, the costs and results of Delphi's Year 2000 program and the extent of any impact on Delphi operations could vary materially from those stated herein.

**European Monetary Union**

Within Europe, the European Economic and Monetary Union (the "EMU") introduced a new currency, the euro, on January 1, 1999. The new currency is in response to the EMU's policy of economic convergence to harmonize trade policy, eliminate business costs associated with currency exchange and to promote the free flow of capital, goods and services.

On January 1, 1999, the participating countries adopted the euro as their local currency, initially available for currency trading on currency exchanges and non-cash transactions such as banking. The existing local currencies, or legacy currencies, will remain legal tender through January 1, 2002. Beginning on January 1, 2002, euro-denominated bills and coins will be issued for cash transactions. For a period of up to six months from this date, both legacy currencies and the euro will be legal tender. On or before July 1, 2002, the participating countries will withdraw all legacy currencies and use exclusively the euro.

The introduction of the euro is a significant event with potential implications for our existing operations within countries participating in the EMU. As such, we have committed resources to conduct risk assessments and to take corrective actions, where required, to ensure that we are prepared for the introduction of the euro. We have undertaken a review of the euro implementation and concentrated on areas such as operations, finance, treasury, legal, information management, procurement and others, both in participating and non-participating European Union countries where we have operations. Also, existing legacy accounting and business systems and other business assets have been reviewed for euro compliance, including assessing any risks from third parties. Progress regarding euro implementation is reported periodically to management.

We have not experienced any significant operational disruptions to date and do not currently expect the continued implementation of the euro to cause any significant operational disruptions. In addition, we have not incurred and do not expect to incur any significant costs from the continued implementation of the euro, including any currency risk, which could materially affect our liquidity or capital resources.

**Deferred Income Taxes**

At December 31, 1998, Delphi's consolidated balance sheet included a net deferred tax asset of about $2.9 billion. This net deferred tax asset relates to temporary differences between amounts of assets and liabilities for financial reporting purposes and the basis of such assets and liabilities as measured by tax laws. For more information, see Note 5 to our consolidated financial statements included elsewhere in this report. About $1.6 billion of the net deferred tax asset balance is related to the obligation for postretirement benefits other than pensions. Realization of the net deferred tax asset is dependent upon profitable operations in the United States and future reversals of existing taxable temporary differences. Although realization is not assured, we believe that it is more likely than not that such benefits will be realized through the reduction of future taxable income. Management has carefully considered various factors in assessing the probability of realizing these deferred tax assets including:

o Delphi's operating results, excluding the impact of special items and work stoppages, over the most recent three year period and overall financial forecasts of book and taxable income for the 1999-2004 period.

o The ability to utilize tax planning, such as capitalization of research and experimentation costs for tax purposes, so that Delphi does not generate any significant U.S. federal tax net operating loss carryforwards.

o The extended period of time over which the tax assets can be utilized. Postretirement benefits become tax deductions over periods up to 50 years.

53

**Environmental Matters**

Delphi is subject to various laws governing the protection of the environment including laws regulating air emissions, water discharges and waste management. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. However, such expenditures were not material during the years ended December 31, 1998, 1997 and 1996 and are not expected to be material in 1999 or 2000. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, we cannot assure you that these requirements will not change or become more stringent in the future in a manner that could have a material adverse effect on our business.

Delphi is also subject to environmental laws requiring investigation and cleanup of environmental contamination and is in various stages of investigation and cleanup at its manufacturing sites where contamination has been alleged. At December 31, 1998, our reserve for such environmental investigation and cleanup totaled about $20 million.

The process of estimating environmental clean up liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remedy and technology will be required, the outcome of discussions with regulatory agencies and, at multi-party sites, other potentially responsible parties. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remedy that is used could significantly change our estimates. Accordingly, we cannot assure you that our environmental cleanup costs and liabilities will not exceed the amount of our current reserve.

**Recently Issued Accounting Pronouncements**

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." SFAS No. 133 requires recognition of all derivative financial instruments as either assets or liabilities in consolidated balance sheets at fair value and determines the method(s) of gain/loss recognition. We are required to adopt SFAS No. 133 with our fiscal year ending December 31, 2000 and are currently assessing the effect that it may have on our consolidated financial statements.

SFAS No. 133 provides that, if certain conditions are met, a derivative may be specifically designated as:

o a hedge of the exposure to changes in the fair value of a recognized asset or liability or an unrecognized firm commitment (a "fair value hedge");

o a hedge of the exposure to variable cash flows of a forecasted transaction (a "cash flow hedge"); or

o a hedge of the foreign currency exposure of a net investment in a foreign operation, an unrecognized firm commitment, an available-for-sale security or a foreign-currency-denominated forecasted transaction (a "foreign currency hedge").

Under SFAS No. 133, the accounting for changes in the fair value of a derivative depends on its intended use and designation. For a fair value hedge, the gain or loss is recognized in earnings in the period of change together with the offsetting loss or gain on the hedged item. For a cash flow hedge, the effective portion of the derivative's gain or loss is initially reported as a component of other comprehensive income and subsequently reclassified into earnings when the forecasted transaction affects earnings. For a foreign currency hedge, the gain or loss is reported in other comprehensive income as part of the cumulative translation adjustment. For all other items not designated as hedging instruments, the gain or loss is recognized in earnings in the period of change.

In March 1998, the Accounting Standards Executive Committee ("ASEC") for the American Institute of Certified Public Accountants released Statement of Position ("SOP") 98-1, "Accounting for the Costs of Computer Software Developed for Internal Use." SOP 98-1 requires the capitalization of certain expenditures for software that is purchased or internally developed once certain criteria are met. Currently, we generally expense the costs of developing or obtaining internal use software as incurred. We adopted SOP 98-1 on January 1, 1999, as required. We expect that about $30 to $40 million of spending that would have otherwise been expensed as incurred will be capitalized in 1999 in accordance with the provisions of SOP 98-1.

54

**Forward-Looking Statements**

Delphi is subject to various factors, many of which are outside of its control, that could cause actual results to differ from those expressed in forward-looking statements made by us throughout this report and elsewhere. All statements which address operating performance, events or developments that we expect or anticipate will occur in the future, including statements relating to volume growth, share of sales and earnings per share growth or statements expressing general optimism about future operating results, are forward-looking statements. The following are the principal important factors which may cause actual results to differ from those expressed in such forward-looking statements:

o Changes in GM's previously announced intention to complete its divestiture of our company later in 1999.

o The ability of our company to increase sales to customers other than GM and to achieve the labor benefits we expect from our separation from GM.

o Changes in the operations, financial condition or results of operations of our customers, including our largest customer, GM.

o Changes in economic conditions, currency exchange rates, or political stability in the major markets where our company procures material, components, and supplies for the production of our principal products or where our products are produced, distributed, or sold (i.e., North America, Europe, Latin America and Asia-Pacific), including the effects of current economic problems in Asia, Brazil and other regions of Latin America, including Mexico.

o Shortages of materials or interruptions in transportation systems, labor strikes, work stoppages, or other interruptions to or difficulties in the employment of labor in the major markets where our company purchases material, components and supplies for the production of our products or where our products are produced, distributed or sold.

o Significant changes in the competitive environment in the major markets where our company purchases material, components and supplies for the production of our products or where our products are produced, distributed, or sold.

o Changes in the laws, regulations, policies or other activities of governments, agencies and similar organizations where such actions may affect the production, licensing, distribution or sale of our company's products, the cost thereof or applicable tax rates.

o The ability of our company to generate cost savings and operational improvements in the future sufficient to offset contractually required price reductions, price reductions necessary to win additional business and increases in raw material costs.

o The ability of our company to maintain financial flexibility to make payments for pensions and other postretirement employee benefits and to implement capital expenditures, all at the levels and times planned by management.

o Additional risk factors include our ability to provide high quality products at competitive prices, to sustain technological competitiveness, to develop new products that meet changing consumer preferences, to meet changing vehicle manufacturer supply requirements on a timely, cost effective basis, and the ability to respond to competitive pressures and react quickly to other major changes in the marketplace.

55

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS

We are exposed to market risks from changes in foreign currency exchange rates and certain commodity prices. In order to manage these risks until January 1, 1999, we participated in GM's risk management program, which includes entering into a variety of foreign exchange and commodity forward contracts and options. The commodity price hedging programs were managed on a centralized basis by GM and foreign currency risks were managed by both GM and certain foreign locations. After January 1, 1999, we will continue to manage market risks we are exposed to using our own centralized risk management program.

A discussion of our accounting policies for derivative instruments is included in Note 2 to our consolidated financial statements included elsewhere in this report and further disclosure is provided in Note 16 to those financial statements. Delphi and GM maintain risk management control systems to monitor foreign exchange and commodity risks, and related hedge positions. Positions are monitored using a variety of analytical techniques including market value, sensitivity analysis, and value-at-risk models. The following analyses are based on sensitivity analysis tests which assume instantaneous, parallel shifts in exchange rates and commodity prices. For options and instruments with non-linear returns, appropriate models are utilized to determine the impact of sensitivity shifts.

### Foreign Currency Exchange Rate Risk

We have foreign currency exposures related to buying, selling and financing in currencies other than the local currencies in which it operates. More specifically, we are exposed to foreign currency risk related to uncertainty to which future earnings or assets and liability values are exposed due to operating cash flows and various financial instruments that are denominated in foreign currencies. Currently, our most significant foreign currency exposures relate to Brazil, Mexico, Germany, France, Spain and South Korea. As of December 31, 1998, the net fair value asset of financial instruments with exposure to foreign currency risk was about $114 million. The potential loss in fair value for such financial instruments from a hypothetical 10% adverse change in quoted foreign currency exchange rates would be about $11 million. The model assumes a parallel shift in foreign currency exchange rates; however, exchange rates rarely move in the same direction. The assumption that exchange rates change in a parallel fashion may overstate the impact of changing exchange rates on assets and liabilities denominated in a foreign currency.

### Commodity Price Risk

Commodity forward and option contracts are executed to offset our exposure to the potential change in prices mainly for various non-ferrous metals used in the manufacturing of automotive components. The net fair value liability of such contracts, excluding the underlying exposures,

as of December 31, 1998 was about $28 million. The potential change in the fair value of commodity forward and option contracts, assuming a 10% change in the underlying commodity price, would be about $29 million at December 31, 1998. This amount excludes the offsetting impact of the price risk inherent in the physical purchase of the underlying commodities.

**Interest Rate Risk**

Due to limited borrowings from third party credit sources, our historical interest rate risk was generally not significant. Subsequent to our separation from GM, we expect to manage our exposure to interest rate risk through the use of derivative instruments designed to manage risk and minimize interest expense.

**ITEM 8. FINANCIAL STATEMENTS**

### RESPONSIBILITY FOR CONSOLIDATED FINANCIAL STATEMENTS

The following consolidated financial statements of Delphi Automotive Systems Corporation ("Delphi") were prepared by management, which is responsible for their integrity and objectivity. The statements have been prepared in conformity with generally accepted accounting principles and, as such, include amounts based on judgments of management.

Management is further responsible for maintaining internal control designed to provide reasonable assurance that the books and records reflect the transactions of Delphi and that established policies and procedures are carefully followed. From a stockholder's point of view, perhaps the most important feature in internal control is that it is continually reviewed for effectiveness and is augmented by written policies and guidelines, the careful selection and training of qualified personnel, and a strong program of internal audit.

Deloitte & Touche LLP, an independent audit firm, is engaged to audit the consolidated financial statements of Delphi and issue reports thereon. The audit is conducted in accordance with generally accepted auditing standards that comprehend the consideration of internal control and tests of transactions to the extent necessary to form an independent opinion on the financial statements prepared by management. The independent auditors' report appears on the next page.

The Board of Directors, through the Audit Committee (composed entirely of non-employee Directors) is responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements. The Audit Committee selects the independent auditors and reviews the scope of the audits and the accounting principles being applied in financial reporting. The independent auditors, representatives of management, and the internal auditors meet regularly (separately and jointly) with the Audit Committee to review the activities of each, to ensure that each is properly discharging its responsibilities, and to assess the effectiveness of internal control. It is management's conclusion that internal control at December 31, 1998 provides reasonable assurance that the books and records reflect the transactions of the companies and that established policies and procedures are complied with. To ensure complete independence, Deloitte & Touche LLP has full and free access to meet with the Audit Committee, without management representatives present, to discuss the results of the audit, the adequacy of internal control, and the quality of financial reporting.

```
/s/ J.T. Battenberg III        /s/ Alan S. Dawes         /s/ Paul R. Free
-----------------------        -----------------         ----------------
J.T. Battenberg III            Alan S. Dawes             Paul R. Free
Chairman, Chief Executive      Chief Financial Officer   Chief Accounting
Officer and President          and Vice President        Officer and
                                                         Controller
```

### INDEPENDENT AUDITORS' REPORT

**Delphi Automotive Systems Corporation:**

We have audited the accompanying consolidated balance sheets of Delphi Automotive Systems Corporation ("Delphi"), a subsidiary of General Motors Corporation, as of December 31, 1998 and 1997, and the related consolidated statements of operations, of equity (deficit) and comprehensive income (loss), and of cash flows for each of the three years in the period ended December 31, 1998. These financial statements are the responsibility of the management of Delphi. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Delphi as of December 31, 1998 and 1997 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1998, in conformity with generally accepted accounting principles.

```
                            /s/ Deloitte & Touche LLP
                            --------------------------
                            Deloitte & Touche LLP

                            Detroit, Michigan
                            January 20, 1999
                            (February 5, 1999 as to Note 17)
```

58

# DELPHI AUTOMOTIVE SYSTEMS CORPORATION

## CONSOLIDATED BALANCE SHEETS

December 31,

1998 1997

(in millions)

## ASSETS

| | 1998 | 1997 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 995 | $ 989 |
| Other marketable securities | 5 | 11 |
| Total cash and marketable securities | 1,000 | 1,000 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 2,236 | 2,284 |
| Other customers | 977 | 982 |
| Inventories, net (Note 4) | 1,770 | 1,868 |
| Deferred income taxes (Note 5) | 285 | 183 |
| Prepaid expenses and other assets | 137 | 61 |
| Total current assets | 6,405 | 6,378 |
| Property, net (Note 6) | 4,965 | 4,600 |
| Deferred income taxes (Note 5) | 2,813 | 3,007 |
| Other assets | 1,323 | 1,041 |
| Total assets | $15,506 | $15,026 |
| LIABILITIES AND EQUITY (DEFICIT) | | |
| Current liabilities: | | |
| Notes payable and current portion of long-term debt (Note 8) | $ 363 | $ 159 |
| Accounts payable: | | |
| General Motors and affiliates | 89 | 86 |
| Other suppliers | 2,171 | 2,157 |
| Accrued liabilities (Note 7) | 1,438 | 1,664 |
| Total current liabilities | 4,061 | 4,066 |
| Long-term debt, including intracompany note payable with General Motors (Note 8) | 3,137 | 3,341 |
| Pension benefits (Note 9) | 2,180 | 1,799 |
| Postretirement benefits other than pensions (Note 9) | 4,573 | 4,788 |
| Other liabilities | 1,546 | 1,445 |
| Total liabilities | 15,497 | 15,439 |
| Commitments and contingencies (Note 10) | | |
| Equity (deficit): | | |
| General Motors' net investment | 77 | (335) |
| Accumulated translation adjustments | (68) | (78) |
| Total equity (deficit) | 9 | (413) |
| Total liabilities and equity (deficit) | $15,506 | $15,026 |

See notes to consolidated financial statements.

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

## CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (in millions, except per share amounts) | | |
| Net sales: | | | |
| General Motors and affiliates...... | $ 22,322 | $25,907 | $25,748 |
| Other customers.................... | 6,157 | 5,540 | 5,284 |
| Total net sales.................... | 28,479 | 31,447 | 31,032 |
| Operating expenses: | | | |
| Cost of sales, excluding items listed below........................ | 26,135 | 27,710 | 27,471 |
| Selling, general and administrative. | 1,463 | 1,415 | 1,445 |
| Depreciation and amortization....... | 1,102 | 1,970 | 843 |
| Total operating expenses........... | 28,700 | 31,095 | 29,759 |
| Operating (loss) income............. | (221) | 352 | 1,273 |
| Interest expense (Note 8)........... | (277) | (287) | (276) |
| Other income, net (Note 12).......... | 232 | 194 | 115 |
| (Loss) income before income taxes.... | (266) | 259 | 1,112 |
| Income tax (benefit) expense (Note 5) | (173) | 44 | 259 |
| Net (loss) income ................... | $ (93) | $ 215 | $ 853 |
| (Loss) earnings per share (Note 2) | | | |
| Basic and diluted................... | $ (0.20) | $ 0.46 | $ 1.83 |

See notes to consolidated financial statements.

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT) AND COMPREHENSIVE INCOME (LOSS)

|  | Comprehensive Income (loss) | Accumulated Translation Adjustments | General Motors' Net Investment | Total Equity (Deficit) |
|---|---|---|---|---|
|  | | (in millions) | | |
| Balance at January 1, 1996.... | | $ 36 | $ 1,318 | $ 1,354 |
| Comprehensive income: | | | | |
| Net income................... | $853 | | 853 | 853 |
| Other comprehensive loss (Note 11)- | | | | |
| Foreign currency translation adjustments.............. | (31) | (31) | | (31) |
| Comprehensive income.......... | $822 | | | |
| Net effect of assets and liabilities transferred to General Motors.............. | | | (1,254) | (1,254) |
| Balance at December 31, 1996. | | 5 | 917 | 922 |
| Comprehensive income: | | | | |
| Net income................... | $215 | | 215 | 215 |
| Other comprehensive loss (Note 11)- | | | | |

| | | | | |
|---|---|---|---|---|
| Foreign currency translation adjustments............... | | (83) | | (83) |
| Comprehensive income.......... | $132 | | | |
| Net effect of assets and liabilities transferred to General Motors........... | | | (1,467) | (1,467) |
| Balance at December 31, 1997. | (78) | | (335) | (413) |
| Comprehensive loss: | | | | |
| Net loss..................... | $(93) | | (93) | (93) |
| Other comprehensive income (Note 11)– | | | | |
| Foreign currency translation adjustments............... | 10 | 10 | | 10 |
| Comprehensive loss............ | $(83) | | | |
| Net effect of assets and liabilities transferred from General Motors.............. | | | 505 | 505 |
| Balance at December 31, 1998 | $(68) | | $ 77 | $ 9 |

See notes to consolidated financial statements.

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 1998 | 1997 | 1996 |
| | (in millions) | | |
| Cash flows from operating activities: | | | |
| Net (loss) income.................... | $ (93) | $ 215 | $ 853 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Depreciation and amortization.... | 1,102 | 1,970 | 843 |
| Pension expense, net of contributions................... | 61 | (29) | 94 |
| Postretirement benefits other than pensions, net of payments and VEBA contributions.......... | (339) | (551) | 403 |
| Deferred income taxes............ | 123 | 196 | 391 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net......... | 37 | (557) | 688 |
| Inventories, net................. | 218 | 92 | (67) |
| Prepaid expenses and other assets | (59) | 95 | (19) |
| Accounts payable................. | (92) | 149 | (361) |
| Accrued liabilities.............. | (150) | 618 | 138 |
| Other liabilities................ | 103 | 1,038 | (506) |
| Other................................ | (62) | (318) | 244 |
| Net cash provided by operating activities..................... | 849 | 2,918 | 2,701 |
| Cash flows from investing activities: | | | |
| Capital expenditures................ | (1,381) | (1,383) | (1,177) |
| Investment in joint ventures and affiliates, net of cash acquired. | (201) | (24) | (54) |
| Acquisition of marketable securities | (695) | (303) | (153) |
| Liquidation of marketable securities | 701 | 321 | 168 |
| Other............................... | 360 | 69 | 221 |
| Net cash used in investing activities................... | (1,216) | (1,320) | (995) |

Cash flows from financing activities:

Cash effect of assets and liabilities

```
    transferred to General Motors......   384  (1,549) (1,686)
                                        -------  ------  -----
      Net cash provided by (used in)     384  (1,549) (1,686)
         financing activities.........-------  ------  -----

Effect of exchange rate fluctuations
  on cash and cash equivalents........   (11)    (31)    (5)
                                        -------  ------  -----
Increase in cash and cash equivalents:    6      18      15
Cash and cash equivalents at
  beginning of year.................     989     971     956
                                        -------  ------  -----
 Cash and cash equivalents at end of  $ 995   $ 989   $ 971
```

year............................======= ====== =====

See notes to consolidated financial statements.

62

**DELPHI AUTOMOTIVE SYSTEMS CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1. BACKGROUND AND BASIS OF PRESENTATION

Background--Delphi Automotive Systems Corporation ("Delphi") was incorporated in late 1998 as a subsidiary of General Motors Corporation ("GM"). During 1998, GM announced its intention to create and eventually divest of a separate company comprised of the GM businesses and operations that now comprise Delphi and the associated assets and liabilities of such businesses and operations (the "Separation"). The divestiture is currently expected to occur in two stages, the first of which involved an offering to the public of approximately 100 million common shares of Delphi (the "IPO"--See Note 17). The second stage involves GM distributing to holders of its $1-2/3 common stock later in 1999, all of its interest in Delphi (the "Distribution") through one of the following transactions:

o A split-off transaction, such as one in which Delphi shares would be offered in exchange for GM $1-2/3 common stock to those GM stockholders who elect to participate in an exchange offer; or

o A spin-off transaction in which the shares of Delphi would be distributed to GM $1-2/3 common stockholders on a pro-rata basis; or

o Some combination of the above.

GM has the sole discretion to determine the timing, structure, and all terms of the distribution. However, GM is not obligated to complete the distribution.

Under Delphi's Amended and Restated Certificate of Incorporation, the authorized capital stock of Delphi consists of two billion shares, of which 1.35 billion shares are common stock, par value $0.01 per share, and 650 million shares are preferred stock, par value $0.10 per share. Delphi will begin accumulating retained earnings on January 1, 1999, the date on which GM transferred to Delphi substantially all of the assets and liabilities related to Delphi's business and operations.

Basis of Presentation--The consolidated financial statements of Delphi reflect the historical results of operations and cash flows of the businesses that were considered part of the Delphi business sector of GM during each respective period; they do not reflect many significant changes that will occur in the operations and funding of Delphi as a result of the Separation and the IPO. The historical consolidated balance sheets reflect the assets and liabilities transferred to Delphi in accordance with the terms of a master separation agreement to which Delphi and GM are parties (the "Separation Agreement"). Delphi and Delco Electronics Corporation ("Delco Electronics"), the electronics and mobile communication business that was transferred to Delphi in December 1997, were under the common control of GM during such periods; therefore, the consolidated financial statements include amounts relating to Delco Electronics for all periods presented, although Delco Electronics was not integrated with Delphi until December 1997.

The following significant factors are reflected in the consolidated financial statements:

**Capital Arrangements**

o Delphi operated under a cash and debt management agreement with GM (the "Cash and Debt Management Agreement"), and an intracompany note payable to GM. The Cash and Debt Management Agreement established Delphi's combined cash and marketable securities balance at $1.0 billion. Delphi's total debt was $3.5 billion, reflecting a $3.1 billion intracompany note payable to GM and outstanding debt at Delphi's international subsidiaries. The $3.1 billion intracompany note payable to GM reflected the portion of GM's outstanding debt that was specifically related to Delphi's operations. The historical consolidated financial statements give effect to the terms of the Cash and Debt Management Agreement and the intracompany note payable, and accordingly, reflect cash and marketable securities and the combined short-term and long-term debt capitalization totaling $1.0 billion and $3.5 billion, respectively, at December 31, 1998 and 1997.

o Interest expense reflects interest associated with the historical debt capitalization discussed above, primarily using a blend of prevailing short-term and long-term weighted-average interest rates commensurate with the overall credit risk of the Delphi business sector.

63

**Employee Benefits Arrangements**

o The Separation Agreement provides generally that pension plan assets and liabilities related to Delphi's U.S. salaried active and inactive employees retiring after January 1, 1999 will be assumed by Delphi. Delphi has established defined benefit pension plans for its salaried employees under the same terms that existed for the GM plans at the time of separation. The consolidated balance sheets reflect the assets and liabilities related to U.S. salaried employees that Delphi assumes pursuant to the Separation Agreement, and exclude employee benefit obligations and assets related to salaried employees retired on or before January 1, 1999. Generally, Delphi's U.S. hourly employees will continue to participate in the defined benefit pension plan for hourly workers administered by GM until the Distribution. Generally, Delphi will assume the pension obligations for U.S. hourly employees who retire after October 1, 1999 and GM will retain pension obligations for U.S. hourly employees who retire on or before October 1, 1999. The amount of such obligations varies depending on factors such as discount rates, asset returns, contribution levels and other factors. The obligation attributable to Delphi was $2.1 billion and $1.7 billion at December 31, 1998 and 1997, respectively. Delphi intends to work with GM to ensure that any plan transfers are accomplished in accordance with applicable laws and regulations.

o The Separation Agreement provides in general that GM will retain other postretirement benefit liabilities related to Delphi's U.S. salaried employees retiring on or prior to January 1, 1999. The liabilities related to Delphi's U.S. salaried active and inactive employees retiring after January 1, 1999 will be assumed by Delphi. Delphi's U.S. hourly employees will continue to participate in the postretirement plans administered by GM until the Distribution, and GM generally will retain postretirement benefit obligations for U.S. hourly employees retired on or before October 1, 1999.

o The liabilities set forth in Delphi's consolidated balance sheets include employee benefit obligations related to its active and inactive employees only; however, the consolidated statements of operations include benefit costs for Delphi's active, inactive and retired employees. Such accrued obligations and employee benefit costs are based upon actuarial methods and assumptions.

**Operating Costs**

o Operating costs and expenses include allocations of general corporate overhead expenses related to GM's corporate headquarters and common support activities, including payroll administration, employee medical coverage and property and casualty insurance, financial, legal, tax and human resources. These allocated costs amounted to $135 million, $130 million and $124 million in 1998, 1997 and 1996, respectively, and have been allocated to Delphi based on usage or allocation methodologies primarily based on total net sales, certain tangible assets and payroll expenses. Although Delphi believes the allocations and charges for such services to be reasonable, the costs of these services charged to Delphi may not be indicative of the costs that would have been incurred if Delphi had been a stand-alone entity.

**Income Taxes**

o Income taxes were determined in accordance with the provisions of Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes." Once Delphi is a stand-alone entity and is no longer included in GM's consolidated income tax return, it will no longer benefit from its position within GM's consolidated income tax environment. As a result, Delphi expects its effective income tax rates in future periods generally to be higher than its historical effective income tax rates.

**Cash Flows**

o The consolidated statements of cash flows present the historical operating cash flows of Delphi's businesses. The net cash effect of the adjustments specified in the Separation Agreement is included in cash flows from financing activities. The net cash effect of the separation adjustments was (less than) more than the net equity effect of such adjustments by approximately $(121) million, $82 million and $432 million in 1998, 1997 and 1996, respectively. This was caused by changes during these years in separation adjustments for various assets and liabilities, principally pension and other postretirement benefits, which affected net equity, but did not necessarily affect cash.

64

The financial information included herein may not necessarily reflect the consolidated results of operations, financial position, changes in

equity (deficit) and cash flows of Delphi in the future or what they would have been had Delphi been a separate, stand-alone entity during the periods presented.

## 2. SIGNIFICANT ACCOUNTING POLICIES

Consolidation--The consolidated financial statements include the accounts of Delphi and domestic and foreign subsidiaries that are majority-owned. Delphi's share of the earnings or losses of affiliates, in which at least 20% of the voting securities is owned, is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between the Delphi businesses have been eliminated.

Use of Estimates--The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect amounts reported therein. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

Earnings Per Common Share--Basic and diluted earnings per share attributable to Delphi common stock were determined based on net income divided by the 465 million common shares outstanding immediately prior to the IPO. For purposes of the earnings per share calculation, the shares outstanding after January 1, 1999 but prior to the IPO are treated as outstanding for all periods presented. There were no potentially dilutive securities outstanding during the periods presented.

Revenue Recognition--Sales are recorded upon shipment of product to customers and transfer of title under standard commercial terms.

Research and Development--Delphi incurs costs in connection with research and development programs that are expected to contribute to future earnings. Such costs are charged against income as incurred. Research and development expenses were $1.4 billion, $1.5 billion and $1.6 billion for the years ended December 31, 1998, 1997 and 1996, respectively.

Cash and Cash Equivalents--Cash and cash equivalents are defined as short-term, highly liquid investments with original maturities of 90 days or less. In addition, pursuant to the Cash and Debt Management Agreement, GM provided Delphi access to cash and cash equivalents in an amount which fluctuated based on Delphi's other balances, such that total cash and marketable securities at each period end was $1.0 billion. Income taxes paid by Delphi totaled $741 million and $132 million in 1998 and 1996, respectively. Income taxes paid during 1997 were not significant. Interest paid by Delphi totaled $286 million, $299 million, and $267 million in 1998, 1997 and 1996, respectively.

Marketable Securities--Marketable securities are classified as available-for-sale. The fair value of such marketable securities approximates book value, with cost determined on the specific identification basis. Proceeds from sales and maturities of marketable securities attributable to Delphi totaled $701 million, $321 million and $168 million in 1998, 1997 and 1996, respectively. The gross gains and losses related to sales of marketable securities were not significant to Delphi.

Inventories--Inventories in the U.S. are stated at the lower of cost or market, as determined substantially by the last-in, first-out (LIFO) method, while inventories in countries other than the U.S., and at Delco Electronics, are stated under the first-in, first-out (FIFO) method. Delphi's inventory data is combined with similar data from other GM businesses for purposes of applying the LIFO method of accounting. Delphi has been allocated a pro rata portion of GM's LIFO reserve based on the relative inventory levels of Delphi before application of such reserve. The effect of the LIFO method of accounting was to increase Delphi's operating income by $38 million, $73 million, and $21 million, in 1998, 1997 and 1996, respectively.

Depreciation and Amortization--Depreciation is provided based on the estimated useful lives of groups of property generally using accelerated methods, which accumulate depreciation of approximately two-thirds of the depreciable cost during the first half of the estimated useful lives. Leasehold improvements are amortized over the period of the lease or the life of the property, whichever is shorter, with the amortization applied directly to the asset account. Expenditures for repairs and maintenance are charged to expense as incurred.

65

Environmental Liabilities--Delphi recognizes environmental cleanup liabilities when a loss is probable and can be reasonably estimated. Such liabilities are generally not subject to insurance coverage. The cost of each environmental cleanup is estimated by engineering, financial, and legal specialists within Delphi based on current law. Such estimates are based primarily upon the estimated cost of investigation and remediation required and the likelihood that other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. For closed or closing plants owned by Delphi and properties being sold, an estimated liability is typically recognized at the time the closure decision is made or sale is recorded and is based on an environmental assessment of the plant property.

The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remedy and technology will be required, the outcome of discussions with regulatory agencies and other PRPs at multi-party sites. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remedy that is used could significantly change Delphi's estimates.

Pursuant to the separation arrangements between Delphi and GM, GM is responsible for environmental liabilities at the GM facilities not transferred to Delphi, including all facilities closed or sold prior to January 1, 1999, except that Delphi is responsible for any environmental liabilities at such facilities that Delphi causes after January 1, 1999. Delphi is responsible for environmental liabilities at the facilities transferred to Delphi, except that GM will be responsible for any environmental liabilities at such facilities that GM causes after January 1, 1999.

In addition, with respect to liability for offsite waste disposal, GM has retained responsibility for sites where GM's liability is known or alleged prior to January 1, 1999, except that Delphi will be responsible for any wastes Delphi contributes to these sites after January 1, 1999. Delphi is not, however, responsible for any contributions to these sites from the facilities transferred to Delphi that occurred prior to January 1, 1999. At other waste disposal sites, GM's and Delphi's respective liability will be allocated based on each party's respective contribution of wastes to such sites. In particular, GM's liability will be based on contributions from the facilities retained by GM and any other facility owned or operated by GM, except the facilities transferred to Delphi. Delphi's liability will be based on contributions from facilities transferred to Delphi and any other facility owned or operated by Delphi.

Foreign Currency Translation--Assets and liabilities of foreign subsidiaries generally are translated to U.S. dollars at end-of-period exchange rates. The effects of translation for most foreign subsidiaries are reported in a separate component of equity. The effect of remeasurement of assets and liabilities of foreign subsidiaries that use the U.S. dollar as their functional currency is included in income. Income statement elements of all foreign subsidiaries are translated to U.S. dollars at average-period exchange rates and are recognized as part of revenues, costs and expenses. Also included in income are gains and losses arising from transactions denominated in a currency other than the functional currency of a particular subsidiary.

Net transaction gains and losses, as described above, decreased net income by $25 million during 1998, and increased net income by $68 million and $21 million during 1997 and 1996, respectively.

Valuation of Long-lived Assets--Management of Delphi periodically evaluates the carrying value of long-lived assets to be held and used, including intangible assets, when events or circumstances warrant such a review. The carrying value of a long-lived asset is considered impaired when the anticipated undiscounted cash flow from such an asset is separately identifiable and is less than the carrying value of the asset. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair market value of the long-lived asset. Fair market value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved. Losses on long-lived assets to be disposed of are determined in a similar manner, except that fair market values are reduced for the cost to dispose of the assets.

Accrued Commitments Under Loss Contracts--Management periodically evaluates the profitability of contractual commitments on a customer basis, and will establish a reserve whenever expected costs exceed related revenues, based upon a reasonable estimate of the costs and product pricing expected to exist over the course of the contract period. Such reserves would be recorded only to the extent the total estimated losses exceeded any related impairment reserves separately recognized on related long-lived assets.

Derivative Financial Instruments--During the periods presented, Delphi's exposure to fluctuations in foreign exchange rates and certain commodities prices was managed by GM. GM is party to a variety of foreign exchange, interest rate, and commodity forward contracts and options entered into in connection with the management of its exposure to fluctuations in foreign exchange rates, interest rates, and certain commodities prices, including foreign exchange and certain commodities price exposures relating to Delphi. These financial exposures were managed in accordance with GM's corporate policies and procedures.

GM established a Risk Management Committee to develop and monitor its financial risk strategies, policies and procedures. The GM Risk Management Committee reviews and approves all new risk management strategies, establishes approval authority guidelines for approved programs and monitors compliance and performance of existing risk management programs. GM does not enter into derivative transactions for trading purposes.

As part of the hedging program approval process, as it relates to Delphi, GM and Delphi management representatives are required to identify the specific financial risk which the derivative transaction will minimize, the appropriate hedging instrument to be used to reduce the risk, and the correlation between the financial risk and the hedging instrument. Purchase orders, letters of intent, vehicle production forecasts, capital planning forecasts, and historical data are used as the basis for determining the anticipated values of the transactions to be hedged. Generally, GM does not enter into derivative transactions that do not have a high correlation with the underlying financial risk. In the infrequent instances in which a derivative transaction is entered into that does not have a high correlation with the underlying exposure, then the derivative is marked to market for accounting purposes. The hedge positions related to Delphi as well as the correlation between the transaction risks and the hedging instruments, are reviewed by GM and Delphi management on an ongoing basis.

Subsequent to the Separation, Delphi has assumed management of its exposure to fluctuations in foreign exchange rates, interest rates, and certain commodity prices. GM has assigned to Delphi certain derivative contracts from its foreign exchange and commodities portfolio, based on Delphi's level of exposure at the time of the Separation. This assignment does not alter the original terms of the contracts being transferred. In addition, Delphi will not be required to pay any fee in order to assume the contracts. GM did not manage any interest rate contracts on behalf of Delphi during the periods presented, and no such contracts were assumed by Delphi as part of the Separation.

Foreign exchange forward and option contracts are accounted for as hedges to the extent they are designated, and are effective, as hedges of firm foreign currency commitments. Additionally, certain foreign exchange option contracts receive hedge accounting treatment to the extent such contracts hedge certain anticipated foreign currency transactions. Other such foreign exchange contracts and options are marked to market on a current basis.

GM, on behalf of Delphi, also enters into commodity forward and option contracts. Since GM has the discretion to settle these transactions either in cash or by taking physical delivery, these contracts are not considered financial instruments for accounting purposes. Commodity forward contracts and options are accounted for as hedges to the extent they are designated, and are effective, as hedges of firm or anticipated commodity purchase contracts. Other commodity forward contracts and options are marked to market on a current basis.

Postemployment Benefits and Employee Termination Benefits--Delphi's postemployment benefits primarily relate to Delphi's extended-disability benefit program in the United States and supplemental unemployment compensation benefits, mainly pursuant to union or other contractual agreements. Extended-disability benefits are accrued on a service-driven basis and supplemental unemployment compensation benefits are accrued on an event-driven basis. Accruals for postemployment benefits represent the discounted future cash expenditures expected during the period between the idling of affected employees and the time when such employees are redeployed, retire or otherwise terminate their employment.

Voluntary termination benefits are accrued when the employees accept the offer. Involuntary termination benefits are accrued when management has committed to a termination plan and the benefit arrangement is communicated to affected employees.

Labor Force--On a worldwide basis, Delphi has a concentration of employees working under union collective bargaining agreements representing approximately 93% of its hourly workforce. Of these represented employees, a significant number of hourly employees are working under agreements that will expire in 1999. Certain suppliers and customers of Delphi also have represented work forces. Future work stoppages by Delphi's employees or by employees of Delphi's suppliers or customers could disrupt Delphi's production of automotive components and systems.

67

During the years ended December 31, 1998, 1997 and 1996, work stoppages at certain GM and Delphi locations had an estimated unfavorable impact on net income of $450 million, $92 million and $281 million, respectively. Delphi generally estimates the impact of work stoppages by multiplying standard contribution margins by the estimated decline in vehicle production that is directly attributable to the work stoppages, after considering partial recovery of lost production, if any, in subsequent periods.

Recently Issued Accounting Pronouncements--In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." SFAS No. 133 requires recognition of all derivative financial instruments as either assets or liabilities in consolidated balance sheets at fair value and determines the method(s) of gain/loss recognition. Delphi is required to adopt SFAS No. 133 with its fiscal year ending December 31, 2000 and is currently assessing the effect that it may have on its consolidated financial statements.

SFAS No. 133 provides that, if certain conditions are met, a derivative may be specifically designated as:

o a hedge of the exposure to changes in the fair value of a recognized asset or liability or an unrecognized firm commitment (a "fair value hedge");

o a hedge of the exposure to variable cash flows of a forecasted transaction ( a "cash flow hedge"); or

o a hedge of the foreign currency exposure of a net investment in a foreign operation, an unrecognized firm commitment, an available-for-sale security or a foreign-currency-denominated forecasted transaction ( a "foreign currency hedge").

Under SFAS No. 133, the accounting for changes in the fair value of a derivative depends on its intended use and designation. For a fair value hedge, the gain or loss is recognized in earnings in the period of change together with the offsetting loss or gain on the hedged item. For a cash flow hedge, the effective portion of the derivative's gain or loss is initially reported as a component of other comprehensive income and subsequently reclassified into earnings when the forecasted transaction affects earnings. For a foreign currency hedge, the gain or loss is reported in other comprehensive income as part of the cumulative translation adjustment. For all other items not designated as hedging instruments, the gain or loss is recognized in earnings in the period of change.

In March 1998, the Accounting Standards Executive Committee ("ASEC") for the American Institute of Certified Public Accountants released Statement of Position ("SOP") 98-1, "Accounting for the Costs of Computer Software Developed for Internal Use." SOP 98-1 requires the capitalization of certain expenditures for software that is purchased or internally developed once certain criteria are met. Currently, Delphi generally expenses the costs of developing or obtaining internal use software as incurred. Delphi adopted SOP 98-1 on January 1, 1999, as required. Delphi expects that about $30 to $40 million of spending that would have otherwise been expensed as incurred will be capitalized in 1999 in accordance with the provisions of SOP 98-1.

3. COMPETITIVENESS INITIATIVES

The global automotive components and systems market is increasingly competitive and is undergoing significant restructuring and consolidation. All of the major industry competitors continue to increase their focus on efficiency and cost improvements, while facing increasing price pressures. As a result, Delphi has implemented a process for evaluating the long-term competitiveness of all facets of its business (the "Competitiveness Studies"). These studies are performed in conjunction with the business planning cycle and are substantially completed in December of each year. Based on the results of the Competitiveness Studies, Delphi recorded pre-tax charges of approximately $310 million and $1.4 billion ($192 million and $870 million after-tax) during the years ended December 31, 1998 and 1997, respectively. The charges were comprised of:

|  | 1998 | | 1997 | |
| --- | --- | --- | --- | --- |
| | Pre-tax | After-tax | Pre-tax | After-tax |
| | ------- | --------- | ------- | --------- |
| $176 million | $109 million | $791 million | $506 million | Underperforming assets |
| $134 million | $83 million | $55 million | $34 million | Capacity reductions |
| n/a | n/a | $516 million | $330 million | Assets held for disposal |

Overall, these charges had the effect of increasing cost of sales and depreciation and amortization by $154 million and $156 million, respectively for the year ended December 31, 1998 and $262 million and $1.1 billion, respectively, for the year ended December 31, 1997.

The amount included for underperforming assets represents charges pursuant to Delphi's policy for the valuation of long-lived assets. Delphi re-evaluates the carrying value of its long-lived assets as events and circumstances of the industry change. The re-evaluation is performed using product specific cash flow information. As a result of this process, the carrying values of certain long-lived assets, principally property, plant and equipment, were determined to be impaired as the separately identifiable, undiscounted future cash flows from such assets were less than their respective carrying values. The resulting impairment charge represented the amount by which the carrying value of such assets exceeded their estimated fair market value.

The amount included for capacity reductions represents postemployment benefits payable to employees, pursuant to contractual agreements. Such capacity reductions affected approximately 5,700 persons and 2,000 persons in 1998 and 1997, respectively. Approximately $60 million of the accruals established in 1998 and 1997 had been paid as of December 31, 1998. The remaining accruals are expected to be paid during 1999.

Assets held for disposal in 1997 primarily related to Delphi's seating, lighting and coil spring businesses, which were announced for sale during 1997, and certain other losses on assets subject to disposal. The related pre-tax charges represented the amount by which the carrying value of such assets exceeded the estimated fair value, net of related costs to dispose. Delphi sold its seating, lighting and coil springs businesses during 1998, resulting in an additional pre-tax loss of $430 million ($271 million after-tax). The additional loss had the effect of increasing cost of sales and depreciation and amortization by $382 million and $48 million, respectively. Delphi's results of operations included total operating losses related to these businesses of $107 million, $488 million and $224 million for the years ended December 31, 1998, 1997 and 1996, respectively.

Separately, Delphi recognized a charge to cost of sales totaling $80 million ($50 million after-tax) during 1997 to provide for postemployment benefits and other site-related closure costs in connection with the decision to cease production at its Trenton, New Jersey, plant. In 1996, Delphi sold four component facilities located in Flint and Livonia, Michigan and Oshawa and Windsor, Ontario, which resulted in a loss of $247 million ($153 million after-tax). The loss had the effect of increasing cost of sales and depreciation and amortization by $167 million and $80 million, respectively.

69

4. INVENTORIES, NET

Inventories, net consisted of:

| | December 31, | |
| --- | --- | --- |
| | 1998 | 1997 |
| | -------- | -------- |
| | (in millions) | |
| Productive material, work-in-process and supplies...................... | $1,910 | $2,035 |
| Finished goods..................... | 253 | 264 |
| | ------ | ------ |
| Total inventories at FIFO....... | 2,163 | 2,299 |
| Less allowance to adjust the carrying value of certain inventories to LIFO.............. | (393) | (431) |
| | ------ | ------ |
| Total inventories, net.......... | $1,770 | $1,868 |

## 5. INCOME TAXES

(Loss) income before income taxes for U.S. and foreign operations was:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (in millions) | | |
| U.S.(Loss)income ..... | $(501) | $(99) | $ 584 |
| Foreign income........ | 235 | 358 | 528 |
| Total.............. | $(266) | $259 | $1,112 |

The provision for income taxes was:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (in millions) | | |
| Income taxes estimated to be (refundable) payable: | | | |
| U.S. federal........................... | $(47) | $ 849 | $(107) |
| Foreign................................ | 134 | 203 | 108 |
| U.S. state and local.................. | (19) | 32 | 50 |
| Total payable currently.............. | 68 | 1,084 | 51 |
| Deferred income tax (benefit) expense, net | | | |
| U.S. federal........................... | (228) | (915) | 244 |
| Foreign................................ | 8 | (47) | (3) |
| U.S. state and local.................. | (11) | (71) | (26) |
| Total deferred..................... | (231) | (1,033) | 215 |
| Investment tax credits................ | (10) | (7) | (7) |
| Total income tax provision.......... | $(173) | $ 44 | $259 |

A reconciliation of the provision for income taxes compared with the amounts at the U.S. federal statutory rate was:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (in millions) | | |
| Tax at U.S. federal statutory income tax rate................. | $ (93) | $ 91 | $389 |
| U.S. state and local income taxes.................... | (27) | (39) | 25 |
| Foreign rates other than 35%...... | 59 | 31 | (80) |
| Research and experimentation credits........................ | (58) | (50) | (49) |
| Other adjustments................. | (54) | 11 | (26) |
| Total income tax provision....... | $(173) | $ 44 | $259 |

Deferred income tax assets and liabilities for 1998 and 1997 reflect the impact of temporary differences between amounts of assets and liabilities for financial reporting purposes and the bases of such assets and liabilities as measured by tax laws. Such deferred tax balances are based on the assets and liabilities transferred to Delphi pursuant to the Separation Agreement.

70

Temporary differences that gave rise to deferred tax assets and liabilities included:

Year Ended December 31,

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Deferred Tax Assets | Deferred Tax Liabilities | Deferred Tax Assets | Deferred Tax Liabilities |
| | (in millions) | | | |
| Postretirement benefits other than pensions...... | $1,575 | $ -- | $1,677 | $ -- |
| Postemployment benefits..... | 167 | -- | 170 | -- |
| Depreciation............... | 8 | -- | -- | 29 |
| Employee benefits........... | 941 | -- | 886 | -- |
| Tax on unremitted profits... | -- | 42 | -- | 36 |
| U.S. state and local taxes.. | 268 | -- | 134 | -- |
| Other U.S.................. | 106 | 68 | 247 | 57 |
| Other foreign.............. | 98 | 56 | 45 | 85 |
| Total.................... | 3,163 | 166 | 3,159 | 207 |
| Valuation allowances........ | (65) | -- | (23) | -- |
| Total deferred taxes...... | $3,098 | $166 | $3,136 | $207 |

Realization of the net deferred tax assets is dependent on future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing temporary differences and carryforwards. Although realization is not assured, management believes that it is more likely than not that the net deferred tax assets will be realized.

Annual tax provisions include amounts considered sufficient to pay assessments that may result from examination of prior year tax returns; however, income tax accruals in the consolidated balance sheets reflect that, as part of the Separation Agreement, GM agreed to indemnify Delphi, excluding Delco Electronics, for prior year tax issues in the United States.

Provisions are made for estimated U.S. and foreign income taxes, less available tax credits and deductions, which may be incurred on the remittance of Delphi's share of subsidiaries' undistributed earnings not deemed to be permanently reinvested. Taxes have not been provided on foreign subsidiaries' earnings which are deemed permanently reinvested, of approximately $33 million at December 31, 1998. The amount of such permanently reinvested earnings is not material to our consolidated financial statements.

## 6. PROPERTY, NET

Property, net consisted of:

| | Estimated Useful Lives (Years) | December 31, | |
|---|---|---|---|
| | | 1998 | 1997 |
| | | (in millions) | |
| Land............................... | -- | $ 60 | $ 66 |
| Land and leasehold improvements.... | 3-30 | 212 | 249 |
| Buildings.......................... | 29-45 | 1,975 | 2,114 |
| Machinery, equipment and tooling... | 3-30 | 9,990 | 10,159 |
| Furniture and office equipment..... | 3-20 | 164 | 153 |
| Construction in progress........... | -- | 752 | 762 |
| Total.............................. | | 13,153 | 13,503 |
| Less accumulated depreciation and amortization...................... | | (8,188) | (8,903) |
| Total property, net................ | | $4,965 | $4,600 |

71

## 7. ACCRUED LIABILITIES

Accrued liabilities consisted of:

| | December 31, | |
|---|---|---|
| | 1998 | 1997 |
| | (in millions) | |
| Payroll related obligations..... | $617 | $636 |
| Income taxes payable............ | 81 | 671 |
| Deferred income taxes........... | 176 | 36 |

Taxes other than income...        138        119
Other............. 10            426        202
                                ------     ------
                    Total......  $1,438    $1,664
                                ======     ======

## 8. INTRACOMPANY NOTES PAYABLE AND LONG-TERM DEBT

Pursuant to the Cash and Debt Management Agreement, Delphi's consolidated financial statements reflect an outstanding intracompany note payable with the automotive and corporate sectors of GM of approximately $3.1 billion at both December 31, 1998 and 1997. This intracompany note payable bears interest at variable interest rates established consistent with the overall credit risk of the Delphi business sector; such rates approximated 6.7%, 7.2% and 7.3% in 1998, 1997 and 1996, respectively. The intracompany note payable matures on January 1, 2000, and is not subject to any collateral or covenant requirements.

At December 31, 1998, Delphi had certain other long-term debt outstanding, principally at certain international subsidiaries. The amount of the intracompany note payable was increased or repaid pursuant to the Cash and Debt Management Agreement such that the total long-term debt outstanding at any period end is $3.5 billion. The repayment schedule of amounts due at December 31, 1998 was as follows: 1999--$363 million; 2000--$3.1 billion; 2001-- $1 million; 2002--$3 million; 2003--$4 million; 2004 and thereafter--$30 million.

On January 1, 1999, immediately prior to the separation, the Cash and Debt Management Agreement was cancelled and amounts due thereunder were settled with certain intracompany accounts receivable, as described further in Note 17, Subsequent Events.

On January 4, 1999, Delphi entered into two financing agreements with a syndicate of lenders providing for an aggregate of $4.9 billion in available revolving credit facilities. In general, borrowings of up to $4.9 billion are available under the facilities through January 3, 2000, after which $1.5 billion will be available through January 3, 2004. The $4.9 billion Delphi may borrow will be reduced to the extent of any net cash proceeds from post IPO public offerings and private placements of debt securities, excluding debt securities with a maturity of less than one year. The total reduction arising from issuances of common stock and debt securities will not exceed $2.0 billion. Borrowings under these financing arrangements may be used for general corporate purposes. The credit facilities include certain customary affirmative and negative covenants. The credit facilities also provide for certain events of default, including upon a change of control, which is defined to include the acquisition of more than 20% of the voting power of Delphi common stock by any person other than GM.

The credit facilities provide that the interest rate is to be based, at Delphi's option, on either an Alternate Base Rate (higher of prime, federal funds or certificate of deposit based rates) or a Eurodollar rate, plus, a margin. Delphi also has the right under the credit facilities to request that lenders provide from time to time alternative rates on loans. The rates offered by the lenders on these loans will either be fixed rates or rates based on a Eurodollar rate, plus at the discretion of the offering lender, a margin. In addition to interest payments, Delphi is obligated to pay certain facility fees throughout the term of the facilities.

## 9. PENSION AND OTHER POSTRETIREMENT BENEFITS

During the periods presented, substantially all of Delphi's U.S. employees participated in GM's defined benefit pension plans and various postretirement medical, dental, vision and life insurance plans. The cost of such benefits is recognized in the consolidated financial statements during the period employees provide service to Delphi. Pension plans covering U.S. represented employees generally provide benefits of negotiated stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The benefits provided by the plans covering U.S. salaried employees are generally based on years of service and salary history. Certain Delphi employees also participate in GM's nonqualified pension plans covering executives, which are unfunded. Such plans are based on targeted wage replacement percentages, and are generally not significant to Delphi. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations.

72

The Separation Agreement provides generally that pension plan assets and liabilities and other postretirement liabilities related to Delphi's U.S. salaried active and inactive employees retiring after January 1, 1999 will be assumed by Delphi. Delphi will establish and administer defined benefit pension and other postretirement plans for its salaried employees under the same terms that existed for the GM plans at the time of separation, subject to all plan terms. The consolidated financial statements reflect the assets and liabilities related to U.S. salaried employees that Delphi will assume pursuant to the Separation Agreement, and exclude employee benefit obligations and any assets related to employees retired as of January 1, 1999. Delphi's U.S. hourly employees will continue to participate in the defined benefit pension plan for hourly workers administered by GM until the Distribution at which time Delphi will assume responsibility for other postretirement costs related to active U.S. hourly employees. Delphi is also responsible for assuming the unfunded hourly pension liability associated with Delphi hourly employees either through the transfer of specified obligations and plan assets to a Delphi plan at the date of the Distribution, or through an equivalent series of future payments to GM under certain circumstances. Delphi's obligation to GM related to the U.S. hourly pension plan is specified in the Separation Agreement to equal the projected benefit obligation related to Delphi U.S. hourly active and inactive employees, using applicable pension actuarial assumptions, less an amount equal to the level of plan assets that would be received by Delphi under applicable laws and regulations had the plan transfer occurred on January 1, 1999, adjusted for subsequent asset returns. Such obligation totaled $2.1 billion and $1.7 billion at December 31, 1998 and 1997, respectively. Delphi intends to work with GM to ensure that any plan transfers are accomplished in accordance with applicable law and regulations.

The net assets (liabilities) related to the defined benefit pension obligation for U.S. salaried employees and other postretirement obligations for U.S. salaried and hourly employees for which Delphi will retain responsibility are as follows:

| | Pension Benefits | | Other Postretirement Benefits (1) | |
|---|---|---|---|---|
| | 1998 | 1997 | 1998 | 1997 |
| | | | (in millions) | |
| Change in benefit obligation: | | | | |
| Benefit obligation at beginning of year ....... | $ 2,511 | $ 2,252 | $ 4,610 | $ 4,307 |
| Service cost ............................. | 95 | 82 | 180 | 175 |
| Interest cost ............................ | 178 | 175 | 901 | 896 |
| Actuarial losses ........................ | 148 | 130 | 186 | 221 |
| Other, including curtailments ........... | 19 | 10 | (17) | -- |
| Impact of Separation Agreement .......... | (567) | (138) | (1,257) | (989) |
| Benefit obligation at end of year ............. | 2,384 | 2,511 | 4,603 | 4,610 |
| Change in plan assets: | | | | |
| Fair value of plan assets at beginning of year | 2,500 | 2,240 | -- | -- |
| Actual return on plan assets ............. | 392 | 544 | | |
| Plan participants' contributions ......... | 7 | 7 | | |
| Impact of Separation Agreement .......... | (426) | (291) | -- | |
| Fair value of plan assets at end of year ..... | 2,473 | 2,500 | -- | -- |
| Funded (unfunded) status ...................... | 89 | (11) | (4,603) | (4,610) |
| Unamortized actuarial loss (gain) ........... | 284 | 291 | 81 | (114) |
| Unamortized prior service cost ........... | 122 | 139 | (51) | (64) |
| Unrecognized transition asset ............ | (22) | (38) | -- | -- |
| Net amount recognized in consolidated balance sheets ............................. | $   473 | $   381 | $(4,573) | $(4,788) |
| Amounts recognized in the consolidated balance sheets consist of: | | | | |
| Long term prepaid benefit cost ........... | 545 | 445 | -- | -- |
| Accrued benefit liability ................ | (72) | (64) | (4,573) | (4,788) |
| Net amount recognized ......................... | $   473 | $   381 | $(4,573) | $(4,788) |

73

(1)During 1998 and 1997, Delphi contributed $677 million and $925 million, respectively, to a Voluntary Employees' Beneficiary Association (VEBA) trust. The contribution was made in connection with GM's pre-funding of a portion of its other postretirement employee benefit liability. In accordance with the terms of the Separation Agreement, GM will retain 100% of the pre-funding and accordingly, Delphi's other postretirement employee benefit liability does not reflect an allocation of the VEBA trust assets.

The projected benefit obligation, accumulated benefit obligation, and fair value of plan assets for salaried employee pension plans with accumulated benefit obligations in excess of plan assets were $124 million, $74 million and $16 million, respectively, as of December 31, 1998, and $97 million, $52 million and $0, respectively, as of December 31, 1997.

Certain of Delphi's international subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service, and other postretirement plans. The unfunded international pension plans have projected benefit obligations of approximately $76 million and $63 million at December 31, 1998 and 1997, respectively. The funded international pension plans have assets in excess of projected benefit obligations of approximately $21 million and $25 million at December 31, 1998 and 1997, respectively. Certain of Delphi's international subsidiaries have other postretirement plans, although most participants are covered by government sponsored or administered programs. The annual cost of such pension and postretirement plans is generally not significant to Delphi.

Benefit costs presented below were determined based on actuarial methods and include costs related to Delphi salaried active employees and retirees for pension expense and Delphi salaried and hourly active employees and retirees for other benefits for all periods presented. Such benefit costs included the following components:

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 1998 | 1997 | 1996 | 1998 | 1997 | 1996 |
| | | | (in millions) | | | |
| Service Cost ....... | $ 95 | $ 82 | $ 88 | $ 180 | $ 175 | $ 185 |
| Interest Cost ...... | 178 | 175 | 368 | 901 | 896 | 859 |

```
Expected return on
  plan assets ......      (341)                        (88)      --         --
Net amortization and
  other ...........       17         19        66      (27)      (24)      (29)
                         -----      -----     -----    -----     -----     -----
Net periodic benefit
  cost ............     $ (51)     $ (11)    $  27    $ 966    $1,047    $1,015
                         =====      =====     =====    =====     ======    ======
```

Also, during the periods presented, Delphi participated in GM's U.S. defined benefit pension plans for hourly employees. GM charged Delphi approximately $330 million, $433 million and $337 million, in 1998, 1997 and 1996, respectively, related to Delphi hourly employees and retirees in the U.S.

The principal assumptions used to determine the pension and other postretirement expense and the actuarial value of the projected benefit obligation for the U.S. salaried pension plan and U.S. postretirement plans were:

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 1998 | 1997 | 1996 | 1998 | 1997 | 1996 |
| Weighted-average discount rate. | 6.75% | 7.0% | 7.5% | 6.75% | 7.25% | 7.8% |
| Weighted-average rate of increase in compensation levels | 5.0% | 5.0% | 5.0% | 4.4% | 4.4% | 4.3% |
| Expected long-term rate of return on plan assets ........ | 10.0% | 10.0% | 10.0% | 10.0% | n/a | n/a |

For measurement purposes, a 6.0% annual rate of increase in the per capita cost of covered health care benefits was assumed for 1999. The rate was assumed to decrease on a linear basis through 2004, to the ultimate weighted-average trend rate of 5.0%.

A one percentage point increase in the assumed health care trend rate would have increased the aggregate service and interest cost components of non-pension postretirement benefit expense for 1998 by $131 million, and would have increased the related accumulated postretirement benefit obligation by $761 million.

74

Delphi has disclosed in the consolidated financial statements certain amounts associated with estimated future postretirement benefits other than pensions and characterized such amounts as "costs" or "obligations." Notwithstanding the recording of such amounts and the use of these terms, Delphi does not admit or otherwise acknowledge that such amounts or existing postretirement benefit plans of GM, other than pensions, represent legally enforceable liabilities of Delphi.

## 10. COMMITMENTS AND CONTINGENCIES

Rental expense totaled $104 million, $99 million and $98 million for the years ended December 31, 1998, 1997 and 1996, respectively. Delphi had minimum lease commitments under noncancelable operating leases at December 31, 1998 totaling $331 million which become due as follows: 1999--$63 million; 2000--$57 million; 2001--$51 million; 2002--$47 million; 2003--$45 million and thereafter--$68 million.

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, employment-related matters and environmental matters. Litigation is subject to many uncertainties, and the outcome of individual litigated matters is not predictable with assurance. After discussions with counsel, it is the opinion of management that the outcome of such matters will not have a material adverse impact on the consolidated financial position, results of operations or cash flows of Delphi.

## 11. OTHER COMPREHENSIVE INCOME (LOSS)

The annual change in other comprehensive income (loss), net of the related tax effect was:

| | Pre-tax Amount | Tax Effect (Credit) | Net Amount |
|---|---|---|---|
| | | (in millions) | |
| Other comprehensive income (loss)-- foreign currency translation adjustments: | | | |
| 1998............................. | 16 | (6) | 10 |
| 1997............................. | (134) | 51 | (83) |
| 1996............................. | (50) | 19 | (31) |

## 12. OTHER INCOME, NET

Other income, net included:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (in millions) | | |
| Claims and commissions..................... | $86 | $80 | $76 |
| Gain (loss) on disposition of assets, net.. | 36 | 52 | (44) |
| Interest income............................ | 57 | 57 | 49 |
| Earnings of non-consolidated affiliates.... | 55 | 27 | 57 |
| Other expense.............................. | (2) | (22) | (23) |
| Other income, net.......................... | $232 | $194 | $115 |

## 13. STOCK INCENTIVE PLANS

Certain eligible employees of Delphi are participants in the General Motors 1997 Stock Incentive Plan ("GMSIP"), formerly the General Motors Amended 1987 Stock Incentive Plan. Pursuant to the GMSIP, shares, rights, or options to acquire GM $1-2/3 common stock may be granted through May 31, 2002. The option price is equal to 100% of the fair market value of GM $1-2/3 common stock on the date the options are granted. These non-qualified options generally expire 10 years from the dates of grant and are subject to earlier termination under certain conditions. Upon completion of the Distribution, all outstanding options on GM $1-2/3 common stock previously granted to Delphi employees will be converted to equivalent stock options on Delphi common stock, subject to the terms of the Separation Agreement.

75

## 14. SEGMENT REPORTING

SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information," established standards for reporting information about operating segments in annual financial statements and requires selected information about operating segments in interim financial reports issued to stockholders. It also established standards for related disclosures about products and services, geographic areas, and major customers. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. Delphi's chief operating decision making group is the Delphi Strategy Board, which is comprised of the Chief Executive Officer and 20 senior executives from the three operating segments and the world headquarters staff. Certain senior executives for each operating segment are also members of a Strategy Board or equivalent committee that manages the profitability and cash flow of each respective segment's various product lines and businesses. The three operating segments are managed separately because of differences in the nature of the respective products.

Delphi's reportable operating segments ("product sectors") are Electronics & Mobile Communication; Safety, Thermal & Electrical Architecture; and Dynamics & Propulsion. The Electronics & Mobile Communication product sector supplies various electronic products, as well as audio and communication systems for vehicles. The Safety, Thermal & Electrical Architecture product sector offers a wide range of products relating to the vehicle interior and powertrain cooling systems and climate control systems. In addition, the segment produces wiring harnesses and connectors for electrical power and signal distribution. The Dynamics & Propulsion product sector offers a wide range of energy and engine management systems, chassis control systems and steering products.

The accounting policies of the product sectors are the same as those described in the summary of significant accounting policies except that the disaggregated financial results for the product sectors have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting in making internal operating decisions. Generally, Delphi evaluates performance based on stand-alone product sector net income and accounts for intersegment sales and transfers as if the sales or transfers were to third parties, that is, at current market prices. Net sales are attributed to geographic areas based on the location of the assets producing the revenues.

Financial information by reportable product sector is as follows:

| 1998 | Electronics & Mobile Communication | Safety, Thermal & Electrical Architecture | Dynamics & Propulsion | Other(a) | Total |
|---|---|---|---|---|---|
|  | (In millions) | | | | |
| Net sales to GM and affiliates............... | $3,917 | $ 8,059 | $10,346 | $ -- | $22,322 |
| Net sales to other customers. | 649 | 3,000 | 2,508 | -- | 6,157 |
| Inter-sector net sales....... | 257 | 167 | 8 | (432) | -- |
| Total net sales............ | $4,823 | $11,226 | $12,862 | $(432) | $28,479 |

| | | | | |
|---|---|---|---|---|
| Depreciation and amortization................. | $ 181 | $ 290 | $ 631 | $ -- | $ 1,102 |
| Interest expense............. | 40 | 105 | 115 | 17 | 277 |
| Income tax expense (benefit). | 119 | (36) | (132) | (124) | (173) |
| Net income (loss) (b)........ | 194 | (44) | (162) | (81) | (93) |
| Sector assets................ | 2,099 | 5,855 | 6,882 | 670 | 15,506 |
| Capital expenditures......... | 180 | 449 | 741 | 11 | 1,381 |

| 1997 | Electronics & Mobile Communication | Safety, Thermal & Electrical Architecture | Dynamics & Propulsion | Other(a) | Total |
|---|---|---|---|---|---|
| ---- | ------------- | ------------ | ---------- | -------- | ----- |
| | | | (In millions) | | |
| Net sales to GM and affiliates................. | $4,652 | $9,756 | $11,499 | $ -- | $25,907 |
| Net sales to other customers. | 539 | 2,776 | 2,225 | -- | 5,540 |
| Inter-sector net sales....... | 348 | 196 | 9 | (553) | -- |
| Total net sales........... | $5,539 | $12,728 | $13,733 | $(553) | $31,447 |
| Depreciation and amortization............... | $ 481 | $ 539 | $ 950 | $ -- | $ 1,970 |
| Interest expense............. | 41 | 109 | 119 | 18 | 287 |
| Income tax expense (benefit). | 11 | 48 | 3 | (18) | 44 |
| Net income (loss)(b)......... | 53 | 234 | 15 | (87) | 215 |
| Sector assets................ | 2,063 | 5,749 | 6,328 | 886 | 15,026 |
| Capital expenditures......... | 122 | 464 | 778 | 19 | 1,383 |

| 1996 | Electronics & Mobile Communication | Safety, Thermal & Electrical Architecture | Dynamics & Propulsion | Other(a) | Total |
|---|---|---|---|---|---|
| ---- | ------------- | ------------ | ---------- | -------- | ----- |
| | | | (In millions) | | |
| Net sales to GM and affiliates................... | $4,540 | $10,009 | $11,199 | $ -- | $25,748 |
| Net sales to other customers.... | 490 | 2,733 | 2,061 | -- | 5,284 |
| Inter-sector net sales.......... | 285 | 200 | 33 | (518) | -- |
| Total net sales............. | $5,315 | $12,942 | $13,293 | $(518) | $31,032 |
| Depreciation and amortization................... | $ 196 | $ 325 | $ 322 | $ -- | $ 843 |
| Interest expense................ | 47 | 102 | 115 | 12 | 276 |
| Income tax expense (benefit).... | 106 | 166 | 67 | (80) | 259 |
| Net income (loss)(b)............ | 349 | 548 | 222 | (266) | 853 |
| Sector assets................... | 2,615 | 5,687 | 6,396 | 692 | 15,390 |
| Capital expenditures............ | 195 | 418 | 548 | 16 | 1,177 |

(a)Other includes activity not allocated to the product sectors and the elimination of inter-sector transactions.

(b)Our operating results for the years ended December 31, 1998, 1997, and 1996 were impacted by a number of special items, including the competitiveness studies, divestitures and plant closings (see Note 3), as well as work stoppages at certain GM and Delphi locations (see Note 2). The net unfavorable impact on net income for each product sector was as follows:

| Year Ended December 31, | Electronics & Mobile Communication | Safety, Thermal & Electrical Architecture | Dynamics & Propulsion | Total |
|---|---|---|---|---|
| ------------ | ------------- | ------------ | ---------- | ----- |
| | | (In millions) | | |
| 1998 | $ 86 | $ 474 | $ 353 | $ 913 |
| 1997 | 239 | 271 | 442 | 952 |
| 1996 | 98 | 282 | 138 | 518 |

Information concerning principal geographic areas is set forth below. Net sales data is for the year ended December 31 and net property data is as of December 31.

| | 1998 | 1997 | 1996 |
|---|---|---|---|

| | Net Sales | Net Property | Net Sales | Net Property | Net Sales | Net Property |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **North America:** | | | | | | |
| United States............ | $19,457 | $3,360 | $21,925 | $3,186 | $22,139 | $3,777 |
| Canada................... | 432 | 15 | 806 | 14 | 719 | 9 |
| Mexico................... | 3,235 | 268 | 3,448 | 263 | 2,714 | 264 |
| Total North America.... | 23,124 | 3,643 | 26,179 | 3,463 | 25,572 | 4,050 |
| **Europe:** | | | | | | |
| France................... | 803 | 262 | 645 | 267 | 713 | 284 |
| Germany.................. | 1,449 | 159 | 1,365 | 181 | 1,502 | 211 |
| Spain.................... | 488 | 133 | 575 | 131 | 637 | 145 |
| United Kingdom........... | 341 | 13 | 324 | 7 | 349 | 47 |
| Other.................... | 1,250 | 347 | 1,311 | 234 | 1,454 | 261 |
| Total Europe........... | 4,331 | 914 | 4,220 | 820 | 4,655 | 948 |
| **South America:** | | | | | | |
| Brazil................... | 444 | 112 | 598 | 91 | 399 | 91 |
| Other.................... | 99 | 16 | 64 | 26 | 43 | 13 |
| Total South America.... | 543 | 128 | 662 | 117 | 442 | 104 |
| All Other................ | 481 | 280 | 386 | 200 | 363 | 139 |
| Total.................. | $28,479 | $4,965 | $31,447 | $4,600 | $31,032 | $5,241 |

Historically, Delphi has relied on GM for a substantial portion of its total revenues. Delphi expects that a significant portion of its future revenues will continue to be generated by GM. Any substantial reduction in orders by GM could have a materially adverse impact on Delphi's operating results.

## 15. FAIR VALUE OF FINANCIAL INSTRUMENTS

The fair value of derivative financial instruments reflects the estimated amounts which Delphi would receive or pay to terminate contracts which it assumed under the Separation Agreement; such estimated amounts take into account the current unrealized gains or losses on open contracts that are deferred and recognized when the offsetting gains or losses are recognized on the related hedged items. The fair value of foreign exchange forward contracts is estimated based on foreign exchange rate quotes at the reporting date. At December 31, 1998 and 1997, the total estimated fair value of open contracts were generally not significant to Delphi. No amounts were recorded for such contracts on Delphi's consolidated balance sheets at these dates.

For certain international long-term debt, which was recorded at $346 million and $230 million, at December 31, 1998 and 1997, respectively, the related fair value approximated $337 million and $232 million. For all other financial instruments recorded at December 31, 1998 and 1997, fair value approximates book value.

## 16. DERIVATIVES INSTRUMENTS

Delphi, through its relationship with GM, is a party to financial instruments with off-balance sheet risk, which are used in the normal course of business to manage exposure principally to foreign exchange rate fluctuations. The primary class of such derivatives used are foreign exchange forward contracts and purchased and written foreign exchange options, which involve varying degrees of market risk, and elements of credit risk in the event of counterparty default. Derivative transactions are entered into in order to hedge underlying business exposures. The market risk in these instruments is offset by opposite movements in the underlying exposure. Cash receipts and payments on these contracts normally occur at maturity.

Delphi is an international corporation with operations in 36 countries, and has foreign currency exposure related to buying and selling in currencies other than the local currencies. Delphi's most significant foreign exposures relate to Brazil, Mexico, Germany, France, Spain and South Korea. The magnitude of these exposures varies over time, depending on the strength of local automotive markets.

78

On Delphi's behalf, GM enters into agreements by which it seeks to manage certain of its foreign exchange exposures in accordance with established policy guidelines. These agreements primarily hedge cash flows such as debt, firm commitments and anticipated transactions involving component materials and fixed asset purchases. As a general practice, GM does not hedge the foreign exchange exposure related to either the translation of overseas earnings into U.S. dollars, or the translation of overseas equity positions back to U.S. dollars. On Delphi's behalf, GM uses foreign exchange forward contracts as well as purchased and written foreign exchange options to manage such foreign exchange and transaction exposures. Foreign exchange forward contracts are legal agreements between two parties to purchase or to sell a foreign currency for a price specified at the contract date, with delivery and settlement in the future.

At December 31, 1998 and 1997, GM held foreign exchange forward contracts related to Delphi totaling $18 million and $31 million, respectively. The foreign exchange options contracts related to Delphi were not significant at December 31, 1998 and 1997. Forward contracts and options related to Delphi's business at the time of the Separation were assumed by Delphi pursuant to the Separation Agreement. Deferred hedging gains and losses on outstanding foreign exchange forward and options contracts were not significant at December 31, 1998 and 1997. Such deferred amounts will be included in the cost of such underlying assets when purchased, and subsequently recognized in operations as part of the basis of these assets. In the event a contract is terminated early or the anticipated transaction is no longer considered likely to occur, the derivative is then marked to market. Foreign exchange forward contracts, which hedge foreign exchange exposures of anticipated inventory or fixed asset transactions, are marked to market and recognized with other gains or losses on foreign exchange transactions in the consolidated statement of operations. Firm commitments typically extend for periods of up to three years.

The foreign contracts or options previously discussed contain an element of risk that counterparties may be unable to meet the terms of the agreements. However, such risk is minimized by limiting the counterparties to major international banks or financial institutions that meet established credit guidelines, and by limiting the risk exposure to any one bank or financial institution. GM generally does not require or place collateral for these financial instruments. Management does not expect to incur any losses as a result of counterparty default.

Delphi has business activities with customers and affiliates around the world. Although Delphi does have large volumes of its receivables from a limited number of vehicle manufacturer customers, particularly GM, such receivables are managed under standard commercial terms. Consequently, in management's opinion, any concentration of credit risk relating to these customers is appropriately managed.

## 17. SUBSEQUENT EVENTS

On January 1, 1999, the assets and liabilities of the Delphi business sector were transferred to Delphi Automotive Systems Corporation in accordance with the Separation Agreement. In addition, Delphi and GM consummated several other transactions, as described below. In February, Delphi issued 100 million shares in the IPO for $17.00 per share less underwriting discounts and commissions of about $0.79 per share. After the IPO, General Motors owned approximately 82.3% of the outstanding shares of Common Stock. The unaudited pro forma condensed consolidated balance sheet data below has been prepared as if the transactions described below and the IPO occurred on December 31, 1998. The unaudited pro forma condensed consolidated statement of operations data has been prepared as if the separation from GM and the IPO had taken place on January 1, 1998. The unaudited pro forma condensed consolidated balance sheet and statement of operations data presented below purport to represent Delphi's financial position and results of operations had the IPO and certain other transactions occurred on the dates indicated. The unaudited pro forma condensed consolidated balance sheet and statement of operations data do not, however, purport to project Delphi's financial position or results of operations for any future date. The unaudited pro forma adjustments are based upon available information and certain assumptions that Delphi believes are reasonable. The unaudited pro forma condensed consolidated balance sheet and statement of operations data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations," appearing elsewhere in this report.

<center>79</center>

<center>Unaudited Pro Forma Condensed Consolidated Statement of Income<br>For The Year Ended December 31, 1998<br>(in millions, except per share amounts)</center>

| | Historical | Adjustments | Pro Forma |
|---|---|---|---|
| Net Sales ................................. | $ 28,479 | | $ 28,479 |
| Operating expenses: | | | |
| Cost of sales, excluding items listed below | 26,135 | $ (248) (1) | 25,887 |
| Selling, general and administrative ....... | 1,463 | (15) (1) | |
| | | 152 (2) | 1,600 |
| Depreciation and amortization ............. | 1,102 | | 1,102 |
| Total operating expenses ................ | 28,700 | (111) | 28,589 |
| Operating loss ............................ | (221) | 111 | (110) |
| Interest expense .......................... | (277) | | (277) |
| Other income, net ......................... | 232 | | 232 |
| Loss before income taxes ................. | (266) | 111 | (155) |
| Income tax benefit ........................ | (173) | 42 (3) | (131) |
| Net loss ................................. | $ (93) | $ 69 | $ (24) |
| | | | |
| Basic and diluted loss per share: | | | |
| Historical-based on 465,000,000 shares outstanding ............................... | $ (0.20) | | |
| Pro forma-based on 565,000,000 shares outstanding ............................... | | | $ (0.04) |

Unaudited Pro Forma Condensed Consolidated Balance Sheet
As of December 31, 1998
(in millions)

| | Historical | Adjustments | Pro Forma |
|---|---|---|---|
| ASSETS | | | |
| Current assets: | | | |
| Cash and marketable securities | $ 1,000 | $ 1,621 (4) | |
| | | (2,100) (5) | |
| | | 3,141 (6) | |
| | | (1,600) (7) | $ 2,062 |
| Accounts receivable, net | | | |
| General Motors and affiliates | 2,236 | 2,100 (5) | |
| | | (1,600) (6) | |
| | | 1,600 (7) | 4,336 |
| Other customers | 977 | | 977 |
| Inventories, net | 1,770 | | 1,770 |
| Deferred income taxes | 285 | | 285 |
| Prepaid expenses and other assets | 137 | | 137 |
| Total current assets | 6,405 | 3,162 | 9,567 |
| Property, net | 4,965 | | 4,965 |
| Deferred income taxes | 2,813 | | 2,813 |
| Other assets | 1,323 | | 1,323 |
| Total assets | $ 15,506 | $ 3,162 | $ 18,668 |
| LIABILITIES AND EQUITY | | | |
| Current liabilities: | | | |
| Notes payable and current portion of | | | |
| long-term debt | $ 363 | | $ 363 |
| Accounts payable | | | |
| General Motors and affiliates | 89 | | 89 |
| Other suppliers | 2,171 | | 2,171 |
| Accrued liabilities | 1,438 | | 1,438 |
| Total current liabilities | 4,061 | | 4,061 |
| Long-term debt, including intracompany | | | |
| note payable with General Motors | 3,137 | $ (3,141) (6) | |
| | | 3,141 (6) | 3,137 |
| Pension benefits | 2,180 | | 2,180 |
| Postretirement benefits other than pensions | 4,573 | | 4,573 |
| Other liabilities | 1,546 | | 1,546 |
| Total liabilities | 15,497 | – | 15,497 |
| Equity: | | | |
| Common Stock | – | 1 (4) | |
| | | 5 (8) | 6 |
| Additional paid in capital | – | 1,620 (4) | |
| | | 1,613 (8) | 3,233 |
| General Motors' net investment | 77 | 1,541 (6) | |
| | | (1,618) (8) | – |
| Accumulated translation adjustments | (68) | – | (68) |
| Total equity | 9 | 3,162 | 3,171 |
| Total liabilities and equity | $ 15,506 | $ 3,162 | $ 18,668 |

81

The following pro forma adjustments were made to reflect the terms of the Separation Agreement and the IPO:

(1) Delphi and General Motors have entered into agreements regarding certain employee benefit obligations. The pro forma adjustment for the year ended December 31, 1998 is summarized as follows (in millions):

| | |
|---|---|
| Pension related costs | $ 210 |
| Postretirement benefits other than pension | (475) |
| Other employee benefits | 2 |
| Total | $ (263) |

```
            Portion attributable to cost of sales         $   (248)
                                                           =======

            Portion attributable to selling, general
                        and administrative                $    (15)
                                                           =======


        (2)Reflects   the   estimated   incremental   selling,   general   and
```

administrative costs associated with operating Delphi as a stand-alone publicly traded company. The pro forma adjustment for the year ended December 31, 1998 is as follows (in millions):

```
            Incremental insurance and risk management     $    36
            Incremental corporate costs*                        48
            Taxes other than income                             52
            Other                                               16
                                                           -------

            Total                                          $  152
                                                           =======
```

* Incremental corporate costs include additional personnel and systems costs required to operate independently, and reflect transitional service arrangements with General Motors at terms provided in the Separation Agreement. Other costs include certain sales tax expenses associated with the separation.

(3)Income taxes were determined in accordance with the provisions of SFAS No.109, "Accounting for Income Taxes." Once Delphi is no longer included in GM's consolidated income tax return, Delphi will no longer benefit from GM's consolidated income tax environment. As a result, Delphi expects effective income tax rates in future periods generally to be higher than Delphi's historical effective income tax rates. For purposes of this pro forma presentation only, adjustments necessary to record the income tax effect of the pro forma adjustments assume a combined federal and state income tax rate of 38%.

(4)Reflects the net proceeds from the sale of 100,000,000 shares of common stock in the IPO at a price of $17.00 per share. The IPO proceeds are being used for general corporate purposes, including working capital requirements that have been impacted by the change in General Motors accounts receivable payment terms described note
(5) below.

(5)Reflects the change in payment terms for intracompany accounts receivable from General Motors in accordance with the terms of the Separation Agreement. Such payment terms, which generally called for payment in the month following shipment by Delphi, were modified to require payment by General Motors on the second day of the second month following shipment by Delphi.

(6)Reflects the settlement of certain intracompany accounts receivable from GM with the intracompany note payable to GM. On January 1, 1999, immediately prior to the transactions contemplated by the Separation Agreement, certain intracompany accounts receivable from GM, of about $1.6 billion, were settled with the $3.1 billion outstanding intracompany note payable to GM with the difference resulting in an increase in GM's net investment in Delphi. It is expected that during the first half of 1999, Delphi will finance its operations with third party funding of up to $3.1 billion.

(7)Reflects the required adjustment, subsequent to the settlement of intracompany accounts receivable described in note (6) above, to adjust cash and accounts receivable balances to levels that are indicative of amounts associated with ongoing operations.

(8)Reflects the adjustment to equity to reclassify GM's net investment as common stock and additional paid-in capital.

82

## 18. QUARTERLY DATA (UNAUDITED)

|  | March 31, | June 30, | Sept. 30, | Dec. 31, | Total |
|---|---|---|---|---|---|
|  | Three months ended | | | | |
|  | (in millions, except per share amounts) | | | | |
| **1998** | | | | | |
| Net sales....................................... | $7,623 | $7,041 | $6,015 | $7,800 | $28,479 |
| Cost of sales, excluding items listed below....... | 6,789 | 6,280 | 6,151 | 6,915 | 26,135 |
| Selling, general and administrative............... | 300 | 367 | 345 | 451 | 1,463 |
| Depreciation and amortization.................... | 200 | 283 | 248 | 371 | 1,102 |
| Operating income (loss).......................... | 334 | 111 | (729) | 63 | (221) |
| Interest expense................................. | (64) | (67) | (68) | (78) | (277) |

```
Other income (expense), net.....................               55      (10)     108      232
                                             ------   ------   ------   ------   -------
Income (loss) before income taxes...............  349     99     (807)     93     (266)
Income tax expense (benefit)....................  113     16     (307)      5     (173)
                                             ------   ------   ------   ------   -------
Net income (loss)............................... $ 236   $  83   $ (500)  $  88   $   (93)
                                             ======   ======   ======   ======   =======
Basic and diluted earning (loss) per share      $ 0.51  $ 0.18  $(1.08)  $ 0.19  $ (0.20)
                                             ======   ======   ======   ======   =======


1997
Net sales........................................ $7,995  $8,190  $7,183  $8,079  $31,447
Cost of sales, excluding items listed below.....  6,957   7,061   6,489   7,203   27,710
Selling, general and administrative.............    334     345     332     404    1,415
Depreciation and amortization...................    207     197     217   1,349    1,970
                                             ------   ------   ------   ------   -------
Operating income (loss).........................    497     587     145    (877)     352
Interest expense................................    (80)    (57)    (69)    (81)    (287)
Other income, net...............................      7      49       9     129      194
                                             ------   ------   ------   ------   -------
Income (loss) before income taxes...............    424     579      85    (829)     259
Income tax expense (benefit)....................    137     206       9    (308)      44
                                             ------   ------   ------   ------   -------
Net income (loss)............................... $ 287   $ 373   $  76   $ (521) $   215
                                             ======   ======   ======   ======   =======
Basic and diluted earnings (loss) per share     $ 0.62  $ 0.80  $ 0.16  $(1.12) $  0.46
                                             ======   ======   ======   ======   =======
```

The following is a summary of various factors that impacted our quarterly operating results during the periods presented:


1998


o Work stoppages at GM and Delphi locations in the United States during 1998 reduced operating income by about $468 million, or $290 million after-tax, and $435 million, or $270 million after-tax, during the second and third quarters of 1998, respectively. The estimated full year impact of work stoppages was $726 million, or $450 million after-tax, after considering partial recovery of lost production in the fourth quarter. See "Labor Force" in Note 2 for additional information.


o During the third quarter of 1998, Delphi recorded an operating loss of $430 million, or $271 million after-tax, related to divestitures involving its seating, lighting and coil spring businesses. See Note 3.


o Charges associated with a Competitiveness Study reduced operating income by $310 million, or $192 million after-tax, during the fourth quarter of 1998. See Note 3.


1997


o During the first quarter of 1997, Delphi recorded an $80 million plant closing charge, or $50 million after-tax, relating to a facility in Trenton, New Jersey. See Note 3.


o Work stoppages at certain GM and Delphi locations during the second quarter of 1997 had an unfavorable impact of $185 million, or $115 million after-tax. The full year impact of work stoppages was $148 million, or $92 million after-tax, after considering partial recovery of lost production primarily in the third quarter of 1997. See "Labor Force" in Note 2 for additional information.


o Other special items included gains aggregating $58 million and $39 million, or $36 million and $24 million after-tax, respectively, during the second and fourth quarters of 1997, respectively. These gains primarily related to the sale of certain businesses and investments, none of which were material on an individual basis.


o During the fourth quarter of 1997, Delphi recorded a $1.4 billion charge, or $870 million after-tax, relating to Competitiveness Studies. See Note 3.

# PART III

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None

**ITEMS 10 THROUGH 13. MANAGEMENT**

**Directors, Executive Officers and Key Employees of Delphi**

Set forth below is certain information concerning the executive officers and key employees of our company. Our Board currently has 11 members. At our first board meeting following the IPO, the original five members of the Board of Directors elected six new directors. Each newly elected director had previously been identified as a director nominee in the February 4, 1999 prospectus relating to our stock offering. The newly elected board members were Oscar De Paula Bernardes Neto, Virgis W. Colbert, Shoichiro Irimajiri (effective April 1, 1999), Susan A. McLaughlin, John D. Opie and Roger S. Penske. The new board members joined previously elected directors J.T. Battenberg III, J. Michael Losh, Harry J. Pearce, John F. Smith, Jr. and Thomas H. Wyman. Messrs. Losh, Pearce, and Smith are currently executive officers and/or directors of General Motors, and Mr. Wyman was a director of General Motors until October, 1998. We expect to add an additional independent Board member in the several months following the IPO. The three directors who are currently executive officers and/or directors of GM have advised us that they will resign from our Board effective as of the completion of the Distribution. The ages listed below are as of January 1, 1999.

| Name | Age | Position |
|------|-----|----------|
| J.T. Battenberg III.............. | 55 | Chairman of the Board, Chief Executive Officer and President |
| Alan S. Dawes.................... | 44 | Chief Financial Officer and Vice President |
| Volker J. Barth.................. | 51 | Vice President |
| William A. Ebbert................ | 56 | Vice President |
| Guy C. Hachey................... | 43 | Vice President |
| David R. Heilman................. | 54 | Vice President |
| Rodney O'Neal.................... | 45 | Vice President |
| Ronald M. Pirtle................. | 44 | Vice President |
| Donald L. Runkle................. | 53 | Vice President |
| Paul J. Tosch................... | 58 | Vice President |
| Hans J. Weiser.................. | 60 | Vice President |
| David B. Wohleen................ | 48 | Vice President |
| John P. Arle.................... | 51 | Vice President, Mergers, Acquisitions and Planning |
| James A. Bertrand............... | 41 | Vice President, Operations |
| John G. Blahnik................. | 44 | Vice President and Treasurer |
| Ray C. Campbell................. | 56 | Vice President, Purchasing |
| Karen L. Healy.................. | 44 | Vice President, Corporate Affairs |
| Peter H. Janak.................. | 59 | Vice President and Chief Information Officer |
| Mark C. Lorenz.................. | 48 | Vice President, Production Control and Logistics |
| Logan G. Robinson............... | 49 | Vice President and General Counsel |
| Mark R. Weber.................. | 50 | Vice President, Human Resources Management |
| Thomas H. Wyman................. | 69 | Director (Lead Independent Director) |
| John F. Smith, Jr............... | 60 | Director |
| Harry J. Pearce................. | 56 | Director |
| J. Michael Losh................. | 52 | Director |
| Oscar De Paula Bernardes Neto..... | 52 | Director |
| Virgis W. Colbert............... | 59 | Director |
| Shoichiro Irimajiri............. | 58 | Director (effective April 1999) |
| Susan A. McLaughlin............. | 46 | Director |
| John D. Opie.................... | 61 | Director |
| Roger S. Penske................. | 61 | Director |

Our Board has been divided into three classes serving staggered terms. After an initial transition period, directors in each class will be elected to serve for three-year terms and until their successors are elected and qualified. Each year, the directors of one class will stand for election as their terms of office expire. Messrs. Battenberg, Colbert and Irimajiri and Ms. McLaughlin have

84

been designated as Class I directors, with their terms of office expiring in 2000; Messrs. Bernardes Neto, Opie and Penske have been designated as Class II directors, with their terms of office expiring in 2001; and Messrs. Losh, Pearce, Smith and Wyman have been designated as Class III directors, with their terms of office expiring in 2002.

Our Board is permitted to appoint a non-employee director to serve as its "lead independent director." The lead independent director serves as a liaison between the Board and members of management and chairs the executive sessions of the Board. Mr. Wyman will initially serve as the lead independent director.

Mr. Battenberg has led Delphi and its precursor, the Automotive Components Group Worldwide ("ACG Worldwide"), since 1992. In July 1995, he was named President of Delphi. He was named Chief Executive Officer of Delphi in August 1998 and Chairman of the Board of Delphi in November 1998. Mr. Battenberg also serves as the Chairman of the Delphi Strategy Board. Mr. Battenberg held various positions with General Motors beginning in 1961, including Superintendent of Industrial Engineering, Comptroller, Production Manager and Plant Manager. In 1986, he was appointed Product Manager for the former Buick-Oldsmobile-Cadillac Group's Flint Automotive Division. He later served as Vice President of the division, and then Vice President and Group Executive for the Buick-Oldsmobile-Cadillac Group. Mr. Battenberg was named Vice President and Group Executive of ACG Worldwide in 1992. Two years later, he was elected a Senior Vice President and President of ACG Worldwide. In July 1995, he was elected Executive Vice President of GM and President of Delphi Automotive

Systems, formerly ACG Worldwide. Mr. Battenberg is on the Board of Trustees of Kettering University, formerly known as General Motors Institute ("GMI"), and the National Advisory Board for Chase Manhattan Corp. He is also a member of the Council on Competitiveness.

Mr. Dawes was named Chief Financial Officer of Delphi in August 1998 and a Delphi Automotive Systems Vice President in November 1998. Previously, Mr. Dawes served as General Manager of Delphi Chassis Systems, formerly Delco Chassis Systems, a position to which he was named in 1994. From 1992 to 1994, he was Executive-in-Charge of Operations for ACG Worldwide. Mr. Dawes joined General Motors in 1981, originally as a financial analyst with its Treasurer's Office, and held a number of positions including Assistant Treasurer in 1988 and Assistant Comptroller in 1991.

Mr. Barth was named a Delphi Automotive Systems Vice President in November 1998 and President of Delphi South America in November 1996. He had been Executive Director of Worldwide Purchasing for Delphi since 1994. From 1993 to 1994, he was Executive Director of Worldwide Purchasing-Metallic. From 1992 to 1993, he was Director of Materials Management for GM do Brasil in Sao Paulo, and from 1991 to 1992, he was Director of Purchasing for the same. Prior thereto, he held several purchasing assignments for GM's Adam Opel subsidiary since joining GM in 1963.

Mr. Ebbert was named a Delphi Automotive Systems Vice President in November 1998 and President of Delphi Asia Pacific in July 1993. He had been Chairman and Managing Director of Vauxhall Motors Limited, UK, since 1988. Previously, Mr. Ebbert had been Group Director of Business Operations for Delphi Automotive Systems. Prior thereto, he held a number of senior assignments with Delphi Saginaw Steering Systems' central office. He joined GM in 1965.

Mr. Hachey was named a Delphi Automotive Systems Vice President and President of Delphi Chassis Systems in November 1998. He had been General Manager of Delphi Chassis Systems since August 1998. Previously, Mr. Hachey had been Manufacturing Manager, Worldwide Operations, for the former Delphi Interior & Lighting Systems since 1995. From 1994 to 1995, he was Director of Manufacturing Operations for Delphi Automotive Systems and, from 1992 to 1994, he was Director of Manufacturing Operations for the heating, ventilation and air conditioning/heat exchangers business unit of what is now Delphi Harrison Thermal Systems. Prior thereto, Mr. Hachey held several manufacturing positions with GM since 1978.

Mr. Heilman was named a Delphi Automotive Systems Vice President and President of Delphi Packard Electric Systems in November 1998. He had been General Manager of Delphi Packard Electric Systems since October 1994. From 1993 to 1994, Mr. Heilman served as Director of Delphi Packard Electric Systems' North American Business Unit and from 1991 to 1993, he was Director of Packard International. Prior thereto, Mr. Heilman served in numerous engineering, manufacturing and product-related positions since joining Delphi Packard Electric Systems in 1964.

Mr. O'Neal was named a Delphi Automotive Systems Vice President and President of Delphi Interior Systems in November 1998. He had been General Manager of the former Delphi Interior & Lighting Systems since May 1997. Previously, Mr. O'Neal had been General Director of Warehousing and Distribution for GM-SPO since 1994. From late 1992 to 1994, Mr. O'Neal served as Director of Manufacturing for ACG Worldwide. From 1991 to late 1992, Mr. O'Neal was first Director of Industrial Engineering for Chevrolet-Pontiac-GM of Canada ("C-P-C") and later was named Director of Manufacturing Engineering with GM. Prior thereto, Mr. O'Neal held numerous engineering and manufacturing positions with GM since 1971.

85

Mr. Pirtle was named a Delphi Automotive Systems Vice President and President of Delphi Harrison Thermal Systems in November 1998. He had been General Manager of Delphi Harrison Thermal Systems since November 1996. Previously, Mr. Pirtle had been Director of North American Operations at Delphi Packard Electric Systems since 1994. From 1992 to 1994, Mr. Pirtle was Finance Director for AC Delco Systems and, from 1990 to 1992, he was Executive-in-Charge of GM's Corporate Strategic Planning Group. Prior thereto, Mr. Pirtle held various engineering and financial and planning positions with GM since 1972. Mr. Pirtle is a Board member of the Alumni Association of Kettering University, formerly GMI, and a Board member of the University of Pittsburgh School of Engineering.

Mr. Runkle was named a Delphi Automotive Systems Vice President and President of Delphi Energy and Engine Management Systems in November 1998. He had been General Manager of Delphi Energy & Engine Management Systems since May 1996. Previously, Mr. Runkle had been General Manager of Delphi Saginaw Steering Systems since August 1993. From 1992 to 1993, Mr. Runkle was in charge of GM's North American Advanced Engineering Center and, from 1988 to 1992, he was in charge of GM's former Advanced Engineering Staff. Prior thereto, Mr. Runkle served in a series of engineering positions with GM since 1968.

Mr. Tosch was named a Delphi Automotive Systems Vice President and President of Delphi Saginaw Steering Systems in November 1998. He had been General Manager of Delphi Saginaw Steering Systems since May 1997. Previously, Mr. Tosch had been General Manager of the former Delphi Interior & Lighting Systems since October 1994. From 1991 to 1994, Mr. Tosch was General Manager of Delphi Harrison Thermal Systems. From 1987 to 1991, he was Managing Director of Vauxhall Motors Limited. Prior thereto, Mr. Tosch held various engineering and managerial positions with GM since 1963.

Mr. Weiser was named a Delphi Automotive Systems Vice President in November 1998 and has been President of Delphi Automotive Systems Europe, formerly ACG Europe, since 1993. He became Managing Director of Packard Electric Europa in Wuppertal, Germany, in 1990 and was appointed Chairman of the Supervisory Board of all Corporate Subsidiaries of Packard Electric Europa, a position he held until his current assignment. Mr. Weiser was appointed Chairman of the Executive Board of Kabelwerke Reinshagen GmbH in 1986. Mr. Weiser had been with

Kabelwerke Reinshagen GmbH since 1974, which was acquired by Delphi Packard Electric in 1981.

Mr. Wohleen was named a Delphi Automotive Systems Vice President and President of Delphi Delco Electronics in November 1998. He had been General Manager of Delphi Delco Electronics since August 1998. Prior to his current position, he had been a General Director of Engineering with Delco Electronics, which is now Delphi Delco Electronics, since February 1997. In 1994, Mr. Wohleen was named Director of Electrical, Interior and HVAC for GM's Midsize Car Division in Warren, Michigan, and in 1995, he assumed additional responsibility for general assembly, tools and process and powertrain coordination for GM's MidLux Car Division in Warren. Prior thereto, Mr. Wohleen held a series of engineering and manufacturing positions with GM since 1978.

Mr. Arle was named Vice President of Mergers, Acquisitions and Planning for Delphi Automotive Systems in November 1998. He had been Executive Director of Planning for Delphi since February 1998. Previously, he was Vice President and Chief Financial Officer for Saab Automobile AB since 1993. From 1992 to 1993, he was Vice President and Finance Manager for GM of Canada, Ltd. From 1988 to 1992, he was General Manager and Comptroller for the GM/Toyota NUMMI joint venture. Prior thereto, he held several finance and human resources positions at GM since 1975.

Mr. Bertrand was named Vice President of Operations for Delphi Automotive Systems in November 1998. He had been Executive Director of Operations for Delphi since June 1997. Previously, he was Executive Director of Development for small cars at GM's International Operations since 1995. From 1992 until 1995, he was Comptroller at Adam Opel AG in Russelsheim, Germany. From 1989 to 1992, he was Director of Financial Analysis and Planning for GM Europe. Prior thereto, he held finance, business and engineering positions for GM since 1979.

Mr. Blahnik was named Treasurer of Delphi Automotive Systems in August 1998 and a Delphi Vice President in November 1998. He had been Executive Director of Finance for Delphi since June 1996. Previously, he was Senior Vice President and Chief Financial Officer at Delco Electronics since 1995. From 1994 to 1995, he was Director of Finance for GM's Lansing Automotive Division. From 1991 to 1994, he was Executive Director for GM's Latin American Operations and President of Banco General Motors, and from 1988 until 1991, he was a Comptroller of GM do Brasil. Prior thereto, he held several finance positions at GM since 1978.

86

Mr. Campbell was named Vice President of Purchasing for Delphi Automotive Systems in November 1998. He had been Executive Director of Worldwide Purchasing for Delphi since November 1996. Previously, he was Executive Director of Worldwide Purchasing, Quality/Supplier Development, at GM's North American Operations since 1995. From 1994 to 1995, he was Executive Director of Worldwide Purchasing, Strategic and Metallic Activities. Prior thereto, he held a variety of managerial and purchasing positions at GM since 1964.

Ms. Healy was named Vice President of Corporate Affairs for Delphi Automotive Systems in November 1998. She had been Executive Director of Communications for Delphi since June 1997. Previously, she was Manufacturing Manager for Delphi's Flint East Operations, Plants 6 and 7, since July 1996. From June 1995 to July 1996, she was Director of Corporate Communications at GM's central office. From January 1995 to June 1995, she was Director of Communications for Delphi. Prior thereto, Ms. Healy held several personnel, labor relations and communications positions at GM since 1976. She serves on the Board of Trustees for the Music Hall Center for the Performing Arts in Detroit and the Executive Board for the Troy Chamber of Commerce.

Mr. Janak was named Chief Information Officer for Delphi Automotive Systems in April 1998 and a Delphi Vice President in November 1998. He had been a Vice President and Chief Information Officer at TRW Inc., since February 1995. Previously, he was Vice President and General Manager of TRW's Information Services Division. Prior thereto, he worked in propulsion engineering for NASA's Apollo program and worked for Chrysler Corporation, Teledyne Brown Engineering, Planning Research Corporation and the German firm, Technologieforshung.

Mr. Lorenz was named Vice President of Production Control and Logistics for Delphi Automotive Systems in November 1998. He had been Director of Production Control and Logistics for Delphi since March 1996. Previously, he had been Director of Materials Management for GM's North American Operations Prototype Shops since June 1993. From 1991 to 1993, he was Director of Materials Management, Experimental Manufacturing. From 1990 to 1991, he was Manager of Synchronous Organization, and from 1989 to 1990, he was Advisor, C-P-C production systems. Prior thereto, he held various manufacturing and materials management positions at GM since 1973.

Mr. Robinson was named General Counsel and a Delphi Automotive Systems Vice President in December 1998. Previously, he was Of Counsel to the Corporate, Securities and Business Law group at Dickinson Wright PLLC, a Michigan law firm headquartered in Detroit, since April 1998. From February 1996 to April 1998, he was Senior Vice President, Secretary and General Counsel for ITT Automotive, Inc. From April 1987 to February 1996, he was a lawyer for Chrysler Corporation serving, among other positions, as Vice President and General Counsel for Chrysler International Corporation, a subsidiary of Chrysler Corporation, and Geschaftsfuhrer, or Managing Director, of Chrysler Austria GmbH. Prior thereto, he held positions at TRW, Inc. in Cleveland, Ohio, and at Coudert Brothers and Wender, Murase & White in New York City.

Mr. Weber was named Vice President of Human Resources Management for Delphi Automotive Systems in November 1998. He had been Executive Director of Human Resources Management for Delphi since January 1995. Previously, he was General Director of Personnel and Public Affairs at the former Inland Fisher Guide since 1993. From 1991 to 1993, he was General Director of Personnel for the same. From 1988 to 1991, he was Director of Industrial Relations at C-P-C, and from 1986 to 1988, he served as Director of Human Resources for Salaried Personnel at C-P-C. From 1985 to 1986, he was Director of General Offices Personnel at C-P-C. Prior thereto, he held a number of human resource and personnel positions at GM since 1966.

Mr. Wyman was named Lead Independent Director for Delphi Automotive Systems in October 1998. Mr. Wyman had served on the Board of Directors of General Motors from 1985 until October 1998. Mr. Wyman was formerly Chairman, President and Chief Executive Officer of CBS, Inc., New York. Mr. Wyman was Senior Advisor of SBC Warburg Inc. from 1996 to 1997 and Chairman of S.G. Warburg & Co. Inc. from 1992 to 1996. Mr. Wyman is also a Director of AT&T Corporation and of AGCO Corporation. Mr. Wyman is a member of the Advisory Board of Nestle USA, Inc., the International Advisory Group of Toshiba Corporation (Tokyo) and The Business Council. Mr. Wyman is Trustee Emeritus of The Ford Foundation and The Aspen Institute and Chairman Emeritus of Amherst College.

Mr. Smith has been associated with General Motors since 1961 and was named a Director of Delphi Automotive Systems in October 1998. On January 1, 1996, Mr. Smith became Chairman of the Board of Directors of GM and in October 1998, Mr. Smith's title was changed from Chief Executive Officer and President to Chief Executive Officer of GM. Effective November 1992, Mr. Smith was elected as GM's Chief Executive Officer and President. Effective August 1990, Mr. Smith was elected Vice Chairman of the Board of Directors of GM and, on April 6, 1992, he was elected President and Chief Operating Officer of GM. Mr. Smith was elected Executive Vice President in charge of International Operations for GM in 1988. He is also a Director of Hughes Electronics and The Procter & Gamble Company. Mr. Smith is Co-Chairman of The Business Roundtable and a member of The Business Council, the U.S.-Japan Business Council, Catalyst and The Chancellor's Executive Committee of the University of Massachusetts. Mr. Smith is a member of the Board of Trustees, Boston University; the Board of Overseers of Memorial Sloan-Kettering Cancer Center; the Board of Governors of The Nature Conservancy; and the Board of Polish-American Enterprise Fund.

Mr. Pearce has been associated with General Motors since 1985 and was named a Director of Delphi Automotive Systems in October 1998. Effective January 1, 1996, Mr. Pearce was elected a Director and became Vice Chairman of the Board of Directors of GM. In July 1994, Mr. Pearce assumed responsibility for GM's Strategic Decision Center, Corporate Communications, Allison Transmission Division, Electro-Motive Division, Urban and Community Affairs, Executive Compensation and Corporate Governance and the Corporate Services Staff. Effective November 1992, he was elected Executive Vice President of GM. In May 1987, Mr. Pearce was elected Vice President and General Counsel of General Motors, a position he retained through August 1, 1994. Mr. Pearce is also a Director of Hughes Electronics, Marriott International, Inc. and MDU Resources Group, Inc. Mr. Pearce is a member of The Conference Board, Northwestern University School of Law Dean's Advisory Council and the Board of Visitors of the United States Air Force Academy. Mr. Pearce is also a Trustee of Howard University.

Mr. Losh has been associated with General Motors since 1964 and was named a Director of Delphi Automotive Systems in October 1998. In July 1994, Mr. Losh was elected Executive Vice President and Chief Financial Officer of GM. Effective May 1992, Mr. Losh was elected Group Executive in charge of North American Vehicle Sales, Service and Marketing of GM. He was named General Manager of GM's Oldsmobile Division in June 1989. In July 1984, Mr. Losh was elected Vice President of General Motors and General Manager of its Pontiac Division.

Mr. Bernardes Neto was elected Chief Executive Officer in 1996 of Bunge International, a Bermuda holding company headquartered in Sao Paulo, Brazil, which controls a number of food, agribusiness and fertilizer companies around the world. Before joining Bunge, he was a Senior Partner with Booz-Allen & Hamilton where he specialized in strategy and organization consulting to industry in Latin America. His 15 years of consulting experience include several projects related to the automotive industry in South America. Mr. Bernardes is a Director for RBS and Alcoa in Brazil. He is also a member of the Advisory Board for Booz-Allen & Hamilton.

Mr. Colbert was appointed an Executive Vice President of Miller Brewing Company in July 1997. He is responsible for all plant operations, brewing, research, quality assurance, engineering, purchasing, corporate operations planning and improvement and information systems. He had been a Senior Vice President, Worldwide Operations since 1995. In 1993, he was elected to the Miller Board of Directors and Executive Committee. Also in 1993, he was named Senior Vice President in charge of operations, a position he held until 1995. From 1990 to 1993, he was Vice President of plant operations, and from 1989 to 1990 he was Vice President of materials manufacturing. Prior thereto he held several manufacturing and production positions at Miller since joining the company in 1979. Mr. Colbert is a Director for Aeroquip-Vickers, Inc., Milwaukee County Council, Boy Scouts of America, Columbia Health Systems and Greater Milwaukee Open. He is Chairman of the Board of the Thurgood Marshall Scholarship Fund and he is a member of the Board of Trustees of Fisk University, Nashville, Tennessee. Mr. Colbert also serves on the Board of Regents of the Milwaukee School of Engineering, is a member of the Executive Advisory Committee for the National Urban League's Black Executive Exchange Program, and serves on the Opportunities Industrialization Centers of America's National Industrial Council.

Mr. Irimajiri was elected President and Representative Director of Sega Enterprises, Ltd. in February 1998. He had been responsible for the CS Business Group, Quality Assurance Division and Intellectual Property Rights Department since August 1997. Previously, he was Co-Chairman of Sega America, Inc., since July 1996. From April 1996 to July 1996, he was responsible for CS Research & Development Group, Overseas Consumer Business Group, Quality Assurance Division, Multimedia Office and Intellectual Property Department. Prior thereto, he held various positions at Sega since 1993. Before joining Sega, Mr. Irimajiri had been an Executive Vice President at Honda Motor Co. Ltd. since June 1990. He was responsible for directing Honda's development and production activities. He had been associated with Honda since 1963.

88

Ms. McLaughlin is President, Consumer Services for BellSouth Telecommunications, Inc., a position she has held since March 1998. From 1987 to 1998, Ms. McLaughlin held numerous financial and marketing management positions at Eastman Kodak in Rochester, N.Y. Her most recent position was Vice President and Chief Operating Officer of Kodak Professional, where she managed that division's worldwide

operations, including sales and marketing. Before joining Kodak, Ms. McLaughlin spent 13 years in corporate banking with Citibank and Chase. Ms. McLaughlin serves on the Board of Directors of Dayton Hudson Corporation.

Mr. Opie was elected Vice Chairman of the Board and an Executive Officer for General Electric Company in 1995. He had been President and Chief Executive Officer of GE Lighting and a GE Senior Vice President since 1986. Previously, he had been Vice President of GE's distribution equipment business since 1983. From 1982 to 1983 he was President of the Specialty Plastics Division. From 1980 to 1982 he was Vice President of the Lexan Products Division of GE Plastics, and from 1977 to 1980 he was General Manager of the division. In 1975, Mr. Opie became General Manager of the battery business, a position he held until moving to GE Plastics. He has been associated with General Electric since 1961.

Mr. Penske is the founder and Chairman of Penske Corporation, which was established in 1969 and is comprised of three business groups: Transportation Services, Automotive and Performance. In the Transportation Services Group, Mr. Penske serves as the Chairman and Chief Executive Officer of Detroit Diesel Corporation. He is Chairman of the Board of Penske Truck Leasing Corporation and Penske Motorsports, Inc. and a Director of General Electric Company and Gulfstream Aerospace Corporation. He is Chairman of the Detroit Investment Fund, which was created by Detroit Renaissance, of which he is also a Director. Mr. Penske is also a member of the Robert Bosch International AG Advisory Board and a Trustee of the Henry Ford Museum & Greenfield Village and a member of the Business Council.

## Committees of the Board of Directors

We have four standing committees: an executive committee (the "Executive Committee"), an audit committee (the "Audit Committee"), an executive development and compensation committee (the "Compensation Committee") and a corporate governance and public issues committee (the "Corporate Committee"). Messrs. Battenberg, Losh, Pearce, Smith and Wyman were appointed as the members of the Executive Committee. Messrs. Bernardes Neto, Opie and Wyman were appointed as the members of the Audit Committee. Messrs. Pearce, Smith and Wyman were appointed as the members of the Compensation Committee. Messrs. Penske and (effective April 1, 1999) Irimajiri were appointed as the members of the Corporate Committee. We expect that membership on some of these committees will be modified and that we will complete the appointment of other members, including newly elected directors to some of these committees. We expect that, so long as GM owns a majority of our outstanding common stock, the majority of the members of the Executive Committee and the Compensation Committee will be directors who are also directors and/or officers of GM.

The Executive Committee is authorized to exercise, between meetings of our Board, all of the powers and authority of the Board in the direction and management of Delphi, except as prohibited by applicable law or our Restated Certificate of Incorporation and except to the extent another committee shall have been accorded authority over the matter. The Audit Committee will select the independent public accountants to audit our annual financial statements and will establish the scope and oversee the annual audit. The Corporate Committee is responsible for matters relating to service on our Board, including the size of our Board and the recommendation of nominees for our Board, and for matters related to corporate governance and the company's business activities as they relate to matters of public policy. The Compensation Committee will determine the compensation for employee directors and, after receiving and considering the recommendation of our Chief Executive Officer and the President, all officers of the company and any other employee that the Compensation Committee may designate from time to time and will approve and administer employee benefit plans. Our Board may establish other committees from time to time to facilitate the management of the business and affairs of our company.

## Compensation of Directors

Directors who are also employees of GM or Delphi receive no remuneration for serving as directors or committee members. Non-employee directors receive compensation consisting of a cash retainer and common stock units. Non-employee directors other than the lead independent director receive total compensation of $110,000 per year, equally divided between the two components, and the lead independent director receives total compensation of $300,000 per year, $100,000 of which is cash and $200,000 of which is common stock units. Non-employee directors other than the lead independent director receive an additional fee of $5,000 per year for serving as chairperson of a board committee.

89

The stock portion of each non-employee director's annual compensation will automatically be deferred in units until such person no longer serves on our Board. Under Delphi's Deferred Compensation Plan for Non-Employee Directors, non-employee directors, at their option, may convert the cash portion of their compensation into common stock units. Dividend equivalents on any common stock units will accrue quarterly and be converted into additional common stock units. Directors will receive the cash value of all of their accumulated common stock units following their departure from the Board.

Stock Ownership of Directors and Executive Officers and Certain Beneficial Owners

To the extent directors and officers of Delphi own shares of GM $1-2/3 common stock at the time of the Distribution, they will participate in the Distribution on the same terms as other holders of GM $1-2/3 common stock. In connection with the IPO, certain executives, including the executive officers named in the Summary Compensation Table in the "--Executive Compensation" section below, were awarded options to purchase shares of Delphi common stock and were awarded restricted stock units. See "--Incentive Plans--Founders Grants." In addition, certain awards of GM $1-2/3 common stock, including the stock options and awards reflected in the tables set forth in the "--Grants of Stock Options," "--Exercises of Stock Options" and "--Long Term Incentive Plan Awards" sections below, will be replaced with comparable awards under Delphi's incentive plans in connection with the completion of the Distribution. See "--Incentive Plans--Substitute Awards."

The following table sets forth the number of shares of Delphi Common Stock and GM $1-2/3 common stock beneficially owned on February 28, 1999 by GM and by each director, each director nominee, each of the executive officers named in the Summary Compensation Table in the "--Executive Compensation" section below, and all directors, director nominees and executive officers of Delphi as a group. Except as otherwise noted, the individual director or executive officer or their family members had sole voting and investment power with respect to such securities.

| Name | Delphi Common Stock — Shares Beneficially Owned(2) | GM $1-2/3 Common Stock | | | |
|---|---|---|---|---|---|
| | | Shares Beneficially Owned(2) | Deferred Stock Units(3) | Total Shares | Stock Options(4) |
| General Motors Corporation (1)... | 465,000,000 | 0 | 0 | 0 | 0 |
| J.T. Battenberg III.............. | 100,000 | 4,157 | 15,493 | 19,650 | 128,401 |
| Alan S. Dawes................... | 30,000 | 8,383 | 2,337 | 10,720 | 66,209 |
| David R. Heilman................ | 6,000 | 11,490 | 2,392 | 13,882 | 11,739 |
| Donald L. Runkle................ | 10,000 | 10,812 | 2,657 | 13,469 | 16,909 |
| Paul J. Tosch(5)................ | 6,000 | 4,072 | 3,072 | 7,144 | 11,394 |
| Thomas H. Wyman................. | 1,000 | 3,084 | 9,930(6) | 13,014 | 0 |
| John F. Smith, Jr............... | 1,000 | 171,465 | 53,694 | 225,159 | 804,495 |
| Harry J. Pearce................. | 0 | 40,357 | 24,663 | 64,990 | 308,211 |
| J. Michael Losh................. | 0 | 29,117 | 14,386 | 43,503 | 239,342 |
| Oscar De Paula Bernardes Neto.... | 0 | 0 | 0 | 0 | 0 |
| Virgis W. Colbert............... | 0 | 0 | 0 | 0 | 0 |
| Shoichiro Irimajiri............. | 0 | 0 | 0 | 0 | 0 |
| Susan A. McLaughlin............. | 0 | 0 | 0 | 0 | 0 |
| John D. Opie.................... | 10,000 | 0 | 0 | 0 | 0 |
| Roger S. Penske................. | 0 | 0 | 0 | 0 | 0 |
| All directors, director nominees and executive officers of Delphi as a group (33 persons)........ | 268,400 | 332,375 | 137,976 | 470,351 | 1,749,837 |

(1)General Motors Corporation's Global Headquarters mailing address is 100 Renaissance Center, P.O. Box 100, Detroit, MI 48265-1000. General Motors Corporation currently owns about 82.3% of our outstanding common stock.

(2)No individual director, director nominee or executive officer beneficially owns 1% or more of the Delphi Common Stock or GM $1-2/3 common stock, nor do the directors, director nominees and executive officers as a group.

(3)Deferred Stock Units for all persons other than Mr. Wyman include shares under the General Motors Benefit Equalization Plan-Savings (the "GM BEP-S"). This plan is a non-qualified "excess benefit" plan that is exempt from ERISA and the Code limitations and provides GM executives with full GM matching contributions without regard to limitations imposed by the Code. The amounts credited under the plan are maintained in share units of GM $1-2/3 common stock. Following termination of employment an employee may, at any time, elect to receive a complete distribution of amounts in the GM BEP-S account, which will be paid in cash. Delphi has adopted its BEP-S in connection with its separation from GM and the amounts in the GM BEP-S will be transferred to Delphi's BEP-S. Deferred Stock Units also includes undelivered GM incentive awards which will vest upon the occurrence of certain events and which are subject to forfeiture under certain circumstances.

90

(4)Includes the number of shares of GM $1-2/3 common stock that may be acquired through the exercise of stock options exercisable within 60 days of February 28, 1999. The shares reported in this column reflect the adjustments to the original option grants to reflect the effect of the recapitalization of GM in connection with transactions completed by General Motors in connection with the 1997 spin-off of the defense electronics business of its Hughes Electronics subsidiary and the related transfer of Delco Electronics to us from Hughes Electronics.

(5)Data for Mr. Tosch include 2,009 shares owned by, and 3,285 shares acquirable pursuant to options held by, his spouse.

(6)Includes amounts under the General Motors Deferred Compensation Plan for Non-Employee Directors and the General Motors Director's Long-Term Stock Incentive Plan. These amounts relate to compensation deferred while Mr. Wyman was a member of the Board of Directors of GM.

**Executive Compensation**

The following table sets forth certain compensation information for the chief executive officer and the four other executive officers of Delphi who, based on salary and bonus compensation from General Motors and its subsidiaries, were the most highly compensated officers of Delphi for the year ended December 31, 1998. All information set forth in this table reflects compensation earned by such individuals for services with General Motors and its subsidiaries.

**Summary Compensation Table**

| | | Annual Compensation | | | Long-Term Compensation | | |
| | | | | | Awards | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Other Annual Compensation ($) | Securities Underlying Options (#)(2) | Long-Term Incentive Payouts($)(3) | All Other Compensation ($)(4) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| J.T. Battenberg III........ Chairman, Chief Executive Officer and President | 1998 | 1,000,000 | 450,000 | 50,624 | 100,000 | 750,000 | 49,215 |
| | 1997 | 887,000 | 1,020,000 | 53,448 | 108,495 | 475,000 | 38,112 |
| Donald L. Runkle........... Vice President | 1998 | 458,000 | 235,000 | n/a | 16,000 | 198,000 | 19,250 |
| | 1997 | 391,000 | 325,000 | n/a | 17,359 | 111,000 | 14,085 |
| David R. Heilman.......... Vice President | 1998 | 369,000 | 211,000 | n/a | 16,000 | 198,000 | 15,488 |
| | 1997 | 350,000 | 295,000 | n/a | 17,359 | 111,000 | 12,600 |
| Paul J. Tosch.............. Vice President | 1998 | 395,000 | 202,000 | n/a | 14,000 | 198,000 | 16,590 |
| | 1997 | 372,000 | 262,000 | n/a | 15,189 | 111,000 | 13,380 |
| Alan S. Dawes............. Chief Financial Officer and Vice President | 1998 | 398,000 | 210,000 | n/a | 14,000 | 198,000 | 16,730 |
| | 1997 | 360,000 | 262,000 | n/a | 15,189 | 111,000 | 12,960 |

----------

(1)These awards are based on performance for 1997 and 1998. General Motors management recommended and the Executive Compensation Committee concurred that 1998 annual awards for GM Named Executive Officers, which included Mr. Battenberg, would be reduced to reflect the year-to-year decline in reported earnings. The other GM Named Executive Officers are Messrs. Smith, Pearce, Wagoner and Hughes.

(2)1997 options are adjusted to reflect the effect of the recapitalization of GM in connection with transactions completed by General Motors in connection with the 1997 spin-off of the defense electronics business of its Hughes Electronics subsidiary and the related transfer of Delco Electronics to us from Hughes Electronics.

(3)Reflects long-term incentive payouts in the form of GM $1-2/3 common stock and GM Class H common stock under the General Motors 1992 Performance Achievement Plan. The performance period for such awards was 1995 through 1997 and 1996 through 1998. The awards to Mr. Battenberg vest in four equal installments. The first installment vests on the date the final award is determined, the second installment vests at the end of the year in which the final award was determined, the third installment vests one year after the second installment vests. The fourth installment of the 1996-1998 grant vests one year after the third installment and the fourth installment of the

91

1995-1997 grant vests subsequent to retirement. The awards to the other named executive officers vest in one or two equal annual installments, depending on the value of the award payout. Dividend equivalents are paid on unvested shares. The following table sets forth the number of GM shares of such award that were vested and paid to the executive officers and the number of shares that remained unvested and unpaid:

| | | | | | | | First and Second Installment of 1995-97 Grant and Third Installment of 1994-96 Grant | | | | | |
| | 1996-98 Grant | | | | | | | | | | | |
| | Shares Vested January 1999(#) | | Shares Unvested(#) | | Shares Vested as of December 31, 1998(#) | | Value of Shares Vested as of December 31, 1998($)* | | Shares Unvested as of December 31, 1998(#) | |
| | $1 2/3 | Cl.H | $1 2/3 | Cl.H | $1 2/3 | Cl.H | $1 2/3 | Cl.H | $1 2/3 | Cl.H |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| J.T. Battenberg III..... | 2,037 | 946 | 6,111 | 2,836 | 6,487 | 2,718 | 464,210 | 107,877 | 6,487 | 2,717 |
| D.L. Runkle.............. | 915 | 0 | 1,774 | 0 | 3,293 | 0 | 235,647 | 0 | 0 | 0 |
| D.R. Heilman............ | 915 | 0 | 1,774 | 0 | 1,858 | 0 | 132,958 | 0 | 0 | 0 |
| P.J. Tosch.............. | 915 | 0 | 1,774 | 0 | 3,178 | 0 | 227,418 | 0 | 0 | 0 |
| A.S. Dawes.............. | 915 | 0 | 1,774 | 0 | 3,178 | 0 | 227,418 | 0 | 0 | 0 |

----------

* Based on the $71.56 closing price of GM $1-2/3 common stock and the $39.69 closing price of GM Class H common stock on the NYSE on December 31, 1998.

(4)Reflects contributions by General Motors on behalf of each executive officer under various savings plans. The amount for Mr. Battenberg also includes imputed income of $7,215 for 1998 and $6,162 for 1997 for endorsement split-dollar life insurance. In the event of Mr. Battenberg's death, General Motors would be reimbursed for its premiums paid on such life insurance policy.

Delphi has established executive compensation practices that will link compensation with the performance of Delphi as well as Delphi's Common Stock. On average, a greater portion of the executive's long-term incentive pay will be linked to the performance of Delphi's Common

Stock through the grant of stock options. Delphi will continually review its executive compensation programs to ensure they are competitive with those generally prevailing in its industry.

## Grants of Stock Options

No stock options or stock appreciation rights were granted by Delphi during the year ended December 31, 1998. The following table shows all grants of options to acquire shares of GM $1-2/3 common stock granted to the executive officers named in the Summary Compensation Table in the "--Executive Compensation" section above under the General Motors 1997 Stock Incentive Plan in the year ended December 31, 1998. Unless exercised prior thereto, the options to purchase GM $1-2/3 common stock reflected below will be replaced with options to purchase Delphi common stock in connection with the completion of the Distribution. See "--Incentive Plans--Substitute Awards."

| Name | Number of Securities Underlying Options Granted(#)(1) | % of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/Sh.) | Expiration Date | Grant Date Present Value($)(2) |
|---|---|---|---|---|---|
| J.T. Battenberg III....... | 100,000 | 0.71 | 56.00 | 1/13/08 | 1,232,000 |
| Donald L. Runkle.......... | 16,000 | 0.11 | 56.00 | 1/13/08 | 197,000 |
| David R. Heilman.......... | 16,000 | 0.11 | 56.00 | 1/13/08 | 197,000 |
| Paul J. Tosch............. | 14,000 | 0.10 | 56.00 | 1/13/08 | 172,000 |
| Alan S. Dawes............. | 14,000 | 0.10 | 56.00 | 1/13/08 | 172,000 |

----------

(1)These options were granted on January 12, 1998 and consist of a combination of non-qualified and incentive stock options. These options become exercisable to the extent of one-third of the grant on January 12, 1999, January 12, 2000 and January 12, 2001, respectively. The incentive stock options expire ten years from the date of grant and the non-qualified options expire two days later.

(2)These values were determined based on the Black-Scholes option pricing model. The following assumptions were made for purposes of calculating the Grant Date Present Value: that the option is exercised in the fifth year after its grant, expected price volatility of 25%, an interest rate of 5.58%, a dividend yield of 3.57% and no adjustments were made for

92

non-transferability. Our use of this model does not necessarily mean that we believe that this model accurately determines the value of options. The ultimate value of the options in this table depends upon each holder's individual investment decisions and the actual performance of GM $1-2/3 common stock and, following the Distribution, Delphi's Common Stock.

## Exercises of Stock Options

No stock options or stock appreciation rights were exercised with respect to Delphi Common Stock during the year ended December 31, 1998. The following table shows aggregate exercises of options to purchase GM $1-2/3 common stock in the year ended December 31, 1998 by the executive officers named in the Summary Compensation Table in the "--Executive Compensation" section above. Unless exercised prior thereto, the unexercised options reflected below will be replaced with options to purchase Delphi common stock in connection with the completion of the Distribution. See "--Incentive Plans--Substitute Awards."

| Name | Shares Acquired on Exercise (#) | Value Realized($) | Number of Securities Underlying Unexercised Options at FY-End (#)(1) Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at FY-End($)(2) Exercisable/Unexercisable |
|---|---|---|---|---|
| J.T. Battenberg III... | 60,513 | 1,605,951 | 67,918/194,027 | 1,193,555/3,351,195 |
| Donald L. Runkle...... | -- | -- | 41,673/27,570 | 890,393/454,906 |
| David R. Heilman...... | 44,089 | 1,289,493 | 620/27,570 | 11,036/205,946 |
| Paul J. Tosch......... | 13,019 | 271,837 | 17,001/24,122 | 294,383/398,012 |
| Alan S. Dawes......... | 3,309 | 99,369 | 60,147/24,122 | 1,684,322/398,012 |

----------

(1) No SARs may be granted under GM's stock incentive plans.

(2)Based on the closing price of GM $1-2/3 common stock of $71.56 on the NYSE on December 31, 1998.

## Long Term Incentive Plan Awards

The following table shows long term incentive plan awards made under the General Motors 1997 Performance Achievement Plan in the year

ended December 31, 1998 to the executive officers named in the Summary Compensation Table in the "--Executive Compensation" section above.

| Name | Performance or Other Period Until Maturation or Payout | Estimated Future Payouts Under Non-Stock Price-Based Plans(1) | | |
|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) |
| J.T. Battenberg III | 1998-2000 | 320,000 | 800,000 | 1,600,000 |
| Donald L. Runkle...... | 1998-2000 | 84,000 | 210,000 | 420,000 |
| David R. Heilman...... | 1998-2000 | 80,000 | 200,000 | 400,000 |
| Paul J. Tosch......... | 1998-2000 | 80,000 | 200,000 | 400,000 |
| Alan S. Dawes......... | 1998-2000 | 80,000 | 200,000 | 400,000 |

(1)These awards relate to performance during 1998 through 2000. If the minimum or threshold performance level is met or exceeded, the percentage of the target award that will eventually be paid to participants will depend on the extent to which the established performance target for the three year performance period is achieved. If the minimum performance level is not met, no awards will be paid.

## Change in Control Agreements

Delphi has entered into change in control agreements ("Change in Control Agreements") with certain of its officers (each, a "Participant"). The Change in Control Agreements generally provide monetary compensation and other benefits to each Participant upon the occurrence of certain triggering events involving a change in control of Delphi.

The Change in Control Agreements specify two triggering events:

(1) a change in control occurs within three years after the Distribution; and

93

(2) within three years after the change in control, one of the following events occur:

(a)the Participant's employment is terminated without cause;

(b)a negative fundamental, material change is made in the Participant's duties or responsibilities;

(c)the Participant's salary, annual or other material compensation or benefits are decreased (and such decrease is unrelated to company or individual performance);

(d)the Participant is required to materially relocate his or her residence or principal office location against his or her will; or

(e)the Participant is not offered a comparable position with the successor entity.

Change in control is defined in the Change in Control Agreements to mean the acquisition by any person, other than the company or any subsidiary of the company, of the beneficial ownership of 50 percent or more of the outstanding common stock; certain mergers, consolidations, other reorganizations of the company in which the company is not the surviving corporation; or any sale, lease, exchange or other transfer of 50% or more of the assets of the company.

Each Participant is entitled to the following benefits at the time of the change in control:

o all of the Participant's unvested options will vest and become immediately exercisable in accordance with their terms;

o all of the Participant's long-term incentive awards will become payable immediately on a pro-rated basis, calculated based on current forecasted payouts;

o any compensation previously deferred at the election of the Participant, together with accrued interest or earnings thereon, will be distributed as a lump sum payout;

o the Participant's Supplemental Executive Retirement Program benefits will be funded through a trust or other mechanism which is protected from the persons controlling Delphi after the occurrence of a change in control; and

o the Participant's medical coverage under the company's then existing medical plan will remain in force for thirty-six months.

Upon the occurrence of both triggering events described above, in addition to the payments and benefits described above, Participants will receive monetary compensation and certain other benefits. Each Participant is entitled to receive in addition to their base salary through the date of their termination and any accrued vacation pay the following amount of monetary compensation:

```
Chairman and CEO              Three times base salary and three
                              times target bonus

Certain Vice Presidents       Two times base salary and two times
                              target bonus

All other Vice Presidents     One times base salary and one times
                              target bonus
```

In addition, at the time of the second triggering event:

o the Participant's life-insurance coverage will be continued and the premiums will be paid for thirty-six months;

o the Participant may receive reimbursement of up to $50,000 for expenses related to outplacement services;

o the Participant's legal fees and expenses will be paid if litigation is required to enforce these change in control rights;

o the Participant will be able to retain his or her company car, if any, for one year thereafter; and

o the Participant will no longer be subject to the non-competition provisions of the Change in Control Agreement

94

The Change in Control Agreements provide that for a period of two years immediately following the Participant's voluntary termination of employment with us or any of our subsidiaries, the Participant agrees not to, without the prior written consent of our Chairman and Chief Executive Officer, engage in or perform any services of a similar nature to those performed at our company for any other corporation or business engaged in the design, manufacture, development, promotion, sale or financing of automobile or truck components, within North America, Latin America, Asia, Australia or Europe in competition with us, any of our subsidiaries or affiliates, or any joint ventures to which we or any of our subsidiaries are a party. The Change in Control Agreements also provide that the Participant shall not disclose any knowledge, information or materials, whether tangible or intangible, regarding proprietary matters relating to the company. We expect that we will enter into Change in Control Agreements with each of our executive officers and certain other officers.

**Incentive Plans**

Before the IPO, Delphi adopted, with the approval of General Motors in its capacity as the sole stockholder of Delphi, the Delphi Automotive Systems Annual Incentive Plan (the "Annual Incentive Plan"), the Delphi Automotive Systems Stock Incentive Plan (the "Stock Incentive Plan") the Delphi Automotive Systems Performance Achievement Plan (the "Performance Achievement Plan") and the Delphi Automotive Systems Classified Salary and Hourly Stock Option Plan (the "Classified Plan"). The Annual Incentive Plan, the Stock Incentive Plan and the Performance Achievement Plan are administered by the Compensation Committee and the Delphi Strategy Board will administer the Classified Plan.

Founders Grants. In connection with the IPO, certain executives were awarded "founders grant" options to purchase shares of Delphi common stock and "founders grant" restricted stock units. In addition, other employees of Delphi were awarded "founders grant" options to purchase shares of Delphi common stock. The founders grants to executives were made pursuant to the Stock Incentive Plan and the founders grants to other employees were made pursuant to the Classified Plan. Stock options awarded to executives as founders grants vest in equal annual installments over the four years following the date on which they were granted and restricted stock units awarded to executives as founders grants vest in full four years from the date on which they were granted. Stock options awarded to all other employees as founders grants vest in full two years from the date on which they were granted. The exercise price per share for these stock options is equal to $18.66 (the average of the high and low prices of the common stock on the first day of trading of the common stock as reported in The Wall Street Journal) and the assumed grant price per share of these restricted stock units was equal to $17.00 per share (the price per share at which the common stock was sold in the IPO).

A total of about 26,000,000 shares of common stock will be issuable upon exercise of these options or vesting of these restricted stock units.

Substitute Awards. In connection with the completion of the Distribution, substitute awards relating to Delphi common stock will be issued to employees of Delphi in exchange for GM $1-2/3 common stock awards. The terms and conditions of each substitute award, including, without limitation, the time or times when, and the manner in which, each option constituting a substitute award will be exercisable, the duration of the exercise period, the permitted method of exercise, settlement and payment, the rules that will apply in the event of the termination of employment of the employee, the events, if any, that may give rise to an employee's right to accelerate the vesting or the time or exercise

thereof and the vesting provisions of any restricted stock unit or performance achievement award constituting substitute awards, will be the same as those of the replaced GM $1-2/3 common stock award. See "Item 1: Business--Arrangements Between Delphi and General Motors-- Employee Matters--Employee Benefits."

Stock Incentive Plan. All officers and certain other employees of Delphi will be eligible to participate in the Stock Incentive Plan. The Stock Incentive Plan provides for the grant of stock options and/or Restricted Stock Units ("RSUs"). An aggregate of 85,000,000 shares of common stock will be reserved for issuance under the Stock Incentive Plan; however, the maximum number of shares that can be granted as RSUs is 8,000,000. It is anticipated that about 650 employees annually will participate in the Stock Incentive Plan, including about 25 officers. Subject to adjustments as set forth in the Stock Incentive Plan, the maximum stock option grant to any individual in any calendar year may not exceed 1,000,000 shares and the maximum RSU grant to any individual in any calendar year may not exceed 500,000 shares.

95

Options granted under the Stock Incentive Plan may be either incentive stock options ("ISOs") or such other forms of non-qualified stock options ("NQSOs") as the Compensation Committee may determine. ISOs are intended to qualify as "incentive stock options" within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"). With certain limited exceptions, the exercise price of any stock option generally shall not be less than 100% of the fair market value of the common stock on the date the option is granted. Payment of the purchase price upon exercise must be made in cash or, unless determined otherwise by the Compensation Committee, by delivery of previously acquired shares of common stock. In the case of shares acquired pursuant to the exercise of an option to acquire such shares, such shares must be held for six months before they may be used in payment of the exercise price for additional stock options.

The term of any option will be determined by the Compensation Committee, but no ISO may be exercised later than ten years after the date of grant, and no NQSO may be exercised later than ten years and two days after the date of grant. Except as otherwise determined by the Compensation Committee, no option shall become exercisable prior to the first anniversary date of the date of the option grant or such later date as may be established by the Compensation Committee. After such date, the option shall be exercisable only in accordance with the terms and conditions established by the Compensation Committee at the time of the grant.

The Stock Incentive Plan provides that, except as otherwise determined by the Compensation Committee, following termination of an employee's employment and contingent upon satisfaction of certain conditions, options held by each employee will expire not later than five years from the date of termination of employment, subject to earlier termination by the terms of the option. However, if termination is due to death, the options will expire three years from the date of death, subject to earlier termination pursuant to the terms of the option.

If required by the Compensation Committee, by accepting an option grant, an employee will agree to remain employed by Delphi for a period of six months following the exercise of any option granted under the Stock Incentive Plan. If the employee retires or terminates employment without the consent of Delphi for any reason other than death within six months of the date of exercise of a stock option, the employee will be required to pay to Delphi the amount of any gain realized upon such exercise.

The Compensation Committee may grant RSUs to such individuals, at such times, and in such amounts as it may determine. Each RSU relates to one share of Delphi's common stock, subject to certain adjustments as described in the Stock Incentive Plan. RSUs will be awarded without consideration other than the rendering of services, unless the Compensation Committee decides otherwise. RSUs shall vest, subject to the satisfaction of certain conditions, at the time or times determined by the Compensation Committee. In addition, the Compensation Committee may establish performance vesting criteria with respect to all or any portion of a grant of RSUs based on certain business criteria set forth in the Stock Incentive Plan.

Upon termination of the participant's employment without the consent of Delphi, all RSUs shall be forfeited subject to such exceptions, if any, as are authorized by the Compensation Committee as to termination of employment by retirement, disability, death or under special circumstances. Awards of RSUs to participants subject to Section 162(m) of the Code are intended to qualify under that section of the Code and the provisions of such awards will be interpreted in a manner consistent with that intent to the extent appropriate.

The Compensation Committee generally has the power and authority to amend, modify, suspend or terminate the Stock Incentive Plan at any time without the approval of Delphi's stockholders, subject to applicable federal securities and tax law limitations and NYSE regulations.

Annual Incentive Plan. Officers and certain other employees of Delphi will be eligible to participate in the Annual Incentive Plan. The Compensation Committee may delegate authority to the Delphi Strategy Board to determine individual awards to employees who are not officers of Delphi. The Annual Incentive Plan provides for the grant of cash awards based upon the achievement of certain target levels of performance. Under the Annual Incentive Plan no individual may be granted an award in excess of $7,500,000 in any calendar year. We anticipate that about 600 employees annually will participate in the Annual Incentive Plan, including about 25 officers.

Pursuant to the Annual Incentive Plan, at the beginning of each year, commencing in 1999, the Compensation Committee will establish a targeted performance level at which a target performance award may be earned, with a threshold or minimum performance level below which no award will be paid, and a maximum level beyond which no additional amounts will be paid, and will establish the corresponding minimum and maximum awards. In determining the performance criteria applicable to any grant of awards, the Compensation Committee may use one or more of the business criteria set forth in the Annual Incentive Plan.

The percentage of each target performance award which will become a final award and be paid to the employee will be determined by the Compensation Committee on the basis of the performance goals established and the related performance achieved, as well as the employee's individual performance during the period. Final awards actually paid to an employee may be less than or greater than 100% of the target award. Final awards will be subject to a vesting schedule established by the Compensation Committee. At the Compensation Committee's discretion, interest may be paid on final awards during or at the end of the vesting period. The Compensation Committee may delegate authority to the Delphi Strategy Board to determine individual final awards for employees who are not officers of the company, subject to a maximum amount approved by the Compensation Committee.

Subject to certain exceptions, the Compensation Committee generally has the power and authority to amend, modify, suspend or terminate the Annual Incentive Plan.

Performance Achievement Plan. Employees are eligible to participate in the Performance Achievement Plan only upon recommendation of the Chief Executive Officer and with the approval of the Compensation Committee, except that the Compensation Committee alone may determine which officers are eligible to participate in such plan. The Performance Achievement Plan provides for the grant of awards based on certain target levels of performance. We anticipate that about 100 employees annually will participate in the Performance Achievement Plan, including about 25 officers.

Employees selected to participate in the Performance Achievement Plan will be granted target performance awards. The performance period for an award must be at least two and not more than five years. It is anticipated that target performance awards will be granted annually commencing in 1999, and will be for a three-year performance period. At the beginning of each performance period, the Compensation Committee will establish a targeted performance level at which a target performance award may be earned, with a threshold or minimum performance level below which no award will be paid, and a maximum level beyond which no additional amounts will be paid. In determining the performance criteria applicable to any grant of awards, the Compensation Committee may use one or more of the business criteria provided in the Performance Achievement Plan.

The percentage of each target performance award which will become a final award and be paid to the employee will be determined by the Compensation Committee on the basis of the performance goals established and the related performance achieved, as well as the employee's individual performance during the period. Final awards actually granted to an employee may be less than or greater than 100% of the target award. The Performance Achievement Plan provides that no individual shall be granted a final award in excess of $7,500,000 for any performance period.

Final awards may be paid in the form of common stock, in cash, or partly in common stock and partly in cash, as the Compensation Committee may determine. Each final award will be subject to a vesting schedule as determined by the Compensation Committee. At the Compensation Committee's discretion, dividend and/or interest equivalents may be paid on final awards during or at the end of the vesting period. In the event that the participant's employment with Delphi is terminated, other than as a result of the participant's death, prior to payment of the final award in full, such payment will be further contingent upon satisfaction of certain conditions, including that the participant refrain from activity that is competitive with the business of Delphi, unless such conditions are waived by the Compensation Committee. The Performance Achievement Plan provides that final awards to be paid in common stock shall be made from shares reacquired by the company, including shares purchased on the open market.

Subject to certain exceptions, the Compensation Committee generally has the power and authority to amend, modify, suspend or terminate the Performance Achievement Plan.

Classified Plan. The Classified Plan provides for the grant of stock options to all non-executive employees of Delphi. An aggregate of 26,000,000 shares of common stock will be reserved for issuance under the Classified Plan. Approximately 200,000 Delphi employees are eligible to participate in the Classified Plan. No individual may be granted options in any calendar year covering more than the target amount of shares granted to the lowest level executive under the Stock Incentive Plan for that year.

Options granted under the Classified Plan will be in the form of non-qualified options. The exercise price of any stock option generally shall not be less than 100% of the fair market of the common stock on the date the option is granted. Payment of the purchase price upon exercise must be made in cash.

97

The term of options granted under the Classified Plan will be determined by the Delphi Strategy Board, but no option may be exercised later than 10 years and two days after the date of grant. Except as determined by the Delphi Strategy Board, no option shall become exercisable prior to the first anniversary of the date of the option grant, and after such date shall be exercisable only in accordance with the terms and conditions established by the Delphi Strategy Board at the time of the grant.

The Classified Plan provides that, except as otherwise determined by the Delphi Strategy Board, following termination of an employee's employment and contingent upon satisfaction of certain conditions, options held by each employee will expire not later than five years from the date of termination of employment, subject to earlier termination by the terms of the option. However, if termination is due to death, the

options will expire three years from the date of death, subject to earlier termination pursuant to the terms of the options.

**Pension Plans**

The retirement program for Delphi executives in the United States consists of the Delphi Retirement Program for Salaried Employees (the "Retirement Program") as well as two non-qualified plans. Together, these plans are referred to here as the "Delphi Salaried Program." For all purposes under the Delphi Salaried Program, the terms "service" and "credited service" refer to combined service with General Motors that is taken into account under the General Motors Retirement Program for Salaried Employees (the "GM Retirement Program") and Delphi.

The Retirement Program is a tax-qualified plan subject to the requirements of the Employee Retirement Income Security Act ("ERISA"). In general, the Retirement Program consists of "Part A" and "Part B" benefits. The non-contributory portion (referred to as "Part A") of the Retirement Program provides benefits under a formula based on years of credited service and an applicable benefit rate. The contributory portion (referred to as "Part B") of the Retirement Program provides benefits under a formula based on years of Part B credited service and upon the average of the highest five years of base salary received during the final ten years of service, subject to certain limitations imposed by the Code, which may change from time to time. Part B of the Retirement Program also provides employees with an annual retirement benefit which is equal to the sum of 100% of the Part B contributions they made to the GM Retirement Program after October 1, 1979, or the Delphi Retirement Program after January 1, 1999, and lesser percentages of their contributions made to the GM Retirement Program before that date. If employees elect not to contribute to Part B of the Retirement Program, they are entitled to receive only basic retirement benefits equal to a flat dollar amount per year of credited service. Benefits under the Retirement Program vest after five years of credited service and are payable at age 65, either in the form of a single life annuity or in a reduced amount in the form of a joint and survivor annuity.

If an executive makes Part B contributions to the Retirement Program, the executive may also be eligible to receive a non-qualified Regular Supplemental Executive Retirement Program ("SERP") benefit. The sum of the Retirement Program's benefits plus the Regular SERP benefit will provide an eligible executive with total annual retirement benefits under the Delphi Salaried Program that are equal to 2% times years of Part B credited service times average annual base salary, less 2% times years of Part A credited service times the maximum annual Social Security benefit in the year of retirement payable to a person retiring at age 65. For example, a 65 year old executive retiring in 1999 would be entitled to $16,476.

The table below shows the regular form of the estimated total annual retirement benefit payable under the Delphi Salaried Program, based on average annual base salary as of December 31, 1998, assuming the executive qualifies for Regular SERP benefits. Such amount would be paid in 12 equal monthly installments per year as a single life annuity to executives retiring in 1999 at age 65. If the executive elects to receive such benefits in the form of a 60% joint and survivor annuity, the single life annuity amounts shown would generally be reduced from 5% to 11%, depending upon the age differential between spouses.

| Average Annual Base Salary(a) | Years of Part B Credited Service | | | |
|---|---|---|---|---|
| | 15 | 25 | 35 | 45 |
| $300,000 | $ 85,057 | $141,762 | $198,467 | 255,172 |
| 480,000 | 139,057 | 231,762 | 324,467 | 417,172 |
| 660,000 | 193,057 | 321,762 | 450,467 | 579,172 |
| 840,000 | 247,057 | 411,762 | 576,467 | 741,172 |
| 1,020,000 | 301,057 | 501,762 | 702,467 | 903,172 |
| 1,200,000 | 355,057 | 591,762 | 828,467 | 1,065,172 |

(a)Average annual base salary means the average of the highest five years of base salary paid during the final ten years of service.

98

The average annual base salary and the years of Part B credited service which may be considered in the Regular SERP calculation as of December 31, 1998 for each of the Named Executive Officers were as follows: J.T. Battenberg III--$767,500--36 years; Donald L. Runkle--$366,583--30 years; Paul J. Tosch--$349,000--40 years; Alan S. Dawes--$333,667--17 years; and David R. Heilman--$304,717--33 years. The annual base salary for the most recent year(s) considered in the calculation reported here are shown in the "Salary" column of the Summary Compensation Table in "--Executive Compensation" above.

Executives may be eligible to receive an Alternative SERP benefit in lieu of the Regular SERP benefit if they satisfy certain criteria, including not working for any competitor or otherwise acting in any manner which is not in the best interests of Delphi. An eligible executive will receive the greater of the Regular SERP benefit or the Alternative SERP benefit. The sum of the Retirement Program's benefits plus the Alternative SERP benefit will provide an eligible executive with total annual retirement benefits under the Delphi Salaried Program that are equal to 1.5% times eligible years of Part B credited service up to a maximum of 35 years, times the executive's average annual total direct compensation, less 100% of the maximum annual Social Security benefit in the year of retirement payable to a person retiring at age 65.

The following table shows the alternative form of the estimated total annual retirement benefit payable under the Delphi Salaried Program, based upon average annual total direct compensation as of December 31, 1998, assuming the executive qualifies for Alternative SERP benefits.

Such amount would be paid in 12 equal monthly installments per year as a single life annuity to executives retiring in 1999 at age 65. The amounts shown would be reduced in the same way as under the regular form if the executive were to elect joint and survivor benefits.

Eligible Years of Part B Credited Service Average Annual --------------------------------------------------------

| Total Direct Compensation(a) | 15 | 20 | 25 | 30 | 35 |
|---|---|---|---|---|---|
| $ 525,000 | $101,649 | $141,024 | $180,399 | $ 219,774 | $ 259,149 |
| 905,000 | 187,149 | 255,024 | 322,899 | 390,774 | 458,649 |
| 1,285,000 | 272,649 | 369,024 | 465,399 | 561,774 | 658,149 |
| 1,665,000 | 358,149 | 483,024 | 607,899 | 732,774 | 857,649 |
| 2,045,000 | 443,649 | 597,024 | 750,399 | 903,774 | 1,057,149 |
| 2,425,000 | 529,149 | 711,024 | 892,899 | 1,074,774 | 1,256,649 |

(a)Average annual total direct compensation means the sum of average annual base salary plus the average of the highest five annual incentive awards earned in respect of the final ten calendar years of service prior to an executive's retirement.

The average annual total direct compensation and the eligible years of Part B credited service which may be considered in the Alternative SERP calculation as of December 31, 1997 for each of the Named Executive Officers was as follows: J.T. Battenberg III--$1,453,900--35 years; Donald L. Runkle--$642,583--30 years; Paul J. Tosch--$603,400--35 years; Alan S. Dawes--$563,067--17 years; and David R. Heilman--$542,917--33 years. The annual total direct compensation for the most recent year(s) considered in the calculation reported here are reported in the "Salary" and "Bonus" columns of the Summary Compensation Table in "--Executive Compensation" above.

In addition, the Delphi Board is expected to delegate to the Compensation Committee discretionary authority to grant additional eligible years of credited service to selected key executives under such terms and conditions as the Compensation Committee shall determine for purposes of computing the regular and alternative forms of SERP for such executives. The Regular or Alternative form of the SERP benefit is provided under a program which is non-qualified for tax purposes and not pre-funded. SERP benefits under the Regular and Alternative form can be reduced or eliminated for both retirees and active employees by the Compensation Committee and/or the Board of Directors.

99

# PART IV

**ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K**
**Page No.**

(a) 1. All Financial Statements

| | |
|---|---|
| -Responsibility for Consolidated Financial Statements | 57 |
| -Independent Auditors' Report | 58 |
| -Consolidated Balance Sheets, December 31, 1998 and 1997 | 59 |
| -Consolidated Statements of Operations for the Years ended December 31, 1998, 1997, and 1996 | 60 |
| -Consolidated Statements of Equity (Deficit) and Comprehensive Income (Loss) for the Years Ended December 31, 1998, 1997, and 1996 | 61 |
| -Consolidated Statements of Cash Flows for the Years Ended December 31, 1998, 1997, and 1996 | 62 |
| -Notes to Consolidated Financial Statements | 63-83 |

2. Financial Statement Schedules - Schedules have been omitted because the information required to be set forth therein is not applicable or is shown in the financial statements or notes thereto.
3. Exhibits (Including Those Incorporated by Reference)

| Exhibit Number | Exhibit Name | |
|---|---|---|
| (3)(a) | Amended and Restated Certificate of Incorporation of Delphi Automotive Systems Corporation, incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-1 (Registration No.333-67333) (hereinafter referred to as the "Registration Statement") which has been filed by Delphi with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended | n/a |
| (3)(b) | By-laws of Delphi Automotive Systems Corporation, incorporated by reference to Exhibit 3.2 to the Registration Statement | n/a |
| (4)(a) | Rights Agreement relating to Delphi's Stockholder Rights Plan | n/a |

```
(10)(a)  Master Separation Agreement among General Motors, Delphi,
         Delphi Automotive Systems, Delphi Technologies, Inc. and
         Delphi Automotive Systems (Holding), Inc., incorporated by
         reference to Exhibit 10.1 to the Registration Statement        n/a
(10)(b)  Component Supply Agreement between Delphi and General Motors,
         incorporated by reference to Exhibit 10.2 to the Registration
         Statement                                                      n/a
(10)(c)  Delphi/SPO Business Relationship Agreement, incorporated by
         reference to Exhibit 10.3 to the Registration Statement        n/a
(10)(d)  U.S. Employee Matters Agreement between Delphi and General
         Motors, incorporated by reference to Exhibit 10.4 to the
         Registration Statement                                         n/a
(10)(e)  Agreement for the Allocation of United States Federal, State
         and Local Income Taxes between General Motors and Delphi,
         incorporated by reference to Exhibit 10.5 to the Registration
         Statement                                                      n/a
(10)(f)  Amended and Restated Agreement for the Allocation of United
         States Federal, State and Local Income Taxes between General
         Motors and Delphi, incorporated by reference to Exhibit 10.6
         to the Registration Statement                                  n/a
(10)(g)  IPO and Distribution Agreement between Delphi and
         General Motors                                                 n/a
(10)(h)  Registration Rights Agreement between Delphi and
         General Motors                                                 n/a
(10)(i)  Form of Change in Control Agreement between Delphi and certain
         of its officers and other executives, incorporated by reference
         to Exhibit 10.9 to the Registration Statement*                 n/a
(10)(j)  Delphi Automotive Systems Corporation Stock Incentive Plan,
         incorporated by reference to Exhibit 10.10 to the Registration
         Statement*                                                     n/a
(10)(k)  Delphi Automotive Systems Performance Achievement
         Plan, incorporated by reference to Exhibit 10.11 to the
         Registration Statement*                                        n/a
(10)(l)  Delphi Automotive Systems Corporation Annual Incentive Plan,
         incorporated by reference to Exhibit 10.12 to the Registration
         Statement*                                                     n/a
(10)(m)  Delphi Automotive Systems Deferred Compensation
         Plan for Non-Employee Directors, incorporated by reference to
         Exhibit 10.13 to the Registration Statement*                   n/a
(10)(n)  $3.5 Billion Competitive Advance and Revolving Credit Facility
         among Delphi and the lenders named therein, incorporated by
         reference to Exhibit 10.14 to the Registration Statement       n/a
```

100

```
Exhibit
Number          Exhibit Name                                    Page No.
------          ------------                                    --------
```

(10)(o) $1.5 Billion Competitive Advance and Revolving Credit Facility among Delphi and the lenders named therein, incorporated by reference to Exhibit 10.15 to the Registration Statement n/a

(10)(p) First Amendment to $3.5 Billion Competitive Advance and

```
         Revolving Credit Facility among Delphi and the lenders named
         therein, incorporated by reference to Exhibit 10.16 to the
         Registration Statement                                         n/a
(12)     Computation  of Ratios of Earnings to Fixed  Charges for the
         Years Ended December 31, 1998, 1997, 1996, 1995 and 1994.      n/a
(21)     Subsidiaries of Delphi                                         n/a
(23)     Consent of Deloitte & Touche LLP                               n/a
(27)     Financial data schedule (for SEC information only)             n/a
```

* Management contract or compensatory plan or arrangement.
(b) Reports on Form 8-K. None

101

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By:

```
                    /s/ J.T. Battenberg III
                    ---------------------------------
                    (J.T. Battenberg III, Chairman
                     of the Board of Directors, Chief
                     Executive Officer and President)
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed on March 15, 1999 by the following persons on behalf of the registrant and in the capacities indicated.

```
         Signature                            Title
         ---------                            -----

/s/ J.T. Battenberg III           Chairman of the Board, Chief Executive
-----------------------------------       Officer and President
(J.T. Battenberg III)                  (Principal Executive Officer)

/s/ Alan S. Dawes                      Chief Financial Officer
-----------------------------------       and Vice President
(Alan S. Dawes)                       (Principal Financial Officer)

/s/ Paul R. Free                  Chief Accounting Officer and Controller
-----------------------------------     (Principal Accounting Officer)
(Paul R. Free)

/s/ Thomas H. Wyman                         Director
-----------------------------------    (Lead Independent Director)
(Thomas H. Wyman)

/s/ Virgis W. Colbert                       Director
-----------------------------------
(Virgis W. Colbert)

/s/ J. Michael Losh                         Director
-----------------------------------
(J. Michael Losh)

/s/ Susan A. McLaughlin                     Director
-----------------------------------
(Susan A. McLaughlin)

/s/ Oscar De Paula Bernardes Neto           Director
-----------------------------------
(Oscar De Paula Bernardes Neto)

/s/ John D. Opie                            Director
-----------------------------------
(John D. Opie)
```

102

## SIGNATURES (concluded)

```
    /s/ Harry J. Pearce                      Director
    -----------------------------------
    (Harry J. Pearce)

    /s/ Roger S. Penske                      Director
    -----------------------------------
    (Roger S. Penske)

    /s/ John F. Smith Jr.                    Director
    -----------------------------------
    (John F. Smith Jr.)
```

103

**RIGHTS AGREEMENT**

by and between

**DELPHI AUTOMOTIVE SYSTEMS CORPORATION**

and

**BANKBOSTON, N.A.,**

**as Rights Agent**

Dated as of February 1, 1999

# TABLE OF CONTENTS

| Section | Page |
| ------- | ---- |
| 1.  Certain Definitions........................................................ | 1 |
| 2.  Appointment of Rights Agent............................................. | 8 |
| 3.  Issuance of Right Certificates......................................... | 8 |
| 4.  Form of Right Certificates.............................................. | 11 |
| 5.  Countersignature and Registration...................................... | 11 |
| 6.  Transfer, Split Up, Combination and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates.................................. | 12 |
| 7.  Exercise of Rights; Exercise Price; Expiration Date of Rights.................................................... | 13 |
| 8.  Cancellation and Destruction of Right Certificates..................... | 16 |
| 9.  Reservation and Availability of Shares of Preferred Stock......................................................... | 16 |
| 10.  Preferred Stock Record Date............................................ | 18 |
| 11.  Adjustment of Exercise Price or Number of Shares...................... | 18 |
| 12.  Certification of Adjusted Exercise Price or Number of Shares................................................... | 25 |
| 13.  Consolidation, Merger or Sale or Transfer of Assets or Earning Power............................................ | 26 |
| 14.  Fractional Rights and Fractional Shares............................... | 31 |
| 15.  Rights of Action........................................................ | 31 |
| 16.  Agreement of Right Holders............................................. | 32 |
| 17.  Right Certificate Holder Not Deemed a Stockholder..................... | 33 |
| 18.  Concerning the Rights Agent............................................ | 33 |

Section                                                                    Page
--------                                                                    ----

19.  Merger or Consolidation of, or Change in Name of,
        the Rights Agent........................................... 34

20.  Duties of Rights Agent........................................ 35

21.  Change of Rights Agent........................................ 37

22.  Issuance of New Right Certificates............................ 38

23.  Redemption.................................................... 39

24.  Notice of Proposed Actions.................................... 40

25.  Notices   .................................................... 41

26.  Supplements and Amendments.................................... 42

27.  Exchange  .................................................... 42

28.  Successors.................................................... 44

29.  Benefits of this Agreement.................................... 44

30.  Delaware Contract............................................. 44

31.  Counterparts.................................................. 44

32.  Descriptive Headings.......................................... 45

33.  Severability.................................................. 45

34.  Determinations and Actions by the Board of Directors ......... 45


Exhibit A     -    Summary of Rights

Exhibit B     -    Form of Right Certificate

Exhibit C     -    Form of Certificate of Designations of Series A
                   Junior Preferred Stock

**RIGHTS AGREEMENT**

Rights Agreement (this "AGREEMENT"), dated as of February 1, 1999, by and between Delphi Automotive Systems Corporation, a Delaware corporation (the "CORPORATION"), and BankBoston, N.A., a national banking association (the "RIGHTS AGENT").

## W I T N E S S E T H :

WHEREAS, on February 1, 1999, the IPO Committee of the Board of Directors (the "IPO COMMITTEE"), as specifically authorized by the Board of Directors of the Corporation, authorized the issuance, as a dividend, of one right (a "RIGHT") for each share of Common Stock, $0.01 par value per share, of the Corporation outstanding as of the time and date determined by the IPO Committee to be the record date of such distribution (the "RECORD DATE"), each such Right representing the right to purchase one one-hundredth of a share of Series A Junior Preferred Stock of the Corporation ("PREFERRED STOCK") having the rights and preferences set forth in the form of Certificate of Designations attached hereto as Exhibit C, which was authorized by the IPO Committee of the Board of Directors on February 1, 1999, upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, the Board of Directors of the Corporation further authorized the issuance of one Right (subject to adjustment) with respect to each share of Common Stock which may be issued between the Record Date and the earlier to occur of the Distribution Date, the Expiration Date or the Final Expiration Date (as such terms are hereinafter defined), including any shares of Common Stock of the Corporation issued in connection with the initial public offering of the Common Stock; provided, however, that Rights may be issued with respect to shares of Common Stock that shall become outstanding after the Distribution Date and prior to the Expiration Date in accordance with Section 22 hereof;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereby agree as follows:

Section 1. Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings provided by this Section 1, any capitalized term defined in this Section 1 and used in the following definitions having the meaning provided by this Section 1:

(a) "ACQUIRING PERSON" shall mean any Person who or which, together with all Affiliates and Associates of such Person, shall be the Beneficial Owner of 15% or more of the Voting Stock of the Corporation then outstanding; provided, however, that an Acquiring Person shall not include (i) an Exempt Person or any Affiliate or Associate of an Exempt Person or (ii) any Person who or which, together with all Affiliates and Associates of such Person, would be an Acquiring Person solely by reason of (A) being the Beneficial Owner of shares of Voting Stock of the Corporation, the Beneficial Ownership of which was acquired by such Person (together with all Affiliates and Associates of such Person) pursuant to any action or transaction or series of related actions or transactions approved by the Board of Directors before such Person (together with all Affiliates and Associates of such Person) otherwise became an Acquiring Person or (B) a reduction in the number of issued and outstanding shares of Voting Stock of the Corporation pursuant to a transaction or a series of related transactions approved by the Board of Directors of the Corporation; provided, further, that in the event a Person described in this clause (ii) does not become an Acquiring Person by reason of subclause (A) or (B) of this clause

(ii), such Person nonetheless shall become an Acquiring Person in the event such Person (together with all Affiliates and Associates of such Person) thereafter acquires Beneficial Ownership of an additional 1% of the Voting Stock of the Corporation, unless the acquisition of such additional Voting Stock results from one or more actions or transactions approved by the Board of Directors of the Corporation. Notwithstanding the foregoing, if the Board of Directors of the Corporation determines in good faith that a Person who would otherwise be an "Acquiring Person" as defined pursuant to the foregoing provisions of this paragraph (a) has become such inadvertently, and such Person divests as promptly as practicable (as determined in good faith by the Board of Directors) a sufficient number of shares of Common Stock so that such Person would no longer be an "Acquiring Person" as defined pursuant to the foregoing provisions of this paragraph (a), then such Person shall not be deemed an "Acquiring Person" for any purposes of this Agreement.

(b) "AFFILIATE" shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and

2

Regulations under the Securities Exchange Act of 1934, as amended ("EXCHANGE ACT"), as in effect on the date of this Agreement.

(c) "ASSOCIATE" of a Person shall mean (i) with respect to a corporation, any officer or director thereof or any Associate of any Subsidiary thereof, or any Beneficial Owner of 10% or more of any class of equity security thereof, (ii) with respect to an association, any officer or director thereof or any Associate of a Subsidiary thereof, (iii) with respect to a partnership, any general partner thereof or any limited partner thereof who is, directly or indirectly, the Beneficial Owner of a 10% ownership interest therein, and any Associate of any Subsidiary thereof, (iv) with respect to a limited liability company, any manager or managing member thereof and any Beneficial Owner of 10% or more or any class of membership interest therein or other equity security thereof, and any Associate of any Subsidiary thereof, (v) with respect to a business trust, any officer or trustee thereof or any Associate of any Subsidiary thereof, (vi) with respect to any other trust or an estate, any trustee, executor or similar fiduciary and any Person who has a 15% or greater interest as a beneficiary in the income from or principal of such trust or estate, (vii) with respect to a natural person, the parents and children thereof and any spouse or relative thereof, or any relative of such spouse, who has the same home as such person, and
(viii) any Affiliate of such Person.

(d) A person shall be deemed the "BENEFICIAL OWNER" of, or to "BENEFICIALLY OWN", any securities (and correlative terms shall have correlative meanings):

(i) which such Person or any of such Person's Affiliates or Associates beneficially owns, directly or indirectly, for purposes of Section 13(d) of the Exchange Act and Regulations 13D and 13G thereunder (or any comparable or successor law or regulation), in each case as in effect on the date hereof; or

(ii) which such Person or any of such Person's Affiliates or Associates has (A) the right to acquire (whether such right is exercisable immediately or only after the passage of time

or the fulfillment of a condition or both) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, other rights (other than the Rights), warrants or options, or otherwise; provided, however, that a Person shall not be deemed the "Beneficial Owner" of, or to "Beneficially Own", securities tendered pursuant to a tender or exchange offer made by such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange or (B) the right to vote, alone or in concert with others, pursuant to any agreement, arrangement or understanding (whether or not in writing); provided, however, that a Person shall not be deemed the "Beneficial Owner" of, or to "Beneficially Own", any securities if the agreement, arrangement or understanding to vote such security (1) arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made pursuant to, and in accordance with, the applicable rules and regulations under the Exchange Act and (2) is not at the time reportable by such Person on a Schedule 13D report under the Exchange Act (or any comparable or successor report), other than by reference to a proxy or consent solicitation being conducted by such Person; or

(iii) which are beneficially owned, directly or indirectly, by any other Person with which such Person or any of such Person's Affiliates or Associates has any agreement, arrangement or understanding (whether or not in writing) for the purpose of acquiring, holding, voting (except as described in clause (B) of subparagraph (ii) of this paragraph (d)) or disposing of any securities of the Corporation; provided, however, that for purposes of determining Beneficial Ownership of securities under this Agreement, officers and directors of the Corporation solely by reason of their status as such shall not constitute a group (notwithstanding that they may be Associates of one another or may be deemed to constitute a group for purposes of Section 13(d) the Exchange Act) and shall not be deemed to own shares owned by another officer or director of the Corporation.

4

Notwithstanding anything in this paragraph (d) to the contrary, (1) a Person engaged in the business of underwriting securities shall not be deemed the "Beneficial Owner" of, or to "Beneficially Own," any securities acquired or otherwise beneficially owned in good faith in a firm commitment underwriting until the expiration of forty days after the date of the sale of securities to the public pursuant to such firm commitment underwriting, and (2) no Person (and no Affiliate or Associate of any Person) shall at any time prior to the Divestiture Date be deemed the "Beneficial Owner" of, or to "Beneficially Own," any securities if such Person is the "Beneficial Owner" of, or "Beneficially Owns," such securities as a result of one or more agreements, arrangements or understandings with any GM Entity (whether or not the Corporation or any other Person is a party thereto) and if such Person would not be the "Beneficial Owner" of, or "Beneficially Own", such securities if such agreements, arrangements or understandings were not then in effect.

(e) "BUSINESS DAY" shall mean any day other than a Saturday, Sunday, or a day on which banking institutions in the State of New York or the Commonwealth of Massachusetts are authorized or obligated by law or executive order to close.

(f) "CLOSE OF BUSINESS" on any given date shall mean 5:00 P.M., Eastern time, on such date; provided, however, that if such date is not a Business Day it shall mean 5:00 P.M., Eastern time, on the next succeeding Business Day.

(g) "COMMON STOCK" when used with reference to the Corporation shall collectively mean the Common Stock, $0.01 par value, of the Corporation and any other common stock of the Corporation into or for which it is changed, converted or exchanged. "COMMON STOCK" when used with reference to any Person other than the Corporation which shall be organized in corporate form shall mean the capital stock or other equity security having of all classes of capital stock or equity securities of such corporation the greatest aggregate voting power in the election of directors. "COMMON STOCK" when used with reference to any Person other than the Corporation which shall not be organized in corporate form shall mean units of beneficial interest in the profits or losses of such Person or other equity

5

security of such Person having of all classes of equity securities of such Person the greatest aggregate voting power in the election of the directors, trustees, managers or other Persons performing like governance functions for such Person.

(h) "CORPORATION" shall have the meaning provided at the beginning hereof; provided, however, that "Corporation" shall also include any successors to the Corporation as provided by Section 28 hereof and shall mean a Principal Party as provided by Section 13(a) hereof.

(i) "DISTRIBUTION DATE" shall have the meaning set forth in Section 3(b) hereof.

(j) "DIVESTITURE DATE" shall mean the time at which GM shall first cease to Beneficially Own fifteen (15%) or more of the Voting Stock of the Corporation then outstanding.

(k) "EXCHANGE ACT" shall have the meaning set forth in
Section 1(b) hereof.

(l) "EXEMPT PERSON" shall mean (i) the Corporation,
(ii) any Subsidiary of the Corporation, (iii) any employee benefit plan or employee stock plan of the Corporation or any Subsidiary of the Corporation, or any trust or other entity organized, appointed, established or holding Voting Stock for or pursuant to the terms of any such plan, or (iv) prior to the Divestiture Date, any GM Entity.

(m) "EXERCISE PRICE" shall have the meaning set forth in Section 4 hereof.

(n) "EXPIRATION DATE" shall have the meaning set forth in Section 7(a) hereof.

(o) "FAIR MARKET VALUE" of any property shall mean the fair market value of such property as determined in accordance with Section 11 (b) hereof.

(p) "FINAL EXPIRATION DATE" shall have the meaning set forth in Section 7(a) hereof.

6

(q) "GM" shall mean General Motors Corporation, a Delaware corporation and any successor company thereto by merger, consolidation or a like transaction.

(r) "GM ENTITY" shall mean GM or any Affiliate or Associate of GM.

(s) "PERSON" shall mean any individual, company, firm, corporation or other entity.

(t) "PRINCIPAL PARTY" shall have the meaning set forth in Section 13(b) hereof.

(u) "REDEMPTION PRICE" shall have the meaning set forth in Section 23(a) hereof.

(v) "RIGHT CERTIFICATE" shall have the meaning set forth in Section 3(d) hereof.

(w) "STOCK ACQUISITION DATE" shall mean the first date on which there shall be a public announcement by the Corporation or an Acquiring Person that an Acquiring Person has become such (which, for purposes of this definition, shall include, without limitation, a report filed pursuant to Section 13(d) of the Exchange Act) or such earlier date as a majority of the Board of Directors of the Corporation shall become aware of the existence of an Acquiring Person.

(x) "SUBSIDIARY" of a Person shall mean any corporation or other entity of which securities or other ownership interests having voting power sufficient to elect a majority of the board of directors or other persons performing similar functions are beneficially owned, directly or indirectly, by such Person or by any corporation or other entity that is otherwise controlled by such Person.

(y) "SUMMARY OF RIGHTS" shall have the meaning set forth in Section 3(a) hereof.

(z) "TRADING DAY" shall have the meaning set forth in Section 11(b) hereof.

(aa) "TRANSFER TAX" shall mean any tax or charge, including any documentary stamp tax, imposed or collected by any governmental or regulatory authority in respect of any transfer of any security, instrument or

7

right, including the Rights, shares of the Common Stock and shares of the Preferred Stock.

(bb) "VOTING STOCK" shall mean (i) the Common Stock of the Corporation and (ii) any other shares of capital stock of the Corporation entitled to vote generally in the election of directors or entitled generally to vote together with the Common Stock in respect of a merger, consolidation, sale of all or substantially all of the Corporation's assets, liquidation, dissolution or winding up which holders of Common Stock are entitled to vote on. For purposes of this Agreement, a stated percentage of the Voting Stock shall mean a number of shares of the Voting Stock as shall equal in voting power that stated percentage of the total voting power of the then outstanding shares of Voting Stock in the election of a majority of the Board of Directors of the Corporation or in respect of a merger, consolidation, sale of all or substantially all of the Corporation's assets, liquidation, dissolution or winding up.

Any determination required to be made by the Board of Directors of the Corporation for purposes of applying the definitions contained in this Section 1 shall be made by a majority of the Board of Directors in its good faith judgment, which determination shall be binding on the Rights Agent and the holders of the Rights.

Section 2. Appointment of Rights Agent. The Corporation hereby appoints the Rights Agent to act as agent for the Corporation and the holders of the Rights (who, in accordance with Section 3 hereof, shall prior to the Distribution Date be the holders of Common Stock) in accordance with the terms and conditions hereof, and the Rights Agent hereby accepts such appointment. The Corporation may from time to time appoint such Co-Rights Agents as it may deem necessary or desirable, upon ten (10) days prior written notice to the Rights Agent. The Rights Agent shall have no duty to supervise, and shall in no event be liable for, the acts or omissions of any such co-Rights Agent.

Section 3. Issuance of Right Certificates.

(a) On the Record Date (or as soon as practicable thereafter), the Corporation or the Rights Agent shall send a copy of a Summary of Rights, in substantially the form attached hereto as Exhibit A (the "SUMMARY OF RIGHTS"), by first class mail, postage prepaid, to each record holder of the Common Stock

8

as of the Record Date, at the address of such holder shown on the records of the Corporation.

(b) Until the close of business on the day which is the earlier of (i) the tenth day after the Stock Acquisition Date or (ii) the tenth Business Day (or such later date as may be determined by action of the Board of Directors prior to such time as any Person becomes an Acquiring Person) after the date of the commencement by any Person (other than an Exempt Person) of, or the first public announcement of the intent of any Person (other than an Exempt Person) to commence, a tender or exchange offer upon the successful consummation of which such Person would be the Beneficial Owner of 15% or more of the then outstanding shares of Voting Stock of the Corporation (including any such date which is after the date of this Agreement and prior to the issuance of the Rights; the earlier of such dates being herein referred to as the "DISTRIBUTION DATE"), (x) the Rights shall be evidenced by the certificates for Common Stock (or in the case of uncertificated shares of Common Stock, by the book-entry account that evidences record ownership of such shares) registered in the names of the holders of Common Stock (together with, in the case of certificates for Common Stock outstanding as of the Record Date, the Summary of Rights) and not by separate Right certificates and the record holders of such certificates (or such book-entry accounts) for Common Stock shall be the record holders of the Rights represented thereby and (y) each Right shall be transferable only simultaneously and together with the transfer of a share of Common Stock (subject to adjustment as hereinafter provided). Until the Distribution Date (or, if earlier, the Expiration Date or Final Expiration Date), the surrender for transfer of any certificate for Common Stock (or the effectuation of a book entry transfer of shares of Common Stock) shall constitute the surrender for transfer of the Right or Rights associated with the Common Stock evidenced thereby, whether or not accompanied by a copy of the Summary of Rights.

(c) Rights shall be issued in respect of all shares of Common Stock that become outstanding after the Record Date but prior to the earliest of the Distribution Date, the Expiration Date or the Final Expiration Date. Certificates for Common Stock (including, without limitation, certificates issued upon original issuance, disposition from the Corporation's treasury or transfer or exchange of Common Stock) after the Record Date but prior to the earliest of the Distribution Date, the Expiration Date, or the Final Expiration Date shall have impressed, printed, written or stamped thereon or otherwise affixed thereto the following legend:

9

This certificate also evidences and entitles the holder hereof to the same number of Rights (subject to adjustment) as the number of shares of Common Stock represented by this certificate, such Rights being on the terms provided under the Rights Agreement between Delphi Automotive Systems Corporation and BankBoston, N.A. (the "Rights Agent"), dated as of February 1, 1999, as it may be amended from time to time (the "Agreement"), the terms of which are incorporated herein by reference and a copy of which is on file at the principal executive offices of Delphi Automotive Systems Corporation. Under certain circumstances, as set forth in the Agreement, such Rights shall be evidenced by separate certificates and shall no longer be evidenced by this certificate. Delphi Automotive Systems Corporation shall mail to the registered holder of this certificate a copy of the Agreement without charge within five days after receipt of a written request therefor. As provided in Section 7(e) of the Agreement, Rights issued to or Beneficially Owned by Acquiring Persons or their Affiliates or Associates (as such terms are defined in the Agreement) or any subsequent holder of such Rights shall be null and void and may not be exercised by or transferred to any Person.

With respect to such certificates containing the foregoing legend, until the Distribution Date the Rights associated with the Common Stock represented by such certificates shall be evidenced by such certificates alone, and the surrender for transfer of any such certificate, except as otherwise provided herein, shall also constitute the transfer of the Rights associated with the Common Stock represented thereby. In the event that the Corporation purchases or otherwise acquires any Common Stock after the Record Date but prior to the Distribution Date, any Rights associated with such Common Stock shall be deemed canceled and retired so that the Corporation shall not be entitled to exercise any Rights associated with the Common Stock which are no longer outstanding. Notwithstanding this paragraph (c), the omission of a legend shall not affect the enforceability of any part of this Agreement or the rights of any holder of the Rights.

(d) As soon as practicable after the Distribution Date, the Corporation will prepare and execute, the Rights Agent will countersign, and the Corporation will send or cause to be sent (and the Rights Agent will, if requested, send), by first class mail, postage prepaid, to each record holder of the Common

10

Stock as of the close of business on the Distribution Date, as shown by the records of the Corporation, at the address of such holder shown on such records, a certificate in the form provided by Section 4 hereof (a "RIGHT CERTIFICATE"), evidencing one Right (subject to adjustment as provided herein) for each share of Common Stock so held. As of and after the Distribution Date, the Rights shall be evidenced solely by Right Certificates and may be transferred by the transfer of the Right Certificate as permitted hereby, separately and apart from any transfer of one or more shares of Common Stock.

Section 4. Form of Right Certificates. The Right Certificates (and the forms of election to purchase shares, certificate and assignment to be printed on the reverse thereof), when, as and if issued, shall be substantially in the form set forth in Exhibit B hereto and may have such marks of identification or designation and such legends, summaries or endorsements printed thereon as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any stock exchange on which the Common Stock or the Rights may from time to time be listed or as the Corporation may deem appropriate to conform to usage or otherwise and as are not inconsistent with the provisions of this Agreement. Subject to the provisions of Section 22 hereof, Right Certificates evidencing Rights whenever issued, (i) shall be dated as of the date of issuance of the Rights they represent and (ii) subject to adjustment from time to time as provided herein, on their face shall entitle the holders thereof to purchase such number of one one-hundredths of a share (including fractional shares which are integral multiples of one-hundredth of a share) of Preferred Stock as shall be set forth thereon at the price per one one-hundredth of a share of Preferred Stock payable upon exercise of a Right provided by Section 7(b) hereof, as the same may from time to time be adjusted as provided herein (the "EXERCISE PRICE").

Section 5. Countersignature and Registration.

(a) Each Right Certificate shall be executed on behalf of the Corporation by its Chairman of the Board, President or any Vice President, either manually or by facsimile signature, and have affixed thereto the Corporation's seal or a facsimile thereof which shall be attested by the Secretary or an Assistant Secretary of the Corporation, either manually or by facsimile signature. Each Right Certificate shall be countersigned by the Rights Agent either manually or by facsimile signature and shall not be valid for any purpose unless so countersigned. In case any officer of the Corporation who shall have signed any Right

11

Certificate shall cease to be such officer of the Corporation before countersignature by the Rights Agent and issuance and delivery of the certificate by the Corporation, such Right Certificate, nevertheless may be countersigned by the Rights Agent and issued and delivered with the same force and effect as though the person who signed such Right Certificates had not ceased to be such officer of the Corporation. Any Right Certificate may be signed on behalf of the Corporation by any person who, on the date of the execution of such Right Certificate, shall be a proper officer of the Corporation to sign such Right Certificate, although at the date of the execution of this Agreement any such person was not such an officer.

(b) Following the Distribution Date, the Rights Agent will keep or cause to be kept, at its principal office or one or more offices designated as the appropriate place for surrender of Right Certificates upon exercise or transfer, and in such other locations as may be required by law, books for registration and transfer of the Right Certificates issued hereunder. Such books shall show the names and addresses of the respective holders of the Right Certificates, the number of Rights evidenced on its face by each of the Right Certificates and the date of each of the Right Certificates.

Section 6. Transfer, Split Up, Combination and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates.

(a) Subject to the provisions of Section 7(e), 7(f) and 14 hereof, at any time after the Close of Business on the Distribution Date, and at or prior to the Close of Business on the earlier of the Expiration Date or the Final Expiration Date, any Right Certificate, may be (i) transferred or (ii) split up, combined or exchanged for one or more other Right Certificates, entitling the registered holder to purchase a like number of one one-hundredths of a share of Preferred Stock as the Right Certificate or Rights Certificates surrendered then entitled such holder to purchase. Any registered holder desiring to transfer, split up, combine or exchange any Right Certificate shall surrender the Right Certificate at the office of the Rights Agent designated for the surrender of Right Certificates with the form of certificate and assignment on the reverse side thereof duly endorsed (or enclose with such Right Certificate a written instrument of transfer in form satisfactory to the Corporation and the Rights Agent), duly executed by the registered holder thereof or his attorney duly authorized in writing, and with such signature duly guaranteed. Any registered holder desiring to split up, combine or exchange any Right Certificate shall make

12

such request in writing delivered to the Rights Agent, and shall surrender the Right Certificate to be split up, combined or exchanged at the office of the Rights Agent designated therefor. Thereupon, the Rights Agent shall countersign and deliver to the person entitled thereto a Right Certificate or Right Certificates, as the case may be, as so requested. The Corporation may require payment of a sum sufficient to cover any Transfer Tax that may be imposed in connection with any transfer, split up, combination or exchange of any Right Certificates.

(b) Subject to the provisions of Section 7(e), 7(f) and 14 hereof, at any time after the Distribution Date and prior to the Expiration Date, upon receipt by the Corporation and the Rights Agent of evidence reasonably satisfactory to them of the loss, theft, destruction or mutilation of a Right Certificate, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to them and, if requested by the Corporation, reimbursement to the Corporation and the Rights Agent of all reasonable expenses incidental thereto, or upon surrender to the Rights Agent and cancellation of the Right Certificate if mutilated, the Corporation shall cause a new Right Certificate of like tenor to be issued and delivered to the registered owner in lieu of the Right Certificate so lost, stolen, destroyed or mutilated.

Section 7. Exercise of Rights; Exercise Price; Expira- tion Date of Rights.

(a) The Rights shall not be exercisable until, and shall become exercisable on, the Distribution Date (unless otherwise provided herein, including, without limitation, the restrictions on exercisability set forth in
Section 7(e) and 27(b) hereof). Except as otherwise provided herein, the Rights may be exercised, in whole or in part, at any time commencing with the Distribution Date upon surrender of the Right Certificate, with the form of election to purchase and certificate on the reverse side thereof duly executed (with signatures duly guaranteed), to the Rights Agent at the principal office of the Rights Agent at 150 Royall Street, Mail Stop 45-02-62, Camden, Massachusetts 02021 (as such address may from time to time be changed), together with payment of the Exercise Price for each Right exercised (as the same may have been adjusted as hereinafter provided), at or prior to the Close of Business on the earlier of (i) January 31, 2009 (the "FINAL EXPIRATION DATE") or
(ii) the date on which the Rights are redeemed as provided in Section 23 hereof or the date on which the Rights are exchanged as provided in Section 27 hereof (such earlier date being herein referred to as the "EXPIRATION DATE").

13

(b) The Exercise Price shall initially be $65 for each one one-hundredth (1/100) of a share of Preferred Stock issued pursuant to the exercise of a Right. The Exercise Price and the number of one one-hundredths of a share of Preferred Stock or other securities or property to be acquired upon exercise of a Right shall be subject to adjustment from time to time as provided in Sections 11 and 13 hereof. The Exercise Price shall be payable in lawful money of the United States of America, in accordance with paragraph (c) below.

(c) Except as otherwise provided herein, upon receipt of a Right Certificate representing exercisable Rights with the form of election to purchase and certificate duly executed, accompanied by payment by certified check, cashier's check, bank draft or money order payable to the Corporation or the Rights Agent of the Exercise Price for the shares of Preferred Stock to be purchased and an amount equal to any applicable Transfer Tax required to be paid by the holder of the Right Certificate in accordance with Section 9(e) hereof, the Rights Agent shall thereupon promptly (i) requisition from any transfer agent of the Preferred Stock of the Corporation one or more certificates representing the number of shares of Preferred Stock to be so purchased, and the Corporation hereby authorizes and directs such transfer agent to comply with all such requests, (ii) as provided in Section 14(b), at the election of the Corporation, cause depositary receipts to be issued in lieu of fractional shares of Preferred Stock, (iii) if the election provided for in the immediately preceding clause (ii) has not been made, requisition from the Corporation the amount of cash to be paid in lieu of the issuance of fractional shares (other than fractions that are integral multiples of one one-hundredth of a share) in accordance with Section 14(b) hereof, (iv) after receipt of such Preferred Stock certificates and, if applicable, depositary receipts, cause the same to be delivered to or upon the order of the registered holder of such Right Certificate, registered in such name or names as may be designated by such holder and (v) when appropriate, after receipt, promptly deliver such cash to or upon the order of the registered holder of such Right Certificate; provided, however, that in the case of a purchase of securities other than Preferred Stock, pursuant to Section 13 hereof, the Rights Agent shall promptly take the appropriate actions corresponding in such case to that referred to in the foregoing clauses (i) through (v) of this Section 7(c). Notwithstanding the foregoing provisions of this Section 7(c), the Corporation may suspend the issuance of shares of Preferred Stock and other securities upon exercise of a Right for a reasonable period, not in excess of 90 days, during which the Corporation seeks to register under the Securities Act of 1933, as amended (the

14

"ACT"), and any applicable securities law of any other jurisdiction, the shares of Preferred Stock or other securities to be issued pursuant to the Rights; provided, however, that nothing contained in this Section 7(c) shall relieve the Corporation of its obligations under Section 9(d) hereof. Upon any such suspension, the Corporation shall issue a public announcement stating that the exercisability of the Rights has been temporarily suspended, as well as a public announcement at such time as the suspension is no longer in effect.

(d) In case the registered holder of any Right Certificate shall exercise less than all the Rights evidenced thereby, a new Right Certificate evidencing Rights equivalent to the Rights remaining unexercised shall be issued by the Rights Agent to the registered holder of such Right Certificate or his assign, subject to the provisions of Section 14(b) hereof.

(e) Notwithstanding any provision of this Agreement to the contrary, from and after the time (the "INVALIDATION TIME") when any Person first becomes an Acquiring Person, any Rights that are Beneficially Owned by (x) such Acquiring Person (or any Associate or Affiliate of such Acquiring Person),
(y) a transferee of such Acquiring Person (or any such Associate or Affiliate) who becomes a transferee after the invalidation time or (z) a transferee of such Acquiring Person (or any such Associate or Affiliate) who becomes a transferee prior to or concurrently with the invalidation time pursuant to either (I) a transfer from the Acquiring Person (or any such Associate or Affiliate) to holders of its equity securities or to any Person with whom it has any continuing agreement, arrangement or understanding regarding the transferred Rights or (II) a transfer which the Board of Directors has determined is part of a plan, arrangement or understanding which has the purpose or effect of avoiding the provisions of this Section 7(e), and subsequent transferees of such Persons referred to in clause (y) and (z) above, shall be null and void without any further action and any holder of such Rights shall thereafter have no rights whatsoever with respect to such Rights under any provision of this Agreement. The Corporation shall use all reasonable efforts to ensure that the provisions of this Section 7(e) are complied with, but shall have no liability to any holder of Right Certificates or any other Person as a result of its failure to make any determination with respect to an Acquiring Person or its Affiliates, Associates or transferees hereunder. No Right Certificate shall be issued pursuant to Section 3 hereof that represents Rights beneficially owned by an Acquiring Person or any Affiliate or Associate thereof whose Rights would be null and void pursuant to the provisions of this Section 7(e); no Right

15

Certificate shall be issued at any time upon the transfer of any Rights to an Acquiring Person (or an Affiliate or Associate of such Acquiring Person) whose Rights would be null and void pursuant to the provisions of this Section 7(e) or any Associate or Affiliate thereof or to any nominee of such Acquiring Person, Associate or Affiliate; and any Right Certificate delivered to the Rights Agent for transfer to an Acquiring Person (or an Associate or Affiliate of such Acquiring Person) whose Rights would be void pursuant to the provisions of this Section 7(e) shall be cancelled.

(f) Notwithstanding anything in this Agreement to the contrary, neither the Rights Agent nor the Corporation shall be obligated to undertake any action with respect to a registered holder upon the occurrence of any purported exercise as set forth in this Section 7 unless such registered holder shall have (i) completed and signed the certificate following the form of election to purchase set forth on the reverse side of the Right Certificate surrendered for such exercise and (ii) provided such additional evidence of the identity of the Beneficial Owner (or former Beneficial Owner) or Affiliates or Associates thereof as the Corporation shall reasonably request.

Section 8. Cancellation and Destruction of Right Certificates. All Right Certificates surrendered for the purpose of exercise, transfer, split up, combination or exchange shall, if surrendered to the Corporation or to any of its agents, be delivered to the Rights Agent for cancellation or in cancelled form, or, if surrendered to the Rights Agent, shall be cancelled by it, and no Right Certificates shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Agreement. The Corporation shall deliver to the Rights Agent for cancellation and retirement, and the Rights Agent shall cancel and retire, any Right Certificate purchased or acquired by the Corporation otherwise than upon the exercise thereof. The Rights Agent shall deliver all cancelled Right Certificates to the Corporation, or shall, at the written request of the Corporation, destroy such cancelled Right Certificates, and in such case shall deliver a certificate of destruction thereof to the Corporation.

Section 9. Reservation and Availability of Shares of Preferred Stock.

(a) The Corporation covenants and agrees that it will cause to be reserved and kept available out of the authorized and unissued shares of preferred stock, $0.10 par value per share, of the Corporation or out of authorized and issued shares of Preferred Stock held in its treasury, such number of shares of

16

Preferred Stock as will from time to time be sufficient to permit the exercise in full of all outstanding Rights.

(b) The Corporation shall use its best efforts to cause, from and after such time as the Rights become exercisable, all shares of Preferred Stock issued or reserved for issuance in accordance with this Agreement to be listed, upon official notice of issuance, upon the principal national securities exchange, if any, upon which the Common Stock is listed or, if the principal market for the Common Stock is not on any national securities exchange, to be eligible for quotation in the National Association of Securities Dealers' Automated Quotation System or any successor thereto or other comparable quotation system.

(c) The Corporation covenants and agrees that it will take all such action as may be necessary to ensure that all shares of Preferred Stock delivered upon exercise of Rights shall, at the time of delivery of the certificates for such shares (subject to payment of the Exercise Price in respect thereof), be duly and validly authorized and issued and fully paid and nonassessable shares.

(d) The Corporation shall use its best efforts to (i) file, as soon as practicable following the occurrence of the event described in Section 11(a)(ii), or as soon as is required by law following the Distribution Date, as the case may be, a registration statement under the Act, with respect to the shares of Preferred Stock purchasable upon exercise of the Rights on an appropriate form, (ii) cause such registration statement to become effective as soon as practicable after such filing, and (iii) cause such registration statement to remain effective (with a prospectus at all times meeting the requirements of the Act) until the earlier of (a) the date as of which the Rights are no longer exercisable for Preferred Stock and (b) the earlier of the Expiration Date and the Final Expiration Date. The Corporation may temporarily suspend, for a period of time not to exceed ninety days, the issuance of shares of Preferred Stock upon exercise of a Right in order to prepare and file a registration statement under the Act and permit it to become effective. The Corporation will also take such action as may be appropriate under, or to ensure compliance with, the securities or "blue sky" laws of the various states in connection with the exercisability of the Rights. Notwithstanding any provision of this Agreement to the contrary, the Rights shall not be exercisable in any jurisdiction unless the requisite qualification in such jurisdiction shall have been obtained and until a registration statement under the Act (if required) shall have been declared effective.

17

(e) The Corporation covenants and agrees that it will pay when due and payable any and all federal and state Transfer Taxes which may be payable in respect of the issuance or delivery of the Right Certificates or of any shares of Preferred Stock issued or delivered upon the exercise of Rights. The Corporation shall not, however, be required to pay any Transfer Tax which may be payable in respect of any transfer or delivery of a Right Certificate to a Person other than, or the issuance or delivery of certificates for Preferred Stock upon exercise of Rights in a name other than that of, the registered holder of the Right Certificate, and the Corporation shall not be required to issue or deliver a Right Certificate or certificate for Preferred Stock to a Person other than such registered holder until any such Transfer Tax shall have been paid (any such Transfer Tax being payable by the holder of such Right Certificate at the time of surrender) or until it has been established to the Corporation's satisfaction that no such Transfer Tax is due.

(f) The requirements of this Section 9 shall apply to shares of Common Stock of the Corporation if the Corporation has elected in accordance with Section 11(a)(iii) hereof to substitute shares of Common Stock for shares of Preferred Stock that otherwise may be purchased upon the exercise of Rights.

Section 10. Preferred Stock Record Date. Each Person in whose name any certificate for shares of Preferred Stock is issued upon the exercise of Rights shall for all purposes be deemed to have become the holder of record of the Preferred Stock represented thereby on, and such certificate shall be dated as of, the date upon which the Right Certificate evidencing such Rights was duly surrendered and payment of the Exercise Price (and any applicable Transfer Taxes) was made; provided, however, that, if the date of such surrender and payment is a date upon which the Preferred Stock transfer books of the Corporation are closed, such Person shall be deemed to have become the record holder of such shares on, and such certificate shall be dated as of, the next succeeding Business Day on which the Preferred Stock transfer books of the Corporation are open.

Section 11. Adjustment of Exercise Price or Number of Shares. The Exercise Price and the number of shares of Preferred Stock which may be purchased upon exercise of a Right are subject to adjustment from time to time as provided in this Section 11.

(a) (i) In the event the Corporation shall at any time after the date of this Agreement (A) declare or pay any dividend on Common Stock payable in shares of Common Stock, (B) subdivide or split the outstanding

18

(C) combine or consolidate the outstanding shares of Common Stock into a smaller number of shares or effect a reverse split of the outstanding shares of Common Stock, then and in each such event the number of one one-hundredths of a share of Preferred Stock issuable upon the Exercise of a Right after the record date for such event (if one shall have been established or, if not, after the date of such event) shall be the number of one one-hundredths of a share of Preferred Stock issuable immediately prior to such event multiplied by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately prior to such event and the denominator of which is the number of shares of Common Stock outstanding immediately after such event and the Exercise Price to be in effect after the record date for such event (if one shall have been established or, if not, after the date of such event) shall be determined by multiplying the Exercise Price in effect immediately prior to such event by such fraction. If an event occurs which would require an adjustment under both this Section 11(a)(i) and Section 11(a)(ii) hereof, the adjustment provided for in this Section 11(a)(i) shall be in addition to, and shall be made prior to, any adjustment required pursuant to Section 11(a)(ii).

(ii) Subject to Section 27 of this Agreement, in the event that any Person shall become an Acquiring Person, then, except as otherwise provided in this Section 11, each holder of a Right, except as provided in Section 7(e) hereof, shall thereafter have the right to receive upon exercise of such Right in accordance with the terms of this Agreement and payment of the Exercise Price, such number of one one-hundredths of a share of Preferred Stock as shall equal the result obtained by (1) multiplying the then current Exercise Price by the number of one one-hundredths of a share of Preferred Stock for which a Right is then exercisable and dividing the product by (2) 50% of the per share Fair Market Value of the Preferred Stock (determined pursuant to Section 11(b) hereof) on the date of such occurrence.

(iii) In the event that the Corporation does not have available sufficient authorized but unissued Preferred Stock to permit the exercise in full of the Rights in accordance with the foregoing subparagraph

(ii), the Corporation shall take all such action as may be necessary to authorize and reserve for issuance such number of additional shares of Preferred Stock as may from time to time be required to be issued upon the exercise in full of all Rights from time to time outstanding and, if necessary, shall use its best efforts to obtain stockholder approval thereof. In lieu of issuing shares of Preferred Stock in accordance with the foregoing subparagraph (ii), the Corporation may, if the Board of Directors determines that such action is necessary or appropriate and not contrary to the interests of holders of Rights, elect to issue or pay, upon the exercise of the Rights, cash, property, shares of Preferred or Common Stock, or any combination thereof, having an aggregate Fair Market Value equal to the Fair Market Value of the shares of Preferred Stock which otherwise would have been issuable pursuant to Section

11(a)(ii), which Fair Market Value shall be determined by an investment banking firm selected by the Board of Directors. For purposes of the preceding sentence, the Fair Market Value of the Preferred Stock shall be as determined pursuant to Section 11(b). Subject to Section 23 hereof, any such election by the Board of Directors of the Corporation must be made and publicly announced within thirty (30) days after the date on which the event described in Section 11(a)(ii) occurs.

(b) For the purpose of this Agreement, the "FAIR MARKET VALUE" of any share of Preferred Stock, Common Stock or any other stock or any Right or other security or any other property on any date shall be determined as provided in this Section 11(b). In the case of a publicly traded stock or other security, the Fair Market Value on any date shall be deemed to be the average of the daily closing prices per share of such stock or per unit of such other security for the 30 consecutive Trading Days (as such term is hereinafter defined) immediately prior to such date; provided, however, that in the event that the Fair Market Value per share of any share of Common Stock is determined during a period which includes any date that is within 30 Trading Days after (i) the ex-dividend date for a dividend or distribution on such stock payable in shares of Common Stock or securities convertible into shares of Common Stock, or (ii) the effective date of any subdivision, split, combination, consolidation, reverse stock split or reclassification of such stock, then, and in each such case, the Fair Market Value shall be appropriately adjusted by the Board of Directors of the Corporation to take into account ex-dividend or post-effective date trading. The

20

closing price for any day shall be the last sale price, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way (in either case, as reported in the applicable transaction reporting system with respect to securities listed or admitted to trading on the New York Stock Exchange), or, if the securities are not listed or admitted to trading on the New York Stock Exchange, as reported in the applicable transaction reporting system with respect to securities listed on the principal national securities exchange on which such security is listed or admitted to trading; or, if not listed or admitted to trading on any national securities exchange, the last quoted price (or, if not so quoted, the average of the high bid and low asked prices) in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ") or such other system then in use; or, if no bids for such security are quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in such security selected by the Board of Directors of the Corporation. The term "TRADING DAY" shall mean a day on which the principal national securities exchange on which such security is listed or admitted to trading is open for the transaction of business or, if such security is not listed or admitted to trading on any national securities exchange, a Business Day. If a security is not publicly held or not so listed or traded, "Fair Market Value" shall mean the fair value per share of stock or per other unit of such other security, as determined by an independent investment banking firm experienced in the valuation of securities selected in good faith by the Board of Directors of the Corporation, or, if no such investment banking firm is, in the good faith judgment of the Board of Directors, available to make such determination, in good faith by the Board of Directors of the Corporation; provided, however, that for purposes of making the adjustment provided for by Section 11(a)(ii) hereof, the Fair Market Value of a share of Preferred Stock shall not be less than 100% of the product of the Fair Market Value of a share of Common Stock multiplied by the higher of the then Dividend Multiple or Vote Multiple applicable to the Preferred Stock (as defined in the Certificate of Designations relating to the Preferred Stock) and shall not exceed 105% of the product of the then Fair Market Value of a share of Common Stock multiplied by the higher of the then Dividend Multiple or Vote Multiple applicable to the Preferred Stock. In the case of property other than securities, the "Fair Market Value" thereof shall be determined in good faith by the Board of Directors of the Corporation based upon such appraisals or valuation reports of such independent experts as the Board of Directors of the Corporation shall in good faith determine to be

21

appropriate in accordance with good business practices and the interests of the holders of Rights. Any such determination of Fair Market Value shall be described in a statement filed with the Rights Agent and shall be binding upon the Rights Agent.

(c) In case the Corporation shall fix a record date for the issuance of rights, options or warrants to all holders of Common Stock entitling them (for a period expiring within 45 calendar days after such record date) to subscribe for or purchase Common Stock or securities convertible into Common Stock at a price per share (or having a conversion price per share, if a security convertible into Common Stock) less than the then current per share Fair Market Value of the Common Stock on such record date, the Exercise Price to be in effect after such record date shall be determined by multiplying the Exercise Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding on such record date plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so to be offered (and/or the aggregate initial conversion price of the convertible securities so to be offered) would purchase at such current Fair Market Value and the denominator of which shall be the number of shares of Common Stock outstanding on such record date plus the number of shares of Common Stock which the aggregate offering price of the convertible securities so to be offered are initially convertible). In case such subscription price may be paid in a consideration part or all of which shall be in a form other than cash, the value of such consideration shall be as determined in good faith by the Board of Directors of the Corporation, whose determination shall be described in a statement filed with the Rights Agent. Shares of Common Stock owned by or held for the account of the Corporation shall not be deemed outstanding for the purpose of any such computation. Such adjustment shall be made successively whenever such a record date is fixed and in the event that such rights, options or warrants are not so issued, the Exercise Price shall be adjusted to be the Exercise Price which would then be in effect if such record date had not been fixed.

(d) In case the Corporation shall fix a record date which is subsequent to the 270th day after the initial issuance of Rights for the making of a distribution to all holders of the Common Stock (including any such distribution made in connection with a consolidation or merger in which the Corporation is the continuing or surviving corporation) of evidences of indebtedness, cash (other than a regular quarterly cash dividend not in excess of 150% of the previous regular quarterly cash

22

dividend out of the earnings or retained earnings of the Corporation) assets (other than a dividend payable in shares of Common Stock) or subscription rights or warrants (excluding those referred to in Section 11(c) hereof), the Exercise Price to be in effect after such record date shall be determined by multiplying the Exercise Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the Fair Market Value of the shares of Common Stock on such record date, less the fair market value (as determined in good faith by the Board of Directors of the Corporation, whose determination shall be described in a statement filed with the Rights Agent) of the portion of the assets or evidences of indebtedness so to be distributed or of such subscription rights or warrants applicable to one share of Common Stock and the denominator of which shall be such current Fair Market Value of the shares of Common Stock. Such adjustment shall be made successively whenever such a record date is fixed and in the event that such distribution is not so made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such record date had not been fixed.

(e) Unless the Corporation shall have exercised its election as provided in Section 11(f), upon each adjustment of the Exercise Price as a result of the calculations made in Section 11(c) and (d), each Right outstanding immediately prior to the making of such adjustment shall thereafter evidence the right to purchase, at the adjusted Exercise Price, that number of one one-hundredths of a share of Preferred Stock obtained by (i) multiplying (x) the number of one one-hundredths of a share of Preferred Stock that could be purchased upon exercise of a Right immediately prior to the adjustment pursuant to this Section 11(e) by (y) the Exercise Price in effect immediately prior to such adjustment of the Exercise Price and (ii) dividing the product so obtained by the Exercise Price in effect immediately after such adjustment of the Exercise Price.

(f) The Corporation may elect on or after the date of any adjustment of the Exercise Price pursuant to Section 11(c) and 11(d) to adjust the number of Rights in substitution for any adjustment pursuant to Section 11(e) in the number of one one-hundredths of a share of Preferred Stock purchasable upon the exercise of a Right. Each of the Rights outstanding after such adjustment of the number of Rights shall be exercisable for the number of one one-hundredths of a share of Preferred Stock for which a Right was exercisable immediately prior to such adjustment. Each Right held of record prior to such adjustment of the number of Rights shall become that number of Rights obtained by dividing the Exercise Price in effect immediately

23

prior to adjustment of the Exercise Price by the Exercise Price in effect immediately after adjustment of the Exercise Price. The Corporation shall make a public announcement of its election to adjust the number of Rights, indicating the record date for the adjustment, and, if known at the time, the amount of the adjustment to be made. This record date may be the date on which the Exercise Price is adjusted or any day thereafter, but, if the Right Certificates have been issued, shall be at least 10 days later than the date of the public announcement. If the Right Certificates have been issued, upon each adjustment of the number of Rights pursuant to this Section 11(e), the Corporation shall, as promptly as practicable, cause to be distributed to holders of record of Right Certificates on such record date Right Certificates evidencing, subject to Section 14 hereof, the additional Rights, if any, to which such holders shall be entitled as a result of such adjustment, or, at the option of the Corporation, shall cause to be distributed to such holders of record in substitution and replacement for the Right Certificates held by such holders prior to the date of adjustment, and upon surrender thereof, if required by the Corporation, new Right Certificates evidencing all the Rights to which such holders shall be entitled after such adjustment. Right Certificates so to be distributed shall be issued, executed and countersigned in the manner provided for herein and shall be registered in the names of the holders of record of Right Certificates on the record date specified in the public announcement.

(g) All calculations under this Section 11 shall be made to the nearest cent or to the nearest one one-hundredth of a share, as the case may be.

(h) Irrespective of any adjustment or change in the Exercise Price or the number of shares of Preferred Stock issuable upon the exercise of the Rights, the Right Certificates theretofore and thereafter issued may continue to express the Exercise Price and the number of shares to be issued upon exercise of the Rights as in the initial Right Certificates issued hereunder but, nevertheless, shall represent the Rights as so adjusted.

(i) Before taking any action that would cause an adjustment reducing the purchase price per whole share of Preferred Stock upon exercise of the Rights below the then par value, if any, of the shares of Preferred Stock, the Corporation shall use its best efforts to take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and non-

24

assessable shares of such Preferred Stock at such adjusted purchase price per share.

(j) Anything in this Section 11 to the contrary notwithstanding, in the event of any reclassification of stock of the Corporation or any recapitalization, reorganization or partial liquidation of the Corporation or similar transaction, the Corporation shall be entitled to make such further adjustments in the number of shares of Preferred Stock which may be acquired upon exercise of the Rights, and such adjustments in the Exercise Price therefor, in addition to those adjustments expressly required by the other paragraphs of this Section 11, as the Board of Directors of the Corporation shall determine to be necessary or appropriate in order for the holders of the Rights in such event to be treated equitably and in accordance with the purpose and intent of this Agreement or in order that any such event shall not, but for such adjustment, in the opinion of counsel to the Corporation, result in the stockholders of the Corporation being subject to any United States federal income tax liability by reason thereof.

(k) If as a result of an adjustment made pursuant to Section 11(a) hereof, the holder of any Right thereafter exercised shall become entitled to receive any shares of capital stock of the Corporation other than the Preferred Stock, thereafter the Exercise Price and the number of such other shares so receivable upon exercise of a Right shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Preferred Stock contained in Sections 11(a), 11(c), 11(e), 11(f) and 11(j) hereof, as applicable, and the provisions of Sections 7, 9, 10, 13 and 14 hereof with respect to the Preferred Stock shall apply on like terms to any such other shares.

Section 12. Certification of Adjusted Exercise Price or Number of Shares. Whenever an adjustment is made as provided in Section 11, 13, 23 or 27, the Corporation shall (a) promptly prepare a certificate setting forth such adjustment, and a brief statement of the facts giving rise to such adjustment, (b) promptly file with the Rights Agent and with each transfer agent for the Preferred Stock a copy of such certificate and (c) mail a brief summary thereof to each holder of a Right Certificate in accordance with Section 25. Notwithstanding the foregoing sentence, the failure of the Corporation to make such certification or give such notice shall not affect the validity of or the force or effect of the requirement for such adjustment. Any adjustment to be made pursuant to Section 11, 13 or 23(c) of this Agreement shall be effective as of the date of the event

25

giving rise to such adjustment. The Rights Agent shall be fully protected in relying on any such certificate and on any adjustment therein contained and shall not be deemed to have knowledge of any adjustment unless and until it shall have received such certificate.

Section 13. Consolidation, Merger or Sale or Transfer of Assets or Earning Power.

(a) In the event that, at any time after the time that any Person becomes an Acquiring Person, (x) the Corporation shall, directly or indirectly, consolidate with, or merge with and into, any other Person or Persons (other than an Exempt Person) and the Corporation shall not be the surviving or continuing corporation of such consolidation or merger, or (y) any Person or Persons (other than an Exempt Person) shall, directly or indirectly, consolidate with, or merge with and into, the Corporation, and the Corporation shall be the continuing or surviving corporation of such consolidation or merger and, in connection with such consolidation or merger, all or part of the outstanding shares of Common Stock shall be changed or converted into or exchanged for stock or other securities of any other Person (other than an Exempt Person) or of the Corporation or cash or any other property, or (z) the Corporation or one or more of its Subsidiaries shall, directly or indirectly, sell or otherwise transfer to any other Person (other than an Exempt Person), in one or more transactions, assets or earning power aggregating more than 50% of the assets or earning power of the Corporation and its Subsidiaries (taken as a whole), then, on the first occurrence of any such event, proper provision shall be made so that (i) each holder of record of a Right, except as provided in Section 7(e) hereof, shall thereafter have the right to receive, upon the exercise thereof at a price equal to the then current Exercise Price multiplied by the number of one one-hundredths of a share of Preferred Stock for which a Right is then exercisable, in accordance with the terms of this Agreement and in lieu of shares of Preferred Stock, such number of shares of validly issued, fully paid, non-assessable and freely tradeable Common Stock of the Principal Party (as defined in Section 13(b) hereof), not subject to any liens, encumbrances, rights of first refusal or other adverse claims, as shall equal the result obtained by (1) multiplying the then current Exercise Price by the number of one one-hundredths of a share of Preferred Stock for which a Right is then exercisable and dividing that product by (2) 50% of the then per share Fair Market Value of the Common Stock of the Principal Party on the date of the consummation, merger, sale or transfer; provided, however, that the Exercise Price (as adjusted) and the number of shares of

26

Common Stock of such Principal Party so receivable upon exercise of a Right shall be subject to further adjustment as appropriate in accordance with Section 11 hereof to reflect any events occurring in respect of the Common Stock of such Principal Party after the occurrence of such consolidation, merger, sale or transfer; (ii) such Principal Party shall thereafter be liable for, and shall assume, by virtue of such consolidation, merger, sale or transfer, all the obligations and duties of the Corporation pursuant to this Agreement; (iii) the term "Corporation" for all purposes of this Agreement shall thereafter be deemed to refer to such Principal Party; (iv) such Principal Party shall take such steps (including, but not limited to, the reservation of a sufficient number of shares of its Common Stock in accordance with the provisions of Section 9 hereof applicable to the reservation of Preferred Stock) in connection with such consummation as may be necessary to assure that the provisions hereof shall thereafter be applicable, as nearly as reasonably may be, in relation to its shares of Common Stock thereafter deliverable upon the exercise of the Rights; provided, however, that, upon the subsequent occurrence of any merger, consolidation, sale of all or substantially all of the assets, recapitalization, reclassification of shares, reorganization or other extraordinary transaction in respect of such Principal Party, each holder of a Right shall thereupon be entitled to receive, upon exercise of a Right and payment of the Exercise Price, such cash, shares, rights, warrants and other property which such holder would have been entitled to receive had it, at the time of such transaction, owned the shares of Common Stock of the Principal Party purchasable upon the exercise of a Right, and such Principal Party shall take such steps (including, but not limited to, reservation of shares of stock) as may be necessary to permit the subsequent exercise of the Rights in accordance with the terms hereof for such cash, shares, rights, warrants and other property; and (v) the provisions of Section 11(a)(ii) hereof shall be of no effect following the occurrence of any event described in clause (x), (y) or (z) above of this Section 13 (a).

(b) "PRINCIPAL PARTY" shall mean

(i) in the case of any transaction described in clause
(x) or (y) of the first sentence of Section 13(a) hereof:
(A) the Person that is the issuer of the securities into which shares of Common Stock of the Corporation are changed or otherwise exchanged or converted in such merger or consolidation, or, if there is more than one such issuer, the issuer of the Common Stock of which has the greatest market value or (B) if

27

no securities are so issued; (I) the Person that is the other party to the merger or consolidation and that survives such merger or consolidation, or, if there is more than one such Person, the Person the Common Stock of which has the greatest market value or (II) if the Person that is the other party to the merger or consolidation does not survive the merger or consolidation, the Person that does survive the merger or consolidation (including the Corporation if it survives); and

(ii) in the case of any transaction described in clause (z) of the first sentence in Section 13(a), the Person that is the party receiving the greatest portion of the assets or earning power transferred pursuant to such transaction or transactions, or, if each Person that is a party to such transaction or transactions receives the same portion of the assets or earning power so transferred or if the Person receiving the greatest portion of the assets or earning power cannot be determined, whichever of such Persons as is the issuer of Common Stock having the greatest market value of shares outstanding;

provided, however, that in any such case, if the Common Stock of such Person is not at such time and has not been continuously over the preceding 12-month period registered under Section 12 of the Exchange Act, then (1) if such Person is a direct or indirect Subsidiary of another Person the Common Stock of which is and has been so registered, the term "Principal Party" shall refer to such other Person, or (2) if such Person is a Subsidiary, directly or indirectly, of more than one Person, the Common Stocks of all of which are and have been so registered, the term "Principal Party" shall refer to whichever of such Persons is the issuer of the Common Stock having the greatest market value of shares outstanding, or (3) if such Person is owned, directly or indirectly, by a joint venture formed by two or more Persons that are not owned, directly or indirectly, by the same Person, the rules set forth in clauses (1) and (2) above shall apply to each of the owners having an interest in the venture as if the Person owned by the joint venture was a Subsidiary of both or all of such joint venturers, and the Principal Party in each such case shall bear the obligations set forth in this Section 13 in the same ratio as its interest in such Person bears to the total of such interests.

(c) The Corporation shall not consummate any consolidation, merger or sale or transfer of assets or earning power

28

referred to in Section 13(a) unless the Principal Party shall have a sufficient number of authorized shares of its Common Stock that have not been issued or reserved for issuance to permit exercise in full of all Rights in accordance with this Section 13 and unless prior thereto the Corporation and the Principal Party involved therein shall have executed and delivered to the Rights Agent an agreement confirming that the Principal Party shall, upon consummation of such consolidation, merger or sale or transfer of assets or earning power, assume this Agreement in accordance with Section 13(a) hereof and that all rights of first refusal or preemptive rights in respect of the issuance of shares of Common Stock of the Principal Party upon exercise of outstanding Rights have been waived and that such transaction shall not result in a default by the Principal Party under this Agreement, and further providing that, as soon as practicable after the date of any consolidation, merger or sale or transfer of assets or earning power referred to in Section 13(a) hereof, the Principal Party will:

(i) prepare and file a registration statement under the Act with respect to the Rights and the securities purchasable upon exercise of the Rights on an appropriate form, use its best efforts to cause such registration statement to become effective as soon as practicable after such filing and use its best efforts to cause such registration statement to remain effective (with a prospectus at all times meeting the requirements of the Act) until the date of expiration of the Rights, and similarly comply with applicable state securities laws;

(ii) use its best efforts to list (or continue the listing of) the Rights and the securities purchasable upon exercise of the Rights on a national securities exchange or to meet the eligibility requirements for quotation on NASDAQ;

(iii) deliver to holders of the Rights historical financial statements for the Principal Party which comply in all respects with the requirements for registration on Form 10 (or any successor form) under the Exchange Act. In the event that any of the transactions described in Section 13(a) hereof shall occur at any time after the occurrence of a transaction described in Section 11(a)(ii) hereof, the Rights which have not theretofore been exercised shall, subject to the provisions of Section 7(e) hereof, thereafter be

29

exercisable in the manner described in Section 13(a); and

(iv) obtain waivers of any rights of first refusal or preemptive rights in respect of the Common Stock of the Principal Party subject to purchase upon exercise of outstanding Rights.

(d) In case the Principal Party which is to be a party to a transaction referred to in this Section 13 has a provision in any of its authorized securities or in its Certificate of Incorporation or By-laws or other instrument governing its affairs, which provision would have the effect of (i) causing such Principal Party to issue, in connection with, or as a consequence of, the consummation of a transaction referred to in this Section 13, shares of Common Stock of such Principal Party at less than the then Fair Market Value per share (determined pursuant to Section 11(b) hereof) or securities exercisable for, or convertible into, Common Stock of such Principal Party at less than such then Fair Market Value (other than to holders of Rights pursuant to this Section 13) or (ii) providing for any special tax or similar payment in connection with the issuance to any holder of a Right of Common Stock of such Principal Party pursuant to the provisions of this Section 13, then, in such event, the Corporation shall not consummate any such transaction unless prior thereto the Corporation and such Principal Party shall have executed and delivered to the Rights Agent a supplemental agreement providing that the provision in question of such Principal Party shall have been canceled, waived or amended, or that the authorized securities shall be redeemed, so that the applicable provision will have no effect in connection with, or as a consequence of, the consummation of the proposed transaction.

(e) The Corporation covenants and agrees that it shall not, at any time after any Person becomes an Acquiring Person, enter into any transaction of the type described in clauses (x) through (z) of the first sentence of Section 13(a) hereof if (i) at the time of or immediately after such consolidation, merger, sale, transfer or other transaction there are any rights, warrants or other instruments or securities outstanding or agreements in effect which would substantially diminish or otherwise eliminate the benefits intended to be afforded by the Rights, (ii) prior to, simultaneously with or immediately after such consolidation, merger, sale, transfer or other transaction, the stockholders of the Person who constitutes, or would constitute, the Principal Party for purposes of Section 13(a) hereof shall have received a distribution of Rights previously

30

owned by such Person of any of its Affiliates or Associates or (ii) the form or nature of organization of the Principal Party would preclude or limit the exercisability of the Rights.

Section 14. Fractional Rights and Fractional Shares.

(a) The Corporation shall not be required to issue fractions of Rights or to distribute Right Certificates which evidence fractional Rights (i.e., Rights to acquire less than one one-hundredth of a share of Preferred Stock), unless such fractional Rights result from a transaction referred to in
Section 11(a)(i) or 11(f) hereof. If the Corporation shall determine not to issue such fractional Rights, then, in lieu of such fractional Rights, there shall be paid to the holders of record of the Right Certificates with regard to which such fractional Rights would otherwise be issuable, an amount in cash equal to the same fraction of the Fair Market Value of a whole Right.

(b) The Corporation shall not be required to issue fractions of shares of Preferred Stock (other than fractions that are integral multiples of one one-hundredth of a share) upon exercise of the Rights or to distribute certificates which evidence fractional shares (other than fractions that are integral multiples of one one-hundredth of a share). In lieu of issuing fractions of shares of Preferred Stock, the Corporation may, at its election, issue depositary receipts evidencing fractions of shares pursuant to an appropriate agreement between the Corporation and a depositary selected by it, provided that such agreement shall provide that the holders of such depositary receipts shall have all of the rights, privileges and preferences to which they would be entitled as owners of the Preferred Stock. With respect to fractional shares that are not integral multiples of one one-hundredth of a share, if the Corporation does not issue such fractional shares or depositary receipts in lieu thereof, there shall be paid to the holders of record of Right Certificates at the time such Right Certificates are exercised as herein provided an amount in cash equal to the same fraction of the Fair Market Value of a share of Preferred Stock.

(c) The holder of a Right by the acceptance of a Right expressly waives his right to receive any fractional Right or any fractional shares of Preferred Stock (other than fractions which are integral multiples of one one-hundredth of a share) upon exercise of a Right.

Section 15. Rights of Action. All rights of action in respect of this Agreement, except the rights of action given to the Rights Agent in Section 18 hereof, are vested in the

31

respective registered holders of the Right Certificates (and, prior to the Distribution Date, the holders of record of the Common Stock); and any holder of record of any Right Certificate (or, prior to the Distribution Date, of the Common Stock), without the consent of the Rights Agent or of the holder of any other Right Certificate (or, prior to the Distribution Date, of the Common Stock), may, in his own behalf and for his own benefit, enforce, and may institute and maintain any suit, action or proceeding against the Corporation to enforce, or otherwise act in respect of, his right to exercise the Rights evidenced by such Right Certificate in the manner provided in such Right Certificate and in this Agreement. Without limiting the foregoing or any remedies available to the holders of Rights, it is specifically acknowledged that the holders of Rights would not have an adequate remedy at law for any breach of this Agreement and will be entitled to specific performance of the obligations under, and injunctive relief against actual or threatened violations of, the obligations of any Person subject to this Agreement.

Section 16. Agreement of Right Holders. Each holder of a Right, by accepting the same, consents and agrees with the Corporation and the Rights Agent and with every other holder of a Right that:

(a) prior to the Distribution Date, the Rights shall be evidenced by the certificates for Common Stock (or in the case of uncertificated shares of Common Stock, by the book-entry account that evidences record ownership of such shares) registered in the name of the holders of Common Stock (together, as applicable, with the Summary of Rights), which certificates for Common Stock (or book-entry account) shall also constitute certificates for Rights, and not by separate Right Certificates, and each Right shall be transferable only simultaneously and together with the transfer of shares of Common Stock;

(b) after the Distribution Date, the Right Certificates are transferable only on the registry books of the Rights Agent if surrendered at the office of the Rights Agent designated for such purpose, duly endorsed or accompanied by a proper instrument of transfer; and

(c) the Corporation and the Rights Agent may deem and treat the Person in whose name the Right Certificate (or, prior to the Distribution Date, the associated Common Stock certificate or, in the case of uncertificated shares of Common Stock, the book-entry account evidencing record

32

ownership of such shares is registered as the absolute owner thereof and of the Rights evidenced thereby (notwithstanding any notations of ownership or writing on the Right Certificates or the associated Common Stock certificate made by anyone other than the Corporation or the Rights Agent) for all purposes whatsoever, and neither the Corporation nor the Rights Agent shall be affected by any notice to the contrary.

Section 17. Right Certificate Holder Not Deemed a Stockholder. No holder, as such, of any Right Certificate shall be entitled to vote, receive dividends or be deemed for any purpose the holder of Preferred Stock or any other securities which may at any time be issuable on the exercise of the Rights represented thereby, nor shall anything contained herein or in any Right Certificate be construed to confer upon the holder of any Right Certificate, as such, any of the rights of a stockholder or other securityholder of the Corporation or of a securityholder of any other Person or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or securityholder action, or to receive notice of meetings or other actions affecting stockholders or securityholders (except as provided in Section 24 hereof), or to receive dividends or subscription rights, or otherwise, except in any such case the rights, if any, in respect thereof provided by this Agreement, until the Right or Rights evidenced by such Right Certificate shall have been exercised in accordance with the provisions hereof for such stock or other security.

Section 18. Concerning the Rights Agent.

(a) The Corporation agrees to pay to the Rights Agent reasonable compensation for all services rendered by it hereunder and, from time to time, on demand of the Rights Agent, its reasonable expenses and counsel fees and other disbursements incurred in the administration and execution of this Agreement and the exercise and performance of its duties hereunder. The Corporation also agrees to indemnify the Rights Agent for, and to hold it harmless against, any loss, liability, or expense, incurred without gross negligence, bad faith or willful misconduct on the part of the Rights Agent, for anything done or omitted to be done by the Rights Agent in connection with the acceptance and administration of this Agreement, including the cost and expenses of defending against any claim of liability relating to the Rights or this Agreement.

33

(b) The Rights Agent shall be protected against, and shall incur no liability for or in respect of, any action taken, suffered or omitted by it in connection with its administration of this Agreement in reliance upon any Right Certificate or certificate for Preferred Stock or for other securities of the Corporation, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, notice, direction, consent, certificate, statement or other paper or document believed by it to be genuine and to be signed, executed and, where necessary, verified or acknowledged, by the proper person or persons.

Section 19. Merger or Consolidation of, or Change in Name of, the Rights Agent.

(a) Any corporation into which the Rights Agent or any successor Rights Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Rights Agent or any successor Rights Agent shall be a party, or any corporation succeeding to the corporate trust or stock transfer business of the Rights Agent or any successor Rights Agent, shall be the successor to the Rights Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Rights Agent under the provisions of Section 21 hereof. In case at the time such successor Rights Agent shall succeed to the agency created by this Agreement any of the Rights Certificates shall have been countersigned but not delivered, any such successor Rights Agent may adopt the countersignature of the predecessor Rights Agent and deliver such Right Certificates so countersigned; and in case at that time any of the Right Certificates shall not have been countersigned, any successor Rights Agent may countersign such Right Certificates either in the name of the predecessor Rights Agent or in the name of the successor Rights Agent; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Agreement.

(b) In case at any time the name of the Rights Agent shall be changed and at such time any of the Right Certificates shall have been countersigned but not delivered, the Rights Agent may adopt the countersignature under its prior name and deliver Right Certificates so countersigned; in case at that time any of the Right Certificates shall not have been countersigned, the Rights Agent may countersign such Right Certificates either in its prior name or in its changed name; in all such cases such

34

Right Certificates shall have the full force provided in the Right Certificates and in this Agreement.

Section 20. Duties of Rights Agent. The Rights Agent undertakes the duties and obligations imposed by this Agreement upon the following terms and conditions, by all of which the Corporation and the holders of Right Certificates by their acceptance thereof shall be bound:

(a) The Rights Agent may consult with legal counsel (who may be legal counsel for the Corporation), and the opinion of such counsel shall be full and complete authorization and protection to the Rights Agent as to any action taken or omitted by it in good faith and in accordance with such opinion.

(b) Whenever in the performance of its duties under this Agreement the Rights Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Corporation prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by the Chairman of the Board, the President or any Vice President and by the Treasurer, Secretary or any Assistant Secretary of the Corporation and delivered to the Rights Agent. Any such certificate shall be full authorization to the Rights Agent for any action taken or suffered in good faith by it under the provisions of this Agreement in reliance upon such certificate.

(c) The Rights Agent shall be liable hereunder only for its own gross negligence, bad faith or willful misconduct. Anything to the contrary notwithstanding, in no event shall the Rights Agent be liable for special, indirect, consequential or incidental loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Rights Agent has been advised of the likelihood of such loss or damage.

(d) The Rights Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Right Certificates (except its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the Corporation only.

(e) The Rights Agent shall not be under any responsibility in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution hereof by the Rights Agent) or in respect of the validity or execution of

35

any Right Certificate (except its countersignature hereof); nor shall it be responsible for any breach by the Corporation of any covenant or condition contained in this Agreement or in any Right Certificate nor shall it be responsible for any adjustment required under the provisions of Section 11 or 13 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment (except with respect to the exercise of Rights evidenced by Right Certificates after receipt of a certificate describing any such adjustment); nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Preferred Stock to be issued pursuant to this Agreement or any Right Certificate or as to whether any shares of Preferred Stock will, when issued, be validly authorized and issued, fully paid and nonassessable.

(f) The Corporation agrees that it will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Rights Agent for the carrying out or performing by the Rights Agent of the provisions of the Agreement.

(g) The Rights Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Chairman of the Board, the President or any Vice President or the Secretary or the Treasurer of the Corporation, and to apply to such officers for advice or instructions in connection with its duties, and it shall not be liable for any action taken or suffered to be taken by it in good faith in accordance with instructions of any such officer or for any delay in acting while waiting for those instructions. Any application by the Rights Agent for written instructions from the Corporation may, at the option of the Rights Agent, set forth in writing any action proposed to be taken or omitted by the Rights Agent under this Agreement and the date on and/or after which such action shall be taken or such omission shall be effective. The Rights Agent shall not be liable for any action taken by, or omission of, the Rights Agent in accordance with a proposal included in any such application on or after the date specified in such application (which date shall not be less than five Business Days after the date any officer of the Corporation actually receives such application unless any such officer shall have consented in writing to an earlier date) unless, prior to taking any such action (or the effective date in the case of an omission), the Rights Agent shall have received written

36

instructions in response to such application specifying the action to be taken or omitted.

(h) The Rights Agent and any shareholder, director, officer or employee of the Rights Agent may buy, sell or deal in any of the Rights or other securities of the Corporation or become pecuniarily interested in any transaction in which the Corporation may be interested, or contract with or lend money to the Corporation or otherwise act as fully and freely as though it were not the Rights Agent under this Agreement. Nothing herein shall preclude the Rights Agent from acting in any other capacity for the Corporation or for any other legal entity.

(i) The Rights Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents, and the Rights Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys or agents or for any loss to the Corporation resulting from any such act, default, neglect or misconduct, provided reasonable care was exercised in the selection and continued employment thereof.

(j) If, with respect to any Rights Certificate surrendered to the Rights Agent for exercise or transfer, the certificate contained in the form of assignment or the form of election to purchase set forth on the reverse thereof, as the case may be, has not been completed to certify the holder is not an Acquiring Person (or an Affiliate or Associate thereof), a Rights Agent shall not take any further action with respect to such requested exercise or transfer without first consulting with the Corporation.

Section 21. Change of Rights Agent. The Rights Agent or any successor Rights Agent may resign and be discharged from its duties under this Agreement upon 30 days' notice in writing mailed to the Corporation and to each transfer agent of the Common Stock and the Preferred Stock by registered or certified mail. The Corporation may remove the Rights Agent or any successor Rights Agent (with or without cause) upon 30 days' notice in writing, mailed to the Rights Agent or successor Rights Agent, as the case may be, and to each transfer agent of the Common Stock and the Preferred Stock by registered or certified mail. If the Rights Agent shall resign or be removed or shall otherwise become incapable of acting, the Corporation shall appoint a successor to the Rights Agent. Notwithstanding the foregoing provisions of this Section 21, in no event shall the resignation or removal of a Rights Agent be effective until a successor Rights Agent shall have been appointed and have

37

accepted such appointment. If the Corporation shall fail to make such appointment within a period of 30 days after such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Rights Agent or by the holder of a Right Certificate (who shall, with such notice, submit his Right Certificate for inspection by the Corporation), then the incumbent Rights Agent or the holder of record of any Right Certificate may apply to any court of competent jurisdiction for the appointment of a new Rights Agent. Any successor Rights Agent, whether appointed by the Corporation or by such a court, shall be (a) a corporation organized and doing business under the laws of the United States or of any state thereof, in good standing, which is authorized under such laws to exercise corporate trust or stock transfer powers and is subject to supervision or examination in the conduct of its corporate trust or stock transfer business by federal or state authorities and which has at the time of its appointment as Rights Agent a combined capital and surplus of at least $5,000,000 or (b) an Affiliate controlled by a corporation described in clause (a) of this sentence. After appointment, the successor Rights Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Rights Agent without further act or deed, but the predecessor Rights Agent shall deliver and transfer to the successor Rights Agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose. Not later than the effective date of any such appointment, the Corporation shall file notice thereof in writing with the predecessor Rights Agent and each transfer agent of the Common Stock and Preferred Stock, and mail a notice thereof in writing to the registered holders of the Right Certificates. Failure to give any notice provided for in this Section 21, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Rights Agent or the appointment of the successor Rights Agent, as the case may be. Notwithstanding the foregoing provisions, in the event of resignation, removal or incapacity of the Rights Agent, the Corporation shall have the authority to act as the Rights Agent until a successor Rights Agent shall have assumed the duties of the Rights Agent hereunder.


Section 22. Issuance of New Right Certificates. Notwithstanding any of the provisions of this Agreement or of the Rights to the contrary, the Corporation may, at its option, issue new Right Certificates evidencing Rights in such form as may be approved by its Board of Directors to reflect any adjustment or change in the Exercise Price per share and the number or kind or class of shares of stock or other securities or property

38

purchasable under the Right Certificates made in accordance with the provisions of this Agreement. In addition, in connection with the issuance or sale of Voting Stock following the Distribution Date and prior to the Expiration Date, the Corporation may with respect to shares of Voting Stock so issued or sold pursuant to (i) the exercise of stock options, (ii) under any employee plan or arrangement, (iii) upon the exercise, conversion or exchange of securities, notes or debentures issued by the Corporation or (iv) a contractual obligation of the Corporation, in each case existing prior to the Distribution Date, issue Rights Certificates representing the appropriate number of Rights in connection with such issuance or sale.

Section 23. Redemption.

(a) The Corporation may, at its option, but only by the vote of a majority of the Board of Directors (determined as if there were no vacancies), redeem all but not less than all of the then outstanding Rights at any time prior to the Close of Business on the tenth day following the Stock Acquisition Date at a redemption price of $.01 per Right, subject to adjustments as provided in Section 23(c) (the "REDEMPTION PRICE"). The redemption of the Rights by the Board of Directors may be made effective at such time after the Board's action to redeem the Rights on such basis and subject to such conditions, as the Board of Directors in its absolute discretion may establish.

(b) Without any further action and without any notice, the right to exercise the Rights will terminate effective at the time so designated by action of the Board of Directors ordering the redemption of the Rights and the only right thereafter of the holders of Rights shall be to receive the Redemption Price. Within 10 days after the effective time of the action of the Board of Directors ordering the redemption of the Rights, the Corporation shall give notice of such redemption to the holders of the then outstanding Rights by mailing such notice to all such holders at their last addresses as they appear upon the registry books of the Rights Agent or, prior to the Distribution Date, on the registry books of the transfer agent for the Common Stock. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each notice of redemption will state the method by which the payment of the Redemption Price will be made. At the option of the Board of Directors, the Redemption Price may be paid in cash to each Rights holder or by the issuance of shares (and, at the Corporation's election pursuant to Section 14(b) hereof, cash or depositary receipts in lieu of fractions of shares other than fractions which are integral multiples of one one-hundredth of a

39

share) of Preferred Stock or Common Stock having a Fair Market Value equal to such cash payment.

(c) In the event the Corporation shall at any time after the date of this Agreement but before the Distribution Date (A) pay any dividend on Common Stock in shares of Common Stock, (B) subdivide or split the outstanding shares of Common Stock into a greater number of shares or (C) combine or consolidate the outstanding shares of Common Stock into a smaller number of shares or effect a reverse split of the outstanding shares of Common Stock and as a consequence thereof the number of Rights outstanding shall change, then, and in each such event, the Redemption Price may, by action of the Board of Directors of the Corporation in its discretion, be appropriately adjusted in respect of such transaction so as to maintain the aggregate Redemption Price of all Rights after such transaction at the same amount, insofar as practicable, as before the transaction.

Section 24. Notice of Proposed Actions.

(a) In case the Corporation, after the Distribution Date, shall propose (i) to effect any of the transactions referred to in Section 11(a)(i) or to pay any dividend to the holders of record of its shares of Common Stock payable in shares of capital stock of any class or to make any other distribution to the holders of record of its Common Stock (other than a regular periodic cash dividend at a rate not in excess of 150% of the rate of the last cash dividend theretofore paid), or (ii) to offer to the holders of record of its Common Stock options, warrants, or other rights to subscribe for or to purchase shares of Common Stock (including any security convertible into or exchangeable for Common Stock) or shares of stock of any class or any other securities, options, warrants, convertible or exchangeable securities or other rights, or (iii) to effect any reclassification of its Preferred Stock or Common Stock or any recapitalization or reorganization of the Corporation, or (iv) to effect any consolidation or merger with or into, or to effect any sale or other transfer (or to permit one or more of its Subsidiaries to effect any sale or other transfer), in one or more transactions, of more than 50% of the assets or earning power of the Corporation and its Subsidiaries (taken as a whole) to, any other Person or Persons, or (v) to effect the liquidation, dissolution or winding up of the Corporation, then, in each such case, the Corporation shall give to each holder of record of a Right Certificate, in accordance with Section 25, notice of such proposed action, which shall specify the record date for the purposes of such transaction referred to in Section 11(a)(i) or such dividend or distribution, or the date on which

40

such reclassification, recapitalization, reorganization, consolidation, merger, sale or transfer of assets, liquidation, dissolution, or winding up is to take place and the record date for determining participation therein by the holders of record of Common Stock or Preferred Stock, if any such date is to be fixed, and such notice shall be so given in the case of any action covered by clause

(i) or (ii) above at least 10 days prior to the record date for determining holders of record of the Preferred Stock for purposes of such action, and in the case of any such other action, at least 10 days prior to the date of the taking of such proposed action or the date of participation therein by the holders of record of Common Stock or Preferred Stock, whichever shall be the earlier. The failure to give notice required by this Section 24 or any defect therein shall not affect the legality or validity of the action taken by the Corporation or the vote upon any such action.

(b) In case the event referred to in Section 11(a)(ii) shall occur, then the Corporation shall as soon as practicable thereafter, in accordance with Section 25 hereof, give to each holder of a Right notice of the occurrence of such event, which notice shall describe the event and the consequences of the event to holders of Rights under Section 11(a)(ii) hereof.

Section 25. Notices. Notices or demands authorized by this Agreement to be given or made by the Rights Agent or by the holder of record of any Right Certificate or Right to or on the Corporation shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Rights Agent) as follows:

Delphi Automotive Systems Corporation 5725 Delphi Drive Troy, Michigan 48098-2815 Attention: Logan G. Robinson

Subject to the provisions of Section 21, any notice or demand authorized by this Agreement to be given or made by the Corporation or by the holder of record of any Right Certificate or Right to or on the Rights Agent shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Corporation) as follows:

41

BankBoston, N.A.:

150 Royall Street,
Mail Stop 45-02-65
Camden, Massachusetts 02021
Attention: Nancy Rizza

Notices or demands authorized by this Agreement to be given or made by the Corporation or the Rights Agent to the holder of record of any Right Certificate or Right shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed to such holder at the address of such holder as shown on the registry books of the Corporation.

Section 26. Supplements and Amendments. For as long as the Rights are then redeemable and except as provided in the last sentence of this Section 26, the Corporation may, in its sole and absolute discretion, and the Rights Agent shall if the Corporation so directs, supplement or amend any provision of this Agreement without the approval of any holders of the Rights. At any time when the Rights are not then redeemable and except as provided in the last sentence of this Section 26, the Corporation may, and the Rights Agent shall if the Corporation so directs, supplement or amend this Agreement without the approval of any holders of Right Certificates (i) to cure any ambiguity,
(ii) to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions herein or (iii) to change or supplement the provisions hereunder in any manner which the Corporation may deem necessary or desirable, provided that no such supplement or amendment pursuant to this clause (iii) shall materially adversely affect the interest of the holders of Right Certificates. Upon the delivery of a certificate from an appropriate officer of the Corporation which states that the proposed supplement or amendment is in compliance with the terms of this Section 26, the Rights Agent shall execute such supplement or amendment. Notwithstanding anything contained in this Agreement to the contrary, no supplement or amendment shall be made which changes the Redemption Price; it being understood that an adjustment of the Redemption Price in accordance with Section 23 shall not be considered a supplement or amendment of this Agreement.

Section 27. Exchange.

(a) The Board of Directors of the Corporation may, at its option, at any time after any Person becomes an Acquiring Person, exchange all or part of the then outstanding and exercisable Rights (which shall not include Rights that have become null and void pursuant to the provisions of

Section 7(e)

42

hereof) for shares of Common Stock at an exchange ratio of one share per Right, appropriately adjusted to reflect any stock split, stock dividend or similar transaction occurring after the date hereof (such exchange ratio being hereinafter referred to as the "EXCHANGE RATIO"). Notwithstanding the foregoing, the Board of Directors shall not be empowered to effect such exchange at any time after any Person (other than an Exempt Person), together with all Affiliates and Associates of such Person, becomes the Beneficial Owner of 50% or more of the Voting Stock then outstanding, but may effect such exchange as of and simultaneously with such Person becoming, together with its Affiliates and Associates, the Beneficial Owner of 50% or more of the Voting Stock then outstanding. From and after the occurrence of an event specified in Section 13(a) hereof, any Rights that theretofore have not been exchanged pursuant to this Section 27(a) shall thereafter be exercisable only in accordance with

Section 13 and may not be exchanged pursuant to this Section 27(a).


(b) Immediately upon the action of the Board of Directors of the Corporation ordering the exchange of any Rights pursuant to paragraph (a) of this Section 27 and without any further action and without any notice, the right to exercise such Rights shall terminate and the only right thereafter of a holder of such Rights shall be to receive that number of shares of Common Stock equal to the number of such Rights held by such holder multiplied by the Exchange Ratio. The Corporation shall promptly give public notice of any such exchange; provided, however, that the failure to give, or any defect in, such notice shall not affect the validity of such exchange. The Corporation promptly shall mail a notice of any such exchange to all of the holders of such Rights at their last addresses as they appear upon the registry books of the Rights Agent. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each such notice of exchange will state the method by which the exchange of the shares of Common Stock for Rights will be effected and, in the event of any partial exchange, the number of Rights which will be exchanged. Any partial exchange shall be effected pro rata based on the number of Rights (other than Rights which have become null and void pursuant to the provisions of Section 7(e) hereof) held by each holder of Rights.


(c) In the event that there shall not be sufficient shares of Common Stock issued but not outstanding or authorized but unissued to permit any exchange of Rights as contemplated in accordance with this Section 27, the Corporation shall substitute to the extent of such insufficiency, for each share of Common

43

Stock that would otherwise be issuable upon exchange of a Right a number of shares of Preferred Stock or fractions thereof having an aggregate Fair Market Value equal to the Fair Market Value of one share of Common Stock as of the date any Person becomes an Acquiring Person.

(d) The Corporation shall not be required to issue fractions of shares of Common Stock or to distribute certificates which evidence fractional shares. In lieu of such fractional shares, the Corporation shall pay to the registered holders of the Right Certificates with regard to which such fractional shares of Common Stock would otherwise be issuable an amount in cash equal to the same fraction of the current market value of a whole share of Common Stock. For the purposes of this paragraph (d), the current market value of a whole share of Common Stock shall be the closing price of a share of Common Stock for the Trading Day immediately prior to the date of exchange pursuant to this Section 27.

Section 28. Successors. All of the covenants and provisions of this Agreement by or for the benefit of the Corporation or the Rights Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 29. Benefits of this Agreement. Nothing in this Agreement shall be construed to give to any person or corporation other than the Corporation, the Rights Agent and the registered holders of the Right Certificates (and, prior to the Distribution Date, the holders of Common Stock in their capacity as holders of the Rights) any legal or equitable right, remedy or claim under this Agreement; but this Agreement shall be for the sole and exclusive benefit of the Corporation, the Rights Agent and the holders of record of the Right Certificates (and, prior to the Distribution Date, the holders of Common Stock in their capacity as holders of the Rights).

Section 30. Delaware Contract. This Agreement and each Right Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed and enforced in accordance with the laws of such state applicable to contracts to be made and performed entirely within such state.

Section 31. Counterparts. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

<center>44</center>

Section 32. Descriptive Headings. Descriptive headings of the several Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 33. Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 34. Determinations and Actions by the Board of Directors. The Board of Directors of the Corporation shall have the exclusive power and authority to interpret and apply this Agreement and to exercise the rights and powers specifically granted to the Board of Directors of the Corporation hereunder and may take such action as may be necessary or advisable in the administration of this Agreement or to amend or supplement this Agreement in accordance with its terms, including, without limitation, the right and power to (i) make all determinations deemed necessary or advisable for the administration of this Agreement or (ii) decide to redeem the Rights or (iii) decide to amend this Agreement. All such actions, calculations, interpretations and determinations (including any decision not to take any action) done or made by the Board of Directors of the Corporation in good faith shall (x) be final, conclusive and binding on the Corporation, the Rights Agent, the holders of the Rights, as such, and all other Persons, and (y) not subject any member of the Board of Directors to any liability to the holders of Rights.

45

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the day and year first above written.

**DELPHI AUTOMOTIVE SYSTEMS
CORPORATION**

```
By:  /s/ Logan G. Robinson
     ------------------------------
    Name:  Logan G. Robinson
    Title:  Vice President and
            General Counsel
```

**BANKBOSTON, N.A.**

```
By: /s/
    ------------------------------
    Name:
    Title:
```

46

**AS PROVIDED IN THE RIGHTS AGREEMENT (AS REFERRED
TO BELOW), RIGHTS ISSUED TO OR BENEFICIALLY OWNED**

BY ACQUIRING PERSONS OR THEIR AFFILIATES OR ASSOCIATES (AS SUCH TERMS ARE DEFINED IN THE RIGHTS AGREEMENT) OR ANY SUBSEQUENT HOLDER OF SUCH RIGHTS SHALL BE NULL AND VOID AND MAY NOT BE EXERCISED OR TRANSFERRED TO ANY PERSON.

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

### SUMMARY OF RIGHTS TO PURCHASE
### SERIES A JUNIOR PREFERRED STOCK

On February 1, 1999, the IPO Committee of the Board of Directors (the "IPO Committee") of Delphi Automotive Systems Corporation (the "Corporation") declared a dividend distribution of one Preferred Stock Purchase Right for each outstanding share of Common Stock, par value $.01 per share (the "Common Stock"), of the Corporation. The distribution is payable as of the time and date determined by the IPO Committee to be the record date of such distribution to stockholders of record on such time and date (the "Record Date"). Each Right entitles the registered holder to purchase from the Corporation one one-hundredth (1/100) of a share of preferred stock of the Corporation, designated as Series A Junior Preferred Stock (the "Preferred Stock") at a price of $65 per one one-hundredth (1/100) of a share ("Exercise Price"). The description and terms of the Rights are set forth in a Rights Agreement (the "Rights Agreement") between the Corporation and BankBoston, N.A., as Rights Agent (the "Rights Agent").

As discussed below, initially the Rights will not be exercisable, certificates will not be sent to stockholders and the Rights will automatically trade with the Common Stock.

The Rights, unless earlier redeemed by the Board of Directors, become exercisable upon the close of business on the day (the "Distribution Date") which is the earlier of (i) the tenth day following a public announcement that a person or group of affiliated or associated persons, with certain exceptions set forth below, has acquired beneficial ownership of 15% or more of the outstanding voting stock of the Corporation (an "Acquiring Person") and (ii) the tenth business day (or such later date as may be determined by the Board of Directors prior to such time as any person or group of affiliated or associated persons becomes an Acquiring

Person) after the date of the commencement of announcement of a person's or group's intention to commence a tender or exchange offer the consummation of which would result in the ownership of 15% or more of the Corporation's outstanding voting stock (even if no shares are actually purchased pursuant to such offer); prior thereto, the Rights would not be exercisable, would not be represented by a separate certificate, and would not be transferable apart from the Corporation's Common Stock, but will instead be evidenced, with respect to any of the Common Stock certificates outstanding as of the Record Date, by such Common Stock certificate with a copy of this Summary of Rights attached thereto (or in the case of uncertificated shares of Common Stock, by the book entry account that evidences record ownership of such shares). An Acquiring Person does not include (A) the Corporation, (B) any subsidiary of the Corporation, (C) any employee benefit plan or employee stock plan of the Corporation or of any subsidiary of the Corporation, or any trust or other entity organized, appointed, established or holding voting stock for or pursuant to the terms of any such plan, (D) any person or group of affiliated or associated persons whose ownership of 15% or more of the shares of voting stock of the Corporation then outstanding results solely from (i) any action or transaction or transactions approved by the Board of Directors before such person or group became an Acquiring Person or (ii) a reduction in the number of issued and outstanding shares of voting stock of the Corporation pursuant to a transaction or transactions approved by the Board of Directors (provided that any person or group that does not become an Acquiring Person by reason of clause (i) or (ii) above shall become an Acquiring Person upon acquisition of an additional 1% of the Corporation's voting stock unless such acquisition of additional voting stock results from one or more actions or transactions approved by the Board of Directors of the Corporation), or (E) prior to the time at which General Motors Corporation ("GM") shall first cease to beneficially own 15% or more of the voting stock of the Corporation then outstanding, GM or any affiliate or associate of GM.

Until the Distribution Date (or earlier redemption, exchange or expiration of the Rights), new Common Stock certificates issued after the Record Date will contain a legend incorporating the Rights Agreement by reference. Until the Distribution Date (or earlier redemption, exchange or expiration of the Rights), the surrender for transfer of any of the Common Stock

2

certificates outstanding as of the Record Date, with or without a copy of this Summary of Rights attached thereto, will also constitute the transfer of the Rights associated with the Common Stock represented by such certificate. As soon as practicable following the Distribution Date, separate certificates evidencing the Rights ("Right Certificates") will be mailed to holders of record of the Common Stock as of the close of business on the Distribution Date and such separate certificates alone will evidence the Rights from and after the Distribution Date.

The Rights are not exercisable until the Distribution Date. The Rights will expire at the close of business on January 31, 2009, unless earlier redeemed by the Corporation as described below.

The Preferred Stock is nonredeemable and, unless otherwise provided in connection with the creation of a subsequent series of preferred stock, subordinate to any other series of the Corporation's preferred stock. The Preferred Stock may not be issued except upon exercise of Rights. Each share of Preferred Stock will be entitled to receive when, as and if declared, a quarterly dividend in an amount equal to the greater of $16.25 per share or 100 times the cash dividends declared on the Corporation's Common Stock. In addition, the holders of the Preferred Stock are entitled to receive 100 times any non-cash dividends (other than dividends payable in equity securities) declared on the Common Stock, in like kind. In the event of the liquidation of the Corporation, the holders of Preferred Stock will be entitled to receive, for each share of Preferred Stock, a payment in an amount equal to the greater of $650 or 100 times the payment made per share of Common Stock. Each share of Preferred Stock will have 100 votes, voting together with the Common Stock. In the event of any merger, consolidation or other transaction in which Common Stock is exchanged, each share of Preferred Stock will be entitled to receive 100 times the amount received per share of Common Stock. The rights of Preferred Stock as to dividends, liquidation and voting are protected by anti-dilution provisions.

The number of shares of Preferred Stock issuable upon exercise of the Rights and Exercise Price of the Rights are subject to certain adjustments from time to time in the event of a stock dividend on, or a subdivision or combination of, the Common Stock. The Exercise Price for the Rights also is subject to adjustment in the event of

3

extraordinary distributions of cash or other property to holders of Common Stock.

Unless the Rights are earlier redeemed or exchanged, in the event that, after the time that a Person becomes an Acquiring Person, the Corporation were to be acquired in a merger or other business combination (in which any shares of Common Stock are changed into or exchanged for other securities or assets) or more than 50% of the assets or earning power of the Corporation and its subsidiaries (taken as a whole) were to be sold or transferred in one or a series of related transactions, the Rights Agreement provides that proper provision will be made so that each holder of record of a Right will from and after such date have the right to receive, upon payment of the Exercise Price, that number of shares of common stock of the acquiring company having a market value at the time of such transaction equal to two times the Exercise Price.

In addition, unless the Rights are earlier redeemed, in the event that a person or group becomes an Acquiring Person, the Rights Agreement provides that proper provisions will be made so that each holder of record of a Right, other than the Acquiring Person (whose Rights will thereupon become null and void), will thereafter have the right to receive, upon payment of the Exercise Price, that number of shares of the Preferred Stock having a market value at the time of the transaction equal to two times the Exercise Price (such market value to be determined with reference to the market value of the Corporation's Common Stock as provided in the Rights Agreement).

At any time after any person or group becomes an Acquiring Person and prior to, or simultaneously with, the acquisition by such person or group of 50% or more of the outstanding voting stock, the Board of Directors of the Corporation may exchange the Rights (other than Rights owned by such person or group which will have become void), in whole or in part, at an exchange ratio of one share of Common Stock per Right (subject to adjustment).

Fractions of shares of Preferred Stock (other than fractions which are integral multiples of one one-hundredth of a share) may, at the election of the Corporation, be evidenced by depositary receipts. The Corporation may also issue cash in lieu of fractional shares which are not integral multiples of one one-hundredth of a share.

4

At any time prior to the close of business on the tenth day after there has been a public announcement that a person has become an Acquiring Person, the Corporation may redeem the Rights in whole, but not in part, at a price of $.01 per Right (the "Redemption Price"). Immediately upon the effective time of the action of the Board of Directors of the Corporation authorizing redemption of the Rights, the right to exercise the Rights will terminate and the only right of the holders of Rights will be to receive the Redemption Price.

For as long as the Rights are then redeemable, the Corporation may, except with respect to the Redemption Price, amend the Rights in any manner, including an amendment to extend the time period in which the Rights may be redeemed. At any time when the Rights are not then redeemable, the Corporation may amend the Rights in any manner that does not materially adversely affect the interests of holders of the Rights as such.

Until a Right is exercised, the holder, as such, will have no rights as a stockholder of the Corporation, including, without limitation, the right to vote or to receive dividends.

A copy of the form of Rights Agreement has been filed with the Securities and Exchange Commission as an Exhibit to the Corporation's Registration Statement on Form S-1 (Registration No. 333-67333). A copy of the Rights Agreement is available free of charge from the Corporation. This summary description of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement which is incorporated in this summary description herein by reference.

5

[Form of Right Certificate]

**Certificate No. W- _____ Rights**

NOT EXERCISABLE AFTER JANUARY 31, 2009 OR EARLIER IF EXCHANGED OR REDEEMED. THE RIGHTS ARE SUBJECT TO REDEMPTION, AT THE OPTION OF THE CORPORATION AND UNDER CERTAIN OTHER CIRCUMSTANCES, AT $.01 PER RIGHT (SUBJECT TO ADJUSTMENT), ON THE TERMS SET FORTH OR REFERRED TO IN THE RIGHTS AGREEMENT. AS PROVIDED IN THE RIGHTS AGREEMENT (AS REFERRED TO BELOW), RIGHTS ISSUED TO OR BENEFICIALLY OWNED BY ACQUIRING PERSONS OR THEIR AFFILIATES OR ASSOCIATES (AS SUCH TERMS ARE DEFINED IN THE RIGHTS AGREEMENT) OR ANY SUBSEQUENT HOLDER OF SUCH RIGHTS SHALL BE NULL AND VOID AND MAY NOT BE EXERCISED OR TRANSFERRED TO ANY PERSON.

**Right Certificate**

This certifies that , or registered assigns, is the registered owner of the number of Rights set forth above, each of which entitles the owner thereof, subject to the terms, provisions and conditions of the Rights Agreement dated as of February 1, 1999 (the "Rights Agreement") by and between Delphi Automotive Systems Corporation, a Delaware corporation (the "Corporation"), and BankBoston, N.A., a national banking association (the "Rights Agent"), to purchase from the Corporation at any time after the Distribution Date (as such term is defined in the Rights Agreement) and prior to 5:00 P.M. (Eastern time) on January 31, 2009 at the office of the Rights Agent designated in the Rights Agreement for such purpose, or its successor as Rights Agent, one one-hundredth (1/100) of a fully paid nonassessable share of Series A Junior Preferred Stock (the "Preferred Stock") of the Corporation at a purchase price of $65, as the same may from time to time be adjusted in accordance with the Rights Agreement (the "Exercise Price"), upon presentation and surrender of this Right Certificate with the Form of Election to Purchase attached hereto duly executed.

As provided in the Rights Agreement, the Exercise Price and the number of shares of Preferred Stock which may be purchased upon the exercise of the Rights evidenced by this Right Certificate are subject to modification and adjustment upon the happening of certain events and, upon

the happening of certain events, securities other than shares of Preferred Stock, or other property, may be acquired upon exercise of the Rights evidenced by this Right Certificate, as provided in the Rights Agreement.

This Right Certificate is subject to all of the terms, provisions and conditions of the Rights Agreement, which terms, provisions and conditions are incorporated herein by reference and made a part hereof and to which Rights Agreement reference is hereby made for a full description of the rights, limitations of rights, obligations, duties and immunities of the Rights Agent, the Corporation and the holders of record of Right Certificates. Copies of the Rights Agreement are on file at the principal executive office of the Corporation.

This Right Certificate, with or without other Right Certificates, upon surrender at the office of the Rights Agent designated in the Rights Agreement for such purpose, may be exchanged for another Right Certificate or Right Certificates of like tenor and date evidencing Rights entitling the holder of record to purchase a like aggregate number of shares of Preferred Stock as the Rights evidenced by the Right Certificate or Right Certificates surrendered shall have entitled such holder to purchase. If this Right Certificate shall be exercised in part, the holder shall be entitled to receive upon surrender hereof, another Right Certificate or Right Certificates for the number of whole Rights not exercised.

Subject to the provisions of the Rights Agreement, the Rights evidenced by this Certificate may be redeemed by the Corporation at its option or under certain other circumstances at a redemption price of $.01 per Right.

No fractional shares of Preferred Stock (other than fractions which are integral multiples of one one-hundredth (1/100) of a share) are required to be issued upon the exercise of any Right or Rights evidenced hereby, and in lieu thereof the Corporation may cause depositary receipts to be issued and/or a cash payment may be made, as provided in the Rights Agreement.

No holder of this Right Certificate, as such, shall be entitled to vote or receive dividends or be deemed for any purpose the holder of Preferred Stock or of any other securities of the Corporation which may at any time be issuable on the exercise hereof, nor shall anything

2

contained in the Rights Agreement or herein be construed to confer upon the holder hereof, as such, any of the rights of a stockholder of the Corporation or any right to vote for the election of directors or upon any matter submitted to stockholders at meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings or other actions affecting stockholders (except as provided in the Rights Agreement), or to receive dividends or subscription rights, or otherwise, until the Right or Rights evidenced by this Right Certificate shall have been exercised as provided in the Rights Agreement.

This Right Certificate shall not be valid or obligatory for any purpose until it shall have been countersigned by the Rights Agent.

WITNESS the facsimile signature of the proper officers of the Corporation and its corporate seal. Dated as of

```
                                      --------------- -----, --------

          ATTEST:                     DELPHI AUTOMOTIVE SYSTEMS
                                      CORPORATION


                                      By
          -------------------------------    -------------------------------
          [Assistant] Secretary              Title:


          Countersigned:

          BANKBOSTON, N.A.


          By
              -------------------------
              Authorized Signature
```

[Form of Reverse Side of Right Certificate]

## FORM OF ASSIGNMENT

(To be executed by the registered holder if such holder desires to transfer the Right Certificates.)

## FOR VALUE RECEIVED

hereby sells, assigns and transfers unto

_____

_____

(Please print name and address of transferee)

Rights evidenced by this Right Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint_____ Attorney to transfer the within Right Certificate on the books of the within-named Corporation, with full power of substitution.

Dated:

---------------------- -----, -------

_____

**Signature**

**Signature Guaranteed:**

4

Certificate

The undersigned hereby certifies by checking the appropriate boxes that:

(1) this Right Certificate [ ] is [ ] is not being sold, assigned or transferred by or on behalf of a Person who is or was an Acquiring Person or an Associate or an Affiliate thereof (as such terms are defined in the Rights Agreement); and

(2) after due inquiry and to the best knowledge of the undersigned, it

[ ] did [ ] did not acquire the Rights evidenced by this Right Certificate from any Person who is, was or subsequently became an Acquiring Person or an Affiliate or Associate thereof (as such terms are defined in the Rights Agreement).

```
      Dated:
             ----------------- -----, ----------      ---------------------------
                                                          Signature
```

**NOTICE**

The signature to the foregoing Assignment and Certificate must correspond to the name as written upon the face of this Right Certificate in every particular, without alteration or enlargement or any change whatsoever.

5

# FORM OF ELECTION TO PURCHASE

(To be executed if registered holder desires to exercise the Right Certificate.)

**TO**

------------------------:

The undersigned hereby irrevocably elects to exercise Rights represented by this Right Certificate to purchase the shares of Preferred Stock issuable upon the exercise of such Rights and requests that certificates for such share(s) be issued in the following name:

Please insert social security
or other identifying number:

---

(Please print name and address)

---

If such number of Rights shall not be all the Rights evidenced by this Right Certificate, a new Right Certificate for the balance remaining of such Rights shall be registered in the name of and delivered to:

Please insert social security
or other identifying number:

---

(Please print name and address)

---

Dated:
-------------- -----, ---------

Signature (Signature must conform in all respects to name of holder as specified on the face of this Right Certificate)

**Signature Guaranteed:**

6

**FORM OF**
**CERTIFICATE OF DESIGNATIONS**
**OF**
**SERIES A JUNIOR PREFERRED STOCK**
**OF**
**DELPHI AUTOMOTIVE SYSTEMS CORPORATION**

Pursuant to Section 151 of the Delaware
General Corporation Law

I, Logan Robinson, Vice President of Delphi Automotive Systems Corporation, a corporation organized and existing under the Delaware General Corporation Law (the "CORPORATION"), in accordance with the provisions of
Section 151 of such law, DO HEREBY CERTIFY that pursuant to the authority conferred upon the IPO Committee of the Board of Directors by Board of Directors and upon the Board of Directors by the Amended and Restated Certificate of Incorporation of the Corporation, the IPO Committee of the Board of Directors on February 1, 1999, adopted the following resolution which creates a series of shares of Preferred Stock designated as Series A Junior Preferred Stock, as follows:

RESOLVED, that pursuant to Section 151(g) of the Delaware General Corporation Law and the authority vested in the Board of Directors of the Corporation in accordance with the provisions of ARTICLE FOURTH of the Amended and Restated Certificate of Incorporation of the Corporation and delegated to the IPO Committee by the Board of Directors, a series of Preferred Stock of the Corporation be, and hereby is, created, and the powers, designations, preferences and relative,

participating, optional or other special rights of the shares of such series and the qualifications, limitations or restrictions thereof, be, and hereby are, as follows:

Section 1. Designation and Amount. The shares of such series shall be designated as "Series A Junior Preferred Stock" (the "SERIES A PREFERRED STOCK") and the number of shares constituting such series shall be 8,700,000.

Section 2. Dividends and Distributions.

(A) Subject to the provisions for adjustment here inafter set forth, and subject to the rights of the holders of any shares of any series of Preferred Stock ranking prior and superior to the Series A Preferred Stock with respect to dividends, the holders of shares of Series A Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, (i) cash dividends in an amount per share (rounded to the nearest cent) equal to 100 times the aggregate per share amount of all cash dividends declared or paid on the Common Stock, $0.01 par value per share, of the Corporation (the "COMMON STOCK") and (ii) a preferential cash dividend (the "PREFERENTIAL DIVIDENDS"), if any, in preference to the holders of Common Stock, on the first day of January, April, July and October of each year (each a "QUARTERLY DIVIDEND PAYMENT DATE"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series A Preferred Stock, payable in an amount (except in the case of the first Quarterly Dividend Payment if the date of the first issuance of Series A Preferred Stock is a date other than a Quarterly Dividend Payment date, in which case such payment shall be a prorated amount of such amount) equal to $16.25 per share of Series A Preferred Stock less the per share amount of all cash dividends declared on the Series A Preferred Stock pursuant to clause (i) of this sentence since the immediately preceding Quarterly Dividend Payment Date or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series A Preferred Stock. In the event the Corporation shall, at any time after the issuance of any share or fraction of a share of Series A Preferred Stock, make any distribution on the shares of Common Stock of the Corporation, whether by way of a dividend or a reclassification of stock, a recapitalization, reorganization or partial liquidation of the Corporation or otherwise, which is payable in cash or any debt security, debt instrument, real or personal property

2

or any other property (other than cash dividends subject to the immediately preceding sentence, a distribution of shares of Common Stock or other capital stock of the Corporation or a distribution of rights or warrants to acquire any such share, including any debt security convertible into or exchangeable for any such share, at a price less than the Fair Market Value (as hereinafter defined) of such share), then, and in each such event, the Corporation shall simultaneously pay on each then outstanding share of Series A Preferred Stock of the Corporation a distribution, in like kind, of 100 times such distribution paid on a share of Common Stock (subject to the provisions for adjustment hereinafter set forth). The dividends and distributions on the Series A Preferred Stock to which holders thereof are entitled pursuant to clause (i) of the first sentence of this paragraph and pursuant to the second sentence of this paragraph are hereinafter referred to as "DIVIDENDS" and the multiple of such cash and non-cash dividends on the Common Stock applicable to the determination of the Dividends, which shall be 100 initially but shall be adjusted from time to time as hereinafter provided, is hereinafter referred to as the "DIVIDEND MULTIPLE". In the event the Corporation shall at any time after the date shares of Common Stock are first publicly held declare or pay any dividend or make any distribution on Common Stock payable in shares of Common Stock, or effect a subdivision or split or a combination, consolidation or reverse split of the outstanding shares of Common Stock into a greater or lesser number of shares of Common Stock, then in each such case the Dividend Multiple thereafter applicable to the determination of the amount of Dividends which holders of shares of Series A Preferred Stock shall be entitled to receive shall be the Dividend Multiple applicable immediately prior to such event multiplied by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B) The Corporation shall declare each Dividend at the same time it declares any cash or non-cash dividend or distribution on the Common Stock in respect of which a Dividend is required to be paid. No cash or non-cash dividend or distribution on the Common Stock in respect of which a Dividend is required to be paid shall be paid or set aside for payment on the Common Stock unless a Dividend in respect of such dividend or distribution on the Common Stock shall be simultaneously paid, or set aside for payment, on the Series A Preferred Stock.

(C) Preferential Dividends shall begin to accrue on outstanding shares of Series A Preferred Stock from the Quarterly

3

Dividend Payment Date next preceding the date of issuance of any shares of Series A Preferred Stock. Accrued but unpaid Preferential Dividends shall cumulate but shall not bear interest. Preferential Dividends paid on the shares of Series A Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding.

Section 3. Voting Rights. The holders of shares of Series A Preferred Stock shall have the following voting rights:

(A) Subject to the provisions for adjustment herein after set forth, each share of Series A Preferred Stock shall entitle the holder thereof to 100 votes on all matters submitted to a vote of the holders of the Common Stock. The number of votes which a holder of Series A Preferred Stock is entitled to cast, as the same may be adjusted from time to time as herein after provided, is hereinafter referred to as the "VOTE MULTIPLE". In the event the Corporation shall at any time after shares of Common Stock are first publicly held declare or pay any dividend on Common Stock payable in shares of Common Stock, or effect a subdivision or split or a combination, consolidation or reverse split of the outstanding shares of Common Stock into a greater or lesser number of shares of Common Stock, then in each such case the Vote Multiple thereafter applicable to the determination of the number of votes per share to which holders of shares of Series A Preferred Stock shall be entitled after such event shall be the Vote Multiple immediately prior to such event multiplied by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B) Except as otherwise provided herein, in the Amended and Restated Certificate of Incorporation or by law, the holders of shares of Series A Preferred Stock and the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(C) In the event that the Preferential Dividends accrued on the Series A Preferred Stock for four or more quarterly dividend periods, whether consecutive or not, shall not have been declared and paid or irrevocably set aside for payment, the holders of record of Preferred Stock of the Corporation of all series (including the Series A Preferred Stock), other than any series in respect of which such right is expressly withheld

4

by the Amended and Restated Certificate of Incorporation or the authorizing resolutions included in any Certificate of Designations therefor, shall have the right, at the next meeting of stockholders called for the election of directors, to elect two members to the Board of Directors, which directors shall be in addition to the number required prior to such event, to serve until the next Annual Meeting and until their successors are elected and qualified or their earlier resignation, removal or incapacity or until such earlier time as all accrued and unpaid Preferential Dividends upon the outstanding shares of Series A Preferred Stock shall have been paid (or irrevocably set aside for payment) in full. The holders of shares of Series A Preferred Stock shall continue to have the right to elect directors as provided by the immediately preceding sentence until all accrued and unpaid Preferential Dividends upon the outstanding shares of Series A Preferred Stock shall have been paid (or set aside for payment) in full. Such directors may be removed and replaced by such stockholders, and vacancies in such directorships may be filled only by such stockholders (or by the remaining director elected by such stockholders, if there be one) in the manner permitted by law; provided, however, that any such action by stockholders shall be taken at a meeting of stock holders and shall not be taken by written consent thereto.

(D) Except as otherwise required by the Amended and Restated Certificate of Incorporation or by law or set forth herein, holders of Series A Preferred Stock shall have no other special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for the taking of any corporate action.

Section 4. Certain Restrictions.

(A) Whenever Preferential Dividends or Dividends are in arrears or the Corporation shall be in default of payment thereof, thereafter and until all accrued and unpaid Preferential Dividends and Dividends, whether or not declared, on shares of Series A Preferred Stock outstanding shall have been paid or set irrevocably aside for payment in full, and in addition to any and all other rights which any holder of shares of Series A Preferred Stock may have in such circumstances, the Corporation shall not:

(i) declare or pay dividends on, make any other distributions on, or redeem or purchase or otherwise acquire for consideration, any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock;

5

(ii) declare or pay dividends on or make any other distributions on any shares of stock ranking on a parity as to dividends with the Series A Preferred Stock, unless dividends are paid ratably on the Series A Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled if the full dividends accrued thereon were to be paid;

(iii) except as permitted by subparagraph (iv) of this paragraph 4(A), redeem or purchase or otherwise acquire for consideration shares of any stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such parity stock in exchange for shares of any stock of the Corporation ranking junior
(both as to dividends and upon liquidation, dissolution or winding up) to the Series A Preferred Stock; or

(iv) purchase or otherwise acquire for consideration any shares of Series A Preferred Stock, or any shares of stock ranking on a parity with the Series A Preferred Stock (either as to dividends or upon liquidation, dissolution or winding up), except in accordance with a purchase offer made to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(B) The Corporation shall not permit any Subsidiary (as hereinafter defined) of the Corporation to purchase or other wise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (A) of this Section 4, purchase or otherwise acquire such shares at such time and in such manner. A "SUBSIDIARY" of the Corporation shall mean any corporation or other entity of which securities or other ownership interests having ordinary voting power sufficient to elect a majority of the board of directors of such corporation or other entity or other persons performing similar functions are beneficially owned, directly or indirectly, by the Corporation or by any corporation or other entity that is otherwise controlled by the Corporation.

6

(C) The Corporation shall not issue any shares of Series A Preferred Stock except upon exercise of Rights issued pursuant to that certain Rights Agreement dated as of February 1, 1999 between the Corporation and BankBoston, N.A., as Rights Agent, as it may be amended from time to time, a copy of which is on file with the Secretary of the Corporation at its principal executive office and shall be made available to stockholders of record without charge upon written request therefor addressed to said Secretary. Notwithstanding the foregoing sentence, nothing contained in the provisions hereof shall prohibit or restrict the Corporation from issuing for any purpose any series of Preferred Stock with rights and privileges similar to, different from, or greater than, those of the Series A Preferred Stock.

Section 5. Reacquired Shares. Any shares of Series A Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof. All such shares upon their retirement and cancellation shall become authorized but unissued shares of Preferred Stock, without designation as to series, and such shares may be reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors.

Section 6. Liquidation, Dissolution or Winding Up. Upon any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, no distribution shall be made (i) to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock unless the holders of shares of Series A Preferred Stock shall have received for each share of Series A Preferred Stock, subject to adjustment as hereinafter provided, (A) $650 plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment or, (B) if greater than the amount specified in clause (i)(A) of this sentence, an amount equal to 100 times the aggregate amount to be distributed per share to holders of Common Stock, as the same may be adjusted as hereinafter provided and (ii) to the holders of stock ranking on a parity upon liquidation, dissolution or winding up with the Series A Preferred Stock, unless simultaneously therewith distributions are made ratably on the Series A Preferred Stock and all other shares of such parity stock in proportion to the total amounts to which the holders of shares of Series A Preferred Stock are entitled under clause (i)(A) of this sentence and to which the holders of such parity shares are entitled, in each case upon such liquidation, dissolution

7

or winding up. The amount to which holders of Series A Preferred Stock may be entitled upon liquidation, dissolution or winding up of the Corporation pursuant to clause (i)(B) of the foregoing sentence is hereinafter referred to as the "PARTICIPATING LIQUIDATION AMOUNT" and the multiple of the amount to be distributed to holders of shares of Common Stock upon the liquidation, dissolution or winding up of the Corporation applicable pursuant to said clause to the determination of the Participating Liquidation Amount, as said multiple may be adjusted from time to time as hereinafter provided, is hereinafter referred to as the "LIQUIDATION MULTIPLE". In the event the Corporation shall at any time after the date shares of Common Stock are first publicly held declare or pay any dividend on Common Stock payable in shares of Common Stock, or effect a subdivision or split or a combination, consolidation or reverse split of the outstanding shares of Common Stock into a greater or lesser number of shares of Common Stock, then, in each such case, the Liquidation Multiple thereafter applicable to the determination of the Participating Liquidation Amount shall be the Liquidation Multiple applicable immediately prior to such event multiplied by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 7. Certain Reclassifications and Other Events.

(A) In the event that holders of shares of Common Stock of the Corporation receive after the date shares of Common Stock are first publicly held, in respect of their shares of Common Stock any share of capital stock of the Corporation (other than any share of Common Stock of the Corporation), whether by way of reclassification, recapitalization, reorganization, dividend or other distribution or otherwise (a "TRANSACTION"), then, and in each such event, the dividend rights, voting rights and rights upon the liquidation, dissolution or winding up of the Corporation of the shares of Series A Preferred Stock shall be adjusted so that after such event the holders of Series A Preferred Stock shall be entitled, in respect of each share of Series A Preferred Stock held, in addition to such rights in respect thereof to which such holder was entitled immediately prior to such adjustment, to (i) such additional dividends as equal the Dividend Multiple in effect immediately prior to such Transaction multiplied by the additional dividends which the holder of a share of Common Stock shall be entitled to receive by virtue of the receipt in the Transaction of such capital stock, (ii) such additional voting rights as equal the Vote Multiple in effect immediately prior to such Transaction multiplied by the additional voting rights which the holder of a share of Common

8

Stock shall be entitled to receive by virtue of the receipt in the Transaction of such capital stock and (ii) such additional distributions upon liquidation, dissolution or winding up of the Corporation as equal the Liquidation Multiple in effect immediately prior to such Transaction multiplied by the additional amount which the holder of a share of Common Stock shall be entitled to receive upon liquidation, dissolution or winding up of the Corporation by virtue of the receipt in the Transaction of such capital stock, as the case may be, all as provided by the terms of such capital stock.

(B) In the event that holders of shares of Common Stock of the Corporation receive after the date shares of Common Stock are first publicly held, in respect of their shares of Common Stock any right or warrant to purchase Common Stock (including as such a right, for all purposes of this paragraph, any security convertible into or exchangeable for Common Stock) at a purchase price per share less than the Fair Market Value of a share of Common Stock on the date of issuance of such right or warrant, then and in each such event the dividend rights, voting rights and rights upon the liquidation, dissolution or winding up of the Corporation of the shares of Series A Preferred Stock shall each be adjusted so that after such event the Dividend Multiple, the Vote Multiple and the Liquidation Multiple shall each be the product of the Dividend Multiple, the Vote Multiple and the Liquidation Multiple, as the case may be, in effect immediately prior to such event multiplied by a fraction the numerator of which shall be the number of shares of Common Stock outstanding immediately before such issuance of rights or warrants plus the maximum number of shares of Common Stock which could be acquired upon exercise in full of all such rights or warrants and the denominator of which shall be the number of shares of Common Stock outstanding immediately before such issuance of rights or warrants plus the number of shares of Common Stock which could be purchased, at the Fair Market Value of the Common Stock at the time of such issuance, by the maximum aggregate consideration payable upon exercise in full of all such rights or warrants.

(C) In the event that holders of shares of Common Stock of the Corporation receive after the date shares of Common Stock are first publicly held, in respect of their shares of Common Stock any right or warrant to purchase capital stock of the Corporation (other than shares of Common Stock), including as such a right, for all purposes of this paragraph, any security convertible into or exchangeable for capital stock of the Corporation (other than Common Stock), at a purchase price per share less than the Fair Market Value of such shares of capital

9

stock on the date of issuance of such right or warrant, then and in each such event the dividend rights, voting rights and rights upon liquidation, dissolution or winding up of the Corporation of the shares of Series A Preferred Stock shall each be adjusted so that after such event each holder of a share of Series A Preferred Stock shall be entitled, in respect of each share of Series A Preferred Stock held, in addition to such rights in respect thereof to which such holder was entitled immediately prior to such event, to receive (i) such additional dividends as equal the Dividend Multiple in effect immediately prior to such event multiplied, first, by the additional dividends to which the holder of a share of Common Stock shall be entitled upon exercise of such right or warrant by virtue of the capital stock which could be acquired upon such exercise and multiplied again by the Discount Fraction (as hereinafter defined) and (ii) such additional voting rights as equal the Vote Multiple in effect immediately prior to such event multiplied, first, by the additional voting rights to which the holder of a share of Common Stock shall be entitled upon exercise of such right or warrant by virtue of the capital stock which could be acquired upon such exercise and multiplied again by the Discount Fraction and

(iii) such additional distributions upon liquidation, dissolution or winding up of the Corporation as equal the Liquidation Multiple in effect immediately prior to such event multiplied, first, by the additional amount which the holder of a share of Common Stock shall be entitled to receive upon liquidation, dissolution or winding up of the Corporation upon exercise of such right or warrant by virtue of the capital stock which could be acquired upon such exercise and multiplied again by the Discount Fraction. For purposes of this paragraph, the "DISCOUNT FRACTION" shall be a fraction the numerator of which shall be the difference between the Fair Market Value of a share of the capital stock subject to a right or warrant distributed to holders of shares of Common Stock of the Corporation as contemplated by this paragraph immediately after the distribution thereof and the purchase price per share for such share of capital stock pursuant to such right or warrant and the denominator of which shall be the Fair Market Value of a share of such capital stock immediately after the distribution of such right or warrant.

(D) For purposes of this Certificate of Designations, the "FAIR MARKET VALUE" of a share of capital stock of the Corporation (including a share of Common Stock) on any date shall be deemed to be the average of the daily closing price per share thereof over the 30 consecutive Trading Days (as such term is hereinafter defined) immediately prior to such date; provided, however, that, in the event that such Fair Market Value of any

10

such share of capital stock is determined during a period which includes any date that is within 30 Trading Days after (i) the ex-dividend date for a dividend or distribution on stock payable in shares of such stock of securities convertible into shares of such stock, or (ii) the effective date of any subdivision, split, combination, consolidation, reverse stock split or reclassification of such stock, then, and in each such case, the Fair Market Value shall be appropriately adjusted by the Board of Directors of the Corporation to take into account ex-dividend or post-effective date trading. The closing price for any day shall be the last sale price, regular way, or, in case, no such sale takes place on such day, the average of the closing bid and asked prices, regular way (in either case, as reported in the applicable transaction reporting system with respect to securities listed or admitted to trading on the New York Stock Exchange), or, if the shares are not listed or admitted to trading on the New York Stock Exchange, as reported in the applicable transaction reporting system with respect to securities listed on the principal national securities exchange on which the shares are listed or admitted to trading or, if the shares are not listed or admitted to trading on any national securities exchange, the last quoted price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ") or such other system then in use, or if on any such date the shares are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the shares selected by the Board of Directors of the Corporation. The term "TRADING DAY" shall mean a day on which the principal national securities exchange on which the shares are listed or admitted to trading is open for the transaction of business or, if the shares are not listed or admitted to trading on any national securities exchange, on which the New York Stock Exchange or such other national securities exchange as may be selected by the Board of Directors of the Corporation is open. If the shares are not publicly held or not so listed or traded on any day within the period of 30 Trading Days applicable to the determination of Fair Market Value thereof as aforesaid, "FAIR MARKET VALUE" shall mean the fair market value thereof per share as determined in good faith by the Board of Directors of the Corporation. In either case referred to in the foregoing sentence, the determination of Fair Market Value shall be described in a statement filed with the Secretary of the Corporation.

11

Section 8. Consolidation, Merger, etc. In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case each outstanding share of Series A Preferred Stock shall at the same time be similarly exchanged for or changed into the aggregate amount of stock, securities, cash and/or other property (payable in like kind), as the case may be, for which or into which each share of Common Stock is changed or exchanged multiplied by the highest of the Vote Multiple, the Dividend Multiple or the Liquidation Multiple in effect immediately prior to such event.

Section 9. Effective Time of Adjustments.

(A) Adjustments to the Series A Preferred Stock required by the provisions hereof shall be effective as of the time at which the event requiring such adjustments occurs.

(B) The Corporation shall give prompt written notice to each holder of a share of Series A Preferred Stock of the effect of any adjustment to the voting rights, dividend rights or rights upon liquidation, dissolution or winding up of the Corporation of such shares required by the provisions hereof. Notwithstanding the foregoing sentence, the failure of the Corporation to give such notice shall not affect the validity of or the force or effect of or the requirement for such adjustment.

Section 10. No Redemption. The shares of Series A Preferred Stock shall not be redeemable at the option of the Corporation or any holder thereof. Notwithstanding the foregoing sentence of this Section, the Corporation may acquire shares of Series A Preferred Stock in any other manner permitted by law, the provisions hereof and the Amended and Restated Certificate of Incorporation of the Corporation.

Section 11. Ranking. Unless otherwise provided in the Amended and Restated Certificate of Incorporation of the Corporation or a Certificate of Designations relating to a subsequent series of preferred stock of the Corporation, the Series A Preferred Stock shall rank junior to all other series of the Corporation's preferred stock as to the payment of dividends and the distribution of assets on liquidation, dissolution or winding up and senior to the Common Stock.

Section 12. Amendment. The provisions hereof and the Amended and Restated Certificate of Incorporation of the Corporation shall not be amended in any manner which would

12

adversely affect the rights, privileges or powers of the Series A Preferred Stock without, in addition to any other vote of stockholders required by law, the affirmative vote of the holders of two-thirds or more of the outstanding shares of Series A Preferred Stock, voting together as a single class.

13

IN WITNESS WHEREOF, I have executed and subscribed this Certificate of Designations and do affirm the foregoing as true under the penalties of perjury this 1st day of February, 1999.

_____

Name:

Title:

**ATTEST:**

_____

**INITIAL PUBLIC OFFERING AND DISTRIBUTION AGREEMENT,**

**DATED AS OF FEBRUARY 1, 1999,**

**BY AND BETWEEN**

**GENERAL MOTORS CORPORATION**

**AND**

**DELPHI AUTOMOTIVE SYSTEMS CORPORATION**

# TABLE OF CONTENTS

Page

1.  Definitions.....................................................................................2

2.  The Initial Public Offering and the Distribution...............................................9
    2.1    The Initial Public Offering.............................................................9
    2.2    The Distribution........................................................................9
    2.3    Certain Stockholder Matters.............................................................9
    2.4    Prior Relationship.....................................................................10
    2.5    Further Assurances Regarding the Distribution..........................................10
    2.6    Abandonment of the Distribution........................................................10

3.  Expenses.......................................................................................11
    3.1    General................................................................................11
    3.2    Certain Expenses Relating to the Initial Public Offering...............................11
    3.3    Certain Expenses Relating to the Distribution..........................................11

4.  Covenants To Preserve Tax-Free Status of the Distribution and the Qualification of the
    Contribution as a D Reorganization.............................................................11
    4.1    Representations and Warranties.........................................................11
    4.2    Restrictions on Delphi.................................................................12
    4.3    Cooperation and Other Covenants........................................................15
    4.4    Indemnification for Tax Liabilities....................................................17
    4.5    Procedure for Indemnification for Tax Liabilities......................................17
    4.6    Arbitration............................................................................18
    4.7    Exclusive Remedies.....................................................................19

5.  Certain Other Covenants........................................................................19
    5.1    Financial and Other Information........................................................19
    5.2    Other Covenants........................................................................25
    5.3    Covenants Regarding the Incurrence of Indebtedness.....................................26

6.  Indemnification................................................................................28
    6.1    Indemnification by Delphi..............................................................28
    6.2    Indemnification by GM..................................................................28
    6.3    Other Liabilities......................................................................29
    6.4    Tax Effects of Indemnification.........................................................29
    6.5    Effect of Insurance Upon Indemnification...............................................30
    6.6    Procedure for Indemnification Involving Third-Party Claims.............................30
    6.7    Procedure for Indemnification Not Involving Third-Party Claims.........................32
    6.8    Exclusive Remedies.....................................................................32

- i -

TABLE OF CONTENTS

Page

7.      Miscellaneous..........................................................................32
        7.1     Dispute Resolution.............................................................32
        7.2     Survival......................................................................32
        7.3     Complete Agreement............................................................32
        7.4     Authority.....................................................................32
        7.5     Governing Law.................................................................33
        7.6     Consent to Exclusive Jurisdiction.............................................33
        7.7     Notices.......................................................................33
        7.8     Amendment and Modification....................................................35
        7.9     Binding Effect; Assignment....................................................35
        7.10    Third Party Beneficiaries.....................................................35
        7.11    Counterparts..................................................................35
        7.12    Waiver........................................................................35
        7.13    Severability..................................................................36
        7.14    Remedies......................................................................36
        7.15    Performance...................................................................36
        7.16    References; Construction......................................................36

Exhibits

Agreements Subject to Section 5.2(c)..........................................................Exhibit A

- ii -

# INITIAL PUBLIC OFFERING AND DISTRIBUTION AGREEMENT

This INITIAL PUBLIC OFFERING AND DISTRIBUTION AGREEMENT (the "Agreement") is made and entered into as of February 1, 1999, by and between General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive Systems Corporation, a Delaware corporation and a wholly owned subsidiary of GM ("Delphi"). Certain capitalized terms used herein are defined in Section 1 of this Agreement.

## RECITALS

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Delphi Automotive Systems Business from GM;

WHEREAS, GM has caused Delphi to be incorporated in order to effect such separation;

WHEREAS, GM and Delphi have previously entered into the Separation Agreement and the Ancillary Agreements (other than this Agreement and the Registration Rights Agreement), each effective as of January 1, 1999, pursuant to which GM has contributed and transferred to Delphi, and Delphi has received and assumed, the assets and liabilities then associated with the Delphi Business as described therein;

WHEREAS, GM and Delphi intend that the Contribution qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Code;

WHEREAS, GM currently owns all of the issued and outstanding Delphi Common Stock;

WHEREAS, Delphi has previously filed the IPO Registration Statement with the SEC but it has not yet become effective;

WHEREAS, the parties currently contemplate that, reasonably promptly following the execution of this Agreement, Delphi shall consummate the Initial Public Offering;

WHEREAS, immediately following the consummation of the Initial Public Offering, GM shall own approximately 82.3% of the outstanding shares of Delphi Common Stock (or approximately 80.2% if the underwriters exercise their over-allotment option in full in accordance with the Underwriting Agreement);

WHEREAS, concurrently with the execution of this Agreement, GM and Delphi are entering into the Registration Rights Agreement;

- 1 -

WHEREAS, GM currently intends to divest itself of its entire ownership of Delphi during 1999 by distributing in the Distribution all of its shares of Delphi Common Stock to the holders of GM $1 2/3 Common Stock;

WHEREAS, GM currently expects to accomplish the Distribution by means of a split-off, a spin-off or some combination of both transactions;

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under Section 355 of the Code;

WHEREAS, the parties intend in this Agreement to set forth the principal arrangements between them regarding the Initial Public Offering and the Distribution; and

WHEREAS, the parties hereto have determined that in order to accomplish the objectives of the Initial Public Offering and the Distribution and to facilitate the consummation thereof, it is necessary and desirable to restructure certain intercompany relationships, allocate certain liabilities and provide for certain indemnification, all as set forth herein;

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

1. DEFINITIONS.

"Abandonment Notice" has the meaning set forth in Section 2.6.

"Acquisition Target" has the meaning set forth in Section 5.3(a)(i).

"Active Trade or Business" means the active conduct of the trade or business (as defined in Section 355(b)(2) of the Code) conducted by Delphi immediately prior to the applicable Distribution Date.

"Adjusted Delphi Indebtedness" has the meaning set forth in Section 5.3.

"Affiliate" means a Delphi Affiliate or a GM Affiliate, as the case may be.

"Agreement" has the meaning set forth in the Preamble.

"Ancillary Agreements" has the meaning ascribed to such term in the Separation Agreement.

"Annual Financial Statements" has the meaning set forth in Section 5.1 (a)(vi).

- 2 -

"Business" means the Delphi Business of the GM Business, as the case may be.

"Business Day" means any day other than a Saturday, a Sunday, or a day on which banking institutions located in the State of New York or Michigan are authorized or obligated by law or executive order to close.

"Claim" has the meaning set forth in Section 6.7.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, together with the rules and regulations promulgated thereunder.

"Contribution" means the transfer of certain assets by GM to Delphi (and the assumption by Delphi of certain liabilities) as contemplated by the Separation Agreement.

"Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"CPR Rules" means the Rules for Non-Administered Arbitration of Business Disputes promulgated by the Center for Public Resources, as in effect on the date hereof.

"D Reorganization" means a transaction qualifying as a reorganization under Section 368(a)(1)(D) of the Code.

"Delphi" has the meaning set forth in the Preamble.

"Delphi Affiliate" means a Person that, after giving effect to the Distribution, directly or indirectly through one or more intermediaries, is Controlled by, or is under common Control with Delphi.

"Delphi Automotive Systems Business" has the meaning ascribed to such term in the Separation Agreement.

"Delphi Business" means any business or operations of Delphi or any Delphi Affiliates, including, in all cases, any predecessor entities (including, without limitation, the Delphi Automotive Systems Business).

"Delphi Capital Stock" means all classes or series of capital stock of Delphi.

"Delphi Common Stock" means the Common Stock, par value $0.01 per share, of Delphi.

"Delphi Indebtedness" has the meaning set forth in Section 5.3.

"Delphi Public Documents" has the meaning set forth in Section 5.1(b)(v).

"Delphi Transfer Agent" means BankBoston, N.A., in its capacity as the transfer agent and registrar for the Delphi Common Stock.

"Delphi's Auditors" has the meaning set forth in Section 5.1(b)(i).

"Dispute Notice" means written notice of any dispute between GM and Delphi arising out of or relating to this Agreement, which shall set forth, in reasonable detail, the nature of the dispute.

"Distribution" means the distribution of Delphi Common Stock by GM in one or more transactions occurring after the Initial Public Offering that collectively have the effect that all shares of Delphi Common Stock held by GM are distributed to GM stockholders, whenever such transaction(s) shall occur.

"Distribution Date" means any date or dates, as the case may be, determined by GM, in its sole and absolute discretion, to be a date on which shares of Delphi Common Stock held by GM are distributed in connection with the Distribution.

"Distribution Registration Statement" means any and all registration statements, information statements or other documents filed by any party with the SEC in connection with any transaction constituting part of the Distribution, in each case as supplemented or amended from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, together with the rules and regulations promulgated thereunder.

"FFO to Debt Ratio" has the meaning set forth in Section 5.3(c).

"GAAP" means generally accepted accounting principles, consistently applied.

"GM" has the meaning set forth in the Preamble.

"GM Affiliate" means a Person that, after giving effect to the Distribution, directly or indirectly through one or more intermediaries, is Controlled by GM.

"GM Annual Statements" has the meaning set forth in Section 5.1(b)(ii).

"GM Business" means any business or operations of GM or any GM Affiliates other than the Delphi Business.

"GM Disclosure Portions" means all material set forth in, or incorporated by reference into, either the IPO Registration Statement or the Distribution Registration Statement, as applicable, to the extent relating exclusively to (i) GM and the GM Affiliates (excluding Delphi and the Delphi

- 4 -

Affiliates), (ii) the GM Business, (iii) GM's intentions with respect to the Distribution or (iv) the terms of the Distribution, including, without limitation, the form, structure and terms of any transaction(s) and/or offering(s) to effect the Distribution and the timing of and conditions to the consummation of the Distribution.

"GM Public Filings" has the meaning set forth in Section 5.1(a)(xiii).

"GM Transfer Agent" means BankBoston, N.A., in its capacity as the transfer agent and registrar for the GM $1 2/3 Common Stock.

"GM $1 2/3 Common Stock" means the Common Stock, par value $1 2/3 per share, of GM.

"GM's Auditors" has the meaning set forth in Section 5.1(b)(ii).

"Indemnifying Party" means a Person that is obligated to provide indemnification under this Agreement.

"Indemnitee" means a Person that is entitled to seek indemnification under this Agreement.

"Indemnity Payment" means an amount that an Indemnifying Party is required to pay to an Indemnitee under this Agreement.

"Initial Public Offering" means the initial public offering by Delphi of shares of Delphi Common Stock as contemplated by the IPO Registration Statement.

"Insurance Proceeds" means the payment received by an insured from an insurance carrier or paid by an insurance carrier on behalf of the insured, net of any applicable premium adjustment and tax effect.

"IPO Registration Statement" means the Registration Statement on Form S-1, Registration No. 333-67333, of Delphi, as supplemented and amended from time to time.

"IRS" means Internal Revenue Service of the U.S. Department of Treasury or any successor agency.

"Losses" means all losses, liabilities, claims, obligations, demands, judgments, damages, dues, penalties, assessments, fines (civil or criminal), costs, liens, expenses, forfeitures, settlements, or fees, reasonable attorneys' fees and court costs, of any nature or kind, whether or not the same would properly be reflected on a balance sheet, and "Loss" means any of these.

"Negotiation Period" means the period of 20 Business Days following the initial meeting of the representatives of GM and Delphi following the receipt of a Dispute Notice.

"Notice" means any notice, request, claim, demand, or other communication under this Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Pre-Distribution Period" means the period of time from the date hereof until the completion of the Distribution.

"Proposed Acquisition Transaction" means a transaction or series of transactions as a result of which any Person or any group of related Persons would (directly or indirectly) acquire, or have the right to acquire, from Delphi or one or more holders of outstanding shares of Delphi Capital Stock, a number of shares of Delphi Capital Stock that would comprise 50% or more of (A) the value of all outstanding shares of Delphi Capital Stock as of the date of such transaction, or in the case of a series of transactions, the date of the last transaction of such series, or (B) the total combined voting power of all outstanding shares of Voting Stock of Delphi as of the date of such transaction, or in the case of a series of transactions, the date of the last transaction of such series.

"Quarterly Financial Statements" has the meaning set forth in Section 5.1(a)(v).

"Registration Rights Agreement" means the Registration Rights Agreement to be entered into between GM and Delphi concurrently with the execution and delivery of this Agreement.

"Regulation S-K" means Regulation S-K of the General Rules and Regulations promulgated by the SEC.

"Regulation S-X" means Regulation S-X of the General Rules and Regulations promulgated by the SEC.

"Representation Date" means any date on which Delphi makes any representation (i) to the IRS or to counsel selected by GM for the purpose of obtaining a Subsequent Tax Opinion/Ruling, or (ii) to GM for the purpose of any determination required to be made by GM pursuant to Section 4.2.

"Representation Letters" means the representation letters and any other materials (including, without limitation, the ruling request and the related supplemental submissions to the IRS) delivered or deliverable by GM and others in connection with the rendering by Tax Counsel and the issuance by the IRS of the Tax Opinions/Rulings, which to the extent related to Delphi shall be in form and substance reasonably satisfactory to Delphi.

- 6 -

"Representative" means, with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants or attorneys.

"Request" has the meaning set forth in Section 6.7.

"Rights Plan" means the Agreement by and between Delphi and BankBoston, N.A., as Rights Agent, as amended from time to time.

"SEC" means the United States Securities and Exchange Commission or any successor agency.

"Securities Act" means the Securities Act of 1933, as amended from time to time, together with the rules and regulations promulgated thereunder.

"Separate Counsel" has the meaning set forth in Section 6.6(b).

"Separation Agreement" means the Master Separation Agreement by and among GM, Delphi, Delphi Automotive Systems LLC, a Delaware limited liability company and a wholly owned subsidiary of GM, Delphi Technologies, Inc., a Delaware corporation and a wholly owned subsidiary of GM, and Delphi Automotive Systems (Holding), Inc., a Delaware corporation and a wholly owned subsidiary of GM, dated as of December 22, 1998, as amended from time to time.

"Service Agent" means (i) for GM, The Corporation Trust Company, with offices on the date hereof at 1209 Orange Street, Wilmington, County of New Castle, Delaware 19801; and (ii) for Delphi, The Corporation Trust Company, with offices on the date hereof at 1209 Orange Street, Wilmington, County of New Castle, Delaware 19801.

"Subsequent Tax Opinion/Ruling" means either (i) an opinion of counsel selected by GM, in its sole and absolute discretion, confirming, in form and substance reasonably satisfactory to GM, that, as a consequence of the consummation of a subsequent transaction, no income, gain or loss for U.S. federal income tax purposes will be recognized by GM, the stockholders or former stockholders of GM, or any GM Affiliate with respect to the Distribution, or
(ii) an IRS private letter ruling to the same effect.

"Subsidiary" means with respect to any specified Person, any corporation or other legal entity of which such Person or any of its Subsidiaries Controls or owns, directly or indirectly, more than 50% of the stock or other equity interest entitled to vote with respect to the election of members to the board of directors or similar governing body; provided, however, that for the purposes of this Agreement, neither Delphi nor any of the Subsidiaries of Delphi shall be deemed to be Subsidiaries of GM or of any of the Subsidiaries of GM.

"Tax" means (i) any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of

- 7 -

the Code), customs duties, capital stock, franchise, profits, withholdings, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on, minimum, estimated, or other tax, assessment, or governmental charge of any kind whatsoever imposed by any governmental authority, including any interest, penalty, or addition thereto, whether disputed or not; (ii) liability for the payment of any amounts of the type described in clause (i) above arising as a result of being (or having been) a member of any group or being (or having been) included or required to be included in any Tax Return related thereto; and (iii) liability for the payment of any amounts of the type described in clause
(i) above as a result of any express or implied obligation to indemnify or otherwise assume or succeed to the liability of any other Person.

"Tax Agreements" means, collectively, the (i) Agreement for the Allocation of United States Federal, State and Local Income Taxes between GM and Delphi, dated as of December 16, 1998, as amended from time to time; (ii) Agreement for the Indemnification of United States Federal, State and Local Non-Income Taxes between GM and Delphi, dated as of December 16, 1998, as amended from time to time; (iii) Amended and Restated Agreement for the Allocation of United States Federal, State and Local Income Taxes between GM and Delphi, dated as of December 16, 1998, as amended from time to time; (iv) Customs Consulting Agreement between GM and Delphi, dated as of December 16, 1998, as amended from time to time; and (v) Tax Compliance and Planning Services Agreement by and between GM and Delphi, dated as of December 16, 1998, as amended from time to time.

"Tax Control" means, with respect to Delphi, ownership of Delphi Capital Stock which constitutes at least 80% of both (i) the total combined voting power of all outstanding shares of Voting Stock of Delphi and (ii) each class and series of Delphi Capital Stock other than Voting Stock of Delphi.

"Tax Counsel" means the law firm of Kirkland & Ellis.

"Tax-Free Status of the Distribution" means the nonrecognition of taxable gain or loss for U.S. federal income tax purposes to GM, GM Affiliates and GM's stockholders in connection with the Distribution.

"Tax Opinions/Rulings" means the opinions of Tax Counsel and the rulings by the IRS deliverable to GM in connection with the Contribution and the Distribution.

"Tax-Related Losses" means (i) all federal, state and local Taxes (including interest and penalties thereon) imposed pursuant to any settlement, final determination, judgment or otherwise; (ii) all accounting, legal and other professional fees, and court costs incurred in connection with such taxes; and
(iii) all costs and expenses that may result from adverse tax consequences to GM or GM's stockholders (including all costs, expenses and damages associated with stockholder litigation or controversies) payable by GM or GM Affiliates.

- 8 -

"Third-Party Claim" means any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person other than GM or any GM Affiliate or Delphi or any Delphi Affiliate which gives rise to a right of indemnification hereunder.

"Underwriting Agreement" means the Underwriting Agreement between Delphi and the underwriters relating to the Initial Public Offering, as amended from time to time.

"Value" means with respect to any trade or business (or portion thereof), the fair market value of the assets constituting such trade or business, less the current liabilities associated with such trade or business, in each case determined as of the applicable Distribution Date.

"Voting Stock" means with respect to any Person, all classes and series of the capital stock of such Person entitled to vote generally in the election of directors.

2. THE INITIAL PUBLIC OFFERING AND THE DISTRIBUTION.

2.1 THE INITIAL PUBLIC OFFERING. Delphi shall consult with, and cooperate in all respects with, GM in connection with the pricing of the Delphi Common Stock to be offered in the Initial Public Offering and shall, at GM's direction, promptly take any and all actions necessary or desirable to consummate the Initial Public Offering as contemplated by the IPO Registration Statement and the Underwriting Agreement.

2.2 THE DISTRIBUTION. GM currently intends, following the consummation of the Initial Public Offering, to complete the Distribution during 1999 by means of a split-off, a spin-off or some combination of both transactions. GM shall, in its sole and absolute discretion, determine whether to proceed with all or part of the Distribution and all terms of the Distribution, including, without limitation, the form, structure and terms of any transaction(s) and/or offering(s) to effect the Distribution and the timing of and conditions to the consummation of the Distribution. In addition, GM may at any time and from time to time until the completion of the Distribution modify or change the terms of the Distribution, including, without limitation, by accelerating or delaying the timing of the consummation of all or part of the Distribution. Delphi shall cooperate with GM in all respects to accomplish the Distribution and shall, at GM's direction, promptly take any and all actions necessary or desirable to effect the Distribution, including, without limitation, the registration under the Securities Act of Delphi Common Stock on an appropriate registration form or forms to be designated by GM. GM shall select any investment banker(s) and manager(s) in connection with the Distribution, as well as any financial printer, solicitation and/or exchange agent and outside counsel for GM; provided that nothing herein shall prohibit Delphi from engaging (at its own expense) its own financial, legal, accounting and other advisors in connection with the Distribution.

2.3 CERTAIN STOCKHOLDER MATTERS. From and after the distribution of Delphi Common Stock in connection with any transaction(s) included as part of the Distribution and until such Delphi Common Stock is duly transferred in accordance with applicable law, Delphi shall regard the

- 9 -

Persons receiving Delphi Common Stock in such transaction(s) as record holders of Delphi Common Stock in accordance with the terms of such transaction(s) without requiring any action on the part of such Persons. Delphi agrees that, subject to any transfers of such stock, (a) each such holder shall be entitled to receive all dividends payable on, and exercise voting rights and all other rights and privileges with respect to, the shares of Delphi Common Stock then held by such holder and (b) each such holder shall be entitled, without any action on the part of such holder, to receive one or more certificates representing, or other evidence of ownership of, the shares of Delphi Common Stock then held by such holder. GM shall cooperate, and shall instruct the GM Transfer Agent to cooperate, with Delphi and the Delphi Transfer Agent, and Delphi shall cooperate, and shall instruct the Delphi Transfer Agent to cooperate, with GM and the GM Transfer Agent, in connection with all aspects of the Distribution and all other matters relating to the issuance and delivery of certificates representing, or other evidence of ownership of, the shares of Delphi Common Stock distributed to the holders of GM $1-2/3 Common Stock in connection with any transaction(s) included as part of the Distribution. Following the Distribution, GM shall instruct the GM Transfer Agent to deliver to the Delphi Transfer Agent true, correct and complete copies of the stock and transfer records reflecting the holders of GM $1-2/3 Common Stock receiving shares of Delphi Common Stock in connection with any transaction(s) included as part of the Distribution.

2.4 PRIOR RELATIONSHIP. Delphi, with respect to Delphi and all of the Delphi Affiliates, and GM, with respect to GM and all of the GM Affiliates, agree to take all commercially reasonable action to discontinue their respective uses as promptly as is commercially reasonable of any printed material that indicates an ownership or other relationship between or among GM and Delphi or any of their respective Affiliates that has changed as a result of the Initial Public Offering, the Distribution or any other transactions contemplated hereby; provided that this Section 2.4 shall not prohibit the use of printed material containing appropriate and accurate references to such relationship.

2.5 FURTHER ASSURANCES REGARDING THE DISTRIBUTION. In addition to the actions specifically provided for elsewhere in this Agreement, Delphi shall, at GM's direction, use all commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things commercially reasonably necessary, proper or expeditious under applicable laws, regulations and agreements in order to consummate and make effective the Distribution as promptly as reasonably practicable. Without limiting the generality of the foregoing, Delphi shall, at GM's direction, cooperate with GM, and execute and deliver, or use all commercially reasonable efforts to cause to have executed and delivered, all instruments, including instruments of conveyance, assignment and transfer, and to make all filings with, and to obtain all consents, approvals or authorizations of, any domestic or foreign governmental or regulatory authority requested by GM in order to consummate and make effective the Distribution.

2.6 ABANDONMENT OF THE DISTRIBUTION. The parties expressly acknowledge and agree that GM is not obligated in any respect to proceed with or complete the Distribution and that GM may, in its sole and absolute discretion, at any time abandon its plans to proceed with or complete the Distribution. In the event that GM so determines that it no longer intends to proceed with or

- 10 -

complete the Distribution, GM shall provide to Delphi a written notification of such determination (an "Abandonment Notice"). Effective as of the date of the Abandonment Notice, (a) provided that no Distribution Date has yet occurred, Sections 4.2 and 4.3 of this Agreement shall terminate, become null and void and have no further force and effect (it being expressly understood and agreed by the parties that such Sections shall remain in full force and effect in the event that a Distribution Date has occurred on or prior to the date of the Abandonment Notice) and (b) GM's rights, and Delphi's obligations, set forth in the Registration Rights Agreement shall immediately become effective.

## 3. EXPENSES.

3.1 GENERAL. Except as otherwise provided in this Agreement, the Separation Agreement, any of the other Ancillary Agreements or any other agreement between the parties relating to the Contribution, the Initial Public Offering or the Distribution, all costs and expenses of either party hereto in connection with the Contribution, the Initial Public Offering and the Distribution shall be paid by the party that incurs such costs and expenses.

3.2 CERTAIN EXPENSES RELATING TO THE INITIAL PUBLIC OFFERING. GM shall be responsible for the payment of all costs, fees and expenses relating to the Initial Public Offering; provided that Delphi shall be responsible for the payment of (a) the costs, fees and expenses of all of Delphi's financial, legal, accounting and other advisors incurred in connection with the Initial Public Offering and (b) any internal fees, costs and expenses incurred by Delphi or any Delphi Affiliate in connection with the Initial Public Offering. GM shall be entitled to any and all amounts received from the underwriters relating to reimbursement for any costs, fees and expenses relating to the Initial Public Offering.

3.3 CERTAIN EXPENSES RELATING TO THE DISTRIBUTION. GM shall generally be responsible for the payment of all costs, fees and expenses relating to the Distribution; provided that Delphi shall be responsible for the payment of (a) the costs, fees and expenses of all of Delphi's financial, legal, accounting and other advisors incurred in connection with the Distribution and (b) any internal fees, costs and expenses incurred by Delphi or any Delphi Affiliate in connection with the Distribution.

4. COVENANTS TO PRESERVE TAX-FREE STATUS OF THE DISTRIBUTION AND THE QUALIFICATION OF THE CONTRIBUTION AS A D REORGANIZATION. Delphi and GM hereby represent and warrant to, and covenant and agree with, each other as follows:

4.1 REPRESENTATIONS AND WARRANTIES.

(a) Delphi. Delphi hereby represents and warrants that (i) it has examined the Tax Opinions/Rulings and the Representation Letters, and (ii) the facts presented and the representations made therein, to the extent descriptive of Delphi or the Delphi Business (including, without limitation, the business purposes for the Distribution, the representations in the Representation Letters and Tax Opinions/Rulings to the extent that they relate to

- 11 -

Delphi or the Delphi Business, and the plans, proposals, intentions and policies of Delphi, are true, correct and complete in all material respects.

(b) GM. GM hereby represents and warrants that (i) it has examined the Tax Opinions/Rulings and the Representation Letters, and (ii) the facts presented and the representations made therein, to the extent descriptive of GM or the GM Business (including, without limitation, the business purposes for the Distribution, the representations in the Representation Letters and Tax Opinions/Rulings to the extent that they relate to GM or the GM Business, and the plans, proposals, intentions and policies of GM), are true, correct and complete in all material respects.

## 4.2 RESTRICTIONS ON DELPHI.

(a) Pre-Distribution Period. Delphi shall not take any action (such action to include, if relevant, the issuance of Delphi Capital Stock upon the exercise by the holders thereof of all options or convertible securities issued by Delphi) during the Pre-Distribution Period if, as a result of taking such action, Delphi would issue a number of shares of Delphi Capital Stock (including by way of the exercise of stock options or the issuance of restricted stock) that would cause GM to cease to have Tax Control of Delphi, unless prior to the consummation of such transaction GM has determined, in its sole and absolute discretion, which discretion shall be exercised in good faith solely to preserve the Tax-Free Status of the Distribution, that such transaction would not jeopardize the Tax-Free Status of the Distribution. Notwithstanding the foregoing provisions of this Section 4.2(a), Delphi shall be permitted to issue stock options and restricted stock awards to its employees so long as (i) Delphi repurchases sufficient shares of issued and outstanding Delphi Capital Stock on or prior to the date such options are exercisable or restricted stock is vested (or deemed vested) to insure that, assuming the exercise of all exercisable options and vesting of such restricted stock, GM would not cease to have Tax Control of Delphi and (ii) Delphi provides GM with prior written notification of the procedures by which Delphi intends to comply with its obligation described in clause (i) above and GM approves of such procedures (which approval shall not be unreasonably withheld). All of the restrictions on Delphi contained in this Section 4.2 shall apply to Delphi during the Pre-Distribution Period as well as the other periods specified in this Section 4.2.

(b) Proposed Acquisition Transactions. Until the first day after the two-year anniversary of the latest Distribution Date, Delphi shall not enter into any Proposed Acquisition Transaction or, to the extent Delphi has the right to prohibit any Proposed Acquisition Transaction, permit any Proposed Acquisition Transaction to occur unless prior to the consummation of such Proposed Acquisition Transaction GM has determined, in its sole and absolute discretion, which discretion shall be exercised in good faith solely to preserve the Tax-Free Status of the Distribution, that such Proposed Acquisition Transaction would not jeopardize the Tax-Free Status of the Distribution.

- 12 -

The foregoing shall not prohibit Delphi from entering into a contract or agreement to consummate any Proposed Acquisition Transaction if such contract or agreement requires satisfaction of the above-described requirement prior to the consummation of such Proposed Acquisition Transaction, such requirement to be satisfied through the cooperation of the parties as described in Section 4.3(b)(ii).

(c) Continuation of Active Trade or Business. Until the first day after the two-year anniversary of the latest Distribution Date,

(i) Delphi shall continue to conduct the Active Trade or Business.

(ii) Subject to clause (c)(iii) below, Delphi shall not (A) liquidate, dispose of, or otherwise discontinue the conduct of any portion of the Active Trade or Business with a Value in excess of $2.0 billion or (B) dispose of any business or assets that would cause Delphi to be operated in a manner inconsistent in any material respect with the business purposes for the Distribution as set forth in the Representation Letters and Tax Opinions/Rulings, in each case unless GM has determined, in its sole and absolute discretion, which discretion shall be exercised in good faith solely to preserve the Tax-Free Status of the Distribution, that such liquidation, disposition, or discontinuance would not jeopardize the Tax-Free Status of the Distribution.

(iii) Delphi shall not under any circumstances liquidate, dispose of, or otherwise discontinue the conduct of any portion of the Active Trade or Business if such liquidation, disposition or discontinuance would breach
Section 4.2(d). Delphi shall continue the active conduct of the Active Trade or Business primarily through officers and employees of Delphi or its Subsidiaries (and not primarily through independent contractors) who are not also officers or employees of GM or of any GM Affiliates. Notwithstanding the foregoing, (A) except with respect to any corporation or other entity the status of which as the direct owner of an active trade or business is material to the Tax-Free Status of the Distribution, liquidations of any of Delphi's Subsidiaries (including Delphi Automotive Systems LLC) into Delphi or one or more Subsidiaries directly or indirectly controlled by Delphi shall not be deemed to breach this Section 4.2(c) and (B) Delphi shall not be prohibited from liquidating, disposing of or otherwise discontinuing the conduct of one or more trades or businesses that constituted part of the Active Trade or Business, or any portion thereof, provided that, in the case of this clause (B), the aggregate Value of such trades or businesses, or portions thereof, so liquidated, disposed of or discontinued shall not exceed $2.0 billion. For purposes of the preceding sentence and clause (c)(ii) above, asset retirements, sale-leaseback arrangements and discontinuances of product lines within a trade or business the active conduct of which is continued shall not be deemed a liquidation, disposition or discontinuance of a trade or business or portion thereof.

- 13 -

(iv) Solely for purposes of this Section 4.2(c), Delphi shall not be treated as directly or indirectly controlling a Subsidiary unless Delphi owns, directly or indirectly, shares of capital stock of such Subsidiary constituting (i) 80% or more of the total combined voting power of all outstanding shares of Voting Stock of such Subsidiary and (ii) 80% or more of the total number of outstanding shares of each class or series of capital stock of such Subsidiary other than Voting Stock.

(d) Continuity of Business.

(i) Until the first day after the two-year anniversary of the latest Distribution Date, (A) Delphi shall not voluntarily dissolve or liquidate, and (B) except in the ordinary course of business, neither Delphi nor any Subsidiaries directly or indirectly controlled by Delphi shall sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of such Subsidiaries) that, in the aggregate, constitute more than (x) 60% of the gross assets of Delphi or (y) 60% of the consolidated gross assets of Delphi (including Delphi Automotive Systems LLC) and such Subsidiaries, unless prior to the consummation of such transaction GM has determined, in its sole and absolute discretion, which discretion shall be exercised in good faith solely to preserve the Tax-Free Status of the Distribution, that such transaction would not jeopardize the Tax-Free Status of the Distribution. The amount of gross assets of Delphi and such Subsidiaries shall be based on the fair market value of each such asset as of the applicable Distribution Date.

(ii) Sales, transfers or other dispositions by Delphi or any of its Subsidiaries to Delphi or one or more Subsidiaries directly or indirectly controlled by Delphi shall not be included in any determinations under this Section 4.2(d) of whether such 60% or more of the gross assets of Delphi or 60% of the consolidated gross assets of Delphi and such Subsidiaries have been sold, transferred or otherwise disposed of.

(iii) Solely for purposes of this Section 4.2(d), Delphi shall not be treated as directly or indirectly controlling a Subsidiary unless Delphi owns, directly or indirectly, shares of capital stock of such Subsidiary constituting (A) 80% or more of the total combined voting power of all outstanding shares of Voting Stock of such Subsidiary and (B) 80% or more of the total number of outstanding shares of each class or series of capital stock of such Subsidiary other than Voting Stock.

- 14 -

(e) Discharge of Intracompany Indebtedness. Prior to the first Distribution Date, Delphi shall fully discharge and satisfy all of the then existing indebtedness owed to GM or any GM Affiliate (other than payables incurred in the ordinary course of the business). From such date until the first day after the two-year anniversary of the latest Distribution Date, Delphi shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or allow to exist any such indebtedness with GM or any GM Affiliate.

(f) Miscellaneous. Until the first day after the two-year anniversary of the latest Distribution Date, Delphi shall not take, or permit any of its Subsidiaries to take, any other actions or enter into any transaction or series of transactions or agree to enter into any other transactions that would be reasonably likely to jeopardize the Tax-Free Status of the Distribution or the qualification of the Contribution as a D Reorganization, including any action or transaction that would be reasonably likely to be inconsistent with any representation made in the Representation Letters, unless prior to the consummation of such action or transaction GM has determined, in its sole and absolute discretion, which discretion shall be exercised in good faith solely to preserve the Tax-Free Status of the Distribution and the qualification of the Contribution as a D Reorganization, that such action or transaction would not jeopardize the Tax-Free Status of the Distribution or the qualification of the Contribution as a D Reorganization. Notwithstanding the foregoing, if and to the extent that any action or transaction is described in and permitted pursuant to Sections 4.2(a), (b), (c), (d) and (e) such action or transaction shall not be prohibited by this Section 4.2(f).

(g) Permitted Actions and Transactions. Notwithstanding the foregoing, the provisions of Section 4.2 shall not prohibit Delphi from (i) implementing, or otherwise complying with the provisions of, the Rights Plan (or any successor stockholders rights plan of Delphi), and (ii) implementing any transaction upon which the IRS has granted a favorable ruling in, or which is described in reasonable detail in, any Tax Opinions/Rulings.

4.3 COOPERATION AND OTHER COVENANTS.

(a) Notice of Subsequent Delphi Actions. Each of Delphi and GM shall furnish the other with a copy of any ruling requests or other documents delivered to the IRS that relates to the Distribution or that could otherwise be reasonably expected to have an impact on the Tax-Free Status of the Distribution or the qualification of the Contribution as a D Reorganization.

(b) Cooperation.

(i) Each of Delphi and GM shall cooperate with the other and shall take (or refrain from taking) all such actions as the other may reasonably request in connection with obtaining any GM determination referred to in Section 4.2. Such cooperation shall include, without limitation, providing any information and/or representations reasonably requested by the other to enable either party (or counsel

- 15 -

for such party) to obtain and maintain any Subsequent Tax Opinion/Ruling that would permit any action described in Section 4.2 to be taken by Delphi or a Delphi Affiliate. From and after any Representation Date in connection with obtaining any such determination or the receipt of a Subsequent Tax Opinion/Ruling and until the first day after the two-year anniversary of the date of such determination or receipt, neither party shall take (nor shall it refrain from taking) any action that would have caused such representation to be untrue unless the other party has determined, in its sole and absolute discretion, which discretion shall be exercised in good faith solely to preserve the Tax-Free Status of the Distribution and the qualification of the Contribution as a D Reorganization, that such action would not jeopardize the Tax-Free Status of the Distribution or the qualification of the Contribution as a D Reorganization.

(ii) In the event that Delphi notifies GM that it desires to take one of the actions described in Section 4.2 and GM concludes that such action might jeopardize the Tax-Free Status of the Distribution or the qualification of the Contribution as a D Reorganization, GM shall, at the request of Delphi, elect either to (i) use all commercially reasonable efforts to obtain a Subsequent Tax Opinion/Ruling that would permit Delphi to take the specified action, and Delphi shall cooperate in connection with such efforts, or
(ii) provide all reasonable cooperation to Delphi in connection with Delphi obtaining such a Subsequent Tax Opinion/Ruling in form and substance reasonably satisfactory to GM; provided, however, that the reasonable costs and expenses incurred by GM of obtaining any such Subsequent Tax Opinion/Ruling shall be borne by GM.

(c) Notice.

(i) Until all restrictions set forth in Section 4.2 have expired, Delphi shall give GM written notice of any intention to effect or permit an action or transaction described in Section 4.2 and which is prohibited thereunder at such time within a period of time reasonably sufficient to enable GM (A) to make the determination referred to in Section 4.2 or (B) to prepare and seek any Subsequent Tax Opinion/ Ruling in connection with such proposed action or transaction. Each such notice by Delphi shall set forth the terms and conditions of the proposed action or transaction, including, without limitation, as applicable, the nature of any related action proposed to be taken by the Board of Directors of Delphi, the approximate number of shares of Delphi Capital Stock proposed to be transferred or issued, the approximate Value of Delphi's assets (or assets of any of Delphi's Subsidiaries) proposed to be transferred, the proposed timetable for such action or transaction, and the number of shares of Delphi Capital Stock otherwise then owned by the other party to the proposed action or transaction, all with sufficient particularity to enable GM to make any such required determination, including information required to prepare and seek a Subsequent Tax Opinion/Ruling in connection with such proposed action or

- 16 -

transaction. All information provided by Delphi to GM pursuant to this Section 4.3 shall be deemed subject to the confidentiality obligations of Article 6 of the Separation Agreement.

(ii) Promptly, but in any event within 15 Business Days, after GM receives such written notice from Delphi, GM shall evaluate such information and notify Delphi in writing of (A) such determination or (B) of GM's intent to seek a Subsequent Tax Opinion/Ruling and the proposed date for submission of the request therefor, which date shall not be more than 45 days after the date GM so notifies Delphi of GM's intent to seek a Subsequent Tax Opinion/Ruling, provided that such 45-day period shall be appropriately extended for any period of noncompliance by Delphi with Section 4.3(b). If GM makes a determination that an action or transaction described in Section 4.2 would jeopardize the Tax-Free Status of the Distribution or the qualification of the Contribution as a D Reorganization, such notice to Delphi shall set forth, in reasonable detail, the reasons therefor. GM shall notify Delphi promptly, but in any event within two Business Days, after the receipt of a Subsequent Tax Opinion/Ruling.

4.4 INDEMNIFICATION FOR TAX LIABILITIES.

(a) General. Notwithstanding any other provision of this Agreement or any provision of any of the Tax Agreements to the contrary but subject to Section 4.4(b), Delphi shall indemnify, defend and hold harmless GM and each GM Affiliate (or any successor to any of them) against any and all Tax-Related Losses incurred by GM in connection with any proposed tax assessment or tax controversy with respect to the Distribution or the Contribution to the extent caused by any breach by Delphi of any of its representations, warranties or covenants made pursuant to this Agreement. All interest or penalties incurred in connection with such Tax-Related Losses shall be computed for the time period up to and including the date that Delphi pays its indemnification obligation in full.

(b) Exceptions to Delphi's Indemnification. If GM (i) makes a determination pursuant to any clause of Section 4.2, on the basis of a Subsequent Tax Opinion/Ruling or otherwise, and (ii) delivers to Delphi written notice of such determination pursuant to Section 4.3(c), Delphi shall have no obligation pursuant to Section 4.4(a), except to the extent that any Tax-Related Losses so incurred resulted from the inaccuracy, incorrectness or incompleteness of any representation provided by Delphi upon which such Subsequent Tax Opinion/Ruling and/or determination was based.

(c) Timing and Method of Tax Indemnification Payments. Delphi shall pay any amount due and payable to GM pursuant to this Section 4.4 on or before the 90th day following the earlier of agreement or determination that such amount is due and payable to GM. All payments pursuant to this Section 4.4 shall be made by wire transfer to the bank

- 17 -

account designated by GM for such purpose, and on the date of such wire transfer Delphi shall give GM notice of the transfer.

4.5 PROCEDURE FOR INDEMNIFICATION FOR TAX LIABILITIES.

(a) Notice of Claim. If GM receives notice of the assertion of any Third-Party Claim with respect to which Delphi may be obligated under Section 4.4 to provide indemnification, GM shall give Delphi notice thereof (together with a copy of such Third- Party Claim, process or other legal pleading) promptly after becoming aware of such Third- Party Claim; provided, however, that the failure of GM to give notice as provided in this Section shall not relieve Delphi of its obligations under Section 4.4, except to the extent that Delphi is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail.

(b) Obligation of Indemnifying Party.

(i) GM and Delphi shall jointly control the defense of, and cooperate with each other with respect to defending, any Third-Party Claim with respect to which Delphi is obligated under Section 4.4 to provide indemnification, provided that Delphi shall forfeit such joint control right with respect to a particular Third-Party Claim if Delphi or any Delphi Affiliate makes any public statement or filing, or takes any action (including, but not limited to, the filing of any submission or pleading, or the giving of a deposition or production of documents, in any administrative or court proceeding) in connection with such Third-Party Claim that is inconsistent in a material respect with any representation or warranty made by Delphi in this Agreement, the Tax Opinions/Rulings, or the Representation Letters.

(ii) Delphi and GM shall exercise their rights to jointly control the defense of any such Third-Party Claim solely for the purpose of defeating such Third-Party Claim and, unless required by applicable law, neither Delphi nor GM shall make any statements or take any actions that could reasonably result in the shifting of liability for any Losses arising out of such Third-Party Claim from the party making such statement or taking such action (or any of its Affiliates) to the other party (or any of its Affiliates).

(iii) Statements made or actions taken by either Delphi or GM in connection with the defense of any such Third-Party Claim shall not prejudice the rights of such party in any subsequent action or proceeding between the parties.

(iv) If either GM or Delphi fails to jointly defend any such Third-Party Claim, the other party shall solely defend such Third-Party Claim and the party failing to jointly defend shall use commercially reasonable efforts to cooperate with the other party in its defense of such Third-Party Claim; provided, however, that GM

- 18 -

may not compromise or settle any such Third-Party Claim without the prior written consent of Delphi, which consent shall not be unreasonably withheld or delayed. All costs and expenses of either party in connection with, and during the course of, the joint control of the defense of any such Third-Party Claim shall be initially paid by the party that incurs such costs and expenses. Such costs and expenses shall be reallocated and reimbursed in accordance with the respective indemnification obligations of the parties at the conclusion of the defense of such Third-Party Claim.

4.6 ARBITRATION. Any dispute between the parties arising out of or relating to this Section 4, including the interpretation of this Section 4, or any actual or purported breach of this Section 4, shall be resolved only in accordance with the following provisions:

(a) Negotiation. GM and Delphi shall attempt in good faith to resolve any such dispute promptly through negotiations of the parties. In the event of any such dispute, either party may deliver a Dispute Notice to the other party, and within 20 Business Days after the receipt of such Dispute Notice, the appropriate representatives of GM and Delphi shall meet to attempt to resolve such dispute. If such dispute has not been resolved within the Negotiation Period, or if one of the parties fails or refuses to negotiate such dispute, the issue shall be settled by arbitration pursuant to Section 4.6(b). The results of such arbitration shall be final and binding on the parties.

(b) Arbitration Procedure. Either party may initiate arbitration with regard to such dispute by giving the other party written notice either (i) at any time following the end of the Negotiation Period, or (ii) if the parties do not meet within 20 Business Days of the receipt of the Dispute Notice, at any time thereafter. The arbitration shall be conducted by three arbitrators in accordance with the CPR Rules, except as otherwise provided in this
Section 4.6. Within 20 days following receipt of the written notice of arbitration, GM and Delphi shall each appoint one arbitrator. The two arbitrators so appointed shall appoint the third arbitrator. If either GM or Delphi shall fail to appoint an arbitrator within such 20-day period, the arbitration shall be by the sole arbitrator appointed by the other party. Whether selected by GM and Delphi or otherwise, each arbitrator selected to resolve such dispute shall be a tax attorney or tax accountant who is generally recognized in the tax community as a qualified and competent tax practitioner with experience in the tax area involved in the issue or issues to be resolved. Such arbitrators shall be empowered to determine whether Delphi is required to indemnify GM pursuant to Section 4.4 and to determine the amount of the related indemnification payment. Each of GM and Delphi shall bear 50% of the aggregate expenses of the arbitrators. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. ss.ss.1-14. The place of arbitration shall be New York, New York. The final decision of the arbitrators shall be rendered no later than one year from the date of the written notice of arbitration.

- 19 -

4.7 EXCLUSIVE REMEDIES. Except for the right to pursue equitable remedies, the remedies provided in this Section 4 shall be deemed the sole and exclusive remedies of the parties with respect to the subject matters of the indemnification provisions of Section 4.4.

5. CERTAIN OTHER COVENANTS.

5.1 FINANCIAL AND OTHER INFORMATION.

(a) Financial Information. Delphi agrees that, for so long as GM is required to consolidate Delphi's results of operations and financial position or to account for its investment in Delphi under the equity method of accounting (determined in accordance with generally accepted accounting principles consistently applied):

(i) Delphi shall, and shall cause each of its Subsidiaries to, maintain a system of internal accounting controls that will provide reasonable assurance that: (A) Delphi's and such Subsidiaries' books, records and accounts fairly reflect all transactions and dispositions of assets and (B) the specific objectives of accounting control are achieved.

(ii) Delphi shall, and shall cause each of its Subsidiaries (other than Delphi Automotive Systems India Limited) to, maintain a fiscal year which commences on January 1 and ends on December 31 of each calendar year.

(iii) Delphi shall deliver to GM a trial balance submission, which shall include amounts relating to each of its Subsidiaries, in such format and detail as GM may request, (A) with respect to each month (other than the last month of each fiscal year), within four Business Days following the last day of each such month, and (B) with respect to each fiscal year, within five Business Days following December 31 of each such year.

(iv) As soon as practicable, and in any event within seven Business Days after the end of each of the first three fiscal quarters in each fiscal year of Delphi and within 14 Business Days after the end of each such fiscal year, Delphi shall deliver to GM a consolidated income statement and balance sheet for Delphi and its Subsidiaries for such fiscal quarter or year, as the case may be.

(v) As soon as practicable, and in any event within 35 days after the end of each of the first three fiscal quarters in each fiscal year of Delphi and no later than five days before Delphi intends to file its Quarterly Financial Statements (as defined below) with the SEC, Delphi shall deliver to GM drafts of (A) the consolidated financial statements of Delphi and its Subsidiaries (and notes thereto) for such periods and for the period from the beginning of the current fiscal year to the end of such quarter, setting forth in each case in comparative form for each such fiscal

- 20 -

quarter of Delphi the consolidated figures (and notes thereto) for the corresponding quarter and periods of the previous fiscal year and all in reasonable detail and prepared in accordance with Article 10 of Regulation S-X, and (B) a discussion and analysis by management of Delphi's and its Subsidiaries' financial condition and results of operations for such fiscal period, including, without limitation, an explanation of any material adverse change, all in reasonable detail and prepared in accordance with Item 303(b) of Regulation S-K. The information set forth in (A) and (B) above is herein referred to as the "Quarterly Financial Statements." No later than the earlier of (x) two Business Days prior to the date Delphi publicly files the Quarterly Financial Statements with the SEC or otherwise makes such Quarterly Financial Statements publicly available or (y) two Business Days prior to the date on which GM has notified Delphi that it intends to file its quarterly financial statements with the SEC, Delphi shall deliver to GM the final form of the Quarterly Financial Statements certified by the chief financial officer of Delphi as presenting fairly, in all material respects, the financial condition and results of operations of Delphi and its Subsidiaries; provided that Delphi may continue to revise such Quarterly Financial Statements prior to the filing thereof in order to make corrections and non-substantive changes which corrections and changes shall be delivered by Delphi to GM as soon as practicable, and in any event within eight hours thereafter; and, provided, further, that GM and Delphi financial representatives shall actively consult with each other regarding any changes (whether or not substantive) which Delphi may consider making to its Quarterly Financial Statements and related disclosures during the three Business Days immediately prior to any anticipated filing with the SEC, and Delphi shall obtain GM's consent prior to making any change to Delphi's Quarterly Financial Statements or related disclosures which would have an effect upon GM's financial statements or related disclosures. In addition to the foregoing, no Quarterly Financial Statement or any other document which refers, or contains information with respect, to the ownership of Delphi by GM, the separation of Delphi from GM or the Distribution shall be filed with the SEC or otherwise made public by Delphi or any of its Subsidiaries without the prior written consent of GM.

(vi) Delphi shall deliver to GM as soon as practicable, and in any event within 45 days after the end of each fiscal year of Delphi and no later than 10 days before Delphi intends to file its Annual Financial Statements (as defined below) with the SEC, (A) drafts of the consolidated financial statements of Delphi (and notes thereto) for such year, setting forth in each case in comparative form the consolidated figures (and notes thereto) for the previous fiscal year and all in reasonable detail and prepared in accordance with Regulation S-X and (B) a discussion and analysis by management of Delphi's and its Subsidiaries' financial condition and results of operations for such year, including, without limitation, an explanation of any material adverse change, all in reasonable detail and prepared in accordance with Item 303(a) of Regulation S-K. The information set forth in (A) and (B) above is herein referred to as the "Annual Financial Statements." Delphi shall deliver to GM all revisions to

- 21 -

such drafts as soon as any such revisions are prepared or made. No later than the earlier of (1) five Business Days prior to the date Delphi publicly files the Annual Financial Statements with the SEC or otherwise makes such Annual Financial Statements publicly available or (2) five Business Days prior to the date on which GM has notified Delphi that it intends to file its annual financial statements with the SEC, Delphi shall deliver to GM the final form of the Annual Financial Statements certified by the chief financial officer of Delphi as presenting fairly, in all material respects, the financial condition and results of operations of Delphi and its Subsidiaries; provided that Delphi may continue to revise such Annual Financial Statements prior to the filing thereof in order to make corrections and non-substantive changes which corrections and changes shall be delivered by Delphi to GM as soon as practicable, and in any event within eight hours thereafter; and, provided, further, that GM and Delphi financial representatives shall actively consult with each other regarding any changes (whether or not substantive) which Delphi may consider making to its Annual Financial Statements and related disclosures during the three Business Days immediately prior to any anticipated filing with the SEC, and Delphi shall obtain GM's consent prior to making any change to Delphi's Annual Financial Statements or related disclosures which would have an effect upon GM's financial statements or related disclosures. In addition to the foregoing, no Annual Financial Statement or any other document which refers, or contains information with respect, to the ownership of Delphi by GM, the separation of Delphi from GM or the Distribution shall be filed with the SEC or otherwise made public by Delphi or any of its Subsidiaries without the prior written consent of GM. In any event, Delphi shall deliver to GM, no later than 80 days after the end of each fiscal year of Delphi, the final form of the Annual Financial Statements accompanied by an opinion thereon by Delphi's independent certified public accountants.

(vii) Delphi shall deliver to GM all Quarterly and Annual Financial Statements of each Subsidiary of Delphi which is itself required to file financial statements with the SEC or otherwise make such financial statements publicly available, with such financial statements to be provided in the same manner and detail and on the same time schedule as those financial statements of Delphi required to be delivered to GM pursuant to this Section 5.1.

(viii) All information provided by Delphi or any of its Subsidiaries to GM pursuant to Sections 5.1(a)(iii) through (vii) inclusive shall be consistent in terms of format and detail and otherwise with the procedures in effect on the date hereof with respect to the provision of such financial information by the Delphi Automotive Systems Business and/or Delphi and its Subsidiaries, as applicable, to GM (and, where appropriate, as presently presented in financial reports to GM's Board of Directors), with such changes therein as may be requested by GM from time to time consistent with changes in reporting by sectors and Subsidiaries of GM.

- 22 -

(ix) Delphi and each of its Subsidiaries which files information with the SEC shall deliver to GM: (A) as soon as the same are prepared, substantially final drafts of: (x) all reports, notices and proxy and information statements to be sent or made available by Delphi or any of its Subsidiaries to their security holders, (y) all regular, periodic and other reports to be filed under Sections 13, 14 and 15 of the Exchange Act (including Reports on Forms 10-K, 10-Q and 8-K and Annual Reports to Shareholders), and (z) all registration statements and prospectuses to be filed by Delphi or any of its Subsidiaries with the SEC or any securities exchange pursuant to the listed company manual (or similar requirements) of such exchange (collectively, the documents identified in clauses (x), (y) and (z) are referred to herein as "Delphi Public Documents"), and (B) as soon as practicable, but in no event later than four Business Days prior to the date the same are printed, sent or filed, whichever is earliest, final copies of all such Delphi Public Documents; provided that Delphi may continue to revise such Delphi Public Documents prior to the filing thereof in order to make corrections and non-substantive changes which corrections and changes shall be delivered by Delphi to GM as soon as practicable, and in any event within eight hours thereafter; and, provided, further, that GM and Delphi financial representatives shall actively consult with each other regarding any changes (whether or not substantive) which Delphi may consider making to any of its Delphi Public Documents and related disclosures prior to any anticipated filing with the SEC, and Delphi shall obtain GM's consent prior to making any change to its Delphi Public Documents or related disclosures which would have an effect upon GM's financial statements or related disclosures. In addition to the foregoing, no Delphi Public Document or any other document which refers, or contains information with respect, to the ownership of Delphi by GM, the separation of Delphi from GM or the Distribution shall be filed with the SEC or otherwise made public by Delphi or any of its Subsidiaries without the prior written consent of GM.

(x) Delphi shall, as promptly as practicable, deliver to GM copies of all annual and other budgets and financial projections (consistent in terms of format and detail and otherwise with the procedures in effect on the date hereof) relating to Delphi or any of its Subsidiaries and shall provide GM an opportunity to meet with management of Delphi to discuss such budgets and projections.

(xi) With reasonable promptness, Delphi shall deliver to GM such additional financial and other information and data with respect to Delphi and its Subsidiaries and their business, properties, financial positions, results of operations and prospects as from time to time may be reasonably requested by GM.

(xii) Prior to issuance, Delphi shall deliver to GM copies of substantially final drafts of all press releases and other statements to be made available by Delphi or any of its Subsidiaries to employees of Delphi or any of its Subsidiaries or to the public concerning material developments in the business, properties, earnings, results

- 23 -

05-44481-rdd    Doc 16465-24    Filed 03/16/09    Entered 03/16/09 14:16:24    D-39
Pg 185 of 223

of operations, financial condition or prospects of Delphi or any of its Subsidiaries or the relationship between (A) Delphi or any of its Subsidiaries and (B) GM or any of its Affiliates. In addition, prior to the issuance of any such press release or public statement, Delphi shall consult with GM regarding any changes (other than typographical or other similar minor changes) to such substantially final drafts. Immediately following the issuance thereof, Delphi shall deliver to GM copies of final drafts of all press releases and other public statements. Delphi and GM will consult with each other as to the timing of their annual and quarterly earnings releases and will give each other an opportunity to review the information therein relating to Delphi and its Subsidiaries and to comment thereon.

(xiii) Delphi shall cooperate fully, and cause its accountants to cooperate fully, with GM to the extent requested by GM in the preparation of GM's public earnings releases, quarterly reports on Form 10-Q, Annual Reports to Shareholders, Annual Reports on Form 10-K, any Current Reports on Form 8-K and any other proxy, information and registration statements, reports, notices, prospectuses and any other filings made by GM with the SEC, any national securities exchange or otherwise made publicly available (collectively, "GM Public Filings"). Delphi agrees to provide to GM all information that GM reasonably requests in connection with any GM Public Filings or that, in the judgment of GM's Legal Staff, is required to be disclosed or incorporated by reference therein under any law, rule or regulation. Such information shall be provided by Delphi in a timely manner on the dates requested by GM (which may be earlier than the dates on which Delphi otherwise would be required hereunder to have such information available) to enable GM to prepare, print and release all GM Public Filings on such dates as GM shall determine. Delphi shall cause its accountants to consent to any reference to them as experts in any GM Public Filings required under any law, rule or regulation. If and to the extent requested by GM, Delphi shall diligently and promptly review all drafts of such GM Public Filings and prepare in a diligent and timely fashion any portion of such GM Public Filing pertaining to Delphi. Prior to any printing or public release of any GM Public Filing, an appropriate executive officer of Delphi shall, if requested by GM, certify that the information relating to Delphi, any Delphi Affiliate or the Delphi Business in such GM Public Filing is accurate, true and correct in all material respects. Unless required by law, rule or regulation, Delphi shall not publicly release any financial or other information which conflicts with the information with respect to Delphi, any Delphi Affiliate or the Delphi Business that is included in any GM Public Filing without GM's prior written consent. Prior to the release or filing thereof, GM shall provide Delphi with a draft of any portion of a GM Public Filing containing information relating to Delphi and its Subsidiaries and shall give Delphi an opportunity to review such information and comment thereon; provided that GM shall determine in its sole discretion the final form and content of all GM Public Filings.

- 24 -

(b) Auditors and Audits; Annual Statements and Accounting. Delphi agrees that, for so long as GM is required to consolidate Delphi's results of operations and financial position or to account for its investment in Delphi under the equity method of accounting (in accordance with generally accepted accounting principles):

(i) Delphi shall not select a different accounting firm than Deloitte & Touche, LLP to serve as its (and its Subsidiaries') independent certified public accountants ("Delphi's Auditors") without GM's prior written consent (which shall not be unreasonably withheld).

(ii) Delphi shall use its best efforts to enable the Delphi Auditors to complete their audit such that they will date their opinion on Delphi's audited annual financial statements on the same date that GM's independent certified public accountants ("GM's Auditors") date their opinion on GM's audited annual financial statements (the "GM Annual Statements"), and to enable GM to meet its timetable for the printing, filing and public dissemination of the GM Annual Statements.

(iii) Delphi shall provide to GM on a timely basis all information that GM reasonably requires to meet its schedule for the preparation, printing, filing, and public dissemination of the GM Annual Statements. Without limiting the generality of the foregoing, Delphi will provide all required financial information with respect to Delphi and its Subsidiaries to Delphi's Auditors in a sufficient and reasonable time and in sufficient detail to permit Delphi's Auditors to take all steps and perform all reviews necessary to provide sufficient assistance to GM's Auditors with respect to information to be included or contained in the GM Annual Statements.

(iv) Delphi shall authorize Delphi's Auditors to make available to GM's Auditors both the personnel who performed or are performing the annual audit of Delphi and work papers related to the annual audit of Delphi, in all cases within a reasonable time prior to Delphi's Auditors' opinion date, so that GM's Auditors are able to perform the procedures they consider necessary to take responsibility for the work of Delphi's Auditors as it relates to GM's Auditors' report on GM's statements, all within sufficient time to enable GM to meet its timetable for the printing, filing and public dissemination of the GM Annual Statements.

(v) Delphi shall provide GM's internal auditors access to Delphi's and its Subsidiaries, books and records so that GM may conduct reasonable audits relating to the financial statements provided by Delphi pursuant hereto as well as to the internal accounting controls and operations of Delphi and its Subsidiaries.

(vi) Delphi shall give GM as much prior notice as reasonably practical of any proposed determination of, or any significant changes in, its accounting estimates or accounting principles from those in effect on the date hereof. Delphi will consult

- 25 -

with GM and, if requested by GM, Delphi will consult with GM's independent public accountants with respect thereto. Delphi will not make any such determination or changes without GM's prior written consent if such a determination or a change would be sufficiently material to be required to be disclosed in Delphi's financial statements as filed with the SEC or otherwise publicly disclosed therein.

(vii) Notwithstanding clause (vi) above, Delphi shall make any changes in its accounting estimates or accounting principles that are requested by GM in order for Delphi's accounting estimates and principles to be consistent with those of GM.

Nothing in this Section 5.1 shall require Delphi to violate any agreement with any of its customers regarding the confidentiality of commercially sensitive information relating to that customer or its business; provided that in the event that Delphi is required under this Section 5.1 to disclose any such information, Delphi shall use all commercially reasonable efforts to seek to obtain such customer's consent to the disclosure of such information.

5.2 OTHER COVENANTS. Delphi hereby covenants and agrees that, for so long as GM beneficially owns at least 50% of the outstanding shares of Delphi Common Stock:

(a) Delphi shall not, without the prior written consent of GM (which it may withhold in its sole and absolute discretion), take, or cause to be taken, directly or indirectly, any action, including making or failing to make any election under the law of any state, which has the effect, directly or indirectly, of restricting or limiting the ability of GM to freely sell, transfer, assign, pledge or otherwise dispose of shares of Delphi Common Stock. Without limiting the generality of the foregoing, Delphi shall not, without the prior written consent of GM (which it may withhold in its sole and absolute discretion), (i) amend, supplement, restate, modify or alter the Rights Plan or any successor stockholder rights plan in any manner that would result in (A) the ownership of Delphi Common Stock by GM causing the rights thereunder to detach or become exercisable and/or (B) GM and its transferees not being entitled to the same rights thereunder as other holders of Delphi Common Stock or (ii) take any action, or take any action to recommend to its stockholders any action, which would among other things, limit the legal rights of, or deny any benefit to, GM as a Delphi stockholder in a manner not applicable to Delphi stockholders generally.

(b) Delphi shall not, without the prior written consent of GM (which it may withhold in its sole and absolute discretion), issue any shares of Delphi Capital Stock or any rights, warrants or options to acquire Delphi Capital Stock (including, without limitation, securities convertible or exchangeable for Delphi Capital Stock), if after giving effect to such issuances and considering all of the shares of Delphi Capital Stock acquirable pursuant to such rights, warrants and options to be outstanding on the date of such issuance (whether or

- 26 -

not then exercisable), GM would own less than 50% of the then outstanding shares of Delphi Common Stock.

(c) To the extent that GM is a party to any contracts or agreements that provide that certain actions of GM's Subsidiaries may result in GM being in breach of or in default under such agreements and GM has advised Delphi of the existence, and has furnished Delphi with copies, of such contracts or agreements (or the relevant portions thereof), Delphi shall not take any actions that reasonably could result in GM being in breach of or in default under any such contract or agreement. As of the date hereof, the contracts and agreements (or relevant portions thereof) applicable to this covenant are set forth on Exhibit A attached hereto. Delphi hereby acknowledges and agrees that GM has furnished it with copies of each contract or agreement (or the relevant portion thereof) listed on Exhibit A. The parties acknowledge and agree that, after the date hereof, GM may in good faith (and not solely with the intention of imposing restrictions on Delphi pursuant to this covenant) enter into additional contracts or agreements that provide that certain actions of GM's Subsidiaries may result in GM being in breach of or in default under such agreements. In such event, Exhibit A shall be deemed to be automatically amended to reflect the addition of any other contracts or agreements (or relevant portions thereof) of which GM advises Delphi after the date hereof in accordance with this Section 5.2(c). Delphi agrees to keep confidential and not to disclose any information provided to it pursuant to this Section 5.2(c).

5.3 COVENANTS REGARDING THE INCURRENCE OF INDEBTEDNESS.

(a) Delphi hereby covenants and agrees that, for so long as GM continues to beneficially own at least 50% of the outstanding shares of Delphi Common Stock, Delphi shall not, and shall not permit any of its Subsidiaries to, without GM's prior written consent (which it may withhold in its sole and absolute discretion), take any of the following actions:

(i) create, incur, assume or suffer to exist any Delphi Indebtedness in excess of an aggregate of $5.0 billion outstanding at any time; provided, however, that Delphi may consummate, or agree to consummate, any acquisition or other similar transaction or series of related transactions involving Delphi or any of its Subsidiaries acquiring Control of any Person (an "Acquisition Target") as a result of which the Delphi Indebtedness would exceed $5.0 billion so long as both (A) the Acquisition Target has an FFO to Debt Ratio equal to or greater than 20% and (B) the Delphi Indebtedness after giving effect to such transaction(s) (including, without duplication, any Delphi Indebtedness incurred in connection therewith and any Target Indebtedness that will become Delphi Indebtedness as a result of such transaction(s)) would not exceed $6.0 billion; and

(ii) consummate, or agree to consummate, any acquisition or other similar transaction or series of related transactions involving Delphi or any of its Subsidiaries acquiring Control of any Acquisition Target with an FFO to Debt Ratio

- 27 -

less than 20% unless the Adjusted Delphi Indebtedness would not exceed $3.0 billion.

(b) In order to implement this Section 5.3, Delphi shall notify GM in writing at least 15 Business Days prior to the time it or any of its Subsidiaries contemplates incurring any Delphi Indebtedness or agreeing to acquire Control of an Acquisition Target of its intention to do so and shall either (i) demonstrate to GM's satisfaction that this Section 5.3 shall not be violated by such proposed additional Delphi Indebtedness or acquisition or (ii) obtain GM's prior written consent to such proposed additional Delphi Indebtedness or acquisition. Any such written notification from Delphi to GM shall include documentation of any existing Delphi Indebtedness and estimated Delphi Indebtedness after giving effect to such proposed incurrence of additional Delphi Indebtedness or acquisition and, if delivered in connection with any transaction (s) involving an Acquisition Target, (A) documentation of the Acquisition Target's Target Indebtedness, (B) calculations of the Acquisition Target's FFO to Debt Ratio and (C) calculations of compliance with this Section 5.3, including the Adjusted Delphi Indebtedness, if applicable. GM shall have the right to verify the accuracy of such information and Delphi shall cooperate fully with GM in such effort (including, without limitation, by providing GM with access to the working papers and underlying documentation related to any calculations used in determining such information).

(c) For purposes of this Section 5.3, the following terms shall have the following meanings:

"Adjusted Delphi Indebtedness" means, with respect to any proposed transaction(s) involving an Acquisition Target, the sum of (i) the Delphi Indebtedness immediately after giving effect to such transaction(s) (including, without duplication, any Delphi Indebtedness incurred in connection therewith and any Target Indebtedness that will become Delphi Indebtedness as a result of such transaction(s)) and (ii) the amount by which the number described in clause (ii) of the definition of "FFO to Debt Ratio" set forth in this Section 5.3 would need to be reduced in order for the Acquisition Target's FFO to Debt Ratio to equal 20%.

"Delphi Indebtedness" means the sum of (i) the aggregate principal amount of total liabilities (whether long-term or short-term) for borrowed money (including capitalized leases) of Delphi and its Subsidiaries, as determined for purposes of its consolidated financial statements prepared in accordance with GAAP, and (ii) the aggregate amount attributable to all factoring or securitization of receivables and other financial assets by Delphi and its Subsidiaries in excess of $1.2 billion.

- 28 -

"FFO to Debt Ratio" means, for any Acquisition Target, as of immediately prior to Delphi acquiring Control of such Acquisition Target in the proposed transaction(s), the percentage determined by dividing (i) the sum of such Acquisition Target's net income plus depreciation and amortization for the last four full fiscal quarters, as determined for purposes of its consolidated financial statements prepared in accordance with GAAP, by (ii) the additional Delphi Indebtedness that would be incurred in connection with such proposed transaction(s), including, without limitation, any Target Indebtedness that will become Delphi Indebtedness as a result of such proposed transaction(s).

"Target Indebtedness" means, with respect to any proposed transaction(s) involving an Acquisition Target, such Acquisition Target's total obligations (whether short-term or long-term) for borrowed money (including capitalized leases) as of immediately prior to Delphi acquiring Control of such Acquisition Target in such proposed transaction(s).

6. INDEMNIFICATION.

6.1 INDEMNIFICATION BY DELPHI. Subject to Section 6.3, Delphi shall indemnify, defend and hold harmless GM, all GM Affiliates and each of their respective directors, officers and employees (in their capacities as such), from and against:

(a) all Losses relating to, arising out of, or due to, directly or indirectly, any breach by Delphi or any Delphi Affiliate of any of the provisions of this Agreement;

(b) all Losses relating to, arising out of, or due to, directly or indirectly, any incorrect, inaccurate or incomplete financial and other information provided by Delphi or any Delphi Affiliate to GM pursuant to Section 5.1 of this Agreement;

(c) all Losses relating to, arising out of, or due to any untrue statement or alleged untrue statement of a material fact contained in, or incorporated by reference into, the IPO Registration Statement or the omission or alleged omission to state (whether pursuant to direct statement or incorporation by reference) in the IPO Registration Statement a material fact required to be stated therein or necessary to make the statements therein not misleading other than with respect to the GM Disclosure Portions; and

(d) all Losses relating to, arising out of, or due to any untrue statement or alleged untrue statement of a material fact contained in, or incorporated by reference into, the Distribution Registration Statement or the omission or alleged omission to state (whether pursuant to direct statement or incorporation by reference) in the Distribution Registration Statement a material fact required to be stated therein or necessary to make the statements therein not misleading other than with respect to the GM Disclosure Portions.

- 29 -

6.2 INDEMNIFICATION BY GM. Subject to Section 6.3, GM shall indemnify, defend, and hold harmless Delphi, all Delphi Affiliates, and each of their respective directors, officers and employees (in their capacities as such), from and against:

(a) all Losses relating to, arising out of, or due to, directly or indirectly, any breach by GM or any GM Affiliate of any of the provisions of this Agreement;

(b) all Losses relating to, arising out of, or due to any untrue statement or alleged untrue statement of a material fact contained in, or incorporated by reference into, the GM Disclosure Portions of the IPO Registration Statement or the omission or alleged omission to state (whether pursuant to direct statement or incorporation by reference) in the GM Disclosure Portions of the IPO Registration Statement a material fact required to be stated therein or necessary to make the statements therein not misleading; and

(c) all Losses relating to, arising out of, or due to any untrue statement or alleged untrue statement of a material fact contained in, or incorporated by reference into, the GM Disclosure Portions of the Distribution Registration Statement or the omission or alleged omission to state (whether pursuant to direct statement or incorporation by reference) in the GM Disclosure Portions of the Distribution Registration Statement a material fact required to be stated therein or necessary to make the statements therein not misleading.

6.3 OTHER LIABILITIES.

(a) Except as provided in Section 6.4, this Section 6 shall not be applicable to any Tax-Related Losses, which shall be governed by Section 4 of this Agreement.

(b) This Section 6 shall not be applicable to any Losses relating to, arising out of, or due to any breach of the provisions of any other contract, agreement or understanding between GM or any GM Affiliate and Delphi or any Delphi Affiliate, including, without limitation, the Separation Agreement and any of the other Ancillary Agreements, which Losses shall be governed by the terms of such contract, agreement or understanding.

6.4 TAX EFFECTS OF INDEMNIFICATION.

(a) Any indemnification payment made under this Agreement shall be characterized for tax purposes as if such payment were made immediately prior to the latest Distribution Date, and shall therefore be treated, to the extent permitted by law, as either (i) a distribution from Delphi to GM or (ii) a capital contribution from GM to Delphi.

(b) The amount of any Loss or Tax-Related Losses for which indemnification is provided under this Agreement shall be (i) increased to take account of net Tax cost, if any, incurred by the Indemnitee arising from the receipt or accrual of an Indemnity Payment hereunder (grossed up for such increase) and (ii) reduced to take account of net Tax benefit,

- 30 -

if any, realized by the Indemnitee arising from incurring or paying such Loss or Tax-Related Losses. In computing the amount of any such Tax cost or Tax benefit, the Indemnitee shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt or accrual of any Indemnity Payment hereunder or incurring or paying any indemnified Loss or Tax-Related Losses. Any Indemnity Payment hereunder shall initially be made without regard to this Section 6.4 and shall be increased or reduced to reflect any such net Tax cost (including gross-up) or net Tax benefit only after the Indemnitee has actually realized such cost or benefit. For purposes of this Agreement, an Indemnitee shall be deemed to have "actually realized" a net Tax cost or a net Tax benefit to the extent that, and at such time as, the amount of Taxes payable by such Indemnitee is increased above or reduced below, as the case may be, the amount of Taxes that such Indemnitee would be required to pay but for the receipt or accrual of the Indemnity Payment or the incurrence or payment of such Loss or Tax-Related Losses, as the case may be. The amount of any increase or reduction hereunder shall be adjusted to reflect any final determination (which shall include the execution of Form 870-AD or successor form) with respect to the Indemnitee's liability for Taxes, and payments between GM and Delphi to reflect such adjustment shall be made if necessary.

6.5 EFFECT OF INSURANCE UPON INDEMNIFICATION. The amount which an Indemnifying Party is required to pay to any Indemnitee pursuant to this Section 6 shall be reduced (including retroactively) by any Insurance Proceeds and other amounts actually recovered by such Indemnitee in reduction of the related Loss, it being understood and agreed that each of Delphi and GM shall use commercially reasonable efforts to collect any such proceeds or other amounts to which it or any of its Affiliates is entitled, without regard to whether it is the Indemnifying Party hereunder. No Indemnitee shall be required, however, to collect any such proceeds or other amounts prior to being entitled to indemnification from an Indemnifying Party hereunder. If an Indemnitee receives an Indemnity Payment in respect of a Loss and subsequently receives Insurance Proceeds or other amounts in respect of such Loss, then such Indemnitee shall pay to such Indemnifying Party an amount equal to the difference between (a) the sum of the amount of such Indemnity Payment and the amount of such Insurance Proceeds or other amounts actually received and (b) the amount of such Loss, in each case adjusted (at such time as appropriate adjustment can be determined) to reflect any premium adjustment attributable to such claim.

6.6 PROCEDURE FOR INDEMNIFICATION INVOLVING THIRD-PARTY CLAIMS.

(a) Notice of Claim. If any Indemnitee receives notice of the assertion of any Third-Party Claim with respect to which an Indemnifying Party is obligated under this Agreement to provide indemnification (other than pursuant to Section 4), such Indemnitee shall give such Indemnifying Party notice thereof (together with a copy of such Third-Party Claim, process or other legal pleading) promptly after becoming aware of such Third-Party Claim; provided, however, that the failure of any Indemnitee to give notice as provided in this Section shall not relieve any Indemnifying Party of its obligations under this Section 6,

- 31 -

except to the extent that such Indemnifying Party is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail.

(b) Obligation of Indemnifying Party. An Indemnifying Party, at such Indemnifying Party's own expense and through counsel chosen by such Indemnifying Party (which counsel shall be reasonably acceptable to the Indemnitee), may elect to defend any Third-Party Claim. If an Indemnifying Party elects to defend a Third-Party Claim, then, within ten Business Days after receiving notice of such Third-Party Claim (or sooner, if the nature of such Third-Party Claim so requires), such Indemnifying Party shall notify the Indemnitee of its intent to do so, and such Indemnitee shall cooperate in the defense of such Third-Party Claim. Such Indemnifying Party shall pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation. Such Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Third-Party Claim. After notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third-Party Claim, such Indemnifying Party shall not be liable to such Indemnitee under this Section 6 for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense thereof other than those expenses referred to in the preceding sentence; provided, however, that such Indemnitee shall have the right to employ one law firm as counsel, together with a separate local law firm in each applicable jurisdiction ("Separate Counsel"), to represent such Indemnitee in any action or group of related actions (which firm or firms shall be reasonably acceptable to the Indemnifying Party) if, in such Indemnitee's reasonable judgment at any time, either a conflict of interest between such Indemnitee and such Indemnifying Party exists in respect of such claim, or there may be defenses available to such Indemnitee which are different from or in addition to those available to such Indemnifying Party and the representation of both parties by the same counsel would be inappropriate, and in that event (i) the reasonable fees and expenses of such Separate Counsel shall be paid by such Indemnifying Party (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one Separate Counsel (excluding local counsel) with respect to any Third-Party Claim (even if against multiple Indemnitees)) and (ii) each of such Indemnifying Party and such Indemnitee shall have the right to conduct its own defense in respect of such claim. If an Indemnifying Party elects not to defend against a Third-Party Claim, or fails to notify an Indemnitee of its election as provided in this Section 6 within the period of ten Business Days described above, the Indemnitee may defend, compromise, and settle such Third-Party Claim and shall be entitled to indemnification hereunder (to the extent permitted hereunder); provided, however, that no such Indemnitee may compromise or settle any Third-Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall not, without the prior written consent of the Indemnitee, (i) settle or compromise any Third-Party Claim or consent to the entry of any judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnitee of a written release from all liability in respect of such Third-Party Claim or (ii) settle or

- 32 -

compromise any Third-Party Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee.

(c) Joint Defense of Certain Claims. Notwithstanding the provisions of Section 6.6(b), GM and Delphi shall jointly control the defense of, and cooperate with each other with respect to defending, any Third-Party Claim with respect to which each party is claiming that it is entitled to indemnification under Section 6.1 or 6.2. If either GM or Delphi fails to defend jointly any such Third-Party Claim, the other party shall solely defend such Third-Party Claim and the party failing to defend jointly shall use all commercially reasonable efforts to cooperate with the other party in its defense of such Third-Party Claim; provided, however, that neither party may compromise or settle any such Third-Party Claim without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. All costs and expenses of either party in connection with, and during the course of, the joint control of the defense of any such Third-Party Claim shall be initially paid by the party that incurs such costs and expenses. Such costs and expenses shall be reallocated and reimbursed in accordance with the respective indemnification obligations of the parties at the conclusion of the defense of such Third-Party Claim.

6.7 PROCEDURE FOR INDEMNIFICATION NOT INVOLVING THIRD-PARTY CLAIMS. If any Indemnitee desires to assert against an Indemnifying Party any claim for indemnification under this Section 6 other than a Third-Party Claim (a "Claim"), the Indemnitee shall deliver to the Indemnifying Party notice of its demand for satisfaction of such Claim (a "Request"), specifying in reasonable detail the amount of such Claim and the basis for asserting such Claim. Within 30 days after the Indemnifying Party has been given a Request, the Indemnifying Party shall either (i) satisfy the Claim requested to be satisfied in such Request by delivering to the Indemnitee payment by wire transfer or a certified or bank cashier's check payable to the Indemnified Party in immediately available funds in an amount equal to the amount of such Claim, or (ii) notify the Indemnitee that the Indemnifying Party contests such Claim by delivering to the Indemnitee a Dispute Notice, stating that the Indemnifying Party objects to such Claim and specifying in reasonable detail the basis for contesting such Claim. Any dispute described in clause (ii) of this Section 6.7 shall be subject to the provisions of Section 7.1.

6.8 EXCLUSIVE REMEDIES. Except for the right to pursue equitable remedies, the remedies provided in this Section 6 shall be deemed the sole and exclusive remedies of the parties with respect to the subject matters of the indemnification provisions of this Section 6.

7. MISCELLANEOUS.

7.1 DISPUTE RESOLUTION. GM and Delphi shall attempt in good faith to resolve any dispute between the parties arising out of or relating to this Agreement promptly through negotiations of the parties prior to seeking any other legal or equitable remedy.

- 33 -

7.2 SURVIVAL. The representations and warranties contained in this Agreement shall survive the execution and delivery hereof and all Distribution Dates until the expiration of all applicable statutes of limitations.

7.3 COMPLETE AGREEMENT. Except as otherwise set forth in this Agreement, this Agreement and the exhibits hereto shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof and shall supersede all prior agreements and understandings, whether written or oral, between the parties with respect to such subject matter.

7.4 AUTHORITY. Each of the parties hereto represents to the other that
(a) it has the corporate power and authority to execute, deliver and perform each of this Agreement and the Registration Rights Agreement, (b) the execution, delivery and performance of each of this Agreement and the Registration Rights Agreement by it has been duly authorized by all necessary corporate action, (c) it has duly and validly executed and delivered each of this Agreement and the Registration Rights Agreement, and (d) each of this Agreement and the Registration Rights Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

7.5 GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (other than the laws regarding conflicts of laws) as to all matters, including matters of validity, construction, effect, performance and remedies.

7.6 CONSENT TO EXCLUSIVE JURISDICTION. Any action, suit or proceeding arising out of any claim that the parties cannot settle through good faith negotiations (except any claim to which Section 4.6 applies) shall be litigated exclusively in the state courts of Delaware. Each of the parties hereto hereby irrevocably and unconditionally (a) submits to the jurisdiction of the state courts of Delaware for any such action, suit or proceeding, (b) agrees not to commence any such action, suit or proceeding except in the state courts of Delaware, (c) waives, and agrees not to plead or to make, any objection to the venue of any such action, suit or proceeding in the state courts of Delaware, (d) waives, and agrees not to plead or to make, any claim that any such action, suit or proceeding brought in the state courts of Delaware has been brought in an improper or otherwise inconvenient forum, (e) waives, and agrees not to plead or to make, any claim that the state courts of Delaware lack personal jurisdiction over it, and (f) waives its right to remove any such action, suit or proceeding to the federal courts except when such courts are vested with sole and exclusive jurisdiction by statute. GM and Delphi shall cooperate with each other in connection with any such action, suit or proceeding to obtain reliable assurances that confidential treatment will be accorded any information that either party shall reasonably deem to be confidential or proprietary. Each of the parties hereto irrevocably designates and appoints its respective Service Agent as its agent to receive service of process in any such action, suit or proceeding. Each of the parties hereto further covenants and agrees that, until the expiration of all applicable statutes of limitations relating to potential claims under this Agreement, each such party shall maintain a duly appointed agent for the service of summonses and other legal process in the State of Delaware, and shall promptly notify

- 34 -

the other party hereto of any change in the name or address of its Service Agent and the name and address of any replacement for its Service Agent, if such agent is no longer the Service Agent named herein. This Section 7.6 is meant to comply with 6 Del. C. Section 2708. Notwithstanding anything contained in this Section 7.6, all claims for indemnification under Section 6 shall be governed by the provisions thereof.

7.7 NOTICES. All Notices shall be in writing and shall be deemed given upon (a) a transmitter's confirmation of a receipt of a facsimile transmission (but only if followed by confirmed delivery of a standard overnight courier the following Business Day or if delivered by hand the following Business Day), or
(b) confirmed delivery of a standard overnight courier or delivered by hand, to the parties at the following addresses:

if to GM to:

General Motors Corporation 767 Fifth Avenue New York, NY 10153 Attention: Treasurer Telecopy No.: (212) 418-3630

with a copy to:

General Motors Corporation 3031 West Grand Boulevard Detroit, MI 48202 Attention: Warren G. Andersen, Esq.

Telecopy No.: (313) 974-0685

with a copy to:

General Motors Corporation
100 Renaissance Center
Detroit, MI 48243
Attention: Chief Financial Officer
Telecopy No.: (313) 667-3122

and, if delivered pursuant to Section 4, with a copy to:

General Motors Corporation
3044 West Grand Boulevard
Detroit, MI 48202
Attention: Chief Tax Officer
Telecopy No.: (313) 556-1552

- 35 -

Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, MI 48098
Attention: General Counsel
Telecopy No.: (248) 813-2523

with a copy to:

Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, MI 48098
Attention: Chief Financial Officer
Telecopy No.: (248) 813-2590

and, if delivered pursuant to Section 4, with a copy to:

Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, MI 48098
Attention: Chief Tax Officer
Telecopy No.: (248) 813-2590

or to such other address as either party hereto may have furnished to the other party by a Notice in writing in accordance with this Section 7.7.

7.8 AMENDMENT AND MODIFICATION. This Agreement may not be amended or modified in any respect except by a written agreement signed by both of the parties hereto.

7.9 BINDING EFFECT; ASSIGNMENT. This Agreement and all of the provisions hereof shall be binding upon the parties hereto and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except with respect to a merger of either party with another Person, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either party hereto without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed.

7.10 THIRD PARTY BENEFICIARIES. The Indemnitees and their respective successors shall be third party beneficiaries of the indemnification provisions of Sections 4 and 6, as applicable, and shall be entitled to enforce those provisions and in connection with such enforcement shall be subject to Section 7.6, in each such case as fully and to the same extent as if they were parties to this Agreement. Except as provided in the previous sentence, nothing in this Agreement, express or implied, is intended to or shall confer upon any Person any legal or equitable right, benefit or remedy

- 36 -

of any nature whatsoever under or by reason of this Agreement and no Person (other than as provided in the previous sentence) shall be deemed a third party beneficiary under or by reason of this Agreement.

7.11 COUNTERPARTS. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Agreement may be executed by facsimile signature.

7.12 WAIVER. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) by the party entitled to enforce such term, but such waiver shall be effective only if it is in writing signed by the party against which such waiver is to be asserted. Unless otherwise expressly provided in this Agreement, no delay or omission on the part of any party in exercising any right or privilege under this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right or privilege under this Agreement operate as a waiver of any other right or privilege under this Agreement nor shall any single or partial exercise of any right or privilege preclude any other or further exercise thereof or the exercise of any other right or privilege under this Agreement. No failure by either party to take any action or assert any right or privilege hereunder shall be deemed to be a waiver of such right or privilege in the event of the continuation or repetition of the circumstances giving rise to such right unless expressly waived in writing by the party against whom the existence of such waiver is asserted.

7.13 SEVERABILITY. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.14 REMEDIES. Each of GM and Delphi shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. Each of GM and Delphi acknowledges and agrees that under certain circumstances the breach by GM or any of its Affiliates or Delphi or any of its Affiliates of a term or provision of this Agreement will materially and irreparably harm the other party, that money damages will accordingly not be an adequate remedy for such breach and that the non-defaulting party, in its sole discretion and in addition to its rights under this Agreement and any other remedies it may have at law or in equity, may apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any breach of the provisions of this Agreement.

7.15 PERFORMANCE. Each of the parties hereto shall use all commercially reasonable efforts to cause to be performed all actions, agreements and obligations set forth herein to be performed by any Affiliate of such party.

- 37 -

7.16 REFERENCES; CONSTRUCTION. The table of contents and the section and other headings and subheadings contained in this Agreement and the exhibits hereto are solely for the purpose of reference, are not part of the agreement of the parties hereto, and shall not in any way affect the meaning or interpretation of this Agreement or any exhibit hereto. All references to days or months shall be deemed references to calendar days or months. All references to "$" shall be deemed references to United States dollars. Unless the context otherwise requires, any reference to a "Section" or an "Exhibit" shall be deemed to refer to a section of this Agreement or an exhibit to this Agreement, as applicable. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, unless otherwise specifically provided, they shall be deemed to be followed by the words "without limitation." This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing the document to be drafted.

* * * * * *

- 38 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date and year first written above.

### GENERAL MOTORS CORPORATION

```
By:  /s/ E.A. Feldstein
     ------------------------------------------
     Name:  E.A. Feldstein
     Its:  Vice President and Treasurer
```

### DELPHI AUTOMOTIVE SYSTEMS CORPORATION

```
By:  /s/ Logan G. Robinson
     ------------------------------------------
     Name:  Logan G. Robinson
     Its:  Vice President and General Counsel
```

**EXHIBIT A**

**AGREEMENTS SUBJECT TO SECTION 5.2(C)**

1. GM is a party to various agreements containing the covenants described on the pages attached hereto as Schedule A-1. Such covenants shall be subject to Section 5.2(c) of the IPO and Distribution Agreement.

**REGISTRATION RIGHTS AGREEMENT**

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), is made and entered into as of February 1, 1999, between General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive Systems Corporation, a Delaware corporation and a wholly owned subsidiary of GM (the "Company").

WHEREAS, the Board of Directors of GM has determined that it would be appropriate and desirable to completely separate the Company's business from GM;

WHEREAS, GM has caused the Company to be incorporated in order to effect such separation;

WHEREAS, GM and Delphi have previously entered into a Master Separation Agreement and certain ancillary agreements, each effective as of January 1, 1999, pursuant to which GM has contributed and transferred to the Company, and the Company has received and assumed, the assets and liabilities then associated with the Company's business as described therein;

WHEREAS, GM and Delphi intend that this contribution qualify as a tax-free reorganization under Section 368(a)(1)(D) of the Internal Revenue Code;

WHEREAS, GM currently owns all of the issued and outstanding shares of the Company's common stock (the "Common Stock");

WHEREAS, the Company is offering and selling to the public (the "IPO") by means of a Registration Statement (File No. 333-67333) initially filed with the Securities and Exchange Commission (the "SEC") on Form S-1 on November 16, 1998 (the "Registration Statement") shares of its Common Stock;

WHEREAS, immediately following the consummation of the IPO, GM shall own approximately 82.3% of the outstanding shares of Common Stock (or approximately 80.2% if the underwriters exercise their over-allotment option in full in accordance with the underwriting agreement relating to the IPO);

WHEREAS, following the IPO, GM currently intends to divest itself of its entire ownership of the Company during 1999 through one or more tax-free distributions or exchanges to the holders of GM $1-2/3 common stock (the "Distribution");

WHEREAS, GM currently expects to accomplish the Distribution by means of a split-off, a spin-off or some combination of both transactions;

WHEREAS, GM and Delphi intend that the Distribution will be tax-free to GM and its stockholders under Section 355 of the Code; and

WHEREAS, concurrently with the execution of this Agreement, GM and the Company are entering into an Initial Public Offering and Distribution Agreement to set forth certain agreements with respect to the IPO and the Distribution; and

WHEREAS, if GM determines not to complete the Distribution, or the Distribution is abandoned without GM divesting itself of 100% of the Common Stock it owns, GM and the Company desire to make certain arrangements to provide GM with registration rights with respect to shares of Common Stock it then holds;

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and intending to be legally bound hereby, the parties hereby agree as follows:

Section 1. Effectiveness of Agreement; Term.

1.1 Effective Date. This Agreement shall become effective upon the date that GM provides to the Company written notice (the "Abandonment Notice") that it no longer intends to proceed with or complete the Distribution (the "Effective Date").

1.2 Shares Covered. This Agreement covers those shares of Common Stock that are held by GM immediately following the IPO and continue to be held by GM as of the date of the Abandonment Notice (subject to the provisions of Section 7, the "Shares"). The "Shares" shall include any securities issued or issuable with respect to the Shares by way of a stock dividend or a stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. The "Shares" shall not include any shares of Common Stock acquired by GM after the completion of the IPO.

GM and any Permitted Transferees (as defined in Section 2.5) are each referred to herein as a "Holder" and collectively as the "Holders" and the Holders of Shares proposed to be included in any registration under this Agreement are each referred to herein as a "Selling Holder" and collectively as the "Selling Holders."

Section 2. Demand Registration.

2.1 Notice. Upon the terms and subject to the conditions set forth herein, upon written notice of any Holder requesting that the Company effect the registration under the Securities Act of 1933, as amended (the "Securities Act"), of any or all of the Shares held by it, which notice shall specify the intended method or methods of disposition of such Shares (which methods may include, without limitation, a Shelf Registration, a Convertible Registration or an Exchange Registration (as

such terms are defined in Section 2.6)], the Company will promptly give written notice of the proposed registration to all other Holders and will use its best efforts to effect (at the earliest reasonable date) the registration under the Securities Act of such Shares (and the Shares of any other Holders joining in such request as are specified in a written notice received by the Company within 20 days after receipt of the Company's written notice of the proposed registration) for disposition in accordance with the intended method or methods of disposition stated in such request (each registration request pursuant to this Section 2.1 is sometimes referred to herein as a "Demand Registration"); provided, however, that:

(a) the Company shall not be obligated to effect registration with respect to Shares pursuant to this Section 2 within 90 days after the effective date of a previous registration, other than a Shelf Registration, effected with respect to Shares pursuant to this Section 2;

(b) if, while a registration request is pending pursuant to this Section 2, the Company determines in the good faith judgment of the general counsel of the Company that such registration would reasonably be expected to have a material adverse effect on any existing proposal or plans by the Company or any of its subsidiaries to engage in any material acquisition, merger, consolidation, tender offer, other business combination, reorganization, securities offering or other material transaction, the Company may postpone for up to 90 days the filing or effectiveness of such registration; provided, however, that the Company may delay a Demand Registration hereunder only once in any 12 month period;

(c) except in the case of a Convertible Registration or an Exchange Registration, the number of the Shares registered pursuant to any registration requested pursuant to this Section 2 shall have an aggregate expected offering price of at least $250 million; and

(d) if a Demand Registration is an underwritten offering and the managing underwriters advise the Company in writing that in their opinion the number of Shares requested to be included in such offering exceeds the number of Shares which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Shares initially requesting such registration or without materially adversely affecting the market for the Common Stock, the Company shall include in such registration the number of Shares requested to be included therein which in the opinion of such underwriters can be sold in an orderly manner within the price range of such offering and without materially adversely affecting the market for the Common Stock, pro rata among the respective Holders thereof on the basis of the amount of Shares owned by each Holder requesting inclusion of Shares in such registration.

2.2 Registration Expenses. All Registration Expenses (as defined in Section 8) for any registration requested pursuant to this Section 2 (including any registration that is delayed or withdrawn) shall be paid by the Company.

3

2.3 Selection of Professionals. The Holders of a majority of the Shares included in any Demand Registration shall have the right to select the investment banker(s) and manager(s) to administer the offering; provided, however, that if such Holders select an investment banker or manager that was not one of the managers of the IPO, such investment banker or manager shall not administer such offering if the Company reasonably objects thereto. The Holders of a majority of the Shares included in any Demand Registration shall have the right to select the financial printer, the solicitation and/or exchange agent (if any) and one counsel for the Selling Holders. The Company shall select its own outside counsel and independent auditors.

2.4 Third Person Shares. The Company shall have the right to cause the registration of securities for sale for the account of any Person (including the Company) other than the Selling Holders (the "Third Person Shares") in any registration of the Shares requested pursuant to this Section 2 so long as the Third Person Shares are disposed of in accordance with the intended method or methods of disposition requested pursuant to this Section 2; provided, however, that the Company shall not have the right to cause the registration of such securities of such other Persons if the registration requested pursuant to this
Section 2 is a Convertible Registration or an Exchange Registration.

If a Demand Registration in which the Company proposes to include Third Person Shares is an underwritten offering and the managing underwriters advise the Company in writing that in their opinion the number of Shares and Third Person Shares requested to be included in such offering exceeds the number of Shares and Third Person Shares which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Shares initially requesting such registration or without materially adversely affecting the market for the Common Stock, the Company shall not include in such registration any Third Person Shares unless all of the Shares initially requested to be included therein are so included.

2.5 Permitted Transferees. As used in this Agreement, "Permitted Transferees" shall mean any transferee, whether direct or indirect, of Shares designated by GM (or a subsequent holder) in a written notice to the Company as provided for in Section 9.7. Any Permitted Transferees of the Shares shall be subject to and bound by all of the terms and conditions herein applicable to Holders. The notice required by this Section 2.5 shall be signed by both the transferring Holder and the Permitted Transferees so designated and shall include an undertaking by the Permitted Transferees to comply with the terms and conditions of this Agreement applicable to Holders.

2.6 Shelf Registration; Convertible Registration; Exchange Registration. With respect to any Demand Registration, the requesting Holders may request the Company to effect a registration of the Shares (a) under a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) (a "Shelf Registration"); (b) in connection with such Holders' registration under the Securities Act of securities (the "Convertible Securities") convertible into, exercisable for or otherwise related to the Shares (a "Convertible Registration"); or (c) in connection with such

4

Holders' offer to exchange the Shares for any debt or equity securities of such Holders, a subsidiary or affiliate thereof or any other Person (an "Exchange Registration").

2.7 SEC Form. The Company shall use its best efforts to cause Demand Registrations to be registered on Form S-3 (or any successor form), and if the Company is not then eligible under the Securities Act to use Form S-3, Demand Registrations shall be registered on Form S-1 (or any successor form). If a Demand Registration is a Convertible Registration or an Exchange Registration, the Company shall effect such registration on the appropriate Form under the Securities Act for such registrations. The Company shall use its best efforts to become eligible to use Form S-3 and, after becoming eligible to use Form S-3, shall use its best efforts to remain so eligible.

2.8 Other Registration Rights. The Company shall not grant to any Persons the right to request the Company to register any equity securities of the Company, or any securities convertible or exchangeable into or exercisable for such securities unless such rights are consistent with the rights granted under this Agreement.

Section 3. Piggyback Registrations.

3.1 Notice and Registration. If the Company proposes to register any of its securities for public sale under the Securities Act (whether proposed to be offered for sale by the Company or any other Person), on a form and in a manner which would permit registration of the Shares for sale to the public under the Securities Act (a "Piggyback Registration"), it will give prompt written notice to the Holders of its intention to do so, and upon the written request of any or all of the Holders delivered to the Company within 20 days after the giving of any such notice (which request shall specify the Shares intended to be disposed of by such Holders), the Company will use its best efforts to effect, in connection with the registration of such other securities, the registration under the Securities Act of all of the Shares which the Company has been so requested to register by such Holders (which shall then become Selling Holders), to the extent required to permit the disposition (in accordance with the same method of disposition as the Company proposes to use to dispose of the other securities) of the Shares to be so registered; provided, however, that:

(a) if, at any time after giving such written notice of its intention to register any of its other securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such other securities, the Company may, at its election, give written notice of such determination to the Selling Holders (or, if prior to delivery of the Holders' written request described above in this Section 3.1, the Holders) and thereupon the Company shall be relieved of its obligation to register such Shares in connection with the registration of such other securities (but not from its obligation to pay Registration Expenses to the extent incurred in connection therewith as provided in Section 3.3), without prejudice, however, to the rights (if any) of any Selling Holders immediately to request (subject to the terms and conditions of Section 2) that such registration be effected as a registration under Section 2;

5

(b) the Company shall not be required to effect any registration of the Shares under this Section 3 incidental to the registration of any of its securities in connection with mergers, acquisitions, exchange offers, subscription offers, dividend reinvestment plans or stock option or other employee benefit plans of the Company;

(c) if a Piggyback Registration is an underwritten primary registration on behalf of the Company and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without materially adversely affecting the marketability of the offering or the market for the Common Stock, the Company shall include in such registration (i) first, the securities the Company proposes to sell, (ii) second, the Shares requested to be included in such registration, pro rata among the Holders of such Shares on the basis of the number of Shares owned by each such Holder, and (iii) third, any other securities requested to be included in such registration; and

(d) if a Piggyback Registration is an underwritten secondary registration on behalf of holders of the Company's securities entitled to demand registration thereof and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without materially adversely affecting the marketability of the offering or the market for the Common Stock, the Company shall include in such registration (i) first, the securities requested to be included therein by the holders requesting such registration and the Shares requested to be included in such registration, pro rata among the holders of such securities on the basis of the number of securities owned by each such holder, and (ii) second, any other securities requested to be included in such registration.

No registration of the Shares effected under this Section 3 shall relieve the Company of its obligation to effect a registration of Shares pursuant to
Section 2.

3.2 Selection of Professionals. If any Piggyback Registration is an underwritten offering and any of the investment banker(s) or manager(s) selected to administer the offering was not one of the managers of the IPO, such investment banker or manager shall not administer such offering if the Holders of a majority of the Shares included in such Piggyback Registration reasonably object thereto. The Holders of a majority of the Shares included in any Piggyback Registration shall have the right to select one counsel for the Selling Holders. The Company shall select its own outside counsel and independent auditors.

3.3 Registration Expenses. The Company will pay all of the Registration Expenses in connection with any registration pursuant to this
Section 3.

6

Section 4. Registration Procedures.

4.1 Registration and Qualification. If and whenever the Company is required to use its best efforts to effect the registration of any of the Shares under the Securities Act as provided in Sections 2 and 3, including an underwritten offering pursuant to a Shelf Registration, the Company will as promptly as is practicable:

(a) prepare and file with the SEC a registration statement with respect to such Shares and use its best efforts to cause such registration statement to become effective (provided that before filing a registration statement or prospectus or any amendments or supplement thereto, the Company shall furnish to the counsel selected by the Holders of a majority of the Shares covered by such registration statement copies of all such documents proposed to be filed (which documents shall be subject to the review and comment of such counsel);

(b) except in the case of a Shelf Registration, Convertible Registration or Exchange Registration, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all of the Shares until the earlier of (i) such time as all of such Shares have been disposed of in accordance with the intended methods of disposition set forth in such registration statement or (ii) the expiration of nine months after such registration statement becomes effective;

(c) in the case of a Shelf Registration (but not including any Convertible Registration), prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all Shares subject thereto for a period ending on the earlier of
(i) 18 months after the effective date of such registration statement and (ii) the date on which all the Shares subject thereto have been sold pursuant to such registration statement (the "Shelf Effective Period");

(d) in the case of a Convertible Registration or an Exchange Registration, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all of the Shares subject thereto until such time as the rules, regulations and requirements of the Securities Act and the terms of the Convertible Securities no longer require such Shares to be registered under the Securities Act (the "Convertible Effective Period");

(e) furnish to the Selling Holders and to any underwriter of such Shares such number of conformed copies of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus

7

included in such registration statement (including each preliminary prospectus and any summary prospectus), in conformity with the requirements of the Securities Act, such documents incorporated by reference in such registration statement or prospectus, and such other documents as the Selling Holders or such underwriter may reasonably request;

(f) use its best efforts to register or qualify all of the Shares covered by such registration statement under such other securities or blue sky laws of such jurisdictions as the Selling Holders or any underwriter of such Shares shall reasonably request, and do any and all other acts and things which may be necessary or advisable to enable the Selling Holders or any underwriter to consummate the disposition in such jurisdictions of the Shares covered by such registration statement, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction where it is not so qualified, or to subject itself to taxation in any such jurisdiction, or to consent to general service of process in any such jurisdiction;

(g) (i) furnish to the Selling Holders, addressed to them, an opinion of counsel for the Company and (ii) use its best efforts to furnish to the Selling Holders, addressed to them, a "cold comfort" letter signed by the independent public accountants who have certified the Company's financial statements included in such registration statement, covering substantially the same matters with respect to such registration statement (and the prospectus included therein) and, in the case of such accountants' letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' letters delivered to underwriters in underwritten public offerings of securities and such other matters as the Selling Holders may reasonably request, in each case, in form and substance and as of the dates reasonably satisfactory to the Selling Holders;

(h) immediately notify the Selling Holders, at any time when a prospectus relating to a registration pursuant to Section 2 or 3 is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and at the request of the Selling Holders prepare and furnish to the Selling Holders a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such Shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading;

(i) permit any Selling Holder which Selling Holder, in its sole and exclusive judgment, might be deemed to be an underwriter or a controlling person of the Company, to participate in the preparation of such registration or comparable statement and to require the insertion

8

therein of material furnished to the Company in writing, which in the reasonable judgment of such Holder and its counsel should be included;

(j) to make available members of management of the Company, as selected by the Holders of a majority of the Shares included in such registration, for assistance in the selling effort relating to the Shares covered by such registration, including, but not limited to, the participation of such members of the Company's management in road show presentations.

(k) in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any securities included in such registration statement for sale in any jurisdiction, the Company shall use it best efforts promptly to obtain the withdrawal of such order; and

(l) use its best efforts to cause Shares covered by such registration statement to be registered with or approved by such other government agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of such Shares.

The Company may require the Selling Holders to furnish the Company with such information regarding the Selling Holders and the distribution of such Shares as the Company may from time to time reasonably request in writing and as shall be required by law, the SEC or any securities exchange on which any shares of Common Stock are then listed for trading in connection with any registration.

4.2 Underwriting. If requested by the underwriters for any underwritten offering in connection with a registration requested hereunder (including any registration under Section 3 which involves, in whole or in part, an underwritten offering), the Company will enter into an underwriting agreement with such underwriters for such offering, such agreement to contain such representations and warranties by the Company and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions, including, without limitation, indemnities and contribution to the effect and to the extent provided in Section 6 and the provision of opinions of counsel and accountants' letters to the effect and to the extent provided in Section 4.1(g). The Company may require that the Shares requested to be registered pursuant to Section 3 be included in such underwriting on the same terms and conditions as shall be applicable to the Other Securities being sold through underwriters under such registration; provided, however, that no Selling Holder shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding such Holder and such Holder's intended method of distribution) or to undertake any indemnification obligations to the Company or the underwriters with respect thereto, except as otherwise provided in Section 6 hereof. The Selling Holders shall be parties to any such underwriting agreement, and the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such Selling Holders.

9

4.3 Blackout Periods for Shelf Registrations.

(a) At any time when a Shelf Registration effected pursuant to
Section 2 relating to the Shares is effective, upon written notice from the Company to the Selling Holders that the Company determines in the good faith judgment of the general counsel of the Company that the Selling Holders' sale of the Shares pursuant to the Shelf Registration would require disclosure of material information which the Company has a bona fide business purpose for preserving as confidential and the disclosure of which would have a material adverse effect on the Company or the Company is unable to comply with SEC requirements (an "Information Blackout"), the Selling Holders shall suspend sales of the Shares pursuant to such Shelf Registration until the earlier of (i) the date upon which such material information is disclosed to the public or ceases to be material, (ii) 90 days after the general counsel of the Company makes such good faith determination or (iii) such time as the Company notifies the Selling Holders that sales pursuant to such Shelf Registration may be resumed (the number of days from such suspension of sales of the Selling Holders until the day when such sales may be resumed hereunder is hereinafter called a "Sales Blackout Period").

(b) If there is an Information Blackout and the Selling Holders do not notify the Company in writing of their desire to cancel such Shelf Registration, the period set forth in Section 4.1(c)(i) shall be extended for a number of days equal to the number of days in the Sales Blackout Period.

4.4 Listing. In connection with the registration of any offering of the Shares pursuant to this Agreement, the Company agrees to use its best efforts to effect the listing of such Shares on any securities exchange on which any shares of the Common Stock are then listed or otherwise facilitate the public trading of such Shares.

4.5 Holdback Agreements.

(a) The Company shall not effect any public sale or distribution of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, during the seven days prior to and during the 90-day period beginning on the effective date of any registration statement in connection with a Demand Registration (other than a Shelf Registration) or a Piggyback Registration, except pursuant to registrations on Form S-8 or any successor form or unless the underwriters managing any such public offering otherwise agree.

(b) If the Holders of Shares notify the Company in writing that they intend to effect an underwritten sale of Shares registered pursuant to a Shelf Registration pursuant to Section 2 hereof, the Company shall not effect any public sale or distribution of its equity securities, or any securities convertible into or exchangeable or exercisable for its equity securities, during the seven days prior to and during the 90-day period beginning on the date such notice is received, except pursuant to registrations on Form S-8 or any successor form or unless the underwriters managing any such public offering otherwise agree.

(c) If the Company completes an underwritten registration with respect to any of its securities (whether offered for sale by the Company or any other Person) on a form and in a manner that would have permitted registration of the Shares and no Holder requested the inclusion of any Shares in such registration, the Holders shall not effect any public sales or distributions of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, until the termination of the holdback period required from the Company by any underwriters in connection with such previous registration, but in no event more than 90 days from the effective date of such registration.

Section 5. Preparation; Reasonable Investigation. In connection with the preparation and filing of each registration statement registering the Shares under the Securities Act and each sale of the Shares thereunder, the Company will give the Selling Holders and the underwriters, if any, and their respective counsel and accountants, access to its financial and other records, pertinent corporate documents and properties of the Company and such opportunities to discuss the business of the Company with its officers and the independent public accountants who have certified its financial statements as shall be necessary, in the opinion of the Selling Holders and such underwriters or their respective counsel, to conduct a reasonable investigation within the meaning of the Securities Act.

Section 6. Indemnification and Contribution.

(a) In the event of any registration of any of the Shares hereunder, the Company will enter into customary indemnification arrangements to indemnify and hold harmless each of the Selling Holders, each of their respective directors and officers, each Person (as defined in (e) below) who participates as an underwriter in the offering or sale of such securities, each officer and director of each underwriter, and each Person, if any, who controls each such Selling Holder or any such underwriter within the meaning of the Securities Act (collectively, the "Covered Persons") against any losses, claims, damages, liabilities and expenses, joint or several, to which such Person may be subject under the Securities Act or otherwise insofar as such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) arise out of are based upon (i) any untrue statement or alleged untrue statement of any material fact contained in any related registration statement filed under the Securities Act, any preliminary prospectus or final prospectus included therein, or any amendment or supplement thereto, or any document incorporated by reference therein, or (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and the Company will reimburse each such Covered Person, as incurred, for any legal or any other expenses reasonably incurred by such Covered Person in connection with investigating or defending any such loss, claim, liability, action or proceeding; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, any such preliminary prospectus or final prospectus, amendment or supplement in reliance upon and in conformity with written information furnished to the Company by such Selling Holder or such underwriter specifically for use in the

11

preparation thereof. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Covered Person and shall survive the transfer of such securities by the Selling Holders. The Company also shall agree to provide for contribution as shall reasonably be requested by the Selling Holders or any underwriters in circumstances where such indemnity is held unenforceable.

(b) Each of the Selling Holders, by virtue of exercising its respective registration rights hereunder, agree and undertake to enter into customary indemnification arrangements to indemnify and hold harmless (in the same manner and to the same extent as set forth in clause (a) of this Section 6) the Company, its directors and officers, each Person who participates as an underwriter in the offering or sale of such securities, each officer and director of each underwriter, and each Person, if any, who controls the Company or any such underwriter within the meaning of the Securities Act, with respect to any statement in or omission from such registration statement, any preliminary prospectus or final prospectus included therein, or any amendment or supplement thereto, if such statement or omission is contained in written information furnished by such Selling Holder to the Company specifically for inclusion in such registration statement or prospectus; provided, however, that the obligation to indemnify shall be individual, not joint and several, for each Selling Holder and shall be limited to the net amount of proceeds received by such Selling Holder from the sale of Shares pursuant to such registration statement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Company or any such director, officer or Person and shall survive the transfer of the registered securities by the Selling Holders.

(c) Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided, however, that the failure to give prompt notice shall not impair any Person's rights to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim.

(d) Indemnification and contribution similar to that specified in the preceding subdivisions of this Section 6 (with appropriate modifications) shall be given by the Company and the Selling Holders with respect to any required registration or other qualification of such Shares under any federal or state law or regulation of governmental authority other than the Securities Act.

(e) "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity, or any department, agency or political subdivision thereof.

Section 7. Benefits and Termination of Registration Rights. The Holders may exercise the registration rights granted hereunder in such manner and proportions as they shall agree among themselves. The registration rights hereunder shall cease to apply to any particular Shares and such securities shall cease to be Shares when: (a) a registration statement with respect to the sale of such Shares shall have become effective under the Securities Act and such Shares shall have been disposed of in accordance with such registration statement; (b) such Shares shall have been sold to the public pursuant to Rule 144 under the Securities Act (or any successor provision); (c) such Shares shall have been otherwise transferred, new certificates for them not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of them shall not require registration or qualification of them under the Securities Act or any similar state law then in force; (d) such Shares shall have ceased to be outstanding and (e) in the case of Shares held by a Permitted Transferee, when such Shares become eligible for sale pursuant to Rule 144(k) under the Securities Act (or any successor provision).

Section 8. Registration Expenses. As used in this Agreement, the term "Registration Expenses" means all expenses incident to the Company's performance of or compliance with the registration requirements set forth in this Agreement including, without limitation, the following: (a) all registration and filing fees; (b) the fees, disbursements and expenses of the Company's counsel and accountants in connection with the registration of the Shares to be disposed of under the Securities Act; (c) the fees, disbursements and expenses of the Selling Holders' counsel and advisors in connection with the registration of the Shares to be disposed of under the Securities Act; (d) all expenses in connection with the preparation, printing and filing of the registration statement, any preliminary prospectus or final prospectus, any other offering document and amendments and supplements thereto and the mailing and delivering of copies thereof to the underwriters and dealers and directly to securityholders in the case of an Exchange Registration; (e) the cost of printing and producing any agreements among underwriters, underwriting agreements, and blue sky or legal investment memoranda, any selling agreements and any amendments thereto or other documents in connection with the offering, sale or delivery of the Shares to be disposed of; (f) all expenses in connection with the qualification of the Shares to be disposed of for offering and sale under state securities laws, including the fees and disbursements of counsel for the underwriters in connection with such qualification and in connection with any blue sky and legal investment surveys; (g) the filing fees incident to securing any required review by the New York Stock Exchange and any other securities exchange on which the Common Stock is then traded or listed of the terms of the sale of the Shares to be disposed of and the trading or listing of all such Shares on each such exchange; (h) the costs of preparing stock certificates; (i) the costs and charges of the Company's transfer agent and registrar; and (j) the fees and disbursements of any custodians, solicitation agents, information agents and/or exchange agents. Registration Expenses shall not include underwriting discounts and

13

underwriters' commissions attributable to the Shares being registered for sale on behalf of the Selling Holders, which shall be paid by the Selling Holders.

Section 9. Miscellaneous.

9.1 No Inconsistent Agreements. The Company shall not on or after the date of this Agreement enter into any agreement with respect to its securities that violates or subordinates the rights expressly granted to the Holders in this Agreement. The Company shall not take any action, or permit any change to occur, with respect to its securities which would adversely affect the ability of the Holders of Shares to include such Shares in a registration undertaken pursuant to this Agreement.

9.2 Complete Agreement. Except as otherwise set forth in this Agreement, this Agreement shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof and shall supersede all prior agreements and understandings, whether written or oral, between the parties with respect to such subject matter.

9.3 Authority. Each of the parties hereto represents to the other that
(i) it has the corporate power and authority to execute, deliver and perform this Agreement, (ii) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate action, (iii) it has duly and validly executed and delivered this Agreement, and (iv) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

9.4 Assignment. This Agreement shall be binding on and inure to the benefit of and be enforceable by the parties hereto and with respect to the Company, its respective successors and assigns, and any Permitted Transferees.

9.5 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (other than the laws regarding conflicts of laws) as to all matters of validity, construction, effect, performance and remedies, executed in and to be performed in that State.

9.6 Severability. In the event that any part of this Agreement is declared by a court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

9.7 Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service if served personally on the party to whom notice is to be given; (ii) on the day of transmission

14

if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to FedEx or Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to GM:

General Motors Corporation 767 Fifth Avenue
New York, New York 10153 Attn: Treasurer
Facsimile: (212) 418-3630

with a copy to:

General Motors Corporation 3031 West Grand Boulevard Detroit, Michigan 48202 Attn: Warren G. Andersen, Esq.

Facsimile: (313) 974-0685

If to any other Holder, the address indicated for such Holder in the Company's stock transfer records

with a copy, so long as GM owns any Shares, to:

General Motors Corporation 3031 West Grand Boulevard Detroit, Michigan 48202 Attn: Warren G. Andersen, Esq.

Facsimile: (313) 974-0685

**If to the Company:**

Delphi Automotive Systems Corporation 5725 Delphi Drive
Troy, Michigan 48098
Attn: General Counsel Facsimile: (248) 813-2523

15

Any party may change its address for the purpose of this Section 9.7 by giving the other party written notice of its new address in the manner set forth above.

9.8 Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.9 Remedies. Each of GM and the Company shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. Each of GM and the Company acknowledges and agrees that under certain circumstances the breach by GM or any of its affiliates or the Company or any of its affiliates of a term or provision of this Agreement will materially and irreparably harm the other party, that money damages will accordingly not be an adequate remedy for such breach and that the non-defaulting party, in its sole discretion and in addition to its rights under this Agreement and any other remedies it may have at law or in equity, may apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any breach of the provisions of this Agreement.

9.10 Waivers. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) by the party entitled to enforce such term, but such waiver shall be effective only if it is in writing signed by the Company and the Holders of a majority of the Shares. Unless otherwise expressly provided in this Agreement, no delay or omission on the part of any party in exercising any right or privilege under this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right or privilege under this Agreement operate as a waiver of any other right or privilege under this Agreement nor shall any single or partial exercise of any right or privilege preclude any other or further exercise thereof or the exercise of any other right or privilege under this Agreement. No failure by either party to take any action or assert any right or privilege hereunder shall be deemed to be a waiver of such right or privilege in the event of the continuation or repetition of the circumstances giving rise to such right unless expressly waived in writing by the party against whom the existence of such waiver is asserted.

9.11 Amendment and Modification. This Agreement may not be amended or modified in any respect except by a written agreement signed by the Company and the Holders of a majority of the Shares.

9.12 Section and Paragraph Headings. The section and paragraph headings in this Agreement are for reference purposes only, are not part of the agreement of the parties hereto, and shall not affect the meaning or interpretation of this Agreement. All references to days or months

16

shall be deemed references to calendar days or months. All references to "$" shall be deemed references to United States dollars. Unless the context otherwise requires, any reference to a "Section" shall be deemed to refer to a section of this Agreement. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, unless otherwise specifically provided, they shall be deemed to be followed by the words "without limitation." This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing the document to be drafted.

9.13 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile signature.

* * *

17

Pg 219 of 223

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date and year first written above.

### GENERAL MOTORS CORPORATION

```
By      /s/ E.A. Feldstein
        ----------------------------------
Name:   E.A. Feldstein
        ----------------------------------
Title:  Vice President and Treasurer
        ----------------------------------
```

### DELPHI AUTOMOTIVE SYSTEMS CORPORATION

```
By      /s/ Logan G. Robinson
        ----------------------------------
Name:   Logan G. Robinson
        ----------------------------------
Title:  Vice President and General Counsel
        ----------------------------------
```

# DELPHI AUTOMOTIVE SYSTEMS

## COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES

| | YEAR ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 1998 | 1997 | 1996 | 1995 | 1994 |
| | (dollars in millions) | | | | |
| Pre tax (loss) income | $ (266) | $ 259 | $ 1,112 | $ 1,946 | $ 1,877 |
| Earnings of non-consolidated affiliates | (55) | (27) | (57) | (47) | (36) |
| Cash dividends received from non-consolidated affiliates | 1 | 12 | 11 | 3 | 1 |
| Portion of rentals deemed to be interest | 37 | 42 | 43 | 36 | 32 |
| Interest and related charges on debt | 277 | 287 | 276 | 293 | 310 |
| Earnings available for fixed charges | $ (6) | $ 573 | $ 1,385 | $ 2,231 | $ 2,184 |
| | | | | | |
| Fixed charges: | | | | | |
| Portion of rentals deemed to be interest | $ 37 | $ 42 | $ 43 | $ 36 | $ 32 |
| Interest and related charges on debt | 277 | 287 | 276 | 293 | 310 |
| Total fixed charges | $ 314 | $ 329 | $ 319 | $ 329 | $ 342 |
| | | | | | |
| Ratio of earnings to fixed charges | N/A | 1.7 | 4.3 | 6.8 | 6.4 |

Fixed charges exceeded earnings by $320 million for the year ended December 31, 1998, resulting in a ratio of less than one.

Our earnings available for fixed charges for the years ended December 31, 1998, 1997 and 1996 were impacted by a number of special items which management views as non-recurring in nature. The special items included charges associated with our evaluation of the competitiveness of our business, divestitures and plant closing charges as well as work stoppages at certain GM and Delphi locations. Excluding the impact of these special items, our ratio of earnings to fixed charges would have been 4.6, 6.3 and 7.0 for the years ended December 31, 1998, 1997 and 1996, respectively. For more information on special items and work stoppages, see "Management's Discussion and Analysis of Financial Condition and Results of Operations-Results of Operations-Special Items and Work Stoppages" and Note 3 to our consolidated financial statements elsewhere in this report.

## SUBSIDIARIES OF DELPHI AUTOMOTIVE SYSTEMS CORPORATION

```
--------------------------------------------------------------------------------
SUBSIDIARY                                      JURISDICTION OF FORMATION
--------------------------------------------------------------------------------

Delphi Automotive Systems LLC                   Delaware
--------------------------------------------------------------------------------

Delco Electronics Corporation                   Delaware
--------------------------------------------------------------------------------

Delphi Automotive Systems (Holding), Inc.       Delaware
--------------------------------------------------------------------------------
```

**INDEPENDENT AUDITORS' CONSENT**

We consent to the incorporation by reference of our report dated January 20, 1999 (February 5, 1999 as to Note 17) appearing in this Annual Report on Form 10-K of Delphi Automotive Systems Corporation for the year ended December 31, 1998, in the following Registration Statements:

```
                      Registration
      Form            Statement No.        Description

      S-8             333-71961            Delphi Automotive Systems Corporation Classified
                                           Salary and Hourly Stock Option Plan

      S-8             333-71899            Delphi Automotive Systems Corporation Stock
                                           Incentive Plan


      /s/ Deloitte & Touche LLP


      Detroit, Michigan
      March 16, 1999
```

**ARTICLE 5**
(Replace this text with the legend)
CIK: 0001072342
NAME: DELPHI AUTOMOTIVE SYSTEMS CORP
MULTIPLIER: 1,000,000
CURRENCY: US dollars

| | |
|---|---:|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | DEC 31 1998 |
| PERIOD START | JAN 01 1998 |
| PERIOD END | DEC 31 1998 |
| EXCHANGE RATE | 1,000 |
| CASH | 1,000 |
| SECURITIES | 0 |
| RECEIVABLES | 3,213 |
| ALLOWANCES | 23 |
| INVENTORY | 1,770 |
| CURRENT ASSETS | 6,405 |
| PP&E | 13,153 |
| DEPRECIATION | 8,188 |
| TOTAL ASSETS | 15,506 |
| CURRENT LIABILITIES | 4,061 |
| BONDS | 3,137 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 0 |
| OTHER SE | (9) |
| TOTAL LIABILITY AND EQUITY | 15,506 |
| SALES | 28,479 |
| TOTAL REVENUES | 0 |
| CGS | 26,135 |
| TOTAL COSTS | 28,700 |
| OTHER EXPENSES | (232) |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 277 |
| INCOME PRETAX | (266) |
| INCOME TAX | (173) |
| INCOME CONTINUING | (93) |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | (93) |
| EPS PRIMARY | (0.20) |
| EPS DILUTED | (0.20) |

**End of Filing**

Powered By 

© 2005 | EDGAR Online, Inc.