Exhibit B-1

Exhibit M-1

## U.S. EMPLOYEE MATTERS AGREEMENT

This U.S. EMPLOYEE MATTERS AGREEMENT, dated as of Dec. 22, 1998 , (the "EM Agreement"), is agreed to by General Motors Corporation ("GM") and Delphi Automotive Systems Corporation ("Delphi"), each a "Party", and collectively, the "Parties".

WHEREAS, Delphi and GM are parties to the Master Separation Agreement (the "MSA") entered into in connection with the separation of Delphi from GM, dated as of Dec. 22, 1998 .

WHEREAS, the MSA provides that the Parties shall enter into this EM Agreement in order to specify the rights and obligations of the Parties with respect to employee matters; and

NOW, THEREFORE the Parties agree as follows with regard to employees employed in the U.S. and U.S. based employees assigned to another country:

1.  DEFINITIONS.

    (a)  "Delphi Business Unit" shall have the same meaning as "Delphi Automotive Systems Business" as defined in the Master Separation Agreement.

    (b)  "Delphi Employees" shall mean all persons who are active employees assigned to, and each person who is on any approved leave of absence from, Delphi, a Delphi Business Unit, or a Delphi or Delphi Business Unit controlled or associated business. Delphi Employees will be designated as hourly or salaried.

    (c)  "Delphi Terminated Employee" shall mean an individual who is not currently a Delphi Employee but whose last employment in the GM Controlled Group of Corporations (as defined in Internal Revenue Code Section 1563) was with Delphi, a Delphi Business Unit or a Delphi Business Unit controlled or associated business.

    (d)  "Distribution Date" shall mean the date on which GM completes the distribution of at least 80 percent of the then outstanding shares of Delphi.

    (e)  "GM Employees" shall mean all persons who are active or former employees of GM who are not a Delphi Employee or Delphi Terminated Employee. GM Employees will be designated as hourly or salaried.

HIGHLY CONFIDENTIAL

(f)    "Effective Time" shall mean January 1, 1999.

(g)    "Flowback" shall mean the transfer or movement of individuals (including, without limitation, applicable individuals at divested units) after the Effective Time between Delphi and GM.

2.    EXHIBITS ATTACHED TO EM AGREEMENT.

The Exhibits and Attachments to this Agreement are incorporated by reference.

3.    RESPONSIBILITY FOR EMPLOYEES.

(a)    For employees who are or become Delphi Employees or Delphi Terminated Employees as of the Effective Time, Delphi (except as set forth in Schedule I of the MSA) and/or Delphi benefit plans shall assume all employment related responsibility, obligation, or liability of GM regardless of when incurred, except as expressly stated in this paragraph 3(a).

The only exceptions (in addition to any set forth in Schedule I of the MSA) to Delphi's responsibility for such individuals are that: (1) Delphi will have no pension or retiree welfare benefit obligation or post-retirement workers compensation responsibility for individuals who have retired under the General Motors Retirement Program for Salaried Employees or are separated employees eligible for only a deferred vested benefit under the General Motors Retirement Program for Salaried Employees as of the Effective Time; and (2) Delphi will have no pension or retiree welfare benefit obligation or post-retirement workers compensation responsibility for hourly employees who retire under the General Motors Hourly Rate Employees Pension Plan or are separated employees eligible for only a deferred vested benefit under the General Motors Hourly Rate Employees Pension Plan on or before October 1, 1999; and GM shall retain such obligations.

To the extent that Delphi or Delphi benefit plans cannot directly assume any responsibility, obligation, or liability, and GM or GM benefit plans thereby directly or indirectly incur costs, obligations, or liability, Delphi shall reimburse/indemnify GM for any and all such costs/liability. Such reimbursement shall be made using the actuarial and other assumptions set forth in Exhibit 1, the Employee Benefit Financial term sheet, if applicable. If language in Exhibit 1 is not directly applicable, the Parties will be guided by the methodology and assumptions of the Exhibit.

2

HIGHLY CONFIDENTIAL                    DPH-ATT 0000223

Exhibit 1, the Employee Benefit Financial term sheet, addresses various cost and "true up" issues related to retirements and Flowback.

(b)    On the Distribution Date Delphi will assume the terms of all applicable national and local collective bargaining agreements.

4.    SALARIED EMPLOYEE FLOWBACK.

(a)    Any salaried GM Employee who is transferred to Delphi or its subsidiaries pursuant to mutual agreement of Delphi and GM after the Effective Time and up until December 31, 2001, shall become a Delphi Employee as of the date of transfer and be covered under the Delphi benefit plans and policies upon transfer. Such an employee shall not be considered a GM Employee from and after the date of his or her transfer of employment. GM service for such employees will be counted for the purpose of meeting all waiting periods and benefit and policy eligibility and computation under Delphi benefit plans and policy. Any amounts for out-of-pocket limits and benefit maximums paid or incurred under the GM Benefit Plan by such employees who Flowback during the plan year in which the Flowback occurred will be counted toward such employee's out-of-pocket limits and benefit maximums under the Delphi Plans.

An appropriate transfer of retirement program assets calculated as set forth in Section 414(l) of the Internal Revenue Code and a cash transfer as set forth in Exhibit 1 related to OPEB liability will follow the transfer. Generally such transfers/payments will be calculated and made on an annual basis. Conversion of applicable stock options will be as set forth in Exhibit 2, the Executive Task Team term sheet covering Methodology for Adjusting Stock Options for GM and Delphi Employees, or if not explicitly covered therein, based upon the same methodology. Any other applicable incentive compensation will be treated as set forth in Exhibit 3, the Executive Task Team term sheet covering Executive Transactions.

(b)    Any salaried Delphi Employee who is transferred to GM or its subsidiaries pursuant to mutual agreement of Delphi and GM after the Effective Time and up until December 31, 2001, shall become a GM Employee as of the date of transfer and be covered under the GM benefit plans and policies upon transfer. Such an employee shall not be considered a Delphi Employee from and after the date of his or her transfer of employment. Delphi service for such employees will be counted for the purpose of meeting all waiting periods and benefit and policy eligibility and computation under GM benefit plans and policy. Any amounts for out-of-pocket limits and benefit maximums paid or incurred under the Delphi Benefit Plan by such employees who Flowback during the plan year in

HIGHLY CONFIDENTIAL

DPH-ATT 0000224

which the Flowback occurred will be counted toward such employee's out-of-pocket limits and benefit maximums under the GM Plans.

An appropriate transfer of retirement program assets calculated as set forth in Section 414(l) of the Internal Revenue Code and a cash transfer as set forth in Exhibit 1 related to OPEB liability will follow the transfer. Generally such transfers/payments will be calculated and made on an annual basis. Conversion of applicable stock options will use the same methodology as set forth in Exhibit 2, the Executive Task Team term sheet covering Methodology for Adjusting Stock Options for GM and Delphi Employees. Any other applicable incentive compensation will be treated as set forth in Exhibit 3, the Executive Task Team term sheet covering Executive Transactions.

(c)   The Benefit Equalization Plan ("BEP"), Supplemental Executive Retirement Program ("SERP"), and Supplemental Life Benefits Program ("SLBP") will be treated as set forth in Section 10 (f) below.

(d)   Prior to January 1, 2002, Delphi will not hire, without the prior written consent of GM, on a regular, contract or other basis, any employee who was employed by GM or any of its affiliates on or after July 1, 1997.

(e)   Prior to January 1, 2002, GM will not hire, without the prior written consent of Delphi, on a regular, contract or other basis, any employee who was employed by a Delphi unit or Delphi on or after July 1, 1997.

(f)   Liabilities and/or costs, including but not limited to workers' compensation, for claims or injuries suffered at or before the time of Flowback remain the responsibility of the sending company.

5.   HOURLY EMPLOYEE FLOWBACK.

(a)   It is anticipated that the Parties will enter into Memoranda of Understandings (MOUs) with the union representatives of hourly employees. The parties will abide by the terms of the MOUs. To the extent the MOUs differ from the terms set forth in this Employee Matters Agreement the Parties will arrange to "true up" the financial arrangements to reflect the original capital structure. Such true up is generally covered in Exhibit 1.

