K&L GATES LLP                  **Hearing Date:  March 24, 2009**
Edward M. Fox, Esq.                                  **10:00 a.m.**
Eric T. Moser, Esq.
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

Attorneys for Wilmington Trust Company,
as Indenture Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                            :        Chapter 11
                                :        Case No. 05-44481 (RDD)
DELPHI CORPORATION, *et al.*,      :        (Jointly Administered)
                                :
       Debtors.                 :
-------------------------------------------------------X

## LIMITED OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 6004 AUTHORIZING AND APPROVING OPTION EXERCISE AGREEMENT WITH GENERAL MOTORS CORPORATION

           Wilmington Trust Company ("WTC"), as indenture trustee for the senior notes

and debentures in the aggregate principal amount of $2 billion (the "Senior Debt") issued by

Delphi Corporation ("Delphi"), by and through its attorneys, K&L Gates LLP, hereby objects to

the Motion for Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 6004 Authorizing and

Approving Option Exercise Agreement with General Motors Corporation ("GM") (the

"Motion") filed by Delphi and its debtor affiliates and subsidiaries (collectively, the "Debtors"),

stating as follows:

### PRELIMINARY STATEMENT

        1.        Having dug a hole operating their domestic businesses at a loss for the

benefit of General Motors Corporation ("GM") so deep that they cannot climb out of it without

GM's help, the Debtors now propose to cannibalize their few remaining assets in order to keep the lights on for the benefit of GM while waiting for GM to throw the Debtors a lifeline to pull them out of their hole and enable them to confirm a plan of reorganization.  Once the Debtors' assets are eaten up awaiting rescue by GM, however, GM will have no reason to use its own limited assets to assist the Debtors, and liquidation will be the inevitable result.

2.    Considered in isolation from the Debtors' deteriorating financial condition, continuing liquidity crises, and inability to finance a plan without substantial financial assistance from GM, of course, the Debtors' proposal to allow GM to accelerate the exercise of its option to purchase their global steering business might seem like a reasonable business decision.

3.    Because GM is the only viable source of funding for a plan, however, the Debtors' decision to sacrifice critical leverage against GM – in the form of the Debtors' ability to retain ownership of a steering business that GM is obviously eager to acquire, and to cut off GM's supply of steering parts if GM refuses to commit to funding an acceptable plan of reorganization – is directly contrary to the best interests of creditors and manifestly not a reasonable exercise of the Debtor's business judgment.

4.    Given the Debtors' precarious financial situation and the state of the automotive industry generally, the Debtors can ill afford to continue to pursue an incremental strategy in their negotiations with GM by selling their assets to GM on a piecemeal basis in exchange for sufficient liquidity to cover their short-term operating losses; losses that, ironically enough, are the result of the Debtors' willingness to continue selling products to GM at a price that is below the cost of production.

5.      Instead, if the Debtors have any hope of consummating a plan, they must condition any sale of assets to GM – or even the continued supply of parts to GM -- on a binding commitment by GM to provide the necessary funding to allow the Debtors to emerge from chapter 11.  Ironically, while the Debtors have demanded just such a commitment from GM by March 9, 2009, they nevertheless seek to move forward with this transaction despite the apparent failure of GM to meet the Debtor's demand for an overall resolution of the Debtors' case.

6.      In the absence of such a concrete funding commitment by GM, the Debtors' decision to allow GM to purchase their global steering business (or any other strategically important business operations) is contrary to the best interest of creditors, and the Motion should therefore be denied.

## FACTUAL BACKGROUND

7.      On October 8, 2005 (the "Petition Date"), Delphi Corporation and certain of its affiliates and subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code").  Since the Petition Date, the Debtors have continued to operate their businesses and remained in possession of their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

A.      **Debtors' Financial Performance**

8.      From 2005 to 2007, Delphi suffered losses totalling more than $10 billion on a consolidated basis: (i) $3.065 billion in 2007; (ii) $5.464 billion in 2006; and (iii) $2.357

billion in 2005 (including a net loss of approximately $743 million for the three-month,

postpetition portion of 2005).[1]

9.      Delphi's financial situation continued to deteriorate in 2008.

10.     In Delphi's 10-K for the fiscal year ended December 31, 2008, Delphi

reported a net operating loss of $1.481 billion, and would have realized nearly $2.295 billion in

total negative net income were it not for the $5.332 billion in one-time gains associated with the

acceleration of certain of GM's obligations under the General Settlement Agreement ("GSA")

and Master Restructuring Agreement ("MRA").[2]

**B.      GM Contract Rejection Motion**

11.     The Debtors long ago identified their unprofitable contracts with GM as

one of the key causes of these staggering losses.

12.     Indeed, on March 31, 2006, the Debtors recognized that they "cannot

continue to supply parts to GM at a loss,"[3] a practice which the Debtors recognized was "steadily

draining value from the Debtors' estates."[4]

13.     Nevertheless, to this day, Delphi continues to sell products to GM at a

loss, and, having drained its other internal cash sources, continues to borrow substantial sums of

cash from GM in order to finance its ability to continue to sell products to GM at a loss.

