**Hearing Date: March 24, 2009**

Marc Abrams
Michael J. Kelly
Richard Mancino
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

*Counsel to the Collective of Tranche C DIP Lenders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                       :
    In re                              :    Chapter 11
                                                       :
DELPHI CORPORATION, et al.,                            :    Case No. 05-44481 (RDD)
                                                       :
                        Debtors.  :    (Jointly Administered)
                                                       :
-------------------------------------------------------x

### LIMITED OBJECTION OF THE TRANCHE C COLLECTIVE TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED R. BANKR. P. 6004 AUTHORIZING AND APPROVING OPTION EXERCISE AGREEMENT WITH GENERAL MOTORS CORPORATION

A collective of Lenders under the Credit Agreement (together, the "Tranche C Collective"[1]), by and through their undersigned counsel, hereby submits this Limited Objection to the Debtors' Motion For Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 6004 Authorizing and Approving Option Exercise Agreement With General Motors Corporation (the "Steering Option Exercise Motion" or the "Motion"), and in support of that Limited Objection respectfully represents as follows:

---

[1] The Tranche C Collective includes: (i) Anchorage Capital Master Offshore, Ltd.; (ii) Anchorage Crossover Credit Finance, Ltd.; (iii) Double Black Diamond Offshore Ltd.; (iv) Black Diamond Offshore Ltd.; (v) Monarch Master Funding Ltd.; (vi) Greywolf Capital Partners II LP; (vii) Greywolf Capital Overseas Master Fund; (viii) GCOF SPV I; (ix) GCP II SPV I; (x) Greywolf Structured Products Master Fund, Ltd.; (xi) Greywolf CLO I, Ltd.; and (xii) SPCP Group, LLC.

**PRELIMINARY STATEMENT**

1.   Delphi Corporation ("Delphi") has been a chapter 11 debtor for over three years. The Debtor acknowledges that, as part of its effort to emerge from chapter 11, it has been negotiating with its former parent and principal customer, General Motors Corporation ("GM"), to reach an agreement pursuant to which GM would make one payment at emergence in combination with the transfer of certain of Delphi's assets to GM. (Mot. at ¶ 21.) Delphi has yet to reach such agreement with GM, although it represents that one is soon to occur. In the midst of those negotiations, Delphi now asks this Court to approve the Global Steering Business Option Exercise Agreement (the "Agreement" or the "OEA"), a hastily-constructed agreement which appears to be materially incomplete, by which it will transfer to GM its global steering and halfshaft business (the "Steering Business") in exchange for some short-term liquidity relief and what amounts to a down-payment on any future sale to GM of Delphi's assets.

2.   Delphi offers the Court no explanation for why it should rush to hand this strategic asset to GM at a time when critical negotiations with GM on a comprehensive deal continue. It is clear from GM's perspective why an accelerated exercise of an option to acquire the Steering Business at this juncture is in its interest – GM can ill-afford disruptions to its supply chain due to its Tier 1 suppliers' financial difficulties. It is clearly in GM's interests to control critical elements of that supply chain – and obtaining the Debtor's Steering Business advances those interests dramatically.

3.   What is not at all clear is whether Delphi's interests are well-served by entering into this Agreement now. Indeed, it can be questioned whether ceding to GM, at this time, an asset that is clearly strategic to GM's continued viability outside of the framework of a final deal with GM represents an exercise of sound business judgment. As Delphi has yet to offer

- 2 -

persuasive evidence why the transfer of this strategic asset to GM could not be accomplished as part of its larger reorganization plan, and no other rationale exists for doing so at this time other than GM's insistence that it happen now, the Court should be reluctant to defer to Delphi's business judgment.

4.      Further, Delphi has made no discernible effort to market the Steering Business recently.  In light of that, Delphi is unable to represent to the stakeholders that a current or potential future automotive supplier would not place a greater value on the Steering Business than GM or would not be able to pay more for the Steering Business than GM.

5.      In addition, the benefits of the proposed Agreement cannot be fully assessed at this time.  For example:

- What Delphi describes as the "most significant benefit" of the proposed transaction, an as yet undetermined payment to Secured Lenders based upon the reduction in collateral caused by the transfer of Steering Business assets to GM, is simply an advance payment on a sale of other facilities to GM as part of the comprehensive deal currently being negotiated.

- Material terms of the transaction remain unresolved, including the treatment of U.S. salaried employees.

