**Hearing Date & Time:  March 24, 2009 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
    In re                                   :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                Debtors.                    :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>DEBTORS' OMNIBUS REPLY IN SUPPORT OF STEERING OPTION EXERCISE MOTION</u>

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus reply in support of their Motion For Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 6004 Authorizing And Approving Option Exercise Agreement With General Motors Corporation (Docket No. 16410), dated March 4, 2009 (the "Motion"). Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion.

1.    In March 2006, Delphi outlined the key tenets of its Transformation Plan. One of those tenets involves streamlining Delphi's product portfolio to capitalize on its world-class technology and market strengths and making the necessary manufacturing alignment with its new focus.  In connection with its portfolio transformation, Delphi identified the Steering Business as a valuable but non-core operating business to be divested because it does not fit into Delphi's future strategic framework.  In February 2008, after extensive marketing efforts and a bidding process, this Court approved Delphi's agreement to sell the Steering Business to an affiliate of  Platinum.  The parties were unable to close the sale, however, and they mutually terminated the agreement earlier this month.

2.    In a strategic action designed to assure Delphi's transformation objectives with respect to its manufacturing footprint, Delphi separately negotiated an arrangement with GM under the Amended MRA under which GM would be required to acquire the Steering Business on December 31, 2010 unless the Steering Business had otherwise been divested. (Amended MRA § 4.06(c).)  In connection with that arrangement, Delphi also granted to GM an option to acquire the Steering Business earlier than December 31, 2010 if "Delphi and GM agree

2

in writing that Delphi's marketing efforts have concluded for such business." (Id. § 4.06(a)(vi)(B).)

    3.  In the Option Exercise Agreement at issue here, Delphi and GM modified the terms of the Amended MRA as it relates to the option, and GM, on behalf of a wholly-owned subsidiary to be designated, agreed to exercise the option pursuant to those modified terms. The Option Exercise Agreement establishes a two-step process for obtaining this Court's approval of GM's purchase of the Steering Business. In the Motion, the Debtors seek approval of the Option Exercise Agreement, which involves approval of the changes to the Amended MRA and GM's exercise of the option under the revised terms. (Option Exercise Agreement ¶ 3(c).)

    4.  Under paragraphs 3(e) and 3(f) of the Option Exercise Agreement, Delphi and GM agreed to use their reasonable best efforts to file on or before April 3 a separate motion seeking, among other things, this Court's approval of the "Option Purchase," and to obtain approval of, among other things, the "Option Purchase" on or before April 23.[1] As defined in paragraph 3 of the Option Exercise Agreement, the term "Option Purchase" means "the sale of the Global Steering Business to the Business Optionee pursuant to the terms of this Agreement and the definitive agreements to be entered into between the parties." In accordance with this approval process, the sale of the Steering Business pursuant to the terms of the Option Exercise Agreement and the definitive agreement(s) to be executed by the parties is not an issue presented by the Motion.

    5.  Six parties in interest filed limited objections and/or responses to the Motion: (i) the Michigan Department of Environmental Quality (the "MDEQ") (Docket No.

---

[1] As provided in paragraph 13 of the Option Exercise Agreement, the parties' obligations under paragraph 3 (and most of the other provisions) are contingent upon this Court's approval of the Option Exercise Agreement on or before March 24 and other approvals.

3

16472), (ii) the Pension Benefit Guaranty Corporation (the "PBGC") (Docket No. 16475), (iii) the official committee of unsecured creditors (the "Creditors' Committee") (Docket No. 16476), (iv) Wilmington Trust Company ("WTC"), as indenture trustee (Docket No. 16478), (v) several lenders calling themselves the "Tranche C Collective" (Docket No. 16492), and (vi) JPMorgan Chase Bank, N.A. ("JPMorgan"), the administrative agent under the Debtors' post-petition credit agreement (Docket No. 16493).[2]

6.     The Debtors settled with the MDEQ and the PBGC by agreeing to add a provision to the proposed Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 6004 Authorizing And Approving Option Exercise Agreement With General Motors Corporation. A copy of the updated proposed order is attached hereto as Exhibit B, and a copy marked to show changes from the original proposed order submitted with the Motion is attached hereto as Exhibit C. The limited objections by the Creditors' Committee, WTC, and the Tranche C Collective and the response and limited objection by JPMorgan (collectively, the "Limited Objections") have not been resolved.

