# Exhibit A

**Exhibit 1**

*OBJECTIONS TO STEERING OPTION EXERCISE MOTION*
*ORGANIZED BY OBJECTOR*

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 1. | 16472 | Michigan Department of Environmental Quality | The Michigan Department of Environmental Quality (the "MDEQ") objects to the Steering Option Exercise Motion (the "Motion") and asserts that General Motors ("GM") is and will remain jointly and severally liable under Michigan state law for response activities incurred by the state of Michigan relating to contamination at two facilities located in Saginaw, Michigan.  MDEQ further asserts that any order approving the exercise of the option should include a provision that makes clear that the Steering transaction would not relieve GM of its liabilities and obligations with regard to such contamination.<br><br>MDEQ further objects because the proposed sale would take place outside of a confirmed plan.  MDEQ requests that any order approving the Motion make adequate provisions in any modified plan to ensure completion of any response activities required at any of the Steering facilities. | This objection is resolved, subject to inclusion of the following language in the Steering Option Exercise Order (the "Order"): "The Michigan Department of Environmental Quality reserves any rights it may have to assert that the contemplated transaction will not relieve GM of any independent liabilities it may have under environmental law with regard to cleanup of contamination at the properties that are subject to the Option Exercise Agreement." |
| 2. | 16475 | Pension Benefit Guaranty Corporation | The Pension Benefit Guaranty Corporation (the "PBGC") objects to the Motion and the asserts that the Debtors' Steering Business includes foreign assets subject to the PBGC's asserted statutory liens against certain non-Debtor global affiliates.  The PBGC argues that because the non-Debtor global affiliates are not subject to the jurisdiction of the Bankruptcy Court, the Steering Business cannot be sold to GM "free and clear" of these statutory liens.  The PBGC requests that any order approving of the Motion preserve the PBGC's right to object to the sale of the Steering Business free and clear of the PBGC's liens on the assets of the non-Debtor global affiliates. | This objection is resolved, subject to inclusion of the following language in the Order: "Entry of this order is without prejudice to PBGC's right to object to any provision in a motion seeking approval of the sale of the Debtors' Steering Business to GM free and clear of PBGC's asserted liens under IRC sections 412(n) or 430(k) against the property of non-Debtor global affiliates." |

|   | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 3. | 16477 | Official Committee of Unsecured Creditors | The Official Committee of Unsecured Creditors (the "Creditors' Committee") states that it does not object to the Motion, provided that, the right of the Creditors' Committee to object to the definitive purchase agreement outlining the actual terms and conditions of Debtors' sale of the Steering Business to GM. The Creditors' Committee further asserts that it cannot evaluate the transaction without first reviewing the definitive purchase agreement as well as the terms of the larger deal with GM. Although the Creditors' Committee recognizes unique circumstances surrounding the sale of the Steering Business to GM, the Creditors Committee asserts that this sale could be just the first of many future allegedly separate transfers to GM outside the context of a chapter 11 plan which the Creditors' Committee asserts may lead to inadequate consideration from GM if pursued on a one-off basis, and thus could negatively impact recoveries to unsecured creditors. | This objection is premature. The Motion only addresses approval of the changes to the Amended MRA and GM's exercise of the option under the changed terms. The Debtors will seek approval of the sale of the Steering Business to GM's designated subsidiary pursuant to the terms of the Option Exercise Agreement and the definitive purchase agreement to be executed by the parties pursuant to a second motion. When the Debtors make their separate motion seeking approval of the sale, the Creditors' Committee, JPMorgan, and all other parties-in-interest will have the opportunity to object to those terms and to have their objections heard by this Court at the sale hearing. Nothing in the Motion is meant to, nor does it, eliminate or limit their rights to present any such objections. |
| 4. | 16478 | Wilmington Trust Company | Wilmington Trust Company ("WTC") asserts that because GM is the only viable source of funding for a plan of reorganization, the Debtors' decision to sell the Steering Business to GM is contrary to the best interests of creditors and is not a reasonable exercise of the Debtors' business judgment. WTC further asserts that, given the Debtors' enormous operating losses, the Debtors must condition any sale of the Steering Business -- or even the continued supply of parts to GM -- upon receiving a binding commitment from GM to provide necessary emergence funding. Finally, WTC argues that the proposed sale would "cannibalize" the Debtors few remaining assets for the benefit of GM. | The Debtors' exercise of their business judgment is reasonable. Although WTC asserts that further negotiations with GM should be scrapped now and replaced with ultimatums and brinkmanship, the Debtors believe that it has been, and continues to be, in their best interests and in the best interests of their stakeholders to seek to work consensually with GM and other customers regarding support of Delphi's emergence from chapter 11 as soon as practicable..<br><br>As set forth more fully in the reply, the Debtors do not believe that it would be responsible or productive to seek to hold hostage either GM's other stakeholders or the United States Treasury, which is GM's principal source of financing at the current time. Rather, the Debtors believe that the responsible course of action continues to be to pursue and promptly conclude further consensual amendments to the GSA and MRA that will facilitate Delphi's prompt emergence from chapter 11 reorganization. Although WTC disagrees with that conclusion, it cannot demonstrate that the Debtors' judgment in this regard is unsound or should be overturned by this Court. |

2

| | | | | |
|---|---|---|---|---|
| 5. | 16492 | The Tranche C Collective | A collective of Lenders of the DIP Credit Agreement (the "Tranche C Collective") objects to the Motion, arguing that the sale of the Steering Business to GM is premature because (i) the proposed transaction would diminish the Debtors' negotiating leverage and (ii) the Steering Business has not recently been marketed.  In particular, the Tranche C Collective first argues that the Debtors have not offered persuasive evidence for why a sale of the sale of the Steering Business could not be accomplished as part of its larger reorganization plan.  While acknowledging that the benefits of the proposed transaction cannot be fully evaluated at this time, the Tranche C Collective expresses its skepticism of the timing of and benefits to be gained by the transaction, arguing instead that the Debtors will only maximize the value of their assets by marshaling them together in their final negotiations, rather than allowing GM to "cherry-pick" the assets it wants, when it wants them.  Second, the Tranche C Collective argues that the Debtors have made no discernable effort to recently market the Steering Business, and therefore cannot represent to stakeholders that another automotive supplier would not place a greater value of the Steering Business than GM. | With respect to the argument that the benefits of the proposed transaction cannot be fully evaluated at this time, see the response in section 3 above.  Furthermore, as the Debtors explained in the Motion, there are several reasons supporting its business judgment regarding the timing of the Option Exercise Agreement:  First, the Debtors have been trying to divest the Steering Business since March 2006.  The Option Exercise Agreement allows the Debtors to take a step toward that objective, and moves them toward substantial completion of the portfolio transformation that is one of the key tenets of Delphi's Transformation Plan.  (See Docket No. 16410 ¶¶ 1, 14, 22, 30, 32.)  Second, the Debtors project that the Steering Business will consume approximately $72 million in cash during the second quarter of 2009.  Closing the sale of the Steering Business on April 30, as contemplated by the Option Exercise Agreement, would result in estimated cash savings of approximately $50 million during that quarter.  (See id. ¶ 32.)  As this Court is aware, these savings are significant when viewed in the context of the Debtors' current liquidity situation.  Third, Delphi's use of its reasonable best efforts to obtain this Court's approval of the Option Exercise Agreement on or before March 24 is a condition precedent to GM's obligation to provide an additional $100 million in liquidity support, which in turn will allow the Debtors to maintain access to up to $117 million in cash collateral under the Accommodation Amendment with the participating DIP lenders.  (See id. ¶¶ 2, 26, 29, 42.)  As such, moving forward with the Option Exercise Agreement is crucial from a short-term liquidity standpoint.<br><br>Second, the Debtors used reasonable business judgment to conclude marketing efforts under the Option Exercise Agreement.  The business judgment to be tested here is whether Delphi acted appropriately in agreeing that its marketing efforts should be deemed concluded assuming that the Option Exercise Agreement is fully implemented (i.e., this Court approves the Motion and also approves the Option Purchase at the subsequent hearing in April).  As set forth more fully in the Motion and the reply, under these circumstances, the Debtors made the business judgment that engaging in further marketing efforts would involve costs that outweigh the potential and possibly non-existent benefits. |

| | | | | |
|---|---|---|---|---|
| | | | The Tranche C Collective appears to dispute the Debtors' characterization of their Steering Business as a non-core business, asserting that the products manufactured by the Steering Business are "critical to OEMs like GM." (Obj. at ¶ 11.) | Notwithstanding the importance of the Steering Business to certain OEMs, the Steering Business has been designated as a non-core business since the Debtors announced their transformation strategy in March 2006. |
| | | | The Tranche C Collective also asserts that "it is arguable that GM should be considered an 'insider' of Delphi such that the two parties could not engage in an arms length negotiation subject to the Debtor's business judgment." (Obj. at ¶ 24.) | This objection is conclusory. A party in interest objecting to a motion under section 363 of the Bankruptcy Code "is required to produce some evidence respecting its objections." Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). The Tranche C Collective has not and cannot come forward with any evidence to substantiate its allegations that GM is an "insider" of Delphi, and that the parties failed to negotiate the Option Exercise Agreement at arm's length. Furthermore, during the course of these cases, this Court has approved several agreements between one or more Debtors and GM without subjecting the agreement to the heightened scrutiny urged by the Tranche C Collective. Indeed, within the past six months alone, this Court has entered at least four orders expressly finding that agreements with GM were "negotiated in good faith and at arm's-length," including an order approving the third amendment to the GM Arrangement less than one month ago. (Docket No. 16379 ¶ 7; Docket No. 14514 ¶ 7; Docket No. 14289 ¶ 7; accord Docket No. 14287 ¶ C(iv).) The Tranche C Collective has not offered any legitimate reason to reach a different conclusion with respect to the Option Exercise Agreement. |
| 6. | 16493 | JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank, N.A. ("JPM"), the administrative agent under the Debtors' DIP facility, does not presently object to the Motion, but files its response to (i) inform the Court that the Debtors may not achieve the benefits of the sale of the Steering Business to GM, (ii) reserve the right to join in objections to the Motion filed by other DIP Lenders and (iii) reserve its right to object to the GM Steering MSPA at the April 23, 2009 hearing. In particular, JPM asserts that if the DIP paydown contemplated in the Motion is insufficient to compensate the Debtors for their loss of assets and jeopardizes their ability to operate, then the primary rationale for selling the Steering Business to GM at this time would be severely undermined. | This objection is premature. The Motion only addresses approval of the changes to the Amended MRA and GM's exercise of the option under the changed terms. The Debtors will seek approval of the sale of the Steering Business to GM's designated subsidiary pursuant to the terms of the Option Exercise Agreement and the definitive purchase agreement to be executed by the parties pursuant to a second motion. Indeed, the Option Exercise Agreement contemplates that the Debtors will seek approval of the sale in a motion to be heard at the April omnibus hearing. The sale of the Steering Business pursuant to the terms of the Option Exercise Agreement and the definitive purchase agreement to be executed by the parties (i) is not an issue presented by the Motion and (ii) as set forth in the Motion, the Option Exercise Agreement is not a comprehensive agreement for the sale of the Steering Business. |

4

| | | | JPM requests that to the extent the Court approves the Motion, the following language be added to the order: "Neither the approval of this Motion nor the failure of any party to raise any particular objection to this Motion shall prejudice the rights of any party in interest to raise any objections to any relief sought in the motion to approve the Master Sale and Purchase Agreement (as defined in the Option Exercise Agreement)." | |