1

UNITED STATES BANKRUPTCY COURT

 DISTRICT OF NEW YORK

Case No. 05-44481-RDD

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            March 17, 2009

            10:18 PM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

1    HEARING re Response to Debtors' Motion for Order Authorizing an

2    Approving Option Exercise Agreement (the "Steering Option

3    Exercise Motion").

4

5    HEARING re Objection to Motion Limited Objection f the Official

6    Committee of Unsecured Creditors to the Debtor's motion for

7    order under 11 U.S.C. Section 363 and Fed.R. Bankr. P. 6004

8    authorizing and approving option exercise agreement with

9    General Motors Corporation.

10

11   HEARING re Affidavit of Service filed by Robert J. Rosenberg on

12   behalf of Official Committee Of Unsecured Creditors.

13

14   HEARING re Objection to Motion Limited Objection of Wilmington

15   Trust Company, as Indenture Trustee, to Motion for Order Under

16   11 U.S.C. 363 and Fed. R. Bankr. P. 6004 Authorizing and

17   Approving Option Exercise Agreement with General Motors

18   Corporation.

19

20   HEARING re Affidavit of Service re Notice Of Adjournment Of

21   Claims Objection Hearing With Respect To Debtors' Objection To

22   Proof Of Claim No. 1406 (Autopartes De Precision, A Division Of

23   Miniature Precision Components).

24

25   Transcribed by:  Pnina Eilberg

```
                                                              3

 1

 2    A P P E A R A N C E S :

 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 4          Attorneys for Debtor

 5          333 West Wacker Drive

 6          Chicago, IL 60606

 7

 8    BY:   JOHN WM. BUTLER, JR., ESQ.

 9          ALBERT L. HOGAN, III, ESQ.

10

11

12    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

13          Attorneys for Debtor

14          Four Times Square

15          New York, NY 10036

16

17    BY:   KAYALYN A. MARAFIOTI, ESQ.

18

19

20    FARELLA BRAUN + MARTEL LLP

21          Attorneys for Section 1114 Committee & DSRA

22          Russ Building

23          San Francisco, CA 94104

24

25    BY:   DEAN M. GLOSTER, ESQ.
```

4

1

2   DAVIS POLK & WARDWELL

3        Attorneys for JPMorgan Chase as DIP Agent

4        450 Lexington Avenue

5        New York, NY 10017

6

7   BY:   BRIAN M. RESNICK, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1              P R O C E E D I N G S

2          THE COURT:  All right.  Delphi.

3          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

4   Al Hogan, Kayalyn Marafioti from Skadden on behalf of the

5   debtors in connection with this hearing.

6          Your Honor, there have been, in connection with prior

7   orders of the Court involving the salaried OPEB termination

8   motion filed by the debtors, two notices of appeal filed.

9   There was a notice of appeal filed at Docket #16404 that

10  appealed from Your Honor's provisional, that appealed from Your

11  Honor's provisional salaried OPEB termination order at

12  Docket # 16380.  And there was a second notice of appeal at

13  Docket #16458.  That appealed from Your Honor's final OPEB

14  termination order at Docket #16448.

15         In addition -- and those were both of those notices

16  of appeal.  The first notice of appeal was filed by the Delphi

17  Salaried Retirees Association and the second notice of appeal

18  was filed on its face by the Delphi Retiree Committee.  I think

19  there is a question as to whether the Delphi Retiree Committee

20  was authorized to actually appeal from the order in terms of

21  their limited appointment.  From the debtors' perspective,

22  we're prepared to treat it as an appeal from the Delphi

23  Salaried Retirees Association.  But I think there is a question

24  here as to that notice of appeal having been filed. Whether it

25  should be filed by the Retirees Committee or by the Delphi

6

1     Salaried Retirees Association, they're represented by the same

2     law firm.  Mr. Gloster's here in court today.

3            Putting aside that issue, the parties are prepared to

4     deem -- have those notices of appeal deemed to be consolidated,

5     and the motion that was filed for a stay pending appeal that

6     was filed by the Delphi Salaried Retirees Association at Docket

7     #16426 would be a motion to cover the consolidated appeal in

8     terms of staying both of those orders.

9            The debtors filed a response, an objection to the

10    motion, at Docket #16457 and the Delphi Salaried Retirees

11    Association filed a response at Docket #16467.  So the

12    procedural -- a couple of procedural questions is, one, in

13    terms of consolidating the appeals the debtors have no

14    objection.  We'd actually support that procedurally.  We agree

15    that the stay hearing today applies to both notices of appeal.

16    We think there is the question that ought to be clarified on

17    the record as to whether the notice of appeal of the final

18    order should be deemed a notice of appeal from the Retirees

19    Committee, which was not appointed for that purpose, or from

20    the Delphi Salaried Retirees Association as these matters are

21    consolidated.

22           In terms of arguing these matters today, my

23    colleague, Mr. Hogan, who is going to be handling the appellate

24    matters for the debtors in the appellate courts, is going to

25    prosecute the objection today and Mr. Gloster's here on behalf

7

1      of, I gather, the Delphi Salaried Retirees Association and the

2      Delphi Retiree Committee.

3              THE COURT:  Okay.  Before we get into the argument on

4      the motion for a stay pending appeal, I'm not quite sure what

5      you're asking from me with regard to who is the proper party to

6      the appeal, ostensibly, by the committee that I authorized to

7      be appointed.  Frankly, that's not something I really thought

8      about until you mentioned it, but it seems to me that the issue

9      of who is entitled to appeal, I think, probably now is an issue

10     that the District Court has, right?

11             MR. BUTLER:  Well Your Honor, the reason I think Your

12     Honor has --

13             THE COURT:  I mean, there may be an issue as to

14     whether, ultimately they're entitled to be paid for it under my

15     order and I guess that's something I would have to ultimately

16     deal with.  But in terms of whether --

17             MR. BUTLER:  Well --

18             THE COURT:  -- it's an entity that's permitted to

19     appeal, and I would think that that's ultimately a standing

20     issue, that the District Court would have because it now has

21     the appeal.

22             MR. BUTLER:  Well, Your Honor was very clear in your

23     order to indicate, and we can raise this point, I just wanted

24     the record here to have the information on it.  The reality is

25     that there is, I think, and we're trying to avoid procedural

8

1   defects here so that we don't end up with the wrong appeal by a

2   party not entitled to appeal in the wrong place and that

3   doesn't do anyone any good.  We want to have a procedurally

4   effective record but the reality is your orders were very clear

5   that the Retirees Committee was appointed for very limited

6   purposes.  Your final order found that their responsibilities

7   were discharged and there was a budget set.  And now we have an

8   appeal from that group which was outside of the scope of the

9   authority of the order.  And I think this Court retains

10  jurisdiction over the statutory committees it appoints.

11         And I don't think that an appeal, however providently

12  filed divests this Court over jurisdiction of its statutory

13  committees.  And we're not trying to confuse the appeal itself,

14  we're quite prepared to deem it an appeal of the Delphi

15  Salaried Retirees Association.  The issue should be joined.

16  It's just a matter -- I'm not sure why Mr. Gloster chose to

17  style it from the Retirees Committee as opposed to from the

18  Association; he represents both of them.  One has an absolute

19  right of appeal, one does not.

20         MR. GLOSTER:  If I could briefly respond, Your Honor?

21         THE COURT:  Well, okay.  But I'd like you to focus on

22  whether this is an issue properly before me or before the

23  District Court.

24         MR. GLOSTER:  It's unnecessary.

25         THE COURT:  Please stand up.

9

1      MR. GLOSTER:  It's unnecessary for you to decide,

2  Your Honor.  The practicality is, before the 1114 Committee was

3  appointed the DSRA opposed the initial motion to terminate all

4  benefits as unvested.  This Court appointed an 1114 Committee

5  to address several issues, including modifying the Court's

6  order as appropriate after negotiations with the debtor and it

7  specifically authorized the committee to raise the issue about

8  whether certain benefits were vested.  That's what was dealt

9  with at the second hearing.  So the real -- the proper party in

10  interest at the second hearing was, in fact, the 1114

11  committee.  But we're prepared to treat the consolidated appeal

12  as -- on behalf of both entities, the DSRA before the 1114

13  Committee was appointed, which opposed the first motion, and

14  the 1114 Committee.  So Your Honor doesn't have to address this

15  at all.

16      THE COURT:  Well, I guess -- the debtors are prepared

17  to let the appeal go forward by the one entity?

18      MR. BUTLER:  Absolutely, Your Honor.

19      THE COURT:  So in that sense I don't need to address

20  it.  I think there still is an issue as to whether the estate

21  should pay the appellant's costs, which would be the case, I

22  guess, if the appeal was properly bought by the committee.  And

23  then, I guess, there's a second issue with regard to the

24  committee being an appellant, which is whether the committee

25  has standing pursuant to my order to pursue the appeal.

10

1        I think the first of those issues is one that I

2    ultimately will deal with.  I think the second issue, although

3    obviously this is on the fly, there's no briefing on this, I

4    think the second issue, the standing issue, is probably one for

5    the District Court at this point, given that the appeal has

6    already been noticed.

7        MR. BUTLER:  Your Honor, I think if we agree, and I

8    think I heard Mr. Gloster appeal that we can deem this as an

9    appeal that has two parties in it, the DRSA, there's no

10   objection to it.

11       THE COURT:  Right.  There's at least one party that

12   has clear standing and that's fine.

13       MR. GLOSTER:  That's correct, Your Honor.

14       THE COURT:  Fine.

15       MR. GLOSTER:  I think it's in everyone's interest to

16   have all of the parties that are appealing bound by the same

17   appeal.

18       THE COURT:  Well, it just may be that the District

19   Court concludes that under my order the committee didn't really

20   have authority to appeal, but that's for whatever district

21   judge has the matter.

22       MR. GLOSTER:  I agree, Your Honor.

23       THE COURT:  Okay.

24       MR. BUTLER:  Thank you, Your Honor.  So we've got --

25   for today we have --

11

1        THE COURT:  And then -- I'm sorry.  As a procedural

2   matter then you all have reached an agreement with regard to

3   certain confidential items on the record?

4        MR. BUTLER:  Yes.  Those have been filed, Your Honor.

5        THE COURT:  Okay.  Fine.  And that's -- I just want

6   to make sure we have all the parties in agreement on that, to

7   the appeal.

8        MR. GLOSTER:  That's my understanding although that

9   agreement was reached with my colleague while I was on the

10  plane but that is my understanding, Your Honor.

11       THE COURT:  Okay.  Very well.  All right.  So then

12  let's turn to the issue of stay pending appeal.

13    (Pause)

14       MR. GLOSTER:  Your Honor, initially in response to

15  Delphi's opposition -- oh, I'm sorry, Your Honor.  Dean Gloster

16  of Farella Braun & Martel on behalf of the stay applicants and

17  the 1114 Committee of Salaried Retirees.

18         Initially let me say, Your Honor, that actually the

19  scope of what we're asking for is less then what we had

20  originally set out in our papers.  I think Delphi has raised

21  the issue that this is a non-trivial expense on Delphi's side

22  of the table and frankly any relief that Your Honor grants

23  should be limited to the -- the really critical harm that would

24  be faced by retirees by the termination of these subsidies.

25  And in further looking at this we think that the critical

12

1   problem is the loss of the healthcare benefits and the

2   prescription drug benefits and not the vision care, the dental,

3   the contribution of one percent of salary for 2,300 active

4   employees.  Those really are not in the same category of

5   extreme hardship and irreparable injury.  So that's the first

6   issue.

7            And the second issue is, we filed the appeals as an

8   expedited appeal, requested that they be expedited, filed the

9   statement of issues and record on appeal, really as soon as we

10  practically could.  And it's in the interest of all the parties

11  to have that appeal resolved as quickly as possible.  So that

12  it may well be, Your Honor, that a sixty day stay is all that

13  we need here, not a ninety day stay.

14           THE COURT:  And when you say sixty day stay, it would

15  be only in respect of the termination of funding of the

16  healthcare and the --

17           MR. GLOSTER:  Prescription drugs.

18           THE COURT:  -- prescription drug benefit?

19           MR. GLOSTER:  That's correct, Your Honor.  And as we

20  see that the critical issue there is if the appellate court

21  reverses, and we believe there is a substantial possibility of

22  success because this is simply a statutory issue of what 1114

23  covers, whether amendable benefits are covered or not, the

24  problem is that if participants in the healthcare plan are out

25  of creditable coverage for more than sixty-three days, then

13

1    under 29 U.S.C. 1181 they lose the ability to roll into a new

2    group health plan and have their preexisting conditions covered

3    by that health plan.

4         And so what happens is, they would enroll in a group

5    health plan that was some sort of follow on, here's what we've

6    put together, here's what we've worked out under the 1114

7    process after it comes back to this Court.  And the difficulty

8    is, they would have to pay for their benefits for a full year

9    before those benefits would cover preexisting conditions.  And

10   for retirees who are over fifty-five and under sixty-five, they

11   commonly have preexisting medical conditions and those are

12   typically the most expensive, most important issues that they

13   face medically.

14        So as we see it, this is kind of a genie, and you

15   can't put the genie back in the bottle once you've terminated

16   these subsidies and people have fallen out of coverage.  And as

17   a practical matter people will fall out of coverage.  When you

18   go from a fully, almost fully, funded subsidized benefit to, in

19   a relative short period of time, losing all of those subsidies

20   and having confusing papers sent to retirees, lots of them are

21   either not going to be in a financial position to continue

22   those benefits or simply won't respond in time and will lose

23   those benefits.  And we think that that will create an enormous

24   hardship and it satisfies the standards in the Second Circuit.

25   We understand that this is expensive but the enormity of the

14

1    harm potentially suffered by retirees is considerable.

2          In addition, Your Honor, if Your Honor disagrees with

3    that, we think that there's a practical reason for at least a

4    thirty day stay here.  The debtors' notices that initially went

5    to retirees about electing the benefits to continue the

6    benefits at their own cost had the wrong fax number about how

7    one responded and had an explanation that if you responded by

8    express mail that it wouldn't be necessarily effective.

9          In addition, the Congress passed and the President

10   signed into law the American Recovery and Reinvestment Act

11   which had substantial changes to COBRA benefit coverage, the

12   continuing coverage.  One of the changes it made was

13   retroactive and it said if you lost your job between September

14   1st of 2008 and December 31st of 2008 then you would be

15   entitled to COBRA continuation coverage and in fact there would

16   be a sixty-five percent subsidy from the government -- there

17   would be a sixty-five percent subsidy for a period of time.

18         The difficulty is that the regulations, the final

19   regulations, on what event constitutes your termination for

20   purposes of this COBRA, this extension of COBRA, the final regs

21   are supposed to come out on March 19th; which means, that for

22   people who left the company -- not you were terminated but

23   rather we want you to leave on an early retirement, we ask you

24   to leave -- there's some uncertainty, at least on the part of

25   the retirees, about whether or not that's going to be covered

1    by these new provisions.  And because of the tight time frames,

2    I think that there's a high likelihood of real chaos here and

3    people not getting benefits that they otherwise will be

4    entitled to if there's not enough time to deal with this.

5            And finally, Your Honor, this Court charged our

6    committee with negotiations with the debtor to try to modify

7    this Court's order consensually and to -- on behalf of all

8    retirees, to dismiss the appeal and to waive the retirees'

9    right to appeal from this Court's orders.  We've taken that

10   very seriously.  There have been discussions with Delphi.

11   There have been exchanges of proposals, obviously there's no

12   certainty as to that but there are very good reasons why both

13   parties would want to settle that out and very good reasons

14   that both parties have more to gain from the settlement then

15   simply proceeding with an appeal.

16           As a practical matter, I think the most likely

17   outcome of that is some sort of much lesser subsidy for a

18   relatively short period of time through a VEBA, a Voluntary

19   Employee Benefit Association, that's set up and charged with

20   obtaining an affordable, lower cost, less rich set of benefits

21   for the retirees that on a slight subsidy basis large numbers

22   of retirees would opt into.

23           We had asked for information from the debtor that

24   would allow us to go to vendors and price that; we've gotten

25   almost all of the information we need.  Assuming we can get the

16

1    rest promptly, we expect that we could roll out the benefit by

2    July 1, under some kind of limited subsidy.

3          If that's the case, simply one more month of health

4    benefits would mean that people would not be out of creditable

5    coverage for more than sixty-three days by the time the new

6    benefit rolled out.  And a one month extension would mean that

7    by the end of that month we would hope that we would be able to

8    communicate with retirees and say this is what the benefit is

9    going to be on July 1, as you consider your options of self-

10   paying for the debtor's benefits or trying to find other

11   coverage or going through one of these state catastrophic plans

12   that doesn't constitute creditable coverage or however you

13   might grapple with your healthcare issues, you should know that

14   on July 1 we're rolling out this benefit and it's got the

15   following monthly subsidy for this period of time.  And it

16   would be eligible for the health coverage tax credit in the

17   future should the pension be turned over to the PBGC.

18         And in that connection, Your Honor, there's an

19   advantage to the retirees for having the retiree committee

20   essentially sponsor that plan, because under the current -- the

21   new legislation passed as part of the American Recovery and

22   Reinvestment Act, a benefit approved by this Court and put

23   together through a VEBA by the debtor or by the committee is

24   statutorily entitled to coverage by the HCTC through the end of

25   December 2010.  But after that period we are probably stuck

17

1    with what the law is before, certainly unless Congress extends

2    that, which is that it has to be the 1114 Committee that goes

3    to the IRS and gets a private letter ruling saying that this is

4    set up in lieu of COBRA continuation coverage.

5        Finally, Your Honor, we disagree with the debtor as

6    to the correct interpretation of the COBRA continuation

7    provisions related to bankruptcy.  We see that the clear

8    reading of 29 U.S.C. 1163(6) is that a modification of benefits

9    in bankruptcy, which under the regs include a cut of the

10   subsidies from the employer, entitle the affected beneficiary

11   to lifetime COBRA continuation coverage and that the one year

12   period, saying that if it's within one year of bankruptcy, is

13   simply a safe harbor.  It says then it is deemed to be related

14   to the bankruptcy.

15       So, Your Honor, we believe that --

16       THE COURT:  What about the regs on that point?

17       MR. GLOSTER:  The regs are at best unclear, Your

18   Honor.  And it may be, although I find it -- I do not know

19   whether there is any intent to clarify that as part of the

20   final COBRA regulations by the 19th.

21       THE COURT:  Okay.

22       MR. GLOSTER:  And that was not part of the ARRA.

23       THE COURT:  Okay.  I interrupted you; I think you

24   were going to say something else.

25       MR. GLOSTER:  Just, Your Honor, that these benefits

18

1    are absolutely critical for human beings.  And I understand

2    that Delphi is facing enormous pressures and enormous

3    difficulty and this is an extraordinary time for the auto

4    industry.  But the very reasons that Delphi did not seek to

5    terminate these benefits before now and has acknowledged that

6    they are a substantial hardship are the same reason that this

7    Court should at least maintain those benefits for sixty or

8    ninety days as to the most critical component, to avoid

9    irreparable injury while an appeal is being resolved where the

10   parties are quickly striking an agreement to settle out that

11   appeal.

12          THE COURT:  Okay.  I have a few questions on what you

13   just went through.  Has there been any quantification of the

14   weekly or monthly cost of continuing just the healthcare and

15   prescription drug benefits?

16          MR. GLOSTER:  In fairness, Your Honor, that is the

17   bulk of the cost.  So the debtor estimated that the monthly

18   cost was something, of all of these benefits, was something in

19   the neighborhood of six million dollars.

20          My understanding, from conversations with counsel for

21   the debtor, that vision and dental may be ten percent or no

22   more than ten percent of that number.  It sounds to us as

23   though the one percent of salary contribution for the 2,300

24   active employees is similarly a small component of that.  And

25   certainly the historical information that Delphi gave us for

19

1    purposes of going to vendors and calculating a new benefit show

2    that the cost of just the health benefits and the prescription

3    drug benefits are something on the order of four million

4    dollars a month.

5              THE COURT:  Okay.

6              MR. GLOSTER:  And that was going backward.

7              THE COURT:  Okay.  And then secondly, the issue of

8    losing preexisting coverage, you say, is triggered after sixty-

9    three days of not having --

10             MR. GLOSTER:  Of not having creditable coverage --

11             THE COURT:  -- creditable coverage.

12             MR. GLOSTER:  -- which is, sort of, a statutory

13   definition of that.

14             THE COURT:  So given the debtor's supplemental notice

15   and where things stand at this point, when is the first day

16   that people would arguably lose supplemental coverage?

17             MR. GLOSTER:  April 1st.  So they would be out of

18   creditable coverage April 1st if they don't continue to pay for

19   their -- pay full freight for the existing benefits or find an

20   alternate benefit at that point that is creditable coverage.

21             THE COURT:  So you're basically looking at the end of

22   June as the date when this -- June 1st?

23             MR. GLOSTER:  Actually, I think it would be more like

24   June 3rd, Your Honor.  So if they lost it on April 1st, if they

25   didn't roll into a new plan --

20

1          THE COURT:  You're right, the beginning of June.

2     Yes.  Okay.  And why was July 1st picked as a potential

3     rollover date as opposed to June 1st or June 15th?

4          MR. GLOSTER:  Because the process on our end looks

5     something like the following.  We need, in order to get vendors

6     to commit to a program for people under sixty-five, it's very

7     hard to get a group plan that doesn't have a problem called the

8     death spiral.  That if you simply offer it to people but saying

9     the people have to pay a hundred percent, the only people who

10    opt in are the people with the most grievous preexisting

11    medical conditions and then the loss rates are so high

12    everybody else leaves the plan and then it gets too expensive.

13         So you need some kind of subsidy and it's unlikely

14    that we will have clarity about the health coverage tax credit

15    at that point and we need to have something so that vendors

16    would even commit to a program.  So we need to negotiate some

17    subsidy with Delphi in return for giving up all of the appeal

18    rights and go to the vendors and say, we're looking at a

19    subsidy of X dollars per month for twelve months, after which

20    time we think that there's a substantial likelihood that the

21    health coverage tax credit will kick in because the pensions,

22    by that time, may be turned over to the PGBC.

23         THE COURT:  So what is the clarifying event?

24         MR. GLOSTER:  What one has to do is quickly negotiate

25    a deal with Delphi and put out an RFP to the vendors that we've

21

1    previously identified.  They will respond within two weeks

2    about what their plans would be, the alternative plans that

3    they would set up.  We would select those plans after they've

4    provided us the pricing and then roll those out to the retirees

5    under some kind of announcement that here's going to be the new

6    benefit.  And as we work with the vendors and our broker about

7    what the timeline is, having told them, look we're going to

8    have to do this on what's really an insanely short time frame,

9    what they're telling us is July 1 is something that is

10   achievable.

11          THE COURT:  I'm sorry; and why is that again?

12          MR. GLOSTER:  Because we have to get the information

13   from Delphi in order to both, (a) send out a request for

14   proposals so that we have the pricing information for what the

15   actual losses are.

16          THE COURT:  Right.  But you said you were close to

17   that.  I mean, that's a matter of --

18          MR. GLOSTER:  Right.  Although it's binary, Your

19   Honor.  We either have the information or we don't.

20          THE COURT:  I understand that.

21          MR. GLOSTER:  And then we send that out to -- we put

22   that in an RFP, we send it to vendors, we get their pricing.

23   We also --

24          THE COURT:  I thought that was in about two weeks.

25          MR. GLOSTER:  The vendors have committed to us that

22

1    they could get back to us in two weeks.

2         THE COURT:  Okay.

3         MR. GLOSTER:  Assuming we had all this information

4    and could get this information out to the vendors and could

5    negotiate some sort of subsidy with Delphi so that they would

6    be willing to commit to that, that's what that looks like.  And

7    then we have to -- and invariably some of the vendors are not

8    right on the two week deadline but we'll get it to you the week

9    after.  And then from those vendors' benefits we have to

10   select, we're going to go with Blue Cross or with Aetna or with

11   whoever and here is the high option and here is the low option

12   and here's the HMO option.  And then we need to actually put

13   that together and then roll it out and put all of the -- they

14   have to put the information out to all of the retirees saying

15   here is the benefit and we have to set it up through a VEBA and

16   then we go ahead and have an open enrollment period and people

17   have the opportunity to opt into that benefit.

18        And more to the point, let's say Your Honor granted

19   even just a thirty day stay and so that people have the

20   existing subsidies through the end, not of March but the end of

21   April.  Ideally we would, before the end of April, be able to

22   tell retirees look here is what's going to come -- here's the

23   benefit that's going to be available and here's the subsidy

24   that's going to be available effective July 1.  And as you make

25   your healthcare choices you may want to consider simply paying

23

1    for the existing benefit from Delphi with whatever much smaller

2    subsidy we've negotiated with Delphi between now and then.  And

3    then if people don't end up doing that, at least by the time

4    the new benefit kicked in they would have only been out of

5    creditable coverage sixty days not sixty-three days.  And

6    people would have an information point about whether it is that

7    they ought to just go get some kind of catastrophic medical

8    coverage that's not creditable coverage from their own state.

9            THE COURT:  Why is this something that needs to be

10    dealt with now as opposed to, say, by the District Court two

11    weeks from now or thirty days from now?

12            MR. GLOSTER:  Well, if Your Honor denies the

13    motion --

14            THE COURT:  When I say deal with it by the District

15    Court I mean a stay pending appeal by the District Court.

16            MR. GLOSTER:  Your Honor, if you deny this motion

17    then of course what happens is we go to the District Court and

18    we ask the District Court to address it.  But I think that

19    there are considerations here -- there's an enormous amount of

20    uncertainty for the retirees right now.  There are issues about

21    people who say that they're not getting the notices.  There are

22    issues if someone's on vacation out of the country they'll just

23    never know what's going to go on.  And I think that --

24            THE COURT:  Well, that --

25            MR. GLOSTER:  We can't solve that problem.

24

1       THE COURT:  We could never solve that problem.  I

2   mean, depending on how long their vacation is.

3       MR. GLOSTER:  But Your Honor, when you deal with that

4   many people --

5       THE COURT:  They're still going to have the

6   uncertainty because it would only be a stay pending appeal,

7   there's still uncertainty.

8       MR. GLOSTER:  Your Honor, we live in an uncertain

9   world these days.  I understand that and all we can do is do

10  the best that we can, understanding that there are trade offs

11  for everything.  And I just think that the balance of the harms

12  here weigh strongly in favor of a limited stay to protect

13  retirees.

14      THE COURT:  I'm just trying to figure out when the

15  irreparable harm kicks in.  Does it kick in April 1st or does

16  it kick in towards the end of May or the beginning of June?

17      MR. GLOSTER:  I think it kicks in April 1st because I

18  think that just in figuring out what it is that we have to do,

19  if we can't get at least one more month then we're just going

20  to run out of --

21      THE COURT:  What I'm saying is, you wouldn't stop

22  doing what you just outlined to me if a stay were not granted.

23  You'd keep doing it; the danger of it not working would become

24  more and more imminent.  And at the same time the District

25  Court might rule.

25

1          MR. GLOSTER:  That's true, Your Honor.  But when you

2     look at what the consequences are, number one, just as Delphi

3     says look we can't tell you that if we don't save a dollar in

4     cash flow now it's the binary difference between the whole

5     thing falling apart and not.  But there's always a risk there

6     and it's actually quite difficult to line up vendors to commit

7     to an under sixty-five health plan without a substantial

8     employer subsidy.  As we get to March 27th and people find

9     other health plans because there's nothing in place here and go

10    ahead and enroll in a different plan, we have fewer and fewer

11    retirees to bring to the table and less critical mass and it

12    becomes more difficult.

13         And then, if the Appellate Court does in fact rule in

14    our favor, and then we come back before this Court and say

15    well, we're going to go through the 1114 process, we're going

16    to negotiate something for retirees in return for giving up

17    these benefits, by then they've been out of creditable coverage

18    for more than sixty-three days and there's just limits to what

19    we can all do.

20         THE COURT:  Well no, if it's reversed they won't be

21    out of creditable coverage because the debtor will have to

22    offer it to them.

23         MR. GLOSTER:  Well if it's reversed they will have

24    lost their benefits on April 1.  And if the appellate process

25    goes through sixty days then --

26

1        THE COURT:  I understand that.  If the appellate

2    process takes longer than the sixty-three days, I understand

3    that point.  I understand that point.  I'm just -- in terms of

4    weighing the harms and the record today versus the record that

5    might be in front of a District Court forty-five days from now,

6    I'm trying to figure out who -- where the balance of harms

7    tips, just in terms of the timing point.

8            Let me raise another issue, which is the absence of a

9    bond here.  The courts have been pretty clear in putting the

10   onus on the movant for a stay pending appeal to explain why a

11   bond isn't appropriate and there's - that you don't need to

12   protect the appellee because of the cost of the stay ultimately

13   being unrecoverable, if the appellee continues to win.

14           MR. GLOSTER:  I guess the answer, Your Honor, is that

15   we don't have the capacity to get the retirees to kick in for

16   the bond.  There's, sort of, a rather amorphous group of

17   retirees on my side of the table.  And if they had access to

18   twenty million dollars they wouldn't be facing the hardship

19   from the termination of benefits.

20           THE COURT:  Well, now we're talking about four

21   million, right?  Because it's really thirty days tacked on to

22   June that we're talking about.

23           MR. GLOSTER:  That's true, Your Honor, but I think

24   we're still one or two orders of magnitude off about our

25   ability to go out and pass the hat in front of the retirees.

27

1          THE COURT:  I understand that your clients are very

2    sympathetic clients, probably more sympathetic than the

3    landlord in Judge Lynch's case that the debtors cite.  But

4    Judge Lynch made the point that just because the landlord was

5    unable to post a bond, doesn't relieve the landlord of the duty

6    to justify to the Court why the appellee shouldn't be

7    protected.

8          MR. BUTLER:  Well, all I can say, Your Honor, this is

9    a close question, at best, of statutory interpretation.  It's

10   an issue that the Second Circuit has not ruled on.  It could

11   work either way and frankly, I think, were we in opposite

12   positions here and the debtor was before the Court saying, you

13   know Your Honor, it's a different situation but we want to

14   appeal this issue, you, like other judges, have discretion to

15   waive the requirement for a bond and particularly when we're

16   simply --

17         THE COURT:  Actually, I'm not sure I do.  I was

18   actually reversed on this issue in what I thought was the most

19   appealing situation, where the appellees were relying upon the

20   continued funding and management of West Point Stevens, were

21   not looking to sell their stock, were relying upon the

22   continued viability of the enterprise.  And it seemed to me,

23   under those circumstances they shouldn't force the appellant,

24   who was funding the enterprise, to have to post a bond.  And

25   the District Court said no, they have to post a bond.

28

1           MR. GLOSTER:  Well, all I can say --

2           THE COURT:  A 200 million dollar bond, in fact, even

3    though they were, at the same time, putting in money that was

4    propping up the value of the stock that these people weren't

5    selling.

6           MR. GLOSTER:  Well Your Honor, all I can say is my

7    clients can only do what we can do, which is to seek to

8    expedite the appeal, to limit our ask to the portion of the

9    benefits that are the most critical and create the greatest

10   harm, to cooperate about filing our notices of appeal and our

11   designation of issues and designation of the record as quickly

12   as we can.  And to cooperate with the debtor to get it resolved

13   as quickly as possible.

14           And then, Your Honor, frankly if what we get is a

15   thirty day stay, actually the risk is on us.  We're likely to

16   go beyond thirty days with an appeal, although I don't know.

17   That's really up to the District Court.  We can only do what we

18   can do but whether it's 200 million, twenty million or two

19   million dollars, we cannot raise that from our clients.

20           And I suppose I'm willing to take the risk, working

21   for free at one level, but we don't have twenty million to

22   front the clients either.

23           THE COURT:  Okay.  All right.  Thank you.

24       (Pause)

25           MR. HOGAN:  Good morning, Judge.  Al Hogan of Skadden

29

1   Arps for the debtors.  Before I get going I do want to clarify

2   one matter that we also conferred with counsel prior to the

3   hearing.  That's the evidentiary record on this hearing.

4   Neither party has any new evidence but we both do incorporate

5   the full evidentiary submissions that were admitted in the

6   first and the second hearing with respect to the debtors'

7   motion.

8            THE COURT:  Okay.

9            MR. HOGAN:  Judge, I want to begin by addressing some

10  of the questions that you asked.  As well, I think I've got

11  some additional information that might help Your Honor and I

12  think it leads into the discussion in the light of what was

13  just presented by counsel.

14           The first question is that, in terms of the

15  quantification of the cost, the debtors presented evidence at

16  the hearing on this matter, uncontroverted evidence, to the

17  annual expected savings for reducing these benefits was

18  approximately seventy million dollars a year.  That was an

19  estimate that worked out to approximately one and a half

20  million dollars a week or six million dollars a month.  And

21  Judge, that estimate did not include the one percent subsidy

22  for existing employees' accounts and so that's a separate

23  issue.

24           And counsel is correct, I've verified that the vision

25  and dental savings really is only somewhere between five and

30

1   ten percent of that number.  So what counsel referred to as the

2   critical aspect of this is still ninety to ninety-five percent

3   of that six million dollar estimate going forward, per month.

4          THE COURT:  So we're talking about five million to

5   five and a half million a month?

6          MR. HOGAN:  5.3, something along that line.  So the

7   lion's share of the expected cost savings does come from the

8   elimination of health care and prescription drug coverage.  And

9   that does happen on a monthly basis.  And that's the debtors'

10  best estimate of the savings going forward.  That's based on

11  the same actuarial assumptions and retirement assumptions that

12  the debtors have annually imposed.  And so we think that

13  there's very little to save.

14         I appreciate that here at this hearing the

15  Association recognized that the debtors actually are expending

16  money here.  I was, frankly, taken aback by the statement in

17  the initial stay motion that no party in interest would be

18  harmed here if a stay is granted and the Association is

19  ultimately unsuccessful on its appeal.  I think the record is

20  clear, we just clarified it.  The answer is six million dollars

21  a month over what's at least requested in the motion -- a

22  ninety day stay.  That's approximately a twenty million dollar

23  expense.  And Judge, that is direct harm to the debtors. As

24  Your Honor observed in the modified bench ruling, bankruptcy is

25  a zero sum game and so it's not so much the debtors on one hand

31

1    versus the retirees on the other.  It's the retirees relative

2    to all of the other stakeholders in this case.

3           And so, twenty million dollars at a time of the

4    current liquidity issues that the debtor faces is real harm,

5    it's concrete harm.  That clearly satisfies that prong of the

6    test in terms of evaluating the stay.

7           Another observation, Judge, is what we just heard

8    really is that opposed to seeking a stay pending appeal, what I

9    think we heard, in a very candid discussion, frankly, is that

10   the Association is asking for a stay that really, I think, is

11   almost a disguised motion for reconsideration of the same kinds

12   of stay and delay arguments they made on the initial motion.

13          So the underlying premise that on April 1 people will

14   fall out of creditable coverage and that's a harm that seeks to

15   be avoided is something that was presented to this Court on the

16   initial motion.  And we've moved -- the debtors' countervailing

17   evidence is that the debtors have a real present need to

18   conserve that cash and to get those balance sheet liabilities

19   off the books so we can proceed with the restructuring efforts.

20          But Judge, the harm that the Association is talking

21   about here really relates to their characterization of a loss

22   of creditable coverage.  And I think we can break that down and

23   look at it in a couple ways.  First is that the notion, and I

24   don't need to dwell on this --  I think from the prior comments

25   it's clear that the Court already comprehends this -- the

32

1   notion that people are going to unwittingly lose their coverage

2   as of April 1 is not substantiated in this record, Judge.

3          And we handed up to the bench this demonstrative

4   chart, counsel has this as well.  I'm not going to spend a lot

5   of time going through this.

6          THE COURT:  I don't think I have it.

7          MR. HOGAN:  May I, Judge?

8          THE COURT:  Sure.

9      (Pause)

10         THE COURT:  Thank you.

11         MR. HOGAN:  So Judge, the purpose of this chart is

12  just to simply show that from early February, the time that the

13  debtors filed the motion, till what will run a period that's

14  greater than two months, out to April 15th, the affected

15  retirees have had clear notice that these benefits are being

16  terminated.

17         They've also had clear notice since the beginning of

18  this process that they have the option to elect continuing

19  coverage and that if they do so there's no break in coverage,

20  there's no break in creditable coverage.  And that's been

21  explained from the beginning of this timeline and it will be

22  explained again in our "second chance" notice.  But if you go

23  back to the beginning, the February 5th letter that was mailed

24  by Delphi, that was Exhibit 1 to Mr. Gebia's (ph.) declaration.

25  One of the objectors actually criticized the debtors for making

33

1  that letter too stark, too conclusory in terms of the fact that

2  these benefits were going to terminate on April 1.  I didn't

3  think that objection was well founded because we also discussed

4  the motion in that letter.

5         But it is clear, as of February 5th, every retiree

6  was mailed a letter that said your coverage is going to

7  terminate on April 1.

8         Then after the hearing we mailed the election forms,

9  which again went through the ramifications of not continuing

10 coverage.  We went through the steps that folks had to take to

11 elect coverage.  We filed the supplemental notice concerning

12 the formation of the Retiree Committee.  And then, Judge, going

13 along the time line, after March 27th, when the initial

14 election forms are due, we are going to send another plain

15 English notice that explains the ramifications, both with

16 respect to not being able to opt back into the Delphi plans,

17 the potential loss of creditable coverage that's going to

18 occur.  We're going to explain all of that to people.  And so I

19 think if you look at this front to back there's --

20        THE COURT:  And they will have until April 15th,

21 those people that haven't yet made the switch?  Those people

22 who didn't yet make the switch will have till April 15th to do

23 that?

24        MR. HOGAN:  That's correct.

25        THE COURT:  Retroactive to the 1st?

34

1        MR. HOGAN:   Retroactive to April 1.

2        THE COURT:   So there wouldn't be any gap for those

3   people?

4        MR. HOGAN:   No gap for those people.  That's entirely

5   correct.  And so what the harm here, that I think the

6   association is really trying -- what it really boils down to is

7   that retirees may choose to not continue to elect Delphi

8   coverage.  The ramifications are going to be clearly spelled

9   out and the options are going to be clearly available all the

10  way through April 15th to continue that creditable coverage.

11       And Judge, when you put it in those terms it really

12  is, will the retirees be harmed in some sense by their choice

13  to not continue coverage?  And it boils down to where should

14  the economic cost for this coverage be shifted?  And again,

15  it's not so much the debtor it's should the debtor's

16  stakeholders bear the cost of retirees continuing their

17  creditable coverage until such time as either the Association

18  is able to work out whatever arrangements they want to work

19  out.  And we heard a lot about that and Judge, they have their

20  goals but none of that is certain.

21       Or is it such time until, consistent with the final

22  order and a PBGC triggering event, which we all hope doesn't

23  happen.  But if that does happen the mechanism is in place

24  where if people elect to maintain coverage the VEBA will be

25  created and they'll be entitled to the eighty percent

35

1    healthcare tax credit.  That's already put in place.  And so I

2    think that it's not the clear, concrete substantial harm that's

3    required to demonstrate a stay to say that people are

4    ultimately going to have a choice as to whether or not to

5    continue coverage and to exercise that choice with full

6    information about the ramifications.

7           Judge, the issues with respect to COBRA coverage,

8    frankly that's still a little bit murky to me.  But two things

9    on that.  There's two COBRA issues rattling around here.  One,

10   I don't think we need to spend a lot of time on.  The Court

11   agreed with the debtors' interpretation of the COBRA lifetime

12   event coverage plus or minus one year.  We don't think a COBRA

13   event has happened in that respect.  And so our notice wasn't

14   misleading in any respect, nobody's harmed by that.

15          The recent amendments to the COBRA legislation

16   surrounding reimbursement for COBRA coverage, again that's --

17   frankly, I think that's an issue of two ships passing in the

18   night.  If there are changes to the COBRA regulations that

19   require COBRA notices to be sent and allow for people to elect

20   COBRA coverage, which by the way would be an alternative

21   different than electing to stay in the Delphi plan, but if

22   people want to make that election and there is a subsidy

23   available under the new legislation, Delphi's going to evaluate

24   that and send out COBRA notices.

25          Just to be clear, Delphi has and is continuing to

36

1    send COBRA notices regarding this termination event to people

2    who have retired within the prior eighteen month window, the

3    company's interpretation of the applicable regulations is that

4    those people are entitled to COBRA notices.  Those are being

5    sent out.  If people want to choose COBRA, the company's view

6    on those is they can do that.  There are ramifications to doing

7    that in terms of COBRA being a distinct and mutually exclusive

8    option for continuing in the Delphi plans.  But the COBRA

9    issues, really here, I just don't think there's any basis to

10   consider a stay here to allow new legislation to be more fully

11   vetted through regulations or otherwise.  Those matters will be

12   dealt with if and when it becomes appropriate for Delphi to

13   send out those COBRA notices.

14          Judge, you asked another question in terms of when

15   does the irreparable harm kick in.  Again, I just want to

16   reiterate, the point here is the retirees can avoid the

17   irreparable harm that really is at the essence of what the

18   Association is talking about by electing to continue the

19   coverage, and they'll have plenty of options to do that.

20          The last issue, Judge.  To touch on the requirement

21   of a bond, I think you have the standard correct.  I think

22   we've cited it correctly in our papers.  The Association's

23   statement that somehow this is a money judgment and so a bond

24   isn't required is just plain wrong.  A bond is the typical

25   requirement in cases like this.  And again, we're dealing with

37

1    a sympathetic group of movants in this case, there's no

2    question about that.  But it's really the -- it's almost an

3    inability to pay argument based on -- based on, sort of, the

4    associational character of the movants who are here in front of

5    the Court.  And so, there really is no evidence with respect to

6    individual retirees' ability to pay.  And I would submit that

7    it's incongruous to allow a  representative body to come before

8    the Court but then to stand back and say well, because we're a

9    representative body we don't have the mechanisms for

10   implementing what is the very standard and I think very common

11   requirement of a bond in this case.

12         Again, it comes back to the -- the bottom line point,

13   Judge is that a stay, and certainly a stay without a bond,

14   takes what is right now an obligation that Delphi does not have

15   and shifts it back on to Delphi.  And the Association's motion

16   for a stay, as we've heard it, is really a motion for a stay so

17   that the Association can continue their own goals and

18   objectives for how this coverage situation plays out.

19         The debtors don't know if the Association is going to

20   be successful, there's an awful lot wrapped up in that.  Will

21   they be able to get vendor coverage that's attractive?

22   Mr. Gloster represented settlement discussions with the

23   debtors, and I think it would be inappropriate to go into

24   those, but there's absolutely no certainty of that.  So as to

25   the real question, I think it comes down to, is a stay

38

1   appropriate in a circumstance where what's being requested is a

2   stay for the committee to pursue its goals and its objective.

3   And the effect of that is to shift what is ultimately just an

4   economic -- just an economic, you know it's hard to say that

5   but it is an economic question from the retirees back to the

6   other stakeholders of Delphi.

7         And so, because the harm to Delphi is clear, because

8   I think that the potential harm to the retirees is not at all

9   concrete and is avoidable in its entirety and because I think

10   that the other factors here tip in Delphi's favor heavily, I

11   don't believe a stay is appropriate in this circumstance.

12         THE COURT:  Are the debtors as committed to an

13   expedited appeal as the appellants here?

14         MR. HOGAN:  We are, Judge.

15         THE COURT:  Okay.  Has the record been transmitted

16   yet?

17         MR. HOGAN:  The record's been filed.  It hasn't been

18   docketed.  We don't have the District Court.  What I hope to do

19   is work with counsel for the Association to do everything we

20   can, substantively and procedurally, working with the various

21   clerks to consolidate and expedite these appeals.

22         THE COURT:  Okay.

23         MR. HOGAN:  Thank you, Judge.

24         THE COURT:  Thank you.

25         MR. GLOSTER:  Very briefly, Your Honor, just a couple

39

1    of things.  First, the debtors in their motion, originally, to

2    terminate benefits said that the all-in cost of all of the

3    benefits that they were terminating for post-employment, other

4    post-employment benefits that were not pensions was seventy

5    million dollars.  That expressly did include the one percent

6    and those different benefits were discussed on pages 6 and 7 of

7    Steven Gebia's declaration.

8         In fairness, I don't think that the one percent is a

9    huge portion of this.  But what we're really talking about is a

10   cost that is somewhere on the order between four and five

11   million.  It's four million in the past; I'm not sure how they

12   get to five million here.

13        THE COURT:  Well, if it's ninety percent wouldn't it

14   be five plus?

15        MR. GLOSTER:  Yes, my understanding is that the one

16   percent of salary for the 2,300 employees where it's paid for

17   their future healthcare is probably something on the order of

18   three plus million dollars a year.  And that the cost of the

19   vision care and dental is something like ten percent of this.

20        THE COURT:  Okay.

21        MR. GLOSTER:  But I'm not quite sure how they ever

22   get to how many things are in the seventy million.  What we can

23   calculate from what they've given us is in the past the health

24   and prescription drugs have been about four million.  When we

25   try to back it out from what -- there's some uncertainty that

40

1    it might be less than that, but it might be five million

2    dollars under their numbers.

3            THE COURT:  Okay.

4            MR. GLOSTER:  The other issues is, you know, the

5    notion that it's not a harm because individuals may choose not

6    to elect Delphi coverage, and it's just up to them.  The

7    practicalities are that these are thousands of retirees living

8    on limited income.  And to say that they simply choose not pay

9    the full cost of the benefits is that they choose to pay their

10   rent instead.  You know, that's the real difficulty.  We've got

11   thousands of people on fixed incomes who, you know, are reliant

12   upon these subsidies for their current level of healthcare and

13   now have to obtain some other benefit, and that many of them

14   are early retirees who left the company because there was a

15   healthcare benefit and, you know, they were allowing the debtor

16   to downsize, and they put in their twenty-five years, mostly at

17   GM and then at Delphi.  And many of them had an understanding,

18   whether legally accurate or not, that they were to get lifetime

19   medical benefits.  And, so, that's who we're really talking

20   about here.  And, in fact, there are some real practical

21   reasons why people are going to fall out of coverage.

22           THE COURT:  Well, but, again, if your clients win on

23   the appeal then that coverage is reinstated, right.  So we're

24   talking about some period between now and mid-June where the

25   harm is to an unspecified number of people who need to have

41

1   health coverage at that point and can't pay for it.  Or not

2   between now, you know, between April and --

3          MR. GLOSTER:  I think as a practical matter, what

4   really happens, Your Honor, assuming that we win on appeal, I

5   think that the Appellate Court simply says look, you need to go

6   through an expedited 1114 process before you terminate all

7   these people.

8          THE COURT:  But until that happens the debtor is

9   liable, right?

10          MR. GLOSTER:  Well, is liable.  But I think what we

11   end up with is probably an administrative claim.  Because we

12   can't simply on June 27th say okay, you guys are back in

13   benefits.  You have to -- some of them are paying for other

14   healthcare coverage, there's all kinds of stuff going on.  What

15   really happens is the debtor comes to us and says look, we're

16   going to make a proposal very quickly, we need to get this

17   dealt with very quickly.  And you know that our judge has

18   already ruled that we're facing serious financial difficulties,

19   and these are amendable benefits.  So even under the 1114

20   process you're not going to end up with a full subsidy, let's

21   talk about what you're really going to get.

22          THE COURT:  No, I understand.  But for the period

23   we're talking about, the period before the District Court

24   rules, I guess I can see that there might be some people,

25   although it's not clear to me from the record how many or to

42

1    what extent, who will not be able to pay for coverage, any

2    coverage, any replacement coverage, starting April 15th.  But

3    if you win on appeal then, you know, the debtors' modification

4    or termination of the funding for that coverage from April 15th

5    forward would have been improper so they would owe that

6    coverage to them.  And those are people who don't have

7    coverage.  So I would assume they'd put them back in the plan,

8    retroactive.

9         MR. GLOSTER:  I don't think it could work that way,

10   Your Honor, because when you show up at the hospital or your

11   healthcare provider, at that point you either have coverage or

12   don't.  You don't say hey, six days from now --

13        THE COURT:  I agree.  There's a potential there for a

14   gap before the Court rules, right.

15        MR. GLOSTER:  And I think that gap is probably going

16   to be filled if we win on appeal with an administrative claim.

17   But I think the administrative claim doesn't put people back

18   where they sort of need to be.

19        THE COURT:  Why wouldn't they have just put them

20   back, and so that they could go to the hospital and say -- from

21   then forward, they could say well, we're --

22        MR. GLOSTER:  Well, they can re-enroll people after

23   the Appellate Court.  But I don't know sort of what their

24   situation is going to be.  But to put people into a group plan

25   after they've had a lapse of creditable coverage --

43

1          THE COURT:  I'm not saying that.  I'm saying that --

2    I'm leaving aside the creditable coverage issue.  I'm saying

3    that it seems to me that given the parties' commitment to an

4    expedited appeal, given the record in this matter and the

5    nature of the issues, you know, this is something I would think

6    that a District Court would rule on promptly and could easily

7    rule on it for June 15th, I would think.  And, if not, I would

8    think that a Court, at that point, would consider whether there

9    should be a stay.  The Court would know then -- the state of

10   the record, would know how long he or she's going to take to

11   rule, would know better how long you might want to provide for

12   some sort of injunction.

13          MR. GLOSTER:  That's possible, Your Honor.  Or the

14   Court may, in the meantime, rule that there is a stay.

15          THE COURT:  Oh, yes, sure.  I understand that.  It

16   just seems to me given all that you laid out to me, and the

17   main risk being the risk of losing preexisting condition

18   coverage, it seems to me that this is premature.

19          MR. GLOSTER:  Well, Your Honor, respectfully, I think

20   it is not premature because time moves very quickly at sixty-

21   three days, and these contacts is a short period of time.  And

22   I think any protection we get on the front end really gives us

23   enough time to try to work something out so that people don't

24   lose that.

25          THE COURT:  But you'll still be doing that, won't

44

1    you?  Let me ask this of the debtors.  My assumption is that

2    the debtors will continue to provide the information.  If I

3    denied the stay today, you're not going to say oh, well, we

4    don't have to do anything at this point.  You're going to

5    complete providing the information that they've asked for in

6    connection with --

7        MR. BUTLER:  Your Honor, we've been providing it to

8    the Delphi Retiree Salaried Association, that's correct.  And

9    we've been providing that information to them.  The retirees'

10   committee's responsibilities in that regard were discharged in

11   the prior order as a retirees committee.  But we're

12   cooperating, Your Honor, we have been.

13       THE COURT:  Okay.  And you wouldn't view this, if I

14   denied this request, as a license to stop talking with them?

15       MR. BUTLER:  No, Your Honor, we would not.

16       THE COURT:  Okay.

17       MR. GLOSTER:  Respectfully, I do want to clarify

18   something.  The retiree committee is obligated under this

19   Court's orders to negotiate with the debtors regarding

20   modifications of those orders in return for giving up the

21   appeal rights of the retirees.

22       THE COURT:  I don't want to get into that.  I think

23   the orders say what they say, and I think they have an

24   incentive -- both sides have an incentive to continue to talk.

25   And, luckily, you're representing -- you're wearing two hats.

45

1          Okay, anything else?

2          MR. GLOSTER:  No, Your Honor.

3          MR. HOGAN:  Nothing further, Judge.

4          THE COURT:  Okay.  Appellants from my February 25th

5  order, which was then made a final order -- when was it March

6  13th?  March 13th -- granting the debtors' OPEB termination

7  motion have moved under Bankruptcy Rule 8005 for a motion

8  staying that order pending their appeal.  The debtors have

9  opposed the motion. The motion for a stay was somewhat modified

10  on the record today.  Rather than a ninety-day stay of all of

11  the order, the movants today sought, in the first instance, a

12  sixty-day stay of the order and, in respect of that order, only

13  insofar as the order would pertain to termination of the

14  debtors' funding of healthcare and prescription drug benefits,

15  under the welfare plans.

16          As a fallback, the movants have sought a thirty-day

17  stay, tying the logic of that stay into their hopes that the

18  rights in respect of COBRA coverage and the implication of the

19  American Recovery and Reinvestment Act would be clarified

20  within that thirty-day stay period.

21          The legal standards for granting a stay pending

22  appeal are fairly clear, with one exception, which I don't

23  believe is dispositive either way here.  The party seeking a

24  stay has the "heavy burden" to demonstrate (1) whether the

25  movant will suffer irreparable injury absent a stay, pending

1    appeal, (2) whether a party wouldn't suffer substantial injury

2    if a stay is issued, (3) whether the movant has demonstrated a

3    substantial possibility, although, less than a likelihood of

4    success on appeal, and (4) the public interest that may be

5    affected.  See In re Calpine Corporation, 2008 Bank. LEXIS, 217

6    at page 10 (Bankr. S.D.N.Y. 2001).  In that opinion Judge

7    Lifland noted, without deciding, that there is authority for

8    either the proposition that all four factors must be met for a

9    stay to be granted, or the proposition that a balancing test

10   among those four factors must be performed to determine whether

11   the stay should be granted.  Id. at pages 11 through 12,

12   citing In re Tower Automotive Inc. for the former proposition

13   at 2006 WL 2583624 at page 1 (Bankr. S.D.N.Y. June 28, 2006),

14   and In re Turner, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997), and

15   then in comparison with those cases and in support of a

16   balancing approach, citing In re Adelphia Communications Corp.,

17   361 B.R. 337, 346 (S.D.N.Y. 2007), and, in addition, Mohammed

18   v. Reno, 309 F.3d 95, 100 (2d Cir. 2002), in which the Second

19   Circuit said the probability of success must be demonstrated as

20   inversely proportional of the amount of irreparable injury

21   plaintiff will suffer absent the stay: simply stated, more of

22   one excuses less of the other.

23        Again, as I said at the beginning, I believe that

24   analysis of this particular motion is the same, or reaches the

25   same result, under either of those two approaches.  That is

1   first and foremost because in any event -- that is, under

2   either approach -- a showing of irreparable harm is the

3   "principal prerequisite" for the issuance of a stay under

4   Bankruptcy Rule 8005.  Grand River Enterprise Six Nations Ltd.

5   v. Pryor, 481 F.3d 60, 66-67 (2d Cir. 2007) (in which the

6   Second Circuit said "we have stated that irreparable harm is

7   the single most important prerequisite for the issuance of a

8   preliminary injunction and that, accordingly, the moving party

9   must first demonstrate that such injury is likely before the

10  other requirements for the issuance of an injunction will be

11  considered"), as well as Adelphia Communications Corporation,

12  361 B.R. 347.  The moving party must prove that it faces

13  irreparable harm that is "neither remote nor speculative but

14  actual and imminent."  Freedom Holdings Inc. v. Spitzer, 408

15  F.3d 112, 114 (2d Cir. 2005), and Tucker Anthony Realty

16  Corporation v. Schlesinger, 888 F.2d 969, 979 (2d Cir. 1989).

17  Moreover, merely invoking equitable mootness is not sufficient

18  to demonstrate irreparable harm.  In re Board of Directors of

19  MultiCanal S.A., 2005 Bank. LEXIS 1865 at page 6 (Bankr.

20  S.D.N.Y. January 6, 2005), and In re Baker, 2005 WL 2105802, at

21  page 9 (E.D.N.Y. August 31, 2005).

22          The termination of the retiree benefits at issue here

23  effectively does not kick in for those who have not obtained

24  replacement coverage until April 15, 2005.  Moreover, it's

25  recognized that the primary danger for such people is the

48

1    inability to subsequently obtain coverage that would cover

2    preexisting conditions.  However, that inability, if it arises,

3    that is, if people are not able to obtain coverage that would

4    preserve existing condition coverage, that event would occur at

5    the earliest given the April 15th date that the debtors have

6    committed to in connection with their so-called "second chance"

7    letter, until mid-June, effectively June 18th, given the sixty-

8    three day period that needs to expire.

9            Given that timing as well as the state of this

10   record, where I suppose I can infer that some individuals will

11   not have the wherewithal to obtain replacement coverage, but

12   that there is no evidence of that fact, to my mind says that

13   the irreparable harm that the movants have posited here is not

14   actual and imminent.  Rather, it seems to me particularly given

15   the parties' commitment to an expedited appeal as well as the

16   debtors' commitment to continue to explore the potential

17   consensual resolution of such an appeal on an expedited basis,

18   that it would be appropriate, instead, to have a second look at

19   the issue of a stay pending appeal weeks if not months from

20   today, and that that look would be by the District Court, who

21   would then, I'm assuming, have been at least briefed on the

22   applicable underlying issues, if not having heard oral

23   argument, and, perhaps, also, could have already ruled by that

24   date.  At that point, also, it would seem to me that the issues

25   I think of secondary importance will have been further

49

1    clarified, those issues being the status of any additional

2    regulations under the Recovery and Reinvestment Act, as well as

3    the fruit of any additional work that the retirees had done

4    with regard to a potential alternative VEBA.

5            So I do not believe that the movants, on this record,

6    as of today, have established irreparable harm, although, as I

7    said, they may do so at an appropriate time, sometime in the

8    coming weeks or months.

9            In addition, under the four factors, in addition to

10   showing irreparable harm, the party seeking a stay must also

11   establish that the non-moving party, that is, here, the

12   debtors, or other parties, will not suffer substantial harm if

13   the stay is granted.  In other words, the moving party must

14   show that the balance of harms tips in favor of granting the

15   stay.  Here, the record shows that the cost of a stay pending

16   appeal is somewhere between four and a little over five million

17   dollars a month.  In terms of this particular -- or these

18   particular debtors, that cost is truly significant, given, in

19   essence, the biweekly or monthly extension of their financing

20   and their great need for the conversion of cash.  The Court's

21   always reluctant to balance dollars versus individuals' health,

22   but ultimately, here, I believe, we are talking about dollars,

23   again, on this record, since there is a clear opportunity for

24   the retirees to obtain coverage that they would be funding and

25   that that opportunity would not be necessary again until April

50

1    15th, and, moreover, would not create the preexisting condition

2    issue until mid-June.

3         The issue of substantial injury to the debtors is

4    magnified significantly here by the conceded inability of the

5    retirees to post a supersedeas bond that would -- or a bond

6    pending appeal that would protect the debtors against the cost

7    of this stay, between eight million and ten million dollars.

8    It appears clear to me that if I were to issue a stay pending

9    appeal, and the debtors continued to prevail, as they did

10   before me, on appeal, they would never get that money back; it

11   would never be paid over to them, it would be gone.  And,

12   therefore, a bond here is quite meaningful in that context.

13   It's clear to me that the movants here have not carried their

14   burden to provide specific reasons why the Court should depart

15   from the standard requirement of granting a stay only after

16   posting a bond because, generally speaking, the elimination of

17   such a requirement should occur only if the failure to post a

18   bond does not unduly danger the other party's interest.  See In

19   re Westpoint Stevens Inc., 2007 U.S. District LEXIS 33725

20   (S.D.N.Y. May 9, 2007), as well as In re DJK Residential, LLC,

21   2008 U.S. District LEXIS 19801, (S.D.N.Y. March 7, 2008).

22        Given those two factors which argue against granting

23   a stay here, I do not believe I need to go into a lengthy

24   discussion of the likelihood of success on the merits or the

25   public interest, or the public interest point.  The equities I

51

1    believe at best for movants balanced here, or given the

2    balanced tension of the interests in the retirees that I've

3    outlined in connection with the discussion of irreparable harm,

4    as well as the interest of not only the debtors but all of

5    their constituents in connection with the -- that I've

6    discussed, in connection with the substantial injury to the

7    nonmoving party factor.

8         With regard to likelihood of success, it is clear

9    here that at least one court has taken a contrary view than I

10   did, and as did the authorities that I've relied upon.  That

11   is, the Farmland court.  So I believe that, standing alone,

12   there is a serious legal question going to the merits.

13   However, I do not believe that in even a proportionality-based

14   analysis, here, the issue of likelihood of success would

15   outweigh the other factors that I've already discussed.

16        In most instances where there is a level of dispute

17   with regard to ultimate success on the merits that exists here,

18   and some showing of irreparable harm, I would normally issue a

19   stay that would at least enable the appellant to rush over to

20   District Court and seek a further stay.  But I don't believe

21   that is appropriate here, again, given the timing that I've

22   outlined.  It would seem to me that the stay issues, rather,

23   become ripe towards the end of May, if not the beginning of

24   June.  And that, in any event, if the movants want to convince

25   the District Court otherwise, they certainly will have time to

52

1    do so before the debtors would be taking irretrievable action.

2             So for those reasons I'll deny the motion.

3             MR. HOGAN:  Judge, just if I could, one minor point

4    of clarification.  In the discussion that you just delivered,

5    Your Honor referenced the date of June 18th as the date for the

6    creditable coverage sixty-three day period lapse, actually I

7    think I agree with Mr. Gloster, the date would actually be June

8    3rd, because the April 15th -

9             THE COURT:  Oh, it would be retroactive to that date?

10            MR. HOGAN:  That's right, retroactive to April 1.

11            THE COURT:  That's fine.

12            MR. HOGAN:  So I wanted to be sure we were clear on

13   that.

14            THE COURT:  It's still in June, though, so I think

15   there's time for these issues to be clarified further.

16            MR. HOGAN:  Correct, Judge.

17            THE COURT:  And perhaps even mooted out if, as I

18   think may be the case here, given the importance of this

19   matter, the District Court might well rule before then.

20            MR. HOGAN:  Thank you, Judge.

21            THE COURT:  Mr. Gloster, you or maybe it was one of

22   your colleagues, raised the issue of a direct appeal.  And I

23   looked at that a little more thoroughly after you were done.

24   As I read the statute and I think the case law, since these

25   cases were filed before BAPCPA, I don't think I have the

53

1    ability to certify a direct appeal to the Second Circuit.

2              MR. GLOSTER:  I agree, Your Honor.

3              THE COURT:  Okay.  Thanks.

4         (Proceedings concluded at 11:41 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1

2                              I N D E X

3

4                              RULINGS

5                                        Page        Line

6    Motion to Lift Stay, Denied          50          25

7    Denied

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1

2                    C E R T I F I C A T I O N

3

4        I, Pnina Eilberg, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Pnina Eilberg

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  March 19, 2009

16

17

18

19

20

21

22

23

24

25