**Bidding Procedures Hearing Date And Time:  April 23, 2009 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  April 16, 2009 at 4:00 p.m.**
**Sale Hearing Date And Time:  May 21, 2009 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  May 14, 2009 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
       In re                                                :    Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :    Case No. 05-44481 (RDD)
                                                            :
                                                            :    (Jointly Administered)
                                                            :
            Debtors.                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, 1123, AND 1146 AND FED. R. BANKR. P. 2002, 6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF DEBTORS' ASSETS COMPRISING DEBTORS' BRAKES AND RIDE DYNAMICS BUSINESSES FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("BRAKES AND RIDE DYNAMICS BUSINESSES SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, 1123, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures described herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain of the Selling Debtor Entities' (defined below) assets and properties (the "Acquired Assets") primarily used in the Selling Debtor Entities' brakes business (the "Brakes Business") and ride dynamics business (the "Ride Dynamics Business," and together with the Brakes Business, the "Sale Businesses") to the Buyer or the Successful Bidder(s) (both as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, free and clear of liens, claims, and encumbrances, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed U.S. Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and collectively with the Assumed U.S. Contracts, the "Assigned Contracts") to the Buyer or the Successful Bidder, as the case may be, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Buyer or the Successful Bidder(s), as the case may be.  In support of this Motion, the Selling Debtor Entities (as defined below) respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").  On February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11.  The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.  In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009 (Docket No. 16403).  The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

4.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

---

[1]   Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

5.    The statutory predicates for the relief requested herein are sections 363,

365, 1123, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

6.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately

$10.3 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[3]

7.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[2]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than two-thirds of Delphi's revenue is generated from non-

GM sources.

C.      Events Leading To The Chapter 11 Filing

        9.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered net operating losses.  In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net

sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors

incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.

employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded

gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined

below), the Company's net operating loss for the year was $1.5 billion.

        10.     The Debtors believe that the Company's financial performance was

deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S.

legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable,

---

[4]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
        valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
        calendar year 2004 was $482 million.

non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a
competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced
number of motor vehicles that GM produces annually in the United States and related pricing
pressures, and (iii) increasing commodity prices.

        11.     In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions
with its major stakeholders had not progressed sufficiently by the end of the third quarter of
2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its
transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

        12.     On March 31, 2006, the Company outlined the key tenets of a
transformation plan that it believed would enable it to return to stable, profitable business
operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the
Company's labor agreements to create a competitive arena in which to conduct business; second,
concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy
and labor costs and to ascertain GM's business commitment to the Company; third, streamlining
their product portfolio to capitalize on their world-class technology and market strengths and
make the necessary manufacturing alignment with their new focus; fourth, transforming their
salaried workforce to ensure that the Company's organizational and cost structure is competitive
and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable
solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    In connection with those discussions, on September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16.    Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) devising a workable solution to Delphi's pension funding situation. Under the

Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the

Debtors and eliminate significant elements of conditionality to the performance of GM's

obligations. Delphi estimated the value of the net consideration received under the Amended

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the Original GSA and Original MRA).

17.    By transferring nearly $2 billion of hourly pension liabilities to GM

through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan

(which was also approved as part of the Amended GSA with the consent of Delphi's U.S.

unions), Delphi made substantial progress towards achieving its pension funding strategy

objectives for hourly employees. In addition, on September 23, 2008, this Court entered an order

authorizing the Debtors to take certain actions with respect to certain of their pension plans for

salaried employees and to implement replacement pension plans that will be more cost-effective

for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.    As a result of all the factors described above, during the fall of 2008 the

Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth

in the Plan Modification Motion. Since the filing of the proposed modifications, however,

substantial uncertainty and a significant decline in capacity in the credit markets, the global

economic downturn generally, and the current economic climate in the automotive industry, have

adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully

consummate a confirmed plan of reorganization. Delphi, therefore, continues to engage in

discussions with certain of its stakeholders to formulate further plan modifications. Moreover, as

a result of the market turbulence, the Debtors were unable to extend the maturity date of their

DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.

Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the

Debtors entered into an accommodation agreement which allows the Debtors, among other

things, to continue using certain of the proceeds of the postpetition financing facility through

June 30, 2009. In addition, to further support the Debtors' liquidity, GM agreed to make certain

advances and to accelerate payment of certain payables to the Debtors.

19.    At the same time, consistent with the plan modifications being negotiated,

the Company has been making further revisions to its business plan consistent with the extremely

low volume production environment in the global automotive industry and depressed global

capital and equity markets. As part of the Debtors' efforts to achieve sufficient emergence

capital funding, Delphi and GM are constructively working together to pull forward elements of

GM's previously agreed-upon support for Delphi into one payment at emergence in combination

with the transfer of certain of Delphi's U.S. sites to GM. This arrangement is designed to

facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global

economy, the automotive industry, and the capital markets. In the meantime, Delphi will

marshal all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will seek to preserve and continue the strategic growth of its non-

U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

<u>Relief Requested</u>

20.    By this Motion, Delphi and the selling Debtor entities described in the

Agreement (the "Selling Debtor Entities")[5] seek approval for the sale of the Sale Businesses to

---

[5]    Under the Agreement, the Selling Debtor Entities are Delphi Corporation, Delphi Automotive Systems LLC,
and Delphi Technologies, Inc. For the purpose of convenience, references to the "Sellers" herein (including in
all exhibits) means, as the context requires, (i) the Selling Debtors Entities to the extent such references
implicate assets of the Selling Debtor Entities or (ii) non-Debtor affiliates to the extent such references

BeijingWest Industries Co., Ltd. (the "Buyer"),[6] subject to additional competitive bidding

pursuant to the proposed Bidding Procedures.  To effect the Sale, the Selling Debtor Entities

seek two types of relief.  First, at the omnibus hearing to be held on April 23, 2009, the Selling

Debtor Entities will seek entry of an order substantially in the form attached hereto as Exhibit B

(the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and

certain bid protections to be provided to the Buyer pursuant to the Agreement (as defined below)

and as described more fully herein.  Second, subject to the terms of the Bidding Procedures

Order, at the omnibus hearing to be held on May 21, 2009, the Selling Debtor Entities will seek

entry of an order substantially in the form attached hereto as Exhibit C (the "Sale Approval

Order") authorizing and approving the Sale to the Buyer or the Successful Bidder(s), as the case

may be, including, without limitation, the assumption and assignment of the Assumed U.S.

Contracts to the Buyer, and the assumption by the Buyer of the Assumed Liabilities.

Basis For Relief

21.    The Company has stated that to achieve the necessary cost savings and

operational effectiveness envisioned in its transformation plan, it must streamline its product

portfolio to capitalize on its world-class technology and market strengths and make necessary

manufacturing realignments.  As part of the Company's transformation plan, in March 2006, the

Company identified both the Chassis Systems product business unit, including the Brakes

Business, and the Ride Dynamics Business as non-core businesses subject to disposition.

---

implicate assets of the non-Debtor affiliates.  Certain assets will be sold under the Agreement by non-Debtor affiliates of the Selling Debtor Entities listed on Schedule 1 to the Agreement.  For convenience, use of the term "Selling Debtor Entities" means, as the context requires, the specific Debtor entity undertaking the transaction referenced to the extent such transaction affects the assets of such entity.

[6]    This Motion refers to BeijingWest Industries Co., Ltd., together with any affiliates it identifies in Schedule 1 of the Agreement, as the "Buyer," and, as the context requires, means the specific Buyer entity undertaking the transaction.

22.    Following broad marketing efforts of the Sale Businesses beginning 17 months ago, on March 30, 2009, the Sellers and the Buyer entered into a Master Sale and Purchase Agreement, a copy of which is attached hereto as Exhibit D (the "Agreement").[7]   The Agreement contemplates a divestiture of the Sale Businesses to the Buyer for a purchase price (the "Purchase Price") of $90 million.[8]   The Purchase Price, the majority of which will be paid upon the closing of the sale, is subject to adjustment for a number of items, including: adjustments for inventory; certain liabilities associated with Global Sale Employees;[9] an upward adjustment for amounts paid to purchase leased engineering vehicles that the Buyer wishes to buy at closing; an adjustment for certain capital expenditures made by the Sellers between June and August 2009, in the event such expenditures are greater or less than the targeted capital expenditures for that period; and, in the event the closing does not occur by November 1, 2009 for certain reasons; an upward or downward adjustment for certain capital expenditures in August, but only in the event that such expenditures are greater or less than the targeted capital expenditures for that period; an upward adjustment for certain payments to a certain customer; an upward adjustment for certain capital expenditures in Mexico; and an upward adjustment for certain advance payments (described below).  In addition, the Buyer has agreed to reimburse the Sellers for capital expenditures (the "Advance Payments") (i) of approximately $7 million (as may be adjusted by the parties under the Agreement) to Shanghai Dynamics and Propulsion Systems, Co., Ltd. ("Delphi China Brakes"), a non-Debtor affiliate, within two days of the entry

---

[7]    The Company's board of directors has authorized the Selling Debtor Entities to consummate the Agreement, subject to the approval of this Court.

[8]    The Preliminary Purchase Price as defined in the Agreement is $90 million.  Without limiting the Buyer's obligations to make Advance Payments or the amount of any related Price Adjustment under the Agreement, the estimated upward pre-Closing adjustment for Advance Payments, assuming a Closing on November 1, 2009, approximates $18 million.

[9]    Capitalized terms used but not otherwise defined herein  shall have the meanings ascribed to them in the Agreement.

of the Sale Approval Order (the "China Advance Payment") and (ii) additional Advance

Payments for certain capital expenditures to the Poland and/or U.K. businesses.  Pursuant to the

Agreement, these Advance Payments are fully secured with a fully perfected first priority lien on

the assets acquired with the applicable Advance Payment.

23.     The divestiture, as memorialized in the Agreement, contemplates that a

substantial portion of the assets will be sold by certain non-Debtor affiliates.  Pursuant to the

purchase price allocation attached to the Agreement as schedule 3.6.1, approximately one-third

of the Purchase Price will be allocated to the Selling Debtor Entities, which own intellectual

property, certain manufacturing assets consigned to Mexican facilities, and certain engineering

assets for the Sale Businesses.  Those transactions to be undertaken by the non-Debtor affiliates,

although memorialized in the Agreement and the attachments thereto, are generally not the

subject of this Motion because those entities are not under the supervision of this Court.  The

discussion in this Motion is generally, but not exclusively, limited to those transactions to be

undertaken by the Selling Debtor Entities which require Court approval.

F.     The Brakes Business

24.     The Brakes Business began in the 1930s as part of GM and was spun off

as part of the Chassis Division in 1999 when Delphi was formed.  At the time of the spinoff, the

Brakes Business began product launches on vehicles produced in China.  Delphi's Brakes

Business produces brake systems as well as brake components.  These systems and components

range from traditional hydraulic brake systems (known as foundation brakes) to controlled brake

products which integrate foundation brakes with electronic controls (such as anti-lock brakes).

In addition to brake systems and components, the Brakes Business also offers value-added brake

corner modules, which typically include assembled components such as steering knuckles, brake

calipers and linings, rotors or drums, wheel bearings, and various fasteners.

25.     The Brakes Business has assets in China, the U.S., and Mexico, with two manufacturing facilities located in Shanghai, China and one such facility in Juarez, Mexico.  In addition to certain engineering capabilities at the Chinese manufacturing sites, the Brakes Business also maintains three technical centers in each of Brighton, Michigan; Dayton, Ohio; and Shanghai, China, in which application and development engineers provide engineering services (the "Engineering Services") which include developing new products and interfacing with customers to fit the product to the vehicle and provide feedback for future product needs.  In addition, the Brakes Business leases certain testing and storage facilities which will be transferred as part of the sale.  The dedicated workforce for the Brakes Business is comprised of approximately 843 employees, including 465 hourly employees and 378 salaried employees.  Of these employees, 149 are U.S. employees, all of whom are salaried employees (primarily engineers).

26.     The Brakes Business has a diversified customer base which primarily consists of China's major automotive OEMs.  Nearly two-thirds of the forecasted 2009 revenue for the Brakes Business is from Shanghai General Motors, but the business has significant sales to BYD, Chang'an Motors, and Chery, among other customers.  At its Mexico plant, the Brakes Business produces brakes for Harley-Davidson Motor Company and is currently Harley-Davidson's exclusive supplier for controlled braking products.  Globally, it is estimated that for the year ended December 31, 2008, the Brakes Business achieved revenue approximating $235 million.  In 2008, the Brakes Business booked more than $900 million in new business.

G.     The Ride Dynamics Business

27.     The Ride Dynamics Business traces its history back to 1927 and is a global designer and manufacturer of highly-engineered suspensions systems.  Since Delphi's spinoff from GM, the Ride Dynamics Business has diversified and expanded its customer base to

become a world leader in suspensions systems. Delphi's Ride Dynamics Business consists primarily of two product lines: passive dampers (including hydraulic/mechanical shocks, struts, and related suspension modules) and electrically-controlled damping systems (including controlled dampers, active stabilizer bars, and leveling systems).

28.    The Ride Dynamics Business has significant manufacturing assets in China, India, Mexico, Poland, and the United Kingdom, and also maintains multiple worldwide engineering locations. The Ride Dynamics Business' products are primarily manufactured in four facilities located in Noida, India; Chihuahua (Los Pinos), Mexico; Krosno, Poland; and Luton, U.K. In addition to certain engineering capabilities at the Ride Dynamics Business' headquarters in Dayton, Ohio, the Ride Dynamics Business also maintains technical centers in Brighton, Michigan; Krakow, Poland; Paris, France; Shanghai, China; and Tokyo, Japan, as well as Italy and Germany, in which application and development engineers provide Engineering Services. The dedicated workforce for the Ride Dynamics Business is comprised of approximately 2,125 employees, including 1,417 hourly employees and 708 salaried employees. Of the latter, 124 are salaried U.S. employees (primarily engineers).

29.    The Ride Dynamics Business has a diversified customer base, including Acura, Audi, BMW, Ferrari, Ford, GM, Land Rover, Mercedes, and other companies. Approximately twenty-five percent of the forecasted 2009 revenue for the Ride Dynamics Business is from sales to General Motors North America, but the business also has significant sales to BMW, Ford, and Honda, among other customers. Globally, for the year ended December 31, 2008, the Ride Dynamics Business achieved estimated revenue approximating $434.6 million.

H.    Factors Leading To The Sale

30.    In March 2006, as part of its transformation plan, the Company identified non-core product lines and manufacturing sites that do not fit into the Company's future strategic framework.  At that time, Delphi identified both its Brakes Business and Ride Dynamics Business as non-core assets, subject to potential divestiture. The Company believes that the Sale Businesses can become more profitable and competitive as stand-alone businesses or as part of a larger organization with the working capital to invest in and support the businesses.  The Company has analyzed alternative options, including the wind-down of the Sale Businesses, and has concluded that both financially and from a customer perspective, the value of the Sale Businesses would be maximized through their divestiture.  The Company is seeking to achieve that goal in a manner that will satisfy the needs of its customers.  The Company, including the Selling Debtor Entities, will manage the transition of the Sale Businesses and the Sale will be completed in coordination with the Company's customers, employees, unions, and other stakeholders.

31.    The Company has actively marketed the Brakes Business since April 2008 and the Ride Dynamics Business since November 2007.  As part of this process, for each of the Sale Businesses the Company contacted approximately 200 potential global buyers, distributed 50-60 confidential information memoranda, and provided a number of parties, including both strategic and financial purchasers, with additional information about the Sale Businesses.  To facilitate an efficient diligence process, the Sellers' management established virtual data rooms to permit interested parties to conduct due diligence.

32.    The Sellers evaluated the terms and benefits of the proposals they received for each of the Sale Businesses, as well as the benefits of other alternatives to divesting the Sale Businesses.  Although the Sale Businesses were marketed separately, in January 2009, the Buyer

emerged as a potential purchaser for both Sale Businesses.  In their business judgment, the

Sellers concluded that the proposal from the Buyer, which formed the basis of the Agreement,

offered the most advantageous terms and the greatest economic benefit for the Sale Businesses to

the Sellers, including the Seller Debtor Entities.  This decision was based on the Sellers' ability

to maximize the value of the business lines as a going concern and minimize the costs associated

with employee termination and severance, as well as the Sellers' belief that the Buyer would

continue to provide quality products to the Company's customers, many of whom buy other

products from Delphi.  The Buyer is a Chinese investment entity, of which key investors include

Shougang Corporation as the majority owner, and an affiliate of Tempo International Group,

Inc.[10]  Under the Agreement, on or prior to April 9, 2009, the Buyer will deliver to an escrow

agent the sum of $20,000,000 as an earnest money deposit amount.  In the event that the

Agreement is terminated as a result of a material breach of the Agreement or Bidding Procedures

by the Buyer, the Sellers would be permitted to retain the Deposit Amount.

I.    The Agreement

33.    Pursuant to the Agreement, (a) the Selling Debtor Entities would (i) sell

the Acquired Assets owned by the Selling Debtor Entities free and clear of any Encumbrances[11]

to the extent permitted under section 363(f) of the Bankruptcy Code, except for Permitted

Encumbrances as defined in the Agreement, in consideration for the Purchase Price, subject to

---

[10]    Tempo International Group, Inc. is a Hong Kong-based family group whose holdings include, among other
businesses, Norstar Founders Group, Ltd., an automotive parts supplier.

[11]    "Encumbrance" means, with respect to the Acquired Assets, any lien, charge, claim, pledge, security interest,
conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option, or other
encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform
Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal
property).

adjustments and other consideration, and (ii) assume (if applicable) and assign the Assigned

Contracts to the Buyer and (b) the Buyer would assume the Assumed Liabilities.

34.    The significant terms of the Agreement are as follows:[12]

(a)    General Terms.  The Buyer would acquire the Acquired Assets, which comprise substantially all of the assets primarily used by the Sale Businesses, which include certain manufacturing facilities, technical centers, managed working capital, intellectual property, contracts, customer accounts, and certain non-U.S. manufacturing facilities through an asset sale.  Acquired Assets being sold by the Selling Debtor Entities are also comprised of intellectual property, including patents and trademarks, and certain prototype, technical, and application engineering centers used by the Sale Businesses, which include engineering resources such as equipment used by the engineers to develop and test products as well as assets held in bond for use in Mexican subsidiaries under Mexican regulatory (IMMEX) provisions at the Juarez and Chihuahua sites (Los Pinos).

(b)    Bankruptcy Court Approval.  The Sale of the Acquired Assets would be subject to competitive bidding pursuant to the Bidding Procedures and approval by this Court.

(c)    Documentation.  The Sale would be effected pursuant to the Agreement and related documentation.  Prior to or at the Closing, certain of the Sellers and the Buyer would enter into the following ancillary agreements, among others (collectively, the "Ancillary Agreements"):[13] (i) the IP Assignment, [14] (ii) the Transfer Agreements (India, Poland, China, Mexico (Los Pinos), Mexico (Juarez), Japan, France, Germany, and England), (iv) the Bills of Sale, (v) the Assignment and Assumption Agreements, (vi) the Manufacturing Services Agreements (Noida and Juarez), (vii) applicable non-U.S. subleases and leases (along with any required consent from any Governmental Authority as set forth in the Agreement), (viii) any applicable assignments or novations of leases for each Leased Real Property, (ix) the Transition Services Agreement, (x) the Seller IP License Agreement, and (xi) any mortgage or pledge agreements executed in connection with the Advance Payments.  The Ancillary Agreements would be delivered to the Sellers on terms reasonably satisfactory to the Sellers on or before the Closing and would be performed in all material respects. The Closing of the Transfer Agreements would take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

(d)    Purchase Price.  The Purchase Price to be paid by the Buyer to the Sellers would be the $90 million Preliminary Purchase Price, subject to certain adjustments which

---

[12]   In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement control.

[13]   Copies of the schedules to the Agreement and the Ancillary Agreements (as defined above) are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[14]   Capitalized terms used in the summary of terms but not otherwise defined herein have the meanings ascribed to them in the Agreement.

include, among other things, adjustments for inventory and for Liabilities associated with Global Sale Employees. Without limiting the Buyer's obligations to make Advance Payments or the amount of any related Price Adjustment under the Agreement, the estimated upward pre-Closing adjustment for the Advance Payments in the Agreement, assuming a Closing on November 1, 2009, approximates $18 million. As set forth on Schedule 3.6.1 to the Agreement, the portion of the Purchase Price to be allocated to the Selling Debtor Entities would be approximately $30 million.

(e)    Deposit Amount. On or prior to April 9, 2009, the Buyer would deliver to an escrow agent pursuant to the Deposit Escrow Agreement the sum of $20,000,000 (approximately 22% of the Preliminary Purchase Price) to be held as an earnest money deposit (such amount, together with the interest accrued thereon prior to Closing less any escrow fees, the "Deposit Amount"). Upon Closing or within 11 Business Days after termination of the Agreement under Section 9.1.5 thereof as a result of a material breach of the Agreement or Bidding Procedures by the Buyer, the Sellers would receive the Deposit Amount. If the Agreement is terminated for any reason other than under Section 9.1.5 of the Agreement, then, on: (i) the date which is no later than ten Business Days after such termination or (ii) in the event that an Alternative Transaction (defined below) is completed, the Return Date (defined below) (whichever would be earlier), the Deposit Amount would be returned to the Buyer.

(f)    Advance Payments. Pursuant to the Agreement, within (i) two Business Days of the date the Sale Approval Order is entered if no objections to the Sale were filed prior to the date of such order or (ii) eleven days after the date the Sale Approval Order is entered if any objections to the Sale were filed before the date of such order, the Buyer would pay to Delphi China Brakes the RMB[15] equivalent (based on foreign exchange rate in effect on the date of the Sale Approval Order) of $7 million as an advance payment of the Price Adjustment allocable to the Acquired Assets in China (the "China Advance Payment"). The China Advance Payment is intended to fund Delphi China Brakes' capital expenditures by Delphi China Brakes with respect to the Brake Business in calendar year 2009 (reimbursing prior payments and funding future expenditures) until the Closing Date. The China Advance Payment is subject to adjustment: if Delphi China Brakes' forecast exceeds $7 million, additional funds would be paid by the Buyer. The China Advance Payment, including any additional amounts paid to Delphi China Brakes in the event that capital expenditures exceed $7 million, would result in upward adjustments to the Preliminary Purchase Price, while at the same time being credited to the Buyer as part of the Purchase Price Adjustments made at Closing. The China Advance Payment would be repaid in RMB within ten business days after any termination of the Agreement. Also pursuant to the Agreement, after September 1, 2009, within two Business Days of a request for an advance payment to fund capital expenditures (consistent with the forecast included as part of Schedule 3.2 of the Agreement) from the local Seller in either Poland or the U.K, the Buyer shall make such Advance Payments to the Polish Seller or U.K. Seller. The Poland and/or U.K Advance Payment would be repaid to the Buyer within ten business days after any termination of the Agreement.

---

[15]    RMB stands for Ren Min Bi, the currency for the People's Republic of China.

(g)    Representations And Warranties.  Pursuant to the Agreement, the Selling Debtor Entities would provide standard representations and warranties relating to the Sale and the Acquired Assets for a transaction of this type and the Buyer would provide standard representations and warranties for a transaction of this type.  The representations and warranties of the Selling Debtor Entities would generally survive closing for one year, with environmental representations and warranties surviving for five years and representations relating to taxes surviving until expiration of the applicable statute of limitations.

(h)    Covenants And Non-Compete.  Subject to the terms of the Bidding Procedures, between the date of signing the Agreement and the closing, the Selling Debtor Entities would be required to refrain from doing any of the following, among other things, without prior written consent of the Buyer (which consent would not be unreasonably withheld or delayed): (i) sell or otherwise dispose of Acquired Assets having an aggregate value exceeding $1,000,000, excluding sales of inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the ordinary course of business, (ii) incur, assume, or guarantee any Debt Obligation that would become an Assumed Liability, (iii) incur any encumbrance on any material Acquired Assets, in each case other than the Permitted Encumbrances as defined in the Agreement, (iv) increase the compensation of any of the Selling Debtor Entities' Sale Businesses' employees other than: (A) in the ordinary course of business or (B) as required by any agreement in effect as of the date of the Agreement or as required by law, (v) make any material change in the accounting methods or practices followed by the Sale Businesses (other than such changes as are required by law or made in conformity with GAAP), (vi) amend a Material Contract other than immaterial changes made in the Ordinary Course of Business, (vii) enter into, modify, or renew any collective bargaining agreements, companywide collective agreements, severance agreements, social plans, Seller Employee Benefit Plans, special works contracts, or compensation arrangements (including any such contracts or agreements that provide for benefits or compensation in the event of a reduction in force or relocation of work) covering Selling Debtor Entities' Sale Businesses' employees, except for renewals and modifications in the ordinary course of business on terms not materially inconsistent with prior practice, (viii) fail to maintain insurance in a manner consistent with the Selling Debtor Entities' past practice, (ix) enter into any Contract for or make any Capital Expenditure, other than any such expenditures included in the capital expenditure budget provided to the Buyer (including capital expenditures funded by the Advance Payments), or (x) agree or commit to do any of the foregoing.  For a period of five years after the closing, subject to certain exclusions, the Selling Debtor Entities would be required not to take certain actions which would compete with the Sale Businesses.  The Sellers would not be required to fund any capital expenditures that are the Buyer's responsibility under the Agreement.

(i)    Indemnity.  Under the Agreement, the Buyer would be obligated to indemnify the Selling Debtor Entities as well as all other Sellers on account of certain losses resulting from or arising out of (i) a breach of any representation or warranty made by any Buyer contained in the Agreement, (ii) the Assumed Liabilities, (iii) a breach of any agreement or covenant of any Buyer contained in the Agreement or any Ancillary Agreements, or (iv) the conduct of the Sale Businesses or the ownership of the Acquired Assets after closing.  The Selling Debtor Entities (jointly and severally with Delphi) would be required to indemnify the relevant Buyer for indemnifiable losses (a) to the extent that the Sale Order or other applicable

provisions of the Bankruptcy Code fails to discharge Liability with respect to any claims relating to Products shipped by a Filing Affiliate prior to closing or other Retained Liabilities of a Filing Affiliate, (b) resulting from or arising out of a breach of any representation or warranty made by such Selling Debtor Entity contained in the Agreement, or (c) resulting from or arising out of a breach of any agreement or covenant of such Selling Debtor Entity contained in the Agreement or any Transfer Agreement.  In addition, all Sellers which are not Selling Debtor Entities would be obligated, severally and not jointly, to indemnify the Buyer on account of (i) breach of any representation or warranty made by such Seller contained in the Agreement, (ii) Retained Liabilities that are retained by such Seller, or (iii) a breach of any agreement or covenant of such Seller contained in the Agreement or any Transfer Agreement. The Sellers' indemnification obligations relating to breaches of representations and warranties, however, would be limited to indemnification claims of which the Sellers are notified on or before the first anniversary of the closing, except for such indemnification claims made with respect to (a) Section 6.32 (Purchased Intellectual Property Assistance), which would survive for two years after closing, (b) Section 4.5 (Sufficiency of Acquired Assets), which would survive for only 180 days after closing, (c) certain environmental matters, of which claims the Sellers would have to be notified on or before the fifth anniversary of the closing, (c) Section 2.3.2 (Product Warrant Claims) and Section 2.3.3 (Product Recall Claims), each of which claims the Sellers would have to be notified on or before the expiration of the relevant Warranty Period, or (d) Taxes, infringement of intellectual property rights, or other claims for which the Sellers agreed to indemnify the Buyers, each of which would survive until expiration of the applicable statute of limitations.  Further, the Sellers would not be obligated to the Buyer for certain indemnifiable losses (generally excluding Retained Liabilities) until (y) an individual claim exceeded $25,000.00 (the "Individual Claim Amount") and (z) the amount of all indemnifiable losses (exceeding the individual claim amount) exceeded $500,000.00 (the "Deductible Amount") or for aggregate indemnifiable losses of all Sellers in excess of the "Cap Amount," defined as $9,100,000.  The Deductible Amount and Cap Amount would not apply to the Selling Debtor Entities for Indemnifiable Losses asserting that the Sale Order or other applicable provisions of the Bankruptcy Code failed to discharge Liability with respect to any claims relating to Products shipped by a Filing Affiliate prior to closing or other Retained Liabilities of a Filing Affiliate, except that the Cap Amount would apply to claims relating to infringement of Intellectual Property Rights.

(j)    Closing Conditions.  The respective obligations of each party to effect the transactions contemplated by the Agreement would be subject to the satisfaction or waiver of customary closing conditions relating to bankruptcy court approvals and regulatory matters (including certain competition filings).  In addition, the obligation of the Buyer to consummate the transactions contemplated by the Agreement would be subject to the satisfaction, or waiver by the Buyer, at or prior to the Closing, of the following conditions: (a) the truth and correctness, as of the Closing Date, of the representations and warranties of the Sellers contained in the Agreement except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect, (b) the performance and compliance by the Sellers in all material respects with all agreements and obligations required by the Agreement to be performed or complied with by the Selling Debtor Entities at or prior to the Closing, (c) the delivery by the Selling Debtor Entities of duly executed copies of each of the Ancillary Agreements, and (d) since the date of the Agreement, no Material Adverse

Effect[16] would have occurred and be continuing at Closing.  Finally, the obligation of the
Sellers to consummate the transactions contemplated by the Agreement would be subject to the
fulfillment at or prior to the Closing of the following conditions, which could be waived by the
Sellers: (i) the truth and correctness, as of the Closing Date, of the representations and
warranties of the Buyer contained in the Agreement, except where the failure of such
representations and warranties to be true and correct would not have a material adverse effect
on the Buyer's ability to consummate the transactions contemplated by the Agreement, (ii) the
performance and compliance by the Buyer in all material respects with all agreements and
obligations required by the Agreement to be performed or complied with at or prior to the
Closing, and (iii) the delivery by the Buyer of duly executed copies of each of the Ancillary
Agreements.

      (k)    <u>Termination</u>.  The Agreement would be terminable prior to Closing under
the following circumstances: (i) upon mutual written consent of the Sellers and the Buyer, (ii)
by either party, provided the terminating party is not in material breach of its obligations under
the Agreement, if Closing does not occur within 30 days after the November 1, 2009 target
date for any reason other than that (a) a law, governmental order, or third-party proceeding
prohibits the consummation of the transaction or (b) all required Governmental Approvals have
not been obtained, (iii) by either party, if the Selling Debtor Entities consummate an
Alternative Transaction (defined below), (iv) by either party, provided the terminating party is
not in material breach of its obligations under the Agreement, if consummation of the Sale
would violate any final non-appealable order of any governmental authority (other than this
Court), (v) by either party, provided the terminating party is not in material breach of its
obligations under the Agreement, if this Court has not entered the Sale Approval Order on or
before 120 days after the date of the Agreement, or if such Sale Approval Order, as of the date
that is 120 days after the date of the Agreement, is subject to a stay or injunction, (vi) by the
Buyer, provided that the Buyer is not in material breach of its obligations under the Agreement,

---

[16]    Under the Agreement, "Material Adverse Effect" is defined as "any change, occurrence or development that has
a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers'
hereunder), results of operations or financial condition of the Business, taken as a whole, but excludes any
effect: (i) resulting from general economic or business conditions or changes in the national or world economy
or financial, banking or securities markets including any disruption thereof or any decline in the price of any
security or any market index; (ii) affecting companies in the industry or markets of the Business generally; (iii)
resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles;
(iv) resulting from any existing event, occurrence or circumstance with respect to which the Buyers have
Knowledge as of the date hereof; (v) that is cured or for which an offer to cure has been made by the Sellers
before the date of any termination of this Agreement by Buyer Parent pursuant to Section 9.1 hereof; (vi)
resulting from increases in energy, electricity, natural gas, oil, steel, aluminum, other raw materials or other
operating costs (other than such increases arising from or in connection with contracts or arrangements entered
into with any Affiliate of any Seller); (vii) resulting from the negotiation, announcement or performance of this
Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or
communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Business;
(viii) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (ix) resulting
from any actions required under this Agreement to obtain any Consent; (x) resulting from the filing of the
Bankruptcy Cases or from any action approved by the Bankruptcy Court; (xi) resulting from any act of God or
other <u>force majeure</u> type event, including acts of war or terrorism, whether or not directed at the Business or
Buyer, not disproportionately affecting the Business relative to its competitors; or (xii) resulting from the
regulatory status of any Buyer."

within ten business days after becoming aware of the occurrence of a Material Adverse Effect if such event is continuing at the time of such termination and not reasonably capable of being cured within 120 days after entry of the Sale Approval Order or the date of the Agreement, whichever is later.  In addition, the Buyer Parent could terminate upon written notice to the Sellers, provided the Buyer Parent was not in material breach of any of its obligations under the Agreement, if the Sellers had materially breached or materially failed to perform any of their obligations under the Agreement, if such material breach or failure to perform was (y) not cured within 30 days after written notice thereof, or promptly after written notice thereof if the time for performance had lapsed, or (z) incapable of being cured by the Sellers.  Finally, the Sellers could terminate upon written notice to the Buyer Parent, provided the Sellers were not in material breach of any of their obligations under the Agreement (including under the Bidding Procedures), if the Buyer had breached or failed to perform in any material respect any of its obligations contained in the Agreement, and such breach or failure to perform (i) was not cured within 30 days after written notice thereof or (ii) was incapable of being cured by the Buyer.

(l)    Break-Up Fee.  If the Agreement were terminated under certain circumstances and the Sellers sold, transferred, leased, or otherwise disposed of all or substantially all of the Sale Businesses or the Acquired Assets in a transaction or a series of related transactions with a party other than the Buyer (an "Alternative Transaction"), then the Sellers would, upon consummation of the Alternative Transaction, be required to pay the Buyer Parent an amount equal to $2,940,000 (representing approximately 3.0% of the sum of the Preliminary Purchase Price (prior to adjustment) plus the estimated China Advance Payment)  (the "Break-Up Fee").  If the Buyer Parent became entitled to receive the Break-Up Fee, then such Break-Up Fee would be the sole and exclusive remedy of the Buyers for any breach by the Sellers of the terms of the Agreement or the Deposit Escrow Agreement (i.e., the Agreement does not contain any Buyer right to receive any expense reimbursement), provided, however, that the Buyer would also be entitled to (a) return of the Deposit Amount, (b) repayments of the Advance Payments, and (c) repayment of the JAVE Payments pursuant to section 6.40 of the Agreement.  The Company would allocate the Break-Up Fee to the Selling Debtor Entities and the non-Debtor Sellers in proportion to the purchase price allocation. Under such circumstances, the Selling Debtor Entities would pay approximately 30% of the Break-Up Fee.  The Break-Up Fee would not be payable if (i) the Buyer was in material breach of the Agreement or the Bidding Procedures or (ii) the Sale would violate any final non-appealable order of any regulatory governmental entity.

(m)    Transfer Taxes.  The Selling Debtor Entities and the Buyer would use commercially reasonable efforts and cooperate in good faith to exempt the Sale from any transfer, documentary, sales, use, registration, recording, stamp, value-added, and other such taxes and related fees (the "Transfer Taxes") as might be payable in connection with the Sale. In the event that an exemption(s) were unavailable, Transfer Taxes that arise would be borne solely by the Buyer.

J.      Workforce Provisions

35.     As of the Closing, the Buyer would offer employment to all of the Selling Debtor Entities' active employees related to the Sale Businesses.  As stated above, the employees of the Selling Debtor Entities are all salaried employees.  All Seller Debtor Entity employees would be offered compensation and benefits that are substantially comparable in the aggregate to the compensation and benefits that they received prior to Closing.  Prior to tendering such offers, the Buyer would be required to provide the Selling Debtors Entities information to satisfy the Selling Debtor Entities that this "substantially comparable in the aggregate" requirement is met, which satisfaction would not be unreasonably withheld by the Selling Debtor Entities.  The Buyer would maintain this requisite level of compensation and benefits for a minimum of one year from the Closing.

36.     The significant terms of the Agreement with respect to employees are as follows:

(a)      Inactive U.S. Employees.  U.S. Employees not active as of the Closing due to disability, family medical leave, or other approved leaves of absence (the "Inactive Employees") would remain the Selling Debtor Entities' responsibility until the Inactive Employees returned to active employment in accordance with the Selling Debtor Entities' leave policies.  The Buyer would offer employment to Inactive Employees who subsequently return to active status in accordance with the Selling Debtor Entities' leave policies and would consider such employees Transferred U.S. Employees as of such date.

(b)      Employee Benefit Plans.  All employees transferred to the Buyer as of the Closing, and such employees' dependents and beneficiaries, would cease to participate in and would no longer be eligible for benefits under the Selling Debtor Entities' benefit plans (other than vested pension benefits) as of the Closing Date, but would commence participation in and become eligible for benefits under the Buyer's employee benefits plans.  Notwithstanding the preceding sentence, the Seller Debtor Entities' benefit plans which are welfare plans as defined under ERISA would retain liability, if any, for all claims incurred by United States employees (and their dependents) prior to the Closing Date.  The Buyer would recognize an employee's pre-Closing credited service with the Selling Debtor Entities for eligibility and vesting purposes.  In no case would credited service be recognized if such recognition would cause a duplication of compensation or benefits as between the Selling Debtor Entities and the Buyer.

(c)    Severance.  Except with respect to U.S. Employees terminated by the Sellers prior to the Closing Date or who otherwise would not become Transferred U.S. Employees, the Selling Debtor Entities would not have any liability to any Transferred U.S. Employees for severance, redundancy, termination, or otherwise on or after the Closing Date.  If the Buyer were to terminate the employment of a transferred U.S. Employee during the one-year period following the Closing Date under circumstances that would have rendered such U.S. Employee eligible for severance benefits had such termination occurred prior to Closing Date, the Buyer would be required to provide such employee the greater of (a) the severance benefits provided for under the terms of the Sellers' severance plan applicable as of the Closing Date, taking into account such U.S. Salaried Employee's combined service with the Buyer or (b) the severance benefits under any applicable Buyer's severance plan or policy; and if severance costs are incurred by any Seller with respect to any Transferred U.S. Employee, all such costs would be immediately reimbursed by the Buyer.  If the Selling Debtor Entities are required to pay severance to non-transferring U.S. Employees, then the Buyer would be restricted from recruiting or hiring such employees until one year after the Closing Date.

(d)    COBRA.  The Selling Debtor Entities would retain responsibility for all liabilities for claims of the U.S. Employees transferred to the Buyer (i) related to compliance with the requirements of continuation coverage under certain sections of the Internal Revenue Code and ERISA or (ii) as the result of any "qualifying event," within the meaning of Section 4980B(f)(3) of the Internal Revenue Code, which occurs prior to the Closing.

K.    Bidding Procedures

37.    The Sale of the Sale Businesses would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The  Selling Debtor Entities believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the value of the Sale Businesses for the benefit of the Sellers, including the Selling Debtor Entities, their estates, their stakeholders, and other interested parties.  Accordingly, the Selling Debtor Entities seek approval of the Bidding Procedures for the Sale of the Sale Businesses.

38.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").  As set forth below, the Debtors wish to set a Bid Deadline (as defined below) of May 11, 2009.  In light of the short

timeframe between the Bidding Procedures hearing and the proposed Bid Deadline, upon the

filing of this Motion, the Sellers would commence the process of contacting potential bidders

and will open the virtual data room to such parties even prior to the Bidding Procedures hearing

to allow such parties the time necessary to conduct due diligence and submit any competing bids.

        39.     The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide, in

relevant part, as follows:[17]

     (a)   <u>Participation Requirements</u>:  To ensure that only bidders with financial ability and a serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the Bidding Procedures establish certain requirements that a potential bidder would have to satisfy to become a "Qualified Bidder":  (i) executing a confidentiality agreement in form and substance satisfactory to Delphi, (ii) providing the Sellers with certain financial assurances, including current audited financial statements or such other forms of financial disclosure and credit-quality support or enhancement acceptable to the Sellers and their financial advisors regarding such bidder's ability to close, and (iii) submitting a preliminary (non-binding) written proposal reflecting (A) the purchase price range, (B) any assets and/or equity interests expected to be excluded, (C) the structure and financing of the transaction, (D) any anticipated regulatory approvals required to close the transaction, (E) the anticipated time frame and any anticipated impediments to obtaining such approvals, (F) any additional conditions to Closing that the Qualified Bidder may wish to impose, and (G) the nature and extent of any due diligence the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

     (b)   <u>Due Diligence</u>:  All Qualified Bidders would be afforded an opportunity to participate in the diligence process.  The Sellers would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.

     (c)   <u>Bid Deadline</u>:  All bids would have to be received not later than 11 a.m. (prevailing Eastern time) on May 11, 2009 (the "Bid Deadline").  The Sellers could extend the Bid Deadline once or successively, but would not be obligated to do so.

     (d)   <u>Bid Requirements</u>:  All bids would be required to include the following: (i) a letter stating that the bidder's offer would be irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the Agreement, purchase price, and proposed schedules, (iii) a good faith deposit in the amount of $20 million, and (iv) satisfactory

---

[17]   In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(e)    Qualified Bids: To be deemed a "Qualified Bid," among other things, a bid would be required to (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are similar to and are not materially more burdensome or conditional than those contained in the Agreement, (ii) have a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Preliminary Purchase Price, plus the amount of the Break-Up Fee, plus the aggregate amount of the Advance Payments, plus $1,000,000 in the case of an initial Qualified Bid, and $500,000 in the case of any subsequent Qualified Bids over the immediately preceding Qualified Bid, (iii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iv) not be conditioned on bid protections or such bid being deemed the Successful Bid by the Sellers, (v) contain acknowledgements and representations that the bidder (A) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement, (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than 15 days after entry of the Sale Approval Order, subject to the receipt of any governmental approvals, which would have to be obtained 60 days after entry of such order, and (vii) be received by the Bid Deadline.  The Selling Debtor Entities would retain the sole right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the bid requirements described in this subsection (e), including bids for a portion of the Acquired Assets.  Notwithstanding the foregoing, the Buyer would be deemed a Qualified Bidder, and the Agreement would be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid would be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than the Agreement would be referred to as a "Subsequent Bid."

(f)    Conduct Of Auction: If the Selling Debtor Entities receive at least one Qualified Bid in addition to that of the Buyer, they would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on May 15, 2009 or such later time as the Sellers notify all Qualified Bidders who have submitted Qualified Bids in accordance with the procedures outlined in the Bidding Procedures, which include the following: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would inform the Selling Debtor Entities whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Selling Debtor Entities would provide such bidders with copies of the Qualified Bid which the Selling Debtor Entities then believe would be the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all Subsequent Bids, (iv) the Sellers would be able to employ and announce at the Auction additional procedural rules that are

reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of this Court entered in connection with the Sale, and (v) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $500,000 higher than the previous bid or bids, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

(g)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, the Sellers, in consultation with their advisors, would review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the "Successful Bid(s)") and the bidder(s) making such bid (the "Successful Bidder(s)").  The Selling Debtor Entities would sell the Acquired Assets for the highest or otherwise best Qualified Bid to the Successful Bidder(s) upon the approval of such Qualified Bid by this Court after the Sale Hearing.

(h)    Sale Hearing: The Selling Debtor Entities request that the Sale Hearing be scheduled for May 21, 2009 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing or any portion thereof, such as with respect to the proposed assumption and assignment of a particular executory contract, could be adjourned or rescheduled in the Debtors' sole discretion, subject to Bankruptcy Court approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.  If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Buyer), the Selling Debtor Entities would report the same to the Bankruptcy Court at the Sale Hearing and would proceed with a sale of the Acquired Assets to the Buyer following entry of the Sale Order.  If the Sellers do receive additional Qualified Bids, then at the Sale Hearing the Selling Debtor Entities would seek approval of the Successful Bid, and, at the Sellers' election, the second highest or best Qualified Bid(s) (the "Alternate Bid(s)," and such bidder(s), the "Alternate Bidder(s)").  Following approval of the Sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of:  (i) failure of a condition precedent beyond the control of either the Sellers or the Successful Bidder(s) or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) would be deemed to be the Successful Bid(s) and the Sellers would be authorized, but not directed, to effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Court.  In accordance with the Supplemental Case Management Order, objections to the sale must be filed seven days prior to the Sale Hearing, except that objections to the conduct of the Auction or the Selling Debtor Entities' selection of the Successful Bidder(s) could be made within the two business days following the Auction or at the Sale Hearing, whichever is earlier.

(i)    Return Of Good Faith Deposits:  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder(s)) would be held in an interest-bearing escrow account and all Qualified Bids would remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders) until two Business Days following the Closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, would be applied against the payment of

the Purchase Price upon Closing of the Sale to the Successful Bidder(s).  If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers would not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit would irrevocably become property of the Sellers.  Subject to the preceding sentence, on the Return Date, the Sellers would be required to return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

(j)    Reservation Of Rights:  The Sellers, after consultation with the agents for their secured lenders and the Committee:  (i) may determine which Qualified Bid(s), if any, is the highest or otherwise best offer and (ii) may at any time reject any bid (other than the Buyer's initial bid) that is determined to be:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Sellers, their estates, and their stakeholders as determined by the Sellers in their sole discretion.

L.    Bid Protections

40.    Since November 2007 and April 2008, for the Ride Dynamics Business and Brakes Business, respectively, the Buyer and its affiliates have expended, and likely would continue to expend, considerable time, money, and energy pursuing the purchase of the Sale Businesses.  The Buyer has engaged in extended arm's length and good faith negotiations regarding a possible sale and the Buyer is not an "insider" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.  Furthermore, the Buyer has worked on an expedited timeline to reach an agreement with the Sellers.  The Agreement is the culmination of all of these efforts.

41.    In recognition of this expenditure of time, energy, and resources, the Sellers have agreed to provide certain bid protections to the Buyer.  Specifically, the Agreement provides for, and the Selling Debtor Entities respectfully request that this Court approve, a Break-Up Fee payable by the Sellers to the Buyer in the amount of $2,940,000 (representing approximately 3.0% of the sum of the Preliminary Purchase Price plus the estimated amount of the China Advance Payment) if the Sellers consummate an Alternative Transaction within

eighteen months after termination of the Agreement; provided that the Buyer is not in material

breach of the Agreement and the Agreement was not terminable based on a nonappealable

Governmental Order restraining a material portion of the transaction.

42.    If the Buyer becomes entitled to receive any Break-Up Fee, as applicable,

then such Break-Up Fee would be the sole and exclusive remedy of the Buyer, whether at law or

in equity, for any breach by Delphi or any of its affiliates of the terms and conditions of the

Agreement or the Deposit Escrow Agreement.  The Agreement does not provide for (and the

Buyer is not entitled to) any type of expense reimbursement.

43.    The Break-Up Fee was a material inducement for, and a condition of, the

Buyer's entry into the Agreement.  The Selling Debtor Entities believe that the Break-Up Fee is

fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and

negotiation undertaken by the Buyer in connection with the Sale and (b) the fact that the Buyer's

efforts have increased the chances that the Selling Debtor Entities would receive the highest or

otherwise best offer for the Acquired Assets.

44.    The Buyer is unwilling to commit to hold open its offer to purchase the

Acquired Assets under the terms of the Agreement without the approval of the Break-Up Fee and

the Bidding Procedures Order.  Thus, absent entry of the Bidding Procedures Order and approval

of the Break-Up Fee, the Selling Debtor Entities would lose the opportunity to obtain what they

believe to be the highest and best offer for the Acquired Assets.

45.    Moreover, payment of the Break-Up Fee would not diminish the value of

the Selling Debtor Entities' estates.  The Sellers would not expect to pay the Break-Up Fee unless

they do so to accept an alternative Successful Bid, which must exceed the price offered by the

Buyer by an amount more than the Break-Up Fee.  Moreover, the portion of the Break-Up Fee

attributable to the Selling Debtor Entities' assets would be in proportion to the allocation of the

Purchase Price to such Debtors, so the burden of the Break-Up Fee would not outweigh the

benefits to the Selling Debtor Entities' estates. The Selling Debtor Entities thus request that this

Court authorize payment of the Break-Up Fee, to the extent triggered, pursuant to the terms and

conditions of the Agreement.

M.      Assumption And Assignment Of Contracts

46.      The Selling Debtor Entities seek authority under section 365 of the

Bankruptcy Code to assume and assign the Assumed U.S. Contracts to the Buyer or the

Successful Bidder(s), as the case may be.  The approximate cost to cure the Assumed U.S.

Contracts is $33,196.15 for the Brakes Business and $419,859.79 for the Ride Dynamics

Business.  In connection with the proposed Sale, the Selling Debtor Entities also seek authority

under section 363 of the Bankruptcy Code to assign the Postpetition Contracts to the Buyer or

the Successful Bidder, as the case may be.  The Debtors believe that there are no past due

obligations under the Postpetition Contracts.

47.      In addition, at least 20 days prior to the Sale Hearing, the Selling Debtor

Entities propose to file with this Court and serve on each non-Debtor party to an Assumed U.S.

Contract a notice substantially in the form attached hereto as Exhibit E (the "Buyer

Assumption/Assignment Notice").  The Buyer Assumption/Assignment Notice would identify

the Buyer as the party that would be assigned all of the Selling Debtor Entities' right, title, and

interest in the Assumed U.S. Contracts, subject to completion of the bidding process provided

under the Bidding Procedures.  The Selling Debtor Entities may (but would not be required to)

serve the Buyer Assumption/Assignment Notice and the Qualified Bidder

Assumption/Assignment Notice (as defined below) upon each non-Debtor counterparty to the

Postpetition Contracts as a means of fulfilling any requirement under the applicable contract to provide notice of assignment.

48.     The Debtors propose that Exhibit 1 to the Buyer Assumption/Assignment Notice be an individualized schedule that would identify a non-Debtor counterparty's particular Assumed U.S. Contract and the cure amount associated with such contract.  Under article 8.2 of the Confirmed Plan, the deadline to seek payment of cure for a particular executory contract or object to the Debtors' proposed cure amounts for executory contracts has passed.  Pursuant to this Court's orders, except for one counterparty,[18] cure amounts have been established for each of the Assumed U.S. Contracts and such counterparties have no further right to challenge the cure amount.

49.     To the extent that a non-Debtor counterparty to an Assumed U.S. Contract believes that adequate assurance has not been established, the Debtors propose that such counterparty be required to file an objection to the assumption and/or assignment of the Assumed U.S. Contract within ten days of service of the Buyer Assumption/Assignment Notice, and that such counterparty be required to state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.  Except as otherwise indicated on the individualized Exhibit 1 to the Buyer Assumption/Assignment Notice, for the reasons set forth in the preceding paragraph, counterparties to the Assumed U.S. Contracts would only have the right to object to the adequate assurance of future performance by the Buyer.

50.     The Debtors believe that these procedures are fair and reasonable and will afford counterparties proper notice of the cure amounts associated with the Assumed U.S.

---

[18]    The Debtors' records show that only one counterparty to an Assumed U.S. Contract has preserved its right to object to the Debtors' proposed cure amount in connection with the Plan.  The individualized Exhibit 1 attached to the Buyer Assumption/Assignment Notice for the non-Debtor counterparty will state clearly and conspicuously that such objection right has been preserved.

Contracts. The Debtors submit that no other notice is necessary. To be clear, the notices of assumption and assignment will be sent only to contract counterparties to the Assumed U.S. Contracts and cure would be paid only to such counterparty. Moreover, the Selling Debtor Entities do not believe there are any postpetition defaults with respect to each Assumed U.S. Contract. To the extent that a counterparty disputes this assertion, however, the counterparty to the Assumed U.S. Contract could include such claim in its objection to the assumption and assignment of its contract.

        51.    To the extent competing Qualified Bids are submitted, then on the later to occur of 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, the Selling Debtor Entities propose to send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as Exhibit F, to each non-Debtor counterparty to an Assumed U.S. Contract identifying any Qualified Bidders as potential parties to which the Assumed U.S. Contracts would be assigned. The Qualified Bidder Assumption/Assignment Notice would give the Selling Debtor Entities the ability to address promptly any adequate assurance issues that counterparties may have with any of the Qualified Bidders. Non-Debtor counterparties to any Assumed U.S. Contract would be required to file an objection to the assumption and/or assignment of the Assumed U.S. Contract two business days prior to the Sale Hearing and such counterparties would be required to state, with specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court. The Debtors propose that objections to the Qualified Bidder Assumption/Assignment Notice not raise issues that could have been asserted in response to the Buyer Assumption/Assignment Notice, but instead be limited to issues unique to the Qualified Bidders.

N.     Notice Of Sale Hearing

52.     Within two business days after entry of the Bidding Procedures Order (the

"Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the

Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the

Bidding Procedures Order by overnight mail, postage prepaid, upon (i) the U.S. Trustee, (ii)

counsel for the Buyer, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity

Committee, (v) counsel for the Debtors' postpetition credit facility, (vi) all entities known to have

expressed an interest in a transaction with respect to the Acquired Assets during the past six

months,[19] (vii) all entities known to have asserted any lien, claim, interest, or encumbrance in or

upon the Acquired Assets, (viii) all United States federal, state, and local regulatory or taxing

authorities or recording offices, including but not limited to environmental regulatory authorities,

which have a reasonably known interest in the relief requested by the Motion, (ix) all parties to

Assigned Contracts, (x) the United States Attorney's office, (xi) the United States Department of

Justice, (xii) the Securities and Exchange Commission, (xiii) the Internal Revenue Service, (xiv)

all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket

No. 2883) (the "Supplemental Case Management Order")), and (xv) such other entities as are

required to be served with notices under the Supplemental Case Management Order.

O.     Publication Notice

53.     The Selling Debtor Entities also request, pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d), that publication of a notice of the Sale in a form substantially similar to the

---

[19]     All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

form annexed hereto as Exhibit G in the Wall Street Journal (U.S. and International Editions),

the Financial Times, and China Automotive News, within five business days following entry of

the Bidding Procedures Order or as soon as practicable thereafter, be deemed proper notice to

any other interested parties whose identities are unknown to the Selling Debtor Entities.

Applicable Authority

P.    Approval Of Bidding Procedures

        54.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

        55.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's section 363(b) motion is

a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's

decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the

time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

        56.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992)(citations omitted). Thereafter, "[p]arties

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to

raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections." Lionel Corp., 722 F.2d at 1071.

57.     As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be "so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74,

80 (Bankr. D. Mass. 2001) (citations omitted).

58.     As set forth above, the Selling Debtor Entities have sound business

justifications for pursuing a sale process at this time. Although the Selling Debtor Entities

believe that the Sale Businesses are strong, the Sale Businesses do not fit the Debtors' anticipated

product portfolio under their transformation plan. Thus, the Selling Debtor Entities have

determined that the value of the Sale Businesses to the Debtors would be maximized through

their divestiture. Moreover, delaying the sale of the Acquired Assets could result in the erosion

of the Sale Businesses' value. Finally, during this time of economic uncertainty in the

automotive industry, pursuing the sale process at this time would boost liquidity because the

Advance Payments as set forth in the Agreement provide funds enabling Delphi to make

necessary capital expenditures. The sale of these non-core assets would therefore not only assist

the Company as it continues to rationalize its product offerings, but would also provide cash for

the Company to help weather the current economic crisis.  Accordingly, there is a sound business

purpose for pursuing the sale process promptly and in accordance with the Bidding Procedures.

59.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may

be reluctant to make an offer because it knows that even if it reaches agreement with the debtor,

its offer will be subject to a higher bid by another party.  Pre-approved bidding procedures

address these concerns by assuring initial bidders that any auction procedure would be

reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures also

reflects sound business judgment.

Q.    Approval Of The Bid Protections

60.    Bidding incentives encourage potential bidders to invest the requisite time,

money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to

the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11

process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citation

omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.

See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has

seriously argued the inapplicability of the business judgment test, and if any such argument had

been made, the Court would be compelled . . . to reject it."); United States Trustee v. Bethlehem

Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL 21738964, at *8 n.13

(S.D.N.Y. July 28, 2003) (court should approve agreements providing bidding incentives "unless

they are unreasonable or appear more likely to chill the bidding process than to enhance it").

One court, explaining the force of the business judgment rule in this context, stated that "the

business judgment rule does not become inapplicable simply because a court decides a break-up
fee is too large." Integrated Resources, 147 B.R. at 660.

61.    In this district, the three questions for a court to consider when assessing a
break-up fee are: "(1) is the relationship of the parties who negotiated the break-up fee tainted by
self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is
the amount of the fee unreasonable relative to the proposed purchase price." Id. at 657-58.

62.    Here, the Selling Debtor Entities seek authority to utilize the Bidding
Procedures and Break-Up Fee in the event that the Buyer is not ultimately the Successful Bidder
or must increase the Buyer's bid price to become the Successful Bidder.  The Break-Up Fee is
fair and reasonable in amount, particularly in view of the efforts previously made and to be made
by the Buyer and the risk to the Buyer of being used as a stalking horse.  Moreover, the required
payment under the proposed Break-Up Fee ($2,940,000, representing approximately  3.0% of the
sum of the Preliminary Purchase Price plus the estimated amount of the China Advance
Payment) not only constitutes a fair and reasonable percentage of a proposed purchase price, but
is within the range that is customary for similar transactions of this type in the bankruptcy
context.  See, e.g., In re Apex Silver Mines, Ltd., Case No. 09-101-82 (JMP) (Bankr. S.D.N.Y.
2009) (approving break-up fee representing 4.51% of total consideration provided under
purchase agreement); In re U.S. Wireless Data, Inc., Case No. 04-12075 (RDD) (Bankr.
S.D.N.Y. 2004) (approving 3% break-up fee in asset sale agreement); In re Allegiance Telecom,
Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and
expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-
16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior
transaction); In re Genuity Inc., Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. 2002) (allowing

4.13% break-up fee if court approved alternative transaction); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee if seller consummated transaction with alternative bidder); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to 4.25% depending on value of alternative transaction).  In addition, the payment of the Break-Up Fee is reasonable in light of (i) the significant investment in time and resources that the Buyer would have contributed as the stalking horse bidder and (ii) the fact that the Agreement does not provide any expense reimbursement to the Buyer.

> 63.    The Selling Debtor Entities submit that the Bidding Procedures and the Break-Up Fee have encouraged competitive bidding because the Buyer would not have entered into the Agreement without such provisions.  The Bidding Procedures and the Break-Up Fee have thus induced a bid that otherwise would not have been made.  Finally, the mere existence of the Bidding Procedures and Break-Up Fee permit the Selling Debtor Entities to insist that competing bids be materially higher or otherwise better than the Agreement, which would produce a clear benefit to the Sellers, including the Selling Debtor Entities, their estates, and their stakeholders.

R.    Sale Of The Acquired Assets Free And
      Clear Of Liens, Claims, Encumbrances, And Interests

> 64.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

65.    Here, section 363(f) of the Bankruptcy Code permits the Selling Debtor Entities to sell the Acquired Assets free and clear of all liens, claims (including successor liability claims and claims arising under the de facto merger doctrine), and encumbrances, other than the Permitted Encumbrances.  See, e.g., In re Refco, Inc., Case No. 05-60006 (Bankr. S.D.N.Y. Nov. 15, 2006) (authorizing certain debtors to sell customer lists free and clear of interests and claims, including successor liability claims); In re Refco, Inc., Case No. 05-60006 (Bankr. S.D.N.Y. Nov. 14, 2005) (authorizing debtors to sell regulated commodities futures merchant business free and clear of interests and claims, including successor liability claims); In re PSINet Inc., Case No. 01-13213 (Bankr. S.D.N.Y. Jan. 15, 2002) (authorizing debtors to sell certain shares free and clear of liens and claims, including claims otherwise arising under doctrines of successor liability); see also In re Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . .successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress."), aff'd, 332 F.3d 283 (3d Cir. 2003).  Because the Buyer is not a successor to the Selling Debtor Entities and the Sale does not constitute a de facto merger, neither successor liability claims nor de facto merger claims should follow the Acquired Assets of the Selling Debtor Entities.

66.    Except for Permitted Encumbrances, each lien, claim, or encumbrance that is not the result of an assumed liability satisfies at least one of the five conditions of section 363(f), and the Selling Debtor Entities submit that any such lien, claim, or encumbrance would

be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and

defenses that the Selling Debtor Entities may possess with respect thereto.  Accordingly, except

for the liens resulting from the Assumed Liabilities or the Permitted Encumbrances, the Selling

Debtor Entities request that the Acquired Assets be transferred to the Successful Bidder(s) free

and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances to

attach to the proceeds of the Sale of the Acquired Assets.

S.      The Buyer Is A Good Faith Purchaser Pursuant Under The Bankruptcy Code, Including
        Section 363(m) Of The Bankruptcy Code, And The Transaction
        Contemplated By The Agreement Should Carry The
        Protections Of Section 363(n) Of The Bankruptcy Code

        67.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

> good faith of a purchaser is shown by the integrity of his conduct during the
> course of the sale proceedings; where there is a lack of such integrity, a good faith
> finding may not be made.  A purchaser's good faith is lost by "fraud, collusion
> between the purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former Bankruptcy

Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc. v. Pan Am

Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y. June 18,

1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

68.     Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n).

69.     The Selling Debtor Entities submit, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction. Throughout the negotiations, the Buyer has at all times acted in good faith. Moreover, to the extent that the Acquired Assets are sold to a Successful Bidder, it will be because of a well-planned competitive process and intense negotiations at arm's length to be conducted at an Auction. As a result, in exchange for the Acquired Assets and Assumed Liabilities that constitute the Sale Businesses, Delphi will receive the Purchase Price of $90 million, subject to certain adjustments explained above. Without limiting the Buyer's obligations to make Advance Payments or the amount of any related Price Adjustment under the Agreement, the estimated upward pre-Closing adjustment for Advance Payments referred to in the Agreement, assuming a Closing on November 1, 2009, approximates $18 million. The Purchase Price represents the best offer received as a result of Delphi's extensive marketing of the Sale Businesses, and the Purchase Price is subject to further competitive bidding at an Auction. As a result of the foregoing, the Selling Debtor Entities request that the court make a finding that the Purchase Price to be paid by the Buyer is fair and reasonable, is the highest or otherwise best offer for the Acquired Assets, and constitutes reasonably equivalent value and fair consideration under any applicable law and that the Buyer or the Successful Bidder, as the case may be, has purchased the Acquired Assets and assumed the Assigned Contracts and Assumed Liabilities in good faith

within the meaning of the Bankruptcy Code (including but not limited to section 363(m) of the

Bankruptcy Code) or in similar applicable state law.  Because a key element of a good faith

finding is that the Buyer's successful bid is not the product of fraud or collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders, the Selling Debtor Entities further request that this Court make a finding that the

transactions contemplated by the Agreement are not avoidable under section 363(n) of the

Bankruptcy Code.

T.    The Assumption And Assignment Of The Assumed U.S. Contracts

        70.    Section 365(f)(2) of the Bankruptcy Code provides that:

> The trustee may assign an executory contract or unexpired lease of the debtor
> only if –
>
> (A)        the trustee assumes such contract or lease in accordance with the
> provisions of this section; and
>
> (B)        adequate assurance of future performance by the assignee of such
> contract or lease is provided, whether or not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2).

        71.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements

for assuming an unexpired lease or executory contract of a debtor.  It provides:

> (b)(1)        If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease unless, at
> the time of the assumption of such contract or lease, the trustee –
>
>     (A)    cures, or provides adequate assurance that the trustee will promptly
> cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

72.    Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds). Courts have consistently held that the phrase does not require total assurances. See In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will fall "considerably short of an absolute guaranty of performance"). In fact, adequate assurance has been provided by demonstrating the Buyer's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

73.    To the extent that any defaults exist under any prepetition executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Acquired Assets or any portion thereof, the Selling Debtor Entities would cure any such default.

As explained above, the Selling Debtor Entities have already determined the amount of such cure amounts. With respect to adequate assurance of future performance, the Buyer (i) has the financial resources to perform under the Assumed U.S. Contracts, shown by the contribution of RMB 800,000,000 (approximately $117 million at current exchange rates) in capital to the Buyer as reflected in the Buyer Parent's Business License, and (ii) is contractually required under the Agreement (a) to retain sufficient registered capital to meet its financial obligations with respect to the Purchase Price and (b) to provide adequate assurance of future performance under each Assumed U.S. Contract. Moreover, if necessary, the Selling Debtor Entities and/or the Buyer or Successful Bidder(s), as the case may be, will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Buyer or the Successful Bidder(s), as the case may be, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

74.    The Sale Hearing therefore will provide this Court and other parties-in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer or the Successful Bidder(s), as the case may be, to provide adequate assurance of future performance under the contracts to be assumed. This Court therefore should have a sufficient basis to authorize the Selling Debtor Entities to assume and assign the Assumed U.S. Contracts as set forth in the Agreement.

U.    Divestiture Authority And Relief From Transfer Taxes Pursuant to Articles 7.29 And 7.30 Of The Plan And Sections 363, 1123, And 1146 Of The Bankruptcy Code

75.    As set forth above, the Debtors decided to sell or wind-down their non-core product lines that do not fit into the Company's future strategic framework as part of their transformation plan. Accordingly, Article 7.29 of the Plan contemplates that the Debtors might enter into transactions to continue to divest their non-core businesses and that the Bankruptcy

Court could enter an order, on or prior to the effective date of the Plan, authorizing the Debtor(s) to sell assets free and clear of liens, claims, and encumbrances, pursuant to section 363 and 1123 of the Bankruptcy Code.  As described above, section 363(b) of the Bankruptcy Code permits debtors to sell property of the estate outside of the ordinary course of business upon notice and a hearing.  Correspondingly, section 1123(a)(5)(D) allows a confirmed plan of reorganization to provide for the sale of property of the estate free and clear of any lien.  The Selling Debtor Entities are, therefore, authorized pursuant to the Plan to seek the relief requested in the Motion.

76.    Furthermore, Article 7.30 of the Plan provides that:

> Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, shall not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

77.    Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. § 1146(c).  In a recent case, the Supreme Court held that transfers pursuant to a plan of reorganization must occur after confirmation of such plan if they are to be subject to section 1146(c).  Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2339 (2008).  Likewise, it is well established in the Second Circuit that the section 1146(c) transfer-tax exemption applies to property sold postconfirmation.  In re Jacoby-Bender, Inc., 758 F.2d 840, 841 (2d Cir. 1985).  In light of the foregoing, the Selling Debtor Entities submit that

the Sale should be exempt under section 1146(c) of the Bankruptcy Code from any stamp,

transfer, sales, recording, or similar taxes.

V.    Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

78.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."

79.    Courts in this district have waived these ten-day stays upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005)

("As I find that the required business need for a waiver has been shown, the order may provide

for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc.,

268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for

waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general, courts will

grant waivers when doing so is important to the Debtor's financial health.  See In re Second

Grand Traverse School, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving

ten-day stay because "time was of the essence"); In re Decora Industries, Inc., No. 00-4459, 2002

WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate

closing is required to remedy Debtors' precarious financial and business position. Accordingly,

the Court will waive the Rules 6004(h) and 6006(d), allowing the parties to close.").

80.    The Selling Debtor Entities expect to continue to market the Sale

Businesses to prospective buyers immediately after the Court enters the Bidding Procedures

Order and prior to the Sale Hearing.  During this time, however, Bankruptcy Rule 6004(h) would

preclude the Buyer from receiving the protections afforded by the Bidding Protections.  In

recognition of the time and effort expended by the Buyer in connection the Sale and to reduce

the Buyer's risk that the Selling Debtor Entities might obtain a higher and better offer for the Sale

Businesses during the ten days before the Bidding Procedures Order becomes final, the Buyer

should receive the protections afforded by the Break-Up Fee.  The Selling Debtor Entities

therefore respectfully request that the Bidding Procedures Order include a waiver of the ten-day

stay provided under Bankruptcy Rule 6004(h).

81.    Because the Selling Debtor Entities have demonstrated a need requiring

the immediate effectiveness of the Bidding Procedures Order, this Court should exercise its

authority under Bankruptcy Rule 6004(h) and waive the ten-day stay as it otherwise would apply

to the Bidding Procedures Order.

W.    Conclusion

82.    The Selling Debtor Entities submit that the granting of the Bidding

Procedures, Break-Up Fee, and Notice Procedures, the setting of a Bidding Procedures Hearing,

the setting of a Sale Hearing, and the entry of an order approving the Sale of the Acquired Assets

free and clear of liens, claims, and encumbrances, the assumption and/or assignment of the

Assigned Contracts, and the assumption of the Assumed Liabilities by the Buyer or the

Successful Bidder(s), as the case may be, are in the best interests of the Selling Debtor Entities'

estates and will maximize value for all stakeholders.

Notice

83.    Notice of this Motion has been provided in accordance with the

Supplemental Case Management Order and the Thirteenth Supplemental Order Under 11 U.S.C.

§§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures

(Docket No. 14534), entered December 4, 2008.  Specifically, the Selling Debtor Entities have

provided notice of this Motion to the Master Service List (as defined in the Supplemental Case

Management Order), each party who filed a notice of appearance or request for documents in

accordance with Bankruptcy Rule 2002, and all entities known to have expressed an interest in a

transaction with respect to the Acquired Assets during the past six months.  Further, after entry

of the Bidding Procedures Order, notice with respect to the Motion and Sale would be provided

in accordance with the Notice Procedures described herein.  In light of the nature of the relief

requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Selling Debtor Entities respectfully request that this Court enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Break-Up Fee, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) approving (i) the Sale of the Acquired Assets free and clear of liens, claims, and encumbrances to the Buyer or to the Successful Bidder, (ii) the assumption and/or assignment of the Assigned Contracts to the Buyer or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Buyer or the Successful Bidder, and (c) granting them such other and further relief as is just.

Dated:       New York, New York
             March 31, 2009

                         SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP


                         By:    /s/ John Wm. Butler, Jr.
                                John Wm. Butler, Jr.
                                John K. Lyons
                                Ron E. Meisler
                         333 West Wacker Drive, Suite 2100
                         Chicago, Illinois 60606
                         (312) 407-0700

                                     - and -


                         By:    /s/ Kayalyn A. Marafioti
                                Kayalyn A. Marafioti
                                Thomas J. Matz
                         Four Times Square
                         New York, New York 10036
                         (212) 735-3000

                         Attorneys for Delphi Corporation, et al.,
                           Debtors and Debtors-in-Possession