Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
      In re                             :     Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :     Case No. 05-44481 (RDD)
                                        :
                 Debtors.     :     (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 363, 365, 1123, AND 1146 AND FED. R.
BANKR. P. 2002, 6004, 6006, AND 9014 AUTHORIZING AND APPROVING
(I) SALE OF DEBTORS' ASSETS COMPRISING DEBTORS' BRAKES AND
RIDE DYNAMICS BUSINESSES FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(III) ASSUMPTION OF CERTAIN LIABILITIES

("BRAKES AND RIDE DYNAMICS SALE APPROVAL ORDER")

Upon the motion, dated March 31, 2009 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for orders pursuant to 11 U.S.C. §§ 363, 365,

1123, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a)(i) approving the bidding

procedures, (ii) granting certain bid protections, (iii) approving the form and manner of sale

notices, and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and

approving (i) the sale (the "Sale") of certain of the Selling Debtor Entities' (defined below) assets

(the "Acquired Assets") comprising substantially all of the assets primarily used in the Selling

Debtor Entities' brakes business (the "Brakes Business") and ride dynamics business (the "Ride

Dynamics Business," together with the "Brakes Business, the "Sale Businesses"), free and clear

of liens, claims, and encumbrances, to BeijingWest Industries Co., Ltd. and certain of its

2

affiliates (the "Buyers") pursuant to the Master Sale And Purchase Agreement, dated March 30, 2009 (such Master Sale and Purchase Agreement, including all schedules, exhibits, and related agreements and documents, the "Agreement," a copy of which (without such schedules, exhibits, and related agreements and documents, other than Schedule 3.6.1 of the Agreement) is attached hereto as Exhibit 1), by and between the Buyers and Delphi and certain of its affiliates, including certain affiliated chapter 11 Debtors as set forth in the Agreement (the "Selling Debtor Entities"),[1] or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases as defined in the Agreement (the "Assumed U.S. Contracts") and the assignment of certain postpetition executory contracts and unexpired leases as defined in the Agreement (the "Postpetition Contracts," and collectively with the Assumed U.S. Contracts, the "Assigned Contracts,") to the Buyers or to the party submitting the highest or otherwise best bid (the "Successful Bidder"), and (iii) the assumption of certain liabilities as defined in the Agreement (the "Assumed Liabilities") by the Buyers or the Successful Bidder; and the Court having entered an order on April [__], 2009 (the "Bidding Procedures Order") (Docket No. [_____]) (a) approving the Bidding Procedures, (b) approving the break-up fee, (c) approving the form and manner of sale notices, and (d) setting the Sale Hearing; and the Sale Hearing having been held on May 21, 2009, at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion and the arguments of counsel made and the evidence proffered or adduced at and on the record of the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the

---

[1]    Under the Agreement, the Selling Debtor Entities are Delphi Corporation, Delphi Automotive Systems LLC, and Delphi Technologies, Inc.  Certain assets will be sold under the Agreement by non-Debtor affiliates of the Selling Debtor Entities listed on Schedule 1 to the Agreement.  The Selling Debtor Entities and the selling non-Debtor affiliates are collectively referred to as the "Sellers."

Selling Debtor Entities, their estates, their stakeholders, and all other parties-in-interest; and after

due deliberation thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over the Motion and the transactions

contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections

363, 365, 1123, and 1146 of 11 U.S.C. §§ 101-1330, as amended and in effect on October 8,

2005 (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014.

C.    As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of Debtors' counsel at the Sale Hearing, (i) proper, timely,

adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, the Bid Deadline, the

Auction, and the assumption and assignment of the Assumed U.S. Contracts, and the Cure

Amounts as approved herein has been provided in accordance with 11 U.S.C. §§ 102(l), 363, and

365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 and such notice was good, sufficient, and

appropriate under the circumstances and (ii) no other or further notice of the Motion, the Sale

Hearing, the Sale, the Bid Deadline, the Auction, or the assumption and assignment of the

Assumed U.S. Contracts as provided herein is necessary or shall be required.

D.    As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when and where appropriate.  See Fed. R. Bankr. P. 7052.

4

Hearing, the Selling Debtor Entities have marketed the Acquired Assets and conducted the sale

process in compliance with the Bidding Procedures set forth in the Motion and in a manner that

afforded a full, fair, and reasonable opportunity for any party to make a higher or better offer to

purchase the Acquired Assets.

E.      The Selling Debtor Entities (i) have full power and authority to execute

the Agreement and all other applicable documents contemplated thereby, and the transfer and

conveyance of the Acquired Assets by the Selling Debtor Entities has been duly and validly

authorized by all necessary action of the Selling Debtor Entities, (ii) have all of the power and

authority necessary to consummate the transactions contemplated by the Agreement, and (iii)

have taken all action necessary to authorize and approve the Agreement and to consummate the

transactions contemplated thereby, and no consents or approvals, other than those expressly

provided for in the Agreement, are required for the Selling Debtor Entities to consummate such

transactions.

F.      The Selling Debtor Entities have demonstrated (i) good, sufficient, and

sound business purposes and justification for the Sale because, among other things, the Selling

Debtor Entities and their advisors diligently and in good faith analyzed other available options in

connection with the disposition of the Acquired Assets and determined that (a) the terms and

conditions set forth in the Agreement, (b) the transfer to Buyers of the Acquired Assets pursuant

to the terms of the Agreement, and (c) the Purchase Price agreed to as reflected in the Agreement

are all fair and reasonable and together constitute the highest or otherwise best value obtainable

for the Acquired Assets and (ii) that compelling circumstances for the Sale pursuant to 11 U.S.C.

§ 363(b) prior to the effective date of the Debtors' Confirmed Plan, as it may be modified, exist

5

because, among other things, absent the Sale the value of the Acquired Assets will be substantially diminished.

        G.      The terms of the Agreement are fair and reasonable in all respects.

        H.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including without limitation: (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel for the Buyers, (iii) counsel for the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee"), (iv) counsel for the official committee of equity security holders appointed in these chapter 11 cases, (v) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months, (vi) all entities known to have asserted any Interests and/or Claims (as defined below) in, upon, or against the Acquired Assets, (vii) all United States federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all counterparties to Assigned Contracts, (ix) the United States Attorney's office, (x) the United States Department of Justice, (xi) the Securities and Exchange Commission, (xii) the Internal Revenue Service, (xiii) all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")), and (xiv) such other entities as are required to be served with notices under the Supplemental Case Management Order.

I.      The Buyers are not "insiders" of any of the Debtors as that term is defined

in 11 U.S.C. § 101(31).

J.      The Agreement was negotiated, proposed, and entered into by the Selling

Debtor Entities and the Buyers without collusion, in good faith, and from arm's-length

bargaining positions.  Neither the Selling Debtor Entities nor the Buyers have engaged in any

conduct that would cause or permit the Sale or any part of the transactions contemplated by the

Agreement to be avoidable under 11 U.S.C. § 363(n).

K.      The Buyers are good faith purchasers, as that term is used in the

Bankruptcy Code, including but not limited to  11 U.S.C. § 363(m) or in similar applicable state

law, and, as such, are entitled to all of the protections afforded thereby.  The Buyers will be

acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions

contemplated by the Agreement at all times after the entry of this order.

L.      The consideration provided by the Buyers for the Acquired Assets

pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for

the Acquired Assets, (iii) will provide a greater recovery for the Selling Debtor Entities'

stakeholders than would be provided by any other practical available alternative, and

(iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code

and under the laws of the United States, any state, territory, or possession thereof, or the District

of Columbia.

M.      The Sale must be approved promptly to preserve the viability of the Sale

Businesses as going concerns. The Sale is consistent with and is contemplated under the terms of

the First Amended Plan Of Reorganization Of Delphi Corporation And Certain Affiliates,

Debtors And Debtors-In-Possession, As Modified (as amended, the "Plan") confirmed by order

7

of this Court on January 25, 2008 (Docket No. 12359), and, accordingly, constitutes a transfer to

which section 1146(c) of the Bankruptcy Code applies.

        N.      The transfers of the Acquired Assets to the Buyers will be legal, valid, and

effective transfers of the Acquired Assets and shall vest the Buyers with all right, title, and

interest of the Selling Debtor Entities to the Acquired Assets free and clear of any and all liens,

claims, interests, and encumbrances (including, but not limited to, Encumbrances as defined in

the Agreement, but excluding Permitted Encumbrances and Assumed Liabilities, each as defined

in the Agreement) of any type whatsoever (whether known or unknown, secured or unsecured, in

the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled,

noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed,

contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-

material, disputed or undisputed, whether arising prior to or subsequent to the commencement of

the chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or

otherwise, including claims otherwise arising under doctrines of de facto merger or successor

liability), including but not limited to those (i) that purport to give to any party a right or option

to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtor

Entities' or the Buyers' interest in the Acquired Assets, or any similar rights, and (ii) relating to

taxes arising under or out of, in connection with, or in any way relating to the operation of the

Sale Businesses prior to the Closing Date, including the transfer of the Acquired Assets to the

Buyers (all such liens, claims, interests, and encumbrances listed herein, the "Interests and/or

Claims").

        O.      If the Sale of the Acquired Assets with respect to the Selling Debtor

Entities were not free and clear of all Interests and/or Claims as set forth in the Agreement and

8

this order, or if the Buyers would, or in the future could, be liable for any of the Interests and/or

Claims as set forth in the Agreement and this order, the Buyers would not have entered into the

Agreement and would not consummate the Sale or the transactions contemplated by the

Agreement, thus adversely affecting the Selling Debtor Entities, their estates, and their

stakeholders.

P.    The Selling Debtor Entities may sell their interests in the Acquired Assets

free and clear of all Interests and/or Claims because, in each case, one or more of the standards

set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests and/or Claims

who did not object to the Sale, or withdrew their objections to the Sale, are deemed to have

consented to the Sale pursuant to 11 U.S.C. § 363(f)(2), and all holders of Interests and/or

Claims are adequately protected by having their Interests and/or Claims, if any, attach to the cash

proceeds of the Sale ultimately attributable to the property against or in which they claim an

Interest and/or assert a Claim with the same priority, validity, force, and effect as such Interests

and/or Claims attached to such property immediately before the closing of the Sale.

Q.    The Selling Debtor Entities have demonstrated that it is an exercise of

their sound business judgment to assume and/or assign the Assigned Contracts, as applicable, to

the Buyers in connection with the consummation of the Sale, and the assumption and/or

assignment of the Assigned Contracts is in the best interests of the Selling Debtor Entities, their

estates, and their creditors.  The Assigned Contracts being assigned to, and the liabilities being

assumed by, the Buyers are an integral part of the Acquired Assets being purchased by the

Buyers and, accordingly, such assumption and/or assignment of Assigned Contracts and

liabilities is reasonable and enhances the value of the Selling Debtor Entities' estates.

9

R.      The Selling Debtor Entities have (i) cured, or have provided adequate

assurance of cure, of any default existing prior to the Closing of the Sale under all of the

Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), and (ii) provided

compensation or adequate assurance of compensation to any party for any actual pecuniary loss

to such party resulting from a default prior to the date hereof under any of the Assigned

Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B).  The Buyers shall have no further

obligations to make any payment or provide any performance to cure any defaults or breaches

arising on or before the closing of the assignment of the Assigned Contracts.

S.      The Buyers have provided adequate assurance of their future performance

of and under the Assigned Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and

365(f)(2)(B).  Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed and

assigned under the Agreement shall be assigned and transferred to, and remain in full force and

effect for the benefit of, the Buyers notwithstanding any provision in the contracts or other

restrictions prohibiting their assignment or transfer.

T.      Approval of the Agreement and consummation of the Sale of the Acquired

Assets and assignment of the Assigned Contracts at this time are in the best interests of the

Selling Debtor Entities, their creditors and other stakeholders, their estates, and other parties-in-

interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

<u>General Provisions</u>

1.      The Motion is GRANTED and APPROVED in all respects.

10

<u>Approval Of The Agreement</u>

2.      Pursuant to 11 U.S.C. § 363(b), the Agreement and all of the terms and conditions thereof are hereby approved.

3.      Pursuant to 11 U.S.C. § 363(b), the Selling Debtor Entities are authorized,[3] but not directed, to perform their obligations under the Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Agreement and the Bidding Procedures as set forth in the Bidding Procedures Order.

4.      Each of the Debtor signatories to the Agreement is authorized, but not directed, to take all actions necessary or appropriate to effectuate the terms of this order.

5.      The Selling Debtor Entities are authorized, but not directed, to execute and deliver, and empowered to perform under, consummate, and implement, the Agreement, together with all additional instruments and documents as may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be requested by the Buyers for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyers or reducing to possession the Acquired Assets, the Assigned Contracts, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Agreement.

6.      This order and the Agreement shall be binding in all respects upon (i) all Selling Debtor Entities, all creditors and other stakeholders (whether known or unknown) of the

---

[3]    As used in this order, "authorized" means to the extent authority under the Bankruptcy Code or from this Court is necessary.

Debtors, all affiliates and subsidiaries of the Selling Debtor Entities (including the reorganized or

reconstituted Debtors after the effective date of the Plan), and any successor to or assignee of any

or all of the Debtors, including, but not limited to, any subsequent trustee appointed in any of the

Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and

shall not be subject to rejection and (ii) the Buyers.  To the extent that any provision of this order

is inconsistent with the terms of the Agreement, this order shall govern.

7.    The terms and provisions of the Agreement and this order shall be binding

in all respects upon the Selling Debtor Entities, their estates, and their stakeholders, the Buyers

and their affiliates, successors, and assigns, and any affected third parties, including, but not

limited to, all entities asserting an Interest and/or Claim against or in any of the Acquired Assets

to be sold to any of the Buyers pursuant to the Agreement, notwithstanding any subsequent

appointment of any trustee or other fiduciary under any section of any chapter of the Bankruptcy

Code, as to which trustee or other fiduciary such terms and provisions likewise shall be binding.

8.    The Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; provided that any such modification,

amendment, or supplement is disclosed to the Creditors' Committee and does not have a material

adverse effect on the Selling Debtor Entities' estates in the good faith business judgment of the

Selling Debtor Entities.

## Sale And Transfer Of The Acquired Assets

9.    Except as expressly permitted or otherwise specifically provided for in the

Agreement or this order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of

the Agreement, the Selling Debtor Entities' right, title, and interest in the Acquired Assets shall

be transferred to and vested in the Buyers free and clear of all Interests and/or Claims, with all

such Interests and/or Claims to attach to the cash proceeds of the Sale in the order of their

priority, with the same validity, force, and effect that they had as against the Acquired Assets

immediately before such transfer, subject to any claims and defenses the Selling Debtor Entities

may possess with respect thereto.

10.     The transfer of the Acquired Assets to the Buyers pursuant to the

Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest

the Buyers with all right, title, and interest of the Selling Debtor Entities in and to the Acquired

Assets free and clear of all Interests and/or Claims of any kind or nature whatsoever.

11.     If any person or entity that has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens</u>, or other documents or agreements evidencing Interests and/or

Claims against or in the Acquired Assets shall not have delivered to the Selling Debtor Entities

prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, or releases of all Interests and/or Claims that

the person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Selling

Debtor Entities are hereby authorized to execute and file such statements, instruments, releases,

and other documents on behalf of the person or entity with respect to the Acquired Assets and

(b) the Buyers are hereby authorized to file, register, or otherwise record a certified copy of this

order which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of

the release of all Interests and/or Claims in the Acquired Assets of any kind or nature whatsoever.

12.     This order (a) shall be effective as a determination that, upon the Closing

of the Sale, all Interests and/or Claims of any kind or nature whatsoever existing as to the Selling

Debtor Entities or the Acquired Assets of the Selling Debtor Entities prior to the Closing of the

Sale have been unconditionally released, discharged, and terminated (other than any surviving

obligations), and that the conveyances described herein have been effected and (b) shall be

binding upon and shall govern the acts of all entities including, but not limited to, all filing

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, administrative agencies, United States governmental departments (whether

federal or state), secretaries of state, federal, state, and local officials, and all other persons and

entities who may be required by operation of law, the duties of their office, or contract, to accept,

file, register, or otherwise record or release any documents or instruments, or who may be

required to report or insure any title or state of title in or to any of the Acquired Assets.

13.     All persons and entities, including, but not limited to, all debt security

holders, equity security holders, United States Federal, state, and local governmental, tax, and

regulatory authorities, lenders, trade creditors, and other stakeholders, holding Interests and/or

Claims of any kind or nature whatsoever against or in the Selling Debtor Entities or the Acquired

Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

non-contingent, senior or subordinated), arising under or out of, in connection with, or in any

way relating to, the Sale Businesses, the Acquired Assets, the operation of the Sale Businesses

by the Selling Debtor Entities prior to the Closing of the Sale, or the transfer of the Acquired

Assets to the Buyers, hereby are forever barred, estopped, and permanently enjoined from

asserting against the Buyers, their successors or assigns, their property, or the Acquired Assets,

such persons' or entities' Interests and/or Claims.  Nothing in this order or the Agreement

14

releases or nullifies any Liability to any United States federal, state, or local governmental

agency under any environmental laws and regulations that any entity would be subject to as

owner or operator of any Acquired Assets after the date of entry of this order.  Nothing in this

order or the Agreement bars, estops, or enjoins any United States federal, state, or local

governmental agency from asserting or enforcing, outside the Court, any liability described in

the preceding sentence.  Notwithstanding the above, nothing herein shall be construed to permit

any United States federal, state, or local governmental agency to obtain penalties from the

Buyers for days of violation of environmental laws and regulations prior to Closing.

14.    All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere with the ability of the Selling Debtor

Entities to sell and transfer the Acquired Assets to the Buyers, in each case in accordance with

the terms of the Agreement or this order.

### Assumption And Assignment Of The Assigned Contracts To The Buyers

15.    Pursuant to 11 U.S.C. § 365, and subject to and conditioned upon the

Closing of the Sale, the Selling Debtor Entities' assumption and assignment to the Buyers, and

the Buyers' assumption on the terms set forth in the Agreement, of the Assumed U.S. Contracts

is hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f) with respect

thereto are hereby deemed satisfied; provided, however, that in the event the effective date of the

Plan occurs prior to the Closing of the Sale, then the Assumed U.S. Contracts shall be assumed

pursuant to the Plan and assigned in accordance with 11 U.S.C. §§ 365 and 1123 and the

provisions of this order pursuant to the terms set forth in the Agreement.

15

16.    The Selling Debtor Entities are hereby authorized in accordance with 11

U.S.C. §§ 105(a), 363, and 365 to (a) assume and/or assign to the Buyers, effective upon the

Closing of the Sale, the Assigned Contracts free and clear of all Interests and/or Claims of any

kind or nature whatsoever and (b) execute and deliver to the Buyers such documents or other

instruments as may be necessary to assign and transfer the Assigned Contracts and Assumed

Liabilities to the Buyers.

17.    The Assigned Contracts shall be transferred to, and remain in full force

and effect for the benefit of, the Buyers in accordance with their respective terms,

notwithstanding any provision in any such Assigned Contract (including those of the type

described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or

conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Selling Debtor

Entities shall be relieved from any further liability with respect to the Assigned Contracts after

such assignment to and assumption of such contracts by the Buyers.

18.    All defaults or other obligations of the Selling Debtor Entities under the

Assigned Contracts arising or accruing prior to the Closing of the Sale (without giving effect to

any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of

the Bankruptcy Code) shall be cured by the Selling Debtor Entities either (i) at the Closing of the

Sale or as soon thereafter as practicable or (ii) in the event the effective date of the Plan occurs

prior to the Closing of the Sale, in accordance with the terms of the Plan, or absent an agreement

as to the Cure Amount between the Selling Debtor Entities and the non-Debtor counterparty to

an Assumed U.S. Contract, by order of this Court, in the amounts as set forth on Schedule 1

hereto, and the Buyers shall have no liability or obligation arising or accruing prior to the date of

the Closing of the Sale, except as otherwise expressly provided in the Agreement.  Cure shall be

16

payable only to the counterparty to any Assumed U.S. Contract.  Each non-Debtor counterparty

to any Assumed U.S. Contract shall be deemed to have consented to the assumption and

assignment of the Assumed U.S. Contract to the Buyers and shall be forever barred, estopped,

and permanently enjoined from asserting against the Selling Debtor Entities or the Buyers, or the

property of any of them, any default existing, arising, or accruing as of the date of the Closing or

any purported written or oral modification to such Assumed U.S. Contract.  Each non-Debtor

counterparty to any Assumed U.S. Contract shall be forever barred, estopped, and permanently

enjoined from asserting against the Buyers (or its property, including the Acquired Assets) any

claim, counterclaim, defense, breach, condition, or setoff asserted or assertable against the

Debtors.  The failure of the Selling Debtor Entities or the Buyers to enforce prior to the Closing

of the Sale one or more terms or conditions of any Assigned Contracts shall not be a waiver of

such terms or conditions or of the Selling Debtor Entities' or Buyers' rights to enforce every term

and condition of any such Assigned Contracts.  There shall be no rent accelerations, assignment

fees, increases (including of rates), or any other fees or penalties charged to the Buyers as a

result of the assumption and assignment of the Assumed U.S. Contracts.

<u>Additional Provisions</u>

19.    The transactions contemplated by the Agreement, and the execution,

delivery, transfer, and/or recordation of any and all documents or instruments necessary or

desirable to consummate the transactions contemplated by the Agreement shall be, and hereby

are, exempt from the imposition and payment of all stamp taxes or any other similar taxes

pursuant to section 1146(c) of the Bankruptcy Code.

20.    The consideration provided by the Buyers for the Acquired Assets under

the Agreement is hereby deemed to constitute reasonably equivalent value and fair consideration

17

under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent

Transfer Act, and the laws of the United States and any state, territory, or possession thereof, or

the District of Columbia.

21.    Upon the Closing of the Sale, this order shall be construed as and shall

constitute for any and all purposes a full and complete general assignment, conveyance, and

transfer of all of the Acquired Assets and Assigned Contracts or a bill of sale transferring good

and marketable title in such Acquired Assets and Assigned Contracts to the Buyers pursuant to

the terms of the Agreement.

22.    Upon the Closing of the Sale, each of the Selling Debtor Entities' creditors

is authorized and directed to execute such documents and take all other such actions as may be

necessary to release their respective Interests and/or Claims against the Acquired Assets, if any,

as such Interests and/or Claims may have been recorded or may otherwise exist.

23.    Each and every United States federal, state, and local governmental

agency or department, and any other person or entity, is hereby directed to accept any and all

documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Agreement.

24.    All entities which are currently, or as of the Closing of the Sale may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Agreement are hereby directed to surrender possession of the Acquired Assets to the Buyers

upon the Closing of the Sale.

18

25.    All entities holding Interests and/or Claims against or in the Selling Debtor Entities or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests and/or Claims of any kind or nature whatsoever against the Buyers, their property, their successors and assigns, or the Acquired Assets with respect to any Interest and/or Claim of any kind or nature whatsoever which such person or entity had, has, or may have against or in the Selling Debtor Entities, their estates, their officers, their directors, their shareholders, or the Acquired Assets.  Following the Closing of the Sale, no holder of an Interest and/or Claim in or against the Selling Debtor Entities shall interfere with the Buyers' title to or use and enjoyment of the Acquired Assets based on or related to such Interest and/or Claim or any actions that the Selling Debtor Entities may take, or have taken, in their chapter 11 cases.

26.    The transactions contemplated by the Agreement have been undertaken by the Buyers in good faith, as that term is used in the Bankruptcy Code, including but not limited to section 363(m) of the Bankruptcy Code or in similar applicable state law, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Acquired Assets shall not affect the validity of the Sale to the Buyers, unless such authorization is duly stayed pending such appeal.  The Buyers are purchasers in good faith of the Acquired Assets pursuant to section 363(m) of the Bankruptcy Code, and are entitled to all of the protections afforded by the Bankruptcy Code, including but not limited to section 363(m) of the Bankruptcy Code or by similar applicable state law.

27.    The consideration provided by the Buyers for the Acquired Assets under the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

19

28.    The purchase price shall be and hereby is allocated between the Selling

Debtor Entities and the non-Debtor Sellers as set forth on Schedule 3.6.1 of the Agreement.

29.    The Selling Debtor Entities, including, but not limited to, their officers,

employees, and agents, are hereby authorized to execute such documents and do such acts as are

necessary or desirable to carry out the transactions contemplated by the terms and conditions of

the Agreement and this order.  The Selling Debtor Entities shall be, and they hereby are,

authorized to take all such actions as may be necessary to effectuate the terms of this order.

30.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of the Selling

Debtor Entities' estates or of the other Sellers, such as funds that are trust funds under any

applicable state lien laws.

31.    To the extent permitted by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Acquired Assets sold, transferred, or conveyed to the Buyers on account of the filing or

pendency of these chapter 11 cases or the consummation of the Sale.

32.    The failure specifically to include or to reference any particular provision

of the Agreement in this order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Agreement be authorized and approved in its entirety.

33.    This Court retains exclusive jurisdiction to interpret, construe, enforce,

and implement the terms and provisions of this order, the Agreement, all amendments thereto,

any waivers and consents thereunder, and of each of the agreements executed in connection

20

therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel

delivery of the Acquired Assets to the Buyers, (b) compel delivery of the purchase price or

performance of other obligations owed pursuant to the Agreement, (c) resolve any disputes

arising under or related to the Agreement, except as otherwise provided therein, (d) interpret,

implement, and enforce the provisions of this order, (e) protect the Buyers against any Interests

and/or Claims against or in the Selling Debtor Entities or the Acquired Assets, of any kind or

nature whatsoever, attaching to the proceeds of the Sale, and (f) determine all disputes among the

Selling Debtor Entities, the Buyers, and any non-Debtor parties to any Assigned Contracts

concerning, inter alia, the Selling Debtor Entities' assumption and/or assignment of any Assumed

and Assigned Contract to the Buyers under the Agreement.

Dated: New York, New York
_____, 2009


_____
UNITED STATES BANKRUPTCY JUDGE

Exhibit 1

**EXECUTION VERSION**

**MASTER SALE AND PURCHASE AGREEMENT**

**AMONG**

**DELPHI CORPORATION**

**AND**

**BEIJINGWEST INDUSTRIES CO., LTD.**

**DATED AS OF**

**March 30, 2009**

# TABLE OF CONTENTS

PAGE NO.

1.  **DEFINITIONS**..................................................................................................... 1
    1.1   Certain Defined Terms ......................................................................... 1
    1.2   Other Interpretive Provisions.............................................................. 19
2.  **PURCHASE AND SALE** ................................................................................. 19
    2.1   Transfers by Sellers and their Affiliates ............................................. 19
    2.2   Assumption of Liabilities..................................................................... 23
    2.3   Retained Liabilities.............................................................................. 25
    2.4   Deferred Items ..................................................................................... 26
3.  **PURCHASE PRICE; ADJUSTMENT; ALLOCATION** .................................. 27
    3.1   Deposit Amount ................................................................................... 27
    3.2   Advance Payments .............................................................................. 28
    3.3   Preliminary Purchase Price ................................................................ 29
    3.4   Preparation of Closing Statement ...................................................... 30
    3.5   Preliminary Purchase Price Adjustments........................................... 32
    3.6   Allocation of Purchase Price .............................................................. 33
    3.7   Pro-Rations.......................................................................................... 34
4.  **REPRESENTATIONS AND WARRANTIES OF SELLERS** ................................ 34
    4.1   Organization ........................................................................................ 34
    4.2   Authorization; Enforceability............................................................... 35
    4.3   Closing Inventory Statement .............................................................. 35
    4.4   No Conflicts or Approvals................................................................... 35
    4.5   Sufficiency of Acquired Assets........................................................... 36
    4.6   Compliance with Law; Permits ........................................................... 36
    4.7   Proceedings......................................................................................... 36
    4.8   Absence of Certain Changes .............................................................. 36
    4.9   Tax Matters ......................................................................................... 36
    4.10  Employee Benefits .............................................................................. 36
    4.11  Intellectual Property ........................................................................... 38
    4.12  Contracts ............................................................................................. 39
    4.13  Environmental Matters ....................................................................... 41
    4.14  Insurance............................................................................................. 41
    4.15  Personal Property Assets, Inventory .................................................. 42
    4.16  Real Property....................................................................................... 42
    4.17  Recorded Permitted Encumbrances................................................... 42
    4.18  UK Employee Liability Information ..................................................... 43
    4.19  No Brokers' Fees ................................................................................. 43
    4.20  Solvency .............................................................................................. 43
    4.21  No Other Representations or Warranties ........................................... 43
    4.22  Fair Disclosure.................................................................................... 43
5.  **REPRESENTATIONS AND WARRANTIES OF BUYERS** .................................. 43
    5.1   Organization ........................................................................................ 43
    5.2   Authorization; Enforceability............................................................... 44
    5.3   No Conflicts or Approvals................................................................... 44
    5.4   Proceedings......................................................................................... 44
    5.5   Solvency .............................................................................................. 45
    5.6   Anti-Money Laundering....................................................................... 45
    5.7   No Inducement or Reliance; Independent Assessment...................... 45
    5.8   Financial Ability................................................................................... 46

|       | 5.9 | Adequate Assurance of Future Performance | 46 |
|       | 5.10 | No Brokers' Fees | 46 |
|       | 5.11 | Compliance with Laws | 46 |
|       | 5.12 | Buyer Entities | 46 |
| **6.** | | **COVENANTS AND AGREEMENTS** | **46** |
|       | 6.1 | Conduct of Business between Signing and Closing | 46 |
|       | 6.2 | Bankruptcy Actions | 48 |
|       | 6.3 | Assumed U.S. Contracts; Cure Amounts; Other Contracts | 48 |
|       | 6.4 | Non-Competition | 49 |
|       | 6.5 | Tax Matters; Cooperation; Preparation of Returns; Tax Elections | 50 |
|       | 6.6 | U.S. Employees; Benefit Plans; Labor Matters | 52 |
|       | 6.7 | EMEA Employees; Benefit Plans; Labor Matters | 55 |
|       | 6.8 | Mexico Employees; Benefits Plans; Labor Matters | 59 |
|       | 6.9 | Asia/Pacific Employees; Benefit Plans; Labor Matters | 61 |
|       | 6.10 | Contact with Employees | 63 |
|       | 6.11 | Contact with Customers and Suppliers | 63 |
|       | 6.12 | Technical Documentation; Trade Secrets | 64 |
|       | 6.13 | Books and Records and Litigation Assistance From and After Closing | 64 |
|       | 6.14 | Corporate Names | 65 |
|       | 6.15 | Intellectual Property and Intellectual Property Licenses | 65 |
|       | 6.16 | Post-Closing Obligations | 66 |
|       | 6.17 | Competition and Other Regulatory Clearance | 66 |
|       | 6.18 | Further Actions | 68 |
|       | 6.19 | Further Assurances | 68 |
|       | 6.20 | Shared Items | 68 |
|       | 6.21 | Buyer's Financing Activities | 69 |
|       | 6.22 | Customs Duties | 69 |
|       | 6.23 | Replacement Products | 69 |
|       | 6.24 | Assignment Contracts | 69 |
|       | 6.25 | Removal of Liens | 70 |
|       | 6.26 | Confidentiality | 70 |
|       | 6.27 | Certain Supply Agreement | 70 |
|       | 6.28 | Physical Separations | 70 |
|       | 6.29 | Schedules | 70 |
|       | 6.30 | Certain Contracts | 70 |
|       | 6.31 | Delphi Supply Contracts | 71 |
|       | 6.32 | Purchased Intellectual Property Assistance | 71 |
|       | 6.33 | Leases | 71 |
|       | 6.34 | E&O Inventory | 71 |
|       | 6.35 | Ford Service Parts | 71 |
|       | 6.36 | China Mortgage | 72 |
|       | 6.37 | Four Post Shaker | 72 |
|       | 6.38 | Ancillary Agreements, Conflicts | 72 |
|       | 6.39 | Seller Support Regarding Establishment of Buyer Entities | 72 |
|       | 6.40 | JAVE Payments | 73 |
|       | 6.41 | Idle Assets in India | 73 |
| **7.** | | **CONDITIONS TO CLOSING** | **73** |
|       | 7.1 | Conditions to Obligations of Seller and Buyer | 73 |
|       | 7.2 | Conditions to Obligations of Buyer | 74 |
|       | 7.3 | Conditions to Obligations of Sellers | 74 |

| 8. | **CLOSING** | **75** |
|---|---|---|
| | 8.1 Closing Date and Time | 75 |
| | 8.2 Effective Date | 75 |
| | 8.3 Transfer Agreement | 75 |
| | 8.4 Ancillary Agreements | 75 |
| | 8.5 Seller's Deliveries at Closing | 76 |
| | 8.6 Buyer's Deliveries at Closing | 77 |
| 9. | **TERMINATION** | **78** |
| | 9.1 Termination | 78 |
| | 9.2 Break-Up Fee | 79 |
| | 9.3 Procedure and Effect of Termination | 79 |
| 10. | **BIDDING PROCEDURES** | **80** |
| | 10.1 Delphi Initial Bankruptcy Actions | 80 |
| | 10.2 Qualified Bidder | 80 |
| | 10.3 Bid Deadline | 81 |
| | 10.4 Due Diligence | 81 |
| | 10.5 Bid Requirements | 81 |
| | 10.6 Qualified Bids | 82 |
| | 10.7 Bid Protection | 83 |
| | 10.8 Auction, Bidding Increments and Bids Remaining Open | 83 |
| | 10.9 Acceptance of Qualified Bids | 84 |
| | 10.10 Sale Hearing | 84 |
| | 10.11 Return of Good Faith Deposit | 85 |
| | 10.12 Reservation of Rights | 85 |
| 11. | **LIABILITY, INDEMNIFICATION** | **85** |
| | 11.1 Limitations of Liability | 85 |
| | 11.2 Survival | 85 |
| | 11.3 Indemnification | 86 |
| | 11.4 Environmental Matters | 88 |
| | 11.5 Indemnification Procedure | 91 |
| | 11.6 Mitigation | 92 |
| | 11.7 Dispute Resolution | 92 |
| 12. | **MISCELLANEOUS** | **93** |
| | 12.1 Fees and Expenses | 93 |
| | 12.2 Bulk Sales Laws | 93 |
| | 12.3 Payments in Dollars | 93 |
| | 12.4 Amendment | 93 |
| | 12.5 Assignment | 93 |
| | 12.6 Waiver | 93 |
| | 12.7 Notices | 94 |
| | 12.8 Entire Agreement | 95 |
| | 12.9 Counterparts | 95 |
| | 12.10 Publicity | 95 |
| | 12.11 Headings | 95 |
| | 12.12 Severability | 95 |
| | 12.13 Third Parties | 95 |
| | 12.14 Governing Law | 96 |
| | 12.15 Venue and Retention of Jurisdiction | 96 |
| | 12.16 No Right of Setoff | 96 |
| | 12.17 Risk of Loss | 96 |
| | 12.18 Enforcement of Agreement | 96 |

## MASTER SALE AND PURCHASE AGREEMENT

**THIS MASTER SALE AND PURCHASE AGREEMENT**, dated as of **March 30, 2009** between **DELPHI CORPORATION,** a Delaware corporation ("**Delphi**") on behalf of itself and the other entities set forth on Schedule 1 (collectively with Delphi, the "**Sellers**," each a "**Seller**"), and **BEIJINGWEST INDUSTRIES CO., LTD.,** a company organized under the laws of the Peoples' Republic of China ("**Buyer Parent**"), on behalf of itself and the other buyers set forth on Schedule 1 (each a "**Buyer**," and, collectively with **Buyer Parent**, the "**Buyers**"), which information for Schedule 1 shall be provided by Buyer Parent to Delphi ten (10) Business Days before Closing (the Sellers and Buyers hereinafter sometimes referred to collectively as the "**Parties**"; each a "**Party**"):

**WHEREAS,** Delphi, through its Affiliates referred to in this Agreement, is engaged in the Business (as hereinafter defined);

**WHEREAS,** the Sellers own the Acquired Assets (as hereinafter defined);

**WHEREAS,** on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq., as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS,** as contemplated by Sections 363, 365 and 1146 of the Bankruptcy Code, the Sellers desire to sell to the Buyers all of their right, title and interest in and to the Acquired Assets, and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree:

## 1.    DEFINITIONS:

**1.1    Certain Defined Terms.**  As used in this Agreement, the following terms have the meanings set forth below or in the sections referred to below:

"**Accounts Payable**" means all trade accounts payable and other obligations to pay suppliers and third parties to the extent arising from the conduct of the Business or relating to the Acquired Assets, including intercompany payables, to the extent not settled prior to the Closing Date.

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers to the extent arising from the conduct of the Business or relating to the Acquired Assets, including Intercompany Receivables and all other accounts or notes receivable and the full benefit of all security for such accounts or notes which are not in excess of customer releases and are supported by shipping records.

"**Acquired Assets**" – Section 2.1.1.

"**Administrative Assets**" means books, records and instruments relating to the Business, operations, condition of (financial or other), or results of operations of each Seller with respect to the Business and other administrative assets primarily used or held for use in the Business, including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records and sale order files; provided, however, that Administrative Assets does not include Intellectual Property or Technical Documentation.

"**Advance Payments**" means advance payments of the Price Adjustment amounts allocable to the Acquired Assets in 2009 in China and in Poland and the U.K. for the period beginning September 1, 2009, in each case consistent with Schedule 3.2.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.  For purposes of this definition, "**control**" means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person.

"**Agreement**" means this Master Sale and Purchase Agreement (including the Schedules and Exhibits referred to herein, each of which is incorporated herein by reference), as amended, modified or supplemented from time to time.

"**Allocation**" – Section 3.6.1.

"**Alternate Bid(s)**" – Section 10.10.

"**Alternate Bidder(s)**" – Section 10.10.

"**Alternative Transaction**" – Section 9.2.1.

"**Ancillary Agreements**" - Section 8.4, together with the China Mortgage and the documents that will evidence the pledge with respect to the Poland Payment and the charge with respect to the U.K. Payment.

"**Asia/Pacific Employees**" means the Global Sale Employees of the Business identified as Asia/Pacific Employees in Schedule 4.10.1, as confirmed by the Parties under Section 6.9 of this Agreement.

"**Assumed Liabilities**" – Section 2.2.

"**Assumed U.S. Contracts**" – Section 6.3.1.

"**Auction**" – Section 10.8.

"**August Capital Expenditures**" – Section 3.3.2.A.

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Benchmark Inventory Amount**" means the amount of $30,000,000 for the Ride Dynamics Business and $15,000,000 for the Brake Business.

"**Bid Deadline**" – Section 10.3.

"**Bidding Procedures**" – Section 10.1.

"**Bidding Procedures Order**" – Section 6.2.1.

"**Bidding Process**" – Section 10.1.

"**Brake Products**" means the base brakes, controlled brakes and brake modules for automotive and other vehicles manufactured and sold by the Sellers as at the Closing Date.

"**Break-Up Fee**" – Section 9.2.1.

"**Business**" means, as of the Closing Date, the: (i) design, testing, manufacture, development, marketing and sale of the Suspension Systems Products and MR Mounts Products by the Sellers at the Manufacturing Facilities and Technical Centers and other locations at which the Sellers conduct such activities with respect to the Products, except for the Excluded Assets ("**Ride Dynamics Business**"); and (ii) design, testing, manufacture, development, marketing and sale of the Brake Products by the Sellers at the Manufacturing Facilities and Technical Centers and other locations at which the Sellers conduct such activities with respect to the Products, except for the Excluded Assets ("**Brake Business**"); provided that in no event shall "Business" include the DPSS Activity.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York and Beijing, the People's Republic of China.

"**Business License**" – Section 5.8.

"**Buyer Employee Benefit Plans**" means Buyers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, vision, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive, supplemental or deferred compensation, executive benefits, hospitalization, severance, early retirement, termination or retirement indemnity, long service payments, housing, company car, meal subsidies, vacation, sick leave, paid or unpaid time off, jubilee awards, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "**employee benefit plans**" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

"**Buyer Parent**" – Preamble.

3

"**Buyer(s)**" – Preamble (the Buyers set forth on <u>Schedule 1</u> will purchase, accept, and acquire the Acquired Assets related to the Manufacturing Facilities, Technical Centers and technology set forth opposite their names).

"**Cap Amount**" **-** Section 11.3.2.B.

"**Capital Expenditures**" means expenditures in connection with the acquisition, installation and capitalizable refurbishment of Personal Property of the Business.

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits and less all outstanding checks and electronic payments of the Business.

"**Certain Agreement**" – Section 6.27.

"**China Mortgage**" - Section 3.2.1.

"**Claims**" mean all Losses, Liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" – Section 8.1.

"**Closing Date**" – Section 8.1.

"**Closing Inventory Statement**" means the statement of Inventory of the Business (as adjusted in accordance with this Agreement) as of 11:59 P.M. (prevailing Eastern Time) on the Closing Date, which statement will be prepared and delivered in accordance with Section 3.4.

"**Closing Statement**" means the Closing Inventory Statement and the statement as of the Closing Date of the amount of   Liabilities associated with Global Sale Employees, and including the amount of  any pro-rations under Section 3.7 which are not addressed at Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreements**" mean all material collective bargaining agreements with any labor union, works council or other representative of Global Sale Employees (including material local agreements, amendments, supplements, letters and memoranda of understanding of any kind).

"**Committee**" – Section 10.3.

"**Competent Authority**" means a Person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

"**Competition/Investment Law**" means any Law that is designed or intended to prohibit, restrict or regulate: (i) foreign investment; or (ii) antitrust, monopolization, restraint of trade or competition.

"**Competitive Business**" – Section 6.4.1.

4

"**Compliance Matter**" means an event, condition, activity, practice, action or omission at a Manufacturing Facility which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

"**Confidential Information Memorandum**" means the confidential memorandum dated October 30, 2007, furnished by W.Y. Campbell & Company, relating to the Ride Dynamics Business and the confidential memorandum dated July, 2008 relating to the Brake Business.

"**Confidentiality Agreement**" means the confidentiality agreement dated February 2, 2009 and the confidentiality agreement dated March 4, 2009, between certain equity holders of Buyer Parent and Delphi relating to the Sale, and any supplements thereto relating to the Business.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination (without objection) of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, license agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature other than Seller Employee Benefit Plans.

"**Controlled Group**" – Section 4.10.7.

"**Copyrights**" mean: (i) copyrights, existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefor; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Corporate Trademark Rights**" means Trademark Rights: (i) that include the term "Delphi"; or (ii) that are used in the Business but also primarily used in other businesses conducted directly or indirectly by Delphi.

"**CPA Firm**" – Section 3.4.3.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Sellers and assignment to (and assumption by) Buyers of the Pre-Petition Contracts included with the Assumed U.S. Contracts under the Sale Approval Order. Each Seller will pay Cure Amounts as agreed to by Delphi and each party to an Assumed U.S. Contract or, absent such agreement, by order of Bankruptcy Court in the time and manner specified by the Sale Approval Order.

"**Data Room**" means the data room(s) in which the material documents and information related to the Business and the Acquired Assets were disclosed to Buyer Parent and its representatives and counsel.

"**Debt Obligations**", as applied to any Person, means obligations for borrowed money as evidenced by bonds, debentures, notes, financing or capital (as opposed to operating) leases (determined in accordance with GAAP) and other similar instruments, and all guaranties of such obligations.

"**Deductible Amount**" - Section 11.3.2.B.

"**Defending Party**" - Section 11.7.1.

"**Deferred Items**" – Section 2.4.1.

"**Delphi**" – Recitals.

"**Delphi China Brakes**" mean Delphi Shanghai Dynamics and Propulsion Systems Co., Ltd., the Seller of the Acquired Assets of the Brake Business located in China.

"**Delphi Group**" means the direct and indirect subsidiaries and Affiliates of Delphi.

"**Demanding Party**" – Section 11.7.1.

"**Deposits**" – Section 2.1.2.D

"**Deposit Amount**" – Section 3.1.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement dated as of the date hereof, executed by and among Buyer Parent, Delphi and Escrow Agent concurrently with this Agreement.

"**Directive**" means the Acquired Rights Directive (Council Directive 77/187/EEC as amended by Council Directive 98/50 EEC and consolidated in Council Directive 2001/23/EEC)

"**DPSS Activity**" means the sale and distribution of Products by Delphi Product and Service Solutions, a division of Delphi, to the European, Middle Eastern, African and Asian Independent Aftermarket.

"**DPSS Inventory**" means all inventory held by members of the Delphi Group on the Closing Date for purposes of the DPSS Activity.

"**E & O Inventory**" means excess and obsolete inventory as determined by Delphi's accounting principles as set forth on Schedule 3.4.1, provided, however, customer demand shall be mutually agreed to by Delphi and Buyer Parent.

"**EC Merger Regulation**" means Council Regulation (EEC) 4064/89 of the European Community, as amended.

"**EMEA Employees**" means the U.K. Employees and employees of the Business wholly employed by the relevant Seller in Poland, France, Germany, Italy and Luxembourg immediately prior to the Closing Date.

"**EMEA Seller**" – Section 6.7.1.B.

"**Encumbrance**" means with respect to the Acquired Assets, any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal property).

"**Environment**" means the following media (whether individually or commingled): air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground), and ground (whether at the surface or below the surface) and all organisms, ecosystems, flora, and natural resources.

"**Environmental Claim**" means a Proceeding by any Person alleging Liability arising from the existence of or a Release of Hazardous Materials, or a noncompliance with any Environmental Law.

"**Environmental Contamination**" means the presence in violation of applicable Environmental Laws or in excess of a Remediation Standard of a Hazardous Material at, in, under or about the Environment at a Manufacturing Facility or damaged friable asbestos in the building or building materials at a Manufacturing Facility in violation of applicable Law.

"**Environmental Damages**" means Losses, Liabilities, costs, damages, fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential (direct damages claimed by injured third parties against a Buyer will not be deemed consequential) or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

"**Environmental Law**" mean all Laws applicable to the conduct and the operation of the Business in force on or prior to the Closing Date, and relating to pollution or the protection of the Environment.

"**Environmental Permits**" mean any licenses, permits, authorizations and approvals issued by any Governmental Authority and required to be obtained by the Business in respect of the Acquired Assets under Environmental Laws material to the conduct and the operation of the Business.

"**Equityholders' Committee**" – Section 10.3.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means the escrow agent under the Deposit Escrow Agreement.

"**Estimated Inventory Amount**" – Section 3.3.2.B.

"**Estimated Past Service Financial Obligations**" – Section 3.3.2.B.

"**Excluded Assets**" – Section 2.1.2.

"**Excluded Intellectual Property**" – Section 2.1.2.B.

"**Excluded Software**" means the Software identified on <u>Schedule 2.1.2.N</u>.

"**EAR**" means Export Administration Regulations.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and operate certain portions of the Business or are Sellers: Delphi Automotive Systems LLC and Delphi Technologies, Inc.

"**Final Closing Statement**" – Section 3.4.3.

"**FINSA**" means Section 721 of the Defense Production Act of 1950, as amended by the Exon-Florio Amendment and the Foreign Investment and National Security Act of 2007 and regulations promulgated thereunder.

"**Four Post Shaker**" – Section 6.37.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**Global Sale Employees**" means all U.S. Employees, as  set forth on <u>Schedule 4.10.1</u> for U.S. locations, and Global Sale Non-U.S. Employees who are wholly employees of any Seller or Seller-Affiliate listed on <u>Schedule 1</u> with respect to the Business, except for Inactive U.S. Employees and inactive Mexico Employees, in each case unless and until they transfer to Buyer.

"**Global Sale Non-U.S. Employees**" means all Global Sale Employees who are not U.S. Employees, and who are included as employees being transferred to Buyers under this Agreement, as set forth on <u>Schedule 4.10.1</u> for locations outside the U.S.

"**Good Faith Deposit**" – Section 10.5.3.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states, including authorized officials of any of the foregoing.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**Hardware Contracts**" – Section 2.1.1.J

"**Hazardous Materials**" means any element, mixture, chemical, material, constituent, waste, pollutant, contaminant, or material including petroleum or petroleum-based or petroleum-derived, polychlorinated biphenyls, noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous) which are regulated or can give rise to Liabilities or Losses under an Environmental Law or an Environmental Permit.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Idle Assets**" – Section 6.41.

"**Inactive U.S. Employees**" – Section 6.6.2.A.

"**Indemnifiable Losses**" – means Losses actually incurred by a Party, including in connection with any actions, suits, demands, assessments, judgments and settlements.

"**Indemnification Claim**" - Section 11.5.

"**Independent Aftermarket**" means the market for the supply of spare and replacement parts to customers other than the OEMs and the respective service parts operations of the OEMs.

"**Individual Claim Amount**" - Section 11.3.2.B.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Intercompany Receivables**" mean the right of any Seller or its Affiliates to payment and performance of any Liabilities of the Businesses.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies and other inventory, primarily used or held for use in the Business located at the Manufacturing Facilities or at the facilities listed on Schedule 4.15.3, in any case consistent with Schedules 2.1.1 and 4.15.3.

"**IP Assignment Agreement**" means that certain IP Assignment Agreement between Buyer and Sellers in the form attached as Exhibit 8.4.1.

"**ITAR**" means International Traffic in Arms Regulations.

"**JAVE**" means certain cost saving programs (Jahrespreisverhandlungen) applicable to certain business awards prior to the time of Closing.

"**JAVE Payments**" – Section 6.40.

"**Juarez Manufacturing Services Agreement**" means a manufacturing services agreement pursuant to which Delphi or its Affiliates will manufacture Buyer's requirements for those Products currently manufactured at the Juarez, Mexico Manufacturing Facility using machinery, equipment and tooling of Buyer, substantially in the form of Exhibit 8.4.6.

9

"**KDAC**" means Korea Delphi Automotive Systems Corporation, a company incorporated in Korea.

"**Know-How**" means proprietary technical and business knowledge and information (including the Technical Information), regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, formulae, algorithms, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential together with the rights to sue or recover and retain damages and costs and attorneys' fees for present and past misappropriations or otherwise of any of the foregoing.

"**Knowledge of Buyers**" or "**Buyers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.A.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order.

"**Leased Real Property**" – Section 4.16.1.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet, including those arising under any Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means Sellers' rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party that is primarily used by the Business.

"**Losses**" mean any and all claims, Liabilities, losses, damages, fines, penalties, and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Management Presentations**" mean the presentations, expert meetings, site visits and question and answer sessions, provided by Delphi and Sellers (and their advisers and counsel) to Buyer Parent and the other Buyers (and their advisers and counsel), with respect to the Business and the Acquired Assets and the transactions contemplated herein.

"**Manufacturing Cost**" means costs incurred within the Manufacturing Facilities in carrying out the manufacturing and assembly of replacement Products, including direct material and labor; as well as manufacturing overhead directly attributable to the manufacture and assembly of Products, such as utilities, but excluding indirect costs that may be allocated to but are not directly originated in sites supporting the manufacturing and assembly of Products.

"**Manufacturing Facilities**" means the Business' manufacturing assembly facilities located at Krosno, Poland; Chihuahua (Los Pinos), Mexico; Juarez, Mexico; Noida, India; Luton, United Kingdom; Hua Jing Road, Shanghai, China; and Xi Ya Road, Shanghai, China each of which is singly referred to as a "**Manufacturing Facility**".

"**Marked Agreement**" – Section 10.5.2.

"**Material Adverse Effect**" means any change, occurrence or development that has a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' hereunder), results of operations or financial condition of the Business taken as a whole, but excludes any effect: (i) resulting from general economic or business conditions or changes in the national or world economy or financial, banking or securities markets including any disruption thereof or any decline in the price of any security or any market index; (ii) affecting companies in the industry or markets of the Business generally; (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) resulting from any existing event, occurrence or circumstance with respect to which the Buyers have Knowledge as of the date hereof; (v) that is cured or for which an offer to cure has been made by the Sellers before the date of any termination of this Agreement by Buyer Parent pursuant to Section 9.1 hereof; (vi) resulting from increases in energy, electricity, natural gas, oil, steel, aluminum, other raw materials or other operating costs (other than such increases arising from or in connection with contracts or arrangements entered into with any Affiliate of any Seller); (vii) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Business; (viii) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (ix) resulting from any actions required under this Agreement to obtain any Consent; (x) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (xi) resulting from any act of God or other *force majeure* type event, including acts of war or terrorism, whether or not directed at the Business or Buyer, not disproportionately affecting the Business relative to its competitors; (xii) resulting from the regulatory status of any Buyer.

"**Material Contracts**" – Section 4.12.1 (and as updated pursuant to Section 4.12.4).

"**Mexico**" means the United Mexican States.

"**Mexico Capital Expenditures**" means Capital Expenditures made for the Manufacturing Facilities in Juarez, Mexico or Los Pinos, Mexico, consistent with Schedule 3.2, and which are reflected on the accounting books and records of a Filing Affiliate.

"**Mexico Employees**" means the employees of the Business employed in the Manufacturing Facility located in Chihuahua (Los Pinos), Mexico and Juarez, Mexico.

"**MR Mounts Products**" means the MagneRide powertrain mounts, manufactured and sold by the Sellers.

"**MSA**" means the manufacturing services agreements referred to in Section 8.4.5 (Noida) and 8.4.6 (Juarez) of this Agreement.

"**Noida Manufacturing Services Agreement**" means a manufacturing services agreement pursuant to which Delphi or its Affiliates will manufacture Buyer's requirements for

those Products currently manufactured at the Noida, India Manufacturing Facility using machinery, equipment and tooling of Buyer, substantially in the form of Exhibit 8.4.5.

"**Notice**" - Section 11.7.1.

"**Non-Assumed Contract**" – Section 6.30.

"**Non-Filing Sellers**" means Sellers not subject to the Bankruptcy Cases.

"**Objection**" – Section 3.4.2.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.6.

"**Ordinary Course of Business**" means, in all material respects, the usual, regular and ordinary course of a business consistent with the past practice thereof, provided that where the Sellers' past practices were modified following filing of the Bankruptcy Cases, such term means, in all material respects, the ordinary course consistent with custom and practice of the Sellers' from and after the Petition Date to the extent consistent with orders issued in the Bankruptcy Cases.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Overseas Investment Project Approval**" means the national or Beijing level legal or regulatory approvals, such as MOFCOM, NDRC or SAFE that may be required to authorize the Business License, contribution of the Sale Funds into Buyer Parent, the obligations set forth in this Agreement (other than competition filings), the projects and actions contemplated by this Agreement, and for the Purchase Price to be paid to Sellers in accordance with the terms of this Agreement.

"**Owned Intellectual Property**" means Intellectual Property in and to which Sellers hold, or have a right to hold, in whole or in part, any right, title and interest.

"**Owned Real Property**" – Section 4.16.2.

"**Past Service Financial Obligations**" – Section 2.2.9.

"**Party(ies)**" means any Seller or Sellers and any Buyer, Buyers or Buyer Parent.

"**Patent Rights**" means: (i) national (including the United States) and multinational invention and design registrations or applications, patents and patent applications, provisionals, substitutions, reissues, divisionals, continuations, continuations-in-part, extensions reexaminations and all rights, in each case, provided by international treaties or conventions; and (ii) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**PBR**" means PBR Knoxville L.L.C., a Delaware limited liability company.

12

"**Permits**" – Section 4.6.

"**Permitted Encumbrance**" means: (i) purchase money security interests ("**PMSI**'s) arising in the Ordinary Course of Business and which will be paid or discharged by Seller in the Ordinary Course of Business, other than recorded PMSIs; (ii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iii) Encumbrances in favor of any Sellers' pre-Petition Date secured lenders and post-Petition Date secured lenders which, upon Closing, will attach to the proceeds of the Sale attributable to the sale of the assets of the Filing Affiliates in the same order and priority that the Encumbrances attached to the assets of the Filing Affiliates, subject to all existing defenses and other objections; (iv) any Encumbrance that may be created by or on behalf of Buyers; (v) in relation to Real Property: (a) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged by Seller in the Ordinary Course of Business; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; (e) easements, covenants, restrictions and other encumbrances of public record; (vii) such other Encumbrances, the existence of which, in the aggregate, would not significantly interfere with or significantly affect the use of the respective underlying asset to which such Encumbrances relate as used on the Closing Date (other than any such Encumbrance which relates to any Debt Obligations of any Seller); (viii) the China Mortgage; and (ix) any liens in connection with the U.K. Payment or the Poland Payment.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means all tangible personal property (other than Inventory) located at the Manufacturing Facilities or at the Technical Centers (in each case consistent with Schedule 2.1.1) or at the facilities listed on Schedule 4.15.3 or Schedule 4.15.4, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere; provided, however, that the Personal Property does not include Intellectual Property or Technical Documentation.

"**Petition Date**" – Recitals.

"**Plan**" – Section 6.1.2.

"**Poland Payment**" – Section 3.2.2.

"**Polish Buyer**" means the Buyer entity created by Buyer Parent in accordance with Section 5.12.

"**Polish Employees**" means the employees of the Business employed in the Manufacturing Facility located in Krosno, Poland or employed in the Technical Center located in Krakow, Poland.

"**Polish Seller**" means Delphi Poland S.A.

"**Post-Closing Compliance Matter**" means a Compliance Matter occurring after the Closing Date.

"**Post-Closing Environmental Contamination**" means Environmental Contamination occurring after the Closing Date.

"**Potential Bidder**" – Section 10.2.

"**Pre-Closing Compliance Matter**" means a Compliance Matter occurring at or prior to the Closing Date.

"**Pre-Closing Environmental Contamination**" means Environmental Contamination occurring at or prior to the Closing Date.

"**Pre-Closing Targeted Capex**" means for Capital Expenditures of all countries other than China for the period from June 1, 2009 to August 31, 2009: (i) $3,146,000 if the Closing occurs on or before the Target Date; and (ii) $1,374,000 if the Closing occurs after the Target Date.

"**Pre-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into by such Filing Affiliates before the Petition Date.

"**Preliminary Purchase Price**" – Section 3.3.1.

"**Price Adjustment**" – Section 3.3.2.

"**Proceeding**" means any action, claim, demand, suit, proceeding, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority, any arbitral institution or arbitral tribunal.

"**Product(s)**" means the Suspension System Products, the MR Mounts Products and the Brakes Products.

"**Product Liability Claims**" means all Losses and Liabilities for Claims made for injury to persons and/or property arising from, caused by or arising out of the manufacture, sale or assembly of any Product, the design of any Product or any Loss or Liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products.

"**Product Recall Claims**" means all Losses and Liabilities arising out of, resulting from or related to any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to the Products.

"**Product Warranty Claims**" means all Losses and Liabilities arising out of, resulting from or relating to product warranty or product return relating to the Products except for Product Recall Claims or Product Liability Claims.

"**Productive Inventory**" means Inventory consisting of finished goods, work-in-process or raw materials.

"**Property Taxes**" – Section 6.5.3.

"**Purchase Price**" – Section 3.5.3.

"**Purchased Intellectual Property**" means Sellers' right, title and interest in Intellectual Property that is used primarily in the Business, subject to the rights of third parties as described in Section 4.11.

"**Qualified Bid**" – Section 10.6.

"**Qualified Bidder**" – Section 10.2.

"**Real Property**" means the Owned Real Property and the Leased Real Property.

"**Recurrent Injuries**" – Section 6.6.1.C.

"**Release**" means any spill, emission, leaking, placement, burial or discharge of any Hazardous Materials at, in, onto, under or through the Real Property or the Environment.

"**Relevant Transfer**" means a relevant transfer under the Transfer Regulations.

"**Relevant Items**" – Section 3.4.2.

"**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

"**Remediation Standards**" means standards: (i) which are the minimum standards based on a risk assessment permitted under Environmental Laws; (ii) which are applicable to the industrial use and operations at the Real Property as carried out at the Closing Date; and (iii) that it is reasonable to consider would be acceptable, to a relevant Competent Authority lawfully exercising its powers under Environmental Laws, in each case as in existence as of the Closing Date.

"**Remedy**" - Section 11.4.3.A.

"**Removal Activities**" - Section 6.37.

"**Required Bid Documents**" – Section 10.5.

"**Retained Liabilities**" – Section 2.3.

"**Return Date**" – Section 10.11.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets from Sellers to Buyers in accordance with this Agreement and the Ancillary Agreements.

"**Sale Approval Order**" – Section 6.2.2.

"**Sale Funds**" – Section 5.8.

"**Sale Hearing**" – Section 10.9.

"**Sale Motion**" means the motion filed by Delphi with the Bankruptcy Court for entry of the Sale Approval Order.

"**SDN List**" – Section 5.6.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Seller Employee Benefit Plans**" means any pension, savings, profit sharing, retirement, bonus, incentive, health, dental, vision, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive, supplemental or deferred compensation, executive benefits, hospitalization, severance, early retirement, termination or retirement indemnity, long service payments, housing, company car, meal subsidies, vacation, sick leave, paid or unpaid time off, jubilee awards, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "**employee benefit plans**" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment, if any, sponsored or maintained or contributed to by any Seller or for which any Seller has any current or contingent Liability and listed on Schedule 4.10.2.

"**Seller IP License Agreement**" – Section 6.15.1.

"**Seller(s)**" means Delphi and/or the relevant Sellers (including Filing Affiliates and non-Filing Affiliates that are Sellers) with respect to the relevant Acquired Assets with respect to the portion of the Business and the context in which such term is used (the Sellers set forth on Schedule 1, will sell, transfer, assign, convey and deliver the Acquired Assets related to the Manufacturing Facilities, Technical Centers and technology set forth opposite their names).

"**Shared Intellectual Property**" means Intellectual Property (other than Corporate Trademark Rights) owned by Delphi or any of its Affiliates that is used in the Business and in one or more other businesses conducted directly or indirectly by Delphi or an Affiliate but is not Purchased Intellectual Property.

"**Software**" means computer software and programs, including source code, object code shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Straddle Period**" – Section 6.5.3.

"**Subsequent Bid**" – Section 10.6.

"**Successful Bid(s)**" – Section 10.8.6.

"**Successful Bidder(s)**" – Section 10.8.6.

"**Suspension Systems Products**" means premium suspension systems including passive dampers and electronically controlled damping systems manufactured and sold by the Sellers.

"**Target Date**" means November 1, 2009.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, escheat, capital, capital gains, sales, use, *ad valorem*, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority.

"**Tax Claim**" means any Claim related to Tax or Taxes.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"**Technical Centers**" means the prototype, technical, application engineering and customer support centers used by: (i) the Ride Dynamics Business which are located at Dayton, Ohio (East River Road); Dayton, Ohio (Research Park); Brighton, Michigan; Krakow, Poland (Podgórki Tynieckie Street); Paris, France; Tokyo, Japan; Russelsheim, Germany; Milford, Michigan (proving grounds); Warren, Michigan; Auburn Hills, Michigan; Munich, Germany; Melbourne, Australia; Shanghai, China; and Noida, India; and (ii) the Brake Business which are located at Dayton, Ohio (East River Road); Brighton, Michigan; Shanghai, China; Taiwan, China; Milford, Michigan; and Marquette, Michigan (test site).

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or primarily used in the Business, in each case pertaining to the design or manufacture of the Products.

"**Third Party**" means any person that is not a Party or a Competent Authority.

"**Third Party Assets**" – Section 2.1.2.A.

"**Trade Secrets**" mean: (i) all forms and types of information, including Technical Documentation, financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, formulae, designs, testing plans, methods, techniques, processes, procedures, programs, program devices, customer and vendor lists, pricing and cost data, whether tangible or intangible, and

regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the information is the subject of efforts that are reasonable under the circumstance to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the other person who can obtain economic value from its disclosure or use; (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean: (i) trademarks, service marks, trademark and service mark applications and registrations, trade names, trade dress, fictitious names, assumed names, logos, slogans, together with all goodwill related to the foregoing and  all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transfer Agreement(s)**" – Section 8.4.2.

"**Transferred U.S. Employees**" – Section 6.6.1.B.

"**Transfer Regulations**" means any Law pursuant to which the employment of any Global Sale Employees will transfer to the relevant Buyer in connection with the transactions contemplated by this Agreement, including but not limited to Directive 77/187/EC as amended by Council Directive 98/50 EEC and consolidated in Council Directive 2001/23/EEC of the European Parliament and Council and any local laws adopted pursuant thereto, the Federal Labor Law of Mexico, and any Law, works council or union agreement otherwise relating to the delivery of information to or consultation with employees or their representatives in connection with the transactions contemplated by this Agreement.

"**Transfer Taxes**" – Section 6.5.4.

"**Transition Services Agreement**" – Exhibit 8.4.11.

"**U.K. Business**" means the portion of the Business conducted by the U.K. Seller.

"**U.K. Buyer**" means the Buyer entity created by Buyer Parent in accordance with Section 5.12 to acquire the Acquired Assets of the U.K. Business.

"**U.K. Employee Liability Information**" means the information which a transferor is obligated to notify to a transferee pursuant to U.K. Regulation 11(2) of the U.K. Regulations regarding any person employed by him who is assigned to the organized grouping of resources or employees which is the subject of a Relevant Transfer.

"**U.K. Employees**" means all employees of the U.K. Seller who are wholly employed in the operation of the U.K. Business immediately prior to the Closing Date save for any such employee who objects to the transfer of his or her employment by reason of Regulation 4(7) of the U.K. Regulations or who otherwise resigns or treats his or her employment as being terminated on or prior to the Closing Date.

"**U.K. Payment**" – Section 3.2.2.

"**U.K. Pension**" means that certain pension plan provided by the U.K. Seller to the U.K. Employees.

"**U.K. Regulations**" means the Transfer of Undertakings (Protection of Employment) Regulations 2006 and/or any other regulations enacted for the purpose of implementing Council Directive 77/187/EEC (as amended by Council Directive 98/50/EEC and consolidated in Council Directive 2001/23/EEC) into English Law.

"**U.K. Seller**" means Delphi Automotive Systems UK Ltd.

"**U.S. Employees**" means the salaried employees who are employed by Sellers wholly in the Business in the United States immediately prior to the Closing and identified on <u>Schedule 4.10.1</u>.

"**USA Patriot Act**" – Section 5.6.

"**WARN Act**" means the United States' Worker Adjustment and Retraining Notification Act, as amended.

"**Warranty Period**" means the Product warranty period contained in the relevant pre-Closing customer Contracts included in the Acquired Assets between Seller(s) and customer(s) of the Business.

**1.2    Other Interpretive Provisions.**  The words "**hereof**", "**herein**" and "**hereunder**" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "**include**", "**includes**" and "**including**" are deemed to be followed by the phrase "**without limitation**."   The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "**dollars**" or "**$**" are deemed references to the lawful money of the United States of America, and all references to "**Euros**" or "**€**" are deemed references to the lawful money of the European Economic and Monetary Union.  References to undertakings by the "**Buyer(s)**" or the "**Seller(s)**" are understood to be undertakings by Delphi and Buyer Parent to cause the relevant Buyer to perform, and the relevant Seller to perform, as the case may be.

**2.     PURCHASE AND SALE:**

**2.1     Transfers by Sellers and their Affiliates:**

**2.1.1     Purchase and Sale of the Acquired Assets.**  Upon the terms and subject to the conditions set forth in this Agreement as supplemented by any applicable Transfer Agreement and subject in each case to Section 2.1.2., the Sellers will sell, transfer, assign, convey and deliver to the Buyers, and the Buyers will purchase, accept and acquire from the Sellers, free and clear of all Encumbrances except Permitted Encumbrances, all of the Acquired Assets on the Closing Date.  Except for the Acquired Assets, the Sellers will retain all other assets, properties, rights and interests owned, used or held by the Sellers.  The "**Acquired Assets**" consist of all of Sellers' right, title and interest in and to the assets and

properties primarily used or held for use in the Business (other than the Excluded Assets), including:

    **A.**    Administrative Assets;

    **B.**    Personal Property (see Schedule 2.1.1), including the Four Post Shaker;

    **C.**    Permits (where transfer is permitted by law);

    **D.**    Inventory (see Schedule 2.1.1 and Schedule 4.15.3);

    **E.**    Contracts;

    **F.**    Real Property;

    **G.**    Tooling deposits from customers of the Business as set forth on Schedule 2.1.1.G;

    **H.**    Purchased Intellectual Property and Technical Documentation (other than Technical Documentation referred to in Schedule 2.1.2.N);

    **I.**    With respect to Software and the Technical Centers indicated as a "shared" site on Schedule 2.1.1, the Acquired Assets consist only of the assets specifically set forth in Schedule 2.1.1.I or (in the case of tangible assets) Schedule 4.15.4;

    **J.**    Notwithstanding Section 2.1.2.N of this Agreement, individual IT hardware leases primarily relating to the Business, including the individual leases for the hardware identified on Schedule 2.1.1.I or Schedule 4.15.4 as Acquired Assets or "included", are Contracts included in the Acquired Assets in accordance with the terms of this Agreement (the "**Hardware Contracts**"), although the master or regional lease agreements relating to such hardware are Excluded Assets;

    **K.**    Engineering vehicles purchased by Delphi as referenced in Section 3.3.2; and

    **L.**    Tooling rebill amounts collected from customers (whether before or after Closing) related to tooling funds paid by Buyer as part of an Advance Payment.

    **2.1.2**  **Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties and assets will not be included in the Acquired Assets (the "**Excluded Assets**"):

    **A.**    **Third Party Assets.**  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer donate and containers owned by an OEM or any other third party, including third party bailed assets, (the "**Third Party Assets**");

provided, however, that any Contracts or other rights the Sellers have pertaining to such Third Party Assets will be transferred as part of the Acquired Assets.

      **B.**    <u>**Excluded Intellectual Property**</u>.  All Intellectual Property not primarily used, primarily arising from, or primarily relating to the Business as currently conducted, including Corporate Trademark Rights (collectively, "**Excluded Intellectual Property**").

      **C.**    <u>**Financial Assets**</u>.  All Cash and Accounts Receivable of the Business as of the Closing Date.

      **D.**    <u>**Deposits**</u>.  All utility deposits, deposits made in connection with leased property, and similar deposits of the Business ("**Deposits**") as of the Closing Date, as applicable, except to the extent that Buyer reimburses Seller for such Deposits and except for tooling deposits.

      **E.**    <u>**Insurance**</u>.  Insurance coverage and insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums; provided that Buyer shall be entitled to insurance proceeds that are payable to a Seller and that are needed to repair any Acquired Assets damaged between the date of this Agreement and Closing, to the extent that such repairs have not been completed prior to Closing.

      **F.**    <u>**Records**</u>.  Any books, records and other materials that any Seller is required by Law to retain, and all "Delphi" marked sales and promotional materials and brochures, subject to Buyer's rights under Section 6.14.1; provided, however, for a period of twelve (12) months following the Closing Date, the relevant Seller shall provide reasonable access to such records upon Buyers' reasonable request.

      **G.**    <u>**Claims**</u>.  All rights, claims, defenses, causes of action or claims of any kind relating to either the Excluded Assets or the Retained Liabilities or any business of the Sellers other than the Business as well as all rights and causes of action against third parties arising out of events occurring before or in connection with the Closing, to the extent that such rights and causes of action relate to the ownership of the Acquired Assets or the operation of the Business prior to or arising out of the Closing, including all claims, rights, causes of action against an employee of the Business who received payments from a Seller or an Affiliate of a Seller pursuant to a Seller retention agreement or similar agreement as a result of the consummation of the transactions contemplated by this Agreement, but excluding any of the foregoing which are related to any Assumed Liabilities.  Without limiting the foregoing, Sellers will retain the right to receive tooling rebill amounts collected from customers (whether before or after Closing) related to Capital Expenditures paid by any Seller and not reimbursed as part of an Advance Payment.

      **H.**    <u>**Tax Refunds; Duties**</u>.  To the extent that the following are or were paid by Sellers (before or after Closing): all tax refunds, credits, prepayments or deferrals and any duty, VAT, or other similar refunds or rights to such refunds relating to any customs transactions occurring prior to the Closing

Date, all Taxes relating to such customs transactions, and all Tax Returns and work papers relating thereto of any Seller for any time period prior to the Closing Date.

I.    **Bankruptcy Rights.**    All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

J.    **Personnel Records.**    All work histories, personnel and medical records of employees and former employees of any Seller who worked at any time for any reason for the Business for whom a record exists at the Business on the Closing Date; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, the appropriate Buyer(s) will be provided the originals of all personnel and medical records of all active Global Sale Employees after posted written notice or other appropriate notice to such Global Sale Employees if legally required or if Sellers so elects. All such personnel and medical records of Global Sale Employees are books and records governed by Section 6.13 of this Agreement.  Upon written request of Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to Sellers (or an Affiliate of Sellers as directed) at which time Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer with copies of the personnel and medical records of such employees.  If an employee exercises any right given to such employee under applicable Law to object to provision of personnel or medical records to any Buyer, the records will not be provided, except to the extent Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local law without adverse consequences to Sellers or to any Affiliate of Sellers.

K.    **Privileged Information and Materials.**    Information and materials protected by the attorney-client privilege (or its equivalent in jurisdictions outside the United States), or that, in the case of environmental-related documents, Sellers consider to be proprietary information.

L.    **Certain Sites.**    (i) Seller's rights in Real Property (including any improvements located thereon) listed on Schedule 2.1.1 as "N" or not included; and (ii) Personal Property and Inventory indicated as "none", "N/A" or "No" on Schedule 2.1.1 or which are located at sites indicated as "Shared" on Schedule 2.1.1, except for such Inventory or Personal Property specifically set forth on Schedules 2.1.1.I, 4.15.3 or 4.15.4.

M.    **Common Delphi Services.**    Subject to the provisions of the Transition Services Agreement, common Delphi services and agreements, including legal, human resources, purchasing, customs, insurance, assets management, finance, tax, and information technology and support and the assets related thereto.

**N.    Inventory, Shared Contracts and Other Assets.**    (i) All Inventory, products, rights, properties, assets and businesses of the Business which will have been transferred or disposed of by Sellers prior to the Closing Date in the Ordinary Course of Business; (ii) any document, information, Permit, Contract, Intellectual Property or other asset the transfer of which is prohibited by any Law; (iii) all computer hardware (other than the Hardware Contracts), equipment, Excluded Software and other assets listed on Schedule 2.1.2.N; (iv) vehicles assigned to Global Sale Employees under Seller's company vehicle program and pooled vehicles; (v) the DPSS Inventory; (vi) the E&O Inventory, subject to Section 6.34; and (vii) any and all utilities and other regional or global Contracts currently used in the Business that are shared with other businesses of any of the Sellers, including contracts referred to in Schedule 2.1.2.N.

**O.    Permits.**    Any and all Permits currently in place which are non-transferable or that are shared with other businesses within the legal entity that currently operates the local portion of the Business.

**P.    Employee Related Assets.**    Any assets related to the Retained Liabilities set forth in Section 2.3.6.

**Q.    KDAC/PBR.**    All assets, business lines, rights, Contracts and claims of KDAC and/or PBR, wherever located, whether tangible or intangible, real, personal or mixed.

**2.1.3    Post-Closing Asset Deliveries.**    Should Sellers or any Buyer (within one hundred eighty (180) days after the Closing Date and subject to the continued employment of Global Sale Employees familiar with the Business), in their reasonable discretion, determine after the Closing Date, that books, records or other tangible assets constituting Acquired Assets are still in the possession of Sellers or any of their Affiliates, Sellers will or will cause such Affiliates to promptly deliver them to Buyer at no cost to Buyer. Should Sellers or Buyers (within one hundred eighty (180) days after the Closing Date), in their reasonable discretion, determine that books, records or other tangible assets constituting Excluded Assets were delivered to a Buyer, such Buyer will promptly return them to the Seller at no cost to Sellers.

**2.2    Assumption of Liabilities**.    Subject to the Buyer's rights of indemnification by Sellers under this Agreement and the Transfer Agreements with respect to the pre-Closing operations of the Business, Buyers will assume, and will thereafter pay, perform and discharge as and when due, and will be liable with respect to only the following Liabilities of Sellers, no matter how arising (collectively, the "**Assumed Liabilities**").

**2.2.1**    All Liabilities of Sellers arising on or after the Closing Date, under any Contracts, licenses, permits, leases and other agreements included in the Acquired Assets and assigned or otherwise transferred to Buyers or any relevant Buyer Affiliate pursuant to the terms of this Agreement, the Patent Assignment, the Trademark Assignment or the Transfer Agreements, and other obligations relating to any Buyer's ownership or use of the Acquired Assets on or after the Closing Date;

**2.2.2**    All Liabilities relating to the Acquired Assets and arising on or after the Closing Date, including Claims and other obligations, in each case to the extent relating to any Buyer's ownership or use of the Acquired Assets;

23

**2.2.3**   All Product Warranty Claims with respect to Products manufactured on, before or after the Closing Date, except that with respect to Products manufactured before the Closing Date by Sellers or any of their predecessors, Buyer shall only assume liability for Product Warranty Claims made following expiration of the applicable Warranty Period;

**2.2.4**   All Product Recall Claims with respect to Products manufactured on, before or after the Closing Date, except that with respect to Products manufactured before the Closing Date by Sellers or any of their predecessors, Buyer shall only assume liability for Product Recall Claims made following expiration of the applicable Warranty Period;

**2.2.5**   All Claims relating to infringement of Intellectual Property and/or Product Liability Claims, in each case relating to Products manufactured on or after the Closing Date;

**2.2.6**   Any and all Environmental Claims, Losses or Liabilities relating to: (i) the existence of or a Release of Hazardous Materials at, on, in or under the Environment at any Real Property used by the Business arising on or after Closing (except that regarding MSA Manufacturing Facilities, Buyer will be responsible only to the extent such Losses or Liabilities are caused by changes to the manufacturing process effected by Buyer despite written objection from Seller, or by the acts of a Buyer employee located at such MSA Manufacturing Facility); or (ii) compliance with or failure to comply with any Environmental Laws or any Environmental Permit, whether in effect prior to or after the Closing Date, related to the operation of the Business arising on or after the Closing Date in respect of the Acquired Assets;

**2.2.7**   All deferred revenue obligations set forth on <u>Schedule 2.2.7</u>, including all obligations to fulfill orders relating to Products of the Business outstanding on the Closing Date;

**2.2.8**   Any and all Tax Claims, to the extent that they arise out of or relate to the period after the Closing Date;

**2.2.9**   Liabilities with respect to Global Sale Employees which are not retained by Seller pursuant to Section 2.3.6, including, but not limited to: (i) obligations to Global Sale Employees arising from such employee's past service with any Seller prior to the Closing Date consistent with the employee information provided in the schedules included under Section 4.10, and the Purchase Price adjustments of Section 3.3.2 (the "**Past Service Financial Obligations**"); and (ii) as set forth in Sections 6.6, 6.7, 6.8 and 6.9;

**2.2.10**  All Liabilities that any Buyer assumes or agrees to pay for or to be responsible for pursuant to the terms of this Agreement or any Ancillary Agreement or as required by Law due to the transfer of the Business to Buyer;

**2.2.11**  All of Delphi's obligations under the JAVE cost saving program made in connection with awards of business prior to the Closing Date; and

**2.2.12**  Liabilities for Taxes related to the debonding or other change in customs status of the Acquired Assets resulting from the Buyer not establishing the required legal entities and obtaining the necessary authorizations from the relevant Governmental Authority to receive the Acquired Assets in their customs status.

**2.3**    **Retained Liabilities.**  Except as referred to in Section 2.2, Buyer will not assume or be deemed to have assumed, and will have no Liability with respect to, any Liabilities of any Seller and such Seller will continue to be responsible for such Liabilities (collectively, "**Retained Liabilities**") including the following:

**2.3.1**    Accounts Payable of the Business as of the Closing Date, including the removal of any Encumbrance arising from the failure to pay any such Accounts Payable;

**2.3.2**    Product Warranty Claims made by a third party against the Business before expiration of the applicable Warranty Period for Products manufactured before the Closing Date;

**2.3.3**    Product Recall Claims made by a third party against the Business before expiration of the applicable Warranty Period for Products manufactured before the Closing Date;

**2.3.4**    Claims relating to infringement of Intellectual Property or Product Liability Claims, in each case for Products manufactured before the Closing Date;

**2.3.5**    Any and all Environmental Claims, Losses or Liabilities relating to the existence of, or a Release of Hazardous Materials of, on, in or under the Environment at any Manufacturing Facility arising before the Closing Date or at any Manufacturing Facility which is subject to an MSA (except to the extent caused by changes to the manufacturing process effected by Buyer despite written objection from Seller, or by the acts of a Buyer employee located at such MSA Manufacturing Facility), or compliance with or failure to comply with any Environmental Laws or any Environmental Permit related to the Business before the Closing Date, including, but not limited to, the liabilities referred to in Schedule 2.3.5;

**2.3.6**    Liabilities with respect to pre-Closing employment of employees including the Global Sale Employees, including: (a) Liabilities of the Sellers for the pension plans existing as of the Closing Date for the benefit of employees of the Business employed in the United States, the United Kingdom (including any early retirement benefits owed to Luton employees who reach age 60 and have completed 10 years of service at the Closing Date) and China, including any Liabilities associated with any underfunding of the same existing as of the Closing Date; (b) those obligations of Sellers to Global Sale Employees set forth in Sections 6.6, 6.7, 6.8 and 6.9, but excluding Past Service Financial Obligations; (c) claims by temporary employees or independent contractors of the Business relating to periods before Closing.

**2.3.7**    Any and all Tax Claims, to the extent that they arise out of or relate to the period ending on or before the Closing Date.

**2.3.8**    All Liabilities for all obligations under any retention agreement or similar agreement allowing for additional compensation to be paid to an employee of the Business by a Seller upon the consummation of the transactions contemplated by this Agreement, to the extent that such Liabilities are not reflected in a dollar-for-dollar price reduction of the Preliminary Purchase Price;

**2.3.9**    Any Liability of Sellers arising prior to the Closing Date for administrative fees and expenses that are "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code, professional fees or expenses under Section 328, 330 or 331 of the

Bankruptcy Code, or any other fees or expenses associated with administration of the Filing Affiliates Bankruptcy Cases;

**2.3.10**  Liabilities related to the Excluded Assets;

**2.3.11**  Any Liability arising out of any Proceeding either pending or for which a written threat exists as of the Closing Date relating to the conduct of the Business prior to the Closing Date (including those disclosed on the Schedules to this Agreement);

**2.3.12**  Any Liability of the Sellers arising out of, relating to, or incurred in connection with the businesses retained by the Sellers and which are not arising out of or incurred in connection with the Business;

**2.3.13**  Liabilities of Sellers related to Debt Obligations; and

**2.3.14**  Liabilities of Sellers arising prior to the Closing Date (and not as a result of the transactions contemplated under this Agreement) under any Law governing the export and import of: (i) Products; (ii) Technical Documentation; or (iii) Intellectual Property.

**2.3.15**  Pre-Closing breaches of that Certain Agreement.

**2.4**   **Deferred Items:**

**2.4.1**   **Non-Assignability.**   To the extent that any Contract, Intellectual Property License Agreement or Permit included in the Acquired Assets is not capable of being assigned (whether pursuant to Section 365 of the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (including a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

**2.4.2**   **Efforts to Obtain Necessary Consents.**   At the applicable Buyer's request, the applicable Seller will, at its expense, use commercially reasonable efforts, and the applicable Buyer will, at its expense, cooperate with Sellers, to obtain the necessary Consents and to resolve the impracticalities of assignment referred to in Section 2.4.1 before or after the Closing Date. In the case of Contracts with third parties in those countries where local law requires consent of the counter-party to assign the obligations under a Contract, if such consent is obtained, Buyer shall execute an appropriate third party novation agreement with the third party and the appropriate Seller in order to effect a transfer of all rights and obligations under the relevant Contract in accordance with the terms of this Section 2.4.2.

**A.**   **If Consents Cannot be Obtained.**   To the extent that the Consents referred to in Section 2.4.1 are not obtained by the applicable Seller, or until the impracticalities of assignment referred to therein are resolved, Sellers' sole responsibility with respect to such matters, notwithstanding Section 2.1.1, will be to use, during the twelve (12) month period commencing on the Closing Date, commercially reasonable efforts, at no out-of-pocket cost (i.e., costs paid to third parties) to Sellers, to: (i) provide to Buyer the benefits of any Deferred Item;

(ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer, without incurring any financial obligation to Buyer; and (iii) enforce for the account of Buyer and at the cost of Buyer any rights of Sellers arising from any Deferred Item referred to in Section 2.4.1 against such issuer thereof or other party or parties thereto.

**2.4.3    Obligation of Buyer to Perform.**  To the extent that any Buyer is provided the benefits of any Deferred Item pursuant to Section 2.4, such Buyer will perform, on behalf of Sellers, for the benefit of the issuer thereof or the other party or parties thereto the obligations of Sellers thereunder or in connection therewith (including payment obligations) and if such Buyer fails to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may suspend their performance under Section 2.4 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or Sellers may perform at Buyer's sole cost and expense, in which case Buyer will reimburse Sellers' costs of such performance immediately upon receipt of an invoice therefor.

**2.4.4    Standard of Care.**  Sellers will have no Liability to any Buyer arising out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyer Parent or its Affiliates.  Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

**3.    PURCHASE PRICE; ADJUSTMENT; ALLOCATION:**

**3.1    Deposit Amount.**  On of before April 9, 2009, Buyer Parent will deliver to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement Twenty Million Dollars ($20,000,000.00) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing Date, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Buyer Parent to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures (which procedures will be set forth in the Deposit Escrow Agreement):

**3.1.1**    Delphi and Buyer Parent will jointly instruct the Escrow Agent to deliver the Deposit Amount on the Closing Date, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement to be applied to the Purchase Price;

**3.1.2**    Within ten (10) Business Days after any termination of this Agreement by Delphi pursuant to Section 9.1.5, Delphi and Buyer Parent will jointly instruct the Escrow Agent to deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement, to be retained by Delphi; or

**3.1.3**    Upon termination of this Agreement in accordance with the termination provisions set forth in Article 9, for any reason other than pursuant to Section 9.1.5, then, on: (i) the date which is no later than ten (10) Business Days after such termination; or (ii) in the event that an Alternative Transaction is completed, the Return Date (whichever is earlier) Delphi and Buyer Parent will jointly instruct the Escrow Agent to deliver the Deposit

Amount, by wire transfer of immediately available funds, to an account designated by Buyer Parent in the Deposit Escrow Agreement, to be retained by Buyer Parent.

**3.2**    **Advance Payments**:

**3.2.1**    Within:(i) two (2) Business Days after the date the Sale Approval Order is entered if no objections to the Sale were filed prior to the date of such order; or (ii) eleven (11) days after the date the Sale Approval Order is entered if any objections to the Sale were filed prior to the date of such order, Buyer will make RMB available to Delphi China Brakes the RMB equivalent (based on foreign exchange rate in effect on the date of the Sale Approval Order), Seven Million US Dollars ($7,000,000.00)) as an Advance Payment . This Advance Payment is intended to fund Delphi China Brake's Capital Expenditures in calendar year 2009 (reimbursing prior payments and funding future expenditures) prior to the Closing Date as set forth on Schedule 3.2 (which schedule also includes mutually agreed procedures relating to requests for, and payments of, Advance Payments), with the first portion of the Advance Payment paid to Delphi China Brakes following the date of the Sale Approval Order as set forth in the first sentence of this Section 3.2 and in Schedule 3.2. Subsequent payments will be made within two (2) Business Days following Buyer's receipt (but subject to Buyer's approval not to be unreasonably withheld or delayed and to be deemed received if Buyer fails to object in writing to any request within two (2) Business Days after receipt of a request) of additional requests in accordance with the procedures set forth as part of Schedule 3.2. If Delphi China Brakes' forecast Capital Expenditures prior to Closing exceeds $7,000,000.00 and subject to Buyer's prior consent (not to be unreasonably withheld or delayed), Buyer shall, on the same terms and conditions, advance an additional $1,000,000 (or such higher amount as is consistent with the forecast included as part of Schedule 3.2, if the Closing occurs after the second quarter of 2009, and in any case all such additional amounts shall for all purposes be considered a portion of the Advance Payment). As a condition to the advance of any portion of the Advance Payment, Buyer shall be satisfied that it has the equivalent of a fully perfected first priority blanket lien on only the assets acquired with the Advance Payment, in the form of a mortgage signed by Delphi China Brakes substantially in the form of Exhibit 3.2.1 and registered with the relevant Governmental Authority ("**China Mortgage**"). The Advance Payment, including any additional amounts paid to Delphi China Brakes in the event that Capital Expenditures exceeds $7,000,000, shall be credited to Buyer as part of the Price Adjustments made at Closing, in accordance with Section 3.3.2 below. The Advance Payment will be repaid in RMB by Delphi China Brakes within ten (10) Business Days after any termination of this Agreement, and the China Mortgage released immediately thereafter.

**3.2.2**    After September 1, 2009, within two (2) Business Days following Buyer's receipt (but subject to Buyer Parent's approval not to be unreasonably withheld or delayed and to be deemed received if Buyer Parent fails to object in writing to any request within two (2) Business Days after receipt of a request) from the relevant local Seller of a request to make available to the Polish Seller or the U.K. Seller (as appropriate) amounts to reimburse the Polish Seller or the U.K. Seller (as appropriate) for Capital Expenditures incurred by them from and including September 1, 2009 through the Closing Date in respect of the Polish Business or the U.K. Business, Buyer Parent shall pay such amounts to the Polish Seller or the U.K. Seller in each case as an advance payment of part of the Price Adjustment allocable to the Acquired Assets, as appropriate, in Poland or the U.K. (in aggregate and consistent with the forecast included as part of Schedule 3.2, the "**Poland Payment**" or the "**U.K. Payment**", as applicable). Requests for and payment of any advance(s) of any portion of the Poland Payment and/or the U.K. Payment shall be made in

accordance with the agreed procedures set forth in <u>Schedule 3.2</u>. As a condition to the advance of any portion of the Poland Payment or the U.K. Payment, Buyer shall be satisfied that it has, or will have upon registration with the appropriate Governmental Authority, the equivalent of a fully perfected first priority lien on only those assets that have been acquired by the Polish Seller or the U.K. Seller (as appropriate) from and including September 1, 2009 and for which the relevant portion of the Poland Payment or the U.K. Payment, as applicable, will be used by the Polish Seller or the U.K. Seller as reimbursement to it for amounts expended in respect of such assets, such lien to be pursuant to the terms of a registered pledge (in Poland) and registered charge (in the U.K.) which is in each case substantially in the form of <u>Exhibit 3.2.2.A</u> in the case of a registered pledge (in Poland) or substantially in the form attached of <u>Exhibit 3.2.2.B</u> in the case of a registered charge (in the U.K.). The total Poland Payment and U.K. Payment shall be credited to Buyer as part of the Price Adjustment made at Closing, in accordance with Section 3.3.2 below. The Poland Payment and the U.K. Payment will be repaid in the currency advanced by the applicable Buyer within ten (10) Business Days after any termination of this Agreement, and the relevant pledges and/or charges released immediately thereafter.

### 3.3    <u>Preliminary Purchase Price</u>:

**3.3.1** On the Closing Date and subject to the terms and conditions of this Agreement, in consideration of the sale of the Acquired Assets, Buyer Parent, on behalf of Buyers, will pay to Delphi or the Sellers designated by Delphi an amount equal to Seventy Million US Dollars (USD$70,000,000.00) (plus the Deposit Amount, the "**Preliminary Purchase Price**"), subject to adjustment pursuant to Section 3.3.2. Without limiting Buyer's obligations under Section 3.2 or the amount of any Price Adjustment under Section 3.3.2(iv)(a), the estimated upward adjustment for Advance Payments under Section 3.3.2, assuming a Target Date Closing, approximates Eighteen Million US Dollars (USD $18,000,000).

**3.3.2** The Preliminary Purchase Price will be subject to a "**Price Adjustment**", otherwise only for: (i) the difference between the Benchmark Inventory Amount and the Estimated Inventory Amount, as described in Section 3.5.1 below; (ii) an amount equal to the amount of Past Service Financial Obligations as of the Closing Date consistent with the Seller's current accounting methodology for such liabilities and <u>Schedule 3.3.2</u>; which shall result in a downward adjustment assuming a benchmark of $0.00; (iii) the amount paid by Delphi to purchase leased engineering vehicles at Closing which vehicles shall be transferred to the Buyer at Closing which shall result in an upward adjustment; (iv) an amount equal to the sum of: (a) the aggregate amounts of the Advance Payments (China, U.K. and Poland); plus (b) the JAVE Payments outstanding at Closing, which will result in an upward adjustment (recognizing that pursuant to Sections 3.2 and 6.40 the foregoing amounts will have already been received by the applicable Seller, and that no additional cash will be paid by Buyer with respect thereto); (v) an amount equal to the Mexico Capital Expenditures paid by Seller on or after September 1, 2009 (or August 1, 2009 if the Sale fails to close by the Target Date for the reasons set forth in Section 3.3.2.A) which shall result in a upward adjustment; (vi) in the event that Capital Expenditures paid by Delphi in Mexico, the U.K. or Poland for the period from June 1, 2009 to August 31, 2009 is: (a) less than Pre-Closing Targeted Capex, a downward Price Adjustment would be made equal to the amount of such deficiencies; and (b) is more than Pre-Closing Targeted Capex, an upward Price Adjustment would be made equal to the amount of such excess; and (vii) the amount of the August Capital Expenditures would be an upward Price Adjustment, if applicable.

**A.**   **August Capital Expenditures.**  In the event that the Closing does not occur on or before the Target Date, an upward Price Adjustment equal to the aggregate amount of Capital Expenditures paid by Sellers pursuant to <u>Schedule 3.2</u> during the month of August, 2009; only in the event that the Closing does not occur on or before the Target Date, as a result of: (y) a  breach by Buyer which would entitle Seller to terminate this Agreement pursuant to Section 9.1.5; or (z) the failure to receive the Overseas Investment Project Approval on or before the Target Date (the "**August Capital Expenditures**").

**B.**   **Pre-Closing Adjustment.**  Approximately thirty (30) days prior to the Closing Date, Delphi will prepare and deliver to Buyer Parent an estimate as of the Closing Date of the: (a) Inventory of the Business which shall be calculated using the methodology consistent with the preparation of the Closing Inventory Statement, as described in Section 3.4 below; provided, however, that such estimate shall be based on the inventory records of Seller (the "**Estimated Inventory Amount**"); (b) the amount of Past Service Financial Obligations ("**Estimated Past Service Financial Obligations**"); (c) the amount of any Price Adjustment for the matters referred to in clauses (iii) through (vii) above, including, with respect to the Mexico Capital Expenditures, the type of documentation as would have been required had Buyer funded such expenditure in accordance with the procedures set forth on <u>Schedule 3.2</u>; and (d) the aggregate amount of the upward or downward Price Adjustment to be made pre-Closing.  If the aggregate pre-Closing Price Adjustment is a positive amount, then such amount shall increase the Preliminary Purchase Price by the amount of the positive number.  If the pre-Closing Price Adjustment is a negative amount, then such amount shall decrease the Preliminary Purchase Price by the amount of the negative number.

**C.**   **Post-Closing Adjustment.**  After Closing, a true-up with respect to changes in Inventory, the Past Service Financial Obligations and the matters set forth in clauses (iv) thru (vii) of Section 3.3.2 (as well as the amount of any pro-rations under Section 3.7 which are not addressed at Closing) will occur in the manner described in Sections 3.3.2 and 3.4, but using the Estimated Inventory Amount, Estimated Past Service Financial Obligations and Estimated Mexico Adjustment from the pre-Closing Price Adjustment calculation as the base numbers instead of amounts from the Benchmark Inventory Amount and the $0.00 benchmark for Past Service Financial Obligations.

**3.4**   **Preparation of Closing Statement:**

**3.4.1**   Within sixty (60) days after the Closing Date, Delphi will prepare and deliver to Buyer Parent a Closing Statement consisting of: (i) a Closing Inventory Statement; (ii) a statement as of the Closing Date of the amount of Past Service Financial Obligations; (iii) the matters set forth in clauses (iv) thru (vii) of Section 3.3.2; and (iv) the amount of any pro-rations under Section 3.7 which are not addressed at Closing.  The Closing Inventory Statement will be based on a physical inventory of the Inventory of the Business, to be taken jointly by the Parties, consistent with past practice, the weekend prior to the Closing Date or such other date as Delphi and Buyer Parent shall agree.  The calculation of the Estimated Inventory Amount and the Closing Inventory Amount shall be determined separately for each of the Ride Dynamics Business and Brake Business and shall utilize a methodology,

and accounting therefor, consistent with the methodology used in determining the Benchmark Inventory Amount (attached as <u>Schedule 3.4.1</u>) with the determination and valuation of E&O Inventory as defined in this Agreement.  The calculation of the Past Service Financial Obligations shall utilize the methodology and accounting therefor consistent with the method used in determining the Estimated Past Service Financial Obligations. Documentation with respect to the matters set forth in clauses (iv) thru (vii) of Section 3.3.2 shall be provided in consistent with <u>Schedule 3.2</u>.  Each Party's out-of-pocket costs associated with such physical inventory count will be borne separately by such Party. Buyers will, after Closing and pending agreement or final determination of the Closing Statement, allow Delphi and its Affiliates and their accountants, agents and advisers such access to the Business, all relevant employees and all relevant records, information and other documentation (and will, upon request, provide copies thereof) as is reasonably necessary to enable Sellers to prepare the Closing Statement and to settle the Final Closing Statement, including access to and the services of key personnel.

**3.4.2**   Buyer Parent will, within thirty (30) days after the delivery by Delphi of the Closing Statement, complete its review of such statement.  If Buyer Parent disagrees with the Closing Statement, Buyer Parent will, on or before the last day of such thirty (30) day period, inform Delphi in writing (the "**Objection**") of disagreements which, individually or in the aggregate exceed $100,000 (collectively, "**Relevant Items**").  The Parties agree that the Objection will not include objections to the valuation process used to arrive at the Closing Inventory Statement nor to the methodology for calculating the Past Service Financial Obligations unless Buyer can demonstrate that the valuation process used was inconsistent with the methodology set forth in <u>Schedule 3.4.1</u> or <u>Schedule 3.3.2</u>, as applicable.  Any Objection will specify in reasonable detail the nature of any disagreement so asserted, and include all supporting schedules, analyses, working papers and other documentation.  If: (i) no such Objection has been timely provided to Seller; or (ii) the sum of all Relevant Items fails to exceed $100,000, then: (a) the Closing Statement will be deemed to be the Final Closing Statement; and (b) Sellers' calculations will be final and binding on the Parties of all items therein.

**3.4.3**   If Buyer Parent delivers an Objection within the time period set forth in Section 3.4.2, then Delphi will have thirty (30) days following the date it receives the Objection to review and respond to the Objection.  If Delphi and Buyer Parent are unable to resolve all of their disagreements with respect to the determination of the foregoing items by the fifteenth (15th) day following Delphi's response thereto, after having used their good faith efforts to reach a resolution, and the amount remaining in dispute exceeds $100,000 they will refer their remaining differences to Grant Thornton (the "**CPA Firm**"), who will, acting as experts in accounting and not as arbitrators, determine on a basis consistent with the requirements of Section 3.4, and only with respect to the specific Relevant Items that remain in dispute, whether and to what extent, if any, the Closing Statement requires adjustment. For the avoidance of doubt, the CPA Firm will not review the valuation process used to arrive at the Closing Inventory Statement unless the Buyer Parent can show that the valuation process used was inconsistent with the methodology set forth in <u>Schedule 3.4.1</u>. Delphi and Buyer Parent will request the CPA Firm to use its commercially reasonable efforts to render its determination within thirty (30) days.  In resolving any disputed item, the CPA Firm: (i) will be bound by the principles set forth in this Section 3.4 and <u>Schedule 3.4.1</u>; (ii) will limit its review to matters specifically set forth in the Objection that remain disputed; and (iii) will not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party. The CPA Firm's determination will be conclusive and binding upon Delphi and Buyers.

Delphi and Buyers will make reasonably available to the CPA Firm all relevant books and records, any work papers (including those of the Parties' respective accountants subject to any conditions such accountants may impose) and supporting documentation relating to the Closing Inventory Statement, and all other items reasonably requested by the CPA Firm. The "**Final Closing Statement**" will be: (i) the Closing Statement if the Parties so agree or if so determined in accordance with Section 3.4.2; or (ii) if an Objection is made under Section 3.4.2, the Closing Statement, as adjusted pursuant to the agreement of the Parties, or as adjusted by the CPA Firm. The fees, costs and expenses of the CPA Firm under this Section 3.4.3: (i) will be borne by Buyer Parent in the proportion that the aggregate dollar amount of such disputed items so submitted that are unsuccessfully disputed by Buyer Parent (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted; and (ii) will be borne by Delphi in the proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by Buyers' Parent (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted. Whether any dispute is resolved by agreement among the Parties or by the CPA Firm, changes to the Closing Statement may be made only for items as to which Buyer Parent has specifically taken exception in the Objection.  Except as set forth above, each Party will bear its own expenses incurred in this dispute resolution process, including fees of its accountants, attorneys and other agents.

### 3.5    Preliminary Purchase Price Adjustments:

3.5.1    **Estimated Inventory Adjustment.**  If the Estimated Inventory Amount is less than (determined separately for the Ride Dynamics Business and the Brake Business) the Benchmark Inventory Amount, the Preliminary Purchase Price paid at Closing will be decreased by an amount equal to such deficiency.  If the Estimated Inventory Amount is greater than (determined separately for the Ride Dynamics Business and the Brake Business) the Benchmark Inventory Amount, the Preliminary Purchase Price paid at Closing will be increased by an amount equal to the excess.

3.5.2    **Final Price Adjustments.**  Following the determination of the Final Closing Statement:

A.    **Inventory.** (i) The appropriate Seller of Inventory will pay to the appropriate Buyer an amount equal to any deficiency (determined separately for the Ride Dynamics Business and the Brake Business) between the amount of Inventory reflected on the Closing Inventory Statement (as set forth in the Final Closing Statement) and the Estimated Inventory Amount; or (ii) the appropriate Buyer will pay to the appropriate Seller of Inventory an amount equal to the amount by which the amount of Inventory reflected on the Closing Inventory Statement exceeds (determined separately for the Ride Dynamics Business and the Brake Business) the Estimated Inventory Amount, as applicable.

Notwithstanding the foregoing provisions of this Article 3, if any Acquired Assets are divested or sold in order to secure the Governmental Approvals contemplated by Section 6.17.1 in one or more transactions that would have impacted the Benchmark Inventory Amount, then the Benchmark Inventory Amount will be reduced to give effect to such divestiture or sale as if such divestiture or sale occurred prior to the determination of the Benchmark Inventory Amount.  In that event, all calculations pursuant to this Section 3.5 will be effected using such adjusted Benchmark Inventory Amount.

**B.**    **Employee Liabilities**.  (i) The appropriate Seller will pay to the appropriate Buyer an amount equal to any deficiency if the Estimated Past Service Financial Obligations is less than the amount of Past Service Financial Obligations as of the Closing Date as reflected in the Final Closing Statement, with respect to the affected employees; or (ii) the appropriate Buyer will pay to the appropriate Seller an amount equal to any excess if the amount of Estimated Past Service Financial Obligations is greater than the amount of Past Service Financial Obligations as of the Closing Date as reflected in the Final Closing Statement with respect to the affected employees, as applicable.

**C.**    **Other Adjustments**.    If the aggregate estimated Price Adjustments pre-Closing for the matters set forth in clauses (iv) thru (vii) of Section 3.2.2 exceed the amount of the Price Adjustments for such matters as reflected in the Final Closing Statement, then Delphi will pay to the appropriate Buyer an amount equal to the excess; if the aggregate estimated Price Adjustments pre-Closing for the matters set forth in clauses (iv) thru (vii) of Section 3.2.2 are less than the Price Adjustment for such matters as reflected in the Final Closing Statement, then Buyer Parent will pay the appropriate Seller an amount equal to the deficit.

**D.**    **Pro-Rations**.  The Preliminary Purchase Price will be increased or decreased, as appropriate, for any pro-rations under Section 3.7.

**E.**    **Final Payment**.  The net deficiency or excess payment pursuant to this Section 3.5.2 will be paid in immediately available funds within thirty (30) days after the ultimate determination of the Final Closing Statement as provided in Section 3.4.

**3.5.3**  **Purchase Price**.  The Preliminary Purchase Price (plus or minus all Price Adjustments) shall be referred to as the "**Purchase Price**".

**3.6**    **Allocation of Purchase Price:**

**3.6.1**    The Parties agree to allocate the Preliminary Purchase Price and all Price Adjustments among the Acquired Assets, for all purposes (including financial, accounting and tax purposes) (the "**Allocation**") in a manner consistent with the Allocation Schedule attached as Schedule 3.6.1.

**3.6.2**    Buyer Parent and Delphi will each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Code (or any successor form or successor provision of any future tax law and similar form with respect to Tax Returns in jurisdictions other than the U.S.) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law.  Delphi will provide Buyer Parent and Buyer Parent will provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under Section 1060 of the Code and similar form with respect to Tax Returns in jurisdictions other than the U.S.

**3.7**    **Pro-Rations:**

**3.7.1**    To the extent that any Seller makes any payment relating to the Business prior to the Closing Date, with respect to any item listed in Section 3.7.2 below relating to periods on or after the Closing Date, as applicable, Buyer will reimburse such Seller for a portion of such payment equal to the amount paid by such Seller multiplied by a fraction the numerator of which is the number of days in the applicable billing period from and including the Closing Date, as applicable to the end of the billing period and the denominator of which is the entire number of days in the applicable billing period; and

**3.7.2**    To the extent Buyer is required to make any payment relating to the Business following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, as applicable, Seller will reimburse such Buyer for a portion of such payment equal to the amount paid by such Buyer multiplied by a fraction the numerator of which is the number of days in the applicable billing period ending on the Closing Date, as applicable and the denominator of which is the entire number of days in the applicable billing period:

**A.**    Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business;

**B.**    Electric, fuel, gas, telephone and other utility charges with respect to the Business;

**C.**    Regarding Global Sale Employees, payroll expenses (excluding vacation pay) and other employee-related payments (of whatsoever kind) or assessments and installments on special benefit assessments;

**D.**    Reimbursable employee business expenses of Global Sale Employees;

**E**.    Lease payments, and property taxes; and

**F.**    Payments and charges due under any Contract other than pursuant to Collective Bargaining Agreements, Seller Employee Benefit Plans and employee payroll-related items except as set forth in Sections 6.6, 6.7, 6.8 and 6.9, Permit, commitment or other binding arrangement to which any Sellers is a party or is obligated and which are being assigned to a Buyer pursuant to this Agreement.

**4.**    **REPRESENTATIONS AND WARRANTIES OF SELLERS:**

Each Seller represents and warrants, as of the date hereof, severally to Buyers with respect to the Acquired Assets being sold by such Seller (except that the Filing Affiliates represent and warrant, jointly and severally, with respect to the Acquired Assets of the Filing Affiliates), as follows:

**4.1**    **Organization.**    Each Seller is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.    Each Seller has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being

conducted, and is duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

4.2    **Authorization; Enforceability.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, as applicable, each Seller has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, if applicable, the execution and delivery of this Agreement and the Ancillary Agreements by Delphi and each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Seller.  This Agreement has been duly executed and delivered by Delphi, and the Ancillary Agreements will be duly executed and delivered by Delphi and each Seller, as applicable, and, assuming due authorization, execution and delivery by Buyer Parent and Buyers, constitutes, or will constitute, a valid and binding agreement of Delphi and each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except: (a) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability; (b) that enforceability of the provisions of this Agreement requiring consummation of the Sale is subject to entry and effectiveness of the Sale Approval Order; and (c) that enforceability of all other provisions of this Agreement is subject to entry and approval of the Bidding Procedures Order.

4.3    **Closing Inventory Statement**. The value of Seller's Inventory as reflected on the Closing Inventory Statement is consistent with the books and records of the relevant Business in all material respects and Schedule 3.4.1.

4.4    **No Conflicts or Approvals.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, except as set forth on Schedule 4.4, the execution, delivery and performance of this Agreement and the Ancillary Agreements by Delphi and each Seller that is a party thereto do not: (i) violate the Organizational Documents of any of Delphi or Sellers; (ii) violate any Governmental Order or Law applicable to any of Delphi or Sellers or any of their respective properties or assets; or (iii) require any Governmental Approval, except as set forth in this Agreement and in each case for consents, approvals, authorizations of, declarations or filings with the Bankruptcy Court, except: (x) as would not, individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement; or (y) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code. Except as set forth on Schedule 4.4, to Seller's Knowledge, none of the Acquired Assets require a license or other U.S. Government approval for export or reexport pursuant to the International Traffic in Arms Regulations (the "**ITAR**") or the Export Administration Regulations (the "**EAR**").

**4.5**     <u>Sufficiency of Acquired Assets</u>:

**4.5.1**     Except as set forth in <u>Schedule 4.5</u>, the Acquired Assets, together with the Intellectual Property rights to be licensed from Sellers to Buyers pursuant to Section 6.15.1, comprise all of the assets used by Sellers to carry on the Business in all material respects as it is now being conducted, except for: (i) Excluded Assets (other than Shared Intellectual Property) referred to in Section 2.1.2, clauses B through Q or any schedule included in any such clause; and (ii) assets used to provide services to the Buyers pursuant to the Transition Services Agreement and other Ancillary Agreements.

**4.5.2**     There is no Personal Property that is currently primarily used by the Business at the Technical Centers listed on <u>Schedule 2.1.1</u> as "shared sites" and that is not included in the Acquired Assets.

**4.6**     <u>Compliance with Law; Permits</u>.   Except as set forth on <u>Schedule 4.6</u>, to the Knowledge of Sellers, the Business is in compliance in all material respects with all Laws. To the Knowledge of Sellers, the Sellers possess all licenses, consents, approvals, permits and other Governmental Approvals ("**Permits**") necessary to own, lease and operate the Acquired Assets, except where the failure to have such Permits would not, individually or in the aggregate have a Material Adverse Effect. The representations and warranties relating to Environmental Laws and with respect to Environmental Permits are exclusively set forth in Section 4.13.

**4.7**     <u>Proceedings</u>.   Except for Claims raised in connection with the pendency of the Bankruptcy Cases, and for the Proceedings set forth in <u>Schedule 4.7</u> (and except with respect to compliance with Environmental Laws, which is covered by Section 4.13), there are no material Proceedings pending or, to the Knowledge of Sellers, threatened in writing against any Seller relating to the Business or any of the Acquired Assets.

**4.8**     <u>Absence of Certain Changes</u>.   Except as set forth in <u>Schedule 4.8</u> or in the Confidential Memorandum, or the Management Presentations previously provided to Buyers, or as otherwise provided by this Agreement, to the Knowledge of Sellers, since September 30, 2008: (i) the Business has been conducted in the Ordinary Course of Business; and (ii) there has not been any change or development in or affecting the Business that has had a Material Adverse Effect.

**4.9**     <u>Tax Matters</u>.   The Sellers have withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any Global Sale Employee of the Business. The Sellers have filed all Tax Returns required to be filed and such Tax Returns were true, correct, and complete in all material respects and each Seller has paid all Taxes shown on its tax returns as due and owing, except where the failure to file or to pay such Taxes would not, individually or in the aggregate, result in any Material Adverse Effect.

**4.10**     <u>Employee Benefits</u>:

**4.10.1**  <u>Schedule 4.10.1</u> contains a list of all Global Sale Employees, including for all Global Sale Employees: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual base rate of compensation; (vi) each person's date of hire; and, if applicable, (vii) any material, individual specific provisions

relating to such person's employment (e.g., non-compete agreement, separation pay agreement, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws).[1]

**4.10.2**  Schedule 4.10.2 sets forth a list of each Seller Employee Benefit Plan.

**4.10.3**  Copies of the following materials have been delivered or made available to Buyer Parent with respect to each Seller Employee Benefit Plan to the extent applicable: (i) current plan documents; (ii) the most recent determination letter from the Internal Revenue Service; (iii) the most recent summary plan description and summary of material modifications to the extent not included in the summary plan description in each case distributed to employees; (iv) current agreements and other documents relating to the funding or payment of benefits; and (v) the most recent actuarial valuation report, if applicable.

**4.10.4**  Except as set forth in Schedule 4.10.4, or where the failure to comply would not, individually or in the aggregate, have a Material Adverse Effect, the Seller Employee Benefit Plans are in substantial compliance with their terms and applicable requirements of ERISA, the Code and other Laws (if applicable).  Each Seller Employee Benefit Plan and related trust which is intended to be qualified within the meaning of Section 401 or 501, as applicable, of the Code has received a favorable determination letter as to its qualification and to the Knowledge of Sellers, nothing has occurred that could reasonably be expected to adversely affect such determination.

**4.10.5**  Except as: (i) set forth in Schedule 4.10.5; and (ii) routine claims for benefits by participants and beneficiaries, there are no pending or, to the Knowledge of Sellers, threatened Proceedings with respect to any Seller Employee Benefit Plans that would result, individually or in the aggregate, in a Liability that would have a Material Adverse Effect.

**4.10.6**  Except as set forth in Schedule 4.10.6, no event or condition has occurred in connection with which any of the Sellers or the Acquired Assets are or could be subject to any Liability or Encumbrance, including, but not limited to, any "withdrawal liability" relating to any "multiemployer plan", under Title IV of ERISA that would have a Material Adverse Effect.  None of the Filing Affiliates currently have, or for the past five (5) years have had an obligation to contribute to a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code.

**4.10.7**  With respect to each group health plan that is subject to Section 4980B of the Code maintained by any entity described in this Section 4.10.7, each member of the Controlled Group (as defined below) have complied with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA, except where the failure to so comply would not have a Material Adverse Effect.  For purposes of this Agreement, "**Controlled Group**" means any trade or business (whether or not incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sellers; or (ii) which together with any of the Sellers is treated as a single employer under Section 414(t) of the Code.

---

[1]    May be delivered to Buyer separately, rather than appended to the Agreement given the type of data included on it.

**4.10.8 Collective Bargaining Agreements.**  Schedule 4.10.8 lists all Collective Bargaining Agreements applicable to Global Sale Employees.  Seller has given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements.  Except as disclosed on Schedule 4.10.8, Seller is in material compliance with each Collective Bargaining Agreement.

**4.10.9 Labor Matters.**  Except as disclosed on Schedule 4.10.9 or as reflected in the Collective Bargaining Agreements, with respect to the Business: (i) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving Sellers; (ii) no Seller has in the past three (3) years experienced any work stoppage or other labor difficulty or union organizational activity relating to any of its employees; (iii) to the Knowledge of Sellers no labor grievance relating to any employee of Sellers is pending as of the date of Schedule 4.10.9; and (iv) no Seller has any labor negotiations in process with any labor union or other labor organization.  Except as set forth on Schedule 4.10.9, or as would not have a Material Adverse Effect, there are no pending claims against Sellers whether under applicable Laws, employment agreements or otherwise asserted by any union, works council or other organization representing employees or any present employee or former employee (including temporary employees) or independent contractor of any other Person as relates to the Business, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off;  (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work or (e) failure to properly categorize an independent contractor or temporary employee as an employee.

**4.11    Intellectual Property:**

**4.11.1** Schedule 4.11.1 is an accurate list for the following Purchased Intellectual Property: (i)  Patent registrations and applications;  (ii)  Trademark registrations and applications;  and (iii)  copyright registrations and applications, indicating for each, the applicable jurisdiction, registration number (or application number), date issued (or date filed) and title/mark.  Except: (a) as set forth in Schedule 4.11.1; (b) instances in which such patents or patent applications are jointly owned with a third party; (c) for rights retained by employee-inventors pursuant to Law; (d) subject to Permitted Encumbrances; and (e) with respect to the rights and limitations established by Material Contracts, Sellers, as expressly set forth in Schedule 4.11.1 or Schedule 4.11.6, own the entire right, title and interest in such patents, trademark registrations, copyright registrations and applications therefor and have the right to transfer Sellers' right, title and interest in them as set forth in this Agreement, free and clear of all liens or Encumbrances.  Buyers shall have the right to bring actions for infringement or unauthorized use of the Purchased Intellectual Property.  Except as set forth in Schedule 4.11.1, or as otherwise determined in the Ordinary Course of Business, any and all renewal and maintenance fees, annuities or other fees payable to any governmental authority to maintain the foregoing Purchased Intellectual Property as active and due before Closing have been paid in full through Closing.  To Sellers' Knowledge, all of the foregoing registered Intellectual Property is valid, subsisting and enforceable in accordance with applicable Law.

**4.11.2** Except: (i) as provided in Schedule 4.11.2; (ii) instances in which such Purchased Intellectual Property is jointly owned with a third party and Shared Intellectual

Property is owned by a third party; (iii) for rights retained by employee inventors pursuant to Law; (iv) as subject to Permitted Encumbrances; and (v) with respect to the rights and limitations established by the Material Contracts, Sellers own the entire right, title and interest to, and have the right to transfer, as set forth in this Agreement, Sellers' right, title and interest to the Copyrights, Software, Trade Secrets and Know-How included in the Purchased Intellectual Property.

**4.11.3** Sellers, in the conduct of the Business, use commercially reasonable efforts to comply with all legal and regulatory requirements relating to the privacy and security of all personal information in the possession of the Business, whether in written or electronic form. Sellers have no Knowledge of any failure to comply with such requirements.

**4.11.4** Except as set forth <u>Schedule 4.11.</u>4, Sellers have received no written claim or written notice from any third party of Intellectual Property infringement or misappropriation, resulting from the operation of the Business during the last six (6) years that would have a Material Adverse Effect.

**4.11.5** Except as set forth in <u>Schedule 4.11.5</u> Sellers have no Sellers' Knowledge of any infringement of the Purchased Intellectual Property that would, individually or in the aggregate, have a Material Adverse Effect.

**4.11.6** <u>Schedule 4.11.6</u> identifies all Intellectual Property license agreements that are not included in the Acquired Assets but that are related to the Purchased Intellectual Property.

**4.11.7** Sellers have the right to grant to Buyer a license to use the Intellectual Property set forth in Schedules A and B of the GM-Delphi Intellectual Property Transfer Agreement effective January 1, 1999 and such Intellectual Property is included in the Shared Intellectual Property to which Sellers are granting Buyers a license pursuant to Section 6.15.1.

**4.11.8** Sellers have not granted any exclusive licenses under the Shared Intellectual Property with respect to products of the type provided by or technologies used in the conduct of the Business.

**4.12**    <u>Contracts</u>:

**4.12.1** <u>Schedule 4.12.1</u> sets forth a list as of the dates set forth therein of each of the following Contracts that are included in the Acquired Assets to which any of the Sellers with respect to the Business, is a party or by which any of them is bound as of the date of this Agreement, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

>    **A.**    Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the relevant Seller party thereto with respect to the Business;

>    **B.**    Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of Debt Obligations, other than letters of credit, overdrafts and other current-account credit facilities entered into in the Ordinary Course of Business, in each case exceeding $500,000;

**C.**    Guarantees of the obligations of other Persons involving the potential expenditure by the Sellers in respect of the Business after the date of this Agreement of more than $500,000 in any instance;

**D.**    Agreements under which any Seller has licensed material Purchased Intellectual Property to, or material Licensed Intellectual Property from, any other Person;

**E.**    Contracts involving the expenditure by the Sellers in respect of the Business of more than $500,000 in any instance for the purchase of materials, supplies, equipment or services, excluding any such contracts that are terminable by the Sellers without penalty on not more than one hundred eighty (180) days notice;

**F.**    Contracts providing that a Seller in respect of the Business will receive future payments aggregating more than $1,000,000 per annum or $7,000,000 in the aggregate prior to the expiration of such Contract; and

**G.**    Leases and subleases for Leased Real Property.

**4.12.2** Except as set forth in Schedule 4.12.2, and other than with respect to monetary defaults by Sellers under Material Contracts that are curable by payment of all Cure Amounts, if applicable, to the Knowledge of Sellers: (i) each Material Contract is in full force and effect, and no event has occurred that constitutes (or with notice or lapse of time would constitute) a material default (except with respect to defaults that need to be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Buyer, if applicable); (ii) there are no material unresolved disputes under any of the Material Contracts; and (iii) the assignment of any Material Contract pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such Material Contract, except where such termination of, or right of termination thereunder, would not have, individually or in the aggregate, a Material Adverse Effect; provided, however, for purposes of construing this Section 4.12.2, $1,000,000 shall be used in place of $500,000 for any Contract described within Section 4.12.1.E above.

**4.12.3** Seller has no Contracts with any United States' Governmental Authority or to Seller's Knowledge, any government contractor, with regard to any Products sold by the Business.

**4.12.4** Sellers have made available to Buyer Parent in the Data Room a true and correct copy of all Material Contracts dated as of September 30, 2008 and, as of a date that is not more than thirty (30) days prior to the Closing Date, Sellers will have made available to Buyer Parent on such data site all Material Contracts entered into after September 30, 2008 through such execution date as is practicable for Sellers to provide.  Except as set forth on Schedule 4.12.4, Material Contracts for the purchase of indirect material or services contain a termination for convenience provision.

**4.12.5** No customer of the Business has notified Sellers of such customer's intent to resource any currently awarded business or terminate any existing Contract before the currently scheduled termination dates.

40

**4.13    Environmental Matters.**    Except as disclosed in Schedule 4.13, since January 1, 2005, to the Knowledge of Sellers:

**4.13.1**  The Business is in material compliance with Environmental Laws and with Environmental Permits applicable to the Business and the Real Property, except where the failure to comply would not have, individually or in the aggregate, a Material Adverse Effect;

**4.13.2**  None of the Sellers with respect to the Acquired Assets, have received any written notice, from a Governmental Authority, alleging that the Business as currently operated, or as operated during the last five (5) years, violates or has violated in any material respects any Environmental Laws or Environmental Permits;

**4.13.3**  The Sellers with respect to the Acquired Assets, have not received, and have no Seller's Knowledge of the issuance of any Environmental Claim with respect to the Real Property that would have, individually or in the aggregate, a Material Adverse Effect;

**4.13.4**  There has been: (i) no Release in violation of, or that may give rise to liability under, applicable Laws of Hazardous Materials on, at or under any Real Property in concentrations exceeding legally applicable and relevant standards for the Real Property as currently used or migrating from any Real Property included in Acquired Assets in concentrations likely to give rise to Environmental Liabilities; (ii) and no notice from any Governmental Authority under 42 U.S.C. §9601 et seq. of any Release of hazardous substances by the Business on any other real property; and

**4.13.5**  The Sellers have undertaken and completed all remedial work related to the removal or remediation of friable asbestos at the Manufacturing Facility located in Luton, UK as required pursuant to applicable law or as recommended by that certain Asbestos Location and Condition Assessment Survey Report, dated September, 2005, prepared by Caswell Environmental Services, Ltd.

**4.13.6**  The Sellers have made available to Buyer copies of all Phase I or Phase II (or their foreign equivalent) environmental reports in its possession regarding the Manufacturing Facilities and Technical Centers and any non-privileged environmental audit or compliance reports; provided that the privileged documents not provided to Buyer contain no material information relating to the presence or management of Hazardous Materials at the Real Property, pre-Closing operational activities at the Real Property relevant to environmental compliance, or known or suspected instances of non-compliance with Environmental Laws at the Real Property, that is not also contained in documents which have been provided to Buyer.

**4.13.7**  The Sellers are undertaking all remedial work required by the Competent Authority and applicable Law to remediate currently known Environmental Contamination at the Manufacturing Facility located in Krosno, Poland.   The estimated remedial cost is $524,000 to complete installation and $628,000 (present value) for operation and maintenance.

**4.14    Insurance.**  Schedule 4.14 contains a complete and correct list, in all material respects, of all material policies of insurance covering the Acquired Assets, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.  All such policies are outstanding and in full force and effect.

**4.15    Personal Property Assets, Inventory:**

**4.15.1**  Except as set forth on Schedule 4.15.1, the Sellers have marketable title to, or hold by valid and existing lease or license, all Personal Property reflected in the Businesses' books of account, except with respect to assets disposed of in the Ordinary Course of Business.

**4.15.2**  The Sellers, with respect to the Acquired Assets, have or will have good and marketable title to, or have or will have valid leasehold interests in, all Personal Property and Inventory being transferred to Buyers under this Agreement, and to Sellers' Knowledge, all transferred Personal Property and Inventory used by the Business are in such condition (considering age and purpose for which they are used) as to enable the Business to be conducted as currently conducted without material disruption.

**4.15.3**  Except as set forth on Schedule 4.15.3, the Inventory included in the Acquired Assets will, as of the Closing Date, be located at the Real Property. All Productive Inventory included in the Acquired Assets is saleable and usable in the ordinary course, except for such Inventory as to which an adjustment is made in the Closing Inventory Statement.

**4.15.4**  Schedule 4.15.4 sets forth a list of substantially all machinery, equipment and capitalized tools with a book value greater than $100,000 included in the Acquired Assets.

**4.15.5**  Except as disclosed on Schedule 4.15.5, with respect to all Personal Property included in the Acquired Assets, Seller has performed maintenance consistent with divisional maintenance policies and procedures and will continue to perform such maintenance through the Closing Date.

**4.16    Real Property:**

**4.16.1  Leased Properties.**    Schedule 4.16.1 lists all real property leased or subleased and constituting Acquired Assets (the "**Leased Real Property**").  With respect to each such parcel of Leased Real Property, the identified lease or sub-lease holder, as applicable, has good and effective leaseholder title thereto, free and clear of any Encumbrances, except for Permitted Encumbrances, granted by any Seller on its leasehold interest.  Delphi has made available to Buyer Parent true and complete copies of the leases and subleases covering the Leased Real Property (as amended to the date of this Agreement).

**4.16.2  Owned Properties.**    Schedule 4.16.2 lists all real property owned which constitutes Acquired Assets (the "**Owned Real Property**").  With respect to each such parcel of the Owned Real Property and except as otherwise specified on Schedule 4.16.2 and except where the failure of any of the following to be true and correct would not have, individually or in the aggregate, a Material Adverse Effect, the identified owner has good and marketable fee simple title, or equivalent title rights in non-U.S. jurisdictions, to the parcel of the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

**4.17    Recorded Permitted Encumbrances.**    All recorded Permitted Encumbrances relating to Personal Property, Inventory and Owned Real Property included in the Acquired

Assets are set forth on <u>Schedule 4.17</u>, excluding, with respect to Owned Real Property: (x) the China Mortgage; (y) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate Proceedings; and (z) easements, covenants, restrictions and other encumbrances of public record that are not related to any Seller Debt Obligations.

**4.18    U.K. Employee Liability Information.**  The U.K. Employee Liability Information: (i) has been provided to the U.K. Buyer at such time or times as are required by the U.K. Regulations; (ii) was complete and accurate at the time that it was provided to the U.K. Buyer; and (iii) has been updated to take account of any changes to such information, as required by the U.K. Regulations.

**4.19    No Brokers' Fees.**  Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyers would be liable.

**4.20    Solvency.**  For any Seller that is not a Filing Affiliate, upon the consummation of the transactions contemplated by this Agreement: (i) none of such Sellers will be insolvent; (ii) none of such Sellers will be left with unreasonably small capital; (iii) none of such Sellers will have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of such Sellers will not be impaired; and (v) immediately following Closing, such Sellers individually and in the aggregate will have sufficient capital to continue as a going concern.

**4.21    No Other Representations or Warranties.**  Except for the representations and warranties contained in this Article 4, the Sellers make no other express or implied representation or warranty to Buyers, and in particular but without limitation, no Seller is making any representations with respect to any plan(s) of Buyers for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence or with respect to the information contained in the Confidential Information Memorandum, Data Room, Management Presentations, reports or any financial forecasts or projections or other information furnished by Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

**4.22    Fair Disclosure.**  Any matter disclosed in any Schedule delivered prior to the execution of this Agreement (or after the execution of this Agreement with Buyer's consent, which consent shall not be unreasonably withheld) will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations, warranties or Schedules contain a reference to such Schedule, so long as it is reasonably apparent that such matter also applies to such other representations and warranties.

**5.    REPRESENTATIONS AND WARRANTIES OF BUYERS**:

Buyers hereby represent and warrant to Sellers, as of the date hereof, as follows:

**5.1    Organization.**  Subject to Section 5.12: (i) each Buyer is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization; and (ii) each Buyer has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good

standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Buyers to consummate the transactions contemplated by this Agreement.

      **5.2**    **Authorization; Enforceability.**  Subject to Section 5.12, each Buyer has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and each Ancillary Agreement to which such Buyer is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements. The execution and delivery of this Agreement and the Ancillary Agreements by each Buyer that is a party to any of such agreements, and the performance by each of them of their respective obligations under any such agreements, in the case of Buyer Parent have been, and in the case of the other Buyers prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Buyer.  This Agreement has been duly executed and delivered by Buyer Parent, and the Ancillary Agreements will be duly executed and delivered by the applicable Buyers and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable Buyers, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

      **5.3**    **No Conflicts or Approvals.**  Except as set forth on <u>Schedule 5.3</u>, the execution, delivery and performance by Buyers of this Agreement and each Ancillary Agreement to which such Buyer is a party and the consummation by Buyers of the transactions contemplated hereby and thereby do not and will not: (i) violate, conflict with or result in a breach by any Buyer of the Organizational Documents of any Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by any Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which any Buyer or any of their properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to any Buyer or any of their respective properties or assets; and (iv) require any Governmental Approval, except for applicable requirements, if any, of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law and FINSA, and approvals required by the Governmental Authorities in the People's Republic of China applicable to Buyer Parent and the joint venture partners who own Buyer Parent,  except, with respect to the foregoing clauses (ii), (iii), and (iv) above as would not, individually or in the aggregate, have a material adverse effect on the ability of Buyers to consummate the transactions contemplated by this Agreement.  As of the date of this Agreement, to Buyer's Knowledge, except for the facts and circumstances giving rise to risks regarding the ability to obtain the Overseas Investment Project Approvals ordinarily accompanying business acquisition transactions, no facts or conditions exist regarding the Sale that are likely to prevent receipt of any necessary Overseas Investment Project Approvals.

      **5.4**    **Proceedings.**  There are no Proceedings pending or, to the Knowledge of Buyers, threatened against any of the Buyers that could reasonably be expected to restrain, delay or inhibit the ability of Buyers to consummate the transactions contemplated by this Agreement.  None of the Buyers is subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Buyers to consummate the transactions contemplated by this Agreement.

**5.5    Solvency.**  Upon the consummation of the transactions contemplated by this Agreement: (i) none of the Buyers will be insolvent; (ii) none of the Buyers or the other legal entities constituting the Business will be left with unreasonably small capital; (iii) none of the Buyers or the Business will have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Buyers and the other legal entities constituting the Business will not be impaired; and (v) immediately following Closing, Buyers individually and in the aggregate will have sufficient capital to continue the Business as a going concern.

**5.6    Anti-Money Laundering.**  Buyers are in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA Patriot Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism or similar provisions or measures as well as any sanctions (either economic or of any other type) in the jurisdictions in which any Buyer operates or does business.  Neither any Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and no Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Buyer Parent agrees that should it or any other Buyer, or any of their directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Buyer Parent will inform Delphi in writing immediately.

**5.7    No Inducement or Reliance; Independent Assessment:**

**5.7.1**  With respect to the Acquired Assets, the Business or any other rights or obligations to be transferred hereunder or under the Transfer Agreements or pursuant hereto or thereto, Buyers have not been induced by and have not relied upon any representations, warranties or statements, whether express or implied, made by Delphi, any of its Affiliates, or any agent, employee, attorney or other representative of Delphi representing or purporting to represent Delphi or any Seller that are not expressly set forth herein or in the Transfer Agreements (including the Schedules and Exhibits hereto and thereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Delphi, any Affiliate of Delphi, or any agent, employee, attorney, other representative of Delphi or other Person will have or be subject to any Liability to Buyer Parent, any Buyer or any other Person resulting from the distribution to Buyer Parent, or Buyer Parent's use of, any such information, including the Confidential Information Memorandum and any information, documents or material made available in the Data Room or any Management Presentations or in any other form in expectation of the transactions contemplated by this Agreement.

**5.7.2**  Each Buyer acknowledges that it has made its own assessment of the present condition and the future prospects of the Business and is sufficiently experienced to make an informed judgment with respect thereto.  Each Buyer acknowledges that neither Delphi nor any of its Affiliates has made any warranty, express or implied, as to the

prospects of the Business or its profitability for any Buyer, or with respect to any forecasts, projections or business plans prepared by or on behalf of Delphi and delivered to any Buyer in connection with Buyers' review of the Business and the negotiation and the execution of this Agreement.

**5.8    Financial Ability.**    Shareholders of Buyer Parent have contributed the RMB 800,000,000 into Buyer Parent, as evidenced by the business license of Buyer Parent attached hereto as Schedule 5.8 (the "**Business License**"), to support Buyer Parent's obligations to consummate the transactions contemplated by this Agreement.    Buyer Parent will retain sufficient registered capital to assure that Buyer Parent has the financial ability to meet its financial obligations under Article 3 of this Agreement before and after Closing (the aggregate amount of such obligations outstanding from time to time are referred to as "**Sale Funds**").

**5.9    Adequate Assurance of Future Performance.**    Each Buyer has provided or will be able to provide, at or prior to the Closing Date, adequate assurance of its future performance under each Assumed U.S. Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed U.S. Contract.

**5.10    No Brokers' Fees.**    Buyers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

**5.11    Compliance with Laws.**    Buyers are in compliance with all Laws applicable to Buyers, except with respect to those violations that could not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Buyer from consummating the transactions contemplated by this Agreement.    Buyers recognize that the Acquired Assets listed on Schedule 4.4 are subject to export controls, and will not divert or otherwise use or make available any such Acquired Assets for military, nuclear, chemical, missile or biological weapons, activities, applications or end uses.

**5.12    Buyer Entities.**    Buyers: (i) will have existing legal entities, including name, jurisdiction of incorporation, tax identification numbers and bank accounts, and will advise Sellers of the relevant Buyer entities' information within seventy-five (75) days after date of the Bidding Procedures Order; (ii) will have taken the required actions such that the representations in Sections 5.1, 5.2 and 5.3 of this Agreement are accurate with respect to such Buyer affiliated entities, and if required by any Law, Buyers' legal entities will be registered in the relevant company register (or have properly applied for such registration); and (iii) will have received all necessary third party routine local operating Permits in connection with the establishment of such Buyer entities (including the IMMEX Permit in order to operate in an in-bond status in Mexico) by the Closing Date.

**6.    COVENANTS AND AGREEMENTS:**

**6.1    Conduct of Business between Signing and Closing:**

**6.1.1**    Except as: (i) contemplated by this Agreement; (ii) disclosed on Schedule 6.1.1; (iii) required by, arising out of, or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iv) required by or resulting from any changes of applicable Laws; or (v) set forth in this Agreement, any Ancillary Agreements, or in connection with the transactions contemplated hereby, from and after the date of this

Agreement and until the Closing Date, Delphi will cause the Sellers to conduct the operations of the Business in the Ordinary Course of Business, or, if applicable, in accordance with orders entered by the Bankruptcy Court, and use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relationships with the Business.  Except: (x) as contemplated by this Agreement or as disclosed on Schedule 6.1.1; or (y) as required by, arising out of, relating to or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court, from and after the date of this Agreement and until the Closing Date, Delphi will cause the Sellers with respect to the Business to refrain from doing any of the following without the prior written consent of Buyer Parent (which consent will not be unreasonably withheld or delayed):

>   **A.**    Sell or otherwise dispose of Acquired Assets having an aggregate value exceeding $1,000,000, excluding sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the Ordinary Course of Business;

>   **B.**    Incur, assume or guarantee any Debt Obligation that would become an Assumed Liability;

>   **C.**    Incur any Encumbrance on any material Acquired Assets, in each case, other than Permitted Encumbrances;

>   **D.**    Increase the cash compensation of the Global Sale Employees other than: (i) in the Ordinary Course of Business; or (ii) as required by any agreement in effect as of the date hereof or as required by Law;

>   **E.**    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are: (i) required by Law; or (ii) made in conformance with GAAP;

>   **F.**    Amend a Material Contract other than immaterial changes made in the Ordinary Course of Business;

>   **G.**    Enter into, modify or renew any collective bargaining agreements, including companywide collective agreements, social plans, Seller Employee Benefit Plans, special works contracts or compensation arrangements (including any such contracts or agreements that provide for benefits or compensation in the event of a reduction in force or relocation of work) covering Global Sale Employees, except for renewals and modifications in the Ordinary Course of Business on terms not materially inconsistent with prior practice;

>   **H.**    Fail to maintain insurance in a manner consistent with Sellers' past practice;

>   **I.**    Enter into any Contract for or make any Capital Expenditure, other than any such expenditures included in the capital expenditure budget provided as part of Schedule 3.2 to Buyer; or

>   **J.**    Agree or commit to do any of the foregoing.

**6.1.2**   Delphi shall, and shall cause each Seller to: (i) use commercially reasonable efforts to adhere to the Capital Expenditure Plan as set forth in Schedule 3.2 (the "**Plan**") such that program launches are not significantly impacted; and (ii) not make any changes to the Plan affecting program launch in any significant respect, in each case without Buyer Parent's consent (which consent will not be unreasonably withheld or delayed) until August 31, 2009 (until Closing in the case of the Mexico Seller) consistent with Schedule 3.2, subject to the obligations of Buyer set forth in Section 3.2 of this Agreement with respect to the Advance Payments for Delphi China.  Delphi shall, and shall cause each Seller to, apply amounts funded by any Buyer for Capital Expenditures pursuant to Section 3.2 in accordance with the provisions of Schedule 3.2.  Sellers will not be required to make any Capital Expenditures that are Buyer's responsibility under Section 3.2 of this Agreement.

**6.2**   **Bankruptcy Actions**:

**6.2.1**   As soon as practicable after the execution of this Agreement, but in no event later than April 3, 2009, Delphi will, and will cause the other Sellers that are Filing Affiliates to, file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures on April 23, 2009 (the "**Bidding Procedures Order**") and entry of a Sale Approval Order on May 21, 2009.

**6.2.2**   Delphi will use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under the Agreement (the "**Sale Approval Order**"), including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by orders of the Bankruptcy Court), the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**6.3**   **Assumed U.S. Contracts; Cure Amounts; Other Contracts**:

**6.3.1**   No later than as soon as practicable after the Auction, Delphi will, pursuant to a motion (which motion may be incorporated into the Sale Motion), move to assume and assign to Buyers the Pre-Petition Contracts listed on Schedule 6.3 (collectively, the "**Assumed U.S. Contracts**") and will provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.  Seller will pay Cure Amounts as agreed to by Delphi and each party to an Assumed U.S. Contract or, absent such agreement, by order of the Bankruptcy Court in the time and manner specified by the Sale Approval Order.  Buyer Parent shall have the right through two (2) Business Days preceding the Closing Date to amend Schedule 6.3 to delete any Assumed U.S. Contracts.

**6.3.2**   Prior to the Closing Date, Seller shall pay any undisputed delinquent amounts owing under Material Contracts (including real estate leases for the Manufacturing Facilities and the Technical Centers) if the Seller party is not a Filing Affiliate prior to Closing, including undisputed amounts owed by any Seller(s) to any Supplier(s) who may be in default of their supply obligations to Sellers, including such Supplier(s) as are set forth on Schedule 4.12.2.

6.4    **Non-Competition**:

**6.4.1**    Delphi undertakes and agrees with Buyer Parent that for a period of five (5) years after the Closing Date, except with the consent of Buyer Parent, Delphi will not, and will cause each Affiliate of Delphi to not, either on its own account or in conjunction with or on behalf of any person, firm or company, whether by sales, marketing or other activities, carry on or be engaged, whether as a shareholder, director, employee, partner or agent in carrying on any business which is engaged, whether directly or indirectly and whether wholly or partially, in the design, development, manufacture, remanufacture or sale of products competitive with the Products as carried on by the Business, at the Closing Date (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 6.4.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which is not primarily engaged in a Competitive Business, provided that Delphi will use commercially reasonable efforts to divest, as soon as practicable after such acquisition or merger, any portion of the Business of such Person that constitutes a Competitive Business, if the Competitive Business accounts for more than fifteen (15%) percent of the sales of the acquired business; (ii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of a non-controlling ownership interest in any Person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen percent of the value of the acquired business at the date of such acquisition (whichever is greater); (iii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any Person engaged in a Competitive Business; (iv) provision of consulting services to, the license of any technology that Delphi or any Delphi Affiliate owns or has license to use to, or the financing (on its own behalf or on behalf of any other Person) of any Person, for the purpose of designing or manufacturing on behalf of Delphi or any Delphi Affiliate or selling to Delphi or any Delphi Affiliate components and parts for automotive applications provided that such components and parts are not in the nature of Products that would be produced by the Ride Dynamics Business or the Brake Business; (v) consistent with Delphi's troubled supplier practices, any direct or indirect activities of Delphi or any Delphi Affiliate to advise, operate, manage or finance a troubled supplier of Delphi or its Affiliates; (vi) the direct or indirect activities of Delphi or any Delphi Affiliate with respect to customer service support for Products manufactured prior to the Closing Date, including but not limited to recall or warranty obligations; (vii) the sale of Inventory, machinery, equipment or tooling related to other damper and brakes businesses in connection with the sale of such businesses to third parties or in connection with the wind-down of such businesses including but not limited to the sale of inventory to Tenneco pursuant to that certain Master Sale and Purchase Agreement between Delphi and Tenneco dated March 7, 2008; (viii) the clearance of the existing inventory or the purchase of inventory or parts from the Buyer after the consummation of the transactions contemplated by this Agreement to allow Delphi or its Affiliated companies to fulfill outstanding purchase orders and service parts obligations, including OEM parts for GM Holden and service parts obligations with respect to any of the Ford Bara, Ford Territory and/or Ford Wagon programs; or (ix) any of the following businesses or activities conducted by Delphi or any Affiliate, joint venture subsidiary or division of Delphi, and any natural extensions thereof as of the Closing Date (each of which will be deemed not to breach this Section 6.4.1): (a) any activity conducted using the Excluded Assets, including but not limited to the sale thereof; (b) the design, development, manufacture, remanufacture or sale of sub-components of the Products or modules or systems containing the Products; (c) the DPSS Activity; (d) Seller's effective non-controlling interest in the Gabriel de Mexico operation held through Seller's participation in the

Promotora Joint Venture with Grupo Condumex; and (e) any activity conducted by KDAC and/or PBR.  Notwithstanding anything to the contrary in this Agreement, the non-competition provisions of this Section 6.4 shall not prohibit any Seller or its Affiliates from providing post-Closing transition services to Persons who have purchased or will purchase a business or businesses of the Sellers.

**6.4.2**   Delphi further undertakes and agrees with Buyer Parent that for a period of five (5) years after the Closing Date, except with the consent of Buyer Parent, Delphi will not, and will cause each Affiliate of Delphi to not, either directly or indirectly through any third party, provide any Intellectual Property or consulting, designing, testing or manufacturing services to, or in any other way assist, any Person other than a Buyer in the operation of any Competitive Business.   Buyer Parent hereby consents to Delphi providing technical assistance to General Motors and its designees pursuant to the Intellectual Property License Agreement dated September 6, 2007, as amended, and to KDAC, PBR, SMW and Bosch under licensing agreements.

**6.4.3**   In the event that the covenants contained in Section 6.4.1 are more restrictive than permitted by Law, the Parties agree that the covenants contained in Section 6.4.1 will be enforceable and enforced to the extent permitted by Law.

**6.5**     <u>**Tax Matters; Cooperation; Preparation of Returns; Tax Elections**</u>:

**6.5.1**   Delphi will be responsible for the preparation and filing of all Tax Returns for the Business for all periods ending on or prior to the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Delphi will make all payments required with respect to any such Tax Return, except as may be prohibited by the Bankruptcy Code.

**6.5.2**   Buyers will be responsible for the preparation and filing of all Tax Returns for the Business for all periods beginning after the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Buyer Parent will make all payments required with respect to any such Tax Return.

**6.5.3**   Buyer shall prepare and file all Tax Returns relating to property Taxes levied with respect to the Acquired Assets ("**Property Taxes**") for any taxable period that begins before the Closing Date and ends after the Closing Date (each such taxable period, a "**Straddle Period**"), whether imposed or assessed before or after the Closing Date other than Straddle Period Tax Returns that Seller is required to file by applicable law.  Seller shall be liable for and shall indemnify Buyer, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives against all liability for the entire amount of Property Taxes levied for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period.  Buyer shall be liable for and shall indemnify Seller, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives against all liability for the entire amount of Property Taxes levied for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Tax period beginning on the day following the Closing Date and the denominator of which is the number of days in the entire Tax period.  Any credits relating to a Straddle Period shall be applied to the entire Straddle Period.  All determinations necessary to give effect to the foregoing allocations shall be made in a manner that does not accelerate deductions or defer income.  With respect to any

such Straddle Period returns or filings, the non-filing party shall pay to the filing party, not later than five (5) Business Days before the due date for payment of such Property Taxes levied for the Straddle Period, provided that the non-filing Party has received notice of the allocation at least ten (10) Business Days prior to the due date for payment under this Section 6.5.3, an amount equal to the portion of such Property Taxes levied for the Straddle Period for which the non-filing party is liable under this Section 6.5.3, and the filing party shall, promptly following the filing thereof, provide the non-filing party with a copy of such return or other filing and a copy of a receipt showing payment of any such Property Taxes levied for the Straddle Period.  If notice of the allocation is not provided to the non-filing party at least fifteen (15) Business Days prior to the due date for payment under this Section 6.5.3, the non-filing party shall pay fifteen (15) days after receipt of notice, but shall have no liability if the payment is not made at least five (5) Business Days before the due date for payment of such Property Taxes levied for the Straddle Period.  For any Property Tax Returns for the Straddle Period which the Seller was required by Law to file prior to the Closing, the Seller shall provide an allocation between Seller and Buyer of the Property Taxes reflected on such returns, applying this Section 6.5.3 and taking into account all payments made as of the Closing Date, as soon as practicable following Closing.  The Party with a net liability to the other Party shall make a payment in settlement of the net liability within fifteen (15) days following the date on which the allocation is provided.  Any payments under this Section 6.5.3 shall be treated as Purchase Price adjustments under Article 3.

6.5.4    Sellers and Buyers will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers, and deliveries to be made to the Buyers hereunder from any transfer, documentary, sales, use, registration, recording, stamp, value-added, China business, recapture and other such taxes (including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Sale Approval Order, in accordance with Section 1146(c) of the Bankruptcy Code.  If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the Acquired Assets to the Buyers will contain the following endorsement:

> Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [Seller], it is exempt from transfer taxes, stamp taxes, or similar taxes pursuant to 11 U.S.C. § 1146(c).

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Sale Approval Order, such Transfer Taxes arising out of or incurred in connection with this Agreement will be borne solely by Buyers.  The party that is legally required to file a Tax Return relating to Transfer Taxes will be responsible for preparing and timely filing such Tax Return.  Buyer Parent will prepare the Transfer Tax returns for which Buyer Parent is responsible as soon as is practicable and provide Delphi with a copy to review.  Delphi agrees to provide Buyer Parent with comments and the amount of transfer tax to be paid in sufficient time to enable Buyer Parent to timely file the return and pay the Transfer Tax.

6.5.5    Delphi and Buyer Parent will cooperate in connection with: (i) the preparation and filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets.  Such

cooperation includes direct access to accounting and finance personnel and books and records related to Taxes.

**6.6     U.S. Employees; Benefit Plans; Labor Matters:**

**6.6.1    U.S. Employees.** Seller and Buyer will collectively update Schedule 4.10.1 as of the day prior to the Closing Date:

**A.**     Subject to Section 6.6.1.B, effective as of the Closing Date, the relevant Buyer will offer employment to all U.S. Employees with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing Date.

**B.**     For all U.S. Employees: (i) Buyers' offer of employment shall be on terms for compensation and benefits substantially comparable in the aggregate to those in place for Sellers' U.S. Employees immediately prior to the Closing Date; provided, however: (a) that only those benefit packages, payments or employer contributions that have been in effect for at least one (1) year and have not been suspended, delayed or terminated in any way, shall be included in the comparison; (b) notwithstanding the preceding clause (a), for purposes of such determination, any benefits under any stock option or equivalent plan, any defined benefit plan, any non-qualified deferred compensation plan or bonus arrangement and any post-termination of employer group health plan or other welfare benefits (other than continuation coverage of group health plan benefits under COBRA) shall be excluded; and (c) notwithstanding the preceding clause (a), for purposes of such determination, the company matching contributions (at the rate of fifty percent (50%) on a participant's elective deferrals of up to: (1) seven percent (7%) of compensation for a participant whose initial service date with Delphi Corporation is after September 30, 2008; or (2) nine percent (9%) of compensation for a participant whose initial service date with Delphi Corporation is on or before September 30, 2008) and the company profit sharing contributions (at the rate of four percent (4%) of a participant's compensation) under the Delphi Salaried Retirement Savings Program will be included in such determination; and (ii) Buyer will maintain Sellers' vacation policy in effect as of the Closing Date for a minimum period of twelve (12) months following the Closing Date except that, subject to Section 6.6.1D, Sellers will be responsible for all accrued, unused and unpaid vacation pay as of the Closing Date for all U.S. Employees who accept employment with Buyers ("**Transferred U.S. Employees**"). Prior to tendering such offers, Buyers will provide Sellers with information sufficient to satisfy Sellers (not to be unreasonably withheld) that such offers meet the "substantially comparable in the aggregate" requirement. For all such Transferred U.S. Employees, Buyers will maintain the requisite level of compensation and benefits (including the vacation policy described above) for a minimum of twelve (12) months following the Closing Date.

**C.**     Seller will be responsible for claims for workers' compensation Liabilities related to injuries or illnesses incurred by Transferred U.S. Employees that arise before Closing; provided that, in the case of non-recurrent injuries, such claims are filed within eighteen (18) months after the Closing or within such shorter period as may apply under applicable Laws; and provided further that Claims for injuries arising from repetitive, work-related activities ("**Recurrent**

**Injuries**") (whether claimed before or after Closing) of Transferred U.S. Employees will be deemed to be Seller Liabilities only if filed with such Seller within twelve (12) months after Closing. All other such Liabilities will be the responsibility of Buyer.

**D.**    At Closing, Seller will reimburse Buyer through an adjustment to the Preliminary Purchase Price for the pro rata share, including any associated employer payroll taxes (e.g., "FICA") of any vacation pay, profit sharing and incentive compensation accrued (and, with regard to vacation, not utilized) by the Transferred U.S. Employees prior to Closing in accordance with the applicable Seller Employee Benefit Plans and policies. The Seller's adjustment amount will be pro rated to reflect the number of days from January 1 to but excluding the date of Closing. Buyer will then recognize and deliver to the Transferred U.S. Salaried Employees any and all such accrued and unutilized vacation pay, profit sharing and incentive compensation due to the Transferred U.S. Employees in accordance with the applicable Seller Employee Benefit Plan and policies for the calendar year in which the Closing occurs. Credit for the provisions for US Employees will be provided in the overall credit for transferred employee obligations on Schedule 3.3.2, as modified in the post Closing Price Adjustments (Employee Purchase Price Adjustments) and shall be conclusive as to the amounts properly payable to each such Transferred U.S. Employee.

**E.**    Seller will remain responsible for all employment rights of U.S. Employees incurred or vesting prior to the Closing Date.

**6.6.2**    **Inactive U.S. Employees:**

**A.**    U.S. Employees who are not active employees as of the Closing Date ("**Inactive U.S. Employees**") due to disability, family medical leave or other approved leave of absence will remain Sellers' responsibility until such employee is ready to return to active employment in accordance with Sellers' leave policies.

**B.**    When an Inactive U.S. Employee is ready to return to active status in accordance with Sellers' leave policies, Buyers will offer employment to such individual in accordance with Section 6.6.1 and, provided such individual accepts Buyers' offer of employment, such individual will be considered a Transferred U.S. Employee as of such date. In the event that an employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Sellers and Buyers; provided that such process does not violate any applicable Law.

**C.**    If Sellers and Buyers do not agree as to an individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the Parties. The cost of such independent medical evaluation will be shared equally by the Parties.

**6.6.3**    **Employee Benefit Plans:**

**A.**    U.S. Employees' and their dependents' and beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) will cease as of the Closing Date.

Notwithstanding the preceding sentence, the Seller Employee Benefit Plans which are welfare plans as defined under ERISA will retain liability for all claims incurred by the U.S. Employees and their dependents and beneficiaries prior to the Closing Date, including claims which are not submitted until after the Closing Date.  A claim will be deemed incurred, as applicable.

     (i)     On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

     (ii)     On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

     (iii)     On the date immediately following a U.S. Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

**B.**     Seller will remain solely responsible for and retain all Liabilities as to U.S. Employees under the Seller Employee Benefit Plans, except as otherwise provided in this Section 6.6.

**C.**     Transferred U.S. Employees' and their dependents' and beneficiaries' participation in and eligibility for benefits under the Buyer Employee Benefit Plans will commence as of the Closing Date.  As to any Buyer Employee Benefit Plans that are not considered as part of the "substantially comparable in the aggregate" analysis under Section 6.6.1.B, the date on which the Buyer Employee Benefit Plan becomes generally available to Buyer's other U.S. employees.

**D.**     Buyer will recognize each Transferred U.S. Employee's pre-Closing length of service and credited service with Seller for eligibility and vesting purposes, but not benefit accrual purposes, with respect to Buyer's Employee Benefit Plans.  However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Sellers and Buyers.

**6.6.4**   **<u>Severance</u>.**  Except with respect to the U.S. Employees who are terminated by the relevant Seller or any of its Affiliates prior to the Closing Date or who otherwise do not become Transferred U.S. Employees, neither Seller nor any of its Affiliates shall have any liability to any Transferred U.S. Employees for severance, redundancy, termination, or otherwise on or after the Closing Date.   Buyer shall be responsible for any liability to any Transferred U.S. Employees in connection with the transactions contemplated by this Agreement, and if incurred by any Seller, all such costs will be immediately reimbursed by Buyer.  Without limiting the foregoing, if a Buyer terminates the employment of a Transferred U.S. Employee during the twelve (12) month period following the Closing Date under circumstances that would have rendered such U.S. Employee eligible for severance benefits had such termination occurred prior to the Closing Date, Buyer shall provide such employee the greater of: (a) the severance benefits provided for under the terms of Seller's severance plan applicable as of the Closing Date, taking into account such U.S. Salaried Employee's

combined service with Buyer; or (b) the severance benefits under any applicable Buyers' severance plan or policy; and if severance costs are incurred by any Seller with respect to any Transferred U.S. Employee(s), all such costs will be immediately reimbursed by Buyer. If Seller is required to pay severance to non transferring U.S. Employees, Buyers are restricted from recruiting or hiring (directly or indirectly through a contract employment firm) such employees until the first anniversary of the Closing Date.

**6.6.5    COBRA.**  Buyers will assume all obligations relating to compliance with the continuation health care coverage requirements of Code Section 4980B and Sections 601 through 608 of ERISA regarding qualifying events in regard to Transferred U.S. Employees arising from the transactions contemplated under this Agreement.  Sellers will retain responsibility for all Liabilities, obligations, commitments, costs and expenses for claims of the U.S. Employees (or dependents thereof who become a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs prior to the Closing.

**6.6.6    WARN Act.**  Sellers will retain all obligations and liabilities relating to WARN Act or other similar notice Laws, if any, by Transferred U.S. Employees arising on or before Closing from the transactions contemplated under this Agreement.

**6.6.7    Cooperation.**  Sellers and Buyers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.6.

**6.6.8    Union and Works Council Notifications.**  Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant Governmental Authority concerning the transactions contemplated by this Agreement.

**6.6.9    401(k) Plans.**  To the extent allowed under applicable Law, U.S. Employees who become eligible for a distribution of their account balances in the Seller's Salaried Retirement Savings Program (a 401(k) plan) will be permitted, at their discretion, and subject to Buyer's approval, to transfer such account balances to Buyer's defined contribution plan.  The manner of such transfer will be a direct rollover, and the Buyer may prohibit the transfer of any participant loan balance.

**6.6.10    Plan Underfunding.**  Seller shall be responsible for any liability for payments arising out of any underfunding of any Seller Employee Benefit Plans as of the Closing Date with respect to the U.S. Employees.

**6.6.11    At Will.**  Notwithstanding any other provision of this Section 6.6: (a) all Transferred U.S. Employees' employment with Buyers will be "at will"; and (b) Buyers will each have the right in their sole discretion to terminate the employment of any Transferred U.S. Employees at any time (subject to the provision of severance to any such terminated Transferred U.S. Employee as provided for under this Section 6.6).

**6.7    EMEA Employees; Benefit Plans; Labor Matters.**  Except as otherwise provided in the relevant Transfer Agreement, the Parties agree as follows:

### 6.7.1    Transferred EMEA Employees:

**A.**    Delphi and the Buyer intend and acknowledge that the transfer of the relevant local Business to the relevant local Buyer on the Closing Date shall, with respect to the EMEA Employees, constitute a Relevant Transfer.  The local Buyer shall with respect to the EMEA employees not incur any Liability arising from or related to the employees of the EMEA Seller for the period prior to Closing except for Liabilities of the type included in Past Service Financial Obligations.

**B.**    Without prejudice to the foregoing, Parent Buyer intends and acknowledges that a Buyer shall make each of the EMEA Employees located in Luxembourg and in Italy a written offer of employment to commence on the Closing Date on the same terms and conditions as it would be obliged to provide to that person if his employment had transferred pursuant to the relevant Transfer Regulations and under which the relevant Buyer agrees to recognize that person's period of service with the relevant Delphi entity, and the relevant Delphi entity shall give all reasonable assistance requested by the relevant Buyer to persuade that person to accept the offer.  For the purpose of this Section 6.7, each of the relevant Luxembourgish and Italian Delphi entities shall be considered as an "**EMEA Seller**".

**C.**    The relevant EMEA Buyer shall treat the period of continuous service of each relevant EMEA Employee employment with the relevant EMEA Seller up to the Closing Date as continuous with such relevant EMEA Employee's service with the relevant Buyer after the Closing Date.

### 6.7.2    Union and Works Council Notifications:

**A.**    The relevant Buyers and relevant EMEA Sellers shall comply with their obligations to notify and consult with the relevant employees, employees' representatives, works councils, unions, labor boards and relevant Governmental Authority in accordance with applicable laws, concerning the transactions contemplated by this Agreement and the relevant Transfer Agreement, if applicable.

**B.**    The Buyers and EMEA Sellers shall cooperate and the EMEA Buyers shall provide to the EMEA Sellers the documents and information required in the course of the Union and Works Council Notifications. The Buyers and EMEA Sellers shall also attend meetings with employees, employees' representatives, works councils, unions, labor boards when required.

### 6.7.3    EMEA Employees Remaining Employed by the EMEA Sellers.  If it is found or alleged that any of the EMEA Employees remains an employee of the EMEA Seller after the Closing Date because the Transfer Regulations are not applicable for any reasons to such EMEA Employee:

**A.**    The relevant EMEA Seller shall notify the relevant Buyer of that finding or allegation as soon as reasonably practicable after becoming aware of it;

**B.** In consultation with the relevant EMEA Seller, the relevant Buyer shall within seven (7) days of becoming aware of the finding or allegation make that person a written offer of employment to commence immediately on the same terms and conditions as the relevant Buyer would be obliged to provide to that person if his employment had transferred pursuant to the Transfer Regulations and under which the relevant Buyer agrees to recognize that person's period of service with the relevant EMEA Seller, and the relevant EMEA Seller shall give all reasonable assistance requested by the relevant Buyer to persuade that person to accept the offer;

**C.** If the offer of employment made by the relevant Buyer is accepted by that person, the relevant EMEA Seller agrees to permit that person to leave the relevant EMEA Seller's employment without having worked his full notice period, if that person or the relevant Buyer so requests;

**D.** The relevant EMEA Seller may within twenty-eight (28) days after becoming aware of that allegation or finding, if that person is still or still claims to be an employee of the relevant EMEA Seller and has not accepted an offer of employment with the relevant Buyer, dismiss that person with the earliest possible effect in accordance with applicable law; and

**E.** The relevant Buyer shall indemnify and keep indemnified the relevant EMEA Seller against all costs, claims, liabilities and expenses (including reasonable legal expenses) which the relevant EMEA Seller may suffer or incur in respect of that dismissal provided that the relevant EMEA Seller takes all reasonable steps to minimize such costs, claims, liabilities and expenses (including, for the avoidance of doubt, by following the statutory dispute resolution procedures where applicable).

**6.7.4** <u>**Other Transferring EMEA Employees.**</u> If as a result of the sale of the relevant EMEA Business and/or the Transfer Regulations, it is found or alleged that the employment of any person other than the EMEA Employees, have transferred to the EMEA Buyers on or after the Closing Date pursuant to the Transfer Regulations:

**A.** The relevant Buyer shall notify the relevant EMEA Seller of that finding or allegation as soon as reasonably practicable after becoming aware of it;

**B.** In consultation with the relevant Buyer, the relevant EMEA Seller shall within seven (7) days of becoming aware of that allegation or finding make that person a written offer of employment to commence immediately on the same terms and conditions as that person was employed prior to the transfer (actual or alleged), and under which the relevant EMEA Seller agrees to recognize that person's prior service with the relevant EMEA Seller, and relevant Buyer shall give all reasonable assistance requested by the relevant EMEA Seller to persuade that person to accept the offer;

**C.** The relevant Buyer shall be obligated to dismiss that person with the earliest possible effect within twenty-eight (28) days after becoming aware of that allegation or finding, if that person is still or still claims to be an employee of

the Buyer and has not accepted an offer of employment with the relevant EMEA Seller; and

**D.** The relevant EMEA Seller shall indemnify and keep indemnified the relevant Buyer against all costs, claims, liabilities and expenses (including reasonable legal expenses) which the relevant Buyer may suffer or incur in respect of that dismissal and the employment of that person at any time up to the date of the dismissal and any other claim brought by that person (or any representative of that person), in each case:

(i)    Provided that the Buyer takes all reasonable steps to minimize such costs, claims, liabilities and expenses (including, for the avoidance of doubt, by following the statutory dispute resolution procedures where applicable);

(ii)    Save to the extent that the Buyer is able to claim successfully in respect of any such costs, claims, liabilities and expenses under the terms of an employer's liability insurance policy transferring by operation of law from the EMEA Seller to the Buyer; and

(iii)    Save to the extent that person is actively employed by the EMEA Buyer (all costs, claims, liabilities, and expenses, including, for example, salaries, attributable to such time of active employment shall be borne by the Buyer).

**6.7.5    Certain Responsibilities.**    Non-Filing Sellers shall be responsible for any liability arising out of the underfunding of any Non-Filing Seller transferable person or private retirement plans of the EMEA Employees as of the Closing Date.    Buyer shall be responsible for all liabilities relating to EMEA Employees after Closing, including terms and conditions of employment and Employee Benefit Plans, in accordance with applicable Laws.

**6.7.6    Plan Underfunding.**    Non-Filing Sellers shall be responsible for any liability arising out of the underfunding of any Non-Filing Seller transferable person or private retirement plans of the EMEA Employees as of the Closing Date.

**6.7.7    Workers' Compensation.**    Non-Filing Sellers will retain responsibility for claims for workers' compensation Liabilities related to injuries or illnesses incurred by the EMEA Employees that arise before Closing; provided that, in the case of non-recurrent injuries, such claims are filed within eighteen (18) months after the Closing or within such shorter period as may apply under applicable Laws; and provided further that Claims for Recurrent Injuries of the EMEA Employees (whether claimed prior to or after Closing) will be deemed to be Seller Liabilities only if filed with such Seller within twelve (12) months after Closing. All other such Liabilities will be the responsibility of the Buyer.

**6.7.8    Vacation and Holiday Pay.**    Buyer will assume Sellers' outstanding obligations in respect of accrued holiday entitlements and accrued holiday remuneration of the EMEA Employees at Closing, provided that the cost of such accrued holiday remuneration accrued as of the Closing Date shall be borne by Sellers (and reflected in an adjustment to the Preliminary Purchase Price), except with respect to employees of the Business employed by a Seller in Italy, Germany or Luxembourg, which employees shall be paid for their vacation accrued as of the Closing Date by the relevant Seller on or about the

Closing Date. In addition, the following shall be transferred by the Seller to the Buyer in respect of the EMEA Employees: the corresponding asset and liability balance sheet provisions, in particular employer and employee loans, travel cost advances and refunds, vacation liabilities (regardless of how far backwards) bonus liabilities, pension and retirement liabilities, relevant part of any social benefit fund (if any), liabilities under the law of respective jurisdiction. All such employee related assets and liabilities shall be shown in a proforma employment transfer balance sheet as of the Closing Date which will be delivered by Seller to Buyer within sixty (60) days from the Closing Date.

6.7.9    **Severance and Redundancy.** Except with respect to the EMEA Employees who are terminated by the relevant Seller or any of its Affiliates prior to the Closing Date, neither Seller nor any of its Affiliates shall have any liability to any EMEA Employees for severance, redundancy, termination, or otherwise after the Closing Date. Buyer shall be responsible for any liability to any EMEA Employees in connection with the transactions contemplated by this Agreement, and if incurred by any Seller, all such costs will be immediately reimbursed by Buyer. When Seller is required to pay severance to the EMEA Employees who reject an offer of employment from the relevant Buyer in situations where the Transfer Regulations do not apply or object to the transfer of their employment to the relevant Buyer when permitted by applicable law, the Buyers are restricted from recruiting or hiring such employees until the first anniversary of the Closing Date unless the relevant Buyer reimburses the relevant Seller for the amount of severance paid.

6.7.10 **U.K. Pension.** U.K. Buyer shall not be required to duplicate the pension or retirement plans of the U.K. Seller in existence on or prior to the Closing Date, or provide the same type of pension or retirement plan; provided, however, that the U.K. Buyer shall provide a pension or retirement plan offering benefits that complies with the requirements of the Transfer Regulations in effect in the U.K.

6.7.11    **France Profit Sharing.** Seller will pay any profit sharing owed by Sellers, for the period from January 1, 2009 until the Closing Date, to EMEA Employees no later than April 30, 2010, based on final amounts confirmed for calendar year 2009.

6.8    **Mexico Employees; Benefit Plans; Labor Matters.** Except as otherwise provided in the Mexico Sale Agreement(s), the Parties agree as follows:

6.8.1    **Transferred Employees.** Seller and Buyer will collectively update Schedule 4.10.1 as of the day prior to Closing:

A.    The relevant Buyer will use all commercially reasonable efforts to qualify for the "substitution of employer process" under Mexican Law. The relevant Buyer will comply with all requirements of the Mexican Law for Mexico Employees for all purposes of the continued employment with the relevant Buyer.

B.    For all Global Sale Employees designated on Schedule 4.10.1 as Mexico Employees Buyer's employment terms and conditions shall be at the same level of compensation and with the same benefits in place immediately prior to the Closing Date, including but not limited to holiday remuneration, extra time, Christmas bonus and pension plan. The specific terms governing the offer of employment to any Mexico Employee will be set forth, to the extent required by applicable Laws, in the Mexico Transfer Agreement, Employee Substitution Agreement and in compliance with applicable Transfer Regulations. Buyer shall

not be required to enlarge or lengthen the rights and benefits of Mexico Employees beyond what they currently enjoy with Seller, and will be solely responsible for all Liabilities to any Mexico Employees in connection with the transactions contemplated by this Agreement, in accordance with applicable Laws, including Laws regarding modification of employment benefits and other terms and conditions, and if incurred by any Seller, all such Liabilities will be immediately reimbursed by Buyer.  Any Mexico Employee who is not an active employee as of the Closing will remain Seller's responsibility until such employee is ready to return to active employment, which will be handled by the Parties in the same manner as set forth in Section 6.6.2 for Inactive U.S. Employees.

C.    Without prejudice and in accordance with this Agreement and the Mexico Sale Agreement(s) and applicable provisions by Law, upon Closing, the relevant Seller and the relevant Buyer shall enter into an Employee Substitution Agreement or any other applicable agreement for the purposes as described in this Agreement and the Mexico Sale Agreement(s).

D.    **Severance, Redundancy and Termination Payments.**    Buyers will be liable for all obligations and liabilities relating to any claims for severance, termination (actual or constructive), redundancy, change in control agreements or other payments or benefits by Mexico Employees arising in connection with the transactions contemplated by this Agreement and the Mexico Transfer Agreement. Except with respect to employees terminated prior to the Closing Date by Seller, neither Seller nor any of its Affiliates shall have any liabilities to Mexico Employees for severance, redundancy, termination or otherwise subsequent to the Closing Date in connection with the post-Closing transactions contemplated by this Agreement or the Mexico Transfer Agreement, and if incurred by any Seller, all such costs will be immediately reimbursed by Buyer.  If Seller is required to pay severance to non transferring Mexico Employees, Buyers are restricted from recruiting or hiring such employees until the first anniversary of the Closing unless the relevant Buyer reimburses the relevant Seller for the amount of severance paid.

E.    **Workers' Compensation.**    Non-Filing Sellers will retain responsibility for Liabilities for all workers' compensation benefits related to injuries or illnesses incurred by the Mexico Employees prior to the Closing Date as required by applicable Transfer Regulations.  All other such Liabilities will be the responsibility of Buyer in accordance with applicable Transfer Regulations.

F.    **Indemnification.**    On the Closing Date, Buyer and/or its representatives, release, remise and forever discharge Seller and their respective officers, shareholders, subsidiaries, Affiliates (including, without limitation, Delphi affiliates in Mexico), joint ventures, contractors, agents and employees, successors, and assigns from any and all manner of actions, causes of actions, suits, proceedings, damages, costs, and claims whatsoever in law or in equity, including claims for severance or "indemnification" under Mexican Federal Labor or applicable Laws that may arise with respect to any matter or event occurring after the Closing Date either from local or national employees.

      **6.8.2**   **Cooperation.**  Sellers and Buyers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.8.

      **6.8.3**   **Collective Bargaining Agreements.**  Buyers will assume the terms and conditions of all of the Collective Bargaining Agreements applicable to the Mexican Employees.

      **6.8.4**   **Union and Works Council Notifications.**  Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the Mexico Employees, Mexico Employee representatives, work councils, unions, labor boards and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

      **6.8.5**   **Plan Underfunding.**  Seller shall be responsible for any liability arising out of underfunding of any Seller transferrable pension or private retirement plans of the Mexico Employees as of the Closing Date.

    **6.9**   **Asia/Pacific Employees; Benefit Plans; Labor Matters.**  Except as otherwise provided in the relevant Transfer Agreement, the Parties agree as follows:

      **6.9.1**   **Asia/Pacific Employees.**  Seller and Buyer will collectively update Schedule 4.10.1 as of the day prior to Closing with respect to the Asia/Pacific Employees:

          **A.**   The relevant Buyer will make an offer of employment to all Asia/Pacific Employees (except employees located at Noida, India who the parties agree will not be transferred) with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing Date. The offer of employment shall be in accordance with the Laws of the country where such Asia/Pacific Employee is located. The relevant Buyer will assume the employment contracts of any Asia/Pacific Employees in accordance with Transfer Regulations, if applicable, and the relevant Transfer Agreement. Buyers will comply with all requirements of the Transfer Regulations, if applicable, and will, in any event, assume and recognize the seniority status and prior service of all Asia/Pacific Employees for all purposes of the continued employment with the relevant Buyer including but not limited to with respect to any Buyer Employer Benefit Plans as if every benefit or entitlement had been accrued by the respective Asia/Pacific Employee while in the employment of the relevant Buyer.

          **B.**   For all Global Sale Employees designated on Schedule 4.10.1 as Asia/Pacific Employees, Buyer's offer of employment (or assumption of employment Contract as applicable) will be on the same terms, at the same level of compensation and with the same benefits in place immediately prior to the Closing Date. The specific terms governing the offer of employment to any Asia/Pacific Employee will be agreed between the parties and set forth in the applicable Transfer Agreements and in compliance with applicable Transfer Regulations.

**C.**    As applicable, the Parties will use commercially reasonable efforts to cause any employment Contracts of the Asia/Pacific Employees whose Contracts do not transfer by their acceptance of the offer from the Buyer, by their reporting to work, by operation of Law (including a Transfer Regulation), by operation of this Agreement or otherwise to be novated from the relevant Seller or other Seller-Affiliated employer to the relevant Buyer or Buyer-Affiliated employer, in accordance with the requirements of this Section 6.9.

**D.**    Effective from  the Closing Date, the relevant Buyer will assume and will be solely responsible for:

(i)    All accrued, unpaid and untaken long service leave, annual leave, holiday entitlements, sick/personal leave and rostered day off leave entitlements of the Asia/Pacific Employees attributable to the period prior to the Closing Date; provided, however, that if Seller bears the cost of any holiday entitlements accrued but relating to post Closing periods, such costs will be reflected in an upward adjustment to the Preliminary Purchase Price; and

(ii)    All wages and salary, annual leave, long service leave, sick/personal leave, rostered day off leave and contributions to personal pension schemes to which any Asia/Pacific Employees are entitled, all statutory contributions and all income tax and national insurance contribution deductibles and all other entitlements of the Asia/Pacific Employees from and after the Closing Date.

**E.**    The following shall be transferred by the relevant Seller to the relevant Buyer in respect of the Asia/Pacific Employees:

(i)    The corresponding asset and liability balance sheet provisions, in particular employer and employee loans, travel cost advances and refunds, vacation liabilities (regardless of how far backwards) bonus liabilities, pensions liabilities, liabilities under the law of the relevant jurisdictions with respect to patents and inventions transferred to Buyer all such employment related assets and liabilities shall be shown in a proforma employment transfer balance sheet as of the Closing Date, which shall be delivered by Seller to Buyer within sixty (60) days after the respective Closing Date.

**6.9.2    Severance and Redundancy Payments.**    Neither Seller nor any of its Affiliates shall have any liability to any Asia/Pacific Employees for severance, redundancy, termination or otherwise: (i) after the Closing Date or (ii) before the Closing Date so long as such liability is triggered in any way by the transactions contemplated by this Agreement. For the avoidance of doubt, Buyer shall be responsible for any liability to any Asia/Pacific Employees in connection with the transactions contemplated by this Agreement, and if incurred by any Seller, all such costs will be immediately reimbursed by Buyer.  When Seller is required to pay severance to non transferring Asia/Pacific Employees, Buyers are restricted from recruiting or hiring such employees until the first anniversary of the Closing Date, unless the relevant Buyer reimburses the relevant Seller for the amount of severance paid.

**6.9.3    Buyers' Employee Benefit Plans.**  Where required by Law, the Buyer will offer the Asia/Pacific Employees a choice of superannuation fund in accordance with local legislative requirements.

**6.9.4    Workers' Compensation.**  In reference to the  Asia/Pacific Employees, Seller will be responsible for claims for workers' compensation Liabilities that arise before Closing provided that, in the case of non-recurrent injuries such claims are filed within eighteen (18) months after the Closing or within such shorter period as may apply under applicable Laws; and provided further that Claims for Recurrent Injuries of the Asia/Pacific Employees (whether claimed prior to or after Closing) will be deemed to be Seller Liabilities only if filed with such Seller within twelve (12) months after Closing.  All other such Liabilities will be the responsibility of the Buyer.

**6.9.5    Cooperation.**  Sellers and Buyers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.9.

**6.9.6    Collective Bargaining Agreements.**  Buyers will assume the terms and conditions of all of the Collective Bargaining Agreements (or their equivalent under applicable Law) applicable to the Asia/Pacific Employees.

**6.9.7    Union and Works Council Notifications.**  Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant Governmental Authorities concerning the transactions contemplated by this Agreement.

**6.9.8    Plan Underfunding.**  Non-Filing Seller shall be responsible for any liability arising out of any underfunding of any transferable pension or private retirement plans of the Asia/Pacific Employees as of the Closing Date.

**6.10    Contact with Employees.**  Buyer shall not take any action or make any statement that is intended to discourage the Global Sale Employees to transfer their employment relationship.  Buyer will submit to Delphi for pre-approval (which approval shall not be unreasonably withheld or delayed): (i) copies of all written documents to be delivered to employees; and (ii) a summary of all talking points.

**6.11    Contact with Customers and Suppliers.**  Prior to the Closing Date, except in the ordinary course as a supplier to certain customers and without discussing the Sale, Buyer Parent and its Affiliates and their respective representatives will contact and communicate with the Global Sale Employees, customers, suppliers and licensors of the Business in connection with the transactions contemplated by this Agreement only with the prior written consent of Delphi, which consent may be conditioned upon a designee of Delphi being present at any such meeting or conference.  Sellers agree to cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer the relationships of Seller existing prior to the Closing and relating to the Business to be operated by Buyer after the Closing, including relationships with customers and suppliers, and, provided doing so does not materially increase Sellers' cost, Sellers will satisfy the Retained Liabilities in a manner that is not detrimental to any of such relationships.

**6.12    Technical Documentation; Trade Secrets.**    Sellers have delivered, or will deliver on or before the Closing Date, to Buyers, a copy of all Technical Documentation (including documented Know-How and Trade Secrets) included in the Acquired Assets.  For a period of not less than ten (10) years commencing on the Closing Date, Buyers will use reasonable efforts to maintain all Technical Documentation applicable to Product design, test, release and validation at a location at which it will be reasonably accessible to Delphi upon request.  During such ten (10) year period, Buyers will not destroy or give up possession of the final copy of such Technical Documentation without offering Delphi the opportunity to obtain a copy of such documentation at Delphi's expense but without any payment to Buyers.

**6.13    Books and Records and Litigation Assistance From and After Closing:**

**6.13.1** Buyer Parent will preserve and keep all books, records, computer files, software programs and any data processing files delivered to Buyer by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by any Law, Governmental Order or in connection with any litigation, audit or appeal of Taxes, or Tax examination, at Buyer's sole cost and expense.  During such period, Buyer will: (i) provide Seller with such documents and information as necessary to complete the accounting books and records of each facility included within the Business, consistent with past practice; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets.  Seller or its Affiliates will reimburse Buyer for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.  In the event Buyer wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, as applicable, it will first give not less than ninety (90) days' prior written notice to Seller, and Seller will have the right, at its option, upon prior written notice given to Buyer within sixty (60) days of receipt of Buyer's notice, to take possession of said records within ninety (90) days after the date of Buyer's notice to Seller hereunder.

**6.13.2** Buyers will, at the reasonable request of Sellers, cooperate fully with Sellers in providing Sellers and their Affiliates (as appropriate) (to the extent possible through Global Sale Employees) with technical assistance and information in respect of any claims brought by or against Sellers and their Affiliates involving the conduct of the Business prior to the Closing Date, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings.  Sellers will reimburse Buyers and their Affiliates for their reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services and reasonable, actual direct employee time costs for any appearances.  Buyers, for themselves and on behalf of their Affiliates, agree to: (i) retain all documents required to be maintained by Law and all documents that may be reasonably required to establish due care or to otherwise assist Sellers and their Affiliates in pursuing, contesting or defending such claims; (ii) make available their documents and records in connection with any pursuit, contest or defense, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Buyers and their Affiliates must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Buyers must notify Sellers of the existence of such privileged documents); and (b) Sellers and their Affiliates will agree to

keep confidential documents and records that are confidential or are subject to trade secret protection); (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Buyers' business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; and (v) make available facilities and exemplar parts for the sole and limited use of assisting Sellers and their Affiliates in the contest or defense.

**6.14    Corporate Names:**

**6.14.1**  Buyers will have the right (including the right to authorize its relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the Business in existence on the Closing Date, any engineering drawings, any signs, billboards and similar materials, and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi for a period of no more than one hundred eighty (180) days after the Closing Date, in a manner consistent with past practice of the Business and the name and reputation associated therewith, provided, that Buyers and their Affiliates will clearly indicate on all signs, billboards and similar materials, and all written materials related to any such sale or disposition, including business cards, stationery, purchase orders, invoices and the like, that the Business is owned by Buyers and their Affiliates and is no longer affiliated with, and Buyer and its Affiliates do not represent, the Sellers or any Affiliate of Seller.

**6.14.2**  After such one hundred eighty (180) day period, Buyers will neither use nor permit the Business to use the name "Delphi" and any trademarks, trade names, brandmarks, brand names, trade dress, labels, containers or logos relating or confusingly similar (including on any signs, billboards, advertising materials, telephone listings, web sites, labels, stationery, office forms, packaging or other materials) in connection with the Business or otherwise.

**6.14.3**  Each of the Parties acknowledges and agrees that the remedy at Law for any breach of the requirements of this Section 6.14 would be inadequate, and agrees and consents that without intending to limit any additional remedies that may be available, temporary and permanent injunctive and other equitable relief may be granted without proof of actual damage or inadequacy of legal remedy in any Proceeding which may be brought to enforce any of the provisions of this Section 6.14.

**6.15    Intellectual Property and Intellectual Property Licenses:**

**6.15.1  License to Buyers.**  At Buyer's request, Delphi has agreed to sign a License Agreement substantially in the form of Exhibit 8.4.12 (the "**Seller IP License Agreement**") to grant a license to the Shared Intellectual Property subject to rights granted prior to the Closing Date, as set forth in Schedule 6.15.1.  Any breach of a representation and warranty in the Seller IP License Agreement shall be treated as if it were a breach of Section 4.11 of this Agreement for purposes of indemnification under Article 11; provided, however that this

Agreement governs over any defined terms used or defined in the Seller IP License Agreement that are inconsistent or otherwise different than defined terms contained in this Agreement.

**6.15.2  License to Sellers.**  Buyer Parent, on behalf of itself and its Affiliates, hereby grants to Seller as of the Closing Date, a worldwide, perpetual, paid-up, royalty free, non-exclusive license to develop, manufacture, use, import, export, offer to sell and sell products and services of the type provided by Sellers and their Affiliates as of the Closing Date (other than the Products), and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, using any Purchased Intellectual Property, subject to any restrictions existing prior to the Closing Date.

**6.15.3  Right to Sublicense.**  The licenses granted, or to be granted pursuant to this Section 6.15: (i) include the right for the licensed party to sub-license to any of its Affiliates, to its and their successors, and to suppliers, customers to the extent of the license granted in this Section 6.15; (ii) do not include any right to use any Trademark Rights; and (iii) are subject to any restrictions existing prior to the Closing Date.

**6.15.4  Shared Intellectual Property.**  Each Seller agrees that it will not transfer or assign its rights to the Shared Intellectual Property to any third party unless such third party: (i) is informed of and agrees to accept such transfer or assignment subject to the license granted herein; and (ii) agrees that any subsequent transfer or assignment will be subject to a similar restriction on future transfers and assignments.

**6.16  Post-Closing Obligations.**  Buyers agree to take all commercially reasonable actions necessary to cause Delphi and its Affiliates to be absolutely and unconditionally relieved on or prior to the Closing Date of all Liabilities and obligations arising on or after Closing out of the letters of credit, performance bonds and other similar items issued and outstanding in connection with the Business as listed on Schedule 6.16, and Buyers will indemnify Delphi and its Affiliates against any Losses arising on or after Closing of any kind whatsoever with respect to such Liabilities and obligations.

**6.17  Competition and Other Regulatory Clearance:**

**6.17.1**  Subject to the terms hereof, Buyers and Delphi agree to cooperate and to use all commercially reasonable efforts to obtain, as promptly as practicable following the date hereof, any Governmental Approvals required, or to the extent applicable, to ensure that any applicable waiting period by law has elapsed for the parties to be able to proceed with the Closing under the HSR Act, EC Merger Regulation, FINSA and any other applicable Competition/Investment Law, to respond to any government requests for information thereunder, to contest and resist in good faith any action that would have the effect of restricting, preventing or prohibiting the transactions contemplated hereby, and to have lifted or overturned any Governmental Order that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement; in this respect, Buyers shall pay all applicable fees, and Buyers and Sellers, if required or appropriate, shall prepare and submit a joint notice and will make (or continue to prosecute, if made previously): (a) the FINSA filing no more than thirty (30) days after the date of this Agreement; and (b) all the competition filings set forth in Schedule 6.17.1 no more than five (5) Business Days after the date of the Sale Approval Order; and Buyer Parent will: (i) promptly inform Delphi of all oral and written communications with any Governmental Authority in respect of any required Governmental Approval; (ii) give Delphi the opportunity to comment on all filings and any

response prepared by Buyers prior to Buyers' submitting such filings or response to the relevant Governmental Authority; and (iii) afford Delphi or any Seller designated by Delphi the opportunity to attend any meetings, telephone conferences or video conferences organized with the Governmental Authorities in relation to any required Governmental Approval.  Notwithstanding the foregoing, the Parties agree that neither of them will make any voluntary filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a material adverse effect that denies any of Sellers or Buyers the benefit of its bargain under this Agreement or where such failure would otherwise be in violation of applicable Law.  Each party hereto will promptly inform the other of any oral or other communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements.  If the Governmental Authority in any such country: (i) imposes conditions upon its approval of the transactions contemplated by this Agreement; or (ii) files a Proceeding before a Governmental Agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement, the Parties will take commercially reasonable steps to negotiate with the Governmental Authority regarding, and comply with, any conditions or modifications requested by such Governmental Authority, consistent with the general intention of this Agreement (that ownership of the Business will be vested in the Buyers and the Acquired Assets will be transferred to the Buyers).  Such compliance may require modifications in structure, economic and other relationships.  Each Party will bear its own costs and expenses incurred in negotiating and agreeing to the required conditions or modifications with the Governmental Authorities; except that in the case of any FINSA filing, Buyer Parent will reimburse all of Seller's out-of-pocket (i.e., excludes Seller's internal costs) costs associated with any such negotiations or agreements and other assistance in connection therewith, or with preparation for such filing, such amounts to be billed and paid monthly on a non-refundable basis (including attorneys' fees and other professional advisors' fees, recognizing that with respect to preparation of the initial FINSA filing, Seller plans to use outside counsel only in an advisory and review capacity).

     **6.17.2**  Buyers will not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the Transfer Agreements or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Transfer Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement or the Transfer Agreements.

     **6.17.3**  Buyers will use their best efforts to obtain all required Overseas Investment Project Approvals no later than one hundred fifty (150) days after the date of this Agreement; and will take no action, and will not fail to take any action, in each case the result of which may be to impede Buyers' ability to obtain all applicable Overseas Investment Project Approvals.  Failure to obtain any and all Overseas Investment Project

Approvals by such date shall be deemed to be a material breach of this Agreement by Buyer, unless such failure is due solely to: (i) a change in the industrial policy of the People's Republic of China applicable to the Overseas Investment Project Approvals that is announced after the date of this Agreement, and proved to Delphi's reasonable satisfaction by copies of such changes (e.g., copies of changes to applicable rules, regulations, orders, etc first published after the date of this Agreement); or (ii) any other failure to obtain all Overseas Investment Project Approvals that is beyond the reasonable control of Buyers and notwithstanding Buyers' best efforts as described in the first sentence of this Section 6.17.3.

**6.17.4** The Parties will use all commercially reasonable efforts to conduct reasonable due diligence and to provide true, accurate, correct and complete information in all filings and submissions related to such filings that are submitted to Governmental Authorities pursuant to Section 6.17.1.

**6.18    Further Actions:**

**6.18.1**  Subject to Section 5.12, Buyers will use all commercially reasonable efforts to facilitate the Closing by the Target Date or sooner, by taking actions which include but are not limited to establishing legal entities, opening bank accounts, securing all approvals set forth on Schedule 5.3 and of the necessary operational permits, procuring DUNs numbers and as well as securing employees sufficient in expertise and number to run the Business after the Closing Date (including the Global Sale Employees).

**6.18.2**  As soon as practicable after the entry of an unstayed Sale Approval Order by the Bankruptcy Court, the Parties will use all commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby and by the Transfer Agreements.  In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.

**6.18.3**  At all times prior to the Closing Date: (i) Delphi will notify Buyer Parent in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same; and (ii) Buyer Parent will notify Delphi in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same.

**6.19    Further Assurances.**  If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, the Parties hereto shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other Party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that, to the extent not indemnified or required hereunder the cost of such action or of such instruments and documents related thereto shall be borne by the Party requesting them.   The foregoing covenant will survive the Closing of the transactions contemplated herein.

**6.20    Shared Items.**  For a period of one hundred twenty (120) days after the Closing, Sellers and Buyers will cooperate to identify shared Personal Property assets (other than

scheduled Excluded Assets, transition services and Shared Intellectual Property) that will not be transferred to Buyers at Closing and to develop the mechanism whereby Buyers will continue to have, for such one hundred and twenty (120) day period, access to such shared assets (other than scheduled Excluded Assets, transition services and Shared Intellectual Property) on substantially the same terms and conditions as in effect prior to Closing.

**6.21    Buyer's Financing Activities:**

**6.21.1**  Buyers acknowledge and agree that: (i) Sellers and their Affiliates have no responsibility for any financing that Buyers may raise in connection with the transactions contemplated hereby including with respect to any offering materials and other documents prepared by or on behalf of or utilized by Buyers or their Affiliates, or Buyers' financing sources, in connection with Buyers' financing activities in connection with the transactions contemplated hereby which include any information provided by Sellers or any of their Affiliates; and (ii) Buyers' obligations to consummate and to cause to be consummated the transactions contemplated by this Agreement and the Transfer Agreements are not subject to any condition or contingency with respect to the financing.

**6.21.2**  Buyers will take, or cause to be taken, all actions and will do, or cause to be done, all things necessary, proper or advisable: (i) to maintain in effect the Business License; (ii) to prevent Buyer Parent from incurring any Debt obligations, making any loan and/or paying or agreeing to pay any cash dividends or distributions to any of its equity holders between the date of this Agreement and the Closing Date that would affect its ability to complete the Sale; and (iii) to ensure that the Sale Funds remain in Buyer Parent and are used solely to pay the Purchase Price. Prior to the Closing Date, Buyers will not agree to, or permit, any amendment or modification of, or waiver under, the Business License without the prior written consent of Delphi.

**6.22    Customs Duties.**  Buyers expressly agree to reimburse Sellers for all customs-related duties, fees, and associated costs incurred by Sellers on behalf of Buyers following the Closing Date, including all such duties, fees, and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally after the Closing Date under Sellers' importer/exporter identification numbers and bonds/guarantees.

**6.23    Replacement Products.**  Buyer agrees that it will  provide replacement Products on a Manufacturing Cost basis (without mark-up) with respect to Product Warranty Claims and Product Recall Claims that are Sellers' responsibility under this Agreement, as well as providing reasonable assistance and cooperation in connection with any such Product Warranty Claims and Product Recall Claims (Sellers reserve the right to interface directly with the applicable customers during this time period, provided that any settlement or resolution reached with such customers shall not impose or create any additional Loss, Liability or other obligation on Buyers), and will use commercially reasonable efforts to schedule the work related to such replacement Products as soon as possible after notice.  Any engineering work and related lab support with respect to such replacement Products will be billed at a rate not to exceed $92.50 per hour.

**6.24    Assignment of Contracts.**    To the extent that the transfer, licensing or sublicensing of any Acquired Assets, Material Contracts, Shared Intellectual Property or Licensed Intellectual Property requires any Consent or Permits from any third party (excluding printers, postal meters and other de minimis items) in order to operate the Business without any material disruption after Closing to any Seller's portion of the Business, Sellers shall obtain such

Consents and Permits prior to the Closing, subject to Buyers' cooperating and providing all documents and information reasonably required of Buyer by any such third party in connection with any such Consents.

      **6.25**   **Removal of Liens.**  Sellers shall remove or cause to be extinguished all Encumbrances encumbering the Acquired Assets on or prior to the Closing Date, other than Permitted Encumbrances.  For purposes of this section, recorded Permitted Encumbrances set forth on <u>Schedule 4.17</u> will not be deemed to be Encumbrances.

      **6.26**   **Confidentiality.**  Sellers shall keep confidential all nonpublic information, including any technology, Know-How, Trade Secrets, product development plans, product specifications, testing results, pricing, customer contacts, market research and personnel and employee matters, relating to the operation of the Business and the sale of the Acquired Assets. In the event that disclosure of such nonpublic information is required to any Governmental Authority or pursuant to any applicable Law, the disclosing party must provide, if practicable, prior written notice to the other party prior to making any such disclosure to allow such party to take action to defend such disclosure and the disclosing party must take adequate steps, including request for confidentiality treatment and document redactions, to ensure the highest level of confidentiality possible under the circumstances.  Such confidentiality obligations shall survive a period of three (3) years after the Closing.

      **6.27**   **Certain Supply Agreement.**  Regarding that certain Delphi Automotive Systems Supply and Development Agreement originally effective as of September 17, 2003 and as amended as of January 25, 2008 (the "**Certain Agreement**"), Delphi will further amend on or before April 9, 2009 (or such later date that may be agreeable to Buyer, not to be unreasonably withheld) the Certain Agreement to include the terms previously agreed  to by Buyer and will concurrently provide evidence to Buyer that Delphi has paid all amount owed thereunder as consideration for such further amendment.

      **6.28**   **Physical Separations.**  To the extent that Delphi requires the physical separation of any Global Sale Employees from any employees of Delphi or any of Delphi's Affiliates after the Closing at any of their current facilities, Delphi shall be solely responsible for such physical separation and have such physical separation completed by the Closing.

      **6.29**   **Schedules.**  By no later than thirty (30) days prior to the Closing, Delphi shall deliver to Buyers all the schedules mentioned in the Agreement but not provided at the execution of this Agreement, including all schedules regarding the Purchased Intellectual Property, Shared Intellectual Property and Licensed Intellectual Property, and all such schedules delivered shall be subject to the review and approval by Buyers, which approval may not be unreasonably withheld or delayed.  Once approved by Buyers, such schedules shall be deemed an integral part of this Agreement as if they were included in this Agreement at the time of execution of this Agreement by the Parties.  For clarity, Seller may update all Schedules prior to the Closing Date solely to reflect changes resulting from activities occurring in the Ordinary Course of Business which would not result in a breach of any of the representations and warranties, covenants and other obligations contained in this Agreement.

      **6.30**   **Certain Contracts.**  On or before May 9, 2009, Buyer will identify in writing any non-cancellable Contracts entered into after the Petition Date for indirect materials or supplies which it does not want to assume (the "**Non-Assumed Contract**") and, following such designation, any Non-Assumed Contract shall be considered an Excluded Asset for all purposes of this Agreement.

**6.31    Delphi Supply Contracts.**  Each of the Parties covenants and agrees that, for twelve (12) months after Closing, it will not: (i) exercise any termination for convenience clause in the Contracts included in the Acquired Assets under which Delphi Affiliates supply products to the Business; and/or (ii) change prices (except for engineering and other mutually agreed changes).

**6.32    Purchased Intellectual Property Assistance.**  Seller shall assist Buyer in obtaining assignments from predecessors in interest to the Purchased Intellectual Property or other recordable instruments to reflect Buyer's ownership of the Purchased Intellectual Property and assist Buyer (in response to inquiries related to origin ownership and scope of Shared Intellectual Property or Licensed Intellectual Property) to the extent practicable.

**6.33    Leases.**  With respect to any leased Manufacturing Facility or subleased Technical Center premises included in the Acquired Assets, where the party to the lease or sublease, as the case may be, is a Non-Filing Affiliate, Seller shall use commercially reasonable efforts to assist Buyer in obtaining from each landlord confirmation that the tenant under the lease is not in default thereunder (the equivalent of an estoppel certificate in the U.S.) and an agreement from any holder of an Encumbrance on any Real Property arising from Debt thereon that such holder would not disturb Buyer's leasehold interest in the event of a default by the landlord (the equivalent of a non-disturbance agreement from a mortgagee).

**6.34    E&O Inventory.**  To the extent not removed prior to the Closing, within the period ending sixty (60) days after the Closing, Delphi at its own expense; (i) has the option to remove Inventory from the Manufacturing Facilities which has been determined to be E&O Inventory, and Sellers may scrap, sell or otherwise dispose of such E&O Inventory, as determined by the relevant Seller in its sole discretion; and (ii) will remove all Hazardous Materials at any of the Manufacturing Facilities that are included in the E&O Inventory (other than Inventory constituting manufacturing waste that is present on a Manufacturing Facility awaiting disposal in the Ordinary Course of Business and in compliance with applicable Laws) and that require special handling in their disposal (as confirmed and specifically identified by the Parties in the physical inventory to be conducted by the Parties).  A schedule of E&O Inventory shall be prepared concurrently with the physical inventory conducted pursuant to Section 3.4 of this Agreement. Any E&O Inventory (other than Hazardous Materials) not removed by Sellers within said sixty (60) day period may be retained by Buyers without any further compensation to Sellers.

**6.35    Ford Service Parts.**  Upon assignment to the Polish Buyer of the purchase order 25407 dated July 20, 2005 issued by Delphi Automotive Systems Australia, Ltd. to the Polish Seller for the purchase of parts from Delphi Poland related to the Ford Bara, Ford Territory and/or Ford Wagon programs, which assumption shall occur at Closing pursuant to this Agreement, the Polish Buyer shall continue to supply such parts to Delphi Automotive Systems Australia, Ltd. without change in the terms of such purchase order; provided, however, that Delphi Automotive Systems Australia, Ltd. shall have the right to terminate such purchase order immediately at any time without liability to the Polish Buyer.  The term of such parts contracts runs for fifteen (15) years after cessation of production parts.  At Delphi's request, Buyer shall support Delphi in efforts to justify increases to Ford Service Part prices as required by Ford Australia terms and conditions.  In exchange, Delphi will support Buyer requests for price increases for bona fide cost increases to the extent that such increases are recovered from Ford Australia in the form of higher pricing.  Delphi will use all commercially reasonable efforts to respond to Buyer requests for cost recovery for products provided under these Ford contracts.

**6.36    China Mortgage.**    Buyer Parent, the local China Buyer and Delphi China Brakes will execute the China Transfer Agreement and the China Mortgage on or before the date of the Sale Approval Order.    Buyer Parent will cause the China Mortgage to be released by the relevant Buyer immediately upon repayment of the Advance Payment, including filing any necessary documents to evidence such release.

**6.37    Four Post Shaker.**    A four post, full car shaker previously used by the Business ("**Four Post Shaker**") is currently being removed from Kettering Plant 16 to be stored at Delphi's Vandalia, Ohio site.    Delphi will be responsible for all costs of dismantling and moving the Four Post Shaker to Delphi's Vandalia site.    Buyer will remove the Four Post Shaker from the Vandalia, Ohio location at Buyer's sole cost and expense on an Ex Works basis either: (i) on or before Closing; or (ii) within six (6) months after the Closing Date, in which case Delphi will continue to store the Four Post Shaker.    If Buyer does not completely remove the Four Post Shaker within six (6) months after the Closing Date), then, unless Seller otherwise agrees (which agreement may be withheld in Seller's sole discretion), Seller may dispose of the Four Post Shaker without any liability to Buyer of any kind or nature whatsoever.

The Four Post Shaker is not currently being used by Sellers, and Sellers make no representation or warranty with respect to the condition or performance of the Four Post Shaker, which is being transferred to Buyer IN ITS PRESENT STATE AND CONDITION, "AS IS, WHERE IS," WITH ALL FAULTS, AND BUYERS' ARE PURCHASING AND ACQUIRING THE FOUR POST SHAKER ON THAT BASIS PURSUANT TO BUYERS' OWN INVESTIGATION AND EXAMINATION AFTER HAVING BEEN PROVIDED WITH AN ADEQUATE OPPORTUNITY AND ACCESS TO THE FOUR POST SHAKER TO COMPLETE SUCH INVESTIGATION OR EXAMINATION.    Buyer may enter Delphi's Vandalia, Ohio site at any time on or after Closing and, at Buyer's sole expense, package, prepare for shipment and load the Four Post Shaker onto the truck(s) of the carrier selected by Buyer, and to transport Four Post Shaker to a Buyer facility (collectively, the "**Removal Activities**").    Delphi will cooperate with Buyer in good faith, including allowing Buyer reasonable access to Delphi's Vandalia, Ohio site in connection with the Removal Activities.    Any Buyer employee or agent participating in the Removal Activities must comply with all applicable laws, regulations, orders and other governmental requirements and with Delphi's regulations and policies when on Delphi's premises.    Buyer will indemnify Seller for any damages caused by the presence on Seller's premises of Buyer's employees or agents on or after Closing in connection with the Removal Activities.    Title and risk of loss with respect to the Four Post Shaker will pass to Buyer at Closing.

**6.38    Ancillary Agreements, Conflicts.**    The Parties will use all commercially reasonable efforts to finalize all Transfer Agreements and other Ancillary Agreements not attached to this Agreement, within thirty (30) Business Days after the date of the Sale Approval Order, but no later than thirty (30) days before Closing, or such earlier date as may be required in connection with Governmental Approvals.

**6.39    Seller Support Regarding Establishment of Buyer Entities.**    At Buyer's reasonable request (which request must include the jurisdiction and nature of the entity to be established), Seller will use commercially reasonable efforts to assist Buyer in the establishment of Buyer entities contemplated by Section 5.12 of this Agreement (other than any China Buyer entities), provided that: (i) such assistance is permissible under applicable Laws; and (ii) Buyer reimburses Seller for its reasonable per diem internal costs and all out-of-pocket costs associated with such assistance, such amounts to be billed and paid monthly on a non-

refundable basis.  Buyer will be solely responsible for all Transfer Taxes relating to transfer of the entities to Buyer.

**6.40    JAVE Funding.**    The Parties will use commercially reasonable efforts to defer any JAVE Payments until after the Closing Date.  In the event that any JAVE Payments are required to be made before the Closing Date, Buyer Parent will pay the appropriate Seller in advance of the due date for such payments,  and such Seller will have no obligation to repay such amounts except upon completion of an Alternative Transaction, in which case, concurrently with the closing of any such Alternative Transaction, Delphi will cause such Seller or the buyer in any such Alternative Transaction to pay to Buyer the aggregate amount of the JAVE Payments.

**6.41    Idle Assets in India.**    Sellers have certain idle assets in India previously used in the Business as set forth in Schedule 6.41 (the "**Idle Assets**").  Title to the Idle Assets will transfer pursuant to the Noida Sale Agreement referred to in Section 8.4.2.A; provided that in no event does Seller make any representation or warranty whatsoever regarding the Idle Assets other than title.  Buyer will remove the Idle Assets from the Noida Manufacturing Facility on or before six (6) months after the Closing Date.  If not removed within six (6) months after the Closing Date, Delphi may dispose of the Idle Assets without any liability to Buyer of whatsoever kind or nature.  Delphi shall not have any obligations or duties with respect to dismantling, packaging, preparation for shipment, debonding, loading and/or delivery of Idle Assets other than the obligation to make the Idle Assets available for such removal.  THE IDLE ASSETS WILL BE DELIVERED TO BUYER BY DELPHI HEREUNDER ON AN "AS-IS – WHERE-IS" BASIS, WITH ALL FAULTS, AND, EXCEPT FOR TITLE, SELLER MAKES NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED, CONCERNING ANY OF THE IDLE ASSETS, ALL OF WHICH ARE EXPRESSLY DISCLAIMED.

**7.    CONDITIONS TO CLOSING:**

**7.1    Conditions to Obligations of Seller and Buyer.**    The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by both Parties at or prior to the Closing Date of the following conditions precedent:

**7.1.1    Sale Approval Order and Bidding Procedures Order.**    The Sale Approval Order and Bidding Procedures Order will be entered by the Bankruptcy Court and will not be subject to a stay or injunction or, if the Sale Approval Order is not received prior to the effective date of a plan of reorganization of the Filing Affiliates from the Bankruptcy Cases, then written affirmation of this Agreement by the reorganized or reconstituted Filing Affiliates shall satisfy this condition.

**7.1.2    No Law, Judgments, etc.**    No provisions of any applicable Law or Governmental Order that restrains, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect (each Party taking any and all steps required by Sections 6.17 of this Agreement); and no threats of preemption or acquisition by any Polish Governmental Authority shall have been received by any Seller after having been notified by such Seller of the Sale in advance of the Closing.

**7.1.3    Governmental Approvals.**    All required Governmental Approvals (including approvals under any Competition/Investment Law, Overseas Investment Project Approval or

as otherwise referred to in Section 6.17), regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated; including the requirements of FINSA .

**7.2**    **Conditions to Obligations of Buyer.**    The obligation of Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing Date of the following conditions (any one or more of which may be waived in whole or in part by Buyer):

**7.2.1**    **Accuracy of Warranties.**    Except as otherwise permitted by this Agreement or a Transfer Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in Article 4 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time) except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

**7.2.2**    **Performance of Covenants.**    Each Seller will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing Date.

**7.2.3**    **Delivery of Ancillary Agreements.**    Sellers will have delivered duly executed copies of each of the Ancillary Agreements.

**7.2.4**    **Encumbrances.**    All Encumbrances encumbering the Acquired Assets, other than Permitted Encumbrances shall be extinguished on or prior to the Closing Date. For purposes of this Section 7.2.4, any Encumbrances held by any Seller or Seller Affiliate will be deemed waived at Closing, and each such Seller shall, or cause the Seller Affiliate to, take all necessary action to extinguish such Encumbrances as soon as practicable after Closing.

**7.2.5**    **No Material Adverse Effect.**    Since the date of this Agreement, no Material Adverse Effect shall have occurred and is continuing at Closing.

**7.2.6**    **Schedules.**    Buyers shall have received and approved (such approval not to be unreasonably withheld or delayed) any updates to the Schedules delivered pursuant to Section 6.29.

**7.2.7**    **Certain Supply Agreement.**    Buyer and that certain supplier of fluid materials for the Business' MR Mounts Products shall have entered into a new agreement or agreed to transfer of existing agreement.

**7.3**    **Conditions to Obligations of Sellers.**    Except as otherwise permitted by this Agreement or a Transfer Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**7.3.1**    **Accuracy of Warranties.**    The representations and warranties of Buyer contained in Article 5 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date

if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

7.3.2 **Performance of Covenants.** Each Buyer and each of its Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

7.3.3 **Delivery of Ancillary Agreements.** Buyers will have delivered duly executed copies of each of the Ancillary Agreements.

## 8. CLOSING:

8.1 **Closing Date and Time.** Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "**Closing**"), will take place at the offices of Delphi at 10:00 a.m. on the second Business Day after the conditions set forth in Article 7 will have been satisfied or waived (other than conditions which by their nature can be satisfied only on the Closing Date), or on such other date or at such other time as the Parties may agree (the "**Closing Date**").

8.2 **Effective Date.** For tax and accounting purposes, the effective time of the transaction will be 11:59 p.m. Eastern time on the Closing Date.

8.3 **Transfer Agreements.** The Closing of the Transfer Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

8.4 **Ancillary Agreements.** On or prior to the Closing Date, the Sellers will duly execute and deliver to the Buyers, and the Buyers will duly execute and deliver to Sellers, each of the following agreements (each, an "**Ancillary Agreement**" and collectively, "**Ancillary Agreements**") to which they are to be a party:

8.4.1 An IP Assignment Agreement, substantially in the form of Exhibit 8.4.1, as well as any other instruments reasonably requested by Buyer to transfer the Purchased Intellectual Property.

8.4.2 The following Transfer Agreements, each of which shall be in a form to be agreed to by the local Buyer and local Seller consistent with the terms of this Agreement and which will become the Exhibits referenced herein (each a "**Transfer Agreement**" and collectively, "**Transfer Agreements**"):

A. Noida Sale Agreement, Exhibit 8.4.2.A.

B. Poland Sale Agreement, Exhibit 8.4.2.B, which is formed of two distinct instruments: (i) a local transfer agreement relating to all Acquired Assts owned by the relevant Seller; and (ii) a real estate transfer deed in customary form (signed before a notary public in Poland) relating to the real estate property located in Krosno which is part of the Acquired Assets.

**C.** China Sale Agreement (Ride Dynamics and Brakes), <u>Exhibit 8.4.2.C</u>.

**D.** Mexico Sale Agreement (Los Pinos), <u>Exhibit 8.4.2.D</u>.

**E.** Mexico Sale Agreement (Juarez), <u>Exhibit 8.4.2.E</u>.

**F.** Japan Sale Agreement, <u>Exhibit 8.4.2.F</u>.

**G.** France Sale Agreement (Ride Dynamics and Brakes), <u>Exhibit 8.4.2.G</u>.

**H.** The Germany Sale Agreement, <u>Exhibit 8.4.2.H</u>.

**I.** The England Sale Agreement, <u>Exhibit 8.4.2.I</u>.

**8.4.3** The Bills of Sale, substantially in the form of <u>Exhibit 8.4.3</u>.

**8.4.4** The Assignment and Assumption Agreements, substantially in the form of <u>Exhibit 8.4.4</u>.

**8.4.5** The Noida Manufacturing Services Agreement, substantially in the form of <u>Exhibit 8.4.5</u>.

**8.4.6** The Juarez Manufacturing Services Agreement, substantially in the form of <u>Exhibit 8.4.6</u>.

**8.4.7** The Krakow Technical Center Lease, substantially in the form of <u>Exhibit 8.4.7</u>, together with any required consent from any Governmental Authority in connection with said Lease.

**8.4.8** The Paris Technical Center Sublease, substantially in the form of <u>Exhibit 8.4.8</u>, together with any required consent from the lessor of the underlying lease.

**8.4.9** The 150 Xi Ya Road Lease Agreement, substantially in the form of <u>Exhibit 8.4.9</u>.

**8.4.10** Assignment/Novations of each of the Leased Real Property, <u>Exhibit 8.4.10.A</u> (11 Xi Ya Road) or <u>Exhibit 8.4.10.B</u> (328 Hua Jing Road) or <u>Exhibit 8.4.10.C</u> (generic form of assignment for other Leased Real Property), as the case may be, each of which Exhibits shall be in a customary form to be agreed by the Parties consistent with the terms of this Agreement.

**8.4.11** The Transition Services Agreement, substantially in the form of <u>Exhibit 8.4.11</u>.

**8.4.12** The Seller IP License Agreement, substantially in the form of <u>Exhibit 8.4.12</u>.

**8.5** <u>**Seller's Deliveries at Closing.**</u> On or prior to the Closing Date, the appropriate Sellers will deliver or cause to be delivered to the relevant Buyer, the following:

**8.5.1**    Non U.S. equivalent of quit claim deeds for the Owned Real Property, or such other form of conveyance in substance equivalent to such form of deed, as mutually agreed by the parties;

**8.5.2**    Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby;

**8.5.3**    Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order;

**8.5.4**    An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 7.2 applicable to Sellers have been fulfilled;

**8.5.5**    All other documents and papers reasonably requested by Buyer to transfer title to the Acquired Assets in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements, including but not limited to consents to assignment and transfer of the Material Contracts received by any Seller prior to Closing;

**8.5.6**    In the case of Mexico, the following original (to the extent reasonably possible) documentation: (i) employment agreements as amended and supplemented, if any, entered into by and between the relevant Seller and each of the Mexican Employees; (ii) certificates of registrations with the Mexican Institute of Social Security of each of the Mexican Employees and amendments thereto; (iii) salaries payment receipts for each of the Mexican Employees for the one (1) year prior to Closing; and (iv) labor benefits payment receipts for each of the Mexican Employees for the one (1) years prior to Closing; and

**8.5.7**    All Technical Documentation as set forth in Section 6.12 and Administrative Assets, and a disc of the Data Room.

**8.6**    **Buyers' Deliveries at Closing.**    On or prior to the Closing Date, Buyers will deliver or cause to be delivered to Delphi and each Seller designated by Delphi the following:

**8.6.1**    The Preliminary Purchase Price, as adjusted pursuant to Section 3.3.2, less the Deposit Escrow Amount and the Advance Payments, by wire transfer of immediately available funds to an account or accounts designated by Delphi, which account or accounts shall be designated not less than two (2) Business Days prior to the Closing Date;

**8.6.2**    Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby; and

**8.6.3**    An officer's certificate, dated as of the Closing Date, executed on behalf of Buyers, certifying that the conditions specified in Section 7.3 applicable to Buyers have been fulfilled.

9.    **TERMINATION:**

**9.1    Termination.**    This Agreement may be terminated at any time prior to the Closing:

**9.1.1**    By the mutual written consent of Delphi and Buyer Parent.

**9.1.2**    By either Delphi or Buyer Parent:

**A.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Closing will not have occurred by thirty (30) days after the Target Date for any reason other than a failure of the conditions set forth in Sections 7.1.2 or 7.1.3.

**B.**    If Seller consummates an Alternative Transaction.

**C.**    Provided the terminating Party is not in material breach of its obligations under Section 6.17.1 of this Agreement, and in the case of Buyer Parent, Sections 6.17.2 or 6.17.3 of this Agreement, if any Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) will have issued a Governmental Order or taken any other action restraining, enjoining or otherwise prohibiting any material portion of the transactions contemplated hereby and such Governmental Order or other action has become final and nonappealable, or in the reasonable opinion of the terminating Party is likely to become final and nonappealable.

**D.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before the date that is one hundred twenty (120) days after the date of this Agreement, or if such Sale Approval Order is subject to a stay or injunction on such date.

**9.1.3**    Provided that Buyer is not in material breach of its obligations under this Agreement, at any time prior to Closing, if a Material Adverse Effect has occurred, Buyer may terminate this Agreement within ten (10) Business Days after becoming aware of such event so long as such event is continuing at the time of any such termination and not reasonably capable of being cured within one hundred twenty (120) days after entry of the Sale Approval Order or the date of this Agreement, whichever is later.

**9.1.4**    By Buyer Parent, upon written notice to Delphi and provided that Buyer Parent is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if Delphi or any Seller has materially breached or materially failed to perform (without taking into account any additional materiality for representations, warranties, and covenant already containing a "materiality" or "Material Adverse Effect" qualification therein) any of its representations, warranties, covenants or other agreements contained in this Agreement if such material breach or failure to perform: (x) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (y) is incapable of being cured by Delphi or any Seller.

**9.1.5** By Delphi, upon written notice to Buyer Parent and provided that Delphi is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if the Buyer Parent or any Buyer has breached or failed to perform in any material respect any of its obligations or covenants contained in this Agreement (including under the Bidding Procedures), and such breach or failure to perform: (i) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (ii) is incapable of being cured by Buyer Parent or any Buyer.

**9.2** <u>**Break-Up Fee:**</u>

**9.2.1** In the event that Delphi sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or substantially all of the Business or the Acquired Assets in a transaction or a series of transactions with one or more Parties other than Buyer Parent or its Affiliates (such event being an "**Alternative Transaction**") and this Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.B, 9.1.2.D, 9.1.3 or 9.1.4 and an Alternative Transaction is consummated within eighteen (18) months after termination of this Agreement, Delphi will, upon the consummation of the Alternative Transaction(s), pay to Buyer Parent an amount equal to Two Million Nine Hundred Forty Thousand Dollars ($2,940,000.00) (the "**Break-Up Fee**"), provided that: (x) Buyer is not in material breach of this Agreement or the Bidding Procedures; and (y) this Agreement is not terminable under Section 9.1.2.C.

**9.2.2** If Buyer Parent becomes entitled to receive any Break-Up Fee, then such Break-Up Fee will be the sole and exclusive remedy of Buyers, whether at law or in equity, for any breach by Delphi or any of its Affiliates of the terms and conditions of this Agreement; provided that Buyer Parent will also be entitled to: (x) the return of the Deposit Amount; (y) the repayment of the Advance Payments pursuant to Section 3.2; and (z) the repayment of the JAVE Payments pursuant to Section 6.40.

**9.3** <u>**Procedure and Effect of Termination.**</u> In the event of the termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof will forthwith be given to all other Parties. If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

**9.3.1** Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**9.3.2** The provisions of the Confidentiality Agreement and any supplemental agreements relating to sensitive data will continue in full force and effect;

**9.3.3** The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 9 (Termination); and (ii) Sections 3.1 (Deposit Amount), 3.2 (Advance Payments), 6.40 (JAVE Funding), 12.1 (Fees and Expenses), 12.5 (Assignment), 12.7 (Notices), 12.8 (Entire Agreement), 12.10 (Publicity), 12.14 (Governing Law) and 12.15 (Venue and Retention of Jurisdiction); and

**9.3.4**    No party to this Agreement will have any Liability under this Agreement to any other except: (i) that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and, except as provided by Section 9.2.2 above, no Party waives any Claim with respect thereto; and (ii) as contemplated by Section 9.3.3 above.

## 10.    BIDDING PROCEDURES:

**10.1    Delphi Initial Bankruptcy Actions.**    This Article 10 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the Sale of the Acquired Assets.  The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Bidding Procedures Order and Sale Approval Order. The following overbid provisions and related bid protections are designed to compensate Buyers for their efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Acquired Assets for the benefit of Sellers' and their Affiliates' creditors, shareholders and bankruptcy estate.

**10.2    Qualified Bidder**. Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by Sellers in their sole discretion, in order to participate in the Bidding Process, each Person (a "**Potential Bidder**"), other than Buyer, must deliver (unless previously delivered) to Delphi, its counsel, its in-house counsel, and its financial advisors at the addresses provided in Section 10.3:

**10.2.1** An executed Confidentiality Agreement in form and substance satisfactory to Delphi;

**10.2.2** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors; and

**10.2.3** A preliminary (non-binding) written proposal regarding: (i) the purchase price range; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform post-Closing, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement will be deemed a "**Qualified Bidder**".  As promptly as practicable, after a Potential Bidder delivers all of the

materials required above, Delphi will determine, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi will allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets and the Business as provided in Section 10.4 below.  Buyer Parent will be deemed a Qualified Bidder for purposes of the Bidding Process.

**10.3    Bid Deadline.**  A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098 Attention: Director, Mergers & Acquisitions, with copies to: (i) Delphi's counsel,  Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: Ron E. Meisler; (ii) Delphi's in-house counsel, Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Attn: Deputy General Counsel – Transactional & Restructuring; (iii) Delphi's financial advisor, W.Y. Campbell & Company, One Woodward Avenue, 26th Floor, Detroit, Michigan 48326; Attn: _____; (iv) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Committee**"), Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude; and (v) counsel for the agent under Delphi's postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick; so as to be received not later than 11:00 A.M. (EST), on a date to be determined by Delphi that is at least five (5) Business Days before the date of the Sale Hearing (the "**Bid Deadline**").  Delphi may extend the Bid Deadline once or successively, but is not obligated to do so.  If Delphi extends the Bid Deadline, it will promptly notify all Qualified Bidders (including Buyer Parent) of such extension.  As soon as reasonably practicable following receipt and qualification of each Qualified Bid, Sellers will deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to counsel for the Official Committee of Equity Security Holders (the "**Equityholders' Committee**").

**10.4    Due Diligence.**  Delphi will afford each Qualified Bidder due diligence access to the Acquired Assets and the Business.  Due diligence access may include Management Presentations as may be scheduled by Delphi, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree.  Delphi will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any additional due diligence will not continue after the Bid Deadline.  Delphi may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at Management Presentations or site inspections.  Neither Delphi nor any of its Affiliates (nor any of their respective representatives) will be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**10.5    Bid Requirements.**    All bids must include the following documents (the "**Required Bid Documents**"):

**10.5.1** A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the Closing of the Sale of the Acquired Assets.

**10.5.2** An executed copy of this Agreement, together with all Schedules and Exhibits to this Agreement (a "**Marked Agreement**"), marked to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Preliminary Purchase Price (as defined in this Agreement).

**10.5.3** A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal to at least Twenty Million Dollars ($20,000,000.00).

**10.5.4** Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Delphi and its advisors.

**10.6    Qualified Bids.** A bid will be considered only if the bid:

**10.6.1** Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**10.6.2** Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that Delphi determines, in its sole but reasonable discretion, are similar to, and are not materially more burdensome or conditional than the terms of the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Preliminary Purchase Price plus the amount of the Break-Up Fee plus the aggregate amount of the Advance Payment, plus: (i) in the case of the initial Qualified Bid, $1,000,000; and (ii) $500,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**10.6.3** Is not conditioned upon: (i) any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment; and (ii) or such bid being deemed the Successful Bid by the Sellers.

**10.6.4** Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**10.6.5** Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required Governmental Approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any Governmental Approvals which must be obtained within sixty (60) days after entry of such order.

**10.6.6** Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi will have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified in Section 10.6 and deem such bids to be Qualified Bids, including bids for a portion of the Acquired Assets (e.g., Ride Dynamics Business or Brake Business). Notwithstanding the foregoing, Buyer Parent will be deemed a

Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than that of Buyer Parent is referred to as a "**Subsequent Bid**".  If Delphi does not receive any Qualified Bids other than the Agreement received from Buyer Parent, Delphi will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of this Agreement.

    **10.7**   **Bid Protection.**   Recognizing Buyer Parent's expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to Buyer Parent.  Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Delphi has agreed that if Delphi does not close with Buyer Parent because Delphi consummates an Alternative Transaction and Buyer Parent is not in breach of the Agreement or the Bidding Procedures, Delphi will pay to Buyer Parent the Break-Up Fee to the extent required under Section 9.2.1 hereof.  The payment of the Break-Up Fee will be governed by the provisions of the Agreement and the order of the Bankruptcy Court approving the Bidding Procedures.

    **10.8**   **Auction, Bidding Increments and Bids Remaining Open.**   If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "**Auction**") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before the tenth (10th) Business Day following the expiration of the Bid Deadline, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60601-1285 or Four Times Square, New York, New York 10036 (at Delphi's election) or such later time or other place as Delphi will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures.  In the event that Delphi does not receive any Qualified Bids prior to the Bid Deadline, the Auction shall be deemed to have occurred on the Bid Deadline and Buyers shall be deemed the successful bidder for the Acquired Assets:

    **10.8.1** Only Delphi, Buyer Parent, any representative of the Committee and the Equityholders' Committee, any representative of Delphi's secured lenders (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only Buyer Parent and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

    **10.8.2** At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Delphi will provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer going into the Auction to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction.  Notwithstanding such determination, Delphi reserves the right, in its sole discretion, to determine which bid, or subsequent bid, is the Successful Bid (as defined below), following the conclusion of the Auction based upon a number of factors and other considerations.

    **10.8.3** All Qualified Bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other

bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**10.8.4** Sellers may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**10.8.5** Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $500,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Buyer Parent), Delphi may give effect to any Break-Up Fee that may be payable to Buyer Parent under the Agreement as well as any assets and/or equity interests to be retained by any Seller.

**10.8.6** At the conclusion of the Auction, or as soon thereafter as practicable, Sellers, in consultation with its financial advisors, will: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "**Successful Bid(s)**" the bidder(s) making such bid, the "**Successful Bidder(s)**").

**10.9**    **Acceptance of Qualified Bids.** Sellers will sell the Acquired Assets for the highest or otherwise best Qualified Bid, as determined by Delphi, upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**"). If, after an Auction in which Buyer Parent: (i) will have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it will, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee. Delphi's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Delphi's acceptance of the bid. Delphi will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

**10.10**    **Sale Hearing.** The Sale Hearing will be held before the Honorable Judge Robert Drain on May 21, 2009 at 10:00 a.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled in Delphi's sole discretion, subject to Bankruptcy Court Approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing. If Delphi does not receive any Qualified Bids (other than the Qualified Bid of Buyer Parent), Delphi will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to Buyer Parent following entry of the Sale Order. If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi will seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**"). Following approval of the

sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and Delphi will effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**10.11  Return of Good Faith Deposit.**  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the Closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder(s).  If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of Delphi.  On the Return Date, Delphi will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**10.12  Reservation of Rights.**  Delphi, after consultation with the agents for its secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than Buyer Parent's initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of Sellers, its estate and creditors as determined by Delphi in its sole discretion.

## 11.  LIABILITY, INDEMNIFICATION:

**11.1  LIMITATIONS OF LIABILITY.** NEITHER DELPHI NOR ANY OF THE OTHER SELLERS UNDERTAKES ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES; DELPHI WILL NOT BE LIABLE FOR ANY, AND BUYERS ASSUME LIABILITY FOR ALL, PERSONAL INJURY AND PROPERTY DAMAGE CONNECTED WITH BUYERS INVESTIGATION AND EXAMINATION OF THE ACQUIRED ASSETS, THE HANDLING, TRANSPORTATION, POSSESSION, PROCESSING, FURTHER MANUFACTURE OR OTHER USE OR RESALE OF ANY OF THE ACQUIRED ASSETS AFTER THE CLOSING DATE, WHETHER SUCH ACQUIRED ASSETS ARE USED OR RESOLD ALONE OR IN COMBINATION WITH OTHER ASSETS OR MATERIALS; AND BUYERS ACKNOWLEDGE THAT THE ACQUIRED ASSETS ARE BEING SOLD IN THEIR PRESENT STATE AND CONDITION, "AS IS, WHERE IS," WITH ALL FAULTS, AND BUYERS' ARE PURCHASING AND ACQUIRING SUCH ACQUIRED ASSETS ON THAT BASIS PURSUANT TO BUYERS' OWN INVESTIGATION AND EXAMINATION AFTER HAVING BEEN PROVIDED WITH AN ADEQUATE OPPORTUNITY AND ACCESS TO SUCH ACQUIRED ASSETS TO COMPLETE SUCH INVESTIGATION OR EXAMINATION AND ON THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT AND THE INDEMNITIES IN SECTION 11.3.2.

**11.2  Survival.**  Except with respect to Sections 2.1 (Transfers by Sellers and their Affiliates), 2.2 (Assumption of Liabilities), 2.3 (Retained Liabilities), Sections 2.4 (Deferred

Items), 3.4 (Preparation of Closing Statement), 3.5 (Preliminary Purchase Price Adjustments), 3.6 (Allocation of Purchase Price), 3.7 (Pro-Rations), 6.4 (Non-Competition), 6.5 (Tax Matters; Cooperation; Preparation of Returns; Tax Elections), 6.6 (U.S. Employees; Benefit Plans; Labor Matters), 6.7 (EMEA Employees; Benefit Plans; Labor Matters); 6.8 (Mexico Employees; Benefit Plans; Labor Matters); 6.9 (Asia/Pacific Employees; Benefit Plans; Labor Matters); 6.12 (Technical Documentation; Trade Secrets), 6.13 (Books and Records and Litigation Assistance from and after Closing), 6.14 (Corporate Names), 6.15 (Intellectual Property and Intellectual Property Licenses), 6.16 (Post-Closing Obligations), 6.19 (Further Assurances) 6.20 (Shared Items Transferred to Buyers), 6.26 (Confidentiality), 6.32 (Purchased Intellectual Property Assistance) (which will survive for two (2) years), Article 11 (Liability, Indemnification), and Article 12 (Miscellaneous) (and the definitions referenced in this Agreement used therein) which shall survive for the applicable statute of limitations or for the timeframe specified in such provision, the representations, warranties, covenants and agreements of Sellers will survive until the first anniversary of the Closing and the execution and delivery of the Ancillary Agreements; provided, however, that: (i) the representations and warranties in Section 4.5.2 (Sufficiency of Acquired Assets) will survive for only 180 days after the Closing Date; (ii) the representations and warranties in Section 4.13 (Environmental Matters) will survive until the fifth (5th) anniversary of the Closing Date; and (iii) the representations, warranties, covenants and agreements of Sellers in this Agreement and the Ancillary Agreements relating to the Taxes shall survive until expiration of the applicable statute of limitations.  The representations, warranties, covenants and agreements of Buyers will survive Closing.

**11.3**  **Indemnification.**  Except as may be expressly set forth in this Agreement or in an Ancillary Agreement, no Seller or Buyer will be required to indemnify any other party to any of such agreements.

**11.3.1** Buyers' Indemnification of Delphi.  From and after the Closing Date, Buyers will, severally and not jointly indemnify, defend and hold harmless Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all Indemnifiable Losses actually incurred by Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents relating to, resulting from or arising out of: (i) a breach of any representation or warranty made by any Buyer contained in this Agreement; (ii) the Assumed Liabilities; (iii) a breach of any agreement or covenant of any Buyer contained in this Agreement or any Transfer Agreements; or (iv) the conduct of the Business or the ownership of the Acquired Assets after Closing.

**11.3.2** Sellers' Indemnification of Buyers.  Subject to the limitations set forth in this Article 11, from and after the Closing Date: (i) each Seller of Acquired Assets (which is not a Filing Affiliate) will (solely with respect to the Retained Liabilities and representations, warranties and covenants related to such Acquired Assets) severally and not jointly indemnify, defend and hold harmless Buyers and their Affiliates and their respective directors, officers, employees, partners, advisors, representatives and agents from and against all Indemnifiable Losses relating to, resulting from or arising out of: (a) a breach of any representation or warranty made by such Seller contained in this Agreement; (b) the Retained Liabilities that are retained by such Seller; or (c) a breach of any agreement or covenant of such Seller contained in this Agreement or any Transfer  Agreement; and (ii) the Sellers that are Filing Affiliates (jointly and severally with Delphi) agree to indemnify the relevant Buyer for Indemnifiable Losses: (x) to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge Liability with respect to any claims relating to Products shipped by a Filing Affiliate prior to Closing or other Retained

86

Liabilities of a Filing Affiliate; (y) resulting from or arising out of a breach of any representation or warranty made by such Filing Affiliate contained in this Agreement; or (z) resulting from or arising out of a breach of any agreement or covenant of such Filing Affiliate contained in this Agreement or any Transfer Agreement.

A.    Seller's obligation to indemnify for Indemnifiable Losses pursuant to Section 11.3.2(i)(a) or (ii)(y) shall apply only to those Claims for which notice is provided to a Seller on or before the date that is twelve (12) months after the Closing Date with the exception of any claims for indemnification made: pursuant to Section 4.5.2 (Sufficiency of Acquired Assets) which must be notified to a Seller on or before the 180th day after the Closing Date; Section 11.4 (Environmental Matters) which must be notified to a Seller on or before the fifth (5th) anniversary of the Closing Date; Sections 2.3.2 (Product Warranty Claims) and 2.3.3 (Product Recall Claims), each of which must be notified to a Seller on or before the expiration of the relevant Warranty Period; and with respect to Taxes, Claims relating to infringement of Intellectual Property or Product Liability Claims, or other Claims under Section 11.3.2, each of which must be noticed prior to expiration of the applicable statute of limitations.

B.    No Seller shall be liable for Indemnifiable Losses pursuant to Section 11.3.2(i)(a) or 11.3.2(i)(c) or 11.3.2(ii)(y) or (z) until: (i) an individual claim or occurrence is greater than Twenty-Five Thousand Dollars ($25,000.00) ("**Individual Claim Amount**") claimed against the Sellers whether individually or collectively; and (ii) the amount of all Indemnifiable Losses (which exceeds the Individual Claim Amount) in the aggregate exceeds Five Hundred Thousand Dollars ($500,000.00) ("**Deductible Amount**"), after which point Seller will be obligated to indemnify Buyer from and against Indemnifiable Losses exceeding the Individual Claim Amounts that are in excess of the Deductible Amount until the aggregate amount of Indemnifiable Losses indemnified reaches an amount equal to Nine Million One Hundred Thousand Dollars ($9,100,000.00), after which no Seller would have any further obligation with respect to Indemnifiable Losses under this Agreement.  The term "**Cap Amount**" refers to the maximum amount payable by a Seller or all Sellers, as the case may be.  Such Cap Amount will not apply to Indemnifiable Losses relating to Retained Liabilities, (except in all cases that the Cap Amount will apply to any and all Claim(s) relating to infringement of Intellectual Property Rights), or any fraud, willful misconduct or intentional breach by a Seller.   Claims arising out of Retained Liabilities shall not be subject to the Individual Claim Amount or the Deductible, except that, notwithstanding anything to the contrary herein, with respect to Claims for Environmental Damages the Individual Claim Amount will apply.

C.    Buyers agree that, from and after the Closing Date, the indemnification provided in this Section 11.3.2 is the exclusive remedy for a breach by any Seller of any representations or warranties contained in this Agreement or any Transfer Agreement, a breach by any Seller of any agreement or covenant contained in this Agreement or any Transfer Agreement, that, by its terms, is intended to be performed by a Seller after the Closing Date,  or arising from any Retained Liabilities, and that there shall be no other remedy for any breach by any Seller of any breach of a covenant or agreement that, by its terms, is intended to be performed by such Seller on or prior to the Closing Date;

provided that the foregoing shall not apply with respect to any breach of Section 6.4.

  **D.**  In calculating amounts payable hereunder, the amount of any Indemnifiable Losses shall be determined without duplication of any other Losses for which a Claim has been made by Buyer or could be made under any other representation, warranty, covenant or agreement included herein, i.e., an indemnified party may not recover more than once for a particular identifiable Loss.

  **E.**  To the extent that any Buyer pays for any Liabilities in Poland which should have been paid by any Seller pursuant to such Seller's indemnification obligations under this Article 11 but for the requirement under Polish Law that an asset purchaser becomes jointly and severally with the seller liable for certain pre-purchase liabilities, such Seller shall immediately reimburse such Buyer for such payment and such reimbursement amount shall not be subject to nor included in the calculation of the Buyer's Individual Claim Amount, Buyer's Deductible Amount or the Seller's Cap Amount.

**11.4**  <u>Environmental Matters</u>:

 **11.4.1** <u>Indemnification of Seller and Buyer</u>:

  **A.**  Subject to the provisions of this Agreement, and solely with respect to the Manufacturing Facilities, each Seller shall indemnify the appropriate Buyer solely for Environmental Damages arising from Pre-Closing Environmental Contamination and Pre-Closing Compliance Matters at the Manufacturing Facility operated by such Seller.

  **B.**  Subject to the provisions of this Agreement, and solely with respect to the Manufacturing Facilities (except that regarding MSA Manufacturing Facilities, Buyer will be responsible only to the extent such Losses or Liabilities are caused by changes to the manufacturing process effected by Buyer despite written objection from Seller, or by the acts of a Buyer employee located at such MSA Manufacturing Facility), Buyer shall indemnify Seller for Environmental Damages arising from Post-Closing Environmental Contamination and Post-Closing Compliance Matters; provided, however that during any period covered by a Manufacturing Services Agreement pursuant to which Seller provides contract manufacturing services to Buyer after the Closing at a particular site, Seller agrees to remain liable for Environmental Damages arising during the period of such Manufacturing Services Agreement at such site.

  **C.**  Subject to the provisions of this Agreement, for those Environmental Damages arising from circumstances that may be considered both: (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination; or (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Closing, and each Party shall indemnify the other for its share as determined by such allocation.

**D.**    Section 11.7 shall apply to any disputes between the parties as to environmental matters.

**11.4.2 <u>Limitations on Liability</u>.**    Claims relating to environmental matters are subject to the limitations of this Section 11.4.2.   Neither Party shall be liable under this Agreement for Environmental Damages:

**A.**    In the case of Environmental Claims arising from Pre-Closing Compliance Matters, unless written notice of such claim has been served on the non-claiming Party on or before the fifth (5th) anniversary of the Closing Date.

**B.**    In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, unless written notice of such claim has been served on the non-claiming Party on or before the fifth (5th) anniversary of the Closing Date.

**C.**    In the case of Environmental Damages arising from Pre-Closing Environmental Conditions, unless the claiming Party discovers the facts and circumstances giving rise to such claim through the normal course of business, which shall include, but not necessarily be limited to, environmental investigation in order to comply with a binding order from a Competent Authority, or in connection with a request or order from a lending institution in connection with a financing, re-financing or other lending transaction, as a part of due diligence investigation with respect to the sale of the Business, arising out of or relating to pre-purchase or pre-occupancy due diligence, or as required by an applicable lease

**D.**    Where the indemnified party uses the Manufacturing Facility for a use other than or more sensitive than an industrial use, or seeks to or changes the zoning or land use classification of the Manufacturing Facility to a classification more sensitive than the industrial classification in effect on the Closing Date;

**E.**    Where, subject to Section 11.4.2.F below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Acquired Assets of a Manufacturing Facility or performing any obligation or exercising any right under this Agreement as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party.

**F.**    The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of Section 11.4.2.E:

(i)    Where the disclosure is required by any law (including any Environmental Law);

(ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated;

(iii)    Where the information is clearly in the public domain through no fault of the claiming Party; or

(iv)    Where the non-claiming Party has given prior written approval to the disclosure.

G.    To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages: (i) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (ii) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this Section 11.4.2.G shall be deemed to be Environmental Damages.

### 11.4.3  Remediation of Environmental Damage:

A.    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter (a "**Remedy**") to no less but no more than the Remediation Standards allowed by applicable Environmental Laws; such Remedial Works may be determined, in compliance with applicable Environmental Laws using risk assessment and related risk evaluation methods.

B.    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

C.    The conduct of a Remedy shall be as follows:

(i)    The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to adopt where such comments do not increase any cost or liability of the Remedy;

(ii)    When requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority;

(iii)    Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation or use of the Manufacturing Facility, and Buyer will reasonably cooperate with

90

Seller including providing access to the Manufacturing Facility and the use of utilities in the conduct of the Remedy;

(iv)    Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

(v)    The conduct of the Remedy shall be deemed complete when, as the case may be:

(a)    The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(b)    Subject to Section 11.4.3.A of this Agreement, the remedy meets the Remediation Standards which are allowed by applicable Environmental Laws.

D.    All Remedial Works required under this Agreement (which in any event remain a Retained Liability not subject to any cap), including Sellers' ongoing remedial work at the Manufacturing Facility located in Krosno, Poland, shall be performed in a timely manner.

**11.5    Indemnification Procedure.**    The obligations of any indemnifying party to indemnify any indemnified party under Sections 11.3.1 or 11.3.2 with respect to Indemnifiable Losses resulting from the assertion of liability by third parties (including Governmental Authorities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**11.5.1** Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of this Section 11.5.1), and the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party.  Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 11, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice.  Any written notice delivered by the indemnified party to the indemnifying party seeking indemnification pursuant to this Agreement with respect to Indemnifiable Losses shall set forth, with as much specificity as is reasonably practicable, the basis of the claim for Indemnifiable Losses, the sections of this Agreement which form the basis for the claim, copies of all material written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Losses that have been or may be sustained by the indemnified party.  The indemnified party shall, and shall cause its employees and representatives to, cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within ninety (90) days after written notice of any such Indemnification Claim (or such earlier period as may be required for a response under applicable Law, as set forth in such written notice), fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made

shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party, subject to the right of the indemnifying party to assume the defense of such Indemnification Claim at any time prior to settlement, compromise or final determination thereof upon written notice to the indemnified party.

**11.5.2** Anything in this Section 11.5 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

**11.5.3** All payments under this Article 11 shall be treated as adjustments to the Purchase Price.

**11.6    Mitigation.**  Notwithstanding any other provision of this Agreement, in no event shall a Party be entitled to indemnification pursuant to this Agreement to the extent any Indemnifiable Losses were attributable to such Party's own gross negligence or willful misconduct or to the extent such Indemnifiable Losses could have reasonably been avoided by an indemnified party, or the damage to such indemnified party from such Indemnifiable Losses reasonably could have been mitigated.

**11.7    Dispute Resolution:**

**11.7.1** Seller and Buyer will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response.  The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this Section 11.7 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

**11.7.2** To the extent they remain unresolved through the procedure set forth in Section 11.7.1 above, all disputes arising out of or in connection with this Agreement or any of the Ancillary Agreements shall be submitted to the Bankruptcy Court (unless the Ancillary Agreements specify to the contrary).  The Parties agree that the Bankruptcy Court retains exclusive jurisdiction to interpret, construe, enforce, and implement the terms and provisions

of this Agreement and of each of the Ancillary Agreements unless an Ancillary Agreement expressly states otherwise. Notwithstanding anything in this Agreement to the contrary, to the extent the Bankruptcy Court refuses to hear any case arising out of or in connection with this Agreement or any Ancillary Agreement, such dispute shall then be finally settled by binding arbitration in London under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said rules in London.

## 12.    **MISCELLANEOUS**:

**12.1    Fees and Expenses**.  Delphi, on behalf of Sellers, on the one hand, and Buyer Parent, on behalf of Buyers, on the other hand, will each bear its own expenses and the expenses of its Affiliates in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, including their respective brokers' or finders' fees and all fees and expenses of their respective counsel, auditors, consultants and other representatives.  Buyer Parent, on behalf of each Buyer, will be solely responsible for: (i) all expenses in connection with its due diligence review of the Business, including, without limitation, surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, UCC lien and other searches; and (ii) any cost in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.

**12.2    Bulk Sales Laws**.  Buyer Parent on behalf of each Buyer waives compliance by Delphi and Sellers with any applicable bulk sales Law.

**12.3    Payments in Dollars**.  Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. Dollars in same day or immediately available funds.

**12.4    Amendment**. This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties.

**12.5    Assignment**.  This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party, provided, that no assignment of any rights or obligations hereunder will be made by any Seller or Buyer without the written consent of the other Party (not to be unreasonably withheld or subsequently revoked), except: (i) in connection with a sale of substantially all of the assets of the Business; and (ii) the assignment of this Agreement by each Filing Affiliate to its succeeding entity following such Filing Affiliate's emergence from Chapter 11 (which assignment will not require the other Party's consent) and will result in such Filing Affiliate and its successor entity being jointly and severally liable for such Filing Affiliate's obligations under this Agreement which the Parties will seek to have such provision included in the Sale Approval Order.  The obligations under this Agreement (including all Exhibits and Ancillary Agreements) of the Sellers who are Filing Affiliates shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Filing Affiliates, and the reorganized or reconstituted debtors, as the case may be, after the effective date of the confirmed plan or plans in the Filing Affiliates' cases.

**12.6    Waiver**.  Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any

provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**12.7    Notices.**   Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

| | |
|---|---|
| <u>If to any Buyer:</u> | **BeijingWest Industries Co., Ltd.**<br>Jiao Dao Er Jie East<br>Doudian Village<br>Fangshang District, Beijing 102402<br>The People's Republic of China<br>Attn: Mr. Fang Jianyi<br>    Chairman and Legal Representative<br>Fax No.: +(86 10) 8829 5578 |
| <u>With a copy to:</u> | **VINSON & ELKINS LLP**<br>20/F, Beijing Silver Tower<br>No. 2 Dong San Huan Bei Lu<br>Chaoyang District, Beijing 100027, China<br>Attn: Xiao Yong<br>Tel +(86 10) 6410 6300<br>Fax +(86 10) 6410 6360 |
| | **HONIGMAN MILLER SCHWARTZ AND COHN LLP**<br>130 S. First Street, Fourth Floor<br>Ann Arbor, MI  48104<br>Attn:    Barbara A. Kaye<br>Tel.:  (734) 418-4260<br>Fax.: (734) 418-4261 |
| <u>If to Delphi:</u> | **DELPHI CORPORATION**<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:  Fred Bellar III<br>    Director – Mergers and Acquisitions<br>Fax No.:  248-813-2410 |
| <u>With a copy to:</u> | **DELPHI CORPORATION**<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:    Deputy General Counsel - |

94

Transactional & Restructuring
Fax No.:  248-813-2491

provided, however, if either Party will have designated a different addressee by notice, then to the last addressee so designated.

**12.8    Entire Agreement.**  This Agreement, together with the Ancillary Agreements and the Confidentiality Agreement contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and thereof; provided that the nonsolicitation of employees provision of the Confidentiality Agreement will not apply to employees of the Business.  Buyers have requested that the signatories to this Agreement execute a Chinese language version of this Agreement (without schedules, exhibits or other attachments), based on the final, signed English version hereof, in order to facilitate the transaction.  Delphi is willing to do so, subject to the Parties' agreement that any terms or conditions in the Chinese version of this Agreement that are additional to or otherwise different than the terms and conditions of this Agreement, shall be of no force or effect (i.e., the English language version of this Agreement shall govern).  The Parties will cooperate between the date of this Agreement and the date of the Sale Approval Order to correct any translation errors in the Chinese version of this Agreement.

**12.9    Counterparts.**  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

**12.10    Publicity.**  Except as required by Law (and then only after prior consultation with the other Party) or in connection with the Bankruptcy Cases, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party (not to be unreasonably withheld, delayed or conditioned).  Any press release or public announcement will take into account the obligation to provide prior information to Sellers' relevant works council, as well as union representatives in Mexico, in accordance with applicable law and past practice of Seller.

**12.11    Headings.**  The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

**12.12    Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable: (i) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**12.13    Third Parties.**  Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and

95

their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.

**12.14  Governing Law.**  This Agreement will in all respects be governed by and construed in accordance with the laws of the State of New York, and to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**12.15  Venue and Retention of Jurisdiction.**  The Parties irrevocably and unconditionally submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and subject to Section 11.7.2, agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**12.16  No Right of Setoff.**  Neither Party nor any of its Affiliates may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it under this Agreement or any Ancillary Agreement against any amounts owed under this Agreement or any Ancillary Agreement by such Person to the other Party or any of such other Party's Affiliates.

**12.17  Risk of Loss.**  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

**12.18  Enforcement of Agreement.**  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI CORPORATION**


By:_____/s/_____
Name: **Fred J. Bellar III**
Title:   **Executive Director of M&A**


**BEIJINGWEST INDUSTRIES CO., LTD.**


By:_____/s/_____
Name:  **Fang Jianyi**
Title: **Chairman and Legal Representative**


The following U.S. Persons sign this Agreement solely with respect to the Acquired Assets being bought or sold by such Person.  Buyers of U.S. Acquired Assets will sign in this manner prior to Closing.


**DELPHI AUTOMOTIVE SYSTEMS LLC**


By:_____/s/_____
Name: **Fred J. Bellar III**
Title:   **Executive Director of M&A**


**DELPHI TECHNOLOGIES, INC.**


By:_____/s/_____
Name: **Fred J. Bellar III**
Title:   **Executive Director of M&A**

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Detail of Sellers and Buyers |
| Schedule 1.1.A | Buyers' Knowledge |
| Schedule 1.1.B | Sellers' Knowledge |
| Schedule 2.1.1 | Acquired Asset Summary on a Site-By-Site Basis |
| Schedule 2.1.1.G | Tooling Deposits |
| Schedule 2.1.1.I | Certain Acquired Assets |
| Schedule 2.1.2.N | Excluded Computer Hardware, Equipment, Software and Other Assets |
| Schedule 2.2.7 | Deferred Revenue Obligations |
| Schedule 2.3.5 | Environmental Liabilities |
| Schedule 3.2 | Capital Expenditures |
| Schedule 3.3.2 | Employee Purchase Price Adjustments |
| Schedule 3.4.1 | Inventory Accounting Methodology |
| Schedule 3.6.1 | Allocation |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6 | Compliance with Laws; Permits |
| Schedule 4.7 | Proceedings against Sellers |
| Schedule 4.8 | Absence of Certain Changes |
| Schedule 4.10.1 | Global Sale Employees |
| Schedule 4.10.2 | Seller Employee Benefit Plans |
| Schedule 4.10.4 | ERISA Compliance |
| Schedule 4.10.5 | Proceedings relating to Seller Employee Benefit Plans |
| Schedule 4.10.6 | ERISA Liabilities |
| Schedule 4.10.8 | Collective Bargaining Agreements |
| Schedule 4.10.9 | Labor Relations |
| Schedule 4.11.1 | Purchased Intellectual Property – Registered |
| Schedule 4.11.2 | Third Party Rights to Intellectual Property |
| Schedule 4.11.4 | Third Party Infringement Claims |
| Schedule 4.11.5 | Infringement |
| Schedule 4.11.6 | Intellectual Property License Agreements |
| Schedule 4.12.1 | Material Contracts |
| Schedule 4.12.2 | Contract Defaults |
| Schedule 4.12.4 | Indirect Material Contracts without Termination for Convenience Provision |
| Schedule 4.13 | Environmental Matters |
| Schedule 4.14 | Insurance |
| Schedule 4.15.1 | Defects in Title for Personal Property Assets |
| Schedule 4.15.3 | Other Inventory Locations |
| Schedule 4.15.4 | Machinery, Equipment and Capitalized Tools |
| Schedule 4.15.5 | Personal Property Maintenance |
| Schedule 4.16.1 | Leased Real Property |
| Schedule 4.16.2 | Owned Real Property |
| Schedule 4.17 | Recorded Permitted Encumbrances |
| Schedule 5.3 | No Conflicts or Approvals |
| Schedule 5.8 | Business License |
| Schedule 6.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 6.3 | Assumed U.S. Contracts |
| Schedule 6.15.1 | Restrictions to License for Shared Intellectual Property |

Schedule 6.16        Post-Closing Obligations
Schedule 6.17.1      Competition Filings
Schedule 6.20        Personal Property Transferred to Buyer
Schedule 6.41        India Idle Assets

# EXHIBITS

| | |
|---|---|
| Exhibit 3.2.1 | Mortgage |
| Exhibit 3.2.2.A | Registered Pledge |
| Exhibit 3.2.2.B | Registered Charge |
| Exhibit 8.4.1 | IP Assignment Agreement |
| Exhibit 8.4.2.A | Noida Sale Agreement |
| Exhibit 8.4.2.B | Poland Sale Agreement |
| Exhibit 8.4.2.C | China Sale Agreement |
| Exhibit 8.4.2.D | Mexico Sale Agreement (Los Pinos) |
| Exhibit 8.4.2.E | Mexico Sale Agreement (Juarez) |
| Exhibit 8.4.2.F | Japan Sale Agreement |
| Exhibit 8.4.2.G | France Sale Agreement |
| Exhibit 8.4.2.H | Germany Sale Agreement |
| Exhibit 8.4.2.I | England Sale Agreement |
| Exhibit 8.4.3 | Bills of Sale |
| Exhibit 8.4.4 | Assignment and Assumption Agreements |
| Exhibit 8.4.5 | Noida Manufacturing Services Agreement |
| Exhibit 8.4.6 | Juarez Manufacturing Services Agreement |
| Exhibit 8.4.7 | Krakow Technical Center Sublease |
| Exhibit 8.4.8 | Paris Technical Center Sublease |
| Exhibit 8.4.9 | 150 Xi Ya Road Lease Agreement |
| Exhibit 8.4.10.A | Lease Assignment – 11 Xi Ya Road |
| Exhibit 8.4.10.B | Lease Assignment – 328 Hua Jing Road |
| Exhibit 8.4.10.C | Lease Assignment – Generic |
| Exhibit 8.4.11 | Transition Services Agreement |
| Exhibit 8.4.12 | Seller IP License Agreement |

<u>**SCHEDULE 1**</u>

<u>**DETAILS OF SELLERS AND BUYERS**</u>

**A.** <u>**Ride Dynamics Business**</u>:

| | ASSET/ STOCK | SELLER | BUYER* |
|---|---|---|---|
| **MANUFACTURING FACILITIES:** | | | |
| Los Pinos, Mexico | Asset | Delphi Sistemas de Energia, S.A. de C.V. and Delphi Automotive Systems, LLC . | |
| Luton, England | Asset | Delphi Automotive Systems UK Ltd. | |
| Krosno, Poland | Asset | Delphi Poland S.A. | |
| Noida, India | Asset | Delphi Automotive Systems PVT LTD | |
| Hua Jing Road, Shanghai, China | Asset | Delphi Shanghai Dynamics & Propulsion Systems Co. Ltd. | |
| | | | |
| **TECHNICAL CENTERS:** | | | |
| Dayton, Ohio – East River Road | Asset | Delphi Automotive Systems LLC | |
| Dayton, Ohio – Research Park | Asset | Delphi Automotive Systems LLC | |
| Milford, Michigan | Asset | Delphi Automotive Systems LLC | |
| Warren, Michigan | Asset | Delphi Automotive Systems LLC | |
| Auburn Hills, Michigan** | Asset | Delphi Automotive Systems LLC | |
| Brighton, Michigan | Asset | Delphi Automotive Systems LLC | |
| Krakow, Poland | Asset | Delphi Poland S.A. | |
| Paris, France | Asset | Delphi France SAS | |
| Bascharage, Luxembourg ** | Asset | Delphi Holdings Luxembourg SARL | |
| Tokyo, Japan | Asset | Delphi Automotive Systems Japan Ltd. | |
| Munich, Germany** | Asset | Delphi Deutschland GmbH | |
| Torino, Italy ** | Asset | Delphi Automotive Systems Italia Srl. | |
| Russelsheim, Germany | Asset | Delphi Deutschland GmbH | |
| Shanghai, China | Asset | Delphi Shanghai Dynamics and Propulsion Systems Co., Ltd. | |
| Melbourne, Australia** | Asset | Delphi Automotive Systems Australia Ltd. | |
| Noida, India | Asset | Delphi Automotive Systems PVT LTD | |
| | | | |

| TECHNOLOGY: | | | |
|---|---|---|---|
| Troy, Michigan | Asset | Delphi Technologies, Inc. | |
| Kettering, Ohio | Asset | Delphi Automotive Systems LLC | |

\*  Local Buyer entities will be created by Buyer Parent in the jurisdiction in which the local Acquired Assets are located.

\*\* In some locations where there is only one employee, his/her computer will transfer with the employee without a separate Transfer Agreement: Auburn Hills, Michigan; Luxembourg; Munich, Germany; Torino, Italy; and Melbourne, Australia.

### B. **Brakes Business**:

| | ASSET/<br>STOCK | SELLER | BUYER* |
|---|---|---|---|
| **MANUFACTURING<br>FACILITIES:** | | | |
| Hua Jing Road,<br>Shanghai, China | Asset | Delphi Shanghai Dynamics &<br>Propulsion Systems Co. Ltd. | |
| 150 Xi Ya Road,<br>Shanghai, China | Asset | Delphi Shanghai Dynamics &<br>Propulsion Systems Co. Ltd. | |
| Juarez, Mexico | Asset | Delphi Automotive Systems LLC | |
| Juarez, Mexico | Asset | Sistemas Electricos y<br>Conmutadores S.A. de C.V.** | |
| Rayong, Thailand | Asset | Delphi Automotive Systems<br>(Thailand) Limited | |
| | | | |
| **TECHNICAL<br>CENTERS:** | | | |
| East River Road,<br>Dayton, Ohio | Asset | Delphi Automotive Systems LLC | |
| Brighton, Michigan | Asset | Delphi Automotive Systems LLC | |
| 11 Xi Ya Road,<br>Shanghai, China | Asset | Delphi Shanghai Dynamics &<br>Propulsion Systems Co. Ltd. | |
| Taiwan, China** | Asset | Delphi Automotive Systems<br>International, Inc., Taiwan<br>Representative Office | |
| Milford, Michigan | Asset | Delphi Automotive Systems LLC | |
| Marquette, Michigan | Asset | Delphi Automotive Systems LLC | |
| Paris, France | Asset | Delphi France SAS | |
| | | | |
| **TECHNOLOGY:** | | | |
| N/A | Asset | Delphi Technologies, Inc. | |
| | | | |
| **MISCELLANEOUS:** | | | |
| Detroit, MI Storage<br>Facility | Asset | Delphi Automotive Systems LLC | |
| Dayton, OH Storage<br>Facility | Asset | Delphi Automotive Systems LLC | |

* Local Buyer entities will be created by Buyer Parent in the jurisdiction in which the local Acquired Assets are located.

**Note:**    In Taiwan, China, where there is only one employee, his/her computer will transfer with the employee without a Transfer Agreement.

### SCHEDULE 3.6.1

### PURCHASE PRICE ALLOCATION

The Preliminary Purchase Price shall be allocated as follows:

|  |  | Payment Allocation $ USD (000s) |
|---|---|---|
| 1. | Delphi Sistemas de Energia, S.A. de C.V.  – Sale of assets | 1,350 |
| 2. | Delphi Automotive Systems UK Ltd. – Sale of assets | 10,098 |
| 3. | Delphi Poland S.A. - – Sale of assets | 23,257 |
| 4. | Delphi Automotive Systems Private Ltd. (India) - Sale of Assets | 3,529 |
| 5. | Delphi Shanghai Dynamics & Propulsion Systems Co. Ltd. - Sale of Assets | 20,343*  ** |
| 6. | Sistemas Electricos y Conmutadores S.A. de C.V. - Sale of Assets | 300 |
| 7. | All Acquired Assets of Filing Affiliates | 29,159 |
| 8. | Delphi France SAS. - Sale of Assets | 1,767* |
| 9. | Delphi Automotive Systems Japan Ltd. – Sale of assets | 190 |
| 10. | Delphi Automotive Systems Australia Ltd.  Sale of  Assets | 7 |
| 11. | Delphi Automotive Systems International, Inc., Taiwan Representative Office | 0 |
|  | TOTAL | 90,000 |

* If Delphi France SAS is able to sell its brake equipment to Delphi Shanghai Dynamics & Propulsion Systems Co. Ltd. for $200,000 before the Closing Date, then the purchase price in the Delphi France SAS local transfer agreement will be reduced by $200,000, and the Delphi Shanghai Dynamics & Propulsion Systems Co. Ltd. allocation would be increased by the same amount.