**Interim Hearing Date and Time:  April 2, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Interim Objection Deadline:  April 2, 2009 at 8:00 a.m. (prevailing Eastern time)**
**Final Hearing Date and Time:  April 23, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Final Objection Deadline:  April 16, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

EXPEDITED MOTION FOR INTERIM AND FINAL ORDER AUTHORIZING DEBTORS TO
(I) ENTER INTO SECOND AMENDMENT TO ACCOMMODATION AGREEMENT WITH
CERTAIN PARTICIPATING DIP LENDERS AND (II)(A) ENTER INTO RELATED
DOCUMENTS AND (B) PAY FEES AND EXPENSES IN CONNECTION THEREWITH

("SECOND ACCOMMODATION AMENDMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Expedited Motion For Interim And Final Order Authorizing Debtors To (I)

Enter Into Second Amendment To Accommodation Agreement With Certain Participating DIP

Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In

Connection Therewith (the "Motion"), and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (together with the Creditors'

Committee, the "Statutory Committees").  On February 26, 2009, the U.S. Trustee appointed an

official committee of retired employees to represent certain of the Debtors' current active salaried

employees, retirees, and their spouses for certain limited purposes.

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009 (Docket No. 16403). The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are sections 363 and 364 of the Bankruptcy Code and rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

10.    The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:  first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive

6

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    In connection with those discussions, on September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

7

16.     Through the Amended GSA and Amended MRA, the Debtors addressed

two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM

for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the

Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the

Debtors and eliminate significant elements of conditionality to the performance of GM's

obligations.  Delphi estimated the value of the net consideration received under the Amended

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the Original GSA and Original MRA).

17.     By transferring nearly $2 billion of hourly pension liabilities to GM

through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan

(which was also approved as part of the Amended GSA with the consent of Delphi's U.S.

unions), Delphi made substantial progress towards achieving its pension funding strategy

objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order

authorizing the Debtors to take certain actions with respect to certain of their pension plans for

salaried employees and to implement replacement pension plans that will be more cost-effective

for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.     As a result of all the factors described above, during the fall of 2008 the

Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth

in the Plan Modification Motion.  Since the filing of the proposed modifications, however,

substantial uncertainty and a significant decline in capacity in the credit markets, the global

economic downturn generally, and the current economic climate in the automotive industry, have

adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully

consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in

8

discussions with certain of its stakeholders to formulate further plan modifications. Moreover, as

a result of the market turbulence, the Debtors were unable to extend the maturity date of their

DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.

Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the

Debtors entered into an accommodation agreement which allows the Debtors, among other

things, to continue using certain of the proceeds of the postpetition financing facility through

June 30, 2009. In addition, to further support the Debtors' liquidity, GM agreed to make certain

advances and to accelerate payment of certain payables to the Debtors.

19.    At the same time, consistent with the plan modifications being negotiated,

the Company has been making further revisions to its business plan consistent with the extremely

low volume production environment in the global automotive industry and depressed global

capital and equity markets. As part of the Debtors' efforts to achieve sufficient emergence

capital funding, Delphi and GM are constructively working together to pull forward elements of

GM's previously agreed-upon support for Delphi into one payment at emergence in combination

with the transfer of certain of Delphi's U.S. sites to GM. This arrangement is designed to

facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global

economy, the automotive industry, and the capital markets. In the meantime, Delphi will

marshal all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will seek to preserve and continue the strategic growth of its non-

U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.    The Accommodation Agreement

20.    In the fourth quarter of 2008, facing frozen global credit markets and one

of the worst bear markets in the history of the global capital markets, the Debtors negotiated an

accommodation agreement (as amended, the "Accommodation Agreement")[4] with the

administrative agent (the "Agent") under the Debtors' then-approximately $4.35 billion DIP

facility (the "DIP Facility")[5] and obtained consent to this agreement from the requisite lenders

under the DIP Facility (the "DIP Lenders").[6]  Under the Accommodation Agreement the Debtors

could continue using certain of the proceeds of the DIP Facility through June 30, 2009 (the

"Accommodation Period"), subject to the terms and conditions set forth in that agreement.[7]  This

Court authorized the Debtors to enter into the Accommodation Agreement by order entered on

December 3, 2008 (the "DIP Accommodation Order") (Docket No. 14515) and the parties

subsequently effectuated the agreement on December 12, 2008.

        21.     To remain in compliance with the Accommodation Agreement and

maximize available liquidity, the Debtors and the requisite percentage of DIP Lenders who

participated in the Accommodation Agreement (the "Participant Lenders") agreed to amend the

Accommodation Agreement on January 30, 2009 (the "First Accommodation Agreement

---

[4]    A copy of the Accommodation Agreement is attached as Exhibit A to the DIP Accommodation Order (as defined below).

[5]    The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November 7, 2008 (Docket No. 14408) (the "Accommodation Motion").

[6]    Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not required to seek the tranche C lenders' consent to the Accommodation Agreement, to encourage tranche C lenders to assist the Debtors with their emergence capital funding efforts, the Debtors nevertheless sought and obtained this Court's approval of certain incentives for those tranche C lenders which consented to the Accommodation Agreement.

[7]    As described more fully in the Accommodation Motion, under the terms of the Accommodation Agreement, the Accommodation Period may be shortened to May 5, 2009 if the Debtors do not meet certain milestones in connection with the Debtors' plan of reorganization.

Amendment").[8]  The First Accommodation Agreement Amendment created a new cash collateral

basket, which allowed the Debtors to deposit up to $117 million in cash and/or certain permitted

securities (the "Incremental Borrowing Base Cash Collateral") in an account or accounts

controlled by the Agent, with the amount of these deposits being included in the Debtors'

Accommodation Period borrowing base.  By including this cash collateral basket in the

Accommodation Period borrowing base, the Debtors preserved critical liquidity by not having to

make mandatory prepayments to the tranche A and tranche B DIP Lenders under the terms of the

Accommodation Agreement.

22.     Under the First Accommodation Agreement Amendment, the

Accommodation Amendment Cash Collateral could be released to the Debtors if (i) the Debtors

satisfied the Accommodation Agreement milestone of having filed modifications to the

Confirmed Plan that are satisfactory to the requisite percentage of DIP Lenders, (ii) the Debtors

reached an effective agreement with GM for the commitment of no less than $450 million under

the Debtors' liquidity support agreement with GM (as amended from time to time, the "GM

Arrangement"), (iii) after giving effect to such a release of the Incremental Borrowing Base Cash

Collateral (a) there would be no continuing default or event of default under the Second

Amended and Restated Credit Agreement[9] or the Accommodation Agreement (other than a

"Specified Default" as defined in the Accommodation Agreement) and (b) the Debtors would be

in compliance with the covenant in section 3(e)(i) of the Accommodation Agreement relating to

---

[8]     See Motion For Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With
        Certain Participating DIP Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses
        In Connection Therewith (Docket No. 14703).

[9]     Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement dated as of May 9, 2008,
        attached as Exhibit A to the Order Supplementing Second DIP Extension Motion (Docket No. 13489)
        Authorizing Increase In Financing Commitments In Response To Oversubscription Of Debtors' Syndication Of
        Second DIP Extension Debtors To Complete Subsequent Tranche C Loan And Related Transactions (Docket
        No. 13699).

the Debtors' Accommodation Period borrowing base.  Alternatively, if the Debtors did not satisfy

the requirements set forth in paragraph 3(m) of the Accommodation Agreement, they would be

required to apply the Incremental Borrowing Base Cash Collateral to repayment of tranches A

and B of the DIP Facility.

   23. The First Accommodation Agreement Amendment also provided for a

reduction from $100 million to $50 million of the minimum liquidity availability that the Debtors

must maintain under section 3(d) of the Accommodation Agreement.   The minimum liquidity

availability would revert to $100 million, however, on the earlier of (i) the date when the

President's Designee notified GM that it is not permitted under the terms of GM's loan agreement

with the U.S. Department of the Treasury (the "Treasury Department") to increase its

commitments under the GM Arrangement to $350 million and (ii) March 25, 2009 (unless the

amendment to the GM Arrangement providing for a commitment increase to $350 million

became effective prior to such date).

   24. On February 24, 2009, the Debtors and the requisite percentage of

Participant Lenders agreed to further amendments to the Accommodation Agreement (the

"Supplemental Accommodation Agreement Amendment").[10]  The Supplemental

Accommodation Agreement Amendment modified certain of the Accommodation Agreement

milestones by extending (i) the date by which the Debtors were required to file modifications to

its plan of reorganization from February 27 to April 2, 2009 and (ii) the date by which a

Bankruptcy Court order approving a modified disclosure statement must be obtained, from

March 31 to May 2, 2009.  The Supplemental Accommodation Agreement Amendment did not

alter the June 30 or May 5, 2009 potential end dates for the Accommodation Period.  The Court

authorized the Debtors' entry into the First Accommodation Agreement Amendment and the

---

[10] See Notice Of Supplemental Amendment To Accommodation Agreement (Docket No. 13629).

Supplemental Accommodation Agreement Amendment by order entered on February 25, 2009

(the "Accommodation Agreement Amendment Order") (Docket No. 16377).[11]

G.    Subsequent Agreements With GM

        25.    To satisfy the requirements for maintaining the liquidity relief provided by

the First Accommodation Agreement Amendment, on February 27, 2009, the Debtors and GM

executed an amendment to the GM Arrangement pursuant to which GM agreed to increase the

aggregate principal amount under the GM Arrangement from $300 million to $350 million

("Amendment No. 4").  On March 3, 2009, Delphi and GM executed an additional amendment to

the GM Arrangement, which provided for GM's further increasing its commitments under the

GM Arrangement from $350 million to $450 million ("Amendment No. 5").  This further $100

million increase in availability under Amendment No. 5 was made in conjunction with and

contingent upon GM's exercising the "Unsold Business Option" referred to in Section 4.06(a)(i)

of the Amended MRA with respect to Delphi's global steering and halfshaft business (the

"Steering Business"), which is the subject of the Global Steering Business Option Exercise

Agreement (the "Option Exercise Agreement") that Delphi and GM executed on March 3, 2009.

        26.    On March 4, 2009, the Debtors filed motions seeking this Court's approval

of (i) Amendment No. 4 and Amendment No. 5 to the GM Arrangement (Docket No. 16411) and

(ii) the Option Exercise Agreement (Docket No. 16410).  These motions were scheduled to be

heard at an omnibus hearing on March 24, 2009.  The night before the hearing, however, counsel

for the Treasury Department notified GM and the Debtors in writing that the Treasury

Department objected to the parties seeking approval of Amendment No. 4, Amendment No. 5,

and the Option Exercise Agreement until the Treasury Department had a further opportunity to

---

[11]    A copy of the First Accommodation Agreement Amendment and the Supplemental Accommodation Agreement
Amendment are attached as Exhibits A and B to the Accommodation Amendment Order, respectively (Docket
No. 16377).

review the details of those transactions and the various alternatives with respect to Delphi's

emergence from chapter 11.  After being informed of the situation at a Chambers conference

held on March 24, 2009, attended by counsel for the Debtors, GM, the Agent, a group of tranche

C DIP Lenders referred to as the "Tranche C Collective," the Statutory Committees, the Pension

Benefit Guarantee Corporation, and the U.S. Trustee, this Court adjourned the hearing on these

motions to April 2, 2009 to allow discussions with respect to these agreements and the Debtors'

overall reorganization framework to progress.

    27.  As a result of this adjournment, the Debtors did not meet the requirements

under the First Accommodation Agreement Amendment with respect to effectuating agreements

with GM to increase GM's liquidity support for Delphi.  This increase needed to be effective on

or prior to March 24, 2009 to avoid a current requirement to repay the DIP Lenders with the

$117 million of Incremental Borrowing Base Cash Collateral and to maintain the minimum

liquidity covenant reduction from $100 million to $50 million.  Moreover, as a result of the

Treasury Department's request for more time to consider the various alternatives for Delphi's

emergence from chapter 11, the Debtors' satisfying the Accommodation Agreement milestone of

filing of plan modifications by April 2, 2009 became impracticable.  Accordingly, as described

below, the Debtors seek this Court's approval of further amendments to the Accommodation

Agreement that would modify the milestones and preserve certain benefits to the Debtors under

the Accommodation Agreement.

Relief Requested

    28.  By this Motion, the Debtors seek entry of an interim and final order

authorizing them to (i) enter into the Second Accommodation Agreement Amendment (as

defined below) with the Participant Lenders party thereto and (ii)(a) enter into related documents

and (b) pay fees and expenses in connection therewith.  Under the terms of the Second

14

Accommodation Agreement Amendment, this Court's approval of the agreement by April 7,

2009 and the payment of related fees and expenses are conditions subsequent to the effectiveness

of the amendment.[12]   Accordingly, the Debtors will seek the Court's interim approval of the

Second Accommodation Agreement Amendment and the payment of related fees and expenses

on an expedited basis at a hearing to be scheduled by order to show cause, subject to a final

hearing on the Motion on April 23, 2009.

<u>Basis For Relief</u>

29.    The Treasury Department's request for additional time to review and

consider Delphi and GM's entry into Amendment No. 4, Amendment No. 5, and the Option

Exercise Agreement, in addition to various alternatives with respect to the Debtors' emergence

from chapter 11, required that the Debtors and the DIP Lenders agree to modifications to the

Accommodation Agreement.   To avoid the negative consequences of the Debtors' not satisfying

the Accommodation Agreement milestones relating to obtaining increased liquidity support from

GM and filing plan modifications, on March 31, 2009 the Debtors entered into an agreement

with the requisite percentage of Participant Lenders to amend certain provisions of the

Accommodation Agreement (the "Second Accommodation Agreement Amendment").[13]   The

Second Accommodation Agreement Amendment provides for, among other things, (i)

modifications to the Debtors' obligations with respect to the Incremental Borrowing Base Cash

Collateral, (ii) modifications to the covenant relating to the Debtors' Minimum Liquidity Amount

(as defined in the Accommodation Agreement), and (iii) replacement of the milestones with

---

[12]   While the Debtors believed that the use of estate property to pay fees to the Participant Lenders in these
amendments should proceed only after the Bankruptcy Court considered and approved the payment of such fees
at the final hearing on this Motion, the Debtors were required to obtain such authority from the Bankruptcy
Court to pay such fees (and pay the expenses of certain professional advisors) by April 7, 2009 in order to
receive requisite lender support for the amendment.

[13]   A copy of the Second Accommodation Agreement Amendment is attached hereto as <u>Exhibit A</u>.

respect to the Debtors' filing of modifications to their Confirmed Plan and emerging from

chapter 11.  Entry into the Second Accommodation Agreement Amendment is a necessary step

to enable the Debtors to maintain operations with sufficient and uninterrupted liquidity as they

continue their complex emergence negotiations with their stakeholders and the Treasury

Department and formulate modifications to their Confirmed Plan.

H.      The Second Accommodation Amendment

        30.     Under the Second Accommodation Agreement Amendment, the DIP

Lenders and the Debtors have agreed to modify the Accommodation Agreement to avoid an

early termination of the Accommodation Period, which without such amendments would have

resulted from the Debtors' (i) nonpayment of the Incremental Borrowing Base Cash Collateral

required after the Debtors did not obtain approval of its agreements with GM to increase of GM's

commitments under the GM Arrangement to $450 million on March 24, 2009 and (ii) not filing

modifications to their Confirmed Plan by April 2, 2009.

        31.     First, under the Second Accommodation Agreement Amendment, the

Debtors' obligation to apply the Incremental Borrowing Base Cash Collateral to repayment of the

DIP Facility as a result of not meeting the March 24, 2009 milestones in the Accommodation

Agreement, which included effectuating an increase of GM's commitments under the GM

Arrangement to $450 million, would be suspended until April 8, 2009.  The Debtors would not

be required to use the Incremental Borrowing Base Cash Collateral to pay down the DIP Facility

on that date if by April 7, 2009, the Debtors are able to (i) effectuate the GM Arrangement

increase to $450 million and (ii) provide to the DIP Lenders an agreement among the Debtors,

GM, and the Treasury Department on a timeline for the resolution of these chapter 11 cases (the

"Timeline Agreement").  The Accommodation Agreement milestones with respect to filing

modifications to the Debtors' Confirmed Plan and obtaining approval of the disclosure statement

16

with respect to such modifications would be replaced with the deadlines to be set forth in the Timeline Agreement.

32.    If the requisite percentage of Participant Lenders determine that the Timeline Agreement is satisfactory and the Debtors accomplish the events set forth in the Timeline Agreement by the agreed dates, the Debtors would be able to access the Incremental Borrowing Base Cash Collateral subject to the limitations set forth in section 3(e)(iv) of the Accommodation Agreement.  It would constitute an Accommodation Default (as defined in the Accommodation Agreement), however, if (i) within five business days of the Debtors' delivery of the Timeline Agreement the requisite percentage of Participating Lenders notifies the Debtors that the Timeline Agreement is not satisfactory,[14] (ii) any of the events set forth on the Timeline Agreement do not occur by the agreed date, or (iii) the requisite percentage of Participant Lenders notify the Debtors that proposed plan modifications filed in accordance with the Timeline Agreement are not satisfactory within ten business days of such filing.

33.    Additionally, the Accommodation Agreement covenant with respect to the debtors' Minimum Liquidity Amount would be reduced to $25 million through and including April 7, 2009 and revert to $100 million on April 8, 2009 unless the $450 million of GM commitments under the GM Arrangement is in effect on or prior to April 7, 2009.

34.    This amendment also modifies the Accommodation Agreement with respect to the Debtors' ability to access cash collateral other than Incremental Borrowing Base Cash Collateral.  Specifically, the Second Accommodation Agreement Amendment amends the Accommodation Agreement to add a requirement that the Debtors may only access Borrowing

---

[14]    Such notification may be in the form of an affirmative notice that such Timeline Agreement is not satisfactory or failure to notify the Debtors that the Timeline Agreement is satisfactory.

Base Cash Collateral (as defined in the Accommodation Agreement)[15] (i) to the extent that such

Borrowing Base Cash Collateral does not fall below a minimum balance set forth in the Second

Accommodation Agreement Amendment and (ii) funds are not otherwise available to pay current

ordinary course operating expenses, including up to $10 million for settlement of the pending

appeals of this Court's Provisional Salaried OPEB Termination Order (Docket No. 16380) and

Final OPEB Termination Order (Docket No. 16448).

       35.     The DIP Lenders conditioned their consent to this amendment on

receiving certain additional protections for them be included in the Second Accommodation

Agreement Amendment.  Specifically, these amendments provide that it would be an

Accommodation Default if, without the consent of the requisite percentage of Participant

Lenders, the Debtors proceed with the hearing to approve the Option Exercise Agreement or sell

the Steering Business to GM.  Accordingly, the Debtors, GM, and the Treasury Department will

have to work together to determine what course of action to take with respect to the Steering

Business.  Further, under the Second Accommodation Agreement Amendment, the Agent and

certain representatives of the DIP Lenders, subject to the limitations set forth in section 3(n)(i) of

the Accommodation Agreement, have the right to participate in material negotiations and

discussions between the Debtors and third parties in connection with the Debtors' emergence

from chapter 11, including negotiations and discussions with GM and the Treasury Department

relating to material transactions or arrangements.

       36.     Notably, certain DIP Lenders also conditioned their consent to this

amendment on the Debtors agreeing that sections 3(e)(iii)-(v) of the Accommodation Agreement

(as amended by the Second Accommodation Agreement Amendment), which provide for

---

[15]   Under the Accommodation Agreement the $117 million of Incremental Borrowing Base Cash Collateral is
separate from and  not included in the definition of Borrowing Base Cash Collateral.

limitations on the Debtors' ability to access Incremental Borrowing Base Cash Collateral and

Borrowing Base Cash Collateral, could not be supplemented, waived, or otherwise modified

without the consent of both a majority of Tranche A and Tranche B Participant Lenders and a

majority of Tranche A, Tranche B, and Tranche C Participant Lenders, notwithstanding a

termination of the Accommodation Period.

37.    The Second Accommodation Agreement Amendment also contains certain

fee and expense provisions, including the payment to the Participant Lenders that consent to the

Second Accommodation Agreement Amendment of an amendment fee of 25 basis points.  Other

fee and expense provisions are contained in separate fee and expense letters, which the parties

have agreed will be kept confidential.[16]

38.    The Second Accommodation Agreement Amendment also contains a

condition subsequent that provides for termination of the amendment if, by April 7, 2009, the

Court has not entered an order satisfactory in form and substance to the Agent authorizing  the

Second Accommodation Agreement Amendment (at least on an interim basis) and the payment

of related fees and expenses.  The Debtors accordingly propose that on an interim basis, pending

a final hearing on the Motion at the omnibus hearing scheduled on April 23, 2009, their

execution and delivery of the Second Accommodation Agreement Amendment as of March 31,

2009, together with all other documentation executed in connection therewith (the "Second

Amendment Documents"), be ratified and approved and that they be authorized, but not directed,

to perform and take all actions necessary to effectuate the Second Accommodation Agreement

Amendment and to pay the related fees and expenses contemplated thereby.  The Debtors also

seek an interim and final ruling that the Second Amendment Documents and each of the

---

[16]    The fee letters will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.

instruments and documents as may be necessary to effectuate the Second Accommodation

Agreement Amendment constitute valid and binding obligations of the Debtors, the Agent, and

the Participant Lenders, enforceable against each party thereto in accordance with their

respective terms.

    39.    The Debtors propose that the DIP Order,[17] as supplemented by the DIP

Extension Order, the Second DIP Extension Order, the Supplemental Second DIP Extension

Order, the Accommodation Order, and the Accommodation Amendment Order (collectively, the

"Prior DIP Orders") be deemed supplemented by any order approving this Motion but otherwise

continue in full force and effect.

<u>Applicable Authority</u>

I.    <u>This Court Should Authorize Second Accommodation Agreement Amendment</u>

    (a)    The Second Accommodation Agreement Amendment Is An Appropriate
        <u>Use Of Estate Property Under Section 363(b)(1) Of The Bankruptcy Code</u>

    40.    The Debtors submit that entry of an order authorizing the entry into and

implementation of the Second Accommodation Agreement Amendment, including the payment

of related fees, is necessary and appropriate and in the best interests of the Debtors' estates.

Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate

"other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).

Use of estate property outside the ordinary course of business may be authorized if the debtor

demonstrates a sound business justification for it.  <u>See</u> <u>Comm. Of Equity Sec. Holders v. Lionel</u>

<u>Corp.</u> (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires

---

[17]    Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed.
    R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)
    Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (Docket No.
    6461) (the "DIP Refinancing Order") (as supplemented by (i) the DIP Extension Order (Docket No. 10957), (ii)
    the Second DIP Extension Order (Docket No. 13489) (as supplemented by the Supplemental Second DIP
    Extension Order (Docket No. 13699)), (iii) the DIP Accommodation Order (Docket No. 14515), and (iv) the
    Accommodation Amendment Order (Docket No. 16377), hereinafter referred to as the "DIP Order")).

finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

41.    Based on the foregoing, the Debtors submit that entry of an order approving the proposed Second Accommodation Agreement Amendment is necessary and appropriate to maintain liquidity as they continue to work to reorganize.  The proposed Second Accommodation Agreement Amendment was negotiated in good faith, at arm's length, and in the exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago,  Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor has exercised its business judgment, a court is not free to second-guess particular provisions but rather must determine whether the proposed action "as a whole is within reasonable business judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

42.    The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a presumption arises that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity." Id.  To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to

produce some evidence respecting its objections." In re Lionel Corp., 722 F.2d at 1071.

43.    The Debtors have exercised sound business judgment in determining that

it is appropriate and necessary to enter into the Second Accommodation Agreement Amendment

to (i) protect liquidity that, absent the Second Accommodation Agreement Amendment, would

otherwise be required to be repaid to the DIP Lenders under the Accommodation Agreement and

(ii) allow the Debtors, the DIP Lenders, GM, and the Treasury Department to agree on a sensible

and practical reconfiguration of the milestones relating to modifications to the Confirmed Plan

and emergence from chapter 11.  While there are provisions in the Second Accommodation

Agreement Amendment which, standing alone, are difficult to defend as commercially

reasonable, the Debtors believe that the proposed terms of the Second Accommodation

Agreement Amendment, taken as a whole, are reasonable, necessary, and in the best interests of

the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the

Second Accommodation Agreement Amendment and take the other actions contemplated by the

Second Accommodation Agreement Amendment as requested herein.

(b)    The Second Accommodation Agreement Amendment
       Should Be Approved Under Section 364(c) Of The Bankruptcy Code

44.    To the extent that section 364 is applicable, the agreement is fully

appropriate under that statutory provision.  The requirement for obtaining postpetition credit

under section 364(c) is a finding, made after notice and a hearing, that the debtors are "unable to

obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11

U.S.C. § 364(c).  This Court already made this finding in the DIP Refinancing Order, which

approved the Debtors' DIP Facility.  This finding is even more justified today because the credit

22

markets have deteriorated precipitously from the strong credit environment that existed in

January 2007 when the Court entered the DIP Refinancing Order.  Because the DIP Facility will

remain in place, subject to the terms of the Accommodation Agreement, as amended by the

Accommodation Amendment, the Debtors should be permitted to continue to grant the liens in

accordance with section 364(c) of the Bankruptcy Code.

        45.     Section 364(c) financing is appropriate when the trustee or debtor-in-

possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

        46.     Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether

    (a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e.,
by allowing a lender only an administrative claim;

    (b)     the credit transaction is necessary to preserve the assets of the estate; and

    (c)     the terms of the transaction are fair, reasonable, and adequate, given the
circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met

when it entered the DIP Refinancing Order.  Because the DIP Facility will remain in place,

subject to the provisions of the Accommodation Agreement, as amended by the Second

Accommodation Agreement Amendment, this Court's prior findings should continue to apply.

(c)    The Second Accommodation Agreement Amendment
Should Be Approved Under Section 364(d) Of The Bankruptcy Code

47.    To the extent that section 364(d) of the Bankruptcy Code is implicated by the Second Accommodation Agreement Amendment, the agreement is appropriate and should be approved under that provision.  Section 364(d)(1) provides that the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

(a)    the trustee is unable to obtain such credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the Debtors have already established that they are unable to obtain credit without priming liens.  The Accommodation Amendment will not impair the priming lien structure under the DIP Facility, as amended, including the adequate protection provided to parties whose liens have been primed. Accordingly, to the extent that the Second Accommodation Agreement Amendment provides for an extension of credit, the Debtors submit that such extension of credit meets the requirements of section 364(d)(1).

(d)    The Amended DIP Facility Should
       Be Accorded The Benefits Of Section 364(e)

48.    Section 364(e) of the Bankruptcy Code provides that the "reversal or appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in food faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."  The Second Accommodation Agreement Amendment was negotiated in good faith and no consideration is being provided to any party to, or guarantor of, obligations arising under the amended DIP Facility, other than as disclosed in the Second Accommodation Agreement Amendment.  Accordingly, the amended DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

(e)    Compliance With General Order No. M-274

49.    The Debtors believe that the relief requested in this Motion and the notice to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"), adopted under General Order No. M-274 of the Board of Judges for the Southern District of New York.  The Debtors do not believe that entering into the Second Accommodation Agreement Amendment creates any incremental right that would trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in the DIP Motion[18] and approved by this Court pursuant to the DIP Refinancing Order.  Accordingly, the Debtors submit that they have satisfied the Guidelines.

---

[18]    Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition

J.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

50.    Bankruptcy Rule 6004(h)[19] provides:  "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay because the Second Accommodation Agreement Amendment will provide immediate relief necessary to facilitate the Debtors' ability to negotiate modifications to its Confirmed Plan.  Although the Court did not grant similar relief from Bankruptcy Rule 6004(h) in granting the Accommodation Order, the Debtors submit that the ability to effectuate the Second Accommodation Agreement Amendment immediately would further the Debtors' complex restructuring efforts, which they are pursuing within tight time constraints.  The Court did grant similar relief in entering each of the Prior DIP Orders, other than the DIP Accommodation Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

51.    Notice of this Motion will be provided in accordance with the order to show cause submitted on March 31, 2009.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt dated December 18, 2006 (Docket No. 6180)

[19]    Formerly Bankruptcy Rule 6004(g).

WHEREFORE the Debtors respectfully request that the Court enter an interim and final order (i) authorizing the Debtors to enter into the Second Accommodation Amendment with the Participant Lenders thereto, (ii) authorizing the Debtors to (a) enter into related documents and (b) pay fees and expenses in connection therewith, and (iii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          March 31, 2009

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr.
       John K. Lyons
       Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti
       Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

- and -

SHEARMAN & STERLING LLP

By:    /s/ Douglas P. Bartner
       Douglas P. Bartner
       Andrew V. Tenzer
       Michael S. Baker
599 Lexington Avenue
New York, New York  10022
(212) 848-4000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession