Hearing Date and Time: April 2, 2009 at 10:00 a.m. (prevailing Eastern time)
Objection Deadline:  April 2, 2009 at 8:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan
Ron E. Meisler

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
         In re                                :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
         Debtors.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


EXPEDITED MOTION UNDER 11 U.S.C. § 363 AND FED R. BANKR. P. 9019 FOR
APPROVAL OF DEBTORS' COMPROMISE AND SETTLEMENT WITH COMMITTEE OF
ELIGIBLE SALARIED RETIREES AND DELPHI SALARIED RETIREES' ASSOCIATION

("SALARIED OPEB SETTLEMENT MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 for entry of an order approving the Debtors' compromise and settlement with the Committee of Eligible Salaried Retirees (the "Retirees' Committee") and the Delphi Salaried Retirees' Association (the "Association") in connection with appeals of the Provisional Salaried OPEB Termination Order (Docket No. 16380) and the Final OPEB Termination Order (Docket No. 16448) (collectively, the "OPEB Termination Orders").   In support of the Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").  Pursuant to this Court's order, on February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes under Bankruptcy Code section 1114.

3.     On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11.  The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications

---

[1]     Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.  In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009 (Docket No. 16403).  The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

4.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested herein are sections 363 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

6.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company

---

[2]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

7.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

---

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered net operating losses.  In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net

sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors

incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.

employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded

gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined

below), the Company's net operating loss for the year was $1.5 billion.

10.     The Debtors believe that the Company's financial performance was

deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S.

legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable,

non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a

competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced

number of motor vehicles that GM produces annually in the United States and related pricing

pressures, and (iii) increasing commodity prices.

11.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[4]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the
recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The
Company's net operating loss in calendar year 2004 was $482 million.

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases,

including Delphi's labor unions and GM.  The effectiveness of certain of these agreements,

including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the

"Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan

Investors refused to fund their obligations under the Investment Agreement, the Debtors

nevertheless continued working with their stakeholders to evaluate their options to move forward

to emerge from chapter 11 as soon as reasonably practicable.

14.    In connection with those discussions, on September 12, 2008, Delphi

announced steps that it was taking to complete the successful restructuring of its U.S. operations

and transformation of the Company on a global basis.  Those steps included implementing

amended, comprehensive settlement agreements with GM, taking action then intended to fund

and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation

process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors

filed a motion for approval of two comprehensive agreements with GM: the Amended and

Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated

Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court

entered an order authorizing the Debtors' implementation of the Amended GSA and the

Amended MRA, the provisions of which became effective on September 29, 2008.

16.    Through the Amended GSA and Amended MRA, the Debtors addressed

two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM

for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the

Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the

Debtors and eliminate significant elements of conditionality to the performance of GM's

obligations.  Delphi estimated the value of the net consideration received under the Amended

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the Original GSA and Original MRA).

8

17.    By transferring nearly $2 billion of hourly pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi made substantial progress towards achieving its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of their pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.    As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth in the Plan Modification Motion.  Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally, and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in discussions with certain of its stakeholders to formulate further plan modifications.  Moreover, as a result of the market turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders. Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an accommodation agreement which allows the Debtors, among other things, to continue using certain of the proceeds of the postpetition financing facility through June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate payment of certain payables to the Debtors.

19.     At the same time, consistent with the plan modifications being negotiated, the Company has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets.  As part of the Debtors' efforts to achieve sufficient emergence capital funding, Delphi and GM are constructively working together to pull forward elements of GM's previously agreed-upon support for Delphi into one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites to GM.  This arrangement is designed to facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global economy, the automotive industry, and the capital markets.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.      The OPEB Termination Orders

20.     Delphi has maintained discretionary welfare benefits for salaried retirees during its chapter 11 cases – including medical insurance and life insurance – for nearly three-and-one-half years.  The projected cash cost of Delphi's contributions to retiree welfare benefits is approximately $70 million per year and the associated balance sheet liability exceeds $1.1 billion.  Delphi has always provided these benefits at will under plans that expressly reserve Delphi's right to modify or terminate them, and Delphi had intended to continue to provide them in an economic climate where Delphi's prospective total enterprise value provided a reasonable basis for doing so.  Under current circumstances, however, Delphi's business judgment no longer permits payment of discretionary expenses of this magnitude.  (See Docket No. 16421 (Robert S. Miller Decl.).)

10

21.     Thus, on February 4, 2009, the Debtors filed a motion seeking the Court's approval to cease contributions to retiree welfare benefit plans after March 31.  (Docket No. 14705 (the "OPEB Termination Motion").)  In the OPEB Termination Motion, the Debtors argued that section 1114 of the Bankruptcy Code does not apply to the Delphi's termination of salaried OPEB because Delphi reserved the right under the plan documents to terminate salaried OPEB at will.

22.     Three groups of retirees and approximately 1,600 individual retirees opposed the OPEB Termination Motion.  Certain retirees, including the Association, contended that section 1114 of the Bankruptcy Code is applicable to Delphi's termination of salaried OPEB regardless of whether Delphi reserved the right to terminate OPEB at will.  In addition, certain retirees moved for appointment of an official committee of retirees pursuant to 11 U.S.C. § 1114(d).  (Docket Nos. 14882, 14886, 15283, 16297.)

23.     At a hearing on February 24, 2009, the Court determined as a matter of law that Delphi may terminate unvested retiree welfare benefits without following the procedures set forth in section 1114 of the Bankruptcy Code.  (Docket No. 16380 (the "Provisional Salaried OPEB Termination Order").)  Although the Court also provisionally determined that Delphi's welfare benefit plans were in fact unvested, at-will benefits, the Court directed the United States Trustee to appoint a Retirees' Committee under the discretionary provisions of section 1114 for the principal limited purpose of determining whether evidence existed that any retiree or group of retirees had vested benefits, and to meet and confer with the Debtors over any consensual modifications to the Provisional Salaried OPEB Termination Order in return for waiving the right to appeal from entry of that order.  (Id.)

11

24.    After discovery and an additional hearing on March 11, 2009, the Court finalized its ruling authorizing Delphi to cease OPEB contributions as of April 1, 2009.  (Docket No. 16448 (the "Final OPEB Termination Order," and together with the Provisional Salaried OPEB Termination Order, the "OPEB Termination Orders").)

25.    Following a third hearing on March 17, 2009, the Court denied the Association's motion to stay the effectiveness of both OPEB Termination Orders during the pendency of appeals.  (Docket No. 16485.)

26.    On March 4, 2009, the Association filed a notice of appeal to the United States District Court for the Southern District of New York from the Provisional Salaried OPEB Termination Order.  (Docket No. 16404.)  On March 13, 2009, the Retirees' Committee filed a notice of appeal to the United States District Court for the Southern District of New York from the Final OPEB Termination Order.  (Docket No. 16458.)  The Debtors, the Association, and the Retirees' Committee agreed to seek consolidation of the appeals from the two OPEB Termination Orders (the "Appeals").  Subsequently, on March 23, 2009, the Association filed an emergency motion in the district court for a 60-day stay of the Provisional OPEB Termination Order. (SDNY Docket No. 5 (the "Stay Motion").)  The Debtors, the Association, and the Retirees' Committee agreed to treat the Stay Motion as applicable to both appeals.  The Debtors opposed the Stay Motion on March 26, 2009.  (SDNY Docket No. 16.)  The district court scheduled a hearing on the Stay Motion for March 31, 2009, but in light of the settlement negotiations between the parties, that hearing has been adjourned to April 7, 2009 by agreement of the parties.

<u>Relief Requested</u>

27.    By this Motion, the Debtors seek entry of an order under Bankruptcy Code section 363(b) and Bankruptcy Rule 9019 authorizing the Debtors to enter into a compromise and settlement (the "Settlement") with the Retirees' Committee and the Association upon

substantially the following terms in complete and final resolution of the Retirees' Committee's and the Association's appeals (together, the "Appeals") of the OPEB Termination Orders:

(a)    the Debtors will pay $8.75 million in overall subsidy payments to the Retirees' Committee for the benefit of Delphi's salaried retirees, not subject to reduction because of enrollment levels, and comprised of (i) a $1 million hardship fund, payable at the beginning of May 2009; (ii) $500,000 Voluntary Employees' Beneficiary Association ("VEBA") set-up costs, payable at the beginning of May 2009 (which the Retirees' Committee may also use for the hardship fund or subsidizing retiree medical benefit costs); (iii) $1.25 million per month for five months, payable monthly at the beginning of each of June through October 2009; and (iv) one final payment of $1 million on November 1, 2009;

(b)    through June 30, 2009, the Debtors will offer salaried retirees a non-retroactive benefits reinstatement opportunity as of the first of the following month.  The Debtors will reasonably cooperate with retirees who elect to continue benefits on a self-pay continuation basis to permit payment deductions from their pension checks;

(c)    pursuant to section 1129(a)(13) of the Bankruptcy Code, the Debtors' plan of reorganization, as modified, will provide for the continuation after its effective date of the payment of any unpaid subsidies in the amounts and on the schedule outlined above;

(d)    the Debtors will pay up to an additional $250,000 in attorneys' fees to counsel for the Retirees' Committee and the Association (i.e., in addition to the $200,000 cap on attorneys' fees provided for by the Provisional Salaried OPEB Termination Order), subject to reasonableness review by the Debtors, and payable 60 days after submission of statements of account to the Debtors;

13

(e)    the parties agree to seek authorization from the Court for the

Retirees' Committee to establish a VEBA as contemplated by the provisions of 26 U.S.C.

§ 35(e)(1)(K) as amended by § 1899G of the American Recovery and Reinvestment Act of 2009

(Pub. L. No. 111-5, 123 Stat 115 (Feb. 17, 2009)) extending the Health Coverage Tax Credit to

benefits provided through a VEBA set up by a section 1114 committee or authorized by a

bankruptcy judge;

(f)    any VEBA established by the Retirees' Committee under 26 U.S.C.

§ 501(c)(9) shall be deemed to meet the Debtors' obligation under paragraph 5 of the Final OPEB

Termination Order to establish under certain circumstances a VEBA for the purpose of qualifying

covered employees who have retired or will retire for the tax credit available through the

American Recovery And Reinvestment Act;

(g)    the Debtors will cause their group life insurance provider, MetLife,

to permit retirees to continue their current level of optional term life insurance coverage (as

outlined under the program in the notices sent to retirees) without the need to re-qualify by

providing medical information, and shall request that MetLife return all copies of health

questionnaire information provided by the retirees to continue the benefit; and

(h)    upon entry of a final order approving this Motion and payment of

the amounts due at the beginning of May 2009, the Retirees' Committee and the Association will

cause their Appeals of the OPEB Termination Orders, including the motion to stay the

effectiveness of the OPEB Termination Orders, to be voluntarily dismissed, with prejudice, and

will waive any and all rights to appeal the OPEB Termination Orders.

<u>Basis For Relief</u>

28.    If the Debtors continue to defend the Appeals there is a risk that the

district court could stay the effectiveness of the OPEB Termination Orders for up to 60 days and

14

thereby require the Debtors to make as much as $12 million in contributions to Salaried OPEB during the 60-day period.  Because the Debtors' total commitment under the Settlement (including attorneys' fees) would be no more than $9 million payable over seven months commencing on May 1, 2009, the Settlement is far more favorable to the Debtors than even an affirmance on appeal would be.  Furthermore, although the parties committed to expedite the Appeals, there can be no guarantee that the Appeals will be resolved in a timely fashion.  Thus, if the district court were to grant the Stay Motion, the district court could also choose to extend the stay longer than 60 days, requiring additional cash contributions from Delphi at a rate of approximately $200,000 per day or $1.5 million per week.  If the Debtors prevail in the Appeals after a stay has been issued, they would be unable to recover any contributions that they paid during the stay period.

29.     There is also no guarantee that the Debtors ultimately will prevail in the Appeals.  This Court previously recognized the split of authority on whether section 1114 of the Bankruptcy Code applies to the termination of at-will retiree benefits.  Although the Court followed the majority rule that a debtor-in-possession need not comply with the procedures and requirements of section 1114 if it has a right to unilaterally terminate retiree benefits under the retirement plan in question and applicable nonbankruptcy law, the district court could rule to the contrary.  Reversal of the OPEB Termination Orders would require the Debtors to make continued contributions to retiree benefit plans while the section 1114 process is implemented at an additional cost to Delphi that far exceeds the cost of the settlement.  In addition, the Debtors' estates could be exposed to claims for payment relating to the alleged wrongful cessation of benefit payments in the interim.  By entering into the Settlement, the Debtors could avoid the

15

inherent risks of litigating the Appeals. Additionally, the Debtors could avoid the attendant costs and expenses, including attorneys' fees, associated with protracted litigation.

30.     Finally, the Settlement will enable the Debtors to eliminate a balance sheet liability of approximately $1.1 billion associated with salaried OPEB. The certainty of the elimination of this liability will benefit all stakeholders, including the current DIP lenders, because it should assist the Company in attracting adequate emergence funding. Accordingly, in the Debtors' business judgment, the Settlement is in the best interests of the Debtors and their estates.

<u>Applicable Authority</u>

G.     <u>The Debtors Have Exercised Sound Business Judgment</u>

31.     Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business if the debtor demonstrates a sound business justification for it. <u>See</u>, <u>e.g.</u>, <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Del. Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

32.     The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must resist becoming "arbiter of disputes between creditors and the estate." <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of

the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial."

Orion Pictures, 4 F.3d at 1098-99.

33.     Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity."  Id.   To satisfy its burden, an objector must "produce

some evidence respecting its objections." Lionel, 722 F.2d at 1071.

34.     As a rule, a debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).

35.     As set forth above, Delphi has sound business justification for reaching the

compromise and settlement with the Retirees' Committee and the Association as described

herein.  The Settlement is necessary to avoid the costs and risks associated with litigating the

Appeals of the OPEB Termination Orders.  Moreover, the Settlement would facilitate a

consensual resolution of the Debtors' OPEB obligations that would allow the Debtors to avoid

further substantial contributions to retiree benefit plans.  Furthermore, the Settlement would

result in the swift elimination of the balance sheet liability associated with salaried OPEB, which

this Court found to be necessary to the Debtors' reorganization.  (Docket No. 16443 at 21.)

Finally, the Debtors negotiated the Settlement with the Retirees' Committee and the Association

at arm's length and in good faith.

H.      The Court Should Approve The Settlement

        36.     Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the

trustee and after notice and a hearing, the court may approve a compromise or settlement."

Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of

reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,

130 (1939)); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (decision to accept or

reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration,

327 B.R. 175 (Bankr. S.D.N.Y. 2005).

        37.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Commc'ns, 327 B.R. at 159 ("The settlement

need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within

the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Cent.

Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)); Nellis v. Shugrue, 165 B.R. 115, 121

(S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is

in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy

context should be approved unless they "'fall below the lowest point in the range of

reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).

        38.     The Supreme Court in TMT Trailer Ferry set forth the following factors

that courts should consider in determining whether a proposed settlement or compromise is in the

best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation,

18

(b)  the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.  TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

39.    Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion.  Adelphia Commc'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

40.    The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances.  See Adelphia Commc'ns, 327 B.R. at 159-60; Penn Cent., 596 F.2d at 1114.  Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'"  In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994).  To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the

issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of

reasonableness.'" Adelphia Commc'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at

608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs,

Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust

Co., 17 F.3d 600 (2d Cir. 1994).

41.    The Settlement should be authorized under Bankruptcy Rule 9019(a)

because the settlement terms are fair and equitable, fall well within the range of reasonableness,

and are in the best interests of the Debtors and their estates.  The Settlement will allow the

Debtors to avoid litigation risks and potential expenses associated with litigating the Appeals.

For these reasons, the Settlement serves the best interests of the Debtors' estates and will

maximize value for all stakeholders.

I.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

42.    Bankruptcy Rule 6004(h)[5] provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise." The Debtors request that this Court waive this ten-

day stay for all of the reasons that expedited treatment of the Motion is warranted.  In particular,

the Debtors believe it is essential that the "second chance" notice being mailed pursuant to

paragraph 5 of the Final OPEB Termination Order contain final information regarding the

settlement.  In addition, finality with respect to removing the $1.1 billion Salaried OPEB liability

from the Debtors' balance sheet would further the Debtors' complex restructuring efforts, which

they are pursuing with tight time constraints.  Courts in this district have waived this ten-day stay

upon a showing of business need. See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175

---

[5] Formerly Bankruptcy Rule 6004(g)

(Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

43.    Notice of this Motion will be provided in accordance with the order to show cause submitted on March 31, 2009.  In light of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that this Court enter an order (i) authorizing, but not directing, the Debtors to compromise and settle with the Retirees' Committee and the Association as described herein and (ii) granting the Debtors such other and further relief as is just.

Dated: New York, New York
        March 31, 2009

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr.
    Albert L. Hogan III
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti
    Thomas J. Matz
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession