1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - - -x

                    U.S. Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    April 2, 2009

                    10:13 AM




B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE



OMNIBUS HEARING

2

1

2   HEARING re Doc #16543; Motion for Interim and Final Order

3   Authorizing Debtors to (I) Enter into Second Amendment to

4   Accommodation Agreement with Certain Participating DIP Lenders

5   And (II)(A) Enter into Related Documents and (B) Pay Fees and

6   Expenses in Connection Therewith

7

8   HEARING re Doc #16535; Motion for Approval of Debtors'

9   Compromise and Settlement With Committee of Eligible Salaried

10  Retirees and Delphi Salaried Retirees' Association (related

11  document(s) [16535])

12

13  HEARING re Doc #16536; Order to Show Cause - Motion for

14  Authorization to Amend Accommodation Agreement (related to Doc.

15  #16534)

16

17  HEARING re Doc #16537; Order to Show Cause - Motion for

18  Approval of Debtors' Compromise and Settlement with Committee

19  of Eligible Salaried Retirees and Delphi Salaried Retirees'

20  Association (related document(s) [16535])

21

22

23

24  Transcribed By:  Clara Rubin

25

3

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4          Attorneys for Debtors, Delphi Corporation, et al.

5          333 West Wacker Drive

6          Suite 2100

7          Chicago, IL 60606

8

9    BY:   JOHN (JACK) WM. BUTLER, JR., ESQ.

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

12         Attorneys for Debtors, Delphi Corporation, et al.

13         Four Times Square

14         New York, New York 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17         ERIC L. COCHRAN, ESQ.

18

19   CADWALADER, WICKERSHAM & TAFT, LLP

20         Attorneys for U.S. Department of Treasury Auto Task Force

21         One World Financial Center

22         New York, NY 10281

23

24   BY:   JOHN J. RAPISARDI, ESQ.

25

4

1

2      DAVIS POLK & WARDWELL

3            Attorneys for JPMorgan Chase, as DIP Agent

4            450 Lexington Avenue

5            New York, NY 10017

6

7      BY:   DONALD S. BERNSTEIN, ESQ.

8            KARIN S. DAY, ESQ.

9            BRIAN M. RESNICK, ESQ.

10

11     KELLEY DRYE & WARREN LLP

12            101 Park Avenue

13            New York, NY 10178

14

15     BY:   CRAIG A. WOLFE, ESQ.

16

17     LATHAM & WATKINS LLP

18            Attorneys for Creditors' Committee

19            53rd at Third

20            885 Third Avenue

21            New York, NY 10022

22

23     BY:   MICHAEL RIELA, ESQ.

24            MARK A. BROUDE, ESQ.

25

```
                                                                5

1

2    PENSION BENEFIT GUARANTY CORPORATION

3          1200 K Street, NW

4          Washington, DC 20005

5

6    BY:   C. WAYNE OWEN, JR., ESQ.

7

8

9    STAHL COWEN CROWLEY ADDIS LLC

10         Attorneys for Delphi Salaried Retirees Association

11         55 West Monroe Street

12         Suite 1200

13         Chicago, IL 60603

14

15   BY:   TRENT P. CORNELL, ESQ.

16

17

18   BINGHAM MCCUTCHEN LLP

19         Attorneys for Creditor, General Electric Capital Corp.

20         One Federal Street

21         Boston, MA 02110

22

23   BY:   HILLARY A. PELLETIER, ESQ. (TELEPHONICALLY)

24

25
```

6

1

2   FARELLA BRAUN + MARTEL LLP

3        Attorneys for Delphi Salaried Retirees Association

4        Russ Building

5        235 Montgomery Street

6        17th Floor

7        San Francisco, CA 94104

8

9   BY:   DEAN M. GLOSTER, ESQ. (TELEPHONICALLY)

10

11

12   MONARCH ALTERNATIVE CAPITAL LP

13        535 Madison Avenue

14        New York, NY 10022

15

16   BY:   ROBERT BURNS, ESQ. (TELEPHONICALLY)

17

18

19   PENTWATER CAPITAL MANAGEMENT, LP

20        227 W. Monroe Street

21        Chicago, IL 60606

22

23   BY:   JORDAN FISHER (TELEPHONICALLY)

24

25

7

P R O C E E D I N G S

1

2    MR. BUTLER:  Judge, good morning.  Jack Butler,

3 Kayalyn Marafioti and Eric Cochran on behalf of the debtors for

4 this special omnibus hearing.  We have four matters on the

5 agenda today.  And with Your Honor's permission, we are within,

6 like, minutes of having a satisfactory resolution among the

7 parties on how to address those motions.

8    THE COURT:  Okay.

9    MR. BUTLER:  And I'd like --

10    THE COURT:  So you'd like some more time?

11    MR. BUTLER:  I'd like at least another ten minutes to

12 confirm the agreements.

13    THE COURT:  Okay.

14    MR. BUTLER:  And the Treasury's here participating

15 with us, Your Honor.

16    THE COURT:  All right.  Well, I got you all in the

17 courtroom, but I guess you're all going to leave for about ten

18 or fifteen minutes.

19    MR. BUTLER:  Yeah.  And I think it won't be longer

20 than that.  I'm just writing some things down.

21    THE COURT:  All right.  You can go back in the

22 conference room, if you want.

23    MR. BUTLER:  Thank you very much, Your Honor.

24    THE COURT:  Okay.  Thank you.  Did you hear that,

25 Mr. Gloster?

8

1         MR. GLOSTER:  I did, Your Honor.

2         THE COURT:  Okay.  Thanks.

3      (Recess from 11:07 a.m. until 11:31 a.m.)

4         THE COURT:  Please be seated.  Okay, we're back on

5   the record in Delphi.

6         MR. BUTLER:  Your Honor, thank you for giving us that

7   recess.  It gave us an opportunity to reach an agreement on how

8   to approach this hearing and the relief we're requesting today,

9   and that agreement is supported by the debtors, the U.S.

10   Treasury, General Motors, the creditors' committee.  That

11   relief has been agreed to and is being recommended by the agent

12   for the DIP lenders and other key members of the steering

13   committee that's working with the company.  Assuming Your Honor

14   approves our approach today, there will be some additional

15   voting that will take place this evening, as would be required

16   to implement the authority we would be seeking today.

17         There are four items up for hearing today.  The --

18   let me just address two items we're asking to be adjourned.

19   First, there is a motion for order authorizing the debtors to

20   enter into a fourth and fifth amendment to the arrangement with

21   General Motors Corporation at docket number 16411.  And there

22   is the debtors' -- the debtors also filed a motion for an order

23   seeking approval of the option exercise agreement with General

24   Motors Corporation, which is found at docket number 16410.

25   Your Honor, we're continuing to discuss those matters with our

9

1    stakeholders and with the U.S. Treasury.  And we'd ask Your

2    Honor to adjourn those matters to the April 23rd omnibus

3    hearing for further consideration.

4            THE COURT:  Okay.  I'll do that.

5            MR. BUTLER:  Thank you, Your Honor.  Now going to the

6    two matters that are on the OSC agenda, Your Honor considered

7    orders to show cause earlier this week to bring before the

8    Court two motions today.  The first is the second accommodation

9    amendment motion found at docket number 16534, and the second

10   is the salaried OPEB settlement motion found at docket number

11   16535.  I'm going to address them, with the Court's permission,

12   in that order.

13           THE COURT:  Okay.

14           MR. BUTLER:  Your Honor, this first matter, then,

15   matter number 1 on the OSC calendar, found at docket number

16   16534, is an interim hearing on the debtors' expedited motion

17   for an order seeking an amendment to the accommodation

18   agreement with certain participating DIP lenders to enter into

19   related documents and to pay fees and expenses in connection

20   with this transaction.  The Court scheduled this hearing by

21   order to show cause, entered at docket number 16536.  I

22   represent to the Court the debtors have complied with the

23   notice provisions of the order, and we have filed an affidavit

24   of service by KCC, which is on the docket.

25           Your Honor, this is the second amendment to the

10

1    accommodation agreement between the debtors and their DIP

2    lenders, which was approved originally by this Court on

3    December 3, 2009 at docket number 14515.  Your Honor previously

4    approved a first amendment and a supplemental amendment to the

5    accommodation agreement in connection with the first amendment

6    by order dated February 25, 2009, found at docket number 16377.

7             Your Honor, the -- this motion arises because of the

8    debtors' need to reset certain of the milestones and other

9    obligations under the company's accommodation agreement with

10   the participating DIP lenders, and it is -- and it reflects,

11   among other things, the engagement of the auto task force of

12   the United States Department of Treasury in the debtors'

13   Chapter 11 cases.  The auto task force filed an appearance

14   yesterday.  They also filed a statement to this motion that was

15   at docket number 16541.  And I'm pleased to report that the

16   Treasury, working with General Motors and our other

17   stakeholders, have agreed to engage in discussions regarding an

18   appropriate resolution to this case which the debtors believe

19   will result in proposed modifications to our confirmed plan of

20   reorganization being filed and the debtors moving forward.

21   Those discussions are going to begin in earnest early next week

22   in Washington, DC.  And the parties have met over the last

23   twenty-four to forty-eight hours to discuss the timetable on

24   which they would seek to achieve resolution of the matters that

25   have been put on the discussion agenda among them.

11

1          As a result of that discussion, the agent and the

2     other key members of the DIP steering company who've

3     participated in these discussions with us over the last day or

4     so have agreed to recommend to the participant lenders that

5     they enter into modifications to the second amendment which

6     otherwise became effective earlier this week, subject to Your

7     Honor's approval, in the respects that I'm going to lay out

8     here on the record in just a couple of minutes.  And that --

9     these modifications, the debtors believe, which have been

10    approved by the same parties, the U.S. Treasury, General

11    Motors, Delphi and the creditors' committee, and are supported

12    here today, should create, in the debtors' view, the

13    environment to move forward with these very important emergency

14    discussions during the month of April while continuing to

15    provide the opportunity for the debtors to have access to

16    liquidity to fund its operations during that period.

17          Your Honor, the changes that we would propose making,

18    and by oral motion do here make, to the relief we're requesting

19    is as follows:  First, the company would agree to, by April

20    6th, make a payment on the tranche A and B loans in the amount

21    of eighty-seven million dollars, which reflects the current

22    amount that is in the tranche C interest reserve.  Your Honor

23    may recall that there was an interest reserve; the debtors have

24    been paying into that.  That amount's eighty-seven million.

25    And there is an agreement from the parties that amount can be

12

1   used by April 6 to reduce the outstanding amount of the As and

2   Bs.

3           The second agreement and change would be that the

4   milestone that had been in the proposed -- or had been in the

5   second amendment that would require the debtors to have access

6   to incremental GM financing in the amount of 450 million by

7   April 7th is being eliminated.

8           The third arrangement is that the milestone that had

9   been in the second amendment dealing with having a timetable

10  agreement by April 7th has been eliminated.

11          Fourth, the -- the fourth modification would be that

12  the minimum borrowing base cash collateral account balance will

13  be 160 million dollars until -- excuse me, will be a hundred

14  and -- yes, 160 million dollars until April 15th.  And from

15  April 19th until we have a satisfactory GM transaction term

16  sheet, which I'll define in a few minutes, that amount will be

17  140 million dollars.  Thereafter, once and upon the GM

18  transaction term sheet being acceptable to the required first-

19  priority participant lenders or the required total

20  participant -- and the to -- let me get it right.  I believe

21  it's and the required total participant lenders.  Assuming that

22  that consent has come in, then the amount would drop to forty-

23  seven -- the minimum borrowing base cash collateral account

24  balance would drop to forty-seven million.  These amounts, Your

25  Honor, are consistent with the cash flow projections the

13

1   company has presented to the stakeholders for continuing to

2   operate in the ordinary course of business during the month of

3   April, the -- through what would be, I think, April 24th, which

4   is the outside date, and I'll walk through this with you, the

5   outside date for these term sheet agreements to have to be

6   agreed to.

7          The fifth item is an agreement that, rather than have

8   these other milestones that we have had that we've now

9   eliminated, there would be a milestone on April 17th that would

10  say that by, on or prior to April 17th, it will be the debtors'

11  responsibility to deliver a term sheet with respect -- that is

12  agreed to by Delphi, GM and the U.S. Treasury that addresses

13  globally GM's participation in these Chapter 11 cases and their

14  contributions to Delphi's emergence.  That transa -- that term

15  sheet has to be delivered by the 17th or there would be an

16  automatic accommodation default.  I'll explain the implications

17  of that in a few minutes.

18          THE COURT:  And it's delivered to the --

19          MR. BUTLER:  The agent --

20          THE COURT:  The agent?

21          MR. BUTLER:  -- for the DIP steering committee.

22          THE COURT:  Okay.

23          MR. BUTLER:  Once we have delivered it, it would be

24  an automatic accommodation termination default if the required

25  first-priority participant lenders or the required total

14

1    participant lenders either notified Delphi within three

2    business days after delivery that the GM transaction term sheet

3    was not satisfactory, or, if they fail to notify us within

4    three business days, that the term sheet is satisfactory.  So

5    they have to give us an affirmative vote within three business

6    days of getting it.  So if we delivered it on the 17th, which

7    is a Friday, the date by which you would need that to come in,

8    I believe, is Wednesday, if I'm counting my business days

9    correctly.  It would be the 22nd of April.

10           And the reason for this, Your Honor -- this sounds

11   like a lot of dates here, but the point, really, of this

12   calendar is to create an environment that's responsive to the

13   U.S. Treasury's request to have additional time to diligence

14   matters and to engage in discussions with the Delphi

15   stakeholders on these matters.  And it was important to

16   establish a timetable that the auto task force was satisfied

17   with, that our DIP lenders found acceptable, that our statutory

18   committee believed was appropriate and that GM and Delphi were

19   prepared to engage in.

20           And I think the important news here is we've

21   established a timetable and an arrangement that these parties

22   believe is appropriate under the circumstances.  And I will

23   let -- I believe Mr. Rapisardi's here on behalf of the auto

24   task force, who will address the Court in a few minutes.

25           The -- and while -- and I'll simply say when you walk

15

1    through how the mechanics of the accommodation agreement works

2    with these various items I've put on the record this morning,

3    the practical implication here is that by April 24th, assuming

4    we deliver the -- we deliver something to the DIP lenders, by

5    April 24th they have to be in agreement with GM, the Treasury

6    and Delphi that the GM transaction term sheet is acceptable.

7             MR. BERNSTEIN:  Your Honor, Don Bernstein from Davis

8    Polk & Wardwell for the DIP agent.  There's one clarification

9    to what Mr. Butler has put on the record.  Mr. Butler mentioned

10   the outside date of the 24th.  He also mentioned the three-day

11   deadline after delivery of a term sheet.  The outside date is

12   the 24th.  So if a term sheet was delivered during the week

13   between the 17th and the 24th, the three-day period would get

14   shortened.  For example, if they delivered it on Thursday, the

15   23rd, it would only be a one-day period.  And if they hadn't

16   heard that the term sheet was approved by the 24th, that would

17   be the outside deadline because the automatic default would

18   have occurred and the 24th is the outside date.

19            THE COURT:  I thought they had to deliver it by the

20   17th?

21            MR. BERNSTEIN:  They do have to --

22            MR. BUTLER:  What we have is a cure period, Your

23   Honor.

24            THE COURT:  All right.

25            MR. BERNSTEIN:  If they're late.

16

1          THE COURT:  That's why there's an outside date of the

2    24th.

3          MR. BERNSTEIN:  Exactly.

4          THE COURT:  Okay.

5          MR. BERNSTEIN:  Thank you, Your Honor.

6          MR. BUTLER:  And the point of this, and I think it's

7    important to say this because we're speaking on the record

8    here, is there's a lot of logistics associated with this.  But

9    from the debtors' perspective, the reason that we're supportive

10   of this and recommend it to the Court is it creates a runway

11   that, I agree with Mr. Bernstein, has an outside date -- unless

12   it's further extended by consent by the parties, currently has

13   an outside date of April 24th.  It is a runway that, the U.S.

14   Treasury is going to tell Your Honor in a few minutes, is

15   acceptable to the auto task force.  And, therefore, we have

16   achieved one very important effort we've been working on for

17   the better part of the last several months, which is to create

18   the terms of engagement and a timetable that's acceptable to

19   the parties.  It is one thing for the debtors to imagine their

20   own timetables.  It is another thing for having the key players

21   who need to reach these agreements actually come before Your

22   Honor and tell them they think these timetables are appropriate

23   and they're prepared to move forward with them.

24          And, so, I agree with Mr. Bernstein that April 24th

25   is the outside date.  I also believe that if we're making

17

1    progress the debtors will certainly ask people to extend that

2    date beyond April 24th if it becomes necessary.  And I assume

3    people will consider that request and act in their best

4    interest, whatever those interests may be.

5              So we are working, I think, together, and I consider

6    this to be a very important and very positive development.

7              The last item, the last modification I wanted to

8    make, and Mr. Resnick will check me on this to make sure I said

9    them all, I think the last modification I need to make here is

10   that the minimum liquidity amount will be twenty-five million

11   dollars throughout the term, the remaining term of the

12   accommodation agreement, period.  And that's important because

13   the borrowing base cash collateral formulas operate along the

14   minimum liquidity amount to provide the -- some of the

15   mechanics for how the debtors finance their case under the

16   accommodation agreement.

17             May I have one moment, Your Honor?

18             THE COURT:  Yes.

19       (Pause)

20             MR. BUTLER:  Your Honor, the one other -- and this is

21   a mechanic -- as Your Honor may recall under the April 7th

22   milestones, have we not met the milestones next week, there

23   will be a 117 million dollar paydown of the -- of one of the

24   cash collateral accounts that exists here.  That paydown would

25   be triggered if we didn't make the April 17th delivery.  So

18

1    it's been extended, in essence, from April 7th to April 17th.

2    This is the same paydown requirement we had previously that we

3    have been able to resolve and negotiate to amendment.  But it

4    is technically correct, and Mr. Resnick properly reminds me

5    that that existing requirement has been extended out to April

6    17th.

7            THE COURT:  And that's if you simply deliver the term

8    sheet on that day, then --

9            MR. BUTLER:  Then you don't have to do that.  And if

10   we don't deliver the term sheet -- actually we have a cure

11   period of five business days --

12           THE COURT:  All right.

13           MR. BUTLER:  -- after that date, which, by the way,

14   happens to end on April 24th, too.

15           THE COURT:  Okay.

16           MR. BUTLER:  So, it is -- as I say, there's a lot of

17   mechanics that have been thought out here by the parties.  But

18   what it boils down to, from the debtors' perspective, is we

19   have an agreed approach on how to --

20           THE COURT:  It's to facilitate good-faith discussions

21   on an expedited timetable.

22           MR. BUTLER:  Exactly, Your Honor.

23           THE COURT:  Okay, with a little play in the joints if

24   people are engaging in good faith, but the playing gets

25   cancelled or something like that.

19

1          MR. BUTLER:  Right.  And, Your Honor, for that

2     reason, one of the things I'd also like Your Honor to do,

3     subject to the Court's calendar, is to set a status conference,

4     a chambers conference, for April 21st, which I think is a

5     Tuesday, in the afternoon, so that we've got a checkpoint.  We

6     may not need to use it but, in the event we do need to use it,

7     I think it's appropriate to have these parties, who have been

8     party to this discussion and represent their agreements to you,

9     come before the Court before anything happens later in that

10    week.  So I'd like to ask for a --

11         THE COURT:  2 o'clock?

12         MR. BUTLER:  That would be great, Your Honor.

13         THE COURT:  Okay.

14         MR. BUTLER:  I think, Your Honor, while --

15         THE COURT:  That could be either on the record or off

16    the record, or both.

17         MR. BUTLER:  Yeah.  Thank you, Your Honor.  I think

18    initially we would ask for it to be off the record, but it may

19    be required for us to go on the record, whatever Your Honor

20    decides at that time, what you want us to do.

21         I believe that -- I know there are a couple of

22    parties we wanted to hear from, but I think we were going to

23    start with Mr. Rapisardi on behalf of the auto task force, who

24    wanted to address the Court.

25         THE COURT:  Good morning.

20

1          MR. RAPISARDI:   Good morning, Your Honor.   John

2     Rapisardi, Cadwalader, on behalf of the auto task force of the

3     Department of Treasury.   Your Honor, the auto task force comes

4     to this case new.   This case is -- parties have been living

5     with this, including yourself, Your Honor, for the last three

6     and a half  years.   The auto task force has literally, within

7     the last week and a half, been conducting extensive due

8     diligence.   Realizing the importance of this case and its

9     importance to General Motors, we need some more time, as we

10    indicated, in the statement that was filed with the Court

11    yesterday.

12          We are in agreement with everything that Mr. Butler,

13    the parties have put on the record with respect to the

14    timelines that have been proposed.   We are convening a meeting

15    in Washington to get the major constituencies together.   And

16    it's our hope and desire that that will lead to a global

17    resolution of all issues affecting General Motors and Delphi,

18    and will bring about a successful result in this case.   There

19    are no guarantees, but it's certainly worth the effort to try

20    to bring everything to a head and in a successful way.   The

21    Treasury Department -- the auto task force stands ready and

22    willing to do as much as possible to help the parties come

23    together and find a resolution.

24          THE COURT:   Okay.   Thank you.

25          MR. BROUDE:   Good morning, Your Honor.   Mark Broude,

21

1    Latham & Watkins, counsel for the creditors' committee.

2    Mr. Butler's correct.  The creditors' committee is on board

3    with this timeline.  We do note that the approval today is an

4    interim approval, and obviously we reserve all our rights come

5    the hearing, which is well scheduled for the 23rd.  Considering

6    final approval, depending upon what happens between now and

7    then, Treasury has invited us to participate on Monday, and we

8    will be there.

9            THE COURT:  Okay.  Thanks.

10            MR. BERNSTEIN:  Your Honor, Don Bernstein, Davis Polk

11    & Wardwell.  We are going to document this this afternoon.  And

12    as Mr. Butler said, we are going to go out for our vote this

13    evening, and we're very hopeful that we'll have the votes to do

14    this.  And hopefully this will be implemented this week.

15            THE COURT:  Okay.  Thank you.  Anyone else?  I had a

16    couple of questions.  The first point you made about the

17    eighty-six million being paid from the tranche C interest

18    reserve, that's permitted under the agreement that set up the

19    reserve?

20            MR. BUTLER:  Yes, Your Honor.  It actually --

21            THE COURT:  I haven't gone back and looked, but I

22    assume you all have.

23            MR. BUTLER:  I'm saying that it is permitted.  The

24    problem -- I mean, the reason the reserve was set up -- it was

25    something that Delphi had negotiated for -- was that the DIP

22

1 agreement prohibits the payment of interest post-default in the

2 DIP agreement to the tranche C lenders until the tranche A and

3 B are paid out.  Delphi wanted, as a basis of good faith, to

4 fund that interest on a current basis out of operations, and

5 we've done that.  And that's why we set up the tranche C

6 reserve.  And the lenders have now concluded that it's

7 appropriate to make this payment, and the debtors do not object

8 to it.  And my understanding is there are other parties who are

9 here in the courtroom also that have agreed to that

10 application.

11   MR. RESNICK:  Your Honor, I'm sorry, just one

12 clarification.  This is Brian Resnick of Davis Polk.  Your

13 Honor, you raise an excellent point.  It would actually be an

14 amendment to the credit agreement -- it would require an

15 amendment to the credit agreement.  So the document would be

16 changed to reflect that, and that would be a required lender

17 vote.  So we would be hopeful that we would get that vote.

18   THE COURT:  Okay.

19   MR. BUTLER:  It's part of the same mechanics, those

20 votes.

21   THE COURT:  I've reviewed the fee letters.  And I

22 guess I have the following question, and it applies to both the

23 tranche C collective as well as the GE.  I haven't looked at

24 the 2019 statement.  Are the debtors comfortable that the

25 tranche C collective is really a representative group of those

23

1    lenders?  And it's not just someone vocal who has hired a

2    lawyer.  I'm assuming the answer is yes, that you are

3    comfortable with that.  But I wanted to make sure before we

4    approved that arrangement.

5        MR. BUTLER:  Willkie Farr has filed a 2019 to

6    describe the tranche C Collective.  We have notified Willkie

7    Farr that the debtors don't believe that that disclosure is

8    complete and accurate as required by the rules.  But we also

9    told them we weren't going to take action on that.  It did

10   identify the members of the tranche C Collective; it did not

11   provide some other disclosures.  We've been able internally to

12   understand the holdings of a number of those members.  And the

13   debtors believe, and I think the agent concurs with us, that

14   the tranche C collective's support is necessary to be able to

15   implement these arrangements the way the voting mechanics work.

16       THE COURT:  So that reflects the members of that

17   collective really are holders of a critical amount of debt.

18       MR. BUTLER:  I think it is without question.  The

19   holders of that -- of the collective hold a very material

20   amount of tranche C debt, and some of them hold actually

21   tranche A and B debt.

22       THE COURT:  All right.  I had a similar question with

23   regard to GE.  Is its role here truly structurally significant,

24   or is this alternatively someone who is just sort of throwing

25   their weight around and --

24

1          MR. BUTLER:  Actually, I think GE has been a very

2    constructive part of this process, and they actually have a

3    group of tranche A and B lenders, as I recall, who work with

4    them.

5          THE COURT:  Okay.

6          MR. BUTLER:  And so there is a -- we don't call it

7    the tranche A-B collective, but there is a group of lenders

8    that work with GE and that GE and its advisors represent on the

9    steering committee.

10         THE COURT:  Okay.  All right.  I think that the only

11   other point I had is, both in terms of the second amendment and

12   what you've just outlined, there are a couple of default events

13   that are truly based on simply the sending of a notice that

14   people aren't satisfied with in the amendment with an amended

15   plan and in the -- what you've just laid out on the record, the

16   term sheet.  I guess I'm more concerned with the amended plan

17   point.  My assumption when I read those types of provisions is

18   that they're always qualified by reasonableness.  If a plan

19   provides that someone's going to be paid out in full, I don't

20   see how they have a right to complain, for example.  On the

21   other hand, if a plan or an amendment or a term sheet would

22   purport to -- would be truly contrary to what would be required

23   under the Bankruptcy Code, then I certainly understand that

24   type of provision.  So I'm assuming that's how people are

25   looking at those rights.

25

1        MR. BUTLER:  I think that's a fair statement, Your

2    Honor.

3        THE COURT:  It's not just an option, in other words.

4        MR. BERNSTEIN:  Well, Your Honor, I mean, during the

5    relevant period here, we would all like to see a plan filed,

6    but the odds are that it won't be.  But I think what we have is

7    the normal contractual requirement of acting in good faith --

8        THE COURT:  That's fine.

9        MR. BERNSTEIN:  -- with respect to that point.

10       THE COURT:  And, again, my focus was on the plan

11   because that's the only provision I had read.  And I don't like

12   to give people vetoes over plans that are separate and apart

13   from their rights under the Code, and I don't think that's the

14   case, here.

15       MR. BUTLER:  And, Your Honor, on that point, I should

16   say I agree with Mr. Bernstein, just to make sure the record's

17   clear.  I think the debtors agree that it is unlikely that the

18   modified plan of reorganization -- the plan modifications be

19   filed during the month of April.

20       THE COURT:  Right.

21       MR. BUTLER:  I agree with that.  I think that one of

22   the things that the parties will be negotiating is what the

23   timetable is for filing, assuming we can reach agreement on the

24   term sheet.  But the timing will be for the filing of those

25   plan modifications.  And that will implicate, I believe, that

26

1    and, I think, frankly, that agreement will be very good news

2    for Delphi and all of its stakeholders.  And I think if we

3    reach the agreements that the parties are engaged in and that

4    Mr. Rapisardi has indicated the auto task force of the U.S.

5    Treasury's now engaged in, if that leads to a consensual

6    agreement, as we all are working to make it do so, I think the

7    announcements we would be making upon the completion of that

8    process and the timetable that we would be announcing for the

9    filing of plan modifications and the prosecution of a modified

10   plan would be, at that point in time, something that people

11   could take some comfort in.  I don't want to speculate as to

12   what those timetables would be now because I think we have to

13   reach agreement on the specifics of how we're going to proceed,

14   and then we will put together a timetable.

15        I will tell the Court we've had conversations with

16   many of these stakeholders about what that timetable would be,

17   and I don't think that there is a material disagreement among

18   the parties as to what the timetable would be.  I think the

19   focus is on getting the actual agreements on the key emergence

20   issues, which, among other things, involves some bit of an

21   allocation of risk, as these negotiations always do, and that,

22   from the debtors' perspective, we think it's extremely good

23   news today that we now have a process, if Your Honor's prepared

24   to approve this, that will allow that engagement to occur.

25        THE COURT:  Okay.  Anyone else?  All right, I will

27

1    approve the second amendment as modified on the record.  And,

2    obviously, it is subject to the necessary votes in the lender

3    group.  And I agree with you that the focus on not only the

4    short-term continuation of the supply arrangement with GM but

5    also the overall resolution of the relationship is a good

6    thing.  And I encourage you all to look at the big picture on

7    that as well as the small picture.  I know that, in just

8    reading the government's response to the automaker's proposals,

9    the governments recognize the importance of continuing the

10   supply relationship, generally without disruption, and that's

11   obviously critical.  But it's clear to me, from reading the

12   responses to the steering motion, that major constituents in

13   this case, I think correctly, are at the point where the

14   debtors have to get beyond, sort of, short-term fixes and focus

15   on the plan.  And I know the debtors have wanted to do that

16   probably more than anybody.  So I'm glad the parties-of-

17   interest are now setting a timetable to do that.  That's tight,

18   but I think it's achievable, given all the work that's been

19   done.

20            MR. BUTLER:  Thank you very much, Your Honor.

21            THE COURT:  So as far as the order is concerned, I

22   mean I'm approving the relief you're seeking today, and the

23   record reflects that and people are acting in reliance upon

24   that.  And I think the terms that you've outlined are clear;

25   the parties certainly know what they are to the extent that

28

1    they haven't been.  I guess you'll be giving me a modified

2    order?

3            MR. BUTLER:  We will be submitting, Your Honor, a

4    modified order.  We'll attach to it the document that will be

5    prepared by Davis Polk on behalf of -- we'll be working with

6    them on whatever -- I think that document -- in the appropriate

7    form under the accommodation agreement to implement what's been

8    agreed to today.  And this does, of course, remain subject to

9    the vote that we have to obtain from the requisite participant

10   lenders under the terms of the accommodation agreement.  And my

11   understanding is the steering committee's going to be pursuing

12   that today.

13           MR. RESNICK:  That's right.  And, Your Honor, because

14   the documentation will require an amendment to the credit

15   agreement, I think the form of order will need to change a

16   little bit to reflect that because now it just approves an

17   amendment to the accommodation agreement.

18           THE COURT:  That's fine.  So I'll look forward to

19   getting that.  But I've approved the motion as of today.

20           MR. BUTLER:  Thank you.  Thank you, Your Honor.  All

21   right, turning now, then, to the second matter on the OSC

22   agenda, this is the salaried OPEB settlement motion at document

23   number 16535.  And this matter, Your Honor, is unopposed.  This

24   is, Your Honor, intended to be a nonevidentiary hearing on the

25   debtors' expedited motion for an order approving the debtors'

29

1    compromising settlement with the retirees' committee and the

2    Delphi Salaried Retirees Association regarding termination of

3    salaried OPEB.

4          Mr. Trent Cornell from the Stahl Cowen firm is in

5    court today for the retirees' committee and the Delphi Salaried

6    Retirees Association, and I believe Mr. Gloster is

7    participating in this hearing telephonically.

8          MR. CORNELL:  That's correct, Your Honor.

9          MR. GLOSTER:  Yes, Your Honor.

10         THE COURT:  Okay.

11         MR. BUTLER:  The Court scheduled this hearing by

12    order to show cause entered at docket number 16537.  The

13    debtors have complied with the notice provisions of that order

14    to show cause, and there has been an affidavit of service filed

15    by KCC with the court and is reflected on the docket.  Your

16    Honor, this settlement relates to the debtors' salaried OPEB

17    termination motion.  At a hearing on February 24th, this Court

18    determined that Section 1114 of the Bankruptcy Code does not

19    apply to retiree welfare benefits, that the debtor reserved the

20    right to amend or modify under nonbankruptcy law.  The Court

21    also appointed a retirees' committee, primarily to determine

22    whether benefits had vested for any retiree group or retiree.

23          At a further hearing on March 11th, the Court

24    finalized its earlier ruling and authorized the debtors to

25    cease contributing to salaried OPEB effective on April 1 of

30

1    this year.  At another hearing on March 17th, the Court denied

2    a motion for a stay pending appeal.  The Delphi Salaried

3    Retirees Association and the retirees' committee filed appeals

4    with the district court that are pending before the Honorable

5    Deborah Batts.  After this Court denied the motion for a stay

6    pending appeal, the association made an emergency motion for a

7    stay pending appeal to the district court.  Judge Batts

8    referred that stay motion to part one, and the Honorable Robert

9    Sweet was scheduled to hear that motion on March 31st.  On

10   March 30th, Judge Sweet granted an adjournment of the hearing

11   of the stay motion pending in the district court until April

12   7th in light of the progress of the settlement discussions and

13   the hope that this Court would consider the settlement I'm

14   about to present today.

15           Your Honor, the relief that is requested is set forth

16   in our motion and in the proposed order.  I'm briefly going to

17   summarize it, but as I do when I put these settlements on the

18   record, it is -- my summary is qualified in its entirety by the

19   actual documents that have been filed before the Court and are

20   before Your Honor.  But just briefly, the agreement that has

21   been reached and that we're asking Your Honor to approve under

22   Section 363(b) and Bankruptcy Rule 9019 would authorize a

23   settlement that is in complete and final resolution of the

24   retiree committee's and association's appeal of the OPEB

25   termination orders.  I should point out, Your Honor, that while

31

1    more than 1,600 parties objected to the motion, the only

2    appeals lodged were by these two groups.  And so if Your

3    Honor's prepared to approve this settlement, this would

4    represent a full and final resolution of these matters without

5    even going into the issue as to the committee's ability to

6    settle this on behalf of anyone in any event.  The only

7    appellants to the order were these two entities, and they are

8    both here and participating in the settlement.

9            The major economic agreement is the debtors will pay

10    8.75 million in overall subsidy payments to the retirees'

11    committee for the benefit of Delphi's salaried retirees, not

12    subject to reduction because of enrollment levels, and

13    comprised of a one million dollar hardship fund payable at the

14    beginning of May 2009, a 500,000 dollar voluntary employees'

15    beneficiary association setup cost payment, also payable at the

16    beginning of May 2009 to set up the VEBA.  The debtors have

17    agreed that the retirees' committee may use those proceeds, the

18    VEBA -- what's been allocated for the VEBA setup, for hardship

19    funds or otherwise subsidizing retiree medical benefit costs if

20    there's -- in the discretion of the committee.  The debtors

21    would -- the payment terms -- the additional payment terms

22    would be 1.25 million per month for five months, payable

23    monthly at the beginning of each of June through October 2009,

24    and a final payment of 1 million on November 1, 2009.

25            I should point out, the settlement, Your Honor,

32

1   includes an invocation of Section 1129(a)(13) of the Bankruptcy

2   Code, which would provide that, in any plan of reorganization,

3   these payments would continue on the schedule I've just

4   described as an agreement between the parties as to the

5   treatment of this claim.

6          The debtors have also agreed, through June 30, 2009,

7   to offer salaried retirees a nonretroactive benefits

8   reinstatement opportunity as of the first of the following

9   month, and we've agreed to reasonably cooperate with retirees

10  who would like to continue benefits on a self-pay continuation

11  basis to permit payment deductions from their pension checks.

12         Next, the debtors have agreed to pay up to an

13  additional 250,000 dollars in attorneys' fees to counsel for

14  the retirees' committee and the association.  This is in

15  addition to the cap Your Honor had set of 200,000 dollars on

16  attorneys' fees, which Your Honor, I think, had indicated

17  wasn't actually a cap, it was the amount we were authorized to,

18  but Your Honor would consider reasonable fees under the

19  totality of the circumstances, and this would be subject to

20  reasonableness review by the debtors and payable sixty days

21  after submission of the statements of account to the debtors.

22         We're asking Your Honor today to -- in the order to

23  specifically authorize the retirees' committee to establish a

24  VEBA as contemplated by the appropriate provisions of the

25  American Recovery Reinvestment Act of 2009 to extend the health

33

1    coverage tax credit, the benefits provided through a VEBA setup

2    by a Section 1114 committee or authorized by a bankruptcy

3    judge.

4        The order also provides that the VEBA established by

5    the retirees' committee under a 26 U.S.C. Section 501(c)(9)

6    would be in lieu of the debtors' obligation under paragraph 5

7    of the final OPEB termination order to establish a VEBA under

8    certain circumstances.

9        Your Honor, we have also agreed to cause Delphi's

10   group life insurance provider, MetLife, to permit retirees to

11   continue their current level of optional term life insurance

12   coverage as outlined under the program and the notices sent to

13   retirees without the need to requalify by providing medical

14   information, and also request that MetLife return all copies of

15   health questionnaire information provided by the retirees to

16   continue the benefit.

17       And finally, Your Honor, in terms of how we would

18   dispose of the appeals, upon entry of a final order approving

19   this motion and by payment of the first tranche of payments,

20   those due on May 1st only, the May 1st payments, the retirees'

21   committee and association will cause the appeals of the OPEB

22   termination orders, including their motion to stay the

23   effectiveness of the OPEB termination orders, to be voluntarily

24   dismissed with prejudice.  And they will waive any and all

25   rights to appeal the OPEB termination orders.

34

1            I should tell Your Honor that we have also agreed,

2    and I think it's implicit in how we've been dealing with this

3    all along, but I'll say it again, that Delphi will continue to

4    cooperate with the committee's VEBA to facilitate the VEBA

5    rolling out an HCTC-compatible benefit broadly to retirees in

6    the event that health care tax credit is triggered by some

7    subsequent event with the debtors' pension plans.  And so we've

8    agreed to cooperate with that as we have to this point, and I

9    wanted to make that statement on the record.

10            Your Honor, very briefly, and we put this in our

11    papers, but I simply want to say, obviously, that we're before

12    the Court because Section 363(b)(1) requires us to get Your

13    Honor's approval for the use of estate assets other than -- in

14    the ordinary course of business and that we need to demonstrate

15    a sound business justification to that.  We believe, under any

16    appropriate 9019 analysis, given the risks and costs of

17    continued litigation, the possibility of estate pending appeal,

18    that would cost more than the amount of the settlement and,

19    frankly, the benefits of making this final not only for the

20    debtors but also for our retirees and actually have established

21    a program that the retirees' committee and the association

22    believes is an appropriate resolution of this dispute so that

23    we can address what's a very difficult issue in a manner that

24    has now been mutually worked out as something that we think

25    more than justifies the debtors' exercise of their business

35

1    judgment in approving this matter.  We'd ask Your Honor to

2    exercise the appropriate review under Second Circuit law to

3    help the debtors give final finality to this transaction.

4              THE COURT:  Okay.

5              MR. BUTLER:  Your Honor, we've also asked in this

6    motion that you waive the ten-day stay under Bankruptcy Rule

7    6004(h).  That is important, as we pointed out in our papers

8    here.  This is unopposed.  We've reviewed this matter with the

9    parties in the courtroom today, certainly with the DIP steering

10   committee members, as we dealt with this issue.  And it is

11   important, given the passing of April 1st, that we have

12   finality here so that we can advise our retirees of this

13   determination.

14             This is particularly important because, under

15   paragraph 5 of the final OPEB termination order, we agreed to

16   provide a second-chance mailing notice to people who had

17   allowed their benefits to lapse as of April 1st.  We're in the

18   process of doing that.  And we've been advised by counsel to

19   the appellants that they believe, as do we, that it's very

20   important to be able -- to have those notices contain final

21   information about this settlement that the parties can rely on

22   as we provide all the information necessary to implement the

23   path that we've now agreed to consensually with the two

24   appellants.

25             Now, that's our presentation.  We're very pleased to

36

1   have been able to reach this arrangement.  We're appreciative

2   to counsel, to Mr. Cornell and to Mr. Gloster, for their

3   cooperation and for the practical approach everyone has taken

4   to resolve this matter.

5            THE COURT:  Okay.  I had two questions.  The first is

6   one of the provisions of the settlement says the debtors will

7   cause MetLife to permit retirees to continue their current

8   level of optional life term insurance coverage.  I just want to

9   make sure that's something that you can actually do?  It's

10  not --

11           MR. BUTLER:  I think it's probably more properly -- I

12  mean, I'll have to ask you, Mr. Gloster and Mr. Cornell.  I

13  think it's our job to request that they do it and to do

14  whatever we can within our control to do it.  We're not

15  obligated to sue them to do it.  We believe -- and, by the

16  way --

17           THE COURT:  You believe you have the right to --

18           MR. BUTLER:  We've already been doing it.

19           THE COURT:  Okay.

20           MR. BUTLER:  This is not new.  We've been already

21  working with MetLife on these matters.

22           THE COURT:  Okay.  And then the other question I had

23  was more for Mr. Gloster and Mr. Cornell.  Most of this -- of

24  the money is being paid to the committee for subsequent

25  allocation for a hardship fund and then the monthly payments.

37

1    I have put something in the order that provides that, after the

2    money has been paid to the committee, the committee will file a

3    report with the Court to describe how the settlement proceeds

4    were spent and allocated fairly and equitably to or on behalf

5    of the salaried retirees.  I want to make sure there is

6    something in your minds, and I know both of you are experienced

7    in this area, as far as a procedure for using the money most

8    fairly among the thousands of people who might use it.  Is

9    there something -- do you have something in mind for that?  I

10   mean, is it -- I'm assuming it's more than just someone calling

11   up and saying I need money.

12            MR. GLOSTER:  Yes, Your Honor.  This is Dean Gloster,

13   Farella Braun + Martel, on behalf of the 1114 committee of the

14   SRA.  The committee has actually thought about this and, in

15   sort of deciding what to do with the money, the plan is that we

16   would set up a hardship fund which would actually have specific

17   requirements and that the money in the hardship fund would be

18   used to fund a portion of the health care premiums of

19   individuals who were retirees and survivors who suffered

20   particular hardship and inability to pay for their medical

21   benefits.  And it would be a plan with a summary plan

22   description, under ERISA, provided to people.  There would be

23   an application process and a specific application that would be

24   reviewed.  And then, as we've done in other cases, there would

25   be a determination by, initially, a board appointed by the 1114

38

1    committee and then approved by the 1114 committee, the

2    determination of that board about who would be awarded the

3    hardship fund.  The remainder is really for the benefit of the

4    retirees, to be distributed to retirees and their survivors or

5    to provide a partial subsidy toward a subsidized benefit

6    program that would be rolled out through a vendor which is put

7    in place with the intention that it would serve as the benefit

8    program eligible for the health coverage tax credit should

9    the -- a pension occurs that would make the retirees qualify

10   for that program.

11        And so the subsidy we actually permit to it being bid

12   from various vendors on such programs to put in place.  And

13   then, frankly, for the retirees in terms of the dollar amount,

14   the amount of money available from the federal government to

15   the health coverage tax credit really dwarfs the rest of these

16   economics.  And if we could put that program in place with the

17   ability to use that small amount money from Delphi to obtain a

18   robust benefit, that will provide a large amount of benefit to

19   a large number of retirees.

20        THE COURT:  So the bulk of the money is intended to

21   be seed money, in essence, for --

22        MR. GLOSTER:  That's correct.

23        THE COURT:  Okay.

24        MR. GLOSTER:  And it solves a practical problem,

25   which is vendors rolling out events that -- to retirees who

39

1    were under sixty-five --

2            THE COURT:  Right.

3            MR. GLOSTER:  -- are concerned about being able to

4    put a program in place that would actually be economic for them

5    and would be economic for the participants without a large

6    employer subsidy.

7            THE COURT:  Right.

8            MR. GLOSTER:  So there's at least some subsidy that

9    we can go to the vendors and say there is, as yet, not any kind

10   of certainty about timing or certainty of whether that health

11   care check -- that it will apply or when it will apply.  But in

12   the meantime, there is the subsidized benefit program so you,

13   Aetna or other vendors, can, in fact, bid on a request for

14   proposal, and it makes economic sense.

15           THE COURT:  Okay.  Will your group be in a position

16   to write a description of what you've just outlined to me that

17   could go out to the retirees?

18           MR. GLOSTER:  Absolutely and we would expect to do

19   that, Your Honor.

20           THE COURT:  Okay.  All right.  So they'll know what

21   the money is being used for and, as far as the hardship money,

22   how they would go about seeking that.

23           MR. GLOSTER:  Exactly.  And, Your Honor, with respect

24   to the hardship fund, we expect to put that together very

25   quickly and have kind of a rolling application process so that

40

1   our hope is that, by the end of April, we would have

2   applications delivered to the committee and would have the

3   ability to act very quickly on some of these hardship

4   situations, because we're talking about critical medical

5   benefits for a group of people on a limited income.

6           THE COURT:  Right.

7           MR. GLOSTER:  And some of the situations they face

8   are really quite --

9           THE COURT:  Pressing.

10          MR. GLOSTER:  Quite pressing.

11          THE COURT:  Okay.  Does anyone have anything more to

12  say on this motion?  All right.  I'll approve the motion.

13  First, it was obviously on short notice.  However, the

14  shortness of the notice was governed by the timing of the case,

15  including the rolling out of the debtors' termination of these

16  benefits, effective as of April 1, and also, of course, by the

17  litigation pending in the district court.  But I believe the

18  notice is adequate under the circumstances, including the fact

19  that any significant payment by the debtors is subject to

20  scrutiny and has been scrutinized by several of the parties who

21  were up here and speaking in connection with the Second

22  Amendment motion that I just heard.

23          The settlement is clearly reasonable from the

24  debtors' perspective in that it brings finality to this issue

25  to the debtors.  Normally, that's the only consideration that I

41

1    would make under the Second Circuit case law.  But given the

2    concern Congress expressed for retirees over their benefits, I

3    also want to note that I believe that the settlement reflects

4    the very sophisticated participation by the retirees' committee

5    and its counsel.  And so, while normally I would never do this

6    in connection with the settlement, again, since it's not my

7    function to approve the fairness of the settlement to the other

8    side, it appears to me, under all the circumstances, to be fair

9    to both sides in light of all the issues and the debtors'

10   condition and the issues raised by the retirees.

11          So I'll enter the order today.  I did add that one

12   paragraph just as a way to ensure in my mind that, just as

13   Mr. Gloster outlined, that these settlement proceeds will be

14   allocated fairly and -- I don't expect a lengthy report; just a

15   summary of what was implemented.

16          MR. CORNELL:  That's fine.  We would do that anyway,

17   the retirees.

18          THE COURT:  Fine.  Thank you.  Okay.  Anything else?

19          MR. BUTLER:  No.  That's it.  Thank you very much.

20          THE COURT:  Okay.

21          MR. BUTLER:  Appreciate it.

22          THE COURT:  Thank you.

23       (Proceedings concluded at 12:22 p.m.)

24

25

42

1

2                                I N D E X

3

4                            R U L I N G S

5   DESCRIPTION                                    PAGE      LINE

6   Second amendment approved, as modified          27         1

7   Motion for approval of debtors' compromise      40        12

8   and settlement with retirees' committee and

9   Delphi's Salaried Retirees Association

10  approved

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1

2                          C E R T I F I C A T I O N

3

4        I, Clara Rubin, certify that the foregoing transcript is a true

5        and accurate record of the proceedings.

6

7        _____

8        Clara Rubin

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date: April 2, 2009

16

17

18

19

20

21

22

23

24

25