**Hearing Date And Time: April 23, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: April 20, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

    In re                                    :        Chapter 11
                                             :
DELPHI CORPORATION, et al.,     :        Case No. 05-44481 (RDD)
                                           :
                    Debtors.      :        (Jointly Administered)
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

EXPEDITED MOTION FOR ORDER DIRECTING UNITED STATES TRUSTEE TO
(I) DISBAND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OR,
ALTERNATIVELY, (II) SUSPEND ACTIVITIES OF OFFICIAL COMMITTEE
<u>OF EQUITY SECURITY HOLDERS AND ITS PROFESSIONALS</u>

("EXPEDITED MOTION TO DISBAND OR SUSPEND EQUITY COMMITTEE")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for an order directing the Office of the United States Trustee (the "U.S. Trustee") to (a) disband the official committee of equity security holders appointed in these chapter 11 cases (the "Equity Committee") as of March 6, 2009 (the "Effective Date") or, alternatively, (b) suspend the activities of the Equity Committee and its counsel, Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"), its financial advisors, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), and its conflicts counsel, Farrell Fritz, P.C. ("Farrell Fritz," and together with Fried Frank and Houlihan Lokey, the "Professionals") as of the Effective Date, subject to reactivation upon application to this Court and notice to the U.S. Trustee.  In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the U.S. Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  As described in further detail herein, on April 28, 2006, the U.S. Trustee appointed the Equity Committee  On February 26, 2009, the U.S. Trustee appointed an official

2

committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

    3.  On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). This Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389). On January 25, 2008, this Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in

global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009 (Docket No. 16403).  The adjournment has facilitated the Debtors' conside ration of further supplemental plan modifications required by the current economic environment.

    4.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    5.  The statutory predicates for the relief requested herein are sections 105 and 1102 of the Bankruptcy Code and rules 2020 and 9014 of the Federal Rules of Bankruptcy Procedure.

B.  Current Business Operations Of The Debtors

    6.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from this Court.[2]

    7.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

    8. Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

    9. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion. Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

10.  The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.  In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.   The Debtors' Transformation Plan

12.  On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

6

their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM. The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan. After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    In connection with those discussions, on September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis. Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA"). On September 26, 2008, this Court

7

entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16. Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation. Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations. Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17. By transferring nearly $2 billion of hourly pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi made substantial progress towards achieving its pension funding strategy objectives for hourly employees. In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of their pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18. As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth in the Plan Modification Motion. Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global

8

economic downturn generally, and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization. Delphi, therefore, continues to engage in discussions with certain of its stakeholders to formulate further plan modifications. Moreover, as a result of the market turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders. Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an accommodation agreement which allows the Debtors, among other things, to continue using certain of the proceeds of the postpetition financing facility through June 30, 2009. In addition, to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate payment of certain payables to the Debtors.

    19.  At the same time, consistent with the plan modifications being negotiated, the Company has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. As part of the Debtors' efforts to achieve sufficient emergence capital funding, Delphi and GM are constructively working together to pull forward elements of GM's previously agreed-upon support for Delphi into one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites to GM. This arrangement is designed to facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global economy, the automotive industry, and the capital markets. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

9

<u>Relief Requested</u>

20.     Based on the current circumstances of these chapter 11 cases, the Debtors request entry of an order directing the U.S. Trustee to disband the Equity Committee as of the Effective Date or, alternatively, to suspend the activities of the Equity Committee and its Professionals as of the Effective Date, subject to reactivation upon application to this Court and notice to the U.S. Trustee.  The circumstances which existed in March 2006 that provided the basis for the appointment of the Equity Committee have changed dramatically since then. Because equity security holders will almost certainly receive no distributions in these chapter 11 cases, the costs to the Debtors' estates of continuing to maintain the Equity Committee can no longer be justified.

<u>Basis For Relief</u>

F.     <u>Appointment Of Equity Committee</u>

21.     On November 7, 2005, Appaloosa Management L.P. ("Appaloosa") sent a letter to the U.S. Trustee requesting that the U.S. Trustee appoint an official committee of equity security holders in these chapter 11 cases.  On December 12 and 19, 2005, the Creditors' Committee and the Debtors, respectively, each sent to the U.S. Trustee a letter opposing Appaloosa's request.

22.     Before receiving a response from the U.S. Trustee, on December 22, 2005 Appaloosa moved under section 1102(a)(2) of the Bankruptcy Code for an order directing the U.S. Trustee to appoint an equity committee in these chapter 11 cases (the "Appaloosa Motion") (Docket No. 1604).  The U.S. Trustee filed a response and subsequently an amended response opposing the Appaloosa Motion (Docket Nos. 1682 and 2636, respectively).  The agent for Delphi's prepetition lenders, the Creditors' Committee, and the Debtors also filed objections to the Motion (Docket Nos. 1693, 2634, and 2629, respectively), GM filed a response (Docket No.

10

1712), and Brandes Investment Partners, L.P. filed a statement in support of the Motion (Docket No. 2878).

23.     This Court conducted a hearing on the Motion on March 21 and 22, 2006 and issued a bench decision (the "2006 Decision") on March 22, 2006 directing the U.S. Trustee to appoint an equity committee. A transcript of the 2006 Decision (the "Transcript") is attached hereto as Exhibit A. On March 30, 2006, this Court issued an order directing the U.S. Trustee to appoint an equity committee (Docket No. 3024) (the "Equity Committee Appointment Order").[4]

G.    The 2006 Decision And Equity Committee Appointment Order Contemplated The Potential Need To Disband The Equity Committee In The Future

24.     In its 2006 Decision, this Court found that because these chapter 11 cases were still in their early stages, it was premature to rule out the possibility of a meaningful distribution to equity security holders. (See Transcript at 166-67, 175). In addition, this Court held that it was appropriate to appoint an equity committee so that equity security holders would be adequately represented in the Debtors' transformation process leading to the negotiation of a plan of reorganization. (See Transcript at 174). This Court cautioned, however, that if in the future it appeared unlikely that equity security holders would receive a distribution, it might be appropriate to disband the equity committee. (See Transcript at 175). Paragraph 7 of the Equity Committee Appointment Order provides:

> The Court will entertain a motion to disband the Equity Committee if subsequent circumstances or conduct of the Equity Committee or its professionals support the conclusion that the Debtor appears to be hopelessly insolvent or the Equity Committee has become dysfunctional, has directly or indirectly influenced the trading value of Delphi's securities for a tactical purpose or not for the benefit of all holders of Delphi's common stock, or has sought to gain undue leverage for itself.

Equity Committee Appointment Order at ¶ 7.

---

[4]    A copy of the Equity Committee Appointment Order is attached hereto as Exhibit B.

11

25. On April 28, 2006, in accordance with the Equity Committee Appointment Order, the U.S. Trustee appointed the Equity Committee. The U.S. Trustee subsequently amended the composition of the Equity Committee on May 11, 2006. By June 2007, the Equity Committee's only institutional members, D.C. Capital Partners, L.P. and Pardus European Special Opportunities Master Fund, L.P., had withdrawn from the Equity Committee.[5]

H.  The Debtors' Anticipated Total Enterprise Value Has Declined Significantly, Eliminating The Likelihood Of Any Distributions To Equity Security Holders

26. Much has changed in the three years since this Court issued its 2006 Decision. The Debtors have worked tirelessly to effectuate their transformation plan, and, as described above, achieved confirmation of the Confirmed Plan.

27. When this Court entered the Confirmation Order, the total business enterprise value associated with the Confirmed Plan was $12.8 billion based upon an agreed negotiated value with the Debtors' principal stakeholders. After the closing on Delphi's Confirmed Plan was suspended on April 4, 2008, Delphi undertook to reaffirm the business plan embodied in the Confirmed Plan. This reaffirmed business plan for 2008-2011 (the "RPOR") was attached to the Modified Disclosure Statement filed on October 3, 2008 as part of the Plan Modification Motion. The mid-point of the total enterprise business valuation associated with the RPOR was $7.2 billion. Because of that reduced valuation, the revised proposed distributions to creditors and equity security holders in the modified plan filed on October 3, 2008 were materially less than under the Confirmed Plan.

28. After the Debtors developed and filed the RPOR, however, the global automotive industry took a dramatic turn for the worse. During the fourth quarter of 2008 and

---

[5] The Equity Committee is now comprised of four individual investors, Luqman Yacub, James E. Bishop, Sr., and James H. Kelly, and James N. Koury, as trustee of the Koury Family Trust.

12

the first quarter of 2009, domestic and global vehicle sales and production plummeted dramatically to lows not seen in decades.  Additionally, the global credit and capital markets remain frozen, which has had a significant negative impact on the Debtors' businesses as well as those of other automotive suppliers and OEMs.   The severity of these economic crises has led governments around the world, including the United States, to take protective actions aimed at avoiding the financial collapse of key participants in the global automotive industry.

29. Facing these significant economic challenges, the Debtors are negotiating with their stakeholders which have a continuing economic interest in the Debtors' reorganization cases to formulate further plan modifications.  In connection with those discussions, the Debtors are making further revisions to their business plan consistent with the recent North American vehicle production volume declines, the global slowdown in vehicle sales, and the ongoing economic recession.  Although no formal revised business plan has been completed, it is anticipated that the total business enterprise value associated with the revised plan will be substantially below the valuation range contained in the Plan Modification Motion and may be equivalent to, or even less than, the amount of the Debtors' postpetition obligations, including the DIP credit facility.[6]

30. Based upon the circumstances of these chapter 11 cases as described above, it is now clear that there is no substantial likelihood of a meaningful distribution to the Debtors' equity security holders.  Thus, the rationale which formed the basis for the appointment of the Equity Committee, as articulated by this Court in its 2006 Decision, is no longer operative. See Transcript at 166.

---

[6] As of the date hereof, Tranches A and B of the Debtors' DIP credit facility are trading at 78.5% of the face amount of such debt and Tranche C of the DIP credit facility is trading at approximately 14.8% of the face amount.  In addition, trading activity in the Debtors' prepetition bonds is currently sporadic, with asking prices ranging from one to three percent of the face amount of such bonds and some recent trades taking place at a price lower than one percent of the face amount.

05-44481-rdd    Doc 16558    Filed 04/13/09    Entered 04/13/09 22:28:27    Main Document
Pg 14 of 20

31. Finally, the Debtors are also concerned about the ongoing cost to their estates of the Equity Committee. The four professional firms[7] that have been retained to represent the Equity Committee over the course of these chapter 11 cases have collectively accrued more than $19 million of fees and expenses, including both fees and expenses that have been awarded by Court order through September 30, 2007 and amounts subsequently billed through February 2009. Any further costs of the Equity Committee are no longer justifiable.

I. The Debtors and Creditors' Committee Have Attempted To Achieve A Consensual Suspension Of The Equity Committee

32. Recognizing these changed circumstances, on February 26, 2009, the Creditors' Committee sent a letter to the U.S. Trustee requesting that she disband the Equity Committee in light of the Debtors' financial state and future financial outlook.[8] The following day, the Debtors advised the U.S. Trustee in writing that they concurred with the Creditors' Committee's request to disband the Equity Committee.[9]

33. On March 5, 2009, the Equity Committee, through its counsel Fried Frank, sent a letter to the U.S. Trustee suggesting, as an alternative to disbanding the committee, that the committee be left in place to monitor and participate in these chapter 11 cases, but that all efforts and activities of the Professionals be suspended as of the close of business on March 6, 2009.[10]

34. The Creditors' Committee informed the U.S. Trustee by letter on March 6, 2009 that it accepted the Equity Committee's proposal.[11] On March 13, 2009, the Debtors

---

[7] In addition to Fried Frank, Houlihan Lokey, and Farrell Fritz, the Equity Committee was represented by Gregory P. Joseph Law Offices LLC as conflicts counsel from November 9, 2007 to August 5, 2008.

[8] A copy of the Creditors' Committee's letter of February 26, 2009 is attached hereto as Exhibit C.

[9] A copy of the Debtors' letter of February 27, 2009 is attached hereto as Exhibit D.

[10] A copy of the Equity Committee's letter of March 5, 2009 is attached hereto as Exhibit E.

[11] A copy of the Creditors' Committee's letter of March 6, 2009 is attached hereto as Exhibit F.

14

reiterated to the U.S. Trustee their previously communicated position that there was no reason not to disband the Equity Committee, given the absence of any circumstances being considered by Delphi, the lenders to its DIP credit facility, the Creditors' Committee, or GM under which any distribution would be made to equity security holders. The Debtors also questioned the efficacy of the Equity Committee's proposal for a statutory committee unrepresented by advisors.[12] By letter dated March 18, 2009, the U.S. Trustee declined to disband the Equity Committee.[13]

        35.    On April 5, 2009, Mr. Luqman Yacub, writing on behalf of the Equity Committee, sent to the U.S. Trustee a letter (a) acknowledging a telephone conference call between the members of the Equity Committee and the U.S Trustee on April 3, 2009 (the "April 3 Conference Call")[14] during which the U.S. Trustee had apparently indicated that it would not seek disbandment of the Equity Committee and that the Equity Committee needed to have counsel in place to function effectively, (b) stating that the Equity Committee believed it should continue to function with the benefit of counsel, (c) withdrawing its previous voluntary suspension of Fried Frank, and (d) confirming that the suspension of the efforts and activities of Houlihan Lokey and Farrell Fritz would remain effective.[15] On April 7, 2009, in a letter to Fried Frank, the U.S. Trustee clarified two points that it had conveyed to the Equity Committee during the April 3 Conference Call.[16] First, the U.S. Trustee stated that if the Equity Committee entered into a stipulation agreeing to be relieved of its fiduciary duty to the equity security holders, the

---

[12]    A copy of the Debtors' letter of March 13, 2009 is attached hereto as <u>Exhibit G</u>.

[13]    A copy of the U.S. Trustee's letter of March 18, 2009 is attached hereto as <u>Exhibit H</u>.

[14]    According to that letter, Fried Frank did not participate in the April 3 Conference Call.

[15]    A copy of the Equity Committee's letter of April 5, 2009 is attached hereto as <u>Exhibit I</u>.

[16]    A copy of the U.S. Trustee's letter of April 7, 2009 is attached hereto as <u>Exhibit J</u>.

U.S. Trustee would be compelled to disband the Equity Committee. Second, the U.S. Trustee advised the members of the Equity Committee that the Debtors had communicated their belief that the Equity Committee must be represented by counsel in these chapter 11 cases but that the U.S. Trustee has not taken a position on whether the Equity Committee may continue in existence without representation of counsel.[17]

36.     The parties' efforts to resolve these conflicting viewpoints through a consensual stipulation have failed. Thus, the Debtors are obliged to bring this Motion seeking an order to disband or suspend the activities of the Equity Committee and its Professionals.

## Applicable Authority

37.     Where, as here, a U.S. Trustee does not agree to an interested party's request to disband an equity committee or other "additional" committee, the interested party may apply to the court for that relief. In re Texaco, Inc., 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987). Unlike the appointment of an unsecured creditors' committee, which is mandatory under section 1102(a)(1) of the Bankruptcy Code if there are creditors willing to serve, the U.S. Trustee's appointment of an equity committee or other statutory committee is not required but may be made by the U.S. Trustee as a matter of administrative discretion, based upon existing conditions at the time of appointment. Id. As section 1102(a)(2) of the Bankruptcy Code provides:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

11 U.S.C. § 1102(a)(2). Appointment of an equity committee should be the "the rare exception." In re Williams Commc'ns Group, Inc., 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002).

---

[17]   The fact that the Equity Committee, with no advisors present, apparently misconstrued the U.S. Trustee's statements during the April 3 Conference Call underscores the Debtors' concern that a statutory committee cannot function effectively without professional guidance.

16

38.     Consistent with paragraph 7 of the Equity Committee Appointment Order, this Court should direct the U.S. Trustee to disband the Equity Committee, or, alternatively, suspend the activities of the Equity Committee and its Professionals. Cf. Bodenstein v. Lentz (In re Mercury Finance Co.), 240 B.R. 270 (N.D. Ill. 1999) (affirming bankruptcy court order directing U.S. Trustee to disband official committee consisting, in part, of equity security holders); Texaco, 79 B.R. at 567 (original conditions justifying separate committee of industry unsecured creditors changed since commencement of cases, thereby eliminating need for separate committee); In re Sharon Steel Corp., 100 B.R. 767 (Bankr. W.D. Pa. 1989) (vacating U.S. Trustee's appointment of interim committee of debenture holders).

39.     Because there are currently no circumstances being considered by the Debtors, the lenders to the DIP credit facility, the Creditors' Committee, or GM under which any distributions would be made to equity security holders, the Equity Committee should either be disbanded or the activities of it and its Professionals suspended. The improbability of a recovery for equity security holders is a major factor when considering the costs of maintaining an equity committee. Under such circumstances, an equity committee is not generally warranted "because neither the debtors nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift." Williams Commc'ns, 281 B.R. at 220 (quoting In re Emons Indus., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985)).

40.     No formal valuation is required to determine whether there is not a substantial likelihood that the equity security holders will receive a meaningful distribution in the case under a strict application of the absolute priority rule. A summary proceeding on the likelihood of a meaningful distribution is sufficient. See, e.g., Williams Commc'ns, 281 B.R. at 221 (holding that valuation is not necessary to determine whether equity committee should be

17

appointed); In re Nw. Corp., 2004 WL 1077913 at *2 (Bankr. D. Del. May 13, 2004) (evidentiary hearing on valuation of debtor's assets not appropriate in determining whether to appoint equity committee). In Williams Commc'ns, the court reached a "practical conclusion, based on a confluence of factors, that the Debtors appear to be hopelessly insolvent," including, among other things, an insolvent balance sheet, the steeply discounted trading value of the debtors' bonds, and the absence of cash distribution under a proposed plan of reorganization. Williams Commc'ns, 281 B.R. at 221 (emphasis in original). Just as a summary proceeding is sufficient to determine whether to appoint an equity committee, a summary proceeding should be sufficient to determine whether to disband an equity committee.

41.    In these chapter 11 cases, the conditions which justified the appointment of the Equity Committee three years ago when this Court issued its 2006 Decision have changed considerably. This Court should reach the practical conclusion that the likelihood of distributions to equity security holders now is remote because, as described above, it is anticipated that the total business enterprise value associated with any revised plan will be substantially below the valuation range contained in the Plan Modification Motion and may be equivalent to, or even less than, the amount of the Debtors' postpetition obligations, including the DIP credit facility. As noted above, the Debtors' postpetition and prepetition debt is currently trading at a steep discount.

42.    In addition, the equity security holders can adequately represent their interests in these chapter 11 cases in the absence of an official committee. Section 1109(b) of the Bankruptcy Code allows an equity security holder to raise and be heard on any issue in these cases. Williams Commc'ns, 281 B.R. at 223; In re Leap Wireless Int'l, Inc., 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003). Should such equity security holders' efforts result in a substantial

18

contribution to the Debtors' estates, they may be reimbursed pursuant to section 503(b)(3)(D) of the Bankruptcy Code.  Williams Commc'ns, 281 B.R. at 223; Leap Wireless Int'l, 295 B.R. at 140.  Accordingly, this Court should enter an order directing the U.S. Trustee to disband the Equity Committee as of the Effective Date, or, alternatively, suspend the activities of the Equity Committee and its Professionals as of the Effective Date, subject to further application to this Court upon notice to the U.S. Trustee.

Notice Of Motion

43. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  Furthermore, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[18]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[18] The Debtors have noticed this Motion for hearing on April 23, 2009.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Creditors' Committee has consented to this Motion's being heard on April 23, 2009.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until April 20, 2009 to file an objection to this Motion.

19

WHEREFORE the Debtors respectfully request that this Court (a) enter an order directing the U.S. Trustee to disband the Equity Committee as of the Effective Date, or, alternatively, to suspend the activities of the Equity Committee and its Professionals as of the Effective Date, subject to further application to this Court upon notice to the U.S. Trustee and (b) grant them such other and further relief as is just.

Dated:   New York, New York
         April 13, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      John K. Lyons
      Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti
      Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession