Court Decision                                    171

1        That's particularly the case here where there truly

2   are extremely difficult negotiations that the debtors must go

3   through.  And I believe that it is important for the debtors

4   to be fortified in those negotiations by the views of key

5   constituencies.  I believe that has occurred with regard to

6   the Creditors' Committee, as is reflected, I believe, by the

7   constructive relationship between the Creditors' Committee

8   and the debtors that I've viewed in this case.  I say

9   "constructive," rather than "hand-in-glove" because it is very

10  clear to me that the Creditors' Committee is nobody's patsy

11  by any means and makes its views known to the debtor very

12  clearly and forcefully, even if those views are unwelcome.

13       It's not particularly clear to me that that same

14  voice has been expressed by the shareholders.  Partly, that

15  is the fault of the shareholders, at least the sophisticated

16  ones.  For example, I am shocked that Appaloosa made this

17  motion and sent the threatening letter to the board that it

18  sent asserting the allegations that it made without once

19  communicating with the debtor.  And I'll return to that

20  later.

21       But Appaloosa, as Mr. Lauria stated, should not

22  really be the focus of a motion to appoint an official equity

23  committee, although Appaloosa's problems may be the focus of

24  who the U.S. Trustee appoints to a committee.

25            Now Appaloosa also alleges that there are actual

Court Decision                                    172

1    conflicts over and above the debtor's tendency in a very

2    large and difficult case not to reach out to a constituency

3    that has not reached out to it.  Again, I have a hard time

4    seeing that.  I certainly do not see a level of actual

5    conflict at the level alleged by Appaloosa in what I again

6    believe was irresponsibly loose language.

7            There are really two bases for Appaloosa's

8    allegation.

9            The first is that because at the start of these

10   cases the debtors proposed what I feel free in calling a

11   generous KECP package that included an allocation of post-

12   reorganization equity to post-reorganization management,the

13   debtors' management--and to the extent the board approved the

14   KECP, the board--believes that management's interests are

15   different than shareholder interests.  I note, however, and

16   this, frankly, was obvious to Appaloosa, or at least should

17   have been, that that motion has been repeatedly adjourned and

18   tabled pending further negotiations with the creditors

19   committee, which as I said is nobody's patsy, and secondly,

20   is subject ultimately to my approval.

21           I also note that, traditionally, provisions for

22   allocation of post-reorganization equity for management are

23   dealt with in a plan that is voted upon by those entitled to

24   vote, and, generally, that is done because those entitled to

25   vote then see how they're being diluted.  Generally,

Court Decision                                                     173

1   notwithstanding some cases where shareholders recover

2   something in respect of their old equity, the major issuance

3   of post-reorganization equity in chapter 11 cases goes to the

4   creditors, and they are the ones who are usually most diluted

5   by such management incentive plans in respect of post-

6   reorganization equity.  In other words, I believe Appaloosa's

7   argument on this point is miscast and at best irrelevant and

8   I believe, again, almost willfully so.

9           Secondly, Appaloosa argues that the debtors' very

10  opposition to this motion shows that the debtors' management

11  and board have an actual conflict in representing the

12  interests of the shareholders, primarily because the debtors

13  have stated that for purposes of this motion, at this time,

14  they are clearly or hopelessly insolvent.  The debtors'

15  objection to the motion, to the contrary, is clearly in good

16  faith.  As Mr. Sheehan and Mr. Resnick testifed, the

17  debtors' goal is to maximize value for all constituencies.  I

18  might understand why an unsophisticated shareholder who did

19  not understand the limited issues and inquiries relevant to a

20  motion under section 1102(a)(2) might make the argument, but,

21  knowing Appaloosa's sophistication, I find this "actual

22  conflict" argument to be rhetoric.

23          As to the timing factor, because of the very serious

24  issues that the debtors are dealing with in these cases,

25  going to the heart of their business, this is to me obviously

Court Decision                              174

1   not a simple balance sheet restructuring where the capital

2   structure simply needs to be adjusted because there's too

3   much funded debt on the books.

4        There are serious -- to use the debtors' phrase

5   "transformational issues" that have to be resolved here.

6   Because of that, I believe that this is the appropriate time

7   to move for an equity committee, and not to wait until later

8   in the day when a plan is actually being negotiated.

9        I also believe as a corollary to that, the function

10  of the equity committee and the makeup of its professional

11  advisors should be reflected by this timing.  As I'll say

12  later, again, I think this leads to the conclusion that

13  although it's not before me, except in my need to weigh the

14  cost of an equity committee's appointment, that it's unlikely

15  that I would approve the retention of investment bankers and

16  accountants or even actuaries at this time for an equity

17  committee, since those functions are not really the functions

18  that need to be performed at this time by an equity

19  committee.

20       So that in contrast, while in the <u>Loral</u> case I

21  believe that it was incumbent to have an equity committee, if

22  at all, towards the end of the case, here, I believe if it is

23  incumbent on there being an equity committee, this is the

24  time to have one formed.

25       It is even conceivable to me that if I did form an

Court Decision                                                           175

1   equity committee now and it turned out that ultimately I

2   approved interim transformational solutions --

3   transformational solutions to the labor and related pension

4   and GM problems that the debtors face--it might be

5   appropriate to disband the equity committee because, in light

6   of those solutions, it might appear clearly at that time that

7   the debtor was hopelessly insolvent or at least that it was

8   likely that there would be no distribution to shareholders.

9          But because of the importance of those pending

10  issues, one could at least see a rationale for having an

11  equity committee with counsel in the near future to deal at

12  least with those transformational issues on behalf of the

13  shareholders.

14         Now, as far as whether the debtor is insolvent or

15  hopelessly insolvent or there is a likelihood of a meaningful

16  distribution to shareholders, I am at this time on this

17  record frankly skeptical that there will be a meaningful

18  distribution, but I'm not prepared to rule it out.  I say

19  that for a number of reasons.

20         First of all, it's undisputed that on a balance-

21  sheet basis, and it is correct that the movants' experts did

22  not disagree that on a balance sheet basis, the debtors'

23  operating -- most recent operating numbers comply with GAAP,

24  there is roughly a 6.3-billion-dollar hole, or insolvency.

25         The question, obviously, is how does one fill that

Court Decision                                                    176

1   hole or bridge that gap?

2        Although Appaloosa's experts made some effort to do

3   it on the asset side, my review of their analysis is that

4   they have not in any meaningful respect convinced me on the

5   asset side of the balance sheet or in their going-concern

6   value, their enterprise value before deductions, that they

7   have -- they have established a credible case to do so.

8        When you really boil it down, giving the benefit of

9   the doubt to why and how the admitted one-billion-two-dollar

10  -- two-hundred-million-dollar error was corrected by Eureka,

11  what Eureka did was essentially look at the debtors' 2005

12  actual performance and annualize the debtors' actual

13  performance for the first 115 days of 2006 for an EBITDA

14  figure that they then multiplied by two different multiples.

15       I believe Mr. Sheehan's testimony as to why,

16  particularly in respect of the annualization of the first

17  quarter of 2006, Eureka's process was materially if not

18  perhaps fatally flawed, in respect of the Eureka expert's

19  analysis of why the debtors did better in the first quarter

20  of 2006 and what the debtors' properly projected earnings

21  should be.

22       Clearly, to me, Mr. Sheehan's explanation of the

23  debtors' analysis of their projected business with GM and the

24  reason for the potential front-loading of income in 2006 was

25  credible and accounted for the difference between the

Court Decision                                                    177

1   bcttoms-up projections that the debtors did and the

2   effectively back-of-the-envelope calculation that Eureka did

3   in respect of EBITDA, and I say "back of the envelope"

4   because,  frankly, given the billion-two error on its March

5   10th report, that's all Eureka was really left with: applying

6   a multiple to 2005 and the first quarter actual numbers of

7   2006 without proper analysis of why those figures can be

8   relied upon as the basis for projected EBITDA.

9           I do recognize, however, that Mr. Sheehan

10  acknowledged that it is possible that the debtor's balance-

11  sheet numbers on the asset side might be higher.  It's my

12  experience, and I think most people's experience who've dealt

13  with Chapter 11 debtors for a lengthy period, that that's

14  hardly ever the case.  Almost invariably, the balance sheet

15  overstates the assets, but that's Mr. Sheehan's belief, and

16  he has clearly been through an intensive analysis of the

17  business on a bottoms-up basis and I accept his statement.

18          Now, on the balance sheet liability side, which is

19  most -- where most of the dispute arises, I've considered the

20  testimony of Messrs. Reese and Williams.  And, frankly, I

21  believe that it's very hard on the record to find any exact

22  number as far as what would be the appropriate net savings in

23  respect of OPEB liabilities after the debtors resolve their

24  transformational issues.

25          Clearly, Appaloosa's argument that the OPEB

1   liabilities go away because the collective bargaining

2   agreements go away in 2007 is -- well, it's almost laughable.

3   The unions aren't going away, and the employees aren't going

4   away without being paid for giving up those rights or having

5   them reinstated in some form.

6           So all the parties recognize that there is a price

7   to resolve those liabilities, including Appaloosa.  The issue

8   is how much of a price has to be paid and how much of a

9   savings can the debtors generate.  I find it hard to believe

10  that despite all of their efforts and all of an equity

11  committee's efforts, there will be a material recovery for

12  shareholders in light of those OPEB negotiations, but the

13  company doesn't preclude it as a possibility.  There are

14  scenarios in which it could occur.  That's agreed to by both

15  sides in this proceeding.

16          And, therefore, while Eureka's March 10th report, as

17  corrected for the billion-two error, still shows on even the

18  most optimistic basis a two-hundred-and-thirty-four-million-

19  dollar insolvency hole, given the huge amounts at stake here

20  in respect of the labor negotiations--and we're talking about

21  potential savings of billions of dollars, I know it's hard to

22  believe it, but $234 million may not be that big of a gap, at

23  least on today's record.

24          I also looked, of course, as Judge Lifland did and

25  Judge Hillman did and other courts have done in connection

Court Decision                                              179

1  with motions under 1102(a)(2), at the trading prices of the

2  debtors' securities when evaluating the debtors' solvency.

3         It's common knowledge that the market in distressed

4  debt and to some extent distressed stock, but more -- more

5  the case of distressed debt, is large, indeed, huge, and

6  active, particularly with respect to public companies such as

7  Delphi.  That is reflected among other things by the numerous

8  Wall Street analysts' reports covering the debt introduced

9  here.

10        There's uncontroverted evidence that Delphi's public

11  debt has consistently traded since the petition date at or

12  below sixty cents on the dollar.  The courts at times have,

13  although not accepting as controlling the trading prices of

14  debt securities, consistently looked at trading prices in the

15  debtors' securities as a indication in this type of summary

16  proceeding of value.

17        Courts obviously know, at least this Court knows,

18  that people engage in a market because they're making various

19  bets on the value of securities.  Some are betting that it's

20  a good idea to sell, and some are betting it's a good idea to

21  buy.  Generally, it's an active market; and, generally,

22  active markets are a good indication of value because there

23  are both buyers and sellers at reasonably arm's length

24  bargaining positions.

25        However, of course, those markets are not guarantees

05-44481-rdd   Doc 16558-2   Filed 04/13/09   Entered 04/13/09 22:28:27   Exhibit A
- Part 2   Pg 10 of 17

Court Decision                                    180

1   of value.  That's why some analysts get fired and some get

2   promoted.  Market security trading price indicators are most

3   telling where they're quite low, where they're in my

4   experience below or well below fifty cents on the dollar,

5   particularly in respect of cases that are in all likelihood

6   going to be resolved one way or another in a fairly short

7   term, and, in the life of a chapter 11 case of a large

8   company, fairly short term is around a year.

9          It's clear to me and it's been clear from the start

10  of these cases that although the debtors are pushing these

11  cases, appropriately so, as fast as they can, this is a

12  longer term process.  They project emergence from bankruptcy

13  in 2007, although they are doing everything they can to

14  emerge sooner than that.

15         Given that, I am not particularly moved either way

16  by the trading ratios or prices.  Mr. Lauria is correct that

17  anyone buying distressed debt is looking for a large return

18  to make up for the risk, particularly where the debt is

19  unsecured, and so it's conceivable that a sixty-percent-on-

20  the-dollar level, while obviously not suggesting solvency,

21  may indicate at least a hope of solvency.

22         This is, for example, different than the trading

23  levels in Loral, which were considerably lower, or in

24  Williams, which were at 15% to 6% of face value.

25         So, all things considered, in respect of the

Court Decision                                                          181

1    solvency analysis, at this point in the case, I cannot find

2    that appointing an equity committee would be a gift.  On the

3    other hand, I am very mindful of the cost to these estates of

4    an equity committee.

5         Some cost clearly is legitimate.  The whole reason

6    you have an equity committee is that the estate bears the

7    cost.  On the other hand, the way that this litigation has

8    been conducted, I mean this litigation in front of me right

9    now, by Appaloosa, gives me very serious pause as to whether

10   the cost ultimately will be appropriate in this case.

11        Now, Appaloosa says I can regulate that by looking

12   at fee applications and the like, but, to some extent, once

13   an equity committee is appointed the cat is out of the bag,

14   and so I have thought very long and hard about whether the

15   cost factor here should lead me not to appoint a committee.

16        I can say this, that I will look very carefully at

17   fee applications of any counsel that is chosen to represent a

18   committee.  I also will look very carefully at whether the

19   continued incurrence of fees is appropriate at various stages

20   in the case where the picture on valuation becomes clearer.

21        But, ultimately, standing alone, as I do believe

22   that I can perhaps with the help of the United States Trustee

23   control costs, the costs alone are not in my mind

24   dispositive, although they are a major factor here calling --

25   arguing that I should not appoint a committee.

Court Decision                                    182

1        The last point which is raised by some courts, it's

2   specifically raised by Judge Case in the <u>Northwestern</u>

3   opinion, is that at least Appaloosa went into this bankruptcy

4   case with its eyes wide open.  Judge Case thought that was a

5   clear factor calling for denial of the motion.  And of course

6   the ability of certain shareholders to fund their own

7   professionals also is clearly a factor arguing against a

8   committee.  See <u>Williams</u>, 281 B.R. at 223.

9        If this were a relatively small pool of

10  shareholders, I would -- I would obviously do the same.  I

11  don't think the fact that Brandes has joined in the motion

12  particularly helps Appaloosa's cause, because Brandes is

13  obviously very well-heeled, very sophisticated and is well

14  represented by another large national firm with a bankruptcy

15  practice.

16       However, I go back to the first point I made.  There

17  are over 300,000 shareholders here.  Given the rapid change

18  in their fortunes from June of 2005 to today, it's fair for

19  me, I think, to assume that some of them may be in the

20  investor equivalent of a state of shock or disbelief and that

21  that's why they're not showing up here today.

22       It seems to me, again, that given the important

23  transformative events that will be taking place in this

24  company through this bankruptcy case over the next few

25  months, it's important to give those people representation,

Court Decision                                          183

1   and if a committee is formed that adequately represents them,

2   then I think that they're entitled to it within the

3   parameters that I've already described.

4           Now, in discussing or mentioning the abrupt changes

5   that have taken place in the fortunes of this company, I do

6   not want to suggest, as Appaloosa, I think, has, that the

7   company has done something over the last several months

8   between June of 2005 and today or even between June of 2005

9   and October when it filed for bankruptcy that is somehow

10  nefarious or improper in respect of its business or its

11  shareholders.

12          I think it's irresponsible to suggest that.

13  Clearly, this company has extremely difficult problems to

14  resolve.  To suggest that it should have spent all of its

15  cash on hand before filing to resolve those problems, to

16  suggest that it should continue with the steady-state

17  projections, which even Appaloosa recognized would lead to

18  the destruction of the debtors' business is absurd and was

19  truly a waste of this Court's time, and, frankly, for those

20  who are not particularly sophisticated and read such

21  allegations in the press, again, Appaloosa's argument or

22  insinuation in this regard was a truly irresponsible attack

23  on the company.

24          So I will order the appointment of an official

25  equity committee.  I'm going to be very clear as to the -- my

Court Decision                                     184

1   expectation as to at least the -- my initial reaction to a

2   request by that committee for retention of professionals.

3          I do not believe that the proper functioning of a

4   committee of equityholders at this time calls for the

5   appointment and retention of investment bankers, accountants

6   or actuaries, and a premise -- a fundamental premise of my

7   ruling is that I would not appoint such parties,

8   professionals at this time.

9          What an equity committee needs to do is to

10  understand through its own members' expertise, and I trust

11  that there will be sophisticated parties like Brandes on the

12  committee, and through the assistance of its counsel, the

13  pressing issues of this case in respect of labor, pension,

14  other benefits and GM.

15         It needs to be informed, it needs to give the debtor

16  its views so that they can be taken into account as the

17  debtor proceeds.

18         To the extent that it feels it needs to do due

19  diligence on actuarial assumptions, I believe an appropriate

20  arrangement can be worked out with regard to using the

21  creditors committee's actuaries.

22         I do not expect an equity committee or its

23  professionals to try to inject themselves into the extremely

24  sensitive negotiations that are ongoing between the debtors,

25  the unions, GM and other parties in the labor transformation

05-44481-rdd   Doc 16558-2   Filed 04/13/09   Entered 04/13/09 22:28:27   Exhibit A
- Part 2   Pg 15 of 17

Court Decision                                              185

1   issue process.

2            They should be able, however, again, to communicate

3   their views to the debtor and be able to be reasonably

4   informed as to the process so that they can make a

5   determination as to whether to oppose or support it whenever

6   an agreement is brought to the Court.

7            It's very clear that one function of a committee may

8   require the committee at times to take an adversarial role in

9   a case.  However, I believe that consistent with all the case

10  law that I've just cited, it is not proper for an equity

11  committee to view its job as one to create leverage by being

12  a thorn in everyone's side.

13           If the equity committee is not engaged in a two-way

14  dialogue with the debtor, I will believe, and I will act on a

15  motion that contends that, the committee is dysfunctional and

16  disband it.

17           I will also look very closely, and I know that the

18  United States Trustee will look very closely, at any

19  suggestion that the equity committee is taking action in

20  court or otherwise not to maximize recoveries for all

21  committee constituents, but instead to artificially pump up

22  the value of the current stock on a trading basis.

23           I am very concerned about the potential that that

24  has already happened in this case--not by an official

25  committee and obviously not by an equity committee, because

Court Decision                                              186

1   one has not been appointed, but by parties involved in this

2   litigation, and I will look at the facts closely, and I've

3   already looked closely at the facts of the apparent release

4   of confidential information.

5        And, having looked at those facts, I continue to

6   have serious questions about that apparent release, and if,

7   in fact, Appaloosa applies to be a member of this committee,

8   I direct the U.S. Trustee to investigate those facts.

9        In short, the equity committee needs to be

10  responsible in looking after the interests of the equity-

11  holders as a group, and I trust it will do so.

12       So, Mr. Lauria, you can submit an order to that

13  effect.

14       COUNSEL:  Thank you, Your Honor.  Thank you, Your

15  Honor.

16       THE COURT:  Thank you.

17     (Proceedings concluded at 7:17 p.m.)

18                      CERTIFICATION

19       We certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter to the best of our

22  knowledge and ability, except where, as indicated, the Court

23  has modified its bench ruling.

24  _____            March 23, 2006
    Coleen Rand
25  Certified Court Transcriptionist/Agency Director
    Rand Transcript Service, Inc.

Court Decision                                    187

| | |
|---|---|
| 1 | _____    March 23, 2006 |
| | Jennifer Linnartz |
| 2 | Certified Court Transcriptionist |
| | For Rand Transcript Service, Inc. |
| 3 | |
| | _____    March 23, 2006 |
| 4 | Cathryn Lynch |
| | Certified Court Transcriptionist |
| 5 | For Rand Transcript Service, Inc. |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |