1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Lead Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          April 23, 2009

          10:33 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Motion for Orders Approving Bidding Procedures;

3    Approving Form and Manner of Sale Notices; and Setting Sale

4    Hearing Date on the Sale of Debtors' Assets Comprising Debtors'

5    Brakes and Ride Dynamics Business

6

7    HEARING re Motion to Compel the Payment of Administrative

8    Expense Claim Pursuant to 11 U.S.C. Section 503(b)(1)(A)

9

10   HEARING re Motion to Disband Committee or suspend Equity

11   Committee

12

13   HEARING re Proposed Forty-Second Omnibus Hearing Agenda

14

15   HEARING re Debtors' Reply in Support of Expedited Motion to

16   Disband or Suspend Equity Committee

17

18   HEARING re Debtors' Reply in Support of Brakes and Ride

19   Dynamics Business Sale Motion

20

21   HEARING re Notice of Hearing

22

23

24

25   Transcribed by:  Sharona Shapiro

3

1

2    A P P E A R A N C E S :

3    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         333 West Wacker Drive

6         Chicago, Illinois 60606

7

8    BY:   JOHN WM. BUTLER, ESQ.

9          RON MEISLER, ESQ.

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12        Attorneys for Debtors

13        4 Times Square

14        New York, New York 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

19        Attorneys for Equity Committee

20        One New York Plaza

21        New York, NY 10004

22

23   BY:   BONNIE STEINGART, ESQ.

24

25

4

1

2    A P P E A R A N C E S : (continued)

3    KELLEY DRYE & WARREN LLP

4          Attorneys for PBGC

5          101 Park Avenue

6          New York, NY 10178

7

8    BY:    CRAIG A. WOLFE, ESQ.

9

10   DAVIS POLK & WARDWELL

11         Attorneys for JPMorgan Chase Bank, N.A. as DIP Agent

12         450 Lexington Avenue

13         New York, NY 10017

14

15   BY:    BRIAN M. RESNICK, ESQ.

16

17   VINSON & ELKINS LLP

18         Attorneys for Beijing West Industries

19         666 Fifth Avenue

20         New York, NY 10103

21

22   BY:    STEVEN M. ABRAMOWITZ, ESQ.

23         WILLIAM L. WALLANDER, ESQ.

24

25

5

1    A P P E A R A N C E S : (continued)

2    U.S. DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        21st Floor

6        New York, NY 10004

7

8    BY:   TRACY HOPE DAVIS, ESQ.

9        BRIAN S. MASUMOTO, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1               P R O C E E D I N G S

2          THE COURT:  Delphi Corporation.

3          MR. BUTLER:  Your Honor, Jack Butler, Kayalyn

4    Marafioti and Ron Meisler here today on behalf of Delphi

5    Corporation for its forty-second omnibus hearing.  We've filed,

6    as is customary, an agenda in the case for this hearing on the

7    docket at docket number 16570 and would ask to proceed in that

8    order.

9          THE COURT:  Okay.  That's fine.

10         MR. BUTLER:  Your Honor, we have a number of motions

11   that were scheduled today that have been adjourned to later

12   dates.

13         Matters 1 and 2, the steering option exercise motion

14   at docket number 16410 and the GM arrangement fourth and fifth

15   amendment approval motion at docket number 16411, have already

16   been adjourned at a chambers conference earlier this week to

17   May 7, 2009.

18         And we have two creditor motions that have also been

19   adjourned.  The first of these is the motion of CXX Transport,

20   Inc. to compel the payment of an administrative expense claim

21   at docket number 16548.  This deals with about 97 freight

22   invoices, about 260,000 dollars in dispute.  This is a pure

23   trade claims reconciliation in the case, Your Honor.  It's the

24   debtors' view, and we believe the facts are, that we've paid

25   all the invoices that have been submitted to us with proper

7

1   documentation, including proofs of delivery.  And there has

2   been an agreement to adjourn this further to the May 21st

3   omnibus hearing so that the movant can review their records and

4   provide for the documentation of the debtors.

5           THE COURT:  Okay.  I'm not sure the claim procedures

6   order applies to a post-petition claim, but I certainly would

7   recommend that the parties, since this appears to be just a

8   dispute over what's owing, that the parties try to follow those

9   procedures even though they don't necessarily --

10          MR. BUTLER:  We've been essentially trying to do that

11  by trying to reconcile their claim.

12          THE COURT:  All right.

13          MR. BUTLER:  And that's what we're working for, Your

14  Honor.

15          THE COURT:  Okay.

16          MR. BUTLER:  I'll take that back as well.  Thank you.

17          THE COURT:  Okay.

18          MR. BUTLER:  And then matter number 4 on the agenda

19  is Lasore's (ph.) motion to compel the debtors' performance

20  under a nonresidential real property lease.  This involves a

21  vacated premises or warehouse in Columbia, Tennessee that was

22  vacated back in October of 2008.  Counsel asked us to further

23  adjourn this matter to a May 21st hearing.  We've agreed to do

24  that.  They understand that we're going to file, at the

25  appropriate juncture in this case, in connection with a plan

8

1   modification hearing, papers that will reject this lease

2   retroactive to that date.  They've been on notice of that since

3   last year.

4          THE COURT:  Okay.

5          MR. BUTLER:  And they've asked us to put this off.

6   We've agreed to do it.

7          THE COURT:  Okay.

8          MR. BUTLER:  Your Honor, the next matter on the

9   agenda is matter number 5.  This is the second accommodation

10  amendment motion at docket number 16534.  Your Honor approved

11  this on an interim basis on April 3 , 2009 at docket number

12  16549.

13         Your Honor, we also have, based on developments

14  between the interim hearing and the final hearing, we've

15  negotiated, as we were advised by the court order this week, we

16  have negotiated further supplemental changes to this amendment

17  and we filed a notice of these supplemental amendments at

18  docket number 16573.  As supplemented, this is the second

19  amendment to the accommodation agreement between the debtors

20  and the DIP lenders.  The original accommodation agreement was

21  approved back on December 3rd on docket number 14515, and the

22  first amendment, as supplemented -- the supplemental amendment

23  was approved by Your Honor on February 25, 2009 at docket

24  number 16377.

25         Your Honor, the genesis, frankly, of these amendments

1    dates back to the fact that last month the auto task force in

2    the United States Treasury blocked, at least on an interim

3    basis, approval of the fourth and fifth amendments to the GM

4    arrangement and the global steering business option exercise

5    agreement.  Those matters remain under negotiation with the

6    auto task force, General Motors, and our DIP lenders, and we

7    are continuing discussions, as Your Honor is aware, with those

8    parties and other stakeholders, including our creditors'

9    committee, regarding developing a term sheet for an appropriate

10   resolution of these cases.

11        The changes that were made to the amendment that is

12   before the Court now for final hearing adjusts the deadlines

13   and milestones for those discussions as they are continuing.

14   Specifically, the second supplemental amendment provides for an

15   extension to May 4, 2009, back from April 17, of the deadline

16   to deliver the DIP lenders a term sheet with GM and the

17   Treasury Department with respect to the resolution of these

18   cases.  The first opportunity for an obligation for the debtors

19   to be triggered with respect to the incremental borrowing base

20   cash collateral would be May 5, 2009.  There's a similar grace

21   period, as there have been in the past, and there is an outside

22   date for the accommodation period of May 9, 2009, in the event

23   that the requisite percentages of participant lenders have not

24   affirmatively notified Delphi that the term sheet delivered to

25   them was satisfactory.  So we've essentially taken the April

10

1    dates and moved them into May as we continue these discussions.

2         There are a couple of other elements of changes that

3    have been noticed out.  These include the fact that if Your

4    Honor approves this matter today, the future tranche, the

5    interest payments would be applied and we'd pay the tranche A

6    and tranche B DIP loans till those loans are repaid in full.

7    The credit agreement would be amended to add the PBGC as a

8    party to which the agents are required to provide copies of the

9    notices prior to taking enforcement action against the

10   collateral.  Certain adjustments would be made to the

11   definition of minimum borrowing base cash collateral account

12   balances, and there would be a payment of an additional twenty

13   basis point fee in connection with this.  There would be a

14   further paydown on the tranche A and B of twenty-five million

15   dollars, and there would also be the payment of some related

16   additional fees and expenses.

17        Your Honor, that's the substance of, I think, the

18   material changes that were made that have been noticed out in

19   connection with this.  There have been no objections filed by

20   any stakeholder, either at the interim or final hearings, save

21   the statements that were filed at the initial hearing by the

22   auto task force which were resolved at that hearing.  And, Your

23   Honor, the order here asks Your Honor to waive, to the extent

24   applicable, the ten-day stay that may be imposed by Bankruptcy

25   Rule 6004(h), as of today's date, because we need to take this

11

1    order on a final basis consistent with the DIP agreement and

2    implement the transactions proposed by it.

3            THE COURT:  Okay.  Let me just make sure -- I

4    received a blackline and clean copy of the second supplemental

5    second amendment as well as the proposed final order.  Have

6    there been any changes since that?

7            MR. BUTLER:  No, Your Honor, there's not been.

8            THE COURT:  And I also received the expense letters

9    that involve two different arrangement fees dealing with the

10   administrative agent and the accommodation agent.  Those are

11   the only two --

12           MR. BUTLER:  Yes, Your Honor.

13           THE COURT:  -- fees in addition to the --

14           MR. BUTLER:  That is correct.

15           THE COURT:  -- to the twenty basis points fees that

16   are alluded to in the amendment?

17           MR. BUTLER:  Correct, Your Honor.

18           THE COURT:  Okay.  All right.  Does anyone have

19   anything to say on this motion?  Okay.

20           This was the subject of a chambers conference earlier

21   this week.  I've reviewed the changes and I find them to be

22   reasonable, and I will approve them.  It clearly makes sense to

23   continue the discussions that now involve the auto task force,

24   given their relationship to GM and the integral nature of GM's

25   role in the interim and final exit process for these debtors.

12

1    So this is a valid exercise of the debtors' business judgment.

2            MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

3    next matter on the agenda is matter number 6.  It's the brakes

4    and ride dynamics businesses sale motion at docket number

5    16533.  There was a response filed, which I'll address in a few

6    minutes, by the Pension Benefit Guaranty Corporation at docket

7    number 16563.

8            Your Honor, this is a transaction in which the

9    debtors propose to sell two businesses: their brakes businesses

10   and their ride dynamics businesses, which were both categorized

11   as noncore assets back in the debtors' 2006 transformation

12   plan.  The proposed purchaser is Beijing West Industries Co.,

13   Ltd.  The selling entities are a combination of debtor and

14   nondebtor entities.  The debtor entities are Delphi

15   Corporation, Delphi Automotive Systems, LLC, and Delphi

16   Technologies, Inc.  There are a number of nondebtor affiliates

17   who are also selling this.  The purchase price is ninety

18   million dollars, subject to certain adjustments.  Approximately

19   thirty million of that is allocated to the selling debtor

20   entities, and the balance of the purchase price and the

21   majority of the assets are being sold outside of the debtor

22   entities.

23           Today's hearing is really focused on approval of the

24   bidding procedures, including the proposed breakup fee, which

25   is three percent of the sum of the preliminary purchase price,

13

1    approximately 2.94 million dollars.  There is, in these

2    procedures, a proposed auction process and notice process

3    similar to the marketing we've done in the past with the other

4    assets.  As our papers indicate, these assets have been

5    extensively marketed over the last several years, but we would

6    give further notice again and provide a bid deadline of May

7    11th, an auction at May 15th, and we would come back here at

8    the May omnibus hearing on May 21st for a final sale hearing.

9         Your Honor, just briefly, the brakes business

10   produces brake systems and components ranging from traditional

11   hydraulic brake systems to controlled brake products and other

12   technology.  The brake system also offers brake corner modules

13   and a series of other assembled components.  The brakes

14   business has assets in China, the U.S., and Mexico, with two

15   manufacturing facilities located outside of the United States,

16   and engineering capabilities both here in the United States and

17   outside of the United States.

18        The ride dynamics business has two product lines, a

19   passive dampers line and an electrically controlled damping

20   systems line.  And it has significant manufacturing assets

21   located in China, India, Mexico, Poland, and the United

22   Kingdom, as well as engineering both within and outside of the

23   debtor entities in the United States.

24        Just to give some indication of employee size, there

25   are 843 employees that work for the brakes businesses.  Of

14

1    those, 149 are U.S. employees.  Primarily all of those are

2    salaried engineers.  With respect to the rides dynamic

3    business, there are about 2,000 -- a little over 2,100

4    employees.  And of those, 124 are U.S. employees, again,

5    primarily salaried engineers.

6          As I indicated, these assets have been extensively

7    marketed since late 2007 and early 2008.  There have been

8    almost 200 potential buyers that have been solicited for this.

9    There were more than fifty confidential information memoranda

10   that were solicited.  And there was a process that led to the

11   transaction that is before the Court today.

12         Your Honor, I think the process we're using here is

13   very similar to those that Your Honor has approved before.  If

14   there is a wrinkle in this particular bidding procedures

15   hearing -- we're asking for approval of the bid protection for

16   the bidding procedures -- it's that the PBGC filed the response

17   that it did at docket number 16563.  And the position that PBGC

18   has taken is not one that we disagree with in terms of the

19   basic assertion, which is that it simply wanted to make sure

20   Your Honor's not trying to sell these assets free and clear of

21   liens that may otherwise be enforceable in nondebtor entities.

22   We're not asking the Court to do that.  Our papers are clear in

23   that respect.  It's not a bidding procedures objection in the

24   first instance, and anyway it would be a sale objection.  But

25   the objection, as it is filed, we think has no merit either at

15

1    the sale hearing or at this hearing.  And I'm not going to

2    really address it beyond that and beyond what's in our

3    response, Your Honor, that we filed yesterday.

4            What it has done, though, is raised a question that

5    we wanted to provide some clarity to the Court on, which is

6    we're asking Your Honor to approve an almost three million

7    dollar breakup fee here, and we wanted to have clarity on this

8    record that the existence of these alleged liens, which the

9    debtors dispute as to their enforceability, would not, in and

10   of themselves, give rise to the purchaser being able to assert

11   a termination event and then collect a breakup fee because of

12   the existence of those.

13           And I would also tell the Court that the debtors are

14   committed, prior to the completion of the sale hearing, to

15   resolve these issues as to the sale on a final basis, either

16   through a resolution with the PBGC so that they would

17   acknowledge the sale would go forward without the assertion of

18   those liens, or an acknowledgment from the buyer that they're

19   prepared to close with the risk of those alleged liens out

20   there, and therefore, these would be viewed as permitted

21   encumbrances.

22           THE COURT:  All right.  Well, in light of the

23   objection, I reviewed the proposed order, and perhaps with a

24   little less care, the agreement.  And I didn't see any

25   obligation on the debtors' behalf to deliver the nondebtor

16

1    assets free and clear of liens.

2          MR. BUTLER:  There is no such obligation, but what

3    there is, is this standard sort of out of bankruptcy court set

4    of obligations in the contract of what's a permitted

5    encumbrance and what's not a permitted encumbrance in that

6    place.  And what I wanted, Your Honor, is we're going to make

7    sure that we have clarity on that between the debtors and --

8          THE COURT:  But it's clear that the right to the

9    breakup fee is not tied to a termination based on the existence

10   of these liens -- these asserted liens.

11         MR. BUTLER:  Based on the alleged existence of the

12   liens.

13         THE COURT:  Right.

14         MR. BUTLER:  Mr. Abramowitz is here on behalf of the

15   purchaser.  We've worked out probably six short paragraphs --

16   and they are relatively short, they're mostly sentences -- that

17   we're going to add to the order on this to make sure that we've

18   clarified it and there's comfort.  But they have agreed that

19   the mere existence of these purported liens, as filed in the

20   D.C.'s reporter's office, without a successful action to

21   enforce the purported liens, are not encumbrances for purposes

22   of their right to a breakup fee.

23         THE COURT:  Okay.

24         MR. BUTLER:  And they've agreed that the purported

25   liens would need to be enforceable in the local and applicable

17

1    jurisdictions in order for those liens to be encumbrances.

2    There's a series of -- those are definitional things -- there's

3    a series of agreements.  We've agreed, among other things, to

4    extend indemnities, to clarify what their termination rights

5    would be without the breakup fee, and to take some other

6    actions.  We'll put this in the order and submit it to Your

7    Honor.

8            THE COURT:  Okay.

9            MR. BUTLER:  I'm not going to read all of the actual

10   language into the record, but we wanted the Court to understand

11   that the mere existence of these alleged liens in these foreign

12   jurisdictions would not give you the right to approve this

13   order today and for tomorrow the purchaser to say okay, pay me

14   2.9 million dollars.

15           I'd also point out that there is, for any alleged

16   breach of the agreement by the sellers, there is a thirty-day

17   notice and a thirty-day cure period.  So we'd have, on this and

18   any other breach, to the extent that the liens were deemed to

19   be enforceable, there still would be a notice process they'd

20   have to go through with us and an opportunity for us to resolve

21   this on a commercial basis with them, and if need be, at that

22   point in time, with the PBGC.  But having said that, Your

23   Honor, it is our intention, prior to the completion of the sale

24   hearing, to resolve these nondebtor issues on a commercial

25   basis.

18

1          THE COURT:  Okay.

2          MR. BUTLER:  The other thing I guess I want to

3    mention, Your Honor, is we did submit a declaration from Mr.

4    Stip (ph.), the company's director of restructuring here at

5    Delphi.  And I would ask Your Honor that that be admitted into

6    evidence supporting his application.

7          THE COURT:  Okay.  Does anyone have any objection to

8    that?  All right, I reviewed it, and it will be admitted.

9          MR. ABRAMOWITZ:  Good morning, Your Honor.  Steven

10   Abramowitz on behalf of the buyer, Beijing West Industries.  I

11   concur, in concept, with what Mr. Butler described.  We do have

12   a complicated series of e-mails that clarify the basic

13   agreement that'll be put into the order.  But the basic

14   agreement is that we agree that because of the current state of

15   the purported liens being asserted by the PBGC, which the buyer

16   believes are not enforceable liens, because of that we would

17   not be entitled to the breakup fee.  So for purposes of the

18   breakup fee, we're making that change.  In exchange, there are

19   other clarifications, including an extension of the indemnity

20   with respect to liens.  And that's going to be worked out in a

21   final order to be delivered --

22         THE COURT:  All right, but I'm not approving that

23   today -- the second point today, or am I?

24         MR. BUTLER:  No, the only thing, Your Honor, that is

25   in here, there are some clarifications to the document.   The

19

1    agreement itself is subject to the final hearing.  The only

2    thing that's being approved today are the bid procedures.

3         THE COURT:  Okay, fine.  All right, anything else on

4    this motion?

5         MR. MENKE:  Your Honor, John Menke with the PBGC.  I

6    just wanted to state for the record that based on the reply

7    that we received from the debtors and discussions with them and

8    what Your Honor said here this morning, we appreciate the

9    clarification that the free and clear language does not apply

10   to these foreign liens, and that we therefore have no other

11   objection with respect to the bid procedures.  And so I suppose

12   we would, to the extent our pleading was deemed to be an

13   objection to bid procedures, we'd be withdrawing that, subject

14   of course, to the possibility that this issue may rear its head

15   at the sale hearing and we're reserving our rights with respect

16   to that.

17        THE COURT:  Okay.

18        MR. ABRAMOWITZ:  I'm sorry, I wanted to clarify one

19   thing.  The point about that we are given an extended indemnity

20   right, that will be in the order that's being approved today.

21        MR. BUTLER:  The indemnities are in the agreement.

22        MR. ABRAMOWITZ:  Right.

23        MR. BUTLER:  I mean, the agreement doesn't get final

24   approval.  The only thing that's ever approved at a bid

25   procedures order are the bid procedures.

20

1          MR. ABRAMOWITZ:  Okay.

2          MR. BUTLER:  The final approval of the indemnity will

3    be in the sale agreement approved at the sale hearing.

4          MR. ABRAMOWITZ:  Correct, but there will be a

5    reference to the indemnity in the --

6          MR. BUTLER:  Yes.

7          THE COURT:  The debtors have amended the underlying

8    purchase agreement to include that provision.

9          MR. BUTLER:  Correct.

10          THE COURT:  And that's a provision that they'll be

11    showing to others as the stalking horse bid.

12          MR. BUTLER:  Correct.

13          THE COURT:  Okay.  All right.

14          MR. ABRAMOWITZ:  Thank you.

15          THE COURT:  All right.  In light of all of those

16    clarifications on the record, I'll approve the bid procedures

17    order and the related breakup fee.  The procedures are

18    reasonable in light of the efforts that the debtors have

19    already undertaken to market these assets, the notice that they

20    contemplate to various parties is appropriate, and the breakup

21    fee itself, in light of the size of the transaction, is

22    reasonable.

23          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

24    last matter on the agenda for today, matter number 7, is the

25    debtors' expedited motion to expand or suspend the equity

21

1    committee, at docket number 16558.  This was filed with the

2    consent of the creditors' committee under the supplemental case

3    management order.  And the only objection that's been filed has

4    been filed by the equity committee at docket number 16565, who

5    also filed a declaration of its chairman, which has also been

6    filed publicly at docket number 16566.  The creditors'

7    committee has filed a statement in support of the debtors'

8    motions at docket number 16568, and we filed our reply

9    yesterday.

10           Your Honor, essentially, because of the circumstances

11   of these Chapter 11 cases, we're asking Your Honor today to

12   enter an order, either disbanding or suspending the equity

13   committee, or directing the U.S. Trustee to do so.  The reason

14   that we have brought this matter to the Court is that the

15   administrative process that was embarked on informally by the

16   debtors last fall and formally by the creditors' committee this

17   spring and then joined in by the debtors, did not result in a

18   satisfactory result that would have addressed the issues and

19   concerns of the debtors involving the use of estate resources.

20   We did not describe that process in great detail.  The equity

21   committee elected, in its filings, to disclose all of the

22   letters that support that administrative process in Exhibits A

23   to I of Mr. Yacoub's (ph.) declaration.  And so I would refer

24   to those -- and they're now part of the record -- as to that

25   administrative process.

22

1          I would, Your Honor, point back to Your Honor's order

2    in docket number 30244 which originally approved the

3    appointment of an equity committee here.  In paragraph 7 of

4    that order, Your Honor indicated that the Court would entertain

5    a motion to disband the equity committee if subsequent

6    circumstances support the conclusion that the debtors appear to

7    be hopelessly insolvent.  And then it goes on to discuss other

8    conditions which are inapplicable here.

9          Your Honor, from the debtors' perspective, as we said

10   in our papers, we believe that the members of the equity

11   committee have performed their functions appropriately in these

12   cases.  We think they've acted in good faith.  We believe they

13   have been given appropriate counsel by their professionals.

14   And the debtors do not have issues with any of that, and we've

15   made that pretty clear in our record -- in our pleadings.  We

16   just believe that, based on the facts and circumstances of this

17   case as they now exist, that the costs of an equity committee

18   are no longer justified, and the existence of an equity

19   committee when there is no reasonable possibility that there

20   would be any distribution to them, that the work of that

21   committee should now conclude.

22          So we filed that motion, Your Honor.  I'm not going

23   to speak beyond the papers that have said that, other than I

24   did want to make the statements on the record about the

25   debtors' views of the responsible nature in which the committee

23

1    has performed its functions to this date, but I ask that Your

2    Honor grant the relief requested in the motion.

3            THE COURT:  Okay.

4            MS. STEINGART:  Good morning, Your Honor.  Bonnie

5    Steingart from Fried, Frank on behalf of the equity committee.

6    It's been three years since the equity committee's appointment.

7    And as you can see from the affidavit of our chairman that was

8    filed, the members of the equity committee continue to be

9    willing to serve.  And the members of the equity committee

10   believe that this is not an opportune time or the correct time

11   to disband the committee.  The debtor is on the brink of

12   proposing yet another modification to its plan, and indeed,

13   it's one that's eagerly awaited by all parties, and certainly

14   the debtors' emergence is something that all of us hope occurs

15   and hope occurs with the debtor as intact as possible.

16           But in connection with those additional filings,

17   there will be numerous third party releases that are requests,

18   some of which will be from equity holders.  And to the extent

19   that the equity committee had a role to begin with, and

20   continues to have a role, it's with respect to addressing those

21   releases and making whatever presentations can be made in

22   support of the equity holders' continuing rights, if any, to

23   pursue claims.

24           As Mr. Butler has indicated, the individuals who

25   serve on the equity committee have served in good faith for a

24

1    number of years.  In a sense, they're volunteers.  It was the

2    U.S. Trustee that solicited, among all the equity holders,

3    individuals to volunteer to be part of this committee.  And

4    these individuals have volunteered and have served over this

5    period of time, often at the expense of their own interests in

6    being able to, at earlier points in time, trade out of these

7    securities at higher prices.  They certainly don't begrudge

8    that, and as I said, are happy to continue to serve and believe

9    that they do have a function.  Thank you, Your Honor.

10            THE COURT:  Well, let me ask you, I take it from your

11    remarks, as well as from Mr. Sheller's (ph.) letter to the U.S.

12    Trustee, that was in response to Mr. Rosenberg's letter on

13    behalf of the creditors' committee that your focus and his

14    focus was on a very limited issue, which is it appears that

15    there's a view, which is certainly understandable, that the

16    only realistic opportunity, even as an opportunity for a

17    recovery by shareholders, is really in respect of claims

18    against third parties that may, for one reason or another, get

19    covered by release in a plan.  Is that fair?

20            MS. STEINGART:  That's correct.

21            THE COURT:  All right.

22            MS. STEINGART:  And also at earlier points in this

23    case --

24            THE COURT:  Oh, no, I'm leaving aside earlier points.

25    It's clear to me there's been a substantial change in

25

1    circumstances --

2            MS. STEINGART:  Right.

3            THE COURT:  -- from what occurred earlier in the

4    case.  I did not take away from -- how do you pronounce it, Mr.

5    Yacoub --

6            MS. STEINGART:  Mr. Yacoub's.

7            THE COURT:  -- Yacoub's letter or affidavit, that the

8    members of the committee viewed the professional's role as

9    limited in that way.  And I can understand that view because

10   those who serve on an official committee are fiduciaries for,

11   in this case, the shareholders.  And that means that they have

12   fiduciary duties to look into all sorts of issues whenever the

13   specter of fiduciary duty arises.  Notwithstanding the

14   qualified immunity that people have when they serve on a

15   committee, their inclination is to look at other issues.  So

16   that, for example, if a plan came out, they would look not only

17   at the release provisions, but ask you and perhaps Houlihan to

18   say well, what is it -- you know, is this really the right

19   projection as far as valuation is concerned, even though it

20   appears that that would be a totally academic exercise.

21           MS. STEINGART:  Right.  At this point, the committee

22   is really only seeking to have the services of its legal

23   advisors and not the other advisors that were retained: one in

24   connection with the investor litigation and the other being

25   Houlihan.  You know, there was also the issue --

26

1          THE COURT:  But legal advisors can look at all sorts

2     of things besides a release.

3          MS. STEINGART:  Well, the difficulty was that many of

4     the materials that the debtors do provide to the committee are

5     materials that are for professional eyes only.  So it's not a

6     matter of following up on issues that are unrelated to the

7     releases.  What it is, is a matter of the committee members

8     themselves not being able to read many of the materials that

9     are directed to them as committee members.  That really created

10    the tension when there was the effort made to have just the

11    committee members serve and not to have the expense --

12         THE COURT:  Right.

13         MS. STEINGART:  -- you know, of professionals.  But

14    then two days later arrived a package of materials where really

15    only professionals could read them.  And everyone's best hopes

16    and plans were sort of shown to be not possible.

17         THE COURT:  Right.  Okay.

18         MS. STEINGART:  Yes.  Thank you, Your Honor.

19         THE COURT:  Does anyone else have anything to say on

20    this motion?  Mr. Masumoto, should I take the U.S. Trustee's

21    last word on this, the last letter in the exhibit package which

22    is your response to Yacoub's letter?

23         MR. MASUMOTO:  Yes, Your Honor.  And I guess just for

24    the record, part of our concern at the later stages of the

25    negotiations was the concept of a committee that would exist

1      without any fiduciary obligations.  And we --

2             THE COURT:  Well, it would clearly have to have

3      fiduciary obligations.  The issue is whether they could

4      exercise those without professionals in a case of this

5      complexity.  I mean, there are cases where committees are able

6      to operate without professionals, but I understand Ms.

7      Steingart's point that this is probably not that type of case.

8             MR. MASUMOTO:  I understand, Your Honor.  And from

9      our standpoint, to the extent that there were any controls on

10     the costs involved that would allow the committee to remain in

11     place, certainly from our standpoint, we view that as an

12     objectionable circumstance.

13            THE COURT:  Okay.

14            MR. MASUMOTO:  Thank you very much.

15            THE COURT:  All right.  Anyone else?  I have before

16     me a motion by the debtors for an order directing the U.S.

17     Trustee to disband the official committee of equity security

18     holders or alternatively to suspend its activities.

19            Actually, let me ask you, Mr. Masumoto, on the second

20     point, on the suspension point, does the U.S. Trustee believe

21     that could happen, whereby that the committee would not be an

22     official committee as of this time, but if some issue arose,

23     you wouldn't have to form a new committee, you could just go to

24     these individuals?

25            MR. MASUMOTO:  Once again, it may be a question of

28

1    nuance, again, but I did want to articulate again, as I stated

2    before, the concern is the existence of a committee with no

3    fiduciary obligations.  If the suspension is treated, in fact,

4    in lieu of a form of disbandment, then --

5            THE COURT:  It would just save the administrative

6    step of having to go out and solicit new people.

7            MR. MASUMOTO:  Right.  I understand, Your Honor, and

8    in that case, again, if the idea of a suspension, in fact,

9    indicates that any members who do operate and negotiate would

10   not be doing so on behalf of the constituency.  Again, that's

11   our concern --

12           THE COURT:  Okay.

13           MR. MASUMOTO:  -- that a committee be in existence

14   but not have a fiduciary obligation.

15           THE COURT:  I understand.  All right.  So let me

16   repeat.  I have before me a motion by the debtors for an order

17   directing the U.S Trustee to disband the official committee of

18   equity security holders or alternatively to suspend their

19   activities without any further date in mind.  The motion is

20   premised upon what appears to be at this point an undisputed

21   fact, which is that looking to the debtors' own assets, there

22   appears to be no reasonable prospect of a recovery in these

23   cases by shareholders, pre-petition shareholders.  And

24   consequently, that the continued service of an official

25   committee is no longer warranted, since the ultimate purpose of

29

1    a committee of that nature will be to obtain a merited or an

2    earned or a proper recovery by its constituents, the

3    shareholders.  Rather, as I stated in my ruling appointing or

4    authorizing the appointment of an official equity committee, in

5    the circumstances where it appears clear that there would be no

6    such recovery, the existence of an official committee would,

7    since it's funded out of the debtors' estate, would in effect

8    be a gift, and gifts are not permitted in this context.

9          The order appointing or authorizing the appointment

10    of the official committee, as well as my bench ruling, clearly

11    contemplated this possibility.  The bench ruling noted that the

12    request to form an equity committee came early in the cases,

13    and that in the particular context of these cases, that timing

14    was appropriate.  That was in light of the fact that the

15    debtors' Chapter 11 cases were not merely going to be cases

16    where the capital structure would be adjusted, but rather were

17    cases where the debtors, a) were attempting to engage in major

18    transformations of their business, and b) were dealing in an

19    environment where their business and industry itself was

20    subject to major transformation.  Given that uncertainty, and

21    the possibility, at the time, that those two transformative

22    possibilities could result in some recovery by shareholders, I

23    believed it was important for the debtors, in their

24    negotiations and analysis, to have the input of an official

25    equity committee.

30

1        I noted several times, however, in the ruling, that

2   depending upon how the transformational solutions actually

3   occurred, and how the debtors' business and industry might be

4   transformed, could well result in a second look at the

5   continued existence of an equity committee.  For example, at

6   page 181 of the transcript I stated, "I also will look very

7   carefully at whether the continued incurrence of fees is

8   appropriate at various stages in the case when picture on

9   valuation becomes clearer."

10        The order itself directing the appointment of the

11   official committee stated in the factual findings section that,

12   quote, "Under the present circumstances, and subject to the

13   terms and conditions of this order, it is a proper exercise of

14   the Court's discretion to direct such an appointment."  And

15   then, as Mr. Butler noted, in paragraph 7 of the order, the

16   order provided that "The Court will entertain a motion to

17   disband the equity committee if subsequent circumstances

18   support the conclusion that the debtor appears to be hopelessly

19   insolvent."

20        Unfortunately, although the debtor, I believe, has

21   been able to fulfill the goals it set itself for transforming

22   its business, the transformation in its industry has gone in a

23   different direction.  And I believe -- and I believe this is

24   uncontroverted on this record, that at this time it appears

25   clear that the debtor will, under any scenario, not be able to

31

1   make a distribution to its pre-petition shareholders from its

2   own assets.  That's reflected, among other things, by the

3   trading prices on the debt that are highlighted in footnote 6

4   of the motion, as well as the pleadings and representations in

5   court by the equity committee today.

6            Under those circumstances, it appears to me to be

7   appropriate not to subject the members of the equity committee

8   to continued service acting as a fiduciary for shareholders who

9   appear to have no hope of a recovery from these debtors.  It's

10  equally appropriate not to saddle the debtors' estate with the

11  cost of maintaining such a committee.  I agree with the U.S.

12  Trustee that in this context, in a case of this complexity, it

13  would not be appropriate to permit the committee to serve

14  without at least counsel.  And I believe that obviously there's

15  no prospect of counsel doing this on a pro bono basis, nor

16  should there be.  So there would obviously be a direct cost to

17  the estate of continuing the committee in existence.

18           In addition, there's an indirect but very meaningful

19  cost of continuing to have the committee in existence, which is

20  the necessity of the other parties-in-interest, obviously

21  including the debtor, but also the other key parties-in-

22  interest, to incur costs in dealing with the equity committee

23  and its professionals.

24           It has been suggested that there is still a potential

25  recovery, or potential for recovery by shareholders in this

32

1    case, not from the debtors' assets, but from potentially a

2    price that might be paid by third parties who would be

3    receiving a release in the case, in respect of rights and

4    claims against them that are not the debtors or a derivative of

5    the debtors' rights, but would be uniquely individual

6    shareholders' rights.  I believe that first, that prospect is

7    one that is, at least based on the current record, speculative.

8    Secondly, I don't believe it is a prospect that the estate

9    should be paying for.  It is a fairly discrete legal issue that

10   many courts have dealt with, including most recently the Second

11   Circuit in the Johns-Manville litigation, which is currently

12   sub judice at the Supreme Court.  I don't believe it is an

13   issue that requires a continuing functioning committee to

14   address.  Rather, if and when such release is sought, I believe

15   that there are sufficient incentives for those who may have

16   unique claims against potentially released parties to raise

17   their issues at that time.

18        I considered, as reflected by my question of Mr.

19   Masumoto, whether instead of disbanding the committee, I should

20   issue an order suspending the committee.  But I believe that

21   while perhaps the order could make it clear that the committee

22   would, during its time of suspension have no fiduciary duties,

23   and that the suspension would only be a procedural mechanism to

24   avoid the delay involved in creating a new committee, should

25   the need ever arise, it appears to me that the suspension of a

33

1    committee would raise more issues than it would potentially

2    solve.  And it would not be clear to me, if I were a member of

3    such a suspended committee, what my duties and obligations

4    were, for example, in respect of trading and the like.

5            And consequently, it seems to me that the proper

6    course here is to disband the committee in light of the

7    occurrence of the condition that I quoted from in my order

8    originally appointing the committee.  And that if in fact there

9    ever is a time when it makes sense to reappoint a committee,

10   these individuals may still be willing to serve, but

11   recognizing that there was a true gap in between when they were

12   not fiduciaries, except of course, in respect of any sort of

13   ongoing obligation or in respect of confidentiality and the

14   like from what they learned when they were serving.

15           So again, I will grant the debtors' motion and issue

16   an order directing the U.S. Trustee to disband the committee.

17   I believe I clearly have the power to do so under the Texaco

18   case from this district as well as the conditions in my own

19   order which contemplated this possibility.

20           In doing so, I want to state, as Mr. Butler stated,

21   that I see no evidence at all of any sort that the committee

22   acted in any way improperly.  There were other potential

23   conditions in my order that stated that if the committee or its

24   professionals did act improperly I would also issue an order

25   disbanding the committee.  That's clearly not the case here.

34

1    The only reason for disbanding the committee is the debtors'

2    present and foreseeable financial condition and the absence of

3    any prospect of a recovery by the shareholders.  But again,

4    from all that I have seen, the committee has acted responsibly

5    in this case in the representation of its constituency, as have

6    the committee's professionals.

7         So in addition to submitting the orders on the bid

8    procedures and the supplemental second amendment, the discs on

9    those orders, Mr. Butler, you should submit the order directing

10   the U.S. Trustee to disband the committee.

11        MR. BUTLER:  We will, Your Honor.

12        THE COURT:  Okay.

13        MR. BUTLER:  Your Honor, that completes the agenda

14   for this morning.  Thank you very much.

15        THE COURT:  Okay.  Thank you.

16        IN UNISON:  Thank you, Your Honor.

17        (Proceedings concluded at 11:21 a.m.)

18

19

20

21

22

23

24

25

35

1

2                               I N D E X

3

4                                 RULINGS

5           Page              Line

6    Supplemental second        11        22

7    amendment motion

8    approved

9    Bid procedures order       20        15

10   and  related breakup

11   fee approved

12   Motion approved to         33        15

13   direct U.S. Trustee to

14   disband the equity

15   committee

16

17

18

19

20

21

22

23

24

25

36

1

2                          C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    SHARONA SHAPIRO

9

10   Veritext LLC

11   200 Old Country Road

12   Suite 580

13   Mineola, NY 11501

14

15   Date:  April 24, 2009

16

17

18

19

20

21

22

23

24

25