**Interim Hearing Date and Time:  May 7, 2009 at 9:00 a.m. (prevailing Eastern time)**
**Interim Objection Deadline:  May 6, 2009 at 12:00 noon (prevailing Eastern time)**
**Final Hearing Date and Time:  May 21, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Final Objection Deadline:  May 14, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                    :
In re                        :      Chapter 11
                                    :
DELPHI CORPORATION, et al.,    :      Case No. 05-44481 (RDD)
                                    :
              Debtors.   :      (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR INTERIM AND FINAL ORDER RATIFYING
AND APPROVING DEBTORS' ENTRY INTO (A) FOURTH AMENDMENT
TO AMENDED AND RESTATED DIP CREDIT AGREEMENT, (B) FIRST
AMENDMENT TO AMENDED AND RESTATED SECURITY AND PLEDGE
<u>AGREEMENT, AND (C) RELATED DOCUMENTS IN CONNECTION THEREWITH</u>

("FOURTH AMENDMENT TO DIP CREDIT AGREEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Expedited Motion For Interim And Final Order Ratifying And Approving Debtors' Entry Into (A) Fourth Amendment To Amended And Restated DIP Credit Agreement, (B) First Amendment To Amended And Restated Security And Pledge Agreement, And (C) Related Documents In Connection Therewith (the "Motion"), and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders, which was disbanded on April 24, 2009.  On February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

2

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to May 21, 2009 (Docket No. 16562). The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

3

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are sections 363 and 364 of the Bankruptcy Code and rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

5

10.    The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:  first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive

6

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    On September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

15.    Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended

7

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the Original GSA and Original MRA).

16.    As a result of all the factors described above, during the fall of 2008 the

Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth

in the Plan Modification Motion.  Since the filing of the proposed modifications, however,

substantial uncertainty and a significant decline in capacity in the credit markets, the global

economic downturn generally, and the current economic climate in the automotive industry, have

adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully

consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in

discussions with certain of its stakeholders to formulate further plan modifications.  In light of

the U.S. Department of the Treasury's (the "Treasury Department") involvement with GM's

restructuring, since the first quarter of 2009 Delphi has also engaged in discussions with the

Treasury Department regarding plan modifications.  Moreover, as a result of the market

turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on

terms reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the

support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into

an accommodation agreement which allows the Debtors, among other things, to continue using

certain of the proceeds of the postpetition financing facility through June 30, 2009.  In addition,

to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate

payment of certain payables to the Debtors.

17.    At the same time, consistent with the plan modifications being negotiated,

the Company has been making further revisions to its business plan consistent with the extremely

low volume production environment in the global automotive industry and depressed global

capital and equity markets.  As part of the Debtors' efforts to achieve sufficient emergence

capital funding, Delphi and GM are constructively working together to pull forward elements of

GM's previously agreed-upon support for Delphi into one payment at emergence in combination

with the transfer of certain of Delphi's U.S. sites to GM.  This arrangement is designed to

facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global

economy, the automotive industry, and the capital markets.  In the meantime, Delphi will

marshal all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will seek to preserve and continue the strategic growth of its non-

U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.      The DIP Facility and Accommodation Agreement

18.     Since January 5, 2007, the Debtors have been operating in these chapter

11 cases by utilizing the proceeds of a refinanced debtor-in-possession facility (the "DIP

Facility")[4] comprised of three tranches:  (i) a first priority revolving credit facility ("Tranche A"),

(ii) a first priority term loan ("Tranche B"), and (ii) a second priority term loan ("Tranche C").[5]

The DIP Facility is governed by an Amended and Restated Revolving Credit, Term Loan and

Guaranty Agreement dated as of May 9, 2008 (as amended, the "Credit Agreement").

19.     In conjunction with the Credit Agreement, the Debtors and the DIP

Lenders also entered into a Security and Pledge Agreement (as amended, the "Security and

Pledge Agreement"), which governs the parties' respective rights with respect to the security

interests, pledges, and liens granted to the DIP Lenders to secure the Debtors' obligations under

the DIP Facility.  Pursuant to the Security and Pledge Agreement, the Debtors have granted,

---

[4]   The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I)
      Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter
      Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing
      Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November
      7, 2008 (Docket No. 14408) (the "Accommodation Motion").

[5]   As of the date of this Motion the Debtors owe approximately $261 million to the Tranche A lenders, $353
      million to the Tranche B lenders, and $2.75 billion to the Tranche C lenders.

among other things, a security interest, pledge, and lien on substantially all of the Debtors' assets,

subject to certain exclusions set forth therein.

20.    In the fourth quarter of 2008, facing frozen global credit markets and one

of the worst bear markets in the history of the global capital markets, the Debtors negotiated an

accommodation agreement (as amended, the "Accommodation Agreement")[6] with the

administrative agent (the "Agent") under the DIP Facility and obtained consent to this agreement

from the requisite lenders under the DIP Facility (the "DIP Lenders").  Under the

Accommodation Agreement the Debtors could continue using certain of the proceeds of the DIP

Facility through June 30, 2009 (the "Accommodation Period"), subject to the terms and

conditions set forth in that agreement, as amended.  This Court authorized the Debtors to enter

into the Accommodation Agreement by order entered on December 3, 2008 (the "DIP

Accommodation Order") (Docket No. 14515) and the parties subsequently effectuated the

agreement on December 12, 2008, which has been amended from time to time.[7]

G.    The Auto Supplier Support Program

21.    As has been widely publicized in the media, the U.S. automotive industry

is currently undergoing a large-scale transformation with significant involvement by the federal

government, specifically, the Treasury Department's Auto Task Force (the "Auto Task Force").

In addition to its substantial role in the ongoing restructurings of Chrysler LLC ("Chrysler") and

GM, the Auto Task Force has taken additional measures to provide financial support to the

network of companies that supply parts to the OEMs.

---

[6]    A copy of the Accommodation Agreement is attached as Exhibit A to the DIP Accommodation Order (as
defined below).

[7]    See the Accommodation Amendment Order entered on February 25, 2009 (Docket No. 16377) (the "First
Accommodation Amendment Order") and the Final Accommodation Supplemental Second Amendments Order
entered on April 23, 2009 (Docket No. 16575) (the "Second Accommodation Amendment Order").

22.        Specifically, on March 19, 2009, the Auto Task Force announced that it was funding up to $5 billion for a program (the "Auto Supplier Support Program") whereby participating suppliers would be able to sell receivables owing from participating OEMs[8] at a modest discount to special purpose vehicles supported by Treasury Department-funded credit facilities at third-party servicers (the "Supplier Program SPVs").[9]  Participating suppliers may opt to sell their eligible receivables for an immediate cash payment from the Supplier Program SPV ("Payment Option 1") or a guaranteed cash payment upon the maturity of the eligible receivables from the Supplier Program SPV ("Payment Option 2").[10]  Only receivables for products shipped after March 19, 2009 on qualifying commercial terms may be sold into the Auto Supplier Support Program.  Both GM and Chrysler established Supplier Program SPVs under the Auto Supplier Support Program in early April 2009.[11]

23.        The Debtors seek to participate in the Auto Supplier Support Program by selling, pursuant to Payment Option 2, qualifying receivables owed to the Debtors by Chrysler and its affiliates (the "Chrysler Receivables") to Chrysler Receivables SPV, LLC ("Chrysler SPV"), which is Chrysler's Supplier Program SPV.[12]  The Debtors' Partial Temporary Accelerated Payment Agreement with GM dated as of December 12, 2009, as amended on January 30, 2009, accelerated payments with respect to receivables owed by GM to Delphi for

---

[8]        Although the Auto Supplier Support program is available to all domestic OEMs, as of the date of this Motion only GM and Chrysler have agreed to participate.

[9]        See Press Release, Treasury Department, Treasury Announces Auto Supplier Support Program (Mar. 19, 2009), available at http://www.treas.gov/press/releases/tg64.htm.

[10]       Under the Auto Supplier Support Program, payments made under Payment Option 1 are discounted by 3% of the face amount of the receivables sold and payments made under Payment Option 2 are discounted by 2% of the face amount of the receivables sold.

[11]       See Press Release, Treasury Department, Treasury Department Statement on Auto Supplier Support Programs (Apr. 6, 2009), available at http://www.ustreas.gov/press/releases/tg86.htm.

[12]

goods shipped after March 19, 2009. Accordingly, as of the date of this Motion, the Debtors are not seeking to sell any receivables to the Support Program SPV established by GM.

24.    As a prerequisite for selling eligible receivables to Chrysler SPV, however, the Debtors must be able to grant Chrysler SPV a first priority security interest in such transferred receivables. This is required to protect Chrysler SPV in the event such transaction is judicially re-characterized as a loan rather than a sale. Additionally, the Debtors were restricted from transferring such eligible receivables under the Credit Agreement. Accordingly, to participate in the program the Debtors needed to amend the Credit Agreement and Security and Pledge Agreement to permit the Debtors to transfer their Chrysler receivables through this program and grant security interests to Chrysler SPV with higher priority than the DIP Lenders' security interests in the Debtors' Chrysler receivables.

25.    On April 24, 2009, the Debtors obtained sufficient DIP Lender approval to amend the Credit Agreement and Security and Pledge Agreement to facilitate the Debtors' participation in the Auto Supplier Support Program (the "Fourth Credit Agreement Amendments"),[13] a copy of which are attached hereto as Exhibit A. Attached as exhibits to the Fourth Credit Agreement Amendments are certain documents in connection with the Auto Supplier Support Program, including the Supplier Purchase Agreement and Lien Priority Agreement (both as defined in the Fourth Credit Agreement Amendments) which the Debtors must execute in order to sell their eligible Chrysler receivables through the Auto Supplier Support Program.

---

[13]    Fourth Amendment to Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement and First Amendment to Amended and Restated Security and Pledge Agreement dated as of April 24, 2009.

<u>Relief Requested</u>

26.    By this Motion, the Debtors seek entry of an interim and final order ratifying and approving their entry into the Fourth Credit Agreement Amendments and related documents, including, but not limited to, those documents attached as exhibits to the Fourth Credit Agreement Amendments.  Under the terms of the Fourth Credit Agreement Amendments, the Debtors agreed to seek interim approval of the Fourth Credit Agreement Amendments on May 7, 2009 and final approval at the May 21, 2009 omnibus hearing.  Accordingly, the Debtors are seeking this Court's interim ratification and approval of the Fourth Credit Agreement Amendments on an expedited basis at an interim hearing to be scheduled by order to show cause, subject to a final hearing on the Motion on May 21, 2009.

<u>Basis For Relief</u>

27.    Companies such as Delphi that supply parts to domestic OEMs are currently operating in the most difficult economic environment the automotive industry has seen in decades.  As the Debtors negotiate a complex global resolution of these chapter 11 cases with their key stakeholders and the Treasury Department in the face of these challenges, the Debtors welcome and are actively seeking any opportunities to protect their assets, including receivables. Accordingly, the Debtors seek to participate in the Auto Supplier Support Program that the Treasury Department has established to foster the necessary flow of automotive parts during this period of restructuring in the automotive industry.

28.    By participating in the Auto Supplier Support Program pursuant to Payment Option 2, Delphi would be guaranteed payment of its Chrysler receivables upon their maturity regardless of the path of Chrysler's restructuring, including a reorganization or liquidation pursuant to a case under title 11.  The elimination of the risk of delay or nonpayment

of Chrysler receivables in the event that Chrysler does become the subject of a case under title 11

is a significant benefit to the Debtors' estates.

29.     To take advantage of this program, the Debtors and the DIP Lenders

agreed to certain amendments to the Credit Agreement and Security and Pledge Agreement to

permit the Debtors to sell their eligible receivables and grant first priority Liens (as defined in the

Credit Agreement) in favor of Chrysler SPV on receivables sold to Chrysler SPV.  Specifically,

the Fourth Credit Agreement Amendments add a new section 8.09 to the Credit Agreement that

authorizes the Agent to execute and deliver such agreements and instruments evidencing (i) the

release of the DIP Lenders' Liens on the Chrysler receivables sold to Chrysler SPV and/or (ii) the

subordination of the DIP Lenders' Liens on the Chrysler receivables so sold to the Liens granted

by the Debtors on such receivables to Chrysler SPV.  Such agreements and instruments must

either be in the form of the Lien Priority Agreement attached as Exhibit C to the Fourth Credit

Agreement Amendments or in such other form as may be satisfactory to the Agent.

30.     Additionally, the negative covenants provisions in the Credit Agreement

relating to (i) Liens, (ii) Indebtedness, (iii) Investments, Loans, and Advances, and

(iv) Disposition of Assets were amended to permit the Debtors to sell their Chrysler receivables

to Chrysler SPV, grant priority liens on such receivables to Chrysler SPV, incur indebtedness if

any such sale is re-characterized as a loan, and, if required under the Auto Supplier Support

Program, repurchase the Chrysler receivables.  Further, the Debtors are required to include

information relating to the receivables sold to Chrysler SPV and amounts owed to the Debtors by

Chrysler SPV in the Borrowing Base Certificates (as defined in the Credit Agreement) that the

Debtors deliver to the Agent.  An amendment to the definition of "Eligible Receivables" and

certain ancillary amendments to the Security and Pledge Agreement were also made in

connection with the Debtors' participation in the Auto Supplier Support Program.

14

31.     In addition to those amendments relating to the Auto Supplier Support Program, the Fourth Credit Agreement Amendments also incorporate a new section 8.10 into the Credit Agreement to alleviate potential obstacles to the Agent's recovery on the DIP Facility in certain foreign jurisdictions.  This new section provides for a "parallel debt," equal to the Debtors' obligations to the DIP Lenders, to be owed to the Agent in its individual capacity rather than as a representative for other DIP Lenders.  Any payment received by the Agent as a "parallel debt" creditor will be distributed according to the priorities set forth under the Loan Documents (as defined in the Credit Agreement).  The purpose of this technical amendment is to facilitate the Agent's ability to recover on the DIP Facility (in accordance with the Credit Agreement, Security and Pledge Agreement, and Accommodation Agreement) in foreign jurisdictions that do not recognize the trust relationship between administrative agents and lending syndicates.

32.     A condition to the effectiveness of the Fourth Credit Agreement Amendments is that the Debtors pay, as they were already obligated to pay under the Credit Agreement prior to the execution of these amendments, the reasonable and out-of-pocket expenses, including the reasonable fees and expenses of the Agent's counsel, incurred in connection with the preparation, negotiation, and execution of these amendments.  No additional fees or expenses are being paid to the DIP Lenders or their advisors in connection with the Fourth Credit Agreement Amendments.

33.     The Fourth Credit Agreement Amendments also contain a provision whereby the Debtors have agreed to seek to obtain this Court's approval of the Fourth Credit Agreement Amendments (i) on an interim basis on May 7, 2009 and (ii) on a final basis on May 21, 2009 (or such other dates as may be agreed to by the Debtors and the Agent).   The Debtors accordingly propose that on an interim basis, pending a final hearing on the Motion at the

15

omnibus hearing scheduled for May 21, 2009, their execution and delivery of the Fourth Credit

Agreement Amendments as of April 24, 2009, together with all other documentation executed in

connection therewith (the " Fourth Credit Agreement Amendment Documents"), be ratified and

approved and that they be authorized, but not directed, to perform and take all actions necessary

to effectuate the Fourth Credit Agreement Amendment Documents and participate in the Auto

Supplier Support Program.  The Debtors also seek an interim and final ruling that the Fourth

Credit Agreement Amendment Documents and each of the instruments and documents as may be

necessary to effectuate the Fourth Credit Agreement Amendments constitute valid and binding

obligations of the Debtors, the Agent, and the DIP Lenders, enforceable against each party

thereto in accordance with their respective terms.

      34.    The Debtors propose that the DIP Order,[14] as supplemented by the DIP

Extension Order, the Second DIP Extension Order, the Supplemental Second DIP Extension

Order, the Accommodation Order, the First Accommodation Amendment Order, and the Second

Accommodation Amendment Order (collectively, the "Prior DIP Orders") be deemed

supplemented by any order approving this Motion but otherwise continue in full force and effect.

<u>Applicable Authority</u>

H.    <u>This Court Should Ratify And Approve The Fourth Credit Agreement Amendments</u>

    (a)    The Fourth Credit Agreement Amendments Are An Appropriate
        <u>Use Of Estate Property Under Section 363(b)(1) Of The Bankruptcy Code</u>

---

[14]    Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed.
R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)
Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (Docket No.
6461) (the "DIP Refinancing Order") (as supplemented by (i) the DIP Extension Order (Docket No. 10957), (ii)
the Second DIP Extension Order (Docket No. 13489) (as supplemented by the Supplemental Second DIP
Extension Order (Docket No. 13699)), (iii) the DIP Accommodation Order (Docket No. 14515), (iv) the First
Accommodation Amendment Order (Docket No. 16377), and (v) the Second Accommodation Amendment
Order (Docket No. 16575), hereinafter referred to as the "DIP Order").

35.     The Debtors submit that entry of an order ratifying and approving the Debtors' entry into and implementation of the Fourth Credit Agreement Amendments, including selling eligible receivables to Chrysler SPV and granting priority liens to Chrysler SPV with respect to such receivables, is necessary and appropriate and in the best interests of the Debtors' estates.  Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

36.     Based on the foregoing, the Debtors submit that entry of an order ratifying and approving the Fourth Credit Agreement Amendments is necessary and appropriate to ensure collection of these receivables as both Delphi and Chrysler continue to work to reorganize.  The Fourth Credit Agreement Amendments were negotiated in good faith, at arm's length, and in the exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago,  Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor has exercised its business judgment, a court is not free to second-guess particular provisions but rather must determine whether the proposed action "as a whole is within reasonable business judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

37.     The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a presumption arises that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to produce some evidence respecting its objections."  In re Lionel Corp., 722 F.2d at 1071.

38.     The Debtors have exercised sound business judgment in determining that it is appropriate and necessary to enter into the Fourth Credit Agreement Amendments to ensure the timely payment of receivables from Chrysler no matter what happens in that company's restructuring.  Accordingly, the Court should ratify and approve the Debtors' entry into the Fourth Credit Agreement Amendments so that they may participate in the Auto Supplier Support Program.

> (b)     The Fourth Credit Agreement Amendments Should
>         Be Approved Under Section 364(c) Of The Bankruptcy Code

39.     To the extent that section 364 is applicable, the granting of liens pursuant to the Fourth Credit Agreement Amendment Documents is fully appropriate under that statutory provision.  The requirement for obtaining postpetition credit under section 364(c) is a finding,

made after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  This Court already made this finding in the DIP Refinancing Order, which approved the Debtors' DIP Facility.  This finding is even more justified today because the credit markets have deteriorated precipitously from the strong credit environment that existed in January 2007 when the Court entered the DIP Refinancing Order.

40.    Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

41.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met when it entered the DIP Refinancing Order.  Because the DIP Facility will remain in place, subject to the provisions of the Accommodation Agreement, this Court's prior findings should continue to apply.

19

42.    No previously unencumbered assets are being affected by these amendments to the detriment of creditors because the DIP Lenders already have security interests in all of the Debtors' receivables.  Moreover, in the ordinary course of their businesses outside of North America, the Debtors utilize accounts receivable factoring facilities to finance working capital needs.  Indeed, as set forth in the Debtors' Form 10-K filed on March 3, 2009, the Debtors had had $264 million outstanding under factoring facilities with a variety of financial institutions as of the end of 2008.  Therefore, participation in the Auto Supplier Support Program, including granting liens on transferred receivables, would be consistent with the Delphi's past and present international financing practices.  Accordingly, the Debtors should be permitted to grant the liens in accordance with section 364(c) of the Bankruptcy Code.

(c)    The Fourth Credit Agreement Amendments Should Be
Approved Under Section 364(d) Of The Bankruptcy Code

43.    To the extent that section 364(d) of the Bankruptcy Code is implicated by the Fourth Credit Agreement Amendments, the agreement is appropriate and should be approved under that provision.  Section 364(d)(1) provides that the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

(a)    the trustee is unable to obtain such credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  Id.

(quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the

Debtors have already established that they are unable to obtain credit without priming liens.  The

Fourth Credit Agreement Amendments will not impair the priming lien structure under the DIP

Facility, as amended, including the adequate protection provided to parties whose liens have

been primed.  Accordingly, to the extent that the Fourth Credit Agreement Amendments provide

for an extension of credit, the Debtors submit that such extension of credit meets the

requirements of section 364(d)(1).

       (d)      The Amended DIP Facility Should
                     Be Accorded The Benefits Of Section 364(e)

           44.       Section 364(e) of the Bankruptcy Code provides that the "reversal or

appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a

lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an

entity that extended such credit in food faith, whether or not such entity knew of the pendency of

the appeal, unless such authorization and the incurring of such debt, or the granting of such

priority or lien, were stayed pending appeal."  The Fourth Credit Agreement Amendments were

negotiated in good faith and no consideration is being provided to any party to, or guarantor of,

obligations arising under the amended DIP Facility, other than as disclosed in the Fourth Credit

Agreement Amendments.  Accordingly, the amended DIP Facility should be accorded the

benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

       (e)      Compliance With General Order No. M-274

           45.       The Debtors believe that the relief requested in this Motion and the notice

to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"),

adopted under General Order No. M-274 of the Board of Judges for the Southern District of New

York.  The Debtors do not believe that entering into the Fourth Credit Agreement Amendments

21

creates any incremental right that would trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in the DIP Motion[15] and approved by this Court pursuant to the DIP Refinancing Order.  Accordingly, the Debtors submit that they have satisfied the Guidelines.

I.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

        46.      Bankruptcy Rule 6004(h)[16] provides:  "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay because the Fourth Credit Agreement Amendments will provide an immediate benefit to the Debtors' estates through participation in the Auto Supplier Support Program.  The Debtors submit that the ability to effectuate the Fourth Credit Agreement Amendments immediately would further the Debtors' complex restructuring efforts, which they are pursuing within tight time constraints.  The Court did grant similar relief in entering each of the Prior DIP Orders, other than the DIP Accommodation Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

---

[15]     Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt dated December 18, 2006 (Docket No. 6180)

[16]     Formerly Bankruptcy Rule 6004(g).

<u>Notice Of Motion</u>

47.    Notice of this Motion will be provided in accordance with the order to show cause submitted on April 29, 2009.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an interim and final order (i) ratifying and approving the Debtors entry into the Fourth Credit Agreement Amendments and related documents and (ii) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
April 29, 2009

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:   /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti
Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

- and -

SHEARMAN & STERLING LLP

By:   /s/ Douglas P. Bartner
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker
599 Lexington Avenue
New York, New York  10022
(212) 848-4000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

24