**Hearing Date And Time: May 21, 2009 at 10:00 a.m.**
**Objection Deadline: May 14, 2009 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
      In re                      :    Chapter 11
                                :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                                :
                                :    (Jointly Administered)
                Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER, SOLELY AS TO STATUTORY COMMITTEES, EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE AND SOLICIT
ACCEPTANCES OF REORGANIZATION PLAN UNDER 11 U.S.C. § 1121(d)

("FIFTH § 1121(d) STATUTORY COMMITTEE EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 1121(d) further extending, solely as between the Debtors and the Statutory Committees (as defined below), the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization, and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders, which was disbanded on April 24, 2009 (together with the Creditors' Committee, the "Statutory Committees"). [1] On February 26, 2009, the U.S. Trustee appointed an official committee

---

[1]    The Debtors have moved for relief with respect to the Equity Committee, although it has been disbanded, because the time to appeal from the order directing the U.S. Trustee to disband the Equity Committee has not yet elapsed. If no appeal is taken by May 4, 2009, then at the hearing on this Motion

of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[2]  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led

_____

the Debtors will seek entry of an order extending their exclusive periods solely as to the Creditors' Committee.

[2]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

3

to Delphi's successful emergence from chapter 11.  The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.  In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to May 21, 2009 (Docket No. 16562) and may further extend the adjournment.  The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

4.      On April 30, 2008, the Debtors obtained an extension, subject to certain exceptions described below, of their exclusive right under section 1121 of the Bankruptcy Code to file one or more reorganization plans until 30 days after substantial consummation of the Confirmed Plan or any modified plan and the exclusive right to solicit and obtain acceptances for those plans until 90 days after substantial consummation of the Confirmed Plan or any modified plan.[3]  The Debtors' exclusive right to file a plan, solely as between the Debtors and the Statutory Committees (the "Plan Proposal Period"), has been extended through and including May 31, 2009, and the right to solicit a plan, solely as between the Debtors and the Statutory Committees (the "Solicitation Period,"

---

[3]    See Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483).

4

and, together with the Plan Proposal Period, the "Exclusive Periods"), has been extended through and including July 31, 2009.[4]

5.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6.      The statutory predicate for the relief requested herein, solely as between the Debtors and the Statutory Committees, is section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B.      Current Business Operations Of The Debtors

7.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[5]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[6]

---

[4]   See Order, Solely As To Statutory Committees, Extending Debtors' Exclusive Periods With Which To File And Solicit Acceptances Of Reorganization Plan Under 11 U.S.C. § 1121(d), dated March 24, 2009 (the " Postconfirmation Exclusivity Order").

[5]   The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[6]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court

8.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on

---

approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

$28.6 billion in net sales.[7]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

11.    The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the

---

[7]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S.

businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

13.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying

the Company's labor agreements to create a competitive arena in which to conduct

business; second, concluding their negotiations with GM to finalize GM's financial support

for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the

Company; third, streamlining their product portfolio to capitalize on their world-class

technology and market strengths and make the necessary manufacturing alignment with

their new focus; fourth, transforming their salaried workforce to ensure that the Company's

organizational and cost structure is competitive and aligned with its product portfolio and

manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

14.    The Confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization

cases, including Delphi's labor unions and GM.  The effectiveness of certain of these

agreements, including the Debtors' two comprehensive agreements with GM (the "Original

GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed

Plan.  After the Plan Investors refused to fund their obligations under the Investment

Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate

their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

8

15.    On September 12, 2008, the Debtors filed a motion for approval of

two comprehensive agreements with GM: the Amended and Restated Global Settlement

Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring

Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order

authorizing the Debtors' implementation of the Amended GSA and the Amended MRA,

the provisions of which became effective on September 29, 2008.

16.    Through the Amended GSA and Amended MRA, the Debtors

addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial

support from GM for certain of Delphi's legacy and labor costs and GM's business

commitments to Delphi going forward and (ii) devising a workable solution to Delphi's

pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to

contribute substantial additional value to the Debtors and eliminate significant elements of

conditionality to the performance of GM's obligations.  Delphi estimated the value of the

net consideration received under the Amended GSA and Amended MRA to be

approximately $10.6 billion (increased from approximately $6.0 billion under the Original

GSA and Original MRA).

17.    As a result of all the factors described above, during the fall of 2008

the Debtors were able to formulate certain modifications to the Confirmed Plan which are

set forth in the Plan Modification Motion.  Since the filing of the proposed modifications,

however, substantial uncertainty and a significant decline in capacity in the credit markets,

the global economic downturn generally, and the current economic climate in the

automotive industry, have adversely impacted Delphi's ability to develop a revised

recapitalization plan and successfully consummate a confirmed plan of reorganization.

Delphi, therefore, continues to engage in discussions with certain of its stakeholders to

formulate further plan modifications.  Moreover, as a result of the market turbulence, the

Debtors were unable to extend the maturity date of their DIP credit facility on terms

reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the

support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered

into an accommodation agreement which allows the Debtors, among other things, to

continue using certain of the proceeds of the postpetition financing facility through

June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make

certain advances and to accelerate payment of certain payables to the Debtors.

18.    At the same time, consistent with the plan modifications being

negotiated, the Company has been making further revisions to its business plan consistent

with the extremely low volume production environment in the global automotive industry

and depressed global capital and equity markets.  As part of the Debtors' efforts to achieve

sufficient emergence capital funding, Delphi and GM have been constructively working

together to pull forward elements of GM's previously agreed-upon support for Delphi into

one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites

to GM.  This arrangement is designed to facilitate Delphi's emergence from chapter 11

notwithstanding the current state of the global economy, the automotive industry, and the

capital markets.  The Presidential Task Force on the Auto Industry (the "Auto Task Force")

has also become a part of these and other strategic discussions, because of the Auto Task

Force's broader involvement in the automobile industry, including the Chrysler and GM

10

restructurings. In the meantime, Delphi will marshal all of its resources to continue to

deliver high-quality products to its customers globally. Additionally, the Company will

seek to preserve and continue the strategic growth of its non-U.S. operations and maintain

its prominence as one of the world's premier auto suppliers.

### Relief Requested

19.    The Debtors seek to extend the Exclusive Periods (solely as to the

Statutory Committees) under section 1121(d) of the Bankruptcy Code to prevent any lapse

in exclusivity as between the Debtors and the Statutory Committees. The Debtors seek

entry of an order further extending (a) the Plan Proposal Period, solely as between the

Debtors and the Statutory Committees, through and including July 31, 2009 and (b) the

Solicitation Period, solely as between the Debtors and the Statutory Committees, through

and including September 30, 2009. Although the Debtors are requesting a further

extension of the Exclusive Periods solely as between the Debtors and the Statutory

Committees, the Debtors nonetheless anticipate emerging from chapter 11 as soon as

reasonably practicable. As explained above, the Exclusive Periods as to all other parties-

in-interest are currently extended until after substantial consummation of the Confirmed

Plan or any modified plan.

### Basis For Relief

20.    As noted, the Debtors filed a reorganization plan, solicited

acceptances of that plan, obtained confirmation of it, and, after the Confirmation Order

became final, commenced a formal closing process that was suspended on April 4, 2008

pending the Debtors' pursuit of their remedies against the Plan Investors in ongoing

litigation and exploration with their stakeholders of possible modifications to the

Confirmed Plan.  The Debtors implemented the Amended GSA and Amended MRA and filed proposed modifications to the Confirmed Plan as part of the Plan Modification Approval Motion.  Due to the dramatic decline in volumes in the auto industry, the Debtors are continuing to negotiate with their DIP lenders, GM, and the Auto Task Force for further support.  Because negotiations are not expected to be final until later this month—in advance of the Obama administration's June 1, 2009 deadline for an agreement on GM's restructuring—the Debtors believe that it will take additional time beyond May 31, 2009 to file appropriate plan modifications and to solicit acceptances of those modifications.

21.     As a policy matter, the Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their businesses and to negotiate, propose, confirm, and consummate a reorganization plan without the deterioration and disruption of their businesses that might be caused by the filing of competing reorganization plans by non-debtor parties.  In re Dow Corning Corp., 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) (stating that primary consideration in determining whether to terminate exclusive periods "should be whether or not doing so would facilitate moving the case forward").  The Debtors are using the time to facilitate emergence from chapter 11 and further its transformation plan, which is consistent with the policy described in Dow Corning.  Therefore a further extension of the Exclusive Periods is justified.

22.     The Debtors have continued to make progress in their reorganization as follows:

- First, as already described above, the Debtors, with the support of the agent to the Debtors' DIP credit facility and the requisite lenders to the facility, have entered

into additional Court-approved amendments to the Accommodation Agreement, which permit the continued use of certain of the proceeds from their DIP credit facility through June 30, 2009, subject to the achievement of certain milestones.

- Second, the Debtors have been involved in ongoing negotiations with GM, the Auto Task Force, and the DIP lenders regarding an emergence capital funding structure that would facilitate the Debtors' emergence from chapter 11.

- Third, the Debtors have obtained Court approval of procedures to sell their brakes and ride dynamics businesses to Beijing West Industries Co., Ltd. for approximately $90 million (subject to estimated upward pre-Closing adjustments for certain Advance Payments approximating $18 million, assuming a November 1, 2009 Closing), of which approximately $30 million would be allocated to the Selling Debtor Entities.

- Fourth, the Debtors have received final approval to terminate certain salaried retiree benefits, thereby eliminating more than $1.1 billion in liabilities from their balance sheet, and have received approval of a settlement agreement with the Retirees' Committee and the Delphi Salaried Retirees' Association settling all appeal rights in connection with the termination of the retiree benefits.

23.    An extension is further justified because the markets have remained extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors to successfully attract emergence capital funding for their Modified Plan.  The Debtors have also filed motions seeking approval of several agreements reached with GM in order to supplement the Debtors' liquidity position and to substantially complete Delphi's portfolio transformation through the sale of Delphi's global Steering business to GM.  On March 23, 2009, counsel for the Auto Task Force notified GM and the Debtors in writing that the Auto Task Force objected to the parties seeking approval of these agreements until it had a further opportunity to review the details of those transactions and the various alternatives with respect to Delphi's emergence from chapter 11.  The Court adjourned the hearing on these motions to May 7, 2009 to allow

discussions with respect to these agreements and the Debtors' overall reorganization framework to progress.

24.     Moreover, the Debtors continue to litigate against the Plan Investors and related parties with respect to their refusal to honor their commitments under the Investment Agreement.  Combined with the other accomplishments detailed below, the unresolved contingencies relating to emergence, and the size and complexity of the Debtors' cases, the Debtors' continued progress toward emergence justifies a further extension of the Exclusive Periods solely as between the Debtors and the Statutory Committees.

<u>Applicable Authority</u>

25.     Under the Bankruptcy Code, a bankruptcy court may confirm only one plan of reorganization.  <u>See</u> 11 U.S.C. § 1129(c).  Because the Plan was confirmed on January 25, 2008 pursuant to the Confirmation Order that became final on February 4, 2008, and because that order cannot be revoked unless "procured by fraud," <u>see</u> 11 U.S.C. § 1144, no other plan of reorganization may now be filed or solicited in these cases.  Instead, unless the Confirmed Plan is withdrawn by the Debtors in accordance with the discretion granted to them by § 14.7(a) of the Confirmed Plan, only modifications to the Confirmed Plan proposed and prosecuted by the Debtors in accordance with section 1127 of the Bankruptcy Code may be considered by the Court.  Thus, section 1129(c) of the Bankruptcy Code operates to extend the exclusive periods until the Confirmed Plan (as modified or otherwise) becomes effective.  The Debtors and the Statutory Committees, however, have expressly reserved in the Postconfirmation Exclusivity Order their rights to

address, if any of the Exclusive Periods expires, whether 11 U.S.C. § 1129(c) prevents the

Statutory Committees from filing and soliciting a competing plan of reorganization.

26.    Nevertheless, section 1121(d) of the Bankruptcy Code permits the

court to extend a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective
> periods specified in subsections (b) and (c) of this section
> and after notice and a hearing, the court may for cause
> reduce or increase the 120-day period or the 180-day period
> referred to in this section.

11 U.S.C. § 1121(d).  The court in In re McLean Industries, Inc., 87 B.R. 830 (Bankr.

S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause"

to extend a debtor's Exclusive Periods:

> (a)    the existence of good-faith progress toward reorganization;
>
> (b)    existence of an unresolved contingency;
>
> (c)    the size and complexity of the debtor's case;
>
> (d)    a finding that the debtor is not seeking to extend exclusivity
> to pressure creditors "to accede to [the debtor's]
> reorganization demands"; and
>
> (e)    the fact that the debtor is paying its bills as they come due.

Id. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003)

(stating that not all factors "are relevant in every case" and court has discretion to "decide

which factors are relevant and give the appropriate weight to each").

27.    At least one court has noted that "cause may be measured by a more

lenient standard in the determination to grant an enlargement of time in which to gain

acceptances to a filed plan."  Gaines v. Perkins (In re Perkins), 71 B.R. 294, 299 (W.D.

Tenn. 1987) (emphasis added); see also In re Express One Int'l, Inc., 194 B.R. 98 (Bankr.

E.D. Tex. 1996) (denying motion to terminate and granting motion to extend exclusivity

based in part on debtors' filing of plan and disclosure statement and imminent hearing on

disclosure statement).  The same standard should apply when a debtor has confirmed a

plan and has moved for approval of modifications to the confirmed plan in accordance with

section 1127.

        28.    In other cases of similar size and complexity to Delphi's, courts have

extended the debtors' exclusive rights to propose a plan of reorganization for periods

similar to those requested by the Debtors.  See, e.g., In re Solutia Inc., No. 03-17949

(Bankr. S.D.N.Y. May 1, 2007) (extending periods for more than 43 months); In re W.R.

Grace & Co., No. 01-01139 (Bankr. D. Del. Oct. 3, 2006) (extending exclusive periods for

more than six years); In re Kaiser Aluminum Corp., No. 02-10429 (Bankr. D. Del. Nov. 2,

2005) (extending periods for approximately 43 months).  In these cases, based upon the

preceding factors and in line with other cases of similar size and complexity, sufficient

cause exists for a prophylactic extension of the Exclusive Periods as between the Debtors

and the Statutory Committees.

F.      The Debtors Have Made Good-Faith Progress Toward Reorganization

        29.    An extension of a debtor's exclusive periods is justified by a debtor's

progress in resolving issues facing its creditors and estates.  McLean Indus., 87 B.R. at

834; In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  As set forth

above, the Debtors' progress in these cases thus far is significant and compels a further

extension of the Exclusive Periods, should it be necessary.

        30.    Claims reconciliation.  The Debtors have reconciled most of the

nearly 17,000 proofs of claim filed in these cases, which assert in the aggregate

16

approximately $34.0 billion in liquidated amounts plus certain unliquidated amounts.  As

of April 30, 2009, the Debtors have objected to approximately 13,400 claims asserting

nearly $10.1 billion (plus additional unliquidated amounts) and this Court has granted

relief with respect to approximately $10.5 billion in asserted liquidated claims (plus

additional unliquidated claims).

31.     <u>Other key accomplishments</u>.  In addition, since the Debtors last

sought an extension of the Exclusivity Periods, they have also:

> (a)     obtained Court approval to sell a parcel of real property located in Anaheim, California to Bircher Anaheim Magnolia Avenue, LLC for approximately $20 million;
>
> (b)     taken steps to further reduce Delphi's U.S. cash burn rate;
>
> (c)     closed the sale of its exhaust business to Bienes Turgon S.A. de C.V. for approximately $17 million; and
>
> (d)     advanced the Plan Investor litigation by conducting expert deposition discovery and obtaining a Court order granting Delphi's motion to file an Amended Complaint.

In summary, the Debtors have continued to make significant, good-faith progress in their

chapter 11 cases.

G.     <u>Unresolved Contingencies Still Exist</u>

32.     Courts have also cited the need to resolve an important contingency

as justification for extending a debtor's exclusive periods.  The tasks of negotiating plan

modifications, securing exit financing, and obtaining Court approval remain significant for

both their magnitude and complexity and amply satisfy the contingency component

described in the <u>McLean Industries</u> test.

17

H.    These Cases Are Large And Complex

33.    The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods as between the Debtors and the Statutory Committees.  See, e.g., In re Texaco Inc., 76 B.R. 322, 324-25, 326-27 (Bankr. S.D.N.Y. 1987) (granting extension of exclusive periods based on debtor's size in $28.5 billion asset case with over 300,000 creditors and stockholders); In re United Press Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) (granting $40 million company extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan.").  These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, formulate a long-term business plan, and obtain confirmation of a reorganization plan.

34.    The Debtors' cases are indisputably large and multi-dimensional. The scope of actions that have been taken, and must be taken, to address Delphi's restructuring requirements is exceedingly complex.  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods, as between the Debtors and Statutory Committees, under the authorities cited above.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous challenges that are unique to the distressed automobile industry and some that

18

affect most large businesses that rely on the capital markets.  The extension of the

exclusive periods is necessary to continue progress in addressing these complexities.

I.      The Debtors Are Using Exclusivity For A Proper Purpose

35.      Courts have denied extensions of exclusive periods when plan

negotiations among parties-in-interest have broken down and the continuation of

exclusivity would merely give the debtor unfair bargaining leverage over the other parties-

in-interest.  See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in

the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981).  Here, however, the Debtors' request for

an extension of the Exclusive Periods as between the Debtors and the Statutory

Committees is not a negotiation tactic.  The Debtors negotiated with certain of their

stakeholders and obtained their acceptance of the Confirmed Plan.  The Debtors have

continued to negotiate with certain of their stakeholders, including reaching the

Accommodation Agreement (and, most recently, the amendments thereto) with the

administrative agent, the majority of the tranche A lenders and tranche B lenders, and

certain tranche C lenders, whereby the Debtors can continue to use certain of the proceeds

of the DIP credit facility through June 30, 2009 (subject to certain conditions).

Accordingly, the Debtors' next steps will include negotiating and finalizing modifications

to the Plan and obtaining emergence capital funding necessary to emerge from chapter 11.

J.      The Debtors Are Paying Their Bills As They Come Due

36.      Courts considering an extension of exclusivity may also assess a

debtor's liquidity and solvency.  See In re Ravenna Indus., Inc., 20 B.R. 886, 890 (Bankr.

N.D. Ohio 1982).  The Debtors have satisfied this test by paying their bills as they come

due, including the statutory fees paid quarterly to the United States Trustee, and by

19

obtaining Court approval of certain amendments to the Accommodation Agreement to preserve the Debtors' liquidity.

K.    The Debtors Have Shown Cause To Further Extend The Exclusive Periods

37.    As described above, the Debtors have made significant and productive strides in these chapter 11 cases.  Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods as between the Debtors and the Statutory Committees.  Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

Notice

38.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Fourteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered May 1, 2009 (Docket No. 16589).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

20

WHEREFORE the Debtors respectfully request that the Court enter an order (a) extending the Debtors' exclusive periods, solely as between the Debtors and the Statutory Committees, (i) to file a plan of reorganization through and including July 31, 2009 and (ii) to solicit acceptance of a plan of reorganization through and including September 30, 2009 and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         May 1, 2009

                            SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                            By:   /s/ John Wm. Butler, Jr.
                                  John Wm. Butler, Jr.
                                  Ron E. Meisler
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois 60606
                            (312) 407-0700

                                          - and –

                            By:   /s/ Kayalyn A. Marafioti
                                  Kayalyn A. Marafioti
                                  Thomas J. Matz
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                            Attorneys for Delphi Corporation, et al.,
                             Debtors and Debtors-in-Possession

21