**Interim Hearing Date and Time:  May 7, 2009 at 9:00 a.m. (prevailing Eastern time)**
**Interim Objection Deadline:  May 7, 2009 at 8:00 a.m. (prevailing Eastern time)**
**Final Hearing Date and Time:  May 21, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Final Objection Deadline:  May 18, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

EXPEDITED MOTION FOR INTERIM AND FINAL ORDER AUTHORIZING DEBTORS TO
(I) ENTER INTO THIRD AMENDMENT TO ACCOMMODATION AGREEMENT WITH
CERTAIN PARTICIPATING DIP LENDERS AND (II)(A) ENTER INTO RELATED
DOCUMENTS AND (B) PAY FEES AND EXPENSES IN CONNECTION THEREWITH

("THIRD ACCOMMODATION AMENDMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Expedited Motion For Interim And Final Order Authorizing Debtors To (I)

Enter Into Third Amendment To Accommodation Agreement With Certain Participating DIP

Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In

Connection Therewith (the "Motion"), and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders, which was disbanded on April 24,

2009.  On February 26, 2009, the U.S. Trustee appointed an official committee of retired

employees to represent certain of the Debtors' current active salaried employees, retirees, and

their spouses for certain limited purposes.

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

2

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court

subsequently entered an order approving the adequacy of the December 10 Disclosure Statement

and granting the related solicitation procedures motion (Docket No. 11389).  On January 25,

2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the

"Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors

on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as

confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a

closing that was commenced but not completed and refused to fund their Investment Agreement

(as defined in the Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed complaints for

damages and specific performance against the Plan Investors and related parties who refused to

honor their equity financing commitments or participate in the closing that would have led to

Delphi's successful emergence from chapter 11.  The Debtors nevertheless have continued to

work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as

practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan

Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications

to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-

soliciting votes on the Confirmed Plan, as modified.  In light of the unprecedented decline in

global automotive production volumes and the deepening of the crisis in global debt and equity

markets, the Debtors adjourned the hearing on the Plan Modification Motion to May 21, 2009

---

[1]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process in the bankruptcy court.

(Docket No. 16562) and may further extend the adjournment.  The adjournment has facilitated

the Debtors' consideration of further supplemental plan modifications required by the current

economic environment.

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are sections 363

and 364 of the Bankruptcy Code and rule 6004(h) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately

$10.3 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[3]

7.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

---

[2]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
       worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
       automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
       proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
       receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
       which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
       2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
       footprint and to lower its overall cost structure.

modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined

below), the Company's net operating loss for the year was $1.5 billion.

10.     The Debtors believe that the Company's financial performance was

deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S.

legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable,

non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a

competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced

number of motor vehicles that GM produces annually in the United States and related pricing

pressures, and (iii) increasing commodity prices.

11.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

12.     On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

6

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their pension situation.

E.      Plan Confirmation And Postconfirmation Matters

13.      The Confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases,

including Delphi's labor unions and GM.  The effectiveness of certain of these agreements,

including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the

"Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan

Investors refused to fund their obligations under the Investment Agreement, the Debtors

nevertheless continued working with their stakeholders to evaluate their options to move forward

to emerge from chapter 11 as soon as reasonably practicable.

14.      On September 12, 2008, the Debtors filed a motion for approval of two

comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement

(the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the

"Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors'

implementation of the Amended GSA and the Amended MRA, the provisions of which became

effective on September 29, 2008.

15.      Through the Amended GSA and Amended MRA, the Debtors addressed

two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM

for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the

Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the

Debtors and eliminate significant elements of conditionality to the performance of GM's

obligations.  Delphi estimated the value of the net consideration received under the Amended

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the Original GSA and Original MRA).

16.    As a result of all the factors described above, during the fall of 2008 the

Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth

in the Plan Modification Motion.  Since the filing of the proposed modifications, however,

substantial uncertainty and a significant decline in capacity in the credit markets, the global

economic downturn generally, and the current economic climate in the automotive industry, have

adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully

consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in

discussions with certain of its stakeholders to formulate further plan modifications.  Moreover, as

a result of the market turbulence, the Debtors were unable to extend the maturity date of their

DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.

Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the

Debtors entered into an accommodation agreement which allows the Debtors, among other

things, to continue using certain of the proceeds of the postpetition financing facility through

June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain

advances and to accelerate payment of certain payables to the Debtors.

17.    At the same time, consistent with the plan modifications being negotiated,

the Company has been making further revisions to its business plan consistent with the extremely

low volume production environment in the global automotive industry and depressed global

capital and equity markets.  As part of the Debtors' efforts to achieve sufficient emergence

capital funding, Delphi and GM have been constructively working together to pull forward

elements of GM's previously agreed-upon support for Delphi into one payment at emergence in

8

combination with the transfer of certain of Delphi's U.S. sites to GM.  This arrangement is

designed to facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the

global economy, the automotive industry, and the capital markets.  The Presidential Task Force

on the Auto Industry (the "Auto Task Force") has also become a part of these and other strategic

discussions, because of the Auto Task Force's broader involvement in the automobile industry,

including the Chrysler and GM restructurings.  In the meantime, Delphi will marshal all of its

resources to continue to deliver high-quality products to its customers globally.  Additionally, the

Company will seek to preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as one of the world's premier auto suppliers.

F.      The Accommodation Agreement And Amendments Thereto

18.      Since January 5, 2007, the Debtors have been operating in these chapter

11 cases by utilizing the proceeds of a refinanced debtor-in-possession facility (the "DIP

Facility")[5] comprised of three tranches:  (i) a first priority revolving credit facility ("Tranche A"),

(ii) a first priority term loan ("Tranche B"), and (ii) a second priority term loan ("Tranche C").[6]

The DIP Facility is governed by an Amended and Restated Revolving Credit, Term Loan and

Guaranty Agreement dated as of May 9, 2008 (as amended, the "Credit Agreement").

19.      In the fourth quarter of 2008, facing frozen global credit markets and one

of the worst bear markets in the history of the global capital markets, the Debtors negotiated an

---

[5]      The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I)
Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter
Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing
Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November
7, 2008 (Docket No. 14408) (the "Accommodation Motion").

[6]      As of the date of this Motion the Debtors owe approximately $249 million to the Tranche A lenders, $337
million to the Tranche B lenders, and $2.75 billion to the Tranche C lenders.

9

accommodation agreement (as amended, the "Accommodation Agreement")[7] with the

administrative agent (the "Agent") under the DIP Facility and obtained consent to this agreement

from the requisite lenders under the DIP Facility (the "DIP Lenders").[8]  Under the

Accommodation Agreement the Debtors could continue using certain of the proceeds of the DIP

Facility through June 30, 2009 (the "Accommodation Period"), subject to the terms and

conditions set forth in that agreement, as amended.  This Court authorized the Debtors to enter

into the Accommodation Agreement by order entered on December 3, 2008 (the "DIP

Accommodation Order") (Docket No. 14515) and the parties subsequently effectuated the

agreement on December 12, 2008.

    20.  To remain in compliance with the Accommodation Agreement and

maximize available liquidity, the Debtors and the requisite percentage of DIP Lenders who

participated in the Accommodation Agreement (the "Participant Lenders") agreed to amend the

Accommodation Agreement on January 30, 2009, which amendments were supplemented by

agreement dated February 25, 2009 (as supplemented, the "First Accommodation Agreement

Amendment").[9]  The Court authorized the Debtors' entry into the First Accommodation

Agreement Amendment by order entered on February 25, 2009 (the "First Accommodation

Amendment Order") (Docket No. 16377).

---

[7] A copy of the Accommodation Agreement is attached as Exhibit A to the DIP Accommodation Order (as defined below).

[8] Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not required to seek the Tranche C lenders' consent to the Accommodation Agreement, to encourage Tranche C lenders to assist the Debtors with their emergence capital funding efforts, the Debtors nevertheless sought and obtained this Court's approval of certain incentives for those Tranche C lenders which consented to the Accommodation Agreement.

[9] See Motion For Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With Certain Participating DIP Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In Connection Therewith (Docket No. 14703).

21.     On March 4, 2009, the Debtors filed motions seeking this Court's approval of (i) amendments to Delphi's liquidity support arrangement with GM (the "GM Arrangement") that would have increased GM's commitments under the GM Arrangement from $300 million to $450 million (Docket No. 16411) and (ii) GM's exercising the "Unsold Business Option" referred to in Section 4.06(a)(i) of the Amended MRA with respect to Delphi's global steering and halfshaft business (Docket No. 16410).  These two motions were scheduled to be heard at an omnibus hearing on March 24, 2009.  The night before the hearing, however, counsel for the Treasury Department notified GM and the Debtors in writing that the Treasury Department objected to the parties seeking approval of these agreements until the Treasury Department had a further opportunity to review the details of those transactions and the various alternatives with respect to Delphi's emergence from chapter 11.  The Court adjourned the hearing on these motions to May 7, 2009 to allow discussions with respect to these agreements and the Debtors' overall reorganization framework to progress.  As a result of subsequent events, the hearing on these motions will now be adjourned to May 21, 2009.

22.     Because those agreements with GM, which would provide significant liquidity to the Debtors, continue to be effectively blocked by the Treasury Department, additional amendments to the Accommodation Agreement were necessary.  Accordingly, on March 31, 2009, the Debtors reached an agreement with the Participant Lenders to certain additional amendments to the Accommodation Agreement (as supplemented by agreements entered into on April 3 and April 22, 2009, the "Second Accommodation Agreement Amendment").[10]  Among other things, the Second Accommodation Agreement Amendment required the Debtors to deliver to the Agent on or prior to May 4, 2009 a detailed term sheet (the

---

[10]     See Expedited Motion For Interim And Final Order Authorizing Debtors To (I) Enter Into Second Amendment To Accommodation Agreement With Certain Participating DIP Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In Connection Therewith (Docket No. 16534).

"Term Sheet") agreed to by both GM and the U.S. Treasury Department Auto Task Force setting

forth the terms of a global resolution of matters relating to GM's contribution to the resolution of

these chapter 11 cases.[11]   The Court authorized the Debtors' entry into the Second

Accommodation Agreement Amendment by final order entered on April 23, 2009 (the "Final

Accommodation Supplemental Second Amendment Order ") (Docket No. 16575).[12]   The Second

Accommodation Agreement Amendment, among other things, modified the milestone dates in

the Accommodation Agreement and provided interim liquidity by lowering the required cash

collateral balances to facilitate continued discussions regarding a consensual resolution of these

chapter 11 cases.

   23.  Following approval of the Second Accommodation Agreement

Amendment, as supplemented, the Debtors continued to seek resolution on a Term Sheet but

were unable to reach agreement by May 4, 2009.  Thus, the Debtors and the DIP Lenders agreed

to further amend the Accommodation Agreement to provide the Debtors additional time and

sufficient liquidity to continue negotiations.

Relief Requested

   24.  By this Motion, the Debtors seek entry of an interim and final order

authorizing them to (i) enter into the Third Accommodation Agreement Amendment (as defined

below) with the Participant Lenders party thereto and (ii)(a) enter into related documents and (b)

pay fees and expenses in connection therewith.  Under the terms of the Third Accommodation

Agreement Amendment, this Court's approval of the agreement prior to May 23, 2009 and the

---

[11]   See Notice of Filing of Second Supplemental Second Amendment to Accommodation Agreement (Docket No. 16573.

[12]   On April 3, 2009, the Court entered an order approving the Supplemental Second Amendment on an interim basis, pending a final hearing scheduled for April 23, 2009 (the "Interim Accommodation Supplemental Second Amendment Order") (Docket No. 16549).  A copy of the Supplemental Second Amendment was attached to the Interim Accommodation Supplemental Second Amendment Order as Exhibit A.

payment of related fees and expenses are conditions subsequent to the effectiveness of the amendment.[13]  Accordingly, the Debtors will seek the Court's interim approval of the Third Accommodation Agreement Amendment and the payment of related fees and expenses on an expedited basis at a hearing to be scheduled by order to show cause, subject to a final hearing on the Motion on May 21, 2009.

<u>Basis For Relief</u>

25.    As a result of not having an agreed-upon term sheet with GM and the Treasury Department by May 4, 2009, the Debtors and the DIP Lenders needed to modify the Accommodation Agreement to avoid the negative consequences of the Debtors' not satisfying certain of the Accommodation Agreement milestones.  Accordingly, on May 6, 2009, the Debtors reached an agreement in principle with their DIP Lenders to amend certain provisions of the Accommodation Agreement (the "Third Accommodation Agreement Amendment") pursuant to the terms described herein.[14]  The Third Accommodation Agreement Amendment provides for, among other things, modifications to the milestones relating to delivery and acceptance of the Term Sheet.  Entry into the Third Accommodation Agreement Amendment is a necessary step to enable the Debtors to maintain operations with sufficient and uninterrupted liquidity as they continue their complex emergence negotiations with their stakeholders and the Treasury Department and formulate modifications to their Confirmed Plan.

---

[13]    As with the Second Accommodation Agreement Amendment, the Debtors are required to obtain authority from the Bankruptcy Court to pay fees to the Participant Lenders in these amendments (and pay the expenses of certain professional advisors) by May 12, 2009 in order to receive requisite lender support for the amendment.

[14]    The Third Accommodation Agreement Amendment was circulated among the DIP Lenders for their approval on May 6, 2009.  The Debtors expect that the amendment will be fully executed by the deadline to receive signature pages on May 7, 2009 at 3:00 p.m. (prevailing Eastern time).  A copy of the Third Accommodation Agreement Amendment is attached hereto as <u>Exhibit A</u>.

G.    The Third Accommodation Amendment

26.    Under the Third Accommodation Agreement Amendment, the DIP
Lenders and the Debtors have agreed to modify the Accommodation Agreement to avoid an
early termination of the Accommodation Period, which would have otherwise resulted from the
Debtors not having delivered the Term Sheet to the Agent by May 4, 2009.  The Third
Accommodation Agreement Amendment leaves the basic framework of the Second
Supplemental Second Amendment intact but further extends the timing of the various
milestones.  Thus, pursuant to the Third Accommodation Agreement Amendment, the timeframe
within which the Debtors are obligated to deliver a Term Sheet to the Agent has been extended
to May 21, 2009.  Failure to meet this revised deadline would constitute an Accommodation
Default.  Further, the Accommodation Period would terminate on June 2, 2009 if the requisite
DIP Lenders had not affirmatively notified the Debtors on or prior to June 1, 2009 that the Term
Sheet was satisfactory.  Additionally, under the Third Accommodation Agreement Amendment
the Debtors would be required to apply the Incremental Borrowing Base Cash Collateral to
repayment of Tranche A and B DIP Loans on May 22, 2009 if the Debtors did not deliver a Term
Sheet to the Agent by May 21, 2009.

27.    In addition to the extension of these milestones, the Third Accommodation
Agreement Amendment adds a new Section 3(o) that provides that the Debtors will agree to
continue to explore strategic alternatives for resolving the chapter 11 cases.

28.    The Third Accommodation Agreement Amendment also contains certain
fee and expense provisions, including the payment to the Participant Lenders that consent to the
Third Accommodation Agreement Amendment of an amendment fee of 20 basis points.  Other

14

fee and expense provisions are contained in separate fee and expense letters, which the parties

have agreed will be kept confidential.[15]

   29. The Third Accommodation Agreement Amendment also contains

conditions subsequent that provide for termination of the amendment under certain conditions.

First, the Third Accommodation Agreement Amendment will terminate on May 12, 2009 if prior

to that date (i) the Court has not entered an order satisfactory in form and substance to the Agent

authorizing the Third Accommodation Agreement Amendment on an interim basis and the

payment of related fees and expenses and (ii) the Debtors have not applied $45 million from the

Incremental Borrowing Base Cash Collateral Accounts to repay the Tranche A and Tranche B

DIP Loans. Second, the Third Accommodation Agreement Amendment will terminate on May

23, 2009 if prior to that date the Court has not entered an order satisfactory in form and

substance to the Agent authorizing the Third Accommodation Agreement Amendment on a final

basis and the payment of related fees and expenses. Finally, the amendment may be terminated

if prior to May 12, 2009 or May 23, 2009, the Debtors have not paid all reimbursable fees and

expenses as required under the DIP Credit Agreement and/or the Expense Side Letters for which

invoices have been submitted prior to that date. The Debtors accordingly propose that on an

interim basis, pending a final hearing on the Motion at the omnibus hearing scheduled on May

21, 2009, their execution and delivery of the Third Accommodation Agreement Amendment as

of May 7, 2009, together with all other documentation executed in connection therewith (the

"Third Amendment Documents"), be ratified and approved and that they be authorized, but not

directed, to perform and take all actions necessary to effectuate the Third Accommodation

Agreement Amendment and to pay the related fees and expenses contemplated thereby. The

---

[15] The fee letters will be provided, upon request, to counsel to the Creditors' Committee (on a professionals' eyes only basis) and the U.S. Trustee, and will be made available to this Court for review.

Debtors also seek an interim and final ruling that the Third Amendment Documents and each of the instruments and documents as may be necessary to effectuate the Third Accommodation Agreement Amendment constitute valid and binding obligations of the Debtors, the Agent, and the Participant Lenders, enforceable against each party thereto in accordance with their respective terms.

30.      The Debtors propose that the DIP Refinancing Order,[16] as supplemented by subsequent Supplemental DIP Orders[17] (the DIP Refinancing Order and the Supplemental DIP Orders, together, the "DIP Order"), be deemed supplemented by any order approving this Motion but otherwise continue in full force and effect.

<u>Applicable Authority</u>

H.      <u>This Court Should Authorize Third Accommodation Agreement Amendment</u>

(a)      The Third Accommodation Agreement Amendment Is An Appropriate <u>Use Of Estate Property Under Section 363(b)(1) Of The Bankruptcy Code</u>

31.      The Debtors submit that entry of an order authorizing the entry into and implementation of the Third Accommodation Agreement Amendment, including the payment of related fees, is necessary and appropriate and in the best interests of the Debtors' estates. Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business may be authorized if the debtor

---

[16]   Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (Docket No. 6461) (the "DIP Refinancing Order").

[17]   The DIP Refinancing Order has been supplemented by (i) the DIP Extension Order (Docket No. 10957), (ii) the Second DIP Extension Order (Docket No. 13489) (as supplemented by the Supplemental Second DIP Extension Order (Docket No. 13699)), (iii) the DIP Accommodation Order (Docket No. 14515), (iv) the Accommodation Amendment Order (Docket No. 16377), (v) the Interim Accommodation Supplemental Second Amendment Order (Docket No. 16549), and (vi) the Final Accommodation Supplemental Second Amendment Order (Docket No. 16575) (collectively, the "Supplemental DIP Orders").

demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires

finding that good business reason exists to grant debtor's application under section 363(b)); see

also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

32.    Based on the foregoing, the Debtors submit that entry of an order

approving the proposed Third Accommodation Agreement Amendment is necessary and

appropriate to maintain liquidity as they continue to work to reorganize.  The proposed Third

Accommodation Agreement Amendment was negotiated in good faith, at arm's length, and in the

exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to a debtor's

business judgment on most business decisions, including the decision to borrow money.  See

Group of Institutional Investors v. Chicago,  Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523,

550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering

whether a debtor has exercised its business judgment, a court is not free to second-guess

particular provisions but rather must determine whether the proposed action "as a whole is within

reasonable business judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr.

S.D.N.Y. 1990).

33.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated

17

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to

produce some evidence respecting its objections."  In re Lionel Corp., 722 F.2d at 1071.

   34. The Debtors have exercised sound business judgment in determining that

it is appropriate and necessary to enter into the Third Accommodation Agreement Amendment to

(i) protect liquidity that, absent the Third Accommodation Agreement Amendment, would

otherwise be required to be repaid to the DIP Lenders under the Accommodation Agreement and

(ii) allow the Debtors, the DIP Lenders, GM, and the Treasury Department to agree on a sensible

and practical reconfiguration of the milestones relating to modifications to the Confirmed Plan

and emergence from chapter 11.  The Debtors believe that the proposed terms of the Third

Accommodation Agreement Amendment, taken as a whole, are reasonable, necessary, and in the

best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to

enter into the Third Accommodation Agreement Amendment and take the other actions

contemplated by the Third Accommodation Agreement Amendment as requested herein.

   (b) The Third Accommodation Agreement Amendment
     Should Be Approved Under Section 364(c) Of The Bankruptcy Code

   35. To the extent that section 364 is applicable, the agreement is fully

appropriate under that statutory provision.  The requirement for obtaining postpetition credit

under section 364(c) is a finding, made after notice and a hearing, that the debtors are "unable to

obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11

U.S.C. § 364(c).  This Court already made this finding in the DIP Refinancing Order, which

approved the Debtors' DIP Facility.  This finding is even more justified today because the credit

18

markets have deteriorated precipitously from the strong credit environment that existed in

January 2007 when the Court entered the DIP Refinancing Order.  Because the DIP Facility will

remain in place, subject to the terms of the Accommodation Agreement, as amended by the

Accommodation Amendment, the Debtors should be permitted to continue to grant the liens in

accordance with section 364(c) of the Bankruptcy Code.

36.    Section 364(c) financing is appropriate when the trustee or debtor-in-

possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

37.    Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether

> (a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e.,
> by allowing a lender only an administrative claim;
>
> (b)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)    the terms of the transaction are fair, reasonable, and adequate, given the
> circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met

when it entered the DIP Refinancing Order.  Because the DIP Facility will remain in place,

subject to the provisions of the Accommodation Agreement, as amended by the Third

Accommodation Agreement Amendment, this Court's prior findings should continue to apply.

      (c)     The Third Accommodation Agreement Amendment
                  <u>Should Be Approved Under Section 364(d) Of The Bankruptcy Code</u>

      38.     To the extent that section 364(d) of the Bankruptcy Code is implicated by the Third Accommodation Agreement Amendment, the agreement is appropriate and should be approved under that provision.  Section 364(d)(1) provides that the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

      (a)     the trustee is unable to obtain such credit otherwise; and

      (b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  <u>In re Mosello</u>, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  <u>Id.</u> (quoting <u>In re Beker Indus. Corp.</u>, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the Debtors have already established that they are unable to obtain credit without priming liens.  The Accommodation Amendment will not impair the priming lien structure under the DIP Facility, as amended, including the adequate protection provided to parties whose liens have been primed.  Accordingly, to the extent that the Third Accommodation Agreement Amendment provides for an extension of credit, the Debtors submit that such extension of credit meets the requirements of section 364(d)(1).

20

(d)    The Amended DIP Facility Should
Be Accorded The Benefits Of Section 364(e)

39.    Section 364(e) of the Bankruptcy Code provides that the "reversal or

appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a

lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an

entity that extended such credit in food faith, whether or not such entity knew of the pendency of

the appeal, unless such authorization and the incurring of such debt, or the granting of such

priority or lien, were stayed pending appeal."  The Third Accommodation Agreement

Amendment was negotiated in good faith and no consideration is being provided to any party to,

or guarantor of, obligations arising under the amended DIP Facility, other than as disclosed in

the Third Accommodation Agreement Amendment.  Accordingly, the amended DIP Facility

should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set

forth herein.

(e)    Compliance With General Order No. M-274

40.    The Debtors believe that the relief requested in this Motion and the notice

to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"),

adopted under General Order No. M-274 of the Board of Judges for the Southern District of New

York.  The Debtors do not believe that entering into the Third Accommodation Agreement

Amendment creates any incremental right that would trigger the application of the Extraordinary

Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in

the DIP Motion[18] and approved by this Court pursuant to the DIP Refinancing Order.

Accordingly, the Debtors submit that they have satisfied the Guidelines.

---

[18]    Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),
And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition

I.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

41.    Bankruptcy Rule 6004(h)[19] provides:  "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay because the Third Accommodation Agreement Amendment will provide immediate relief necessary to facilitate the Debtors' ability to negotiate modifications to its Confirmed Plan. Although the Court did not grant similar relief from Bankruptcy Rule 6004(h) in granting the Accommodation Order, the Debtors submit that the ability to effectuate the Third Accommodation Agreement Amendment immediately would further the Debtors' complex restructuring efforts, which they are pursuing within tight time constraints.  The Court did grant similar relief in entering each of the Supplemental DIP Orders, other than the DIP Accommodation Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

42.    Notice of this Motion will be provided in accordance with the proposed order to show cause submitted to the Court on May 6, 2009.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt dated December 18, 2006 (Docket No. 6180)

[19]    Formerly Bankruptcy Rule 6004(g).

WHEREFORE the Debtors respectfully request that the Court enter an interim and final order (i) authorizing the Debtors to enter into the Third Accommodation Amendment with the Participant Lenders thereto, (ii) authorizing the Debtors to (a) enter into related documents and (b) pay fees and expenses in connection therewith, and (iii) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                May 6, 2009

                                SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                                By:    /s/ John Wm. Butler, Jr.
                                       John Wm. Butler, Jr.
                                       John K. Lyons
                                       Ron E. Meisler
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                       - and -

                                By:    /s/ Kayalyn A. Marafioti
                                       Kayalyn A. Marafioti
                                       Thomas J. Matz
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                       - and -

                                SHEARMAN & STERLING LLP

                                By:    /s/ Douglas P. Bartner
                                       Douglas P. Bartner
                                       Andrew V. Tenzer
                                       Michael S. Baker
                                599 Lexington Avenue
                                New York, New York  10022
                                (212) 848-4000

                                Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession

23