**Hearing Date and Time: May 21, 2009 at 10:00 a.m. Eastern Time**
**Objection Deadline: May 18, 2009 at 4:00 p.m. Eastern Time**

MUNSCH HARDT KOPF & HARR, P.C.
Russell L. Munsch, Esq.
Texas Bar No. 14671500
Raymond J. Urbanik, Esq.
New York   RU 1842
Jay H. Ong, Esq.
Texas Bar No. 24028756
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Telecopier: (214) 855-7584
*Attorneys for Computer Sciences Corporation*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **DELPHI CORPORATION, <u>et</u> <u>al</u>.,** | **Case No. 05-44481 (RDD)** |
| **Debtors.** | **Jointly Administered** |

## MOTION OF COMPUTER SCIENCES CORPORATION PURSUANT TO 11 U.S.C. § 503 FOR ORDER ALLOWING AND DIRECTING PAYMENT OF ADMINISTRATIVE EXPENSE PRIORITY CLAIM FOR UNPAID POST-PETITION OBLIGATIONS

TO THE HONORABLE ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:

Computer Sciences Corporation ("<u>CSC</u>"), party to a post-petition contract with the

Debtors, an administrative expense priority creditor and party-in-interest in the above-captioned,

jointly administered Chapter 11 bankruptcy cases ("<u>Bankruptcy Case</u>") of Delphi Corporation

("<u>Delphi</u>") and its affiliated Debtors (collectively, "<u>Debtors</u>"), hereby moves for an order of this

Court Allowing and Directing Payment of Administrative Expense Priority Claim for Unpaid

Post-petition Obligations ("Motion"), and in support hereof, would respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.    CSC and the Debtors are parties to a Master Services Agreement dated March 9, 2007, as amended (the "MSA"), under which CSC provides technology services to the Debtors, including worldwide telecommunication and network support services and application development and maintenance services.

2.    Since its execution, CSC has consistently and conscientiously performed its obligations under the MSA in good faith.  Unfortunately, however, relations between CSC and Delphi have been strained in recent months as Delphi has defaulted under its obligations under the MSA by, among other things, failing to pay substantial amounts when due, including, but not limited to, charges that are by definition under the MSA deemed as "undisputed."  Pursuant to the MSA, Delphi is required to pay to CSC all Undisputed Charges when due.  Additionally, Delphi has refused to negotiate with CSC in good faith to attempt to resolve charges that Delphi categorizes as disputed charges, as that term is defined under the MSA.   Finally, as of the date of this Motion, Delphi has failed to fulfill obligations under the MSA to deposit certain amounts into escrow in a timely manner, some of which amounts will be past due if not deposited by the hearing date of this Motion.

3.    As of the date of this Motion, Delphi's refusal to comply with the MSA has resulted in arrearages of $15,665,101 in undisputed, past due charges as defined under the MSA ("Undisputed Charges") and $13,158,384 in disputed charges as defined in the MSA ("Disputed

Charges"), for a total outstanding amount due and owing to CSC of $28,823,485.[1]  CSC also believes other significant amounts are owed in relation to other unresolved disputes.  However, they are not being sought at this time.  Finally, under the MSA, on or before May 12, 2009, the Debtors are required to deposit approximately $1,247,210 into escrow and CSC also has the present right to demand an additional deposit of $6,158,579 into escrow.

4.       In light of the very substantial amounts at stake, CSC can neither be expected, nor should be expected, to continue providing services under the post-petition MSA under current conditions and without compensation.  Pursuant to the MSA and applicable law, the Debtors must fulfill their post-petition obligations to CSC in the ordinary course and continue to fulfill those obligations going forward, or procure alternate services.

5.       As a result of Delphi's failure to pay Undisputed Charges, on May 5, 2009, CSC delivered a notice of termination of the MSA ("Termination Notice"), effective as of May 5, 2009, a true and correct copy of which is attached hereto as **Exhibit "A"** and incorporated herein by reference for all purposes.[2]  To further protect its rights, CSC now seeks the allowance and immediate payment of an administrative expense priority claim for the Debtors' liabilities resulting from their defaults under the MSA.

6.       Notwithstanding the delivery of the Termination Notice and lack of payment, CSC is not, at this time, seeking to abandon its duties under the MSA.  CSC has contractual

---

[1]    The escrow shortage is a subset of Disputed Charges and therefore does not increase the aggregate past due amount.  Any Debtors' failure, however, to satisfy the escrow shortage gives rise to an additional default under the MSA.

Capitalized terms used and not otherwise defined herein have the same definitions as in the MSA.

[2]    The MSA, as a post-petition contract, is exempt from the scope of the automatic stay.  *See Bellini Imps., Ltd. v. Mason & Dixon Lines, Inc.*, 944 F.2d 199, 201 (4th Cir. 1991) (holding that the automatic stay does not apply to a claim for breach of a post-petition contract); *In re Plexus Enter., Inc.*, 289 B.R. 778, 779 (Bankr. M.D. Fla. 2002); *In re First Am.. Health Care of Georgia, Inc.*, Nos. 96-20188, 20190, 20218, 1997 WL 33477665, at *5 (Bankr. S.D. Ga. Apr. 8, 1997) (stating that the automatic stay does not prevent the termination of a post-petition contract under its terms) (citing *Hazen First State Bank v. Speight*, 888 F.2d 574, 576 (8th Cir. 1989)).

obligations to provide "Termination Assistance Services" pursuant to the MSA, and CSC commits to abide by such obligations provided that Delphi fully complies with its duties and obligations under the MSA, including mandatory required payments in advance to CSC for Termination Assistance Services.  The MSA requires mandatory payment in <u>advance of the month</u> for which Termination Assistance Services are requested.  Delphi therefore must immediately remit payment of the May 2009 Termination Assistance Services as well as the other amounts described above.  (*See* MSA 4.4(a)(4)).  CSC estimates that monthly Termination Assistance Services, based on current volumes, are approximately $8 million per month.

## II.  <u>JURISDICTION AND VENUE</u>

7.      This Court has jurisdiction over the Bankruptcy Case and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

8.      Venue of the above-captioned, jointly administered Bankruptcy Case, and of this Motion, is appropriate before this Court in this district under 28 U.S.C. §§ 1408 and 1409.  Pursuant to section 19.4 of the MSA, any and all legal actions brought in connection with the MSA and prior to the Debtors' emergence from bankruptcy, are required to be brought before this Court.  (*See* MSA § 19.4.)

9.      The statutory predicate for the relief requested herein is section 503 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>").

## III.  <u>BACKGROUND</u>

### A.      General Bankruptcy Background

10.      On October 8, 2005, Delphi and certain of its subsidiaries and affiliates filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On October 14, 2005, additional of Delphi's Debtor affiliates filed with this Court their own voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  By Order of this Court entered on

October 8, 2005 [Docket No. 28], this Court ordered that the Debtors' Chapter 11 cases be jointly administered.

11.     Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors remain in possession and control of their assets and property, have continued to manage their affairs, and continue to operate their business.  No trustee or examiner has been appointed under section 1104 of the Bankruptcy Code.

12.     On October 20, 2005, the United States Trustee filed with this Court its Notice of Appointment of the Official Committee of Unsecured Creditors in the Bankruptcy Case [Docket No. 469].

13.     CSC is a world leader in the information technology and professional services industry.  Since its founding in 1959, CSC has helped clients use information technology more efficiently in order to improve their operations and profitability, achieve superior business results, and focus on core competencies.  (*See, e.g.*, MSA § 1.2.)  CSC offers information technology and business process outsourcing, information technology and professional products and services, and related maintenance and support.

14.     On March 9, 2007, Delphi and CSC entered into the MSA, expressly covering Delphi and its affiliates.  In connection therewith, on or about March 30, 2007, the Debtors filed their Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Application Maintenance and Support Agreements ("MSA Motion") [Docket No. 7524], seeking, *inter alia*, this Court's authorization for them to enter into, and perform, the MSA.  On April 23, 2007, the Court entered its Order [Docket No. 7774] granting the Motion.

15.     On April 30, 2007, Delphi and CSC entered into Amendment No. 1 to the MSA. The Amendment's purpose is to add network management and telecommunication services to the scope of the MSA.[3]  In connection therewith, on May 11, 2007, the Debtors filed their Motion for Order Under 11 U.S.C. Section 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Network Support Services Agreement [Docket No. 7926], seeking this Court's authorization for them to enter into, and perform, Amendment No. 1 to the MSA.  On May 31, 2007, this Court entered its Order [Docket No. 8119] granting its authorization for the Debtors to enter into and perform Amendment No. 1.

**B.      Background of the MSA**

**(a)      General**

16.     Currently 523 CSC employees in thirty (30) countries around the world provide services to Delphi in performance of the MSA[4].  In general, the MSA is a service contract for the provision of global telecommunications and network support services, and application development and maintenance services, to Delphi and its affiliates.  As detailed in the Debtors' MSA Motion, the MSA involves CSC's provision of system support and related services to the Debtors' supply chain and manufacturing functions, as well as for certain software referred to as "SAP".  (*See* MSA Motion ¶ 15.)  SAP software integrates the Debtors' various operational functions, including, but not limited to, manufacturing, distributions, accounting and human

---

[3]    The MSA (as amended) constitutes **Exhibit "B"** to this Motion and is incorporated herein by reference.  Due to the inclusion of competitively sensitive, proprietary, and confidential business information, the MSA, as well as **Exhibits "C" through "E"** herein, are not attached hereto.  In part to protect any interests the Debtors may have in any confidential information they may contend is contained in these documents relating to the MSA, CSC contemporaneously requests, by separate motion, this Court's authorization to file these Exhibits under seal ("Seal Motion").

[4]    The current CSC head count is 360 employees in the United States, Mexico and Brazil ("Americas Region"), 126 employees in Europe, the Middle East and Africa ("EMEA") and 37 employees in Asia and the Pacific Region.

resources, and provides real time data and controls to centralize the management of such operations.

17.    The MSA relates to virtually all aspects of the Debtors' operations.  The services called for thereunder are divided into five basic categories or phases: (i) an initial phase of transition services; (ii) transformation services to upgrade the Debtors' existing systems, information technology and infrastructure with new and upgraded programs, components and functions; (iii) base services; (iv) discrete projects for nonrecurring services not provided for among the other categories of services; and (v) termination assistance services, at Delphi's request, to facilitate a smooth transition from CSC to other service arrangements at the end of the term.

18.    The MSA expires on May 31, 2012, unless earlier terminated.  Under the MSA, Delphi has certain rights to extend the initial term.  (MSA §§ 3.1-.2.)  Under the MSA, Delphi is expressly liable for any and all services provided to other entities entitled to receive such services, including through "Companion Agreements."  (MSA § 2.3(b)-(d)).

**(b)    Provisions and Structure for Payment and Disputes**

19.    Section 12.2 of the MSA provides, in pertinent part:

> [E]ach Monthly Invoice provided for under **Section 12.1** shall be due and payable by Delphi in accordance with Delphi's Multilateral Netting System ("**MNS-2**") (which provides, on average, that payment shall be on the second day of the second month following the date Delphi receives and is invoiced for the applicable Services), unless the amount in question is disputed in accordance with **Section 12.4**. Any undisputed amount due under this Agreement for which a time for payment is not otherwise specified also shall be due and payable as provided in the preceding sentence.

(MSA § 12.2.)  In practice, however, Delphi's MNS-2 system provides for an invoice payment cycle under the MSA of approximately 45-days from the date of monthly invoice.  Monthly Base Charges have a current rate of approximately $6,056,759 per month.

20.     The MSA contains a mechanism for the resolution of disputes.  Section 12.4 of

the MSA provides, in pertinent part:

Delphi may withhold payment of particular Charges that Delphi reasonably disputes in
good faith subject to the following:

(a)  **Notice of Dispute**.  If Service Provider's [re: CSC] invoice includes sufficient
detail and supporting documentation to enable Delphi to reasonably determine
whether Service Provider's Charges are in accordance with this Agreement,
Delphi shall notify Service Provider on or before the payment due date of such
invoice if it disputes any of the Charges in such invoice.

****

(c)  **Description and Explanation.**  If Delphi disputes any Service Provider
Charges, Delphi shall promptly notify Service Provider after becoming aware…of
the issue and provide a written description of the particular Charges in dispute and
a written explanation, in reasonable detail based upon the information then-
available to Delphi, of the reason why Delphi disputes such Charges.   Service
Provider shall promptly notify Delphi if it believes that Delphi has not provided
the detail required by this Section 12.4(c).

****

(f)  **Escrow**.  Once disputed amounts withheld by Delphi reach a threshold
amount of one (1) month of the then-current Monthly Base Charges without
regards as to the claim, cause or nature of the dispute, including any claim, setoff,
or other type of deduction (the "Disputed Charges Threshold"), then at Service
Provider's written request to Delphi's Chief Information Officer any amounts
disputed by Delphi under this Section 12.4 in excess of the Disputed Charges
Threshold shall be placed in an interest-bearing escrow account for the benefit of
both Parties, pursuant to the escrow agreement set forth in Schedule 32, pending
resolution of the dispute relating to such withholding.   Such deposit shall occur
within fifteen (15) business days after such request by Service Provider to
Delphi's Chief Information Officer….]

(MSA § 12.4.)[5]

---

[5]     Effective January 17, 2008, Delphi and CSC entered into their Escrow Agreement for Disputed Amounts (the
"Escrow Agreement"), in order to implement these provisions.  The Escrow Agreement constitutes **Exhibit "C"**
to this Motion and is incorporated herein by reference for all purposes.

21.    CSC has the right to terminate the MSA in the event that the Debtors fail to pay the Undisputed Charges or fail to place Disputed Charges into escrow to the extent required by section 12.4 of the MSA.  Section 20.1(b) of the MSA provides in pertinent part:

> In the event that Delphi fails to pay Service Provider undisputed amounts properly due and owing to Service Provider under this Agreement exceeding in the aggregate one (1) month of Monthly Base Charges by the specified due date, or fails to place disputed amounts into escrow, to the extent required by Section 12.4, and fails to cure such default within thirty (30) days of notice from Service Provider of its intention to terminate for failure to make such payment, Service Provider may, by notice to Delphi, terminate the Term.

(MSA § 20.1(b).)

## C.    The Debtors' Contractual Defaults – Delphi's Failure to Pay Undisputed Charges

22.    Under the MSA, current Undisputed Charges are $15,665,101.[6]  Delphi elected to not dispute these charges in accordance with section 12.4 and they are therefore immediately due and payable to CSC.  To properly dispute charges, section 12.4 requires that Delphi: (i) promptly notify CSC after becoming aware of the disputed issue, but not later than the due date of the relevant invoice containing such charges; (ii) provide a written description of the particular charges in dispute and a written explanation, in reasonable detail, of Delphi's position.

23.    Delphi's failure to comply with section 12.4 constitutes its waiver of any right to contest payment of $15,665,101.  Nonetheless, Delphi has initiated remedies not permitted under the MSA, whereby it is improperly delaying or failing to make payment, and therefore breaching the express terms and conditions of the MSA.  For example, Delphi will refuse to pay an invoice which contains a relatively minor error.  It is not uncommon for Delphi to refuse to pay a large invoice over a very minor error and on occasion withhold payment and reference on a non-

---

[6]    Due to their extreme volume, it is not feasible for CSC to attach its underlying invoices comprising its claims raised herein.  For example, in March 2009, CSC delivered one hundred ninety-eight (198) separate invoices to the Debtors, containing 23,664 invoice line items.  Notwithstanding, CSC will make such documentation available to the Court at hearing on its Motion, as well as to all bona fide parties in interest requesting same, subject to any appropriate protective provisions.

monetary error which does not even impact the amount of the invoice.  Another mechanism used to delay or withhold payment to CSC (again untimely and therefore not in compliance with the MSA) is to assert some procedural omission such as the failure of a supervisor to sign off on a work order.  Delphi also recently asserted unspecified "offsets, credits and other holdbacks" without any justification.

24.     The billing arrangement as between Delphi and CSC is complex.  On a typical month, CSC will deliver nearly two hundred invoices to Delphi containing over 20,000 line items of detail.  CSC believes Delphi uses the complexity of the invoices for its benefit to aggressively delay and withhold payment. CSC will provide evidence to the Court at the hearing on this matter that various other types of reductions taken by Delphi are simply not authorized under the MSA.

25.     By way of illustration, on April 30, 2009, the Debtors attempted to raise improper deductions under the MSA with respect to four invoices delivered by CSC to the Debtors, in the total amount of $1,791,560.[7] However, the only basis specified by the Debtors for these disputes is, "there are a lot of corrections and different amounts."  Even leaving aside issues of untimeliness, this approach clearly falls short of the Debtors' obligations under section 12.4 to provide reasonable details to CSC of their alleged disputes.

26.     The Debtors have also complained that CSC's invoices sometimes fail to contain required codes provided for in the parties' "Global Common Invoice Detail."  However, the Debtors' are required to provide this information to CSC in their purchase orders so that CSC can thereafter reference it in its invoices.  Instead, the Debtors have frequently delayed for months providing this information to CSC, and then used their own delays and omissions to refuse to pay

---

[7]   Invoice Nos. 5024008902, 5024010079, 5024008904 and 5024009258.

CSC's invoices.  The data required is actually to be initially provided by the Debtors and has no impact on the validity of the underlying charges themselves.

27.    The Debtors often wait to raise the withheld amount only when CSC inquires about the Debtors' nonpayment of its invoices.  In some cases Delphi does so informally and provides little or no detail to CSC other than to allege the very existence of supposed "billing errors."  Even when the Debtors provide CSC formal responses disputing charges (again, only in response to demands by CSC for payment of past due amounts), such formal responses are untimely, particularly considering the regularity of the parties' dealings.

**D.    The Debtors' Contractual Defaults – Delphi's Failure to Escrow Required Amounts**

28.    As set forth above, section 12.4(f) of the MSA obligates the Debtors to deposit Disputed Charges into an interest bearing escrow account once, and to the extent that, they exceed the threshold amount of one (1) month of the then-current Monthly Base Charges.  Such obligation applies **irrespective** of the "claim, cause or nature of the dispute, including any claim, setoff, or other type of deduction."  (MSA § 12.4(f).)  Section 12.4(f) further provides that the Debtors must make their deposit within fifteen (15) business days after CSC makes its request to Delphi to escrow such amounts.  The intent of these escrow provisions is obvious: they provide protection to CSC for the eventual payment of disputed amounts resolved in its favor, and the ability of Delphi to assert *legitimate* billing issues and errors.

29.    Delphi's failures to comply with the MSA also pertain to improper reductions of the mandatory MSA escrow provisions.  Delphi has previously deposited into the escrow account a total of $2,643,474.  As of the date of this Motion, the total disputed amounts under the MSA however equal $13,158,384.  On or about April 21, 2009, Eileen Sweeney of CSC delivered to Delphi CSC's formal, written demand for deposit of escrow amounts pursuant to section 12.4 of the MSA.  As of that date, the total amount of prior charges disputed by Delphi equaled

$9,947,443, and the escrow balance was $2,643,474.  With a Monthly Base Charge threshold of $6,056,759 as of such date, CSC's letter formally requested that the Debtors deposit an additional $1,247,210 into escrow.  *See* Letter from Eileen Sweeney to Bette Walker, dated April 21, 2009 ("April 21, 2009 Letter").[8]  Moreover, CSC also has the present right to demand an additional deposit of $6,158,579 into escrow.

30.     On or about April 23, 2009, Delphi responded to the April 21, 2009 letter.  Delphi contends that the charges comprising the $1,247,210 sought by CSC for escrow deposit are offset by a Specialized Skill Rate Credit provided for under the MSA.[9]  (*See* MSA Schedule 4, § 6.5.)

31.     Delphi's claim to this credit is invalid because Delphi's calculation of the credit is inconsistent with the party's agreement in December 2007 to a specific methodology for the calculation of same.  Since that time, the parties employed this methodology to calculate and reconcile credits due to and accepted by Delphi, over the course of twelve (12) months, without any objection by Delphi as to the propriety of the methodology.  Using this credit as a basis for not paying amounts escrow is unsupported under the MSA.  Such reductions are not permitted to Delphi mandatory escrow amounts.  The express terms of the MSA, section 12.4, provide that the escrow obligations apply to any charges under the MSA disputed by the Debtors, "without regard as to the claim, cause or nature of the dispute, including any claim, setoff, or other type of deduction."  (MSA § 12.4.)   Delphi improperly attempts to argue that this offset or reduction somehow does not constitute a "dispute."   However, it plainly is a dispute as Delphi acknowledges when it states that "Section 12.3 of the Agreement entitles Delphi to *set-off*

---

[8]   The April 21, 2008 Letter constitutes **Exhibit "D"** to this Motion and is incorporated herein by reference for all purposes.

[9]   On or about April 20, 2009, Delphi had sent a letter to CSC raising the $1,247,210 Specialized Skill Rate Credit claimed by Delphi, recognizing the parties' dispute as to the validity and accounting of the Debtors' credits under the MSA, and informing CSC that the Debtors would not pay such amounts.

*amounts due Delphi against amounts owed to CSC.*  Delphi is contractually entitled to this credit..."  *See* Letter from Lori Tremonte to Eileen Sweeney, dated April 23, 2009 ("April 23, 2009 Letter"), at p. 2 (emphasis supplied).[10]

32.    In light of the foregoing, the Debtors are obligated to deposit the $1,247,210 required into escrow by May 6, 2009 (fifteen (15) days from the date of the April 21, 2009 Letter), the failure of which constitutes an additional default under the terms of the MSA.

**E.    The Debtors' Disputed Charges Are Invalid**

33.    Under section 12.4 of the MSA there is a structured mechanism for the Debtors to dispute charges and withhold payment for disputed charges.  Currently, the Debtors are withholding $13,158,384 in Disputed Charges.  Despite the Debtors' contentions, as set forth below, CSC is clearly entitled to the Disputed Charges.  The Disputed Charges stem from various projects under different service areas provided by CSC.  A breakdown of the disputes by service area is as follows:

34.    Steering Project.  Under this category of Disputed Charges, the Debtors contend that CSC caused delays in the "Steering Project" that resulted in a delay in the sale of that division of their operations.  Based on those alleged delays, the Debtors refuse to pay CSC any charges associated with the Steering Project.  Specifically, the Debtors are refusing to pay $4,425,409 in charges associated with that project.  CSC did not, however, cause any of the delays associated with Steering Project.  Rather, the parties to the sale transaction caused any delays associated with the project.  More important, the Debtors expressly authorized the delays through two "Change Controls" and the Execution Statement of Work for the project.  As a

---

[10]    The April 23, 2008 constitutes **Exhibit "E"** to this Motion and is incorporated herein by reference for all purposes.

result, the Debtors withholding of $4,425,409 in charges associated with the Steering Project is improper.

35.    <u>Brazil PIS/COFIN Tax</u>.  Brazil applies a tax to certain IT services provided by CSC to Delphi in Brazil.  CSC has paid this tax in the past, and invoiced Delphi for the amount of the tax.  Delphi refuses to pay this tax, despite the fact that under the MSA, Delphi—not CSC—must pay the taxes on IT services.  The amount of this tax, and the amount Delphi owes CSC, is $574,852.

36.    <u>Intrusion Detection ARCs</u>.  In regard to this category, beginning in June 2008, the Debtors designated 41 intrusion detection devices ("<u>IDDs</u>") for CSC to maintain, monitor and manage.  As requested, CSC provided those services.  Now, the Debtors claim that they did not request CSC to perform those services.  The Debtors further argue that, in any event, they should not be billed for the services associated with the IDDs because those services are within the scope of an agreement they have with EDS.  Nonetheless, despite CSC providing the Debtors' with documentation to support its position, they have refused to pay CSC $1,749,715 for the services it provided concerning the IDDs.  CSC has informed the Debtors that it is willing to shift responsibility of the IDDs to EDS.  Regardless, however, CSC is entitled to compensation for the services it rendered in regard to the IDDs.

37.    <u>Specialized Skill Rate Credit</u>.  On certain projects for the Debtors, CSC was required to use "special skills" in time and materials, which are more costly.  To prevent the overuse of those special skills and to minimize costs, CSC agreed to give the Debtors a credit if, on any given project, the use of special skills exceeded a certain ratio agreed to by the parties.  Depending on the type of project, the parties agreed to a ratio that would allow special skills to be used for 2.5% to 12.5% of a project.

38.    Typically, projects are split into two phases – a planning phase and an execution phase.  Most required special skills are used during the planning phase of a project.  Sometimes, special skills are required for as much as 40% of the planning time of a project.

39.    CSC allocated the agreed percentage of allowed special skills to cover the entire lifecycle of a project and invoiced the Debtors under that methodology.  In December 2008, the Debtors objected to CSC's methodology and argued that the total project hours (planning + execution) should not be used in calculating the credit for special skills.  Rather, it should be calculated separately for each phase (planning and execution) of a project.  Therefore, as alleged by the Debtors, they had been paying too much in special skills because they should have received larger credits for specialized skills during the planning phase of projects.  Specifically, the Debtors claim that they should have received additional credits in the amount of $1,247,210. Based on that argument, the Debtors improperly withheld $1,247,210 in funds owed CSC.

40.    <u>MAN Charges</u>.  Delphi has requested and CSC has installed metropolitan area network ("<u>MAN</u>") circuits at certain points in Delphi's network.  These MAN circuits act as access circuits that connect directly to Delphi sites and are very expensive to install.  During the bidding process, Delphi represented to CSC that it had no MAN circuits and needed none. Throughout the performance of the MSA, however, Delphi has installed these MAN circuits and directed CSC to pay for them, claiming they are "backbone" network circuits for which CSC is responsible.  The total cost of these circuits to date totals $992,923, which amount Delphi is withholding from CSC.  Because these circuits act as access points for Delphi and do not form the backbone of the network, Delphi, not CSC, is responsible for them.

41.    <u>Conversion of Critical Sites to Standard Sites</u>.  This category of Disputed Charges relates to the Debtors' attempt to convert all critical resource units (e.g., LAN ports) to standard

resource units. Based on that conversion, there was a reduction of resource unit volumes to zero, which volume reduction triggers a termination charge under the MSA. (*See* MSA §§ 4.5(a), Schedule 4-H § 1.4, Supplemental Schedule 4 § 5.0(g).) The Debtors refuse to acknowledge the termination charge and takes the improper position that they may unilaterally reduce service volumes without charge. Under the MSA, however, CSC is entitled to a termination charge of $1,284,498, which the Debtors have withheld.

42.     <u>Transformation Milestones</u>. The Disputed Charges concerning "transformation milestones" relate to payments due for completion of milestones associated with CSC's transformation of voice services and installation of new telephone systems in and at Delphi locations. Ignoring previous agreements relating to volume and documentation requirements, Delphi has without justification denied or delayed approval of completed milestones and thus improperly prevented CSC from invoicing the charges associated with these milestones. First, Delphi contends that CSC has failed to provide certain reporting that is not required under the parties' agreements. Second, Delphi has delayed payment through an incorrect interpretation of the milestones agreed by the parties. Specifically, these milestones track percentages of completion of these services and generally follow a 25%-50%-75% format, however, these milestones may be formally expressed in total volumes (e.g., units) that are intended to achieve such percentages. Subsequent to the parties' agreement on these thresholds, Delphi has closed and consolidated a number of locations. Thus, the original *volume* thresholds are impossible to meet, although CSC has completed the percentage threshold of over 75% of these underlying services. Delphi previously agreed to adjust and conform these volume thresholds accordingly, but has instead seized upon them to raise disingenuous defenses to payment. Thus, CSC was

forced to invoice such charges without Delphi's approval, and Delphi then improperly withheld the invoiced amounts of $2,883,777.

## IV.   ARGUMENT AND AUTHORITY[11]

**A.     CSC is Entitled to An Administrative Expense Priority Claim for Unpaid Amounts Owing to it Pursuant to the MSA**

43.     Section 503(b)(1)(A) of the Bankruptcy Code provides for the allowance of administrative expense priority claims for "the actual, necessary costs and expenses of preserving the [debtor's] estate…rendered after the commencement of the case." 11.U.S.C. § 503(b)(1)(A); *see also In re Enron Corp.*, 300 B.R. 201, 206-07 (Bankr. S.D.N.Y. 2003).  In *Enron Corp.*, the Court stated that:

> [a]dministrative expenses are afforded a priority to facilitate the reorganization effort by encouraging third parties, who might be reluctant to deal with a debtor-in-possession, to transact such business.  Otherwise, absent this incentive, the third parties would refrain from dealing with the debtor-in-possession, thereby inhibiting the reorganization effort and harming pre-petition creditors.

*Id*. at 207.

44.     Generally, a claimant seeking an administrative expense priority claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code must show that the expense arose "out of a transaction between the creditor and the bankrupt's trustee or debtor in possession," and "that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc. (In re McFarlin's Inc.)*, 789 F.2d 98, 101 (2d. Cir. 1986) (citations omitted); *In re Crystal Apparel, Inc.*, 220 B.R. 816, 830 (Bankr. S.D.N.Y. 1998).

45.     Moreover, Courts hold that claims under a post-petition contract authorized by the Court, are entitled to administrative expense priority, just as in the case of assumed executory

---

[11]   This Motion also constitutes CSC's supporting memorandum.

contracts. *Nostas Assoc. v. Costich (In re Klein Sleep Prod., Inc.)*, 78 F.3d 18, 20 (2d. Cir. 1996) ("Special priority is . . . accorded to expenses incurred under new contracts with the debtor, as 'administrative expenses' of the estate."); *U.S. v. Dewey Freight System, Inc.*, 31 F.3d 620, 624 n.4 (8th Cir. 1994) ("Debtor's liabilities under post-petition contracts, like its liabilities under assumed executory contracts, are expenses of administration.") (c*iting NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531-32, (1984)); *In re Chugiak Boat Works, Inc.*, 18 B.R. 292, 297 (Bankr. D. Alaska 1982) (holding newly executed, post-petition contracts are entitled to administrative expense priority).

46.     All liabilities flowing from breach of a post-petition contract are entitled to administrative expense priority. *See Klein Sleep*, 78 F.3d. at 23; *In re Trans World Airlines, Inc.*, 145 F.3d 124 (3d. Cir. 1998) (where court approves post-petition contract out of the ordinary course, it need not revisit the issue of necessity and benefit to the estate in evaluating the creditor's administrative priority claim). Accordingly, the fact that the post-petition MSA was approved by this Court upon the Debtor's MSA Motion establishes that the MSA provides and constitutes a valid benefit to the estates on a post-petition basis, and was in the best interests of the estates and their creditors. *Id.* at 25. Moreover, affording administrative priority to liabilities flowing from post-petition contracts furthers the bankruptcy policy of granting priority to claims of creditors who continue to do business with an insolvent debtor. *Adamowicz v. Pergament (In re The Lamparter Org., Inc.)*, 207 B.R. 48, 51 (E.D.N.Y. 1997).

47.     Even were this not the case, as discussed hereinabove, the nature of the MSA, and its relationship to virtually all aspects of the Debtors' operations, unquestionably establishes that the services provided for thereunder are necessary and beneficial to the Debtors' estates. Put simply, the Debtors cannot continue to operate without the services called for in the MSA.

48.    The MSA provides that CSC's claims arising under the MSA and prior to the Debtors' emergence from Chapter 11, "<u>shall</u> constitute administrative expenses of the Debtors of the kind specified in sections 503(b) and 507(a) of the Bankruptcy Code . . . ."  (MSA § 2.4. (emphasis added).

49.    CSC believes the Debtors have no basis for withholding payment of the Undisputed Charges of $15,665,101 and requests that the Court order immediate payment. There is a well developed structure for the assertion of disputes, and Delphi has failed to adhere to the procedure.  Rather, Delphi:  (i) improperly contends that discrete billing errors for minor sub-amounts justifies withholding millions of dollars in charges as to which no objection (whether valid or not) has even been raised; (ii)  disputes charges contained in invoices and rationalize that their disputes and requested offsets do not actually constitute disputes or offsets within the plain meaning of the MSA; (iii) complains to CSC of missing invoice codes which should contain information that the Debtors themselves are intentionally delaying in providing to CSC, in violation of the agreement, in order to render CSC's invoices procedurally defective; (iv) fails to timely raise any objections or disputes with CSC, including in invoice discussion meetings, except retroactively, as alleged defenses to actual payment; and (v) fails to adhere to provisions and procedures in the MSA requiring them to provide CSC enough detail to conduct problem analyses in an effort to resolve the issues.  (*See* MSA § 7.3.)

50.    Delphi's arguments regarding the Disputed Charges are inconsistent with the MSA.  It is difficult to understand Delphi's reasoning that "disputes" and requested "offsets" are not actually disputes and offsets for the purpose of avoiding their escrow obligations.  CSC's proof at hearing on this Motion will establish that the Debtors' position with respect to each category of Disputed Charges is invalid and should be rejected.  Even assuming that the Debtors'

disputes are colorable, they have no justification for refusing to fulfill their mandatory escrow obligations.

51.    Section 21.20 of the MSA obligates the parties to perform in good faith.  Section 12.4 of the MSA expressly allows Delphi to withhold only "particular Charges that Delphi reasonably disputes in good faith."   Yet, Delphi's practice has been to provide CSC only unsupported and unspecific reasons for withholding.

52.    CSC is entitled to an administrative expense priority claim in the amount of not less than $28,823.485, constituted by the Undisputed Charges, as well as all Disputed Charges, which should be resolved in its favor.  *In re Crystal Apparel, Inc.*, 220 B.R. at 830 ("Transactions in the ordinary course of business of the debtor in possession create expenses of administration.").  CSC has clearly satisfied the requirements of showing both a post-petition transaction with the Debtors, and that the services called for in the MSA are necessary and beneficial to the estates.

**B.    The Debtors Must Prepay CSC for Termination Assistance Services Upon Termination**

53.    It is anticipated that Delphi will require Termination Assistance Services from CSC in order to transition their infrastructure and information technology to alternate providers.[12]

54.    Section 4.4(a)(4) deals with advance payment by Delphi and states:

Service Provider shall provide Termination Assistance Services to Delphi and the other Eligible Recipients, or their designee(s), regardless of the reason for the expiration or termination of the Term, provided that, if this Agreement is terminated by Service Provider under Section 20.1(b) for Delphi's failure to pay undisputed amounts due under this Agreement, or for Delphi's failure to place disputed amounts into escrow, to the extent required by Section 12.4(f), Service Provider may require payment by Delphi in

---

[12]    The Debtors are entitled to request Termination Assistance Services but are not required to do so.  The point of this section is that such an election is essentially a practical certainty.

advance of the month in which such Termination Assistance Services will be provided or performed under this Section 4.4.

(MSA § 4.4(a)(4).)

55.     The import of this section is clear: post-termination by CSC for a nonpayment default, Delphi must prepay for Termination Assistance Services.  Section 4.4(b) of the MSA specifies the "Termination Assistance Services" to be provided include both special transition services and "the Services to continue without interruption or adverse effect (except as otherwise provided in a written transition plan approved by Delphi)."  (MSA § 4.4(b).)  In other words, all contract services (such as, but not limited to, base and project services), themselves become "Termination Assistance Services" on a post-termination basis, to the extent that the Debtors wish to continue receiving them.  Thus, the Debtors' post-termination prepayment obligations apply to services thereafter provided pursuant to the MSA.  CSC requests that this Court direct Delphi to timely pay prior to the 1st day of each month any invoice presented by CSC for services that CSC provides Termination Assistance Services for that month.  CSC commits to provide its invoice for payment at least five (5) business days prior to the first of each month.  CSC requires that all payments be made to it in the United States in order to facilitate payment efficiency for both CSC and Delphi.  In the event Delphi fails to timely pay Termination Assistance Services, CSC requests authority to immediately terminate all CSC services on the fifteenth (15) day of the month for which payment has not been received.

56.     As a result of Delphi's default, CSC noticed its termination of the MSA on May 5, 2009.  Termination Assistance Services for May 2009 are now due and owing.  CSC will supplement this Motion prior to the time of hearing, however it is estimated that May charges will total approximately $8 million.

## V. <u>SUMMARY OF RELIEF REQUESTED</u>

57.     In conclusion, CSC requests that this Court order Delphi to:  (a) immediately remit to CSC the sum of $28,823,485 representing amounts owed to CSC under both the Non-Disputed and Disputed Categories; (b) order the replenishment of any and all escrow defaults; (c) order Delphi to remit to CSC Termination Assistance Services for May 2009 in the amount provided by CSC prior to, or at the hearing on this Motion; and (d) direct Delphi to pay to CSC, on a monthly basis, all Termination Assistance amounts prior to the first day of each month, paid to CSC in the United States, and in the event such payment is not made, that CSC be permitted to terminate <u>all</u> services to Delphi by the 15th day of said month.  Finally, to the extent payment of services for April 2009 becomes due prior to the date of the hearing on the Motion, CSC requests immediate payment for the April 2009 services.

## VI. <u>NO PRIOR REQUEST</u>

58.     No previous request for the relief sought herein has been made to this or any other Court.  Because performance of the MSA is continuing as of the date of this Motion, CSC's claims requested herein should not be considered as exhaustive of its claims against the Debtors arising under the MSA.  CSC expressly reserves any and all rights and remedies to seek the allowance and payment of other and further claims arising in connection with the MSA, as well as to seek any and all other legal remedies and relief to which it may be entitled in connection with the MSA.

## VII. <u>WAIVER OF MEMORANDUM OF LAW</u>

59.     In accordance with Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, no separate memorandum of law is necessary as all authorities relied on in support of this Motion are set forth herein.

WHEREFORE, premises considered, Computer Sciences Corporation respectfully requests that this Court grant its Motion and order the Debtors to: (i) promptly and timely pay to CSC's Undisputed Charges and Disputed Charges; (ii) fulfill their escrow obligations with respect to outstanding Disputed Charges pending their resolution; (iii) in the event that the Debtors seek Termination Assistance Services, to prepay CSC for all such services in the United States prior to the first day of each month in which the services requested are to be performed, as an express precondition of any obligation by CSC to provide such services and to authorize CSC to terminate the provision of all services by the 15th day of said month if such prepayment is not timely received; and (iv) grant to CSC such other and further relief as is just and equitable both at law and in equity.

Respectfully submitted, this 6th day of May, 2009.

MUNSCH HARDT KOPF & HARR, P.C.


By: _/s/ Raymond J. Urbanik_
Russell L. Munsch, Esq.
Texas Bar No. 14671500
Raymond J. Urbanik
New York Bar RU 1842
Texas Bar No. 20414050
Jay H. Ong, Esq.
Texas Bar No. 24028756

3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas  75201
Telephone:  (214) 855-7500
Facsimile:  (214) 855-7584

ATTORNEYS FOR COMPUTER SCIENCES CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, in addition to electronic service via the Court's CM/ECF System, on the 6th day of May, 2009, I personally caused a true and correct copy of the foregoing document and exhibits (except to the extent sought for filing under seal), to be served via first-class U.S. mail, postage pre-paid and properly addressed, to the parties listed on the attached service list.

*/s/ Raymond J. Urbanik*
Raymond J. Urbanik