# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:** Delphi Corporation, <u>et al.</u> [1]
**Case Number:** Jointly Administered 05-44481 (RDD)

**Quarterly Operating Report for the Period Ended:**
March 31, 2009

**Debtors' Address:**
5725 Delphi Drive
Troy, Michigan 48098

**Operating Loss for the Three Months Ended March 31, 2009:** $454 million

**Debtors' Attorneys:**
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti
Thomas J. Matz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:** May 12, 2009       /s/: THOMAS S. TIMKO
                             Thomas S. Timko
                             Chief Accounting Officer and Controller

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

## DELPHI CORPORATION, et al.
## QUARTERLY OPERATING REPORT

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**INDEX**

| **Description** | **Page** |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the three months ended March 31, 2009 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of March 31, 2009 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the three months ended March 31, 2009 | 6 |
| Notes to Quarterly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 27 |
| Schedule of Payroll Taxes Paid | 28 |
| Schedule of Other Taxes Collected, Incurred and Paid | 30 |
| Schedule of Disbursements | 35 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended March 31, 2009 (in millions) |
|---|---|
| Net sales: | |
| General Motors and affiliates | $ 521 |
| Other customers | 464 |
| Non-Debtor affiliates | 44 |
| Total net sales | 1,029 |
| | |
| Operating expenses: | |
| Cost of sales, excluding items listed below | 1,268 |
| Depreciation and amortization | 83 |
| Selling, general and administrative | 132 |
| Total operating expenses | 1,483 |
| | |
| Operating loss | (454) |
| Interest expense (contractual interest expense was $161 million) | (131) |
| Other expense, net | (4) |
| Reorganization items, net | 1,159 |
| Income tax benefit | 52 |
| Equity loss from non-consolidated affiliates, net of tax | (7) |
| Income from continuing operations | 615 |
| Income from discontinued operations, net of tax | 25 |
| Equity loss from non-Debtor affiliates, net of tax | (88) |
| | |
| Net income | 552 |
| Net income attributable to noncontrolling interest | — |
| Net income attributable to Debtors | $ 552 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | March 31, 2009 (in millions) |
|---|---:|
| **ASSETS** | |
| Current assets: | |
| Cash and cash equivalents | $            61 |
| Restricted cash | 410 |
| Accounts receivable, net: | |
| General Motors and affiliates | 523 |
| Other third parties | 336 |
| Non-Debtor affiliates | 253 |
| Notes receivable from non-Debtor affiliates | 97 |
| Inventories, net | 471 |
| Other current assets | 160 |
| Assets held for sale | 485 |
| Total current assets | 2,796 |
| Long-term assets: | |
| Property, net | 1,165 |
| Investments in affiliates | 229 |
| Investments in non-Debtor affiliates | 752 |
| Notes receivable from non-Debtor affiliates | 1,429 |
| Other long-term assets | 217 |
| Total long-term assets | 3,792 |
| Total assets | $         6,588 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| Current liabilities not subject to compromise: | |
| Short-term debt | $         3,942 |
| Accounts payable | 473 |
| Accounts payable to non-Debtor affiliates | 486 |
| Accrued liabilities | 1,217 |
| Liabilities held for sale | 262 |
| Total current liabilities not subject to compromise | 6,380 |
| Long-term liabilities not subject to compromise: | |
| Employee benefit obligations and other | 723 |
| Total long-term liabilities not subject to compromise | 723 |
| Liabilities subject to compromise | 13,516 |
| Total liabilities | 20,619 |
| Stockholders' deficit: | |
| Total Debtors stockholders' deficit | (14,031) |
| Noncontrolling interest | — |
| Total stockholders' deficit | (14,031) |
| Total liabilities and stockholders' deficit | $         6,588 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended March 31, 2009 (in millions) |
|---|---|
| Cash flows from operating activities: | |
| Net cash used in operating activities | $ (369) |
| Cash flows from investing activities: | |
| Capital expenditures | (45) |
| Proceeds from sale of property | 4 |
| Proceeds from divestitures | 1 |
| Increase in restricted cash | (55) |
| Other, net | 5 |
| Discontinued operations | (1) |
| Net cash used in investing activities | (91) |
| Cash flows from financing activities: | |
| Net repayments of borrowings under amended and restated debtor-in-possession facility | (146) |
| Repayments of borrowings under other debt agreements | (1) |
| Issuance costs related to the Accommodation Agreement | (16) |
| Net borrowings under GM liquidity support agreements | 453 |
| Net cash provided by financing activities | 290 |
| Decrease in cash and cash equivalents | (170) |
| Cash and cash equivalents at beginning of period | 231 |
| Cash and cash equivalents at end of period | $ 61 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**NOTES TO QUARTERLY OPERATING REPORT**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

**1. Background and Organization**

*General –* Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

*Chapter 11 Reorganization Cases –* On October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively, the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.

*Equity Purchase and Commitment Agreement –* Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, as described below, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, General Motors Corporation ("GM"), and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in June 2009.

***U.S. Labor Agreements* –** On March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As approved and confirmed by the Court, a series of settlement agreements or memoranda of understanding (each, a memorandum of understanding or "MOU") among Delphi, its unions, and GM settled the 1113/1114 Motion with respect to each of Delphi's unions.

***Plan of Reorganization* –** On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because, as noted above, the Investors refused to participate in the closing, which was commenced but not completed on April 4, 2008. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM. The Plan incorporates, approves, and is consistent with the terms of each agreement.

Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) was extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan. On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against an affiliate of lead investor, Appaloosa, and the other Investors. Notwithstanding the foregoing, pursuant to an order entered by the Court on March 24, 2009, the Debtors' exclusive period for filing a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee, is extended through and including May 31, 2009 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee, is extended through and including July 31, 2009. On May 1, 2009, Delphi filed a motion seeking to extend such exclusive periods, solely with respect to the statutory committees, to July 31, 2009 and September 30, 2009, respectively. On April 23, 2009 the Court approved Delphi's motion to disband the Equity Committee as a result of changed circumstances in Delphi's chapter 11 cases.

On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court, which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However, since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization or other consensual resolution of Delphi's chapter 11 cases. Delphi continued comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi made further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the revised plan or other economic distribution in connection with another resolution of Delphi's chapter 11 cases, will be substantially below

the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. Accordingly, we believe it is likely that (i) we will not be able to satisfy all the conditions for the receipt by GM of the preferred stock or that the economic value of reorganized Delphi will exceed $7.13 billion and (ii) GM will not receive a distribution on account of its general unsecured claim. However, if there are distributions, pursuant to the Amended GSA, 50% of all distributions that would otherwise be made to GM on account of its administrative claim would be made to holders of general unsecured claims until such holders have received distributions on account of their general unsubordinated unsecured claims equal in value of up to $300 million. As part of the May 21, 2009 milestone under the Accommodation Agreement, as defined below, requiring Delphi to submit a detailed Term Sheet, as defined below, to the agent under its debtor-in-possession financing facility, Delphi is continuing discussions on proposed modifications to the Plan, and further amendments to the Amended GSA and Amended MRA, as defined below, and expects that the term sheet will include agreement on sources of supplemental liquidity to enable Delphi to continue financing its operations until such time as the transactions in the term sheet can be implemented and Delphi is able to emerge from chapter 11 or another consensual resolution of Delphi's chapter 11 cases is reached. However, as discussions are ongoing, we can provide no assurances that this will be the case.

Delphi will not emerge from bankruptcy as a going concern unless and until Delphi is able to obtain approval of necessary modifications to the Plan that recognize the existing market conditions, or there is another consensual resolution of Delphi's chapter 11 cases. Moreover, the continued forbearance by Delphi's lenders under the debtor-in-possession financing and the effectiveness of any revised plan of reorganization are subject to a number of conditions, including the entry of certain orders by the Court and, with respect to the effectiveness of a plan, the obtaining of necessary emergence capital. There can be no assurances that such emergence capital will be obtained (or, if obtained, the terms thereof) or such other conditions will be satisfied. For a discussion of certain risks and uncertainties related to the Debtors' chapter 11 cases and reorganization objectives refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and in the Quarterly Report on Form 10-Q for the quarter ended March 31, 2009. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder its ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers. Accordingly, no assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. If certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by a company's equity security holders and certain classes of creditors and notwithstanding the fact that such equity security holders and such classes of creditors do not receive or retain any property under the plan on account of their equity or creditor interests. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in its common stock or other equity securities, or any claims relating to prepetition liabilities.

The Amended GSA and the Amended MRA, as defined below, became effective during the third quarter of 2008. For costs and benefits and timing of recognition related to these agreements, refer to the detailed discussion under GM Settlement below. The cost related to the remaining components of the transformation plan will be recognized in the Company's consolidated financial statements as each other element of the Plan (as modified), including the remaining portions of the U.S. labor agreements, or as the terms of any future confirmed plan of reorganization, become effective. The confirmation and consummation of a plan of reorganization and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

*GM Settlement* – Delphi and GM have entered into comprehensive settlement agreements consisting of the Global Settlement Agreement, as amended (the "GSA") and the Master Restructuring Agreement, as amended (the "MRA"). The GSA and the MRA, as amended through January 25, 2008, comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and the MRA provided that such agreements were not effective until and unless Delphi emerges from chapter 11. However, as part of Delphi's overall negotiations with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi agreed with GM and filed further amendments to the GSA and MRA (the "Amended MRA") with the Court on September 12, 2008 and subsequently entered into an additional amendment to the GSA as of September 25, 2008 (as so amended, the "Amended GSA"). On September 26, 2008, Delphi received the consent of

its labor unions to implement certain aspects of the agreements as described in more detail below. The Court approved such amendments on September 26, 2008 and the Amended GSA and Amended MRA became effective on September 29, 2008. These amended agreements include provisions related to the transfer of certain legacy pension and other postretirement benefit obligations and became effective independent of and in advance of substantial consummation of an amended plan of reorganization. The effectiveness of these agreements resulted in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs.

The Amended GSA resolves outstanding issues between Delphi and GM including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under a Delphi plan of reorganization; and various other legacy U.S. hourly workforce benefit issues. Except for the second step of the transfer of a substantial portion of the assets and liabilities under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan"), the obligations under the Amended GSA are not conditioned on the effectiveness of an amended plan of reorganization.

The Amended GSA addresses commitments by Delphi and GM regarding other U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases. During the three months ended March 31, 2009, GM funded an additional $25 million of OPEB payments made to the hourly workforce, of which $19 million was reimbursement for amounts paid by Delphi during the quarter prior to the administrative transfer and $6 million was applied to the receivable from GM at December 31, 2008. As of March 31, 2009, Delphi also has a receivable from GM related to the funding of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") buydown arrangements under the 2007 U.S. hourly workforce special attrition programs of $68 million.

The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship since filing for chapter 11 and following Delphi's emergence from chapter 11. The Amended MRA addresses the scope of GM's existing and future business awards to Delphi and related pricing and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing U.S. hourly workforce labor costs, the disposition of certain Delphi facilities, and the treatment of existing commercial agreements between Delphi and GM. The obligations under the Amended MRA generally are not conditioned on the effectiveness of an amended plan of reorganization. The following details the activity under the Amended MRA during the three months ended March 31, 2009:

- *Keep Site Facilitation Fee* - On March 31, 2009, Delphi received its first quarterly installment of the annual Keep Site Facilitation Fee of $27.5 million, of which approximately $25 million was recorded as revenue and approximately $3 million was recorded as a deferred liability.
- *Reimbursement of Hourly Labor Costs* - During the three months ended March 31, 2009, Delphi received a $38 million reimbursement from GM of hourly labor costs in excess of $26 per hour, which was recorded as a reduction to cost of sales.
- *Production Cash Burn Breakeven Reimbursement* - During the three months ended March 31, 2009, Delphi received $56 million production cash burn breakeven reimbursement from GM which was recorded in income from discontinued operations. An additional $24 million was recorded as a receivable from GM as of March 31, 2009, of which $23 million was recorded in discontinued operations and $1 million was recorded as a reduction to cost of sales during the three months ended March 31, 2009.
- *Reimbursement of Hourly Workers' Compensation and Other Benefits* – During the three months ended March 31, 2009, Delphi received reimbursement of $3 million and an additional $7 million is recorded as a receivable from GM as of March 31, 2009, for a total reduction to cost of sales of $10 million.

The following table details changes during the three months ended March 31, 2009 in the GM and affiliates accounts receivable balance attributable to the Amended GSA and the Amended MRA, recorded in GM and affiliates accounts receivable in the accompanying consolidated balance sheet at March 31, 2009:

**Amended GSA and Amended MRA - GM**
**Accounts Receivable**

|  | (in millions) |
| --- | --- |
| Balance at December 31, 2008 | $  141 |
| GM obligations recognized | 175 |
| Payments received from GM | (150) |
| Balance at March 31, 2009 | $  166 |

Case Number:  05-44481 (RDD) (Jointly Administered)

As of March 31, 2009, $130 million of the Amended GSA and Amended MRA accounts receivable was included in accounts receivable from General Motors and affiliates and $36 million was included in assets held for sale on the consolidated balance sheet.

The following table details the GM obligations recognized during the three months ended March 31, 2009:

**GM Obligations Recognized**
**January 1, 2009 – March 31, 2009**

|  | (in millions) |
|---|---|
| Amount recognized in pre-tax earnings | $  74 |
| Amount recognized in discontinued operations | 79 |
| Amount of pass-through OPEB reimbursement | 19 |
| Amount recognized in deferred liability | 3 |
| Total | $  175 |

Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 for more information on the effectiveness of the Amended GSA and the Amended MRA.

## 2. Basis of Presentation

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. In addition, the financial statements and supplemental information contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements, and as such, their net income is included as "Equity loss from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included in "Investments in non-Debtor affiliates" in the balance sheet.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, among other disclosures, it does require that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

The unaudited combined financial statements have been derived from the books and records of the Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment), the Debtors believe that the financial information could be subject to changes, and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with U.S. GAAP. Included in these financial statements is the impact of Delphi's adoption of Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51.*, which resulted in adjustments in the presentation of the accompanying financial statements. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. Therefore, this report should be read in conjunction with the Company's consolidated financial statements and notes thereto included in its Annual Report on Form 10-K for the year ended December 31, 2008 filed with the U.S. Securities and Exchange Commission ("SEC").

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the consolidated results of operations, financial position, and cash flows of the Debtors in the future.

*Going Concern* – The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement and related accommodation agreement, as described below; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii)

return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including further extensions of its accommodation agreement allowing the Debtors to retain the proceeds of, or an extension or replacement of their DIP financing agreement, which otherwise matured on December 31, 2008. Prior to expiration of the DIP financing agreement (the "Amended and Restated DIP Credit Facility"), Delphi entered into an accommodation agreement, which has been subsequently amended to revise the applicable covenants and milestone requirements (as so amended through the date hereof, the "Accommodation Agreement") allowing Delphi to retain the proceeds of the Amended and Restated DIP Credit Facility until June 30, 2009, provided Delphi continues to remain in compliance with all applicable covenants under the Accommodation Agreement and the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions) as described further in Note 3. Debtor-in-Possession ("DIP") Financing.

In addition, GM has supplemented Delphi's liquidity through (i) an agreement (the "GM Advance Agreement") pursuant to which GM has agreed, subject to certain conditions, to provide a $300 million facility ($253 million was outstanding as of March 31, 2009), which may be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the terms of the GM Advance Agreement throughout the term of the accommodation period under the Accommodation Agreement and, (ii) by agreeing, subject to certain conditions, to accelerate payment of certain payables to Delphi, (the "Partial Temporary Accelerated Payments Agreement"), which has resulted in an additional $200 million of liquidity in the first quarter of 2009 and which resulted in an additional $100 million of liquidity in April 2009. Refer to Note 3. Debtor-in-Possession ("DIP") Financing for more information regarding the terms of the Accommodation Agreement, GM Advance Agreement and the Partial Temporary Accelerated Payments Agreement.

Accordingly, the Accommodation Agreement and support from GM coupled with savings realized as a result of significant cost reductions and cash conservation measures implemented by Delphi globally have provided Delphi with access to sufficient liquidity to fund its operations and remain in compliance with the covenants in the Amended and Restated DIP Credit Facility and Accommodation Agreement into May 2009 as it continued discussions with its stakeholders on proposed modifications to the Plan or another consensual resolution of Delphi's chapter 11 cases. Pursuant to the Accommodation Agreement, Delphi has until May 21, 2009 to deliver to the agent under the Amended and Restated DIP Credit Facility a detailed term sheet (the "Term Sheet") which has been agreed to by both GM and the U.S. Treasury and which sets forth the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's chapter 11 cases, including, without limitation, all material transactions between Delphi and GM relevant to such resolution (refer to Note 3. Debtor-in-Possession ("DIP") Financing). Failure to deliver a satisfactory Term Sheet or meet the other milestones under the Accommodation Agreement will be an event of default under the Accommodation Agreement and absent receipt of a waiver will result in a termination of the accommodation period entitling Delphi's lenders to exercise all available remedies, including foreclosure on substantially all of Delphi's assets. Such actions may result in the temporary or permanent suspension and ultimate sale or liquidation of the operations of Delphi. Delphi anticipates that the Term Sheet will comprehend additional liquidity support from its stakeholders to allow it to continue operations until a consensual resolution can be implemented, however, as discussions are ongoing, there can be no assurances that this will be the case.

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008 (the effective date of the Accommodation Agreement). However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement, as amended). There can be no assurance that Delphi will continue to comply with the terms and conditions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement) or that the Term Sheet will comprehend sufficient additional liquidity support for Delphi to continue operating its business or remain compliant in view of anticipated additional production cuts by its customers. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying condensed combined debtors-in-possession financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. Refer to Equity Purchase and Commitment Agreement and The Plan of Reorganization in Note 1. Background and Organization. Pending confirmation and consummation of the plan of reorganization (as amended), an alternative plan of reorganization or other consensual resolution of Delphi's chapter 11 cases, Delphi and certain of its U.S.

subsidiaries will continue as "debtors-in-possession" in chapter 11.  On October 3, 2008, Delphi filed a motion seeking Court approval of proposed modifications to its confirmed plan of reorganization, however the hearing on the motion has been adjourned and Delphi continues discussions with its stakeholders regarding a path to emergence from chapter 11 or another consensual resolution of Delphi's chapter 11 cases.  There can be no assurances as to when Delphi will confirm or consummate a modified plan or other consensual resolution of Delphi's chapter 11 cases.  Consummation of a confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization (as amended).

We anticipate dramatically lower production volumes throughout the second and third quarters of 2009 given the recently announced production shutdowns by both GM and Chrysler LLC ("Chrysler"), which will likely result in significantly lower receivables, earnings and a subsequent reduction in cash flow toward the beginning of the third quarter.  There can be no assurances, particularly given the current constraints in the credit markets, that we will be able to maintain access to existing financing sources or secure additional financing as necessary to supplement the loss in liquidity resulting from such dramatically lower volumes.  We must continue implementing and executing our cash savings initiatives to preserve liquidity in this very difficult economic environment.  However, there can be no assurances that such initiatives will be able to offset the impact of a prolonged shut down and that we will not require supplemental liquidity even beyond any contemplated by the Term Sheet.  The failure to secure adequate supplemental liquidity will put increased stress on our ability to continue to fund our North American operations, benefit from any recovery of volumes when GM, Chrysler and other customers restart manufacturing operations and may hinder our ability to remain compliant with the financial covenants in our Accommodation Agreement.  We may need to sharply curtail operations, including the temporary or permanent shutdown of one or more operations in North America to remain in compliance and if we cannot remain in compliance, even with such actions, our lenders under the Amended and Restated DIP Credit Facility may seek to foreclose upon substantially all of our assets and proceed toward a sale or liquidation.  Refer to Part II. Item 1A. Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009.

Delphi's ability to develop a revised recapitalization plan and consummate a confirmed plan of reorganization has been adversely affected by the substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the global automotive industry.  In addition, there can be no assurances that the cash conservation measures Delphi implements now or in the future will not delay or limit its ability to achieve its long range business objectives or participate in future growth opportunities when economic conditions improve.  Furthermore, should additional cost saving measures or other significant actions, including sales of assets and wind-down of operations become necessary, whether because of a prolonged shut down by our customers, constraints in the global credit market continue or worsen, the global recession deepens, the current economic climate in the global automotive industry does not improve over the course of 2009 or otherwise, Delphi's inability to conserve liquidity or obtain alternative financing would likely have a detrimental impact on the Company's financial condition and operations.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  During the three months ended March 31, 2009, the Debtors did not receive dividends from non-Debtor affiliates.  Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore would be recorded in equity income from non-Debtor affiliates, net of tax.

*General Motors and Affiliates* – Includes activity with GM and its consolidated subsidiaries.  Activity with GM's non-consolidated affiliates (such as GM Shanghai) and activity with other Tier 1 suppliers which sell directly to GM is classified as other (non-GM) customer activity.

*Restricted Cash* – At March 31, 2009, the Debtors had $410 million in restricted cash, primarily related to cash collateral required under the debtor-in-possession credit facility.  Refer to Note 3. Debtor-in-Possession ("DIP") Financing for more information.  Additionally, restricted cash includes cash for use for the pre-retirement portion of the U.S. employee workforce transition programs and balances on deposit at financial institutions that have issued letters of credit in favor of Delphi.

*Property* – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

*Discontinued Operations* – In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet. SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business"). While the historical results of operations of the Steering Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to discontinued operations in the statements of operations. Certain employee pension and other postretirement benefit liabilities for the Steering Business were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans were allocated to discontinued operations in the statements of operations. Allocations have been made based upon a reasonable allocation method. Refer to Note 9. Divestitures for more information.

*Securities and ERISA Litigation Charges* – Delphi, along with certain of its subsidiaries, current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. One consolidated class action complaint alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws (the "Securities Action"). Another group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under Employee Retirement Income Security Act ("ERISA"). On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action"). Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the Securities Action, the ERISA Action, and shareholder derivative actions in consolidated proceedings (the "Multidistrict Litigation" or "MDL") reached an agreement with the lead plaintiffs in the Securities Actions (the "Lead Plaintiffs") and named plaintiffs in the amended ERISA Action (the "ERISA Plaintiffs") resulting in a settlement of the Multidistrict Litigation (the "MDL Settlements"). Pursuant to the MDL Settlements, the class claimants will receive cash and allowed claims in the chapter 11 cases that, when valued at the face amount of the allowed claims, is equivalent to approximately $351 million. On December 4, 2007, the U.S. District Court for the Eastern District of Michigan (the "District Court") held a hearing to consider proposed modifications to the MDL Settlements (the "Modified MDL Settlements") and tentatively approved the Modified MDL Settlements, after determining that the modifications were at least neutral to the Lead Plaintiffs and potentially provide a net benefit to the Lead Plaintiffs. The District Court approved the Modified MDL Settlements in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered final orders and judgments dated January 23, 2008 with respect to the securities and ERISA actions. On January 25, 2008, the Court approved the Modified MDL Settlements. As provided in the confirmation order, the Modified MDL Settlements are contingent upon the effective date of the Plan occurring, and if, for any reason, Delphi cannot emerge from chapter 11 as contemplated, the Modified MDL Settlements will become null and void. The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

As a result of the Modified MDL Settlements, as of March 31, 2009, Delphi has a liability of $351 million recorded for this matter. Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million. As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage. In conjunction with the Modified MDL Settlements, Delphi expects recoveries of $148 million for the settlement

amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

*Warranty Matters* – Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

*Environmental Matters* – Delphi is subject to the requirements of U.S. federal, state and local environmental and occupational safety and health laws and regulations. As of March 31, 2009 our reserve for environmental investigation and remediation was approximately $93 million. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the separation of Delphi from GM in 1999. Addressing contamination at various sites, including facilities designated as non-core and slated for closure or sale, is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent management's best estimate of the cost to complete such actions. Management believes that its March 31, 2009 accruals will be adequate to cover the estimated liability for its exposure with respect to such matters and that these costs will be incurred over the next 20 years. However, as we continue the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. We cannot ensure that environmental requirements will not change or become more stringent over time or that our eventual environmental remediation costs and liabilities will not exceed the amount of our current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology. Estimates are made on an undiscounted basis and exclude the effects of inflation. If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range. At March 31, 2009, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $83 million.

*Contractual Interest Expense and Interest Expense on Unsecured Claims* – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008. The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims. At March 31, 2009, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 1.Background and Organization, Plan of Reorganization, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Accordingly, Delphi anticipates that it will be relieved of this liability if and when the modifications are approved.

*Taxes* – Delphi recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws. Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result does not recognize income tax benefits for net operating losses for its U.S. entities.

The Debtors have received Court authorization, but not direction, to pay sales, use, trust fund, and certain other taxes in the normal course. Accordingly, the Debtors have paid the applicable taxes when due. See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

During the three months ended March 31, 2009, Delphi recognized $52 million tax benefit in continuing operations related to the elimination of the disproportionate tax effects in other comprehensive income related to the salaried OPEB obligation which was settled during the same period, as detailed below under Salaried OPEB Settlement.

*Pension and OPEB Matters*– Since entering chapter 11, Delphi had generally limited its contributions to the Hourly Plan, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan (together, the "Pension Plans") to "normal cost" contributions, which are less than the minimum funding requirements established by the IRC and ERISA. Following the Court's approval of the Hourly and Salaried Pension Program Modification Motion on September 23, 2008, the Salaried Plan, the Mechatronic Plan, the ASEC Plan, and the PHI Non-Bargaining Plan were frozen effective September 30, 2008. The Hourly Plan was frozen on November 30, 2008. By freezing the Pension Plans, Delphi halted the accrual of normal cost payments going forward thereby preserving liquidity. Certain collectively bargained hourly employees remain covered by the Hourly Plan's Individual Retirement Plan formula (a cash balance benefit providing an annual pay credit accrual of 5.4% of base wages).

Pursuant to the pertinent terms of certain pension funding waivers secured from the Internal Revenue Service ("IRS") in 2006 and 2007, Delphi provided to the Pension Benefit Guaranty Corporation ("PBGC") letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan. Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008. The cash proceeds from the letters of credit were deposited into the Hourly and Salaried Plans and initially recognized as Delphi funding contributions to the respective plans for the plan year ended September 30, 2008. However, on January 16, 2009, Delphi filed amended Forms 5500 (Annual Return Report of Employee Benefit Plan) with the IRS that applied all contributions made to the Hourly and Salaried Plans in 2008, including the proceeds from the letters of credit, back to the plan year ended September 30, 2007. This contribution carry back, together with the September 29, 2008 414(l) Net Liability Transfer discussed below, had the effect that no contributions were due under the Hourly Plan for the plan year ended September 30, 2008.

As discussed in Note 1. Background and Organization, GM Settlement, on September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan. The 414(l) Net Liability Transfer is to occur in two separate steps. The First Pension Transfer occurred on September 29, 2008. The Second Pension Transfer will transfer substantially all of the remaining assets and liabilities of the Hourly Plan upon Delphi's emergence from chapter 11 if the terms of the Amended GSA are met.

Approximately $56 million remains due as a minimum funding contribution under the Salaried Plan for the plan year ended September 30, 2008, and approximately $13 million remains due as minimum funding contribution under the Delphi Mechatronics Retirement Program, the ASEC Manufacturing Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan for the plan year ended December 31, 2008. As permitted under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), Delphi elected to defer the contribution necessary to satisfy this remaining obligation until no later than the due date for minimum contributions, which is June 15, 2009 for the Salaried Plan and September 15, 2009 for the subsidiary plans. On December 15, 2008, Delphi applied to the IRS for a waiver of the minimum funding contribution of approximately $56 million to the Salaried Plan for the plan year ended September 30, 2008, and permission to instead amortize amounts due in over future plan years. That application remains pending.

As reflected above, Delphi has not made certain minimum required contributions to the Pension Plans and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million and $226 million for plan years ended September 30, 2006 and September 30, 2007, respectively. If these asserted assessments are not paid, the IRS could increase the assessments that relate to the Salaried Plan to 100% of any Salaried Plan contributions considered by the IRS to be due and unpaid. However, because the 414(l) Net Liability Transfer to the GM hourly plan avoided an accumulated funding deficiency in the Delphi Hourly Plan for the plan year ended September 30, 2008, exposure to the 100% excise tax related to the Delphi Hourly Plan has been eliminated for the plan year ended September 30, 2008. Assuming Delphi is assessed excise taxes for all plan years through 2007, the total exposure to date could approximate $383 million, plus interest and penalties, which could be substantial. In addition, if the IRS does not agree to waive the minimum required funding contribution under the Salaried Plan for the plan year ended September 30, 2008, the IRS may assess an additional excise tax of approximately $6 million if Delphi does not remit $56 million to the Salaried Plan by June 15, 2009. Additional excise taxes could be assessed with respect to the subsidiary plans if the minimum required contributions to those plans for the plan year ended December 31, 2008, are not remitted by September 15, 2009. To the extent not promptly paid by Delphi, any such excise tax assessments might be increased to 100% of any Salaried Plan and subsidiary plan contributions considered by the IRS to be due and unpaid.

Although the IRS has asserted certain of the excise tax assessments described above and might seek to assess additional excise taxes, plus interest and penalties, related to the Pension Plans, Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments. Accordingly, management has concluded that an unfavorable outcome is not currently probable and, as of March 31, 2009, no amounts have been recorded for any potential excise tax assessment.

If the Company emerges from chapter 11 as contemplated by the Amended GSA and the Amended MRA, then completing the second step of the 414(l) Net Liability Transfer will allow us to satisfy substantially all of the pension funding obligations to our hourly employees, however that second transfer is conditioned on our emergence from chapter 11 under a modified plan of reorganization that meets the terms of the Amended GSA, and it appears unlikely at this time that such condition will be met. If the conditions to the second step of the 414(l) Net Liability Transfer are not satisfied, and the second step does not take place, we do not believe we will be able to fund those U.S. pension obligations. In addition, we still maintain responsibility for and need to meet U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees and certain subsidiary employees. We may be unable to satisfy our U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees or certain subsidiary employees. Due to the impact of the global economic recession, including reduced global automotive production, capital markets volatility that has adversely affected our pension asset return expectations, a declining interest rate environment, or other reasons, our funding requirements have substantially increased since September 30, 2008. Should we be unable to obtain funding from some other source to resolve these pension funding obligations, either Delphi or the Pension Benefit Guaranty Corporation (the "PBGC") may initiate plan terminations. The PBGC would seek termination, if in its view, the risk of loss with respect to the plans may increase unreasonably if the plans are not terminated. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the date of emergence, and the funded status of the Pension Plans at the date of emergence. Refer to Note 10. Pension and Other Postretirement Benefits, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 for further information.

*Salaried OPEB Settlement* – On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing retiree medical and life insurance benefits (collectively "OPEB") benefits in retirement to salaried employees, retirees, and surviving spouses after March 31, 2009. On February 24, 2009, the Court provisionally approved Delphi's motion to terminate such benefits effective March 31, 2009 based on the Court's finding that the Company had met its evidentiary burdens, subject to the appointment of a retirees' committee (the "Retirees' Committee") to review whether it believes that any of the affected programs involved vested benefits (as opposed to "at will" or discretionary, unvested benefits). On March 11, 2009, the Court issued a final order approving Delphi's motion to terminate salaried OPEB benefits. The Court approved a settlement agreement (the "Settlement"), between Delphi and the Retirees' Committee and the Delphi Salaried Retirees' Association (the "Association") settling any and all rights for the parties to appeal the Court's March 11, 2009 final order authorizing Delphi to terminate salaried OPEB benefits to the U.S. District Court for the Southern District of New York (the "District Court"). Pursuant to the Settlement, Delphi has agreed to provide the Retirees' Committee with consideration of $9 million to resolve pending litigation, including withdrawing the appeals of the Retirees' Committee and the Association to the District Court. The consideration provided by Delphi under the Settlement includes an initial $1 million payment May 1, 2009 to a hardship fund, subsequent monthly payments of $1.25 million for five months beginning in June 2009, and a final $1 million payment in November 2009. In addition, Delphi has agreed to contribute $500,000 by May 1, 2009 toward the creation of a Voluntary Employees' Beneficiary Association ("VEBA") and to reimburse up to an additional $250,000 of reasonable legal expenses incurred by the counsel for the Retirees' Committee and the Association. Delphi has no future funding obligations or commitments to the VEBA. Following the initial payment by May 1, 2009 of the $1.5 million, the District Court dismissed the appeal filed by the retirees with prejudice. Delphi recognized a salaried OPEB settlement gain from reorganization of $1,168 million during the three months ended March 31, 2009. This settlement gain reflects the reversal of existing liabilities of $1,173 million ($1,181 million net of $8 million to pay salaried OPEB claims incurred but not reported as of March 31, 2009) and the recognition of previously unamortized net gains included in accumulated other comprehensive income of $4 million. The reorganization gain also reflects the impact of the $9 million consideration to be provided for the Settlement described above.

### 3. Debtor-in-Possession ("DIP") Financing

**Amended and Restated DIP Credit Facility and Accommodation Agreement**

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to amend and extend its Refinanced DIP Credit Facility (the "Amended and Restated DIP Credit Facility"), which amendments and extension became effective in May 2008.  As a result of the amendment and restatement, the aggregate size of the facility was reduced from $4.5 billion to $4.35 billion, consisting of a $1.1 billion first priority revolving credit facility (the "Tranche A Facility" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan") and a $2.75 billion second priority term loan (the "Tranche C Term Loan").

On November 7, 2008, Delphi filed a motion with the Court seeking authority to enter into the Accommodation Agreement allowing Delphi to retain the proceeds of its Amended and Restated DIP Credit Facility, which otherwise matured on December 31, 2008.  On December 3, 2008, the Court entered an order approving Delphi's motion and authorizing Delphi to enter into the Accommodation Agreement following the expiration of the applicable appeal period, assuming resolution of any objections filed in the interim.  On December 12, 2008, Delphi satisfied the closing conditions set forth in the Accommodation Agreement and the Accommodation Agreement became effective.  On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement.  In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement.  In addition, GM agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement.  The Amendment and GM's agreement to accelerate payments were effective January 30, 2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders.  The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees.  Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement.  On March 31, 2009, Delphi entered into the Second Amendment to the Accommodation Agreement that included certain updated milestones and covenant provisions that were subsequently eliminated in the First Supplement entered on April 3, 2009.  The First Supplement contained a number of new covenants and milestone requirements.  On April 22, 2009, Delphi entered into the Second Supplement that, amount other things, extended certain milestone dates.

In connection with the Second Amendment Delphi applied all previously collected interest payments in respect of the Tranche C Term Loan, approximately $86 million, ratably as repayments of principal outstanding under the Tranche A Facility and Tranche B Term Loan.  In conjunction with the effectiveness of the Second Supplement, $25 million of amounts in a cash collateral account were ratably applied to pay down principal amounts outstanding under the Tranche A Facility and Tranche B Term Loan.  In addition, the Second Supplement provides that all future Tranche C interest payments will be applied ratably to repayments of principal amounts outstanding under the Tranche A Facility and the Tranche B Term Loan until paid in full.

On May 7, 2009 Delphi entered into a further amendment (the "Third Amendment") to the Accommodation Agreement, which further extended certain milestones dates in the Accommodation Agreement.  The Third Amendment received interim approval on May 7, 2009 and became immediately effective, however, it is subject to certain post-closing conditions including receipt of final approval of the Court before May 23, 2009 and the payment of fees and certain expenses to consenting lenders.  In conjunction with the effectiveness of the Third Amendment, $45 million of amounts in a cash collateral account were ratably applied to pay down principal amounts outstanding under the Tranche A Facility and Tranche B Term Loan with the result that as of May 8, 2009, there remained approximately $230 million and $311 million outstanding under each facility, respectively.  There also remained approximately $2.75 billion outstanding under the Tranche C Term Loan.

<u>Termination Date of the Accommodation Agreement</u>

Under the Accommodation Agreement (as amended by the Amendment and Supplemental Amendment and the Second Amendment and Second Supplement), Delphi may continue using the proceeds of the Amended and Restated DIP Credit Facility and the lenders have agreed, among other things, to forbear from the exercise of certain default-related remedies, in each case until the earlier to occur of (i) June 30, 2009; (ii) Delphi's failure to comply with its covenants, including the milestone dates described below, under the Accommodation Agreement or the occurrence of certain other events set forth in the Accommodation Agreement; and (iii) an event of default under the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions).

However, the Accommodation Agreement (as amended by the Third Amendment) contains certain milestone dates, which if not met require Delphi to apply the $47 million currently held as cash collateral in the "Basket" (as defined below) to pay down a portion of the Tranche A Facility and Tranche B Term Loan (the "Repayment Obligation") and may result in an event of default and termination of the accommodation period. Specifically, Delphi is required to deliver on or before May 21, 2009 to the agent under the Amended and Restated DIP Credit Facility a detailed Term Sheet, which has been agreed to by both GM and the U.S. Treasury and which sets forth the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's chapter 11 cases, including, without limitation, all material transactions between Delphi and GM relevant to such resolution. The Accommodation Agreement further provides that the Repayment Obligation will be triggered and an event of default under the Accommodation Agreement will occur (i) on May 22, 2009 if the Term Sheet is not delivered by May 21, 2009, or (ii) in the event a majority of the Tranche A and Tranche B lenders who have signed the Accommodation Agreement or a majority of all lenders who have signed the Accommodation Agreement either (A) notify Delphi within 3 business days of delivery of the Term Sheet that the Term Sheet is not satisfactory or (B) fail to notify Delphi within such time period, that the Term Sheet is satisfactory. In addition, the accommodation period under the Accommodation Agreement will terminate (a) at any time during the occurrence and during the continuation of an event of default under the Accommodation Agreement resulting from a failure to timely deliver the Term Sheet or to satisfy the Repayment Obligation, in each case upon the direction by the Tranche A and Tranche B lenders who have signed the Accommodation Agreement or upon the direction of a majority of all lenders who have signed the Accommodation Agreement (or in any event, upon the expiration of a five business day period beginning upon such event of default, in the case of a failure to satisfy the Repayment Obligation) and (b) upon expiration of a five business day period beginning upon notice by the requisite lenders described above that the Term Sheet is not satisfactory or Delphi not receiving notice that the Term Sheet is satisfactory. Notwithstanding the foregoing, the accommodation period under the Accommodation Agreement will terminate on June 2, 2009, in the event that a majority of the Tranche A and Tranche B lenders who have signed the Accommodation Agreement and a majority of all lenders who signed the Accommodation Agreement had not notified Delphi that the Term Sheet is satisfactory on or before June 1, 2009.

<u>Requirements of the Accommodation Agreement</u>

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, as of December 12, 2008, the effective date of the Accommodation Agreement, Delphi is no longer able to make additional draws under the facility. However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement). Additionally, prior to the effective date of the Accommodation Agreement, Delphi was required to and did the following (i) replace or cash collateralize, at 105% of the undrawn amount thereof, all outstanding letters of credit under the Amended and Restated DIP Credit Facility that had not been collateralized prior to that date, and (ii) limit the aggregate principal amounts outstanding under the Tranche A Facility borrowings to no more than $377 million.

In addition, in conjunction with the Accommodation Agreement, Delphi increased its pledge of the equity interests in Delphi's first-tier foreign subsidiaries from 65% to 100%, which triggered a deemed dividend for tax purposes (no additional cash taxes were incurred).

Prior to the effectiveness of the Accommodation Agreement, Delphi was permitted to and did provide cash collateral, in an aggregate amount of $200 million, which was pledged to the administrative agent for the benefit of the lenders ("Borrowing Base Cash Collateral"). Upon Delphi's request, portions or all of the Borrowing Base Cash Collateral will be transferred back to Delphi provided that (i) Delphi is in compliance with the borrowing base calculation in the Accommodation Agreement, (ii) no event of default has occurred and (iii) Delphi maintains a Minimum Borrowing Base Cash Collateral Account Balance (as defined in the Accommodation Agreement) of $160 million through and including April 18, 2009, $115 million from April 19, 2009 until the Term Sheet has been approved by the lenders as set forth above, and thereafter at an amount set forth in the Term Sheet.

Case Number:  05-44481 (RDD) (Jointly Administered)

In conjunction with the Amendment, a separate cash collateral account of up to $117 million (the "Basket") was established, which solely for purposes of the prepayment provisions in the Accommodation Agreement is considered an offset to amounts outstanding under the Revolving Facility.  As noted above, in conjunction with the Second Supplement and the Third Amendment, $25 million and $45 million from the Basket, respectively, was ratably applied to pay down principal amounts outstanding under the Tranche A Facility and Tranche B Term Loan. Remaining amounts in the Basket may be released to Delphi (and each such release may not be restored) if each of the following conditions is satisfied at the time of the release: (a) after giving effect to the release, Delphi is compliant with the mandatory prepayment provisions in the Accommodation Agreement and all other covenants in the Amended and Restated DIP Credit Facility as modified by the Accommodation Agreement and the Amendment, and (b) availability under the GM Advance Agreement has been increased to and remains at $450 million.  GM had previously agreed to increase amounts available under the GM Advance Agreement to $450 million, subject to (i) GM not being notified by the President's Designee that such increase is not permitted in accordance with the provisions of GM's federal loans, (ii) Court approval, (iii) the GM board of directors' approval, (iv) Delphi and GM executing a definitive transaction agreement relating to the sale of Delphi's Steering Business, and (v) Court approval of the Steering Business Option Exercise Agreement.  The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement.  Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed by GM and Delphi.  The Option Exercise Agreement is subject to conditions described in Note 9. Divestitures.  However, the U.S. Treasury objected to the proposed increase to GM's commitments under the GM Advance Agreement and as a result of such objections, Delphi adjourned the hearings on its motions to obtain Court approval of the amendments to the GM Advance Agreement and the Steering Business Option Exercise Agreement.  To date, Delphi has been able to maintain sufficient liquidity to continue operations despite being prevented from effectuating the above-described increases in GM's commitments under the GM Advance Agreement.  However, there can be no assurances this will continue to be the case, particularly in the absence of a near term agreement on a Term Sheet which comprehends additional liquidity support (refer to Liquidity Outlook in Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 1A. Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009).

<u>Terms of the Amended and Restated DIP Credit Facility and Accommodation Agreement</u>
The facilities currently bear interest at the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent, as detailed in the table below, and the amounts outstanding (in millions) and rates effective as of March 31, 2009 were:

| | ABR plus | Borrowings as of March 31, 2009 (in millions) | Rates effective as of March 31, 2009 |
|---|---|---|---|
| Tranche A............................ | 5.00% | $308 | 9.25% |
| Tranche B ........................... | 5.00% | $416 | 9.25% |
| Tranche C ........................... | 6.25% | $2,750 | 10.50% |

The Tranche A, Tranche B and Tranche C facilities include an ABR floor of 4.25%.

The Company had $107 million in letters of credit outstanding under the Revolving Facility as of March 31, 2009.  The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Accommodation Agreement.  Under the Accommodation Agreement, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate.  Based on the borrowing base computation in effect at March 31, 2009, as defined in the Accommodation Agreement, Delphi's borrowing base was reduced by a deduction of $249 million for unrealized losses related to Delphi's hedging portfolio, which as of March 31, 2009 resulted in net losses included in accumulated other comprehensive income ("OCI") of $242 million pre-tax, primarily related to copper and Mexican Peso hedges, as further described in Note 14. Derivatives and Hedging Activities and Fair Value Measurements, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability, among other things, to incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock.  As long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply

(except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). Delphi's Facility Availability Amount was less than $500 million at March 31, 2009 as all commitments were cancelled with the effectiveness of the Accommodation Agreement on December 12, 2008.

The Accommodation Agreement also contains additional covenants, amends certain of the existing covenants in the Amended and Restated DIP Credit Facility and includes additional events of default under the Amended and Restated DIP Credit Facility. Additional covenants under the Accommodation Agreement include (i) a prescribed minimum borrower liquidity level, which in conjunction with the Second Supplement was set at $25 million through the remainder of the accommodation period, (ii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility pursuant to an Accommodation Agreement borrowing base covenant, (iii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility to the extent any specified litigation proceeds are received in cash, (iv) a prohibition on the repatriation of cash from foreign subsidiaries as cash dividends, cash otherwise distributed in redemption of or in exchange for equity interests in foreign subsidiaries or through the repayment of notes unless used to repay obligations under the Amended and Restated DIP Credit Facility and (v) a requirement to repay $60 million in obligations under the Amended and Restated DIP Credit Facility in accordance with the schedule set forth in the Accommodation Agreement.

Changes to covenants under the Amended and Restated DIP Credit Facility include (i) a reduction in the cap on permitted debt and liens on assets of foreign subsidiaries, (ii) a reduction in the cap on net cash proceeds from asset sales before such proceeds must be utilized to repay the obligations under the Amended and Restated DIP Credit Facility, (iii) modifications to certain debt and lien baskets, including permitting cash collateralization of letters of credit and an increase in secured hedging obligations and (iv) enhanced monthly financial reporting. The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility and Accommodation Agreement) for Delphi and its direct and indirect subsidiaries, on a consolidated basis. The covenants also impose restrictions on Delphi's derivative contracts. Refer to Note 14. Derivatives and Hedging Activities and Fair Value Measurements, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 for more information. Delphi was in compliance with the Amended and Restated DIP Credit Facility and Accommodation Agreement covenants as of March 31, 2009, including the Global EBITDAR covenant of $(150) million.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.

New events of default under the Amended and Restated DIP Credit Facility include (i) any amendment, waiver, supplement or modification to the Amended GSA or the Amended MRA requiring Court approval that, taken as a whole, materially impairs the rights of Delphi or its affiliated debtors as borrowers or guarantors, materially reduces the amount, or decelerates the timing of, any material payments under either such agreement, if the Required Lenders object, (ii) any repudiation in writing or termination of the Amended GSA or the Amended MRA by any party thereto, or a failure to perform any obligation thereunder, which failure materially impairs the rights of Delphi thereunder, (iii) certain amendments, waivers, modifications, or supplementations of any term of the GM Advance Agreement or the Partial Temporary Accelerated Payments Agreement (as defined below), (iv) any event or condition that results in GM not funding amounts requested under the GM Advance Agreement and (v) the enforcement or failure to stay enforcement of a judgment or order against any borrower or guarantor with respect to any amounts advanced under the Amended and Restated DIP Credit Facility.

In the first quarter of 2009, the Company received authority from the Court to pay applicable fees to various lenders in conjunction with the Amendment and Supplemental Amendment, and paid approximately $16 million in fees to the consenting lenders for both amendments. Delphi also paid arrangement and other fees to various lenders associated with the amendments.

**Advance Agreement and Liquidity Support from General Motors and Related Matters**

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the

GM Advance Agreement. The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, as more fully described in Note 2. Transformation Plan and Chapter 11 Bankruptcy, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009, and Delphi was not able to redraw the original $650 million facility amount.

On September 26, 2008, the Court granted Delphi's motion to amend the GM Advance Agreement to provide for a $300 million facility, which could be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement signed on August 7, 2008 and to give GM an administrative claim for all unpaid advances under such additional facility. Continued availability to draw against the additional $300 million facility was conditioned upon Delphi filing a plan of reorganization and related disclosure statement in form and substance materially consistent with Section 5 of the Amended GSA and Section 7.01 of the Amended MRA which condition was satisfied with Delphi's filing of proposed modifications to its previously confirmed plan of reorganization with the Court on October 3, 2008, and certain other conditions.

In support of Delphi's efforts to obtain the Accommodation Agreement, GM agreed to extend the term of the GM Advance Agreement, pursuant to the terms set forth in an amendment thereto filed with the Court on November 7, 2008 (as supplemented) (the "GM Advance Agreement Amendment"), through the earlier of (i) June 30, 2009, (ii) such date as Delphi files any motion seeking to amend the plan of reorganization in a manner that is not reasonably satisfactory to GM, (iii) the termination of the Accommodation Agreement or the accommodation period therein, or (iv) such date when a plan of reorganization becomes effective. The Court approved Delphi's motion to amend and extend the GM Advance Agreement concurrently with the approval of Delphi's motion seeking authority to enter into the Accommodation Agreement. Additionally, GM has agreed, subject to certain conditions, to accelerate payment of certain payables up to $300 million to Delphi, pursuant to the Partial Temporary Accelerated Payments Agreement. As of March 31, 2009, GM had accelerated payment of $200 million under such agreement and in April, GM accelerated the remaining $100 million, therefore no amounts remain to be accelerated thereunder. The Partial Temporary Accelerated Payments Agreement provides that GM will generally recoup these accelerated payments over its three subsequent monthly payments on or after the date that GM's obligation to advance funds under the GM Advance Agreement terminates or advances made become due and payable in accordance with the GM Advance Agreement. Both the amendment to the GM Advance Agreement and the Partial Temporary Accelerated Payments Agreement were effective concurrent with the Accommodation Agreement, on December 12, 2008. Conforming amendments were made to the GM Advance Agreement and Partial Temporary Accelerated Payments Agreement contemporaneously with Court approval of the Amendment and Supplemental Amendment to the Accommodation Agreement as described above. Delphi and GM entered into subsequent amendments to the GM Advance Agreement to reflect the conditions pursuant to which GM will agree to increase the amounts available under such agreement, however, as noted in the immediately preceding section under "Amended and Restated DIP Credit Facility and Accommodation Agreement," the U.S. Treasury objected to such amendments and Delphi adjourned the Court hearing seeking approval of the proposed amendments.

The GM Advance Agreement currently has a targeted cash balance amount of $25 million and Delphi is required to use any free cash flow above the targeted cash balance amount (as determined in accordance with the GM Advance Agreement) to repay from time to time any amounts outstanding thereunder. As of March 31, 2009, $253 million was outstanding pursuant to the GM Advance Agreement and $47 million was available for future advances. There can be no assurances, however, that GM will have sufficient liquidity to continue to advance amounts under the GM Advance Agreement. Refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and Part II. Item 1A. Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 for risks and uncertainties related to our business relationship with GM.

## 4.  Reorganization Items

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors, and unions. The Debtors' reorganization items consist of the following:

|  | (Income)/Expense Three Months Ended March 31, 2009 (in millions) |
| --- | --- |
| Salaried OPEB settlement | $ (1,168) |
| Professional fees directly related to reorganization | 23 |
| Other | (14) |
| Total Reorganization Items | $ (1,159) |

Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions. Professional Fees also include $4 million during the three months ended March 31, 2009 for certain legal advisors to GM. Professional Fees for the three months ended March 31, 2009 were estimated by the Debtors and will be reconciled to actual invoices when received.

## 5. Assets

Other current assets consisted of the following:

|  | March 31, 2009 (in millions) |
| --- | --- |
| Taxes other than income | $ 10 |
| Prepaid insurance and other expenses | 64 |
| Deposits to vendors | 34 |
| Debt issuance costs | 37 |
| Other | 15 |
| Total | $ 160 |

Other long-term assets consisted of the following:

|  | March 31, 2009 (in millions) |
| --- | --- |
| Long-term notes receivable | $ 19 |
| Income taxes receivable | 45 |
| Goodwill | 37 |
| Intangible assets | 16 |
| Deferred charges | 10 |
| Other investments | 16 |
| Other | 74 |
| Total | $ 217 |

**6. Liabilities**

Accrued liabilities consisted of the following:

| | March 31, 2009 (in millions) |
|---|---|
| Payroll related obligations.................................................. | $    38 |
| Employee benefits, including current pension obligations. | 80 |
| Taxes other than income.................................................... | 33 |
| Warranty obligations ....................................................... | 74 |
| U.S. employee workforce transition program.................... | 105 |
| Employee termination benefits and other exit costs ......... | 80 |
| Interest on prepetition claims ........................................... | 415 |
| Working capital backstop – Steering Business.................. | 210 |
| Other.................................................................................. | 182 |
| Total .......................................................................... | $1,217 |

Employee benefit obligations and other consisted of the following:

| | March 31, 2009 (in millions) |
|---|---|
| Workers compensation .................................................... | $   311 |
| Environmental ................................................................. | 86 |
| Extended disability benefits ............................................. | 61 |
| Warranty obligations ....................................................... | 116 |
| Other long-term debt ....................................................... | 19 |
| Other.................................................................................. | 130 |
| Total .......................................................................... | $   723 |

**7.  Liabilities Subject to Compromise**

The Debtors have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time, as of March 31, 2009, the Debtors had objected to approximately 13,300 proofs of claim which asserted approximately $9.9 billion in aggregate liquidated amounts plus additional unliquidated amounts.  The Court has entered orders disallowing and/or claimants have withdrawn approximately 10,000 of those claims, which orders reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts.  In addition, the Court has entered an order allowing or modifying approximately 4,000 claims, reducing the aggregate amounts asserted on those claims by $351 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced.  The determination of how these liabilities are to be settled and treated is set forth in the Plan, which was approved by the Court on January 25, 2008. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject

to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.  Liabilities subject to compromise consist of the following:

|  | March 31, 2009 |
| --- | --- |
|  | (in millions) |
| Pension obligations | $      5,347 |
| Postretirement obligations other than pensions | 31 |
| Allowed GM general unsecured claim | 2,500 |
| Allowed GM administrative claim | 1,628 |
| Allowed IUE-CWA and USW claims | 129 |
| Debt and notes payable | 1,984 |
| Accounts payable | 811 |
| Junior subordinated notes due 2033 | 391 |
| Securities and ERISA litigation liability | 351 |
| Supplemental executive retirement program | 117 |
| Other | 227 |
| Total Liabilities Subject to Compromise | $      13,516 |

## 8.  Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and are being paid under agreed-upon payment terms.

## 9.  Divestitures

### Discontinued Operations

***Steering and Halfshaft Business*** - In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement").  In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business.  Pursuant to the Amended MRA, GM has agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010.  On March 3, 2009, Delphi and Platinum reached an agreement under which the Purchase Agreement was terminated (the "Termination Agreement") and Delphi and GM reached an agreement (the "Option Exercise Agreement"), subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM will exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM  to purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances (the "Steering Purchase").  GM has agreed to guaranty the payment and performance of its wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.

The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement.  Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed to by GM and Delphi.  Delphi agreed to use its reasonable best efforts to obtain Court approval of the Option Exercise Agreement on or before March 24, 2009, and Delphi and GM agreed to use their reasonable best efforts to obtain Court approval of the Steering Purchase and assignment and assumption of contracts on or before April 23, 2009 and to close the Steering Purchase on or before April 30, 2009.  For a detailed description of the terms of the Option Exercise Agreement refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2008.  On March 23, 2009 GM received a written notice from the U.S. Treasury objecting to GM's entry into the Option Exercise Agreement.  In its notice, the U.S. Treasury stated that it would reconsider such objection upon further review of the proposal.  In order to provide the U.S. Treasury with additional time to consider the option to purchase the Steering Business, Delphi adjourned the Court hearing seeking approval of agreement until May 21, 2009.  As discussed in Note 3. Debtor-in-Possession ("DIP") Financing, discussions on a Term Sheet continue and it is anticipated that such discussions will include a final resolution regarding the Steering Business and other Delphi non-core manufacturing facilities and product lines.

On September 30, 2008, in conjunction with the effectiveness of the Amended MRA, Delphi received and recorded as a deferred liability a $210 million advance on working capital recovery from GM related to the Steering Business.  During the three months ended March 31, 2009 Delphi recorded income of $25 million, net of tax, due to the results of operations and adjustment of assets held for sale to fair value of the Steering Business.

### Automotive Holdings Group Segment

***Global Suspension and Brakes Business Sale –*** On March 31, 2009, Delphi announced that it had entered into an asset sale and purchase agreement with BeijingWest Industries Co., Ltd. for the sale of Delphi's remaining chassis business, the global suspension and brakes business, whereby Beijing West Industries Co., Ltd. will acquire machinery and equipment, intellectual property and certain real property.  The carrying value of the net assets to be sold approximates $100 million as of March 31, 2009.  Certain customer and supplier contracts will also be assumed and/or assigned to BeijingWest Industries Co., Ltd.  Delphi filed a motion with the Court on March 31, 2009 requesting a hearing on April 23, 2009, to approve bidding procedures, and a hearing on May 21, 2009, to authorize and approve the sale of the assets.  The Court approved bidding procedures for the sale of these assets on April 23, 2009 which will result in held for sale accounting under SFAS 144 in the second quarter of 2009.  Delphi expects the hearing to proceed on May 21, 2009 and the closing of the sale to occur during the fourth quarter of 2009.

### Powertrain Systems Segment

***Global Exhaust Business Sale –*** On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business").  On December 17, 2008, Delphi received approval from the Court for the sale of assets related to the Exhaust Business to Bienes Turgon S.A. de C.V. ("Bienes Turgon") for $17 million (subject to adjustments).  The Exhaust Business revenues for 2008 were approximately $317 million.  On April 30, 2009, Delphi finalized the sale of the assets and shares related to the Company's global exhaust business in Blonie, Poland; Clayton, Australia; Port Elizabeth, South Africa; joint venture interests in Monterrey, Mexico; technical centers in Auburn Hills, Michigan; and Bascharage, Luxembourg. As part of this transaction, the sale of assets to Bienes Turgon from the remaining two locations (Gurgaon, India and Shanghai, China) is expected to close during the second half of 2009, and Delphi recognized a charge of $14 million in cost of sales during the fourth quarter of 2008 and a reduction of $1 million in cost of sales during the first quarter of 2009 related to the assets held for sale of the Exhaust Business.  Although Delphi is divesting its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

### Electronics and Safety Segment

***Held-For-Sale Gain –*** In 2008, Delphi made the decision to divest a certain manufacturing business in Germany.  Based on an estimate of anticipated proceeds, Delphi recognized a charge of $13 million, included in cost of sales, in the fourth quarter of 2008 and recognized a gain of $1 million during the first quarter of 2009 related to the assets held for sale.  The divestiture is expected to occur during 2009.

**DELPHI CORPORATION, <u>et al.</u>**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**THREE MONTHS ENDED MARCH 31, 2009**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $        308,914,671 | $            81,236,351 | $            32,346,810 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**THREE MONTHS ENDED MARCH 31, 2009**

| Payee | Payroll Taxes Paid |
|---|---|
| Internal Revenue Service | $    93,965,242 |
| State of Michigan | 4,037,292 |
| City of Saginaw, MI | 62,979 |
| City of Flint, MI | 50,797 |
| City of Detroit, MI | 10,221 |
| City of Grand Rapids, MI | 6,934 |
| City of Walker, MI | 798 |
| City of Pontiac, MI | 591 |
| City of Lansing, MI | 47 |
| State of Indiana | 3,852,538 |
| State of New York | 2,551,176 |
| State of Ohio | 1,117,155 |
| City of Dayton, OH | 120,904 |
| City of Vandalia, OH | 110,271 |
| City of Kettering, OH | 91,733 |
| City of Moraine, OH | 50,623 |
| City of Warren, OH | 34,498 |
| City of Rita, OH | 21,520 |
| City of Niles, OH | 17,799 |
| Ohio School District | 17,034 |
| City of Elyria, OH | 14,140 |
| City of Hubbard, OH | 4,706 |
| City of Columbus, OH | 2,892 |
| City of Port Clinton, OH | 2,188 |
| City of Newton Falls, OH | 2,096 |
| City of Lordstown, OH | 2,091 |
| City of Norwalk, OH | 1,181 |
| City of Trotwood, OH | 719 |
| City of Dublin, OH | 660 |
| City of Toledo, OH | 597 |
| City of Springfield, OH | 533 |
| City of Canton, OH | 409 |
| City of Akron, OH | 242 |
| City of Troy, OH | 70 |
| City of Xenia, OH | 44 |
| City of Hamilton, OH | 26 |
| City of Cincinnati, OH | 8 |
| Inland Revenue Service (UK) | 905,597 |
| State of Alabama | 707,148 |
| City of Gadsden, AL | 1,719 |
| State of Mississippi | 227,061 |
| State of Wisconsin | 220,454 |
| State of California | 82,040 |
| State of Colorado | 67,741 |
| City of Denver, CO | 4,533 |
| State of New Mexico | 38,208 |
| State of Pennsylvania | 29,468 |
| City of Towamencin, PA | 125 |
| State of South Carolina | 23,235 |
| State of Kansas | 20,784 |
| State of Illinois | 15,099 |
| State of Georgia | 13,672 |
| State of North Carolina | 9,142 |
| State of Iowa | 8,878 |
| State of Virgina | 7,099 |

| Payee | Payroll Taxes Paid |
|-------|-------------------:|
| State of Oregon | $       6,639 |
| State of Arizona | 5,648 |
| State of Kentucky | 3,985 |
| City of Elizabethtown, KY | 651 |
| City of Bowling Green, KY | 386 |
| State of Missouri | 5,114 |
| State of Texas | 2,519 |
| State of New Jersey | 2,337 |
| State of Maryland | 2,026 |
| State of Arkansas | 1,791 |
| State of Louisiana | 1,547 |
| State of Utah | 973 |
| State of Massachusetts | 419 |
| State of West Virginia | 303 |
| Total | $     108,569,095 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED MARCH 31, 2009**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Madison County, Indiana | Personal Property | $ 681,622 | $ 681,622 |
| Cameron County, Texas | Personal Property | 417,346 | 417,346 |
| Hinds County, Mississippi | Personal Property | 405,248 | 405,248 |
| El Paso County, Texas | Personal Property | 244,219 | 244,219 |
| United Independent School District, Texas | Personal Property | 124,600 | 124,600 |
| Lincoln County, Mississippi | Personal Property | 90,828 | 90,828 |
| Oak Creek, Wisconsin | Personal Property | 73,954 | 73,954 |
| Maury County, Tennessee | Personal Property | 51,615 | 51,615 |
| Bexar County, Texas | Personal Property | 40,550 | 40,550 |
| Maury County, TN | Personal Property | 35,527 | 35,527 |
| Madison County, Mississippi | Personal Property | 29,548 | 29,548 |
| Troy, Michigan | Personal Property | 28,423 | 28,423 |
| Lexington County, South Carolina | Personal Property | 25,818 | 25,818 |
| Marion County, South Carolina | Personal Property | 23,743 | 23,743 |
| Pinellas County, FL | Personal Property | 23,568 | 23,568 |
| Hidalgo County, Texas | Personal Property | 20,967 | 20,967 |
| Harlingen, Texas | Personal Property | 19,955 | 19,955 |
| Shelby County, Indiana | Personal Property | 11,403 | 11,403 |
| Bay County, FL | Personal Property | 10,326 | 10,326 |
| Smith County, Mississippi | Personal Property | 9,760 | 9,760 |
| Hidalgo Schools, Texas | Personal Property | 9,116 | 9,116 |
| Parker County, Texas | Personal Property | 8,870 | 8,870 |
| Miami Dade County, FL | Personal Property | 8,813 | 8,813 |
| Manatee County, FL | Personal Property | 7,471 | 7,471 |
| Angelina County, Texas | Personal Property | 6,823 | 6,823 |
| Newton County, Mississippi | Personal Property | 6,570 | 6,570 |
| Dearborn, Michigan | Personal Property | 6,310 | 6,310 |
| Lowndes County, Mississippi | Personal Property | 5,898 | 5,898 |
| York County, South Carolina | Personal Property | 5,401 | 5,401 |
| Dallas County, Texas | Personal Property | 5,382 | 5,382 |
| Madison County, Tennessee | Personal Property | 4,185 | 4,185 |
| Webb County, Texas | Personal Property | 3,852 | 3,852 |
| Laredo, Texas | Personal Property | 3,827 | 3,827 |
| Harris County, Texas | Personal Property | 3,230 | 3,230 |
| McAllen, Texas | Personal Property | 3,193 | 3,193 |
| Lubbock County, Texas | Personal Property | 3,083 | 3,083 |
| Travis County Tax Collector, TX | Personal Property | 3,023 | 3,023 |
| Hamilton County, Tennessee | Personal Property | 2,880 | 2,880 |
| Oxford Township, Michigan | Personal Property | 2,815 | 2,815 |
| Anderson County, South Carolina | Personal Property | 2,692 | 2,692 |
| Carrollton-Farmers Branch Independent School District, Texas | Personal Property | 2,594 | 2,594 |
| St. Joseph County, Indiana | Personal Property | 2,501 | 2,501 |
| Santa Rosa County, FL | Personal Property | 2,309 | 2,309 |
| Chattanooga, Tennessee | Personal Property | 2,011 | 2,011 |
| Novi, Michigan | Personal Property | 1,947 | 1,947 |
| Spartanburg County, South Carolina | Personal Property | 1,858 | 1,858 |
| Torrington, Connecticut | Personal Property | 1,603 | 1,603 |
| Giles County, Tennessee | Personal Property | 1,350 | 1,350 |
| Chesterfield County, South Carolina | Personal Property | 1,300 | 1,300 |
| Saginaw, Michigan | Personal Property | 1,140 | 1,140 |
| Grand Blanc Charter Township, Michigan | Personal Property | 1,095 | 1,095 |
| Baldwin County, Alabama | Personal Property | 1,056 | 1,056 |
| Davison, Michigan | Personal Property | 982 | 982 |
| Greenwood County, South Carolina | Personal Property | 965 | 965 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Bistol, Connecticut | Personal Property | $    935 | $    935 |
| Tarrant County, Texas | Personal Property | 892 | 892 |
| Laurens County, South Carolina | Personal Property | 890 | 890 |
| Sumner County, Tennessee | Personal Property | 840 | 840 |
| St Johns County, FL | Personal Property | 761 | 761 |
| Davidson County, Tennessee | Personal Property | 708 | 708 |
| Wilson County, Tennessee | Personal Property | 660 | 660 |
| Auburn Hills, Michigan | Personal Property | 577 | 577 |
| Garland Independent School District, Texas | Personal Property | 533 | 533 |
| Spaulding Township, Michigan | Personal Property | 524 | 524 |
| Detroit, Michigan | Personal Property | 474 | 474 |
| Montgomery County, Tennessee | Personal Property | 425 | 425 |
| Hazlehurst, Mississippi | Personal Property | 395 | 395 |
| Collin County, Texas | Personal Property | 375 | 375 |
| Shelby County, TN | Personal Property | 372 | 372 |
| Clinton, Tennessee | Personal Property | 366 | 366 |
| Donna Independent School District, Texas | Personal Property | 352 | 352 |
| Salisbury, Connecticut | Personal Property | 319 | 319 |
| Copiah County, Mississippi | Personal Property | 311 | 311 |
| Gallatin, Tennessee | Personal Property | 299 | 299 |
| Garland, Texas | Personal Property | 298 | 298 |
| Pickens County, Georgia | Personal Property | 264 | 264 |
| Rankin County, Mississippi | Personal Property | 248 | 248 |
| Nacogdoches County, Texas | Personal Property | 241 | 241 |
| Oconee County, South Carolina | Personal Property | 212 | 212 |
| Taylor, Michigan | Personal Property | 203 | 203 |
| Bridgeport Charter Township, Michigan | Personal Property | 189 | 189 |
| Hillsborough County, FL | Personal Property | 184 | 184 |
| Alamo, Texas | Personal Property | 174 | 174 |
| Yazoo County, Mississippi | Personal Property | 144 | 144 |
| Eagle Pass Independent School District, Texas | Personal Property | 143 | 143 |
| Goodlettsville, Tennessee | Personal Property | 132 | 132 |
| Los Fresnos Consolidated Independent School District, Texas | Personal Property | 122 | 122 |
| Jackson County, MO | Personal Property | 109 | 109 |
| Portland, Tennessee | Personal Property | 104 | 104 |
| Laport County, IN | Personal Property | 82 | 82 |
| Lenox, Michigan | Personal Property | 80 | 80 |
| Lebanon, Tennessee | Personal Property | 78 | 78 |
| Warren, Michigan | Personal Property | 64 | 64 |
| Berea City, Kentucky | Personal Property | 62 | 62 |
| Maverick County, Texas | Personal Property | 58 | 58 |
| Genesee Charter Township, Michigan | Personal Property | 54 | 54 |
| Valwood Improvement Authority, Texas | Personal Property | 53 | 53 |
| Commerce Township, Michigan | Personal Property | 50 | 50 |
| Clinton Charter Township, Michigan | Personal Property | 49 | 49 |
| Wixom, Michigan | Personal Property | 42 | 42 |
| Fairfield County, South Carolina | Personal Property | 39 | 39 |
| Smith County, Tennessee | Personal Property | 39 | 39 |
| Van Buren County, Tennessee | Personal Property | 38 | 38 |
| Burkburnett Independent School District, Texas | Personal Property | 35 | 35 |
| Clarkesville, Georgia | Personal Property | 35 | 35 |
| Dyer County, Tennessee | Personal Property | 35 | 35 |
| Spring Branch Independent School District, Texas | Personal Property | 33 | 33 |
| Robertson County, Tennessee | Personal Property | 26 | 26 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Denton County, Texas | Personal Property | $    25 | $    25 |
| Aiken County, South Carolina | Personal Property | 23 | 23 |
| Putnam County, Tennessee | Personal Property | 22 | 22 |
| Edgefield County, South Carolina | Personal Property | 18 | 18 |
| Nueces County, Texas | Personal Property | 18 | 18 |
| Gordonsville, Tennessee | Personal Property | 15 | 15 |
| Wichita County, Texas | Personal Property | 12 | 12 |
| Williamson County, Tennessee | Personal Property | 12 | 12 |
| Greene County, Tennessee | Personal Property | 11 | 11 |
| Greenville County, South Carolina | Personal Property | 10 | 10 |
| Haywood County, Tennessee | Personal Property | 10 | 10 |
| Buena Vista Township, Michigan | Personal Property | 9 | 9 |
| Brownsville, Tennessee | Personal Property | 7 | 7 |
| Zilwaukee Township, Michigan | Personal Property | 6 | 6 |
| Algood, Tennessee | Personal Property | 5 | 5 |
| McNairy County, Tennessee | Personal Property | 4 | 4 |
| Franklin, Tennessee | Personal Property | 2 | 2 |
| Selmer, Tennessee | Personal Property | 2 | 2 |
| Flint, Michigan | Real Property | 666,864 | 666,864 |
| Montgomery County, Ohio | Real Property | 655,859 | 655,859 |
| Trumbull County, Ohio | Real Property | 464,603 | 464,603 |
| Lockport, New York | Real Property | 452,791 | 452,791 |
| Buena Vista Township, Michigan | Real Property | 307,338 | 307,338 |
| Rochester, New York | Real Property | 293,585 | 293,585 |
| Troy, Michigan | Real Property | 283,059 | 283,059 |
| Lockport City, NY | Real Property | 196,211 | 196,211 |
| Oak Creek, Wisconsin | Real Property | 134,168 | 134,168 |
| Franklin County, Ohio | Real Property | 114,851 | 114,851 |
| Lincoln County, Mississippi | Real Property | 105,284 | 105,284 |
| San Benito Consolidated Independent School District, Texas | Real Property | 71,702 | 71,702 |
| City of Oak Creek, WI | Real Property | 58,588 | 58,588 |
| Saginaw, Michigan | Real Property | 38,582 | 38,582 |
| Portage County, Ohio | Real Property | 22,990 | 22,990 |
| Wyoming, Michigan | Real Property | 18,149 | 18,149 |
| Henrietta, New York | Real Property | 25 | 25 |
| State of Michigan | Use | 640,766 | 640,766 |
| State of Ohio | Use | 473,824 | 473,824 |
| State of Indiana | Use | 306,875 | 306,875 |
| State of New York | Use | 259,749 | 259,749 |
| State of Texas | Use | 66,051 | 66,051 |
| State of Ohio | Use | 47,592 | 47,592 |
| Limestone County, Alabama (Pay to: Alabama Department of Revenue) | Use | 24,985 | 24,985 |
| State of Mississippi | Use | 12,525 | 12,525 |
| State of Alabama | Use | 10,670 | 10,670 |
| State of Wisconsin | Use | 4,418 | 4,418 |
| Colorado Dept of Revenue | Use | 2,155 | 2,155 |
| State of Ohio | Kilowatt Hour | 30,898 | 30,898 |
| Dept. of Treasury, OH | Kilowatt Hour | 4,522 | 4,522 |
| State of Alabama | Consumer Use | 18,663 | 18,663 |
| US Treasury/IRS | Withholding (non-payroll) | 14,522 | 14,522 |
| US Treasury/IRS | Withholding (non-payroll) | 1,119 | 1,119 |
| State of Alabama | Seller's Use | 7,655 | 7,655 |
| State of Virginia | Sales | 2,528 | 2,528 |
| State of Texas | Sales | 2,466 | 2,466 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| State of Illinois | Sales | $ 536 | $ 536 |
| State of Utah | Sales | 333 | 333 |
| State of Colorado | Sales | 152 | 152 |
| Colorado Dept of Revenue | Sales | 99 | 99 |
| State of Washington | Business & Occupation | 4,879 | 4,879 |
| Colorado Dept of Revenue | Utility | 708 | 708 |
| South Carolina Department of Revenue | Sales & Use | 166 | 166 |
| Total | | $ 8,333,608 | $ 8,333,608 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED MARCH 31, 2009**

Note 1:    The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:    Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF DISBURSEMENTS**
**THREE MONTHS ENDED MARCH 31, 2009**

| Debtor Name | Case Number | Amount [1] |
|---|---|---|
| Delphi NY Holdings Corporation | 05-44480 | $ — |
| Delphi Corporation | 05-44481 | 4,910 |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 12,850,970 |
| Delphi Medical Systems Texas Corporation | 05-44511 | — |
| Delphi Medical Systems Corporation | 05-44529 | 2,246,150 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 1,429,012 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 4,999,226 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 18,363,951 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | — |
| Delphi China LLC | 05-44577 | — |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 322,017 |
| Delphi International Services, Inc. | 05-44583 | 20,393,062 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | 3,617 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | 204,608 |
| Delco Electronics Overseas Corporation | 05-44610 | 11,684,834 |
| Delphi Diesel Systems Corporation | 05-44612 | 58,441,411 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 692,723 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 217,698 |
| Delphi Connection Systems | 05-44624 | 12,443,347 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 208,920,153 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 368,918,595 |
| Delphi Automotive Systems LLC | 05-44640 | 1,668,292,677 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 22,484,330 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | — |

(1) Operating expenses for the three months ended March 31, 2009 were used as a proxy for disbursements.