**Hearing Date And Time: TBD**
**Objection Deadline: TBD**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :
      In re                         :       Chapter 11
                                    :
DELPHI CORPORATION, et al.,      :       Case No. 05-44481 (RDD)
                                    :
                    Debtors.     :       (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**(A) SUPPLEMENT TO MOTION FOR ORDER (I) APPROVING MODIFICATIONS TO DEBTORS'
FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND RELATED
DISCLOSURES AND VOTING PROCEDURES AND (II) SETTING FINAL HEARING DATE TO
CONSIDER MODIFICATIONS TO CONFIRMED FIRST AMENDED PLAN OF
REORGANIZATION AND (B) REQUEST TO SET ADMINISTRATIVE EXPENSE CLAIMS BAR
DATE AND ALTERNATIVE SALE HEARING DATE**

**("SUPPLEMENT TO PLAN MODIFICATION APPROVAL MOTION")**

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors")[1],

hereby submit this (A) supplement (the "Motion Supplement") to the Motion for Order (I)

Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and

Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider

Modifications to Confirmed First Amended Plan of Reorganization (Docket No. 14310) (the

"Plan Modification Approval Motion") under 11 U.S.C. § 1127[2] and (B) request to set

administrative expense claims bar date and alternative sale hearing date (the "Alternative Sale

Hearing").  By this Motion Supplement, the Debtors seek an order an order (a) approving certain

modifications to the confirmed First Amended Joint Plan of Reorganization of Delphi

Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, as amended on January

25, 2008 (the "Confirmed Plan"), related disclosure statement (Docket No. 11388) (the

"December 10 Disclosure Statement"), and voting procedures as set forth in the December 10

Solicitation Procedures Order[3] (Docket No. 11389) and (b) setting a final hearing date on

---

[1]    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under
chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy
Code").

[2]    Section 1127 of the Bankruptcy Code provides, in relevant part:

    (b)    The proponent of a plan or the reorganized debtor may modify such plan at any time after
    confirmation of such plan and before substantial consummation of such plan, but may not modify such plan
    so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such
    plan as modified under this subsection becomes the plan only if circumstances warrant such modification
    and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

    (c)    The proponent of a modification shall comply with section 1125 of this title with respect to the
    plan as modified.

    (d)    Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or
    rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder
    changes such holder's previous acceptance or rejection.

[3]    See Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for
Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures
for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII)

approval of the Debtors' proposed plan modifications for July 23, 2009.  The Debtors also

request the setting of a bar date for filing proofs of administrative expense for postpetition claims

arising before June 1, 2009 and an Alternative Sale Hearing date of July 23, 2009 to be used,

only if necessary, to consider the sale of substantially all the Debtors' assets pursuant to section

363 of the Bankruptcy Code if the Court does not approve the Debtors' proposed plan

modifications on that date.

    As further described herein, the Debtors are proposing further modifications to the

Confirmed Plan (the "Modified Plan") that the Debtors believe require resolicitation.  On

October 3, 2008, the Debtors filed the Plan Modification Approval Motion to approve certain

modifications to the Confirmed Plan, related disclosures, and certain voting procedures and to set

a final hearing on the motion.  The hearing on the Plan Modification Approval Motion was

originally scheduled for October 23, 2008 but was subsequently adjourned several times, most

recently to June 2, 2009 (see docket numbers 14351, 14376, 14429, 14580, 16403, 16562, 16616,

and 16643).  Since the filing of the Plan Modification Approval Motion, a number of events have

propelled the Debtors to propose further modifications to the Confirmed Plan.  This Motion

Supplement supplements the adjourned Plan Modification Approval Motion.  Because the

proposed modifications to the Confirmed Plan require resolicitation and court approval, the

Debtors propose the following schedule for resolicitation and approval of such modifications:

| Date | Event |
|------|-------|
| June 16, 2009 | Deadline to publish notice of hearing to approve modifications to Confirmed Plan |

---

Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures, entered on December 10, 2007 (Docket No. 11389) (the "December 10 Solicitation Procedures Order").

| | Deadline to commence mailing of solicitation packages |
|---|---|
| July 2, 2009 | Rule 3018(a) motion deadline |
| | Modified Plan exhibit filing deadline, including deadline to file the 363 implementation agreement (the "363 Implementation Agreement") |
| | Deadline to file Notice of Non-Assumption of Executory Contracts |
| July 9, 2009 | Deadline to file announcement of Article 9 Purchaser (if necessary) |
| July 10, 2009 | Bar date for filing proofs of administrative expense for administrative expenses for postpetition claims arising before June 1, 2009 |
| July 14, 2009 | Deadline to object to modifications to the Confirmed Plan and the 363 Implementation Agreement |
| July 14, 2009 | Voting deadline |
| July 20, 2009 | Ballot report certification and filing deadline at 4:00 p.m. (prevailing Eastern time) |
| July 21, 2009 | Deadline to file reply in support of the Modified Plan and the Master Disposition Agreement and in support of the transactions set forth in the Master Disposition Agreement, as modified by the 363 Implementation Agreement and file any proposed revisions to the Final Modification Approval Order and to submit a proposed alternative form of sale order under section 363 of the Bankruptcy Code |
| July 23, 2009 | Hearing to approve modifications to the Confirmed Plan and to approve such plan as Modified (the "Final Modification Hearing") or, in the alternative, to approve the Master Disposition Agreement (defined below) pursuant to section 363 of the Bankruptcy Code (the "Alternative Sale Hearing") |

In further support of this Motion Supplement, the Debtors respectfully represent as follows:

Preliminary Statement

1.        Delphi is on the brink of emergence from chapter 11.  The Debtors have

accomplished their stated reorganization goals, maintained their business despite a global

economic recession and the failed promises of would-be investors, and persevered in the face of

unprecedented challenges that have flooded the automotive industry.  The relief that Delphi now

seeks – an expedited hearing for the Court to approve this Motion Supplement to modify the

Confirmed Plan – will enable the Debtors to complete the final phase of their reorganization.

Due to the nature of this transaction, there is no time to spare.  The Debtors need to act now to

effectuate the Modified Plan and the transactions incorporated therein to allow them to maximize

value to their stakeholders.  Without the requested relief, Delphi would be unable to effectuate a

plan of reorganization.

2.        In March 2006, approximately six months after the commencement of

these chapter 11 cases, the Debtors announced the five key tenets of their transformation plan

that they believed would enable them to return to stable, profitable business operations.

Thereafter, over the next 18 months, the Debtors worked diligently with their stakeholders to

achieve these goals.  By September 2007, the Debtors had negotiated an investment agreement

with a group of plan investors and had filed a plan of reorganization designed to allow Delphi to

emerge from chapter 11 as a viable entity with significant recoveries for its stakeholders.

Although the plan of reorganization and investment agreement were ultimately amended, in

January 2008, this Court approved the Confirmed Plan and the Debtors' hope for emergence

from chapter 11 was within reach.

3.        During February and March 2008, the Debtors succeeded in obtaining

$6.1 billion in exit financing commitments and by April 4, 2008 the Debtors had satisfied the

conditions required to substantially consummate the Confirmed Plan.  The plan investors,

however, refused to participate in the closing and refused to fund their investment agreement

with Delphi.  This devastating move by the plan investors precluded the Debtors from emerging

from chapter 11, and Delphi was required to reevaluate and retool its business plan and

emergence strategy.

4.        Over the next six months, the Debtors revised their go-forward business

plan and developed certain modifications to the Confirmed Plan so that Delphi could emerge on

an standalone basis, without plan investor support.  The lack of the plan investors' $2.5 billion

investment, together with the overall economic decline, particularly in the automotive industry,

and the total collapse of the credit markets in the later half of 2008 significantly reduced the

Debtors' enterprise value.  In addition, the Debtors were unable to secure necessary exit

financing, forcing the Debtors to remain in chapter 11.  Despite these challenges, on October 3,

2008, the Debtors filed certain proposed modifications to the Confirmed Plan that incorporated a

significantly lower enterprise value and recoveries to creditors that were lower than those

approved by the Court in the Confirmed Plan.  As a result of the lack of available credit in the

credit markets, the Debtors were unable to secure necessary emergence capital and thus were not

able to obtain approval of the modifications to the Confirmed Plan.

5.        Their unexpected prolonged stay in chapter 11 posed yet another challenge

to the Debtors because their DIP credit facility was set to mature on December 31, 2008.

Because of the collapse of the credit markets, the Debtors were unable to extend the maturity

date of their DIP credit facility on reasonably acceptable terms.  Accordingly, in December 2008,

the Debtors and their debtor-in-possession lenders (the "DIP Lenders") entered into an

accommodation agreement, as subsequently amended, to allow the Debtors, among other things,

to continue using certain of the proceeds of the DIP credit facility through June 30, 2009.  In

addition, and in connection with certain amendments to the accommodation agreement with the

DIP Lenders, General Motors Corporation ("GM") agreed to provide the Debtors with additional

liquidity and to accelerate payment of certain receivables to allow the Debtors to maintain

ongoing operations in this challenging economic environment.

6.      In the interim, the U.S. government's well-publicized involvement with

the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into

the automotive industry, including GM, added yet another layer of complexity to the Debtors'

emergence plan.  Indeed, in March 2009, in connection with a proposed amendment to the

accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an

additional $150 million in liquidity under an amendment to the previously-approved liquidity

arrangement between Delphi and GM.  The Treasury Department, however, acting pursuant to its

authority under GM's loan agreement with the U.S. government, notified the Debtors and GM

that it objected to the parties' seeking approval of these amendments and requested additional

time to consider these agreements and various alternatives with respect to the Debtors'

emergence from chapter 11.  Since that time, the Debtors, GM, and the Treasury Department

have been working on and negotiating a global solution to allow the Debtors to emerge from

chapter 11.  As part of that solution, the Treasury Department has now agreed to allow GM to

provide up to an additional $250 million to support Delphi as it seeks approval of its Modified

Plan and emergence from chapter 11.

7.      This process has resulted in agreements with necessary parties that will

enable the Debtors to emerge from chapter 11 and will allow the Debtors to continue to deliver

high-quality products to their customers with the support of their supply base.  The Debtors have

reached an agreement with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum

Capital Equity Partners, L.P., and, with support from the Treasury Department, GM Components

Holding, LLC ("GM Components"), an affiliate of GM, whereby the Debtors would sell certain

of their North American assets to GM Components and contemporaneously effectuate

transactions through which Parnassus would operate certain of Delphi's U.S. and non-U.S.

businesses going forward with emergence capital commitments of approximately $3.6 billion

and without the legacy costs associated with the North American sites that are being acquired by

GM Components together with Delphi's global Steering business.  The Debtors must proceed on

an expedited basis to solicit votes on the Modified Plan.  Failure to move forward now on this

accelerated time frame could seriously jeopardize the Debtors' ability to emerge from chapter 11.

### Summary Of Proposed Modifications To The Confirmed Plan

8.    Section 14.3 of the Confirmed Plan, to which no party objected and which

was approved by a substantial majority of creditors who voted on the Confirmed Plan, remains in

effect and provides that only the Debtors may seek modifications of the Confirmed Plan pursuant

to section 1127(b) of the Bankruptcy Code.  Moreover, the Debtors previously obtained an

extension, subject to certain exceptions described below, of their exclusive right under section

1121 of the Bankruptcy Code to file one or more reorganization plans until 30 days after

substantial consummation of the Confirmed Plan or any modified plan and the exclusive right to

solicit and obtain acceptances for such plans until 90 days after substantial consummation of the

Confirmed Plan or any modified plan.[4]  The Debtors' exclusive right to file a plan, solely as

between the Debtors and the official committee of unsecured creditors (the "Creditors'

Committee") (the "Plan Proposal Period"), has been extended through and including July 31,

---

[4]    See Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit
Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483) (the "Postconfirmation
Exclusivity Order").

2009 and the right to solicit a plan, solely as between the Debtors and the Creditors' Committee

(the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods"),

through and including September 30, 2009.[5]

9.    Because the Debtors have the exclusive right to propose modifications to

the Confirmed Plan or file and solicit a new plan, the Debtors have taken into consideration all of

the factors described above and are proposing the following modifications to the Confirmed Plan

for approval by this Court:

| | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Plan Investor** | Plan Investors' commitment to invest up to $2.55 billion | Acquisition of the Company's operating businesses by Parnassus Holdings II, LLC, an affiliate of Platinum Equity Capital Partners II, L.P., and of certain North American operations and the global Steering business by certain affiliates of General Motors Corporation |
| **Rights Offering** | $1.75 billion discount rights offering | No rights offering |
| **Emergence Capital and Capital Commitments** | $4.7 billion | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements  Parnassus Holdings II, LLC has obtained approximately $3.6 billion in emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Revolver** | $1.4 billion | Not applicable |

[5]    See Order, Solely As To Creditors' Committee, Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan Under 11 U.S.C. § 1121(d), dated May 21, 2009 (Docket No. 16631) (together with the Postconfirmation Exclusivity Order, the "Postconfirmation Exclusivity Orders").

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Total Enterprise Value** | Agreed plan value of $12.8 billion | Not applicable as a result of the Master Disposition Agreement and related transactions |
| **Defined Benefit Pension Plans** | - $1.5 billion 414(l) Transfer of hourly pension plan to GM<br>- All salaried pension plans and remaining hourly pension plans assumed | - 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008.<br><br>- Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM.  The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim |
| **GM** | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the 414(l) assumption | GM will purchase from Delphi for additional consideration certain assets of the Company and will be subject to certain obligations as set forth in the Master Disposition Agreement (which will supersede the Amended Master Restructuring Agreement that will be terminated), including providing certain funding, waiving certain claims and assuming various liabilities.  GM will not receive any distribution on account of its Allowed Claim |
| **DIP Facility Revolver Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **Senior Secured Hedge Obligations** | Paid in the ordinary course of business | Paid in the ordinary course of business with agreed collateralization upon emergence |
| **DIP Facility Second Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date through consummation of a transaction that provides for the cash payment of approximately $291 million, interest in Parnassus Holdings II, LLC in the nominal amount of $145.5 million with a preferred return at a per annum rate of interest of 8% and to be paid pursuant to a waterfall formula as part of the equity distribution of Parnassus Holding LLC and any unpaid balance to be paid ten years after the effective date of Modified Plan, and the first settlement or other proceeds from the Corporation's plan investor litigation up to approximately $146 million |
| **Secured Claims (Excluding DIP Claims)** | Paid in Cash in full or reinstated | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury Bill rate on the effective date, plus 200 basis points; (ii) receive their collateral free and clear of liens; or (iii) receive such other treatment agreed upon by the parties that is more favorable to the Debtors |

| | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Unsecured Creditors** | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br>-78.6% in new common stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Pro rata share of deferred consideration under the Master Disposition Agreement |
| **Post-petition Interest** | Post-petition Interest to be paid on certain General Unsecured Claims | No post-petition interest will be accrued or paid on General Unsecured Claims under the Modified Plan |
| **MDL Litigation Claims** | Allowed claims with same treatment as General Unsecured Claims | No recovery under the Modified Plan |
| **Equity** | Direct grant of new common stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | No recovery under the Modified Plan |

<u>Relief Requested</u>

10.     By this Motion Supplement, the Debtors request entry of an order (the "Proposed Order") (a) approving certain modifications to the Confirmed Plan, the December 10 Disclosure Statement, and voting procedures as set forth in the December 10 Solicitation Procedures Order and (b) setting a final hearing date on approval of the Debtors' proposed plan

modifications for July 23, 2009.  The Debtors also request the setting of a bar date for filing

proofs of administrative expense for postpetition claims arising before June 1, 2009 and an

Alternative Sale Hearing date of July 23, 2009 to be used, only if necessary, to consider the sale

of substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code if the

Court does not approve the Debtors' proposed plan modifications on that date.

<u>Basis For Relief</u>

11.    As discussed in the Plan Modification Approval Motion, the Debtors

proposed to use the procedures approved by this Court in the December 10 Solicitation

Procedures Order to solicit votes on the Modified Plan, with certain exceptions as forth in the

Plan Modification Approval Motion.  This Motion Supplement amends and restates the Plan

Modification Approval Motion.  Thus, the relief requested and the proposed procedures set forth

in this Motion Supplement incorporate the previously-adjourned Plan Modification Approval

Motion, to the extent still relevant under the terms of the Modified Plan.  A clean copy of the

Modified Plan, along with certain exhibits thereto, is attached hereto as <u>Exhibit 1-A</u>.  Copies of

the Modified Plan (a) marked only to show additions to the Confirmed Plan and (b) marked to

show all changes from the Confirmed Plan, are attached hereto as <u>Exhibit 1-B</u> and <u>Exhibit 1-C</u>,

respectively.  The proposed modifications are necessary and will allow recoveries to certain

stakeholders in a very challenging macroeconomic climate.

12.    Pursuant to 11 U.S.C. § 1127(c) of the Bankruptcy Code, "[t]he proponent

of a modification shall comply with section 1125 of this title with respect to the plan as

modified."  Under section 1125, as incorporated by section 1127 of the Bankruptcy Code, the

Debtors cannot solicit votes from the affected classes "unless, at the time of or before such

solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written

disclosure statement approved, after notice and a hearing, by the court as containing adequate

13

information." 11 U.S.C. § 1125(b). Section 1125(a)(1) defines "adequate information" as

"information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the

nature and history of the debtor and the condition of the debtor's books and records, that would

enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant

class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

           13.     In December 2007, the Court approved the December 10 Disclosure

Statement and determined that it contained "adequate information," as that term is defined in

section 1125 of the Bankruptcy Code. The Debtors subsequently commenced the solicitation of

votes on the December 10 Plan[6] and received overwhelming support for the plan on a class by

class basis. Due to the material modifications made to the Confirmed Plan on account of the

Plan Investors' breach and the global economic downturn, the Debtors must once again solicit

votes on the Confirmed Plan, as modified. To comply with section 1127(c) as it incorporates

1125(b) of the Bankruptcy Code, the Debtors have supplemented the December 10 Disclosure

Statement to provide holders of claims or interests with adequate information regarding the

modifications to the Confirmed Plan (the "Supplement"). Attached hereto as Exhibit 2 is the

Supplement.[7] The Debtors propose to include the Supplement in the Solicitation Package (as

defined in the December 10 Solicitation Procedures Order and modified herein) that will be

distributed. Accordingly, the Debtors seek approval of the Supplement and a finding that the

Supplement complies with applicable provisions of the Bankruptcy Code.

---

[6]    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi
Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "December
10 Plan") and the December 10 Disclosure Statement. On January 25, 2008, the Court entered an order
confirming the December 10 Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order
became final on February 4, 2008.

[7]    In addition, the following updated appendices to the Supplement are attached hereto: Historical Financial
Statements (as Exhibit 2-A) and Updated Liquidation Analysis (as Exhibit 2-B).

A.      Prior Approval Of Disclosure Statement And Procedures For Soliciting Votes On Plan

14.      In connection with the solicitation of votes on the Modified Plan, the

Debtors propose to adopt substantially the same procedures as those previously approved by this

Court in the December 10 Solicitation Procedures Order, with limited appropriate modifications.

The resolicitation timeline contemplated herein satisfies applicable procedural rules while

acknowledging that the Debtors' current liquidity constraints require them to emerge from

reorganization as soon as possible.  Any delay in this expedited process could result in a

liquidation as contemplated by the Debtors' hypothetical liquidation analysis.

B.      Adoption Of Previously Approved Procedures And Documents For Soliciting Votes On
        Modified Plan With Certain Modifications

15.      The December 10 Solicitation Procedures Order approved procedures for

the Debtors, through Kurtzman Carson Consultants, LLC ("KCC") and Financial Balloting

Group, LLC (together with KCC, the "Voting Agents"), to transmit various solicitation materials

to the classes of claims and interest holders entitled to vote on the December 10 Plan, as well as

more limited documents to be sent to those not entitled to vote on the December 10 Plan.  In

addition, the December 10 Solicitation Procedures Order approved certain forms of ballots to be

used to solicit votes, established procedures in connection with the tabulation of votes, and

approved certain other procedures to facilitate and streamline the solicitation process.  The

procedures and documents approved in the December 10 Solicitation Procedures Order allowed

the Debtors to efficiently and effectively solicit the votes of, and provide notice to, more than

500,000 parties-in-interest.

16.      The Debtors propose to utilize the same procedures and the same

documents that were previously approved by this Court in the December 10 Solicitation

Procedures Order in connection with the solicitation of votes on, and the provision of notice

15

regarding, various aspects of the Modified Plan, with the following modifications and exceptions summarized here and explained in more detail below:

- Adding to certain ballots certain provisions relating to 11 U.S.C. § 1127(d) and application of § 1127(d) to the tabulation of votes, to the extent applicable, on the Modified Plan;

- Updating notices previously provided to certain parties to reflect changes to the Modified Plan;

- Changing dates and deadlines in the resolicitation process and associated procedures;

- Removing IRS forms W-9 (Request for Taxpayer Identification Number and Certification) and W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding) from the Solicitation Package and adding an Administrative Expense Claim Form and the Notice of Administrative Claim Bar Date to the Solicitation Package;

- Limiting the publications in which the Final Modification Hearing Notice (as defined below) would be published;

- Eliminating the requirement to provide notice to holders of Classes F (Intercompany Claims) or I (Other Interests) claims or interests;

- Eliminating the requirement to provide special notice to Union employees, former employees, and certain non-represented hourly active employees and retires;

- Deeming acceptance by any class in which no class member votes;

- Requiring Intermediary Record Owners to maintain Beneficial Owner voting data for one additional year, until July 14, 2010;

- Changing the Cure Claim Procedures pursuant to the Modified Plan, including approval of notices for assumption and assignment of certain contracts to GM Components and Parnassus, and a notice of non-assumption of certain executory contracts;

- Establishing a record date for holders of secured claims in Class A and approving the form of ballot to solicit votes from holders of secured claims in such class;

- Providing only a Non-Voting Status Notice and a Final Plan Modification Hearing Notice to holders of claims or interests in Classes E (Section 510(b)

16

Note Claims), G (existing Common Stock and Section 510(b) Equity Claims), and H (Section 510(b) ERISA Claims);

- Removing the solicitation letter from the official committee of equity holders; and

- Eliminating notice for reclamation claimants.

C.    Updated General Procedures From December 10 Solicitation Procedures Order

17.    Final Modification Hearing Date.  By this Motion Supplement, the Debtors request that the Court set July 23, 2009 at 10:00 a.m. (prevailing Eastern time) as the hearing date to consider approval of the Modified Plan (the "Final Modification Hearing Date"). The Debtors also request that if the Court orders that the Final Modification Hearing Date be adjourned from time to time, it may do so by announcing the adjournment in open court, without further notice to parties-in-interest.

18.    Procedures For Filing Objections To Proposed Modifications To Confirmed Plan.  Because 11 U.S.C. § 1127(b) provides that a plan, as modified, becomes the plan if the "court, after notice and a hearing, confirms such plan as modified, under section 1129 of [the Bankruptcy Code]," rule 3020(b)(1) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") provides guidance in setting an objection deadline with respect to the modifications sought by the Debtors.  Specifically, Bankruptcy Rule 3020(b)(1) provides that objections to confirmation of a plan must be filed and served "within a time fixed by the court." The Debtors request that the Court set 4:00 p.m. (prevailing Eastern time) on July 14, 2009 (the "Modified Plan Objection Deadline") as the last date and time for filing and serving objections to the approval of the Modified Plan ("Modified Plan Objections").  As discussed, the Debtors propose to send, or cause to be sent in the manner described below, the Solicitation Packages and other notices on or before June 16, 2009.  Accordingly, the Modified Plan Objection Deadline would not occur until at least 28 days after the date the Solicitation Packages and other notices

are sent. The Debtors request that only timely filed and served written Modified Plan Objections be considered and that Modified Plan Objections that are not timely filed and served in the manner described herein be overruled without consideration by the Court.

19.     The Debtors also request that the Court direct that Modified Plan Objections, if any, must (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, (iii) set forth the name of the objector and the nature and amount of any claim or interest asserted by the objector against or in the Debtors, their estates, or their property, (iv) state with particularity the legal and factual bases for the objection, and (v) be filed with the Court together with proof of service, and served by personal service, overnight delivery, or first-class mail, with a hard copy delivered to the chambers of the Honorable Robert D. Drain, so as to be RECEIVED no later than the Modified Plan Objection Deadline, by the following (collectively, the "Notice Parties"):

The Debtors

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Att'n: General Counsel

Counsel For The Debtors

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Att'n: John Wm. Butler, Jr.
Att'n: Ron E. Meisler

        and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Att'n: Kayalyn A. Marafioti
Att'n: Thomas J. Matz

18

United States Trustee

The Office of the United States Trustee
33 Whitehall Street, Suite 2100
New York, New York 10004
Att'n: Brian Masumoto

Counsel For The Creditors' Committee

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Att'n: Robert J. Rosenberg
Att'n: Mitchell A. Seider
Att'n: Mark A. Broude

Counsel For The Postpetition Lenders

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York  10022
Att'n:  Donald S. Bernstein
Att'n:  Brian M. Resnick

Counsel For The Tranche C Collective

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Att'n: Richard Mancino
Att'n: Marc Abrams

Counsel For The United States Department of the Treasury
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Att'n:  John J. Rapisardi
Att'n:  Oren B. Haker

Counsel For The United States Department of Justice

United States Department of Justice
86 Chambers Street, 3rd Floor
New York, New York 10007
Att'n: Matthew L. Schwartz
Att'n: Joseph N. Cordaro

Counsel For General Motors Corporation
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Att'n:  Jeffrey L. Tanenbaum
Att'n:  Robert J. Lemons

Counsel For Parnassus Holdings II, LLC
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Att'n:  Adam C. Harris
Att'n:  David J. Karp

20.    Ballots.  The Debtors request that the Court approve the ballots for voting

on the Modified Plan in substantially the forms attached collectively to the Proposed Order as

Exhibit B, which, to the extent included, are substantially the same as those used in the

solicitation of votes on the December 10 Plan and which this Court previously approved in the

December 10 Solicitation Procedures Order.  The Ballots have been updated to reflect the

changes to the procedures set forth in this Supplement and to conform with the facts and

circumstances of a section 1127 resolicitation, including substitutions of dates and provisions

relating to the tabulation protocol described in detail below.[8]

21.    Notices.  Similarly, the Debtors also request that the Court approve the

Notices in substantially the forms attached collectively to the Proposed Order as Exhibit C

(Unimpaired Notice), Exhibit D (Non-Voting Status Notice), Exhibit E (Notice To Parties

Subject To A Post-Solicitation Date Objection), and Exhibit F (Notice to Employees Regarding

Multiple Solicitation Documents), which this Court previously approved in the December 10

Solicitation Procedures Order, to be sent to various parties in connection with the resolicitation

---

[8]    If the Court determines that a new record date should be established and that section 1127(d) of the Bankruptcy
Code should not be applied in connection with solicitation of votes on the Modified Plan, the Debtors would
remove the references to section 1127(d) on the ballots, as applicable.

of votes on the Modified Plan.  These notices remain in substantially the same form in which

they were previously approved by the Court, but have been conformed to the facts and

circumstances of a section 1127 resolicitation.

        22.     <u>Voting Certification</u>.  Rule 3018-1 of the Local Bankruptcy Rules for the

United States Bankruptcy Court for the Southern District of New York requires the certification

of acceptance and rejections of the plan to be filed at least five days before the hearing on

confirmation of a chapter 11 plan.  Consistent with the December 10 Solicitation Procedure

Order, the Debtors request that this five-day requirement be modified to permit the Voting

Agents to file their certifications no later than 4:00 p.m. (prevailing Eastern time) on July 20,

2009, or three days prior to the hearing to approve modifications to the Confirmed Plan.

        23.     <u>Notice Of Hearing On Approval Of Plan Modifications</u>.  The Debtors

propose to provide a notice of the Final Modification Hearing (the "Final Modification Hearing

Notice"), substantially in the form attached to the Proposed Order as Exhibit G, in the same

manner and on the same categories of parties as were provided the Confirmation Hearing Notice

pursuant to the December 10 Solicitation Procedures Order, and with the exceptions detailed in

this Supplement.  In addition, the Debtors propose to give supplemental publication notice of the

Final Modification Hearing by causing the Final Modification Hearing Notice to be published

not fewer than 25 days before the Final Modification Hearing in the <u>Detroit Free Press</u>, the <u>New

York Times</u> (national edition), the <u>Wall Street Journal</u> (national, European, and Asian editions),

and <u>USA Today</u> (worldwide).  For avoidance of doubt and for the reasons set forth below, the

Debtors propose that holders of claims or interests in Classes F (Intercompany Claims) and I

(Other Interests) not be sent a Final Modification Hearing Notice because, as explained in greater

detail below, their treatment under the Modified Plan will not differ from their treatment under the Confirmed Plan.

D.     Modifications To The December 10 Solicitation Procedures Order

24.     Key Dates And Deadlines.  In the motion requesting the relief granted in the December 10 Solicitation Procedures Order, the Debtors sought approval of a schedule for the Debtors to solicit votes on the December 10 Plan.  The chart below summarizes certain key dates and deadlines that the Debtors propose to use in connection with the resolicitation of votes on the Modified Plan.

| Event | Proposed Date Or Deadline Under Plan Modification Approval Order |
|---|---|
| Deadline By Which Trustees And Transfer Agents Must Provide Record Holder Information | • no later than two business days after the later of (a) the record date and (b) the date the order approving the Supplement is entered |
| Solicitation Mailing Deadline | • June 16, 2009<br>• 28 days before voting deadline and objection deadline |
| Deadline For Filing Of Plan Exhibits And Disclosure Statement Appendices (the "Exhibit Filing Date") | • July 2, 2009<br>• 12 days before voting deadline |
| Rule 3018(a) Motion Deadline | • Received no later than 4:00 p.m. (prevailing Eastern time) on July 2, 2009<br>• If the Debtors object to a claim or interest after June 19, 2009, the Rule 3018(a) Motion Deadline would be extended for that claim or interest such that the deadline would be ten days following the filing of the Debtors' objection |
| Plan Objection Deadline | • July 14, 2009, 4:00 p.m. (prevailing Eastern time)<br>• 28 days after Solicitation Mailing Deadline |
| Voting Deadline | • Received by the Voting Agents no later than 7:00 p.m. (prevailing Eastern time) on July 14, 2009<br>• 28 days after Solicitation Mailing Deadline |
| Voting Agent Certification Deadline | • July 20, 2009, 4:00 p.m. (prevailing Eastern time) |
| Final Modification Hearing Date | • To commence on July 23, 2009<br>• 37 days after anticipated mailing of solicitation |

| Event | Proposed Date Or Deadline Under Plan Modification Approval Order |
|---|---|
| | documents |

25. <u>Content And Transmittal Of Solicitation Packages</u>. The Debtors propose that the contents of the Solicitation Package be modified to include a copy or conformed copy of the Final Modification Hearing Notice, a copy or conformed copy of any applicable notice or ballot, and a CD-ROM[9] including a copy of the order approving the Motion and this Motion Supplement (without exhibits attached), a solicitation letter from the official committee of unsecured creditors, if any, the Supplement, the December 10 Solicitation Procedures Order (without exhibits), the Modified Plan, and the publicly-filed materials appended thereto. The Debtors propose that the Solicitation Package not include an Internal Revenue Service form W-9 (Request for Taxpayer Identification Number and Certification) or form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding) to be returned with a party's ballot. The December 10 Solicitation Procedures Order permitted the Debtors, in their discretion, to include the forms W-9 or form W-8BEN.[10] Although these forms were included in the Debtors' Solicitation Package that was delivered in connection with the December 10 Plan,

---

[9] The Supplement and Modified Plan, including exhibits, are more than 1,000 pages in length. Accordingly, to reduce substantially the administrative costs associated with printing and mailing such a voluminous document, the Debtors propose to serve the Disclosure Statement Supplement and Modified Plan (including exhibits) via CD-ROM instead of in printed format on all parties. This procedure was approved by this Court in the December 10 Solicitation Procedures Order with respect to the solicitation of the December 10 Plan and has also been approved in several other large chapter 11 cases in this district. <u>See, e.g.</u>, <u>In re Delta Airlines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y.); <u>In re Adelphia Commc'ns Corp.</u>, Case No. 02-41729 (Bankr. S.D.N.Y.); <u>In re Enron Corp.</u>, Ch. 11 Case No. 01-16034 (Bankr. S.D.N.Y.). The Modified Plan and Supplement would also be available at no charge via the Internet at www.delphidocket.com. In addition, the Debtors would provide parties-in-interest (at no charge) a hard copy of the Solicitation Package upon reasonable written or telephonic request as set forth below.

[10] The U.S. federal tax law requires withholding of tax in respect of certain payments made to certain payees. With respect to a payment made to a U.S. payee, such withholding may be avoided in certain circumstances if the U.S. payee timely furnishes an Internal Revenue Service Form W-9. Similarly, with respect to a payment made to a non-U.S. payee, such withholding may be avoided (or the amount of such withholding may be reduced) in certain circumstances if the non-U.S. payee timely furnishes an Internal Revenue Service Form W-8BEN.

only a relatively small number of completed forms were returned to the Debtors. Because

including these forms in the Solicitation Package was not required, and the Debtors do not

believe that inclusion of the form W-9 and form W-8BEN in the Solicitation Package on the

Modified Plan will be effective at this time to collect the additional data that the Debtors are

seeking, the Debtors propose not to include these forms in the Solicitation Package.

26.    Notice Not Required For Holders of Claims and Interests In Classes F And

I. The Debtors propose that because the treatment of Class F (Intercompany Claims) in the

Modified Plan is identical to the treatment that was provided to that class under the Confirmed

Plan, the Debtors should not be required to solicit votes on the Modified Plan from such class,

and accordingly, no solicitation materials would be sent to those parties. Similarly, the Debtors

propose that no notice of the Modified Plan, Supplement, or any hearings related thereto, be

required to be provided to holders of claims or interests in non-voting Class I (Other Interests).

Under the Modified Plan, the Class I (Other Interests) will be deemed cancelled and the holders

of Class I (Other Interests) will not receive or retain any property in account of their interests.

The treatment of the holders of Class I (Other Interests) under the Modified Plan is identical to

the treatment afforded such holders under the Confirmed Plan, and the Debtors have previously

incurred significant costs in providing notice to the members of Class I (Other Interests) in

connection with the solicitation of votes on the Confirmed Plan.[11] With respect to these parties,

---

[11]    Members of Class I include, among others, recipients of certain stock options granted to the entire
population of Delphi salaried and hourly employees worldwide, many of whom are no longer employed by
Delphi. In connection with solicitation on the December 10 Plan, because holders of interests in Class I
were deemed to reject the December 10 Plan, those holders received a Confirmation Hearing Notice (as
defined in the December 10 Solicitation Procedures Order) and a notice of non-voting status. The more
than 80,000 holders of interests in Class I are located in various countries throughout the world, and
therefore the Debtors incurred the expense of translating the Confirmation Hearing Notice and notice of
non-voting status into 13 different languages. Because the proposed treatment of Class I under the
Modified Plan is identical to the treatment provided to Class I under the Confirmed Plan – deemed rejection
– the Debtors believe that the substantial cost to translate the notices into 13 languages and transmit it to

therefore, additional notice of the Modified Plan would be redundant and unnecessary and therefore should be dispensed with.

27.     Notices To Union-Represented Employees And Former Employees Not Required.  In connection with the solicitation on the December 10 Plan, the Debtors sent specialized notices to the current and former employees represented by Unions (as defined in the December 10 Disclosure Statement) and certain non-represented hourly active employees and retirees.  Although the Union agreements are to be assumed and assigned under the terms of the master disposition agreement attached as an exhibit to the Modified Plan (the "Master Disposition Agreement"),[12] the Debtors believe that no special Union or non-represented hourly active employee and retiree notices are required in connection with solicitation of votes on the Modified Plan because notice of the assumption and assignment will be provided to the Union representatives of the current and former employees.

28.     Notice To Be Provided To Holders Of Claims And Interests In Classes E, G, and H.  In the Modified Plan, holders of claims and interests in Class E (Section 510(b) Note Claims), Class G (existing Common Stock and Section 510(b) Equity Claims), and Class H (Section 510(b) ERISA Claims) will not receive or retain any property or interest on account of their respective claims and interests.  Under the Confirmed Plan, holders of claims and interests in Classes E (Section 510(b) Note Claims), G (existing Common Stock and Section 510(b) Equity Claims), and H (Section 510(b) ERISA Claims) were to receive distributions on account of their respective claims and interests.  Accordingly, those classes were impaired and received ballots in accordance with the procedures approved in the December 10 Solicitation Procedures

---

more than 80,000 parties cannot be justified and no that additional notice to holders of interests in Class I should be required.

[12]     The material and non-confidential exhibits to the Master Disposition Agreement will be filed pursuant to a notice of filing as soon as reasonably practicable.

Order.  Because the Modified Plan will not provide any recovery to holders of claims or interests in these classes, these classes will be deemed to have rejected the Modified Plan.  Accordingly, the Debtors propose to send only a (i) Non-Voting Status Notice and (ii) a Final Modification Hearing Notice to holders of claims and interests in Classes E, G, and H, rather than the Solicitation Package or any other notice in connection with the Supplement.

   29. <u>Maintaining Record Date Established In December 10 Solicitation Procedures Order For Classes C-1, C-2, and D</u>.  Section 1127(d) of the Bankruptcy Code provides that "[a]ny holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the Court, such holder changes such holder's previous acceptance or rejection."  Thus, if a holder of a claim or interest does not vote to accept or reject the Modified Plan by the Voting Deadline, that holder's prior vote would count as it was originally cast, but only to the extent that such holder is entitled to vote on the Modified Plan.  Implementation of the foregoing would require the Debtors to maintain the November 26, 2007 record date (for voting purposes only) established by this Court under the December 10 Solicitation Procedures Order.  The plain language of the Bankruptcy Code requires the Debtors to use the November 26, 2007 record date.  Furthermore, the legislative history of section 1127(d) notes that the purpose of section 1127(d) is to "simplif[y] [the] modification procedure by deeming any creditor or equity security holder that has already accepted or rejected the plan to have accepted or rejected the modification."  H.R. Rep. No. 95-595, at 411 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6367.  Because the Debtors already have the information necessary to implement solicitation using the November 26, 2007 record date, consistent with Congress' intent and the purpose of section 1127(d), keeping that record date would simplify the Debtors' resolicitation effort and minimize the confusion,

expense, and time necessary to complete the solicitation of votes on the Modified Plan. This process would allow claimants and interest holders who are satisfied with their prior vote to leave that vote in place, while affording them a meaningful opportunity to change their vote if they so choose. This procedure is consistent with section 1127(d) of the Bankruptcy Code and is the only feasible means of implementing section 11 U.S.C. § 1127(d).

30.      Moreover, the Debtors are not aware of any reported decision under section 1127(d) requiring a new record date for resoliciting votes on a modified plan.[13]  In addition, to the extent a party purchased a claim or interest after the voting record date, such party purchased the claim or interest subject to the record date previously established by this Court in the December 10 Solicitation Procedures Order. Using the November 26, 2007 record date, therefore, is appropriate. The Debtors request that this Court confirm November 26, 2007 as the record date for purposes of determining members of Classes C-1 (General Unsecured Claims), C-2 (PBGC Claims),[14] and D (GM Claim) for soliciting votes on the Modified Plan.

31.      Although the statutory requirements of section 1127 appear to be mandatory, the Debtors also recognize that as a result of general economic conditions and the depressed state of the global automotive industry, their current business enterprise value has declined by more than two-thirds of the valuation accepted by the Court when the Confirmed Plan was approved in January 2008. This result, combined with general unwillingness of the Debtors' stakeholders to bridge the Debtors' liquidity and continued operations under chapter 11

---

[13]   But see, e.g., In re Am. Banknote Corp., Case No. 99 B 11577 (Bankr. S.D.N.Y. 2002) (upon modification of plan post-confirmation under 11 U.S.C. § 1127(b), court established new record date for previously unsolicited class as well as class whose treatment under plan had been modified); cf. In re Oakwood Homes Corp., Case No. 02-13396 (Bankr. D. Del. 2004) (upon modification of plan pre-confirmation, court set new record date).

[14]   Although the PBGC did not receive a ballot for its contingent unsecured claim in the prior solicitation, solicitation of votes on these claims would be the same whether the record date were November 26, 2007 or a later date. Because the PBGC is the sole member of the class, determining the members of Class C-2 for voting purposes would be the same regardless of the whether the record date for Class C-2 was November 26, 2007 or a later date.

protection until there is a more favorable economic environment, necessarily has led to

significantly reduced recoveries under the Modified Plan for more senior classes and the

elimination of recoveries for more junior classes.  The Debtors also recognize that numerous

notices to transfer claims have been filed since the November 26, 2007 record date that was

established in the December 10 Solicitation Procedures Order.  Accordingly, although the

Debtors believe that they are obligated to incorporate the requirements of section 1127 into this

Motion, the Debtors believe that some of their stakeholders may seek the establishment of a new

record date with respect to holders of claims in Classes C-1, C-2, and D.  Should the Court

determine that a new record date is permissible and desirable, the Debtors request a finding by

the Court that section 1127(d) is inapplicable under the circumstances, thus allowing the Debtors

to solicit votes on the Modified Plan without regard for any previous vote on the December 10

Plan.  If the Court decides to establish a new record date in connection with solicitation of votes

on the Modified Plan, the Debtors request that the Court establish June 8, 2009 as the record date

for determining (i) creditors and interest holders entitled to receive Solicitation Packages and

other notices and (ii) creditors entitled to vote to accept or reject the Modified Plan,

notwithstanding anything to the contrary in the Bankruptcy Rules.[15]

> 32.    Establishing Record Date For Holders Of Class A.  Under the December

10 Solicitation Procedures Order, holders of Class A secured claims were unimpaired and

---

[15]    Paragraph 36 of the Confirmation Order provides that the "Reorganized Debtors, the Disbursing Agent, the Indenture Trustee (as agent or Servicer as described in Section 9.5 of the Plan), and Servicers shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after January 17, 2008."  The same paragraph of the Confirmation Order also provides that the "Reorganized Debtors, the Disbursing Agent, the Indenture Trustee (as agent or Servicer as described in Section 9.5 of the Plan), and Servicers shall have no obligation to recognize the transfer of the Senior Notes, the TOPrS, or the Subordinated Notes occurring after" January 17, 2008.  Although the Confirmation Order has permitted the Debtors not to recognize post-January 17, 2008 transfers, the order does not prohibit the Debtors from doing so.  Accordingly, if the Court determines that a new record date should be set, the Debtors would recognize transfers that occurred after January 17, 2008 so that the new record date would reflect the most current information with respect to holders of claims for solicitation purposes.

"conclusively presumed to have accepted the Plan" pursuant to 11 U.S.C. § 1126(f). (December

10 Solicitation Procedures Order ¶ 22.) Under the Modified Plan, however, holders of secured

claims in Class A are impaired, and therefore the Debtors will solicit votes on the Modified Plan

from holders of claims in Class A. Moreover, because holders of Class A claims did not have

the opportunity to cast votes on the December 10 Plan, section 1127(d) of the Bankruptcy Code

should not apply to them. The plain language of section 1127(d) provides that the provision

applies to "[a]ny holder of a claim or interest that has accepted or rejected a plan . . . ." (emphasis

added). This provision parallels that of section 1126(c) which provides that "[a] class of claims

has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in

amount and more than one-half in number of the allowed claims . . . ." (emphasis added). In

contrast, section 1126(f) states that "a class that is not impaired under a plan, and each holder of

a claim or interest of such class, are conclusively presumed to have accepted the plan, and

solicitation of acceptances with respect to such class from holders of claims or interests of such

class is not required." (emphasis added). See also In re Placid Oil Co., 92 B.R. 183, 186 (Bankr.

N.D. Tex. 1988) ("Pursuant to [s]ection 1127(d) of the Code, each vote cast by a Holder of a

Claim in respect of the Second Amended Joint Plan and not changed by a vote cast in respect of

the Plan shall be effective as a vote cast in respect of the Plan."). Thus, section 1127(d) applies

to a class of claims that "has accepted" the plan by casting a ballot on a plan, but not necessarily

to a class of claims that is only "conclusively presumed to have accepted the plan." Because

holders of claims in Class A did not have the opportunity to vote to accept or reject the

December 10 Plan, section 1127(d) should not apply to Class A claims.

        33.     Based on the Debtors' knowledge and belief, the holders of Class A

secured claims entitled to vote on the Modified Plan would be the same regardless of whether the

record date were set as November 26, 2007 or some other later date.[16]  Because section 1127(d)

should not apply to holders of Class A claims, and because the Debtors would be soliciting votes

from holders of Class A claims for the first time, the Court should confirm a new record date for

soliciting votes from holders of Class A claims.  Because the Debtors are statutorily required to

use the November 26, 2007 record date with respect to those classes of claims previously

solicited and which the Debtors seek to resolicit, the Debtors for consistency therefore propose

that the Court establish November 26, 2007 as the record date for purposes of determining

members of Class A that are entitled to receive a Solicitation Package and entitled to vote on the

Modified Plan.  If the Court determines that a new record date should be established for holders

of claims in Classes C and D as described above, the Debtors request that such record date also

be established as the record date for holders of claims in Class A.

            34.    Effect Of Failure Of Class To Vote. The Debtors also propose that if no

claim or interest holder of a particular class votes either to accept or reject the Modified Plan,

then that class would be deemed to have accepted the Modified Plan.

            35.    Maintenance Of Records By Intermediary Record Holders. Pursuant to the

procedures approved in the December 10 Solicitation Procedures Order, Intermediary Record

---

[16]    Although two notices of claims transfer were processed after November 26, 2007 for claims originally filed as
secured claims, solicitation of votes on these claims would be the same whether the record date were November
26, 2007 or a later date.  One of the notices purported to transfer two proofs of claim, each of which asserted
secured, priority, and general unsecured claims.  The secured claims, however, were disallowed pursuant to a
stipulation entered by this Court on June 30, 2007.  Similarly, the second of the two claims was filed as a
secured claim, and as of November 26, 2007, the claim was subject to an objection seeking to reclassify the
claim as part priority and part general unsecured claim.  In accordance with paragraph 25 of the December 10
Solicitation  Procedures Order, the holder of such claim was allowed to vote its general unsecured claim in the
amount set forth in the Debtors' objection pending at the time of solicitation on the December 10 Plan.  In
December 2008, this claim was ordered modified to general unsecured claim status.  Thus, determining the
members of Class A for voting purposes would be the same regardless of the whether the record date for Class
A was November 26, 2007 or a later date.

Owners[17] who were required to use a master ballot in substantially the form of the master ballots

attached as Exhibit B to the December 10 Solicitation Procedures Order (each, a "Master Ballot")

as part of the voting process were required to retain for inspection by the Court ballots

substantially in the form of the beneficial owner ballots attached as part of Exhibit A to the

December 10 Solicitation Procedures Order (each, a "Beneficial Owner Ballot") cast by the

beneficial owners (the "Beneficial Owners") for one year following the January 11, 2008 voting

deadline set by that order, and Intermediary Record Owners who were required to send

Prevalidated Ballots[18] to Beneficial Owners for direct return to the respective Voting Agent were

also required to retain for inspection by the Court a list of those Beneficial Owners to whom the

Prevalidated Ballots were sent for one year following the January 11, 2008 Voting Deadline.  To

facilitate the Debtors' resolicitation of votes on the Modified Plan, the Debtors request that this

Court direct the Intermediary Record Owners to maintain these records, and any new or other

data relating to Beneficial Owners, until July 14, 2010.

      36.      <u>Distribution of Solicitation Packages To And Votes By Beneficial Owners</u>.

As set forth in the December 10 Solicitation Procedures Order and the Proposed Order, within

five business days after an Intermediary Record Owner's receipt of the Solicitation Packages, the

Intermediary Record Owner is required to distribute the Solicitation Packages to the respective

Beneficial Owners for which it holds securities.  The Intermediary Record Owner is required to

obtain the votes of the Beneficial Owners using the Master Ballots and Beneficial Owner Ballots.

Alternatively, the Intermediary Record Owner may use a Prevalidated Ballot for voting by the

---

[17]    "Intermediary Record Owners" means (i) each registered holder of Securities as of the Record Date entitled to vote on the Modified Plan (collectively, the "Record Owners") and (ii) to each bank or brokerage firm, or the agent therefor, identified by the Debtors or the Voting Agents as an entity through which beneficial owners (the "Beneficial Owners") hold such Securities.

[18]    Under the December 10 Solicitation Procedures Order, "Prevalidated Ballots" were prevalidated Beneficial Owner Ballots used by Intermediary Record Owners who were unable to use the Master Ballot option.

Beneficial Owner.  Finally, the Debtors are authorized to reimburse the Intermediary Record

Owners for their reasonable and customary out-of-pocket expenses in connection with these

procedures.  The Debtors request that these procedures be followed in connection with

solicitation of votes on the Modified Plan as well.

E.    Modified Cure Claim Procedures

37.    Under Article 8.1 of the Modified Plan, upon the effective date, all

executory contracts and unexpired leases shall be deemed assumed in accordance with sections

365 and 1123 of the Bankruptcy Code as of the Effective Date (as defined in the Modified Plan),

unless such executory contracts or unexpired leases (i) shall have been previously rejected by the

Debtors by final order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject, or

otherwise authorizes rejection, filed on or before the date of entry of an order approving the

Modified Plan, (iii) shall be rejected or assumed pursuant to a motion to sell or transfer property

or assets filed by the Debtors prior to the substantial consummation of the Modified Plan, (iv)

shall have expired or terminated on or prior to the Effective Date (and not otherwise extended)

pursuant to their own terms, (v) are listed on the schedule of rejected contracts attached as

Exhibit 8.1(a)-Rejected Contracts to the Modified Plan, or (vi) are otherwise rejected pursuant to

the terms of the Modified Plan.

38.    For those prepetition executory contracts and unexpired leases that the

Debtors seek to assume or assume and assign pursuant to the Modified Plan under sections 365

and 1123 of the Bankruptcy Code, the Debtors will be required to cure certain defaults as

required by the Bankruptcy Code.  In the December 10 Solicitation Procedures Order and the

Confirmation Order, this Court approved certain procedures with respect to the assumption of

executory contracts and unexpired leases under the Confirmed Plan and the payment of the

related cure amount.  The Confirmed Plan provided for payment of cure for Material Supply

Agreements (as defined in the Confirmed Plan) in cash or plan currency, at the counterparty's election.  Based upon the reduced recoveries anticipated in the Modified Plan, the Debtors now propose to make these cure payments in cash only and would not offer the plan currency election.

39.    <u>Amended Cure Amount Notices</u>.  Under the procedures set forth in the December 10 Solicitation Procedures Order and the Confirmation Order, the Debtors sent out, as required, Cure Amount Notices (as defined in the Confirmed Plan) to counterparties whose Material Supply Agreements were being assumed pursuant to the Confirmed Plan.  The Cure Amount Notices set forth the cure amount and allowed the counterparty to elect payment of its cure amount in cash or plan currency.  These Cure Amount Notices (as defined in the Confirmed Plan) were sent out in December 2007 and all counterparties were required to return the notices on or before January 11, 2008 indicating (i) whether they disputed the cure amount and (ii) their election to receive payment of the cure amount in cash or plan currency.  Of the 1,669 Cure Amount Notices that were delivered, approximately 130 remain disputed and the Confirmed Plan provides procedures for resolving these.  With the exception of approximately 20 executory contracts or unexpired leases for which the Debtors have determined that the previously noticed cure amounts were overstated, the Debtors would not be sending out new or additional Cure Amount Notices under the Modified Plan.  To be clear, subject to the paragraph below, the cure amounts established pursuant to the Cure Amount Notices and the related procedures, including those procedures governing payment, would remain binding and the Debtors would continue to apply procedures previously approved by this Court to resolve the remaining disputed cure amounts.

40.    For the approximately 20 executory contracts or unexpired leases for which the Debtors sent Cure Amount Notices containing amounts which were overstated, at least

20 days prior to the Effective Date, the Debtors propose to file with the Court and serve upon the counterparties to such contracts a separate notice stating the amount the Debtors believe necessary to cure such contract (the "Amended Cure Amount Notice").  The Debtors propose that if the contract counterparties do not object to the Amended Cure Amount Notice, the amended cure amount would have to be paid pursuant to the procedures set forth in the Modified Plan.  The Debtors request that the Court approve the Amended Cure Amount Notice in substantially the form attached to the Proposed Order as Exhibit H.

41.     If an affected contract counterparty disagrees with the cure amount listed on the Amended Cure Amount Notice, the Debtors propose that the contract counterparty would then have ten days from the service of the Amended Cure Amount Notice to object to the revised cure amount, and would be required to state in its objection, with specificity, the legal and factual basis of its objection.  The Debtors propose that any objection to an Amended Cure Amount Notice be filed with the Court and served on the Notice Parties.  If no objection is timely received, the Debtors request that each counterparty be deemed to have consented to the cure amount set forth on the Amended Cure Amount Notice.

42.     Any unresolved objection to an Amended Cure Amount Notice would be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon by the parties.  If an objection to an Amended Cure Amount Notice cannot be resolved consensually among the parties, the Debtors propose that notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, would have the right to reject the contract or lease for a period of

five days after entry of a final order establishing cure in an amount not acceptable to the Debtors
or the Reorganized Debtors, as the case may be, or the assignee.

        43.      <u>Notice Of Non-Assumption.</u>  Because the Cure Amount Notices were
delivered approximately 17 months ago, certain of the Material Supply Agreements to be
assumed and cured under the Confirmed Plan have since expired or terminated and thus are no
longer executory.  In addition, pursuant to Article 8.2(b) of the Confirmed Plan, any counterparty
to an other executory contract or other unexpired lease (the "Other Executory Contracts or
Unexpired Leases") who wished to assert that Cure was required as a condition to assumption
must have filed and served a proposed cure proposal (a "Cure Proposal") so as to be received by
the Debtors by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the
Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").
Certain Other Executory Contracts or Unexpired Leases have since expired or have been
terminated since April 2008.  Moreover, the Debtors may decide to reject certain Material
Supply Agreements and/or Other Executory Contracts or Unexpired Leases either by motion or
by including them on Exhibit 8.1(a) of the Modified Plan.  The Debtors propose to send a Notice
of Non-Assumption of Executory Contracts by July 2, 2009, substantially in the form attached to
the Proposed Order as Exhibit I, to counterparties to expired or terminated Material Supply
Agreements that previously received a Cure Amount Notice and to counterparties to expired or
terminated Other Executory Contracts or Unexpired Leases who submitted Cure Proposals by the
Cure Proposal Submission Deadline, whether or not such Cure Proposal was subject to a Cure
Proposal Objection, so that the counterparties are aware that such contracts are no longer being
assumed or cured.

44.    <u>Assigned Contracts</u>.  Furthermore, in accordance with the Modified Plan, the Debtors intend to (a) assume and assign to GM Components certain executory contacts and unexpired leases (the "GM Components Assumed Contracts") as provided in the Master Disposition Agreement and (b) assume and assign to Parnassus certain executory contacts and unexpired leases (the "Parnassus Assumed Contracts," and together with the GM Components Assumed Contracts, the "Assigned Contracts"), and as provided in the Master Disposition Agreement.  Under the Master Disposition Agreement, however, GM Components and Parnassus, respectively, rather than the Debtors, would bear the responsibility for the cure of any defaults under these contracts.  For the Assigned Contracts, the Debtors propose that the cure amounts established pursuant to the procedures in the Confirmed Plan and the December 10 Solicitation Procedures Order would remain in effect, except as may be modified by the Amended Cure Amount Notice as discussed above.

45.    To notify the applicable contract counterparties of the assumption and assignment of the Assigned Contracts, at least 20 days prior to the Effective Date, the Debtors propose to file with the Court and serve (a) a notice (the "GM Components Assumption and Assignment Notice"), substantially in the form attached to the Proposed Order as Exhibit J, identifying GM Components as the party to which the Debtors would assign all of their right, title, and interest in the GM Components Assumed Contracts, and (b) a notice (the "Parnassus Assumption and Assignment Notice," and together with the GM Components Assumption and Assignment Notice, the "MDA Assumption and Assignment Notices"), substantially in the form attached to the Proposed Order as Exhibit K, identifying Parnassus as the party to which the Debtors would assign all of their right, title, and interest in the Parnassus Assumed Contracts. The MDA Assumption and Assignments Notices would also list the cure amounts, if any,

established pursuant to the procedures in the Confirmed Plan and the December 10 Solicitation

Procedures Order, except as may be modified by the Amended Cure Amount Notice.

46.    Each contract counterparty to an Assigned Contract would then have ten

days from the service of the applicable MDA Assumption and Assignment Notice to object to

the proposed assumption, including an objection on account of a postpetition default, and would

be required to state in its objection, with specificity, the legal and factual basis of its objection.

To be clear, parties would not be entitled to dispute previously established cure amounts.  The

Debtors propose that any objection to an MDA Assumption and Assignment Notice be filed with

the Court and served on the Notice Parties.  The Debtors request that if no objection is timely

received, each counterparty to the Assigned Contracts would be deemed to have consented to the

assumption and assignment and would be deemed to have waived its right to challenge the

Debtors' or Reorganized Debtors', as they case may be, assumption and assignment of such

contract or lease and would be barred from challenging the ability of any Debtor or Reorganized

Debtor, as the case may be, GM Components, Parnassus, or their respective assignees to provide

"adequate assurance of future performance" (within the meaning of section 365 of the

Bankruptcy Code) under the contract or lease to be assumed, or any other matter pertaining to

assumption.

47.    Any unresolved objection to an MDA Assumption and Assignment Notice

would be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by

the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such

other date as may be agreed upon by the parties.  If an objection to an MDA Assumption and

Assignment Notice cannot be resolved consensually among the parties, the Debtors propose that

notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors or the

Reorganized Debtors, as the case may be, would have the right to reject (and shall if directed by

a Buyer pursuant to the terms of the Master Disposition Agreement) the contract or lease for a

period of five days after entry of a final order establishing adequate assurance on terms not

reasonably acceptable to the Debtors or the Reorganized Debtors, as the case may be, and the

assignee.

F.      Elimination Of Notice For Reclamation Claims

                48.     The Debtors anticipate filing a motion seeking an order from the Court

reclassifying reclamation claims asserted by sellers of goods with a statutory or common law

right to reclamation or holders of such claims (the "Reclamation Claims") as general unsecured

nonpriority claims because the goods and/or the proceeds from the sale of the goods that are the

subject of Reclamation Claims are or were subject to, among other things, a valid prior security

interest.  The Debtors will seek this relief in the near term rather than following emergence

because obtaining this relief would establish that the Reclamation Claims are not entitled to

administrative expense priority.  Accordingly, the Debtors would not need to maintain a reserve

for the Reclamation Claims in the Modified Plan.  Because the Reclamation Claims will be dealt

with under a separate motion, the Debtors propose not to send out any additional notices to

holders of Reclamation Claims in connection with the solicitation of votes on the Modified Plan.

Each holder of a Reclamation Claim, however, would receive a Class C-1 (General Unsecured

Claims) ballot including the amount of the Reclamation Claim as a general unsecured

nonpriority claim.[19]

---

[19]     In the event that the Debtors do not prevail on their motion seeking an order reclassifying the Reclamation
        Claims as general unsecured nonpriority claims, for tabulation purposes the Voting Agents would not count the
        portion of the ballot representing the Reclamation Claim.

G.      Administrative Expense Claims Bar Date

49.     To identify administrative expense claims that would either be paid

pursuant to the terms of the Master Disposition Agreement or the Modified Plan, the Debtors

propose that any party who wishes to assert an administrative claim under 11 U.S.C. § 503(b) for

the period from the commencement of these cases through June 1, 2009 would be required to file

a proof of administrative expense (each, an "Administrative Expense Claim Form") for the

purpose of asserting an administrative expense request, including any substantial contribution

claims (each, an "Administrative Expense Claim" or "Claim") against any of the Debtors.  The

Debtors propose that the Court establish 5:00 p.m. (prevailing Eastern time) on July 10, 2009 as

the deadline for submitting all Administrative Expense Claims (the "Administrative Expense Bar

Date") for the period from the commencement of these cases through June 1, 2009.

50.     Notwithstanding the preceding paragraph, creditors holding or wishing to

assert the following types of claims against the Debtors need not file an Administrative Expense

Claim Form:

- Any claim for postpetition goods and services delivered to the Debtors prior to June 1, 2009 that are not yet due and payable pursuant to the applicable contract terms;

- Employee claims arising prior to June 1, 2009 for wages, salary, and other benefits arising in the ordinary course of business that are not yet due and payable;

- Any claim for which the party has already properly filed an Administrative Expense Claim Form or a proof of claim form with the Court which has not been expunged by order of the Court and provided that such proof of claim clearly and unequivocally sets forth that such claim is made for an administrative expense priority;

- Any claim for fees and/or reimbursement of expenses by a professional employed in these chapter 11 cases accruing through January 25, 2008, to the

extent that such claim is subject to this Court's Interim Compensation Orders (defined below);[20] or

- Any claim asserted by any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control, or hold with power to vote, 50 percent or more of the outstanding voting securities of such subsidiary.

51.     To submit a valid Administrative Expense Claim, the Debtors propose that parties-in-interest be required to submit a Claim on a administrative expense claim form substantially in the form attached to the Proposed Order as Exhibit L the Administrative Expense Claim Form and deliver such Claim to its claims agent, Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, so as to be received no later than the Administrative Expense Bar Date.  The Debtors propose that Claims may be submitted in person or by courier service, hand delivery, or mail addressed to KCC at the foregoing address.  The Debtors propose that any Administrative Expense Claim submitted by facsimile, e-mail, or by other electronic means not be accepted and not be deemed filed until such Claim is submitted by one of the methods described in the previous sentence.  Claims would be deemed filed only when actually received by KCC.  The Debtors request that any party who is entitled to but fails to file a timely Administrative Expense Claim be forever barred, estopped, and enjoined from asserting such request against the Debtors or the Reorganized Debtors, and that the Debtors or

---

[20]    See Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated November 4, 2005 (Docket No. 869) (the "Interim Compensation Order"); Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 8, 2006 (Docket No. 2747) (the "Supplemental Compensation Order"); Second Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 28, 2006 (Docket No. 2986) (the "Second Supplemental Interim Compensation Order"); and Third Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, dated May 5, 2006 (Docket No. 3630) (together with the Interim Compensation Order, the Supplemental Compensation Order, and the Second Supplemental Interim Compensation Order, the "Interim Compensation Orders").

Reorganized Debtors and their property would be forever discharged from any and all indebtedness, liability, or obligation with respect to such request.

52.    To provide further notice of the Administrative Expense Bar Date, the Debtors propose to mail a notice (the "Notice of Administrative Claim Bar Date") substantially in the form attached to the Proposed Order as Exhibit M, together with a form of Administrative Expense Claim Form, to all parties who will receive the Final Modification Hearing Notice or any other party who the Debtors, in their discretion, deem appropriate. In addition, the Debtors would publish the Notice of Administrative Claim Bar Date in the Detroit Free Press, the New York Times (national edition), the Wall Street Journal (national, European, and Asian editions), and USA Today (worldwide). The Debtors submit that such notice is adequate in the circumstances and that no other notice need be given.

H.    Scheduling A Sale Hearing Date In The Alternative

53.    In the event that the Debtors are not able to implement the transactions contemplated in the Master Disposition Agreement through the Modified Plan, GM Components, as a condition to entering into the Master Disposition Agreement and providing the Debtors with interim financial support, has required the Debtors to obtain a hearing date for the Alternative Sale Hearing, which date shall be no later than July 23, 2009, the date proposed for the Final Modification Hearing. The Alternative Sale Hearing is intended to ensure that if the Debtors are unable to obtain approval of their Modified Plan on July 23, 2009, the Debtors would nonetheless be in a position to proceed on that date to seek this Court's authorization under 11 U.S.C. §§ 363 and 365 to complete the transactions set forth in the Master Disposition Agreement, as modified by the 363 Implementation Agreement. The 363 Implementation Agreement will be filed by July 2, 2009.

41

54.      GM Components and Parnassus have committed to the Debtors that
completion of the transactions contemplated by the Master Disposition Agreement through a
section 363 sale instead of under the Modified Plan will not materially change the economics of
the transactions, except that GM Components would no longer commit to provide holders of
allowed General Unsecured Claims (as defined in the Modified Plan) with a pro rata share of
deferred consideration.  For greater certainty, GM Components and Parnassus have agreed that
should the transactions be consummated pursuant to a section 363 sale order rather than under
the Modified Plan, GM Components and Parnassus would nonetheless purchase the same assets
and assume the same liabilities as provided in the Master Disposition Agreement.  Also, with the
exception of the deferred compensation that would have been paid to holders of allowed General
Unsecured Claims under the Modified Plan, the Debtors would receive the same consideration
from GM Components and Parnassus, including the financial support for the Delphi estates'
wind-down requirements, as provided in Article 3 of the Master Disposition Agreement.
Accordingly, the Debtors request that this Court schedule July 23, 2009 as the date for the
Alternative Sale Hearing.

Applicable Authority

55.      <u>Modifications To Plan</u>.  Section 1127 of the Bankruptcy Code applies
when a party seeks to modify a plan of reorganization.  Specifically, 11 U.S.C. § 1127(b)
provides that a "proponent of a plan or the reorganized debtor may modify such plan at any time
after confirmation of such plan and before substantial consummation of such plan."  The
modifications, however, "may not modify such plan so that such plan as modified fails to meet
the requirements of sections 1122 and 1123 of this title."  <u>Id.</u>  The proponent of a modified plan
is also required to comply with the disclosure and solicitation requirements outlined in section
1125 of the Bankruptcy Code.  11 U.S.C. § 1127(c).  Whether a debtor needs to resolicit votes on

42

modifications to a plan of reorganization depends on whether the modification is material or not and whether the creditors and interest holders are adversely affected. See In re Am. Solar King Corp., 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (finding that plan modification reducing distribution to creditors by less than one percent did not require resolicitation); In re Boroff, 189 B.R. 53, 57 (D. Vt. 1995) (quoting In re Frontier Airlines, Inc., 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988) ("If the modification adversely affects the interests of a creditor in more than a purely ministerial, de minimis manner, that creditor should have the opportunity to reconsider and change his or her vote.")).

56.    When a debtor resolicits acceptances of a modified plan, section 1127 of the Bankruptcy Code provides that a holder's prior vote may be counted with respect to the modified plan.  Accordingly, a vote cast on the December 10 Plan may be counted as a vote on the Modified Plan.  11 U.S.C. § 1127(d) (holder may be "deemed to have accepted or rejected, as the case may be, such plan as modified").  See, e.g., Enron Corp v. New Power Co. (In re New Power Co.), 438 F.3d 1113, 1117-18 (11th Cir. 2006) (court may deem holder's prior vote of acceptance for original plan as acceptance of a modified plan even without resoliciting "unless the modification materially and adversely changes the way that claim or interest holder is treated"); In re McCommas LFG Processing Partners, LP, Nos. 07-32222-HDH-11, 07-32219-DHD-11, 2007 WL 4234139, at *3 (Bankr. N.D. Tex. Nov. 29, 2007) ("[p]ursuant to section 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, all acceptances of the Plan prior to such Modifications are deemed acceptances of the Plan").

57.    Supplement To December 10 Disclosure Statement.  As required by section 1127(c) of the Bankruptcy Code, the Debtors believe that resolicitation of votes on the Modified Plan is required, and therefore the Debtors have filed with this Court the Supplement

together with the Modified Plan.  Section 1125(b) of the Bankruptcy Code, as incorporated by

section 1127 of the Bankruptcy Code, prohibits postpetition solicitation of a reorganization plan

unless the plan and "a written disclosure statement approved, after notice and a hearing, by the

court as containing adequate information" are transmitted to those persons whose votes are being

solicited.  As previously stated, the Debtors filed the Modified Plan and Supplement, and are

seeking this Court's approval to commence solicitation of acceptances of the Modified Plan.

        58.     This Court previously approved the December 10 Disclosure Statement as

providing adequate information within the meaning of section 1125(a)(1) of the Bankruptcy

Code.  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, that would enable a
> hypothetical reasonable investor typical of holders of claims or interests of
> the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).  Because certain events have transpired since the approval of the

December 10 Disclosure Statement and the confirmation of the Confirmed Plan, modifications to

the Confirmed Plan became necessary and the Debtors have supplemented the December 10

Disclosure Statement accordingly.  The Debtors believe that the Supplement contains "adequate

information" as contemplated by the Bankruptcy Code and should be approved for resolicitation

of votes on the Modified Plan in accordance with section 1127(b).

        59.     In examining the adequacy of the information contained in a disclosure

statement, a bankruptcy court has broad discretion.  See Texas Extrusion Corp. v. Lockheed

Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988); In re Dakota Rail, Inc.,

104 B.R. 138, 143 (Bankr. D. Minn. 1989) (court has "wide discretion to determine . . . whether

a disclosure statement contains adequate information without burdensome, unnecessary, and

cumbersome detail"); see also Abel v. Shugrue (In re Ionosphere Clubs, Inc.), 179 B.R. 24, 29

44

(S.D.N.Y. 1995) (determination of whether disclosure statement contains adequate information must be made on case-by-case basis).  Accordingly, the determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the applicable facts and circumstances.  The legislative history of section 1125 indicates that "in determining what constitutes adequate information with respect to a particular disclosure statement, '[b]oth the kind and form of information are left essentially to the judicial discretion of the court' and that '[t]he information required will necessarily be governed by the circumstances of the case.'"  Cajun Electric Power Coop. v. Sw. Elec. Power Co. (In re Cajun Electric Power Coop.), 150 F.3d 503, 518 (5th Cir. 1998) (citing S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907).  In that regard, "facts which inform claimants about the financial results of acceptance or rejection of a plan, must be included." Hargrove v. Tega Cay Dev. Co., Inc. (In re Point Wylie Co.), 78 B.R. 453, 460 (Bankr. D. S.C. 1987).  "The necessary implication of this is that a debtor must amend its disclosure statement, when necessary to be fully accurate."  Id.

60.    The Supplement provides adequate information regarding the informational items which have changed since the December 10 Disclosure Statement was approved by this Court. Indeed, the Supplement contains descriptions and summaries of, among other things, (i) the Modified Plan and the agreements underlying the Modified Plan, (ii) the significant events during the chapter 11 cases since approval of the December 10 Disclosure Statement, (iii) the claims asserted against the Debtors' estates, (iv) various risk factors affecting the Modified Plan and the Debtors' restructuring, (v) a liquidation analysis setting forth the estimated return that creditors would receive in a hypothetical chapter 7 case, (vi) certain securities law and tax law consequences of the Modified Plan, and (vii) a disclaimer indicating

that no statements or information concerning the Debtors and their assets and securities are authorized other than those set forth in the Supplement.

61.    The Debtors further request that the Court authorize them to (i) make non-material changes to the Supplement and related documents (including the exhibits thereto and to this Supplement) and (ii) revise the Supplement and related documents (including the exhibits thereto) to add further disclosure concerning events occurring at or after the hearing approving the Supplement (the "Preliminary Modification Hearing"), before distributing it to each person and entity in accordance with the terms of the proposed order granting this Motion Supplement. If so permitted, the Debtors would file copies with the Court of any pages marked to show the changes.

62.    Consistent with the Court's finding in connection with the December 10 Disclosure Statement, the Debtors also request that this Court find that, as far as the Court has been made aware, (i) all material information regarding the Debtors and their subsidiaries, their respective assets, affairs, and financial conditions, and the reorganization and restructuring provided for under the Modified Plan has been set forth in the Supplement and the Debtors' public filings with the Securities and Exchange Commission before the date of the Preliminary Modification Hearing (or the exhibits or appendices thereto), or that all such material information has been disclosed fully and adequately thereby, and (ii) there is no material nonpublic information regarding the Debtors or their subsidiaries, their respective assets, affairs, or financial condition, or the reorganization and restructuring provided for under the Modified Plan, that has not been disclosed.

63.    <u>Effect Of Failure Of Class To Vote</u>.  Several courts have held that if no claim or interest holder of a particular class votes either to accept or reject the plan, then that

46

class would be deemed to have accepted the plan.  See Heins v. Ruti-Sweetwater, Inc. (In re

Ruti-Sweetwater, Inc.), 836 F.2d 1263, 1266-67 (10th Cir. 1988) (holding that nonvoting class

was deemed to have accepted plan for the purposes of 11 U.S.C. 1129(a)(8) and 1129(b) and

noting that holding otherwise would encourage creditors to "sit idly by," effectively "plac[ing] all

reorganization plans at risk in terms of reliance and finality."); In re Adelphia Comm'ns Corp.,

368 B.R. 140, 261-62 (Bankr. S.D.N.Y. 2007) ("Regarding non-voters as rejecters runs contrary

to the Code's fundamental principle, and the language of section 1126(c), that only those actually

voting be counted in determining whether a class has met the requirements . . . for acceptance or

rejection of a plan . . . ."); In re Campbell, 89 B.R. 187, 188 (Bankr. N.D. Fla. 1988) ("[T]hose

impaired classes which failed to vote and did not object to confirmation of the plan are deemed

to have accepted the plan for the purposes of meeting the requirements of § 1129(a)(8 of the

Bankruptcy Code."); but see In re Friese, 103 B.R. 90, 92-93 (Bankr. S.D.N.Y. 1989) (holding

that "the court cannot deem an impaired class to have accepted a plan if no creditors in the class

have voted.").  Especially where the "effect of not voting is announced in advance," if no claim

or interest holder of a particular class votes either to accept or reject the Modified Plan, then that

class should be deemed to have accepted the Modified Plan.  In re Adelphia Comm'ns Corp., 368

B.R. at 262.  Accordingly, if a particular class fails to vote on the Modified Plan, that class

should be deemed to accept the Modified Plan.

      64.  Establishment Of Administrative Expense Bar Date.  Bankruptcy Code

section 503(a) provides that "an entity may timely file a request for payment of an administrative

expense."  Pursuant to Bankruptcy Code section 105, this Court may issue any order "necessary

or appropriate" to carry out, among other things, the mandate of Bankruptcy Code 503(a).  Read

together, these two provisions authorize approval of a deadline to file Administrative Expense Claims.

65.    Bankruptcy Rule 3003(c)(3) provides that "[t]he court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed."  Further, Local Rule 3003-1 provides that a "request for an order establishing a deadline for filing proofs of claim in a chapter 11 case shall conform to procedural guidelines for requests for bar orders contained in any applicable standing order issued by this Court."  General Order M-279 generally provides that the bar date should be at least thirty-five days after the mailing date and at least twenty-five days after the publication date.  However, "for cause shown the Court may reduce the notice period [for establishing the bar date] to twenty days after mailing in accordance with [Bankruptcy Rules] 2002(a)(7) and 9006(c)(2)."  See General Order M-279.

66.    Cause exists to set July 10, 2009 as the Administrative Expense Bar Date because such a bar date is needed to identify administrative expense claims that would either be paid pursuant to the terms of the Master Disposition Agreement or the Modified Plan. Bankruptcy Code sections 105 and 503, together with Bankruptcy Rules 2002(a)(7), 3003, 9006(c)(2), Local Rule 3003-1, and General Order M-279, thus permit the Court to approve the proposed administrative expense filing procedures and to approve the form, manner, and sufficiency of notice of the Administrative Expense Bar Date.

67.    Alternative Sale Hearing.  In the event that the Court does not enter an order approving the Modified Plan on July 23, 2009, the Debtors request that this Court consider the sale of substantially all of the Debtors' assets pursuant to the Master Disposition Agreement, as modified by the 363 Implementation Agreement, on July 23, 2009.  Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary

course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Use of estate property

outside the ordinary course of business may be authorized if the debtor demonstrates a sound

business justification for it.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); see also In re Delaware

& Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).  Similarly, under section 365 of the

Bankruptcy Code a debtor, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the

Bankruptcy Code provides, among other things, that if there has been a default in an executory

contract or unexpired lease of the debtor, the debtor may not assume such contract or lease

unless, at the time of the assumption of such contract or lease, the debtor "cures, or provides

adequate assurance that the trustee will promptly cure, such default" and "provides adequate

assurance of future performance under such contract or lease."  11 U.S.C. § 365(b)(1).  Courts

have consistently held that "adequate assurance of future performance" does not require total

assurance.  See In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not

mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns,

Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (although no single solution will satisfy every

case, required assurance will fall "considerably short of an absolute guaranty of performance").

Furthermore, section 365(f)(2) of the Bankruptcy Code provides that the trustee may assign an

executory contract or unexpired lease of the debtor only if – "(A) the trustee assumes such

contract or lease in accordance with the provisions of this section; and (B) adequate assurance of

future performance by the assignee of such contract or lease is provided, whether or not there has

been a default in such contract or lease." 11 U.S.C. § 365(f)(2).

68.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.

(In re Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." Id.  As a rule, the debtor's business judgment "should be

approved by the court unless it is shown to be "so manifestly unreasonable that it could not be

based upon sound business judgment, but only on bad faith, or whim or caprice." In re Aerovox,

Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).  In addition, proceeding with

the sale under section 363 of the Bankruptcy Code, if necessary, would allow the Debtors to sell

the assets free and clear of any lien, claim, or interest in such property.  11 U.S.C. § 363(f).  As

set forth elsewhere in this Motion Supplement, the global economic recession and the

unprecedented challenges that have flooded the automotive industry require prompt action.  If

the Debtors cannot obtain this Court's approval of the Modified Plan, it is their business

judgment that they would need to sell their assets in the manner set forth the Master Disposition

Agreement, as modified by the 363 Implementation Agreement.

69.    General Order 331 contemplates that a sale of assets under 363 may be

either public or private.  See General Order 331, n.2 ("With the exception of providing for such

disclosure, these Guidelines do not express a preference for public over private sales as a means

to maximize the sale price."); id. at section I.D.3. ("If no auction is contemplated . . . the sale

motion must so state and explain why such sale is likely to maximize the sale price.").  Courts

have also held that a debtor may sell assets without conducting an auction.  See In re Trans

World Airlines, Inc., Case No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. April 2, 2001)

("a § 363(b) sale transaction does not require an auction procedure.  The auction procedure has

developed over the years as an effective means for producing an arm's length fair value

transaction."); cf. In re Woods, 215 B.R. 623, 626-27 (10th Cir. B.A.P 1998) (recognizing

validity of sale, in connection with plan of reorganization, pursuant to section 363 without

auction).  The Master Disposition Agreement builds in the flexibility to proceed with a sale of

substantially of the Debtors' assets in the absence of a confirmed plan pursuant to sale hearing on

July 23, 2009.  Given the current state of the economy in general and the automotive industry in

particular, if the Debtors are unable to obtain approval of the Modified Plan on July 23, 2009, the

Debtors must have the ability and flexibility to sell all of their assets on that date to consummate

the transactions under the Master Disposition Agreement because the Debtors believe that the

economics of the transactions contemplated in the Master Disposition Agreement maximizes the

value of the Debtors' estates.

<u>Notice</u>

70.    Notice of this Motion Supplement will be provided in accordance with this

Court's instructions.  In light of the nature of the relief requested, the Debtors submit that no

other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) approving the Supplement and certain modifications to the Confirmed Plan and notices for resoliciting votes of affected classes on the Modified Plan, (b) setting a final hearing date on approval of the Debtors ' proposed Modified Plan, (c) setting a bar date for filing proofs of claims for administrative expense for postpetition claims arising prior to June 1, 2009, (d) setting a sale hearing date for July 23, 2009, only if necessary, to consider the sale of substantially all the Debtors' assets if the Court does not approve the Debtors' proposed plan modifications on that date, and (e) granting them such other and further relief as is just.

Dated:    New York, New York
          June 1, 2009
                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

                         By:    /s/ John Wm. Butler, Jr.
                                John Wm. Butler, Jr.
                                Ron E. Meisler
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                       - and –

                         By:    /s/ Kayalyn A. Marafioti
                                Kayalyn A. Marafioti
                                Thomas J. Matz
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession