**Exhibit 2-A**

**[Appendix B To The Supplement—Historical Financial Results]**

**APPENDIX B**

**HISTORICAL FINANCIAL RESULTS**

**APPENDIX B-1**

Consolidated Financial Statements and Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-K For The Year Ended December 31, 2008,
Filed March 3, 2009

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (in millions, except per share amounts) | | |
| **Net sales:** | | | |
| General Motors and affiliates | $ 5,525 | $ 8,301 | $ 9,344 |
| Other customers | 12,535 | 13,982 | 13,393 |
| Total net sales | 18,060 | 22,283 | 22,737 |
| **Operating expenses:** | | | |
| Cost of sales, excluding items listed below | 17,068 | 21,066 | 21,966 |
| U.S. employee workforce transition program charges (Note 16) | 78 | 212 | 2,706 |
| GM settlement (Note 2 – MRA) | (254) | — | — |
| Depreciation and amortization | 827 | 914 | 954 |
| Long-lived asset impairment charges (Note 9) | 37 | 98 | 172 |
| Goodwill impairment charges (Note 10) | 325 | — | — |
| Selling, general and administrative | 1,460 | 1,595 | 1,481 |
| Securities & ERISA litigation charge (Note 18) | — | 343 | — |
| Total operating expenses | 19,541 | 24,228 | 27,279 |
| Operating loss | (1,481) | (1,945) | (4,542) |
| Interest expense (Contractual interest expense for 2008, 2007 and 2006 was $564 million, $494 million and $577 million, respectively) (Note 1) | (437) | (769) | (427) |
| Loss on extinguishment of debt | (49) | (27) | — |
| Other income, net (Note 20) | 69 | 110 | 40 |
| Reorganization items, net: | | | |
| GM settlement (Notes 2 and 3 - GSA) | 5,332 | — | — |
| Professional fees and other, net (Note 3) | (185) | (163) | (92) |
| Income (loss) from continuing operations before income taxes, minority interest and equity income | 3,249 | (2,794) | (5,021) |
| Income tax (expense) benefit | (166) | 522 | (130) |
| Minority interest, net of tax | (28) | (63) | (34) |
| Equity income, net of tax | 1 | 27 | 44 |
| Income (loss) from continuing operations | 3,056 | (2,308) | (5,141) |
| Loss from discontinued operations, net of tax (Note 5) | (19) | (757) | (326) |
| Cumulative effect of accounting change, net of tax | — | — | 3 |
| Net income (loss) | $ 3,037 | $ (3,065) | $ (5,464) |
| **Basic and diluted income (loss) per share** | | | |
| Continuing operations | $ 5.41 | $ (4.11) | $ (9.16) |
| Discontinued operations | (0.03) | (1.34) | (0.58) |
| Cumulative effect of accounting change | — | — | 0.01 |
| Basic and diluted income (loss) per share | $ 5.38 | $ (5.45) | $ (9.73) |

See notes to consolidated financial statements.

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 959 | $ 1,036 |
| Restricted cash (Note 1) | 403 | 173 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 822 | 1,257 |
| Other | 1,572 | 2,637 |
| Inventories, net (Note 11) | 1,285 | 1,808 |
| Other current assets | 613 | 588 |
| Assets held for sale (Note 5) | 497 | 720 |
| Total current assets | 6,151 | 8,219 |
| Long-term assets: | | |
| Property, net (Note 9) | 3,397 | 3,863 |
| Investments in affiliates (Note 19) | 303 | 387 |
| Goodwill (Note 10) | 62 | 397 |
| Other | 393 | 801 |
| Total long-term assets | 4,155 | 5,448 |
| Total assets | $ 10,306 | $ 13,667 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Notes payable and current portion of long-term debt (Note 15) | $ 554 | $ 749 |
| Debtor-in-possession financing (Note 15) | 3,620 | 2,746 |
| Accounts payable | 1,771 | 2,904 |
| Accrued liabilities (Note 12) | 2,171 | 2,281 |
| Liabilities held for sale (Note 5) | 313 | 412 |
| Total current liabilities | 8,429 | 9,092 |
| Long-term liabilities: | | |
| Long-term debt (Note 15) | 55 | 59 |
| Employee benefit obligations (Note 17) | 552 | 443 |
| Other (Note 12) | 973 | 1,185 |
| Total long-term liabilities | 1,580 | 1,687 |
| Liabilities subject to compromise (Note 14) | 14,583 | 16,197 |
| Total liabilities | 24,592 | 26,976 |
| Commitments and contingencies (Note 18) | | |
| Minority interest | 139 | 163 |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued | 6 | 6 |
| Additional paid-in capital | 2,747 | 2,756 |
| Accumulated deficit | (12,064) | (14,976) |
| Accumulated other comprehensive income (loss): | | |
| Employee benefit plans (Note 17) | (4,867) | (1,679) |
| Other | (241) | 446 |
| Total accumulated other comprehensive income (loss) | (5,108) | (1,233) |
| Treasury stock, at cost (391 thousand and 1.5 million shares in 2008 and 2007, respectively) | (6) | (25) |
| Total stockholders' deficit | (14,425) | (13,472) |
| Total liabilities and stockholders' deficit | $ 10,306 | $ 13,667 |

See notes to consolidated financial statements.

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2008** | **2007** | **2006** |
| | **(in millions)** | | |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ 3,037 | $ (3,065) | $ (5,464) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 827 | 914 | 954 |
| Long-lived asset and goodwill impairment charges | 362 | 98 | 172 |
| Deferred income taxes | (15) | (638) | (55) |
| Pension and other postretirement benefit expenses | 611 | 905 | 1,392 |
| Equity income | (1) | (27) | (44) |
| Reorganization items (Notes 2 and 3 – GSA) | (5,147) | 163 | 92 |
| GM settlement (Note 2 – MRA) | (254) | — | — |
| GM warranty settlement (Note 13) | (107) | — | — |
| U.S. employee workforce transition program charges | 78 | 212 | 2,706 |
| Loss on extinguishment of debt | 49 | 27 | — |
| Securities & ERISA litigation charge | — | 343 | — |
| Loss on liquidation/deconsolidation of investment | — | 79 | — |
| Loss on assets held for sale, net of gain on sale of investment | 9 | — | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | 1,361 | (186) | 78 |
| Inventories, net | 476 | 29 | (242) |
| Other current assets | 245 | (38) | (71) |
| Accounts payable | (1,009) | 303 | 411 |
| Accrued and other long-term liabilities | (512) | 747 | 428 |
| Other, net | (197) | (42) | 39 |
| U.S. employee workforce transition program payments, net of reimbursement by GM | (219) | (528) | (249) |
| Pension contributions | (383) | (304) | (305) |
| Other postretirement benefit payments | (216) | (207) | (262) |
| Receipts (payments) for GM settlement and reorganization items, net | 1,115 | (142) | (70) |
| Dividends from equity investments | 11 | 45 | 19 |
| Discontinued operations (Note 5) | 115 | 1,023 | 480 |
| Net cash provided by (used in) operating activities | 236 | (289) | 9 |
| | | | |
| Cash flows from investing activities: | | | |
| Capital expenditures | (797) | (580) | (622) |
| Proceeds from sale of non-U.S. trade bank notes | 219 | 191 | 173 |
| Proceeds from divestitures and sale of property | 216 | 129 | 85 |
| Increase in restricted cash | (230) | (22) | (105) |
| Other, net | (37) | 1 | 3 |
| Discontinued operations | (110) | (58) | (88) |
| Net cash used in investing activities | (739) | (339) | (554) |
| | | | |
| Cash flows from financing activities: | | | |
| Proceeds from amended and restated debtor-in-possession facility, net of issuance cost of $92 million | 3,528 | — | — |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost of $7 million | — | 2,691 | — |
| Repayments of borrowings from refinanced debtor-in-possession facility | (2,746) | — | — |
| Net repayments of borrowings under refinanced debtor-in-possession facility | — | (250) | — |
| Repayments of borrowings under prepetition term loan facility | — | (988) | — |
| (Repayments) borrowings under prepetition revolving credit facility | — | (1,508) | 2 |
| Repayments under cash overdraft | — | — | (29) |
| Net (repayments) borrowings under other short-term debt agreements | (203) | 49 | (111) |
| Accommodation agreement issuance costs | (58) | — | — |
| Dividend payments of consolidated affiliates to minority shareholders | (47) | (50) | (22) |
| Other, net | — | — | (4) |
| Discontinued operations | (9) | (2) | 42 |
| Net cash provided by (used in) financing activities | 465 | (58) | (122) |
| | | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | (39) | 114 | 79 |
| | | | |
| Decrease in cash and cash equivalents | (77) | (572) | (588) |
| Cash and cash equivalents at beginning of year | 1,036 | 1,608 | 2,196 |
| Cash and cash equivalents at end of year | $ 959 | $ 1,036 | $ 1,608 |

See notes to consolidated financial statements.

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT) AND CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS

| | Common Stock | | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | | | Treasury Stock | Total Stockholders' Equity (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | Employee Benefit Plans | Other | Total | | |
| | | | | | (in millions) | | | | |
| **Balance at December 31, 2005** | 565 | 6 | 2,744 | (6,429) | (2,395) | (119) | (2,514) | (52) | (6,245) |
| Net loss | — | — | — | (5,464) | — | — | — | — | (5,464) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | 231 | 231 | — | 231 |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | 44 | 44 | — | 44 |
| Minimum pension liability adjustment, net of tax | — | — | — | — | 1,281 | — | 1,281 | — | 1,281 |
| Total comprehensive loss | | | | | | | | | (3,908) |
| Adoption of FASB Statement No. 158 | — | — | — | — | (1,927) | — | (1,927) | — | (1,927) |
| Share-based compensation expense | — | — | 25 | — | — | — | — | — | 25 |
| **Balance at December 31, 2006** | 565 | 6 | 2,769 | (11,893) | (3,041) (a) | 156 (b) | (2,885) | (52) | (12,055) |
| Net loss | — | — | — | (3,065) | — | — | — | — | (3,065) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | 294 | 294 | — | 294 |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | (4) | (4) | — | (4) |
| Employee benefit plans liability adjustment, net of tax | — | — | — | — | 1,362 (c) | — | 1,362 | — | 1,362 |
| Total comprehensive loss | | | | | | | | | (1,413) |
| Adoption of FIN 48 | — | — | — | (18) | — | — | — | — | (18) |
| Share-based compensation expense | — | — | 14 | — | — | — | — | — | 14 |
| Treasury shares issued | — | — | (27) | — | — | — | — | 27 | — |
| **Balance at December 31, 2007** | 565 | $ 6 | $ 2,756 | $(14,976) | $ (1,679) (a) | $ 446 (b) | $(1,233) | $ (25) | $(13,472) |
| Adoption of FASB Statement No. 158, net of tax | — | — | — | (125) | (12) | — | (12) | — | (137) |
| **Balance at January 1, 2008** | 565 | $ 6 | $ 2,756 | $(15,101) | $ (1,691) (a) | $ 446 (b) | $(1,245) | $ (25) | $(13,609) |
| Net income | — | — | — | 3,037 | — | — | — | — | 3,037 |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | (441) | (441) | — | (441) |
| Net change in unrecognized loss on derivative instruments, net of tax | — | — | — | — | — | (246) | (246) | — | (246) |
| Employee benefit plans liability adjustment, net of tax | — | — | — | — | (3,176) | — | (3,176) | — | (3,176) |
| Total comprehensive loss | | | | | | | | | (826) |
| Share-based compensation expense | — | — | 10 | — | — | — | — | — | 10 |
| Treasury shares issued | — | — | (19) | — | — | — | — | 19 | — |
| **Balance at December 31, 2008** | 565 | $ 6 | $ 2,747 | $(12,064) | $ (4,867) (a) | $ (241) (b) | $(5,108) | $ (6) | $(14,425) |

(a) Accumulated Other Comprehensive Loss –Employee Benefit Plans includes a loss for pension, postretirement and postemployment liabilities of $4,867 million (net of a $490 million tax effect), $1,679 million (net of a $457 million tax effect) and $3,041 million (net of a $1,213 million tax effect) for 2008, 2007 and 2006, respectively.

(b) Accumulated Other Comprehensive Loss –Other includes a loss of $44 million for 2008 and a gain of $394 million and $100 million for 2007 and 2006, respectively, within currency translation adjustments and other; and a loss of $194 million for 2008 and a gain of $52 million and $56 million, for 2007 and 2006, respectively, within net change in unrecognized gain on derivative instruments, and other loss of $3 million for 2008.

(c) Includes a tax benefit of $703 million related to $1.9 billion U.S. pre-tax other comprehensive income related to employee benefits. Refer to Note 8. Income Taxes for more information

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. SIGNIFICANT ACCOUNTING POLICIES

*Nature of Operations*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  Delphi's most significant customer is General Motors Corporation ("GM") and North America and Europe are its most significant markets.  Delphi is continuing to diversify its customer base and geographic markets.

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary.  Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting.  All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated.  All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included.

*Bankruptcy Filing*— On October 8, 2005 (the "Petition Date"), Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of  the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings").  The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)."  The Debtors continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.  Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings, continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.  However, Delphi's Board of Directors authorized Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), to file a petition for Concurso, or bankruptcy, under Spanish law, in March 2007 exclusively for that entity.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared.  However, among other disclosures, it does require that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.  Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations.  The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities.  Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts.  In addition, reorganization items must be disclosed separately in the statement of cash flows.  Delphi adopted SOP 90-7 effective October 8, 2005 and has segregated those items as outlined above for all reporting periods subsequent to such date.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including an accommodation agreement allowing the Debtors to retain the proceeds of, or an extension or replacement of their DIP financing agreement, which otherwise matured on December 31, 2008.  Prior to expiration of the DIP financing agreement (the "Amended and Restated DIP Credit Facility"), Delphi entered into an accommodation agreement (the "Accommodation Agreement") allowing Delphi to retain the proceeds of Amended and Restated DIP Credit Facility until the earlier of June 30, 2009 (or May 5, 2009 if Delphi does not achieve certain milestones in its reorganization cases), provided Delphi continues to remain in compliance with all applicable covenants under the Accommodation Agreement and the Amended and Restated DIP Credit  Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions) as described further in Note 15. Debt.

On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement.  In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement.  In addition, GM

agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement. The Amendment and GM's agreement to accelerate payments were effective January 30, 2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders. The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees. Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement. Accordingly, absent changes to the GM Advance Agreement, Delphi believes it has access to sufficient liquidity to fund its operations and remain in compliance with the covenants in the Amended and Restated DIP Credit Facility and Accommodation Agreement into April 2009. In addition, Delphi projects it will have sufficient additional liquidity support to manage its U.S. operations into May 2009 as it continues discussions with its stakeholders on proposed modifications to the Plan, subject to satisfaction of certain specified milestones in its reorganization cases and the conditions necessary to consummate the agreement reached with GM on March 3, 2009 described below whereby GM would increase the amounts available under the GM Advance Agreement to a total of $450 million.

On February 27, 2009, as provided for under the January 30, 2009 amendment to the Partial Temporary Accelerated Payments Agreement, GM opted to commit to increase from $300 million to $350 million the amounts available under the GM Advance Agreement, subject to (i) the President's Designee in accordance with the provisions of GM's federal loans not having notified GM prior to March 24, 2009 that the increase is not permitted, and (ii) Court approval of the increase prior to March 25, 2009. Additionally, on March 3, 2009 GM committed to further increase from $350 million to $450 million the amounts available under the GM Advance Agreement, subject to (i) the President's Designee in accordance with the provisions of GM's federal loans not having notified GM prior to March 24, 2009 that the increase is not permitted, (ii) Court approval of the further increase prior to March 25, 2009, (iii) approval by GM's board of directors, (iv) execution of a definitive transaction agreement relating to the sale of Delphi's Steering Business to GM prior to March 24, 2009, and (v) Court approval of the Steering Business Option Exercise Agreement between Delphi and GM prior to March 25, 2009. The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement. Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed by GM and Delphi. The Option Exercise Agreement is subject to conditions described in Note 25. Subsequent Events. In addition, the Amendment and Supplemental Amendment to the Accommodation Agreement will allow Delphi to access additional liquidity through the periodic release of amounts currently in a cash collateral basket of up to $117 million, provided (i) that all of the above conditions necessary to increase amounts available under the GM Advance Agreement to $450 million are satisfied, (ii) Delphi remains in compliance with all mandatory prepayment provisions and other covenants in the Accommodation Agreement, including the borrowing base calculation after giving effect to such release, and (iii) Delphi has achieved the remaining specified milestones in its reorganization cases, including the filing of a plan of reorganization or modifications to the Plan meeting the conditions specified in the Accommodation Agreement by April 2. Delphi believes receipt of GM's commitment is a significant step toward Delphi being able to secure such additional liquidity. Refer to Note 25. Subsequent Events for more information.

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008, (the effective date of the Accommodation Agreement). However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement, as amended). There can be no assurance the outside termination date of the Accommodation Agreement will not be shortened from June 30, 2009 to May 5, 2009 or that Delphi will continue to comply with the terms and conditions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement). These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. Delphi subsequently filed complaints seeking redress for the breach of the investment agreement and damages related to the consequent delay of Delphi's emergence from chapter 11. On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not intend to prosecute such complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the previously confirmed plan of reorganization, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against an affiliate of lead investor, Appaloosa Management L.P. and the other investors who were party to the Equity Purchase and Commitment Agreement dated as of August 3, 2007, as amended. Pending confirmation and consummation of the plan of reorganization (as amended) or an alternative plan of reorganization, Delphi and certain of its U.S. subsidiaries will continue as "debtors-in-possession" in chapter 11.

On October 3, 2008, Delphi filed a motion seeking Court approval of proposed modifications to its confirmed plan of reorganization. There can be no assurances as to when Delphi will confirm or consummate a modified plan. Consummation of a confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization (as amended).

*Contractual Interest Expense and Interest Expense on Unsecured Claims*— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008. The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims. At December 31, 2008 and 2007, Delphi had accrued interest of $415 million and $411 million, respectively, in accrued liabilities in the accompanying balance sheets for prepetition claims. As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Accordingly, Delphi anticipates that it will be relieved of this liability if and when the plan modifications are approved.

*Use of Estimates*—Preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During 2008, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, worker's compensation accruals and healthcare accruals. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from these estimates.

*Revenue Recognition*—Delphi's revenue recognition policy requires the recognition of sales when there is evidence of a sales agreement, the delivery of goods has occurred, the sales price is fixed or determinable and the collectibility of revenue is reasonably assured. Delphi generally records sales upon shipment of product to customers and transfer of title under standard commercial terms. In addition, if Delphi enters into retroactive price adjustments with its customers, these reductions to revenue are recorded when they are determined to be probable and estimable. From time to time, Delphi enters into pricing agreements with its customers that provide for price reductions, some of which are conditional upon achieving certain joint cost saving targets. In these instances, revenue is recognized based on the agreed-upon price at the time of shipment.

Sales incentives and allowances are recognized as a reduction to revenue at the time of the related sale. In addition, from time to time Delphi makes payments to customers in conjunction with ongoing and in limited circumstances future business. Delphi recognizes these payments to customers as a reduction to revenue at the time Delphi commits to make these payments.

Shipping and handling fees billed to customers are included in net sales, while costs of shipping and handling are included in cost of sales.

*Discontinued Operations*—In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet. SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities to be disposed of and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business"). The sales of the U.S. operations and certain of the non-U.S. operations of the Steering Business are expected to be sales of assets and are expected to include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts. The sales of certain non-U.S. operations of the Steering Business are expected to be stock sales and are expected to include all assets and liabilities for the sites. The sale of the Interiors and Closures Business closed on February 29, 2008. The majority of the Interiors and

9

Closures Business sale was accomplished through asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to the loss from discontinued operations in the statements of operations. Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses. Allocations have been made based upon a reasonable allocation method. Refer to Note 5. Discontinued Operations for more information.

*Research and Development*—Delphi incurs costs in connection with research and development programs that are expected to contribute to future earnings. Such costs are charged against income as incurred. Research and development expenses (including engineering) were $1.9 billion, $2.0 billion and $2.0 billion for the years ended December 31, 2008, 2007 and 2006, respectively.

*Cash and Cash Equivalents*—Cash and cash equivalents are defined as short-term, highly liquid investments with original maturities of 90 days or less.

*Marketable Securities*—Delphi generally holds marketable securities with maturities of 90 days or less, which are classified as cash and cash equivalents for financial statement purposes. Delphi also has securities that are held for a period longer than 90 days. Debt securities are classified as held-to-maturity, and accordingly are recorded at cost in Delphi's consolidated financial statements. Equity securities are classified as available-for-sale and are recorded in the consolidated financial statements at market value with changes in market value included in other comprehensive income ("OCI"). At December 31, 2008 and 2007, Delphi had available-for-sale securities with a cost basis of $38 million and $3 million, respectively, and a carrying value of $32 million and $3 million, respectively. In the event that the Company's debt or equity securities experience an other-than-temporary impairment in value, such impairment is recognized as a loss in the statement of operations.

*Restricted Cash*— At December 31, 2008 and 2007, Delphi had $403 million and $173 million in restricted cash, respectively. At December 31, 2008, Delphi provided a total of $323 million in cash collateral as required under the debtor-in-possession credit facility, including $123 million related to outstanding letters of credit at December 31, 2008. Additionally, restricted cash includes cash for use for the pre-retirement portion of the U.S. employee workforce transition programs, refer to Note 16. U.S. Employee Workforce Transition Programs, and balances on deposit at financial institutions that have issued letters of credit in favor of Delphi.

*Accounts Receivable*—Delphi enters into agreements to sell certain of its accounts receivable, primarily in Europe. Since the agreements allow Delphi to maintain effective control over the receivables, these various accounts receivable factoring facilities were accounted for as short-term debt at December 31, 2008 and 2007. The Company generally does not require collateral related to its trade accounts receivable. The allowance for doubtful accounts is established based upon analysis of trade receivables for known collectibility issues and the aging of the trade receivables at the end of each period. As of December 31, 2008 and 2007, the allowance for doubtful accounts was $164 million and $143 million, respectively. The Company exchanges certain amounts of accounts receivable, primarily in China, for bank notes with original maturities greater than 90 days. The collection of such notes are reflected in the investing activities in the consolidated statement of cash flows. Refer to Note 18. Commitments and Contingencies for a discussion of Delphi's concentration of risk with GM sales and accounts receivable.

*Inventories*— Inventories are stated at the lower of cost, determined on a first-in, first-out basis ("FIFO"), or market, including direct material costs and direct and indirect manufacturing costs, refer to Note 11. Inventories, Net.

From time to time, Delphi may receive payments from suppliers. Delphi recognizes these payments from suppliers as a reduction of the cost of the material acquired during the period to which the payments relate. In some instances, supplier rebates are received in conjunction with or concurrent with the negotiation of future purchase agreements and these amounts are amortized over the prospective agreement period.

*Property*—Property, plant and equipment, including internally-developed internal use software, is recorded at cost. Major improvements that materially extend the useful life of property are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. Depreciation is provided based on the estimated useful lives of groups of property generally using an accelerated method, which accumulates depreciation of approximately two-thirds of the depreciable cost during the first half of the estimated useful lives, or using straight-line methods. Leasehold improvements are amortized over the period of the lease or the life of the property, whichever is shorter, with the amortization applied directly to the asset account.

*Special Tools*— Special tools balances represent Delphi-owned tools, dies, jigs and other items used in the manufacture of customer components. At December 31, 2008 and 2007 the special tools balance was $387 million and $461 million, respectively, included within

property, net in the consolidated balance sheet.  Special tools also includes unreimbursed pre-production tooling costs related to customer-owned tools for which the customer has provided a non-cancelable right to use the tool.  Delphi-owned special tools balances are amortized over the expected life of the special tool or the life of the related vehicle program, whichever is shorter.  The unreimbursed costs incurred related to customer-owned special tools that are not subject to reimbursement are capitalized and amortized over the expected life of the special tool or the life of the related vehicle program, whichever is shorter.  Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.  As of December 31, 2008 and 2007, the Delphi-owned special tools balances were $321 million and $362 million, respectively, and the customer-owned special tools balances were $66 million and $99 million, respectively.

*Valuation of Long-Lived Assets*—Delphi periodically evaluates the carrying value of long-lived assets held for use including intangible assets when events or circumstances warrant such a review.  The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset.  In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset.  Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved and our review of appraisals.  Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced for the cost to dispose of the assets.  Refer to Note 5. Discontinued Operations and Note 9. Property, Net for more information.

*Intangible Assets*—Delphi has definite-lived intangible assets of approximately $28 million and $40 million as of December 31, 2008 and 2007, respectively.  In general, these intangible assets are being amortized over their useful lives, normally 3-17 years.

*Goodwill*—Delphi reviews the recoverability of goodwill at least annually as of May 31 and any time business conditions indicate a potential change in recoverability.  During 2008, Delphi recognized goodwill impairment charges totaling $325 million related to the Electrical/Electronic Architecture and Electronics and Safety segments.  Refer to Note 10. Goodwill for more information.

*Environmental Liabilities*—Delphi recognizes environmental remediation liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage.  The cost of each environmental remediation is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable.  The process of estimating environmental remediation liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multi-party sites.  In future periods, new laws or regulations, advances in remediation technologies and additional information about the ultimate remediation methodology to be used could significantly change Delphi's estimates.  Refer to Note 18. Commitments and Contingencies.

*Warranty*—Delphi recognizes expected warranty costs for products sold at the time of sale of the product based on Delphi estimates of the amount that will eventually be required to settle such obligations.  These accruals are based on factors such as past experience, production changes, industry developments and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.  Refer to Note 13. Warranty Obligations.

*Asset Retirement Obligations*—Delphi recognizes asset retirement obligations in accordance with SFAS No. 143 ("SFAS 143"), *Accounting for Asset Retirement Obligations,* and FASB Interpretation 47 ("FIN 47"), *Accounting for Conditional Asset Retirement Obligations, an interpretation of SFAS No. 143.*  Delphi identified conditional retirement obligations primarily related to asbestos abatement at certain of its sites.  To a lesser extent, Delphi also has conditional retirement obligations at certain sites related to the removal of storage tanks and polychlorinated biphenyl ("PCB") disposal costs.  Asset retirement obligations were $21 million and $27 million at December 31, 2008 and 2007, respectively.

*Debt Issuance Costs*— The costs related to the issuance or modification of long-term debt are generally deferred and amortized into interest expense over the life of each debt issue.  Deferred amounts associated with debt extinguished prior to maturity are expensed. Refer to Note 15. Debt for more information.

*Annual Incentive Plans*— The short-term annual incentive plan (the "AIP") provides the opportunity for incentive payments to executives provided that specified corporate and divisional financial targets are met.  During 2008, 2007 and 2006, Delphi recorded expense of $21 million, $149 million and $167 million, respectively, related to executive and U.S. salaried employee incentive plans, including $1 million, $18 million and $20 million, respectively, included in loss from discontinued operations.  In conjunction with the February 17, 2006 approval of the AIP, certain incentive compensation plans previously in place for Delphi executives were cancelled resulting in the reduction of expense of approximately $21 million for incentive compensation in 2006.  During the years ended December 31, 2008 and 2007, Delphi paid $78 million and $155 million, respectively, related to executive and U.S. salaried employee incentive plans.

***Postemployment Benefits***— Delphi accrues for costs associated with postemployment benefits provided to inactive employees throughout the duration of their employment. Delphi uses future production estimates combined with workforce geographic and demographic data to develop projections of time frames and related expense for postemployment benefits. For purposes of accounting for postemployment benefits, inactive employees represent those employees who have been other than temporarily idled. Delphi considers all idled employees in excess of approximately 10% of the total workforce at a facility to be other than temporarily idled. As a result of the U.S. employee special attrition programs, Delphi determined that certain previously recorded accruals for postemployment benefits, representing the future cash expenditures expected during the period between the idling of affected employees and the time when such employees are redeployed, retire, or otherwise terminate their employment, were no longer necessary and accordingly Delphi reduced such accruals by $108 million during 2006, which was recorded in cost of sales. There was no liability for postemployment benefits of other than temporarily idled employees at December 31, 2008 and 2007.

Delphi also accrues for costs associated with extended disability benefits for its employees. Discounting of the future extended-disability expenditures is based on the nature of the obligation and the timing of the expected benefit payments. At December 31, 2008 and 2007, the short-term extended-disability liability balance of $7 million and $10 million, respectively, was included in accrued liabilities in the accompanying consolidated balance sheets. The long-term extended-disability liability balance included in other long-term liabilities in the accompanying consolidated balance sheets at December 31, 2008 and 2007 was $60 million and $72 million, respectively, calculated with a weighted-average discount rate of 6.36% and 5.90%, respectively. During 2006, as a result of the U.S. workforce transition programs, Delphi recognized a related curtailment gain of $59 million. Pursuant to the Amended MRA (as defined in Note 2. Transformation Plan and Chapter 11 Bankruptcy), GM will reimburse Delphi for extended disability benefits paid by Delphi after January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive, and retired employees. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

***Employee Termination Benefits and Other Exit Costs***— Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company. This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract. All other exit costs are expensed as incurred. Refer to Note 7. Employee Termination Benefits and Other Exit Costs. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for employee termination benefits and other exit costs related to non-core product lines and refer to Note 16. U.S. Employee Workforce Transition Programs for employee termination benefits and other exit costs related to the 2007 U.S. labor agreements. Pursuant to the Amended MRA (as defined in Note 2. Transformation Plan and Chapter 11 Bankruptcy), GM will reimburse Delphi for severance obligations paid by Delphi after January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive, and retired employees.

***Worker's Compensation Benefits***—Delphi's worker's compensation benefit accruals are actuarially determined and are subject to the existing worker's compensation laws that vary by state. Accruals for worker's compensation benefits represent the discounted future cash expenditures expected during the period between the incidents necessitating the employees to be idled and the time when such employees return to work, are eligible for retirement or otherwise terminate their employment. The discount rate at December 31, 2008 and 2007 of 6.0% and 5.9%, respectively, was selected by analyzing the results of matching the projected benefit payments with a portfolio of high quality fixed income investments rated AA- or higher by Standard and Poor's. At December 31, 2008 and 2007, the short-term worker's compensation liability included in accrued liabilities in the accompanying consolidated balance sheets was $75 million and $49 million, respectively. The long-term worker's compensation liability included in other long-term liabilities in the accompanying consolidated balance sheets at December 31, 2008 and 2007 was $325 million and $328 million, respectively. Pursuant to the Amended MRA (as defined in Note 2. Transformation Plan and Chapter 11 Bankruptcy), GM will reimburse Delphi for workers compensation benefits paid by Delphi after January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive, and retired employees. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

***Foreign Currency Translation***—Assets and liabilities of non-U.S. subsidiaries are translated to U.S. dollars at end-of-period currency exchange rates. The consolidated statements of operations of non-U.S. subsidiaries are translated to U.S. dollars at average-period currency exchange rates. The effect of translation for non-U.S. subsidiaries is generally reported in OCI. The effect of remeasurement of assets and liabilities of non-U.S. subsidiaries that use the U.S. dollar as their functional currency is primarily included in cost of goods sold. Also included in cost of goods sold are gains and losses arising from transactions denominated in a currency other than the functional currency of a particular entity. Net transaction gains, as described above, decreased cost of sales by $74 million (including $59 million recognized in the fourth quarter related to intercompany loans), $13 million and $45 million in 2008, 2007 and 2006, respectively.

***Derivative Financial Instruments***— Delphi records all derivative instruments on the balance sheet at fair value with changes in fair value recorded currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.

12

Delphi manages its exposure to fluctuations in currency exchange rates, interest rates and certain commodity prices by entering into a variety of forward contracts and swaps with various counterparties. Such financial exposures are managed in accordance with Delphi's policies and procedures. Delphi does not enter into derivative transactions for speculative or trading purposes. As part of the hedging program approval process, Delphi identifies the specific financial risk which the derivative transaction will minimize, the appropriate hedging instrument to be used to reduce the risk and the correlation between the financial risk and the hedging instrument. Purchase orders, letters of intent, capital planning forecasts and historical data are used as the basis for determining the anticipated values of the transactions to be hedged. Delphi does not enter into derivative transactions that do not have a high correlation with the underlying financial risk. The hedge positions entered into by Delphi, as well as the correlation between the transaction risks and the hedging instruments, are reviewed on an ongoing basis.

Foreign exchange forward contracts are accounted for as hedges of firm or forecasted foreign currency commitments to the extent they are designated and assessed as highly effective. All other foreign exchange contracts are marked to market on a current basis. Commodity swaps are accounted for as hedges of firm or anticipated commodity purchase contracts to the extent they are designated and assessed as effective. All other commodity derivative contracts that are not designated as hedges are either marked to market on a current basis or are exempted from mark to market accounting as normal purchases. At December 31, 2008 and 2007, Delphi's exposure to movements in interest rates was not hedged with derivative instruments. Refer to Note 23. Fair Value of Financial Instruments, Derivatives and Hedging Activities for more information.

*Common Stock and Preferred Stock*—Delphi currently has one class of common stock outstanding. There are 1,350 million shares of common stock authorized at both December 31, 2008 and 2007, of which 564,635,299 were outstanding (565,025,907 shares issued less 390,608 held as treasury stock) at December 31, 2008 and 563,477,461 were outstanding (565,025,907 shares issued less 1,548,446 held as treasury stock) at December 31, 2007. Holders of Delphi common stock are entitled to one vote per share with respect to each matter presented to its shareholders on which the holders of common stock are entitled to vote. Delphi did not pay dividends in 2008, 2007 and 2006. There are no cumulative voting rights. As of December 31, 2008 and 2007, Delphi had no issued and outstanding preferred stock.

*Recently Issued Accounting Pronouncements*— In September 2006, the Financial Accounting Standards Board (the "FASB") issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*. In February 2008, the FASB issued FASB Staff Position No. 157-2 ("FSP 157-2"), *Effective Date of FASB Statement No. 157,* which partially defers the effective date of SFAS No. 157 for one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. The FSP does not defer recognition and disclosure requirements for financial assets and liabilities or for nonfinancial assets and nonfinancial liabilities that are remeasured at least annually. Delphi expects to adopt the provisions of SFAS No. 157 as of January 1, 2009 for nonfinancial assets and liabilities that are subject to the deferral, which include long-lived assets and goodwill.

SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition of fair value is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset, and fair value should be based on assumptions that market participants would use, including non-performance risk. SFAS 157 also establishes a fair value hierarchy to prioritize inputs used in measuring fair value. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. The Company utilized the fair value measures of SFAS 157 in accounting for its marketable securities, including those held by its pension plans, and derivative financial instruments. The adoption of SFAS 157 did not have a significant impact on Delphi's financial statements. Refer to Note 24. Fair Value Measurements for the disclosures required by SFAS 157.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R).* SFAS 158 requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefits plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year. Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the accumulated deficit by $129 million and accumulated other comprehensive loss by $10 million.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115.* SFAS 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting

requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi adopted SFAS 159 as of January 1, 2008 and has not elected the fair value option for any financial instruments.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 ("SFAS 141"), as revised in 2007 ("SFAS 141R"), *Business Combinations*. SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. In addition, SFAS 141R changes the accounting for various components of a business combination, including pre-acquisition contingencies, the measurement period, in-process research and development and restructuring activities, amongst others. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. Earlier adoption is prohibited. SOP 90-7 requires the reorganization value of an entity upon emergence from bankruptcy to be allocated to the entity's assets in a manner consistent with the accounting for business combinations as specified by SFAS 141. As a result, entities emerging from bankruptcy after the effective date of SFAS 141R will apply the provisions of the new standard upon emergence. Delphi is currently assessing the impact SFAS 141R may have upon its accounting for its emergence from bankruptcy.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51*. SFAS 160 establishes new accounting and reporting standards for noncontrolling interests in subsidiaries and for the consolidation or deconsolidation of subsidiaries upon a change in control. SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Earlier adoption is prohibited. Delphi does not expect the adoption of SFAS 160 to have a significant impact on its financial statements.

In March 2008, the FASB issued Statement of Financial Accounting Standards No. 161 ("SFAS 161"), *Disclosures about Derivative Instruments and Hedging Activities - an Amendment of FASB Statement 133*. SFAS 161 enhances required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (a) an entity uses derivative instruments; (b) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* and (c) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS 161 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after November 15, 2008. Earlier adoption is encouraged. Delphi does not expect the adoption of SFAS 161 to have a significant impact on its financial statements other than providing the new disclosures required by SFAS 161.

In April 2008, the FASB issued FASB Staff Position SOP 90-7-1 ("FSP SOP 90-7-1"), *An Amendment of AICPA Statement of Position 90-7*. FSP SOP 90-7-1 resolves the conflict between the guidance requiring early adoption of new accounting standards for entities required to follow fresh-start reporting under SOP 90-7, and other authoritative accounting standards that expressly prohibit early adoption. Specifically, FSP SOP 90-7-1 requires an entity emerging from bankruptcy and applying fresh-start reporting to follow only the accounting standards in effect at the date fresh-start reporting is adopted, which include those standards eligible for early adoption if an election is made to adopt early.

In December 2008, the FASB issued FASB Staff Position 132(R)-1 (FSP 132(R)-1), *Employers' Disclosures about Postretirement Benefit Plan Assets*. FSP 132(R)-1 provides guidance on disclosures about plan assets of a defined benefit pension or other postretirement plan. Specifically, FSP 132(R)-1 requires enhanced disclosures of how investment allocation decisions are made, including pertinent factors to further understand investment policies and strategies, the major categories of plan assets, the inputs and valuation techniques used to measure the fair value of plan assets, the effect of fair value measurements using significant unobservable inputs on changes in plan assets for the period, and significant concentrations of risk within plan assets. FSP 132(R)-1 and the enhanced disclosures about plan assets are required for fiscal years ending after December 15, 2009. Earlier application is permitted. Delphi is currently assessing the impact FSP 132(R)-1 may have on its financial statements.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

On September 6, 2007 Delphi filed its proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outline Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM, a plan to streamline our product portfolio and make the necessary manufacturing alignment with our new focus, transform our cost structure and resolve our pension funding situation. On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's Plan and Disclosure Statement became final. Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. On April 4, 2008, Delphi announced that

although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA and that Appaloosa is entitled to terminate the EPCA. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Creditors' Committee and Equity Committee in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both statutory committees, to develop modifications to the Plan that would allow Delphi to emerge from chapter 11. On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization. Delphi continues to be engaged in comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the modified plan will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. These factors also continue to delay Delphi's emergence from chapter 11 and its ability to refinance its Amended and Restated DIP Credit Facility.

### Plan of Reorganization and Transformation Plan

### Elements of Transformation Plan

On March 31, 2006, we announced our transformation plan centered around five key elements, each of which is also addressed in our Plan and related Disclosure Statement. The progress on each element is discussed below.

*GM* - Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of the Global Settlement Agreement, as amended (the "GSA") and the Master Restructuring Agreement, as amended (the "MRA"). The GSA and the MRA, as amended through January 25, 2008, comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and the MRA provided that such agreements were not effective until and unless Delphi emerges from chapter 11. However, as part of Delphi's overall negotiations with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi agreed with GM and filed further amendments to the GSA and MRA (the "Amended MRA") with the Court on September 12, 2008 and subsequently entered into an additional amendment to the GSA as of September 25, 2008 (as so amended, the "Amended GSA"). On September 26, 2008, Delphi received the consent of its labor unions to implement certain aspects of the agreements as described in more detail below. The Court approved such amendments on September 26, 2008 and the Amended GSA and Amended MRA became effective on September 29, 2008. These amended agreements include provisions related to the transfer of certain legacy pension and other postretirement benefit obligations and became effective independent of and in advance of substantial consummation of an amended plan of reorganization. The effectiveness of these agreements resulted in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs.

*Global Settlement Agreement -* The Amended GSA resolves outstanding issues between Delphi and GM, including: litigation commenced in March 2006 by Delphi to terminate supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under a Delphi plan of reorganization; and various other legacy U.S. hourly workforce benefit issues. Except for the second step of the transfer of a substantial portion of the assets and liabilities under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") as specifically noted below, the obligations under the Amended GSA are not conditioned on the effectiveness of an amended plan of reorganization.

The Amended GSA addresses commitments by Delphi and GM regarding other U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases. In 2008, Delphi recorded a net reorganization gain of $5.3 billion in connection with the

effectiveness of the Amended GSA. In addition, under the Amended GSA, Delphi received net cash from GM totaling $760 million in 2008, principally related to reimbursement of hourly OPEB benefit payments since January 1, 2007 and amounts paid by Delphi under special attrition programs.

The following table provides each component of the net reorganization gain recorded for the elements of the Amended GSA that were implemented during 2008 and which are described in more detail below. The table also reflects the net cash received in 2008 attributable to each of the elements of the Amended GSA:

| | Reorganization Gain (Loss) Upon Effectiveness | Cash Received From GM Upon Effectiveness | Pre-Tax Earnings Benefit From GM Post Effectiveness | Cash Received From GM Post Effectiveness |
|---|---|---|---|---|
| | | (in millions) | | |
| **Hourly Pension Plan Settlement:** | | | | |
| Hourly Plan First Pension Transfer to GM...................... | $    2,083 | $    — | $    — | $    — |
| Recognition of Hourly Plan related OCI amounts............ | (494) | — | — | — |
| **Hourly OPEB Settlement:** | | | | |
| GM assumption of OPEB obligation ............................... | 6,821 | — | — | — |
| Recognition of OPEB related OCI amounts.................... | 266 | — | — | — |
| **Allowed Claims and Other:** | | | | |
| Allowed GM administrative claim................................... | (1,628) | — | — | — |
| Allowed GM general unsecured claim............................. | (2,500) | — | — | — |
| Allowed IUE-CWA and USW claims.............................. | (129) | — | — | — |
| OPEB reimbursement from GM ...................................... | 353 | 350 | 60 | 51 |
| Special attrition programs (Note 16).............................. | 491 | 230 | — | 68 |
| Other, net ........................................................................ | 69 | 61 | — | — |
| Total, net ........................................................................ | $    5,332 | $    641 | $    60 | $    119 |

*Hourly Pension Plan Settlement – First Pension Transfer to GM* - On September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan pursuant to section 414(l) of the Internal Revenue Code (the "414(l) Net Liability Transfer"). Pursuant to the Amended GSA, the 414(l) Net Liability Transfer is to occur in two separate steps and is sufficient to avoid an Hourly Plan accumulated funding deficiency for the plan year ended September 30, 2008. The first step occurred on September 29, 2008 and Delphi transferred liabilities of approximately $2.6 billion and assets of approximately $486 million from the Hourly Plan to the GM Hourly-Rate Employees Pension Plan, representing 30% and 10% of the projected benefit obligation and plan assets, respectively, as of September 29, 2008 (the "First Pension Transfer"). The $486 million transferred represented 90% of the initially estimated $540 million of assets to be transferred under the First Pension Transfer. The remaining assets will be transferred by March 29, 2009 upon finalization of the related valuations. The transfer was accounted for as a settlement under Statement of Financial Accounting Standards No. 88, *Employer's Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefit* ("SFAS 88"), and the obligations of the Hourly Plan were remeasured prior to the transfer occurring. Refer to Note 17. Pension and Other Postretirement Benefits for further information. Delphi recognized $494 million of previously unrecognized actuarial losses recorded in other comprehensive income ("OCI"), which represents the pro rata portion of the projected benefit obligation transferred to GM relative to the total projected benefit obligation of the Hourly Plan.

*Hourly Pension Plan Settlement – Second Pension Transfer to GM* - The second step of the 414(l) Net Liability Transfer (the "Second Pension Transfer"), will occur upon the effectiveness of an amended plan of reorganization that (i) provides for the treatment of GM's claims and releases as set forth in the Amended GSA, including the delivery of preferred stock to satisfy GM's allowed administrative claim as described below, and (ii) contains interpretive provisions required by the Amended GSA regarding conflicts between such a plan and the Amended GSA. Due to the effectiveness of the Second Pension Transfer being contingent upon Delphi's emergence from chapter 11, it does not meet the criteria for settlement accounting as of December 31, 2008. Delphi will continue to account for the remaining pension liability under Statement of Financial Accounting Standards No. 87, *Employer's Accounting for Pensions,* until such time that it is settled, which is currently anticipated to be upon emergence from chapter 11.

*Hourly Plan Freeze and Triggering of Benefit Guarantees* – As provided for under certain union settlement agreements and implementation agreements, Delphi froze its Hourly Plan for future benefit accruals as of November 30, 2008. In addition, as a result of the triggering of the benefit guarantees, certain eligible hourly employees will receive up to seven years of credited service under the pension and OPEB plans sponsored by GM.

*Hourly OPEB Settlement and OPEB Reimbursement from GM* – On September 23, 2008, Delphi received approval from the Court and on September 26, 2008 received the consent of its labor unions to cease providing traditional U.S. hourly OPEB. In addition, upon effectiveness of the Amended GSA, GM assumed financial responsibility for all Delphi traditional hourly OPEB liabilities from and after January 1, 2007. GM assumed approximately $6.8 billion of postretirement benefit liabilities for certain of the Company's active and retired hourly employees, which was included in the reorganization gain. The assumption of the traditional hourly OPEB liability by GM

and GM's agreement to reimburse postretirement benefit expenses through the transfer date constitute a settlement under Statement of Financial Accounting Standards No. 106, *Employer's Accounting for Postretirement Benefits Other Than Pensions*. Delphi recognized $266 million of previously unrecognized actuarial gains recorded in OCI in connection with the settlement. Additionally, on September 30, 2008, GM reimbursed Delphi approximately $350 million for previous OPEB payments made to the hourly workforce from and after January 1, 2007. During the fourth quarter of 2008, GM funded an additional $51 million of OPEB payments made to the hourly workforce and an additional $9 million is recorded as a receivable from GM as of December 31, 2008. Refer to Note 17. Pensions and Other Postretirement Benefits for further information.

*Allowed GM Administrative and General Unsecured Claims* - In connection with the 414(l) Net Liability Transfer, GM will receive an allowed administrative claim in the amount of up to $2.1 billion, to be provided in two steps. Upon completion of the First Pension Transfer on September 29, 2008, GM received a claim equivalent to 77.5% of the net unfunded liabilities transferred, or $1.6 billion. Upon completion of the Second Pension Transfer, which will occur upon the effectiveness of an amended plan of reorganization that satisfies the requirements of the Amended GSA, GM will receive the balance of the $2.1 billion claim. Of the $2.1 billion administrative claim, $1.6 billion was recognized and included in the reorganization gain in 2008 and $427 million will be granted and recognized by Delphi when the remaining assets and liabilities allocable to certain participants of the Hourly Plan included in the 414(l) Net Liability Transfer are transferred to the GM Hourly-Rate Employees Pension Plan. The amount of the claim to be granted upon completion of the Second Pension Transfer is not dependent upon the amount of the assets and liabilities at the time of the transfer.

Upon Delphi's emergence from bankruptcy, the plan of reorganization may, subject to certain conditions, satisfy GM's administrative claim through the issuance of non-voting convertible preferred stock, provided that (i) Delphi's exit financing does not exceed $3.0 billion (plus a revolving credit facility), (ii) no equity securities are issued that are senior to or pari passu with GM's preferred stock, (iii) the plan of reorganization provides for the GM releases as described in the Amended GSA, and (iv) the plan of reorganization contains interpretive provisions required by the Amended GSA regarding conflicts between such a plan and the Amended GSA.

Under the terms of the Amended GSA, if all conditions for the receipt by GM of the preferred stock described above are satisfied, holders of general unsubordinated unsecured claims, other than holders of claims arising from Delphi's trust preferred securities, will receive pro rata distributions of common stock in reorganized Delphi to the extent necessary to permit such holders to receive 20% of their allowed general unsubordinated unsecured claims, which distributions are dependent upon an agreed valuation formulation set forth in the Amended GSA, and the distribution of non-voting convertible preferred stock to GM will be reduced by a corresponding amount. In the event that total enterprise value set forth in the plan of reorganization or disclosure statement (as subsequently modified hereafter) exceeds $7.13 billion, Delphi and GM have agreed to work in good faith with the official committee of unsecured creditors to establish a reasonable allocation of the value in excess of $7.13 billion in light of the actual economic value of a reorganized Delphi.

Under the terms of the Amended GSA, if any of the conditions to GM's acceptance of preferred stock in satisfaction of its administrative claim is not satisfied or waived by GM, holders of general unsubordinated unsecured claims, other than holders of claims arising from Delphi's trust preferred securities, will receive 50% of all distributions that would otherwise be made to GM on account of its $2.1 billion administrative claim up to the amount necessary for such holders to receive an aggregate distribution of up to $300 million, exclusive of any value received as a result of such holders participation in any rights offering.

With respect to GM's claims in the Company's chapter 11 cases, GM has agreed to a general unsecured claim of $2.5 billion, primarily for OPEB and special attrition programs for the U.S. hourly workforce, and to subordinate its recovery on such claim until other general unsecured creditors have achieved a recovery of 20% of the allowed amount of their claims (other than holders of claims arising from Delphi's trust preferred securities). If Delphi's other general unsecured creditors have received a distribution of 20% of the allowed amount of their claims, if there is any remaining value to be distributed, GM would receive a distribution on its general unsecured claim until it has received a 20% distribution on such claim amount. Once GM has received a 20% distribution on its general unsecured claim, and if there is any remaining value to be distributed, any additional distributions would be shared ratably between GM and Delphi's other general unsecured creditors.

On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court, which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization. Delphi continues to be engaged in comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the revised plan will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. Accordingly, we believe it is likely that (i) we will

not be able to satisfy all the conditions for the receipt by GM of the preferred stock or that the economic value of reorganized Delphi will exceed $7.13 billion, (ii) that 50% of GM's administrative claim will be subordinated to the claims of general unsecured creditors as described above and (iii) that GM will receive the full allowed amount of its general unsecured claim. As part of the April 2 milestone for Delphi's filing of modifications to its previously confirmed plan of reorganization, as contemplated by the Supplemental Amendment, Delphi and GM are discussing potential modifications to the Amended MRA, including pulling forward elements of GM's previously agreed support for Delphi, such as the production cash burn breakeven and labor subsidy payments referred to below, into one payment at emergence in combination with the transfer to GM of certain of Delphi's U.S. manufacturing sites dedicated principally to supplying product to GM.

GM and certain related parties and Delphi and certain related parties have exchanged broad, global releases, effective as of the effective date of the Amended GSA (which releases do not apply to certain surviving claims as set forth in the Amended GSA). In addition to providing a release to GM, the Company agreed to withdraw with prejudice the sealed complaint (the "GM Complaint") filed against GM in the Court on October 5, 2007.

*Allowed IUE-CWA and USW Claims* – General unsecured claims in the amounts of $126 million and $3 million were granted to the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 87L (the "USW"), respectively, under the respective labor settlement agreements.

*Special Attrition Programs* – The reorganization gain included $491 million of reimbursement related to the 2006 and 2007 special attrition programs because these programs were directly related to the chapter 11 cases. On September 30, 2008, GM reimbursed Delphi $230 million related to the funding of various 2007 U.S. hourly workforce special attrition programs, consistent with the provisions of the U.S. labor union settlement agreements. Additionally, previously recognized GM general unsecured claims of $333 million primarily related to the 2006 U.S. hourly workforce attrition programs previously reimbursed by GM have been forgiven and subsumed in the overall $2.5 billion allowed general unsecured claim granted to GM, as discussed above. During the fourth quarter of 2008, GM reimbursed Delphi $68 million related to the funding of the UAW buydown arrangements under the 2007 U.S. hourly workforce special attrition programs. Refer to Note 16. U.S. Employee Workforce Transition Programs for more information.

*Other, Net* – Other, net of $69 million includes a $51 million reimbursement from GM related to the U.S. labor settlement agreement with the IUE-CWA, dated August 5, 2007, of which $25 million is reimbursement of costs and expenses incurred by Delphi in connection with the execution and performance of the IUE-CWA labor agreement and $26 million is reimbursement to Delphi for a portion of the allowed claim under the IUE-CWA labor agreement.

**Master Restructuring Agreement** - The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship since filing for chapter 11 and following Delphi's emergence from chapter 11. The Amended MRA addresses the scope of GM's existing and future business awards to Delphi and related pricing and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing U.S. hourly workforce labor costs, the disposition of certain Delphi facilities, and the treatment of existing commercial agreements between Delphi and GM. The obligations under the Amended MRA generally are not conditioned on the effectiveness of a modified plan of reorganization. Upon effectiveness of the Amended MRA in 2008, Delphi received net cash from GM totaling $559 million and recognized related pre-tax earnings of $355 million, of which $254 million was recorded in GM settlement in operating expenses and $101 million was recorded in discontinued operations. GM's obligations under the Amended MRA are not subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") employees would survive any such termination). As part of the April 2 milestone for Delphi's filing of modifications to its previously confirmed plan of reorganization, as contemplated by the Supplemental Amendment, Delphi and GM are discussing potential modifications to the Amended MRA, including pulling forward elements of GM's previously agreed support for Delphi, such as the production cash burn breakeven and labor subsidy payments referred to below, into one payment at emergence in combination with the transfer to GM of certain of Delphi's U.S. manufacturing sites dedicated principally to supplying product to GM.

The following table shows each component of the pre-tax earnings recorded upon effectiveness of the Amended MRA in 2008 and the cash received in 2008:

| | GM Settlement Gain In Pre-Tax Earnings Upon Effectiveness | Cash Received From GM Upon Effectiveness | Pre-Tax Earnings Benefit Post Effectiveness | Cash Received From GM Post Effectiveness |
|---|---|---|---|---|
| | | (in millions) | | |
| Reimbursement of hourly labor costs | $    272 | $    273 | $    25 | $    2 |
| Production cash burn breakeven reimbursement | 81 | 74 | 70 | 28 |
| Working capital backstop – Steering Business | — | 210 | — | — |
| Other | 2 | 2 | — | — |
| Total, net | $    355 | $    559 | $    95 | $    30 |
| Continuing operations | $    254 | | $    75 | |
| Discontinued operations | $    101 | | $    20 | |

*Existing and Future Business Awards and Related Matters* – The Amended MRA (1) addresses the scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including (2) GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards; (2) eliminates the requirement to implement price-downs with respect to certain businesses since Delphi filed for chapter 11 and restricts GM's ability to re-source products manufactured at core U.S. operations through at least December 31, 2011 and Mexican operations through December 31, 2010; (3) contains a commitment by GM to provide Delphi with an annual Keep Site Facilitation Fee of $110 million in 2009 and 2010 which is not contingent on Delphi's emergence from chapter 11, payable in quarterly installments during these periods, which, consistent with Delphi's policy, will be recognized in earnings over future production periods; and (4) contains commitments by GM concerning the sale of certain of Delphi's non-core businesses and additional commitments by GM if certain of Delphi's businesses and facilities are not sold or wound down by specified future dates.

*Reimbursement of Hourly Labor Costs* – GM has agreed to reimburse the Company for hourly workforce labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and OPEB contributions provided under the supplemental wage agreement, at specified UAW manufacturing facilities retained by Delphi. On September 30, 2008, Delphi received payment from GM of $273 million for retroactive labor costs from October 1, 2006 through September 30, 2008. Of the total received, $239 million was included in GM settlement as a reduction of operating expenses and $33 million was included in discontinued operations as it related to the Steering Business and the Interiors and Closures Business. The economic substance of this provision of the Amended MRA is to lower Delphi's labor costs at specified UAW-represented manufacturing facilities to $26 per hour, excluding certain costs, in order to maintain competitive operations in the U.S. Consistent with the economic substance of this provision, Delphi recorded the labor subsidy amounts received as a reduction of cost of sales. Future labor subsidy amounts will be recognized in the period receivable from GM, and will be treated as a reduction to cost of sales or discontinued operations, as appropriate. During the fourth quarter of 2008, Delphi refunded $5 million of the payment to GM based on agreed upon revisions to the estimates paid for retroactive labor costs and received an additional $7 million reimbursement of labor costs from GM and an additional $22 million is recorded as a receivable from GM as of December 31, 2008, for a total reduction to cost of sales of $25 million in the fourth quarter of 2008.

*Production Cash Burn Breakeven Reimbursement* – Delphi has agreed to continue manufacturing at certain non-core sites to meet GM's production requirements and GM is providing operating cash flow breakeven support, or production cash burn breakeven ("PCBB") from January 1, 2008 through site-specified time periods to compensate Delphi for keeping these sites in production. Additionally, GM has agreed to reimburse capital spending in excess of $500,000 at the PCBB sites from January 1, 2008 through site-specified time periods. GM reimbursed Delphi $74 million on September 30, 2008 for the retroactive portion of the PCBB payments through August 2008. Upon effectiveness of the Amended MRA, Delphi recognized $81 million for the retroactive portion of the PCBB amounts received or receivable through September 2008, of which $15 million was included in GM settlement as a reduction of operating expenses and $66 million was included in discontinued operations. Future PCBB reimbursement, including capital spending, received from GM will be recognized contemporaneously as incurred, and will be treated as a reduction to cost of sales, fixed assets or discontinued operations, as appropriate. During the fourth quarter of 2008, Delphi received $28 million PCBB reimbursement from GM and an additional $42 million is recorded as a receivable as of December 31, 2008, of which $50 million was recorded as a reduction to cost of sales and $20 million was recorded in discontinued operations.

*Working Capital Backstop – Steering Business* – GM agreed to provide payments to Delphi for the Steering Business if the sales value is less than defined estimated working capital amounts of the businesses. In addition, GM agreed to provide payments to Delphi related to the Steering Business if it is not sold prior to the effectiveness of the MRA. GM provided a $210 million advance on working capital recovery to Delphi related to the Steering Business on September 30, 2008. This payment is recorded as a deferred liability as of December 31, 2008. GM also agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010. In the event of a sale to a third party, Delphi will reimburse GM for the amount of the advance, and GM will pay Delphi an amount equal to the lesser of (a) $210 million and (b) two thirds of the amount, if any, by which the net working capital associated with the business exceeds the sales proceeds. In the event the Steering Business is not sold to a third party and is purchased

19

by GM, the $210 million advance will be retained by Delphi to the extent it meets the working capital criteria as defined in the Amended MRA at the time of the transfer. However, on March 3, 2009, Delphi and GM reached an agreement subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM will exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM to purchase the Steering Business.  The Steering Business is reported as discontinued operations, refer to Note 25. Subsequent Events for further information.

*Reimbursement of Hourly Workers' Compensation and Other Benefits* – GM will reimburse Delphi for all current and future workers compensation, disability, supplemental unemployment benefits, and severance obligations paid by Delphi after January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive, and retired employees.  Consistent with the substance of the provision, Delphi will recognize future anticipated reimbursements from GM contemporaneously with Delphi's incurrence of related cash payments in future periods.  There is no financial impact related to this matter in 2008.

*Accelerated GM North American Payment Terms* - The Amended MRA accelerates GM's North American payment terms through 2011 upon (a) the effectiveness of an agreement giving GM certain access rights to four of the Company's U.S plants in the event that the reorganized Company experiences extreme financial distress that would prevent Delphi from delivering parts at some point in the future and (b) the consummation of a modified chapter 11 plan of reorganization pursuant to which Delphi emerges with substantially all of its core businesses.  There is no financial impact for this matter in 2008.  The accelerated payments are expected to result in an increase in cash and a reduction in accounts receivable and will have no impact on the statement of operations.

***Pensions*** - Devise a workable solution to the current pension funding situation, whether by deferring contributions to the pension trusts or otherwise.

Since entering chapter 11, Delphi has limited its contributions to the Hourly Plan, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan (together, the "Pension Plans") to amounts necessary to fund benefits accrued on account of postpetition service.

Pursuant to the pertinent terms of certain pension funding waivers secured from the Internal Revenue Service ("IRS") in 2006 and 2007, Delphi provided to the Pension Benefit Guaranty Corporation ("PBGC") letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan.  Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008.  The cash proceeds from the letters of credit were deposited into the Hourly and Salaried Plans and initially recognized as Delphi funding contributions to the respective plans for the plan year ended September 30, 2008.  However, on January 16, 2009, Delphi filed amended Forms 5500 (Annual Return Report of Employee Benefit Plan) with the IRS that applied all contributions made to the Hourly and Salaried Plans in 2008, including the proceeds from the letters of credit, back to the plan year ended September 30, 2007.  This contribution carry back, together with the 414(l) Net Liability Transfer discussed below, had the effect that no contributions were due under the Hourly Plan for the plan year ended September 30, 2008.  Approximately $56 million remains due as a minimum funding contribution under the Salaried Plan for the plan year ended September 30, 2008, and approximately $13 million remains due as minimum funding contribution under the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan.  As permitted under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), Delphi elected to defer the contribution necessary to satisfy this remaining obligation until no later than the due date for minimum contributions, which is  June 15, 2009 for the Salaried Plan and September 15, 2009 for the subsidiary plans.  On December 15, 2008, Delphi applied to the IRS for a waiver of the obligation to make the minimum funding contribution to the Salaried Plan by June 15, 2009, and permission to instead pay the amount due in installments over the next five years.  That application remains pending.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the Labor section, Delphi froze the Salaried Plan, the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program and the PHI Non-Bargaining Retirement Plan effective as of September 30, 2008. Delphi reached agreement with its labor unions which allowed Delphi to freeze the accrual of traditional benefits under the Hourly Plan effective as of November 30, 2008.  Certain collectively bargained hourly employees remain covered by the Hourly Plan's Individual Retirement Plan formula (a cash balance benefit providing an annual pay credit accrual of 5.4% of base wages).  Refer to Note 17. Pension and Other Postretirement Benefits to the consolidated financial statements for more information.

As discussed above in the GM section, on September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan.  The 414(l) Net Liability Transfer is to occur in two separate steps.  The First Pension Transfer occurred on September 29, 2008.  The Second Pension Transfer will transfer substantially all of the remaining assets and liabilities of the Hourly Plan upon Delphi's emergence from chapter 11 if the terms of the Amended GSA are met.

As reflected above, Delphi has not made certain minimum required contributions to the Pension Plans and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million and $226 million for plan years ended September 30, 2006 and September 30, 2007, respectively. If these asserted assessments are not paid, the IRS could increase the assessments that relate to the Salaried Plan to 100% of any Salaried Plan contributions considered by the IRS to be due and unpaid. However, because the 414(l) Net Liability Transfer to the GM hourly plan avoided an accumulated funding deficiency in the Delphi Hourly Plan for the plan year ended September 30, 2008, exposure to the 100% excise tax related to the Delphi Hourly Plan has been eliminated. Assuming Delphi is assessed excise taxes for all plan years through 2007, the total exposure to date could approximate $383 million, plus interest and penalties which could be substantial. In addition, if the IRS does not agree to waive the minimum required funding contribution under the Salaried Plan for the plan year ended September 30, 2008, the IRS may assess an additional excise tax of approximately $6 million if Delphi does not remit $56 million to the Salaried Plan by June 15, 2009. Additional excise taxes could be assessed with respect to the subsidiary plans if the minimum required contributions to those plans for the plan year ended December 31, 2008, are not remitted by September 15, 2009. To the extent not promptly paid by Delphi, any such excise tax assessments might be increased to 100% of any Salaried Plan and subsidiary plan contributions considered by the IRS to be due and unpaid.

Although the IRS has asserted certain of the excise tax assessments described above and might seek to assess additional excise taxes, plus interest and penalties, related to the Pension Plans, Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments. Accordingly, management has concluded that an unfavorable outcome is not currently probable and, as of December 31, 2008, no amounts have been recorded for any potential excise tax assessment.

Upon emergence from chapter 11, the Company intends to meet the minimum funding standards under section 412 of the Code applicable to the Pension Plans. If completed, the second step of the 414(l) Net Liability Transfer will allow us to satisfy substantially all of the pension funding obligations to our hourly employees, however that second transfer is conditioned on our emergence from chapter 11 under a modified plan of reorganization that meets the terms of the Amended GSA. If the conditions to the second step of the 414(l) Net Liability Transfer are not satisfied, and the second step does not take place, we do not believe we will be able to fund those U.S. pension obligations. In addition, we still maintain responsibility for and need to meet U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees and certain subsidiary employees. We may be unable to satisfy our U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees or certain subsidiary employees. Due to the impact of the global economic recession, including reduced global automotive production, capital markets volatility that has adversely affected our pension asset return expectations, a declining interest rate environment, or other reasons, our funding requirements have substantially increased since September 30, 2008. Should we be unable to obtain funding from some other source to resolve these pension funding obligations, either Delphi or the Pension Benefit Guaranty Corporation (the "PBGC") may initiate plan terminations. The PBGC would seek termination, if in its view, the risk of loss with respect to the plans may increase unreasonably if the plans are not terminated. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the date of emergence, and the funded status of the Pension Plans at the date of emergence. Refer to Note 17. Pension and Other Postretirement Benefits for further information.

*__Labor__* - Modify our labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements became effective in 2007, and the remaining portions were tied to the effectiveness of the GSA and the MRA, and substantial consummation of the Plan as confirmed by the Court. However, as noted above, Delphi filed amendments to the GSA and the MRA in the Court on September 12, 2008, and subsequently entered into an additional amendment to the GSA as of September 25, 2008. The Court approved such amendments on September 26, 2008. The Amended GSA and the Amended MRA became effective on September 29, 2008.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower future hourly wages. Refer to Note 16. U.S. Employee Workforce Transition Programs for more information.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by

entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

*Portfolio* - Streamline our product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with our new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, wheel bearings and power products. In connection with the Company's continuous evaluation of its product portfolio, in 2008, Delphi determined that the global exhaust business no longer fit within the Company's future product portfolio. With the exception of the catalyst and global exhaust product lines, included in the Powertrain Systems segment, and the steering and halfshaft product lines and interiors and closures product lines included in discontinued operations, these non-core product lines are included in the Company's Automotive Holdings Group segment, refer to Note 22. Segment Reporting.

Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, unions and other stakeholders to carefully manage the transition of affected product lines and manufacturing sites. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

During 2008, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and the global exhaust business and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, the global bearings business, the U.S. suspensions business and the power products business. Refer to Note 5. Discontinued Operations and Note 6. Acquisitions and Divestitures for more information.

Costs recorded during 2008 and 2007 related to the transformation plan for non-core product lines include impairments of long-lived assets, employee termination benefits and other exit costs and U.S. employee workforce transition program charges and are further described in Note 5. Discontinued Operations, Note 9. Property, Net, Note 7. Employee Termination Benefits and Other Exit Costs and Note 16. U.S. Employee Workforce Transition Programs.

*Cost Structure* - Transform our salaried workforce and reduce general and administrative expenses to ensure that the organizational and cost structure is competitive and aligned with our product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with business needs. However, additional investment is required to fully implement these initiatives and Delphi does not expect to fully realize substantial savings until 2009 and beyond. Additionally, due to the continuing challenging economic environment, further restructuring initiatives may need to be implemented. However, to improve short-term cash flow until the consummation of a confirmed plan of reorganization, certain restructuring initiatives are being delayed until the second half of 2009. In addition, Delphi continues to implement a number of cash conservation measures, including the suspension of 2009 pay increases and annual incentive payments in the U.S. for eligible executives and non-executive salaried employees, the intended cessation of health care and life insurance benefits in retirement to salaried employees and retirees, a decrease in salaried severance payments and the elimination of salaried flex payments in 2009. Delphi continues to reduce other structural costs to further align itself with the current and projected volume outlook.

**Equity Purchase and Commitment Agreement**

Under the terms and subject to the conditions of the EPCA between Delphi and the Investors, dated as of August 3, 2007, as amended, the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, as described below, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in May 2009.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares. However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of expense related to these fees and other expenses during 2008.

### The Plan of Reorganization

As noted above, due to the Investors failure to fund their commitments under the EPCA, Delphi has not yet consummated the Plan. Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) was extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan. On July 23, 2008, Delphi's Creditors' Committee and WTC, as Indenture Trustee and a member of the UCC, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against an affiliate of lead investor, Appaloosa, and the other Investors. Notwithstanding the foregoing, pursuant to an order entered by the Court on October 27, 2008, the Debtors' exclusive period for filing a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee is extended through and including March 31, 2009 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee is extended through and including May 31, 2009.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both statutory committees, to develop modifications to the Plan that would allow Delphi to emerge from chapter 11. On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.

Delphi continues to be engaged in comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the modified plan will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. These factors also continue to delay Delphi's emergence from chapter 11 and its ability to refinance its Amended and Restated DIP Credit Facility. To address the likelihood of continued low U.S. automotive production volumes, Delphi continues to implement a number of cash conservation measures, including temporary lay-offs and salaried benefit cuts for both active employees and retirees, delay of capital and other expenditures, permanent salaried work-force reductions and other cost saving measures to ensure adequate liquidity for operations until volumes recover or until the Company is able to complete further restructuring efforts in response to changes in vehicle markets. The combination of these actions, together with the above noted Amendment and Supplemental Amendment to the Accommodation Agreement, and GM's commitment to increase amounts available under the GM Advance Agreement, assuming all required governmental approvals are received, all other conditions with respect to such commitment are satisfied prior to March 25, 2009, and Delphi is able to meet certain specified milestones in its reorganization cases, is expected to provide the Company with sufficient short-term U.S. liquidity to support its working capital requirements and operations into May 2009. In addition, the Amendment and Supplemental Amendment to the Accommodation Agreement will allow Delphi to access additional liquidity through the periodic release of amounts currently in a cash collateral basket of up to $117 million, provided (i) that all of the above conditions necessary to increase amounts available under the GM Advance Agreement to $450 million are satisfied, (ii) Delphi remains in compliance with all mandatory prepayment provisions and other covenants in the Accommodation Agreement, including the borrowing base calculation after giving effect to such release, and (iii) Delphi has achieved the remaining specified milestones in its reorganization cases, including the filing of a plan of reorganization or modifications to the Plan meeting the conditions specified in the Accommodation Agreement by April 2. However liquidity remains constrained and Delphi must continue implementing and executing its cash savings initiatives to preserve liquidity in this very difficult economic environment. Delphi continues to be engaged in comprehensive discussions with GM related to GM's role in a revised plan of reorganization, including potential modifications the Amended MRA as part of the April 2 milestone for Delphi's filing of modifications to its previously confirmed plan of reorganization, as contemplated by the Supplemental Amendment. Delphi and GM are discussing pulling forward elements of GM's previously agreed support for Delphi into one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites to GM. Refer to "Elements of Transformation Plan" above.

Delphi will not emerge from bankruptcy as a going concern unless and until Delphi is able to obtain approval of necessary modifications to the Plan that recognize the existing market conditions. Moreover, the continued forbearance by Delphi's lenders under the DIP financing and the effectiveness of any revised plan of reorganization is subject to a number of conditions, including the entry of certain orders by the Court and the obtaining of necessary emergence capital. There can be no assurances that such emergence capital will be obtained (or, if obtained, the terms thereof) or such other conditions will be satisfied. For a discussion of certain risks and uncertainties related to the Debtors' chapter 11 cases and reorganization objectives refer to Item 1A. Risk Factors in this Annual Report on Form 10-K. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder its ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers. Accordingly, no assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. If certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by a company's equity security holders and notwithstanding the fact that such equity security holders do not receive or retain any property on account of their equity interests under the plan. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in its common stock or other equity securities, or any claims relating to prepetition liabilities.

The Amended GSA and the Amended MRA became effective during the third quarter of 2008. For costs and benefits and timing of recognition related to these agreements, refer to the detailed discussion under GM above. The cost related to the remaining components of the transformation plan will be recognized in the Company's consolidated financial statements as each other element of the Plan (as modified), including the remaining portions of the U.S. labor agreements, or as the terms of any future confirmed plan of reorganization, become effective. The confirmation and consummation of a plan of reorganization and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

### DASE Liquidation

Delphi's Chapter 11 Filings related solely to its U.S. operations. Nevertheless, Delphi has been seeking and will continue to seek to optimize its global manufacturing footprint to lower its overall cost structure by focusing on strategic product lines where it has significant

competitive and technological advantages and selling or winding down non-core product lines.  In particular, in February 2007, Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain.  The closure of this facility is consistent with Delphi's transformation plan previously announced in March 2006.  The facility, which had approximately 1,600 employees, was the primary holding of DASE.

On March 20, 2007, DASE filed a petition for Concurso, or bankruptcy under Spanish law, exclusively for that legal entity, and in an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso.  As a result of the Spanish court declaring DASE to be in Concurso and the subsequent appointment of three DASE receivers by the Spanish court, Delphi no longer possesses effective control over DASE and has de-consolidated the financial results of DASE effective April 2007.  The total expense in 2007 associated with the exit of the Puerto Real site in Cadiz, Spain is approximately $268 million ($107 million in discontinued operations and $161 million in the Automotive Holdings segment).

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business to be separately disclosed.  Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions.  Delphi's reorganization items consist of the following:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| | (in millions) | | |
| GM Amended GSA settlement (Note 2)..................................... | $ 5,332 | $ — | $ — |
| Professional fees directly related to reorganization ..................... | (107) | (169) | (150) |
| Interest income........................................................................... | 7 | 11 | 55 |
| Write off of previously capitalized fees and expenses related to the EPCA | (79) | — | — |
| Gain (loss) on settlement of prepetition liabilities ...................... | (1) | 2 | 3 |
| Other............................................................................................ | (5) | (7) | — |
| Total Reorganization Items.................................................. | $ 5,147 | $ (163) | $ (92) |

Delphi recorded a net reorganization gain of $5.3 billion in 2008 and received $641 million on September 30, 2008 as a result of the effectiveness of the Amended GSA, as described in Note 2. Transformation Plan and Chapter 11 Bankruptcy.  In 2008, 2007 and 2006, reorganization items resulted in approximately $6 million, $11 million and $60 million, respectively, of cash received related to interest income.  Cash paid for professional fees was approximately $110 million, $153 million and $122 million during 2008, 2007 and 2006, respectively.  Professional fees for 2008 also includes arrangement and other fees paid to various lenders in conjunction with the bankruptcy exit financing that was commenced but not completed in April 2008.

## 4. WEIGHTED AVERAGE SHARES AND DIVIDENDS

Basic and diluted income (loss) per share amounts were computed using weighted average shares outstanding for each respective period.  As a result of the market price of shares as compared to the price associated with outstanding options in 2008 and the losses incurred in 2007 and 2006, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

| | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
| | (in thousands) | | |
| Weighted average basic and diluted shares outstanding ................................................ | 564,361 | 561,884 | 561,782 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

| | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
| | (in thousands) | | |
| Anti-dilutive securities ............................... | 58,953 | 74,310 | 83,904 |

On September 8, 2005, the Board of Directors announced the elimination of Delphi's quarterly dividend on Delphi common stock.  In addition, the Company's DIP financing agreement includes a negative covenant prohibiting the payment of dividends by the Company. The Company does not expect to pay dividends prior to emergence or in the foreseeable future.

## 5. DISCONTINUED OPERATIONS

The Court approval of Delphi's plan to dispose of Interiors and Closures and the Steering Business triggered held for sale accounting in 2007.

### Steering and Halfshaft Business

In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Pursuant to the terms of the Purchase Agreement, any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement since the transaction did not close by August 31, 2008. Prior to entry into the agreements described below in March 2009, neither party had terminated the Purchase Agreement. Pursuant to the Amended MRA, GM has agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010. On March 3, 2009, however, Delphi and Platinum reached an agreement under which the Purchase Agreement would be terminated (the "Termination Agreement") and Delphi and GM reached an agreement (the "Option Exercise Agreement"), subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM will exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM to purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances (the "Steering Purchase"), which is described more fully in Note 25. Subsequent Events. GM has agreed to guaranty the payment and performance of its wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.

On September 30, 2008, in conjunction with the effectiveness of the Amended MRA, Delphi received and recorded as a deferred liability a $210 million advance on working capital recovery from GM related to the Steering Business. In conjunction with the proceeds of this working capital advance from GM, as well as entering into the Termination Agreement and the Option Exercise Agreement for the Steering Purchase, Delphi has adjusted its estimate of assets held for sale to $210 million and continues to account for the business as a discontinued operation. During 2008, Delphi recorded a loss of $34 million, net of tax, due to the results of operations, adjustment of assets held for sale to fair value of the Steering Business as of December 31, 2008 and the effectiveness of the Amended MRA. In 2007, Delphi recognized a charge of $507 million related to the assets held for sale of the Steering Business, including $26 million of curtailment loss on pension benefits for impacted employees.

Prior to the assets of the Steering Business being classified as held for sale, Delphi recorded an impairment charge related to the Steering Business in 2007. Based on the ongoing sale and labor negotiations during March 2007, previous estimates of sale proceeds were reduced. Based on this development Delphi determined that an indicator of impairment was present for the U.S. long-lived assets of the Steering Business. Delphi tested the recoverability of the Steering Business U.S. long-lived assets by comparing the estimated undiscounted future cash flows from its use and anticipated disposition of those assets to their carrying value. Based on its recoverability assessment, Delphi determined that the carrying value of its Steering Business assets at its U.S. sites exceeded the undiscounted estimated future cash flows at those sites. Accordingly, Delphi determined the fair value of its held-for-use long-lived assets at those sites by applying various valuation techniques, including discounted cash flow analysis, replacement cost and orderly liquidation value. As a result of its fair value assessment, Delphi recognized asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering Business of $152 million in 2007.

### Interiors and Closures Business

Delphi and certain of its affiliates closed on the sale of the Interiors and Closures Business to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, on February 29, 2008. Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value. During the third quarter of 2008, Delphi and Inteva agreed on final working capital adjustments and Delphi received a payment of $2 million. During 2008, as a result of the operating results net of the loss on sale of the Interiors and Closures Business, Delphi recorded income of $15 million, net of tax. In 2007, Delphi recognized a charge of $88 million related to the assets held for sale of the Interiors and Closures Business, including $8 million of curtailment loss on pension benefits for impacted employees.

### Results of Discontinued Operations

The Interiors and Closures Business, through the date of the sale, and the Steering Business are reported as discontinued operations in the consolidated statement of operations and statement of cash flows for 2008, 2007 and 2006. The assets and liabilities of the Steering Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of December 31, 2008 and 2007. The assets and liabilities of the Interiors and Closures Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of December 31, 2007. The results of prior periods have been restated to reflect this presentation.

The results of the discontinued operations are summarized as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (in millions) | | |
| Sales: | | | |
| Steering Business | $ 2,082 | $ 2,602 | $ 2,462 |
| Interiors and Closures Business | 241 | 1,275 | 1,193 |
| Total sales | $ 2,323 | $ 3,877 | $ 3,655 |
| | | | |
| Loss before income taxes (including minority interest and equity income, net of tax) | $ (8) | $ (749) | $ (320) |
| Provision for income taxes | (11) | (8) | (6) |
| Loss from discontinued operations | $ (19) | $ (757) | $ (326) |
| *Steering Business* | *(34)* | *(677)* | *(281)* |
| *Interiors and Closures Business* | *15* | *(80)* | *(45)* |

Assets and liabilities of the discontinued operations are summarized as follows:

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (in millions) | |
| Current Assets: | | |
| Cash | $ 20 | $ 49 |
| Accounts receivable | 299 | 411 |
| Inventory | 152 | 188 |
| Other current assets | 24 | 8 |
| Long-term assets: | | |
| Property, net | — | 48 |
| Other long-term assets | 2 | 16 |
| Assets held for sale | $ 497 | $ 720 |
| *Steering Business* | *497* | *594* |
| *Interiors and Closures Business* | *—* | *126* |
| | | |
| Current Liabilities: | | |
| Short-term debt | $ 30 | $ 49 |
| Accounts payable | 174 | 271 |
| Accrued liabilities | 68 | 53 |
| Other long-term liabilities | 21 | 14 |
| Minority interest | 20 | 25 |
| Liabilities held for sale | $ 313 | $ 412 |
| *Steering Business* | *313* | *392* |
| *Interiors and Closures Business* | *—* | *20* |

Operating cash flows for discontinued operations are summarized as follows:

| | **Year Ended December 31,** | | |
| | **2008** | **2007** | **2006** |
| | | **(in millions)** | |
| Charge related to assets held for sale | $ 33 | $ 561 | $ — |
| Long-lived asset impairment charges | — | 193 | 43 |
| Pension and other postretirement benefit expenses | 23 | 75 | 94 |
| Pension curtailment | — | 34 | — |
| U.S. employee workforce transition program charges | 4 | 32 | 249 |
| GM Amended MRA settlement (Note 2) | (101) | — | — |
| Changes in net operating assets | 156 | 128 | 94 |
| Total | $ 115 | $ 1,023 | $ 480 |
| *Steering Business* | *85* | *899* | *372* |
| *Interiors and Closures Business* | *30* | *124* | *108* |

## 6. ACQUISITIONS AND DIVESTITURES

The results of operations, including the gain or loss on divestitures, associated with Delphi's acquisitions and divestitures described below were not significant to the consolidated financial statements in any period presented, and the divestitures did not meet the discontinued operations criteria.

### Automotive Holdings Group Segment

*Power Products Business Sale* – On May 27, 2008 and in accordance with the terms of an order authorizing the sale of certain assets for less than $10 million, Delphi served notice of its intention to sell its power products business (the "Power Products Business") to Strattec Security Corporation, Witte-Velvert GmbH & Co. KG, Vehicle Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers") for approximately $8 million. On June 4, 2008, the Debtors filed a motion to assume and assign certain prepetition executory contracts related to the Power Products Business to the Strattec Buyers. On June 24, 2008, the Court entered an order authorizing the Debtors to assume and assign such contracts to the Strattec Buyers. The 2007 annual revenues for the Power Products Business were $59 million. Delphi recognized an initial loss of $3 million during the second quarter of 2008, included in cost of sales, related to the assets held for sale of the Power Products Business. On November 7, 2008, Delphi and the Strattec Buyers agreed to an amendment to the purchase and sale agreement, which among other things, reduced the consideration to be received by Delphi to approximately $5 million. The sale occurred on November 30, 2008 and resulted in an additional loss of approximately $2 million, which was recorded to cost of sales. Delphi received final consideration of approximately $7 million which includes final working capital adjustments.

*U.S. Suspensions Asset Sale* – On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets"), to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration. On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline. On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco. The 2007 annual revenues for the Kettering Assets were $113 million. The sale occurred on May 30, 2008 and resulted in a gain of $8 million, which was recorded as a reduction of cost of sales. Additionally, Delphi received proceeds from this sale of approximately $18 million in 2008.

*Bearings Business Product Sale* – On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business"). On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code. On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos"), which was the successful bidder at the auction held on February 19, and 20, 2008. The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008. The 2007 annual revenues for the Bearings Business were $280 million, which included $108 million of intra-segment sales. During 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business. The sale occurred on April 30, 2008, and Delphi received net proceeds from this sale of approximately $15 million.

*Brake Hose Business Sale* – On September 28, 2007, Delphi closed on the sale of substantially all of the assets exclusively used in the brake hose product line produced at one of Delphi's manufacturing sites located in Dayton, Ohio (the "Brake Hose Business"). The sales price for the Brake Hose Business was $10 million and the sale resulted in a gain of $2 million, which was recorded to a reduction to cost of sales in 2007. The Brake Hose Business revenues were $33 million for the nine month period ended September 30, 2007.

***North American Brake Product Asset Sale*** – On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan; Spring Hill, Tennessee; Oshawa, Ontario, Canada; and Saltillo, Mexico facilities. The 2007 annual revenues for North American Brake Components were $568 million. The sale occurred in the first quarter of 2008 and resulted in a gain of $5 million, which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $40 million.

***Mexico Brake Plant Business*** – On July 19, 2007, Delphi received approval from the Court to proceed with the sale of certain assets used in the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business") for $15 million. The sale of the Mexico Brake Plant Business closed on October 1, 2007 and resulted in a gain of $4 million, which was recorded as a reduction to cost of sales in 2007.

### Powertrain Systems Segment

***Global Exhaust Business Sale*** – On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business"). On December 17, 2008 Delphi received approval from the Court for the sale of assets related to the Exhaust Business to Bienes Turgon S.A. de C.V. for $17 million (subject to adjustments). The Exhaust Business revenues for 2008 were approximately $317 million. The sale is expected to close during the first half of 2009 and Delphi recognized a charge of $14 million in cost of sales during the fourth quarter of 2008 related to the assets held for sale of the Exhaust Business. Although Delphi intends to divest its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

***Catalyst Product Line Sale*** – On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore for approximately $67 million which included certain post-closing working capital adjustments. Delphi recorded the loss of $30 million on the sale of the Catalyst Business in cost of sales in the third quarter of 2007. The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million. During 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

***Battery Product Line Sale*** – In 2005, Delphi sold its battery product line, with the exception of two U.S. operations, to Johnson Control, Inc. ("JCI"). In 2006, Delphi sold certain assets related to one of the remaining facilities to JCI, and in 2007, Delphi ceased production at the remaining U.S. battery manufacturing facility, and closed the facility. In 2006, Delphi received approximately $10 million as agreed upon in the 2005 agreement between Delphi and GM, the principal battery customer, which was executed in connection with the sale of Delphi's battery business. In accordance with the 2005 agreement, upon completion of the transition of the supply of battery products to JCI, Delphi received a $6 million payment in 2007, which was recorded as a reduction to cost of sales.

### Electronics and Safety Segment

***Acquisition of Joint Venture*** – In 2008, Delphi made an additional investment in a consolidated South American majority-owned subsidiary for approximately $35 million in cash and short term notes. As a result, the ownership interest is now 100 percent.

***Held-For-Sale Loss*** – In 2008, Delphi made the decision to divest a certain manufacturing business in Germany. Based on an estimate of anticipated proceeds, Delphi recognized a charge of $13 million, included in cost of sales, related to the assets held for sale. The divestiture is expected to occur during 2009.

***MobileAria Asset Sale*** - In 2006, Delphi sold certain of its assets in MobileAria, a consolidated entity, which resulted in a gain of $7 million which has been recognized as a reduction of cost of sales in 2006.

### Thermal Systems Segment

***SDAAC Additional Investment-*** In 2006, Delphi made an additional investment in Shanghai Delphi Automotive Air Conditioning Co. ("SDAAC") for approximately $14 million, which increased its equity ownership interest in SDAAC from 34 percent to 50 percent. SDAAC's annual revenues for 2005 were approximately $133 million. In the third quarter of 2006 Delphi obtained a controlling management interest in SDAAC and began consolidating the entity. Prior to obtaining a controlling management interest, the entity was accounted for using the equity method.

## 7. EMPLOYEE TERMINATION BENEFITS AND OTHER EXIT COSTS

Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company.  Delphi's employee termination benefit and other exit costs are undertaken as necessary to execute management's strategy, streamline operations, take advantage of available capacity and resources, and ultimately achieve net cost reductions.  These activities generally fall in one of two categories:

(1)   Realignment of existing manufacturing capacity and closure of facilities and other exit or disposal activities, as it relates to executing the Company's strategy in the normal course of business.

(2)   Transformation plan activities, which support the Company's overall transformation initiatives announced in 2006, including selling or winding down non-core product lines, transforming its salaried workforce to reduce general and administrative expenses, and modifying labor agreements with its principal unions in the U.S.

The following table summarizes the employee termination benefit and other exit cost charges recorded for the years ended December 31, 2008, 2007 and 2006 by operating segment:

| Segment | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | (in millions) | |
| Electronics and Safety | $ 147 | $ 36 | $ 18 |
| Powertrain Systems | 63 | 55 | 58 |
| Electrical/Electronic Architecture | 78 | 132 | 82 |
| Thermal Systems | 24 | 48 | 73 |
| Automotive Holdings Group | 88 | 239 | 27 |
| Corporate and Other | 14 | 30 | 11 |
| Continuing Operations | 414 | 540 | 269 |
| Discontinued Operations | 58 | 132 | 30 |
| Total | $ 472 | $ 672 | $ 299 |
| *Cost of sales* | *378* | *493* | *253* |
| *Selling, general and administrative expenses* | *36* | *47* | *16* |
| *Discontinued operations* | *58* | *132* | *30* |

The table below summarizes the activity in the employee termination benefits and exit costs liability for the year ended December 31, 2007 and 2008:

| | Employee Termination Benefits Liability | Other Exit Costs Liability | Total |
|---|---|---|---|
| | | (in millions) | |
| Accrual balance at December 31, 2006 | $ 163 | $ 3 | $ 166 |
| Provision for estimated expenses incurred during the period | 506 | 166 | 672 |
| Payments made during the year | (395) | (65) | (460) |
| Other | — | (79) | (79) |
| Accrual balance at December 31, 2007 | $ 274 | $ 25 | $ 299 |
| Provision for estimated expenses incurred during the period | 346 | 126 | 472 |
| Payments made during the year | (415) | (106) | (521) |
| Accrual balance at December 31, 2008 | $ 205 | $ 45 | $ 250 |

Approximately $213 million and $276 million of the employee termination benefits and other exit costs accrual balance as of December 31, 2008 and 2007, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets.  Approximately $13 million and $23 million of the employee termination benefits and other exit costs accrual balance as of December 31, 2008 and 2007, respectively, is included in other long-term liabilities.  Approximately $24 million of the employee termination benefits and other exit costs accrual balance as of December 31, 2008 is included in liabilities held for sale.

Delphi has initiated several programs to streamline operations and lower costs.  The following are details of significant charges during 2008.

- *Realignment of existing manufacturing capacity and closure of facilities.*  As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electronics and Safety and the Automotive Holdings Group segments plan to transfer core products manufactured at a shared location in Portugal to a lower cost market and exit non-core products from that facility in 2009, and recognized employee termination benefits of $51 million during 2008.  Additionally, the Electronics and Safety, Electrical/Electronic Architecture, Thermal Systems and Automotive Holdings Group segments executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $118 million of employee termination benefits and other related exit costs during 2008.  In addition, the Electronics and Safety segment is exiting

production of a non-profitable product line and recorded $22 million of contract termination costs.  European operations in the Electronics and Safety and Electrical/Electronic Architecture segments incurred $12 million of employee termination benefits and other exit costs in conjunction with headcount reductions and programs related to the rationalization of manufacturing and engineering process.  Delphi's Powertrain Systems segment transferred manual operations to lower cost markets in eastern Europe and Asia Pacific during 2008 and incurred employee termination benefits and other exit costs of $10 million.

- *Transformation plan activities.*  As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $50 million related to the closure of a manufacturing facility in Athens, Alabama during 2008, which related to the Steering Business and was recorded in discontinued operations.  As part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees in North America during 2008 for involuntary separation and incurred $160 million in related employee termination benefits included in continuing operations, and incurred $2 million in discontinued operations.

The following are details of significant charges during 2007.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electrical/Electronic Architecture segment transferred manufacturing operations from Germany, Portugal and Spain to lower cost markets in Eastern Europe and Asia Pacific during 2007.  As a result, the Electrical/Electronic Architecture segment significantly reduced the number of employees at these locations, and announced involuntary employee separation packages for approximately $66 million.  Additionally, the Electrical/Electronic Architecture and Thermal Systems segments executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $35 million of employee termination benefits and other related exit costs.

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $268 million related to the closure of a manufacturing facility in Cadiz, Spain, of which $161 million related to the Automotive Holdings Group segment and $107 million, which related to the Steering Business, was recorded in loss from discontinued operations.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.  As a part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees, primarily in North America, during 2007 for involuntary separation, and incurred $63 million in related employee termination benefits in the Electronics and Safety, Powertrain Systems, Electrical/Electronic Architecture, Thermal Systems, and Automotive Holdings Group segments.  Additionally, Delphi is implementing a plan for consolidation and outsourcing of certain administrative functions, including financial services and information technology.  During 2007, Delphi incurred $19 million related to the outsourcing plan in the Corporate and Other segment.  Finally, as part of Delphi's initiative to modify its labor agreements, Delphi signed agreements with the UAW and all of its other principal U.S. labor unions during 2007. The new agreements offered certain eligible Delphi employees severance payments and supplemental unemployment benefits, among other options.  Delphi incurred $56 million of employee termination benefits related to these agreements, primarily in the Powertrain Systems, Electronics and Safety, Thermal Systems and Automotive Holdings Group segments.  Refer to Note 16. U.S. Employee Workforce Transition Programs.

The following are details of significant charges during 2006:

- *Realignment of existing manufacturing capacity and closure of facilities.* During 2006, Delphi's Thermal Systems segment transferred certain operations in France to lower cost markets within Eastern Europe, and incurred related employee termination benefit and other exit costs of approximately $65 million.  Delphi's Powertrain Systems segment transferred operations from France and various other high cost markets within Europe to lower cost markets within Eastern Europe and Asia Pacific, and incurred employee termination benefit and other exit costs of approximately $50 million related to these activities.  Additionally, Delphi's Electrical/Electronic Architecture segment transferred operations from Spain and Germany to lower cost markets in Europe, and also realigned operations within North America.  The Electrical/Electronic Architecture segment incurred approximately $49 million in employee termination benefits and other exit costs in these realignment and exit activities.

- *Transformation plan activities.* Delphi incurred employee termination benefits and other exit costs of $15 million related to involuntary separation of salaried employees, primarily in North America, in its Electronics and Safety, Powertrain Systems, Electrical/Electronic Architecture, and Automotive Holdings Group segments.

## 8. INCOME TAXES

Income (loss) from continuing operations before income taxes, minority interest and equity income for U.S. and non-U.S. operations and the components of the provision for income taxes are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| | | **(in millions)** | |
| U.S. income (loss) | $4,030 | $(3,286) | $(5,331) |
| Non-U.S. (loss) income | (781) | 492 | 310 |
| Income (loss) from continuing operations before income taxes, minority interest and equity income | $ 3,249 | $(2,794) | $(5,021) |

The non-U.S. loss of $781 million includes an inter-company loss of $863 million related to an international restructuring transaction. This transaction involved the transfer of certain European subsidiaries to Delphi's Luxembourg holding company in exchange for Euro denominated debt which created an inter-company gain in the U.S. and a corresponding foreign loss.  The provision (benefit) for income taxes is comprised of:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| | | **(in millions)** | |
| Current income tax expense: | | | |
| U.S. federal | $ — | $ — | $ — |
| Non-U.S. | 176 | 166 | 124 |
| U.S. state and local | (1) | (4) | (17) |
| Total current | 175 | 162 | 107 |
| Deferred income tax (benefit) expense, net: | | | |
| U.S. federal | (10) | (649) | (2) |
| Non-U.S. | (5) | 8 | 18 |
| U.S. state and local | — | (54) | — |
| Total deferred | (15) | (695) | 16 |
| Investment tax credits | (1) | (1) | (1) |
| Less:  Income tax benefit related to minority interest | 7 | 12 | 8 |
| Total Income tax expense (benefit) | $ 166 | $ (522) | $ 130 |

Cash paid or withheld for income taxes, primarily non-U.S., was $141 million, $175 million and $171 million in 2008, 2007 and 2006, respectively.

A reconciliation of the provision (benefit) for income taxes compared with the amounts at the U.S. federal statutory rate was:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| | | **(in millions)** | |
| Tax at U.S. federal statutory income tax rate | $ 1,137 | $ (978) | $ (1,757) |
| U.S. income taxed at other rates | 114 | (97) | (62) |
| Non U.S. income taxed at other rates | 281 | (172) | (209) |
| Change in valuation allowance | (1,386) | 668 | 2,154 |
| Other changes in tax reserves | — | (3) | (26) |
| Withholding taxes | 24 | 30 | 21 |
| Other adjustments | (4) | 30 | 9 |
| Total income tax provision (benefit) | $ 166 | $ (522) | $ 130 |

Included in loss from discontinued operations are income tax provisions of $11 million, $8 million and $6 million for the years ended December 31, 2008, 2007 and 2006, respectively.

**Deferred income taxes and related valuation allowances**

Delphi accounts for income taxes and the related accounts under the liability method. Deferred income tax assets and liabilities for 2008 and 2007 reflect the impact of temporary differences between amounts of assets and liabilities for financial reporting purposes and the bases of such assets and liabilities as measured by tax laws. Significant components of Delphi's deferred tax assets and liabilities are as follows:

|  | Year Ended December 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| **Deferred tax assets** | | |
| Other postretirement benefits | $ 478 | $ 3,630 |
| Pension benefits | 2,150 | 1,043 |
| R&D capitalization | 1,562 | 1,864 |
| Liabilities subject to compromise | 1,847 | 314 |
| Net operating loss carryforwards | 847 | 782 |
| Foreign tax credits | 664 | 205 |
| Depreciation | 369 | 524 |
| General business credits | 461 | 435 |
| Other employee benefits | 218 | 248 |
| Other U.S | 857 | 854 |
| Other non-U.S. | 391 | 370 |
| Total gross deferred tax assets | 9,844 | 10,269 |
| Less: valuation allowances | (9,144) | (9,744) |
| Total deferred tax assets | $ 700 | $ 525 |
| **Deferred tax liabilities** | | |
| Depreciation | $ 219 | $ 247 |
| Tax on unremitted profits | 23 | 46 |
| Other U.S | 262 | 73 |
| Other non-U.S. | 51 | 74 |
| Total gross deferred tax liabilities | 555 | 440 |
| Net deferred tax assets | $ 145 | $ 85 |

Net current and non-current deferred tax assets and liabilities are included in the consolidated balance sheet as follows:

|  | Year Ended December 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| Current assets | $ 96 | $ 58 |
| Current liabilities | (9) | (16) |
| Long term assets | 85 | 43 |
| Long term liabilities | (27) | — |
| Total deferred tax asset | $ 145 | $ 85 |

*Valuation allowance*

Realization of the net deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carryforwards. Valuation allowances are provided against deferred tax assets when, based on all available evidence, it is considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods. Delphi evaluates the potential realization of deferred tax assets on a jurisdiction-by-jurisdiction basis. Due to Delphi's recent history of losses, the Company has determined that a full valuation allowance for its net deferred tax assets continues to be appropriate in the following significant tax jurisdictions: U.S., France, Luxembourg, Romania and Spain. Delphi has not recognized the tax benefit on current operating losses generated in these countries in the amount of $139 million and $172 million for the years ended December 31, 2008 and 2007, respectively.

During 2008, due to continued losses in Austria, Hungary, Portugal and Germany, Delphi concluded it was no longer more likely than not that the deferred tax assets in these jurisdictions will be realized. The deferred tax assets impacted by these changes in circumstances were approximately $14 million. Due to operational changes, Delphi recorded a reversal of the valuation allowance of $8 million related to its Belgian operations, resulting in a net charge to the provision for income taxes of $6 million for 2008.

The net deferred tax assets of $145 million are primarily comprised of amounts from the U.K., Poland, Mexico, China and Brazil. A significant decrease in the U.S. deferred tax asset for other postretirement benefits ("OPEB") was a result of the assumption by GM of the hourly OPEB obligation. Additionally, as part of the agreement to assume Delphi's hourly OPEB obligation and certain special attrition programs, GM has agreed to accept a general unsecured claim of $2.5 billion, which has resulted in a significant increase in the U.S.

deferred tax asset for liabilities subject to comprise.  A full valuation allowance has been recorded for all U.S. deferred tax assets, including those for OPEB and liabilities subject to compromise.

### Tax return filing determinations and elections

In connection with filing its 2008 U.S. federal income tax return, Delphi will make certain determinations and elections, based upon the best information available at the extended U.S. federal income tax return due date of September 15, 2009, including potential information about emergence from Chapter 11 proceedings.  For example, Delphi may elect to capitalize certain 2008 U.S. research and development ("R&D") expenditures in order to minimize U.S.-source tax losses that offset foreign-source income, thereby facilitating the utilization of available foreign tax credits in the U.S. federal income tax return.  Such an election would have the effect of reducing the deferred tax assets for net operating losses ("NOL's") and foreign tax credit carryforwards and increasing the deferred tax asset for capitalized R&D by an equivalent amount.  Such elections or determinations will not, however, have a material effect on the net deferred tax assets, since a full valuation allowance has been recorded for all U.S. deferred tax assets.

### Net operating loss carryforwards

As of December 31, 2008, Delphi has recorded deferred tax assets of approximately $847 million for NOL carryforwards, comprised of $483 million for U.S. federal and state NOL's and $364 million for non-U.S. NOL's, with recorded valuation allowances of $483 million and $355 million, respectively.  These NOL's are available to offset future taxable income and realization is dependent on generating sufficient taxable income prior to expiration of the loss carryforwards.  The non-U.S. NOL's relate primarily to France, Spain, Luxembourg and Germany.  The NOL carryforwards have expiration dates ranging from one year to an indefinite period.

### Capitalized Research & Development Expenditures

Delphi has previously elected to capitalize certain R&D expenditures for U.S. tax purposes.  The effect of this capitalization is to substantially reduce the deferred tax asset with respect to U.S. NOL carryforwards and to create a deferred tax asset for capitalized R&D expenditures.  These deferred tax assets were $1,562 million and $1,864 million at December 31, 2008 and 2007, respectively.  A full valuation allowance has been recorded for these deferred tax assets.  The capitalized R&D expenditures will be amortized and deducted over a period of ten years, beginning in the year of capitalization.

### Tax credit carryforwards

Delphi received dividend distributions and deemed dividend distributions of accumulated earnings from certain foreign subsidiaries in 2008 and 2007.  These distributions generated significant foreign tax credits and resulted in a $664 million and $205 million foreign tax credit carryforward at December 31, 2008 and 2007 that can be used to offset future U.S. tax on foreign source income.  Additionally, Delphi's deferred tax assets include $461 million and $435 million of general business credits (primarily R&D credits) carryforwards at December 31, 2008 and 2007, respectively.  A full valuation allowance has been recorded for these foreign tax credit and general business credit carryforwards.  These tax credit carryforwards expire in 2019 through 2028.

## Other comprehensive income taxes

Generally, the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as OCI.  However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.  In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets.  In instances where a valuation allowance is established against current year operating losses, income from other sources, including other comprehensive income, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets.  The intraperiod tax allocation rules related to items charged directly to OCI can result in disproportionate tax effects that remain in OCI until certain events occur.

As of December 31, 2007, Delphi had disproportionate tax effects in OCI related to the hourly pension and OPEB obligations of a $533 million tax benefit and a $311 million tax expense, respectively.  During 2008, Delphi accounted for its hourly pension and OPEB transfer to GM as settlement of liabilities.  As a result, Delphi eliminated the disproportionate tax effect in OCI related to the hourly pension and OPEB obligations on a pro rata basis to the amount of the obligation that was settled.  Accordingly, Delphi recorded a net $9 million tax benefit in continuing operations for 2008, comprised of a $320 million tax benefit and $311 million tax expense related to the hourly pension and OPEB obligation settlement, respectively.

In 2007, U.S. pre-tax other comprehensive income, primarily attributable to employee benefits, offset approximately $1.9 billion of U.S. pre-tax operating losses, reducing the Company's current year valuation allowance and resulting in a benefit of $703 million allocated to the current year loss from continuing operations.

**Cumulative undistributed foreign earnings**

Provisions are made for estimated U.S. and non-U.S. income taxes, less available tax credits and deductions, which may be incurred on the remittance of Delphi's share of subsidiaries' undistributed cumulative earnings that are not deemed to be indefinitely reinvested.  In general, it is the practice and intention of Delphi to reinvest the earnings of its foreign subsidiaries in those operations.  During 2008 Delphi had dividend distributions and deemed dividends related to certain financing and European restructuring transactions that result in a significant portion of the cumulative undistributed foreign earnings being included in the U.S. income tax provision.  U.S. income taxes and non-U.S. withholding taxes were not provided on approximately $184 million and $1.4 billion of cumulative undistributed earnings as of December 31, 2008 and 2007, respectively, as such amounts are deemed to be indefinitely reinvested.  It is not practicable to calculate the unrecognized tax provision on these earnings to the extent not indefinitely reinvested as the actual tax liability, if any, is dependent on circumstances existing when the remittance occurs.  Delphi does intend to remit dividends from certain lower-tier foreign subsidiaries.

In addition, Delphi currently experiences tax holidays in various non-U.S. jurisdictions with expiration dates from 2009 through indefinite.  The income tax benefits attributable to these tax holidays are approximately $10 million ($0.02 per share) for 2008, approximately $21 million ($0.04 per share) for 2007 and $17 million ($0.03 per share) for 2006.

**Uncertain tax positions**

Delphi recognizes tax benefits only for tax positions that are more likely than not to be sustained upon examination by tax authorities.  The amount recognized is measured as the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement.  Unrecognized tax benefits are tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

We adopted FIN 48 on January 1, 2007.  At adoption, Delphi had recorded liabilities for unrecognized tax benefits of $62 million ($92 million if interest and penalties were included) of which $71 million, if recognized, would impact the effective tax rate.

A reconciliation of the gross change in the unrecognized tax benefits balance, excluding interest and penalties is as follows:

|  | Year Ended December 31, | |
|---|---|---|
|  | **2008** | **2007** |
|  | (in millions) | |
| Balance at January 1 | $      63 | $      62 |
| Additions related to current year | 17 | 14 |
| Additions related to prior year | 2 | 5 |
| Reductions related to prior year | (1) | (8) |
| Reductions due to expirations of statute of limitations | (2) | (3) |
| Settlements–cash | — | (7) |
| Balance at December 31 | $      79 | $      63 |

A portion of our unrecognized tax benefits would, if recognized, reduce our effective tax rate. The remaining unrecognized tax benefits relate to tax positions for which only the timing of the benefit is uncertain.  Recognition of these tax benefits would reduce our effective tax rate only through a reduction of accrued interest and penalties. As of December 31, 2008 and 2007, the amounts of unrecognized tax benefit that would reduce our effective tax rate were $53 million and $60 million, respectively.

### *Total amounts of interest and penalties recognized*

Delphi recognizes interest and penalties as part of income tax expense. Total accrued liabilities for interest and penalties were $22 million and $26 million at December 31, 2008 and 2007, respectively. Total interest and penalties recognized as part of income tax expense (benefit) were $(4) million for 2008 and $(4) million for 2007

### *Reasonably possible that total amount of unrecognized tax benefits could significantly increase or decrease within 12 months after the reporting date*

Delphi files tax returns in multiple jurisdictions and is subject to examination by taxing authorities throughout the world.  Foreign taxing jurisdictions significant to Delphi include Brazil, China, France, Germany, Mexico, Poland and the U.K.  It is reasonably possible that audit settlements, the conclusion of current examinations or the expiration of the statute of limitations in several jurisdictions could impact the company's unrecognized tax benefits.  However, Delphi does not expect the overall change in unrecognized tax benefits over the next twelve months to be significant.

*Description of tax years that remain subject to examination by major jurisdiction*

In the U.S., federal income tax returns for years prior to 2008 have been effectively settled.  It is anticipated that claims pending from prepetition periods will be settled upon emergence.  In addition, open tax years related to various states remain subject to examination, but are not considered to be material.

Foreign taxing jurisdictions significant to Delphi include Brazil, China, France, Germany, Mexico, Poland, and the U.K.   Open tax years related to these foreign taxing jurisdictions remain subject to examination and could result in additional tax liabilities.  In general, Delphi affiliates are no longer subject to income tax examinations by foreign tax authorities for years before 2002.

## 9. PROPERTY, NET

Property, net consisted of:

| | Estimated Useful Lives (Years) | December 31, | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| | | (in millions) | |
| Land | — | $   115 | $   123 |
| Land and leasehold improvements | 3-31 | 190 | 217 |
| Buildings | 29-40 | 1,643 | 1,818 |
| Machinery, equipment, and tooling | 3-27 | 4,581 | 6,180 |
| Furniture and office equipment | 3-15 | 710 | 726 |
| Construction in progress | — | 265 | 236 |
| Total | | 7,504 | 9,300 |
| Less: accumulated depreciation and amortization | | (4,107) | (5,437) |
| Total property, net | | $  3,397 | $  3,863 |

Delphi evaluates the recoverability of certain long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.  Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets.  Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets.  The fair value of the assets was determined based on the "held for use" classification.  Delphi may incur significant impairment charges or losses on divestitures upon these assets being classified as "held for sale."  The following table summarizes the impairment charges related to long-lived assets held for use for the years ended December 31, 2008, 2007 and 2006:

| Segment | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
| | | (in millions) | |
| Electronics and Safety | $   15 | $    1 | $    4 |
| Powertrain Systems | — | 13 | 12 |
| Electrical/Electronic Architecture | 2 | 6 | 1 |
| Thermal Systems | 10 | — | 11 |
| Automotive Holdings Group | 10 | 78 | 144 |
| Continuing operations | 37 | 98 | 172 |
| Discontinued operations | — | 193 | 43 |
| Total | $   37 | $  291 | $  215 |

During 2008, Delphi's Electronics and Safety segment recorded $10 million of long-lived asset and tooling impairment charges related to the exit of a non-profitable product line.  Additionally, the Thermal Systems segment recorded $6 million related to the planned exit of a manufacturing facility in Suzhou, China in 2009.

Delphi's Bearings Business was a non-product line in the Automotive Holdings Group segment that Delphi sold in 2008.  During 2007, Delphi had reassessed its estimated net proceeds from the ultimate sale and disposition of the Bearings Business, indicating an indicator of impairment.  Delphi determined that the carrying value of the Bearings Business exceeded the undiscounted estimated future cash flows and consequently recognized impairment charges of $54 million in 2007.  Also during 2007, Delphi recognized $11 million of long-lived asset impairment related to a plant in Delphi's Automotive Holdings Group segment.  This impairment was caused by a deterioration in the expected net proceeds resulting from the use and ultimate sale of these assets.  In addition, Delphi recognized $7 million of long-lived asset impairment for the Catalyst Business in the Powertrain Systems segment in 2007, which was caused by a deterioration in the estimated future cash flows through the expected sale date.  The Catalyst Business was sold during the third quarter of 2007, refer to Note 6. Acquisitions and Divestitures.

During 2006, Delphi experienced deteriorated financial performance including reduced profitability at certain sites and product lines resulting from flattening revenue together with higher commodity cost.  These factors resulted in substantial losses and an unfavorable

outlook, which were indicators of potential impairment. Delphi tested the recoverability of its long-lived assets using projected future undiscounted cash flows based on internal budgets, recent and forecasted sales data, independent automotive production volume estimates and customer commitments. Based primarily on Delphi's review of fair value appraisals, Delphi recorded long-lived asset impairment charges of $215 million for 2006. Refer to Note 5. Discontinued Operations for a discussion of the long-lived asset impairment charges recorded in loss from discontinued operations.

## 10. GOODWILL

The changes in carrying amount of goodwill for the years ended December 31, 2008 and 2007 are as follows:

|  | 2008 | 2007 |
|---|---|---|
|  | **(in millions)** | |
| Balance at January 1, .............................................. | $   397 | $   378 |
| Acquisitions ........................................................... | 19 | — |
| Impairment............................................................. | (325) | — |
| Currency translation............................................... | (29) | 19 |
| Balance at December 31, ......................................... | $   62(a) | $   397 (b) |

(a) $62 million in Corporate and Other
(b) $165 million in Electrical/Electronic Architecture, $155 million in Electronics and Safety and $77 million in Corporate and Other

Delphi reviews the recoverability of goodwill annually on May 31 and at any other time when business conditions indicate a potential change in recoverability. In conjunction with Delphi's annual recoverability tests, the deterioration of Delphi's financial performance, combined with an unfavorable outlook, were indicators for potential impairment. More specifically, during the second and fourth quarters of 2008, Delphi experienced deteriorated financial performance primarily due to significant reductions in global customer production volumes, particularly related to GM North America, continuing unfavorable pricing pressures and increasing commodity prices. This caused previously unanticipated projected revenue and operating income declines. As a result of these changes, long-term projections showed significant declines in discounted future operating cash flows. Fair value was also adversely affected by declining industry market valuation metrics. These revised cash flows and declining market conditions caused the implied fair values of the Electrical/Electronic Architecture segment and the Electronics and Safety segment to be less than their respective book values. Accordingly, in 2008 the Company recorded goodwill impairment charges related to the Electrical/Electronic Architecture segment and the Electronics and Safety segment, totaling $168 million and $157 million, respectively.

Delphi performed its goodwill impairment test by comparing the carrying value of each of its reporting units to the fair value of the reporting unit. In determining fair value of reporting units, Delphi utilized a number of methodologies, including discounted cash flow analysis and review of fair value appraisals. Where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized. The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill. The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the implied fair value of goodwill for the reporting unit. Delphi's reporting units are the global businesses focused on product families. The fair value of the reporting units was negatively impacted by the continued deterioration of global business conditions as previously described.

## 11. INVENTORIES, NET

A summary of inventories, net is shown below:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | **(in millions)** | |
| Productive material ........................................................ | $   663 | $   926 |
| Work-in-process and supplies........................................ | 253 | 386 |
| Finished goods ............................................................... | 369 | 496 |
| Total.......................................................................... | $ 1,285 | $ 1,808 |

## 12. LIABILITIES

Accrued liabilities consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | **2008** | **2007** |
| | **(in millions)** | |
| Payroll related obligations | $ 207 | $ 238 |
| Employee benefits, including current pension obligations | 136 | 185 |
| Accrued income taxes | 72 | 54 |
| Taxes other than income | 199 | 195 |
| Warranty obligations (Note 13) | 128 | 244 |
| U.S. employee workforce transition programs (Note 16) | 115 | 234 |
| Employee termination benefits and other exit costs (Note 7) | 213 | 276 |
| Interest on prepetition claims (Note 1) | 415 | 411 |
| Working capital backstop – Steering Business (Note 2) | 210 | — |
| Derivative financial instruments (Note 23) | 132 | 24 |
| Other | 344 | 420 |
| Total | $ 2,171 | $ 2,281 |

Other long-term liabilities consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | **2008** | **2007** |
| | **(in millions)** | |
| Workers compensation | $ 325 | $ 328 |
| Environmental (Note 18) | 97 | 112 |
| U.S. employee workforce transition programs (Note 16) | 8 | 148 |
| Extended disability benefits | 60 | 72 |
| Warranty obligations (Note 13) | 236 | 315 |
| Payroll-related obligations | 35 | 34 |
| Accrued income taxes | 71 | 55 |
| Derivative financial instruments (Note 23) | 36 | — |
| Other | 105 | 121 |
| Total | $ 973 | $ 1,185 |

## 13. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the years ended December 31, 2008 and 2007:

| | **2008** | **2007** |
| --- | --- | --- |
| | **(in millions)** | |
| Accrual balance at beginning of year | $ 559 | $ 383 |
| Provision for estimated warranties incurred during the period | 66 | 176 |
| Provision for changes in estimate for preexisting warranties | 34 | 115 |
| GM warranty forgiveness | (112) | — |
| Settlements made during the year (in cash or in kind) | (167) | (128) |
| Foreign currency translation and other | (16) | 13 |
| Accrual balance at end of year | $ 364 | $ 559 |

Approximately $128 million and $244 million of the warranty accrual balance as of December 31, 2008 and 2007, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $236 million and $315 million of the warranty accrual balance as of December 31, 2008 and 2007, respectively, is included in other long-term liabilities.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases. Delphi elected to defer amounts due under the Warranty Settlement Agreement until it received payments from GM, on or about the time of its emergence from chapter 11. In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable,

including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in its existing debtors-in-possession credit facility, GM agreed, on July 31, 2008 to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi recorded the extinguishment of this liability as a reduction of warranty expense in 2008, of which $107 million was included in cost of sales and $5 million was included in discontinued operations. In 2007, Delphi recorded $83 million, net of an $8 million recovery, of additional warranty expense for a range of specific GM warranty claims, primarily in the Electronics and Safety (related to the instrument clusters product line which was transferred to the Electronics and Safety segment effective December 2007) and Powertrain Systems segments. Additionally, Delphi recorded an increase to warranty reserves for specific warranty claims related to the Powertrain Systems segment during 2007. Refer to Note 18. Commitments and Contingencies, Ordinary Business Litigation for additional disclosure regarding warranty matters.

## 14. LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals. The following data regarding the number and amount of claims and proof of claims is unaudited.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business. In addition, pursuant to the Plan, the Debtors assumed most of their executory contracts and unexpired leases with respect to the Debtors' operations, and rejected certain of them, with the approval of the Court. As of December 31, 2008, the Debtors' have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. Many of these claims have been found to be duplicative, based on contingencies that have not occurred, or are otherwise overstated, and therefore have been determined to be invalid. As a result, the aggregate amount of claims filed with the Court exceeds the amount that has been to date allowed by the Court. As of December 31, 2008, the Debtors have filed 33 omnibus claims objections that objected to claims on procedural or substantive grounds. Pursuant to these claims objections, the Debtors have objected to approximately 13,400 proofs of claim which asserted approximately $10.0 billion in aggregate liquidated amounts plus additional unliquidated amounts. As of December 31, 2008, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,900 of those claims, which orders reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order modifying approximately 3,910 claims reducing the aggregate amounts asserted on those claims by $342 million, which amounts are subject to further objection by the Debtors at a later date on any basis. The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. The determination of how these liabilities are to be settled and treated is set forth in the Plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court. As of January 25, 2008, the total general unsecured claims, other than funded debt claims, against the Company had been reduced to an amount of approximately $1.45 billion. (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases).

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities Subject to Compromise consist of the following:

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (in millions) | |
| Pension obligations | $ 5,321 | $ 3,329 |
| Postretirement obligations other than pensions | 1,201 | 8,786 |
| Allowed GM general unsecured claim (Note 2) | 2,500 | — |
| Allowed GM administrative claim (Note 2) | 1,628 | — |
| Allowed IUE-CWA and USW claims (Note 2) | 129 | — |
| Debt and notes payable | 1,984 | 1,984 |
| Accounts payable | 732 | 744 |
| Junior subordinated notes due 2033 | 391 | 391 |
| GM claim for U.S. employee workforce transition programs (Note 2) | — | 312 |
| Securities & ERISA litigation liability (Note 18) | 351 | 351 |
| Other | 346 | 300 |
| Total Liabilities Subject to Compromise | $ 14,583 | $ 16,197 |

The decrease in liabilities subject to compromise as of December 31, 2008 is due to the reductions of postretirement obligations and the GM claim for the U.S. employee workforce transition programs resulting from the effectiveness of the Amended GSA and the Amended MRA during 2008.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.  The remaining other postretirement benefit obligations are primarily for salaried employees.  On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses (refer to Note 25. Subsequent Events).

## 15. DEBT

Due to the Chapter 11 Filings (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy), prepetition long-term debt of the Debtors has been reclassified to the caption Liabilities Subject to Compromise (Refer to Note 14. Liabilities Subject to Compromise) on the consolidated balance sheet.  The following is a summary of Long-Term Debt, including current maturities, and unsecured long-term debt included in Liabilities Subject to Compromise as of December 31, 2008 and 2007:

| | December 31, | | | |
|---|---|---|---|---|
| | 2008 | | 2007 | |
| | Subject to Compromise | Debt | Subject to Compromise | Debt |
| | (in millions) | | | |
| 6.55%, unsecured notes, due 2006 | $ 500 (a)(b)(c) | $ — | $ 500 (a)(b)(c) | $ — |
| 6.50%, unsecured notes, due 2009 | 498 (a)(b)(c) | — | 498 (a)(b)(c) | — |
| 6.50%, unsecured notes, due 2013 | 493 (a)(b)(c) | — | 493 (a)(b)(c) | — |
| 7.125%, debentures, due 2029 | 493 (a)(b)(c) | — | 493 (a)(b)(c) | — |
| Junior subordinated notes due 2033 (d) | 391 (a)(b)(c) | — | 391 (a)(b)(c) | — |
| Amended and restated DIP facility | — | 3,620 (b) | — | — |
| Refinanced DIP facility | — | — | — | 2,746 |
| Accounts receivable factoring and European securitization program | — | 352 | — | 589 |
| Capital leases and other | — (c) | 257 | — (c) | 219 |
| Total debt | $2,375 | 4,229 | $2,375 | 3,554 |
| Less: current portion | | (4,174) | | (3,495) |
| Long-term debt | | $ 55 | | $ 59 |

(a)  Pursuant to the requirements of SOP 90-7 as of the Chapter 11 Filings, deferred financing fees related to prepetition debt are no longer being amortized and have been included as an adjustment to the net carrying value of the related prepetition debt at December 31, 2008 and 2007.

(b)  Debt in default.

(c)  The Chapter 11 Filings triggered defaults on substantially all prepetition debt and certain lease obligations.

(d)  In conjunction with the liquidation of the Delphi Trust I and Delphi Trust II on November 14, 2006, the interests of Delphi Trust I and Delphi Trust II in the junior subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts.

The stay of proceedings provisions of section 362 of the Bankruptcy Code apply to actions to collect prepetition indebtedness or to exercise control over the property of the Debtors' estate in respect of such defaults.  The rights of and ultimate payments by the Debtors under prepetition obligations will be addressed in any plan of reorganization and may be substantially altered.  This could result in unsecured claims being compromised at less, and possibly substantially less, than 100% of their face value.

**Current Capital Structure**

*Amended and Restated DIP Credit Facility and Accommodation Agreement*– During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to amend and extend its Refinanced DIP Credit Facility (the "Amended and Restated DIP Credit Facility"), which amendments and extension became effective in May 2008. As a result of the amendment and restatement, the aggregate size of the facility was reduced from $4.5 billion to $4.35 billion, consisting of a $1.1 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan") and a $2.75 billion second priority term loan (the "Tranche C Term Loan").

On November 7, 2008, Delphi filed a motion with the Court seeking authority to enter into the Accommodation Agreement allowing Delphi to retain the proceeds of its Amended and Restated DIP Credit Facility, which otherwise matured on December 31, 2008. On December 3, 2008, the Court entered an order approving Delphi's motion and authorizing Delphi to enter into the Accommodation Agreement following the expiration of the applicable appeal period, assuming resolution of any objections filed in the interim. On December 12, 2008, Delphi satisfied the closing conditions set forth in the Accommodation Agreement and the Accommodation Agreement became effective. On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement. In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement. In addition, GM agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement. The Amendment and GM's agreement to accelerate payments were effective January 30, 2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders. The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees. Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement. Refer to Note 25. Subsequent Events for more information.

<u>Termination Date of the Accommodation Agreement</u>
Under the Accommodation Agreement (as amended by the Amendment and the Supplemental Amendment), Delphi may continue using the proceeds of the Amended and Restated DIP Credit Facility and the lenders have agreed, among other things, to forbear from the exercise of certain default-related remedies, in each case until the earlier to occur of:

- June 30, 2009, but subject to the satisfaction of certain conditions below;
- Delphi's failure to comply with its covenants under the Accommodation Agreement or the occurrence of certain other events set forth in the Accommodation Agreement; and
- An event of default under the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions).

However, as referenced above, the expiration date of June 30, 2009 for the accommodation period will be shortened to May 5, 2009 if Delphi has not satisfied the following conditions:

(a)   received binding commitments, subject to customary conditions, on or prior to April 2, 2009, for debt and equity financing sufficient for it to emerge from chapter 11 pursuant to the modified plan of reorganization which was filed with the Court on October 3, 2008, or any other plan of reorganization that provides the administrative agent and the lenders under the Amended and Restated DIP Credit Facility with the same treatment as that set forth in the modified plan of reorganization; or

(b)   (i) has filed  on or prior to April 2, 2009, modifications to the modified plan of reorganization or any other plan of reorganization to which the administrative agent does not submit a notice, within ten business days of such filing, informing Delphi that either (A) the Required Lenders (as defined in the Accommodation Agreement) or (B) lenders party to the Accommodation Agreement holding Tranche A, Tranche B Term Loan and Tranche C Term Loan commitments and exposure representing in excess of 50% of the Tranche A, Tranche B Term Loan and Tranche C Term Loan commitments and exposure held by all lenders party to the Accommodation Agreement (the "Required Total Participant Lenders"), affirmatively oppose such modifications or plan of reorganization (a "Notice"), and

(ii) on or prior to May 2, 2009, has obtained entry of the Court's order approving modifications to the Disclosure Statement with respect to the modified plan of reorganization, as may have been further modified, or a disclosure statement with respect to such other plan of reorganization as described above and the approval to re-solicit or solicit

votes, as the case may be. The administrative agent would submit a Notice if either the Required Lenders or the Required Total Participant Lenders vote, within ten business days after the filing of the modifications to the modified plan of reorganization or the new plan of reorganization, to oppose such plan modifications (or any such other filed plan of reorganization) on the grounds that such plan was not acceptable to them.

There can be no assurance the outside termination date of the Accommodation Agreement will not be shortened from June 30, 2009 to May 5, 2009 because there can be no assurance that we will meet the conditions of (a) or (b) above.

### *Requirements of the Accommodation Agreement*

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008, (the effective date of the Accommodation Agreement). However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement). Additionally, prior to the effective date of the Accommodation Agreement, Delphi was required to and did the following:

- replace or cash collateralize, at 105% of the undrawn amount thereof, all outstanding letters of credit under the Amended and Restated DIP Credit Facility that had not been collateralized prior to that date, and

- limit the aggregate principal amounts outstanding under Tranche A borrowings to no more than $377 million.

Prior to the effectiveness of the Accommodation Agreement, Delphi was permitted to and did provide cash collateral, in an aggregate amount of $200 million, which was pledged to the administrative agent for the benefit of the lenders ("Borrowing Base Cash Collateral"). Upon Delphi's request, portions or all of the Borrowing Base Cash Collateral will be transferred back to Delphi provided that Delphi is in compliance with the borrowing base calculation in the Accommodation Agreement and no event of default has occurred. In addition, under certain conditions included in the Accommodation Agreement, Delphi increased its pledge of the equity interests in Delphi's first-tier foreign subsidiaries from 65% to 100%, which triggered a deemed dividend for tax purposes (no additional cash taxes were incurred).

### *Terms of the Amended and Restated DIP Credit Facility and Accommodation Agreement*

The facilities currently bear interest at the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent, as detailed in the table below, and the amounts outstanding (in millions) and rates effective as of December 31, 2008 were:

|          | **ABR plus** | **Borrowings as of December 31, 2008** | **Rates effective as of December 31, 2008** |
|----------|--------------|----------------------------------------|---------------------------------------------|
| Tranche A | 5.00%       | $370                                   | 9.25%                                       |
| Tranche B | 5.00%       | $500                                   | 9.25%                                       |
| Tranche C | 6.25%       | $2,750                                 | 10.50%                                      |

Tranche A, Tranche B and Tranche C facilities include ABR floor of 4.25%

The Company had $117 million in letters of credit outstanding under the Revolving Facility as of December 31, 2008. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Accommodation Agreement. Under the Accommodation Agreement, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate. Based on the current borrowing base computation in effect at December 31, 2008, as defined in the Accommodation Agreement, Delphi's borrowing base was reduced by the maximum deduction of $275 million for unrealized losses related to Delphi's hedging portfolio, which as of December 31, 2008 resulted in net losses included in OCI of $194 million pre-tax, primarily related to copper and Mexican Peso hedges, as further described in Note 23. Fair Value of Financial Instruments, Derivatives and Hedging Activities to the consolidated financial statements.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability, among other things, to incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. As long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). Delphi's Facility Availability Amount was less than $500 million at December 31, 2008 as all commitments were cancelled with the effectiveness of the Accommodation Agreement on December 12, 2008.

The Accommodation Agreement also contains additional covenants, amends certain of the existing covenants in the Amended and Restated DIP Credit Facility and includes additional events of default under the Amended and Restated DIP Credit Facility. Additional covenants under the Accommodation Agreement include (i) a prescribed minimum borrower liquidity level, (ii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility pursuant to an Accommodation Agreement borrowing base covenant

(approximately $131 million was repaid during January 2009 as a result of the borrowing base calculation), (iii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility to the extent any specified litigation proceeds are received in cash, (iv) a prohibition on the repatriation of cash from foreign subsidiaries as cash dividends, cash otherwise distributed in redemption of or in exchange for equity interests in foreign subsidiaries or through the repayment of notes unless used to repay obligations under the Amended and Restated DIP Credit Facility and (v) a requirement to repay $60 million in obligations under the Amended and Restated DIP Credit Facility in accordance with the schedule set forth in the Accommodation Agreement.

Changes to covenants under the Amended and Restated DIP Credit Facility include (i) a reduction in the cap on permitted debt and liens on assets of foreign subsidiaries, (ii) a reduction in the cap on net cash proceeds from asset sales before such proceeds must be utilized to repay the obligations under the Amended and Restated DIP Credit Facility, (iii) modifications to certain debt and lien baskets, including permitting cash collateralization of letters of credit and an increase in secured hedging obligations and (iv) enhanced monthly financial reporting.

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility and Accommodation Agreement) for Delphi and its direct and indirect subsidiaries, on a consolidated basis. Prior to the Amendment the Global EBITDAR covenant was $450 million for the period ended December 31, 2008.

The covenants also impose restrictions on Delphi's derivative contracts. Refer to Note 23. Fair Value of Financial Instruments, Derivatives and Hedging Activities for more information.

Delphi was in compliance with the Amended and Restated DIP Credit Facility and Accommodation Agreement covenants as of December 31, 2008. However, during December 2008 as a result of significant vehicle production cuts, particularly in North America, the amount of outstanding accounts receivable and inventory declined, thus requiring periodic repayments of amounts outstanding under Tranches A and B of the Amended and Restated DIP Credit Facility to maintain compliance with the borrowing base computation. As of January 31, 2009 there was approximately $314 million outstanding under Tranche A and approximately $425 million outstanding under the Tranche B Term Loan. Reduced volume projections were expected to result in a significant decline in rolling 12-month cumulative Global EBITDAR at the end of January 2009, which without the Amendment might have put Delphi's ability to comply with the Global EBITDAR covenants at risk. In addition, this deterioration reduced the amount of outstanding receivables, potentially requiring Delphi to repay significant additional amounts currently outstanding under the Revolving Facility in the months of January and February 2009, further reducing liquidity in its North American operations. However, as discussed further in Note 25. Subsequent Events, pursuant to the Amendment, the lenders have agreed to restructure the components of the borrowing base supporting amounts outstanding under and modify certain covenants contained in the Accommodation Agreement.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.

New events of default under the Amended and Restated DIP Credit Facility include (i) any amendment, waiver, supplement or modification to the Amended GSA or the Amended MRA requiring Court approval that, taken as a whole, materially impairs the rights of Delphi or its affiliated debtors as borrowers or guarantors, materially reduces the amount, or decelerates the timing of, any material payments under either such agreement, if the Required Lenders object, (ii) any repudiation in writing or termination of the Amended GSA or the Amended MRA by any party thereto, or a failure to perform any obligation thereunder, which failure materially impairs the rights of Delphi thereunder, (iii) certain amendments, waivers, modifications, or supplementations of any term of the GM Advance Agreement or the Partial Temporary Accelerated Payments Agreement (as defined below), (iv) any event or condition that results in GM not funding amounts requested under the GM Advance Agreement and (v) the enforcement or failure to stay enforcement of a judgment or order against any borrower or guarantor with respect to any amounts advanced under the Amended and Restated DIP Credit Facility.

In connection with the Accommodation Agreement, Delphi has paid fees to the consenting lenders of 200 basis points, or approximately $37 million. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Accommodation Agreement. The Company also received authority to pay applicable fees to various lenders in conjunction with the Amendment and the Supplemental Amendment, and has paid approximately $11 million in fees to the consenting lenders for both amendments.

In connection with the entry into the Amended and Restated DIP Credit Facility in May 2008, Delphi paid a total of approximately $75 million to participating lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant

changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of December 31, 2008, $56 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility, as modified by the Accommodation Agreement.

In 2007, concurrently with the entry into the Refinanced DIP Credit Facility, Delphi expensed $25 million of unamortized debt issuance costs related to the Revolving Credit, Term Loan and Guaranty Agreement Delphi entered into on October 14, 2005, as amended through November 13, 2006, and the Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt, as these fees relate to the refinancing of the term loans, and $2 million was recognized as interest expense, as these fees relate to the refinancing of the revolving credit facility.

***Advance Agreement and Liquidity Support from General Motors and Related Matters -*** Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, and Delphi was not able to redraw the original $650 million facility amount.

On September 26, 2008, the Court granted Delphi's motion to amend the GM Advance Agreement to provide for an additional $300 million facility which could be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement signed on August 7, 2008 and to give GM an administrative claim for all unpaid advances under such additional facility. Continued availability to draw against the additional $300 million facility was conditioned upon Delphi filing a plan of reorganization and related disclosure statement in form and substance materially consistent with Section 5 of the Amended GSA and Section 7.01 of the Amended MRA which condition was satisfied with Delphi's filing of proposed modifications to its previously confirmed plan of reorganization with the Court on October 3, 2008, and certain other conditions.

In support of Delphi's efforts to obtain the Accommodation Agreement, GM agreed to extend the term of the GM Advance Agreement, pursuant to the terms set forth in an amendment thereto filed with the Court on November 7, 2008 (as supplemented) (the "GM Advance Agreement Amendment"), through the earlier of (i) June 30, 2009, (ii) such date as Delphi files any motion seeking to amend the plan of reorganization in a manner that is not reasonably satisfactory to GM, (iii) the termination of the Accommodation Agreement or the accommodation period therein, or (iv) such date when a plan of reorganization becomes effective. The Court approved Delphi's motion to amend and extend the GM Advance Agreement concurrently with the approval of Delphi's motion seeking authority to enter into the Accommodation Agreement. Additionally, GM has agreed, subject to certain conditions, to accelerate payment of certain payables to Delphi, pursuant to the Partial Temporary Accelerated Payments Agreement, which could result in an additional $300 million of liquidity to Delphi through May of 2009. The Partial Temporary Accelerated Payments Agreement provides that GM will generally recoup these accelerated payments over its three subsequent monthly payments on or after the date that GM's obligation to advance funds under the GM Advance Agreement terminates or advances made become due and payable in accordance with the GM Advance Agreement. Both the amendment to the GM Advance Agreement and the Partial Temporary Accelerated Payments Agreement were effective concurrent with the Accommodation Agreement, on December 12, 2008. Conforming amendments were made to the GM Advance Agreement and Partial Temporary Accelerated Payments Agreement contemporaneously with Court approval of the Amendment and Supplemental Amendment to the Accommodation Agreement as described in Note 25. Subsequent Events. Additionally, Delphi anticipates filing a motion with the Court seeking approval of subsequent amendments to the GM Advance Agreement to reflect the conditions pursuant to which GM will agree to increase the amounts available under such agreement, see Note 25. Subsequent Events.

There can be no assurances, however that GM will have sufficient liquidity to accelerate payables to Delphi or advance amounts under the GM Advance Agreement. Refer to Item 1A. Risk Factors in this Annual Report on Form 10-K for risks and uncertainties related to our business relationship with GM.

The GM Advance Agreement currently has a targeted cash balance amount of $25 million and Delphi is required to use any free cash flow above the targeted cash balance amount (as determined in accordance with the GM Advance Agreement) to repay from time to time any amounts outstanding thereunder. As of December 31, 2008, no amounts were outstanding pursuant to the GM Advance Agreement and $300 million was available for future advances.

***European Securitization Factoring*** – In December 2008, Delphi signed a termination agreement under the European accounts receivables securitization program (the "European Program") establishing that the program principal would be repaid by March 31, 2009. However, in January 2009, Delphi entered into an extension to the termination period such that the program principal will be repaid by

44

June 17, 2009 via amortization of principal over the extension period. The program had an availability of €178 million ($249 million with December 31, 2008 foreign currency exchange rates) and £12 million ($17 million with December 31, 2008 foreign currency exchange rates) until the termination date. During the extension period, the availability under the program is capped at dollar equivalent of the sum of €38 million ($54 million with December 31, 2008 foreign currency exchange rates) and £9 million ($13 million with December 31, 2008 foreign currency exchange rates). Borrowings on the accounts receivable transferred under this program are accounted for as short-term debt. As of December 31, 2008 and 2007, outstanding borrowings under this program were approximately $88 million and $205 million, respectively. Delphi continues to have access to other forms of receivables financing in Europe as noted below, and has received preliminary credit approval from a syndicate of lenders on a replacement securitization program that it is seeking to implement in the first quarter of 2009.

The table below shows a reconciliation of changes in interest in accounts receivables transferred for the period ended December 31, 2008.

|  | (in millions) |
| --- | --- |
| Beginning Balance at December 31, 2007 | $    205 |
| Receivables transferred | 1,496 |
| Proceeds from new securitizations | (1,549) |
| Receivables Repurchased | (96) |
| Other | 32 |
| Ending balance | $    88 |

*Accounts Receivable Factoring* – Delphi also maintains various accounts receivable factoring facilities in Europe that are accounted for as short-term debt. These uncommitted factoring facilities are available through various financial institutions. As of December 31, 2008 and 2007, we had $264 million and $384 million, respectively, outstanding under these accounts receivable factoring facilities.

*Capital Leases and Other* – As of December 31, 2008 and 2007, Delphi had other debt outstanding issued by certain international subsidiaries, primarily bank lines in Asia Pacific, and capital lease obligations of approximately $257 million and approximately $219 million, respectively.

*Junior Subordinated Notes* - Delphi has outstanding junior subordinated debt with an aggregate principal value of $400 million. The junior subordinated debt is represented by two global notes held by the Depository Trust Company or its nominee. The first junior subordinated note, with an aggregate principal value of $250 million, bears interest at 8.25% per year and matures on November 15, 2033. The second junior subordinated note bears interest at a fixed rate through November 15, 2008 and at an adjustable rate thereafter until it matures on November 15, 2033. Delphi originally issued these notes to Delphi Trust I and Delphi Trust II, respectively, both of which were Delphi subsidiaries. Delphi's chapter 11 filing constituted an "early termination event" pursuant to which both trusts were required to be dissolved in accordance with their respective trust declarations. On November 14, 2006, both trusts were terminated. In connection with the terminations, the interests of Delphi Trust I and Delphi Trust II in the subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts. Pursuant to the requirements of SOP 90-7, as of the Chapter 11 Filings, deferred financing fees related to the Trusts are no longer being amortized and have been included as an adjustment of their net carrying value. Delphi determined that both Trust I and Trust II were considered variable interest entities, of which Delphi was not the primary beneficiary. As a result, although both Trust I and Trust II were 100% owned by Delphi, the Company did not consolidate them into its financial statements. However, the Trust I and Trust II notes are reflected as liabilities subject to compromise on the consolidated balance sheet. The related contractual interest for the years ended December 31, 2008, 2007 and 2006 is not recognized in accordance with the provisions of SOP 90-7. If Trust I and Trust II had been consolidated by Delphi, there would be no material impact in any of the periods presented.

*Interest* - Cash paid for interest related to amounts outstanding within Delphi's current capital structure totaled $442 million, $377 million and $424 million in 2008, 2007 and 2006, respectively.

In accordance with SOP 90-7, effective October 8, 2005, the Company ceased accruing and paying interest expense on its outstanding unsecured prepetition debt classified as subject to compromise. In 2007, the Company began recording prior contractual interest expense related to prepetition debt and allowed unsecured claims because it became probable that the interest would become an allowed claim based on the Plan. At December 31, 2008 and 2007, Delphi had accrued interest of $415 million and $411 million, respectively, in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Accordingly, Delphi anticipates that it will be relieved of this liability if and when the plan modifications are approved. The Company's contractual interest not accrued or paid in 2008 was $131 million, contractual interest accrued but not paid in 2007 was $133 million, and contractual interest not accrued or paid in 2006 was $148 million. In accordance with the Court-approved first day motion, the Company continues to accrue and pay the contractual interest on the secured credit facilities.

The principal maturities of debt, net of applicable discount and issuance costs, and the minimum capital lease obligations not subject to compromise for the five years subsequent to 2008 are as follows:

| Year | Debt and Capital Lease Obligations (in millions) |
|---|---|
| 2009 | $ 4,174 |
| 2010 | 19 |
| 2011 | 5 |
| 2012 | 5 |
| 2013 | 5 |
| Thereafter | 21 |
| Total | $ 4,229 |

### Indebtedness Throughout 2007

*Refinanced DIP Credit Facility*– On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion.  On January 9, 2007, Delphi refinanced its prepetition and postpetition credit facilities obligations by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  The Refinanced DIP Credit Facility consisted of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan").  The Refinanced DIP Credit Facility was obtained to refinance both the $2.0 billion Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of November 21, 2005 (as amended, the "Amended DIP Credit Facility") and the approximate $2.5 billion outstanding on its $2.8 billion Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility").  As of January 9, 2007, both the Refinanced DIP Credit Facility $250 million Tranche B Term Loan and approximately $2.5 billion Tranche C Term Loan were funded.

The Refinanced DIP Credit Facility carried an interest rate at the option of Delphi of either the Administrative Agent's Alternate Base Rate plus (i) with respect to Tranche A borrowings, 2.50%, (ii) with respect to Tranche B borrowings, 2.50%, (iii) with respect to Tranche C borrowings, 3.00%, or LIBOR plus (x) with respect to Tranche A borrowings, 3.50%, (y) with respect to Tranche B borrowings 3.50%, and (z) with respect to Tranche C borrowings 4.00%.  The LIBOR interest rate period could be set at a two-week or one-, three-, or six-month period as selected by Delphi in accordance with the terms of the Refinanced DIP Credit Facility.  Accordingly, the interest rate fluctuated based on the movement of the Alternate Base Rate or LIBOR through the term of the Refinanced DIP Credit Facility.  Also as of December 31, 2007, there were no amounts outstanding under the Revolving Facility and the Company had $255 million in letters of credit outstanding under the Revolving Facility as of that date, including $150 million related to the letters of credit provided to the PBGC discussed further in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

*Other*– Delphi had access to the European Program, various accounts receivable factoring facilities in Europe and had other international subsidiary debt and capital lease obligations during 2007, as further described above under "Current Capital Structure."

### 16. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

The following table represents the movement in the U.S. employee workforce transition program liability for 2007 and 2008:

| U.S. Employee Workforce Transition Program Liability | (in millions) |
|---|---|
| Balance at December 31, 2006 | $ 830 |
| U.S. employee workforce transition program charges | 52 |
| Buy-down wage liability | 323 |
| Payments | (793) |
| Pension and other postretirement benefits (Note 17) | (48) |
| Accretion and other | 18 |
| Balance at December 31, 2007 | $ 382 |
| U.S. employee workforce transition program charges | 21 |
| Buy-down wage liability adjustment | (37) |
| Payments | (219) |
| Pre-retirement program pension payment to GM | (9) |
| Pension and other postretirement benefits (Note 17) | (23) |
| Accretion and other | 8 |
| Balance at December 31, 2008 | $ 123 |

Approximately $115 million and $234 million of the U.S. employee workforce transition program liability is included in accrued liabilities at December 31, 2008 and 2007, respectively, and approximately $8 million and $148 million is included in other long-term liabilities at December 31, 2008 and 2007, respectively, in the consolidated balance sheet.

The following table represents the movement in the U.S. employee workforce transition program buydown wage asset for 2007 and 2008:

### U.S. Employee Workforce Transition Program Buydown Wage Asset

|  | (in millions) |
|---|---:|
| Balance at December 31, 2006 | $ — |
| Buy-down wage asset | 323 |
| Amortization expense | (22) |
| Balance at December 31, 2007 | $ 301 |
| Buy-down wage asset adjustment | (49) |
| Amortization expense | (61) |
| Amounts reimbursed by GM upon Amended GSA effectiveness | (155) |
| Reclassified amounts as a receivable from GM under Amended GSA | (126) |
| Reorganization gain | 90 |
| Balance at December 31, 2008 | $ = |

As of December 31, 2007, approximately $80 million of the U.S. employee workforce transition program buydown wage asset was included in other current assets and approximately $221 million was included in other long-term assets in the consolidated balance sheet.

**2007 Workforce Transition Programs**

On June 22, 2007, Delphi, GM, and the UAW signed the UAW settlement agreement which included a workforce transition program for eligible UAW employees (the "UAW Workforce Transition Program"). Included in the UAW Workforce Transition Program is an attrition program similar to the U.S. employee special attrition programs offered in June 2006. The attrition program in the UAW Workforce Transition Program offered certain eligible Delphi employees the following options: (i) normal and early voluntary retirements with a lump sum incentive payment of $35,000, (ii) a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service are granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they will retire without additional incentives, and (iii) buyout payments which, depending on the amount of seniority or credited service, range from $70,000 to $140,000. The UAW Workforce Transition Program also offered the following options: (i) flowback rights to eligible Delphi employees as of the date of the filing of Delphi's bankruptcy petition who do not elect the attrition option, including a relocation allowance of up to $67,000 in certain circumstances when plants cease production, (ii) buy-down payments totaling up to $105,000 for eligible traditional employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (iii) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (iv) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to September 14, 2011.

On August 5, 2007, Delphi, GM and the IUE-CWA signed the IUE-CWA settlement agreement, which included a workforce transition program for eligible IUE-CWA employees (the "IUE-CWA Workforce Transition Program") and included an attrition program similar to the 2006 U.S. employee special attrition programs. The attrition program in the IUE-CWA Workforce Transition Program was similar to the attrition program included in the UAW Workforce Transition Program except that the buyout payments based on seniority or credited service ranged from $40,000 to $140,000. The IUE-CWA Workforce Transition Program also offers the following options: (i) special employee placement opportunities with GM for eligible Delphi employees who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when specific plants cease production, (ii) provision of buy-down payments totaling up to $125,000 for eligible employees who do not elect the attrition option or become employed by GM and continue to work for Delphi under the terms of the IUE-CWA settlement agreement, and (iii) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to October 12, 2011.

On July 31 and August 1, 2007, Delphi and GM signed settlement agreements with the IAM, IBEW, IUOE Local 18S, IUOE Local 101S, and IUOE Local 832S (collectively the "Splinter Unions"). With the exception of the IUOE Local 101S Agreement, these Splinter Union settlement agreements included workforce transition programs (the "Splinter Unions Workforce Transition Program") and included attrition programs similar to the attrition program included in the IUE-CWA Workforce Transition Program. The Splinter Unions Workforce Transition Program also offered options of buy-down payments totaling up to $10,000 for eligible employees or severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011.

On August 16, 2007, Delphi, GM and the USW signed the USW settlement agreements, which included certain workforce transition options for eligible USW employees at the Home Avenue and Vandalia operations similar to certain options presented in the IUE-CWA Workforce Transition Program.

During 2007, Delphi recorded charges for the attrition programs of approximately $52 million, which included a reduction in the U.S. employee workforce transition program liability of $64 million due to a change in estimated future payments for both the 2006 and 2007 programs. The estimated payments to be made under the buy-down arrangements within the Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts,*" the wage asset is being amortized over the life of the respective union agreements. In 2008 and 2007, Delphi recognized $61 million and $22 million, respectively, of wage asset amortization. The corresponding wage liability is being reduced as buy-down payments are made. Delphi paid $83 million and $120 million during the years ended December 31, 2008 and 2007, respectively. As of December 31, 2008 and 2007, Delphi had $83 million and $203 million of liability recorded, respectively. At December 31, 2008 and 2007, Delphi had $68 million and $2 million, respectively, recorded as receivable from GM.

During the year ended December 31, 2007, Delphi also recorded pension curtailment losses of $175 million, which were partially offset by a curtailment gain of $5 million related to other postretirement benefits. These curtailments are discussed further in Note 17. Pension and Other Postretirement Benefits.

Total workforce transition program charges were $244 million for 2007, of which $212 million is recorded in U.S. workforce transition program charges and $32 million is recorded in loss on discontinued operations. In addition, costs related to severance payments and supplemental unemployment benefits for U.S. employees at sites that will be sold or wound down in accordance with the workforce transition programs of $56 million were included in cost of sales.

**2006 Attrition Programs**

On March 22, 2006, Delphi, GM and the UAW agreed on a special attrition program (the "UAW Special Attrition Program"), and on May 12, 2006, the Court entered the final order approving Delphi's entry into the program with certain modifications. Delphi, GM, and the UAW agreed on a supplemental agreement on June 5, 2006 (the "UAW Supplemental Agreement") to the UAW Special Attrition Program which was approved by the Court by order entered on July 7, 2006 (collectively, the UAW Special Attrition Program and UAW Supplemental Agreement are referred to herein as the "UAW Attrition Programs"). The UAW Attrition Programs offered, among other things, certain eligible Delphi U.S. hourly employees represented by the UAW normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM. The programs also provided a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service were granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they would be eligible to retire without additional incentives. The programs also provided buyout payments which, depending on the amount of seniority or credited service, ranged from $40,000 to $140,000. GM agreed to reimburse Delphi for one-half of these buyout payments and Delphi agreed to provide an allowed prepetition general unsecured claim to GM. In addition, employees who elected to participate in the UAW Attrition Programs were eligible to retire as employees of Delphi or flow back to GM and retire. During 2006, approximately 10,000 employees elected to flow back to GM and retire. Although GM agreed to assume the postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans. Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for the actual costs of providing such coverage. During 2007, GM overpaid Delphi. Therefore as of December 31, 2007, Delphi owed GM approximately $10 million which was repaid during 2008.

On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program which mirrored in all material respects the UAW Attrition Programs. The lump sum incentive payments of $35,000 per eligible employee and one-half of the $40,000 to $140,000 buyout payments are being paid by Delphi and reimbursed by GM. GM will receive an allowed prepetition general unsecured claim equal to the amount it reimburses Delphi for the buyout payments. The IUE-CWA special attrition program (the "IUE-CWA Special Attrition Program") was approved by the Court by order entered on July 7, 2006.

Delphi recorded special termination benefit charges of approximately $1,117 million for the year ended December 31, 2006, for the pre-retirement and buyout portions of the cost of the U.S. employee special attrition programs. Since Delphi agreed to provide GM with an allowed prepetition general unsecured claim for its 50% share of the financial responsibility of the buyout payments, Delphi expensed 100% of the buyout payments. In addition, Delphi recorded net pension and postretirement benefit curtailment charges of approximately $1,897 million and a credit of $59 million due to a curtailment gain related to extended disability benefits for the year ended December 31, 2006. Total workforce transition charges were $2,955 million, of which $2,706 million is recorded in U.S. workforce transition charges and $249 million is recorded in loss on discontinued operations.

**2008 Reimbursement**

As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, the net reorganization gain recorded for the elements of the Amended GSA that were implemented during 2008, included $491 million related to GM's reimbursement of costs incurred under the 2006 and 2007 special attrition programs. GM reimbursed Delphi $230 million related to the funding of various 2007 U.S. hourly workforce special attrition programs, consistent with the provisions of the U.S. labor union settlement agreements. Additionally, previously recognized GM general unsecured claims of $333 million primarily related to the 2006 U.S. hourly workforce attrition programs previously reimbursed by GM have been forgiven and subsumed in the overall $2.5 billion allowed general unsecured claim granted to GM. The following table details this component of the reorganization gain and cash received:

| Amended GSA Effectiveness | Reorganization Gain | Cash |
|---|---|---|
| | (in millions) | |
| Amounts reimbursed for buyouts | $ 68 | $ 68 |
| Amounts reimbursed for retirement incentives | — | 7 |
| Amounts reimbursed for buy-downs | 90 | 155 |
| Forgiveness of 2006 special attrition program allowed claim | 333 | — |
| Total | $ 491 | $ 230 |

## 17. PENSION AND OTHER POSTRETIREMENT BENEFITS

Delphi sponsors pension plans covering unionized employees in the U.S., which generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. Delphi also sponsors defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in non-qualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, Korea, Turkey, Italy and the United Kingdom ("UK"). The UK and certain Mexican plans are funded.

Delphi froze the Salaried Plan, the Supplemental Executive Retirement Program ("SERP") the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program and the PHI Non-Bargaining Retirement Plan effective as of September 30, 2008. Effective as of October 1, 2008, Delphi's existing Savings-Stock Purchase Program for Salaried Employees was enhanced to provide a Delphi matching contribution and a 4% non-elective Delphi retirement contribution. Additionally, Delphi reached agreement with its labor unions resulting in a freeze of traditional benefit accruals under the Hourly Plan effective as of November 30, 2008.

Delphi also maintains other postretirement benefit plans, which provide covered U.S. hourly and salaried employees with retiree medical and life insurance benefits. On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses (refer to Note 25. Subsequent Events). Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such other postretirement benefit plans was not significant to Delphi.

The 2008 and 2007 amounts shown below reflect Delphi's defined benefit pension and other postretirement benefit obligations.

| | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. Plans | | Non-U.S. Plans | | | |
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Benefit obligation at beginning of year | $ 14,054 | $ 14,910 | $ 1,589 | $ 1,635 | $ 8,732 | $ 9,055 |
| Service cost | 128 | 170 | 50 | 47 | 27 | 81 |
| Interest cost | 814 | 851 | 90 | 81 | 428 | 542 |
| Plan participants' contributions | 4 | 5 | 6 | 5 | — | 3 |
| Actuarial losses (gains) | 251 | (589) | (126) | (176) | (1,018) | (471) |
| Benefits paid | (1,150) | (1,045) | (146) | (108) | (216) | (243) |
| Special termination benefits | — | — | — | — | — | 3 |
| Impact of transfers / settlements | (2,623) | — | 55 | 48 | (6,821) | — |
| Impact of curtailments | 75 | (254) | 2 | 5 | (10) | (100) |
| Impact of adoption of SFAS 158 | — | — | 26 | — | 132 | — |
| Plan amendments and other | (142) | 6 | 59 | 5 | (53) | (138) |
| Exchange rate movements | — | — | (363) | 47 | — | — |
| Benefit obligation at end of year | $ 11,411 | $ 14,054 | $ 1,242 | $ 1,589 | $ 1,201 | $ 8,732 |
| | | | | | | |
| Change in plan assets: | | | | | | |
| Fair value of plan assets at beginning of year | $ 10,748 | $ 10,722 | $ 1,146 | $ 1,025 | $ — | $ — |
| Actual return on plan assets | (3,155) | 857 | (263) | 113 | — | — |
| Delphi contributions | 264 | 209 | 119 | 95 | 216 | 240 |
| Plan participants' contributions | 4 | 5 | 6 | 5 | — | 3 |
| Benefits paid | (1,150) | (1,045) | (146) | (108) | (216) | (243) |
| Impact of transfers / settlements | (540) | — | — | — | — | — |
| Exchange rate movements and other | (24) | — | (240) | 16 | — | — |
| Fair value of plan assets at end of year | $ 6,147 | $ 10,748 | $ 622 | $ 1,146 | $ — | $ — |
| | | | | | | |
| Underfunded status | $ (5,264) | $ (3,306) | $ (620) | $ (443) | $ (1,201) | $ (8,732) |
| | | | | | | |
| Amounts recognized in the consolidated balance sheets consist of: | | | | | | |
| Other non-current assets (including OPEB flow-in receivable) | $ — | $ — | $ — | $ 1 | $ — | $ 97 |
| Current liabilities | — | — | (21) | (13) | — | — |
| Non-current liabilities | — | — | (542) | (406) | — | — |
| Liabilities subject to compromise | (5,264) | (3,306) | (57) | (25) | (1,201) | (8,829) |
| Total | $ (5,264) | $ (3,306) | $ (620) | $ (443) | $ (1,201) | $ (8,732) |
| | | | | | | |
| Amounts recognized in accumulated other comprehensive income consist of (pre-tax): | | | | | | |
| Actuarial loss | $ 5,062 | $ 1,330 | $ 412 | $ 311 | $ 373 | $ 1,176 |
| Prior service cost (credit) | 86 | 112 | 28 | 33 | (518) | (736) |
| Net transition obligation | — | — | 4 | 6 | — | — |
| Total | $ 5,148 | $ 1,442 | $ 444 | $ 350 | $ (145) | $ 440 |

The projected benefit obligation ("PBO"), accumulated benefit obligation ("ABO"), and fair value of plan assets for pension plans with accumulated benefit obligations in excess of plan assets and with plan assets in excess of accumulated benefit obligations are as follows:

| | U.S. Plans | | Primary Non-U.S. Plans | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | | (in millions) | | |
| Plans with ABO in Excess of Plan Assets | | | | |
| PBO ...................................................... | $11,411 | $14,054 | $ 1,144 | $ 1,499 |
| ABO ...................................................... | 11,409 | 14,051 | 1,002 | 1,284 |
| Fair value of plan assets at end of year.. | 6,147 | 10,748 | 557 | 1,055 |
| Plans with Plan Assets in Excess of ABO | | | | |
| PBO ...................................................... | $    — | $    — | $  98 | $  90 |
| ABO ...................................................... | — | — | 60 | 58 |
| Fair value of plan assets at end of year.. | — | — | 65 | 91 |
| Total | | | | |
| PBO ...................................................... | $11,411 | $14,054 | $ 1,242 | $ 1,589 |
| ABO ...................................................... | 11,409 | 14,051 | 1,062 | 1,342 |
| Fair value of plan assets at end of year.. | 6,147 | 10,748 | 622 | 1,146 |

Benefit costs presented below were determined based on actuarial methods and included the following:

| | Pension Benefits | | | | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. Plans | | | Non-U.S. Plans | | | | | |
| | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** |
| | | | | (in millions) | | | | | |
| Service cost (a)...................................... | $ 128 | $ 170 | $ 268 | $ 50 | $ 47 | $ 42 | $  27 | $ 81 | $ 171 |
| Interest cost........................................... | 814 | 851 | 793 | 90 | 81 | 66 | 428 | 542 | 561 |
| Expected return on plan assets ............. | (833) | (867) | (820) | (86) | (81) | (69) | — | — | — |
| Special termination benefits................. | — | — | — | — | — | 20 | — | — | — |
| Settlement loss (gain)........................... | 494 | — | — | 55 | — | — | (7,087) | — | — |
| Curtailment loss (gain)-PBO................. | 75 | 22 | 1,518 | 2 | 60 | — | (8) | — | (349) |
| Curtailment loss (gain)-prior service ... | — | 194 | 397 | — | — | — | (74) | (7) | 329 |
| Amortization of transition amount....... | — | — | — | 1 | 1 | 1 | — | — | — |
| Amortization of prior service costs (credit)............................................. | 26 | 52 | 107 | 7 | 4 | 3 | (108) | (99) | (99) |
| Amortization of actuarial losses........... | 21 | 75 | 192 | 5 | 32 | 26 | 37 | 74 | 255 |
| Net periodic benefit cost.................. | $ 725 | $ 497 | $2,455 | $ 124 | $ 144 | $  89 | $ (6,785) | $ 591 | $ 868 |

(a)  Includes $23 million, $48 million and $29 million for the years ended December 31, 2008, 2007 and 2006, respectively, of costs previously accrued related to the U.S. employee workforce transition programs.

Net periodic benefit cost above reflects $23 million, $147 million and $186 million that was included in loss from discontinued operations for the years ended December 31, 2008, 2007 and 2006, respectively.

**Settlements and Curtailments**

On September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan, pursuant to section 414(l) of the Code (the "414(l) Net Liability Transfer"), as agreed under the Amended GSA.  The 414(l) Net Liability Transfer is to occur in two separate steps.

On September 29, 2008, Delphi completed the first step of the 414(l) Net Liability Transfer, transferring liabilities of approximately $2.6 billion and assets of approximately $486 million of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan, representing

30% and 10% of the projected benefit obligation and plan assets, respectively, as of September 29, 2008. The 414(l) Net Liability Transfer is sufficient to avoid an accumulated funding deficiency for the Hourly Plan for plan year ended September 30, 2008. The $486 million transferred represented 90% of the initially estimated $540 million of assets to be transferred under the first step of the 414(l) Net Liability Transfer. The remaining assets will be transferred by March 29, 2009 upon finalization of related valuations. In consideration of the first step of the 414(l) Net Liability Transfer, GM received an allowed administrative bankruptcy claim equivalent to 77.5% of the net unfunded liabilities transferred, or $1.6 billion. The first step of the 414(l) Net Liability Transfer was accounted for as a partial settlement of the Hourly Plan under SFAS 88. Delphi recognized a SFAS 88 settlement loss of $494 million included in reorganization items in the consolidated statements of operations for 2008, which reflects the recognition of $494 million of previously unrecognized actuarial losses. The amount of actuarial losses recognized represents the proportion of the projected benefit obligation transferred to GM relative to the total projected benefit obligation of the Hourly Plan.

The second step of the 414(l) Net Liability Transfer will include all remaining Hourly Plan assets and obligations related to plan participants with prior GM service and will occur upon the effectiveness of an amended plan of reorganization that (i) provides for the treatment of GM's claims and releases as set forth in the Amended GSA and (ii) contains interpretive provisions under the Amended GSA regarding conflicts between such plan and the Amended GSA, see Note 2. Transformation Plan and Chapter 11 Bankruptcy.

Under the terms of the Amended GSA and union labor agreements, GM assumed $6.8 billion of traditional hourly OPEB liabilities related to plan participants with prior GM service. GM's assumption of these traditional hourly OPEB liabilities constitutes a settlement under Statement of Financial Accounting Standards No. 106, *Employer's Accounting for Postretirement Benefits Other Than Pensions.* Delphi recognized a settlement gain of $7.1 billion in reorganization items in the consolidated statements of operations for 2008, which reflects the assumption by GM of the net unfunded liability of $6.8 billion and the recognition of $266 million of previously unrecognized actuarial gains.

As a result of the salaried workforce transformation plan activities in North America discussed in Note 7. Employee Termination Benefits and Other Exit Costs, salaried separations in 2008 have resulted in significant reductions in expected future service, or curtailments, of the Salaried Plan, OPEB and SERP. Delphi recorded net salaried pension curtailment losses of $75 million and salaried OPEB curtailment gains of $82 million for 2008.

In 2007, Delphi recorded pension curtailment losses of approximately $216 million. Of this amount, $175 million was recorded to recognize the effect of employees who elected to participate in the workforce transition programs and the effect of prospective plan amendments that will eliminate the accrual of future defined pension benefits for salaried and certain hourly employees on emergence from bankruptcy with $135 million included in U.S. employee workforce transition program charges and $40 million included in loss from discontinued operations. In addition, $34 million of pension curtailment loss is included in loss from discontinued operations related to the divestiture of businesses. The remaining $7 million of pension curtailment loss relates to U.S. employees at sites that will be sold or wound down and is included in cost of sales. In addition, Delphi recorded other postretirement benefit curtailment gains of $7 million in 2007, of which $3 million was recorded in U.S. employee workforce transition program charges, $2 million was recorded in loss from discontinued operations and $2 million was recorded in cost of sales, to recognize the effects of the workforce transition programs and the elimination of the accrual of retiree medical benefits for certain hourly employees. In 2006, Delphi recorded net pension and postretirement benefit curtailment charges of approximately $1.9 billion in the U.S. employee workforce transition program charges line item of the statement of operations related to UAW- and IUE-CWA-represented hourly employees who elected to participate in the U.S. employee special attrition programs discussed in Note 16. U.S. Employee Workforce Transition Programs.

Experience gains and losses, as well as the effects of changes in actuarial assumptions and plan provisions are amortized over the average future service period of employees. The estimated actuarial loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated OCI into net periodic benefit cost in 2009 are $234 million and $30 million, respectively. The estimated actuarial loss and prior service credit for the other defined benefit postretirement plans that will be amortized from OCI into net periodic benefit credit in 2009 are $34 million and $94 million, respectively.

The principal assumptions used to determine the pension and other postretirement expense and the actuarial value of the projected benefit obligation for the U.S. and non-U.S. pension plan and postretirement plans were:

**Assumptions used to determine benefit obligations at December 31:**

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | **2008** | **2007** | **2008** | **2007** | **2008** | **2007** |
|---|---|---|---|---|---|---|
| Weighted-average discount rate | 6.16% | 6.35% | 6.39% | 5.30% | 6.12% | 6.40% |
| Weighted-average rate of increase in compensation levels | 4.50% | 4.04% | 3.97% | 4.16% | 4.50% | 3.31% |

**Assumptions used to determine net expense for years ended December 31:**

| | Pension Benefits | | | | | | Other Postretirement Benefits | | |
| | U.S. Plans | | | Non-U.S. Plans | | | | | |
| | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** | **2008** | **2007** | **2006** |
|---|---|---|---|---|---|---|---|---|---|
| Weighted-average discount rate .......... | 6.35% | 5.90% | 5.50% | 5.99% | 4.96% | 4.91% | 6.41% | 6.10% | 5.50% |
| Weighted-average rate of increase in compensation levels ..................... | 4.45% | 4.12% | 3.99% | 4.16% | 3.67% | 3.45% | 4.50% | 3.94% | 3.99% |
| Expected long-term rate of return on plan assets ................................... | 8.75% | 8.75% | 8.75% | 8.28% | 8.05% | 8.20% | N/A | N/A | N/A |

In 2007 and 2006, Delphi selected discount rates for measurements by analyzing the results of matching each plan's projected benefit obligations with hypothetical portfolios of high quality corporate bonds rated AA- or higher by Standard and Poor's and with a portfolio of high quality investments. Because high quality corporate bonds in sufficient quantity and with appropriate maturities are not available for all years when benefit cash flows are expected to be paid, hypothetical bonds were imputed based on combinations of existing bonds, and interpolation and extrapolation reflecting current and past yield trends. In 2008, due to a reduction in the number of high quality corporate bonds, Delphi selected discount rates for measurements as of December 31, 2008 by analyzing the results of matching each plan's projected benefit obligations with the portfolio of high quality investments. Delphi selected discount rates for its non-U.S. plans by analyzing the yields of high quality fixed income investments.

For 2008, 2007 and 2006 expense, Delphi assumed a U.S. long-term asset rate of return of 8.75%. In developing the 8.75% expected long-term rate of return assumption, Delphi evaluated input from its third party pension plan asset manager, including a review of asset class return expectations and long-term inflation assumptions. Delphi also considered its post-spin off and GM's pre-spinoff historical 10-year and 20-year compounded returns, which were consistent with its long-term rate of return assumption. For the determination of 2009 expense, Delphi will assume a U.S. long-term asset rate of return of 8.25%. This 50 basis point reduction was based on the updated historical 10-year and 20-year compounded returns analysis. The primary non-U.S. plans conduct similar studies in conjunction with local actuaries and asset managers. While the studies give appropriate consideration to recent fund performance and historical returns, the assumptions are primarily long-term, prospective rates.

Delphi's pension expense for 2009 is determined at the 2008 measurement date. For purposes of analysis, the following table highlights the sensitivity of the Company's pension obligations and expense to changes in key assumptions:

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
|---|---|---|
| 25 basis point (bp) decrease in discount rate | + $13 million | + $300 million |
| 25 bp increase in discount rate | - $12 million | - $300 million |
| 25 bp decrease in long-term return on assets | + $18 million | — |
| 25 bp increase in long-term return on assets | - $18 million | — |

The above sensitivities reflect the effect of changing one assumption at a time. It should be noted that economic factors and conditions often affect multiple assumptions simultaneously and the effects of changes in key assumptions are not necessarily linear. The above sensitivities also assume no changes to the design of the pension plans and no major restructuring programs.

Delphi's other postretirement benefit expense for 2009 is determined at the 2008 measurement date. For purposes of analysis, the following table highlights the sensitivity of the Company's postretirement obligations and expense to changes in assumptions:

| Change in Assumption | Impact on Postretirement Expense | Impact on Postretirement Benefit Obligation |
|---|---|---|
| 25 basis point (bp) decrease in discount rate | + $4 million | + $19 million |
| 25 bp increase in discount rate | - $4 million | - $18 million |
| 1 % increase in health care trend rate | + $6 million | + $73 million |
| 1 % decrease in health care trend rate | - $5 million | - $63 million |

The above sensitivities reflect the effect of changing one assumption at a time. It should be noted that economic factors and conditions often affect multiple assumptions simultaneously and the effects of changes in key assumptions are not necessarily linear. The above sensitivities also assume no changes to the postretirement plan design and no major restructuring programs.

Delphi's pension plan asset allocation at December 31, 2008 and 2007, and target allocation for 2009 are as follows:

| Asset Category | Percentage of Plan Assets at December 31, | | | | Target Allocation |
| | U.S. Plans | | Non-U.S. Plans | | U.S. Plans |
| | 2008 | 2007 | 2008 | 2007 | 2009 |
|---|---|---|---|---|---|
| Equity Securities | 55% | 57% | 51% | 61% | 60% |
| Fixed Income | 20% | 25% | 28% | 24% | 25% |
| Private Equity | 8% | 6% | — | — | 4% |
| Real Estate | 11% | 8% | 12% | 14% | 7% |
| Other | 6% | 4% | 9% | 1% | 4% |
| Total | 100% | 100% | 100% | 100% | 100% |

Delphi invests in a diversified portfolio consisting of an array of asset classes that attempts to maximize returns while minimizing volatility.  These asset classes include U.S. domestic equities, developed market equities, emerging market equities, private equity, global high quality and high yield fixed income, real estate, and absolute return strategies.

## SFAS 158 Adoption

In September 2006, the FASB issued SFAS 158, which requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefit plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008.  Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year.  Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, and utilized the second transition approach provided under SFAS 158.  Under this approach, net periodic benefit cost related to these plans for the period between the most recent measurement date of September 30, 2007 and December 31, 2008, was allocated proportionately between an adjustment of accumulated deficit as of January 1, 2008 and amounts to be recognized as net periodic benefit cost during 2008.

The following table summarizes the pre-tax impact of the adoption of the measurement date provisions of SFAS 158:

| | U.S Retiree Medical Plans | Non-U.S. Pension Plans | Total |
| | Increase / (Decrease) (in millions) | | |
|---|---|---|---|
| Pension and other postretirement benefit liabilities ...... | $ 132 | $ 7 | $ 139 |
| Accumulated deficit as of January 1, 2008 ................... | $ 117 | $ 12 | $ 129 |
| Accumulated other comprehensive loss as of January 1, 2008 .......................................................................... | $ 15 | $ (5) | $ 10 |

## Pension Funding

As permitted under chapter 11 of the Bankruptcy Code, during 2008, Delphi contributed only the portion of the required contributions attributable to service after the Chapter 11 Filings and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005, and September 30, 2007, respectively, and may assert additional excise taxes against Delphi.  Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and, as a result, the Company would not be liable for any such assessments.  Accordingly, management has concluded that an unfavorable outcome is not currently probable and, as of December 31, 2008, no amounts have been recorded for any potential excise tax assessment.

During 2008, Delphi contributed approximately $264 million to its U.S. pension plans, of which $45 million and $46 million related to services rendered during the fourth quarter of 2007 and the first quarter of 2008, respectively, and the remaining $172.5 million related to the PBGC draw against the letters of credit in favor of the Hourly and Salaried Plans discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy to the consolidated financial statements.  As permitted under ERISA and the Code, all of these amounts have been applied to the plan years ended September 30, 2007.  As further permitted under ERISA and the Code, Delphi elected to defer contributions necessary to satisfy approximately $69 million of additional minimum funding obligations under the Salaried and subsidiary plans until as late as June 15, 2009 for the Salaried Plan (later, if the IRS grants the funding waiver requested by Delphi on December 15, 2008) and as late as September 15, 2009 for the subsidiary plans.

During 2007 and 2006, Delphi contributed $209 million and $243 million, respectively, to its U.S. pension plans, representing the portion of the pension contribution attributable to services rendered by employees of the Debtors in the respective plan years ended

September 30, 2007 and 2006.  Under ERISA and the Code, minimum funding payments of approximately $1.2 billion to the U.S. pension plans were due in 2007 and 2006.

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

|  | Projected Pension Benefit Payments | | Projected Postretirement Benefit Payments |
|  | U.S. Plans | Non-U.S. Plans | |
|  |  | (in millions) |  |
| 2009 | $   941 | $   58 | $   74 |
| 2010 | 926 | 55 | 79 |
| 2011 | 913 | 58 | 85 |
| 2012 | 894 | 62 | 89 |
| 2013 | 878 | 66 | 88 |
| 2014 – 2018 | 4,144 | 519 | 445 |

Delphi's annual measurement date for its pension and other postretirement benefit plans is December 31, Delphi's fiscal year-end.

For postretirement plan measurement purposes, Delphi assumed an average 8% initial annual rate of increase in the per capita cost of covered health care benefits.  The rate was assumed to decrease on a gradual basis through 2018, to the ultimate weighted-average trend rate of 5%.

Delphi also sponsors defined contribution plans for certain U.S. hourly and salaried employees.  Delphi's expense related to the contributions for these plans was $23 million, $10 million and $8 million for 2008, 2007 and 2006, respectively.

## 18. COMMITMENTS AND CONTINGENCIES

### Shareholder Lawsuits

As previously disclosed, the Company, along with certain of its subsidiaries, current and former directors of the Company, and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005.  These lawsuits (the "Multidistrict Litigation") were coordinated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and assigned to Hon. Gerald E. Rosen in the United States District Court for the Eastern District of Michigan (the "District Court").  Set forth below is a description of the Multidistrict Litigation and a summary of a settlement concerning the Multidistrict Litigation.

The Multidistrict Litigation is comprised of lawsuits in three categories.  One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA.  On October 21, 2005, the District Court appointed interim lead plaintiffs for the putative class.  On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action") with a class period of May 28, 1999 to November 1, 2005.  Plaintiffs in the ERISA Action allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA.  The Company, which was initially named as a defendant in these lawsuits, was not named as a defendant in the ERISA Action due to its chapter 11 filing, but the plaintiffs stated that they intended to proceed with claims against the Company in the ongoing bankruptcy cases, and would seek to name the Company as a defendant in the ERISA Action if the bankruptcy stay were modified or lifted to permit such action.  On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to plaintiffs' counsel and other parties in the case.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws.  On September 30, 2005, the court-appointed Lead Plaintiffs filed a consolidated class action complaint (the "Securities Action") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005.  The Securities Action names several additional defendants, including Delphi Trust I and Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities.  The Securities Action, which had been consolidated in the United States District Court for Southern District of New York, was subsequently transferred to the District Court as part of the Multidistrict Litigation (as was a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I, which was subsequently consolidated into the Securities Action).  The Securities Action was stayed against the Company pursuant to the Bankruptcy Code, but continued against the other defendants.  On February 15, 2007, the District Court partially

granted the Lead Plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the Lead Plaintiffs to obtain certain discovery from the defendants.  On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to the Lead Plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions").  A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court.  These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results.  The federal cases were coordinated with the securities and ERISA class actions in the Multidistrict Litigation.  Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the Shareholder Derivative Actions were administratively closed.

Following mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi named as defendants, and certain other defendants involved in the Multidistrict Litigation reached agreements with the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action to settle the claims asserted against them in those actions (the "MDL Settlements").

On September 5, 2007 the District Court entered an order preliminarily certifying a class in the Securities Action and the ERISA Action, preliminarily approving the MDL Settlements, and scheduling a fairness hearing on November 13, 2007.  On November 13, 2007, the District Court conducted the fairness hearing and took the matter under advisement.  Separately, on October 29, 2007, the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements.  On October 29, 2007, the Court lifted the automatic stay as to the discovery provided to the Lead Plaintiffs.  On December 4, 2007, the District Court held another hearing to consider proposed modifications to the proposed settlement of the Securities Action (as modified, the "Securities Settlement"), and tentatively approved the Securities Settlement, after determining that the modifications were at least neutral to the class and may potentially provide a net benefit to the class.

The District Court approved the MDL Settlements (including the Securities Settlement) in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered an Order and Final Judgment dated January 23, 2008 in both the Securities Action and ERISA Action.  One security holder appealed certain aspects of the District Court's opinion and order, as amended, approving the MDL Settlements.  That appeal is pending before the United States Court of Appeals for the Sixth Circuit.

On January 25, 2008, the Court approved the MDL Settlements.  Under the terms of the MDL Settlements, the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action will receive claims that will be satisfied through Delphi's Plan as confirmed by the Court pursuant to the confirmation order.  Under the Securities Settlement, (i) the Lead Plaintiffs will be granted an allowed claim in the face amount of $179 million, which will be satisfied by Delphi providing $179 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan, and (ii) the class in the Securities Action will receive $15 million to be provided by a third party, a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases.  If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the amount received by the class in the Securities Action.  Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged.

The settlement of the ERISA Action is structured similarly to the settlement reached with the Lead Plaintiffs.  The claim of the named plaintiffs in the ERISA Action will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the plan of reorganization.  The class in the ERISA Action will also receive a distribution of insurance proceeds in the amount of approximately $22 million.  Unlike the settlement of the Securities Action, no member of the class in the ERISA Action can "opt out" of the settlement.

Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007, pending the effective date of the MDL Settlements.

The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants.  As provided in the confirmation order, the MDL Settlements are

contingent upon the effective date of the Plan occurring as well as the payment of the $15 million amount to be provided by a third party, and if, for any reason, these contingencies are not met, the MDL Settlements will become null and void.  Delphi is in discussion with various of its stakeholders regarding potential modifications to the terms of the MDL Settlements that would allow for the MDL Settlements, as modified, to become effective in advance of the resolution of Delphi's chapter 11 cases, however there can be no assurances that the parties will reach agreement on such modifications. If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

    The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties.  The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand.  As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

    As a result of the MDL Settlements, as of December 31, 2008 and December 31, 2007, Delphi has a liability of $351 million recorded for this matter.  Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million.  As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage.  In conjunction with the MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries on the effective date of the MDL Settlements.

**Environmental Matters**

    Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations.  For a discussion of matters relating to compliance with laws for the protection of the environment, refer to Item 1.  Business – Environmental Compliance in this Annual report on Form 10-K.

    As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont City Landfill Site (the "Site") located in Tremont, Ohio, which is alleged to involve ground water contamination.  In September 2002, Delphi and other PRPs entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study (the "Feasibility Study") concerning a portion of the Site.  The Remedial Investigation and Alternatives Array Document were finalized in 2007.  The Feasibility Study was approved (with modifications) by the EPA on November 25, 2008. On December 11, 2008, Delphi and the other PRPs filed a Notice of Objection and Invocation of Dispute Resolution with the EPA.  Delphi and the other PRPs believe that the modifications to the Feasibility Study required by the EPA are not supported by the site assessment information developed to date, and would have the effect of unjustifiably increasing the likelihood of the EPA ultimately selecting excavation as the remedial approach for the Site.  The dispute resolution process is pending.  In the interim, Delphi and the other PRPs and the EPA are evaluating an additional remedial alternative for inclusion in the Feasibility Study.  The additional remedy would involve installation of numerous wells at the Site for removal of liquid wastes.  A Record of Decision is expected to be issued in 2009.  Although Delphi believes that capping and future monitoring alone would be an appropriate and protective remedy, a different cleanup approach ultimately may be required for the Site.  Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves.  As of December 31, 2008, Delphi has recorded its best estimate of its share of the remediation based on the removal of liquids remedy.  However, if that remedy is not accepted, Delphi's expenditures for remediation could increase by $11 million to $15 million in excess of its existing reserves.  Delphi will continue to reassess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

    Delphi received a Notice of Intent to File Civil Administrative Complaint ("Notice") from the EPA on May 30, 2008 regarding a June 2007 chlorine gas cylinder leak that occurred at the Saginaw, Michigan Delphi Steering facility.  The Notice alleges that Delphi failed to properly notify agency officials about the leak or the presence of chlorine gas at the site, and describes the EPA's intent to seek approximately $0.1 million in civil penalties relating to the incident.  Although Delphi disagrees with certain of the agency's assertions, Delphi resolved the matter in February 2009 through signing a Consent Agreement and Final Order that commits Delphi to pay a civil penalty of $66,887.

    As of December 31, 2008 and 2007, our reserve for environmental investigation and remediation was approximately $106 million (of which $9 million was recorded in accrued liabilities and $97 million was recorded in other long-term liabilities) and $112 million (recorded in other long-term liabilities), respectively.  As of December 31, 2008 and 2007, $95 million and $101 million, respectively, of the reserve related to sites within the U.S.  The amounts recorded take into account the fact that GM retained the environmental liability

for certain inactive sites as part of the Separation. Delphi completed a number of environmental investigations during 2006 in conjunction with our transformation plan, which contemplated significant restructuring activity, including the sale or closure of numerous facilities. As part of developing and evaluating various restructuring alternatives, environmental assessments that included identification of areas of interest, soil and groundwater testing, risk assessment and identification of remediation issues were performed at nearly all major U.S. facilities. These assessments identified previously unknown conditions and led to new information that allowed us to further update our reasonable estimate of required remediation for previously identified conditions requiring an adjustment to our environmental reserve of approximately $70 million in 2006. The recorded reserves relate to 35 facilities and are comprised of investigation, remediation and operation and maintenance of the remedy, including postremediation monitoring costs. Addressing contamination at various sites, including facilities designated as non-core and slated for closure or sale, is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent management's best estimate of the cost to complete such actions. Management believes that its December 31, 2008 accruals will be adequate to cover the estimated liability for its exposure with respect to such matters and that these costs will be incurred over the next 20 years. However, as we continue the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. We cannot ensure that environmental requirements will not change or become more stringent over time or that our eventual environmental remediation costs and liabilities will not exceed the amount of our current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology. Estimates are made on an undiscounted basis and exclude the effects of inflation. If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range. At December 31, 2008, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $82 million.

**Other**

As mentioned above, Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future. In 2007, Delphi commissioned building demolition assessments for certain sites that may ultimately be demolished or sold in the next few years. These assessments provided detailed estimates of quantities of asbestos at these particular sites and detailed cost estimates for remediation of that asbestos, which resulted in a $14 million revision to the existing estimates increasing the related asset retirement obligations. There was no significant adjustment in 2008.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization. The modified Plan sets forth the treatment of claims against and interest in the Debtors. (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases). Under the modified Plan, the automatic stay remains in effect until the effective date of the modified Plan.

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements. However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates. Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility. Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

<ins>GM Warranty Settlement Agreement</ins>

As previously disclosed, GM alleged that catalytic converters supplied by Delphi's Powertrain Systems segment to GM for certain 2001 and 2002 vehicle platforms did not conform to specifications. In May 2007 GM informed Delphi that it has experienced higher than normal warranty claims with respect to certain 2003-2005 vehicle models due to instrument clusters previously supplied by Delphi's Automotive Holdings Group segment. Effective December 2007, the responsibility for this product line was transferred to the Electronics and Safety segment. In 2007, Delphi reached a tentative agreement with GM to resolve these claims along with certain other known warranty matters. Based on the agreement, Delphi recorded $83 million of additional warranty expense in cost of sales in 2007, net of $8 million of recovery, primarily related to the Electronics and Safety and Powertrain Systems segments. On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving these and certain other known warranty matters. Under the terms of the Warranty Settlement Agreement, Delphi agreed to pay

GM up to an estimated $199 million, comprised of approximately $127 million to be paid in cash over time as noted below, and up to approximately $72 million to be paid in the form of delivery by Delphi to GM of replacement product.  The Warranty Settlement Agreement settled all outstanding warranty claims and issues related to any component or assembly supplied by Delphi to GM, which as of August 10, 2007 were (i) known by GM, subject to certain specified exceptions, (ii) believed by GM to be Delphi's responsibility in whole or in part, and (iii) in GM's normal investigation process, or which should have been within that process, but were withheld for the purpose of pursuing a claim against Delphi.  Included in the settlement were all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases ("GM's Proof of Claim").

In addition, the Warranty Settlement Agreement limited Delphi's liability related to certain other warranty claims that have become known by GM on or after June 5, 2007, and generally prohibited both GM and Delphi from initiating actions against the other related to any warranty claims settled in the agreement.  In accordance with the Warranty Settlement Agreement, Delphi's claims agent reduced the liquidated component relating to warranty claims contained in GM's Proof of Claim by approximately $530 million which includes, among other things, those personal injury claims asserted in GM's Proof of Claim that relate to warranty claims settled in the agreement, and expunged with prejudice the unliquidated component relating to warranty claims asserted in GM's Proof of Claim.  Pursuant to the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007, (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million, or GM believed the claim would exceed $1 million, (iii) the claim is in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed or reasonably should have believed that Delphi had some responsibility for the claim.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until its emergence from chapter 11.  The amount due under the Warranty Settlement Agreement accrued interest at the rate of 6% per annum.  In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in its Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest.  As a result, Delphi recorded the extinguishment of this liability as a reduction of warranty expense in 2008, of which $107 million was included in cost of sales, which had a corresponding favorable impact on operating income, and $5 million was included in discontinued operations.

<u>Other Warranty Matters</u>

During 2008, Delphi recovered $17 million from a supplier and recorded it as a reduction of warranty expense in discontinued operations.  Delphi began experiencing quality issues regarding parts supplied to GM from the Steering Business in 2005 and established warranty reserves to cover the estimated costs of various repairs that may be implemented.  The reserve was subsequently reduced due to a settlement reached with GM and the settlement was paid in 2006.  Delphi continued to negotiate with the supplier to determine if any portion of the expense was recoverable, and in 2008, Delphi and the supplier reached an agreement whereby the supplier paid Delphi $17 million to resolve the matter.

Also during 2008, Delphi recovered $28 million from an affiliated supplier and recorded it as a reduction of warranty expense.  Delphi began experiencing quality issues regarding parts purchased by Delphi's Thermal Systems segment during 2006 and established warranty reserves of approximately $60 million to cover the cost of various repairs that may be implemented.  The reserve has subsequently been adjusted for payments, settlements and the impact of foreign currency exchange rate fluctuations.  As of December 31, 2008 and December 31, 2007, the related reserve was $17 million and $41 million, respectively.

During 2007, Delphi observed higher than normal warranty claims on engine electronic control units supplied for certain 2005-2007 vehicle models by Delphi's Powertrain Systems segment and recorded $93 million of additional warranty expense in cost of sales in 2007.  Delphi continues to negotiate a settlement with its customer on this matter.

**Intellectual Property Matters**

In December 2007, the Company concluded patent license negotiations with Denso and reached a settlement agreement in connection with variable valve timing technology.  Under the settlement agreement, which was subject to the Court's approval, the Company is authorized to use the technology pursuant to a license agreement with Denso, and the Company will pay Denso a royalty based upon the sales of products containing the technology.

Litigation is subject to many uncertainties, and the outcome of individual litigated matters is not predictable with assurance.  After discussions with counsel, it is the opinion of Delphi that the outcome of such matters will not have a material adverse impact on the consolidated financial position, results of operations or cash flows of Delphi.

**Operating Leases**

Rental expense totaled $140 million, $154 million and $147 million for the years ended December 31, 2008, 2007 and 2006, respectively.  As of December 31, 2008, Delphi had minimum lease commitments under noncancelable operating leases totaling $385 million, which become due as follows:

| Year | Minimum Future Operating Lease Commitments |
|---|---|
| | (in millions) |
| 2009 ......................................................... | $    92 |
| 2010 ......................................................... | 73 |
| 2011 ......................................................... | 63 |
| 2012 ......................................................... | 52 |
| 2013 ......................................................... | 47 |
| Thereafter .................................................. | 58 |
| Total ...................................................... | $    385 |

**Concentrations of Risk**

The Company's business is labor intensive and utilizes a large number of unionized employees.  A strike or other form of significant work disruption by the unions would likely have an adverse effect on the Company's ability to operate its business.  The majority of Delphi's U.S. hourly workforce is represented by two unions, the UAW (approximately 85%) and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Industrial Division of the Communication Workers of America, AFL-CIO, CLC ("IUE-CWA") (approximately 12%).  During the second quarter of 2007, Delphi signed an agreement with the UAW, and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007.  Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions, covering a four-year term with each union.

GM is Delphi's largest customer and accounted for 31% of its total net sales from continuing operations in 2008, and a portion of Delphi's non-GM sales are to Tier 1 suppliers who ultimately sell its products to GM.  GM accounts for 52% of Delphi's net sales in North America where it has limited ability to adjust its cost structure to changing economic and industry conditions.  Additionally, Delphi's revenues have been and will continue to be affected by decreases in GM's business or market share.  GM has reported a variety of challenges it is facing, including severe liquidity issues, its relationships with its unions and large shareholders and its cost and pricing structures as further described in Item 1A. Risk Factors.

Delphi's other domestic customers are facing similar pressures and challenges as those that GM is facing.  Global sales to Ford Motor Company and Chrysler Corporation were approximately 6% and 1% of total sales in 2008, respectively.

**19. INVESTMENTS IN AFFILIATES**

As part of our operations, we have investments in 15 non-consolidated affiliates.  These affiliates are not publicly traded companies and are located primarily in Korea, China, the U.S., Mexico, Japan, India, Spain, and Belgium.  Our ownership percentages vary generally from approximately 20% to 50%, with our most significant investments in Korea Delphi Automotive Systems Corporation (of which we own 50%), Daesung Electric Co. Ltd (of which we own 49.5%), and Promotora de Partes Electricas Automotrices, S.A. de C.V. (of which we own 40%).  Our aggregate investment in non-consolidated affiliates was $303 million and $396 million at December 31, 2008 and 2007, respectively, of which $9 million was recorded in assets held for sale in 2007.  Delphi has received dividends of $11 million, $45 million and $19 million for the years ended December 31, 2008, 2007 and 2006, respectively, from non-consolidated affiliates.

The following is a summary of the combined financial information for our significant affiliates accounted for under the equity method as of December 31, 2008 and 2007 and for the years ended December 31, 2008, 2007 and 2006 (unaudited):

|  | As of December 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| Current assets | $   818 | $   1,128 |
| Non-current assets | 501 | 584 |
| Total assets | $   1,319 | $   1,712 |
| | | |
| Current liabilities | $   504 | $   662 |
| Non-current liabilities | 197 | 240 |
| Stockholders' equity | 618 | 810 |
| Total liabilities and stockholders' equity | $   1,319 | $   1,712 |

|  | Year Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|  | (in millions) | | |
| Net sales | $   2,477 | $   2,926 | $   2,595 |
| Gross profit | $   273 | $   390 | $   399 |
| Net income | $   53 | $   99 | $   122 |

A summary of transactions with affiliates is shown below:

|  | Year Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|  | (in millions) | | |
| Sales to affiliates | $   48 | $   72 | $   71 |
| Purchases from affiliates | $   267 | $   323 | $   281 |

## 20. OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

|  | Year Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|  | (in millions) | | |
| Interest income | $ 38 | $ 68 | $ 50 |
| Other, net | 31 | 42 | (10) |
| Other income, net | $ 69 | $110 | $ 40 |

Other, net for the year ended December 31, 2008 includes a $32 million gain from the sale of an investment accounted for under the cost method that had been previously fully impaired, which was offset by $16 million of expense related to an allowance recorded against a note receivable.  Other, net for the year ended December 31, 2007 includes $36 million received from GM pursuant to an intellectual property license agreement.

## 21. SHARE-BASED COMPENSATION

Delphi's share-based compensation programs include stock options, restricted stock units, and stock appreciation rights ("SAR").  The Company adopted SFAS No. 123 (Revised 2004), *Share-Based Payments* ("SFAS No. 123(R)"), effective January 1, 2006 using the modified-prospective method.  This method does not require prior period amounts to be restated to reflect the adoption of SFAS No. 123(R).  SFAS No. 123(R) requires compensation cost to be recognized for equity or liability instruments based on the grant-date fair value, with expense recognized over the periods that an employee provides service in exchange for the award.  In addition, SFAS No. 123(R) requires the Company to estimate forfeitures at the grant date, while prior to the adoption of SFAS No. 123(R), the Company accounted for forfeitures as they occurred.  The related adjustment is a benefit of $3 million (there is no income tax effect due to the fact Delphi has a full valuation allowance for all of its U.S. net deferred tax assets) and has been presented separately as a cumulative effect of change in accounting principle in the financial statements.  In addition, while the Company will recognize compensation cost for newly issued equity or liability instruments over the periods that an employee provides service in exchange for the award, the Company will continue to follow a nominal vesting approach for all awards issued prior to the adoption of SFAS No. 123(R).

Approximately $10 million, $14 million and $28 million of share-based compensation cost was recognized during 2008, 2007 and 2006, respectively, of which $5 million and $5 million are included in loss from discontinued operations for the years ended December 31, 2007 and 2006, respectively.  As described below, 2008 expense was primarily related to the cancellation of all outstanding restricted stock units in May 2008.  All previously issued stock options had been expensed.

*Share-Based Compensation Plans*

Delphi has no intention during bankruptcy to deliver approximately 22 million shares of stock for future grants under its Long-Term Incentive Plan ("LTIP").  As a result, as of December 31, 2005, there were no shares available for future grants of options or restricted stock units.  In addition, to date, Delphi has not issued common stock for any option that was granted but unvested at the time of the Chapter 11 Filings that subsequently vested.

A summary of activity for the Company's stock options is as follows:

|  | Stock Options (a) (in thousands) | Weighted Average Exercise Price |
|---|---|---|
| Outstanding as of January 1, 2008 ........... | 67,968 | $13.49 |
| Granted .................................................. | — | — |
| Exercised ............................................... | — | — |
| Forfeited................................................. | (9,015) | $13.81 |
| Outstanding as of December 31, 2008 ..... | 58,953 | $13.43 |
| Options exercisable December 31, 2008 | 58,953 | $13.43 |

(a)  Includes options that were granted and unvested at the time of the Chapter 11 Filings on October 8, 2005.  The Company cancelled future grants of stock-based compensation under its long-term incentive plan and will not issue any shares of common stock pursuant to previously granted stock option awards that had not vested prior to the commencement of reorganization cases.

The following is a summary of the range of weighted average remaining lives of options outstanding and exercisable as of December 31, 2008:

### Approved by Stockholders

| Range of Exercise Prices | Outstanding Stock Options (in thousands) | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable (in thousands) | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.00-$10.00 | 9,986 | 4.3 | $  8.43 | 9,986 | $  8.43 |
| $10.01-$20.00 | 33,214 | 2.6 | $ 13.31 | 33,214 | $ 13.31 |
| $20.01-$30.00 | 60 | — | $ 20.64 | 60 | $ 20.64 |
|  | 43,260 |  | $ 12.20 | 43,260 | $ 12.20 |

### Other Plans

| Range of Exercise Prices | Outstanding Stock Options (in thousands) | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable (in thousands) | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.00-$10.00 | — | — | $  — | — | $  — |
| $10.01-$20.00 | 13,807 | 0.8 | $ 16.29 | 13,807 | $ 16.29 |
| $20.01-$30.00 | 1,886 | — | $ 20.64 | 1,886 | $ 20.64 |
|  | 15,693 |  | $ 16.81 | 15,693 | $ 16.81 |

*Restricted Stock Units*

A summary of activity for the Company's restricted stock units is as follows:

|  | Restricted Stock Units (in thousands) | Weighted Average Grant Date Fair Value |
|---|---|---|
| Non-vested at January 1, 2008 | 6,342 | $ 8.47 |
| Vested | (1,741) | $ 7.51 |
| Forfeited | (159) | $ 8.31 |
| Cancelled | (4,442) | $ 8.86 |
| Non-vested at December 31, 2008 | — | $ — |

In May 2008, Delphi cancelled all non-vested restricted stock units, resulting in the recording of $7 million of unrecognized compensation cost. As of December 31, 2007, there was approximately $12 million of unrecognized compensation cost related to non-vested restricted stock units.

## 22. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as the Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronics controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.
- Corporate and Other, which includes the Product and Service Solutions business which is comprised of automotive aftermarket, including diesel and original equipment service, consumer electronics and medical systems, in addition to the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, and the elimination of inter-segment transactions and charges related to U.S. employee workforce transition programs.

We also have non-core steering and halfshaft product lines and interiors and closures product lines that are reported in discontinued operations. Previously, the steering and halfshaft product line was a separate operating segment and the interiors and closures product line was part of our Automotive Holdings Group segment. Refer to Note 5. Discontinued Operations for more information.

The accounting policies of the segments are the same as those described in Note 1. Significant Accounting Policies, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and operating income before depreciation and amortization, including long-lived asset and goodwill impairment charges, transformation and rationalization charges and discontinued operations ("OIBDAR") and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices. Delphi's management believes that OIBDAR is a meaningful measure of performance and it is used by management and the Board of Directors to analyze Company and stand-alone segment operating performance. Management also uses OIBDAR for planning and forecasting purposes.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Included below are sales and operating data for Delphi's segments for the years ended December 31, 2008, 2007 and 2006 as well as balance sheet data as of December 31, 2008 and 2007.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|
| **2008:** | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,165 | $ 1,075 | $ 1,440 | $ 1,083 | $ 471 | $ 291 | $ 5,525 |
| Net sales to other customers ...... | 2,739 | 3,009 | 4,064 | 957 | 780 | 986 | 12,535 |
| Inter-segment net sales.............. | 144 | 386 | 145 | 81 | 97 | (853) | — |
|    Total net sales...................... | $ 4,048 | $ 4,470 | $ 5,649 | $ 2,121 | $ 1,348 | $ 424 | $ 18,060 |
| GM settlement (Note 2 – MRA) ... | $ (42) | $ (94) | $ (15) | $ (88) | $ (62) | $ 47 | $ (254) |
| Depreciation & Amortization ...... | $ 235 | $ 248 | $ 187 | $ 71 | $ 32 | $ 54 | $ 827 |
| Long-lived asset impairment charges .................................. | $ 15 | $ — | $ 2 | $ 10 | $ 10 | $ — | $ 37 |
| Goodwill impairment charges.... | $ 157 | $ — | $ 168 | $ — | $ — | $ — | $ 325 |
| Operating income (loss) (b) ....... | $ (654) | $ (130) | $ (361) | $ 18 | $ (68) | $ (286) | $ (1,481) |
| OIBDAR (f) ............................. | $ (70) | $ 120 | $ 96 | $ 39 | $ 44 | $ 40 | $ 269 |
| Minority Interest ..................... | $ — | $ (13) | $ (12) | $ (4) | $ 1 | $ — | $ (28) |
| Equity income (loss) ................. | $ — | $ 3 | $ 9 | $ 6 | $ (22) | $ 5 | $ 1 |
| **2007:** | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,606 | $ 1,563 | $ 1,750 | $ 1,355 | $ 1,585 | $ 442 | $ 8,301 |
| Net sales to other customers ...... | 3,179 | 3,607 | 4,038 | 937 | 1,172 | 1,049 | 13,982 |
| Inter-segment net sales.............. | 250 | 493 | 180 | 120 | 189 | (1,232) | — |
|    Total net sales...................... | $ 5,035 | $ 5,663 | $ 5,968 | $ 2,412 | $ 2,946 | $ 259 | $ 22,283 |
| Depreciation & Amortization .... | $ 267 | $ 266 | $ 175 | $ 61 | $ 63 | $ 82 | $ 914 |
| Long-lived asset impairment charges .................................. | $ 1 | $ 13 | $ 6 | $ — | $ 78 | $ — | $ 98 |
| Operating income (loss) (c) ....... | $ 63 | $ (276) | $ (36) | $ (29) | $ (393) | $ (1,274) | $ (1,945) |
| OIBDAR (f) ............................. | $ 439 | $ 125 | $ 329 | $ 84 | $ 73 | $ (319) | $ 731 |
| Minority Interest ..................... | $ (1) | $ (28) | $ (22) | $ (3) | $ — | $ (9) | $ (63) |
| Equity income (loss) ................. | $ 1 | $ 15 | $ (2) | $ 6 | $ (1) | $ 8 | $ 27 |
| **2006:** | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,587 | $ 1,745 | $ 1,772 | $ 1,600 | $ 2,031 | $ 609 | $ 9,344 |
| Net sales to other customers ...... | 3,278 | 3,399 | 3,420 | 849 | 1,376 | 1,071 | 13,393 |
| Inter-segment net sales.............. | 228 | 421 | 173 | 158 | 231 | (1,211) | — |
|    Total net sales...................... | $ 5,093 | $ 5,565 | $ 5,365 | $ 2,607 | $ 3,638 | $ 469 | $ 22,737 |
| Depreciation & Amortization .... | $ 268 | $ 260 | $ 175 | $ 67 | $ 100 | $ 84 | $ 954 |
| Long-lived asset impairment charges .................................. | $ 4 | $ 12 | $ 1 | $ 11 | $ 144 | $ — | $ 172 |
| Operating income (loss) (d) ....... | $ 188 | $ (128) | $ (110) | $ (170) | $ (488) | $ (3,834) | $ (4,542) |
| OIBDAR (f) ............................. | $ 489 | $ 234 | $ 154 | $ (6) | $ (121) | $ (864) | $ (114) |
| Minority Interest ..................... | $ (6) | $ (28) | $ (17) | $ 9 | $ — | $ 8 | $ (34) |
| Equity income (loss) ................. | $ 6 | $ 10 | $ 18 | $ (11) | $ 16 | $ 5 | $ 44 |

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group(e) | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|
| **Balance as of:** | | | | | | | |
| December 31, 2008 | | | | | | | |
| Investment in affiliates | $ 40 | $ 57 | $ 104 | $ 61 | $ 25 | $ 16 | $ 303 |
| Goodwill | $ — | $ — | $ — | $ — | $ — | $ 62 | $ 62 |
| Capital expenditures | $ 166 | $ 306 | $ 179 | $ 98 | $ 15 | $ 33 | $ 797 |
| Segment assets | $ 2,651 | $ 3,084 | $ 3,163 | $ 1,112 | $ 406 | $ (110) | $ 10,306 |
| December 31, 2007 | | | | | | | |
| Investment in affiliates | $ 46 | $ 61 | $ 130 | $ 77 | $ 50 | $ 23 | $ 387 |
| Goodwill | $ 155 | $ — | $ 165 | $ — | $ — | $ 77 | $ 397 |
| Capital expenditures | $ 161 | $ 149 | $ 182 | $ 66 | $ 3 | $ 19 | $ 580 |
| Segment assets | $ 3,610 | $ 3,450 | $ 4,001 | $ 1,288 | $ 1,261 | $ 57 | $ 13,667 |

(a)   Corporate and Other includes the elimination of inter-segment transactions and charges related to U.S. employee workforce transition programs in the amount of $78 million in 2008, $212 million in 2007 and $2,706 million in 2006 (Refer to Note 16. U.S. Employee Workforce Transition Programs).  Corporate and Other also includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.  Additionally, Corporate and Other includes assets held for sale of $497 million and $594 million within Segment assets for 2008 and 2007, respectively.

(b)   Includes charges recorded in 2008 related to long-lived asset and goodwill impairments and costs associated with employee termination benefits and other exit costs of $319 million for Electronics and Safety, $63 million for Powertrain Systems, $248 million for Electrical/Electronic Architecture, $34 million for Thermal Systems, $98 million for Automotive Holdings Group and $14 million for Corporate and Other.

(c)   Includes charges recorded in 2007 related to long-lived asset impairments and costs associated with employee termination benefits and other exit costs with $37 million for Electronics and Safety, $68 million for Powertrain Systems, $138 million for Electrical/Electronic Architecture, $48 million for Thermal Systems, $317 million for Automotive Holdings Group and $30 million for Corporate and Other.

(d)   Includes charges recorded in 2006 related to long-lived asset impairments and costs associated with employee termination benefits and other exit costs with $22 million for Electronics and Safety, $70 million for Powertrain Systems, $83 million for Electrical/Electronic Architecture, $84 million for Thermal Systems, $171 million for Automotive Holdings Group and $11 million for Corporate and Other.

(e)   Includes assets held for sale of $126 million within Segment assets for 2007.

(f)   Delphi's management relies on segment OIBDAR as a key performance measure.  OIBDAR is defined as operating income before depreciation and amortization, including long-lived asset and goodwill impairment charges, transformation and rationalization charges related to plant consolidations, plant wind-downs and discontinued operations.  Segment OIBDAR should not be considered a substitute for results prepared in accordance with U.S. GAAP and should not be considered an alternative to operating income, which is the most directly comparable financial measure to OIBDAR that is in accordance with U.S. GAAP.  Segment OIBDAR, as determined and measured by Delphi, should also not be compared to similarly titled measures reported by other companies.

The calculation of OIBDAR, as derived from operating income, is as follows for the years ended December 31, 2008, 2007 and 2006:

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| **2008:** | | | | | | | |
| Operating income (loss) | $ (654) | $ (130) | $ (361) | $ 18 | $ (68) | $ (286) | $ (1,481) |
| Depreciation and amortization | 235 | 248 | 187 | 71 | 32 | 54 | 827 |
| Long-lived asset impairment charges | 15 | — | 2 | 10 | 10 | — | 37 |
| Goodwill impairment charges | 157 | — | 168 | — | — | — | 325 |
| Transformation and rationalization charges: | | | | | | | |
|   U.S. employee workforce transition program charges | — | — | — | — | — | 78 | 78 |
|   GM settlement – MRA | (42) | (94) | (15) | (88) | (62) | 47 | (254) |
|   Employee termination benefits and other exit costs | 147 | 63 | 78 | 24 | 88 | 14 | 414 |
|   Loss on divestitures | 13 | 14 | — | — | 34 | — | 61 |
|   Other transformation and rationalization costs | 59 | 19 | 37 | 4 | — | 128 | 247 |
| Discontinued operations | — | — | — | — | 10 | 5 | 15 |
| OIBDAR | $ (70) | $ 120 | $ 96 | $ 39 | $ 44 | $ 40 | $ 269 |

Other transformation and rationalization costs for the year ended December 31, 2008 primarily includes approximately $140 million of costs necessary to implement information technology systems to support finance, manufacturing and product development initiatives; and approximately $60 million of costs related to Delphi's engineering and manufacturing footprint rotation, certain plant consolidations and closures, and startup costs related to the consolidation of many staff administrative functions into a global business service group.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| **2007:** | | | | | | | |
| Operating income (loss) | $ 63 | $ (276) | $ (36) | $ (29) | $ (393) | $ (1,274) | $ (1,945) |
| Depreciation and amortization | 267 | 266 | 175 | 61 | 63 | 82 | 914 |
| Long-lived asset impairment charges | 1 | 13 | 6 | — | 78 | — | 98 |
| Transformation and rationalization charges: | | | | | | | |
| U.S. employee workforce transition program charges | — | — | — | — | — | 212 | 212 |
| Securities & ERISA litigation charge | — | — | — | — | — | 343 | 343 |
| Employee termination benefits and other exit costs | 36 | 55 | 132 | 48 | 239 | 30 | 540 |
| Loss on divestitures | — | 30 | — | — | — | — | 30 |
| Other transformation and rationalization costs | 72 | 37 | 52 | 4 | 5 | 77 | 247 |
| Discontinued operations | — | — | — | — | 81 | 211 | 292 |
| OIBDAR | $ 439 | $ 125 | $ 329 | $ 84 | $ 73 | $ (319) | $ 731 |

Other transformation and rationalization costs for the year ended December 31, 2007 includes approximately $110 million of costs incurred for the deployment of the Company's enterprise software solution, including the implementation of a perpetual inventory system, as well as costs necessary to implement information technology systems to support finance, manufacturing and product development initiatives; approximately $60 million of costs related to Delphi's engineering and manufacturing footprint rotation, certain plant consolidations and closures, and startup costs related to the consolidation of many staff administrative functions into a global business service group, and $32 million related to employee benefit plan settlements in Mexico.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| **2006:** | | | | | | | |
| Operating income (loss) | $ 188 | $ (128) | $ (110) | $ (170) | $ (488) | $ (3,834) | $ (4,542) |
| Depreciation and amortization | 268 | 260 | 175 | 67 | 100 | 84 | 954 |
| Long-lived asset impairment charges | 4 | 12 | 1 | 11 | 144 | — | 172 |
| Transformation and rationalization charges: | | | | | | | |
| U.S. employee workforce transition program charges | — | — | — | — | — | 2,706 | 2,706 |
| Employee termination benefits and other exit costs | 18 | 58 | 82 | 73 | 27 | 11 | 269 |
| Other transformation and rationalization costs | 11 | 32 | 6 | 13 | 39 | 90 | 191 |
| Discontinued operations | — | — | — | — | 57 | 79 | 136 |
| OIBDAR | $ 489 | $ 234 | $ 154 | $ (6) | $ (121) | $ (864) | $ (114) |

Other transformation and rationalization costs for the year ended December 31, 2006 includes approximately $70 million of costs incurred to complete a number of environmental investigations in conjunction with our transformation plan; and approximately $40 million of costs necessary to implement information technology systems to support finance, manufacturing and product development initiatives.

Information concerning principal geographic areas is set forth below.  Net sales data reflects the manufacturing location and is for the years ended December 31.  Net property data is as of December 31.

| | Year Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | | | 2007 | | | | 2006 | | | |
| | Net Sales | | | | Net Sales | | | | Net Sales | | | |
| | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property |
| | | | | | | (dollars in millions) | | | | | | |
| North America | $ 4,026 | $ 3,645 | $ 7,671 | $ 1,425 | $ 6,782 | $ 4,975 | $11,757 | $ 1,906 | $ 8,040 | $ 5,881 | $13,921 | $ 2,024 |
| Europe, Middle East, & Africa | 885 | 6,346 | 7,231 | 1,412 | 1,002 | 6,396 | 7,398 | 1,476 | 879 | 5,463 | 6,342 | 1,539 |
| Asia Pacific | 104 | 1,917 | 2,021 | 429 | 76 | 2,105 | 2,181 | 341 | 71 | 1,700 | 1,771 | 367 |
| South America | 510 | 627 | 1,137 | 131 | 441 | 506 | 947 | 140 | 354 | 349 | 703 | 136 |
| Total | $ 5,525 | $12,535 | $18,060 | $ 3,397 | $ 8,301 | $13,982 | $22,283 | $ 3,863 | $ 9,344 | $13,393 | $22,737 | $ 4,066 |

## 23.  FAIR VALUE OF FINANCIAL INSTRUMENTS, DERIVATIVES AND HEDGING ACTIVITIES

Delphi's financial instruments include its Amended and Restated DIP Credit Facility, unsecured notes, junior subordinated notes, and other financing instruments.  The fair value of these financial instruments is based on quoted market prices for instruments with public market data or the current book value for instruments without a quoted public market price.  As of December 31, 2008 and 2007, the total of the financial instruments listed above was recorded at $6.6 billion and $5.9 billion, respectively, and had estimated fair values of $1.6 billion and $4.9 billion, respectively.  For all other financial instruments recorded at December 31, 2008 and 2007, fair value approximates book value.

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks.  To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets.  For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies.  Designation is performed on a transaction basis to support hedge accounting for most transactions.  The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged.  Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy.  Delphi does not hold or issue derivative financial instruments for trading purposes.

Delphi has foreign currency exchange exposure from buying and selling in currencies other than the functional currencies of its operating units.  The primary purpose of the Company's foreign currency hedging activities is to manage the volatility associated with forecasted foreign currency purchases and sales.  Principal currencies hedged include the Mexican Peso, Euro, Turkish New Lira, Romanian New Leu, and Hungarian Forint. Delphi primarily utilizes forward exchange contracts with average maturities of less than 24 months, which qualify as cash flow hedges.

Delphi has exposure to the prices of commodities in the procurement of certain raw materials.  The primary purpose of the Company's commodity price hedging activities is to manage the volatility associated with these forecasted purchases.  Delphi primarily utilizes forward contracts with average maturities of less than 24 months, which qualify as cash flow hedges.  These instruments are intended to offset the effect of changes in commodity prices on forecasted purchases.

Delphi did not have any interest rate derivative instruments outstanding at December 31, 2008 or 2007.

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.  The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates.  Additionally, adjustments for non-performance risk are also considered in determining fair value.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of December 31, 2008 and 2007 are as follows:

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Current assets | $    12 | $    40 |
| Non-current assets | — | 13 |
| Total assets | $    12 | $    53 |
| Current liabilities | $    (132) | $    24 |
| Non-current liabilities | (36) | — |
| Total liabilities | $    (168) | $    24 |

The fair value of financial instruments recorded decreased from December 31, 2007 to December 31, 2008 primarily due to the decrease in the market price of commodities and certain foreign currencies.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net unrealized losses included in OCI as of December 31, 2008, were $194 million and net gains of $52 million were included in OCI as of December 31, 2007. Of the December 31, 2008 OCI balance, a loss of approximately $137 million is expected to be included in cost of sales within the next 12 months and a loss of approximately $56 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is probable that the original forecasted transactions will not occur. The amount included in cost of sales related to hedge ineffectiveness was $12 million, $2 million and $7 million for the years ended December 31, 2008, 2007 and 2006, respectively. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was not significant in 2008 or 2007 and was $14 million in 2006.

Primarily during the fourth quarter of 2008, substantial volatility in the commodity and currency markets significantly impacted the price of commodities and foreign currency exchange rates that impact Delphi's operations. Two of Delphi's largest exposures, copper and the Mexican Peso to U.S. Dollar exchange rate, experienced substantial volatility during the fourth quarter of 2008. As a result of the market volatility, Delphi has experienced unrealized losses in its derivative contracts. As of December 31, 2008, Delphi was in a net derivative liability position for its hedging portfolio. As discussed further in Note 24. Fair Value Measurements, Delphi's net derivative liability position was reduced by $296 million to $168 million for its non-performance risk. The reduction to the net derivative liability resulted in an increase to pre-tax earnings of $9 million, recorded as a reduction to cost of sales. The remaining adjustment amount of $287 million is reflected in the net losses of $194 million included in OCI as of December 31, 2008 discussed above as it related to derivative financial instruments that qualify as hedges. As a result of the net liability position for its hedging portfolio as of December 31, 2008, Delphi's most recent weekly borrowing base computation, as further described in Note 15. Debt, included the maximum deduction from its borrowing base of $275 million.

The Accommodation Agreement imposes restrictions on Delphi's ability to enter into hedging transactions. Specifically, the Accommodation Agreement disallows any new hedging activity, with the exception of any transactions to offset existing hedge positions. Additionally, the Accommodation Agreement enables participant lenders to terminate hedging agreements if the aggregate liability of Delphi's hedge exposure exceeds $500 million, as defined in the Accommodation Agreement.

## 24. FAIR VALUE MEASUREMENTS

SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value.

SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition of fair value is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset, and fair value should be based on assumptions that market participants would use, including non-performance risk. SFAS 157 also establishes a fair value hierarchy to prioritize inputs used in measuring fair value as follows:

- *Level 1:* Observable inputs such as quoted prices in active markets;
- *Level 2:* Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and
- *Level 3:* Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in SFAS 157:

a. *Market approach:* Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.
b. *Cost approach:* Amount that would be required to replace the service capacity of an asset (replacement cost).
c. *Income approach:* Techniques to convert future amounts to a single present amount based upon market expectations (including present value techniques, option-pricing and excess earnings models).

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet hedge accounting criteria. Delphi's derivative exposures are with counterparties with long-term investment grade credit ratings. Delphi estimates the fair value of its derivative contracts using an income approach based on valuation techniques to convert future amounts to a single, discounted amount. Estimates of the fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates. Delphi also considers the risk of non-performance in the estimation of fair value, and includes an adjustment for non-performance risk in the measure of fair value of derivative instruments. The non-performance risk adjustment reflects the full credit default spread ("CDS") applied to the net commodity and foreign currency exposures by counterparty. When Delphi is in a net derivative asset position, the counterparty CDS rates are applied to the net derivative asset position. When Delphi is in a net derivative liability position, estimates of Delphi's CDS rates are applied to the net derivative liability position.

In certain instances where market data is not available, Delphi uses management judgment to develop assumptions that are used to determine fair value. This could include situations of market illiquidity for a particular currency or commodity or where observable market data may be limited. In those situations, Delphi generally surveys investment banks and/or brokers and utilizes the surveyed prices and rates in estimating fair value.

As of December 31, 2008, Delphi was in a net derivative liability position. As a result of Delphi's chapter 11 proceedings, CDS rates are currently not available for Delphi debt. As a result, Delphi obtained estimates of trading levels for its debt from investment banks as well as CDS rates for similarly situated entities to apply to its net derivative liability position for non-performance risk. The adjustment for non-performance risk reduced Delphi's net derivative liability position by $296 million to $168 million. The reduction to the net derivative liability resulted in an increase to pre-tax earnings of $9 million, recorded as a reduction to cost of sales. The remaining adjustment amount of $287 million is reflected within equity as a component of OCI as it related to derivative financial instruments that qualify as hedges. There was no material adjustment for non-performance risk related to derivative assets as of December 31, 2008 as Delphi's net derivative asset position at December 31, 2008 related to exposures with counterparties with investment grade credit ratings.

As of December 31, 2008, Delphi had the following assets measured at fair value on a recurring basis:

| | Fair Value Measurements Using: | | | |
| | Total as of December 31, 2008 | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| --- | --- | --- | --- | --- |
| | | | (in millions) | |
| Available for sale securities | $ 32 | $ 23 | $ 9 | $ — |
| Foreign currency derivatives | 12 | — | — | 12 |
| Total | $ 44 | $ 23 | $ 9 | $ 12 |

As of December 31, 2008, Delphi had the following liabilities measured at fair value on a recurring basis:

| | Fair Value Measurements Using: | | | |
| | Total as of December 31, 2008 | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| --- | --- | --- | --- | --- |
| | | | (in millions) | |
| Commodity derivatives | $ 99 | $ — | $ — | $ 99 |
| Foreign currency derivatives | 69 | — | — | 69 |
| Total | $ 168 | $ — | $ — | $ 168 |

The following table summarizes the changes in Level 3 financial instruments measured at fair value on a recurring basis for the year ended December 31, 2008.

| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3): | | | | | |
| | Fair Value January 1, 2008 | Total Realized / Unrealized Gains / (Losses) | Net Purchases / (Settlements) | Net Transfers Into / (Out of) Level 3 | Fair Value December 31, 2008 | Changes to Unrealized Gains / (Losses) on Instruments Still Held |
| | | | (in millions) | | | |
| Commodity and foreign currency derivatives...................................... | $ — | $ (147) | $ (38) | $ 29 | $ (156) | $ (163) |
| Total Level 3 Fair Value ........... | $ — | $ (147) | $ (38) | $ 29 | $ (156) | $ (163) |

## 25. SUBSEQUENT EVENTS

Events have occurred subsequent to December 31, 2008 that, although they do not impact the reported balances or results of operations as of that date, are material to the Company's ongoing operations. These events are listed below.

**Amendment to Accommodation Agreement**

On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement. In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement. In addition, GM agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement. The Amendment and GM's agreement to accelerate payments were effective January 30, 2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders. The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees. Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement.

Pursuant to the Amendment, the lenders have agreed to modify certain covenants contained in the Accommodation Agreement. Specifically the Amendment provides for:

–   Revised rolling 12-month cumulative Global EBITDAR covenant levels based upon the current economic and automotive environment as follows:

| Period Ending | Global EBITDAR |
| --- | --- |
| | (in millions) |
| January 31, 2009 ............................. | $185 |
| February 28, 2009 ........................... | $(50) |
| March 31, 2009 ............................... | $(150) |
| April 30, 2009 ................................. | $(250) |
| May 31, 2009 .................................. | $(350) |

–   An additional cash collateral basket of up to $117 million (the "Basket"), which solely for purposes of the prepayment provisions in the Accommodation Agreement is considered an offset to amounts outstanding under the Revolving Facility (provided during February 2009). The Basket may be released to Delphi (and each such release may not be restored) upon the satisfaction of certain conditions described below.

By February 27, 2009 GM agreed that it would either (a) convert, subject to obtaining the approval of the Court and obtaining any required approvals from the President's Designee pursuant to its loan agreement with the U.S. Treasury, the $50 million acceleration of payment terms referred to above to increase the amount available under the GM Advance Agreement to an aggregate of $350 million or (b) accelerate an additional $50 million in advances. The Amendment further provided that if GM chose option (a), the prescribed minimum borrower liquidity level in the Accommodation Agreement would be reduced to $50 million and the target cash balance in the GM Advance Agreement would be increased to $50 million, provided that all necessary approvals to amend the GM Advance Agreement have been received, before March 25, 2009. On February 27, 2009, GM chose option (a) and committed to increase from $300 million to

$350 million the amounts available under the GM Advance Agreement, subject to receipt prior to March 24, 2009, of required approvals of the President's Designee in accordance with the provisions of GM's federal loans and prior to March 25, 2009, approval of the Court.

To provide additional liquidity support, the Amendment (as modified by the Supplemental Amendment) further provides that the amounts in the Basket may be released to Delphi if each of the following conditions is satisfied at the time of the release (a) by April 2, 2009 Delphi has filed a plan of reorganization or modifications to Delphi's existing plan of reorganization meeting the conditions specified in the Accommodation Agreement and the 10 business day notice period after April 2, 2009 has elapsed without the majority of Tranche A and Tranche B lenders or majority of all lenders who signed the Accommodation Agreement having delivered notice that such plan of reorganization or modifications to Delphi's existing Plan of Reorganization are not satisfactory, (b) after giving effect to the release, Delphi is compliant with the mandatory prepayment provisions in the Accommodation Agreement and all other covenants in the Amended and Restated DIP Credit Facility as modified by the Accommodation Agreement and the Amendment, and (c) prior to March 25, 2009 GM has agreed and has obtained all required approvals to increase the available amounts under the GM Advance Agreement to $450 million (which includes any conversion by GM of the previously accelerated payables described above into advances under the GM Advance Agreement).  As noted above, GM has committed to increase to $450 million the amounts available under the GM Advance Agreement, subject to (i) GM not being notified by the President's Designee that such increase is not permitted in accordance with the provisions of GM's federal loans, (ii) Court approval, (iii) the GM board of directors' approval, (iv) Delphi and GM executing a definitive transaction agreement relating to the sale of Delphi's Steering Business, and (v) Court approval of the Steering Business Option Exercise Agreement.  The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement.  Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed by GM and Delphi.  The Option Exercise Agreement is subject to conditions described below under Steering and Halfshaft Business.  Provided all necessary approvals are received and all conditions are satisfied to increase the amounts available under the GM Advance Agreement to $450 million prior to March 25, 2009, the targeted cash balance amount will be increased to $50 million.  Delphi believes GM's commitment to increase availability under the GM Advance Agreement is a significant step toward Delphi being able to access amounts in the Basket.

Notwithstanding the above, Delphi will be required to apply all amounts in the Basket to pay down the Amended and Restated DIP Credit Facility under the following circumstances:  (i) Delphi has not delivered to the agent under the Amended and Restated DIP Credit Facility a proposal to GM regarding Delphi's North American sites and the related GM plan to support Delphi's overall emergence plan by February 17, 2009 (the "Proposal"); (ii) Delphi has not delivered to the agent under the Amended and Restated DIP Credit Facility a business plan incorporating the Proposal by February 20, 2009 (the "Business Plan") and shall have delivered a supplement to such proposal by March 24, 2009; (iii) a majority of lenders executing the Amendment direct the agent under the Amended and Restated DIP Credit Facility on or before March 6, 2009 that the Proposal or the Business Plan is not satisfactory, (iv) a majority of lenders executing the supplement to the First Amendment shall direct the agent under the Amended and Restated DIP Credit Facility on or prior to April 7, 2009 that the March 24, 2009 supplement referred to in clause (ii) is not satisfactory, (v) if Delphi fails to file a plan of reorganization or modifications to its existing plan of reorganization meeting the conditions specified in the Accommodation Agreement by April 2, 2009 or if within 10 business days of such filing the majority of Tranche A and Tranche B lenders or majority of all lenders who signed the Accommodation Agreement deliver notice that such filing is not satisfactory, or (vi) if on March 24, 2009 there is less than $450 million of aggregate availability committed under the GM Advance Agreement.  Delphi did timely deliver the Proposal and Business Plan to the agent as provided in clauses (i) and (ii) above and to date has not received any indication that such items were not satisfactory.  In addition, Delphi will be required to apply an amount equal to twenty percent of the aggregate amount in the Basket to pay down the Amended and Restated DIP Credit Facility in the event that (A) Delphi does not deliver certain analyses on or before March 4, 2009, or (B) a majority of lenders executing the Supplemental Amendment shall direct the agent under the Amended and Restated DIP Credit Facility on or prior to March 18, 2009 that such certain analyses are not satisfactory.

The foregoing description of the Amendment, the Supplemental Amendment, the amendment to the Partial Temporary Accelerated Payments Agreement and the amendment to the GM Advance Agreement is a general description only.  For additional detail, see the underlying agreements, which are filed or incorporated by reference as exhibits to this Annual Report on Form 10-K.

### Steering and Halfshaft Business

In the fourth quarter of 2007, Delphi executed the Purchase Agreement with an affiliate of Platinum, for the sale of the Steering Business and executed the Transaction Agreement with GM.  In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business.  Pursuant to the terms of the Purchase Agreement, any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement since the transaction did not close by August 31, 2008.  Prior to entry into the agreements described below in March 2009, neither party had terminated the Purchase Agreement.  Pursuant to the Amended MRA, GM agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010.  On March 3, 2009, however, Delphi and Platinum entered into the Termination Agreement and Delphi and GM entered into the Option Exercise Agreement, subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM will exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned

subsidiary of GM to complete the Steering Purchase.  GM has agreed to guaranty the payment and performance of its wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.

The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement.  Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed to by GM and Delphi.  In addition to certain other milestones, Delphi has agreed to use its reasonable best efforts to obtain Court approval of the Option Exercise Agreement on or before March 24, 2009, and Delphi and GM have agreed to use their reasonable best efforts to obtain Court approval of the Steering Purchase and assignment and assumption of contracts on or before April 23, 2009 and to close the Steering Purchase on or before April 30, 2009.  The parties have agreed to file a motion seeking such required approvals of the Steering Purchase and the assignment and assumption of contracts with the Court.

Delphi and GM will enter into a transition services agreement on reasonable and customary terms pursuant to which Delphi will provide, among other things, general transition services with GM through mid-2011 and information technology transition services through December 2012. Other material terms of the Option Exercise Agreement include, but are not limited to, the following: (a) at the closing of the Steering  Purchase, the parties will forego the working capital true-up set forth in the Amended MRA; (b) GM will not exercise certain of GM's rights under the Amended MRA; (c) GM will pay all cure costs, with respect to all prepetition contracts which it requests be assumed and assigned to it; (d) GM will assume all postpetition trade payables with respect to the contracts included within the definition of the Steering Business (provided that Delphi will pay all trade payables prior to the closing in the ordinary course of business); (e) in lieu of an additional labor reimbursement contemplated under the Amended MRA, at closing GM will assume certain of Delphi's labor and workers' compensation obligations; and (f) GM will assume responsibility, and waive any obligations of Delphi relating to, warranty, recall, and products liability with respect to products manufactured for, or sold to, GM by the Steering Business, whether before or after the closing and Delphi will retain responsibility for such liability with respect to products sold to non-GM customers prior to closing.  Pursuant to the Termination Agreement, Delphi and Platinum have agreed to return the deposit amount under the Purchase Agreement to Platinum.

The closing of the Steering Purchase is conditioned on GM paying to the administrative agent under Delphi's Amended and Restated DIP Facility, for the benefit of the lenders thereunder, a non-refundable amount equal to the reduction in available receivables, available inventory, and fixed asset component of the borrowing base caused directly by the consummation of such purchase.  In the event Delphi and GM reach an agreement for the sale of any of Delphi's other businesses and manufacturing sites in the U.S. to GM, then, upon the closing of such sale, such payment would constitute partial prepayment of the consideration for the sale of such facilities.  The above summary is qualified by reference to the terms and provisions of any final agreement filed with the Court.

**Salaried Retiree OPEB and Life Insurance**

On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses as soon as practicable after March 31, 2009.  On February 24, 2009, the Court provisionally approved Delphi's motion to modify salaried health care and life insurance benefits in retirement to eliminate Company funding effective April 1, 2009.  The Court also authorized Delphi to immediately begin the administrative process to implement these modifications.  The provisional approval was based on the Court's finding that the Company had met its evidentiary burdens, subject to the appointment of a Retirees' Committee to review whether it believes that any of the affected programs involved vested benefits (as opposed to "at will" or discretionary, unvested benefits).  The Court scheduled a hearing to review the committee's findings for March 11, 2009.  Delphi's termination of health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses will enable Delphi to settle the related APBO of more than $1.1 billion and conserve projected annual cash expenditures of approximately $70 million.

**Tax Credit Receipt**

In January 2009, Delphi received an accelerated payment of €46 million (approximately $61 million at January 31, 2009 exchange rates) for tax credits owed to Delphi by the government of France.  Delphi is continuing to seek additional support from certain foreign governments as part of its overall efforts to improve liquidity.

## 26. QUARTERLY DATA (UNAUDITED)

The following is a condensed summary of the Company's unaudited quarterly results of continuing operations for fiscal 2008 and 2007. These amounts have been restated for discontinued operations.

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | March 31, | June 30, | Sept. 30, | Dec. 31, | Total |
| | | | (in millions, except per share amounts) | | |
| **2008** | | | | | |
| Net sales | $ 5,252 | $ 5,234 | $ 4,377 | $ 3,197 | $18,060 |
| Cost of sales | 4,897 | 4,821 | 4,117 | 3,233 | 17,068 |
| Gross profit (a) | $ 355 | $ 413 | $ 260 | $ (36) | $ 992 |
| | | | | | |
| U.S. employee workforce transition program charges | $ 36 | $ 18 | $ 22 | $ 2 | $ 78 |
| GM settlement (Note 2 – MRA) | $ — | $ — | $ (254) | $ — | $ (254) |
| Long lived asset impairment charges | $ 3 | $ 5 | $ 5 | $ 24 | $ 37 |
| Goodwill impairment charges | $ — | $ 168 | $ — | $ 157 | $ 325 |
| Operating loss | $ (267) | $ (365) | $ (96) | $ (753) | $(1,481) |
| | | | | | |
| (Loss) income from continuing operations (b) | $ (530) | $ (559) | $ 5,143 | $ (998) | $ 3,056 |
| (Loss) income from discontinued operations, net of tax | (59) | 8 | 75 | (43) | (19) |
| Net (loss) income | $ (589) | $ (551) | $ 5,218 | $(1,041) | $ 3,037 |
| | | | | | |
| Basic and diluted (loss) income per share | | | | | |
| Continuing operations | $ (0.94) | $ (0.99) | $ 9.11 | $ (1.77) | $ 5.41 |
| Discontinued operations | (0.10) | 0.01 | 0.13 | (0.07) | (0.03) |
| Basic and diluted (loss) income per share | $ (1.04) | $ (0.98) | $ 9.24 | $ (1.84) | $ 5.38 |
| | | | | | |
| Common stock price | | | | | |
| High | $ 0.22 | $ 0.14 | $ 0.11 | $ 0.08 | $ 0.22 |
| Low | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.02 | $ 0.02 |
| **2007** | | | | | |
| Net sales | $ 5,682 | $ 6,000 | $ 5,279 | $ 5,322 | $22,283 |
| Cost of sales | 5,306 | 5,654 | 5,111 | 4,995 | 21,066 |
| Gross profit (a) | $ 376 | $ 346 | $ 168 | $ 327 | $ 1,217 |
| | | | | | |
| U.S. employee workforce transition program charges | $ (6) | $ — | $ 197 | $ 21 | $ 212 |
| Long lived asset impairment charges | $ 6 | $ 34 | $ 14 | $ 44 | $ 98 |
| Securities and ERISA litigation charge | $ — | $ 332 | $ 21 | $ (10) | $ 343 |
| Operating loss | $ (215) | $ (644) | $ (663) | $ (423) | $(1,945) |
| | | | | | |
| (Loss) income from continuing operations (b) | $ (391) | $ (808) | $(1,149) | $ 40 | $(2,308) |
| Loss from discontinued operations, net of tax (c) | (142) | (13) | (20) | (582) | (757) |
| Net loss | $ (533) | $ (821) | $(1,169) | $ (542) | $(3,065) |
| | | | | | |
| Basic and diluted (loss) income per share | | | | | |
| Continuing operations | $ (0.70) | $ (1.44) | $ (2.04) | $ 0.07 | $ (4.11) |
| Discontinued operations | (0.25) | (0.02) | (0.04) | (1.03) | (1.34) |
| Basic and diluted loss per share | $ (0.95) | $ (1.46) | $ (2.08) | $ (0.96) | $ (5.45) |
| | | | | | |
| Common stock price | | | | | |
| High | $ 3.86 | $ 3.12 | $ 2.59 | $ 0.49 | $ 3.86 |
| Low | $ 2.25 | $ 1.46 | $ 0.44 | $ 0.10 | $ 0.10 |

a) Gross profit is defined as net sales less cost of sales (excluding U.S. employee workforce transition program charges, GM settlement, Depreciation and amortization, Long-lived asset impairment charges and Goodwill impairment charges).

b) (Loss) income from continuing operations includes the reorganization gains of $5,586 million in the third quarter of 2008 related to the GM settlements, and a tax benefit of $703 million in the fourth quarter of 2007 related to credits in other comprehensive income. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy and Note 8. Income Taxes for more information.

c) Loss from discontinued operations includes a charge of $595 million related to the assets held for sale for the Steering and Interiors and Closures Businesses, including the impact of curtailment loss on pension benefits for impacted employees in the fourth quarter of 2007.

**27. DEBTORS' CONDENSED COMBINED FINANCIAL STATEMENTS**

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements. Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements. As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates. During 2008, 2007 and 2006, the Debtors received approximately $292 million, $644 million and $2 million, respectively, of dividends from non-Debtor affiliates. Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statement of Operations and therefore were recorded in equity income from non-Debtor affiliates, net of tax. During 2008 and 2007, a non-Debtor entity repatriated $16 million and $106 million, respectively, to a Debtor entity in the form of a capital reduction. This transaction is reflected in the condensed combined statement of cash flows as a return on investment in non-Debtor affiliates.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008. The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims. At December 31, 2008 and 2007, Delphi had accrued interest of $415 million and $411 million, respectively, in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Accordingly, Delphi anticipates that it will be relieved of this liability if and when the plan modifications are approved.

*GM Settlement* - Delphi filed amendments to the MRA in the Court on September 12, 2008, and subsequently entered into an additional amendment to the GSA as of September 25, 2008. The Court approved such amendments on September 26, 2008 and the Amended GSA and the Amended MRA became effective on September 29, 2008. Upon effectiveness of the Amended MRA, Delphi recorded a reduction to operating expenses of $254 million, as discussed further in Note 2. Transformation Plan and Chapter 11 Bankruptcy to the consolidated financial statements.

*U.S. Employee Workforce Transition Programs*—The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi. The estimated payments to be made under the buy-down arrangements with the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts,*" the wage asset was being amortized over the life of the respective union agreements. The corresponding wage liability will be reduced as buy-down payments are made. Based on the Amended GSA, Delphi received reimbursement from GM of $230 million during the third quarter of 2008 for certain costs related to the Workforce Transition Programs. In addition, because the Amended GSA provides for reimbursement of payments to be made under the buy-down arrangements with the UAW and IUE-CWA Workforce Transition Programs, $126 million of the related wage asset was reclassified to GM and affiliates accounts receivable on the consolidated balance sheet as of December 31, 2008 and the remaining $90 million of the related wage asset was recorded to reorganization items on the consolidated statement of operations for 2008.

*Goodwill Impairment Charges*—During 2008, Delphi experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices. This caused previously unanticipated projected revenue and operating income declines. As a result of these changes, long-term projections showed declines in discounted future operating cash flows. These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture and Electronics and Safety segment to be less than their book value. The fair values were also adversely affected by declining industry market valuation metrics. Accordingly, the Debtors

recorded $115 million of goodwill impairment charges in the Debtor financial statements during 2008 related to the Electrical/Electronic Architecture and Electronics and Safety segments.  Refer to Note 10. Goodwill for more information.

*Income Tax Benefit*– Delphi recorded income tax expense of $14 million for 2008 and recorded an income tax benefit of $691 million for 2007.

Generally, the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as OCI.  However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.  The intraperiod tax allocation rules in SFAS 109 related to items charged directly to OCI can result in disproportionate tax effects that remain in OCI until certain events occur.

As of December 31, 2007, Delphi had disproportionate tax effects in OCI related to the hourly pension and OPEB obligations of a $533 million tax benefit and a $311 million tax expense, respectively.  During 2008, Delphi accounted for its hourly pension and OPEB transfer to GM as settlement of liabilities.  As a result, Delphi eliminated the disproportionate tax effect in OCI related to the hourly pension and OPEB obligations on a pro rata basis to the amount of the obligation that was settled.  Accordingly, Delphi recorded a tax benefit of $9 million in continuing operations for 2008, comprised of a $320 million tax benefit and $311 million tax expense related to the hourly pension and OPEB obligation settlement, respectively.  The annual effective tax rate in 2007 was impacted by tax benefit of $703 million related to $1.9 billion U.S. pre-tax other comprehensive income related to employee benefits.  Delphi continues to maintain a full valuation allowance for its deferred tax assets in the U.S. as it is more likely than not that the benefits will not be recognized.

Additionally, Delphi's annual effective tax rate was impacted by withholding tax expense of $21 million and $25 million in 2008 and 2007 respectively.  Delphi had a tax contingency reserve expense of $7 million and a benefit of $12 million as of December 31, 2008 and 2007, respectively, which also impacted the annual effective tax rate.

*Liabilities*— Accrued liabilities consisted of the following:

|  | December 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| Payroll related obligations | $ 39 | $ 48 |
| Employee benefits, including current pension obligations | 84 | 120 |
| Taxes other than income | 36 | 70 |
| Warranty obligations | 74 | 173 |
| U.S. employee workforce transition program | 115 | 234 |
| Employee termination benefits and other exit costs | 81 | 105 |
| Interest on prepetition claims | 415 | 411 |
| Working capital backstop – Steering Business | 210 | — |
| Other | 264 | 167 |
| Total | $1,318 | $1,328 |

Employee benefit and other consisted of the following:

|  | December 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| Workers compensation | $ 325 | $ 328 |
| Environmental | 90 | 103 |
| Extended disability benefits | 60 | 72 |
| Warranty | 130 | 203 |
| Other | 131 | 245 |
| Total | $ 736 | $ 951 |

*Assets Held for Sale*—The assets held for sale by the Debtors as of December 31, 2008 and 2007 include the net assets held for sale of the Non-debtor affiliates of $263 million and $294 million, respectively, which was reclassified from investments in non-Debtor affiliates.  During 2008 and 2007, the Debtor assets held for sale were revalued based on the expected proceeds, resulting in a charge related to the assets held for sale of $50 million and $561 million, respectively.  Additionally, during 2007, Delphi recorded a $34 million curtailment loss on pension benefits.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|
| | | (in millions) | |
| Net sales........................................................................................ | $  7,988 | $  11,978 | $  14,149 |
| Operating expenses: | | | |
| Cost of sales, excluding items listed below............................... | 8,404 | 12,453 | 14,645 |
| U.S. employee workforce transition program charges ................. | 78 | 212 | 2,706 |
| GM settlement (Note 2 – MRA)................................................... | (254) | — | — |
| Depreciation and amortization.................................................... | 405 | 511 | 562 |
| Long-lived asset impairment charges.......................................... | 9 | 84 | 102 |
| Goodwill impairment charges...................................................... | 115 | — | — |
| Selling, general and administrative ............................................. | 857 | 1,008 | 1,006 |
| Securities & ERISA litigation charge ......................................... | — | 343 | — |
| Total operating expenses ........................................................ | 9,614 | 14,611 | 19,021 |
| Operating loss ................................................................................. | (1,626) | (2,633) | (4,872) |
| Interest expense (contractual interest expense for the year ended December 31, 2008, 2007 and 2006 was $510 million, $444 million and $526 million, respectively)....................................................... | (386) | (722) | (378) |
| Loss on extinguishment of debt....................................................... | (49) | (27) | — |
| Other income (expense), net............................................................ | 2 | 36 | (11) |
| Reorganization items: | | | |
| GM settlement (Notes 2 and 3 – GSA) ........................................ | 5,332 | — | — |
| Professional fees and other, net (Note 3)..................................... | (129) | (136) | (70) |
| Income (loss) from continuing operations before income tax benefit and equity income............................................................. | 3,144 | (3,482) | (5,331) |
| Income tax (expense) benefit .......................................................... | (14) | 691 | (1) |
| Equity income from non-consolidated affiliates, net of tax .............. | 2 | 21 | 37 |
| Income (loss) from continuing operations before discontinued operations and equity income from non-Debtor affiliates ............ | 3,132 | (2,770) | (5,295) |
| Loss from discontinued operations, net of tax (Note 5) .................... | (62) | (695) | (326) |
| Equity (loss) income from non-Debtor affiliates, net of tax............... | (33) | 400 | 154 |
| Cumulative effect of accounting change ......................................... | — | — | 3 |
| Net income (loss)............................................................................ | $  3,037 | $  (3,065) | $  (5,464) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 231 | $ 113 |
| Restricted cash | 355 | 125 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 670 | 972 |
| Other third parties | 385 | 623 |
| Non-Debtor affiliates | 249 | 250 |
| Notes receivable from non-Debtor affiliates | 77 | 278 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 418 | 652 |
| Finished goods | 75 | 171 |
| Other current assets | 204 | 385 |
| Assets held for sale | 333 | 475 |
| Total current assets | 2,997 | 4,044 |
| Long-term assets: | | |
| Property, net | 1,182 | 1,446 |
| Investments in affiliates | 251 | 331 |
| Investments in non-Debtor affiliates | 1,104 | 3,267 |
| Goodwill | 37 | 152 |
| Notes receivable from non-Debtor affiliates | 1,429 | — |
| Other | 183 | 512 |
| Total long-term assets | 4,186 | 5,708 |
| Total assets | $ 7,183 | $ 9,752 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Short-term debt | $ 3,635 | $ 2,782 |
| Accounts payable | 551 | 1,007 |
| Accounts payable to non-Debtor affiliates | 535 | 689 |
| Accrued liabilities | 1,318 | 1,328 |
| Liabilities held for sale | 149 | 167 |
| Total current liabilities | 6,188 | 5,973 |
| Long-term debt | 20 | 24 |
| Employee benefits and other | 736 | 951 |
| Total long-term liabilities | 756 | 975 |
| Liabilities subject to compromise | 14,664 | 16,276 |
| Total liabilities | 21,608 | 23,224 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (14,425) | (13,472) |
| Total liabilities and stockholders' deficit | $ 7,183 | $ 9,752 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Year ended December 31, 2008 | Year ended December 31, 2007 (in millions) | Year ended December 31, 2006 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net cash used in operating activities | $ (481) | $ (114) | $ (572) |
| Cash flows from investing activities: | | | |
| Capital expenditures | (279) | (224) | (217) |
| Proceeds from divestitures and sale of property | 178 | 87 | 21 |
| Investment in joint ventures | (8) | (11) | — |
| Increase in restricted cash | (230) | (13) | (102) |
| Proceeds from notes receivable from non-Debtor affiliates | 265 | — | — |
| Return on investment in non-Debtor affiliates | 16 | 106 | — |
| Other, net | (16) | — | (7) |
| Discontinued operations | (26) | (28) | (69) |
| Net used in investing activities | (100) | (83) | (374) |
| Cash flows from financing activities: | | | |
| Proceeds from amended and restated debtor-in-possession facility, net of issuance cost of $92 million | 3,528 | — | — |
| Proceeds from Refinanced DIP Credit Facility, net of issuance costs | — | 2,691 | — |
| (Repayments) proceeds from debtor-in-possession facility, net | — | (250) | — |
| Repayments of borrowings under term loan | — | (988) | — |
| (Repayments) proceeds from prepetition secured revolving credit facility, net | — | (1,508) | 2 |
| Repayments of borrowings from refinanced debtor-in-possession facility | (2,746) | — | — |
| Accommodation agreement issuance costs | (58) | — | — |
| (Repayments) proceeds under cash overdraft | — | — | (29) |
| Repayments of borrowings under other debt agreements | (25) | (11) | (12) |
| Net cash provided by (used in) financing activities | 699 | (66) | (39) |
| Increase (decrease) in cash and cash equivalents | 118 | (263) | (985) |
| Cash and cash equivalents at beginning of period | 113 | 376 | 1,361 |
| Cash and cash equivalents at end of period | $ 231 | $ 113 | $ 376 |

**APPENDIX B-2**

Consolidated Financial Statements and Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-Q For The Quarter Ended March 31, 2009,
Filed May 11, 2009

PART I.  FINANCIAL INFORMATION

ITEM 1.   FINANCIAL STATEMENTS

### DELPHI CORPORATION
### (DEBTOR-IN-POSSESSION)
### CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)

|  | Three Months Ended March 31, | |
| --- | ---: | ---: |
|  | **2009** | **2008** |
|  | **(in millions, except per share amounts)** | |
| Net sales: | | |
| General Motors and affiliates | $  734 | $ 1,641 |
| Other customers | 1,791 | 3,611 |
| Total net sales | 2,525 | 5,252 |
|  | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 2,632 | 4,933 |
| Depreciation and amortization | 172 | 222 |
| Selling, general and administrative | 255 | 364 |
| Total operating expenses | 3,059 | 5,519 |
|  | | |
| Operating loss | (534) | (267) |
| Interest expense (contractual interest expense for the three months ended March 31, 2009 and 2008 was $168 million and $129 million, respectively) | (137) | (110) |
| Other income, net | 9 | 19 |
| Reorganization items | 1,144 | (109) |
| Income (loss) from continuing operations before income taxes and equity income | 482 | (467) |
| Income tax benefit (expense) | 51 | (63) |
| Income (loss) from continuing operations before equity income | 533 | (530) |
| Equity (loss) income, net of tax | (8) | 11 |
| Income (loss) from continuing operations | 525 | (519) |
| Income (loss) from discontinued operations, net of tax | 31 | (58) |
| Net income (loss) | 556 | (577) |
| Net income attributable to noncontrolling interest | 4 | 12 |
| Net income (loss) attributable to Delphi | $  552 | $ (589) |
|  | | |
| Basic and diluted income (loss) per share: | | |
| Continuing operations attributable to Delphi | $ 0.92 | $ (0.94) |
| Discontinued operations attributable to Delphi | 0.06 | (0.10) |
| Basic and diluted income (loss) per share | $ 0.98 | $ (1.04) |
|  | | |
| Amounts attributable to Delphi: | | |
| Income (loss) from continuing operations | $  521 | $ (530) |
| Discontinued operations | 31 | (59) |
| Net income (loss) attributable to Delphi | $  552 | $ (589) |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED BALANCE SHEETS**

| | March 31, 2009 (Unaudited) | December 31, 2008 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 650 | $ 959 |
| Restricted cash | 449 | 403 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 695 | 822 |
| Other | 1,519 | 1,572 |
| Inventories, net (Note 3) | 1,130 | 1,285 |
| Other current assets (Note 4) | 484 | 613 |
| Assets held for sale (Note 15) | 551 | 497 |
| Total current assets | 5,478 | 6,151 |
| Long-term assets: | | |
| Property, net | 3,214 | 3,397 |
| Investments in affiliates | 280 | 303 |
| Other long-term assets (Note 4) | 442 | 455 |
| Total long-term assets | 3,936 | 4,155 |
| Total assets | $ 9,414 | $ 10,306 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Short-term debt (Note 8) | $ 4,244 | $ 4,174 |
| Accounts payable | 1,567 | 1,771 |
| Accrued liabilities (Note 5) | 2,164 | 2,171 |
| Liabilities held for sale (Note 15) | 328 | 293 |
| Total current liabilities | 8,303 | 8,409 |
| Long-Term liabilities: | | |
| Employee benefit plan obligations (Note 10) | 538 | 552 |
| Other long-term liabilities (Note 5) | 1,014 | 1,028 |
| Total long-term liabilities | 1,552 | 1,580 |
| Liabilities subject to compromise (Note 2) | 13,435 | 14,583 |
| Total liabilities | 23,290 | 24,572 |
| Commitments and contingencies (Note 11) | | |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2009 and 2008 | 6 | 6 |
| Additional paid-in capital | 2,747 | 2,747 |
| Accumulated deficit | (11,512) | (12,064) |
| Accumulated other comprehensive loss: | | |
| Employee benefit plans (Note 10) | (4,894) | (4,867) |
| Other | (352) | (219) |
| Total accumulated other comprehensive loss | (5,246) | (5,086) |
| Treasury stock, at cost (389 thousand and 391 thousand shares in 2009 and 2008, respectively) | (6) | (6) |
| Total Delphi stockholders' deficit | (14,011) | (14,403) |
| Noncontrolling interest | 135 | 137 |
| Total stockholders' deficit | (13,876) | (14,266) |
| Total liabilities and stockholders' deficit | $ 9,414 | $ 10,306 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2009** | **2008** |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net income (loss) | $ 556 | $ (577) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 172 | 222 |
| Pension and other postretirement benefit expenses | 126 | 185 |
| Reorganization items | (1,144) | 109 |
| (Gain) loss on assets held for sale | (4) | 30 |
| Deferred income taxes | (65) | (4) |
| Other, net | 8 | 25 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | 130 | (395) |
| Inventories, net | 152 | (50) |
| Other assets | 115 | 18 |
| Accounts payable | (112) | 176 |
| Accrued and other long-term liabilities | (120) | 97 |
| Other, net | 49 | 36 |
| U.S. employee workforce transition program payments | (13) | (71) |
| Pension contributions | (25) | (68) |
| Other postretirement benefit payments | (19) | (66) |
| Other, net | (25) | (11) |
| Discontinued operations (Note 15) | — | 54 |
| Net cash used in operating activities | (219) | (290) |
| | | |
| Cash flows from investing activities: | | |
| Capital expenditures | (166) | (255) |
| Proceeds from sale of property | 8 | 21 |
| Proceeds from sale of non-U.S. trade bank notes | 43 | 62 |
| Proceeds from divestitures, net | 4 | 87 |
| Increase in restricted cash | (46) | (2) |
| Other, net | 1 | 3 |
| Discontinued operations | (12) | (70) |
| Net cash used in investing activities | (168) | (154) |
| | | |
| Cash flows from financing activities: | | |
| Net repayments of borrowings under amended and restated debtor-in-possession facility | (146) | — |
| Net borrowings under refinanced debtor-in-possession facility | — | 452 |
| Net (repayments) borrowings under other debt agreements | (207) | 210 |
| Issuance costs related to the Accommodation Agreement | (16) | — |
| Net borrowings under GM liquidity support agreements | 453 | — |
| Other, net | (1) | (7) |
| Discontinued operations | 14 | 11 |
| Net cash provided by financing activities | 97 | 666 |
| | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | (19) | 52 |
| | | |
| (Decrease) increase in cash and cash equivalents | (309) | 274 |
| Cash and cash equivalents at beginning of period | 959 | 1,036 |
| Cash and cash equivalents at end of period | $ 650 | $ 1,310 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS) (Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2009** | **2008** |
| | (in millions) | |
| Net income (loss) ................................................. | $    556 | $    (577) |
| Other comprehensive income: | | |
| Currency translation adjustments, net of tax (a) ............. | (84) | 72 |
| Net change in unrecognized loss on derivative instruments, net of tax (b) ........................................ | (48) | 96 |
| Employee benefit plans adjustment, net of tax (c) .......... | (27) | (30) |
| Other comprehensive (loss) income ........................... | (159) | 138 |
| Comprehensive income (loss) ........................................... | 397 | (439) |
| Comprehensive income attributable to noncontrolling interest ........................................................... | 5 | 11 |
| Comprehensive income (loss) attributable to Delphi ......... | $    392 | $    (450) |

(d)  Currency translation adjustments are net of $2 million and ($1) million tax effect for the three months ended March 31, 2009 and 2008, respectively.

(e)  There was no tax effect on the net change in unrecognized gain on derivative instruments for the three months ended March 31, 2009 and 2008, respectively.

(f)  Employee benefit plans adjustments includes a loss for pension, postretirement and postemployment liabilities of $(27) million (net of a ($75) million tax effect) and ($30) million (there was no tax effect) for the three months ended March 31, 2009 and 2008, respectively.

See notes to consolidated financial statements.

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (DEFICIT) (Unaudited)

| | Common Stock Shares | Amount | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss (in millions) | Treasury Stock | Noncontrolling Interest | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2008** | 565 | $ 6 | $ 2,747 | $ (12,064) | $ (5,086) | $ (6) | $ 137 | $ (14,266) |
| Net income | — | — | — | 552 | — | — | 4 | 556 |
| Currency translation adjustments and other, net of tax | — | — | — | — | (85) | — | 1 | (84) |
| Net change in unrecognized loss on derivative instruments, net of tax | — | — | — | — | (48) | — | — | (48) |
| Employee benefit plans liability adjustment, net of tax | — | — | — | — | (27) | — | — | (27) |
| Deconsolidation of noncontrolling interest | — | — | — | — | — | — | (7) | (7) |
| **Balance at March 31, 2009** | 565 | $ 6 | $ 2,747 | $ (11,512) | $ (5,246) | $ (6) | $ 135 | $ (13,876) |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

## 1. BASIS OF PRESENTATION

*General*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company"), is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's largest customer is General Motors Corporation ("GM") and North America and Europe are its largest markets. Delphi is continuing to diversify its customer base and geographic markets. The consolidated financial statements and notes thereto included in this report should be read in conjunction with Delphi's consolidated financial statements and notes thereto included in Delphi's Annual Report on Form 10-K for the year ended December 31, 2008 filed with the United States ("U.S.") Securities and Exchange Commission ("SEC").

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included. The results for interim periods are not necessarily indicative of results that may be expected from any other interim period or for the full year and may not necessarily reflect the consolidated results of operations, financial position and cash flows of Delphi in the future.

*Restricted Cash*— At March 31, 2009 and December 31, 2008, Delphi had $449 million and $403 million in restricted cash, respectively, primarily related to cash collateral as required under its debtor-in-possession credit facility. Refer to Note 8. Debt for additional information. Additionally, restricted cash includes cash for use for the pre-retirement portion of the U.S. employee workforce transition programs, refer to Note 9. U.S. Employee Workforce Transition Programs, and balances on deposit at financial institutions that have issued letters of credit in favor of Delphi.

*Bankruptcy Filing*—On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively, the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings, continue their business operations without supervision from the Court and are not subject to the requirements of the Bankruptcy Code. However, Delphi's Board of Directors authorized Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), to file a petition for Concurso, or bankruptcy, under Spanish law, in March 2007 exclusively for that entity.

American Institute of Certified Public Accountants Statement of Position 90-7 ("SOP 90-7"), *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi adopted SOP 90-7 effective October 8, 2005 and has segregated those items as outlined above for all reporting periods subsequent to such date.

*Going Concern*— The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement and related accommodation agreement, as described below; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including further extensions of its accommodation agreement allowing the Debtors to retain the proceeds of, or an extension or replacement of their DIP financing agreement, which otherwise matured on December 31, 2008. Prior to expiration of the DIP financing agreement (the "Amended and Restated DIP Credit Facility"), Delphi entered into an accommodation agreement, which has been subsequently amended to revise the applicable covenants and milestone

requirements (as so amended through the date hereof, the "Accommodation Agreement") allowing Delphi to retain the proceeds of the Amended and Restated DIP Credit Facility until June 30, 2009, provided Delphi continues to remain in compliance with all applicable covenants under the Accommodation Agreement and the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions) as described further in Note 8. Debt,

In addition, GM has supplemented Delphi's liquidity through (i) an agreement (the "GM Advance Agreement") pursuant to which GM has agreed, subject to certain conditions, to provide a $300 million facility ($253 million was outstanding as of March 31, 2009), which may be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the terms of the GM Advance Agreement throughout the term of the accommodation period under the Accommodation Agreement and, (ii) by agreeing, subject to certain conditions, to accelerate payment of certain payables to Delphi, (the "Partial Temporary Accelerated Payments Agreement"), which has resulted in an additional $200 million of liquidity in the first quarter of 2009 and which resulted in an additional $100 million of liquidity in April 2009.  Refer to Note 8. Debt for more information regarding the terms of the Accommodation Agreement, GM Advance Agreement and the Partial Temporary Accelerated Payments Agreement.

Accordingly, the Accommodation Agreement and support from GM coupled with savings realized as a result of significant cost reductions and cash conservation measures implemented by Delphi globally have provided Delphi with access to sufficient liquidity to fund its operations and remain in compliance with the covenants in the Amended and Restated DIP Credit Facility and Accommodation Agreement into May 2009 as it continued discussions with its stakeholders on proposed modifications to the Plan or another consensual resolution of Delphi's chapter 11 cases.  Pursuant to the Accommodation Agreement, Delphi has until May 21, 2009 to deliver to the agent under the Amended and Restated DIP Credit Facility a detailed term sheet (the "Term Sheet") which has been agreed to by both GM and the U.S. Treasury and which sets forth the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's chapter 11 cases, including, without limitation, all material transactions between Delphi and GM relevant to such resolution (refer to Note 8. Debt).  Failure to deliver a satisfactory Term Sheet or meet the other milestones under the Accommodation Agreement will be an event of default under the Accommodation Agreement and absent receipt of a waiver will result in a termination of the accommodation period entitling Delphi's lenders to exercise all available remedies, including foreclosure on substantially all of Delphi's assets.  Such actions may result in the temporary or permanent suspension and ultimate sale or liquidation of the operations of Delphi.  Delphi anticipates that the Term Sheet will comprehend additional liquidity support from its stakeholders to allow it to continue operations until a consensual resolution can be implemented, however, as discussions are ongoing, there can be no assurances that this will be the case.

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008 (the effective date of the Accommodation Agreement).  However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement, as amended).  There can be no assurance that Delphi will continue to comply with the terms and conditions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement) or that the Term Sheet will comprehend sufficient additional liquidity support for Delphi to continue operating its business or remain compliant in view of anticipated additional production cuts by its customers.  These matters create substantial uncertainty relating to the Company's ability to continue as a going concern.  The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties.  In addition, the Company filed its proposed plan of reorganization with the Court in September 2007.  The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008.  Refer to Equity Purchase and Commitment Agreement and The Plan of Reorganization in Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.  Pending confirmation and consummation of the plan of reorganization (as amended), an alternative plan of reorganization or other consensual resolution of Delphi's chapter 11 cases, Delphi and certain of its U.S. subsidiaries will continue as "debtors-in-possession" in chapter 11.  On October 3, 2008, Delphi filed a motion seeking Court approval of proposed modifications to its confirmed plan of reorganization, however the hearing on the motion has been adjourned and Delphi continues discussions with its stakeholders regarding a path to emergence from chapter 11.  There can be no assurances as to when Delphi will confirm or consummate a modified plan or other consensual resolution of Delphi's chapter 11 cases.  Consummation of a confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization (as amended).

***Contractual Interest Expense and Interest Expense on Unsecured Claims***— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008.  The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims.  Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million during the

quarter ended March 31, 2008.  At March 31, 2009 and December 31, 2008, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims.  As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims.  Accordingly, Delphi anticipates that it will be relieved of this liability if and when the plan modifications are approved.

*Use of Estimates*—Preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein.  During the first quarter of 2009, there were no material changes in the methods or policies used to establish accounting estimates.  Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, workers' compensation accruals and healthcare accruals.  Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Discontinued Operations*—In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component.  The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet.  SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business").  While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to discontinued operations in the statements of operations.  Certain employee pension and other postretirement benefit liabilities for the Steering Business were not allocated to liabilities held for sale in the balance sheets.  Expenses related to the service cost of employee pension and other postretirement benefit plans were allocated to discontinued operations in the statements of operations.  Allocations have been made based upon a reasonable allocation method.  Refer to Note 15. Discontinued Operations for more information.

*Recently Issued Accounting Pronouncements*—In September 2006, the Financial Accounting Standards Board (the "FASB") issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*.  In February 2008, the FASB issued FASB Staff Position No. 157-2 ("FSP 157-2"), *Effective Date of FASB Statement No. 157*, which partially deferred the effective date of SFAS No. 157 for one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis.  The FSP does not defer recognition and disclosure requirements for financial assets and liabilities or for nonfinancial assets and nonfinancial liabilities that are remeasured at least annually.  Delphi adopted the provisions of SFAS No. 157 as of January 1, 2009 for nonfinancial assets and liabilities that are subject to the deferral (including long-lived assets and goodwill, asset retirement obligations and liabilities for exit or disposal activities measured at fair value upon initial recognition) and the adoption did not have a significant impact on Delphi's financial statements.  Refer to Note 14. Derivatives and Hedging Activities and Fair Value Measurements for the disclosures required by SFAS 157.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (Revised 2007) ("SFAS 141R"), *Business Combinations*.  SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions.  SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008.  Earlier adoption is prohibited.  The adoption of SFAS 141R as of January 1, 2009 did not have a significant impact on Delphi's financial statements.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51*.  SFAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary.  SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008.  Delphi adopted SFAS 160 as of January 1, 2009 and the accompanying financial statements reflect the provisions of SFAS 160 for all periods presented.

In March 2008, the FASB issued Statement of Financial Accounting Standards No. 161 ("SFAS 161"), *Disclosures about Derivative Instruments and Hedging Activities - an Amendment of FASB Statement 133*.  SFAS 161 enhances required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (a) an entity uses derivative instruments; (b) derivative

instruments and related hedged items are accounted for under FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133"); and (c) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS 161 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after November 15, 2008. Delphi adopted SFAS 161 as of January 1, 2009. The adoption of SFAS 161 did not have a significant impact on Delphi's financial statements other than providing the new disclosures required by SFAS 161.

In December 2008, the FASB issued FASB Staff Position 132(R)-1 (FSP 132(R)-1), *Employers' Disclosures about Postretirement Benefit Plan Assets*. FSP 132(R)-1 provides guidance on disclosures about plan assets of a defined benefit pension or other postretirement plan. Specifically, FSP 132(R)-1 requires enhanced disclosures of how investment allocation decisions are made, including pertinent factors to further understand investment policies and strategies, the major categories of plan assets, the inputs and valuation techniques used to measure the fair value of plan assets, the effect of fair value measurements using significant unobservable inputs on changes in plan assets for the period, and significant concentrations of risk within plan assets. FSP 132(R)-1 and the enhanced disclosures about plan assets are required for fiscal years ending after December 15, 2009. Earlier application is permitted. Delphi is currently assessing the impact FSP 132(R)-1 may have on its financial statements.

In April 2009, the FASB issued FASB Staff Position No. 141(R)-1 ("FSP 141R-1"), *Accounting for Assets Acquired and Liabilities Assumed in a Business Combination That Arise from Contingencies*. FSP 141R-1 amends the guidance in SFAS 141R to:

- Require that assets acquired and liabilities assumed in a business combination that arise from contingencies be recognized at fair value if fair value can be reasonably estimated. If fair value of such an asset or liability cannot be reasonably estimated, the asset or liability would generally be recognized in accordance with FASB Statement No. 5 ("SFAS 5"), *Accounting for Contingencies*, and FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss*. Further, the FASB decided to remove the subsequent accounting guidance for assets and liabilities arising from contingencies from SFAS 141R, and carry forward without significant revision the guidance in FASB Statement No. 141, *Business Combinations*.
- Eliminate the requirement to disclose an estimate of the range of outcomes of recognized contingencies at the acquisition date. For unrecognized contingencies, the FASB decided to require that entities include only the disclosures required by SFAS 5 and that those disclosures be included in the business combination footnote.
- Require that contingent consideration arrangements of an acquiree assumed by the acquirer in a business combination be treated as contingent consideration of the acquirer and initially and subsequently measured at fair value in accordance with SFAS 141R.

FSP 141R-1 is effective for assets or liabilities arising from contingencies in business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. The adoption of FSP 141R-1 as of January 1, 2009 did not have a significant impact on Delphi's financial statements.

In April 2009, the FASB issued FASB Staff Position No. 157-4 ("FSP 157-4"), *Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly*. FSP 157-4 (i) affirms that the objective of fair value when the market for an asset is not active is the price that would be received to sell the asset in an orderly transaction, (ii) clarifies and includes additional factors for determining whether there has been a significant decrease in market activity for an asset when the market for that asset is not active, (iii) eliminates the proposed presumption that all transactions are distressed (not orderly) unless proven otherwise, but instead requires an entity to base its conclusion about whether a transaction was not orderly on the weight of the evidence, (iv) includes an example that provides additional explanation on estimating fair value when the market activity for an asset has declined significantly, (v) requires an entity to disclose a change in valuation technique (and the related inputs) resulting from the application of FSP 157-4 and to quantify its effects, if practicable, and (vi) applies to all fair value measurements when appropriate. FSP 157-4 must be applied prospectively and retrospective application is not permitted. FSP 157-4 is effective for interim and annual periods ending after June 15, 2009, with early adoption permitted for periods ending after March 15, 2009. An entity early adopting FSP 157-4 must also early adopt FAS 115-2 and FAS 124-2, *Recognition and Presentation of Other-Than-Temporary Impairments,* as defined and described below. Delphi is currently assessing the impact FSP 157-4 may have on its financial statements.

In April 2009, the FASB issued FASB Staff Position Nos. 115-2 and 124-2 ("FSP FAS 115-2 and FAS 124-2"), *Recognition and Presentation of Other-Than-Temporary Impairments*. FSP FAS 115-2 and FAS 124-2 (i) changes existing guidance for determining whether an impairment is other than temporary to debt securities; (ii) replaces the existing requirement that the entity's management assert it has both the intent and ability to hold an impaired security until recovery with a requirement that management assert: (*a*) it does not have the intent to sell the security; and (*b*) it is more likely than not it will not have to sell the security before recovery of its cost basis; (iii) incorporates examples of factors from existing literature that should be considered in determining whether a debt security is other-than-temporarily impaired; (iv) requires that an entity recognize noncredit losses on held-to-maturity debt securities in other comprehensive income and amortize that amount over the remaining life of the security in a prospective manner by offsetting the recorded value of the asset unless the security is subsequently sold or there are additional credit losses; (v) requires an entity to present the total other-than-temporary impairment in the statement of earnings with an offset for the amount recognized in other comprehensive income; and (vi) upon adoption requires an entity to record a cumulative-effect adjustment as of the beginning of the period of adoption to reclassify the noncredit component of a previously recognized other-temporary impairment from retained earnings to accumulated other comprehensive income if the entity does not intend to sell the security and it is not more likely than not that the entity will be required to sell the security before recovery. FSP FAS 115-2 and FAS 124-2 is effective for interim and annual periods ending after June 15, 2009, with early

adoption permitted for periods ending after March 15, 2009. An entity may early adopt FSP FAS 115-2 and FAS 124-2 only if it also elects to early adopt FSP 157-4. Delphi is currently assessing the impact FSP FAS 115-2 and FAS 124-2 may have on its financial statements.

In April 2009, the FASB issued FASB Staff Position No. 107-1 and Accounting Principles Board Opinion 28-1 ("FSP FAS 107-1 and APB 28-1"), *Interim Disclosures about Fair Value of Financial Instruments.* This FSP amends FASB Statement No. 107, *Disclosures about Fair Value of Financial Instruments,* to require an entity to provide disclosures about fair value of financial instruments in interim financial statements. This FSP also amends APB Opinion No. 28, *Interim Financial Reporting,* to require those disclosures in summarized financial information at interim reporting periods. Under FSP FAS 107-1 and APB 28-1, a publicly traded company shall include disclosures about the fair value of its financial instruments whenever it issues summarized financial information for interim reporting periods. In addition, an entity shall disclose in the body or in the accompanying notes of its summarized financial information for interim reporting periods and in its financial statements for annual reporting periods the fair value of all financial instruments for which it is practicable to estimate that value, whether recognized or not recognized in the statement of financial position, as required by Statement 107. FSP FAS 107-1 and APB 28-1 is effective for interim periods ending after June 15, 2009, with early adoption permitted for periods ending after March 15, 2009. However, an entity may early adopt these interim fair value disclosure requirements only if it also elects to early adopt FSP 157-4 and FSP FAS 115-2 and FAS 124-2. Delphi is currently assessing the impact FSP FAS 107-1 and APB 28-1 may have on its financial statements.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

### Plan of Reorganization and Transformation Plan

### Elements of Transformation Plan

On September 6, 2007 Delphi filed its proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outline Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM, a plan to streamline our product portfolio and make the necessary manufacturing alignment with our new focus, transform our cost structure and resolve our pension funding situation. On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's Plan and Disclosure Statement became final. Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA and that Appaloosa is entitled to terminate the EPCA. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Official Committee of Equity Security Holders (the "Equity Committee") in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA. Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both statutory committees, to develop modifications to the Plan that would allow Delphi to emerge from chapter 11. On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However, since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization or other consensual resolution of Delphi's chapter 11 cases. Delphi continues comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi made further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan

has been completed, it is anticipated that the total business enterprise value associated with the modified plan or other economic distribution in connection with another resolution of Delphi's chapter 11 cases, will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. These factors also continue to delay Delphi's emergence from chapter 11 and its ability to refinance its Amended and Restated DIP Credit Facility.

_GM_ - Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of the Global Settlement Agreement, as amended (the "GSA") and the Master Restructuring Agreement, as amended (the "MRA"). The GSA and the MRA, as amended through January 25, 2008, comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and the MRA provided that such agreements were not effective until and unless Delphi emerges from chapter 11. However, as part of Delphi's overall negotiations with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi agreed with GM and filed further amendments to the GSA and MRA (the "Amended MRA") with the Court on September 12, 2008 and subsequently entered into an additional amendment to the GSA as of September 25, 2008 (as so amended, the "Amended GSA"). On September 26, 2008, Delphi received the consent of its labor unions to implement certain aspects of the agreements as described in more detail below. The Court approved such amendments on September 26, 2008 and the Amended GSA and Amended MRA became effective on September 29, 2008. These amended agreements include provisions related to the transfer of certain legacy pension and other postretirement benefit obligations and became effective independent of and in advance of substantial consummation of an amended plan of reorganization. The effectiveness of these agreements resulted in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs.

_Global Settlement Agreement_ - The Amended GSA resolves outstanding issues between Delphi and GM, including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under a Delphi plan of reorganization; and various other legacy U.S. hourly workforce benefit issues. Except for the second step of the transfer of a substantial portion of the assets and liabilities under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") as specifically noted below, the obligations under the Amended GSA are not conditioned on the effectiveness of an amended plan of reorganization.

The Amended GSA addresses commitments by Delphi and GM regarding other U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases.

_Hourly Pension Plan Settlement – First Pension Transfer to GM_ - On September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan pursuant to section 414(l) of the Internal Revenue Code (the "414(l) Net Liability Transfer"). Pursuant to the Amended GSA, the 414(l) Net Liability Transfer is to occur in two separate steps with the first step sufficient to avoid an Hourly Plan accumulated funding deficiency for the plan year ended September 30, 2008. The first step occurred on September 29, 2008 and Delphi transferred liabilities of approximately $2.6 billion and assets of approximately $0.5 billion from the Hourly Plan to the GM Hourly-Rate Employees Pension Plan, representing 30% and 10% of the projected benefit obligation and plan assets, respectively, as of September 29, 2008 (the "First Pension Transfer"). The First Pension Transfer was accounted for as a settlement under Statement of Financial Accounting Standards No. 88, _Employer's Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefit_ ("SFAS 88") in the third quarter of 2008, and the obligations of the Hourly Plan were remeasured prior to the transfer occurring.

_Hourly Pension Plan Settlement – Second Pension Transfer to GM_ - The second step of the 414(l) Net Liability Transfer (the "Second Pension Transfer"), will occur upon the effectiveness of an amended plan of reorganization that (i) provides for the treatment of GM's claims and releases as set forth in the Amended GSA, including the delivery of preferred stock to satisfy GM's allowed administrative claim as described below, and (ii) contains interpretive provisions required by the Amended GSA regarding conflicts between such a plan and the Amended GSA. Due to the effectiveness of the Second Pension Transfer being contingent upon Delphi's emergence from chapter 11, it does not meet the criteria for settlement accounting as of March 31, 2009. Delphi will continue to account for the remaining pension liability under Statement of Financial Accounting Standards No. 87, _Employer's Accounting for Pensions,_ until such time that it is settled, which is currently anticipated to be upon emergence from chapter 11.

_Hourly Plan Freeze and Triggering of Benefit Guarantees_ – As provided for under certain union settlement agreements and implementation agreements, Delphi froze its Hourly Plan for future benefit accruals as of November 30, 2008. In addition, as a result of the triggering of the benefit guarantees, certain eligible hourly employees will receive up to seven years of credited service under the pension and OPEB plans sponsored by GM.

*Hourly OPEB Settlement and OPEB Reimbursement from GM* – On September 23, 2008, Delphi received approval from the Court and on September 26, 2008 received the consent of its labor unions to cease providing traditional U.S. hourly OPEB. In addition, upon effectiveness of the Amended GSA, GM assumed financial responsibility for all Delphi traditional hourly OPEB liabilities from and after January 1, 2007. GM assumed approximately $6.8 billion of postretirement benefit liabilities for certain of the Company's active and retired hourly employees. The assumption of the traditional hourly OPEB liability by GM and GM's agreement to reimburse postretirement benefit expenses through the administrative transfer date of February 1, 2009 was accounted for as a settlement under Statement of Financial Accounting Standards No. 106, *Employer's Accounting for Postretirement Benefits Other Than Pensions*, in the third quarter of 2008. During the first quarter of 2009, GM funded an additional $25 million of OPEB payments made to the hourly workforce, of which $19 million was reimbursement for amounts paid by Delphi during the quarter prior to the administrative transfer and $6 million was applied to the receivable from GM at December 31, 2008. Refer to Note 10. Pensions and Other Postretirement Benefits for further information.

*Allowed GM Administrative and General Unsecured Claims* - In connection with the 414(l) Net Liability Transfer, GM will receive an allowed administrative claim in the amount of up to $2.1 billion, to be provided in two steps. Upon completion of the First Pension Transfer on September 29, 2008, GM received a claim equivalent to 77.5% of the net unfunded liabilities transferred, or $1.6 billion. Upon completion of the Second Pension Transfer, which will occur upon the effectiveness of an amended plan of reorganization that satisfies the requirements of the Amended GSA, GM will receive the balance of the $2.1 billion claim. Of the $2.1 billion administrative claim, $1.6 billion was recognized and included in the reorganization gain in 2008 and $427 million will be granted and recognized by Delphi when the remaining assets and liabilities allocable to certain participants of the Hourly Plan included in the 414(l) Net Liability Transfer are transferred to the GM Hourly-Rate Employees Pension Plan. The amount of the claim to be granted upon completion of the Second Pension Transfer is not dependent upon the amount of the assets and liabilities at the time of the transfer.

Upon Delphi's emergence from bankruptcy, the plan of reorganization may, subject to certain conditions, satisfy GM's administrative claim through the issuance of non-voting convertible preferred stock, provided that (i) Delphi's exit financing does not exceed $3.0 billion (plus a revolving credit facility), (ii) no equity securities are issued that are senior to or pari passu with GM's preferred stock, (iii) the plan of reorganization provides for the GM releases as described in the Amended GSA, and (iv) the plan of reorganization contains interpretive provisions required by the Amended GSA regarding conflicts between such a plan and the Amended GSA.

With respect to GM's claims in the Company's chapter 11 cases, GM under the Amended GSA has agreed to a general unsecured claim of $2.5 billion, primarily for OPEB and special attrition programs for the U.S. hourly workforce, and to subordinate its recovery on such claim until other general unsecured creditors (other than holders of claims arising from Delphi's trust preferred securities) have achieved a recovery of 20% of the allowed amount of their claims. Once Delphi's other general unsecured creditors have received a distribution of 20% of the allowed amount of their claims, if there is any remaining value to be distributed, GM would receive a distribution on its general unsecured claim until it has received a 20% distribution on such claim amount. Once GM has received a 20% distribution on its general unsecured claim, and if there is any remaining value to be distributed, any additional distributions would be shared ratably between GM and Delphi's other general unsecured creditors.

On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court, which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However, since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization or other consensual resolution of Delphi's chapter 11 cases. Delphi continued comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi made further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the revised plan or other economic distribution in connection with another resolution of Delphi's chapter 11 cases, will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. Accordingly, we believe it is likely that (i) we will not be able to satisfy all the conditions for the receipt by GM of the preferred stock or that the economic value of reorganized Delphi will exceed $7.13 billion and (ii) GM will not receive a distribution on account of its general unsecured claim. However, if there are distributions, pursuant to the Amended GSA, 50% of all distributions that would otherwise be made to GM on account of its administrative claim would be made to holders of general unsecured claims until such holders have received distributions on account of their general unsubordinated unsecured claims equal in value of up to $300 million. As part of the May 21, 2009 milestone under the Accommodation Agreement requiring Delphi to submit the Term Sheet, Delphi is continuing discussions on proposed modifications to the Plan, and further amendments to the Amended GSA and Amended MRA and expects that the Term Sheet will include agreement on sources of supplemental liquidity to enable Delphi to continue financing its operations until such time as the transactions in the Term Sheet can be implemented and Delphi is able to emerge from chapter 11 or another consensual resolution of Delphi's chapter 11 cases is reached. However, as discussions are ongoing, we can provide no assurances that this will be the case.

GM and certain related parties and Delphi and certain related parties have exchanged broad, global releases, effective as of the effective date of the Amended GSA (which releases do not apply to certain surviving claims as set forth in the Amended GSA). In addition to providing a release to GM, the Company agreed to withdraw with prejudice the sealed complaint (the "GM Complaint") filed against GM in the Court on October 5, 2007.

*Allowed IUE-CWA and USW Claims* – General unsecured claims in the amounts of $126 million and $3 million were granted to the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 87L (the "USW"), respectively, under the respective labor settlement agreements.

*Special Attrition Programs* - Previously recognized GM general unsecured claims of $333 million primarily related to the 2006 U.S. hourly workforce attrition programs previously reimbursed by GM have been forgiven and subsumed in the overall $2.5 billion allowed general unsecured claim granted to GM, as discussed above. As of March 31, 2009 and December 31, 2008, Delphi's receivable from GM related to the funding of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") buydown arrangements under the 2007 U.S. hourly workforce special attrition programs was $68 million. Refer to Note 9. U.S. Employee Workforce Transition Programs for more information.

**Master Restructuring Agreement** - The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship since filing for chapter 11 and following Delphi's emergence from chapter 11. The Amended MRA addresses the scope of GM's existing and future business awards to Delphi and related pricing and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing U.S. hourly workforce labor costs, the disposition of certain Delphi facilities, and the treatment of existing commercial agreements between Delphi and GM. The obligations under the Amended MRA generally are not conditioned on the effectiveness of a modified plan of reorganization. GM's obligations under the Amended MRA are not subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy UAW employees would survive any such termination). As part of the ongoing discussions among Delphi, the United States Treasury and GM regarding GM's overall contribution to the resolution of Delphi's chapter 11 cases, the parties are considering further amendments to the Amended MRA and Amended GSA, which may include, among other things, a sale of one or more U.S. manufacturing sites to GM. Any payment that GM would make for such sites would likely be in lieu of GM's previously agreed upon support for Delphi, such as the production cash burn breakeven and labor subsidy payments referred to below.

*Existing and Future Business Awards and Related Matters* – The Amended MRA (1) addresses the scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards; (2) eliminates the requirement to implement price-downs with respect to certain businesses since Delphi filed for chapter 11 and restricts GM's ability to re-source products manufactured at core U.S. operations through at least December 31, 2011 and Mexican operations through December 31, 2010; (3) contains a commitment by GM to provide Delphi with an annual Keep Site Facilitation Fee of $110 million in 2009 and 2010 which is not contingent on Delphi's emergence from chapter 11, payable in quarterly installments during these periods, which, consistent with Delphi's policy, will be recognized in earnings over future production periods; and (4) contains commitments by GM concerning the sale of certain of Delphi's non-core businesses and additional commitments by GM if certain of Delphi's businesses and facilities are not sold or wound down by specified future dates. On March 31, 2009, Delphi received its first quarterly installment of the annual Keep Site Facilitation Fee of $27.5 million, of which approximately $25 million was recorded as revenue and approximately $3 million was recorded as a deferred liability.

*Reimbursement of Hourly Labor Costs* – GM has agreed to reimburse the Company for hourly workforce labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and OPEB contributions provided under the supplemental wage agreement, at specified UAW manufacturing facilities retained by Delphi. The economic substance of this provision of the Amended MRA is to lower Delphi's labor costs at specified UAW-represented manufacturing facilities to $26 per hour, excluding certain costs, in order to maintain competitive operations in the U.S. Consistent with the economic substance of this provision, the labor subsidy amounts received by Delphi are recorded as a reduction of cost of sales in the period receivable from GM. During the first quarter of 2009, Delphi received a $38 million reimbursement from GM of hourly labor costs in excess of $26 per hour, which was recorded as a reduction to cost of sales.

*Production Cash Burn Breakeven Reimbursement* – Delphi has agreed to continue manufacturing at certain non-core sites to meet GM's production requirements and GM is providing operating cash flow breakeven support, or production cash burn breakeven ("PCBB") from January 1, 2008 through site-specified time periods to compensate Delphi for keeping these sites in production. Additionally, GM has agreed to reimburse capital spending in excess of $500,000 at the PCBB sites from January 1, 2008 through site-specified time periods. PCBB reimbursement, including capital spending, from GM is recognized contemporaneously as incurred, and is treated as a reduction to cost of sales, fixed assets or discontinued operations, as appropriate. During the first quarter of 2009, Delphi received $56 million PCBB reimbursement from GM which was recorded in income from discontinued operations. An additional $24 million was recorded as a receivable from GM as of March 31, 2009, of which $23 million was recorded in discontinued operations and $1 million was recorded as a reduction to cost of sales during the first quarter of 2009.

*Working Capital Backstop – Steering Business* – GM agreed to provide payments to Delphi for the Steering Business if the sales value is less than defined estimated working capital amounts of the businesses.  In addition, GM agreed to provide payments to Delphi related to the Steering Business if it is not sold prior to the effectiveness of the MRA.  GM provided a $210 million advance on working capital recovery to Delphi related to the Steering Business on September 30, 2008.  This payment is recorded as a deferred liability as of March 31, 2009.  The Steering Business is reported as discontinued operations, refer to Note 15. Discontinued Operations for further information.

*Reimbursement of Hourly Workers' Compensation and Other Benefits* – GM agreed to reimburse Delphi for all current and future workers compensation, disability, supplemental unemployment benefits, and severance obligations paid by Delphi after January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive, and retired employees.  Consistent with the substance of the provision, Delphi recognizes future anticipated reimbursements from GM contemporaneously with Delphi's incurrence of related cash payments.  During the first quarter of 2009, Delphi received reimbursement of $3 million and an additional $7 million is recorded as a receivable from GM as of March 31, 2009, for a total reduction to cost of sales of $10 million.

*Accelerated GM North American Payment Terms* - The Amended MRA accelerates GM's North American payment terms through 2011 upon (a) the effectiveness of an agreement giving GM certain access rights to four of the Company's U.S plants in the event that the reorganized Company experiences extreme financial distress that would prevent Delphi from delivering parts at some point in the future and (b) the consummation of a modified chapter 11 plan of reorganization pursuant to which Delphi emerges with substantially all of its core businesses.  As these conditions have not yet occurred, the provisions of this program are not yet effective, and there was no financial impact for this matter in the first quarter of 2009 or 2008.  The accelerated payments are expected to result in an increase in cash and a reduction in accounts receivable and will have no impact on the statement of operations.

The following table details changes during the three months ended March 31, 2009 in the GM and affiliates accounts receivable balance attributable to the Amended GSA and the Amended MRA, recorded in GM and affiliates accounts receivable in the accompanying consolidated balance sheet at March 31, 2009 and December 31, 2008:

**Amended GSA and Amended MRA - GM**
**Accounts Receivable**

|  | (in millions) |
|---|---|
| Balance at December 31, 2008 | $   141 |
| GM obligations recognized | 175 |
| Payments received from GM | (150) |
| Balance at March 31, 2009 | $   166 |

As of March 31, 2009, $130 million of the Amended GSA and Amended MRA accounts receivable was included in accounts receivable from General Motors and affiliates and $36 million was included in assets held for sale on the consolidated balance sheet.

The following table details the GM obligations recognized during the three months ended March 31, 2009:

**GM Obligations Recognized**
**January 1, 2009 – March 31, 2009**

|  | (in millions) |
|---|---|
| Amount recognized in pre-tax earnings | $   74 |
| Amount recognized in discontinued operations | 79 |
| Amount of pass-through OPEB reimbursement | 19 |
| Amount recognized in deferred liability | 3 |
| Total | $   175 |

**_Pensions_** - Devise a workable solution to the current pension funding situation.

Since entering chapter 11, Delphi had generally limited its contributions to the Hourly Plan, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan (together, the "Pension Plans") to "normal cost" contributions, which are less than the minimum funding requirements established by the IRC and ERISA.  Following the Court's approval of the Hourly and Salaried Pension Program Modification Motion on September 23, 2008, the Salaried Plan, the Mechatronic Plan, the ASEC Plan, and the PHI Non-Bargaining Plan were frozen effective September 30, 2008.  The Hourly Plan was frozen on November 30, 2008.  By freezing the Pension Plans, Delphi halted the accrual of normal cost payments going forward thereby preserving liquidity.

Pursuant to the pertinent terms of certain pension funding waivers secured from the Internal Revenue Service ("IRS") in 2006 and 2007, Delphi provided to the Pension Benefit Guaranty Corporation ("PBGC") letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan.  Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008.  The cash proceeds from the letters of credit were deposited into the Hourly and Salaried

Plans and initially recognized as Delphi funding contributions to the respective plans for the plan year ended September 30, 2008. However, on January 16, 2009, Delphi filed amended Forms 5500 (Annual Return Report of Employee Benefit Plan) with the IRS that applied all contributions made to the Hourly and Salaried Plans in 2008, including the proceeds from the letters of credit, back to the plan year ended September 30, 2007. This contribution carry back, together with the September 29, 2008 414(l) Net Liability Transfer discussed below, had the effect that no contributions were due under the Hourly Plan for the plan year ended September 30, 2008.

Approximately $56 million remains due as a minimum funding contribution under the Salaried Plan for the plan year ended September 30, 2008, and approximately $13 million remains due as minimum funding contribution under the Delphi Mechatronics Retirement Program, the ASEC Manufacturing Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan for the plan year ended December 31, 2008. As permitted under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), Delphi elected to defer the contribution necessary to satisfy this remaining obligation until no later than the due date for minimum contributions, which is June 15, 2009 for the Salaried Plan and September 15, 2009 for the subsidiary plans. On December 15, 2008, Delphi applied to the IRS for a waiver of the minimum funding contribution of approximately $56 million to the Salaried Plan for the plan year ended September 30, 2008, and permission to instead amortize amounts due in over future plan years. That application remains pending.

As reflected above, Delphi has not made certain minimum required contributions to the Pension Plans and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million and $226 million for plan years ended September 30, 2006 and September 30, 2007, respectively. If these asserted assessments are not paid, the IRS could increase the assessments that relate to the Salaried Plan to 100% of any Salaried Plan contributions considered by the IRS to be due and unpaid. However, because the 414(l) Net Liability Transfer to the GM hourly plan avoided an accumulated funding deficiency in the Delphi Hourly Plan for the plan year ended September 30, 2008, exposure to the 100% excise tax related to the Delphi Hourly Plan has been eliminated for the plan year ended September 30, 2008. Assuming Delphi is assessed excise taxes for all plan years through 2007, the total exposure to date could approximate $383 million, plus interest and penalties, which could be substantial. In addition, if the IRS does not agree to waive the minimum required funding contribution under the Salaried Plan for the plan year ended September 30, 2008, the IRS may assess an additional excise tax of approximately $6 million if Delphi does not remit $56 million to the Salaried Plan by June 15, 2009. Additional excise taxes could be assessed with respect to the subsidiary plans if the minimum required contributions to those plans for the plan year ended December 31, 2008, are not remitted by September 15, 2009. To the extent not promptly paid by Delphi, any such excise tax assessments might be increased to 100% of any Salaried Plan and subsidiary plan contributions considered by the IRS to be due and unpaid.

Although the IRS has asserted certain of the excise tax assessments described above and might seek to assess additional excise taxes, plus interest and penalties, related to the Pension Plans, Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments. Accordingly, management has concluded that an unfavorable outcome is not currently probable and, as of March 31, 2009, no amounts have been recorded for any potential excise tax assessment.

If the Company emerges from chapter 11 as contemplated by the Amended GSA and the Amended MRA, then completing the second step of the 414(l) Net Liability Transfer will allow us to satisfy substantially all of the pension funding obligations to our hourly employees, however that second transfer is conditioned on our emergence from chapter 11 under a modified plan of reorganization that meets the terms of the Amended GSA, and it appears unlikely at this time that such conditions will be met. If the conditions to the second step of the 414(l) Net Liability Transfer are not satisfied, and the second step does not take place, we do not believe we will be able to fund those U.S. pension obligations. In addition, we still maintain responsibility for and need to meet U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees and certain subsidiary employees. We may be unable to satisfy our U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees or certain subsidiary employees. Due to the impact of the global economic recession, including reduced global automotive production, capital markets volatility that has adversely affected our pension asset return expectations, a declining interest rate environment, or other reasons, our funding requirements have substantially increased since September 30, 2008. Should we be unable to obtain funding from some other source to resolve these pension funding obligations, either Delphi or the Pension Benefit Guaranty Corporation (the "PBGC") may initiate plan terminations. The PBGC would seek termination, if in its view, the risk of loss with respect to the plans may increase unreasonably if the plans are not terminated. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the date of emergence, and the funded status of the Pension Plans at the date of emergence. Refer to Note 10. Pension and Other Postretirement Benefits for further information.

_Labor_ - Modify Delphi's labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the UAW, and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and

1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements became effective in 2007, and the remaining portions were tied to the effectiveness of the GSA and the MRA, and substantial consummation of the Plan as confirmed by the Court. However, as noted above, Delphi filed amendments to the GSA and the MRA in the Court on September 12, 2008, and subsequently entered into an additional amendment to the GSA as of September 25, 2008. The Court approved such amendments on September 26, 2008. The Amended GSA and the Amended MRA became effective on September 29, 2008.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower hourly wages. Refer to Note 9. U.S. Employee Workforce Transition Programs for more information.

*Portfolio* - Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with Delphi's new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, wheel bearings and power products. In connection with the Company's continuous evaluation of its product portfolio, in 2008, Delphi determined that the global exhaust business no longer fit within the Company's future product portfolio. With the exception of the catalyst and global exhaust product lines, included in the Powertrain Systems segment, and the steering and halfshaft product lines and interiors and closures product lines, included in discontinued operations, the Company's non-core product lines are included in the Company's Automotive Holdings Group segment, refer to Note 18. Segment Reporting.

Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, labor unions and other stakeholders to carefully manage the transition of affected product lines and manufacturing sites. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has consulted with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

Costs recorded in the three months ended March 31, 2009 related to the transformation plan for non-core product lines include employee termination benefits and other exit costs and U.S. employee workforce transition program charges and are further described in Note 7. Employee Termination Benefits and Other Exit Costs, Note 9. U.S. Employee Workforce Transition Programs and Note 15. Discontinued Operations. In April 2009, Delphi received Court approval of bidding procedures for the sale of the remaining global suspension and brakes business. Refer to Note 17. Acquisitions and Divestitures for more information.

*Cost Structure* - Transform the salaried workforce and reduce general and administrative expenses to ensure that the organizational and cost structure is competitive and aligned with Delphi's product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in pursuit of its transformation objective to reduce selling, general and administrative expenses. These initiatives include changing the model for delivery of financial services, information technology and certain sales administration activities; as well as the reduction of the global salaried workforce by leveraging attrition and using salaried separation plans, and the realignment of certain salaried benefit programs with business conditions. While the continually challenging economic environment persists, further restructuring initiatives continue to be required. Delphi has implemented a number of cash conservation measures, including a short-term salaried layoff plan, the suspension of 2009 pay increases and annual incentive payments for eligible employees, the cessation of health care and life insurance benefits in retirement to salaried employees and retirees effective March 31, 2009 (refer to Note 10. Pension and Other Postretirement Benefits), a decrease in salaried severance payments and the elimination of salaried flex payments in 2009. Delphi continues to reduce other structural costs to further align itself with the current and projected volume outlook.

## Equity Purchase and Commitment Agreement

Under the terms and subject to the conditions of the EPCA between Delphi and the Investors, the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, as described below, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in June 2009.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares. However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of expense related to these fees and other expenses during the first quarter of 2008.

### The Plan of Reorganization

As noted above, due to the Investors failure to fund their commitments under the EPCA, Delphi has not yet consummated the Plan. Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) was extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan. On July 23, 2008, Delphi's Creditors' Committee and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against an affiliate of lead investor, Appaloosa, and the other Investors. Notwithstanding the foregoing, pursuant to an order entered by the Court on March 24, 2009, the Debtors' exclusive period for filing a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee, is extended through and including May 31, 2009 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee, is extended through and including July 31, 2009. On May 1, 2009, Delphi filed a motion seeking to extend such exclusive periods, solely with respect to the statutory committees, to July 31, 2009 and September 30, 2009, respectively. On April 23, 2009 the Court approved Delphi's motion to disband the Equity Committee as a result of changed circumstances in Delphi's chapter 11 cases.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of their statutory committees, to develop modifications to the Plan that would allow Delphi to emerge from chapter 11. On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However, since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization or other consensual resolution of Delphi's chapter 11 cases. Delphi continued comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi made further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the modified plan or other economic distribution in connection with another resolution of Delphi's chapter 11 cases, will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. These factors also continue to delay Delphi's emergence from chapter 11 and its ability to refinance its Amended and Restated DIP Credit Facility. To address the likelihood of continued low U.S. automotive production volumes, Delphi continues to implement a number of cash conservation measures, including temporary lay-offs and salaried benefit cuts for both active employees and retirees, delay of capital and other expenditures, permanent salaried work-force reductions and other cost saving measures to ensure adequate liquidity for operations until volumes recover or until the Company is able to complete further restructuring efforts in response to changes in vehicle markets. The Accommodation Agreement and support from GM coupled with savings realized as a result of significant cost cutting and cash conservation measures implemented by Delphi globally have provided Delphi with access to sufficient liquidity to fund its operations and remain in compliance with the covenants in the Amended and Restated DIP Credit Facility and Accommodation Agreement into May 2009 as it continued discussions with its stakeholders on proposed modifications to the Plan. As noted above, Delphi, GM and the United States Treasury are continuing to discuss the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's chapter 11 cases. As part of the ongoing discussions, the parties are considering further amendments to the Amended MRA and Amended GSA, which may include among other things, a sale of one or more U.S. manufacturing sites to GM. Refer to "Elements of Transformation Plan" above. Until such time as the Term Sheet is agreed upon and even assuming that the Term Sheet comprehends additional liquidity support to facilitate Delphi's emergence from chapter 11 or another consensual resolution of Delphi's chapter 11 cases, liquidity is expected to remain constrained through the remainder of the year and Delphi must continue implementing and executing its cash savings initiatives to preserve liquidity in this very difficult economic environment. Additionally, there can be no assurances that any liquidity support provided for in the Term Sheet or Delphi's initiatives will be sufficient to compensate for the liquidity shortfall anticipated as a result of the announced customer production cuts (refer to Item 1A. Risk Factors in the Quarterly Report on Form 10-Q).

Delphi will not emerge from bankruptcy as a going concern unless and until Delphi is able to obtain approval of necessary modifications to the Plan that recognize the existing market conditions, or there is another consensual resolution of Delphi's chapter 11 cases. Moreover, the continued forbearance by Delphi's lenders under the DIP financing and the effectiveness of any revised plan of reorganization are subject to a number of conditions, including the entry of certain orders by the Court and, with respect to the effectiveness of a plan, the obtaining of necessary emergence capital. There can be no assurances that such emergence capital will be obtained (or, if obtained, the terms thereof) or such other conditions will be satisfied. For a discussion of certain risks and uncertainties related to the Debtors' chapter 11 cases and reorganization objectives refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and in this Quarterly Report on Form 10-Q. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder its ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers. Accordingly, no assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. If certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by a company's equity security holders and certain classes of creditors and notwithstanding the fact that such equity security holders and such classes of creditors do not receive or retain any property under the plan on account of their equity or creditor interests. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in its common stock or other equity securities, or any claims relating to prepetition liabilities.

The Amended GSA and the Amended MRA became effective during the third quarter of 2008. The cost related to the remaining components of the transformation plan will be recognized in the Company's consolidated financial statements as each other element of the Plan (as modified), including the remaining portions of the U.S. labor agreements, or as the terms of any future confirmed plan of reorganization, become effective. The confirmation and consummation of a plan of reorganization and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets

and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

## Reorganization Items

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions. The Debtors' reorganization items consist of the following:

| | (Income) / Expense Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| | (in millions) | |
| Salaried OPEB settlement (Note 10)........................................... | $(1,168) | $   — |
| Professional fees directly related to reorganization.................... | 23 | 29 |
| Interest income.................................................................... | — | (2) |
| Write off of previously capitalized fees or expenses related to the EPCA ............................................................................ | — | 79 |
| Other................................................................................... | 1 | 3 |
| Total Reorganization Items ................................................. | $(1,144) | $   109 |

Cash paid for professional fees was approximately $21 million and $18 million, respectively, for the three months ended March 31, 2009 and 2008.

## Liabilities Subject to Compromise

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals. The following data regarding the number and amount of claims and proof of claims is unaudited.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business. In addition, pursuant to the Plan, the Debtors assumed most of their executory contracts and unexpired leases with respect to the Debtors' operations, and rejected certain of them, with the approval of the Court. As of March 31, 2009, the Debtors' have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. Many of these claims have been found to be duplicative, based on contingencies that have not occurred, or are otherwise overstated, and therefore have been determined to be invalid. As a result, the aggregate amount of claims filed with the Court exceeds the amount that has been to date allowed by the Court. As of March 31, 2009, the Debtors have filed 33 omnibus claims objections that objected to claims on procedural or substantive grounds. Pursuant to these claims objections, the Debtors have objected to approximately 13,300 proofs of claim asserting approximately $9.9 billion in aggregate liquidated amounts plus additional unliquidated amounts. As of March 31, 2009, the Court has entered orders disallowing and/or claimants have withdrawn approximately 10,000 of those claims, which orders reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order modifying approximately 4,000 claims reducing the aggregate amounts asserted on those claims by $351 million, which amounts are subject to further objection by the Debtors at a later date on any basis. The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. The determination of how these liabilities are to be settled and treated is set forth in the Plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court. As of January 25, 2008, the total general unsecured claims, other than funded debt claims, against the

Company had been reduced to an amount of approximately $1.45 billion.  Refer to Plan of Reorganization and Transformation Plan above for details on the chapter 11 cases.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts.  The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities subject to compromise consist of the following:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (in millions) | |
| Pension obligations (Note 10) | $ 5,347 | $ 5,321 |
| Postretirement obligations other than pensions (Note 10) | 31 | 1,201 |
| Allowed GM general unsecured claim | 2,500 | 2,500 |
| Allowed GM administrative claim | 1,628 | 1,628 |
| Allowed IUE-CWA and USW claims | 129 | 129 |
| Debt and notes payable | 1,984 | 1,984 |
| Accounts payable | 730 | 732 |
| Junior subordinated notes due 2033 | 391 | 391 |
| Securities & ERISA litigation liability (Note 11) | 351 | 351 |
| Supplemental executive retirement program | 117 | 118 |
| Other | 227 | 228 |
| Total Liabilities Subject to Compromise | $ 13,435 | $ 14,583 |

The decrease in liabilities subject to compromise at March 31, 2009 is due to the impact of the termination of health care and life insurance benefits in retirement to salaried employees, retirees and surviving spouses effective March 31, 2009 (refer to Note 10. Pension and Other Postretirement Benefits).

## 3. INVENTORIES, NET

Inventories are stated at the lower of cost, determined on a first-in, first-out basis ("FIFO"), or market, including direct material costs and direct and indirect manufacturing costs.  A summary of inventories, net is shown below:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (in millions) | |
| Productive material | $ 600 | $ 663 |
| Work-in-process and supplies | 202 | 253 |
| Finished goods | 328 | 369 |
| Total | $ 1,130 | $ 1,285 |

## 4. ASSETS

Other current assets consisted of the following:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (in millions) | |
| Income and other taxes receivable | $ 166 | $ 240 |
| Prepaid insurance and other expenses | 118 | 121 |
| Deferred income taxes | 85 | 96 |
| Deposits to vendors | 43 | 46 |
| Notes receivable | 20 | 28 |
| Debt issuance costs | 37 | 56 |
| Other | 15 | 26 |
| Total | $ 484 | $ 613 |

Other long-term assets consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | (in millions) | |
| Deferred income taxes | $ 65 | $ 85 |
| Notes receivable | 19 | 21 |
| Income and other taxes receivable | 104 | 91 |
| Goodwill | 61 | 62 |
| Intangible assets | 26 | 28 |
| Deferred charges | 14 | 14 |
| Other investments | 24 | 25 |
| Other | 129 | 129 |
| Total | $ 442 | $ 455 |

## 5. LIABILITIES

Accrued liabilities consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | (in millions) | |
| Payroll-related obligations | $ 244 | $ 207 |
| Employee benefits, including current pension obligations | 127 | 136 |
| Accrued income taxes | 81 | 72 |
| Taxes other than income | 172 | 199 |
| Warranty obligations (Note 6) | 126 | 128 |
| U.S. employee workforce transition program (Note 9) | 105 | 115 |
| Employee termination benefits and other exit costs (Note 7) | 194 | 213 |
| Interest on prepetition claims (Note 1) | 415 | 415 |
| Working capital backstop – Steering Business (Note 2) | 210 | 210 |
| Derivative financial instruments (Note 14) | 142 | 132 |
| Other | 348 | 344 |
| Total | $ 2,164 | $ 2,171 |

Other long-term liabilities consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | (in millions) | |
| Workers compensation | $ 311 | $ 325 |
| Environmental (Note 11) | 93 | 97 |
| Extended disability benefits | 61 | 60 |
| Warranty obligations (Note 6) | 207 | 236 |
| Payroll-related obligations | 29 | 35 |
| Accrued income taxes | 105 | 71 |
| Other long-term debt (Note 8) | 61 | 55 |
| Derivative financial instruments (Note 14) | 42 | 36 |
| Other | 105 | 113 |
| Total | $ 1,014 | $ 1,028 |

## 6. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations.  These accruals are based on factors such as past experience, production changes, industry developments and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the three months ended March 31, 2009:

|  | Warranty Obligations (in millions) |
|---|---|
| Balance at December 31, 2008 .................................................................................. | $  364 |
| Provision for estimated warranties issued during the period ............................. | 13 |
| Provision for changes in estimate for preexisting warranties ............................ | (3) |
| Settlements made during the period (in cash or in kind) .................................... | (31) |
| Foreign currency translation and other............................................................... | (10) |
| Balance at March 31, 2009 ..................................................................................... | $  333 |

Approximately $126 million and $128 million of warranty obligations as of March 31, 2009 and December 31, 2008, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets.  Approximately $207 million and $236 million of warranty obligations as of March 31, 2009 and December 31, 2008, respectively, is included in other long-term liabilities.

## 7. EMPLOYEE TERMINATION BENEFITS AND OTHER EXIT COSTS

Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company.  This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business.  These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements.  Voluntary termination benefits are accrued when an employee accepts the related offer.  Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan.  Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract.   All other exit costs are accrued when incurred.

Delphi's employee termination benefit and other exit costs are undertaken as necessary to execute management's strategy, streamline operations, take advantage of available capacity and resources, and ultimately achieve net cost reductions.  These activities generally fall into one of two categories:

(3)   Realignment of existing manufacturing capacity and closure of facilities and other exit or disposal activities, as it relates to executing the Company's strategy in the normal course of business.

(4)   Transformation plan activities, which support the Company's overall transformation initiatives announced in 2006, including selling or winding down non-core product lines, transforming its salaried workforce to reduce general and administrative expenses, and modifying labor agreements with its principal unions in the U.S.

The following table summarizes the employee termination benefit and other exit cost charges recorded for the three months ended March 31, 2009 and 2008 by operating segment:

| Segment | Three Months Ended March 31, | |
| | 2009 | 2008 |
| | (in millions) | |
|---|---|---|
| Electronics & Safety | $ 17 | $ 28 |
| Powertrain Systems | 5 | 4 |
| Electrical/Electronic Architecture | 32 | 13 |
| Thermal Systems | 2 | 3 |
| Automotive Holdings Group | 9 | 43 |
| Corporate and Other | (6) | — |
| Continuing Operations | 59 | 91 |
| Discontinued Operations | (10) | 35 |
| Total | $ 49 | $ 126 |
| *Cost of sales* | *55* | *86* |
| *Selling, general and administrative expenses* | *4* | *5* |
| *Discontinued operations* | *(10)* | *35* |

The table below summarizes the activity in the employee termination benefits and exit costs liability for the three months ended March 31, 2009:

| | Employee Termination Benefits Liability | Other Exit Costs Liability | Total |
| | (in millions) | | |
|---|---|---|---|
| Accrual balance at December 31, 2008 | $ 205 | $ 45 | $ 250 |
| Provision for estimated expenses incurred during the period | 34 | 25 | 59 |
| Provision for changes in estimates for preexisting programs | (10) | — | (10) |
| Payments made during the year | (65) | (26) | (91) |
| Severance reimbursed or reimbursable by GM under the Amended MRA | 53 | — | 53 |
| Foreign currency and other | (9) | (1) | (10) |
| Accrual balance at March 31, 2009 | $ 208 | $ 43 | $ 251 |

Approximately $194 million and $213 million of the employee termination benefits and other exit costs accrual balance as of March 31, 2009 and December 31, 2008, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $19 million and $13 million of the employee termination benefits and other exit costs accrual balance as of March 31, 2009 and December 31, 2008, respectively, is included in other long-term liabilities. Approximately $38 million and $24 million of the employee termination benefits and other exit costs accrual balance as of March 31, 2009 and December 31, 2008, respectively, is included in liabilities held for sale.

Delphi has initiated several programs to streamline operations and lower costs. The following are details of significant charges during the three months ended March 31, 2009.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, the Electronics and Safety, Powertrain Systems, Electrical/Electronic Architecture, Thermal Systems and Automotive Holdings Group segments executed initiatives to realign manufacturing operations within North America to lower cost markets and to reduce headcount in line with the realigned manufacturing operations, and incurred approximately $29 million of employee termination benefits and other related exit costs during the first quarter of 2009. Additionally, European, South American and Asian operations in the Electronics and Safety and Electrical/Electronic Architecture segments incurred $11 million of employee termination benefits and other exit costs in conjunction with headcount reductions and programs related to the rationalization of manufacturing and engineering process. Offsetting these costs, was a change in estimate to a previously accrued liability related to settlements with the UAW and various other labor unions of $7 million.

- *Transformation plan activities.* As part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees in North America during the first quarter of 2009 for involuntary separation and incurred $17 million in related employee termination benefits included in continuing operations. Delphi also incurred $7 million of U.S. salaried separations recorded in discontinued operations. As a result of the Amended MRA, $53 million of U.S. employee termination benefits have been or will be reimbursed by GM, of which $44 million related to U.S. hourly separations and $9 million related to U.S. salaried separations.

The following are details of significant charges during the three months ended March 31, 2008.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electronics and Safety and Automotive Holdings Group segments plan to transfer core products manufactured at a shared location in Portugal to a lower cost market and exit non-core products from that facility and recognized employee termination benefits of $44 million. Additionally, Electronics and Safety, Electrical / Electronic Architecture segment, Thermal Systems and the Automotive Holdings Group executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $23 million of employee termination benefits and other related exit costs.

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $31 million related to the closure of a manufacturing facility in Athens, Alabama during the first quarter of 2008, which related to the Steering Business and was recorded in loss from discontinued operations. As part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees in North America during the first quarter of 2008 for involuntary separation and incurred $18 million in related employee termination benefits in the Electronics and Safety, Powertrain Systems, Electrical / Electronic Architecture and Automotive Holdings Group segments.

## 8. DEBT

### Amended and Restated DIP Credit Facility and Accommodation Agreement

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to amend and extend its Refinanced DIP Credit Facility (the "Amended and Restated DIP Credit Facility"), which amendments and extension became effective in May 2008. As a result of the amendment and restatement, the aggregate size of the facility was reduced from $4.5 billion to $4.35 billion, consisting of a $1.1 billion first priority revolving credit facility (the "Tranche A Facility" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan") and a $2.75 billion second priority term loan (the "Tranche C Term Loan").

On November 7, 2008, Delphi filed a motion with the Court seeking authority to enter into the Accommodation Agreement allowing Delphi to retain the proceeds of its Amended and Restated DIP Credit Facility, which otherwise matured on December 31, 2008. On December 3, 2008, the Court entered an order approving Delphi's motion and authorizing Delphi to enter into the Accommodation Agreement following the expiration of the applicable appeal period, assuming resolution of any objections filed in the interim. On December 12, 2008, Delphi satisfied the closing conditions set forth in the Accommodation Agreement and the Accommodation Agreement became effective. On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement. In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement. In addition, GM agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement. The Amendment and GM's agreement to accelerate payments were effective January 30, 2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders. The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees. Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement. On March 31, 2009, Delphi entered into the Second Amendment to the Accommodation Agreement that included certain updated milestones and covenant provisions that were subsequently eliminated in the First Supplement entered on April 3, 2009. The First Supplement contained a number of new covenants and milestone requirements. On April 22, 2009, Delphi entered into the Second Supplement that, amount other things, extended certain milestone dates.

In connection with the Second Amendment Delphi applied all previously collected interest payments in respect of the Tranche C Term Loan, approximately $86 million, ratably as repayments of principal outstanding under the Tranche A Facility and Tranche B Term Loan. In conjunction with the effectiveness of the Second Supplement, $25 million of amounts in a cash collateral account were ratably applied to pay down principal amounts outstanding under the Tranche A Facility and Tranche B Term Loan. In addition, the Second Supplement provides that all future Tranche C interest payments will be applied ratably to repayments of principal amounts outstanding under the Tranche A Facility and the Tranche B Term Loan until paid in full.

On May 7, 2009 Delphi entered into a further amendment (the "Third Amendment") to the Accommodation Agreement, which further extended certain milestones dates in the Accommodation Agreement.  The Third Amendment received interim approval on May 7, 2009 and became immediately effective, however, it is subject to certain post-closing conditions including receipt of final approval of the Court before May 23, 2009 and the payment of fees and certain expenses to consenting lenders. In conjunction with the effectiveness of the Third Amendment, $45 million of amounts in a cash collateral account were ratably applied to pay down principal amounts outstanding under the Tranche A Facility and Tranche B Term Loan with the result that as of May 8, 2009, there remained approximately $230 million and $311 million outstanding under each facility, respectively.  There also remained approximately $2.75 billion outstanding under the Tranche C Term Loan.

<u>Termination Date of the Accommodation Agreement</u>

Under the Accommodation Agreement (as amended by the Amendment and Supplemental Amendment and the Second Amendment and Second Supplement), Delphi may continue using the proceeds of the Amended and Restated DIP Credit Facility and the lenders have agreed, among other things, to forbear from the exercise of certain default-related remedies, in each case until the earlier to occur of (i) June 30, 2009; (ii) Delphi's failure to comply with its covenants, including the milestone dates described below, under the Accommodation Agreement or the occurrence of certain other events set forth in the Accommodation Agreement; and (iii) an event of default under the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions).

However, the Accommodation Agreement (as amended by the Third Amendment) contains certain milestone dates, which if not met require Delphi to apply the $47 million currently held as cash collateral in the "Basket" (as defined below) to pay down a portion of the Tranche A Facility and Tranche B Term Loan (the "Repayment Obligation") and may result in an event of default and termination of the accommodation period.  Specifically, Delphi is required to deliver on or before May 21, 2009 to the agent under the Amended and Restated DIP Credit Facility a detailed term sheet (the "Term Sheet"), which has been agreed to by both GM and the U.S. Treasury and which sets forth the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's chapter 11 cases, including, without limitation, all material transactions between Delphi and GM relevant to such resolution.  The Accommodation Agreement further provides that the Repayment Obligation will be triggered and an event of default under the Accommodation Agreement will occur (i) on May 22, 2009 if the Term Sheet is not delivered by May 21, 2009, or (ii) in the event a majority of the Tranche A and Tranche B lenders who have signed the Accommodation Agreement or a majority of all lenders who have signed the Accommodation Agreement either (A) notify Delphi within 3 business days of delivery of the Term Sheet that the Term Sheet is not satisfactory or (B) fail to notify Delphi within such time period, that the Term Sheet is satisfactory.  In addition, the accommodation period under the Accommodation Agreement will terminate (a) at any time during the occurrence and during the continuation of an event of default under the Accommodation Agreement resulting from a failure to timely deliver the Term Sheet or to satisfy the Repayment Obligation, in each case upon the direction by the Tranche A and Tranche B lenders who have signed the Accommodation Agreement or upon the direction of a majority of all lenders who have signed the Accommodation Agreement (or in any event, upon the expiration of a five business day period beginning upon such event of default, in the case of a failure to satisfy the Repayment Obligation) and (b) upon expiration of a five business day period beginning upon notice by the requisite lenders described above that the Term Sheet is not satisfactory or Delphi not receiving notice that the Term Sheet is satisfactory.  Notwithstanding the foregoing, the accommodation period under the Accommodation Agreement will terminate on June 2, 2009, in the event that a majority of the Tranche A and Tranche B lenders who have signed the Accommodation Agreement and a majority of all lenders who signed the Accommodation Agreement had not notified Delphi that the Term Sheet is satisfactory on or before June 1, 2009.

<u>Requirements of the Accommodation Agreement</u>

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, as of December 12, 2008, the effective date of the Accommodation Agreement, Delphi is no longer able to make additional draws under the facility.  However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement).  Additionally, prior to the effective date of the Accommodation Agreement, Delphi was required to and did the following (i) replace or cash collateralize, at 105% of the undrawn amount thereof, all outstanding letters of credit under the Amended and Restated DIP Credit Facility that had not been collateralized prior to that date, and (ii) limit the aggregate principal amounts outstanding under the Tranche A Facility borrowings to no more than $377 million.

In addition, in conjunction with the Accommodation Agreement, Delphi increased its pledge of the equity interests in Delphi's first-tier foreign subsidiaries from 65% to 100%, which triggered a deemed dividend for tax purposes (no additional cash taxes were incurred).

Prior to the effectiveness of the Accommodation Agreement, Delphi was permitted to and did provide cash collateral, in an aggregate amount of $200 million, which was pledged to the administrative agent for the benefit of the lenders ("Borrowing Base Cash Collateral").  Upon Delphi's request, portions or all of the Borrowing Base Cash Collateral will be transferred back to Delphi provided that (i) Delphi is in compliance with the borrowing base calculation in the Accommodation Agreement, (ii) no event of default has occurred and (iii) Delphi maintains a Minimum Borrowing Base Cash Collateral Account Balance (as defined in the Accommodation Agreement)  of $160 million through and including April 18, 2009, $115 million from April 19, 2009 until the Term Sheet has been approved by the lenders as set forth above, and thereafter at an amount set forth in the Term Sheet.

In conjunction with the Amendment, a separate cash collateral account of up to $117 million (the "Basket") was established, which solely for purposes of the prepayment provisions in the Accommodation Agreement is considered an offset to amounts outstanding under the Revolving Facility.  As noted above, in conjunction with the Second Supplement and the Third Amendment, $25 million and $45 million from the Basket, respectively, was ratably applied to pay down principal amounts outstanding under the Tranche A Facility and Tranche B Term Loan.  Remaining amounts in the Basket may be released to Delphi (and each such release may not be restored) if each of the following conditions is satisfied at the time of the release: (a) after giving effect to the release, Delphi is compliant with the mandatory prepayment provisions in the Accommodation Agreement and all other covenants in the Amended and Restated DIP Credit Facility as modified by the Accommodation Agreement and the Amendment, and (b) availability under the GM Advance Agreement has been increased to and remains at $450 million.  GM had previously agreed to increase amounts available under the GM Advance Agreement to $450 million, subject to (i) GM not being notified by the President's Designee that such increase is not permitted in accordance with the provisions of GM's federal loans, (ii) Court approval, (iii) the GM board of directors' approval, (iv) Delphi and GM executing a definitive transaction agreement relating to the sale of Delphi's Steering Business, and (v) Court approval of the Steering Business Option Exercise Agreement.  The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement.  Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed by GM and Delphi.  The Option Exercise Agreement is subject to conditions described in Note 15. Discontinued Operations.  However, the U.S. Treasury objected to the proposed increase to GM's commitments under the GM Advance Agreement and as a result of such objections, Delphi adjourned the hearings on its motions to obtain Court approval of the amendments to the GM Advance Agreement and the Steering Business Option Exercise Agreement.  To date, Delphi has been able to maintain sufficient liquidity to continue operations despite being prevented from effectuating the above-described increases in GM's commitments under the GM Advance Agreement.  However, there can be no assurances this will continue to be the case, particularly in the absence of a near term agreement on a Term Sheet which comprehends additional liquidity support (refer to Liquidity Outlook in Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 1A. Risk Factors in this Quarterly Report on Form 10-Q).

<u>Terms of the Amended and Restated DIP Credit Facility and Accommodation Agreement</u>

The facilities currently bear interest at the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent, as detailed in the table below, and the amounts outstanding (in millions) and rates effective as of March 31, 2009 were:

|  | **ABR plus** | **Borrowings as of March 31, 2009** (in millions) | **Rates effective as of March 31, 2009** |
|---|---|---|---|
| Tranche A ............................. | 5.00% | $308 | 9.25% |
| Tranche B ............................. | 5.00% | $416 | 9.25% |
| Tranche C ............................. | 6.25% | $2,750 | 10.50% |

The Tranche A, Tranche B and Tranche C facilities include an ABR floor of 4.25%.

The Company had $107 million in letters of credit outstanding under the Revolving Facility as of March 31, 2009.  The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Accommodation Agreement.  Under the Accommodation Agreement, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate.  Based on the borrowing base computation in effect at March 31, 2009, as defined in the Accommodation Agreement, Delphi's borrowing base was reduced by a deduction of $249 million for unrealized losses related to Delphi's hedging portfolio, which as of March 31, 2009 resulted in net losses included in accumulated other comprehensive income ("OCI") of $242 million pre-tax, primarily related to copper and Mexican Peso hedges, as further described in Note 14. Derivatives and Hedging Activities and Fair Value Measurements.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability, among other things, to incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock.  As long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).  Delphi's Facility Availability Amount was less than $500 million at March 31, 2009 as all commitments were cancelled with the effectiveness of the Accommodation Agreement on December 12, 2008.

The Accommodation Agreement also contains additional covenants, amends certain of the existing covenants in the Amended and Restated DIP Credit Facility and includes additional events of default under the Amended and Restated DIP Credit Facility.  Additional covenants under the Accommodation Agreement include (i) a prescribed minimum borrower liquidity level, which in conjunction with the Second Supplement was set at $25 million through the remainder of the accommodation period, (ii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility pursuant to an Accommodation Agreement borrowing base covenant, (iii) a

requirement to repay obligations under the Amended and Restated DIP Credit Facility to the extent any specified litigation proceeds are received in cash, (iv) a prohibition on the repatriation of cash from foreign subsidiaries as cash dividends, cash otherwise distributed in redemption of or in exchange for equity interests in foreign subsidiaries or through the repayment of notes unless used to repay obligations under the Amended and Restated DIP Credit Facility and (v) a requirement to repay $60 million in obligations under the Amended and Restated DIP Credit Facility in accordance with the schedule set forth in the Accommodation Agreement.

Changes to covenants under the Amended and Restated DIP Credit Facility include (i) a reduction in the cap on permitted debt and liens on assets of foreign subsidiaries, (ii) a reduction in the cap on net cash proceeds from asset sales before such proceeds must be utilized to repay the obligations under the Amended and Restated DIP Credit Facility, (iii) modifications to certain debt and lien baskets, including permitting cash collateralization of letters of credit and an increase in secured hedging obligations and (iv) enhanced monthly financial reporting.  The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility and Accommodation Agreement) for Delphi and its direct and indirect subsidiaries, on a consolidated basis.  The covenants also impose restrictions on Delphi's derivative contracts.  Refer to Note 14. Derivatives and Hedging Activities and Fair Value Measurements for more information.  Delphi was in compliance with the Amended and Restated DIP Credit Facility and Accommodation Agreement covenants as of March 31, 2009, including the Global EBITDAR covenant of $(150) million.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.

New events of default under the Amended and Restated DIP Credit Facility include (i) any amendment, waiver, supplement or modification to the Amended GSA or the Amended MRA requiring Court approval that, taken as a whole, materially impairs the rights of Delphi or its affiliated debtors as borrowers or guarantors, materially reduces the amount, or decelerates the timing of, any material payments under either such agreement, if the Required Lenders object, (ii) any repudiation in writing or termination of the Amended GSA or the Amended MRA by any party thereto, or a failure to perform any obligation thereunder, which failure materially impairs the rights of Delphi thereunder, (iii) certain amendments, waivers, modifications, or supplementations of any term of the GM Advance Agreement or the Partial Temporary Accelerated Payments Agreement (as defined below), (iv) any event or condition that results in GM not funding amounts requested under the GM Advance Agreement and (v) the enforcement or failure to stay enforcement of a judgment or order against any borrower or guarantor with respect to any amounts advanced under the Amended and Restated DIP Credit Facility.

In the first quarter of 2009, the Company received authority from the Court to pay applicable fees to various lenders in conjunction with the Amendment and Supplemental Amendment, and paid approximately $16 million in fees to the consenting lenders for both amendments.  Delphi also paid arrangement and other fees to various lenders associated with the amendments.

**Advance Agreement and Liquidity Support from General Motors and Related Matters**

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, as more fully described in Note 2. Transformation Plan and Chapter 11 Bankruptcy, and Delphi was not able to redraw the original $650 million facility amount.

On September 26, 2008, the Court granted Delphi's motion to amend the GM Advance Agreement to provide for a $300 million facility, which could be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement signed on August 7, 2008 and to give GM an administrative claim for all unpaid advances under such additional facility. Continued availability to draw against the additional $300 million facility was conditioned upon Delphi filing a plan of reorganization and related disclosure statement in form and substance materially consistent with Section 5 of the Amended GSA and Section 7.01 of the Amended MRA which condition was satisfied with Delphi's filing of proposed modifications to its previously confirmed plan of reorganization with the Court on October 3, 2008, and certain other conditions.

In support of Delphi's efforts to obtain the Accommodation Agreement, GM agreed to extend the term of the GM Advance Agreement, pursuant to the terms set forth in an amendment thereto filed with the Court on November 7, 2008 (as supplemented) (the "GM Advance Agreement Amendment"), through the earlier of (i) June 30, 2009, (ii) such date as Delphi files any motion seeking to amend the plan of reorganization in a manner that is not reasonably satisfactory to GM, (iii) the termination of the Accommodation Agreement or the accommodation period therein, or (iv) such date when a plan of reorganization becomes effective. The Court approved Delphi's motion to amend and extend the GM Advance Agreement concurrently with the approval of Delphi's motion seeking authority to enter into the Accommodation Agreement. Additionally, GM has agreed, subject to certain conditions, to accelerate payment of certain payables up to $300 million to Delphi, pursuant to the Partial Temporary Accelerated Payments Agreement. As of March 31, 2009, GM had accelerated payment of $200 million under such agreement and in April, GM accelerated the remaining $100 million, therefore no amounts remain to be accelerated thereunder. The Partial Temporary Accelerated Payments Agreement provides that GM will generally recoup these accelerated payments over its three subsequent monthly payments on or after the date that GM's obligation to advance funds under the GM Advance Agreement terminates or advances made become due and payable in accordance with the GM Advance Agreement. Both the amendment to the GM Advance Agreement and the Partial Temporary Accelerated Payments Agreement were effective concurrent with the Accommodation Agreement, on December 12, 2008. Conforming amendments were made to the GM Advance Agreement and Partial Temporary Accelerated Payments Agreement contemporaneously with Court approval of the Amendment and Supplemental Amendment to the Accommodation Agreement as described above. Delphi and GM entered into subsequent amendments to the GM Advance Agreement to reflect the conditions pursuant to which GM will agree to increase the amounts available under such agreement, however, as noted in the immediately preceding section under "Amended and Restated DIP Credit Facility and Accommodation Agreement," the U.S. Treasury objected to such amendments and Delphi adjourned the Court hearing seeking approval of the proposed amendments.

The GM Advance Agreement currently has a targeted cash balance amount of $25 million and Delphi is required to use any free cash flow above the targeted cash balance amount (as determined in accordance with the GM Advance Agreement) to repay from time to time any amounts outstanding thereunder. As of March 31, 2009, $253 million was outstanding pursuant to the GM Advance Agreement and $47 million was available for future advances. There can be no assurances, however, that GM will have sufficient liquidity to continue to advance amounts under the GM Advance Agreement. Refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and Part II. Item 1A. Risk Factors in this Quarterly Report on Form 10-Q for risks and uncertainties related to our business relationship with GM.

## 9. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

The following table represents the activity in the U.S. employee workforce transition program liability for the three months ended March 31, 2009:

**U.S. Employee Workforce Transition Program Liability**

| | Buydown Wage Liability | Pre-Retirement Program Liability (in millions) | Total |
|---|---|---|---|
| Balance at December 31, 2008 | $   83 | $   40 | $   123 |
| Payments | — | (13) | (13) |
| Balance at March 31, 2009 | $   83 | $   27 | $   110 |

At March 31, 2009 and December 31, 2008, $105 million and $115 million, respectively, of the U.S. employee workforce transition program liability is included in accrued liabilities, and $5 million and $8 million, respectively, is included in other long-term liabilities in the consolidated balance sheets. At March 31, 2009 and December 31, 2008, Delphi had $68 million of buydown wage liability recorded as a receivable from GM related to Delphi's buydown wage obligations pursuant to the terms of the Amended GSA (see Note 2. Transformation Plan and Chapter 11 Bankruptcy).

## 10. PENSION AND OTHER POSTRETIREMENT BENEFITS

Delphi sponsors pension plans covering unionized employees in the U.S., which generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. Delphi also sponsors defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in non-qualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, Korea, Turkey, Italy and the United Kingdom ("UK"). The UK and certain Mexican plans are funded quarterly.

Delphi froze the Salaried Plan, the Supplemental Executive Retirement Program ("SERP"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program and the PHI Non-Bargaining Retirement Plan effective September 30, 2008. Effective as of October 1, 2008, Delphi's existing Savings-Stock Purchase Program for Salaried Employees was renamed the Salaried Retirement Savings Program and was enhanced to provide a Delphi matching contribution and a 4% non-elective Delphi retirement contribution. Additionally, Delphi reached agreement with its labor unions resulting in a freeze of traditional benefit accruals under the Hourly Plan effective as of November 30, 2008. Certain collectively bargained hourly employees remain covered by the Hourly Plan's Individual Retirement Plan formula (a cash balance benefit providing an annual pay credit accrual of 5.4% of base wages).

On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing retiree medical and life insurance benefits (collectively "OPEB") benefits in retirement to salaried employees, retirees, and surviving spouses after March 31, 2009. On February 24, 2009, the Court provisionally approved Delphi's motion to terminate such benefits effective March 31, 2009 based on the Court's finding that the Company had met its evidentiary burdens, subject to the appointment of a retirees' committee (the "Retirees' Committee") to review whether it believes that any of the affected programs involved vested benefits (as opposed to "at will" or discretionary, unvested benefits). On March 11, 2009, the Court issued a final order approving Delphi's motion to terminate salaried OPEB benefits. The Court approved a settlement agreement (the "Settlement"), between Delphi and the Retirees' Committee and the Delphi Salaried Retirees' Association (the "Association") settling any and all rights for the parties to appeal the Court's March 11, 2009 final order authorizing Delphi to terminate salaried OPEB benefits to the U.S. District Court for the Southern District of New York (the "District Court"). Pursuant to the Settlement, Delphi has agreed to provide the Retirees' Committee with consideration of $9 million to resolve pending litigation, including withdrawing the appeals of the Retirees' Committee and the Association to the District Court. The consideration provided by Delphi under the Settlement includes an initial $1 million payment in May 2009 to a hardship fund, subsequent monthly payments of $1.25 million for five months beginning in June 2009, and a final $1 million payment in November 2009. In addition, Delphi has agreed to contribute $500,000 by May 1, 2009 toward the creation of a Voluntary Employees' Beneficiary Association ("VEBA") and to reimburse up to an additional $250,000 of reasonable legal expenses incurred by the counsel for the Retirees' Committee and the Association. Delphi has no future funding obligations or commitments to the VEBA. Following the initial payment by May 1, 2009 of the $1.5 million, the District Court dismissed the appeal filed by the retirees with prejudice. Delphi recognized a salaried OPEB settlement gain from reorganization of $1,168 million during the three months ended March 31, 2009. This settlement gain reflects the reversal of existing liabilities of $1,173 million ($1,181 million net of $8 million to pay salaried OPEB claims incurred but not reported as of March 31, 2009) and the recognition of previously unamortized net gains included in accumulated other

comprehensive income of $4 million. The reorganization gain also reflects the impact of the $9 million consideration to be provided for the Settlement described above.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three-month periods ended March 31, 2009 and 2008 for U.S. and non-U.S. employees:

| | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. Plans | | Non-U.S. Plans | | | |
| | | | Three Months Ended March 31, | | | |
| | **2009** | **2008** | **2009** | **2008** | **2009** | **2008** |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Service cost (a) ................................. | $ 5 | $ 41 | $ 8 | $ 11 | $ 4 | $ 7 |
| Interest cost....................................... | 168 | 213 | 18 | 23 | 18 | 137 |
| Expected return on plan assets........... | (146) | (218) | (14) | (23) | — | — |
| Settlements ....................................... | — | — | 15 | 11 | (1,177) | — |
| Amortization of prior service costs.... | 7 | 7 | 1 | 1 | (24) | (27) |
| Amortization of actuarial losses ........ | 54 | 5 | 4 | 6 | 9 | 11 |
| Net periodic benefit cost ................ | $ 88 | $ 48 | $ 32 | $ 29 | $(1,170) | $ 128 |

(a) Includes $9 million for the three month periods ended March 31, 2008 of costs previously accrued related to the U.S. employee workforce transition programs.

Net periodic benefit cost above reflects $1 million and $11 million that were included in loss from discontinued operations for the three-month periods ended March 31, 2009 and 2008, respectively.

Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for information about the funding of Delphi's pension plans and excise taxes asserted by the IRS against Delphi.

## 11. COMMITMENTS AND CONTINGENCIES

### Shareholder Lawsuits

As previously disclosed, the Company, along with certain of its subsidiaries, current and former directors of the Company, and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. These lawsuits (the "Multidistrict Litigation") were coordinated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and assigned to Hon. Gerald E. Rosen in the United States District Court for the Eastern District of Michigan (the "District Court"). Set forth below is a description of the Multidistrict Litigation and a summary of a settlement concerning the Multidistrict Litigation.

The Multidistrict Litigation is comprised of lawsuits in three categories. One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is based on allegations that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA (the "ERISA Action"). A second group of class action lawsuits (the "Securities Action") alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions"). A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court. These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results. The federal cases were coordinated with the securities and ERISA class actions in the Multidistrict Litigation. Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the Shareholder Derivative Actions were administratively closed. For more details regarding the procedural history of the three categories of lawsuits, refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

Following mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi named as defendants, and certain other defendants involved in the Multidistrict Litigation reached agreements with the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action to settle the claims asserted against them in those actions (the "MDL Settlements").

On September 5, 2007 the District Court entered an order preliminarily certifying a class in the Securities Action and the ERISA Action, preliminarily approving the MDL Settlements, and scheduling a fairness hearing on November 13, 2007. On November 13, 2007, the District Court conducted the fairness hearing and took the matter under advisement. Separately, on October 29, 2007, the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements. On October 29, 2007, the Court lifted the automatic stay as to the discovery provided to the Lead Plaintiffs. On December 4, 2007, the District Court held another hearing to consider proposed modifications to the proposed settlement of the Securities Action (as modified, the "Securities Settlement"), and tentatively approved the Securities Settlement, after determining that the modifications were at least neutral to the class and may potentially provide a net benefit to the class.

The District Court approved the MDL Settlements (including the Securities Settlement) in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered an Order and Final Judgment dated January 23, 2008 in both the Securities Action and ERISA Action. One security holder appealed certain aspects of the District Court's opinion and order, as amended, approving the MDL Settlements. That appeal is pending before the United States Court of Appeals for the Sixth Circuit.

On January 25, 2008, the Court approved the MDL Settlements. Under the terms of the MDL Settlements, the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action will receive claims that will be satisfied through Delphi's Plan as confirmed by the Court pursuant to the confirmation order. Under the Securities Settlement, (i) the Lead Plaintiffs will be granted an allowed claim in the face amount of $179 million, which will be satisfied by Delphi providing $179 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan, and (ii) the class in the Securities Action will receive $15 million to be provided by a third party, a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases. If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the amount received by the class in the Securities Action. Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged.

The settlement of the ERISA Action is structured similarly to the settlement reached with the Lead Plaintiffs. The claim of the named plaintiffs in the ERISA Action will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the plan of reorganization. The class in the ERISA Action will also receive a distribution of insurance proceeds in the amount of approximately $22 million. Unlike the settlement of the Securities Action, no member of the class in the ERISA Action can "opt out" of the settlement.

Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007, pending the effective date of the MDL Settlements.

The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. As provided in the confirmation order, the MDL Settlements are contingent upon the effective date of the Plan occurring as well as the payment of the $15 million amount to be provided by a third party, and if, for any reason, these contingencies are not met, the MDL Settlements will become null and void. Delphi is in discussion with several of its stakeholders regarding potential modifications to the terms of the MDL Settlements that would allow for the MDL Settlements, as modified, to become effective in advance of the resolution of Delphi's chapter 11 cases, however there can be no assurances that the parties will reach agreement on such modifications. If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties. The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand. As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL Settlements, as of March 31, 2009 and December 31, 2008, Delphi has a liability of $351 million recorded for this matter. Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total

of $200 million.  As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage.  In conjunction with the MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries on the effective date of the MDL Settlements.

**Salaried OPEB Settlement**

   The Court approved a settlement between Delphi and the group of retirees who had filed objections to Delphi's motion seeking the authority to cease providing health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses as of March 31, 2009.  Refer to Note 10. Pension and Other Postretirement Benefits for more information.

**Ordinary Business Litigation**

   Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

   Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate.  Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

   With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements.  However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates.  Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility.  Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

   During the first quarter of 2008, Delphi recovered $28 million from an affiliated supplier and recorded it as a reduction of warranty expense.  Delphi began experiencing quality issues regarding parts purchased by Delphi's Thermal Systems segment during the third quarter of 2006 and established warranty reserves of approximately $60 million to cover the cost of various repairs that may be implemented.  The reserve has subsequently been adjusted for payments and settlements.  As of March 31, 2009 and December 31, 2008, the related reserve was $12 million and $17 million, respectively.

**Environmental Matters**

   As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont City Landfill Site (the "Site") located in Tremont, Ohio, which is alleged to involve ground water contamination.  In September 2002, Delphi and other PRPs entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study (the "Feasibility Study") concerning a portion of the Site.  The Remedial Investigation and Alternatives Array Document were finalized in 2007.  The Feasibility Study was approved (with modifications) by the EPA on November 25, 2008.  On December 11, 2008, Delphi and the other PRPs filed a Notice of Objection and Invocation of Dispute Resolution with the EPA.  Delphi and the other PRPs believe that the modifications to the Feasibility Study required by the EPA are not supported by the site assessment information developed to date, and would have the effect of unjustifiably increasing the likelihood of the EPA ultimately selecting excavation as the remedial approach for the Site.  The dispute resolution process is pending.  In the interim, Delphi and the other PRPs and the EPA are evaluating an additional remedial alternative for inclusion in the Feasibility Study.  The additional remedy would involve installation of numerous wells at the Site for removal of liquid wastes.  A Record of Decision is expected to be issued in 2009.  Although Delphi believes that capping and future monitoring alone would be an appropriate and protective remedy, a different cleanup approach ultimately may be required for the Site.  Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves.  As of March 31, 2009, Delphi has recorded its best estimate of its share of the remediation based on the removal of liquids remedy.  However, if that remedy is not accepted, Delphi's expenditures for remediation could increase by $11 million to $15 million in excess of its existing reserves.  Delphi will continue to reassess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

   Delphi received a Notice of Intent to File Civil Administrative Complaint ("Notice") from the EPA on May 30, 2008 regarding a June 2007 chlorine gas cylinder leak that occurred at the Saginaw, Michigan Delphi Steering facility.  The Notice alleges that Delphi failed to properly notify agency officials about the leak or the presence of chlorine gas at the site, and describes the EPA's intent to seek approximately $0.1 million in civil penalties relating to the incident.  Although Delphi disagreed with certain of the agency's assertions, Delphi resolved the matter in February 2009 through signing a Consent Agreement and Final Order and paying a civil penalty of $66,887.

As of March 31, 2009 and December 31, 2008, our reserve for environmental investigation and remediation was approximately $103 million (of which $10 million was recorded in accrued liabilities and $93 million was recorded in other long-term liabilities) and $106 million (of which $9 million was recorded in accrued liabilities and $97 million was recorded in other long-term liabilities), respectively. As of March 31, 2009 and December 31, 2008, $93 million and $95 million, respectively, of the reserve related to sites within the U.S. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the Separation. Addressing contamination at various sites, including facilities designated as non-core and slated for closure or sale, is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent management's best estimate of the cost to complete such actions. Management believes that its March 31, 2009 accruals will be adequate to cover the estimated liability for its exposure with respect to such matters and that these costs will be incurred over the next 20 years. However, as we continue the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. We cannot ensure that environmental requirements will not change or become more stringent over time or that our eventual environmental remediation costs and liabilities will not exceed the amount of our current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology. Estimates are made on an undiscounted basis and exclude the effects of inflation. If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range. At March 31, 2009, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $85 million.

**Other**

Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

**Concentrations of Risk**

GM is Delphi's largest customer and accounted for 29% of its total net sales from continuing operations during the three months ended March 31, 2009, and a portion of Delphi's non-GM sales are to Tier 1 suppliers who ultimately sell its products to GM. GM accounts for 52% of Delphi's net sales in North America. Delphi's revenues have been and will continue to be affected by decreases in GM's business or market share. GM has reported a variety of challenges it is facing, including severe liquidity issues, its relationships with its unions and large shareholders and its cost and pricing structures as further described in Item 1A. Risk Factors of the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and in Part II. Item 1A. Risk Factors in this Quarterly Report on Form 10-Q.

Delphi's other domestic customers are facing similar pressures and challenges as those that GM is facing. Global sales to Ford Motor Company and Chrysler LLC ("Chrysler") were approximately 7% and 1% of total sales during the three months ended March 31, 2009, respectively. In the accompanying balance sheet, Delphi has approximately $23 million recorded as accounts receivable from Chrysler, which filed for reorganization relief under chapter 11 of the Bankruptcy Code on April 30, 2009. Of this total, Delphi has collected approximately $12 million subsequent to March 31, 2009 and prior to Chrysler's chapter 11 filing. In addition, Delphi has applied to be a participant in the U.S. government Auto Supplier Support Program relative to certain of its receivables from Chrysler. Of the remaining accounts receivable not collected through April 30, 2009, approximately $7 million is related to Chrysler entities not encompassed in Chrysler's chapter 11 filing.

## 12. INCOME TAXES

Generally, the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as OCI. However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year. The intraperiod tax allocation rules in Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes*, ("SFAS 109") related to items charged directly to OCI can result in disproportionate tax effects that remain in OCI until certain events occur.

As discussed in Note 10. Pension and Other Postretirement Benefits, Delphi recognized a salaried OPEB settlement gain from reorganization of $1,168 million during the three months ended March 31, 2009. As of December 31, 2008, Delphi had disproportionate tax effects in OCI related to the salaried OPEB obligations of a $52 million tax benefit. Delphi eliminated the disproportionate tax effect in OCI related to the salaried OPEB obligations on a pro rata basis based on the amount of the obligation that was settled. Accordingly, Delphi has recorded a $52 million tax benefit in continuing operations for the three months ended March 31, 2009.

**13. WEIGHTED AVERAGE SHARES**

Basic and diluted income (loss) per share amounts were computed using weighted average shares outstanding for each respective period.  As a result of the market price of shares as compared to the price associated with outstanding options in the three months ended March 31, 2009 and the losses incurred in the three months ended March 31, 2008, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted income (loss) per share were:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2009** | **2008** |
|  | (in thousands) | |
| Weighted average basic and diluted shares outstanding........ | 564,637 | 563,646 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2009** | **2008** |
|  | (in thousands) | |
| Anti-dilutive securities ............................. | 46,543 | 66,696 |

**14. DERIVATIVES AND HEDGING ACTIVITIES AND FAIR VALUE MEASUREMENTS**

**Derivatives and Hedging Activities**

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks.  To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets.  For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to its risk management policies, which prohibit holding or issuing derivative financial instruments for trading purposes, and designation of derivative instruments is performed on a transaction basis to support hedge accounting.  The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged.  Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy.  As of March 31, 2009, Delphi has entered into derivate instruments to hedge cash flows extending out to February 2011.

As of March 31, 2009, the Company had the following outstanding notional amounts related to commodity and foreign currency forward contracts that were entered into to hedge forecasted exposures:

| Commodity | Quantity Hedged | Unit of Measure |
|---|---|---|
| | (in thousands) | |
| Copper | 69,280 | pounds |
| Secondary Aluminum | 15,309 | pounds |
| Primary Aluminum | 8,488 | pounds |
| Natural Gas | 802 | MMBTU |
| Nickel | 382 | pounds |

| Foreign Currency | (in millions) | |
|---|---|---|
| Korean Won | 18,534 | KRW |
| Mexican Peso | 10,814 | MXN |
| Hungarian Font | 5,691 | HUF |
| Japanese Yen | 1,168 | JPY |
| Romanian Leu | 175 | RON |
| Euro | 147 | EUR |
| New Turkish Lira | 145 | TRY |
| Polish Zloty | 29 | PLN |
| Singapore Dollar | 20 | SGD |
| South African Rand | 19 | ZAR |

The Company had additional foreign currency forward contracts that individually amounted to less than $10 million.

As of December 31, 2008, the fair value of derivative financial instruments recorded in the consolidated balance sheets as current assets were $12 million, as current liabilities were $132 million and as non-current liabilities were $36 million. The fair value of derivative financial instruments recorded in the consolidated balance sheets as of March 31, 2009 are as follows:

| | Asset Derivatives | | Liability Derivatives | |
|---|---|---|---|---|
| | Balance Sheet Location | March 31, 2009 | Balance Sheet Location | March 31, 2009 |
| | | (in millions) | | |
| **Designated derivatives instruments:** | | | | |
| Commodity derivatives | Other Current Assets | $   — | Accrued Liabilities | $   63 |
| Foreign currency derivatives | Other Current Assets | 1 | Accrued Liabilities | 79 |
| Foreign currency derivatives* | Accrued Liabilities | 12 | Other Current Assets | — |
| Commodity derivatives | Other Long-Term Assets | — | Other Long-Term Liabilities | 10 |
| Foreign currency derivatives* | Other Long-Term Liabilities | 26 | Other Long-Term Liabilities | 63 |
| Total derivatives designated as hedging instruments | | $   39 | | $   215 |
| | | | | |
| **Derivatives not designated:** | | | | |
| Commodity derivatives | Other Current Assets | $   — | Accrued Liabilities | $   17 |
| Foreign currency derivatives | Other Current Assets | — | Accrued Liabilities | 13 |
| Foreign currency derivatives* | Accrued Liabilities | 18 | Other Current Assets | — |
| Foreign currency derivatives* | Other Long-Term Liabilities | 5 | Other Long-Term Liabilities | — |
| Total derivatives not designated as hedging instruments | | $   23 | | $   30 |

* Derivative instruments within this category are subject to master netting arrangements and are presented on a net basis in the consolidated balance sheets in accordance with FASB Interpretation No. 39, *Offsetting of Amounts Related to Certain Contracts (An Interpretation of APB Opinion No. 10 and FASB Statement No. 105)*.

The fair value of the net liability position of Delphi's financial instruments increased from December 31, 2008 to March 31, 2009 primarily due to the increase in the market price of commodities and the adjustment for non-performance risk.

The effect of derivative financial instruments in the consolidated statement of operations for the three months ended March 31, 2009 is as follows:

| | Amount of Loss Recognized in OCI (Effective Portion) | Location of Loss Reclassified from OCI into Income (Effective Portion) | Amount of Loss Reclassified from OCI into Income (Effective Portion) (in millions) | Location of Gain (Loss) Recognized in Income (Ineffective Portion Excluded from Effectiveness Testing) | Amount of Gain Recognized in Income (Ineffective Portion Excluded from Effectiveness Testing) |
|---|---|---|---|---|---|
| **Designated derivatives instruments:** | | | | | |
| Commodity derivatives | $    (42) | Cost of sales | $    (49) | Cost of sales | $    — |
| Foreign currency derivatives | (73) | Cost of sales | (18) | Cost of sales | 7 |
| Total | $   (115) | | $   (67) | | $    7 |

| | Location of Gain (Loss) Recognized in Income | Amount of Gain (Loss) Recognized in Income |
|---|---|---|
| **Derivatives not designated:** | | |
| Commodity derivatives | Cost of sales | $    (15) |
| Foreign currency derivatives | Cost of sales | 5 |
| Total | | $    (10) |

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of hedge derivative contracts at each reporting period. Net losses included in accumulated OCI as of March 31, 2009 were $242 million pre-tax. Of this pre-tax total, a loss of approximately $186 million is expected to be included in cost of sales within the next 12 months and a loss of approximately $55 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was an approximate gain of $7 million and $1 million for the three months ended March 31, 2009 and 2008, respectively. The amount included in cost of sales related to the time value of options was not significant in the three months ended March 31, 2009 and 2008.

During the latter part of 2008 and through March 31, 2009, substantial volatility in the commodity and currency markets significantly impacted the price of commodities and foreign currency exchange rates that impact Delphi's operations. Two of Delphi's largest exposures, copper and the Mexican Peso to U.S. Dollar exchange rate, experienced substantial volatility during the first quarter of 2009. As a result of the market volatility, Delphi has experienced unrealized losses in its derivative contracts. As of March 31, 2009 and December 31, 2008, Delphi was in a net derivative liability position for its hedging portfolio. As discussed further under Fair Value Measurements below, Delphi's net derivative liability position was reduced to $184 million as of March 31, 2009 and to $168 million as of December 31, 2008. As a result of the net liability position for its hedging portfolio as of March 31, 2009, Delphi's borrowing base computation in effect at March 31, 2009, as further described in Note 8. Debt, included a deduction from its borrowing base of $249 million.

The Accommodation Agreement imposes restrictions on Delphi's ability to enter into hedging transactions. Specifically, the Accommodation Agreement disallows any new hedging activity, with the exception of any transactions to offset existing hedge positions. Additionally, the Accommodation Agreement enables participant lenders to terminate hedging agreements if the aggregate liability of Delphi's hedge exposure exceeds $500 million, as defined in the Accommodation Agreement.

**Fair Value Measurements**

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet hedge accounting criteria. Delphi's derivative exposures are with counterparties with long-term investment grade credit ratings. Delphi estimates the fair value of its derivative contracts using an income approach based on valuation techniques to convert future amounts to a single, discounted amount. Estimates of the fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates. Delphi also considers the risk of non-performance in the estimation of fair value, and includes an adjustment for non-performance risk in the measure of fair value of derivative instruments. The non-performance risk adjustment reflects the full credit default spread ("CDS") applied to the net commodity and foreign currency exposures by counterparty. When Delphi is in a net derivative asset position,

the counterparty CDS rates are applied to the net derivative asset position.  When Delphi is in a net derivative liability position, estimates of Delphi's CDS rates are applied to the net derivative liability position.

In certain instances where market data is not available, Delphi uses management judgment to develop assumptions that are used to determine fair value.  This could include situations of market illiquidity for a particular currency or commodity or where observable market data may be limited.  In those situations, Delphi generally surveys investment banks and/or brokers and utilizes the surveyed prices and rates in estimating fair value.

As of March 31, 2009 and December 31, 2008, Delphi was in a net derivative liability position.  As a result of Delphi's chapter 11 proceedings, CDS rates are currently not available for Delphi debt.  As a result, Delphi obtained estimates of trading levels for its debt from investment banks as well as CDS rates for similarly situated entities to apply to its net derivative liability position for non-performance risk.  The adjustment for non-performance risk reduced Delphi's net derivative liability position as of March 31, 2009 by $140 million to $184 million and as of December 31, 2008 by $296 million to $168 million.  The reduction to the net derivative liability as of March 31, 2009 resulted in a decrease to pre-tax earnings of $5 million, recorded as an increase to cost of sales.  The remaining adjustment amount of $135 million is reflected within equity as a component of OCI as it related to derivative financial instruments that qualify as hedges.  There was no material adjustment for non-performance risk related to derivative assets as of March 31, 2009 or December 31, 2008 as Delphi's net derivative asset position at March 31, 2009 and December 31, 2008 related to exposures with counterparties with investment grade credit ratings.

As of March 31, 2009 and December 31, 2008, Delphi had the following assets measured at fair value on a recurring basis:

| | | Fair Value Measurements Using: | | |
|---|---|---|---|---|
| As of March 31, 2009: | Total | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| | | (in millions) | | |
| Available for sale securities | $ 22 | $ 16 | $ 6 | $ — |
| Foreign currency derivatives | 1 | — | — | 1 |
| Total | $ 23 | $ 16 | $ 6 | $ 1 |
| As of December 31, 2008: | | | | |
| Available for sale securities | $ 32 | $ 23 | $ 9 | $ — |
| Foreign currency derivatives | 12 | — | — | 12 |
| Total | $ 44 | $ 23 | $ 9 | $ 12 |

As of March 31, 2009 and December 31, 2008, Delphi had the following liabilities measured at fair value on a recurring basis:

| | | Fair Value Measurements Using: | | |
|---|---|---|---|---|
| As of March 31, 2009: | Total | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| | | (in millions) | | |
| Commodity derivatives | $ 90 | $ — | $ — | $ 90 |
| Foreign currency derivatives | 94 | — | — | 94 |
| Total | $ 184 | $ — | $ — | $ 184 |
| As of December 31, 2008: | | | | |
| Commodity derivatives | $ 99 | $ — | $ — | $ 99 |
| Foreign currency derivatives | 69 | — | — | 69 |
| Total | $ 168 | $ — | $ — | $ 168 |

The following table summarizes the changes in Level 3 financial instruments measured at fair value on a recurring basis for the three months ended March 31, 2009.

| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3): | | | | | |
|---|---|---|---|---|---|---|
| | Fair Value January 1, 2009 | Total Realized / Unrealized Gains / (Losses) | Net Settlements | Net Transfers Into / (Out of) Level 3 | Fair Value March 31, 2009 | Changes to Unrealized Gains / (Losses) on Instruments Still Held |
| | | | (in millions) | | | |
| Commodity and foreign currency derivatives..................................... | $ (156) | $ (115) | $ 88 | $ — | $ (183) | $ (96) |
| Total Level 3 Fair Value ........... | $ (156) | $ (115) | $ 88 | $ — | $ (183) | $ (96) |

## 15. DISCONTINUED OPERATIONS

The Court approval of Delphi's plan to dispose of the Steering Business and the Interiors and Closures Business triggered held for sale accounting under SFAS 144 in 2007.

### Steering and Halfshaft Business

In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Pursuant to the Amended MRA, GM has agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010. On March 3, 2009, Delphi and Platinum reached an agreement under which the Purchase Agreement was terminated (the "Termination Agreement") and Delphi and GM reached an agreement (the "Option Exercise Agreement"), subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM will exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM to purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances (the "Steering Purchase"). GM has agreed to guaranty the payment and performance of its wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.

The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement. Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed to by GM and Delphi. Delphi agreed to use its reasonable best efforts to obtain Court approval of the Option Exercise Agreement on or before March 24, 2009, and Delphi and GM agreed to use their reasonable best efforts to obtain Court approval of the Steering Purchase and assignment and assumption of contracts on or before April 23, 2009 and to close the Steering Purchase on or before April 30, 2009. For a detailed description of the terms of the Option Exercise Agreement refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2008. On March 23, 2009 GM received a written notice from the U.S. Treasury objecting to GM's entry into the Option Exercise Agreement. In its notice, the U.S. Treasury stated that it would reconsider such objection upon further review of the proposal. In order to provide the U.S. Treasury with additional time to consider the option to purchase the Steering Business, Delphi adjourned the Court hearing seeking approval of agreement until May 21, 2009. As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, discussions on a Term Sheet continue and it is anticipated that such discussions will include a final resolution regarding the Steering Business and other Delphi non-core manufacturing facilities and product lines.

On September 30, 2008, in conjunction with the effectiveness of the Amended MRA, Delphi received and recorded as a deferred liability a $210 million advance on working capital recovery from GM related to the Steering Business. During the three months ended March 31, 2009 and 2008, Delphi recorded income of $31 million, net of tax, and a loss of $77 million, net of tax, respectively, due to the results of operations and adjustment of assets held for sale to fair value of the Steering Business.

**Interiors and Closures Business**

Delphi and certain of its affiliates closed on the sale of the Interiors and Closures Business to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, on February 29, 2008.  Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value.  During the first quarter of 2008, as a result of the operating results and sale of the Interiors and Closures Business, Delphi recorded income of $18 million, net of tax.

The Interiors and Closures Business, through the date of the sale, and the Steering Business are reported as discontinued operations in the consolidated statement of operations and statement of cash flows for the three months ended March 31, 2009 and 2008.  The assets and liabilities of the Steering Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of March 31, 2009 and December 31, 2008.

**Results of Discontinued Operations**

The results of the discontinued operations are summarized as follows:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2009** | **2008** |
|  | **(in millions)** | |
| Sales: | | |
| Steering Business | $    358 | $    569 |
| Interiors and Closures Business | — | 241 |
| Total sales | $    358 | $    810 |
| | | |
| Income (loss) before income taxes (including loss attributable to noncontrolling interest and equity income, net of tax) | $    33 | $    (55) |
| Provision for income taxes | (2) | (4) |
| Income (loss) from discontinued operations | $    31 | $    (59) |
| *Steering Business* | *31* | *(77)* |
| *Interiors and Closures Business* | *—* | *18* |

Assets and liabilities of the Steering Business are summarized as follows:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | **(in millions)** | |
| Current assets: | | |
| Cash | $    20 | $    20 |
| Accounts receivable | 328 | 299 |
| Inventory | 158 | 152 |
| Other current assets | 23 | 24 |
| Long-term assets | 22 | 2 |
| Assets held for sale | $    551 | $    497 |
| | | |
| Current liabilities: | | |
| Short-term debt | $    37 | $    30 |
| Accounts payable | 176 | 174 |
| Accrued liabilities | 94 | 68 |
| Other long-term liabilities | 21 | 21 |
| Liabilities held for sale | $    328 | $    293 |

Cash flows from operating activities for discontinued operations are summarized as follows:

|  | Three Months Ended March 31, | |
|  | 2009 | 2008 |
|  | (in millions) | |
| (Gain) charge related to assets held for sale | $ (20) | $ 7 |
| Pension and other postretirement benefit expenses | 1 | 11 |
| U.S. employee workforce transition program charges | — | 1 |
| Changes in net operating assets | 19 | 35 |
| Total | $ — | $ 54 |
| *Steering Business* | — | *24* |
| *Interiors and Closures Business* | — | *30* |

# 16. OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

|  | Three Months Ended March 31, | |
|  | 2009 | 2008 |
|  | (in millions) | |
| Interest income | $ 3 | $ 13 |
| Other, net | 6 | 6 |
| Other income, net | $ 9 | $ 19 |

# 17. ACQUISITIONS AND DIVESTITURES

The results of operations, including the gain or loss on divestitures, associated with Delphi's acquisitions and divestitures described below were not significant to the consolidated financial statements in any period presented, and the divestitures did not meet the discontinued operations criteria.

## Automotive Holdings Group Segment

*Bearings Business Product Sale* – On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business"). On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code. On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos"), which was the successful bidder at the auction held on February 19, and 20, 2008. The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008. The 2007 annual revenues for the Bearings Business were $280 million, which included $108 million of intra-segment sales. During the first quarter of 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business. The sale occurred on April 30, 2008, and Delphi received net proceeds from this sale of approximately $15 million.

*North American Brake Product Asset Sale* – On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan; Spring Hill, Tennessee; Oshawa, Ontario, Canada; and Saltillo, Mexico facilities. The 2007 annual revenues for North American Brake Components were $568 million. The sale occurred in the first quarter of 2008 and resulted in a gain of $5 million, which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $38 million during the first quarter of 2008.

*Global Suspension and Brakes Business Sale* – On March 31, 2009, Delphi announced that it had entered into an asset sale and purchase agreement with BeijingWest Industries Co., Ltd. for the sale of Delphi's remaining chassis business, the global suspension and brakes business, whereby Beijing West Industries Co., Ltd. will acquire machinery and equipment, intellectual property and certain real property. The carrying value of the net assets to be sold approximates $100 million as of March 31, 2009. Certain customer and supplier contracts will also be assumed and/or assigned to BeijingWest Industries Co., Ltd. Delphi filed a motion with the Court on March 31, 2009 requesting a hearing on April 23, 2009, to approve bidding procedures, and a hearing on May 21, 2009, to authorize and approve the sale of the assets. The Court approved bidding procedures for the sale of these assets on April 23, 2009 which will result in held for sale

accounting under SFAS 144 in the second quarter of 2009.  Delphi expects the hearing to proceed on May 21, 2009 and the closing of the sale to occur during the fourth quarter of 2009.

### Powertrain Systems Segment

*Global Exhaust Business Sale* – On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business").  On December 17, 2008, Delphi received approval from the Court for the sale of assets related to the Exhaust Business to Bienes Turgon S.A. de C.V. ("Bienes Turgon") for $17 million (subject to adjustments).  The Exhaust Business revenues for 2008 were approximately $317 million.  On April 30, 2009, Delphi finalized the sale of the assets and shares related to the Company's global exhaust business in Blonie, Poland; Clayton, Australia; Port Elizabeth, South Africa; joint venture interests in Monterrey, Mexico; technical centers in Auburn Hills, Michigan; and Bascharage, Luxembourg.  As part of this transaction, the sale of assets to Bienes Turgon from the remaining two locations (Gurgaon, India and Shanghai, China) is expected to close during the second half of 2009, and Delphi recognized a charge of $14 million in cost of sales during the fourth quarter of 2008 and a reduction of $1 million in cost of sales during the first quarter of 2009 related to the assets held for sale of the Exhaust Business.  Although Delphi is divesting its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

*Catalyst Product Line Sale* – On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore for approximately $67 million which included certain post-closing working capital adjustments.  Delphi recorded the loss of $30 million on the sale of the Catalyst Business in cost of sales in the third quarter of 2007.  The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million.  During the first quarter of 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

### Electronics and Safety Segment

*Held-For-Sale Gain* – In 2008, Delphi made the decision to divest a certain manufacturing business in Germany.  Based on an estimate of anticipated proceeds, Delphi recognized a charge of $13 million, included in cost of sales, in the fourth quarter of 2008 and recognized a gain of $1 million during the first quarter of 2009 related to the assets held for sale.  The divestiture is expected to occur during 2009.

## 18. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as the Automotive Holdings Group, consisting of business operations to be sold or wound down.  An overview of Delphi's reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronics controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.
- Corporate and Other, which includes the Product and Service Solutions business which is comprised of independent aftermarket, diesel aftermarket, original equipment service and medical systems, in addition to the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, and the elimination of inter-segment transactions and charges related to U.S. employee workforce transition programs.

Delphi also has non-core steering and halfshaft product lines and interiors and closures product lines that are reported in discontinued operations.  Previously, the steering and halfshaft product line was a separate operating segment and the interiors and closures product line was part of the Automotive Holdings Group segment.  Refer to Note 15. Discontinued Operations for more information.

The accounting policies of the segments are the same as those described in Note 1. Basis of Presentation, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions.  Generally,

Delphi evaluates performance based on stand-alone segment operating income and operating income before depreciation and amortization, including long-lived asset and goodwill impairment charges, transformation and rationalization charges and discontinued operations ("OIBDAR") and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.  Delphi's management believes that OIBDAR is a meaningful measure of performance and it is used by management and the Board of Directors to analyze Company and stand-alone segment operating performance.  Management also uses OIBDAR for planning and forecasting purposes.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Included below are sales and operating data for Delphi's segments for the three months ended March 31, 2009 and 2008.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| **For the Three Months Ended:** | | | | | | | |
| **March 31, 2009** | | | | | | | |
| Net sales to GM and affiliates.... | $ 164 | $ 155 | $ 193 | $ 124 | $ 23 | $ 75 | $ 734 |
| Net sales to other customers....... | 351 | 413 | 608 | 146 | 93 | 180 | 1,791 |
| Inter-segment net sales .............. | 21 | 67 | 23 | 16 | 8 | (135) | — |
| Total net sales ...................... | $ 536 | $ 635 | $ 824 | $ 286 | $ 124 | $ 120 | $ 2,525 |
| Depreciation and amortization ... | $ 48 | $ 49 | $ 47 | $ 16 | $ 2 | $ 10 | $ 172 |
| Operating (loss) income ............ | $ (160) | $ (139) | $ (178) | $ (43) | $ (15) | $ 1 | $ (534) |
| OIBDAR.................................. | $ (91) | $ (80) | $ (97) | $ (25) | $ (5) | $ 7 | $ (291) |
| Equity (loss) income.................. | $ (4) | $ (3) | $ 1 | $ — | $ (1) | $ (1) | $ (8) |
| Net income attributable to noncontrolling interest............ | $ — | $ 1 | $ 1 | $ 2 | $ — | $ — | $ 4 |
| **March 31, 2008** | | | | | | | |
| Net sales to GM and affiliates.... | $ 349 | $ 308 | $ 403 | $ 296 | $ 195 | $ 90 | $ 1,641 |
| Net sales to other customers....... | 818 | 866 | 1,137 | 251 | 280 | 259 | 3,611 |
| Inter-segment net sales .............. | 48 | 109 | 44 | 27 | 42 | (270) | — |
| Total net sales ...................... | $ 1,215 | $ 1,283 | $ 1,584 | $ 574 | $ 517 | $ 79 | $ 5,252 |
| Depreciation and amortization ... | $ 64 | $ 68 | $ 45 | $ 15 | $ 14 | $ 16 | $ 222 |
| Operating (loss) income ............ | $ (80) | $ (13) | $ (6) | $ 26 | $ (70) | $ (124) | $ (267) |
| OIBDAR.................................. | $ 27 | $ 62 | $ 60 | $ 45 | $ 30 | $ (70) | $ 154 |
| Equity income.......................... | $ — | $ 4 | $ 3 | $ 2 | $ (1) | $ 3 | $ 11 |
| Net income attributable to noncontrolling interest............ | $ — | $ 6 | $ 4 | $ 1 | $ — | $ 1 | $ 12 |

Delphi's management relies on segment OIBDAR as a key performance measure.  OIBDAR is defined as operating income before depreciation and amortization, including long-lived asset and goodwill impairment charges, transformation and rationalization charges related to plant consolidations, plant wind-downs and discontinued operations.  Segment OIBDAR should not be considered a substitute for results prepared in accordance with U.S. GAAP and should not be considered an alternative to operating income, which is the most directly comparable financial measure to OIBDAR that is in accordance with U.S. GAAP.  Segment OIBDAR, as determined and measured by Delphi, should also not be compared to similarly titled measures reported by other companies.

The calculation of OIBDAR, as derived from operating income, is as follows for the three months ended March 31, 2009 and 2008:

| For the Three Months Ended | Electronics and Safety | | Powertrain Systems | | Electrical/ Electronic Architecture | | Thermal Systems | | Automotive Holdings Group | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | |
| **March 31, 2009:** | | | | | | | | | | | | | | |
| Operating income (loss) | $ | (160) | $ | (139) | $ | (178) | $ | (43) | $ | (15) | $ | 1 | $ | (534) |
| Depreciation and amortization | | 48 | | 49 | | 47 | | 16 | | 2 | | 10 | | 172 |
| Transformation and rationalization charges: | | | | | | | | | | | | | | |
| Employee termination benefits and other exit costs | | 17 | | 5 | | 32 | | 2 | | 9 | | (6) | | 59 |
| Other transformation and rationalization costs | | 4 | | 5 | | 2 | | — | | (1) | | (1) | | 9 |
| Discontinued operations | | — | | — | | — | | — | | — | | 3 | | 3 |
| OIBDAR | $ | (91) | $ | (80) | $ | (97) | $ | (25) | $ | (5) | $ | 7 | $ | (291) |

Other transformation and rationalization costs for the three months ended March 31, 2009 primarily includes $12 million of workers compensation liabilities assumed by GM. These costs were offset by approximately $7 million of costs necessary to implement information technology systems to support finance, manufacturing and product development initiatives.

| For the Three Months Ended | Electronics and Safety | | Powertrain Systems | | Electrical/ Electronic Architecture | | Thermal Systems | | Automotive Holdings Group | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | |
| **March 31, 2008:** | | | | | | | | | | | | | | |
| Operating income (loss) | $ | (80) | $ | (13) | $ | (6) | $ | 26 | $ | (70) | $ | (124) | $ | (267) |
| Depreciation and amortization | | 64 | | 68 | | 45 | | 15 | | 14 | | 16 | | 222 |
| Transformation and rationalization charges: | | | | | | | | | | | | | | |
| U.S. employee workforce transition program charges | | — | | — | | — | | — | | — | | 36 | | 36 |
| Employee termination benefits and other exit costs | | 28 | | 4 | | 13 | | 3 | | 43 | | — | | 91 |
| Loss on divestitures | | — | | — | | — | | — | | 30 | | — | | 30 |
| Other transformation and rationalization costs | | 15 | | 3 | | 8 | | 1 | | 5 | | 27 | | 59 |
| Discontinued operations | | — | | — | | — | | — | | 8 | | (25) | | (17) |
| OIBDAR | $ | 27 | $ | 62 | $ | 60 | $ | 45 | $ | 30 | $ | (70) | $ | 154 |

Other transformation and rationalization costs for the three months ended March 31, 2008 primarily includes approximately $21 million of costs necessary to implement information technology systems to support finance, manufacturing and product development initiatives; and approximately $16 million of costs related to Delphi's engineering and manufacturing footprint rotation, certain plant consolidations and closures, and startup costs related to the consolidation of many staff administrative functions into a global business service group

## 19. SUBSEQUENT EVENTS

Certain events have occurred subsequent to March 31, 2009 that do not impact the reported balances or results of operations as of that date, but are material to the Company's ongoing operations. These events are listed below.

### Anaheim Land Sale

On April 20, 2009, Delphi closed on the sale of a parcel of land located in the City of Anaheim, County of Orange, California to Birtcher Anaheim Magnolia Avenue LLC (the "Buyer"), and received proceeds of $20 million. The sale is expected to result in a gain of approximately $16 million in the second quarter of 2009.

### Accommodation Agreement

On April 2, 2009, the Court approved on an interim basis the Second Amendment entered into on March 31, 2009, as supplemented by certain further modifications to the Accommodation Agreement and the Amended and Restated DIP Credit Facility by the Supplemental Amendment, subject to requisite lender approval of those modifications. On April 3, 2009, the requisite approval of the lenders was obtained. On April 3, 2009, Delphi entered into the First Supplement. On April 22, 2009, Delphi entered into a further supplement (the "Second Supplement") to the Second Amendment. The Second Supplement received the required lender consent and was

immediately effective, however, it was subject to certain post-closing conditions.  On April 23, 2009, the Court approved on a final basis the Second Amendment as supplemented by the First Supplement and Second Supplement (the "Supplemental Amendment").  On May 7, 2009 Delphi entered into a further amendment (the "Third Amendment") to the Accommodation Agreement, which further extended certain milestones dates in the Accommodation Agreement.  Refer to Note 8. Debt for further information on the conditions of the Supplemental Amendment.

## 20. DEBTORS' CONDENSED COMBINED FINANCIAL STATEMENTS

### Basis of Presentation

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements.  As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates.  During the three months ended March 31, 2009 and 2008, the Debtors did not receive dividends from non-Debtor affiliates.  Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore would be recorded in equity income from non-Debtor affiliates, net of tax.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt during the six months ended June 30, 2007.  In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008.  The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims.  At March 31, 2009 and December 31, 2008, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims.  As discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims.  Accordingly, Delphi anticipates that it will be relieved of this liability if and when the modifications are approved.

*Income Tax Benefit*– Delphi recorded income tax benefit of $52 million and income tax expense of $3 million for the three months ended March 31, 2009 and 2008, respectively.

During the three months ended March 31, 2009, Delphi recognized $52 million tax benefit in continuing operations related to the elimination of the disproportionate tax effects in OCI related to the salaried OPEB obligation which was settled during the same period

*Assets*— Other current assets consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | **(in millions)** | |
| Taxes other than income | $ 10 | $ 10 |
| Prepaid insurance and other expenses | 64 | 70 |
| Deposits to vendors | 34 | 36 |
| Debt issuance costs | 37 | 56 |
| Other | 15 | 32 |
| Total | $ 160 | $ 204 |

Other long-term assets consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | **(in millions)** | |
| Long-term notes receivable | $ 19 | $ 21 |
| Income taxes receivable | 45 | 45 |
| Goodwill | 37 | 37 |
| Intangible assets | 16 | 18 |
| Deferred charges | 10 | 10 |
| Other investments | 16 | 22 |
| Other | 74 | 67 |
| Total | $ 217 | $ 220 |

*Liabilities*— Accrued liabilities consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | **(in millions)** | |
| Payroll related obligations | $ 38 | $ 39 |
| Employee benefits, including current pension obligations | 80 | 84 |
| Taxes other than income | 33 | 36 |
| Warranty obligations | 74 | 74 |
| U.S. employee workforce transition program | 105 | 115 |
| Employee termination benefits and other exit costs | 80 | 81 |
| Interest on prepetition claims | 415 | 415 |
| Working capital backstop – Steering Business | 210 | 210 |
| Other | 182 | 264 |
| Total | $1,217 | $1,318 |

Employee benefit and other consisted of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | **(in millions)** | |
| Workers compensation | $ 311 | $ 325 |
| Environmental | 86 | 90 |
| Extended disability benefits | 61 | 60 |
| Warranty | 116 | 130 |
| Other long-term debt | 19 | 20 |
| Other | 130 | 131 |
| Total | $ 723 | $ 756 |

*Assets Held for Sale*—The assets held for sale by the Debtors at March 31, 2009 and December 31, 2008 include the net assets held for sale of the non-Debtor affiliates of $430 million and $263 million, respectively, which was reclassified from investments in non-Debtor affiliates.  During the three months ended March 31, 2009 and 2008, the Debtor assets held for sale were revalued based on the expected proceeds, resulting in a gain related to the assets held for sale of $20 million and a loss of $7 million, respectively.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENTS OF OPERATIONS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Three Months Ended March 31 | |
|---|---|---|
| | **2009** | **2008** |
| | (in millions) | |
| Net sales | $ 1,029 | $ 2,328 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 1,268 | 2,489 |
| Depreciation and amortization | 83 | 115 |
| Selling, general and administrative | 132 | 225 |
| Total operating expenses | 1,483 | 2,829 |
| | | |
| Operating loss | (454) | (501) |
| Interest expense (contractual interest expense for the three months ended March 31, 2009 and 2008 was $161 million and $113 million, respectively) | (131) | (95) |
| Other expense, net | (4) | — |
| Reorganization items, net | 1,159 | (100) |
| Income (loss) from continuing operations before income tax expense and equity income | 570 | (696) |
| Income tax benefit (expense) | 52 | (3) |
| Income (loss) from continuing operations before equity income | 622 | (699) |
| Equity (loss) income from non-consolidated affiliates, net of tax | (7) | 7 |
| Income (loss) from continuing operations before discontinued operations and equity income from non-Debtor affiliates | 615 | (692) |
| Income (loss) from discontinued operations, net of tax | 25 | (82) |
| Equity (loss) income from non-Debtor affiliates, net of tax | (88) | 185 |
| Net income (loss) | 552 | (589) |
| Net income (loss) attributable to noncontrolling interest | — | — |
| Net income (loss) attributable to Debtors | $ 552 | $ (589) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | March 31, 2009 (Unaudited) | December 31, 2008 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 61 | $ 231 |
| Restricted cash | 410 | 355 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 523 | 670 |
| Other third parties | 336 | 385 |
| Non-Debtor affiliates | 253 | 249 |
| Notes receivable from non-Debtor affiliates | 97 | 77 |
| Inventories, net | 471 | 493 |
| Other current assets | 160 | 204 |
| Assets held for sale | 485 | 333 |
| Total current assets | 2,796 | 2,997 |
| Long-term assets: | | |
| Property, net | 1,165 | 1,182 |
| Investments in affiliates | 229 | 251 |
| Investments in non-Debtor affiliates | 752 | 1,104 |
| Notes receivable from non-Debtor affiliates | 1,429 | 1,429 |
| Other long-term assets | 217 | 220 |
| Total long-term assets | 3,792 | 4,186 |
| Total assets | $ 6,588 | $ 7,183 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Short-term debt | $ 3,942 | $ 3,635 |
| Accounts payable | 473 | 551 |
| Accounts payable to non-Debtor affiliates | 486 | 535 |
| Accrued liabilities | 1,217 | 1,318 |
| Liabilities held for sale | 262 | 149 |
| Total current liabilities | 6,380 | 6,188 |
| Long-term liabilities not subject to compromise: | | |
| Employee benefits and other | 723 | 756 |
| Total long-term liabilities | 723 | 756 |
| Liabilities subject to compromise | 13,516 | 14,664 |
| Total liabilities | 20,619 | 21,608 |
| Stockholders' deficit: | | |
| Total Debtors stockholders' deficit | (14,031) | (14,425) |
| Noncontrolling interest | — | — |
| Total stockholders' deficit | (14,031) | (14,425) |
| Total liabilities and stockholders' deficit | $ 6,588 | $ 7,183 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2009** | **2008** |
|  | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash used in operating activities | $ (369) | $ (555) |
| Cash flows from investing activities: | | |
| Capital expenditures | (45) | (105) |
| Proceeds from sale of property | 4 | 11 |
| Proceeds from divestitures | 1 | 85 |
| Decrease (increase) in restricted cash | (55) | — |
| Proceeds from notes receivable from non-Debtor affiliates | — | 100 |
| Other, net | 5 | (12) |
| Discontinued operations | (1) | (38) |
| Net cash (used in) provided by investing activities | (91) | 41 |
| Cash flows from financing activities: | | |
| Net repayments of borrowings under amended and restated debtor-in-possession facility | (146) | — |
| Net borrowings under refinanced debtor-in-possession facility | — | 452 |
| Repayments of borrowings under other debt agreements | (1) | (4) |
| Issuance costs related to the Accommodation Agreement | (16) | — |
| Net borrowings under GM liquidity support agreements | 453 | — |
| Net cash provided by financing activities | 290 | 448 |
| Decrease in cash and cash equivalents | (170) | (66) |
| Cash and cash equivalents at beginning of period | 231 | 113 |
| Cash and cash equivalents at end of period | $ 61 | $ 47 |

127