**Interim Hearing Date and Time:  [TBD] (prevailing Eastern time)**
**Interim Objection Deadline:  [TBD] (prevailing Eastern time)**
**Final Hearing Date and Time:  June 16, 2009, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Final Objection Deadline:  June 12, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                   :
      In re                             :     Chapter 11
                                     :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                                     :
                   Debtors.     :     (Jointly Administered)
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SUPPLEMENT TO MOTION FOR ORDER AUTHORIZING DEBTORS
TO ENTER INTO FOURTH AMENDMENT AND FIFTH AMENDMENT
TO ARRANGEMENT WITH GENERAL MOTORS CORPORATION

("SUPPLEMENT TO GM ARRANGEMENT FOURTH AND
FIFTH AMENDMENT APPROVAL MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Supplement To Motion For Order Authorizing Debtors To Enter Into Fourth Amendment And Fifth Amendment To Arrangement With General Motors Corporation (the "Motion Supplement").[1]  As further described herein, in conjunction with Debtors' proposed further modifications to the Confirmed Plan (the "Modified Plan"), the Debtors have reached an agreement with General Motors Corporation ("GM") whereby GM would provide an additional $250 million of interim financing to the Debtors through an amendment and restatement of the previously-approved liquidity support agreement among the Debtors and GM (as amended from time to time, the "GM Arrangement").  This agreement supplants the proposed fourth and fifth amendments to the GM Arrangement, which the United States Department of the Treasury's (the "Treasury Department") Task Force on the Auto Industry (the "Auto Task Force") previously was not ready to support.  By this Motion Supplement, the Debtors seek interim and final approval of this financing arrangement.  In further support of this Motion Supplement, the Debtors respectfully represent as follows:

<u>Preliminary Statement</u>

1.        Delphi is on the brink of emergence from chapter 11.  The Debtors have achieved their reorganization goals, maintained their business despite a global economic recession and the failed promises of would-be investors, and persevered in the face of unprecedented challenges that have flooded the automotive industry.  The relief that Delphi now seeks – an expedited hearing for the Court to approve the proposed modifications to the Confirmed Plan and necessary amendments to its financing agreement with GM to facilitate such

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion For Order Authorizing Debtors To Enter Into Fourth Amendment And Fifth Amendment To Arrangement With General Motors Corporation (the "Motion") (Docket No. 16411).

2

modifications – will enable the Debtors to complete the final phase of their reorganization.  Due to the nature of this transaction, there is no time to spare.  The Debtors need to act now to effectuate the Modified Plan and the transactions incorporated therein to allow them to maximize value to their stakeholders.  Without the requested relief, Delphi would likely be unable to effectuate a plan of reorganization.

2.     In March 2006, approximately six months after the commencement of these chapter 11 cases, the Debtors announced the five key tenets of their transformation plan that they believed would enable them to return to stable, profitable business operations.  Thereafter, over the next 18 months, the Debtors worked diligently with their stakeholders to achieve these goals.  By September 2007, the Debtors had negotiated an investment agreement with a group of plan investors and had filed a plan of reorganization designed to allow Delphi to emerge from chapter 11 as a viable entity with significant recoveries for its stakeholders.  Although the plan of reorganization and investment agreement were ultimately amended, in January 2008, this Court approved the Confirmed Plan and the Debtors' hope for emergence from chapter 11 was within reach.

3.     During February and March 2008, the Debtors succeeded in obtaining $6.1 billion in exit financing commitments and by April 4, 2008 the Debtors had satisfied the conditions required to substantially consummate the Confirmed Plan.  The plan investors, however, refused to participate in the closing and refused to fund their investment agreement with Delphi.  This devastating move by the plan investors precluded the Debtors from emerging from chapter 11, and Delphi was required to reevaluate and retool its business plan and emergence strategy.

4.     Over the next six months, the Debtors revised their go-forward business plan and developed certain modifications to the Confirmed Plan so that Delphi could emerge on

an standalone basis, without plan investor support.  The lack of the plan investors' $2.5 billion investment, together with the overall economic decline, particularly in the automotive industry, and the total collapse of the credit markets in the latter half of 2008 significantly reduced the Debtors' enterprise value.  In addition, the Debtors were unable to secure necessary exit financing, forcing the Debtors to remain in chapter 11.  Despite these challenges, on October 3, 2008, the Debtors filed certain proposed modifications to the Confirmed Plan that incorporated a significantly lower enterprise value and reduced recoveries to creditors from those that were approved by the Court in the Confirmed Plan.  As a result of the lack of available credit in the credit markets, the Debtors were unable to secure necessary emergence capital and thus were not able to obtain approval of the modifications to the Confirmed Plan.

5.      Their unexpected prolonged stay in chapter 11 posed yet another challenge to the Debtors because their DIP credit facility was set to mature on December 31, 2008.  Because of the collapse of the credit markets, the Debtors were unable to extend the maturity date of their DIP credit facility on reasonably acceptable terms.  Accordingly, in December 2008, the Debtors and their debtor-in-possession lenders (the "DIP Lenders") entered into an accommodation agreement, as subsequently amended, to allow the Debtors, among other things, to continue using certain of the proceeds of the DIP credit facility through June 30, 2009.  In addition, and in connection with certain amendments to the accommodation agreement with the DIP Lenders, GM agreed to provide the Debtors with additional liquidity and to accelerate payment of certain receivables to allow the Debtors to maintain ongoing operations in this challenging economic environment.

6.      In the interim, the U.S. government's well-publicized involvement with the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into the automotive industry, including GM, added yet another key stakeholder to the negotiations

4

with the Debtors regarding their emergence plan. Indeed, in March 2009, in connection with a proposed amendment to the accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an additional $150 million in liquidity under amendments to the previously-approved liquidity arrangement between Delphi and GM. The Treasury Department, however, acting pursuant to its authority under GM's loan agreement with the Treasury Department, notified the Debtors and GM that it was not yet supportive of the parties' seeking approval of these amendments and requested additional time to consider these agreements and various alternatives with respect to the Debtors' emergence from chapter 11. Since that time, the Debtors, GM, and the Treasury Department have been working on and negotiating a global solution to allow the Debtors to emerge from chapter 11. As part of that solution, GM has agreed to provide up to an additional $250 million to support Delphi as it seeks approval of its Modified Plan and emergence from chapter 11.[2]

    7.    This process has resulted in agreements with certain parties that will enable the Debtors to emerge from chapter 11 and will allow the Debtors to continue to deliver high-quality products to their customers with the support of their supply base. The Debtors have reached an agreement with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum Capital Equity Partners, L.P., and GM Components Holdings, LLC ("GM Components"), an affiliate of GM, whereby the Debtors would sell certain of their North American assets to GM Components and contemporaneously effectuate transactions through which Parnassus would operate certain of Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the legacy costs associated with the North American sites that are being acquired by GM Components together with Delphi's

---

[2]    As described below, the Debtors are also seeking, in the alternative, approval of the Sale Transactions (as defined below) that form the basis of the Modified Plan pursuant to section 363 of the Bankruptcy Code, independently of and not pursuant to, or contingent on, any plan of reorganization.

global steering business (the "Sale Transactions").  The Debtors must proceed on an expedited

basis to obtain the relief sought herein so that they can proceed to solicit votes on the Modified

Plan.  Failure to move forward now on this accelerated time frame could seriously jeopardize the

Debtors' ability to emerge from chapter 11.

A.      The Debtors' Financing Since The Fourth Quarter Of 2008

        8.      Since January 5, 2007, the Debtors have been operating in these chapter

11 cases by utilizing the proceeds of a refinanced debtor-in-possession facility (the "DIP

Facility")[3] comprised of three tranches:  (i) a first priority revolving credit facility ("Tranche A"),

(ii) a first priority term loan ("Tranche B"), and (ii) a second priority term loan ("Tranche C").[4]

The DIP Facility is governed by an Amended and Restated Revolving Credit, Term Loan and

Guaranty Agreement dated as of May 9, 2008 (as amended, the "DIP Credit Agreement").

        9.      In the fourth quarter of 2008, facing frozen global credit markets and one

of the worst bear markets in the history of the global capital markets, the Debtors negotiated an

accommodation agreement (as amended from time to time, the "Accommodation Agreement")

with the DIP Facility administrative agent (the "Agent") and certain required DIP Lenders.

Under the Accommodation Agreement, and subject to the terms and conditions set forth therein,

the Debtors could continue using certain of the proceeds of their then-approximately $4.35

billion DIP credit facility through June 30, 2009 (the "Accommodation Period").  This Court

authorized the Debtors to enter into the Accommodation Agreement by order entered on

December 3, 2008 (Docket No. 14515) and the parties subsequently effectuated the agreement

---

[3]     The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November 7, 2008 (Docket No. 14408) (the "Accommodation Motion").

[4]     As of the date of this Motion the Debtors owe approximately $249 million to the Tranche A lenders, $337 million to the Tranche B lenders, and $2.75 billion to the Tranche C lenders.

on December 12, 2008.  From time to time during the first and second quarters of 2009, the

Debtors reached Court-approved agreements with the DIP Lenders to, among other things,

modify the Debtors' obligations under the Accommodation Agreement so that the Debtors could

remain in compliance with that agreement and maximize available liquidity as they negotiated a

global resolution of these chapter 11 cases.[5]

   10. Concurrently with its approval of the Accommodation Agreement on

December 3, 2008, the Court also entered an order approving a second amendment

("Amendment No. 2") to the GM Arrangement (Docket No. 14514).  Amendment No. 2

extended the availability of the existing $300 million liquidity support from December 31, 2008

to June 30, 2009, subject to certain conditions and provisions for earlier termination upon the

occurrence of specified events.[6]

   11. As part of the order approving Amendment No. 2 to the GM Arrangement,

the Court also approved Delphi's entry into the Partial Temporary Accelerated Payment

Agreement with GM (the "Pull-Forward Agreement"), which provided for GM to accelerate the

payment of up to $300 million in trade accounts payable to Delphi over the three-month period

---

[5] See (i) First Accommodation Amendment Order, entered February 25, 2009 (Docket No. 16377), (ii) Interim
Accommodation Supplemental Second Amendment Order, entered April 3, 2009 (Docket No. 16549),
(iii) Final Accommodation Supplemental Second Amendment Order, entered April 23, 2009 (Docket No.
16575), (iv) Interim Accommodation Third Amendment Order, entered May 7, 2009 (Docket No. 16609), and
(v) Final Accommodation Third Amendment Order, entered May 21, 2009 (Docket No. 16633).

[6] Under the original GM Arrangement, GM had provided up to $650 million in advances to Delphi in respect of
payments GM would otherwise have made upon the effectiveness of the GSA and MRA.  Upon the
effectiveness of the Amended GSA and Amended MRA on September 29, 2008, this commitment terminated
and the amounts advanced were set off against amounts to be paid by GM or its affiliates for the benefit of the
Debtors under the Amended GSA and the Amended MRA.  GM and the Debtors entered into a first amendment
("Amendment No. 1") to the GM Arrangement as of October 6, 2008 (Docket No. 14289).  Pursuant to
Amendment No. 1, GM agreed to make available to the Debtors an additional Tranche B consisting of $300
million in advances under the terms and conditions set forth therein and pursuant to section 364(b) of the
Bankruptcy Code.  As part of the GM Arrangement, Delphi agreed to pay certain fees and expenses and to
indemnify certain parties under specified conditions.  In addition, other Debtors guaranteed Delphi's obligations
thereunder.  The GM Arrangement also provides that the Debtors' obligations thereunder are entitled to
administrative expense priority under section 503(b)(1) of the Bankruptcy Code, subject to the terms of the GM
Arrangement and the Second DIP Extension Order (Docket No. 13489).

7

beginning in March 2009. Under the Pull-Forward Agreement, GM made a $50 million, a $150 million, and a $100 million payment to DAS LLC in January, March, and April 2009, respectively. These payments represented a partial temporary acceleration of accounts payable to DAS LLC for component parts supplied to GMNA and GM's service parts organization, with the effect of decreasing GM's payables not yet due to DAS LLC by the amount paid.

12.     On January 30, 2009 Delphi reached an agreement with GM with respect to a third amendment ("Amendment No. 3") to the GM Arrangement, which generally contained amendments that conform the GM Arrangement to the amended terms of the Pull-Forward Agreement (as described below) and the amended terms of the Accommodation Agreement.

13.     On January 30, 2009, Delphi and GM also agreed to an amendment to the Pull-Forward Agreement (the "Pull-Forward Amendment") designed to immediately enhance the Debtors' liquidity by, as described above, further accelerating trade payments to the first quarter of 2009. The Pull-Forward Amendment provided that GM may convert the first $50 million of the May 2009 pull-forward payment (and, if made, the second $50 million of the May 2009 pull-forward payment) into Tranche B advances under the GM Arrangement, provided that GM's total Tranche B commitment is simultaneously increased by any amount so converted. Upon such conversion, the GM payables owing to Delphi that correspond to the accelerated payment or payments so converted would be reinstated so that GM remains obligated to make such payments as if they had never been accelerated. On February 25, 2009, the Court entered an order authorizing the Debtors to enter into Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment (Docket No. 16379).

14.     On March 4, 2009, the Debtors filed a motion (the "Motion") seeking this Court's approval of a fourth amendment and fifth amendment to the GM Arrangement (respectively, "Amendment No. 4" and "Amendment No. 5") (Docket No. 16411), which

amendments would have provided the Debtors with an additional $150 million of liquidity

support.  Amendment No. 4 provided for an increase of GM's total commitment under the GM

Arrangement from $300 million to $350 million and Amendment No. 5 provided for a

subsequent increase of GM's total commitment under the GM Arrangement from $350 million to

$450 million, each subject to the terms and conditions of those amendments.  On March 4, 2009,

the Debtors also filed a motion seeking approval of GM's exercising the "Unsold Business

Option" referred to in Section 4.06(a)(i) of the Amended MRA with respect to Delphi's global

steering and halfshaft business (the "Steering Option Exercise Motion") (Docket No. 16410).

15.     The Motion and the Steering Option Exercise Motion were scheduled to

be heard at an omnibus hearing on March 24, 2009.  The night before the hearing, however,

counsel for the Auto Task Force notified GM and the Debtors in writing that the Auto Task

Force was not supportive of the parties' seeking approval of these agreements until it had a

further opportunity to review the details of those transactions and the various alternatives with

respect to Delphi's emergence from chapter 11.  At the request of the parties, this Court has

adjourned the hearing on these motions from time to time to allow discussions with respect to

these agreements and the Debtors' overall reorganization framework to progress, with the last

adjournment being to June 2, 2009.

16.     The Debtors' complex and difficult negotiations with its key stakeholders

and the Auto Task Force have culminated in the transactions set forth in the supplement to the

Plan Modification Motion that the Debtors have filed concurrently herewith.  Specifically, the

Debtors have reached an agreement with Parnassus and GM Components, whereby the Debtors

would sell certain of their North American assets to GM Components and contemporaneously

effectuate transactions through which Parnassus would acquire and operate certain of Delphi's

U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of

approximately $3.6 billion and without the labor-related legacy costs associated with the North

American sites that are being acquired by GM Components together with Delphi's global

steering business.  To facilitate the Sale Transactions and the Debtors' emergence from chapter

11 at this time, the Auto Task Force has authorized GM to provide the Debtors with $250 million

of critical interim financing through the amendments to the GM Arrangement described below.

Relief Requested

17.    The Debtors file this Motion Supplement seeking entry of an interim order

approving the amendments to the GM Arrangement set forth in the Amended and Restated GM

Arrangement attached hereto as Exhibit A (the "Amended and Restated GM Arrangement"),

which supplant Amendment No. 4 and Amendment No. 5, pending a final hearing on the Motion

Supplement on June 16, 2009.  As discussed below, the Amended and Restated GM

Arrangement provides for a $250 million increase of GM's total commitment under the GM

Arrangement, subject to the terms and conditions set forth in the agreement.

Basis For Relief

18.    As noted above, at this critical juncture the Debtors require short-term

bridge financing to fund their operations as they proceed to effectuate the Sale Transactions and

take the steps necessary to obtain confirmation of the Plan Modifications within the tight time

frames imposed by the Debtors' current circumstances.  GM is willing to provide such interim

financing on the terms set forth in the Amended and Restated GM Arrangement to facilitate the

Debtors' emergence from chapter 11 and, moreover, is willing to cancel the Debtors' repayment

obligations with respect to the full $550 million under the Amended and Restated GM

Arrangement upon consummation of the Sale Transactions.  Without such favorable financing,

the Sale Transactions and the Plan Modifications could not succeed, risking great loss of value to

10

the Debtors' estates and their stakeholders. Accordingly, the Debtors' request that this Court

grant the relief sought herein.

B.      The Amended And Restated GM Arrangement

        19.     The Debtors and GM have negotiated amendments to the GM

Arrangement which supplant Amendment No. 4 and Amendment No. 5 and provide for an

overall increase of $250 million in GM's unsecured commitments under the GM Arrangement

from $300 million to $550 million in the form of a new "Tranche C Commitment."[7]

        20.     The new $250 million Tranche C Commitment is intended to provide the

Debtors with the interim liquidity that they require while they seek to consummate the Sale

Transactions and emerge from chapter 11. Accordingly, the Tranche C Commitment is

scheduled to terminate on the earlier of (i) September 30, 2009,[8] (ii) the date on which the

Debtors seek to amend or otherwise modify the plan of reorganization filed on October 3, 2008

in a manner not satisfactory to GM, (iii) the date the DIP Facility is repaid in full, (iv) the

effective date of the Modified Plan, (v) the earlier of (a) the date the Court denies the motion

seeking approval of the Sale Transactions, (b) July 23, 2009, unless the Court has approved the

Sale Transactions by that date, or (c) seven days after the date the Court enters an order

enjoining, restraining, or otherwise restricting the Debtors from seeking approval of the Modified

Plan or the Stand Alone Sale (as defined below), if such order has not been reversed, (vi) the date

---

[7]    From and after the Tranche C Effective Date and prior to the Tranche B Termination Date, the Tranche C
       Commitments shall not exceed an aggregate outstanding principal amount of $250,000,000. From and after the
       Tranche B Termination Date, the Tranche C Commitments shall not exceed an aggregate principal amount of
       $250,000,000 plus the aggregate amount of any prepayments made by the Delphi to GM on and after the
       Tranche B Termination Date in accordance with Section 2.09(b) of the Amended and Restated GM
       Arrangement.

[8]    If pursuant to Section 12.1.2 of the Master Disposition Agreement governing the Sale Transaction (the "Sale
       Agreement"), the termination date of the Sale Agreement has been extended to October 30, 2009, then the
       outside termination date of September 30, 2009 of the Tranche C Commitment shall also be extended to
       October 30, 2009.

on which the Sale Agreement terminates, and (vii) the date on which the Sale Transactions are consummated.  The existing $300 million Tranche B Commitment, which the Court previously approved in December 2008, is scheduled to terminate on June 30, 2009, unless terminated earlier as set forth in the definition of "Tranche B Scheduled Termination Date" in the Amended and Restated GM Arrangement.

21.    Notably, under section 2.07 of the Amended and Restated GM Arrangement, if the Modified Plan or the Sale Transactions have been consummated on or before the Tranche B Termination Date and Tranche C Termination Date (both as defined in the Amended and Restated GM Arrangement), the loans outstanding under the Amended and Restated GM Arrangement would be automatically cancelled and the Debtors would not be required to pay GM the $550 million principal amount with respect to such loans.  Moreover, under section 2.05, the Debtors would not be required to pay accrued interest with respect to each of the Tranche B Commitments and the Tranche C Commitments if the Modified Plan or Sale Transactions are consummated on or before the Tranche B and Tranche C Termination Date, respectively.

22.    The effectiveness of the Amended and Restated GM Arrangement is subject to certain conditions precedent set forth in Section 4.01 thereof, which include: (i) GM's approval of the terms of any amendments or modifications to the DIP Credit Agreement, Accommodation Agreement, or Confirmed Plan, (ii) this Court's entry of an interim order approving the Amended and Restated GM Arrangement,[9] and (iii) neither the Agent nor any DIP Lender having taken any action to exercise remedies under the DIP Credit Agreement or

---

[9]    Section 4.01(f) requires that the interim order approving this agreement (i) grant GM administrative claims with respect to its commitments under the agreement, (ii) authorize extensions of credit in an aggregate principal amount up to the Tranche C Commitment, (iii) authorize the payment by Delphi of all fees and expenses provided for in the agreement, and (iv) be in form and substance reasonably acceptable to GM.

the related security documents with respect to any collateral, other than (a) with respect to cash collateral held in cash collateral accounts as of the effective date of the Tranche C Commitments (the "Tranche C Effective Date") as provided in the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) and (b) the giving of notice and direction by the DIP Lenders to the Agent with respect to actions contemplated under the Modified Plan.

23.    With respect to the Sale Transactions, section 4.01 of the Amended and Restated GM Arrangement also requires as a condition to the effectiveness of the agreement that the Debtors have executed the documents in connection with the Sale Transactions and that they seek approval of the Sale Transactions concurrently through a plan of reorganization and a stand-alone section 363 sale.  Specifically, on or before June 1, 2009, the Debtors are required to file a motion (the "Solicitation Motion"), in form and substance reasonably satisfactory to GM, which seeks, in the alternative, either (i) to approve, among other things, the modifications under the Modified Plan pursuant to which the Debtors will perform their obligations under the Sale Documents or (ii) approval to enter into and perform their obligations under the Sale Documents under section 363 of the Bankruptcy Code, independent of and not pursuant to or contingent on the effectiveness of, any plan of reorganization (the "Stand Alone Sale").  The Amended and Restated GM Arrangement requires that, on or prior to June 10, 2009, the Court enter an order, in form and substance reasonably acceptable to GM, approving the relief sought in the Solicitation Motion and scheduling a hearing for the approval of the Modified Plan or the Stand Alone Sale, to be held on or prior to July 23, 2009.

24.    As set forth in section 4.04(d) of the Amended and Restated GM Arrangement, the Debtors must achieve certain milestones in order to borrow with respect to the new Tranche C Commitments (the "Milestones").  These milestones are as follow:

On the date of each Tranche C Advance requested on and after each of the dates set forth in the following clauses (i) – (v), the following conditions shall have been satisfied: (i) on the tenth date after the Tranche C Effective Date, the Interim Order shall not be stayed, modified or reversed or subject to any appeal, (ii) the Solicitation Order shall have become final and non-appealable within ten days of the Tranche C Effective Date (the "Final Solicitation Order"), (iii) by July 2, 2009, the Borrower shall have filed the 363 Implementation Agreement with the Bankruptcy Court pursuant to the Solicitation Order, (iv) by July 23, 2009, a hearing shall have been held to approve the Modified Reorganization Plan or the Stand Alone Sale, and the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to GM, approving the Modified Reorganization Plan or the Stand Alone Sale (in either case, such order referred to herein as the "Sale Transactions Order") and (v) within ten (10) days of the entry after the Sale Transactions Order and in any event no later than August 3, 2009, such Sale Transactions Order shall have become final and nonappealable.

25.     Moreover, the Debtors' ability to borrow with respect to the Tranche C Commitment is contingent upon, among other things, (i) no amendment or other modification to the DIP Credit Agreement or the Accommodation Agreement having been made and no motion to approve any such amendment or modification having been filed that is not reasonably acceptable to GM, (ii) no new agreement or amendment, extension, or other modification having been made and no motion to approve any such new agreement, amendment, extension, or other modification having been filed that requires payment of interest on account of the Tranche C loans under the DIP Credit Agreement,[10] (iii) neither the Agent nor any DIP Lender having taken any action to exercise remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (a) with respect to cash collateral held in cash collateral accounts as of the Tranche C Effective Date as provided in the DIP Credit Agreement and the other Loan Documents and (b) the giving of notice and direction by the DIP

---

[10]    Further, section 5.06 has been added to the Amended and Restated GM Arrangement to include the following covenant:  "At no time after the Tranche C Effective Date shall proceeds of the Tranche C Loans be used to pay amounts to the DIP Agent or the DIP Lenders on account of interest owing on the tranche c loans under the DIP Credit Agreement."

14

Lenders to the Agent with respect to actions contemplated under the Modified Plan., (iv) no

motion or other pleading having been filed, without GM's consent, seeking approval of or entry

of an order confirming a plan of reorganization, other than the Modified Plan (v) no stay,

amendment, reversal, or other modification having been made in a manner that is not reasonably

acceptable to GM to (a) the interim and/or final order approving the Amended and Restated GM

Arrangement, (b) the Solicitation Order, or (c) the Sale Transactions Order, (vi) no stay, reversal,

or other modification having been made in a manner that is not reasonably acceptable to GM to

any future order relating to or approving amendments to the DIP Credit Agreement or

Accommodation Agreement, (vii) no default, material breach (not waived by the applicable party

or parties) by Delphi, or termination having occurred under any of the Sale Documents (as

defined in the Amended and Restated GM Arrangement), and Delphi not having taken any action

or filed any motion to terminate, modify, or reject any of the Sale Documents, and (viii) on the

date of each advance under the Amended and Restated GM Arrangement, no Event of Default or

event which upon notice or lapse of time or both would constitute an Event of Default having

occurred and be continuing under the Amended and Restated GM Arrangement.

<u>Applicable Authority</u>

C.      The Court Should Authorize The
        <u>Amended And Restated GM Arrangement</u>

        26.      The Debtors seek approval of the Amended and Restated GM

Arrangement, which increases GM's unsecured obligations under the GM Arrangement from

$300 million to $550 million.  According to the terms of the GM Arrangement, Delphi is to grant

GM an administrative claim for such increased amounts under section 503(b) of the Bankruptcy

Code.

27.    Under section 364(b) of the Bankruptcy Code, a debtor may obtain
unsecured credit outside the ordinary course of business and provide the lender extending such
credit with an administrative priority claim for such amounts under section 503(b)(1) of the
Bankruptcy Code.  11 U.S.C. § 364(b).  Bankruptcy courts have discretion in determining
whether to approve such transactions, although such "discretion is not unbridled."  In re Ames
Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).  In making such determinations,
"courts have focused their attention on proposed terms that would tilt the conduct of the
bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code
confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions
by parties-in-interest from being decided on their merits."  Id. (citations omitted).

28.    With respect to the GM Arrangement, the Court determined that these
standards were met when it approved (i) the GM Arrangement,[11] (ii) the additional $300 million
commitment from GM in Amendment No. 1,[12] (iii) the extension of that commitment in
Amendment No. 2,[13] and (iv) to the extent section 364(b) was applicable, the modifications
accomplished by Amendment No. 3.[14]  Because the GM Arrangement will remain in place, as
amended and restated, the Court's prior findings should apply.

---

[11]    Order (I) Supplementing January 5, 2008 DIP Order (Docket No. 6461) and Authorizing Debtors to (A) Extend
Maturity Date of DIP Facility, (B) Enter into Related Documents, and (C) Pay Fees in Connection Therewith
and (II) Authorizing Debtors to Enter into Arrangement with General Motors Corporation or an Affiliate
(Docket No. 13489).

[12]    Order Authorizing Amendment to Arrangement with General Motors Corporation Approved Pursuant to
Second DIP Extension Order [Docket No. 13489] (Docket No. 14289).

[13]    Order Authorizing Debtors to Enter (I) Second Amendment to Arrangement with General Motors Corporation
Approved Pursuant to Second Dip Extension Order (Docket No. 13489) and (II) Partial Temporary Accelerated
Payment Agreement (Docket No. 14514).

[14]    Order Authorizing Debtors to Enter into (I) Third Amendment to Arrangement with General Motors
Corporation Approved Pursuant to Second DIP Extension Order (Docket No. 13489) and (II) First Amendment
to Partial Temporary Accelerated Payment Agreement (Docket No. 16379).

(b)       Application Of The Business Judgment Standard

29.       Based on the foregoing, the Debtors submit that entry of an order

approving the Amended and Restated GM Arrangement is necessary and appropriate to complete

the Debtors' reorganization efforts.  The agreements were negotiated in good faith, at arm's

length, and in the exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer

to the debtor's business judgment on most business decisions, including the decision to borrow

money.  See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,

318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In

considering whether a debtor has exercised its business judgment, a court is not free to second-

guess particular provisions but rather determines whether the proposed action "as a whole is

within reasonable business judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888

(Bankr. S.D.N.Y. 1990).

30.       The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection. Rather, an objector "is required to

produce some evidence respecting its objections." Comm. Of Equity Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

31.    The Debtors have exercised sound business judgment in determining that it is appropriate and necessary to enter into the Amended and Restated GM Arrangement to ensure that the Debtors have the necessary liquidity to continue to work to emerge from chapter 11. The Debtors have determined that, in light of the constraints on their liquidity, the current turmoil in the automotive industry, and the ongoing freeze of the global capital markets, to preserve value for their estates they must seek to effectuate the Sale Transactions and emerge from chapter 11 at this time.

32.    Without access to capital from other sources and with the termination of the Accommodation Period looming, the unsecured financing being offered to the Debtors through the Amended and Restated GM Arrangement is the only viable option available to the Debtors to fund operations while completing the Sale Transactions. Further, the Amended and Restated GM Arrangement provides for the cancellation of the Debtors' repayment obligations with respect to this $550 million loan in connection with the effectiveness of the Sale Transactions or Modified Plan. Accordingly, not only would the Amended and Restated GM Arrangement preserve the going-concern value of these estates by facilitating the Sale Transactions, the cancellation of the obligations thereunder would add substantial value to these estates as well. Indeed, in light of the current circumstances facing the Debtors, the proposed terms of the Amended and Restated GM Arrangement are fair, reasonable, and necessary and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the Amended and Restated GM Arrangement, and take the other actions contemplated by the Amended and Restated GM Arrangement and as requested herein.

18

D.    The Amended and Restated GM Arrangement
Should Be Accorded The Benefits Of Section 364(e)

33.    Section 364(e) of the Bankruptcy Code provides that the "reversal or appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in food faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."  The Amended and Restated GM Arrangement was negotiated in good faith and no consideration is being provided to any party to, or guarantor of, obligations arising under these agreements other than as disclosed therein.  Accordingly, the agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

E.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

34.    Bankruptcy Rule 6004(h)[15] provides:  "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay because Delphi needs the immediate liquidity relief that the Amended and Restated GM Arrangement provides so that it may proceed with the Sale Transactions and emerge from chapter 11.  Moreover, the Court granted the Debtors' request for relief from Bankruptcy Rule 6004(h) in connection with the original GM Arrangement and each of the subsequent amendments thereto.  Other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may

---

[15]    Formerly Bankruptcy Rule 6004(g).

19

provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re

PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business

exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

35.      Notice of this Motion Supplement will be provided in accordance with this

Court's instructions.  In light of the nature of the relief requested, the Debtors submit that no

other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order

(i) authorizing the Debtors to enter into the Amended and Restated GM Arrangement and

(ii) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                June 1, 2009

                            SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                            By:    /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr.
                                   John K. Lyons
                                   Ron E. Meisler
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois 60606
                            (312) 407-0700

                                          - and -

                            By:    /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti
                                   Thomas J. Matz
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                                          - and -

                            SHEARMAN & STERLING LLP

                            By:    /s/ Douglas P. Bartner
                                   Douglas P. Bartner
                                   Andrew V. Tenzer
                                   Michael S. Baker
                            599 Lexington Avenue
                            New York, New York  10022
                            (212) 848-4000

                            Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession