SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 546(c) AND AMENDED
RECLAMATION PROCEDURES ORDER CLASSIFYING  RECLAMATION CLAIMS
AS GENERAL UNSECURED NONPRIORITY CLAIMS FOR ALL PURPOSES

("MOTION TO DETERMINE RECLAMATION CLAIMS")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for an order pursuant to 11 U.S.C. § 546(c) and the Second Amended And Restated Final Order Under 11 U.S.C. §§ 362, 503, And 546 And Fed. R. Bankr. P. 9019 Establishing Procedures For Treatment Of Reclamation Claims (Docket No. 10409) (the "Amended Reclamation Procedures Order") classifying the claims against the Debtors' estates identified in Exhibit A[1] attached hereto (the "Reclamation Claims") as general unsecured nonpriority claims for all purposes, including for purposes of voting and distribution under any plan of reorganization, and respectfully represent as follows:

Preliminary Statement

1.      The Reclamation Claims are not entitled to administrative expense priority due to the Debtors' prepetition secured lenders' prior liens on the goods to be reclaimed. Consequently, the Reclamation Claims, to the extent they are or become fixed and allowed claims, should be treated as general unsecured claims under any modifications to the Confirmed Plan (as defined below) or any plan of reorganization of the Debtors.

2.      It is well established in this district under the decisions rendered in the In re Dana Corp. and In re Dairy Mart Convenience Stores, Inc. cases that reclamation claims are subject to the superior rights of a holder of a prior perfected security interest in the reclaimed

---

[1]    Certain of the Reclamation Claims have been transferred to third parties as part of a transfer of a proof of claim or scheduled liability pursuant to rule 3001(e) of the Federal Rules of Bankruptcy Procedure. Accordingly, Exhibit A lists both the party that asserted the Reclamation Claim during the window established by 11 U.S.C. § 546(c) and, where a Reclamation Claim has been transferred, the current holder of the Reclamation Claim.

goods.  See In re Dana Corp., 367 B.R. 409, 420-21 (Bankr. S.D.N.Y. 2007);[2] In re Dairy Mart

Convenience Stores, Inc., 302 B.R. 128, 134-36 (Bankr. S.D.N.Y. 2003).

       3.      As was the case in Dana and Dairy Mart, the goods subject to the

Reclamation Claims constituted the collateral of the Debtors' prepetition secured lenders.  On

January 5, 2007, this Court approved the Debtors' refinancing of its postpetition secured

financing which, on closing, satisfied the prepetition secured lenders' liens and simultaneously

granted first priority security interests in, and liens on, all of the prepetition collateral, including

the reclaimed goods, in favor of the Debtors' postpetition secured lenders.  Accordingly, the

Debtors effectively disposed of the reclaimed goods upon closing of the Debtors' Court-approved

postpetition financing, thus terminating any interest the Reclamation Claimants may have had in

the reclaimed goods.  The Reclamation Claims are, therefore, not entitled to administrative

priority under section 546(c) of the Bankruptcy Code.

       4.      Based on the foregoing and for the reasons set forth below, the Debtors

request entry of an order classifying the Reclamation Claims as general unsecured nonpriority

claims for all purposes, including for purposes of voting and distribution under any plan of

reorganization.

Background

A.     The Chapter 11 Filings

       5.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

---

[2]    The Dana court specifically dealt with reclamation claims asserted in a chapter 11 case commenced after the
enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").  Nonetheless, the
reasoning outlined by the Dana court has equal force with respect to section 546(c) as it existed prior to the
enactment of BAPCPA.  See Dana, 367 B.R. at 418 (finding that amended section 546(c) under BAPCPA does
not create new federal right of reclamation and analyzing pre-BAPCPA case law regarding application of prior
lien defense).  See also In re Advanced Mktg. Servs., Inc., 360 B.R. 421, 426 n.6 (Bankr. D. Del. 2007) ("[t]he
Court would reach the same result under section 546(c) as it existed prior to BAPCPA").

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

6.      No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders, which was disbanded on April 24, 2009.  On February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

7.      On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement

(as defined in the Confirmed Plan) with Delphi.[3]  On May 16, 2008, Delphi filed complaints for

damages and specific performance against the Plan Investors and related parties who refused to

honor their equity financing commitments or participate in the closing that would have led to

Delphi's successful emergence from chapter 11.  Since that time, however, the Debtors

nevertheless have continued to work with their stakeholders to achieve their goal of emerging

from chapter 11 as soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket

No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i)

certain modifications to the Confirmed Plan and December 10 Disclosure Statement and

(ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.  In light of the

unprecedented decline in global automotive production volumes and the deepening of the crisis

in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification

Motion several times.  On June 1, 2009 the Debtors filed a supplement to the Plan Modification

Motion amending and restating the relief sought in the Plan Modification Motion (the "Motion

Supplement").  Among other things, the Motion Supplement seeks approval of (i) certain

modifications to the Confirmed Plan (the "Modified Plan"), (ii) a supplement to the Disclosure

Statement (the "Disclosure Statement Supplement"), and (iii) procedures for re-soliciting votes

on the Modified Plan.  The Motion Supplement is scheduled to be heard on June 10, 2009.

8.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

---

[3]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process.

9.    The statutory predicates for the relief requested herein are sections 363 and 364 of the Bankruptcy Code and rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

10.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[4]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[5]

11.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

12.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[4]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[5]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In
connection with these transactions, Delphi accelerated its evolution from a North American-
based, captive automotive supplier to a global supplier of components, integrated systems, and
modules for a wide range of customers and applications.  Although GM is still the Company's
single largest customer, today more than two-thirds of Delphi's revenue is generated from non-
GM sources.

C.      Events Leading To The Chapter 11 Filing

        13.      In the first two years following Delphi's separation from GM, the
Company generated approximately $2 billion in net income.  Every year thereafter, however,
with the exception of 2002, the Company has suffered net operating losses.  In calendar year
2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net
sales.[6]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net
losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors
incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.
employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.
Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded
gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined
below), the Company's net operating loss for the year was $1.5 billion.

        14.      The Debtors believe that the Company's financial performance was
deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S.
legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable,

---

[6]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
       valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
       calendar year 2004 was $482 million.

non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

15.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

16.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

17.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, as the Debtors continued working with their stakeholders to evaluate their options to emerge from chapter 11, the Debtors sought approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

18.    Through the Amended GSA and Amended MRA, the Debtors addressed, at least in part, two goals of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) working to solve Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

19.    As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which were set forth

in the Plan Modification Motion.  Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally, and the current economic climate in the automotive industry adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Moreover, as a result of the market turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an accommodation agreement (as subsequently amended) which allows the Debtors, among other things, to continue using certain of the proceeds of the postpetition financing facility through June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate payment of certain payables to the Debtors, including entry into an amended and restated agreement as of June 1, 2009, to provide the Debtors up to $250 million of additional pre-emergence liquidity through July 31, 2009 to support Delphi's transformation plan and its reorganization plan.

20.    Also on June 1, 2009, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, Delphi reached an agreement to effect its emergence from chapter 11 through a transaction with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum Equity, and with the support of GM Components Holdings LLC ("GM Components"), an affiliate of GM.  In the exercise of the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all of their creditors, the Debtors executed the agreement to reflect the foregoing transactions

through a plan of reorganization.  The agreement and the changes to the Confirmed Plan were filed as part of the Motion Supplement on June 1, 2009.

21.     Ultimately, this emergence structure is similar to that which was contemplated in the Confirmed Plan.  Instead of having a plan investor sponsoring their plan and emerging as the majority owner of the continuing business enterprise, however, Delphi has agreed to contemporaneously effectuate transactions through which Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that, together with Delphi's global Steering business, are being acquired by GM Components Holding LLC.  A new company, DPH Holdings Co., will emerge as a reorganized entity that retains certain other residual non-core and non-strategic assets and liabilities that are expected to be divested over time.

22.     Consummation of these transactions through the Modified Plan, which embodies concessions made by parties-in-interest to resolve these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a distribution to holders of general unsecured claims.  Moreover, Delphi's emerging businesses will continue to develop technology and products and produce them for the benefit of their customers under the guidance of Platinum, which has experience providing operational support to companies to help them create long term value.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

<u>Relief Requested</u>

23.      By this Motion, the Debtors seek entry of an order under section 546(c)

of the Bankruptcy Code and paragraph 2(c)(iii) of the Amended Reclamation Procedures Order

classifying the Reclamation Claims as general unsecured nonpriority claims for all purposes,

including for purposes of voting and distribution under any plan of reorganization of the

Debtors.

<u>Basis For Relief</u>

24.      The relief requested in this Motion is warranted in light of the disposition

of the Prepetition Collateral (as defined below), including goods subject to reclamation

demands, which has resulted in the effective disposition of the reclaimed goods in favor of the

DIP Lenders (as defined below).  By minimizing the amount of priority claims against the

Debtors' estates, the proposed relief would facilitate the Debtors' restructuring efforts.

Moreover, by requesting this relief, the Debtors are implementing certain rights and defenses

granted to them under to the Reclamation Procedures Order and the Amended Reclamation

Procedures Order.

<u>The Reclamation Claims And Reclamation Procedures</u>

F.      <u>Existing Reclamation Procedures</u>

25.      On November 4, 2005, this Court entered an order[7] (the "Reclamation

Procedures Order") establishing procedures for resolving reclamation claims.  Among other

things, the Reclamation Procedures Order required the Debtors to provide each Reclamation

Claimant with a so-called statement of reclamation (each, a "Statement of Reclamation") setting

forth the extent and basis, if any, upon which the Debtors believed the Reclamation Claimant's

---

[7]      (<u>See</u> Amended Final Reclamation Order Under 11 U.S.C. §§ 362, 503, And 546 And Fed. R. Bankr. P. 9019
Establishing Procedures For The Treatment of Reclamation Claims (Docket No. 881).)

reclamation claim was not legally valid.  In addition, paragraph 2(b)(ii) of the Reclamation

Procedures Order required that each such Statement of Reclamation identify any defenses that

the Debtors chose to reserve.  In accordance with paragraph 2(b)(ii) of the Reclamation

Procedures Order, the Debtors reserved the right in the Statement of Reclamation provided to

each Seller to reduce or disallow a reclamation claim if the goods and/or the proceeds from the

sale of the goods are or were subject to a valid security interest (the "Prior Lien Defense," and

together with the Debtors' other reserved defenses, the "Reserved Defenses").

26.    On October 1, 2007, at the Debtors' request, this Court entered the

Amended Reclamation Procedures Order, which amended and restated the Reclamation

Procedures Order in conjunction with the Confirmed Plan.[8]  Under the amended procedures (the

"Amended Procedures"), each holder of a Reclamation Claim (each, a "Reclamation Claimant")

was given the choice to elect for its Reclamation Claim the treatment afforded to allowed general

unsecured claims under the Confirmed Plan (which included postpetition interest on the allowed

amount of the claim) rather than have the Debtors seek a judicial determination that Reclamation

Claims were not entitled to priority treatment because of the Prior Lien Defense.  If a

Reclamation Claimant elected to decline the treatment afforded to general unsecured creditors,

then a hearing on that Reclamation Claimant's reclamation claim was to be automatically

adjourned to a contested hearing to be held after the effective date of the Confirmed Plan.  The

parties were to litigate before this Court to determine whether the Prior Lien Defense applied to

that Reclamation Claimant's Reclamation Claim.  In addition, the Debtors were to retain all other

Reserved Defenses with respect to such Reclamation Claims.  To make this selection and request

treatment of its Reclamation Claim as a general unsecured claim, the Reclamation Claimant was

---

[8]    Paragraph 2(b)(ii) in the Reclamation Procedures Order is identical to paragraph 2(b)(ii) in the Amended
Reclamation Procedures Order.

required to so mark and return an election notice provided to Reclamation Claimants as part of

the solicitation materials for the Confirmed Plan by the voting deadline on the Confirmed Plan.

G.    Assertion Of Prior Lien Defense

27.    In light of the current economic environment and their consideration of

further supplemental plan modifications, the Debtors have determined to assert the Prior Lien

Defense now rather than after emergence from chapter 11.  Pursuant to paragraph 2(c)(iii) of the

Amended Reclamation Procedures Order, in the event that no consensual resolution of a

reclamation demand can be reached, the Debtors are required to file a motion for determination

of such reclamation demands.  To comply with that provision, the Debtors have filed this

Motion to assert the Prior Lien Defense and request an order classifying the Reclamation

Claims as general unsecured nonpriority claims for all purposes, including for purposes of

voting and distribution under any plan of reorganization.

28.    Obtaining an order of this Court respecting the Prior Lien Defense at this

time rather than following emergence would eliminate any uncertainty regarding the

classification of the asserted Reclamation Claims and obviate the need to maintain a reserve for

the Reclamation Claims in a modified Confirmed Plan or any other plan of reorganization of the

Debtors.  Thus, a determination by this Court that the Reclamation Claims should be treated as

general unsecured claims and not as priority claims will facilitate the Debtors' restructuring

efforts.

H.    The Reclamation Claims

29.    Creditors asserted 855 reclamation demands against the Debtors' estates

during these chapter 11 cases, asserting an aggregate amount of approximately $282.7 million.

Such creditors asserted written reclamation demands during the window established by section

546(c) of the Bankruptcy Code at a time when the goods were un-reclaimable due to the pre-

14

existing blanket lien on such goods held by the Prepetition Secured Lenders (as defined below).

As of the date of this Motion, 505 reclamation demands (the "Disallowed Reclamation

Demands") asserting an aggregate amount of approximately $163 million have been resolved in

the amount of zero, either pursuant to a letter agreement (each, a "Reclamation Letter

Agreement") entered into between the Debtors and the reclaiming party, by default pursuant to

the Reclamation Procedures, or pursuant to the Debtors' process for resolving proofs of claim

filed in these chapter 11 cases.  Accordingly, these 505 Disallowed Reclamation Demands are

not included on <u>Exhibit A</u> hereto, which lists the 350 Reclamation Claims that are the subject of

this Motion.

        30.     The Debtors estimate the aggregate maximum liability of the 350

Reclamation Claims to be approximately $17.5 million, subject to further reduction.  As of the

date of this Motion, only 15 of the 350 Reclamation Claims remained "disputed" in amount.

The aggregate asserted amount of the 15 "disputed" Reclamation Claims is approximately $18.8

million, but the Debtors' books and records show that the aggregate amount of these "disputed"

Reclamation Claims is only approximately $1.4 million.  The aggregate maximum liability for

the 335 Reclamation Claims that have been resolved is approximately $16.1 million.   The

chart attached hereto as <u>Exhibit A</u> shows (a) the current agreed-upon liability for each of the

335 resolved Reclamation Claims, subject to the Reserved Defenses, and (b) the asserted

amount of each of the 15 "disputed" Reclamation Claims and the Debtors' reconciled estimate

of such claims.

        31.     This estimated amount of $17.5 million, if ultimately determined by this

Court to be entitled to priority treatment, may have to be paid from the funds made available to

satisfy certain allowed secured, administrative, and priority claims under a modified Confirmed

Plan or any other plan of reorganization of the Debtors.  The Debtors submit that because the subject goods, which would not otherwise be reclaimable, were subject to the pre-existing and senior liens of the Prepetition Secured Lenders, the Reclamation Claims should be only afforded treatment as general unsecured claims under a modified Confirmed Plan or any other plan of reorganization of the Debtors.

The Debtors' Prepetition Secured Debt

I.       The Prepetition Credit Facility

32.      Prior to commencing these chapter 11 cases, the Debtors' secured bank debt arose under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").  The Prepetition Credit Agreement provided for revolving loans, term loans, swingline loans, and the issuance of letters of credit up to an aggregate principal amount of $2.825 billion.  As of the Petition Date, Delphi was indebted to a syndicate of lenders (the "Prepetition Secured Lenders") in the aggregate amount of $2,579,783,051.85 (the "Prepetition Credit Facility").  The Prepetition Credit Facility was secured by security interests in substantially all of the material tangible and intangible assets of Delphi and its affiliate Debtors (the "Prepetition Collateral"), including all accounts, chattel paper, deposit accounts, documents, equipment, fixtures, general intangibles, instruments, intellectual property, inventory, investment property, letter of credit rights, all other property not described in this list, all books and records pertaining to the Prepetition Collateral, and all proceeds, supporting obligations and products of any and all of the Prepetition Collateral.[9]

---

[9]    The Prepetition Collateral did not include certain real property, capital stock of foreign subsidiaries pledged under the Prepetition Credit Facility to the extent that local law requirements were not satisfied, certain manufacturing plants or facilities, and shares of stock or indebtedness of any U.S. subsidiary of Delphi that owns such a manufacturing plant of facility.

J.    The DIP Facility

33.    After the Debtors commenced these chapter 11 cases, on October 28, 2005, this Court entered an order[10] (the "Original DIP Order") authorizing the Debtors to enter into a $2 billion postpetition credit facility comprised of a $1.75 billion revolving line of credit and a $250 million term loan (the "Original DIP Facility") from a syndicate of lenders (the "Original DIP Lenders").  The Original DIP Facility was secured by (a) a perfected first priority lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets (subject to certain exclusions), (c) superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the Original DIP Facility, and (d) a first priority senior priming lien (the "Priming Lien") under section 364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property. Pursuant to the Original DIP Order, the result of the Priming Lien was that the Prepetition Secured Lenders' liens were subordinated to those liens securing the Original DIP Lenders' claims under the Original DIP Facility.

K.    The Refinanced DIP Facility

34.    In late 2006, in light of the then-favorable environment in the capital markets, the Debtors determined that they could replace their existing Prepetition Credit Facility and Original DIP Facility with a new facility combining the two on more favorable terms.  On

---

[10]    (See Final Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 9014 (I) Authorizing Debtors To Obtain Postpetition Financing, (II) To Utilize Cash Collateral And (III) Granting Adequate Protection To Prepetition Secured Parties (Docket No. 797).)

January 5, 2007, this Court entered an order[11] (the "DIP Refinancing Order") authorizing the
Debtors to refinance their secured debt by entering into the current postpetition financing
facility (the "DIP Facility") governed by the Revolving Credit, Term Loan, and Guaranty
Agreement (the "DIP Credit Agreement") with JPMorgan Chase Bank, N.A. serving as
administrative agent.  The DIP Facility was essentially a $4.5 billion replacement financing
facility, the proceeds of which the Debtors used to repay the $2.0 billion Original DIP Facility
and the approximately $2.5 billion outstanding on the Debtors' $2.825 billion Prepetition Credit
Facility.  The terms of the DIP Credit Agreement were specifically negotiated to maintain in all
material respects the relative priority between the Prepetition Secured Lenders and the Original
DIP Lenders (together, the "DIP Lenders").  The DIP Facility replaced the Original DIP Loan
with a replacement $1.75 billion first priority revolving credit facility and a $250 million first
priority term loan.

35.    The Prepetition Credit Facility was rolled into the DIP Facility as an
approximately $2.495 billion second priority term loan.  Pursuant to paragraph 11(a) of the DIP
Refinancing Order, the Debtors were authorized and directed to use the proceeds of borrowings
under the DIP Facility to irrevocably repay in full all obligations then due and payable to the
Prepetition Secured Lenders under the Prepetition Credit Facility and the Original DIP Order.
Upon repayment of all such obligations, all liens, mortgages, and security interests granted to
the Prepetition Secured Lenders under the Prepetition Credit Facility and the Original DIP
Order were deemed released and of no further force or effect.  (See DIP Refinancing Order ¶
11(a).)

---

[11]    (See Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And
Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Postpetition Financing And (II)
Authorizing Debtors To Refinance Secured Postpetition Financing And Prepetition Secured Debt (Docket No.
6461).)

36.      Like the Original DIP Facility, the DIP Facility is secured by (a) a perfected first priority lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets (subject to certain exclusions), (c) superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the DIP Facility, and (d) a first priority senior priming lien under section 364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property.

37.      The DIP Refinancing Order has been subsequently supplemented by orders entered on November 16, 2007 (Docket No. 10957), April 30, 2008 (Docket No. 13489), May 29, 2008 (Docket No. 13699), December 3, 2008 (Docket No. 14515) (the "Accommodation Order"), February 25, 2009 (Docket No. 16377), April 3, 2009 (Docket No. 16549), April 23, 2009 (Docket No. 16575), May 7, 2009 (Docket Nos. 16609 and 16610), and May 21, 2009 (Docket Nos. 16633 and 16634) (collectively, the "Supplemental DIP Orders"). The Accommodation Order authorized the Debtors to enter into an accommodation agreement (the "Accommodation Agreement"), which was subsequently amended, with the requisite percentage of the DIP Lenders, which, subject to the terms and conditions set forth therein, allows the Debtors to continue using the proceeds of the DIP Facility through June 30, 2009. The relief sought in this Motion is expected to further the Debtors' restructuring efforts in the current macroeconomic climate by, among other things, reducing the amount of administrative claims that the Debtors must satisfy to emerge from Chapter 11.

Applicable Authority

38.      As described above, paragraph 2(b)(ii) of the Amended Reclamation Procedures Order authorizes the Debtors to reserve certain defenses to the Reclamation Claims, including the Prior Lien Defense.  In accordance with paragraph 2(b)(ii) of the Amended

19

Reclamation Procedures Order, the Debtors in each Statement of Reclamation reserved the right

to assert the Prior Lien Defense.  In addition, the Debtors have reserved the Prior Lien Defense

and the other Reserved Defenses in each (a) Reclamation Letter Agreement, (b) Statement of

Reclamation resolving a reclamation demand by default pursuant to the Reclamation

Procedures, and (c) order or stipulation entered by this Court resolving proofs of claim filed in

these chapter 11 cases in which a claimant reserved its right to assert priority treatment on

account of a reclamation demand.

   39.  Reclamation rights are generally governed by section 2-702(2) of the

Uniform Commercial Code (the "UCC").  Section 2-702(2) of the UCC allows a seller of goods,

upon discovering that the buyer has received the goods on credit while insolvent, to reclaim the

goods upon a demand made within ten days after the buyer's receipt of the goods.  Under section

546(c) of the Bankruptcy Code, a seller of goods to a debtor, in the ordinary course of the seller's

business, retains its statutory or common law right to reclaim the goods if it establishes each of

the following elements by a preponderance of the evidence:

   (a)  that it has a statutory or common law right to reclaim the goods;

   (b)  that the goods were sold in the ordinary course of the seller's business;

   (c)  that the debtor was insolvent at the time the goods were received; and

   (d)  that it made a written demand for reclamation within the statutory time limit after the debtor received the goods.

11 U.S.C. § 546(c); Dairy Mart, 302 B.R. at 133; In re Victory Markets Inc., 212 B.R. 738, 741

(Bankr. N.D.N.Y. 1997).

   40.  The purpose of section 546(c) of the Bankruptcy Code is to recognize any

right to reclamation that a seller may have under non-bankruptcy law.  Dairy Mart, 302 B.R. at

132-33.  It is black letter law that section 546(c) does not create a new, independent right to

reclamation but merely affords the seller an opportunity to avail itself of any reclamation right it

may have under non-bankruptcy law.  Dana, 367 B.R. at 414; Dairy Mart, 302 B.R. at 133 (citing

Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.), 239 B.R. 261, 267 (Bankr. S.D.N.Y. 1999);

Victory Markets, 212 B.R. at 741; Toshiba Am., Inc. v. Video King of Ill., Inc. (In re Video King

of Ill., Inc.), 100 B.R. 1008, 1013 (Bankr. N.D. Ill. 1989)).

       41.    Once the right to reclamation is established, the court has discretion to

substitute an administrative claim or lien in place of the right to reclaim.  Dairy Mart, 302 B.R. at

133 (citing Pester Ref. Co. v. Ethyl Corp. (In re Pester Ref. Co.), 964 F.2d 842, 845 (8th Cir.

1992)).  If under non-bankruptcy law the value of the reclamation claim is zero, however, section

546(c) does not permit the court to enhance the reclamation claimant's position.  Dairy Mart, 302

B.R. at 133.  Thus, the reclaiming seller is entitled to receive only what it would have received

outside bankruptcy after payment of any superior claim.  Id. at 134.

       42.    Pursuant to section 2-702(3) of the UCC, a seller's right to reclamation is

subject to "the rights of a buyer in ordinary course or other good faith purchaser."[12]  UCC § 2-

702(3).  Holders of a prior perfected, floating lien on inventory, such as the Prepetition Secured

Lenders, are treated as good faith purchasers with rights superior to those of a reclaiming seller.

---

[12]  As of the Petition Date, the Debtors operated plants and facilities in the following 20 states:  Alabama, Arizona, California, Colorado, Georgia, Illinois, Indiana, Kansas, Michigan, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, and Wisconsin.  Each of these states has adopted section 2-702 of the UCC, with nine of these states further restricting parties' reclamation rights, making them subject to the rights of "other lien creditor[s]."  Compare Cal. Com. Code § 2702, Colo. Rev. Stat. § 4-2-702, 810 ILCS 5/2-702, Ind. Code § 26-1-2-702, Kan. Stat. Ann. § 84-2-702, Miss. Code Ann. § 75-2-702, N.J. Stat. Ann. § 12A:2-702, N.Y. U.C.C. Law § 2-702, Okla. Stat. tit. 12A, § 2-702, 13 Pa. Cons. Stat. § 2702, and Wis. Stat. § 402.702 (each adopting section 2-702 as written) with Ala. Code § 7-2-702, Ariz. Rev. Stat. Ann. § 47-2702, Ga. Code Ann. § 11-2-702, Mich. Comp. Laws § 440.2702, Mo. Rev. Stat. § 400.2-702, Ohio Rev. Code Ann. § 1302.76, S.C. Code Ann. § 36-2-702, Tenn. Code Ann. § 47-2-702, and Tex. Bus. & Com. Code Ann. § 2.702 (each revising section 2-702 to include the rights of "other lien creditor[s]").

<u>Dairy Mart</u>, 302 B.R. at 133; <u>Arlco</u>, 239 B.R. at 267-68; <u>In re Advanced Mktg. Servs., Inc.</u>, 360

B.R. 421, 426 (Bankr. D. Del. 2007).[13]

        43.    Moreover, "'a reclaiming seller is entitled to a lien or administrative expense

claim only to the extent that the value of the specific inventory in which the reclaiming seller

asserts an interest exceeds the amount of the floating lien in the debtor's inventory.'" <u>Dana</u>, 367

B.R. at 419 (quoting <u>Yenkin Majestic Paint Corp. v. Wheeling-Pittsburgh Steel Corp.</u> (In re

Pittsburgh-Canfield Corp.), 309 B.R. 277, 287 (B.A.P. 6th Cir. 2004)); <u>Dairy Mart</u>, 302 B.R. at

134; <u>Victory Markets</u>, 212 B.R. at 744.  This is because a secured creditor has the option of

proceeding against any of its collateral.  Marshalling of proceeds is not permissible because of

the prejudice that would result to the senior creditor by the imposed delay, added cost, or

inconvenience in collecting on its claim when it has a more readily available method to collect

the amount owed.  <u>Dairy Mart</u>, 302 B.R. at 134-35 (citing <u>Arlco</u>, 239 B.R. at 274-76).  Thus,

"[w]hen goods subject to a reclamation demand are liquidated and the proceeds used to pay the

---

[13]    The recent ruling by the United States Court of Appeals for the Sixth Circuit in <u>Phar-Mor, Inc. v. McKesson Corp.</u>, 534 F.3d 502 (6th Cir. 2008) is not applicable here.  In <u>Phar-Mor</u>, the Sixth Circuit held that because reclaiming creditors have a right under the UCC to reclaim the goods, the bankruptcy court was obligated under section 546(c) to grant the reclamation request or to grant the reclaiming creditor either an administrative expense priority claim or a lien on the proceeds resulting from the use of the goods by the debtor.  The Sixth Circuit concluded that the "subject to" caveat in the UCC does not allow a secured creditor's claim to defeat a seller's reclamation right.  <u>Phar-Mor</u>, 534 F.3d at 506.  First, the Sixth Circuit is not binding on this Court.  Second, the Sixth Circuit is <u>Phar-Mor</u> decision abrogates the "subject to" language in section 2-702(3) of the UCC by following a line of cases that has been justifiably criticized by many courts in this district and others.  <u>See, e.g.</u>, <u>Dana</u>, 367 B.R. at 419-21 (rejecting reclamation claimant's argument that payment in full of prepetition secured debt through postpetition financing rather than sale of claimed goods released liens and that right to reclaim was not affected by secured creditors); <u>Advanced Mktg. Servs.</u>, 360 B.R. at 426 (denying reclamation claimant's request for injunctive relief where prepetition secured debt would soon be satisfied by rollup under postpetition financing because subject goods were subject to secured lenders first priority liens).  The cases cited by the Sixth Circuit in support of its ruling in <u>Phar-Mor</u> improperly granted either an administrative expense priority without considering the reclamation claims' value in comparison to the secured creditors' interests or a lien in other assets of the bankruptcy estate in which the reclaiming seller had no interest.  <u>See, e.g.</u>, <u>Galey & Lord Inc. v. Arley Corp.</u> (In re Arlco, Inc.), 239 B.R. 261, 272-73 (Bankr. S.D.N.Y. 1999) ("[G]ranting an administrative claim or lien when the secured creditors have paid their claims out of the goods to be reclaimed 'would afford the reclamation seller something it does not have under the UCC – a priority interest in the buyer's assets other than the goods to be reclaimed.'" (quoting <u>Pester Ref. Co. v. Ethyl Corp.</u> (In re Pester Ref. Co.), 964 F.2d 842, 847 (8th Cir. 1992))).

secured creditor's claim, the reclaiming seller's subordinated right is rendered valueless." Id. at

134 (citing Arlco, 239 B.R. at 273). See also Dana, 367 B.R. at 419 ("if the value of any given

reclaiming supplier's goods does not exceed the amount of debt secured by the prior lien, that

reclamation claim is valueless"); Advanced Mktg. Servs., 360 B.R. at 427 ("'unsecured creditors

cannot invoke the equitable doctrine of marshalling'" (quoting Pittsburgh-Canfield, 309 B.R. at

291)); Allegiance Healthcare Corp. v. Primary Health Sys., Inc. (In re Primary Health Sys., Inc.),

258 B.R. 111, 117 (Bankr. D. Del. 2001) ("Permitting such a creditor (whose claim outside of

bankruptcy is nothing more than a general unsecured claim) to elevate its claim to administrative

or secured status in bankruptcy would give it a windfall.").[14]

44.    Under the Amended Reclamation Procedures Order, the Debtors have

reconciled all 855 reclamation demands asserted against them in these chapter 11 cases,

resolving 840 of such demands.  As noted above, 505 reclamation demands have been resolved

in the amount of zero.  With respect to the remaining 350 Reclamation Claims that are the

subject of this Motion, the Debtors preserved certain Reserved Defenses, including the Prior

Lien Defense, under section 546 of the Bankruptcy Code and section 2-702(2) of the UCC.

45.    This Court previously stated that "a reclaiming creditor does not have a

right of reclamation until it is established that either the secured creditor, with a prior interest in

its particular asset, has released the asset or has been paid in full."  (See August 17 Transcript

35:17-21.)  Therefore, the value of a reclamation claim will be determined by the decision that a

secured creditor makes with respect to its lien on the reclaimed goods.  See Arlco, 239 B.R. at

272.  Courts have consistently held that a reclaiming creditor has an in rem right and that if the

---

[14]    As noted by this Court at the August 17, 2006 hearing in discussing the rights of reclaiming sellers whose rights
are subject to those of a secured creditor, "priorities are to be determined narrowly in bankruptcy given the fact
that any priority takes money out of the pocket of those who do not have a priority."  (Hr'g Tr. 37:17-19, Aug.
17, 2006 (the "August 17 Transcript") (citing Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 547 U.S. 651,
667 (2006)).)  A copy of an excerpt from the August 17 Transcript is attached as Exhibit B hereto.

secured creditor has been satisfied out of the proceeds from the claimed goods or has released its

lien, the value of that in rem right is zero. Dana, 367 B.R. at 419.

46.     Courts in this jurisdiction have held that the simultaneous release of a

prepetition lenders' lien and the grant of a postpetition lien to postpetition lenders of a debtor's

prepetition and postpetition property constitutes an integrated transaction rendering the

reclamation claims valueless. See, e.g., Dana, 367 B.R. at 421 (finding that integrated

transaction rendered reclamation claims valueless, even when the prepetition secured lenders

were paid in full); Dairy Mart, 302 B.R. at 134 (holding that rollover lien pursuant to DIP

refinancing order is an integrated transaction).  Here, as described above, the DIP Refinancing

Order provides for the simultaneous release of the Prepetition Secured Lenders' liens upon full

repayment of the obligations to the Prepetition Secured Lenders from the DIP Facility.  The DIP

Refinancing Order also grants a lien to the DIP Lenders on all prepetition and postpetition

property of the Debtors that was unencumbered after the prepetition secured lender's liens were

released.  (See DIP Refinancing Order ¶¶ 11(a), 6(a).)

47.     "[I]f the value of any given reclaiming supplier's goods does not exceed

the amount of debt secured by the prior lien, that reclamation claim is valueless." Dana, 367

B.R. at 419.  The Debtors' prepetition secured debt under the Prepetition Secured Facility

totaled $2,579,783,051.85.  The Debtors' estimated possible liability for all of the Reclamation

Claims is approximately $17.5 million, the maximum possible liability is approximately $34.9

million, and the largest of the Reclamation Claims asserts a liability of $5,186,958.58.

Accordingly, the Reclamation Claims are valueless.  Based on the reasoning of Dairy Mart and

Dana, the subject goods related to Reclamation Claims are subject to the prior liens of the

Prepetition Secured Lenders.  Because the DIP Refinancing Order caused these liens to be

released, thereby satisfying the secured debt in part through the proceeds from the subject

goods, the Reclamation Claims are not entitled to administrative priority status. For these

reasons, the Reclamation Claims should be classified as general unsecured claims and afforded

the treatment of the same under a modified Confirmed Plan or any plan of reorganization of the

Debtors.

<u>Notice</u>

48.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Fourteenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered May 1, 2009 (Docket No. 16589). Furthermore, the

Debtors have complied with the Supplemental Case Management Order with respect to the

filing of this Motion and the need for expedited relief.[15] In light of the nature of the relief

requested, the Debtors submit that no other or further notice is necessary.

---

[15]    The Debtors have noticed this Motion for hearing on June 16, 2009. In compliance with the terms of the
Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee
regarding the relief sought in this Motion as well as the timing of its filing. The Creditors' Committee has
consented to this Motion's being heard on June 16, 2009. Because this Motion is being filed on fewer than 20
days' notice, parties-in-interest will have until June 12, 2009 to file an objection to this Motion.

WHEREFORE the Debtors respectfully request that the Court enter an order

(a) classifying the Reclamation Claims as general unsecured nonpriority claims for all purposes,

including for purposes of voting and distribution under any plan of reorganization, and (b)

granting the Debtors such other further relief as is just.

Dated:        New York, New York
              June 5, 2009

                            SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP
                            By:    /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr.
                                   John K. Lyons
                                   Ron E. Meisler
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois 60606
                            (312) 407-0700

                                         - and –

                            By:    /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti
                                   Thomas J. Matz
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                            Attorneys for Delphi Corporation, et al.,
                              Debtors and Debtors-in-Possession