Hearing Date and Time: June 10, 2009 at 9:30 a.m.
Objection Deadline: June 9, 2009 at 12:00 p.m.

DECHERT LLP
Glenn E. Siegel
Charles I. Poret
Daniel C. Malone
James O. Moore
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for Kensington International Limited,*
*Manchester Securities Corp. and*
*Springfield Associates, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                              :
In re:                                        :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                              Debtors.        :        Jointly Administered
-------------------------------------------------------------X

**OBJECTION OF KENSINGTON INTERNATIONAL LIMITED,**
**MANCHESTER SECURITIES CORP. AND SPRINGFIELD ASSOCIATES, LLC**
**TO DEBTORS' MOTION SEEKING TO MODIFY ITS PLAN OF REORGANIZATION**

    Kensington International Limited, Manchester Securities Corp. and Springfield

Associates, LLC (the "Manchester Entities"), in their capacity as DIP Lenders[1] to the Debtors

under that certain Revolving Credit, Term Loan and Guaranty Agreement among Delphi

Corporation, as Borrower, and the Subsidiaries of the Borrower, as Guarantors, and the Lenders,

dated January 9, 2007, as amended by the Amended and Restated Revolving Credit, Term Loan

---

[1]  All capitalized terms not expressly defined in this statement shall be construed to have
the same meaning as such terms have been defined in the DIP Credit Agreement (as
hereinafter defined).

and Guaranty Agreement among Delphi Corporation, as Borrower, and the Subsidiaries of the

Borrower, as Guarantors, and the Lenders (as thereafter amended, supplemented or otherwise

modified from time to time), dated as of May 9, 2008 (the "DIP Credit Agreement"), by and

through their undersigned counsel, hereby file this objection (the "Objection")[2] to the Debtors'

(A) Supplement to Motion for Order (I) Approving Modifications to Debtors' First Amended

Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and

(II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of

Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternative

Sale Hearing Date, dated June 1, 2009 [Docket No. 16646] (the "Plan Modification Motion").  In

support of this Objection, the Manchester Entities respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have proposed to modify their plan of reorganization (the "Proposed

Plan Modifications") pursuant to section 1127 of the Bankruptcy Code.  The Proposed Plan

Modifications seek to modify an already confirmed plan of reorganization, which, as required by

law, paid in full the DIP Lenders as providers of post-petition debtor-in-possession financing

("DIP Financing").  The DIP Lenders have superpriority, secured, administrative expense claims

because of their provision of DIP Financing.  The Proposed Plan Modifications would leave

unpaid the DIP Lenders while selling the assets in which the DIP Lenders have a security interest

to a third party.  The proceeds of the sale would satisfy the claims of junior administrative

---

[2]      The Manchester Entities also join in the Response and Partial Objection of the Collective
of DIP Lenders.

creditors but pay to the DIP Lenders a fraction of what these assets are worth.  To make matters worse, the Proposed Plan Modifications and the Debtor's contingency plan, an Alternative 363 Sale (defined below), seek to effectuate the transfer of these assets without providing the DIP Lenders with their contractual and legal rights to credit bid their claims in a competing transaction.  The apparent basis for this relief is that the Debtor will obtain the consent of the DIP Lenders to this transaction.

2.       The transaction, as proposed by the Debtors and as spelled out in the master disposition agreement among the Debtors, GM Components Holdings, LLC, General Motors Corporation ("GM"), Parnassus Holdings II, LLC ("Parnassus") and the Other Sellers and Other Buyers Party Thereto, dated June 1, 2009 (the "Master Disposition Agreement"), would transfer all of the Debtors' assets to GM and Parnassus in exchange for a package of value for the DIP Lenders that the Debtors apparently value at up to approximately 20 cents on the dollar, but which is actually economically worth much less than this, and indeed may be worth considerably less even than would be realized in a liquidation of the Debtors' assets.  Contrary to both law and the DIP Credit Agreement, the proposed transaction is a private sale that does not afford the DIP Lenders the opportunity to bid on the purchase of their collateral.  No cause exists for trampling the DIP Lenders' rights in this respect.

3.       In furtherance of a credit bid, the Manchester Entities together with certain members of the Collective of DIP Lenders have formed the DIP Lender Funding Group (the "DIP Lender Funding Group").  The Manchester Entities together with the members of the Collective of DIP Lenders hold in excess of $1 billion dollars of DIP Financing.  The DIP Lender Funding Group has received numerous expressions of interest from other DIP Lenders

and expects to be able to raise sufficient funds to finance any anticipated liquidity needs in connection with a credit bid.

## JURISDICTION AND STATUTORY PREDICATES

4.      This Court has jurisdiction over these bankruptcy cases arising under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceedings under 28 U.S.C. § 157(b)(2).  Venue for the Debtors' bankruptcy cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105, 363, 503 and 1129.

## BACKGROUND

6.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

7.      No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

### A. The Manchester Entities' Involvement in the Debtors' Bankruptcy Cases

8.      The Manchester Entities are among the DIP Lenders that provided additional DIP Financing under the Refinanced DIP Credit Facility (defined below).  The Manchester Entities and other DIP Lenders, acting in the best interests of the estates, have negotiated extensions to

the DIP Credit Agreement with the Debtors and other parties in interest in good faith and are continuing to seek a consensual resolution with the Debtors.

9.        In the course of their lengthy negotiations with the Debtors, the Manchester Entities and the other DIP Lenders have been accommodating and have demonstrated a willingness to make extraordinary concessions.  The DIP Lenders have provided a consistent and in fact remarkable level of support to the estates throughout the entire period of these cases and have even granted both access to cash collateral beyond the maturity date of the DIP Loans and an Accommodation Agreement (as defined below), knowingly permitting the continued dissipation of hundreds upon hundreds of millions of dollars of such collateral and further extending such Accommodation Agreement no less than five separate times, including as recently as yesterday, June 8, 2009, in an attempt to work in good faith to achieve a consensual resolution of these cases.  The DIP Lenders are prepared to negotiate a confirmable plan that would allow the Debtors to exit bankruptcy and assure that GM maintains continuity of supply, rather than force the Debtors to liquidate all of their assets.  Moreover, the Manchester Entities and the other DIP Lenders have consistently made clear that they will work with GM, the United States Department of Treasury (the "U.S. Treasury") and the Auto Task Force (the "Auto Task Force") to ensure that any transition of ownership to the DIP Lenders would not result in unnecessary disruption to the United States auto industry.  The Manchester Entities are willing to continue to negotiate in an effort to reach a consensual agreement that maximizes the value of the estates and achieves the best outcome for all affected parties.

### B.  The Debtors' Original DIP Credit Agreement and Modifications Thereto

10.    During the first quarter of 2007, the Debtors refinanced their post-petition credit

facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the

"Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate

of lenders.  By order dated January 5, 2007, this Court approved the Refinanced DIP Credit

Facility and entered the Order under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing

Debtors to Obtain Post-Petition Financing and (II) Authorizing Debtors to Refinance Secured

Post-Petition Financing and Prepetition Secured Debt [Docket No. 6461] (the "DIP Order").

11.    During the second quarter of 2008, the Debtors received this Court's approval and

the required commitments from its lenders to amend and extend its Refinanced DIP Credit

Facility (the "Amended and Restated DIP Credit Facility"), which amendments and extension

became effective in May 2008.  As a result of the amendment and restatement, the aggregate size

of the facility was reduced from $4.5 billion to $4.35 billion, consisting of a $1.1 billion first

priority revolving credit facility ("Tranche A"), a $500 million first priority term loan

("Tranche B") and a $2.75 billion second priority term loan (the "Tranche C Term Loan").

12.    After it became apparent that the Debtors would not be able to repay the DIP

Lenders in advance of the Amended and Restated DIP Credit Facility's December 31, 2008

maturity date, the DIP Lenders negotiated with the company a pre-emptive forbearance

agreement to provide the Debtors with additional time to emerge from chapter 11 bankruptcy and

to ensure that liquidation would not occur (the "Accommodation Agreement").  On December 3,

2008, the Bankruptcy Court entered an order granting the Debtors' motion for an order

approving the Accommodation Agreement, dated December 3, 2008.  The Accommodation

Agreement allowed the Debtors to continue using certain of the proceeds of the post-petition

financing facility through June 30, 2009.  In addition, the Accommodation Agreement included

milestones required to be met to preserve the forbearance period, including, among others:

(i) that by February 27, 2009 *the Debtors file a plan of reorganization that is acceptable to the*

*DIP Lenders* and outlines a path for the Debtors' emergence; and (ii) that the DIP Loan be

governed by a borrowing base formula that helps to protect DIP Lenders against a shrinking pool

of collateral.

       13.     As a result of the rapid decline in the auto sector, the Debtors approached the DIP

Lenders with a request to renegotiate certain of the above-mentioned milestone provisions.  On

February 25, 2009, the Bankruptcy Court entered an order approving amendments to the

Debtors' Accommodation Agreement that, among other things, modified certain of the

milestones that the Debtors were required to satisfy to maintain certain protections under the

Accommodation Agreement, including provisions allowing GM to provide critical incremental

liquidity to the Debtors.

       14.     When the U.S. Treasury announced through its Auto Task Force that it was

unwilling to allow GM to provide the Debtors with certain liquidity advances by the milestone

dates and needed more time to review GM's relationship with the Debtors before agreeing to a

business plan involving the sale of certain facilities, the DIP Lenders granted the Auto Task

Force several additional windows of time to assess the situation and establish a timeline for

consensual resolution.  On April 3, 2009, the Bankruptcy Court set a date by which the Auto

Task Force was obligated to reach a consensual timeline for emergence with the DIP Lenders or

else the DIP Lenders would be permitted to direct the exercise of remedies against the Debtors,

including foreclosure on assets and liquidation.  But on the deadline, April 23, 2009, no such

consensual agreement had been reached.  In good faith, the DIP Lenders once more agreed to

permit the continued use (i.e., dissipation) of their cash collateral in order to allow the Debtors to

continue to produce parts for GM in North America on an even more dramatically uneconomic

basis than has historically been the case in light of the well-publicized and precipitous recent

declines in domestic industry sales volumes.  In connection with the DIP Lenders' agreement to

forbear exercising their remedies on default, this Court approved further amendments to the

Accommodation Agreement, extending the milestone dates in the Accommodation Agreement

and providing interim liquidity by lowering the required cash collateral balances to facilitate

continued discussions regarding a consensual resolution of the Debtors' chapter 11 cases.

     15.     Subsequently, during the months of May and June of this year, the DIP Lenders

approved several further extensions of the Accommodation Agreement and permitted continued

use of cash collateral, on recent occasions in the absence of receiving any fee or other

remuneration whatsoever, in a continued attempt to resolve these cases constructively and

consensually.

### C.  **The Debtors' Plan of Reorganization**

     16.     On September 6, 2007, the Debtors filed the Joint Plan of Reorganization of

Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and the

Disclosure Statement with Respect to Joint Plan of Reorganization of Delphi Corporation and

Certain Affiliates, Debtors and Debtors-In-Possession.  On December 10, 2007, the Debtors filed

the First Amended Joint Plan of Reorganization of Delphi Corporation Certain Affiliates,

Debtors and Debtors-In-Possession (the "<u>Confirmed Plan</u>") and an accompanying disclosure statement.  On that same day, this Court entered an order approving the disclosure statement and related solicitation procedures.  On January 25, 2008, this Court entered an order confirming the plan, which became final on February 4, 2008.

17.     The Confirmed Plan provided for funding plan distributions of (i) $2.55 billion in equity investment, including a rights offering; (ii) debt financing consisting of a $1.6 billion asset-based revolving loan facility; $3.7 billion of first-lien funded financing, and $1.5 billion of second-lien funded financing; (iii) existing cash balances; and (iv) the operations of the Debtors. Confirmed Plan at § 7.12.  The Tranche C Term Loan was deemed an allowed administrative claim under section 2.1 of the Confirmed Plan.  The principal of the Tranche C Term Loan was to be paid in full in cash on the effective date of the plan (the "<u>Effective Date</u>").  Confirmed Plan at § 10.1(b).

18.     Pursuant to the Confirmed Plan, a group of investors was to invest $2.55 billion in capital to enable the Debtors emerge from bankruptcy.  The Debtors announced on April 4, 2008 that they would be unable to substantially consummate the Confirmed Plan.  Press Release, Delphi Corp., Delphi Comments on Plan Reorganization Closing Efforts (Apr. 4, 2008) <u>available at</u> http://delphidocket.com/documents/0544481080404000000000001.pdf.

**D.   <u>The Plan Modification Motion</u>**

19.     More than 18 months after confirmation of its still-born plan of reorganization, the Debtors now seek to modify the Confirmed Plan pursuant to the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (as Modified) (the "<u>Modified Plan</u>").  As described in the Debtors' Plan Modification Motion

9

and the Supplement to the First Amended Disclosure Statement With Respect to First Amended

Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-

In-Possession (the "<u>Disclosure Statement Supplement</u>"), the Debtors have reached an agreement

with Parnassus, an affiliate of Platinum Capital Equity Partners, L.P. ("<u>Platinum</u>"), with support

from GM and the U.S. Treasury.

20.     The Debtors are moving for an order allowing them to proceed on an expedited

basis to solicit votes for the Modified Plan.  The voting and objection deadline contained in the

Modified Plan is scheduled as July 14, 2009, and a final hearing on the Modified Plan is

scheduled for July 23, 2009.

21.     The agreements for which the Debtors seek this Court's approval under the

Modified Plan include: (i) the Master Disposition Agreement; (ii) the DIP transfer agreement,

which governs the sale of the Debtors' assets under the DIP Credit Agreement; and (iii) a

settlement agreement with the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") that would

grant the PBGC an unsecured non-priority claim and a cash payment; and (iv) other government

approvals.  Although the terms of the transition agreements between the Debtors, GM and

Platinum are not yet fully known, the DIP Lender Funding Group expects that any credit bid

financed by them would not necessarily seek to disrupt agreements reached with other

stakeholders in Delphi.

22.     The Modified Plan and the Disclosure Statement Supplement provide scant

information about the agreements reached among GM, Platinum and Delphi.  But GM filed a

Form 8-K, dated June 1, 2009, that gives a slightly better idea of the proposed transactions

contemplated by the Modified Plan and Master Disposition Agreement.[3]  GM has agreed to purchase certain of the Debtors' facilities in the United States (the "UAW Plants")[4] and the Debtors' global steering business.  GM also has agreed to provide a capital investment and back-up financing to Parnassus, which will acquire substantially all of the Debtors' remaining assets.[5] Certain excluded assets and liabilities will be retained by the Debtors' and later sold or liquidated.

23.    Additionally, GM has agreed to provide financing through a $250 million credit facility to fund the Debtors' business operations, provided that the transactions contemplated by the Master Disposition Agreement are consummated and either the Modified Plan or the Alternative 363 Sale (defined below) is approved.  The U.S. Treasury signed off on GM's additional financing.  GM also will pay or assume approximately $900 million of the Debtors' obligations related to its Amended and Restated DIP Credit Facility and $200 million of other of the Debtors' obligations, which are junior in priority to the DIP Lenders' claims and are to be shared with Parnassus.  Both GM's administrative claims of approximately $300 million associated with its credit agreement with the Debtors and its transferred pension costs of approximately $1.6 billion for hourly employees will be waived at the closing of the transactions contemplated by the Master Disposition Agreement.

---

[3]    Notably, GM's Form 8-K references that certain Secured Superpriority Debtor-in-Possession Credit Agreement among GM, the Guarantors, and the Lenders that are parties thereto dated as of June 3, 2009, which presumably protects the very rights of DIP lenders that GM seeks to trample in these cases.

[4]    GM has agreed to acquire facilities in Kokomo, Indiana; Rochester, New York; Lockport, New York; and Grand Rapids, Michigan.

[5]    These assets include the Debtors' headquarters in Troy, Michigan.

24.     The Modified Plan is doomed from the start, given its failure to recognize the rights of the Debtors' most senior administrative creditors, the DIP Lenders.  Nonetheless, the DIP Lender Funding Group is interested in funding an alternative transaction with respect to Delphi.  The DIP Lender Funding Group expects that any credit bid they finance would also offer GM the right to purchase the UAW Plants from Delphi.

25.     The Debtors attribute the value offered to the Tranche C DIP Lenders under the Plan Modification Motion at approximately 20 cents on the dollar.[6]  Such a recovery falls substantially short of the true value of the DIP Lenders' collateral under either a going-concern, liquidation or any other scenario.  By way of observation, it is a whopping 40-70% lower than the market price of claims under the Tranche C Term Loan (approximately 35.25 cents on the dollar) at the time the Debtors filed the Plan Modification Motion.

26.     Finally, the Plan Modification Motion contemplates that, in the event that the Modified Plan is not confirmed, the Debtors will effect the Master Disposition Agreement as modified by the 363 Implementation Agreement (the "Alternative 363 Sale").  The 363

---

[6]     By no means do the Manchester Entities concede that the recovery is as much as 20% and do not even have the information by which they can appropriately determine the true value of the proposed recovery.  A 20% recovery represents, after all, nearly the best case recovery to the Tranche C DIP Lenders in the event that all the contingent proceeds are actually received and the Tranche C DIP Lenders are paid market rates of interest in connection with any amounts not received up front.  The Manchester Entities believe the recovery is more likely in the range of 10-20% and is itself an extreme and tenuous projection because it requires the assumption that the Tranche C DIP Lenders actually receive $141 million from a contingent litigation claim and that the Class C interest in Parnassus actually yields $144.5 million under a waterfall based upon projected future operations.  The only assured payment to the Tranche C DIP Lenders is $291 million in cash, itself only approximately 10% of the full amount owed.

Implementation Agreement has not yet been filed, and it cannot be approved unless it is modified

to provide for the rights of the DIP Lenders to credit bid for their collateral.

## ARGUMENT

## I.  OBJECTION TO THE PROPOSED PLAN MODIFICATIONS

### A.  The Modified Plan is Not Confirmable Because the Manchester Entities Are DIP Lenders and Are Entitled to be Paid in Full.

#### a.  All Operative Documents in these Bankruptcy Cases Recognize the Superpriority Administrative Status of the Manchester Entities' Claims.

27.    The Modified Plan is not confirmable because it does not provide for the full

payment of the DIP Lenders' administrative claims, even though such claims were bargained-for

among the parties and recognized by this Court.  The DIP Credit Agreement provides the terms

under which the Manchester Entities and the other DIP Lenders extended DIP Financing to the

Debtors.  Those terms include superpriority status for the DIP Lenders' claims, as provided in

section 2.25 of the DIP Credit Agreement, which provides:

> …pursuant to Section 364(c)(1) of the Bankruptcy Code, [the DIP
> Lenders' claims] shall at all times constitute allowed claims in the
> Cases having priority over any and all administrative expenses,
> diminution claims (including the Replacement Liens and Junior
> Adequate Protection Liens) and all other claims against the
> Borrower and the Guarantors, now existing or hereafter arising, of
> any kind whatsoever, including all administrative expenses of the
> kind specified in Sections 503(b) or 507(b) of the Bankruptcy
> Code…

28.    Both the DIP Order and the Confirmed Plan recognize the DIP Lenders'

superpriority administrative status.  The DIP Order provides:

> Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the
> DIP Obligations shall constitute allowed claims against the
> Debtors with priority over any and all administrative expenses,
> diminution claims…and all other claims against the Debtors, now

13

> existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses…(the "Superpriority Claims"), …which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof….

DIP Order at ¶ 5.  The DIP Lenders' claims are allowed as administrative expenses under section 2.1 of the Confirmed Plan.  As such, the DIP Lenders' cannot be paid less than the full amount owed without their consent and without the right to bid in their debt.

29.    Despite these protections afforded to the DIP Lenders under the DIP Credit Agreement, the DIP Order and the Confirmed Plan, the Debtors now seek to subvert the DIP Lenders' rights by paying them less than the full amounts to which they are entitled.  See Modified Plan at §§ 2.1, 7.8.  The amounts owed to the Manchester Entities and other DIP Lenders are not prepetition claims that can be compromised and altered under a chapter 11 plan.  The DIP Lenders have superpriority administrative status for the full amount of the DIP Financing assistance that they provided to the Debtors throughout these bankruptcy cases.  This superpriority status is inviolate, and the Modified Plan cannot be confirmed because of its failure to pay in full the claims of the Manchester Entities and the other DIP Lenders.

**b.  The Bankruptcy Code Affords the Greatest Possible Protection to the Manchester Entities and Other DIP Lenders.**

30.    The Bankruptcy Code offers near ironclad protection to lenders that provide DIP Financing because such protection is critical to attracting the funding that facilitates the reorganization process.  Section 503(b) of the Bankruptcy Code authorizes the allowance of administrative expenses.  Section 1129(a)(9) requires that the full amount of allowed administrative expense claims be paid in cash in full on the Effective Date, unless the holder of the claim has agreed otherwise.

31.     When the estate is administratively insolvent, the administrative claimants are paid and the remaining creditors of the estate receive no payment.  See In re Midway Airlines Corporation, 406 F.3d 229, 241 (4th Cir. 2005) (reversing decisions of bankruptcy court and district court that allowed only part of an administrative claim under section 503(b)).

32.     While the Manchester Entities and other Tranche C DIP Lenders would receive, without their consent, less than full payment for their allowed administrative expense claims under the Modified Plan, the Tranche A and Tranche B claims would be satisfied in full and lower priority creditors also would receive remuneration.  See Modified Plan at Article V.  The Bankruptcy Code does not permit such disparate treatment of DIP lenders.

### c.   The DIP Lenders Will Not Consent to the Modified Plan.

33.     The only possibility of confirming the Modified Plan is to obtain the consent of the DIP Lenders.  But the DIP Lenders will not consent to the Modified Plan because the DIP Loan is not being paid in full and the DIP Lenders do not have the opportunity to credit bid their superpriority secured administrative claim.  Therefore, if the Debtors attempt to confirm the Modified Plan, the Manchester Entities will file an appropriate objection.

34.     The Modified Plan is not confirmable because it provides for the full payment of some, but not all, administrative claims, it provides for the payment of lower priority claims before all administrative claims are paid in full, and the Debtors cannot obtain the consent of each administrative claimant to their treatment under the Modified Plan.

d. **Substantial Modifications to the DIP Order**
**that Reduce the Rights of DIP Lenders Without**
**Their Approval Will Chill Future Post-Petition Financing.**

35.    Finally, the Debtors' Proposed Plan Modifications threaten to alter significantly and adversely the treatment of the Manchester Entities' Tranche C Term Loan.  Court approval of such amendments, without first obtaining the DIP Lenders' approval, will have a chilling effect on future post-petition financing to chapter 11 debtors.  The general purpose of section 364 of the Bankruptcy Code is to induce lenders to extend credit after the commencement of a chapter 11 case.  DIP lenders have few incentives to lend to debtors other than to protect their pre-petition credit position or to profit from a new investment opportunity.  Because lenders are reluctant to provide loans to distressed entities, the Bankruptcy Code expressly includes inducements, such as the administrative priority incentives under section 503(b) and the superpriority status afforded to DIP Lenders' liens under section 364(c), effectively rendering DIP financing among the safest types of lending.[7]  Moreover, in today's economic climate where there is a dearth of financing, courts generally recognize even greater incentives than those already expressly stated in the Bankruptcy Code, as long as they are not egregious and do not attempt to curtail the rights the debtor filed for bankruptcy to access.  Norton Bankruptcy Law and Practice 3d, § 94:33 (2009).

36.    For example, it is customary for DIP lenders to exert oversight in chapter 11 financing arrangements.  Id. § 94:21.  Specifically, it is not atypical for a DIP lender to demand that the debtor agree not to file a plan of reorganization that impairs that DIP lender's claims.

---

[7]    Section 364(c) of the Bankruptcy Code states that the Court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) . . . ."

See, e.g., Official Committee of Unsecured Creditors v. New World Pasta Co., 322 B.R. 560 (M.D. Pa. 2005) (upholding bankruptcy court approval of provision allowing lender to cease funding to debtors in an event that a plan was crammed down on lender).  The DIP Lenders in these cases conditioned their extension of approximately $4.5 billion in DIP Financing on their receiving superpriority status for their claims.  See DIP Credit Agreement at ¶ 2.25.

37.    In addition, although compliance with provisions of a pre-petition loan document is not necessarily enforceable in bankruptcy, DIP lenders can enforce the debtor's compliance with post-petition loan documents, and DIP lenders rely on this protection when deciding to lend to debtors.  Here, the DIP Lenders relied first on the DIP Credit Agreement when they provided DIP Financing to the Debtors and later on the Accommodation Agreement when they agreed to forbear exercising their remedies on the Debtor's default.

38.    Accordingly, if the Debtors' Plan Modification Motion is granted, the relief requested therein would wreak havoc on the availability of post-petition lending for troubled companies, as no secured creditor would be sure the covenants agreed to in the loan documents and approved by the bankruptcy court would be respected.

### B.  The Modified Plan Cannot Be Confirmed Because it Does Not Provide Procedures for the DIP Lenders to Credit Bid.

39.    The Debtors' Modified Plan calls for confirmation pursuant to section 1129(b) of the Bankruptcy Code and a sale of substantially all assets of the Debtors' businesses to Parnassus and GM.  The Modified Plan does not provide an opportunity for secured creditors, such as the Manchester Entities and other DIP Lenders, to credit bid on the proposed sales.  The Modified Plan is not confirmable because such a sale cannot be conducted without providing procedures for secured creditors to credit bid.

40.     Section 1129(b)(2)(A)(ii) requires that any sale of secured assets under a plan of
reorganization is subject to section 363(k) of the Code.  Section 363(k) allows a lienholder to bid
up to the entire amount of the claim when a sale of property out of the ordinary course of
business is proposed, unless the court orders otherwise for cause.  Section 363(k) empowers
secured creditors to bid the total face value of their claims.  It does not limit credit bids to the
economic value of claims as determined under section 506(a) of the Bankruptcy Code.  In re
SubMicron Sys. Corp., 432 F.3d 448 (3d Cir. 2006).

41.     The interplay of sections 1129(b)(2)(A)(ii) and 363(k) require that "property
encumbered by a lien in favor of a non-recourse secured creditor should be sold at [public] sale
or, if the property is not sold at auction, the secured creditor should be allowed to match any
offer made by a prospective purchaser at a private sale."  In re Woodridge North Apts., 71 B.R.
189, 191 (Bankr. N.D. Cal. 1987) citing 5 Collier on Bankruptcy, ¶ 1111.02 at 1111-23-24 (15th
ed. 1987).  By allowing an undersecured creditor to credit bid, the creditor can protect its interest
in the full value of the property.  See In re California Hancock, Inc., 88 B.R. 226, 231 (B.A.P.
9th Cir. 1988).

42.     Reorganization plans typically include procedures for selling assets outlined in the
plan, such as marketing the assets, signing an agreement with a stalking horse bidder and
conducting an auction to the highest and best bidder.  The Modified Plan does not provide for a
public auction or competitive bidding of any kind.  It offers no way for the DIP Lenders or other
secured creditors to protect the full value of their interests in the property of the estate.

43.     Furthermore, such a sale does not legally authorize the Debtors to pay the DIP
Lenders in less than full satisfaction of their claims.  A creditor that is not satisfied in full

18

through the sale of the collateral on which it holds a lien and was not allowed to credit bid retains

a deficiency claim.  See Woodridge North Apts., 71 B.R. at 192.  The Debtors, however, are

required to pay the administrative claims of the DIP Lenders in full before paying any other

claimant with a lower priority.

## II.    LIMITED OBJECTION TO THE ALTERNATIVE 363 SALE

### A.  **The Alternative 363 Sale as Proposed by the Debtors Cannot Be Consummated.**

44.    The Alternative 363 Sale will fail because the Debtors must obtain the consent of

the DIP Lenders before seeking a sale that would impact the DIP Lenders' liens.  See DIP Credit

Agreement at ¶10.09 (requiring the prior consent of each affected DIP Lender for any attempt to

"reduce the principal amount of any Loan or the rate of interest payable thereon").  The

Alternative 363 Sale also will fail because the DIP Lenders will not consent to the Alternative

363 Sale without a full and unfettered right to credit bid their loans.

45.    The Debtors' proposed Alternative 363 Sale expressly violates both the DIP

Credit Agreement and the DIP Order.  If the Parnassus and GM transactions contemplated in the

Plan Modification Motion were accomplished through the Alternative 363 Sale, without allowing

for a credit bid and without the consent of the DIP Lenders, they would violate the DIP Credit

Agreement, which provides that the Debtors cannot modify the DIP Lenders' rights and remedies

under the DIP Credit Agreement.  See DIP Credit Agreement at ¶ 13(a)-(d).  Were the Debtors'

Alternative 363 Sale to be approved, it would result in a less than par recovery for the DIP

Lenders, in direct contravention of the DIP Order, which grants the DIP Lenders' claims the

status of administrative expenses that must be paid in full.  DIP Order at ¶ 5.

46.     Moreover, the Alternative 363 Sale violates section 363(k) of the Bankruptcy

Code, which allows a secured lender to protect against the sale of their collateral for less than the

amount of debt owed to them by the estates.  Section 363(k) of the Bankruptcy Code is intended

to allow a secured creditor to prevent the debtor from selling collateral for less than the amount

of its debt.  See, e.g., In re Chrysler LLC, et al., Case No. 09-50002 (AJG), Opinion Granting

Debtors' Motion Seeking Authority to Sell Substantially All of the Debtors' Assets at 19,

(Bankr. S.D.N.Y. June 2, 2009) [Docket No. 3073] (recognizing the first-lien lenders' right to

credit bid); see also In re Terrace Gardens Park P'ship, 96 B.R. 707, 712 (Bankr. W.D. Texas

1989) (section 363(k) "allows a secured creditor to bid . . . to prevent a sale over its objection for

less than what the creditor is due"); In re Collins, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995)

(section 363(k) provides "a secured creditor the right to bid in the amount of its debt to prevent a

sale over its objection for less than what it is owed").

47.     A secured creditor therefore has the choice whether to accept the sale of the

collateral, or if the price of the sale is unsatisfactory, to purchase the collateral itself.  These

procedures specifically protect against the outcome proposed by the Alternative 363 Sale, in

which a secured lender's collateral is sold under section 363 for less than the secured lender itself

would offer to pay for that collateral.

48.     The Plan Modification Motion makes no assertions as to cause for denying the

DIP Lenders such rights.  Indeed, the equities weigh heavily in favor of protecting the DIP

Lenders' right to credit bid in these cases, as the Alternative 363 Sale would allow a favored

bidder to spirit valuable assets away from the estates for far less than their worth, leaving the

estates' stakeholders holding the bag, precisely the result which section 363(k) is intended to avert.

###    B.   The Alternative 363 Sale is a Private Sale
that Fails to Maximize the Value of the Estates.

49.    A debtor has a fiduciary obligation to maximize the value of its estate for all stakeholders.  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352 (1985) (bankruptcy trustee "has the duty to maximize the value of the estate"); cf. Revlon Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986) (duty of the board in a sale of the company is obtain the best price for the shareholders).  Accordingly, when seeking approval of a sale outside the ordinary course of business, the debtor is required to demonstrate that it obtained the highest and best price for the assets to be sold, regardless of whether the sale is to be conducted privately or through an open auction process.  See, e.g., In re Integrated Res., Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (holding that, for the bankruptcy court to approved a proposed sale of assets, a debtor must generally prove that the "proffered purchase price is the highest and best offer").

50.    The Alternative 363 Sale seeks to accomplish a private sale of substantially all of the Debtors' assets, despite serious interest from the DIP Lenders in effectuating an alternative transaction.  Private sales represent a value-maximizing alternative only where a public auction is not feasible or is unlikely to fetch competitive bids.  See, e.g., In re Trans World Airlines, Inc., Case No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. April 2, 2001) (approving private sale where the debtor "had no other strategic transaction available to it and had *no other offer for value* to which it could turn" [emphasis supplied]).  In fact, long-standing bankruptcy practice establishes that a public auction represents the best method of obtaining the highest and best

price for estate assets.  See id. ("[t]he auction procedure has developed over the years as an

effective means of producing an arm's length fair value transaction"); see also In re Nicole

Energy Servs., 385 B.R. 201, 234-35 (Bankr. S.D. Ohio 2008) (acknowledging that in asset sales

with only one bidder, prices offered were less likely to be reliable and should be approved only

after "careful and heightened scrutiny").

51.        Accordingly, courts will examine a private sale that does not provide for a

competitive bidding process with heightened scrutiny to ensure that the purchaser is not

receiving a "sweetheart deal."  In re Embrace Sys. Corp., 178 B.R. 112, 126 (Bankr. W.D. Mich.

1995).  General Order M-331 in this District codifies this heightened scrutiny by placing the

burden on the debtor to justify use of a private sale as opposed to a public auction.  See General

Order M-331, Guidelines for the Conduct of Asset Sales at § I.D.3 ("if no auction is

contemplated . . . the sale motion must so state and explain why such sale is likely to maximize

the sale price").

52.        The Debtors make the conclusory assertion that "the economics of the

transactions contemplated in the Master Disposition maximizes the value of the estate."  Plan

Modification Motion at ¶ 69.  The Debtors however, make no showing of their efforts to shop the

estates' assets to more than one purchaser before proposing a private sale to that purchaser.

See In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (debtors'

fiduciary duty to maximize the estate includes "testing the marketplace for expressions of

interest").  Even worse, the structure of a private sale does not allow the Debtors to

accommodate the expressed interest on the part of the DIP Lenders to bid for the estates' assets,

much less evaluate their bid.

53.     The Alternative 363 Sale amounts to a lockup agreement, wherein the proposed purchasers are guaranteed a sweetheart deal and are simultaneously immunized from forthcoming higher and better offers.  Moreover, this arrangement is contemplated by the Debtors despite inbound interest on the part of demonstrably capable lenders with serious intentions to bid on the property of the estates.  The refusal to implement procedures for evaluating competing bids in the Alternative 363 Sale flies in the face of bankruptcy law as well as the Debtors' fiduciary duties to the estates.  Therefore, the Alternative 363 Sale cannot be approved, and an alternative transaction must be considered.

### C.  A Fair and Open Sale Process Would Bring Greater Value to the Estates.

54.     In contrast to the Alternative 363 Sale, a fair and open 363 process would allow for the greatest value to be brought into the estate so that the greatest value for all creditors results.  See Collier on Bankruptcy § 363.02(2) (stating, "[T]he ultimate purpose [of a 363 sale] will be to obtain the highest aggregate bid" and ". . . reorganizing the estate in a manner most advantageous to creditors.").

55.     The DIP Lenders are not opposed to supporting the Alternative 363 Sale if the process proposed by the Debtors will be amended to be fair and open so that the DIP Lender Funding Group may finance a credit bid for the Debtors' assets.  In addition, in a 363 sale, and pursuant to the DIP Credit Agreement, the DIP Lenders should have the right to credit bid the entirety of their claims, pursuant to 363(k) without prejudicing their rights to foreclose on the collateral securing their loans.  Further, in order to trump the DIP Lenders' credit bid, a competing and higher offer would have to be presented to the Debtors.

56.    The Alternative 363 Sale as proposed by the Debtors cannot be consummated. This Court should order a sale process that is open and fair to all parties, achieves the Debtors' objectives of emerging from their bankruptcy cases, and maximizes the value of the estates. To ensure these results, the Manchester Entities ask that they and the other DIP Lenders have the opportunity to reach an agreement with the Debtors on forms of bidding procedures and a non-disclosure agreement. Failing the parties' ability to agree on the forms within five days after the entry of an order on the Plan Modification Motion, the Manchester Entities requests that this Court allow them to submit their own bidding procedures and non-disclosure agreement.

## CONCLUSION

57.    The Manchester Entities respectfully request that, for the reasons stated in the

Objection, this Court deny the Plan Modification Motion unless the DIP Lenders are afforded

their right to credit bid.

Dated: June 9, 2009
      New York, New York

/s/ Glenn E. Siegel
Glenn E. Siegel
Charles I. Poret
Daniel C. Malone
James O. Moore
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for Kensington International
Limited, Manchester Securities Corp. and
Springfield Associates, LLC*

On Brief:
Nicole Duva
Bret Harper
Jennifer Kernkamp
Alessandra Tebaldi-Castelli