DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 450-6501
Donald S. Bernstein
Benjamin S. Kaminetzky
Brian M. Resnick

*Counsel to JPMorgan Chase Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |
|---|---|
| | : |
| **In re:** | : |
| | : **Chapter 11 Case No.** |
| | : |
| **DELPHI CORP., et al.,** | : **05-44481 (RDD)** |
| | : |
| | : **(Jointly Administered)** |
| **Debtors.** | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### OBJECTION OF JPMORGAN CHASE BANK, N.A. TO THE DEBTORS' SUPPLEMENT TO PLAN MODIFICATION APPROVAL MOTION

JPMorgan Chase Bank, N.A. ("**JPMC**"), the Administrative Agent (the

"**Administrative Agent**") for the Debtors' Amended and Restated Revolving Credit,

Term Loan and Guaranty Agreement dated as of May 9, 2008 (as amended, the "**DIP**

**Credit Agreement**"), respectfully submits this objection (the "**Objection**") to the

Debtors' Supplement to Plan Modification Approval Motion (the "**Motion**").[1]  In support

of its Objection, JPMC respectfully states as follows:

---

[1] Except as otherwise stated, all capitalized terms appearing herein retain the meanings assigned to them in Debtors' Motion.

**BACKGROUND**

**The DIP Credit Agreement**

1.    Pursuant to this Court's order dated January 5, 2007,[2] the Debtors entered

into a debtor-in-possession Revolving Credit, Term Loan and Guaranty Agreement (as

amended from time to time, the "**DIP Facility**") with certain lenders party thereto

(together with their successors and assigns, the "**DIP Lenders**") and the Administrative

Agent, which was comprised of (i) a first-priority revolving loan and letter of credit

facility in an amount not to exceed $1,750,000,000 (the "**Tranche A Loans**"), (ii) a first-

priority term loan facility in the amount of $250,000,000 (the "**Tranche B Loans**") and

(iii) a second-priority term loan facility in the amount of $2,495,820,240.59 (the

"**Tranche C Loans**").  The Debtors used the proceeds of the Tranche A Loans and

Tranche B Loans to refinance their existing debtor-in-possession facility dated as of

November 21, 2005, and for working capital and other general corporate purposes.  The

Debtors used the proceeds of the Tranche C Loans to refinance the indebtedness under

their secured pre-petition facility dated as of June 14, 2005 (the "**Pre-Petition Facility**").

The Debtors decided to refinance the Pre-Petition Facility with the proceeds of the

Tranche C Loans in order to save approximately $8 million per month in financing costs.[3]

---

[2] Order under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors to Obtain Post-Petition Financing and (II) Authorizing Debtors to Refinance Secured Post-Petition Financing and Prepetition Secured Debt [Docket No. 6461] (as amended and supplemented from time to time, the "**DIP Refinancing Order**").

[3] Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors to Obtain Postpetition Financing and (II) Authorizing Debtors to Refinance Secured Postpetition Financing and Prepetition Secured Debt ¶ 14 [Docket No. 6180].

Although some of the Tranche C Lenders were lenders under the Pre-Petition Facility

(the "**Pre-Petition Lenders**"), less than half of the exposure under the Pre-Petition

Facility was rolled into Tranche C Loans under the DIP Facility.  Over half of Tranche C

Loans were provided by DIP Lenders who were not Pre-Petition Lenders or represent

increases in exposure by Pre-Petition Lenders who provided capital to the Debtors in

amounts exceeding their previously outstanding pre-petition loans.

2.      The DIP Refinancing Order provides, *inter alia*, that the obligations under

the DIP Facility (the "**DIP Claims**") constitute allowed super-priority claims with

priority over any and all administrative expenses pursuant to section 364(c)(1) of the

Bankruptcy Code (subject to certain limited exceptions).  (DIP Refinancing Order § 5(a)).

The DIP Claims are secured by first priority liens on all of the Debtors' assets (subject to

certain limited exceptions) pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the

Bankruptcy Code.  (DIP Refinancing Order § 6).  The DIP Refinancing Order may not be

modified without the prior written consent of the Administrative Agent.  (DIP

Refinancing Order § 13(b)).

3.      On November 20, 2007, the DIP Lenders agreed to extend the DIP

Facility's maturity date from December 31, 2007 to July 1, 2008 to provide the Debtors

with adequate time to obtain requisite consent for their plan of reorganization.[4]  On May

9, 2008, the DIP Lenders granted the Debtors a further extension of the DIP Facility's

maturity to December 31, 2008 in order to ensure that the Debtors had sufficient liquidity

_____

[4] Order Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And
Authorizing Debtors To (I) Extend Maturity Date Of DIP Facility, (II) Enter Into Related Documents, And
(III) Pay Fees In Connection Therewith [Docket No. 10957].

3

through the end of 2008 as they attempted to emerge from chapter 11.[5]  Pursuant to the

May 9, 2008 amendment of the DIP Facility and a supplemental amendment thereto,[6] the

Tranche A Loan commitments were decreased to $1.1 billion, the amount of Tranche B

Loans was increased to $500 million and the amount of Tranche C Loans was increased

to $2.75 billion.  By increasing the amount of the Tranche B Loans and Tranche C Loans,

the Tranche B Lenders and Tranche C Lenders each provided the Debtors with

approximately $250 million of additional liquidity to fund their operations.

        4.        In response to the Debtors' impending inability to repay the principal

amounts under the DIP Facility due on December 31, 2008, the DIP Lenders agreed

pursuant to an Accommodation Agreement dated as of December 12, 2008 (as amended,

the "**Accommodation Agreement**")[7] to permit the Debtors to continue to operate

notwithstanding the passing of the maturity date and other specified defaults, and to

forbear from exercising remedies under the DIP Facility for up to six months, subject to

the Debtors meeting certain milestones.  The Debtors have failed to meet several

milestones and have defaulted under the Accommodation Agreement several times since

entering into the Accommodation Agreement, and each time the DIP Lenders have

---

[5] Order (I) Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (A) Extend Maturity Date Of DIP Facility, (B) Enter Into Related Documents, And (C) Pay Fees In Connection Therewith And (II) Authorizing Debtors To Enter Into Arrangement With General Motors Corporation Or An Affiliate [Docket No. 13489].

[6] Order Supplementing Second DIP Extension Order (Docket No. 13489) Authorizing Increase In Financing Commitments In Response To Oversubscription Of Debtors' Syndication Of Second DIP Extension [Docket No. 13699].

[7] Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith [Docket No. 14515].

4

worked cooperatively with the Debtors to provide amendments to the Accommodation

Agreement in order to continue the forbearance thereunder and provide the Debtors with

further access to the DIP Lenders' cash collateral.  While the Accommodation Agreement

has been in effect, the DIP Lenders have allowed the Debtors to continue to use cash

collateral, including by permitting the Debtors on several occasions to draw from

segregated cash collateral accounts maintained for the benefit of the DIP Lenders.

Currently, there is approximately $230 million in outstanding Tranche A Loans and $61.5

million of Letter of Credit exposure, $311 million in outstanding Tranche B Loans and

approximately $2.89 million in outstanding Tranche C Loans (which includes interest

that has accrued, and not been paid, since the effective date of the Accommodation

Agreement).

        5.        As mentioned throughout the Debtors' Motion, the DIP Credit Agreement

provides that upon the occurrence and during the continuance of an Event of Default,

"the Administrative Agent may, and at the request of the Required Lenders, shall, …

(v) exercise any and all remedies under the Loan Documents and under applicable law

available to the Administrative Agent and the Lenders."  (DIP Credit Agreement § 7.01).

The term "Required Lenders" is defined in the DIP Credit Agreement as Lenders holding

a majority in amount of Tranche A Loans (and LC Exposure) and Tranche B Loans.  The

Tranche C Loans are not included in the definition of "Required Lenders."

        6.        The views of Tranche C Lenders are, however, very relevant to any matter

that involves a determination by the Required Lenders under the DIP Credit Agreement.

According to the Administrative Agent's records regarding the holdings of DIP Loans as

of June 8, 2009, DIP Lenders who hold Tranche C Loans also hold approximately 76% of

the Tranche A and Tranche B Loans, and six of the seven largest Tranche C Lenders hold approximately 55% of the Tranche A and Tranche B facilities.

7.    Both implementation of the Modified Plan (as defined below) and the alternative sale under section 363 of the Bankruptcy Code contemplated by the Motion (the "**Section 363 Sale Alternative**") require the consent of the Required Lenders.[8]  As is apparent from the percentages set forth above, due to the substantial overlap among the three tranches, it appears highly unlikely that the Debtors will be able to obtain Required Lender consent to the Modified Plan or the Section 363 Sale Alternative unless the DIP Lenders view the consideration offered to all three tranches of the DIP Facility as being fair and adequate.

**The Confirmed Plan**

8.    The Debtors filed their Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession [Docket No. 9263] on September 6, 2007 and filed an amendment thereto on December 20, 2007[9] (such plan, as amended, the "**Confirmed Plan**").  On January 25, 2008, the Court entered an order confirming the plan (the "**Confirmation Order**"),[10] and the Confirmation Order became effective on February 4, 2008.  Under the Confirmed Plan, all outstanding amounts due in respect of the Tranche A Loans, Tranche B Loans and Tranche C Loans were to be paid

---

[8] *See, infra* n. 12.

[9] First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession [Docket No. 11386].

[10] Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. §§ 1129(a) and (b) and Fed. Bankr. P. 3020 Confirming First Amended Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession, as Modified [Docket No. 12359].

in full in cash on the effective date of the Confirmed Plan.  Unfortunately, however, the

Debtors have been unable to consummate the Confirmed Plan.

**The Motion**

9.      The Debtors, by their Motion, seek entry of an order approving certain

modifications to their Confirmed Plan (the "**Modified Plan**"), the related supplemental

disclosure statement, and voting procedures, and setting a final hearing date on approval

of the Debtors' proposed plan.  (Motion ¶ 10).  The Debtors also request the setting of an

Alternative Sale Hearing date of July 23, 2009 to be used, if necessary, to consider the

sale of substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy

Code if the Court does not approve the Debtors' proposed plan modifications on that

date.  (*Id.*).

10.      Of far greater importance than the relief expressly sought by the Debtors'

Motion is the relief that the Debtors' Motion does *not* expressly seek.  In particular, the

Debtors' Motion, Modified Plan and supplemental disclosure statement each contemplate

a transaction (the "**GM-Platinum Transaction**") pursuant to a so-called Master

Disposition Agreement among the Debtors, GM, and the LLC (the "**MDA**") and related

documents whereby an affiliate of General Motors ("**GM**") will acquire certain North

American assets of the Debtors, and Parnassus Holdings II, LLC (the "**LLC**"), a new

company formed by Platinum Equity ("**Platinum**") will acquire the remainder of the

Debtors' assets.  Although the Debtors' proposed Modifications Procedures Order does

not authorize the Debtors to enter into the GM-Platinum Transaction, the MDA by its

terms purports to bind the Debtors from and after the date of entry of such order.

7

11.      The Motion thus initiates a process whereby the Debtors purport to bind themselves to pursue a closed, private sale of substantially all of the Debtors' assets to GM and Platinum pursuant to a contract with a robust "no shop" provision.  The Debtors will be foreclosed from soliciting alternative bids or conducting an auction (pursuant to Section 9.40 of the MDA), and will have only limited flexibility to consider, encourage and negotiate alternative transactions that might provide superior value to the Debtors' estates.

12.      Indeed, it is the Administrative Agent's understanding that it is the Debtors' expectation that the Court, by approving the Motion, will preclude itself from considering, *sua sponte*, alternative transactions, including credit bids.

13.      The procedure by which the Debtors propose to dispose of substantially all of their assets conflicts not only with the strong policy favoring competitive bidding in sales in bankruptcy proceedings, but also with the substantial protections that the Bankruptcy Code provides to secured parties in general and the rights and remedies granted to the DIP Lenders in particular.

14.      The GM-Platinum Transaction, whether implemented through the Modified Plan or the Section 363 Sale Alternative (as defined below), would impair the interests of the Tranche C Lenders, in that it contemplates paying the Tranche C Lenders only a fraction of the face value of their secured, super-priority claims:  their $2.75 billion loan would be deemed "satisfied in full" with a cash payment of $291 million, an equity participation in the LLC (nominally in the form of a note) of up to $145.5 million and up to approximately $146 million from the first settlement or other proceeds from Delphi's plan investor litigation.  (Motion at 11).  Administrative expenses and certain

8

pre-petition unsecured claims (both of which are junior to the DIP Claims) would be assumed and/or paid in cash in full, and the remaining general unsecured claims would receive a distribution on account of their claims.

15.     Not surprisingly, it is apparent to the Administrative Agent that a significant number of Tranche C Lenders, including those with the largest percentage holdings, believe that the GM-Platinum Transaction does not provide fair or adequate recoveries to the Tranche C Lenders.[11]  Accordingly, if the Debtors' Motion is granted, there is a high likelihood that neither the Modified Plan nor the Section 363 Sale Alternative will obtain the requisite support of the DIP Lenders.

16.     The Administrative Agent understands that certain Tranche C Lenders have advised the Debtors that in light of the inadequate proposed recoveries for Tranche C Lenders under the GM-Platinum Transaction certain Tranche C Lenders are considering proposing an alternative transaction that they assert would generate more value for stakeholders of Delphi.

17.     As suggested above, however, the Section 363 Sale Alternative is a closed, private sale that purports to limit this Court's flexibility to consider competing offers, including credit bids.

18.     For example, the MDA and the Debtors' proposed Modification Procedures Order contain provisions that, in each case subject to a "fiduciary out":

---

[11] Although the Modified Plan says that it "is the product of extensive discussions and negotiations between and among the Debtors [and] the DIP Steering Committee", (Modified Plan § I.C), that is unfortunately not the case.  The DIP Steering Committee was not afforded the opportunity to negotiate the Modified Plan and has not approved or agreed to any provisions thereof.

- provide that the Debtors may not "solicit, initiate, respond to, continue, encourage or facilitate . . . any inquiries or the making of any proposal with respect to . . . the possibility of a Competing Transaction," MDA § 9.40;

- provide the Debtors may not "enter into or continue any negotiations or discussion with any Person (other than the Buyers) regarding the possibility of a Competing Transaction," *id.*; and

- prohibit the Debtors from "enter[ing] into any agreement requiring [them] to abandon, terminate or fail to consummate the transactions contemplated by [the MDA]," *id.*

While it is unclear whether the Court will interpret the MDA and the proposed Modifications Procedures Order, if entered, to preclude the Court from considering competing offers that may be put forward at any hearing on the Modified Plan or at any sale hearing under section 363 of the Bankruptcy Code, the Administrative Agent has been advised by the Debtors that it is their intention that no such offers will be entertained by the Court without the support of the Debtors.

19.     Whatever one might say about the Debtors seeking to bind themselves to the restrictions contained in the MDA (and the Debtors may assert they had no choice but to do so), to protect the Debtors' estates and the Debtors' stakeholders, the Court must under all circumstances retain the flexibility to consider competing offers for all or any portion of the Debtors' assets, whether or not such offers are supported by the Debtors.

20.     Based on the holdings of Tranche A and B Loans described above, if the Court does not retain the ability to consider alternative bids in connection with the Section 363 Sale Alternative, DIP Lenders who would prefer an alternative transaction to the recoveries contemplated by the GM-Platinum Transaction still have the option of seeking to direct the Administrative Agent to exercise remedies with respect to their

10

collateral prior to the hearing date on the Section 363 Sale Alternative. The Administrative Agent believes, however, that the potentially chaotic and adversarial context of any such exercise of remedies could severely compromise Delphi's business and also compromise GM's ability to purchase assets from Delphi that are necessary to its business, which would in turn be severely disruptive of GM's own restructuring and the U.S. automotive industry as a whole.

21.    The Administrative Agent is doing everything it can to avoid this result by facilitating the development of fully-consensual alternatives to the GM-Platinum Transaction. Indeed, a fair and competitive section 363 sale process, that encourages rather than discourages bidding from DIP Lenders and other parties, is the best way to maximize the likelihood of such a consensual outcome.

22.    In furtherance of the objective of a fully consensual resolution of these chapter 11 cases, the Administrative Agent objects to the relief requested in the Motion. While, as indicated below, there are certain specific problems with the Plan Modifications and related disclosure, the Administrative Agent's more fundamental objection is to the private and closed nature of the Section 363 Sale Alternative as proposed by the Debtors' Motion and to the implication that, by granting the relief sought in the Motion, the Court is relinquishing the ability to consider competing offers, including credit bids, at the time of the hearing on the Section 363 Sale Alternative. Not only does the requested relief by the Debtors chill the possibility of superior, alternative transactions, but, equally important, the inability of the Court to entertain competitive bids at the sale hearing could cause the DIP Lenders to prematurely and unnecessarily

exercise their remedies, and almost certainly reduces the likelihood of a consensual

resolution of these chapter 11 cases.

**The GM-Platinum Transaction**

23.    To understand why the Court should retain the flexibility to consider

competitive offers at any sale hearing it is helpful to understand (i) the basic structure of

the GM-Platinum Transaction (to the extent it has been publicly revealed); (ii) alternative

transactions that could generate more value for Delphi's stakeholders, ideally with the

consent and participation of GM but if necessary without; and (iii) the rights and

remedies of the DIP Lenders.

24.    A brief description of the GM-Platinum transaction is contained in GM's

Form 8-K filed June 5, 2009:

> On June 1, 2009 General Motors Corporation ("GM") reached agreement with
> Delphi Corporation ("Delphi") . . . to purchase certain facilities in the United
> States and Delphi's global steering business.  GM also agreed to provide a capital
> investment and back-up financing to a new company ("Acquisition Company")
> formed by Platinum Equity ("Platinum"), which will acquire substantially all of
> Delphi's remaining assets.  Additionally, GM agreed to provide financing to fund
> Delphi's business operations until the closing of these proposed transactions,
> which are described below.
>
> . . . .
>
> On June 1, 2009, the parties entered into the Master Disposition Agreement
> among Delphi Corporation, GM Components Holdings, LLC, General Motors
> Corporation (solely with respect to certain provisions), Parnassus Holdings II,
> LLC, and the Other Sellers and Other Buyers Party thereto (the "MDA").  Under
> the MDA, GM agreed to acquire Delphi's global steering business and its
> facilities in Kokomo, Indiana, Rochester, New York, Lockport, New York, and
> Grand Rapids, Michigan; Acquisition Company agreed to acquire substantially
> all of Delphi's remaining assets, including its Troy, Michigan headquarters
> building. Certain excluded assets and liabilities will be retained by a Delphi
> entity to be sold or liquidated.  The Delphi employees at each acquired facility
> will transfer to the company that acquires that facility.  In connection with this
> acquisition, GM agreed to pay or assume approximately $600 million of Delphi
> obligations related to its senior debtor-in-possession ("DIP") credit facility,
> including certain secured hedge transactions, approximately $300 million of

Delphi obligations related to its junior DIP credit facility, and approximately $200 million of other Delphi obligations to be shared with Acquisition Company, including administrative claims. GM's administrative claims associated with its credit agreement with Delphi, of approximately $300 million, and with transferred pension costs for hourly employees, of approximately $1.6 billion will be waived at the closing of the transactions contemplated by the MDA. The closing under the MDA is subject to Bankruptcy Court approval of either the Modified Plan or the Section 363 Sales, other required government approvals, and resolution of Delphi's pension obligations.

In connection with the MDA, GM and Delphi amended their existing liquidity agreement to provide that GM will furnish a $250 million credit facility to Delphi, conditioned on progress in achieving the transactions contemplated by the MDA and approval of either the Modified Plan or the Section 363 Sales. This credit facility will terminate at the earliest of: confirmation of the Modified Plan, consummation of the Section 363 Sales, termination of the Modified Plan or the Section 363 Sales, or September 30, 2009. Upon the consummation of either the Modified Plan or the Section 363 Sales, GM will waive all amounts outstanding under Delphi's $250 million credit facility.

In related agreements GM agreed to acquire, prior to the consummation of the transactions contemplated by the MDA, Class A Membership Interests in Acquisition Company for $2 billion of cash, with Platinum acquiring Class B Membership Interests for $250 million of cash, and Delphi acquiring Class C Membership Interests on behalf of certain of its junior DIP lenders for forgiveness of a portion of its debt. GM and Platinum also agreed to establish a secured delayed draw term loan facility for Acquisition Company, with GM committing to provide $500 million and Platinum committing to $250 million. Finally, GM agreed to carry all existing Delphi supply agreements and purchase orders for North America forward to the end of the related product program, and Acquisition Company agreed to provide GM with certain protection of supply commitments as requested by GM.

25.    Although the description of the GM-Platinum Transaction in GM's Form 8-K is opaque in some respects, it is apparent that (i) GM has agreed to acquire Delphi's global steering business and its facilities in Kokomo, Indiana, Rochester, New York, Lockport, New York, and Grand Rapids, Michigan (the "**GM Purchased Assets**"), and (ii) the LLC has agreed to acquire Delphi's remaining assets (the "**ROW Assets**").

26.    From the description supplied by GM's Form 8-K, the basic GM-Platinum Transaction appears to be as follows:

13

    A.      GM will pay Delphi the following consideration for the GM Purchased Assets:

- $900 million to be paid to the DIP Lenders and hedging counterparties;

- Assumption of $200 million of administrative expense; and

- Assumption of a $1.6 billion of pension-plan funding liabilities.

    B.      The LLC will pay Delphi the following consideration for the ROW Assets:

- A Class C Membership Interest in the face amount of $145.5 million.

    C.      GM and Platinum commit to invest in the LLC, presumably to support its business after the closing, the following amounts:

- GM will invest (i) $2 billion in a Class A Membership Interest in the LLC, and (ii) $500 million in a delayed draw term loan facility.

- Platinum will invest (i) $250 million in a Class B Membership Interest in the LLC, and (ii) $250 million in a delayed draw term loan facility.

## Possible Alternatives to the GM-Platinum Transaction

As noted above, the Administrative Agent has been advised that a number of DIP Lenders are currently seeking to develop alternatives to the GM-Platinum Transaction because, among other things, they believe the consideration being paid to Delphi for the ROW Assets should be far more than the value of the $145.5 million Class C Membership Interest. These DIP Lenders believe that the GM-Platinum Transaction will siphon an extraordinary amount of value from Delphi's stakeholders to Platinum by offering Platinum rewards incommensurate to its relatively modest investments in the LLC. If these lenders are correct, there are obvious alternative transactions that could be

more favorable to the Debtors' estates and to GM than the GM-Platinum Transaction.

For illustrative purposes it is worth considering three of these alternatives:

**Alternative 1**:

If GM were willing to consider a consensual transaction with the DIP Lenders, the DIP Lenders could (i) offer the GM Purchased Assets to GM for the same consideration being paid by GM in the GM-Platinum Transaction, and (ii) provide to the LLC, in lieu of all or a portion of Platinum's investment, the relatively modest amount of capital coming from Platinum.  In this alternative, the DIP Lenders could share with GM some of the rewards Platinum is reaping, either by increasing GM's return on the money it is investing in the LLC, or by reducing the amount it is required to invest for the same return.  Based purely on the economics of such a transaction, both GM and the DIP Lenders should be better off.

**Alternative 2**:

If GM were willing to consider a consensual transaction with the DIP Lenders, the DIP Lenders could (i) offer the GM Purchased Assets to GM for the same consideration being paid by GM in the GM-Platinum Transaction, and (ii) provide to the LLC some or all of the capital being provided by *both* Platinum and GM for the ROW Assets, thereby reducing or eliminating the need for GM to make an investment.  In other words, GM might be relieved of putting up some or all of the $2 billion for the Class B Membership interest and the $500 million delayed draw term loan, which should be a highly attractive proposition for GM and its financing source, the United States Treasury.

**Alternative 3**:

If GM decided not to pursue a consensual transaction with the DIP Lenders and declined to acquire the GM Purchased Assets or invest in the ROW Assets, the DIP Lenders might conclude that they could tolerate the loss of the purchase price of the GM Purchased Assets in order to acquire only the ROW Assets, for example through a credit bid of their claims.  In this scenario, the DIP Lenders would, as in Alternative 2, have to provide financing of the ROW Assets, and would preserve their deficiency claim against Delphi's estate, which could in turn dispose of the GM Purchased Assets to GM or any other party.

27.    From the Administrative Agent's perspective, the preferred alternatives of

those suggested above are Alternatives 1 and 2.  In these alternatives, GM would acquire

the GM Purchased Assets for the same price they are paying in the GM-Platinum

Transaction and could achieve benefits in connection with the sale of the ROW Assets that are not available to GM in the GM-Platinum Transaction.  The Administrative Agent submits that consensual alternatives like Alternatives 1 and 2 are most likely to result if competitive bidding, including credit bidding, is entertained by the Court at the sale hearing and any premature exercise of remedies by the DIP Lenders seeking to implement an alternative transaction can be avoided.

## AUTHORITIES

28.    "[T]he Bankruptcy Code offers substantial protection[s] to a lender willing to take the risk of extending credit to a trustee or debtor-in-possession." *Small v. Beverly Bank*, 936 F.2d 945, 949 (7th Cir. 1991).  Any diminution of these protections would entail severe consequences, as it would "discourage creditors from supporting debtors' reorganization efforts." *In re Flagstaff Foodserve Corp.*, 762 F.2d 10, 13 (2d Cir. 1985); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990) ("If creditors fear that the rug will be pulled out from under them, they will hesitate to lend.").

29.    In the present context, these protections prohibit confirmation of the Debtors' Modified Plan or consummation of the Section 363 Sale Alternative absent the DIP Lenders' support.  Section 1129(a)(9)(A) of the Bankruptcy Code requires that the DIP Lenders support any plan that, like the Debtors' Modified Plan, fails to provide for full payment of their super-priority claims.  *See* 11 U.S.C. § 1129(a)(9)(A); *In re Teligent, Inc.*, 282 B.R. 765, 770 (Bankr. S.D.N.Y. 2002) ("Section 1129(a)(9) of the Bankruptcy Code . . . requires administrative and priority creditors to be paid in full unless they agree to a different treatment of their claims.").

16

30.     The DIP Refinancing Order, coupled with "the principle that bankruptcy judges may make *binding* commitments to give priority to new credit," likewise prohibits consummation of the Section 363 Sale Alternative absent DIP Lender support.  *See Kham & Nate's Shoes*, 908 F.2d at 1355 (explaining that "[a] judge lacks the power to undo the priority granted by a financing order without first finding that the creditor acted in bad faith," "a very narrow exception" inapplicable here) (emphasis in original).[12]  The public policy protecting lien holders is so strong, that appellate courts have overturned provisions of a sale order improperly stripping a secured creditor of its liens, notwithstanding the statutory mootness provision in section 363(m) of the Bankruptcy Code.  *See Clear Channel Outdoor, Inc. v. Nancy Knupfer*, 391 B.R. 25 (B.A.P. 9th Cir. 2008).

31.     If the Section 363 Sale Alternative remains a private sale, the DIP Lenders have the option of preemptively exercising various remedies available to them under the DIP Credit Agreement, the Security and Pledge Agreement, the DIP Refinancing Order and applicable law to assure themselves the opportunity to implement an alternative

---

[12] The DIP Refinancing Order provides, *inter alia*, that the DIP Documents (as defined in the DIP Refinancing Order), including the Security and Pledge Agreement (as defined in the DIP Credit Agreement (the "**Security and Pledge Agreement**")), are binding agreements of the Debtors (DIP Refinancing Order § 4(c)), and the DIP Refinancing Order cannot be modified without the consent of the Administrative Agent (DIP Refinancing Order § 13(b)).  The Security and Pledge Agreement provides that the DIP Liens (as defined in the DIP Refinancing Order) shall remain in full force and effect until the payment in full of the DIP Claims.  (Security and Pledge Agreement § 23).  Furthermore, any order purporting to modify the DIP Refinancing Order by releasing the DIP Liens without the Administrative Agent's consent would "not affect … the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations", and "[n]otwithstanding any such … modification … any … DIP Obligations incurred by the Debtors to the Agent or the DIP Lenders prior to the actual receipt of written notice by the Agent of the effective date of such … modification … shall be governed in all respects by the original provisions of [the DIP Refinancing Order]."  (DIP Refinancing Order § 13(c)).  Therefore, as contemplated by and consistent with the policies behind § 364(e) of the Bankruptcy Code, a DIP Lender cannot be stripped of its liens securing obligations incurred in good faith. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990).  No party has made any allegations that the DIP Lenders have ever acted in bad faith.

transaction.[13]  For example, the DIP Lenders may direct the Administrative Agent, as secured party, to put the assets of Delphi up for sale (as provided in Section 15 of the Security and Pledge Agreement) in an auction where the DIP Lenders will be entitled to credit bid their claims for all or any portion of the collateral, as permitted both under state law and under section 363 of the Bankruptcy Code.  *See* 11 U.S.C. § 363(k); *Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 460 (3d Cir. 2006); *Paul T. v. Fifth Third Mortgage Co.* (*In re J & M Salupo Dev. Co.*), 388 B.R. 795, 803 (B.A.P. 6th Cir. 2008) (characterizing the ability to credit bid as a "fundamental protection" that allows a secured creditor "to determine at auction, based on its assessment of current market conditions and its prediction of future market conditions, whether to accept the current cash value of the property or to hold the property in anticipation of future appreciation in value"); *In re Chrysler LLC, et al.,* Case No. 09-50002 (AJG), Opinion Granting Debtors' Motion Seeking Authority to Sell Substantially All of the Debtors' Assets at 19 (Bankr. S.D.N.Y. June 2, 2009) [Docket No. 3073] (recognizing the right of the secured lenders to credit bid for the assets).

32.    Apart from the possibility the DIP Lenders could exercise these remedies to preempt the Section 363 Sale Alternative, public policy strongly supports competitive bids in connection with a section 363 sale, especially in connection with a sale of all or substantially all of a chapter 11 debtor's business.  *See generally In re Psychometric Sys.*,

---

[13] *See, e.g.,* DIP Credit Agreement § 7.01 (providing for the "exercise [of] any and all remedies under the Loan Documents and under applicable law available to the Administrative Agent and the Lenders"); DIP Refinancing Order ¶ 7(b) (vacating and modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Administrative Agent and the DIP Lenders to exercise, on five business days' notice and without further order of the court, all rights and remedies against the Collateral provided in the DIP Documents).

367 B.R. 670, 676 (Bankr. D. Colo. 2007) (recognizing the "strong policy favoring competitive bidding . . . to sales in bankruptcy proceedings" (internal quotation marks omitted)).[14]  There is every reason to believe that the opportunity for competitive bidding here, where the DIP Lenders appear to be organizing themselves to make such a bid, would enhance value for Delphi's stakeholders, and particularly for the Tranche C Lenders.

### PROPOSED MODIFICATIONS TO ORDER

33.    At a minimum, the opportunity for the Court to entertain alternative bids, including credit bids for all or any portion of the Debtors' assets, would consolidate proceedings before this Court and create a forum for give and take among the parties, as well as the mediator appointed in these chapter 11 cases, leading up to the sale hearing. The Administrative Agent submits that this open, orderly and, most importantly, competitive process (rather than the closed and intentionally non-competitive process proposed by the Debtors) is the process most likely to produce the desired and value-maximizing consensual outcome, as well as the greatest stability for GM, Delphi and the entire automotive industry.  The alternative, a preemptive exercise of remedies by the DIP Lenders, would have the opposite destabilizing effect.

---

[14] *Accord In re Adoption of Guidelines for the Conduct of Asset Sales*, General Order M-331, at 2 (Bankr. S.D.N.Y. 2006) (Bernstein, C.J.) (motion seeking entry of sale order that does not contemplate debtor's active solicitation of higher and better offers must explain why debtor proposes to structure the sale in such a manner); *In re Beck Indus., Inc.*, 605 F.2d 624, 637 (2d Cir. 1979) (explaining that the court's aim in approving procedures for sale of the debtor's assets should be "to maximize the bidding, not to restrict it"); *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (explaining that "[c]ompetitive bidding yields higher offers and thus benefits the estate"); *In re Dartmouth Audio, Inc.*, 42 B.R. 871, 874 (Bankr. D.N.H. 1984) (same).

34.    The Administrative Agent accordingly requests that the relief sought by the Motion be modified so that the Court will be able to entertain at any sale hearing competitive bids, including credit bids, for all or any portion of the assets proposed to be sold by Delphi in connection with the GM-Platinum Transaction.  The Court's order should also provide that the Debtors must cooperate with potential bidders by providing DIP Lenders interested in pursuing a competitive bid and other credible participants in a possible bid with the information necessary to formulate a competitive bid subject to reasonable and promptly negotiated non-disclosure agreements.[15]  Paragraph 34 of the Debtors' proposed Modification Procedures Order appears to give the Debtors the authority to assume and assign executory contracts and leases to GM Components and the LLC even prior to the Final Modification Hearing.  In furtherance of fostering an open auction process where GM and Platinum do not have an undue advantage over other bidders, this paragraph should be modified to clarify that the Debtors are not permitted to assume and assign executory contracts and leases to GM Components or the LLC prior to consummation of the GM-Platinum Transaction.

35.    Finally, the Debtors, GM and Platinum should also be required to clarify, as a condition to granting any relief pursuant to the Motions, that such competitive bids

---

[15] It might seem unnecessary to specify in the Modification Procedures Order that the Debtors are required to cooperate with and provide necessary information to prospective bidders, especially in light of the proposed protective order currently being considered by the Court.  However the "no-shop" provision in the MDA and possibly some reluctance on the Debtors' part to facilitate alternative transactions appears to be causing the negotiations with certain DIP Lenders over a non-disclosure agreement to drag unnecessarily.  Such "over negotiating" would seem unnecessary, especially with members of the DIP Lender Steering Committee, who are already subject to and have consistently abided by confidentiality restrictions.  In any event, any discomfort or reluctance the Debtors may have over cooperating with or providing information to bidders would surely be relieved by a decretal paragraph in the Modification Procedures Order along the lines requested.

may be entertained and facilitated as set forth above, and the MDA may be terminated in

the event a competitive bid is successful, without liability to the Debtors or any other

party.

36.     These modifications to the requested relief will avoid the premature

exercise of remedies by the DIP Lenders and will consolidate the competition between a

GM-Platinum Transaction and an alternative transaction before this Court.  Such an

orderly and competitive process is most likely to lead to the optimal outcome:  a

consensual compromise that leads to a value maximizing resolution of these chapter 11

cases.

## REQUEST FOR RESERVATION OF RIGHTS

37.     The Modified Plan contemplates a consensual foreclosure by the

Administrative Agent in full satisfaction and discharge of the DIP Claims pursuant to

section 9-620 of the UCC, or in the alternative a credit bid of the full amount of the

Debtors' outstanding obligations that are due and owing under the DIP Credit Agreement

in a sale conducted pursuant to section 9-610 of the UCC.  (Modified Plan § 7.8).  Each

of these mechanisms would purportedly have the effect of fully discharging the DIP

Claims and waiving the deficiency claims in respect of the Tranche C Loans as well as

the contingent obligations that pursuant to the DIP Refinancing Order and the DIP Credit

Agreement expressly survive the repayment of the Loans (as defined in the DIP Credit

Agreement) and the termination of the DIP Credit Agreement (notably the fee and

expense reimbursement provisions and indemnity provisions of the DIP Credit

Agreement).  (DIP Refinancing Order ¶ 13(d); DIP Credit Agreement § 10.12).  The

Debtors have not established that these mechanisms can, under the DIP Credit

21

Agreement, the DIP Refinancing Order and applicable law, discharge such deficiency claims.

38.     The disclosure accompanying the Modified Plan does not address the treatment of letters of credit issued under the DIP Credit Agreement (the "**Letters of Credit**"), for which Tranche A Lenders retain an obligation to reimburse the Issuing Bank (as defined in the DIP Credit Agreement) in the event a Letter of Credit is drawn and the Debtors fail to reimburse the Issuing Bank.  (*Id*. § 2.03(e)).  Moreover, under the DIP Credit Agreement, the DIP Lenders (including the Tranche A, Tranche B and Tranche C Lenders) retain an obligation to reimburse the Administrative Agent for any fees and expenses or indemnification claims with respect to which the Debtors fail to reimburse the Administrative Agent.  (DIP Credit Agreement § 8.04).  Thus, the DIP Lenders of all tranches would be subject to further exposure in respect of fees and expenses, indemnification and Letters of Credit after the effectiveness of the Modified Plan, and the claims of the DIP Lenders (and the Agent) in respect of these amounts are not appropriately addressed in the Modified Plan.

39.     The Administrative Agent reserves all of its rights to object to any and all of the provisions of the Modified Plan (including, without limitation, the provisions described in the prior two paragraphs), and the Administrative Agent respectfully requests that the proposed Modification Procedures Order be modified to provide that the failure of the Administrative Agent to object to any issues in the Modified Plan shall not constitute a waiver of its rights to object at the Final Modification Hearing.

## CONCLUSION

40.        In light of the foregoing, the Administrative Agent respectfully submits that the Court should deny the Debtors' Motion unless the Modification Procedures Order is modified to (1) provide that the Court will entertain at any sale hearing competitive bids, including credit bids, for all or any portion of the assets proposed to be sold by Delphi in connection with the GM-Platinum Transaction, (2) provide that the Debtors must cooperate with potential bidders by providing DIP Lenders interested in pursuing a competitive bid and other credible participants in possible bids with the information necessary to formulate and put forward a competitive bid subject to reasonable and promptly negotiated non-disclosure agreements, (3) provide that the Debtors shall not assume and assign executory contracts and leases to GM Components and the LLC prior to emergence and (4) state that the Administrative Agent reserves all of its rights to object to any and all of the provisions of the Modified Plan.  Finally, as a condition to granting relief in respect of the Motions, the Debtors, GM and Platinum should also be required to clarify that such competitive bids may be entertained and facilitated as set forth in the order, and the MDA may be terminated in the event a competitive bid is approved by the Court without liability, whether under the MDA or otherwise, to the Debtors or any other party.

New York, New York
Dated: June 9, 2009

By:  /s/ Donald S. Bernstein
     Donald S. Bernstein
     Benjamin S. Kaminetzky
     Brian M. Resnick

     DAVIS POLK & WARDWELL
     450 Lexington Avenue
     New York, New York 10017
     Telephone: (212) 450-4000
     Facsimile:  (212) 450-6501

     *Counsel to JPMorgan Chase Bank, N.A.*