**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4802
(212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
        mitchell.seider@lw.com
        mark.broude@lw.com
        michael.riela@lw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' (A) SUPPLEMENT TO MOTION FOR ORDER (I) APPROVING MODIFICATIONS TO DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND RELATED DISCLOSURES AND VOTING PROCEDURES AND (II) SETTING FINAL HEARING DATE TO CONSIDER MODIFICATIONS TO CONFIRMED FIRST AMENDED PLAN OF REORGANIZATION AND (B) REQUEST TO SET ADMINISTRATIVE EXPENSE CLAIMS BAR DATE AND ALTERNATIVE SALE HEARING DATE**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the

"Debtors"), by and through its undersigned counsel, hereby submits this Objection to the

Debtors' *(A) Supplement to Motion for Order (I) Approving Modifications to Debtors' First*

*Amended Plan of Reorganization (As Modified) And Related Disclosures and Voting Procedures*

and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Request To Set Administrative Expense Claims Bar Date and Alternative Sale Hearing Date (the "Motion").  It is not entirely clear what relief the Debtors are requesting with respect to the Motion during the June 10, 2009 hearing.  When the Committee's counsel inquired what the Debtors would be asking this Court to address during the June 10 hearing, Debtors' counsel replied that "the relief as to the Plan Modification is more like akin to a disclosure statement type hearing."  Accordingly, by this Objection, the Committee is objecting to both the proposed solicitation procedures and the disclosure statement that was filed with the Motion.  In support of this Objection, the Committee respectfully states as follows:

## BACKGROUND

1.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, the three remaining Debtors also filed voluntary petitions.

2.      The Committee was appointed nine days after the Petition Date, on October 17, 2005.[1]  The Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. and Moelis & Company LLC as its co-investment bankers.

## I.      The Failed Plan of Reorganization and the Debtors' Declining Value

3.      On December 10, 2007, the Debtors filed their amended chapter 11 plan and an accompanying disclosure statement.  On January 25, 2008, this Court entered an order confirming that plan, as modified (the "Confirmed Plan").  The Confirmed Plan provided for a

---

[1]  The current members of the Committee are: (a) Freescale Semiconductor, Inc.; (b) IUE-CWA; (c) Wilmington Trust Company, as Indenture Trustee and (d) Tyco Electronics Corporation.  The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

NY\1538878.1

"par plus accrued" recovery for general unsecured creditors at an agreed-upon total enterprise value for the Debtors.  However, on April 4, 2008, the plan investors purported to terminate that certain Equity Purchase and Commitment Agreement, and the Confirmed Plan has not become effective.

4.    The plan investors' refusal to make their $2.5 billion investment, together with the economic decline generally (and in the automotive industry in particular) and the collapse of the credit markets after the termination of the Equity Purchase and Commitment Agreement, significantly reduced the Debtors' total enterprise value.  In addition, the Debtors faced serious liquidity constraints.

5.    To help address the Debtors' liquidity constraints, General Motors Corporation ("GM") provided up to $650 million in advances to the Debtors under a liquidity support agreement among the Debtors and GM, dated on or about May 9, 2008 (the "GM Arrangement").  GM agreed to make these advances in respect of payments it would otherwise have made upon the effectiveness of the Global Settlement Agreement (the "GSA") and the Master Restructuring Agreement (the "MRA") between the Debtors and GM.  Upon the effectiveness of the amendments to the GSA and the MRA in September 2008, this commitment terminated and the amounts advanced were set off against amounts to be paid by GM or its affiliates for the benefit of the Debtors under the GSA and the MRA.  GM and the Debtors entered into a first amendment to the GM Arrangement as of October 6, 2008, pursuant to which GM agreed to make available to the Debtors an additional $300 million in advances under the terms and conditions set forth therein.  A second amendment to the GM Arrangement extended the availability of the existing $300 million liquidity support from December 31, 2008 to June

NY\1538878.1

30, 2009.[2]  On June 1, 2009, the Debtors filed a motion for an order authorizing the increase in that liquidity support to $550 million.

      6.      Meanwhile, the Debtors were unable to extend the December 31, 2008 maturity date of the DIP Credit Agreement on reasonably acceptable terms.  Accordingly, with the support of the administrative agent and the requisite lenders to the DIP credit facility, the Debtors entered into that certain Accommodation Agreement among the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, and the DIP Lenders party thereto (as amended, the "Accommodation Agreement").  Under the Accommodation Agreement, the Debtors could continue using certain of the proceeds of the DIP Facility through June 30, 2009 (the "Accommodation Period"), subject to the terms and conditions set forth in that agreement. However, the Accommodation Period terminates prior to June 30, 2009 if the Debtors do not meet certain milestones in connection with a modified plan of reorganization.

## II.      The Proposed Modified Plan

      7.      The Debtors, at the insistence of the United States Treasury (the "Treasury"), is selling its domestic business to GM at a fire sale price (with the goal of ensuring that GM's supply from the Debtors continues, not maximizing the value of the Debtors' estates), and Treasury is forcing a sale of the rest of the business to a private equity fund for one dollar while making sure creditors get nothing.

---

2  As part of the order approving the second amendment to the GM Arrangement, this Court also approved the Debtors' entry into a Partial Temporary Accelerated Payment Agreement with GM (as amended, the "Pull-Forward Agreement"), which provided for GM to accelerate the payment of up to $300 million in trade accounts payable to the Debtors over a defined period beginning in March 2009.  On January 30, 2009 the Debtors reached an agreement with GM with respect to a third amendment to the GM Arrangement, which generally contained amendments that conform the GM Arrangement to the amended terms of the Pull-Forward Agreement and the amended terms of the Accommodation Agreement.

NY\1538878.1

8.    On June 1, 2009, the Debtors filed a supplement to their October 3, 2008 motion for an order approving modifications to the Confirmed Plan (such plan as modified, the "Proposed Modified Plan").  The Proposed Modified Plan, which the Debtors negotiated with GM and the Treasury, with a grand total of about 10 minutes of input from the Committee, provides for a transaction in which the Debtors would sell most of their assets and businesses to Parnassus Holdings II, LLC ("Parnassus"), with substantial support from GM, and for another transaction in which GM would acquire the Debtors' global steering division and other selected U.S. operations.  Certain other residual non-core and non-strategic assets and liabilities would be retained by a reorganized entity, and would be divested over time.[3]

9.    While the Confirmed Plan had provided for a "par plus accrued" recovery for general unsecured creditors at an agreed-upon total enterprise value, under the Proposed Modified Plan general unsecured creditors are to receive effectively nothing.  The Proposed Modified Plan provides for general unsecured creditor to receive $3 for every $97 in cash that is actually distributed to Parnassus, but only after Parnassus has actually distributed $7.2 billion to its members, plus the 8% preferred return payable to holders of Parnassus Class C Interests (as defined in the Proposed Modified Plan), to the holders of its equity, plus some *undisclosed* rate of return to GM on account of its **[REDACTED]** loan to Parnassus.  In no event would general unsecured creditors' recovery exceed $180 million in the aggregate.  Thus, the value of the Parnassus assets is completely irrelevant to whether the general unsecured creditors receive any distribution – Parnassus must actually generate and distribute substantially more than $7.2 billion in actual cash returns to its equity and GM must receive payment in full of its **[REDACTED]** loan plus an unknown (and presumably healthy) return on that amount before the unsecured

---

[3]  It is unclear from the Proposed Modified Plan who would receive the proceeds of those divestments.

creditors receive even a penny.  For the unsecured creditors to reach the $180 million cap, the cash return to Parnassus' equity must be well in excess of <u>$13 billion</u>.

10.      It is clear that the unsecured creditors will never receive a single distribution. This, of course, is in stark contrast to the $300 million carve-out from GM's administrative expense claim that the Committee negotiated with the Debtors and GM in connection with the amendments to the GSA and the MRA.  Thus, the effect of the Proposed Modified Plan is that GM, having already received a release, acquires certain plants and is otherwise guaranteed a continued source for its parts, Parnassus acquires assets almost for free[4] and the unsecured creditors get nothing.

11.      In addition, Platinum Equity Capital Partners II, L.P. or its affiliates ("<u>Platinum</u>") and GM stand to receive astronomical returns under the Proposed Modified Plan.  For example, if Parnassus is sold for $7.2 billion, general unsecured creditors would receive nothing under the terms of the Proposed Modified Plan, but Platinum would receive **[REDACTED]** on account of its equity interest in Parnassus.[5]  To make it clear, Platinum would contribute at most $250 million plus one dollar in Parnassus, and would receive **[REDACTED]** if Parnassus is sold for $7.2 billion, a return of over **[REDACTED]**, while the unsecured creditors still receive nothing. In that scenario, GM would receive **[REDACTED]**, plus whatever return it receives on account of its **[REDACTED]** loan.  As another example, if Parnassus is sold for $13 billion, general unsecured creditors would receive a distribution somewhat less than $180 million.  However, Platinum would receive **[REDACTED]** on account of its equity interest in Parnassus, while GM

---

[4]  The "Master Disposition Agreement" under which Parnassus acquires its assets provides for Parnassus to pay $1, plus the assumption of certain liabilities and the payment of certain unspecified administrative expenses.  Parnassus' source of funding appears to be a loan from GM and an "Equity Commitment Letter" which is nowhere defined or described.

[5]  This example does not even take into account the return to GM on account of its loan to Parnassus, more value that goes to GM.

would receive **[REDACTED]**, plus the return it receives on account of its **[REDACTED]** loan.

Parnassus' and GM's potential recoveries are not being capped in any way under the Proposed

Modified Plan.  These are extraordinary returns for Parnassus and GM, and begs the question of

why the Debtors are proposing a chapter 11 plan that provides a private equity fund and its

former parent these levels of returns, while general unsecured creditors receive a mere pittance

(if they receive anything at all).

12.    To add insult to injury, GM and the Treasury insisted on (and the Debtors agreed

to include) two separate and distinct "death trap" provisions in the Proposed Modified Plan

aimed squarely at the Committee's constituents.  First, GM presented the Committee with a

proposal during a ten minute meeting between those parties during the recent mediation.[6]  GM

refused to engage the Committee in discussions during the remainder of the mediation, and the

Treasury never met with the Committee during that mediation.  After three days of silence after

the ten minute meeting, GM informed the Committee that it had four hours to accept that

proposal, or else the general unsecured creditors' recovery would be reduced to the level that is

now set forth in the Proposed Modified Plan.  Because the Committee did not accept the

proposal, GM, the Treasury and the Debtors reduced the general unsecured creditors' stated

potential recovery under the Revised Proposed Plan by 40 percent.  Under the second death trap

provision, if the Proposed Modified Plan cannot be confirmed (presumably as a result of general

unsecured creditor opposition), the exact same transactions would be undertaken as section 363

sales and the stated recovery to general unsecured creditors would be explicitly be taken away.

In other words, the Debtors are demanding that general unsecured creditors support a chapter 11

---

[6]  GM's proposal provided for the general unsecured creditors to receive $5 for every $95 in cash that is actually distributed to Parnassus in excess of $7.2 billion, excluding the 8% preferred return payable to holders of Parnassus Class C Interests (as defined in the Proposed Modified Plan), up to a maximum recovery of $300 million.

7

plan where they get *de facto* nothing, or else there would be section 363 sales in which general unsecured creditors truly get nothing.[7]

## OBJECTION

### I.    No Order Should be Entered Without a Full and Fair Process

13.    As an initial matter, the Committee is of the firm opinion that the entire plan process is deeply and fundamentally flawed, and is being run for the benefit of GM, the Treasury and Parnassus.  The Proposed Plan simply provides for Parnassus to take the Debtors' assets for *de minimis* value (to be exact, one dollar plus some assumed liabilities), and provides the possibility for Parnassus and GM to achieve oversized returns while general unsecured creditors receive nothing.  Moreover, the Debtors, GM and the Treasury are seeking approval of the Proposed Modified Plan on a short timeframe. The Committee respectfully submits that, in light of the significant flaws in the Proposed Modified Plan and the process in which it was formulated, this Court should allow a reasonable time to permit a real process to unfold. Certainly, the Debtors could find a potential purchaser (and indeed, they already know of at least one potential purchaser) who is actually prepared to pay for the Debtors' assets rather than accept a gift.

14.    Indeed, it is apparent that the Debtors are being forced by the Treasury and GM to practically give away their assets to Parnassus.  If the Proposed Modified Plan is confirmed and becomes effective, Parnassus' sole significant potential obligation would to contribute additional money into what would become its own business.  While the Debtors and Parnassus may trumpet this potential future contribution as "new value," it should be noted that to the extent Parnassus

---

[7]  The proposed section 363 sales (that would take place if the Proposed Modified Plan is not confirmed) is by definition and by structure a *sub rosa* plan.  The section 363 sales would result the exact same outcome as the Proposed Modified Plan, but for the distribution to unsecured creditors.

NY\1538878.1

actually does make any contributions: (a) it would be making the contributions to its own business and (b) as discussed *supra*, Parnassus would be entitled to receive a hefty return on those contributions before general unsecured creditors receive any recovery.  Moreover, Parnassus' and GM's potential recoveries are not being capped in any way.  While the Proposed Modified Plan is a fabulous economic deal for Parnassus and would ensure that GM continues to receive consistent supply from Delphi, the Debtors' estates and creditors would not receive any apparent value of any significance under the Proposed Modified Plan.

15.    The Debtors have not described or justified this proposed transaction by which Parnassus (as opposed to, for instance, a vehicle that is formed for the benefit of unsecured creditors) should receive the benefit of Treasury-sponsored largesse, or why the unsecured creditors must be made to suffer while a private-equity fund that is favored by the Treasury reaps an enormous benefit.[8]  The Debtors, with the backing of the Treasury and GM, are trying to start a process that will create tremendous pressure to ratify that end result.

16.    The Committee respectfully submits that this Court should not approve any of the relief that is sought by the Motion, but rather should require the Debtors, GM and the Treasury to explain and justify why the transactions described in the Proposed Modified Plan benefit the Debtors, their estates and their creditors.  The Committee believes that an alternative transaction could be structured (or at least explored – something the Debtors have apparently not done) that truly maximizes the value of the Debtors' estates and provides a real possibility that general unsecured creditors will receive a meaningful recovery.  Unfortunately, none of the Debtors, GM or Treasury seem willing to even try to explore those alternatives.

---

[8]  Indeed, as discussed below, one other potential purchaser has proposed to acquire the Debtors' global assets and businesses, subject to due diligence that the party asserts would take only three weeks or slightly longer.  The Debtors refused to engage with that potential purchaser, but instead are focused only on the transaction with Parnassus.

NY\1538878.1

17.    If this Court is inclined to permit the plan process to proceed, then the Committee raises the following objections to the proposed disclosure statement and the proposed voting and tabulation procedures.

## II.    The Proposed Voting and Tabulation Procedures

18.    The Committee objects to certain voting and tabulation procedures that the Debtors are asking this Court to adopt.  In particular, the Committee objects to the maintenance of the November 26, 2007 voting record date, the request that the Debtors not be required to resolicit the votes of general unsecured creditors for the Proposed Modified Plan, and the Debtors' request to deem any class in which no creditor votes to have accepted the Proposed Modified Plan.

### A.    Section 1127(d) of the Bankruptcy Code Does Not Require the Maintenance of the November 26, 2007 Voting Record Date, Nor Does it Prohibit This Court From Ordering a Full Re-Solicitation of Votes of Impaired Classes

19.    The Committee notes that section 1127(d) of the Bankruptcy Code could be interpreted to authorize or even require this Court (a) to count the votes submitted on the Confirmed Plan for purposes of determining acceptance or rejection of the Proposed Modified Plan by an impaired class that is entitled to vote, except for votes that are actually changed and (b) maintaining November 26, 2007 (the voting record date that was established for the Confirmed Plan) as the voting record date for the Proposed Modified Plan.  However, because the differences between the Confirmed Plan and the Proposed Modified Plan are so extensive, the Proposed Modified Plan should be considered an entirely new plan, rather than a simple modification of the Confirmed Plan.  Thus, section 1127(d) of the Bankruptcy Code should not be interpreted to restrain this Court from establishing a new voting record date and ordering a

NY\1538878.1

full resolicitation of votes from the class of general unsecured creditors (while disregarding the

votes that were submitted in respect of the Confirmed Plan).[9]

20.    In addition, because so much time – over 18 months – has passed since the record

date for the Confirmed Plan, and because of the sheer volume of claims that have traded hands

since that date, the effect of maintaining the existing record date would be to disenfranchise

untold numbers of creditors.  To do otherwise would require that all holders of claims that have

purchased their claims in the last 18 months identify and locate the holder of that claim as of

November 2007, find out if that holder submitted a ballot and then if necessary cause that holder

to submit a changed vote – all in four weeks.  Indeed, in the case of bondholders who have

purchased bonds in the past eighteen months, there is likely no way to determine who the holders

of those bonds were at the time of the original voting record date.  Thus, maintaining the existing

voting record date is simply inequitable, as it will effectively disenfranchise untold numbers of

creditors and allow the Debtors to rely upon affirmative votes for a chapter 11 plan that paid par

plus accrued interest as being votes in favor of a "modified" plan that at best provides a pittance.

### B.    A New Voting Record Date Must Be Established and Full Resolicitation Must be Ordered

21.    Establishing a new voting record date and ordering a full resolicitation of votes

not only permissible when a new plan is proposed, it is also consistent with basic common sense.

As noted above, the Confirmed Plan was to provide holders of allowed general unsecured claims

with a "par plus accrued" recovery, while the Proposed Modified Plan would provide general

unsecured creditors with an effective recovery of zero.  No creditor that previously had voted in

---

[9]  Even if this Court were to determine that the Proposed Modified Plan is a modification of the Confirmed Plan and not a completely new plan, a new record date should still be established and a full resolicitation of votes should still be required, even though such relief may not technically comply with section 1127(d) of the Bankruptcy Code. Given the very significant changes that were made to the Confirmed Plan and given the claims trading that has taken place since November 26, 2007, using the old record date and not requiring resolicitation would disenfranchise numerous general unsecured creditors.

NY\1538878.1

support of a plan that was to provide full recovery should be deemed to accept a subsequent plan

providing a zero recovery if he fails to submit a ballot on account of the subsequent plan.  That

defies common sense.

22.    In fact, in paragraph 31 of the Motion, even the Debtors suggest that this Court

establish June 8, 2009 as the new record date.  The Committee endorses this suggestion.

C.    **Classes in Which No Members Vote Should Not
Be Deemed to Accept the Proposed Modified Plan**

23.    The Committee also objects to the Debtors' request that classes in which no class

member casts a vote be deemed to accept the Proposed Modified Plan.  The Debtors do not cite

any authority to support its request.  In fact, the language of section 1126(c) of the Bankruptcy

Code suggests just the opposite.  That section states that a class of claims accepts a plan when

the plan "has been accepted" by holders of at least two-thirds in amount and more than one-half

in number of the allowed claims of such class that "have accepted or rejected" the plan.  That

language suggests that for a class to accept a plan, a creditor in that class must affirmatively

accept the plan.

24.    It should be noted that the Proposed Modified Plan provides for the impairment of

the subclasses of secured claims (Classes 1A-1 and 6A-1), while the Confirmed Plan had

provided that these subclasses of secured claims would be unimpaired.  The Committee does not

know exactly why the Debtors decided to impair holders of secured claims under the Proposed

Modified Plan.  Nevertheless, the effect of this impairment, coupled with the Debtors' proposal

to deem classes in which no holders vote as having accepted the Proposed Modified Plan, would

be that an impaired accepting class of creditors would be created if any secured creditor simply

fails to vote on the Proposed Modified Plan.[10]  This would mean that section 1129(a)(10) of the

Bankruptcy Code could be satisfied so long as any one secured creditor fails to vote, even if

every other class overwhelmingly rejects the Proposed Modified Plan.  Such non-voting secured

creditors should not be considered to be an impaired accepting class of claims for purposes of

section 1129(a)(10) of the Bankruptcy Code.

        **D.**        **Treatment of the PBGC's Claim**

        25.        The Debtors also should not be permitted to use the separate classification of the

claim of the Pension Benefit Guaranty Corporation (the "PBGC") to engineer a consenting

impaired class for purposes of section 1129(a)(10) of the Bankruptcy Code.  The Proposed

Modified Plan provides for the PBGC to receive a general unsecured claim, which claim would

receive the same treatment as the claims of other unsecured creditors under that plan.  The

PBGC's vote with respect to the Proposed Modified Plan should be included with the votes of

the other general unsecured creditors for purposes of section 1129(a)(10) of the Bankruptcy

Code.

**II.**        **The Disclosure Statement Does Not Provide Adequate Information**

        26.        Section 1127(c) of the Bankruptcy Code requires the proponent of a plan

modification to comply with the disclosure requirements of section 1125 of the Bankruptcy

Code.  In turn, section 1125(b) provides that before acceptances of a proposed plan may be

solicited, the plan proponent must transmit to all holders of claims and interests "a written

disclosure statement approved, after notice and a hearing, by the court as containing adequate

information."  Section 1125(a) of the Bankruptcy Code, as applicable to the Debtors' chapter 11

cases, defines "adequate information" as:

---

[10]   Under the Proposed Modified Plan, each holder of a secured claim would be a member of its own subclass
within Class 1A-1 or Class 6A-1.

NY\1538878.1

> information of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records, that
> would enable a hypothetical reasonable investor typical of holders
> of claims or interests of the relevant class to make an informed
> judgment about the plan, but adequate information need not
> include such information about any other possible or proposed
> plan[.]

11 U.S.C. § 1125(a)(1) (pre-BAPCPA).[11]

27.     Under section 1125 of the Bankruptcy Code, a disclosure statement must contain

adequate information such that a hypothetical reasonable investor may make an informed

judgment about acceptance or rejection of a plan.  *See* 11 U.S.C. § 1125(a); *see also In re*

*Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Century Glove, Inc. v. First*

*American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) (stating that section 1125 of the

Bankruptcy Code "seeks to guarantee a minimum amount of information to the creditor asked for

its vote.").  Sufficient financial information must be provided so that a creditor can make an

informed judgment whether to accept or reject the plan.  *See In re McLean Indus., Inc.*, 87 B.R.

830, 834 (Bankr. S.D.N.Y. 1987) (noting that "substantial financial information with respect to

the ramifications of any proposed plan will have to be provided to, and digested by, the creditors

and other parties in interest in order to arrive at an informed decision concerning the acceptance

or rejection of a proposed plan").

28.     Although the type and amount of information required to be contained in a

disclosure statement varies from case to case, section 1125 of the Bankruptcy Code is biased

toward more disclosure than less.  *See, e.g.*, *Ryan Operations G.P. v. Santiam-Midwest Lumber*

*Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (stating that "[b]ecause creditors and the bankruptcy court

---

[11]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective as of October 17,
2005 and does not affect these chapter 11 cases, which were filed on October 8, 2005.

rely heavily on the debtor's disclosure statement in determining whether to approve a proposed

reorganization plan, the importance of full and honest disclosure cannot be overstated"); *Oneida*

*Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3rd Cir. 1988) (stating that the

fact that creditors and courts heavily rely on disclosure statements increases a debtor's obligation

to provide necessary, adequate information upon which such parties can make informed

decisions regarding proposed plan).  It is not only the quantity, but also the quality, of the

disclosed information that matters.  Frequently, courts have found that a disclosure statement that

does not provide sufficient factual support for its position cannot be approved.  *See, e.g.*, *In re*

*Egan*, 33 B.R. 672, 675-76 (Bankr. N.D. Ill. 1983) (noting that a disclosure statement is

"intended to be a source of factual information upon which one can make an informed judgment

about a reorganization plan.").

29.    The Debtors have failed to provide to the Committee or its professionals certain

vital information that it needs to fully analyze the Proposed Modified Plan.[12]  Not only should

this information be provided to the Committee forthwith, it should also be included in the

disclosure statement accompanying the Proposed Modified Plan (the "<u>Disclosure Statement</u>") so

that creditors may have the benefit of this information when determining whether to accept or

reject the Proposed Modified Plan.  This information includes:

> a.    The Committee has not received any information from the Debtors, the
> Treasury or GM about what return GM would receive on account of its loan to
> Parnassus.  General unsecured creditors would not receive a recovery under the
> Proposed Modified Plan until GM receives some level of return on account of its
> loan.  GM should not be permitted to obtain outsized returns before general
> unsecured creditors receive anything.

---

[12]  In addition, the Debtors have continued to provide critical  information to the Committee on a "professionals'
eyes basis" only.  While the Committee and its professionals were willing to abide by these limitations in the past, at
this critical juncture, it is absolutely essential that the entire Committee (not just its professionals) receive all
pertinent information regarding the Proposed Modified Plan and the Debtors on a consistent, ongoing basis.

b.      The Committee has not received sufficient information regarding what Parnassus' potential future contributions and obligations to Delphi's businesses would be.  This is particularly important, given that Parnassus would be expected to achieve astronomical returns under the transactions contemplated by the Proposed Modified Plan.

c.      Section 7.17(a) of the Proposed Modified Plan states that the remaining assets and liabilities of Delphi's hourly pension plan will "no longer be the responsibility of the Debtors and will be addressed by GM."  The Committee does not have any information about how that plan would be "addressed" by GM and how that may affect the Debtors and the possibility that general unsecured creditors might receive any recovery under the Proposed Modified Plan or how any clam might be diluted by a large claim in favor of the PBGC arising from plan termination.

d.      The Debtors must provide additional information about the process the Debtors, GM and the Treasury used to select Platinum as the purchaser. Specifically, the Debtors should describe how many (if any) competing bids or indications of interest they or the Treasury received, and whether the Debtors and Treasury refused to engage in discussions with any other potential purchasers besides the one of whom the Committee is already aware.

30.      In addition, to provide adequate information to creditors, the Disclosure Statement should include language prepared by the Committee indicating its opposition to the Proposed Modified Plan.  Moreover, the Disclosure Statement should include a letter from the Committee directed to holders of general unsecured claims.  That letter would describe in detail the basis for the Committee's strong opposition to the Proposed Modified Plan.  Such letter likely would include the information below.

### A.      The Debtors, at the Treasury's Insistence. Have Proposed a Plan That Effectively Provides a Zero Recovery to Unsecured Creditors

31.      On June 1, 2009 the Debtors filed a supplement to their October 3, 2008 motion for an order approving the Proposed Modified Plan.  The Proposed Modified Plan was the product of an agreement among the Debtors, GM and the Treasury, which has taken a lead role in negotiating on behalf of GM.

16

32.    Despite this Court's admonitions that the Committee should participate in plan negotiations in a meaningful way, the Committee did not have any significant role in any of the negotiations that led to the Proposed Modified Plan.  Indeed, during the recent mediation sessions with Judge Morris, representatives of GM met with the Committee's professionals for only about ten minutes, while representatives of the Treasury and DIP Lenders did not bother to meet with the Committee's professionals at all.  During that ten minute meeting took place, GM presented the Committee with the proposal that the Committee could not accept because it provided no real recovery to general unsecured creditors.  When the Committee did not accept that proposal, GM, the Treasury and the Debtors reduced the general unsecured creditors' stated potential recovery under the Revised Proposed Plan by 40 percent (*i.e.*, to the level set forth in the Proposed Modified Plan).

33.    The result of this flawed negotiation process is a Proposed Modified Plan that the Committee vigorously opposes.[13]  While the Proposed Modified Plan nominally provides for some *de minimis* potential recovery to general unsecured creditors, any recoveries to general unsecured creditors are not based on the Debtors' total enterprise value, but rather are conditioned on Parnassus Holdings II, LLC ("Parnassus") first receiving cash in the amount of $7.2 billion plus the 8% preferred return to holders of Parnassus Class C Interests (as defined in the Proposed Modified Plan).  In addition, general unsecured creditors would not receive any recovery unless and until GM receives some level of return that is not disclosed anywhere in the Disclosure Statement or Proposed Modified Plan.  Because the Debtors, the Treasury and GM will not share that information, the Committee can only hazard a guess that the required return to

---

[13]  In addition, to the Committee's knowledge, the DIP Lenders (particularly, the Tranche C DIP Lenders) have not agreed to the terms of the Proposed Modified Plan.

NY\1538878.1

GM would have to be enormous before general unsecured creditors receive a penny. That clearly would be inappropriate.

34.    Effectively, the Proposed Modified Plan provides general unsecured creditors with a zero recovery. This, of course, is far less than the recovery that the Committee negotiated with the Debtors and GM in September 2008 in connection with the amendments to the Global Support Agreement and the Master Restructuring Agreement between Delphi and GM (described *infra*).

35.    The Committee's proposal regarding a recovery to unsecured creditors under a chapter 11 plan was entirely reasonable. The Committee would support a chapter 11 plan that would provide general unsecured creditors a recovery if and when the Debtors' total enterprise value exceeds $7.2 billion, calculated by an objective measure. That $7.2 billion enterprise value was the Debtors' estimated total enterprise value at or about the time this Court entered an order approving the amendments to the Debtors' Global Support Agreement and Master Restructuring Agreement in September 2008. This conceptually would operate like a warrant that would be "in the money" only when the Debtors' total enterprise value exceeds $7.2 billion, calculated by an objective measure. The Committee communicated its modest offer to the Debtors, the DIP Lenders, GM and the Treasury, but none of these parties accepted that offer – indeed, none of them even responded to it or engaged the Committee in any discussions about it. Instead, the Debtors, GM and the Treasury are supporting the Proposed Modified Plan that contains the double death trap provisions aimed at the general unsecured creditors.

**B.    The Debtors Refuse to Allow at Least
One Other Potential Purchaser to Conduct Due Diligence**

36.    Since the beginning of these chapter 11 cases, the Debtors have disregarded the interests of their creditors in favor of GM's (and now the Treasury's) wishes. Sadly, the Debtors

NY\1538878.1

have done so again.  Through the Proposed Modified Plan, the Debtors have bowed to the

Treasury's wishes, and have even refused to consider entreaties from at least one party that has

expressed a willingness to purchase the Debtors' assets through a transaction that could very well

deliver more value to the estates than the transactions set forth in the Proposed Modified Plan.  In

particular, one potential purchaser has proposed to acquire the Debtors' global assets and

businesses, subject to due diligence that the party asserts would take only three weeks or slightly

longer.  In their quest to consummate a deal with GM and the Treasury at breakneck speed, the

Debtors have informed this potential purchaser that any due diligence period beyond one week is

not possible, thus scuttling any potential transaction with that party.  The Debtors' fiduciary

duties obligate them to explore potential transactions that maximize value.  In breach of those

fiduciary duties, they are refusing to do so.[14]

### C. The Committee Believes That GM and its Directors and Top Officers Dishonestly Procured a Full Release by the Debtors' Estates in September 2008, and the Debtors Are Not Pursuing Their Available Legal Remedies

37.  In September 2008, the Debtors and GM entered into amendments to the Global

Settlement Agreement (the "GSA") and the Master Restructuring Agreement (the "MRA")

between the Debtors and GM.  In exchange for what the Debtors asserted was approximately

$10.6 billion in net contributions by GM to their transformation, GM bargained for and obtained

an immediate and full release of all claims that the Debtors and their estates may assert against

GM and its directors and officers.

---

[14]  There is sufficient time for this and other potential purchasers to conduct due diligence.  In the past and up to the present time, GM has told the Debtors who may and who may not purchase their assets.  That cannot continue now.

NY\1538878.1

38.    The Committee initially vigorously opposed the proposed amendments to the GSA and the MRA,[15] but it withdrew its objection to the Debtors' motion to approve the amendments only after the Debtors and GM agreed to insert additional provisions into the amended GSA.  One such provision stated that if any condition to GM's receipt of the preferred stock under a plan of reorganization is not satisfied or waived by GM, then holders of general unsubordinated unsecured claims would receive 50% of all distributions that otherwise would be made to GM on account of its allowed administrative expense claim, to the extent necessary for such holders to receive an aggregate distribution of $300 million on account of their allowed general unsubordinated unsecured claims.  Thus, the Committee agreed to abandon its litigation against the amended GSA and MRA and not to object to the immediate and full release of GM and its directors and officers, in return for an assurance that general unsecured creditors would share equally with GM on its recovery on account of the GM administrative expense claim.

39.    The Committee was led to believe that the September 2008 amendments to the GSA and MRA would pave the way for the Debtors to exit chapter 11 protection expeditiously, and that GM would have the financial wherewithal to provide the Debtors with the support that was called for under the amended GSA and MRA.  The Debtors' estimated total enterprise value at the time the amendments were approved by this Court was approximately $7.2 billion, which was based in large part upon the Debtors' and the Committee's assumptions as to GM's future production and sales volumes.  The Committee had agreed to the amendments to the GSA and the MRA (including the full release of GM and its directors and officers) while relying on

---

[15]  Soon after its formation, the Committee began to investigate GM's involvement in the Debtors' business affairs. Based on information that the Committee obtained in its investigation and information produced by the Debtors, the Committee determined that GM's conduct leading up to and following the 1999 spin-off of the Debtors gave rise to certain very significant actions, objections, and rights against GM (the "<u>GM Claims and Defenses</u>").  The GM Claims and Defenses include upwards of nineteen counts against GM and certain of its former and current officers and directors, including counts of fraud, breach of fiduciary duty, conspiracy, and fraudulent transfer.  The GM Claims and Defenses were significant assets of the Debtors' estates.

projections of GM's North American sales and production volumes, as stated by GM and as forecasted by industry analyst Global Insight/DRI.  However, the Committee recently has been informed that just days or weeks after the Committee and GM met face-to-face on September 25, 2008 and after this Court approved the amendments to the GSA and the MRA the next day, GM publicly announced very significant reductions in its projections for future production and sales of its vehicles in North America.  Those reductions were not disclosed to the Committee during the time in which the amended GSA and MRA were negotiated.

40.    The Committee believes that GM and its directors and top officers procured the release by the Debtors' estates while concealing GM's true production and sales forecasts, allowing the Debtors and the Committee to rely on GM's stated future projections and on the inflated Global Insight/DRI projections.  In sum, the Committee believes that GM and its directors and top officers knew at the time the amended agreements were being presented to this Court for approval that one of the fundamental bases for those agreements – projections as to GM's future production – was incorrect.[16]  Nevertheless, they remained silent because Court approval of those amendments would grant GM and its directors and officers a release of the Debtors' estates' valuable claims.  Indeed, as it turned out, all of the "new value" that GM provided to Delphi during these chapter 11 cases ended up benefiting only GM.

41.    Despite the conduct of GM and its directors and officers, the Debtors have not taken any steps to pursue the estates' remedies.  For example, the Debtors have not sought to

---

[16]  Section 1104(e) of the Bankruptcy Code provides that if there are reasonable grounds to suspect that GM's current directors, its Chief Executive Officer or its Chief Financial Officer participated in fraud, dishonesty or criminal conduct in the management of GM or its public financial reporting, then the United States Trustee must move for the appointment of a trustee in the GM bankruptcy cases (which were filed in this District on June 1, 2009) under section 1104(a) of the Bankruptcy Code.  The potential dishonest and fraudulent conduct by the Debtors' directors and top executives may require the United States Trustee in the GM bankruptcy case to move for the appointment of a trustee in that case.

NY\1538878.1

modify or vacate this Court's order approving the amendments to the GSA and MRA, or the

releases granted to GM.

      **WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion

and (b) grant the Committee such other relief that it deems just and proper.

Dated: June 9, 2008
      New York, New York

                                    **LATHAM & WATKINS LLP**

                                    By: /s/ Robert J. Rosenberg
                                      Robert J. Rosenberg (RR-9585)
                                      Mitchell A. Seider (MS-4321)
                                      Mark A. Broude (MB-1902)
                                      Michael J. Riela (MR-7829)
                                      885 Third Avenue, Suite 1000
                                      New York, New York 10022
                                      Telephone:  (212) 906-1200

                                    Attorneys for the Official Committee
                                    of Unsecured Creditors

NY\1538878.1