Marc Abrams
Michael J. Kelly
Richard Mancino
Christopher J. St. Jeanos
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

*Counsel to the Collective of DIP Lenders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
In re                           :       Chapter 11
                                                       :
DELPHI CORPORATION, et al.,     :       Case No. 05-44481 (RDD)
                                                       :
                    Debtors.    :       (Jointly Administered)
                                                       :
-------------------------------------------------------x

### RESPONSE AND PARTIAL OBJECTION OF THE COLLECTIVE OF DIP LENDERS TO DEBTORS' (A) SUPPLEMENT TO MOTION FOR ORDER (I) APPROVING MODIFICATION TO DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND RELATED DISCLOSURES AND VOTING PROCEDURES AND (II) SETTING FINAL HEARING DATE TO CONSIDER MODIFICATIONS TO FIRST AMENDED PLAN OF REORGANIZATION AND (B) REQUEST TO SET ADMINISTRATIVE EXPENSE CLAIMS BAR DATE AND ALTERNATIVE SALE HEARING DATE

A collective of Lenders under the DIP Credit Agreement (together, the

"Collective"[1]), with significant holdings of Tranche A, B, and C loans, by and through their

undersigned counsel, hereby submits this Response And Partial Objection Of The Collective of

DIP Lenders To Debtors' (A) Supplement To Motion For Order (I) Approving Modification To

---

[1]     The Collective includes:  (i) Double Black Diamond Offshore Ltd.; (ii) Black Diamond Offshore Ltd.;
(iii) Monarch Master Funding Ltd.; (iv) Greywolf Capital Partners II LP; (v) Greywolf Capital Overseas
Master Fund; (vi) GCOF SPV I; (vii) GCP II SPV I; (viii) Greywolf Structured Products Master Fund, Ltd.;
(ix) Greywolf CLO I, Ltd.; and (x) SPCP Group, LLC.

Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To First Amended Plan Of Reorganization And (B) Request To Set Administrative Expense Claims Bar Date And Alternative Sale Hearing Date (the "Motion").  The Motion and transactions contemplated thereby constitute an unprecedented attempt by a debtor to strip away the unassailable superpriority liens of secured post-petition debtor in possession lenders and divert the collateral securing those liens without the consent – and over the objection of – those lenders.[2] This brazen reallocation is fundamentally flawed and will not command the support required under the DIP Credit Agreement[3] and, therefore, are incapable of being implemented. Accordingly, in support of this Response and Partial Objection, the Collective respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Delphi Corporation ("Delphi") is an essential part of the North American automotive industry, whose products are integrated into virtually every major automotive original equipment manufacturer's ("OEM") global platforms.  Due to the highly engineered nature of Delphi's products, OEMs would require substantial time and incur material expense to find alternate sources of supply that would not jeopardize the safety of production vehicles.

2.      Throughout the nearly four years that Delphi and certain of its subsidiaries and affiliates (collectively, the "Debtors") have been in chapter 11 of the Bankruptcy Code, Delphi has continued to supply automotive parts to General Motors Corporation ("GM") and its

---

[2]      Importantly, the treatment of pre-petition lenders in the Chrysler and GM bankruptcies are not a guide to this Court because, unlike the pre-petition creditors in those cases, the DIP Lenders here provided post-petition loans with superior protections under the Bankruptcy Code and court-approved rights.

[3]      The Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of May 9, 2008 with JPMorgan Chase Bank N.A., as Administrative Agent.

other North American customers at a loss, as failure to continue such supply would likely result in the shut-down of the entire North American automotive industry.  The Debtors subsidized those losses by using the DIP Lenders' cash collateral and cash flow generated by their non-U.S. business.

3.      The Debtors have repeatedly represented to this Court and their stakeholders that the only viable path to their emergence from bankruptcy was to reach a consensual agreement with their former parent and biggest customer, GM.  The linchpin of such an agreement, Delphi insisted, would be the sale to GM of certain United States Delphi facilities critical to GM's operations (the four so-called "UAW Keep Sites" and the Global Steering Business).  Such an agreement would allow GM to control the supply of the components without which it cannot build cars, and thereby avoid the monumental costs that a disruption to GM's just-in-time supply chain would certainly cause.

4.      On the strength of these assurances, Delphi's secured DIP Lenders with significant input from the Collective have worked with the Debtors to achieve a successful reorganization.  Despite holding unquestioned rights as postpetition secured lenders – including, in the company's own words, "administrative and superpriority claims and superpriority liens and . . . the right to avoid having their claims subjected to compromise without their consent under a chapter 11 plan of reorganization"[4] – the DIP Lenders have made one concession after another to assist Delphi in emerging from chapter 11 and to ensure the continuation of supply to the North American automotive industry.  Their goal has been, and continues to be, to maximize Delphi's value so that they can obtain a fair recovery consistent with their rights as postpetition

---

[4]      Debtors' Omnibus Reply in Support of Accommodation Motion and Response to Tranche C Collective's Cross-Motion Pursuant to 11 U.S.C. §§ 105(a), 361, 363(e) and 1107(a) For Adequate Protection ("Omnibus Reply"), Docket 14481 at ¶ 9.

secured lenders and with their own fiduciary obligations.  While the Collective supports a

transaction in which GM can obtain the North American assets it needs to produce cars and

trucks without interruption, the DIP Lenders are entitled to approve the sale of their collateral or

otherwise take control of it through foreclosure and credit bidding.

5.      However, by agreeing to turn its assets over at a discount price to GM and

Parnassus Holdings II, LLC ("Parnassus"), a joint venture between GM and Platinum Capital

Equity Partners, L.P.  ("Platinum") (for which GM is providing 88% of the equity[5]), Delphi has

unmistakably reneged on its commitment, and abdicated its fiduciary and contractual obligations

to maximize the value of the DIP Lenders' collateral in what we can only describe as a

misguided capitulation to the Administration's policy.  The proposed transaction (the "Proposed

Transaction") that the Debtors will ask the Court to approve as part of a modified Plan of

Reorganization or, alternatively, as a private sale pursuant to section 363 of the Code, is the

product of a fundamentally flawed process.  The Proposed Transaction was secretly negotiated –

while a court-ordered mediation was in progress – without anything remotely resembling a

proper M&A process[6] – and in violation of the DIP Lenders' rights.

6.      In addition, Delphi ensured that any negotiations among the DIP Lenders,

GM and the U.S. Treasury's Auto Task Force ("Auto Task Force") could not take place on a

level negotiating field by attempting to establish a ceiling on any recovery for the Tranche C

Lenders by issuing a so-called Hypothetical Liquidation Analysis ("HLA") whose shockingly

---

[5]      See General Motors Form 8-K, filed with the U.S. Securities and Exchange Commission on June 5, 2009.

[6]      The Debtors did not conduct a robust M&A process.  Rather, they breached sections 3(n) and 3(o) of the
Accommodation Agreement by failing to cooperate with the DIP Lender Representatives and OHorizons
LLC (the Collective's financial advisor) in connection with continuing a non-public process to explore the
sale of all or substantially all of the assets or equity of one or more divisions or business units of Delphi or
its subsidiaries.  In addition, the Debtors have refused to engage with independent bidders that have
submitted legitimate proposals to buy all or substantially all of the company's business.  These violations
by the Debtors will be further explored in discovery.

low liquidation values are based on an unrealistic "cold shut-down" of the entire North American automotive industry.  That assumption was contradicted not just by Delphi's own reorganization process which is based entirely on <u>not</u> shutting down the North American automotive industry, but also by almost every other distressed supplier bankruptcy (in which OEMs like GM worked with, not against, their suppliers to ensure continuity of supply and a non-disruptive wind-down of operations).  Delphi's two prior liquidation analyses did not assume the "cold shut-down," fire sale scenarios on which the HLA is based.  The unrealistic assumptions behind the HLA were demonstrated to all the world when, in the midst of the mediation, the United Auto Workers ("UAW") announced that it had agreed with GM to take into its revised collective bargaining agreements the four Delphi UAW Keep Sites and Delphi's Global Steering Business that GM intended to acquire from Delphi, presumably not in the context of an out-of-control liquidation precipitated by GM's refusal to purchase parts from Delphi.  (A copy of the UAW announcement is attached as Exhibit A.)  What is more, Delphi has failed to give any weight to the alternative liquidation analyses ("ALA") presented to it by the DIP Agent's financial consultants (The Blackstone Group and Alvarez & Marsal) and by the Collective's financial and automotive consultants (OHorizons LLC), each of which demonstrates in their own ALA (on an assumed liquidation basis) that the value of the Estates' assets can be maximized through an orderly wind-down and sales process through which GM can obtain the assets it needs while Delphi has sufficient capital to restructure, operate or sell its remaining businesses, and thereby provide the DIP Lenders with a substantially greater recovery than that postulated in the HLA.

7.    Not surprisingly, then, the Proposed Transaction that resulted from Delphi's secret negotiations with GM, Platinum and the Auto Task Force represents a give-away by the Debtors of significant value to these third parties in exchange for inadequate consideration

to the DIP Lenders.[7]  While key elements of the deal are still not available to the DIP Lenders,[8]

based on the information that has been provided, it appears that Delphi on June 1, 2009 agreed to

sell (1) to GM its global steering business and the facilities that the UAW announced on May 26,

2009 that GM had agreed to acquire, and (2) to Parnassus substantially all of the rest of its

business at a bargain basement price that will not be approved by the DIP Lenders.  Parnassus is

an entity funded principally by GM (and thus controlled by the Auto Task Force) in which GM's

and the Auto Task Force's hand-picked private equity buy-out partner Platinum provides the

appearance of an independent third-party in exchange for disproportionate economic returns.  All

this is being done, while ensuring that Delphi's senior management and board are well taken care

of.  The Proposed Transaction further purports to provide for the payment in full of certain

administrative claims (such as those of the professionals), while relegating to the superpriority

administrative claims of the Tranche C Lenders to only 10 cents of cash and contingent

recoveries which at most amount only to pennies on the dollar.

        8.      The Collective does not here quarrel with the Auto Task Force's efforts to

nationalize and restructure the U.S. automotive industry in what portends to be the greatest

salvage operation in the history of the industrialized world.  While GM has historically been the

path to Delphi's emergence from bankruptcy, Delphi's successful reorganization is now a virtual

prerequisite for the viability of the "New GM".  The Collective has no interest in derailing GM's

restructuring, which would clearly benefit no one. However, GM's goals cannot achieved by

---

[7]    The Proposed Transaction does not short-change the Debtors' board, senior management or professionals. The purchaser agrees to assume Delphi's obligations to senior management, and both they and the board will receive indemnification rights and protective insurance coverage going forward.

[8]    The Master Disposition Agreement (the "MDA") as filed does not include any schedules or exhibits, including those detailing the specific assets and liabilities to be transferred to the GM Buyers and Parnassus.  Also, copies of the Securities Purchase Agreement between Parnassus and GM, the Equity Commitment Letter, financing agreements and loan documents referred to in the MDA were not provided. This information is necessary to fully understand and assess the transactions contemplated by the MDA.

running roughshod over the contractual rights and legal entitlements of Delphi's postpetition

secured lenders or by ignoring the Bankruptcy Code's statutory requirements regarding plans of

reorganization, section 363 sale transactions, and the treatment and priority of postpetition

secured administrative creditors.  The Collective cannot stand back while assets to which it is

entitled under the DIP Credit Agreement, this Court's DIP Approval Order and the Bankruptcy

Code are being wrongfully expropriated in favor of third parties.  The Bankruptcy Code is

naught but empty words if this inversion of economic priorities is allowed to proceed unchecked.

   9.  Which brings us to the Debtors' Motion.  We appreciate that the Debtors'

request that a schedule be set is not the place to air all of the reasons that the Proposed

Transaction cannot be approved either in a plan of reorganization or through a private sale

pursuant to section 363 of the Code, and we will not do so here.  For present purposes, it is

imperative that the Court understand that the Proposed Transaction is unlikely to be approved,

either as part of a Modified Plan or in a private 363 sale.  Nevertheless, the Collective does not

object to the Court's establishing a schedule along the lines of what the Debtors propose.

However, the Collective is unwilling to sit by while the Debtors pursue a futile plan process, and

then face an Alternate Sale Hearing in which the Debtors seek to convert the Proposed

Transaction into a 363 sale and seek to preclude a competitive process (by way of a "no-shop"

provision and insistence on a private sale) due to the alleged "melting ice cube" nature of the

business.  (In fact, while a significant portion of cash-burning North American operations will be

acquired by GM, the foreign operations are generating cash and are a profitable enterprise.)

Instead the DIP Lenders propose that the Debtors now commence a true, competitive sale

process in which third parties and the DIP Lenders as credit bidders can have the same access to

due diligence as GM and its chosen partner have had, and have adequate time to formulate a

competitive bid and line-up financing.  To that end, the Collective asks the Court to adopt and

implement bidding and auction procedures designed to ensure a fair, open and robust auction

process.

### FACTUAL AND PROCEDURAL BACKGROUND

10.     The Debtors have been in chapter 11 for more than four years.  A plan of

reorganization has been confirmed, but not consummated.  In recognition of the many

uncertainties surrounding the viability of the Debtors' Plan of Reorganization, the Court reserved

to itself the right to revoke the Confirmation Order.  (See Hr'g Tr., 45, 67-68, Jan. 17, 2008,

Docket No. 12477.)

11.     The members of the Collective are parties to the DIP Credit Agreement.

The DIP Lenders as a group are owed in excess of $3.25 billion in principal, plus accrued

interest.  The DIP Lenders hold superpriority liens on substantially all assets of the Debtors (the

"Collateral").  The Collective alone holds in excess of $800 million in Tranche A, B and C loans

and is well aware that there are many other similarly positioned institutions who share the

Collective's dissatisfaction with the Debtors' plan

12.     The Court approved the DIP Credit Agreement by the DIP Refinancing

Order, entered January 5, 2007 (as supplemented, the "DIP Order").  Among other things, the

DIP Order granted the DIP Lenders superpriority administrative claims (DIP Order ¶ 5) and

superpriority and priming security interests and liens in the Collateral (id. ¶ 6).  In addition, in

paragraph 7 of the DIP Order (entitled "Protection of DIP Lenders' Rights"), the Court vacated

the automatic stay to allow the Agent and the DIP Lenders to exercise "all rights and remedies

against the Collateral provided for in the DIP Documents [which include the DIP Credit

Agreement and the Amended and Restated Security and Pledge Agreement]" in the event of the

occurrence of an Event of Default under the DIP Credit Agreement. (Id. ¶ 7(b).) The DIP Order also provided that, "[i]n any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing," and that the parties waived any right to seek relief, including under section 105 of the Code, that "would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents." (Id.) The DIP matured on December 31, 2008. It was not repaid, triggering an unquestioned Event of Default. Subject only to the forbearance embodied in the Accommodation Agreement, the DIP Lenders are entitled at any time to exercise any and all of their remedies under the DIP Credit Agreement and the DIP Order. The DIP Lenders' indisputable rights include, among others, the ability to foreclose on the Collateral or consent – in their sole discretion – to the alternative disposition of the Collateral.

13.    Throughout the course of these proceedings, the DIP Lenders have made numerous concessions to assist in Delphi's emergence from chapter 11. These concessions have included (i) extending the Maturity Date of the DIP Credit Agreement; (ii) agreeing through the Accommodation Agreement to forbear from exercising remedies (even though Delphi is in default on repaying their loans); (iii) allowing Delphi to continue to use their cash collateral to continue operations, thereby ensuring an uninterrupted supply of product to GM and the Debtors' other customers; and (iv) agreeing to numerous extensions of the Accommodation Period, most recently in the Fifth Amendment, which was executed last night. In return, Delphi failed to take advantage of the breathing room the DIP Lenders have granted it. When the Accommodation Period was originally proposed in November 2008, Delphi had more than $800 million in available cash. Today, its available cash resources have been reduced to approximately $25

million.  Instead of using the Accommodation Period to maximize its value as an independent

player in the global automotive market, Delphi has squandered more than $100 million per

month and invaluable goodwill by failing to take advantage of the assistance, advice and

breathing room the DIP Lenders have proffered, leaving itself vulnerable to predatory tactics and

sources of influence outside the traditional checks and balances of chapter 11.

          14.     Rather, during the Accommodation Agreement's forbearance period,

Delphi continued negotiations with GM on the sale of the four UAW "Keep Sites" and Delphi's

Global Steering Business, and refused to explore other opportunities to market its global

businesses.  By March 4, 2009, when Delphi filed a motion to permit GM prematurely to

exercise its option to buy the Global Steering Business (the "Steering Motion"), Delphi

represented to the Court that a term sheet reflecting a global agreement with GM was just days

away.[9]  In conjunction with the Steering Motion, Delphi also sought approval of two

amendments to the GM-Delphi Agreement, pursuant to which GM agreed to increase its junior

unsecured funding commitment by $150 million.

          15.     The day before the hearing on the Steering Motion, the process stalled

with the Auto Task Force refusing to consent to GM's purchase of the Global Steering Business

and blocking GM increasing its critical funding commitment to Delphi.  The Auto Task Force

explained that it needed more time to get up to speed on the Delphi-GM relationship and

expressed a preference for addressing these matters as part of an overall resolution of Delphi's

chapter 11 proceedings.  Sharing this latter goal, the DIP Lenders continued to support Delphi's

---

[9]     Delphi stated that it and GM were "affirmatively committed" to reaching agreement on a term sheet
covering a comprehensive deal before March 9, 2009.  (Steering Mot., Docket 16410 ¶ 31.)

efforts to operate and to negotiate with GM, despite the substantial uncertainty created by the involvement of the Auto Task Force.

16.    Lacking additional funding from GM, Delphi looked to its DIP Lenders for further liquidity.  By way of additional amendments to the Accommodation Agreement, the DIP Lenders permitted Delphi the continued use of their cash collateral.  But the DIP Lenders' agreement was not without conditions.  Among other things, the DIP Lenders required Delphi to agree to commence an M&A process, which commitment was reflected in sections 3(n) and (o) of the Accommodation Agreement dated December 12, 2008 (as amended).

17.    Over time, it became clear that direct negotiations between the DIP Lenders, on the one hand, and GM and the Auto Task Force, on the other, were necessary if progress was to be made toward a consensual resolution.  The Collective preferred direct negotiations but the Auto Task Force refused to engage directly with the DIP Lenders, citing governmental ethics concerns.  Informed that the Auto Task Force had allegedly asked Delphi and its counsel to act as intermediaries, the Collective tried to negotiate in this manner.  However, Delphi proved to be an unreliable go-between; instead, picking sides, Delphi tried to force an artificial ceiling on any recovery by the Tranche C Lenders through publication of its HLA and its telegraphing that the values in that analysis were the most the Tranche C Lenders could expect.

18.    Afraid that Delphi had irrevocably chilled the prospects of a consensual resolution, the DIP Lenders nevertheless asked the Court to appoint an impartial mediator to facilitate negotiations.  The Court issued its Mediation Order on May 20, 2009, directing mediation before the Honorable Cecilia Morris.  The efforts of Judge Morris could not, however, overcome the deleterious impact Delphi's flawed HLA had on any prospects for a successful

mediation.  As noted, Delphi's HLA is based on the unrealistic assumption that, instead of acting

rationally, GM and the Auto Task Force would rather shut down the North American automotive

industry and Delphi would enter a free-fall liquidation precipitated by a "cold shut-down" of

operations.  That assumption is contradicted by Delphi's and GM's actions throughout the course

of Delphi's chapter 11 proceedings, as well as virtually all every other distressed supplier

bankruptcies, including most recently that of Visteon.[10]  GM and the Auto Task Force are

attempting to satisfy the DIP Tranche C claim with consideration in a nominal amount of 20

cents (although the actual value is substantially less given the speculative and time-deferred

nature of the Class C Membership Interest and potential litigation recovery) which, not

surprisingly, just happens to equal the 20 cent mid-point of the Debtor's original HLA.

19.    While Delphi's HLA assumes wholly unrealistic valuations and recovery

ranges for the Collective, alternative liquidation analyses prepared by the Agent's financial

consultants Blackstone and A&M and by the Collective's automotive experts OHorizons showed

that, when realistic and factual assumptions were used, the Debtors' businesses supported

substantially higher valuations and significantly greater recoveries even in a liquidation

context.[11]  These analyses highlighted the value represented in Delphi's "Rest of World"

business segment, which Delphi projects to generate substantial EBITDAR.[12]

---

[10]    Visteon announced on June 5, 2009 that Ford Motor Company will provide at least $125 million of DIP
financing in its chapter 11 case.  See Visteon Form 8-K filed with the U.S. Securities and Exchange
Commission on June 4, 2009.  Visteon previously had transferred 24 facilities to an entity owned by Ford
(Automotive Component Holdings) and Ford had provided Visteon with financing and funding for its
restructuring activities.  This "supplier playbook" was followed in other automotive parts supplier
bankruptcies including Collins & Aikman and Plastech Engineered Products.

[11]    The Court should not assume, as Delphi will maintain, that a pure liquidation analysis is the appropriate
measure in the context of a section 363 sale transaction.  See, e.g., In re Tempo Tech. Corp., 202 B.R. 363,
369 (Bankr. D. Del. 1996); see also In re Beker Indust. Corp., 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

[12]    Delphi's RoW business segment includes its European operations which Delphi did not inherit from GM
but rather were acquired by Delphi.  Based on information provided by Delphi, the European operations are

20.     In retrospect, once the playing field was un-leveled by Delphi's unreliable HLAs, negotiations among the DIP Lenders, GM and the Auto Task Force were doomed to fail, although not for lack of effort and willingness to compromise by the DIP Lenders.

21.     On June 1, 2009, the Debtors filed the instant Motion, seeking to schedule a hearing on the Modified Plan, and related disclosures and voting procedures, and seeking an Alternative Sale Hearing date to consider the Proposed Transaction that is outlined in the Motion as a private sale under section 363 of the Code.  The Proposed Transaction that Delphi disclosed for the first time in its Motion consists of the MDA, dated as of June 1, 2009, among Delphi, GM Components Holdings, LLC ("Parent", and together with certain other buyers, the "GM Buyers"), GM, and Parnassus.  Pursuant to the MDA, Delphi proposes to sell substantially all of its productive assets to the GM Buyers and Parnassus in exchange for their assumption of specified liabilities and certain other consideration.

22.     Specifically, pursuant to the MDA, Delphi will sell to the GM Buyers the Global Steering Business and the UAW Keep Sites, proceeds from the sale of the brakes and suspension and exhaust businesses, and rights relating to Delphi's lawsuit against Appaloosa Management L.P.  In exchange for these and certain other assets, the GM Buyers will (i) pay Delphi $291,020,079 in cash, certain fees under the DIP Agreement and 50% of the chapter 11 administrative claims to be paid by Delphi's filing affiliates, (ii) pay accrued and unpaid interest and outstanding principal amounts of the Tranche A Loans and Tranche B Loans, (iii) waive its pre-petition, administrative and future bankruptcy claims, and (iv) assume certain liabilities relating to the acquired assets, including cure amounts for pre-petition contracts assumed by the

---

able to operate on a self-sustaining basis.  Not surprisingly, soon after receiving the DIP Lenders' alternative liquidation analyses, Delphi produced a so-called "Updated HLA," which assigned even less value to its RoW operations than did the original HLA.  The Updated HLA cannot, however, be squared with Delphi's projections.

GM Buyers.  The MDA also provides that most of Delphi's remaining assets – including the

extremely valuable RoW businesses – will be sold to Parnassus for a purchase price consisting

primarily of a Class C membership interest in Parnassus in the nominal amount of $145.5

million, with an annual 8% cash dividend and subject to mandatory redemption ten years after

issuance.  Parnassus also agrees to assume certain liabilities relating to the acquired assets,

including cure amounts for pre-petition contracts assumed by Parnassus, and specified director,

officer and employee related liabilities, including employment and incentive agreements for

eligible executives, indemnification obligations with respect to current and former directors,

officers and executives and the obligation to maintain D & O insurance.

> 23.    The structure of the MDA transactions is suspect.  The MDA contemplates

two separate and distinct transactions – one with the GM Buyers and one with Parnassus –

whereby different assets are acquired and different liabilities are assumed by the GM Buyers and

by Parnassus, and each pays a separate purchase price.  Yet, these disparate transactions were

combined together into a single agreement (the MDA).  The only reasonable explanation for

combining them together was a desire to preclude competitive bidding by giving the appearance

that a potential bidder could only be competitive if its offer was comparable to the purchases by

the GM Buyers and Parnassus taken as a whole.  As disclosed in the Motion and its annexed

papers – which lacked most of the schedules and other information necessary to enable the DIP

Lenders to understand or evaluate the transaction – the Proposed Transaction appears to be

premised on the Tranche A and B Lenders credit-bidding the entire principal amount of Tranche

C Loans (approximately $2.459 billion following repayment of $291 million) in exchange for the

first $145 million in net recovery under the Plan Investor Litigation (which in itself is an

uncertain event) and a highly speculative $145 million stated amount of Class C Membership

interests in Parnassus.  While the exact value of this consideration is unclear, the Collective

estimates that it amounts to just a fraction of the $2.75 billion principal amount the Tranche C

Lenders are owed.

### RESPONSE AND PARTIAL OBJECTION

I. **THE COLLECTIVE DOES NOT OBJECT TO THE COURT ENTERING A SCHEDULE THAT ALLOWS TIME FOR DISCOVERY AND OTHER PROCEEDINGS, PROVIDED THAT THE COURT PUTS IN PLACE FAIR AUCTION AND BIDDING PROCEDURES THAT CAN MAXIMIZE THE VALUE OF THE ESTATES.**

24.    Under section 1127(a) of the Code, a debtor may seek to modify a

confirmed plan of reorganization should circumstances warrant.  See 11 U.S.C. § 1127(a).  It is

clear, however, that what the Debtors propose here is really a completely new plan of

reorganization, different in kind, not merely degree, from its moribund predecessor.  Yet, rather

than asking the Court to exercise its power to revoke the Confirmation Order – a power the Court

expressly reserved to itself [13]– the Debtors have filed, and repeatedly adjourned, motions to

modify the Plan in pursuit of their desire to maintain exclusive control over the plan process.

25.    By making the Proposed Transaction the key element of their Motion, the

Debtors have guaranteed that the plan confirmation process they envision unfolding over the

next six weeks will be a futile exercise.  The Debtors concede the Plan requires, at a minimum,

consent of the Required Lenders under the DIP Credit Agreement.  The Plan will fail because the

DIP Lenders will not support or consent to a transaction that, like the Proposed Transaction, is

based upon a reckless assessment of the Estates' value, was negotiated in secret without the

benefit of a properly conducted M&A process or an open auction and bidding process, fails to

realize for the Debtors' stakeholders the significant values embedded in the company's

operations, especially in the RoW, and discriminates against the DIP Lenders without their

---

[13]        See Hr'g Tr., 45, 67-68, Jan. 17, 2008, Docket No. 12477.

consent.[14]  Thus, without the DIP Lenders' support, the Modified Plan or any 363 sale to which

the plan may toggle can never be implemented.

26.    The Collective cannot stand by while their rights under the DIP Credit

Agreement, this Court's DIP Order and the Bankruptcy Code are trampled by a management and

board that have aligned themselves with favored third parties in order to divert value to entities

to whom they owe no fiduciary duties.  In these circumstances, the Collective will not "agree to

the different treatment" contained in the Modified Plan or Proposed Transaction.

27.    Nevertheless, the Collective is willing to proceed with a time-line similar

to the schedule that the Debtors propose so long as it is accompanied by auction and bidding

procedures that will allow for the consideration of alternative proposals more likely to maximize

the value of the Debtors' Estates than the Proposed Transaction.[15]  In this regard, the DIP

Lenders ask the Court to establish appropriate auction and bidding procedures.  Such a schedule

would also allow the parties to engage in discovery and to pursue the due diligence necessary to

understand the Proposed Transaction and to consider alternative transactions.  Accordingly, the

Collective asks the Court to approve the following schedule (dates and events not found in the

Debtors' schedule are bolded):

| Date | Event |
|------|-------|
| **June 11, 2009** | **Commencement of Document Discovery** |

---

[14]    Under Section 1129(a)(9) a plan cannot be confirmed unless all administrative expense priority claims are
paid in cash, in full, unless such claimholders agree to different treatment.  See 11 U.S.C. § 1129(a)(9)(A).
The DIP lenders have "administrative and superpriority claims and superpriority liens and, accordingly, the
right to avoid having their claims subjected to compromise without their consent under a chapter 11 plan of
reorganization."  (Omnibus Reply ¶ 9.)

[15]    The DIP Lenders could achieve the same result by allowing the Accommodation Period to expire on June
12 and commencing foreclosure proceedings; however, the Collective would prefer to proceed via an
orderly section 363 sale process conducted under the supervision of the Bankruptcy Court.

| | |
|---|---|
| June 16, 2009 | Deadline to publish notice of hearing to approve modifications to Confirmed Plan |
| | Deadline to commence mailing of solicitation packages |
| **June 21, 2009** | **Completion of Document Discovery** |
| **June 26-July 14, 2009** | **Depositions and Expert Depositions** |
| July 2, 2009 | Rule 3018(a) motion deadline |
| | Modified Plan exhibit filing deadline, including deadline to file the 363 implementation agreement (the "363 Implementation Agreement") |
| | Deadline to file Notice of Non-Assumption of Executory Contracts |
| July 9, 2009 | Deadline to file announcement of Article 9 Purchaser (if necessary) |
| July 10, 2009 | Bar date for filing proofs of administrative expense for administrative expenses for postpetition claims arising before June 1, 2009 |
| July 13, 2009 | Completion of Depositions and Expert Depositions |
| July 14, 2009 | Voting deadline |
| **July 17, 2009** *(July 14 on Debtors' schedule)* | **Deadline to object to modifications to the Confirmed Plan and the 363 Implementation Agreement** |
| **July 20, 2009** | **Auction** |
| July 20, 2009 | Ballot report certification and filing deadline at 4:00 p.m. (prevailing Eastern time) |
| July 21, 2009 | Deadline to file reply in support of the Modified Plan and the Master Disposition Agreement and in support of the transactions set forth in the Master Disposition Agreement, as modified by the 363 Implementation Agreement and file any proposed revisions to the Final Modification Approval Order and to submit a proposed alternative form of sale order under section 363 of the Bankruptcy Code |
| July 23, 2009 | Hearing to approve modifications to the Confirmed Plan and to approve such plan as Modified (the "Final Modification Hearing") or, in the alternative, to approve the Master Disposition Agreement |

|   | (defined below) pursuant to section 363 of the Bankruptcy Code (the "Alternative Sale Hearing") |
|---|---|

## II.    THE DISCLOSURE STATEMENT SUPPLEMENT DOES NOT CONTAIN ADEQUATE INFORMATION AS IT FAILS TO INCLUDE THE DEBTORS' VALUATION OF THE ASSETS TO BE TRANSFERRED TO THE DIP LENDERS.

28.    The DIP Lenders object to the Debtors' Disclosure Statement Supplement as it does not contain adequate information as required under the Bankruptcy Code.  Pursuant to Section 7.8 of the Modified Plan, the Tranche C DIP Lenders are to receive a cash payment, together with an equity interest in Parnassus, denominated as a Class C Membership Interest in Parnassus, and the first "approximately $146 million" of net proceeds of the Plan Investor Litigation (if such proceeds are ever generated).  These "Transferred Assets" are to be received pursuant to some form of consensual foreclosure or credit bid.  However, the Disclosure Statement Supplement neither provides the Debtors' valuation of the Class C Membership Interest nor sufficient information for the Tranche C Lenders to value such non-cash consideration.  Of all the information creditors are entitled to receive pursuant to section 1125 of the Bankruptcy Code, an estimated value of recovery is perhaps the most fundamental.[16]

---

[16]    The Collective does not agree with or adopt the statements and assertions by the Debtors in their Disclosure Statement Supplement.  Also, the Collective objects to the assertion in Article I.C. of the Plan that it is the product of extensive negotiations with the Steering Committee.  The failure specifically to object to other inaccurate statements shall not be taken as a consent thereto.  Moreover, the proposed order approving the solicitation procedures includes findings are overly broad and should be deleted.   For example, the propriety of the Debtors' SEC filings is not an issue before the Court.

III.    THE COURT SHOULD DENY THE MOTION TO THE EXTENT IT SEEKS TO UTILIZE AN
        "ALTERNATIVE SALE HEARING" PURSUANT TO SECTION 363 TO ACHIEVE WHAT THE
        DEBTORS CANNOT PROPERLY ACHIEVE THROUGH THE PLAN CONFIRMATION
        PROCESS:  A SALE OF THE DEBTOR'S ASSETS WITHOUT THE DIP LENDERS' CONSENT
        AND WITHOUT A COMPETITIVE AUCTION PROCESS IN PLACE DESIGNED TO
        MAXIMIZE VALUE.

        29.     The Motion also asks the Court to schedule a hearing date for an

"Alternative Sale Hearing" on or before July 23, 2009.  This Alternative Sale Hearing date is

intended to be a placeholder for a hearing on the propriety of the Debtors' transferring

substantially all of their assets to GM and Parnassus pursuant to a Section 363(b)(1) sales

transaction which, as the Debtors finally acknowledge on the very last page of their Motion, is

intended to be a private sales transaction, not conducted pursuant to public auction and bidding

procedures.  (See Mot. ¶ 69.)  Recognizing that the Modified Plan may not be confirmable, the

Debtors want the option of cramming through the very same, deeply flawed Proposed

Transaction that forms the basis of their Modified Plan[17] without exposing it to other or better

bids and without having to comply with Code requirements for the confirmation of a plan of

reorganization.

        30.     When a debtor proposes to sell substantially all of its assets without the

structure of a chapter 11 disclosure statement and plan, courts apply greater scrutiny than they do

on other sales.  This heightened scrutiny is necessary because such sales constitute an essential

termination of the debtor's on-going business, leaving only the orderly distribution of the sale

proceeds to be performed under the law governing the priority of creditors.  See, e.g., In re

Channel One Commc'ns, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing In re Indust.

---

[17]     The Debtors state that the Proposed Transaction would be modified with a "363 Implementation
         Agreement," and would vary only slightly from the original Proposed Transaction as GM Components will
         not commit to provide the general unsecured claims with a pro rata share of deferred consideration.  (Mot.
         ¶ 54.)

Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)

(the transaction "must be closely scrutinized, and the proponent bears a heightened burden of

proving the elements necessary for authorization.")); In re Wilde Horse Enters., Inc., 136 B.R.

830, 841 (Bankr. C.D. Cal. 1991); Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage

Indus., Inc.), 43 F.3d 714, 720 n.9 (1st Cir. 1994) (order confirming a chapter 11 liquidation sale

warrants special "bankruptcy court scrutiny"); 3 COLLIER ON BANKRUPTCY, ¶ 363.02[3].

   31. For the reasons that follow, the Court should not entertain, even

provisionally, this Proposed Transaction as an alternative 363 sale transaction because it

presumptively violates the DIP Credit Agreement and DIP Order, there is no basis to conclude it

will be consented to by the Required Lenders, is by definition an improper *sub rosa* plan and is

designed to be a private sale that is not subject to a public auction process that maximizes value.

Moreover, the Debtors propose to strip the DIP Lenders of their statutory rights to credit bid

under section 363(k) of the Bankruptcy Code.  Instead, the court should put in place proper

bidding procedures and sales process to ensure that the value of the Estates is maximized and a

transaction is proposed that is acceptable to the DIP Lenders.

  A. A Transaction Reached Without A Fair And Open Auction Process Will Be Futile Because Such A Sale Violates The DIP Credit Agreement And This Court's DIP Order And Is An Improper *Sub Rosa* Plan.

   32. While the Court may of course provisionally schedule the Alternative Sale

Hearing date, it should do so in the knowledge that the sales process envisioned by the Debtors

cannot possibly result in an approvable sales transaction for a variety of reasons, only three of

which are noted below.[18]

_____

[18] The Collective reserves all of its rights and objections with respect to the Modified Plan and the contemplated private 363 sale, including without limitation those contained in this objection.  The

i.      The Modified Plan Cannot Be Confirmed Unless The DIP Loans Are Paid In Full
        Or the DIP Lenders Consent.

33.     Section 1129(a)(9)(A) of the Bankruptcy Code provides that a plan cannot

be confirmed unless all administrative expense priority claims are paid in cash, in full, on the

effective date, unless such claimholders consent to different treatment.  See 11 U.S.C.

§ 1129(a)(9)(A).  The Modified Plan does not provide for payment in full in cash, and assuming

*arguendo* that the Required Lenders can consent on behalf of all DIP Lenders, there is no basis to

conclude that such consent will be obtained.

ii.     The Contemplated Private 363 Sale Violates The DIP Credit Agreement And This
        Court's DIP Order.

34.     The section 363 sale contemplated by the Debtors will be futile because

the DIP Credit Agreement prohibits Delphi from proceeding with its plan to sell all or

substantially of its assets in a section 363 sale (or otherwise) without the consent of the DIP

Lenders.

35.     Section 6 of the DIP Credit Agreement sets out the Debtors' promise not

to take certain actions (the "Negative Covenants").  Section 6.10, entitled "Disposition of

Assets," prohibits the sale of the Debtors' assets except in specific circumstances not present

here.  These provisions state, in pertinent part, that "[f]rom the Closing Date and for so long as

. . . any amount shall remain outstanding or unpaid under this Agreement, the Borrower and each

of the Guarantors will not, and will not permit any of their respective Subsidiaries to . . . [s]ell or

otherwise dispose of any assets (including the sale or issuance of any capital stock of any

---

Collective also reserves all of its rights against third parties, including claims of tortious interference with
their contractual rights.

Subsidiary), whether now owned or hereafter acquired [with certain exceptions not applicable

here]." (DIP Credit Agreement, § 6.10.)

36.    The Proposed Transaction is precisely the sort of asset disposition that is

expressly prohibited by the DIP Credit Agreement unless the DIP Lenders consent. The DIP

Lenders' consent to the Proposed Transaction, either in connection with a Modified Plan or a

private 363 sale, has not been obtained. The Debtors will not succeed in obtaining their consent

to the lopsided and inequitable transaction proposed here. In light of this reality, the Debtors'

alternative section 363 sale cannot possibly succeed.

37.    In addition, the DIP Order expressly provides that "the DIP Liens, the

Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted

by the provisions of this Order and the DIP Documents shall survive, and shall not be modified,

impaired or discharged by (i) the entry of an order converting any of the Cases to a case under

chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases *or by

any other act or omission*, or (ii) the entry of an order confirming a plan of reorganization in any

of the Cases . . . [and] all other rights and remedies of the Agent and the DIP Lenders granted by

the provisions of this Order and the DIP Documents shall continue in full force and effect until

the DIP Obligations are indefeasibly paid in full." (DIP Order ¶ 13(d) (emphasis added).)

Clearly a section 363 sale would be considered an "act" under this provision, and the Order

directly states that the DIP Lenders' interests will survive until paid in full. The DIP Order

provides further that "[n]o obligation, payment, transfer or grant of security under the DIP

Documents or this Order shall be stayed, restrained, voidable, or recoverable under the

Bankruptcy Code or under any applicable law (including, without limitation, under section

502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or

counterclaim." (DIP Order ¶ 4(c).) Therefore, pursuant to these provisions, any section 363 sale that would eliminate, reduce or effect the DIP Lenders' interests would be a direct violation of the DIP Order.

38.    Moreover, pursuant to paragraph 7 of the DIP Order, the Court vacated the automatic stay to allow the Agent and the DIP Lenders to exercise "all rights and remedies against the Collateral provided for in the DIP Documents" in the event of the occurrence of an Event of Default under the DIP Credit Agreement. (Id. ¶ 7(b).) The DIP Order goes on to provide that, "[i]n any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing," and that the parties waive any right to seek relief, including under section 105 of the Bankruptcy Code, that "would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents." (Id.) As stated above, an Event of Default has clearly occurred. Therefore, subject only to the forbearance embodied in the Accommodation Agreement, the DIP Lenders have an express, court-authorized right to exercise any and all of their remedies, including that of foreclosure, and the Debtors have waived any right to intervene or to contest or seek to impair such remedy. Accordingly, any relief that would strip the DIP Lenders of their superpriority liens on the Collateral would violate the terms of the DIP Order as entered by this Court.

iii.    The Contemplated Private 363 Sale Is An Improper *Sub Rosa* Plan.

39.    The Debtors' own papers establish, quite clearly, that they are simply asking the Court to effect the very same plan modifications they know cannot be accomplished through plan confirmation by means of a 363 sale. This is the very definition of a *sub rosa* plan, and it cannot be permitted.

40.    It is settled that a section 363 sale that contravenes the Bankruptcy Code's

plan requirements *sub rosa* is "beyond the scope of section 363(b) and should not be approved

under that section." In re Westpoint Stevens Inc., 333 B.R. 30, 52 (S.D.N.Y. 2005). See also

Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re

Continental Air Lines, Inc.), 780 F.2d 1223, 1226-28 (5th Cir. 1986) (same). The proposed sale,

which challenges the fundamental tenets of the bankruptcy code and usurps the DIP Lenders'

constitutional property interests, would effectively "short circuit" the requirements of chapter 11,

"run roughshod over disfavored creditors' rights," and improperly "sidestep" creditor protections

afforded in the Bankruptcy Code. Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re

Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983); In re Westpoint Stevens Inc., 333 B.R.

at 50.

41.    The Proposed Transaction represents a direct violation of the absolute

priority rule, as it contemplates paying amounts to junior, subordinate claimants and transferring

valuable assets to third parties favored by the Debtors, GM and the Auto Task Force, while the

DIP Lenders – holding not only secured, but court-approved postpetition superpriority claims –

are to receive mere pennies on the dollar.[19]  Finally, the Proposed Transaction has been

structured so that GM and Parnassus are paying as consideration for the assets they are

purchasing non-operating administrative liabilities (MDA §§ 3.1.1.G and 3.2.4) and Parnassus is

---

[19]    GM and Parnassus "have committed to the Debtors that completion of the transactions contemplated by the
Master Disposition Agreement through a section 363 sale instead of under the Modified Plan will not
materially change the economics of the transactions, except that GM Components would no longer commit
to provide holders of allowed General Unsecured Claims (as defined in the Modified Plan) with a pro rata
share of deferred consideration."  (Mot. ¶ 54.)  While GM Components has not committed to allow such
treatment of unsecured claimholders, the Motion does not state that the Debtors will not include such
provision with respect to the section 363 sale.

- 24 -

assuming non-operating "Specified Director, Officer and Employee Related Liabilities," which

includes indemnification rights for senior management and the board.

42.    This is precisely the sort of treatment of secured creditors that the District

Court in Westpoint Stevens held to be unlawful:

> The Bankruptcy Court pointed to no authority, nor has this court despite the extensive
> research efforts of counsel and the undersigned's own chambers found any, standing for
> the proposition that an action in derogation of a senior creditor's contractual rights can be
> forced upon that creditor for the purpose of providing 'adequate protection' to a junior
> creditor . . . .  Taken to its logical extreme, the Bankruptcy Court's notion of adequate
> protection would allow a powerful creditor and debtor anxious to achieve some value for
> its favored constituencies to run roughshod over disfavored creditors' rights, so long as a
> section 363(b) asset sale transaction could be defended as an exercise of reasonable
> business judgment in the context of dire economic circumstances.

333 B.R. at 49-50.  Clearly, the proposed private 363 sale the Debtors will pursue seeks to do

precisely what the Court in Westpoint Stevens held the Code will not permit – allow Delphi, GM

and the Auto Task Force to arrogate the Collective's rights and property interests in order to

benefit at the Collective's expense their favored constituencies in the broader context of an

automotive industry in dire economic straits.  But that context does not excuse departures from

precedent and statutory directives that the Court is bound to follow here.  In these circumstances,

secured creditors like the DIP Lenders are entitled to either: (a) payment in full under a plan as

required by section 1129; or (b) a 363 sale conducted through a competitive process in which the

proceeds are applied in accordance with the absolute priority rule that is not a *sub rosa* plan.  To

allow treatment pursuant to a sale that explicitly is not permitted under a plan would turn the

Bankruptcy Code on its head, and is the exact situation the *sub rosa* doctrine is meant to protect

against.

43.    As shown, the Debtors' proposed procedure itself concedes that it is a *sub
rosa* plan, by contemplating a Proposed Transaction that cannot be confirmed, and then

attempting to circumvent the creditors' exercise of their statutory rights to reject a plan by

cramming through the exact same transaction under section 363.   Accordingly, if the Court is to

schedule an Alternative Sale Hearing date, it should do so only after implementing bidding

procedures equity requires be put in place so that the "highest and best" offer can prevail.

Otherwise, as the above discussion demonstrates, the Proposed Transaction will not be

approvable.

        B.      The Proposed Sale Transaction Must Be Subject To An Auction Process In Order
                To Maximize Value And, To That End, The Court Should Adopt Fair, Open, And
                Robust Bidding Procedures And Sale Process.

        44.      It is indisputable that "[w]hen a debtor desires to sell an asset, its main

responsibility, and the primary concern of the bankruptcy court, is the maximization of the value

of the asset sold."  Integrated Res., Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (citing John

J. Jerome & Robert D. Drain, Bankruptcy Court Is Newest Arena For M & A Action, N.Y.L.J.,

June 3, 1991, at 8, col. 4); see also Simantob v. Claims Prosecutor (In re Lahijani), 325 B.R. 282,

288 (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal

value is realized by the estate under the circumstances.").  The greatest safeguard for obtaining

maximum value in a sale of substantially all of the Debtors' assets is to conduct the sale subject

to bidding procedures and a public auction.  A competitive bidding process for a company's

assets is the best way to ensure that the real and highest value is attained.   "[M]ost of the

proponents of § 363 sales argue that competitive markets are the assurance of *bona fide* sales for

highest value."  In re Gulf Coast Oil Corp., 2009 Bankr. LEXIS at *39-40 (Bankr. S.D. Tex. Feb.

11, 2009) (emphasis in original); see also In re Nicole Energy Servs., Inc., 385 B.R. 201, 237

(Bankr. S.D. Ohio 2008) ("By offering essentially 'the world' an opportunity to participate in the

bidding process, the Trustee felt that the sale efforts would allow him 'to determine whether the

asset [wa]s being substantially under-valued.'"); In re Lahijani, 325 B.R. at 289 ("The price

achieved by an auction is ordinarily assumed to approximate market value . . .").

45.    Well-designed bidding procedures facilitate a fair sale of a chapter 11

debtor's assets through a process that maximizes the value of the estate. See, e.g., Four B. Corp.

v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in

bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at

hand"); In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 54 (Bankr. M.D.N.C. 2003); In

re President Casinos, Inc., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004).  To that end, courts

recognize that procedures that enhance rather than inhibit competitive bidding are consistent with

the goal of maximizing the value received by the estate and, therefore, are appropriate in the

context of bankruptcy sales. See Wintz v. Am. Freightways, Inc. (In re Wintz Cos.), 230 B.R.

840, 846 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000).  "Structured bid procedures

should provide a vehicle to enhance the bid process and should not be a mechanism to chill

prospective bidders' interests." President Casinos, 314 B.R. at 786.

46.    Here, suitable bidding procedures will facilitate an open and fair public

sale that will encourage competing bids and maximize value to the Estates.  The assets proposed

to be sold are:  (1) the GM Sale Securities (as defined in the MDA) and the GM Acquired Assets

(as defined in the MDA, and together with the GM Sale Securities, the "GM Assets"); (2) the

Company Sale Securities (as defined in the MDA) and the Company Acquired Assets (as defined

in the MDA, and together with the Company Sale Securities, the "RoW Assets"); (3) the

Excluded Assets (as such term is defined in the MDA); or (4) some combination or subset of the

GM Assets, the RoW Assets, and the Excluded Assets.  The Collective believes that giving

interested parties the option of bidding on some or all of the assets will ultimately maximize value for the Debtors.

47.      Appropriate bidding procedures also will provide the opportunity for interested parties, who the Collective believes are capable of consummating the transactions, to bid on the assets in a transparent and competitive process.  Parties who have thus far been excluded from sale discussions will be able to conduct the necessary diligence and potentially participate in the bidding process.  The Collective believes that a sale pursuant to fair bidding procedures will ensure that the true and highest value of the Debtors' assets will be attained, and urges this Court to adopt such procedures.

48.      Indeed, courts consistently favor auction processes over private sales, and have expressly ordered public auctions when private transactions are found not to be in the best interests of the estate or where the purchase price offered is inadequate.  See In re Planned Systems, Inc., 82 B.R. 919, 923-24 (Bankr. S.D. Ohio 1988) (court denied private sale and ordered public auction to take place where it was unclear that the private bid was in the best interests of the creditors, stating that the court "generally favors a public sale of property of the estate"); In re Ohio Corrugating Co., 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (court ordered public auction when two bids had been received on the property being sold, stating that it would "not bar any party from bidding, as 'our objective is to maximize the bidding, not restrict it.'") (internal citations omitted).  Cf.  In re Lahijani, 325 B.R. at 287 ("Objections to sale that are based on inadequacy of price are often resolved by the court ordering an auction . . . .").  Moreover, courts will not approve transactions where the debtor's assets were not properly subjected to a competitive marketing and bidding process.  See In re Country Manor of Kenton, Inc., 172 B.R. 217, 221 (Bankr. N.D. Ohio 1994) (denying a private sale in part because the

"factor the Court [was] most concerned about" was the "lack of effort in soliciting other offers,"

and because the property had not been properly advertised).  As these and other cases show,

courts should not allow private sales to proceed where an auction process is lacking because

allowing participants to bid is the most effective means of attaining the highest and fairest value

for the assets.

49.    Here, however, the Debtors apparently reject a fair auction process, yet

provide no justification for preferring a palpably improper private sale process, nor can they.

The Debtors did not engage in an M&A process before agreeing to the Proposed Transaction

with GM and Platinum.  In fact, the Debtors refused to consider bona fide proposals and

expressions of interest, opting instead to pursue secret negotiations with GM and the Auto Task

Force and those parties' favored bidder.  Indeed, the Debtors put an exclamation point on their

rejection of a fair sales process by consenting to a "no-shop" provision in the MDA that is more

onerous and one-sided than any that have been approved in other cases.  Although labeled a "no-

shop," this provision is in reality a "no-talk" with a fiduciary out.  In addition, the MDA does not

contain a termination right in the event the Debtors in exercising such a "fiduciary out" are

presented with a higher and better proposal.  In circumstances like these – where there has not

been a robust M&A process, alternative bidders have been ignored or discouraged, and the

Debtors preempt their right to explore alternative transactions by means of an improper no-shop

provision – there can be no justification for a private sale under section 363(b)(1) of the Code.

50.    On the last page of the Motion the Debtors cite two cases, ostensibly

supporting their rejection of the normal bidding and auction procedures of a properly conducted

363 sale.  Their reliance on these cases is unavailing.  In re Trans World Airlines, Inc., No. 01-

00056, 2001 WL 1820326 (Bankr. D. Del. 2001) ("TWA"), which they allege supports the

position that a section 363 transaction does not require an auction process, does not stand for that proposition.  In TWA, the section 363 sale was being conducted pursuant to bidding procedures and an auction, which auction proceeding, the court noted, "was expected to reflect the fair market value of the assets sold, i.e., the highest and best bid."  Id. at *4 ("[t]he auction procedure has developed over the years as an effective means for producing an arm's length *fair value* negotiation." (emphasis added)).  Id.  There, the private sale went forward only after the auction process produced one transaction that the court held did not comply with the bidding procedures. While the record did not reflect why the bidder increased its bid price in the absence of a competing bid, the court noted that "[o]ne could speculate that it did so to enhance the prospects for obtaining court approval of the sale transaction," and the court had no problem with it, since "it enhanced the value of the transaction to the bankruptcy estate."[20]  Id. at *9.

51.    The Debtors also cite to In re Woods, 215 B.R. 623 (B.A.P. 10th Cir. 1998), in support of their position that a stand-alone private section 363 sale may go forward without an auction process, in circumstances where it cannot be accomplished through their proposed plan.  However, in Woods, the sale was being implemented through a confirmed plan of reorganization that was approved by the debtor's creditors and that expressly provided for such sales to go forward.  Id. at 626.  Here, the Debtors propose to push through a private sale without the support of their secured creditors and without having marketed their assets.  Not only do a multitude of alternative transactions with other bidders remain unexplored, but the Debtors have attempted to voluntarily shackle themselves with a "no shop" clause that forestalls other bids.

---

[20]    However, in the midst of the process, when the alternative transaction was under consideration, the stalking horse bidder actually increased its bid from $500 million to $742 million, thereby directly reflecting the value that can be realized from a bidding process, even from the same bidder.  Id. at *9.

52.     Last, citing a footnote from this Court's General Order M-331, which adopts guidelines for the conduct of asset sales, the Debtors suggest that the use of a private sale here has already been pre-approved.  That Order of course does no such thing.  Rather, it simply notes that an asset sale pursuant to section 363 can be public or private.  But, General Order M-331 goes on to say that "[i]f no auction is contemplated or the debtor has not actively solicited or will not actively solicit higher and better offers, the motion seeking approval of the sale should explain why the debtor proposed to structure the same in such manner."  (General Order M-331, Section I.A.)  The Motion provides no such explanation and thus violates General Order M-331's disclosure requirements, which call for details regarding the Debtors' marketing efforts, the offered purchase price, and explanation of "Extraordinary Provisions," which include agreements with management.  More important, the General Order expressly requires that, "[i]f no auction is contemplated, the debtor has agreed to a limited no-shop or no-solicitation provision, or the debtor has otherwise not sought or is not actively seeking higher or better offers, the sale motion must so state and explain why such sale is likely to maximize the sale price."  (Id. at Section I.D.3.)  The Motion, therefore, not only contemplates an inadequate sale process that will not be tested by the market, but one that does not comply with General Order M-331.

53.     For these reasons, the Collective supports the implementation of appropriate bidding procedures, which will be a more productive path than simply shutting down the futile process the Debtors have proposed.  The Collective, together with the other DIP Lenders, have tried for many months to work constructively with the Debtors toward a consensual resolution of this case that will maximize value.  The Debtors have not always reciprocated, and indeed, as the instant Motion starkly reveals, they have acted contrary to their creditors' best interests.  Nevertheless, the Collective has never sought to put roadblocks in the

way of a consensual resolution of this case, and they will not do so now.  The Collective seeks

only fair, open, and robust auction and bidding processes that are designed, contrary to the lack

of process proposed by Delphi at the urging of the Auto Task Force, to maximize value to the

Estates and all constituencies, and requests that the Court refuse to schedule the Alternate Sale

Hearing until such procedure is in place.

## IV.    THE COLLECTIVE OBJECTS TO THE PROCEDURES REGARDING ADMINISTRATIVE EXPENSE CLAIM FORMS TO THE EXTENT THAT THEY EXEMPT INTER-COMPANY CLAIMS.

54.    In the Motion, the Debtors have proposed procedures for creditors wishing

to file an administrative expense claim ("Administrative Expense Claim Form") against the

Debtors.  In connection with these procedures, the Debtors have proposed that certain parties be

exempt from filing an Administrative Expense Claim Form.  Among the exempted parties are

creditors holding "[a]ny claim asserted by any Debtor or any direct or indirect subsidiary of any

of the Debtors in which the Debtors in the aggregate directly or indirectly own, control, or hold

with power to vote, 50 percent or more of the outstanding voting securities of such subsidiary."

(Mot. ¶ 50.)  However, in order to adequately analyze and understand the Proposed Transaction

and position parties to make informed bids on clusters of assets, parties in interest would need to

be aware of the nature and extent of inter-company claims.  Accordingly, the Collective objects

to the procedures regarding Administrative Expense Claim Forms to the extent that they exempt

inter-company claims.

## V.    THE COLLECTIVE OBJECTS TO THE PROPOSED ORDER TO THE EXTENT IT CONTEMPLATES SUBSTANTIVE RELIEF.

55.    While the Debtors are generally seeking procedural relief pursuant to the

Motion, paragraph 34 of the Proposed Order contemplates substantive relief, providing that the

Debtors will be authorized to assume and assign certain contracts.  Such relief is premature.  The

Collective objects to paragraph 34 of the Proposed Order to the extent its application is not

subject to approval of the Modified Plan.

## **RESERVATION OF RIGHTS**

56.    To the extent the Debtors refuse to engage in a proper auction and sale

process, the DIP Lenders reserve all of their rights under the DIP Credit Agreement, the DIP

Order and applicable law, including the right not to consent to or to object to the Proposed

Transaction, the right to foreclose and the right to credit bid.

57.    The objections to the Motion and the Modified Plan and the Proposed

Transaction discussed above are merely illustrative of some of the objections that the Collective

has regarding the Debtors' the Modified Plan and the Proposed Transaction.  The Collective

expressly reserves any and all rights to object to the Modified Plan, the Proposed Transaction or

any other transaction the Debtors may enter into which does not provide the benefits necessary to

ensure a successful and consensual emergence from chapter 11, as well as to any section 363 sale

eventually put before the Court.  The Collective also reserves its rights against any other parties,

including GM, Platinum, Parnassus and the Auto Task Force.  Nothing in this Objection

constitutes a consent under or waiver of rights with respect to the DIP Credit Agreement or the

DIP Order or otherwise.

WHEREFORE, the Collective respectfully requests that the Court enter a

Scheduling Order modified as proposed herein and enter an Order approving and implementing

fair and appropriate bidding procedures proposed by the Collective and the DIP Lenders, and as

necessary rejecting any proposed sales procedures implied in the Debtors' Motion regarding the

setting of an Alternative Sale Hearing date or modifying such procedures in a manner that will

make them appropriate to facilitate an open and fair public sale that maximizes value to the

Estates.

Dated:  June 9, 2009
      New York, New York

                                      Respectfully submitted,

                                      WILLKIE FARR & GALLAGHER LLP

                                      By:  /s/ Richard Mancino
                                          Richard Mancino
                                          (A Member of the Firm)

                                          Marc Abrams
                                          Michael J. Kelly
                                        Christopher J. St. Jeanos

                                    787 Seventh Avenue
                                    New York, NY 10019-6099
                                     (212) 728-8000

                                    *Counsel to the Collective of DIP Lenders*