MUNSCH HARDT KOPF & HARR, P.C.
Raymond J. Urbanik, Esq.
New York   RU 1842
Jay H. Ong, Esq.
Texas Bar No. 24028756
Davor Rukavina, Esq.
Texas Bar No. 24030781
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Telecopier:  (214) 855-7584

*Attorneys for Computer Sciences Corporation*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| .............................................................x | : | |
| In re: | : | Chapter 11 |
| | : | Case No. 05-4481 (RDD) |
| DELPHI CORPORATION, et al., | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| _____x | : | |
| | : | |
| COMPUTER SCIENCES CORPORATION | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Adversary Proceeding |
| DELPHI CORPORATION, | : | Case No _____ - _____ |
| | : | |
| Defendant. | : | |
| .............................................................x | | |

COMPLAINT OF COMPUTER SCIENCES CORPORATION FOR DECLARATORY JUDGMENT WITH
RESPECT TO MASTER SERVICES AGREEMENT WITH DELPHI CORPORATION, AND FOR RELATED
DAMAGES ARISING FROM BREACH OF POST-PETITION CONTRACT

**COMPLAINT, REQUEST FOR EXPEDITED DECLARATORY JUDGMENT AND SPECIFIC PERFORMANCE, AND REQUEST FOR PRELIMINARY INJUNCTION**

Computer Sciences Corporation ("CSC" or "Plaintiff"), party to a post petition contract with Delphi Corporation ("Delphi" or "Defendant"), an administrative expense priority creditor and party-in-interest in the above-captioned, jointly-administered Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Case") of Delphi and its affiliated debtors (collectively, the "Debtors"), alleges for this Complaint ("Complaint") against Delphi as follows:

## I.    SUMMARY OF RELIEF REQUESTED

1.    This is an action for, among other things, several forms of expedited relief necessary to the mitigation of damages and preservation of the status quo while this case is pending.   CSC's causes of action stem from breaches by Delphi of the Master Services Agreement ("MSA") entered post-petition between CSC and Delphi, and from other acts and omissions.   Under the MSA, CSC provides technology services to Delphi, including worldwide telecommunication, network support, application development and maintenance services.

2.    Delphi breached the MSA by, among other things, (a) failing and refusing to pay undisputed charges under the terms of the MSA; (b) failing and refusing to prepay CSC on a monthly basis for Termination Assistance Services, as required by the MSA, to secure CSC in the payment for its services rendered after termination of the MSA; and (c) failing to escrow funds in a timely manner, as required by the MSA, to secure CSC in the payment of certain disputed charges pending resolution of the disputes.

3.    CSC seeks three types of expedited relief: (a) a declaratory judgment, pursuant to Federal Rule of Civil Procedure 57, that CSC properly terminated the Master Services Agreement ("MSA") and is entitled to monthly prepayments for continuing Termination Assistance Services requested by Delphi under the MSA; (b) an order of specific performance

requiring Delphi to prepay for the Termination Assistance Services and deposit certain sums into escrow, as required by the MSA, to secure CSC in the payment of its charges pending resolution of disputes regarding a set of specifically identified charges; and (c) as an alternative to specific performance, a mandatory injunction requiring Delphi to make the contractually required payments and deposits described in (b), above.

## II.   SUMMARY OF FACTUAL BASES FOR RELIEF REQUESTED

4.      CSC terminated the MSA, effective May 5, 2009, because of Delphi's default in its contractual obligation to timely pay millions of dollars of undisputed charges under the MSA.

5.      Section 4.4(a)(4) of the MSA provides that if CSC terminates the MSA for failure to pay undisputed amounts, CSC has the right to require Delphi to pay in advance on a monthly basis for any continuing Termination Assistance Services that Delphi requests under the termination provisions of the MSA.  Termination Assistance Services are services provided by CSC (which include all services under the MSA) for a contractually-specified period following termination of the MSA, to assist with the transition to a new technology services provider. Pursuant to section 4.4(a)(4), CSC has demanded payment in advance for the Termination Assistance Services, but Delphi has failed and refused to pay in advance.  Delphi contends that CSC was not justified in terminating the MSA because Delphi belatedly (and outside the timeframe set in the MSA) attempted to dispute the previously undisputed charges.

6.      CSC would like to continue to provide the requested Termination Assistance Services to assist Delphi in a smooth transition as Delphi moves to another technology services provider.  CSC is unwilling, however, to incur additional payment risk after Delphi has already defaulted on millions of dollars in undisputed payment obligations.  Delphi continues to demand that CSC provide Termination Assistance Services, and contends that it will suffer significant damage to its business if CSC does not provide the requested services, but Delphi refuses to

honor its obligation to pay in advance for such services.  This puts CSC in the untenable position of having to choose whether to protect its own business from a payment risk totaling millions of dollars, or withdraw its Termination Assistance Services, which, according to Delphi, would cause significant damage to Delphi's business.

7.     Consequently, CSC, pursuant to Federal Rule of Civil Procedure 57 and the MSA, requests an expedited hearing on its request for a declaratory judgment that CSC properly terminated the MSA and is entitled to prepayment, on a monthly basis, for Termination Assistance Services.

8.     Additionally, the MSA provides a formal procedure for Delphi to dispute charges invoiced by CSC.  While Delphi did not properly dispute the charges described in paragraphs 4 through 7, above, it did dispute certain other charges, thus subjecting them to the contractually dictated dispute resolution procedure.  That procedure, however, required Delphi to submit certain sums of money into escrow to secure CSC in the payment of any of the disputed charges that were eventually determined to be accurate, due and payable.  Delphi has failed to honor its contractual obligation to submit said funds into escrow in a timely manner, thus depriving CSC of the security contemplated by the MSA.

9.     CSC seeks an expedited order of specific performance or, alternatively, a mandatory preliminary injunction, requiring Delphi to prepay CSC monthly for the Termination Assistance Services, and requiring Delphi to deposit the contractually required sums into escrow, as required by the MSA to secure CSC in the payment of disputed charges that are eventually determined to be accurate, due and payable.

10.     Additionally, CSC asserts causes of action at law and in equity for damages and equitable relief resulting from other breaches, acts and omissions by Delphi, but CSC does not request or require expedited relief with respect to those causes of action.

### III.    PARTIES

11.     Plaintiff is a corporation organized under the laws of Nevada with its primary place of business at 3170 Fairview Park Drive, Falls Church, VA 22042.

12.     Defendant is a corporation organized under the laws of Delaware with its primary place of business at 57525 Delphi Drive, Troy, Michigan 48098.  Defendant may be served with process through its counsel of record.

### IV.    JURISDICTION & VENUE

13.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising in or relating to the Bankruptcy Case commenced under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

14.     Venue is proper in this Court under 28 U.S.C. § 1409.  Pursuant to section 19.4 of the MSA, the parties agreed that any and all legal actions brought in connection with the MSA and prior to the Debtors' emergence from bankruptcy, are required to be brought before this Court.  See MSA, § 19.4.

15.     The cause of action set forth herein arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, as well as section 503 of the Bankruptcy Code, and applicable state law. There exists an actual controversy among the parties that is otherwise within the jurisdiction of this Court. This proceeding is initiated pursuant to Rule 7001(1), (7) and (9) of the Federal Rules of Bankruptcy Procedure.

## V.    BACKGROUND

### A.    General bankruptcy background

16.    On October 8, 2005, Delphi and certain of its subsidiaries and affiliates filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On October 14, 2005, additional of Delphi's Debtor affiliates filed with this Court their own voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  By Order of this Court entered on October 8, 2005 [Bankruptcy Case Docket No. 28], this Court ordered that the Debtors' Chapter 11 cases be jointly administered.

17.    Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors remain in possession and control of their assets and property, have continued to manage their affairs, and continue to operate their business.  No trustee or examiner has been appointed under section 1104 of the Bankruptcy Code.  On October 20, 2005, the United States Trustee filed with this Court its Notice of Appointment of the Official Committee of Unsecured Creditors in the Bankruptcy Case [Bankruptcy Case Docket No. 469].

18.    CSC is a world leader in the information technology and professional services industry.  Since its founding in 1959, CSC has helped clients use information technology more efficiently in order to improve their operations and profitability, achieve superior business results, and focus on core competencies. See, e.g., MSA, § 1.2.  CSC offers information technology and business process outsourcing, information technology and professional products and services, and related maintenance and support.

19.     On March 9, 2007, Delphi and CSC entered into the MSA[1], expressly covering Delphi and its affiliates.  In connection therewith, on or about March 30, 2007, the Debtors filed their Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Application Maintenance and Support Agreements ("MSA Motion") [Bankruptcy Case Docket No. 7524], seeking, inter alia, this Court's authorization for them to enter into, and perform, the MSA.  On April 23, 2007, the Court entered its Order [Docket No. 7774] granting the MSA Motion.

20.     On April 30, 2007, Delphi and CSC entered into Amendment No. 1 to the MSA ("Amendment No. 1").  The purpose of Amendment No. 1 was to add network management and telecommunication services to the scope of the MSA.  In connection therewith, on May 11, 2007, the Debtors filed their Motion for Order Under 11 U.S.C. Section 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Network Support Services Agreement [Bankruptcy Case Docket No. 7926], seeking this Court's authorization for them to enter into, and perform, Amendment No. 1 to the MSA.  On May 31, 2007, this Court entered its Order [Bankruptcy Case Docket No. 8119] granting its authorization for the Debtors to enter into and perform Amendment No. 1.

B.     **The MSA**

21.     The MSA relates to virtually all aspects of the Debtors' operations.  CSC provides the Debtors with approximately two-thirds of the Debtors' global information technology service needs, at an approximate cost of $6 million per month.  Currently, approximately 523 CSC

---

[1] The MSA is Exhibit "A".  Due to sensitive, proprietary, and confidential business information, the MSA, as well as certain other exhibits to this Complaint, were not filed therewith.  In part to protect any interests the Debtors may have in any confidential information they may contend is contained in these documents relating to the MSA, CSC will contemporaneously request, by separate motion, this Court's authorization to file all such documents under seal.

employees in thirty (30) countries around the world provide services to Delphi in performance of the MSA.[2]

22.    The MSA involves CSC's provision of system support and related services to the Debtors' supply chain and manufacturing functions, as well as for certain software referred to as "SAP". SAP software integrates the Debtors' various operational functions, including, but not limited to, manufacturing, distribution, accounting and human resources, and provides real time data and controls to centralize the management of such operations.

23.    The services under the MSA are divided into five basic categories or phases: (i) an initial phase of transition services; (ii) transformation services to upgrade the Debtors' existing systems, information technology and infrastructure with new and upgraded programs, components and functions; (iii) base services; (iv) discrete projects for non-recurring services not provided for among the other categories of services; and (v) Termination Assistance Services, at Delphi's request, to facilitate a smooth transition from CSC to another technology service provider upon the termination of the MSA.

C.    **Provisions and structure for paying and disputing charges**

24.    The Monthly Base Charges under the MSA currently total approximately $6,056,759 per month.

25.    Section 12.2 of the MSA provides that unless invoiced charges are formally disputed by Delphi pursuant to a specific procedure set out in Section 12.4, Delphi must pay such charges according to a specific schedule that results in a payment cycle of approximately 45 days.

---

[2] The current CSC "head count" is 360 employees in the United States, Mexico and Brazil ("Americas Region"), 126 employees in Europe, the Middle East and Africa ("EMEA") and 37 employees in Asia and the Pacific Region.

26.     If Delphi disputes a charge appearing on an invoice, it is required to notify CSC of the dispute "on or before the payment due date of such invoice."  Section 12.4.

27.     Only upon such notice of a dispute is Delphi authorized to withhold payment. Section 12.4.

28.     Delphi is also required to provide "a written description of the particular Charges in dispute and a written explanation, in reasonable detail" of the reason for the dispute, based on the information then available to Delphi.  Section 12.4.

29.     If disputed amounts withheld by Delphi reach a total amounting to one month of the then current Monthly Base Charges, then, at CSC's request, Delphi is required within 15 days to deposit into an escrow account any disputed amounts in excess of one month's Monthly Base Charges.

30.     CSC has the right to terminate the MSA if Delphi fails to pay invoices not disputed in accordance with the dispute procedures or if Delphi fails to deposit the required amount of withheld moneys into escrow:

> In the event that Delphi fails to pay Service Provider undisputed amounts properly due and owing to Service Provider under this Agreement exceeding in the aggregate one (1) month of Monthly Base Charges by the specified due date, or fails to place disputed amounts into escrow, to the extent required by Section 12.4, and fails to cure such default within thirty (30) days of notice from Service Provider of its intention to terminate for failure to make such payment, Service Provider may, by notice to Delphi, terminate the Term.

MSA § 20.1(b).

## VI.    FACTS REGARDING REQUESTS FOR EXPEDITED RELIEF

### A.    Delphi's failure to pay undisputed charges, and CSC's resulting termination

31.    As of April 2, 2009, undisputed charges outstanding under the MSA totaled

$12,725,513.[3]  Delphi did not dispute these charges in accordance with section 12.4, and they

therefore became immediately due and payable.

32.    Delphi, however, did not pay the undisputed charges.  On April 3, 2009 CSC

provided Delphi with written notice of default and a 30-day opportunity to cure, as required by

the MSA.[4]  Delphi did not pay the undisputed amounts within the 30-day cure period.

33.    Accordingly, CSC exercised its rights under Section 20.1(b) of the MSA and

issued a termination notice on May 5, 2009, terminating the MSA effective May 5, 2009.[5]

### B.    Delphi's refusal to prepay for Termination Assistance Services

34.    The MSA allows Delphi, upon termination, to request Termination Assistance

Services from CSC for up to 18 months after the termination date.  These services are designed

to ensure an orderly transition to a new technology services provider with a minimum of

disruption to Delphi's business.  CSC, however, is entitled to require monthly payment in

advance for Termination Assistance Services.

35.    Section 4.4(a)(4) deals with advance payment by Delphi and provides:

Service Provider shall provide Termination Assistance Services to Delphi and the
other Eligible Recipients, or their designee(s), regardless of the reason for the
expiration or termination of the Term, provided that, if this Agreement is
terminated by Service Provider under Section 20.1(b) for Delphi's failure to pay
undisputed amounts due under this Agreement, or for Delphi's failure to place
disputed amounts into escrow, to the extent required by Section 12.4(f), Service
Provider may require payment by Delphi in advance of the month in which such

---

[3] Due to their volume, it is not feasible for CSC to attach its underlying invoices comprising its claims raised herein.
CSC will make such documentation available to the Court prior to any evidentiary hearing.

[4] See Exhibit "B".

[5] See Exhibit "C".

Termination Assistance Services will be provided or performed under this Section 4.4.

MSA § 4.4(a)(4).

36.    On May 5, 2009 CSC provided written notice to Delphi of CSC's demand for prepayment for the Termination Assistance Services.[6]    CSC has further invoiced for the Termination Assistance Services for May and June 2009, by invoices dated on or about April 25, 2009, and May 25, 2009, respectively.    Delphi has refused to prepay for the Termination Assistance Services.

37.    It is this refusal by Delphi to prepay for the Termination Assistance Services that forms the basis for CSC's request for an expedited hearing of its declaratory judgment cause of action.

## C.    Delphi's failure to escrow required amounts

38.    As set forth above, section 12.4(f) of the MSA obligates Delphi to deposit disputed charges into an interest bearing escrow account to the extent they exceed the threshold amount of one month of the then-current Monthly Base Charges.    This escrow obligation applies irrespective of the "claim, cause or nature of the dispute, including any claim, setoff, or other type of deduction."    (MSA § 12.4(f).)    Section 12.4(f) further provides that Delphi must make such deposit within fifteen (15) business days after CSC makes its request to Delphi to escrow such amounts.    The escrow provision allows Delphi to dispute billing issues while ensuring protection to CSC for the eventual payment of disputed amounts resolved in its favor.

39.    As of June 9, 2009, Delphi had deposited into the escrow account a total of $9,474,412, while the total Disputed Charges under the MSA equaled $16,909,802.    On June 9, 2009, Richard Sandler of CSC delivered to Delphi CSC's formal, written demand for deposit of

---

[6] See Exhibit "D".

escrow amounts pursuant to section 12.4 of the MSA.  With a Monthly Base Charge threshold of

$6,056,759 as of such date, CSC's letter formally requested that Delphi deposit an additional

$1,378,631 into escrow.  See Letter from Richard Sandler to Bette Walker, dated June 9, 2009

("June 9, 2009 Letter").[7]  In light of the foregoing, Delphi is obligated to deposit $1,378,631 into

escrow by June 30, 2009 (fifteen (15) business days from the date of the June 9, 2009 Letter), the

failure of which would constitute a breach of the MSA.

## VII.    FACTS REGARDING DELPHI'S ADDITIONAL BREACHES

### A.    Improperly disputed charges withheld by Delphi[8]

40.    Section 12.4 of the MSA provides a structured mechanism for the Debtors to

dispute charges and withhold payment for disputed charges.  Currently, the Debtors are

withholding $16,909,802 in disputed charges.  The disputed charges stem from various projects

under different service areas provided by CSC.  The specific disputed charges withheld and

refused for payment by Delphi can be set forth in the following general categories (collectively,

the "Disputed Withhold Charges").

### a.    Steering Project

41.    Under this category of Disputed Withhold Charges, Delphi contends that CSC

caused delays in the "Steering Project" that resulted in a delay in the sale of that division of the

Debtors' operations.  Based on those alleged delays, Delphi has refused to pay CSC certain

charges associated with the Steering Project, which charges total $4,425,409.  CSC did not,

however, cause any of the delays associated with Steering Project.  Rather, the parties to the sale

transaction caused any delays associated with the project.  More important, the Debtors expressly

authorized the delays through two "Change Controls" and an Execution Statement of Work for

---

[7] See Exhibit "E".

[8] CSC is in discussions with Delphi to submit certain of their disputes to mediation.

COMPLAINT OF COMPUTER SCIENCES CORPORATION FOR DECLARATORY JUDGMENT WITH
RESPECT TO MASTER SERVICES AGREEMENT WITH DELPHI CORPORATION, AND FOR RELATED
DAMAGES ARISING FROM BREACH OF POST-PETITION CONTRACT – Page 11

the project. As a result, Delphi's withholding of $4,425,409 in charges associated with the Steering Project is improper.

### b. Brazil PIS/COFIN tax

42.    Brazil applies a tax to certain information technology services provided by CSC to Delphi in Brazil. CSC has paid this tax in the past, and invoiced Delphi for the amount of the tax. Delphi refuses to pay this tax, despite the fact that under the MSA, Delphi—not CSC—must pay the taxes on IT services. The amount of this tax, and the amount Delphi owes CSC, is $574,852.

### c. Intrusion detection ARCs

43.    Beginning in June 2008, the Debtors expressly designated 41 intrusion detection devices ("IDDs") for CSC to maintain, monitor and manage. As requested, CSC provided those services. Now, Delphi claims that it did not request CSC to perform those services. Delphi further argues that, in any event, it should not be billed for the services associated with the IDDs because those services are within the scope of an agreement they have with another service provider ("EDS"). Nonetheless, despite CSC providing Delphi with documentation to support its position, Delphi has refused to pay CSC $1,749,715 for the services CSC provided concerning the IDDs. CSC has informed the Debtors that it is willing to shift responsibility of the IDDs to EDS. Regardless, however, CSC is entitled to compensation for the services it rendered in regard to the IDDs.

### d. Specialized Skill Rate Credit

44.    On certain projects for the Debtors, CSC was required to use "special skills" in time and materials, which are more costly. To prevent the overuse of those special skills and to minimize costs, CSC agreed to give the Debtors a credit if, on any given project, the use of special skills exceeded a certain ratio agreed to by the parties. Depending on the type of project,

the parties agreed to a ratio that would allow special skills to be used for 2.5% to 12.5% of a project.

45.     Typically, projects are split into two phases – a planning phase and an execution phase.  Most required special skills are used during the planning phase of a project.  Sometimes, special skills are required for as much as 40% of the planning time of a project.

46.     CSC allocated the agreed percentage of allowed special skills to cover the entire lifecycle of a project and invoiced the Debtors under that methodology.  In December 2008, Delphi objected to CSC's methodology.  Delphi then argued that the total project hours (planning + execution) should not be used in calculating the credit for special skills, but should be calculated separately for each phase (planning and execution) of a project.  Therefore, Delphi alleged that it had been paying too much in special skills because it should have received larger credits for specialized skills during the planning phase of projects.  Specifically, Delphi claims that it should have received additional credits in the amount of $1,247,210.  Based on that argument, Delphi improperly withheld $1,247,210 in funds owed CSC.  Delphi should be estopped from asserting this position retroactively, after CSC has relied upon the parties' understanding and course of dealing in performing its obligations under the MSA.

       e.    **MAN charges**

47.     Delphi has requested and CSC has provided metropolitan area network ("MAN") circuits at certain points in Delphi's network.  These MAN circuits act as access circuits that connect directly or indirectly to Delphi sites and are very costly for CSC to provide.  During the bidding process, Delphi represented to CSC that it had no more than six (6) total MAN circuits.  These numbers were reflected in the agreed-upon baseline for such circuits in the MSA.  Subsequent to the inception of the MSA, CSC added at Delphi's request additional MAN circuits.  Throughout the performance of the MSA, however, despite requesting these MAN

circuits and accepting the benefit of them, Delphi has refused to pay most of the charges for them. The grounds for Delphi's refusal are unclear but they appear to stem at least in part from arguments that that (i) some of these circuits are "backbone" network circuits for which CSC is responsible; and (ii) some are within the contractual baseline and so are not subject to additional charges. As to the former, the circuits in question are MAN circuits rather than backbone circuits and so Delphi's claim is unfounded. As to the latter, CSC has not charged for the baseline circuits and so Delphi's claim here is unfounded as well. In addition, Delphi has withheld some payments for these circuits without any clear explanation of the basis for such withholdings. The total amount to date of charges for these circuits that Delphi has withheld totals $1,092,128, all of which is properly due and owing to CSC.

### f.    Conversion of critical sites to standard sites

48.    This category of Disputed Withhold Charges relates to the Debtors' attempt to convert all critical resource units (e.g., network ports) to standard resource units. Based on that conversion, there was a reduction of resource unit volumes to zero, which volume reduction triggers a termination charge under the MSA. See MSA, §§ 4.5(a), Schedule 4-H (§ 1.4), Supplemental Schedule 4 (§ 5.0(g)). Delphi refuses to acknowledge the termination charge and takes the improper position that it may unilaterally eliminate services by reducing volumes to zero, without incurring charge. Because CSC claimed that this charge was due, during the pendency of this dispute, CSC did not process the resource volume reduction; ultimately, as an accommodation to Delphi, and in resolution of the dispute, CSC agreed to process the reductions. Delphi subsequently withheld the amount of the difference in charges that would have resulted from such reduction. The amount of this withhold is $1,284,498. In addition, Delphi continues to dispute its obligation to pay termination charges. While the amount of such termination charges has not been fully calculated, they are in excess of $2,000,000.

### g.   Transformation milestones

49.   The Disputed Withhold Charges concerning "transformation milestones" relate to payments due for completion of milestones associated with CSC's transformation of voice services and installation of new telephone systems in and at Delphi locations.  Ignoring previous agreements relating to volume and documentation requirements, Delphi has without justification denied or delayed approval of completed milestones and thus improperly prevented CSC from invoicing the charges associated with these milestones.  First, Delphi contends that CSC has failed to provide certain reporting that is not required under the MSA.  Second, Delphi has delayed payment through an incorrect interpretation of the milestones agreed by the parties.  Specifically, these milestones track percentages of completion of these services and generally follow a 25%-50%-75% formula; however, these milestones may be formally expressed in total volumes (e.g., units) that are intended to achieve such percentages.  Subsequent to the parties' agreement on these thresholds, Delphi has closed and consolidated a number of locations.  Thus, the original volume thresholds are impossible to meet, although CSC has completed the percentage threshold of over 75% of these underlying services.  Delphi previously agreed to adjust and conform these volume thresholds accordingly, but has instead seized upon them to raise disingenuous defenses to payment.  Thus, CSC has been forced to invoice such charges without Delphi's approval, and Delphi then improperly withheld the invoiced amounts of $2,533,777.

### h.   ISPS development

50.   Delphi has withheld payment of certain charges requested by Delphi relating to an "ISPS" project, on the alleged basis that CSC failed to timely invoice Delphi for these services.  However, Delphi failed to provide timely notice to CSC of its termination of the ISPS project, , which notice was necessary to trigger CSC's project billing system.  Delphi thus prevented

timely billing by CSC by failing to issue the notice.  Delphi has never contended that it did not

request, receive or accept the underlying services in question.  These Disputed Withhold Charges

total $395,539.

      **i.**      **Steering (withhold against March invoice)**

51.      Delphi has withheld from payment to CSC $2,771,890 in charges corresponding

to a Steering Project known as "Rhodes" on the alleged basis that they were untimely billed.

Again, Delphi disputes these charges as untimely billed but does not dispute the underlying

charges themselves.  CSC was prevented from timely billing Delphi by Delphi's suspension and

eventual cancellation of the project due to failed negotiations with its buyer for the Steering

business.  Because of this, CSC was eventually forced to issue invoices outside of the partiers'

agreed milestone process, which charges Delphi then disputed.

      **j.**      **Spain Deferred Country Credit**

52.      Under the provisions of the MSA, CSC is financially responsible for application

services beginning July 2007.  If CSC does not provide such services, CSC is required to credit

to Delphi Delphi's costs of continuing to providing those services to itself (the "deferred country

credit").  Because of Delphi concerns regarding local workers council requirements in Spain,

CSC did not begin providing the services in Spain in July 2007 and, instead, issued Delphi

credits for the costs Delphi claimed to be incurring in providing the services itself.  CSC's Spain

deferred country credits were based entirely on information provided by Delphi; Delphi

prevented CSC from independently confirming these numbers, by, among other things, expressly

forbidding CSC to contact relevant Delphi personnel in Spain.  Delphi's information indicated

that the Delphi staff providing the services included 18 FTPs (full time persons, which includes

full-time equivalents for Delphi employees, contractors, and third party support).  CSC

calculated deferred country credits based on the costs to Delphi of these alleged 18 FTPs, which

were applied to the invoices for services from July 2007, through March 2009.   In fact the number of FTPs used by Delphi was substantially less than 18.   In October 2008, Delphi first allowed CSC to contact Delphi's staff in Spain. After interviewing Delphi's staff, CSC began to believe that the costs stated by Delphi, and upon which CSC's credits were based, were significantly overstated.   On November 10, 2008, CSC notified Delphi of this belief, and requested that Delphi verify the cost information Delphi had provided in 2007, and repeated this request in December, 2008, and in January, February and March 2009.   But Delphi refused to respond to such requests.   CSC determined, based on the best information available to it, that the true number of FTPs was 11.5 for July 2007 through December 2007; 8 for January 2008 through October 2008; and 5.1 for November 2008 through March 2009.   In April 2009, CSC invoiced Delphi $693,198, which is the amount of the over-credits in the period July 2007 through March 2009.   In response to that invoice, Delphi has withheld $436,198, claiming that Delphi is responsible for only the over-credits beginning at the time CSC notified Delphi of such over-credits (i.e., November 2008).   Delphi claims that invoiced amounts for over-credits prior to November 2008 are untimely, though Delphi has not disputed CSC's calculation of the amount of the over-credit.   Delphi's basis for this withholding is invalid.   First, the amounts over-credited to Delphi were based on information provided by Delphi and which Delphi prevented CSC from confirming prior to October 2008.   Second, Delphi's lack of responsiveness to CSC's requests for verification of the Delphi information further prevented CSC from accurately reflecting these credits on the invoice until April 2009.   Delphi's dispute is without merit, and the full amount of the withhold should be returned to CSC.

## VIII.   COUNT ONE: EXPEDITED DECLARATORY JUDGMENT

53.   CSC repeats and realleges for all purposes paragraphs 1 through 52 of this Complaint as if completely set forth in this section.

54.     Delphi contends that CSC was not justified in terminating the MSA because of Delphi's failure to pay the undisputed charges.  Consequently, there exists an actual, present controversy between CSC and Delphi as to whether the MSA has been terminated, whether and to what extent CSC must provide Termination Assistance Services, and whether Delphi must prepay for such Termination Assistance Services on a monthly basis.

55.     CSC accordingly requests this Court's declaratory judgment that, due to Delphi's failure to pay the undisputed charges when due, CSC properly terminated the MSA, and that Delphi must prepay CSC, on a monthly basis, for Termination Assistance Services.

56.     CSC specifically requests that this Court declare that Delphi must timely pay to CSC, prior to the 1st day of each month, all prepayment invoices presented by CSC, and must make such payments in the United States.

57.     CSC further requests the Court's declaratory judgment that in the event that Delphi breaches its obligations to timely pay Termination Assistance Services, CSC may immediately terminate all CSC services effective on or after the fifteenth (15) day of such month for which payment has not been received.

58.     Because of the risk that CSC would run by providing the Termination Assistance Services without prepayment, and because a refusal to provide the Termination Assistance Services due to the lack of prepayment could, potentially, cause damage to Delphi's business, CSC requests that the Court expedite the hearing on this cause of action.

## IX.     COUNT TWO: SPECIFIC ENFORCEMENT OF ESCROW AND PREPAYMENT OBLIGATIONS

59.     CSC repeats and realleges for all purposes paragraphs 1 through 58 of this Complaint as if completely set forth in this section.

60.    Delphi materially breached the MSA by failing and refusing to prepay CSC monthly for the requested Termination Assistance Services.

61.    Based on past experience, CSC reasonably anticipates that Delphi will materially breach its obligations under the MSA by failing to honor escrow deposit requests in the total amount of $1,378,631 (as of the date of filing of this Complaint).

62.    CSC requests an expedited hearing on this cause of action for specific performance, because CSC is currently in an unsecured position with respect to the prepayments and the disputed charges, and the MSA provisions requiring the prepayments and escrow were specifically designed to ensure that CSC's payment risk would be limited.  Despite Delphi's imposition on CSC of these payment risks not contemplated by the MSA, CSC continues to protect Delphi's business from undue risk by providing the Termination Assistance Services despite Delphi's breaches.

63.    As a matter of equity, CSC should not be put in a position in which it must take good faith action to protect Delphi from preventable business damage, while being subjected by Delphi's own breaches to inequitable payment risks with respect to those good faith actions.

64.    CSC is therefore entitled to the Court's judgment requiring Delphi to prepay, on a monthly basis, for the Termination Assistance Services, and requiring Delphi to deposit into escrow not less than $ 1,378,631 pending the resolution of any disputed charges.

## X.    COUNT THREE:  PRELIMINARY INJUNCTION

65.    CSC repeats and realleges for all purposes paragraphs 1 through 64 of this Complaint as if completely set forth in this section

66.    Pleading in the alternative, CSC requests a mandatory preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, requiring Delphi to make the escrow payments and prepayments described in Count Two.

67.    Pursuant to Federal Rule 65(a)(2), the Court has the authority to advance any or all of CSC's other causes of action for hearing at the same time as the preliminary injunction hearing.

## XI.    COUNT FOUR: BREACH OF CONTRACT

68.    CSC repeats and realleges for all purposes paragraphs 1 through 67 of this Complaint as if completely set forth in this section.

69.    The MSA constituted a valid agreement supported by legal consideration and the mutual agreement and mutuality of obligations of the parties, and created a contract binding on the parties.

70.    As set forth herein above, Delphi materially breached the MSA by failing to pay to CSC past due undisputed charges, as well as the following Disputed Withhold Charges (as defined in the MSA): (i) Steering Project; (ii) Intrusion Detection ARCs; (iii) charges withheld by Delphi on the basis of its invalid contention that Delphi is entitled to an additional Specialized Skill Rate Credit in the amount of $1,247,210; (iv) MAN Charges; (v) charges related to Conversion of Critical Sites to Standard Sites; (vi) Transformation Milestones, including Delphi's failure to timely approve of completed milestones, and failure to implement agreed upon methodologies to conform volume thresholds for billing purposes; (vii) ISPS Development; (viii) Steering (Withhold Against March Invoice) and (ix) Spain

71.    In addition to CSC's right to receive its charges under the MSA, as a result of Delphi's breach, CSC has suffered, and will continue to suffer, damages in an amount to be proven at trial, including but not limited to, the following: (i) damages associated with CSC third party agreements, including termination or cancellation fees, fees to effect assignments, fees or cost increases associated with volume reductions, and any non-cancelable charges that CSC is contractually required to pay; (ii) damages associated with CSC's assets, including reductions

and write-offs of net book value of assets, cost of disposal or redeployment of assets, cost of

replacing assets, and cost of packaging, removing assets from Delphi facilities and transportation

to CSC facilities; (iii) damages associated with cost of CSC personnel, including costs of

additional personnel required to support termination, costs of idle time, redundancy and

severance, and costs of redeployment of personnel; and (iv) damages associated with failure to

recover through charges balance sheet amounts and overhead. .

## XII.   COUNT FIVE: QUANTUM MERUIT

72.    CSC repeats and realleges for all purposes paragraphs 1 through 71 of this

Complaint as if completely set forth in this section.

73.    Alternatively, CSC is entitled to judgment in CSC's favor for the value of services

provided by CSC to Delphi in the following categories of Disputed Charges: Intrusion Detection

ARCs, Transformation Milestones, ISPS Development, and Steering (Withhold against March

invoice), , as well as any other services that Delphi contends were not properly provided to

Delphi under the MSA, but which Delphi requested, received and accepted without payment to

CSC.

74.    CSC provided said services to Delphi under circumstances that made it clear to

Delphi that CSC expected and intended to be paid.  Delphi accepted the services and enjoyed the

benefits of the services, knowing that CSC expected and intended to be paid.  It would be

inequitable to allow Delphi to retain the value and benefit of such unpaid services provided by

CSC, including at a cost to itself, without compensation to CSC for same.

75.    Accordingly, to the extent that the Court determines that CSC is not entitled to

recover under the MSA for any portion of its services provided to Delphi as requested herein,

Delphi has been unjustly enriched in a commensurate amount and CSC is therefore entitled to a

judgment by the Court in an amount to be determined by the Court constituting the value of services requested, received and accepted by Delphi without payment to CSC.

## XIII.   COUNT SEVEN: ADMINISTRATIVE EXPENSE PRIORITY

76.    Pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, CSC is entitled to the allowance and prompt payment of an administrative expense priority claim or claims in the Debtors' Bankruptcy Case corresponding to its unpaid, past due charges arising under the MSA, including, but not limited to: (i) all unpaid Undisputed Charges; (ii) all unpaid, past due Disputed Charges; (iii) Delphi's prepayment obligations for Termination Assistance Services, to the extent that such prepayments have come due; and (iv) all other liabilities and damages flowing from the MSA and Delphi's breaches thereof.

77.    Because the MSA is a post-petition contract expressly approved by this Court, such a claim or claims may be awarded without the need to separately establish that such services provided an actual or necessary benefit to the Debtors' estates.  Moreover, the MSA expressly provides that CSC's claims arising under the MSA and prior to the Debtors' emergence from Chapter 11, "shall constitute administrative expenses of the Debtors of the kind specified in sections 503(b) and 507(a) of the Bankruptcy Code . . . ."  MSA § 2.4. (emphasis added)

## XIV.   RESERVATION OF RIGHTS

78.    CSC reserves any and all rights to amend this Complaint and to enforce any and all other remedies available to it.

## XV.   PRAYER FOR RELIEF

79.    Wherefore, premises considered, CSC respectfully request that this Court enter judgment in its favor and grant the following relief:

(a) Grant CSC a declaratory judgment that due to Delphi's failure to pay undisputed charges when due, CSC properly terminated the MSA and Delphi must prepay, on a monthly basis, for all services provided by CSC which are Termination Assistance Services;

(b) Ordering Delphi to fulfill all obligations under the escrow provisions of the MSA including payment of any amounts owed currently up through the date of the resolution of this Adversary Proceeding;

(c) Enter any and all orders necessary to advance any and all of CSC causes of actions for expedited hearing;

(d) Grant CSC all damages set forth herein for breaches of the MSA by Delphi;

(e) Grant CSC relief based on quantum merit for services provided for Delphi that CSC expected and intended to be paid;

(f) Grant the payment of an administrative expense priority claim to CSC pursuant to Bankruptcy Code § 503;

(g) Awarding CSC any and all of damages against Delphi in the amount to be determined at trial;

(h) Awarding CSC attorney fees and cost as is appropriate; and

(i) Awarding any and all further relief the Court deems just.

Dated:  June 9, 2009

              **MUNSCH HARDT KOPF & HARR, P.C.**

By: _____

           Raymond J. Urbanik, Esq.
           NY RU 1842
           Jay H. Ong
           TX Bar No. 24053668
           Davor Rukavina, Esq.
           TX Bar No. 24030781
           3800 Lincoln Plaza
           500 N. Akard Street
           Dallas, Texas  75201
           Telephone:  (214) 855-7500
           Facsimile:  (214) 855-7584

           **ATTORNEYS FOR COMPUTER SCIENCES
           CORPORATION**