**Hearing Date:  June 10, 2009 at 9:30 a.m**.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan, III
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO
<u>PLAN MODIFICATION APPROVAL MOTION</u>

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby submit this omnibus reply (the "Reply") to the objections (the "Objections") filed by various parties (the "Objectors") objecting to the October 3, 2008 Motion for Order (I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization (Docket No. 14310) (the "Motion" or the "Plan Modification Approval Motion"), which was supplemented on June 1, 2009 by the Debtors' (A) Supplement to the Plan Modification Approval Motion and (B) Request to Set Administrative Expense Claims Bar Date and Alternative Sale Hearing Date (Docket No. 16646) (the "Supplement to Plan Modification Approval Motion").

Preliminary Statement

When Delphi sought chapter 11 protection more than three and a half years ago in the fourth quarter of 2005, every member of Delphi management and many of the Debtors' stakeholders understood that they were committing themselves to a corporate restructuring of unprecedented complexity, one that entailed significant risk but which confronted squarely the need to reshape an iconic American industry to revitalize its central role in the nation's global business.  The Confirmed Plan reflected the Debtors' achievement of all five of their principal Transformation Plan objectives adopted in 2006 – including preservation of all of Delphi's defined benefit pension plans.  Pursuant to the Confirmed Plan, the Debtors also achieved multiple compromises and settlements with their stakeholders, and raised more than $6.1 billion in committed exit financing.

Unfortunately, the Debtors' vision of the reorganized Delphi and related stakeholder recoveries represented by the Confirmed Plan has been under siege since the Plan Investors' eleventh-hour derailment of the effectiveness of the Confirmed Plan in April 2008. During the fourteen months since the Debtors' closing of the Confirmed Plan was suspended, the various micro- and macro-level "event risks" that have shaped the restructuring process – including the seizure of the capital markets, the stunning collapse of the global auto industry, and the chapter 11 cases of two of Detroit's "Big Three" – have become well known to the Debtors and their stakeholders alike.

During this fourteen month period, the Debtors have pursued a "dual track" reorganization by pursuing remedies against the Plan Investors on the one hand and sorting out a modified business plan reflective of subsequent events and seeking alternative emergence capital on the other hand.  In October 2008, the Debtors filed their Plan Modification Motion, which reflected substantially reduced recoveries to stakeholders based on a modified business plan valued at approximately $7.2 billion at the midpoint range on a total enterprise valuation basis. However, the Debtors were never able to raise the required emergence capital to fund the proposed plan modifications.  Subsequent event risks required the business plan to be revised yet again with a further dramatic reduction in total enterprise value to a point that was at or below the amount of Delphi's postpetition administrative claims.  These developments put the prospects of full recovery for the subordinated tranche of the DIP facility and any recovery for prepetition creditors or interest holders at substantial risk.

To further underscore the near depression in the capital markets, the Debtors were not even able to convince their DIP Lenders to extend the maturity date of the DIP Agreement beyond December 2008.  Instead, to continue funding their operations, the Debtors were left to

negotiate an Accommodation Agreement with the requisite group of DIP Lenders, and the GM Arrangement with GM.  Since that time, GM has provided the Debtors with approximately $600 million in liquidity support and accelerated trade payments over and above what GM otherwise would have paid through purchase orders for Delphi products; the DIP Lenders have made available to the Debtors approximately $85 million in borrowing base collateral for the Debtors to operate their businesses; and the Debtors have paid their DIP Lenders more than $500 million in principal repayments, interest, and fees.

During the Accommodation Agreement period, the Debtors have sought to resolve three key emergence issues – obtaining further operating and financial concessions from GM in respect of declining North American operations; resolving their defined benefit pension plans which could no longer be supported by Delphi following emergence from chapter 11; and raising sufficient emergence capital from third parties and/or their stakeholders to fund a modified business plan.  On the latter point, no credible commitment for sufficient emergence capital was ever forthcoming from Delphi's stakeholders or other third parties until the United States Treasury Auto Task Force intervened in Delphi's chapter 11 cases in March 2009 in support of GM.

Thus, the transactions with GM and Platinum announced by Delphi on June 1, 2009 represent the first fully funded, feasible emergence transactions since the Plan Investors walked away from the Confirmed Plan fourteen months ago.  These emergence transactions, which involve approximately $3.6 billion in emergence capital and commitments, meet important objectives established by Delphi, GM, and Platinum.  For Delphi, the transactions maximize business enterprise value and related recoveries for Delphi's stakeholders; maximize feasibility and speed of execution (including provision of sufficient interim liquidity); protect

4

franchise value by ensuring continuity of supply for Delphi's customers; preserve Delphi's supplier tiers; preserve Delphi's human capital (to the extent possible under the circumstances); and provide the opportunity to consummate a Modified Plan in order to reach a comprehensive resolution of Delphi's chapter 11 cases and achieve Delphi's transformation objectives (to the extent possible under the circumstances). For GM and Platinum, the transactions ensure continuation of supply for GM, maximize feasibility and speed of execution, and rationalize (minimize) transaction economics consistent with the above.

Importantly to Delphi, GM and Platinum have agreed that the emergence transactions may be consummated through the Modified Plan under section 1127 of the Bankruptcy Code or through a private sale under section 363 Bankruptcy Code if sufficient stakeholder support is not obtained to confirm and consummate the Modified Plan. Equally important, GM has agreed to provide up to $250 million in incremental liquidity support on a subordinated basis to the DIP Lenders to bridge the Debtors' financing requirements to consummation of either a Modified Plan or private sale. Also of significance is that the transaction agreements with GM and Platinum permit Delphi to consider unsolicited alternative transactions between now and the approval hearing for the Modified Plan and/or private sale on July 23, 2009. It is no coincidence that every provision of the Master Disposition Agreement is subject to the clear and unambiguous statement "that nothing in this Agreement shall prevent or restrict Delphi's Board of Directors from taking actions (or directing management to take actions) which the Board reasonably believes are required by their fiduciary duties (taking into account the advice of counsel in appropriate circumstances)." (Master Disposition Agreement § 9.40.)

Although the Debtors understand that many of their stakeholders are disappointed with the recoveries anticipated under the proposed transactions – which is reflected in the

5

number of objections filed to the Supplement to the Plan Modification Motion – it is instructive that not one of them has objected to the proposed $250 million financing from GM. The Debtors believe that no objections were lodged to the subordinated financing to be provided by GM to bridge these cases to emergence because Delphi's stakeholders recognize that the incremental financing is absolutely necessary to preserve the value of Delphi's estates and none of them is prepared to provide substitute financing – especially on the subordinated priority agreed to by GM.

Although stakeholders understandably wish for the facts to be different than they are, there is no dispute that Delphi's business enterprise value has deteriorated dramatically since confirmation of the Confirmed Plan. This is reflected in changes in the amount and currency of distributions to senior stakeholders, and in the elimination of distributions to more junior stakeholders. And although Delphi has explored numerous options for continuing its salaried pension plan, none were determined to be feasible because no one was prepared to shoulder the multi-billion dollar obligation associated with preservation of the salaried pension plan.

The simple truth is that not one of the objections filed to the Plan Modification Approval Order should result in this Court denying the relief sought at the preliminary hearing on the Modified Plan. While many of the objectors provide no cognizable legal basis for their objections to be sustained, there are certain objections which, while premature today, could influence whether the Debtors will be able to consummate the proposed emergence transactions through the Modified Plan or will instead be required to consummate private sale transactions. However unsatisfying the proposed emergence transactions may be to many of Delphi's stakeholders, this Court should not be deterred from entering the proposed order and satisfying the remaining conditions to the $250 million bridge DIP financing that is unopposed. That

6

action by this Court will provide a fully financed runway to the July 23, 2009 approval hearing at which the Court can then consider the Modified Plan on its merits or, if necessary, the alternative private sale transactions. It will also provide an opportunity for any unsolicited feasible transactions to be considered appropriately by Delphi's Board of Directors.

Changes To Supplement

For the convenience of this Court and the recipients of this Reply, attached hereto as <u>Exhibit A</u> is a detailed chart summarizing the issues raised in the Objections, including the basis of the Objection and the Debtors' response to the Objection. Although this Reply highlights only certain objections, it incorporates the responses in the chart.

The Debtors have modified the Supplement to update previously-reported information since the filing of the Supplement on June 1, 2009. For example, the Debtors have added additional disclosure regarding:

- Updates regarding the bankruptcy filing of General Motors;
- The addition of an "Other Priority Claims" class;
- The treatment of certain workers' compensation claims;
- Certain additional disclosure requested by the Plan Investors, Wilmington Trust, and the DIP Agent; and
- Additional disclosure regarding risk factors.

In addition, the following documents are attached hereto as <u>Exhibits B</u> through <u>E</u> showing the updates and revisions made since the filing on June 1, 2009:

- Proposed Order, marked to show changes against version filed on June 1, 2009 (Exhibit B);
- A marked version of the Disclosure Statement Supplement, marked to show all changes since June 1, 2009 (Exhibit C);

- A marked version of Appendix A to the Disclosure Statement (Plan Of Reorganization (As Modified)) (changed pages only), marked to show all changes since June 1, 2009 (Exhibit D); and

- A marked version of Plan Exhibit 7.7 (the Master Disposition Agreement) (changed pages only) showing certain conforming changes made since June 1, 2009 (Exhibit E).

In addition, the Debtors have attached hereto as Exhibit F two demonstrative slides illustrating (i) the interrelated nature of the Master Disposition Agreement with the amended GM financing arrangement that is also before the Court, and (ii) the Debtors' key emergence issues that are resolved by the Master Disposition Agreement.

Section 1127 of the Bankruptcy Code requires the proponent of a modification to a plan to comply with the disclosure and solicitation requirements outlined in section 1125 of the Bankruptcy Code. 11 U.S.C. § 1127(c). To be approved, a disclosure statement must provide "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor . . . typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125. With these changes, the Supplement is more than adequate to enable Delphi's stakeholders to make an informed decision when voting on the Plan. Most of the additional disclosures requested by the Objectors are beyond the scope of the "adequate information" requirement and appear to be relevant only for reasons other than providing a basis for an informed judgment about the Plan. Therefore, the Supplement, including the modifications described above, should be approved.

### Tranche C Lenders' Objection To Consensual Foreclosure

Certain Tranche C objectors appear to contend that the Modified Plan is patently unconfirmable because Tranche C Lenders will not be paid in full in cash under the Modified Plan and will not consent to the transaction. Pursuant to section 1129(a)(9)(A) of the Bankruptcy

8

Code, a bankruptcy court may only confirm a plan of reorganization if the plan provides for payment in full, in cash, of all allowed administrative claims unless the holders of such claims consent to some different treatment. However, the Plan's provision for a consensual foreclosure by the DIP Agent comports with section 1129(a)(9).

As this Court already recognized in connection with the Debtors' motion to approve the Accommodation Agreement, the intercreditor arrangement under the DIP Credit Agreement provides for enforcement rights by collective action. This bargained-for arrangement vests the DIP Agent – either in its own discretion or as compelled by a majority of Tranche A and Tranche B lenders constituting the "Required Lenders" (as defined in the DIP Credit Agreement) – with the exclusive right to exercise remedies upon an event of default. Accommodation Agmt. Hr'g Tr. 154, Dec. 1, 2008; accord Chase Manhattan Bank v. Motorola, Inc., 136 F. Supp. 2d 265, 271 (S.D.N.Y. 2001); Mizuho Corp. Bank, Ltd. v. Enron Corp. (In re Enron Corp.), 302 B.R. 463, 472-77 (Bankr. S.D.N.Y. 2003); Beal Savings Bank v. Sommer, 865 N.E.2d 1210, 1215-16 (N.Y. 2007). This Court already found that lenders under the DIP Credit Agreement had bargained away their individual rights to enforce remedies upon an event of default in favor of collective enforcement rights exercisable only by the DIP Agent:

> The objectors contend that, given the anticipated maturity of the loans at the end of this month, they individually have the right to act to enforce Delphi's payment obligation, but I conclude that the agreement itself does not provide them with that right. And under New York law, the remedy provision of the agreement provides, instead, that right to be exercised by the agent, either in its discretion or a the direction of the required lenders. Therefore, I believe that, in entering into the credit agreement or by purchasing Tranche C or A or B loans, each DIP lender agreed or know that it would be subject to subject to such a limitation on its right to act unilaterally to, for example, sue the debtor for breach of the DIP Agreement.

Accommodation Agmt. Hr'g Tr. 154-55.

Among the remedies available to the DIP Agent upon an event of default, section 7.01 of the DIP Credit Agreement provides that the DIP Agent may "exercise any and all

9

remedies under the Loan Documents and under applicable law available to the Administrative Agent and the Lenders."  In addition, section 15(a) of the Security And Pledge Agreement specifically provides: "The Agent may exercise in respect of the Collateral . . . all rights and remedies of a secured party on default under the Uniform Commercial Code . . . ."  Accordingly, the treatment set forth in the Plan regarding the satisfaction and discharge of the DIP Credit Agreement – either through strict foreclosure under section 9-620 of the UCC or a public sale under section 9-610 of the UCC – falls squarely within the remedies of the DIP Agent contemplated by the DIP Lenders.  The DIP Lenders have consented to such treatment as part of the intercreditor arrangement under the DIP Credit Agreement.  The treatment of the DIP Facility Claims, therefore, complies with the conditions to confirmation set forth section 1129(a)(9) of the Bankruptcy Code.

The collective action mechanism under the DIP Credit Agreement is well established in these cases.  In any event, any doubt as to whether this issue poses an impediment to confirmation should be heard at the final modification hearing.  A hearing considering the adequacy of disclosure is not the time to consider the merits of a plan under section 1129.  In fact, a disclosure statement that otherwise adequately describes the plan in question must be approved, unless "the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible.'"  In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (citation omitted).  The same rule should apply to supplemental disclosure under section 1127(c).

### Reply To 1127(d) Objections

As the Debtors set out in the Supplement to Plan Modification Approval Motion, to comply with the non-discretionary provision of 11 U.S.C. § 1127(d), the Debtors must maintain the November 26, 2007 record date that was previously approved by this Court.

Although the Debtors realize that more than 18 months have lapsed since the November 26, 2007 record date, the December 10 Solicitation Procedures Order sets the record date at November 26, 2007 and any party who purchased a claim or interest after that record date purchased the claim or interest subject to the record date established by this Court.  This is similar to a situation in which a party who purchases a security following the ex-dividend date is not entitled to receive the dividend; instead, the dividend is payable to the seller of the security.  In a slightly different context, this Court established record dates for claim and equity distributions and made clear that the Debtors would not need to recognize purchasers of claims or interests following the distribution record date.  (Confirmation Order ¶¶ 36-37.)  The principle here is the same and the Debtors believe that maintaining the voting record date as previously established by this Court is similarly appropriate.

The Debtors are not aware of any reported decision under section 1127(d) requiring a new record date for resoliciting votes on a modified plan.[1]  Moreover, one court that set a new voting record date was forced to waive, without analysis, compliance with section 1127(d).  See In re Adelphia Communications Corp., No. 02-41729 (Bankr. S.D.N.Y. April 28, 2006) (REG) (Docket No. 10634) (ordering that "notwithstanding the provisions of section 1127(d) of the Bankruptcy Code . . . all ballots previously submitted to accept or reject the November Plan shall be and hereby are disregarded").  At least one court retained the prior voting record date (which was established 4 months before the resolicitation) where the resolicitation of various holders of securities was required.  See In re Northwestern Corp., No.

---

[1] But see, e.g., In re Am. Banknote Corp., Case No. 99 B 11577 (Bankr. S.D.N.Y. 2002) (upon modification of plan post-confirmation under 11 U.S.C. § 1127(b), court established new record date for previously unsolicited class as well as class whose treatment under plan had been modified); cf. In re Oakwood Homes Corp., Case No. 02-13396 (Bankr. D. Del. 2004) (upon modification of plan pre-confirmation, court set new record date).

11

03-12872 (Bankr. D. Del. Sept. 1, 2004) (retaining prior voting record date for resolicitation of certain securities holders). Because the requirements of section 1127(d) appear to be mandatory, the only way for the Debtors to comply with these requirements when soliciting votes on the Modified Plan is by maintaining the November 26, 2007 record date.[2]

### Classification of PBGC Claim

Section 1122(a) of the Bankruptcy Code provides in relevant part that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). The Second Circuit has held that dissimilar claims may not be placed in the same class, but not all similar claims must be placed in the same class so long as there is a "legitimate reason" justifying the separate classification. See Aetna Casualty and Surety Co. v. Clerk, U.S. Bankruptcy Court, New York (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996) ("[c]lassification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason"); see also Boston Post Road Ltd. P'Ship v. FDIC (In re Boston Post Road Ltd. P'Ship), 21 F.3d 477, 483 (2d Cir. 1994). The Debtors have placed the PBGC general unsecured claim in Class C-2, classified separately from other general unsecured claims. The arguments raised by certain objectors to challenge this classification are without merit.

Under section 1122(a) of the Bankruptcy Code, the relevant inquiry is whether all claims of a class have substantially similar rights to the debtor's assets. In re Drexel Burnham Lambert Group, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992). "A plan proponent is afforded

---

[2] In the event the Court nevertheless determines that a new record date is permissible and desirable, the Debtors request that the Court establish June 8, 2009 as the record date.

12

significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar." Id.; see also In re AG Consultants, Grain Division, Inc., 77 B.R. 665, 676 (Bankr. N.D. Ind. 1987); In re Jersey City Medical Center, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (permitting debtor to classify general unsecured claims into four classes); In re U.S. Truck Co., Inc., 800 F.2d 581, 586 (6th Cir. 1986) (permitting separate classification of Teamsters' claims, reasoning that union employees had "virtually unique" interest).

        The Debtors have legitimate reasons to classify the PBGC general unsecured claim separately from other General Unsecured Claims because the PBGC general unsecured claim is against each of the Debtor entities and will receive the treatment to be included in the anticipated PBGC Settlement Agreement. See In re Kaiser Aluminum, No. 02-10429 (JKF), 2006 WL 616243, *5 (Bankr. D. Del. Feb. 6, 2006) (approving separate classification of unsecured PBGC claims "based on the fact that the PBGC Claims are allowed against each of the Reorganizing Debtors and are receiving the treatment negotiated in the PBGC Settlement Agreement."). The PBGC settlement agreement (to be filed on or before the plan exhibit filing date) will resolve complex issues unique to the global resolution of the Debtors' pension situation. For example, the PBGC settlement agreement will resolve, among other claims, claims with respect to the conditional adequate protection liens granted by this Court in certain of DASHI's assets.[3] Moreover, the settlement agreement will resolve purported liens that the PBGC asserts

---

[3]   See Order Under 11 U.S.C. §§ 363(c), 1107, and 1108, and Cash Management Order, and Alternatively, Under 11 U.S.C. §§ 363(b)(1) and 364(c), Confirming Authority of Delphi Automotive Systems (Holding), Inc. to Complete Intercompany Transfer of Funds, dated October 26, 2007 (Docket No. 10725); Order Under 11 U.S.C. §§ 361 And 363, Fed. R. Bankr. P. 9019, And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated May 29, 2008 (Docket No. 13694).

against certain non-U.S. affiliates of the Debtors on account of unpaid minimum funding obligations in connection with the Debtors pension plans.  Cf. 26 U.S.C. § 412(n) and § 430(k).

Furthermore, even if this Court ignores the contingent secured claims that will be resolved by the settlement agreement and incorporated into the Debtors' decision to separately classify the PBGC claims, the separate classification would still be proper even though the general unsecured claim component of the PBGC's claims is similar in certain respects to other general unsecured claims.  This is because "[c]ourts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims." In re Drexel Burnham Lambert Group, 138 B.R. at 757.  The Bankruptcy Code "does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes."  Id. (citing In re AG Consultants, Grain Division, Inc., 77 B.R. 665, 674 (Bankr. N.D. Ind. 1987)); see also Jersey City Medical Center, 817 F.2d at 1060 ("The express language of [section 1122] explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes.").  But the PBGC's claims are multi-dimensional and not simply general unsecured claims.  In fact, lumping the PBGC's claims together with the general unsecured claims would be improper because of the dissimilarities presented by the various claims asserted by the PBGC and to be resolved by the settlement.  Accordingly, the Debtors have legitimate reasons for separately classifying the claim.

WHEREFORE, the Debtors respectfully request that this Court (a) overrule the Objections, (b) grant the Plan Modification Approval Motion and approve the Supplement, (c) enter the revised proposed Order, and (d) grant the Debtors all such other and further relief as is just.

Dated:  New York, New York
        June 10, 2009

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM LLP

                                    By:    /s/ John Wm. Butler, Jr.
                                           John Wm. Butler, Jr.
                                           Albert L. Hogan, III
                                           Ron E. Meisler
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700

                                             - and –

                                    By:    /s/ Kayalyn A. Marafioti
                                           Kayalyn A. Marafioti

                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession