1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        June 10, 2009

        9:35 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2      Motion to Authorize Motion for Order Under 11 U.S.C. Section 363

3      and Fed. R. Bankr. P. 6004 Authorizing and Approving Option

4      Exercise Agreement with General Motors Corporation

5

6      Supplement to GM Arrangement Fourth and Fifth Amendment Approval

7      Motion

8

9      Supplement to Plan Modification Approval Motion

10

11     Proposed Off-Omnibus Hearing Agenda

12

13     Objection to Motion filed by Celeste R. Gill on behalf of

14     Michigan Department of Environmental Quality

15

16     Response to Debtors' Motion for Order Authorizing and Approving

17     Option Exercise Agreement

18

19     Limited Objection of Official Committee of Unsecured Creditors

20     to the Debtors' Motion

21

22

23

24

25     Transcribed by:  Dena Page

3

1    A P P E A R A N C E S :

2    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

3         Attorneys for Debtors

4         333 West Wacker Drive

5         Chicago, Illinois 60606

6

7    BY:   JOHN WM. BUTLER, JR., ESQ.

8          ALBERT L. HOGAN, III, ESQ.

9

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12        Attorneys for Debtors

13        4 Times Square

14        New York, New York 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18

19   LATHAM & WATKINS, LLP

20        Attorneys for Creditors' Committee

21        885 Third Avenue

22        New York, New York 10022

23

24   BY:   MARK A. BROUDE, ESQ.

25         ROBERT J. ROSENBERG, ESQ.

4

1    BARNES & THORNBURG, LLP

2         Attorneys for Delphi Retirees

3         171 Monroe Avenue N.W.

4         Suite 1000

5         Grand Rapids, MI 49503

6

7    BY:   PATRICK E. MEARS, ESQ.

8

9

10   COHEN, WEISS AND SIMON LLP

11        Attorneys for United Auto Workers

12        330 West 42nd Street

13        New York, NY 10036

14

15   BY:   BABETTE A. CECCOTTI, ESQ.

16

17

18   DAVIS POLK & WARDWELL

19        Attorneys for JPMorgan Chase Bank, N.A. as DIP Agent

20        450 Lexington Avenue

21        New York, NY 10017

22

23   BY:   BENJAMIN S. KAMINETZKY, ESQ.

24        DONALD S. BERNSTEIN, ESQ.

25

5

1    DECHERT, LLP

2         Attorneys for Manchester Entities

3         1095 Avenue of the Americas

4         New York, NY 10036

5

6    BY:   GLENN E. SIEGEL, ESQ.

7          CHARLES I. PORET, ESQ.

8

9

10   K&L GATES, LLP

11        Attorneys for Wilmington Trust Company as Indentured

12          Trustee

13        599 Lexington Avenue

14        New York, NY 10022

15

16   BY:   EDWARD M. FOX, ESQ.

17

18

19   KELLER ROHRBACK, PLC

20        Attorneys for ERISA MDL Plaintiffs

21        3101 North Central Avenue

22        Suite 1400

23        Phoenix, AZ 85012

24

25   BY:   GARY A. GOTTO, ESQ.

6

1   LOWENSTEIN SANDLER

2        Attorneys for Lead Plaintiffs

3        1251 Avenue of the Americas

4        New York, NY 10020

5

6   BY:   S. JASON TEELE, ESQ.

7

8

9   SCHULTE ROTH & ZABEL LLP

10        Attorneys for Platinum Equity Capital Partners II, L.P.

11            and Parnassus Holdings II, LLC

12        919 Third Avenue

13        New York, NY 10022

14

15   BY:   ADAM C. HARRIS, ESQ.

16         DAVID J. KARP, ESQ.

17

18

19   WHITE & CASE LLP

20        Attorneys for ADMP and AMLP

21        1155 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  GLENN M. KURTZ, ESQ.

25

7

1    WEIL GOTSHAL & MANGES LLP

2          Attorneys for General Motors

3          767 Fifth Avenue

4          New York, NY 10153

5

6    BY:   JEFFREY L. TANENBAUM, ESQ.

7          TED S. WAKSMAN, ESQ.

8          ROBERT J. LEMONS, ESQ.

9

10

11   WILLKIE FARR & GALLAGHER LLP

12          Attorneys for the Collective of DIP Lenders

13          787 Seventh Avenue

14          New York, NY 10019

15

16   BY:   CHRISTOPHER J. ST. JEANOS, ESQ.

17          MICHAEL J. KELLY, ESQ.

18          MARC ABRAMS, ESQ.

19

20

21

22

23

24

25

8

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Okay.  Delphi Corporation.
 3          MR. BUTLER:  Your Honor, Jack Butler, Kayalyn
 4  Marafioti, and Al Hogan on behalf of Delphi Corporation for
 5  this off-omnibus hearing.  Your Honor, there are three matters
 6  on today's agenda.  The first is the steering option exercise
 7  motion, at docket number 16410.  That is the transaction, Your
 8  Honor, that is superseded by the master disposition agreement.
 9  We propose to carry it on the docket until there's an ultimate
10  disposition of the other matter before the Court, and
11  therefore, at this hearing, at least, we're just asking to move
12  it to the June 16th omnibus calendar.
13          THE COURT:  Okay.
14          MR. BUTLER:  Your Honor, the second matter on the
15  agenda is the supplement to the GM arrangement fourth and fifth
16  amendment approval motion at docket number 16647.  There are no
17  objections filed to this motion.  As Your Honor's aware, the
18  hearing on the debtors' March 4, 2009 motion to approve
19  amendments number four and five for the debtors' existing
20  liquidity support arrangement with GM was adjourned.  From time
21  to time that transaction, taken together, those two amendments
22  would have provided an additional 150 million dollars of
23  liquidity under the GM arrangement.
24          As Your Honor will recall, on March 23rd of this
25  year, counsel for the U.S. Treasury Department Auto Task Force
```

9

1   notified GM and Delphi in writing that the Auto Task Force

2   objected to the party seeking approval of amendments number

3   four and five as those amendments had been brought to the

4   Court.  We've been negotiating since that time on approach for

5   additional liquidity for these cases, Your Honor, and the

6   supplement to that motion which provides for an amended and

7   restated agreement, provides for a 250 million dollar

8   incremental subordinated financing arrangement between Delphi

9   and GM pursuant to the amended GM arrangement.  This is

10  intended to bridge the financing requirements of the debtors

11  through the time the Court can consider, at a final hearing,

12  the debtors' proposed plan modifications or, alternatively, a

13  private sale under Section 363 to General Motors and Platinum.

14          This financing, if approved by Your Honor, will be

15  the first time in many months that the debtors have been able

16  to announce publicly that they have a sufficient liquidity and

17  a liquidity runway to be able to bridge to a proposed emergence

18  in these cases.

19          Your Honor, in terms of the exhibit index four, this

20  motion, there are eleven exhibits.  The first is the

21  declaration of Keith Stipp.  The second, there are four

22  exhibits -- three exhibits, rather, dealing with the supplement

23  to the GM arrangement to the fourth and fifth amendment.

24  They're presentation materials that are exhibit five through

25  eight.  Exhibits nine and ten are reserved, and exhibit eleven

10

1    is the proposed order.  Your Honor, I would move admission of

2    these exhibits?

3            THE COURT:  Does anyone have any objection to their

4    admission?

5            MR. ABRAMS:  Your Honor, just a point of order.  Marc

6    Abrams on behalf of certain of the DIP lenders.  This

7    declaration was served up around 5:30 this morning, I believe,

8    and it is, to put it mildly, somewhat gratuitous since this

9    motion was uncontested.  So there are a couple of concerns I

10   want to articulate to the Court.  One would be that since we

11   haven't had time to vet it and to study it, although a casual

12   review suggests that we would dispute many of the assertions,

13   we would like it to be clear that we are not prejudiced today,

14   with respect to those assertions, for not contesting them at

15   this point in time given that the motion before the Court is

16   uncontested and, given the lack of time to thoroughly prepare

17   and analyze a response to Mr. Stipp's declaration.

18           The second point, I think, is a little trickier, and

19   that is there is a contested motion before the Court with

20   respect to plan modifications.  And what I would not want to

21   happen here, given what I just said, is for the record of this

22   motion to seep into that and to supply, through this

23   declaration which was submitted for a specific purpose, a

24   supposed evidentiary record where, again, no one has had an

25   opportunity to react, no one has really had an opportunity to

11

1    take discovery with respect to the gratuitous submission, and

2    where prejudice could befall parties of interest at a later

3    date if they did not, at this point, make clear to the Court

4    their concerns that they not be bound by these factual

5    statements in this context.

6             THE COURT:  Okay, I haven't read this declaration.  I

7    did manage to read the debtors' response, which I got this

8    morning.  So what is it being offered?  What is the --

9             MR. BUTLER:  Your Honor, it's being offered only in

10   connection with the financing motion.  We are -- the difference

11   between the two hearings, the plan modification hearing is not

12   an evidentiary hearing, from the debtors' perspective.  We

13   don't intend to present this exhibit or any -- this declaration

14   or any other declaratory evidence in connection with that

15   hearing.

16            THE COURT:  Okay.

17            MR. BUTLER:  With respect to the plan -- with respect

18   to the financing hearing there is, we believe, the requirement

19   to create an evidentiary basis for the relief that we're

20   seeking here.  We've done this traditionally in these cases

21   when we've sought large amounts of money to be approved from

22   the DIP.  This is not different than our prior examples.

23            THE COURT:  So this declaration doesn't describe any

24   changes to the agreement or supplement any understandings in

25   connection with the DIP agreement?

1      MR. BUTLER:  No, this describes the change -- this

2   does describe the change -- this exhibit, this declaration is

3   about this motion and describes --

4      THE COURT:  No, no, I wasn't clear.  Does the

5   declaration describe any changes to the motion as it was filed,

6   since it was filed?

7      MR. BUTLER:  I don't think so, Your Honor.

8      THE COURT:  Okay.

9      MR. BUTLER:  I mean, what it does is describe

10   debtors' business judgment --

11      THE COURT:  Why the debtors are entering into it --

12      MR. BUTLER:  -- why aren't the --

13      THE COURT:  -- which is essentially what's set forth

14   in the motion itself.

15      MR. BUTLER:  Essentially, that is correct, Your

16   Honor.  Provides some additional evidentiary basis for the

17   liquidity, it points out that it provides data entry support

18   for many of the statements made in the motion which were

19   statements that were pled.  This is the evidentiary record to

20   support those statements, including, for example, that the

21   company needs liquidity today to be able to move forward with

22   the financing requirements over the balance of the -- over the

23   balance of this week and moving forward.  So it provides all of

24   the -- it provides information regarding -- includes, attached

25   to it, Your Honor, is the debtors' -- this is why it's highly

13

1    confidential -- the debtors' cash flows which are the basis for

2    the financing.  It provides information with respect to the GM

3    arrangement and the accommodation agreement, and Your Honor, we

4    would argue is entirely appropriate and consistent with the

5    motion that is before the Court now.

6         THE COURT:  Let me just take a look at is.

7         MR. BUTLER:  Sure.

8      (Pause)

9         THE COURT:  Okay, I've taken a look at it.  Based on

10   Mr. Butler's representation that this is, as it's clear from

11   the document itself, offered only in connection with this

12   motion which is unopposed, I don't believe that its admission

13   into evidence somehow estops any party who's objecting to other

14   relief that the debtors are seeking.  So on that basis, I'll

15   admit it.

16   (Declaration of Keith Stipp was hereby admitted into evidence

17   as Debtor's Exhibit 1, as of this date.)

18   (Documents relating to the Supplement to the GM Arrangement to

19   the Fourth and Fifth Amendment was hereby admitted into

20   evidence as Debtor's Exhibit 2, 3, 4, as of this date.)

21   (Presentation Materials was hereby admitted into evidence as

22   Debtor's Exhibit 5, 6, 7, 8, as of this date.)

23   (Proposed Order was hereby admitted into evidence as Debtor's

24   Exhibit 11, as of this date.)

25         MR. BUTLER:  Thank you, Your Honor.

14

1        MR. ABRAMS:  Your Honor, Your Honor.

2        MR. BUTLER:  Your Honor, we don't have any other --

3  unless the Court has questions, this is an interim hearing

4  because it was filed on less than fifteen days' notice.

5  There'll be a final hearing on next week at the omnibus

6  hearing.  We have presented to the Court a blacklined interim

7  order, and would ask Your Honor to enter the order subject to

8  any questions the Court might have.

9        THE COURT:  Well, before -- I do have a question, but

10  let me hear from anyone else who wants to speak on this motion.

11        MR. BERNSTEIN:  All right, Your Honor, Don Bernstein

12  from Davis Polk for the administrative agent under the DIP

13  credit agreement.  We have another procedural issue.  As you'll

14  see from the Stipp affidavit, there are a number of conditions

15  in this financing, and many of them are very much tied to the

16  disposition of the objections on the plan modification motion.

17  We would suggest, Your Honor, that it may make sense to hear

18  those objections before ruling on this motion, because if some

19  of those conditions aren't satisfied after you've ruled, this

20  motion may have to be revisited, and we may have to hear from

21  the debtor as to how to address that.

22        THE COURT:  Well, that really went to my question,

23  also.  Most of the conditions to termination of the commitment

24  are in the future.  But one of them, as I read it, is it

25  terminates seven days after the Court enters an order

15

1    enjoining, restraining, or otherwise restricting the debtors

2    from seeking approval of the modified plan or the stand-alone

3    sale.  And the first potential for my doing that is in

4    connection with the second motion that's scheduled for today

5    which is opposed by a number of parties.  Most of those parties

6    do not completely oppose the relief that is sought but seek

7    modifications of it.  So I have a couple of question.  One is,

8    if I approve this now, subject to the order being entered, of

9    course, but if I approve it now, and then I grant some or all

10   of the objections, other than giving GM the right to terminate,

11   what harm is there to the debtor as far as my having approved

12   something that then will terminate seven days from now.  Are

13   there fees that would be paid in the interim?

14          MR. BUTLER:  No, Your Honor, unlike the DIP

15   agreements with the DIP lenders, there are no fees payable to

16   GM in connect with this arrangement.

17          THE COURT:  And would there be money advanced in the

18   interim?

19          MR. BUTLER:  We would hope, Your Honor.  That's one

20   of the things that GM will have to make a decision about

21   depending upon Your Honor's decisions today and the facts of

22   the case.  The reality is, as Mr. Stipp's affidavit discloses,

23   and as the parties are aware that have received highly

24   confidential information, the company needs access to this

25   facility this week to continue to operate in the ordinary

16

1    course of business.

2            THE COURT:  Right.

3            MR. BUTLER:  And I think, while I respect

4    Mr. Bernstein's position, if you were rising not as an objector

5    but as a proponent of the DIP lenders, if the DIP lenders were

6    actually providing this financing, I think what he would have

7    said, what he's said in prior instances is the agent there --

8    here it would be GM -- would have to make a decision about what

9    it's prepared to do in light of any other decisions that the

10   Court makes.  This motion doesn't predispose or predetermine

11   the plan modification motion.  What it does describe is the

12   terms and conditions under which a party is prepared to put 250

13   million dollars of incremental financing into this case, the

14   only source of financing that's been offered to the debtors

15   from anybody --

16           THE COURT:  Right.

17           MR. BUTLER:  -- in terms of incremental financing.

18           THE COURT:  And as far as the treatment of that

19   financing, if there were to be a default, first since it is

20   unopposed, I took it to mean that the DIP lenders have

21   consented to the financing in terms of any modification that

22   might result in terms of the DIP order or any of the provisions

23   of the DIP order.

24           MR. BUTLER:  Your Honor, certainly, this, as the

25   motion makes clear in what I think is fairly in these

17

1    circumstances, the debtors have been able to procure 250

2    million dollars worth of incremental financing that is

3    subordinated to the DIP.  And therefore, it is junior in

4    recover to the DIP.

5         THE COURT:  Okay, so then my other question is, as I

6    read this description, it struck me as somewhat ambiguous, of

7    the termination of that enjoining, restraining, or otherwise

8    restricting the debtors from seeking approval of the modified

9    plan or a stand-alone sale.  There are certain aspects of the

10   objections that really don't go to what would one describe as

11   enjoining or restraining but do put some added disclosure

12   requirements onto what the debtors are seeking in connection

13   with the procedures order on the modified plan.  And it strikes

14   me, and I could ask for clarification on that point now or wait

15   and see what happens as far as the hearing that's coming up in

16   a few minutes, and then ask the debtor and GM if the changes,

17   if any -- because this is all hypothetical -- that I suggest

18   should be made to the modification procedures order would trip

19   up this condition.  I hate to approve something and then to

20   leave open whether it would immediately be terminatable.  On

21   the other hand, I hate to put the debtors and GM to a series of

22   hypothetical questions when I haven't reached that view.  So

23   let me tell you, my inclination is to suggest that in light of

24   the terms of this DIP, including its subordination provision,

25   including the absence of a fee requirement, that it seems

18

1    appropriate to approve it.  On the other hand, because of the

2    termination issue and how it ties in to the motion that's also

3    on for today, I would want to clarify that issue, I think, and

4    I think the debtors would, too.  And it may make sense to do

5    that in light of the actual result of the hearing on the

6    modification motion.

7          MR. BUTLER:  Your Honor, I think -- just two

8    observations -- first, we would expect General Motors to

9    continue to act reasonably, as they have since they entered the

10    GM arrangement last -- in the middle of 2008, in terms of how

11    they would administer this.  I think Mr. Tanenbaum is here on

12    their behalf and can speak on their behalf.  But the reality

13    here is what we've been able to successfully negotiate with

14    General Motors is a clear, unambiguous financial liquidity

15    runway to bridge us through to Your Honor's determination of

16    either the modified plan or an alternative sale.  And all this

17    condition says is if at some point between now and then, Your

18    Honor changes direction at the request of some party and that

19    runway no longer heads to that destination but instead heads to

20    some other destination, General Motors' view is somebody else

21    should come up with the money to fund the case.  They're not

22    going to provide the bridge liquidity, and that's all that

23    provision says.

24          I'd also point out, Your Honor, at the very last

25    hearing I was at, and it's -- and I'll say at the outset, from

19

1    the company's perspective, this is a difficult hearing for us

2    to prosecute because we understand that many of our

3    stakeholders are unhappy, and they're the stakeholders to whom

4    we owe fiduciary duties, and we have worked tirelessly to

5    maximize value for them.  And so it's not a happy day when you

6    have people who are unhappy.  On the other hand, we also have a

7    duty to bring these cases to the best conclusion that we can

8    and to maximize value in connection with that, and I would

9    point out that at the very last hearing that was before Your

10   Honor, the DIP lenders required us to seek approval of an

11   amendment to the modification agreement, or rather, the

12   accommodation agreement that I was required to tell Your Honor

13   was going to go into default that night at midnight.  And yet

14   we proceeded to get approval of it because -- and Your Honor

15   noted on the record at the time -- because the Court had a

16   record of the DIP lenders acting reasonably in their

17   administration of these defaults.  I mean, and so --

18          THE COURT:  Well, there was a record, also, that the

19   agent believed he would get the approval.

20          MR. BUTLER:  Right.  No, no, no, that defaulted --

21   no, on that hearing, there was no promises of what would happen

22   next.  I'm just pointing out to you that when it suited the DIP

23   lenders, we got approval of agreements that actually, as a

24   factual matter, would default that same day.  And they have

25   acted reasonably, and I would say to Your Honor -- and we have

20

1 said in our papers and I would say on this record -- I believe

2 our DIP lenders, our agent, in particular, has acted with great

3 restraint and great care and with great reason in working with

4 the debtors in these remarkable moments.  I have not, in my

5 experience, ever dealt with a situation where the capital

6 markets and the economy in which we live would have a DIP of

7 this magnitude end up maturing and not being repaid in

8 accordance with its terms and entering into an accommodation

9 agreement, all the things we've done.  So let me be clear on

10 this record, the debtors are not in any respect critical of our

11 agent, or for that matter, our required lenders who have, time

12 and again, tried to work with the debtors for what they have

13 believed to be their economic interest.

14    THE COURT:  Well, I -- let me cut this short -- I

15 don't believe that this particular issue we're talking about is

16 that big a deal.  Again, my inclination is to preliminarily

17 approve this, but on this one point, I may want some

18 clarification which will come in light of the upcoming hearing.

19 The condition for the DIP is that it be approved sometime

20 today.

21    MR. BUTLER:  Right.

22    THE COURT:  So I don't want to indicate that it's

23 anything more than that.  I think everything else I've read and

24 you've confirmed to me about this motion argues for approval of

25 the transaction, but I think it makes sense to clarify this one

21

1     point if we can --

2              MR. TANENBAUM:  Your Honor, can I --

3              THE COURT:  -- rather than posing you and GM a lot of

4     hypothetical questions before I know whether it makes sense to

5     even ask any of the questions.

6              MR. TANENBAUM:  I just want to make sure that this --

7              THE COURT:  Can you -- can you pick him up on -- you

8     may have to -- someone may have to give him a seat to -- and

9     they can trade.

10             MR. BUTLER:  It's going to cost him, Your Honor.

11             THE COURT:  If they could trade with Mr. Tanenbaum,

12    perhaps.

13             MR. TANENBAUM:  That's okay, Your Honor.

14             THE COURT:  Okay.

15             MR. TANENBAUM:  I'll stay back where I -- Your Honor,

16    I just wanted to make sure that there's one --

17             THE COURT:  Just for the record, could you identify

18    yourself?

19             MR. TANENBAUM:  Jeff Tanenbaum, Weil Gotshal for

20    General Motors.

21             THE COURT:  Okay.

22             MR. TANENBAUM:  Your Honor, I'm not quite sure what

23    sections or provisions the dialogue is referring to, but I do

24    want to just refer to 401JII which states that on or before

25    June 10, 2009, the bankruptcy court shall have entered an

22

1    order --

2         THE COURT:  Right.

3         MR. TANENBAUM:  -- in form and substance reasonably

4    acceptable to GM granting the relief requested --

5         THE COURT:  Right.

6         MR. TANENBAUM:  -- by the solicitation motion.

7         THE COURT:  So it doesn't have to be -- right.

8         MR. TANENBAUM:  It can be whenever it is, and I

9    gather we will scrutinize that order and will --

10        THE COURT:  Right.

11        MR. TANENBAUM:  -- be reasonable, as Mr. Butler

12   suggests we always are.

13        THE COURT:  And similarly, the order approving the

14   DIP doesn't have to be entered at 10 a.m. on June 10; it can be

15   entered at 1 p.m.

16        MR. TANENBAUM:  That's true, Your Honor.

17        THE COURT:  All right, so I'm going to give you my

18   preliminary ruling on this, which is that I'm going to approve

19   this motion for the reasons that I'm about to state on the

20   record, which is the debtors have prudently determined that

21   they need additional DIP financing to carry them at least

22   through the period contemplated by this agreement -- or two

23   agreements with GM, and that the terms of that financing are

24   such that I don't find them to be improvident or such that the

25   debtors are not using their proper business judgment when

23

1   entering into them.  And I say that in full appreciation of the

2   particular context that we're in in this case.  I don't find

3   the terms of this agreement, particularly given its

4   subordination and the absence of fees, unduly or even

5   particularly coercive in connection with the other related

6   transactions that are referred to in the agreement.  I think

7   they give the debtor sufficient flexibility.  However, my

8   ruling is preliminary because I think there may be a need to

9   clarify at least one of the potential termination rights, and I

10  recognize, as you have, that GM, based on what I have seen, has

11  been acting in good faith and reasonably.  And rather than

12  raise a series of hypothetical questions to clarify that point

13  now, it seems to me that if there's the need for any

14  clarification, it should be made in light of real questions

15  that may get asked later today.

16          MR. BUTLER:  Thank you, Your Honor.

17          THE COURT:  Okay.

18          MR. BUTLER:  Your Honor, before we move to the

19  contested calendar, we've got a couple of minutes of just

20  questions that I think will make, for counsel, I think will --

21          THE COURT:  Before we do that -- I'm sorry, just we

22  may not come back to this -- as far as the interim order is

23  concerned, are there any changes that are being proposed to it

24  from the draft that I've received?

25          MR. BUTLER:  We submitted a blackline, I believe, to

24

1    chambers with respect to the interim order.  No changes from

2    when we originally filed, right?  No.

3              MR. ABRAMS:  I'm not sure everyone's seen that order,

4    Your Honor.

5              THE COURT:  Well, the black --

6              MR. BUTLER:  Mr. Abrams, you're not in contest of the

7    motion.

8              THE COURT:  No, but this --

9              MR. ABRAMS:  Okay, so I just accept the order.

10             THE COURT:  -- I didn't see a blackline on this

11   particular interim order.  Is there one?

12             MR. BUTLER:  No, I think it was blacklined against

13   the prior order.  I don't think there's been any changes to

14   what was submitted to chambers --

15             THE COURT:  Okay.

16             MR. BUTLER:  -- what was attached to the motion.

17             THE COURT:  All right.  So the order that was

18   attached to the motion --

19             MR. SIEGEL:  Your Honor, could I just clarification

20   on that?  Glenn Siegel on behalf of Manchester entities.  I'm

21   now confused.  Is Mr. Butler saying that there was a blackline

22   submitted with the initial motion, which is the only blackline

23   this Court has seen, and that's blacklined against the last

24   order?  Or has there been a subsequent blackline filed?

25             THE COURT:  I've only seen the order that was filed

25

1    with the motion.

2              MR. BUTLER:  Correct, and that's --

3              THE COURT:  Okay.

4              MR. BUTLER:  That's correct, Your Honor.

5              THE COURT:  All right, so the order with the motion

6    would be the one I would enter.

7              MR. SIEGEL:  Okay, so that's the one we actually

8    reviewed, so we're fine.

9              THE COURT:  Right, right, and I'm comfortable with

10   that order, as well.  Okay, all right, so --

11             MR. BUTLER:  Your Honor, if I could just have a very

12   brief recess before we start the contested hearing, probably

13   five to ten minutes.

14             THE COURT:  Okay, that's fine.  Is it five -- I could

15   just stay here.

16             MR. BUTLER:  I really think it will be five to ten

17   minutes.  There's a couple questions I've got to find out to

18   make sure that we move this forward efficiently.

19             THE COURT:  Okay.

20             MR. BUTLER:  I have a feeling if I make a couple

21   statements right now, there may be some objections, and I'd

22   like to resolve this.

23             THE COURT:  All right, that's fine.  So I'll come

24   back in ten minutes.

25             MR. BUTLER:  Thank you, Your Honor.

26

1          (Recess from 10:04 a.m. to 10:12 a.m.)

2          THE COURT:  Okay, we're back on the record in in re:

3     Delphi.

4          MR. BUTLER:  Your Honor, thank you for that brief

5     adjournment.  We are ready to proceed now on matter number

6     three on the agenda.  This is the supplement to the plan

7     modification approval motion, filed at docket number 16646.

8     The hearing on this matter is being conducted pursuant to an

9     amended order that Your Honor entered scheduling a hearing

10    today.  That order's found at docket number 16652.  By this

11    motion supplement, the debtors seek an order approving certain

12    modifications to the confirmed first amended joint plan of

13    reorganization of Delphi Corporation and certain affiliates, as

14    debtors and debtors-in-possession, as amended on January 25,

15    2008 to the confirmed plan.  The related disclosure statement

16    at docket number 11388, which is the December 10, 2007

17    disclosure statement, and voting procedures as set forth in the

18    December 10, 2007 solicitation procedures order found at docket

19    number 11389.  We're asking Your Honor today to set a final

20    hearing date on approval of the debtors' proposed plan

21    modifications under Section 1127 of the Bankruptcy Code for

22    July 23, 2009.  In connection with these cases, we're asking

23    Your Honor to set an administrative expense claims bar date for

24    postpetition claims arising before June 1, 2009, as well as an

25    alternative sale hearing date of July 23, 2009 to be used only

27

1      if necessary to consider the sale of substantially all the

2      debtors' assets pursuant to a private sale under Section 363 of

3      the Bankruptcy Code if the Court does not approve the debtors'

4      proposed plan modifications on that date.  Your Honor, that's

5      the sum of the relief that we're seeking today.  This is, from

6      the debtors' perspective, largely a procedural hearing.  We are

7      not proceeding -- or at least, the debtors are not intending to

8      proceed with an evidentiary hearing.  We have no evidence or

9      exhibits for the record today, but instead rely on the

10     pleadings that have been documented.

11          Your Honor, very briefly, because we have filed a

12     reply to the objections that have been filed -- as Your Honor's

13     aware, several hundred objections have been filed to this case,

14     the majority of them, probably ninety percent of the objections

15     or more, are filed by participants in the debtors' salaried

16     defined benefit program which is, under the terms of the

17     modified plan, going to be terminated in connection with an

18     agreement to be reached with the PBGC on or before the exhibit

19     filing date in these cases.  And there is, understandably,

20     concern expressed by the pensioners in that transaction.  The

21     balance of the objections are filed by a number of our key

22     stakeholders in this case, including our DIP lenders and our

23     official unsecured creditors' committee.

24          Your Honor, in terms of conducting this hearing, I'm

25     not going to make an extended argument in favor of these

28

1   documents that we have filed with the Court.  We have done so

2   in our papers and our reply.  The debtors believe that, for the

3   first time in fourteen months since the plan investors walked

4   away from this company on April 4th of 2008, that we're before

5   this Court with a fully-funded feasible set of emergence

6   transactions that will allow this company to emerge from

7   Chapter 11 that have a few, if any, material contingencies to

8   their execution and that will provide a resolution of these

9   Chapter 11 cases.  These transactions largely address the

10  objectives that Delphi had set out for itself over the last,

11  certainly, six months, objectives that we have shared with our

12  principal stakeholders and discussed with them in detail.  That

13  doesn't mean by any stretch of the imagination that the debtors

14  have achieved everything they would have preferred to achieve.

15  It is no small, in some respect, failure on our part that we

16  find ourselves in a position, now, of having to no longer be in

17  a position to support the salaried pension program when we had

18  a plan that was capable of being closed in April of 2008 and

19  that was fully funded and would have preserved that plan, among

20  other matters.  But we are where we are, and the debtors'

21  fiduciary obligations are to look forward and not backward, and

22  to bring the transaction to the table that we believe, based on

23  our information, is one that is funded, feasible, capable of

24  execution, and based on the debtors' analysis, maximizes value.

25           Today is not a day to sort out valuation.  The merits

29

1   of this transaction are for another day, specifically for July

2   23rd, if Your Honor approves that date.  But the fact that we

3   have been able to bring such a transaction to the Court, the

4   fact that we have been able to obtain sufficient financing in

5   the motion Your Honor already provisionally approved to fund

6   the debtors' cases and provide the liquidity runway to that

7   date is extremely important to the company.  And the fact that

8   we have been able to provide a liquidity runway, that will give

9   the Court and the company the opportunity to consider any

10  unsolicited feasible transactions that are submitted between

11  now and then in accordance with the debtors' fiduciary duties

12  is important as well.  The parties in this case have -- that

13  are parties to this agreement have adopted a private sales

14  transaction because of the very unique nature of the

15  transaction.  My person as well as professional belief is that

16  there's no transaction that's probably more ideally suited to

17  the requirements of a private sale than this, in which there

18  has been a determination made by the parties making emergence

19  capital as to what the relationships between them should be

20  and, clearly, the support of our largest customer, General

21  Motors, both in terms of providing substantial liquidity, but

22  also in further modifying its commercial relationships with the

23  company and its satisfaction with its partner in moving forward

24  is critical of the successful negotiation of that transaction.

25  It is -- in our reply, we made it clear that we have the

30

1    appropriate fiduciary outs in the NDA, that all the provisions

2    are subject to that fiduciary out, there is a nonsolicit

3    agreement in the NDA that would prevent us from soliciting

4    competing transactions, but certainly not from considering

5    them.

6           So Your Honor, unless Your Honor has specific

7    questions of the company at the front end of this hearing, I

8    think we're prepared to rely on the papers we've filed,

9    including our reply.  We have provided in the reply a summary

10   of the objections and our responses to each of those.  We have

11   provided blacklined copies of changed pages to the material

12   documents and we're prepared to address any of the objections

13   or any of the questions the Court may have in connection with

14   this hearing.

15          THE COURT:  Okay.  I don't have questions now.  I

16   think that it is important to focus on what it is, actually,

17   that the debtors are seeking approval of today as opposed to at

18   the end of July in connection with this hearing.  I understand,

19   from reading the objections, that as of today, important

20   constituents in this case have stated that they won't approve

21   the transactions that are contemplated.  But I generally agree

22   with the debtors' view that that is an issue, ultimately, for

23   another day.  On the other hand, I think that the context is

24   one that requires an acknowledgement that those statements have

25   been made.  But I don't think that we're well-served by going

31

1    through all of the reasons why people don't approve the

2    underlying deal.  What I view is that is before me today is,

3    perhaps, most importantly, two things, and then some subsidiary

4    issues.  First, I want to make sure I understand whether the

5    debtors, today, are asking me for approval of any portion of

6    the, what I'll refer to as the sale agreement that would,

7    therefore, bind the debtors prior to the general approval

8    hearing, and in particular, I'm focusing on the restrictions in

9    9.40.  Secondly, I think what is before me, clearly, and again,

10   I do have that question as to whether that issue is before me,

11   but I think what is clearly before me is whether the supplement

12   to the disclosure statement, in fact, contains adequate

13   information for those who need to rely on it.  And then it

14   seems to me, thirdly, that in connection with the procedural

15   relief that the debtors are seeking, in addition to the issues

16   about the proper record date and the proper treatment of empty

17   classes or empty voted classes and some of the other issues

18   that have been raised, there is a fundamental procedural issue

19   that's tied into my first question, which is, even assuming

20   that the debtors aren't seeking actual approval of, in large

21   measure, a private sale process, is the case such that unless I

22   impose some additional requirements for that process, there's

23   going to be a de facto private sale process.  And therefore, I

24   need to focus now on whether there needs to be additional

25   protections to ensure that within the time constraints imposed

32

1    by the debtors' liquidity, there's reasonable assurance that

2    the highest and best value for these assets is obtained.  So

3    that's what I really want to focus on.  So maybe I should ask

4    you that one question, even though I said I didn't have any

5    questions for now, which is are you seeking, today, approval

6    of, in particular, Section -- I believe it's 9.40 so that the

7    debtors would actually be bound by that provision, or are we

8    really talking about the latter issue, which is should I impose

9    some specific additional requirements, as the DIP lenders have

10   requested, to make this less of a private sale process?

11            MR. BUTLER:  Your Honor, I'll state my view, and I'm

12   sure Mr. Tanenbaum on behalf of General Motors, Mr. Harris on

13   behalf of Platinum can correct me if they disagree.  I do not

14   view Your Honor as approving the master disposition agreement

15   today.  I do believe, however, that the company is obliged to

16   and would follow the terms and conditions of the master

17   disposition agreement going forward in this interim period

18   because the failure to do so would cause there to be

19   unsatisfied condition at closing such that what is now not a

20   conditional sale would, in fact, become a conditional sale or

21   an option with respect to Platinum and General Motors.  And we

22   have all seen the havoc in this case that potential acquirers

23   have raised when they have asserted option agreements in this

24   deal.

25            THE COURT:  Okay.

1            MR. BUTLER:  And so I --

2            THE COURT:  So it's really a -- the debtors would be

3      clearly pursuing a course of action consistent with this

4      provision because they would want to preserve their rights

5      under the agreement.

6            MR. BUTLER:  Correct.

7            THE COURT:  Okay.  All right.

8            MR. BUTLER:  And so we would -- that's how would be

9      addressing that.  I assume Mr. Tanenbaum, Mr. Harris, that they

10     would not disagree with that, because if I have it wrong, they

11     should come.

12           MR. HARRIS:  Adam Harris from Schulte Roth on behalf

13     of Platinum Equity.  No, Mr. Butler's statement is correct,

14     Your Honor.  This provision that was heavily negotiated does

15     contain weekly but customary fiduciary out, supporting debtors,

16     entertaining offers that are presented to the company, and in

17     that light, we would expect the company to abide by that going

18     forward through closing.

19           THE COURT:  Okay, and if they don't, you might assert

20     a termination right?

21           MR. HARRIS:  We have that right, Your Honor, yes.

22           THE COURT:  Okay, fine.  Okay, so I'll hear from the

23     objectors, and given the issues that I've mentioned, it

24     probably makes sense to hear from the DIP lenders, first.  I

25     know that there are other issues that have been raised.  I

34

1    would also note, and the debtors have already partially

2    answered my first question because I noted that you deleted the

3    paragraph in the proposed order that would have authorized the

4    assumption of certain contracts in the interim, before the deal

5    closed.  So I think to the extent anyone has not seen that

6    deletion, that issue's not an issue anymore.

7          MR. ABRAMS:  Good morning, again, Your Honor.  Marc

8    Abrams on behalf of certain identified DIP lenders to Delphi

9    Corporation.  Your Honor, I think the first point we'd like to

10   emphasize is that the objectors, including our clients, are not

11   here today to scuttle what's transpired in the last few weeks.

12   What we are here today to do, and what I think we have done, is

13   demonstrate to Your Honor that the process that is before the

14   Court is seriously flawed and has to be fixed.  And only

15   through fixing that process can lenders be expected to forbear

16   and to attempt to cooperate and participate in a way that may

17   produce a consensus at the end of the day.  We are not here to

18   threaten --

19          THE COURT:  In light of that, I understand from your

20   objection that you're working within the same timeline with

21   some additional events as the debtors propose.  You're not

22   looking to extend the timeline beyond July 23rd, for example.

23          MR. ABRAMS:  We are not, Your Honor.  And I would

24   only caution to say at this point in time, but certainly based

25   on what we know today, we are not seeking to extend the

35

1    timeline.  We appreciate that liquidity is tight.  We, frankly,

2    view ourselves as having had fobbed upon us the sole

3    responsibility to finance this company, now, for several

4    months.  So while we have resisted, today, commenting on

5    Mr. Butler's statements that only GM appears to have stepped up

6    to the plate, that pretty much ignores recent history.

7          THE COURT:  Well, no, he said you all had been

8    engaging in good faith, too, so.

9          MR. ABRAMS:  That's true, he's been fair in his

10   compliments, Your Honor, throughout the case.  But I do think

11   that the central point, here, is that this process is severely

12   flawed.  What we are simply asking Your Honor to do, again,

13   reserving all of our rights to the extent that at some point in

14   time they may need to be exercised, is to open this up in a

15   transparent, fair, balanced, and honest manner and allow

16   competition to be excited in the marketplace and among the DIP

17   lenders themselves, and to see if, in fact, those who recently

18   invested billions of dollars in this company on the basis that

19   a DIP loan is money good, which I think I refer to as the T

20   bill of a bankruptcy claim, is in fact worth somewhere in the

21   few nickels price range.  And the fact of the matter is that

22   what is before Your Honor is anything but an open, fair, and

23   balanced process.  What is before Your Honor -- and even today,

24   the company clings to the notion that this is a private sale

25   that is justified under the circumstances.  The reality is that

36

1    there is nothing that is justified here that should induce this

2    Court to ignore the letter of the law, ignore the due process

3    rights of these lenders, and to permit to proceed what we

4    believe is nothing more than a perversion of what Chapter 11 is

5    supposed to be.  And even though we recognize and do not

6    begrudge the great difficulty that our government has today in

7    attempting to salvage what was once a robust global automotive

8    industry, the rule of law and the commercial rights and

9    expectations of creditors, particularly DIP lenders, cannot

10   bend in the face of such political forces.  There is a process

11   here; there is a system here and it has to be abided if people

12   are going to get their just due in these proceedings.  So we

13   have made a lot of arguments in our papers.  I don't intend to

14   rehash --

15             RECORDED MESSAGE:  Warning, your call is being

16   recorded.

17             MR. ABRAMS:  I thought all my calls were being

18   recorded.

19             MR. SPEAKER:  That would be the government content.

20             MR. ABRAMS:  Don't worry about this.

21             THE COURT:  Of course, the whole hearing's being

22   recorded.  That's why we have transcripts.  But, all right.

23             MR. ABRAMS:  Here's what I think is really the nub of

24   the problem as I see this thing progressing today, and as I

25   understand Your Honor's comments.  We have zero confidence that

37

1    the company can rely upon that fiduciary out in a way that will

2    give us our just due and our entitlement.  I say that for a

3    couple of reasons.  One, I think there has been a palpable

4    distortion in the normal governance of all of these automotive

5    companies.

6            THE COURT:  I'm sorry about that.  I don't know why

7    the feedback came in.

8            MR. ABRAMS:  And I don't mean that in any Dickensian

9    way or any sinister way.  What I'm simply suggesting, Your

10   Honor, is that the Treasury, as we know, is basically out there

11   picking the winners and losers in a massive effort to

12   rationalize a global industry here in the States.  And the

13   Treasury, ultimately, as we know from Chrysler, from the GM

14   situation, from Delphi today, is the ultimate if not exclusive

15   allocator of capital to the automotive industry.  And because

16   of that, I'm simply suggesting, Your Honor, that a board of

17   directors in this environment is no longer the independent

18   disinterested fiduciary that it might once have been before we

19   introduced the influence and political prowess of the U.S.

20   Treasury to the equation.  Now, when you add to that the fact

21   that at least in our view, in the most recent weeks, this board

22   has taken action and approved transactions that are, in our

23   view, abominations and which, in our view, are completely

24   without regard to our legal rights and entitlements.  We had a

25   very difficult time concluding that this board and management

38

1     can self-police its fiduciary responsibilities in this case

2     given those pressures and given those sources of influence.

3     And what that suggests to us, Your Honor, is that any auction

4     process here has to be Court-supervised.  It has to be open,

5     there has to be a directive from Your Honor that information be

6     made available subject to appropriate confidentiality and other

7     arrangements, but it cannot continue this case in a vein where

8     things are occurring behind closed doors to which we have no

9     visibility, arrangements and deals are being cut behind those

10    doors that are basically handed to us as a fait accompli --

11    something I was very concerned about merely a few weeks ago, in

12    fact, has come to pass -- and where competition is stifled and

13    where folks are being deprived of an opportunity to demonstrate

14    that they're being asked to sacrifice way too much in these

15    cases to achieve what is, broadly speaking, a common good for

16    Delphi, for the industry, and for everyone else.

17              And I might also add, Your Honor, and I say this with

18    all seriousness, the transactions that is before your court

19    contains elements which, at least to me, suggests that there is

20    a self-interest at play here, among the board.  And that self-

21    interest takes the form of causing a buyer to assume not

22    ordinary course operating liabilities, but rather corporate

23    indemnities and similar type protections.  When a board in the

24    maelstrom of this economic environment and in the context of

25    what they had to know would be a highly contested and largely

39

1   viewed sell-out transaction has caused the buyer to assume

2   those responsibilities, you have to ask yourself, are they

3   truly good and honest stewards of these estates?  And I'm

4   simply saying, whether or not they are or they aren't, we're

5   not prepared to take that chance at this point, going forward.

6   And therefore, we would ask that whatever Your Honor is

7   inclined to do with respect to opening this process up,

8   shedding some light on it, that it be done under your auspices

9   and under your supervision, and that we all will take great

10  comfort, if you're prepared to go in that direction, over

11  allowing Delphi in these straited circumstances to be the sole

12  arbiter and judge of what, in fact, its fiduciary

13  responsibilities are under these circumstances.

14          Unless Your Honor has questions about our submission,

15  I thought that the sequence would be that Abrams would open,

16  then Mr. Bernstein would talk about some constructive

17  approaches that would add some flesh and bones to my comments,

18  and then perhaps Mr. Siegel would clean up for us in the third

19  spot.  So if Your Honor has any questions, I'd be glad to

20  answer them.

21          THE COURT:  Well, one of the points raised here is

22  that at least as far as the requirements 1127(c), which is that

23  1125 apply, that your clients really don't have anything to do

24  with the disclosure statement.  Is that -- what is your

25  response to that?

40

1          MR. ABRAMS:  Well, Your Honor, I mean --

2          THE COURT:  I mean, I know there are other aspects of

3     this relief that your clients clearly have --

4          MR. ABRAMS:  I think it's an academic --

5          THE COURT:  -- something to do with, and I don't

6     think the debtors would dispute that.  But as far as the

7     disclosure statement is concerned?

8          MR. ABRAMS:  I think it's an academic matter.  This

9     is a plan modification like the New Testament is a modification

10    of the Old Testament.  But the reality is that we're not here

11    to forestall, to obstruct, to stop.  The only question I would

12    say with respect to the disclosure statement is if, in fact, we

13    are heading down a competitive auction process, the only way

14    that third parties subject to whatever information flow Your

15    Honor's prepared to allow can truly evaluate the bogey against

16    which they're bidding, there needs to be greater insight into

17    what that deeply subordinated Platinum Equity piece really is

18    worth, compared to its face value.  But that would be the --

19         THE COURT:  The Tranche C interest?

20         MR. ABRAMS:  By coincidence, yes, the Tranche C

21    interest.

22         THE COURT:  Oh, not the Tranche C interest, the Class

23    C interest.

24         MR. ABRAMS:  The Class C interest.  That would be the

25    one area where I thought a little light could be shed on how

41

1    one should approach valuing that.  But beyond that, I think

2    disclosure, in this instance, is really an issue for

3    Mr. Rosenberg and his stakeholders.

4            THE COURT:  Okay, thank you.

5            MR. ABRAMS:  Thank you, Your Honor.

6            MR. BERNSTEIN:  Your Honor, Don Bernstein for the

7    administrative agent under the DIP credit facility.  We come

8    with a slightly different perspective, perhaps, from some of

9    the lenders.  We are, as you know, an administrative agent.  We

10   are also technically the secured party under the DIP credit

11   agreement.  And our perspective is that the best resolution

12   here is a consensual resolution, and that means several things.

13   One of the concerns we have, Your Honor, is that if this

14   process is not opened up to competitive bidding, that we will

15   receive an instruction sometime between now and the sale

16   hearing from the DIP lenders who control exercise remedies,

17   here, because they will want an auction.  And if remedies are

18   exercised, the agent, in effect, would be mandated to conduct

19   an auction of the debtors' assets.  And that will permit those

20   who have an interest in investing to do so.  We do not think

21   that that would be a constructive event, Your Honor.  In fact,

22   we think it would be very destructive.  But, if the DIP lenders

23   were left no alternative, they might issue such an instruction.

24           On the other hand, I think without really disturbing

25   the relief that the debtor has requested, it's possible to make

42

1    it clear, either on the record here or on the order, that this

2    Court will entertain competitive bids, including credit bids,

3    at the time of the sale hearing.  And the reason I believe the

4    Court should be entertaining those bids really relate to some

5    of the things that Mr. Abrams has said, which, for better or

6    for worse, constrain the ability of the debtor to really

7    function with total flexibility on competitive bidding here.

8    And I don't want to belabor that point, but I think it's

9    important that the Court retain that flexibility and be able to

10   hear, at the time of the sale hearing, competitive

11   transactions, and also, Your Honor, address any credit bids

12   that might be made, which, as Your Honor knows, under Section

13   363(k), are permitted, and moreover, under the DIP credit

14   agreement and the DIP order, it is clear to us that the DIP

15   lender's consent would be required to release the liens here.

16   So any transaction that occurs at that hearing will require the

17   DIP lender consent at that time

18        So we have filed papers, and you will see at the end

19   of our objection a list of things we think the Court can do

20   consistent with the relief requested, and we believe consistent

21   with the financing agreement to make sure that the Court

22   retains flexibility to keep the process open, to make sure

23   potential bidders get the information that they need, and to

24   make sure that all parties' rights are reserved, including both

25   the right to credit bid and the rights under the DIP credit

43

1    agreement to be required -- any required consents in connection

2    with any transaction.  So that is really what we're requesting

3    the Court to do, and we do believe that the Court can make it

4    clear on this record and in the order that those rights are

5    preserved.

6         THE COURT:  Well, let me ask you one question related

7    to what you've raised.  And I can tell you that the question is

8    prompted by a prior case of mine where this issue apparently

9    was not laid out clearly enough.  There's clearly, under

10   363(k), a right to credit bid, i.e., to bid one's debt.  In

11   that case, which is the WestPoint Stevens case, and quite

12   likely in this case, if there is a competing bid, the bid would

13   entail not only bidding debt but some other form of

14   consideration.

15        MR. BERNSTEIN:  Your Honor, I don't believe that's

16   the case, if you really parse through what's likely to happen.

17   There is a three plus billion dollar loan that can be credit

18   bid here.  You would compare that to the consideration coming

19   to the stakeholders in this estate and to the DIP lenders and

20   whether the liens were being discharged.  After the assets are

21   acquired, there would be a need, on the part of those who buy

22   the assets to make sure that there was adequate financing.  But

23   that would not be part of the bid.

24        THE COURT:  Well, my concern is to leave this issue,

25   this potential problem open.  I understand the request for an

44

1   auction environment in the bankruptcy court.  That's the

2   traditional approach to sales, not only in assets, but of

3   businesses in bankruptcy.  And I understand why the agent and

4   the lenders would view the alternative, which is an auction or

5   auctions under state procedures, as not being as beneficial to

6   anybody, including the debtor but also to the secured lenders.

7   But it seems to me if one's going to have an auction, and there

8   is bidding that includes consideration other than claims, then

9   those participating in the auction who are creditors should

10  agree, as a condition to the auction, that they will accept the

11  highest and best bid, that they will not then assert their

12  rights as secured creditors afterwards, as if the auction

13  hadn't happened.  You understand what I'm saying?

14          MR. BERNSTEIN:  Yeah, you're saying, Your Honor, that

15  if the Court approves a transaction, you're suggesting that

16  people should no longer assert their rights as secured

17  creditors at that point.

18          THE COURT:  Well, if they participate in the

19  auction --

20          MR. BERNSTEIN:  Yeah.  I can't speak --

21          THE COURT:  Right.

22          MR. BERNSTEIN:  -- to those who might participate,

23  Your Honor, and they're not even all in the room.  What I will

24  say is that you really have to look at two separate points in

25  time.  You have to look at a point in time at the hearing when

45

1   there may be two different kinds of bids.  Some parties may

2   come in with bids that include other consideration; other

3   parties may come in with just a credit bid.

4           THE COURT:  And I'm focusing only on the former.

5           MR. BERNSTEIN:  Right.

6           THE COURT:  If it's just a credit bid, I don't think

7   it's an issue.

8           MR. BERNSTEIN:  Okay, well, I can't speak to whether

9   those who participate in the auction and make other types of

10  bids would be willing to relinquish their rights as creditors.

11  My honest answer to you, Your Honor, is if they -- you really

12  have to pose that question to them because I just --

13          THE COURT:  Well --

14          MR. BERNSTEIN:  -- and I don't even know who they're

15  going to be.

16          THE COURT:  Well, I'm going to pose it to the

17  constituents who are here who are asking for an auction because

18  I don't want to have happen again what happened in WestPoint

19  Stevens.  I was of the belief that, at the request of secured

20  lenders, we were having an auction and the best bid would win.

21  I believe that's what was agreed to, and nevertheless, after

22  the best bid won, the losers, secured creditors, objected on

23  the basis that their secured creditor rights were being

24  impaired.  That was sustained.  However, on remand, my

25  conclusion that we weren't going to have another auction and go

46

1   through the same thing because it was really a sham was also

2   sustained.  So, it seems to be if one's really going to have an

3   auction that's both credit bidding and consideration, one

4   should accept that the purpose of that auction is to get the

5   best price and not to simply -- because otherwise, who would

6   participate in it?

7           MR. BERNSTEIN:  Right.  But just to clarify, Your

8   Honor, if the secured creditors made a pure credit bid --

9           THE COURT:  I think that's a different story --

10          MR. BERNSTEIN:  Yeah.

11          THE COURT:  -- because that's not, you know, that's

12  just their right under 363(k).

13          MR. BERNSTEIN:  Yeah, now, Your Honor, we have the

14  difficulty, of course, of having a syndicate with large numbers

15  of lenders where one or two or three parties might make a mixed

16  bid of the kind that you're talking about.  I don't think that

17  other secured creditors or even the agent would be in a

18  position to waive the rights of the group.

19          THE COURT:  I'm not suggesting that.  I'm really

20  trying to get your thoughts --

21          MR. BERNSTEIN:  Yeah.

22          THE COURT:  -- and others' thoughts on this

23  approach --

24          MR. BERNSTEIN:  Yeah.

25          THE COURT:  -- which is that those who would

1    participate on the auction would be bound by the result.

2           MR. BERNSTEIN:  Okay, Your Honor, I think as an

3    agent, we would probably object to that if that were the

4    procedure simply because if they lose in that context, they

5    still do have their rights, especially under the DIP order,

6    which can't be taken away from them.

7           THE COURT:  Except by consent.

8           MR. BERNSTEIN:  Except by consent.

9           THE COURT:  And of course, you could consent as part

10   of participating in the auction.

11          MR. BERNSTEIN:  I have a feeling we might receive a

12   prompt direction as to how to proceed there.

13          THE COURT:  All right, okay.

14          MR. SIEGEL:  Your Honor, I don't mean to interrupt,

15   Mr. Bernstein --

16          THE COURT:  Could you just, for the record, identify

17   yourself?

18          MR. BERNSTEIN:  No, Your Honor, I really had

19   finished, unless you have questions.

20          THE COURT:  Okay, no that's fine.  So maybe you

21   can --

22          MR. SIEGEL:  It's my turn anyway.  So why don't I get

23   up.

24          THE COURT:  -- you can speak in your turn.

25          MR. SIEGEL:  Thank you.  Good morning, Your Honor.

48

1    Glenn Siegel from Dechert on behalf of the Manchester Entities.

2    I actually got up to take Mr. Bernstein off the hook on the

3    questions because I think I'm in a better position --

4         THE COURT:  It's always fun to put the agent on the

5    hook, isn't it?

6         MR. SIEGEL:  Yeah, I know.  But we actually represent

7    a significant DIP lender, and together with Mr. Abrams'

8    clients, we think we would be the driving force behind any

9    credit bid in any event.  Your Honor, what we really need is

10   some clarification about what you mean, because we, frankly,

11   are more concerned that the assets be disposed of in a process

12   that protects all of our rights.  Whether that happens in

13   bankruptcy, which we think is much more of the preferred

14   process, or otherwise is a separate issue, but we would like to

15   have this done through the bankruptcy court.

16        Mr. Bernstein made a fair point when he said that our

17   perception is that what would really be happening here is a

18   pure credit bid.  However, in making a pure credit bid, in

19   order to get the lenders together to make that clear credit

20   bid, we have to know what we're going to do with the asset

21   after we require the asset, which means that we need to have

22   available to us all the information we have as secured

23   creditors and make that available in order to figure out what

24   we're going to do in that process.  If we have all the

25   information that we need in the process, and by the way, I do

49

1    not envy Mr. Butler's position, and I just read it back

2    according to my own notes to talk about the predicament that we

3    find ourselves in, what I -- and this is not a transcription;

4    this is simply my notes reading back, so if I need to be

5    corrected, I will be -- but what Mr. Butler said was the NDA's

6    not being approved today, but that the company would follow the

7    terms because they cannot bind the prospective purchaser, and

8    it becomes an option under those circumstances.  Faced with

9    that perspective and in representing the interests of his

10   client, I think it will be very difficult for Mr. Butler to

11   easily give us the information we need to prepare a credit bid.

12   And under those circumstances, we are uncomfortable.

13          What we would suggest, Your Honor, is -- and

14   obviously, I can't talk about this on the fly completely; I can

15   simply tell you my impression in talking to my clients -- that

16   if my clients are certain that they can bid the full amount,

17   under 363(k), of the entirety of the DIP loan in an auction

18   process before this Court, and they have available to them the

19   information that DIP lenders are entitled to, under the

20   agreement, which they can share with the entirety of the DIP

21   lending group -- because this needs to be a collective

22   decision, and obviously this is subject to appropriate

23   nondisclosure agreements; we're not suggesting that the whole

24   world needs to know about this -- we think we might very well

25   be in a position to agree that the results of the auction bind

50

1    us.  But that is under a circumstance where we know that we can

2    bid the entirety of our claim under 363(k).  And by the way,

3    that is an issue between us and the agent.  We and the agent

4    have to be satisfied that the agent has the directions the

5    agent needs in order to make that kind of a bid.  Under those

6    types of circumstances -- and again, we need to be satisfied

7    about the information we receive and our ability to go

8    forward -- that may be possible.

9           But given where we are today, and given the

10   constraints under which the debtor has been operating, it's

11   very difficult for me to say that because the big information

12   for us, as Your Honor knows, has been information.  And as

13   Mr. Bernstein said, this is a large group of lenders.  They

14   need to know what they're doing when they do this.  And subject

15   to confidentiality, they need to be able to vindicate their own

16   rights.  And that's the issue here for us.  And they are

17   prepared to vindicate their rights; they are prepared to

18   finance a company on a going-forward basis.  As we say in our

19   papers, we are prepared to work with the government and GM to

20   work out something that's amicable.  I would only note that

21   while there is not sufficient public information to say

22   anything definitively, we can observe, based on the GMAK, at

23   the very least, that there is an agreement wherein GM is taking

24   a series of the U.S. plants and purchasing them, that they are

25   including them in their own operations, and that the ultimate

51

1    configuration of the Platinum bid is going to be that the

2    Platinum piece of this bid is for the rest of the world.  That

3    is not a structure that is antithetical to the goals of the DIP

4    lenders.  There are ways in which we can go through this

5    process, and we can work with people.  But if we do not have

6    access to information, and we do not have the ability to look

7    at this process in its entirety, we are going to be hamstrung.

8    And that's a very real issue for the DIP lenders.

9          And I appreciate the difficulties of this process,

10   but we are not intending to play hide-the-ball with this Court.

11   I don't know what happened in WestPoint Stevens, but what I can

12   say to you is we are prepared to exercise the credit bid right

13   and if -- by the way, if somebody bids more than the entirety

14   of the DIP loan, then they bid more than the entirety of the

15   DIP loan and then we're taken out.  As far as I know, there's

16   no proposal to do that right now on the table, and protecting

17   our rights, this is what we're prepared to do, including

18   finance an acquisition of the business.  Just to be clear.

19         Your Honor, obviously, in responding to your

20   question --

21         THE COURT:  What you're addressing here goes beyond

22   the protective order that I entered yesterday because you're

23   actually acting for a sort of affirmative process, right?

24         MR. SIEGEL:  Your Honor, I think that's correct, but

25   we are where we are and the disadvantage of doing these things

52

1    out of order -- because this hearing really is the one that

2    addresses the process and what we do going forward -- is that

3    we are in a difficult position articulating to you what our

4    needs are.  And I think when we spoke to Your Honor and we

5    dealt with the protective order issues, we had an inability to

6    crystallize those issues for you in a way that we could make

7    clear what our goals are in this process.  Hopefully, I have

8    stated them very clearly at this point.  It's very hard to say

9    that we are separate bidders providing additional

10   consideration.  That is not what's happening here.  We are

11   credit bidders.  But in the process of acting as credit

12   bidders, we need to know what we're going to do with those

13   assets.

14           THE COURT:  Well, in addition to being a credit

15   bidder, you'd be bidding in for a business.  There'd be

16   executory contracts to assume, you'd have to show adequate

17   assurance of future performance.  There are other aspects than

18   just saying I have two billion of debt, I own this.

19           MR. SIEGEL:  Well, there are executory --

20           THE COURT:  What do you own if you're not assuming

21   the executory contracts, for example?  I mean, there are other

22   things that would need to be included in a bid.

23           MR. SIEGEL:  But I think those executory contracts,

24   whether assumed or not, are part of our collateral package.

25           THE COURT:  Well, I don't know.  That's something

53

1    you'd have to clarify.

2         MR. SIEGEL:  I mean, we can go back and look through

3    the documents, but that's my belief.  Now, obviously, we went a

4    little out of order in what I intended to say --

5         THE COURT:  Okay, why don't you go ahead with the

6    rest, then?

7         MR. SIEGEL:  -- so, yeah, let me just try and check

8    through my notes, and some of what I've said probably subsumed

9    some of the other things I was going to say.  But just a few --

10   I'll try be brief with respect to the remainder of this.

11        THE COURT:  Okay.

12        MR. SIEGEL:  First of all, Mr. Butler got up and said

13   that many of the stakeholders had gotten up and expressed their

14   displeasure with this motion.  I would point out that which is

15   obvious, which is other than GM which is the sponsor of the

16   bid, there is no stakeholder has indicated any support of this,

17   and it's understandable that GM would support since it's their

18   bid.  Our concern is that whatever Your Honor orders today,

19   there will be a train leaving the station.  And we would like

20   two trains leaving the station.  In the event that the debtor

21   is unsuccessful in confirming the plan, which we think likely,

22   we need to have another process, namely a sales process, that

23   reaches the conclusion, and we're prepared to have that

24   conclusion reached on July 23rd.  As I've expressed to Your

25   Honor just previously, our biggest concern is that there be a

54

1    process that's opened that enables us to credit bid, enables us

2    to get the information we need in order to credit bid, and

3    helps the debtor get out of the box it's in because of the no-

4    shop provision.  I think that the debtor is in a difficult

5    position here because of this provision, and we need to find a

6    way to help the debtor have an open process while

7    simultaneously not being accused of somehow reneging on the NDA

8    and turning this into an option.  And that, I think, is a

9    genuine concern.

10           To that end, what we think would be sensible is an

11   agreement that we could put together a marketing plan and

12   together bidding procedures that make sense that would be

13   approved in tandem with this order so that we actually have a

14   playing field, that that would be what would ordinarily be the

15   case.  I appreciate Mr. Butler's assertion that this ought to

16   be a private sale, but we just beg to differ.  And we do not

17   know why, even in the context of a private sale, a lender's

18   right to bid in under 363(k) could be eviscerated.  And that's

19   a significant issue.

20           Now, I -- and by the way, just to follow up on my

21   earlier point about dealing with GM, I think one thing we need

22   to be clear of here is that the government's legitimate policy

23   objectives related to the resurrection of the U.S. auto

24   industry need not require ignoring the rights of predators

25   under the Bankruptcy Code.  They are not inconsistent with each

1    other.  Nor is it the intent of the DIP lenders to ignore the

2    government and the needs of the government in the process.  But

3    we need to be part of the process, and this is not the GM

4    bankruptcy case.  This is the Delphi bankruptcy case.  There

5    are different constituencies and there are different issues

6    involved, and those need to be taken into consideration,

7    including the rights of the postpetition superpriority

8    administrative creditors that are the creditors under the DIP

9    lending agreement.  And the law is fairly well developed as to

10   the rights of those creditors, and we ought not to ignore them.

11        Your Honor, I think that's all I have right now.

12   Thank you.

13        THE COURT:  Okay, thank you.  Mr. Rosenberg?

14        MR. ROSENBERG:  Am I next, Your Honor?

15        THE COURT:  I think so.

16        MR. ROSENBERG:  I guess I'm in the slightly unusual

17   position of being kind of at that bottom of the food chain at

18   this point, and yet agreeing with virtually everything that the

19   three representatives of the DIP lenders said.  We gave a

20   number of examples in our papers as to why the government

21   process was opaque and not transparent and certainly not run

22   for the benefit of the Delphi estate and the interest in that

23   estate.  It was clearly and articulately stated to be a process

24   to preserve GM.  No argument with that.  That was the policy;

25   that was what was involved.  But as Mr. Siegel just indicated,

56

1    this is the Delphi bankruptcy, not the GM bankruptcy.  Those

2    issues can be addressed down the hall to Judge Gerber.  We

3    have --

4        THE COURT:  Well, except that the only reason GM's

5    doing this is to preserve GM.  So you have to keep that in

6    mind.

7        MR. ROSENBERG:  Your Honor, I do keep that in mind.

8    But when the results of that is outrageously large returns

9    which I can't talk about the record which was set forth in my

10   papers, and I'm not clear why I can't talk about it on the

11   record, but we won't have that argument today --

12       MR. SIEGEL:  I think you just did, Mr. Rosenberg.

13       MR. ROSENBERG:  -- for the benefit of a private

14   equity firm selected through some totally untransparent process

15   by the government and the benefit of GM with no numbers

16   available to anyone else to see whether or not the returns are

17   so outsized that they should be going, at least in part, to the

18   constituents of this estate, Your Honor, it's just not enough

19   to say GM's doing it, so everyone's got to go along.

20       THE COURT:  But in part, you're saying that because

21   it's not just GM.  There's another party involved --

22       MR. ROSENBERG:  Absolutely.

23       THE COURT:  -- which is something called Platinum.

24       MR. ROSENBERG:  Absolutely, I'm saying that, Your

25   Honor, and that goes to the point that the DIP lenders have

1    been making except takes it a little bit further.  The DIP

2    lenders rightfully are complaining about the absence of an open

3    process here, pursuant to which they can exercise their rights

4    to put together a deal that presumably would benefit them.  I

5    take it a step further and say that there has been no process

6    pursuant to which any interested third party can come in and

7    potentially make a better offer, a more appealing offer.  And

8    again, we have clear evidence of at least one situation where

9    the party asked for three weeks of due diligence and was simply

10    turned away.  And that was two weeks ago.  They could have been

11    one week from completion of their due diligence.  So, Your

12    Honor, what you have here is a complete opaque process where

13    parties were chosen, for reasons that are not clear, to

14    potentially create outsized returns that should be going to the

15    unsecured creditors of this estate for reasons that are not

16    clear and which have not been analyzed or disclosed, and they

17    finish it by saying if you don't agree to a plan that gives you

18    nothing, we'll do a private sale on the same undisclosed terms

19    and undisclosed analysis to give you nothing.  And Your Honor,

20    I suggest to you that this is a deeply flawed process.

21        So on the issue of the sale -- and I'll address the

22    modifications to the disclosure statement separately, now or

23    later, or whenever you want me to -- I am fully on board with

24    what the DIP lenders have said except they haven't gone quite

25    far enough.  What Your Honor needs to impose here and supervise

58

1    within the time constraints -- but that's why the supervision

2    is necessary -- is a fully open process pursuant to which

3    legitimate bidders -- and that, too, is subject to

4    supervision -- can come forward and participate in this

5    process.  That has not happened; it needs to happen.  This is

6    an estate.

7            Shall I proceed on to the --

8            THE COURT:  Yes.

9            MR. ROSENBERG:  -- disclosure statement?  Or you want

10   to do that separately?

11           THE COURT:  No, you can go ahead to that disclosure

12   statement and the voting issues.

13           MR. ROSENBERG:  Okay, I think we're raising really

14   two legal issues, Your Honor, plus a volume of disclosure

15   issue.  And you summarized them earlier, but they really are a

16   record voting date and whether the class has to be resolicited.

17   Secondly, the issue of what is an impaired class, including a

18   class where nobody votes, and the third issue is the disclosure

19   that we feel is necessary to describe what is involved in this

20   proposed plan in terms of money in, money out.  So taking those

21   one at a time.

22           1127(d) says what it says, but I loved Mr. Abrams'

23   comments about the Old Testament and New Testament and couldn't

24   possibly improve upon that.

25           THE COURT:  Well, I guess the other issue with

59

1      1127(d) is who's the holder --

2                MR. ROSENBERG:  Precisely.

3                THE COURT:  -- that's referred to in it.

4                MR. ROSENBERG:  Who is the holder?  Certainly not

5      somebody who held eighteen months ago on a record date then.

6      Your Honor, this screams --

7                THE COURT:  And doesn't hold now.

8                MR. ROSENBERG:  Certainly -- if holds now, no

9      problem.  But we know that there's been a huge amount of

10     trading in the interim, and they're asking people to be

11     involved when they've been gone for eighteen months, and

12     everyone who's been involved over the last eighteen months to

13     be disenfranchised.  Assuming there were any reasonable way for

14     the sellers to track down the buyers and vice versa, Your

15     Honor, it's just not practical, it's just not fair, and it is

16     not required by the statutes.  The situation screams for a new

17     record date.  This is not a situation where a hundred percent

18     plan became a ninety-five percent plan so you might shrug and

19     say well, those old holders can be bound, they won't bother to

20     change their votes.  Obviously, this is a completely new

21     situation.  To call it the same plan is ludicrous.  This is the

22     plan that provides the unsecured creditors with nothing.

23     Nothing under any reasonable projection.  To say --

24               THE COURT:  Well, I'm more trouble by the notion --

25     of the lapse of time and the trading because at that point, you

60

1      don't really know who the holders are.

2           MR. ROSENBERG:  You certainly don't, Your Honor.

3      You'll be sending the notice that you have to change your vote

4      to people who had been gone for eighteen months.  It makes no

5      equitable sense.  So I don't know that I have to belabor it

6      more than that.

7           The debtor has also, on the probably very good

8      assumption that the unsecured creditors will reject the plan,

9      attempted to create other impaired classes.  We can argue

10     classification down the road that I don't think is an issue for

11     today, unless Your Honor wants it to be, but the debtor is, if

12     I understand it, asking for a ruling today that a nonvote in a

13     class is an accepting class.  They've taken each secured

14     creditor who previously was given unimpaired treatment, very

15     slightly impaired them, put each one in a separate class, and

16     hopes that they get some affirmative votes.  They either will

17     or they won't, that either is or isn't real impairment.  We'll

18     find out at the confirmation hearing.  But again, the ruling

19     they're seeking today is that failure to vote in a class

20     constitutes acceptance.  That's not the law, it certainly

21     shouldn't be the law on these facts, and the Court should issue

22     no such ruling -- it should rule to the contrary, but it could

23     also simply not rule.  That would be okay, too, if the Court

24     wants --

25          THE COURT:  Well, let me explore that point.  I mean,

61

1    in some of the cases that have dealt with this issue, it's

2    clear from reading the facts that the Court had not decided at

3    the time of the solicitation --

4            MR. ROSENBERG:  Correct.

5            THE COURT:  -- whether an empty class would be deemed

6    to have accepted, although it did permit the debtors to put in

7    the disclosure statement, and on the ballot, the debtor's

8    position or the plan proponent's position, that they would take

9    at the confirmation hearing the position that an empty class is

10   deemed to have voted yes.  And that at least gave people fair

11   notice and it would encourage them to vote.  And frankly, I

12   don't see anything wrong with that.

13           MR. ROSENBERG:  Nor do I, Your Honor.  That would be

14   a fine resolution for today.

15           THE COURT:  Okay.

16           MR. ROSENBERG:  It's the seeking of an affirmative

17   ruling from this Court today that we find unacceptable.

18           THE COURT:  Okay.

19           MR. ROSENBERG:  The final point, then, is the level

20   of disclosure, here, Your Honor.  Again, as Your Honor saw from

21   our redacted -- if Your Honor signs the order --

22           THE COURT:  And that's redacted because of a

23   nondisclosure agreement --

24           MR. ROSENBERG:  No, no.

25           THE COURT:  -- and this was labeled confidential?

62

1    Or --

2            MR. ROSENBERG:  Your Honor, it's redacted simply

3    because we didn't want to have an argument with the debtor.

4    What is redacted are our calculations --

5            THE COURT:  No, I know.

6            MR. ROSENBERG:  -- of the returns.

7            THE COURT:  I know.  I was just -- it wasn't clear to

8    me what --

9            MR. ROSENBERG:  And it's nothing that you couldn't

10   figure out with a simple calculator from that which is in the

11   DIP papers which is quoted directly from the debtors' public

12   disclosures.  But the debtor gave us the specific documents

13   from which we calculated it on a highly confidential basis.  I

14   don't know why we needed them to so calculate.  It wasn't a

15   fight we wanted to have today.

16           THE COURT:  Okay.

17           MR. BUTLER:  Nor did they ever discuss it with us,

18   Your Honor.

19           THE COURT:  Okay.  All right.  I mean, it didn't seem

20   to me to be information that would be covered by 107, so --

21           MR. ROSENBERG:  I --

22           THE COURT:  I haven't entered the order yet.  I mean,

23   obviously I read the unredacted version since that's what I

24   always get.  But anyway.

25           MR. ROSENBERG:  Yes.  I was just being ultra careful

63

1    in avoiding an argument.

2              THE COURT:  Okay.

3              MR. ROSENBERG:  That's all.

4              THE COURT:  All right.

5              MR. ROSENBERG:  So, Your Honor --

6              THE COURT:  Well, maybe, as Mr. Butler's suggesting,

7    we can avoid the need for a sealing order --

8              MR. ROSENBERG:  That would be just fine.

9              THE COURT:  -- if you could talk that through with

10   the debtors.

11             MR. ROSENBERG:  The point is, Your Honor, this is all

12   highly relevant information in terms of the creditors deciding

13   whether or not that which has been presented is something that

14   should be accepted.  It is one thing to say that the DIP

15   lenders come first.  We know that.  It's another thing to say

16   agree to a plan where parties who were selected in a

17   noncompetitive opaque process are getting outsized returns and

18   the arithmetic needs to be laid out in the plan so that

19   creditors can see whether or not what they're being proposed to

20   get is an appropriate return.

21             Of course, in addition -- well, I guess I kind of

22   thematically, Your Honor, laid it all out in that one sentence.

23   It involves how the process evolved, how the plan was or was

24   not negotiated, what the numbers are that go into that plan,

25   and what the projected returns are at the various levels before

64

1    the unsecured creditors would see a nickel, let alone what the

2    projected returns are after the creditors receive a very modest

3    capped amount of money.  So all of that, Your Honor, we believe

4    has to go into the disclosure statement.

5              THE COURT:  Okay.

6              MR. ROSENBERG:  Thank you.

7              MR. FOX:  Good morning, Your Honor.

8              THE COURT:  Good morning.

9              MR. FOX:  Edward Fox from K&L Gates on behalf of

10   Wilmington Trust Company as indenture trustee for the two

11   billion of senior debt issued by Delphi Corporation.  I'll be

12   brief because most of the points have been covered, but there

13   are a couple of things that I do want to stress.

14             First, with respect to the sale process, although

15   that's been substantially covered, in listening to Mr. Siegel's

16   comments, it sounded at one point as if the goal of at least

17   the secured lenders' concerns is to have a process where they

18   can compete against Parnassus or Platinum.  There should be an

19   open process in which anybody can compete, not just the DIP

20   lenders.  And I would suggest at this point that some kind of a

21   court-appointed monitor to make sure that that process happens

22   properly and expeditiously would be appropriate.  With respect

23   to the disclosure issues --

24             THE COURT:  Why wouldn't the creditors' committee

25   advisor be --

65

1          MR. FOX:  The committee would be fine if the

2    committee can -- that'd be fine, Your Honor.

3          THE COURT:  I'm just throwing that out as to why one

4    would need an independent -- another party.

5          MR. FOX:  The committee would be absolutely fine,

6    Your Honor.

7          THE COURT:  Okay.

8          MR. FOX:  With respect to disclosure issues, I'll put

9    it succinctly.  Creditors who are being asked to vote on a plan

10   modification need to be told what the likelihood is that

11   they'll ever receive anything in terms of the recovery they're

12   being offered and when they might receive it.  And neither of

13   those two things is in the supplement to the disclosure

14   statement.

15          Secondly, the chart, particularly that describes

16   recoveries, is confusing because it's not clear in terms of the

17   treatment of unsecured creditors, the fact that apparently the

18   PBGC's unsecured claim which it would receive as a result of

19   the termination of the salaried employee plan I believe will

20   become part of the overall general unsecured creditors' pool

21   which would effectively, I believe, double that pool from three

22   billion in change to six billion.  And it's not clear from the

23   chart for unsecured creditors -- or it seems apparent from the

24   chart that the claim to be given to the PBGC is not included in

25   the amount of claims that are listed as unsecured claims that

1    would share in the total capped 180 million dollar recovery.

2    So that needs to be resolved.

3            With respect to the voting issue, again I agree with

4    Mr. Rosenberg on this point.  And if you look at the -- whether

5    it's the statute or the rules, it consistently refers to

6    "holders of claims or creditors".  In either case, that means

7    you have to hold the claim now in order to vote, not you used

8    to hold it and you no longer have a claim.  So the voting

9    deadline needs to be yesterday or today, not fifteen months

10   ago.  And we discussed that further.

11           And the final point that there needs to be disclosure

12   about that's relevant to holders of the senior debt is the

13   issue of the payment of the indenture trustee's fees.  The

14   original confirmation order which the debtor --

15           THE COURT:  Have you seen their blackline on that?

16           MR. FOX:  I have not.

17           THE COURT:  I think they added something on that.

18           MR. FOX:  Okay.

19           MR. SPEAKER:  It was attached to the reply.

20           MR. FOX:  I didn't stay up till 4:30 this morning to

21   see it.  So as long as that's addressed so that people know

22   what the result is going to be.

23           THE COURT:  Okay.

24       (Pause)

25           MR. KURTZ:  Good morning, Your Honor.

67

1          THE COURT:  Good morning.

2          MR. KURTZ:  Glenn Kurtz of White & Case on behalf of

3    ADAH and AMLP.  Initially, Your Honor, the plan investors

4    support the debtors' decision to move expeditiously towards a

5    confirmation.  We filed a limited objection that simply raises

6    two issues with respect to the disclosure statement.

7          The first issue is it's simply not clear to us who it

8    is that will be authorized to maintain, continue and settle the

9    adversary proceeding with the plan investors.  We think that's

10   important information that has to be considered.

11         THE COURT:  Right.

12         MR. KURTZ:  And I guess on a related point, who will

13   be funding that?  And --

14         THE COURT:  I assume whoever owns it.

15         MR. KURTZ:  Yes, I think that may be right, but there

16   may be a threshold question about who actually owns it.  The

17   economics look like they go in different directions.  It looks

18   like GM has the claim.  The economics go somewhere else.  I

19   think there's got to be an alignment, potentially, between

20   those that prosecute a claim and those that would be the

21   recipients of any benefit of the claim.  So we're looking for

22   under champerty principles --

23         THE COURT:  For disclosure purposes?

24         MR. KURTZ:  I think for disclosure purposes so that

25   we know whether we or others would need to show up and object

68

1    with respect to any of this.  I think it's being characterized

2    and treated as a material asset of the estate, and I think

3    there has to be some understanding as to how that will be

4    handled and managed, and I think there has to be some

5    understanding about whether that's legal or not --

6            THE COURT:  Okay.

7            MR. KURTZ:  -- under champerty principles or

8    otherwise.  The second issue, which I suspect is really not an

9    issue at all, there's a lot of statements that are made as to

10   the purported merits and underlying facts and the claims and

11   the defenses and the like.  We just want some assurance that

12   there are no rights, claims, defenses, or positions -- I should

13   probably say counterclaims -- that are being impacted in

14   connection with the plan of reorganization.  And we have

15   suggested some language which we think makes that clear.

16   That's on pages 4 and 5 of our objection and --

17           THE COURT:  You wanted it stated that this is the

18   debtors' views of the litigation and if the litigation is not

19   resolved then the ultimate outcome remains to be determined?

20           MR. KURTZ:  Correct, that there's no impairment, that

21   we don't have to come in and object as to the statements that

22   are made.  They're just the debtors' statements.  The real

23   matter will be resolved by Your Honor in connection with a

24   summary judgment trial or otherwise.

25           THE COURT:  Okay.  And on that topic, I don't know if

69

1    it was someone from your office or one of the other parties --

2    obviously I didn't get around to ruling on summary judgment

3    today.  I will contact the parties in advance before I give you

4    my ruling, so you don't have to --

5             MR. KURTZ:  Wait around for it.

6             THE COURT:  You don't have to wait around, right.

7             MR. KURTZ:  Other than that, Your Honor, any

8    objections that we have we would raise at confirmation.  We

9    just really wanted to ensure that those matters were addressed

10   in the disclosure statement.

11            THE COURT:  Okay.

12            MR. KURTZ:  Thank you, judge.

13            THE COURT:  The objection filed by Mr. Mears, has

14   that been resolved?  I think the debtors clarified it in their

15   response.

16            MR. MEARS:  Your Honor, this is Mr. Mears.

17            THE COURT:  Okay.

18            MR. MEARS:  We've agreed to withdraw it.  We've had

19   conversations with the debtor and commitments by the debtor

20   that need not been gone into here.

21            THE COURT:  Okay.  Thank you.

22            MR. MEARS:  Thank you.

23            THE COURT:  Anyone else?

24            MS. CECCOTTI:  Your Honor, I wonder if I might just

25   make a brief statement, having listened to the objectors, if I

70

1    can get to the podium.

2        (Pause)

3            MS. CECCOTTI:  Good morning, Your Honor, Babette

4    Ceccotti, Cohen, Weiss and Simon, for the Auto Workers.

5            THE COURT:  Good morning.

6            MS. CECCOTTI:  We did not file a pleading with

7    respect to the debtors' motion, having taken the view, as

8    Mr. Butler set out at the outset, that this was largely

9    procedural and that Your Honor would set a schedule including a

10   schedule that would include the filing of additional documents

11   I understand the debtors are going to be submitting.  I

12   understand schedules were filed very early this morning to the

13   NDA and we have not had the opportunity to look at those.

14   So we had a couple of minor administerial issues along the

15   lines of record date and so forth that we took up with the

16   folks at Skadden when the debtors initiated the modification

17   process last year, and we didn't think that those merited re-

18   raising again.

19           However, having read the objections and having

20   listened to the lenders this morning, I guess I want to make

21   sure that we have placed on the record the UAW's complete

22   reservation of its rights with respect to whatever process it

23   is that the Court ultimately decides to authorize here today.

24           We understand from reading the debtors' motion that

25   they are intending to proceed with this as a plan process.

71

1    They have expressed their preference for Delphi to resolve

2    itself through a plan process, consistently, I believe, since

3    the confirmed plan did not consummate last year.  We understand

4    that they have incorporated an alternative 363 process or

5    private sale, I guess I should say, as an alternative to that.

6    We understand that our ability to review that will be subject

7    to, again, further documents that they are planning to file in

8    accordance with the schedule laid out in their motion and that

9    we will have an opportunity to review that and if necessary

10   object to it.

11        My concern in listening to what you're being asked to

12   do today by the lenders is to create a process that may not be

13   totally procedural.  I think you started to ask Mr. Siegel

14   about the contracts and so forth, and that certainly has

15   generated in my mind a number of questions about exactly what

16   these lenders have in mind when they talk about opening the

17   process up.

18        To the extent that we are talking about something

19   that is not purely procedural and that may come back to

20   encroach upon the union's agreements or other substantive

21   rights, I want to make it absolutely clear that we are

22   reserving absolutely all of our rights in connection with that

23   process, should the Court go down that road.  And I just did

24   not want our silence here today to indicate anything other than

25   that fact.  So I'm just taking that opportunity --

72

1          THE COURT:  Okay.

2          MS. CECCOTTI:  -- to make that point, and I hope

3     everyone appreciates it and understands it.

4          THE COURT:  So, for example, if the winning bidder

5     were Wal-Mart, you wouldn't -- I mean, your rights are

6     reserved.

7          MS. CECCOTTI:  Excuse me?

8          THE COURT:  If the winning bidder were Wal-Mart, your

9     rights would be reserved, obviously.

10         MS. CECCOTTI:  If the winning bidder is --

11         THE COURT:  Is a nonunion -- you know, a company that

12    is a nonunion shop.

13         MS. CECCOTTI:  Let me answer it this way.  We have

14    participated -- there have been a number of discrete sale

15    processes throughout this case since its inception, and we have

16    participated, including at the level of bidding procedures,

17    because our contracts give us certain rights to do that.

18         THE COURT:  Right.

19         MS. CECCOTTI:  And we would expect to, again, reserve

20    all of our rights with respect to any process that the Court

21    decides to enter into.

22         THE COURT:  Okay.  And I accept that completely.

23         MS. CECCOTTI:  All right.

24         THE COURT:  It seems to me that the first thing that

25    one considers when evaluating whether a proposal is highest and

1    best is whether it can actually be closed.  And if there are

2    legitimate impediments to a closing, then that's an issue.  So

3    just as the debtors have throughout this process dealt with the

4    union's rights, I think that any process going forward would

5    have to do that too.

6         MS. CECCOTTI:  Thank you.

7         THE COURT:  Okay.  Mr. Butler?

8         MR. BUTLER:  Your Honor, if the Court pleases, I'd

9    like to ask for a brief recess to organize my thoughts and

10   consult with a few parties before I address the objections that

11   have been placed on the record.

12        THE COURT:  That's fine.  Ten minutes?  Fifteen

13   minutes?

14        MR. BUTLER:  Fifteen minutes should do it fine.

15        THE COURT:  Fifteen?  Okay.  So I'll be back at a

16   quarter to 12.

17        MR. BUTLER:  Thank you, Your Honor.

18      (Recess from 11:28 a.m. until 11:55 a.m.)

19        THE COURT:  Please be seated.  Okay.  We're back on

20   the record in Delphi Corporation.

21        MR. BUTLER:  Your Honor, I stand to respond to the

22   objections that were raised on the record by the objectors.  I

23   am going to leave to the papers those objections not

24   specifically raised in our responses in our reply brief

25   together with any questions you may have of me as I go through

74

1    this presentation.

2         THE COURT:  Okay.

3         MR. BUTLER:  Let me start, if I may -- I'm going to

4    start with just to resolve a few things to clear some paper

5    away from the podium here.  Mr. Kurtz got up as the last

6    objector on behalf of Appaloosa with respect to the limited

7    objection.  And one of the things he sought was a savings

8    language that would be in the supplement.  We did put in

9    savings language in the supplement.  It's blacklined in the

10   reply at S-24 and S-25.  That makes it clear that the

11   confirmation of the modified plan won't constitute any finding

12   or ruling with respect to any claims, counterclaims and so

13   forth.  That language is in the supplement, and I think we

14   should have resolved that concern.

15        With respect to where the plan investor litigation

16   goes in terms of who's acquiring that asset.  Under Section

17   2.1.3(iv) of the NDA, the Master Disposition Agreement, which

18   has also been filed, it's clear that -- and is an exhibit to

19   the plan -- it's clear that asset goes to General Motors

20   Corporation under the transaction.  In terms of what

21   arrangement GM may have with respect to any other party that's

22   not a debtor to these cases, with respect to that, the

23   prosecution of that matter, I don't believe that's the business

24   of the plan investors.  But I mean, the actual asset moves to

25   General Motors under the Master Disposition Agreement.  And

75

1    then there is a, as I think Your Honor's --

2         THE COURT:  Well, doesn't a portion of the proceeds,

3    though, go to creditors?

4         MR. BUTLER:   A portion of the proceeds, the first

5    nickel of it, would go to the DIP lenders, to the Tranche C

6    lenders from any settlement or judgment in connection with

7    that, yes.  But in terms of -- you know, he was asking, he

8    wanted to know who was funding it, who had control over it, who

9    can make decisions about it.  I'm not sure as a defendant

10   that's what he gets to know.

11        THE COURT:  Well, I agree with that as a defendant,

12   but I think that this provision does leave open a couple of

13   issues.  One is it doesn't specify who can settle.  And under

14   the Second Circuit case law I think that's an issue you want to

15   clarify.

16        MR. BUTLER:  Okay.

17        THE COURT:  And secondly, if it's being offered -- I

18   appreciate that this is a disclosure statement and it's being

19   offered to DIP lenders who are not actually voting on the

20   disclosure statement, but it would seem to me that if you want

21   their agreement to a transaction, it needs to be spelled out,

22   at least to them, that it won't just be -- the lawsuit will be

23   actually prosecuted or how it will be dealt with.  I mean, if I

24   were them, I'd want to make sure that this offer of proceeds

25   was not illusory.  And if the person who owns it doesn't really

76

1    have an incentive to prosecute it -- and maybe they do because

2    it's 50 percent, not 100 percent, but I just think that as far

3    as that issue, to the extent anyone who is voting on the plan

4    should have disclosure of it, you know, I think you need to

5    disclose it.  If they're not voting on the plan, then just as a

6    separate matter I think you ought to go through that with them,

7    and maybe you have.  But the thing that I think needs to be

8    clarified is right to settle, given the Second Circuit case

9    law.

10            MR. BUTLER:  All right, we will do that, Your Honor.

11            THE COURT:  Okay.

12            MR. BUTLER:  I think that's the only comments I had

13    on Mr. Kurtz's objection.  Let me then turn to the DIP lenders

14    and then I'll work backwards through the rest of the -- or

15    forward, as the case may be, through the rest of the

16    objections.  First, we heard from Mr. Abrams and from

17    Mr. Bernstein and from Mr. Siegel.  Let me start with

18    Mr. Abrams and his comments.  Your Honor, I think -- and to the

19    extent that he didn't address the information issues, I think

20    Siegel may have, and let me just make clear on this record a

21    couple of items.

22            First, the two principal advisors to the DIP agent

23    and steering committee, Alvarez & Marsal and Blackstone -- and

24    in fact up until recently Blackstone was the advisor to the

25    Tranche C collective.  Those parties have had access to the

1    same electronic data rooms at Delphi that Platinum and other

2    interested bidders have had access to since January of this

3    year.  They've had access for over five months.  This business

4    about not having information is just utter rubbish from the

5    debtors' perspective.  Those advisors have had access since

6    January.

7            Elliott -- which is Mr. Siegel's client through a

8    different name, Elliott Associates, which actually manages the

9    funds that have filed that objection -- obtained access in May

10   of this year through their separate advisor who recently, in

11   the last day or so, had their access turned off because they

12   refused to sign an NDA.  We gave them access on the promise

13   they would sign an NDA.  When they never signed one we turned

14   the access off in the last couple of days, and we'll turn it

15   back on if they sign an NDA under the terms that have been

16   discussed with chambers.  Silver Point, the other who has led

17   the Tranche C collective, has had its own direct access since

18   February 5th of this year, and its advisors -- its other

19   advisors, since they all have multiple advisors, Storm (ph.)

20   and CCG Advisors, have had access since May 10th of this year.

21           So for there to be a suggestion that the DIP lenders,

22   through their key advisors, and in the case of Blackstone and

23   Elliott, particularly -- excuse me, Silver Point and Elliott,

24   and particularly Silver Point, have not had access over these

25   many months to the same information that Platinum and other

78

1    potential parties have considered, just is not accurate.

2         Similarly, Mr. Rosenberg's comment -- he may just not

3    have the information correct, because his characterization I

4    disagree with -- there was an unsolicited bidder that

5    approached the company a few weeks ago who withdrew on their

6    own.  They weren't sent away.  And if it ever becomes an issue,

7    I can put all the papers and evidence into the court.  But it's

8    not the case that this company has ever sent any bidder away as

9    we've worked through these cases over the many months that

10   we've been trying to find capital.

11        I think the one thing that has been apparent to

12   anyone who's been following this case anywhere on the planet is

13   that this company has been seeking out capital, leading up to

14   the plan investor transaction which was represented by the

15   confirmed plan, and certainly thereafter for the last fourteen

16   months.

17        Let me also say that while the DIP lenders may be

18   having a change of heart now and the capital markets may be

19   changing and there may be other things out there in the economy

20   that are changing their views, including who owns what piece of

21   the DIP, because there's constant trading in the DIP these

22   days.  The fact of the matter is that Delphi was summoned to a

23   meeting by the DIP steering committee on April 6th of this year

24   and was told quite plainly at that time, that at least as of

25   that moment, there was no emergence capital coming from the DIP

79

1    lenders to Delphi and that we should plan our exit or emergence

2    with that understanding.

3          Now, things change, but to somehow suggest, in papers

4    or at this podium, that there has not been a continuing good

5    faith dialogue between our DIP steering committee and the

6    company on these realm of issues over the last number of months

7    since the accommodation agreement was entered into, I just

8    don't think is doing justice to the hundreds of hours of time

9    that have been developed and devoted to these conversations and

10   the access to information.  And one only has to look at the

11   millions of dollars of bills that the company has paid in

12   advisor's fees to the DIP lenders since the accommodation

13   agreement was entered into.  And one presumably could look at

14   the detail of those bills to just understand how pervasive the

15   access and the due diligence has been.

16         And I just want this record to be clear that this

17   company is not turning away people and this company has

18   provided as transparent -- in terms of information, as

19   transparent a process to our DIP lenders as we should be

20   expected to.  And we should be expected to.  The fact is -- and

21   I think the company's been the first to say this, I said it

22   earlier in this hearing -- this has been an extraordinary time

23   in this case, in this economy and in the restructuring industry

24   and certainly in the automotive industry.  And we have done all

25   that we can do to try to reasonably cooperate with people.

1          I don't want to stand here, Your Honor, and re-

2     litigate the protective order.  There's an order that's entered

3     here and there's a process, presumably, in that order if people

4     want to seek modifications of it.  And we can respond, but

5     there is a protective order that's been entered by the Court.

6     We certainly are going to abide by its terms, and it's a matter

7     of public record.

8          I do want to address Mr. Abrams' comments regarding

9     the board and the exercise of its fiduciary duties.  While I am

10    sorry that he and his clients apparently have zero confidence

11    in that process, and while I acknowledge that in his remarks,

12    towards the end of them, he moderated the views in his comments

13    as to whether or not the directors were good and honest, and

14    seemed to moderate his views and essentially take back the

15    allegation that they might not be.  The reality is that these

16    directors, the vast majority of whom are independent directors,

17    have worked tirelessly throughout these Chapter 11 cases to

18    maximize value for stakeholders and to fulfill their fiduciary

19    duties under Delaware law.  Your Honor has made that judgment

20    on specific instances numerous times during these cases, and

21    the directors are no less vigilant.

22          The fact is -- and it is at this moment an

23    irrefutable fact -- the fact is that despite all of the access

24    that the DIP lenders have had information for the last six

25    months, and despite all of the things that have occurred in the

1    last six months, the only fully feasible, fully funded

2    transaction that we have to move forward with is the

3    transaction that we filed on June 1st.  And I am not --

4    although I have the right under 408, in fact, to talk about

5    settlement matters to impeach or repudiate statements made to a

6    Court, I'm going to refrain myself from doing that.  But there

7    were opportunities -- clear opportunities that the DIP lenders

8    had to pursue other transactions that were offered over the

9    last three months which they declined.

10           Having said all of that, as we have said at every

11   single hearing where we've had to deal with these issues,

12   Delphi recognizes its fiduciary duty, and we are trying to

13   maximize value for stakeholders, but that doesn't mean that we

14   necessarily always agree with our stakeholders about what the

15   process is for doing that.

16           And I would simply indicate, Your Honor, that I

17   thought in the first six or seven pages of our reply, we could

18   not have been clearer to the Court or clearer to the

19   stakeholders here about how the company would behave over the

20   next five weeks leading into the July 23rd hearing.  If the

21   company receives an unsolicited offer, it will consider it.  If

22   the company receives a request for due diligence and people are

23   prepared to sign a reasonable nondisclosure agreement like the

24   three dozen or more that have already been signed in these

25   cases by other parties over the course of the last many months,

82

1    the company will provide them information to make that

2    evaluation and try to sort that out.  What the company is going

3    to do in the interim, what it proposes to do, is to honor its

4    commitments otherwise under the Master Disposition Agreement.

5           When I look to Mr. Bernstein's comments --

6           THE COURT:  Well, let's stop on this point.  I

7    believe what you just said, but what you just said is somewhat

8    contradictory, given the language of 9.40 of the NDA.  I

9    appreciate it has a fiduciary out, but the language here is

10   broader than any language I've ever seen in a provision like

11   this.  In addition to saying, "The debtor shall not solicit or

12   initiate", it says "The debtor shall not respond to, continue,

13   encourage, or facilitate or furnish or disclose nonpublic

14   information in furtherance of any inquiries or the making of

15   any proposal with respect to, or enter into or continue in any

16   negotiations or discussion with any person regarding the

17   possibility of a competing transaction."

18          Now, I appreciate there's a fiduciary out in

19   connection with that, but it seems to me that given all of that

20   language, unless there's a really, really good reason, which

21   the papers don't disclose, that this is essentially a private

22   sale, I think that the assertion of a fiduciary out here is

23   going to raise litigation issues.

24          MR. BUTLER:  Well --

25          THE COURT:  And I don't -- I mean, given that this

83

1    language is so antithetical to the normal process, and I would

2    expect it only to be in a document where the Court is satisfied

3    that the debtor has, through a private sale, maximized the

4    value, would I let a debtor go down this path.  It just seems

5    to me that, particularly given the timeline that the DIP

6    lenders have said that they're willing to abide by, and I think

7    that is in light of the fact that there has been enormous

8    amount of information provided to them that the debtors have a

9    data room, etcetera, why even get into this issue?  I mean, it

10   just seems to me -- why are we not permitting a process that's

11   one where there can be a higher bidder?

12          MR. BUTLER:  Your Honor, I think what we're doing

13   here is trying very hard not to mislead the Court.  And I think

14   it's extremely important that the Court look at the substance

15   of this transaction.  I think there was a reason Ms. Ceccotti

16   chose to get up from the UAW, in light of the comments of the

17   DIP lenders, and reserve the UAW rights.  The fact of the

18   matter is that the transaction that we're pursuing pursuant to

19   a private sale, which is permitted by this district, and

20   permitted -- and there was a major case just decided in the

21   District of Delaware on this point --

22          THE COURT:  Mr. Butler, I wrote those guidelines, all

23   right?  And it's very important to remember that the guidelines

24   say that if you're going to pursue a private sale you've got to

25   say why.  And it's an important -- it's a burden to overcome.

84

1        MR. BUTLER:  And the nature of it is this is a unique

2    transaction.  And the transaction involves -- as you know, Your

3    Honor, the Master Disposition Agreement is a three-party

4    transaction.  In order for it to be successful, not only does

5    there need to be an appropriate equity partner going forward

6    that is acceptable to General Motors that we're able to -- but

7    General Motors had to fundamentally alter their relationships

8    going forward with the company and make sure that we were able

9    to move forward in that transaction.

10       THE COURT:  I understand the GM piece of it.  I don't

11   understand why -- and particularly from what's been disclosed,

12   what's so special about Platinum?  I mean, they probably have a

13   lot of money.  They have good lawyers.  Other people have a lot

14   of money and have good lawyers.  As far as I'm concerned,

15   they're just guys in suits.

16       MR. BUTLER:  Right.  Well, I --

17       THE COURT:  I mean, why can't other guys in suits pay

18   more?

19       MR. BUTLER:  Right.  Well, the other guys in suits

20   can pay more if they're acceptable as partners to General

21   Motors.

22       THE COURT:  Well, all right, but --

23       MR. BUTLER:  No, but that's not to be -- I mean, I

24   want to say it.  That is not to be a fact that -- you know, I

25   just need to say -- is overlooked here.  We have for the last

85

1   six months, almost the last fourteen months, but the last six

2   months we have been searching for solutions to that three-

3   legged stool we've talked to everybody about.

4           THE COURT:   I understand that, but unless -- and

5   there is a provision in here that says there are no undisclosed

6   agreements between Platinum and GM.

7           MR. BUTLER:   Right.

8           THE COURT:   But I don't know what makes Platinum

9   acceptable to GM and why Platinum is unique in this regard.   I

10  mean, it just -- it doesn't really come through.   They may be,

11  and it may be that ultimately if, I don't know, you know,

12  whatever hedge fund, if ever one does, and goes to GM and says

13  we'll do the same things but we'll pay more.   I just -- it

14  doesn't -- it seems to me that unless I hear more, there's

15  something going on here that just doesn't seem to make sense.

16  I mean, I understand that GM wants to move quickly.   I

17  understand that GM would like to have their relationship

18  clarified.   But if you're moving on the same timeline --

19          MR. BUTLER:   Well, Your Honor, as we disclosed in our

20  papers and disclosed to our stakeholders, GM's top priority in

21  all of this -- as GM has indicated, Your Honor, you know, to

22  the company we've indicated in our papers, the number one

23  priority for General Motors is continuity and protection of

24  supply, which is why GM is putting in the billions of dollars

25  that they have disclosed publicly in their 8-K, and why they're

1    waiving billions of dollars of additional claims against the

2    company, including by the way, the 250 million dollar interim

3    financing facility Your Honor has provisionally approved.

4          THE COURT:  Right.

5          MR. BUTLER:  They're doing that for protection of

6    supply.  They have made a judgment that they are comfortable

7    with Platinum as a partner and as the ultimate owner of the

8    company with respect to protection of supply issues.  That's

9    their judgment.  You've asked me to stand up and try and -- I

10   can't get into their head as to why that is, Your Honor.

11   That's their judgment, and they're the ones that have put

12   billions of dollars at stake riding on that judgment.  All

13   right?

14         And the reason I think this is uniquely appropriate

15   in terms of a private sale transaction, subject to the

16   protections I already put in the papers and want to talk about

17   in a second, is that this is a transaction that will depend on,

18   among other things, the unions being comfortable that they will

19   assign their contracts, that they won't object to the

20   assumption of their contracts, General Motors being satisfied

21   that the concessions into making the new Delphi as it moves

22   forward are appropriate based on the people who are going to be

23   controlling that company.

24         And those are judgments that are really outside of

25   the debtors' control.  Delphi doesn't control -- no one at

87

1    Delphi controls those judgments.  There are real elements of

2    this transaction.  Someone who walks in and says "I want to pay

3    X amount of dollars", a dollar more, a hundred dollars more, if

4    GM says I'm not prepared to do a deal with those folks, I'm not

5    prepared to give them that supply agreement, I'm not prepared

6    to enter into the same kind of ancillary documents with them,

7    I'm not prepared to accept that kind of governance with them,

8    then it's a fundamentally different transaction.  And that's

9    the point here is that this --

10             THE COURT:  But that's all if, right?  We don't know

11   that yet.

12             MR. BUTLER:  No, Your Honor, we don't know whether or

13   not GM -- and by the way, that's always the case in a private

14   sale, you don't know.  But the question is does it have the

15   contours?  Is this a straight-up sale of assets?  And the

16   answer is it's not.  It's a very complex transaction which in

17   fact, among other things -- and I think most of the people in

18   this room would acknowledge that I've been the preacher for a

19   plan here.  There are a lot of people who would just as soon do

20   this as a sale, and I've been one of the people who's been

21   advocating trying to comprehensively address the issues in this

22   case, as Ms. Ceccotti noted, through modifications to the plan,

23   and therefore create a vehicle pursuant to which unsecured

24   creditors could get, potentially, down the line, some value

25   under some circumstances, as opposed to nothing, because under

88

1    a sale they get nothing.  And I'm a little confused by

2    Mr. Rosenberg's argument because if there's a sale they won't

3    get anything.

4         THE COURT:  Well, you can have a bidding process in

5    connection with the plan and a sale.  I mean, both things go

6    together.

7         MR. BUTLER:  Right.  But as Your Honor's pointed out

8    to me when we did the plan investor process, under 1123 you do

9    not need, for plan investors or for transactions under a plan,

10   to have a separate bidding process.  It's not required.  And

11   the --

12        THE COURT:  But that's in a case where you had had

13   the process, right?  I mean, you had a bidding process for the

14   plan sponsor originally.

15        MR. BUTLER:  Your Honor, we've been in a process with

16   the DIP lenders since January.  I mean, somehow -- that's why I

17   don't want the Court to be misled here.  I don't believe that

18   the agent, that Mr. Bernstein is going to stand up and say,

19   "Oh, no, we didn't have access to the Platinum information

20   since January."  I don't think Mr. Bernstein is going to stand

21   up and say, "Oh, no, Judge, we didn't tell them on April 6th

22   there was no capital for them."  I don't think he'll

23   misrepresent what was said.

24        THE COURT:  I understand that, but I also --

25        MR. BUTLER:  Okay.  So --

89

1      THE COURT:  I also want -- I mean, there's really

2  nothing in here about Platinum.  I don't even know if the

3  equity commitment is attached.  And they just seem to sort of

4  come out of nowhere.  And it just seems to me that, unless I'm

5  missing something, I don't see why there shouldn't be an

6  opportunity for someone to come out of nowhere or somewhere and

7  say I'll fund a plan that's better or I'll fund a sale that's

8  better or you know, permit -- and if it doesn't happen, then it

9  would seem to me that the record really is clear at that point.

10      MR. BUTLER:  But, Your Honor, we have permitted that

11  process, and our reply contemplates that process.  And I said

12  it in the last part of the preliminary statement, this

13  liquidity runway that GM is providing of 250 million dollars

14  through July 23rd provides the opportunity for unsolicited

15  offers to be considered by the company.  That process is there.

16      THE COURT:  It doesn't really.  This paragraph

17  doesn't really say that.  It just doesn't.

18      MR. BUTLER:  Well --

19      THE COURT:  And I've already basically said that on

20  the conference calls we've had.

21      MR. BUTLER:  Well --

22      THE COURT:  And something else is going on here in

23  this paragraph that is not being explained to me.  I'm just not

24  comfortable with this.

25      MR. BUTLER:  Your Honor, let me try and be as clear

90

1      as I can, and Mr. Abrams and Mr. Tanenbaum are here and they

2      can address the Court or they can dispute my view.  This is a

3      provision that was required by General Motors and Platinum as

4      we were completing the Master Disposition Agreement.  We

5      insisted on the fiduciary out, and we told them clearly -- and

6      I think they would acknowledge on this record -- that we would

7      continue to provide information to people who approached us and

8      that we would continue to consider, in accordance with our

9      fiduciary duties, any unsolicited offer that we received, and

10     that neither of those would be a breach of the NDA or any of

11     the related transaction documents.

12            I think that Mr. Tanenbaum and that Mr. Harris and

13     their clients expressly understand that and are expecting it,

14     and if anything, I think as it relates to the DIP lenders,

15     because there's not a parade of other people around -- with

16     respect to the DIP lenders, I think they probably would like to

17     know from the DIP lenders, sooner or later, whether they're

18     going to actually put together an alternative transaction or

19     not.  They would probably prefer that.

20            But just to be clear, this record, I think, is

21     crystal clear on the fact, and I think our papers are crystal

22     clear on the fact that we will in fact provide that information

23     and we will in fact consider those offers.  But what we are

24     not -- the part that we're focused on that we're not permitted

25     to do is that we're not prepared to solicit, initiate, do that

91

1    kind of process going forward in connection with this

2    transaction, not when the same people who are providing this

3    fully funded emergence transaction which is feasible for the

4    company are also providing the 250 million dollars to operate

5    over the next six weeks to eight weeks.  I mean, they're

6    providing the funding and they're providing a deal that

7    actually works.  I'm the one that wants it to work along with

8    our client under plan --

9          THE COURT:  I don't have, particularly, an issue with

10   the solicitation provision, because there are lots of other

11   people involved in this case, and this case is high profile.  I

12   have not heard either party to this agreement, either of the

13   nondebtor parties to this agreement say that what you're doing

14   is right.  I spent six hours with another hedge fund two days

15   ago where there seemed to be plenty of statements by the debtor

16   saying this is what we're doing.  And the hedge fund said well,

17   it doesn't matter, the condition is what it is and we're

18   relying on it.  And it just seems to me, if this doesn't

19   describe what the debtors are going to do, then we should

20   change it and make it clear.  I don't want to get in a

21   situation where people say there's no deal.

22         MR. BUTLER:  Mr. Harris?  Mr. Tanenbaum?  Do you want

23   to address the Court on that subject, please?

24         MR. HARRIS:  If I may, Your Honor.

25         THE COURT:  And again, what I'm really talking about

92

1    here is all of the stuff that really handcuffs the debtor once

2    someone contacts them.

3         MR. HARRIS:  Your Honor, let me, if I might, just

4    give you a little bit of background because Your Honor asked a

5    lot of questions about who Platinum is and I'll just give you

6    the thirty second --

7         THE COURT:  Okay.

8         MR. HARRIS:  -- because I think it bears on actually

9    how the provision's written and how it got to where it is,

10   including the breadth of it.  And the fact of the matter is,

11   there's a lot of guys at Platinum who do wear suits, there's a

12   lot of guys at Platinum who don't wear suits, including the

13   forty operational people that we have on the ground that we

14   have that have been working on this matter to develop all the

15   operational plans that we intend to implement, assuming this

16   transaction goes through.

17        We came knocking on Delphi's door to get involved in

18   this process some time ago, and it took our effort and the

19   efforts of everybody at Platinum to basically convince both

20   them and GM that we were real, we knew what we were doing, and

21   that we had the resources to actually implement a successful

22   turnaround here, not only because of the money we were prepared

23   to put in but also because of the operational expertise that we

24   could bring to the table.

25        And that was no easy task, frankly, because like Your

93

1    Honor, Platinum is a private investment fund.  We invest money,

2    we try and get returns.  I mean, Mr. Rosenberg doesn't like how

3    much he thinks we're going to make here, but the fact of the

4    matter is, that's what we do it for.  But we also have

5    successful outcomes, and we do it not only for our benefit but

6    for the benefit of others as well, including union members and

7    those who are in the employ of these companies that might not

8    otherwise survive.

9        So when we negotiated this provision, Your Honor, it

10   was on the back of this company having had fourteen months of

11   effectively being rudderless, their plan investors having

12   walked away, and having devoted substantial resources in the

13   face of, frankly, everybody in the entire world who's in this

14   business or wants to be in this business having the opportunity

15   to do exactly the same thing we did, which was knock on

16   Delphi's door, knock on GM's door, and see if there was a

17   transaction that they could negotiate that made any sense for

18   all of those parties.

19       We undertook that process, Your Honor.  We

20   successfully made our way through that.  The DIP lenders could

21   have done it at any point in time.  They chose not to do it.

22   And because of how far we'd come and what we'd invested in

23   this, we talked to the company about two different

24   possibilities.  One was do we go the traditional route of

25   bidding procedures, breakup fees, that whole deal, which was

94

1    one source.

2         We sat with the company and were convinced that

3    proceeding in the way that Delphi wanted to go forward on a

4    private sale through the plan or alternative 363 was the right

5    way to do it.  But in return for that, we wanted the company to

6    continue to be focused on moving forward with transactions

7    other than those that they believed, in their fiduciary duty,

8    have a real prospect of moving forward.

9         We didn't totally handcuff the company, Your Honor.

10   We obviously understood the need for the fiduciary exceptions

11   here.  We think it applies, frankly, to all of the sub-clauses

12   of Section 9.40, and I believe that Mr. Butler and his

13   colleagues, in consultation with the board, are going to do

14   what's right for the estate in terms of responding to and

15   otherwise dealing with unsolicited offers that come across the

16   transom.

17        We fully expected, Your Honor, that once this became

18   a public deal, there could well be other parties who would be

19   interested in either stepping into our shoes or offering a

20   similar transaction.  We understood that risk and we did it,

21   but we wanted to make sure that the company was focused on only

22   those that they thought had a reasonable prospect of going

23   forward.

24        The DIP lenders, Your Honor, have always been in this

25   game.  They've been here well before we got here.  They could

95

1    have at any time done what they're now saying they want to do.

2    And if they step up and do it and they make a proposal, the

3    company's obviously going to have to respond to it and give

4    them whatever it is they think they need.  The non-solicit,

5    Your Honor, in my view, is fully qualified by the fiduciary

6    out.  We don't intend to use it as a basis for litigation here.

7    We want to do this deal.  We want to close this deal.  We

8    understand the company has to look at other alternatives that

9    are presented, to the extent they have a reasonable prospect of

10   getting done.  That decision is the company's decision.  It's

11   not our decision.

12            And I suspect that Mr. Butler and his colleagues, in

13   advising the board, are going to broadly interpret that so that

14   it can come back to Your Honor at the appropriate time and say

15   we entertained as many unsolicited offers as we got, we looked

16   at whatever people were throwing in there.  We looked at who

17   they are and what their financing is and what their

18   relationships are what their experience in the industry is, and

19   concluded that they either were or were not potentially viable

20   bidders here who were worth devoting management time and

21   resource to for purposes of evaluating alternative

22   transactions.

23            So we're not looking at this as a fodder for

24   litigation in any way, shape or form.  And frankly, we're not

25   looking at it as an out to try and get out of a transaction

96

1    which we've been really working hard at and devoting

2    substantial resources to in order to stay in.  We want to do

3    this deal.  We spent enormous amounts of time and money to get

4    to the position we're in right now.  We understand the company

5    has a fiduciary obligation to its constituents to entertain

6    other offers that are submitted, and we fully expect that they

7    will perform in accordance with that as we go forward.

8               THE COURT:  Okay.  Thank you.

9               MR. TANENBAUM:  Your Honor, this is clearly a unique

10   process and I just want to give you some views from the GM

11   perspective as to how we are looking at this private sale

12   scenario.  Mr. Butler did state that protection of supply is an

13   incredibly important piece of any equation here in terms of

14   doing a transaction.  General Motors' primary goal here, in

15   many respects, is to gain a maximum amount of comfort with the

16   counterparties it's going to have to deal with going forward.

17   I can't express the importance of that.  We've had numerous

18   discussions over the past six to twelve months with a number of

19   parties.

20          I think Mr. Butler clearly expressed the openness and

21   transparency of this process.  We have met with the DIP

22   lenders.  And, I'll use the words for better or worse, because

23   everybody can characterize those meetings.  We have exchanged

24   term sheets with the DIP lenders.  We had another party at the

25   table with us simultaneously with Mr. Harris's clients.  We

1   negotiated heavily with both of them, and that other party

2   happened to walk at the last minute.  These agreements are

3   incredibly complex.  There are commercial agreements that deal

4   with the interaction of the parties throughout the world

5   globally as well as domestically.

6          Let us not lose sight of the fact as well, as part of

7   this comfort level, the federal government is funding billions

8   of dollars into this transaction.  The comfort level equates

9   with being willing to invest two and a half billion dollars of

10  debt and equity into the transaction with Platinum.  It

11  incorporates the concept of paying up to a billion dollars for

12  domestic sites, keep sites, or UAW sites, as we call them and

13  also pay Trance A, B, and C claims as part of that process.

14  The total numbers could end up at a level of four billion

15  dollars, give or take.  So it is incredibly important, and this

16  is a unique situation.  This is not just somebody coming in at

17  the eleventh hour and saying, here I am, I'd like to step into

18  the shoes of somebody that we've spent two months negotiating

19  with and getting comfortable with and saying our offer is

20  higher, you have to accept that.

21         And I want the Court -- I think everybody in this

22  courtroom understands what we're dealing with here.  We are

23  going to be going to court in the General Motors case shortly

24  to seek approval of what we need to do here.  That approval is

25  likely to be sought prior to July 23rd.  That's not to say

98

1    that's going to be the end of the day or that we can't go back

2    and modify that.  We are on an incredibly tight timeline here.

3    I don't know when the GM case expects that that sale might be

4    approved or when it might close, but what we're trying to do

5    here is simultaneously deal with an incredibly important

6    situation for both the Delphi Chapter 11 case and the General

7    Motors Chapter 11 case.

8            We're not looking to waive anybody's rights.  I agree

9    with Mr. Harris's assessment of the provision.  We've had a

10   discussion amongst ourselves.  Mr. Butler's statements about

11   entertaining other parties is absolutely accurate.  But I do

12   want people to appreciate what's gone into the documentation we

13   have to date, and going backwards and understanding the number

14   of parties and the openness of this process.

15           So we do have a five week, six week window before

16   July 23 to preserve due process for people in this courtroom

17   that have asked for it as well as others that may come to the

18   fore.  But let's not lose sight of the fact that we've been at

19   this for a very long time, there are billions of dollars

20   committed to this transaction, and it's important for everybody

21   here that this move forward.  So I think that I would reiterate

22   and agree with the words of Mr. Harris and Mr. Butler

23   concerning what the intent of that provision is, but I also

24   wanted the Court to understand from General Motors' perspective

25   what it is dealing with here and how it is trying to move

99

1    forward on a number of fronts.

2              THE COURT:  Okay.  Are you finished?

3              MR. BUTLER:  I haven't started.

4              THE COURT:  Well, on this issue, on this process

5    issue.

6              MR. BUTLER:  I'm sorry, I didn't realize I was going

7    to need to stop at each issue.  I'll stop and hear what he has

8    to say.

9              THE COURT:  Okay.  Well, why don't we deal with this

10   process issue?

11             MR. ABRAMS:  Your Honor, I'm going to be brief and

12   I'm going to stick to the process issue.  I think I know

13   Mr. Butler now for a long time and I know him to be a very

14   effective advocate, and frankly, I thought his defense of the

15   current posture of these cases, and in particular his response

16   to Your Honor's questions, were completely lacking.  And I say

17   that with all due respect, but the reality in these cases today

18   is that they had been hijacked.  Where the sine qua non of a

19   transaction in this case becomes the acceptability of a third

20   party to the company's largest customer, and we're told that

21   because of that and the fact they had a veto over what unfolds

22   in this court by way of an M&A process, that does nothing but

23   reinforce the need for Your Honor to be actively involved in an

24   open and fair M&A process.

25             And if you take a step back -- and I have to, in all

100

1    due respect to Mr. Harris who's a newcomer to this case, and

2    frankly the fox in the hen house -- if you take a step back and

3    you realize that GM has secured up all of its U.S. assets in

4    this transaction, and that what we're talking about is the

5    acceptability of Platinum with respect to the operation of the

6    rest of the world, where GM, at best, is a twenty percent

7    customer on a blended basis with respect to Delphi's output,

8    then where is Mercedes Benz?  Where is Fiat?  Where is every

9    foreign OEM?  And where are they in respect to this transaction

10   and their consent because they're more dependent upon the

11   European platform than General Motors.

12          So what is this excuse about General Motors and

13   whether or not a partner's acceptable to them?  Frankly, who

14   cares?  We don't care if it's acceptable to them.  They don't

15   want us as their partner.  They made that clear.  Someone has

16   hand-picked Platinum for reasons that are just completely

17   beyond the pale at this point.  And we're told that we should

18   sit back and allow a private sale to unfold because the largest

19   customer in this case who is protecting its supply of parts and

20   who has to put money into this company again, like everyone

21   else has done, so it can buy its parts, happens to like that

22   party.

23          It's ridiculous what's unfolding here.  This case has

24   become a subsidiary of the General Motors situation.  That is

25   not what this case is about.  It's about the stakeholders

1    before Your Honor and whether we're getting a fair return.  And

2    these arguments are complete rubbish, not this argument about

3    information and access to a data room, the arguments that are

4    being made today are complete rubbish.

5           And the reality is that this process has been not

6    constructed in a fair way.  The playing field is completely

7    tilted against every stakeholder in this courtroom, and

8    something has to be done about it at this point or we're all

9    going to have to resort to remedies.  And GM has no veto over

10   remedies, and that would be the worst case for everyone in this

11   courtroom.  GM, the DIP lenders, the unsecured creditors, the

12   United States, that would be the worst conceivable outcome.

13   And all we're doing now is looking at a blueprint for

14   litigation and foreclosure, not a consensual deal.

15          People have to wake up and get real about this

16   situation.  This is not fair.  It's inequitable.  And the

17   excuses that have been cocked up in this courtroom today are

18   just incredible.  They are so unpersuasive, it's almost hard to

19   believe they're being made.  "We'll do the right thing."

20   "Trust us."  "We've been knocking on the door for a long time."

21   You know what?  We've been led down the primrose path since the

22   beginning of this year to May on some white elephant stand-

23   alone plan where GM and Delphi were going to deliver a deal for

24   us, while people are knocking on the door unbeknownst to us,

25   and now we're supposed to say okay, we were a little busy on

1   this detour, this frolic?

2          Oh, come on, Judge.  This makes no sense, what's

3   unfolding here, and it's completely inappropriate.  And to sit

4   here and say that we should trust anyone when they have erected

5   barriers to competition that are so substantial that we're

6   told, "Don't worry, rest on this slender reed of a fiduciary

7   out."  Fiduciary outs are not static.  When a board is

8   confronted with a fiduciary out two months from now, and the

9   company's on fumes and has a dollar in the bank, what's the

10   fiduciary going to do at that point?  Pull the plug?  I don't

11   think so.  It is an evolving process.  That out is absolutely

12   worthless to us, and it's not something we're going to rely

13   upon, and it's not something you should rely upon as the Court

14   overseeing this proceeding, because it takes away all of Your

15   Honor's judicial oversight and powers in this case under the

16   Code and reposes it, I don't know where, but certainly not in

17   the hands of Delphi and its board of directors.

18          MR. BUTLER:  Your Honor, the one thing that

19   Mr. Abrams said in that discussion that I think we both agree

20   on, and it was a caution that Mr. Bernstein laid out earlier

21   which I think is an appropriate caution.  And that is that in

22   fact, contrary to Mr. Abrams' statements, these cases have not

23   been hijacked.  There's a transaction here.  And if at the end

24   of the day the DIP lenders conclude that that transaction is

25   not in their best economic interests, they have remedies that

103

1      they can pursue.

2            There is always the alternative here of the DIP

3      lenders foreclosing on these assets.  That's been available to

4      them at various times since December.  I am hopeful that is not

5      what they will do.  I think that people who are trying to move

6      this transaction to closing need to understand those risks.

7      And hopefully those issues will cause people to continue to

8      talk with each other between now and July 23rd.

9            I think Mr. Bernstein's caution was a fair one that

10     the agent doesn't look forward to getting that kind of

11     instruction, and whether that instruction is forthcoming or

12     not, I think is a matter of speculation not certainty, even

13     under the transaction that has been proposed.

14            But the fact of the matter is, I don't think this

15     record could be clearer, and Mr. Abrams, first having argued

16     with his colleagues that they weren't getting information, now

17     when I put the facts in the record, having said well, those

18     don't matter any more, the fact is the DIP lenders have been

19     getting information, the same information as Platinum, the same

20     information as other prospective bidders since at least

21     January.  And we've already entered a protective order on how

22     as DIP lenders they'll get information.  We have an NDA out on

23     to them on how they'll get it as acquirers.

24            We had made it clear on this record, and you've heard

25     the acquiescence of both Mr. Harris and Mr. Tanenbaum that

104

1    we're going to continue to provide information to these or

2    other bona fide unsolicited offers and work with the DIP

3    agents, and we're going to continue to evaluate transactions in

4    our fiduciary duties, and clearly, as with any sale transaction

5    or any plan transaction, whether this is an 1123 transaction

6    before you on July 23rd or a 363 transaction, if the DIP

7    lenders are unhappy with it at that time, they'll have either

8    had the opportunity to have exercised their remedies before

9    that time or they will -- seeing as the accommodation period

10   ends I think tomorrow -- or they will have the opportunity to

11   inform the Court that they disagree with our conduct over the

12   preceding six weeks.  I don't think that they will, at the end

13   of the day.

14        I think we have done the right thing and will

15   continue to do the right thing, and the reality is, as Your

16   Honor pointed out at the beginning of this hearing, there will

17   be no disposition of merits of the Master Disposition Agreement

18   until July 23rd and you'll have a complete record at that time

19   as to what has occurred.

20        THE COURT:  I guess I'm having a hard time seeing how

21   what the DIP lenders and the committee have proposed hurts the

22   debtor.  And why to the contrary it doesn't make it clear to

23   people who -- I guess there are still credit committees, right,

24   or bosses -- they can go to their boss and say look, there is

25   nothing funky about this, we got what we wanted, and it didn't

105

1    pan out, or, you know, maybe it did pan out to this extent.

2    Why is that a bad thing?  How does that hurt the debtor?

3              MR. BUTLER:  Your Honor, to the extent that we are

4    doing a process that -- and Your Honor understands in approving

5    some alternative process that takes into account the realities

6    of this case and the timeline, I suppose it doesn't prejudice

7    the debtors.  But the point is that the unions will have to be

8    satisfied.  General Motors will have to be satisfied.  All

9    right?  And those are outside of the control of the debtors.

10   We've brought -- Your Honor has asked us --

11             THE COURT:  No, they don't have to be satisfied.

12   There is an alternative here where no one's satisfied.  I mean,

13   that is an alternative.

14             MR. BUTLER:  Right.

15             THE COURT:  And so why not try to keep everyone as

16   satisfied as possible?  Why cut it off now?

17             MR. BUTLER:  But we're not cutting it off now.

18             THE COURT:  Well, you know, I hear what you said and

19   I clearly heard what Mr. Harris said, and I very much

20   appreciated what he said.  I heard what Mr. Tanenbaum said.

21   But nevertheless, it's said in the context of opposing this

22   request, and I'm not sure, you know, how to take it in that

23   context.

24             MR. BUTLER:  Well, look --

25             THE COURT:  People, in my experience, have come out

1    of the woodwork.  That has happened.  That happens in cases,

2    even cases of this size.  And people who have great records

3    with unions have come out of the woodwork at times.  Maybe

4    you've already talked to those types of people.  Maybe you

5    talked to them six months ago and now that they see where

6    Platinum is with GM and they have some sort of an idea, or

7    maybe now that things have gone to where they've gone in the

8    Chrysler case -- there could be a whole slew of reasons why

9    that has changed.

10            And it seems to me that if I were to deny the

11   creditors' objection on this point, that it wouldn't be a

12   particularly good message to those people, notwithstanding what

13   you've said, notwithstanding what Mr. Harris and Mr. Tanenbaum

14   said.  It just wouldn't be that good a message to them.  It

15   does seem to me that one should put some parameters around --

16   if we're going to go down a process like this, one should put

17   parameters around it so that the people who are saying they

18   want to embark on that process actually follow it as opposed to

19   just using it as a pretext for trying to increase some sort of

20   leverage in an objection.

21            And I've looked carefully at that issue.  I don't

22   think this process creates any sort of opportunity that the

23   parties and I can't manage for people being mischievous, as

24   opposed to trying to maximize value.  I won't let bidders be

25   mischievous, in other words.  And I think -- as reflected on

107

1    how I wanted to distinguish bidders from DIP lenders in the

2    discussion on the protective order.  I mean, I think it's

3    largely been avoided here.

4            There's been a lot of rhetoric in the Chrysler case

5    about this isn't fair, this isn't fair, etcetera.  It seems to

6    me there's ultimately a significant economic decision that the

7    parties have to make here, which is, you know, is it worth

8    going along with what's being proposed.  And it's easier to

9    make that decision if you're reasonably comfortable that there

10   has been, now that is has been proposed, an opportunity to beat

11   it.  And I'm just not sure, absent putting in a structure that

12   lays out how you can beat it, that people will be comfortable

13   on that point.  And I don't know, particularly when the

14   timeline is the same timeline.

15           I don't view it as a process designed to show who can

16   hurt the debtors more.  I mean, that's not a winning bid, who

17   can hurt the debtors more.  It's a process to show who can help

18   the debtors more as a going concern.  The alternatives are -- I

19   mean, we don't have to worry about the alternatives.  Everyone

20   knows what the alternative is, and that can be implemented.

21           MR. BUTLER:  Right.  We all understand the

22   alternative is --

23           THE COURT:  Right.

24           MR. BUTLER:  -- that the DIP lenders take the assets.

25           THE COURT:  So I --

108

1        MR. BUTLER:  So the question is --

2        THE COURT:  Whatever that means.  So again, what I'm

3   focusing on is the process where people do something more than

4   just take the assets.  And I, frankly, view the Platinum bid as

5   that type of bid.  People are doing something more than just

6   taking the assets.  And as I said, I wouldn't want to embark on

7   that process unless the rules were clear that if you're going

8   to be bidding to do something more than just taking the assets,

9   then whoever wins wins.

10        MR. BUTLER:  But Your Honor, that's the problem.  The

11   process -- just to say it, the process that we proposed is a

12   process that recognizes the realities of this case.  It's a

13   private sale process which means that anybody can come at the

14   July 23rd hearing, and between now and then they can make an

15   offer, they can get information.  If they're unhappy with what

16   occurs, and there's a party in standing that wants to take up

17   that cause, like the DIP lenders, we'll be before you on the

18   23rd, and our position --

19        THE COURT:  I'd rather avoid that and just have it be

20   clear that they can come in and get the information and bid,

21   make a bid.

22        MR. BUTLER:  Right, but --

23        THE COURT:  Well, I mean, what's the difference?

24        MR. BUTLER:  It's not clear to me, Your Honor, how

25   that process works -- and I know how to do 363 processes -- and

1    what's really being sought by the DIP lenders here.  I think

2    the DIP lenders are seeking to merge the DIP lender and acquire

3    provisions of your protective order.

4            THE COURT:  Well --

5            MR. BUTLER:  And I think they're -- you know, and the

6    reality is that I think they're looking to give information

7    that's been given to the DIP lenders to third parties.  I think

8    they're looking to give the architecture --

9            THE COURT:  But most of that information would be

10   available to third parties anyway under a confidentiality

11   agreement, almost all of it.

12           MR. BUTLER:  Well, for example, the ancillary

13   agreem -- some of the things we've been asked to give the DIP

14   lenders, Your Honor, and we've agreed to under the protective

15   order, would not be made available.  The ancillary agreements

16   between GM and Platinum would not be made available, for

17   example.  You know, to understand what those private agreements

18   are is not something a bidder gets to sort out ahead of time.

19   You know, that's proprietary information.  They don't get --

20   and Your Honor's made this point to us before -- they don't get

21   the proprietary agreements that made up the essence of this

22   transaction and all the work that's gone into it by the parties

23   and then get to take those and try and rip them apart.

24           THE COURT:  Well, let's explore that a bit.  All

25   right?  I'm not so sure that's right.  And frankly, under 2004,

1    given what this plan says is going to the creditors, why

2    wouldn't you have a right to get that under 2004?  I understand

3    how Platinum is evaluating the deal would not go to a buyer.

4    But if you're telling people to vote on a plan premised upon a

5    Class C interest, and you're telling your DIP lenders to agree

6    to a deal based on a Class C interest, and they cannot tell,

7    not how Platinum values the Class C interest, but what the

8    agreements are that supports that Class C interests, it's a

9    complete leap in the dark.  I mean, you might as well be

10   telling them nothing.  It's actually misinformation because you

11   don't know what it is.  You're suggesting there's something

12   there.  As far as unsecured creditors are concerned -- because

13   I understand you shared a lot of this information with the DIP

14   lenders --

15             MR. BUTLER:  Right.

16             THE COURT:  -- but as far as unsecured creditors are

17   concerned, Platinum could have an agreement with GM that says

18   you know, as an economic matter, as a practical matter we get

19   everything.  And so this is illusory.  It seems to me if

20   Platinum wants people to accept this deal -- of course I would

21   never expect them to say how they value it, but they have to

22   see what the agreements are.

23             MR. BUTLER:  Your Honor, I would --

24             THE COURT:  And I don't see how sharing the

25   agreements with another bidder, even, would kill the

111

1    agreements.  They're still agreements.  The other bidder could

2    only say, you know, U.S. Treasury, you can get more out of my

3    deal.  And then they'd have to evaluate whether for some other

4    reason, I'm not quite sure what it would be, but for some other

5    reason we don't want more money.  That would be a pretty

6    difficult decision to make for the U.S. Treasury, I would

7    think.  And so I mean, again, how one buyer evaluates a deal is

8    proprietary, but what that deal is, particularly when elements

9    of that deal are being touted as -- you know, the upside of

10   that deal is being touted as something that creditors should

11   want, when you can't tell what it is you're getting, I have a

12   problem with that.

13          And you know, there are cases in this district,

14   there's an excellent one by Judge Bernstein that says that if

15   DIP lenders sit on their rights and the plan proposes to pay

16   them less than 100 cents, well, you know, that's it, too bad.

17   So in a way, this disclosure is an issue for them too.  I don't

18   know.  I think that --

19          MR. BUTLER:  Your Honor, the only way I can respond

20   to you is as follows.  I don't know, and I'll have to inquire,

21   but I don't know whether General Motors and Platinum are

22   prepared to disclose proprietary agreements between them in a

23   public way.

24          THE COURT:  No, I'm not saying -- if you were a buyer

25   you would have to sign a confidentiality agreement.

112

1      MR. BUTLER:  I just misunderstood you.  I thought you

2  just talked about saying it's got to be in the disclosure

3  agreement so everybody knows.

4      THE COURT:  I think --

5      MR. BUTLER:  You know --

6      THE COURT:  -- I mean, it seems to me that --

7      MR. BUTLER:  Because --

8      THE COURT:  -- there needs to be some way for the

9  people who are voting on the plan to understand from some

10  source, maybe filtered through a review by a committee,

11  something about what the economics are because if you read the

12  disclosure statement you have no idea.  I mean, there's this

13  Class C interest and there it is.  And you read the agreement

14  and --

15      MR. BUTLER:  It is the hope certificate that it was

16  intended to be.  Let me just say to Your Honor --

17      THE COURT:  But it's not necessarily -- but it isn't

18  like a warrant because you don't have the information to value

19  the warrant.  You couldn't do -- I don't think you could do any

20  sort of warrant analysis on this.

21      MR. BUTLER:  Your Honor, my response to you is to

22  simply say that the creditors' committee may get what it

23  ultimately is seeking here and that is no plan at all.

24  Because, ultimately, here the proponents of the plan process

25  and trying to put this into a plan, trying to make sure that

1    the administrative expenses in this case that are operating

2    liabilities were address, trying to address that is something

3    the debtor's been worked on very hard.  We've convinced General

4    Motors, we've convinced Platinum that that was the way to go as

5    opposed to simply saying sell it to me under 363 and then my

6    agreement's between me and -- they're just our business and

7    nobody else's.

8            And I'm just saying to you -- I'm just pointing out,

9    Your Honor --

10           THE COURT:  There are two different disclosure

11   issues.  There's the ability to let a bidder, who signed a

12   confidentiality agreement, know what it's bidding against.  And

13   then there's the disclosure to those who are being asked to

14   vote on a plan or agree to a transaction.  The latter group,

15   you can have confidentiality agreements with or protective

16   order with and you go have that with the DIP lenders.

17           As far as voting on a plan is concerned, it's a

18   difficult issue to grapple with.  I don't know whether your

19   disclosure statement does it at this point.  Unless it

20   basically says there's absolutely no assurance you'll get

21   anything at all because we are not privy to tell you that

22   there's anything there because we don't know.

23           MR. BUTLER:  I believe it actually does say that.

24           THE COURT:  Well --

25           MR. BUTLER:  It's the risk factor.  Look, the goal

1    here --

2          THE COURT:  The risk factor is one thing but I view

3    these things, generally, and I think I've told you this before

4    through the prism of my mother who's a smart person but not a

5    financial expert and I know she would be confused by it.  I'm

6    confused by it.  I don't know what -- I think it's not just a

7    risk factor.  I think it's basically we can't tell you what

8    we're getting because it doesn't say what you're getting.

9          Now maybe there's a way to summarize that, I'm

10   assuming there is, frankly.  There must be a way to summarize

11   that without disclosing the detail of the agreements.

12   Mr. Tanenbaum said it, there's a fundamental premise here that

13   the relationship between GM and the successor entity will

14   continue in a way that assures GM production.

15         Now, if there's some monetary parameters around that,

16   I think that that's worth summarizing without saying all the

17   details of that relationship.

18         MR. BUTLER:  But the reality is, Your Honor, that as

19   it goes to the creditors' committee, and I understand

20   Mr. Rosenberg's objection about it, but the fact is the deal on

21   the table is that 7.2 billion dollars of distributions have to

22   go out under the waterfall before they get anything, that's

23   pretty clear.  And I think the supplement says that clearly.

24   And it makes no representation that there will ever be 7.2

25   billion dollars worth of proceeds.  But it creates the

115

1   opportunity for there to be.  And if we go to sale route

2   there'll be no opportunity.

3          THE COURT:  I don't know.  How does the applicable

4   transfer agreement change all that, since that's the qualifier

5   for every obligation by the purchasers here?

6          MR. BUTLER:  I'm sorry?

7          THE COURT:  Under the NDA, article two, the purchase

8   and sale provision --

9          MR. BUTLER:  Right.

10          THE COURT:  -- it says, "Upon the terms and subject

11   to conditions set forth in this agreement," and then it says,

12   "As modified or supplemented by any applicable transfer

13   agreement," what's that?  I'm assuming a transfer agreement

14   deals specifically with the relationship with GM, right?

15          MR. BUTLER:  Among other things, yes.

16          THE COURT:  So, where's that agreement?

17          MR. BUTLER:  I believe that the -- some of the

18   agreements are scheduled -- on the schedules and exhibits, Your

19   Honor.

20          THE COURT:  Does that affect the 7.2?

21          MR. BUTLER:  I'd have to check, Your Honor.  I want

22   to make sure I get the right defined term here.

23          THE COURT:  Okay.

24          MR. BUTLER:  Just one moment, Your Honor, there's

25   many agreements.

1          THE COURT:  Okay.

2      (Pause)

3          MR. BUTLER:  I thought that was the case.  The

4   transfer agreements, Your Honor, are just the local agreements

5   and local jurisdictions pursuant to which we transfer assets.

6   And I don't think those are a major issue but I wanted to make

7   sure I have the right definition.

8          THE COURT:  It's my fault; we've been, for the last

9   ten minutes, kind of, mixing apples and oranges.  There are the

10  disclosure statement issues that I'm afraid we're going to have

11  to get to.  But before we get to those, and you haven't even

12  gotten to those, we got off track because of my questions,

13  there's the issue about this sale process and what gets

14  disclosed to other good faith bidders.  And again, you can

15  control who a good faith bidder is, everyone's advisor knows

16  how to deal with that.

17         But if someone is wanting information as a bidder to

18  own these assets in a way that is not destructive, it would

19  seem to me that they would need to know what they're bidding

20  against and it would seem to me that the government would want

21  to know that.  Just to get -- it would make it hard for me if I

22  were a loan officer or what the equivalent is at a hedge fund,

23  I don't know what they call them at a hedge fund but the

24  equivalent of a loan officer, to say to my boss well let's go

25  along with this transaction because the boss is going to say

117

1    well what is it.  And maybe they'll know that from --

2              MR. BUTLER:  The DIP lenders will know that.

3              THE COURT:  -- what you've disclosed.  And then

4    you'll say, well was there -- what about doing better then

5    that.  And well, we couldn't disclose the terms of it to any

6    other bidder, if that were the response, I'd kind of be hanging

7    my head at that point wanting to go out and get a drink.  It

8    doesn't --

9              MR. BUTLER:  Your Honor, but therein lies the -- any

10   one of those ninety or 150 lenders disclosing the information

11   or having someone contact the company and seek to obtain

12   information.

13             THE COURT:  No, no.

14             MR. BUTLER:  Because that's part of what we're

15   talking about here.

16             THE COURT:  But again, I got the impression from what

17   you said that if a prospective buyer, Mr. X, who's done

18   business -- who's rescued business in the past and made deals

19   with unions, showed up and said I'd like to team up with

20   Elliott Associates but I want to know what I'm putting my money

21   into, I got the impression that you were saying to me that you

22   would not be able to give to them the agreements between GM and

23   Platinum that in this NDA it is a rep and warranty that there

24   are no other agreements then what the company has.

25             MR. BUTLER:  No, what we would do, Your Honor, and by

118

1    the way we've not turned away any such bidder ever in the three

2    and a half years of this case.

3            THE COURT:  I understand that.

4            MR. BUTLER:  And have signed up dozens.

5            THE COURT:  The records very clear with that.  That's

6    not an issue.  But I'm just focusing on the next three weeks.

7            MR. BUTLER:  All right.  So let's say someone -- I've

8    already made it clear in this record, if someone were to

9    contact us and they're a bona fide purchaser, they would in

10   fact get access to the data room as we've given access to so

11   many other people.

12           THE COURT:  All right.

13           MR. BUTLER:  When it came to the GM agreements, we

14   would send them to GM.  We would say, part of your job, if you

15   want this transaction, is you've got to go and negotiate with

16   GM, those are not Delphi documents.  Those are not Delphi

17   agreements.  If you want a supply agreement with GM, you need

18   to engage them.  That's what everybody's done in this process

19   up to date.  And you've seen in all of the sales we've done in

20   this case we've divested assets.  Your Honor is aware that in

21   every single instance people had to go out and negotiate

22   separately those agreements with general motors.  We haven't

23   brought those agreements into this court.  Delphi hasn't been

24   running those agreements; those are third party agreements

25   between those folks and General Motors.

119

1          And so what we would say if someone came to Elliott

2     and said we're a bona fide PE firm and we're working with you

3     or we're going to be the operators and we gave them access to

4     the data room.  We would, as it relates to GM matters, we would

5     turn them over to GM and that's the process.  I think it's not

6     for me to negotiate or for me to disclose.  It's for GM to

7     decide, is this someone I want to do business and under what

8     terms will I do business with them, I think.

9          MR. BERNSTEIN:  Your Honor, if I might.  One of the

10    difficulties here is that the way this process has evolved, as

11    Mr. Butler has described it, one of the buyers is in the

12    position of qualifying other bidders here.  So if General

13    Motors doesn't want to talk to someone and reveal to them what

14    their deal with Platinum is so that that party can determine

15    whether they can offer a better deal to General Motors, General

16    Motors shuts down the process.

17         And what we are asking here, Your Honor, is for this

18    to be a competitive situation and the competition from the

19    point of view of many of these bidders is with Platinum.  They

20    have to know what Platinum is offering General Motors so they

21    can compete because the debtor and the process has been set up

22    so that one of the buyers, General Motors, is qualifying the

23    bidders.

24         MR. BUTLER:  Your Honor, and that's why -- I'll say

25    it again and obviously the Court will direct us what to do and

1    we will do it faithfully, but that's why we called this a

2    private sale transaction.

3        What the reality that everyone apparently wants to

4    ignore in this room is that General Motors is proposing to put

5    in upwards of four billion dollars into this transaction, much

6    of it coming from the support they're getting from the U.S.

7    Treasury based on judgments they're making in their case for

8    protection and supply, without which this company would be in

9    liquidation.

10        And what I kind of hear Mr. Bernstein saying is, we

11    ought to set it up a way so GM doesn't have any choice.

12        MR. BERNSTEIN:  No, not saying --

13        MR. BUTLER:  And GM doesn't get that.  We can't force

14    them.

15        THE COURT:  No, it's just information, that's all.

16        MR. BUTLER:  No, he said set up a process so that

17    GM -- how do you take GM out of the process?

18        THE COURT:  No, you can't take GM out of the process

19    but it's information.  That's all we're talking about.

20        MR. BUTLER:  I didn't say that I was asking GM's

21    permission to give them information.  I'm not asking them.  I

22    didn't say anything about that.

23        THE COURT:  No, but it seems to me it's the key piece

24    of information.

25        MR. BUTLER:  I am saying that GM has to decide, I

121

1   think, whether GM -- what supply agreement GM wants to give

2   that bidder, I think.  Maybe I'm wrong.  Maybe we can tell GM

3   what supply agreement they should enter into.  But GM has not

4   said to us, because we've asked the question, is this supply

5   agreement you've entered into available to anybody who walks

6   down the street?

7           THE COURT:  No, of course not.

8           MR. BUTLER:  And they've said no.

9           THE COURT:  But Mr. X doesn't even know whether it's

10  worth pursuing unless he's read it.  Of course Mr. X has to

11  satisfy GM or Mrs. X has to satisfy GM if it's their desire to

12  buy this company and run it as a going concern.  Of course they

13  have to do that.

14          MR. BUTLER:  But assuming the debtors give all of the

15  information in our data room to somebody who's coming up, the

16  same information we gave to Platinum.

17          THE COURT:  But that's a room.  You have these

18  contracts.

19          MR. BUTLER:  Right.

20          THE COURT:  They're disclosed.  There's a rep in the

21  NDA that said there are no other contracts between GM and

22  Platinum.

23          MR. BUTLER:  We're actually filing them with the

24  Court --

25          THE COURT:  So you have them.

1          MR. BUTLER:  -- on a highly confidential basis.

2          THE COURT:  Right.  I mean it's -- just because

3    someone hasn't put them in the data room the debtors still have

4    the information.  Just the existence of the agreements itself

5    doesn't seem to me to be proprietary information.  If there's

6    sensitive information about GM or Platinum, there's ways to

7    deal with a buyer, A, who decided the prospective buyer is in

8    good faith.  B, that includes the assets and you have a non-

9    disclosure agreement.  But to just preclude -- to say that the

10   very existence of the agreement is not disclosable, to me is --

11         MR. BUTLER:  No, the existence of the agreements has

12   been disclosed.  The question is -- and look --

13         THE COURT:  Well, no because you don't -- there could

14   be one, two, three; you really don't know whether they exist.

15   I really appreciate what the debtors are doing; you're trying

16   to have a transaction here.  You're trying to do it through a

17   plan and you're thinking of the down side, which is the

18   fallback on a sale transaction, that's all prudent, that's all

19   good.  And you're trying to persuade people not to exercise the

20   rights they have to short circuit that process.

21         But I still come back to how does it hurt the

22   debtors, on the same timeline that you're on, to have what I

23   would view as a normal opportunity for someone to come in.  I

24   don't see how it hurts.  And to my mind, that's what needs to

25   be shown before a debtor really embarks on a private sale

1    process.

2          MR. BUTLER:  Your Honor, we need to move forward

3    today so we need to do whatever -- we need to move forward in

4    the process Your Honor's prepared to approve and that General

5    Motors, in particular, is prepared to fund seeing as they're

6    the funders here.  And the -- nobody else.

7          I'm not quite sure, frankly, in the context of this

8    case, I admit and I'm not easily mystified, I don't know what a

9    normal process is over the next five weeks in this case because

10   I don't understand how, and I'm just saying it so that we

11   don't -- I can foresee we're going to have these arguments in

12   five weeks looking back and all the complaints about it.  And I

13   can see right now, and that's why I'm saying it so that at

14   least I can say it on this record so I can point back, Your

15   Honor, and say I did not want the Court misled.

16         THE COURT:  Well, what is it --

17         MR. BUTLER:  But the fact is --

18         THE COURT:  Mr. Bernstein and Mr. Abrams and

19   Mr. Rosenberg, what is it exactly that you're proposing?

20         MR. BERNSTEIN:  Simply, Your Honor, at this point

21   understanding the transaction in its full extent between

22   Platinum, GM, and the company --

23         THE COURT:  Well --

24         MR. BERNSTEIN:  -- so that people can understand

25   whether they can compete against that transaction and how.

124

1        THE COURT:  And then let's break that down because

2   the agent understands that transaction but you --

3        MR. BERNSTEIN:  The agent does not have the equity

4   splits between Platinum and General Motors so it's unable to

5   say whether it's willing to offer a better deal then Platinum's

6   willing to offer.  And that's true of the steering committee

7   and it's true of the other parties here.

8        We can make guesses, we're trying to make guesses

9   from the tea leaves that we've got but we don't understand

10  that.  And that is fundamentally what people need to understand

11  if they're going to make a proposal that competes with

12  Platinum's offer.

13       THE COURT:  Well, you're saying to me even as the

14  agent you don't know what makes up the Class C interest?

15       MR. BERNSTEIN:  Yeah.  Your Honor, we have been given

16  information about the returns that our piece of paper would get

17  but not the returns between the other two parties as

18  distributions come out to us.  And so it's really the returns

19  between the other two parties that are relevant because it is

20  Platinum's offer to General Motors and this company that is

21  really being competed against here.  And if we don't understand

22  what they're offering and what they're keeping, it's impossible

23  to compete against that transaction.

24       THE COURT:  As a bidder.

25       MR. BERNSTIEN:  As a bidder.  Including as a credit

125

1    bidder, Your Honor.

2         THE COURT:  I would think as a DIP lender you

3    wouldn't need to know because you only know what's coming to

4    you.

5         MR. BERNSTEIN:  Yeah, I mean it affects our recovery

6    and the debtor has very cautiously tried to suggest to us how

7    our recovery is affected.

8         But you see, we have two choices here Your Honor.

9    There's a choice of approaching General Motors and the company

10   with an alternative to the Platinum transaction.  Or there is a

11   choice of looking at these assets as two pools of assets, those

12   that are being purchased in the Platinum bid and those that are

13   being purchased directly by General Motors and focusing just on

14   a credit bid, frankly, for the assets that are being purchased

15   in the Platinum transaction.  And that credit bid might not

16   involve the rest of the assets and the rest of the assets could

17   then be sold to General Motors.

18        We don't understand enough to understand how to

19   structure that transaction, how it would compare to the

20   Platinum transaction, whether there's a better three-way

21   transaction between Delphi and a DIP lender group of investors

22   and General Motors.  And as we go on here time is running and

23   this is not simple, as you have pointed out and as the debtor

24   has pointed out.  And so if there were access to information,

25   people could actually formulate a view and we could see whether

1    it was for real that there might actually be alternative

2    transactions here.  If there aren't, we should know that by

3    mid-July and we know where we are.  But we really should give a

4    fair chance here to see whether there are alternative

5    transactions that might make everybody better off.

6              MR. BUTLER:  Well, Mr. Bernstein just said two

7    things.  One is alternative to Platinum and whether we use the

8    company's procedures or some other procedures Your Honor

9    imposes.  We have indicated that the company is going to

10   provide information to unsolicited parties with respect to

11   alternative transactions.  And so, that issue, I think, we can

12   do it whether by the company's proposed process or your own,

13   Judge, your own process.

14             The other -- what's going on here, and I haven't had

15   a chance to talk to Mr. Bernstein's comments is Mr. Bernstein

16   and the DIP lenders would almost like a declaratory ruling from

17   Your Honor on how 363(k) works in the context of this

18   transaction.  And they would like to be able to split the NDA

19   into two different deals and somehow credit bid for part of the

20   assets.  I want to reserve all of our rights with respect to

21   that because it's not clear that they can do any of that.

22             THE COURT:  That's fine.  I don't think he was asking

23   for that.

24             MR. BUTLER:  He said --

25             THE COURT:  I think what he was explaining is that,

1    as he said in his opening remarks, there is a risk here that

2    the DIP lenders will exercise their remedies.  There is an

3    alternative -- there are many alternatives to that course and

4    one of them is for them to get satisfied that, conceivably,

5    they can exercise on a consensual basis some of their remedies

6    and GM would be happy to.  That's a possibility, right?  Is

7    that what you were getting at?

8              MR. BERNSTEIN:  That's what I was saying, Your Honor.

9              THE COURT:  Not on a forced basis.

10             MR. BERNSTEIN:  Well, that's our preference for it

11   not to be on a forced basis but the way -- if we can't -- if we

12   don't have the information necessary to try to make a bid

13   that's competitive with the Platinum bid; it leaves us with few

14   alternatives.  And as I said before, Your Honor, the agent may

15   get that instruction and it may target just certain assets, it

16   may not target all of the assets of this company.  And in fact

17   that's -- but that is not the desirable outcome.  The desirable

18   outcome is for there to be a consensual transaction here, it

19   could be a four-way transaction, it might involve Platinum.

20   But we're not even being given the opportunity to formulate

21   anything.

22             MR. BUTLER:  Your Honor, actually I think they are

23   but I just don't think -- as it relates to the DIP lenders I

24   just don't think that is at all accurate.  What they --

25             THE COURT:  Well, if they don't know what Platinum's

1    getting out of the deal I think it's pretty accurate.

2            MR. BUTLER:  No, Your Honor.  What they're wanting to

3    do is not do a transaction that's alternative to GM and

4    Platinum, to the master disposition agreement.  What they're

5    trying to do is invade the agreement and take Platinum's place,

6    one of the parties to that agreement, as opposed to an

7    alternative.  None of them are suggesting --

8            THE COURT:  But it's all -- but it would all be

9    consensual, that's the key thing.  You all have a nice

10   potential standoff here and that's been evident to me for the

11   last three months.  And at some point that issue will be

12   resolved, I'm assuming consensually.  But it seems to me that,

13   and I don't fault Platinum for this but it seems to me that at

14   this point one party of the standoff is trying to throw sand in

15   the other party's eyes.  And I don't -- why do that?  I don't

16   see any merit to it.  I don't see how it hurts not to have them

17   be well informed, unless I'm missing something.  Unless you

18   think that they're going to be destroying the company somehow.

19           MR. BUTLER:  It's not clear to me that if you have a

20   group of people buying assets under an agreement that

21   competitors get to understand the splits between those parties.

22           THE COURT:  I agree.  But if you want them to say

23   yes, it seems to me -- frankly, I don't say yes unless I

24   understand, it's that simple.  Unless I understand, I don't say

25   yes.  And clearly, under 1125, people don't vote unless they

129

 1   have adequate information.  And I learned more about Platinum

 2   today then -- I mean, I didn't learn anything about Platinum in

 3   the disclosure statement, absolutely nothing.  I didn't know

 4   that Platinum had done any work.  I didn't know what Platinum's

 5   relationship -- I still don't know actually what Platinum's

 6   relationship with GM is.  I don't know how Platinum's continued

 7   role here, since GM is getting these four or five plants

 8   outright, what Platinum's role is for them.  It's a black box.

 9   And frankly, it seems to me, if the lenders were really to be

10   destructive they would have proposed something quite different

11   from what they're proposing.  And I have tried to be clear that

12   if they're to be given the option of something other than a

13   credit bid, which to my mind is -- on a nonconsensual basis a

14   credit bid is the same as pulling the plug in many respects.

15   But if they're to be given an option to do something other then

16   that, then it has to be something that they concede something

17   on too, which again is that it really will be an auction and

18   they'll be satisfied with the winning bidder, the ones who bid.

19   The ones who don't bid still have their rights but the ones who

20   bid --

21            Again, I appreciate what you're trying to do here but

22   I think under the constraints of both the practical issue,

23   which is you're trying to get consent from people, and the

24   legal issue which is, at least as far as the unsecureds are

25   concerned, you're trying to persuade them to vote.  You've go

130

1    to give -- I think you've got to give more information.

2            And maybe GM wants to assert some confidentiality

3    right that they have in terms of giving you their contracts

4    under this agreement.  To me 107 is designed for that but

5    that's offset by Rule 2004.  And I think legitimate concerns

6    for confidentiality can be protected but I don't think you can

7    just, sort of, ram this through without either risking very

8    serious consequences of saying I'm not going to have my hand

9    forced, I'm not talking about me now I'm talking about a lender

10   saying I'm not going to have my hand forced by this.  In fact,

11   I don't like it enough so I'll vote no and exercise remedies.

12   Or you'll have issues at the end of the day at the approval

13   hearing.

14           I don't think this process that the lenders and the

15   committee has proposed is particularly onerous.

16           MR. BUTLER:  Could you say what the process is, Your

17   Honor, because it's not at all clear.

18           THE COURT:  What I'm saying is that the debtor will

19   provide the relevant information to enable a prospective bidder

20   to evaluate the transaction and bid against it, subject to all

21   the constraints on finding that the bidder is a prospective

22   bidder in good faith and that they have the wherewithal to do

23   the transaction.  And that they'll sign the customary

24   nondisclosure agreement.  And I think that for a number of

25   reasons, including this agreement in the NDA, it should

1    probably be overseen by the committee, or at least its

2    professionals.  And again, bidders are bidders, lenders are

3    lenders.  They're kept separate as the protective order says.

4    And that if you're a lender and you're bidding and you're

5    bidding something other than just your claim, you really do

6    abide by the results of the auction one way or the other.

7         And in evaluating the bids, obviously one takes into

8    account all the things you do when you evaluate a bid.  It's --

9    whether it can be the risks of not closing, the risks of

10   delivery on the value and the like.  The destructive bid here

11   is going to be the foreclosure.  It's not going to -- a credit

12   bid, to my mind, is the same thing as foreclosure unless it's

13   backed up by real focus on preserving the asset.  And that

14   clearly is a consensual process that involves GM.

15        I think there's an unnecessary amount of suspicion

16   here.  I think, as you've said, the debtor is trying to do the

17   right thing.  Throughout this entire case GM has been trying to

18   do the right thing.  And I don't want that to change now that

19   you're at the short strokes and you're about a month and a half

20   away from potentially ending the case.

21        MR. BUTLER:  Your Honor, what does the Court have in

22   mind when you say oversight by the committee?  What's the

23   committee supposed to be doing here?

24        THE COURT:  Well, I imagine they can work very well

25   with whoever you have had in charge of the M&A transactions.

132

1    It really is oversight, not running the process but just making

2    sure it's fair.

3                MR. BUTLER:  Are you talking about the advisors?

4                THE COURT:  Yeah.

5                MR. BUTLER:  Not the committee?

6                THE COURT:  No, the committee's advisors.

7                MR. ABRAMS:  Your Honor, if I could just speak on

8    behalf of the DIP lenders briefly.  I think Your Honor's

9    message -- I think we all speak in a coordinated fashion.  One,

10   we understand Your Honor's directive.  Two, I think the notion

11   that the one statutory fiduciary with no skin in the game, in

12   particular Mr. Rosenberg and the committee's professionals

13   having oversight responsibility and the ability to report to

14   Your Honor with respect to the "fairness" issue --

15               THE COURT:  Well, that's what oversight's about.

16               MR. ABRAMS:  -- I think is absolutely appropriate.  I

17   think perhaps, as well Your Honor, since we have to dialogue

18   and discuss a number of issues, off the record frankly for

19   efficiency sake; we would like Your Honor to consider a

20   periodic status conference among the parties in interest to

21   discuss where we are and whether any issues are in need of Your

22   Honor's consideration.

23               THE COURT:  You know, I -- I don't want to have

24   creeping litigation.  And Judge Morris is very good for you all

25   to focus any sort of settlement dialogue.

133

1          MR. ABRAMS:  I was thinking more in terms of things

2   as fundamental as the form of an NDA and whether or not it

3   is --

4          THE COURT:  The form of, I'm sorry:

5          MR. ABRAMS:  No, the nondisclosure agreement.

6          THE COURT:  I assume you all are capable of working

7   those things out.  You all know if you can't that you'll get a

8   hearing on two hours notice or one hour notice on a Friday at 4

9   o'clock.  But I don't want to encourage people to formalize

10  something more than I think you need to.

11         MR. ABRAMS:  Now that we have Bob, Your Honor, I

12  think we'll be able to work our way through it.

13         THE COURT:  Okay.

14         MR. BERNSTEIN:  Your Honor, can I ask for one

15  clarification?  One of the points that's been made is the, and

16  this is also true in the protective order that Your Honor

17  referred to, is the distinction between activities as a

18  creditor and activities as a bidder.  Here the decision that

19  people are making is whether a transaction that potentially is

20  an investor transaction and a consensual transaction is

21  sufficiently attractive to cause them not to exercise remedies

22  as a creditor.  And it becomes very difficult when you're

23  talking about a single individual who's making that decision to

24  have this kind of bifurcation that you're talking about.  And

25  it's going to create enormous problems for the agent because

134

1    the agent won't know who they can tell what.  Someone from

2    Elliott calls and then we have to start saying are you on the

3    creditor's side, are you on the investor's side.  And then we

4    have to talk to the creditor's side about whether a transaction

5    that Elliott's proposing on the investor side is something

6    that's going to cause the creditor's side not to exercise

7    remedies, it becomes unworkable.

8            THE COURT:  I don't know if it really is unworkable.

9    I mean, you certainly can have them identify who they are and

10   you can kick them out of the room when you're talking about it.

11           MR. BERNSTEIN:  It is going to mean that all of that

12   wonderful information that Mr. Butler says that the creditors

13   have access to is going to be unavailable to the people at the

14   same institution who are acting on the investor's side.

15           THE COURT:  No, they would get it as an investor.

16           MR. BERNSTEIN:  But they're going to have to start

17   from scratch and we've only got for weeks here to get this

18   done.

19           MR. SIEGEL:  Your Honor, you said earlier in the

20   discussion that you believe that it's unlikely that there's

21   information --

22           THE COURT:  It's very little information we're

23   talking about that would be distinguished between the two, at

24   least that I'm talking about.

25           MR. SIEGEL:  But Your Honor, it's --

135

1                THE COURT:  That's all I --

2                MR. BERNSTEIN:  I mean, are we just talking --

3                THE COURT:  The distinction is really -- it appeared

4    to me, from the discussion over the protective order, that

5    because Platinum wanted to persuade the lender group that their

6    deal was good, that they were going to be giving the lenders

7    information about their own analysis of the deal.  That type of

8    information, Platinum's own analysis of the deal, I don't think

9    a prospective buyer should have.

10               MR. BERNSTEIN:  Right.  But the --

11               THE COURT:  I mean --

12               MR. BERNSTEIN:  But if we're talking --

13               THE COURT:  It seems to me you can kick someone out

14   of the room when that's coming.  Or they can say that they're

15   not going to get that.

16               MR. SIEGEL:  Your Honor --

17               THE COURT:  Almost all the other -- I can't think of

18   any other information that a buyer would be precluded from

19   getting.

20               MR. BERNSTEIN:  Let's just use some examples.  We've

21   got the information about the equity splits.  We got the

22   information about ongoing agreements between the Parnassus

23   entity, which is the buyer vehicle and General Motors.  There

24   are bunches of pieces of information that any buyer and any

25   creditor is going to want to know if they're formulating either

136

1    a credit bid or a competing bid.

2         THE COURT:  Again, it seemed to me there was only a

3    small category of information that wouldn't properly be

4    available to a buyer.

5         MR. BERNSTEIN:  You're really talking about

6    Platinum's own financial analysis.

7         THE COURT:  That's what I had in mind except for, I

8    do think, attention should be paid to qualifying a buyer to

9    make sure that they're not just trying to learn stuff.

10        MR. SIEGEL:  But Your Honor, to the extent that we're

11   talking about that specific information, I think we're

12   comfortable saying that, for example, Elliott could be excluded

13   from that.  However, what creates almost an insurmountable

14   obstacle for us is the idea that if we have the same set of

15   information, whether we're -- because we're acting as a credit

16   bidder ultimately we want to, for lack of a better word, figure

17   out how we're going to finance the business after we're done

18   doing the successful credit bid, we need to factor that into

19   the decision about --

20        THE COURT:  But that's already excluded.  The

21   debtor's already gave you that.

22        MR. BUTLER:  It's already in the order.

23        MR. SIEGEL:  But that's not fair because -- let me

24   explain what I mean.

25        THE COURT:  Okay.

137

1          MR. SIEGEL:  When we get drafts of NDAs there are

2     specific restrictions on how we can use the information that we

3     receive.  And that's our problem.

4          MR. BUTLER:  As a bidder.

5          THE COURT:  But I think we just talked about the

6     bidder point.  But if you're trying to evaluate how you finance

7     the deal after you foreclosed, hypothetically, the protective

8     order covers that.

9          MR. SIEGEL:  Yes.  But Your Honor, the problem is

10    that as things currently stand the same person can't make both

11    evaluations.

12         THE COURT:  But what I'm saying is it seems to me

13    it's a very limited portion of information that the bidder

14    person doesn't get and frankly shouldn't want to get anyway.

15    And I'm not quite sure why a lender would want it, frankly.

16         MR. SIEGEL:  I think we're agreeing on that point,

17    Your Honor, but the point is that there should be no reason for

18    different people at the same institution, so long as they don't

19    have that little piece of information --

20         THE COURT:  Well, of course.  But then you don't need

21    that screening procedure.  I mean, I don't think you need to

22    spell that out other than to say there'd be an appropriate

23    screening procedure.

24         MR. BERNSTEIN:  That's a clarification on the

25    protective order --

138

1          MR. SIEGEL:  We appreciate that.

2          MR. BERNSTEIN:  -- that we didn't understand that it

3     was limited to that limited type of information, Your Honor.

4     Thank you.

5          MR. SIEGEL:  That helps.

6          THE COURT:  It has to be a screening procedure that

7     screens.  If you don't need to screen then you don't need to

8     screen.

9          MR. SIEGEL:  Then that solves the problem.  We had a

10    difference in interpretation of what that language meant.

11         THE COURT:  But I think that, again, I want to be

12    clear about this, this is not an excuse for people to nose

13    around.

14         MR. SIEGEL:  No.  That's not what this is about.

15         THE COURT:  Okay.  All right.

16         MR. HARRIS:  Your Honor, if I might actually answer

17    one of the questions you raised before to Mr. Butler about -- I

18    think your question was, please explain to me why the process

19    that's being suggested here is deleterious to Delphi and I'd

20    like to address, actually, that point.

21         THE COURT:  Okay.

22         MR. HARRIS:  My clients, and people can cast whatever

23    aspersions they want of them, actually have been out in the

24    marketplace with respect to dealing with prospective customers,

25    both here and abroad, understanding their views on Delphi and

1    what it is the company has been an extremist for a substantial

2    period of time, is getting a lifeline from GM today to give it

3    some additional ability.  But like it or not, the announcement

4    of this transaction has actually created stability in the

5    marketplace with respect to its ongoing customer relationships.

6         And based upon that we weren't asked, we were told

7    when we signed our NDA there are no outs in this deal.  There

8    is no more material adverse affect out.  There are, like, maybe

9    three outs in the whole deal if certain things can't get done

10   which are instrumental to the transaction, including things

11   that have to happen in the GM bankruptcy case.  To create a

12   process that is undefined and which the marketplace, outside of

13   this courtroom, may or may not understand about who the future

14   owner of this company is going to be and what they're going to

15   do.

16        THE COURT:  I don't think it's undefined.  It has to

17   be a better deal then you guys.

18        MR. HARRIS:  I understand.

19        THE COURT:  So you tell every supplier it's either me

20   or someone better.  And I was probably flip about talking about

21   people in suits.  Platinum may be the greatest thing since

22   sliced bread, probably is.  But I don't -- I think that in my

23   view a process like this makes it more certain, rather than

24   less, that the right person or the right group ends up with

25   these assets.

140

1          MR. HARRIS:  Your Honor, I'm not disagreeing with

2     you.  What I'm suggesting to you is that if Your Honor believes

3     that a process such as what's being suggested by the creditors'

4     committee and the DIP lenders should be going forward, that it

5     needs to be a defined process with hard dates, hard auction

6     and --

7          THE COURT:  I'm happy to --

8          MR. HARRIS:  -- and not just submit your bid and show

9     up on the 23rd and see what happens.  Because I think the

10    marketplace needs the information and the stability -0-

11         THE COURT:  I agree with that.

12         MR. HARRIS:  -- that a formal process would actually

13    put including, potentially, and I'm going to throw it out

14    there, the stalking horse protections for those of us who have

15    been in this process.

16         THE COURT:  All right.  That's fair.  The timeline

17    that Mr. Abrams' pleading laid out seemed fairly reasonable to

18    me.  I think the debtors and the committee should focus on

19    that, if there's something I've missed on that.  But again,

20    this is not -- this is a timeline that accommodates the

21    timeline in the Platinum/GM deal.  And that's about all I could

22    say about it.  It is clear to me the debtors know how to run a

23    sale process; they do know how to do that.  And I know that the

24    committee's advisors know how to do that.  It's not --

25    unfortunately you're not writing on a blank slate by any means.

141

1          MR. BUTLER:  Your Honor, I'm a little confused

2    about -- you said the timeline on pages 16 and 17 is a

3    litigation timeline.  It says, "Commencement of document

4    discovery, completion of document discovery, depositions and

5    expert depositions".

6          THE COURT:  No, but having an auction on the 20th.

7          MR. BUTLER:  That's the only -- okay.

8          THE COURT:  It seemed to me that you'd have to have

9    the bids in before the 15th because that's an important day for

10   the GM case.

11         MR. BUTLER:  In before when, I'm sorry?

12         THE COURT:  July 15th.

13         MR. BUTLER:  The hearing's July 13th.

14         THE COURT:  Well, that's before the 15th.  I guess

15   you're right; it would have to be the 12th.

16         I think you all should sit down and work through

17   that.  You're perfectly capable of doing it.  I know you can do

18   it.

19          MR. ABRAMS:  Just one point of clarification.  It

20   went by fast but it struck me as worth noting.  Mr. Harris made

21   reference to bid protections in a context where, as far as we

22   know, this deal was handed to us final on a silver platter and

23   I have no idea what kind of work they did or whether one can

24   now claim an entitlement to something when you didn't follow

25   the process the way it was designed to be followed from day

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

142

1      one.

2              But put that to the side, we'll talk about that but I

3      hope that doesn't become the gating issue to whether we

4      actually have cooperation here.

5              THE COURT:  I think you should talk about it.

6              MR. BUTLER:  Your Honor, I'm assuming that there

7      should be -- you've indicated in this court before what

8      customary bid protections are, I think we understand what they

9      are.

10             MR. SIEGEL:  Your Honor, I have a suggestion to maybe

11     facilitate things.  We now have a professional that's available

12     to us to try and facilitate the process.  Could I suggest that

13     Mr. Rosenberg work with us to submit an order on what we have?

14             THE COURT:  Well, no --

15             MR. BUTLER:  Your Honor, the debtor's aren't

16     abdicating their role here to Mr. Siegel.

17             THE COURT:  I think that Mr. Rosenberg and the

18     committee's financial advisor should sit down immediately with

19     the debtor's counsel and advisor and come up with something.  I

20     don't think you'll be disappointed by it.  And I'm sure they'll

21     circulate it to you all.  Because again, part of this is not a

22     litigation process, part of this is to lay the groundwork to

23     make sure that people in this group of DIP lenders are

24     reasonably comfortable that even if they're not putting the

25     money in the value that's being provided here really is the

143

1    highest and best.  And that's a process that I've encouraged

2    that the parties do, not only between themselves but going so

3    far as to have the mediation.  So I think it's largely

4    consensual.

5            We've spent a fair amount of time, at this point on

6    what is clearly the most important issue, to my mind, here.

7    Can I give you my preliminary thoughts on the voting issues?

8            MR. BUTLER:  Yes, Your Honor.

9            THE COURT:  And that may help focus your arguments.

10           It seems to me, on the empty class issue, you should

11   put in the ballot and prominently in the disclosure statement,

12   in the executive summary part, that the debtors intend to

13   assert that if a class contains no votes that that is a vote in

14   favor of the plan.  But that that issue, ultimately, will be

15   decided by the court.  However, parties are encouraged to vote

16   because they may be waiving their rights if they don't.

17           It seems to me, based on my reading of Adelphia and

18   other cases that this issue is not clear cut.  It may be

19   appropriate in certain situations, as it was in Adelphia where

20   it was a tiny class and you had a multi-debtor plan.  And it

21   was being used as a tactic in a way that caused unnecessary

22   cost.  But there may be situations where it's not appropriate

23   to assert it.  And rather than prejudging that issue, I think

24   it's probably better to give people fair warning and encourage

25   them to vote and leave it for another day.

144

1          On the record date, given the time that's lapsed and

2   I'm assuming the substantial changing of hands of the claims, I

3   think there's a real issue as to whether you're really having

4   the same holders, the holders who 1127(d) is talking about

5   being deemed to have already voted.  I think there's -- it's as

6   likely as good an interpretation that you have to look at the

7   current holders.  And there may be lots and lots of current

8   holders who weren't holders back in 2008.  So I think you,

9   unfortunately, I know there's a cost to it but I think you have

10  to set a new record date for the unsecureds.

11          MR. BUTLER:  Your Honor, we intended to resolicit the

12  class in any event.  So it's -- we came to the Court with what

13  the, I think, plain language of 1127 says.  And I think it was

14  clear from our papers we're prepared to be guided by the Court

15  on what to do.  And we proposed, I think, even in our papers

16  that if the Court were to determine that there was a basis to

17  read 1127 as to requiring a new record date, that we set it a

18  June 9th --

19          THE COURT:  June 8th.  It just seems to me knowing --

20  having dealt with this issue before, it's going to be very

21  hard, if you don't set a new date, for the title holders to

22  track people down at this point.  And -- was there another

23  voting issue besides that at this point?

24          MR. BUTLER:  None that we had, Your Honor.

25          MR. ROSENBERG:  I think those are the voting issues,

1      Your Honor.

2              THE COURT:  All right.  On the disclosure statement,

3      I mean, no one has mentioned this.  Obviously this is less than

4      twenty-five days but I do have the authority to shorten the

5      time for the approval of a disclosure statement.

6              I'm happy to go through with you questions I have on

7      this that I think you probably need to address.  I think you

8      should come up with language first on this sale process and

9      dealing with Section 9.40.

10             By far, the most difficult thing to deal with is the

11     Class C interest.  I think you can go one of two ways there, I

12     think you have to say either that it's a complete black box and

13     we can make no assurances about anything.  Or you could say

14     based upon your review of the underlying agreements there's

15     some possibility of it being obtained.  It's hard for me to

16     know because I don't really know how it actually works.  I'm

17     assuming you have summarized this for the agent.  As

18     Mr. Bernstein said, they don't have the splits as between GM

19     and Parnassus but you've given some indication to the agent, in

20     a fairly schematic form, about what the lenders might expect

21     from a Class C interest.

22             MR. BUTLER:  Yes, Your Honor.  In fact, Parnassus met

23     with some of the DIP lenders directly on that point.

24             THE COURT:  Okay.  So --

25             MR. BUTLER:  But I would just indicate, Your Honor,

1    that there is some additional information that I think is going

2    to be forthcoming to the agent.  Your Honor, the order was

3    entered yesterday, late afternoon, in preparing this hearing

4    but there will be more information forthcoming.

5             THE COURT:  But what I'm saying is, it seems to me

6    that -- I don't know if you can provide an even more concise

7    summary of that for the disclosure statement.  But if you're

8    not going to go the route of this is a complete black box then

9    I think that's where you need to go.

10             MR. BUTLER:  Okay.

11             THE COURT:  I found confusing, and again most people

12    just look at the chart, I found confusing the statement in the

13    chart that talks about defined benefit plans.

14             MR. BUTLER:  Page number, please?

15             THE COURT:  S(IX) that says "Upon consummation of the

16    modified plan, the remaining assets and liabilities of Delphi's

17    of hourly pension plan will no longer be the responsibility of

18    the debtors and will be addressed by GM."  It's not clear to me

19    what that -- does that mean picked up by GM?  Addressed is a

20    pretty affirmative word to me.  It doesn't equal assume but it

21    does somehow suggest that there's responsibility there for it.

22             And then, of course right after that, it talks about

23    the salaried pension being involuntarily terminated and that

24    there'll be a negotiated settlement including an allowed

25    unsecured prepetition claim.  That's clear, I don't have a

147

1      problem with that, it's the first part.

2             MR. BUTLER:  The word address, Your Honor, is the

3      word that the Treasury and GM have given us.

4             THE COURT:  All right.

5             MR. BUTLER:  And so I don't have any other word to

6      describe it unless I'm given another word.  I'm being very

7      candid with the Court.

8             THE COURT:  Well, I guess you could say we don't know

9      what this means.  I think you need to say something like this

10     is what we've been told by GM and the Treasury.

11            MR. BUTLER:  Okay.

12            THE COURT:  We don't know more then that.

13            MR. BUTLER:  Okay.

14            THE COURT:  We've talked about the Class C, which is

15     on the next page, S-X it's referred to.  I think when you say

16     unsecured creditors, I think Mr. Fox made this point, I think

17     when you say pro rata share you need to say with the PBGC.

18            MR. BUTLER:  Okay.

19            THE COURT:  The cash payment, this is now S-XX, the

20     cash payment of thirty million to the PBGC, it's not clear

21     where that's coming from.  Is that coming from the deal?

22            MR. BUTLER:  The settlement agreement is supposed to

23     indicate that, Your Honor.

24            THE COURT:  All right.

25            MR. BUTLER:  Which is supposed to be filed by the

148

1    exhibit filing date.

2         THE COURT:  Okay.  Well maybe you should say from a

3    source to be subsequently disclosed.

4         THE COURT:  On page S-XXIV, the third paragraph on

5    the bottom.  The last line says, "Distributions to the general

6    unsecured creditors and the PBGC are in satisfaction of GM's

7    obligations under Section 4.04 of the amended GSA".  Is this

8    referring to the settlement, the carve-out that was negotiated

9    a few months ago?

10        MR. BUTLER:  Yes, because that carve-out -- just to

11   be clear, the carve-out was pursuant to an administrative claim

12   that's being waived --

13        THE COURT:  Right.

14        MR. BUTLER:  -- in its entirety.

15        THE COURT:  I think you should spell that out a

16   little more.

17        MR. BUTLER:  Okay.

18        THE COURT:  Because that was an important point for

19   the committee and for the unsecureds.  If you want you can say

20   something to the effect that if your belief that if GM wouldn't

21   recover anything on its administrative claim anyway so the

22   carve-out's meaningless.  I don't know if that's what you

23   believe or not but if you want to put some value on it and say

24   that this is a fair settlement it would make it more effective

25   as a settlement in a plan because people would have notice of

1    what the settlement's about.

2          MR. BUTLER:  But the point is on the plan GM waived

3    the claims so there's no recovery, just to be clear.

4          THE COURT:  I understand but what's happening --

5    that's why I said what I said about the analysis of it.  If

6    they didn't waive the claim an unsecured creditor might think

7    well, I might do better with them not waiving the claim because

8    I get up to 300 million dollars from it.  Maybe the debtors

9    have analyzed that and said well if they didn't waive the claim

10   you wouldn't get anything because they wouldn't get anything.

11   I'm just throwing that out; I don't know if that's true.  I

12   don't know if that is the debtor's analysis of it.  But you see

13   what I'm saying?  In terms of analyzing --

14         MR. BUTLER:  I don't know that we've done an analysis

15   of alternative deals and transactions in that respect.

16         THE COURT:  Okay.  Well, but I'm assuming that when

17   it says it's in -- okay.  I guess what I'm asking you to say is

18   what is the basis for saying it's in satisfaction?  If you want

19   this to be -- to have some meaning at the confirmation hearing,

20   in terms of this plan satisfies this as a settlement or as --

21         MR. BUTLER:  It may very well be that that word

22   satisfied has to come out.

23         THE COURT:  Okay.  It wasn't clear to me, from the

24   NDA, and therefore it's not clear to me on page S-XXVI, that

25   other than administrative claims that are paid in the ordinary

150

1    course, and the debtors have been very clear that they're

2    continuing to pay administrative claims in the ordinary course.

3    I'm assuming that that's one of the reasons that Mr. Mears

4    withdrew his client's objection.  What other administrative

5    claims are being paid and what other administrative claims are

6    not being paid?  From the NDA you get the impression that some

7    are being paid and some aren't.

8           And S-XXVI says "Estimated amount of claims to be

9    paid on the effective date," it doesn't say estimated allowed

10   amount of claims.  So it's not clear to me whether this is a

11   smaller universe then the allowed --

12          MR. BUTLER:  This is a much smaller universe.

13          THE COURT:  Okay.  So maybe you should put that in.

14          MR. BUTLER:  The amount to be paid on the effective

15   date is a fraction of the administrative claims.

16          THE COURT:  So you should probably make that clear.

17   And this is separate and apart from the DIP claims, obviously,

18   because that's dealt with elsewhere.

19          I think you need to say something -- I know you have

20   a risk section but on S-XLVII, which is the carryover

21   description of administrative claims, unless you do cover it

22   more in the risk section or have a cross reference to the risk

23   section there's the implication here that there will either be

24   an agreement to this payment of the DIP amount or it will be

25   paid as determined by the Court.  There is an alternative here

1    which is that the Court will say, no you can't do it this way.

2    And I think you need to highlight the DIP lenders position on

3    this point, which is that you can't sell free and clear and

4    happen to be paid less than full.  You could say that's their

5    position.

6            You've not set this up in a way, and I've drawn a

7    blank on Judge Bernstein's case, that would basically say to

8    the admin creditors you're getting this unless you object.  I

9    think you could do that under the case law in this district but

10   you haven't done that.  So I think you need to highlight that

11   there is this open issue.

12           Since the fundamental issue here is tied into the

13   NDA, I think that it would be helpful to a voting creditor to

14   have some more information about Parnassus and Platinum,

15   including what Mr. Harris told us today, which is that they've

16   spent a lot of time on this deal and they intend to continue

17   this business as a going concern.  And also, I didn't see the

18   equity backstop by Platinum.  I think we need to have some

19   assurance that there really is a real company as opposed to an

20   acquisition vehicle.

21           MR. BUTLER:  Yeah.  It exists.

22           THE COURT:  I did have this question, which appears

23   in the key section of the NDA, the purchase and sale agreement.

24   In every context there's this phrase, as modified or

25   supplemented by any applicable transfer agreement.  I think you

152

1    should clarify whether those are viewed to provide material

2    modifications that would go to the consideration that creditors

3    are supposed to receive here.

4            And on 25 there's this issue about the right to

5    settle but --

6            MR. BUTLER:  I'm sorry?

7            THE COURT:  On page 25 of the NDA it wasn't clear to

8    me who had the right to settle a litigation.  And I think there

9    probably should be something in there, not for the benefit of

10   the defendants in Delphi vs. Appaloosa but for voters as to --

11   that the parties intend that litigation would be pursued

12   vigorously or funded appropriately or something like that.

13           The excluded facilities, is that something that's

14   still to be decided?

15           MR. BUTLER:  No, Your Honor.

16           THE COURT:  Okay.  So maybe that --

17           MR. BUTLER:  That's on a schedule, I believe.

18           THE COURT:  Okay.

19           MR. BUTLER:  And that's what stays in the DPH

20   Holdings.

21           THE COURT:  Okay.  All right.  This wasn't -- on page

22   36, 2.7 deals with -- it's headed allocation among buyers.  And

23   it says, "To the extent it is unclear whether a particular

24   asset or liability should be considered a GM acquired asset or

25   a company acquired asset, i.e. a Parnassus asset, where GM

153

1    assumed liability or a company assumed liability as the case

2    may be.  Such allocation the parties will work together in good

3    faith to reasonably allocate."

4          It's not clear to me whether that means GM and

5    Parnassus or GM, Delphi and Parnassus.  Although later on it

6    does refer to something being mutually agreed upon between

7    company buyers and GM buyers.  And again, if you're going to

8    have a carried interest in the Parnassus piece of this, I think

9    that you need to know who's doing this allocation.  And

10   obviously if it's -- it would seem to me that the debtor should

11   be involved in it to make sure that it really is a fair

12   allocation.

13         9.2.3 on page 64, this -- maybe I'm just reading this

14   wrong but it refers to what happens in the alternative 363

15   sale.  And then it says, "Provided, however, that the amounts

16   payable under Section 2.3.3 of this agreement shall not be

17   included in the consideration."

18         MR. BUTLER:  Right.  That's the consideration of the

19   creditors, Your Honor.

20         THE COURT:  I just don't think it's the right cross

21   reference.

22         MR. BUTLER:  Maybe it's not the right cross

23   reference?

24         THE COURT:  Yeah.  That refers to the retained plans.

25         MR. BUTLER:  I know that people were trying to clean

154

1    up the references here.

2              THE COURT:  Yeah.  It's on page 33.

3              MR. BUTLER:  That's correct, Your Honor.  We'll clean

4    it up.

5              THE COURT:  Okay.

6              MR. BUTLER:  It should be 3.2.3, I believe.

7              THE COURT:  Okay.

8              MR. BUTLER:  It's 3.2.3.

9              THE COURT:  And I just want to make sure, again, that

10   the language in the summary on the pension plans is consistent

11   with the language on page 69, particularly in (e) on 69.  I

12   think it is but again maybe I was thrown off by the word

13   addressed.

14        (Pause)

15             THE COURT:  The closing of this agreement, the drop

16   dead date is September 30th, although there's a potential

17   extension.  And it wasn't clear to me what happens with the

18   financing between the -- what I've approved today and that

19   date.

20             MR. BUTLER:  Your Honor, the -- that is the outside

21   drop dead date under this agreement.

22             THE COURT:  Right.

23             MR. BUTLER:  The targeted closing date is July 31st.

24   and there's not much financing in the company to go beyond that

25   time.

155

1          THE COURT:  Okay.  Well, I think that's maybe worth

2     pointing out.  That the parties to the agreement, all of them,

3     intend to close on that date because obviously the other

4     parties could have you all under a barrel if they stretch it

5     out.  And then you -- I guess Mr. Tanenbaum answered my

6     question that the termination of July 15th was for the GM

7     Bankruptcy Court approval of GM's entry.

8          MR. BUTLER:  Right.

9          THE COURT:  And you already have a date for that.  So

10    I don't think -- I guess you could put in the disclosure

11    statement that that hearing's been scheduled for that date.

12         MR. BUTLER:  Okay.  So Your Honor, subject to

13    addressing the comments you've just given us and addressing

14    with -- working with Mr. Rosenberg on adding different

15    procedures between now and -- supplemental procedures between

16    now and July 23rd, and the rulings you've made on 1127 and a

17    couple of the other matters, are there any other matters that

18    Your Honor believe need to be addressed or you prefer to rule

19    on the motion?

20         THE COURT:  Before I hear from -- I'll hear from

21    Mr. Rosenberg on this, but there was a point -- I think you've

22    addressed this, about the committee being able to express its

23    view and you changed that around slightly.

24         MR. BUTLER:  We don't have any problem with the

25    committee putting a letter in here and addressing their view.

156

1          THE COURT:  Okay.  Is there anything else?

2          MR. ROSENBERG: No.  That resolved one of three issues

3    I wanted to raise, Your Honor.

4          THE COURT:  Okay.

5          MR. ROSENBERG:  And I think Mr. Bernstein wants to me

6    raise a fourth, I'm going to have to ask him what that is.

7    Before I get to that, I would request that Your Honor direct

8    that the disclosure statement include, in chart form, something

9    that shows that at zero recovery to the unsecured creditors,

10   Platinum has gotten out X and GM has gotten out Y at 100

11   million, at 180 million where the committee has capped out to

12   show the limitations here, notwithstanding the massive profits

13   that would be earned at that point.  I think it's highly

14   relevant to --

15         THE COURT:  No, I think -- it seems to me what should

16   be disclosed is what is necessary to get money to the

17   unsecured, not what the other guys are getting.  You can object

18   to the deal on the basis that other guys are getting more.

19         MR. ROSENBERG:  Okay.

20         THE COURT:  But I just -- I think it's what you're

21   getting that really counts.

22         MR. ROSENBERG:  Okay.

23         THE COURT:  As opposed to what the other guy is

24   getting.  I just -- I think it's -- you're going to get people,

25   no matter what, who just vote no because they're angry.  But I

1  think rationally people should look at what they're getting and

2  the odds -- the likelihood -- what it will take to get to that.

3  And again, it's not clear to me whether the debtor's going to

4  be able to say some projection of what it will take to get

5  that.  If not, then they'll have to say we don't know, we

6  cannot tell you whether you're going to get any.

7        MR. ROSENBERG:  It's clear, Your Honor, what it would

8  take to get to that.

9        THE COURT:  All right.  Well that, I think -- you

10  don't need to say what Platinum is getting but I think you need

11  to say what --

12        MR. ROSENBERG:  Okay.

13        THE COURT:  I think you need to say what the debtor's

14  getting.

15        MR. ROSENBERG:  Okay.  And you don't think it's

16  relevant to suggest that when the committee gets capped or the

17  unsecured creditors get capped and get no more, that Platinum

18  is getting X and GM's getting Y?

19        THE COURT:  Well that's implicit.  It's a cap and the

20  other guys own the company so they're going to get more.

21        MR. ROSENBERG:  Okay.

22        THE COURT:  As far as the disclosure statement is

23  concerned, I guess your letter can say what your letter says.

24        MR. ROSENBERG:  Our letter can say all that.  Yes,

25  sir.

158

1           THE COURT:  But I think it's the disclosure statement

2     that focuses really on what creditors are getting.

3           MR. ROSENBERG:  Okay.  My next point is that I would

4     like to ask Mr. Butler, on the record, whether he's going to

5     insist on filing an objection before we start discovery.

6           MR. BUTLER:  That's been the procedure in these cases

7     all along.  I'm not going to waive the process of these cases.

8           MR. ROSENBERG:  Okay.

9           THE COURT:  We're on a short timeline so I think it's

10    probably better to do that.

11          MR. ROSENBERG:  To?

12          THE COURT:  I mean, I think you know the basis for

13    your objection, you can modify it, I suppose.  New things come

14    up.

15          MR. ROSENBERG:  Okay.  Mr. Bernstein will make his

16    own point, Your Honor.  Thank you.

17          MR. BERNSTEIN:  Your Honor, I just want to comment, I

18    understand where we have ended up at this hearing.  But as we

19    go forward here we have a very short time, as you observe.  And

20    unless the debtor embraces the outcome of this hearing, it's

21    going to be very difficult for us to move forward because they

22    are in control of the very information that we spent a lot of

23    the hearing talking about.

24          I understand the debtor is in a difficult position

25    and frankly we sympathize with them because they're under great

159

1    pressure and they would also have other parties to deal with.

2    But at least we now know what the ground rules are and we'd

3    appreciate really an accelerated process here so we can get to

4    a conclusion quickly.  And the conclusion may be that there is

5    no other deal.  The conclusion may be that there are other

6    deals.  But one way or another, we want to accelerate that

7    process.

8         THE COURT:  I don't need to direct the debtor to

9    embrace it.  I think the debtor understands that they own the

10   land.

11        MR. BUTLER:  Your Honor, I think the record's been

12   very clear here that we have companies at all times faithfully

13   carried out the orders of this court.  And has worked, I think,

14   throughout this process with the DIP lenders, the DIP steering

15   committee on a cooperative basis and we'll continue to do so.

16        THE COURT:  Okay.  And again, I stand ready to deal

17   with you all on very short notice if you can't resolve it,

18   although I'm fairly comfortable you will resolve these issues.

19        Okay.  Let me go back to the GM agreements.  I'm

20   prepared to approve those based on the record of this hearing.

21   So that order will be entered.  I think you need to make a few

22   modifications to the black line you gave me this morning on the

23   other order.

24        MR. BUTLER:  On the modification order?

25        THE COURT:  Yeah.

160

1          MR. BUTLER:  Yes, we do.  We have to sit with

2     Mr. Rosenberg and work those out.

3          THE COURT:  Right.

4          MR. BUTLER:  So, yes.

5          THE COURT:  And I should have been there now but I'm

6     going to be up at the judicial conference, I'm going up there

7     shortly, so I'll be out of pocket for a while and I may not be

8     able to look at this, anyway, till tomorrow.  But I'm prepared

9     to approve the disclosure statement supplement, assuming the

10    changes are made that I've directed.  And you know the drill on

11    that, you can submit the black line to Court after you've made

12    them and I'll review them and tell you whether they're

13    compliant with what I said on the record and if they are then

14    I'll ask you to file it with the Court and then the order will

15    be entered.

16         And the solicitation issues, you have a couple minor

17    changes there to make but otherwise that looked fine to me.

18         MR. BUTLER:  Thank you very much, Your Honor.

19         MR. TANENBAUM: Your Honor, I just have one comment.

20         THE COURT:  I just want to make sure you're picked up

21    on the transcript, Mr. Tanenbaum.

22         MR. TANENBAUM:  I understand you just approved the

23    LSA motion but till we see the order and understand how --

24         THE COURT:  I understand.  I think what I've directed

25    here is reasonable though, for GM.  I don't think that --

161

1          MR. TANENBAUM:  I might say one thing for the record,

2   and I wasn't going to get into.  We have an agreement with

3   Platinum that we may need to work through to accommodate some

4   of the items that you've addressed.  So there's no guarantee

5   that --

6          THE COURT:  I understand.  I understand.  Okay.

7   Anything else?  No?  All right.  Thank you.

8          ALL:  Thank you, Your Honor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

162

```
 1
 2                        I N D E X
 3
 4                      E X H I B I T S
 5     DEBTOR'S  DESCRIPTION                    PAGE
 6     1         Declaration of Keith          13
 7               Stipp
 8     2, 3, 4   Documents relating            13
 9               to the Supplement
10               to the GM Arrangement
11               to the Fourth and Fifth
12               Amendment
13     5, 6, 7, 8 Presentation                  13
14               Materials
15     11        Proposed Order                13
16
17                        RULINGS
18                    Page    Line
19     Preliminary Approval of   23      1
20     Supplement to GM
21     Arrangement
22     GM Agreements, Approved   159     21
23
24
25
```

163

1

2                          C E R T I F I C A T I O N

3

4       I, Dena Page, court approved transcriber, certify that the

5    foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8

9    _____ __6/12/2009_____

10   Signature of Transcriber              Date

11

12   _Dena Page_____

13   typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25