**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
### DELPHI CORPORATION AND CERTAIN AFFILIATES,
### DEBTORS AND DEBTORS-IN-POSSESSION
### (AS MODIFIED)

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Toll Free: (800) 718-5305
International: (248) 813-2698
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
(248) 813-2000
David M. Sherbin
Sean P. Corcoran
Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated:        December 10, 2007

As Modified:  January 25, 2008
             June 16, 2009
             New York, New York

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME .................................................................................................4

A.    Scope Of Definitions..............................................................................................4
B.    Definitions...............................................................................................................4
1.1    "503 Deadline"...............................................................................................4
1.2    "Administrative Claim" ................................................................................4
1.3    "Administrative Claims Bar Date".............................................................4
1.4    "ADR Procedures" ........................................................................................4
1.5    "Affiliate Debtors" ........................................................................................4
1.6    "Affiliates" .....................................................................................................5
1.7    "Allowed Claim".............................................................................................5
1.8    "Allowed Class . . . Claim" or "Allowed Class . . . Interest" .................5
1.9    "Allowed Interest" ........................................................................................5
1.10    "Article 9 Notice" ........................................................................................5
1.11    "Article 9 Objection Deadline" .................................................................6
1.12    "Avoidance Claims".......................................................................................6
1.13    "Ballot" ..........................................................................................................6
1.14    "Bankruptcy Code".........................................................................................6
1.15    "Bankruptcy Court" .....................................................................................6
1.16    "Bankruptcy Rules" .....................................................................................6
1.17    "Bar Date" .....................................................................................................6
1.18    "Bar Date Order"...........................................................................................6
1.19    "Beneficiaries" ..............................................................................................6
1.20    "Business Day" ..............................................................................................6
1.21    "Buyers" .........................................................................................................6
1.22    "Cash" .............................................................................................................6
1.23    "Cash Reserve" ..............................................................................................7
1.24    "Causes of Action".........................................................................................7
1.25    "Certificate" ...................................................................................................7
1.26    "Certificate of Incorporation and Bylaws" .............................................7
1.27    "Chapter 11 Cases" .......................................................................................7
1.28    "Claim" ...........................................................................................................7
1.29    "Claims Agent" ..............................................................................................7
1.30    "Claims/Interests Objection Deadline" ....................................................7
1.31    "Class"..............................................................................................................7
1.32    "Confirmation Date" .....................................................................................7
1.33    "Confirmation Hearing" ..............................................................................7
1.34    "Confirmation Order" ...................................................................................7
1.35    "Connection Systems Debtors"....................................................................8
1.36    "Contingent PBGC Secured Claim" ..........................................................8
1.37    "Continuing Indemnification Rights" .......................................................8
1.38    "Controlled Affiliate".....................................................................................8
1.39    "Creditors' Committee"..................................................................................8
1.40    "Cure" .............................................................................................................8
1.41    "Cure Amount Notice".....................................................................................8

i

| | | |
|---|---|---|
| 1.42 | "Cure Amount Proposal" | 8 |
| 1.43 | "DASHI Debtors" | 9 |
| 1.44 | "Debtor" | 9 |
| 1.45 | "Debtors" | 9 |
| 1.46 | "Delphi" | 9 |
| 1.47 | "Delphi-DAS Debtors" | 9 |
| 1.48 | "Delphi-GM Arrangement" | 9 |
| 1.49 | "Delphi-GM Definitive Documents" | 9 |
| 1.50 | "Delphi-GM Global Settlement Agreement" | 9 |
| 1.51 | "Delphi-GM Master Restructuring Agreement" | 9 |
| 1.52 | "Delphi HRP" | 9 |
| 1.53 | "Delphi-PBGC Settlement Agreement" | 9 |
| 1.54 | "DIP Accommodation Agreement" | 10 |
| 1.55 | "DIP Accommodation Agreement Order" | 10 |
| 1.56 | "DIP Agent" | 10 |
| 1.57 | "DIP Claims" | 10 |
| 1.58 | "DIP Credit Agreement" | 10 |
| 1.59 | "DIP Facility" | 10 |
| 1.60 | "DIP Facility First Priority Term Claim" | 10 |
| 1.61 | "DIP Facility Order" | 10 |
| 1.62 | "DIP Facility Revolver Claim" | 10 |
| 1.63 | "DIP Facility Second Priority Term Claim" | 11 |
| 1.64 | "DIP Lenders" | 11 |
| 1.65 | "DIP Lenders Steering Committee" | 11 |
| 1.66 | "DIP Loan Documents" | 11 |
| 1.67 | "DIP Priority Payment Amount" | 11 |
| 1.68 | "DIP Transfer" | 11 |
| 1.69 | "Disallowed Claim" | 11 |
| 1.70 | "Disallowed Interest" | 11 |
| 1.71 | "Disbursing Agent" | 12 |
| 1.72 | "Disclosure Statement" | 12 |
| 1.73 | "Disposition Transactions" | 12 |
| 1.74 | "Disputed Claim" or "Disputed Interest" | 12 |
| 1.75 | "Distribution Date" | 12 |
| 1.76 | "Distribution Reserve" | 12 |
| 1.77 | "Effective Date" | 12 |
| 1.78 | "Emergence Capital" | 12 |
| 1.79 | "Employee-Related Obligation" | 12 |
| 1.80 | "Equity Committee" | 12 |
| 1.81 | "ERISA" | 12 |
| 1.82 | "ERISA Plaintiffs" | 13 |
| 1.83 | "ERISA Settlement" | 13 |
| 1.84 | "Estates" | 13 |
| 1.85 | "Exchange Act" | 13 |
| 1.86 | "Exhibit" | 13 |
| 1.87 | "Exhibit Filing Date" | 13 |
| 1.88 | "Existing Common Stock" | 13 |
| 1.89 | "Existing Securities" | 13 |

1.90    "Face Amount" ................................................................................13
1.91    "Final Modification Hearing" ..........................................................13
1.92    "Final Order" ...................................................................................13
1.93    "Flow-Through Claim" .....................................................................14
1.94    "General Unsecured Claim" ..............................................................14
1.95    "General Unsecured MDA Distribution" ...........................................14
1.96    "GM" ................................................................................................14
1.97    "GM Acquired Assets" .....................................................................14
1.98    "GM 414(l) Administrative Claim" ...................................................14
1.99    "GM Administrative Claim" ..............................................................14
1.100   "GM Arrangement Administrative Claim" .........................................14
1.101   "GM Assumed Contracts" .................................................................14
1.102   "GM Assumed Liabilities" ................................................................14
1.103   "GM Buyer(s)" ..................................................................................14
1.104   "GM Unsecured Claim" .....................................................................14
1.105   "Holdback Amount" ..........................................................................15
1.106   "Holdback Escrow Account" .............................................................15
1.107   "IAM" ...............................................................................................15
1.108   "IAM Memorandum of Understanding" .............................................15
1.109   "IBEW" .............................................................................................15
1.110   "IBEW E&S Memorandum of Understanding" ..................................15
1.111   "IBEW Powertrain Memorandum of Understanding" .........................15
1.112   "Impaired" ........................................................................................15
1.113   "Indemnification Rights" ..................................................................15
1.114   "Indemnitee" .....................................................................................15
1.115   "Indenture Trustees" .........................................................................16
1.116   "Indentures" ......................................................................................16
1.117   "Insurance Coverage" .......................................................................16
1.118   "Insurance Settlement" ......................................................................16
1.119   "Intercompany Claim" .......................................................................16
1.120   "Intercompany Executory Contract" ..................................................16
1.121   "Intercompany Unexpired Lease" ......................................................16
1.122   "Interest" ...........................................................................................16
1.123   "Investment Agreement" ...................................................................16
1.124   "IRC" ................................................................................................16
1.125   "IRC Section 414(l) Transfer" ..........................................................16
1.126   "IUE-CWA" ......................................................................................16
1.127   "IUE-CWA 1113/114 Settlement Approval Order" ...........................16
1.128   "IUE-CWA Benefit Guarantee" .........................................................17
1.129   "IUE-CWA Benefit Guarantee Term Sheet" .....................................17
1.130   "IUE-CWA-Delphi-GM Memorandum of Understanding" .................17
1.131   "IUOE" ..............................................................................................17
1.132   "IUOE Local 18S Memorandum of Understanding" ...........................17
1.133   "IUOE Local 101S Memorandum of Understanding" .........................17
1.134   "IUOE Local 832S Memorandum of Understanding" .........................17
1.135   "IUOE-IBEW-IAM OPEB Term Sheet" ...........................................17
1.136   "IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order" .........18
1.137   "Lead Plaintiffs" ...............................................................................18

1.138 "Management Compensation Plan" .................................................................18
1.139 "Master Disposition Agreement" ..................................................................18
1.140 "Material Supply Agreement" .......................................................................18
1.141 "MDA Assumption And Assignment Notice" ...........................................18
1.142 "MDL Actions" ..............................................................................................18
1.143 "MDL Court" .................................................................................................18
1.144 "MDL Settlements" .......................................................................................18
1.145 "Modification Approval Date" .....................................................................18
1.146 "Modification Approval Order" ...................................................................19
1.147 "Modification Procedures Order" ................................................................19
1.148 "New Common Stock" ..................................................................................19
1.149 "Non-Represented Term Sheet" ..................................................................19
1.150 "Omitted Material Supply Agreement Objection Deadline" ....................19
1.151 "OPEB" ...........................................................................................................19
1.152 "Ordinary Course Professionals Order" .....................................................19
1.153 "Other Executory Contract" ........................................................................19
1.154 "Other Interests" ...........................................................................................19
1.155 "Other MDA Assumed Contracts" ..............................................................19
1.156 "Other Priority Claim" ..................................................................................19
1.157 "Other Unexpired Lease" ..............................................................................19
1.158 "Parnassus" ....................................................................................................19
1.159 "Parnassus Acquired Assets" .......................................................................19
1.160 "Parnassus Assumed Contracts" ..................................................................19
1.161 "Parnassus Assumed Liabilities" .................................................................20
1.162 "Parnassus Class C Interest" ........................................................................20
1.163 "PBGC" ...........................................................................................................20
1.164 "PBGC Claims" ..............................................................................................20
1.165 "PBGC General Unsecured Claim" ..............................................................20
1.166 "Pension Plans" ..............................................................................................20
1.167 "Periodic Distribution Date" ........................................................................20
1.168 "Person" ..........................................................................................................20
1.169 "Petition Date" ...............................................................................................20
1.170 "Plan" ..............................................................................................................21
1.171 "Plan Investors" .............................................................................................21
1.172 "Plan Objection Deadline" ............................................................................21
1.173 "Platinum" ......................................................................................................21
1.174 "Post-Confirmation Reorganized DPH Holdings Share Trust" ...............21
1.175 "Post-Confirmation Trust Agreement" .......................................................21
1.176 "Post-Confirmation Trust Plan Administrator" .........................................21
1.177 "Prepetition Employee-Related Obligation" ..............................................21
1.178 "Prepetition Employee-Related Obligations Bar Date" ............................21
1.179 "Priority Tax Claim" ......................................................................................21
1.180 "Pro Rata" .......................................................................................................22
1.181 "Professional" .................................................................................................22
1.182 "Professional Claim" ......................................................................................22
1.183 "Professional Fee Order" ...............................................................................22
1.184 "Reinstated" or "Reinstatement" .................................................................22
1.185 "Released Parties" ..........................................................................................22

iv

1.186  "Reorganized . . . " ...................................................................................................23
1.187  "Reorganized Debtor" or "Reorganized Debtors" ...............................................23
1.188  "Reorganized DPH Holdings" ............................................................................23
1.189  "Restructuring Debtors" .....................................................................................23
1.190  "Restructuring Transaction(s)" ..........................................................................23
1.191  "Restructuring Transaction Notice" ...................................................................23
1.192  "Retained Actions" .............................................................................................23
1.193  "Retained Assets" ...............................................................................................23
1.194  "Scheduled" ........................................................................................................23
1.195  "Schedules" .........................................................................................................23
1.196  "Section 510(b) Equity Claim" ..........................................................................24
1.197  "Section 510(b) ERISA Claim" .........................................................................24
1.198  "Section 510(b) Note Claim" .............................................................................24
1.199  "Section 510(b) Opt Out Claim" ........................................................................24
1.200  "Section 510(b) Opt Out Equity Claim" .............................................................24
1.201  "Section 510(b) Opt Out Note Claim" ................................................................24
1.202  "Secured Claim" .................................................................................................24
1.203  "Securities Act" ..................................................................................................24
1.204  "Securities Settlement" .......................................................................................24
1.205  "Security" ............................................................................................................24
1.206  "Security And Pledge Agreement" .....................................................................25
1.207  "Senior Notes" ....................................................................................................25
1.208  "Senior Notes Claim" .........................................................................................25
1.209  "Senior Notes Indenture" ...................................................................................25
1.210  "Senior Notes Indenture Trustee" ......................................................................25
1.211  "SERP" ...............................................................................................................25
1.212  "SERP Claim" .....................................................................................................25
1.213  "Servicer" ...........................................................................................................25
1.214  "Solicitation Procedures Order" .........................................................................25
1.215  "Specialty Electronics Debtors" .........................................................................25
1.216  "Statutory Committees" ......................................................................................25
1.217  "Subordinated Notes" .........................................................................................25
1.218  "Subordinated Notes Holder" .............................................................................25
1.219  "Subordinated Notes Indenture" .........................................................................25
1.220  "Subordinated Notes Indenture Trustee" ............................................................25
1.221  "Supplemental Distribution Account" .................................................................26
1.222  "Transferred Assets" ...........................................................................................26
1.223  "TOPrS" ..............................................................................................................26
1.224  "TOPrS Claim" ...................................................................................................26
1.225  "UAW" ................................................................................................................26
1.226  "UAW 1113/1114 Settlement Approval Order" ..................................................26
1.227  "UAW Benefit Guarantee" .................................................................................26
1.228  "UAW Benefit Guarantee Term Sheet" ..............................................................26
1.229  "UAW-Delphi-GM Memorandum of Understanding" .........................................26
1.230  "UCC" .................................................................................................................26
1.231  "Unimpaired" ......................................................................................................26
1.232  "Union Settlement Agreements" .........................................................................27
1.233  "Unions" ..............................................................................................................27

1.234    "USW" ...................................................................................27
1.235    "USW 1113/1114 Settlement Approval Order"..........................27
1.236    "USW Benefit Guarantee" .......................................................27
1.237    "USW Benefit Guarantee Term Sheet".....................................27
1.238    "USW-Delphi-GM Memoranda of Understanding" ...................27
1.239    "USW-Home Avenue Memorandum of Understanding" ............27
1.240    "USW-Vandalia Memorandum of Understanding" ...................27
1.241    "Voting Deadline".....................................................................27
C.      Rules Of Interpretation ...........................................................27
D.      Computation Of Time ..............................................................28
E.      References To Monetary Figures..............................................28
F.      Exhibits ....................................................................................28
ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS....................29
2.1     Administrative Claims ..............................................................29
2.2     Priority Tax Claims ..................................................................29
2.3     GM Administrative Claim. .......................................................30
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS .........................................30
3.1     The Debtors...............................................................................30
3.2     Classification Of Claims And Interests....................................30
ARTICLE IV IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS
IMPAIRED AND UNIMPAIRED BY THE PLAN.......................................................................31
4.1     Classes Of Claims That Are Unimpaired.................................31
4.2     Impaired Classes Of Claims And Interests. .............................32
ARTICLE V PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS .................32
5.1     Class 1A-1 and Class 6A-1 (Secured Claims) ..........................32
5.2     Class 1B through Class 12B (Flow-Through Claims) ...............33
5.3     Class 1C-1 through Class 12C-1 (General Unsecured Claims)................33
5.4     Class 1C-2 through Class 12C-2 (PBGC Claims) .....................33
5.5     Class 1D through Class 12D (GM Unsecured Claim).................33
5.6     Class 1E (Section 510(b) Note Claims).....................................33
5.7     Class 1F through Class 13F (Intercompany Claims) .................34
5.8     Class 1G-1 (Existing Common Stock).......................................34
5.9     Class 1G-2 (Section 510(b) Equity Claims) ..............................34
5.10    Class 1H and Class 8H (Section 510(b) ERISA Claims) ..........34
5.11    Class 1I (Other Interests) .........................................................34
5.12    Class 1J through Class 12J (Interests In Affiliate Debtors)......34
5.13    Class 1K through Class 12K (Other Priority Claims)................34
ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS
....................................................................................................................................................34
6.1     Impaired Classes Of Claims Entitled To Vote..........................34
6.2     Classes Deemed To Accept The Plan .......................................35
6.3     Acceptance By Impaired Classes..............................................35
6.4     Classes Deemed To Reject The Plan ........................................35
6.5     Prior Acceptances Or Rejections Of The Plan..........................35
6.6     Approval of Modifications Subject To Sections 1127 And 1129(b)
        Of The Bankruptcy Code ..........................................................35

ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN ........................................35
    7.1     Continued Corporate Existence ...............................................................35
    7.2     Substantive Consolidation .......................................................................36
    7.3     Restructuring Transactions. .....................................................................37
    7.4     Certificate Of Incorporation And Bylaws. ...............................................38
    7.5     Directors And Officers Of Reorganized DPH Holdings And
           Affiliate Debtors. ...................................................................................38
    7.6     Consummation Of Disposition Transactions .............................................38
    7.7     Master Disposition Agreement. ...............................................................38
    7.8     Transfer Of Collateral. ............................................................................39
    7.9     Post-Confirmation Reorganized DPH Holdings Share Trust .....................40
    7.10    Emergence Capital. .................................................................................41
    7.11    Management Compensation Plan. ............................................................41
    7.12    Procedures For Asserting Certain Claims ..................................................41
    7.13    Cancellation Of Existing Securities And Agreements ...............................42
    7.14    Sources of Cash For Plan Distributions ....................................................42
    7.15    Establishment Of A General Unsecured Distribution Account. .................42
    7.16    Collective Bargaining Agreements. .........................................................43
    7.17    Pension Matters And PBGC Settlement. ..................................................44
    7.18    Salaried OPEB Settlement ......................................................................45
    7.19    Preservation Of Causes Of Action ...........................................................45
    7.20    Reservation Of Rights .............................................................................45
    7.21    Exclusivity Period ..................................................................................45
    7.22    Dismissal Of Complaints. .......................................................................45
    7.23    Corporate Action ....................................................................................45
    7.24    Effectuating Documents; Further Transactions .........................................46
    7.25    Consummation Of Divestiture Transactions .............................................46
    7.26    Exemption From Certain Transfer Taxes And Recording Fees ..................46
ARTICLE VIII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ...........................46
    8.1     Assumed And Rejected Contracts And Leases ..........................................46
    8.2     Cure Procedures and Payments Related To Assumption Of
           Executory Contracts And Unexpired Leases ............................................47
    8.3     Assignment Pursuant To Restructuring Transaction. .................................52
    8.4     Rejection Damages Bar Date ...................................................................52
    8.5     Assumption and Assignment of Divestiture-Related Executory
           Contracts and Unexpired Leases. ............................................................52
ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS ...........................................53
    9.1     Time Of Distributions. ............................................................................53
    9.2     No Interest On Disputed Claims ...............................................................53
    9.3     Disbursing Agent. ...................................................................................53
    9.4     Surrender Of Securities Or Instruments ....................................................53
    9.5     Services Of Indenture Trustees, Agents, And Servicers .............................54
    9.6     Claims Administration Responsibility ......................................................54
    9.7     Delivery Of Distributions .......................................................................55
    9.8     Procedures For Treating And Resolving Disputed And Contingent
           Claims ...................................................................................................55
    9.9     Section 510(b) Opt Out Claims ...............................................................57
    9.10    Allocation Of Plan Distributions Between Principal And Interest. ............57

ARTICLE X ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE
CLAIMS ................................................................................................58
    10.1    DIP Facility Claims.................................................................58
    10.2    Pre-Confirmation Administrative Claim Procedures................58
    10.3    Professional Claims ...............................................................58
    10.4    Substantial Contribution Compensation And Expenses Bar Date............59
    10.5    Other Administrative Claims ..................................................59
ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ................................60
    11.1    Revesting Of Assets ...............................................................60
    11.2    Discharge Of The Debtors .....................................................60
    11.3    Compromises And Settlements...............................................60
    11.4    Release By Debtors Of Certain Parties....................................61
    11.5    Release By Holders Of Claims And Interests...........................61
    11.6    Release By Unions..................................................................62
    11.7    Release Of GM By Debtors And Third Parties. .......................62
    11.8    Reserved................................................................................62
    11.9    Setoffs ..................................................................................62
    11.10   Subordination Rights .............................................................62
    11.11   Exculpation And Limitation Of Liability ................................63
    11.12   Indemnification Obligations ..................................................64
    11.13   Exclusions And Limitations On Exculpation, Indemnification, And
           Releases................................................................................65
    11.14   Injunction ..............................................................................65
ARTICLE XII CONDITIONS PRECEDENT ........................................................................65
    12.1    Confirmation .........................................................................65
    12.2    Conditions To The Effective Date Of The Plan.......................65
    12.3    Waiver Of Conditions Precedent ...........................................66
ARTICLE XIII RETENTION OF JURISDICTION .................................................................66
ARTICLE XIV MISCELLANEOUS PROVISIONS ................................................................69
    14.1    Binding Effect.......................................................................69
    14.2    Payment Of Statutory Fees ....................................................69
    14.3    Modification And Amendments ..............................................69
    14.4    Reserved................................................................................69
    14.5    Withholding And Reporting Requirements ..............................69
    14.6    Committees ............................................................................69
    14.7    Revocation, Withdrawal, Or Non-Consummation....................70
    14.8    Notices ..................................................................................70
    14.9    Term Of Injunctions Or Stays................................................72
    14.10   Governing Law .....................................................................72
    14.11   No Waiver Or Estoppel..........................................................72
    14.12   Conflicts................................................................................72

## EXHIBITS

| | |
|---|---|
| **Exhibit 7.3** | **Restructuring Transactions Notice** |
| **Exhibit 7.4(a)** | **Certificate Of Incorporation For Reorganized DPH Holdings** |
| **Exhibit 7.4(b)** | **Bylaws Of Reorganized DPH Holdings** |
| **Exhibit 7.7** | **Master Disposition Agreement** |
| **Exhibit 7.9** | **Post-Confirmation Reorganized DPH Holdings Share Trust Agreement** |
| **Exhibit 7.11** | **Management Compensation Plan** |
| **Exhibit 7.17** | **Delphi-PBGC Settlement Agreement** |
| **Exhibit 7.19** | **Retained Causes Of Action** |
| **Exhibit 8.1(a)** | **Executory Contracts And Unexpired Leases To Be Rejected** |
| **Exhibit 10.5** | **Administrative Claim Request Form** |

## **INTRODUCTION**

Delphi Corporation and certain of its direct and indirect subsidiaries, debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 Cases, hereby propose this joint plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors.  Capitalized terms used herein shall have the meanings ascribed to them in Article I.B. of this Plan.

The subsidiaries of Delphi incorporated outside of the United States are not the subject of the Chapter 11 Cases.

These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  The distributions to be made to holders of Claims and Interests are set forth herein.

The Debtors' reorganization plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008, and the confirmation order became final on February 4, 2008.  The Debtors met the conditions required to consummate the plan, including obtaining $6.1 billion of exit financing, but on April 4, 2008, the Plan Investors delivered to Delphi a letter stating that such letter "constitutes a notice of immediate termination" of the Investment Agreement.  The financing the Debtors were to receive under the Investment Agreement was an integral element to the consummation of the Plan.  Appaloosa Management L.P.'s ("Appaloosa") April 4 letter alleged that Delphi had breached certain provisions of the Investment Agreement and that Appaloosa was entitled to terminate the Investment Agreement.  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their contractual obligations.  Nevertheless, the termination of the Investment Agreement resulted in the Debtors' inability to consummate the Plan without additional modifications.  The Debtors are now seeking approval of modifications to the Plan pursuant to section 1127 of the Bankruptcy Code.

This Plan provides for the substantive consolidation of certain of the Estates, but only for the purposes of voting and making distributions to holders of Claims under this Plan.  Under section 1127 of the Bankruptcy Code, as it incorporates section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to holders of Claims and Interests.  The Disclosure Statement Supplement (the "Supplement") relating to this Plan was approved by the Bankruptcy Court on June 16, 2009, and has been distributed simultaneously with this Plan to all parties whose votes are being solicited.  The Supplement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, and certain related matters.

1

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS PLAN AND THE SUPPLEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.


**PLEASE TAKE NOTICE THAT YOUR PREVIOUS ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  CONSEQUENTLY, YOUR VOTE ON THE MODIFICATIONS TO THE PLAN IS IMPORTANT.**


Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIV of this Plan, each of the Debtors expressly reserves its respective rights to alter, amend, modify, revoke, or withdraw this Plan with respect to such Debtor, one or more times, prior to this Plan's substantial consummation.


A complete list of the Debtors is set forth below.  The list identifies each Debtor by its case number in these Chapter 11 Cases.

## **THE DEBTORS**

- ASEC Manufacturing General Partnership, 05-44482

- ASEC Sales General Partnership, 05-44484

- Aspire, Inc, 05-44618

- Delco Electronics Overseas Corporation, 05-44610

- Delphi Automotive Systems (Holding), Inc., 05-44596

- Delphi Automotive Systems Global (Holding), Inc., 05-44636

- Delphi Automotive Systems Human Resources LLC, 05-44639

- Delphi Automotive Systems International, Inc., 05-44589

- Delphi Automotive Systems Korea, Inc., 05-44580

- Delphi Automotive Systems LLC, 05-44640

- Delphi Automotive Systems Overseas Corporation, 05-44593

- Delphi Automotive Systems Risk Management Corp., 05-44570

- Delphi Automotive Systems Services LLC, 05-44632

- Delphi Automotive Systems Tennessee, Inc., 05-44558

- Delphi Automotive Systems Thailand, Inc., 05-44586

- Delphi China LLC, 05-44577

- Delphi Connection Systems, 05-44624

- Delphi Corporation, 05-44481

- Delphi Diesel Systems Corp., 05-44612

- Delphi Electronics (Holding) LLC, 05-44547

- Delphi Foreign Sales Corporation, 05-44638

- Delphi Furukawa Wiring Systems LLC, 05-47452

- Delphi Integrated Service Solutions, Inc., 05-44623

- Delphi International Holdings Corp., 05-44591

- Delphi International Services, Inc., 05-44583

- Delphi Liquidation Holding Company, 05-44542

- Delphi LLC, 05-44615

- Delphi Mechatronic Systems, Inc., 05-44567

- Delphi Medical Systems Colorado Corporation, 05-44507

- Delphi Medical Systems Corporation, 05-44529

- Delphi Medical Systems Texas Corporation, 05-44511

- Delphi NY Holding Corporation, 05-44480

- Delphi Receivables LLC, 05-47459

- Delphi Services Holding Corporation, 05-44633

- Delphi Technologies, Inc., 05-44554

- DREAL, Inc., 05-44627

- Environmental Catalysts, LLC, 05-44503

- Exhaust Systems Corporation, 05-44573

- MobileAria, Inc., 05-47474

- Packard Hughes Interconnect Company, 05-44626

- Specialty Electronics International Ltd., 05-44536

- Specialty Electronics, Inc., 05-44539

## ARTICLE I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope Of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B. of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

1.1    **"503 Deadline"** has the meaning ascribed to it in Article 10.4 hereof.

1.2    **"Administrative Claim"** means a Claim (other than the GM Administrative Claim) for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, the DIP Facility Second Priority Term Claim, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

1.3    **"Administrative Claims Bar Date"** means the deadline for filing proofs of or requests for payment of Administrative Claims arising after June 1, 2009, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to Professional Claims, which shall be subject to the provisions of Article 10.3 hereof.

1.4    **"ADR Procedures"** means any alternative dispute resolution procedures approved by the Bankruptcy Court prior to the Effective Date, including, but not limited to, those approved in the Amended And Restated Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, entered June 26, 2007.

1.5    **"Affiliate Debtors"** means all the Debtors, other than Delphi.

**1.6** **"Affiliates"** has the meaning given such term by section 101(2) of the Bankruptcy Code.

**1.7** **"Allowed Claim"** means a Claim, or any portion thereof,

**(a)** that has been allowed by a Final Order of the Bankruptcy Court (or such other court or forum as the Reorganized Debtors and the holder of such Claim agree may adjudicate such Claim and objections thereto);

**(b)** as to which a proof of claim has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, or is allowed by any Final Order of the Bankruptcy Court or by other applicable non-bankruptcy law, but only to the extent that such claim is identified in such proof of claim in a liquidated and noncontingent amount, and either (i) no objection to its allowance has been filed, or is intended to be filed, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied by a Final Order;

**(c)** as to which no proof of claim has been filed with the Bankruptcy Court and (i) which is Scheduled as liquidated in an amount other than zero and not contingent or disputed, but solely to the extent of such liquidated amount and (ii) no objection to its allowance has been filed, or is intended to be filed, by the Debtors or the Reorganized Debtors, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court;

**(d)** that is expressly allowed in a liquidated amount in this Plan; or

**(e)** that is a Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim; provided that both the Bankruptcy Court and MDL Court shall have approved the MDL Settlements, except to the extent that any such Claim is or becomes a Section 510(b) Opt Out Claim.

**1.8** **"Allowed Class . . . Claim"** or **"Allowed Class . . . Interest"** means an Allowed Claim or an Allowed Interest in the specified Class.

**1.9** **"Allowed Interest"** means an Interest in any Debtor, which has been or hereafter is listed by such Debtor in its books and records as liquidated in an amount and not disputed or contingent; provided, however, that to the extent an Interest is a Disputed Interest, the determination of whether such Interest shall be allowed and/or the amount of any such Interest shall be determined, resolved, or adjudicated, as the case may be, in the manner in which such Interest would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced; and provided further, however, that proofs of Interest need not and should not be filed in the Bankruptcy Court with respect to any Interests; and provided further, however, that the Reorganized Debtors, in their discretion, may bring an objection or motion with respect to a Disputed Interest before the Bankruptcy Court for resolution.

**1.10** **"Article 9 Notice"** has the meaning ascribed in Article 7.8(b) of this Plan.

**1.11**    **"Article 9 Objection Deadline"** means that date provided for in the Article 9 Notice to object to the DIP Agent's acceptance of the Transferred Assets under section 9-620 of the UCC.

**1.12**    **"Avoidance Claims"** means Causes of Action or defenses arising under any of sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute such Causes of Action.

**1.13**    **"Ballot"** means each of the ballot forms that is distributed with the Disclosure Statement to holders of Claims and Interests included in Classes that are Impaired under this Plan and entitled to vote under Article VI of this Plan.

**1.14**    **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date.

**1.15**    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.16**    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.17**    **"Bar Date"** means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.  Except as explicitly provided in the Bar Date Order, the Bar Date was July 31, 2006.

**1.18**    **"Bar Date Order"** means the order entered by the Bankruptcy Court on April 12, 2006, which established the Bar Date, and any subsequent order supplementing such initial order or relating thereto.

**1.19**    **"Beneficiaries"** means those Holders of Claims that are to be satisfied under the Plan by post-Effective Date distributions to be made by Reorganized DPH Holdings at the direction of the Post-Confirmation Trust Plan Administrator.

**1.20**    **"Business Day"** means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**1.21**    **"Buyers"** means, collectively, GM Buyer and Parnassus.

**1.22**    **"Cash"** means legal tender of the United States of America and equivalents thereof.

6

**1.23**    **"Cash Reserve"** means the cash reserved, as determined by the Debtors or the Reorganized Debtors in their sole and absolute discretion, sufficient to pay Administrative Claims, Other Secured Claims, Priority Tax Claims, and as otherwise required by this Plan.

**1.24**    **"Causes of Action"** means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Claims, unless otherwise waived or released by the Debtors or the Reorganized Debtors to the extent such Cause of Action is a Cause of Action held by the Debtors or the Reorganized Debtors.

**1.25**    **"Certificate"** has the meaning ascribed to it in <u>Article 9.4</u> hereof.

**1.26**    **"Certificate of Incorporation and Bylaws"** means the Certificate of Incorporation and Bylaws (or other similar documents) of Reorganized DPH Holdings, in substantially the forms attached hereto as <u>Exhibit 7.4(a)</u> and <u>Exhibit 7.4(b)</u> respectively.

**1.27**    **"Chapter 11 Cases"** means the chapter 11 cases of the Debtors pending in the Bankruptcy Court and being jointly administered with one another under Case No. 05-44481, and the phrase "Chapter 11 Case" when used with reference to a particular Debtor means the particular case under chapter 11 of the Bankruptcy Code that such Debtor commenced in the Bankruptcy Court.

**1.28**    **"Claim"** means a claim against one of the Debtors (or all or some of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

**1.29**    **"Claims Agent"** means Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, Attention: Delphi Corporation.

**1.30**    **"Claims/Interests Objection Deadline"** means, as applicable (except for Administrative Claims), (a) the day that is the later of (i) the first Business Day that is at least 120 days after the Effective Date and (ii) as to proofs of claim filed after the Bar Date, the first Business Day that is at least 120 days after a Final Order is entered deeming the late filed claim to be treated as timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

**1.31**    **"Class"** means a category of holders of Claims or Interests as described in <u>Article III</u> of this Plan.

**1.32**    **"Confirmation Date"** means the date of entry of the Confirmation Order.

**1.33**    **"Confirmation Hearing"** means the hearing before the Bankruptcy Court commencing on January 17, 2008 held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters.

**1.34**    **"Confirmation Order"** means the order entered on January 25, 2008 by the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

**1.35    "Connection Systems Debtors"** means, collectively, Packard Hughes Interconnect Company and Delphi Connection Systems, as substantively consolidated for Plan purposes.

**1.36    "Contingent PBGC Secured Claim"** means any Claim of the PBGC asserted against the applicable Debtors or group of Debtors, which Claims were granted conditional adequate protection liens pursuant to, and in the priority and with the validity set forth in, the Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfer Of Repatriated Funds, dated May 29, 2008 (Docket No. 13694) and the Second Supplemental Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019 And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated July 30, 2008 (Docket No. 14005).

**1.37    "Continuing Indemnification Rights"** means those Indemnification Rights held by any Indemnitee who is a Released Party, together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date.

**1.38    "Controlled Affiliate"** means any Affiliate in which a Debtor (whether directly or indirectly and whether by ownership or share capital, the possession of voting power, contract or otherwise) has the power to appoint and/or remove the majority of the members of the board of directors or other governing body of such Affiliate or otherwise to direct or cause the direction of the affairs and policies of such Affiliate.

**1.39    "Creditors' Committee"** means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on October 17, 2005, as reconstituted from time to time.

**1.40    "Cure"** means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all undisputed, unpaid, and past due monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.41    "Cure Amount Notice"** means the notice of proposed Cure amount provided to counterparties to Material Supply Agreements pursuant to the Solicitation Procedures Order and the Confirmation Order, and such notices provided under the Modification Procedures Order.

**1.42    "Cure Amount Proposal"** has the meaning ascribed to it in Article 8.2 of this Plan.

**1.43    "DASHI Debtors"** means, collectively, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc., as substantively consolidated for Plan purposes.

**1.44    "Debtor"** means, individually, any of Delphi or the Affiliate Debtors.

**1.45    "Debtors"** means, collectively, Delphi and the Affiliate Debtors.

**1.46    "Delphi"** means Delphi Corporation, a Delaware corporation, debtor-in-possession in the above-captioned Case No. 05-44481 (RDD) pending in the Bankruptcy Court.

**1.47    "Delphi-DAS Debtors"** means, collectively, Delphi Corporation, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Global (Holdings), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Services LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi LLC, Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Tennessee, Inc., Delphi Technologies, Inc., Delphi Electronics (Holding) LLC, Delphi Liquidation Holding Company, DREAL, Inc., Environmental Catalysts, LLC, and Exhaust Systems Corporation, as substantively consolidated for Plan purposes.

**1.48    "Delphi-GM Arrangement"** means that certain agreement between the Debtors and GM, dated May 9, 2008, as subsequently amended, supplemented, or otherwise modified from time to time, pursuant to which GM agreed to make specified accommodations to enhance the Debtors' liquidity.

**1.49    "Delphi-GM Definitive Documents"** means the Delphi-GM Global Settlement Agreement, the Delphi-GM Master Restructuring Agreement, each as amended and supplemented, and all attachments and exhibits thereto.

**1.50    "Delphi-GM Global Settlement Agreement"** means that certain Amended and Restated Global Settlement Agreement between Delphi Corporation, on behalf of itself and certain subsidiaries and Affiliates, and General Motors Corporation, dated September 12, 2008 and September 25, 2008.

**1.51    "Delphi-GM Master Restructuring Agreement"** means that certain Amended and Restated Master Restructuring Agreement between Delphi Corporation and General Motors Corporation, dated September 12, 2008.

**1.52    "Delphi HRP"** means the Delphi Hourly-Rate Employees Pension Plan.

**1.53    "Delphi-PBGC Settlement Agreement"** means an agreement to be entered into between Delphi and the PBGC that provides for, among other things, resolution of the Debtors' Pension Plans and related Claims, if any, and attached hereto substantially in the form of Exhibit 7.17.

9

**1.54    "DIP Accommodation Agreement"** means that certain Accommodation Agreement, dated December 12, 2008, by and among the Debtors, the DIP Agent, and the requisite percentage of DIP Lenders, as amended and supplemented.

**1.55    "DIP Accommodation Agreement Order"** means, collectively, the Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, entered by the Bankruptcy Court on December 3, 2008 (Docket No. 14515), the Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With Certain Participating Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In Connection Therewith, entered by the Bankruptcy Court on February 25, 2009 (Docket No. 16377), and any and all other orders entered by the Bankruptcy Court authorizing and approving the amendments to the DIP Accommodation Agreement.

**1.56    "DIP Agent"** means the administrative agent for the DIP Lenders as defined in the DIP Credit Agreement.

**1.57    "DIP Claims"** means, collectively, the DIP Facility First Priority Term Claim, DIP Facility Revolver Claim, and DIP Facility Second Priority Term Claim.

**1.58    "DIP Credit Agreement"** means that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of May 9, 2008, by and among the Debtors, the DIP Agent, and the DIP Lenders, which was executed by the Debtors in connection with the DIP Facility, as amended, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith.

**1.59    "DIP Facility"** means the debtor-in-possession secured financing facility provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

**1.60    "DIP Facility First Priority Term Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $500 million term loan facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

**1.61    "DIP Facility Order"** means, collectively, (a) the interim order that was entered by the Bankruptcy Court on October 12, 2005, (b) the final order that was entered by the Bankruptcy Court on October 28, 2005, authorizing and approving the DIP Facility and the agreements related thereto, (c) the order that was entered by the Bankruptcy Court on January 5, 2007, authorizing the Debtors to refinance the DIP Facility, and (d) any and all orders entered by the Bankruptcy Court authorizing and approving the amendments to the DIP Credit Agreement.

**1.62    "DIP Facility Revolver Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $1.1 billion revolving lending facility, including, without limitation,

10

principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

        1.63    **"DIP Facility Second Priority Term Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $2.754 billion term loan facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

        1.64    **"DIP Lenders"** means the lenders and issuers from time to time party to the DIP Credit Agreement.

        1.65    **"DIP Lenders Steering Committee"** means the committee with members consisting of certain DIP Lenders with DIP Facility First Priority Term Claims, DIP Facility Revolver Claims, and DIP Facility Second Priority Term Claims.

        1.66    **"DIP Loan Documents"** means the DIP Facility together with the DIP Accommodation Agreement as authorized by the Bankruptcy Court pursuant to the DIP Accommodation Agreement Order, and all documents relating thereto.

        1.67    **"DIP Priority Payment Amount"** means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the closing date of the Master Disposition Agreement, in dollars: (i) all outstanding and unpaid fees and expenses then due under Section 10.05 of the DIP Credit Agreement (including any counsel and advisor fees payable under Section 10.05 of the DIP Credit Agreement); (ii) accrued and unpaid interest and fees then due on account of DIP Facility Revolver Claims and DIP Facility First Priority Term Claims; (iii) the DIP Facility Revolver Claims and DIP Facility First Priority Term Claims for then outstanding principal amounts; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Credit Agreement) that are not assumed liabilities under the Master Disposition Agreement for those Hedging Agreements (as defined in the DIP Credit Agreement) that are not assumed liabilities under the Master Disposition Agreement.

        1.68    **"DIP Transfer"** means the transfer or sale of the Transferred Assets as provided in <u>Article 7.8</u> of this Plan.

        1.69    **"Disallowed Claim"** means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

        1.70    **"Disallowed Interest"** means an Interest or any portion thereof that has been disallowed by a Final Order or a settlement.

**1.71**    **"Disbursing Agent"** means Reorganized DPH Holdings, or any Person designated by it, in its sole discretion, to serve as a disbursing agent under this Plan.

**1.72**    **"Disclosure Statement"** means the written disclosure statement or any supplements thereto (including the Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

**1.73**    **"Disposition Transactions"** means those transactions described in the Master Disposition Agreement and contemplated by the DIP Transfer.

**1.74**    **"Disputed Claim" or "Disputed Interest"** means a Claim or any portion thereof, or an Interest or an portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest, as the case may be.

**1.75**    **"Distribution Date"** means the date, selected by the Reorganized Debtors, upon which distributions to holders of Allowed Claims entitled to receive distributions under this Plan shall commence; provided, however, that the Distribution Date shall occur as soon as reasonably practicable after the Effective Date, but in any event no later than 30 days after the Effective Date.

**1.76**    **"Distribution Reserve"** means, as applicable, one or more reserves of property for distribution to holders of Allowed Claims in the Chapter 11 Cases to be reserved pending allowance of Disputed Claims in accordance with Article 9.8 of this Plan.

**1.77**    **"Effective Date"** means the Business Day determined by the Debtors on which all conditions to the consummation of this Plan set forth in Article 12.2 of this Plan have been either satisfied or waived as provided in Article 12.3 of this Plan and the day upon which this Plan is substantially consummated.

**1.78**    **"Emergence Capital"** means that certain amount to be provided to the Reorganized Debtors by GM pursuant to Sections 3.1.1, 3.1.3, 3.2.1, and 3.2.3 of the Master Disposition Agreement related to the post-Effective Date operations of Reorganized DPH Holdings and the Reorganized Debtors.

**1.79**    **"Employee-Related Obligation"** means a Claim of a salaried employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for (i) severance, provided, however, that such employee was in his or her capacity as an employee of a Debtor on or after June 1, 2009, and (ii) indemnification, provided, however, that such employee was in his or her capacity as an employee of a Debtor as of the date of the commencement of the hearing on the Disclosure Statement.

**1.80**    **"Equity Committee"** means the official committee of equity security holders that was appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on April 28, 2006 and disbanded on April 24, 2009.

**1.81**    **"ERISA"** means Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 and 26 U.S.C. §§ 401-420, as amended.

**1.82    "ERISA Plaintiffs"** means, collectively, Gregory Bartell, Thomas Kessler, Neal Folck, Donald McEvoy, Irene Polito, and Kimberly Chase-Orr on behalf of participants in the Debtors and their subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, as styled in the MDL Actions.

**1.83    "ERISA Settlement"** means that certain settlement of the ERISA-related MDL Actions, as it may be amended or modified.

**1.84    "Estates"** means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.85    "Exchange Act"** means the Securities Exchange Act of 1934, as now in effect or hereafter amended.

**1.86    "Exhibit"** means an exhibit annexed either to this Plan or as an appendix to the Disclosure Statement.

**1.87    "Exhibit Filing Date"** means the date on which Exhibits to this Plan or the Disclosure Statement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice.

**1.88    "Existing Common Stock"** means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

**1.89    "Existing Securities"** means, collectively, the Senior Notes, the Subordinated Notes, and the Existing Common Stock.

**1.90    "Face Amount"** means, (a) when used in reference to a Disputed or Disallowed Claim, the full stated liquidated amount claimed by the holder of a Claim in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (b) when used in reference to an Allowed Claim, the allowed amount of such Claim, and (c) when used in reference to a TOPrS Claim, $0.

**1.91    "Final Modification Hearing"** means the final hearing before the Bankruptcy Court held under section 1127 of the Bankruptcy Code to consider modification of this Plan and related matters.

**1.92    "Final Order"** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

13

**1.93    "Flow-Through Claim"** means a claim arising from an Employee-Related Obligation; provided, however, that all Estate Causes of Action and defenses to any Flow-Through Claim shall be fully preserved.

**1.94    "General Unsecured Claim"** means any Claim, including a Senior Note Claim, TOPrS Claim or a SERP Claim, that is not otherwise an Administrative Claim, Priority Tax Claim, GM Administrative Claim, Secured Claim, Contingent PBGC Secured Claim, Flow-Through Claim, GM Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

**1.95    "General Unsecured MDA Distribution"** means, if and to the extent Parnassus makes distributions to its members (which for the avoidance of doubt do not include the 8% preferred return payable to holders of Parnassus Class C Interests) in excess of $7.2 billion, an amount equal to $3 dollars for every $97 dollars so distributed in excess of $7.2 billion; provided, however, that in no event shall the General Unsecured MDA Distribution exceed $180,000,000 in the aggregate.

**1.96    "GM"** means General Motors Corporation.

**1.97    "GM Acquired Assets"** has the meaning set forth in the Master Disposition Agreement.

**1.98    "GM 414(l) Administrative Claim"** means the claim of GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in section 2.03(c) of the Delphi-GM Global Settlement Agreement of no more in the aggregate than $2.055 billion.

**1.99    "GM Administrative Claim"** means the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim.

**1.100    "GM Arrangement Administrative Claim"** means the claim of GM under the Delphi-GM Arrangement.

**1.101    "GM Assumed Contracts"** means those prepetition executory contracts and/or unexpired leases acquired by GM under the terms of the Master Disposition Agreement.

**1.102    "GM Assumed Liabilities"** means liabilities assumed by GM under the terms of the Master Disposition Agreement.

**1.103    "GM Buyer(s)"** has the meaning set forth in the Master Disposition Agreement.

**1.104    "GM Unsecured Claim"** means any Claim of GM, excluding the GM Administrative Claim and all other Claims and amounts to be treated pursuant to the Master Disposition Agreement (or any agreements ancillary to the Master Disposition Agreement) or the Delphi-GM Global Settlement Agreement, but shall otherwise include all claims asserted in GM's proof of claim, which was allowed in the amount of $2.5 billion upon the effectiveness of the Delphi-GM Global Settlement Agreement.

14

**1.105    "Holdback Amount"** means the amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order.

**1.106    "Holdback Escrow Account"** means the escrow account into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**1.107    "IAM"** means the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78.

**1.108    "IAM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IAM, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.109    "IBEW"** means the International Brotherhood of Electrical Workers and its Local 663.

**1.110    "IBEW E&S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IBEW and its Local 663 relating to Delphi Electronics and Safety, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.111    "IBEW Powertrain Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IBEW and its Local 663 relating to Delphi Powertrain, Delphi, and GM, and all attachment and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.112    "Impaired"** refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.113    "Indemnification Rights"** means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.

**1.114    "Indemnitee"** means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights.

15

**1.115    "Indenture Trustees"** means the Senior Notes Indenture Trustee and the Subordinated Notes Indenture Trustee.

**1.116    "Indentures"** means the Senior Notes Indenture and the Subordinated Notes Indenture.

**1.117    "Insurance Coverage"** has the meaning ascribed to it in <u>Article 11.12</u> of this Plan.

**1.118    "Insurance Settlement"** means that certain agreement among Delphi, certain insured officers and directors, and certain insurance carriers resolving certain insurance claims related to the MDL Actions, as it may be amended or modified.

**1.119    "Intercompany Claim"** means a Claim by a Debtor, a Controlled Affiliate of a Debtor, or a non-Debtor Controlled Affiliate against another Debtor, Controlled Affiliate of a Debtor, or non-Debtor Controlled Affiliate.

**1.120    "Intercompany Executory Contract"** means an executory contract solely between two or more Debtors or an executory contract solely between one or more Debtors and one or more non-Debtor Controlled Affiliates.

**1.121    "Intercompany Unexpired Lease"** means an unexpired lease solely between two or more Debtors or an unexpired lease solely between one or more Debtors and one or more non-Debtor Controlled Affiliates.

**1.122    "Interest"** means the legal, equitable, contractual, and other rights of any Person with respect to Existing Common Stock, Other Interests, or any other equity securities of, or ownership interests in, Delphi or the Affiliate Debtors.

**1.123    "Investment Agreement"**  means that Equity Purchase and Commitment Agreement, dated December 10, 2007, between the Plan Investors and Delphi, as the same may have been amended, modified, or supplemented from time to time, and all documents executed in connection therewith.

**1.124    "IRC"** means the Internal Revenue Code of 1986, as amended.

**1.125    "IRC Section 414(l) Transfer"** means the transaction or transactions through which the GM Hourly-Rate Employees Pension Plan assumed or shall assume from Delphi Hourly-Rate Employee Pension Plan pension obligations and applicable pensions assets pursuant the terms of the Delphi-GM Definitive Documents, IRC section 414(l), and Section 208 of ERISA.

**1.126    "IUE-CWA"** means the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its applicable local unions.

**1.127    "IUE-CWA 1113/114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 16, 2007 approving the IUE-CWA-Delphi-GM Memorandum of Understanding.

**1.128    "IUE-CWA Benefit Guarantee"** means the benefit guarantee agreement between GM and the IUE-CWA, dated November 13, 1999.

**1.129    "IUE-CWA Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the IUE-CWA-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the IUE-CWA regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the IUE-CWA Benefit Guarantee.

**1.130    "IUE-CWA-Delphi-GM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 5, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUE-CWA, Delphi, and GM, and all attachments and exhibits thereto and all IUE-CWA-Delphi collective bargaining agreements referenced therein as modified; and (ii) the IUE-CWA-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.131    "IUOE"** means the International Union of Operating Engineers Locals 832S, 18S, and 101S, and their affiliated entities.

**1.132    "IUOE Local 18S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE 18S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.133    "IUOE Local 101S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE Local 101S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.134    "IUOE Local 832S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE Local 832S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**1.135    "IUOE-IBEW-IAM OPEB Term Sheet"** means that term sheet, attached as Attachment B to the IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IAM Memorandum of Understanding, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, and IUOE Local 832S Memorandum of Understanding, regarding Delphi's cessation of post-retirement health care benefits and employer-paid post retirement life insurance benefits and GM's agreement to provide certain post retirement benefits to certain retired employees currently receiving such

17

benefits from Delphi and other active employees who may become eligible for OPEB in accordance therewith.

      **1.136   "IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 16, 2007 approving the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, and IUOE Local 832S Memorandum of Understanding.

      **1.137   "Lead Plaintiffs"** means, collectively, Teachers' Retirement System of Oklahoma, Public Employees' Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H, and Stichting Pensioenfonds ABP, as styled in the MDL Actions.

      **1.138   "Management Compensation Plan"** means those certain plans and/or agreements by which the Reorganized Debtors, as substantially in the forms set forth on Exhibit 7.11 hereto, and Parnassus shall implement a compensation program for certain members of management and other employees on and after the Effective Date.

      **1.139   "Master Disposition Agreement"** means that certain master disposition agreement among Delphi, GM Components Holdings, LLC, Parnassus Holdings II, LLC and Other Sellers and Other Buyers Party thereto, dated as of June 1, 2009.

      **1.140   "Material Supply Agreement"** means any agreement to which any of the Debtors is a party and pursuant to which the Debtors purchase materials which are directly incorporated into one or more of the Debtors' products.

      **1.141   "MDA Assumption And Assignment Notice"** has the meaning ascribed in Article 8.2(c).

      **1.142   "MDL Actions"** means those certain actions consolidated in that certain multi-district litigation proceeding captioned In re Delphi Corporation Securities, Derivative & ERISA Litigation, MDL No. 1725 (GER), pending in the United States District Court for the Eastern District of Michigan, related to certain actions for damages arising from the purchase or sale of the Senior Notes, the TOPrS, the Subordinated Notes, or Existing Common Stock, for violations of the securities laws, for violations of ERISA, misrepresentations, or any similar Claims.

      **1.143   "MDL Court"** means the United States District Court for the Eastern District of Michigan.

      **1.144   "MDL Settlements"** means, collectively, the ERISA Settlement, the Securities Settlement, and the Insurance Settlement.

      **1.145   "Modification Approval Date"** means the date of entry of the Modification Approval Order.

**1.146    "Modification Approval Order"** means the order entered by the Bankruptcy Court approving the modifications to this Plan under section 1127 of the Bankruptcy Code.

**1.147    "Modification Procedures Order"** means the order entered by the Bankruptcy Court on June 16, 2009 authorizing the procedures by which votes on the modifications to this Plan are to take place, among other matters.

**1.148    "New Common Stock"** means the share(s) of new common stock of Reorganized DPH Holdings.

**1.149    "Non-Represented Term Sheet"** means the Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees entered into between Delphi and GM, dated August 3, 2007.

**1.150    "Omitted Material Supply Agreement Objection Deadline"** means February 8, 2008, the date that was ten days after service of notice upon counterparties to Material Supply Agreements as required by paragraph 24 of the Confirmation Order.

**1.151    "OPEB"** means other post-employment benefits obligations.

**1.152    "Ordinary Course Professionals Order"** means the order entered by the Bankruptcy Court on November 4, 2005 authorizing the retention of professionals utilized by the Debtors in the ordinary course of business.

**1.153    "Other Executory Contract"** means any executory contract, other than a Material Supply Agreement and Other Unexpired Lease, to which any of the Debtors is a party.

**1.154    "Other Interests"** means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

**1.155    "Other MDA Assumed Contracts"** means, collectively, Other Executory Contracts and Other Unexpired Leases to be assigned to Buyers pursuant to the MDA.

**1.156    "Other Priority Claim"** means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.

**1.157    "Other Unexpired Lease"** means any unexpired lease, other than a Material Supply Agreement and Other Executory Contract, to which any of the Debtors is a party.

**1.158    "Parnassus"** means Parnassus Holdings II, LLC, an affiliate of Platinum, or such other entity designated by Platinum, as set forth in the Master Disposition Agreement.

**1.159    "Parnassus Acquired Assets"** has the meaning ascribed to "Company Acquired Assets" as set forth in the Master Disposition Agreement.

**1.160    "Parnassus Assumed Contracts"** means those prepetition executory contracts and/or unexpired leases acquired by Parnassus under the terms of the Master Disposition Agreement.

19

**1.161    "Parnassus Assumed Liabilities"** means those liabilities assumed by Parnassus under the terms of the Master Disposition Agreement.

**1.162    "Parnassus Class C Interest"** means Class C membership interests in Parnassus in the nominal amount of $145.5 million, having an annual cash dividend at the rate of 8% (payable quarterly in arrears), and subject to mandatory redemption at the conclusion of the tenth year after issuance; and (1) being subject to mandatory redemption in such amounts as set forth in the operating agreement of Parnassus (the "Operating Agreement") and at such times as distributions are made to the holders of the Class A and Class B interests of Parnassus, and (2) ranking pari passu in right of distribution with the holders of the Class A and Class B interests of Parnassus in such percentages as set forth in the Operating Agreement.  The Parnassus Class C Interest may be issued by Parnassus or such other entity as may be the "Company Buyer" under the Master Disposition Agreement and shall be held by either the "Sellers" (as such term is defined in the Master Disposition Agreement), a trust or an agent as determined by the Sellers, provided, however, that regardless of the issuer or form, the Parnassus Class C Interest shall have substantially the same terms, conditions and economic entitlements as set forth herein.

**1.163    "PBGC"** means the Pension Benefit Guaranty Corporation.

**1.164    "PBGC Claims"** means the Contingent PBGC Secured Claim and PBGC General Unsecured Claim.

**1.165    "PBGC General Unsecured Claim"** means any Claim of the PBGC against the applicable Debtors or group of Debtors arising from or relating to the Pension Plans that are not secured by valid, perfected, and enforceable liens against the assets or property of the Debtors.

**1.166    "Pension Plans"** means Delphi Corporation:  the Delphi Hourly Rate Employees Pension Plan and the Delphi Retirement Program for Salaried Employees; Delphi Mechatronic Systems, Inc.:  the Delphi Mechatronic Systems Retirement Program; ASEC Manufacturing:  the ASEC Manufacturing Retirement Program; and Packard-Hughes Interconnect Company:  the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan.

**1.167    "Periodic Distribution Date"** means, as applicable, (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring ninety (90) days after the Distribution Date and (ii) subsequently, the first Business Day occurring ninety (90) days after the immediately preceding Periodic Distribution Date, or such other Business Day selected by Reorganized DPH Holdings in its sole and absolute discretion; provided, however, distribution dates shall be no more than quarterly.

**1.168    "Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

**1.169    "Petition Date"** means, as applicable, (a) October 8, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such

20

date or (b) October 14, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date.

1.170  **"Plan"** means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as confirmed by the Bankruptcy Court on January 25, 2008 and as may be modified in accordance with the Bankruptcy Code and Bankruptcy Rules, including as modified by the Modification Approval Order, and all exhibits, supplements, appendices, and schedules hereto, either in its or their present form or as the same may be further altered, amended, or modified from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

1.171  **"Plan Investors"** means A-D Acquisition Holdings, LLC, Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC, Goldman Sachs & Co., and Pardus DPH Holding LLC.

1.172  **"Plan Objection Deadline"** means July 15, 2009 at 4:00 p.m. prevailing Eastern time.

1.173  **"Platinum"** means Platinum Equity Capital Partners II, L.P.

1.174  **"Post-Confirmation Reorganized DPH Holdings Share Trust"** means that certain trust to be created on the Effective Date in accordance with the provisions of Article 7.9 and the Post-Confirmation Trust Agreement.

1.175  **"Post-Confirmation Trust Agreement"** means that certain trust agreement that, among other things, (a) establishes and governs the Post-Confirmation Reorganized DPH Holdings Share Trust, and (b) describes the powers, duties, and responsibilities of the Post-Confirmation Trust Plan Administrator.

1.176  **"Post-Confirmation Trust Plan Administrator"** means that Person designated by the Debtors, identified at or prior to the Final Modification Hearing, and retained as of the Effective Date as the employee or fiduciary responsible for implementing the applicable provisions of the Plan and administering the Post-Confirmation Reorganized DPH Holdings Share Trust in accordance with the Plan and the Post-Confirmation Trust Agreement, and any successor appointed in accordance with the Post-Confirmation Trust Agreement.

1.177  **"Prepetition Employee-Related Obligation"** means a Claim arising prior to the Petition Date of an hourly employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for post-employment benefits, including, without limitation, retiree health care and life insurance.

1.178  **"Prepetition Employee-Related Obligations Bar Date"** means the deadline for filing proofs of claim in accordance with Article 7.12 of this Plan with respect to Prepetition Employee-Related Obligations, which shall be 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

1.179  **"Priority Tax Claim"** means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.180    "Pro Rata"** means, (a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

**1.181    "Professional"** means any Person retained in the Chapter 11 Cases by separate Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise; provided, however, that Professional does not include any Person retained pursuant to the Ordinary Course Professionals Order.

**1.182    "Professional Claim"** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

**1.183    "Professional Fee Order"** means the order entered by the Bankruptcy Court on November 4, 2005, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**1.184    "Reinstated" or "Reinstatement"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of a Claim so as to leave such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder of a Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to achieve Reinstatement.

**1.185    "Released Parties"** means, collectively, (a) all officers of each of the Debtors and Reorganized Debtors, all members of the boards of directors of each of the Debtors and Reorganized Debtors, and all employees of each of the Debtors and Reorganized Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) the DIP Steering Committee and all current and former members of the DIP Steering Committee in their respective capacities as such, (g) Parnassus, (h) Platinum, (i) all Professionals, (j) the Unions and current or former members, officers, and committee members of the Unions, (k) the Indenture Trustees, in their capacities as such, and (l) with respect to each of the above-named Persons, such

22

Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

**1.186    "Reorganized . . . "** means the applicable Debtor from and after the Effective Date.

**1.187    "Reorganized Debtor" or "Reorganized Debtors"** means, individually, any Debtor and, collectively, all Debtors, in each case from and after the Effective Date.

**1.188    "Reorganized DPH Holdings"** means Reorganized Delphi from and after the Effective Date, a corporation organized under the laws of Delaware or under such other law as determined by the Debtors, which will be the parent holding company of the Reorganized Debtors, the stock of which will be issued to the Post-Confirmation Reorganized DPH Holdings Share Trust.

**1.189    "Restructuring Debtors"** means those Debtors that shall be the subject of a Restructuring Transaction under this Plan.

**1.190    "Restructuring Transaction(s)"** means a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate directly owned by a Debtor merges with or transfers some or substantially all of its assets and liabilities to a Reorganized Debtor or its Affiliates, on or following the Confirmation Date, as set forth in the Restructuring Transaction Notice.

**1.191    "Restructuring Transaction Notice"** means the notice filed with the Bankruptcy Court on or before the Exhibit Filing Date, a copy of which is attached as <u>Exhibit 7.3</u> to this Plan, describing the anticipated post-Effective Date structure of the Reorganized Debtors.

**1.192    "Retained Actions"** means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, Claims and Causes of Action brought prior to the Effective Date or identified in the Schedules, other than Claims explicitly released under this Plan or by Final Order of the Bankruptcy Court prior to the date hereof.  A non-exclusive list of Retained Actions is attached hereto as <u>Exhibit 7.19</u>.

**1.193    "Retained Assets"** means all assets of the Debtors that are not the GM Acquired Assets or the Parnassus Acquired Assets.

**1.194    "Scheduled"** means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**1.195    "Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.196    "Section 510(b) Equity Claim"** means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

**1.197    "Section 510(b) ERISA Claim"** means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

**1.198    "Section 510(b) Note Claim"** means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

**1.199    "Section 510(b) Opt Out Claim"** means any Section 510(b) Opt Out Note Claim or Section 510(b) Opt Out Equity Claim.

**1.200    "Section 510(b) Opt Out Equity Claim"** means any Section 510(b) Equity Claim, the holder of which has opted not to participate in the Securities Settlement pursuant to the procedures set forth in the "Notice of Settlement" approved by the MDL Court.

**1.201    "Section 510(b) Opt Out Note Claim"** means any Section 510(b) Note Claim, the holder of which has opted not to participate in the Securities Settlement pursuant to the procedures set forth in the "Notice of Settlement" approved by the MDL Court.

**1.202    "Secured Claim"** means a Claim, other than the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, or DIP Facility Second Priority Term Claim, secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

**1.203    "Securities Act"** means the Securities Act of 1933, as now in effect or hereafter amended.

**1.204    "Securities Settlement"** means that certain stipulation and agreement of settlement of the securities-related MDL Actions, as it may be amended or modified.

**1.205    "Security"** has the meaning ascribed to it in section 101(49) of the Bankruptcy Code.

**1.206    "Security And Pledge Agreement"** has the meaning specified in the DIP Credit Agreement.

**1.207    "Senior Notes"** means, collectively, the (a) 6.55% Notes due 2006, (b) 6.5% Notes due 2009, (c) 6.5% Notes due 2013, and (d) 7.125% Notes due 2029, all issued by Delphi under the Senior Notes Indenture.

**1.208    "Senior Notes Claim"** means a Claim arising under or as a result of the Senior Notes.

**1.209    "Senior Notes Indenture"** means that certain indenture for the debt securities between Delphi Corporation and the First National Bank of Chicago, as indenture trustee, dated as of April 28, 1999.

**1.210    "Senior Notes Indenture Trustee"** means the indenture trustee under the Senior Notes Indenture.

**1.211    "SERP"** means the prepetition supplemental executive retirement program between Delphi and certain employees.

**1.212    "SERP Claim"** means a Claim of a SERP participant arising out of the SERP.

**1.213    "Servicer"** has the meaning ascribed to it in <u>Article 7.13</u> of this Plan.

**1.214    "Solicitation Procedures Order"** means the order entered by the Bankruptcy Court on December 10, 2007 authorizing the procedures by which solicitation of votes on this Plan is to take place, among other matters.

**1.215    "Specialty Electronics Debtors"** means, collectively, Specialty Electronics, Inc. and Specialty Electronics International Ltd., as substantively consolidated for Plan purposes.

**1.216    "Statutory Committees"** means the Creditors' Committee and the Equity Committee.

**1.217    "Subordinated Notes"** means those notes issued pursuant to the Subordinated Notes Indenture.

**1.218    "Subordinated Notes Holder"** means a holder of Subordinated Notes.

**1.219    "Subordinated Notes Indenture"** means that certain indenture for the subordinated debt securities between Delphi Corporation and Bank One Trust Company, N.A., as trustee indenture, dated as of October 28, 2003.

**1.220    "Subordinated Notes Indenture Trustee"** means the trustee under the Subordinated Notes Indenture.

**1.221    "Supplemental Distribution Account"** means the property remaining in the applicable Distribution Reserve, if any, to the extent that a Disputed Class C Claim is not allowed or is allowed in an amount less than the amount reserved for such Disputed Claim.

**1.222    "Transferred Assets"** means that certain collateral under the DIP Credit Agreement consisting of (i) Cash in an amount equal to the DIP Priority Payment Amount, (ii) Cash in the amount of $291,020,079, (iii) Parnassus Class C Interests, and (iv) up to $ 145,510,040 of the net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) from the pending lawsuit, including any settlement thereof, by Delphi against Appaloosa Management L.P. and certain other of the Plan Investors or other parties arising from or relating to the Investment Agreement to which Delphi is a party.

**1.223    "TOPrS"** means (a) those 8.25% Cumulative Trust Preferred Securities issued by Delphi Trust I and (b) those Adjustable Rate Trust Preferred Securities issued by Delphi Trust II.

**1.224    "TOPrS Claim"** means a Claim of a Subordinated Notes Holder arising under or as a result of the Subordinated Notes.

**1.225    "UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable local unions, and other affiliated entities.

**1.226    "UAW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on July 19, 2007 approving the UAW-Delphi-GM Memorandum of Understanding.

**1.227    "UAW Benefit Guarantee"** means the benefit guarantee agreement between GM and the UAW, dated September 30, 1999.

**1.228    "UAW Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the UAW-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the UAW regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the UAW Benefit Guarantee.

**1.229    "UAW-Delphi-GM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated June 22, 2007, as approved by the Bankruptcy Court on July 19, 2007 among the UAW, Delphi and GM, and all attachments and exhibits thereto and all UAW-Delphi collective bargaining agreements referenced therein as modified; and (ii) the UAW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 26, 2008.

**1.230    "UCC"** means the Uniform Commercial Code, as in effect in the State of New York.

**1.231    "Unimpaired"** means, with respect to a Claim, any Claim that is not Impaired.

26

**1.232   "Union Settlement Agreements"** means, collectively, the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUE-CWA Benefit Guarantee Term Sheet, IUE-CWA-Delphi-GM Memorandum of Understanding, IUOE-IBEW-IAM OPEB Term Sheet, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, IUOE Local 832S Memorandum of Understanding, UAW Benefit Guarantee Term Sheet, UAW-Delphi-GM Memorandum of Understanding, USW Benefit Guarantee Term Sheet, and USW-Delphi-GM Memoranda of Understanding.

**1.233   "Unions"** means the IAM, the IBEW, the IUOE, the IUE-CWA, the UAW, and the USW.

**1.234   "USW"** means the United Steel Workers and its applicable local unions.

**1.235   "USW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 29, 2007 approving the USW-Delphi-GM Memoranda of Understanding.

**1.236   "USW Benefit Guarantee"** means the benefit guarantee agreement between GM and the USW, dated December 13, 1999, and signed December 16 and 17, 1999.

**1.237   "USW Benefit Guarantee Term Sheet"** means that certain term sheet attached as Attachment B to each of the USW-Delphi-GM Memoranda of Understanding.

**1.238   "USW-Delphi-GM Memoranda of Understanding"** means, collectively, the (i) USW-Home Avenue Memorandum of Understanding; (ii) the USW-Vandalia Memorandum of Understanding; and (iii) USW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25-26, 2008.

**1.239   "USW-Home Avenue Memorandum of Understanding"** means that certain memorandum of understanding, dated August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, among the USW, Delphi, and GM, and all attachments and exhibits thereto.

**1.240   "USW-Vandalia Memorandum of Understanding"** means that certain memorandum of understanding, dated August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, among the USW, Delphi, and GM, and all attachments and exhibits thereto.

**1.241   "Voting Deadline"** means July 15, 2009 at 7:00 p.m. prevailing Eastern time.

## C.   <u>Rules Of Interpretation</u>

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in this Plan to an existing document or

schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

This Plan is the product of extensive discussions and negotiations between and among the Debtors, GM, Parnassus, and certain other creditors and constituencies. Each of the foregoing was represented by counsel, who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, the general rule of contract construction known as "<u>contra preferentem</u>" shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, or any contract, instrument, release, indenture, exhibit, or other agreement or document generated in connection herewith.

## D. <u>Computation Of Time</u>

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## E. <u>References To Monetary Figures</u>

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## F. <u>Exhibits</u>

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), or Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Att'n: Kayalyn A. Marafioti), counsel to the Debtors, or by downloading such exhibits from the Debtors' informational website at www.delphidocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control

28

as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND
## PRIORITY TAX CLAIMS

2.1     **Administrative Claims.**  Subject to the Master Disposition Agreement and the provisions of Article X of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim shall have agreed upon in writing; provided, however, that (x) holders of the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim shall be deemed to have Allowed Administrative Claims as of the Effective Date in such amount as the Debtors and such holders of such DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim shall have agreed upon in writing or as determined by the Bankruptcy Court, which Claims shall be satisfied in accordance with Article X of this Plan, (y) holders of hedging claims arising under the DIP Facility shall receive the treatment described in the Master Disposition Agreement, and (z) the holder of an Administrative Claim shall have filed a proof of claim form no later than the July 15, 2009, pursuant to the procedures described in Article 10.2 and the Modification Procedures Order, and such Claim shall have become an Allowed Claim. For the avoidance of doubt, the GM Administrative Claim shall receive the treatment set forth in Article 2.3 of this Plan.

2.2     **Priority Tax Claims.**  Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) hereof, or (iii) payment in full in Cash; provided, however, that holders of Priority Tax Claims whose Claims have been assumed by the Buyers pursuant to the Master Disposition Agreement shall be treated in the manner set forth therein.

29

**2.3    GM Administrative Claim.**  For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in Section 2.03(c) of the Delphi-GM Global Settlement Agreement, GM has received and shall receive allowed administrative expense claims of no more in the aggregate than $2.055 billion (the "GM 414(l) Administrative Claim").  Upon the Effective Date and the consummation of the Master Disposition Agreement, GM shall waive and release the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim, and GM shall accordingly receive no distribution on account of such claims.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1    The Debtors.**  There are a total of 42 Debtors.  Certain of the Debtors shall be substantively consolidated for Plan voting and distribution purposes as described in Article 7.2. Each Debtor or group of consolidated Debtors has been assigned a number below for the purposes of classifying and treating Claims against and Interests in each Debtor or consolidated group of Debtors for balloting purposes.  The Claims against and Interests in each Debtor or consolidated group of Debtors, in turn, have been assigned to separate lettered Classes with respect to each Debtor or consolidated group of Debtors, based on the type of Claim involved.  Accordingly, the classification of any particular Claim or Interest in any of the Debtors or consolidated group of Debtors depends on the particular Debtor against which such Claim is asserted (or in which such Interest is held) and the type of Claim or Interest in question.  The numbers applicable to the various Debtors or consolidated Debtor groups are as follows:

| Number | Consolidated Debtor Group Or Debtor Name |
|--------|-------------------------------------------|
| 1 | Delphi-DAS Debtors |
| 2 | DASHI Debtors |
| 3 | Connection System Debtors |
| 4 | Specialty Electronics Debtors |
| 5 | Delco Electronics Overseas Corporation |
| 6 | Delphi Diesel Systems Corp. |
| 7 | Delphi Furukawa Wiring Systems LLC |
| 8 | Delphi Mechatronic Systems, Inc. |
| 9 | Delphi Medical Systems Corporation |
| 10 | Delphi Medical Systems Colorado Corporation |
| 11 | Delphi Medical Systems Texas Corporation |
| 12 | MobileAria, Inc. |

**3.2    Classification Of Claims And Interests.**

**(a)**    Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code,

30

Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in <u>Article II</u> above.

**(b)**    Claims against and Interests in each of the Debtors are divided into lettered Classes.  Not all of the Classes apply to every Debtor, and consequently not all of the lettered Classes appear in the case of each Debtor.  For purposes of voting, claims within the Class shall be counted for each applicable Debtor or group of consolidated Debtors.  Whenever such a Class of Claims or Equity Interests is relevant to a particular Debtor, that class of Claims or Interests shall be grouped under the appropriate lettered Class from the following list:

| | |
|---|---|
| Class A-1 | Class A-1 consists of separate subclasses for all Secured Claims, other than the Contingent PBGC Secured Claims, against the applicable Debtor or consolidated group of Debtors. |
| Class B | Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors. |
| Class C-1 | Class C-1 consists of all General Unsecured Claims, other than the PBGC General Unsecured Claims, against the applicable Debtor or consolidated group of Debtors. |
| Class C-2 | Class C-2 consists of all PBGC Claims against the applicable Debtor or consolidated group of Debtors. |
| Class D | Class D consists of the GM Unsecured Claim against the applicable Debtor or consolidated group of Debtors. |
| Class E | Class E consists of all Section 510(b) Note Claims against Delphi Corporation. |
| Class F | Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors. |
| Class G-1 | Class G-1 consists of all Existing Common Stock of Delphi Corporation. |
| Class G-2 | Class G-2 consists of all Section 510(b) Equity Claims against Delphi Corporation. |
| Class H | Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors. |
| Class I | Class I consists of all Other Interests in Delphi Corporation. |
| Class J | Class J consists of all Interests in the Affiliate Debtors. |
| Class K | Class K consists of all Other Priority Claims against the applicable Debtor or consolidated group of Debtors. |

## ARTICLE IV

## IDENTIFICATION OF CLASSES OF CLAIMS
## <u>AND INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN</u>

**4.1    Classes Of Claims That Are Unimpaired.**  The following Classes of Claims and Interests are Unimpaired by the Plan:

**Class 1B through Class 12B**    (Flow-Through Claims)
**Class 1J through Class 12J**    (Interests in the Affiliate Debtors)

31

**Class 1K through Class 12K**     (Other Priority Claims)

**4.2     Impaired Classes Of Claims And Interests.**  The following Classes of Claims and Interests are Impaired by the Plan:

| | |
|---|---|
| **Class 1A-1 and Class 6A-1** | (Secured Claims) |
| **Class 1C-1 through Class 12C-1** | (General Unsecured Claims) |
| **Class 1C-2 through Class 12C-2** | (PBGC Claims) |
| **Class 1D through Class 12D** | (GM Unsecured Claim) |
| **Class 1E** | (Section 510(b) Note Claims) |
| **Class 1F through Class 12F** | (Intercompany Claims) |
| **Class 1G-1** | (Existing Common Stock) |
| **Class 1G-2** | (Section 510(b) Equity Claims) |
| **Class 1H, 8H** | (Section 510(b) ERISA Claims) |
| **Class 1I** | (Other Interests) |

## ARTICLE V

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

**5.1     Class 1A-1 and Class 6A-1 (Secured Claims).**  Except as otherwise provided in and subject to Article 9.8 of this Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim shall receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date plus interest accruing at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date plus 200 basis points (the "Secured Claim Interest Rate"), and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code for the period between the Petition Date and the Effective Date, such interest shall have accrued at the applicable non-default contractual rate or statutory rate, as the case may be, and be included in the Allowed amount of such Secured Claim; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as to which the Debtors or Reorganized Debtors, as the case may be, and the holder of such Allowed Secured Claim have agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above.  Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, with respect to the treatment in clause (i) and clause (iii) above, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied pursuant to this Plan; provided, however, that such holder of an Allowed Secured Claim shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtors are in compliance with this Article 5.1. To the extent the Debtors or the Reorganized Debtors elect the

treatment set forth in clause (ii) above, all valid liens shall be discharged and otherwise satisfied upon the receipt of the claimant's collateral by the holder of such Allowed Secured Claim.

   **5.2  Class 1B through Class 12B (Flow-Through Claims).**  The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, shall be unaltered by the Plan and shall be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto, which shall be fully preserved); provided, however, that any Flow Through Claim assumed pursuant to the Master Disposition Agreement will receive the treatment specified therein. The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases shall be without prejudice to a Reorganized Debtors' right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court or such other court of competent jurisdiction.

   **5.3  Class 1C-1 through Class 12C-1 (General Unsecured Claims).**  On the Effective Date, the Disbursing Agent shall establish a distribution account to hold the proceeds, if any, of the General Unsecured MDA Distribution.  Except as otherwise provided in and subject to Articles 9.8 and 11.10 of this Plan, commencing on the first Periodic Distribution Date occurring after the later of (i) the date when the proceeds of the General Unsecured MDA Distribution may be distributed to holders of General Unsecured Claims, (ii) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (iii) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the proceeds of the General Unsecured MDA Distribution.  In addition, if applicable, on each Periodic Distribution Date, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the proceeds of the General Unsecured MDA Distribution held in the Supplemental Distribution Account; provided, however, that no distribution from the Supplemental Distribution Account shall be made if, in the Reorganized Debtors' or the Disbursing Agent's sole discretion, the value of the property in the Supplemental Distribution Account is insufficient.  Distributions made pursuant to this Article 5.3 and Articles 5.4, 5.5, and 11.10 shall be in complete satisfaction of all obligations of GM under Section 4.04 of the Delphi-GM Global Settlement Agreement.

   **5.4  Class 1C-2 through Class 12C-2 (PBGC Claims).**  Pursuant to Article 7.17, and except as otherwise provided in and subject to Articles 9.8 and 11.10 of this Plan, the PBGC shall receive, on the Distribution Date on account of its PBGC Claims in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed PBGC Claims, the treatment set forth in Article 7.17 of this Plan.

   **5.5  Class 1D through Class 12D (GM Unsecured Claim).**  In full settlement, satisfaction, and release of the GM Unsecured Claim, GM shall receive the remaining releases provided for in section 4.01 of the Delphi-GM Global Settlement Agreement.

   **5.6  Class 1E (Section 510(b) Note Claims).**  Holders of Section 510(b) Note Claims shall not be entitled to, and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) Note Claims.

**5.7    Class 1F through Class 13F (Intercompany Claims).**  On the Effective Date, and subject to the Master Disposition Agreement, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, shall not receive a distribution on the Effective Date and instead shall either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.

**5.8    Class 1G-1 (Existing Common Stock).**  On the Effective Date, the Existing Common Stock shall be cancelled and extinguished.  The holders of Existing Common Stock shall not be entitled to, and shall not, receive or retain any property or interest on account of such Existing Common Stock.

**5.9    Class 1G-2 (Section 510(b) Equity Claims)**.  Holders of Section 510(b) Equity Claims shall not be entitled to, and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) Equity Claims.

**5.10    Class 1H and Class 8H (Section 510(b) ERISA Claims)**.  The ERISA Settlement disbursing agent, on behalf of all holders of Section 510(b) ERISA Claims, shall not be entitled to and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) ERISA Claims.

**5.11    Class 1I (Other Interests)**.  On the Effective Date, all Other Interests shall be deemed cancelled and the holders of Other Interests shall not receive or retain any property on account of such Other Interests under this Plan.

**5.12    Class 1J through Class 12J (Interests In Affiliate Debtors)**.  On the Effective Date, except as otherwise contemplated by the Restructuring Transactions or the Master Disposition Agreement, the holders of Interests in the Affiliate Debtors shall retain such Interests in the Affiliate Debtors under the Plan.

**5.13    Class 1K through Class 12K (Other Priority Claims).**  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

**ARTICLE VI**

**ACCEPTANCE OR REJECTION OF THE PLAN;**
**EFFECT OF REJECTION BY ONE OR MORE**
**IMPAIRED CLASSES OF CLAIMS OR INTERESTS**

**6.1    Impaired Classes Of Claims Entitled To Vote.**  Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan and

Article 6.2, Article 6.4, and Article 6.5 of this Plan, holders of Claims and Interests in each Impaired Class are entitled to vote in their respective classes as a class to accept or reject this Plan.

**6.2    Classes Deemed To Accept The Plan.** Classes 1B through 12B, 1J through 12J, and 1K through 12K are Unimpaired under this Plan. Pursuant to section 1126(f) of the Bankruptcy Code, such Classes are conclusively presumed to have accepted this Plan, and the votes of holders of Claims and Interests in such Classes therefore shall not be solicited. Because all Debtors are proponents of this Plan, the votes of holders of such Claims in Class 1F through 12F (Intercompany Claims) shall not be solicited.

**6.3    Acceptance By Impaired Classes.** Classes 1A-1 and 6A-1, Classes 1C-1 through 12C-1, and 1D through 12D are Impaired under this Plan. In addition, Classes 1C-2 through 12C-2 shall be Impaired to the extent the Claims in such Classes are Allowed. Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**6.4    Classes Deemed To Reject The Plan**. Holders of Claims and Interests in Class 1E, 1G-1, 1G-2, 1H, 8H and 1I are not entitled to receive any distribution under the Plan on account of their Claims or Interests. Since none of the holders of Claims or Interests in Class 1E, 1G-1, 1G-2, 1H, and 1I are entitled to receive a distribution under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, each holder of a Claim or Interest in such Class is conclusively presumed to have rejected the Plan, and the votes of such holders of Claims or Interests therefore shall not be solicited.

**6.5    Prior Acceptances Or Rejections Of The Plan.** The previous votes by any holder of a Claim that has accepted or rejected the Plan shall not be counted.

**6.6    Approval of Modifications Subject To Sections 1127 And 1129(b) Of The Bankruptcy Code.** Because Classes 1E, 1G-1, 1G-2, 1H, 8H and 1I are deemed to reject the Plan, the Debtors shall request approval of the modifications to the Plan, as it may be modified from time to time, pursuant to section 1127 and 1129(b) of the Bankruptcy Code.

## ARTICLE VII

## MEANS FOR IMPLEMENTATION OF THE PLAN

**7.1    Continued Corporate Existence**

**(a)**    Subject to the Restructuring Transactions and Disposition Transactions contemplated by this Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date,

35

except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by this Plan and the Certificate of Incorporation and Bylaws without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

**(b)**    There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases.  The continued existence, operation, and ownership of such non-Debtor Affiliates is a material component of the business of the Debtors and Reorganized Debtors, as applicable, and, as set forth in <u>Article 11.1</u> of this Plan but subject to the Restructuring Transactions and Disposition Transactions, all of the Debtors' equity interests and other property interests in such non-Debtor Affiliates shall revest in the applicable Reorganized Debtor or its successor on the Effective Date.

## 7.2    Substantive Consolidation

**(a)**    This Plan provides for the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan.  For purposes of this Plan, the DAS Debtors shall be substantively consolidated; the DASHI Debtors shall be substantively consolidated; the Connection System Debtors shall be substantively consolidated; the Specialty Electronics Debtors shall be substantively consolidated; and the remaining Debtors shall not be substantively consolidated.  None of the substantively consolidated Debtor entities shall be consolidated with each other.  Notwithstanding the foregoing, but subject to the Disposition Transactions, the Debtors reserve all rights with respect to the substantive consolidation of any and all of the Debtors.

**(b)**    With respect to the consolidated Debtor entities, on the Effective Date, and only as to the consolidated Debtor entities, (i) all assets and third-party liabilities of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will, for voting and distribution purposes only, be treated as if they were merged, (ii) each Claim against the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will be deemed a single Claim against and a single obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, (iii) all Intercompany Claims by, between, and among the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will, for voting and distribution purposes only, be eliminated, and (iv) any obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, and all guaranties thereof by one or more of the other Delphi-DAS Debtors, DASHI Debtors, Connection Systems Debtors, and Specialty Electronics Debtors, respectively, will be deemed to be one obligation of all of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively.  Except as set forth in this Article, and subject to the Disposition Transactions, such substantive consolidation shall not (other than for purposes related to this Plan) (w) affect the legal and corporate structures of the Debtors or Reorganized Debtors, subject to the right of the Debtors or Reorganized Debtors

36

to effect the Restructuring Transactions contemplated by this Plan, (x) cause any Debtor to be liable for any Claim or Interest under this Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Interest shall not be affected by such substantive consolidation, (y) except as otherwise stated in this Article 7.2, affect Intercompany Claims of Debtors against Debtors, and (z) affect Interests in the Affiliate Debtors except as otherwise may be required in connection with the Restructuring Transactions contemplated by this Plan.

Notwithstanding that the Bankruptcy Court has already approved the substantive consolidation of certain of the Debtors' Estates in the Confirmation Order, this Plan shall serve as, and shall be deemed to be, a request for entry of an order confirming the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. If no objection to substantive consolidation of certain of the Debtors' Estates is timely filed and served by any holder of an impaired Claim affected by the Plan as provided in the Modification Procedures Order, or such other date as may be established by the Bankruptcy Court, the Modification Approval Order shall serve as the order approving the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan, and any objections thereto shall be part of the Final Modification Hearing.

### 7.3 Restructuring Transactions.

(a) On or following the Modification Approval Date, the Debtors or Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions as set forth in the Restructuring Transaction Notice including, but not limited to, actions necessary to execute the Disposition Transactions and any other transactions described in this Plan. The anticipated post-Effective Date structure of the Reorganized Debtors is attached as Exhibit 7.3.

(b) The Restructuring Transactions may include without limitation: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtors and Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transactions. The form of each Restructuring Transaction shall be determined by the boards of directors of a Debtor or Reorganized Debtor party to any Restructuring Transaction. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations of each merged Debtor under this Plan. In the event that a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which

37

owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Debtor.  Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

**7.4     Certificate Of Incorporation And Bylaws.**  The Certificate of Incorporation of Reorganized DPH Holdings, substantially in the form attached hereto as <u>Exhibit 7.4(a)</u>, and Bylaws of Reorganized DPH Holdings, substantially in the form attached hereto as <u>Exhibit 7.4(b)</u>, shall be adopted and amended as may be required so that they are consistent with the provisions of this Plan and otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Each Affiliate Debtor shall amend its certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

**7.5     Directors And Officers Of Reorganized DPH Holdings And Affiliate Debtors.**  The Debtors shall file a notice listing the officers and directors of Reorganized DPH Holdings no later than the Exhibit Filing Date.  Unless the Debtors otherwise file a notice on or prior to the Final Modification Hearing, the existing directors and officers of the Affiliate Debtors shall continue to serve in their current capacities after the Effective Date.

**7.6     Consummation Of Disposition Transactions**

**(a)     Disposition Transactions To Occur On Effective Date.**  On the Effective Date, the Debtors shall consummate the Disposition Transactions, pursuant to which, among other things, (i) the GM Acquired Assets including the GM Assumed Contracts shall be transferred to GM Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, (ii) the Parnassus Acquired Assets including the Parnassus Assumed Contracts shall be transferred to Parnassus free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, and (iii) the DIP Lenders shall effectuate the DIP Transfer.

**(b)     Sequence Of Effectuating Disposition Transactions.**  For purposes of implementing the Disposition Transactions on the Effective Date, such transactions shall be deemed to occur on the Effective Date in the following order:  (i) Delphi's Existing Common Stock shall be cancelled and New Common Stock of Reorganized DPH Holdings shall be issued to the Post-Confirmation Reorganized DPH Holdings Share Trust Trust; (ii) Reorganized DPH Holdings shall sell, transfer, assign, convey, and deliver all assets required to be delivered under the Master Disposition Agreement to the Buyers for the consideration described in the Master Disposition Agreement; and (iii) the DIP Lenders shall effectuate the DIP Transfer.

**7.7     Master Disposition Agreement.**

**(a)     Approval Of Master Disposition Agreement**.  This Plan constitutes a request to authorize and approve the Master Disposition Agreement, attached hereto as <u>Exhibit 7.7</u>.

(b)    **Sale Of Assets To GM Buyer.**  Pursuant to the terms of the Master Disposition Agreement, section 1123(a)(5) of the Bankruptcy Code and the Modification Approval Order, on the Effective Date, the Debtors shall consummate the transfer, free and clear of any Claims, liens and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to the GM Buyer of the GM Acquired Assets, the GM Assumed Contracts and the GM Assumed Liabilities.

(c)    **Sale Of Assets To Parnassus.**  Pursuant to the terms of the Master Disposition Agreement, section 1123(a)(5) of the Bankruptcy Code and the Modification Approval Order, on the Effective Date, the Debtors shall consummate the transfer, free and clear of any Claims, liens and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to Parnassus of the Parnassus Acquired Assets, the Parnassus Assumed Contracts, and the Parnassus Assumed Liabilities.

**7.8    Transfer Of Collateral.**

(a)    **Consensual Foreclosure.**  This Plan constitutes a request to authorize and approve the transfer of the Transferred Assets under the DIP Credit Agreement to the DIP Agent and to deem such DIP Transfer to be a consensual foreclosure by the DIP Agent in full satisfaction and discharge of the DIP Claims pursuant to Article 9-620 of the UCC.  The DIP Transfer is necessary to implement this Plan and is integral to completing the transactions contemplated by this Plan, including without limitation, the Master Disposition Agreement.

(b)    **Alternative Foreclosure Procedures.**  The Debtors shall provide notification of the DIP Lenders' intent to accept the Transferred Assets to all parties entitled to notice pursuant to section 9-621(a) of the UCC (the "Article 9 Notice").  The Article 9 Notice shall set forth the parties entitled to file an objection, refer parties to the procedures for submitting a Competing Proposal, and provide the deadline for filing an objection.  If the Debtors receive on or prior to the Article 9 Objection Deadline a valid objection to the DIP Agent's acceptance of the Transferred Assets under section 9-620 of the UCC, then the Debtors shall promptly file and serve a subsequent notice pursuant to sections 9-611 and 9-613 of the UCC (the "Public Sale Foreclosure Notice"), which notice shall set forth the procedures to be employed in connection the public sale of the Transferred Assets to be conducted pursuant to section 9-610 of the UCC (the "Public Sale Foreclosures Procedures").  On or following the tenth day following service of the Public Sale Foreclosure Notice, if ever, the Debtors shall conduct the section 9-610 public sale and the DIP Agent shall be deemed to have submitted a credit bid at the public sale in the full amount of the Debtors' outstanding obligations that are due and owing under the DIP Credit Agreement.  To the extent a successful bidder is selected pursuant to the Public Sale Foreclosure Procedures, then the proceeds of such transaction shall be used first to satisfy all outstanding obligations under the DIP Loan Documents in accordance with the terms of the DIP Credit Agreement and the DIP Accommodation Agreement, including, without limitation, the Security And Pledge Agreement, and then any additional proceeds shall be transferred to the Reorganized Debtors and distributed as required by applicable law, including the absolute priority rule set forth in section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

(c)    **Termination Of DIP Facility Claims And Cancellation Of Liens.**
Upon the consummation of the DIP Transfer on the Effective Date, (i) the DIP Facility Claims
shall be fully discharged, released, terminated, and if necessary, deemed waived, (ii) all Claims,
liens, security interests, and obligations related thereto on Collateral wherever located shall be
fully discharged, released, terminated, and if necessary, deemed waived without need for any
further action, (iii) the Debtors and the Reorganized Debtors shall be fully discharged and released
of all obligations of any kind relating to the DIP Facility, and which discharge and release shall be
deemed to be effective, pursuant to Article 9 of the UCC, and the Debtors and Reorganized
Debtors shall have no further obligation to the DIP Lenders under and relating to the DIP Facility,
and (iv) the DIP Lenders shall be deemed to be bound to the provisions of Article XI of this Plan
and the Modification Approval Order.  To the extent that the DIP Lenders or the DIP Agent have
filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations
under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any and all
commercially reasonable steps requested by the Reorganized Debtors that are necessary to cancel
and/or extinguish such publicly filed liens and/or security interests.

(d)    **DIP Facility Revolver Claim and DIP Facility First Priority
Term Claim Distributions.**  Pursuant to the DIP Transfer and Section 15(g) of the Security And
Pledge Agreement, the DIP Agent shall transfer Cash to the holders of DIP Facility Revolver
Claims and DIP Facility First Priority Term Claims in an amount equal to the DIP Priority
Payment Amount.

(e)    **DIP Facility Second Priority Term Claim Distributions.**  Pursuant
to the DIP Transfer and Section 15(g) of the Security and Pledge Agreement, the DIP Agent shall
transfer to the holders of DIP Facility Second Priority Term Claims (i) $291,020,079 million in
Cash, (ii) their pro rata portion of Parnassus Class C Interests, and (iii) up to $145,510,040 of the
net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its
affiliates) from the pending lawsuit, including any settlement thereof, by Delphi against
Appaloosa Management L.P. and certain of the other Plan Investors or other parties arising from or
relating to the Investment Agreement to which Delphi is a party.

### 7.9    Post-Confirmation Reorganized DPH Holdings Share Trust

(a)    **Post-Confirmation Reorganized DPH Holdings Share Trust.**  On
the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, shall
execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the
Post-Confirmation Reorganized DPH Holdings Share Trust pursuant the Post-Confirmation Trust
Agreement, substantially in the form attached as Exhibit 7.9.  On the Effective Date, and in
accordance with and pursuant to the terms of the Plan, the Post-Confirmation Reorganized DPH
Holdings Share Trust shall become the sole shareholder of Reorganized DPH Holdings.

(b)    **Appointment Of Post-Confirmation Trust Plan Administrator.**
On the Effective Date,  the Post-Confirmation Trust Plan Administrator shall be appointed in
accordance with the Post-Confirmation Trust Agreement and the Post-Confirmation Reorganized
DPH Holdings Share Trust shall be administered by the Post-Confirmation Trust Plan
Administrator in accordance with the Post-Confirmation Trust Agreement.

**7.10    Emergence Capital.**  On the Effective Date, pursuant to the Master Disposition Agreement, the Reorganized Debtors shall receive the Emergence Capital sufficient to make payments as may be required on the Effective Date and conduct their post-reorganization operations.

**7.11    Management Compensation Plan.**  The Debtors or Parnassus shall enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors and officers who shall continue in such capacities (or similar capacities) after the Effective Date, as more fully stated with respect to the Reorganized Debtors on Exhibit 7.11 attached hereto; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, such employee shall be required to contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described with respect to the Reorganized Debtors on Exhibit 7.11, may include equity and other incentive plans as components of compensation to be paid to executives after the Effective Date.

**7.12    Procedures For Asserting Certain Claims.**

**(a)    SERP Claims.**  All persons holding or wishing to assert Claims solely on the basis of pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date; provided, however, that to the extent that (a) a SERP claimant's SERP Claim has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) a SERP claimant timely and properly filed a proof of claim asserting his or her SERP Claim, then such SERP claimant need not file and serve an additional executed proof of claim.  All such SERP Claims not Scheduled or filed prior to the time set forth above in this Article 7.12 shall be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.  Any Claims arising out of the SERP after the Effective Date shall be disallowed in their entirety regardless of whether a proof of claim has been filed for such contingent claim.  On the Effective Date, the Debtors shall reject or otherwise terminate the SERP. In accordance with that certain Order Authorizing Modification Of Benefits Under Hourly And Salaried Pension Programs And Modification Of Applicable Union Agreements In Connection Therewith, entered on September 23, 2008 (Docket No. 14258), on the Effective Date, the Amended SERP (as defined in the related order) and Amended SRESP (as defined in the related order) shall be vested and payable in accordance with the terms of such order and the related non-qualified pension plans.

**(b)    Prepetition Employee-Related Obligations.**  Except as set forth in Article 7.12(a) above, all Persons holding or wishing to assert Prepetition Employee-Related Obligations must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 45 days after the Effective Date; provided, however, that such claimant need not file and serve an executed proof of claim to the extent that (a) such claimant's Prepetition Employee-Related Obligation has already been Scheduled as non-disputed, non-contingent, and in

41

a liquidated amount or (b) such a claimant already timely and properly filed a proof of claim asserting such Prepetition Employee-Related Obligation.  All Prepetition Employee-Related Obligations not Scheduled or filed prior to the time set forth above in this Article 7.12(b) shall be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.

> **7.13    Cancellation Of Existing Securities And Agreements**.  On the Effective Date, except as otherwise specifically provided for herein (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under this Plan, shall be cancelled; provided, however, that Interests in the Affiliate Debtors shall not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under this Plan, as the case may be, shall be released and discharged; provided, however, that any agreement (including the Indentures) that governs the rights of a holder of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer") shall continue in effect solely for purposes of (x) allowing such Servicer to make the distributions on account of such Claims under this Plan as provided in Article IX of this Plan and (y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement; provided further, however, that the preceding proviso shall not affect the discharge of Claims against or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, Modification Approval Order, or this Plan, or result in any expense or liability to the Reorganized Debtors.  The Reorganized Debtors shall not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Plan except as expressly provided in Article 9.5 hereof; provided further, however, that nothing herein shall preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

> **7.14    Sources of Cash For Plan Distributions**.  Except as otherwise provided in the Plan, Confirmation Order, or the Modification Approval Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from the Emergence Capital, existing Cash balances, the operations of the Debtors and the Reorganized Debtors.

> **7.15    Establishment Of A General Unsecured Distribution Account.**  On the Effective Date, the Disbursing Agent shall establish a distribution account on behalf of holders of General Unsecured Claims for the purpose of holding the proceeds of the General Unsecured MDA Distribution, if any, to be distributed to holders of General Unsecured Claims in accordance with Article 5.3 of this Plan and the Master Disposition Agreement.

### 7.16   Collective Bargaining Agreements.

**(a)   UAW.** Pursuant to this Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, a copy of which is attached as <u>Exhibit 1</u> to the UAW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding and Exhibit 2 to the UAW 1113/1114 Settlement Approval Order, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

**(b)   IUE-CWA.** Pursuant to this Plan and in accordance with the IUE-CWA 1113/1114 Settlement Approval Order, on the Effective Date, the IUE-CWA-Delphi-GM Memorandum of Understanding, a copy of which is attached as <u>Exhibit 1</u> to the IUE-CWA 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the IUE-CWA-Delphi-GM Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

**(c)   USW.** Pursuant to this Plan and in accordance with the USW 1113/1114 Settlement Approval Order, on the Effective Date, (i) the USW-Home Avenue Memorandum of Understanding, a copy of which is attached as <u>Exhibit 1</u> to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Home Avenue Memorandum of Understanding and (ii) the USW-Vandalia Memorandum of Understanding, a copy of which is attached as <u>Exhibit 2</u> to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Vandalia Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

**(d)   IUOE.** Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IUOE Local 832S Memorandum of Understanding, a copy of which is attached as <u>Exhibit 1</u> to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 832S Memorandum of Understanding, (ii) the IUOE Local 18S Memorandum of Understanding, a copy of which is attached as <u>Exhibit 2</u> to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 18S Memorandum of Understanding, and (iii) the IUOE Local 101S Memorandum of Understanding, a copy of which is attached as <u>Exhibit 3</u> to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 101S Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement..

(e)    **IBEW.**  Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IBEW E&S Memorandum of Understanding, a copy of which is attached as <u>Exhibit 4</u> to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW E&S Memorandum of Understanding and (ii) the IBEW Powertrain Memorandum of Understanding, a copy of which is attached as <u>Exhibit 5</u> to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW Powertrain Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(f)    **IAM.**  Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, the IAM-Delphi Memorandum of Understanding, a copy of which is attached as <u>Exhibit 6</u> to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IAM-Delphi Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

### 7.17    Pension Matters And PBGC Settlement.

(a)    **Delphi HRP.**  Upon the Effective Date, the Delphi HRP shall no longer be the responsibility of the Debtors and will be addressed by GM.

(b)    **Salaried and Subsidiary Pension Plans.**  The Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan shall be terminated (the "Salaried and Other Pension Plans").

(c)    **PBGC Settlement.**  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan constitutes the Debtors' request to authorize and approve the settlement with the PBGC (the "PBGC Settlement Agreement"), attached hereto substantially in the form of <u>Exhibit 7.17</u>.  Pursuant to the PBGC Settlement Agreement and this Plan, the Debtors shall grant the PBGC an allowed general unsecured nonpriority claim (the "PBGC General Unsecured Claim"), which shall receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.3 of this Plan and other consideration for (i) no distribution being made on account of the Contingent PBGC Secured Claims other than the distribution to be made as set forth above, (ii) the PBGC's settlement of its claims arising under Title IV of ERISA with respect to the Salaried and Other Pension Plans, (iii) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by this Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (iv) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or

44

otherwise.  Except as specifically provided in the PBGC Settlement Agreement and as set forth in
Article V above, on the Effective Date, all liens arising from or relating to the Delphi HRP and/or
the Salaried and Other Pension Plans shall be terminated and discharged.

      **7.18**    **Salaried OPEB Settlement**.  The Debtors will continue the payments on
the schedule authorized under the Order Pursuant to 11 U.S.C  § 363 and Fed. R. Bankr. P. 9019
For Order Approving Debtors' Compromise and Settlement with Committee of Eligible Salaried
Retirees and Delphi Salaried Retirees' Association (Docket No. 16545).

      **7.19**    **Preservation Of Causes Of Action.**  In accordance with section 1123(b)(3)
of the Bankruptcy Code and except as otherwise provided in this Plan or the Master Disposition
Agreement, the Reorganized Debtors shall retain and may (but are not required to) enforce all
Retained Actions and all other similar claims arising under applicable state laws, including,
without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee
and debtor-in-possession under the Bankruptcy Code.  The Debtors or the Reorganized Debtors, in
their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or
enforce such Retained Actions (or decline to do any of the foregoing), and shall not be required to
seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any
successors may pursue such litigation claims in accordance with the best interests of the
Reorganized Debtors or any successors holding such rights of action.  Notwithstanding the
foregoing, Causes of Action against Persons arising under section 544, 545, 547, 548, or 553 of the
Bankruptcy Code or similar state laws shall not be retained by the Reorganized Debtors unless
specifically listed on Exhibit 7.19 hereto.

      **7.20**    **Reservation Of Rights.**  With respect to any avoidance causes of action
under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in
accordance with Article 7.19 of this Plan, the Debtors and the Reorganized Debtors, as applicable,
reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use
defensively the abandoned avoidance cause of action as a basis to object to all or any part of a
claim against any Estate asserted by a creditor which remains in possession of, or otherwise
obtains the benefit of, the avoidable transfer.

      **7.21**    **Exclusivity Period.**  The Debtors shall retain the exclusive right to amend
or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan,
through and until the Effective Date.

      **7.22**    **Dismissal Of Complaints.**  Upon the Effective Date of this Plan, the
proceedings initiated by the Creditors' Committee and the Senior Notes Indenture Trustee for the
revocation of the Confirmation Order shall be closed and the complaints seeking relief therefor
shall be dismissed as moot.

      **7.23**    **Corporate Action.**  Each of the matters provided for under this Plan
involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be
taken by or required of any Debtor or Reorganized Debtor shall, as of the Effective Date, be
deemed to have occurred and be effective as provided herein, and shall be authorized, approved,
and to the extent taken prior to the Effective Date, ratified in all respects without any requirement
of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized
Debtors.

**7.24    Effectuating Documents; Further Transactions.**  Each of the Chief Executive Officer, Chief Financial Officer, and General Counsel of the Debtors, or their respective designees, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.  The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**7.25    Consummation Of Divestiture Transactions**.  In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to sell assets free and clear of liens, Claims, and encumbrances, such Debtor(s) and or Reorganized Debtor(s), as the case may be, shall be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, Claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

**7.26    Exemption From Certain Transfer Taxes And Recording Fees.**  Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or from a Reorganized Debtor to any other Person or entity pursuant to this Plan, Master Disposition Agreement, or any agreement regarding the transfer of title to or ownership of any of the Debtors' or the Reorganized Debtors' real or personal property, shall not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**8.1    Assumed And Rejected Contracts And Leases.**

**(a)    Executory Contracts And Unexpired Leases.**    All executory contracts and unexpired leases as to which any of the Debtors is a party shall be deemed automatically assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject, or that otherwise authorizes rejection, filed on or before the Modification Approval Date, (iii) shall be rejected or assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors prior to the Effective Date, (iv) shall have expired or terminated on or prior to the Effective Date (and not otherwise extended) pursuant to their own terms, (v) are listed on the schedule of rejected contracts attached hereto as <u>Exhibit 8.1(a)—Rejected Contracts</u>, or (vi) are otherwise rejected pursuant to the terms of this Plan and/or upon the direction of either Buyer pursuant to the Master Disposition Agreement.  Subject to the foregoing sentence and consummation of this Plan, entry of the Plan Modification Approval Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the

Bankruptcy Code as of the Effective Date.  Upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed, or assumed and assigned, as applicable, pursuant to this Article 8.l(a) shall vest in and be fully enforceable by the applicable Reorganized Debtor or its assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  Subject to the Master Disposition Agreement, the Debtors reserve the right to file a motion on or before the Modification Approval Date to reject any executory contract or unexpired lease.

(b)    **Real Property Agreements**.  Each executory contract and unexpired lease that is assumed by the applicable Reorganized Debtor and relates to the use, ability to acquire, or occupancy of real property shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.  In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

(c)    **Exhibits Not Admissions.**  Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1(a) nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1(a) on or before the Modification Approval Date.

**8.2    Cure Procedures and Payments Related To Assumption Of Executory Contracts And Unexpired Leases**.

(a)    **Material Supply Agreements**.  The provisions (if any) of each Material Supply Agreement to be assumed under this Plan which are or may be in default shall be satisfied solely by Cure.  For the avoidance of any doubt, any monetary amounts by which each Material Supply Agreement to be assumed pursuant to this Plan is in default shall be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and shall be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent an Allowed Claim includes a claim for default of a Material Supply Agreement assumed under this Plan, then any Cure distributed pursuant to this section on account of such Material Supply Agreement shall offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Material Supply Agreement so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

(i)        **Cure Amount Notices.**  Pursuant to the Solicitation Procedures Order and the Confirmation Order, the Debtors issued a Cure Amount Notice to counterparties to Material Supply Agreements.  The proposed Cure amount set forth in such Cure Amount Notice was equal to the amount that the applicable Debtor believed it or the applicable Reorganized Debtor would be obligated to pay in connection with an assumption of such contract under section 365(b)(1) of the Bankruptcy Code (such amount, the "Cure Amount Proposal").  With respect to reconciling the amount of Cure, the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order and subsequently modified by the Modification Procedures Order, and implemented in accordance therewith shall control and accordingly, Cure shall be equal to (i) subject to modification by written agreement between the Debtors and the applicable counterparty to reduce the Allowed Cure amount, the amount set forth on the Cure Amount Notice, to the extent that no proper and timely objection was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, unless the Debtors send an Amended Cure Amount Notice (as defined below) to an applicable counterparty in which case Cure shall be determined pursuant to the procedures set forth in the Modification Procedures Order, or (ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure Amount Proposal was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, (a) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty or, (b) to the extent no such agreement was or is reached, such other amount as ordered by the Bankruptcy Court.  The Debtors shall send an amended notice with respect to such Cure Amount Notices for which the Debtors have since determined that the Cure Amount Proposal was overstated.  To reduce the overstated Cure amount to its proper amount, the Debtors may, at least 20 days prior to the Effective Date, file with the Court and serve a separate notice (the "Amended Cure Amount Notice") stating the amended Cure amount that the Debtors believe is necessary and proper to cure such contract.  Pursuant to the Modification Procedures Order, if an affected contract counterparty disagrees with the Cure amount listed on the Amended Cure Amount Notice, then the counterparty shall file an objection within ten days of receipt of the Amended Cure Amount Notice to object to the amended Cure amount.  If no objection is timely received, each counterparty shall be deemed to have consented to the Cure amount set forth on the Amended Cure Amount Notice.  Any unresolved objection to an Amended Cure Amount Notice shall be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon by the parties.

(ii)       **Objections To Cure Amount Notices And Payment Of Cure.**  The Cure Amount Notice provided procedures for contracts that were to be assumed by the Reorganized Debtors (and with respect to contracts to be assumed and assigned to GM or Parnassus pursuant to the Modification Procedures Order, such notice of assumption and assigment shall provide procedures) for each counterparty to object to, among other things, the assumption or assumption and assignment of the applicable contract.  The Cure Amount Notice also provided procedures for each counterparty to object to the Cure Amount Proposal.  If the counterparty responded to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order, as modified by the

48

Confirmation Order, or if the counterparty responded to the Amended Cure Amount Notice in accordance with the procedures herein and in the Modification Procedures Order, and the counterparty asserted a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to assumptions, then the Cure shall be paid, honored, or otherwise occur following the later of a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty and the Debtors or Reorganized Debtors, or a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Material Supply Agreement; provided that if there is a dispute as to the amount of Cure or adequate assurance that cannot be resolved consensually among the applicable counterparty and the Debtors, Reorganized Debtors, or the Buyers then notwithstanding anything to the contrary herein, in the Confirmation Order, in the Modification Procedures Order, or in the Modification Approval Order, the Debtors or Reorganized Debtors, shall have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing (a) a Cure amount in excess of that provided by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors and the assignee, if applicable, of such Material Supply Agreement.  To the extent disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan.  If the non-Debtor counterparty to the Material Supply Agreement did not respond to the Cure Amount Notice in accordance with the Solicitation Procedures Order, or even if responded, did not dispute the Cure amount set forth in the Cure Amount Notice or did not dispute the Cure amount set forth in the Amended Cure Amount Notice, then Cure shall be paid in the amount set forth in the Cure Amount Notice or Amended Cure Amount Notice, as applicable, within a reasonable period of time following the Effective Date.

        **(iii)**      **Form Of Cure Payments.**  Notwithstanding anything to the contrary in the Solicitation Procedures Order, as modified by the Confirmation Order, and supplemented by the Modification Procedures Order, a Cure Amount Notice, the First Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12899), the Second Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12900), and the Third Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12901), absent a consensual agreement between the Debtors and the applicable counterparty, each counterparty to a Material Supply

49

Agreement shall be paid in cash for the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to this Plan and the Master Disposition Agreement.

**(b)    Other Executory Contracts And Other Unexpired Leases**.  The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed, or assumed and assigned, under this Plan which are or may be in default shall be satisfied solely by Cure.  For the avoidance of doubt, any monetary amounts by which each Other Executory Contract or Other Unexpired Lease to be assumed pursuant to this Plan is in default shall be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and shall be paid to the non-Debtor counterparty to the Other Executory Contract or Other Unexpired Lease.  Any Cure distributed pursuant to this section shall offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Other Executory Contract or Other Unexpired Lease so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

**(i)    Cure Proposals.**  Pursuant to Article 8.2(b), as confirmed on January 25, 2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who wished to assert that Cure is required as a condition to assumption must have filed and served a proposed cure proposal (a "Cure Proposal") so as to be received by the Debtors and their counsel at the address set forth in Article 14.8 hereof by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

**(ii)    Cure Proposal Objections.**  The Debtors or Reorganized Debtors shall have the right to amend, modify, or supplement the Cure Proposal Objections. Counterparties to an Other Executory Contract or Other Unexpired Lease which failed to file and serve a Cure Proposal by the Cure Proposal Submission Deadline in accordance with the procedures set forth in the Plan confirmed on January 25, 2008, shall each be deemed to have waived its right to assert a default requiring Cure and any default existing as of January 25, 2008 shall have been deemed cured as of the day following the Cure Proposal Submission Deadline and such party shall forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Cure Proposal Submission Deadline.  Counterparties shall assert any claims for defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure Proposal Submission Deadline as Administrative Claims and shall file and serve such claims before the Administrative Claims Bar Date in accordance with the Modification Approval Order and as otherwise set forth in Articles 10.2 and 10.5.  If a counterparty included an assertion in its timely filed and served Cure Proposal disputing (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, or if there is a Cure Proposal Objection then the disputed matter shall be set for hearing in the Bankruptcy Court, which hearing shall be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the

50

Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, shall be paid, honored, or otherwise occur following the earlier of a consensual resolution or the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if there is a dispute as to the amount of Cure or regarding adequate assurance that cannot be resolved consensually among the parties, notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors shall have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing (a) a Cure amount in excess of that asserted by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or the Reorganized Debtors, as the case may be, and the assignee of such contract or lease. To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan.

(iii) **Payment Of Cure.** Except as otherwise provided in this Article VIII, to the extent a Cure Proposal was timely filed and served and is not disputed, the Debtors or Reorganized Debtors, as the case may be, shall pay the Cure Proposal, if any, to the counterparty within a reasonable period of time following the Effective Date. Disputed Cure Proposals or any other disputes regarding Cure or the assumption or assumption and assignment of an Other Executory Contract or Other Unexpired Lease that are resolved consensually or by agreement or Final Order shall be paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by the later of a reasonable period of time following the Effective Date and a reasonable period of time following such agreement or Final Order.

(c) **Other Executory Contracts And Other Unexpired Leases Assigned to Buyers**. Pursuant to the Master Disposition Agreement, the Debtors or Reorganized Debtors, as the case may be, shall assign certain Other Executory Contracts and Other Unexpired Leases to GM Buyer or Parnassus. In connection therewith and in accordance with the procedures set forth in the Modification Procedures Order, Delphi shall serve each counterparty to a GM Assumed Contract or Parnassus Assumed Contract the respective notice (together, the "MDA Assumption and Assignment Notices"), which shall identify the respective Buyer as the party to whom all of the Debtors' rights, title, and interests in the Other MDA Assumed Contracts shall be assigned. Counterparties to Other MDA Assumed Contracts which failed to file and serve an objection to the MDA Assumption and Assignment Notice by the deadline set forth in the Modification Procedures Order, shall each be deemed to have waived its right to challenge the Debtors' or the Reorganized Debtors' assignment of such contract or lease and shall be barred from challenging the ability of any Debtor or Reorganized Debtor, as the case may be, or the respective Buyer or its assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, and shall be barred from making any other challenge pertaining to assumption. If there is an objection to the MDA Assumption and Assignment Notice and the parties cannot consensually resolve their dispute, then the disputed matter shall be set for hearing in the Bankruptcy Court, which hearing

51

shall be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, shall be paid, honored, and otherwise occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors or Reorganized Debtors, as the case may be, shall have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing Cure (and shall if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) or adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors, as applicable, and the assignee. To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan. Notwithstanding anything to the contrary in this Article 8.2(c), Article 8.2(b)(ii) shall control with respect to Cure amounts related to Other MDA Assumed Contracts.

**(d) Intercompany Executory Contracts And Intercompany Unexpired Leases.** Subject to the Master Disposition Agreement, any Claim outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease shall be Reinstated and shall be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

**8.3 Assignment Pursuant To Restructuring Transaction.** To the extent the Debtor which is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated herein, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

**8.4 Rejection Damages Bar Date.** If the rejection by the Debtors (pursuant to this Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Modification Approval Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

**8.5 Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases.** In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to assume and assign or reject certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor(s) does not assume and assign or reject such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption or rejection shall be consummated pursuant to Article VIII of this Plan and service of notice and any Cure payments owed to a non-Debtor counterparty under such contracts and leases shall be made pursuant to Article 8.2 of the Plan and (b) a Debtor(s) or Reorganized Debtor(s), as the case may be,

shall be permitted to either reject or assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1    Time Of Distributions.**  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date.

**9.2    No Interest On Disputed Claims.**  Unless otherwise specifically provided for in this Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**9.3    Disbursing Agent.**  The Disbursing Agent shall make all distributions required under this Plan except with respect to any holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer, as applicable, who shall deliver such distributions to the holders of Claims in accordance with the provisions of this Plan and the terms of any governing agreement; provided, however, that if any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, shall make such distributions.

**9.4    Surrender Of Securities Or Instruments.**  On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") shall surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate shall be cancelled solely with respect to the Debtors and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments; provided, however, that this Article 9.4 shall not apply to any Claims Reinstated pursuant to the terms of this Plan.  No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

**9.5**    **Services Of Indenture Trustees, Agents, And Servicers.**  The services, with respect to implementation of the distributions contemplated by this Plan, of Servicers under the relevant agreements that govern the rights of holders of Claims and Interests shall be as set forth elsewhere in this Plan.  The Reorganized Debtors shall reimburse any Servicer (including the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under this Plan to holders of Allowed Claims, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties shall report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

**9.6**    **Claims Administration Responsibility.**

**(a)**    **Reorganized Debtors.**    The Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in this Article IX.

**(b)**    **Filing Of Objections.**  Unless otherwise extended by the Bankruptcy Court, any objections to Claims and/or Interests shall be served and filed on or before the Claims/Interests Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest). Notwithstanding any authority to the contrary, an objection to a Claim or Interest shall be deemed properly served on the holder of the Claim or Interest if the Debtors or Reorganized Debtors effect service in any of the following manners:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

**(c)**    **Determination Of Claims.**  Any Claim determined and liquidated pursuant to (i) the ADR Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.  Nothing contained in this <u>Article 9.6</u> shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

54

**(d)    Claims Bar Date.**  Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Article 8.3 of this Plan for the filing of such claims, (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to Articles 10.2 and 10.5 of this Plan, or (iv) with respect to Claims that are Prepetition Employee Related Obligations, the bar date established pursuant to Article 7.12(b) of this Plan, shall not be recognized, or recorded on the claims register, by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, or other parties-in-interest to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

### 9.7    Delivery Of Distributions.

**(a)    Allowed Claims.**  Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

**(b)    Undeliverable Distributions.**  If any distribution to a holder of a Claim is returned as undeliverable, no further distributions to such holder of such Claim shall be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such holder of the Claim without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable distributions.  All claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim becomes an Allowed Claim, after which date all unclaimed property shall revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

### 9.8    Procedures For Treating And Resolving Disputed And Contingent Claims.

**(a)    No Distributions Pending Allowance.**  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections

55

to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims/Interests Objection Deadline.

**(b)    Distribution Reserves.** The Reorganized Debtors or Disbursing Agent shall withhold the Distribution Reserves, if any, from the property to be distributed to particular classes under this Plan based upon the Face Amount of Disputed Claims. The Reorganized Debtors or Disbursing Agent shall withhold such amounts or property as may be necessary from property to be distributed to such Classes of Claims under the Plan on a Pro Rata basis based upon the Face Amount of such Claims. The Reorganized Debtors or Disbursing Agent shall also place in the applicable Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld as the applicable Distribution Reserve, to the extent that such property continues to be withheld as the applicable Distribution Reserve at the time such distributions are made or such obligations arise. Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

**(i)    Estimation Of Claims For Distribution Reserves.** To the extent that any Claims remain Disputed Claims as of the Effective Date, the Debtors or Reorganized Debtors shall seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves. Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or the Reorganized Debtors' rejection of an executory contract, pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated; provided, however, that if the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**(c)    No Recourse To Debtors Or Reorganized Debtors.** Any Disputed Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserve established on account of such Disputed Claim. In no event shall any holder of a Disputed Claim have any recourse with respect

to distributions made, or to be made, under the Plan to holders of such Claims to any Debtor or Reorganized Debtor on account of such Disputed Claim, regardless of whether such Disputed Claim shall ultimately become an Allowed Claim or regardless of whether sufficient Cash, or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

        **(d)    Distributions After Allowance.**    Payments and distributions from the Distribution Reserve to each respective holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such holder of a Claim.  On the first Periodic Distribution Date following the date when a Disputed Claim becomes undisputed, noncontingent, and liquidated, the Disbursing Agent shall distribute to the holder of such Allowed Claim any proceeds from the General Unsecured MDA Distribution, or other property, from the Distribution Reserve that would have been distributed on the dates when distributions were previously made had such Allowed Claim been an Allowed Claim on such dates and shall not be limited by the Disputed Claim Amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims.  Upon such distribution, the Distribution Reserve shall be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.

        **(e)    De Minimis Distributions.**    Neither the Disbursing Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $25,000; <u>provided</u> that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $25,000 if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date or (ii) the amount to be distributed to the specific holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such holder and (y) have a value less than $50.00.

        **9.9    Section 510(b) Opt Out Claims.**  No Section 510(b) Opt Out Claim shall be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution that would have otherwise been distributed under the Plan solely from the applicable portion of the Securities Settlement.  In no event shall any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made, or to be made, under the Securities Settlement to holders of such Claims or Interests to or against any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim shall ultimately become an Allowed Claim.

        **9.10    Allocation Of Plan Distributions Between Principal And Interest.**  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount

of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE X

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

### 10.1    DIP Facility Claims.

(a)    **DIP Transfer.**  The DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim shall be satisfied and discharged in their entirety pursuant to the DIP Transfer.

(b)    **Cancellation Of Liens.**  Upon consummation of the DIP Transfer, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders of the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

### 10.2    Pre-Confirmation Administrative Claim Procedures.  Pursuant to the Modification Procedures Order, all requests for payment of an Administrative Claim through June 1, 2009 (other than as set forth in the Modification Procedures Order, Article 10.1, or Article 10.3 of this Plan) must be filed with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than the July 15, 2009.  Any request for payment of an Administrative Claim pursuant to this Article 10.2 that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim request made pursuant to this Article 10.2 without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

### 10.3    Professional Claims.

(a)    **Final Fee Applications.**    All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.

**(b)    Payment Of Interim Amounts.**    Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to prior periods through the Modification Approval Order Date.  To receive payment on the Effective Date for unbilled fees and expenses incurred through the Modification Approval Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Modification Approval Date and shall deliver such estimate to the Debtors, counsel for the Creditors' Committee, and the United States Trustee for the Southern District of New York. Within 45 days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable. Should the estimated payment received by any Professional exceed the actual fees and expenses for such period, this excess amount shall be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional.

**(c)    Holdback Amount.**    On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

**(d)    Post-Confirmation Date Retention.**    Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business.

**10.4    Substantial Contribution Compensation And Expenses Bar Date.**  Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

**10.5    Other Administrative Claims.**  All other requests for payment of an Administrative Claim (other than as set forth in Article 10.1, Article 10.2, Article 10.3, or Article 10.4 of this Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached hereto as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors and the Creditors' Committee no later than 30 days after the Effective Date.  Any request for

payment of an Administrative Claim pursuant to this Article 10.5 that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

## ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Revesting Of Assets.**  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions and Retained Assets, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court or are the subject of any of the Disposition Transactions) shall revest in each of the Reorganized Debtors which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan, the Confirmation Order, and the Modification Approval Order.

**11.2    Discharge Of The Debtors.**  Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

**11.3    Compromises And Settlements.**  In accordance with Article 9.6 of this Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against

other Persons up to and including the Effective Date.  After the Effective Date, any such right shall pass to the Reorganized Debtors as contemplated in <u>Article 11.1</u> of this Plan, without the need for further approval of the Bankruptcy Court.

       **11.4    Release By Debtors Of Certain Parties.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to <u>Article 11.13</u> of this Plan, effective as of the Effective Date (and with respect to the DIP Lenders, the DIP Agent, and the members of the DIP Steering Committee, upon the consummation of the DIP Transer, which shall be deemed to occur on the Effective Date), each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases. The Reorganized Debtors, including Reorganized DPH Holdings, and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.  Notwithstanding the foregoing, nothing in this Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.**

       **11.5    Release By Holders Of Claims And Interests .  On the Effective Date, (a) each Person who votes to accept this Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor) which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under this Plan and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with this Plan (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination,**

filing, implementation, administration, confirmation, or consummation of this Plan, the Disclosure Statement, the Plan Exhibits, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with either this Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 cases; provided, however, that (A) this Article 11.5 is subject to and limited by Article 11.13 of this Plan and (B) this Article 11.5 shall not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates shall be as set forth in the Delphi-GM Global Settlement Agreement and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

11.6    **Release By Unions.**  The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding, (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding, and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference herein in their entirety.

11.7    **Release Of GM By Debtors And Third Parties.**  On the Effective Date, GM shall receive all releases provided for in Section 4.01 of the Delphi-GM Global Settlement Agreement, which provisions are incorporated by reference herein in their entirety.

11.8    **Reserved.**

11.9    **Setoffs.**  Subject to Article 11.13 of this Plan, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

11.10    **Subordination Rights.**

62

(a)    All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date; provided, further, that the subordination rights of Senior Debt (as such term is defined in the Subordinated Notes Indenture) shall be deemed satisfied through the distributions described in Article 5.4, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims shall not receive a distribution under this Plan.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including any Plan Exhibits), the Confirmation Order, or the Modification Approval Order the right of any of the Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.  Unless the Plan (including Plan Exhibits), the Confirmation Order, or the Modification Approval Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

**11.11   Exculpation And Limitation Of Liability. Subject to Article 11.13 of this Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent, the DIP Lenders in their capacities as such, GM, Parnassus, Platinum, the Indenture Trustees in their capacities as such, and any of such parties' respective current or former members, officers, directors, committee members, affiliates, employees, advisors, attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents, and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the Plan Exhibits, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements,**

63

and protective orders entered during the Chapter 11 Cases, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  Other than as provided for in this Article and in **Article 11.13**, no party or its agents, employees, representatives, current or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this Article for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases.  For the avoidance of doubt, the exculpatory provisions of this Article, which apply to postpetition conduct, are not intended, nor shall they be construed, to bar any governmental unit from pursuing any police or regulatory action.  Moreover, nothing in this Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Debtors or the Buyers from their obligations under the Disposition Agreements, (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby, or (v) any of the Debtors from their obligations under this Plan or the transactions contemplated thereby.

**11.12  Indemnification Obligations.**  Subject to Article 11.13 of this Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights shall be released and discharged on and as of the Effective Date except for Continuing Indemnification Rights (which shall remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases); (b) the Debtors or the Reorganized Debtors, as the case may be, shall maintain directors' and officers' insurance providing coverage for those Indemnitees currently covered by such policies for the remaining term of such policy and shall maintain tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy in an aggregate amount not to exceed $10 million; (c) the insurers who issue the Insurance Coverage shall be authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, shall indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or

64

retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.  Notwithstanding subclause (a) above, pursuant to the Stipulation and Agreement of Insurance Settlement (the "Insurance Stipulation") the Delphi Officers' and Directors' (as defined in the Insurance Stipulation) indemnification claims related to the MDL Actions and related government investigations and proceedings have been estimated at $0 for all purposes in these cases, and the Delphi Officers and Directors have released all such indemnification claims against Delphi, subject to the Delphi Officers' and Directors' right to assert an indemnification claim against Delphi for legal fees and expenses incurred in the defense of unsuccessful claims asserted as a defense or set-off by Delphi against the Delphi Officers and Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

**11.13   Exclusions And Limitations On Exculpation, Indemnification, And Releases.**  Notwithstanding anything in this Plan to the contrary, no provision of this Plan, the Confirmation Order, or the Modification Approval Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Person not specifically released hereunder, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

**11.14   Injunction.  Subject to <u>Article 11.13</u> of this Plan, and except as required and to the limited extent necessary to transfer the Transferred Assets to the DIP Lenders as provided in <u>Article 7.8</u> of this Plan, the satisfaction, release, and discharge pursuant to this <u>Article XI</u> shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

# ARTICLE XII

## <u>CONDITIONS PRECEDENT</u>

**12.1   Confirmation.**  The Confirmation Order was entered on January 25, 2008, and became a final order on February 4, 2008.

**12.2   Conditions To The Effective Date Of The Plan.**  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

**(a)**   The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Plan.

**(b)**   The Debtors or the Reorganized Debtors, as the case may be, shall have entered into the Master Disposition Agreement, and all conditions precedent to the

consummation of the Master Disposition Agreement shall have been waived or satisfied in accordance with the terms thereof.

**(c)**    The Debtors or the Reorganized Debtors , as the case may be, and the DIP Agent shall have effectuated the DIP Transfer.

**(d)**    The Debtors or the Reorganized Debtors, as the case may be, shall have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

**(e)**    The Bankruptcy Court shall have entered one or more orders, which may include the Modification Approval Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of this Plan.

**(f)**    Each Exhibit, document, or agreement to be executed in connection with this Plan shall be in form and substance reasonably acceptable to the Debtors.

**12.3    Waiver Of Conditions Precedent.** The conditions set forth in 12.2(e)  and 12.2(f) of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XIII

## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan, including, among others, the following matters:

**(a)**    to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

**(b)**    to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

**(c)**    to adjudicate any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under this Plan;

**(d)**    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

**(e)**    to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

**(f)**    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

**(g)**    to issue orders in aid of execution, implementation, or consummation of this Plan;

**(h)**    to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order or Modification Approval Order;

**(i)**    to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

**(j)**    to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

**(k)**    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan the Confirmation Order, or the Modification Approval Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan; provided that retention of jurisdiction as to disputes involving GM shall be as set forth in Article XIII (u);

67

**(l)**    to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

**(m)**    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**(n)**    to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

**(o)**    to hear any other matter not inconsistent with the Bankruptcy Code;

**(p)**    to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

**(q)**    to enter a final decree closing the Chapter 11 Cases;

**(r)**    to enforce all orders previously entered by the Bankruptcy Court;

**(s)**    to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim;

**(t)**    to hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement;

**(u)**    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents, the Master Disposition Agreement, except as provided in such documents; and

**(v)**    to hear and determine all matters relating to the Contingent PBGC Secured Claims or the Delphi-PBGC Settlement Agreement.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court shall retain exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions.  Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors shall have authority to bring such action in any other court of competent jurisdiction.

# ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.1    Binding Effect**.  Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former holders of Claims, all current and former holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**14.2    Payment Of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed.

**14.3    Modification And Amendments**.  The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing.  The Debtors may alter, amend, or modify any Exhibits to this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of this Plan with respect to any Debtor as defined in section 1101(2) of the Bankruptcy Code, any Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**14.4    Reserved.**

**14.5    Withholding And Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**14.6    Committees**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, underlined provided that obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms. The Statutory Committees may make applications for Professional Claims and members of the Statutory Committees may make requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with challenges to any order confirming the Plan or any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date and for the other duties and responsibilities of the Statutory Committees set forth in this Section and other services as may be requested by, the Debtors and the

Reorganized Debtors shall pay the fees and expenses in respect of such services in the ordinary course of business without further order of the Bankruptcy Court. This Section shall apply for all purposes and to all Debtors and their respective Estates under the Plan.

### 14.7   Revocation, Withdrawal, Or Non-Consummation.

(a)   **Right to revoke or withdraw.**  Each of the Debtors reserves the right to revoke or withdraw this Plan with respect to such Debtor at any time prior to the Effective Date.

(b)   **Effect of withdrawal, revocation, or non-consummation.**  If any of the Debtors revokes or withdraws this Plan as to such Debtor prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan with respect to such Debtor or Debtors (including the fixing or limiting to an amount certain any Claim or Class of Claims with respect to such Debtor or Debtors, the effect of substantive consolidation for purposes under this Plan, or the allocation of the distributions to be made hereunder), the assumption or rejection of executory contracts or leases effected by this Plan with respect to such Debtor or Debtors, and any document or agreement executed pursuant to this Plan with respect to such Debtor or Debtors shall be null and void as to such Debtor or Debtors.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against such Debtor or Debtors or any other Person, to prejudice in any manner the rights of any such Debtor or Debtors, the holder of a Claim or Interest, or any Person in any further proceedings involving such Debtor or Debtors or to constitute an admission of any sort by the Debtors or any other Person.

### 14.8   Notices.  Any notice required or permitted to be provided to the Debtors, Creditors' Committee, GM, and Parnassus shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

**If to the Debtors:**

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Att'n:   David M. Sherbin
         General Counsel

with a copy to:

Skadden, Arps, Slate, Meagher &
  Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
Att'n:   John Wm. Butler, Jr.
         Ron E. Meisler

– and –

Skadden, Arps, Slate, Meagher &
   Flom LLP
Four Times Square
New York, New York 10036
Att'n:   Kayalyn A. Marafioti

**If to the Creditors' Committee:**

Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, New York 10022-4834
Att'n:   Robert J. Rosenberg
         Mitchell A. Seider
         Mark A. Broude

**If to General Motors:**

General Motors Corporation
300 GM Renaissance Center
Detroit, Michigan 48265
Attn:  General Counsel

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Att'n:   Jeffrey L. Tanenbaum
         Robert J. Lemons

**If to Parnassus:**

Parnassus Holdings II, LLC
c/o Platinum Equity Capital Partners II, L.P.
360 N. Crescent Drive, South Building
Beverly Hills, California 90210

with a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attn:   Adam C. Harris
         David J. Karp

**14.9    Term Of Injunctions Or Stays**.  Unless otherwise provided herein or in the Confirmation Order or the Modification Approval Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date or the Modification Approval Date, shall remain in full force and effect until the Effective Date.

**14.10    Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation of the applicable Debtor.

**14.11    No Waiver Or Estoppel**.  Upon the Effective Date, each holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, the Equity Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**14.12    Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.

Dated:       December 10, 2007

As Modified:  January 25, 2008
              June 16, 2009
              Troy, Michigan

                              DELPHI CORPORATION AND THE AFFILIATE
                                 DEBTORS


                              By:  /s/ John D. Sheehan
                                   John D. Sheehan
                                   Vice President, Chief Financial Officer

Exhibit 7.3

Restructuring Transactions Notice

[To be filed on or before the Exhibit Filing Date]

Exhibit 7.4(a)

Certificate Of Incorporation For Reorganized DPH Holdings

[To be filed on or before the Exhibit Filing Date]

Exhibit 7.4(b)

Bylaws Of Reorganized DPH Holdings

[To be filed on or before the Exhibit Filing Date]

Exhibit 7.7

Master Disposition Agreement

[Exhibits and Schedules to the Master Disposition Agreement will be filed under separate notice]

**FREEDOM OF INFORMATION ACT CONFIDENTIALITY REQUESTED**

**EXECUTION COPY**

**MASTER DISPOSITION AGREEMENT**

**AMONG**

**DELPHI CORPORATION,**

**GM COMPONENTS HOLDINGS, LLC,**

**GENERAL MOTORS CORPORATION**
**(SOLELY WITH RESPECT TO ARTICLE 6 AND SECTIONS 9.11.1, 9.19, AND 9.38),**

**PARNASSUS HOLDINGS II , LLC,**

**AND**

**THE OTHER SELLERS AND OTHER BUYERS PARTY HERETO**

**DATED AS OF**

**June 1, 2009**

**(revised as of June __, 2009)**

# TABLE OF CONTENTS

**ARTICLE 1. DEFINITIONS.**..................................................................................**2**

    **1.1 Certain Defined Terms.**..........................................................................**2**

    **1.2 Other Interpretive Provisions.**............................................................**25**

**ARTICLE 2. PURCHASE AND SALE.**......................................................**25**

    **2.1 Transfers by Sellers and their Affiliates.**...........................................**25**

    **2.2 Assumption of Liabilities.**....................................................................**32**

    **2.3 Retained Liabilities.**.............................................................................**33**

    **2.4 JV Companies Liabilities, Sale Company Liabilities.**........................**34**

    **2.5 Deferred Items.**....................................................................................**34**

    **2.6 Restrictive Covenants.**.........................................................................**35**

    **2.7 Allocation Among Buyers.**...................................................................**36**

**ARTICLE 3. PURCHASE PRICE; ALLOCATION.**................................**36**

    **3.1 GM Purchase Price.**............................................................................**36**

    **3.2 Company Purchase Price.**...................................................................**37**

    **3.3 GM Purchase Price and Company Purchase Price Allocation.**.........**38**

**ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLERS.**.........................**38**

    **4.1 Organization.**.......................................................................................**38**

    **4.2 Authorization; Enforceability.**............................................................**39**

    **4.3 Capital Stock of the Sale Companies and JV Companies.**.................**39**

    **4.4 No Conflict or Approvals.**...................................................................**40**

    **4.5 Sufficiency of Acquired Assets.**...........................................................**41**

    **4.6 Intellectual Property.**...........................................................................**41**

    **4.7 Personal Property Assets, Inventory.**.................................................**42**

i

**4.8 Real Property.** ...................................................................................................42

**4.9 Financial Statements.** ........................................................................................43

**4.10    Compliance with Law; Permits.** ....................................................................44

**4.11    Proceedings; Orders.** ......................................................................................44

**4.12    Tax Matters.** ....................................................................................................44

**4.13    Employee Benefits; Labor.** ............................................................................45

**4.14    Contracts.** ........................................................................................................48

**4.15    Environmental Matters.** ..................................................................................49

**4.16    Insurance.** ........................................................................................................50

**4.17    No Brokers' Fees.** ............................................................................................50

**4.18    Affiliate Transactions.** ....................................................................................51

**4.19    No Other Representations or Warranties.** ......................................................51

**4.20    Fair Disclosure; Schedule Data.** ....................................................................51

**ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF GM BUYERS.** ..................51

**5.1 Organization.** ......................................................................................................51

**5.2 Authorization; Enforceability.** ...........................................................................52

**5.3 No Conflicts or Approvals.** .................................................................................52

**5.4 Proceedings.** .......................................................................................................53

**5.5 Investment Representations.** ..............................................................................53

**5.6 Financial Ability.** ................................................................................................53

**5.7 Adequate Assurance of Future Performance.** ....................................................54

**5.8 No Brokers' Fees.** ...............................................................................................54

**5.9 Anti-Money Laundering.** ....................................................................................54

**5.10    Compliance with Laws.** ..................................................................................54

**5.11    No Undisclosed Agreements.** ..........................................................................55

ii

**ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF GM** ....................................55

    **6.1 Authorization; Enforceability.**....................................................................55

    **6.2 No Conflicts or Approvals.**.......................................................................55

    **6.3 GM Financing Arrangements.**..................................................................56

**ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF COMPANY BUYER.** ......56

    **7.1 Organization.**...........................................................................................56

    **7.2 Authorization; Enforceability.**....................................................................56

    **7.3 No Conflicts or Approvals.**.......................................................................57

    **7.4 Proceedings.**.............................................................................................57

    **7.5 Investment Representations.**....................................................................58

    **7.6 Equity Commitment Letter.**......................................................................58

    **7.7 Adequate Assurance of Future Performance.**...........................................59

    **7.8 No Brokers' Fees.**.....................................................................................60

    **7.9 Anti-Money Laundering.**...........................................................................60

    **7.10    Compliance with Laws.**......................................................................60

    **7.11    No Undisclosed Contracts.**.................................................................60

**ARTICLE 8. INTENTIONALLY OMITTED** ..............................................................60

**ARTICLE 9. COVENANTS AND AGREEMENTS.** ....................................................61

    **9.1 Conduct of Business between Signing and Closing.**..................................61

    **9.2 Bankruptcy Actions.**.................................................................................63

    **9.3 Assumed Contracts; Cure Amounts.**.......................................................64

    **9.4 Tax Matters; Cooperation; Preparation of Returns; Tax Elections.**..........65

    **9.5 Employees; Benefit Plans; Labor Matters.**...............................................67

    **9.6 Pre-Closing Cooperation; Contact with Customers and Suppliers.**..........71

    **9.7 Technical Documentation; Trade Secrets.**...............................................71

iii

**9.8 Corporate Names.** ...................................................................................**71**

**9.9 Information Technology; Intellectual Property Rights and Licenses.** .......................**72**

**9.10    Shared Items Transferred to Buyers** .................................................**77**

**9.11    Buyer Guarantee.** ...........................................................................**77**

**9.12    Letters of Credit.** ............................................................................**77**

**9.13    Competition Clearance.** ..................................................................**77**

**9.14    Further Actions.** .............................................................................**79**

**9.15    Further Assurances.** ........................................................................**79**

**9.16    Customs Duties.** .............................................................................**79**

**9.17    Enterprise Contracts.** .....................................................................**80**

**9.18    Confidentiality.** .............................................................................**80**

**9.19    Termination of Certain Agreements.** .............................................**81**

**9.20    Certain Mexican Matters.** .............................................................**82**

**9.21    Transfer of Certain Sale Securities.** ..............................................**84**

**9.22    Certain Bank Accounts.** .................................................................**84**

**9.23    Certain China Matters.** ..................................................................**84**

**9.24    Certain Poland Matters.** .................................................................**85**

**9.25    Non-GM Customers.** .......................................................................**85**

**9.26    Transfer of Quotas in Saginaw Brazil.** .........................................**85**

**9.27    Transfer of the Brazilian Real Estate** ...........................................**86**

**9.28    Environmental Permits.** ................................................................**86**

**9.29    Conflict and Privilege Waivers.** ....................................................**86**

**9.30    Preservation of Environmental Records.** ......................................**87**

**9.31    DIP Transfer Matters.** ...................................................................**87**

**9.32    Reorganization and Restructuring.** ...............................................**88**

iv

9.33    Certain Other Actions. ...................................................................................88

9.34    Retained Plans. ...............................................................................................88

9.35    Certain India Matters. ....................................................................................89

9.36    Pending Transactions. ....................................................................................89

9.37    Delphi FICA Litigation. ..................................................................................89

9.38    GM Financing. .................................................................................................89

9.39    Environmental Matters. .................................................................................90

9.40    Non-Solicitation. ..............................................................................................90

9.41    Employment, Retirement, Indemnification, and Other Agreements, and
        Incentive Compensation Programs. ..............................................................91

9.42    India Matters. ..................................................................................................92

9.43    Prosecution and Settlement of Appaloosa Claim. .......................................92

ARTICLE 10. CONDITIONS TO CLOSING. .........................................................93

10.1    Conditions to Obligations of Sellers and Buyers. ........................................93

10.2    Conditions to Obligations of Sellers. .............................................................94

10.3    Conditions to Obligations of GM Buyers. .....................................................94

10.4    Conditions to Obligations of Company Buyer. .............................................95

ARTICLE 11. CLOSING. ...........................................................................................96

11.1    Closing Time and Date. ...................................................................................96

11.2    GM Ancillary Agreements. .............................................................................97

11.3    Company Ancillary Agreements. ...................................................................99

11.4    Sellers' Deliveries at Closing. ........................................................................100

11.5    Buyers' Deliveries at Closing. ........................................................................101

11.6    Post-Closing Deliveries. ..................................................................................103

11.7    Post-Closing Transfer of Intellectual Property Rights. ...............................103

**ARTICLE 12. TERMINATION.**................................................................................**104**

    **12.1**    **Termination.**.................................................................................**104**

    **12.2**    **Procedure and Effect of Termination.**...................................**105**

**ARTICLE 13. LIABILITY, SURVIVAL.**.....................................................**106**

    **13.1**    **LIMITATIONS OF LIABILITY.**............................................**106**

    **13.2**    **Termination Fee.**.......................................................................**106**

    **13.3**    **Survival.**....................................................................................**106**

**ARTICLE 14. MISCELLANEOUS.**.............................................................**107**

    **14.1**    **Fees and Expenses.**..................................................................**107**

    **14.2**    **Bulk Sales Laws.**.....................................................................**107**

    **14.3**    **Payments in Dollars.**...............................................................**107**

    **14.4**    **Amendment.**.............................................................................**107**

    **14.5**    **Assignment.**..............................................................................**107**

    **14.6**    **No Successor Liability.**...........................................................**108**

    **14.7**    **Waiver.**......................................................................................**108**

    **14.8**    **Notices.**......................................................................................**109**

    **14.9**    **Entire Agreement.**..................................................................**110**

    **14.10**        **Counterparts.**...........................................................**111**

    **14.11**        **Publicity.**...................................................................**111**

    **14.12**        **Headings.**...................................................................**111**

    **14.13**        **Severability.**.............................................................**111**

    **14.14**        **Third Parties.**..........................................................**111**

    **14.15**        **Governing Law.**.......................................................**111**

    **14.16**        **Venue and Retention of Jurisdiction.**...................**111**

    **14.17**        **Risk of Loss.**.............................................................**112**

**14.18**     **Enforcement of Agreement.** ...............................................................112

**14.19**     **Sellers' Obligations.** ..........................................................................112

**14.20**     **Bankruptcy Court Approval.** ............................................................112

**14.21**     **Reasonably Equivalent Value.** .........................................................113

**14.22**     **Identification of Exhibits and Schedules to be Filed Under Seal** ...................113

# MASTER DISPOSITION AGREEMENT

THIS MASTER DISPOSITION AGREEMENT (this "**Agreement**"), dated as of June 1, 2009 (revised as of June __, 2009), is among DELPHI CORPORATION, a Delaware corporation ("**Delphi**") on behalf of itself and the other entities set forth on Schedule 1 and Schedule 2; GM COMPONENTS HOLDINGS, LLC, a Delaware limited liability company ("**Parent**"), on behalf of itself and the other buyers set forth on Schedule 1, which is to be provided by Parent to Delphi as provided in this Agreement (each a "**GM Buyer**," and, collectively with Parent and the Australian Buyer (as defined below), the "**GM Buyers**"); GENERAL MOTORS CORPORATION, a Delaware Corporation ("**GM**") (solely with respect to ARTICLE 6 and Sections 9.11.1, 9.19, 9.38.1 and 9.38.2); PARNASSUS HOLDINGS II, LLC, a Delaware limited liability company on behalf of itself and the other buyers that may later be set forth on Schedule 2 as provided in this Agreement ("**Company Buyer**," and collectively with the GM Buyers, the "**Buyer**" or "**Buyers**").

WHEREAS, Parent is a direct or indirect subsidiary of GM;

WHEREAS, Company Buyer is an Affiliate of Platinum Equity Capital Partners II, L.P.;

WHEREAS, Delphi, through certain of its Affiliates referred to in this Agreement, is engaged in the Steering Business and the business conducted at the UAW Sites (but excluding the business conducted at the technical centers included in the UAW Sites other than the Lockport technical center) (together, the "**GM Business**") and the Company Business (as hereinafter defined);

WHEREAS, the GM Securities Sellers (as hereinafter defined) own, directly or indirectly, the GM Sale Securities (as hereinafter defined), and the Company Securities Sellers (as hereinafter defined) own, directly or indirectly Company Sale Securities (as hereinafter defined);

WHEREAS, the GM Asset Sellers (as hereinafter defined) own the GM Acquired Assets (as hereinafter defined), and the Company Asset Sellers (as hereinafter defined) own the Company Acquired Assets (as hereinafter defined);

WHEREAS, on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101-1330 (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall be an Exhibit to the Plan of Reorganization (as hereinafter defined);

WHEREAS, Delphi and the applicable Sellers desire to sell substantially all of their assets and specified liabilities with respect to the GM Business and the Company Business to the applicable Buyers and the Buyers desire to acquire substantially all of such assets and the specified liabilities as set forth in this Agreement; and

1

WHEREAS, in furtherance of that desire and as contemplated by Sections 365, 1123 and 1146 of the Bankruptcy Code and in furtherance of the Filing Affiliates' plan of reorganization, the GM Securities Sellers, Company Securities Sellers, the GM Asset Sellers and Company Asset Sellers desire to sell or cause the sale to the applicable Buyers all of their respective right, title and interest in and to the GM Sale Securities, the Company Sale Securities, GM Acquired Assets (as hereinafter defined) and the Company Acquired Assets (as hereinafter defined), and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree as follows:

## ARTICLE 1.
## DEFINITIONS.

### 1.1    Certain Defined Terms.

As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"**Accounts Receivable**" means all trade accounts receivable, including intercompany trade receivables, and other rights to payment from customers and all other accounts or notes receivable from third parties and Affiliates and the full benefit of all security for such accounts or notes that are not received prior to the Closing Date.

"**Acquired Assets**" means the GM Acquired Assets and the Company Acquired Assets.

"**Acquired Contracts**" means all Contracts that relate to the GM Business or the Company Business, as the case may be, provided that in the case of Pre-Petition Contracts, the Acquired Contracts include only the Assumed and Assigned Contracts.

"**Administrative Assets**" of an Asset Seller, means books, records and instruments relating to the business, operations, condition of (financial or other), or results of operations of such Asset Seller with respect to the applicable Business and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, computer files, operating data and plans, sales materials and records, purchasing materials and records, personnel records of employees, billing records, sale order files, accounting records, other financial records, and related work papers that relate to the applicable Acquired Assets, budgets, pricing guidelines, ledgers, journals, deeds and title policies; provided, however, that Administrative Assets do not include Intellectual Property, Technical Documentation, Environmental Records or GM Environmental Records.

"**Administrative Claims**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, claims arising under the DIP Agreement, the actual, necessary costs and expenses, incurred on or after the Petition Date,

of preserving the estates and operating the business of Delphi, including wages, salaries, or commissions for services rendered after the Petition Date, professional claims, all fees and charges assessed against the estates under chapter 123 of title 28, United States Code, and all allowed claims that are to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

"**Affiliate**" means, with respect to any Person, any Person which directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  The term "control" for purposes of this definition, means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person.  For the purpose of applying this definition to GM under <u>Section 9.13.2</u>, "control" means ownership of more than twenty percent (20%) of the shares or other equity interests of such Person.

"**Agreement**" – Recitals.

"**Ancillary Agreements**" means the GM Ancillary Agreements or the Company Ancillary Agreements, as applicable.

"**Appaloosa Claim**" means Delphi's claims against Appaloosa Management L.P. or any other plan investors or other parties arising from or relating to the Equity Purchase and Commitment Agreement, dated as of August 3, 2007, as amended, including that certain litigation against Appaloosa Management L.P. and other plan investors who were party to such Equity Purchase and Commitment Agreement, as amended, and styled Delphi Corporation v. Appaloosa Management L.P., et al., filed in the U.S. Bankruptcy Court S.D.N.Y. on May 16, 2008 (Case No. 05-44481), including any settlements, modifications or claims related thereto.

"**Asset Sellers**" means the GM Asset Sellers and the Company Asset Sellers, as applicable.

"**Assumed Administrative Liabilities**" means the Administrative Claims excluding Liabilities under the DIP Agreement, with respect to the categories set forth on <u>Schedule 1.1.A</u> and, with respect to the GM Buyers, those Hedging Agreements which they assume.

"**Assumed and Assigned Contracts**" – <u>Section 9.3</u>.

"**Assumed Liabilities**" – GM Assumed Liabilities or Company Assumed Liabilities, as applicable.

"**Australian Assets**" means the GM Acquired Assets located or taken to be located in Australia.

"**Australian Buyer**" means the Australian Buyer of the Australian Assets, Rhodes Automotive manufacturing Pty Limited ABN 41 129 320 494.

"**Australian Seller**" means the Australian Seller of the Australian Assets, Delphi Automotive Systems Australia Limited ABN 31 065 439 885.

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Brazilian Real Estate**" means the fraction of the condominium stated as being owned by Delphi Brazil and enrolled under the real estate certificate (matrícula) No. 76.477 registered before the real estate register office of the City of Porto Alegre, State of Rio Grande do Sul.

"**Business**" means the GM Business or the Company Business, as applicable.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer Loan Documents**" means the loan documents to be executed on or prior to the Closing pursuant to which GM and an Affiliate of Company Buyer have agreed to make certain loans and provide certain financial accommodations to Company Buyer.

"**Buyer(s)**" – Recitals.

"**Buyer Transition Services Agreement**" means the Transition Services Agreement in the form attached hereto as Exhibit 11.3.2 to be entered between GM Buyers and Company Buyer.

"**C Lenders**" means all Tranche C Lenders (as defined in the DIP Agreement).

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits at Closing and less all outstanding checks and electronic payments of the Business, in each case as determined in accordance with GAAP.

"**China Entities**" means Delphi Saginaw Lingyun Drive Shaft Co. Ltd., Saginaw Lingyun Drive Shaft (Wuhu) Co., Ltd. and Saginaw Steering (Suzhou) Co., Ltd.

"**China L/C**" – Section 9.23.1.

"**China L/C Period**" – Section 9.23.1.

"**Claims**" mean all bankruptcy claims (as defined in Section 101 of the Bankruptcy Code), other claims, written notices, causes of actions, proceedings, complaints, investigations and Proceedings, of any nature whatsoever.

"**Closing**" – Section 11.1.1.

"**Closing Date**" – Section 11.1.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

4

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union, works council or other representatives of Transferred Employees (including local agreements, amendments and supplements, and material letters and memoranda of understanding of any kind) that are in effect as of the date of this Agreement.

"**Commercial Agreement**" means the Commercial Agreement among the GM Buyers and Company Buyers of even date herewith.

"**Company Acquired Assets**" – Section 2.1.4.

"**Company Ancillary Agreements**" means the Transfer Agreements and other agreements referred to in Section 11.3.

"**Company Asset Buyer(s)**" means the Buyers set forth on Schedule 2, which Company Buyer will use commercially reasonable efforts to provide to Delphi ten (10) Business Days after the date of this Agreement, with respect to the assets set forth opposite their names.

"**Company Asset Sellers**" means Sellers set forth on Schedule 2, with respect to the assets set forth opposite their names.

"**Company Assumed Liabilities**" – Section 2.2.2

"**Company Business**" means all businesses of Delphi and its subsidiaries, other than the GM Business, the businesses solely conducted at the Excluded Assets and the businesses to be sold as part of the Pending Transactions.

"**Company Buyer**" – Recitals.

"**Company Confidentiality Agreement**" means the confidentiality agreement between Platinum Equity and Delphi, dated September 5, 2008.

"**Company IP License Agreement**" – Section 9.9.3.

"**Company Licensed Intellectual Property**" means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is used or held for use in the Company Business.

"**Company Owned Real Property**" means the Real Property owned by any of the Company Sale Companies or Company Asset Sellers as of the date of this Agreement or which constitute Company Acquired Assets, excluding any real property that constitutes GM Owned Real Property.

"**Company Purchase Price**" – Section 3.2.1.

"**Company Purchased Intellectual Property**" means any Seller's and/or any of their respective Affiliate's right, title and interest in Intellectual Property other than the Steering Purchased Intellectual Property and subject to rights granted to GM Buyers hereunder.

5

"**Company Real Property**" means the real property relating to the Company Business.

"**Company Sale Companies**" mean the Sale Companies being transferred to Company Buyer, directly or indirectly, under this Agreement.

"**Company Sale Securities**" mean all of the outstanding shares of the Sale Companies, and all of the outstanding shares of the JV Companies that are owned by Sellers as set forth on Schedule 2 to this Agreement.

"**Company Securities Buyers**" means the Buyers set forth on Schedule 2, which Company Buyers will use their commercially reasonable efforts to provide to Delphi, ten (10) Business Days before Closing but, in any event, in sufficient time to complete filings under Competition/Investment Laws, with respect to the Sale Companies set forth opposite their names.

"**Company Securities Seller(s)**" means the securities sellers set forth on Schedule 2 to this Agreement, with respect to the Company Sale Securities set forth opposite their names.

"**Company Sellers**" means the Company Securities Sellers and Company Asset Sellers, as applicable.

"**Company Transfer Agreements**" means any agreements which govern the transfer of Company Acquired Assets under the laws of jurisdictions outside the United States.

"**Competing Transaction**" – Section 0.

"**Competition/Investment Law**" means any Law that is designed or intended to prohibit, restrict or regulate:  (i) foreign investment; or (ii) antitrust, monopolization, restraint of trade or competition.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

"**Controlled Group**" means any trade or business (whether or not incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sale Companies; or (ii) which together with any of the Sale Companies is treated as a single employer under Section 414(t) of the Code.

"**Copyrights**" mean:  (i) all copyrights, works of authorship or copyrightable works existing anywhere (registered, published, unpublished, protected by statutory law or otherwise)

6

and registrations, renewals, revivals, reissuances, extensions and applications for copyright registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefor; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**CSC**" – Section 9.9.12.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of and/or assignment to Buyers of the Pre-Petition Contracts included within the Assumed and Assigned Contracts under the Plan Modification Order.

"**Data Room**" means the virtual data room maintained by Merrill Corporation in which the documents and information related to the Steering Business were disclosed to Parent's representatives and counsel and the virtual data rooms maintained by Delphi in which documents and information related to the other Acquired Assets, Sale Companies and applicable JV Companies were disclosed to Parent's and Company Buyer's representatives and counsel.

"**Day 1**" means work commenced among the Sellers, the GM Buyers and the Company Buyers to separate the information technology systems required to run the GM Business from the Sellers' and the Company Buyers' systems on the Closing Date or at a mutually agreed upon post-Closing Date.

"**Day 2**" means logical and physical separation such that the information technology systems required to run the GM Business in a stand-alone application environment, a stand alone database environment and a stand-alone physical data center environment, including, for example, in cases where a physical move of the application may be required, such as a move from a Delphi-wide environment to a GM Business dedicated environment.

"**Debt Obligations**", as applied to any Person, mean obligations (i) for borrowed money, (ii) evidenced by bonds, debentures, notes, and similar instruments, (iii) under financing or capital (as opposed to operating) leases (determined in accordance with GAAP) and other similar instruments, and (iv) all accrued interest, fees and charges in respect of any of the foregoing.

"**Deferred Item(s)**" – Section 2.5.1.

"**Delphi**" – Recitals.

"**Delphi Brazil**" means Delphi Automotive Systems do Brasil Ltda., a Brazilian limited liability company, with head office at Avenida Goiás, No. 1820 / 1860, in the City of São Caetano do Sul, State of São Paulo, enrolled with the Brazilian General Taxpayers' Registration (CNPJ/MF) under No. 00.857.758/0001-40.

"**Delphi FICA Litigation**" means the FICA refund claim being litigated in Delphi Corporation, Delphi Automotive Systems LLC, and Delphi Automotive Systems Services LLC v. United States of America, (Case no. 08 Civ 04487 (PKC) in the U.S. District court of the Southern District of New York) in which Delphi et. al. is seeking a refund of employment taxes relating to payments made to certain union members upon ratification of collective bargaining agreements in 1999 and 2003 together with any other similar claims relating to other pre-Closing periods.

"**Delphi HRP**" means the Delphi Hourly-Rate Employees Pension Plan.

"**Delphi India**" means Delphi Automotive Systems Pvt. Ltd.

"**Delphi Polska**" means Delphi Polska Automotive Systems Sp.z.o.o., a Polish company.

"**DEOC**" – Section 9.5.4.A.

"**DIP Agent**" means JPMorgan Chase Bank, N.A. in its capacity as the administrative agent under the DIP Agreement.

"**DIP Agreement**" means that certain Amended and Restated Revolving Credit, Term and Guaranty Agreement, dated as of May 9, 2008, among Delphi, the subsidiaries of Delphi named therein, the lenders party thereto and the DIP Agent, as amended through May 21, 2009.

"**DIP Lenders**" shall mean the Senior DIP Lenders and the C Lenders.

"**DIP Priority Payment**" means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the Closing Date, in dollars: (i) all outstanding and unpaid fees and expenses then due under Section 10.05 of the DIP Agreement (including any counsel and advisor fees payable under Section 10.05 of the DIP Agreement); (ii) accrued and unpaid interest and fees then due on account of Tranche A Loans (as defined in the DIP Agreement) and Tranche B Loans (as defined in the DIP Agreement); (iii) the then outstanding principal amounts of the Tranche A Loans and Tranche B Loans; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Agreement) that are not Assumed Liabilities for those Hedging Agreements (as defined in the DIP Agreement) that are not Assumed Liabilities; provided that any such amount under this subsection (iv) shall be reduced by the amount of the Hedging Agreements that are Assumed Liabilities.

"**EC Merger Regulation**" means Council Regulation of the European Community No. 139/2004 of January 20, 2004 on the control of concentrations between undertakings.

"**EDS**" – Section 9.9.12.

"**Encumbrance**" means:   (i) with respect to the Sale Securities, any voting trust, shareholder agreement, proxy, preemptive right, right of first refusal, or other similar restriction; and (ii) with respect to the Acquired Assets (including the Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates) or any other property or asset, any lien, charge, claim, pledge, security interest, conditional sale agreement or any other title retention agreement, lease, mortgage, security interest, option or other encumbrance

(including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over Personal Property).

"**Enterprise Contracts**" – <u>Section 9.17</u>.

"**Enterprise Providers**" – <u>Section 9.17</u>.

"**Environment**" means the following media (whether individually or commingled):  air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground) and ground (whether at the surface or below the surface) and all organisms, ecosystems, flora and natural resources.

"**Environmental Law**" means any and all statutes, rules, regulations, ordinances, directives, decrees, treaties, provisions of any constitution and principles (including principles of the common law) and Governmental Orders applicable to the conduct and the operation of the Business, and relating to pollution or the protection of the Environment or protection of human health from environmental hazards, excluding workplace health and safety laws (including OSHA and similar foreign laws).

"**Environmental Permits**" mean any licenses, permits, authorizations and approvals issued by any Governmental Authority and required to be obtained by the Business in respect of the Acquired Assets under Environmental Laws.

"**Environmental Records**" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, relating to:  (i) the use, management, handling, transportation, release, storage, treatment or disposal of any Hazardous Material in, about or under any Real Property; (ii) the environmental condition of the Real Property; and (iii) compliance with Environmental Laws by the Business; whether located at a Real Property or in the possession of Delphi's Legal Staff or Operations Support Group at Delphi's Troy headquarters or otherwise provided to the GM Buyers or the Company Buyer for Real Property relating to the GM Business or the Company Business, respectively; excluding, however, any such records which are subject to the attorney-client, attorney work product or similar privilege because such records contain confidential communications, mental impressions, conclusions, opinions or legal theories of Sellers' counsel ("**Privileged Environmental Records**"); <u>provided</u>, <u>however</u>, that Sellers shall ensure that any material factual or technical information or data regarding the environmental condition or compliance status of any property or facility of the Business or the Real Property is otherwise contained in the Environmental Records.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Excepted Shared Intellectual Property**" means the Shared Intellectual Property listed in <u>Schedule 9.9.1.A</u>.

"**Excluded Assets**" – Section 2.1.5.

"**Excluded Facilities**" – Section 2.1.5.F.

"**Existing GM Assets**" – Section 12.1.6.

"**Facilities Separation & Relocation Plan**" – Section 9.9.10.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and are Asset Sellers and/or Securities Sellers: Delphi Automotive Systems LLC, Delphi China LLC, Delphi Automotive Systems (Holding), Inc. and Delphi Technologies, Inc., and the Affiliates identified on Schedule 1.1.F.

"**Final Order**" means an order of the Bankruptcy Court or any court with jurisdiction, or findings and conclusions relating to an order of the Bankruptcy Court or any court with jurisdiction, as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Federal Rule of Civil Procedures 60(b)) or a petition for a writ of certiorari has expired and no such appeal, motion or petition is pending.

"**Final Plan Modification Hearing**" means the Bankruptcy Court hearing to approve the Plan Modification Order.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period, unless otherwise noted or disclosed herein.

"**GM**" – Recitals.

"**GM Acquired Assets**" – Section 2.1.3.

"**GM Ancillary Agreements**" – means the Transfer Agreements and other agreements referred to in Section 11.2.

"**GM Asset Buyer(s)**" means the Buyers set forth on Schedule 1, which GM will use commercially reasonable efforts to provide by Parent to Delphi not less than ten (10) Business Days after the date of this Agreement (it being understood that such Buyers identified after the date of this Agreement must agree in writing to be bound by all of the terms, conditions, and provisions in this Agreement and no other GM Buyer is released from its obligation hereunder), with respect to the assets set forth opposite their names and the Australian Buyer in respect of the Australian Assets.

"**GM Asset Sellers**" means Sellers set forth on Schedule 1, with respect to the assets set forth opposite their names and the Australian Seller in respect of the Australian Assets.

"**GM Assumed Contracts**" – Section 12.1.6

"**GM Assumed Liabilities**" – Section 2.2.1.

10

"**GM Business**" – Recitals.

"**GM Buyer(s)**" – Recitals.

"**GM/Company Ancillary Agreements**" means this Agreement, the Buyer Transition Services Agreement, the Supply Agreement, the Commercial Agreement, the Access Agreement, the Securities Purchase Agreement and any other agreement executed and delivered in connection therewith.

"**GM Confidentiality Agreement**" means the confidentiality agreement between GM and Delphi dated September 12, 2005, as amended.

"**GM-Delphi Agreement**" means the Agreement dated as of May 9, 2008 among GM, Delphi and the Filing Affiliates, as amended by Amendment No. 1 dated October 6, 2008, Amendment No. 2 dated November 7, 2008, and Amendment No. 3 dated January 30, 2009 and as amended and restated in its entirety pursuant to the Interim Financing Amendment.

"**GM-Delphi Liquidity Agreements**" mean (i) the GM-Delphi Agreement and (ii) the Partial Temporary Accelerated Payment Agreement dated as of December 12, 2008 (as amended through January 30, 2009).

"**GM Environmental Records**" mean any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, relating to:  (i) the use, management, handling, transportation, release, storage, treatment or disposal of any Hazardous Material; (ii) environmental site conditions; and (iii) compliance with Environmental Laws, in each case concerning the GM Business or any GM Real Property, so long as such records were provided by GM to any of Sellers or Delphi Automotive Systems Corporation, a Delaware corporation, or their respective Affiliates, and which are still in the possession of Delphi's Legal Staff or Operations Support Group at Delphi's Troy headquarters or located at any GM Real Property.  Privileged Environmental Records shall not include any GM Environmental Records.

"**GM Financing**" – Section 6.3.

"**GM Financing Agreements**" – Section 6.1.

"**GM Leased Real Property**" – Section 4.8.1.

"**GM IP License Agreement**" – Section 9.9.1.

"**GM Licensed Intellectual Property**" – means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is used or held for use in the GM Business, including such rights in associated Contracts listed on Schedule 4.14.1.

"**GM Owned Real Property**" – Section 4.8.2.

11

"**GM Purchase Price**" – <u>Section 3.1.1</u>.

"**GM Real Property**" – means the GM Leased Real Property and the GM Owned Real Property.

"**GM Sale Companies**" mean the Sale Companies being transferred to GM Buyer, directly or indirectly, under this Agreement.

"**GM Sales Securities**" mean all of the outstanding shares of the Sale Companies and all of the outstanding shares of the JV Companies that are owned by Sellers as set forth on <u>Schedule 1</u> to this Agreement.

"**GM Securities Buyers**" means the Buyers set forth on <u>Schedule 1</u>, which GM Buyers will use their commercially reasonable efforts to provide to Delphi, ten (10) Business Days before Closing, but in any event, in sufficient time to complete filings under Competition/Investment Laws, with respect to the Sale Companies set forth opposite their names.

"**GM Securities Seller(s)**" means the securities sellers set forth on <u>Schedule 1</u> to this Agreement, with respect to the GM Sale Securities set forth opposite their names.

"**GM Sellers**" means the GM Securities Sellers and GM Asset Sellers, as applicable.

"**GM Transfer Agreements**" – <u>Section 11.2.3</u>.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states such as the European Union.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**GSA**" means the Global Settlement Agreement, as amended, effective as of September 29, 2008, between Delphi and GM.

"**Hazardous Materials**" means any element, mixture, chemical, hazardous substance, constituent, waste, pollutant, contaminant or material including petroleum or petroleum-based or petroleum-derived substances, polychlorinated biphenyls, asbestos-containing materials, noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous), which are regulated, or can give rise to Losses under an Environmental Law or an Environmental Permit.

12

"**Hearing Date**" – <u>Section 9.2.2.</u>

"**Hedging Agreements**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic financial or pricing indices or measures of economic, financial or pricing risk or value, any similar transaction or any combination of the foregoing transactions.

"**HP**" – <u>Section 9.9.12.</u>

"**HSR Act**" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Income Tax**" or "**Income Taxes**" means any and all United States or non-United States federal, national, state or local Tax based on or measured in whole or in part by income or profits, including any interest, penalties or other additions thereto.

"**India L/C**" – <u>Section 9.35.</u>

"**India L/C Period**" – <u>Section 9.35.</u>

"**Information Tax Returns**" – <u>Section 9.4.3.</u>

"**Insurance Policies**" means all insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Interim Financing Amendment**" means that certain amended and restated GM-Delphi Liquidity Agreement, dated the date hereof, by and among GM and Delphi and the Filing Affiliates, that, among other things, provides up to $250 million of additional liquidity to Delphi through the Closing Date.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, office supplies, parts, packaging materials and other inventory and accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted or located at customers' premises on consignment, or wherever else located, which are used or held for use by Sellers or the Sale Companies in the conduct of the Business (together with all rights of Sellers against suppliers of such inventories).

"**IP License Agreements**" means collectively the GM IP License Agreement, the Company IP License Agreement and the Pending Transactions IP License Agreements.

"**IUE-CWA**" means the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its Local Unions 717 (Warren), 83698 (Clinton) and 83718 (Brookhaven).

13

"**JV Companies**" means the Steering JV Companies and the Company JV Companies.

"**KDAC**" means Korea Delphi Automotive Systems Corporation.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques, technologies, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, formulae, algorithms, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential together with the rights to sue or recover and retain damages and costs and attorneys' fees for present, past and future misappropriations or otherwise of any of the foregoing.

"**Knowledge**" means Knowledge of Company Buyer, Knowledge of GM Buyer or Knowledge of Sellers, as applicable.

"**Knowledge of Company Buyer**" or "**Company Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Delphi**" or "**Delphi's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Buyers**" or "**Buyers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of GM Buyer**" or "**GM Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order, but not including Environmental Laws.

"**Leases**" – Section 4.8.1.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet or otherwise, or due or to become due, including Debt

Obligations and those arising under any Law, Environmental Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means the GM Licensed Intellectual Property and the Company Licensed Intellectual Property.

"**Losses**" mean any and all Claims, Liabilities, losses, damages, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Manufacturing Facilities**" means the manufacturing facilities owned or operated by the Steering Business located at Saginaw, Michigan; Queretaro, Mexico; Juarez, Mexico; Sabinas Hidalgo, Mexico; Strasbourg, France; Somerton, Australia; Bangalore, India; Suzhou, China; Porto Alegre, Brazil; Gliwice, Poland; Gurgaon, India; and Tychy, Poland.

"**Material Adverse Effect**" means any change, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' hereunder), results of operations or financial condition of the GM Business or the Company Business, as applicable, taken as a whole, but excludes any effect:  (i) resulting from general economic or business conditions (except to the extent such change, occurrence or development has a significantly disproportionate adverse effect on such Business); (ii) affecting companies in its industry or its markets generally (except to the extent such change, occurrence or development has a significantly disproportionate adverse affect on such Business); (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) that is cured before the date of any termination of this Agreement by Parent pursuant to Section 12.1 hereof; (v) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of such Business; (vi) resulting from any act or omission of any Seller taken with respect to the Company Business or the GM Business, as applicable, with the prior written consent of GM or the Company Buyer, as applicable; (vii) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (viii) resulting from the regulatory status of any Buyer; (ix) resulting from acts of war or terrorism, whether or not directed at such Business or Buyer; or (x) resulting from the financial condition of GM or any voluntary or involuntary filing of bankruptcy involving GM.

"**Material Contracts**" – Section 4.14.1.

"**Mexican VAT Amount**" – Section 9.20.1.

"**Mexico Deposit**" – Section 9.20.2.

"**Mexico LTAs**" – Section 9.20.1.

"**Modification Procedures Order**" means that certain Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider

Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Claims Bar Date and Alternative Hearing Date, as entered by the Bankruptcy Court on June __, 2009.

"**MRA**" means the Amended and Restated Restructuring Agreement dated September 12, 2008 between GM and Delphi.

"**New York Courts**" – Section 14.16.

"**Non-Solicitation Period**" – Section 0.

"**Non-U.S. Benefit Plan**" – Section 4.13.13.

"**Non-U.S. Employees**" means the employees (salaried and hourly) who are employed by Asset Sellers or Seller Affiliate in, and dedicated to, the Business in a country other than the United States immediately prior to the Closing and identified on Schedule 4.13.1.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.9.

"**Operating Agreement**" means the operating agreement contemplated in the Buyer Loan Documents substantially in the form of Exhibit 1.2.

"**Option Exercise Agreement**" means the Option Exercise Agreement dated March 3, 2009 between GM and Delphi.

"**Ordinary Course of Business**" means the usual, regular and ordinary course of a business consistent with the past practice thereof (including with respect to quantity and frequency); provided, however, that where the Sellers' practices are modified to address the effects of economic conditions affecting the automotive and automotive supply industry or current economic conditions, such term means practices consistent with the practices of Sellers and its Affiliates used in managing Delphi's business in general; and, provided further, that the Sellers' usual, regular and ordinary course of business shall be deemed to include practices which are consistent with the practices of the Sellers from and after the Petition Date to the extent consistent with the Bankruptcy Code or orders issued by the Bankruptcy Court.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Other Services**" – Section 9.17.

"**Other Steering Business Liabilities**" means the Liabilities of Non-Filing Affiliate Sellers that are attributable to the Steering Business other than Liabilities with respect to Income Taxes and Debt Obligations or Liabilities arising under any Environmental Law.

16

"**Other Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of Sellers used but not primarily used in the Business.

"**Parent**" – Recitals.

"**Parnassus Class C Interest**" means Class C membership interests in Parnassus in the nominal amount of $145.5 million, having an annual cash dividend at the rate of 8% (payable quarterly in arrears), and subject to mandatory redemption at the conclusion of the tenth year after issuance; and (1) being subject to mandatory redemption in such amounts as set forth in the operating agreement and at such times as distributions are made to the holders of the Class A and Class B interests of Parnassus, and (2) ranking pari passu in right of distribution with the holders of the Class A and Class B interests of Parnassus in the percentages set forth in the operating agreement.  The Parnassus Class C Interest may be issued by Parnassus Holdings II, LLC or such other entity as may be the "Company Buyer" under this Agreement, and shall be held by either Sellers, a trust or an agent as determined by Sellers, <u>provided</u>, <u>however</u>, that regardless of the issuer or form, the Parnassus Class C Interest shall have substantially the same terms, conditions and economic entitlements as set forth herein.

"**Party(ies)**" means the Sellers and/or Buyers.

"**Patent Rights**" means:  (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational invention and design registrations or applications, patents and patent applications, provisionals, substitutions, reissues, divisionals, continuations, continuations-in-part, extensions and reexaminations and all rights, in each case provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**PE Financing Agreements**" – means the Buyer Loan Documents, and Securities Purchase Agreement (together, and including, without limitation, any and all exhibits, annexes, schedules, fee letters and other ancillary documents).

"**Pending Transactions**" means Seller's pending transactions set forth on <u>Schedule 2.1.5.J</u>.

"**Pending Transactions IP License Agreement**" – <u>Section 9.9.4</u>.

"**Permits**" means licenses, consents, approvals, permits and other Governmental Approvals, but not including Environmental Permits.

"**Permitted Encumbrance**" means:  (i) security interests relating to vendor tooling arising in the Ordinary Course of Business and not delinquent; (ii) any Encumbrance that may be created by or on behalf of GM or its Affiliates with respect to the GM Acquired Assets or the GM Sale Securities, or by or on behalf of Company Buyer or its Affiliates with respect to the Company Acquired Assets or the Company Sale Securities or Buyers; and (iii) in relation to Real

Property:  (a) Encumbrances relating to any current real estate or ad valorem taxes, proceedings or assessments not yet due and payable or delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged prior to the Closing Date; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose (other than the failure of the applicable Buyer to own the relevant property); (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; and (e) easements, covenants, restrictions and other encumbrances of public record (provided that, in the event any such Encumbrance relates to a sum owed, the applicable Seller shall indemnify GM and the applicable Buyer against any costs or expenses arising therefrom); (iv) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the underlying asset to which such Encumbrances relate; and (v) in the case of Sale Securities of the JV Companies, restrictions contained in the joint venture agreement or shareholders agreement or related agreements affecting such Sale Securities.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere primarily used or held for use in the conduct of the applicable Business; provided, however, that the Personal Property does not include Intellectual Property.

"**Petition Date**" – Recitals.

"**Plan Modification Motion**" – Section 9.2.1.

"**Plan Modification Order**" means the order entered by the Bankruptcy Court approving the modifications to the Filing Affiliates' Plan of Reorganization under section 1127 of the Bankruptcy Code, including all transactions contemplated by this Agreement.

"**Plan of Reorganization**" or "**Plan**" means Delphi's joint plan of reorganization, including all schedules and exhibits thereto, as confirmed by the Bankruptcy Court on January 25, 2008, as modified by the Plan Modification Order entered by the Bankruptcy Court approving modifications to Delphi's joint plan of reorganization under section 1127 of the Bankruptcy Code.

"**Plan of Reorganization Documents**" means those documents that are to be filed by the Filing Affiliates with the Bankruptcy Court seeking modifications to the Plan of Reorganization.

"**Post-Closing Mexico Utilities**" – Section 9.20.2.

18

"**Post-Petition Contracts**" mean the Acquired Contracts of the Filing Affiliates relating to the applicable Business entered into by such Filing Affiliates on or after the Petition Date.

"**Pre-Petition Contracts**" mean the Acquired Contracts of the Filing Affiliates relating to the applicable Business entered into by such Filing Affiliates before the Petition Date.

"**President's Designee**" has the meaning given to such term in that certain Loan and Security Agreement by and between GM and The United States Department of the Treasury, dated as of December 31, 2008, as may be amended from time to time.

"**Privileged Environmental Records**" is defined within the definition of Environmental Records.

"**Proceeding**" means any action, claim, charge, complaint, grievance, demand, suit, proceeding, arbitration, citation, summons, subpoena, inquiry, or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority or any arbitrator or arbitration or grievance panel.

"**Product(s)**" means the UAW Site Products and the Steering Products.

"**PRP**" – Section 9.5.3.

"**Purchase Price**" means the GM Purchase Price and the Company Purchase Price.

"**Purchase Price Assumed Debt**" – Section 9.20.1.

"**Purchased Intellectual Property**" means the Steering Purchased Intellectual Property and the Company Purchased Intellectual Property.

"**Real Property**" means the Owned Real Property and the Leased Real Property.

"**Retained Liabilities**" – Section 2.3.

"**Retained Plans**" – Section 2.3.3

"**Saginaw Brazil**" means Saginaw Indústria e Comércio de Auto Peças Ltda., a Brazilian limited liability company, with head office at Rua Giuseppe Mandelli, No. 118, Bairro São João, in the City of Porto Alegre, State of Rio Grande do Sul, enrolled with the Brazilian General Taxpayers' Registration (CNPJ/MF) under No. 08.762.025/0001-34.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets and Sale Securities from applicable Sellers to applicable Buyers in accordance with this Agreement and the relevant Transfer Agreements.

"**Sale Companies**" mean the Affiliates of Delphi engaged in the applicable Business, the stock or other equity of which is being transferred to Buyer, directly or indirectly, under this Agreement, as indicated on Schedule 1 and Schedule 2 (excluding the JV Companies), Delphi Polska and Steeringmex.

19

"**Sale Securities**" mean the GM Sale Securities and the Company Sale Securities, as applicable.

"**SDN List**" – Section 5.9.

"**Section 363 Implementation Agreement**" – Section 9.2.2.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Purchase Agreement**" means that certain Securities Purchase Agreement dated the date hereof among Company Buyer, an Affiliate of Company Buyer and GM.

"**Securities Seller(s)**" means the GM Securities Sellers and the Company Securities Sellers.

"**Seller Employee Benefit Plans**" means Sellers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written policies, practices or understandings relating to employment as applicable to Transferred Employees whether or not collectively bargained.

"**Seller Transition Services Agreement**" – Section 11.3.3.

"**Seller U.S. CBAs**" means the nationally and locally negotiated Collective Bargaining Agreements between Sellers and the applicable union with respect to the U.S. Hourly Employees and, at the Lockport and Rochester sites, the represented U.S. Salaried Employees, including any letter agreements, memorandums of understanding, supplemental agreements and employee benefit plan agreements applicable to represented employees that were in effect immediately prior to the date of this Agreement and which are included on Schedule 4.13.11.

"**Sellers**" means the GM Securities Sellers with respect to the GM Sale Securities, the GM Asset Sellers with respect to the GM Acquired Assets, Company Securities Sellers with respect to the Company Sale Securities and the Company Asset Sellers with respect to the Company Acquired Assets, in each case including Filing Affiliates and non-Filing Affiliates that are Sellers. Seller means any one of such Sellers, as applicable.

"**Senior DIP Lender**" means collectively the Tranche A Lenders and Tranche B Lenders (as such terms are defined in the DIP Agreement).

"**Separation & Relocation Activities**" – Section 9.9.10.

"**Shared Intellectual Property**" means Intellectual Property owned by any Seller and/or any Seller's Affiliates that is used by more than one of the GM Business, the Company Business or the business of a Pending Transaction and includes customizations, interfaces, enhancements

and other modifications to Software licensed from Third Parties, but not used primarily for such Business.

"**Shared Licensed Intellectual Property**" means any Seller's and/or any Seller's Affiliates' rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party and that is used by the applicable Business, excluding Licensed Intellectual Property and, except in the case of Software licensed from GM or EDS, Software.

"**Shared Software Licenses**" means all shared licenses of Software that are currently used in the applicable Business under Delphi-wide Contracts but which are not primarily used by such Business.

"**Software**" means computer software and programs, including source code, object code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, development programs and systems, testing programs and systems, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto, in each case including all customizations, interfaces, enhancements and other modifications related to the foregoing.

"**Specified Director, Officer and Employee Related Liabilities**" – Section 9.41.

"**Steering Business**" means the global steering and halfshaft businesses operated by Delphi and its Affiliates, throughout the Delphi Steering Systems Division, including the design, testing, manufacture, development, marketing, sale and distribution of the Products, and all of the business conducted at the Manufacturing Facilities and the Delphi Steering Systems Division related business conducted at the Technical Centers and Sales Offices**,** except for (i) all assets, business lines, rights, Contracts and Claims of KDAC, wherever located, whether tangible or intangible, real, personal or mixed and (ii) all computer hardware, equipment, Software, Contracts, and other assets listed on Schedule 2.1.5.K

"**Steering Excluded Products**" means products identified in Schedule 9.9.1.B.

"**Steering JV Companies**" means the following joint ventures which are engaged in the manufacture, development and sale of Products:  Delphi Saginaw Lingyun Drive Shaft Co. Ltd and Saginaw Lingyun Drive Shaft (Wuhu) Co., Ltd.

"**Steering Licensed Intellectual Property**" means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is primarily used or held for use in or primarily related to, the Steering Business, including such rights in associated Contracts listed on Schedules 1.1.D.1, 1.1.D.2 and 1.1.D.3.

"**Steering Products**" means the Products set forth in Schedule 1.1.C.

"**Steering Purchased Intellectual Property**" means any Seller's and/or any of their respective Affiliate's right, title and interest in Intellectual Property that is primarily used or held for use in, or primarily related to, the Steering Business, including the Intellectual Property listed in Schedules 1.1.D.1, 1.1.D.2 and 1.1.D.3; subject to Sections 2.1.3.H and 2.1.4.I in the case of

21

Intellectual Property relating to the UAW Sites and subject to the rights granted to Company Buyer hereunder.

"**Steering (Suzhou)**" – <u>Section 9.23.1</u>.

"**Steering Technology**" means the Patent Rights, Copyrights, Trade Secrets and Know-How initially developed primarily for use in the Products used in the Steering Business and which constitutes a critical manufacturing, design or engineering element specific to the Products as compared to comparable products manufactured by competitors of the Steering Business.

"**Steeringmex**" – <u>Section 9.20.1</u>.

"**Supply Agreement**" means the Supply Agreement among the GM Buyers and Company Buyers of even date herewith.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"**Technical Centers and Sales Offices**" means the technical and customer support centers of the Steering Business located at Casa Grande, Arizona; Dearborn, Michigan; Saginaw, Michigan; Milford, Michigan; Russelsheim, Germany; Torino, Italy; Paris, France; Beijing, China; Shanghai, China; Hachioji, Japan; Krakow, Poland; SeongNam-si, Korea; Melbourne, Australia; Pune, India; Sao Caetano, Brazil; Bursa, Turkey and Eisenach, Germany, including any satellite offices thereto.

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or primarily used in the Business.

"**Temporarily Excluded Assets**" – <u>Section 11.1.2</u>.

"**Threshold**" - Section 9.43

"**Trade Secrets**" means:  (i) all forms and types of information, financial, business, scientific, technical, economic, manufacturing and/or engineering information, including

patterns, plans, compilations, specifications, tooling, program devices, formulae, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, program devices, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if:  (a) the information is the subject of efforts that are reasonable under the circumstances to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the other persons who can obtain economic value from its disclosure or use; (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present, future and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean trademarks, service marks, trademark and service mark applications and registrations, Internet domain name registrations, trade names, trade dress, fictitious names, assumed names, logos and slogans, including those listed on Schedule 1.1.D.2 together with all goodwill related to the foregoing and all rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**Transfer Agreements**" means the GM Transfer Agreements and the Company Transfer Agreements.

"**Transfer Regulation**" means any Law pursuant to which the employment of any employee of an Asset Seller (or any employee of any other Affiliate of Delphi, except the Sale Companies, who is working for the applicable Business) will transfer to a Buyer in connection with the transactions contemplated by this Agreement, including pursuant to Directive 77/187/EC of the European Parliament and council and any Law adopted pursuant thereto, and any Law, works council or registered or  enforceable union agreement or written contract of employment.

"**Transfer Taxes**" – Section 9.4.5.

"**Transferred Account(s)**" – Section 9.22.

"**Transferred Asset Seller Employees**" means:  all U.S. Employees and Non-U.S. Employees who are employees of any Asset Seller or Seller Affiliate who become Buyers' employees pursuant to Section 9.5 hereof.  No individual who has retired or otherwise terminated employment with Sellers prior to Closing will be deemed to be a Transferred Asset Seller Employee.

"**Transferred Employees**" means:  (i) all Transferred Asset Seller Employees; and (ii) all employees of the Sale Companies.

"**Transferred Insurance Policies**" means all Insurance Policies which are primarily related to the GM Business, GM Acquired Assets or the GM Assumed Liabilities including those set forth on Schedule 1.1.E, but excluding those set forth on Schedule 1.1.D.

23

"**Transferred Non-U.S. Employees**" means all Transferred Asset Seller Employees who are Non-U.S. Employees.

"**Transferred U.S. Employees**" means all Transferred Asset Seller Employees who are either Transferred U.S. Hourly Employees or Transferred U.S. Salaried Employees.

"**Transferred U.S. Hourly Employees**" – Section 9.5.3.

"**Transferred U.S. Salaried Employees**" – Section 9.5.2.

"**UAW**" means the International Union, United Automobile, Aerospace and Agricultural Works of America and its Local Unions 699 (Saginaw), 686 (Lockport – Hourly), 686 (Lockport – salaried), 1097 (Rochester – hourly), 1097 (Rochester – salaried), 292 (Kokomo), 167 (Grand Rapids).

"**UAW Sites**" means the manufacturing facilities owned or operated by Sellers and located in Grand Rapids, Michigan, Rochester, New York (excluding the Henrietta technical center); Kokomo, Indiana (including the Cuneo Warehouse, and including the technical center); and Lockport, New York (including the technical center).

"**UAW Site Products**" means products produced at the UAW Sites on or before the Closing Date and the additional products that GM and any Seller have agreed will be produced at the UAW Sites but does not include products which are manufactured at the Technical Centers at the UAW Sites if such products are not actually manufactured at the UAW Sites outside of the Technical Center.

"**U.S.**" means the United States of America.

"**U.S. Employees**" means U.S. Hourly Employees and U.S. Salaried Employees.

"**U.S. Hourly Employees**" means the hourly employees of Asset Sellers or a Seller Affiliate who are employed at or are bargaining unit members of the relevant Business in the United States immediately prior to the Closing and who are identified on Schedule 4.13.1 (as the same may be amended prior to the Closing Date with Buyer's prior written consent, not to be unreasonably withheld).

"**U.S. Income Taxes**" mean any Income Taxes due to the United States or to any state or locality in the United States.

"**U.S. Salaried Employees**" means the salaried employees who are employed by Sellers or a Seller Affiliate in or primarily assigned to the relevant Business in the United States as of the Closing and who are identified on Schedule 4.13.1 (as the same may be amended prior to the Closing Date with the applicable  Buyer's prior written consent, not to be unreasonably withheld).

"**USA PATRIOT Act**" – Section 5.9.

"**WARN ACT**" means the Worker Adjustment and Retraining Notification Act and any similar applicable foreign, state or local law, regulation or ordinance.

## 1.2      Other Interpretive Provisions.

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America, and all references to "euros" or "€" are deemed references to the lawful money of the European Economic and Monetary Union. References to undertakings by the "Buyer(s)" or the "Seller(s)" are understood to be undertakings by Parent to cause the relevant Buyer(s) to perform, and by Delphi to cause the relevant Seller(s) to perform, as the case may be.

## ARTICLE 2.
## PURCHASE AND SALE.

### 2.1      Transfers by Sellers and their Affiliates.

**2.1.1.**     Purchase and Sale of the GM Sale Securities. Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, the GM Securities Sellers will sell, transfer, assign, convey and deliver to the GM Buyers, and the GM Buyers will purchase, accept and acquire, the GM Sale Securities free and clear of all Encumbrances except Permitted Encumbrances.

**2.1.2.**     Purchase and Sale of the Company Sale Securities. Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, the Company Securities Sellers will sell, transfer, assign, convey and deliver to the Company Buyer, and the Company Buyer will purchase, accept and acquire, the Company Sale Securities free and clear of all Encumbrances except Permitted Encumbrances; provided that the Sellers will consider in good faith any request of a Company Buyer to, in lieu of purchasing the Company Sale Securities, instead purchase the assets and assume the related liabilities of any Sale Company pursuant to a mutually agreeable asset purchase agreement with such Sale Company.

**2.1.3.**     Purchase and Sale of the GM Acquired Assets. Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, the GM Asset Sellers will sell, transfer, assign, convey and deliver to the GM Asset Buyers, and the GM Asset Buyers will purchase, accept and acquire from the GM Asset Sellers, free and clear of all Encumbrances, except Permitted Encumbrances:

(i)    in respect of the Australian Assets, Delphi will procure and cause the Australian Seller to transfer, assign, convey and deliver to the Australian Buyer and the Parent will procure and cause the Australian Buyer to purchase, accept and acquire from the Australian Seller, free and clear of all Encumbrances except Permitted Encumbrances, all properties, assets, rights, titles and interests of every kind and nature, owned by the GM Asset Sellers primarily used or held for use in, or primarily related to, the GM Business, whether tangible or intangible, real or personal and wherever located and by whomever possessed;

(ii)    the technical centers included in the UAW Sites;

(iii)    all proceeds received by any Seller in respect of the sale of (x) the brakes and suspension business and (y) the exhaust business;

(iv)    all rights to sue, or to benefit from any lawsuit or settlement relating to the Appaloosa Claim; and

(v)    The Hedging Agreements other than any Hedging Agreement that may be terminated at Closing;

(vi)    50% of the net proceeds from the Delphi FICA Litigation;

(vii)    The Mexico Deposit and the utility contracts referred to in Section 9.20.2;

(viii)    all properties, assets, rights, titles and interests of every kind and nature, owned by the GM Asset Sellers, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all assets related to the GM Business, including, without limitation, all of the following assets, in each case primarily related to the GM Business but excluding Excluded Assets pursuant to Section 2.1.5 (all of the assets to be sold, assigned, transferred and delivered to GM Asset Buyers hereby are called the "**GM Acquired Assets**"):

A.    All Accounts Receivable (including Accounts Receivable owed by Affiliates of Sellers), but excluding intercompany receivables due from Filing Affiliates to Filing Affiliates (other than trade receivables);

B.    Real Property, which such Real Property shall be subject to the Company Buyer's lease rights with respect to the technical centers located in the Kokomo, Indiana and Lockport, New York**;**

C.    Personal Property (including the personal property, machinery and other assets located at the technical centers located in Lockport, New York and Kokomo, Indiana);

D.    Inventory;

E.    All of GM Asset Sellers' Acquired Contracts and rights under the Acquired Contracts, including any rights under tax abatements, incentive agreements, or

26

other similar tax credit arrangements with any Taxing Authority, that are primarily related to the GM Business or the GM Acquired Assets;

     F.    Administrative Assets;

     G.    Permits used or held for use in, or related to, the conduct of the GM Business or in the operations at the GM Real Property;

     H.    Steering Purchased Intellectual Property and Steering Licensed Intellectual Property;

     I.    Technical Documentation;

     J.    Prepaid expenses, deposits and advances;

     K.    Tax credits and Tax refunds related to the GM Business and the GM Acquired Assets, including Delphi's New York investment tax credit refund claim and any property tax refund related to the GM Business;

     L.    Cash that is held by Filing Affiliates in the U.S.;

     M.    Motor vehicles owned or leased by Sellers (in each case, to the extent transferable pursuant to the terms of such leases or financing documents);

     N.    All Transferred Insurance Policies, and including all rights to the benefits, coverages and proceeds under such Transferred Insurance Policies; provided, however, that Sellers and Company Buyer will be named as additional named insureds on any such Transferred Insurance Policies to the extent they cover any of the Excluded Assets or Company Acquired Assets or relate to any Retained Liabilities or any Company Assumed Liabilities or to any Sale Company acquired by the Company Buyer, in each case, as applicable, and Seller and Company Buyer will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Excluded Asset, Company Acquired Asset, Retained Liability or Company Assumed Liability or to any Sale Company acquired by the Company Buyer, as applicable; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured;

     O.    All goodwill as a going concern and all other intangible properties other than Intellectual Property (which is covered in Section 2.1.3H above);

     P.    All warranties and Claims;

     Q.    Environmental Permits;

     R.    Environmental Records;

S.    GM Environmental Records;

T.    Wage escrow accounts applicable to Transferred U.S. Hourly Employees who are PRPs at the UAW Sites; and

U.    Other books and records relating to the GM Business.

**2.1.4.**    <u>Purchase and Sale of the Company Acquired Assets</u>.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing the Company Asset Sellers will sell, transfer, assign, convey and deliver to the Company Asset Buyers, and the Company Asset Buyers will purchase, accept and acquire from the Company Asset Sellers, free and clear of all Encumbrances, except Permitted Encumbrances, all properties, assets, rights, titles and interests of every kind and nature, owned by the Company Asset Sellers, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all assets related to the Company Business , including, without limitation, the following assets, but excluding the GM Sale Securities, the GM Acquired Assets, and the Excluded Assets pursuant to <u>Section 2.1.5</u> (all of the assets to be sold, assigned, transferred and delivered to Company Asset Buyers hereby are called the "**Company Acquired Assets**"):

A.    All Accounts Receivable (including Accounts Receivable owed by Affiliates of Sellers), but excluding intercompany receivables due from Filing Affiliates to Filing Affiliates (other than trade receivables);

B.    The Company Sale Securities;

C.    Company Real Property;

D.    Personal Property;

E.    Inventory;

F.    all of Company Asset Sellers' Acquired Contracts and rights under the Acquired Contracts, including any rights under tax abatements, incentive agreements, or other similar tax credit arrangements with any Taxing Authority that are not primarily related to the GM Business or the GM Acquired Assets;

G.    Administrative Assets;

H.    Permits used or held for use in, or related to, the conduct of the Company Business or in the operations at the Company Real Property;

I.    Company Purchased Intellectual Property and Company Licensed Intellectual Property;

J.    Technical Documentation;

K.    Prepaid expenses, deposits and advances;

L.      Motor vehicles owned or leased by Sellers (in each case, to the extent transferable pursuant to the terms of such leases or financing documents);

M.      All Insurance Policies; provided, however, that Sellers and GM Buyers will be named as additional named insureds on any such Insurance Policies to the extent they cover any of the Excluded Assets or GM Acquired Assets or relate to any Retained Liabilities or any GM Assumed Liabilities, in each case as applicable, and Seller and GM Buyers receive the benefit of all such claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Excluded Asset, GM Acquired Asset, Retained Liability or GM Assumed Liability, as applicable; and provided further that no changes shall be made by the named insured to any insurance policy that materially and  adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured;

N.      All Trademark Rights of any of the Sellers, including the name "Delphi" or any related or similar Trademark Rights to the extent the same incorporate the name "Delphi" or any variation thereof;

O.      All goodwill as a going concern and all other intangible properties other than Intellectual Property (which is covered in Section 2.1.4.I above);

P.      All warranties and Claims;

Q.      Environmental Permits;

R.      Environmental Records;

S.      Tax credits and Tax refunds related to the Company Business, including Delphi's Michigan MEGA tax credit entitlements and any property tax refunds related to the Company Business, as well as any other Tax credit or refund not covered by Sections 2.1.3.K or 2.1.5.G**;**

T.      50% of the net proceeds from the Delphi FICA Litigation; and

U.      Wage escrow accounts applicable to Transferred U.S. Hourly Employees who are PRPs at the sites included in the Company Acquired Assets.

V.      Other books and records relating to the Company Business.

**2.1.5.**      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties, assets, rights, title and interests of the Asset Sellers will not be included in the GM Acquired Assets or the Company Acquired Assets (the "**Excluded Assets**"):

A.      Third Party Assets.  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third

party, including third party bailed assets, <u>provided</u>, <u>however</u>, that any Contracts, rights or licenses pertaining to such bailed assets will be transferred as part of the Acquired Assets.

B.    <u>Insurance Policies</u>.  All Insurance Policies related solely to the other Excluded Assets or listed on <u>Schedule 1.1.D</u>; provided, however, that Buyers and Sellers will be named as an additional named insured on any such Insurance Policies to the extent they cover any of the Acquired Assets of such Buyer or relate to any Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer and Buyers will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Acquired Assets of such Buyer or Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured.

C.    <u>Records</u>.  Any books, records (including Tax records) and other materials primarily relating to Excluded Assets or Retained Liabilities, or that any Asset Seller is required by Law to retain (<u>provided</u> that the Asset Sellers shall provide Buyers with copies of the same), all Tax Returns of any Asset Seller for time periods prior to Closing, and related work papers.

D.    <u>Bankruptcy Rights</u>.  All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions including avoidance actions and arising under such Sections by operation of law or otherwise, including without limitation any and all proceeds of the foregoing.

E.    <u>Personnel Records</u>.  All work histories, personnel and medical records of employees and former employees of any Asset Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; <u>provided</u>, <u>however</u>, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, at the election of the applicable Buyer(s) the appropriate Buyer(s) will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if the Asset Sellers so elect.  Upon written request of the Asset Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to the Asset Sellers (or an Affiliate of the Asset Sellers as directed) at which time the Asset Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer(s) with copies of the personnel and medical records to such Buyer; <u>provided</u>, no such records will be provided unless the Asset Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local Law without

material adverse consequences to the Asset Sellers or to any Affiliate of the Asset Sellers.

        F.    <u>Excluded Facilities</u>.    All Real Property (including any improvements located thereon) listed in <u>Schedule 2.1.5.F</u> (the "**Excluded Facilities**") and personal property and other assets located at the Excluded Facilities.

        G.    <u>Tax Refunds</u>.  All refunds, credits, prepayments or deferrals of or against any Taxes, including deferred Taxes of any nature, in each case that relate to Excluded Assets and relate to periods or portions thereof prior to the Closing; <u>provided</u> that, in no event, shall any Buyer be required to make a payment to a Seller with respect to any of the foregoing other than providing to the applicable Seller any Tax refunds received by such Buyer with respect to Taxes paid by a Seller or its Affiliates or refundable tax credits with respect to a period prior to the Closing.

        H.    <u>Inventory and Other Assets</u>.  All Inventory of the GM Business and the Company Business disposed of by Sellers prior to Closing in the Ordinary Course of Business, and not in violation of this Agreement;

        I.    <u>Cash Collateral</u>.  Cash collateral pledged for the benefit of the Senior DIP Lenders.

        J.    <u>Pending Transactions</u>.  All of Sellers' Pending Transactions as set forth on <u>Schedule 2.1.5.J</u>, other than the proceeds relating to the brakes and suspension business and exhaust business.

        K.    <u>Other Excluded Assets</u>.  The assets listed on <u>Schedule 2.1.5.K</u>.

        L.    <u>Filing Affiliate Receivables</u>.  Intercompany receivables due from Filing Affiliates to other Filing Affiliates (other than trade receivables).

        M.    <u>Wage Escrow Accounts</u>.  Wage escrow accounts applicable to Non-Transferred Hourly Employees at the sites included in the Excluded Facilities.

At any time prior to Closing, upon notice by Buyer to Delphi, Delphi will consider in good faith a request to exclude from the transactions contemplated by this Agreement, *de minimis* additional assets or real property.  In the event Delphi agrees to do so the applicable definitions of Acquired Assets, and/or Real Property will be amended as set forth in such notice to remove the additional excluded assets or real property and the definition of Excluded Assets and/or Excluded Facilities, if applicable, may be amended as provided in such notice to include such additional excluded assets or real property or Manufacturing Facilities.

At any time prior to Closing, upon notice to Delphi, GM Buyers, or any of them, may elect to exclude from the transactions contemplated by this Agreement the assets and related Liabilities related to the Manufacturing Facilities located in Strasbourg, France and/or Gurgaon, India.  In such event, the applicable definitions of Purchased Assets, Sale Companies, Securities Sellers, Manufacturing Facilities, Products and/or Real Property will be amended as set forth in such notice to remove the additional excluded assets, real property, Sale Companies or

31

Manufacturing Facilities and the definition of Excluded Assets and/or Excluded Facilities, if applicable, may be amended as provided in such notice to include such additional excluded assets, real property or Manufacturing Facilities.  In the event GM Buyers elect to exclude either such Manufacturing Facilities, GM Buyers will increase the aggregate amount of the expenses it will be required to fund under Section 3.1.1.F by the amount of the net actual incremental costs incurred by Sellers as a result of GM Buyers excluding such Manufacturing Facilities in an amount mutually agreed to by the parties acting reasonably.

**2.1.6.**    Post-Closing Deliveries.

A.    Should Sellers or Buyers, in their reasonable discretion, determine after the Closing that any Acquired Assets are still in the possession of Sellers or any of their Affiliates, Sellers will or will cause such Affiliates to promptly deliver such Acquired Assets to the appropriate Buyers at such Buyer's cost (limited to expenses paid to third parties in compliance with a request from such Buyer and not including any internal fee, cost or overhead of the Sellers).  Should Buyers, in their reasonable discretion, determine after the Closing that an asset was delivered to the wrong Buyer or an Excluded Asset was delivered to a Buyer, such receiving Buyer will promptly provide them to correct the Buyer or return it to the appropriate Seller, with any related costs to be split evenly between such Buyers or by the Buyer transferring to the Seller.

B.    After the Closing, Sellers shall permit, and hereby authorize, Buyers to collect, in the name of Sellers, all Accounts Receivable constituting part of such Buyers' Acquired Assets and to endorse with the name of any applicable Seller for deposit in such Buyers' accounts any checks or drafts received in payment thereof. Sellers shall promptly deliver to the applicable Buyers any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of such Buyers' Acquired Assets.

**2.2**    **Assumption of Liabilities.**

**2.2.1.**    GM Assumed Liabilities.

Subject to the terms and conditions set forth herein the GM Buyers will assume only the following Liabilities, and no other Liabilities of Sellers (collectively, the "**GM Assumed Liabilities**"):

A.    Assumed Administrative Liabilities with respect to the GM Acquired Assets;

B.    the Hedging Agreements;

C.    the Other Steering Business Liabilities;

D.    the following, and only the following, pre-petition Liabilities as they relate to the GM Acquired Assets:

(i)        Cure Amounts for Pre-Petition Contracts included among the Assumed and Assigned Contracts assumed by the GM Buyers in accordance with Section 9.3; and

(ii)        To the extent not discharged pursuant to the Plan of Reorganization, for each GM Buyer, (i) the real and personal property Taxes with respect to the GM Acquired Assets to be acquired by it, (ii) any other Taxes with respect to the GM Business to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, including withholding, FICA and FUTA Taxes related to the employees of the GM Business, and (iii) to the extent that payroll services were provided by or through GM and the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, withholding, FICA and FUTA Taxes related to the employees of the Company Business;

2.2.2.        Subject to the terms and conditions set forth herein, the Company Buyers will assume only the following Liabilities, and no other Liabilities of Sellers (collectively, the "**Company Assumed Liabilities**"):

A.        Assumed Administrative Liabilities with respect to the Company Acquired Assets;

B.        the Specified Director, Officer and Employee Related Liabilities; and

C.        the following and only the following pre-petition Liabilities as they relate to the Company Acquired Assets:

(i)        Cure Amounts for Pre-Petition Contracts included among the Assumed and Assigned Contracts assumed by the Company Buyers in accordance with Section 9.3; and

(ii)        To the extent not discharged pursuant to the Plan of Reorganization, for the Company Buyer, (i) real and personal property Taxes with respect to the Company Acquired Assets, and (ii) to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, any other Taxes with respect to the Company Business, including withholding, FICA and FUTA Taxes related to the employees of the Company Business, unless such Taxes are assumed pursuant to Section 2.2.1.D(ii).

### 2.3    Retained Liabilities.

All Liabilities of the Sellers which are not Assumed Liabilities are herein collectively referred to as the "**Retained Liabilities**", including without limitation:

2.3.1.        Those Sellers who are Filing Affiliates will remain responsible for and shall pay, perform or discharge (or cause to be paid, performed or discharged) the Administrative

Claims set forth on <u>Schedule 2.3.1</u> and except as set forth in <u>Sections 2.2.1.D(ii)</u> and <u>2.2.2.C(ii)</u>, post-petition Liabilities for all Taxes;

**2.3.2.**   The applicable Sellers will remain responsible for and shall pay, perform or discharge (or cause to be paid, performed or discharged) all Liabilities relating to:

A.   the Excluded Assets; and

B.   the Excluded Facilities.

**2.3.3.**   The applicable Sellers will remain responsible for and shall pay, perform or discharge their obligations under the Delphi Retirement Program for Salaried Employee, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan, (collectively, the "**Retained Plans**").

**2.3.4.**   Intercompany payables due to Filing Affiliates from Filing Affiliates (other than trade payables).

**2.3.5.**   All Liabilities relating to the DIP Agreement and the Interim Financing Amendment (in each case any supplement, amendment, modification thereto or any agreement(s) or instrument that is in replacement or substitution therefor).

### 2.4   <u>JV Companies Liabilities, Sale Company Liabilities.</u>

Notwithstanding anything to the contrary herein, the Liabilities of the JV Companies and the Sale Companies will not be affected by the Agreement, and the Sellers will have no obligations for such Liabilities.

### 2.5   <u>Deferred Items.</u>

**2.5.1.**   <u>Non-Assignability</u>.   To the extent that any Contract, Permit or Environmental Permit included in the Acquired Assets is not capable of being assigned, transferred or reissued (whether pursuant to the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable Law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (including a Governmental Authority) ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained or the applicable Buyer specifically indicates in writing (with specific reference to this <u>Section 2.5.1</u> and the Deferred Item at issue) at Closing that it desires such Deferred Item be transferred notwithstanding such restriction and indemnifies the applicable Seller for any liability relating to such transfer; provided that Sellers may not assign such right to indemnity to any Person.

**2.5.2.**   <u>Efforts to Obtain Necessary Consents</u>.   At the applicable Buyer's request, the applicable Seller will, at the requesting Buyer's sole cost and expense, use commercially reasonable efforts, and take such other commercially reasonable actions as such Buyer may request, and such applicable Buyer will, at its expense, cooperate with such Seller, to

obtain the necessary Consents and to resolve the impracticalities of assignment, transfer or reissuance referred to in <u>Section 2.5.1</u> before or after the Closing.

**2.5.3.** <u>If Consents Cannot be Obtained</u>.  To the extent that the Consents referred to in <u>Section 2.5.1</u> are not obtained by the applicable Seller, or until the impracticalities of assignment, transfer or reissuance referred to therein are resolved, such Sellers' sole responsibility with respect to such matters, notwithstanding <u>Sections 2.1.3</u> and <u>2.1.4</u>, will be to appoint the applicable Buyer as its agent to use such Buyer's commercially reasonable efforts during the twelve (12) month period commencing with the Closing to: (i) provide to the applicable Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to such Buyer, without incurring a financial obligation to such Buyer; and (iii) enforce for the account of such Buyer and at the cost of such Buyer any rights of such Seller arising from any Deferred Item referred to in <u>Section 2.5.1</u> against such issuer thereof or other party or parties thereto; <u>provided</u>, <u>however</u>, that any such efforts shall be made with the consent of such Buyer.  Such Buyer will pay such Seller or the Buyer acting as Seller's agent the cost (including the cost of any internal resources) of providing the benefits of any Deferred Item.

**2.5.4.** <u>Obligation of Buyer to Perform</u>.  To the extent that any Buyer is provided the benefits pursuant to <u>Section 2.5.3</u> of any Deferred Item, such Buyer will perform, on behalf of the applicable Seller, for the benefit of the issuer thereof or the other party or parties thereto (including payment obligations) the obligations of such Seller thereunder or in connection therewith and if such Buyer fails to perform to the extent required herein, such Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under <u>Section 2.5.3</u> in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or upon such Buyer's request, such Seller will perform, at such Buyer's sole cost and expense, in which case such Buyer will reimburse such Seller's costs of such performance immediately upon receipt of an invoice therefor.

**2.5.5.** <u>Standard of Care</u>.  Sellers will have no Liability to any Buyer arising out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyers; provided such gross negligence or willful misconduct standard shall not apply with respect to the remittance of any collected Accounts Receivable to Buyers under any deferred items.  Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

## 2.6    <u>Restrictive Covenants</u>.

To the extent that the GM Acquired Assets include a contract or other obligation, including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit the GM Buyers from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Sellers shall at the request of the GM Buyers use commercially reasonable efforts to terminate such contract or obligations and, at the election of the GM Buyers, such contract or obligation shall be

excluded from the Acquired Assets; and in such case, Sellers and the GM Buyers shall use their respective commercially reasonable efforts, at GM Buyer's cost, to provide the GM Buyers with the rights and benefits of such excluded contract or obligation.  To the extent that the GM Acquired Assets include a contract or obligation pursuant to which a third party has a preemptive or similar right to purchase any asset (including an equity interest in a joint venture), Sellers shall use commercially reasonable efforts to cause such third party not to exercise such right; and in such case, Sellers and GM Buyers shall use their respective commercially reasonable efforts, at GM Buyer's cost, to provide the GM Buyers with the rights and benefits of such asset (other than with respect to joint ventures).

To the extent that the Company Acquired Assets include a contract or other obligation, including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit the Company Buyers from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Sellers shall at the request of the Company Buyers use commercially reasonable efforts to terminate such contract or obligations.  To the extent that the Company Acquired Assets include a contract or obligation pursuant to which a third party has a preemptive or similar right to purchase any asset (including an equity interest in a joint venture), Sellers shall use commercially reasonable efforts to cause such third party not to exercise such right.

### 2.7    Allocation Among Buyers.

To the extent it is unclear whether a particular asset or liability should be considered a GM Acquired Asset or a Company Acquired Asset, or a GM Assumed Liability or a Company Assumed Liability, as the case may be (such as allocation of Accounts Receivable and accounts payable to a particular site), Delphi, GM Buyers and the Company Buyers will work together in good faith to reasonably allocate such assets or liabilities.  In addition, with respect to accounts payable and Accounts Receivable relating to the UAW Sites the receivables will be collected and allocated and the payables paid and allocated to the appropriate Buyer as mutually agreed upon between Company Buyers and GM Buyers.  Prior to Closing, the GM Buyer and Company Buyer will in good faith agree upon how intercompany receivables and intercompany payables shall be allocated between them following the Closing Date.

## ARTICLE 3.
## PURCHASE PRICE; ALLOCATION.

### 3.1    GM Purchase Price.

**3.1.1.**    On the Closing Date, subject to the terms and conditions of this Agreement, in consideration of the Sale, Parent, on behalf of the GM Buyers, will pay a purchase price (the "**GM Purchase Price**") consisting of the following components:

A.    The assumption of the applicable Assumed Liabilities of the GM Business;

B.    The assumption or payment of the applicable Cure Amounts of the GM Business;

36

C.    The waiver by GM of its pre-petition Claims, Administrative Claims and future Claims in the Bankruptcy Cases including without limitation any such Claims pursuant to Global Settlement Agreement, as amended, effective as of September 29, 2008 and each of the GM-Delphi Liquidity Agreements;

D.    The payment to Delphi of the DIP Priority Payment;

E.    The payment to Delphi of $291,020,079 in cash;

F.    The payment to Delphi of certain expenses of Delphi and its Filing Affiliates following the Closing as set forth on Exhibit 3.1.1.F; and

G.    50% of professional fees (not to exceed $15,000,000 as the payment from the GM Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the  Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation of approval for the Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to this Section 3.1.1.G, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

**3.1.2.**    The GM Purchase Price will be paid or delivered to the Person provided above.

**3.1.3.**    Following the Closing, GM Buyer shall pay to Delphi the portion of the net proceeds that are recovered in connection with the pursuit of the Appaloosa Claim as provided by the Plan of Reorganization, subject to the terms, conditions and limits specified therein, which such payment shall be made regardless of whether the transactions contemplated hereby are consummated pursuant to a Plan of Reorganization or a Plan Modification Order.

**3.2**    **Company Purchase Price.**

**3.2.1.**    On the Closing Date, and subject to the terms and conditions of this Agreement, in consideration of the Sale, the Company, on behalf of the Company Buyer, will pay a purchase price (the "**Company Purchase Price**") consisting of the following components:

A.    The assumption of the applicable Assumed Liabilities of the Company Business;

B.    The assumption or payment of the applicable Cure Amounts of the Company Business;

C.    $1.00 (one dollar); and

D.    The payment to Delphi  (to be held either by Sellers, a trust or an agent, as determined by Sellers) of the Parnassus Class C Interest of Company Buyer, either directly or indirectly through one or more intermediaries.

37

**3.2.2.**    The Company Purchase Price will be paid or delivered to the Person provided above.

**3.2.3.**    Following the Closing, Company Buyer shall pay to a disbursement agent such amounts payable to the unsecured creditors of Delphi and the Filing Affiliates pursuant to the Plan of Reorganization as filed on the date of execution of this Agreement (without modification as to the consideration to be paid under this Section 3.2.3 unless consented to by Company Buyer), for distribution to such unsecured creditors on behalf of Delphi and the Filing Affiliates, subject to the terms, conditions and limits as set forth in the Plan of Reorganization, which payment to the disbursement agent shall only be made if the transactions contemplated hereby are consummated pursuant to a Plan of Reorganization.

**3.2.4.**    50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization).

**3.3**    **GM Purchase Price and Company Purchase Price Allocation.**

The DIP Priority Payment shall be delivered, if so directed, by Delphi directly to the DIP Agent to be held by the DIP Agent as collateral for the outstanding obligations under the DIP Agreement or as may otherwise be agreed upon by the DIP Agent and Delphi. At Closing, Delphi shall deliver to the Buyers payoff letters in customary form or reasonably satisfactory to GM from the DIP Agent setting forth the DIP Priority Payment. The sum of the GM Purchase Price and the Company Purchase Price and any other relevant items, including the GM Assumed Liabilities and the Company Assumed Liabilities, shall be allocated among the GM Acquired Assets, GM Sale Securities, Company Acquired Assets and Company Sale Securities as jointly determined by Delphi, GM and Company Buyer within a reasonable period of time, but not longer than 90 days after the Closing Date. To the extent permitted by Law, the Sellers and Buyers agree to abide by such allocation for all Tax purposes, and shall take no position on any Tax return inconsistent with such allocation. Without limiting the foregoing, the Sellers and Buyers shall file IRS Form 8594 in a manner consistent with such allocation. Each of the Sellers and Buyers will use their respective commercially reasonable efforts to sustain such allocation in any subsequent audit, similar proceeding, appeal, or court proceeding.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF SELLERS.

Except as set forth in Delphi's reports filed with the Securities and Exchange Commission, each Seller represents and warrants severally and jointly with Delphi to the applicable Buyers only with respect to itself and with respect to the Acquired Assets or Sale Securities being sold by such Seller to such Buyer as follows:

**4.1**    **Organization.**

Each Seller represents to the applicable Buyer that such Seller and, if applicable, the Sale Company being sold by such Seller is a legal entity duly organized, validly existing, and except

as would not reasonably be expected to have a Material Adverse Effect, in good standing under the Laws of its jurisdiction of incorporation or organization.  Each Seller represents to the applicable Buyer that such Seller and such, if applicable, Sale Company has or will the full requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed or admitted to do business in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed has not had and would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.  Delphi represents to the GM Buyer that it has delivered prior to the execution of this Agreement, or will deliver prior to Closing, deliver to the GM Buyer true and complete copies of the certificate of incorporation and by-laws or similar Organizational Documents of each of the Sale Companies relating to the Steering Business as in full force and effect on the date hereof.

### 4.2    Authorization; Enforceability.

Each Seller represents to the applicable Buyer that subject to entry and effectiveness of the Plan Modification Order, and the effectiveness of an appropriate amendment to the DIP Agreement permitting the sale of the Business and entry of a Final Order from the Bankruptcy Court related thereto, each such Seller has or will have at Closing, the requisite corporate or other organizational power and authority to:  (i) execute and deliver to the applicable Buyer this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements, including to own, hold, sell and transfer (pursuant to this Agreement) the Acquired Assets and the Sale Securities.  Subject to entry and effectiveness of the Plan Modification Order, if applicable, the execution and delivery of this Agreement and the Ancillary Agreements to the applicable Buyer by Delphi and each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Person.  Each Seller represents to the applicable Buyer that this Agreement has been duly executed and delivered to the applicable Buyer by such Seller, and the Ancillary Agreements will be duly executed and delivered by such Seller, as applicable, and, assuming due authorization, execution and delivery the applicable Buyers, constitutes, or will constitute, a valid and binding agreement of each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except:  (a) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability; and (b) that enforceability of this Agreement is subject to entry and effectiveness of the Plan Modification Order.

### 4.3    Capital Stock of the Sale Companies and JV Companies.

**4.3.1.**    Except as set forth on Schedule 4.3.1, each Securities Seller represents to the applicable Buyer that (i) such Securities Seller's equity interests in the Sale Company and, if applicable, JV Company, is owned, directly or indirectly, by such Securities Seller as set forth

on <u>Schedule 1</u> and <u>Schedule 2</u> to the Agreement (which Schedule also sets forth the number and type of such equity interests held by each Securities Seller); (ii) such Securities Seller's Sale Securities are duly authorized, validly issued, fully paid up and non-assessable and are not subject to any preemptive rights; and (iii) there are no voting trust agreements or other contracts, agreements or arrangements, to which any Securities Seller is a party, restricting voting or dividend rights or transferability with respect to the Sale Securities.

        **4.3.2.**      Except as set forth on <u>Schedule 4.3.1</u> or <u>Schedule 4.3.2</u>, each Securities Seller represents to the applicable Buyer that there is no outstanding security, right, subscription, warrant, option, privilege or other agreement, commitment or contract, preemptive, contractual or otherwise that gives the right to:  (i) purchase or otherwise receive or be issued any share capital or similar equity interest of such Sale Company or, if applicable, a JV Company or any security of any kind convertible into or exchangeable or exercisable for any share capital of such Sale Company or, if applicable, a JV Company; or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to a holder of share capital or similar equity interest of such Sale Company or, if applicable, a JV Company, including any rights to participate in the equity or income of such Sale Company or, if applicable, a JV Company, or to participate in or direct the election of any directors of such Sale Company or, if applicable, a JV Company or the manner in which any share capital or similar equity interest of such Sale Company or, if applicable, a JV Company, are voted.

        **4.3.3.**      Each Securities Seller represents to the applicable Buyer that at Closing upon payment of the Purchase Price, such Securities Seller will convey to the applicable Buyer valid and marketable title to (x) all of the issued and outstanding shares of capital stock of such Sale Company; and (y) if applicable, all shares of the JV Companies currently owned by such Securities Seller; in each case, free and clear of all Encumbrances except Permitted Encumbrances.

        **4.4**        <u>**No Conflict or Approvals.**</u>

        Except as set forth on <u>Schedule 4.4</u>, each Seller represents to the applicable Buyer that subject to entry and effectiveness of the Plan Modification Order and the effectiveness of an appropriate amendment to the DIP Agreement permitting the sale of the Business and entry of a final order from the Bankruptcy Court related thereto, the execution, delivery and performance by such Seller of this Agreement and the Ancillary Agreements do not:  (i) violate, conflict with or result in a breach of Organizational Documents of such Seller or, if applicable, the JV Companies; (ii) violate or result in a breach of any Governmental Order or Law applicable to such Seller, such Sale Company or the JV Companies or any of their respective properties or assets; (iii) require any Governmental Approval, except as set forth in this Agreement and in each case for consents, approvals, authorizations of, declarations or filings with the Bankruptcy Court; or (iv) result in a breach, right of acceleration, termination, modification or cancellation of any of the Material Contracts of such Seller or Sale Companies; except:  (x) as would not, individually or in the aggregate, have a Material Adverse Effect or a Material Adverse Effect on the ability of such Seller to consummate the transactions contemplated by this Agreement; or (y) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**4.5**      **Sufficiency of Acquired Assets.**

Except as set forth on Schedule 4.5, the Acquired Assets and assets of the Sale Companies, together with the Intellectual Property rights to be licensed from Sellers to Buyers pursuant to the IP License Agreement and the services to be provided to Buyers pursuant to the Transition Services Agreement, comprise all of the assets necessary to carry on the Company Business and the Steering Business in all material respects as they are now being conducted.

**4.6**      **Intellectual Property.**

**4.6.1.**      Schedule 1.1.D.1, Schedule 1.1.D.2 and Schedule 1.1.D.3, respectively, list all the issued Patent Rights and Patent Rights applications, all Trademark Rights registrations and applications therefor, and all Copyright registrations and applications therefor, included in the Purchased Intellectual Property for the Steering Business identified as of the date of this Agreement.  Except as:  (i) set forth in Schedule 1.1.D.1; or (ii) instances in which such issued Patent Rights or Patent Rights applications are jointly owned with a third party, or (iii) as would not reasonably be expected to result in a Material Adverse Effect and subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own the entire right, title and interest in their respective Purchased Intellectual Property, and have the right to transfer such Sellers' right, title and interest in them and have the right to license the Shared Intellectual Property as set forth in this Agreement.  Buyers shall have the right to bring actions for all past, present and future infringement or unauthorized use of the Purchased Intellectual Property.

**4.6.2.**      There are no licenses to Affiliates of Sellers of Steering Technology other than those set forth in Schedule 4.6.2.

**4.6.3.**      Except as set forth in Schedule 4.6.3 with respect to the Steering Business as of the date of such schedule, and except as would not reasonably be expected to have Material Adverse Effect:  (i) each Seller has not, to such Seller's Knowledge, infringed, misappropriated or otherwise violated, and the operation of the Business as currently conducted does not to such Sellers' Knowledge infringe, misappropriate or otherwise violate any Intellectual Property rights of any third party to any extent that would have a Material Adverse Effect; and (ii) each Seller has no Knowledge of any allegation by any third party of such Seller's Intellectual Property infringement or misappropriation, resulting from the operation of the Business during the last three (3) years that would have a Material Adverse Effect.

**4.6.4.**      Except as set forth in Schedule 4.6.4 with respect to the Steering Business as of the date of such schedule, each Seller has no Knowledge of any material infringement, misappropriation or other violation of such Seller's Purchased Intellectual Property by any Person that would have a Material Adverse Effect

**4.6.5.**      Except as set forth on Schedule 4.6.5 with respect to the Steering Business as of the date of such schedule, and except as would not reasonably be expected to have Material Adverse Effect:  (i) Delphi has received no notice of a claim by any third party contesting the validity, enforceability, use or ownership of any of the material Purchased Intellectual Property within the past three (3) years that to Delphi's Knowledge is currently

41

outstanding or is threatened; and (ii) each Seller and Sale Company has taken reasonable measures to protect the confidentiality and value of such Seller's and Sale Company's Trade Secrets included in the Purchased Intellectual Property.

### 4.7    Personal Property Assets, Inventory.

**4.7.1.**    Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, such Asset Seller and such Sale Company have good title to, or hold by valid and existing lease or license, all of their Personal Property included in their respective Acquired Assets.  All such Personal Property is free and clear of all Encumbrances, other than Permitted Encumbrances.

**4.7.2.**    Each Seller represents to the applicable Buyer that such Sale Company and such Asset Seller, with respect to their Acquired Assets, will own, or have valid leasehold interests in, all of their Personal Property and Inventory being transferred to applicable Buyers under this Agreement, and to each Seller's Knowledge, all of their respective transferred Personal Property used by the applicable Business are in such condition (considering age and purpose for which they are used) as to enable the applicable Business to be conducted as currently conducted without material disruption.

**4.7.3.**    Each Seller represents to the applicable Buyer that except as would not result in a Material Adverse Effect, the Inventory included in such Seller's Acquired Assets will, as of the Closing, be:  (i) located at the Real Property; (ii) of a quality usable and saleable in the Ordinary Course of Business, subject to normal allowances for spoilage, damage and outdated items.

### 4.8    Real Property.

**4.8.1.**    Leased Properties.  <u>Schedule 4.8.1</u> lists the address of all real property leased, subleased or equivalent leasehold rights in U.S. and non-U.S. jurisdictions, by any GM Sale Company or constituting GM Acquired Assets (the "**GM Leased Real Property**"), including any option to purchase the underlying property and leasehold improvements thereon and all security deposits deposited on or on behalf of each Seller related to such leases.  Delphi has made available to Parent true and complete copies of the leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) (the "**Leases**") and subleases covering the GM Leased Real Property (as amended to the date of this Agreement).  With respect to the GM Leased Real Property, each lease and sublease and except as otherwise specified on <u>Schedule 4.8.1</u> or where the failure of any of the following to be true and correct has not and would not reasonably be expected to have a Material Adverse Effect:

A.    The Leases are, to the Knowledge of the applicable Seller, in all material respects, valid, binding, enforceable and in full force and effect, in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a Proceeding in equity or at law); and

B.    (i) None of the Sale Companies, or the Asset Sellers or, to the Knowledge of the applicable Seller, any other party to its Leases, is in material breach under its Leases, other than with respect to monetary defaults by such Asset Sellers under the Leases that are curable by payment of all Cure Amounts, if applicable, and, to the Knowledge of Sellers, no event has occurred which, with the delivery of notice or passage of time or expiration of any grace period would constitute a material breach of the respective Sale Company's or its Asset Seller's obligations under the Leases (except with respect to breaches that need not be cured under Section 365 of the Bankruptcy Code for the Filing Affiliates to assume and assign the Leases to Buyer, if applicable); and (ii) none of the Sale Companies or the Asset Sellers has received a notice of breach with respect to its Leases.

**4.8.2.**    Owned Properties.  Schedule 4.8.2 lists the address of all real property owned by any of the GM Sale Companies or GM Asset Sellers or which constitutes GM Acquired Assets (the "**GM Owned Real Property**").  With respect to each such parcel of the GM Owned Real Property and except as otherwise specified on Schedule 4.8.2, the identified owner has good and marketable fee simple title, or equivalent title rights in non-U.S. jurisdictions, to the parcel of the GM Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

### 4.9    Financial Statements.

**4.9.1.**    The GM Sellers represent to the GM Buyers as follows with respect to the Steering Business:  Schedule 4.9.1 sets forth the unaudited combined balance sheets of the Global Steering Business as of December 31, 2005 and 2006 and the related unaudited combined statements of income for the years ended December 31, 2005 and 2006 (referred to as the "Historical Financial Statements").  Except as set forth on Schedule 4.9.1, and limited to such applicable Seller's Knowledge with respect to the JV Companies, each Historical Financial Statement was, at the time prepared, (i) true, correct and complete in all material respects with respect to the purpose for which it was prepared, as of the date thereof, subject to the absence of notes and normal year end adjustments; (ii) consistent with prior practice, subject to the exceptions and adjustments described in Schedule 4.9.2; (iii) prepared from the accounting records of the Asset Sellers, Sale Companies and JV Companies, in accordance with the specific accounting treatments consistently used by Seller in preparation of its books and records; (iv) with respect to the Historical Financial Statements, subject to the exceptions and adjustments set forth in Schedule 4.9.2, presents fairly in all material respects the financial condition and the results of operations of the combined business as of the respective dates of and for the periods referred to in such financial statements; and (v) in accordance with GAAP.  For the avoidance of doubt, subparagraph (iii) shall take precedence over subparagraphs (iv) and (v), and subparagraph (iv) shall take precedence over subparagraph (v).

**4.9.2.**    The GM Sellers represent to the GM Buyers as follows:  Except as specifically reflected or reserved against in the December 31, 2006 balance sheet that is part of the Historical Financial Statements or otherwise disclosed on Schedule 4.9.2, there are no Liabilities that would be required to be disclosed in accordance with GAAP against, relating to or affecting the Steering Business, other than Liabilities incurred in the Ordinary Course of Business since December 31, 2006.

### 4.10    Compliance with Law; Permits

Except as set forth on Schedule 4.10, each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, its applicable Business is currently in material compliance with all material Laws.  Each of the Sale Companies possess all Permits necessary to own, lease and operate its assets and conduct the applicable Business as currently conducted, and the Asset Sellers possess all Permits necessary to own, lease and operate their respective Acquired Assets except as would not reasonably be expected to result in a Material Adverse Effect.   The representations and warranties relating to Environmental Laws and Environmental Permits are exclusively set forth in Section 4.15.

### 4.11    Proceedings; Orders.

Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, and except for the pendency of the Bankruptcy Cases (and except with respect to compliance with Environmental Laws, which is covered by Section 4.15), there are no Proceedings or Governmental Orders pending against such Sale Company or such Asset Sellers or, to the Knowledge of each Seller, the JV Companies, and to the Knowledge of each Seller there are no Proceedings or Governmental Orders threatened against any of such Sale Company, such Asset Sellers or the JV Companies with respect to its applicable Business.

### 4.12    Tax Matters.

**4.12.1.**    Except as set forth in Schedule 4.12.1, each Sale Company and Asset Seller has:  (i) duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all of its material Tax Returns required to be filed and, when filed, such Tax Returns were true, correct and complete in all material respects; and (ii) paid all of its material Taxes shown thereon as due and owing, except in the case of Filing Affiliates, Taxes which may have been prohibited by the Bankruptcy Code.

**4.12.2.**    The Sellers and Sale Companies have each withheld and paid all of their respective material Taxes required to have been withheld and paid in connection with amounts paid or owing to any Transferred Employee.

**4.12.3.**    Except as set forth in Schedule 4.12.3, no Sale Company has received any notice of assessment with respect to the potential underpayment of Taxes or other deficiency.  Except as disclosed in Schedule 4.12.3, all assessments made as a result of any examinations with respect to, in connection with, associated with or related to, the Sale Companies have been fully paid or are fully reflected as a liability in the financial statements of the Sale Company.

**4.12.4.**    No Sale Company is a party to any agreement, Contract or plan that has resulted or would result, separately or in the aggregate, in the payment of any excess parachute payments within the meaning of Code Section 280G.

**4.12.5.**      Except with respect to Taxes not yet due and payable or as set forth in Schedule 4.12.5, there are no tax liens on the Acquired Assets or on any of the assets of the Sale Companies that arose in connection with any failure (or alleged failure) to pay any Tax.

**4.12.6.**      Except as set forth in Schedule 4.12.6, no Sale Companies have waived any statue of limitations or agreed to any extension of time with respect to an assessment or deficiency of Taxes.

### 4.13      **Employee Benefits; Labor**.

**4.13.1.**      Schedule 4.13.1 contains a list of all U.S. Employees and Non-U.S. Employees of the Steering Business, and employees of the Sale Companies included in the Steering Business, including for all such employees: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed (including without limitation those on layoff status) or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual base rate of compensation; (vi) each person's date of hire; and (vii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, separation pay agreement), in each case, to the extent permitted to be disclosed under applicable Law (including local privacy laws).

**4.13.2.**      Schedule 4.13.2, sets forth a list of the Seller Employee Benefit Plans, including each Non-U.S. Benefit Plan for the employees of the Steering Business and each Employee Benefit Plan for U.S. Employees.

**4.13.3.**      To the extent applicable to employees of the Steering Business and each Seller Employee Benefit Plan for U.S. Employees, copies of the following materials have been delivered or made available to Parent with respect to each Seller Employee Benefit Plan to the extent applicable to the Steering Business: (i) current plan documents, any related trust agreements, service provider agreements, insurance contracts or agreements with investment managers; (ii) the most recent summary plan description and summary of material modifications to the extent not included in the summary plan description in each case distributed to employees; (iii) current agreements and other documents relating to the funding or payment of benefits; and (iv) the most recent actuarial valuation report, if applicable.

**4.13.4.**      Except as set forth in Schedule 4.13.4, or where the failure to comply would not have a Material Adverse Effect, the Seller Employee Benefit Plans are in compliance with their terms and applicable requirements of ERISA, the Code and other Laws (if applicable). Each Seller Employee Benefit Plan and related trust which is intended to be qualified within the meaning of Section 401 or 501, as applicable, of the Code has received a favorable determination letter as to its qualification and to the Knowledge of Sellers, nothing has occurred that could reasonably be expected to adversely affect such determination.

**4.13.5.**      Except as: (i) set forth in Schedule 4.13.5; and (ii) routine claims for benefits by participants and beneficiaries, there are no pending or, to the Knowledge of Sellers, material threatened Proceedings in the U.S. with respect to any Seller Employee Benefit Plans of

the Steering Business or that otherwise might have a Material Adverse Effect with respect to the other Seller Employee Benefit Plans applicable to any U.S. Employees.

       **4.13.6.**    Except as set forth in <u>Schedule 4.13.6</u> no event or condition has occurred in connection with which any of the Sale Companies or Sellers or any member of the Controlled Group (as defined below) could be subject to any material Liability or Encumbrance under Title IV of ERISA.

       **4.13.7.**    None of the Sale Companies nor any member of the Controlled Group (as defined below) currently has or for the past five (5) years has had an obligation to contribute to a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code.

       **4.13.8.**    With respect to each group health plan that is subject to Section 4980B of the Code maintained by any entity described in this <u>Section 4.13.8</u>, the Sale Companies and each member of the Controlled Group (as defined below) have complied with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA, except where the failure to so comply would not have a Material Adverse Effect.  Except as set forth on <u>Schedule 4.13.8</u>, no Seller Employee Benefit Plan provides welfare coverage that extends after the termination of employment other than for continued coverage provided pursuant to the requirements of Section 4980B of the Code or other similar provision of state law.  For purposes of this Agreement, "**Controlled Group**" means any trade or business (whether or not incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sale Companies; or (ii) which together with any of the Sale Companies is treated as a single employer under Section 414(t) of the Code.

       **4.13.9.**    Sellers are not in default in performing any of their obligations under any Seller Employee Benefit Plan or any related trust agreement or insurance contract with respect to the Steering Business or, in the case of any other business of the Sellers, where such default would reasonably be expected to result in a Material Adverse Effect.  Except as set forth on <u>Schedule 4.13.9</u>, all contributions and other payments required to be made by Sellers to any Seller Employee Benefit Plan with respect to any period ending before or at the Closing Date have been made or reserves adequate for such contributions or other payments have been or will be set aside therefor.  There are no material outstanding Liabilities of, or related to, any Seller Employee Benefit Plan other than Liabilities for benefits to be paid in the Ordinary Course of Business to participants in such Seller Employee Benefit Plan and their beneficiaries in accordance with the terms of such Seller Employee Benefit Plan.  Except as set forth on <u>Schedule 4.13.9</u>, there are no Contracts or other arrangements providing for any bonus or other payments to any Transferred Employees arising as a result of the transactions contemplated hereby.

       **4.13.10.**    No transaction contemplated by this Agreement will result in liability under Sections  4062, 4063, 4064, or 4069 of ERISA or otherwise, with respect to Sellers or Buyers or any corporation or organization controlled by or under common control with any of the foregoing within the meaning of Section 4001 of ERISA, and no event or condition exists or has existed which would reasonably be expected to result in any such liability with respect to the foregoing within the meaning of Section 4001 of ERISA.

**4.13.11.**   Schedule 4.13.11 lists all material Collective Bargaining Agreements applicable to employees of the Steering Business or U.S. Hourly Employees.  Sellers have given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements with respect to the Steering Business and the Seller's business in the U.S.  Except as disclosed on Schedule 4.13.11, Sellers are, and for the past twelve (12) months (i) with respect to the Steering Business and the Seller's business in the U.S. have remained in material compliance with each Collective Bargaining Agreement and (ii) with respect to the Seller's non-U.S. business have remained in compliance with each Collective Bargaining Agreement except where failure to be in compliance would have a Material Adverse Effect.  With respect to the transactions contemplated under this Agreement, any notice required under any Law or Collective Bargaining Agreement has been or prior to Closing will be given, and Seller will be in compliance with all bargaining obligations with any employee representative except where failure to be in compliance would have a Material Adverse Effect.

**4.13.12.**   Except as disclosed on Schedule 4.13.12: (i) with respect to the Seller's Steering Business and Seller's U.S. business, there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving Sellers or any Sale Company; (ii) with respect to the Seller's Steering Business and Seller's U.S. business, neither Sellers nor any Sale Company has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; (iii) with respect to the Seller's Steering Business, no material labor grievance relating to any employee of Sellers or any Sale Company is pending as of the date of Schedule 4.13.12; and (iv) with respect to the Seller's Steering Business and Seller's U.S. business, neither Sellers nor any Sale Company has any labor negotiations in process with any labor union or other labor organization.  Except as set forth on Schedule 4.13.12 or as would not have a Material Adverse Effect, there are no pending litigations, administrative proceedings, grievances, arbitrations, investigations or claims against Sellers or any Sale Companies whether under applicable Laws, Collective Bargaining Agreements, employment agreements or otherwise asserted by any present employee or former employee (or their representative) or any other Person as relates to the Business, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off; or (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work, and, to Sellers' Knowledge, there are no such claims which have yet to be asserted.

**4.13.13.**   With respect to each benefit plan, bonus, deferred compensation, severance pay, pension, profit-sharing, retirement, insurance, stock purchase, stock option, vacation pay, sick pay or other fringe benefit plan, arrangement or practice that is currently sponsored or maintained outside the jurisdiction of the United States by any Sale Company, that is not subject to the laws of the United States, and that covers an employee of a Sale Company that resides or works outside the United States (each a "**Non-U.S. Benefit Plan**"), the following representations are made with respect to those Non U.S. Benefit Plans (x) with respect to the Seller's Steering Business and (y) except as would not have or reasonably be expected to have a Material Adverse Effect, with respect to the Seller's businesses other than the Seller's Steering Business:

47

A.      All employer and employee contributions, to the extent directly paid by the employer, to each Non U.S. Benefit Plan required by law or by the terms of such Non U.S. Benefit Plan have been made, or, if applicable, accrued in accordance with GAAP; and

B.      Each Non U.S. Benefit Plan required to be registered or approved has been registered or approved and has been maintained in good standing with applicable regulatory authorities.  Each Non U.S. Benefit Plan is now and always has been operated in material compliance with all applicable Laws.

### 4.14    Contracts.

4.14.1.    Schedule 4.14.1 sets forth a true and complete list as of the date of such schedule of each of the following Contracts to which such Sale Company, or such Asset Seller with respect to the Steering Business, is a party or by which any of them is bound, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

A.      Contracts (other than purchase order Contracts) involving the expenditure by the Sale Companies or the Asset Sellers in respect of the Steering Business of more than $500,000 in any instance for the purchase of materials, supplies, equipment or services, excluding any such contracts that are terminable by the Sale Companies or the Asset Sellers without penalty on not more than one hundred eighty (180) days notice;

B.      Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of material Debt Obligations with respect to the Steering Business;

C.      Guarantees of obligations (other than endorsements made for collection) involving the potential expenditure by the Sale Companies or the Asset Sellers in respect of the Steering Business after the date of this Agreement of more than $500,000 in any instance;

D.      Contracts under which any Seller or the Sale Companies has licensed material Purchased Intellectual Property to, or material Licensed Intellectual Property from, any other Person with respect to the Steering Business;

E.      Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the Sale Companies or the relevant Asset Seller party thereto with respect to the Steering Business;

F.      All Contracts containing any provision or covenant prohibiting or materially limiting the ability of any Sale Company to engage in any Business activity or in any region or compete with any Person with respect to the Steering Business;

G.      All Contracts (other than purchase order Contracts with Affiliates) between the Sale Companies or Asset Sellers with respect to the Steering Business, on

48

the one hand, and any Seller or its officers, directors or Affiliates (other than the Sale Companies or any of the Asset Sellers with respect to the Steering Business);

> H.    Contracts (other than purchase order Contracts) providing that a Sale Company or any Asset Seller in respect of the Steering Business will receive future payments aggregating more than $2,500,000 per annum or $10,000,000 in the aggregate prior to the expiration of such Contract;

> I.    Collective Bargaining Agreements, works council agreements and similar agreements with any labor organization or employee representative with respect to the Steering Business;

> J.    All letters of credit, performance bonds and other similar items issued and outstanding in connection with the Steering Business; and

> K.    Agreements compromising, settling or resolving any material dispute affecting a Seller or a Sale Company pursuant to which, on or after the execution date of this Agreement, any Seller, with respect to a matter that would otherwise become an Assumed Liability, or any Sale Company will be required to pay consideration valued in excess of $500,000 or to satisfy monitoring or reporting obligations to any Governmental Authority outside the Ordinary Course of Business with respect to the Steering Business.

> 4.14.2.    As of the date of such schedule and with respect to the Steering Business, except as set forth in Schedule 4.14.2, and other than with respect to monetary defaults by Sellers under Material Contracts that are curable by payment of all Cure Amounts, if applicable, no event has occurred or would be reasonably likely to occur as of the date of such schedule that constitutes a material default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Buyers, if applicable) by: (i) any of the Sale Companies or any Asset Seller under any Material Contract; or (ii) any other party to any Material Contract. As of the date of such schedule and with respect to the Steering Business, Schedule 4.14.2 identifies all Post Petition Contracts included within the Material Contracts, other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business.

> 4.14.3.    The Sellers have made or will make available to the GM Buyers a true and correct copy of all written Contracts disclosed on Schedule 4.14.1 (other than purchase orders and those subject to confidentiality provisions that prohibit disclosure to third parties), in each case together with all amendments, waivers or other changes thereto.

> ### 4.15    Environmental Matters.

Except as disclosed in Schedule 4.15, since January 1, 1999, to the Knowledge of each of the Sellers with respect to such Seller's Business or except as would not reasonably be expected to result in a Material Adverse Effect:

> 4.15.1.    The Business is in compliance with Environmental Laws and with Environmental Permits applicable to the Business and the Real Property;

49

4.15.2.    From February 1, 2009 through the Closing, no lien, restrictive covenant, engineering and/or institutional control or other land or resource use restriction has been, nor shall any be, recorded against or imposed upon the Real Property under Environmental Laws;

4.15.3.    None of the Sale Companies or the Asset Sellers with respect to their respective Acquired Assets and their Business has received any written notice from a Governmental Authority alleging that the Business as currently operated violates in any material respects any Environmental Laws or Environmental Permits;

4.15.4.    Each Sale Company and Asset Seller with respect to their respective Acquired Assets and their Business has not received and has no Knowledge of the issuance of any Claim under Environmental Law with respect to the Real Property;

4.15.5.    Each Sale Company and Asset Seller with respect to their respective Acquired Assets and their Business has obtained and maintains in full force and effect all Environmental Permits required for the operation of the Business and occupancy of the Real Property; and

4.15.6.    By the Closing Date, Sellers shall have delivered or otherwise made available to (a) the GM Buyers, the GM Environmental Records and all Environmental Records at any GM Real Property relating to the GM Business, and (b) the Company Buyer, all Environmental Records at any Company Real Property relating to the Company Business.

### 4.16    Insurance.

4.16.1.    Schedule 4.16 contains a complete and correct list, in all material respects, of all material policies of insurance, other than Insurance Policies relating to multiple business lines of Delphi, covering any of the assets primarily used in the Steering Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.

4.16.2.    Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, with respect to their Transferred Insurance Policies, all such policies are outstanding and in full force and effect and neither the Sale Companies, the Asset Sellers nor the Person to whom any policy has been issued has received any notice of cancellation or termination in respect of any policy or is in default thereunder. Each Seller represents to the applicable Buyer that neither such Sale Company, such Asset Sellers nor the Person to whom any Policy has been issued has received notice that any insurer under such Transferred Insurance Policies is denying coverage or defending under a reservation of rights clause.

### 4.17    No Brokers' Fees.

Each Seller represents to the applicable Buyer that such Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyers, the Sale

Companies or the JV Companies would be liable (including any claim for a finder's fee or brokerage commission).

### 4.18    Affiliate Transactions.

Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, (i) none of its officers or directors of any Seller provides or causes to be provided any assets, services or facilities used or held for use in connection with the Business; and (ii) the Business does not provide or cause to be provided any assets, services or facilities to any such officer or director.

### 4.19    No Other Representations or Warranties.

Except for the representations and warranties contained in this Article 4:  (i) the Sellers make no other express or implied representation or warranty to any of the Buyers; and (ii) no Seller is making any representations with respect to any plan(s) of Buyers for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose. For the avoidance of doubt, except for the representations and warranties contained in this Article 4, no warranty or representation is given on the contents of the documents provided during due diligence, including any information in any Data Room and any other reports, financial forecasts, projections or information furnished by or on behalf of Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

### 4.20    Fair Disclosure; Schedule Data.

4.20.1.    The information set forth in each Section of the Schedules shall be deemed to provide the information contemplated by, or otherwise qualify, the representation and warranties of the Sellers set forth in the corresponding section or subsection of the agreement and any other representation of the Sellers, but only to the extent that it is reasonably apparent on the face of the Schedule that it applies to such other representation.

4.20.2.    The information set forth on the schedules referred to in this Article 4 in each case is only provided as of the date set forth on such schedule.  To the extent that a schedule is dated prior to the date of this Agreement, the related representation in this Agreement is only made as of such date.

### ARTICLE 5.
### REPRESENTATIONS AND WARRANTIES OF GM BUYERS.

GM Buyers jointly and severally represent and warrant to the GM Sellers and Company Buyers as follows:

### 5.1    Organization.

Each GM Buyer represents to the GM Sellers that it is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  Each GM Buyer represents to the GM Sellers that it has the full requisite corporate

or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed or admitted to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed:  (i) has not had and would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of GM Buyers to consummate the transactions contemplated by this Agreement; or (ii) would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on GM Buyers.

### 5.2    **Authorization; Enforceability.**

Each GM Buyer represents to the GM Sellers that it has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to the GM Sellers and perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements to the GM Sellers by each GM Buyer and the performance by each of them of their respective obligations hereunder and thereunder, in the case of Parent have been, and in the case of the other Buyers prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such GM Buyer and, upon such authorization, no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby.  This Agreement has been duly executed and delivered by the GM Buyers, and the Ancillary Agreements will be duly executed and delivered by the applicable GM Buyers and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable GM Buyers, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

### 5.3    **No Conflicts or Approvals.**

Each GM Buyer represents to the GM Sellers that the execution, delivery to the GM Sellers and performance by GM Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the GM Buyers of the transactions contemplated hereby and thereby do not and will not:  (i) violate, conflict with or result in a breach by the GM Buyer of the Organizational Documents of the GM Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by GM Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which the GM Buyer or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to GM Buyer or any of its properties or assets; or (iv) except for applicable requirements of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of GM Buyer to consummate the transactions contemplated by this Agreement.

### 5.4    **Proceedings**.

Each GM Buyer represents to the GM Sellers that as of the date hereof, there are no Proceedings pending or, to the Knowledge of GM Buyer, threatened against GM Buyer that would reasonably be expected to restrain, delay or inhibit the ability of GM Buyer to consummate the transactions contemplated by this Agreement.  Each GM Buyer represents to the GM Sellers that as of the date hereof, such GM Buyer is not subject to any Governmental Order that would reasonably be expected to restrain, delay or otherwise inhibit the ability of such GM Buyer to consummate the transactions contemplated by this Agreement.

### 5.5    **Investment Representations**.

**5.5.1.**    Each GM Buyer represents to the GM Sellers that the GM Buyer is acquiring the GM Sale Securities for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any other jurisdiction.  Each GM Buyer agrees with GM Sellers that it will not transfer any of the GM Sale Securities, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

**5.5.2.**    Each GM Buyer represents to the GM Sellers that such GM Buyer is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

**5.5.3.**    Each GM Buyer represents to the GM Sellers that such GM Buyer understands that the acquisition of the GM Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Each GM Buyer represents to the GM Sellers that GM Buyer and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the GM Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**5.5.4.**    Each GM Buyer further understands and acknowledges to the GM Sellers that the GM Sale Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees with GM Sellers that the GM Sale Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, pursuant to an applicable exemption therefrom.

**5.5.5.**    GM Buyer acknowledges to GM Seller that the offer and sale of the GM Sale Securities has not been accomplished by the publication of any advertisement.

### 5.6    **Financial Ability**.

GM Buyers have the financial ability or will have available at Closing, sufficient Cash in immediately available funds to pay the GM Purchase Price, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.

### 5.7    Adequate Assurance of Future Performance.

Each GM Buyer represents to the Sellers that such GM Buyer will be able to provide, at or prior to Closing, adequate assurance of its future performance (or future performance of any applicable subsidiary of a GM Buyer) under each applicable Acquired Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Acquired Contract. Each GM Buyer acknowledges to the applicable GM Seller and agrees with the GM Seller that if it is necessary to provide a Contract counter-party with additional assurances to satisfy such GM Buyer's obligations to provide adequate assurance in accordance with this Section 5.7, all such costs and expenses or other actions required will be borne and performed by such GM Buyer without recourse to Sellers.

### 5.8    No Brokers' Fees.

Except for Evercore Partners and AlixPartners (which shall be paid by GM or a GM Buyer), payment of whose fees will be solely GM's responsibility, each GM Buyer represents to the GM Sellers that such GM Buyer has not employed any finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

### 5.9    Anti-Money Laundering.

Each GM Buyer represents to the GM Sellers that such GM Buyer is in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Buyer operates or does business. Neither such GM Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and such GM Buyer is not affiliated in any way with, nor providing financial or material support to, any such persons or entities. Each GM Buyer agrees that should it or any GM Buyer, or any of their directors, officers or affiliates be named at any time prior to Closing on the SDN List, or any other similar list maintained by the U.S. Government, it will inform Delphi in writing immediately.

### 5.10    Compliance with Laws.

Each GM Buyer represents to the GM Sellers that such GM Buyer is in compliance with all Laws applicable to such GM Buyer, except with respect to those violations that would not

reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting such GM Buyer from consummating the transactions contemplated by this Agreement.

### 5.11    No Undisclosed Agreements.

GM Buyer has disclosed and will disclose all written agreements between it and the Company Buyer relating to the subject matter of this Agreement or Delphi.

## ARTICLE 6.
## REPRESENTATIONS AND WARRANTIES OF GM

### 6.1    Authorization; Enforceability.

GM represents to Delphi that it has the requisite corporate power and authority to execute and deliver the Buyer Loan Documents and the Securities Purchase Agreement (together, and including, without limitation, any and all exhibits, annexes, schedules, fee letters and other ancillary documents, the "**GM Financing Agreements**") and this Agreement and perform its obligations thereunder and hereunder.  The execution and delivery of this Agreement and the GM Financing Agreements by GM and the performance by GM of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action on the part of GM, and no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, the GM Financing Agreements or the transactions contemplated hereby or thereby.  This Agreement and the Securities Purchase Agreement have been duly executed and delivered by GM and the Buyer Loan Documents will have been duly executed and delivered by GM on or prior to the Closing and, assuming due authorization, execution and delivery by the other parties hereto and thereto (other than the GM Buyers), subject to obtaining requisite Bankruptcy Court approval, constitutes, or in the case of the Buyer Loan Documents will constitute as of the Closing, a valid and binding agreement of GM, enforceable against GM in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

### 6.2    No Conflicts or Approvals.

GM represents to Delphi that the execution, delivery and performance by GM of this Agreement and the GM Financing Agreements (when executed) and the consummation by GM of the transactions contemplated hereby and thereby do not and will not:  (i) violate, conflict with or result in a breach by the GM of the Organizational Documents of GM; (ii) violate, conflict with or result in a breach of, or constitute a default by GM (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which the GM or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to GM or any of its properties or assets; or (iv) except for applicable requirements of the HSR Act and other applicable Competition/Investment Law, and obtaining

55

requisite Bankruptcy Court approval, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of GM to consummate the transactions contemplated by this Agreement, the Securities Purchase Agreement or the Buyer Loan Documents (when executed).  GM has received the Consent of the President's Designee with respect to the transactions contemplated by this Agreement.

### 6.3    GM Financing Arrangements.

GM represents to Delphi that it has delivered to Delphi (a) a true, correct and complete signed copy of the Securities Purchase Agreement, including all exhibits and schedules thereto and (b) a true correct and complete copy of the form of Buyer Loan Documents, including all exhibits and schedules thereto, pursuant to which GM has agreed to provide to the Company Buyer on or prior to the Closing Date the equity and debt financing described therein (the "**GM Financing**").  The GM Financing Agreements are subject to no contingencies or conditions other than those set forth in the copies of the GM Financing Agreements delivered to Delphi.  As of the date hereof, no event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of GM under the GM Financing Agreements.

## ARTICLE 7.
## REPRESENTATIONS AND WARRANTIES OF COMPANY BUYER.

The Company Buyer represents and warrants (and to the extent there is more than one Company Buyer, the Company Buyers jointly and severally represent and warrant to) to the Company Sellers and the GM Buyers, as follows:

### 7.1    Organization.

The Company Buyer represents to the Company Sellers that it is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  The Company Buyer represents to the Company Sellers that it has the full requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed or admitted to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed:  (i) has not had and would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Company Buyer to consummate the transactions contemplated by this Agreement; or (ii) would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Company Buyer.

### 7.2    Authorization; Enforceability.

The Company Buyer represents to the Company Sellers that it has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to the Sellers and perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements by the Company Buyer and the performance by each of them of their respective obligations hereunder and thereunder, have been, and in the case of

the other Company Buyers prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Company Buyer and, upon such authorization, no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby.  The Company Buyer represents to the Company Sellers that this Agreement has been duly executed and delivered by the Company Buyer to the Company Sellers, and the Ancillary Agreements will be duly executed and delivered by the Company Buyer and, assuming due authorization, execution and delivery by Company Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable Company Buyer, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law) and, in addition, the Parnassus Class C Interest, when issued and delivered in accordance with the terms of this Agreement and the Operating Agreement, will be duly authorized, validly issued, fully paid, and non-assessable and free of all preemptive rights, Liens, voting or transfer restrictions and encumbrances, except as specifically set forth in the Operating Agreement or as may be provided under federal or state securities laws.

### 7.3     No Conflicts or Approvals.

The Company Buyer represents to the Company Sellers that the execution, delivery to the Sellers and performance by Company Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the Company Buyer of the transactions contemplated hereby and thereby do not and will not:  (i) violate, conflict with or result in a breach by the Company Buyer of the Organizational Documents of the Company Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by Company Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which the Company Buyer or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to Company Buyer or any of its properties or assets; or (iv) except for applicable requirements of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of Company Buyer to consummate the transactions contemplated by this Agreement.

### 7.4     Proceedings.

The Company Buyer represents to the Company Sellers that as of the date hereof, there are no Proceedings pending or, to the Knowledge of Company Buyer, threatened against Company Buyer that could reasonably be expected to restrain, delay or inhibit the ability of Company Buyer to consummate the transactions contemplated by this Agreement. The Company Buyer represents to the Company Sellers that as of the date hereof, Company Buyer is not subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Company Buyer to consummate the transactions contemplated by this Agreement.

**7.5**        **Investment Representations.**

**7.5.1.**        The Company Buyer represents to the Company Sellers that the Company Buyer is acquiring the Sale Securities for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any other jurisdiction.    Company Buyer agrees with Sellers that it will not transfer any of the Sale Securities, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

**7.5.2.**        The Company Buyer represents to the Company Sellers that Company Buyer is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

**7.5.3.**        The Company Buyer represents to the Company Sellers that Company Buyer understands that the acquisition of the Company Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk. The Company Buyer represents to the Company Sellers that Company Buyer and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**7.5.4.**        Company Buyer further understands and acknowledges to Company Sellers that the Company Sale Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees with Company Sellers that the Company Sale Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, pursuant to an applicable exemption therefrom.

**7.5.5.**        Company Buyer acknowledges to Company Seller that the offer and sale of the Sale Securities has not been accomplished by the publication of any advertisement.

**7.6**        **Equity Commitment Letter.**

**7.6.1.**        The Company Buyer has provided to Sellers a true, complete and correct copy of the executed Equity Commitment Letter.  The execution and delivery of the PE Financing Agreements and the Equity Commitment Letter by the Company Buyer and its affiliated parent(s) party thereto and the performance by each of them of their respective obligations thereunder have been duly authorized by each such party thereto and no other corporate, shareholder, partner or similar proceedings or actions are necessary to authorize or consummate the transactions contemplated by the Equity Commitment Letter.  Each of the Equity Commitment Letter and the Securities Purchase Agreement has been duly executed and delivered by the Company Buyer and its Affiliated Parents' Party thereto, is in full force and effect on the date hereof and constitutes (and at the Closing, the Buyer Loan Documents will have been duly executed and delivered by the Company Buyer and its affiliated Parent(s) Party thereto and, assuming due authorization, execution and delivery by GM, will constitute) a valid

58

and binding agreement of such parties, enforceable against each of them in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law). The Equity Commitment Letter and the PE Financing Agreement are subject to no contingencies or conditions other than those set forth in the copies of the execution versions thereof delivered to Delphi, the Securities Purchase Agreement or (if the Buyer Loan Documents were in effect) the Buyer Loan Documents.

**7.6.2.**    The execution, delivery and performance by the Company Buyer and its affiliated parent(s) party thereto of the Equity Commitment Letter and the PE Financing Agreements to which they are a party: (i) violate, conflict with or result in a breach by any of the parties thereto of their organizational documents; (ii) violate, conflict with or result in a breach of, or constitute a default by any of the parties thereto (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which such party or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to any party thereto or any of its properties or assets; or (iv) require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of such party to consummate the transactions contemplated by the Equity Commitment Letter and the PE Financing Agreements.

**7.6.3.**    Upon the closing of the transactions contemplated by the Securities Purchase Agreement, the Buyer Loan Documents and the Equity Commitment Letter, Company Buyer (i) will have sufficient funds available to pay the Company Purchase Price, any fees and expenses incurred by Company Buyer in connection with this Agreement and any other amounts necessary under this Agreement and (ii) has not incurred any obligation, commitment, restriction or Liability of any kind that would materially impair or materially adversely affect such resources and capabilities.

## 7.7    Adequate Assurance of Future Performance.

The Company Buyer represents to the Company Sellers that Company Buyer will be able to provide, at or prior to Closing, adequate assurance of its future performance (or future performance of any applicable subsidiary of Buyer) under each applicable Assumed and Assigned Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract. Company Buyer acknowledges to Company Seller and agrees with Seller that if it is necessary to provide a contract counter-party with additional assurances to satisfy Company Buyer's obligations to provide adequate assurance in accordance with this Section 7.7, all such costs and expenses or other actions required will be borne and performed by Buyer without recourse to Sellers.

### 7.8    No Brokers' Fees.

The Company Buyer represents to the Company Sellers that Company Buyer has not employed any finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

### 7.9    Anti-Money Laundering.

The Company Buyer represents to the Company Sellers that Company Buyer is in compliance with: (i) all applicable provisions of the USA PATRIOT Act as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Company Buyer operates or does business.  Neither any Company Buyer nor any of its directors, officers or affiliates is identified on the SDN List or otherwise the target of an economic sanctions program administered by OFAC, and no Company Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Company Buyer agrees that should it or any Company Buyer, or any of their directors, officers or affiliates be named at any time prior to Closing on the SDN List, or any other similar list maintained by the U.S. Government, will inform Delphi in writing immediately.

### 7.10    Compliance with Laws.

The Company Buyer represents to the Company Seller that Company Buyer is in compliance with all Laws applicable to Company Buyer, except with respect to those violations that would not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Company Buyer from consummating the transactions contemplated by this Agreement.

### 7.11    No Undisclosed Contracts.

Company Buyer has disclosed and will disclose all written agreements between it and the GM Buyers relating to the subject matter of this Agreement or Delphi.

### ARTICLE 8.
### INTENTIONALLY OMITTED

# ARTICLE 9.
## COVENANTS AND AGREEMENTS.

### 9.1    Conduct of Business between Signing and Closing.

**9.1.1.**    Except as: (a) contemplated by this Agreement; (b) disclosed on Schedule 9.1.1 with respect to the Steering Business and in a business plan previously provided to Buyers with respect to the UAW Sites or the Company Business; (c) required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller); or (d) required by or resulting from any changes of applicable Laws, from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to reasonably conduct the operations of the GM Business and the Company Business, as applicable, in a manner reasonably intended to preserve the value of the GM Sale Securities, Company Sale Securities, GM Acquired Assets and Company Acquired Assets, as the case may be, taking into account the current state of the auto industry and Delphi's liquidity.

**9.1.2.**    Except (a) as contemplated by this Agreement or as disclosed on Schedule 9.1.1; or (b) as required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller), from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to refrain from doing any of the following with respect to the GM Business or the Company Business without the prior written consent of the applicable Buyers (which consent will not be unreasonably withheld or delayed, or conditioned) in each case only to the extent Delphi can comply by acting reasonably to preserve the value of the GM Sale Securities, Company Sale Securities, GM Acquired Assets and Company Acquired Assets taking into account the current state of the auto industry and Delphi's liquidity:

    A.    In the case of any applicable Sale Company, acquire assets or commit to capital expenditures (or in the case of any applicable Asset Seller, acquire assets or commit to capital expenditures with respect to assets that would become Acquired Assets) with an aggregate value exceeding $5,000,000, in each case excluding acquisitions of Assets or capital expenditures made in the Ordinary Course of Business in accordance with the applicable Business' budgeted capital expenditures;

    B.    Except in each case, for $50,000,000 secured financing facility with respect to Delphi's Mexican operations and €125,000,000 secured financing facility with respect to Delphi's operations in Germany (the proceeds of which financing shall not be used outside of Germany), (i) in the case of any applicable Sale Company, incur, assume or guarantee any Debt Obligations in excess of $1,000,000 or voluntarily purchase, cancel, prepay or otherwise provide for a complete or partial discharge in advance of a scheduled payment date with respect to any material Debt Obligations (in each case, other than intercompany Debt Obligations that are repaid on or before Closing); and (ii) in the case of any applicable Seller with respect to an applicable Business, incur, assume or guarantee any Debt Obligation that would become an applicable Assumed Liability;

C.    (i) With respect to any applicable Sale Company, declare or pay dividends from such Sale Company to any Person other than another Sale Company, other than transfers of up to $104 million; (ii) with respect to any applicable Sale Company incorporated or organized in the U.S. enter into any loan agreement or provide any loan to another Sale Company incorporated or organized outside the U.S., or (iii) with respect to any applicable Sale Company incorporated or organized outside the U.S., enter into any loan agreement with or provide any loan to another Sale Company incorporated or organized in the U.S.;

D.    Incur any Encumbrance on any assets of any applicable Sale Company or any applicable Acquired Assets, in each case, other than Permitted Encumbrances or in the Ordinary Course of Business;

E.    Settle or compromise any Proceeding in excess of $2,500,000 with respect to an Assumed Liability;

F.    Hire any individual with a base salary in excess of $200,000 per annum;

G.    With respect to any applicable Sale Company, other than in the Ordinary Course of Business, make any material election relating to Taxes (except such that are consistent with past practice) or settle or compromise any material Tax liability or amend any material Tax return;

H.    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are:  (i) required by Law; or (ii) made in conformance with GAAP);

I.    Enter into any partnership or joint venture agreement between any applicable Sale Company and any other Person or modify any organizational agreement with respect to an applicable JV Company in a manner which is materially adverse to a GM Buyer or Company Buyer as the case may be;

J.    Enter into, terminate or make any material amendment to a Material Contract other than in the Ordinary Course of Business;

K.    Amend any Organizational Document of any applicable Sale Company or applicable JV Company unless required under applicable law;

L.    Make any material change in its methods of management, marketing, accounting or operating or practices relating to payments;

M.    Fail to maintain insurance in a manner consistent with the applicable Seller's past practice;

N.    Accelerate the collection of Accounts Receivable in any Sale Company incorporated or organized in the U.S. in a manner not consistent with the Ordinary Course of Business;

O.    Pay trade payables more slowly than has been the Ordinary Course of Business;

P.    Take or permit to be taken any action outside the Ordinary Course of Business which results in a material increase in deferred revenue obligations;  or

Q.    Agree or commit to do any of the foregoing.

**9.1.3.**    Except (a) as contemplated by this Agreement or as disclosed on Schedule 9.1.1; or (b) as required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller), from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to refrain from doing any of the following with respect to the GM Business or the Company Business without the prior written consent of the applicable Buyers (which consent will not be unreasonably withheld or delayed, or conditioned):

A.    Split, combine or reclassify any capital stock or other equity interests or purchase or sell any capital stock or other equity interests of any Sale Company or JV Company or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such capital stock or other equity interests;

B.    Sell or otherwise dispose of any applicable Acquired Assets and assets of any applicable Sale Company having an aggregate value exceeding $1,000,000, excluding sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case other than in the Ordinary Course of Business and the Pending Transactions;

C.    Merge or consolidate any applicable Sale Company or JV Company with or into any other Person or enter into any agreement requiring any such merger or consolidation;

D.    Increase the cash compensation or grant the right to receive any severance, termination or retention pay of the Transferred Employees other than:  (i) in the Ordinary Course of Business; or (ii) as required by any agreement in effect as of the date hereof or as required by Law; or

E.    Except as required by Law, enter into or amend any applicable Seller Employee Benefit Plan, the consequence of which would be to materially increase any Liability to be assumed by applicable Buyers.

**9.2**    **Bankruptcy Actions.**

**9.2.1.**    On or before June 1, 2009, Delphi will, and will cause the other Sellers that are Filing Affiliates to file this Agreement as an exhibit to its modified Plan of Reorganization and seek approval for, among other things, the Filing Affiliates to enter into and perform their obligations under this Agreement and the Ancillary Agreements in connection with

63

the resolicitation of votes on the modified Plan of Reorganization, and to seek alternative relief in such motion under section 363 of the Bankruptcy Code to enter into and perform their obligations under the Agreement and the Ancillary Agreements independently of and not pursuant to, or contingent on, any Plan of Reorganization (the "**Plan Modification Motion**") and any order entered by the Bankruptcy Court granting relief under the Plan Modification Motion pursuant to either section 363 or section 1127 of the Bankruptcy Code shall be referred to herein as the "**Plan Modification Order**").

      **9.2.2.**    Delphi shall obtain a hearing date for the Plan Modification Motion, which date shall be no later than July 23, 2009 (the "**Hearing Date**"), and such scheduling order shall affirmatively state that the Court will conduct on the Hearing Date an asset sale hearing under section 363 of the Bankruptcy Code if the Bankruptcy Court does not otherwise conduct a plan modification hearing and approve such modifications under section 1127 of the Bankruptcy Code on the Hearing Date.  The scheduling order shall also include dates that are reasonably acceptable to the Buyers for the filing of the agreement discussed below in Section 9.2.3 (the "**Section 363 Implementation Agreement**") (which shall be filed on the exhibit filing deadline for the Modified Plan), the deadline for any objections to be filed in opposition to the section 363 sale and/or the Section 363 Implementation Agreement (which shall be the same day as objections to the proposed modifications to the Confirmed Plan shall be due), and the deadline for filing a proposed form of section 363 sale order (which shall be the same day as proposed revisions to the Plan Modification order shall be due).

      **9.2.3.**    Delphi and Buyers agree that the transaction pursuant to section 363 of the Bankruptcy Code will be on terms which result in (a) Buyers purchasing the same assets, and assuming the same liabilities, as provided in Article 2 hereof, and (b) Delphi receiving the same consideration, including the financial support for Delphi estates' wind-down requirements, as provided in Article 3 hereof; provided, however, that the amounts payable under Section 3.2.3 of this Agreement shall not be included in the consideration paid under the section 363 sale transaction.  Delphi and Buyers acknowledge and recognize that certain amendments to this Agreement and the Ancillary Agreements will be required to implement the agreement in this Section 9.2.3 and agree that they will negotiate and enter into the Section 363 Implementation Agreement to document such amendments and implementation understandings as are required to give effect hereto.

      **9.3**    **Assumed Contracts; Cure Amounts.**

      As part of the Plan of Reorganization Documents, Delphi will move to assume and assign to the applicable Buyers the Pre-Petition Contracts listed on Schedule 9.3 and assign the Post-Petition Contracts to the applicable Buyer (collectively, the "**Assumed and Assigned Contracts**") and will provide notice thereof to the Contract counterparties and all other parties in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. With respect to contracts assumed by such Buyer, each Buyer shall pay all Cure Amounts as have already been established: (i) through prior orders of the Bankruptcy Court that were entered in 2008 in connection with the Sale to Steering Solutions Corporation that was terminated on March 3, 2009; (ii) pursuant to the procedures established by the Bankruptcy Court in connection with Delphi's Plan of Reorganization that was confirmed by the Bankruptcy Court in January 2008, as such plan may be amended from time to time; or (iii) as otherwise agreed to by such

Buyer, Delphi, and the Contract counter-party or, absent an already established amount or such agreement, by order of the Bankruptcy Court in the time and manner specified by the Plan Modification Order; provided, however, within five days after entry of a final, non-appealable order of the Bankruptcy Court establishing a Cure Amount for which the applicable Buyer is responsible or adequate assurance on terms not reasonably acceptable to the relevant Buyer, such Buyer may direct Delphi to, and Delphi shall, reject such Assumed and Assigned Contract. Such motion or subsequent notice shall identify the specific Cure Amount established (or otherwise agreed) for each Pre-Petition Contract and state that such Cure Amount shall be the only cure required to assume such Contract pursuant to Section 365 of the Bankruptcy Code and/or assign it to such Buyer and that such counter-party shall be barred and enjoined from asserting against any Buyer, the Acquired Assets and Sellers that any additional prepetition defaults, breaches, or claims of pecuniary loss exists with respect to such Contract. The applicable Buyer shall have the ability to add or delete Contracts to, or from, Schedule 9.3 up and through the time of the Final Plan Modification Hearing in its sole and absolute discretion so long as the appropriate notice is provided to the Contract counter-party and any delay in approval of the assignability of and Cure Amount for such additional Contracts shall not affect the Closing. With respect to any Assumed and Assigned Contracts that are "shared" and relate to the business, assets or entity acquired hereunder by more than one Buyer, then the applicable Buyers will agree that one of the Buyers will become the assignee of the shared Assumed and Assigned Contract and will also agree to an equitable allocation of Cure Amounts between them; however, if one Buyer elects not to pay its share pursuant to this sentence, then the other Buyer can pay the entire Cure Amount and will have no liability or other obligation with respect to the Assumed and Assigned Contracts to the Buyer refusing to so pay, notwithstanding anything to the contrary in this Agreement. In the Plan of Reorganization Documents, Delphi shall provide for a mechanism reasonably satisfactory to the applicable Buyer to ensure that those Contracts to be assumed and assigned to such Buyer at Closing are actually assigned to such Buyer at Closing notwithstanding any contested Cure Amounts; provided that the applicable Buyer shall establish an escrow account funded with cash sufficient to pay the face amount of the disputed Cure Amounts asserted, the excess funds of which shall be returned to such Buyer as Cure Amounts are resolved.

**9.4    Tax Matters; Cooperation; Preparation of Returns; Tax Elections.**

      **9.4.1.**    Asset Sellers will be responsible for the preparation and filing of all Tax Returns of Asset Sellers for all tax periods ending on or prior to the Closing, including without limitation amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Buyers will make available to Asset Sellers during normal business hours (and to Asset Sellers' accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by the Asset Sellers to prepare these Tax Returns. Asset Sellers will be responsible for and will make all payments required with respect to any such Tax Returns.

      **9.4.2.**    For Sale Companies and JV Companies, Seller will be responsible for the preparation and filing of all Tax Returns for all tax periods that are due on or prior to the Closing, including without limitation amended returns, applications for loss carryback refunds and applications for estimated tax refunds.

**9.4.3.**        For Sale Companies and JV Companies, Buyers will be responsible for the preparation and filing of all Tax Returns for all periods that are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and combined Tax Returns of Delphi will include the operations of the Business), including any IRS Forms 5471, 8858 and 8865 relating to the Sale Companies and the JV Companies transferred, directly or indirectly, in the transactions contemplated by this Agreement (the "**Information Tax Returns**") (which IRS Forms 5471, 8858 and 8865 Delphi will also be required to file under applicable Law).  Buyers shall provide to Sellers a copy of any Information Tax Returns at least sixty (60) days prior to their due date which shall be extended.  For the avoidance of doubt, Buyers shall indemnify, defend and hold harmless the Sellers and their Affiliates for any and all Losses which are imposed on, sustained, incurred or suffered by or against the Sellers or their Affiliates resulting from any failure to timely file the Information Tax Returns.

**9.4.4.**        Sellers shall be responsible for the customs filings for goods released from the border prior to Closing and Buyers shall be responsible for the customs filings for goods in-transit as of and after the Closing.

**9.4.5.**        The Sellers and the Buyers will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers and deliveries to be made to the Buyers hereunder from, or minimize, any transfer, documentary, sales, use, registration, recording, stamp, value-added and other such taxes (including all applicable real estate transfer taxes) and related fees (including notarial fees as well as any penalties, interest and additions to tax), together with any foreign income Taxes attributable to any gain realized by any Seller (but excludes any U.S. Income Taxes) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Plan Modification Order, in accordance with Section 1146 of the Bankruptcy Code.  If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the Acquired Assets to the Buyers will contain the following or similar endorsement; provided that in no case will the Sellers be liable for such Transfer Taxes or the Tax due on Tax Returns related thereto:

> Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [Seller], it is exempt from transfer taxes, stamp taxes, or similar taxes pursuant to 11 U.S.C. § 1146.

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Plan Modification Order, such Transfer Taxes and costs arising out of or incurred in connection with this Agreement will be borne solely by the relevant Buyer.  The party that is legally required to file a Tax Return relating to Transfer Taxes shall be responsible for preparing and timely filing the Tax Returns relating to such Transfer Taxes.  In the event VAT (or GST) is levied on an asset transfer, Seller must provide the relevant Buyer with a VAT (or GST) compliant invoice and assist in the recovery of the VAT (or GST), if possible.

**9.4.6.**        Delphi and Buyer will cooperate in connection with:  (i) the preparation and filing of any Tax Return (including any Information Tax Returns), Tax election, Tax consent or certification or any claim for a Tax refund including any duty drawback claims; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in

respect of Taxes related to the Business or the Acquired Assets.  Such cooperation includes direct access to accounting and finance personnel.

**9.4.7.**    Sellers will, in their sole discretion, cooperate in good faith with Buyers and Buyers' agents to minimize any U.S. federal and state payroll tax liabilities that either party may bear, including that the payroll taxes of the U.S. Transferred Employees will be treated in accordance with the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53, to which treatment Buyers hereby consent.

**9.4.8.**    Sellers will provide Buyers with such certifications as are necessary to exempt all payments made hereunder from withholding under Internal Revenue Code Section 1445.

**9.4.9.**    Sellers will assign to the applicable Buyers, and will cooperate with the applicable Buyers to obtain any necessary approvals or consents to effect such assignment, any and all interests in, or rights to, any property tax abatements, incentive agreements, or other similar arrangements with any Taxing Authority primarily related to the Business or the Acquired Assets to the extent allowed under applicable Law.  If, after the transfer occurs, a repayment of all or a portion of any such property tax abatement, incentive agreements, or other similar arrangements with any Taxing Authority is required because of any action taken by a Buyer or such Buyer's Affiliates (other than any actions contemplated by this Agreement), then such Buyer will be responsible for such repayment.

**9.4.10.**    Sellers will provide Buyers with all information and documentation reasonably available and requested, to permit Buyers to apply for and receive a Research and Experimentation tax credit under Code Section 41 with respect to the Business, including gross receipts and qualified research expenses for the 1984-1988 base period, plus the amount of gross receipts for the immediately preceding four years.

**9.4.11.**    Neither Buyers nor any Affiliate of Buyers shall take any action which could increase any of the Sellers' liability for Taxes.  Neither Buyers nor any of their Affiliates shall make any election under Section 338(g) of the Code (or any analogous provision of state, local or non-United States Tax Law) with respect to the purchase of the Sale Securities pursuant to this Agreement without the prior written consent of Delphi, which consent may not be unreasonably conditioned, delayed or withheld.

**9.4.12.**    Liabilities for Taxes related to the debonding or other change in customs status of the Acquired Assets resulting from Buyers not establishing the required legal entities and obtaining the necessary authorizations from the relevant Governmental Authority to receive the Acquired Assets in their customs status shall be borne by the Buyers.  Sellers and Buyers agree to cooperate in good faith to obtain such authorizations.

## 9.5    Employees; Benefit Plans; Labor Matters.

**9.5.1.**    Transferred Non-U.S. Employees.  Effective as of the Closing, the relevant Buyer will assume the existing employment Contracts of all Non-U.S. Employees (including entering into replacement, or novation of, existing employment Contract, their terms, or substitution of employer, where applicable) if and to the extent required by applicable

67

Transfer Regulations or the applicable Transfer Agreement, and will take all necessary steps to assume the employment Contracts of all employees employed the Sale Companies immediately prior to Closing if and to the extent that their employment is governed by any Transfer Regulation.

      **9.5.2.**     Transfer of U.S. Salaried Employees.  Effective as of the Closing, the relevant Buyer will offer employment to the U.S. Salaried Employees of the relevant Business whom the respective Buyer elects to employ in its sole discretion.  U.S. Salaried Employees who accept Buyers' offer of employment (by reporting to work or otherwise) are referred to herein as ("**Transferred U.S. Salaried Employees**").

        A.    For all Transferred U.S. Salaried Employees, the relevant Buyer's offer of employment will be on terms established in Buyer's sole discretion.  The applicable Buyers shall use reasonable efforts to tender such offers to employees no later than ten (10) days prior to Closing.

        B.    Subject to applicable Law, Transferred U.S. Salaried Employees will be regarded as newly hired regular employees of the relevant Buyer at a level/classification determined by Buyers, except that Buyers will recognize length of service with Sellers and Buyer with respect to participation in any Buyer severance program, and for vacation eligibility, and with respect to Company Buyer, participation in any Company Buyer Non-Qualified Retirement Program.

        C.    Buyers will waive application of any new-hire waiting period with respect to Transferred U.S. Salaried Employee participation in and eligibility for benefits under any applicable Buyer Employee Benefit Plan for salaried employees.

        D.    Buyers reserve the right to amend, modify, suspend or terminate all terms and conditions of employment, including all benefit plans and programs at Buyers' discretion.

        E.    The relevant Buyers will assume all salaried Seller U.S. CBAs applicable at the Rochester and Lockport sites.

        F.    The GM Buyers shall have the right to hire any U.S. Salaried Employees currently employed at any facility of GM or its Affiliates or any of the technical centers included within the definition of the UAW Sites.

      **9.5.3.**     Transfer of U.S. Hourly Employees.  Effective as of the Closing, the relevant Buyers will employ all active and inactive U.S. Hourly Employees (e.g., currently on the rolls, whether on temporary layoff, indefinite layoff, workers' compensation, disability, or other leaves of absence), including without limitation pre-retirement program participants ("**PRPs**")) of the relevant Business. U.S. Hourly Employees who accept Buyers' offer of employment (by reporting to work or otherwise) are referred to herein as "**Transferred U.S. Hourly Employees**".

        A.    The relevant Buyers will assume the terms and conditions of all applicable Seller U.S. CBAs in effect at the relevant Business.  Assumption of the terms

68

and conditions of applicable Seller U.S. CBAs pursuant to this <u>Section 9.5.3A</u> shall not constitute assumption of Sellers's pre-Closing Liabilities under Seller U.S. CBAs (including, without limitation, any Liabilities related to the Retained Plans which shall be retained by Sellers);  provided however, that nothing in <u>Section 9.5.3A</u> shall be deemed to impair, nullify or cancel the relevant Buyer's assumption of liabilities elsewhere in this Agreement, if any.

B.    Buyers will recognize the seniority status of all Transferred U.S. Hourly Employees who are employed in accordance with a Collective Bargaining Agreement for all purposes of continued employment with Buyers.

C.    Buyers will waive application of any new-hire waiting period with respect to participation in any applicable Buyer Employee Benefit Plan for U.S. Hourly Employees.

**9.5.4.**    <u>Employee Benefit Plans</u>.

A.    From and after the Closing (i)  each Sale Company will continue to be responsible for all accrued pension liabilities and assets for all of its Transferred Non-U.S. Employees and all current employees, and (ii)  in the case of Delphi Electronics Overseas Corporation ("**DEOC**"), the entity specified by Company Buyer (in its sole discretion) to be the purchaser of the DEOC assets, will assume all accrued pension liabilities and assets for all of DEOC's Transferred Non-U.S. Employees and all current employees.  The Parties will comply with the specific mechanism for transfer of applicable pension liabilities and assets of Non-U.S. Transferred Employees as specifically set out in the relevant Transfer Agreement (the form and substance of which shall be reasonably acceptable to each of the Parties).

B.    Subject to the applicable Buyer's assumption of the Seller U.S. CBAs pursuant to <u>Section 9.5.3</u>, nothing contained in this Agreement requires Buyers to establish an employee benefit pension plan with respect to any Transferred U.S. Employees.

C.    Where  required by law, the relevant Buyer must continue to provide employee benefit plans to Transferred Employees or former employees of Sellers.  The Company Buyer will administer for Buyers, employee benefit plans applicable to Transferred Employees or former employees of Sellers in accordance with the terms of the Transition Services Agreement.

D.    Transferred U.S. Employees' and their dependents' and beneficiaries' active participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) will cease at Closing.

E.    The parties will explore plan sponsorship alternatives including GM Buyer and Company Buyer assumption if deemed to be in the best interests of the plan participants and beneficiaries.  As of the Closing Date, the GM Buyer will assume sponsorship of the following Seller tax qualified defined contribution plans: Seller's Delphi Salaried Retirement Savings Program (formerly the Delphi Saving-Stock

Purchase Program), the Delphi Personal Savings Plan for Hourly-Rate Employees, and the Delphi Income Security Plan for Hourly-Rate Employees if deemed to be in the best interests of the plan participants and beneficiaries. As of the Closing Date, the Company Buyer will assume sponsorship of the following Seller tax qualified defined contribution plans if deemed to be in the best interests of plan participants and beneficiaries: the Packard Hughes Interconnect Retirement Savings Plan, the Delphi Diesel 401(k) plan, and the Delphi Medical 401(k) Savings Plan.

**9.5.5.** <u>COBRA</u>. Sellers will retain all obligations relating to compliance with the continuation health care coverage requirements of Section 4980B and Sections 601 through 608 of ERISA regarding qualifying events in regard to Transferred U.S. Employees arising from or prior to the transactions contemplated under this Agreement.

**9.5.6.** <u>WARN Act</u>. The relevant Buyers will assume all WARN Act Liabilities, if any, arising at the relevant Business from any employment loss or layoff of U.S. Salaried Employees, U.S. Hourly Employees, and/or U.S. Transferred Employees occurring on or after the Closing Date. On or before the Closing Date, Sellers shall provide Buyers with a list of employee layoffs, by location, implemented by Sellers in the ninety (90) day period preceding the Closing Date. Sellers will retain all WARN Act obligations and liabilities relating to layoff of U.S. Salaried Employees, U.S. Hourly Employees, and/or Transferred Asset Seller Employees by Sellers on or prior to the Closing Date.

**9.5.7.** <u>Grievances</u>. The relevant Buyers will assume responsibility to administer all labor grievances and arbitration proceedings based on events occurring after the Closing Date.

**9.5.8.** <u>Cooperation</u>. Sellers and Buyers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this <u>Section 9.5</u>.

**9.5.9.** <u>Union and Works Council Notifications</u>. Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

**9.5.10.** <u>No Third Party Rights</u>. Nothing in this <u>Section 9.5</u> and its subparts, express or implied, shall create a third party beneficiary relationship or otherwise confer any benefit, entitlement, or right upon any person or entity other than the parties hereto or serve to amend or create any employee benefit plan or arrangement.

**9.5.11.** <u>Severance</u>.

A. With respect to any former U.S. Salaried Employees of any Seller whose employment has been terminated prior to the date hereof and are or may be entitled to severance or termination payments or similar benefits, Sellers shall use their commercially reasonable efforts to cause any obligation to pay such severance or

termination payments to cease as of the Closing, and neither Company Buyer nor GM Buyers shall have any Liability relating to any such payments or benefits.

B.      With respect to (i) any U.S. Salaried Employees of any Seller whose employment is terminated on or after the date hereof but at or before Closing or (ii) any U.S. Salaried Employees working at Automotive Holdings Group or Athens as of the Closing and whose employment is terminated after the Closing, each of Company Buyer and GM Buyer shall make the following payments on and after the Closing:

(i)      at the Closing, Company Buyer shall pay to GM Buyer an amount equal to 50% of the amount of any cash payments made by Delphi on or after the date hereof and prior to Closing; and

(ii)      from and after the Closing, each of Company Buyer and GM Buyer agree to pay Delphi 50% of the amount of any cash payments made by a Seller to any such terminated U.S. Employees but in no event more than would be payable under the Delphi severance program in effect as of May 1, 2009;

provided that the aggregate amount of any payments made by each of GM Buyer or Company Buyers pursuant to this Section 9.5.11 shall not exceed $12,500,000 (which in the case of GM Buyer shall include an amount payable by Company Buyer pursuant to clause (i) above).

### 9.6      Pre-Closing Cooperation; Contact with Customers and Suppliers.

For purposes of Buyers' transition efforts, each applicable Seller shall provide the applicable Buyers or their representatives upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of any Seller or Sale Company, reasonable access during normal business hours to the employees, facilities, books and records of the Business.  Each applicable Seller will cooperate, and cause their employees to cooperate, with the applicable Buyer's efforts to transition the ownership and operation of the applicable Business.  Each Buyer may meet with the applicable suppliers, customers, and service providers of and to the applicable Business in order to discuss transitional matters and post closing business arrangements and to take actions necessary such that such Buyer may begin operating the applicable Business immediately upon Closing.

### 9.7      Technical Documentation; Trade Secrets.

Each Seller has delivered, or will deliver on or before the Closing Date, to the applicable Buyer, a copy of all Technical Documentation (including, but not limited to, documented Know-How and Trade Secrets) included in the Acquired Assets and Other Technical Documentation being acquired by such Buyer.

### 9.8      Corporate Names.

9.8.1.      The GM Buyers will have the right (including the right to authorize their relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the GM Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi after the Closing

Date in a manner consistent with past practice of the Business and the name and reputation associated therewith.

**9.8.2.**    The GM Buyers will promptly, and in any event within one (1) year of the Closing Date, cease all use and cause the GM Sale Companies to cease all trademark and trade name use of the name "Delphi" and any trademarks, trade names, brand names or logos relating thereto as used by GM Sellers or the GM Sale Companies as of the Closing Date (including on any signs, billboards, advertising materials, telephone listings, labels, stationery, office forms, packaging or other materials of the GM Sale Companies) in connection with the businesses of the GM Sale Companies or otherwise.  Notwithstanding the foregoing, the GM Buyers and the GM Sale Companies shall not be required to repackage existing finished goods and any existing inventories or service materials of the GM Business in existence at the Closing and may use up or sell off the same in the Ordinary Course of Business.

**9.8.3.**    Promptly following the Closing, the GM Buyers will cause each of the Sale Companies, and will use commercially reasonable efforts to cause each JV Company, to amend its certificate of incorporation, partnership agreement, limited liability company agreement and other applicable documents, in order to change the names of such companies to a name not containing the word "Delphi", with such changes to take effect pursuant to the terms of the respective transfer deed governing the sale of each GM Sale Company and applicable JV Company.  The GM Buyers will make all required filings with Governmental Authorities to effect such amendments.  If any preceding change is not permissible by law or commercially reasonable within one (1) year of the Closing Date, the GM Sale Companies or applicable JV Company shall operate under a "d/b/a" or other similar business name.

**9.8.4.**    If the Company Buyer believes that the GM Buyers have breached or failed to perform in any material respect any of the GM Buyer's obligations contained in Sections 9.8.2 and 9.8.3, the Company Buyer shall provide the GM Buyer with written notice of the alleged breach.

**9.8.5.**    Nothing herein shall prevent or limit the rights of the GM Buyers to use the name "Saginaw Steering" or the like.

**9.9**    **Information Technology; Intellectual Property Rights and Licenses.**

**9.9.1.**    Steering Licenses. Each Seller and Company Buyer, hereby grants, on behalf of itself and its Affiliates, to GM Buyers, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on Schedule 9.9.1.A) with the right to sublicense to GM Buyers' Affiliates, successors, assigns and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by the Steering Business prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of Exhibit 9.9.1 ("**GM IP License Agreement**").  Further, each of Seller and Company Buyer, on behalf of itself and its Affiliates, hereby grants to GM Buyers, as of the Closing Date with respect to the Steering Business, a sublicense to the extent permitted by and

subject to the terms and conditions of Seller's existing agreements (including any such agreements acquired hereunder by Company Buyer's) to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the GM IP License Agreement.  The licenses and sublicenses granted to GM Buyers under this Section 9.9.1 do not extend to the Steering Excluded Products identified on Schedule 9.9.1.B.  Further, the license and sublicense granted pursuant to the GM IP License Agreement and this Section 9.9.1 are not assignable in whole or in part except to a purchaser of all or substantially all of the Steering Business to which the license pertains.

    **9.9.2.**  UAW Site Licenses.  Each Seller hereby grants, on behalf of itself and its Affiliates, as of the Closing Date, to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' Affiliates to:

      A.  make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute UAW Site Products and any derivatives and/or re-use/extension thereof, necessary to service contracts with existing non-GM customers include with the Acquired Assets; and

      B.  to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute UAW Site Products and any derivatives and/or re-use/extension thereof, for GM Buyer's (and GM Buyer's affiliates') original equipment (OE) and original equipment–sales (OE-S) distribution channels for vehicles and vehicle parts and aftermarket requirements of GM Buyer's products produced by the Business.

  Any system developed by or with GM shall be considered a GM OE system under this license.

    **9.9.3.**  Company Licenses. Seller hereby grants, on behalf of itself and its Affiliates, to Company Buyer, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on Schedule 9.9.1.A) with the right to sublicense to Company Buyer Affiliates, successors, assigns, customers and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by the Company Business prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of Exhibit 9.9.3 ("**Company IP License Agreement**").  Further, Seller, on behalf of itself and its Affiliates, hereby grants to Company Buyer, as of the Closing Date with respect to the Company Business, a sublicense to the extent permitted by and subject to the terms and conditions of Seller's existing agreements, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the Company IP License Agreement.  The licenses and sublicenses granted to Company Buyer under this Section 9.9.3 do not extend to the Steering

Excluded Products identified on Schedule 9.9.1.B. Further, the license and sublicense granted pursuant to the Company IP License Agreement and this Section 9.9.3 are not assignable in whole or in part except to a purchaser of all or substantially all of the business to which the respective license(s) relate.

      **9.9.4.**    Pending Transaction Licenses. Company Buyer hereby grants, on behalf of itself and its Affiliates, to Seller, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on Schedule 9.9.1.A) with the right to sublicense to Seller Affiliates, successors, assigns, customers and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by Seller in connection with the business of a Pending Transaction prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of Exhibit 9.9.4 ("**Pending Transactions IP License Agreement**"). Further, Company Buyer, on behalf of itself and its Affiliates, hereby grants to Seller, as of the Closing Date with respect to the business of a Pending Transaction, a sublicense to the extent permitted by and subject to the terms and conditions of any existing agreements included within the Acquired Assets, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the Pending Transactions IP License Agreement. The licenses and sublicenses granted to Seller under this Section 9.9.4 do not extend to the Steering Excluded Products identified on Schedule 9.9.1.B. Further, the license and sublicense granted pursuant to the Pending Transactions IP License Agreement and this Section 9.9.4 are not assignable in whole or in part except to a purchaser of all or substantially all of the business to which the respective license(s) relate.

      A.    In the event that a Pending Transaction fails to be completed and is terminated, and subject to any rights granted under any existing court approved contract with any Seller, each of Seller and Company Buyer agrees to make Intellectual Property owned by Sellers and Sellers' affiliates used in the business subject to the failed Pending Transaction available for sale or paid-up license to any purchaser of the assets subject to the failed Pending Transaction.

      B.    In the event that a Pending Transaction fails to be completed and is terminated and Seller decides that it will not seek a new purchaser of the assets subject to such Pending Transactions, subject to any rights granted under any existing court approved contract with any Seller, and contingent upon closing of this Agreement, each Seller grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' Affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products sold to GM Buyers by the business subject to the failed Pending Transaction.

C.    In the event that, in connection with the operation of the business of a Pending Transaction, there is a breach of a current supply commitment to GM or any of its Affiliates under circumstances where such breach threatens to interrupt supply to GM or any GM Affiliate, then, subject to any Seller obligations under any existing court approved contract with any Seller and contingent upon closing of this Agreement, each Seller grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products subject to the threatened interruption of supply. The rights set forth in this paragraph shall lapse if a Pending Transaction is consummated according to an existing court approved agreement related to the Pending Transaction or a party that is or becomes an approved supplier of GM acquires the business of the Pending Transaction.

**9.9.5.**    Licenses Generally.

(i)    Each Party shall make all Shared Intellectual Property available to each other Party and to the Seller by delivering to such other Party all Other Technical Documentation and other technical information in its    possession reasonably necessary to continue the other Party's Business or of a Pending Transaction.

(ii)    Each Party may assign or otherwise transfer this license and its rights or obligations under this license to any affiliated or successor company or to any purchaser of a substantial part of such Party's business to which this license relates. In addition, each Party may sublicense or otherwise delegate, in whole or in part, this license and its rights or obligations to any such affiliate, successor or purchaser.

(iii)    This license is binding upon successors, heirs and assigns of the Sellers and Buyers and any and all future owners of the Shared Intellectual Property.

(iv)    This Agreement governs over any inconsistent or otherwise different terms contained in the IP License Agreements.

**9.9.6.**    Further Understandings. It is further understood and agreed that the licenses granted above in this Section 9.9 do not include any right to use any Trademark Rights.

**9.9.7.**    Shared Intellectual Property. Each of the Sellers, GM Buyer and Company Buyer agree that it will not transfer or assign its rights to the Shared Intellectual Property to any third party unless such third party: (i) is informed of and agrees to accept such transfer or assignment subject to the license granted herein; and (ii) agrees that any subsequent transfer or assignment will be subject to a similar restriction on future transfers and assignments.

**9.9.8.**    Shared Licensed Intellectual Property. Sellers and the applicable Buyers, as the case may be, extend and hereby grant to each other Party its rights under the

Shared Licensed Intellectual Property to the extent that such licenses can be extended to such other Parties, including a right to other Parties to sublicense to any entity that is a successor or assignee of any portion of the Business or the business of a Pending Transaction operated by such other Parties.

**9.9.9.**    Transfer of Shared Software Licenses. For those Shared Software Licenses of the Steering Business set forth on Schedule 9.9.9, Sellers and the applicable GM Buyers and Company Buyer shall transfer to the applicable GM Buyers the number of license seats or other license rights specified for each applicable license. The Parties will cooperate to develop a similar list for the UAW Sites. Sellers shall be responsible for any obligations under any Shared Software Licenses or Software licenses primarily used in the Business that are due and payable prior to the Closing Date, for maintenance payments, license fees and any other fees due to applicable third party licensors of the Shared Software Licenses or Software licenses. Buyers acknowledge that they shall be responsible for all license transfer fees and the costs of obtaining and making payments under any post-Closing maintenance agreements required in order to use the foregoing license rights.

**9.9.10.**    Separation Activities. Buyers will be solely responsible for their respective and their allocable share of Sellers' costs, of all separation, relocation, start-up costs and other related activities related to the separation of the GM Business (the "**Separation & Relocation Activities**"), including:  (i) all Day 1 and Day 2 separation activities, including any activities performed by Delphi personnel or its informational technology suppliers; (ii) modification of the Buyers payroll system in preparation for Day 1 and transitional services; (iii) segregation of the manufacturing facilities and technical centers to be co-located following Closing; (iv) relocation from any technical center or sales offices as identified in the Facilities Separation & Relocation Plan; and (v) any setup fees required by third party service providers. Buyers acknowledge and agree that it is necessary to promptly begin the Separation & Relocation Activities and that the execution of the foregoing Separation & Relocation Activities are their sole responsibility. The parties shall reasonably cooperate with each other to implement such activities, separations and relocations in an effort to complete the activities contemplated by this Section 9.9.10 in a reasonable, expeditious and cost-effective manner which in the case of the Steering Business shall be in accordance with the facilities separation and relocation plan set forth in Schedule 9.9.10 relating to the Steering Business (the "**Facilities Separation & Relocation Plan**"). Other than the costs to be borne by the Buyers with respect to Separation & Relocation Activities, as described above, no Buyer will have any further obligation to provide information technology services, or to pay costs with respect thereto, except as may be provided in the applicable Transition Services Agreements to be entered into by the Buyers (as contemplated by this Agreement). Following completion of the Separation & Relocation Activities, the Buyers will have no further obligation with respect to IT services or related costs except as set forth in the Transition Services Agreement.

**9.9.11.**    Assignments. Sellers shall assist Buyers in obtaining assignments from predecessors in interest to the Purchased Intellectual Property, or in obtaining other recordable instruments to reflect the applicable Buyers' ownership of the Purchased Intellectual Property.

**9.9.12.**    Outsourced Service Providers. Sellers, without having to incur additional costs, shall cooperate with GM with respect to GM entering into new agreements with

Sellers' outsourced service providers and software license providers, including Electronic Data Systems Corporation, EDS Information Systems, LLC and its affiliates (collectively, "**EDS**"), Computer Sciences Corporation and its affiliates (collectively, "**CSC**"), and the Hewlett Packard Company and its affiliates (collectively, "**HP**"); provided that there is no material out-of-pocket cost or other material adverse financial impact to Sellers or their Affiliates.

### 9.10    Shared Items Transferred to Buyers.

With respect to any contracts with goods or services included in the Acquired Assets and that are used by both the GM Business and Company Business, including with respect to the Steering Business contracts that are set forth on Schedule 9.10, and that will be transferred to one of the Buyers at Closing, the applicable Buyers will provide the other applicable Buyer with the benefits of such contracts in substantially the same manner described in Section 2.5 above regarding Deferred Items, and other applicable Buyer who does not receive such contract will reimburse the Buyer who did receive such contract for such benefits in substantially the manner described in Section 2.5, until the earlier of such time as separate contracts for such goods or services have been agreed between the applicable Buyer and the other party or parties to such contract or contracts, or until the termination of such contract or contracts.

### 9.11    Buyer Guarantee.

9.11.1.    GM guarantees the full and timely performance of all of GM Buyer's obligations hereunder arising prior to or at the Closing; provided that GM shall have no Liability or responsibility for any obligations of any GM Buyer arising after the Closing.  This is a guarantee of payment and performance and not of collection.

9.11.2.    Company Buyer has delivered to Sellers an equity commitment letter, dated the date hereof, and the affiliated parent(s) of Company Buyer's obligations shall be limited to those set forth in such equity commitment letter.

### 9.12    Letters of Credit.

Each applicable Buyer agrees to use its commercially reasonable efforts to cause Delphi and its Affiliates to be absolutely and unconditionally relieved by no later than 360 days following the Closing of all Liabilities and obligations arising out of the letters of credit, performance bonds and other similar items issued and outstanding in connection with the Business, to the extent set forth on Schedule 9.12 hereof or to the extent Delphi or its Affiliates later inform the applicable Buyer of such an item, and the applicable Buyers will indemnify Delphi and its Affiliates against any Losses of any kind whatsoever with respect to such Liabilities and obligations.

### 9.13    Competition Clearance.

9.13.1.    Subject to the terms hereof, Buyers and Sellers agree to cooperate and to use commercially reasonable efforts to obtain, as promptly as practicable following the date hereof, any Governmental Approvals required for the Closing under the HSR Act, EC Merger Regulation and any other applicable Competition/Investment Law, to respond to any government requests for information thereunder, to contest and resist in good faith any action thereunder, and

to have lifted or overturned any Governmental Order that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement.    The Parties will use commercially reasonable efforts to complete Schedule 9.13.1, no later than three (3) Business Days after the date hereof which will include a list of all countries in which competition filings may be required or are appropriate.    In this respect, each applicable Buyer will make (or continue to prosecute, if made previously) all the competition filings set forth in Schedule 9.13.1 promptly, but in no event later than thirty (30) days after the date hereof, and such Buyers will: (i) promptly inform Delphi of all oral and written communications with any Governmental Authority in respect of any required Governmental Approval; (ii) give Delphi the opportunity to comment on all filings and any response prepared by such Buyer prior to Buyers' submitting such response to the relevant Governmental Authority; and (iii) afford Delphi or any Seller designated by Delphi the opportunity to attend any meetings, telephone conferences or video conferences organized with the Governmental Authorities in relation to any required Governmental Approval.    Notwithstanding the foregoing, the Parties agree that none of them will make any voluntary filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect (including on the ability of a Party to consummate the transactions contemplated by this Agreement and the Ancillary Agreements) or otherwise be in violation of applicable Law. Each Party hereto will promptly inform the other of any oral or other communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements.    If the competition authority in any such country:    (i) imposes conditions upon its approval of the transactions contemplated by this Agreement; or (ii) files a Proceeding before a Governmental Agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement, the Parties will take commercially reasonable steps to negotiate with the competition authority regarding, and comply with, any conditions or modifications requested by such competition authority, consistent with the general intention of this Agreement (that ownership of the Business will be vested in the Buyers).    Such compliance may require modifications in structure, economic and other relationships.    The applicable Buyers will be solely responsible for all costs and expenses incurred by such Party in negotiating and agreeing to the required conditions or modifications with the competition authorities.    Notwithstanding anything herein to the contrary, in no event shall GM or its Affiliates be obligated to dispose of, or divest themselves of, any line of business or restrict themselves from engaging in a line of business in which they are currently engaged, in order to obtain any regulatory approvals.

       **9.13.2.**    From the date of this Agreement until Closing, each Buyer will not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the GM Transfer Agreements or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the GM Transfer Agreements; (iii) significantly

increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement or the GM Transfer Agreements; provided, however the foregoing shall not restrict Buyers or their respective Affiliates from acquiring an interest in any entity (or any Affiliate of any entity) to which they convey any of their assets or rights.

### 9.14    **Further Actions.**

**9.14.1.**    The Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby and by the GM Transfer Agreements.  In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.  To the extent the form of any of the agreements or instruments required to effectuate the transactions contemplated by this Agreement have not yet been agreed upon the parties will act reasonably in finalizing the forms of such agreements or instruments.

**9.14.2.**    At all times prior to the Closing each Party will notify the other Parties in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in <u>ARTICLE 10</u>  to be satisfied, promptly upon any of them becoming aware of the same.

**9.14.3.**    Nothing in this Agreement or the Ancillary Agreements will prevent or restrict GM, the GM Buyers, or their respective Affiliates and representatives from taking any action that is in accordance with paragraph 46 of the Modification Procedures Order.

### 9.15    **Further Assurances.**

Subject to the terms and conditions herein provided, the Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements. If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement or the Ancillary Agreements, the Parties shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other Party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that the cost of such action or of such instruments and documents related thereto shall be borne by the relevant Buyer.  The foregoing covenant will survive the Closing of the transactions contemplated herein.

### 9.16    **Customs Duties.**

Each Party expressly agrees to reimburse the other Party for customs-related duties, fees and associated costs incurred by one Party on behalf another Party after Closing.  Taxes, except those which are not assessed on an ad valorem basis, incurred in connection with goods co-

loaded on containers that clear customs intentionally or unintentionally under one Party's importer/exporter identification numbers and bonds/guarantees post-Closing, shall be borne by the owner of the co-loaded goods; other Taxes (those which are not assessed on an ad valorem basis) on such co-loaded goods shall be shared pro-rata based on value.

### 9.17    Enterprise Contracts.

The Parties acknowledge that: (i) the Business currently benefits from certain services or receives certain products of the type listed on Schedule 9.17 ("**Other Services**") provided by third parties ("**Enterprise Providers**") under enterprise contracts with Delphi and/or one of its Affiliates ("**Enterprise Contracts**"); and (ii) it may not be practical for GM Buyers to enter into replacement contracts with all of such Enterprise Providers as of the Closing Date.  After signing this Agreement and prior to Closing, GM Buyers will use commercially reasonable efforts to enter into replacement contracts covering such Other Services.  In the event that GM Buyers are unable to secure such replacement contracts, after having used commercially reasonable efforts as required by the preceding sentence, Sellers will use commercially reasonable efforts to make available to GM Buyers the Other Services provided under such Enterprise Contracts of the type described on Schedule 9.17.  GM Buyers will pay Sellers the cost (including the cost of any internal resources) of providing such Other Services.  The obligations in this Section 9.17 shall not apply to: (i) any Contracts that are Acquired Assets; (ii) any service provided under the Transition Services Agreement; (iii) any services or products identified in Schedule 9.17 under the heading "Products/Services excluded from Section 9.17" in the Transition Services Agreement as an "Excluded Service"; or (iv) products or services which the applicable Sellers are prohibited from providing to Buyers pursuant to applicable Law.  For avoidance of doubt, GM Buyers will not be restricted in any way from engaging directly with the current outsourced service providers with respect to current direct and shared services, Day 1 separation activities and Day 2 preparation.  GM will have access to the current statements of work, service level agreements and other agreements etc. with outsourced service providers.

### 9.18    Confidentiality.

After the Closing, Sellers shall, and shall cause their Affiliates to, maintain as confidential and shall not use or disclose (except as required by law, as necessary to defend against a Claim or as authorized in writing by the applicable Buyer) any confidential information (including any confidential Environmental Records and any confidential GM Environmental Records) concerning the businesses and affairs of the Business, except to the extent such confidential information; (i) was used by Delphi's divisions other than the Business prior to the Closing Date; (ii) becomes generally available to the public other than as a result of a disclosure by Delphi or its representatives in violation of the terms hereof; (iii) becomes available to Delphi on a non-confidential basis from a source other than the Buyers or their representatives; or (iv) is covered by the licenses granted pursuant to the IP License Agreements (provided that confidential information excepted from the obligations of this Section 9.18 only by this subsection (iv) will be treated in the same manner as Sellers treat their own confidential information).  In the event any Seller or any of their Affiliates is required by law to disclose any confidential information, such Party shall promptly notify the applicable Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with such Buyer to preserve the confidentiality of such

information consistent with applicable law.  GM shall be the beneficiaries of any confidentiality or nondisclosure agreement entered into with respect to a potential acquisition of the steering assets of Delphi before the Closing between Delphi or its Affiliates, on the one hand, and any Person, on the other, and shall be entitled to enforce such agreement after the Closing Date.

### 9.19    Termination of Certain Agreements.

9.19.1.    Effective on the Closing Date, without further action by the Parties, the following agreements shall be terminated in their respective entireties and the Parties thereto shall have no further obligations thereunder:

A.    the Option Exercise Agreement;

B.    the Connector Penetration Agreement dated August 7, 2001 (which Buyers do not hereby admit exists);

C.    the Environmental Matters Agreement between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, dated as of October 1998;

D.    the Amended and Restated Agreement for the Allocation of U.S. Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM;

E.    the Agreement for Indemnification of United States Federal, State and Local Non-Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, provided that Delphi's obligations shall be limited amounts received by Delphi after the date of this Agreement;

F.    the Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002;

G.    the Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000;

H.    the Administrative Services Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000;

I.    the Trademark and Trade Name Agreement dated as of January 1, 1999 between Delphi Automotive Systems Corporation (n/k/a Delphi), DAS, and GM;

J.    the Intellectual Property Contracts Transfer Agreement dated as of December 4, 1998, between DTI and GM, as amended October 31, 2001;

K.    the Intellectual Property License Agreement dated as of December 4, 1998, between DTI and GM;

L.    the Intellectual Property Transfer Agreement dated as of December 4, 1998 between DTI and GM;

81

M.    the GM-Delphi Technology Transfer Agreement between Delphi Technologies, Inc. and GM dated December 4, 1998;

N.    the Battery Facilitation Agreement – Transaction Summary dated as of March 21, 2005 between Delphi and GM;

O.    the Letter Agreement dated August 10, 2004 regarding potential changes in Delphi's battery operations signed by Mary Boland (GM) and John Blahnik (Delphi);

P.    the Letter Agreement dated June 30, 2005 regarding the sale by Delphi of its global battery business to JCI signed by Bo Andersson (GM) and Steve Olsen (Delphi);

Q.    the Letter Agreement dated June 30, 2005 regarding the potential subsidy to be paid by Delphi to JCI for employees at the New Brunswick battery plant; and

R.    the GM-Delphi Liquidity Agreements.

The Parties will execute and deliver such further instruments or agreements as may be reasonably requested by the other Parties in order to further evidence the foregoing terminations. Notwithstanding any provision to the contrary herein, to the extent that any agreement listed in this section contains a license under any form of Intellectual Property to any GM Buyer or affiliate thereof, or any option to purchase any patent or other intellectual property, or any commitment not to challenge or claim ownership in any Trademark of any GM Buyer, such license(s), option(s) and commitment(s) shall survive and remain in full force and effect.

9.19.2.    Effective on the Closing Date, without further action by the Parties the MRA shall (except as specifically set forth below) be terminated in its entirety and the parties thereto shall have no further obligations thereunder (other than as specifically set forth in this Section 9.19.2), including, without limitation, any obligations of Delphi for payments with respect to flowbacks under Section 5.11 of the MRA or otherwise.  Notwithstanding the foregoing, GM agrees to pay any and all amounts due to Delphi which accrue under the MRA for periods prior to Closing regardless of the date on which such amounts become due under the terms of the MRA.  In addition, GM shall continue to be responsible for the payment of all costs and amounts due to Delphi under the MRA with respect to the Athens Facility (as defined in the MRA).

9.19.3.    Effective on the Closing Date, without further action by the Parties, Sellers shall be deemed to have waived any and all Claims (past and future) against GM or its Affiliates pursuant to the GSA and the GM-Delphi Liquidity Agreements.

9.20    **Certain Mexican Matters.**

Delphi and the applicable Sellers commit to the following with respect to the GM Buyers:

**9.20.1.** **Mexico LTAs**.  Immediately before Closing, Delphi will cause the asset sale transactions contemplated in the local transfer agreements set forth in Schedules 9.20.1(i)-(iii) ("**Mexico LTAs**") (consolidation of assets of the Steering Business currently operated by Rio Bravo Electricos, S.A. de C.V., Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V. and Delphi Automotive Systems, S.A. de C.V. into Steeringmex) to be completed in accordance with the terms and conditions set forth in the Mexico LTAs.  The Mexico LTAs set forth the terms under which the assets described therein are transferred by various Delphi Affiliates to Steeringmex, S. de R.L. de C.V., a Mexican limited liability company ("**Steeringmex**").  Under Section 5B of certain of the Mexico LTAs, a second installment payment of purchase price is required to be made (the "**Purchase Price Assumed Debt**").  Notwithstanding anything to the contrary in ARTICLE 3 of this Agreement, neither of the following items will be included in any determination of the GM Purchase Price:  (i) the Purchase Price Assumed Debt; and (ii) the Mexican VAT aggregating $1,324,408 USD (the "**Mexican VAT Amount**") under certain of the Mexico LTAs that is recoverable by Steeringmex, with respect to the payment required to be made under Section 5A of such Mexico LTAs.  At GM Buyer's request, immediately before Closing, Sellers will, at GM Buyers' sole cost and expense, cause Delphi Ensamble de Cables y Components, S. de R.L. de C.V. to file an action in the nature of a claim for declaratory judgment regarding the validity of the title to the GM Owned Real Property and to continue the proceeding at GM Buyers' sole cost and expense until its conclusion.  In this case, transfer of title to the GM Owned Real Property in Mexico will not be carried out to Steeringmex prior to closing, but promptly following the conclusion of the aforementioned declaratory judgment, as set forth in the corresponding Mexico LTA.

**9.20.2.** **Utility Contracts**.  A Seller Affiliate will allow Steeringmex, until thirty (30) days after Closing, to continue to receive electricity ("**Post-Closing Mexico Utilities**") under certain mutually agreed utility contracts listed in Schedule 9.20.2 to this Agreement from the applicable utility service provider(s), including keeping that certain $180,000.00 deposit (the "**Mexico Deposit**") in place.  Steeringmex will enter into separate utility contracts with the applicable utility service provider(s).  Within ten (10) days after receipt of an invoice for the Post-Closing Mexico Utilities, Steeringmex will pay the applicable Seller Affiliate for the Post-Closing Mexico Utilities.

**9.20.3.** **Certain GM Acquired Assets Located in Mexico**.  The GM Acquired Assets that are located in Mexico and subject to a temporary importation customs regime shall be transferred by the applicable GM Asset Sellers to the applicable GM Asset Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant GM Acquired Assets' temporary importation customs status.  Specifically, the applicable GM Sellers shall transfer temporary imported Acquired Assets of the Steering Business through the so-called "virtual export pedimentos" and the applicable GM Asset Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation.  The applicable GM Asset Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

**9.20.4.** **Certain Company Acquired Assets Located in Mexico**.  The Company Acquired Assets of the Company Business that are located in Mexico and subject to a temporary importation customs regime shall be transferred by the applicable Company Asset

Sellers to the applicable Company Asset Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant Acquired Assets' temporary importation customs status.  Specifically, the applicable Company Sellers shall transfer temporary imported Company Acquired Assets through the so-called "virtual export pedimentos" and the applicable Company Asset Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation.  The applicable Company Asset Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

### 9.21    Transfer of Certain Sale Securities.

In order to effectuate the sale of the Sale Securities pursuant to Section 2.1.1 hereof, Sellers may, prior to Closing and after consultation with the applicable Buyers, transfer certain of the Sale Securities to special purpose vehicles in the form of intermediate holding companies.  In the event of any such transfer, the shares of the intermediate holding company will become the Sale Securities transferred hereunder.

### 9.22    Certain Bank Accounts.

Parent will duly execute and deliver to Delphi Corporation, the Novation Letter in the form attached hereto as Exhibit 9.22 in order to transfer certain lock box bank accounts at J.P. Morgan Chase, N.A. to Buyers (the "**Transferred Account(s)**") with an effective date as of the Closing Date.  On or before the Closing Date, Delphi will counter-sign such Novation Letter and deliver the same to J.P. Morgan Chase, N.A.  In the event any Party receives any payments which are not included among such Party's Acquired Assets, such receiving Party will remit such payment to the appropriate other party within five (5) Business Days of receipt.

### 9.23    Certain China Matters.

**9.23.1.**    An Affiliate of the China Sellers has established a letter of credit (the "**China L/C**") in support of Saginaw Steering (Suzhou) Co., Ltd., a Sale Company ("**Steering (Suzhou)**").  Delphi will cause such Affiliate to keep the China L/C in place for no more than three hundred sixty (360) days following Closing (the "**China L/C Period**").  Parent will cause Steering (Suzhou) to establish, in no event later than three hundred sixty (360) days following Closing, a replacement for the China L/C.  Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause Steering (Suzhou) to pay to the relevant Seller Affiliate all costs incurred by such Seller Affiliate in connection with keeping the China L/C open during the China L/C Period.

**9.23.2.**    The GM Buyers acknowledge Sellers' beneficial ownership of the China Entities until the Closing Date and agree that, until the Closing, it shall have no rights other than to hold legal title with respect to the China Entities.  The GM Buyers agree not to encumber the China Entities or interfere with the operation of the business conducted by the China Entities until the Closing.  Upon Closing, all of GM Sellers' beneficial ownership and/or other interests in the China Entities shall automatically transfer to Steering Holding Pte. Ltd; provided, however, that in the event this Agreement does not become effective or this Agreement is terminated pursuant to ARTICLE 12, the GM Buyers shall, upon Delphi's request, take all

steps and actions necessary to promptly transfer to Delphi or its designee any and all legal ownership rights the GM Buyers may have with respect to the China Entities or, at Delphi's election, Steering Holding Pte. Ltd or Rhodes Holding II Sarl, as applicable.

### 9.24    Certain Poland Matters.

Delphi will use commercially reasonable efforts to transfer all of its shares in Delphi Polska to a Dutch BV (created or purchased off the shelf between the signing of this Agreement and Closing) which, following the transfer, will own all the shares in Delphi Polska. Sellers will use commercially reasonable efforts to create or purchase such Dutch BV following the execution of this Agreement. In the event Sellers are unable to register such Dutch BV with the relevant Governmental Authorities within fifteen (15) days following the date of this Agreement, upon request, Parent agrees to create or purchase a Dutch BV to be used to purchase the shares of Delphi Polska. GM Buyers will reimburse Sellers for all costs incurred in creating, acquiring or transferring the Dutch BV as such costs are incurred by Sellers or their Affiliates. Delphi will not indemnify GM Buyer for any Tax or other Liabilities of the Dutch BV.

### 9.25    Non-GM Customers.

Each Buyer may consult with any customers of the Business that such Buyer is acquiring hereunder to discuss the potential impact of the transactions contemplated hereunder on the ongoing commercial relationship between such Business and any such customers.

### 9.26    Transfer of Quotas in Saginaw Brazil.

Prior to Closing, the applicable GM Sellers will take all actions required to cause Delphi Brazil to acquire the one (1) quota of the capital of Saginaw Brazil held by Jefferson Felix de Oliveira, a Brazilian citizen, married, mechanic engineer, resident and domiciled in the City of Porto Alegre, State of Rio Grande do Sul, with office at Rua Giuseppe Mandelli, No. 118, Bairro São João, in the City of Porto Alegre, State of Rio Grande do Sul, Zip Code, bearer of the Identity Card R.G. No. No. 5.004.573.671 SSP/RG, enrolled with the Brazilian Individual Taxpayers' Register (CPF/MF) under No. 491.466.290-68. As a result of such transfer, Delphi Brazil will become the lawful owner of one hundred percent (100%) of the quotas of Saginaw Brazil.

A.    Simultaneously with the transfer of the sole quota mentioned in this Section 9.26, the applicable GM Sellers will cause Delphi Brazil to execute an amendment to the articles of organization of Saginaw Brazil in accordance with applicable Brazilian Law, pursuant to which the applicable GM Sellers shall become the new owners of one hundred percent (100%) of the quotas in Saginaw Brazil representing 54,639,116 (fifty-four million six hundred and thirty-nine thousand one hundred and sixteen) quotas. As a result, the applicable GM Sellers will become the lawful owners of all, but not less than all, of one hundred percent (100%) of the quotas of Saginaw Brazil. The Applicable GM Sellers will cause Saginaw Brazil to file the amendment to the articles of organization mentioned above for registration with the competent commercial registry and perform all actions that may be required to obtain such registration as soon as practicable, but in any event no later than thirty (30) days from

the date of the execution of the amendment to the articles of organization of Saginaw Brazil, in compliance with applicable Brazilian Law.

       B.     Prior to Closing, the applicable GM Sellers intend all the quotas of Saginaw Brazil to be dividended from Delphi Brazil to the applicable GM Sellers.  Prior to Closing, Delphi Brazil will take all actions required to register the dividend from Delphi Brazil to the applicable GM Sellers and the foreign investment of the applicable GM Sellers in the capital of Saginaw Brazil before the Brazilian Central Bank in accordance with applicable Brazilian Law.

### 9.27      **Transfer of the Brazilian Real Estate.**

Delphi Brazil acquired the Brazilian Real Estate on March 3, 1999 and contributed the Brazilian Real Estate to the capital of Saginaw Brazil, on April 1, 2008 as payment-in of its equity interest in the capital of Saginaw Brazil. Notwithstanding the above, Delphi Brazil has not registered the transfer of the Brazilian Real Estate to Saginaw Brazil in the real estate enrollment certificate (matrícula) of the competent real estate register to officer.  Promptly following the Closing, the Brazil Sellers will, and will cause Delphi Brazil to (i) perform any and all actions that may be required to transfer the Brazilian Real Estate owned by Delphi Brazil to Saginaw Brazil, free and clear of any Encumbrance, other than Permitted Encumbrances, in accordance with applicable Law; and (ii) execute any and all documents that may be required to perfect the transfer of the Brazilian Real Estate to Saginaw Brazil in accordance with applicable Law, including but not limited to executing and registering a Public Deed for Transfer of Real Property for Corporate Capital Payment (Escritura de Conferência de Bens para Integralização de Capital Social) in the real estate enrollment certificate (matrícula) of the Brazilian Real Estate before the competent real estate register office of the City of Porto Alegre, State of Rio Grande do Sul, Brazil.  GM Buyers will be solely responsible for all taxes, costs and expenses in connection with such transfer, in accordance with all applicable Brazilian legal requirements.

### 9.28      **Environmental Permits.**

On the date of the execution of this Agreement or as soon as reasonably possible thereafter, and following the Closing, Sellers shall cooperate with Buyers in taking all reasonable steps to facilitate the transfer, assignment or procurement of the reissuance of any Environmental Permit necessary to operate the Business.

### 9.29      **Conflict and Privilege Waivers.**

       A.     Effective as of the execution date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates, successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Environmental Law related matter for which any Buyer may be required to respond, involving in each case the applicable Acquired Assets, the Business, the Sale Companies or their respective

assets and not relating to any Excluded Facility.  In addition, effective on the execution date of this Agreement, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Environmental Law related matter for which any Buyer may be required to respond, in each case involving the applicable Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Facility.  Within fifteen (15) days after the execution date of this Agreement, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form attached as <u>Exhibit 9.29.A</u> together with a list of their consultants and advisors.

> B.    Effective on the Closing Date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Liability (other than as addressed in subsection (A) above) for which any Buyer may be required to respond, involving in each case the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability. In addition, effective on the Closing Date, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Liability for which any Buyer may be required to respond, in each case involving the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.  At Closing, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form attached as <u>Exhibit 9.29.B</u> together with a list of their consultants and advisors.  To the extent that any Liability that is the subject of this Section relates both to any Purchased Asset, Business, Sale Company and/or its assets on the one hand, and an Excluded Asset and/or Retained Liability on the other hand then the applicable Seller and Buyer agree that the waiver set forth herein will be effective only upon execution of a mutually acceptable joint defense agreement which the Parties agree to execute on or before Closing.

### 9.30    Preservation of Environmental Records.

Prior to Closing, Sellers and their respective Affiliates will preserve all Environmental Records and GM Environmental Records and will not damage, destroy or alter any Environmental Records or GM Environmental Records.

### 9.31    DIP Transfer Matters.

Subject to the terms and conditions herein provided and if required by applicable Law or the DIP Agreement (or the DIP Agent at the direction of the requisite DIP Lenders), upon

request of any of the Sellers, the Parties shall permit the Sellers to implement a transaction pursuant to which the Sellers transfer, or cause to be transferred, to the DIP Agent on behalf of the DIP Lenders assets secured under the DIP Agreement in satisfaction of the obligations under the DIP Agreement, and the Sellers or the DIP Agent on behalf of the DIP Lenders, as applicable, simultaneously transfers, or causes to be transferred, all of the GM Acquired Assets to the GM Buyers and all of the Company Acquired Assets to the Company Asset Buyers on terms consistent with this Agreement; provided, that in no event shall any such transaction result in a material economic cost to or material adverse effect on the Business, the Acquired Assets, the Buyers or their respective subsidiaries, or increase the Assumed Liabilities.

### 9.32    Reorganization and Restructuring.

Prior to the Closing, the Sellers, the Sale Companies and Buyers shall consider in good faith any and all internal restructuring steps and consider any transactions and elections as may be requested by the Buyers or Sellers in their respective sole discretion (including capital contributions, cross-chain sales, dividend distributions, spin-offs, mergers, redemptions, tax elections, conversions and reincorporations).  Notwithstanding the foregoing, (a) the failure of any such reorganization or restructuring steps to occur shall in no way delay the Closing of the transactions contemplated by this agreement, (b) the applicable Buyers or Sellers, as the case may be, shall bear all costs related to any such reorganization or restructuring including any costs incurred by any the other Parties, and (c) the other Parties shall have no liability for the failure of any such reorganization or restructuring steps to occur.

### 9.33    Certain Other Actions.

Sellers agree to use commercially reasonable efforts to (a) prior to June 30, 2009, reduce any pledge of the stock of the Sale Companies organized outside the United States owned by Filing Affiliates from one-hundred percent (100%) to sixty-five percent (65%) and to assure that no assets of the Sale Companies organized outside the United States are pledged, (b) if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of Delphi Technologies, Inc., a Delaware corporation, in order to permit the unencumbered sale of the shares of such corporation instead of the sale of the assets of such corporation and (c) if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of certain Filing Affiliates that are Company Sellers of Company Sale Securities in order to permit the unencumbered sale of the shares of such Filing Affiliates instead of the sale of such Company Sale Securities.  At Company Buyer's sole option, the Company Buyer may elect to purchase the shares of one or more Filing Affiliates instead of purchasing the assets or Company Sale Securities held directly by such Filing Affiliate.

### 9.34    Retained Plans.

The Parties acknowledge that Delphi may, at its sole election terminate any or all of the Retained Plans .

### 9.35    Certain India Matters.

Delphi Automotive Systems Pvt. Ltd. ("**Delphi India**") has established a letter of credit (the "**India L/C**") in support of its Steering Business.  Delphi will cause Delphi India to keep the India L/C in place for no more than ninety (90) days following Closing (the "**India L/C Period**").  Parent will cause the applicable GM Buyer to establish, as soon as possible after Closing and in no event later than ninety (90) days following Closing, a replacement for the India L/C.  Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause the applicable GM Buyer to pay to Delphi India all costs incurred by Delphi India in connection with keeping the India L/C open during the India L/C Period.

### 9.36    Pending Transactions.

In the event that any of the Pending Transactions are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the Pending Transactions under the applicable sale and related agreements, including the Transition Services Agreement (subject to Delphi's reimbursement of Company Buyer's actual costs in accordance with the terms of the Transition Services Agreement), and pay to Delphi, in U.S. Dollars, the entire purchase price received from the respective buyers under the Pending Transactions, within ten (10) Business Days after receipt, except that funds paid to a non-U.S. Sale Company will be paid to Delphi as soon as legally permitted under applicable Law, and in advance of amounts paid to other Company Affiliates.

### 9.37    Delphi FICA Litigation.

Delphi shall timely file any FICA refund claims arising in connection with the collective bargaining agreements in 2007.  GM Buyer and Company Buyer shall cooperate in the prosecution of the Delphi FICA Litigation.

### 9.38    GM Financing.

**9.38.1.**    Prior to the Closing or the termination of this Agreement, GM shall not (x) terminate the GM Financing Agreements or (y) amend or otherwise modify the terms of the GM Financing Agreements (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the GM Financing Agreements or otherwise in a manner that would materially adversely impact the ability of GM or the Company Buyer to consummate,  the transactions contemplated by the GM Financing Agreements (including in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.38.2.**    GM shall, prior to or concurrently with the Closing, execute and deliver the Buyer Loan Documents, provide the financing contemplated by the GM Financing on the terms and subject to the conditions described in the GM Financing Agreements and otherwise perform and comply on a timely basis with all of its obligations under the GM Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions

89

and other requirements to the consummation of the financing contemplated by the GM Financing Agreement.

9.38.3.    Prior to the Closing or the termination of this Agreement, the Company Buyer shall not (x) terminate the Equity Commitment Letter or the PE Financing Arrangements or (y) amend or otherwise modify the terms of the Equity Commitment Letter or the PE Financing Arrangements (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the Equity Commitment Letter or the PE Financing Arrangements or otherwise in a manner that would materially adversely impact the ability of the Company Buyer to consummate the transactions contemplated by the Equity Commitment Letter or the PE Financing Arrangements or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

9.38.4.    The Company Buyer shall, prior to or concurrently with the Closing, execute and deliver the Buyer Loan Documents and otherwise perform and comply on a timely basis with all of its obligations under the PE Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions and other requirements to the consummation of the financing contemplated by the PE Financing Agreements.

### 9.39    Environmental Matters.

Notwithstanding anything in this Agreement to the contrary, neither Sellers and their Affiliates, on the one hand, nor any Buyer, on the other hand, assumes any Liability under Environmental Laws of the other.  Nothing in this Agreement is intended to nullify any Liability to any federal, state or local environmental agency under Environmental Laws that either Seller and/or their Affiliates or any Buyer may have as a result of their status as an owner or operator of any property or facility, or as an arranger for disposal of any Hazardous Materials generated at any property or facility.  At Closing, Seller and its Affiliates shall discharge in the pending Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have.  After the Closing neither Sellers and their Affiliates, on the one hand, nor any Buyers, on the other hand, shall assert or pursue any Claim against the other under any Environmental Law for any Liability for Hazardous Materials contamination located on a GM Real Property or a Company Real Property.

### 9.40    Non-Solicitation.

Each of Delphi and the Sellers agree, severally, that until the earlier of (i) when this Agreement is terminated under the terms hereof and (ii) the Closing (the "**Non-Solicitation Period**"), Delphi and the Sellers, as applicable, shall not, and shall not knowingly permit Delphi, the Seller or any of their respective officers, directors, agents or Affiliates to solicit or initiate any inquiries or the making of any proposal with respect to the sale (whether by sale of stock, merger, consolidation, sale of assets or other disposition) of all or any part of the GM Business and the Company Business or any significant portion of their consolidated assets or issued or unissued capital stock; provided, however, that nothing in this Agreement shall prevent or restrict Delphi's Board of Directors from taking actions (or directing management to take actions) which (i) the Board reasonably believes are required by their fiduciary duties (taking

90

into account the advice of counsel in appropriate circumstances) or (ii) are in accordance with paragraph 46 of the Modification Procedures Order.  From and after the execution of this Agreement, Delphi and the Sellers shall immediately advise the Buyers of the receipt, directly or indirectly, of any inquiries, discussions, negotiations, or proposals relating to a Competing Transaction (including the specific terms thereof and the identity of the other individual or entity or individuals or entities involved) and promptly furnish to the Buyers a copy of any such written proposal in addition to a copy of any information provided to or by any third party relating thereto, in each case only to the extent discussed or provided to Delphi's Board of Directors.

### 9.41    <u>Employment, Retirement, Indemnification, and Other Agreements, and Incentive Compensation Programs</u>.

Prior to Closing, the Company Asset Buyers shall take all actions necessary to enter into or assume (at the Company Asset Buyer's sole discretion) the agreements, obtain insurance coverage and undertake or assume the obligations, in connection with the Specified Director, Officer and Employee Related Liabilities that in the aggregate provide substantially similar economic benefits to the applicable directors, officers and employees as currently exist under existing agreements and policies with respect to Delphi's directors, officers and employees other than with respect to change in control agreements.  "**Specified Director, Officer and Employee Related Liabilities**" means (i) employment and incentive agreements and policies (which shall includes equity, supplemental retirement benefits, bonus and other incentive plans and policies to be paid to executives after the effective date of the Plan of Reorganization) with substantially all of Delphi's current, eligible executives who continue to be employed after the effective date of the Plan of Reorganization, (ii) the obligation to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of a director, officer, or employee pursuant to the applicable Delphi and Affiliate of Delphi certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against any director, officer, or employee of the debtors who were in that role as of the date of October 3, 2007 based upon any act or omission related to a director's, officer's or employee's service with, for, or on behalf of Delphi or an Affiliate of Delphi, (iii) the obligation to maintain directors' and officers' insurance providing coverage for those directors, officers, and employees currently covered by such policies for the remaining term of such policy and to maintain tail coverage under policies in existence as of the effective date of the Plan of Reorganization for a period of six years after the effective date of the Plan of Reorganization, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such persons based upon any act or omission related to such person's service with, for, or on behalf of the debtors in at least the scope and amount as currently maintained by Delphi and Affiliates of Delphi, and (iv) the obligation to indemnify current or former directors, officers, and employees who were not employed in such capacity by Delphi or an Affiliate of Delphi as of October 3, 2007, solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the insurance coverage referred to in section (iii) or any prior similar policy in an aggregate amount not to exceed $10 million.

### 9.42    India Matters.

The applicable Delphi Asset Seller in India shall use commercially reasonable efforts to prior to Closing (A)  procure a "no objection letter" from the appropriate authority pursuant to section 281(1) of the Income Tax Act, 1961 of India to the proposed transfer of the Acquired Assets of the GM Business conducted in India from the Seller to the Buyer with no conditions included in such objection letter, other than those as are reasonably acceptable to the applicable Seller and applicable GM Buyer  and (B) establish proper, clear and valid leasehold rights in favor of the applicable GM Buyer to the premises forming part of the lease for the premises situated in the State of Haryana, India and subject to the Seller furnishing all necessary permission(s) and authorization(s) obtained by AJS Associates and/or individual allottees of the premises forming part of the leases from the Haryana Urban Development Authority for the purpose of creating valid leasehold rights in favor of the GM Buyer.

### 9.43    Prosecution and Settlement of Appaloosa Claim.

Prior to the Closing, Delphi shall continue to control the prosecution and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution and, subject to applicable law, shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer which shall not be unreasonably withheld. Following the Closing, (i) GM, GM Buyer and Delphi agree to take appropriate actions and enter into appropriate agreements such that subject to applicable law, GM or GM Buyer shall control the prosecution and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution, and Delphi shall cooperate with GM and GM Buyer in any such prosecution; provided, however, if requested by GM or GM Buyer in writing, Delphi shall prosecute such Claim at the direction of GM or GM Buyer, as applicable, and GM or GM Buyer, as applicable, shall reimburse Delphi for any reasonable, external, out-of-pocket costs and expenses incurred by Delphi in connection with any such prosecution; provided, further, however, that if GM or GM Buyer has requested that Delphi prosecute such Claim as provided above, Delphi shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer; (ii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto, in each case for an amount that would be less than the maximum distribution to the C Lenders provided by Article 7.8(e)(iii) of the Plan (the "Threshold"), without the prior written consent of Delphi which shall not be unreasonably withheld; provided, that Delphi may not withhold its consent unless it agrees within 20 days of the request for consent to pay all costs and expenses associated with of the continuing prosecution of the Appaloosa Claim and demonstrates to GM's and GM Buyer's reasonable satisfaction the ability to fund such costs and expenses; provided, further, that Delphi shall not have any right to consent to the entry of any judgment with respect to the Appaloosa Claim or any settlement with respect thereto if the C Lenders would receive an amount from such settlement equal to or greater than the Threshold; (iii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto unless such judgment or settlement (A) contains a full release of all counter, cross or similar claims by the defendants and (B) does not contain non-economic relief detrimental to Delphi's current or former officers, directors, or employees; and (iv) GM and GM Buyer shall

92

consult with Delphi regarding any request by Delphi for GM or GM Buyer to consent to the entry of any judgment with respect to the Appaloosa Claim or entry into any settlement.  Delphi and GM and/or the GM Buyer will enter into an agreement in mutually acceptable form for the purpose of facilitating communications regarding the Appaloosa Claim and, to the maximum extent permissible, protecting confidential and privileged information shared in connection therewith.

## ARTICLE 10.
## CONDITIONS TO CLOSING.

### 10.1    Conditions to Obligations of Sellers and Buyers.

The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by each Party at or prior to the Closing Date of the following conditions precedent.

**10.1.1.**    Plan of Reorganization.  The conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived pursuant to the terms of the Plan of Reorganization, and the Plan of Reorganization does not contain any changes from the draft version delivered to GM and the Buyers on June 1, 2009 that would have a material adverse impact on the Sale without the consent of GM and the Company Buyer or an adverse impact on GM without the consent of GM.  Any exhibits and schedules to the Plan of Reorganization not delivered to the Buyers prior to the date of this Agreement, must not have a material adverse impact on the Sale without the consent of GM and the Company Buyer, a material adverse impact on GM without the consent of GM or a material adverse impact on Company Buyer without the consent of Company Buyer.  The Plan Modification Order shall have been entered and become a Final Order in form and substance satisfactory to GM and Company Buyer.

**10.1.2.**    Governmental Approvals; Plan Modification Order.  All required Governmental Approvals (including approvals under any Competition/Investment Law, as identified on Schedule 10.1.2) regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated; provided that to the extent such consent, approval, order, authorization, registration, declaration or filing has not been obtained or completed with respect to an immaterial Acquired Asset, Parent may elect in its sole discretion to cause the applicable Buyer to consummate the acquisition of those Acquired Assets for which such consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and defer the acquisition of all remaining Acquired Assets until such remaining consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and provided further that the full Purchase Price for such assets is paid.

**10.1.3.**    No Order.  There shall not be in effect any Governmental Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

**10.1.4.**    DIP Amendment.

The DIP Agreement shall have been amended or otherwise modified to the extent necessary to permit the consummation of the transactions contemplated hereby, and such amendment or other modification shall be in full force and effect and not be subject to any unsatisfied condition precedent or condition subsequent not otherwise waived by the DIP Lenders.

## 10.2    Conditions to Obligations of Sellers.

The obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

10.2.1.    Accuracy of Warranties.  The representations and warranties of Buyers contained in Articles 4 and 7 and of GM in Article 6 of this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of date of the Agreement and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

10.2.2.    Performance of Covenants.  Each of the Buyers and their Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by them at or prior to the Closing.

10.2.3.    Delivery of Ancillary Agreements.  Buyers will have delivered duly executed copies of each of the applicable Ancillary Agreements.

10.2.4.    Collective Bargaining Agreements.  GM Buyer and Company Buyer will assume their respective Seller U.S. CBAs, including all amendments and supplements thereto.

10.2.5.    Hourly Pension Plan.  Delphi and its Affiliates shall be satisfied that the Delphi HRP will not be an obligation of Delphi following the Closing and Delphi shall have been relieved of all obligations with respect thereto.

10.2.6.    Consents.  The UAW, IUE-CWA and the USW will have waived Seller U.S. CBA restrictions upon the sale of operations in a form reasonably satisfactory to Seller.

## 10.3    Conditions to Obligations of GM Buyers.

The obligation of GM Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by GM Buyers):

10.3.1.    Accuracy of Warranties.  The representations and warranties of Sellers made to all Buyers or the GM Buyers, but, for the avoidance of doubt, not the representations and warranties of Sellers made exclusively to the Company Buyer, contained in this Agreement

(without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on any Seller's ability to consummate the transactions contemplated by this Agreement.

**10.3.2.**    <u>Performance of Covenants</u>.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the GM Buyers.

**10.3.3.**    <u>Delivery of Ancillary Agreements</u>.  Sellers will have delivered duly executed copies of each of the GM Ancillary Agreements.

**10.3.4.**    <u>Release of Certain Liens</u>.  The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the GM Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the GM Sales Securities.

**10.3.5.**    <u>Financing</u>. The Company Buyer shall have received the Class B Purchase Price under the Securities Purchase Agreement; PE and its Affiliates shall not be in breach or default of any material obligations it has under the PE Financing Agreements and PE and its Affiliates shall have executed and delivered the Buyer Loan Documents and the Operating Agreement, which Buyer Loan Documents shall be in full force and effect.

**10.3.6.**    <u>Transfer of Environmental Permits and Approvals</u>.  All material Environmental Permits shall have been transferred, assigned or reissued to Buyers or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, Buyers have received written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

**10.3.7.**    <u>Property Transfer Obligations</u>.  All obligations required under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3 shall have been satisfied.

**10.3.8.**    <u>DIP Payoff Letters</u>.  The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to GM.

### 10.4    <u>Conditions to Obligations of Company Buyer</u>.

The obligation of Company Buyer to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by the Company Buyer):

**10.4.1.**    <u>Accuracy of Warranties</u>.  The representations and warranties of Sellers made to all Buyers or the Company Buyer, but, for the avoidance of doubt, not the

95

representations and warranties of Sellers made exclusively to the GM Buyers, contained in this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on any Seller's ability to consummate the transactions contemplated by this Agreement.

**10.4.2.**    Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the Company Buyer.

**10.4.3.**    Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the GM/Company Ancillary Agreements, which shall be in full force and effect.

**10.4.4.**    Release of Certain Liens.  The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the Company Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the Company Sales Securities.

**10.4.5.**    Financing.  The Company Buyer shall have received the Class A Purchase Price under the Securities Purchase Agreement and the amount of Loans (as defined in the Buyer Loan Documents) requested by the Company Buyer to be made by GM under the Buyer Loan Documents on the Closing Date, GM and its Affiliates shall not be in breach or default of any material obligations it has under the GM Financing Agreements and GM and its Affiliates shall have executed and delivered the Buyer Loan Documents and the Operating Agreement, which Buyer Loan Documents shall be in full force and effect.

**10.4.6.**    DIP Payoff Letters.  The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to Company Buyer.

**ARTICLE 11.**
**CLOSING.**

## 11.1    Closing Time and Date.

**11.1.1.**    Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of all of the transactions contemplated by this Agreement to occur at Closing will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036, at 10:00 a.m. at the month end following two (2) Business Days of the date that all of the conditions set forth in ARTICLE 10 have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may otherwise agree (the "**Closing Date**").  For Tax and accounting purposes, the parties shall use their commercially reasonable efforts to cause the effective time of the transaction to be 11:59 p.m., local time, on the accounting month end

following the Closing Date. The Closing of the GM Transfer Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

**11.1.2.** In the event any condition to Closing contained in <u>Section 10.1.2</u> or <u>10.3</u> has not been satisfied with respect to an immaterial Acquired Asset, GM Buyer may elect to delay the Closing with respect to such immaterial Acquired Asset or Sale Company (a "**Temporarily Excluded Assets**"), and shall be required to proceed to Closing with respect to rest of the transactions contemplated by this Agreement. In such event, (i) GM Buyers will not be deemed to have assumed any Liabilities which relate to the Temporarily Excluded Assets, (ii) the full Purchase Price will be paid at Closing notwithstanding that the Temporarily Excluded Assets have not been transferred, and (iii) Sellers will continue to operate the Temporarily Excluded Assets and will supply GM Buyers and the Sale Companies and perform the other obligations in the same manner as prior to the Closing, except that GM Buyers will be responsible for paying Sellers, in advance, for all of their direct and indirect costs and expenses reasonably incurred in operating the Temporarily Excluded Assets to the extent they exceed revenues generated from operating such Temporarily Excluded Assets until they can be transferred to GM Buyers. Sellers and GM Buyers will continue to use their respective commercially reasonable best efforts to cause the satisfaction of all unsatisfied conditions precedent to the transfer of the Temporarily Excluded Assets as soon as practicable. The GM Buyers may elect to close on the transfer of the Temporarily Excluded Assets at any time upon notice to Delphi and the provisions of this Agreement will continue to apply to the Temporarily Excluded Assets as if no Closing under this Agreement had yet taken place.

## 11.2    GM Ancillary Agreements.

At or prior to the Closing, the applicable Sellers will duly execute and deliver to the GM Buyers, and the GM Buyers will duly execute and deliver to GM Sellers, each of the following agreements to which they are to be a party:

**11.2.1.** The following lease agreements:

A. Assignment and Assumption Agreement regarding Building 1 at the Somerton, Australia Real Property, substantially in the form of <u>Exhibit 11.2.1.A</u>.

B. Sublease regarding the Technical Center located at Paris, France, substantially in the form of <u>Exhibit 11.2.1.B</u>.

C. Sublease regarding the lease located at 1230 West Gila Bend Highway, Valley Industrial Park, Casa Grande, Arizona, substantially in the form of <u>Exhibit 11.2.1.C</u>.

D. The applicable GM Buyer and applicable Company Buyer will enter into a lease for a portion of the Lockport, New York technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for Company to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years, providing for a mutually acceptable allocation of use of personal property during the term of such lease.

E.      The applicable GM Buyer and applicable Company Buyer will enter into a lease for the Kokomo, Indiana technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for Company to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years.  During the term of such lease, the applicable GM Buyer shall not sell or otherwise dispose of any of such Personal Property.  The applicable GM Buyer and applicable Company Buyer will use commercially reasonable efforts to develop and implement a separation plan for their respective businesses conducted at Kokomo, Indiana and following such separation, the applicable Company Buyer shall have an option to purchase the real property and/or related Personal Property for the price of $1.00, subject to a lease back to the applicable GM Buyer of the portion that will continue to be occupied by the applicable GM Buyer and the provision for the use by the applicable GM Buyer of the relevant related Personal Property.  The lease back to the GM buyer shall provide for the applicable GM Buyer to pay its pro rate share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by such parties.

**11.2.2.**    Patent Rights assignments by the applicable GM Sellers to the applicable GM Buyer substantially in the form of <u>Exhibits 11.2.2.A.1</u> through <u>11.2.2.A.16</u>, a Trademark Assignment by the applicable GM Seller to the applicable GM Buyer substantially in the form of <u>Exhibit 11.2.2.B</u>, and a Copyright Assignment by the applicable GM Seller to the applicable GM Buyers substantially in the form of <u>Exhibit 11.2.2.C</u>, whereby recorded title to the Purchased Intellectual Property may be recorded as being transferred from the applicable GM Seller to the applicable GM Buyers, as well as any other deeds, bills of sale, endorsements, assignments, affidavits and other instruments of sale, conveyance, transfer and assignment relating to the Purchased Intellectual Property, including an assignment to the applicable GM Sellers' rights in and to the "Saginaw Steering" name and trademark, any assignment of rights to Intellectual Property under any employment or independent contractor agreements and any necessary releases of security interest in forms appropriate for releasing any security interests filed in any patent offices.

**11.2.3.**    The    following    agreements    (collectively    the    "**GM Transfer Agreements**"):

A.      France Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.A</u>.

B.      Australia Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.B</u>.

C.      India Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.C</u>.

D.      Germany Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.D</u>.

E.    Italy Asset Sale Agreement, substantially in the form set forth in Exhibit 11.2.3.E.

F.    Korea Asset Sale Agreement, substantially in the form set forth in Exhibit 11.2.3.F.

G.    Japan Asset Sale Agreement, substantially in the form set forth in Exhibit 11.2.3.G.

H.    Share Transfer Agreement with respect to Delphi Polska, substantially in the form set forth in Exhibit 11.2.3.H.

**11.2.4.**    The Bill of Sale, substantially in the form set forth in Exhibit 11.2.4.

**11.2.5.**    The Assignment and Assumption Agreement, substantially in the form set forth in Exhibit 11.2.5.

**11.2.6.**    The GM IP License Agreement.

**11.2.7.**    The applicable Seller Transition Services Agreement between Delphi and GM substantially in the form set forth in Exhibit 11.2.7.

**11.2.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3**    **Company Ancillary Agreements.**

At or prior to the Closing, the applicable Company Sellers will duly execute and deliver to the Company Buyer, and the Company Buyer will duly execute and deliver to the applicable Company Sellers, each of the following agreements to which they are to be a party:

**11.3.1.**    Assignments, in recordable form, with respect to each of the Copyrights, Patent Rights, Trademark Rights included within the Purchased Intellectual Property, duly executed by each Seller, as applicable, and in form and substance reasonably satisfactory to Buyer.

**11.3.2.**    The Buyer Transition Services Agreement substantially in the form set forth in Exhibit 11.3.2;

**11.3.3.**    The transition services agreement between Delphi and the Company Buyer, substantially in the form set forth in Exhibit 11.3.3 (the "**Seller Transition Services Agreement**").

**11.3.4.**    The bills of sale, substantially in the form set forth in Exhibit 11.3.4.

**11.3.5.**    The assignment and assumption agreements, substantially in the form set forth in Exhibit 11.3.5.

99

**11.3.6.**    The Company IP License Agreements.

**11.3.7.**    Lease by GM to Company Buyer of technical centers at Kokomo, Indiana and Lockport, New York pursuant to Sections 11.2.1.D and 11.2.1.E.

**11.3.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3.9.**    The Operating Agreement.

**11.3.10.**    Other Ancillary Agreements.

**11.4    Sellers' Deliveries at Closing.**

At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the applicable Buyer:

**11.4.1.**    To the extent that equity interests of Sale Companies or the JV Companies are represented by stock certificates, original certificates evidencing the Sale Securities (to the extent applicable in the respective jurisdiction), which certificates will be duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of the relevant Buyer or its permitted assigns.

**11.4.2.**    Quitclaim deeds (or non U.S. equivalent) for the GM Owned Real Property and the Company Owned Real Property, substantially in the form of Exhibit 11.4.2 or such other form of conveyance in substance equivalent to such form of deed.

**11.4.3.**    Copies of the resolutions (or local equivalent) of the boards of directors of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby.

**11.4.4.**    Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Plan Modification Order.

**11.4.5.**    The minutes and other partnership or limited liability company record books of the Sale Companies and all stock transfer ledgers and other records evidencing the equity ownership of the Sale Companies.

**11.4.6.**    Resignations of all directors (or equivalent) and officers of the Sale Companies and of any Seller representatives in similar positions with the JV Companies, except as otherwise requested by Parent no less than ten (10) Business Days prior to the Closing Date.

**11.4.7.**    A non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445(b) of the

Internal Revenue Code so that Buyers are exempt from withholding any portion of the Purchase Price thereunder.

**11.4.8.**    All other documents and papers reasonably requested by Buyers to transfer title to the Acquired Assets or Sale Securities in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**11.4.9.**    A certificate signed by each Seller, dated the date of the Closing Date (in form and substance reasonably satisfactory to Buyer), certifying that the conditions specified in Section 10.3 have been satisfied as of the Closing.

**11.4.10.**    Written acknowledgements from the applicable Governmental Authorities that all material Environmental Permits have been transferred, assigned or reissued to Buyer or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

**11.4.11.**    Environmental Records and GM Environmental Records without redaction or deletion.  Environmental Records and GM Environmental Records located at the Real Property immediately following the Closing will be deemed to be delivered for purposes of this Section 11.4.

**11.4.12.**    Copies of all documents required to effect the transfer of ownership and possession of any Real Property under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3.

**11.4.13.**    The applicable Transition Services Agreements substantially set forth in Exhibits 11.2.7 and 11.3.3.

**11.4.14.**    Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (A) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (B) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

**11.4.15.**    Amendments to the Rhodes I and Rhodes II Operating Agreements in the forms previously provided to Sellers.

**11.4.16.**    DIP Agreement payoff letter in customary form or reasonably acceptable to Buyers.

## 11.5    Buyers' Deliveries at Closing.

**11.5.1.**    At or prior to the Closing, GM Buyers will deliver or cause to be delivered the following:

A.    The waiver by GM of its pre-petition Claims, Administrative Claims, and future Claims in the Bankruptcy Cases including without limitation any

such Claims pursuant to the Global Settlement Agreement, as amended, effective as of September 29, 2008, between Delphi and GM and each of the GM-Delphi Liquidity Agreements;

B.  The payment to Delphi of the DIP Priority Payment;

C.  The payment to Delphi of $291,020,079 in cash;

D.  The assumption or payment of the applicable Cure Amounts for the GM Business;

E.  The payment to Delphi of certain expenses of Delphi and its Filing Affiliates following the Closing as set forth on <u>Exhibit 3.1.1.F</u>.

F.  Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

G.  An officer's certificate, dated as of the Closing Date, executed on behalf of each of the Buyers, certifying that the conditions specified in <u>Section 10.2</u> have been fulfilled;

H.  Each GM/Company Ancillary Agreement to which a GM Buyers is a party; and

I.  50% of professional fees (not to exceed $15,000,000 as the payment from the GM Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the  Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation of approval for the Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to this Section 3.1.1.G, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

**11.5.2.**  At or prior to the Closing, Company Buyer will deliver or cause to be delivered the following;

A.  $1.00 (one dollar);

B.  The payment to Delphi of the Parnassus Class C Interest of Company Buyer, either directly or indirectly through one or more intermediaries, which shall be held either by Sellers, a trust or an agent, as determined by Sellers.

C.  50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required to be paid in

cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the  Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization).

D.    The assumption or payment of the Cure Amounts for the Company Business;

E.    Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

F.    Each GM/Company Ancillary Agreement to which a Company Buyer is a party;

G.    An officer's certificate, dated as of the Closing Date, executed on behalf of each of the Buyers, certifying that the conditions specified in Section 10.2 have been fulfilled; and

H.    Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (i) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (ii) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

### 11.6    Post-Closing Deliveries.

Promptly following the Closing, the Sale Companies will deliver to the applicable Buyer signature cards from all banks or financial institutions with which the Sale Companies have any account, designating signatures approved by the applicable Buyer.

### 11.7    Post-Closing Transfer of Intellectual Property Rights.

11.7.1.    If, after the Closing, either Party identifies any Intellectual Property right, including any application or registration for the Intellectual Property that such Party believes should have been included in its Purchased Intellectual Property, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in such party Purchased Intellectual Property and assigned to such Buyer.  If the Parties agree that such Intellectual Property right should have been included in the Purchased Intellectual Property and assigned to another Buyer, Sellers or Buyer or their respective Affiliate, as applicable, shall assign or cause to be assigned such Intellectual Property right to Buyers at no additional cost to Buyers.  The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute at no additional cost to Buyers all documents reasonably requested by the other Party to effect such transfer and/or assignment.

11.7.2.    If, after Closing, a Buyer identifies any Intellectual Property right, including any patent or patent application that it believes should have been included in the

Shared Intellectual Property licensed under the GM IP License Agreement or the Company IP License Agreement, as applicable, but which is reasonably within the scope of Excepted Shared Intellectual Property identified in the GM IP License Agreement or the Company IP License Agreement, as applicable, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in the Shared Intellectual Property licensed to Buyers hereunder.  If the Parties agree that such Intellectual Property right should have been included in the Shared Intellectual Property licensed to Buyers hereunder, the Parties shall amend <u>Schedule 9.9.1.A</u> to specifically exclude such Intellectual Property right from the Excepted Shared Intellectual Property, and Buyers shall receive, via amendment to this Agreement, a license under such Intellectual Property right with terms identical to those of the license granted in <u>Section 9.9.1</u>.  The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute all documents reasonably requested by the other Party to effect such license.  All amendments, covenants and agreements to be provided under this Section shall be at no additional cost to Buyers.

## ARTICLE 12.
## TERMINATION.

### 12.1    <u>Termination</u>.

This Agreement may be terminated at any time prior to the Closing:

**12.1.1.**    By the mutual written consent of Delphi, Parent and Company Buyer.

**12.1.2.**    By any Party if the Closing has not occurred by September 30, 2009, <u>provided</u> such date shall be extended until November 30, 2009 in the event that all conditions to Closing are satisfied or capable of being satisfied on the Closing Date, other than the condition set forth in <u>Section 10.1.2</u> and <u>provided</u> <u>further</u> that the terminating party will not have the right to terminate this Agreement if it is in material default hereunder.

**12.1.3.**    By Delphi if (a) the Interim Financing Amendment shall not have been executed and delivered by GM on or prior to June 1, 2009, (b) the Interim Financing Amendment have not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders in form and substance reasonably satisfactory to Delphi, (c) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect  at any time on or after June 10, 2009 or (d) GM breaches any of its material covenants, obligations or agreements under either of the GM-Liquidity Agreements (as modified by the Interim Financing Amendment).

**12.1.4.**    By GM if (a) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders; (b) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect  at any time on or after June 10, 2009; or (c) Delphi breaches any of its material covenants, obligations or agreements under the GM-Liquidity Agreements (as modified by the Interim Financing Amendment), or an event of default has occurred and is continuing under the Interim Financing Amendment; or (d) the Interim Financing Amendment has otherwise been terminated in accordance with its terms.

**12.1.5.** This Agreement may be terminated by either of GM or Company Buyer if (x) the Plan Modification Order in form and substance satisfactory to GM or Company Buyer, as applicable, has not been entered by the Bankruptcy Court on or prior to July 23, 2009, or (y) such Plan Modification Order in form and substance satisfactory to GM or Company Buyer, as applicable, has not become a Final Order within ten (10) days of such order's entry.

**12.1.6.** This Agreement will automatically terminate, without any further action by any party hereto, on July 15, 2009 (or such later date as may be mutually agreed upon by GM, Company Buyer and Delphi in writing) if GM is the subject of a case under the Bankruptcy Code and (a) federal court approval of GM's entry into, and performance under, this Agreement and all Ancillary Agreements to which GM is or is to be a party has not been obtained, (b) federal court authority to assume all purchase orders and commercial agreements between Sellers and GM the Ancillary Agreement to which GM is or is to be a party and the Securities Purchase Agreement, (the "**GM Assumed Contracts**"), upon the closing of this Agreement has not been obtained, (c) if GM has received federal court authorization to transfer assets (including the stock of subsidiaries) related to the GM Assumed Contracts to any other person that will then hold substantially all of the Existing GM Assets, GM has not received authority to assign such contracts to such transferee, or (d) GM, or if substantially all of the existing GM Assets have been transferred, the entity that then holds substantially all of the Existing GM Assets, has not agreed in writing to assume the GM Assumed Contracts upon the closing of this Agreement. For purposes of this Section 12.1.6, "**Existing GM Assets**" means the assets of GM as of the time immediately prior to one of the events set forth in clauses (a), (b), (c) or (d) of the preceding sentence, as applicable.

## 12.2    Procedure and Effect of Termination.

In the event of the termination of this Agreement pursuant to Section 12.1, written notice thereof will forthwith be given to all other Parties. If this Agreement is terminated:

**12.2.1.** Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**12.2.2.** The provisions of the GM or Company Confidentiality Agreement, as applicable, will continue in full force and effect; and

**12.2.3.** The following Sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: ARTICLE 12 (Termination) and; Sections 14.1 (Fees and Expenses), 14.5 (Assignment), 14.7 (Waiver), 14.8 (Notices), 14.9 (Entire Agreement), 14.11 (Publicity), 14.15 (Governing Law) and 14.16 (Venue and Retention of Jurisdiction).

**12.2.4.** No party to this Agreement will have any Liability under this Agreement to any other except that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and no Party waives any Claim with respect thereto.

**12.2.5.**    The MRA, including Section 4.06(c) and related provisions, shall be unaffected by such termination.  For avoidance of doubt, under no circumstances shall a default under this Agreement constitute a default under the MRA.

## ARTICLE 13.
## LIABILITY, SURVIVAL.

### 13.1    LIMITATIONS OF LIABILITY.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL HAVE ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES.  IN NO EVENT WILL THE COMPANY BUYER OR ANY OF ITS AFFILIATES HAVE ANY LIABILITY PRIOR TO THE CLOSING FOR DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ACTUAL, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, TO ANY PARTY OR ANY OF THE PARTIES' RESPECTIVE AFFILIATES OR TO ANY OTHER PERSON WITH RESPECT TO THIS AGREEMENT EXCEPT TO THE EXTENT OF THE TERMINATION FEE SET FORTH IN THE EQUITY COMMITMENT LETTER AND THEN SOLELY TO THE PARTIES THERETO TO THE EXTENT PROVIDED THEREIN.

### 13.2    Termination Fee.

In the event that a Termination Fee (as defined in the Securities Purchase Agreement) is payable under the Equity Commitment Letter or the Securities Purchase Agreement to GM,  and GM receives such termination fee in full, then GM shall either (i) agree to consummate all of the transactions under this Agreement in accordance with the terms thereof, including fulfilling the obligations of Company Buyer hereunder, as if this Agreement were not terminated if applicable, or (ii) if GM elects not to so consummate such transactions, then GM shall pay to Delphi an amount equal to the positive difference, if any, equal to (a) the total amount of such Termination Fee less (b) the amount advanced under the Interim Financing Amendment after the date of this Agreement as Tranche C Advances.

Nothing in Section 13.1 or 13.2 shall limit a Party's rights under Section 14.18 of this Agreement.

### 13.3    Survival.

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder until fully performed, and each party hereto shall be liable to the other after the Closing for any breach thereof.

## ARTICLE 14.
## MISCELLANEOUS.

### 14.1    Fees and Expenses.

Except as may otherwise be specifically provided in this Agreement, each of the Parties will be responsible for its own costs and expenses related to this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby.

### 14.2    Bulk Sales Laws.

Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

### 14.3    Payments in Dollars.

Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. dollars in same day or immediately available funds.

### 14.4    Amendment.

This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties.  The Parties acknowledge and agree, however, that the Schedules and the Exhibits, other than Schedule 1.1.A "Assumed Administrative Liabilities", Schedule 2.1.5.F "Excluded Facilities", Schedule 2.1.5.J "Pending Transactions", and Exhibit 3.1.1.F "Wind Up Costs", the IP License Agreements and the GM Company Ancillary Agreements, which are not executed on the date hereof, are in draft form and will be revised and finalized in a manner consistent with this Agreement to the mutual satisfaction of the Parties each acting reasonably, prior to Closing.

### 14.5    Assignment.

This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party and their Affiliates, provided, that except as otherwise provided in this Section 14.5,  no assignment of any rights or obligations hereunder will be made by any Buyer without the written consent of Delphi, or by any Seller hereto without the written consent of one or both of GM and Company Buyer based on which Buyer is impacted by the request, except in connection with a Pending Transaction.  Any GM Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) (i) to GM or any of its Affiliates (including any Affiliate formed after the date hereof that may be a corporation or limited liability company), (ii) to the applicable Buyer's lenders or (iii) in connection with the direct or indirect sale, merger, consolidation or similar reorganization of all or a substantial portion of GM's business; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party is released from its obligations hereunder.  Upon any such permitted assignment, the references in

107

this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires.  Any Company Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) to any Affiliate or other designee of Company Buyer; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party is released from its obligations hereunder.  Upon any such permitted assignment, the references in this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires.

### 14.6    <u>No Successor Liability</u>.

Except where expressly prohibited under applicable law , upon the Closing, the Buyers shall not be deemed to:  (a) be the successor of the Filing Affiliates; (b) have, de facto, or otherwise, merged with or into the Filing Affiliates; (c) be a mere continuation or substantial continuation of the Filing Affiliates or the enterprise(s) of the Filing Affiliates; or (d) be liable for any acts or omissions of the Filing Affiliates in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Buyers shall not be liable for any Claims against the Filing Affiliates or any of their predecessors or affiliates, and the Buyers shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Filing Affiliates arising prior to the Closing Date, including, but not limited to, Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date, except as expressly provided in this Agreement.  The Buyers acknowledge and agree that this <u>Section 14.6</u> shall not in any be deemed to expand or modify Sellers' indemnification obligations under this Agreement or any Ancillary Agreement.  Nothing in this provision shall preclude the application of the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53.

### 14.7    <u>Waiver</u>.

Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement:  (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  At any time prior to the Closing Date, the Parties may:  (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**14.8**     **Notices.**

Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes:  (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

|   |   |
|---|---|
| If to any GM Buyer: | c/o General Motors Corporation<br>767 Fifth Avenue<br>14th Floor<br>New York, NY 10153<br>Attn:  Director of Business Development<br>Fax:  (212) 418-3623 |
| | and |
| | General Motors Corporation<br>300 GM Renaissance Center<br>Detroit, MI 48265<br>Attn:  General Counsel<br>Fax:  313-665-4960 |
| With a copy to: | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Ave.<br>Detroit, MI 48226<br>Attn:  Robert B. Weiss<br>Tel.:  (313) 465-7596<br>Fax.:  (313) 465-7597 |
| If to any Company Buyer: | Parnassus Holdings II, LLC<br>c/o Platinum Equity<br>360 North Crescent Drive<br>South Building<br>Beverly Hills, CA 90210<br>Attn:<br>Tel.:<br>Fax: |
| With a copy to: | Schulte Roth & Zabel LLP |

109

919 Third Avenue
New York, NY 10022
Adam Harris, Marc Weingarten
 and David E. Rosewater;
Tel.: (212)-756-2000
Fax: (212) 593-5955


If to Delphi:                    DELPHI CORPORATION
                                 5725 Delphi Drive
                                 Troy, Michigan 48098
                                 Attn:  Executive Director of Restructuring
                                 Fax:  (248) 813-2612


With a copy to:                  DELPHI CORPORATION
                                 5725 Delphi Drive
                                 Troy, Michigan 48098
                                 Attn:  Deputy General Counsel -
                                        Transactional & Restructuring
                                 Fax:  (248) 813-2491


With a copy to:                  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                 4 Times Square
                                 New York, New York 10036
                                 Attn:  Eric Cochran
                                        Marie Gibson
                                 Fax:  (212) 735-2000


provided, however, if either Party will have designated a different addressee by notice, then to
the last addressee so designated.

### 14.9    Entire Agreement.

This Agreement, including all agreements incorporated by reference herein, the Ancillary
Agreements and the GM Confidentiality Agreement or the Company Confidentiality Agreement,
as applicable, constitute the entire agreement of the Parties with respect to the subject matter
hereof and supersede all prior agreements and understandings, both written and oral, between the
Parties with respect to the subject matter hereof, provided, however that existing commercial
agreements between GM and Delphi which are otherwise addressed in this agreement shall not
be superceded.  This Agreement is the product of negotiations between the Parties and represents
the Parties' intentions.  In any action to enforce or interpret this Agreement, this Agreement shall
be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement
as a whole, shall be construed more or less favorably to any Party.

14.10    **Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement. Facsimile signatures will be treated as originals.

14.11    **Publicity.**

Except for statements by Delphi in connection with the Bankruptcy Cases or as otherwise required by Law, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without consulting with the other Party.

14.12    **Headings.**

The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

14.13    **Severability.**

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable: (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

14.14    **Third Parties.**

Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.

14.15    **Governing Law.**

This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.

14.16    **Venue and Retention of Jurisdiction.**

By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; provided, however, that after the second (2nd) anniversary of the date of this Agreement, the Bankruptcy

111

Court and the Supreme Court of New York, New York County and the United States District Court for the Southern District of New York (the "**New York Courts**") shall have non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; and, provided, further, that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement shall terminate upon the fourth (4th) anniversary of the date of this Agreement and the New York Courts shall have exclusive jurisdiction after the fourth (4th) anniversary of the date of this Agreement.  Each Party further agrees to waive any objection based on forum non conveniens.

### 14.17    Risk of Loss.

Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

### 14.18    Enforcement of Agreement.

The Parties acknowledge and agree that the covenants and undertakings contained in this Agreement and the Ancillary Agreements relate to matters which are of a special, unique and extraordinary character and that a violation of any of the terms of this Agreement or any Ancillary Agreement will cause irreparable injury to the other Parties and that the amount of such injury will be extremely difficult, if not impossible, to estimate or determine and may not be adequately compensated by monetary damages alone.  Therefore, each Party acknowledges that the other Party will be entitled, in addition to all other rights and remedies available under this Agreement, and Ancillary Agreement, and applicable law, as a matter of course, to an injunction, order of specific performance, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation of any terms of this Agreement or any Ancillary Agreement without proof of actual damages and without any requirement for the securing or posting of any bond.

### 14.19    Sellers' Obligations.

Nothing contained in any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agreement and the Plan Modification Order.  The Filing Affiliates' obligations under this Agreement (including all Exhibits and Ancillary Agreements) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Filing Affiliates, and the reorganized or reconstituted Filing Affiliates, as the case may be, after the effective date of the confirmed plan or plans in the Filing Affiliates' cases.

### 14.20    Bankruptcy Court Approval.

Notwithstanding anything to the contrary herein, the Parties' obligations under this Agreement are expressly subject to entry of the Plan Modification Order.

### 14.21    Reasonably Equivalent Value.

As set forth in the Recitals to this Agreement, consideration under the Agreement was provided by all Parties to the Agreement.  This Agreement is not the product of collusion among the Parties and is the result of arms' length negotiations.  Each of the Parties hereto acknowledge and agree that it received reasonably equivalent value for the consideration provided by such Party.

### 14.22    Identification of Exhibits and Schedules to be Filed Under Seal.

(i)    The parties agree that certain documents attached as Exhibits and Schedules hereto contain sensitive and confidential business terms which, if publicly disclosed, could detrimentally affect the parties.  Certain of these documents contain detailed proprietary information describing certain aspects of the business relationship between the parties and the parties believe these documents contain sensitive and confidential information of a type not typically disclosed to the public or made available in the automotive industry.  Moreover, certain of these documents contain confidentiality provisions which compel the parties to maintain the confidentiality of the terms of such agreements.

(ii)    The parties hereto agree to use commercially reasonable efforts to obtain approval by the Bankruptcy Court of an order authorizing the parties to file the following Exhibits and Schedules hereto under seal:

<u>Schedules</u>

| | |
|---|---|
| Schedule 1 | Detail of Sellers and GM Buyers |
| Schedule 1.1.A | Assumed Administrative Liabilities |
| Schedule 1.1.B | GM Buyers' Knowledge, Company Buyers' Knowledge and Sellers' Knowledge |
| Schedule 1.1.C | Steering Products |
| Schedule 1.1.D | Excluded Insurance Policies |
| Schedule 1.1.D.1 | Patents |
| Schedule 1.1.D.2 | Trademarks Rights |
| Schedule 1.1.D.3 | Copyrights |
| Schedule 1.1.E | Transferred Insurance Policies |
| Schedule 2 | Details of Sellers and Company Buyer |
| Schedule 2.1.5.F | Excluded Facilities |
| Schedule 2.1.5.J | Pending Transactions |
| Schedule 2.1.5.K | Other Excluded Assets |

113

| | |
|---|---|
| Schedule 2.3.1 | Administrative Claims |
| Schedule 4.3.1 | Sale Companies and JV Companies |
| Schedule 4.3.2 | Capital Stock |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6.2 | Licenses to Affiliates |
| Schedule 4.6.3 | Infringement and Allegations of Infringement of Third Party Intellectual Property |
| Schedule 4.6.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.6.5 | Intellectual Property Notices |
| Schedule 4.8.1 | GM Leased Real Property |
| Schedule 4.8.2 | GM Owned Real Property |
| Schedule 4.9.1. | Historical Financial Statements |
| Schedule 4.9.2 | Financial Statement Exceptions |
| Schedule 4.10 | Compliance with Laws |
| Schedule 4.12.1 | Tax Returns |
| Schedule 4.12.3 | Tax Deficiencies |
| Schedule 4.12.5 | Tax Liens |
| Schedule 4.12.6 | Tax Waivers or Extensions |
| Schedule 4.13.1 | Employee List |
| Schedule 4.13.5 | Proceedings  Relating to Employee Benefit Plan |
| Schedule 4.13.6 | Employee Benefit Plan/No Material Liability or Encumbrance under Title IV of ERISA |
| Schedule 4.13.8 | Welfare Benefits |
| Schedule 4.13.9 | Contributions to Seller Employee Benefit Plan |
| Schedule 4.13.12 | No Threatened Labor Stoppage |
| Schedule 4.14.1 | Material Contracts |
| Schedule 4.14.2 | Default/Post-Petition Contracts |
| Schedule 4.15 | Environmental Matters |
| Schedule 4.16 | Insurance Policies |
| Schedule 9.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |

114

| Schedule 9.9.1.B | Steering Excluded Products |
|---|---|
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| Schedule 9.12 | Letters of Credit |
| Schedule 9.20.1(i) | Mexico LTA – Rio Bravo Electricos S.A. de C.V. |
| Schedule 9.20.1(ii) | Mexico LTA – Alambrados y Circuitos Electricos, S.A. de C.V. |
| Schedule 9.20.3(iii) | Mexico LTA – Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V. |
| Schedule 9.20.2 | Post-Closing Mexico Utility Contracts |

Exhibits

| 1.2 | Operating Agreement |
|---|---|
| 3.1.1.F | Wind Up Costs |
| 9.9.1 | GM IP License Agreement |
| 9.9.3 | Company IP License Agreement |
| 9.9.4 | Pending Transaction IP License Agreement |
| 9.22 | Novation Letter |
| 9.29 | Form of Privilege Waivers |
| 11.2.1.A | Somerton, Australia Transfer and Variation of Lease (Assignment and Assumption Agreement) |
| 11.2.1.B | Paris Technical Center Sublease |
| 11.2.1.C | Casa Grande Sublease |
| 11.2.2.A.1 | U.S. Patent Assignment (Delphi Technologies) |
| 11.2.2.A.2 | EP Jointly Held Patent Applications Assignment (Delphi Technologies) |
| 11.2.2.A.3 | EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies) |
| 11.2.2.A.4 | DE Patents Assignment (Delphi France) |
| 11.2.2.A.5 | ES Patents Assignment (Delphi France) |
| 11.2.2.A.6 | FR Patents Assignment (Delphi France) |
| 11.2.2.A.7 | GB Patents Assignment (Delphi France) |
| 11.2.2.A.8 | IT Patents Assignment (Delphi France) |
| 11.2.2.A.9 | U.S. Patent Assignment (Delphi France) |

115

| | |
|---|---|
| 11.2.2.A.10 | AU Patent Assignment (Delphi Technologies) |
| 11.2.2.A.11 | BR Patent Assignment (Delphi Technologies) |
| 11.2.2.A.12 | CN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.13 | HK Patent Assignment (Delphi Technologies) |
| 11.2.2.A.14 | IN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.15 | JP Patent Assignment (Delphi Technologies) |
| 11.2.2.A.16 | KP Patent Assignment (Delphi Technologies) |
| 11.2.2.B | Omnibus Trademark Assignment (Delphi Technologies) |
| 11.2.2.C | Copyright Assignment (Delphi Technologies) |
| 11.2.3.A | France Asset Sale Agreement* |
| 11.2.3.B | Australia Asset Sale Agreement* |
| 11.2.3.C | India Asset Sale Agreement* |
| 11.2.3.D | Germany Asset Sale Agreement* |
| 11.2.3.E | Italy Asset Sale Agreement* |
| 11.2.3.F | Korea Asset Sale Agreement* |
| 11.2.3.G | Japan Asset Sale Agreement* |
| 11.2.3.H | Netherlands Asset Sale Agreement |
| 11.2.7 | GM/Delphi Seller Transition Services Agreement |
| 11.3.2 | Buyers Transition Services Agreement |

[Remainder of the page left intentionally blank.]

116

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION


By: _____
    Name:
    Title:


GM COMPONENTS HOLDINGS, LLC


By: _____
    Name:
    Title:


GENERAL MOTORS CORPORATION (solely with respect to ARTICLE 6 and Sections 9.11.1, 9.19,  AND 9.38)


By: _____
    Name:
    Title:


PARNASSUS HOLDINGS II, LLC


By: _____
    Name:
    Title:

## **SCHEDULES**

| | |
|---|---|
| Schedule 1 | Detail of Sellers and GM Buyers |
| Schedule 1.1.A | Assumed Administrative Liabilities |
| Schedule 1.1.B | GM Buyers' Knowledge, Company Buyers' Knowledge and Sellers' Knowledge |
| Schedule 1.1.C | Steering Products |
| Schedule 1.1.D | Excluded Insurance Policies |
| Schedule 1.1.D.1 | Patents |
| Schedule 1.1.D.2 | Trademark Rights |
| Schedule 1.1.D.3 | Copyrights |
| Schedule 1.1.E | Transferred Insurance Policies |
| Schedule 1.1. F | Filing Affiliates |
| Schedule 2 | Detail of Sellers and Company Buyer |
| Schedule 2.1.5.F | Excluded Facilities |
| Schedule 2.1.5.J | Pending Transactions |
| Schedule 2.1.5.K | Other Excluded Assets |
| Schedule 2.3.1 | Administrative Claims |
| Schedule 4.3.1 | Sale Companies and JV Companies |
| Schedule 4.3.2 | Capital Stock |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6.2 | Licenses to Affiliates |
| Schedule 4.6.3 | Infringement and Allegations of Infringement of Third Party Intellectual Property |
| Schedule 4.6.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.6.5 | Intellectual Property Notices |
| Schedule 4.8.1 | GM Leased Real Property |
| Schedule 4.8.2 | GM Owned Real Property |
| Schedule 4.9.1 | Historical Financial Statements |
| Schedule 4.9.2 | Financial Statement Exceptions |

118

| | |
|---|---|
| Schedule 4.10 | Compliance with Laws |
| Schedule 4.12.1 | Tax Returns |
| Schedule 4.12.3 | Tax Deficiencies |
| Schedule 4.12.5 | Tax Liens |
| Schedule 4.12.6 | Tax Waivers or Extensions |
| Schedule 4.13.1 | Employee List |
| Schedule 4.13.2 | Employee Benefit Plans |
| Schedule 4.13.4 | ERISA Compliance |
| Schedule 4.13.5 | Proceedings  Relating to Employee Benefit Plan |
| Schedule 4.13.6 | Employee Benefit Plan/No Material Liability or Encumbrance under Title IV of ERISA |
| Schedule 4.13.8 | Welfare Benefits |
| Schedule 4.13.9 | Contributions to Seller Employee Benefit Plan |
| Schedule 4.13.11 | Collective Bargaining Agreements |
| Schedule 4.13.12 | No Threatened Labor Stoppage |
| Schedule 4.14.1 | Material Contracts |
| Schedule 4.14.2 | Default/Post-Petition Contracts |
| Schedule 4.15 | Environmental Matters |
| Schedule 4.16 | Insurance Policies |
| Schedule 9.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 9.3 | Assumed and Assigned Contracts |
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |
| Schedule 9.9.1.B | Steering Excluded Products |
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| Schedule 9.12 | Letters of Credit |
| Schedule 9.13.1 | Competition Clearance/Governmental Approvals |
| Schedule 9.17 | Other Services |
| Schedule 9.20.1(i) | Mexico LTA – Rio Bravo Electricos S.A. de C.V. |
| Schedule 9.20.1(ii) | Mexico LTA – Alambrados y Circuitos Electricos, S.A. de C.V. |
| Schedule 9.20.1(iii) | México LTA – Delphi Ensamble de Cables y Componentes, S. de |

R.L. de CV.

Schedule 9.20.2          Post-Closing Mexico Utility Contracts

Schedule 10.1.2          Approvals under Competition or Investment Law

## EXHIBITS

| | |
|---|---|
| **Exhibit 1.2** | **Operating Agreement** |
| **Exhibit 3.1.1.F** | **Wind Up Costs** |
| **Exhibit 9.9.1** | **GM IP License Agreement** |
| **Exhibit 9.9.3** | **Company IP License Agreements** |
| **Exhibit 9.9.4** | **Pending Transactions IP License Agreement** |
| **Exhibit 9.22** | **Novation Letter** |
| **Exhibit 9.29.A** | **Form of Environmental Privilege Waivers** |
| **Exhibit 9.29.B** | **Form of Privilege Waivers** |
| **Exhibit 11.2.1.A** | **Somerton, Australia Assignment and Assumption Agreement** |
| **Exhibit 11.2.1.B** | **Paris Technical Center Sublease** |
| **Exhibit 11.2.1.C** | **Casa Grande Sublease** |
| **Exhibit 11.2.2.A.1** | **U.S. Patent Assignment (Delphi Technologies)** |
| **Exhibit 11.2.2.A.2** | **EP Jointly Held Patent Applications Assignment (Delphi Technologies)** |
| **Exhibit 11.2.2.A.3** | **EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies)** |
| **Exhibit 11.2.2.A.4** | **DE Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.5** | **ES Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.6** | **FR Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.7** | **GB Patents Assignment (Delphi France)** |
| **Exhibit11.2.2.A.8** | **IT Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.9** | **U.S. Patent Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.10** | **AU Patent Assignment (Delphi Technologies)** |
| **Exhibit 11.2.2.A.11** | **BR Patent Assignment (Delphi Technologies)** |
| **Exhibit 11.2.2.A.12** | **CN Patent Assignment (Delphi Technologies)** |

121

**Exhibit 11.2.2.A.13**    **HK Patent Assignment (Delphi Technologies)**

**Exhibit 11.2.2.A.14**    **IN Patent Assignment (Delphi Technologies)**

**Exhibit 11.2.2.A.15**    **JP Patent Assignment (Delphi Technologies)**

**Exhibit 11.2.2.A.16**    **KP Patent Assignment (Delphi Technologies)**

**Exhibit 11.2.2.B**    **Omnibus Trademark Assignment (Delphi Technologies)**

**Exhibit 11.2.2.C**    **Copyright Assignment (Delphi Technologies)**

**Exhibit 11.2.3.A**    **France Asset Sale Agreement**

**Exhibit 11.2.3.B**    **Australia Asset Sale Agreement**

**Exhibit 11.2.3.C**    **India Asset Sale Agreement**

**Exhibit 11.2.3.D**    **Germany Asset Sale Agreement**

**Exhibit 11.2.3.E**    **Italy Asset Sale Agreement**

**Exhibit 11.2.3.F**    **Korea Asset Sale Agreement**

**Exhibit 11.2.3.G**    **Japan Asset Sale Agreement**

**Exhibit 11.2.3.H**    **Netherlands (Poland) Share Transfer Agreement**

**Exhibit 11.2.4**    **GM Bill of Sale**

**Exhibit 11.2.5**    **GM Assignment and Assumption Agreement**

**Exhibit 11.2.7**    **GM and Delphi Seller Transition Services Agreement**

**Exhibit 11.3.2**    **Buyer Transition Services Agreement**

**Exhibit 11.3.3**    **Seller Transition Services Agreement**

**Exhibit 11.3.4**    **Company Bills of Sale**

**Exhibit 11.3.5**    **Company Assignment and Assumption Agreements**

**Exhibit 11.4.2**    **Form of Quit Claim Deeds**

Rev. 05/27/09

## SCHEDULE 1.1.F*

## FILING AFFILIATES

### Entity Name and State of Incorporation/Formation

ASEC Manufacturing General Partnership (Delaware)
ASEC Sales General Partnership (Delaware)
Aspire, Inc. (Michigan)
Delco Electronics Overseas Corporation (Delaware)
Delphi Automotive Systems (Holding), Inc. (Delaware)
Delphi Automotive System Global (Holding), Inc. (Delaware)
Delphi Automotive Systems Human Resources LLC (Delaware)
Delphi Automotive Systems International, Inc. (Delaware)
Delphi Automotive Systems Korea, Inc. (Delaware)
Delphi Automotive Systems LLC
Delphi Automotive Systems Overseas Corporation ( Delaware)
Delphi Automotive Systems Risk Management Corp. (Delaware)
Delphi Automotive Systems Services LLC (Delaware)
Delphi Automotive Systems Tennessee, Inc. (Delaware)
Delphi Automotive Systems Thailand, Inc. (Delaware)
Delphi China LLC (Delaware)
Delphi Connection Systems (California)
Delphi Corporation
Delphi Diesel Systems Corp. (Delaware)
Delphi Electronics (Holding) LLC (Delaware)
Delphi Foreign Sales Corporation (Virgin Islands)
Delphi Furukawa Wiring Systems LLC (Delaware) (80%)
Delphi Integrated Service Solutions (Michigan)
Delphi International Holdings Corp. (Delaware)
Delphi International Services, Inc. (Delaware)
Delphi Liquidation Holding Company (Delaware)
Delphi LLC (Delaware)
Delphi Mechatronic Systems, Inc. (Delaware)
Delphi Medical Systems Colorado Corporation (Colorado)
Delphi Medical Systems Corporation (Delaware)
Delphi Medical Systems Texas Corporation (Delaware)
Delphi NY Holding Corporation (New York)
Delphi Receivables LLC
Delphi Services Holding LLC, fka Delphi Services Holding Corporation
(Delaware)
Delphi Technologies, Inc. (Delaware)
DREAL, Inc. (Delaware)
Environmental Catalysts, LLC (Delaware)
Exhaust Systems Corporation (Delaware)
MobileAria, Inc. (71.2%)
Packard Hughes Interconnect Company (Delaware)

**DELPHI CONFIDENTIAL**
*Not limited to Steering Business

**Rev. 05/27/09**

## SCHEDULE 1.1.F*

## FILING AFFILIATES

Specialty Electronics International Ltd. (Virgin Islands)
Specialty Electronics, Inc. (South Carolina)

**DELPHI CONFIDENTIAL**
*Not limited to Steering Business

Rev. 5/28/09

## SCHEDULE 4.13.4
## ERISA COMPLIANCE

See Schedule 4.13.6

**DELPHI CONFIDENTIAL**

**Rev. 06/04/09**

### SCHEDULE 9.13.1

### COMPETITION CLEARANCE/GOVERNMENT APPROVALS

A.    GM Transaction

     1.    United States

     2.    China – done

     3.    South Korea

     4.    Europe – update to earlier filing

     5.    Brazil – new filing

     6.    Mexico

     7.    Australia - done

B.    Platinum Transaction

     1.    Brazil

     2.    Canada

     3.    China

     4.    Columbia

     5.    EU

     6.    Mexico

     7.    Russia

     8.    South Korea

     9.    Turkey

     10.    Ukraine

     11.    United States

Rev. 05/29/09

**SCHEDULE 9.17**

**OTHER SERVICES**

Products/Services included within Section 9.17
Equipment Leases
IT and telecommunication service providers
Electric, Gas, Water and Utility services
Medical services
Transportation and Logistics services
Warehousing services
Facilities Services
Cafeteria Services
Wastewater Services
Security Services
Cleaning Services
Mail Services
Maintenance Services
Uniform Services
Cell Phones
Credit cards
Contract House/Placement services
Office supplies

Products/Services excluded from Section 9.17
Treasury Services
Risk Management and insurance services
Life and Disability related services
Customs Services
Insurance services
Expatriate related services
Legal Services
Tax Services
Marketing and advertising
Political Action Committee services
Financial and Accounting services

**DELPHI CONFIDENTIAL**

**Rev. 05/9/09**

## SCHEDULE 10.1.2

## APPROVALS UNDER COMPETITION OR INVESTMENT LAW

See Schedule 9.13.1

**DELPHI CONFIDENTIAL**

6/8/09

## EXHIBIT 11.2.5

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "**Agreement**") is made as of _____, **2009**, by and among **GM COMPONENTS HOLDINGS, LLC,** a Delaware limited liability company (the "**GM Buyer**"), on the one hand, and **DELPHI CORPORATION,** a Delaware corporation, on behalf of Filing Affiliates that are parties to Acquired Contracts to be assigned to GM Asset Buyers (collectively, "**Delphi**") on the other hand, pursuant to that certain **Master Disposition Agreement**, dated **June 1, 2009** by and among Delphi, GM Buyer and Company Buyer (as the same may be amended from time to time, the "**Disposition Agreement**").  Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to them in the Disposition Agreement.

## RECITALS:

**WHEREAS,** on October 8, 2005, Seller filed a voluntary petition for reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended, in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS,** pursuant to that certain order entered by the Bankruptcy Court on _____, 2009 (the "**Modification Approval Order**"), approving, among other things, the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (the "**Modified Plan**") and the Disposition Agreement, which provides for: (i) the sale of certain of Delphi's assets comprising substantially all of the Business free and clear of liens, claims and encumbrances; (ii) the assumption and assignment of certain executory contracts and unexpired leases; and (iii) the assumption of certain liabilities;

**WHEREAS,** pursuant to the provisions of the Disposition Agreement: (i) Delphi is concurrently herewith selling, conveying, transferring, assigning and delivering to GM Buyer and GM Buyer is concurrently herewith purchasing and accepting from Delphi, all of Delphi's right, title and interest in and to the Acquired Contracts; and (ii) Delphi is concurrently herewith assigning, transferring and setting over and GM Buyer is assuming the obligations to be performed under the Acquired Contracts, in each case, to the extent provided in the Disposition Agreement (the "**Acquired Contracts Liabilities**"); and

**WHEREAS,** (i) Delphi desires to assign its interest in and to the Acquired Contracts and Acquired Contracts Liabilities to GM Buyer as set forth in the Disposition Agreement; and (ii) GM Buyer shall acquire and assume the interests and obligations in and to the Acquired Contracts and Acquired Contracts Liabilities as set forth in the Disposition Agreement.

## AGREEMENT:

**NOW, THEREFORE,** in consideration of the premises set forth above and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1

1.      Delphi has assumed the Acquired Contracts pursuant to the Disposition Agreement, as approved in the Modification Approval Order and Delphi hereby irrevocably sells, conveys, transfers, assigns and delivers to GM Buyer all of Delphi's right, title and interest in and to the Acquired Contracts to the extent provided in the Disposition Agreement, provided however, that as set forth more fully in Section 9.3 of the Disposition Agreement, GM Buyer shall pay the related Cure Amounts.

2.      GM Buyer hereby irrevocably: (i) accepts the sale, conveyance, transfer, assignment and delivery of the Acquired Contracts pursuant to the Disposition Agreement; and (ii) assumes the Acquired Contracts Liabilities.

3.      GM Buyer and Delphi agree that this Agreement is subject to the terms and conditions of the Disposition Agreement, including without limitation the representations, warranties, covenants, exclusions and indemnities set forth therein, and that this Agreement shall not be deemed to limit, enlarge or extinguish any obligation of GM Buyer or Delphi under the Disposition Agreement, all of which obligations shall survive the delivery of this Agreement in accordance with the terms of the Disposition Agreement. In the event of any inconsistency between the terms and conditions of this Agreement and those of the Disposition Agreement, the terms and conditions of the Disposition Agreement will govern and control.  Delphi does not make any representation or warranty, whether express or implied, herein with respect to the Acquired Contracts or Acquired Contracts Liabilities.

4.      Delphi hereby appoints GM Buyer, its successors and permitted assigns, the true and lawful attorney, irrevocably, of Delphi with full power of substitution, in the name of Delphi or otherwise, and on behalf of and for the benefit of GM Buyer, its successors and permitted assigns: (a) to enforce the Acquired Contracts hereby assigned or intended so to be and to give receipts, releases and acquittances for and in respect to the same or any part thereof; and (b) from time to time to institute, prosecute, compromise and settle as such party's assignee, any and all proceedings at law, in equity or otherwise, which GM Buyer, its successors and permitted assigns may deem proper to collect, assert or enforce any claim, title or right hereby assigned or intended to so be, that GM Buyer, its successors and permitted assigns may deem desirable; *provided, however*, that except as may be set forth in the Disposition Agreement, any actions taken by GM Buyer, its successors and permitted assigns pursuant to the foregoing appointment shall be at GM Buyer's sole cost and expense without liability to Delphi. Delphi hereby acknowledges that the appointment hereby made and the powers hereby granted are coupled with an interest and are not and shall not be revocable by it in any manner or for any reason.

5.      This Agreement shall be binding upon the Parties hereto and their respective successors and permitted assigns and shall inure to the benefit of, and be enforceable by, the Parties hereto and their respective successors and permitted assigns.

6.      No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in a writing specifically referencing this Agreement and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time.

7.      This Agreement shall be construed by and governed in accordance with the Laws of the State of New York, without giving effect to any choice of law or conflict of law

GM ASSIGNMENT & ASSUMPTION AGR

6/8/09

provision or rule that would cause the application of the Laws of any jurisdiction other than the State of New York.

8.      The Parties irrevocably and unconditionally submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

9.      Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term of provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

10.     The headings and subheadings of this Agreement are inserted for convenience of reference only and shall not affect the interpretation of this Agreement.

11.     This Agreement may be executed in one or more counterparts for the convenience of the parties hereto, all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** this Agreement has been duly executed and delivered by the duly authorized officers of Delphi and GM Buyer as of the date and year first written above.

**GM COMPONENTS HOLDINGS, LLC**

Executed on _____, **2009**                    By:_____
                                                   Name:
                                                   Title:

**DELPHI CORPORATION**

Executed on _____, **2009**                   By:_____
                                                   Name:
                                                   Title:

GM ASSIGNMENT & ASSUMPTION AGR

**EXHIBIT 11.4.2**

## QUIT CLAIM DEED

**KNOW ALL MEN BY THESE PRESENTS:  That Delphi Automotive Systems LLC,** a Delaware limited liability company ("**Grantor**"), whose address is 5725 Delphi Drive, Troy, Michigan 48098, for good and valuable consideration, quit claims to _____**,** a _____corporation ("**Grantee**"), whose address is _____, all of its right, title and interest in and to the following described premises situated in the Township of Buena Vista, County of Saginaw and State of Michigan, to-wit:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

together with all improvements thereon and claims to water, tenements, hereditaments, appurtenances and all rights and interests whatsoever therein or related thereto. Because the transaction contemplated by this Quit Claim Deed has been authorized pursuant to an Order of the United States Bankruptcy Court for the Southern District of New York under a chapter 11 plan of Grantor in the matter entitled [_____, Case No. _____], this conveyance is exempt from transfer taxes, stamp taxes, or any other similar taxes pursuant to 11 U.S.C. § 1146(c).

The Grantor further grants to the Grantee the right to make any and all divisions under Section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967, as amended.

This Property may be located within the vicinity of farmland or a farm operation. Generally accepted agriculture and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

Dated this _____ day of _____, **2009**.

**DELPHI AUTOMOTIVE SYSTEMS LLC,**
a Delaware limited liability company

By: _____

Print Name: _____

Its:    Authorized Signatory

STATE OF MICHIGAN          §
                          §
COUNTY OF OAKLAND         §

The foregoing instrument was acknowledged before me this _____ day of _____, 2009 by _____, the Authorized Signatory of Delphi Automotive Systems LLC.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _____ day of _____, 2009.

_____

Notary Public, State of Michigan, County of _____

My commission expires: _____

**When Recorded Return To:**                    **Drafted by:**

Sean P. Corcoran, Esquire
Delphi Automotive Systems
5725 Delphi Drive
MC:  483-400-603
Troy, MI  48098

**Send Subsequent Tax Bills To:** Grantee

Tax Parcel #_____ Recording Fee _____ Revenue Stamps _____

## EXHIBIT "A"
## LEGAL DESCRIPTION

Land situated in the Township of Buena Vista, Saginaw County, Michigan, described as follows:

A part of the East 3/4 of the South 1/2 of Section 28, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows:  To fix the point of beginning: COMMENCE at the Southeast corner of Section 28; thence North 00°30'30" West, on the East line of said Section, 4.52 feet to the Northerly line of the Chesapeake and Ohio Railroad right-of-way; thence North 77°44'30" West, on said Northerly line, 64.59 feet to the point of beginning of this description; thence North 00°30'30" West, on a line which is parallel to and 63.00 feet, measured at right angles, West of said East Section line, 2,606.85 feet to the East and West 1/4 line of said Section; thence North 90°00'00" West, on said 1/4 line, 1,970.65 feet; thence South 00°42'43" West, 50.00 feet; thence North 90°00'00" West, parallel to said East and West 1/4 line, 388.81 feet; thence North 00°42'43" West, 50.00 feet; thence North 90°00'00" West, on said East and West 1/4 line, 144.01 feet to the centerpost of said Section; thence South 00°42'43" West, on the North and South 1/4 line, 100.01 feet; thence North 90°00'00" West, 99.01 feet; thence South 00°42'43" West, 16.68 feet; thence South 89°58'13" West, 68.13 feet to the point of curvature of a curve of a 365.74 foot radius curve to the left; thence Southwesterly along the arc of said curve, 405.92 feet to the point of tangency of said curve, said arc being subtended by a chord bearing South 58°10'31.5" West, 385.40 feet to said point of tangency; thence South 26°22'50" West, 989.25 feet to the point of curvature of a 879.93 foot radius curve to the left; thence Southwesterly along the arc of said curve, 324.46 feet to the point of tangency of said curve, said arc being subtended by a chord bearing South 15°49'01.5" West, 322.63 feet to said point of tangency; thence South 05°15'13" West, 222.23 feet; thence South 00°17'13" West, 92.02 feet to the Northerly line of the Chesapeake and Ohio Railroad right-of-way; thence South 77°44'30" East, on said Northerly right-of way line, 3,654.26 feet to the point of beginning.

Also, a part of the East 3/4 of the South 1/2 of Section 28 and a part of the East 3/4 of the North 1/2 of Section 33, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix the point of beginning:  COMMENCE at the Northeast corner of said Section 33 which is also the Southeast corner of said Section 28; thence South 00°43'00" West, on the East line of Section 33, 97.54 feet to the Southerly line of the Chesapeake and Ohio Railroad right-of-way; thence North 77°44'30" West, on said Southerly right-of-way line, 64.30 feet to the point of beginning of this description; thence South 00°43'00" West, on a line which is parallel with and 63.00 feet, measured at right angles, West of said East Section line, 2,468.71 feet; thence North 89°56'00" West, on a line which is parallel to and 75.50 feet, measured at right angles, North of the East and West 1/4 line of Section 33, 907.00 feet; thence North 00°43'00" East, on a line which is parallel to and 970.00 feet, measured parallel to said East and West 1/4 line, West of said East line of Section 33, 10.50 feet; thence North 89°56'00" West, on a line which is parallel to and 86.00 feet, measured at right angles, North of said East and West 1/4 line, 1,479.72 feet to the point of curvature of a curve to the right having a radius of 630.20 feet; thence Northwesterly on the arc of said curve to the right being a line which is concentric to and 86.00 feet, measured radially, Northeasterly of the centerline of Hess Road relocated, 180.40 feet to a point on the North and South 1/4 line of said Section 33, said arc being subtended by a chord bearing North 81°43'58" West, 179.78 feet to said point; thence South 00°51'00" West, on said North and South 1/4 line, 88.85 feet to a point

on the centerline of Hess Road relocated which is North 00°51'00" East, 22.80 feet from the centerpost of said Section 33; thence Northwesterly 170.75 feet along said centerline of Hess Road relocated and the arc of a curve to the right to the point of tangency, said curve having a radius of 716.78 feet, said arc being subtended by a chord bearing North 68°37'20" West, 170.34 feet to said point of tangency; thence North 61°47'52" West, along said centerline, 317.26 feet to the point of curvature of a curve to the left having a radius of 716.78 feet; thence Northwesterly along the arc of said curve, 227.34 feet to a point on the West line of the East 1/2 of the East 1/2 of the Northwest 1/4 of said Section 33, said arc being subtended by a chord bearing North 70°53'02.5" West, 226.39 feet to said point; thence North 00°54'40" East, along said line, 50.59 feet to a point on the arc of a 766.78 foot radius curve to the left; thence Westerly, along the arc of said curve to the left, 99.42 feet to a point on said arc, said arc being subtended by chord bearing North 83°56'46.2" West, 99.35 feet to said point, thence North 00°54'40" East, 25.00 feet to a point on the arc of a 791.78 foot radius curve to the left; thence Westerly, along the arc of said 791.78 foot radius curve to the left, 26.27 feet to the point of tangency, said arc being subtended by chord bearing North 88°58'58" West, 26.27 feet to said point of tangency; thence North 89°56'00" West, along the North line of relocated Hess Road, 232.78 feet to the Easterly right-of-way of Highway I-75; thence Northerly along the arc of a 3,744.83 foot radius curve to the right, 148.53 feet to the point of tangency of said curve, said arc being subtended by a chord bearing North 00°51'10.6" West, 148.53 feet to said point of tangency; thence North 00°17'00" East, along the East line of Highway I-75, 2,098.62 feet to the North line of said Section 33; thence continuing North 00°17'00" East, on said East line and into Section 28 aforesaid, 357.32 feet; thence North 51°15'33" East, 39.90 feet; thence North 00°17'00" East, 290.64 feet to the Southerly line of the Chesapeake and Ohio Railroad right-of-way; thence South 77°44'30" East, on said right-of-way line, 1,157.91 feet; thence South 65°49'30" East, continuing along said right-of-way line, 290.58 feet; thence South 77°44'30" East, on said right-of-way line, 1,522.35 feet; thence South 85°05'30" East, on said right-of-way line, 468.78 feet; thence South 77°44'30" East, on said right-of-way line, 216.64 feet to the point of beginning.

Exhibit 7.9

Post-Confirmation Reorganized DPH Holdings
Share Trust Agreement

[To be filed on or before the Exhibit Filing Date]

Exhibit 7.11

Management Compensation Plan

[To be filed on or before the Exhibit Filing Date]

Exhibit 7.17

Delphi-PBGC Settlement Agreement

[To be filed on or before the Exhibit Filing Date]

Exhibit 7.19

Retained Causes Of Action

[To be filed on or before the Exhibit Filing Date]

Exhibit 8.1(a)

Executory Contracts And Unexpired Leases To Be Rejected

[To be filed on or before the Exhibit Filing Date]

Exhibit 10.5

Administrative Claim Request Form

[To be filed on or before the Exhibit Filing Date]