# **<u>EXHIBIT A</u>**

**Confidential Treatment Requested by General Motors Corporation Pursuant to the Freedom of Information Act**

EXECUTION VERSION

## AMENDED & RESTATED GM-DELPHI AGREEMENT

**AMENDED & RESTATED GM-DELPHI AGREEMENT**, dated as of June 1, 2009, among DELPHI CORPORATION, a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), the subsidiaries of the Borrower signatory hereto (each a "Guarantor" and collectively the "Guarantors"), each of which Guarantors is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Borrower and the Guarantors, each a "Case" and collectively, the "Cases"), and GENERAL MOTORS CORPORATION ("GM").

## RECITALS:

**WHEREAS**, on October 8, 2005, the Borrower and the Guarantors filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower, the Guarantors hereunder and certain financial institutions from time to time party thereto (the "DIP Lenders") and JPMorgan Chase Bank, N.A., as administrative agent for the DIP Lenders have previously entered into (i) that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of November 20, 2007 (as amended through April 22, 2009 and as such may be further amended, modified, refinanced or replaced from time to time, in each case, except upon the effectiveness of a Reorganization Plan, the "DIP Credit Agreement") and (ii) the Accommodation Agreement (as defined herein);

**WHEREAS**, in connection with the Master Restructuring Agreement and the Global Settlement Agreement, the Borrower requested, and GM agreed, to make certain funds available to the Borrower as more particularly described in that certain Agreement, dated as of May 9, 2008 (as amended by Amendment No. 1, effective as of October 6, 2008, Amendment No. 2, effective as of December 12, 2008 and Amendment No. 3, effective as of January 30, 2009 and as may have been further amended, modified, refinanced or replaced from time to time, the "Original GM-Delphi Agreement");

**WHEREAS**, pursuant to the Original GM-Delphi Agreement, GM provided financial accommodations to the Borrower on the terms and conditions set forth therein;

**WHEREAS**, the Guarantors agreed to guarantee the obligations of Borrower under the Original GM-Delphi Agreement;

**WHEREAS**, in connection with the Sale Transactions (as defined herein), the Borrower has requested, and GM has agreed to provide, additional debtor-in-possession loans in an aggregate amount not to exceed the Tranche C Commitment (as defined herein) pursuant to and in accordance with the terms and conditions set forth herein; and

**WHEREAS**, the Guarantors have agreed to continue to guarantee the obligations of the Borrower under this Agreement; and

**WHEREAS**, GM, the Borrower and the Guarantors have agreed to amend and restate the terms of the Original GM-Delphi Agreement in its entirety in the manner set out in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01.   Defined Terms.** Capitalized terms that are not otherwise defined herein shall have the meaning set forth in the DIP Credit Agreement, including as set forth in Section 8.14.

"363 Sale Implementation Agreement" has the meaning set forth in the Sale Agreement; provided that such agreement shall be on the terms and conditions set forth in section 9.2 of the Sale Agreement and such other terms as may be agreed by the parties thereto, and provided in any event that such agreement shall be in form and substance satisfactory to GM and the Company Buyer (as defined in the Sale Agreement).

"Accommodation Agreement" shall mean that certain Accommodation Agreement, dated December 12, 2008, as amended through May 7, 2009, and as may be further amended, modified, or replaced from time to time; *provided*, that, in the event such agreement is amended or otherwise modified in a manner adverse to GM, the definitions and other references to the Accommodation Agreement herein shall be deemed references to such agreement without giving effect to any such amendment or modification.

"Accommodation Approval Order" shall mean that certain order of the Bankruptcy Court entered on December 3, 2008 approving the Accommodation Agreement.

"Accommodation Default" shall have the meaning set forth in the Accommodation Agreement.

"Adjusted DIP Pricing" shall have the meaning set forth in Section 2.05(a).

"Administrative Claims" shall have the meaning set forth in Section 2.11.

"Advance" shall mean any (i) Tranche A Advance, (ii) Tranche B Advance or (iii) Tranche C Advance, as the context may require.

"Advance Request" shall mean a written request executed and delivered by the Borrower for an Advance in accordance with Section 2.02.

"Affiliates" shall have the meaning set forth in the Global Settlement Agreement.

"Agreement" shall mean this Amended and Restated GM-Delphi Agreement, dated as of June 1, 2009,  as may be amended, supplemented or otherwise modified from time to time.

"Approval Order" shall have the meaning set forth in Section 4.04(e).

"Automatic Accommodation Termination Default" shall have the meaning set forth in the Accommodation Agreement.

"Borrower" shall have the meaning set forth in the preamble to this Agreement.

"Case" and "Cases" shall have the meaning set forth in the preamble to this Agreement.

"Commitment" shall mean (i) the Tranche A Commitment, (ii) the Tranche B Commitment or (iii) the Tranche C Commitment, as the context may require.

"DIP Agent" shall mean "Administrative Agent" as defined in the DIP Credit Agreement.

"DIP Credit Agreement" shall have the meaning set forth in the recitals to this Agreement.

"DIP Extension Order" shall have the meaning set forth in the Original GM-Delphi Agreement.

"DIP Lenders" shall have the meaning set forth in the recitals to this Agreement.

"DIP Termination Date" shall mean the date on which the commitments under the DIP Credit Agreement have been terminated, the Borrower's obligations thereunder (other than contingent obligations for which no demand has been made) have been paid in full and any outstanding Letters of Credit have been cash collateralized or backstopped by other letters of credit in accordance with the DIP Credit Agreement, whether pursuant to a Reorganization Plan or otherwise (other than pursuant to a refinancing or replacement, except upon the effectiveness of a Reorganization Plan, of the DIP Credit Agreement).

"Event of Default" shall have the meaning set forth in Section 6.01.

"Existing Confirmed Plan" shall mean the First Amended Joint Plan of Reorganization of the Borrower and certain affiliates, debtors and debtors-in-possession, as modified, which was confirmed by order of the United States Bankruptcy Court for the Southern District of New York entered January 25, 2008 (docket no. 12359).

"Existing Plan" means the Reorganization Plan and Disclosure Statement filed by Delphi in the United States Bankruptcy Court for the Southern District of New York on October 3, 2008.

"Final Solicitation Order" shall have the meaning set forth in Section 4.04(d).

"Global Settlement Agreement" shall mean that certain Amended and Restated Global Settlement agreement between the Borrower and GM dated September 12, 2008.

"GM" shall have the meaning set forth in the preamble to this Agreement.

"GM-Delphi Pull-Forward Agreement" shall mean the Partial Temporary Accelerated Payment Agreement, dated as of December 12, 2008, by and between the Borrower, on behalf of itself and its subsidiaries and Affiliates operating as debtors and debtors in possession in the Cases, and GM, as amended by the First Amendment to the GM-Delphi Pull-Forward Agreement, dated as of January 20, 2009.

"GM-Related Parties" shall have the meaning set forth in the Global Restructuring Agreement.

"Guarantor" and "Guarantors" shall have the meaning set forth in the preamble to this Agreement.

"Indemnitee" shall have the meaning set forth in Section 8.04(b).

"Interest Payment Date" shall mean the last day of each March, June, September and December, commencing on September 30, 2008.

"Interim Approval Order" shall have the meaning set forth in Section 4.01(f).

"Loan" and "Loans" shall have the meaning set forth in Section 2.01(c).

"Master Restructuring Agreement" shall mean that certain Amended and Restated Master Restructuring Agreement between the Borrower and GM dated September 12, 2008.

"Minimum Liquidity Amount" shall have the meaning set forth in the Accommodation Agreement.

"Modified Reorganization Plan" shall mean the Existing Plan modified in form and substance in a manner reasonably acceptable to GM and providing for, among other things, the Sales Transactions.

"Obligations" shall mean the (i) Tranche A Obligations, (ii) Tranche B Obligations and (iii) Tranche C Obligations.

"Original GM-Delphi Agreement" shall have the meaning set forth in the recitals to this Agreement.

"Reorganization Plan" shall mean a chapter 11 plan of reorganization or liquidation, including any amendment thereto, in any of the Cases.

"Restricting Order" shall have the meaning set forth in Section 4.04(g).

"Sale Agreement" means that certain Master Disposition Agreement, dated June 1, 2009 by and among the Borrower, GM Components Holdings, LLC, GM (solely with respect to certain provisions as more fully described therein) and Parnassus Holdings II, LLC, in substantially the form attached hereto as Exhibit A.

"Sale Documents" means the Sale Agreement, the Ancillary Agreements (as defined in the Sale Agreement) and each of the other agreements, instruments and documents being or to be executed by Delphi in connection therewith, providing for, *inter alia*, the sale of certain assets of the Borrower and its Subsidiaries.

"Sale Order Condition" shall mean the earlier of (i) the date on which the Bankruptcy Court denies the motion to approve the Modified Reorganization Plan or the Stand Alone Sale, (ii) July 23, 2009, unless the Bankruptcy Court has entered the Sale Transactions Order by such

date or (iii) the date which is seven days after the date on which any Restricting Order is entered, if such Restricting Order has not been reversed or otherwise modified to GM's satisfaction.

"Sale Transactions" shall mean the sale of certain assets of the Borrower and its Subsidiaries pursuant to and in accordance with the terms and conditions of the Sale Agreement and the other Sale Documents.

"Sale Transactions Order" shall have the meaning set forth in Section 4.04(d).

"Second Amendment Approval Order" shall mean the "Approval Order", as defined in Amendment No. 2 to the Original GM-Delphi Agreement, effective as of December 12, 2008.

"Set-Off Right" shall mean the right of GM to set-off and apply any and all indebtedness and other liabilities at any time owing by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor against any and all of the Obligations of such Borrower or Guarantor then existing under this Agreement in accordance with Section 6.01.

"Solicitation Motion" shall have the meaning set forth in Section 4.01(j).

"Solicitation Order" shall have the meaning set forth in Section 4.01(j).

"Specified Availability" shall mean, on any date of determination, with respect to (a) Tranche A Loans, the amount by which the Tranche A Available Funds is less than $500,000,000 on such date, (b) Tranche B Loans, (i) the amount projected by the Borrower on such date to be the net use of cash by the Borrower and the Guarantors for the period commencing on such date through the next Monday or Thursday, as the case may be, *plus* (ii)(x) $25,000,000 or (y) $50,000,000 at any time when the Minimum Liquidity Amount is equal to $50,000,000 *minus* (iii) the Tranche B Available Funds as of the close of business on the Business Day immediately preceding the date of such determination and (c) Tranche C Loans, (i) the amount projected by the Borrower on such date to be the net use of cash by the Borrower and the Guarantors for the period commencing on such date through the next Monday or Thursday, as the case may be, *plus* (ii) $25,000,000 *minus* (iii) the Tranche C Available Funds as of the close of business on the Business Day immediately preceding the date of such determination.

"Specified Availability Certificate" shall mean a certificate in a form reasonably acceptable to GM signed by a Financial Officer of the Borrower, certifying (a) the amount of the Tranche B Available Funds and Tranche C Available Funds as of the close of business on the Business Day immediately preceding the date of such certificate and (b) the Specified Availability as of such date and, in each case, reflecting the calculation thereof (based on day-to-day monthly cash projections consistent with past practice).

"Stand Alone Sale" shall have the meaning set forth in Section 4.01(j).

"Subsequent Commitment" shall have the meaning set forth for the term "Subsequent Tranche C Commitment" in the DIP Credit Agreement.

"Tranche A Advance" shall mean any Tranche A Loans made pursuant to this Agreement on a single date.

"Tranche A Availability Certificate" shall have the meaning set forth in Section 4.02(a).

"<u>Tranche A Available Funds</u>" shall mean, on any date of determination, the sum of (i) all unrestricted cash and cash equivalents of the Borrower and the Guarantors (as reflected on a consolidated balance sheet of the Borrower and the Guarantors) *plus* (ii) the Available Amount (as defined under the DIP Credit Agreement on the date hereof) *plus* (iii) the GM Prepayment Reserve (as defined under the DIP Credit Agreement on the date hereof) *plus* (iv) on and after the first date on which the Subsequent Commitment becomes available to the Borrower for borrowings under the DIP Credit Agreement in accordance with the terms and conditions thereof, any unused portion of the Subsequent Commitment.

"<u>Tranche A Commitment</u>" shall mean the commitment of GM to make loans from time to time (a) prior to June 1, 2008 in an aggregate outstanding principal amount not to exceed $200,000,000, (b) from and after June 1, 2008 and prior to July 1, 2008 in an aggregate outstanding principal amount not to exceed $300,000,000 and (c) from and after July 1, 2008 in an aggregate outstanding principal amount not to exceed $650,000,000; *provided* that on and after the effectiveness of the amendments to each of the Master Restructuring Agreement and the Global Settlement Agreement referred to in <u>Section 5.03</u> of the Original GM-Delphi Agreement, such Tranche A Commitment shall be permanently reduced from time to time by the aggregate amount paid by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor from and after the Tranche A Effective Date (whether through the exercise of the Set-Off Right hereunder or otherwise paid in cash) under such agreements.

"<u>Tranche A Effective Date</u>" means May 9, 2008.

"<u>Tranche A Excess Availability</u>" shall have the meaning set forth in <u>Section 2.09(a)</u>.

"<u>Tranche A Loans</u>" shall have the meaning set forth in <u>Section 2.01(a)</u>.

"<u>Tranche A Obligations</u>" shall mean (a) the due and punctual payment of principal of and interest on (subject to the provisos to <u>Section 2.05(b)</u>) the Tranche A Loans and (b) the due and punctual payment of all other present and future, fixed or contingent, monetary obligations of the Borrower and the Guarantors to GM with respect to the Tranche A Loans under this Agreement.

"<u>Tranche A Scheduled Termination Date</u>" shall mean September 12, 2008.

"<u>Tranche A Termination Date</u>" shall mean the earlier of the Tranche A Scheduled Termination Date and the date on which Tranche A Obligations become due and payable in accordance with <u>Section 6.01</u>.

"<u>Tranche B Advance</u>" shall mean any Tranche B Loans made pursuant to this Agreement on a single date.

"<u>Tranche B Available Funds</u>" shall mean, on any date of determination, all unrestricted cash and cash equivalents of the Borrower and the Guarantors (as reflected on a consolidated balance sheet of the Borrower and the Guarantors) on such date.

"<u>Tranche B Commitment</u>" shall mean the commitment of GM to make loans from time to time (a) from and after October 1, 2008 and prior to November 1, 2008 in an aggregate outstanding principal amount not to exceed $200,000,000 and (b) from and after November 1, 2008 in an aggregate outstanding principal amount not to exceed $300,000,000.

"Tranche B Effective Date" means October 6, 2008.

"Tranche B Excess Availability" shall have the meaning set forth in Section 2.09(b).

"Tranche B Loans" shall have the meaning set forth in Section 2.01(b).

"Tranche B Obligations" shall mean (a) the due and punctual payment of principal of and interest on (subject to the provisos to Section 2.05(b)) the Tranche B Loans and (b) the due and punctual payment of all other present and future, fixed or contingent, monetary obligations of the Borrower and the Guarantors to GM with respect to the Tranche B Loans under this Agreement.

"Tranche B Scheduled Termination Date" shall mean the earliest of (a) June 30, 2009, (b) the date on which the Borrower or any Guarantor files any motion or other pleading seeking to amend or otherwise modify the Existing Plan in a manner not reasonably satisfactory to GM, (c) the DIP Termination Date, (d) the expiration or termination of the Accommodation Agreement or the Accommodation Period (as defined in the Accommodation Agreement) and (e) the date on which a Reorganization Plan becomes effective.

"Tranche B Termination Date" shall mean the earlier of the Tranche B Scheduled Termination Date and the date on which Tranche B Obligations become due and payable in accordance with Section 6.01.

"Tranche C Advance" shall mean any Tranche C Loans made pursuant to this Agreement on a single date.

"Tranche C Available Funds" shall mean, on any date of determination, all unrestricted cash and cash equivalents of the Borrower and the Guarantors (as reflected on a consolidated balance sheet of the Borrower and the Guarantors) on such date.

"Tranche C Commitment" shall mean the commitment of GM to make loans from time to time (i) from and after the Tranche C Effective Date and prior to the Tranche B Termination Date in an aggregate outstanding principal amount not to exceed $250,000,000 and (ii) from and after the Tranche B Termination Date in an aggregate principal amount not to exceed the sum of $250,000,000 *plus* the aggregate amount of any prepayments made by the Borrower to GM on and after the Tranche B Termination Date in accordance with Section 2.09(b) herein.

"Tranche C Effective Date" shall have the meaning set forth in Section 4.01.

"Tranche C Loans" shall have the meaning set forth in Section 2.01(c).

"Tranche C Obligations" shall mean (a) the due and punctual payment of principal of and interest on (subject to the provisos to Section 2.05(b)) the Tranche C Loans and (b) the due and punctual payment of all other present and future, fixed or contingent, monetary obligations of the Borrower and the Guarantors to GM with respect to the Tranche C Loans under this Agreement.

"Tranche C Scheduled Termination Date" shall mean the earliest of (a) September 30, 2009, or if pursuant to Section 12.1.2 of the Sale Agreement, the termination date of the Sale Agreement has been extended to October 30, 2009, then October 30, 2009, (b) the date on which the Borrower or any Guarantor files any motion or other pleading seeking to amend or otherwise modify the Existing Plan in a manner not satisfactory to GM (it being understood that for

purposes of this clause (b), GM shall be deemed to have consented to the motions and pleadings that are satisfactory to GM in accordance with Section 4.01(j) Section 4.04(d)), (c) the DIP Termination Date, (d) the effective date of the Modified Reorganization Plan, (e) the date on which the Sale Order Condition has occurred, (f) the date on which the Sale Agreement terminates and (g) the date on which the Sale Transactions are consummated.

"Tranche C Termination Date" shall mean the Tranche C Scheduled Termination Date.

"Weekly Cash Projection" shall mean a certificate in a form reasonably acceptable to GM signed by a Financial Officer of the Borrower, certifying the amount projected by the Borrower to be the net use of cash by the Borrower and the Guarantors for the seven-day period (including an interim projection through next Monday or Thursday, as the case may be) commencing on the date of such certificate and reflecting the calculation thereof (based on day-to-day monthly cash projections consistent with past practice).

Any reference herein to the effectiveness of the amendments to each of the Master Restructuring Agreement and the Global Settlement Agreement referred to in Section 5.03 of the Original GM-Delphi Agreement, or the date on which each of the Master Restructuring Agreement and the Global Settlement Agreement shall have become effective pursuant to Section 5.03 of the Original GM-Delphi Agreement, shall be deemed to be September 12, 2008.

## ARTICLE II
## AMOUNT AND TERMS OF ADVANCES

**Section 2.01.    Commitment**.  GM agrees, upon the terms and subject to the conditions set forth herein, to make available to the Borrower:

(a)        during the period commencing on the Tranche A Effective Date and ending on the Tranche A Termination Date, loans in an aggregate outstanding principal amount not to exceed the Tranche A Commitment (all such loans, collectively, the "Tranche A Loans"), which Tranche A Loans may be repaid and reborrowed in accordance with the provisions of this Agreement; *provided* that (a) the amount of any Tranche A Advance shall not exceed the least of (i) the unused portion of the Tranche A Commitment, (ii) without giving effect to such Tranche A Advance, the sum of (y) Specified Availability as of the close of business on the Business Day immediately preceding the date of such Tranche A Advance *plus* (z) the amount, if any, necessary to round up to the nearest minimum or integral multiple amount required by Section 2.02(a) and (iii) the aggregate amount requested by the Borrower in the applicable Advance Request in accordance with Section 2.02(a) and (b) the aggregate amount of all outstanding Tranche A Loans shall not exceed the Tranche A Commitment.  The Tranche A Commitment shall terminate immediately and without further action on the Tranche A Termination Date.

(b)        during the period commencing on the Tranche B Effective Date and ending on the Tranche B Termination Date, loans in an aggregate outstanding principal amount not to exceed the Tranche B Commitment (all such loans, collectively, the "Tranche B Loans"), which Tranche B Loans may be repaid and reborrowed in accordance with the provisions of this Agreement; *provided* that (a) the amount of any Tranche B Advance shall not exceed the least of (i) the unused portion of the Tranche B Commitment, (ii) without giving effect to such Tranche B Advance, the sum of (y) Specified Availability as of the date of the applicable Advance *plus* (z) the amount, if any, necessary to round up to the nearest minimum or integral multiple amount required by Section 2.02(a) and (iii) the aggregate amount requested by the Borrower in the

applicable Advance Request in accordance with Section 2.02(a) and (b) the aggregate amount of all outstanding Tranche B Loans shall not exceed the Tranche B Commitment. The Tranche B Commitment shall terminate immediately and without further action on the Tranche B Termination Date.

(c)    during the period commencing on the Tranche C Effective Date and ending on the Tranche C Termination Date, loans in an aggregate outstanding principal amount not to exceed the Tranche C Commitment then in effect (all such loans, collectively, the "Tranche C Loans" and together with the Tranche A Loans and the Tranche B Loans, the "Loans" or each individually, a "Loan"), which Tranche C Loans may be repaid and reborrowed in accordance with the provisions of this Agreement; *provided* that (a) the amount of any Tranche C Advance shall not exceed the least of (i) the unused portion of the Tranche C Commitment then in effect, (ii) without giving effect to such Tranche C Advance, the sum of (x) Specified Availability as of the date of the applicable Advance *plus* (y) the amount, if any, necessary to round up to the nearest minimum or integral multiple amount required by Section 2.02(a) *less* (z) the amount by which the Tranche B Commitment exceeds the Tranche B Loans then outstanding (*provided* that the conditions to Tranche B Loans set forth in Section 4.03 are satisified and Tranche B Loans are available to the Borrower on the date of the Advance Request and on the date for which the Advance has been requested in respect of such Tranche C Loan), and (iii) the aggregate amount requested by the Borrower in the applicable Advance Request in accordance with Section 2.02(a) and (b) the aggregate amount of all outstanding Tranche C Loans shall not exceed the Tranche C Commitment then in effect. The Tranche C Commitment shall terminate immediately and without further action on the Tranche C Termination Date.

**Section 2.02.    Requests for Advances**. To request an Advance of Loans, the Borrower shall deliver an Advance Request to GM no later than 11:00 a.m., New York City time (a) for an Advance that is requested to be made on a Monday (or if such date is not a Business Day, the next succeeding Business Day), on the immediately preceding Thursday (or if such date is not a Business Day, the next succeeding Business Day), (b) for an Advance that is requested to be made on a Thursday (or if such date is not a Business Day, the next succeeding Business Day), on the immediately preceding Monday (or if such date is not a Business Day, the next succeeding Business Day) and (c) for an Advance of $25,000,000 or less, on the date that is two (2) Business Days before the date of the proposed Advance. Such Advance Request shall be in a form reasonably acceptable to GM, signed and certified by a Financial Officer of the Borrower and delivered in accordance with the notice provisions set forth in Section 8.01; *provided* that, notwithstanding anything in Section 8.01 to the contrary, Advance Requests may be delivered in .pdf or similar format by electronic mail. Such Advance Request shall specify the following information:

(a)    whether the requested Advance is a Tranche A Advance, a Tranche B Advance and/or a Tranche C Advance;

(b)    the aggregate amount of the requested Tranche A Advance, Tranche B Advance and/or Tranche C Advance, which in each case shall be in an aggregate amount that is in an integral multiple of $5,000,000 and not less than $10,000,000;

(c)    the date of such Advance, which,

(i)    with respect to Tranche A Loans shall be a Business Day on or after the Tranche A Effective Date;

(ii)     with respect to Tranche B Loans shall be a Business Day on or after the Tranche B Effective Date; and

(iii)     with respect to Tranche C Loans shall be a Business Day on or after the Tranche C Effective Date; and

(d)     the initial Interest Period applicable thereto, which shall be a period contemplated by the definition of the term "*Interest Period*"; *provided* that if no Interest Period is specified with respect to any portion of the Loan, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

**Section 2.03.     Funding of Advances**. Upon satisfaction or waiver of the applicable conditions precedent specified herein, GM shall make the proceeds of the Loans available to Borrower by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Borrower most recently designated by it for such purpose by written notice to GM.

**Section 2.04.     Interest Elections**. Each Advance of Loans shall have an initial Interest Period as specified in such Advance Request. Thereafter, the Borrower may elect to continue such Advance and may elect Interest Periods therefor, in accordance with the provisions set forth in Section 2.06(b), (c) and (e) of the DIP Credit Agreement (which provisions have been duly incorporated by reference by Section 8.14 herein); *provided* that there shall be no more than ten (10) Interest Periods outstanding at any time.

**Section 2.05.     Interest on the Loans**.

(a)     Subject to the provisions of Section 2.06, each Advance shall be comprised entirely of Eurodollar Loans and shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal, during each Interest Period applicable thereto, to the Adjusted LIBO Rate for such Interest Period in effect for such Advance plus 5.25%; *provided* that if the applicable Adjusted LIBO Rate at the time of determination of the interest rate for an Advance is below 3.25%, the Adjusted LIBO Rate for such Advance for such Interest Period shall be deemed to be 3.25%; *provided*, *further*, that, in the event the DIP Credit Agreement is amended, modified, refinanced or replaced so that the pricing for the tranche bearing the highest pricing under the DIP Credit Agreement (the "Adjusted DIP Pricing") is greater than the rates set forth above, then the rates set forth above in this Section 2.05(a) shall be automatically adjusted so that the pricing for the Advances is the same as such Adjusted DIP Pricing.

(b)     Accrued interest on all of the Loans shall be payable in arrears on each Interest Payment Date applicable thereto, on the applicable Scheduled Termination Date and after such Scheduled Termination Date on demand and upon any repayment or prepayment thereof, other than a prepayment pursuant to Section 2.09 hereof (on the amount prepaid); *provided* that until the DIP Termination Date, all interest, including amounts owing pursuant to Section 2.06, shall be paid in kind by increasing the principal amount of the Loans then outstanding in an aggregate amount equal to the interest due on each Interest Payment Date; and *provided, further*, that (A) with respect to all Tranche A Loans, if the Master Restructuring Agreement and the Global Settlement Agreement become effective on or before the Tranche A Termination Date, then all interest accrued and owing hereunder, whether before or after the effectiveness of the Master Restructuring Agreement and the Global Settlement Agreement, including amounts owing

pursuant to Section 2.06 and any amounts which have been previously added to the principal amount of the Loans outstanding pursuant to the preceding proviso, shall be automatically cancelled and shall not be included in the Borrower's Tranche A Obligations hereunder, (B) with respect to all Tranche B Loans, if the Modified Reorganization Plan or the Sale Transactions have been consummated on or before the Tranche B Termination Date, then in either case, all interest accrued and owing hereunder, whether before or after such effectiveness, including amounts owing pursuant to Section 2.06 and any amounts which have been previously added to the principal amount of the Loans outstanding pursuant to the preceding proviso, shall be automatically cancelled and shall not be included in the Borrower's Tranche B Obligations hereunder, and (C) with respect to all Tranche C Loans, if the Modified Reorganization Plan or the Sale Transactions have been consummated on or before the Tranche C Termination Date, then in either case, all interest accrued and owing hereunder, whether before or after such effectiveness, including amounts owing pursuant to Section 2.06 and any amounts which have been previously added to the principal amount of the Loans outstanding pursuant to the preceding proviso, shall be automatically cancelled and shall not be included in the Borrower's Tranche C Obligations hereunder

Section 2.06.    **Default Interest**. If the Borrower or any Guarantor, as the case may be, shall default in the payment of the principal of or interest on any Loan becoming due hereunder, whether at stated maturity, by acceleration or otherwise, the Borrower or such Guarantor, as the case may be, shall on demand from time to time pay interest, to the extent permitted by law and subject to and in accordance with Section 2.05(b), on all Loans up to (but not including) the date of actual payment (after as well as before judgment) at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the rate then applicable for such Advances plus 2.0%; *provided* that if the Adjusted DIP Pricing then in effect includes default interest pursuant to Section 2.09 of the DIP Credit Agreement, the additional 2.0% shall not apply.

Section 2.07.    **Repayment of Obligations**. The Borrower hereby unconditionally promises to pay to GM (i) the then unpaid Tranche A Obligations on the Tranche A Scheduled Termination Date, (ii) the then unpaid Tranche B Obligations on the Tranche C Scheduled Termination Date and (iii) the then unpaid Tranche C Obligations on the Tranche C Scheduled Termination Date or, in each case, earlier, if otherwise required by the terms hereof; *provided* that, subject to Section 6.01, such Obligations shall be paid as a set-off by GM of amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor pursuant to the Global Settlement Agreement and the Master Restructuring Agreement, as and when such amounts become payable; and *provided further* that upon consummation of the Sale Transactions, the principal amount of the Tranche B Loans and the Tranche C Loans shall be automatically cancelled and shall not be included in the Borrower's Obligations.  GM shall maintain in accordance with customary practice an account or accounts evidencing the indebtedness of the Borrower to GM resulting from each Loan made by GM, including (i) the amount of each Loan made hereunder and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to GM, (iii) the amount of any interest paid in kind pursuant to Section 2.05(b) and (iv) the amounts of principal and interest paid by the Borrower to GM from time to time hereunder.  The entries made in such accounts shall be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of GM to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

**Section 2.08.    Optional Termination or Reduction of Commitments**. Upon at least one (1) Business Day's prior written notice to GM, the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, the unused portions of the Commitments.  Each such reduction of the Commitments shall be in the principal amount of $25,000,000 or any integral multiple of $5,000,000 in excess thereof.

**Section 2.09.    Mandatory Prepayment**.

(a)      Tranche A Loans.  If the aggregate amount of the Tranche A Available Funds exceeds $500,000,000 (such excess amount at any time, the "Tranche A Excess Availability") and such excess is greater than $5,000,000 (i) if the Borrowing Base Certificate is delivered on a weekly basis, on the date such Borrowing Base Certificate is delivered and (ii) otherwise, on the last Business Day of any calendar week, the Borrower shall prepay the Loans (excluding any portion of the Loans comprising interest that is paid in kind on such Loans pursuant to Section 2.05(b)) within one (1) Business Day of such date in an amount equal to the Tranche A Excess Availability.  Notwithstanding anything to the contrary contained in this Agreement, from and after the effectiveness of the amendments to each of the Master Restructuring Agreement and the Global Settlement Agreement referred to in Section 5.03, the Borrower shall immediately repay, as a set-off by GM in accordance with Section 2.07, an amount equal to the lesser of (x) the Tranche A Obligations outstanding hereunder on such date and (y) any amounts due and payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor under such agreements on such date.

(b)      Tranche B Loans.  If, on any Monday or Thursday of any calendar week the aggregate amount of the Tranche B Available Funds exceeds the amount projected by the Borrower on such date to be the net use of cash by the Borrower and the Guarantors for the period commencing on such date through the next Monday or Thursday, as the case may be, *plus* (i) $25,000,000 or (ii) $50,000,000 at any time when the Minimum Liquidity Amount is equal to $50,000,000 (such excess amount at any time, the "Tranche B Excess Availability"), the Borrower shall prepay the Loans (excluding any portion of the Loans comprising interest that is paid in kind on such Loans pursuant to Section 2.05(b)) within one (1) Business Day of such date in an amount equal to the Tranche B Excess Availability.  Notwithstanding anything to the contrary contained in this Agreement, from and after the Tranche C Termination Date the Borrower shall immediately repay, as a set-off by GM in accordance with Section 2.07, an amount equal to the lesser of (x) the Tranche B Obligations outstanding hereunder on such date and (y) any amounts due and payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor under such agreements on such date.

**Section 2.10.    Payments Generally**.

(a)      The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees or other amounts payable hereunder) prior to 2:00 p.m., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of GM, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to GM at its offices at 767 Fifth Avenue, 14th Floor, New York, New York, except that payments pursuant to Section 8.04 shall be made directly to the Persons entitled thereto. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business

Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to GM to pay fully all amounts of principal, interest, fees and expenses then due hereunder, such funds shall be applied (i) *first*, towards payment of fees and expenses then due under Section 8.04, (ii) *second*, towards payment of interest accrued and then due hereunder on account of the Loans (including any interest payable pursuant to Section 2.06) and (iii) *third*, towards payment of principal of the Loans then due hereunder.

(c)     Notwithstanding anything to the contrary set forth herein, GM shall have the right to exercise the Set-Off Right, subject to Section 6.01, against any amounts owed under this Agreement in such order as it shall elect in its sole discretion.

**Section 2.11.    Priority**.  The Borrower and each of the Guarantors hereby covenants, represents and warrants that, upon entry of the Interim Approval Order, the Obligations owing to GM or its Affiliates shall at all times constitute allowed claims in the Cases having administrative expense priority pursuant to Section 503(b)(1) of the Bankruptcy Code (such allowed claims, the "Administrative Claims").  The parties hereto agree that GM's Set-Off Rights shall rank ahead of general unsecured claims at all times.

**Section 2.12.    Payment of Obligations**. Subject to the provisions of Section 2.07 and Section 6.01, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement, GM shall be entitled to payment of such Obligations in accordance with the terms hereof without further application to or order of the Bankruptcy Court.

**Section 2.13.    No Discharge; Survival of Claims**. Each of the Borrower and the Guarantors agrees that, except to the extent that GM shall have been paid in full (whether by exercising its Set-Off Rights or otherwise), (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Administrative Claims granted to GM pursuant to the Interim Approval Order, the Approval Order and described in Section 2.11 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

In order to induce GM to make the Loans hereunder, the Borrower and each of the Guarantors jointly and severally represent and warrant as follows:

**Section 3.01.    Organization and Authority**. Each of the Borrower and the Guarantors (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified as a foreign corporation or other organization and in good standing in each jurisdiction where the conduct of its business requires such qualification, except to the extent that all failures to be duly qualified and in good standing could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (iii) subject to the entry by the Bankruptcy Court of the Interim Approval Order, has the requisite power and authority to effect the transactions contemplated hereby, and (iv) subject to the entry by the Bankruptcy Court of the Interim Approval Order, has all requisite power and authority and the legal right to own, pledge,

mortgage and operate its properties, and to conduct its business as now or currently proposed to be conducted, except where the failure thereof could not reasonably be expected to have a Material Adverse Effect.

Section 3.02.    **Due Execution**. Upon the entry by the Bankruptcy Court of the  Interim Approval Order, the execution, delivery and performance by each of the Borrower and the Guarantors of this Agreement (i) are within the respective powers of each of the Borrower and the Guarantors, have been duly authorized by all necessary action including the consent of shareholders where required, and do not (A) contravene the charter or by-laws of any of the Borrower or the Guarantors, (B) violate any law (including the Securities Exchange Act of 1934) or regulation (including Regulations T, U or X of the Board), or any order or decree of any court or Governmental Authority, conflict with or result in a breach of, or constitute a default under, any material contractual obligation entered into prior to the Filing Date binding on the Borrower or the Guarantors or any of their properties except to the extent that all such violations, conflicts or breaches could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, or (C) conflict with or result in a breach of, or constitute a default under, any material contractual obligation entered into after the Filing Date binding on the Borrower or the Guarantors or any of their properties; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority other than (A) the entry of the Interim Approval Order and (B) other consents, authorizations, approvals, notices, filings or registrations the failure to obtain or make which could not, in the aggregate, reasonably be expected to have a Material Adverse Effect. Upon the entry by the Bankruptcy Court of the Interim Approval Order, this Agreement has been duly executed and delivered by each of the Borrower and the Guarantors. This Agreement is a legal, valid and binding obligation of the Borrower and each Guarantor, as the case may be, enforceable against the Borrower and the Guarantors, as the case may be, in accordance with its terms and the Interim Approval Order and the Approval Order.

Section 3.03.    **Use of Proceeds**. The proceeds of the Loans shall be used for working capital and for other general corporate purposes of the Borrower and its Subsidiaries, subject to the provisions of Section 5.06.

**ARTICLE IV**
**CONDITIONS OF LENDING**

Section 4.01.    **Conditions Precedent to Effectiveness**. This Agreement shall become effective on the date (the "Tranche C Effective Date") on which each of the following shall have occurred and GM shall have received evidence reasonably satisfactory to it of such occurrence:

(a)    Execution of Agreement. This Agreement shall have been executed by the Borrower and each of the Guarantors.

(b)    Documents and Certificates.    GM shall have received such documents and certificates as GM or its counsel may reasonably request relating to the organization, existence and good standing of each of the Borrower and the Guarantors, the authorization of the transactions under this Agreement and any other legal matters relating to each of the Borrower and the Guarantors, the Agreement or the transactions contemplated hereunder, all in form and substance reasonably satisfactory to GM and its counsel.

(c)    <u>DIP Credit Agreement Modifications</u>.   The terms of any amendments or modifications to the DIP Credit Agreement or the Accommodation Agreement shall be on terms reasonably acceptable to GM.

(d)    <u>Modifications to Existing Plan</u>.   No motion or other pleading shall have been filed, without GM's consent, seeking the approval of a Reorganization Plan which contains modifications to the Existing Plan (it being understood that for purposes of this <u>Section 4.01(d)</u>, GM shall be deemed to have consented to the motions and pleadings that are satisfactory to GM in accordance with <u>Section 4.01(j)</u>).

(e)    <u>Other Contracts</u>.   The Borrower or any Guarantor shall not, to the extent that the Global Settlement Agreement or Master Restructuring Agreement have not been terminated by GM, have filed a motion or other pleading seeking to reject any executory contract between the Borrower or any Guarantor and GM or any of its Affiliates.

(f)    <u>Approval Order</u>.   The Bankruptcy Court shall have entered an interim order approving this Agreement and the Administrative Claims as described in <u>Section 2.11</u> (the "<u>Interim Approval Order</u>"), which Interim Approval Order (i) shall authorize extensions of credit in an aggregate principal amount up to the amount of the Tranche C Commitment, (ii) shall authorize the payment by the Borrower of all fees and expenses provided for herein and (iii) shall be in form and substance reasonably acceptable to GM.

(g)    <u>No DIP Action</u>.   Neither the DIP Agent nor any DIP Lender shall have taken any action to exercise any remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (x) in respect of cash collateral held in cash collateral accounts as of the Tranche C Effective Date as provided in the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) and (y) the giving of notice and the direction by the DIP Lenders to the DIP Agent with respect to actions contemplated under the Modified Reorganization Plan.

(h)    <u>Fees and Expenses</u>.   GM shall have received the payment by the Borrower of all fees and expenses referred to herein.

(i)    <u>Sale Transaction</u>.   Each of the Sale Documents shall have been duly executed and delivered in form and substance reasonably satisfactory to GM (it being understood that the Sale Agreement attached hereto as <u>Exhibit A</u> and the Sale Documents attached as exhibits to the Modified Reorganization Plan as of the date hereof are in form and substance satisfactory to GM).

(j)    <u>Sale Motion</u>.   (i) On or before June 1, 2009 the Borrower shall have, and shall have caused the other Sellers (as defined in the Sale Agreement) that are Filing Affiliates (as defined in the Sale Agreement) to have, filed a motion (in form and substance reasonably satisfactory to GM)  (the "<u>Solicitation Motion</u>") seeking, in the alternative, either (A) to approve, among other things, the modifications to the Modified Reorganization Plan pursuant to which the Borrower and other Sellers that are Filing Affiliates will perform their obligations under the Sale Documents or (B) approval to enter into and perform their obligations under the Sale Documents under Section 363 of the Bankruptcy Code, independent of and not pursuant to or contingent on the effectiveness of, any Reorganization Plan (the "<u>Stand Alone Sale</u>") and (ii) on or before June 5, 2009, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to GM, granting the relief requested in the Solicitation Motion (the "<u>Solicitation</u>

Order"), and shall have scheduled a hearing date for the approval of each of the Modified Reorganization Plan or the Standalone Sale, which date shall be no later than July 23, 2009.

**Section 4.02.    Conditions Precedent to Each Tranche A Loan**.  The obligation of GM to make each Tranche A Loan is subject to the satisfaction (or waiver in accordance with Section 8.07) of the following conditions precedent:

(a)    Advance Request and Availability Certificate. GM shall have received (i) an Advance Request with respect to such Tranche A Loan as required by Article 2 and (ii) a certificate in a form reasonably acceptable to GM signed by a Financial Officer of the Borrower, certifying the amount of the Specified Availability as of the close of business on the Business Day immediately preceding the date of such Advance and reflecting the calculation thereof (a "Tranche A Availability Certificate").

(b)    Representations and Warranties. All representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the date of each Advance hereunder with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date.

(c)    No Default.  On the date of each Advance hereunder (i) no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default shall have occurred and be continuing under this Agreement, (ii) no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default, shall have occurred and be continuing under the DIP Credit Agreement, in each case, unless such event has been waived (or deemed waived) or amended by the DIP Lenders and (iii) no amendments or other modifications to the DIP Credit Agreement with the effect of reducing the aggregate commitments or amounts available thereunder (except in accordance with the terms of the DIP Credit Agreement in effect on the date hereof) shall have become effective.

(d)    Modifications to Existing Confirmed Plan.  No motion or other pleading shall have been filed seeking the approval of a Reorganization Plan which contains modifications to the Existing Confirmed Plan which would have a material impact on GM, on the benefits GM reasonably expected to receive under the Existing Confirmed Plan (including, without limitation, GM's distributions thereunder), the Global Settlement Agreement, the Master Restructuring Agreement, or on the ability of the Borrower and its subsidiaries and Affiliates operating as debtors and debtors-in-possession in the Cases to fulfill any obligations to any GM-Related Parties under the Existing Confirmed Plan, the Global Settlement Agreement, the Master Restructuring Agreement, or any agreements assumed, reinstated, or ratified under the Master Restructuring Agreement; provided that the parties to this Agreement agree that, among other things, any increase in the amount of distributions (or change in the form of distributions) to holders of claims or equity interests under the Existing Confirmed Plan, any change in any of the provisions of section 4.01, 4.02, or 4.03 of the Global Settlement Agreement, or any change in the identity of the Plan Investors (as defined in the Existing Confirmed Plan) other than as permitted by the EPCA shall be deemed to have a material impact on GM, on the benefits GM reasonably expected to receive under the Existing Confirmed Plan (including, without limitation, GM's distributions thereunder), the Global Settlement Agreement, the Master Restructuring Agreement, or on the ability of the Borrower and its subsidiaries and Affiliates operating as debtors and debtors-in-possession in the Cases to fulfill any obligations to any GM-Related Parties under the Existing Confirmed Plan, the Global Settlement Agreement, the Master Restructuring Agreement, or any agreements assumed, reinstated, or ratified under the Master Restructuring Agreement.

16

(e)     Other Contracts.  The Borrower or any Guarantor shall not, to the extent that the Global Settlement Agreement or Master Restructuring Agreement have not been terminated by GM, have filed a motion or other pleading seeking to reject any executory contract between the Borrower or any Guarantor and GM or any of its Affiliates.

The request by the Borrower for, and the acceptance by the Borrower of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Borrower that the conditions specified in this Section have been satisfied or waived at that time.

**Section 4.03.   Conditions Precedent to Each Tranche B Loan.**  The obligation of GM to make each Tranche B Loan is subject to the satisfaction (or waiver in accordance with Section 8.07) of the following conditions precedent:

(a)     Advance Request and Financial Officer's Certificates.  GM shall have received (i) an Advance Request with respect to such Tranche B Loan as required by Article 2, together with the Weekly Cash Projection, and (ii) the Specified Availability Certificate dated the date of the Advance.

(b)     Representations and Warranties.  All representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the date of each Advance hereunder with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date.

(c)     No Default.  On the date of each Advance hereunder (i) no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default shall have occurred and be continuing under this Agreement, (ii) no Automatic Accommodation Termination Default and no Accommodation Default, and no event which upon notice or lapse of time or both would constitute an Automatic Accommodation Termination Default or an Accommodation Default, shall have occurred and be continuing under the Accommodation Agreement, in each case, unless such event has been waived or amended by the requisite DIP Lenders, (iii) no amendments or other modifications to the DIP Credit Agreement with the effect of reducing the aggregate commitments or amounts available thereunder (except in accordance with the terms of the DIP Credit Agreement in effect on the Second Amendment Effective Date (after giving effect to the Accommodation Agreement)) shall have become effective and (iv) no amendments or other modifications to the Accommodation Agreement in a manner materially adverse to GM shall have become effective.

(d)     Reorganization Plan.  No motion or other pleading shall have been filed by the Borrower or any Guarantor seeking to amend or otherwise modify such Reorganization Plan and Disclosure Statement in a manner not reasonably satisfactory to GM.

**Section 4.04.   Conditions Precedent to Each Tranche C Loan**.  The obligation of GM to make each Tranche C Loan is subject to the satisfaction (or waiver in accordance with Section 8.07) of the following conditions precedent:

(a)     Advance Request and Financial Officer's Certificates. GM shall have received (i) an Advance Request with respect to such Tranche C Loan as required by Article 2, together with the Weekly Cash Projection, and (ii) the Specified Availability Certificate dated the date of the Advance.

(b)     <u>Representations and Warranties</u>. All representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the date of each Advance hereunder with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date.

(c)     <u>DIP Amendments; Actions</u>.  On the date of each Tranche C Advance hereunder (i) no amendment or other modification shall have been made and no motion to approve any such amendment or modification to the DIP Credit Agreement or the Accommodation Agreement that is not reasonably acceptable to GM shall have been filed with the Bankruptcy Court, (ii) no new agreement or amendment, extension or other modification shall have been made that requires payment of interest on account of the tranche C loans under the DIP Credit Agreement and no motion to approve any such new agreement, amendment, extension or other modification that requires payment of interest on account of the tranche C loans under the DIP Credit Agreement shall have been filed with the Bankruptcy Court and (iii) neither the DIP Agent nor any DIP Lender shall have taken any action to exercise any remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (x) in respect of cash collateral held in cash collateral accounts as of the Tranche C Effective Date as provided in the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) and (y) the giving of notice and the direction by the DIP Lenders to the DIP Agent with respect to actions contemplated under the Modified Reorganization Plan.

(d)     <u>Milestones</u>.  On the date of each Tranche C Advance requested on and after each of the dates set forth in the following clauses (i) – (v), the following conditions shall have been satisfied: (i) on the tenth date after the Tranche C Effective Date, the Interim Order shall not be stayed, modified or reversed or subject to any appeal, (ii) the Solicitation Order shall have become final and non-appealable within ten days of the Tranche C Effective Date (the "<u>Final Solicitation Order</u>"), (iii) by July 2, 2009, the Borrower shall have filed the 363 Implementation Agreement with the Bankruptcy Court pursuant to the Solicitation Order, (iv) by July 23, 2009, a hearing shall have been held to approve the Modified  Reorganization Plan or the Stand Alone Sale, and the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to GM, approving the Modified Reorganization Plan or the Stand Alone Sale (in either case, such order referred to herein as the "<u>Sale Transactions Order</u>") and (v) within ten (10) days of the entry after the Sale Transactions Order and in any event no later than August 3, 2009, such Sale Transactions Order shall have become final and non-appealable.

(e)     <u>Reorganization Plan; Orders</u>.  No motion or other pleading shall have been filed, without GM's consent, seeking (i) approval of a Reorganization Plan which contains modifications to the Existing Plan or (ii) entry of an order confirming or otherwise approving such Reorganization Plan, and no such order shall have been entered without GM's consent (it being understood that for purposes of this <u>Section 4.04(e)</u>, GM shall be deemed to have consented to the motions and pleadings that are satisfactory to GM in accordance with <u>Section 4.04(d)</u>). Any final order that is entered approving this Agreement (such order, and before such order is entered, the Interim Approval Order, is sometimes referred to herein as the "<u>Approval Order</u>") shall be in form and substance reasonably acceptable to GM. At no time after the Interim Approval Order, the Approval Order, the Solicitation Order, the Final Solicitation Order or the Sale Transactions Order has been entered shall any such order be stayed, amended, reversed or otherwise modified in a manner that is not reasonably acceptable to GM.  At no time after any order relating to or approving any modifications to the DIP Credit Agreement or the

Accommodation Agreement has been entered shall any such order be stayed, reversed or otherwise modified in a manner that is not reasonably acceptable to GM.

(f)     Sale Documents.  No default, material breach (not waived by the applicable party or parties) by Delphi, or termination shall have occurred under any of the Sale Documents, and the Borrower shall not have taken any action or filed any motion to terminate, modify or reject any of the Sale Documents and no amendments or modifications thereto not reasonably acceptable to GM shall have been entered in to.

(g)     Restrictions.  An order shall not have been entered by the Bankruptcy Court enjoining, restraining or otherwise restricting the Borrower from proceeding to seek approval of the Modified Reorganization Plan or the Stand Alone Sale on the terms set forth therein (any such order, a "Restricting Order").

(h)     No Default.  On the date of each Advance hereunder no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default shall have occurred and be continuing under this Agreement.

The request by the Borrower for, and the acceptance by the Borrower of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Borrower that the conditions specified in this Section have been satisfied or waived at that time.

## ARTICLE V
## COVENANTS

From the Tranche A Effective Date and for so long as the Commitments shall be in effect or any amount shall remain outstanding or unpaid under this Agreement, the Borrower and each of the Guarantors agree that they will, and will cause each of their respective Subsidiaries to:

**Section 5.01.    Existence**.  Preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except (i) (A) if in the reasonable business judgment of the Borrower it is no longer necessary for the Borrower and the Guarantors to preserve and maintain such rights, privileges, qualifications, permits, licenses and franchises, and (B) such failure to preserve the same could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) as otherwise permitted in connection with sales of assets permitted by Section 6.10 of the DIP Credit Agreement.

**Section 5.02.    Notice of Event of Default, etc**.  Promptly give to GM notice in writing of any Accommodation Default, any Automatic Accommodation Termination Default or the occurrence of any event or circumstance which with the passage of time or giving of notice or both would constitute such event under the Accommodation Agreement or an Event of Default hereunder.

**Section 5.03.    [Reserved]**

**Section 5.04.    Financial Officer's Certificates**.  As long as any Advances shall be outstanding, on each Monday and Thursday of each calendar week (or, if not a Business Day, on the next succeeding Business Day) and, if more frequent, on each date on which an Advance

Request is delivered and on each date an Advance is made, deliver to GM the Weekly Cash Projection and the Specified Availability Certificate.

**Section 5.05.    Information**.  Deliver to GM all financial statements, reports, documents and other information that it provides to the DIP Lenders pursuant to the DIP Credit Agreement, at the same time such information is delivered to the DIP Lenders, in each case subject to compliance with the terms and conditions of confidentiality arrangements entered into with the Borrower.

**Section 5.06.    Use of Proceeds**.   At no time after the Tranche C Effective Date shall proceeds of the Tranche C Loans be used to pay amounts to the DIP Agent or the DIP Lenders on account of interest owing on the tranche C loans under the DIP Credit Agreement.

## ARTICLE VI
## EVENTS OF DEFAULT

**Section 6.01.    Events of Default**. In the case of the happening of any of the following events and the continuance thereof beyond the applicable grace period, if any (each, an "Event of Default"):

(a)    any material representation or warranty made by the Borrower or any Guarantor in this Agreement or in connection with this Agreement or the credit extensions hereunder or any material statement or representation made in any report, financial statement, certificate or other document furnished by the Borrower or any Guarantor to GM under or in connection with this Agreement, shall prove to have been false or misleading in any material respect when made; or

(b)    default shall be made in the payment of any (i) interest on the Loans payable hereunder when due (other than amounts set forth in clause (ii) hereof), and such default shall continue unremedied for more than three (3) Business Days or (ii) principal of the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise; or

(c)    default shall be made by the Borrower or any Guarantor in the due observance or performance of any covenant, condition or agreement herein and, with respect to Section 5.01 (but only with respect to any Guarantor) and Section 5.05 only, such default shall continue unremedied for more than ten (10) days; or

(d)    any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower or any Guarantor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or

(e)    any material provision of this Agreement shall, for any reason, cease to be valid and binding on the Borrower or any of the Guarantors, or the Borrower or any of the Guarantors shall so assert in any pleading filed in any court; or

(f)      an order of the Bankruptcy Court shall be entered (i) reversing, staying for a period in excess of ten (10) days, or vacating the Approval Order, the DIP Extension Order, the Second Amendment Approval Order or the Accommodation Approval Order or (ii) without the written consent of GM, otherwise amending, supplementing or modifying the Approval Order, the DIP Extension Order, the Second Amendment Approval Order or the Accommodation Approval Order in a manner that is reasonably determined by GM to be adverse to GM;

then, and in every such event and at any time thereafter during the continuance of such event, and to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, GM may, by notice to the Borrower (with a copy to counsels for the Official Creditors' Committee and the Official Equity Committee appointed in the Cases, to counsel for the Administrative Agent under the DIP Credit Agreement and to the United States Trustee for the Southern District of New York), take one or more of the following actions, at the same or different times (*provided* that with respect to clause (iv) below, GM shall provide the Borrower (with a copy to counsels for the Official Creditors' Committee and the Official Equity Committee in the Cases, to counsel for the Administrative Agent under the DIP Credit Agreement and to the United States Trustee Southern District of New York) with five (5) Business Days' written notice prior to taking the action contemplated thereby) (i) terminate or suspend forthwith the Commitments; (ii) declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein to the contrary notwithstanding; (iii) exercise the Set-Off Right against all amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor (including, without limitation, against any amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor under the Master Restructuring Agreement and the Global Settlement Agreement), which Set-Off Right shall be in addition to other rights and remedies which GM may have; and (iv) exercise any and all remedies under applicable law otherwise available to GM; *provided* that, notwithstanding anything to the contrary contained in this Agreement, GM hereby agrees not to exercise any Set-Off Right pursuant to this Section 6.01 or otherwise (which rights, with respect to any Obligations owing under this Agreement, may only be exercised against the Borrower and the Guarantors) with respect to the Obligations arising under this Agreement (A) against any amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor under the Master Restructuring Agreement and the Global Settlement Agreement (1) with respect to any Tranche A Obligations and any prepayments due and payable under Section 2.09, until the effective date of the amendments to such agreements referred to in Section 5.03 and (2) with respect to any Tranche B Obligations (other than any prepayments due and payable under Section 2.09), until the later of (x) the effective date of the amendments to such agreements referred to in Section 5.03 and (y) the Tranche B Termination Date and (B) except with respect to any prepayments due and payable under Section 2.09, against all other amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor (or defer, delay or suspend the payment of any other amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor) until after the DIP Termination Date.  Any payment received as a result of the exercise of remedies hereunder shall be applied in accordance with Section 2.10(b).

It is understood and agreed among the parties hereto that, except as expressly provided herein, no default or breach by the Borrower or any of its Subsidiaries under any other agreement entered into with GM or its Affiliates shall give rise to a default hereunder, and neither GM nor its Affiliates shall exercise any rights under any such other agreement as against any other such party as a result of a default hereunder.

Notwithstanding anything to the contrary contained in this Agreement, until after the DIP Termination Date, the Borrower and the Guarantors shall not make any payment to GM or its Affiliates with respect to the Obligations hereunder (except (a) with respect to any prepayments due and payable under Section 2.09, whether in cash or through any Set-Off Right exercised by GM or its Affiliates, (b) interest to the extent paid in kind under Section 2.05(b), and (c) any Obligations due hereunder paid through any Set-Off Right exercised by GM or its Affiliates against amounts payable by GM or its Affiliates to or for the credit or the account of the Borrower or any Guarantor pursuant to the Global Settlement Agreement or Master Restructuring Agreement as permitted hereunder).

## ARTICLE VII
## GUARANTY

**Section 7.01.    Guaranty**.

(a)    Each of the Guarantors unconditionally and irrevocably guarantees the due and punctual payment by the Borrower of the Obligations. Each of the Guarantors further agrees that the Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and it will remain bound upon this guaranty notwithstanding any extension or renewal of any of the Obligations. The Obligations of the Guarantors shall be joint and several.

(b)    Each of the Guarantors waives presentation to, demand for payment from and protest to the Borrower or any other Guarantor, and also waives notice of protest for nonpayment. The Obligations of the Guarantors hereunder shall not be affected by (i) the failure of GM to assert any claim or demand or to enforce any right or remedy against the Borrower or any other Guarantor under the provisions of this Agreement or otherwise; (ii) any extension or renewal of any provision hereof or thereof, (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of this Agreement; (iv) the release, exchange, waiver or foreclosure of any security held by GM for the Obligations or any of them; (v) the failure of GM to exercise any right or remedy against any other Guarantor; or (vi) the release or substitution of the Borrower or any other Guarantor.

(c)    Each of the Guarantors further agrees that this guaranty constitutes a guaranty of payment when due and not just of collection, and waives any right to require that any resort be had by GM to any security held for payment of the Obligations or to any balance of any deposit, account or credit on the books of GM in favor of the Borrower or any other Guarantor, or to any other Person.

(d)    Each of the Guarantors hereby waives any defense that it might have based on a failure to remain informed of the financial condition of the Borrower and of any other Guarantor and any circumstances affecting the ability of the Borrower to perform under this Agreement.

(e)    Each Guarantor's guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any other instrument evidencing any

Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Obligations which might otherwise constitute a defense to this Guaranty. GM makes no representation or warranty in respect to any such circumstances or shall have any duty or responsibility whatsoever to any Guarantor in respect of the management and maintenance of the Obligations.

(f)        Subject to the provisions of <u>Section 6.01</u>, upon the Obligations becoming due and payable (by acceleration or otherwise), GM shall be entitled to immediate payment of such Obligations by the Guarantors upon written demand by GM without further application to or order of the Bankruptcy Court.

**Section 7.02.    <u>No Impairment of Guaranty</u>**. The obligations of the Guarantors hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations. Without limiting the generality of the foregoing, the obligations of the Guarantors hereunder shall not be discharged or impaired or otherwise affected by the failure of GM to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law, unless and until the Obligations are paid in full.

**Section 7.03.    <u>Subrogation</u>**. Upon payment by any Guarantor of any sums to GM hereunder, all rights of such Guarantor against the Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full of all the Obligations. If any amount shall be paid to such Guarantor for the account of the Borrower in respect of the Loans, such amount shall be held in trust for the benefit of GM and shall forthwith be paid to GM to be credited and applied to the Obligations, whether matured or unmatured.

**ARTICLE VIII
MISCELLANEOUS**

**Section 8.01.    <u>Notices</u>**.

(a)        Subject to paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Borrower, to it at 5725 Delphi Drive, Troy, Michigan 48098, Attention: Treasurer (Telecopy No. 248-813-2648; Telephone No. 248-813-2592); with a copy to Deputy General Counsel, Transactional and Restructuring (Telecopy No. 248-816-2491; Telephone No. 248-813-2492); and

(ii)        if to General Motors Corporation, to it at 767 Fifth Avenue, 14th floor, New York, New York 10153, Attention: Treasurer, with a copy to General Motors

Corporation, 767 Fifth Avenue, 14th floor, New York, New York 10153, Attention: Director, Business Development.

(b)    GM or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**Section 8.02.    Survival of Agreement, Representations and Warranties, etc**.    All warranties, representations and covenants made by the Borrower or any Guarantor herein or in any certificate or other instrument delivered by it or on its behalf in connection with this Agreement shall be considered to have been relied upon by GM and shall survive the making of the Loans herein contemplated regardless of any investigation made by GM or on its behalf and shall continue in full force and effect (in the case of any representations and warranties, as of the date when made or deemed to be made) so long as any amount due or to become due hereunder is outstanding and unpaid and so long as the Commitments have not been terminated.

**Section 8.03.    Successors and Assigns**.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no party hereto may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of (a) in the case of the Borrower or any Guarantor, GM, and (b) in the case of GM, the Borrower and to the extent reasonably necessary or advisable, by the Administrative Agent under the DIP Credit Agreement (in each case, in connection with the assignment of outstanding Loans, but not the Commitments, such consent not to be unreasonably withheld or delayed), (and any attempted assignment or transfer without such consent shall be null and void); *provided* that the consent of the Borrower or the Administrative Agent under the DIP Credit Agreement shall not be required for GM to assign or otherwise transfer (i) its rights and obligations hereunder to any of its Affiliates that have the ability to perform hereunder or (ii) its rights and obligations with respect to the outstanding Loans, but not the Commitments, to another Person following the occurrence of an Event of Default which is continuing; and *provided*, *further* that (i) for purposes of this agreement, the term "GM" shall include GM's successors and assigns hereunder, (ii) such assignee shall have no greater rights than GM would have had under this agreement, including as to rights to payment, enforcement and collection, and (iii) any such assignee shall agree in writing to be bound by the provisions of this agreement as if such assignee were GM.

**Section 8.04.    Expenses; Indemnity; Damage Waiver**.

(a)    The Borrower shall pay or reimburse: (A) all reasonable fees and reasonable out-of-pocket expenses of GM (including the reasonable fees, disbursements and other charges of counsel) associated with this Agreement, and the preparation, execution, delivery and administration of this Agreement and any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (B) all fees and expenses of GM (including the fees, disbursements and other charges of counsel) incurred in connection with the enforcement of this Agreement.    All payments or reimbursements pursuant to this clause shall be payable promptly upon written demand together with back-up documentation supporting such reimbursement request. GM's

right to reimbursement pursuant to this clause or any other provision of this Agreement shall not be construed to limit GM's rights to reimbursement under any other agreement or arrangement it may have with the Borrower or any of its Subsidiaries.

(b)     The Borrower shall indemnify GM and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (it being understood that claims for expense reimbursement hereunder shall be accompanied by back-up documentation supporting such request), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or (ii) any Loan or the use of the proceeds therefrom; <u>*provided*</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee (or such Indemnitee's officers, directors, employees or affiliates).

(c)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions hereunder, any Loan or the use of the proceeds thereof.

**Section 8.05.   <u>CHOICE OF LAW</u>**. THIS AGREEMENT SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

**Section 8.06.   <u>No Waiver</u>**.  No failure on the part of GM to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**Section 8.07.   <u>Amendments, etc</u>**.  No modification, amendment or waiver of any provision of this Agreement, and no consent to any departure by the Borrower or any Guarantor herefrom, shall in any event be effective unless the same shall be in writing and signed by GM and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower or any Guarantor shall entitle the Borrower or any Guarantor to any other or further notice or demand in the same, similar or other circumstances. No amendment to this Agreement shall be effective against the Borrower or any Guarantor unless signed by the Borrower or such Guarantor, as the case may be.

**Section 8.08.   <u>Severability</u>**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 8.09. **Headings**. Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

Section 8.10. **Survival**. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that GM may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.16, 2.17, 2.18 and 10.04 of the DIP Credit Agreement (which provisions have been duly incorporated by reference by Section 8.14 herein) and Section 8.04 herein shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 8.11. **Execution in Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constituted the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective on the Tranche C Effective Date, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement amends and restates in its entirety the Original GM-Delphi Agreement, which shall have no further effect after the Tranche C Effective Date.

Section 8.12. **Further Assurances**. Whenever and so often as reasonably requested by GM, the Borrower and the Guarantors will promptly execute and deliver or cause to be executed and delivered all such other and further instruments, documents or assurances, and promptly do or cause to be done all such other and further things as may be necessary and reasonably required in order to further and more fully vest in GM all rights, interests, powers, benefits, privileges and advantages conferred or intended to be conferred by this Agreement.

Section 8.13. **WAIVER OF JURY TRIAL**. EACH OF THE BORROWER, THE GUARANTORS AND GM HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.14. **Incorporation by Reference**. The terms and conditions of the following sections of the DIP Credit Agreement are hereby incorporated by reference into, and form integral parts of, this Agreement, *mutatis mutandis*, and GM, for purposes hereunder, shall be deemed a "Lender" and/or the "Administrative Agent", as applicable: Section 1 (Definitions); Section 2.06(b), (c) and (e) (Interest Elections); Section 2.10 (Alternate Rate of Interest); Section

2.16 (Increased Costs); Section 2.17 (Break Funding Payments); Section 2.18 (Taxes); and Section 10.04 (Confidentiality).

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties have entered into this Amended & Restated GM-Delphi Agreement as of the date first above written.

**BORROWER**

DELPHI CORPORATION

By: _____
        Name: John D. Sheehan
            Title: Vice President and Chief
                    Financial Officer

**GUARANTORS:**


DELPHI AUTOMOTIVE SYSTEMS
   (HOLDING), INC.,
a Delaware corporation


By: _____
      Name: John D. Sheehan
      Title: President


DELPHI AUTOMOTIVE SYSTEMS GLOBAL
   (HOLDING), INC.,
a Delaware corporation


By: _____
      Name: John D. Sheehan
      Title: President


DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company


By: _____
      Name: John D. Sheehan
      Title: Vice President & Chief Financial
      Officer


DELPHI AUTOMOTIVE SYSTEMS RISK
   MANAGEMENT CORP.,
a Delaware corporation


By: _____
      Name: John D. Sheehan
      Title: Vice President & Treasurer

DELPHI FOREIGN SALES CORPORATION,
a Virgin Islands corporation

By: _____
       Name: John D. Sheehan
       Title: Controller

DELPHI INTERNATIONAL HOLDINGS
CORP.,
a Delaware corporation

By: _____
       Name: John D. Sheehan
       Title: President

DELPHI LIQUIDATION HOLDING
COMPANY,
a Delaware corporation

By: _____
       Name: John D. Sheehan
       Title: President

DELPHI LLC,
a Delaware limited liability company

By: _____
       Name: John D. Sheehan
       Title: President

DELPHI NY HOLDING CORPORATION,
a New York corporation

By: _____
       Name: John D. Sheehan
       Title: President

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

ASEC MANUFACTURING,
a Delaware general partnership


By: _____

      Name: John P. Arle
      Title: Treasurer


ASEC SALES,
a Delaware general partnership


By: _____

      Name: John P. Arle
      Title: Treasurer


DELCO ELECTRONICS OVERSEAS
      CORPORATION,
a Delaware corporation


By: _____

      Name: John P. Arle
      Title: Assistant Treasurer


DELPHI AUTOMOTIVE SYSTEMS KOREA,
      INC.,
a Delaware corporation


By: _____

      Name: John P. Arle
      Title: Chief Executive Officer &
President


DELPHI AUTOMOTIVE SYSTEMS HUMAN
      RESOURCES LLC,
a Delaware limited liability company


By: _____

Name: John P. Arle
Title: Vice President & Treasurer

[Signature Page to Amended and Restated GM-Delphi Agreement]

DELPHI AUTOMOTIVE SYSTEMS
    INTERNATIONAL, INC.,
a Delaware corporation


By: _____
        Name: John P. Arle
        Title: Treasurer


DELPHI AUTOMOTIVE SYSTEMS
    OVERSEAS CORPORATION,
a Delaware corporation


By: _____
        Name: John P. Arle
        Title: Treasurer


DELPHI AUTOMOTIVE SYSTEMS
    SERVICES LLC,
a Delaware limited liability company


By: _____
        Name: John P. Arle
        Title: Treasurer


DELPHI AUTOMOTIVE SYSTEMS
    TENNESSEE, INC.,
a Delaware corporation


By: _____
        Name: John P. Arle
        Title: Treasurer


DELPHI AUTOMOTIVE SYSTEMS
    THAILAND, INC.,
a Delaware corporation


[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

By: _____
Name: John P. Arle
Title: Treasurer

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

DELPHI CONNECTION SYSTEMS,
a California corporation


By: _____
     Name: John P. Arle
     Title: Treasurer


DELPHI ELECTRONICS (HOLDING) LLC,
a Delaware limited liability company


By: _____
     Name: John P. Arle
     Title: Assistant Treasurer


DELPHI INTERNATIONAL SERVICES, INC.,
a Delaware corporation


By: _____
     Name: John P. Arle
     Title: Chief Financial Officer &
Treasurer


DELPHI MECHATRONIC SYSTEMS, INC.,
a Delaware corporation


By: _____
     Name: John P. Arle
     Title: Treasurer


DELPHI SERVICES HOLDING
CORPORATION,
a Delaware corporation


By: _____
     Name: John P. Arle
     Title: Treasurer

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

EXHAUST SYSTEMS CORPORATION,
a Delaware corporation

By: _____

      Name: John P. Arle
      Title: Assistant Treasurer

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

ASPIRE, INC.,
a Michigan corporation

By:    _____
      Name: James P. Whitson
      Title: Vice President


DELPHI CHINA LLC,
a Delaware limited liability company


By:    _____
      Name: James P. Whitson
      Title: Chief Tax Officer


DELPHI DIESEL SYSTEMS CORP.,
a Delaware corporation


By:    _____
      Name: James P. Whitson
      Title: Chief Tax Officer


DELPHI INTEGRATED SERVICE
   SOLUTIONS, INC.,
a Michigan corporation


By:    _____
      Name: James P. Whitson
      Title: Vice President


SPECIALTY ELECTRONICS, INC.,
a South Carolina corporation


By:    _____
      Name: James P. Whitson
      Title: Chief Tax Officer


[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

SPECIALTY ELECTRONICS
   INTERNATIONAL LTD.,
a Virgin Islands corporation


By: _____
       Name: James P. Whitson
       Title: Chief Tax Officer



PACKARD HUGHES INTERCONNECT
COMPANY,
a Delaware corporation


By: _____
       Name: James P. Whitson
       Title: Chief Tax Officer



ENVIRONMENTAL CATALYSTS, LLC,
a Delaware limited liability company


By: _____
       Name: James P. Whitson
       Title: Chief Tax Officer

[SIGNATURE PAGE TO AMENDED AND RESTATED GM-DELPHI AGREEMENT]

DELPHI MEDICAL SYSTEMS COLORADO
    CORPORATION,
a Colorado corporation


By: _____
        Name: John P. Arle
        Title: Assistant Treasurer


DELPHI MEDICAL SYSTEMS
CORPORATION,
a Delaware corporation


By: _____
        Name: John P. Arle
        Title: Assistant Treasurer


DELPHI MEDICAL SYSTEMS TEXAS
    CORPORATION,
a Delaware corporation


By: _____
        Name: John P. Arle
        Title: Assistant Treasurer

DELPHI TECHNOLOGIES, INC.,
a Delaware corporation


By: _____
Name: John P. Arle
Title: Vice President and Treasurer

DREAL, INC.,
a Delaware corporation


By: _____
Name: James P. Whitson
Title: Chief Tax Officer

**LENDER**

GENERAL MOTORS CORPORATION

By: _____

       Name: Walter G. Borst
       Title: Treasurer

# EXHIBIT A

## MASTER DISPOSITION AGREEMENT