1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


      Debtor.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          One Bowling Green

          New York, New York


          June 16, 2009

          10:27 AM



B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Doc #16411; Motion for Order Authorizing Debtors to

3    Enter into Fourth Amendment and Fifth Amendment to Arrangement

4    with General Motors Corporation

5

6    HEARING re Doc #16644; Motion to Authorize Expedited Motion of

7    Deloitte & Touche LLP for an Order Terminating the Debtors'

8    Retention of Deloitte & Touche LLP as their Independent

9    Auditors and Accountants

10

11   HEARING re Doc #16663; Expedited Motion for Order and Amended

12   Reclamation Procedures Order Classifying Reclamation Claims as

13   General Unsecured Nonpriority Claims for All Purposes

14

15   HEARING re Doc #17012; Proposed Forty-Fourth Omnibus Hearing

16   Agenda

17

18

19

20

21

22

23

24   Transcribed By:  Clara Rubin

25

3

1

2   A P P E A R A N C E S :

3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4         Attorneys for Delphi Corporation

5         333 West Wacker Drive

6         Suite 2100

7         Chicago, IL 60606

8

9   BY:   JOHN (JACK) WM. BUTLER, JR., ESQ.

10        JOHN K. LYONS, ESQ.

11

12  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

13        Attorneys for Delphi Corporation

14        Four Times Square

15        New York, New York 10036

16

17  BY:   KAYALYN A. MARAFIOTI, ESQ.

18

19  CONLIN, MCKENNEY & PHILBRICK, P.C.

20        Attorneys for Brazeway Inc./JPMorgan Chase

21        350 S. Main Street

22        Suite 400

23        Ann Arbor, MI 48104

24

25  BY:   BRUCE N. ELLIOTT, ESQ.

4

1

2    DAVIS POLK & WARDWELL

3         Attorneys for JPMorgan Chase Bank, N.A.

4         450 Lexington Avenue

5         New York, NY 10017

6

7    BY:   DONALD S. BERNSTEIN, ESQ.

8          BRIAN M. RESNICK, ESQ.

9

10

11   DECHERT LLP

12        Attorneys for Elliott Entities

13        1095 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   GLENN E. SIEGEL, ESQ.

17

18

19   K&L GATES LLP

20        Attorneys for JPMorgan Chase

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:   EUNICE RIM, ESQ.

25

5

1

2     LATHAM & WATKINS LLP

3          Attorneys for Creditors' Committee

4          53rd at Third

5          885 Third Avenue

6          New York, NY 10022

7

8     BY:   MARK A. BROUDE, ESQ.

9          ROBERT J. ROSENBERG, ESQ.

10

11

12    LOEB & LOEB LLP

13          Attorneys for Deloitte & Touche LLP

14          345 Park Avenue

15          New York, NY 10154

16

17    BY:   DANIEL G. BESIKOF, ESQ.

18

19

20    MORGAN, LEWIS & BOCKIUS

21          Attorneys for Hitachi Chemical (Singapore) Pte

22          101 Park Avenue

23          New York, NY 10178

24

25    BY:   MATTHEW W. OLSEN, ESQ.

6

1

2    RICHARDS KIBBE & ORBE LLP

3         Attorneys for Goldman Sachs Credit Partners LP

4         One World Financial Center

5         New York, NY 10281

6

7    BY:   MICHAEL FRIEDMAN, ESQ.

8          KEITH M. SAMBUR, ESQ.

9

10

11   WEIL, GOTSHAL & MANGES LLP

12        Attorneys for General Motors

13        767 Fifth Avenue

14        New York, NY 10153

15

16   BY:   JEFFREY L. TANENBAUM, ESQ.

17

18

19   WILLKIE FARR & GALLAGHER LLP

20        Attorneys for the Collective of DIP Lenders

21        767 Seventh Avenue

22        New York, NY 10019

23

24   BY:   MICHAEL J. KELLY, ESQ.

25

7

1

2    GOLDBERG KOHN

3         Attorneys for Creditor Omron Daltec

4         55 East Monroe Street

5         Suite 3300

6         Chicago, IL 60603

7

8    BY:   DANIELLE WILDERN JUHLE, ESQ. (TELEPHONICALLY)

9

10   MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C.

11        Attorneys for Creditor

12        Calder Plaza Building

13        250 Monroe Avenue NW

14        Suite 800

15        Grand Rapids, MI 49503

16

17   BY:   THOMAS P. SARB, ESQ. (TELEPHONICALLY)

18

19   PENTWATER CAPITAL MANAGEMENT

20        Interested Party

21        Chicago, IL

22

23   BY:   JORDAN FISHER (TELEPHONICALLY)

24

25   PHIL IVALDY, IN PRO PER (TELEPHONICALLY)

8

1          P R O C E E D I N G S

2          THE COURT:  Well, I presume that about two-thirds, at

3     least, of the people are here are here on Delphi.  So I'll take

4     the Delphi case first and then move on to the other items on

5     the calendar.

6          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

7     Kayalyn Marafioti and John Lyons here on behalf of Delphi

8     Corporation for its forty-fourth omnibus hearing.  There are

9     three matters on the agenda.  The first matter, Your Honor, is

10    the steering option exercise motion, docket number 16410.  As

11    we indicated, Your Honor, previously, we're carrying this

12    matter until Your Honor is able to rule on the plan

13    modification motion that we previously filed at the final

14    hearing for that motion.  And so we'd like to adjourn this to

15    the July 23rd omnibus hearing.

16         THE COURT:  Okay, that's fine.

17         MR. BUTLER:  Thank you.  Your Honor, the second matter

18    today is the final hearing on the debtors' supplemental motion

19    for an order authorizing the debtors to amend their existing

20    financing arrangements with the General Motors Corporation.

21    The original motion was filed at docket number 16411.  The

22    supplement was filed at docket number 16647.  Your Honor

23    approved the interim -- this financing arrangement on an

24    interim basis last week at docket number 16951.

25         There's only one objection, Your Honor, that's been

9

1    received with respect to this motion; it's a letter by

2    Mr. Ernest Knobelspiesse, K-N-O-B-E-L-S-P-I-E-S-S-E, dated June

3    9th, which appeared on the Court's docket yesterday afternoon

4    at docket number 17015.  Mr. Knobelspiesse, who's a former

5    employee of the debtors, requested that the Court defer/deny

6    approval of the financing from General Motors, but does not set

7    forth any basis to deny final approval of this motion as

8    supplemented.  We ask Your Honor to overrule that objection.

9           Your Honor, in addition, I was advised by General

10   Motors and the United States Treasury that they wanted to

11   address the Court in connection with this hearing.

12           THE COURT:  On this?  On the funding motion?

13           MR. BUTLER:  Yes, Your Honor.

14           THE COURT:  Okay.

15           MR. TANENBAUM:  Good morning, Your Honor.

16           THE COURT:  Good morning.

17           MR. TANENBAUM:  Jeffrey Tanenbaum from Weil Gotshal on

18   behalf of General Motors.  Your Honor, at the end of the

19   hearing last week I reminded the Court that our obligation to

20   fund under the LSA is premised upon seeing an order, a plan

21   modification order, that's reasonably acceptable to us.  At

22   that time, the Court entered the interim order.  After

23   consultation with the auto task force, Your Honor, we believe

24   it would be appropriate if the Court deferred entry of this

25   final order on the LSA until we see an opportunity to review --

10

1    we have an opportunity to review the plan modification order.

2    We were not sure where the Court is with respect to that.  We

3    understand that an order was submitted.  We saw letters

4    submitted from Mr. Siegel on behalf of certain of the DIP

5    lenders.  Mr. Rosenberg submitted an order.

6         Your Honor, we're going to be in the position of

7    having to review that order in any case, and we thought it

8    would be appropriate, in the event that we do have any issues

9    with that order, that we sort of keep both of these orders on

10   the same time line, so to speak, and have an opportunity to

11   review Your Honor's order in that regard before you enter the

12   final LSA order.

13        THE COURT:  Well, I mean, I'm not sure what posture

14   that puts me in procedurally.  I mean, GM has its rights under

15   the agreement not to extend the financing.  And I assume that

16   if the modification order is not acceptable, then GM will so

17   inform the debtors and there'll be discussion, and perhaps

18   there'll be a modification of the order or perhaps there won't

19   be.  But if I just hold off signing it, then what would happen?

20   Would we have a new hearing?  I'm just not sure what --

21        MR. TANENBAUM:  Well, Your Honor, if Your Honor

22   does -- in the absence of Your Honor signing that order, we are

23   in a limbo state in any event.  I'm not trying to be cute with

24   my argument at all.

25        THE COURT:  Right.

11

1        MR. TANENBAUM:  I'm trying to just put everybody in a

2   position where it's not awkward for us.  It's going to be

3   difficult enough to receive an order and make as prompt a

4   decision as possible.  The debtors are in need of financing;

5   everybody is totally appreciative of that fact.  I don't see

6   any downside in deferring the entry of that order because,

7   notwithstanding the entry of that order this morning, we still

8   cannot act, and we will not be able to act --

9        THE COURT:  Well, the only downside, I think, is the

10  one I identified, which is, I wouldn't know -- it's not clear

11  to me what the next step would be with this financing motion if

12  I had not entered the order and then GM notified the Court that

13  it wasn't satisfied with the --

14       MR. TANENBAUM:  Well, Your Honor, with all due

15  respect, in the last twenty-four hours I've seen more

16  communications with a Court than I think I've ever seen in the

17  last thirty years.  I --

18       THE COURT:  No, I understand --

19       MR. TANENBAUM:  I assume, Your Honor, after we see the

20  order entered on the plan modification motion, we would

21  immediately review it and inform chambers immediately as to

22  what issues, if any, we had.  Your Honor may still decide to

23  enter the LSA amendment order notwithstanding, but at least at

24  that point if things were to come to a head we could bring them

25  to a head in that vein, which I --

12

1          THE COURT:  All right, so you're not amending the LSA,

2     then?

3          MR. TANENBAUM:  No, we're not doing any -- making any

4     amendments --

5          THE COURT:  All right.

6          MR. TANENBAUM:  -- to the LSA.

7          THE COURT:  Okay.

8          All right, do Debtors have any view on this?

9          MR. BUTLER:  Your Honor, as we advised General Motors

10    and the auto task force prior to the commencement of this

11    hearing, we respectfully disagree with their position.  I do

12    understand and respect the fact that they wanted to have on the

13    record of this hearing the fact that there are conditions that

14    are yet unfulfilled in the LSA; that means that they're not

15    obliged to lend under the LSA.  And those conditions exist

16    under the interim order; they exist under the final order.

17    There is no prejudice at all to General Motors, insofar as

18    we're aware, to having the order entered and having a final

19    determination on this motion.

20          Procedurally, the debtors believe that's the correct

21    thing to do, although we're fully cognizant, and I think all

22    the stakeholders are fully cognizant, of the conditions to the

23    new financing.  And Mr. Tanenbaum is correct; the debtors need

24    access to the financing.  We needed it last week and we needed

25    access to the financing this week.  There has to be resolution

13

1    of these matters.  But I don't think, and I don't think

2    Mr. Tanenbaum is making the argument, that GM is any way

3    prejudiced by entry of this order.

4            THE COURT:  Right, because the order gives GM the

5    ability not to fund if it's not satisfied with the --

6            MR. BUTLER:  Right.  There's a condition that can

7    either be enforced or waived in the sole judgment of General

8    Motors.

9            THE COURT:  Right.  Well, it's, in all events, moot

10   because I intend to enter both orders today.  So I don't think

11   there's really much of an issue.  I have read the

12   correspondence that went to me, including Mr. Tanenbaum's

13   letter.  And I assume that since that letter went out he's

14   gotten all the correspondence that went to me.  Is that

15   correct?

16           MR. TANENBAUM:  Yes, Your Honor.  I sent by e-mail

17   after someone had sent me Mr. Siegel's letter.

18           THE COURT:  All right.

19           MR. TANENBAUM:  So I'm now fully informed, I believe,

20   unless there's something else floating around that I'm not

21   aware of.

22           THE COURT:  Well, I don't think so.  And I could give

23   you all my general view on the correspondence.  I do not intend

24   in this order and the bidding procedures that are attached to

25   it to make any rulings, even implied rulings, on credit bid

14

1   issues.  I think those are important issues, if they ever do

2   come to a head, that should be addressed at that time as

3   opposed to now.

4        And I think the procedures, as drafted and as

5   commented on by the creditors' committee, are flexible enough

6   so that someone who believes they're making a good-faith bid

7   that is one that, with proper authorization, includes a credit

8   bid element to it as well as another element, another element

9   of consideration, will be able to have his or her day in court.

10  These procedures ultimately are qualified by both fiduciary

11  duties and the Court's duty to approve the highest and best

12  proposal and evaluate the debtor's exercise of its business

13  judgment.

14       So I don't want these procedures to be a device for

15  constricting rights, whether those rights are creditors' rights

16  or the debtors' rights.  So I'm not going to get into the

17  issues about the credit bidding in the procedures.

18       I also believe that when the debtors posit that they

19  will be making the determination of the highest and best

20  bidder, that's qualified by the language in the order which

21  provides for full committee review and communication and the

22  ultimate fact that the Court determines the highest and best

23  result in evaluating the debtors' business judgment.

24       So I'm not particularly bothered by those provisions.

25  And I believe that, again, given the fact that all of these

15

1    provisions are qualified by the debtors' duty to act as a

2    fiduciary and the review by the committee and the ultimate

3    review by the Court, I believe that any buyer who is interested

4    in these assets will realize that they are not tied, as a legal

5    matter, to the exact terms of the deal that's on the table.

6    And I don't think the debtors would disagree with that.  I

7    think a prospective buyer would also have to understand that

8    actual monies ultimately, I believe, are going to be involved

9    in dealing with these assets.

10          So the one aspect of the proposed procedures that did

11    give me real pause, although it may be appropriate to tweak

12    some of the other language a little bit but not significantly,

13    is the validation of a thirty million dollar reimbursement for

14    Platinum.  I don't believe something like that should be done

15    without opportunity for notice and a hearing, unless it's

16    agreed to by the primary parties in the case.  I think it

17    should bear some real -- that any sort of breakup fee or

18    expense reimbursement should bear some appropriate

19    correspondence to the value that the estate is getting from the

20    party that would be getting such a stalking horse or bidder

21    protection or reimbursement, and that it should be paid out of

22    the proceeds of the transaction so that it's really something

23    that clearly is for the benefit of the estate as opposed to

24    some other party.

25          But I'm reluctant to pick a number based on this

16

1   record without an opportunity for notice and a hearing.  I also

2   believe that, notwithstanding the O'Brien Energy case, a bidder

3   who eventually is outbid but has not yet gotten its protection,

4   and I believe that there's certainly time to get it noticed for

5   a hearing, but if for some reason that time slips by, I believe

6   that bidder, who really does contribute by forming a template

7   or doing due diligence that others rely on, is going to be

8   entitled to a 503(b) type of substantial contribution payment,

9   even if it is ultimately outbid.

10       So I think Platinum could take some comfort from the

11   fact that it'll have time to put -- or the debtor will have

12   time to put a motion in front of me for approval, focused on,

13   again, what's the benefit to the estate of this transaction and

14   what are the proceeds that the amount would be paid out of.

15       But that was my one serious problem with the

16   procedures that were proposed.

17       So I hope that GM could take away from that some

18   feeling of comfort that what it had agreed to is pretty close

19   to what I'm prepared to approve.

20       MR. TANENBAUM:  Your Honor, I'll defer to the auto

21   task force, but I'm just going to make one point, and it's

22   going to be redundant, and that is, to the extent that General

23   Motors or the auto task force have a clarification issue or a

24   comment on the order, it just seems fairer and a better

25   approach to have that opportunity and to engage chambers, which

17

1    I don't think is going to delay anything, but I'll leave it at

2    that.  I just --

3            THE COURT:  All right.  I just don't want to drag it

4    out too much.  And I do know that, based on the last letter

5    from the debtors' counsel, GM and the task force had signed off

6    on the procedures in the order.  And, again, the only thing I

7    really have a significant issue with is the thirty million

8    proposed fee, which frankly, given the absence of notice and an

9    opportunity for a hearing, would be suspect if I approved it

10   today.  So it would be hard for me to believe that someone

11   would withhold funding over something that wasn't really

12   authorized under the Bankruptcy Code on the limited notice that

13   we have.

14           MR. SIEGEL:  Your Honor, Glenn Siegel for Elliott

15   Associates.  We do have one other outstanding issue, which we

16   were only able to bring to this Court's attention this morning.

17   We have been unable to negotiate a nondisclosure agreement with

18   the debtor.  We engaged the monitor, namely committee counsel,

19   with respect to this document yesterday.  And the monitor has

20   at least agreed that the form that we have --

21           THE COURT:  By "the monitor", who -- Mr. Rosenberg,

22   right?

23           MR. SIEGEL:  Mr. Rosenberg --

24           THE COURT:  Okay.  All right.

25           MR. SIEGEL:  -- who has agreed that our form is, I

18

1      believe his words were, appropriate and reasonable.

2            I'm not asking you to do anything at this moment, but

3      we did send Your Honor an e-mail this morning asking for you

4      intervention to see if we could resolve this, since obviously

5      we need to get in there and look at documents.

6            THE COURT:  All right.  Well, I don't know whether

7      Mr. Rosenberg has a chance to talk to the debtors about this,

8      but I'm available later this afternoon to talk about that.

9            MR. ROSENBERG:  Yeah, we have spoken, Your Honor.  I

10     think that, clearly, the debtor continues to disagree with the

11     draft that frankly I think, after significant changes

12     yesterday, is now a reasonable and appropriate form.  And,

13     indeed, I believe that part of the debtors' objection goes to a

14     point that Your Honor just ruled on, which is the credit bid

15     issue and postponing that for another day.

16           So in my monitor role, I do believe that what I

17     discussed with the Tranche C lenders yesterday, at least as

18     represented by Mr. Siegel, does at this juncture represent an

19     appropriate NDA.  I find it kind of baffling that an issue like

20     an NDA would ever make its way into a courtroom.  You would

21     have thought the parties could work that out fairly easily.

22     But I am deeply concerned, given the shortness of the process,

23     that these sorts of issues not linger on and delay the process

24     pursuant to which higher and better value may come out of this

25     process in a very short time frame that we all know ends in

19

1    mid-July.

2         THE COURT:  Okay.

3         MR. BUTLER:  Your Honor, if I can address this.

4    First, let's be clear, and the proposed plan modification order

5    makes clear, that the debtors are obliged to offer the same NDA

6    that Platinum signed to other parties.  Over the course of the

7    last few days, not waiting for the plan modification order to

8    be signed, third parties have approached the debtors, have

9    signed the Platinum form of NDA and have access to the

10   information.

11        In addition, the DIP lenders, through the protective

12   order, have access to substantially all the information they're

13   going to get as under the NDA.  The difference in the NDA is

14   whether you're acting as -- which hat you're wearing in terms

15   of how you're going through it.

16        We found out about 10 o'clock last night on a

17   communication from Mr. Siegel about the conversations he had

18   had with Mr. Rosenberg, and we had not had an opportunity to

19   speak to Mr. Rosenberg; I did so before this hearing.  I

20   provided Mr. Rosenberg nine issues that we have and a markup to

21   show what the concerns are.  I'm prepared to meet and confer

22   with them.

23        But these all reflect departures that the DIP lenders

24   want from the Platinum form.  They want a better deal, a

25   different deal, than Platinum had in terms of the NDA.  They're

20

1   unwilling to sign and be governed by the same rules Platinum

2   was.  They want their own special rules.  And this is not an

3   issue, I think, where the debtors are being overzealous.  We're

4   prepared to sign the Platinum form of agreement with the DIP

5   lenders today.  They just don't want to follow the rules.

6          THE COURT:  Well --

7          MR. SIEGEL:  Your Honor, not to --

8          THE COURT:  -- I --

9          MR. SIEGEL:  -- go on ad infinitum about this --

10         MR. BUTLER:  I didn't raise it.  This is here as an

11  omnibus issue, Mr. Siegel.  You chose to bring it up.

12         MR. SIEGEL:  Undoubtedly.  The issues that Mr. Butler

13  raises are issues that reflect the fact that we are, in fact,

14  DIP lenders.  And we think -- rather than argue it right now,

15  we think that these are changes that are material to us and

16  would be irrelevant to all the other parties who've signed this

17  document.  And let's just leave it at that.

18         THE COURT:  All right, well, you all should go through

19  it.  But I -- you know, there's a general form of an NDA, and

20  they have a well-recognized purpose.  I haven't read Platinum's

21  NDA.  I didn't rule that only Platinum's NDA and no other NDA

22  would be acceptable.  But it's hard for me to say more without

23  seeing what the specific differences are.

24         But, again, I -- it seemed to me that, as I said last

25  week, the two-hat issue should be pretty limited so that the

21

1   information that's not to be provided to a bidder who also is a

2   DIP lender in their capacity as a bidder is really limited to,

3   again, Platinum's analysis of its deal and the debtors'

4   analysis of the value of the Platinum deal, because that's not

5   something you'd give to a bidder.

6        So -- and, again, I think that anything that shoehorns

7   or predetermines the credit bid issues shouldn't be dealt with

8   in this form.  It should be dealt with, unless the parties

9   agree to do it in this form, you know, if and when it ever

10  comes up.  So that's all the guidance I can give you.

11       MR. BUTLER:  I appreciate it, Your Honor, and I think

12  our form actually addresses those issues.  I'm happy to meet

13  and confer with people again on this --

14       THE COURT:  Okay.

15       MR. BUTLER:  -- but I just wanted the Court to

16  understand that the holdup here is because the DIP lenders are

17  not willing -- or Mr. Siegel's clients are not willing to sign

18  the form of NDA.  Even over the weekend, other prospective

19  bidders have signed --

20       THE COURT:  All right.

21       MR. BUTLER:  -- and already have access to.

22       THE COURT:  Okay, but it may be that -- well, I won't

23  say more.  I mean, it may be because the other people aren't

24  DIP lenders.  But as long as the agreement appropriately

25  protects the debtors' information, that should be the focus.

22

1          MR. BUTLER:  Thank you, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. BUTLER:  So I think we're still back with the --

4          THE COURT:  Well, on the financing amendment, I'll

5     approve the debtors' motion.  As you noted, it's only opposed

6     by the letter objection by Mr. Knobelspiesse.  I've reviewed

7     that objection; it goes almost exclusively to the timing of the

8     motion.  But I believe, based on both the applicable Bankruptcy

9     Rules as well as the facts, that the timing is appropriate

10    here, given the debtors' need for the financing as well as, I

11    believe, the ability of parties-in-interest to review the

12    terms.  So I'll approve it.

13         MR. BUTLER:  Thank you, Your Honor.  Your Honor,

14    matter number 3 on the agenda is the expedited motion of

15    Deloitte & Touche for an order terminating the debtors'

16    retention of D&T as their independent auditors and accountants,

17    found at docket number 16644.  This matter is unopposed, and

18    counsel for Deloitte & Touche would like to present it to the

19    Court.

20         THE COURT:  Okay.

21         MR. BESIKOF:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MR. BESIKOF:  Dan Besikof of Loeb & Loeb on behalf of

24    Deloitte & Touche LLP.  Deloitte's move for the formal

25    termination of its retention as the debtors' independent

23

1    auditors and accountants -- Deloitte seeks this relief so that

2    it and its affiliates can perform services for third parties in

3    connection with the debtors' cases.  Specifically, Your Honor,

4    Deloitte's affiliate, Deloitte Tax LLP, has been asked to

5    represent a potential purchaser of debtors' assets and has

6    actually performed a small amount of preliminary work on that

7    purchaser's behalf.

8         Deloitte was retained as the debtors' auditors and

9    accountants in January 2006 to audit the debtors' 2005

10   financial statements and perform other related services.

11   Deloitte's retention has completed, and its formal engagement

12   by the debtors is no longer necessary.  Deloitte completed its

13   2005 audit work approximately three years ago in July 2006.

14   Since then, Deloitte's done no meaningful work for the debtors

15   other than to issue a handful of audit consents.  And the

16   debtors have replaced Deloitte as independent auditors and

17   accountants by retaining Ernst & Young approximately three

18   years ago.  The last work of any kind performed by Deloitte for

19   the debtors was more than a year ago, in March 2008, in

20   connection with the issuance of an audit consent.  The debtors

21   have informed Deloitte that they don't believe any further

22   audit consents will be required or that any other services of

23   any other kind will be required in the cases.

24        Deloitte's discussed the relief and previewed the

25   motion with the debtor, the committee and the U.S. Trustee.

24

1    None of those parties has objected.  In addition, Your Honor,

2    the relief sought by Deloitte would not cause any prejudice to

3    the estate; in fact, may have some benefit to the estate.

4        Deloitte would adhere to all applicable professional

5    standards in connection with any third-party representation

6    relating to the debtors and would establish appropriate

7    confidentiality procedures to ensure that any confidential

8    information obtained by Deloitte in the scope of its retention

9    by the debtors is protected.

10       In addition, Your Honor, any confidential information

11   obtained by Deloitte in the scope of its retention is likely

12   stale at this point since the last meaningful work that

13   Deloitte did on the debtors' behalf was approximately three

14   years ago and related to fiscal year 2005.

15       Finally, the services to be rendered by Deloitte Tax

16   could actually benefit the estate by assisting a purchaser or a

17   potential purchaser of assets in preparing and submitting a

18   bid, which would likely be of significant benefit.

19       Your Honor, in addition to the foregoing, section

20   10.3(d) of the debtors' confirmed plan, which governs the

21   debtors' post-confirmation retention and compensation of estate

22   professionals, already permits this relief.  The provision

23   provides that estate professionals do not need to satisfy the

24   provisions of Sections 327 through 331 of the Bankruptcy Code

25   in connection with post-confirmation services.  Accordingly,

25

1    even if additional services were required, Deloitte would not

2    need to remain disinterested or satisfy the other disclosure or

3    other requirements in order to perform them.

4         And that's really it, Your Honor.

5         THE COURT:  Okay.

6         MR. BESIKOF:  I'm happy to answer any of your

7    questions.

8         THE COURT:  Well, I've reviewed the motion, and I'll

9    approve the request, which is the termination of Deloitte's

10   services.  I didn't see a proposed order, so do you have one

11   with you?

12        MR. BESIKOF:  I do have one.

13        THE COURT:  Okay.  And I take it, given what you've

14   just said and also what was stated in the motion, that the

15   order doesn't contain a provision finding that whatever

16   Deloitte does is free to do, because, obviously, Deloitte still

17   needs to comply with the procedures that you've outlined and

18   has whatever duties it has under applicable law.

19        MR. BESIKOF:  Right.  I think the order just provides

20   that Deloitte is released as auditors and accountants to the

21   debtors --

22        THE COURT:  Okay.  All right --

23        MR. BESIKOF:  -- that it's no longer subject to

24   disclosure requirements and that it's -- and I think that's it.

25        THE COURT:  Okay.  So I'll approve the motion, then.

26

1          MR. BESIKOF:  Thank you, Your Honor.  And I'll hand up

2     an order, if I may.

3          THE COURT:  Thank you.

4      (Pause)

5          MR. BUTLER:  Your Honor, the next matter on the

6     agenda, and the final matter on the agenda, is the debtors'

7     expedited motion for an order under Section 546(c) in the

8     amended reclamation procedures order classifying reclamation

9     claims as general, unsecured, nonpriority claims for all

10    purposes; found at docket number 16663.

11         THE COURT:  Okay.  I don't know whether everyone here

12    on the Delphi case wants to stay for that motion.  If you

13    don't, you can be excused.  Okay?  All right?

14         MR. BERNSTEIN:  Your Honor --

15         THE COURT:  Mr. Bernstein?

16         MR. BUTLER:  Riveted on this motion.

17         MR. BERNSTEIN:  Can I just raise one scheduling

18    question?  Don Bernstein from Davis Polk --

19         THE COURT:  Yes.

20         MR. BERNSTEIN:  -- for the administrative agent on the

21    debtor-in-possession financing, and that is that Mr. Siegel's

22    firm has a pending request for a conference with the Court.

23    And I know you have expressed views on the order, but also

24    there --

25         THE COURT:  This is the -- let me make sure I

27

1    understand the pending request.  This is the one that was just

2    discussed on their -- on the NDA?

3         MR. BERNSTEIN:  That, I believe, is the one that's

4    pending.

5         THE COURT:  Okay.  All right.

6         MR. BERNSTEIN:  And the concern I have, Your Honor, as

7    the administrative agent, is that every day that ticks by here

8    gets us closer to events that we probably would prefer not to

9    have to face.  And what I would really like to see is some

10   resolution of that today, one way or the other.  And if the

11   parties can't reach agreement, they may need the Court to

12   intervene.

13        THE COURT:  Well, I'm free, as I said, this afternoon.

14   I think you should be able to reach agreement based on what was

15   said today but, if not, I'm free this afternoon.  I intend to

16   enter the modification order after this hearing, so I don't

17   think I need any more input on that.

18        MR. BERNSTEIN:  All right.  Thank you, Your Honor.

19        MR. BUTLER:  This has been moving forward on the --

20   wait just a minute.

21        THE COURT:  There are some seats there.  Okay.  All

22   right.

23        MR. BUTLER:  Moving forward on that, on the

24   reclamation motion, Your Honor, a total of eight holders of

25   reclamation claims have filed objections.  These represent, in

28

1    the aggregate, forty-one reclamation claims.  And I won't go

2    through the list.  They're all listed and docketed on the

3    omnibus agenda.

4         Yesterday, the debtors filed an omnibus reply at

5    docket number 17021 and held a meet-and-confer with counsel for

6    the objecting parties.  At that meet-and-confer, there was

7    agreement that this motion did not present evidentiary issues

8    and could be addressed by oral argument for the parties.  I'll

9    begin to present the motion.  And counsel for, I believe, two

10   of the objecting parties, Hitachi Chemical and JPMorgan, will

11   present argument on behalf of the objectors.  I also believe

12   that Brazeway's counsel, whose objection raises a unique issue

13   to that claim, will also make -- wishes to make a statement on

14   the record.

15        Now, just, Your Honor, to put this in context, there

16   were 350 reclamation claims subject to the original procedures

17   motion.  As I indicated, there are some 41 objections that are

18   included here that -- I guess, 40 or -- I guess, 41 objections,

19   which means there's 309 total claims that did not respond to

20   the objection.

21        Originally, Your Honor, there were 855 reclamation

22   claims, totaling 282.7 million dollars.  These were reduced

23   down to potentially now less than 350 claims with what the

24   debtor estimates is a total of about 17 1/2 million dollars of

25   potential liability.  I think the outside number on just the

29

1   face amount of those claims is closer to about 35 million

2   dollars.  So that's really what's at issue here in terms of

3   priority.  It's no longer the larger amount.

4          Your Honor, obviously, with respect to the -- and just

5   to give Your Honor a chronology here of what, I think, are

6   relevant to this argument, back in 2005 on June 14, Delphi

7   entered into a third amended and restated credit agreement with

8   its prepetition secured lenders.  In that agreement, they

9   obtained a blanket lien on inventory.  The debtors filed their

10  cases on October 8th, 2005, and on October 28, 2005 the

11  original DIP order was entered in which the prepetition secured

12  lenders' blanket liens were subordinated to the original DIP

13  liens but they were not released.

14         On November 4th of 2005, the reclamation procedures

15  order was entered.  And from a period from then through the

16  middle of 2006, the debtors reconciled some 855 reclamation

17  claims.

18         In July 2006, a reclamation creditor by the name of

19  Speedline Technologies filed a motion for the return of

20  reclamation goods or payment of their administrative claim.

21  They had shipped equipment, not inventory, that was consumed.

22  They asked the equipment to be returned.  Your Honor ruled on

23  August 17th of 2006, denied Speedline's motion and noted in

24  that ruling that reclamation claims are potentially subject to

25  the prior lien defense.  And that particular ruling has been

30

1    commented on in a number of the objections.

2            There was at that time -- while Your Honor

3    acknowledged the prior lien defense as a potential defense, you

4    did decline the creditors' committee's request at that time to

5    apply the prior lien defense because the prepetition secured

6    lenders' liens had not yet been released.

7            We filed our original plan of reorganization the next

8    year in September of 2007.  On October 1st of that year, you

9    entered an amended reclamation procedures process which

10   established a mechanism for reclamation claimants to elect

11   treatment as general unsecured creditors or litigate the prior

12   lien defense after confirmation.  That mechanism was included

13   in the confirmed plan that was confirmed on January 25th of

14   2008.

15           Following that period, as we all know, on April 4th

16   the plan investors, in 2008, did not close the confirmed plan.

17   We filed plan modifications earlier this month on June 1st to

18   move forward, and on June 5th we filed this motion to classify

19   reclamation claims.  And there were -- and one other

20   significant event that I should also point out, which I think

21   we'll be talking about in this hearing, is in 2007 the DIP was

22   refinanced and the prepetition loan, the third amended and

23   restated credit agreement, was refinanced and paid out in that

24   transaction.  And the property rights, including all the

25   collateral rights in the inventory, were transferred to the DIP

31

1    at that time.

2         Your Honor, that's just a brief chronology of what has

3    occurred here.

4         THE COURT:  But before you get into -- I'm assuming

5    you're going to go to the argument now.

6         MR. BUTLER:  Yeah.

7         THE COURT:  But before you do that, I just want to

8    cover a couple procedural things.  This is couched as a motion

9    to reclassify, but was individual notice given to each of the

10   reclamation claimants?

11        MR. BUTLER:  Yes.  Yes.

12        THE COURT:  So they wouldn't have had to just look at

13   the chart.  They would have gotten their own notice --

14        MR. BUTLER:  Correct.

15        THE COURT:  -- that they were being reclassified?

16        MR. LYONS:  They would have received the motion

17   itself, Your Honor.

18        THE COURT:  But with their name highlighted in it;

19   that this is covering them?

20        UNIDENTIFIED SPEAKER:  No, I don't think we --

21        MR. LYONS:  No, we didn't have the -- no, we did not

22   have that particular -- Your Honor, we did not have the

23   particularized notice that we would have for an omnibus

24   objection.

25        THE COURT:  Okay.  So I guess one issue I have is --

32

1   obviously, the people who objected had actual notice, as

2   evidenced by their objection.  I had some issue in my mind

3   whether this would fall under 3007(d) given that it was not

4   necessarily a claim objection, but it does seek to reclassify

5   claims, and effectively it would value them -- seeks to value

6   them at zero.

7        The other question I had is, I want to make sure I

8   understand this, I'm assuming that at least some reclamation

9   claimants opted into unsecured creditor treatment pursuant to

10   the October 1 amended reclamation order?

11        MR. BUTLER:  Yes.

12        THE COURT:  Are those claimants covered by this

13   motion, or are the debtors treating them as already having

14   agreed to unsecured creditor status?

15        MR. BUTLER:  They're covered by this motion.

16        THE COURT:  Okay.  So -- all right.  Okay, so you can

17   go ahead and --

18        MR. BUTLER:  Your Honor, on the first part, we did not

19   send -- we didn't treat this, under 3007(d), as a

20   particularized notice matter as we have the others, and I guess

21   I should -- at the front end.  And this issue is, frankly, the

22   prior lien defense; it's a legal issue that'd reply to 1 or 300

23   claims.  I made a point of not asking the Court to enter

24   relief, simply because people hadn't responded.  Typically, we

25   would, at the outset of these hearings, ask the Court to grant

33

1    the motion as to anyone who hadn't filed an objection.  I

2    didn't do that.  I don't think it's necessary in this case,

3    because ultimately if Your Honor's prepared to consider the

4    merits with respect to the eight objectors and rule on the

5    legal issue, it's applicable to everybody.

6          If Your Honor believes that we should send out -- you

7    know, defer this hearing and send out particularized notice to

8    everybody, we're prepared to do that.  It's really whatever the

9    Court wants.

10          THE COURT:  Well, there's an alternative, which is, if

11   I rule in your favor I could have you settle an order on five

12   or ten days' notice.  And there may be instances, there might

13   be one even in these eight object -- in one of these eight

14   objections, where if I rule in your favor there still might be

15   some issue as to the amount of the claim or whether it's been

16   agreed to or not.  One of the parties raised that issue in

17   objecting here.  So there might be some merit in --

18          MR. BUTLER:  Right.

19          THE COURT:  -- in doing something like that.

20          MR. BUTLER:  I don't believe we're trying to fix the

21   amounts of claims here.  This is --

22          THE COURT:  Well --

23          MR. BUTLER:  -- limited to one particular issue.

24          THE COURT:  Okay.  Someone said that we have a

25   different deal with the debtor --

34

1          MR. BUTLER:  Right.  No, that -- I mean, you'll hear

2     that in the Brazeway discussion.

3          THE COURT:  Right.

4          MR. BUTLER:  That was the unique issue that I

5     discussed, Your Honor, earlier.  Brazeway raised an issue that

6     their reclamation claim shouldn't be on the motion because it

7     was superseded by a cure claim --

8          THE COURT:  Right.

9          MR. BUTLER:  -- pursuant to the stipulation resolving

10    the reclamation claim and the proof of claim.  We have a

11    different view of that, which is that the stipulation preserved

12    their rights to a cure in the event the executory contracts

13    were assumed.  The original plan would have called for those to

14    have been assumed; the modified plan does not.  And therefore,

15    as a matter of due process, they're cover -- you know, we

16    needed to give them notice to have them covered here.  We

17    weren't going to do this -- we weren't going to have this

18    hearing, hopefully prevail at this hearing, and then

19    subsequently say oh, by the way, your claim which was dealt

20    with under the original plan is being treated differently under

21    the modified plan.

22         THE COURT:  Right.

23         MR. BUTLER:  That's why we gave everybody who could be

24    covered here, who has a reclamation claim that has not been

25    eliminated in the procedures process -- all of those

35

1    reclamation claimants were notified of this motion and this

2    hearing date.

3             THE COURT:  Okay.

4             MR. BUTLER:  Your Honor, as I'll talk about in just a

5    few minutes, I mean, the refinance DIP facility which closed --

6    it was approved by the Court on January 5th, 2007.  Your Honor

7    entered an order that authorized the debtors to refinance their

8    prepetition secured debt by entering into what is the current

9    postpetition financing facility that's governed by the

10   revolving credit term loan and guarantee agreement.

11            The DIP facility was essentially a 4.5 billion dollar

12   replacement facility, the proceeds of which the debtors used to

13   repay the original DIP facility of 2 billion and the

14   approximate 2.5 billion outstanding on the debtors' 2.825

15   billion dollar prepetition credit facility.

16            The prepetition credit facility was essentially rolled

17   into the DIP facility as approximately a 2.495 billion dollar

18   second-priority term loan.  Pursuant to paragraph 11(a) of the

19   DIP refinancing order, the debtors were authorized and directed

20   to use the proceeds of the borrowings under the DIP facility to

21   revocably repay in full all obligations then due and payable to

22   the prepetition secured lenders under the prepetition credit

23   facility and the original DIP order.

24            And, Your Honor, the property interest that the

25   prepetition lenders had was simultaneously subsumed by and

1    belongs now to the DIP lenders.  I think that's important.

2    That's first --

3              THE COURT:  Was it fully paid out?  Is there anything

4    left?

5              MR. BUTLER:  No.  No, it was paid out and, in fact,

6    under paragraph 11(a) --

7              THE COURT:  So the refinancing date occurred?

8              MR. BUTLER:  Right.

9              THE COURT:  Okay.  All right.

10             MR. BUTLER:  And, in fact, paragraph 11(a) of the DIP

11   financing order specifically calls out the completion of that

12   repayment and the release of the prepetition liens as the

13   postpetition liens were put in place to cover that same

14   property.

15             Your Honor, and, again, the -- I'm not, unless Your

16   Honor wants me to go through it, I'm not going to go through

17   all the legal argument in our motions and in our response.  The

18   question here really is that the objectors would like Your

19   Honor to adopt the Phar-Mor ruling in the Sixth Circuit as

20   opposed to the line of cases that have been adopted in this

21   district.  And Phar-Mor stands for a proposition that is not

22   present here.  They would ultimately -- they argue that you

23   should follow Phar-Mor and not grant the prior lien defense

24   because postpetition lenders are not good-faith purchasers to

25   whom reclamation rights would be subordinated under Article

37

1    2-702(3) of the Uniform Commercial Code.  That is simply not

2    the law in this jurisdiction.

3         The two cases that have been -- that are cited most

4    notably on this subject are In re Dana Corp. and In re Dairy

5    Mart Convenience Stores, Inc.  And I would simply say to Your

6    Honor that the Dana case in particular is square-on; the kinds

7    of facts here deals with a postpetition facility, in our view.

8         Unless Your Honor has specific questions about it,

9    from our perspective we're really going to rely on the argument

10   and answer any questions the objectors might raise.

11        THE COURT:  Okay.  Thanks.

12        MR. OLSEN:  Good morning, Your Honor.  Matthew Olsen

13   of Morgan Lewis on behalf of Hitachi Chemical (Singapore) Pte.

14        THE COURT:  Good morning.

15        MR. OLSEN:  Your Honor, the debtors improperly seek to

16   reclassify reclamation claims to general unsecured claims on

17   the basis that such claims are subject to the superior rights

18   of the DIP lenders in all reclaimed goods.  As a result, the

19   debtors contend that all reclamation claims are valueless.

20        The debtors' argument begins with the premise that,

21   pursuant to UCC 2-702(3), all reclamation claims were subject

22   to the rights of the debtors' prepetition lenders as a result

23   of their blanket security interest and after acquired property,

24   including inventory, although Hitachi does not concede this

25   point, which, as maybe discussed later by counsel for Brazeway

1    Inc., was specifically rejected by the Sixth Circuit in the

2    Phar-Mor Inc. case.  For purposes of my present argument, I can

3    assume that, in fact, reclamation claims were subject to the

4    prepetition lenders' liens.

5         Of course, as Your Honor recognized in your bench

6    ruling concerning the Speedline motion, the fact that

7    reclamation claims may have been subject to the debtors'

8    prepetition liens does not mean such claims were extinguished

9    but only that they are held in abeyance pending the ultimate

10   disposition of the prepetition lenders' claims.

11        In their motion, the debtors concede that the

12   prepetition lenders' claims were paid in full from the proceeds

13   of the debtors' postpetition financing on or shortly after

14   January 5th, 2007 and not from the proceeds of the reclaimed

15   goods.  And I refer Your Honor to the motion at pages 3 and 18.

16        Moreover, pursuant to the express terms of the Court's

17   final DIP order, specifically paragraph 11(a), upon repayment

18   of the prepetition lenders' claims from the proceeds of the DIP

19   financing, all of the prepetition lenders' liens and security

20   interests in the debtors' assets were expressly released.  They

21   were not transferred or assumed by the DIP lenders, as was

22   suggested by debtors' counsel.  The release of this lien, of

23   course, includes all reclaimed goods and their proceeds.

24        Recognizing that the prepetition lenders' liens were

25   expressly released, the debtors contend that Hitachi's

39

1     reclamation claim is also subject to the liens granted to the

2     DIP lenders under the final DIP financing order.  Yet, the

3     debtors conceded that the DIP lenders' liens are newly created

4     under the DIP order and that the DIP lenders did not assume or

5     receive a transfer of the prepetition lenders' liens.

6          The debtors argue that, like the prepetition lenders

7     in acquiring their liens, the DIP lenders became good-faith

8     purchasers of all the debtors' assets, including the reclaimed

9     goods.  But, clearly, if the DIP lenders are held not to be

10    good-faith purchasers of the reclaimed goods or their proceeds

11    for purposes of UCC 2-702(3), the sellers' reclamation claims

12    would not be subject to the DIP lenders' liens.

13         Your Honor, the DIP lenders cannot be good-faith

14    purchasers with respect to the goods or the proceeds subject to

15    reclamation claims because the DIP lenders acquired their liens

16    well after and in full knowledge of the various reclamation

17    claims asserted by Hitachi and others.

18         And in our objection, we cite to the Bankruptcy

19    Court's decision in In re Phar-Mor Inc., 301 B.R. 482 at page

20    497, which held that the DIP lenders there could not qualify as

21    good-faith purchasers under 2-702(3) where such lenders had

22    prior notice of reclamation claims.

23         Recognizing the importance of this point, the debtors

24    spend almost their entire reply arguing that the DIP lenders

25    were good-faith purchasers for purposes of the UCC.  Yet, as

40

1   the debtors point out, the UCC does not define good-faith

2   purchaser, only the separate concepts of good faith and

3   purchaser.  As their argument goes, because the DIP lenders'

4   liens were acquired honestly, and the taking of the security

5   interest is a purchase under the UCC, the DIP lenders must

6   therefore be good-faith purchasers.  But that approach is wrong

7   as a matter of law.  The combined term "good-faith purchaser"

8   has a well-established meaning under applicable case law.  A

9   good-faith purchaser is one who purchases assets for value in

10  good faith and without notice of adverse claims.  And in this

11  regard I refer Your Honor to the cases of In re Made in

12  Detroit, Inc., 414 F.3d 576, 581 (6th Cir. 2005); In re

13  Willemain, 764 F.2d 1019 at 1023 (4th Cir. 1985); and Greylock

14  Glen Corp. v. Community Savings Bank, 656 F.2d 1 at 4

15  (1st Cir. 1981).  Here, the DIP --

16        THE COURT:  I'm sorry, what was the page for that one?

17        MR. OLSEN:  Glen Corp. was 656 F.2d 1 at page 4.  And

18  I give you the full citations, Your Honor, because I learned of

19  the good-faith argument as posited by Debtors for the first

20  time in their reply.  So these cases do not appear in our

21  papers.

22        Here, the DIP lenders had prior knowledge of the

23  reclamation demands prior to making the DIP loans and, thus,

24  did not qualify as good-faith purchasers with respect to the

25  reclaimed goods and proceeds.  The debtors' argument simply

1    ignores the established definition of good-faith purchaser

2    under applicable case law and the facts of this case.

3         In support of their arguments, the debtors principally

4    rely on the prior decisions of this Court, including In re

5    Arlco, In re Dairy Mart, In re Dana Corp., as well as the Sixth

6    Circuit BAP's decision in In re Pittsburgh-Canfield Corp.

7    However, these decisions are either distinguishable from the

8    facts of this case or are significantly undermined by the Sixth

9    Circuit's recent decision in Phar-Mor Inc.

10        The Arlow (sic) case is readily distinguishable from

11   this case because there the Court found that all the reclaimed

12   goods were sold and their proceeds applied in payment of the

13   prepetition lenders' claims.  And I refer to page 273 of that

14   decision.  Here, as mentioned, the prepetition lenders' claims

15   were expressly satisfied from the proceeds of the DIP

16   financing.

17        The Sixth Circuit BAP's decision in In re Pittsburgh-

18   Canfield Corp. is unhelpful to the debtors for two reasons:

19   First, the Court noted that the DIP lenders assumed the

20   prepetition liens, whereas here the prepetition liens were

21   expressly released; and, two, the decision has been flatly

22   rejected by the Sixth Circuit Court of Appeals in Phar-Mor.

23        THE COURT:  But not on that basis.

24        MR. OLSEN:  Not on that basis.  I think that is

25   probably true.  One point which I haven't emphasized yet, Your

42

1    Honor, and I think counsel may have brought to your attention,

2    is that the Phar-Mor Sixth Circuit case actually goes further

3    than Hitachi needs it to go today.  It would stand for the

4    proposition that the reclamation claimants' claims are not even

5    subject to the prepetition lenders' claims.

6         THE COURT:  Right.

7         MR. OLSEN:  The approach that I think is most

8    appropriate and which we're advancing today is that of the

9    Bankruptcy Court's decision in Phar-Mor, which was upheld by

10   the Sixth Circuit.  It's also --

11        THE COURT:  Well, no, the Sixth Circuit didn't deal

12   with the Bankruptcy's Court's logic.  The Bankruptcy Court said

13   that the DIP, having taken out the prepetition liens, was not

14   therefore a -- fell within the subject (2) language.  It didn't

15   fall within the subject (2) language because it took out the

16   liens.  And it's assumed without any citation that it wasn't in

17   good faith.

18        MR. OLSEN:  Well, you're referring to the Bankruptcy

19   Court's decision, Your Honor.

20        THE COURT:  Right, Judge Bodoh's decision.

21        MR. OLSEN:  I don't recall specifically what citation

22   it gave, but my understanding --

23        THE COURT:  I don't think he gave any.

24        MR. OLSEN:  Well, my reading of the decision was that

25   it based it on its understanding of the definition under the

1    UCC.  And as I mentioned earlier in my discussion, there is

2    independent case law to support that interpretation.

3           THE COURT:  Okay.

4           MR. OLSEN:  It's also interesting to note that

5    Bankruptcy Judge Bodoh of the Northern District of Ohio

6    presided both over Phar-Mor and Pittsburgh-Canfield.  And in

7    the Phar-Mor decision he specifically distinguished the

8    Pittsburgh-Canfield case because there the DIP lenders assumed

9    and received the transfer of the prepetition liens, whereas in

10   the Phar-Mor case there was an express release, as is the case

11   here.  And I refer to footnote 7 of page 497 of the Phar-Mor

12   bankruptcy case in that regard.

13          The Dairy Mart decision of this Court is at least

14   partly distinguishable from this case because although there,

15   as here, the prepetition lenders' liens were expressly released

16   in connection with the DIP financing, the Court emphasized that

17   the proceeds of the reclaimed goods were applied to pay down

18   the prepetition lenders' claim before the prepetition lenders'

19   claims were paid in full from the DIP financing.  And I refer

20   to page 135 for that point.  Thus, whether the reclamation

21   claims were subject to the DIP lenders' security interest was

22   not essential to the outcome of that decision.

23          Finally, Your Honor, the Dana decision is admittedly

24   most directly at odds with Hitachi's argument today and the

25   Phar-Mor decisions which we support.  Though, preliminarily I

44

1    would note that nowhere in the Dana decision is it clear that

2    the prepetition lenders' liens were released as a result of the

3    DIP financing.

4         But more importantly, in characterizing the

5    prepetition DIP financing as an integrated transaction, the

6    Court seemingly ignored the requirement of UCC 2-702(3) that

7    the DIP lenders must be good-faith purchasers of the reclaimed

8    goods.  That was the holding of the Phar-Mor Bankruptcy Court

9    which the Dana Court declined to follow and which has been

10   subsequently followed by the Bankruptcy Court in In re

11   Georgetown Steel, 318 B.R. 340 (Distr. S.C. 2004) and, as

12   mentioned, upheld by the Sixth Circuit Court of Appeals.  And

13   of course, Your Honor, there is no contrary law from the Second

14   Circuit in this regard.

15        The Phar-Mor Bankruptcy Court correctly held that the

16   value of the seller's right of reclamation depends on the

17   actual disposition of the subject goods.  There the Court

18   emphasized, as is the case here, that the prepetition lenders

19   chose to release their security interests and were paid in full

20   through the DIP financing.  The DIP lenders did not assume the

21   liens that secured the prepetition lenders' claims, though they

22   were free to do so, as the DIP lenders did in the Pittsburgh-

23   Canfield case.

24        In sum, Your Honor, once the prepetition lenders'

25   claims in this case were satisfied and their liens released,

45

1    the reclaiming sellers, including Hitachi, retained priority

2    claims to any remaining reclaimed goods or proceeds therefrom,

3    which claims are not subject to the security interests of the

4    DIP lenders.  Accordingly, the debtors' motion should be

5    denied.

6         Unless Your Honor has any further questions, I'll

7    conclude my argument.

8         THE COURT:  This all hangs on the good-faith point,

9    right, because the DIP agreement itself gives the DIP lenders

10   replacement first-priority liens?

11        MR. OLSEN:  I think that's right, Your Honor.  The

12   point is that a reclamation claim would have been made by

13   various sellers on or after the petition date in October of

14   2005.

15        THE COURT:  Right.

16        MR. OLSEN:  Admittedly, the security interest in

17   reclaimed goods that the prepetition lenders would have

18   attached instantly, and that security agreement was entered

19   into prior to the shipment of the reclaimed goods.  But, in

20   contrast, the DIP lenders came well after the fact and in full

21   knowledge of the reclamation claims.  And under the plain

22   language of UCC 702(3), they should not be entitled to take a

23   priority with respect to those reclaimed goods but certainly

24   with respect to the remainder of the debtors' assets.

25        THE COURT:  But there's a finding in the DIP order

46

1    that they acted in good faith.

2         MR. OLSEN:  Well, Your Honor, as Your Honor's well

3    aware, the term "good faith" is bandied about in many ways,

4    both in the UCC and the Bankruptcy Code, and it most often

5    means simply that one acted honestly at arm's length and is

6    entitled to the consequences of that behavior.

7         But here the point is not that they acted in good

8    faith, we wouldn't challenge that, but rather that they were a

9    good-faith purchaser, which is a term of art which can only be

10   defined by case law and is more akin to the notion of a bona

11   fide purchaser under real estate law and the recording

12   statutes, which, as Your Honor knows, one cannot be a bona fide

13   purchaser if one has constructive knowledge of a prior

14   recordation.

15        THE COURT:  But, then, what do you do with the fact

16   that they're given a first-priority priming lien?

17        MR. OLSEN:  Well, Your Honor, I would say that

18   certainly that primes prior liens, including the prepetition

19   lenders if they had not been released in the first wave of DIP

20   lenders, and that it's a good lien against all assets.  But

21   because of the specific provision of UCC 2-702(3), I do not

22   believe that that is a priming or priority lien with respect to

23   reclaimed goods.

24        THE COURT:  But why?

25        MR. OLSEN:  Simply because the language of 2-702(3)

1    plainly says that a reclaimed good is subject only to the

2    rights of a buyer in the ordinary course, which clearly the DIP

3    lenders are not, or a good-faith purchaser.  It previously had

4    said "and the lien creditor", which has now been stricken from

5    the statute.  So I believe that the DIP lenders are neither an

6    ordinary-course buyer or a good-faith purchaser under that

7    statute and, therefore, the reclamation sellers are not subject

8    to the DIP lenders.

9         THE COURT:  Well, but I guess I -- I mean, that order

10   has long been a final order.

11        MR. OLSEN:  Well, again, Your Honor --

12        THE COURT:  Who -- you're saying the DIP lenders had

13   notice of the reclamation claims but, clearly, the reclamation

14   claimants had notice of the DIP order.

15        MR. OLSEN:  Well, the point is the sequence of events.

16   The reclamation claim -- the reclamation goods were shipped

17   prior to the petition date.  The demands were sent on or before

18   ten days after the petition date.  Both the original DIP

19   lenders as well as the refinancing DIP lenders would have taken

20   their liens and financed the estate well after the reclamation

21   demand letters were sent and filed on the docket.  And to the

22   extent that the DIP order provides that they acted in good

23   faith, I wouldn't challenge that.  My point is that the concept

24   of good faith in isolation is completely different or is

25   significantly different from the concept of a good-faith

48

1    purchaser, which is a term of art which is not defined by the

2    UCC.

3          THE COURT:  Okay.  I didn't -- you said that -- I

4    think you said that Pittsburgh-Canfield acknowledged --

5          MR. OLSEN:  Your Honor, it's actually the Phar-Mor

6    Bankruptcy Court decision, which was written briefly after the

7    Pittsburgh-Canfield bankruptcy decision.  Both were written by

8    Judge Bodoh.  And if you look at footnote 7 of the Phar-Mor

9    decision, you will find Judge Bodoh's referencing the

10   Pittsburgh-Canfield case and acknowledging the key distinction

11   between the two is that in Phar-Mor there was an express

12   release of the prepetition lenders' liens, whereas in

13   Pittsburgh-Canfield there was an assumption and transfer to the

14   DIP lenders.

15         THE COURT:  Well, okay.  Judge Og (ph.) wrote the

16   Pittsburgh -- Judge Bodoh wasn't part of the panel in

17   Pittsburgh-Canfield.

18         MR. OLSEN:  No, I agree, Your Honor.  The case -- the

19   Pittsburgh-Canfield BAP decision, which I do discuss in my

20   argument and papers, is separate and subsequent to the

21   Pittsburgh-Canfield bankruptcy decision.

22         THE COURT:  Okay.

23         MR. OLSEN:  And unless -- I could be mistaken.

24         THE COURT:  So you're saying they were affirming Judge

25   Bodoh?

49

1          MR. OLSEN:  They were probably reversing him -- well,

2     no, no, in Pittsburgh-Canfield the panel would have affirmed

3     Judge Bodoh, correct, Your Honor.

4          (Pause)

5          THE COURT:  Okay.  And in the Phar-Mor case, Judge

6     Bodoh doesn't discuss non-UCC law on good faith.

7          MR. OLSEN:  I expect that's true.

8          THE COURT:  He says -- he simply says, "No action on

9     the part of a debtor should be permitted to defeat a seller's

10    right to reclamation."

11         MR. OLSEN:  I believe if you look to the last sentence

12    of that paragraph, he will acknowledge that the DIP lenders in

13    that case can't be good-faith purchasers.

14         THE COURT:  Right.  Okay.

15         MR. OLSEN:  But as I had mentioned, Your Honor, the

16    holding of that case is supported by a series of other

17    bankruptcy- and appellate-level decisions in interpreting the

18    definition of good-faith purchaser which cannot be found in the

19    UCC itself.

20         THE COURT:  Do they interpret it -- do they interpret

21    the term in a UCC context?

22         MR. OLSEN:  I believe they do, Your Honor.

23         THE COURT:  Okay.

24         MR. OLSEN:  Thank you, Your Honor.

25         MR. ELLIOTT:  Your Honor, Bruce Elliott appearing for

50

1    Brazeway and JPMorgan Chase.

2         THE COURT:  Good morning.

3         MR. ELLIOTT:  I'm sure the Court is familiar with our

4    position on this.  Quite frankly, we asked not to be included

5    in the motion once we had notice of it because our former

6    reclamation claim has been essentially merged or has been

7    morphed into a cure claim.

8         THE COURT:  Well, have the debtors assumed this

9    agreement?

10        MR. ELLIOTT:  Well, that's a question, Your Honor.

11   And the reason we had a problem --

12        THE COURT:  Well, is there an order approving an

13   assumption of the contract?

14        MR. ELLIOTT:  There was no order approving assumption

15   of the contract, Your Honor, but at this point in time, at best

16   it's a conditional or a contingent reversion back to a

17   reclamation claim.  And none of those conditions have happened.

18   And it seems to me they're putting the cart before the horse

19   when they're including us in this motion.

20        THE COURT:  Well, let me make sure I --

21        Mr. Butler, the debtors have not assumed this

22   contract?

23        MR. BUTLER:  No, Your Honor.  It would have been

24   assumed under the effective date of the eventual plan.

25        THE COURT:  Okay.  So if the debtors assume the

51

1    agreement, then as far as Brazeway's concerned this issue would

2    have no bearing, correct --

3           MR. BUTLER:  That's correct, Your Honor.

4           THE COURT:  -- because then the claim would be paid as

5    a cure claim.

6           MR. BUTLER:  That's correct, Your Honor, but by way of

7    disclosure, we included Brazeway here because under the

8    modified plan we don't believe their contract will be assumed.

9           THE COURT:  Okay.

10          MR. BUTLER:  And, therefore, they have a reclamation

11   interest.  The reclamation interest was never transformed into

12   a cure claim.  I mean, ultimately the cure claim only is paid

13   in the event the contract was assumed.

14          THE COURT:  Okay.

15          MR. BUTLER:  The contract was never assumed.

16          THE COURT:  All right.

17          MR. ELLIOTT:  Your Honor, the order -- the stipulation

18   order says it is an agreed cure claim.  That's the current

19   condition of the claim.

20          THE COURT:  But that's contingent upon the agreement

21   being assumed, right?

22          MR. ELLIOTT:  Then essentially it's being unwound.

23   While it had -- essentially, the debtor had agreed to assume

24   the contract.  I think it was effective upon -- or upon the

25   effective date of the plan.

52

1          THE COURT:  Okay.

2          MR. ELLIOTT:  Obviously, all the things that have

3    happened since that time have put the matter in limbo.  But at

4    this point in time those conditions have not occurred.  We're

5    being told that the contract may not be assumed, but we don't

6    have notice of that.  All these conditions are still not

7    fulfilled.  If those conditions occur hereafter, that's one

8    thing.  And we will address those, when they are properly

9    noticed, in an opportunity for hearing before the Court.  But,

10   Your Honor, again, I think the cart is before the horse at this

11   time --

12         THE COURT:  Well, but --

13         MR. ELLIOTT:  -- with respect to this claim.

14         THE COURT:  But let me -- I mean, let's go back to

15   square one.  Your client and other vendors asserted reclamation

16   claims.  There was always the inherent possibility that the

17   debtor would assume those underlying contracts.  That would

18   preclude the Court from determining the reclamation claim,

19   wouldn't it?

20         MR. ELLIOTT:  Well, Your Honor --

21         THE COURT:  I mean --

22         MR. ELLIOTT:  -- the Court --

23         THE COURT:  -- it's still a claim, so, you know, if

24   it's an unsecured claim, it's just as a reclamation claim it

25   would have zero dollars, on the debtors' theory.  It would

53

1  still be an unsecured claim and it would still be subject to

2  cure if the debtors determined that it was beneficial to their

3  estate to assume the contract.  So it wouldn't be premature to

4  determine the reclamation claim.

5       MR. ELLIOTT:  Well, Your Honor, of course, the amount

6  of the reclamation claim was disputed, and that was the subject

7  of our motion for reconsideration.  We believe we had a bona

8  fide reclamation claim, in the amount that was originally

9  filed, for 572,000.

10      THE COURT:  Right.  But they're not looking for

11 determination of amounts.  They're simply saying it's zero

12 because of the intervening or superior rights of secured

13 creditors.

14      MR. ELLIOTT:  Well, Your Honor, again, from the

15 status -- a portion of our claim was deemed to be unsecured.

16 So the Court made a determination in that, as well as it made a

17 determination that that is a cure claim, again, subject to

18 certain conditions.  But it seems to me that the conditions --

19 since the conditions haven't happened, it's still a cure claim;

20 it's still subject to further conditions that have not

21 occurred.  So that leaves us in sort of a limbo situation here.

22 I understand the Court's, and I understand the debtors',

23 concern about trying to deal with it as a reclamation claim as

24 a possibility in the future, but that future is not here and

25 not now.

54

1          THE COURT:  Okay.

2          MR. ELLIOTT:  I would just support and echo the

3    arguments regarding the legal positions of counsel for Hitachi.

4    It seems to me, Your Honor, that the Courts in Phar-Mor were

5    trying to at least give some real support and some teeth to

6    2-702 and a reclaiming creditor, which existed, at that point

7    in time, prior to the 2005 amendments.  I think that's what

8    we're trying to accomplish here:  give the other reclaiming

9    creditors something separate and apart from a general unsecured

10   claim.  Thank you, Your Honor.

11         THE COURT:  Okay.

12         Anyone else on the claimants' side?

13         All right.  I've read all the objections, and they lay

14   out the views.  Most of them adopt the Hitachi objection, so --

15         MR. BUTLER:  Your Honor, I'll just take guidance from

16   the Court.  I mean, I recognize that the Phar-Mor Court found,

17   in the Court's word, the holdings of the decisions in this

18   district as being not practical and the reasoning not

19   compelling.  It's the only reference to --

20         THE COURT:  Right.  But, again, that's an issue that I

21   think, although obviously the claimants are reserving for

22   whatever appellate rights they have, I think they know pretty

23   well where I come out on that issue because of the Speedline

24   ruling and the like, which is that, as I think first very

25   clearly laid out by Judge Gonzalez in the Arlco case, when you

55

1    parse through the relevant sections of the UCC, a good-faith

2    purchaser includes a blanket lienholder.  And I think, frankly,

3    that the Sixth Circuit opinion, partially relying on a case

4    based on a judgment lien, which is a different animal under

5    that version of the UCC that was applicable, didn't read the

6    provisions of the UCC appropriately and didn't recognize the

7    rights of a blanket lienholder.

8         But I think their issue is more narrow, at least the

9    issue that Hitachi's pursued at oral argument, which is that

10   the -- it's really not the Sixth Circuit opinion but Judge

11   Bodoh's opinion in the Phar-Mor case, which is that by

12   releasing the lien, albeit simultaneously having a replacement

13   lien granted to the DIP lenders, the reclamation claimants

14   squeezed in because of the DIP lenders' knowledge of their

15   claims.  And, of course, that was also an issue dealt with by

16   Judge Lifland and by Judge Gonzalez.  But I think that's really

17   the issue that I want to hear about.

18        MR. BUTLER:  Your Honor, I mean, you're right.  Judge

19   Gonzalez addressed it, that very issue --

20        THE COURT:  In Dairy Mart.

21        MR. BUTLER:  -- in Dairy Mart at pages 135 and 136 of

22   that opinion; Judge Lifland discussed the same issues at pages

23   421 and 422 of the Dana opinion; and are very clear on the

24   point that -- and Judge Lifland was particularly focused on

25   what the effect would be on DIP financing transactions.  If you

1    could not -- if somehow you would be -- you would somehow

2    create intervening reclamation rights when you have a

3    simultaneous transaction releasing the prepetition lien and

4    simultaneously granting the lien to the postpetition lender, it

5    has to be viewed as an integrated transaction is what Judge

6    Lifland says, both quoting Dairy Mart and then applying it to

7    the facts of the Dana case at page 421 of the opinion.

8         And on the same page, Judge Lifland goes further and

9    addresses the good-faith issues, found them unsupportable and

10   unpersuasive, looking to the terms of the interim and final DIP

11   order that were both final and unappealable and contained, as

12   he pointed out, explicit findings of good faith on page 421 of

13   the Dana opinion, which is -- and Judge Lifland even went on to

14   say look, these reclamation claimants weren't, quote "lulled"

15   by the debtors into believing they would receive administrative

16   claims with reclamation demands.

17        And I think it's very clear, Your Honor -- again, at

18   421 of the opinion, and it's very clear in the reclamation

19   procedures orders here the many statements made by the

20   creditors' committee during the course of this case on this

21   subject and that no one could look at the record of this case,

22   either the reclamation procedures orders, the two of them that

23   were entered, the disclosures and the debtors' prior disclosure

24   statement, or in any other writing, and believe that this prior

25   lien defense was not exclusively reserved throughout the entire

57

1    case.  It, in fact, was -- that whole discussion was included

2    in the disclosure statement in the original confirmed plan as

3    well.

4          And just to say it, when this refinancing transaction

5    took place at the end of 2006/beginning of 2007 -- Your Honor

6    had approved it in January of 2007 -- the reclamation creditors

7    had filed notices of appearance, had notice of that, and nobody

8    objected to it.  It was not opposed.  And I just -- you know, I

9    do think there are some bases to distinguish, as Your Honor

10   has, some of the Phar-Mor reasoning.  And I think this case is

11   squarely in the sights of both Judge Gonzalez's and Judge

12   Lifland's rulings in these three prior cases that we've cited.

13         That's all I have, Your Honor, unless you have other

14   questions.

15      (Pause)

16         THE COURT:  Okay, anything else?

17         MR. SAMBUR:  May I, Your Honor?

18         THE COURT:  Sure.

19         MR. SAMBUR:  Thank you.  Keith Sambur from Richards

20   Kibbe & Orbe on behalf of Goldman Sachs Credit Partners LP.

21   Your Honor, Goldman Sachs Credit Partners filed a joinder -- an

22   amended joinder to the objection of Hitachi and JPMorgan.  We

23   obviously agree with the statements made on the record today by

24   Hitachi.  I just wanted to make one point, Your Honor, and that

25   is, even if the reclamation claims are subject to the DIP

58

1    claims, there has been no evidence on the record and no

2    determination of how the ultimate disposition of those

3    claims -- or how those claims will be ultimately disposed of

4    and whether there is value left over to be had for the

5    reclamation creditors.  I just wanted to make that point on the

6    record.  Thank you, Your Honor.

7         THE COURT:  Well, on that point, I mean, if it turns

8    out that the DIP loans are paid in full, then I would assume

9    you'd move for some form of reconsideration, right, at that

10   point?

11        MR. SAMBUR:  That's unclear from the motion.  This is

12   a motion to reclassify.  At that point -- I mean, if Your

13   Honor's saying that --

14        THE COURT:  Right.

15        MR. SAMBUR:  -- those rights would be preserved and

16   that would appear in an order, that would be one thing,

17   although I haven't seen the order; I don't believe at this

18   point -- or the proposed order does not state that.

19        THE COURT:  Well, I mean, I find it hard to accept

20   that a debtor would have to wait until it's at a -- it has a

21   pretend closing and then makes a motion.  I would think the

22   debtor could get a ruling before then, subject, however, to the

23   facts materially changing as to the disposition of the

24   collateral.

25        MR. SAMBUR:  Sure.  I mean, to that point, Your Honor,

59

1    then --

2            THE COURT:  Mr. Butler, I mean, is --

3            MR. BUTLER:  Your Honor, actually, I think counsel's

4    looking at the wrong transaction.

5            THE COURT:  Well, you're saying the original --

6            MR. BUTLER:  These reclamation claims became worthless

7    in 2007 at the time that the refinancing took place.  That's

8    when the transfer occurred.  That's when the property was

9    transferred.  The amount of the DIP claims that were

10   transferred -- the previous debt that was transferred along

11   with the property rights far exceeded the amount of these DIP

12   claims, which is what the case law requires.

13           So the transaction that I think is relevant is the

14   January 5, 2007 transaction.  From the debtors' perspective,

15   these reclamation claims became unsecured claims at that point

16   in time.  And the reason the debtors didn't bring a motion

17   immediately is that we had, as Your Honor knows, in the

18   original plan, had a different approach to treatment of these

19   claims as we -- that plan, as Your Honor remembers, was based

20   on a series of settlements.  And the prior lien defense was

21   preserved, but we actually approached things in a different way

22   under that plan.  That plan is now subject to modification.

23   That treatment's not going to be afforded.  And, therefore,

24   it's the January 5, 2007 transaction that'd be relevant.

25           THE COURT:  And let me make sure I understand that

60

1    point.  The -- you're saying that the paydown of the

2    prepetition secured debt was a sale --

3            MR. BUTLER:  Yes.

4            THE COURT:  -- in satisfaction there --

5            MR. BUTLER:  Yes.

6            THE COURT:  -- and that the amount of the debt far

7    exceeded the --

8            MR. BUTLER:  Yes, that's --

9            THE COURT:  -- reclamation claims?

10           MR. BUTLER:  That's what the transaction was in

11   January of 2007, and that's what makes the -- and from the

12   debtors' perspective, the -- it appropriate to get the relief

13   on a final basis now.  We talked about that, Your Honor, I

14   think, in paragraph 47 of our original motion.

15           THE COURT:  As the Pittsburgh-Canfield Court says,

16   there's no question -- this is what you're arguing -- there's

17   no question that if any of the reclamation claimants chose or

18   were permitted to obtain possession of their goods and were

19   required to pay the DIP lenders, or prepetition lenders for

20   that matter, an amount sufficient to satisfy the outstanding

21   lien at the time, that none of the reclamation claimants would

22   have come away with any proceeds?

23           MR. BUTLER:  That's correct, Your Honor.

24           THE COURT:  That's your point?  Okay --

25           MR. SAMBUR:  Your Honor, if I --

1            THE COURT:  -- what's your response to that?

2            MR. SAMBUR:  Sure.  If I may.  I mean, at the time

3     that the DIP was refinanced, there was over 2 billion dollars

4     in excess value that the lenders placed upon the debtors'

5     enterprise at that time.  Your Honor made a point earlier that

6     the debtors shouldn't have to wait till the end of the case in

7     order to determine what the value of these reclamations were,

8     and it should have been determined at that time, not now, if,

9     in fact, they are not subject to the DIP lien.  Their argument

10    seems to be breaking down a bit.  Either the reclamation liens

11    are subject to the prepetition lien and when those were

12    released the reclamation claim took a priority position, or

13    they have become subject to the DIP liens which have not yet

14    been released or satisfied.  And there has not been a

15    disposition of the collateral in any way.

16            THE COURT:  Okay.

17            MR. SAMBUR:  Either this is an integrated transaction

18    and there has not been a disposition, or it's not an integrated

19    transaction.  And when those liens were released, the liens of

20    the reclamation claims became first priority with respect to

21    those goods that were subject to the reclamation claims.

22            THE COURT:  Okay.  What's the response to that,

23    Mr. Butler?  I mean, you could spin out a hypothetical where a

24    debtor refinances prepetition debt with postpetition debt.  And

25    there's lots of coverage, and the debtor does so solely to

62

1    squish down the reclamation claimants.  That, to me, doesn't

2    sound particularly fair.

3           MR. BUTLER:  Well, if the transaction was as you

4    described, Your Honor, I'm sure at the contested hearing on

5    that motion you wouldn't find the transaction would have been

6    in good faith.  I mean, we can spin out a lot of hypotheticals.

7    You know, I do believe the case law makes it pretty clear it

8    was an integrated transaction at the time.  And there was, in

9    fact, and counsel made -- they made the argument about things

10   were released.  The case law makes pretty clear what the effect

11   of that is.  But I do believe that the value -- that you

12   measure the value -- at least our reading of the cases was you

13   measure the value at that time for the reasons -- the same

14   reason Your Honor discussed just a few minutes ago.

15          And, Your Honor, one other point I'll make is that

16   counsel's argument seemed to be almost like he was making a

17   marshaling argument; and we addressed that as well in our

18   papers.  And marshaling's not permitted in these circumstances,

19   and we argue that at paragraph 43 of our motion.

20          THE COURT:  Okay.

21          MR. SAMBUR:  Thank you, Your Honor.

22      (Pause)

23          THE COURT:  All right, I have before me a motion by

24   the debtors that seeks an order classifying reclamation claims

25   as general unsecured nonpriority claims for all purposes.  The

63

1    motion sets forth the intersecting time lines of the

2    reclamation claims asserted against the debtor and their

3    treatment, as well as the incurrence of essentially blanket

4    liens on the debtors' assets, including the goods that are

5    covered by the reclamation claims.

6         The debtors had a prepetition secured credit facility

7    which, as of the petition date, had outstanding under it in

8    excess of 2.5 billion dollars with, for purposes of this

9    motion, blanket liens on the debtors' property covering the

10   goods that were delivered and subsequently formed the basis for

11   reclamation claims covered by this motion.

12        The debtors early in their case obtained a debtor-in-

13   possession financing facility; that facility added a new layer

14   of debtor-in-possession financing on a secured basis in

15   addition to the existing secured credit facility, which

16   remained in place subject to the adequate protection provided

17   for in the DIP order.  Not long thereafter, the debtors also

18   obtained approval on November 4th, 2005 of a reclamations

19   procedures order that set forth a procedure for dealing with

20   reclamation claims, including determining the amount of such

21   claims and whether such claims went through the hoops of

22   Section 546 of the Bankruptcy Code as well as Section 2-702 of

23   the UCC applicable as to each claim.  The reclamation

24   procedures order importantly identified and preserved what the

25   debtors defined as the prior lien defense, which is the defense

64

1    that they are now relying on in their motion.

2          The Court, in August of 2006, issued a bench ruling in

3    connection with a request by a reclamation claimant for the

4    allowance and enforcement of its reclamation claim that largely

5    acknowledged the prior lien defense.  And there were no further

6    such requests by reclamation claimaints.  Instead, the

7    claimants and the debtors went through their reclamation

8    procedures as set forth in a reclamation procedure order, and

9    then subsequently the debtors obtained on October 1st, 2007 an

10    amended reclamation procedures order that permitted reclamation

11    claimants to opt into treatment as an unsecured creditor under

12    the debtors' Chapter 11 plan, which was subsequently confirmed,

13    and included that opt-in right.  Many reclamation creditors did

14    so in the view that their treatment under the plan as an

15    unsecured creditor would be preferable to their rights as a

16    reclamation creditor.

17          The debtors' plan was confirmed but has not gone

18    effective, and in the interim the value of the debtors'

19    business has substantially declined such that at this point the

20    debtors, in projecting their sources and uses of cash upon

21    emergence from Chapter 11 under a proposed modified plan, are

22    seeking a determination that reclamation claims that have not

23    been resolved and reclamation claims where parties had opted

24    into unsecured creditor treatment under the confirmed plan

25    should be valued at zero dollars given the prior lien defense.

65

1   That is, in addition to dealing with reclamation claims that

2   have not been resolved and that that did not opt into unsecured

3   creditor treatment, the debtors have recognized that the opt-in

4   right was granted under entirely different circumstances and

5   that at this point such parties would, in all likelihood,

6   assert a reclamation claim and, projecting that possibility or

7   predicting that possibility, the debtors have included that

8   group also in their motion before me today.

9        One other important event in the time line occurred on

10  January 5th, 2007.  On that date I entered an order authorizing

11  the debtors to obtain DIP financing and to refinance the

12  existing DIP and the prepetition secured debt that had been

13  also referenced in the DIP order.  The reason for that request

14  by the debtors was that they could obtain far more favorable

15  terms for the refinancing than the amounts that they were then

16  paying out.

17       Under the refinancing order, that is, the January 5th,

18  2007 order, which was on notice to parties-in-interest under

19  the Court's notice procedures orders, including to all those

20  who had filed a notice of appearance in the case, the Court

21  granted priming liens to the DIP lenders in paragraph 6.  In

22  addition, in paragraph 11(a), the order provides:

23       "The adequate protection liens and other rights

24  afforded to the Prepetition Agent and the Prepetition Secured

25  Lenders under paragraphs 12 and 13 of the existing DIP order

66

1    shall continue in effect until the Debtors repay the amounts

2    outstanding under the existing prepetition facility documents

3    and the existing DIP order in accordance with this paragraph

4    11.

5            "On the Refinancing Date, the Debtors are hereby

6    authorized and directed to use the proceeds of borrowings under

7    the DIP credit agreement to irrevocably repay in full all

8    obligations then due and payable to the Prepetition Agent the

9    Prepetition Secured Lenders under the existing prepetition

10   facility documents and the existing DIP order.

11           "Upon repayment of all such obligations, all liens,

12   mortgages and security interests granted to the Prepetition

13   Agent and the Prepetition Secured Lenders under the existing

14   prepetition facility documents and the existing DIP order shall

15   be deemed released and of no further force of effect, and the

16   provisions of paragraphs 12 and 13 of the existing DIP order

17   shall be of no further force or effect."

18           However, upon that date, obviously the DIP lenders,

19   under the January 5th order, would, pursuant to paragraph 6,

20   retain their blanket postpetition liens on a primary or priming

21   basis.

22           The DIP order that I've just quoted also found that

23   the financing was negotiated in good faith and that the DIP

24   lenders would have the full benefit because of their good faith

25   of Section 364(e) of the Bankruptcy Code.

67

1          The objectors to the debtors' motion make two

2     arguments, and then one objector, Brazeway, makes a third.  Let

3     me deal with the third one first.  Brazeway contends that,

4     because the debtors entered into an agreement with it providing

5     that the prepetition amount owed to it, including the amount

6     owed underlying its reclamation claim, would be fixed as a cure

7     claim under Section 365(d) of the Bankruptcy Code in the event

8     that the Chapter 11 went effective and the underlying contract

9     was assumed, that this motion is premature or improperly

10    brought at this time.  I don't agree with that objection.  The

11    agreement clearly has not been assumed.  It could not be

12    assumed absent a final order approving the assumption and all

13    of the conditions to the assumption having occurred.  The

14    debtors acknowledge that if the contract is ultimately assumed

15    and not rejected that the debtors will abide by their agreement

16    and treat the amount owing as a cure claim that would be paid

17    pursuant to that agreement, and that the relief that they're

18    seeking in this motion against Brazeway would not apply.

19          However, I believe that the debtors, in planning their

20    exit or emergence from bankruptcy, are entitled to have a

21    determination under the assumption that the Brazeway contract

22    will not be assumed and therefore that the cure claim agreement

23    will not apply.  In that instance, Brazeway would have a

24    reclamation claim, and it is appropriate, I believe, for me at

25    this point to determine Brazeway's rights in respect of that

1   claim.

2          The other two arguments are, first, that the prior

3   lien defense is not a valid defense against reclamation claims.

4   Following the logic set forth by the Sixth Circuit in Phar-Mor

5   Inc. v. McKesson Corporation, 534 F.3d 502 (6th Cir. 2008),

6   cert. denied, 2009 U.S. LEXIS 3134 (Apr. 27 2009), the second

7   argument is that even if I do not follow the logic of the Phar-

8   Mor case that I've just cited, the fact that the prepetition

9   secured credit facility was repaid and the liens released under

10  the January 5, 2007 DIP order would, according to the

11  objectors, mean that there is no intervening good-faith

12  purchaser who would take the goods that give rise to the

13  reclamation claim with priority over them.

14          As far as the first argument is concerned, I have

15  again reviewed what I believe to be the relevant case law,

16  including not only the Phar-Mor case but a number of other

17  decisions that I'll cite.  And I continue to believe, as I did

18  when I ruled on the Speedline reclamation claim in 2006, that

19  proper interpretation of the relevant provisions of the UCC,

20  which I believe Section 546(c) of the Bankruptcy Code directs

21  the Court to, and that's particularly clear under the version

22  of the Bankruptcy Code that existed and governs with respect to

23  this Chapter 11 case, i.e., the pre-BAPCPA version of the Code,

24  that a lien creditor with a blanket security interest that

25  includes the goods that give rise to the reclamation claim

69

1    does, in fact, take with a superior right to the reclamation

2    claimant.  And if, in fact, the value of that lien leaves

3    nothing for the reclamation claimant, then the reclamation

4    claim should be viewed as one that has a zero value, and that

5    it should, as the debtors seek in this motion, therefore be

6    treated as a general unsecured claim in its allowed amount.

7           The rationale for that conclusion is set forth at

8    length in three cases from this district:  In re Arlco Inc.,

9    239 B.R. 261 (Bankr. S.D.N.Y. 1999); In re Dairy Mart

10   Convenience Stores, Inc., 302 B.R. 128 (Bankr. S.D.N.Y. 2003);

11   and In re Dana Corporation, 367 B.R. 409 (Bankr. S.D.N.Y.

12   2007).  The Dana Corporation case is under BAPCPA, but the

13   logic on this issue applies equally to pre-BAPCPA cases.  This

14   is also the view of the leading treatise on bankruptcy, as it

15   appears at 5 Collier on Bankruptcy, paragraph 546.04[a][7].

16   See also In re Pittsburgh-Canfield Corporation, 309 B.R. 277

17   (BAP 6th Cir. 2004); and In re Advanced Marketing Services,

18   Inc., 360 B.R. 421 (Bankr. D. Del. 2007).

19          Clearly, as Judge Gonzalez set forth in the Arlco

20   decision, first, Section 546(c) of the Bankruptcy Code is not

21   intended to increase any rights that a creditor would have

22   outside of bankruptcy.  Rather, it refers the Court to

23   applicable nonbankruptcy law with regard to the rights of

24   reclamation creditors.  UCC Section 2-702(3) provides that the

25   right to reclamation is "subject to the rights of a buyer in

1    ordinary course or other good faith purchaser under this

2    Article," and then it has, in parentheses, "(Section 2-403)."

3            In nine of the states where the debtor does business,

4    the UCC provision that I've just quoted also recognizes the

5    rights of, quote, "other lien creditors" as well as buyers in

6    the ordinary course or other good-faith purchasers.

7            As Judge Gonzalez notes in Arlco, Section 2-403 does

8    not define good faith or purchaser.  However, Section 1-201 of

9    the UCC defines good faith as "honesty in fact in the conduct

10    or transaction concerned", which is further refined.  We're

11    dealing with a merchant which requires observance of reasonable

12    commercial standards of fair dealing in the trade.

13            Section 1-201(33) defines purchaser as one who "takes

14    by purchase", and purchase includes, among other things, a

15    mortgage, pledge, lien or other voluntary transaction creating

16    an interest in property.  Therefore, if one goes back to

17    Section 2-403, applying those terms, the definition of

18    purchaser is broad enough to include an Article 9 secured

19    party.

20            I believe, therefore, and, again, based on the logic

21    of the Arlco decision, that reclamation creditors took subject

22    to the rights of the prepetition secured lenders who had a lien

23    on their goods as well as substantially all of the debtors'

24    other property.  The Arlco decision also stands for the

25    proposition that such secured creditors are not required to

1   marshal their property in asserting their rights and remedies

2   for the benefit of reclamation creditors.

3       I believe that the Phar-Mor case unfortunately ignores

4   that statutory foundation and relies largely upon a case

5   premised upon an earlier version of the UCC:  In re Mel Golde

6   Shoes, Inc., 403 F.2d 658, which dealt with not a mortgage lien

7   creditor but a judgment lien creditor and took that holding and

8   applied it, I believe, improperly to -- or incorrectly to a

9   mortgage lien creditor.

10      It also found that there was a trust relationship

11  between a debtor and a reclamation creditor, notwithstanding

12  the absence of any trust language in the UCC, or the relevant

13  provisions of the UCC, and the definitions that I just went

14  through.  Moreover, it appears to overlook the fact that under

15  the UCC, in Section 2-403, quote, "A person with voidable title

16  has power to transfer a good title to a good faith purchaser

17  for value."  And value includes rights acquired as security for

18  a preexisting claim.

19      So I believe that it's appropriate to follow the logic

20  of the several cases I have cited and not to follow the logic

21  of the Phar-Mor case and, therefore, to recognize the validity

22  of the so-called prior lien defense.

23      That still leaves the issue of whether the replacement

24  by the debtors, with the consent of the existing secured

25  lenders, in the January 5th refinancing order enabled the

1    reclamation claimants to have a superior right to the liens and

2    claims of the DIP lenders and, therefore, not to be subject

3    anymore to the prior lien defense.   This issue has been dealt

4    with by a number of bankruptcy court-level decisions.   It is

5    the view of the editors of Collier that the prior lien defense

6    can arise from either a pre- or postpetition transaction and

7    may encompass both pre- and postpetition collateral, although

8    they recognize that at least one case goes the other way.

9    Again, see 5 Collier on Bankruptcy, paragraph 546.04[a][7].

10              The primary case relied upon by the objectors is the

11   underlying bankruptcy court decision in In re Phar-Mor Inc.,

12   301 B.R. 482 (Bankr. N.D. Ohio 2003).   That decision ultimately

13   was overruled not on this point but on the general acceptance

14   of the prior lien defense by the Sixth Circuit Phar-Mor

15   decision that I've cited.   That decision, because it didn't

16   recognize the prior lien defense, did not then go on to discuss

17   the Bankruptcy Court's ultimate ruling which is relevant here.

18   In its ultimate ruling, the Bankruptcy Court in the Phar-Mor

19   case, after acknowledging the validity of the prior lien

20   defense, determined that the defense would not apply under the

21   present circumstances because, similar to the present facts,

22   the debtor had entered into a DIP agreement which was approved

23   by a DIP order, pursuant to which the prepetition lenders were

24   paid off and their liens deemed released.   And the DIP order

25   gave the debtors authority to grant new liens with

1    superpriority to the DIP lenders.

2            The Bankruptcy Court concluded that the new DIP

3    lenders did not, through their blanket liens, trump the

4    interests of reclamation creditors.  The rationale for that

5    conclusion is set forth at page 497 of the decision.  And it's

6    stated in three ways.  First, the Court says the debtor's

7    decision to grant a security interest in inventory to a

8    subsequent secured lender "cannot defeat a seller's reclamation

9    rights if the seller asserted its rights before the security

10   interest is granted," since, as the Court believes, "no action

11   on the part of a debtor should be permitted to defeat a

12   seller's right to reclamation."

13           It's not clear to me that this grant would necessarily

14   defeat the right to reclamation since, immediately before the

15   grant of the lien, the right to reclamation, as recognized by

16   the Court, was worthless given the existence of the prepetition

17   lien.

18           In addition, notwithstanding the Court's reference to

19   subsequent secured lenders, an emphasis just below, then, that

20   the interest to which reclamation claimants may be subservient

21   must be a prior secured lien.  The statute itself does not

22   refer to the rights of prior good-faith purchasers; rather, it

23   says "other good-faith purchasers".

24           In addition, the Court states, in one sentence without

25   support, "Having notice of the reclamation demands, the DIP

74

1    lenders cannot qualify as good-faith purchasers under Section

2    2-702(3)."

3           The objectors would have me read into the definition

4    of good faith and purchaser under the UCC, as I previously

5    summarized and as summarized in the Arlco case, the definition

6    of -- or the concept of prior notice generally.  I, however,

7    believe that, under the present facts, that reading would be

8    inappropriate.  I do so for two reasons.  First, I believe that

9    the logic on this issue set forth by Judge Lifland in In re

10   Dana Corporation, where he specifically addresses the

11   Bankruptcy Court Phar-Mor case on this point, is well taken and

12   that the replacement and satisfaction of a prepetition blanket

13   security interest by a postpetition blanket security interest

14   renders the reclamation claims for those goods valueless.  That

15   analysis is found at 367 B.R. 419 through 421.  He cites,

16   appropriately, In re Dairy Mart Convenience Stores Inc., 302

17   B.R. 128 at page 135 through 136 on this point.

18          Moreover, it appears to me that the refinancing DIP

19   agreement and the proposed order approving it was on more than

20   sufficient notice and as a final order at this point.  And it

21   gives the DIP lenders valid, perfected, enforceable liens on

22   the refinancing date on substantially all of the debtors'

23   assets, including the assets that would give rise to the

24   reclamation claim of each of the objectors.

25          In light of that fact and in light of the specific

1    good-faith finding by the Court in that order, it would appear

2    to me that that order should trump the objectors' notice

3    argument -- they too had notice and did not object to this

4    order, which I view to be binding -- and give rise to the very

5    type of good-faith lien that I've already concluded would be

6    superior to the reclamation interest of the objectors.

7           As Judge Lifland determined in Dana Corporation,

8    "Because the reclaimed goods or the proceeds thereof were

9    either liquidated in satisfaction of the Prepetition

10   Indebtedness or pledged the DIP Lenders pursuant to the DIP

11   Facility, the reclaimed goods effectively were disposed as part

12   of", and here I would substitute in "the refinancing date

13   payment", "of the Prepetition Credit Facility.  Accordingly,

14   the Reclamation Claims are valueless as the goods remained

15   subject to the Prior Lien Defense."  367 B.R. at 421.

16          A similar point was made in the Pittsburg-Canfield

17   case, which pointed out at page 288 that no repossession of the

18   goods under these facts would have prevented the requirement of

19   satisfying the outstanding liens as existed here.

20          Ultimately, again, I think that what I'm being asked

21   to do is marshal the assets rather than recognize the fact that

22   they've been, in essence, purchased by the existing DIP lenders

23   under the January 2007 order.

24          So for those reasons, I'll grant the debtors' motion.

25   As I said at the beginning of this argument, I had some concern

76

1    that this motion would fall into the category of an omnibus

2    claim objection in that it is, in effect, an objection to the

3    reclamation claims, although it seeks simply the

4    reclassification of those claims given that they would have

5    zero value as reclamation claims, and therefore it would be

6    subject to Rule 3007(d) of the Bankruptcy Rules, which it does

7    not appear to me has been satisfied here given the nature of

8    the notice.

9           So I will ask the debtors to settle a copy of the

10   order -- or the proposed order individually on the reclamation

11   claimants who appear on the exhibit to the motion, and inform

12   them that, unless an objection is entered -- I'm sorry, filed

13   and served within ten days of the settlement, the order will be

14   entered.  The notice can inform them of my ruling.

15          Hopefully the transcript will be out fairly shortly.

16   But, obviously, this is notice of settlement after the order

17   is -- the Court has entered a ruling.

18          MR. BUTLER:  Your Honor, just so the record is clear,

19   then, on the -- I'm assuming in that notice of settlement you

20   want us to use the particularized form of notice --

21          THE COURT:  Yes --

22          MR. BUTLER:  -- that we've used before?

23          THE COURT:  Yes, please.

24          MR. BUTLER:  We shall, Your Honor.

25          THE COURT:  Okay.

1           MR. ELLIOTT:  Your Honor, one other thing with respect

2       to the Brazeway claim, Your Honor's not making a decision here

3       in resolution of the amount of the reclamation claim, is that

4       correct?

5           THE COURT:  That's right.  The debtors are not seeking

6       anything today other than -- well, when you say "the amount",

7       the reclamation claims that are covered by this motion, as

8       reclamation claims, have zero dollars -- zero value, zero

9       dollar value.  As a cure claim, that's decided pursuant to your

10      separate order or agreement.  Is that clear?

11          MR. ELLIOTT:  Well, Your Honor, a motion was filed

12      indicating that the resolu -- or the cure amount was resolved,

13      which it's not.  And that's -- I just want to make that clear

14      on the record.

15          THE COURT:  Well, the cure amount --

16          MR. ELLIOTT:  I'm sorry, I'm sorry, the reclamation

17      claim --

18          THE COURT:  As a reclamation claim.

19          MR. ELLIOTT:  The reclamation claim amount.

20          THE COURT:  Correct, but -- so I'm not determining

21      it's dollar Y or dollar X because I don't have to because I

22      determined it has no value.

23          MR. ELLIOTT:  Thank you.

24          MR. OLSEN:  Your Honor, Matt Olsen for Hitachi.  Did

25      you say that the order would not be entered until after the

78

1      ten-day notice period with respect to the settlement --

2              THE COURT:  Correct.

3              MR. OLSEN:  -- or that it will be entered today

4      contingent upon objections?

5              THE COURT:  No, it's going to be settled on the

6      parties.  So it'll be entered only after the notice of

7      settlement period expires.

8              MR. OLSEN:  Okay.  Thank you, Your Honor.

9              MR. BUTLER:  Thank you, Judge.  That's all we have for

10     Delphi today.

11             THE COURT:  Okay.  Thank you.

12         (Proceedings concluded at 12:32 PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

79

1                                    I N D E X

2

3                                  R U L I N G S

4        DESCRIPTION                              PAGE      LINE

5        Debtors' motion for order authorizing      22         5

6        debtors to enter into fourth amendment

7        and fifth amendment to arrangement with

8        General Motors Corporation granted

9

10       Debtors' motion to authorize expedited     25         9

11       motion of Deloitte & Touche LLP for an

12       order terminating the debtors' retention

13       of Deloitte & Touche LLP as their

14       independent auditors and accountants granted

15

16       Debtors' expedited motion for order and    75        24

17       amended reclamation procedures order

18       classifying reclamation claims as general

19       unsecured nonpriority claims for all purposes,

20       granted

21

22

23

24

25

80

1

2                          C E R T I F I C A T I O N

3

4         I, Clara Rubin, certify that the foregoing transcript is a true

5         and accurate record of the proceedings.

6

7         _____

8         Clara Rubin

9         AAERT Certified Electronic Transcriber (CET**D-491)

10

11        Veritext LLC

12        200 Old Country Road

13        Suite 580

14        Mineola, NY 11501

15

16        Date: June 18, 2009

17

18

19

20

21

22

23

24

25