**Hearing Date And Time: July 23, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Response Date And Time: July 16, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                :
      In re                              :     Chapter 11
                                                :
DELPHI CORPORATION, et al.,         :     Case No. 05-44481 (RDD)
                                                :
                                                :     (Jointly Administered)
                 Debtors.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

DEBTORS' THIRTY-FOURTH OMNIBUS OBJECTION PURSUANT TO 11 U.S.C. § 502(b) AND
FED. R. BANKR. P. 3007 TO (I) EXPUNGE (A) CERTAIN PENSION AND OPEB CLAIMS, (B)
CERTAIN INDIVIDUAL WORKERS' COMPENSATION CLAIMS, (C) CERTAIN DUPLICATE
AND/OR AMENDED INDIVIDUAL WORKERS' COMPENSATION CLAIMS, (D) CERTAIN
UNTIMELY INDIVIDUAL WORKERS' COMPENSATION CLAIMS, (E) A SECURED BOOKS AND
RECORDS CLAIM, AND (F) CERTAIN UNTIMELY CLAIMS, (II) MODIFY CERTAIN (A) WAGE AND
BENEFIT CLAIMS, (B) STATE WORKERS' COMPENSATION CLAIMS, AND (C) INDIVIDUAL
WORKERS' COMPENSATION CLAIMS ASSERTING PRIORITY, (III) PROVISIONALLY DISALLOW
<u>CERTAIN UNION CLAIMS, AND (IV) MODIFY AND ALLOW CERTAIN SETTLED CLAIMS</u>

("THIRTY-FOURTH OMNIBUS CLAIMS OBJECTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Thirty-Fourth Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To (I) Expunge (A) Certain Pension And OPEB Claims, (B) Certain Individual Workers' Compensation Claims, (C) Certain Duplicate And/Or Amended Individual Workers' Compensation Claims, (D) Certain Untimely Individual Workers' Compensation Claims, (E) A Secured Books And Records Claim, And (F) Certain Untimely Claims, (II) Modify Certain (A) Wage And Benefit Claims, (B) State Workers' Compensation Claims, And (C) Individual Workers' Compensation Claims Asserting Priority, (III) Provisionally Disallow Certain Union Claims, And (IV) Modify And Allow Certain Settled Claims (the "Thirty-Fourth Omnibus Claims Objection" or the "Objection"), and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders, which was disbanded on April 24, 2009.  On February 26, 2009, the U.S. Trustee appointed an official committee of retired

2

employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

        3.      On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[1] On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. Since that time, however, the Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket

---

[1]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors. In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process.

No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i)

certain modifications to the Confirmed Plan and December 10 Disclosure Statement and

(ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.  In light of the

unprecedented decline in global automotive production volumes and the deepening of the crisis

in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification

Motion several times.  On June 1, 2009 the Debtors filed a supplement to the Plan Modification

Motion amending and restating the relief sought in the Plan Modification Motion (the "Motion

Supplement").  Among other things, the Motion Supplement seeks approval of (i) certain

modifications to the Confirmed Plan (the "Modified Plan"), (ii) a supplement to the Disclosure

Statement (the "Disclosure Statement Supplement"), and (iii) procedures for re-soliciting votes

on the Modified Plan.  The Motion Supplement was approved with modifications by order

entered June 10, 2009 (the "Modification Procedures Order") and the Debtors are currently

soliciting votes on the Modified Plan.

     4.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

     5.  The statutory predicates for the relief requested herein are sections 502(b)

of the Bankruptcy Code and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.  <u>Current Business Operations Of The Debtors</u>

     6.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately

$10.3 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[3]

   7.  The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

   8.  Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

---

[2] The aggregated financial data used herein generally consists of consolidated information from Delphi and its
worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[3] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

10.      The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

---

[4]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

11.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

12.      On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.      Plan Confirmation And Postconfirmation Matters

13.      The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan

7

Investors refused to fund their obligations under the Investment Agreement, as the Debtors

continued working with their stakeholders to evaluate their options to emerge from chapter 11,

the Debtors sought approval of two comprehensive agreements with GM: the Amended and

Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated

Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court

entered an order authorizing the Debtors' implementation of the Amended GSA and the

Amended MRA, the provisions of which became effective on September 29, 2008.

14.    Through the Amended GSA and Amended MRA, the Debtors addressed,

at least in part, two goals of their Transformation Plan:  (i) obtaining financial support from GM

for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) working to solve Delphi's pension funding situation.  Under the Amended GSA

and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and

eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi

estimated the value of the net consideration received under the Amended GSA and Amended

MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the

Original GSA and Original MRA).

15.    As a result of all the factors described above, during the fall of 2008 the

Debtors were able to formulate certain modifications to the Confirmed Plan which were set forth

in the Plan Modification Motion.  Since the filing of the proposed modifications, however,

substantial uncertainty and a significant decline in capacity in the credit markets, the global

economic downturn generally, and the current economic climate in the automotive industry

adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully

consummate a confirmed plan of reorganization.  Moreover, as a result of the market turbulence,

the Debtors were unable to extend the maturity date of their DIP credit facility on terms

reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the support

of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an

accommodation agreement (as subsequently amended) which allows the Debtors, among other

things, to continue using certain of the proceeds of the postpetition financing facility through

June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain

advances and to accelerate payment of certain payables to the Debtors, including entry into an

amended and restated agreement as of June 1, 2009, to provide the Debtors up to $250 million of

additional pre-emergence liquidity through July 31, 2009 to support Delphi's transformation plan

and its reorganization plan.

16.    Also on June 1, 2009, while facing the most difficult economic period in

decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, Delphi

reached an agreement to effect its emergence from chapter 11 through a transaction with

Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum Equity, and with the support

of GM Components Holdings LLC ("GM Components"), an affiliate of GM.  In the exercise of

the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all

of their creditors, the Debtors executed an agreement (the "Master Disposition Agreement") to

reflect the foregoing transactions through a plan of reorganization.  The agreement and the

changes to the Confirmed Plan were filed as part of the Motion Supplement on June 1, 2009.

17.    Ultimately, the emergence structure contemplated in the Modified Plan is

similar to that which was contemplated in the Confirmed Plan.  Instead of having a plan investor

sponsoring their plan and emerging as the majority owner of the continuing business enterprise,

however, Delphi has agreed to contemporaneously effectuate transactions through which

Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that, together with Delphi's global Steering business, are being acquired by GM Components Holding LLC.  A new company, DPH Holdings Co., will emerge as a reorganized entity that retains certain other residual non-core and non-strategic assets and liabilities that are expected to be divested over time.  On June 16, 2009, this Court entered the Modification Procedures Order which, among other things, authorized the Debtors to commence solicitation of votes on the Modified Plan.  In addition, the Modification Procedures Order established procedures through which unsolicited proposals for alternative transactions to the Master Disposition Agreement would be evaluated and administered.

18.    Consummation of these transactions through the Modified Plan, which embodies concessions made by parties-in-interest to resolve these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a distribution to holders of general unsecured claims.  Moreover, Delphi's emerging businesses will continue to develop technology and products and produce them for the benefit of their customers either under the guidance of Platinum Equity, which has experience providing operational support to companies to help them create long term value, or in conjunction with an alternative transaction, if any.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.    Bar Date, Proofs Of Claim, And Omnibus Claims Objections

19.    On April 12, 2006, this Court entered an Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a)

Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice

Thereof (Docket No. 3206) (the "Bar Date Order").  Among other things, the Bar Date Order

established July 31, 2006 (the "Bar Date") as the last date for all persons and entities holding or

wishing to assert "Claims," as such term is defined in 11 U.S.C. § 101(5) (each, a "Claim"),

against a Debtor (collectively, the "Claimants") to file a proof of claim with respect to each such

Claim.

20.    On or prior to April 20, 2006, Kurtzman Carson Consultants LLC, the

claims and noticing agent in these cases (the "Claims Agent"), provided notice of the Bar Date

by mailing a notice of Bar Date approved by this Court (the "Bar Date Notice"), together with a

proof of claim form, to (a) the persons or entities set forth in the Debtors' Schedules of Assets

and Liabilities and Statements of Financial Affairs filed with this Court on January 20, 2006 (and

subsequently amended on February 1, 2006 and April 18, 2006) (collectively, the "Schedules and

Statements")[5] and (b) the persons and entities included in the notice database compiled by the

Debtors, but not listed on any of the Schedules and Statements.  In total, the Debtors provided

Bar Date Notices to more than 500,000 persons and entities.

21.    In addition, the Debtors published the Bar Date Notice in the New York

Times (National Edition), the Wall Street Journal (National, European, and Asian Editions),

USA Today (Worldwide Edition), the Automotive News (National Edition), and in local editions

of the following publications: the Adrian Daily Telegram, the Arizona Daily Star, the Buffalo

News, the Chicago Sun Times, the Clinton News, the Columbia Dispatch, the Daily Leader,

Dayton Daily News, the Detroit Free Press, the El Paso Times, the Fitzgerald Herald Leader, the

---

[5]    The Schedules and Statement were subsequently amended on October 12, 2007, January 17, 2008, and October
10, 2008.

Flint Journal, the Gadsden Times, the Grand Rapids Press, the Greenville News, the Indianapolis Star, the Kansas City Star, the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News, the Milwaukee Journal Sentinel, the Mobile Beacon, the Mobile Register, the Oakland Press, the Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky Register, the Tribune Chronicle, the Tulsa World, the Tuscaloosa News, and The Vindicator, and electronically through posting on the Delphi Legal Information Website, www.delphidocket.com, on or before April 24, 2006.

22.    Approximately 16,835 proofs of claim (the "Proofs of Claim") have been filed against the Debtors in these cases.  The Debtors have filed 33 omnibus Claims objections,[6] pursuant to which this Court has disallowed and expunged 9,951 Claims and modified 3,998 Claims.  In addition, the hearings with respect to 145 Claims remain adjourned pursuant to the Claims Objection Procedures Order (as defined below).

23.    On October 31, 2006, the Debtors filed the Motion For Order Pursuant To 11 U.S.C. §§ 502(b) And 502(c) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Disallowance Or Estimation Of Claims And (ii) Certain Notices And Procedures Governing Hearings Regarding Disallowance Or Estimation Of Claims (Docket No. 5453), in which the Debtors requested this Court, among other things, to approve certain procedures for contested claim objections.  On December 7, 2006,

---

[6]    The Debtors filed Claims objections on September 19, 2006 (Docket No. 5151), October 31, 2006 (Docket Nos. 5451 and 5452), December 8, 2006 (Docket Nos. 6099 and 6100), January 12, 2007 (Docket Nos. 6571 and 6585), February 15, 2007  (Docket Nos. 6962 and 6968), March 16, 2007 (Docket Nos. 7300 and 7301), April 27, 2007 (Docket Nos. 7824 and 7825), May 22, 2007 (Docket Nos. 7998 and 7999), June 15, 2007 (Docket Nos. 8270 and 8271), July 13, 2007 (Docket Nos. 8616 and 8617), August 24, 2007 (Docket No. 9151), September 21, 2007 (Docket No. 9535), October 26, 2007 (Docket No. 10738), November 19, 2007 (Docket No. 10982), December 21, 2007 (Docket No. 11588), January 18, 2008 (Docket No. 12288), February 15, 2008 (Docket Nos. 12686 and 12687), March 27, 2008 (Docket Nos. 13269 and 13270), June 27, 2008 (Docket No. 13823), October 17, 2008 (Docket No. 14349), November 14, 2008 (Docket No. 14442), and December 22, 2008 (Docket No. 14619).

the Court entered the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections to Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").

   24. On November 30, 2007, the Debtors filed the Motion Under New

Bankruptcy Rule 3007(c) And 11 U.S.C. § 105(a) For Order Authorizing Debtors To Continue

Claims Objection Procedures Under Order Dated December 7, 2006 Pursuant To 11 U.S.C. §

502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I)

Dates For Hearings Regarding Objections To Claims And (II) Certain Notices And Procedures

Governing Objections To Claims (Docket No. 11187).  In that motion, the Debtors requested this

Court, among other things, to authorize the Debtors to continue certain of their current practices

and procedures for filing and serving notice of omnibus Claims objections pursuant to the Claims

Objection Procedures Order, including omnibus Claims objections to more than 100 Claims.  On

December 20, 2007, this Court granted this relief by entering the Order Under New Bankruptcy

Rule 3007 And 11 U.S.C. § 105(a) Authorizing Debtors To Continue Claims Objection

Procedures Under Order Dated December 7, 2006 Pursuant To 11 U.S.C. § 502(b) And Fed. R.

Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings

Regarding Objections To Claims And (II) Certain Notices And Procedures Governing

Objections To Claims (Docket No. 11561).

   25. In this Objection, the Debtors are objecting to 608 Proofs of Claim, all of

which are set forth on Exhibit J hereto in alphabetical order by Claimant and cross-referenced by

proof of claim number and basis of objection.

<u>Relief Requested</u>

26.    By this Objection, the Debtors seek entry of an order pursuant to section

502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 disallowing and expunging (a) the

Claims for liabilities owing in connection with the Debtors' pension and other post-employment

benefits ("OPEB") programs (each, a "Pension Or OPEB Claim" and collectively, the "Pension

Or OPEB Claims") set forth on <u>Exhibit A</u> hereto as "Pension And OPEB Claims" because the

Debtors are not liable for such Claims, (b) on a provisional basis the Claims filed by national and

local unions set forth on <u>Exhibit C</u> hereto as "Provisionally Disallowed Union Claims" because

they were filed by current or former employees of the Debtors, all of whom are or were

represented by the International Union of Operating Engineers Locals 832S, 18S, and 101S (the

"IUOE"), the International Brotherhood of Electrical Workers and its Local 663 (the "IBEW"),

or the International Association of Machinists and Aerospace Workers and its District 10 and

Tool and Die Makers Lodge 78 (the "IAM"), or by persons with claims derived from their

relationship with such a current or former employee of the Debtors, for wages and benefits,

future pension benefits, or other post-employment benefits and that were waived and released

pursuant to certain settlement agreements between the Debtors and each of the IUOE, the IBEW,

and the IAM, respectively, (c) the Claims set forth on <u>Exhibit E-1</u> hereto because they were

asserted by individual current or former employees of the Debtors for workers' compensation

benefits not reflected on the Debtors' books and records (the "Individual Workers' Compensation

Books Snd Records Claims"), (d) Claims set forth on <u>Exhibit E-3</u> hereto as "Claims To Be

Expunged" because they are duplicative of other Claims or have been amended or superseded by

later-filed Claims by current or former employees of the Debtors for workers' compensation

benefits (the "Individual Workers' Compensation Duplicate And Amended Claims"), (e) the

14

Claim filed by an employee of the Debtors for workers' compensation benefits set forth on Exhibit E-4 because it was untimely filed pursuant to the Bar Date Order (the "Untimely Individual Workers' Compensation Claim"), (f) the Claim set forth on Exhibit F hereto because it asserts liabilities that are not reflected on the Debtors' books and records (the "Secured Books And Records Claim"), and (g) the Claims set forth on Exhibit G hereto because they were untimely filed pursuant to the Bar Date Order (the "Untimely Claims").

27.    Second, the Debtors seek entry of an order pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 revising the asserted amount or classification, and/or changing the identity of the alleged Debtor, with respect to (a) the Claims filed for certain wages and benefits (the "Wage And Benefit Claims Subject To Modification") set forth on Exhibit B, (b) the Claims filed by individuals for workers' compensation benefits (the "Individual Workers' Compensation Claims Subject To Modification") set forth on Exhibit E-2 because such Claims are being modified to reflect the correct classification as a result of wage and benefit payments previously made that exceed $10,000.00, and (c) the claims filed by certain states for workers' compensation program related payouts (the "State Workers' Compensation Claims Subject To Modification") set forth on Exhibit D because such claims are not afforded priority treatment under section 507 of the Bankruptcy Code.

28.    Third, the Debtors seek entry of an order pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 modifying and allowing the Claims (the "Claims Allowed Pursuant To Settlement") set forth on Exhibit H hereto because the Debtors have reached a settlement in principle with the holders of such Claims in the amount of each such Claim as set forth on Exhibit H.

<u>Objections To Claims</u>

G.    <u>Pension And OPEB Claims</u>

29.    During the Debtors' review of the Proofs of Claim, the Debtors determined

that certain Proofs of Claim assert liabilities or dollar amounts in connection with the Pension

Plans (as defined below)[7] that are not owing by the Debtors because such Claims (i) are not

enforceable against the Debtors or property of the Debtors for the purposes of section 502(b)(1)

of the Bankruptcy Code because the Pension Plans are separate legal entities distinct from the

Debtors' estates and (ii) to the extent that the Pension Plans are terminated, may not be asserted

by plan participants because, under ERISA, the Pension Benefit Guaranty Corporation ("PBGC")

is the sole entity entitled to assert pension claims against the Debtors' estates.  Set forth on

<u>Exhibit A</u> hereto are the Claims that the Debtors have identified as Claims asserted by pension

plan participants for which the Debtors are not liable (the "Pension Claims").  In addition, the

Debtors determined that certain Proofs of Claim assert liabilities or dollar amounts (a) on

account of certain employee benefit plans and programs that provided post-retirement health and

life insurance benefits ("Salaried OPEB") to salaried retirees and their surviving spouses that are

not owing by the Debtors because Salaried OPEB is terminable at will and does not give rise to a

right to payment (the "Salaried OPEB Claims") or (b) on account of certain employee benefit

plans and programs that provided post-retirement health and life insurance benefits ("Hourly

OPEB") to hourly retirees and their surviving spouses that are not owing by the Debtors because

---

[7]    As of the date of this Objection, Delphi or other Debtors sponsor the Delphi Hourly-Rate Employees Pension
Plan, the Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement
Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining
Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan (together, the "Pension
Plans") under 29 U.S.C. § 1002(16)(B).  Each of these Pension Plans is a single employer, defined benefit plan
covered by Title IV of Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C.
§§ 1301 et seq

the Hourly OPEB was discontinued by agreement with the certain of Delphi's labor unions (the "Hourly OPEB Claims," together with Pension Claims and Salaried OPEB Claims, the "Pension And OPEB Claims").

30.    Set forth on Exhibit A hereto are the Pension And OPEB Claims that the Debtors have identified as Claims for which the Debtors are not liable.

31.    Pension Claims.  First, the Pension Claims are not Claims enforceable against the Debtors or property of the Debtors for the purposes of section 502(b)(1) of the Bankruptcy Code because the Pension Plans are separate legal entities distinct from the Debtors' estates.  See In re Springfield Furniture, Inc., 145 B.R. 520, 528 (Bankr. E.D. Va. 1992) (holding that defined benefit pension plan and trust holding assets of plan are separate and distinct legal entities and thus "the assets of the Trust (and Plan) are not assets of the Debtors' bankruptcy estate").  The Pension Plans – not the Debtors – are obligated to pay benefits to Pension Plan participants, so any claims arising from the Pension Plans are claims against the Pension Plans rather than the Debtors.

32.    Second, to the extent that any of the Pension Plans is terminated, under ERISA, the PBGC has the sole and total right to recover against employers for pension plan underfunding and participants have no right to make claims against their employers for benefits under terminated plans.  See 29 U.S.C. § 1362; see also United Steelworkers of Amer. v. United Eng'g, Inc., 52 F.3d 1386, 1390 (6th Cir. 1995); Int'l Ass'n of Machinists and Aerospace Workers v. Rome Cable Corp., 810 F. Supp. 402 (N.D.N.Y. 1993); In re Lineal Group, Inc., 226 B.R. 608 (Bankr. M.D. Tenn. 1998).

33.    Salaried And Hourly OPEB Claims.  This Court has previously determined that the Debtors' Salaried OPEB was not vested and was provided on an at will basis.

17

See Final Order Under 11 U.S.C. §§ 105, 363 (b)(1), 1108, And 1114 (d) (I) Confirming

Debtors' Authority to Terminate Employer-Paid Post-Retirement Health Care Benefits And

Employer-Paid Post-Retirement Life Insurance Benefits For Certain (a) Salaried Employees And

(b) Retirees and Their Surviving Spouses And (II) Amending Scope And Establishing Deadline

For Completion Of Retirees' Committee's Responsibilities, dated March 11, 2009 (Docket No.

16448) (the "Final OPEB Termination Order").[8]  Additionally, on September 25 and 26, 2008,

the Debtors' unions consented to the cessation of the Debtors' Hourly OPEB and thus waived the

assertion of certain Hourly OPEB Claims under the terms of the union implementation

agreements.[9]

        34.    The cancellation of a benefit provided on an at will basis does not give rise

to a "claim" as defined in section 101(5) of the Bankruptcy Code because the retiree has no

"right to payment."  See, e.g., In re Ionosphere Clubs, Inc., 134 B.R. 515, 519 n. 4 (Bankr.

S.D.N.Y. 1991) (noting that terminating plans which are terminable at will gave rise to no claims

whatsoever); In re Wellman, Inc., No. 08-10595, slip op. at 6 (Bankr. S.D.N.Y. Jan. 23, 2009)

(sustaining debtors' objection to disallow portion of claims for modified severance benefits that

exceeded amounts owed under amended severance plan, reasoning that because old severance

plan was terminable at will, claims under old severance plan were not enforceable).

        35.    Accordingly, the Debtors (a) object to the Pension And OPEB Claims and

(b) seek entry of an order disallowing and expunging the Pension And OPEB Claims in their

entirety.

---

[8]  "The Debtors' Salaried OPEB benefits have not vested and the Debtors have reserved the right to modify or terminate Salaried OPEB benefits."  Final OPEB Termination Order at ¶ 2.

[9]  The Debtors expressly reserve the right to assert that certain Hourly OPEB Claims asserted by union members who participated in attrition programs approved by this Court have been waived pursuant to individual releases signed by such Claimants as part of those attrition programs.

H.    Wage And Benefit Claims Subject To Modification

36.    During their Claims review, the Debtors determined that certain Claims for wages and benefits incorrectly assert priority status (collectively, the "Wage And Benefit Claims Subject To Modification").

37.    Although in this Thirty-Fourth Omnibus Claims Objection the Debtors do not seek to disallow and expunge the Wage And Benefit Claims Subject To Modification, based on an initial review, the Debtors have determined that such Claims should be reclassified in the manner set forth on Exhibit B hereto.  The basis for placing a Claim in the Wage And Benefit Claims Subject To Modification category of objection is that such Claim seeks priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, which require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave, and employee benefit contributions be accorded priority in an amount not to exceed $10,000.00 per employee.  Each of these Claimants, however, has already received payments exceeding $10,000.00 in the aggregate pursuant to the Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (i) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (ii) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In the Ordinary Course; And (iii) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations, entered October 13, 2005 (Docket No. 198) (the "Human Capital Obligations Order").  Thus, the Debtors seek to appropriately reclassify the Wage And Benefit Claims Subject To Modification.

38.    Set forth on Exhibit B hereto is a list of Wage And Benefit Claims Subject To Modification that the Debtors believe should be modified solely to assert a properly classified, fully liquidated claim amount.  For each Wage And Benefit Claim Subject To Modification, Exhibit B reflects the amount, classification, and Debtor asserted in the Claimant's Proof of

Claim in a column titled "Claim As Docketed" and the proposed modified dollar amount and classification for the Claim and the Debtor against which the Claim should be asserted in a column titled "Claim As Modified."

39.     The Debtors object to the classification for each Wage And Benefit Claim Subject To Modification listed on <u>Exhibit B</u> and request that each such Claim be revised to reflect the amount, classification, and Debtor listed in the "Claim As Modified" column of <u>Exhibit B</u>.  Thus, no Claimant listed on <u>Exhibit B</u> would be entitled to (a) recover for any Wage And Benefit Claim Subject To Modification in an amount exceeding the dollar value listed as the "Modified Total" for such Claim on <u>Exhibit B</u>, (b) assert a classification that is inconsistent with that listed in the "Claim As Modified" column, and/or (c) assert a Claim against a Debtor other than that whose case number is listed in the "Claim As Modified" column on <u>Exhibit B</u>, subject to the Debtors' right to further object to each such Wage And Benefit Claim Subject To Modification.  For clarity, <u>Exhibit B</u> refers to the Debtor entities by case number and <u>Exhibit I</u> displays the formal name of four Debtor entities and their associated bankruptcy case numbers referenced in <u>Exhibit B</u>.

40.     The inclusion of the Wage And Benefit Claims Subject To Modification on <u>Exhibit B</u>, however, does not reflect the Debtors' view as to the ultimate validity of any such Claim.  The Debtors therefore expressly reserve all of their rights to further object to any or all of the Wage And Benefit Claims Subject To Modification at a later date on any basis whatsoever.

41.     Accordingly, the Debtors (a) object to the asserted classification for each Wage And Benefit Claim Subject To Modification and (b) seek an order modifying the Wage And Benefit Claims Subject To Modification to reflect the Modified Total, classification for the Claim, and/or the Debtor against which such Claim should be asserted, as set forth on <u>Exhibit B</u>.

20

I.    National And Local Union Claims To Be Provisionally Disallowed and Expunged

42.    During their Claims review, the Debtors determined that certain of the Proofs of Claim were filed by current or former employees of the Debtors who are or were represented by the IUOE, the IBEW, or the IAM, or by persons with claims derived from their relationship with such current or former employees, and assert Claims solely on the basis of employee wages and benefits, future pension benefits, or other post-employment benefits (collectively, the "Provisionally Disallowed Union Claims").  By this Objection, the Debtors seek entry of an order pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 disallowing and expunging, as of the effectiveness of the waiver provisions (as described and quoted below) (the "Waiver Date") contained in the respective settlement agreements between the Debtors and the IUOE, the IBEW, and the IAM, those Claims set forth on Exhibit C hereto.

43.    The Debtors believe that, as of the Waiver Date, the Provisionally Disallowed Union Claims should be disallowed and expunged.  Although the Debtors believe that many of the Provisionally Disallowed Union Claims would be resolved after the Waiver Date without an objection, the Debtors are filing this objection prior to the Waiver Date to make clear that the holders of the Provisionally Disallowed Union Claims are not entitled to vote on the Plan (as modified) on account of such Provisionally Disallowed Union Claims.

44.    Pursuant to the Debtors' respective agreements with the IUOE, IBEW, and IAM as described in footnote 10 to this Objection, the IUOE, the IBEW, and the IAM and all of their members have agreed to waive and release, upon the effective date of the Plan (the "Effective Date"), all claims arising from the respective collective bargaining agreements

between the Debtors and each of the IUOE, the IBEW, and the IAM.[10]  Therefore, because the

Provisionally Disallowed Union Claims arise from the collective bargaining agreements between

the Debtors and the Provisionally Disallowed Union Claims are waived and released pursuant to

the IUOE, IBEW, and IAM Settlement Agreements, the Provisionally Disallowed Union Claims

should be disallowed and expunged as of the Waiver Date.

        45.     Not only have the Provisionally Disallowed Union Claims been waived

and released as of the Waiver Date, but the Debtors believe that certain of the Provisionally

Disallowed Union Claims have been satisfied in the ordinary course of the Debtors' business.  As

noted above, the Human Capital Obligations Order authorized (but did not direct) the Debtors to

pay, among other things, employees' prepetition and postpetition wages and salaries.  Therefore,

pursuant to the Human Capital Obligations Order, the Debtors have continued to pay such wages

and salaries in the ordinary course of the Debtors' business, do not believe they currently owe

any prepetition wages or salaries to any current or former employee, and believe that certain of

the Provisionally Disallowed Union Claims have already been satisfied.

        46.     Attached hereto as <u>Exhibit C</u> is a list of the Provisionally Disallowed

Union Claims.  Accordingly, the Debtors (a) object to the Provisionally Disallowed Union

---

[10]    The Debtors entered into three settlement agreements with the IUOE, two settlement agreements with the
IBEW, and one settlement agreement with the IAM (collectively, the "IUOE, IBEW, and IAM Settlement
Agreements").  The IUOE, IBEW, and IAM Settlement Agreements, copies of which are attached to, and
approved by, an order (Docket No. 9107) entered by this Court on August 16, 2007, all provide, in relevant part:

        On the [E]ffective [D]ate . . . the [IUOE/IBEW/IAM], all employees and former employees of Delphi
        represented or formerly represented by the[IUOE/IBEW/IAM], and all persons or entities with claims
        derived from or related to any relationship with such employees or former employees of Delphi, shall
        waive and release and be deemed to have waived and released any and all claims of any nature, whether
        liquidated or unliquidated, contingent or non-contingent, asserted or unasserted, existing and/or arising in
        the future against Delphi, its subsidiaries, or affiliates . . . and the officers, directors, employees, fiduciaries,
        and agents of each, arising directly or indirectly from or in any way related to any obligations under the
        collective bargaining agreements between Delphi and the [IUOE/IBEW/IAM] and between GM and the
        [IUOE/IBEW/IAM] related to such employees . . . .

Claims and (b) seek entry of an order disallowing and expunging, upon the occurrence of the Waiver Date, the Provisionally Disallowed Union Claims in their entirety.

J.      State Workers' Compensation Claims Subject To Modification

47.     During their Claims review, the Debtors determined that certain Claims filed by various states incorrectly assert priority status (collectively, the "State Workers' Compensation Claims Subject To Modification").  Although in this Thirty-Fourth Omnibus Claims Objection the Debtors do not seek to disallow and expunge the State Workers' Compensation Claims Subject To Modification, based on an initial review, the Debtors have determined that such Claims should be reclassified in the manner set forth on Exhibit D hereto.

48.     In many states where the Debtors conduct business, the Debtors self-insure their workers' compensation programs and, as required by state law, have obtained letters of credit for the benefit of the states in the event that the Debtors would fail to pay workers compensation claims.  Certain states in which the Debtors are self-insured have filed contingent Claims for repayment in the event that the Debtors do not satisfy prepetition workers' compensation liabilities.  If the Debtors default on such obligations such states may allege that their Claims for recovery of payments made to workers should be entitled to priority treatment by characterizing such claims as "excise taxes," covered by section 507(a)(8) of the Bankruptcy Code.

49.     The Debtors assert that these Claims – i.e., the State Workers' Compensation Claims Subject To Modification – should not be given priority claim status under section 507(a)(8)(E) of the Bankruptcy Code and instead should be classified as general unsecured claims.  The amount of the letters of credit that have been issued in favor of the states asserting State Workers' Compensation Claims Subject To Modification are well in excess of the priority amount of such Claims permitted under section 507(a)(8)(E) of the Bankruptcy Code.

Accordingly, those Claims will be satisfied through the application of those states' existing letters of credit.

50.    In addition, Claims made by states for reimbursement of workers' compensation claims may not be excise taxes because allowing government entities to receive priority claims for the same obligations for which sureties and other insurance providers would only receive general unsecured claims could disadvantage private creditors.  See George v. Uninsured Employers Fund, 361 F.3d 1157, 1162 (9th Cir. 2004); but see In re Chateaugay Corporation, 153 B.R. 632 (S.D.N.Y. Bankr 1993) (holding that payments by state for workers' compensation obligations should be accorded priority as excise taxes).  Thus, the Debtors seek to appropriately reclassify the Claims.

51.    Set forth on Exhibit D hereto is a list of State Workers' Compensation Claims Subject To Modification that the Debtors believe should be modified solely to assert a properly classified, fully liquidated claim amount.  For each State Workers' Compensation Claim Subject To Modification, Exhibit D reflects the amount, classification, and Debtor asserted in the Claimant's Proof of Claim in a column titled "Claim As Docketed" and the proposed modified dollar amount and classification for the Claim and the Debtor against which the Claim should be asserted in a column titled "Claim As Modified."

52.    The Debtors object to the classification for each State Workers' Compensation Claim Subject To Modification listed on Exhibit D and request that each such Claim be revised to reflect the amount, classification, and Debtor listed in the "Claim As Modified" column of Exhibit D.  Thus, no Claimant listed on Exhibit D would be entitled to (a) recover for any State Workers' Compensation Claim Subject To Modification in an amount exceeding the dollar value listed as the "Modified Total" for such Claim on Exhibit D, (b) assert

a classification that is inconsistent with that listed in the "Claim As Modified" column, and/or (c) assert a Claim against a Debtor other than that whose case number is listed in the "Claim As Modified" column on <u>Exhibit D</u>, subject to the Debtors' right to further object to each such State Workers' Compensation Claim Subject To Modification.  For clarity, <u>Exhibit D</u> refers to the Debtor entities by case number and <u>Exhibit I</u> displays the formal name of four Debtor entities and their associated bankruptcy case numbers referenced in <u>Exhibit D</u>.

53.    The inclusion of the State Workers' Compensation Claims Subject To Modification on <u>Exhibit D</u>, however, does not reflect the Debtors' view as to the ultimate validity of any such Claim.  The Debtors therefore expressly reserve all of their rights to further object to any or all of the State Workers' Compensation Claims Subject To Modification at a later date on any basis whatsoever.

54.    Accordingly, the Debtors (a) object to the asserted classification for each State Workers' Compensation Claim Subject To Modification and (b) seek an order modifying the State Workers' Compensation Claims Subject To Modification to reflect the Modified Total, classification for the Claim, and/or the Debtor against which such Claim should be asserted, as set forth on <u>Exhibit D</u>.

K.    <u>Individual Workers' Compensation Claims</u>

55.    During their Claims review, the Debtors determined that certain Proofs of Claim that were filed by individual current or former employees for workers' compensation benefits that (a) asserted liabilities or dollar amounts that are not owing pursuant to the Debtors' books and records (the "Individual Workers' Compensation Books And Records Claims"), (b) incorrectly asserted priority status (the "Individual Workers' Compensation Claims Subject To Modification"), (c) asserted duplicate Claims (each, an "Individual Workers' Compensation

Duplicate And Amended Claims") for a single liability, or (d) were filed after the Bar Date ("Untimely Individual Workers' Compensation Claims")

56.    <u>Individual Workers' Compensation Books And Records Claims</u>.  The Debtors believe that the parties asserting the Individual Workers' Compensation Books And Records Claims are not creditors of the Debtors.  Therefore, their Claims should be expunged.

57.    A Claimant's proof of claim is entitled to the presumption of <u>prima facie</u> validity under Bankruptcy Rule 3001(f) only until an objecting party refutes "'at least one of the allegations that is essential to the claim's legal sufficiency.'"  <u>In re WorldCom, Inc.</u>, No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. 2005) (quoting <u>In re Allegheny Int'l, Inc.</u>, 954 F.2d 167, 173-74 (3d Cir. 1992)).  Once such an allegation is refuted, "'the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.'"  <u>Id</u>.

58.    Attached hereto as <u>Exhibit E-1</u> is a list of Individual Workers' Compensation Books And Records Claims that the Debtors have identified as Claims for which the Debtors are not liable.  If this Court does not disallow and expunge these Claims in full, the Debtors expressly reserve all of their rights to further object to the Individual Workers' Compensation Books And Records Claims at a later date on any basis whatsoever.

59.    Accordingly, the Debtors (a) object to the Individual Workers' Compensation Books And Records Claims and (b) seek entry of an order disallowing and expunging the Individual Workers' Compensation Books And Records Claims in their entirety.

60.    <u>Individual Workers' Compensation Claims Subject To Modification</u>. During their Claims review, the Debtors determined that certain Claims filed by individuals for workers' compensation benefits incorrectly assert priority status (collectively, the "Individual Workers' Compensation Claims Subject To Modification").

26

61.     Although in this Thirty-Fourth Omnibus Claims Objection the Debtors do not seek to disallow and expunge the Individual Workers' Compensation Claims Subject To Modification, based on an initial review, the Debtors have determined that such Claims should be reclassified in the manner set forth on Exhibit E-2 hereto.  The basis for placing a Claim in the Individual Workers' Compensation Claims Subject To Modification category of objection is that such Claims seek priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, which require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave, and employee benefit contributions be accorded priority in an amount not to exceed $10,000.00 per employee.  However, each of the Claimants asserting such Claims has already received postpetition payments from the Debtors exceeding $10,000.00 in the aggregate pursuant to the Human Capital Obligations Order.  Thus, the Debtors seek to appropriately reclassify the Individual Workers' Compensation Claims Subject To Modification.

62.     Set forth on Exhibit E-2 hereto is a list of Individual Workers' Compensation Claims Subject To Modification that the Debtors believe should be modified solely to assert a properly classified, fully liquidated claim amount.  For each Individual Workers' Compensation Claims Subject To Modification, Exhibit E-2 reflects the amount, classification, and Debtor asserted in the Claimant's Proof of Claim in a column titled "Claim As Docketed" and the proposed modified dollar amount and classification for the Claim and the Debtor against which the Claim should be asserted in a column titled "Claim As Modified."

63.     The Debtors object to the classification for each Individual Workers' Compensation Claims Subject To Modification listed on Exhibit E-2 and request that each such Claim be revised to reflect the amount, classification, and Debtor listed in the "Claim As Modified" column of Exhibit E-2.  Thus, no Claimant listed on Exhibit E-2 would be entitled to

27

(a) recover for any Individual Workers' Compensation Claims Subject To Modification in an amount exceeding the dollar value listed as the "Modified Total" for such Claim on Exhibit E-2, (b) assert a classification that is inconsistent with that listed in the "Claim As Modified" column, and/or (c) assert a Claim against a Debtor other than that whose case number is listed in the "Claim As Modified" column on Exhibit E-2, subject to the Debtors' right to further object to each such Individual Workers' Compensation Claims Subject To Modification. For clarity, Exhibit E-2 refers to the Debtor entities by case number and Exhibit I displays the formal name of four Debtor entities and their associated bankruptcy case numbers referenced in Exhibit E-2.

64.    The inclusion of the Individual Workers' Compensation Claims Subject To Modification on Exhibit E-2, however, does not reflect the Debtors' view as to the ultimate validity of any such Claim. The Debtors therefore expressly reserve all of their rights to further object to any or all of the Individual Workers' Compensation Claims Subject To Modification at a later date on any basis whatsoever.

65.    Accordingly, the Debtors (a) object to the asserted classification for each Individual Workers' Compensation Claims Subject To Modification and (b) seek an order modifying the Individual Workers' Compensation Claims Subject To Modification to reflect the Modified Total, classification for the Claim, and/or the Debtor against which such Claim should be asserted, as set forth on Exhibit E-2.

66.    Individual Workers' Compensation Duplicate And Amended Claims. During their Claims review, the Debtors determined that certain of such Proofs of Claim in fact assert duplicate Claims (each, a "Duplicate Claim") for a single workers' compensation liability. In some instances, Duplicate Claims arose when a Claimant filed Proofs of Claim against multiple Debtor entities for the same workers' compensation liability. In an effort to eliminate

28

the Duplicate Claims, the Debtors reviewed the Proofs of Claim, the supporting documentation provided in those Proofs of Claim, and the Debtors' Schedules and Statements to determine which duplicate claim should be the surviving claim.

67.    Additionally, the Debtors determined that many Claims evidenced by Proofs of Claim were subsequently amended or superseded by other Proofs of Claim filed by creditors with respect to the same liabilities (the "Amended Claims").  For instance, many Amended Claims were filed to amend an amount previously claimed in an earlier Proof of Claim (the "Original Claim").  Other Amended Claims were filed to amend the classification of part or all of an earlier Original Claim.

68.    It is axiomatic that creditors are not entitled to multiple recoveries for a single liability against a debtor.  Accordingly, the Debtors wish to eliminate the Duplicate Claims.  In addition, the Debtors wish to eliminate from the Debtors' claims register Original Claims for which Amended Claims were subsequently filed (collectively, the "Individual Workers' Compensation Duplicate Or Amended Claims").

69.    Set forth on Exhibit E-3 hereto is a list of Claims that the Debtors have identified as Individual Workers' Compensation Duplicate Or Amended Claims.  For each Individual Workers' Compensation Duplicate Or Amended Claim, Exhibit E-3 classifies a Proof of Claim as either a "Claim To Be Expunged" (the "Expunged Claim") or as a "Surviving Claim" (the "Surviving Claim").  Generally, the Surviving Claims reflect the classifications of the liabilities as reflected on the Debtors' Schedules and Statements.   The Debtors request that the Claims marked as Expunged Claims on Exhibit E-3 be disallowed and expunged.  With respect to the Claims on Exhibit E-3 marked as Surviving Claims, the Debtors do not seek any relief at this time.  The inclusion of the Surviving Claims on Exhibit E-3, however, does not reflect any

view by the Debtors as to the ultimate validity of any such Claims. The Debtors therefore expressly reserve all of their rights to further object to any or all of the Surviving Claims at a later date on any basis whatsoever.

70.    Accordingly, the Debtors (a) object to the Individual Workers' Compensation Duplicate Or Amended Claims and (b) seek entry of an order disallowing and expunging the Individual Workers' Compensation Duplicate Or Amended Claims in their entirety.

71.    <u>Untimely Individual Workers' Compensation Claims</u>. Although the Bar Date passed almost three years ago, various parties have continued to file Proofs of Claim in these chapter 11 cases. During their Claims review, the Debtors have determined that a certain Proof of Claim asserting a workers' compensation claim was received by the Debtors after the Bar Date (the "Untimely Individual Workers' Compensation Claim"). The Debtors object to the Untimely Individual Workers' Compensation Claim because it was not timely filed pursuant to the Bar Date Order. The Untimely Individual Workers' Compensation Claim is identified on <u>Exhibit E-4</u> hereto. Accordingly, the Debtors (a) object to the Untimely Individual Workers' Compensation Claim[11] and (b) seek entry of an order disallowing and expunging the Untimely Individual Workers' Compensation Claim in its entirety.

L.    <u>Secured Claim Not Reflected On The Debtors' Books And Records</u>

72.    During their Claims review, the Debtors determined that a certain Proof of Claim asserts, as a secured claim, liabilities that are not owing pursuant to the Debtors' books

---

[11]    The Untimely Individual Workers' Compensation Claim listed on <u>Exhibit E-4</u> hereto was not included as part of the Motion for Order Under Fed. R. Bankr. P. 3003(c)(3) And 9006(b)(1) Deeming Certain Proofs Of Claim Timely Filed, filed September 29, 2006 (Docket No. 5238) (the "Claims Timeliness Motion").

and records (the "Secured Books And Records Claim").  The Debtors believe that the party

asserting the Secured Books And Records Claim is not a creditor of the Debtors.

73.    A Claimant's proof of claim is entitled to the presumption of <u>prima facie</u>

validity under Bankruptcy Rule 3001(f) only until an objecting party refutes "'at least one of the

allegations that is essential to the claim's legal sufficiency.'"  <u>In re WorldCom, Inc.</u>, No. 02-

13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. 2005) (quoting <u>In re Allegheny Int'l, Inc.</u>, 954

F.2d 167, 173-74 (3d Cir. 1992)).  Once such an allegation is refuted, "'the burden reverts to the

claimant to prove the validity of the claim by a preponderance of the evidence.'"  <u>Id</u>.

74.    Set forth on <u>Exhibit F</u> is the Secured Books And Records Claim that the

Debtors have identified as a Claim for which the Debtors are not liable.  If this Court does not

disallow and expunge this Claim in full, the Debtors expressly reserve all of their rights to

further object to the Secured Books And Records Claim at a later date on any basis whatsoever.

75.    Accordingly, the Debtors (a) object to the Secured Books And Records

Claim and (b) seek entry of an order disallowing and expunging the Secured Books And Records

Claim in its entirety.

M.    <u>Untimely Claims</u>

76.    During their continuing Claims review, the Debtors have determined that

certain Proofs of Claim were received by the Debtors after the Bar Date (the "Untimely Claims").

The Debtors object to the Untimely Claims on the basis that they were not timely filed pursuant

to the Bar Date Order.  The Untimely Claims are identified on <u>Exhibit G</u> hereto.  Accordingly,

the Debtors (a) object to the Untimely Claims[12] and (b) seek entry of an order disallowing and expunging the Untimely Claims in their entirety.

N.    Allowed Claims Pursuant To Settlements

77.    During their Claims review, the Debtors determined that certain Proofs of Claim assert liabilities and dollar amounts with respect to which the Debtors have reached settlements in principle with the holders of the Claims (the "Claims Allowed Pursuant To Settlement").  Accordingly, the Debtors seek to modify and allow the Claims Allowed Pursuant To Settlement to make them consistent with the settlements reached between the parties.

78.    Set forth on Exhibit H are the Claims that the Debtors have identified as the Claims Allowed Pursuant To Settlement.  The Debtors request that the Claim amounts be modified as reflected on Exhibit H and that such Claims be allowed.

79.    Accordingly, the Debtors seek entry of an order modifying and allowing the Claims Allowed Pursuant To Settlement and request that each such Claim be revised to reflect the amount, classification, and Debtor listed in the "Claim As Allowed" column of Exhibit H.

80.    For each Claim Allowed Pursuant to Settlement that the Debtors seek to allow pursuant to this Objection, such allowance is conditioned upon the following releases and reservations of rights:

(a)    The allowance of the Claim shall act as an injunction against any "Person" (as that term is defined in 101(41) of the Bankruptcy Code) commencing any action, employment of process, or act to collect, offset, or recover with respect to each such Claim.  This injunction specifically includes all Actions under the Employee Retirement Income Security Act of 1974, as amended, which regulates employee benefit plans; Title VII of the Civil Rights Act of 1964, as

---

[12]    The Untimely Claims listed on Exhibit G hereto were not included as part of the Claims Timeliness Motion.

amended, which prohibits discrimination in employment based on race, color, national origin, religion, or sex; the Americans with Disabilities Act, which prohibits discrimination in employment based on disability; the Age Discrimination in Employment Act, which prohibits discrimination in employment based on age; the Equal Pay Act, which prohibits wage discrimination; state fair employment practices or civil rights laws; and any other federal, state or local law, order, or regulation or the common law relating to employment or employment discrimination, including those which preclude any form of discrimination based on age. Nothing contained herein is intended to preclude Delphi from continuing the benefits provided under the Delphi Life And Disability Benefits Program For Salaried Employees and the Salaried Health Care Plan (or Claimant's rights, if any, to receive benefits thereunder), subject to the terms thereof and Delphi's rights and defenses thereto. Furthermore, nothing contained herein shall alter (a) the Claimant's right(s) to continue to receive benefits related to the Delphi Retirement Program for Salaried Employees and (b) Delphi's reciprocal rights and defenses thereto.

(b)     The allowance of the Claim will hereby resolve all of the responses filed by Claimants to prior omnibus claims objections with respect to each such Claim subject to this Thirty-Fourth Omnibus Claims Objection.

(c)     Without further order of this Court, the Debtors are authorized to offset or reduce the Claim for purposes of distribution to holders of allowed claims entitled to receive distributions under any plan of reorganization of the Debtors by the amount of any cure payments made on account of the assumption, pursuant to section 365 of the Bankruptcy Code, of an executory contract or unexpired lease to which the counterparty associated with the Proof of Claim is a party.

<u>Separate Contested Matters</u>

81.     Pursuant to the Claims Objection Procedures Order, to the extent that a response is filed with respect to any Claim listed in this Thirty-Fourth Omnibus Claims Objection, each such Claim and the objection to such Claim asserted in this Objection will be deemed to constitute a separate contested matter as contemplated by Bankruptcy Rule 9014. Pursuant to the Claims Objection Procedures Order, any order entered by the Court with respect

to an objection asserted in this Objection will be deemed a separate order with respect to each Claim.

Reservation Of Rights

82.    The Debtors expressly reserve the right to amend, modify, or supplement this Thirty-Fourth Omnibus Claims Objection and to file additional objections to any other Claims (filed or not) which may be asserted against the Debtors, including without limitation the right to object to any Claim not objected to in this Objection on the basis that it has been asserted against the wrong Debtor entity.  Should one or more of the grounds for objection stated in this Objection be dismissed, the Debtors reserve their rights to object on other stated grounds or on any other grounds that the Debtors discover during the pendency of these cases.  In addition, the Debtors reserve the right to seek further reduction of any Claim to the extent that such Claim has been paid.

Responses To Objections

59.    Responses to the Thirty-Fourth Omnibus Claims Objection are governed by the provisions of the Claims Objection Procedures Order.  The following summarizes the provisions of that Order, but is qualified in all respects by the express terms thereof.

O.    Filing And Service Of Responses

60.    To contest an objection, responses (each, a "Response"), if any, to the Thirty-Fourth Omnibus Claims Objection must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Claims Objection Procedures Order, (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based

34

word processing format), (d) be submitted in hard copy form directly to the chambers of the

Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court

for the Southern District of New York, One Bowling Green, Room 632, New York, New York

10004, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098

(Att'n: General Counsel) and (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom

LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr., John K.

Lyons, and Joseph N. Wharton), in each case so as to be **received no later than 4:00 p.m.**

**(prevailing Eastern time) on July 16, 2009**.

P.      Contents Of Responses

      61.      Every Response to this Thirty-Fourth Omnibus Claims Objection must

contain at a minimum the following:

      (a)      the title of the claims objection to which the Response is directed;

      (b)      the name of the Claimant and a brief description of the basis for
the amount of the Claim;

      (c)      a concise statement setting forth the reasons why the Claim should
not be disallowed and expunged, including, but not limited to, the
specific factual and legal bases upon which the Claimant will rely
in opposing the claims objection;

      (d)      unless already set forth in the Proof of Claim previously filed with
the Court, documentation sufficient to establish a prima facie right
to payment; provided, however, that the Claimant need not
disclose confidential, proprietary, or otherwise protected
information in the Response; provided further, however, that the
Claimant must disclose to the Debtors all information and provide
copies of all documents that the Claimant believes to be
confidential, proprietary, or otherwise protected and upon which
the Claimant intends to rely in support of its Claim, subject to
appropriate confidentiality constraints;

      (e)      to the extent that the Claim is contingent or fully or partially
unliquidated, the amount that the Claimant believes would be the
allowable amount of such Claim upon liquidation of the Claim or
occurrence of the contingency, as appropriate; and

(f)    the address(es) to which the Debtors must return any reply to the Response, if different from the address(es) presented in the claim.

Q.    Timely Response Required

62.    If a Response is properly and timely filed and served in accordance with the foregoing procedures, the hearing on the relevant Claims covered by the Response will be adjourned to a future hearing, the date of which will be determined by the Debtors, by serving notice to the Claimant as provided in the Claims Objection Procedures Order.  With respect to all uncontested objections, the Debtors request that this Court conduct a final hearing on July 23, 2009 at 10:00 a.m. (prevailing Eastern time).  The procedures set forth in the Claims Objection Procedures Order will apply to all Responses and hearings arising from this Thirty-Fourth Omnibus Claims Objection.

63.    Pursuant to the Claims Objection Procedures Order, only those Responses made in writing and timely filed and received will be considered by the Court.  If a Claimant whose Proof of Claim is subject to the Thirty-Fourth Omnibus Claims Objection and who is served with the Thirty-Fourth Omnibus Claims Objection fails to file and serve a timely Response in compliance with the Claims Objection Procedures Order, the Debtors may present to the Court an appropriate order seeking relief with respect to such Claim consistent with the relief sought in the Thirty-Fourth Omnibus Claims Objection without further notice to the Claimant, provided that, upon entry of such an order, the Claimant will receive notice of the entry of such order as provided in the Claims Objection Procedures Order; provided further, however, that if the Claimant files a timely Response which does not include the required minimum information required by the Claims Objection Procedures Order, the Debtors may seek disallowance and expungement of the relevant Claim or Claims only in accordance with the Claims Objection Procedures Order.

64.    To the extent that a Claim would be subject to estimation pursuant to section 502(c) of the Bankruptcy Code, if the Claimant has filed a Response in accordance with the procedures outlined above which (a) acknowledges that the Claim is contingent or fully or partially unliquidated and (b) provides the amount that the Claimant believes would be the allowable amount of such Claim upon liquidation of the Claim or occurrence of the contingency, as appropriate (the "Claimant's Asserted Estimated Amount"), <u>pursuant to the Claims Objection Procedures Order the Debtors may elect to accept provisionally the Claimant's Asserted Estimated Amount as the estimated amount of such Claim pursuant to section 502(c) of the Bankruptcy Code for all purposes other than allowance, but including voting and establishing reserves for purposes of distribution under a reorganization plan, subject to further objection and reduction as appropriate and section 502(j) of the Bankruptcy Code</u>, by providing notice as described more fully in the Claims Objection Procedures Order.

Replies To Responses

65.    Replies to any Responses will be governed by the Claims Objection Procedures Order.

Service Of Thirty-Fourth Omnibus Claims Objection Order

66.    Service of any order with regard to this Thirty-Fourth Omnibus Claims Objection will be made in accordance with the Claims Objection Procedures Order.

Further Information

67.    Questions about this Thirty-Fourth Omnibus Claims Objection or requests for additional information about the proposed disposition of Claims hereunder should be directed to the Debtors' counsel by e-mail to delphi@skadden.com, by telephone at 1-800-718-5305, or in writing to Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago,

Illinois 60606 (Att'n: John Wm. Butler, Jr., John K. Lyons, and Joseph N. Wharton).  Questions

regarding the amount of a Claim or the filing of a Claim should be directed to the Claims Agent

at 1-888-249-2691 or www.delphidocket.com.  Claimants should not contact the Clerk of the

Bankruptcy Court to discuss the merits of their Claims.

Notice

68.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Fourteenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered May 1, 2009 (Docket No. 16589).  In light of the nature

of the relief requested, the Debtors submit that no other or further notice is necessary.

69.    Pursuant to the Claims Objection Procedures Order, the Debtors will

provide each Claimant whose Proof of Claim is subject to an objection pursuant to this Thirty-

Fourth Omnibus Claims Objection with a personalized Notice Of Objection To Claim which

specifically identifies the Claimant's Proof of Claim that is subject to an objection and the basis

for such objection as well as a copy of the Claims Objection Procedures Order.  A form of the

Notice Of Objection To Claim to be sent to the Claimants listed on Exhibits A, C, E-1, E-3, E-4,

F, and G is attached hereto as Exhibit K.  A form of the Notice Of Objection To Claim to be sent

to the Claimants listed on Exhibits B, D, and E-2 is attached hereto as Exhibit L.  A form of the

Notice Of Objection To Claim to be sent to the Claimants listed on Exhibit H is attached hereto

as Exhibit M.  Claimants will receive a copy of this Thirty-Fourth Omnibus Claims Objection

38

without Exhibits A through M hereto.  Claimants will nonetheless be able to review Exhibits A

through M hereto free of charge by accessing the Debtors' Legal Information Website

(www.delphidocket.com).  In light of the nature of the relief requested, the Debtors submit that

no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          June 22, 2009

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      John K. Lyons
      Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606

      - and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti

Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
      Debtors and Debtors-in-Possession