**Hearing Date And Time:  July 1, 2009 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :
       In re                               :   Chapter 11
                                           :
DELPHI CORPORATION, et al.,                :   Case No. 05-44481 (RDD)
                                           :
                                           :   (Jointly Administered)
           Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 2002,
6004, AND 9014 AUTHORIZING DEBTORS TO PROVIDE EXPENSE REIMBURSEMENT TO
PLATINUM EQUITY ADVISORS, LLC IN CONNECTION WITH SALE OF
<u>DEBTORS' ASSETS PURSUANT TO MASTER DISPOSITION AGREEMENT</u>

("PLATINUM EXPENSE REIMBURSEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for order under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, and 9014 authorizing the Debtors to provide an expense reimbursement to Platinum Equity Advisors, LLC ("Platinum") in connection with the sale of the Debtors' assets pursuant to the Master Disposition Agreement (as defined below). In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders, which was disbanded on April 24, 2009. On February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

2

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[1] On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. Since that time, however, the Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

4.     On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity

---

[1] Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors. In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process.

3

markets, the Debtors adjourned the hearing on the Plan Modification Motion several times. On June 1, 2009 the Debtors filed a supplement to the Plan Modification Motion, amending and restating the relief sought in that motion (the "Motion Supplement"). Among other things, the Motion Supplement sought approval of (i) certain modifications to the Confirmed Plan (the "Modified Plan"), (ii) a supplement to the Disclosure Statement (the "Disclosure Statement Supplement"), and (iii) procedures for re-soliciting votes on the Modified Plan. The Motion Supplement was approved with modifications by order entered June 10, 2009 (the "Modification Procedures Order") and the Debtors are currently soliciting votes on the Modified Plan.

5.   This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6.   The statutory predicates for the relief requested herein are section 363 of the Bankruptcy Code and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   <u>The Debtors' Transformation Plan</u>

7.   On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive

4

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

C.      Plan Confirmation And Postconfirmation Matters

8.      The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM. The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan. After the Plan Investors refused to fund their obligations under the Investment Agreement, as the Debtors continued working with their stakeholders to evaluate their options to emerge from chapter 11, the Debtors sought approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA"). On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

9.      Through the Amended GSA and Amended MRA, the Debtors addressed, at least in part, two goals of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) working to solve Delphi's pension funding situation. Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations. Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

5

10. As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which were set forth in the Plan Modification Motion.  Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally, and the current economic climate in the automotive industry adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Moreover, as a result of the market turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an accommodation agreement (as subsequently amended) which allows the Debtors, among other things, to continue using certain of the proceeds of the postpetition financing facility through June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate payment of certain payables to the Debtors, including entry into an amended and restated agreement as of June 1, 2009, to provide the Debtors up to $250 million of additional pre-emergence liquidity to support Delphi's transformation plan and its reorganization plan.

11. Also on June 1, 2009, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, Delphi reached an agreement to effect its emergence from chapter 11 through a transaction with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum, and with the support of GM Components Holdings LLC ("GM Components"), an affiliate of GM.  In the exercise of the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all of

6

their stakeholders, the Debtors executed an agreement (the "Master Disposition Agreement") to reflect the foregoing transactions through a plan of reorganization. The agreement and the changes to the Confirmed Plan were filed as part of the Motion Supplement on June 1, 2009.

    12.  Ultimately, the emergence structure contemplated in the Modified Plan is similar to that which was contemplated in the Confirmed Plan. Instead of having a plan investor sponsoring their plan and emerging as the majority owner of the continuing business enterprise, however, Delphi has agreed to contemporaneously effectuate transactions through which Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that, together with Delphi's global Steering business, are being acquired by GM Components Holding LLC. A new company, DPH Holdings Co., will emerge as a reorganized entity that retains certain other residual non-core and non-strategic assets and liabilities that are expected to be divested over time. On June 16, 2009, the Bankruptcy Court entered the Modification Procedures Order which, among other things, authorized the Debtors to commence solicitation of votes on the Modified Plan. In addition, the Modification Procedures Order established procedures through which unsolicited proposals for alternative transactions to the Master Disposition Agreement ("Alternative Transactions") would be evaluated and administered (the "Supplemental Procedures").

    13.  Consummation of these transactions underlying the Master Disposition Agreement through the Modified Plan, which embodies concessions made by parties-in-interest to resolve these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a distribution to holders of general unsecured claims. Moreover, Delphi's emerging businesses will continue to develop technology

and products and produce them for the benefit of their customers through consummation of the Master Disposition Agreement with Platinum, which has experience providing operational support to companies to help them create long term value, and GM, or in conjunction with an Alternative Transaction, if any. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

Relief Requested

14.     By this Motion and as contemplated by paragraph 46 of the Modification Procedures Order, the Debtors seek approval for Platinum to receive an expense reimbursement in an amount up to $30 million for expenses and costs incurred in connection with Platinum's comprehensive investigation of Delphi, which ultimately culminated in Platinum's execution of the Master Disposition Agreement (and conducting related diligence efforts relating to Delphi Corporation) (the "Expense Reimbursement"). The Expense Reimbursement would be payable upon the closing of an Alternative Transaction pursuant to the Supplemental Procedures from the proceeds of the Alternative Transaction, if any, whether executed pursuant to a Modified Plan or otherwise.

Basis For Relief

15.     The Master Disposition Agreement is premised upon a private sale transaction among several parties. The buyers – Parnassus, GM Components, and certain of their affiliates – have a limited ability to terminate the agreement and Delphi may only consider unsolicited alternative transactions in accordance with Delphi's board of directors' fiduciary duties. At the hearing on June 10, 2009, this Court ruled that supplemental procedures governing a process for the submission of potential Alternative Transactions should be delineated to

8

provide a transparent process for Delphi's exercise of its fiduciary duties. Thus, with the entry of the Modification Procedures Order and Supplemental Procedures, the Alternative Transaction process became more defined, with the requirement that potential bidders make proposals based upon the transaction set forth in the Master Disposition Agreement. In light of the significant time, energy, and resources that Platinum has expended to pursue the transactions memorialized therein, and as contemplated by paragraph 46 of the Modification Procedures Order, the Debtors are seeking an Expense Reimbursement for Platinum, which the Debtors believe is reasonable and appropriate under the circumstances. The Debtors have brought this Motion on an expedited timeframe because if this Motion is granted, other potential purchasers of the Debtors' businesses must incorporate the Expense Reimbursement in their proposed Alternative Transactions, the deadline for the submission of which is July 10, 2009.

D.   Platinum's Efforts

16.   As more fully described in the declaration of Dan Krasner, dated June 25, 2009 (the "Krasner Declaration")[2], Platinum has expended significant capital and time on the transaction memorialized in the Master Disposition Agreement. Since 2006, Platinum has been engaged in pursuing investment opportunities in Delphi including, on several occasions, attempting to lead a transaction that would provide for a comprehensive resolution of the Debtors' chapter 11 cases. In addition to engaging a cadre of outside consultants and law firms, both foreign and domestic, Platinum has also dedicated its executive team and other of its professionals to an analysis of Delphi's operations. Krasner Declaration ¶ 14.

---

[2]   The Krasner Declaration is attached hereto as Exhibit A. The declaration of John D. Sheehan, dated June 25, 2009, is attached hereto as Exhibit B (the "Sheehan Declaration"). The declaration of William R. Shaw, dated June 25, 2009, is attached hereto as Exhibit C (the "Shaw Declaration").

9

17.     Platinum has spent a significant number of hours analyzing all aspects of Delphi's business from a global, divisional, product business unit, and product line perspective. Krasner Declaration ¶ 2. Platinum has studied, in detail, Delphi's revenue and capital plans, its programs, commodity exposure, currency exposure, manufacturing footprint, IT systems, allocation methodology, engineering resources, and SG&A resources. Id. Representatives of Platinum have held a plethora of meetings with Delphi's management and employees at the headquarters and divisional levels to discuss the various aspects of Delphi's business. Id. Based on this analysis, Platinum has prepared a strategic operating plan for Delphi going forward. Id. This plan is not premised on revenues returning to their pre-2008 levels, but rather contemplates a significant amount of restructuring and cost reduction initiatives within Delphi. Id. Platinum has committed a large team of dedicated resources, both internal and external, with significant operational expertise to execute on the operating plan immediately. Id.

18.     Platinum has also worked diligently to obtain the support of Delphi's constituents in this transaction, including Delphi's unions (particularly the UAW), GM, and other parties-in-interest. Krasner Declaration ¶ 15. Platinum has completed all of its due diligence, conducted world-wide site tours, held world-wide and domestic meetings with customers, and had discussions with third party service providers. Id. Platinum and its consultants have dedicated time to gain an understanding Delphi's operations, the cash required to fund Delphi's negative operating cash position, Delphi's restructuring needs, and its working capital needs. Krasner Declaration ¶ 6.

19.     For the Debtors, the transaction with Platinum, GM, and certain of their affiliates as set forth in the Master Disposition Agreement represents the path to a global resolution of their chapter 11 cases. The Master Disposition Agreement has facilitated access

10

to vital liquidity and the satisfaction of significant administrative and other liabilities, thereby providing value to the Debtors' estates that no other party was willing to commit to provide. For Platinum, the Master Disposition Agreement represents a fully diligenced, fully negotiated, definitive transaction with Delphi and GM with virtually no closing conditions (the equity purchase and commitment agreement underlying the Confirmed Plan, by contrast, contained dozens of conditions). Krasner Declaration ¶ 5. The terms of the Master Disposition Agreement were negotiated by the parties thereto at arms'-length and in good faith. Platinum effectively has no "outs" in its transaction with Delphi and has assumed tremendous business risk because on and after June 1, 2009, there is no "Material Adverse Effect" condition to close. Id. In addition, Platinum's commitment to assemble a global solution for Delphi has satisfied a GM requirement for interim funding to Delphi, thus helping to make possible the $250 million of interim financing from GM. Id.

20. As set forth in the Sheehan Declaration, Delphi has recognized Platinum's substantial efforts, and acknowledges that the significant amount of time Platinum has worked to understand the business, as well as dialog with Delphi's customers and suppliers has been instrumental in allowing Platinum to be in a position to participate with GM in this transaction. Sheehan Declaration ¶ 10. Moreover, the Debtors believe that Platinum's extensive diligence efforts and the understanding of the operational needs of the Debtors' businesses that they have acquired has increased the likelihood of success for the entity that Platinum will operate upon the closing of the transaction. Id.

E. Proposed Expense Reimbursement

21. In light of Platinum's significant efforts which have allowed the Debtors to proffer a transaction capable of being closed expediently that provides a global resolution of the Debtors' chapter 11 cases, as more fully described in the Sheehan Declaration, the Debtors

11

propose that upon the closing of an Alternative Transaction pursuant to the Supplemental Procedures, whether executed pursuant to a Modified Plan or otherwise, Platinum would receive from the proceeds of the Alternative Transaction an Expense Reimbursement in an amount up to $30 million for expenses and costs incurred in connection with Platinum's comprehensive investigation of Delphi.

22.     Platinum provided the path to a full and final global resolution to the Debtors' chapter 11 cases, as required by GM, such that Delphi has been able to secure access to liquidity from GM to operate its business.  Sheehan Declaration ¶ 58.  Since January 2009 and March 2009, GM and U.S. Treasury, respectively, have consistently stated that GM would not provide further pre- or post-emergence liquidity to Delphi without a full and final global resolution to Delphi's chapter 11 cases.  Sheehan Declaration ¶ 54.  Until the execution of the Master Disposition Agreement, no other party was willing and able to serve in a role comparable to that of Platinum.  Thus, the access to additional liquidity from GM in light of the global resolution that Platinum's participation has facilitated represents value that Platinum has brought to the estate and for which it should be reimbursed, in the event an Alternative Transaction is consummated.  Sheehan Declaration ¶ 58.

23.     The Debtors believe that the Expense Reimbursement is fair and reasonable because, by playing a key role in a unitary transaction with GM (with the support of the U.S. Treasury), Platinum has paved the way for the Debtors to be in a position to emerge from chapter 11 while addressing comprehensively the major restructuring issues that have faced the Debtors.  Prior to Platinum's entry into the Master Disposition Agreement, no other party, including the DIP Lenders, other of Delphi's creditors, or a third party, was prepared to commit

the resources necessary to consummate a global transaction and assume the related liabilities in the manner in which Platinum has agreed to proceed under the Master Disposition Agreement.

Applicable Authority

24. Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del. 1991). The Debtors believe the use of estate property as described herein is appropriate whether an Alternative Transaction is consummated under section 1123 pursuant to the Modified Plan or through section 363(b).

25. The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993). This Court's consideration of a debtor's section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

26. Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992)(citations omitted). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel Corp., 722 F.2d at 1071.

27. As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be "so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).

28. As set forth above, the Debtors have sound business justifications for seeking an Expense Reimbursement for Platinum. The Master Disposition Agreement contemplates a private sale among the Debtors, Platinum (and certain of its affiliates), and GM (and certain of its affiliates). As a result of this Court's ruling in connection with the Modification Procedures Order, certain changes were made to agreements between the parties to the Master Disposition Agreement to facilitate the process set forth in the Supplemental Procedures. In connection with those changes, the Debtors agreed to seek an expense reimbursement for Platinum if another party is chosen to pursue an Alternative Transaction with the Debtors. Because the Supplemental Procedures provide that July 10, 2009 is the Alternative Transaction deadline, the Debtors have brought this Motion on expedited notice so that, if granted, the Expense Reimbursement will be contemplated in the bids of other potential

14

purchasers.  See declaration of Kayalyn A. Marafioti, dated June 25, 2009 (the "Marafioti Declaration") ¶ 6.

29. The proposed Expense Reimbursement is analogous to a bidding incentive.  Bidding incentives encourage potential bidders to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).  Bankruptcy courts often approve bidding incentives under the business judgment rule.  See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it."); United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL 21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it"); Integrated Resources, 147 B.R. at 650.

30. The Expense Reimbursement was negotiated in good faith and is fair and reasonable in amount, particularly in view of (i) the time, effort, and resources expended by Platinum to conduct due diligence on the Company and enter a realizable agreement to purchase certain of the Debtors businesses through its partnership with GM, (ii) the amount of the overall value that Platinum has and will contribute to the businesses, and (iii) the liabilities that Platinum will assume as a purchaser of certain of Delphi's businesses pursuant to the Master Disposition Agreement.  In addition, because Platinum facilitated a global resolution of the Debtors' chapter 11 cases, GM (with the support of U.S. Treasury) was willing to provide a crucial $250 million

15

of interim financing and to proceed with the Master Disposition Agreement, which has resulted in the resolution of billions of dollars of claims.

F.      Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

31.     Bankruptcy Rule 6004(h) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."

32.     Courts in this district have waived these ten-day stays upon a showing of business need. See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)[3]."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)). In general, courts will grant waivers when doing so is important to the Debtor's financial health. See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

33.     Because the Debtors have demonstrated a need requiring the immediate effectiveness of any order approving the relief requested in this Motion (the "Platinum Expense Reimbursement Order"), this Court should exercise its authority under Bankruptcy Rule 6004(h)

---

[3]     Bankruptcy Rule 6004(h) was formerly Rule 6004(g).

and waive the ten-day stay as it otherwise would apply to the Platinum Expense Reimbursement Order.

## Notice

34.     Notice of this Motion generally has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Fourteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered May 1, 2009 (Docket No. 16589).  The Debtors are seeking to proceed with this Motion with fewer than 10 days' notice for the reasons set forth in the Marafioti Declaration and as discussed with this Court during the chambers conference on June 17, 2009.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that this Court enter an order (i) authorizing the payment to Platinum of the Expense Reimbursement and (ii) granting them such other and further relief as is just.

Dated:    New York, New York
          June 25, 2009

                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

                              By:   /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr.
                                    Albert L. Hogan III
                                    Ron E. Meisler
                              155 North Wacker Drive
                              Chicago, Illinois 60606
                              (312) 407-0700

                                         - and -

                              By:   /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession

18