# EXHIBIT B

**Hearing Date And Time:  July 1, 2009 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                      :
        In re                                         :        Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :        Case No. 05-44481 (RDD)
                                                      :
                                                      :        (Jointly Administered)
                        Debtors.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - -   x

DECLARATION OF JOHN D. SHEEHAN IN SUPPORT
OF PLATINUM EXPENSE REIMBURSEMENT MOTION

I, John D. Sheehan, declare as follows:

1.      I am the Vice President and Chief Financial Officer of Delphi
Corporation ("Delphi").  In addition, I am a member of the Delphi Strategy Board,
Delphi's top policy-making group.  I joined Delphi in July 2002 as its Chief Accounting
Officer and Controller, and held those positions through July 2006.  In March 2005, I was
named acting Chief Financial Officer.  As such, my responsibilities included oversight of
Delphi's treasury, tax, mergers and acquisitions, internal and external reporting, internal
control, budgeting, forecasting, and financial planning and analysis.  I was named Vice
President and Chief Restructuring Officer effective October 2005, and continued in that
capacity until October 3, 2008, when I was named Chief Financial Officer.  Before I
joined Delphi, I was a partner at KPMG LLP, where I worked for 20 years on a number
of assignments in the United States, England, and Germany.

2.      Since the Debtors filed their voluntary petitions for reorganization
relief with this Court, I have been involved to some degree in virtually all of the
significant decisions made by Delphi in connection with all aspects of Delphi's
transformation plan and these chapter 11 cases.  Except as otherwise indicated, all facts
and opinions set forth in this declaration are based upon my personal knowledge and
experience, my review of relevant documents, my involvement in and knowledge of the
Debtors' businesses, and knowledge obtained from Delphi employees reporting to me and
upon whom I rely in the regular course of performing my duties.  I submit this
declaration in support of the Platinum Expense Reimbursement Motion.

3.      On June 1, 2009, Delphi entered into the Master Disposition
Agreement with affiliates of General Motors Corporation ("GM") and Platinum Equity,

LLC ("Platinum").  The MDA will facilitate a global resolution of Delphi's chapter 11

cases through the purchase by Platinum of substantially all of Delphi's global businesses,

the purchase by GM of four U.S. manufacturing facilities (the "Keep Sites") and the

Delphi global steering division, and the assumption by Platinum and GM of liabilities

associated with the businesses and facilities they are purchasing. The MDA transaction is

the product of many months of extensive discussions among Delphi and its stakeholders,

including its DIP lenders, GM, the Automotive Task Force of the U.S. Treasury

Department, the Creditors' Committee, and potential third-party investors, including

Platinum and other investors who have expressed an interest in Delphi both before and

after Delphi's plan investors refused to close their investment under Delphi's confirmed

plan of reorganization (the "Confirmed Plan").

    4.  The MDA does not provide Platinum with either a break-up fee or

expense reimbursement in the event the transaction is not consummated because the

parties contemplated a private sale to Platinum, either in connection with Delphi's

proposed modifications to the Confirmed Plan or pursuant to a section 363 sale if the

proposed modifications are not approved.  Although Delphi's motion in support of its

proposed plan modifications contemplated that Delphi in the exercise of its fiduciary

duties could consider any alternative transactions that were proposed prior to

consummation of an emergence transaction, the plan modification procedures order

incorporated into Exhibit N formal procedures for Delphi and potential bidders to follow

in making and evaluating offers of alternative transactions.

    5.  As was discussed with the Court during the hearing to approve the

plan modification procedures, Platinum is now exposed to the risk inherent in the process

ordered by the Court. Thus, Delphi is seeking authority to provide for reimbursement of

Platinum's expenses in the event that Delphi accepts and consummates an Alternative

Transaction under the procedures. The purpose of this declaration is to describe the

breadth and history of Platinum's relationship with Delphi, the transparent process that

Delphi engaged in leading up to the MDA, and my views regarding the amount of the

Platinum expense reimbursement.

<u>Breadth And History Of Platinum's Relationship With Delphi</u>

6.      Platinum first became involved with Delphi as early as the spring

of 2006 in connection with Platinum's interest in purchasing Delphi's global steering

division, but also developed an interest in investing in reorganized Delphi. Although

Platinum was at that time significantly engaged in discussions regarding the purchase of

Delphi's global steering division, it also executed an NDA in February 2007 related to

this broader interest. Pursuant to the NDA, I provided to Platinum Delphi's business plan

and other due diligence materials. In April 2007 Platinum submitted to me a written

expression of interest in investing in reorganized Delphi, including an Equity

Commitment Term Sheet. At a meeting later that spring, Rod O'Neal and I informed

representatives of Platinum that Delphi was not prepared to explore an investment

transaction with Platinum at that time because other parties-in-interest had an agreement

to invest in reorganized Delphi.

7.      After the transaction with our plan investors failed to close,

Platinum again approached Delphi with an interest in participating in our restructuring.

From September 2008 to January 2009, Platinum engaged in substantive and intensive

due diligence with Delphi, both at the corporate headquarters and with each of our global

operating divisions.  While Platinum was still seeking to consummate the purchase of

Delphi's global steering division, it was also very engaged in attempting to lead a

comprehensive Delphi emergence transaction.  Platinum committed substantial internal

resources and engaged multiple financial and operational diligence firms to support its

efforts, including multiple teams that met with Delphi in every region of the world.

        8.      In January 2009, I arranged for Platinum to meet with the lead DIP

lender from the Tranche C Collective.  I believed that putting them in contact with each

other could help enable Delphi to complete an emergence transaction.

        9.      In the second half of January 2009, Rod O'Neal and I decided that

it would no longer be productive to continue discussions and due diligence with Platinum

because of the level of progress achieved at that time in discussions with GM and our

DIP lenders on reaching an agreement for Delphi to emerge from chapter 11.  My belief

at that time was that the DIP lenders understood the liquidity requirements of Delphi

post-emergence, were prepared to take equity of Delphi in exchange for their debt, and

would be supportive owners of the business.  When circumstances changed in April

2009, however, Platinum authorized me to express Platinum's interest to the Auto Task

Force and came back to the table.

        10.      Over the past three years Platinum has dedicated a team of

professionals to forge strong relationships in the automotive industry, not just with

Delphi but also with the OEMs (particular GM and Ford), the UAW, and other suppliers.

Platinum personnel spent weeks at a time learning the industry, the management teams

and the issues.  All of this knowledge was brought to bear as Platinum negotiated an

agreement for a Delphi emergence transaction.  Furthermore, I believe this knowledge

will benefit Delphi post-emergence as we meet our commitments to our customers,

suppliers, and employees.  The automotive industry has evolved and changed during the

past year in ways that were previously unthinkable, and I believe that Platinum has

assembled the necessary financial and operational skills to lead Delphi in the future.

Emergence Transaction Process Leading To Executing MDA With Platinum

11.    Since April 2008 when the plan investors refused to close on their

investment transaction under Delphi's confirmed plan of reorganization, GM has

provided significant incremental liquidity necessary for Delphi to continue operating.

Although Delphi's DIP lenders are no longer providing incremental liquidity to Delphi,

they also supported Delphi by allowing Delphi to maintain access to certain proceeds of

Delphi's existing DIP facility.  Thus, in addition to the Creditors' Committee and the

Equity Committee (until it was recently disbanded), the DIP lenders and GM have closely

monitored Delphi's efforts to effectuate an emergence transaction throughout this time

period.

12.    Immediately after the plan investors walked away from their

obligations, Delphi initiated a process to stabilize its liquidity situation and develop an

updated business plan.  As a result of the Confirmed Plan not being consummated, most

of GM's obligations to Delphi under the original Global Settlement Agreement (the

"GSA") and Master Restructuring Agreement ("MRA") did not become effective.

Accordingly, GM helped Delphi stabilize its liquidity by entering into an agreement with

Delphi as of May 9, 2008 (the "GM Arrangement") to provide for up to $650 million in

GM advances to cover amounts that would have been paid or reimbursed by GM if the

original GSA and MRA had become effective.  During the months of April through June

2008, Delphi also developed an updated business plan based upon its delayed emergence
and the state of the automotive industry at that time.

      13.     Based on Delphi's updated business plan, GM indicated in June
2008 that it was not prepared to provide Delphi the level of incremental financial support
that would be necessary to support an internally funded plan of reorganization without
external equity financing.  Delphi then began a thorough review of strategic alternatives,
including completing a chapter 11 plan of reorganization, the sale of the Company in
whole or in part, or liquidating under chapter 11 or chapter 7, among other potential
strategic alternatives.  As part of this review, Delphi's financial advisor Rothschild
prepared a strategic analysis of the value Delphi's bankruptcy estates might receive
through a partial sale of Delphi's business units.  This process culminated in presentations
and discussions at two meetings of Delphi's board of directors on July 15 and August 20,
2008.  Delphi ultimately determined that it would achieve greater value for stakeholders
through completing a reorganization of the company in chapter 11.  Delphi reviewed
these strategic alternatives and conclusions with its stakeholders.

      14.     As a result of the review of strategic alternatives, Delphi continued
to pursue negotiated modifications to the original GSA and MRA as well as
modifications to its Confirmed Plan that would support emergence from chapter 11.
Delphi and GM entered into amendments to the GSA and MRA under which most of
GM's obligations became immediately effective as of September 29, 2008.  As a result,
the advances under the GM Arrangement were set off against amounts to be paid by GM
under the amended GSA and MRA, and GM's $650 million commitment terminated.

15.    GM continued to support Delphi's liquidity needs by entering into the First Amendment to the GM Arrangement, effective as of October 6, 2008, by which GM made an additional $300 million in advances available to Delphi through December 31, 2008.  This commitment supported Delphi's funding needs through the planned emergence under proposed modifications to Delphi's Confirmed Plan that were filed on October 3, 2008.

16.    In conjunction with the plan modifications filed publicly on October 3, 2008, a member of the Creditors' Committee attempted to achieve a creditor-supported rights offering and Delphi held discussions with potential third-party investors, but such discussions were not fruitful.

17.    Unfortunately, market conditions deteriorated significantly in the wake of the failure of Lehman Brothers in September 2008, thereby limiting Delphi's ability to access the credit markets to support its emergence under the proposed plan modifications.  In addition, following the stock market collapse in October 2008, the automotive industry suffered historic declines in volume and there was market speculation about GM's financial health and the consequences of a potential GM chapter 11 filing.  When it became clear in the face of these events that Delphi could not emerge from chapter 11 by December 31, 2008, GM entered into a Second Amendment to the GM Arrangement as of December 3, 2008, to extend the availability of the $300 million commitment from December 31, 2008 to June 30, 2009.  At the same time, GM provided an additional $300 million in liquidity by agreeing to temporarily accelerate certain accounts payable to Delphi during the second quarter of 2009 (the "Pull-Forward

Agreement").[1] Although the DIP lenders would not agree to extend the maturity date on

Delphi's DIP facility beyond December 31, 2008, the requisite percentage of DIP lenders

also provided support to Delphi by agreeing not to exercise remedies under the DIP

facility until June 30, 2009, subject to the terms and conditions of the Accommodation

Agreement effective as of December 3, 2008.

18.    Starting in late November 2008 and continuing through the month

of December, certain of the Tranche C DIP lenders, including Silver Point, Anchorage,

Monarch, and Carlson (the "Tranche C Collective"), as well as financial advisors to the

DIP lenders and the Tranche C Collective (e.g., Alvarez & Marsal, Blackstone, and

Storm Consulting), conducted significant operational due diligence on Delphi's

businesses.  This due diligence included on-site due diligence at Delphi's corporate

headquarters in Troy, Michigan, as well as in Delphi's divisions, including in Kokomo,

Indiana and Warren, Ohio.  At that point I believed the Tranche C Collective had an

expectation that they would be the owners of Delphi going forward.

19.    In December 2008 the Bush Administration decided to make funds

from the Troubled Asset Relief Program available to GM and Chrysler.  In late December

2008 and over the year-end holidays, Delphi was focused on how to further amend the

MRA in light of the historic changes to the auto industry in the fourth quarter of 2008.

At this time, Delphi was considering selling the Keep Sites to generate cash to pay off the

Tranche A and Tranche B DIP Lenders.  In turn, Delphi hoped to pay the Tranche C DIP

lenders in equity in reorganized Delphi rather than in cash, and to secure funding in the

---

[1] GM and Delphi subsequently amended the Pull-Forward Agreement to further accelerate some of the
trade payments to the first quarter of 2009, and entered into a Third Amendment to the GM Arrangement to
provide GM the option to covert certain of the accelerated trade payments to advances under the GM
Arrangement.

capital markets, including from DIP lenders, to fund Delphi going forward.  In the early part of January 2009, the discussions with GM focused primarily on the four Keep Sites, production volumes anticipated in 2009, and the resulting effects on Delphi's business plan and liquidity requirements.

20.    Over the December 2008 holiday period Rod O'Neal and I engaged in discussions with members of the Tranche C Collective regarding prospective executive incentive compensation programs and met at their request with an individual they had identified to us to be a potential future member of Delphi's board of directors.  Each of these events, together with the significant diligence conducted during the month of December, reinforced my view that the Tranche C lenders were preparing to be (and were prepared to be) Delphi's future owners.

21.    During the first half of January 2009, Delphi's DIP lenders organized an unofficial steering committee (the "DIP Steering Committee") consisting of certain Tranche A, Tranche B, and Tranche C lenders.  One of the Tranche C lenders on the DIP Steering Committee was our largest DIP lender at the time and was the organizer and leader of the Tranche C Collective.

22.    On January 15, 2009, Delphi had its first real negotiating session with GM since GM became eligible for TARP funds.  AlixPartners, a new financial advisor to GM, took the lead and made it clear that GM was no longer in a position to provide incremental liquidity to Delphi in the absence of a definitive agreement for a comprehensive solution to GM's relationship with Delphi.  We informed the DIP Steering Committee of the information conveyed during this meeting.

23.    To support our newly formed DIP Steering Committee as well as GM's advisors' desire to engage in a new round of due diligence of Delphi, Delphi established a data room on January 18, 2009. In addition to GM and our DIP lenders, I wanted to ensure that Delphi's other stakeholders, including the statutory committees, were kept apprised so that they would be very involved in and supportive of Delphi's actions. Generally, whenever we had a session with GM, Delphi would advise the DIP Steering Committee of the materials reviewed, matters discussed, and positions expressed by the parties. In addition, the statutory committees, the DIP Steering Committee, the DIP lenders' advisors (e.g., Alvarez & Marsal, Blackstone, O'Horizons, and Storm Consulting), and the PBGC all had access to the data room and the opportunity to request and receive diligence sessions. During this time the Tranche C Collective members had already completed substantial business due diligence. During January and February, the principal areas of focus in due diligence were Delphi's business plan, liquidity projections, and negotiations with GM.

24.    Delphi formally met with our DIP Steering Committee ten times between January 14 and March 26, 2009, including meetings with members of Delphi's treasury, strategic planning, restructuring, and legal staffs. During these meetings, Delphi provided the DIP Steering Committee with substantive information about Delphi's business plan, global liquidity, negotiations with GM, and other subjects. The meetings included significant discussions among the parties on the state of the auto industry and resolution of Delphi's chapter 11 cases. In addition, we consulted with the DIP Steering Committee on strategies to sell the Keep Sites to GM to generate proceeds to pay off DIP

11

loans, and informed them of the incremental funding needed to operate Delphi's
businesses.

25.    In late February 2009 Delphi provided to the DIP Agent for
distribution to all of the DIP lenders who had agreed to receive non-public information
about Delphi (the "Private-Side Lenders") detailed information on the Company's
business plan.  The information included a "three statement" business plan as well as
substantive information on details of the business plan by division and by geographic
region.  Further, in early March Delphi provided to the DIP Agent for distribution to
Private-Side Lenders an emergence liquidity sensitivity analysis (the "ELSA").  The
ELSA, which was the product of a joint work effort with the DIP lenders' financial
advisors, provided a detailed analysis of Delphi's required emergence liquidity based
upon a downside business planning scenario.  Each of these documents, which have been
available to all Private-Side Lenders for months, provided our DIP lenders with
significant information on Delphi's business plan and post-emergence liquidity needs.

26.    In the meantime, Delphi had been negotiating with GM regarding
a term sheet reflecting amendments to the MRA as well as an agreement for GM to
purchase Delphi's global steering division.  By the end of February 2009, GM and Delphi
had agreed to enter into the Steering Option Exercise Agreement and had otherwise
virtually completed the negotiations over the MRA amendments, including agreements in
principle regarding transfer of the four UAW Keep Sites, ongoing commercial
arrangements, and treatment of intellectual property and tooling.  We kept the DIP
Steering Committee fully apprised of our discussions with GM.  During this time, I or

Keith Stipp, Executive Director – Restructuring for Delphi, spoke with members of the
DIP Steering Committee on nearly a daily basis, including on weekends.

27.     Given the progress toward a comprehensive resolution, in late
February and early March 2009, GM agreed to provide $150 million of additional interim
financing pursuant to the Fourth and Fifth Amendments to the GM Arrangement.

28.     During this time it had become apparent that any external funding
for Delphi's reorganization would likely come with substantial government involvement
and assistance.  For that reason, during the month of February 2009 I spent about 30
percent of my time in Washington, D.C., often with Rod O'Neal, to meet senators and
congressmen and relate to them the Delphi story.  We also wanted to make sure that the
Treasury Department was aware of the size of Delphi and its importance to GM and other
automobile manufacturers.  Treasury's Auto Task Force was formed in late February, and
we met with the Auto Task Force in early March to describe Delphi's situation, including
its importance to the global automotive industry and to GM in particular.

29.     The Auto Task Force intervened in these cases on March 23, 2009,
when it objected to GM's entry into the previously negotiated Fourth and Fifth
Amendments to the GM Arrangement on the grounds that it needed more time to review
the transactions and Delphi's liquidity needs.

30.     On March 25, 2009, I, Keith Stipp, and John Arle from Delphi, and
Rick Westenberg from GM, met in Washington, D.C. with Harry Wilson and Matthew
Feldman of the Auto Task Force.  At the meeting, we discussed Delphi's short-term
liquidity needs and the previously negotiated agreements with GM, and generally told

13

them Delphi's story.  On April 3, 2009, Delphi delivered a substantial set of written

materials to the Auto Task Force regarding Delphi's business plan and liquidity.

31.    On Sunday, April 5, 2009, Harry Wilson convened a conference

call with me and other representatives of Delphi.  He indicated the preliminary view of

the Auto Task Force that it was not prepared to provide emergence funding for Delphi's

exit from chapter 11.  Instead, he informed us, the Auto Task Force was only prepared to

acquire, at a fair price, certain Delphi assets including but not limited to the four UAW

Keep Sites and Delphi's global steering division as supply protection for GM.

32.    Throughout the month of March as Delphi had reviewed its

liquidity requirements under the ELSA with its DIP lenders, Delphi had made clear that

Delphi would require post-emergence liquidity to have a feasible business plan.  Later in

the day on April 5, I informed the DIP Steering Committee of the call with the Auto Task

Force.

33.    The DIP Steering Committee requested a meeting in New York for

the following day.  We met at the offices of Davis Polk with J.P. Morgan and the head of

the Tranche C Collective representing the DIP lenders, as well as Alvarez & Marsal,

Blackstone, and Willkie, Farr & Gallagher, counsel to the Tranche C Collective.  At that

meeting, I was informed by counsel for the DIP Agent that, based on their discussions

with all lenders, the lenders were not prepared to provide interim or emergence funding.

34.    Counsel for the DIP Agent also informed us that in the lenders'

view Delphi's only alternative was to pursue a self-financed liquidation.  They envisioned

Delphi selling assets (manufacturing facilities, business lines, or divisions) to secure

operating liquidity and then using the proceeds to fund operations and, to the extent

additional proceeds were available, to pay down the DIP.  Under this scenario Delphi

would then move on to sell additional assets.

35.    I was concerned that such an approach would yield little or no

value for our DIP lenders.  First, I believed that Delphi would not receive significant new

business from customers once those customers became aware that Delphi would be

selling off business lines and, therefore, Delphi's enterprise value would rapidly

deteriorate.  Second, suppliers' concerns regarding a possible Delphi liquidation could

lead them to seek to shorten or accelerate payment terms, thereby requiring Delphi to

procure additional liquidity to fund operations.  Third, based on Delphi's experience

selling businesses into the depressed auto market, I was concerned that buyers might only

be willing to accept liabilities but not pay any significant cash proceeds for the acquired

businesses.  Fourth, given Delphi's short-term need to stabilize liquidity, I was concerned

with the amount of time that would be required to effect such sales.[2]

36.    In addition to the value destruction which I believed would result

from the liquidation approach suggested by the DIP lenders, the fact that no incremental

DIP financing or emergence capital was available from my broad syndicate of lenders led

me to conclude that there would be no market transaction available from third parties.

37.    Shortly after receiving this message from the DIP lenders, Steve

Miller and Rod O'Neal had dinner with the CEO of another automotive supplier who had

previously expressed interest in investing in all or part of Delphi.  In addition, given

Platinum's prior and consistent interest, we had been keeping Platinum apprised of

---

[2] Delphi has not hesitated to explore divestitures that are in line with its transformation goals.  During these
chapter 11 cases Delphi has divested to a diverse group of buyers more than 20 businesses or portions of
businesses, representing between $3 and $4 billion in annual revenue (exclusive of operations being sold to
GM, restructuring of ownership positions, and minor divestitures by joint ventures).

developments.  I informed Platinum of these events and Platinum asked us to make the

Auto Task Force aware of their interest.  I called Harry Wilson to inform him of this.

38.    On Monday and Tuesday, April 13 and 14, 2009, the DIP Agent

and the DIP lenders' advisors (and, on April 14, a member of the Tranche C Collective)

met with the Auto Task Force.  In these meetings the DIP lenders presented an analysis

of the cost to GM if Delphi were unwilling or unable to provide supply to GM should the

DIP lenders exercise certain remedies resulting in a shutdown of Delphi.  The analysis

was the product of a detailed operational and financial analysis performed by third party

consultants for the DIP lenders that previously held senior management positions in GM's

purchasing organization.  The analysis asserted that it would take GM years and tens of

billions of dollars to fully re-source Delphi's products because Delphi is a sole source

provider of many components for every vehicle GM produces.

39.    A fundamental change to the landscape of these cases occurred in

mid-April when GM, with the support of the Auto Task Force, agreed to support a

comprehensive resolution of the Delphi chapter 11 cases.  On April 18, 2009, GM

provided a comprehensive proposal directly to Delphi's DIP lenders.  Importantly, the

proposal provided for payment in full of the Tranche A and Tranche B DIP lenders, and

offered the Tranche C lenders a recovery of approximately 3% in cash and a 67%

economic interest in the equity of a newly capitalized Delphi.  The proposal made clear

that GM was prepared to fund the company pre- and post-emergence.  This proposal

made by GM provided the same basic transaction structure that GM and Platinum

ultimately negotiated in connection with the MDA transaction.  Delphi received a copy of

the proposal the next day, April 19, 2009, and provided written comments to the DIP

lenders later that day. Importantly, the Delphi comments on the GM proposal recommended that the DIP lenders focus on the financing and corporate governance aspects of the proposal.

40.    Rather than following Delphi's recommendations, on the night of April 19, 2009, the DIP Steering Committee countered with a separate proposal. Instead of choosing to engage the transaction structure put forward by the Auto Task Force, the DIP lenders put forth a response that encompassed a completely different structure. It provided for a total recovery for the Tranche C lenders of at least $750 million in cash, $625 million in debt, and of 51% of the equity of new Delphi. This response chilled discussions with GM and the Auto Task Force and effectively ended their dialogue with the DIP lenders. GM and the Auto Task Force withdrew the prior offer and began looking for a different solution in lieu of partnering with the DIP lenders.[3]

41.    During this time, the DIP lenders were fully informed that Platinum and another bidder were engaged in due diligence working towards a transaction with Delphi and GM that was supported by the Auto Task Force. I kept the DIP Steering Committee members apprised of the status of the parties' due diligence. Despite this awareness, at no time did the DIP lenders tell me that they had changed their position articulated on April 6 that none of them was prepared to put new money into Delphi.

42.    In early May 2009, Delphi completed and distributed to stakeholders its hypothetical liquidation analysis. GM and the Auto Task Force had been of the view that the Tranche C lenders were not entitled to a recovery because the value

---

[3] The DIP Lenders made a second counter offer on April 28, 2009, in which they generally conformed to the transaction structure that had been proposed in the April 18, 2009 GM proposal, but they left the economic terms blank.

of Delphi's assets would be lost without GM's injection of new money. Delphi asked its advisors at FTI to prepare a liquidation analysis in part to demonstrate to GM and the Auto Task Force that Delphi's Tranche C lenders would likely receive some recovery even in a liquidation scenario. The mid-point of the range of recoveries showed that the Tranche C lenders would receive approximately a 20% recovery in liquidation. Delphi then advocated that the Tranche C DIP lenders needed to receive a recovery at least in that range in a comprehensive transaction.

43.    On May 5, 2009, counsel for the Auto Task Force sent a letter to Delphi disclosing that negotiations were ongoing with two potential buyers and setting a May 18, 2009, target for completion of negotiations. Notwithstanding that timeframe, the letter also indicated that the Auto Task Force would not object to providing additional time for the DIP lenders to market Delphi's assets if the DIP lenders were willing to fund Delphi's operations during the additional time.[4]

44.    On May 12, 2009, Delphi convened a series of meetings with stakeholders in Skadden's Washington, D.C. offices. Delphi met with the DIP lenders in the morning and then with GM and the Auto Task Force in the afternoon. Delphi delivered to the Auto Task Force a statement of the objectives we understood the Auto Task Force wanted to achieve in a Delphi transaction. In addition, we set out Delphi's objectives and the elements of a Debtors-sponsored emergence transaction. In the meeting with the Auto Task Force, Delphi and its advisors sought to support and convey the DIP lenders' positions to the Auto Task Force.

---

[4] In connection with their agreement to extend certain milestones under the Accommodation Agreement, certain DIP Lenders sought Delphi's agreement to a marketing process with the DIP Steering Committee. Although I did execute the marketing letter on May 7, 2009, the Tranche C Collective did not follow through on the alternative marketing process.

45.     The transaction objectives that Delphi put forth were to (i) maximize business enterprise value and related recoveries for Delphi's stakeholders; (ii) maximize feasibility and speed of execution (including provision of sufficient interim liquidity); (iii) protect franchise value by ensuring continuity of supply for Delphi's customers, preserving Delphi's supplier tiers, and preserving Delphi's human capital (to the extent possible under the circumstances); and (iv) provide the opportunity to consummate a modified plan of reorganization in order to achieve a comprehensive resolution of Delphi's chapter 11 cases and achieve Delphi's transformation objectives (to the extent possible under the circumstances).

46.     In addition, Delphi put forth the following outline of the required elements for a Debtors-sponsored emergence transaction:

> 1.  Resolution of Stakeholder Recoveries (assuming non-consensual)
> - DIP Tranche A/B (full recovery; paid in cash)
> - Hedge Obligations (full recovery; roll over on a secured basis)
> - DIP Tranche C (evaluate HLA recoveries (including stakeholder feedback), market valuation and trading history and foreclosure risk data points)
> - Administrative claims (assumption/payment in ordinary course
> - General Unsecured Creditors (warrant structure)
> -Validate the value of new equity if used as portion of currency to be distributed
>
> 2.  Resolution of Delphi-General Motors Commercial Discussions (see attachments)
> - Reaffirm General Motors' commitment to Delphi portfolio
> - Plant ownership:  UAW keep sites / Other US plants / Mexico plants
> - Protection of supply:  access agreements, IP rights and tooling ownership
> - Understand GSA/MRA modifications and validate corresponding changes to RPOR, ELSA and related financial information provided to the US Treasury Auto Task Force, Delphi stakeholders and prospective acquirers
>
> 3.  Resolution of Defined Benefit Pension Plans
> - Implement 414(l) transactions for HRP (second step) and SRP

- Confirm consistent treatment of General Motors' pensioners (whether retired from Delphi or General Motors)
-Alternatively, resolve PBGC ROW liens if pensions are terminated by PBGC

4.  Resolution of Emergence Funding
- Select mutually acceptable third-party acquirer
- Finalize structure and amount of US Treasury funding

5.  Resolution of Human Capital Issues
- Agree on plan structure to maximize job preservation
- Confirm intended treatment of confirmed plan provisions affecting human capital (including Articles VII and XI)
- Confirm treatment of salaried severance program

6.  Transaction Implementation
- Resolve approach to consummation:  plan modifications vs. Section 363 sale (or combination of both approaches)
- Adopt DIP Facility "collective action" mechanics
- Develop contingency plans for interim funding to emergence (including consideration of any potential DIP Lenders' objection(s))
- Resolve disposition of avoidance actions
- Resolve allocation of potential Plan Investor litigation settlement proceeds

47.     The next day, May 13, Bill Shaw from Rothschild and I met with the lead member of the Tranche C Collective.  I expressed my view that to achieve a consensual resolution the DIP lenders needed to understand that traditional negotiation of starting high and then gradually making concessions would not work in these circumstances.  I suggested that the goal should be to identify the correct recovery and agree to it quickly.  I requested them to authorize Bill Shaw and me to present a proposal to GM and the Auto Task Force for a 25% recovery made up of 10% in cash, 10% in a note, and 5% based on a recovery in the plan investor litigation.  Nevertheless, the Tranche C lender delivered a letter to me making adjustments to Delphi's liquidation analysis and showing a mid-point recovery of 45%.  The letter also indicated that the

Tranche C lender was conducting its own liquidation analysis that would show 45% to be the low-end of the range of recovery, rather than the mid-point.

48.     From May 18 forward, GM and the Auto Task Force negotiated directly with the bidders who were seeking to partner with them.  Delphi was kept apprised of the discussions and negotiations.  I also kept the DIP lenders apprised.

49.     The Court appointed Judge Cecelia Morris to serve as a judicial mediator for Delphi and its stakeholders to attempt to reach a consensual, comprehensive resolution.  Delphi, the DIP lenders, GM, the Auto Task Force, the Creditors' Committee, the PBGC, and the UAW participated in approximately twenty hours of mediation beginning on May 26, 2009.  Unfortunately, this process did not result in a consensual resolution.  On the night of Friday, May 29, the DIP lenders delivered a proposal seeking a 10% cash recovery and two-thirds of the equity in new Delphi.

50.     Meanwhile, GM and the Auto Task Force continued negotiations with the two bidders.  I understand that the other potential bidder withdrew from consideration because it was unwilling to support a plan of reorganization structure or to assume substantial administrative liabilities.  Therefore, GM, the Auto Task Force, and Delphi completed negotiations with Platinum for entry into the Master Disposition Agreement dated June 1, 2009.

51.     On May 26, 2009, Delphi received a letter from another potential bidder.  Although we worked with this bidder's advisors over the next couple of days to sign an NDA required for due diligence, given the timing of the need to complete a transaction that bidder decided not to proceed.  That bidder has not reengaged in the process under the Exhibit N procedures.

21

Business Judgment Regarding Platinum Expense Reimbursement

52.    Delphi entered into the MDA transaction with Platinum on a
private sale basis, rather than incorporating bidding procedures, in part because Delphi
has, in my opinion, been fully marketed to potential investors over the years that it has
been in chapter 11.  I have interacted with and provided Delphi's financial and business
information to a multitude of potential investors.  Accordingly, I believed that any
interested parties were likely aware of and monitoring Delphi's situation.  Moreover,
Delphi was faced with significant liquidity issues.  From the time the amendments to the
GSA and MRA in September 2008 until Delphi filed its proposed supplemental plan
modifications on June 1, 2009, GM provided $600 million in additional liquidity to fund
Delphi's operations.  And in connection with the supplemental plan modifications, GM
has agreed to provide an additional $250 million in interim financing to support Delphi's
operations through emergence form chapter 11.  I considered it unlikely that an
alternative transaction would emerge that would solve for Delphi's liquidity needs.

53.    Although Delphi appreciates the DIP lenders' support under the
Accommodation Agreement, the DIP lenders have not contributed incremental liquidity
to support Delphi's operations during this time.  Indeed, although the DIP lenders made
approximately $85 million in borrowing base collateral available to Delphi to fund
operations, the Debtors have paid them more than $500 million in principal repayments,
interest, and fees as the price for the Accommodation Agreement and subsequent
amendments.  Thus, much of the interim funding providing by GM has effectively been
used to pay down the DIP loan.  More recently, the requisite DIP lenders have granted
increasingly short extensions of the milestones in the Accommodation Agreement.

22

Pursuant to the Third Accommodation Agreement Amendment, the timeframe in which

to deliver a Term Sheet was extended to May 21, 2009. Further, the Accommodation

Period would have terminated on June 2, 2009 if the requisite DIP lenders did not

affirmatively notify Delphi on or prior to June 1, 2009 that the Term Sheet was

satisfactory.  Five subsequent amendments each extended the June 2, 2009 termination

date by a matter of a few days at a time, to June 9, June 13, June 20, and June 24, and

June 27, respectively.

       54.     Since January 2009 (and in the case of the Auto Task Force, since

March 2009), GM has consistently stated that it was not prepared to provide further pre-

or post-emergence liquidity to Delphi without a full and final global resolution to

Delphi's bankruptcy cases.  Faced with the DIP lenders' refusal to provide liquidity to

Delphi, and buoyed by the Auto Task Force's acknowledgment and support for GM's

business judgment, Delphi negotiated a transaction that provides $250 million in interim

funding, billions in emergence capital, and a comprehensive resolution to Delphi's

chapter 11 cases.  Delphi persuaded GM and the Auto Task Force to proceed with a plan

of reorganization, with the 363 sale only as a back-up alternative.  The transaction with

Platinum also allows Delphi to continue to operate and allows non-GM suppliers and

customers to have confidence due to corporate governance control being placed in a non-

GM third party.

       55.     Delphi expressed the view – and continues to believe – that a

reorganization plan is superior to an asset sale because it provides a comprehensive

resolution to these cases.  Delphi has already substantially completed its restructuring.

But for exit financing, the Debtors have been ready to emerge from chapter 11 for 14

months.  The Modified Plan provides for the payment of all administrative claims.  These administrative expenses are largely for the suppliers, customers, and employees who have provided the environment that has allowed Delphi to continue to operate day-to-day over the past 14 months.  These expenses are necessary to preservation of value that otherwise would be pennies on liquidation basis.[5]

      56.    I am aware that certain DIP lenders now claim to potentially want to contribute new money to Delphi's emergence or to participate in a transaction outside the Exhibit N bidding process.  Up to this point most of my interactions with the DIP Steering Committee were with the DIP Agent and with the leader of the Tranche C Collective.  Very recently another DIP lender did come forward and increase significantly its investment in the DIP (the "New DIP Lender"), making the New DIP Lender Delphi's largest DIP lender today.  Whereas the leader of the Tranche C Collective is an original, par holder of the DIP, the New DIP Lender purchased most of its Tranche C holdings as a distressed, speculative investment.  Indeed, based upon information received from the DIP Agent, the New DIP Lender purchased more than two-thirds of the nominal amount of its holdings on or after June 1, 2009.[6]

      57.    Thus there has been an enormous amount of trading in the Tranche C DIP loan, most prominently reflecting the New DIP Lender's purchases and the leader of the Tranche C Collective's sales.  Quite simply, the New DIP Lender is a willing speculator who bought into the DIP Loan at distressed levels and with a different agenda than the leader of the Tranche C Collective.

---

[5] It is not true that Delphi prefers a plan of reorganization in order to enrich management.  Under the MDA, change of control agreements terminate and are not replaced.  Similarly, the $18mm emergence cash bucket under the Confirmed Plan is eliminated.

[6] As of June 19, 2009, the three-month average of the midpoint trading price for Delphi's Tranche C DIP loan was $.20.

58.     I believe it is reasonable to obligate a winning bidder to reimburse

Platinum's expenses given the implementation of the supplemental procedures.  Platinum

provided the path to a full and final global resolution to Delphi's bankruptcy cases, as

required by GM, such that Delphi has been able to secure access to liquidity from GM to

operate its businesses.  The foregoing represents value that Platinum has brought to the

estates and for which it should be reimbursed in the event Delphi consummates an

alternate transaction.  The amount is reasonable up to the $30 million cap in connection

with the overall transaction, and was proposed and accepted in good faith.

59.     Platinum represented to me that as of May 31, 2009, it has third-

party expenses of approximately $20 million that are related to its overall due diligence in

connection with a Delphi transaction.[7]  Platinum hired a number of consultants including

Marakon Associates, PricewaterhouseCoopers, Answerport, Inc., and the law firms of

Schulte Roth & Zabel LLP, Kirkland & Ellis LLP, and Foley & Lardner LLP, to assist

them in their diligence efforts and negotiations.  In addition, as of May 31, 2009,

Platinum has approximately $17 million of internal costs related to Delphi.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on June 25, 2009.



                            /s/ John D. Sheehan
                            JOHN D. SHEEHAN

---

[7] This amount includes, without limitation, out-of-pocket expenses incurred in connection with Platinum's
consideration of the purchase of Delphi's steering division.