**EXHIBIT C**

**Hearing Date And Time:  July 1, 2009 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |
|---|---|
| : | |
| In re : | Chapter 11 |
| : | |
| DELPHI CORPORATION, et al., : | Case No. 05-44481 (RDD) |
| : | |
| : | (Jointly Administered) |
| Debtors. : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |

<u>DECLARATION OF WILLIAM R. SHAW IN SUPPORT
OF PLATINUM EXPENSE REIMBURSEMENT MOTION</u>

I, William R. Shaw, declare as follows:

1. I make this declaration in support of the Platinum Expense Reimbursement Motion prepared and submitted by Delphi.

2. I joined Rothschild Inc. in 2000 and am a Managing Director in its restructuring practice. Prior to joining Rothschild, I worked in Peter J. Solomon Company's restructuring group. I also worked at Zolfo Cooper LLC for three years specializing in turnarounds and reorganizations of distressed companies. I began my career at Ernst & Young LLP. I hold a Bachelor of Arts degree from Colgate University and an M.B.A. from the New York University Stern School of Business.

3. Rothschild maintains an office at 1251 Avenue of the Americas, 51st Floor, New York, New York 10020. It is a member of one of the world's leading independent investment banking groups, with expertise in domestic and cross-border mergers, acquisitions, restructurings, privatization, and other financial advisory services, and with particular experience in providing high-quality investment banking and financial advisory services to financially-troubled companies. Rothschild has significant experience in a variety of industries, including the automotive industry. Its restructuring clients include debtors, bondholders, creditors' committees, single creditor classes, and secured creditors.

4. I have more than 13 years of restructuring experience, including both out-of-court and in-court restructurings, financings, and sellside divestitures. My restructuring transactions have included advising Recycled Paper Greetings, Trident Exploration, New World Pasta, Pacific Gas and Electric Company, France Telecom in the restructuring of NTL, Special Metals Corporation, Cydsa, James River Coal

Company, Merrill Corporation, Key Plastics, Heartland Steel, Metropolitan Mortgage & Securities, the secured debtholders committee of Murrin Murrin, the Official Bondholders Committee of Geneva Steel, the Official Unsecured Creditors Committee of Orbcomm Global, and the senior lenders of Tokheim Corporation.

5.  Rothschild has been involved in all aspects of the Debtors' restructuring. Delphi retained Rothschild on May 1, 2005 as financial advisors and investment bankers. In performing Rothschild's functions as the Debtors' lead investment bankers and financial advisors in these cases, I and other Rothschild personnel have provided professional analyses and advice to Delphi's management and board of directors with respect to the matters described in this declaration.

6.  I am not being compensated separately for my testimony in Delphi's chapter 11 cases. From time to time throughout these chapter 11 cases, the Court has approved Rothschild's applications for compensation and reimbursement with respect to its fees and expenses in connection with its work for the Debtors in these chapter 11 cases.

Exploration Of Strategic Alternatives

7.  On April 6, 2009, I attended a meeting at which counsel for the DIP Agent stated, based on discussions with Delphi's DIP lenders, that the lenders were not prepared to provide additional DIP financing or emergence funding for Delphi and that, in the lenders' view, Delphi should begin selling core assets (manufacturing facilities, business lines, or divisions) to generate operating liquidity and pay down the DIP loan with any excess proceeds. Under this scenario, Delphi would then move on to sell additional assets until it had completed a self-financed liquidation.

3

8.      The company previously considered and analyzed a partial sale scenario in the summer of 2008, although some of the reasons were different. After the plan investors had failed to close on their investment transaction in connection with Delphi's confirmed plan of reorganization in April 2008, and GM indicated in June 2008 that it was not prepared to provide Delphi the level of incremental financial support that would be necessary to support an internally funded plan of reorganization without external equity financing, Rothschild was involved in Delphi's consideration of a strategy to engage in a partial sale of core assets to generate enough liquidity to emerge from chapter 11, as described below.

9.      In July 2008, Delphi and its advisors started a process to identify and assess the range of strategic alternatives available to Delphi under the circumstances. As part of this process, Delphi and its advisors consulted with the statutory committees and their advisors and obtained their general agreement that the following six strategic alternatives should be considered:

- seek Plan modifications providing for equity financing in the form of a rights offering backstopped by creditors or other potential investors;

- remain in chapter 11 until market conditions improve and the Debtors can emerge on terms more favorable to its stakeholders;

- reorganize around Delphi's operations outside of North America and exit its North American operations through divestitures or wind-downs;

- sell a portion of the Debtors' core business assets in an attempt to generate enough liquidity to emerge from chapter 11;

- sell all of the Debtors' assets in an orderly manner such that Delphi's businesses would be sold as a going concern; and

- dispose of all of the Debtors' assets through an orderly liquidation.

4

10. Rothschild was involved in preliminary assessments of these strategic alternatives between June 25 and July 15, 2008, when the alternatives were first presented to Delphi's board of directors. The Debtors' legal advisors and their financial advisors at FTI Consulting, Inc. were also involved in analyzing these strategic alternatives.

11. Between the July 15, 2008 and August 20, 2008 board of directors meetings, Delphi's management, Rothschild, and the Debtors' other advisors continued to assess these strategic alternatives. In connection with the meeting on August 20, 2008, Rothschild advised the board of directors regarding the principal advantages and disadvantages of a modified plan with a potential rights offering as compared with other strategic alternatives, such as remaining in chapter 11 and seeking to generate liquidity through a sale of assets. In presenting this analysis Rothschild made reference to a document that had been provided to the board of directors to summarize the advantages and disadvantages of each strategic alternative.

12. In connection with the partial sale scenario, we identified numerous risks including, among other things, likely loss of new business from customers, no assurance that a sale would generate sufficient proceeds in light of market conditions, and the extensive time required for execution. In addition, we were concerned that a partial sale would not generate net proceeds materially greater than the associated reduction in debt capacity of the remaining portions of Delphi's businesses, and would result in lower stakeholder recoveries than in a modified plan with a rights offering. Based on this analysis and the circumstances as they existed at that time, Rothschild advised the Board that a modified plan of reorganization including a rights

5

offering backstopped by creditors or other potential investors should create the greatest likelihood that value would be distributed to the Debtors' stakeholders. Delphi reviewed these strategic alternatives and conclusions with its stakeholders, including the statutory committees, the DIP lenders, and GM.

13. GM agreed with this approach, as evidenced by the consensual amendments to the Global Settlement Agreement and the Master Restructuring Agreement that GM entered into effective as of September 29, 2008, and by GM's agreement to provide $300 million in additional incremental liquidity support effective as of October 6, 2008.

14. The statutory committees did not advocate a different approach either, and in fact the Creditors' Committee was focused on minimizing value leakage to third parties that could result from a sale or investment, as well as third-party execution risk, in connection with the plan modifications filed on October 3, 2008. Indeed, Moelis & Company, the financial advisor to the Creditors' Committee, as well as a member of the Creditors' Committee, led an effort to assemble a creditor-supported rights offering.

15. With Delphi's filing of its proposed plan modifications, the deal structure, Delphi's financing needs, and Delphi's financial projections were made public for all parties to evaluate. In the September to October 2008 time period surrounding the October plan modifications, Delphi received at least ten expressions of interest related to potential equity investments or transactions involving acquisition of the Company as a whole, including from Platinum and from the other bidder that negotiated to potentially partner with GM in a Treasury-supported Delphi transaction.

16.     Unfortunately, market conditions deteriorated significantly in the wake of the failure of Lehman Brothers in September 2008, the stock market collapse in October 2008, and the historic declines in the auto industry in the fourth quarter of 2008.

Expressions Of Interest In Delphi

17.     During the more than three and one-half years that Delphi's very well-publicized chapter 11 cases have been pending, Delphi has received a number of expressions of interested from parties interested in a Delphi transaction.

18.     Throughout these cases, Rothschild has maintained a confidential log of expressions of interest in Delphi it received or became aware of.  As currently maintained, this log is divided into three parts:  (i) interest in the alternative transaction process under the supplemental procedures ordered by the Court; (ii) prior interest in Delphi/providing capital; and (iii) interest in a business unit or asset of Delphi.

19.     With respect to the current alternative transaction process under the supplemental procedures, the log currently reflects a total of seven inbound inquiries, three of which continue to move forward.  All but one of these parties had been monitoring Delphi's situation for some time.

Marketing Letter

20.     In connection with the DIP lenders' agreement to extend certain milestones under the Accommodation Agreement, certain Tranche C DIP Lenders sought Delphi's agreement to a marketing process with the DIP Steering Committee.  Although the Accommodation Agreement was extended without the marketing letter being executed, Delphi unilaterally executed the marketing letter on May 7, 2009.

7

21.     On May 4 and again on May 18, 2009, I provided the then-current draft of the confidential log of interested parties to the DIP Agent, the leader of the Tranche C Collective, and the lenders' advisors Blackstone and O'Horizons.

22.     Ultimately, the Tranche C Collective did not engage with Delphi or Rothschild to follow through with a marketing process under the May 7, 2009 letter.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on June 25, 2009.



        /s/     William R. Shaw
               WILLIAM R. SHAW

8