Hearing Date and Time: July 1, 2009 at 10:00 a.m.

DECHERT LLP
Glenn E. Siegel
Charles I. Poret
Daniel C. Malone
James O. Moore
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Counsel for Kensington International Limited,
Manchester Securities Corp. and
Springfield Associates, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
In re:                                                       :    Chapter 11
                                                             :
DELPHI CORPORATION, et al.,                                  :    Case No. 05-44481 (RDD)
                                                             :
                        Debtors.                             :    Jointly Administered
-------------------------------------------------------------X

### OBJECTION OF KENSINGTON INTERNATIONAL LIMITED, MANCHESTER SECURITIES CORP. AND SPRINGFIELD ASSOCIATES, LLC TO DEBTORS' EXPEDITED MOTION SEEKING TO PROVIDE EXPENSE REIMBURSEMENT TO PLATINUM EQUITY ADVISORS, LLC

Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC (the "Manchester Entities"), in their capacity as DIP Lenders[1] to the Debtors under that certain Revolving Credit, Term Loan and Guaranty Agreement among Delphi Corporation, as Borrower, and the Subsidiaries of the Borrower, as Guarantors, and the Lenders, dated January 9, 2007, as amended by the Amended and Restated Revolving Credit, Term Loan

---

[1] All capitalized terms not expressly defined in this statement shall be construed to have the same meaning as as given them in the DIP Credit Agreement (as hereinafter defined).

15160330

and Guaranty Agreement among Delphi Corporation, as Borrower, and the Subsidiaries of the Borrower, as Guarantors, and the Lenders (as thereafter amended, supplemented or otherwise modified from time to time), dated as of May 9, 2008 (the "DIP Credit Agreement"), by and through their undersigned counsel, hereby file this objection (the "Objection")[2] to the Debtors' Expedited Motion for Order Under 11 U.S.C. § 363 and Fed. Bankr. Pr. 2002, 6004, and 9014 Authorizing Debtors to Provide Expense Reimbursement to Platinum Equity Advisors, LLC in Connection With Sale of Debtors' Assets Pursuant to Master Disposition Agreement [Docket No. 17317] (the "Motion"). In support of this Objection, the Manchester Entities respectfully state as follows:

## PRELIMINARY STATEMENT

1. In response to the Court's rejection of a private sale of the Debtors' assets pursuant to the Master Disposition Agreement (as defined below), the Debtors have proposed to provide for expense reimbursement to Platinum Capital Equity Partners, L.P. ("Platinum") in the amount of $30 million in consideration for its proposal to purchase substantially all of the Debtors' assets should an Alternative Transaction (as defined below) prevail over Platinum's deal with the Debtors. The transaction, as spelled out in the master disposition agreement among the Debtors, GM Components Holdings, LLC, General Motors Corporation ("GM"), Parnassus Holdings II, LLC ("Parnassus") and the Other Sellers and Other Buyers Party Thereto, dated June 1, 2009 (the "Master Disposition Agreement"), would transfer all of the Debtors' assets to

---

[2]  The Manchester Entities also join in the Response and Objection of the Collective of DIP Lenders to the Debtors' Expedited Motion for Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, and 9014 Authorizing Debtors to Provide Expense Reimbursement to Platinum Equity Advisors, LLC in Connection with Sale of Debtors' Assets Pursuant to Master Disposition Agreement.

2

GM and Parnassus, an affiliate of Platinum, in exchange for a package of value for the Tranche C Lenders that the Debtors value at up to approximately 20 cents on the dollar, but which is actually worth much less.

2. Under the Master Disposition Agreement, Platinum would not contribute anything directly to the Debtors' estates. For its $250 million cash contribution to Parnassus, Platinum would receive approximately 60% of Parnassus' equity. For approximately 40 percent of Parnassus' equity interests, GM would contribute $2 billion. Parnassus would contribute to the Debtors' estates $1, equity securities with a nominal value of $145.5 million, and payment of certain administrative claims.

3. The Debtors seek to justify this $30 million windfall to Platinum by baldly stating that Platinum has expended a significant amount of time, energy and resources in its pursuit of the transaction. Additionally, they contend that no other party was willing to serve in a comparable role. Finally, they assert that Platinum's participation has caused GM to contribute additional liquidity to the Debtors' estates that, impliedly, it would not have contributed otherwise.

4. Payment of $30 million out of highly distressed bankruptcy estates cannot be justified as a reimbursement for Platinum's purported "legitimate expenses." Platinum has not provided any factual basis for its claim to have spent such outrageous sums during the course of its diligence. If $30 million was indeed spent in preparing to purchase the Debtors' assets, such an amount is so out of line with reasonable and customary practice that it cannot equitably be paid from the pockets of the stakeholders in these cases.

5.  The Debtors further characterize the payment to Platinum as "analogous to a bidding incentive." But an after-the-fact payment to Platinum does not relate to any legitimate bidding incentive. In fact, given that the conduct which the Debtors argue must be incentivized has already occurred, payment of the requested reimbursement amounts to a gift. When Platinum entered into the Master Disposition Agreement it had not bargained for a breakup fee, and now that it has bound itself to the proposed transaction, payment from the Debtors is unnecessary to secure Platinum's commitment. Indeed, by proposing effectively to burden a successful competing bidder with a $30 million fee, the Debtors seek to hamper bidding, rather than to encourage it. The law in this district does not permit the payment of a breakup fee in such circumstances.

## JURISDICTION AND STATUTORY PREDICATES

6.  This Court has jurisdiction over these bankruptcy cases arising under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceedings under 28 U.S.C. § 157(b)(2). Venue for the Debtors' bankruptcy cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

7.  The asserted statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 363.

## BACKGROUND

8.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

4

9.   No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

### A. The Manchester Entities' Involvement in the Debtors' Bankruptcy Cases

10.   The Manchester Entities are among the DIP Lenders that provided additional DIP Financing under the Revolving Credit, Term Loan, and Guaranty Agreement (as amended, the "DIP Credit Facility"). The DIP Lenders have contributed approximately $3.5 billion of outstanding financing to fund the Debtors' reorganization. The DIP Lenders made numerous attempts over the course of these chapter 11 cases to reach a consensual resolution with the Debtors and GM. Additionally, they have refrained from exercising remedies to which they are entitled under the DIP Credit Agreement following the Debtors' defaults and have authorized the release of their cash collateral to further aid the Debtors' reorganization.

11.   In the course of lengthy negotiations with the Debtors, the Manchester Entities and the other DIP Lenders have provided consistent support to the estates. The DIP Lenders have granted access to cash collateral beyond the maturity date of the DIP Loans and have negotiated with the company a pre-emptive forbearance agreement to provide the Debtors with additional time to emerge from chapter 11 bankruptcy and to ensure that liquidation would not occur (the "Accommodation Agreement"). The DIP Lenders have extended the Accommodation Agreement eight separate times, including as recently as June 26, 2009, knowingly permitting the continued dissipation of their collateral. The DIP Lenders are prepared to negotiate a confirmable plan that would allow the Debtors to exit bankruptcy and assure that GM maintains continuity of supply, rather than force the Debtors to liquidate all of their assets.

5

12. Moreover, the Manchester Entities and the other DIP Lenders have consistently made clear that they will work with GM, the United States Department of Treasury (the "U.S. Treasury") and the Auto Task Force (the "Auto Task Force") to ensure that any transition of ownership to the DIP Lenders would not result in unnecessary disruption to the United States auto industry. The Manchester Entities are willing to continue to negotiate in an effort to reach an agreement that maximizes the value of the estates and the benefit to all stakeholders.

13. In order to protect their collateral and prevent the Debtors, GM and Platinum from forcing an undervaluation of the Debtors' assets on the DIP Lenders, the Manchester Entities, together with certain members of the Collective of DIP Lenders, have formed the DIP Lender Funding Group (the "DIP Lender Funding Group"), which will seek to credit bid and offset the value of their claims against the purchase price for the assets. The Manchester Entities, together with the members of the Collective of DIP Lenders, hold well in excess of $1 billion dollars of DIP Financing. The DIP Lender Funding Group has received numerous expressions of interest from other DIP Lenders and expects to be able to raise sufficient funds to finance anticipated liquidity needs in connection with a credit bid.

**B. The DIP Lenders' Negotiations with Delphi and GM**

14. Following the failure of the Debtors' equity-backed reorganization plan, the DIP Lenders worked closely with the Debtors and GM to achieve a consensual resolution of these chapter 11 cases.

15. In December 2008, the Auto Task Force was created to distribute funds from the Troubled Asset Relief Program to GM and Chrysler. In mid-January 2009, GM informed the

6

Debtors that it could not continue to provide incremental liquidity to Delphi unless the Debtors could identify a solution to resolve these chapter 11 cases.

16.     Between mid-January and the end of March 2009, the Debtors formally met with the DIP Lenders, represented by the DIP Steering Committee, ten times to discuss, among other things, a comprehensive solution for Delphi.  As a result, GM agreed to provide $150 million of additional interim financing to Delphi.

17.     The Auto Task Force inserted itself into these proceedings on March 23, 2009, forbidding GM from providing interim or emergence funding for Delphi in accordance with the negotiations that GM had with the DIP Steering Committee.  GM would only be allowed to acquire certain of the Debtors' assets that are essential to GM's continued viability.

18.     The DIP Steering Committee met with the Debtors one day after they learned of the Auto Task Force's mandates.  At that time, certain members of the DIP Steering Committee stated they too were not prepared to provide interim or exit financing for Delphi.  As a result of the Auto Task Force's decision, Delphi faced liquidation.

19.     In mid-April, the DIP Steering Committee met with the Auto Task Force. Following the meeting, the Auto Task Force changed course and agreed to provide interim and emergence funding for Delphi.  GM approached the DIP Steering Committee with an offer that would give the Tranche C DIP Lenders an economic interest in the equity of the reorganized Delphi.  The proposed transaction was similar in structure to the Master Disposition Agreement.

20.     As is customary in a normal M&A process, the DIP Steering Committee made a counteroffer to GM and the Auto Task Force that proposed a different structure for the transaction.  The Auto Task Force broke off negotiations.  Nevertheless, the DIP Steering

7

Committee made a second counteroffer, which conformed to the Auto Task Force's structure, in an attempt to move the discussions forward constructively towards a consensual resolution. GM and the Auto Task Force withdrew their initial offer. It was at this time that the DIP Lenders learned Platinum and another potential purchaser were pursuing transactions with Delphi.

21.     This Court appointed Judge Cecilia Morris to mediate between Delphi, the DIP Lenders, GM, the Auto Task Force and other interested parties. As a result of the mediation, on May 29, 2009, the DIP Lenders made a third offer to the Debtors. GM responded with a take-it-or-leave-it offer that was unacceptable to the DIP Lenders and well beneath even the liquidation value of the estates, to say nothing of their value as going concerns. On June 1, 2009, the Debtors, GM, the Auto Task Force and Platinum agreed to the Master Disposition Agreement, thereby foreclosing the possibility of reaching a consensual deal with the DIP Lenders.

C.  **Platinum's Expressions of Interest and Negotiations with Delphi and GM**

22.     Platinum first expressed its interest in acquiring a piece of Delphi in 2006 and signed an NDA giving them access to diligence materials in February 2007. After Platinum submitted a formal expression of interest to the Debtors, certain of the Debtors' management team responded that the Debtors were not interested in pursuing a transaction with Platinum.

23.     Platinum approached the Debtors for the second time following the failure of the Debtors' equity-backed reorganization plan in 2008. Platinum conducted some undefined level of due diligence until January 2009, when the Debtors again informed Platinum they were not interested in its proposal.

8

24. Finally, in April 2009, two months before agreeing to the Master Disposition Agreement, Platinum authorized the Debtors to express their interest in Delphi to the Auto Task Force. It is unclear who approached whom.

### D. The Debtors' Proposed Transaction with Platinum and GM

25. More than a year after the Debtors failed to consummate their confirmed plan of reorganization, the Debtors sought to modify the Confirmed Plan pursuant to the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (as Modified) (the "Modified Plan"). As described in the Debtors' Plan Modification Motion and the Supplement to the First Amended Disclosure Statement with Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (the "Disclosure Statement Supplement"), the Debtors have reached an agreement with Parnassus with support from GM and the U.S. Treasury.

26. Although the Modified Plan and the Disclosure Statement Supplement provide scant information about the agreements reached among GM, Platinum and Delphi, it appears Platinum will provide nothing directly to the Debtors' estates and will make relatively small equity and debt financing contributions to Parnassus following the transfer.

27. In the event that the Modified Plan is not confirmed, the Debtors will seek to effect the Master Disposition Agreement as modified by the 363 Implementation Agreement (the "Alternative 363 Sale"). On June 16, 2009, the Court entered an order (the "Modification Procedures Order") approving, among other things, bidding procedures to govern proposals for alternative transactions to the Master Disposition Agreement to ensure a fair and open auction

9

process for the Debtors' assets in order to maximize the value to the estates. On June 29, 2009, the Court entered an order (the "Supplemental Procedures Order") providing for supplemental procedures to govern a Pure Credit Bid (as defined in the Supplemental Procedures Order) by the DIP Lenders.

### E. The Platinum Expense Reimbursement Motion

28.    The Debtors now seek approval to pay to Platinum an expense reimbursement in "an amount up to $30 million" for expenses incurred by Platinum in connection with their pursuit of a deal with the Debtors (the "Platinum Fee"). In the event the Master Disposition Agreement is not the winning bid at the auction, this so-called reimbursement of expenses would be paid out of the proceeds of an Alternative Transaction (as defined in the approved bidding procedures), which the Debtors contend requires a potential purchaser to provide for funding the Platinum Fee in any proposed Alternative Transaction.

29.    The Debtors support their request by stating that, in their business judgment, such a fee is warranted "in light of Platinum's significant efforts" in executing the Master Disposition Agreement, for enabling Delphi to access additional liquidity from GM and for Platinum's willingness to assume the role offered to it by GM and the Auto Task Force.

## ARGUMENT

### I. OBJECTION TO PLATINUM FEE

#### A. The Platinum Fee Is an Unnecessary and Excessive Breakup Fee.

30.    The bidder protection commonly known as a breakup fee "is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated

10

Resources), 147 B.R. 650, 653 (S.D.N.Y. 1992). While expense reimbursement may be included in the calculation of a breakup fee, its primary purpose is to protect the bidder. The Debtors as much as admit that the Platinum Fee is a bidder protection in the Motion, calling it "analogous to a bidding incentive." Motion at 15. The Platinum Fee's asserted purpose is the same as is used to justify the payment of breakup fees generally.

### i. A Breakup Fee Is Unnecessary and Inappropriate.

31. There are three questions courts should consider in assessing a break-up fee: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" In re Integrated Resources, 147 B.R. at 657. A "stalking horse" is entitled to a breakup fee where "the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." Id. at 662.

32. Because the Master Disposition Agreement was negotiated, agreed to and approved by this Court before the request for a breakup fee, the proposed fee could not possibly have attracted or retained Platinum's bid. The Master Disposition Agreement, especially as it relates to Platinum, also did not establish a bid standard or minimum bid. The DIP Steering Committee was engaged in negotiations with GM and the Debtors regarding a transaction with a substantially similar structure, and of higher value to the Debtors' estates, before talks began between Platinum and GM. Such negotiations among the DIP Steering Committee, GM and the Debtors continued until the Master Disposition Agreement was signed.

11

33.     Where there are other interested buyers, a breakup fee is both unnecessary to encourage other bidders and inappropriate because it would hamper a debtor's ability to sell its assets. <u>Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)</u>, 2002 U.S. Dist. LEXIS 20759 (S.D.N.Y. 2002), <u>aff'd</u> 2003 U.S. App. LEXIS 20126 (2d Cir. 2003). While negotiating the Master Disposition Agreement with Platinum, the Debtors and GM concurrently conducted negotiations with the DIP Lenders and an unidentified interested third party. There were multiple parties interested in purchasing the Debtors' assets. Thus, the DIP Lenders, and at least one other party, were interested and actively pursuing a deal long before Platinum began talking to GM.

### ii. The Size of the Breakup Fee Does Not Correspond to the Value that Platinum Might Contribute to the Estates.

34.     Breakup fees generally correspond appropriately to the value that is being contributed to the estate. As the Court said at the June 16, 2009 omnibus hearing, a breakup fee "should bear some appropriate correspondence to the value that the estate is getting from the party that would be getting such a stalking horse or bidder protection or reimbursement." Tr. at 15.

35.     The $30 million Platinum Fee is entirely excessive with respect to Platinum's proposed contribution to the estate pursuant to the terms of the Master Disposition Agreement. Platinum will directly contribute nothing to the Debtors' estates, but instead will provide $250 million in cash to Parnassus following the sale. Parnassus will pay the Debtors' estates $1 and contribute equity securities with a nominal value of $145.5 million and payment of certain administrative claims. Assuming, *arguendo*, that Platinum's $250 million payment to Parnassus can be considered Platinum's contribution to the purchase price for substantially all of the

12

Debtors' assets, the breakup fee would amount to 12% of that contribution.  In cases where a breakup fee has been deemed appropriate, including by this Court, the amount of the fee is usually between 1% and 2% of the purchase price.  See Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614 (S.D.N.Y. 1987); In re Loral Space & Communications Ltd., Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003); In re Magellan Health Services, Inc., Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. 2003); In re Adelphia Business Solutions, Inc., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y 1990); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

    36.    The only amount relevant to the calculation of a breakup fee is the contribution that Platinum itself is making to the Debtors' estates.  The Debtors cannot include in their calculation any financing to be provided on the backend to Parnassus that will never pass through the Debtors' estates or the portion of the purchase price being paid by GM or Parnassus, i.e. not Platinum.  Viewed solely in relation to Platinum's cash contribution to Parnassus, the range for a breakup fee, if one were appropriate at all in this case, would be between $2.5 and $5 million, not $30 million.

    **B. Even if the Platinum Fee Is Characterized as an Expense Reimbursement, the Amount Is Unreasonable and Unverifiable.**

    37.    Section 363(b) of the Bankruptcy Code may authorize a debtor to enter into a reimbursement agreement with a potential buyer, unless it is unreasonable or more likely than not to chill the bidding process. See In re Bethlehem Steel Corporation, 2003 U.S. Dist. LEXIS 12909, *34 (S.D.N.Y. 2003).  Additionally, the bankruptcy court may not authorize payment of such expenses under § 363(b) unless it finds "a good business reason" for the reimbursement

13

based on evidence presented before the court.  See <u>In re Lionel Corp</u>. 722 F. 2d 1063, 1071 (2d Cir. 1983).

38.  To the extent Platinum is being reimbursed for expenses, Platinum can be reimbursed only for expenses for which it reasonably could have expected to be reimbursed at the time they were incurred.  There is no good business reason to reimburse Platinum for three years' worth of diligence when only the period from mid-April to June 1st of this year could reasonably have been expected to result in a sale.  Platinum had been shut out by the Debtors with respect to all of its prior expressions of interest; accordingly, neither Platinum nor the Debtors could have reasonably expected that Platinum would be reimbursed for any diligence it conducted prior to April 2009.

39.  The Debtors have not presented sufficient evidence to justify $30 million worth of expenses meriting reimbursement from the Debtors' estates.  The only evidence of the expenses incurred by Platinum resides in the Declaration of John D. Sheehan In Support of Platinum Expense Reimbursement Motion, which states that the $30 million sum includes diligence completed before April 2009 and does not break down expenses by time period or itemize or categorize the expenses.  Neither the Motion nor the proposed order offer any evidence of the expenses actually incurred by Platinum.

40.  According to the Motion, Platinum has spent significant time, energy and resources pursuing the transactions contemplated by the Master Disposition Agreement.  John D. Sheehan, the Chief Financial Officer of Delphi, states in his declaration that Platinum incurred third-party expenses related to its due diligence of approximately $20 million and $17 million in internal costs.  Sheehan Decl. at ¶ 59.  Dan Krasner, Senior Vice President of Platinum, states in

14

his declaration that Platinum has "fully diligenced" this transaction and "at least forty Platinum professionals have been involved in Platinum's analysis of Delphi."  Krasner Decl. at ¶¶ 5, 14.  The Manchester Entities recently learned that the electronic data room purportedly containing all of the diligence materials that Delphi provided to Platinum contains approximately 400 documents, a fair number of which are power point presentations prepared by the Debtors.  The electronic data room is completely devoid of such standard information as corporate records, material contracts, certain financing agreements, real estate documents, intercompany agreements, intellectual property documents and agreements, litigation and government proceedings, employee and labor matters, tax matters and environmental matters.  Of note, the data room does not include any agreements or documents concerning the indebtedness of Delphi's foreign subsidiaries, which comprise the portion of Delphi's assets being purchased by Parnassus.

41.    It strains credulity to believe that Platinum incurred $30 million of expenses and utilized forty professionals to review 400 documents.  It is also directly contradictory to the statements of Dan Krasner that Platinum conducted "thousands of hours of diligence" or that Platinum "has a comprehensive understanding of what is required to successfully transfer" certain assets and operational control to GM, including "technical centers, personnel (particularly engineers and overhead resources), real estate and information technology resources and systems" when they supposedly have not seen any documents related to real estate, intellectual property, intercompany agreements, or employee and labor matters, among other things.  Krasner Decl. at ¶¶ 8, 13.

15

42.     Additionally, the Debtors' heavy reliance on their assertion that Platinum's involvement in the transaction was integral to GM's extension of interim financing is misplaced. Prior to Platinum's involvement, GM had agreed to provide $600 million of interim financing to Delphi on numerous occasions. GM was prepared to continue providing liquidity to the Debtors until the Auto Task Force intervened. The Auto Task Force changed course and agreed to allow GM to continue providing interim financing following its meeting with the DIP Steering Committee, prior to ever speaking with Platinum.

### C.  The Motion Should Be Denied Because Platinum Has Not Contributed Value to the Estates

43.     Yet another reason it is pointless to pay the Platinum Fee is because Platinum has not added value in proposing a still-born transaction. As stated in the Manchester Entities' Objection to the Debtors' Motion Seeking to Modify its Plan of Reorganization, filed on June 9, 2009 [Docket No. 16895], the transaction supposedly orchestrated by Platinum is not confirmable or capable of consummation because the Manchester Entities and other DIP Lenders are entitled to be paid in full and will not consent to the Modified Plan or the Alternative 363 Sale as proposed. There is no justification to reward Platinum for proposing a transaction that will fail.

## II.  OBJECTION TO APPLICATION OF PLATINUM FEE TO CREDIT BIDDERS

44. Even if the Court authorizes some form or amount of fee to Platinum in connection with an Alternative Transaction, it cannot apply to a Pure Credit Bid as defined in the Supplemental Procedures Order, which by its terms is not an Alternative Transaction.  To hold otherwise would potentially foreclose the DIP Lenders from the remedies they are entitled to under the DIP Credit Agreement, a result contrary to law and this Court's previous rulings.

## III. OBJECTION TO TIMING OF MOTION

45. Even if the Motion did not fail for the reasons enumerated above, it should be denied now because it is premature.  The appropriate time for the Court to consider a breakup fee or expense reimbursement of the stalking horse bidder is after the auction.  See, e.g., In re O'Brien Environmental Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999).  Rather than predict the effect that Platinum's efforts will have on the auction process, the Court can suspend this decision until the hearing on the auction results.  The Court will be in a better position to determine an appropriate fee, if any, to Platinum once the auction is complete.

46. Moreover, the rationale given for the Platinum Fee suggests that the Motion should be considered, if at all, at the end of the cases under the substantial contribution standard under section 503(b) of the Bankruptcy Code.  John D. Sheehan states in his declaration that the $30 million Platinum Fee is reasonable because it "represents value that Platinum has brought to the estates."  Sheehan Decl. at ¶ 58. While the Manchester Entities dispute whether Platinum has contributed any value to these cases, Mr. Sheehan's rationale is, if anything, more like a justification of Platinum's substantial contribution to the estates than a basis for supporting a breakup fee or expense reimbursement.  That any amount to Platinum should be considered after

17

the completion of these cases under section 503(b) of the Bankruptcy Code seems particularly appropriate given the Court's comments on the record.  During the omnibus hearing on June 16, 2009, the Court observed, "a bidder who eventually is outbid but has not yet gotten its protection…[and] who really does contribute by forming a template or doing due diligence that others rely on, is going to be entitled to a 503(b) type of substantial contribution payment, even if it is ultimately outbid."  Tr. at 16.

47.     Finally, it appears the timing of the Motion is designed to have the court enter an order that requires bidders to fund an additional $30 million in fees to Platinum in order to become the Successful Bidder (as defined in the approved bidding procedures).  This tactic would chill the participation of other bidders and, among other things, amounts to yet another attempt to impede the DIP Lenders from making a Pure Credit Bid in violation of their rights under section 363(k) of the Bankruptcy Code.

**CONCLUSION**

48.     The Manchester Entities respectfully request that, for the reasons stated in the Objection, the Court deny the Motion.

Dated: June 30, 2009
         New York, New York

/s/ Glenn E. Siegel
Glenn E. Siegel
Charles I. Poret
Daniel C. Malone
James O. Moore
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC*

On Brief:
Nicole Duva
Bret Harper