Marc Abrams
Michael J. Kelly
Brian E. O'Connor
Christopher J. St. Jeanos
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

*Counsel to the Collective of DIP Lenders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
: 
    In re                                     :         Chapter 11
: 
DELPHI CORPORATION, et al.,       :         Case No. 05-44481 (RDD)
: 
                      Debtors.     :         (Jointly Administered)
: 
------------------------------------------------------x

**RESPONSE AND OBJECTION OF THE COLLECTIVE OF DIP LENDERS TO THE DEBTORS' EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 2002, 6004, AND 9014 AUTHORIZING DEBTORS TO PROVIDE EXPENSE REIMBURSEMENT TO PLATINUM EQUITY ADVISORS, LLC IN CONNECTION WITH SALE OF DEBTORS' ASSETS <u>PURSUANT TO MASTER DISPOSITION AGREEMENT</u>**

A collective of Lenders under the DIP Credit Agreement (together, the "Collective"[1]), with significant holdings of Tranche A, B, and C loans, by and through their undersigned counsel, hereby submits this Response And Objection Of The Collective Of DIP Lenders To The Debtors' Expedited Motion for Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, and 9014 Authorizing Debtors To Provide Expense Reimbursement To Platinum

---

[1] The Collective includes: (i) Double Black Diamond Offshore Ltd.; (ii) Black Diamond Offshore Ltd.; (iii) Monarch Master Funding Ltd.; (iv) Greywolf Capital Partners II LP; (v) Greywolf Capital Overseas Master Fund; (vi) GCOF SPV I; (vii) GCP II SPV I; (viii) Greywolf Structured Products Master Fund, Ltd.; (ix) Greywolf CLO I, Ltd.; and (x) SPCP Group, LLC.

Equity Advisors, LLC In connection With Sale Of Debtors' Assets Pursuant To Master Disposition Agreement (the "Motion"). In support of this Response and Objection, the Collective respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Having failed in their effort to conduct a quick private sale to Platinum, the Debtors have changed course and now seek to ensure a sale to Platinum a different way: by undermining the auction process ordered by the Court through the simple expedient of forcing any winning bidder to pay Platinum a disguised $30 million break-up fee. If the winning bidder is forced to pay that break-up fee, the chances that Platinum -- the Debtors' clear favorite among potential acquirors -- will maintain the winning bid rise dramatically. DIP Lenders wishing to credit bid will be deterred by the purported need to bid $30 million in cash (and waive their rights as DIP Lenders under the DIP Order). Cash bidders too will be chilled by the massive break-up fee (at least 12 percent of Platinum's contributed consideration). The Court should not allow the Debtors to make a gift of the DIP Lenders' money in order to rig the bid process in Platinum's favor. The Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Debtors have been in chapter 11 for more than four years. A plan of reorganization has been confirmed, but not consummated.

3. The members of the Collective are parties to the DIP Credit Agreement. The DIP Lenders as a group are owed in excess of $3.25 billion in principal, plus accrued interest. The DIP Lenders hold superpriority liens on substantially all assets of the Debtors (the "Collateral"). The Collective alone holds in excess of $800 million in Tranche A, B and C loans and is well aware that there are many other similarly positioned institutions who share the Collective's dissatisfaction with the Debtors' plan

4.      The Court approved the DIP Credit Agreement by the DIP Refinancing Order, entered January 5, 2007 (as supplemented, the "DIP Order").  Among other things, the DIP Order granted the DIP Lenders superpriority administrative claims and superpriority and priming security interests and liens in the Collateral. (DIP Order ¶¶ 5, 6.)  In addition, in paragraph 7 of the DIP Order (entitled "Protection of DIP Lenders' Rights"), the Court vacated the automatic stay to allow the Agent and the DIP Lenders to exercise "all rights and remedies against the Collateral provided for in the DIP Documents [which include the DIP Credit Agreement and the Amended and Restated Security and Pledge Agreement]" in the event of the occurrence of an Event of Default under the DIP Credit Agreement.  (Id. ¶ 7(b).)  The DIP Order also provided that, "[i]n any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing," and that the parties waived any right to seek relief, including under section 105 of the Code, that "would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents."  (Id.)  The DIP matured on December 31, 2008.  It was not repaid, triggering an unquestioned Event of Default.  Subject only to the forbearance embodied in the Accommodation Agreement, the DIP Lenders are entitled at any time to exercise any and all of their remedies under the DIP Credit Agreement and the DIP Order.  The DIP Lenders' indisputable rights include, among others, the ability to foreclose on the Collateral or consent – in their sole discretion – to the alternative disposition of the Collateral.

5.      On June 1, 2009, the Debtors moved to schedule a hearing on the Modified Plan and related disclosures and voting procedures, and sought an Alternative Sale Hearing date to consider the Proposed Transaction that is outlined in the motion as a private sale

- 3 -

under section 363 of the Code.  The Proposed Transaction that Delphi disclosed for the first time in its motion consists of the MDA, dated as of June 1, 2009, among Delphi, GM Components Holdings, LLC ("Parent", and together with certain other buyers, the "GM Buyers"), GM, and Parnassus Holdings II, LLC ("Parnassus").  Pursuant to the MDA, Delphi proposes to sell substantially all of its productive assets to the GM Buyers and Parnassus in exchange for their assumption of specified liabilities and certain other consideration.

        6.      The Collective objected to the Debtors' Modified Plan, arguing that the Debtors should not be permitted to pursue a plan modification or private 363 sale because neither proposal would satisfy the superpriority liens of the DIP Lenders, and argued that the Court should instead institute procedures for competitive bids for the Debtors' assets.  The DIP Lenders also argued that the no-shop provision of the MDA inappropriately restricted the sale process and hindered the potential to maximize the value of the sale to the Estate.

        7.      The Court agreed that a sale of substantially all of the Debtors' assets should be exposed to the light of a competitive process.  When asked about the effect of the no-shop provision in the MDA, counsel for Platinum acknowledged that Platinum had not sought a break-up fee when it agreed to be bound by the terms of the MDA, which contemplated that the Court might open up the sale process.  (See Hr'g Tr. 94:17-20, Jun. 10, 2009, Docket No. 17011) ("June 10 Hr'g Tr.") ("We fully expected . . . that once this became a public deal, there could well be other parties who would be interested in stepping in our shoes or offering a similar transaction.")  On June 16, 2009, the Court entered the Modification Procedures Order and Supplemental Procedures, outlining a mechanism designed to maximize the value of the Debtors' assets through a plan or, in the alternative, a 363 sale.

8. The Debtors, however, would still prefer a sale to Platinum, and on June 25, 2009, they filed this Motion, seeking, *inter alia*, that the Court impose a $30 million "expense reimbursement" requirement on any winning bidder. The Debtors seek to impose this $30 million burden on other bidders purportedly because Platinum has agreed to serve as a so-called "stalking horse" bidder -- albeit an involuntary stalking horse -- and the $30 million is necessary to incentivize it. However, given that Platinum signed the MDA with virtually no walk rights and without any insistence on any break-up fee or expense reimbursement provision, no basis exists to grant the extraordinary relief sought in the Motion. Rewarding Platinum now (and belatedly) would only serve to chill rather than enhance the bidding for the Debtors' assets and make a sale to Platinum a foregone conclusion.

## RESPONSE AND OBJECTION

### I. THE COLLECTIVE OBJECTS TO THE DEBTORS' MOTION ON THE GROUNDS THAT PLATINUM IS NOT ENTITLED TO THE REQUESTED $30 MILLION PAYMENT AS A MATTER OF LAW.

9. The Debtors seek authorization to provide Platinum with what they term an "expense reimbursement" of $30 million purportedly to encourage it to proceed as a stalking horse in the auction process ordered by the Court. (Mot. at 1.) Although the Debtors use the term "expense reimbursement," they openly acknowledge that the $30 million is in reality a break-up fee. In their view, the $30 million payment to Platinum "is analogous to a bidding incentive" and is being offered to "encourage" Platinum, as a potential bidder, "to invest the requisite time, money, and effort to negotiate with a debtor and perform necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process." (Mot. at 15.).

10. The Debtors ignore the purpose of break-up fees. This "stalking horse" left the barn long before the Debtors filed the Motion. Platinum neither requires nor deserves

financial inducements to proceed with the MDA, inasmuch as it voluntarily assumed the risk that its "private" acquisition of a bankrupt company's assets would be market tested, particularly in the context of a chapter 11 proceeding in which the DIP Lenders' claims are being massively impaired.  When it entered into the MDA on June 1, 2009, Platinum obligated itself to purchase substantially all of Delphi's global businesses.  It did so without bargaining for a break-up fee or an expense reimbursement provision.  It hoped to consummate its acquisition through a confirmed plan of reorganization or a private sale under section 363 without exposing the Debtors' assets to a public auction.  The Court, however, properly put a crimp in that plan.  Now, the Debtors seek approval to provide Platinum with a belated "expense reimbursement" to essentially function as an involuntary stalking horse.

11.     An award of a $30 million disguised break-up fee will not encourage additional bids for the Debtors' assets, but rather will serve only to chill the bidding.  The amount of the "expense reimbursement" is in itself excessive.  Even more important, the Debtors' Motion, if granted, would enable the Debtors to contend that the winning bidder must include at least $30 million in cash in its bid to fund the "expense reimbursement."  The Debtors would likely contend that a DIP Lender making a pure credit bid -- without the $30 million cash component -- cannot be the winning bidder.  If that were the case, a DIP Lender would have to make a Hybrid Credit Bid consisting of a credit bid plus cash and, in doing so, waive its right not to consent to the sale if it is not the winning bidder.  There can be little doubt that the Debtors' and Platinum's goal here is to chill the bidding, not encourage it.

12.     The Court should not permit the Debtors to undermine the sale process at the eleventh hour.  The role of the Court is clear: "to allow the forces of the free market to determine the outcome to the greatest extent possible within the bounds of the law."  <u>Hanson</u>

Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264, 274 (2d Cir. 1986) (reversing denial of preliminary injunction of break-up fee and other "lock-up" conditions that deterred bidding in corporate sale).

### A. The Debtors' Motion Should Be Denied Because The $30 Million Break-Up Fee Is By Definition Not Necessary To Encourage Platinum To Bid.

13.     The Debtors are correct that break-up fees are acceptable deal conditions when they serve as "an incentive payment to a prospective purchaser" to facilitate a bid process. In re Integrated Res., Inc., 147 B.R. 650, 653 (S.D.N.Y. 1992); see also In re 310 Assocs., 346 F.3d 31, 34 (2d Cir. 2003) ("Breakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders"). Such fees "may … be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614, 624 (S.D.N.Y. 1987).

14.     However, "if break-up fees … stifle bidding they are not enforceable." Integrated Res., 147 B.R. at 659. When determining if a break-up fee stifles bidding rather than encourages it, "the court should consider whether the proposed acquiror attracted other bidders or simply received a potential windfall." Id. at 660 (emphasis added). Break-up fees that "effectively end the auction" should not be approved, particularly where "the directors 'knew or should have known' that bidding would cease as a result." Samjens, 663 F. Supp. at 624; Integrated Res., 147 B.R. at 660 (quoting Hanson Trust, 781 F.2d at 277).

15.     By definition, the Debtors cannot establish that a $30 million "expense reimbursement" provision is necessary to induce Platinum to make a bid and serve as a stalking horse, for the simple reason that it was not necessary to obtain Platinum's agreement to the

- 7 -

MDA. The Debtors concede in their motion papers that Platinum did not require this $30 million break-up fee as an incentive to enter into the MDA. (Mot. at 11.) The Debtors initially intended to consummate a "private sale transaction" in which their assets would be sold to Platinum without any auction at all -- and, consequently, without any need to encourage bidding by anyone else. (Mot. at 8.) The MDA that the Debtors and Platinum executed -- without any break-up fee or expense reimbursement provision as an incentive to Platinum -- left "no 'outs' [for Platinum] in its transaction with Delphi." (Mot. at 11.) It does not even contain a "'Material Adverse Effect' condition to close." (Id.) At the hearing to approve the Plan Modification Procedures, counsel for Platinum acknowledged that Platinum had considered whether to demand a break-up fee and chose to go forward without one. (June 10 Hr'g Tr. 93:22 – 94:5) According to the Debtors, "the MDA does not provide Platinum with either a break-up fee or expense reimbursement in the event the transaction is not consummated because the parties contemplated a private sale to Platinum[.]" (Sheehan Decl. ¶ 4.)[2] In other words, Platinum locked itself into the MDA without a $30 million break-up fee or expense reimbursement provision.

16. Had Platinum needed an incentive, it could have bargained for a break-up fee or expense reimbursement as a deal protection in the MDA, especially since the Court's decision to open up a competitive sales process could not have come as a surprise to Platinum. The MDA acknowledges the possibility of competition: it contains a provision restricting Delphi's ability to entertain offers from other potential purchasers.[3] Moreover, at the June 10

---

[2] "Sheehan Decl." refers to the Declaration of John D. Sheehan In Support Of Platinum Expense Reimbursement Motion, dated June 25, 2009.

[3] The Master Disposition Agreement, when filed on June 1, 2009, included a section entitled "9.40 Non-Solicitation," which provides, "Each of Delphi and the Sellers agree" that Delphi shall not, directly or indirectly: "(B) solicit, initiate, respond to, continue, encourage or facilitate, or furnish or disclose nonpublic information in

- 8 -

hearing, Platinum acknowledged that the Debtors had to entertain other bidders, but that Platinum wanted this transaction to close and it had invested time and resources for that purpose. (June 10 Hr'g Tr. 94:17-96:7.) Platinum understood there could be competition -- the Debtors can hardly claim now that the Court-ordered auction process was not foreseeable.

17. A $30 million expense reimbursement cannot be "necessary" to incentivize Platinum to make a deal that it already made. In In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 536 (3d Cir. 1999), the Third Circuit upheld the refusal of the Bankruptcy Court to approve a break-up fee requested by an unsuccessful bidder. In that case, the unsuccessful bidder reached an agreement with the debtor to purchase the debtor's business that contained a clause voiding the agreement in the event the court failed to approve the inclusion of a break-up fee. The Bankruptcy Court "refused to approve the break-up fee and expense provisions, expressing concerns that allowing such fees and expenses would perhaps chill and or at best certainly complicate the competitive bidding process." Id. at 529 (internal quotations omitted). Notwithstanding the court's ruling, the bidder eventually re-entered the bidding and lost. Id. at 530. The unsuccessful bidder then sought payment of its "Fees and Expenses" and was denied. Id. On appeal, the District Court and the Third Circuit both affirmed. The Third Circuit emphasized that "when [the bidder] decided to reenter the bidding, it knew that it risked not

---

furtherance of, any inquiries or the making of any proposal with respect to, or enter into or continue any negotiations or discussion with any Person (other than the Buyers) regarding the possibility of Competing Transaction; (C) except as otherwise required by Law, order of a Governmental Authority or similar compulsion, provide any nonpublic financial or other confidential or proprietary information regarding the GM Business or the Company Business (including any nonpublic materials containing Purchaser's proposal and any other nonpublic financial information, projections or proposals regarding Delphi or any Seller) to any Person (other than the Buyers and its representatives) whom Delphi or any of the Sellers or their respective Affiliates knows would have any interest in participating in Competing Transaction[.]" (Master Disposition Agreement ¶9.40) (emphasis added). The MDA defines a Governmental Authority as "any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision[.]" This Court, therefore, is a Governmental Authority under the MDA, and the MDA anticipated that Court would issue the Modification Procedure Order and Supplemental Procedures and expose the Debtors' assets to a public auction process.

receiving any break-up fees or expenses. Its decision to proceed in the face of this risk undercuts its current contention that it viewed the fees and expenses as necessary to make its continued involvement worthwhile." Id. at 537.

18. There is even less justification here for providing Platinum with a break-up fee or expense reimbursement. Unlike the bidder in O'Brien, Platinum never bargained for inclusion of a break-up fee or expense reimbursement provision in the MDA (or for the right to insist on one) or a walk right in the event the Debtors' assets were exposed to a public auction. Moreover, the Debtors do not contend that Platinum is now insisting on a $30 million expense reimbursement provision in order to proceed with the MDA. How could it, given the binding terms of the MDA? In fact, the Debtors do not even contend that Platinum has asked for a $30 million expense reimbursement. Instead, they say only that they are "seeking authority to provide for reimbursement of Platinum's expenses in the event that Delphi accepts and consummates an Alternative Transaction" because "Platinum is now exposed to the risk inherent in the [auction] process ordered by the Court." (Sheehan Decl. ¶ 5), and because "Platinum provided the path to a full and final global resolution to Delphi's bankruptcy cases … such that Delphi has been able to secure access to [$250 million in] liquidity from GM to operate its business. The foregoing represents value that Platinum has brought to the estates and for which it should be reimbursed in the event Delphi consummates an alternate transaction." (Id. at ¶ 58 (emphasis added).)

19. In short, the Debtors want to make a gift to Platinum. The Debtors should not, however, be so quick to spend other people's money. Any consideration obtained in an Alternative Transaction should flow to the Debtors' numerous creditors, both secured and unsecured, who are receiving little to no compensation for their long-standing investment in

Delphi.  See In re America West Airlines, 166 B.R. 908, 913 (Bankr. D. Ariz. 1994) (refusing to approve a breakup fee because sale proceeds should be preserved to go to the Estate's creditors, bondholders and shareholders);  In re Integrated Res., Inc., 135 B.R. 746, 750-51 (Bankr. S.D.N.Y. 1992) ("When a sale of debtor's assets outside the ordinary course of business is proposed … bankruptcy courts will carefully scrutinize the use of break-up fees.  This is because bidding incentives impose expense on the debtor's estate" and "affect the debtor, creditors and equity holders, alike").  The proposed expense reimbursement would give Platinum a full 5% of the Debtors' proposed maximum recovery to Tranche C Lenders. Platinum has not provided any value to the Estate to deserve this gift, especially since it is purchasing Delphi's global businesses for a price that is grossly disproportionate to their value, and since Platinum is already legally bound under the MDA and is clearly not in need of any incentive to proceed.  The Motion should, therefore, be denied as a matter of law.  Integrated Res., 147 B.R. at 659.

     **B.**    **The Debtors' Motion Should Be Denied Because The $30 Million Break-Up Fee Will Chill Bidding And Undermine The Auction Process.**

     20.    The Debtors' Motion should be denied for another reason.  Besides being unnecessary to incentivize Platinum to proceed with the MDA, the $30 million "expense reimbursement" provision will be a disincentive to other bidders.  Break-up fees and expense reimbursement provisions increase the cost of a transaction.  If they are necessary to incentivize a true stalking horse bidder, reasonable in amount, and provide a true benefit to the estate, break-up fees may be appropriate.  Here, not only is the $30 million "expense reimbursement" provision unnecessary, but it is certain to serve only to deter other bidders from participating in the auction and/or tilt the playing field towards Platinum.  See Integrated Res., 147 B.R. at 659 ("if break-up fees … stifle bidding they are not enforceable");  Samjens, 663 F. Supp. at 624 (same).  "Although the assurance of a break-up fee may serve to induce an initial bid (a

- 11 -

permissible purpose)" -- which, as discussed above, did not occur here -- "it may also serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose)." O'Brien, 181 F.3d at 535.

21. The Debtors have already acknowledged that several other interested parties have requested access to due diligence for the purposes of considering making a competing bid. At the June 10 and June 16 hearings, the DIP Lenders indicated that they may be interested in making a credit bid for some or all of the Debtors' assets. Neither of these expressions of interest are a result of Platinum's "willingness" to serve as a stalking horse.

22. Platinum is without doubt the Debtors' preferred acquiror, due to the Debtors' stated belief that "Platinum's extensive diligence efforts and the understanding of the operational needs of the Debtors' businesses … has increased the likelihood of success for the entity that Platinum will operate upon the closing of the transaction." (Mot. at 11; Sheehan Decl. ¶ 10.) By requesting that a $30 million break-up fee be paid by an alternative winning bidder "from the proceeds of the Alternative Transaction," (Mot. at 12), the Debtors are again trying to game the system to produce their desired result -- a Platinum victory. This is precisely the purpose of a break-up fee that the O'Brien court identified as "impermissible." 181 F.3d at 535.

23. Platinum's $30 million expense reimbursement is designed to stymie credit bids. If the Court were to grant the Debtors' Motion any credit bidder would have to include at least $30 million in cash in its bid because the $30 million "expense reimbursement" must be paid from the proceeds of the Alternative Transaction. (Mot. at 14-15.) Pursuant to paragraph 46 of the Modification Procedures Order, any DIP Lender who makes a Hybrid Credit Bid, rather than a pure credit bid, will "be deemed to have irrevocably consented to the transactions contemplated by the Supplemental Procedures and ultimately approved by this

- 12 -

Court for all purposes under the DIP Credit Agreement" even if that DIP Lender loses the bidding.  As a result, if the Debtors have their way, they will have effectively eliminated pure credit bids from the auction.  No pure credit bid could satisfy the requirement that the $30 million 'expense reimbursement" be paid from the proceeds of the Alternative Transaction, inasmuch as a credit bid would include no cash.

24.     Moreover, a DIP Lender would have to think long and hard about making a Hybrid Credit Bid.  The price of admission to the auction would be the surrender of valuable contractual and statutory rights—the ability to refuse to consent to the sale of the Debtors' assets to the winning bidder if the DIP Lender's bid were unsuccessful.  As a result, awarding Platinum a $30 million "expense reimbursement" would serve to chill rather than encourage bidding—the exact opposite of the purpose of break-up fees and expense reimbursement provisions.  The Debtors should not be permitted to game the auction in that manner.

      **C.**      **Even If The Debtors' Motion Did Not Fail As A Matter Of Law, It Could Not Be Granted Until After The Auction Process Is Complete.**

25.     Whether Platinum's efforts will encourage other bidders to step forward, which is the purpose of a break-up fee and expense reimbursement provision, or instead chill the bidding as the Collective believes, will not be known for certain until the auction process is complete.  To the extent the Court believes it is possible that Platinum's prospective conduct may benefit the Estate, it should defer ruling on the Debtors' Motion until after the auction has occurred.  See, e.g., O'Brien, 181 F.3d at 537 (ruling on the propriety of a payment of a break-up fee to a losing initial bidder following the auction).  Given that the Motion has been publicly made, all potential bidders will have had notice of it and, should the Court order that it be considered after the sale, will have factored it into their bidding calculations.

## II. THE DEBTORS' MOTION SHOULD BE DENIED BECAUSE THE EXPENSE REIMBURSEMENT PROVISION IS EXCESSIVE.

26. The Debtors' Motion should be denied for yet another reason: a $30 million "expense reimbursement" provision is excessive. It is excessive for several reasons. First, it is unclear to what extent the Debtors seek to compensate Platinum only for out-of-pocket third party expenses or for internal lost opportunity costs as well. The Debtors have offered only a single conclusory statement from John Sheehan, Delphi's Chief Financial Officer, that "Platinum represented to me that as of May 31, 2009, it has third party expenses of approximately $20 million that are related to its overall due diligence in connection with a Delphi transaction. … In addition, as of May 31, 2009, Platinum has approximately $17 million of internal costs related to Delphi." (Sheehan Decl. ¶ 59.) The latter $17 million of "internal costs" sounds very much like a break-up fee rather than expense reimbursement.

27. Second, it is clear from the Debtors' Motion and supporting papers that the Debtors seek to compensate Platinum for activities that go far beyond due diligence for, and negotiation of, the MDA. Platinum only became involved in discussions with the Debtors and Auto Task Force concerning the MDA in April 2009. It was not until June 1, 2009, the day when the motion for plan modification procedures was filed, that GM, the Auto Task Force, and Delphi completed negotiations with Platinum to enter into the MDA. (Sheehan Decl. ¶ 50). Platinum, however, has been looking at acquiring Delphi for three years, and the Debtors seek to compensate Platinum for its expenses and internal costs incurred throughout that period. (Id. ¶ 6.) Mr. Sheehan, for example, states that the "value that Platinum has brought to the estates and for which it should be reimbursed" is that "Platinum provided the path to the full and final global resolution to Delphi's bankruptcy cases, as required by GM, such that Delphi has been able to secure access to liquidity from GM to operate its businesses." (Id. ¶ 58.) According to Mr.

- 14 -

Sheehan, those amounts include "out-of-pocket expenses incurred in connection with Platinum's consideration of the purchase of Delphi's steering division."  (Id. ¶ 59 at n.7.)

28.  The proposed transaction that forms the basis for the auction process, however, has not been in development for the past three years.  Indeed, as the Debtors clearly understand, changing economic conditions during that time have repeatedly caused all parties involved in Delphi's reorganization to pivot and seek different solutions to assist the Debtors in emerging from bankruptcy.  (See, e.g., Sheehan Decl. ¶ 17 (discussing the effect of the significant deterioration of "market conditions" on the Debtors' reorganization.)  Moreover, to the extent Platinum "dedicated" time and money during those three years "to understanding Delphi's operations," Platinum clearly did so in an effort to understand whether it could make a profit by purchasing Delphi.  The Debtors make no effort to differentiate between expenses incurred by Platinum in connection with proposing the MDA and Platinum's other self-serving efforts.  Mr. Sheehan attributes at least some of the expenses incurred by Platinum to its efforts to evaluate Delphi's Steering Division -- a division that it is not purchasing -- and to time spent meeting with customers and the UAW to understand the industry in which the Debtors operate.  (Sheehan Decl. ¶ 10; Krasner Decl ¶ 7.)[5]  Those self-serving efforts by Platinum -- though they may be valuable in running the Debtors' business following the consummation of a transaction -- do not constitute value provided to the Estate today for which Platinum should be reimbursed.

29.  Third, when characterized as a break-up fee, as it should be at least in part, the proposed $30 million is excessive.  "A break-up fee should constitute a fair and reasonable

---

[5]  "Krasner Decl." refers to the Declaration of Dan Krasner In Support Of Platinum Expense Reimbursement Motion, dated June 25, 2009.

percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." Integrated Res., 147 B.R. at 662.  Generally, courts deem a break-up fee to be reasonable if it is set at one to three percent of the purchase price.  See Id.  (affirming acceptance of break-up fee that was 1.6% of the proposed purchase price).  See also In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions, break-up fees ranging from one to two percent of the purchase price have been authorized by some courts"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 29 (Bankr. S.D.N.Y. 1989) (approving $500,000 break-up fee in connection with $76 million sale because the amount was "not unreasonable in relation to the size of the sale, [and] the work and expense involved").  Here, by contrast, the Debtors seek a $30 million break-up fee for a transaction in which Platinum intends to contribute consideration (principally in the form of equity in the acquiror) which has a value of less than 250 million -- a whopping 12 percent of the purchase price.  Under no circumstances could that possibly be reasonable, and, as discussed above, the Debtors make no attempt in their Motion to link the amount of the break-up fee to the efforts expended by Platinum.  Accordingly, the Motion should be denied.[6]

### III.   THE PROPOSED EXPENSE REIMBURSEMENT VIOLATES SECTION 13(A) OF THE DIP ORDER

30.     The Expense Reimbursement sought by the Debtors is a violation of the DIP Order because the DIP Lenders' liens attach to the proceeds of the sale of the Debtors' assets and therefore proceeds from the sale may not be transferred to Platinum.  Section 13(a) of the DIP Order provides that "[n]o claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Agent and the DIP Lenders" "shall be granted or allowed

---

[6]  In the event the Court does not deny the Motion, the Collective reserves the right to take discovery in advance of the Alternative Sale Hearing.

- 16 -

while any portion of the Financing (or any refinancing thereof) or the Commitments thereunder or the DIP obligations remain outstanding, and the DIP Liens, the Replacement Liens and the Junior Adequate Protection Liens shall not be (i) solely in the case of the DIP Liens, subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest[.]" (DIP Order ¶ 13.) The DIP Lenders have the right to refuse to consent to the sale of the Debtors' assets if their liens are not satisfied in full. Even if this Court were to allow a sale of the Debtors' assets to be consummated without payment in full, all of the proceeds of the sale would have to be paid first to the DIP Lenders in satisfaction of their superpriority liens. Any expense reimbursement paid to Platinum from the proceeds of an Alternative Transaction would divert consideration that is due to the DIP Lenders and be a violation of the DIP Order.

**IV.    THE COURT SHOULD NOT WAIVE THE RULE 6004(H) STAY.**

31.    The Debtors' request for a waiver of the 10 day stay imposed by Federal Rule of Bankruptcy Procedure 6004(h) has no merit. As the Debtors admit, they must show a "business need" to waive the stay. See, e.g., In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for waiver of ten-day stays); (Mot. at 16.) In support of their request, the Debtors offer no justification whatsoever for waiving the stay. (Mot. at 16.) That is not surprising, inasmuch as in no event will any "expense reimbursement" be paid within ten days from entry of an order on the Debtors' Motion. That is the case because the hearing to approve an Alternative Transaction will not take place until July 23, 2009 and the $30 million is to be paid from the proceeds of the Alternative Transaction. Why the need then for waiver of the Rule 6004(h) stay? There is no need. Accordingly, the Debtors' request to waive the stay should be denied.

Dated: June 30, 2009
New York, New York

        Respectfully submitted,

        WILLKIE FARR & GALLAGHER LLP

        By: /s/ Brian E. O'Connor
            Brian E. O'Connor
            (A Member of the Firm)

            Marc Abrams
            Michael J. Kelly
            Christopher J. St. Jeanos

787 Seventh Avenue
New York, NY 10019-6099
 (212) 728-8000

*Counsel to the Collective of DIP Lenders*