**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4802
(212) 906-1200
Robert J. Rosenberg (RR-9585)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
        mark.broude@lw.com
        michael.riela@lw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE EXPEDITED MOTION FOR ORDER AUTHORIZING DEBTORS TO PROVIDE EXPENSE REIMBURSEMENT TO PLATINUM EQUITY ADVISORS, LLC IN CONNECTION WITH SALE OF DEBTORS' ASSETS PURSUANT TO MASTER DISPOSITION AGREEMENT**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this Objection to the Debtors' *Expedited Motion for Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, and 9014 Authorizing Debtors to Provide Expense Reimbursement to Platinum Equity Advisors, LLC in Connection With Sale of Debtors' Assets Pursuant to Master Disposition Agreement* (the "Motion"). In support of this Objection, the Committee respectfully states as follows:

NY\1545305.3

**BACKGROUND**

1.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On October 14, 2005, the three remaining Debtors also filed voluntary petitions.

2.      The Committee was appointed nine days after the Petition Date, on October 17, 2005.[1] The Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. and Moelis & Company LLC as its co-investment bankers.

**I.      The Failed Plan of Reorganization and the Debtors' Declining Value**

3.      On December 10, 2007, the Debtors filed their amended chapter 11 plan and an accompanying disclosure statement. On January 25, 2008, this Court entered an order confirming that plan, as modified (the "Confirmed Plan"). The Confirmed Plan provided for a "par plus accrued" recovery for general unsecured creditors at an agreed-upon total enterprise value for the Debtors. However, on April 4, 2008, the plan investors purported to terminate that certain Equity Purchase and Commitment Agreement, and the Confirmed Plan has not become effective.

4.      The plan investors' refusal to make their $2.5 billion investment, together with the economic decline generally (and in the automotive industry in particular) and the collapse of the credit markets after the termination of the Equity Purchase and Commitment Agreement, significantly reduced the Debtors' total enterprise value. In addition, the Debtors faced serious liquidity constraints.

---

[1] The current members of the Committee are: (a) Freescale Semiconductor, Inc.; (b) IUE-CWA; (c) Wilmington Trust Company, as Indenture Trustee and (d) Tyco Electronics Corporation. The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

2

5.  To help address the Debtors' liquidity constraints, General Motors Corporation ("GM") provided up to $650 million in advances to the Debtors under a liquidity support agreement among the Debtors and GM, dated on or about May 9, 2008 (the "GM Arrangement"). GM agreed to make these advances in respect of payments it would otherwise have made upon the effectiveness of the Global Settlement Agreement (the "GSA") and the Master Restructuring Agreement (the "MRA") between the Debtors and GM. Upon the effectiveness of the amendments to the GSA and the MRA in September 2008, this commitment terminated and the amounts advanced were set off against amounts to be paid by GM or its affiliates for the benefit of the Debtors under the GSA and the MRA.[2]

6.  Meanwhile, the Debtors were unable to extend the December 31, 2008 maturity date of the DIP Credit Agreement on reasonably acceptable terms. Accordingly, with the support of the administrative agent and the requisite lenders to the DIP credit facility, the Debtors entered into that certain Accommodation Agreement among the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, and the DIP Lenders party thereto (as amended, the "Accommodation Agreement"). Under the Accommodation Agreement, the Debtors could continue using certain of the proceeds of the DIP Facility through June 30, 2009 (the "Accommodation Period"), subject to the terms and conditions set forth in that agreement. However, the Accommodation Period terminates prior to June 30, 2009 if the Debtors do not meet certain milestones in connection with a modified plan of reorganization.

---

[2] GM and the Debtors entered into a first amendment to the GM Arrangement as of October 6, 2008, pursuant to which GM agreed to make available to the Debtors an additional $300 million in advances under the terms and conditions set forth therein. A second amendment to the GM Arrangement extended the availability of the existing $300 million liquidity support from December 31, 2008 to June 30, 2009.[2] On June 1, 2009, the Debtors filed a motion for an order authorizing the increase in that liquidity support to $550 million, which was subsequently granted.

3

**II.     The Proposed Modified Plan**

7.     On June 1, 2009, the Debtors filed a supplement to their October 3, 2008 motion for an order approving modifications to the Confirmed Plan (such plan as modified, the "Proposed Modified Plan").  The Proposed Modified Plan provides for a transaction in which the Debtors would sell most of their assets and businesses to Parnassus Holdings II, LLC ("Parnassus") which is an affiliate of Platinum Equity Advisors, LLC ("Platinum"), with substantial support from GM, and for another transaction in which GM would acquire the Debtors' global steering division and other selected U.S. operations.  Certain other residual non-core and non-strategic assets and liabilities would be retained by a reorganized entity, and would be divested over time.[3]  The effect of the Proposed Modified Plan is that GM, having already received a release, acquires certain plants and is otherwise guaranteed a continued source for its parts, Parnassus acquires assets almost for free[4] and the unsecured creditors get nothing.

8.     The United States Treasury has allowed GM to provide up to an additional $250 million of funding under the GM Arrangement to support the Debtors as they seek approval of the Proposed Modified Plan.

9.     On June 16, 2009, this Court entered an order granting disclosure and solicitation procedures with respect to the Proposed Modified Plan (the "Modification Procedures Order") which, among other things, authorized the Debtors to commence solicitation of votes on the Proposed Modified Plan and established procedures through which unsolicited proposals for alternative transactions to the Master Disposition Agreement ("Alternative Transactions") would

---

[3] It is unclear from the Proposed Modified Plan who would receive the proceeds of those divestments.

[4] The Master Disposition Agreement under which Parnassus acquires its assets provides for Parnassus to pay $1, plus the assumption of certain liabilities and the payment of certain unspecified administrative expenses.  Parnassus' source of funding appears to be a loan from GM and an "Equity Commitment Letter" which is nowhere defined or described.

4

NY\1545305.3

be evaluated and administered. The Modification Procedures Order provides that the Debtors may seek Court approval of an expense reimbursement or other form of buyer protection to be paid from the proceeds of a successful Alternative Transaction if Parnassus is not the successful bidder.

### III. The Motion

10. On June 25, 2009, the Debtors filed the Motion. The Motion requests entry of an order permitting the Debtors to reimburse Platinum up to $30 million upon the closing of an Alterative Transaction,[5] for expenses and costs incurred by Platinum in connection with its investigation of the Debtors.

11. The hearing on the Motion is scheduled for July 1, 2009, a mere six days after the Motion was filed.[6]

### OBJECTION

12. As the Committee has already pointed out, the proposed transaction provides no value to unsecured creditors and the potential for extraordinary returns to Platinum where Platinum has astonishingly little money at risk. Quite simply, Platinum is the beneficiary of the United States Treasury's largesse with taxpayer money. Now, to add insult to injury (more accurately to add injury to injury) the Debtors now seek to protect Platinum from the possibility that someone might actually want to provide value to the estate by seeking authority to pay Platinum the expenses that Platinum has incurred over a three year period, including expenses

---

[5] In the Motion the Debtors only seeks approval to pay the proposed Expense Reimbursement "upon the closing of an Alternative Transaction pursuant to the Supplemental Procedures." Motion at ¶ 14. Thus, the Expense Reimbursement would not be payable if this Court declines to approve any Alternative Transaction, or if this Court approves a transaction outside of the Supplemental Procedures.

[6] In violation of this Court's March 17, 2006 Supplemental Case Management Order, the Debtors filed the Motion on only six days' notice and have not obtained an order to show cause by this Court. In addition, the Debtors have failed to obtain (or even request) the Committee's consent to the expedited hearing.

5

incurred in connection a transaction that Platinum ultimately abandoned.  The extent of the Debtors' requested relief is simply unsupportable.

13. The Committee does not object to the concept of Platinum receiving reimbursement of reasonable, documented out-of-pocket expenses upon the closing of an Alterative Transaction, up to an appropriately modest cap, provided that such expenses relate solely to the Master Disposition Agreement and not to any prior transactions.  However, $30 million is an absurdly unreasonable amount.  Indeed, it is ironic that the Debtors are rushing to seek approval of such a substantial amount of reimbursement to support a transaction that does not pay certain administrative claims in full and effectively pays unsecured creditors nothing.

14. While the Debtors state in the Motion that Platinum spent significant time and money conducting due diligence with respect to the Debtors, nowhere in the Motion do the Debtors describe how much value Platinum (as opposed to GM) is providing to their estates.  Indeed, based on the Master Disposition Agreement and the pleadings filed in support of that transaction, it appears that the only sums of any significance being contributed by Platinum (other than the $1 paid to the estate) are amounts either contributed as equity or loaned as debt to Parnassus – amounts from which the Debtors receive absolutely no direct benefit.  Based on the cash actually being paid by Platinum to the estate ($1), the proposed expense reimbursement represents 3,000,000,000% of the purchase price being paid by Platinum.

15. Furthermore, even if one accepts for the sake of argument that Platinum's efforts were essential to obtaining the $250 million of incremental liquidity from GM described in paragraph 8 of this objection, it would not justify $30 million of expense reimbursement.  That amount is equal to 12% of $250 million – which is extraordinarily high by any measure.  The proposed expense reimbursement is best analogized to a break-up fee.  Courts typically approve

6

break-up fees for stalking horse bidders up to approximately 3% (though break-up fees slightly higher than 3% have been approved in exceptional circumstances).  *See, e.g.*, *In re PennCorp Financial Group, Inc.*, Case No. 00-888 (PJW) (Bankr. D. Del. 2000) (2.3% break-up fee); *In re CXM, Inc.*, 307 B.R. 94 (Bankr. N.D. Ill. 2004) (2.59% break-up fee); *In re ARM Financial Group, Inc.*, No. 99- 4430 (PJW) (Bankr. D. Del. 2000) (3% break-up fee); *Gey Associates General P'ship v. 310 Associates, L.P.*, 2002 WL 31426344 (S.D.N.Y. 2002), *aff'd* 346 F.3d 31 (2d Cir. 2003) (3.23% breakup fee).

16. Based on the 3% maximum standard that courts typically apply to break-up fee requests, the Committee submits that this Court should not approve any expense reimbursement for Platinum exceeding $7.5 million.

17. Essentially the only justification proffered by the Debtors for the $30 million figure is the effort that Platinum has purportedly already spent engaging with the Debtors. However, as both the Motion and the supporting Krasner Affidavit acknowledge, that effort has been spent over the past three years, and was not limited to the transactions embodied in the Master Disposition Agreement.  (see, e.g., Motion at ¶ 16; Krasner Affidavit at ¶ 3.)  As this Court no doubt recalls, much of that effort relates to Platinum's attempts to purchase the Debtors' steering division.  Not only did Platinum ultimately walk away from that transaction, but the steering division is now one of the divisions being purchased by GM.  There is no conceivable justification to reimburse Platinum for its expenses in connection with a transaction that it has abandoned, resulting in the need to sell the same business to GM.

18. The Committee, along with other parties to these cases, has already filed objections challenging the propriety of the process by which the Master Disposition Agreement was negotiated and Platinum picked as the potential acquirer of the estates' assets.  The Court

will address those objections at the hearing currently scheduled for July 23, 2009.  If the Debtors continue to insist that on some basis the $30 million expense reimbursement is justified, then alternatively the Committee suggests that this Court put off any consideration of that request until the proposed auction has concluded and this Court has ruled on the propriety of the proposed transaction; at the point the request can be reviewed under the "substantial contribution" standards.

19. Furthermore, the Debtors are seeking to introduce factual statements in connection with the Motion that relate to the propriety of the entire transaction (see, for example, Sheehan Affidavit at ¶ 52.)  The Committee, as well as a number of other parties, are currently engaged in discovery with respect to these very issues in connection with the hearing scheduled for July 23, 2009.  As a result, it is premature for the Court to address these factual issues on such an expedited basis.  Instead, the entire issue should be adjourned to be considered in light of the factual record developed at the July 23 hearing.

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion and (b) grant the Committee such other relief that it deems just and proper.

Dated: June 30, 2009
      New York, New York

                              **LATHAM & WATKINS LLP**

                              By: /s/ Robert J. Rosenberg
                                 Robert J. Rosenberg (RR-9585)
                                 Mark A. Broude (MB-1902)
                                 Michael J. Riela (MR-7829)
                                 885 Third Avenue, Suite 1000
                                 New York, New York 10022
                                 Telephone:  (212) 906-1200

                              Attorneys for the Official Committee
                              of Unsecured Creditors

NY\1545305.3