IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| Debtors. | : | (Jointly Administered) |

**<u>AFFIDAVIT OF PUBLICATION OF KATHY ARMENGOL IN THE USA TODAY (INTERNATIONAL)</u>**



7950 Jones Branch Drive • McLean, Virginia 22108
(703) 854-3400



# VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

Being duly sworn, Kathy Armengol says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: June 19th 2009 on the following legal advertisement- **DELPHI CORPORATION.** published in the international edition of **USA Today.**

_____
Principal Clerk of USA TODAY
June 26 2009

This _26_ day of _June_ month
_2009_ year.

_____
Notary Public

Marcus Dane Edmonds
Notary Public ID 7165468
Commonwealth of Virginia
My commission expires
09/30/2012

baby broke my heart. That my daughters will need to greet their grandpa the way it daily.

My parents divorced when I was young, so I grew up amid fractured portraits of my father — a blurry memory here, a family legend there. It seems I've spent my entire life struggling to pull Dad into focus, as if flipping through channel after channel of snow.

**A funny man, an angry man**

I remember the funny man with the scratchy face and gravelly voice and thick, dark-rimmed glasses. He owned a toy store in Baltimore, and every Friday night he brought home a box load of inventory for his four small boys — trains and teddy bears and little silver robots with red light bulb eyes. I was only 3 when I learned the word "surplus," and I liked hearing it.

I remember the angry man who fought loudly with Mommy, then moved away to New York City. The house grew quieter, which I didn't mind, and lonelier, which I did. Over the next decade, visits with Dad grew more infrequent and less satisfying. In 1964, my brothers and I joined him and his new wife for an exciting trip to the World's Fair. In 1974, my mom was my only parent to attend my high school graduation.

And, of course, I remember the broken man who had amassed a fortune as a stockbroker, only to watch it evaporate at the hands of a shady client. By then I was living in Manhattan, a college graduate eager to show my father I could be more to him than

Father's Day is Hallmark intended. But for others — millions of us — the day is a painful walk down a pocked road. It's about writing the ending to an unfinished story.

simply a sad reminder of his failed first marriage. My longing to forge a bond with him was my constant companion, yet our occasional dinners at his favorite East Side steakhouse were always tortured affairs.

"Let's get into the trenches," he'd say, announcing once again his need to talk about his divorce from my mother and his heartbreaking bitterness about it all. I always left those dinners feeling empty.

So, yes, by the time Dad died, I felt a burden lift. And I convinced myself that if I poured everything I had ever wanted my father to be for me into everything I wanted to be for my own children, I would somehow write that closing chapter to Dad's and my story.

I wasn't foolish enough to expect a happily ever after, but I thought I could conjure something that resembled hope.

So I doted on my girls, and taught myself to enjoy Barbie dolls and Golden Books and

And I learned to grapple with the crippling self-doubt each time I failed my kids, convincing myself it was OK to have punished them, or missed a school event or, worst of all, made them cry. The first time one of my daughters, red-faced and furious, screamed, "I hate you, Daddy!", it was like a knife to the heart. But some deep innerwisdom — or, more likely, survival mechanism — told me that in the turbulent, beautiful, complicated universe of parenting, those words somehow meant she loved me.

My daughters are now 10 and 14. Bridgette is heading off to high school, armed with her mom's grace and equanimity, and a dose of her dad's mischievousness. Audrey, like any youngest child, has a piece of all of us in her — Mommy's love of books, Daddy's love of music, Bridgey's love of life.

But both girls have their grandpa's soul — his temper, his humor, his passion. Those are the same gifts he gave to me. And though I'll probably never succeed in finding that elusive end to Dad's and my story, I take comfort in knowing that my children, each and every day, are writing it for me.

*Bruce Kluger is on USA TODAY's board of contributors and is co-author, with David Tabatsky, of the new book* Dear President Obama: Letters of Hope from Children Across America.

fiance of the U.N. Security Council. Many of the U.S. allies are of foreign policy where the supreme leader, Ayatollah Ali Khamenei, will not want to lose control, viewing it as key to regime survival. Even if he makes domestic concessions to defuse this crisis, he will likely still hold the reins of the nuclear program.

This also explains President Obama's current stance. The U.S. could be left dealing with unsavory elements of the regime if Washington wants to forestall a nuclear Iran. As such, Obama will be taking a page out of the past. In the tradition of the 1970s and 1980s in dealing with the Soviet Union, the U.S. knew how to balance its aim for nuclear arms control alongside concerns for human rights. This dual approach cast a spotlight on the Soviets' legitimacy deficit.

**Then and now**

Yet, there are differences between then and now. Classic Cold War deterrence is inadequate with Iran. At that time, there was ongoing communication between the United States and the Soviet Union, including functioning embassies and a leadership hotline. Even so, there were near-miscalculations.

In the case of Iran, there is a lack of communication and lots of local triggers for conflict. Unlike the case of the Soviet Union, where there

**'Engagement without illusions'**

There has to be another way. Call it "engagement without illusions." Under this approach, the United States would engage and press Iran at the same time. Iran will see what can be gained by giving up the prospect of nuclear weapons.

At the same time, Iran needs to understand what it stands to lose. In short, the U.S. needs leverage and a unified position. The Europeans, Arabs, Russians and Chinese have long favored direct American engagement with Iran; they now need to make clear what the consequences would be if such engagement failed. Such leverage requires the credible threat, at a minimum, of comprehensive economic sanctions if talks fail. Nothing should be ruled out. Engagement can be a key to the solution or the springboard for tougher measures. The decision will be Iran's.

Given the pace of the Iranian nuclear program, time is of the essence. Diplomacy should be conducted with a sense of urgency, no matter who is in power.

*David Makovsky, Ziegler Distinguished Fellow at The Washington Institute for Near East Policy, is co-author with Dennis Ross of the new book* Myths, Illusions and Peace: Finding A New Direction for America in the Middle East.

---

# Help Us Keep American Theatre aLive!

America's not-for-profit theatres are doing everything they can to adapt to the current economic crisis. By resizing, relocating, and refocusing, we are making progress. But more needs to be done. We need your help. With contributions from people like you, we can continue to keep curtains going up across the country. Because not-for-profit theatres not only provide great entertainment, they also enrich the quality of life of children and families throughout America.

**Keep American Theatre aLive!**
Send your donation today to:
NCTF, 505 Eighth Avenue, Suite 2303, NY, NY 10018
Or call 212-750-6895
or simply visit us online at www.nctf.org

"Live theatre in every city is one of the great achievements of our country, but it can't survive without your help." — Hal Holbrook, Honorary Chairman, NCTF, an association of America's leading regional theatres

USA TODAY  usatoday.com

---

**Legal Notice**  **Legal Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
In re                                    ) Chapter 11
DELPHI CORPORATION, et al.,              ) Case No. 05-44481 (RDD)
          Debtors.                       ) (Jointly Administered)

**NOTICE OF BAR DATE FOR FILING PROOFS OF ADMINISTRATIVE EXPENSE**

PLEASE TAKE NOTICE that on June 16, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Modification Procedures Order") (Docket No. 17032), which among other things, established July 15, 2009 (the "Administrative Expense Bar Date") as the last date to file proof of administrative expense (each, an "Administrative Expense Claim Form") for the purpose of asserting administrative expense claims ("Administrative Expense Claims" or "Claims"), against Delphi Corporation ("Delphi") and its affiliated debtors and debtors-in-possession (the "Debtors" or "Company"). The Administrative Expense Bar Date and the procedure set out below for filing proofs of administrative expense with respect to Claims apply to all alleged postpetition Claims against the Debtors that arose, accrued, or that were incurred on or before June 1, 2009.

PLEASE TAKE FURTHER NOTICE THAT the Modification Procedures Order requires all parties to file an Administrative Expense Claim Form with Kurtzman Carson Consultants LLC ("KCC"), the claims, noticing, and solicitation agent in these cases, so that such Administrative Expense Claim Form is received on or before 5:00 p.m., prevailing Eastern time, on the Administrative Expense Bar Date.

WHO SHOULD FILE AN ADMINISTRATIVE EXPENSE CLAIM FORM. You must file an Administrative Expense Claim Form if you believe that you are entitled to an Administrative Expense Claim as described in 11 U.S.C. § 503, except as provided below.

You do not need to file an Administrative Expense Claim Form for (i) any claim for postpetition goods and services delivered to the Debtors prior to June 1, 2009 that are not yet due and payable pursuant to the applicable contract terms, (ii) employee claims arising prior to June 1, 2009 for wages, salary, and other benefits arising in the ordinary course of business that are not yet due and payable; (iii) any claim for which the party has already properly filed an Administrative Expense Claim Form or a proof of claim form with the Court which has not been expunged by order of the Court and provided that such proof of claim clearly and unequivocally sets forth that such claim is made for an administrative expense priority; (iv) any claim for fees and/or reimbursement of expenses by a professional employed in these chapter 11 cases accruing through January 25, 2008, to the extent that such claim is subject to this Court's Interim Compensation Orders;[1] or (v) any claim asserted by any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control or hold with power to vote, 50% or more of the outstanding voting securities of such subsidiary.

TIME AND PLACE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS. A signed original of any Administrative Expense Claim Form, together with accompanying documentation, must be delivered to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, so as to be received no later than 5:00 p.m., prevailing Eastern time, on the Administrative Expense Bar Date. Claims may be submitted in person or by courier service, hand delivery or mail addressed to KCC at the foregoing address. Any Claim submitted by facsimile, e-mail, or by other electronic means will not be accepted and will not be deemed filed until such Claim is submitted by one of the methods described in the preceding sentence. Claims will be deemed filed only when actually received by KCC. If you wish to receive acknowledgment of KCC's receipt of your Claim, you must also submit a copy of your original Claim and a self-addressed, stamped envelope.

CONSEQUENCES OF FAILURE TO TIMELY SUBMIT ADMINISTRATIVE EXPENSE CLAIM FORM. ANY PARTY THAT IS REQUIRED BUT FAILS TO FILE AN ADMINISTRATIVE EXPENSE CLAIM FORM IN ACCORDANCE WITH THIS NOTICE ON OR BEFORE THE ADMINISTRATIVE EXPENSE BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, AND THEIR PROPERTY SHALL BE FOREVER DISCHARGED FROM ANY AND ALL INDEBTEDNESS, LIABILITY, OR OBLIGATION WITH RESPECT TO SUCH CLAIM.

PLEASE TAKE FURTHER NOTICE that all pleadings and orders of the Bankruptcy Court are publicly available along with the docket and other case information by accessing the Delphi Legal Information Website at www.delphidocket.com and may also be obtained, upon reasonable written request, from the Creditor Voting Agent, Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, Att'n: Delphi Corporation, et al.

Delphi Legal Information Hotline:       Delphi Legal Information Website:
Toll Free: (800) 718-5305               http://www.delphidocket.com
International: (248) 813-2698
Dated: New York, New York, June 16, 2009

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
John Wm. Butler, Jr., Ron E. Meisler, 333 West Wacker    Kayalyn A. Marafioti, Thomas J. Matz, Four Times
Drive, Suite 2100, Chicago, Illinois 60606              Square, New York, New York 10036
                Attorneys for Delphi Corporation, et al., Debtors and Debtors-in-Possession

[1] See Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated November 4, 2005 (Docket No. 869) (the "Interim Compensation Order"); Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 8, 2006 (Docket No. 2747) (the "Supplemental Compensation Order"); Second Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated March 28, 2006 (Docket No. 2986) (the "Second Supplemental Interim Compensation Order"); and Third Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, dated May 5, 2006 (Docket No. 3630) (the "Third Supplemental Interim Compensation Order"); Fourth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated July 13, 2006 (Docket No. 4545) (the "Fourth Supplemental Interim Compensation Order"); Fifth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses, dated October 13, 2006 (Docket No. 5310) (the "Fifth Supplemental Interim Compensation Order"); Sixth Supplemental Order Under 11 U.S.C. Section 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated December 12, 2006 (Docket No. 6145) (the "Sixth Supplemental Interim Compensation Order"); and the Seventh Supplemental Order Under 11 U.S.C. §331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated January 28, 2008 (Docket No. 12367) (together with the Interim Compensation Order, the Supplemental Compensation Order, the Second Supplemental Interim Compensation Order, the Third Supplemental Interim Compensation Order, the Fourth Supplemental Interim Compensation Order, the Fifth Supplemental Interim Compensation Order, and the Sixth Interim Compensation Order, the "Interim Compensation Orders").