Hearing Date And Time: July 1, 2009 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |
|---|---|
| : | |
|    In re                                               : | Chapter 11 |
| : | |
| DELPHI CORPORATION, et al.,         : | Case No. 05-44481 (RDD) |
| : | |
| : | (Jointly Administered) |
|                  Debtors.                    : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |

OMNIBUS REPLY IN SUPPORT OF
PLATINUM EXPENSE REIMBURSEMENT MOTION

   Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus reply to the objections (the "Objections") filed by various parties (the "Objectors") objecting to the expedited motion (the "Motion") for order under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, and 9014 authorizing the Debtors to provide an expense reimbursement to Platinum Equity Advisors, LLC ("Platinum") in connection with the sale of the Debtors' assets pursuant to the Master Disposition Agreement.  For the convenience of this Court and the recipients of this Reply, attached hereto as <u>Exhibit A</u> is a detailed chart summarizing the issues raised in the Objections, including the basis of the Objection and the Debtors' response to the Objection.  Although this Reply highlights only certain objections, it incorporates the responses in the chart.

*****

   On April 6, 2009, the DIP Lenders faced a choice.  The day prior, having earlier blocked Delphi's access to $150 million in incremental liquidity under GM Arrangement Amendments Nos. 4 and 5, the Auto Task Force had informed Delphi that GM was not prepared to provide emergence financing to Delphi, and, instead, was only willing to support GM's acquisition of North American assets essential to protecting supply for GM.  The DIP Lenders' Steering Committee, when presented with this news, chose to send a sober message to Delphi: rather than seeking at that time to lead or even pursue a transaction that would create a pathway for Delphi to emerge from chapter 11, the DIP Lenders instead told Delphi that they were unwilling to provide <u>any</u> incremental interim financing or <u>any</u> emergence financing to Delphi.  Indeed, the DIP Lenders' Steering Committee summoned Delphi senior management to the

Administrative Agent's counsel's office in New York City and informed Delphi that its only alternative was to pursue a self-financed liquidation.

Delphi sought a different path because, in Delphi's view, a self-financed liquidation would have caused significant value erosion and would have led to materially decreased recoveries for many of the stakeholders who have supported Delphi throughout its transformation process.  One of Delphi's actions to seek out that different path was to continue its ongoing discussions with Platinum, which had demonstrated a consistent interest over three years in investing in Delphi.  When presented with the same facts as the DIP Lenders, Platinum perceived an opportunity and asked Delphi to make the Auto Task Force aware of their continued interest in a comprehensive transaction with Delphi.  Delphi did, and at the same time tried to convince the Auto Task Force and GM that supporting Delphi's emergence through a modified reorganization plan was the better course for GM to follow.

Not long thereafter, GM, with the Auto Task Force's support, indicated that it had reconsidered and would now be willing to support a comprehensive resolution of Delphi's chapter 11 cases.  Because of its extensive knowledge of Delphi formed through its extensive diligence efforts, Platinum was able to engage quickly and to build on the trust and understanding among the parties required for a complex transaction.

Platinum, however, had not yet earned an agreement – others still had the opportunity.  Concurrently, Delphi, GM, and the Auto Task Force were engaged with other potential partners and also in direct discussions with the DIP Lenders.  Indeed, in April 2009, the DIP Lenders rejected a comprehensive transaction that would have given them supermajority ownership of reorganized Delphi without any further interim or emergence funding from the DIP Lenders.

3

After having been spurned by the DIP Lenders, GM and the Auto Task Force turned their focus to potential third-party partners while continuing to negotiate potential stakeholder recoveries with Delphi and the DIP Lenders. Delphi formulated and shared with GM, the Auto Task Force, the DIP Lenders, the Creditors Committee, and other key stakeholders a series of objectives and criteria by which Delphi would consider leading a Delphi-sponsored solution with GM, the Auto Task Force and a third-party partner. During this period a third-party partner other than Platinum actually garnered "frontrunner status" with the Auto Task Force and GM – only to lose it to Platinum because of an unwillingness to support emergence through a reorganization plan. It was also during this period that GM, the Auto Task Force, Delphi, the DIP Lenders, the Creditors Committee, and certain other stakeholders participated in more than 20 hours of judicial mediation – organized at the request of the DIP Lenders – to seek to settle the amount of the DIP Lenders' recoveries in these cases, among other matters. Discussions with the DIP Lenders were unsuccessful. Thus, by the end of May, the DIP Lenders would not fund the incremental interim liquidity required to bridge Delphi's operations to a comprehensive resolution, provide the requisite amount of emergence capital, or agree to the level of stakeholder recoveries proposed to be funded by GM with the Auto Task Force's support. Following this impasse, on June 1, 2009, Delphi, GM, and the Auto Task Force completed negotiations with Platinum for entry into the Master Disposition Agreement and filed the Supplement to the Plan Modification Motion. Through the Master Disposition Agreement, Delphi had, in fact, achieved a different path deemed unobtainable by the DIP Lenders in early April: a fully-diligenced transaction with the necessary amount of committed interim and emergence funding, and which provided for a comprehensive resolution of these chapter 11 cases.

In their objections to the Plan Modification Motion and to this Expense Reimbursement Motion, the DIP Lenders have attempted to re-write this history. Rather than acknowledge the substantial value that Platinum's participation in these chapter 11 cases has created, the DIP Lenders have claimed that they were somehow excluded from the process (despite having rejected GM's and the Auto Task Force's offer to become their financial partner without any additional capital commitments), denied access to information (despite more than six months of financial advisory due diligence at a cost to Delphi in excess of $6 million), and otherwise prevented from participating in considering a Delphi transaction.

The actual facts set forth in the Declarations of John Sheehan and William Shaw set this record straight. In fact, over the last six months the DIP Lenders had the opportunity to step in and fashion a transaction to lead Delphi out of chapter 11, or to influence the transaction reflected in the MDA, but apparently made the business decision to not do so.

Now, certain DIP Lenders are obviously unhappy with the transaction that resulted. Since the MDA was signed, the DIP Lenders have endeavored to obfuscate the facts and portray themselves as unwilling investors trapped in Delphi's circumstances. At the same time, the majority of the top 11 DIP Lenders actually <u>increased</u> their DIP exposure to Delphi through massive claims trading[1], and attempted to scuttle the only viable, fully funded, feasible emergence transaction that has been on the table in these chapter 11 cases for nearly 15 months. Certain Objectors actually contend that the Debtors somehow breached their fiduciary duties

---

[1] Since the Accommodation Agreement was put into place (and as of June 18, 2009), 8 of the top 11 DIP Lenders have <u>increased</u> their collective exposure by approximately $807 million and the largest DIP Lender has <u>increased</u> its position by more than $455 million while all of the other DIP Lenders have <u>reduced</u> their exposure in the aggregate by approximately $1.29 billion (through facility size reductions, principal paydowns and claims trading), Said another way, since the DIP Credit Facility matured in December 2008, the top 11 DIP Lenders have <u>increased</u> their aggregate exposure by 11.5% to $2.25 billion while all other DIP Lenders have *decreased* their aggregate exposure by 55% to $1.04 billion.

5

simply by entering into the MDA.  Given the result that the Debtors have achieved under the circumstances, this position is unfounded and incredible.

The objections to the Motion similarly stretch reality.  The fact is, Platinum has been an integral part of developing an emergence transaction that maximizes value for the Debtors' estates, which was negotiated as a unitary transaction between Delphi, GM, and Platinum.  Even though the Debtors were prepared to exercise their fiduciary duties with respect to further unsolicited proposals in competition to the MDA, at the Objectors' urging the Court has established the Supplemental Procedures, which are designed to provide a transparent process for the consideration of any Alternative Transactions to the MDA.  In order to make those procedures effective, Platinum essentially agreed with GM that GM would be free to facilitate such Alternative Transactions if they arose.  As a result, it is undisputed that Platinum is now subject to substantially increased risk that the MDA, to which Platinum is an indispensable party, could be cast aside in favor of an Alternative Transaction (which, by definition, would be on even higher or otherwise better terms for Delphi than the MDA).  If that happens and all of Delphi's stakeholders benefit further because of Platinum's long-standing participation in these chapter 11 cases, then it is it is entirely reasonable that Platinum to be reimbursed for its actual internal and external costs and expenses.

In opposition, the Objectors ignore the fundamental change that Platinum's involvement has helped to bring about since April 6, 2009, and, instead, characterize the proposed expense reimbursement as a "gift" that is unsupported (according to the Objectors) by any value whatsoever to the Debtors' estates.  They ignore the fact that Platinum's extensive interest and active involvement in Delphi over the prior three years put Platinum in a unique position to perceive and pursue the opportunity that has resulted in the MDA.  And, even though

6

they now hope to use the MDA as the platform to obtain an even higher or better Alternative Transaction, they believe Platinum should get nothing if Delphi (and they) are able to achieve a higher or otherwise better result.  The inequity of the Objectors' position is manifest.

    Similarly, the Objectors' contention that the expense reimbursement will "chill" the development of Alternative Transaction is unfounded.  First, as to Pure Credit Bids (as defined in the Supplemental Order Amending the Modification Procedures Order), the Objectors' concern is entirely misplaced, as Pure Credit Bids will not trigger the expense reimbursement for Platinum.  And, as to Alternative Transactions, the facts have already shown the Objectors' unsupported claims to be off the mark:  to date, three Qualified Bidders have already engaged in and are following the Supplemental Procedures for the formulation of an Alternative Transaction.  For any party seriously interested in pursuing a significant transaction with Delphi, the level of reimbursement being proposed for Platinum is not a material impediment.

    Finally, the Objectors' argument that the Court should refrain from granting relief now and instead put off consideration of this matter until after the auction takes place misses the point of the current Motion:  The Debtors, with the Court's guidance in recent hearings and Chambers Conferences, have moved on an expedited basis to seek approval of a level of expense reimbursement for Platinum that actually caps reimbursement of Platinum's greater expenditure of external and internal costs so that interested bidders can take that factor into account when making their bids.  It is only sensible that the amount of that reimbursement be established now, prior to the time for the submission of any potentially competing bid, since the Modification Procedures Order requires that the expense reimbursement be paid from the proceeds of the Successful Bid.  To wait, as the Objectors suggest, would simply inject confusion into the process and undermine the orderly consideration of potentially competing proposals.

Based on the record before the Court, there is more than sufficient information to conclude that the expense reimbursement being sought for Platinum in the event the Debtors' consummate an Alternative Transaction is both reasonable and fair. Given the tremendous effort that Platinum has expended, and the resulting value that has already been created for the Debtors (and which would only be further increased in the event that an Alternative Transaction is achieved), this Court should approve the reimbursement in the amount requested.

WHEREFORE, the Debtors respectfully request that this Court (a) overrule the Objections, (b) grant the Motion, (c) enter the proposed Order, and (d) grant the Debtors all such other and further relief as is just.

Dated:   New York, New York
         July 1, 2009

           SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP

           By:   /s/ John Wm. Butler, Jr.
                 John Wm. Butler, Jr.
                 Albert L. Hogan III
                 Ron E. Meisler
           155 North Wacker Drive
           Chicago, Illinois 60606
           (312) 407-0700

                - and -

           By:   /s/ Kayalyn A. Marafioti
                 Kayalyn A. Marafioti
           Four Times Square
           New York, New York 10036
           (212) 735-3000

           Attorneys for Delphi Corporation, et al.,
            Debtors and Debtors-in-Possession