**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Erica E. Carrig (EC-2096)
1540 Broadway
New York, NY  10036-4039
Phone:  212-858-1000
Facsimile:  212-858-1500

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Mark D. Houle (Cal. Bar. No. 194861) *(Pro Hac Admission*
*Granted by Order entered September 27, 2006)*
650 Town Center Drive, Suite 550
Costa Mesa, CA  92626-7122
Telephone: (714) 436-6800
Facsimile: (714) 436-2800

*Attorneys for Hyundai Motor Company*
*and Hyundai Motor America*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
                                        :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **DELPHI CORPORATION, *et al.*** | : | **Case No. 05-44481 (RDD)** |
| | : | **(Jointly Administered)** |
|     **Debtors.** | : | |
| | : | |

---------------------------------------------------------------------x

**DECLARATION OF JASON R. ERB IN SUPPORT OF MOTION OF HYUNDAI**
**MOTOR COMPANY AND HYUNDAI MOTOR AMERICA PURSUANT TO RULE**
**3018(a) REQUESTING TEMPORARY ALLOWANCE OF CLAIMS FOR PURPOSES**
**OF VOTING TO ACCEPT OR REJECT THE PLAN**

    I, Jason R. Erb, declare under penalty of perjury as follows:

    1.      I am an attorney duly licensed to practice law in the State of California, and I am

Assistant General Counsel for defendant Hyundai Motor America ("HMA").  I make this

declaration in connection with the Motion ("Motion") of Hyundai Motor Company and Hyundai

Motor America (collectively, "Hyundai") Pursuant to Bankruptcy Rule 3018(a) Requesting

Temporary Allowance of Claims for Purposes Voting to Accept or Reject the Plan of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Debtors").  Hyundai's

instant Motion to estimate its claims against Delphi entities based on information put together in

a matter of a few days; with additional time, Hyundai might be able to better estimate the claims

described herein and might also identify additional claims.  Hyundai reserves all rights to amend

or supplement the information provided herein as necessary.  If called as a witness, I could and

would competently testify to all facts within my personal knowledge.

## PENDING PATENT LITIGATION

2.      Hyundai has been sued for infringement of certain patents in relation to occupant

classification sensing products supplied by Delphi that have been incorporated into certain

Hyundai vehicles, in that certain action styled, *Automotive Technologies International, Inc. v.*

*General Motors Corporation, et al.*, United States District Court for the Eastern District of

Texas, Marshall Division, No. 2:08-CV-57.  That action also involves a companion case, *Delphi*

*Corporation v. Automotive Technologies International, Inc.*, United States District Court for the

Eastern District of Michigan, Southern Division, No. 08-CV-11048 (collectively, both related

actions referred to as the "ATI Action").    Following Hyundai's demands in relation to the ATI

Action, Delphi agreed to and did assume Hyundai's defense of the ATI Action.  Trial in the ATI

Action is scheduled for November 2011.

3.      Hyundai estimates two categories of estimated claims with respect to the ATI

Action – (1) its ultimate exposure in relation to the infringement claims made by plaintiff

Automotive Technologies International ("ATI") and (2) its costs of defense if Delphi were to no

longer provide a defense (as apparently contemplated under Delphi's new plan).  With respect to

estimated exposure, Hyundai is familiar with the damages model employed by ATI in the ATI

Action through other patent litigation.  Specifically, Hyundai understands that ATI claims to

have developed a damages model that uses a 3% royalty applied to the alleged cost of the

patented components, producing an average royalty per vehicle sold of $64.80.  While Hyundai,

to be sure, does not agree with the model, its assumptions, or its resulting calculations (nor for

that matter that the patents in the ATI Action are valid or infringed), use of the model in the ATI

2

Action, based on the sale of 495,133 allegedly infringing vehicles reported to the close of business on June 29, 2009, would yield total damages sought in the amount of $32,084,618.

4.      At that level of exposure, according to the most recent survey by the American Intellectual Property Law Association on litigation costs in the United States, the median cost of defense for a patent litigation matter through trial would be $5 million.  A true and correct copy of an excerpt from that 2007 survey is attached hereto as Exhibit 1.  Given that the ATI Action involves multiple patents and overlapping proceedings in two separate courts (and because the latest survey is a few years old by now), we suspect that the costs of defense for the ATI Action might exceed the 2007 median, but, to be conservative, we have nonetheless adopted this benchmark as an estimate for these purposes.  With the estimated exposure from the ATI Action, we calculate a total estimated claim of $37,084,618.

<u>PRODUCT LIABILITY PREMIUMS</u>

5.      On or about October 15, 2007, Hyundai Motor Company and Delphi Automotive Systems, LLC, entered into a separate Product Liability Agreement respecting sales of airbag components by Delphi and its affiliates to Hyundai and its affiliates.  A true and correct copy of that agreement is attached hereto as Exhibit 2.  In connection with that agreement, Hyundai agreed to pay a 3.5% premium to Delphi in consideration of Delphi's promise to conditionally defend and indemnify Hyundai with respect to product liability claims in relation to the Delphi-supplied components.  See Exhibit 2, ¶ 15.  Since October 15, 2007, Hyundai has paid Delphi at least $41.6 million in relation to airbag components that Delphi has supplied to Hyundai for its North American-built vehicles alone.  Under the agreement, 3.5% of that sum was paid for an indemnity promise that Delphi apparently now seeks to discharge.  Consequently, Hyundai also seeks an estimated $1,456,847 for these product liability risk premiums paid.  Hyundai will supplement and revise this amount following review of additional amounts paid to Delphi by Hyundai's purchasing units in South Korea.

## OTHER CLAIMS

6.     In connection with vehicles currently on the road and in use across the United States and elsewhere in the world that incorporate components supplied to Hyundai by Delphi, Hyundai contends that it presently may have contingent, unknown claims relating to such components' possible future costs and expenses deriving from, among other things, consumer warranties, product liability risks, and competing intellectual property rights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of July, 2009, at Fountain Valley, California.

Jason R. Erb

4

# Exhibit 1.

## TYPICAL COSTS OF LITIGATION

Survey participants were asked to provide cost estimates, *but only for the types of litigation they had personal knowledge of, either as a service provider (attorney in private practice) or as a purchaser (corporate counsel), and were engaged in recently.* "Total cost" was requested, including outside legal and paralegal services, local counsel, associates, paralegals, travel and living expenses, fees and costs for court reporters, photocopies, courier services, exhibit preparation, analytical testing, expert witnesses, translators, surveys, jury advisors, and similar expenses.

The following table reports median litigation costs for <u>Patent Infringement</u>, <u>Trademark Infringement</u>, <u>Trademark Opposition/Cancellation</u>, <u>Copyright Infringement</u>, <u>Trade Secret Misappropriation</u>, <u>Two-Party Interference</u>, and <u>Inter Partes Reexamination</u>.

| MEDIAN LITIGATION COSTS | $000s | | | |
|---|---|---|---|---|
| | 2001 | 2003 | 2005 | 2007 |
| **PATENT INFRINGEMENT SUIT** | | | | |
| LESS THAN $1 MILLION AT RISK | | | | |
| End of discovery | $250 | $290 | $350 | $350 |
| Inclusive, all costs | 499 | 500 | 650 | 600 |
| $1-$25 MILLION AT RISK | | | | |
| End of discovery | $ 797 | $1,001 | $1,250 | $1,250 |
| Inclusive, all costs | 1,499 | 2,000 | 2,000 | 2,500 |
| MORE THAN $25 MILLION AT RISK | | | | |
| End of discovery | $1,508 | $2,508 | $3,000 | $3,000 |
| Inclusive, all costs | 2,992 | 3,995 | 4,500 | 5,000 |
| | | | | |
| **TRADEMARK INFRINGEMENT SUIT** | | | | |
| LESS THAN $1 MILLION AT RISK | | | | |
| End of discovery | $102 | $150 | $200 | $150 |
| Inclusive, all costs | 230 | 298 | 300 | 255 |
| $1-$25 MILLION AT RISK | | | | |
| End of discovery | $299 | $365 | $400 | $350 |
| Inclusive, all costs | 502 | 602 | 700 | 650 |
| MORE THAN $25 MILLION AT RISK | | | | |
| End of discovery | $ 502 | $ 599 | $ 750 | $ 600 |
| Inclusive, all costs | 1,001 | 1,006 | 1,250 | 1,250 |
| | | | | |
| **TRADEMARK OPPOSITION/CANCELLATION** | | | | |
| End of discovery | $35 | $50 | $50 | $50 |
| Inclusive, all costs | 50 | 78 | 80 | 75 |
| | | | | |
| **COPYRIGHT INFRINGEMENT SUIT** | | | | |
| LESS THAN $1 MILLION AT RISK | | | | |
| End of discovery | $101 | $101 | $138 | $150 |
| Inclusive, all costs | 200 | 249 | 250 | 290 |
| $1-$25 MILLION AT RISK | | | | |
| End of discovery | $202 | $298 | $250 | $350 |
| Inclusive, all costs | 400 | 499 | 440 | 500 |
| MORE THAN $25 MILLION AT RISK | | | | |
| End of discovery | $400 | $501 | $550 | $ 550 |
| Inclusive, all costs | 750 | 950 | 975 | 1,000 |

# Exhibit 2.

PRODUCT LIABILITY AGREEMENT

Hyundai Airbag Systems

This Product Liability Agreement (this "Agreement") is made as of _OCTOBER 15, 2007_ by and between Delphi Automotive Systems, LLC ("Delphi"), and Hyundai Motor Company ("HMC").

In consideration of the mutual promises contained in this Agreement and intending to legally bind, and apply this Agreement to their Affiliates throughout the world who agree to be bound by the terms of this Agreement, Delphi and HMC agree as follows:

1.   Definitions.  As used in this Agreement, the capitalized terms set forth below will have the following meanings:

   (a)   "Affiliate" means, with respect to any given entity, any other entity that is directly or indirectly controlled by the given entity, under common control with the given entity, or in which a majority ownership interest is directly or indirectly maintained by the given entity.

   (b)   "Ambiguous Claim" means a Claim where (i) the court judgment does not clearly establish liability between Buyer and Seller, or (ii) if there is no judgment, the results of a good faith review and analysis of the underlying facts of such Claim by Buyer and Seller do not provide a reasonably sufficient basis to determine whether any existing or future Losses covered by such Claim are, or will be, Seller-Covered Losses or Buyer-Covered Losses.

   (c)   "Buyer" means HMC and its Affiliates, including its U.S. Affiliates.

   (d)   "Buyer-Covered Losses" means all Losses to the extent proximately caused by (i) improper installation, handling, maintenance or service of a HMC Airbag System and/or HMC Airbag System Component, (ii) a Component Defect or a System Nonconformance of a HMC Airbag System or HMC Airbag System Component that was designed by Seller with specific direction by Buyer or reliance on specific data or other specifications furnished by Buyer. However, when Seller negligently fails to correct or to request Buyer to correct such Component Defect or System Nonconformance because of a failure on its part to exercise the degree of due care that should be reasonably expected from an airbag supplier, such Losses are to be Seller-Covered Losses, or (iii) any independent violations of law, negligence, failure to warn or other independent action or inaction on the part of Buyer adversely affecting the proper use and performance of a HMC Airbag System and/or a HMC Airbag System Component.

(e)   "Claim" means any claim, lawsuit, action, proceeding or investigation relating to any HMC Airbag System or HMC Airbag System Components (whether such claim is based upon an allegation of strict liability, negligence, warranty, failure to warn or any other legal theory) made by a third party against any of the Parties alleging or asserting death of, or injury to, any person, or damage to property. For purposes of this Agreement, a multi-plaintiff or purported class action lawsuit will be considered to be a single Claim.

(f)   "Component Defect" means a defect in material and/or workmanship, design or manufacture of a HMC Airbag System Component manufactured and supplied by Delphi, which defect is either: (1) admitted to by Delphi; (2) established by a court judgment, through specific findings of fact, that a defect attributable to Delphi was the proximate cause of the Claim; or (3) with respect to all other Claims, established through the arbitration process set out in Section 16(c) below.

(g)   "Internal Costs" means all costs and expenses incurred internally by a Party to investigate and defend a Claim, including, without limitation, internal costs and expenses to produce documents and make employee witnesses and employee experts available for pretrial interviews, depositions, trial testimony as well as related travel, food and lodging expenses.

(h)   "HMC Airbag System" means Advanced and Depowered Airbag Systems developed by Delphi for HMC which meet the vehicle performance objectives as set forth in the applicable Customer Requirement Document ("CRD"). These systems are listed in Appendix A.

(i)   "HMC Airbag System Components" means components comprising a frontal or side Airbag System supplied by Delphi to HMC as listed in Appendix A

(j)   "Losses" means (a) the monetary settlement of a Claim or (b) a final, non-appealable monetary judgment by an arbiter of competent jurisdiction entered in connection with a Claim together, in each case, with all reasonable Out-of-Pocket Costs incurred by the Parties in connection with the investigation and defense of such Claim. Losses do not include Internal Costs related to a Claim.

(k)   "North America" means The United States and Puerto Rico, Mexico and Canada.

(l)   "Out-of-Pocket Costs" means all reasonable out-of-pocket costs and expenses incurred by a Party in investigating and defending a Claim other than Internal Costs. This would include, without limitation, reasonable outside counsel fees and reasonable fees and costs associated with retaining non-employee investigators and experts.

(m)   "Party" means Buyer and Seller on an individual basis, and "Parties" means Buyer and Seller on a collective basis.

(n)   "Seller" means Delphi and its Affiliates.

(o)   "Seller-Covered Losses" means  Losses, arising from any Claim caused by a defective HMC Airbag System or HMC Airbag Component supplied by Seller, except to the extent such Losses are considered Buyer-Covered Losses.

(p)   "Shared Losses" means Losses arising out of an Ambiguous Claim which HMC and Delphi have expressly agreed in writing to allocate between them in accordance with the provisions of Section 7 of this Agreement.

(q)   "System Nonconformance" means the failure of a HMC Airbag System to conform with the applicable specifications as set forth in the CRD, which nonconformance is either: (1) admitted to by Delphi; (2) established by a court judgment, through specific findings of fact, that a defect attributable to Delphi was the proximate cause of the Claim; or (3) with respect to all other Claims, established through the arbitration process set out in Section 16(c) below.

(r)   The use of the symbol $ denotes U.S. dollars.

2.   Application.  The provisions of this Agreement apply and relate to the HMC Airbag Systems and HMC Airbag System Components as listed in Appendix A and do not apply to any other components or products supplied by Seller to Buyer.

3.   Notice of Claims.  In the event a Party receives notice of an actual or potential Claim, or an event, accident or circumstance ("Occurrence") that may result in a Claim, the Party receiving such notice will , as soon as possible but no later than ninety (90) days, notify the other Party.  Notice will include, but not be limited to; descriptions of the Occurrence; the nature of any alleged injury or damage; and how, when and where the Occurrence took place.  In the event a Claim is made, notice will also include copies of each and every non-privileged, court-filed document relating to such Claim (whether received from a third party or prepared or filed by the Party itself), including complaints and pleadings.

4.   Product Support.  Seller will designate primary contacts for Buyer within Seller's U.S. Engineering and Legal Staffs of Delphi who will serve to facilitate and coordinate the implementation of Seller's various obligations under this Agreement.  As reasonably requested, each Party will make available, without charge, knowledgeable employees of such Party to provide (a) consultation in North America with respect to investigations of incidents which occur in North America relating to HMC Airbag Systems and/or HMC Airbag System Components, and (b) testimony at any deposition or other proceedings in North

America relating to Claims. Upon request, each Party will also promptly produce and make available all non-privileged documents and records in its possession requested by the other in investigating any incident relating to HMC Airbag Systems and/or HMC Airbag System Components, or defending any Claims. The Parties agree to seek appropriate protective orders and confidentiality agreements in those cases where confidential, proprietary or trade secret information is contained in the documents or records provided. In addition, during the pendency of any Claim, Seller and Buyer shall not take any adverse action, including third-party claims, against each other, regarding the Claim at issue; provided, however, that each Party may take any action to enforce the terms of this Agreement.

5.  <u>Defense and Settlement.</u>  Buyer will assume the defense of all Claims subject to reasonable consultation with Seller. Buyer shall have the full authority to settle all Claims for which (a) the sole relief is monetary damages that are paid in full by Buyer or (b) there is no finding or admission of any violation of law or the rights of any person by Seller. Neither Buyer nor Seller will settle any Claim that might give rise to liability of the other without first consulting with the other Party and providing the other Party with reasonable notice, but in no event less than twenty-one (21) days. At Seller's expense, Seller (and at Seller's discretion, Seller's insurers) will be given the opportunity to participate in the settlement, defense and trial of any Claim.

6.  <u>Indemnification</u>
    (a) In the event a judgment is entered on a Claim, clearly establishing Losses covered by Seller-Covered Losses, Delphi will promptly indemnify and hold Buyer harmless from and against all Seller-Covered Losses with respect to any single Claim in excess of $50,000 paid by Buyer to a claimant. In no event will Seller be liable for consequential damages, indirect costs or lost profits to Buyer or its distributors arising out of any events or circumstances giving rise to any Seller-Covered Losses.

    (b) In the event a judgment is entered on a Claim, clearly establishing Losses covered by Buyer-Covered Losses, HMC will promptly indemnify and hold Seller harmless from and against all Buyer-Covered Losses in excess of $50,000 paid by Seller to a claimant of a Claim. In no event will Buyer be liable for consequential damages, indirect costs or lost profits to Seller or its Affiliates arising out of any events or circumstances giving rise to any Buyer-Covered Losses.

    (c) In the following event, a Claim shall be treated as an Ambiguous Claim and resolved as set forth below in Section 7.

        1) when Buyer settles a Claim (in accordance with the terms of this agreement); or
        2) when a Claim is dismissed after substantial expenses have been incurred; or

3) when a defense verdict is entered on a Claim, but the court judgment does not establish the existence of a defect.

7.    In the event of an Ambiguous Claim, Delphi and HMC will allocate responsibility for Shared Losses between themselves. The decision to treat any Losses as Shared Losses and the determination of the specific percentage allocation of responsibility for such Shared Losses between Delphi and HMC will be made on a case-by-case basis through good faith negotiations based on all of the facts and circumstances of such Ambiguous Claim, provided, however, that Delphi and HMC will consider the general criteria for distinguishing Buyer-Covered Losses and Seller-Covered Losses, as well as the severity of injuries allegedly caused by such criteria. In addition, HMC acknowledges that it will be responsible for and pay the first $50,000 of any Shared Loss arising from any Ambiguous Claim. Neither Party shall be liable for consequential damages, indirect costs or lost profits to the other Party or its Affiliates arising out of any events or circumstances giving rise to any Shared Losses.

8.    Recoveries from Third Parties. Each Party will, upon request, cooperate with and assist the other Party and its insurers, in the enforcement of any right against any person or organization that may be liable to the Party because of a Claim.

9.    Indemnification for Shared Losses.   Delphi and HMC will each indemnify and hold the other harmless from any Shared Losses under Section 7, in accordance with their respective percentage allocation of responsibility for such Shared Losses.

10.    Calculation of Indemnification Payments. All amounts which a Party is required to pay to any other Party pursuant to this Agreement shall be calculated on an after-tax basis, taking into account the net present value of any tax cost and tax benefit to the indemnified Party in connection with such indemnification payment.

11.    Recalls. Recalls (including service campaigns) are subject to the terms and conditions of the Basic Agreement, Quality Assurance Agreement and Claim Compensation Agreement which separately were concluded on January 1, 2002 between Delphi and HMC.

12.    Further Assurances. The parties agree to (a) execute and deliver to each other such other documents and (b) do such other acts and things, all as they may reasonably request for the purpose of carrying out the intent of this Agreement.

13.    Governing Law. This Agreement shall be governed by and construed according to the laws of the State of California without application of conflict of law principles and specifically excluding application of the U.N. Convention on Contracts for the International Sale of Goods.

14.    Dispute Resolution. The Parties shall resolve all disputes arising under this Agreement as set forth below. Failure of one Party to comply with the time

periods set forth herein or in the rules referenced herein shall permit the other Party to proceed to next level of dispute resolution described below.

(a)  Negotiation. Buyer and Seller will, in the first instance, attempt to settle any and all disputes between them arising in connection with this Agreement by good faith negotiations. If any disputes between Buyer and Seller are not settled within twenty-eight (28) days after the first notice of a claim is sent by either party, Buyer and Seller will jointly refer the dispute to their respective senior management for decision. If senior management cannot agree within twenty-eight (28) days of the referral, either Buyer or Seller may elect to mediate the dispute in accordance with Section 14(b) below.

(b)  Mediation. After compliance with the above, either Buyer or Seller may elect to utilize a nonbinding resolution procedure whereby Buyer and Seller each presents its case at a hearing before an independent third-party mediator, in accordance with the current International Mediation Rules of the American Arbitration Association ("AAA"). The mediation shall take place in the Los Angeles, California area. Either Party may commence mediation by providing to AAA and the other Party a written request for mediation, setting forth the subject of the dispute and the relief requested. The parties will cooperate with AAA and with one another in selecting a mediator from AAA panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. Except for an action to obtain equitable relief, neither Party may commence a civil action with respect to the matters submitted to mediation until after the completion of the initial mediation session, or forty-five (45) days after the date of filing the written request for mediation, whichever occurs first. Mediation may continue after the commencement of a civil action, if the parties so desire. The provisions of this Section may be enforced by any Court of competent jurisdiction, and the Party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the Party against whom enforcement is ordered. The third-party mediator shall render his/her opinion as to how the matter would be resolved had the mediation proceedings been a court applying the law that applies to the particular dispute at issue. After senior management representatives of each Party receive the opinion, they will meet and try again to resolve the matter.   If the matter cannot be resolved at within fourteen (14) days of the conclusion of the mediation, either Buyer or Seller may request submission of the matter to binding arbitration in accordance with Section 14(c) below.

(c)  Arbitration. Unless otherwise agreed to by the Parties, the arbitration will be administered according to the International Arbitration Rules of the AAA effective May 1, 2006. In the event of any conflict between the AAA rules and this Agreement, the provisions of this Agreement will govern (provided no state law modifying the procedural rules of AAA will be modified by the application of the choice of law provision herein).  The arbitration

proceedings will take place in the Los Angeles, California area and will be conducted in English. Arbitration (and the enforcement of the decision) under this Section 14(c) is subject to the Federal Arbitration Act, 9 U.S.C.A. Section 1 et. seq. (the "Act"), provided the provisions of the Act will not act to modify the provisions in this Agreement of the AAA Rules referenced above. The arbitration award will be final and binding upon both Buyer and Seller, and judgment thereon may be entered in any court having jurisdiction over the Party against whom enforcement is sought or such Party's property, and application may be made to such court for judicial acceptance of the award and an order of enforcement (or both).

   (d)   Setoff. Both parties waive any right of setoff they may have with respect to the subject matter of this Agreement.

15.   In exchange for Seller's obligations under this Agreement, Buyer shall pay Seller a premium of 3.5% on the agreed price of all Airbag System Components sold by Seller to Buyer.

16.   No Agency: This Agreement does not cause or permit any Party to be the agent or legal representative of any other Party.

17.   Notices. Notices under this Agreement must be in tangible written form (letter, facsimile, e-mail or telegram) and will be effective when received by the addressee at its address indicated below. However, no facsimile or e-mail notice shall be deemed communicated until telephone confirmation of receipt by the individual addressee is received.

   (a)   Notices sent to Seller must be addressed as follows:

Delphi Automotive Systems, LLC
5825 Delphi Drive
Troy, Michigan 48098- 2815
USA
Attn:   James G. Derian
Facsimile: 1-248-813-1122

with a copy to:

Dae Un Lee
Delphi Korea Corporation
5-30, Bangya-Ri, Munmak-Eup, Wonju-City
Kwangwon-Do, Korea,220-805
Facsimile:  (82)33-730-2209

7-13

(b)    Notices sent to Buyer must be addressed as follows:

Hyundai Motor Company
231, Yangjae-Dong, Seocho-Gu,
Seoul, Korea
Attn:   Jeong G. Seo
Facsimile:    82-2-3464-3423

with a copy to:

Thomas N. Vanderford, Jr.
Assistant General Counsel
Hyundai Motor America
10550 Talbert Avenue
Fountain Valley, CA 92708
U.S.A.
Facsimile:    1-714-965-3815

(c)    The Parties by notice hereunder may designate other addresses to which
notices will be sent.

18.    Amendments.  No amendment to this Agreement will be binding upon any Party
unless it is in writing and is signed by a duly authorized representative of Delphi and
HMC.

19.    Parties in Interest.  This Agreement shall be binding upon and inure solely to the
benefit of each party hereto and their legal representatives and successors, and
each Subsidiary and each Affiliate of the parties hereto that agrees to be bound by
the terms of this Agreement.  No Party may assign any of its rights or delegate any of
its obligations under this Agreement without the prior written consent of Delphi and
HMC.  Nothing in this Agreement, express or implied, is intended to confer upon any
other Person any rights or remedies of any nature whatsoever under or by reason of
this Agreement.

20.    Assignment.  This Agreement binds and inures to the benefit of the Parties and their
respective successors, but no rights, interests or obligations of Buyer or Seller may
be assigned without the prior written consent of the other.

21.    Headings.  Captions and headings in this Agreement are for convenience of
reference only, and do not affect or vary the meaning of its substantive provisions.

22.    Entire Agreement.  This Agreement is the entire agreement between the Parties
with respect to its subject matter.  All prior understandings and agreements
regarding the subject matter of this Agreement are superceded by this Agreement.

23.   Counterparts. This Agreement may be executed in separate counterparts, each of which when so executed and delivered will be an original, but all of which counterparts will together constitute one and the same instrument.

24.   Severability. If any term or provision of this Agreement, or the application thereof to any person or circumstance, shall be contrary to law or shall be adjudged by any court or government agency of competent jurisdiction to be invalid, void or unenforceable, such term or provision shall be deemed deleted from this Agreement and the remaining provisions and any application thereof shall continue in full force and effect.

25.   Corporate Authority. The persons executing this Agreement of behalf of the Parties warrant that they are duly authorized to execute this Agreement on behalf of said Parties and that by so executing this Agreement such Party is formally bound to the provisions of this Agreement.

26.   Term. This Agreement, notwithstanding the actual date of signature, will be deemed to have commenced effective as of the 1st day of June, 2004 and will continue to be effective until terminated by the parties based on mutual agreement. Each party's indemnification obligation will continue for all "HMC Airbag System" and "HMC Airbag System Components" supplied prior to the termination date.

EXECUTED by Delphi and HMC by their duly authorized representatives effective as of the date first set forth above.

For and on behalf of
Hyundai Motor Company
and its Affiliates

For and on behalf of
Delphi Automotive Systems, LLC
and its Affiliates

Seung-Hwan Ko
Executive Vice President

Jeffrey J. Owens
President
Delphi Electronics & Safety

Delphi Korea Corporation hereby agrees to all terms and conditions set forth in this Agreement.

Delphi Korea Corporation

Dae Un Lee
President

Date: _____

Appendix A    Airbag Systems Developed by Delphi for HMC

| HMC Platform | Applicable Airbag System(s) | Start of Production | Remarks |
|---|---|---|---|
| JM | Frontal | 1-Jun-04 | |
| TG | Frontal | 1-Jul-05 | |
| CM | Frontal | 15-Jan-05 | |
| GK-F/LFT | Frontal | 19-Oct-06 | |
| BH | Frontal | 1-Jun-06 | |
| VI | Frontal | 1-Nov-09 | |
| SK | Frontal | 1-Dec-08 | |
| PO | Frontal | 1-Nov-09 | |
| All future platforms | Any airbag systems developed by Delphi for HMC | SOP date for each respective platform | |