# Exhibit A

## FIRST AMENDMENT TO
## MASTER DISPOSITION AGREEMENT

This FIRST AMENDMENT TO MASTER DISPOSITION AGREEMENT, dated as of July 2, 2009 (the "Amendment"), is made and entered into by and among DELPHI CORPORATION, a Delaware corporation ("Delphi") on behalf of itself and the other entities set forth on Schedule 1 and Schedule 2 to the Agreement (as defined below); GM COMPONENTS HOLDINGS, LLC, a Delaware limited liability company ("Parent"), on behalf of itself and the other buyers set forth on Schedule 1 to the Agreement (each a "GM Buyer," and, collectively with Parent and the Australian Buyer (as defined in the Agreement), the "GM Buyers"); GENERAL MOTORS CORPORATION, a Delaware Corporation ("GM") (solely with respect to ARTICLE 6 and Sections 9.11.1, 9.19, 9.38.1 and 9.38.2 of the Agreement); PARNASSUS HOLDINGS II, LLC, a Delaware limited liability company on behalf of itself and the other buyers that may later be set forth on Schedule 2 as provided in the Agreement ("Company Buyer," and collectively with the GM Buyers, the "Buyer" or "Buyers").

## W I T N E S S E T H

WHEREAS, the parties have entered into a Master Disposition Agreement, dated as of June 1, 2009, as revised on June 16, 2009 (the "Agreement");

WHEREAS, on June 16, 2009, the Bankruptcy Court entered the Modification Procedures Order (as hereinafter defined) which provided for the procedures for, among other things, the filing of this Amendment with the Bankruptcy Court;

WHEREAS, the parties desire to amend the Agreement as set forth herein; and

WHEREAS, this Amendment is the Section 363 Implementation Agreement referred to in the Agreement;

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Amendment, and subject to the conditions set forth herein, the parties hereto agree as follows:

1.    <u>Definitions</u>.  Capitalized terms used but not otherwise defined in this Amendment shall have the respective meanings ascribed thereto in the Agreement.

2.    <u>Immediately Effective Amendments</u>.

    (a)    <u>Definitions</u>.

        (i)    The definition of "Competing Transaction" in Section 1.1 is hereby deleted in its entirety.

        (ii)    The definition of "Modification Procedures Order" in Section 1.1 is hereby deleted in its entirety and the following is inserted in place thereof:

"**Modification Procedures Order**" means that certain Order (A)(I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense Claims Bar Date And Alternative Transaction Hearing Date, as entered by the Bankruptcy Court on June 16, 2009, as amended and supplemented by the Order Amending And Supplementing (i) Order (A)(I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense Claims Bar Date And Alternative Transaction Hearing Date (Docket # 17032) And (ii) The Protective Order Governing Production And Use Of Confidential And Highly Confidential Information In Connection With (A) Supplement To Plan Modification Approval Motion And (B) Supplement To GM Arrangement Fourth And Fifth Amendment Approval Motion (Docket No. 16920), entered by the Bankruptcy Court on June 29, 2009.

(b)  <u>Rootstown, Ohio Technical Center</u>.  The following is inserted as a new Section 11.3.11:

Delphi and the applicable Company Buyer will enter into a month-to-month lease for a maximum term of three years for the Rootstown, Ohio technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for the Company Buyer to pay its pro rata share of costs on a triple net basis, plus $41,666.67 per month. During the term of such lease, the applicable Company Buyer shall not sell or otherwise dispose of any of such Personal Property.

(c)  Section 9.40 is hereby amended to replace the words "Competing Transaction" with the words "transaction described in this <u>Section 9.40</u>."

(d)  <u>Schedule Revisions</u>.  Schedule 2.1.5.F is hereby amended by including a reference to "Rootstown, Ohio."

3.  Other than with respect to the amendments contained in Section 2 of this Amendment, which amendments to the Agreement shall become effective immediately upon execution of this Amendment, the following amendments to the Agreement will become effective without any further action by any of the parties if and when the Bankruptcy Court, instead of approving the Agreement as a plan modification under section 1127 of the Bankruptcy Code, (a) conducts a hearing on the sale, as set forth in the Agreement, of Delphi's and the Filing Affiliates' assets under section 363 of the Bankruptcy Code, and (b) enters a section 363 sale order, which shall be in form and substance reasonably acceptable to the parties hereto, approving the Agreement and authorizing Delphi and the Filing Affiliates to perform thereunder:

2

(a)    <u>Recitals</u>.

    (i)    The ninth recital is hereby deleted in its entirety and the following is inserted in place thereof:

        WHEREAS, in furtherance of that desire and as contemplated by Sections 363 and 1146 of the Bankruptcy Code and in furtherance of the Filing Affiliates' efforts to consummate a restructuring transaction to maximize value for their stakeholders, the GM Securities Sellers, Company Securities Sellers, the GM Asset Sellers and Company Asset Sellers desire to sell or cause the sale to the applicable Buyers all of their respective right, title and interest in and to the GM Sale Securities, the Company Sale Securities, GM Acquired Assets (as hereinafter defined) and the Company Acquired Assets (as hereinafter defined), and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

(b)    <u>Definitions</u>.

    (i)    The definition of "Excluded Facilities" in Section 1.1 is hereby deleted in its entirety and the following is inserted in place thereof:

        "**Excluded Facilities**" – <u>Section 2.1.5.E.</u>

    (ii)    The definition of "Plan Modification Order" in Section 1.1 is hereby deleted in its entirety and the following is inserted in place thereof:

        "**Plan Modification Order**" – <u>Section 9.2.1</u>.

    (iii)    The following language is deleted from the end of the definition for "Transferred Insurance Policies" in Section 1.1.:

        ", but excluding those set forth on Schedule 1.1.D"

    (iv)    The definition of "Plan of Reorganization" or "Plan" in Section 1.1 is hereby deleted in its entirety and the following is inserted in place thereof:

        "**Plan of Reorganization**" or "**Plan**" means the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, dated December 10, 2007, as modified on January 25, 2008 and June 16, 2009, including all schedules and exhibits thereto.

    (v)    The following definitions are hereby deleted in their entirety from Section 1.1:

        "**Pending Transactions IP License Agreement**"

**"Plan of Reorganization Documents"**

(vi)    The following are added as new definitions in Section 1.1:

**"Chapter 11 Cases"** shall mean the chapter 11 cases of the Filing Affiliates pending in the Bankruptcy Court and being jointly administered with one another under Case No. 05-44481, and the phrase "Chapter 11 Case" when used with reference to a particular Filing Affiliates shall mean the particular case under Chapter 11 of the Bankruptcy Code commenced by such Filing Affiliates in the Bankruptcy Court.

**"Company Acquired Facilities"** – <u>Section 2.1.4.C.</u>

**"Company Buyer Releasors"** means Company Buyer, each of its Affiliates, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

**"Company Buyer Released Parties"** means Company Buyers and their Affiliates, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

**"Delphi Affiliate Parties"** means the Filing Affiliates, the estates of the Filing Affiliates as created under Bankruptcy Code section 541, the Delphi HRP, the Delphi Health Care Program for Hourly Employees, the Delphi Life and Disability Benefits Program for Hourly Employees, any other Delphi pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

**"Delphi-Related Parties"** means Affiliates of the Filing Affiliates (other than the Delphi-Related Parties), and each of such Affiliate's current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

**"GM Releasors"** means GM, each of its Affiliates, the General Motors Hourly-Rate Employees Pension Plan, the GM Health Care Program for

4

Hourly Employees, the GM Life and Disability Benefits Program for Hourly Employees, any other GM pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

"**GM-Related Parties**" shall mean GM, Parent, each of their Affiliates, the General Motors Hourly-Rate Employees Pension Plan, the GM Health Care Program for Hourly Employees, the GM Life and Disability Benefits Program for Hourly Employees, any other GM pension or welfare benefit plan, and each of their respective current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities) in their respective capacities.

(c)     <u>Purchase and Sale</u>.

(i)     <u>Real Property</u>.  Section 2.1.4.C is hereby deleted in its entirety and the following is inserted in place thereof:

C.     Company Real Property and the manufacturing facility located at each of East Flint, Michigan and Rootstown, Ohio and all Real Property and Personal Property related thereto (the "**Company Acquired Facilities**");

(ii)    Permits.  The following language is hereby added to the end of Section 2.1.4.H:

"or the Company Acquired Facilities"

(iii)   <u>Wage Escrow</u>.  The following language is hereby added to the end of Section 2.1.4.U:

"and wage escrow accounts applicable to Non-Transferred Hourly Employees at the sites included in the Company Acquired Facilities, and the funds therein shall be applied for the purposes for which such wage escrow accounts have been established"

(iv)    <u>Additional Company Acquired Assets</u>.  The following are inserted as new Sections 2.1.4.W through 2.1.4.BB:

W.     <u>Tax Refunds</u>.  All refunds, credits, prepayments or deferrals of or against any Taxes, including deferred Taxes of any nature, in each case that relate to the Company Acquired Assets and relate to periods or portions thereof prior to the Closing; <u>provided</u> that, in no event, shall GM Buyer be required to make a payment to the Company Buyer with respect

5

to any of the foregoing other than providing to the Company Buyer any Tax refunds received by the GM Buyer with respect to Taxes paid by the Company Buyer or its Affiliates or refundable tax credits with respect to a period prior to the Closing.

X.      <u>Pending Transactions</u>.  All of Sellers' Pending Transactions as set forth on <u>Schedule 2.1.4.X</u>, other than the proceeds relating to the brakes and suspension business and exhaust business.

Y.      <u>Other Acquired Assets</u>.  The assets listed on <u>Schedule 2.1.4.Y</u>.

Z.      <u>Filing Affiliate Receivables</u>.  Intercompany receivables due from Filing Affiliates to other Filing Affiliates (other than trade receivables acquired by GM Buyer hereunder).

AA.     <u>Tax Returns</u>.  All Tax Returns of any Asset Seller for time periods prior to Closing, and related work papers.

BB.     <u>Bankruptcy Rights</u>.  All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions including avoidance actions and arising under such Sections by operation of law or otherwise, including without limitation any and all proceeds of the foregoing.

(v)    <u>Excluded Assets</u>.

(1)     Sections 2.1.5.D, 2.1.5.G, 2.1.5.J,  2.1.5.K, 2.1.5.L and 2.1.5.M are hereby deleted in their entirety.

(2)     Section 2.1.5.B is hereby deleted in its entirety and the following is inserted in place thereof

B.      <u>Insurance Policies</u>.  All Insurance Policies related solely to the other Excluded Assets or director and officer liability; <u>provided, however,</u> that Buyers and Sellers will be named as an additional named insured on any such Insurance Policies to the extent they cover any of the Acquired Assets of such Buyer or relate to any Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer and Buyers will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Acquired Assets of such Buyer or Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely

affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured.

(3)     The following language is deleted from Section 2.1.5.C:

", all Tax Returns of any Asset Seller for time periods prior to Closing, and related work papers."

(4)     Section 2.1.5.E is hereby deleted in its entirety and the following is inserted in place thereof:

D.     <u>Personnel Records</u>.  All work histories, personnel and medical records of employees and former employees of any Asset Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, the GM Buyers will be provided the originals of all personnel and medical records of all applicable Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if the Asset Sellers so elect and the Company Buyer will be provided with the originals of all personnel and medical records of all other employees and former employees.  Upon written request of the Asset Sellers (or an Affiliate of Sellers), and to the extent required by Law, Buyer will promptly return or cause to be returned any and all of these records to the Asset Sellers (or an Affiliate of the Asset Sellers as directed) at which time the Asset Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer(s) with copies of the personnel and medical records to such Buyer; provided, no such records will be provided unless the Asset Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local Law without material adverse consequences to the Asset Sellers or to any Affiliate of the Asset Sellers.

(5)     Section 2.1.5.F is hereby deleted in its entirety and the following is inserted in place thereof:

E.     <u>Excluded Facilities</u>.  All Real Property (including any improvements located thereon) listed in <u>Schedule 2.1.5.E</u> (the "**Excluded Facilities**") and personal property and other assets located at the Excluded Facilities.

(6)     Section 2.1.5.H is hereby re-labeled as Section 2.1.5.F.

(7)    Section 2.1.5.I is hereby re-labeled as Section 2.1.5.G.

(vi)    <u>GM Assumed Liabilities</u>. Section 2.2.1(D)(ii) is hereby deleted in its entirety and the following is inserted in place thereof:

(ii)    For each GM Buyer, (i) the real and personal property Taxes with respect to the GM Acquired Assets to be acquired by it, but only to the extent not exempted by the Plan Modification Order (ii) any other Taxes with respect to the GM Business to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, including withholding, FICA and FUTA Taxes related to the employees of the GM Business, and (iii) to the extent that payroll services were provided by or through GM and the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, withholding, FICA and FUTA Taxes related to the employees of the Company Business;

(vii)    <u>Company Assumed Liabilities</u>.

(1)    Section 2.2.2(C)(ii) is hereby deleted in its entirety and the following is inserted in place thereof:

(ii)    For the Company Buyer, (i) real and personal property Taxes with respect to the Company Acquired Assets, but only to the extent not exempted by the Plan Modification Order and (ii) to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, any other Taxes with respect to the Company Business, including withholding, FICA and FUTA Taxes related to the employees of the Company Business, unless such Taxes are assumed pursuant to <u>Section 2.2.1.D(ii)</u>.

(2)    The following is inserted as new Sections 2.2.2.D and 2.2.2.E:

D.    Intercompany payables due to Filing Affiliates from Filing Affiliates (other than trade payables).

E.    Liabilities set forth on <u>Schedule 2.2.2.E</u>.

(viii)    <u>Retained Liabilities</u>.

(1)    The following is inserted at the beginning of Section 2.3.1:

Other than the Claims to be assumed by Company Buyer pursuant to Section 2.2.2.E,

(2)    The following is inserted at the end of Section 2.3.1:

related to Excluded Assets and Excluded Facilities.

(3)    Section 2.3.4 is hereby deleted in its entirety.

(4)    Section 2.3.5 is hereby renumbered as Section 2.3.4.

(d)    <u>Purchase Price</u>.

    (i)    <u>GM Purchase Price</u>.

        (1)    The following is hereby added to the end of Section 3.1.1.E: ";
and"

        (2)    Section 3.1.1.F is hereby deleted in its entirety.

        (3)    Section 3.1.1.G is hereby deleted in its entirety and the following is
inserted in place thereof:

> F.      50% of professional fees (not to exceed $15,000,000 as the payment from the GM Buyer) that are Administrative Claims required in accordance with the terms of such Administrative Claims to be paid in cash (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation with respect to seeking approval for such Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to this Section 3.1.1.G, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

        (4)    Section 3.1.3 is hereby deleted in its entirety and the following is
inserted in place thereof:

> Following the Closing, GM Buyer shall pay to the DIP Agent on behalf of the C Lenders up to $145,510,040 (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) of the net proceeds that are recovered in connection with the pursuit of the Appaloosa Claim.

    (ii)    <u>Company Purchase Price</u>.

        (1)    Section 3.2.3 is hereby deleted in its entirety.

        (2)    Section 3.2.4 is hereby deleted in its entirety and the following is
inserted in place thereof:

3.2.3.  50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required in accordance with the terms of such Administrative Claims to be paid in cash (excluding the costs of solicitation of approval for the Plan of Reorganization).

(e)    <u>Covenants and Agreements</u>.

(i)    <u>Assumed Contracts; Cure Amounts</u>.

(1)    The first sentence of Section 9.3 is hereby deleted in its entirety and the following is inserted in place thereof:

Pursuant to the Plan Modification Motion, Delphi has moved to assume and assign to the applicable Buyers the Pre-Petition Contracts listed on Schedule 9.3 and assign the Post-Petition Contracts to the applicable Buyer (collectively, the "**Assumed and Assigned Contracts**") and will provide notice thereof to the Contract counterparties and all other parties in accordance with the Modification Procedures Order and all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.

(2)    The last sentence of Section 9.3 is hereby deleted in its entirety and the following is inserted in place thereof:

The Plan Modification Order shall provide for a mechanism reasonably satisfactory to the applicable Buyer to ensure that those Contracts to be assumed and assigned to such Buyer at Closing are actually assigned to such Buyer at Closing notwithstanding any contested Cure Amounts; <u>provided</u> that the applicable Buyer shall establish an escrow account funded with cash sufficient to pay the face amount of the disputed Cure Amounts asserted, the excess funds of which shall be returned to such Buyer as Cure Amounts are resolved.

(ii)    <u>Severance</u>.  Section 9.5.11.B(ii) is hereby deleted in its entirety and the following is inserted in place thereof:

(ii)    from and after the Closing, each of Company Buyer and GM Buyer agree to pay to such person or persons 50% of the amount of any cash payments that Seller would have otherwise owed to any such terminated U.S. Employees but in no event more than would be payable under the Delphi severance program in effect as of May 1, 2009;

(iii)    <u>Pending Transaction Licenses</u>.  Section 9.9.4 is hereby deleted in its entirety and the following is inserted in place thereof:

10

A.      In the event that a Pending Transaction fails to be completed and is terminated and Company Buyer decides that it will not seek a new purchaser of the assets subject to such Pending Transactions, subject to any rights granted under any contract with any Company Buyer, and contingent upon closing of this Agreement, Company Buyer grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Company Buyer and Company Buyer's Affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products sold to GM Buyers by the business which was the subject of the failed Pending Transaction.

B.      In the event that, in connection with the operation of the business of a Pending Transaction, there is a breach of a current supply commitment to GM or any of its Affiliates under circumstances where such breach threatens to interrupt supply to GM or any GM Affiliate, then, subject to any obligations under any existing contract with any Company Buyer and contingent upon closing of this Agreement, Company Buyer grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Company Buyer and Company Buyer's affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products subject to the threatened interruption of supply.  The rights set forth in this paragraph shall lapse if a Pending Transaction is consummated according to an existing court approved agreement related to the Pending Transaction or a party that is or becomes an approved supplier of GM acquires the business of the Pending Transaction.

(iv)    <u>Licenses Generally</u>.  Section 9.9.5(i) is hereby deleted in its entirety and the following is inserted in place thereof:

(i) Each Party shall make all Shared Intellectual Property available to each other Party and to the Seller if necessary for the continued operation, if any, of Sellers, by delivering to such other Party all Other Technical Documentation and other technical information in its  possession reasonably necessary to continue the other Party's Business or of a Pending Transaction.

(v)     <u>Termination of Certain Agreements</u>.  The last two sentences of Section 9.19.2 are hereby deleted in their entirety and the following is inserted in place thereof:

Notwithstanding the foregoing, GM agrees to pay to the Company Buyer

or its Affiliate or assignee , and not Delphi, any and all amounts otherwise due to Delphi which accrue under the MRA for periods prior to Closing regardless of the date on which such amounts become due under the terms of the MRA.  In addition, GM shall continue to be responsible for the payment of all costs and amounts due under the MRA with respect to the Athens Facility (as defined in the MRA), and such payments shall be made to Company Buyer for application to the costs that were intended to be covered hereby.

(vi)    Pending Transactions.  Section 9.36 is hereby deleted in its entirety and the following is inserted in place thereof:

**9.36    Pending Transactions.**

In the event that any of the Pending Transactions are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the Pending Transactions under the applicable sale and related agreements, including the Transition Services Agreement.

(vii)    Environmental Matters.  The third sentence of Section 9.39 is hereby deleted in its entirety and the following is inserted in place thereof:

Seller and its Affiliates shall use commercially reasonable efforts to discharge in the Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have.

(viii)    Non-Solicitation.  The proviso in Section 9.40 is hereby deleted in its entirety and the following is inserted in place thereof:

provided, however, that nothing in this Agreement shall prevent or restrict Delphi's Board of Directors from taking actions (or directing management to take actions) which (i) the Board reasonably believes are required by their fiduciary duties (taking into account the advice of counsel in appropriate circumstances) or (ii) are in accordance with the Modification Procedures Order

(ix)    Employment, Retirement, Indemnification, and Other Agreements, and Incentive Compensation Programs.  The references in Section 9.41 to "the effective date of the Plan of Reorganization" are here by deleted and replaced by references to "the Closing Date."

(x)    Prosecution and Settlement of Appaloosa Claim.  Subsection (ii) of Section 9.43 is hereby deleted in its entirety and the following is inserted in place thereof:

(ii) GM and GM Buyer shall not consent to the entry of any judgment with

12

respect to the Appaloosa Claim or enter into any settlement with respect thereto, in each case for an amount that would be less than $145,510,040 of the net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) from the Appaloosa Claim (the "**Threshold**"), without the prior written consent of Delphi which shall not be unreasonably withheld; provided, that Delphi may not withhold its consent unless it agrees within 20 days of the request for consent to pay all costs and expenses associated with of the continuing prosecution of the Appaloosa Claim and demonstrates to GM's and GM Buyer's reasonable satisfaction the ability to fund such costs and expenses; provided, further, that Delphi shall not have any right to consent to the entry of any judgment with respect to the Appaloosa Claim or any settlement with respect thereto if the C Lenders would receive an amount from such settlement equal to or greater than the Threshold;

(xi)    Releases.  The following is added as a new Section 9.44:

**9.44    Releases.**

9.44.1  GM Release.  The GM Releasors agree that effective as of the Closing Date, the release in Section 4.02 of the GSA will be extended from the Effective Date (as defined in the GSA) to the Closing Date.

9.44.2  Seller Release of GM.  The Delphi-Related Parties and the Delphi Affiliate Parties agree that effective as of the Closing Date, the release in Section 4.01 of the GSA will be extended from the Effective Date (as defined in the GSA) to the Closing Date.  Notwithstanding the foregoing, the releases in this Section 9.44.2 shall not release the GM-Related Parties from obligations set forth in this Agreement and obligations under agreements entered into in connection with this Agreement.  Moreover, this release shall not release the GM-Related Parties from any obligations under any agreement of Delphi or its Affiliates being assigned to GM-Related Parties under this Agreement.

9.44.3  Company Buyer Release.

A.      The Company Buyer Releasors agree that effective as of the Closing Date, the Delphi-Related Parties shall be forever released by the Company Buyer Releasors from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Company Buyer Releasors ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Closing Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related Parties, including without limitation claims based in whole or in part upon any act or omission, transaction, agreement, event, action, or

other occurrence taking place or failing to take place on or before the
Closing Date related to (i) the Chapter 11 Cases, or (ii) the formulation,
preparation, negotiation, dissemination, confirmation (if applicable), or
consummation (if applicable, but, in any event, not performance) of the
Plan, the Disclosure Statement, this Agreement (as amended), or any
contract, instrument, or other agreement or document created, modified,
amended, or entered into in connection with any of the foregoing.  The
releases provided for in this Section 9.44.3.A shall include any and all
claims that any of the Company Buyer Releasors have or would have been
legally entitled to assert in their own right (whether individually or
collectively) and shall be effective against any person or entity that would
have been legally entitled to assert such claim derivatively or otherwise on
behalf of any of the Company Buyer Releasors.

B.      Company Buyers agrees that effective as of the Closing Date, the
Delphi Affiliate Parties shall be forever released by the Company Buyer
Releasors from any and all claims, debts, obligations, rights, suits,
damages, actions, causes of action, remedies, and liabilities whatsoever,
which the Company Buyer Releasors ever had, now have, or hereafter
may have, whether known or unknown, liquidated or unliquidated,
contingent or noncontingent, asserted or unasserted, foreseen or
unforeseen, (whether based in whole or in part upon any act or omission,
transaction, agreement, event, action, or other occurrence taking place or
failing to take place on or before the Closing Date, existing as of the
Closing Date,) in law, at equity, or otherwise, that are related to (i) the
Chapter 11 Cases, (ii) the formulation, preparation, negotiation,
dissemination, confirmation(if applicable), or consummation (if applicable,
but, in any event, not performance) of any Plan, the Disclosure Statement,
this Agreement (as amended), or any contract, instrument, or other
agreement or document created, modified, amended, or entered into in
connection with any of the foregoing, or (iii) any obligation of the Delphi
Affiliate Parties which is directly related to any obligation which is being
released by Company Buyer Releasors pursuant to Section 9.44.e.A of this
Agreement.  The releases provided for in this Section 9.44.e.B include any
and all claims that any of the Company Buyer Releasors have or would
have been legally entitled to assert in its own right (whether individually
or collectively) and shall be effective against any person or entity
(including without limitation, any holder of a claim against or equity
interest in any of the Company Buyer Releasors) that would have been
legally entitled to assert such claim derivatively or otherwise on behalf of
any of the Company Buyer Releasors.

C.      Notwithstanding the foregoing, the releases in this Section 9.44
shall not release the Sellers from obligations set forth in this Agreement
and obligations under agreements entered into in connection with this
Agreement.  Moreover, this release shall not release Company Buyer from

any obligations under any agreement of Delphi or its Affiliates being assigned to Company Buyer under this Agreement.

9.44.4  <u>Seller Release of Company Buyer</u>.

A.      Delphi agrees that effective as of the Closing Date, the Company Buyer Released Parties shall be forever released by the Delphi-Related Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Delphi-Related Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Closing Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Company Buyer Released Parties, including without limitation claims based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Closing Date related to (i) the Chapter 11 Cases, or (ii) the formulation, preparation, negotiation, dissemination, confirmation (if applicable), or consummation (if applicable, but, in any event, not performance) of the Plan, the Disclosure Statement, this Agreement (as amended), or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing.  The releases provided for in this <u>Section 9.44.4.A</u> shall include any and all claims that any of the Delphi-Related Parties have or would have been legally entitled to assert in their own right (whether individually or collectively) and shall be effective against any person or entity that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Delphi-Related Parties.

B.      Delphi agrees that effective as of the Closing Date, the Company Buyer Released Parties shall be forever released by the Delphi Affiliate Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Delphi Affiliate Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, (whether based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Closing Date, existing as of the Closing Date,) in law, at equity, or otherwise, that are related to (i) the Chapter 11 Cases, (ii) the formulation, preparation, negotiation, dissemination, confirmation (if applicable), or consummation (if applicable, but, in any event, not performance) of any Plan, the Disclosure Statement, this Agreement, or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the

foregoing, or (iii) any obligation of the Company Buyer Released Parties which is directly related to any obligation which is being released by Delphi Affiliate Parties pursuant to Section 9.44.4.A of this Agreement. The releases provided for in this Section 9.44.4.B include any and all claims that any of the Delphi Affiliate Parties have or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity (including without limitation, any holder of a claim against or equity interest in any of the Delphi Affiliate Parties) that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Delphi Affiliate Parties.

(xii)    Wind Up Costs.  The following is added as a new Section 9.45:

**9.45    Wind Up Costs.**

At Closing, GM shall pay certain expenses of Company Buyer or its Affiliate or assignee following the Closing consistent with Exhibit 9.45 and that certain letter agreement among GM Buyer, Company Buyer and Delphi dated July 2, 2009.

(f)    Conditions to Closing.

(i)    Entry of Plan Modification Order.  Section 10.1.1 is hereby deleted in its entirety and the following is inserted in place thereof:

Entry of Plan Modification Order.  The Plan Modification Order shall have been entered and become a Final Order in form and substance satisfactory to GM, Company Buyer and Delphi.

(ii)    Conditions to Obligations of GM Buyers.  Section 10.3.8 is hereby deleted in its entirety and the following is inserted in place thereof:

The Sellers shall have delivered to the GM Buyers either (a) the DIP Agreement payoff letters in customary form or reasonably acceptable to GM, (b) evidence reasonably acceptable to GM Buyer reflecting required DIP Lender consent or (c) the sale order for the transactions contemplated by this Agreement pursuant to which the GM Acquired Assets are being transferred free and clear of Encumbrances, other than Permitted Encumbrances.

(iii)    Conditions and Obligations of Company Buyers.  Section 10.4.6 is hereby deleted in its entirety and the following is inserted in place thereof:

The Sellers shall have delivered to the Company Buyers either (a) the DIP Agreement payoff letters in customary form or reasonably acceptable to Company Buyer, (b) evidence reasonably acceptable to Company Buyer

reflecting required DIP Lender consent or (c) the sale order for the transactions contemplated by this Agreement pursuant to which the Company Buyer Acquired Assets are being transferred free and clear of Encumbrances, other than Permitted Encumbrances.

(g)   Closing.

(i)   Company Ancillary Agreements.  Section 11.3.11 is hereby deleted in its entirety.

(ii)   Sellers' Deliveries at Closing.  Section 11.4.16 is hereby deleted in its entirety and the following is inserted in place thereof:

Either (a) the DIP Agreement payoff letters in customary form or reasonably acceptable to Buyers, (b) evidence reflecting required DIP Lender consent or (c) other indication that the transactions contemplated by this Agreement are permitted by the Bankruptcy Court pursuant to which the Acquired Assets are being transferred free and clear of Encumbrances.

(iii)   GM Buyers' Deliveries at Closing.

(1)   Section 11.5.1.D is hereby deleted in its entirety and the following is inserted in place thereof:

The assumption or payment of the applicable Cure Amounts for the GM Business, which payment shall be made directly by GM Buyers to the contract counterparty;

(2)   Section 11.5.1.E is hereby deleted in its entirety and the following is inserted in place thereof:

E.   The payment of certain expenses of Company Buyer in accordance with on Exhibit 9.45 and that certain letter agreement among GM Buyer, Company Buyer and Delphi dated July 2, 2009;

(3)   Section 11.5.1.I is hereby deleted in its entirety and the following is inserted in place thereof:

50% of professional fees (not to exceed $15,000,000 as the payment from the GM Buyer) that are Administrative Claims required in accordance with the terms of such Administrative Claims to be paid in cash (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation with respect to seeking approval for such Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid

17

pursuant to <u>Section 9.45.2.A</u>, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

    (iv)   <u>Company Buyer Deliveries at Closing</u>.

        (1)   Section 11.5.2.C is hereby deleted in its entirety and the following is inserted in place thereof:

           50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required in accordance with the terms of such Administrative Claims to be paid in cash (excluding the costs of solicitation of approval for the Plan of Reorganization);

        (2)   Section 11.5.2.D is hereby deleted in its entirety and the following is inserted in place thereof:

           The assumption or payment of the Cure Amounts for the Company Business, which payment shall be made directly to Company Buyers to the contract counterparty;

(h)   <u>Miscellaneous</u>.

    (i)   <u>Amendment</u>. The references in Section 14.4 to "Exhibit 3.1.1.F" are here by deleted and replaced by references to "Exhibit 9.45"

    (ii)   <u>Venue and Retention of Jurisdiction</u>. The following is added as a new sentence before the final sentence of Section 14.16:

        To the extent that the Bankruptcy Court no longer has jurisdiction on or before the fourth (4th) anniversary of the date of this Agreement, the New York Courts shall have exclusive jurisdiction over all matters related to this Agreement.

(i)   <u>Schedule Revisions</u>.

    (i)   Schedule 1.1.D is hereby deleted.

    (ii)   Schedule 2.1.5.F is hereby amended by deleting the reference to "Rootstown, Ohio."

    (iii)   Schedule 2.1.5.J is hereby re-labeled as Schedule 2.1.4.X.

    (iv)   Section 2.1.5.K is hereby re-labeled as Schedule 2.1.4.Y and titled "Other Assumed Assets" .

      (v)     Schedule 2.1.5.F is hereby re-labeled as Schedule 2.1.5.E and references to "Flint, Michigan" and "Rootstown, Ohio" are hereby deleted.

(j)    <u>Exhibit Revisions</u>.

      (i)     Exhibit 3.1.1.F is re-labeled as Exhibit 9.45.

      (ii)    Exhibit 9.9.4 is hereby deleted in its entirety.

4.    <u>363 Implementation</u>.  By entering into this Amendment, the parties hereto acknowledge and agree that any and all obligations of the Buyers under <u>Section 9.2.3</u> of the Agreement have been fully satisfied.

5.    <u>Governing Law</u>.  This Amendment shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.

6.    <u>Counterparts</u>.  This Amendment may be executed in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which together shall constitute one and the same instrument.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION

By: _____

    Name: DAVID M SHERBIN

    Title: VP + GENERAL COUNSEL

GM COMPONENTS HOLDINGS, LLC

By: _____

    Name:

    Title:

GENERAL MOTORS CORPORATION (solely with respect to ARTICLE 6 AND Sections 9.11.1, 9.19 and 9.38 of the Agreement)

By: _____

    Name:

    Title:

PARNASSUS HOLDINGS II, LLC

By: _____

    Name:

    Title:

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION

By: _____
    Name:
    Title:


GM COMPONENTS HOLDINGS, LLC

By: _____
    Name:   NIHARIKA  RAMDEV
    Title:   VICE - PRESIDENT


GENERAL MOTORS CORPORATION (solely with respect to ARTICLE 6 AND Sections 9.11.1, 9.19 and 9.38 of the Agreement)

By: _____
    Name:   WALTER G. BORST
    Title:   TREASURER


PARNASSUS HOLDINGS II, LLC

By: _____
    Name:
    Title:


*Signature page to First Amendment to Master Disposition Agreement*

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION

By: _____
    Name:
    Title:

GM COMPONENTS HOLDINGS, LLC

By: _____
    Name:
    Title:

GENERAL MOTORS CORPORATION

By: _____
    Name:
    Title:

PARNASSUS HOLDINGS II, LLC

By: _____
    Name: Johnny Lopez
    Title:   Vice President

*Signature page to First Amendment to Master Disposition Agreement*

## **Schedule 2.2.2.E**

Attached

Schedule 2.2.2.E

**WIND UP COSTS**

Facility Wind Down Costs

Post petition Workers Comp
Post petition Post-Employment EDB
Spring Hill Lease Cancellation (1 yr rent + restoration)
Industrial Revenue Bond Repayment - to the extent related to the Company Acquired Facilities
Secured & Priority Taxes (payable over 6 years)
Transition Services From Company Buyers and GM Buyers provided at no costs
Salary OPEB Settlement approved by court
Cadiz negotiated settlement below court approval levels
Sale of Excluded Asset IP
Asset Proceeds
DPH Holdings / AHG Staff


Prior GM Commitments / Hourly

PRP
PRP Cash Escrow
MRA payments due for month of closing
Hourly severance Athens
Hourly severance Other Sub Pay
Hourly Buydown Payment - UAW