Hearing Date and Time: July 23, 2009 at 10:00 a.m.
Objection Deadline: July 15, 2009 at 4:00 p.m.

MUNSCH HARDT KOPF & HARR, P.C.
Raymond J. Urbanik, Esq.
New York   RU 1842
Davor Rukavina, Esq.
Texas Bar No. 24030781
*Pro Hac Vice* Application Pending
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Telecopier: (214) 855-7584
*Attorneys for Computer Sciences Corporation*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **DELPHI CORPORATION, <u>et</u> <u>al</u>.,** | **Case No. 05-44481 (RDD)** |
| Debtors. | **Jointly Administered** |

**OBJECTION OF COMPUTER SCIENCES CORPORATION TO: (I) CONFIRMATION OF DEBTORS' MODIFIED CONFIRMED PLAN; AND (II) DEBTORS' MOTION FOR SALE OF SUBSTANTIALLY ALL OF THEIR BUSINESS OPERATIONS**

TO THE HONORABLE ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:

Computer Sciences Corporation ("<u>CSC</u>"), party to a postpetition contract with the Debtors and an administrative expense creditor and party-in-interest in the above-captioned, jointly administered Chapter 11 bankruptcy cases ("<u>Bankruptcy Case</u>") of Delphi Corporation ("<u>Delphi</u>") and its affiliated debtors-in-possession (collectively, the "<u>Debtors</u>"), hereby objects (the "<u>Objection</u>") to the Debtors' proposed modifications to their confirmed plan and to the Debtors' proposed sale of substantially all of their business operations, respectfully stating as follows:

## I. PRELIMINARY STATEMENT

1. CSC and Delphi are parties to the MSA[1] – a postpetition contract that CSC validly terminated on account of Delphi's failure to pay more than $12 million of undisputed charges under the MSA. Delphi contests the termination of the MSA, and this question is presently the subject of the Adversary Proceeding which this Court has set for expedited trial commencing on August 3, 2009. At the same time, the Modified Plan and the Proposed Sale treat the MSA as a valid, non-terminated contract, which the Debtors propose to assign and transfer to General Motors and to Parnassus. Although it is clear that questions concerning the validity of the termination of the MSA are to be adjudicated in the Adversary Proceeding by *both* CSC and the Debtors, and that nothing in the Modified Plan or the Proposed Sale can revive the terminated MSA or grant any assignee or transferee thereof any more rights than the Debtors now have, the Debtors have refused to include any protective provision in their pleadings and proposed orders confirming the same. CSC therefore files this protective Objection to the Modified Plan and the Proposed Sale because, under either scenario, the Debtors are proposing to assign and transfer something that does not exist and to strip CSC of its due process rights regarding the same.

## II. JURISDICTION AND VENUE

2. On October 8 and October 14, 2005, the Debtors filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. By order entered on October 8, 2005, this Court ordered the joint administration of the Debtors' bankruptcy cases under the above-styled and numbered Bankruptcy Case.

---

[1] Capitalized terms used in this Summary are defined elsewhere in this Objection.

Page 2

3. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors remain in possession and control of their assets and property, have continued to manage their affairs, and continue to operate their businesses.

4. This Court has jurisdiction over the Bankruptcy Case, the Modified Plan, the Proposed Sale, and this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

### III. BACKGROUND

**A.    THE MSA AND ITS TERMINATION**

5. CSC is a world leader in the information technology and professional services industry. Since its founding in 1959, CSC has helped clients use information technology more efficiently in order to improve their operations and profitability, achieve superior business results, and focus on core competencies. CSC offers information technology and business process outsourcing, information technology and professional products and services, and related maintenance and support.

6. On March 9, 2007, the Debtors and CSC executed that certain *Master Services Agreement* (as amended, the "MSA").[2] As the MSA is a postpetition contract, on March 30, 2007, the Debtors filed their *Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Application Maintenance and Support Agreements* [Docket No. 7524], seeking this Court's authorization for them to enter into, and perform, the MSA. This Court granted such authority by order entered April 23, 2007 [Docket No. 7774].

---

[2] A true and correct copy of the MSA has been filed under seal in the Adversary Proceeding (defined below).

7. On April 30, 2007, Delphi and CSC entered into Amendment No. 1 to the MSA, the purpose of which was to add network management and telecommunication services to the scope of the MSA. In connection therewith, on May 11, 2007, the Debtors filed their *Motion for Order Under 11 U.S.C. Section 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors to Enter into Network Support Services Agreement* [Docket No. 7926], seeking this Court's authorization for them to enter into, and perform, said amendment. This Court granted such authority by order entered May 31, 2007 [Docket No. 8119].

8. The MSA relates to virtually all aspects of the Debtors' operations. CSC provides the Debtors with approximately two-thirds of their global information technology service needs in thirty (30) countries around the world. The MSA involves CSC's provision of system support and related services to the Debtors' supply chain and manufacturing functions, as well as for certain software which integrates the Debtors' various operational functions, including manufacturing, distribution, accounting and human resources, and provides real time data and controls to centralize the management of such operations. There is no question that the services provided by CSC under the MSA are critical. As admitted by the Debtors in the Adversary Proceeding, "CSC provides mission-critical technology services to Delphi, including, among other services, 'worldwide telecommunication, network support, application development and maintenance services' . . . CSC also provides such mission-critical technology services to each of Delphi's 144 subsidiaries and affiliates." *See* Adversary Proceeding Docket No. 7 at p. 2.

9. The services under the MSA are divided into five basic categories or phases: (i) an initial phase of transition services; (ii) transformation services to upgrade the Debtors' existing systems, information technology and infrastructure with new and upgraded programs, components and functions; (iii) base services; (iv) discrete projects for non-recurring services not

provided for among the other categories of services; and (v) "Termination Assistance Services," at Delphi's request, to facilitate a smooth transition from CSC to another technology service provider upon the termination of the MSA.

10. CSC has the right to terminate the MSA if Delphi fails to pay invoices not disputed in accordance with the dispute procedures or if Delphi fails to deposit the required amount of withheld moneys on account of a billing dispute into escrow:

> In the event that Delphi fails to pay Service Provider undisputed amounts properly due and owing to Service Provider under this Agreement exceeding in the aggregate one (1) month of Monthly Base Charges by the specified due date, or fails to place disputed amounts into escrow, to the extent required by Section 12.4, and fails to cure such default within thirty (30) days of notice from Service Provider of its intention to terminate for failure to make such payment, Service Provider may, by notice to Delphi, terminate the Term.

MSA § 20.1(b).

11. As of April 2, 2009, undisputed charges outstanding under the MSA totaled $12,725,513. Delphi did not dispute these charges in accordance with the MSA, and these charges therefore became properly due and payable. Delphi failed to pay these charges as required. On April 3, 2009, CSC provided written notice to Delphi of its default under the MSA along with a thirty day opportunity to cure the same, a true and correct copy of which is attached hereto as Exhibit "A" and incorporated herein.

12. Delphi failed to cure its defaults within the contractual cure period. Accordingly, by notice issued May 5, 2009, CSC terminated the MSA effective May 5, 2009, a true and correct copy of which is attached hereto as Exhibit "B" and incorporated herein.

13. As of May 5, 2009, therefore, the MSA was terminated.

14. After the termination of the MSA, the MSA permits Delhi to request Termination Assistance Services from CSC for up to eighteen (18) months after the date of termination.

These services are designed to ensure an orderly transition to a new technology services provider with a minimum of disruption to Delphi's business. However, CSC is entitled to monthly payment in advance for Termination Assistance Services under the MSA. *See* MSA at § 4.4(a)(4).

15. Although CSC demanded prepayment for Termination Assistance Services immediately with its May 5, 2009 termination notice, Delphi has failed to prepay CSC for the same as required by the MSA. Instead, and notwithstanding its clear failure to pay or to dispute more than $12 million in charges under the MSA, Delphi has taken the position that the MSA has not been properly terminated by CSC and that the MSA's non-termination payment provisions therefore apply (which Delphi has likewise breached on multiple occasions). While the Debtors have failed to fully articulate the factual and legal bases for their argument, the Debtors have alleged that CSC improperly billed Delphi for services and that Delphi was justified in refusing to pay the same. The Debtors ignore the fact that the MSA has a mechanism to address any alleged billing dispute, which mechanism Delphi failed to trigger and to comply with if it in fact believed that the charges as issue were not properly invoiced.

16. Upon information and belief, the reason why Delphi failed to pay CSC's proper and owing charges had nothing to do with any alleged billing dispute or improper performance by CSC. Rather, upon further information and belief, the reason why Delphi failed to pay the same was because of a lack of adequate cash flow. That the Debtors could not comply with their obligations under a postpetition contract party raised grave concerns regarding their financial viability – concerns which were further evidenced by the recent need for $250 million in financing from General Motors.

**B.    THE ADVERSARY PROCEEDING**

17.    Due to the Debtors' multiple breaches of the MSA and the Debtors' refusal to prepay for Termination Assistance Services, on June 10, 2009 CSC filed with this Court its *Complaint, Request for Expedited Declaratory Judgment and Specific Performance, and Request for Preliminary Injunction*, thereby commencing Adversary Proceeding No. 09-01271 (RDD) (the "Adversary Proceeding").

18.    By the Adversary Proceeding, CSC requests: (i) declaratory judgment that it properly terminated the MSA; (ii) the specific performance by the Debtors of their remaining obligations under the MSA, including to escrow disputed funds and to prepay for Termination Assistance Services as required by the MSA; (iii) a preliminary injunction requiring the Debtors to escrow disputed funds and to prepay for Termination Assistance Services under the MSA; (iv) damages for the Debtors' breaches of the MSA; (v) damages in *quantum meruit*; and (vi) the allowance of an administrative claim against the Debtors for all amounts owing under the MSA.

19.    On June 22, 2009, the Debtors filed *Delphi's Answer, Affirmative Defenses, and Counterclaim to Complaint of Computer Sciences Corporation*, whereby the Debtors, among other things, dispute the proper termination of the MSA and assert counterclaims for alleged breach of contract and the issuance of an injunction prohibiting CSC from allegedly abandoning services under the MSA.

20.    On June 26, 2009, this Court entered its *Joint Stipulation and Agreed Scheduling Order* (the "Scheduling Order") in the Adversary Proceeding, a true and correct copy of which is attached hereto as Exhibit "C" and incorporated herein [Adversary Proceeding Docket No. 10]. Among other things, the Scheduling Order provides for expedited discovery on the issues regarding the proper termination of the MSA, including CSC's requested declaration that the

MSA has been properly terminated. The Scheduling Order bifurcates the Adversary Proceeding, with the initial portion of the Adversary Proceeding to consider the proper termination of the MSA, which portion this Court has set for expedited trial commencing on August 3, 2009.

21. Accordingly, as of early August, 2009, this Court will be presented with arguments and evidence as to the proper termination of the MSA, and this Court will adjudicate this disputed termination issue in the Adversary Proceeding.

C.  THE MODIFIED PLAN AND THE PROPOSED SALE

22. On December 10, 2007, the Debtors filed the *First Amended Joint Plan of Reorganization of Delphi Corporation Certain Affiliates* (the "Confirmed Plan"), which was confirmed by order of this Court on January 25, 2008. On April 4, 2008, the Debtors announced that they would be unable to substantially consummate the Confirmed Plan.

23. On June 1, 2009, the Debtors filed their *Supplement to Plan Modification Approval Motion* [Docket No. 16646], whereby the Debtors requested: (i) the Court's approval of various modifications to the Confirmed Plan, together with the Court's approval of the Debtors' underlying solicitation package related to the same; and (ii) procedures governing a proposed section 363 sale of substantially all of their business operations as an alternative to the confirmation of any modified plan (the "Proposed Sale").

24. On June 16, 2009, this Court entered its *Modification Procedures Order* [Docket No. 17032], pursuant to which, among other things, the Court approved various procedures relating to the Debtors' filing and solicitation of modifications to the Confirmed Plan, and relating to the Proposed Sale. Also on June 16, 2009, the Debtors filed their *First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors, and Debtors-In-Possession (As Modified)* (the "Modified Plan").

25. The centerpiece of both the Modified Plan and the Proposed Sale is that certain *Master Disposition Agreement*, dated June 1, 2009, by and between the Debtors, General Motors Corporation, GM Components Holdings, LLC, Parnassus Holdings II, LLC, and certain other parties (the "Disposition Agreement"). The Disposition Agreement basically carves out the Debtors' business operations and proposes to transfer to General Motors various of the Debtors' domestic facilities and their global steering business, while Parnassus will generally purchase substantially all of the Debtors' remaining assets, with the Debtors retaining whatever remains.

26. Part of the assets that the Debtors propose to sell, assign, and transfer to General Motors and to Parnassus is the MSA, after partitioning the same. The Disposition Agreement does not treat the MSA as terminated, nor does it contemplate its potential termination. Rather, the Modified Plan, Proposed Sale, and Disposition Agreement all appear to treat the MSA as a non-terminated, valid, and ongoing contract, to be transferred *in toto*.

### IV. OBJECTIONS

27. Because of the potential preclusive effects of the Modified Plan and Proposed Sale, CSC objects to the Modified Plan and to the Proposed Sale to the extent that both propose to transfer and assign the MSA in anything other than its present state, and therefore to transfer and assign something that does not exist and that the Debtors have no ability to transfer.

28. CSC understands that a dispute regarding the termination of the MSA exists; hence the purpose of the Adversary Proceeding. The problem with the Modified Plan and the Proposed Sale, however, is that by treating the MSA as not terminated, the Debtors or their assignees may take the position that the transfer and assignment of the MSA constitutes an implicit finding by this Court that the MSA has not been terminated, to the prejudice of CSC and to the prejudice of the issues set for trial in the Adversary Proceeding. This problem is made all

the more serious given the critical nature of the CSC's services to the Debtors, as outlined above, and therefore the critical nature of such services to any transferee.

29.     This prejudice is easily cured through simple language in any order confirming the Modified Plan or approving the Proposed Sale to the effect that such order is without any prejudice to CSC or the Adversary Proceeding, and is without any preclusive effect as to the termination of the MSA and the parties' remaining rights thereunder.  CSC requested just such language from the Debtors – language that would be expected and appropriate if the Debtors in fact had no intention of attempting to prejudice CSC.  Not only did the Debtors categorically refuse to include any such protective provision, they offered no colorable explanation for their refusal.  This categorical refusal raises additional concerns regarding the Debtors' intent to seek to impermissibly prejudice CSC through the plan and sale process.

30.     Pursuant to the Bankruptcy Code, the Court can confirm the Modified Plan only if the Debtors' modifications otherwise comply with section 1129 of the Bankruptcy Code and only if the Court finds that "circumstances warrant such modification."  11 U.S.C. § 1127(b) (2005). Accordingly, in order to confirm the Modified Plan, the Debtors have to prove, among other things, that the Modified Plan "complies with the provisions of this title" and that the Modified Plan is "not by any means forbidden by law." *Id*. at § 1129(a)(2)-(3).  The Modified Plan also has to be feasible, *i.e.* the Debtors have to demonstrate the ability to perform their obligations under the Modified Plan.  *See generally id*. at § 1129(a)(11).

31.     Because the MSA is a postpetition contract, the cure, assumption, and assignment procedures of section 365 of the Bankruptcy Code do not apply.  With respect to postpetition transactions such as the MSA, "the bankruptcy court cannot create an interest for the debtor where none exists." *Terry Oilfield Supply Co. Inc. v. American Security Bank*, 195 B.R. 66, 72

Page 10

(S.D. Tex. 1996). Simply put, the Debtors have no resort to the Bankruptcy Code to cure their multiple breaches of the MSA and to somehow undo its termination.

32. The Modified Plan proposes to transfer to General Motors and to Parnassus something that does not exist, or something that the Debtors have no ability to transfer in anything other than its present state. If the Debtors propose to treat the Modified Plan as providing for the transfer of the MSA in anything but its present state, then the Modified Plan fails to comply with the provisions of the Bankruptcy Code, is forbidden by law, and is not feasible. This is because the MSA is what it is: whether it has been terminated or not, the plan and sale process cannot take from CSC any rights greater than whatever rights presently exist under the MSA. Anything less violates CSC's due process rights and substantive interests in its property, just as a plan transferring real property not owned by the debtor, and without the actual owner's consent, would be patently unconfirmable.

33. Similarly, the sale or transfer of the MSA cannot be free and clear of all of CSC's contractual rights and remedies, including the termination of the MSA and the requirement that any transferee of the terminated MSA prepay for Termination Assistance Services. *See, e.g., Folger Adam Security Inc. v. Dematteis/Macgregor JV*, 209 F.3d 252, 261-62 (3d Cir. 2000) (holding that a section 363(f) sale was not free and clear of a contractual counterparty's contract rights and defenses). Contractual rights are not "interests" within the meaning of section 363(f) of the Bankruptcy Code, and any transfer of the MSA free of CSC's defenses and contract rights would, as above, violate CSC's due process rights.

34. Aside from the Debtors' inability to transfer the MSA in anything but its presently terminated state, the Debtors may not employ the confirmation and sale process to effectively try the issue concerning the proper termination of the MSA. In its Scheduling Order, this Court has

specifically ruled that "*[t]his Order* governs the pre-trial and trial schedule for the Expedited Counts . . ." Scheduling Order at ¶ 15 (emphasis added). "Expedited Counts" are defied as "Counts One, Two, and Three of the Complaint, but solely to the extent that they relate to CSC's factual claims that the [MSA] between the parties has been validly and effectively terminated and whether Delphi has present prepayment obligations to CSC for its services provided thereunder." *Id*. at p.2. "The Expedited Counts shall be tried on an expedited basis *pursuant to the schedule set forth herein*." *Id*. at ¶ 1 (emphasis added).

35.  This Court has already ordered – with the Debtors' consent – that the issue of the proper termination of the MSA shall be tried in the context of the Adversary Proceeding. The Debtors, therefore, cannot resort to the plan and sale process to effectively obviate the Scheduling Order and undo this Court's order by seeking to try an issue in the plan and sale process that this Court has explicitly ordered to be tried in the Adversary Proceeding – with the Debtors' affirmative consent.

36.  By the same logic, CSC is not requesting that the Court make any finding to the effect that the MSA has been terminated in the context of the Modified Plan or other Proposed Sale. On the contrary, CSC files this protective Objection to request the very opposite: that any order confirming the Modified Plan or approving the Proposed Sale specifically provide that it is without prejudice to: (i) the issue concerning the termination of the MSA; (ii) the state in which any transferee acquires the MSA, *i.e.* terminated or not terminated; (iii) the prepayment by any transferee of the MSA of Termination Assistance Services; and (iv) all other issues in the Adversary Proceeding. For the reasons stated above, CSC submits that any contrary finding or conclusion would be inappropriate and would render the Modified Plan and the Proposed Sale defective, while violating CSC's due process rights.

37. If it is the Debtors' intention that the plan and sale process not prejudice CSC's rights as stated above, then the Debtors should not take issue with CSC's requested protective language. If, however, the Debtors take issue with the same, this will evidence their intention to seek to prejudice CSC, and CSC reserves all of its rights in such an event, including, should it become necessary, to try the issue of the termination of the MSA as part of the plan and sale process.

### IV. WAIVER OF MEMORANDUM OF LAW

38. In accordance with Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, no separate memorandum of law is necessary as all authorities relied on in support of this Motion are set forth herein.

### V. NOTICE

39. Notice of this Motion has been provided to (i) the Debtors and their counsel, (ii) the Office of the United States Trustee for the Southern District of New York, (iii) counsel for the Creditors' Committee, (iv) counsel for the agent under the Debtors' prepetition credit facility, (v) counsel for the agent under the Debtors' postpetition credit facility, (vi) all parties as required by the Federal and Local Rules of Bankruptcy Procedure.

### VI. PRAYER

WHEREFORE, premises considered, Computer Sciences Corporation respectfully requests that this Court: (i) confirm the Modified Plan or approve the Proposed Sale only with the protective provisions requested above; (ii) in the alternative, deny confirmation of the Modified Plan and deny approval of the Proposed Sale; and (iii) grant CSC such other and further relief to which it may show itself to be justly entitled.

Respectfully submitted, this 7th day of July, 2009.

                                MUNSCH HARDT KOPF & HARR, P.C.

                                By:   */s/ Raymond J. Urbanik*
                                    Raymond J. Urbanik, Esq.
                                    New York   RU 1842
                                    Davor Rukavina, Esq.
                                    Texas Bar No. 24030781
                                    *Pro Hac Vice* Application Pending
                                    3800 Lincoln Plaza
                                    500 N. Akard Street
                                    Dallas, Texas  75201
                                    Telephone:  (214) 855-7500
                                    Facsimile:  (214) 855-7584

                                ATTORNEYS FOR COMPUTER SCIENCES
                                CORPORATION

**CERTIFICATE OF SERVICE**

  This is to certify that on the 7th day of July, 2009, I caused a true and correct copy of the foregoing pleading to be served via U.S. first class mail, postage prepaid, on each of the parties listed below.

| | |
|---|---|
| John Wm. Butler, Jr.<br>George N. Panagskis<br>Ron E. Meisler<br>Nathan L. Stuart<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>333 West Wacker Dr., Suite 2100<br>Chicago, Illinois  60606-1285 | Thomas J. Matz<br>Kayalyn A. Marafioti<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Four Times Square<br>New York, NY  10036 |
| Adam C. Harris<br>David J. Karp<br>SCHULTE ROTH & ZABEL LLP<br>919 Third Avenue<br>New York, New York  10022 | Jeffrey L. Tanenbaum<br>Robert J. Lemons<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York  10153 |
| Edward M. Fox, Esq.<br>K&L GATES LLP<br>599 Lexington Avenue<br>New York, New York 10022 | Marc Abrams<br>Michael J. Kelly<br>Richard Mancino<br>Christopher J. St. Jeanos<br>Terence K. McLaughlin<br>WILLKIE FARR & GALLAGHER LLP<br>787 Seventh Avenue<br>New York, NY 10019-6099 |
| Robert J. Rosenburg<br>Mitchell A. Seider<br>Mark A. Broude<br>Michael Riela<br>LATHAM & WATKINS<br>885 Third Avenue<br>New York, New York  10022 | Glenn E. Siegel<br>Charles I. Poret<br>Daniel C. Malone<br>James O. Moore<br>DECHERT LLP<br>1095 Avenue of the Americas<br>New York, New York 10036-6797 |
| Donald S. Bernstein<br>Brian M. Resnick<br>DAVIS POLK & WARDWELL<br>450 Lexington Avenue<br>New York, New York 10022 | Alicia M. Leonhard<br>Brian Masumoto<br>THE OFFICE OF THE UNITED STATES TRUSTEE<br>22 Whitehall St., 21st Floor<br>New York, New York  10004 |

**Page 15**

Deborah M. Buell
CLEARLY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York  10006

J. Christopher Shore
Douglas P. Blumstein
WHITE & CASE LLP
1155 Avenue of Americas
New York, New York  10036-2787

Myron Kirschbaum
Benjamin Mintz
Sapna W. Palla
Angela R. Vicari
KAYE SCHOLER LLP
425 Park Avenue
New York, New York  10022

Alan E. Marder
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
Garden City, New York  11530

Thomas E. Lauria
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida  33131

Leslie G. Fagen
Marc Falcone
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of Americas
New York, New York  10019


   /s/ *Raymond J. Urbanik*
   Raymond J. Urbanik, Esq.