1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        July 1, 2009

        10:13 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Emergency Motion to Authorize Expedited Motion for

3    Order Authorizing Debtors to Provide Expense Reimbursement to

4    Platinum Equity Advisors, LLC in Connection with Sale of

5    Debtors' Assets Pursuant to Master Disposition Agreement.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Penina Wolicki

3

1    A P P E A R A N C E S :

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for Debtors

4         333 West Wacker Drive

5         Suite 2100

6         Chicago, IL 60606

7

8    BY:   JOHN WILLIAM BUTLER JR., ESQ.

9          ALBERT L. HOGAN, III, ESQ.

10         KAYALYN MARAFIOTI, ESQ.

11

12

13   WILLKIE FARR & GALLAGHER LLP

14        Attorneys for collective DIP lenders

15        787 Seventh Avenue

16        New York, NY 10019

17

18   BY:   BRIAN E. O'CONNOR, ESQ.

19         DAVID GISE, ESQ.

20         JAIME L. LAVIN, ESQ.

21         MIKE KELLY, ESQ.

22

23

24

25

4

```
 1    LATHAM & WATKINS LLP

 2         Attorneys for Creditors' Committee

 3         885 Third Avenue

 4         New York, NY 10022

 5

 6    BY:   MARK A. BROUDE, ESQ.

 7

 8

 9    DECHERT LLP

10         Attorneys for DIP Lenders, Kensington Int'l Ltd.,

11         Manchester Securities Corp., Springfield Associates LLC

12         1095 Avenue of the Americas

13         New York, NY 10036

14

15    BY:   CHARLES I. PORET, ESQ.

16         DANIEL C. MALONE, ESQ.

17         JAMES O. MOORE, ESQ.

18

19    SCHULTE ROTH & ZABEL LLP

20         Attorneys for Platinum Equity Capital Partners LLP

21         And Parnassus entities

22         919 Third Avenue

23         New York, NY 10022

24

25    BY:   ADAM C. HARRIS, ESQ.
```

5

1

2    DAVIS POLK & WARDWELL LLP

3         Attorneys for JPMorgan Chase Bank, N.A. as DIP Agent

4         450 Lexington Avenue

5         New York, NY 10017

6

7    BY:   BRIAN M. RESNICK, ESQ.

8          DONALD BERNSTEIN, ESQ.

9          KARIN S. DAY, ESQ. (TELEPHONICALLY)

10

11

12   U.S. DEPARTMENT OF JUSTICE

13        U.S. Attorney's Office

14        86 Chambers Street

15        3rd Floor

16        New York, NY 10007

17

18   BY:   JOSEPH N. CORDARO, AUSA

19

20

21

22

23

24

25

6

1                    P R O C E E D I N G S

2        THE COURT:  Please be seated.  Delphi Corporation.

3        (Pause)

4        THE COURT:  You won't be called for a while, ma'am.

5    So my clerk will get you when you're called.

6        (Pause)

7        MR. BUTLER:  Your Honor, good morning.  Jack Butler,

8    Kayalyn Marafioti and Al Hogan here on behalf of Delphi

9    Corporation, all found for this hearing relating to the expense

10   reimbursement motion.  We did file an agenda with the

11   objections at docket number 17394.  This is a motion that was

12   brought on, on an expedited basis at docket number 17317.  It

13   was brought on to discussions that we had with Your Honor

14   previously, including the chambers conference and the prior

15   hearing, indicating that we put the request for expedited

16   relief in the actual motion and file an affidavit, which we

17   did, as opposed to going to the OSC route.  And that matter is

18   before the Court.

19        So we have the declaration of my colleague, Ms.

20   Marafioti at docket number 17318 as well as the notice of

21   expedited motion at docket number 17337.  There have been four

22   objections filed -- or actually, three objections and a joinder

23   to the motion.  There was an objection filed at docket number

24   17395 by Kensington International Ltd., Manchester Securities

25   Corp. and Springfield Associates LLC at docket number 17396 by

7

1    the collective of DIP lenders; at docket number 17397 by the

2    creditors' committee; and a joinder in docket number 17399 by

3    JPMorgan Chase as administrative agent.

4         Your Honor, in terms of the evidentiary record today,

5    we have prepared a record of twenty-five items, including three

6    declarations that have also been filed publically.  We have

7    agreed with the creditors' committee, as I think Your Honor

8    would expect, that the admission of these declarations and this

9    evidentiary record is for the purpose of this motion only.  It

10   does not apply to evidence that would be admitted in connection

11   with the July 23 hearing.  There's a separate discovery track

12   going on for that matter.  Some of these same matters may come

13   back up at the July 23rd hearing, but they would be developed

14   in connection with that record and not this.  And I agreed with

15   Mr. Broude to make comment on the record.

16        There are three declarations that have been filed

17   publically:  That of Dan Krasner in support of the Platinum

18   expense reimbursement motion and then Mr. Sheehan, the

19   company's chief financial officer, at Exhibit 2; and Exhibit 3,

20   Mr. Shaw from Rothshild, on behalf of the motion as well.  As I

21   indicated earlier, Exhibit 4 is the declaration of my

22   colleague, Ms. Marafioti.  The balance of the proposed exhibits

23   relate to pleadings that have been filed and a series of

24   additional documents and presentation shows related to the

25   motion and some confidentiality nondisclosure agreements, as

8

1    well as the objections.

2        With the agreement that I placed on the record with

3    the creditors' committee, Your Honor, and subject to cross

4    examination when I present them of the declarants, I would move

5    admission of the evidence -- of the exhibits into evidence.

6        THE COURT:  Okay.  Any objections to their admission

7    on that basis?

8        MR. O'CONNOR:  Your Honor, Brian O'Connor from Wilkie

9    Farr & Gallagher on behalf of the collective of DIP lenders.

10    The only objection, Your Honor, is as you'll hear, when we have

11    a chance to speak, this motion was brought on on such an

12    expedited nature that we've had no opportunity to take any

13    discovery.  One of the arguments I will make later, Your Honor,

14    is that we think if Your Honor doesn't deny this motion as a

15    matter of law, even if you were to accept everything the

16    debtors say as true, we would believe you ought to defer

17    consideration of the motion until at the sale hearing, and

18    during the interim we'll take discovery and be in a position to

19    raise objections and cross examine witnesses on these facts at

20    that time.

21        MR. BUTLER:  Your Honor, from the debtors'

22    perspective, we actually discussed the timing of bringing on

23    this motion, the date it was going to be brought on, in a

24    chambers conference in which the Tranche C collective

25    participated --

9

1        THE COURT:  But this is just on the evidence coming

2    in.

3        MR. BUTLER:  Right.

4        THE COURT:  And there's no objection to the evidence

5    coming in, it's just a reservation of rights on this one legal

6    argument which we'll address later.  So on the basis that you

7    stated, Mr. Butler, I'll admit the proposed exhibits.

8    (Declaration of Mr. Krasner was hereby received in evidence as

9    Debtor's Exhibit 1 as of this date.)

10   (Declaration of Mr. Shaw was hereby received in evidence as

11   Debtor's Exhibit 3, as of this date.)

12   (Declaration of Mr. Sheehan was hereby received in evidence as

13   Debtor's Exhibit 2, as of this date.)

14   (Declaration of Ms. Marafioti was hereby received in evidence

15   as Debtor's Exhibit 4, as of this date.)

16   (Balance of Exhibits were hereby received in evidence as

17   Debtor's Exhibits, as of this date.)

18       MR. BUTLER:  Thank you, Your Honor.  Your Honor, and

19   then in terms of presenting the declarants for any cross

20   examination the parties may have for the purpose of this

21   record, I first present Mr. Sheehan, the company's chief

22   financial officer, with respect to his declaration, which is

23   Exhibit B to the motion, and Exhibit 2 to the record.

24       THE COURT:  Okay.  Does anyone want to cross examine

25   Mr. Sheehan?

1          MR. O'CONNOR:  Again, Your Honor, we'd reserve our

2     rights to examine these witnesses at a later point in time.  I

3     don't think we're in a position to do that today, given the

4     expedited nature of the motion and the lack of any discovery.

5          MR. BUTLER:  Your Honor, on that point, the Tranche C

6     collective, as I said, was at the prior chambers conference

7     when the state hearing date was selected, and they have not,

8     since being served the motion a week ago, they have not sought

9     any discovery of any kind, on an expedited basis or otherwise.

10    And for them to sit on their hands and then walk into court and

11    say I didn't have any opportunity because I didn't choose to

12    ask to depose these folks, I think shouldn't be countenanced by

13    the Court.

14         MR. O'CONNOR:  Your Honor, here's one comment, and

15    that is, I understand -- I was not present at that chambers

16    conference -- but I understand from my colleague, that although

17    Mr. Butler said they would do it on an expedited basis, no date

18    was selected.

19         THE COURT:  Okay.  Well, I may have questions of Mr.

20    Sheehan, but let me ask you, Mr. Butler.  Maybe this can just

21    be clarified by you on the record based on his -- my questions

22    go to his affidavit, and I just want to make sure I understand

23    it clearly.

24         First, paragraph 39 of his affidavit which is on page

25    16, states, "A fundamental change in the landscape of these

11

1   cases occurred in mid-April, when GM with the support of the

2   auto task force, agreed to support a comprehensive resolution

3   of the Delphi Chapter 11 cases.  On April 18, 2009, GM provided

4   a comprehensive proposal directed at Delphi's DIP lenders.

5   Importantly, the proposal provided for payment in full of the

6   Tranche A and Tranche B DIP lenders and offered the Tranche C

7   lenders a recovery of approximately three percent in cash and a

8   sixty-seven percent economic interest in the equity of a newly

9   capitalized Delphi.  The proposal made clear that GM was

10   prepared to fund the company pre- and post-emergence.  This

11   proposal made by GM provided the same basic transaction

12   structure that GM and Platinum ultimately negotiated in

13   connection with the MDA transaction."

14        So my question that I would ask Mr. Sheehan is, am I

15   right that at that time GM had not negotiated its agreement

16   with Platinum?

17        MR. BUTLER:  That's correct, Your Honor.

18        THE COURT:  Okay.  And then turning to page 25

19   paragraph 59, Mr. Sheehan states, "Platinum represented to me

20   that as of May 31, 2009, it has third-party expenses of

21   approximately 20 million dollars that are related to its

22   overall due diligence in connection with a Delphi transaction.

23   Platinum hired a number of consultants including Marakon

24   Associates, PricewaterhouseCoopers, Answerport, Inc., and the

25   law firms of Schulte Roth & Zabel LLP, Kirkland & Ellis LLP,

12

1    and Foley & Lardner LLP, to assist them in their due diligence

2    efforts and negotiations.  In addition, as of May 31, 2009,

3    Platinum has approximately 17 million of internal costs related

4    to Delphi."

5          So my first question is, the representation of the 20

6    million, that includes all of Platinum's third-party expenses,

7    including in connection with the earlier steering deal and all

8    the other efforts during the course of the case?

9          MR. BUTLER:  It includes all -- it includes all the

10   expenses that have been incurred, as I understand it -- Mr.

11   Krasner's here on behalf of Platinum.  But it includes the

12   expenses that have been accrued in connection with the two MDA

13   agreements that are now Exhibit 20 and 21 to the record, in

14   which they were exploring a comprehensive transaction with

15   Delphi for all of the company.

16         THE COURT:  But does it --

17         MR. BUTLER:  And the answer to that question is yes.

18         THE COURT:  But it also includes the steering deal and

19   everything else?

20         MR. BUTLER:  Yes, which was --

21         THE COURT:  Okay.

22         MR. BUTLER:  -- part of the overall diligence here

23   that allowed them to move forward.

24         THE COURT:  Okay.  And the 17 million of internal

25   costs, has the company done any analysis of what those are?

13

1          MR. BUTLER:  There have been some discussions between

2     Mr. Sheehan and Mr. Krasner regarding that.  Here has not been

3     a complete documentation supported with that.  There have been

4     discussions between the two principals about those expenses.

5     And obviously, Your Honor, the aggregate of those two numbers

6     is 37 million, and Delphi proposes to cap this expense

7     reimbursement at 30 million.

8          THE COURT:  Okay.  All right.  So I don't need to have

9     any questions of Mr. Sheehan.  And since no one else has any

10    questions, I take it, I'll accept his affidavit as the proffer

11    of his testimony.

12         MR. BUTLER:  Your Honor, the next witness we'd proffer

13    for cross examination is William R. Shaw, managing director of

14    Rothschild.  His declaration is Exhibit 3 to the record and

15    Exhibit C to the motion.

16         THE COURT:  Okay.  Does anyone want to cross examine

17    Mr. Shaw?

18         MR. O'CONNOR:  Same reservation of rights, Your Honor.

19         MR. PORET:  Your Honor, Charles Poret from Dechert on

20    behalf of Manchester and Kensington.  We join in the

21    reservations that the collective has made.

22         THE COURT:  Okay.

23         MR. RESNICK:  Your Honor, Brian Resnick of Davis Polk

24    for JPMorgan, the administrative agent under the DIP facility.

25    We join in as well.

14

1      THE COURT:  Okay.  I have no questions of Mr. Shaw on

2 his affidavit, so that will be a proffer of his testimony as

3 well.  Accepted.

4      MR. BUTLER:  Thank you, Your Honor.  And, Your Honor,

5 the next declaration we would offer is that of Dan Krasner from

6 Platinum.  That's Exhibit A to the motion and Exhibit number 1

7 to the record.

8      (Pause)

9      THE COURT:  Okay.  Does anyone want to cross examine

10 Mr. Krasner?

11     MR. O'CONNOR:  Same reservation of rights on behalf of

12 the collective of DIP lenders.

13     MR. PORET:  Your Honor, given the fact that Delphi has

14 submitted that there is no present documentation on any of

15 these expenses and that they purport to cover prior unrelated

16 transactions, we too will reserve rights on this.

17     MR. RESNICK:  Same reservation on behalf of the DIP

18 agent.

19     THE COURT:  Okay.  I have no questions of Mr. Krasner.

20 So I will accept his declaration.

21     MR. BUTLER:  And finally, Your Honor, the last

22 declaration is Exhibit number 4 to the record, which is the

23 declaration of my colleague, Ms. Marafioti, which I would offer

24 into --

25     THE COURT:  And that's in support of the entering of

15

1    the order to show cause?

2           MR. BUTLER:  Correct.

3           THE COURT:  Okay.

4           MR. BUTLER:  For the expedited hearing, as Your Honor

5    indicated.

6           THE COURT:  All right.  Okay.  Does anyone want to

7    cross examine Ms. Marafioti?

8           MR. O'CONNOR:  No, Your Honor.

9           THE COURT:  Okay.  Very well.

10           MR. BUTLER:  Your Honor, I think that completes the

11    evidentiary record in support of the motion.  We have, in

12    connection with the objections which we received yesterday

13    afternoon, have prepared an omnibus reply and we filed it --

14    made it available to the parties, and we've made it available

15    to the Court.  And in that, we summarized the objections that

16    have been reached and that have been lodged and our proposed

17    response to each of them -- our actual response to each of them

18    in terms of the debtors' views.

19           We believe the positions are largely incorrect and in

20    several instances totally inapplicable to this motion.  A

21    couple of things I think I'd like to say at the outset, Your

22    Honor, and then I prefer to expedite the hearing by responding

23    to the objectors after they've had a chance to address the

24    Court, if that's acceptable, Your Honor.

25           THE COURT:  Okay.

16

1        MR. BUTLER:  But I do have a few things I'd like to

2   place on the record first.

3        THE COURT:  Okay.

4        MR. BUTLER:  Or answer the Court's questions, if the

5   Court would prefer.

6        THE COURT:  Well, I had an initial question, which

7   is -- and when I addressed this issue at the last hearing, I

8   had not thought of this point.  But how, other than through

9   consent, would this relief be capable of being granted, given

10  Section 13(a) of the DIP order?  And by consent, I mean consent

11  of the DIP lenders.

12       MR. BUTLER:  Your Honor, I think, as we've indicated

13  on our chart here, that the -- and this is objection number 8

14  on page 4 of the chart -- is the Court provided the opportunity

15  for an expense reimbursement provision here in connection with

16  the modifications the Court made to the debtors' motion seeking

17  preliminary approval of the plan modification motion back on

18  June 10th.  And specifically, there were a series of changes

19  that were made that are focused on in paragraph 46 of the

20  order, entered at the -- with the approval of the DIP lenders

21  and at their urging.

22       It provided that, "The debtors may seek Court approval

23  in recognition of the company's buyers' expenditure of time,

24  energy and resources of an expense reimbursement or other form

25  of buyer protection to be paid from the proceeds of the

1   successful alternative transaction, if the company buyer is not

2   the successful bidder, as such term is defined in the

3   supplemental procedures.  If the Court approves such

4   reimbursements or other protection, such order shall become

5   part of the supplemental procedures."  Seeing as it's to become

6   part of the supplemental procedures, that contemplates that

7   would have been done on an expedited basis.  The lenders did

8   not reserve any rights with respect to that -- with respect to

9   paragraph 46.  And in fact --

10          THE COURT:  But it says "if".  I mean, you could seek

11   it, but I don't buy that one.  I'm sorry.

12          MR. BUTLER:  Well, Your Honor --

13          THE COURT:  I mean, you're saying that even though I

14   say "the debtors may seek" and "if granted it will become", and

15   saying that that's a waiver by the DIP lenders?

16          MR. BUTLER:  No, Your Honor.  What I'm saying is that

17   at the -- if you look at the record of the hearing on June

18   10th, the DIP lenders sought a process for the debtors to

19   evaluate unsolicited offers.  And that process required, among

20   other things, in order for General Motors to provide the

21   continued financing to the company, the 250 million dollars, in

22   order for General Motors to go forward as part of the unitary

23   master disposition agreement, it required a number of changes

24   to the agreement, and it required the last eighteen lines or so

25   of paragraph 46, dealing with the savings clause in here for

18

1   what GM was able to do with alternative transactions in setting

2   up this process.

3           There was discussion on that record about whether

4   the -- what should be made available to the company buyer, in

5   this case Platinum -- the company buyer, in connection with

6   those changes.  And when you go back and examine that record,

7   it was at least the company's view, and I think Parnassus

8   relied on it when they agreed with GM to make the changes to

9   the MDA and to agree to this paragraph 46 as it was entered,

10  and GM agreed to it in order to provide the continued

11  financing, that the -- I think people relied -- Parnassus

12  relied on the record, as I think the debtors and GM did.  And

13  there was nowhere in that record when there was a discussion of

14  providing under those circumstances, under the changed

15  circumstances, of providing some form of expense reimbursement

16  to Parnassus, was there any reservation of right or objection

17  by the lenders who actually sought that --

18          THE COURT:  Well, didn't Mr. --

19          MR. BUTLER:  -- relief.

20          THE COURT:  -- didn't Mr. Abrams in quite high dudgeon

21  and said there's no right to this, and I said, well, why don't

22  you talk to them?  I don't know whether there was any

23  discussion.  Given the objections, obviously there was no

24  agreement.

25          MR. BUTLER:  Fine.

19

1          THE COURT:  All right.  Anyway, why don't we move on

2     to the other responses.  That was my only real question, and

3     then you can go on to your remarks.

4          MR. BUTLER:  Your Honor, we're certainly, in

5     connection with this, relying on the record of June 10th and

6     relying on the form of the order that was entered.  And we've

7     reserved generally our view of the application of the

8     provisions of the DIP credit agreement.

9          As you know, the lenders are taking the position that

10    this Court can neither confirm a plan nor approve any sale

11    without their consent, that they have absolute veto right over

12    any actions that this Court might take for any resolutions of

13    these cases.  That is their position.  We don't agree with it.

14    We intend to litigate that on the 23rd as it relates to the

15    overall transaction.  We don't believe that the credit

16    agreement -- the covenants in the credit agreement can, in

17    fact, hold this estate completely hostage to the whims of the

18    DIP lenders, when they're unwilling to exercise remedies.  So

19    they don't want to exercise remedies on the one hand, they

20    don't want to permit a sale to go forward on the other hand,

21    they don't want to permit a reorganization to go forward, on

22    the third part.

23          I don't think that's what the DIP order contemplates.

24    I don't think that's how one reads the DIP agreement.  And

25    ultimately, the covenants in the DIP agreement, which lead,

20

1    under the DIP agreement to breaches in the ability to exercise

2    remedies, we're already well beyond that, because this DIP

3    matured six months ago.  And I don't believe that you can use

4    the provisions of the DIP agreement in the way in which the

5    lenders choose to use them.  We didn't intend to argue that

6    this hearing and deal with it.  We think that's more for the

7    July 23rd hearing.  But that's certainly the position that

8    they've taken with us and they've taken in their papers, that

9    neither the Court nor the debtors can do anything.  We can't

10    advance to Go, we can't collect 200 dollars or anything without

11    their consent.

12         THE COURT:  But this is not the day for that argument.

13    This is a much more limited point.

14         MR. BUTLER:  Oh, this is the tip of the iceberg of

15    that argument, Judge.  That's why it was made.

16         THE COURT:  Okay.

17         MR. BUTLER:  The points that, Your Honor, I wanted to

18    make to the Court really dealt with paragraph 46, because I

19    think the statements that were made in some of the objections

20    are just simply incorrect.  It said that there are -- it simply

21    inferred that there were no changed circumstances that would

22    have justified an expense reimbursement being granted here in

23    these circumstances.  And I would point Your Honor to the last

24    section of paragraph 46, starting with the phrase that "In

25    order to facilitate an alternative transaction, notwithstanding

21

1    any other provision in the master disposition agreement or any

2    agreement contemplated thereby or any agreement between GM and

3    Parnassus and their respective affiliates, GM is entitled," and

4    it goes on to say all the things GM can do to facilitate an

5    alternative transaction, and makes it clear that neither

6    Parnassus or any of its affiliates would have any claims for

7    breach of the MDA or any of the other agreements between the

8    two parties as a result of the actions permitted by that

9    paragraph.

10         That was language that was negotiated in the days

11   following Your Honor's ruling on June 10th that led to the

12   modification of procedures order being entered on June 16th.

13   And it is, I think, the changed circumstance without which GM

14   would not have provided the financing, without which it was

15   clearly GM's view that they were not able to facilitate any

16   kind of alternative transaction, to the extent that they were a

17   necessary party.  I think most people believe them to be a

18   necessary party to any ultimate transaction or disposition of

19   these cases under the circumstances.  And that required a

20   further set of consensual agreements between Parnassus and GM

21   for the benefit of this process and these estates.  And I

22   simply wanted to make sure that the argument today was grounded

23   in paragraph 46.

24         Your Honor, that was the -- paragraph 46 was the

25   principal point I wanted to make in our opening, and then I

22

1    wanted to respond to the objections that were placed on the

2    record.  We've already done that in our reply, but I'll answer

3    any questions the Court has or address the objectors as they

4    decide to present their objections.

5              THE COURT:  Okay.

6              MR. O'CONNOR:  Good morning, Your Honor.  Brian

7    O'Connor from Wilkie Farr & Gallagher on behalf of the

8    collective of DIP lenders.  I think I can be brief.  I think

9    all of the objections are pretty much the same in terms of the

10   arguments they set forth.  So let me try to expedite this.

11             First, Your Honor, I think it's a misnomer to

12   characterize the relief being sought as an expense

13   reimbursement.  What the debtors are asking for is to pay

14   Platinum 30 million dollars, or as Your Honor has pointed out,

15   20 million dollars in third-party expenses, and some balance in

16   what they call internal costs.

17             First of all, the record is totally insufficient, I

18   think, for Your Honor to grant that relief.  That includes

19   restatements in the declaration about what we're told from the

20   debtors about what those expenses are.  It's clear that those

21   expenses go well beyond any expenses that were incurred by the

22   Platinum in connection with the MDA, which they only began to

23   negotiate in April and concluded in June.

24             I think the debtors have been forthright in admitting

25   that what they're asking to do is to reimburse Platinum for

23

1   expenses that may go back as far as three years.  And there's

2   nothing in the record to explain what portion of the 20 million

3   dollars in expenses relate to the MDA transaction as opposed

4   to, as Your Honor asked, the potential purchase of the steering

5   business or what Platinum has also said they did, and that was

6   to go out and talk to customers in the industry and the UAW,

7   just to understand the automotive industry, perhaps for

8   purposes unrelated to Delphi.

9        So, Your Honor, I think when it comes to internal

10   costs, I think now we're talking about what really amounts to a

11   breakup fee, not expense reimbursement.  These are apparently

12   17 million dollars in lost opportunity costs.  So I do think

13   that we ought to look at this, not as a pure expense

14   reimbursement, but at least in part as a breakup fee.  So then

15   we need to look at what's the purpose of breakup fees.

16        And the purpose of the breakup fee, obviously, is

17   designed to induce a bidder to step forward and to agree to go

18   forward as a stalking horse.  And, Your Honor, I don't see how,

19   on the record, Your Honor could conclude that that's the case

20   here, given the fact that Platinum had already entered into the

21   MDA.  It entered into the MDA without insisting or bargaining

22   on any expense reimbursement or breakup fee.  It is obligated

23   under the MDA to proceed.  As the debtor said, I think, in

24   their last conference with the Court, they said there are no

25   outs for Platinum under this agreement.

24

1    And so to say now that we need to incentivize Platinum

2    to proceed as a stalking horse, well, it's a little late to do

3    that.  That stalking horse left the barn a while ago.  There

4    certainly is no need to incentivize Platinum to continue to do

5    what it's already obligated to do.  So from that perspective,

6    the whole purpose of a breakup fee doesn't -- would not appear

7    to be implicated here.

8    THE COURT:  Mr. Butler's point is that while Platinum

9    may have had no outs under the MDA, the MDA apparently

10   contemplates separate agreements between Platinum and GM which

11   would restrict GM's abilities to talk to third parties, and

12   that in contemplation of a right to seek the breakup fee,

13   Platinum waived those requirements --

14   MR. O'CONNOR:  Well, Your Honor, I still --

15   THE COURT:  -- or waived those covenants.

16   MR. O'CONNOR:  -- right.  I still don't think that

17   changes the fact that the agreement that we're talking about,

18   the MDA, Platinum was already obligated to pursue.  I think

19   it's --

20   THE COURT:  But his point is that the MDA is tied

21   into, in fact, the more important agreements, are the

22   agreements between Platinum and GM that the debtor's not a

23   party to.

24   MR. O'CONNOR:  Well, the other point I would make on

25   that, Your Honor, is that certainly, it could not have come as

25

1    any surprise to anyone in this case that it was entirely

2    possible, given the Chapter 11 context, that the so-called

3    private sale that Platinum wanted to go forward with would, in

4    fact, be opened up to a market test through a public auction

5    process.  They are aware of that was a possibility.  In section

6    9.4 of the agreement it's clear that they were aware of the

7    fact that a government authority, including the Court, could

8    require the debtors to open this up to a public auction

9    process.  And again, they took the risk at that point to go

10   forward with that process knowing it could be opened up,

11   knowing that other things might have to be done.  And they

12   chose to do that without bargaining for a bid protection like

13   an expense reimbursement or a breakup fee.

14           And I don't see why, at this stage , that the estate

15   should be burdened with, or more importantly, really our

16   clients, the DIP lenders, should be burdened with having 30

17   million dollars of proceeds paid out just to require Platinum

18   to go forward with the risk that it assumed.

19           Your Honor, the other point on this is, if you look at

20   this as a breakup fee, or at least in part a breakup fee, it

21   clearly is excessive.  First of all, there was no documentation

22   as to what the expenses are.  There are 20 million dollars.

23   They relate to a three-year period.  How much relates to the

24   MDA?  It's completely unclear.  I have no idea what the

25   internal costs are, what they relate to.  I assume they relate

26

1   to the three-year period as well.  And if you were to look at

2   this and analyze this in terms of the traditional breakup fee

3   case law, I mean, breakup fees are normally in the range of one

4   to three percent, three percent at the highest.

5        And if you look at what Platinum is contributing here,

6   it's equity of 250 million dollars to the acquiring entity.

7   And even if you viewed that as consideration going to the

8   debtors, which it's not, that 30 million dollars would be

9   twelve percent, four times the highest range of any of the

10  cases that have approved a payment of breakup fees.  Your

11  Honor, we think that that's certainly going to chill the

12  bidding.  I won't address the argument about the DIP order.  I

13  certainly -- you know our position on that, that you could not

14  grant this relief without violating the DIP order.

15       And the final point that I'd make, Your Honor, is as I

16  said in our reservation of rights, if Your Honor doesn't deny

17  this as a matter of law, even accepting the facts in the

18  record, the evidence that you've admitted, we do think that you

19  ought to defer consideration of this until the sale hearing.

20  One of the -- of course, the purpose of a breakup fee is to

21  encourage bidding, not chill bidding.  And until we see the

22  results of the auction, you're really not in a position to

23  determine whether or not whatever Platinum contends it's done

24  has benefitted the estate.  And in the interim, we'd be able to

25  take discovery and be in a position to look at exactly what

1    these expenses are, what these costs are.

2        THE COURT:  Well, leaving aside the discovery point,

3    wouldn't that mean that the Court should defer every request

4    for a breakup fee or expense reimbursement?

5        MR. O'CONNOR:  Well, I think in some ways, yes, Your

6    Honor; in the sense that until you see whether or not the

7    estates benefit -- if you want to adopt the O'Brien test in the

8    Third Circuit -- until you see what the results of the auction

9    are, you're not really in a position to determine whether it's

10   going to benefit.

11       THE COURT:  But the Third Circuit dealt with the facts

12   at hand, which is that there was no pre-approval.  But on the

13   other hand, courts in the Third Circuit routinely approve

14   breakup fees and expense reimbursements before auctions, and

15   include the recognition of the need to deal with that in the

16   bidding procedures.

17       MR. O'CONNOR:  Well, that's true, Your Honor.  But in

18   the normal case, this is done in two steps.  The bidding

19   company insists on getting preliminary approval by the Court of

20   the bidding protections.  They didn't do that.  They chose not

21   to do that here.  And I think, under the circumstances, even if

22   you were to tentatively approve something, I think you'd have

23   to take a second look at it to see whether there's actually

24   been a benefit to the estate.

25       THE COURT:  But doesn't that argument really just go

28

1    back to the first one, which is, that Platinum took the risk

2    originally?

3         MR. O'CONNOR:  I think so.  I think that's the

4    predominant argument, Your Honor, that they're big boys; they

5    walked into this with their eyes open; they knew that there was

6    the strong likelihood that they were not going to be able to do

7    this on a private sale.  They didn't ask for any preliminary

8    approval to bind them to the contract.  And now, after the

9    fact, they're coming in, and essentially the debtors want to

10   give them a gift at this point of somebody else's money, and we

11   don't think that's appropriate.

12        THE COURT:  Okay.

13        MR. O'CONNOR:  Thank you, Your Honor.

14        THE COURT:  Thank you.

15        MR. PORET:  Your Honor --

16        THE COURT:  You can stay there if you want.  It's no

17   problem.

18        MR. PORET:  Charles Poret from Dechert.  Mr. O'Connor

19   has essentially said it all.  I would just like to point out

20   that in response to your question, responding to what Mr.

21   Butler said that the Platinum gave up certain rights in order

22   to open up this bidding process, including allowing the

23   Parnassus-GM agreements to be seen and not kept part of their

24   private sale.  Well, it's my understanding that to this date we

25   still haven't gotten those documents.  We still haven't gotten

29

1   most of the schedules to the MDA.  That if their argument that

2   it's consideration for asking for some reimbursement or breakup

3   fee after the fact when they consciously entered into a

4   transaction without bargaining for such or seeking approval of

5   such, then there's a failure of consideration right then and

6   there.

7           On the June 16th transcript Your Honor even indicated,

8   on pages 15 and 16, that any possible expense reimbursement or

9   breakup fee would have to bear a reasonable relation to the

10  amount of value added.  There's been no evidentiary proof of

11  any value added to these proceedings by Platinum by going into

12  a private deal with Delphi.  And you also indicated on page 16

13  that if this was appropriate at all, it would come up later on

14  in a 503(b) situation.

15          We think that essentially, to sum up, on this record,

16  to request an order approving a 30 million dollar fee or a fee

17  of any amount without submitting any evidentiary support, any

18  out-of-pocket expenses, legal fees, any other expenses, any

19  analysis of internal time and costs, and that it carries over

20  to several transactions, including an attempt to buy the

21  steering division, which failed, it's just way overreaching and

22  should be denied as a matter of law.

23          THE COURT:  Okay.

24          MR. RESNICK:  Your Honor, Brian Resnick, again, for

25  the administrative agent.  We join in the objections by Wilkie

30

1   and Dechert and agree with what they have said.  We appreciate

2   that the debtors have clarified in their reply that this fee

3   would not be payable in the event they pure credit bid, is the

4   successful transaction.  And we just wanted that to be clear on

5   the record.

6        Also, we vehemently disagree with the debtors' reading

7   of the DIP order and the DIP documents, but we agree with Your

8   Honor that that should be reserved for another day, and of

9   course, we reserve all rights with respect to those arguments.

10  And we also agree with Your Honor that there was no waiver in

11  any of the prior hearings of our rights to argue that our

12  consent is required under paragraph 13(a) of the DIP order.

13       MR. BROUDE:  Good morning, Your Honor.  Mark Broude,

14  Latham & Watkins LLP, on behalf of the official committee of

15  unsecured creditors.  There are a few problems that we have

16  with the relief that's being sought today, Your Honor.  As Your

17  Honor has recognized, the expenses for which the debtor is

18  seeking to reimburse Platinum do not relate entirely to the

19  transaction that's before Your Honor, but in fact go back over

20  three years, and include some untold amount of money that

21  Platinum spent in connection with the steering transaction.

22       Now, as Your Honor may recall, Platinum was the

23  stalking-horse bidder in the steering transaction.  At the time

24  of that transaction, Your Honor entered an order approving

25  bidding protection for Platinum, including the reimbursement of

31

1    these very expenses.  Now, Platinum was the winning bidder in

2    that transaction, and so wasn't paid those expenses, but then

3    it ultimately walked away from that transaction.  So in effect,

4    what they were seeking today, Your Honor, is to get another set

5    of reimbursement expenses for expenses that Your Honor has

6    already dealt with before.

7         The fact that some of that knowledge is useful today

8    does not justify including that in today's expense

9    reimbursement.  Further, there's really no basis to include

10   reimbursement of internal expenses.  I'm not sure if they're

11   asking for the estate to pay some portion of the salaries of

12   the people involved or other sort of expenses that are usually

13   just part of the cost of doing business.

14        Second, Your Honor, the debtors have provided

15   absolutely no justification for the 30 million dollar figure

16   other than Platinum has already spent it.  There is no attempt

17   in Mr. Sheehan's affidavit or in Mr. Shaw's affidavit to

18   justify that as a -- in relationship to what Platinum's

19   actually paying.  In fact, Your Honor, in terms of what is out-

20   of-pocket expenses or out-of-pocket cost of Platinum, which is

21   one dollar, it's actually a 3 billion percent breakup fee.  And

22   there's just absolutely no attempt made to justify that in

23   relation to the value the estate is receiving.

24        Even if one could argue that somehow Platinum is

25   directly responsible for the 250 million dollars that GM, not

32

1     Platinum, has provided to the estate, as Mr. O'Connor

2     mentioned, that's a twelve percent fee, which is still several

3     times larger than what are traditional fees in these cases.  We

4     think that, quite frankly, if there's to be a fee at all, a

5     much more rational fee is something that is measured in the

6     neighborhood of 5 to 7 million dollars as a function of the 250

7     million dollars that GM is providing, certainly not 30 million

8     dollars.

9          Finally, Your Honor, I don't actually view this as

10    similar to other breakup fee situations where, in fact, you are

11    provided up front.  Everybody here that's in the courtroom

12    today, the DIP lenders, the creditors' committee and others,

13    have objected to the fundamental nature of the sale.  And

14    what's unique about this, Your Honor, is the involvement that

15    General Motors and the United States Treasury have had in the

16    sale.  I mean, when you go through the papers that the debtors

17    have submitted, and particularly the affidavits of Mr. Sheehan

18    and Mr. Shaw, what's clear is that Platinum negotiated its deal

19    with GM and Treasury and presented it to the debtors.

20         The debtors ultimately -- frankly, the debtors had

21    very little choice in this matter, and that's an issue we will

22    be dealing with at length on July 23rd.  But this is not a

23    normal situation where the people may object to whether a sale

24    today is appropriate.  What we're talking about is a process

25    which many people in the room view as being fundamentally

33

1    flawed.  And if, in fact, at the end of the day, Your Honor

2    would rule that the whole process was flawed, then the basis

3    for seeking the expense reimbursement would then go away.  So

4    we believe that, if Your Honor is otherwise inclined to grant

5    the fee, we think it should actually be deferred to the July

6    23rd hearing.

7         THE COURT:  Well, let me just briefly address that

8    last point.  The bidding procedures contemplate third parties

9    coming in and making a bid.  And they are supposed to have

10   access to not only the transaction documents that Parnassus and

11   Platinum have negotiated with the debtors, but also with GM.

12   Why wouldn't that be a benefit in that they would have access

13   to those documents that they could say to the debtors, they

14   could say to GM, we're willing to pay more and step into those

15   documents?  They in essence have a template then.

16        MR. BROUDE:  And, Your Honor, I would agree with that.

17   But that presupposes Your Honor ultimately approves the

18   transaction at the end of the day.

19        THE COURT:  Well, I understand.  But if I don't

20   approve it, then they don't get their bid, right?  Because you

21   have a credit -- I guess the alternative is a pure credit bid.

22        MR. BROUDE:  Well, that's -- understanding the --

23        THE COURT:  Well, I guess that's an issue.  When the

24   debtors say it doesn't include a pure credit bid, I am assuming

25   it also doesn't include foreclosure, right?

34

1        MR. BROUDE:  I would hope not, Your Honor.  And I

2    guess to the extent that this fee, if approved today, would

3    only be payable if, in fact, Your Honor approved a transaction,

4    then that's what I think addressed that last point.  Because if

5    Your Honor ultimately decides that, in fact, the whole process

6    is flawed, no transaction should be approved, then by

7    definition the fee wouldn't be payable.

8        THE COURT:  Okay.  Mr. Butler, could we address that

9    last point, first?

10       MR. BUTLER:  Your Honor --

11       THE COURT:  When I reread the bidding procedures, I

12   didn't actually see a definition of alternative transaction.

13   The term was used, but it didn't really -- it wasn't really

14   defined.  Is it meant to be -- I'm assuming it's meant to be

15   something I approve, either as part of the bidding procedures

16   or down the road.

17       MR. BUTLER:  Yes, Your Honor.  And, in fact, and we

18   say it clearly in our response and clearly -- we believe it's

19   clearly in our motion seeking this, is the debtors have

20   actually worked very hard to put limitations on this expense

21   reimbursement.  It is not payable in connection with a pure

22   credit bid.  It is not payable in any circumstance unless a

23   higher or better alternative transaction is both approved by

24   Your Honor and actually consummated.  So this isn't one -- many

25   times these triggers come when you veer away from the current

35

1    deal.

2         This isn't what's before the Court.  What's before the

3    Court, in plain English, what our motion says, what our

4    documents say, what our response says is, this only gets

5    triggered if there is an alternative transaction.  That means

6    an alternative transaction that occurs in connection with the

7    supplemental procedures in which the case -- and I agree with

8    Mr. Broude's footnote in his response, because I think he got

9    it and he read it and he put a footnote in, which I think

10   amplifies what the debtor said, which is -- in his response,

11   which says in -- I don't have the exact footnote number here,

12   but it makes it clear that this is not payable unless an

13   alternative transaction is consummated and closed.

14        So that's not a foreclosure.  It's not a pure credit

15   bid.  And that has been plain from the start.  There was an

16   important limitation.  I think Mr. Harris will, when he gets up

17   and he wants to comment, will acknowledge that that's precisely

18   what we talked about with Platinum.  And that's what the relief

19   we sought was from the beginning.  So I'd just --

20        THE COURT:  Okay.

21        MR. BUTLER:  -- answer that point up front.

22        THE COURT:  Okay.

23        MR. BUTLER:  It was, to us, an important limitation.

24   And part of the problems we have here is we go and negotiate

25   those important limitations, as Mr. Broude in his papers

36

1    acknowledged, because he referenced it, and then we get

2    objections to just, you know, there's a straw man out there

3    that these create affordables that just don't apply here.  This

4    was a carefully crafted acknowledgement of when this thing

5    ought to be paid.

6           I also think, Your Honor, that, as Your Honor

7    considers the various objections that have been lodged, I do

8    think it's important, and I think Your Honor got the gist of

9    the argument earlier, but I do urge Your Honor to take into

10   account very carefully the paragraph 46 language that GM

11   required be in there in order for GM to move forward and fund

12   the estate and in order for the MDA process to move forward.

13   Because that was the product of discussions between the

14   debtors, GM and Platinum.  And the reality is, there could have

15   been this transparent process that Your Honor was seeking with

16   respect to the debtors' consideration of unsolicited third-

17   party offers.  But if, in fact, it was akin to an exclusivity

18   arrangement between GM and Parnassus, such that GM couldn't

19   talk to anybody else, that process would have had, really, no

20   legitimate opportunities, in the debtors' view, to go anywhere.

21          And so ultimately, the language in paragraph 46 was

22   crafted, it was something that was designed by General Motors.

23   We thought it was eminently reasonable.  And it represented a

24   change circumstance.  And it's in that context that the Court,

25   I think, needs to consider this proposal.  It's the very same

37

1    paragraph in this proposal we discussed.  And of course, as

2    Your Honor knows, the order that was submitted to Your Honor,

3    the deal that had been struck between GM and Delphi and

4    Parnassus for those changed circumstances, was that the 30

5    million dollar transaction fee be approved as part of the

6    modification of procedures order.  And Your Honor, on the

7    record at the June 16th hearing, indicated it was disinclined

8    to approve it on that record, and wanted us to bring it by

9    separate motion.

10        Now -- which we have done.  Now, the experience in

11   these cases up till now has been, in each of these cases -- and

12   this was brought in the same way that's consistent with this,

13   is the expense reimbursement has, in no -- we've sold billions

14   of dollars'-worth of businesses in this case, and we have never

15   proved up the expense reimbursement in court.  Not one time.

16   And in fact, under the steering deal, just to correct the

17   record, Platinum did not walk away from the steering deal.

18   Ultimately, as Your Honor recalled, there was a discussion and

19   negotiation between General Motors and Delphi about an enhanced

20   steering exercise option that had a lot of beneficial

21   arrangements in it for Delphi.  We filed that motion, and as

22   part of that -- and you may recall, it was included in that

23   motion -- we entered into a termination agreement with Platinum

24   in which they agreed that their relationship with us with

25   respect to that transaction would be terminated.

38

1          It was hardly a walk-away.  And they agreed to

2    release -- even though an arguably, an expense reimbursement

3    provision was payable, it was 6 million dollars in that

4    transaction, by the way, that that 6 million dollar payment for

5    what was a transaction that is dwarfed by this MDA, they agreed

6    to waive any liability of the estate for payment of that

7    transaction fee.  So I think to say on the record that they

8    somehow walked away and they aren't entitled to things, they

9    walked away, and in the context of that transaction, seeking to

10   continue to cooperate with the debtors, released the estate

11   from any liability as it related to that agreement.

12          THE COURT:  Who gets the steering business under the

13   MDA?

14          MR. BUTLER:  Ultimately, this is an integrated

15   transaction.  It goes to GM.  And that's one of the things I

16   think that has been another sort of theme here.  And I think

17   you're going to see it maybe play out in an effort by some of

18   the lenders at the sale hearing, is this is -- the MDA is an

19   integrated transaction.  In order to be able to accomplish it,

20   there were a series of principles that had to be agreed to.

21          And I couldn't disagree more with the statements made

22   on this record by Mr. Broude that because his -- the

23   evidentiary record will not support that the debtors played --

24   did not play a material role in the negotiation of the MDA.

25   Quite to the contrary, the debtors, as was clear in Mr.

39

1   Sheehan's declaration, which has been admitted into evidence,

2   is not controverted here for this record.  The fact is, in

3   early May the debtors, in answering a question from the

4   government and from General Motors about what would it take for

5   the debtors to sponsor an ultimate resolution of these cases,

6   the debtors set out a series of goals and objectives and a

7   series of principles which it shared with the DIP lenders, the

8   creditors' committee, the government and General Motors, as

9   well as the private side partners that were being considered at

10  that time.  And the company stuck to those principles.  And

11  there were many, many, many changes to the structure to meet

12  the deal principles that the company put in place there.

13          And so, for example, one of the very conveniently

14  ignored items here is that, under the MDA, billions of dollars

15  of administrative claims are assumed by the company buyer and

16  General Motors in connection with the MDA, if and when it's

17  consummated.  And that is enormous value to this estate.  And

18  there is an enormous amount of administrative claims that are

19  being assumed directly by the Parnassus entity that are going

20  forward here.  And so --

21          THE COURT:  Well, when you say that it's being assumed

22  by the Parnassus entity --

23          MR. BUTLER:  Right.

24          THE COURT:  -- what is the capitalization of that

25  Parnassus entity?

40

1          MR. BUTLER:  The capitalization of the Parnassus

2     entity, as we've indicated, Your Honor, that company has 3.6

3     billion dollars in emergence capital and capital commitments to

4     it from --

5          THE COURT:  But where --

6          MR. BUTLER:  -- from General Motors --

7          THE COURT:  From GM?

8          MR. BUTLER:  -- and Parnassus.

9          THE COURT:  Okay.

10         MR. BUTLER:  But the fact is --

11         THE COURT:  Well, from Platinum?

12         MR. BUTLER:  Yes, from Platinum.

13         THE COURT:  The 250 million from Platinum?

14         MR. BUTLER:  No, it's actually 500 million.

15         THE COURT:  Okay.

16         MR. BUTLER:  It's actually -- it may be more than

17    that.  It's actually at least 500 million.  But the fact is,

18    Your Honor --

19         THE COURT:  I'm sorry, where does the other 250 come

20    from?

21         MR. BUTLER:  They committed to loan additional

22    proceeds to -- if necessary, as did General Motors.

23         THE COURT:  Okay.

24         MR. BUTLER:  The total commitment's 500 million from

25    them, as has been disclosed, not 250 as it relates to that.

1    But they also will end up operating this business.  And what

2    I --

3            THE COURT:  But that's a loan, right, not a capital

4    contribution?

5            MR. BUTLER:  Yeah, it's a loan to a privately held

6    company that they own.

7            THE COURT:  Right.

8            MR. BUTLER:  So Your Honor can --

9            THE COURT:  But at that point it owns this business?

10           MR. BUTLER:  Yes, it owns the business, but --

11           THE COURT:  Right.

12           MR. BUTLER:  -- you asked how is it that billions of

13   dollars of estate obligations are going to be paid.  They're

14   going to be paid by the MDA counterparties but they're putting

15   in capital to pay them.  And one of the things that we seem to

16   be missing here is that the only transaction that's been able

17   to be put on the table in the last fifteen months -- and the

18   plan investors walked away -- that is feasible, fully funded,

19   essentially unconditional and capable of execution is the MDA.

20   All right.  And there's been billions of dollars committed to

21   it, and there are billions of dollars of estate obligations

22   that are being satisfied.  And to trivialize that, people try

23   to pull it away and try to divide it.  It is an integrated

24   transaction that's before the Court, and that's what's going to

25   be before the Court on the 23rd.

42

1          And I think -- you know, and by the way, that same --

2     that transaction going forward and having that comprehensive

3     resolution was an absolute requirement.  And the evidentiary

4     record here, the letters from the government make very clear,

5     and from General Motors, make very clear that having that

6     comprehensive resolution was an absolute requirement for GM,

7     with the support of the government putting in 250 million

8     dollars in this case, to provide incremental liquidity.  A

9     total of 850 million dollars has been put in by General Motors

10    since last December to support the operations of this business;

11    zero has been put in by anybody else.

12         And the reali -- and those are the realities of these

13    cases.  I mean, the reality of these cases is to maintain value

14    for our stakeholders.  We have been able to find the liquidity,

15    we have been able to find the transactions, and we presented

16    them to the Court, the only one that at least I'm aware of

17    exists that's a viable one.  And we have agreed, obviously,

18    Your Honor, and have been moving forward, to support this

19    alternative transaction process that has been fashioned in the

20    supplemental procedures.

21         I would disagree with counsel when they say gee, you

22    haven't given us all the MDA exhibits.  What they want to do is

23    to rewrite the MDA.  The MDA lists specifically in it the

24    timetable for the creation of various exhibits to the MDA.

25    Some had to be created immediately; they have been and they've

43

1   been shared.  Others are on a longer timetable under the terms

2   of the MDA and they're not ready yet.  And they're complaining

3   because they're not ready yet.  The fact of the matter is they

4   can't require people to operate on a timetable that's different

5   than it's in the contract.  That's not due diligence; that's

6   trying to do something else.

7           THE COURT:  So the debtors are provided all the

8   exhibits to the MDA that --

9           MR. BUTLER:  That have been --

10          THE COURT:  -- that they --

11          MR. BUTLER:  That have been created to date.

12          THE COURT:  -- that they have?

13          MR. BUTLER:  Yes.  And the reality is that there's a

14  list of exhibits, and there's more being created daily as they

15  continue to work on it, like any other M&A transaction.  But if

16  Your Honor looks at the MDA, there are specific provisions that

17  say these exhibits and schedules need to be created immediately

18  and the balance of these have to be created prior to closing.

19  And the parties are working on those to create those.  Most of

20  those schedules and exhibits are outside of the control of the

21  debtors; they're being created by other parties.

22          THE COURT:  So I guess the ones that had been provided

23  are the ones that are truly integral, right?  Those are the

24  really important ones --

25          MR. BUTLER:  No, Your Honor, I think --

44

1      THE COURT:  -- since this is an integrated

2  transaction?

3      MR. BUTLER:  No, Your Honor, they're all integral.

4  You look -- Your Honor, you look at a transaction at closing.

5      THE COURT:  That's why GM put all this money in,

6  right, because they knew they had a deal?  So I'm assuming what

7  the deal is what's in hand, right?

8      MR. BUTLER:  Your Honor, yes, subject to complete --

9      THE COURT:  All right, so the other exhibits are

10  probably fairly trivial.

11      MR. BUTLER:  Well, Your Honor, they're -- I

12  wouldn't -- I'm not going to characterize what GM or Parnassus

13  considers those exhibits to be.  I'm saying to Your Honor it's

14  a very normal process that's ongoing here.

15      THE COURT:  Okay.

16      MR. BUTLER:  It's contemplated by the contract, and

17  people are working in good faith.  And as they contin -- as

18  they produce the documents, they're turning them over.  I'm not

19  trying to characterize what people think of each exhibit.

20      THE COURT:  Okay.

21    (Pause)

22      MR. BUTLER:  Your Honor, I think -- otherwise, I'm

23  going to rely on the responses we put in our reply, which

24  are -- respond to each of the nine objections that were raised.

25      THE COURT:  Okay.

45

1          MR. BUTLER:  Thank you, Judge.

2          MR. HARRIS:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. HARRIS:  Adam Harris from Schulte Roth on behalf

5     of Platinum Equity and Parnassus entities.  Your Honor, I'm

6     going to start off with some brief comments, because a lot has

7     been said about Parnassus and Platinum, and a lot of

8     aspersions, frankly, casted in our direction for reasons I'm

9     not totally understanding here.

10          THE COURT:  I don't -- I didn't really see any.  I

11    mean, the only one -- and I didn't really actually hear Mr.

12    Broude say this -- was the suggestion that Platinum had not

13    followed through on the steering deal and that, obviously, if

14    that were the case the debtors would have sued you a long time

15    ago.  So I don't -- anyway, you can say what you want, but I

16    didn't really hear people casting aspersions on Platinum or

17    Parnassus, per se.  They may not like the deal, but they

18    haven't said that --

19          MR. HARRIS:  Your Honor, and back on the June 10th

20    hearing, Your Honor actually asked a lot of questions about who

21    Platinum Equity was, what we were all about, how we got here,

22    what was the circumstances that led to the creation of the MDA,

23    why we were the party that ultimately ended up as a party to

24    that MDA rather than somebody else.  I mean, I think, Your

25    Honor, that the declarations of Mr. Sheehan, Mr. Shaw and Mr.

46

1    Krasner lay out very clearly how this process has unfolded.

2    There was also a lot of statements made on that record about

3    inferences about backroom deals; Mr. Broude raised it again

4    today about this being a deal that was negotiated by GM and the

5    auto task force and Platinum and just dropped on Delphi.

6    Frankly, nothing could be further from the truth.

7         Your Honor, the MDA -- it was a product of

8    negotiations between several different parties and done in

9    parallel, if you will, as Mr. Sheehan's declaration clearly

10   states, with ongoing negotiations with other interested third

11   parties as well as the DIP lenders and other parties inside the

12   case.  And everybody was completely and totally aware of what

13   was going on at that time frame.  There is, and can be, no

14   statements made by anybody that somehow they were unaware that

15   there was a deal that was being worked on between Platinum and

16   GM and Delphi at that point in time.  In fact, we were sitting

17   in conference rooms in the same offices, sometimes next to each

18   other, sometimes upstairs or downstairs from one another, and

19   we actually broke out of a negotiation session on Friday night,

20   May 29th, to go upstairs and sit with the DIP lenders and

21   explain to them the details of our deal and our operating plan.

22   So for anybody to say that they had no idea what was going on

23   or what was happening at the time is simply incorrect.

24        But putting that aside, Your Honor, the MDA, when we

25   entered into it -- everybody's making a lot of statements about

47

1    we took the risk, we understood the risk that other people

2    could show up.  And, you know, in some respects, Your Honor,

3    that's right, but you got to put it in context.  When you look

4    at Mr. Sheehan's declaration, Your Honor, this company had been

5    out in the market, talking to third parties, talking to its DIP

6    lenders, and was unable to bring any transaction to fruition

7    other than ours.  That was the facts that were presented to us

8    at the time, and we understood that.

9          As Mr. Butler said, and we agree, we always knew that

10   the DIP lenders had the right to either credit bid or foreclose

11   here.  We're not expecting, never anticipated, we would get any

12   kind of protection in that circumstance.  That was always out

13   there and something to be addressed.

14         THE COURT:  But that's --

15         MR. HARRIS:  But --

16         THE COURT:  Just so I get the time frame right, that's

17   starting in, like, May of this year?

18         MR. HARRIS:  Your Honor, the first draft of the MDA

19   that we actually saw, which followed on several negotiating

20   sessions regarding Platinum's presentation of its business plan

21   and restructuring plan to GM and Delphi and the auto task

22   force, the first draft we saw, I believe, was the Monday of

23   Labor Day Weekend.

24         UNIDENTIFIED SPEAKER:  Memorial Day.

25         UNIDENTIFIED SPEAKER:  Memorial Day.

48

1        MR. HARRIS:  Memorial Day Weekend.  Sorry, Memorial

2    Day Weekend.  I'm getting ahead of myself here.  Memorial Day

3    Weekend.  And from then forth, it was from there till June 1

4    that we were in substantive negotiations over the details of

5    that agreement and a lot of the ancillary agreements which went

6    along with it.

7        But when you look at the MDA, Your Honor, the MDA is

8    taking a worldwide business and breaking it up not in

9    necessarily easy segments but in pieces pulled out of various

10   parts of the world, some of which are going to GM, some of

11   which would be going to Parnassus.  And that is an

12   extraordinarily difficult and complex transaction to be able to

13   pull off.

14       And frankly, Your Honor, the only reason we were in a

15   position to do that and to agree to the terms in the transition

16   services arrangements that have been worked out with GM is

17   because we had been doing diligence on this company for the

18   better part of three years.  We understood the entire business;

19   we understood the IT issues; we understand the Treasury-related

20   issues; we understand what's going on in all the foreign

21   countries because we put people on planes and sent them there

22   for extended periods of time to sit with operating management

23   at local levels to understand their businesses, how they

24   operated, what their customer bases were, and to understand the

25   dynamics of that and how that we'd -- how we could change the

49

1    structure to make it long-term economically viable.

2          So, Your Honor, all the things that are in Mr.

3    Krasner's affidavit, all the things that are in Mr. Sheehan's

4    affidavit, lead one to the inevitable conclusion that when the

5    MDA was signed we had every reason to believe at that time when

6    we signed the agreement that the only potential other party

7    that could be interested in these assets were the gentlemen

8    sitting at the table to my far left, the DIP lenders.  No other

9    third party was out there, and the debtors had no intention of

10   going out to start and solicit anybody else.

11          THE COURT:  The affidavits say that they'd been in

12   serious negotiations with at least one and perhaps two other

13   parties.

14          MR. HARRIS:  But that's -- Your Honor, I believe that

15   reference is only since the procedures were put in place

16   subseq --

17          THE COURT:  I don't think so.  I --

18          MR. HARRIS:  Well, there were prior to, Your Honor,

19   but at the time we signed the MDA those parties had not agreed

20   to the terms that Delphi felt were necessary in order --

21          THE COURT:  Well, no, I understand that, but it's

22   often the case that people like that come back once an

23   agreement's signed.

24          MR. HARRIS:  It's possible, Your Honor, but, I mean --

25   and I suppose that risk was out there, but the way we set up

50

1    the MDA, at the request of the debtors, was as a private

2    transaction.  We talked about expense reimbursements and

3    breakup fees at that time.  We agreed on the non-solicit

4    provision that was in section 9.40 of the MDA.  And we moved

5    forward on that basis with a signed deal with GM, which they

6    were locked into, and with a signed deal with Delphi, which was

7    obviously also subject to Court approval.

8           Now, Your Honor, the landscape, not at our request

9    clearly, not at GM's request, at the request of the other

10   parties in the case, changed dramatically on June 10th.  We

11   went from what was effectively a private sale, where the DIP

12   lenders preserved their right to credit bid or foreclose, to

13   what is effectively an open auction process.  And in the

14   context of that, we were asked to do several things relative to

15   the MDA, not the least of which was to, effectively, release GM

16   from any obligations they might have to us under that contract,

17   to work exclusively with us and under our other arrangements.

18   We were asked to do that.  We were asked to basically make

19   other changes to the MDA to accommodate the bid procedures that

20   have now been approved by the Court.  We agreed to do that, in

21   return for which the company agreed to move forward with this

22   expense reimbursement motion, because, effectively, Your Honor,

23   there's only one circumstance in which it ever gets paid.  If

24   an alternative transaction that provides value to the estate,

25   higher than what we are providing, is approved by this Court,

51

1    the fee gets paid.  It's not a credit bid situation, it's not a

2    foreclosure.  But somebody's got to come in and top the bid of

3    GM and Parnassus.

4            And, Your Honor, just to put it in context, from our

5    perspective, looking at the schedules that we've worked up with

6    Delphi, we value the consideration to the Delphi estate on an

7    aggregate basis under that transaction at north of five billion

8    dollars when you take into account all the liabilities that are

9    being assumed by GM and Delphi, the cash that's being provided,

10   claim relief, and so forth.  It is an extraordinarily large

11   number.

12           Now, the DIP lenders ignore all that because, frankly,

13   most of it's not going in their pockets.  They don't consider

14   it consideration if it's coming to them.  They say, well, Your

15   Honor, only look at the 250 million dollars that Parnassus --

16   that Platinum is putting into Parnassus and calculate a fee off

17   of that.  Mr. Broude said fee of two to three percent off of

18   that.  The wrong analysis, Your Honor.  He's focusing on the

19   wrong thing.  What the case law says is you look at the

20   consideration that's being provided to the estate and you

21   calculate if off of that.  And here, if you take Mr. Broude's

22   percentage and you apply it, it comes out to a number well in

23   excess of the thirty million dollars that's being suggested

24   here.

25           There are credit -- there are liabilities of this

52

1    estate, Your Honor.  All of the administrative expenses of this

2    estate, all of them, are being picked up by Parnassus as the

3    acquiring entity, or GM under the terms of this transaction.

4         And if you -- even if you just look at a piece of

5    that, Your Honor, what's Parnassus doing, the consideration

6    that we're picking up is still well in excess of a billion

7    dollars.  It's not a divisible transaction, but if you look at

8    the schedule of who's picking up what, our piece of it's well

9    over a billion dollars.

10        THE COURT:  Where's -- how?

11        MR. HARRIS:  Because, Your Honor, we're pick --

12        THE COURT:  I don't see that in the MDA, which is the

13   only thing I have.

14        MR. HARRIS:  Your Honor, if you look at the schedule

15   of assumed liabilities, which I forget what the cross-reference

16   is to the exhibit, it includes picking up all of the post-

17   petition trade.  It includes picking up all the -- you know, we

18   have -- there's, like, 65 million dollars in cures; there's the

19   145 million dollars of membership interests in Parnassus that

20   are being provided to the Class C -- Tranche C DIP lenders;

21   there's several hundred million dollars of other items.  And on

22   schedule it comes to 1.3 billion dollars that's being picked up

23   by Parnassus.  GM --

24        THE COURT:  Where's the money from?

25        MR. HARRIS:  It's being paid through the

53

1    capitalization of the new entity and paid over time as those

2    obligations become due.

3            THE COURT:  Out of the new entity's assets, right, the

4    assets you're buying?  Isn't it an LBO?

5            MR. HARRIS:  Well, and the cash that we're putting in

6    it.

7            THE COURT:  The 250 million --

8            MR. HARRIS:  The 250 million --

9            THE COURT:  -- plus the loan --

10           MR. HARRIS:  It's the 250 mill --

11           THE COURT:  -- which is also going to get repaid?

12           MR. HARRIS:  It's the 250 million that they're --

13           THE COURT:  Are you going to say that any bidder can

14   count towards its purchase price the financing that it

15   provides --

16           MR. HARRIS:  Your Honor --

17           THE COURT:  -- as credit?

18           MR. HARRIS:  Your Honor, you look at the consideration

19   that's actu -- it's not --

20           THE COURT:  I know, I'm looking at the consideration

21   that comes to the estate.

22           MR. HARRIS:  Right, and the capitalization of

23   Parnassus is combined; it's 2.25 billion dollars of equity and

24   750 million of loans.  So that 2.25 billion of equity and the

25   future earning power of that entity is going to relieve this

54

1   estate of in excess of --

2           THE COURT:  Have you ever seen a bidding topping fee

3   calculated on that basis where you look at the capitalization

4   of the acquirer?

5           MR. HARRIS:  Your Honor, I'm not suggesting we look at

6   the capitalization of the acquirer.  I'm suggesting we look

7   at --

8           THE COURT:  It sounds like what you're saying.

9           MR. HARRIS:  No, actually, I don't think I am.

10          THE COURT:  Okay.

11          MR. HARRIS:  I think what I'm saying is that you look

12  at the consideration that's being provided to the estate in

13  terms of relief of obligations or payment of its debts, and

14  that's the basis upon which you calculate the breakup -- the

15  expense reimbursement.  The consideration here to this estate,

16  putting aside for the moment who it goes to, is in excess of

17  five billion dollars under this transaction.

18          Your Honor also raises several other questions which

19  I'd like to just address for a moment; one of them was how you

20  deal with paragraph 13(a) of the DIP order.  Your Honor,

21  putting aside the fact that the team of the DIP lenders have

22  decided selectively of when to argue this and when not to,

23  given that there have been several other breakup fees and

24  expense reimbursements approved on other sales in the case --

25          THE COURT:  Well, they consented there.

55

1          MR. HARRIS:  I underst -- I did say "selectively".

2          THE COURT:  Okay.

3          MR. HARRIS:  I didn't say they didn't have the right.

4          THE COURT:  All right.

5          MR. HARRIS:  I believe, Your Honor, that, like in many

6     other transactions, their rights here relate solely to matters

7     affecting -- that constitute proceeds of the sale.  Your Honor,

8     you could extend that argument, frankly, to a buyer's agreement

9     to assume liabilities, pay cure costs and other things, and

10    they could argue till the cows come home that's all

11    consideration that they should receive rather than other

12    parties.  I believe, Your Honor, that, in cases similar to

13    this, that arguments can be crafted that basically say it's a

14    fee that's payable by the successful bidder, it falls outside

15    the context of proceeds and, therefore, it does not fall

16    necessarily within the liens of the DIP lenders.

17          I mean, Your Honor, there are two or three other

18    people here who have expressed interest and are doing

19    diligence; they know about this motion.  Yesterday we asked Mr.

20    Sheehan whether any -- when these objections came in, whether

21    anybody who's doing diligence had complained about the prospect

22    of having to potentially pay up to thirty million dollars as

23    expense reimbursement to Platinum should they be declared the

24    winning bidder and close their alternative transaction.  Mr.

25    Sheehan's answer is no one has made any comments about it at

1    all.  It is, frankly, potentially a rounding error in the

2    context of the magnitude of the deal, including the size of the

3    purchase price, the amount of assumed liabilities and the

4    overall issues extant in this case.

5         And, Your Honor, I think at this point we have set a

6    floor here that is going to define what constitutes potentially

7    a higher or better offer.  That incremental value is not

8    something that is available to anybody else today.  And, Your

9    Honor, to the extent we are here setting that floor and causing

10   other people to look at our transaction and have to overbid it,

11   that is a direct conferrable benefit on the estate and all of

12   its creditors for which expense reimbursement, we believe,

13   would be appropriate.

14        I'd be happy to answer any questions Your Honor might

15   have.

16     (Pause)

17        THE COURT:  Yeah, that's fine, thanks.

18        MR. HARRIS:  Thank you, Your Honor.

19        MR. O'CONNOR:  Your Honor, may I make one brief

20   observation?  We've heard today, or after the last conference

21   where the debtors contended that Platinum was bound and

22   virtually had no outs, we've heard today that, in light of

23   what's happened recently, Platinum agreed to allow GM to do

24   certain additional things, perhaps to deal with an alternative

25   bidder, and we've heard that they requested that the debtors

57

1    seek this relief.  But what we haven't heard is that they

2    conditioned the granting of those additional modifications on

3    obtaining that relief.  We're back in the same position as we

4    were the first time, or slightly different.  They may have

5    asked for something this time, but unlike the traditional

6    bidder that says I'm not going to go forward unless I get

7    preliminary approval they haven't even asked for that now.

8              THE COURT:  Okay.

9              Anything else?

10             MR. PORET:  Your Honor, putting aside that the

11   schedules that were referred to, the assumed liabilities,

12   haven't been produced until the so-called due diligence phase,

13   which is sorely lacking, this whole business ignores the fact

14   that it was the DIP lenders who put in billions of dollars that

15   kept this company going and alive while they developed a

16   private transaction with Platinum.  The company defaulted on

17   its obligations.  The DIP lenders extended --

18             THE COURT:  But I don't -- how is that relevant to

19   this motion, then?

20             MR. PORET:  It's relevant in terms of the value that

21   is supposedly being received by the creditors, by the DIP

22   lenders in this transaction where one dollar is being put in to

23   purchase the company.  And through other transactions,

24   administrative claims or other claims that were junior to the

25   DIP lenders are going to be paid by other parties while the DIP

58

1    lenders are going to be paid, at best, twenty cents on the

2    dollar, but in actuality a lot less.

3        THE COURT:  But, I mean, your remedy for that is to

4    credit bid and then this transa -- this fee wouldn't be owing.

5        MR. PORET:  You're right.  I was just putting --

6    trying to put in context this seemingly extraordinary request

7    for a breakup fee approval at this time.

8        THE COURT:  Are you -- maybe I misheard you.  Are you

9    saying that the schedule of assumed liabilities has not been

10   provided to you?

11       MR. PORET:  I'm told by people that have been involved

12   in that that we haven't received that.  We haven't received a

13   lot of schedules; we haven't received a lot of agreements.

14   Essentially, Platinum --

15       THE COURT:  Well, I'm just focusing on that one, the

16   schedule of assumed liabilities.

17       MR. BUTLER:  Your Honor, the schedule of assumed

18   liabilities, I think, has been put in there; it was also

19   disclosed in the supplement to the disclosure statement.  There

20   are charts in there that lay out plainly what's being assumed,

21   in the actual supplement to the disclosure statement.

22       MR. KELLY:  Your Honor, Mike Kelly from Willkie Farr.

23   Your Honor, a number of schedules have not been supplied to us.

24   I know that letters have gone to the Court, and I believe

25   Elliott is prepared to address it afterwards, but the fact of

59

1    the matter is we're playing a game of cat and mouse here and we

2    don't have all of the information to bid against; the debtors

3    know it.  The correspondence has been back and forth.  It's --

4    and we can address it in the chambers conference if you'd like.

5        MR. BUTLER:  Your Honor, the schedule of assumed

6    liabilities, by the way, those schedules were actually

7    published in romanettes xviii and xix of the supplement to the

8    disclosure statement and were out for the whole world to see.

9    And the debtors certainly will prepare to address the matters

10   in a chambers conference, but the fact of the matter is the

11   debtors have fulfilled their responsibilities and will continue

12   to fulfill their responsibilities in terms of due diligence.  I

13   have a lot to say about that in the chambers --

14       MR. KELLY:  Your Honor, timing is everything, okay,

15   and Mr. Butler knows that.  At the end of the day, nobody can

16   put together a credible bid unless they have the entirety of

17   the package in front of them.  They shouldn't have to be Lewis

18   and Clark going hunting for things.  We have assumed contracts,

19   schedules that have not been supplied.  They should be working

20   to give everything to anyone who wants to bid.  We shouldn't be

21   chasing ourselves on this.  And certainly today, where we're

22   just talking about a breakup fee, the question is have they

23   done enough to act and add value to the estate?  And I'm just

24   submitting to Your Honor that, as long as we're chasing them, I

25   don't know how that can be the case.

60

1          MR. BUTLER:  Your Honor, on the subject of due

2    diligence, Mr. Kelly represents a party who has been doing due

3    diligence in this estate since last November.  This estate has

4    paid their advisors millions of dollars in due diligence fees

5    to do diligence to this estate.  To suggest that the collective

6    of Tranche C lenders has not had an opportunity over the last

7    seven months to do diligence to this estate pretty much on an

8    unfettered basis is just completely unsupported in the facts.

9    And the fact that they then -- the parties then chose not to

10   sign up to the protective order after Your Honor entered it for

11   weeks, you know, they take no responsibility for anything; it's

12   always the other guy.  And the fact is if we have to prove this

13   in an evidentiary record, we will lay it out and we will prove

14   it.  The debtors have completely fulfilled their fiduciary

15   duties, they're continuing to do so, and this continued

16   assassination on the record, which is completely unsupported by

17   the facts, has to stop.

18          THE COURT:  Well, I just wanted to focus on the

19   schedule of assumed liabilities since that's --

20          MR. BUTLER:  Right here in the disclosure statement,

21   Judge.

22          THE COURT:  Okay, so --

23          MR. KELLY:  Is that the schedule to the contract?

24          THE COURT:  Well, I --

25          MR. KELLY:  Mr. Butler, is that the schedule to the

61

1   contract?

2          MR. BUTLER:  I don't know, Mr. Kelly.

3          MR. KELLY:  Okay.  Thank you.

4          MR. BUTLER:  All I know is that all the information is

5   publicly posted.

6          MR. KELLY:  Your Honor, what we're asking for, again,

7   is to hang up the Lewis and Clark hats and instead hand us the

8   contract with the schedules as prepared so that we know what

9   we're shooting at.

10         THE COURT:  Well, but the debtors have said that they

11   haven't been -- you've gotten everything that's been prepared.

12         MR. KELLY:  And that's my point.  For today, the

13   question is do we have a contract that we're shooting against?

14   Answer:  Absolutely not.  I don't know how a breakup fee can be

15   approved when we don't have something to shoot at.  We'll deal

16   with that on the 23rd or before, what Mr. Butler is getting at,

17   but for the Court today, do I have a deal or do I have to go

18   hunting through data rooms to get the underlying data?  That's

19   not what a breakup is about; that's not what a stalking horse

20   is about.

21         MR. BUTLER:  Just to say, Your Honor, Mr. Kelly isn't

22   even prepared to follow the supplemental procedures.  They're

23   doing this pure credit bid and all these other transactions.

24   They're not even prepared to follow the procedures or follow

25   the diligence -- scope of diligence that's set forth in Your

VERITEXT REPORTING COMPANY

62

1    Honor's prior orders.  I mean, the debtors are going to be

2    prepared to make a complete record of this because we are tired

3    of being accused publicly of not doing our jobs when it

4    couldn't be farther from the truth.  And, Judge, you know, it's

5    going to have to stop.  And the fact that they think they have

6    this form here to make it so it's reported in the media when

7    it's completely untrue, all right, has got to stop.

8         The company has tried to be very reserved in how it's

9    dealt with this publicly, because they are our DIP lenders; we

10   are trying to work with them, all right.  But we noticed that

11   it's -- you know, that these statements are just not true.

12        THE COURT:  Okay, anything else?

13        All right, I have before me a motion brought on by

14   order to show cause under Section 363(b) of the Bankruptcy

15   Code, authorizing the debtors to provide expense reimbursement

16   to Platinum Equity Advisors, LLC in connection with the

17   proposed sale of the debtors' assets pursuant to a master

18   disposition agreement, as amended.

19        The debtors entered into the form of the original

20   master disposition agreement on June 1st, 2009 and sought

21   approval, on an expedited basis, of, among other things,

22   scheduling the final hearing on that agreement and related

23   transactions to be implemented through a Chapter 11 plan and,

24   alternatively, through a sale.

25        I granted approval of the supplement to the disclosure

63

1    statement that set that schedule in motion.  However, I

2    required that there be an amendment to section 9.40 of the

3    original form of the master disposition agreement which I

4    believed too narrowly circumscribed the debtors' ability to

5    facilitate competing transactions and ultimately raised

6    litigation and fiduciary duty issues that, whether or not the

7    debtors were complying with their fiduciary duties, would have

8    unduly complicated the implementation of the transactions

9    contemplated by the amended plan and the MDA.

10           Section 9.40 was subsequently amended, as well as

11   there being subsequent amendments to third-party agreements

12   related to the transaction between Platinum, its acquisition

13   vehicle Parnassus, and GM.  I also entered a bidding procedures

14   order, which has since been supplemented by bidding procedures

15   for pure credit bids as well as a clarification of a point in

16   the bidding procedures order, all with the intention of

17   facilitating a due diligence and alternative transaction sale

18   process to permit competitive bids involving third parties, as

19   well as pure credit bids.

20           The original MDA did not contemplate any sort of

21   expense reimbursement or other buyer protection provisions that

22   are often included in transactions that are subsequently bid

23   against in bankruptcy cases.  As an aside, separate and apart

24   from there being bid procedures and courts generally viewing

25   the promulgation of bid procedures to be a constructive thing,

64

1    any transaction, even a private sale transaction, in a

2    bankruptcy case has the potential for turning into an auction,

3    albeit not necessarily with bidding procedures because it must

4    be noticed with an opportunity for objection with ultimate

5    review by the bankruptcy court and, obviously, if one of the

6    objections is that there's a higher and better transaction out

7    there and the Court agrees with that, then, effectively,

8    there's been a competing bid.

9         In any event, this particular MDA did not provide for

10   buyer protections in that form.  However, in connection with

11   the hearing on approval of the supplemental disclosure

12   statement and scheduling of the transaction hearings, the

13   parties discussed on the record, and I suggested, that

14   appropriate buyer protection procedures should be considered

15   here in light of the amendments to the MDA that I was

16   requiring.

17        The DIP lender collective very clearly expressed its

18   reservation of rights on that point at the hearing at which I

19   suggested that they speak with and negotiate with Platinum over

20   what might be an appropriate stalking horse protection in light

21   of all the facts.  Subsequently, as part of the order approving

22   the supplemental disclosure and setting transaction hearing

23   dates and providing other relief, the Court approved the

24   following, which appears in paragraph 46 of the order:

25        To the extent that a, quote, "potential bidder desires

65

1     to submit to the Debtors a proposed alternative transaction to

2     be considered by the Debtors in lieu of the Master Disposition

3     Agreement, the procedures attached hereto as Exhibit N and

4     incorporated herein by reference shall govern in all respects."

5     Those are the bidding procedures for third-party transactions

6     other than pure credit bids.  They've since been somewhat

7     modified, but they still generally apply.

8            Then the same paragraph provides, "The Debtors may

9     seek approval, in recognition of the Company Buyer's

10    expenditure of time, energy and resources, of an expense

11    reimbursement or other form of buyer protection to be paid from

12    the proceeds of a successful alternative transaction if the

13    Company Buyer is not the successful bidder, as such term is

14    defined in the supplemental procedures.  If the Court approves

15    such reimbursement or other protection, such order shall become

16    part of the supplemental procedures."

17           There follow three other sentences dealing with the

18    supplemental bidding procedures.  And I should note that the

19    term "Company Buyer" means Platinum here, or

20    Platinum/Parnassus.

21           Then the same paragraph provides, "In order to

22    facilitate an alternative transaction, notwithstanding any

23    other provision in the Master Disposition Agreement, any other

24    agreement contemplated thereby or any agreement between GM and

25    Parnassus or their respective affiliates, GM, its affiliates

66

1    and representatives shall be entitled to:  (1) furnish to any

2    individual or entity, which may include, without limitation,

3    any potential purchaser, financing source or other interested

4    party, (a) all exhibits, schedules and agreements under the

5    master disposition agreement and any other related agreements

6    between GM and Parnassus or their respective affiliates, and

7    (b) information related to the transferred assets and

8    liabilities as defined in the supplemental procedures and the

9    transactions contemplated by the Master Disposition Agreement

10   or by agreements between GM and Parnassus or their respective

11   affiliates; (2) participate in discussions or negotiations with

12   any such individual or entity; or (3) enter into and perform

13   under any agreement, whether as purchaser, equity participant,

14   financing source, customer or otherwise, with any such

15   individual or entity related to any alternative transaction.

16   Neither Parnassus nor any of its affiliates shall have any

17   claims, including, without limitation, for breach of the Master

18   Disposition Agreement and any other agreement contemplated

19   thereby or any other agreement between GM and Parnassus or

20   their respective affiliates, against GM, its affiliates or its

21   representatives arising from or relating to any action

22   permitted by this paragraph."

23          Originally, the order proposed by the debtors provided

24   in this paragraph for the simple allowance of a thirty million

25   dollar expense reimbursement to Parnassus in the event of a

67

1    successful alternative transaction going to a third party, but

2    I concluded that such relief could not be granted without

3    notice and a hearing and an opportunity for objection.  And,

4    therefore, the order as entered by the Court is as I've just

5    read it.

6         The debtors subsequently sought to have such approval

7    of a breakup fee up to thirty million dollars of Platinum's

8    expenses incurred, it appears to me, at any time during the

9    course of this Chapter 11 case, in connection with its efforts

10   involving the debtors.  And that motion has received four

11   objections on various grounds.  The first ground that I asked

12   Mr. Butler to address is that the proposed relief, which would

13   seek a finding that Platinum would receive from the proceeds of

14   an alternative transaction an expense reimbursement in an

15   amount of up to thirty million for expenses and costs incurred

16   and that would also grant the motion in full, violates

17   paragraph 13(a) of the debtor-in-possession financing order,

18   which provides that, quote, "No claim or lien having a priority

19   superior to or pari passu with those granted by this order to

20   the Agent and the DIP lenders shall be granted or allowed while

21   any portion of the financing or the commitments thereunder or

22   the DIP obligations remain outstanding," and providing further

23   that, "The DIP liens shall not be, in the case of the DIP

24   liens, subject to or junior to any lien or security interest

25   that is voided or preserved or (2) subordinated to or made pari

1    passu with any other lien or security interest."

2            The DIP lenders contend that the proposed relief would

3    provide for a Court-approved right of Platinum to receive up to

4    thirty million dollars from the proceeds of a transaction with

5    the debtor out of the purchase price before payment to other

6    parties, including the DIP lenders, and therefore violates

7    paragraph 13(a), unless they consent to such payment.  It's

8    correctly been pointed out that in numerous instances

9    throughout these cases the Court has approved buyer

10    protections, including expense reimbursements and breakup fees,

11    to which the DIP lenders did not object and therefore were

12    deemed to have consented, and that arguably that sets some

13    precedent.  However, clearly, the DIP lenders here have

14    objected to the proposal and, I believe, understandably so

15    given that, unlike in the other transactions, it does not

16    appear that under the present circumstances they'll be paid in

17    full, whereas at the time of the other transactions that

18    appeared to be the case, although clearly not from the proceeds

19    of the transaction at issue.

20            It's also argued by Platinum that the Court, in

21    approving this order, which has been carefully drafted not to

22    provide for the actual allowance of any claim under Section 503

23    and Section 507 of the Bankruptcy Code to be had by Parnassus

24    or any lien right to be given to Parnassus but simply provides

25    that the thirty million dollars of the purchase price will be

1   paid to Parnassus, is not actually in violation of paragraph

2   13(a) of the DIP order.  I believe this is not analogous,

3   however, to situations where a purchaser determines where its

4   consideration will go, including, for example, to particular

5   assigned contracts, but is rather a requirement imposed upon

6   the purchaser by the debtor through its request of the Court.

7   And, to me, that seems directly in contravention of the DIP

8   order that I quoted.

9          So it appears to me that unless the DIP lenders

10  consent, which they may do at some point, the relief sought is

11  precluded by the terms of the DIP order.  To my mind, that ends

12  the issue.  However, I would also note the following,

13  particularly since it is possible that it may be argued that

14  the DIP lenders' consent may be implied from their lack of

15  asserting remedies in response to a breach of the DIP

16  agreement.  Further, I continue to believe that if the parties

17  did talk to each other in light of their actual rights under

18  the Bankruptcy Code, they would be able to resolve this and

19  potentially other matters on a consensual basis.  Therefore,

20  I'll address the other objections that were raised.

21         It was contended by the DIP lenders that the Court

22  should not grant any form of buyer protection to Platinum or

23  Parnassus because, effectively, Platinum has bound itself to

24  proceed with the MDA without requiring such protection.  One

25  could read, clearly, former section 9.41 of the MDA as doing

70

1    just that.  However, I can't ignore the fact that, as a part of

2    the order approving the supplemental disclosure statement and

3    setting the timetable for the transaction to go forward and to

4    facilitate a sale to an alternative buyer, Parnassus waived

5    rights it had under agreements between it and GM in the same

6    paragraph where it was contemplated that the debtors would seek

7    approval of an expense reimbursement and/or other buyer

8    protection.  It seems to me that, given that fact as well as

9    the potential benefit to the debtors and creditors of a

10   template in the form of the MDA for other competing bidders,

11   that the Platinum/Parnassus entity should not be precluded

12   under all circumstances from obtaining an appropriate expense

13   reimbursement or buyer protection in the form of a breakup fee.

14           That being said, I believe that, on this record, the

15   request as made by the debtor for an up-to thirty million

16   dollar expense reimbursement is not reasonable or appropriate.

17   I say that for two reasons.  First, as an expense

18   reimbursement, it very clearly covers expenses that very

19   clearly, to me, would not be proper for this particular

20   transaction.  First, it covers expenses incurred very vaguely

21   in connection with Platinum's analysis and research of the

22   debtor going back three years, including in respect of times

23   when, according to Mr. Sheehan's affidavit, the debtor was

24   committed to other transactions and so advised Platinum, as

25   well as in connection with a transaction involving Platinum's

71

1    proposed purchase of the debtor's steering business that,

2    apparently through no fault of Platinum, fell through.  That

3    asset is now being sold not to Platinum but transferred to GM

4    under the transactions at issue.

5         In addition, the proposed thirty million of expenses

6    includes several million dollars, at least, of internal

7    Platinum expenses, which are not described but, very clearly

8    under the terms of this motion, could include salaries and

9    overhead of Platinum workers, which I believe would be wholly

10   inappropriate for an expense reimbursement in connection with a

11   transaction that ultimately developed after GM, on April 18th

12   of 2009, and the auto task force, at the same time, informed

13   the debtors that, contrary to the earlier statements of the

14   auto task force, GM, through the government, was prepared to

15   finance substantially all of the debtor's proposed exit from

16   Chapter 11.

17        The Platinum transaction was negotiated after that

18   date, and I do not believe that it should be linked to GM or

19   the government's contributions which they determined could be

20   made before that date for purposes of determining what an

21   appropriate expense reimbursement or breakup fee would be.  On

22   the other hand, I do believe that in drafting and preparing the

23   documentation for that transaction, which under the terms of

24   paragraph 46 of the order and under the debtor's

25   representations at this hearing will be made available to

72

1    competing bidders, I believe Platinum has incurred expenses

2    that it should, on an appropriate motion, be compensated for

3    out of the proceeds of an alternative transaction.

4         But that's not what's been sought here.  Rather, an

5    expense reimbursement on this basis has been sought, which I

6    believe would be unprecedented, and set an extremely bad

7    precedent for the future.  I believe that Platinum, being very

8    well-advised, understands that proposition.

9         I have not viewed this as a breakup fee since it was

10   described as an expense reimbursement, but I would also note

11   that, based upon the value provided directly by Platinum as

12   part of this transaction, I believe that thirty million

13   dramatically exceeds the proper amount of a breakup fee,

14   particularly in this context where there is a legitimate

15   argument that Platinum has already agreed to go forward without

16   anything by way of a buyer protection.

17        What I have in mind as something that might be

18   appropriate is analogous to what was ultimately approved in the

19   Refco case where I disapproved a breakup fee for a transaction

20   that was clearly not supportive of the breakup fee but noted

21   that the work done by that proposed buyer had provided a value

22   to the debtor's estate.  That amount was subsequently settled

23   for, I believe, around a million-five.  I'm not saying that's

24   the right number here -- it may well be higher than that, as

25   counsel for the committee acknowledged -- but I think it should

1    be tied to something akin to the expenses incurred by Platinum

2    in negotiating this deal and the documents upon which it's

3    based, which, again, can serve as a template for anyone coming

4    in on short notice in connection with a bid and discussions

5    with GM.

6         So for those reasons, I'll deny the motion.  Counsel

7    for the DIP agent can submit an order to that effect.

8         Now, there have been statements about a chambers

9    conference.  As you can see, I have a very heavy docket today.

10   I'm happy to have a chambers conference with the parties about

11   their due diligence issues, although I would note, having read

12   the letter from Dechert, from Mr. Siegel, requesting a chambers

13   conference, that came in on the 29th, it seems to me that

14   almost all of the items on that list, which go to contracts and

15   corporate documents, are items that, while they may not be in

16   the data room, are items that the debtors, I would assume, have

17   a pretty good handle on.  This is a public company, and I would

18   assume that they could obtain most of that stuff.  And Mr.

19   Butler's response has suggested that the debtors are in fact

20   doing that.  Clearly, the debtors keep track of the contracts

21   that they have assumed, the contracts that they have assumed

22   only as part of the plan and that therefore may be rejected

23   ultimately since the plan has never gone effective, and the

24   like, since they're repeatedly able to tell me the status of

25   those agreements.  And they have a good team at the debtors and

74

1    at Skadden dealing with contract issues.

2         So it seems to me that this information generally

3    should be available either because it's a public company and

4    therefore would be keeping track of litigation and government

5    proceedings, environmental matters and tax matters, or because

6    the debtors keep track because of their obligations under

7    Section 365 of material contracts and intercompany agreements

8    and leases.  So it doesn't seem to me a chambers conference is

9    necessary on this.  If I'm missing something or if there is an

10   impediment because the parties are desirous of every last

11   document and the debtors are only able to produce documents

12   readily and have to look for other ones, I don't see why this

13   can't be worked out.

14        MR. KELLY:  Your Honor, Mike Kelly.  A propos of that,

15   I just want to make one statement on the record, and it

16   obviously has gotten a little bit heated at times.  I've

17   contacted the office; we do have one of the schedules Mr.

18   Butler referred to.  And I certainly don't want him walking out

19   of here thinking that I misled.

20        On one of the assumed liabilities, Jack, we do have

21   that schedule; we don't have some of the other ones that were

22   mentioned.

23        I just didn't want the record to be --

24        THE COURT:  All right.

25        MR. KELLY:  -- inaccurate.

75

1          THE COURT:  Well, it seems to me that there is -- I

2     have gotten the impression that there's a bit of posturing

3     going on here.  And I think that if you have a due diligence

4     team, it can sit down with the people who obviously have been

5     available throughout this case, since I read Mr. Shaw's

6     affidavit and Rothschild has been paid millions of dollars for

7     this, that this should happen like that if it hasn't happened

8     already.

9          And I take you at your word, Mr. Butler, that it has

10    happened already, but it should happen, or else that money's

11    coming back.  All right?  So that's the chambers conference.

12          MR. BUTLER:  Thank you, Your Honor.

13          THE COURT:  This is not a private sale.  And if I find

14    at the hearing that it was conducted that way, I don't care, it

15    will not be approved.

16          Now, I believe you, at your word, that you are

17    creating a public sale hearing and you are responsive, and I

18    know there's nothing more frustrating than to be pillaried in

19    the media for not doing it, but I want to make sure that it

20    actually happens, and I will be furious if I find that there

21    has been posturing when in fact it has happened.  Okay.

22          MR. BUTLER:  Thank you, Your Honor.

23      (Proceedings concluded at 12:05 PM)

24

25

76

1

2                                    I N D E X

3

4                                E X H I B I T S

5     DEBTOR'S              DESCRIPTION              PAGE

6     1                     Declaration of Mr.      9

7                           Krasner

8     2                     Declaration of Mr.      9

9                           Sheehan

10    3                     Declaration of Mr.      9

11                          Shaw

12    4                     Declaration of Ms.      9

13                          Marafioti

14    Unnumbered            Balance of              9

15                          Exhibits

16

17                                 RULINGS

18                                          PAGE        LINE

19    Emergency motion to authorize expedited    73        6

20    motion for order authorizing debtors to

21    provide expense reimbursement to Platinum

22    Equity Advisors, LLC in connection with

23    sale of debtors' assets pursuant to

24    master disposition agreement, denied

25

77

1

2                    C E R T I F I C A T I O N

3

4       I, Penina Wolicki, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       Penina Wolicki

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  July 6, 2009

16

17

18

19

20

21

22

23

24

25