CELESTE R. GILL
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT, NATURAL RESOURCES AND AGRICULTURE DIVISION
525 W. Ottawa, 6th Floor, G. Mennen Williams Building
P.O. Box 30755
Lansing, MI 48909
Telephone: 517-373-7540
Facsimile: 517-373-1610
E-mail: gillcr@michigan.gov

Attorney for the Michigan Department of Environmental Quality

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
IN RE:                                                      :
                                                            :          Chapter 11
DELPHI CORPORATION, *et al*,              :          Case No. 05-44481 (RDD)
                                                            :          Debtors.
------------------------------------------------------------x

### MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY'S LIMITED OBJECTION TO THE FIRST AMENDED PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) AND ANY ALTERNATE SALES TRANSACTIONS

The Michigan Department of Environmental Quality (MDEQ), by and through its attorneys, Michael A. Cox, Attorney General and Celeste R. Gill, Assistant Attorney General, files this limited objection to the First Amended Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (As Modified), (Modified Plan) and any Alternative Transactions. MDEQ states the following in support of its objection:

**Background**

1.  Delphi Corporation (hereinafter Delphi or Debtors) was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation (GM). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.

Hazardous substances, including petroleum products, exceeding the cleanup criteria under Michigan's Natural Resources and Environmental Protection Act (NREPA), Part 201, Environmental Remediation, 1994 PA 451, as amended, MCL 324.20101 *et seq*, and Part 213, Leaking Underground Storage Tanks, *MCL 324.21301 et seq.* have been released at the various sites or facilities in Michigan, resulting in environmental contamination.

    2.    Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi, as an independent company, and in particular its subsidiary, Delphi Automotive Systems, LLC (DAS) in accordance with the terms of a Master Separation Agreement (MSA) between Delphi and GM. As part of the Agreement, DAS assumed primary responsibility for environmental investigation and remediation at the former GM divisions and subsidiaries.

    3.    In addition, Section 20126 of the Michigan's Natural Resources and Environmental Protection Act (NRPEA), 1994 PA 451, as amended, provides in part:

> (1) Notwithstanding any other provision or rule of law and except as provided in subsection (2), (3), (4), and (5) and section 20128, the following persons are liable under this part:
>
>     (a) The owner[1] or operator[2] of a facility[3] if the owner or operator is responsible for an activity causing a release or threat of release.

---

[1] Owner means a person who owns a facility. MCL 324.20101(1)(z).
[2] Operator means a person who is in control of or responsible for the operation of the facility [with some exceptions]. MCL 324.20101(y).
[3] Facility means any area, place, or property where a hazardous substance in excess of the concentrations which satisfy the requirements of section 20120a(1)(a) or (17) or the cleanup criteria for unrestricted residential use under Part 213 has been released, deposited, disposed of, or other wise comes to be located. Facility does not include any area, place, or property at which response activities have been completed which satisfy the cleanup criteria for the residential category provided for in Sections 20120a(1)(a) and (17) or at which corrective action has been completed under Part 213 which satisfies the cleanup criteria for unrestricted residential use. MCL 324.20101(1)(o).

2

> (b) The owner or operator of a facility at the time of disposal[4] of a hazardous substance if the owner or operator is responsible for an activity causing a release or threat of release.
>
> (c) An owner or operator of a facility who becomes an owner or operator on or after June 5, 1995, unless the owner or operator complies with both of the following:
>> (i) A baseline environmental assessment is conducted prior to or within 45 days after the earlier of the date of purchase, occupancy, or foreclosure. For purpose of this section, assessing property to conduct a baseline environmental assessment does not constitute occupancy.
>> (ii) The owner discloses the results of a baseline environmental assessment to the department and subsequent purchaser or transferee if the baseline environmental assessment confirms that the property is a facility.

Thus, Delphi is a liable party under Part 201 of the NREPA.

4. A liable party has affirmative obligations to investigate and remediate contamination for which it is responsible. Part 201 provides in part: "[a]n owner or operator of property who has knowledge that the property is a facility and who is liable under Section 20126 should do all of the following: (a) *Determine* the nature and extent of a release at the facility…(g) *Diligently* pursue response activities necessary to achieve the cleanup criteria specified in this part and rules promulgated under this part.[5]

5. Delphi also has ongoing obligations at some of its facilities under Part 213 of NREPA related to corrective actions for releases from underground storage tanks; under Part 111 of NREPA as a number of its properties are considered hazardous waste facilities; and under Part 31 of NREPA related to water quality.[6]

---

[4] Disposal means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous substance into or on any land or water so that the hazardous substance or any constituent of the hazardous substance may enter into the environment or be emitted into the air or discharged into any groundwater or surface water. MCL 324.20101(i).
[5] MCL 324.20114(1)(a) and (g).
[6] MCL 324.21301 *et seq.*, MCL 324.11101 *et seq.*, and MCL 324.3101 *et seq.*, respectively.

6.      Under Part 213 of the NREPA, the owner[7] or operator[8] of a Underground Storage Tank (UST) system at the time of the release or the owner of the property on which a UST system is located, is liable for performing response and/or corrective action or retaining a consultant to complete all of the requirements of the part necessary to address the release and any resulting contamination.[9]

7.      In addition, GM remains directly liable under Section 20126(1)(a) of the NREPA to the extent that GM was responsible for an activity causing a release at each of the Delphi facilities prior to Delphi's separation from GM notwithstanding the terms of the MSA.  Section 20130(1) provides in part that "[a]n indemnification, hold harmless, or similar agreement or conveyance *is not effective to transfer* from a person who is liable under section 20126 to the state for evaluation or response activity costs or damages for a release or threat of release to any other person *the liability imposed under this part*."  MCL 324.20130(1) (emphasis added).

8.      Under Parts 201 and 213 of the NREPA, the MDEQ may recover the costs of response activity or corrective action it incurs at a facility.[10]

9.      Finally, under Section 20126a of the NREPA, a liable person is *jointly and severally* liable for all costs of response activity lawfully incurred by the state of Michigan relating to the selection and implementation of response activity or corrective action under Part 201.

---

[7] Under Part 213, "Owner means a person who holds, or at the time of a release who held, a legal, equitable, or possessory interest of any kind in an underground storage tank system or in the property on which an underground storage tank system is located including, but not limited to a trust, vendor, vendee, lessor, or lessee and who is liable under part 201."

[8] Under Part 213, "Operator means a person who is presently, or was at the time of release, in control of, or responsible for, the operation of an underground storage tank system and who is liable under part 201."

[9] MCL 324.21304 -21312a.

[10] MCL 324.20126a, MCL 324.20137(1) and MCL 324.21323(1).

10. In October, 2005, Delphi filed for bankruptcy under Chapter 11 of the Bankruptcy Code 11 USC 101 *et seq*.

11. The MDEQ filed a proof of claim for unsecured claims of $64,329.64 for response activity costs it incurred prepetition. Along with it proof of claim, MDEQ submitted an estimate of over $9.7 million in additional costs to complete response activities at certain Delphi facilities, including those related to the Saginaw Steering operations at 1400 and 3900 Holland Avenue in Saginaw, Michigan.[11]

12. On or about January 25, 2008, Delphi's First Amended Plan was confirmed by this Court, but it was never consummated. Under the confirmed plan, environmental obligations were treated as flow-through claims, to be addressed in the ordinary course of business by the reorganized debtor. Delphi has since filed modifications to the confirmed plan and asked the Court to approve them or in the alternative allow it to enter into an alternate sales transaction.

## **Modified Plan**

13. Delphi is asking the Court to approve its proposed Modified Plan which makes substantial changes from the Confirmed Plan's treatment of certain claims. The Modified Plan provides for the transfer of certain assets and facilities to GM Components Holding, LLC or Parnassus Holdings II, LLC pursuant to Section 1123 of the Bankruptcy Code.[12] Certain Retained Assets will be placed in the reorganized Debtor entity, Reorganized DPH Holdings Co. for further disposition. Among the assets to be transferred to GM Components is Delphi's global

---

[11] Approximately $6 million and $3 million, respectively. The MDEQ also estimated costs for the following facilities: Delphi Energy and Chassis (Saginaw), Delphi Saginaw Division, Plant 2, Delphi Saginaw (Owens Road), and Inland Division, GMC Adrian Plant.

[12] Based on information and belief, GM Components Holding, LLC, which at the time of the filing of the Modified Plan was a subsidiary of General Motors Corporation ("Old GM"), since consummation of the sales transaction between Old GM and General Motors Company ("New GM") has become a subsidiary of New GM.

5

Steering business. It is not clear which assets (including land and buildings) will be transferred as part of the Global Steering Business. The MDEQ is aware of at least two facilities (or former facilities) located in Saginaw, Michigan (1400 and 3900 Holland Avenue), that had been used for by GM and Delphi for the Steering Business. As indicated above, both facilities are now sites of environmental contamination with ongoing clean up requirements. The Modified Plan also anticipates the transfer certain other facilities, including Delphi's Wyoming, Michigan facility, a hazardous waste corrective action site under Part 111 of the NREPA.[13]

14.  The Modified Plan proposes to accomplish its goals through the terms of a Master Disposition Agreement (MDA) between Delphi, GM, GM Components and Parnassus, that in addition to providing for the transfer of the specific properties/facilities, would do so free and clear of all liens, claims, and encumbrances.

15.  With regard to environmental liabilities, Section 9.39, <u>Environmental Matters</u>, of the MDA provides in part:

> Notwithstanding anything in this Agreement to the contrary, neither Sellers and their Affiliates, on the one hand, nor any Buyer, on the other hand, assumes any Liability under Environmental Law of the other. Nothing in this Agreement is intended to nullify any Liability to any federal, state or local environmental agency under Environmental Laws that either Seller and/or their Affiliates or any Buyer as result of their status as an owner or operator of any property or facility, or as an arranger for disposal of any Hazardous Materials generated at any property or facility. *At Closing, Seller and its Affiliates shall discharge in the pending Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have.* After the Closing neither Sellers and their Affiliates, on the one hand, nor any Buyers, on the other hand, shall assert or pursue any Claim against the other under any Environmental Law for any Liability for Hazardous Materials contamination located on a GM Real Property or a Company Real Property. (emphasis added).[14]

---

[13] It is not clear that any facilities located in Michigan will be transferred to Parnassus.

[14] First Amendments to the MDA filed on July 2, 2009 deleted the third sentence and inserted the following sentence instead: " Seller and its Affiliates shall use commercially reasonable efforts to discharge in the Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have."

6

16.     Article 11.7 of the Modified Plan provides the following release language:

Release of GM by Debtors and Third Parties. On the Effective Date, GM shall receive all releases provided for in Section 4.01 of the Delphi-GM Global Settlement Agreement (GSA), which provisions are incorporated by reference herein in their entirety.

17.     Section 4.01(c) of the GSA provides the following broad and ambiguous language:

(c) The Plan shall provide that effective as of the Effective Date, *the GM-Related Parties shall be forever released by the Additional Releasing Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Additional Releasing Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related Parties, including without limitation claims based in whole* or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Effective Date *related to (i) the Separation*, (ii) any collective bargaining agreements to which any Delphi-Related Party is now or has been a party, (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties, (iv) *the Chapter 11 Cases*, or (v) the formulation, preparation, negotiation, dissemination, confirmation, or consummation (but not performance) of the Plan, the Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, *or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing. The releases provided for in this section 4.01(c) shall include any and all claims that any of the Additional Releasing Parties have or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Additional Releasing Parties*. (emphasis added)

18.     "Additional Releasing Parties" as defined in the GSA includes but is not limited to (i) creditors of any of the Debtors and current and former holders of equity interests in Delphi. The Michigan Department of Environmental Quality is a creditor of the Debtors and based upon the broad definition provided in the GSA would be considered an "Additional Releasing Party."

7

19. Although MDEQ is not a party to the GSA, a private agreement between the Debtors and GM, the GSA as incorporated into the Modified Plan appears to provide releases of any and all claims it had or may have against GM, which is not a debtor in this case.

20. Articles 11.2 of the Modified Plan dealing with the discharge of the Debtors provides in part:

> **Discharge Of The Debtors**. Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, *the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless or whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights and Interests, including, but not limited to, Claims or Interests that arose before the Effective Date*, …. and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted this Plan. (emphasis added).

21. In the event that the Modified Plan cannot be confirmed, Debtors are asking this Court to authorize the transfer of its assets as proposed in the MDA, pursuant to Section 363 of the Bankruptcy Code.

## Objection

<u>The Modified Plan should not be approved as is.</u>

22. The Modified Plan, as proposed, does not meet all of the requirements of 11 USC 1129 and it cannot be confirmed. "[T]he debtor-in-possession or trustee has an affirmative duty to propose a plan that complies with the requirements of the bankruptcy code, and the court may

8

only approve the plan if the 'proponent of the plan complies with the applicable provision of [Title 11].'"[15]

23.     The Modified Plan does not comply with applicable provisions of the Bankruptcy Code as required by 11 USC 1129(a)(1) because Article 11.7 of the Modified Plan provides for the releases included in section 4.01(c) of the GSA for the benefit of GM, a nondebtor in this case. With a limited exception, the Bankruptcy Code does not explicitly provide for nondebtor releases.[16] In fact, 11 USC 524(e) provides that "[e]xcept as provided in subsection (a)(3) of this section, discharge of the debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." And while it is true that 11 USC 105(a) gives the this Court authority "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the [Code], it does not allow the bankruptcy court to create substantive rights that are otherwise unavailable under applicable law."[17]

24.     Nondebtor releases are "proper only in rare cases."[18]  And while the courts have looked at several factors in determining whether to grant nondebtor releases, this bankruptcy case does not present a situation in which the Court should use its equitable powers to grant releases to this nondebtor.[19]

25.     GM owned and operated most, if not all, of Delphi's facilities prior to its spin-off in 1999, including the Steering operations in Saginaw, Michigan. Releases from these facilities were confirmed and reported during GM's ownership and operation. Under Part 201 of the

---

[15] *In re Perez,* 30 F3d 1209 (CA 9 1994).
[16] See, 11 USC 524(g).
[17] *In re Metromedia Fiber Network, Inc.*, 416 F3d 136, 142 (2d Cir 2005) *citing New England Diaries, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)* 351 F3d 86, 92 (2d Cir 2003) (internal quotations omitted).
[18] In re Metromedia Fiber Network, 416 F3d at 141.
[19] See generally, *In re Dow Corning Corporation*, 280 F3d 648 (6th Cir, 2002); *In re Metromedia Fiber*, 416 F3d 136; *In re Spiegel, Inc.*, 46 Bankr Ct Dec 272 (Bankr SDNY 2006).

NREPA, a party that causes a release or threat of release remains liable even if it transfers the property or facility on which contamination is located. So, in addition to the fact that no other provision of the Code provides for such a release, GM remains separately and directly liable for contamination at various Delphi facilities and under applicable federal and state environmental laws, it may not contract away that liability.

26. Further, considering the broad release language that Debtors propose to incorporate in the Modified Plan, MDEQ is concerned that claims it has now or may have in the future against GM unrelated to Delphi facilities may also be released. The Court has no authority to grant such releases to GM as provided in Article 11.7 of the Modified Plan.

27. Even if the Court has authority to provide such relief, the release provided in Article 11.7 of the Plan is not consensual nor is it supported by consideration to support such extraordinary relief.[20] "A nondebtor release is not adequately supported by consideration simply because the nondebtor contributed something to the reorganization and the enjoined creditor took something out."[21] If the Plan is approved with the proposed GM release language, the MDEQ may be enjoined from pursuing any claims or actions it has against GM although it received no consideration.

28. MDEQ objected to similar provisions in the Confirmed Plan and the Amended GSA on the grounds provided above. In both cases, exceptions to the releases were provided in the Order approving the documents for among other things, governmental entities enforcement of environmental laws. GM has already acknowledged and this Court provided in its September 26, 2008, Order approving the Amended Global Settlement Agreement and the Amended MRA that nothing in those documents, "*any Delphi Plan, including amendments, supplements, or*

---

[20] *See generally*, *In re Metromedia Fiber Network, Inc.*, 416 F3d 136.
[21] In re Metromedia Fiber Network, 416 2d Cir at 143.

*modifications, or any Confirmation Order with respect to any Delphi Plan shall provide for the release or injunction, with respect to the GM-Related Parties*, of any . . . (ii) claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, or liabilities of any State or any agency of any State, under state or federal environmental laws. . . ." (emphasis added). Therefore, GM is not entitled to any releases in the Modified Plan with respect to any claims or obligations it may have to the MDEQ under any environmental law, and the Plan should not be confirmed unless it is further modified or the order confirming it make it clear that the release provided to GM in section 4.01(c) of the GSA does not release the GM affiliated Parties from any Cause of Action held by a governmental entity based on the environmental laws of the United States or any domestic state, city, or municipality.

29.    The Modified Plan also does not comply with applicable provisions of the Bankruptcy Code as required by 11 USC 1129(a)(1) because it fails to acknowledge or properly classify environmental claims such as the MDEQ's claim.  The Modified Plan does not address the environmental contamination at the Michigan facilities.  And, as more clearly stated in the Supplement to the Disclosure Statement, Delphi intends to discharge their environmental liabilities if at all possible.

30.    The Debtors cannot walk away from their obligation to address environmental contamination at their Michigan facilities.  It is settled law that property of a bankruptcy estate cannot be abandoned in violation of State laws that protect public health and safety.[22]

---

[22] *See, Midlantic National Bank v New Jersey Department of Environmental Protection*, 474 US 494 (1986), *In re Wall Tube & Metal Products, Co.*, 831 F2d 118, 122 (CA 6 1987), *Dep't of Environmental Resources v. Conroy*, 24 F3d 568 (CA 3 1994), *In re Torwico Electronics, Inc.*, 8 F3d 146 (CA 3 1993), and 28 USC § 959.

Likewise, a debtor cannot abandon the hazardous conditions it creates, but instead must comply with state environmental laws.[23] .

31.    While the Debtors have not sought abandonment under Section 554 of the Code, and instead intend to sell substantially all of their assets to either GM or Parnassus, the effect of the Modified Plan and the MDA may be the same as an abandonment.  However, Section 20130 of the NREPA provides in part: "An indemnification, hold harmless, or similar agreement or conveyance is not effective to transfer from a person who is liable under section 20126 to the state for the evaluation or response activity costs or damages for a release or threat of release to any other person the liability imposed under this part."  To the extent the Plan is an attempt to abandon Debtors' obligation to address environmental contamination for which it is liable, it is not confirmable.

32.    Article 11.2 of the Modified Plan provides for overly broad discharges for the Debtors, including things that are not claims under Section 101 of the Bankruptcy Code, such as Causes of Actions, Liabilities, and Interests.  The Bankruptcy Code simply does not provide for such discharges.

33.    In light of the Debtors' intent to discharge its environmental liabilities, and its failure to make adequate provision for addressing environmental contamination at the Michigan facilities in the Modified Plan, MDEQ believes that it will eventually have to take over response activities to ensure that appropriate cleanups occurs.  Delphi must comply with state and local laws that are protective of the environment, public health and safety and, therefore, must perform

---

[23] *See, In re Stevens*, 68 BR 774, 783 (D ME 1987)

and continue to comply with state regulations.[24]  MDEQ asserts that Delphi continuing obligation must be addressed in full under the Modified Plan or any order confirming it.

Limited Objection to Approval of an Alternate Section 363 Sale.

34.     If the Court decides not to confirm the Plan, the Debtors and other parties should not be allowed to do an end run around the Plan confirmation process by having the exact same transaction approved as a Section 363 sale.  In fact Section 363(b)(1) "mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan."[25]  So, the result should be the same.

35.     Section 363(f) of the Bankruptcy Code allows the sale of property free and clear of *interest* in the property *only if*:

> (1) *applicable nonbankruptcy law permits* sale of such property free and clear of such interest;
>
> (2)  such entity *consents*;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in *bona fide dispute*; or
>
> (5)  such entity *could be compelled*, in a legal or equitable proceeding, *to accept a money satisfaction of such interest*. (emphasis added).

---

[24] *Midlantic Nat'l Bank v New Jersey Dep't of Environmental Protection*, 474 US at 505.  *See also,* 28 USC 959.

[25] *In re Abbotts Dairies*, 788 F2d 143, 150 (3rd Cir 1986); *see also* Colliers on Bankruptcy – 15th Edition Rev. P. 363.02 citing, *Stephens Indus, Inc. v McClung*, 789 F2d 386 (6th Cir 1986) ("Because there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court."), *Western Auto Supply Co. v Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F3d 714 n.9 (1st Cir 1994) (collecting authorities)("[T]he order confirming a chapter 11 liquidation sale warrants special bankruptcy scrutiny."); *In re Public Serv Co*, 90 BR 575 (Bankr DNH 1988) (the more the sale or transaction affects the terms of the ultimate pan (sic), the more scrutiny is required).

36.     As discussed above, property of a bankruptcy estate cannot be abandoned or maintained in violation of State laws that protect public health and safety.[26] And, applicable nonbankruptcy law does not permit such transfers free and clear of a state's interest in having the Environmental laws complied with. The proposed "sales transaction" involves transferring substantially all of Delphi's valuable assets to either GM Holdings (New GM) or Parnassus and liquidating the remaining assets. The transferred assets will include properties that are sites of environmental contamination. The MDA does not provide the means for adequately addressing existing contamination at the transferred property, thus potentially leaving those liabilities along with the remaining (i.e. less desirable) assets in the bankruptcy estate.

37.     Nothing in Section 363 of the Bankruptcy Code should be construed as releasing or relieving the Buyers from any police or regulatory liability to a governmental entity as the owner or operator of property.[27] The Buyers, as the purchaser of contaminated property, should not be permitted to own or operate that property without having to comply with environmental laws that apply to all owners and operators of property, regardless of whether the property may have been contaminated by prior owners. In fact, the United States Supreme Court in *Ohio v. Kovacs*[28] stated "that anyone in possession of the site – whether it is Kovocs or another in the event of receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or a bankruptcy trustee – must comply with the environmental laws of the State of Ohio. Plainly that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse

---

[26] *See, Midlantic National Bank v New Jersey Department of Environmental Protection*, 474 US 494 (1986), *In re Wall Tube & Metal Products, Co.*, 831 F2d 118, 122 (CA 6 1987), *Dep't of Environmental Resources v. Conroy*, 24 F3d 568 (CA 3 1994), *In re Torwico Electronics, Inc.*, 8 F3d 146 (CA 3 1993), and 28 USC § 959.
[27] See generally, *In re CMC Heartland Partners*, 966 F2d 1143 (7th Cir. 1992); *In re Torwico Electronics, Inc.*, 8 F3d 146 (3d Cir 1993).
[28] 469 US 274, 285 (1985.

14

to remove the source of such condition." Further, Section 20107a of the NREPA provides in part:

> (1) A person who owns[29] or operates[30] property that he or she has knowledge is a facility[31] shall do all of the following with respect to hazardous substances at the facility:
>
> > (a) Undertake measures as are necessary to prevent exacerbation of the existing contamination.
> >
> > (b) Exercise due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances, mitigate fire and explosion hazards due to hazardous substances, and allow for the intended use of the facility in a manner that protects public health and safety.
> >
> > (c) Take reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the consequences that foreseeably could result from those acts or omissions.

38. The Buyers will also have general obligation to comply with all environmental law, especially with respect to permits, licenses and other governmental authorizations (including those related to the handling of hazardous materials).[32]

39. The MDEQ's interest in obtaining full compliance with the Environmental laws is not in dispute and it clearly does not consent to anything that purports to relieve or limit the

---

[29] Owner means a person who owns a facility. MCL 324.20101(1)(z).

[30] Operator means a person who is in control of or responsible for the operation of the facility [with some exceptions]. MCL 324.20101(y).

[31] Facility means any area, place, or property where a hazardous substance in excess of the concentrations which satisfy the requirements of Section 20120a(1)(a) or (17) or the cleanup criteria for unrestricted residential use under Part 213 has been released, deposited, disposed of, or other wise comes to be located. Facility does not include any area, place, or property at which response activities have been completed which satisfy the cleanup criteria for the residential category provided for in Sections 20120a(1)(a) and (17) or at which corrective action has been completed under Part 213 which satisfies the cleanup criteria for unrestricted residential use. MCL 324.20101(1)(o).

[32] In order to continue to operate at the Debtors' various facilities, the Purchaser may have to comply with the terms of various Administrative Orders on Consent (AOCs) or Consent Orders or Judgments.

15

Buyers liability or obligation, with respect to the transferred assets, to comply with requirements that all owner or operators are subject to under the environmental laws.

40. Finally section 363 of the Bankruptcy Code does not permit the sale of property free and clear of an interest if the holder of the interest could not be compelled to accept money in satisfaction of such interest.[33] The MDEQ cannot be compelled to accept money in place of an owner or operator's obligation to comply with the legal requirement that apply to the owners or operators of property under the environmental laws.

41. Bankruptcy Code, section 363(e) states that:

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest

* * *

42. Any Sales Order approving a sales transaction must make clear the Buyers' understanding and intention to comply with any and all environmental laws and other obligations as the owner or operator of facilities including things such as due care, that may be related to pre-closing releases and liabilities of the Debtors and State permitting requirements. And, any order approving a sales transaction must provide adequate means for addressing environmental contamination at the Delphi facilities.

43. To the extent the Buyers seeks a judicial determination that is not a successor to Delphi, it has not provided support for that contention. Because it is an issue of the various

---

[33] *See, Gouveia v Tazbir*, 37 F3d 295 (7th Cir 1994). *See also, Zerand-Bernal, Inc. v Cox*, 23 F3d 159, 163 (7th Cir 1994) ("[N]o one believes... that a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale price ... [or to] immunize such buyer from all state and federal laws that might reduce the value of the assets bought from the bankrupt").

16

states' law it is too complicated an issue for such Summary Disposition, and MDEQ reserves it right to raise further objections with regard to this issue.

Conclusion

44. Extensive legal authority, including the Bankruptcy Code and Supreme Court decisions indicate that the bankruptcy process should not be used as a vehicle for avoiding obligation to address environmental contamination at property of bankruptcy estates. The MDEQ requests that any order approving the Modified Plan or an alternate sales transaction to make adequate provisions to ensure that any response activities that are required at any of the transferred facilities are completed.

## Reservation of Rights

45. MDEQ reserves the right to assert further objections to the Modified Plan and or an alternate section 363 sale.

## Memorandum of Law

46. Because the relevant authorities in support of the requested relief are cited in this Objection, the MDEQ requests that the requirement of a separate memorandum of law under Local Bankruptcy Rule 9013-1 (b) be deemed satisfied.

WHEREFORE, the MDEQ respectfully requests that this Court deny confirmation of the Modified Plan or an alternative sales transaction unless the proposed changes herein are incorporated into the Modified Plan or any order confirming or approving the Modified Plan or MDA, and grant such other and further relief as is just had appropriate.

Respectfully submitted,

Michael A. Cox
Attorney General


/s/   Celeste R. Gill
Celeste R. Gill (Admitted Pro Hac Vice)
Assistant Attorney General
Environment, Natural Resources
and Agriculture Division
6th Floor, Williams Building
525 W. Ottawa
P.O. Box 30755
Lansing, MI   48909
(517) 373-7540
E-mail:  gillcr@michigan.gov

Dated:  July 14, 2009

LF:Delphi/Objection to plan as modified

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY'S LIMITED OBJECTION TO THE FIRST AMENDED PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) AND ANY ALTERNATIVE TRANSACTIONS  has been served by electronic and/or overnight mail on the parties listed below on this 14th day of July, 2009.

Honorable Robert D. Drain
US Bankruptcy Judge
One Bowling Green
Room 632
New York, NY  10004

Skadden, Arps, Slate, Meagher & Flom LLP
Attn:   Kayalyn A. Marafioti
         Gregory W. Fox
Four Times Square
New York, NY  10036

Latham & Watkins LLP
Attn:  Robert J. Rosenberg
        Mark A. Broude
        Mitchell A. Seider
885 Third Avenue
New York, NY  10022

Cadwalader, Wickersham & Taft LLP
Attn:   John J. Rapisardi
         Oren B. Haker
One World Financial Center
New York, NY  10281

Weil, Gotshal & Manges LLP
Attn:   Robert J. Lemons
         Jeffery L. Tanenbaum
767 Fifth Avenue
New York, NY  10153

Delphi Corporation
Attn:  General Counsel
5725 Delphi Drive
Troy, MI  48098

Skadden, Arps, Slate, Meagher & Flom LLP
Attn:   John Wm. Butler, Jr.
         Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, IL 60609

Davis Polk & Wardwell
Attn:   Donald Bernstein
         Brian Resnick
450 Lexington Avenue
New York, NY 10022

Willkie Farr & Gallagher LLP
Attn:  Richard Mancino
        Marc Abrams
787 Seventh Avenue
New York, NY  10019

The Office of the United States Trustee
Attn:  Brian Masumoto
33 Whitehall Street, Suite 2100
New York, NY  10004

| | |
|---|---|
| Schulte Roth & Zabel LLP<br>Attn:  Adam C. Harris<br>         David J. Karp<br>919 Third Avenue<br>New York, NY  10022 | United States Department of Justice<br>Attn:  Matthew L. Schwartz<br>         Joseph N. Cordaro<br>86 Chambers Street, 3rd Floor<br>New York, NY  10007 |

/s/   Celeste R. Gill
Celeste R. Gill
Assistant Attorney General
Environment, Natural Resources
and Agriculture Division
6th Floor, Williams Building
525 W. Ottawa
P.O. Box 30755
Lansing, MI   48909
(517) 373-7540
E-mail:  gillcr@michigan.gov