UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No.: 05-44481 (RDD) |
| DELPHI CORPORATION, et. al., | Chapter 11 |
| Debtors | (Jointly Administered) |

<u>OBJECTION OF SUNRISE MEDICAL HHG, INC. TO CURE AMOUNT</u>

1.    Sunrise Medical HHG, Inc. ("Sunrise") is the counterparty to the First Amended Development and Supply Agreement dated May 10, 2007 ("FADSA").  A true and correct copy of which is attached as Exhibit "A."

2.    Pursuant to Paragraph 32, page 19 of the Court's Modification Procedure Order ("MPO") of June 16, 2009, Sunrise objects to the cure amount listed as "O" in the Delphi Parnassus Assumption and Assignment Notices Errata Schedule 2 ("Parnassus A&A Notice").

3.    Attached hereto as Exhibit "B" is the calculation of Sunrise claimed cure amount based upon Delphi's failure to perform under the FADSA from and after May 10, 2007.

4.    To the extent of any proposed assignment, Sunrise reserves its right to allege that FADSA is not assignable.

5.    Sunrise is prepared to discuss resolution of its objection pursuant to Paragraph 35, page 20 of the MPO.

DATED: July 15, 2009

PROCOPIO, CORY, HARGREAVES &
    SAVITCH LLP


By:   /s/ Philip J. Giacinti, Jr.
        Philip J. Giacinti, Jr. (Bar No. 065909)
        PROCOPIO, CORY, HARGREAVES
           SAVITCH LLP
        530 B Street, Suite 2100
        San Diego, California  92101
        Telephone: 619.238.1900
        Facsimile: 619.235.0398
        Attorneys for Creditor, Sunrise Medical
        HHG, Inc.

106144/000439/1073672.01

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is PROCOPIO, CORY, HARGREAVES & SAVITCH LLP, 530 "B" Street, Suite 2100, San Diego, California 92101. On July 15, 2009, I served the within documents:

### OBJECTION OF SUNRISE MEDICAL HHG, INC. TO CURE AMOUNT

☐    **BY FACSIMILE** by transmitting via facsimile number (619) 235-0398 the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m. A copy of the transmission confirmation report is attached hereto.

☒    **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

**See attached Service List.**

☐    **BY OVERNIGHT DELIVERY** by placing the document(s) listed above in a sealed overnight envelope and depositing it for overnight delivery at San Diego, California, addressed as set forth below. I am readily familiar with the practice of this firm for collection and processing of correspondence for processing by overnight mail. Pursuant to this practice, correspondence would be deposited in the overnight box located at 530 "B" Street, San Diego, California 92101 in the ordinary course of business on the date of this declaration.

☐    **BY PERSONAL SERVICE** by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒    **BY CM/ECF NOTICE OF ELECTRONIC FILING** by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☐    *(State)* I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

106144/000439/1073672.01

X   *(Federal)*  I declare under penalty of perjury under the laws of the United States that the
above is true and correct.

Executed on July 15, 2009, at San Diego, California.

/s/ Christine A. Waltman
Christine A. Waltman

## SERVICE LIST

Honorable Robert D. Drain
United States Bankruptcy Judge
U.S.B.C. Southern District of New York
One Bowling Green
New York, NY 10004-1408

Johm Wm. Butler, JR.
Ron E. Meisler
Skadden Arps Slate Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, IL  60606

*Counsel for the Debtors*

Brian Masumoto
Office of the United States Trustee
33 Whitehall Street, Suite 2100
New York, NY  10004

Donald Bernstein
Brian Resnick
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017

*Counsel to Post-petition Lenders*

John J. Rapisardi
Oren B. Haker
Cadwalader, Wickersham & Taft LLP
One Wolf Financial Center
New York, NY  10281

*Counsel for the U.S. Department of Treasury*

Delphi Corporation
(Attn:  General Counsel)
5725 Delphi Drive
Troy, Michigan  48098

Kayalyn A. Marafioti
Gregory W. Fox
Skadden Arps Slate Meagher & Flom LLP
Four Times Square
New York, NY  10036

*Counsel for the Debtors*

Robert J. Rosenberg
Mark A. Broude
Latham & Watkins, LLP
885 Third Avenue
New York, NY  10022

*Counsel to Official Creditors' Committee*

Richard Mancino
Marc Abrams
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019

*Counsel for The Tranche C Collective*

Matthew L. Schwartz
Joseph N. Cordaro
United States Department of Justice
86 Chamber Street, 3rd Floor
New York, NY  10007

*Counsel for the U.S. Department of Justice*

4

Jeffrey L. Tanenbaum                    Adam C. Harris
Robert J. Lemons                        David J. Karp
Weil Gitschal & Manges, LLP             Schulte Roth & Zabel LLP
767 Fifth Avenue                        919 Third Avenue
New York, NY  10153                     New York, NY  10022

*Counsel for General Motors Corporation*    *Counsel for Parnassus Holdings II, LLC*

106144/000439/1073672.01

EXECUTION COPY

## FIRST AMENDMENT TO DEVELOPMENT AND SUPPLY AGREEMENT

FIRST AMENDMENT TO DEVELOPMENT AND SUPPLY AGREEMENT (this "**Amendment**") entered into as of May 10, 2007 ("**Amendment Effective Date**") by and between Sunrise Medical Inc. ("**Sunrise**"), and Delphi Medical Systems Corporation, Debtor and Debtor-in-Possession in that administratively consolidated case entitled In re Delphi Corporation, et al., United States Bankruptcy Court for the Southern District of New York, Case No.: 05-44481 (RDD) ("**Delphi**").

### BACKGROUND

1.    Sunrise and Delphi are parties to that certain Development and Supply Agreement, dated as of January 28, 2004, (the "Agreement").

2.    Sunrise and Delphi desire that from and after the Amendment Effective Date the Agreement be amended subject to and upon the terms and conditions set forth herein.

3.    Notwithstanding 11 U.S.C. § 365, this Amendment to the Agreement is intended to bind both Sunrise and Delphi to the terms of the Agreement as hereinafter amended from and after the Amendment Effective Date.

4.    In the event the plan of reorganization of Delphi contains neither assumption nor rejection of the Agreement as amended, the parties intend the reorganized Delphi to be bound by the terms of this Agreement as amended.

5.    Sunrise agrees and acknowledges that this Amendment is not intended, nor shall it be construed, as an assumption of the Agreement, it being the intention of the parties that this Amendment merely modifies the Agreement, and does not create a new post-petition contract. Delphi reserves all rights to assume or reject the Agreement, as modified by this Amendment, in accordance with applicable bankruptcy laws.

NOW, THEREFORE, in consideration of the mutual promises contained herein and intending to be legally bound, Sunrise and Delphi agree as follows:

1.    **Defined Terms Generally**.  As used herein, all terms that are defined in the Agreement shall have the same meanings herein.

2.    **New Defined Terms in Agreement**.  Article 1 of the Agreement is amended by adding the following new defined terms in alphabetical order:

"Customer Requirement Document" (CRD) is the totality of the product requirements agreed to by the Parties and is contained in **Exhibit 3**.

"Production Year" is defined as a calendar year beginning on January 1, 2007 and repeating each subsequent year.

"Firm Order" is defined as a purchase order issued by Sunrise to Delphi or an obligation by Sunrise to provide a purchase order with associated pricing and delivery dates."

3.    **Amendment to Section 1.13 of the Agreement (Products)**.  Section 1.13 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"Products" shall mean (i) Rehab Control Systems and Standard Control Systems sold hereunder by Delphi, which are identified in **Exhibit 1** , (ii) Service Parts (as defined in Section 13.1), and (iii) all other goods identified in **Exhibit 1** or otherwise delivered by Delphi to Sunrise under this Agreement."

**EXHIBIT A**    1

EXECUTION COPY

4.   **Amendment to Section 1.14 of the Agreement (Rehab Control System).** Section 1.14 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"**Rehab Control System**" means a Motor Control Module together with other modules and components to allow users to operate Wheelchairs designed to meet the specifications attached to this Agreement as **Exhibit 3**.

5.   **Amendment to Section 1.15 of the Agreement (Standard Control System).** Section 1.15 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"**Standard Control System**" means a Motor Control Module together with other modules and components to allow users to operate Wheelchairs designed to meet the specifications attached to this Agreement as **Exhibit 3**."

6.   **Amendment to Section 3.2 of the Agreement (Forecasts; Purchase Orders).** Section 3.2 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

(a)   **Beginning Forecast.** At least ninety (90) days prior to the Start of Production, Sunrise shall provide Delphi its estimated monthly purchase volume for each of the Products during the twelve (12) month period commencing upon the Start of Production, and the weekly forecast for the initial eight (8) week period commencing upon the Start of Production (the "**Beginning Forecast**"). The estimated purchase volume for the Products during the first four (4) week period of the Beginning Forecast shall be deemed to be a firm order.

(b)   **Rolling 6 Month Forecast.** Within thirty (30) days prior to the Start of Production, and on approximately the tenth (10th) day of each month thereafter, Sunrise shall deliver to Delphi a rolling six (6) month estimate of Product purchases (each, a "**Rolling Forecast**"). The first twelve (12) week period of each Rolling Forecast shall be deemed to be a "Firm Order", however if Sunrise does not provide an updated forecast within ten (10) days after the beginning of any month, then Delphi shall use the most recent forecast provided by Sunrise as the then-applicable Rolling Forecast. Sunrise shall make reasonable efforts to provide Delphi with adequate advance notice of any special forecasts, or any unique demand increases or decreases for the Products.

(c)   **Submittal of Purchase Orders.** Sunrise shall use its reasonable efforts to submit Firm Orders to Delphi in accordance with the Beginning Forecast and each Rolling Forecast, and Delphi shall accept purchase orders from Sunrise submitted in accordance with this Agreement. Purchase orders may be issued by mail, fax, e-mail, or (upon mutual agreement of the Parties), electronic data interchange. All purchase orders issued hereunder shall be deemed to incorporate and be governed by the terms and conditions of this Agreement. Purchase orders may be issued by multiple Sunrise locations or designated, Sunrise approved, supplier(s) subject to acceptable credit terms by Delphi."

7.   **Amendment to Section 3.3 of the Agreement (Confirmation of Orders).** Section 3.3 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"Delphi shall notify Sunrise in writing of its confirmation of purchase orders within two (2) business days of receipt of such purchase orders. If Delphi does not confirm Sunrise's purchase order within four (4) business days, Delphi shall be deemed to have confirmed acceptance of the purchase order."

EXECUTION COPY

8.   **Amendment to Section 3.5 of the Agreement (Rescheduling of Orders.** Section 3.5 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"Delphi agrees to fulfill all orders which do not exceed 120% of the "Firm Orders" referenced in 3.2(b). above. Delphi is authorized to purchase 120% of the required components to support Firm Orders, plus components identified as having long lead times or minimum order quantities as listed on **Exhibit G** (Long Lead Component Purchase Authorization). Sunrise authorizes Delphi to build 30 days of finished goods, plus an additional 30 days of Work in Process (WIP including PCAs), plus procure 30 days of raw materials not listed on **Exhibit G**.  In cases of schedule reductions by Sunrise resulting in excess inventory or obsolete inventory that is not consumed within a ninety (90) day period, Sunrise agrees to purchase excess inventory at burdened costs (not to exceed cost plus 7%) or in production units within 60 days of notification by Delphi."

9.   **Amendment to Section 4.2(c) of the Agreement (Shortfall Payments).** Section 4.2 (c) of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"If the volume of all Rehab Control Systems delivered to Sunrise by Delphi in a Production Year falls below 70% of the total forecasted volumes of Rehab Control Systems set forth in **Exhibit 2** (the "**Rehab Control Forecast**") for that Production Year, Sunrise will pay to Delphi a shortfall payment calculated as follows: Delphi, at the end of each Production Year, will compare the actual and forecasted Production Year total volumes for all Rehab Control Systems as set forth in **Exhibit 2** and if the volume of all the Rehab Control Systems delivered to Sunrise by Delphi during such Production Year falls below 70% of the total Rehab Control Forecast for such Production Year, Sunrise shall pay to Delphi an amount equal to Eighty-Three and 98/100 Dollars ($83.98) multiplied by the remainder obtained when (x) the actual number of Rehab Control Systems delivered to Sunrise by Delphi for such Production Year is subtracted from (y) 70% of the total Rehab Control Forecast for such Production Year. A Rehab Control System is defined by an average cost of $543.83 in Rehab modules. Annual Rehab Controller volumes for a Production Year shall be calculated by the following formula: (Total Rehab Controller and Accessory Sales in Dollars for the production year / $543.83).

In the event of either (i) a Force Majeure situation which causes Delphi to be unable to perform its obligations to deliver any Rehab Control Systems for a period of time of fifteen (15) days or longer, or (ii) Delphi's inability, solely at Delphi's fault, to perform its obligations to deliver any Rehab Control Systems ordered by Sunrise for a period of time of fifteen (15) days or longer (each of such periods during which Delphi is unable to perform its obligations to deliver any Rehab Control Systems being a "Rehab Interruption Period"), then for purposes of determining shortfall payments pursuant to this Section 4.2(c) for such Production Year, the Rehab Control Forecast for that Production Year will be reduced by the number of Rehab Control Systems ordered by Sunrise during the Rehab Interruption Period which were not delivered by Delphi (the "Undelivered Rehab Units"), but then increased by the number of (a) such Undelivered Rehab Units which were subsequently delivered by Delphi during the Production Year and (b) such other Undelivered Rehab Units Delphi offered to deliver during such Production Year (other than, in the case of this clause (b), such Undelivered Rehab Units for which Sunrise purchased substitute products from a third party as cover and Undelivered Rehab Units for those Sunrise sales orders with its customers that Sunrise and Delphi reasonably agree at that time, based on evidence provided by Sunrise, were permanently lost as a direct result of the Rehab Interruption Period."

EXECUTION COPY

10.  __Amendment to Section 4.2 paragraph (d) of the Agreement (Overage Payments).__  Section 4.2 paragraph (d) of the Agreement is hereby deleted in its entirety.

11.  __Amendment to Section 4.3 paragraphs (c), (d) and (e) of the Agreement (Short Fall and Overage Payments).__  Section 4.3 paragraphs (c), (d), and (e) of the Agreement are each hereby deleted in their entirety.

12.  __Amendment to Section 4.4 of the Agreement (Mechanics for Payments; Payments Ending).__  Section 4.4 of the Agreement is hereby deleted in its entirety.

13.  __Amendment to Section 5.1 of the Agreement (Tooling Payments).__  Section 5.1 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

> "Sunrise has reimbursed Delphi for Product tooling costs incurred by Delphi in the amount of One Million Fifty-Five Thousand Seven Hundred Sixty-Two Dollars and Eighty Cents ($1,055,762.80).  Upon the Amendment Effective Date, Sunrise agrees to reimburse Delphi for additional Product tooling cost in the amount of One Million Forty-Two Thousand One Hundred Forty-Seven Dollars and Twenty-Seven Cents ($1,042,147.27) ("**Sunrise Tooling**").  The parties further agree that Sunrise, by reimbursing Delphi for the Sunrise Tooling, does not waive its rights to assert recoupment or its rights as a secured creditor by virtue of its prior possession of the tooling reimbursement, and that Sunrise's rights shall not be prejudiced by the release of the tooling reimbursement should Delphi choose not to assume this Amended Agreement at or before confirmation of a plan of reorganization.  Delphi explicitly reserves its rights to contest Sunrise's claims on any grounds other than Sunrise's having paid the tooling reimbursement in the event of rejection of the Agreement as amended.  This includes all changes requested by Sunrise through December 31, 2005.  Delphi may use Sunrise-owned tooling to support orders for other customers upon prior written notice.  In no event will the Sunrise Tooling be used to directly or indirectly provide products for Invacare Corporation or an Invacare subsidiary that Invacare owns greater than 50%.  Delphi agrees to assume all liability for perpetual tooling maintenance and replacement.  Prices charged to Sunrise for Rehab Controllers shall be at least 5% less than the prices Delphi charges any other customer (including without limitation, any Affiliate of Delphi, for the same Rehab Controllers.  Prices charged to Sunrise for Standard Controllers in similar quantities and delivery conditions shall be no more expensive than prices Delphi charges to any other customer or Affiliate of Delphi.  Sunrise giving permission to Delphi to use Sunrise tooling for other customers will in no way impact Sunrise's rights, its intellectual property or Delphi's exclusivity obligations hereunder."

14.  __Amendment to Section 6.1 of the Agreement (Initial Exclusivity Period).__  Section 6.1 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

> "Until July 1, 2008, Delphi will not sell any Rehab Control Systems (or key features thereof including, without limitation, a Motor Control Module, hand control or programmer to another Wheelchair manufacturer which is a Direct Competitor of Sunrise.  Notwithstanding the foregoing, Delphi shall be free to sell any Standard Control Systems to anyone at any time."

15.  __Amendment to Section 6.2 of the Agreement (Exclusivity Period for Functional Improvements).__  Section 6.2 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

> "Until the earlier of: (i) July 1, 2008, or (ii) the first commercial sale by a third party manufacturer of Wheelchair controllers of a Wheelchair or Wheelchair controller which replicates an EFF, Delphi will not sell Wheelchair controllers incorporating any EFF to

any Direct Competitor of Sunrise. Each EFE will be considered independently for purposes of subsection (ii) in the foregoing sentence so that the first commercial sale by a third party manufacturer of Wheelchair controllers of a Wheelchair or Wheelchair controller which replicates an EFE shall not relieve Delphi of its exclusivity obligation with respect to all other EFE. For purposes of this Section 6.2, any feature or function enhancement being suggested by Sunrise will not be deemed to be an EFE to the extent such feature or function enhancement was suggested to Delphi by another Delphi customer prior in time to Sunrise suggesting the same feature or function enhancement. A mutually-agreed list of all EFE suggested by Sunrise as of the Effective Date of this Agreement is set forth on **Exhibit 6** attached hereto ("**Initial Product EFEs**"). Following the Effective Date, all future Exclusive Feature Enhancements shall be identified on **Exhibit 7** attached hereto as amended by the Parties from time to time ("**Future Product EFEs**"). Delphi will not sell Wheelchair controllers incorporating any mutually agreed Future Product EFE's to any Direct Competitor of Sunrise for a period of twelve (12) months following the initial commercial sale of the Future Product EFE to Sunrise. Notwithstanding the foregoing, the exclusivity protections identified in (i) and (ii) above do not apply to (a) any feature or function enhancement which is not an Exclusive Feature Enhancement and (b) any non-custom components incorporated into the Wheelchair controller. Furthermore, the limitation upon Delphi's sales of Wheelchair controllers does not apply to Wheelchair controllers which do not incorporate any EFE, even if such third-party Wheelchairs include non-custom components found on Sunrise Wheelchairs."

16.  **Amendment to Section 8.4 of the Agreement (Late Delivery).** Section 8.4 of the Agreement is hereby amended by amending and restating the text thereof to read in its entirety as follows:

"In the event of any unexcused late delivery which is more than fifteen (15) days beyond a mutually-agreed delivery date, Sunrise shall be entitled to recover the difference between the price hereunder and the price it pays a third party supplier for replacement products to satisfy customer demands, if the price of replacement products is greater than the price of Products. If Delphi fails to make delivery of Products within forty-five (45) days after a mutually-agreed delivery date, then Sunrise may terminate the portion of the purchase order which has not been delivered. In the event Sunrise terminates the portion of the purchase order not delivered, Sunrise shall be entitled to recover the difference between the price hereunder and the price it pays a third party supplier for replacement products to satisfy current customer demands, if the price of replacement products is greater than the price of Products. If after forty-five (45) days the purchase order is terminated, the volume commitment will be reduced by the amount terminated. The section does not apply if Sunrise is responsible for the delay."

17.  **Pricing.** Prices reflected in **Exhibit 1** will become effective as of April 1, 2007. Payment will be retroactive and payable within 14 days of the signing of this document. Delphi will extend a 2% annual price reduction on July 1st of each calendar year beginning in 2008 and extending through 2011, as reflected in **Exhibit 1**.

18.  **Amendment to Section 17.4 of the Agreement.** Section 17.4(a) of the Agreement is modified to add the following language to the end thereof:

"; provided, however, that Sunrise acknowledges that Delphi filed for protection under Chapter 11 of the United States bankruptcy laws on October 8, 2005, and that such filing shall not implicate the provisions of this Section 17.4(a)."

19.  Software License/Escrow.

(a)  Within sixty (60) days after signing this Amendment (subject to any delays caused by the escrow agent, provided that the parties shall use commercially reasonable efforts to minimize same), Delphi and Sunrise will execute a commercially reasonable escrow agreement with a reputable, mutually-agreed third-party escrow agent, the terms of which will be mutually agreed upon and govern Sunrise's access to the Source Materials (as defined below).  Such terms shall provide, at a minimum, that Sunrise shall have access to the Source Materials on the Failure Date (as defined below).  Sunrise will pay the maintenance fees on the escrow account.  Within five days after the escrow agreement is signed, Delphi shall deposit (such date, the "Initial Deposit Date") a complete and current copy of all source code with comments, applicable compiler program(s), and CRDs (Customer Requirements Documents) to allow a reasonably skilled programmer to maintain, support and update all software related to the Rehab Control Systems and Standard Control Systems (the "Source Materials") with the escrow agent.  Delphi shall place all material improvements, updates, upgrades or new releases to the Source Materials into such escrow account within three (3) months after their use by Delphi.  The escrow agreement shall be considered a part of this Agreement (and the license in Section 20(b) herein) for purposes of 11 U.S.C. § 365(n)(1)(B).

(b)  The third sentence of Section 17.6 of the Agreement is hereby replaced with the following:

   Delphi hereby grants to Sunrise and its Affiliates a worldwide, non-transferable license under all of its Intellectual Property necessary to manufacture (or have manufactured by a third party), use, distribute, offer to sell the Rehab Control Systems and Standard Control Systems, including the right to copy, use, distribute, perform, display and make derivative works based upon all software (including the Source Materials, subject to Section 22(a)) and other copyrightable works included in such Intellectual Property.  Sunrise covenants that it and its Affiliates shall not exercise any of their rights under such license unless and until (1) the date that Delphi materially fails to perform its obligations under the Agreement, (2) such failure is not cured within forty-five (45) days after Delphi is provided written notice of breach, and (3) such failure is not excused or otherwise the result of a failure, omission, or contractual breach by Sunrise (the "Failure Date")."

(c)  In the fourth sentence of Section 17.6 of the Agreement, the phrase "the date of abandonment or termination," shall be replaced with "the Failure Date."

(d)  The fifth sentence of Section 17.6 of the Agreement is hereby deleted.

(e)  The final sentence of Section 17.6 of the Agreement is hereby replaced with the following:

   "In addition, in the event that the Agreement is terminated under any circumstances, Delphi will within 90 days return to Sunrise all tooling paid for by Sunrise."

20.  Amendment Effective Date.  This Amendment shall become effective on the date of execution whether or not Delphi assumes or rejects this Agreement as amended in its plan of reorganization.

21.  Assignment.  The following language shall be added to the end of each sentence in Section 20.4 of the Agreement: "excluding any division, subsidiary, or affiliate of Invacare and Pride corporations."

22.  Miscellaneous.

(a)  This Amendment shall be limited precisely as written.  Except to the extent hereby amended, the Agreement remains in full force and effect.  Whenever the "Agreement" is referred to in the Agreement or any of the other documents or papers executed or delivered in connection therewith, such reference shall be deemed to mean the Agreement as modified by this Amendment.

EXECUTION COPY

(b) This Amendment shall be governed by and construed according to the laws of the State of Michigan as such laws are applied to contracts between residents of the State of Michigan to be performed entirely within such state.

IN WITNESS WHEREOF, Sunrise and Delphi have caused this Amendment to be executed in duplicate by their duly authorized representatives as of the date first above written.

SUNRISE MEDICAL INC.

By:

Title: CEO

DELPHI MEDICAL SYSTEMS
CORPORATION

By:

Title: MANAGING DIRECTOR

EXECUTION COPY

Exhibit 1
Product Listing

Exhibit 1 Product
Listing

EXECUTION COPY

Exhibit 2
Rehab Control Forecast

Exhibit 2 Rehab
Control Forecast

EXECUTION COPY

Exhibit 3
Customer Requirements Document

**Electronic copy of CRD "X"**

CRD Signature Pages

| Exhibit 3A | Exhibit 3B | Exhibit 3C |
|---|---|---|
| Standard_MCM page 1 October 4 2006 Rev | Standard_MCM page 1 October 4 2006 Rev | SCIM page 1 October 4 2006 Rev . |
| Exhibit 3D | Exhibit 3E | Exhibit 3F |
| Rehab_Sub-system page 1 October 4 20x | Rehab_MCM page 1 October 4 2006 Rev . | Rehab_HCM page 1 October 4 2006 Rev |
| Exhibit 3G | Exhibit 3H | Exhibit 3I |
| QMAC page 1 December 11 2006 Rr | Standard_Sub-system page 1 October 4 2 | Mini-Attendant page 1 October 4 2006 Rev |
| Exhibit 3J | Exhibit 3K | Exhibit 3L |
| HIP page 1 December 13 2006 Rr | ED page 1 October 2 2006 Rev 2.0.pdf | ECM page 1 December 5 2006 rev |
| Exhibit 3M | | |
| PCSS page 1 June 6 2006 rev .05.pdf | | |

EXECUTION COPY

Exhibit G
Long Lead Component Purchase Authorization

Exhibit G Long Lead
Component Purchase

Project Huron Contract Exhibit 1 Dated 051007

| PN | Description | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| | | | Price by Year | | | |
| 020006 | SCM | $ 174.69 | $ 171.20 | $ 167.77 | $ 164.42 | $ 161.13 |
| 020008 | ECM | $ 245.69 | $ 240.98 | $ 236.16 | $ 231.43 | $ 226.80 |
| 020023 | HHP | $ 137.50 | $ 134.75 | $ 132.06 | $ 129.41 | $ 126.83 |
| 020024 | ED | $ 211.42 | $ 207.19 | $ 203.05 | $ 198.99 | $ 195.01 |
| 020007 | MODULE GMAC | $ 181.59 | $ 177.96 | $ 174.40 | $ 170.91 | $ 167.49 |
| 020009 | COMPACT Joystick/Mini Hand | $ 183.54 | $ 179.86 | $ 176.27 | $ 172.74 | $ 169.29 |
| 020013 | HCM, 9B Std | $ 108.03 | $ 108.03 | $ 108.03 | $ 108.03 | $ 108.03 |
| 101569 | HCM, 5B Std | $ 105.96 | $ 105.96 | $ 105.96 | $ 105.96 | $ 105.96 |
| 101568 | HCM, 4B Std | $ 105.96 | $ 105.96 | $ 105.96 | $ 105.96 | $ 105.96 |
| 101564 | CONTROLLER  Standard B | Dropped | Dropped | Dropped | Dropped | Dropped |
| 020004 | CONTROLLER Std Lts & Act | $ 139.61 | $ 139.61 | $ 139.61 | $ 139.61 | $ 139.61 |
| 101566 | CONTROLLER Standard A | $ 116.39 | $ 116.39 | $ 116.39 | $ 116.39 | $ 116.39 |
| 020010 | HCM, Rehab 7B Basic | $ 178.56 | $ 174.99 | $ 171.49 | $ 168.06 | $ 164.70 |
| 020011 | HCM, Rehab 7B Basic w/Lights | $ 178.56 | $ 174.99 | $ 171.49 | $ 168.06 | $ 164.70 |
| 020012 | HCM, Rehab 3B Basic | $ 181.08 | $ 177.46 | $ 173.91 | $ 170.43 | $ 167.02 |
| 020017 | HCM, Rehab 7B Phono | $ 183.18 | $ 179.52 | $ 175.93 | $ 172.41 | $ 168.96 |
| 020018 | HCM, Rehab 7B Switch | $ 202.70 | $ 198.64 | $ 194.67 | $ 190.78 | $ 186.96 |
| 020019 | HCM, Rehab 7B Lights & Switch | $ 183.18 | $ 179.52 | $ 175.93 | $ 172.41 | $ 168.96 |
| 020020 | HCM, Rehab 7B Lights & Phono | $ 202.70 | $ 198.64 | $ 194.67 | $ 190.78 | $ 186.96 |
| 020021 | HCM, Rehab 3B Phono | $ 185.70 | $ 181.99 | $ 178.35 | $ 174.78 | $ 171.29 |
| 020022 | HCM, Rehab 3B Switch | $ 205.22 | $ 201.11 | $ 197.09 | $ 193.15 | $ 189.28 |
| 020000 | CONTROLLER Rehab Basic | $ 233.29 | $ 228.62 | $ 224.05 | $ 219.57 | $ 215.18 |
| 020001 | CONTROLLER Rehab Full | $ 289.23 | $ 283.45 | $ 277.78 | $ 272.22 | $ 266.78 |

Approved by Sunrise Medical _____    Date: _____
Approved by Delphi  Medical _____    Date: _____

## Project Huron Exhibit 2
### Rehab Controls Forecast
*May 10, 2007*

| Rehab Controllers (QR) | Production Year | | | | | TOTAL |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | |
| Total Rehab Control System (QR) Forecast | 6,800 | 10,500 | 15,000 | 15,360 | 17,540 | 64,600 |
| Cumulated volumes | 6,800 | 17,430 | 32,430 | 47,790 | 64,800 | |

Production Year as defined in the Amendment dated May 10, 2007.

Exhibit G
Long Lead Components 02-08-07

Non-PCA Long Lead Items 60 days or greater

| Planner ID | Part Number | Description | Purch LT (Business Days) |
|---|---|---|---|
| ABF | 28004569 | DISPLAY, LCD, ED | 100 |
| ABF | 28004607 | DISPLAY, LCD, HHP | 100 |
| ABF | 28004633 | SWITCH, JOYSTICK | 80 |
| ABF | 28009636 | JOYSTICK, P&G | 80 |
| ABF | 28016378 | BASE, MCM | 70 |
| ABF | 28016360 | CONTROLLER, REHAB FULL | 65 |
| ABF | 28016364 | CONTROLLER, REHAB BASIC | 65 |
| ABF | 28016367 | CONTROLLER, STD BASIC | 65 |
| ABF | 28016371 | CONTROLLER, STD L&A | 65 |
| ABF | 28016375 | CONTROLLER, STD W/ACTUAT | 65 |
| ABF | 28021174 | SCR, M3 X 1.12 X 8T | 60 |

PCA Long Lead Components 80 days or greater

| Planner ID | Part Number | Description | Purch LT (Business Days) |
|---|---|---|---|
| ECF | 9390565 | THERMISTOR-SM,NTC | 110 |
| ECF | 9400164 | IC-XC161CS,32FF,BA | 110 |
| ECF | 16064843 | XSTR-PNP,SOT23 | 110 |
| ECF | 16084378 | XSTR-NPN,SOT23 | 110 |
| ECF | 16216844 | IC-CMOS,LED DRVR,SM | 110 |
| ECF | 16265969 | IC-CMOS,ADMUX | 110 |
| ECF | 21001376 | IC-16K,EE,I2C,85,SO | 110 |
| ECF | 21001469 | THERMISTOR-NTC,10K | 110 |
| ECF | 28003256 | SENSOR-PRESSURE | 110 |
| ECF | 28019678 | IC-IR REMOTE CONTROL | 110 |
| ECF | 16242598 | XSTR-PFET,SOT223 | 107 |
| ECF | 9352017 | IC-IRDA,TFDU4100 | 100 |
| ECF | 9397252 | INDUCTOR-471UH,SM | 100 |
| ECF | 9398730 | XSTR-PFET,D3PAK | 100 |
| ECF | 9398946 | IC-BTS716G, SO-20 | 100 |
| ECF | 9399594 | IC-VREG,ADJ,SO-8 | 100 |
| ECF | 16246966 | FUSE-RESET,0.50A,SM | 100 |
| ECF | 16250181 | IC-CMOS,OP-AMP,QUAD | 100 |
| ECF | 16253026 | IC-QUAD HI-SPEED 10 | 100 |
| ECF | 21001380 | IC-32K,EE,I2C,85,SO | 100 |
| ECF | 28001404 | CAP-ELR,6800UF,35V | 100 |
| ECF | 28008988 | IC-DVR,A3940 FULL BRIDGE | 100 |
| ECF | 210025580O | IC-XC161CJ,16,85C | 100 |
| ECF | 9379640 | IC-HIGHSIDE SWITCH | 90 |
| ECF | 9400020 | RELAY-SPDT,DUAL,EX2 | 90 |
| ECF | 21001375 | IC-EEPROM,8K I2C,SO | 90 |
| ECF | 28003153 | INDUCTOR-680UH, SM | 90 |
| ECF | 28007359 | HEADER-8POS M,R/A,2MM,SM | 90 |
| ECF | 9376504 | DIO-RECT,SMC | 80 |
| ECF | 9378948 | RELAY-SPDT,F8R51D12 | 80 |
| ECF | 9392787 | XSTR-PFET,SOT23 | 80 |

| | | | |
|---|---|---|---|
| ECF | 9395684 | DIO-SHTKY,SMC | 80 |
| ECF | 9395631 | RES-SM,0.249OHM,1WA | 80 |
| ECF | 9397594 | CAP-SM,EL,100UF,63V | 80 |
| ECF | 9397624 | XSTR-NFET,DPAK | 80 |
| ECF | 9397622 | CAP-SM,0.33UF,0805 | 80 |
| ECF | 9397997 | IC-TJA1040, CAN TRA | 80 |
| ECF | 9399019 | CAP-SM,TA,47UF,10% | 80 |
| ECF | 9401172 | INDUCTOR-150UH,SM | 80 |
| ECF | 9401764 | HEADER-06POS,M,V,2M | 80 |
| ECF | 9402894 | HEADER-30POS,F,V,.5MM,SM | 80 |
| ECF | 9402921 | DIO-ZENER,SOD123 | 80 |
| ECF | 16046571 | XSTR-DAR,BCV27 | 80 |
| ECF | 16047157 | XSTR-PNP,SOT23 | 80 |
| ECF | 16057208 | XSTR-NPN,SOT23 | 80 |
| ECF | 16068830 | XSTR-NFET,EM,SOT23 | 80 |
| ECF | 16127476 | RES-SM,0.1OHM 2W 1% | 80 |
| ECF | 16167464 | CAP-SM,0603,1000PF | 80 |
| ECF | 16167476 | CAP-SM,0603,.01UF | 80 |
| ECF | 16191467 | CAP-SM,.01UF,ESD | 80 |
| ECF | 16191468 | CAP-SM,1000PF,ESD | 80 |
| ECF | 16214986 | CAP-SM,ELR,47UF,50V | 80 |
| ECF | 16228268 | DIO-SIGNAL,SOT23 | 80 |
| ECF | 16228496 | DIO-RECT,SMA | 80 |
| ECF | 16252892 | DIO-SHTKY,SOD123 | 80 |
| ECF | 16253008 | IC-DUAL RAIL-TO-RAI | 80 |
| ECF | 16257058 | CAP-SM,ELR,220UF35V | 80 |
| ECF | 28003202 | RESONATOR-8.0MHZ,SM | 80 |
| ECF | 28003509 | IC-VREG,12V,D2PAK | 80 |
| ECF | 28003510 | IC-VREG,5V,SO-8 | 80 |
| ECF | 28003512 | IC-VREG,12V,SO-14 | 80 |
| ECF | 28004114 | HEADER-02POS,M,V,1. | 80 |
| ECF | 28004415 | HEADER-03POS,M,R/A,1.5MM | 80 |
| ECF | 28004416 | HEADER-04POS,M,R/A,1.5MM | 80 |
| ECF | 28004418 | HEADER-06POS,M,R/A,1.5MM | 80 |
| ECF | 28004427 | HEADER-14POS,M,R/A,1.5MM | 80 |
| ECF | 28004773 | XSTR-NFET,D2PAK-7L | 80 |
| ECF | 28006683 | HEADER-14POS,M,R/A,1.5MM | 80 |
| ECF | 28006687 | IC-EEPROM,4K,I2C,SO | 80 |
| ECF | 28010790 | RELAY-VF7-11H12 | 80 |
| ECF | 28010777 | HEADER-04POS,M,R/A | 80 |
| ECF | 28018176 | HEADER-SCIM I/O | 80 |
| ECF | 28018177 | HEADER-ECM I/O | 80 |
| ECF | 28018178 | HEADER-BUS-SCIM-ECM | 80 |
| ECF | 28018181 | HEADER-OUTPUT-QMAC2 ACT | 80 |
| ECF | 28018182 | HEADER-INPUT-QMAC2 BATT | 80 |
| ECF | 28018671 | XSTR-NFET,DPAK | 80 |
| ECF | 28018677 | XSTR-NFET,DPAK | 80 |
| ECF | 28036333 | VARISTOR-0.1J,30V, SM | 80 |
| ECF | 28072560 | HEADER-MTG CTRL R | 80 |
| ECF | 28072561 | HEADER-MTG CTRL L | 80 |

In re Delphi Corporation, et al.
U.S.B.C. Southern District of New York Case No. 05-44481-RDD

## ATTACHMENT TO SUNRISE MEDICAL CURE AMOUNT OBJECTION

1.      Pursuant to Paragraph 3, page 1 of the FADSA both Sunrise and Delphi are bound by the terms of FADSA after May 10, 2007.

2.      Pursuant to the terms of the Modification Procedures Order dated June 16, 2009 ("MPO"), ¶¶ 32-33, p. 19, any objection to the "cure amount" shall be filed within 10 days of the service of the Cure Amount Notice.

3.      Between May 10, 2007 and June 1, 2009, Delphi failed to perform under the terms of the FADSA including but not limited to the following:

Delphi was to develop the Rehab controller as specified under Sunrise Medical specifications. Delphi developed under sole responsibility the Standard controller system and asked Sunrise Medical for development support in terms of specifications for this system. Delphi was responsible to deliver failure free system components in hardware and software. Sunrise was to compensate for the software development and to pay for all capital expenses of Delphi which was required for producing and quality test the hardware. Delphi failed in delivering a failure free hardware system in time. Meaning the Delphi components failed multiple times in EMC ("Electro Magnetic Compensation") testing. Therefore the system introduction to the market was significantly delayed, the development cost raised and the material cost increased. In addition, the first software release 1.9 did not function. This caused Sunrise to discontinue some of the options (e.g. motor encoders which is related to the Quickie inteli drive feature) in the market place, which Sunrise offered at the initial launch, causing damage to Sunrise reputation and lost sales. After launch and after release of the software 2.0 further software issues were recognized, Delphi did not agree to fix these under their responsibility. Sunrise estimated the workload to fix this at $75.000, Delphi quoted these for $300,000.

4.      Sunrise estimates its damages for Delphi's failure in performance at $37,000,000.

   a.      Sunrise Development Investment: $10,001,577.

   b.      Sunrise Lost Profit: $27,727,000.

5.      This objection to cure amount may be subject to further negotiation of the parties pursuant to the terms of the MPO.

- 1 -

106144/000439/1073911.01

EXHIBIT B