One of the items the MOUs are expected to address is hourly Flowback. In the event of hourly Flowback, the following financial arrangements will apply unless otherwise designated by the terms of the applicable MOU or otherwise agreed by the parties:

4

HIGHLY CONFIDENTIAL

DPH-ATT 0000225

i.   Pension.

i.1.    Except as otherwise provided in this Agreement, Delphi's defined benefit pension plan covering hourly employees (hereinafter referred to as the "Delphi Pension Plan"), effective as of the Distribution Date, will cover all eligible hourly Delphi Employees and employees of divested units as set forth in 8(d) below. The Delphi Pension Plan will contain terms identical to the GM Hourly-Rate Employees Pension Plan (hereinafter referred to as the "GM Pension Plan") except for those provisions required to be changed as a result of a new Plan sponsor and the provisions addressed in this Agreement. In the event of hourly Flowback after the Distribution Date, the intent of the parties is to provide employees with benefits from the Delphi Pension Plan and the GM Pension Plan which, apart from any difference that may result from future bargaining, in aggregate, will equal the benefits that would have been provided had the Delphi separation not occurred. In order to address Flowback of employees from Delphi to GM after the Distribution Date where the employee has not retired as of October 1, 1999, the Delphi Pension Plan will provide as set forth in i.2. through i.5.

i.2.    Pro-rata share shall mean a percentage based on the number of years of credited service recognized under the Delphi Pension Plan divided by the total years of credited service under the GM Pension Plan acquired after the Distribution Date and the number of years of credited service recognized under the Delphi Pension Plan.

i.3.    Except as provided in i.4. below, all hourly employees with unbroken seniority who Flowback from Delphi to GM after the Distribution Date and are not retired on or before October 1, 1999, shall be entitled to payment from the Delphi Pension Plan upon retirement from GM. Such payment will be equal to a pro-rata share of the total benefits that would be payable under the Delphi Pension Plan, determined as if the employee were then retiring from Delphi on a voluntary basis taking into account the credited service under the GM Pension Plan acquired after the Distribution Date and the credited service under the Delphi Pension Plan as of the Date of Retirement. The payment will include a basic benefit (reduced for age where appropriate) for each year of credited service under the Delphi Pension Plan, and any applicable supplement in an amount equal to the difference between the basic benefit and the pro-rata share of the total benefit calculated above.

5

HIGHLY CONFIDENTIAL

DPH-ATT 0000226

i.4.    Unless GM and Delphi agree to a "Mutual Retirement" (as defined in the GM Pension Plan), or Delphi approves a disability retirement (such approval shall not be unreasonably withheld), any employee who is covered under the Delphi Pension Plan who flows back to GM after the Distribution Date and who retires from GM but is not otherwise eligible to retire under the Delphi Pension Plan (taking into account for eligibility purposes credited service under the GM Pension Plan acquired after the Distribution Date), shall be eligible under the Delphi Pension Plan only for unreduced benefits at age sixty-two (62) and one (1) month at the benefit levels in effect under the Delphi Pension Plan as of the date of retirement from GM increased as appropriate until age 62 and one month as if the Delphi Pension Plan benefits had commenced as of the date the employee retired from GM, provided, however, if such an employee grows into eligibility for an 85 point retirement, Delphi's responsibility, subject to any applicable age reductions, will commence the first of the month following attainment of Age 60.

i.5.    The surviving spouse of an employee who has unbroken seniority at Delphi at the Distribution Date, is vested under the Delphi Pension Plan as of such date and dies while employed by GM, shall be eligible for payment from the Delphi Pension Plan of a pro-rata death benefit based on Delphi credited service and the Delphi benefit levels in effect at the time of death. All other Pension Plan terms shall apply, including but not limited to those regarding eligibility, and duration of surviving spouse benefits.

i.6.    In order to address Flowback of employees from GM to Delphi after the Distribution Date where the employee has not retired as of October 1, 1999, the GM Pension Plan will provide as set forth in i.7. through i.10.

i.7.    Pro-rata share shall mean a percentage based on the number of years of credited service recognized under the GM Pension Plan divided by the total years of credited service under the Delphi Pension Plan acquired after the Distribution Date and the number of years of credited service recognized under the GM Pension Plan.

i.8.    Except as provided in i.9. below, all hourly employees with unbroken seniority who Flowback from GM to Delphi after the Distribution Date and are not retired on or before October 1, 1999, shall be entitled to payment from the GM Pension Plan upon retirement from Delphi. Such payment will be equal to a pro-rata share of the total benefits that would be payable under the GM

6

HIGHLY CONFIDENTIAL

DPH-ATT 0000227

Pension Plan, determined as if the employee were then retiring from GM on a voluntary basis taking into account the credited service under the Delphi Pension Plan acquired after the Distribution Date and the credited service under the GM Pension Plan as of the Date of Retirement. The payment will include a basic benefit (reduced for age where appropriate) for each year of credited service under the GM Pension Plan, and any applicable supplement in an amount equal to the difference between the basic benefit and the pro-rata share of the total benefit calculated above.

i.9.    Unless GM and Delphi agree to a "Mutual Retirement" (as defined in the Delphi Pension Plan), or GM approves a disability retirement (such approval shall not be unreasonably withheld), any employee who is covered under the GM Pension Plan who flows back to Delphi after the Distribution Date and who retires from Delphi but is not otherwise eligible to retire under the GM Pension Plan (taking into account for eligibility purposes credited service under the Delphi Pension Plan acquired after the Distribution Date), shall be eligible under the GM Pension Plan only for unreduced benefits at age sixty-two (62) and one (1) month at the benefit levels in effect under the GM Pension Plan as of the date of retirement from Delphi increased as appropriate until age 62 and one month as if the GM Pension Plan benefits had commenced as of the date the employee retired from Delphi provided, however, if such an employee grows into eligibility for an 85 point retirement, GM's responsibility, subject to any applicable age reductions, will commence the first of the month following attainment of age 60.

i.10.    The surviving spouse of an employee who has unbroken seniority at GM at the Distribution Date, is vested under the GM Pension Plan as of such date and dies while employed by Delphi, shall be eligible for payment from the GM Pension Plan of a pro-rata death benefit based on GM credited service and the GM benefit levels in effect at the time of death. All other GM Pension Plan terms shall apply, including but not limited to those regarding eligibility, and duration of surviving spouse benefits.

ii.    OPEB.  OPEB costs associated with hourly employee movement between the companies after the Effective Time will be addressed as set forth in Exhibit 1.

iii.    Savings Plans.  Upon Flowback employees may transfer existing savings plan assets to the new employer's savings plan or keep them in the sending employer's savings plan.

7

HIGHLY CONFIDENTIAL

iv.   SUB/GIS and JOBS.  SUB/GIS and JOBS will be treated as set forth in Exhibit 4, the Labor Relations term sheet.  It is not anticipated that there be a reallocation of the caps upon Flowback to GM or Delphi.

v.   Liabilities and/or costs, including but not limited to workers' compensation, for claims or injuries suffered at or before the time of Flowback remain the responsibility of the sending company.

vi.   Legal Services Plans will be treated as set forth in Exhibit 4, the Labor Relations term sheet.

vii.   Joint Funds will be treated as set forth in Exhibit 4, the Labor Relations term sheet.  It is not anticipated that there be a reallocation of the Joint funds upon Flowback to GM or Delphi.

viii.   Relocation costs associated with the Flowback of employees will be shared as set forth in Exhibit 4, the Labor Relations term sheet.

(b)   With the exception of "Flowbacks", prior to January 1, 2002 Delphi will not hire, without the prior written consent of GM, on a regular, contract or other basis, any employee who was employed by GM or any of its affiliates on or after July 1, 1997.  Notwithstanding the above Delphi may hire on an ad hoc, non-systematic, limited duration basis such hourly employees in order to meet its short-term operational needs.

(c)   With the exception of "Flowbacks", prior to January 1, 2002 GM will not hire, without the prior written consent of Delphi, on a regular, contract or other basis, any employee who was employed by a Delphi unit or Delphi on or after July 1, 1997.  Notwithstanding the above, GM may hire on an ad hoc, non-systematic, limited duration basis such hourly employees in order to meet its short term operational needs.

6.   SPONSORSHIP OF EMPLOYEE BENEFIT PLANS AND EMPLOYEE ARRANGEMENTS BY DELPHI.

At the Effective Time for salaried employees and the Distribution Date for hourly employees, Delphi will establish the Employee Benefit Plans and Employee Arrangements listed in Exhibit 5.  Such Employee Benefit Plans and Employee Arrangements will have terms substantially identical to the corresponding GM Employee Benefit Plans and Employee Arrangements and provide for service credit for prior GM service, except as otherwise set forth herein.  Delphi will assume the liabilities with respect to Delphi Employees under such plans except as provided in Section 3(a), whether incurred before or after the Effective Time.  Except as set forth in Section 12(c)

8

HIGHLY CONFIDENTIAL

nothing in this Agreement shall prohibit Delphi from amending, modifying or terminating Delphi Employee Benefit Plans and Employee Arrangements.

7.    EMPLOYEE SAVINGS PLANS.

(a)    Effective at the Effective Time for salaried employees and the Distribution Date for hourly employees, or as soon thereafter as practical, to the extent permissible under applicable law the account balances of Delphi Employees in GM Savings Plans will be transferred to accounts in the Delphi Savings Plans.

(b)    Effective as of the Distribution Date Delphi and GM shall amend each of their Savings Plans to add Delphi Common Stock (referred to herein as "Delphi Stock") as an additional investment fund to receive and hold Delphi Stock. The amendments shall provide that participants in the GM Savings Plans may not transfer funds into or make additional voluntary investments in the Delphi Stock investment fund.

8.    CREATION OF RETIREMENT PLANS AND TRANSFER OF GM RETIREMENT PLAN ASSETS AND LIABILITIES.

(a)    Effective as of Effective Time for salaried employees and the Distribution Date for hourly employees, Delphi shall:

(i)    Establish a defined benefit Delphi pension plan for the benefit of the Delphi Employees formerly covered by the GM Retirement Program for Salaried Employees with terms and conditions that are substantially identical to those of such plan, including, but not limited to, credit for past service with GM and its subsidiaries for eligibility, vesting, early retirement, and, contingent upon the transfer of assets set forth in Exhibit 1, benefit accrual and compensation earned with GM or its subsidiaries (the Delphi Salaried Retirement Program); and

(ii)    Establish a defined benefit Delphi pension plan for the benefit of the Delphi Employees formerly covered by the GM Hourly Rate Employees Pension Plan with terms and conditions that are substantially identical to those of such plan, including credit for past service with GM and its subsidiaries for eligibility, vesting, early retirement, and, contingent upon the transfer of assets set forth in Exhibit 1, benefit accrual earned with GM or its subsidiaries.

9

HIGHLY CONFIDENTIAL

DPH-ATT 0000230

Both the Delphi Retirement Program for Salaried Employees and the Delphi Hourly Rate Employee Pension Plan (together, the "Delphi Retirement Plans") shall comply with Section 411(d)(6) of the Internal Revenue Code of 1986, as amended from time to time, ("Code") to protect Delphi Employees with respect to benefits earned and other protected provisions under the GM Retirement Program for Salaried Employees and the GM Hourly Rate Employee Pension Plan (together, the "GM Retirement Plans").

(b)     GM shall cause a "spin-off" transfer, within the meaning of Section 414(l) of the Code, from the GM Retirement Plans to the Delphi Retirement Plans, in the manner and at the times specified in Exhibit 1. The computation of the amounts to be transferred shall be performed separately for each of the GM Retirement Plans.

(c)     The Delphi Retirement Plans shall also cover the provision of benefits for employees of divested units which were formerly Delphi operations to the extent that the GM Retirement Plans cover the provision of benefits for such "divested employees" as of the Effective Time, except as follows. The GM Retirement Program for Salaried Employees will continue to cover such "divested salaried employees" who have retired from GM and the buyer as of the Effective Time and the GM Hourly Rate Employee Pension Plan will continue to cover such "divested hourly employees" who retire from GM and the buyer as of October 1, 1999. To the extent the Parties are unable to arrange with an applicable third party (such as a buyer of a divested unit) for direct payment of benefits or transfer of obligations, Delphi agrees to reimburse GM for any such amounts. Such reimbursement shall be made using the actuarial and other assumptions set forth in Exhibit 1, if applicable. If language in Exhibit 1, the Employee Benefit Financial term sheet, is not directly applicable, the Parties will be guided by the methodology and assumptions of the Exhibit.

(d)     The GM Salaried Retirement Program has contracted with certain Life Insurance Companies to provide insured payments for certain participants who made contributions to the Retirement Plans for certain periods. Delphi agrees to enter into separate agreements with the Life Insurance Companies to provide comparable benefits for those who become Delphi Employees.

9.     GM STOCK INCENTIVE PLAN.

Treatment of applicable stock options will be as set forth in Exhibit 2, the Executive Task Team term sheet covering Methodology for Adjusting Stock Options for GM and Delphi Employees, or if not explicitly covered therein, based upon the same methodology. Any other applicable incentive compensation will be treated as set forth in Exhibit 3, the Executive Task Team term sheet covering Executive Transactions.

10

HIGHLY CONFIDENTIAL

DPH-ATT 0000231

10.    DELPHI EMPLOYEE BENEFIT PLANS.

(a)    Delphi shall pay the liabilities and expenses under the Delphi Benefit Plans with respect to Delphi Employees. The Delphi Benefit Plans shall also cover the provision of benefits for employees of divested units which were formerly Delphi operations to the extent that the GM Benefit Plans cover the provision of benefits for such "divested employees" as of the Effective Time, except that the GM Benefit Plans to the extent applicable will continue to cover such "divested employees" who have retired from GM on or before the Effective Time or for hourly employees on or before October 1, 1999. To the extent the Parties are unable to arrange with an applicable third party (such as a buyer of a divested unit) for direct payment of benefits or transfer of obligations, Delphi agrees to reimburse GM for any such amounts. Such reimbursement shall be made using the actuarial and other assumptions set forth in Exhibit 1, if applicable. If language in Exhibit 1, the Employee Benefit Financial term sheet, is not directly applicable, the Parties will be guided by the methodology and assumptions of the Exhibit.

(b)    GM involvement in assisting in the administration of the Delphi Benefit Plans shall be as set forth in Exhibit 6, the Employee Matters Transition Services Agreement and term sheets incorporated therein.

(c)    All GM VEBA assets will continue to be applicable only for payment of benefits/expenses under GM Welfare Benefit Plans. There will be no transfer of VEBA assets to Delphi or Delphi Welfare Benefit Plans.

(d)    Assets in the GM/IUE SUB Trust Fund or any successor trust fund will be split pro-rata between the GM/IUE SUB Trust Fund or its successor trust fund and the Delphi/IUE SUB Trust Fund or Delphi/IUE successor trust fund based on the proportion that Delphi IUE represented eligible employees bear to GM IUE represented eligible employees plus Delphi IUE represented eligible employees, as of the Distribution Date. Any Delphi expenses allocated to the SUB trust or successor trust will reduce the amount of such trust allocated to Delphi on the Distribution Date.

(e)    Life Insurance Plan reserves will be allocated pro rata between the applicable Delphi and GM Life Insurance Plans as set forth in the Life and Disability Benefits term sheet.

(f)    With respect to the GM BEP plans, SERP, and SLBP (collectively the "non-qualified plans") and the separate corresponding unfunded non-qualified plans, established by Delphi, GM and Delphi agree as follows:

11

HIGHLY CONFIDENTIAL

(i) To the extent any GM Employee is transferred to Delphi on or after the Effective Time and up through December 31, 2001, the liability under the GM unfunded non-qualified plans for such employee shall be a Delphi liability payable under the corresponding Delphi plans from and after the date such employee is employed by Delphi.

(ii) To the extent any Delphi Employee is transferred to or otherwise employed by GM on or after the Effective Time and up through December 31, 2001, the liability under the Delphi unfunded non-qualified plans for such employee shall be a GM Liability payable under the corresponding GM plans from and after the date such employee is employed by GM.

(iii) If such a non-qualified plan is funded and an employee transfers pursuant to Section 4(a) of the Agreement, the assets associated with the transferring employee will be transferred. Such transfer will be calculated consistent with the funding assumptions of the plan.

11.    WORKERS' COMPENSATION.

(a) Except as specifically set forth in Section 3(a), 4(f) and 5(a)v. above, workers' compensation liability for all Delphi Employees and Delphi Terminated Employees shall be assumed and retained by Delphi or its subsidiaries at and following the Effective Time, regardless of the time an individual became a Delphi Employee. To the extent such liability cannot be directly assumed by Delphi, Delphi shall reimburse/indemnify GM for any and all such costs/liability GM directly or indirectly incurs in regard to such individuals. Such reimbursement shall include reimbursement for retrospective premium adjustments relating to such individuals.

12.    FURTHER AGREEMENTS.

From and after the Effective Time for salaried employees and the Distribution Date for hourly employees:

(a) Delphi shall, and shall cause its subsidiaries, to honor and provide for payment of benefits and compensation under all Delphi Employee Benefit Plans and Delphi Employee Arrangements in accordance with their terms, as amended from time to time subject to the terms of this EM Agreement.

12

HIGHLY CONFIDENTIAL

DPH-ATT 0000233

(b)    Delphi shall, and shall cause its subsidiaries, to provide credit to Delphi Employees for service with GM, its successors and its affiliates for purposes of eligibility, vesting and eligibility to retire (but not for benefit accruals except as set forth in Section 8 above) under all Employee Benefit Plans. No pre-existing conditions exclusions will apply under the Delphi medical plans except to the extent such exclusion is applicable under the plan of GM in effect immediately prior to the Effective Time for salaried employees and the Distribution Date for hourly employees. Any amounts for out-of-pocket limits and benefit maximums paid or incurred under the GM Benefit Plans by such employees during the plan year will be counted toward such employee's out-of-pocket limits and benefit maximums under the Delphi Plans for the same plan year.

(c)    Delphi shall, and shall cause its subsidiaries to continue any GM Employee Benefit Plan and GM Employee Arrangement that is a severance benefit plan or arrangement, without any adverse changes until December 31, 1999.

(d)    Notwithstanding anything herein to the contrary, to the extent that GM or Delphi hold a controlling interest in a subsidiary that maintains pension, savings and/or welfare plans separate and apart from the GM or Delphi plans, and such subsidiary becomes a subsidiary of Delphi as a result of the Delphi separation transaction, the plans of such subsidiary shall become/remain the responsibility of such subsidiary, and no division or split-up of such plan will occur as a result of the Delphi separation transaction.

(e)    Except as set forth in Section 12(c), nothing in this Agreement shall prohibit Delphi from amending, modifying or terminating Delphi Employee Benefit Plans and Employee Arrangements.

13.    COOPERATION.

Delphi and GM shall reasonably cooperate with each other in carrying out the terms of this EM Agreement, and each party shall exchange such information with the other party, as may be reasonably required by the other party, with respect thereto.

14.    NO THIRD PARTY BENEFICIARIES.

No provision in this EM Agreement or in any Schedule, including any Attachment thereto, shall confer upon any person, other than the signatories hereto, any rights or remedies with respect to the employment, compensation, benefits, or other terms and conditions of employment of any persons, provided that any rights to be provided under

13

HIGHLY CONFIDENTIAL

DPH-ATT 0000234

the Delphi Employee Benefit Plans or their successors, pursuant to this EM Agreement and the attached Schedules, shall be enforceable by the participants thereunder.

## 15.    SEVERABILITY.

In case any one or more of the provisions contained in this EM Agreement or the Schedules and Attachments hereto shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction or a qualified arbitrator, the validity, legality and enforceability of the remaining provisions contained herein and other applications thereof shall not in any way be diminished.

## 16.    GOVERNING LAW.

To the extent not governed by federal law, this EM Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, regardless of the laws that might otherwise govern under principles of conflicts of laws applicable thereto.

## 17.    PRESS RELEASES.

Except as may be required by law or State or Federal Agencies, no press release concerning the existence of this EM Agreement shall be made by one Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld.

## 18.    ENTIRE AGREEMENT: AMENDMENTS.

The MSA, this EM Agreement and the Exhibits and Attachments to this EM Agreement constitute the entire agreement among the Parties and supersede all other pre-existing agreements, with respect to the matters expressly provided for in this EM Agreement and the Exhibits and Attachments hereto. This Agreement may be amended or modified only by mutual agreement in writing, signed by an authorized representative of each Party. Provided, however, that it is anticipated that the Parties will sign memoranda of understanding with the union representatives of represented employees affected by the transaction, and to the extent such memoranda conflict with the terms of the MSA, EM Agreement or Transition Services Agreement and are signed or approved by both Delphi and GM, the memoranda shall control subject to the first paragraph of Section 5(a) above.

14

19.    ORDER OF PRECEDENCE.

The Parties hereto agree that if any terms of this EM Agreement conflict with the terms in the MSA, the terms of this EM Agreement shall govern with respect to the resolution of such conflict. Furthermore if the terms of any incorporated term sheet differ from the terms of this EM Agreement the terms of the term sheet shall govern.

20.    TRANSITION SERVICES

Transition services for employee matters will be governed by the Employee Matters Transition Services Agreement attached as Exhibit 6 or in the case of payments related to the Health Care Initiatives term sheet, will be made pursuant to the payment terms provided in that term sheet.

21.    COUNTERPARTS.

This EM Agreement may be executed in counterparts, each of which shall be deemed an original.

22.    NOTICES.

All notices or other communications hereunder or under any Schedule or Attachment hereto, shall be in writing, signed by the party providing such notice, and shall be considered properly given or made and shall be deemed to have been duly given on the date of delivery, when delivered personally or transmitted and received by telex or telecopies/facsimile transmitter, receipt acknowledged or confirmed during normal business hours, or in the case of registered or certified mail, return receipt requested, postage prepaid, on the date shown on such return receipt. Each party shall promptly notify the other Party of any change in the name of either individual designated below to receipt a copy of notices.

Any notices to GM shall be sent as follows:

Kathleen S. Barclay
Vice President
Global HR and GMU
30400 Mound Road
Mail Code 480-108-309
Warren, MI 48090
Telephone: (810) 986-6034
Facsimile:  (810) 986-1402

15

HIGHLY CONFIDENTIAL

DPH-ATT 0000236

Any notices to Delphi shall be sent as follows:

Mark Weber
Vice President HRM
Delphi Automotive Systems
5725 Delphi Drive
Mail Code 483-400-606
Troy, MI 48098
Telephone: (248) 813-2521
Facsimile: (248) 813-2523

23.    DESCRIPTIVE HEADINGS.

The section and clause headings of this EM Agreement are for reference purposes only
and shall not affect the meaning or interpretation of this EM Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this EM Agreement as of the
date written above.

GENERAL MOTORS CORPORATION          DELPHI AUTOMOTIVE SYSTEMS

By: _____          By: _____
        Vice President
        Global Human Resources and            Vice President
Title: General Motors University    Title: Human Resource Management

16

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

DPH-ATT 0000238

DEC 23 '98 16:10 FR GM PENSION FUNDING    212 444 6211 TO 85640210    P.02/22

## Signatory Page

On this, December _23_, 1998, General Motors and Delphi Automotive Systems, by their duly authorized respective officers agree to the terms and conditions in the Attachments listed below:

### Attachment Title

I.    General Approach to Split of Pension Plans

II.   Treatment of True-up Resulting from Delaying Split of Hourly Plan

III.  Effects Bargaining Contingency True-up

IV.   Treatment of Benefit Obligations for Delphi Hourly Employees Who Retire On or Prior to Hourly Retiree Cutoff Date

V.    Treatment of OPEB Obligations for Flowback Employees

VI.   Treatment of Benefit Obligations for Salaried Early Attrition Programs Between 10/1/98 and 10/1/99

VII.  Agreement on any Financial Value Received from MetLife

VIII. DAS's 1999 Pension Expense for the US Hourly Plan


E. A. Feldstein
Vice President & Treasurer
General Motors Corporation

J. G. Blahnik
Treasurer
Delphi Automotive Systems

Page 1 of 1

** TOTAL PAGE.001 **

HIGHLY CONFIDENTIAL

DPH-ATT 0000239

HIGHLY CONFIDENTIAL

DPH-ATT 0000240

DEC 23 '98 16:10 FR GM PENSION FUNDING   212 444 6211 TO 85640210        P.03/22

# Separation of Delphi Automotive Systems
# Employee Benefit Financial Term Sheet

The following Attachments I through VIII and the Signatory Page comprise the Term Sheet relating to employee benefit financial matters. As indicated by their respective officers' signatures, each party has agreed to the terms as set forth in Attachments I through VIII, which will ultimately be included in the U.S. Employee Matters Agreement.

| Attachment | Description |
|---|---|
| I | General Approach to Split of Pension Plans |
| II | Treatment of True-Up Resulting from Delaying Split of Hourly Plan |
| III | Effects Bargaining Contingency True-Up |
| IV | Treatment of Benefit Obligations for Delphi Hourly Employees who Retiree on or Prior to Hourly Retiree Cutoff Date |
| V | Treatment of OPEB Obligations for Flowback Employees |
| VI | Treatment of Benefit Obligations for Salaried Early Attrition Programs Between 10/1/98 and 1/1/99 |
| VII | Agreement on any Financial Value Received from MetLife |
| VIII | DAS's 1999 Pension Expense for the US Hourly Plan |

Page 1 of 1

HIGHLY CONFIDENTIAL

DPH-ATT 0000241

## Attachment I
## Approach for Split of US Pension Assets and Related Issues

- This attachment details the approach to be used for the split of pension assets (excluding EDS stock) and related Part-B insurance contracts
  - The salaried plan will be split as of 1/1/99 and the hourly plan will be split as of the Distribution Date

### Split of Pension Assets

- The split of both the GM hourly and salaried pension plans calls for a two-stage transfer of assets from GM to Delphi
  - Initial transfer, which will occur on the date of the plan split (1/1/99 for the salaried plan and the Distribution Date for the hourly plan) entails transfer of a conservative estimate of securities to Delphi based upon preliminary valuation work conducted by Wyatt
  - Upon completion of Wyatt's detailed asset transfer calculation, "Subsequent Transfer" to occur 90 to 120 days after "Initial Transfer"
    - Subsequent transfer will utilize IRC discount rate assumptions used for the Initial Transfer since Subsequent Transfer will still be related to initial transaction
    - In this sense, second transfer can be characterized as a "true-up" to initial transfer plus an adjustment of assets representing asset returns between plan split date and date of Subsequent Transfer
- Both the Initial Transfer and the Subsequent Transfer will involve combination of privately traded and publicly traded assets
  - Subsequent Transfer will aim to achieve a pro-rata allocation of privately-traded assets (approx. 10% of total GM pension asset portfolio) based upon overall asset allocation percentages for GM and Delphi, respectively
  - Publicly traded securities will also be transferred based upon input from GMIMCo, GM, and Delphi, and subject to the ultimate discretion of the Investment Funds Committees (IFC) of the GM BOD

### Background

- For clarification, Wyatt has been estimating the split of pension assets and liabilities by utilizing the 10/1/97 GM/Delphi population census data and rolling it forward by utilizing an August, 1998 update of retirements, quits, new hires, etc.
  - As of 1/1/99, Wyatt will have completed its analysis of the 10/1/98 GM/Delphi population census data, which will be utilized to value the initial estimate of the salaried pension split
    - Updated census data at year-end is likely to cause slight changes over current asset and liability allocation estimates
    - 10/1/98 data still does not include Social Security number detail for employees in shared CISCO code units (although certain estimates have been applied) and for the actual number of employees who will have retired from Delphi between 10/1/98 and 12/31/98

HIGHLY CONFIDENTIAL

DPH-ATT 0000242

- Targeted date for completion of the final valuation of the salaried pension and hourly "phantom" plan split, is March to April, 1999
  - New 1/1/99 census data that separately distinguishes all employees as either from GM or Delphi should be received by mid-January
  - Following the receipt of this census information from GM, a completely new and final valuation will be conducted for both GM and Delphi, which will take an additional eight to ten weeks to complete
    - This process will consist of a reconciliation of the two data sets and will properly assign employee liabilities within shared CISCO code units
  - GMIMCo has communicated that this timeframe is acceptable with them and that they will have a final asset valuation completed

- A similar methodology and timeline based on the Distribution Date will be utilized for the split of the hourly pension plan

- Assets currently under both the GM Salaried and Hourly Pension Plans (except EDS stock) are held by one common group of trusts
  - Under this trust structure, 40 to 45 separate pools of assets are held in which the GM salaried and hourly plans have varied levels of ownership
    - Pools are segregated by basic investment objective (e.g., high quality fixed income, high yield, small cap equity, etc.)
    - Basic ownership structure is similar to a series of 40 to 45 mutual funds
  - Upon transfer of assets to Delphi (and assuming that GMIMCo is initially identified as the asset manager for the Delphi plans), the split of assets will involve the transfer of some of the shares of ownership of these 40 to 45 separate pools from the GM salaried and hourly plans to the Delphi salaried and hourly plans
    - As a result, basic legal and physical transfer of assets is relatively simple

- GMIMCo has conducted a separate review (entitled "Asset/Liability Study") to evaluate, among other things, the optimal mix of assets for the new Delphi plans
  - Given that Delphi is not assuming the liabilities for current retirees, GMIMCo has preliminarily recommended that Delphi's portfolio allocation be different from NewGM's to reflect the difference in liability structure
  - While the ultimate decision of the mix of pension assets is subject to the discretion of the Investment Funds Committee (IFC) of the GM BOD, both Delphi and GM concur with GMIMCo's general recommendation provided that the residual mix of assets still closely matches the duration of NewGM's pension liabilities

## Detailed Plan Split Approach

- Regarding the implementation of the transfer of assets, the Initial Transfer is to consist of a conservative amount of assets based upon Wyatt's preliminary valuation
  - For example, conservative amount to reflect approximately 90% of preliminary calculated assets in order to provide a cushion for any difference that may arise upon completion of final valuation

HIGHLY CONFIDENTIAL

- – Subsequent Transfer will occur 90 to 120 days after the Initial Transfer based upon final valuation
  - • Subsequent Transfer will not only contemplate the difference between actual assets owed and amount originally transferred ("true-up") but also an appropriate amount to reflect asset earnings (based upon actual asset earnings realized by the Delphi pension plan during this period) on these outstanding "true-up" assets

- Within the pension trust structure, assets can be classified into two general categories:
  1. Privately placed assets (i.e., private real estate and private market equity)
  2. Publicly traded assets

- For privately placed assets (approximately 10% of all pension assets or $7.0 billion), valuations cannot be made by reference to public market trading prices
  - – GMIMCo has implemented detailed written procedures for deriving a fair value for these assets
  - – However, because valuation is not as precise as for publicly traded securities, a pro-rata split will be implemented for these assets based upon the overall respective asset allocation percentages to Delphi and GM

- Regarding publicly traded assets (approximately 90% of total pension assets), a market valuation is readily obtainable as of 1/1/99
  - – These assets will be allocated in accordance with GMIMCo's recommendation so that the overall investment policy of Delphi's hourly and salaried plan assets is consistent with Delphi plans' liabilities

- With respect to the Subsequent Transfer, the asset allocation among the pools within the common trust will be performed in accordance with the percentage allocations under the Initial Transfer
  - – Specifically, the overall allocation of privately placed assets should remain on a pro-rata split basis with the sub-allocation of assets to the pools of various privately placed assets also remaining in accordance with the initial allocation of privately placed pools
  - – Similarly, the allocation of publicly traded assets should also remain in accordance with the initial allocation of publicly traded pools

- As a result, the asset returns on the publicly traded portion of the "true-up" assets should then be based upon a weighted average of the actual returns of the publicly traded assets that will be transferred (calculated from the actual returns within each respective pool)
  - – Any incremental portion of privately held assets that is part of the transfer need not have an asset earnings component since it is simply transferred on a pro-rata basis

HIGHLY CONFIDENTIAL

DPH-ATT 0000244

### Salaried Plan Part-B Insurance Contracts

- GM salaried pension plan has certain insurance contracts that provide a "backstop guarantee" for the ultimate payment of Part-B Primary benefits relating to employee contributions made prior to 1985
  - As detailed below , salaried plan provides employees option to make contributory payments (Part-B contributions) to pension plan over time of career with GM
    - For employee contributions made prior to 1985, GM's benefit plan provides for these contributions to be backstopped through three separate insurance contracts

- Current insurance contracts are complex and unique participatory arrangements that will require detailed negotiations (approximately six months) with the three insurance carriers to break out Delphi
  - Given participatory arrangement, in which the GM salaried plan is required to fund cash in the event the insurance contracts' asset returns are insufficient to cover present value of liabilities, insurance carriers will want to review Delphi's credit rating, the funded status of its salaried pension plan, and the underlying risks of the separate Delphi population before they are able to separately price these arrangements

- Agreement is to continue Delphi with an undivided interest in the insurance contracts as a transitionary measure until mid-Q2, 1999 or when Delphi leaves the GM Control Group, whichever is earlier, when contracts are targeted to be broken out separately
  - GMIMCo will work with Watson Wyatt to establish mechanisms to track Delphi's insurance contract assets and liabilities separately from GM's during this transitionary time period

- If NYTO and GMIMCo are unable to get insurance companies to agree to split the contracts, Delphi will independently purchase and pay for annuity contracts to insure these liabilities

### Background

- Under the GM U.S. Salaried Pension Plan, employees have the option to make contributory payments toward their pension plan (Part-B)
  - In return for these contributions, salaried employees are able to enjoy enhanced pension benefits (versus the hourly plan) by receiving a percent of final average pay formula (Part-B Supplementary) and an additional annual benefit approximately equal to the sum total of the nominal contributions made by the employee over his/her career
  - For employee contributions made prior to 1985, Part-B Supplementary benefit were covered by an insurance company backstop provision

HIGHLY CONFIDENTIAL

DPH-ATT 0000245

- In order to fulfill this plan provision, GMIMCo has negotiated three separate agreements with Aetna, MetLife, and Prudential
  - These agreements are unique participatory arrangements that enable GMIMCo to actively manage the dedicated asset portfolios
  - However, in the event that the present value of the insured contract liabilities were to fall below the value of dedicated assets, GM salaried plan is also required to make a contribution within five days from either the salaried pension plan (permitted under ERISA) or from operating cash
    - Recent decline in interest rates has caused GM to contribute approximately $18 million per month from the salaried plan to the three insurance contracts

- Insurance companies price the risk of these agreements by not only assessing the underlying liabilities (based upon participant demographics) but also the funded status of GM's salaried pension plan and the overall risk of GM bankruptcy
  - Payment is provided to insurance companies in the form of a percentage of the plan's assets placed under their custody

- According to Watson Wyatt, the present value of the insured portion of the Part-B Supplementary liability currently totals approximately $3.6 billion, which is broken out equally among the three insurance carriers
  - However, since Delphi is only assuming the pension liabilities for active employees, its share of the insured Part-B liability amounts to approximately $100 to $150 million

### Split of Salaried Insured Liabilities

- While the terms of these agreements do not specifically enable GM to split the insurance contracts between GM and Delphi (nor cancel them), GMIMCo and Wyatt believe it may be possible to negotiate with the insurance companies
  - However, based upon recent experience commonizing terms and provisions within the three separate agreements, they have also indicated that negotiations will likely take several months in order to achieve equitable pricing

- Under this alternative, insurance companies would have to recalculate Delphi's premiums and may need to obtain state regulatory approval to issue additional contracts
  - Insurance companies will need to separately assess the riskiness of the liabilities for the Delphi employee population, the projected funded status of their salaried plan, and Delphi's separate credit rating in order to estimate the contract premiums
  - NYTO and GMIMCo have initiated a bidding process to assess economic cost of this split

- Since this process is likely to continue beyond 1/1/99 (salaried plan split date), a transitionary process will need to be implemented
  - Specifically, while Delphi remains part of the GM control group of corporations (as defined in IRC Section 1563), it may still access the existing insurance contracts based on an undivided percentage interest

HIGHLY CONFIDENTIAL

DPH-ATT 0000246

- Regarding the insurance contract assets, GMIMCo has indicated that they can be retained under the same common trust and they will work with Watson Wyatt to devise a mechanism to track separately each company's investments, asset return performance, and pro-rata share of insurance premiums
  - Upon the ultimate split of these insurance contracts, Delphi's portion of the assets held by the insurance companies pursuant to the contracts would be credited to the Delphi salaried plan
  - Any contributions required by the insurance companies will be split pro-rata between the two corporations
- If NYTO and GMIMCo are unable to get insurance companies to agree to split the contracts, Delphi will independently purchase and pay for annuity contracts to insure these liabilities

HIGHLY CONFIDENTIAL

DPH-ATT 0000247

### Attachment II
### Treatment of True-Up Resulting from Delaying Split of
### Hourly Employee Benefit Plans

#### Scope / Recitals

- GM and Delphi have agreed that Delphi, as of 1/1/99, will be responsible for all past and future service benefit obligations related to its active employees

- Initial "Agreed-Upon Approach" was to split the hourly and salaried employee benefit plans effective 1/1/99
  - However, the split of the hourly plans has been delayed until Delphi's full separation from the GM control group ("Delayed Plan Split Date")
  - As a result of this delay, both pension and OPEB true-ups will be required

#### Pension True-up

- Wyatt will conduct a "Phantom Split" of the hourly pension plan as of 1/1/99 (detailed by employee) based upon IRC 414(l), (i.e., "Agreed Upon Capital Structure")

- The amount of assets, if any, that will be transferred in cash from outside the pension plans will be calculated as follows:
  1. Reference the assets under the Phantom Split related to employees who are still active at Delphi as of the Delayed Plan Split Date and roll this amount forward with the actual asset returns of Delphi's Phantom Hourly Pension Trust realized between 1/1/99 and the Delayed Plan Split Date
     - GMIMCo to provide independent analysis of asset returns by tracking the performance of the pension asset allocation that has been agreed upon between Delphi and GM as though the assets were invested separately under a Delphi Hourly Pension Trust
  2. This amount will then be subtracted from the assets that are transferred under ERISA and IRC Section 414(l) (as of the Delayed Plan Split Date) and the difference will be transferred to/(from) GM
     - Amount to be transferred will be carried forward from the Delayed Plan Split Date until actual transfer based upon the SFAS-87 discount rate incorporated into GM's 12/31/98 annual report

- For the Flowback employees who either return to GM or transfer to Delphi between 1/1/99 and the Delayed Plan Split Date, the value of the assets that are allocated to them at the Delayed Plan Split Date (under ERISA and IRC regulations) will be subtracted from their SFAS-87 liabilities as of the same date
  - SFAS-87 liabilities to utilize all assumptions, including discount rate, that were incorporated into GM's 12/31/98 annual report
  - The net difference, if any, will be transferred to/(from) GM

Page 1 of 2

HIGHLY CONFIDENTIAL

DPH-ATT 0000248

### OPEB True-up

- The OPEB obligation that will be transferred to Delphi will be an unfunded liability, that will incorporate the past service for all active Delphi employees as of the Delayed Plan Split Date
  - For flowbacks that occur between 1/1/99 and Delayed Plan Split Date, Delphi to reimburse GM in a manner consistent with the overall OPEB Flowback Attachment entitled, "Handling of US OPEB Obligations for Hourly, Salaried, and Executive Employee Flowbacks"

- Retiring Employees between 1/1/99 and Delayed Plan Split Date are counted against the True-up for the 7,000 addressed within the Attachment entitled "Treatment of Benefit Obligations for Delphi Hourly Employees Who Retire on or Prior to Retiree Cutoff Date"
  - Therefore, no additional OPEB true-up is necessary for these retirees

### Sharing of Third-Party Actuarial Costs

- GM and Delphi will bear equally the costs of all third-party actuarial expenses that are incurred relative to the valuation and repayment of this Contingency true-up

Page 2 of 2

HIGHLY CONFIDENTIAL

DPH-ATT 0000249

## Attachment III
## Contingency True-up

### Scope / Recitals

- A situation may arise in which the outcome of Effects Bargaining is different than the agreed-upon split of employee benefit obligations
  - An extreme scenario of Effects Bargaining would be a "Full Our-Watch, Your-Watch" scenario, in which GM is responsible for not only Delphi's retiree obligations but also the liabilities associated with past service of Delphi's active employees
    - Under this extreme scenario, Delphi will still be liable to GM for the unfunded portion of the past service obligation (Pension, OPEB, Worker's Compensation, Extended Disability Benefits (EDB) and Sickness and Accident(S&A)) related to the Delphi active employees ("Unfunded Balance")
  - This Contingency True-up will be utilized under any instance in which GM is required to assume all or a portion of Delphi's past service obligations for hourly employees that are not retired on or before 10/1/99 or those hourly employees associated with Delphi's previously divested operations
    - The calculation of this obligation will be based on assumptions utilized in GM's year-end 1998 consolidated financial statements and will be made as of the Distribution Date

### Payment of Contingency True-up

- Under any Contingency True-up scenario, Delphi's budgeted hourly pension contributions in the amount of $1.6 billion for 1999, $1.5 billion for 2000, and $1.0 billion for 2001, less Delphi hourly pension service cost for these years related to the employees at Delphi at 1/1/99 who remain at Delphi as of 10/1/99, will first be utilized for making payment to GM toward the Unfunded Balance
  - Delphi will pay GM the first $1.6 billion less 1999 Delphi hourly pension service cost as described above before January 1, 2000 followed by $2.5 billion less 2000 and 2001 Delphi hourly pension service cost as described above (or if the Unfunded Balance is less, such lesser amount) to be paid no later than year-end 2000
  - If actual Delphi hourly pension service costs for any of the years mentioned above are not available at the time of the payment, the best estimates of such costs available at that time will be utilized in the above calculation
  - All payments made will first be credited toward the portion of the Unfunded Balance relating to employee benefit obligations for hourly employees who have since retired after 1/1/99

- The Unfunded Balance will be carried forward at an interest rate equal to the SFAS-87, SFAS-106 discount rates utilized within GM's 12/31/98 financial statements for pension and OPEB, respectively

Page 1 of 2

HIGHLY CONFIDENTIAL

DPH-ATT 0000250

- The Worker's Compensation, EDB, and S&A portions of the Unfunded Balance will be carried forward at an interest rate equal to the SFAS-112 discount rate within GM's 12/31/98 financial statements
- In the event the sum of any payments Delphi has made still do not exceed the Unfunded Balance, the pension, OPEB, EDB, and S&A remaining amounts of the Unfunded Balance ("Residual Unfunded Balance") will be carried forward at the interest rates described above

- GM and Delphi recognize that there exists a relationship between Attachment III and Attachment IV of this Term Sheet, and that, in the event of a Contingency True-up scenario, the calculation of the Unfunded Balance will be made in such a way that will hold Delphi's Agreed Upon Capital Structure (as of 1/1/99) substantially the same
  - Any deterioration in Delphi's Capital Structure after 1/1/99 related to items in Attachment IV is borne by Delphi
  - In the event of a Contingency True-up scenario, the calculation of the Unfunded Balance will include, but is not limited to, compensation for the incremental liabilities related to any Delphi hourly retirees between 1/1/99 and 10/1/99 in excess of the Capital Structure retiree assumptions

- The total Residual Unfunded Balance will be repaid as follows
  - Wyatt will independently establish an estimated pattern for cessation of employment (retirement, death or quit) for the Delphi active employees
  - On an annual basis, Delphi will transfer to GM sufficient cash to fully defease the Residual Unfunded Balance, carried forward at a growth rate equal to the SFAS-87 and SFAS-106 discount rates utilized within GM's 12/31/98 financial statements for the remaining unfunded pension and OPEB liabilities, respectively, for the estimated employees that are actuarially expected to cease employment during that year

- Above process to occur for a period of up to 15 years, of which any time during the 6th year through the 15th year, Delphi will provide a final cash settlement to GM based upon the unpaid obligation, carried forward with interest as calculated above ("Final Settlement")
  - Timing of final settlement subject to mutual agreement between both parties but to occur no later than the 15th year

## Sharing of Third-Party Actuarial Costs

- GM and Delphi will bear equally the costs of all third-party actuarial expenses that are incurred relative to the valuation and repayment of this Contingency true-up

HIGHLY CONFIDENTIAL

DPH-ATT 0000251

DEC 23 '98 16:14 FR GM PENSION FUNDING    212 444 6211 TO 85640210    ---    P.14/22

## Attachment IV
### Treatment of Benefit Obligations for Delphi Hourly Employees Who Retire On or Prior to the Hourly Retiree Cutoff Date

#### Scope / Recitals

- Hourly employees, who initially are Delphi's responsibility (including employees from Delphi divested operations), vis-à-vis GM, and retire on or prior to the "Hourly Retiree Cutoff Date" (date is targeted to be 10/1/99 but is ultimately subject to the outcome of Effects Bargaining), will be treated as GM retirees ("Hourly Retiring Employees")
- Initial forecast is that 7,000 Delphi hourly employees will retire during the plan year from 10/1/98 to 10/1/99
  - Both parties concur that estimate of 7,000 Hourly Retiring Employees for the 12 month period appears appropriate given average annual historical retirements of approximately 3,000 to 5,675 Delphi hourly employees
    - 7,000 retirees represents approximately a 25% premium over 12 months of actual 1998 Delphi hourly retirements, which is reasonable given spin/split-off dynamic that will likely naturally incent incremental retirements
  - Importantly, however, both parties also acknowledge that as many as 21,000 Delphi hourly employees will be eligible for retirement by 10/1/99
  - Moreover, regarding Hourly Retiring Employees who are incented to retire early through a Mutually Satisfactory Retirement ("MSR Program"), the treatment for pensions and OPEB is addressed within this agreement
    - However, both parties acknowledge that any other MSR Program incentive costs (e.g. cash, car vouchers, etc.) will be directly paid by Delphi

#### Treatment for Pensions and Related Worker's Compensation, Extended Disability Benefits (EDB), and Sickness and Accident (S&A) True-ups

- The total amount of cash and pension assets due related to the Hourly Retiring Employees ("Pension Total Transfer Amount") will be equal to the PBO for the Hourly Retiring Employees as of the Hourly Retiree Cutoff Date
  - PBO to utilize all actuarial assumptions, including discount rate, incorporated into GM's 12/31/98 annual report
  - The incremental unfunded pension costs of any hourly MSR Program retirements will automatically be contemplated since true-up comparison is to PBO, which implicitly includes the present value of the incremental pension costs associated with MSR Programs
- In accordance with ERISA and IRC regulations, a plan-to-plan transfer will be implemented for the maximum permissible amount ("Maximum ERISA Amount") for the Hourly Retiring Employees
  - As calculated below, the balance of the amount due to/(from) GM will be transferred outside the pension plans

Page 1 of 3

HIGHLY CONFIDENTIAL

DPH-ATT 0000252

- Since the hourly plan will not be split until full separation of Delphi, the portion to be transferred outside the plans will be specifically equal to the Pension Total Transfer Amount less the following three amounts:
  1. The 414(l) pension assets that were retained by GM for hourly retirees that retired subsequent to 1/1/99 but on or prior to the Delayed Plan Split Date, rolled forward for asset earnings realized by GM's Hourly Pension Plan between the Delayed Plan Split Date and the Hourly Retiree Cutoff Date
  2. The Maximum ERISA Amount transferred as described above for employees that retire subsequent to the Delayed Plan Split Date but on or prior to the Hourly Retiree Cutoff Date
  3. An agreed upon credit in the amount of $400 million, which reflects an approximation of the assets that would be due outside the plans if 7,000 Delphi employees were to retire on or before the Hourly Retiree Cutoff Date

- Additionally, Delphi will compensate GM in cash (for the full amount for any Workers' Compensation, Extended Disability Benefits ("EDB"), and Sickness and Accident ("S&A") liabilities that it assumes related to Hourly Retiring Employees
  - Calculation of such liability will be valued by independent actuaries, utilizing the assumptions incorporated into GM's 12/31/98 annual report

- All amounts above will be due 15 days after the completion of the actuarial valuation for these liabilities

- The Pension Total Transfer Amount will grow with interest from the Hourly retiree Cutoff Date at the SFAS-87 discount rate incorporated into GM's 12/31/98 annual report while the Workers' Compensation, EDB, and S&A Liabilities will grow with interest at the SFAS-112 discount rate incorporated into GM's 12/31/98 annual report

Treatment for OPEB

- GM will initially retain the estimated OPEB liability for the forecasted 7,000 Retiring Employees
  - Therefore, a cash transfer to/(from) GM will occur depending upon whether the "actual" OPEB obligation is greater/(less) than the original estimate, the difference of which is rolled forward from Hourly Retiree Cutoff Date with interest ("Cash True-up")

- Estimate will be based upon SFAS-106 assumptions utilized by GM to report its OPEB obligations within the 12/31/98 financial statements
  - Wyatt to perform independent calculation on a commercially reasonable basis
  - Rollforward of interest will be based upon SFAS-106 interest rate utilized GM's 12/31/98 annual report

- Cash True-up will be based upon not only a difference in the number of retirements from the original 7,000 person estimate but also any difference between the estimated demographics and the actual demographics of the total population (including the original 7,000)
  - Initial estimate of 7,000 person OPEB liability to be retained by GM will be based upon average age/service demographics for Delphi active employees as of 10/1/98

Page 2 of 3

HIGHLY CONFIDENTIAL



- However, to the extent that the actual Retiring Employee population is either younger or older than the average age/service demographics mentioned above, the actual liability assumed by GM will be greater or smaller, respectively, than the initial estimate
- Since proposed structure compares actual number of Retiring Employees to original 7,000 estimate, no separate adjustment will be required for any employees who are incented to retire early through an MSR Program

- On a separate but related matter, it is appropriate that the Cash True-up is based upon a comparison to the entire 7,000 person population even though this figure represents a forecast of people who will retire beginning 10/1/98 and not when Delphi becomes a separate incorporated entity as of 1/1/99
  - In this regard, Delphi's and GM's 1/1/99 OPEB obligations are actually based upon the amounts outstanding as of 10/1/98
  - Since Delphi's 1/1/99 (10/1/98) OPEB obligation was utilized to formulate the agreed upon capital structure, any variance from this amount should be transferred to/(from) GM

- All amounts above will be due 15 days after the completion of the actuarial valuation for these liabilities

### Sharing of Third-Party Actuarial Costs

- GM and Delphi will bear equally the costs of all third-party actuarial expenses that are incurred relative to the valuation and repayment of this Retiree true-up

Page 3 of 3

HIGHLY CONFIDENTIAL

DPH-ATT 0000254

### Addendum 3 to Separation Agreement Relating to Delphi Hourly Employees Who Retiree Prior to the Hourly Retiree Cutoff Date

- Attachment IV of the U.S. Employee Matters Agreement Employee Benefit Financial Term Sheet (Tab 1) between GM and Delphi stipulates that Delphi will receive an "agreed-upon credit" of $400 million for the calculation of the portion of the Pension Total Transfer Amount to be transferred outside the pension plans

- Both parties understand that this amount has now changed to $375 million. Therefore, both parties agree that this new figure will be used as the amount of credit Delphi receives in the aforementioned Attachment IV

E. A. Feldstein
Vice-President and Treasurer
General Motors Corporation

J. G. Blahnik
Treasurer
Delphi Automotive Systems

CC: Adi? Affy.
John Behrfeldt

Page 1 of 1

HIGHLY CONFIDENTIAL

DPH-ATT 0000255

## Attachment V
### Handling of U.S. OPEB Obligations for Hourly, Salaried, and Executive Employee Flowbacks

Scope

In accordance with the Labor Relations Term Sheet, General Motors will accept U.S. hourly employee flowbacks from Delphi Automotive Systems (DAS) or DAS divested operations as appropriate job openings become available at GM under terms of its various union agreements. Likewise, DAS will accept GM U.S. hourly employee flowbacks to the extent jobs become available at DAS.

From a post-retirement benefit standpoint, the organization that receives the flowback employee ("Receiving Organization") will administer health care and life insurance benefits. This Term Sheet covers the process by which GM and DAS will provide a cash settlement for the hourly, salaried, and executive U.S. OPEB obligation for flowbacks at the time of the flowbacks' actuarially estimated cessation of employment (defined as retirement, quit, or death).

1998 Year End Valuation of Flowback Obligations

Flowbacks will be considered components of the overall actuarial assumptions of both organizations. Flowback assumptions to be contained in DAS's pro forma liabilities upon separation (1/1/99) will be made based on GM's Employment Cost Analysis' (ECA) assessment of potential net openings at GM. The projections of flowbacks (including those flowbacks that churn, i.e. flowback only to retire soon thereafter) to be used in the 1999 - 2003 Budget/Business Plan and DAS pro formas are as follows:

|                      | 1999  | 2000  | 2001  | 2002  | 2003  |
|----------------------|-------|-------|-------|-------|-------|
| # Hourly Flowbacks   | 4,200 | 4,000 | 3,700 | 3,400 | 3,300 |
| # Salaried Flowbacks | 0     | 0     | 0     | 0     | 0     |

It should be noted that the flowback estimates reflected above may not be representative of the actual net number of flowbacks that occur between GM and DAS. Of the 4,200 employees expected to flowback during 1999, 1,000 were expected to retire during 1999. Treatment for these 1,000 retiring flowbacks is comprehended under language contained in the Attachment titled "Treatment of Benefit Obligations for Delphi Hourly Employees Who Retire on or Prior to Hourly Retiree Cutoff Date".

OPEB Valuation / Settlement Process for Hourly and Salaried Flowbacks Excluding Executives

Beginning in 2000, an annual assessment of the number of flowbacks that occurred in the preceding calendar year will be completed no later than January 31st. The initial assessment of hourly and salaried flowbacks in 2000 will include all those that have flowed back since 1/1/99. Valuations will be performed by the Receiving Organization on each calendar year's group of flowback employees. The SFAS-106 assumptions (including discount rate, mortality, health care trend, etc.) to be used in valuing the flowback OPEB obligation will be based upon those incorporated into the Receiving Organization's most recent annual report.

Upon identification of the preceding year's flowback population, the actuaries will also establish an estimated pattern for cessation of employment (retirement, death, or quit) for the group. Once established, the cessation of employment schedule will remain constant for the respective annual flowback group and will be utilized to determine the timing of payments due to GM for the group of flowbacks in a given year.

Page 1 of 2

HIGHLY CONFIDENTIAL

DPH-ATT 0000256

From the Receiving Organization's perspective, employees will begin accruing service and related interest costs from the time of flowback. However, for GAAP purposes, it is the intent of both parties that the liability and expense related to employees' service earned prior to the transfer date will not be recorded by the Receiving Organization until the unpaid obligation is fully defeased. Therefore, since the OPEB obligation will continue to float with annual changes in discount rate and other actuarial assumptions, the flowback true-up due to the Receiving Organization must also float in order to perfectly offset this obligation. With each subsequent year, the flowback true-up that is still outstanding will be restated to reflect the Receiving Organization's latest OPEB assumptions, including discount rate, that were incorporated into the Receiving Organization's most recent annual report. In this regard, the flowback true-up will be restated to grow with interest, from the original date of flowback, at the latest discount rate for OPEB incorporated into the Receiving Organization's most recent annual report.

Settlement will be made in the form of cash to the appropriate organization on or before February 15th for employees that were actuarially expected to retire in the preceding year with the first payment being made in 2001. The "Settlement Amount" of the obligation will include the amount accrued at the time of flowback (i.e., APBO) and grown with interest as stated above from the point of flowback to the settlement date for the actuarially estimated number of flowbacks that retire, die, or quit during the year.

### Final OPEB Settlement

At any time after the sixth year following the date of separation of DAS from GM (and before 15 years after separation), if mutually agreeable by both parties, a final payment will be made for all yet unpaid OPEB flowback liabilities calculated as described above in the OPEB Valuation / Settlement Process for Hourly and Salaried Flowbacks Excluding Executives ("Final Settlement Amount"). However, both parties agree that the Final Settlement Amount will be made no later than the fifteenth year following separation.

### Executive Flowbacks

Per the Executive Transactions term sheet, both parties have agreed that, subsequent to 1/1/99, certain executive employees will be transferred between GM and DAS. The salaried pension plan assets and liabilities related to these employees will be transferred from the plan of the Transferring Organization to the Receiving Organization in compliance with ERISA and IRC regulations. The SERP/Excess and OPEB liabilities will be transferred back as an unfunded liability except for the portion accrued with the Transferring Organization between 1/1/99 and the date of transfer. The portion accrued while the executive employee was with the Transferring Organization between 1/1/99 and the date of transfer will be settled with a cash payment between the two organizations. Said amounts will be calculated independently by a third party actuary utilizing all actuarial assumptions incorporated into the latest year-end Consolidated Financial Statements of the Receiving Organization.

### Sharing of Third-Party Actuarial Costs

GM and Delphi will bear equally the costs of all third-party actuarial expenses that are incurred relative to the valuation and repayment of this flowback true-up.

HIGHLY CONFIDENTIAL

DPH-ATT 0000257

## Attachment VI
### Treatment of Benefit Obligations for Delphi Salaried and Hourly Employees Who Retire Between 10/1/98 and 1/1/99

#### Scope / Recitals

- Delphi, under its own initiative, plans to administer at least three early retirement programs

- Since the proposed period of the salaried window separation (1/1/99 to 4/1/99) and the hourly window separation (prior to 1/1/99) overlap with the cut-off for Delphi employees to retire and be treated as a GM retiree, some of the retirement benefits of these employees will remain the obligation of GM ("Window Employees")
    - As a result, a true-up calculation will be required for the present value of any incremental liabilities (pension and OPEB) that are not fully funded on a SFAS 87 basis through pension plan transfer following ERISA and IRC regulations pertaining to pension plan splits
    - GM has agreed to assume the liability for normal and early retirements (non-Window retirements) that occur on or before 1/1/99 and therefore no similar true-up is proposed

#### Calculation of True-up

- Regarding pensions, Wyatt will independently calculate true-up for the Window Employees
    - Pension liabilities to be measured under SFAS-87 assumptions, including discount rate, that will be utilized within GM's 12/31/98 financial statements
    - Calculated liability will be compared to assets that are able to be allocated to these Window Employees under ERISA and IRC regulations
    - Net difference, if any, to be transferred from Delphi to GM in the form of a one-time cash transfer
    - Wyatt will complete analysis on a commercially reasonable basis

- Regarding OPEB, Wyatt will independently calculate obligations for any salaried Window Employee who is incented to retire subsequent to 10/1/98 and on or prior to 1/1/99
    - Hourly OPEB true-up has been addressed separately as part of the attachment entitled "Treatment of Benefit Obligations for Delphi Hourly Employees Who Retire On or Prior to Retiree Cutoff Date"
    - OPEB obligation to be valued utilizing SFAS-106 assumptions, including discount rate, that will be utilized within GM's 12/31/98 financial statements
    - Amount will be transferred as a one-time cash payment from Delphi to GM 15 days after the completion of actuarial calculations

Page 1 of 2

HIGHLY CONFIDENTIAL

DPH-ATT 0000258

## Sharing of Third-Party Actuarial Costs

- GM and Delphi will bear equally the costs of all third-party actuarial expenses that are incurred relative to the valuation and repayment of this salaried Window Employee true-up

HIGHLY CONFIDENTIAL

DPH-ATT 0000259



DEC 23 '98 16:16 FR GM PENSION FUNDING    212 444 6211 TO 85640210    P.21/22

### Attachment VII
### Agreement on any Financial Value Received from MetLife

GM and DAS agree that any financial value distributed either in cash or in kind to DAS
or GM in regard to the initial public offering or change in financial structure of
Metropolitan Life Insurance Company shall be retained by GM. To the extent any such
financial value is distributed to DAS, DAS will immediately transfer such value in the
form it was received to GM. In the event that any such value is distributed directly from
MetLife to DAS employees, DAS will not bear any financial responsibility to GM.

HIGHLY CONFIDENTIAL

DEC 23 '98 16:16 FR GM PENSION FUNDING    212 444 6211 TO 85640210    P.22/22

## Attachment VIII
## DAS's 1999 Pension Expense for the US Hourly Plan

To the extent that Delphi's 1999 pension expense for the US hourly pension plan is different from the original estimated budget of $175 million after-tax, the amount of the difference up to $19 million after-tax attributable to Delphi not receiving an additional $300 million in assets as of 12/31/98 due to the use of a PBGC discount rate will be credited in a pension expense reallocation such that DAS's 1999 pension expense for the US hourly pension plan is improved by an amount not to exceed $19 million after-tax.

Page 1 of 1

** TOTAL PAGE.22 **

HIGHLY CONFIDENTIAL

DPH-ATT 0000261