---

[1]  See Delphi 10-K dated February 19, 2008 ("2007 Annual Report"), p. 100.

[2]  See Delphi 10-K dated March 3, 2009 ("2008 Annual Report"), p. 113.

[3]  Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain
Executory Contracts with General Motors Corporation (the "GM Rejection Motion"), ¶ 5.

[4]  GM Rejection Motion, ¶ 56.

C.    **The Plan**

14.    On December 10, 2007, the Debtors filed their First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors and Debtors-in-Possession (the "Plan").

15.    On January 25, 2008, the Court issued its Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. §§ 1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors in Possession, as Modified (the "Confirmation Order").

16.    Following entry of the Confirmation Order, the Debtors sought to obtain exit financing in the capital markets.

17.    The Debtors were unable to obtain adequate financing on satisfactory terms in the capital markets.  Ultimately, however, the Debtors were able to obtain a commitment from GM to participate in the Debtors' exit financing arrangements on "below-market terms"[5] that permitted the Debtors to obtain the necessary financing and satisfy their interest rate covenants with their plan investors.

18.    Notwithstanding GM's exit-financing assistance, however, on April 4, 2008, Delphi announced that "although it ha[d] met the conditions required to substantially consummate its [Plan] . . . Delphi's plan investors refused to participate in a closing . . . and refused to fund their investment agreement with the Company."[6]

---

[5] See Expedited Motion under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) for Implementation of Debtors' Confirmed Plan of Reorganization (Docket No. 12978), ¶ 5.

[6]  Delphi Press Release dated April 4, 2008, p. 1.

19.    Delphi has since acknowledged that "[u]nless a decree of specific performance is issued by the Court, there is no possibility that the Plan can be consummated."[7]

**D.    Amendments to the MRA and GSA**

20.    On September 12, 2008, the Debtors filed an Expedited Motion for Order Authorizing Debtors to Implement Amended and Restated Global Settlement Agreement and Master Restructuring Agreement with General Motors Corporation (the "GSA Amendment Motion"), which sought approval for, among other things, the immediate transfer of certain of the Debtors' pension obligations to GM in consideration for the immediate release of substantially all claims that the Debtors or their estates may have against GM.

21.    On September 26, 2008, the Court entered an Order granting the GSA Amendment Motion.

**E.    Proposed Amendments to the Plan**

22.    On October 3, 2008, the Debtors filed a Motion for Order: (I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization (the "Plan Modification Motion").

23.    The Plan Modification Motion proposed a number of material changes to the Plan, including a substantial reduction in the recovery for unsecured creditors, including the

---

[7]  See Memorandum of Law of Plaintiff Delphi Corporation in Opposition to Defendants' Motion to Dismiss the Complaint in Adversary No. 08-1232 (RDD), p. 9.

Senior Debt, from 100% under the Plan (as confirmed) to approximately 38.8% under the Plan as modified by the Plan Modification Motion.[8]

24.     Since the filing of the Plan Modification Motion, the Debtors have indicated that they intend to make further changes to the Plan beyond those proposed by the Plan Modification Motion, which will further reduce recoveries by the Debtors' general unsecured creditors.[9]

25.     By notices of adjournment filed on October 18, 2008, October 28, 2008, November 12, 2008, December 10, 2008, and March 4, 2009, the Debtors have adjourned the hearing with respect to the Plan Modification Motion, which is now scheduled to take place on April 23, 2009.

**F.      Defaults under the DIP Agreement**

26.     The Debtors' debtor in possession financing facility (the "DIP Facility") matured on December 31, 2008, and has not been paid off or refinanced.

27.     As a result, the Debtors are in default of their DIP Facility,[10] and had no choice but to enter into an accommodation agreement (the "Accommodation Agreement") with their DIP lenders that will permit the continued use of certain proceeds of the DIP Facility Agreements through June 30, 2009, subject to the Debtors' continuing satisfaction of certain conditions, including the maintenance of adequate levels of liquidity.[11]

---

[8]  Delphi Press Release dated October 3, 2008, p. 2.

[9]  See 2008 Annual Report, p. 46.

[10]  See 2008 Annual Report, p. 47 ("Notwithstanding the Accommodation Agreement and Amendment, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility . . . .").

[11]  Motion, ¶ 20.

28.    In order to meet these liquidity covenants, the Debtors have entered into a liquidity support agreement with GM (the "GM Arrangement") pursuant to which GM has agreed to advance up to an additional $450 million to the Debtors, and a Partial Temporary Accelerated Payment Agreement (the "Pull-Forward Agreement") with GM, "which provides for GM to accelerate the payment of up to $300 million in trade accounts payable to Delphi over the three-month period beginning in March 2009."[12]

## H.    Steering Option Exercise Motion

29.    On March 4, 2009, the Debtors filed the instant Motion, which seeks approval for the Debtors entry into a Global Steering Business Option Exercise Agreement (the "Option Agreement") that would allow GM to exercise its option under the Amended and Restated Master Restructuring Agreement dated September 12, 2008 (the "MRA") to purchase the Debtors' global steering business nearly eighteen months earlier than the August 31, 2010 option date contemplated by the MRA.[13]

30.    In exchange for this acceleration of GM's ability to acquire the Debtors' global steering business, GM would agree to: (i) provide the Debtors with additional liquidity that is expected to be sufficient to permit the Debtors' continued operations through May 2009 and (ii) make certain favorable modifications to the option terms established by the MRA.

31.    While the Debtors state in the Motion that

GM and Delphi have also affirmatively committed to reaching an agreement on a term sheet covering the transfer of certain other Delphi facilities on or prior to March 9, 2009, which will be a fundamental part of the Debtors Plan modification

---

[12]  See Motion for Order Authorizing Debtors To Enter Into Fourth Amendment and Fifth Amendment to Arrangement With General Motors Corporation, ¶ 22.

[13]  See Amended MRA, § 4.06(a)(vi), p. 50.

Motion ¶ 31, paragraph 8 of the Option Agreement expressly provides that "**reaching such agreement on or before March 9, 2009 . . . is not a condition to any of the parties' rights or obligations under this Agreement or the MRA.**"  Option Agreement, ¶ 8 (emphasis added). Consequently, there is no consequence for GM's failure to reach agreement with Delphi on a Term Sheet prior to March 9, 2009, or ever, nor is GM even required to use reasonable efforts to reach an agreement.

32.     To the best of WTC's knowledge, the Debtors have not yet reached agreement on a Term Sheet with GM.

### THE MOTION MUST BE DENIED

33.     Section 363(b) of the Bankruptcy Code provides that the Debtors "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

34.     Under section 363(b), the Debtors bear the burden of demonstrating that there is "a good business reason" for entering into the Option Agreement.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

35.     In considering whether the Debtors have met that burden, the Court may not blindly defer to the Debtors' supposed business judgment, but must, instead, "consider all salient factors pertaining to the proceeding, and . . . act to further the diverse interests of the debtor, creditors and equity holders, alike."  Id.

36.     The Debtors have reached a critical juncture in their bankruptcy cases, and decisive action is needed to maximize the value of the Debtors' estates and preserve the possibility of a meaningful recovery for the Debtors' general unsecured creditors.

37.    Nearly a full year has passed since the failed closing under the confirmed First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors and Debtors-in-Possession (the "Plan").

38.    Nearly three months have passed since the expiration of the Debtors' DIP Facility.

39.    Yet, despite seemingly endless negotiations, the Debtors have not been able to reach agreement with GM concerning the terms of an amended plan of reorganization, let alone one that would provide a meaningful recovery to the Debtors' unsecured creditors.

40.    The Debtors have, however, continued to suffer enormous operating losses that diminish the value of the Debtors' estates further with each passing day, despite their recognition of the need to stop selling products to GM at a loss and their need to obtain GM's assistance in order to confirm a plan of reorganization.

41.    Confronted with such dire financial circumstances, the Debtors' fiduciary duties to the creditors of their estates should compel them to insist that GM make an immediate and firm commitment to fund a workable plan of reorganization for the Debtors as a condition to the Debtors' willingness to transfer the steering business or any other business to GM or even to continue shipping the parts that GM needs in order to continue operating.

42.    Instead, unfortunately, the Debtors propose to allow GM to obtain the assets it needs to ensure the vitality of its business without requiring a corresponding commitment to provide the funding the Debtors need in order to facilitate the confirmation of an amended plan of reorganization and their eventual emergence from chapter 11.

43.    If this pattern is allowed to continue – namely, if the Debtors continue to supply parts to GM at a loss and/or allow GM to acquire the plants at which those parts are

manufactured -- GM will have no financial incentive to provide the Debtors with the funding necessary to finance the Debtors' plan of reorganization.

44.      Instead, GM will simply continue to fund the Debtors short-term liquidity needs in order to ensure an uninterrupted supply of parts and will either resource those same parts away from the Debtors or will eventually acquire the plants which produce the parts it needs when the Debtors are eventually forced to liquidate.

45.      Granting the relief requested by the Motion would thus undermine the Debtors' ability to propose, finance, and consummate an amended plan of reorganization that provides a meaningful recovery to their creditors, and the Motion should therefore be denied in its entirety outside the context of a confirmed and effective plan of reorganization.

WHEREFORE, WTC respectfully requests that the Court enter an order denying the Motion outside of the context of a confirmed and effective plan of reorganization, and granting such other and further relief as this Court deems just and proper.


Dated: New York, New York
         March 17, 2009

K&L GATES LLP

By:    */s/ Edward M. Fox*
       Edward M. Fox
       A Member of the Firm
Attorneys for Wilmington Trust Company,
as Indenture Trustee
599 Lexington Avenue
New York, NY 10022
(212) 536-3900