A complete analysis of this sale cannot therefore be made at this time.

6.      The Tranche C Collective is skeptical of the timing of and benefits to be gained by this transaction.  Delphi is and will remain a critical and strategic supplier of parts to GM, including those produced by the Steering Business.  To relinquish assets of strategic significance to GM in piecemeal fashion, while still in the process of negotiating a broader transaction regarding other parts of Delphi's business that are critical to GM, seems to unnecessarily squander negotiating leverage.  Delphi will only maximize the value of its assets sought by GM by marshaling them together in the final negotiations, rather than allowing GM to cherry-pick the assets it wants, when it wants them.

7. We recognize that Delphi is operating in an extremely difficult economic and operational environment. Accordingly, the Tranche C Collective has tried to be as supportive as possible of management's efforts to reorganize. It is with great reluctance, then, that the Tranche C Collective states that it believes that this transaction is ill-advised at this critical time and may not be the best exercise of Delphi's business judgment. We recognize that the Court might ordinarily be minded to defer to Delphi's judgment with respect to its efforts to obtain additional liquidity. However, where the counterparty is GM, not just a run-of-the-mill creditor or arm's length transaction partner, we believe that heightened scrutiny and circumspection should be brought to bear when assessing this and any future transaction between Delphi and GM.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     The Chapter 11 Filings and Debtors' Efforts to Emerge From Bankruptcy**

8. Delphi and certain of its subsidiaries and affiliates (collectively, the "Debtors") have been in chapter 11 for more than three years. A plan of reorganization has been confirmed, but not consummated.

9. At this point, the Debtors' efforts to emerge from bankruptcy are focused on reaching an agreement with GM whereby the parties will "pull forward elements of GM's previously agreed-upon support for Delphi into one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites to GM." (Mot. at ¶ 21.)

**B.     Delphi's Steering Business**

10. Delphi considers the halfshaft and steering system products that comprise its Steering Business to be "non-core." (Mot. at ¶ 1.)[2] Yet, less than two months ago, Delphi

---

[2]     Delphi reports on the Steering Business as part of its "discontinued operations." See Delphi Corporation Form 10-K, filed March 3, 2009, at 15-16.

- 4 -

celebrated its steering products in a press release as an example of its "technological prowess." (Press Release, Delphi Corp., Delphi Steering Column Helps 2009 Ford F-150 Become America's Safest Full-Size Pickup (January 26, 2009), attached as Exhibit A.)  In the same press release, Delphi noted that it supplies steering products and halfshafts to more than 60 customers across the globe, including GM.  (Id.)  Many of these customers compete with GM, and will remain critical to Delphi as it operates its other businesses moving forward.

11.     However Delphi may now categorize its Steering Business, there is no question that the products this Business manufactures are critical to OEMs like GM.  Because steering parts are a fundamental component of a vehicle's safety system, they must be extensively tested and validated.  Accordingly, for any OEM, replacing a current supplier of steering parts would present great challenges and take time.  GM itself recognized this fact in its June 2006 objection to Debtors' motion approving rejection of certain contracts, where it stated:

> Because of GM's historical relationship with Delphi, most parts that Delphi manufactures for GM are not readily available from an alternate source due, among other things, to capacity issues within the automotive parts supply industry, the length of time it takes to validate and obtain safety regulatory approval of a new supplier's parts, and lead time to develop and build tools for manufacture.  For example, **Delphi currently provides over 60% of GM's North American steering columns**: almost three million per year.  That volume **simply can not be resourced quickly** as there is not currently sufficient excess capacity within the entire industry to accommodate GM's needs.  So Delphi's failure to ship would halt GM's production line until GM could find an adequate replacement.

(Supplemental Objection & Mem. of Law of General Motors Corp. in Opp'n to Debtors' Mot. for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Approving Rejection of Certain Executory Contracts (Docket No. 4019) at 29 (emphasis added).)

12.     More generally, GM is well aware of how important Delphi's continued viability is to GM's own ability to survive.  In its reorganization plan to the U.S. Treasury Department last month, GM asserted that: "If Delphi is unsuccessful in . . . raising exit financing, it would

- 5 -

represent significant risk to [GM's] revised Plan.  In this event, [GM] would consider alternative strategies, including utilizing other sources of supply, albeit requiring some lead time to accomplish." (GM 2009-2014 Restructuring Plan, Presented to the U.S. Dep't of the Treasury as Required Under Section 7.20 of the Loan & Security Agreement Between General Motors & the U.S. Dep't of the Treasury Dated December 31, 2008, February 17, 2009 at 33-34, relevant excerpts of which are attached as Exhibit B.)

C.      **Delphi's Efforts to Sell the Steering Business**

13.     By the Motion, the Debtors seek approval of the Agreement, under which a wholly-owned subsidiary of GM will exercise an option to purchase the Steering Business (the "Steering Option Purchase"). (Mot. at ¶ 28.)   As described in the Motion, the sale of the Steering Business has been one objective of Delphi's "transformation plan." (Mot. at ¶ 42 ("the sale of the Steering Business to GM . . . substantially completes Delphi's portfolio transformation . . .").)

     **1.      Platinum Sale**

14.     Delphi previously contracted to sell the Steering Business to an affiliate of Platinum (the "Platinum Steering MSPA").  The Court approved the sale on February 25, 2008.

15.     In its motion seeking approval of that transaction, Delphi represented that it would receive approximately $447 million worth of consideration, separate from GM becoming responsible for certain expenses estimated to be $65 million. (Platinum Steering Sale Mot. at ¶ 17 (Docket No. 11390).)  Under the Platinum Steering MSPA, Delphi's U.S. Employees would be offered employment. (Platinum Steering MSPA at § 6.6.2.)

16.     Delphi states that the Platinum Steering MSPA was mutually terminated on March 3, 2009. (Mot. at ¶ 22). According to Delphi, one reason the sale was not completed was the "need for Platinum and GM to reach terms on an amended supply agreement." (Id.)  The

Motion does not say why an amended supply agreement was not entered into, but without one GM has no certain source for steering components.

### 2. Amended MRA

17. The Amended and Restated Master Restructuring Agreement between Delphi and GM (the "Amended MRA") included terms under which ownership of the Steering Business could potentially transfer to GM. Under section 4.06(a) of the Amended MRA, upon the occurrence of particular conditions before December 31, 2010, GM obtains the option to purchase the Steering Business (among other businesses) under terms generally set forth in the Amended MRA. It is that option that GM seeks to exercise here.

18. Under the Amended MRA, GM can exercise the option prior to August 31, 2010 only if it secures Delphi's agreement that Delphi has concluded its "marketing efforts" relating to the Steering Business. (Am. MRA § 4.06(a)(vi).)

### 3. The Agreement

19. In the Agreement, Delphi and GM "agree" that Delphi's efforts to market the Steering Business "have concluded." (OEA at ¶ 2.) The Motion is silent as to what recent efforts, *if any*, Delphi made to market the Steering Business. Delphi has not filed an affidavit attesting to a thorough and exhaustive sale process. Instead, Delphi apparently relies on marketing efforts that transpired more than a year ago, while conceding that they could be recommenced.[3] (See Mot. at ¶ 30 (Steering Business was "extensively marketed" prior to the Agreement with Platinum).)

---

[3] In the event that the OEA is not approved, Delphi "would not consider its marketing efforts to be concluded," and would evaluate the next steps. (Mot. at ¶ 30).

20.     The OEA is not a fully negotiated or integrated agreement.  As set out in the OEA, additional negotiation is necessary before the sale can close.  (E.g., OEA at ¶ 6(i) ("[T]reatment of U.S. salaried employees will be subject to a further agreement between GM and Delphi.").)  The sale is subject to the execution of a "definitive" agreement on or before March 23, 2009.  Delphi anticipates filing a motion seeking to assume and assign the applicable contracts, and approve the Steering Option Purchase, on April 3, 2009.  (OEA at ¶ 3(e).)

21.     Delphi acknowledges that the Steering Option Purchase is one part of a larger and more comprehensive negotiation with GM.  As described by Delphi, GM and Delphi also "affirmatively committed" to reaching an agreement on a term sheet covering a comprehensive deal before March 9th.  (Mot. at ¶ 31.)  As of the filing of this Limited Objection, no term sheet agreement has been announced.

22.     The benefit Delphi characterizes as "most significant" is that the closing of the Steering Option Purchase is "conditioned on GM's paying to the administrative agent under Delphi's DIP Facility, for the benefit of the lenders thereunder, a non-refundable amount" estimated to be "between $150 million to $200 million" as of the projected closing date.  (Mot. at ¶ 35; see also OEA at ¶ 7.)  While Delphi describes this payment as "non-refundable," it later concedes – in a footnote – that "[i]n the event Delphi and GM reach an agreement for the sale of any of Delphi's other non-core businesses and manufacturing sites in the U.S. to GM, then . . . such payment would constitute partial prepayment of the consideration for the sale of such facilities."  (Mot. at ¶ 35 n.12; see also OEA at ¶ 7.)  Thus, the value of this "payment" which Delphi trumpets in its Motion can only be assessed in the context of whatever final deal it is able to reach with GM.

- 8 -

23.     Finally, approval of the OEA is a condition to the effectiveness to Amendment No. 5 to the GM Arrangement, under which GM has committed to provide $100 million in incremental liquidity to Delphi.[4]  (Mot. at ¶¶ 26, 27.)

## ARGUMENT

### Delphi's Decision to Enter into the OEA While Negotiations with GM Continue Is Not an Exercise of Sound Business Judgment.

24.     While it may be true, as Delphi argues (Mot. at ¶ 40), that bankruptcy courts routinely defer to debtors' judgment on most business decisions, approval of those decisions is no mere formality.  Where, as here, the debtor can offer no compelling business justification for handing over a major asset of strategic importance to a buyer with whom the debtor continues to negotiate the sale of other assets, other than the buyer's insistence that it happen now, the debtor's business judgment is entitled to little or no deference.  In fact, given GM and Delphi's multi-faceted and symbiotic relationship, and the leverage over Delphi that GM has heretofore exerted, it is arguable that GM should be considered an "insider" of Delphi such that the two parties could not engage in an arm's length negotiation subject to the Debtor's business judgment.  See, e.g., In re Winstar Communications, Inc., 554 F.3d 382, 396-397 (3d Cir. 2009).

**A.      The Sale of the Steering Business to GM Now Is Premature.**

        **1.      The Sale of the Steering Business Now Will Diminish Delphi's Negotiating Leverage.**

25.     The proposed sale to GM of Debtors' Steering Business cannot be viewed in a vacuum.  Negotiations are underway even now between Debtors and GM over a comprehensive deal which the Debtors admit is imperative to facilitate an exit from chapter 11.  (Mot. at ¶ 1.)

---

[4]  The Amended Accommodation Agreement does not mandate that Delphi sell the Steering Business to GM as a condition of its providing additional liquidity financing.

- 9 -

While the final term sheet the Debtors predicted might be produced by March 9 has not materialized, the negotiations are clearly at a "crucial stage where the path the Debtor will take is to be determined."  In re Beker Indus. Corp., 64 B.R. 900, 906 (S.D.N.Y. 1986), rev'd on other grounds, 89 B.R. 336 (S.D.N.Y. 1988).  Significantly, the Debtors have not demonstrated that a sale now of the Steering Business increases the likelihood of emerging from their negotiations with the best deal possible.  See Comm. of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).  From Delphi's perspective, there is no reason to rush.

26.    GM is in no position to resource this business at this time.  (See discussion, supra, at ¶¶ 11-12.)  It is therefore clear why, from GM's perspective, a hurried exercise of an option to acquire the Steering Business is in its interest:  GM is desperate to consolidate critical elements of its supply chain.  But that is no justification for *Delphi* rushing into this sale with material terms left open.  As the Second Circuit noted in Lionel, "there must be some articulated business justification, **other than appeasement of major creditors**, for [selling] property out of the ordinary course of business."  Lionel, 722 F.2d at 1070 (emphasis added).

27.    Holding onto the Steering Business and using it as leverage while negotiating a global deal with GM could result in more value being provided to Delphi and its stakeholders.  See In re Beker, 64 B.R. at 905 ("holding the [assets] . . . could result in a substantial increase in the sale price or in their use as a vehicle to attract investments to fund a plan").  Allowing GM to cherry-pick strategic assets does not maximize value.

### 2.    The Steering Business Apparently Has Not Been Marketed Since the Sale to Platinum.

28.    Absent Delphi's agreeing that marketing efforts for the Steering Business have ended, GM could not exercise the option to purchase it until August 31, 2010.  Delphi has simply agreed with GM that marketing efforts "have concluded," without having made *any* effort to

- 10 -

market the Steering Business after it learned that the sale to Platinum would not close. (OEA at ¶ 2.) Thus, Delphi cannot represent that a current or potential future automotive supplier would not pay more for the Steering Business than GM.

29.   The only reason that Delphi suggests for rushing now to transfer the Steering Business to GM is Delphi's need of a liquidity cushion to allow it to continue operating into May 2009 and to avoid mandatory prepayments of up to $117 million to the Tranche A and B Lenders. (Mot. at ¶ 26.) However, Delphi has established neither that it had to hand GM this strategic asset to obtain liquidity, nor that the additional liquidity warrants ceding leverage to GM.

**B.    The Benefits of the OEA Cannot Be Measured at This Time.**

30.   Delphi contends that the value it will derive from the OEA is "greater than" that provided under either the Amended MRA or the Platinum Steering MSPA. (Mot. at ¶ 30; see also Mot. at ¶ 1.)[5] Yet, many of the benefits Delphi purportedly receives under the OEA cannot be assessed at present.

31.   The benefit that Delphi characterizes as the "most significant" is that the closing of the sale is "conditioned on GM's paying to the administrative agent under Delphi's DIP Facility, for the benefit of the lenders thereunder, a non-refundable amount" estimated to be "between $150 million to $200 million as of the projected closing date." (Mot. at ¶ 35; see also

---

[5]   Some of the terms in the OEA seem to be *less* advantageous than the Amended MRA. For example, the Amended MRA only requires that Delphi provide transition services for up to one year at 100% cost, subject to two possible incremental three-month extensions of time for escalating rates above 100%. The Amended MRA does not distinguish between IT and non-IT services. In contrast, the OEA requires Delphi to provide IT services until December 31, 2012 at 100% cost. It also requires Delphi to provide non-IT services under terms that are slightly less advantageous than the terms in the Amended MRA (Compare OEA at ¶ 4(c)) with Am. MRA at § 4.06(a)(x).)

- 11 -

OEA at ¶ 7.) But this payment constitutes a partial prepayment for any broader transaction later agreed to by GM. (Mot. at ¶ 35 n.12.)

32.     This "payment" is hardly a "benefit" given by GM in exchange for the Steering Business. At best, it is a down-payment by GM on a subsequent transaction – a transaction that Delphi characterizes as essential to its ability to emerge from bankruptcy. Having succeeded in cherry-picking the Steering Business from Delphi, GM will undoubtedly seek to exploit its leverage over Delphi in any further negotiations over the remaining Delphi assets.

33.     Also, the OEA explicitly says that the "treatment of U.S. salaried employees will be subject to a further agreement between GM and Delphi." (OEA at ¶ 6(i).) In contrast, the Amended MRA and the Platinum Steering MSPA both cover this issue with terms favorable to Delphi. (Amended MRA at § 4.06(a)(ii) (GM shall offer employment to U.S. salaried employees of the Steering Business); Platinum Steering MSPA at § 6.6.2) (similar).) Only time will tell whether the negotiation process yields terms more valuable to Delphi than the terms of the Amended MRA or the Platinum Steering MSPA.

## RESERVATION OF RIGHTS

34.     As noted, the Tranche C Collective has concerns regarding the Debtors' negotiations, and other relationships, with GM. The Tranche C Collective expressly reserves any and all rights to object to any other transaction the Debtors may enter into with GM which does not provide the benefits necessary to ensure a successful and consensual emergence from chapter 11, including but not limited to the definitive Option Purchase Agreement in the event that it should come before the Bankruptcy Court for approval on or before April 23, 2009.

WHEREFORE, the Tranche C Collective respectfully requests that the Court enter an order denying the Motion, without prejudice to the Debtors' later seeking approval of a sale of the Steering Business in conjunction with a proposed comprehensive transaction with GM that is

satisfactory to the Debtors' stakeholders and will result in a consensual resolution of the Debtors' chapter 11 cases, and such other and further relief as this Court deems just and proper.

Dated: March 20, 2009
      New York, New York

                    Respectfully submitted,

                    WILLKIE FARR & GALLAGHER LLP

                    By: /s/ Richard Mancino
                         Richard Mancino
                         (A Member of the Firm)

                         Marc Abrams
                         Michael J. Kelly
                      787 Seventh Avenue
                    New York, NY 10019-6099
                    (212) 728-8000

                    *Counsel to the Collective of Tranche C DIP Lenders*