A.     The Motion Does Not Seek Approval Of The Option Purchase

7.     A number of points raised in the Limited Objections are attributable to misperceptions and doubts regarding the approval process described in the Option Exercise Agreement and the limited nature of the relief requested in the Motion. The Creditors' Committee and JPMorgan argue, for example, that the Motion should be denied to the extent that the Debtors are seeking to preclude parties-in-interest from objecting to the sale of the Steering Business to GM at a later hearing. (Docket No. 16476 ¶¶ 6, 9; Docket No. 16493 at 4-5.) Indeed,

---

[2]  A chart summarizing the objectors' arguments and the Debtors' responses is attached hereto as Exhibit A.

4

that is the Creditors' Committee's sole basis for opposing the Motion. (Docket No. 16476 ¶¶ 6, 9.)

        8.     This is not a valid objection. In accordance with the Option Exercise Agreement, the sale of the Steering Business to GM's designated subsidiary "pursuant to the terms of this Agreement [the Option Exercise Agreement] and the definitive agreements to be entered into between the parties" will be the subject of a separate motion to be heard at a subsequent hearing. (Option Exercise Agreement ¶¶ 3, 3(e), 3(f).) When the Debtors make their separate motion seeking approval of the sale, the Creditors' Committee, JPMorgan, and all other parties-in-interest will have the opportunity to object to those terms and to have their objections heard by this Court at the sale hearing. Nothing in the Motion is meant to, nor does it, eliminate or limit their rights to present any such objections.

        9.     That does not mean that the relief requested in the Motion is illusory or insignificant. The Debtors are seeking this Court's approval of modifications to the terms of the Amended MRA as they relate to GM's option to purchase the Steering Business, as well as GM's exercise of the option pursuant to the modified terms. If this Court approves the Option Exercise Agreement, the parties will be bound, for example, to use their reasonable best efforts to file on or before April 3 a separate motion seeking to "assume and assign the applicable contracts" related to the Steering Business and approve the Option Purchase, as provided in paragraph 3(e). They will also be bound to use their reasonable best efforts to close the sale of the Steering Business on or before April 30, as provided in paragraph 3 of the Option Exercise Agreement.

        10.     Furthermore, the Option Exercise Agreement includes terms that are distinct from the terms of the Option Purchase and the assumption and assignment issues to be decided later. Those terms will also become binding upon this Court's approval of the Option

Exercise Agreement.  But again, this Court's approval of the Option Purchase – whether pursuant to the terms included in the Option Exercise Agreement or another definitive agreement to be negotiated – is a separate issue that will be addressed in a separate motion and decided at a separate hearing, with all parties-in-interest preserving all of their rights to object at that time should they wish to do so.  This Court should retain its ability to determine the preclusive effect of its order granting the Motion in the event that it does not approve the Option Purchase at the subsequent hearing.

11.     In a related argument, the Tranche C Collective and JPMorgan take issue with the Option Exercise Agreement because it does not set forth all of the terms that will govern GM's purchase of the Steering Business, including terms concerning the treatment of U.S. salaried employees and the final calculation of the DIP Paydown under paragraph 7 of the Option Exercise Agreement.  (Docket No. 16492 ¶¶ 5, 30, 33; Docket No. 16493 at 2-3.)  Like the argument regarding objection rights, this argument is based on a misunderstanding of the Option Exercise Agreement.  Having said that, Delphi and GM did bargain for, and the Option Exercise Agreement does require, that the parties use their reasonable best efforts to execute a definitive Master Sale and Purchase Agreement on or before March 23.  (Option Exercise Agreement ¶ 3(d).)  While the definitive documentation remains incomplete as of the filing of this omnibus reply, Delphi has exercised its reasonable best efforts to enter into such documentation, and the Debtors will provide the definitive documents to the objectors and this Court at the hearing on this Motion, if available, or, if not available at that time, will provide

them in connection with the separate motion contemplated under paragraph 3(e) of the Option Exercise Agreement.[3]

12.     The Option Exercise Agreement is not, and does not purport to be, a comprehensive agreement for the sale of the Steering Business.  Again, the definition of "Option Purchase" in paragraph 3 demonstrates that the terms of the sale will include terms set forth in "definitive agreements to be executed by the parties."  Other provisions of the Option Exercise Agreement underscore that it is not the sole source of sale terms.  In paragraph 3(d), for instance, the parties agreed to use their reasonable best efforts to execute "a definitive Master Sale and Purchase Agreement on or before March 23."  In another example, the parties agreed in paragraph 6(i) that "[t]he treatment of U.S. salaried employees will be subject to a further agreement between GM and Delphi."[4]  The Option Exercise Agreement, by design, does not contain a complete recitation of the terms of the sale of the Steering Business, and the Debtors are not seeking this Court's approval of the sale in the pending Motion.  In criticizing the Option Exercise Agreement as incomplete, the Tranche C Collective and JPMorgan miss both of those points.

B.    GM Is Not A Delphi "Insider"

13.     In its limited objection, the Tranche C Collective contends that this Court should give "little or no deference" to the Debtors' business judgment to enter into the Option

---

[3] Under section 3(f) of Amendment No. 5 to the GM Arrangement, Delphi's use of its reasonable best efforts to obtain this Court's approval of the Option Exercise Agreement on or before March 24 is a condition precedent to GM's obligation to provide an additional $100 million in liquidity support.  (The Debtors are seeking approval of Amendment No. 5 to the GM Arrangement in a separate motion to be heard on March 24, 2009. (See Docket No. 16411.)  No objections have been filed regarding that motion.)  The additional $100 million provided under that amendment will bring GM's total support under the GM Arrangement, as amended, to $450 million, which in turn allows the Debtors to maintain access to up to $117 million in cash collateral under the Accommodation Amendment with the participating DIP lenders.

[4] The parties' obligations under paragraph 6 (as well as their obligations under nearly all of the other provisions of the Option Exercise Agreement) are contingent upon this Court's approval of the Option Exercise Agreement on or before March 24 and other approvals, as provided in paragraph 13 of the Option Exercise Agreement.

7

Exercise Agreement because "it is arguable that GM should be considered an 'insider' of Delphi such that the two parties could not engage in an arm's length negotiation." (Docket No. 16472 ¶ 24.) As an initial matter, it is well-settled that a party-in-interest objecting to a motion under section 363 of the Bankruptcy Code "is required to produce some evidence respecting its objections." Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). The Tranche C Collective has not and cannot come forward with any evidence to substantiate its allegations that GM is an "insider" of Delphi, and that the parties failed to negotiate the Option Exercise Agreement at arm's length. The Tranche C Collective's conclusory accusation is particularly inappropriate in this context, as courts have recognized that a determination of "insider" status for bankruptcy purposes is "fact intensive." E.g., Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.), 277 B.R. 520, 564 (Bankr. S.D.N.Y. 2002); Hirsch v. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).

    14. Because the Tranche C Collective cannot support its argument with any facts, there is no basis for concluding that GM is an "insider."[5] See, e.g., Statutory Committee of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 343 (Bankr. S.D.N.Y. 2007) (rejecting argument that entity was "insider" of debtor when "no evidence was presented on that subject during the trial"); In re Dana Corp., 351 B.R. 96, 103 (Bankr. S.D.N.Y. 2006) (rejecting argument that individuals were "insiders" of debtor as "improper and without basis . . . absent a showing of proof"); Official Committee of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.), 335 B.R. 22, 28 (S.D.N.Y. 2005) (rejecting "insider" argument when objector "failed to meet its burden to

---

[5] The "insider" case cited by the Tranche C Collective, Schubert v. Lucent Technologies Inc. (In re Winstar Communications, Inc.), 554 F.3d 382 (3d Cir. 2009) (Docket No. 16472 ¶ 24), is consistent with these principles. In that case, the Third Circuit affirmed a determination that a creditor was an "insider" based on "extensive findings" supported by the record. Id. at 397.

8

produce evidence that the [transaction] was an insider transaction subject to heightened scrutiny").

16. Furthermore, during the course of these cases, this Court has approved several agreements between one or more Debtors and GM without subjecting the agreement to the heightened scrutiny urged by the Tranche C Collective. Indeed, within the past six months alone, this Court has entered at least four orders expressly finding that agreements with GM were "negotiated in good faith and at arm's-length," including an order approving the third amendment to the GM Arrangement less than one month ago. (Docket No. 16379 ¶ 7; Docket No. 14514 ¶ 7; Docket No. 14289 ¶ 7; accord Docket No. 14287 ¶ C(iv).) The Tranche C Collective has not offered any legitimate reason to reach a different conclusion with respect to the Option Exercise Agreement. As such, and consistent with this Court's consideration of the other agreements involving the Debtors and GM throughout the course of these cases, this Court should evaluate the Debtors' business judgment to enter into the Option Exercise Agreement under the standard articulated in Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095 (2d Cir. 1993), and not the heightened standard proposed by the Tranche C Collective.

C.   The Debtors Made A Reasonable Business Judgment To Conclude Marketing Efforts Under The Option Exercise Agreement

16. Under section 4.06(a)(vi)(B) of the Amended MRA, GM was granted the right to exercise its option to purchase the Steering Business on or after the earlier of (i) the date "Delphi and GM agree in writing that Delphi's marketing efforts have concluded for such business" or (ii) August 31, 2010 (provided that Delphi had not sold the Steering Business by then). In paragraph 2 of the Option Exercise Agreement, Delphi and GM agreed that Delphi's marketing efforts have concluded with respect to the Steering Business, triggering GM's right to exercise the option pursuant to section 4.06(a)(vi)(B)(i) of the Amended MRA. The Tranche C

9

Collective objects to that aspect of the Option Exercise Agreement, contending that further marketing efforts could lead to a more valuable transaction. (Docket No. 16472 ¶¶ 4, 19, 28.) While that argument cannot be squared with the long and extensive history of the Debtors' marketing and attempting to divest the Steering Business on the most favorable terms possible,[6] the business judgment to be tested here is whether Delphi acted appropriately in agreeing that its marketing efforts should be deemed concluded assuming that the Option Exercise Agreement is fully implemented (i.e., this Court approves the Motion and also approves the Option Purchase at the subsequent hearing in April).

17.     In the months following this Court's approval of the sale of the Steering Business to Platinum's affiliate, conditions in the automotive industry, the credit and capital markets, and the broader economy continued to deteriorate. Delphi attempted to close the sale of the Steering Business to Platinum's affiliate but was unable to do so, and the parties eventually mutually terminated their agreement in early March 2009. The Debtors demonstrated in the Motion that the terms of the option as set forth in the Amended MRA and modified in the Option Exercise Agreement are, in many respects, more favorable than the negotiated terms of the agreement with Platinum's affiliate, particularly when viewed in the context of GM's related agreement to provide an additional $100 million in liquidity support under Amendment No. 5 to the GM Arrangement. The Debtors also demonstrated that, in many respects, the terms of the

---

[6]  The Debtors actively marketed the Steering Business for more than eighteen months following the announcement of the Transformation Plan in March 2006. The marketing process involved contacting approximately 90 potential buyers, entering into confidentiality agreements and providing due diligence information to approximately 30 potential buyers, and considering several proposals. At the conclusion of that process, the Debtors determined that a proposal from Platinum's affiliates provided the most advantageous terms and the greatest economic benefit, and Delphi entered into an agreement with Platinum's affiliate in December 2007. The sale to Platinum's affiliate was then subjected to a competitive bidding process that was approved by this Court in December 2007 (see Docket No. 11578) and conducted in December 2007 and January 2008. No potential buyer came forward with a better proposal during the bidding process, and this Court approved Delphi's agreement to sell the Steering Business to Platinum's affiliate in February 2008. (See Docket No. 12868.)

10

option as modified by the Option Exercise Agreement are more favorable than the terms as originally outlined in the Amended MRA in September 2008. Neither the Tranche C Collective nor any of the other objectors seriously disputes those points. Under these circumstances, the Debtors made the business judgment that engaging in further marketing efforts would involve costs that outweigh the potential and possibly non-existent benefits.

D. <u>The Debtors Have Ample Justification For Entering Into The Option Exercise Agreement Now</u>

18. The final argument raised by the Tranche C Collective is that the Debtors have not provided a convincing rationale for entering into the Option Exercise Agreement now, before there is a comprehensive agreement on modifications to the Confirmed Plan and a transfer of facilities to GM. (Docket No. 14972 ¶¶ 2-3, 26-27.) That is not the case. As the Debtors explained in the Motion, there are several reasons supporting its business judgment regarding the timing of the Option Exercise Agreement:

- The Debtors have been trying to divest the Steering Business since March 2006. The Option Exercise Agreement allows the Debtors to take a step toward that objective, and moves them toward substantial completion of the portfolio transformation that is one of the key tenets of Delphi's Transformation Plan. (<u>See</u> Docket No. 16410 ¶¶ 1, 14, 22, 30, 32.)

- The Debtors project that the Steering Business will consume approximately $72 million in cash during the second quarter of 2009. Closing the sale of the Steering Business on April 30, as contemplated by the Option Exercise Agreement, would result in estimated cash savings of approximately $50 million during that quarter. (<u>See id.</u> ¶ 32.) As this Court is aware, these savings are significant when viewed in the context of the Debtors' current liquidity situation.

- Delphi's use of its reasonable best efforts to obtain this Court's approval of the Option Exercise Agreement on or before March 24 is a condition precedent to GM's obligation to provide an additional $100 million in liquidity support, which in turn will allow the Debtors to maintain access to up to $117 million in cash collateral under the Accommodation Amendment with the participating DIP lenders. (<u>See id.</u> ¶¶ 2, 26, 29, 42.) As such, moving forward with the Option Exercise Agreement is crucial from a short-term liquidity standpoint.

11

E.   WTC's Limited Objection Is Without Merit

19.   In its limited objection, WTC does not take issue with any aspect of the Debtors' business judgment as it relates specifically to the Option Exercise Agreement. Instead, WTC launches a broader attack on the Debtors' strategy of negotiating with GM regarding modifications to the Confirmed Plan. According to WTC, those negotiations should be scrapped now and replaced with ultimatums and brinkmanship. WTC asserts, for example, that the only acceptable course of action available to the Debtors at this point is to:

> insist that GM make an immediate and firm commitment to fund a workable plan of reorganization for the Debtors as a condition to the Debtors' willingness to transfer the steering business or any other business to GM or even to continue shipping the parts that GM needs in order to continue operating.

(Docket No. 16478 ¶ 41; accord id. ¶ 5 (stating that Debtors "must condition any sale of assets to GM – or even the continued supply of parts to GM – on a binding commitment by GM to provide the necessary funding to allow the Debtors to emerge from chapter 11").)

20.   The Debtors presumably are at odds with WTC because the Debtors believe that it has been, and continues to be, in their best interests and in the best interests of their stakeholders to seek to work consensually with GM and other customers regarding support of Delphi's emergence from chapter 11 reorganization as soon as practicable. The Debtors' business judgment in this regard is informed by the effects that a material disruption in the continuity of supply by Delphi (given its scope and global reach) would have on the financial viability of individual customers and on the global automotive industry taken as a whole. Those effects are particularly certain in GM's circumstances where supply disruptions would likely have a catastrophic impact on GM's global businesses (as opposed to only in the United States). Nor does Delphi believe that it would be responsible or productive to seek to hold hostage either GM's other stakeholders or the United States Treasury, which is GM's principal source of

financing at the current time. Delphi's conduct in this regard since 2005 has contributed to consensual discussions that have resulted in GM committing to provide net contributions to Delphi (albeit in settlement of meritorious litigation claims among other matters) of more than $11 billion (according to GM's public disclosures). The Debtors believe that the responsible course of action continues to be to pursue and promptly conclude further consensual amendments to the GSA and MRA that will facilitate Delphi's prompt emergence from chapter 11 reorganization. Although WTC disagrees with that conclusion, it cannot demonstrate that the Debtors' judgment in this regard is unsound or should be overturned by this Court.

WHEREFORE, the Debtors' respectfully request that this Court (i) overrule the limited objections and/or responses filed by the Creditors' Committee, WTC, the Tranche C Collective, and JPMorgan, (ii) grant the Motion, (iii) enter an order in substantially the same form as the proposed order attached hereto as Exhibit B, and (iv) grant the Debtors such other and further relief as is just.

Dated: New York, New York
March 23, 2009

                     SKADDEN, ARPS, SLATE, MEAGHER
                       &FLOM LLP

By:  /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr.
     Albert L. Hogan III
     Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:  /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti
     Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession