DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 450-6501
Donald S. Bernstein
Benjamin S. Kaminetzky
Rajesh S. James
Brian M. Resnick

*Counsel to JPMorgan Chase Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|                              |   |                              |
|------------------------------|---|------------------------------|
| In re:                       | : |                              |
|                              | : | **Chapter 11 Case No.**      |
|                              | : |                              |
| **DELPHI CORP., et al.,**    | : | **05-44481 (RDD)**           |
|                              | : |                              |
|                              | : | **(Jointly Administered)**   |
| **Debtors.**                 | : |                              |
|                              | : |                              |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OBJECTION OF JPMORGAN CHASE BANK, N.A. TO THE PROPOSED SALE
OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO
AFFILIATES OF GENERAL MOTORS AND PLATINUM EQUITY LLC**

JPMorgan Chase Bank, N.A. ("**JPMC**"), the Administrative Agent (the "**Administrative**

**Agent**") for the Debtors' Amended and Restated Revolving Credit, Term Loan and Guaranty

Agreement dated as of May 9, 2008 (as amended, supplemented, waived, or otherwise modified

from time to time, the "**DIP Credit Agreement**"), respectfully submits this objection (the

"**Objection**") to the motion (the "**Motion**") filed by Delphi Corporation and its debtor

subsidiaries and affiliates (collectively, the "**Debtors**") for approval of the sale of all or

substantially all of the Debtors' assets to affiliates of General Motors ("**GM**") and Platinum

Equity, LLC ("**Platinum**") pursuant to modifications to the confirmed First Amended Plan of

Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession

(the "**Modified Plan**") or, in the alternative, section 363(b) of the Bankruptcy Code (the

"**Section 363 Sale Alternative**") in the event the Modified Plan cannot be confirmed [Docket

No. 16646].

## PRELIMINARY STATEMENT

1.      Only two weeks ago, this Court denied the Debtors' Platinum Expense

Reimbursement Motion,[1] which sought to divert up to $30 million to Platinum from the proceeds

of a sale of the Debtors' assets before the DIP Lenders' claims, secured by those same assets, are

paid in full.  As the Court recognized,  the Debtors' proposed order had been "carefully drafted"

in an apparent effort to circumvent the strictures of the debtor-in-possession financing order.

Nonetheless, the Court found that the Debtors' proposal was "directly in contravention" of the

DIP Refinancing Order (as defined below).  (July 1, 2009 Hr'g Tr. 69:7.)  And that, the Court

held, "ends the issue."  (*Id.* 69:11–12.)

2.      As Debtors' counsel has acknowledged, however, the Platinum Expense

Reimbursement Motion was only "the tip of the iceberg."  (July 1, 2009 Hr'g Tr. 20:14.)  The

proposed Section 363 Sale Alternative to which this objection relates is the iceberg's submerged

mass.  The Platinum Expense Reimbursement Motion sought, without the DIP Lenders' consent,

to funnel to Platinum $30 million of proceeds from a sale of Debtors' assets before the DIP

Lenders' claims secured by those assets are paid in full.  The Motion now before the Court seeks

to sell those very assets and to funnel away from the DIP Lenders and to Platinum, GM and

administrative and other creditors junior to the DIP Lenders the most valuable collateral in

---

[1] Expedited Motion for Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, and 9014 Authorizing Debtors to Provide Expense Reimbursement to Platinum Equity Advisors, LLC in Connection with Sale of Debtors' Assets Pursuant to Master Disposition Agreement [Docket No. 17317].

Delphi's estate free and clear of the DIP Lenders' liens.  This the Debtors ask the Court to do

without the support of DIP Lenders or even of Delphi's Creditors' Committee, in blatant

violation of the DIP Refinancing Order[2] and the underlying DIP Documents.[3]

     3.      As discussed below, the consummation of the GM-Platinum Transaction (as

defined below) pursuant to Section 363 of the Bankruptcy Code absent Required Lender consent

would contravene the express and unequivocal terms of the DIP Refinancing Order and the DIP

Documents.  And, as was the case with the Debtors' Platinum Expense Reimbursement Motion,

that "ends the issue."

     4.      Whether parties such as GM, the United States Treasury or even junior

administrative or other claimants in these Chapter 11 cases might benefit from consummating the

GM-Platinum Transaction is of no relevance if the threshold condition for moving forward with

any sale and release of DIP Collateral is not met.  For such a transaction to be approved and

consummated, the requisite consents under the DIP Documents and the DIP Refinancing Order

must be obtained.  Accordingly, the relief requested in the motion must be denied.

     5.      As the Second Circuit and other federal courts have recognized, section 364(e),

section 363(m) and companion provisions instantiate a principle that when bankruptcy courts

make binding commitments to post-petition secured creditors, absent "bad faith" (a narrow

exception not applicable here), such commitments must be honored.  *Kham & Nate's Shoes
No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990); *accord IBI Sec. Serv.,
Inc. v. Chapter 7 Trustee for IBI Sec. Serv., Inc.*, 133 F.3d 205, 208–09 (2d Cir. 1998).

[2] Order under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors to Obtain Post-Petition Financing and (II) Authorizing Debtors to Refinance Secured Post-Petition Financing and Prepetition Secured Debt [Docket No. 6461] (as amended and supplemented from time to time, the "**DIP Refinancing Order**").

[3] The term "**DIP Documents**" shall have the meaning assigned such term in the DIP Refinancing Order.

6.      DIP financing orders are the prime example of this principle.  Section 364 is premised on the strong public policy of encouraging post-petition lending to bankrupt companies, many of which would be forced to liquidate if they could not procure financing.  If efforts—like the Debtors' efforts in connection with the proposed Section 363 Sale Alternative— to rewrite the terms of DIP financing orders were to succeed, lenders would be reluctant to extend critical financing.  *Kham & Nate's Shoes*, 908 F.2d at 1355 ("If creditors fear that the rug will be pulled out from under them, they will hesitate to lend.").  As such, any order authorizing consummation of the proposed GM-Platinum Transaction over the DIP Lenders' objections and in contravention of the DIP Refinancing Order and the DIP Documents would have a chilling effect on DIP lending that would remain long after these chapter 11 cases have concluded. Given that such action would violate both the statute and this important bankruptcy policy, ***it is no surprise that the Administrative Agent has been unable to locate any case, decided either under the Bankruptcy Code or under predecessor acts, in which a court has permitted a debtor to sell assets free and clear of the liens held by DIP lenders without their consent.***

7.      In sum, approval of the proposed GM-Platinum Transaction should be denied because:

> (1)    Absent DIP Lender consent, the Debtors' consummation of the Section 363 Sale would violate the express and unequivocal terms of the DIP Refinancing Order and the DIP Documents.

> (2)    The DIP Lenders have not supplied such consent; instead, they—like the Committee of Unsecured Creditors—have vehemently objected to the proposed GM-Platinum Transaction.

> (3)    Any order approving the GM-Platinum Transaction over the DIP Lenders' objection—and in violation of the DIP Refinancing Order and the DIP Documents—would be both illegal and unprecedented, and would have far-reaching and potentially catastrophic consequences on the availability of DIP financing and the vitality of future chapter 11 reorganizations.

8.      For these reasons, and additional reasons discussed below, this Court should

decline to approve the Section 363 Sale Alternative.

## BACKGROUND

### The DIP Credit Agreement

9.      Pursuant to this Court's order dated January 5, 2007, the Debtors entered into a

debtor-in-possession Revolving Credit, Term Loan and Guaranty Agreement (as amended from

time to time, the "**DIP Facility**") with certain lenders party thereto (together with their

successors and assigns, the "**DIP Lenders**") and the Administrative Agent, which was comprised

of (i) a first-priority revolving loan and letter of credit facility in an amount not to exceed

$1,750,000,000 (the "**Tranche A Loans**"), (ii) a first-priority term loan facility in the amount of

$250,000,000 (the "**Tranche B Loans**") and (iii) a second-priority term loan facility in the

amount of $2,495,820,240.59 (the **"Tranche C Loans"**).

10.     The Debtors used the proceeds of the Tranche A Loans and Tranche B Loans to

refinance their existing debtor-in-possession facility dated as of November 21, 2005, and for

working capital and other general corporate purposes.  The Debtors used the proceeds of the

Tranche C Loans to refinance the indebtedness under their secured pre-petition facility dated as

of June 14, 2005 (the "**Pre-Petition Facility**").  The Debtors decided to refinance the Pre-

Petition Facility with the proceeds of the Tranche C Loans in order to save approximately $8

million per month in financing costs.

11.     The DIP Refinancing Order provides, inter alia, that the obligations under the DIP

Facility (the "**DIP Claims**") constitute allowed super-priority claims with priority over any and

all administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code (subject to

certain limited exceptions).  (DIP Refinancing Order § 5(a).)  The DIP Claims are secured by

5

first-priority liens on all of the Debtors' assets (subject to certain limited exceptions) pursuant to

sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code.  (DIP Refinancing Order

§ 6.)  The DIP Refinancing Order further provides that the DIP Documents (as defined in the

DIP Refinancing Order), including the Security and Pledge Agreement (as defined in the DIP

Credit Agreement (the "**Security and Pledge Agreement**")), "*constitute valid and binding*

*obligations of the Debtors, enforceable against each Debtor party thereto in accordance with*

*the terms of the DIP Documents*" and that "*[n]o . . . grant of security under the DIP*

*Documents or this Order shall be stayed, restrained, voidable, or recoverable under the*

*Bankruptcy Code or under any applicable law . . . or subject to any defense, reduction, setoff,*

*recoupment or counterclaim*." (DIP Refinancing Order § 4(c) (emphasis added).)  Moreover, the

DIP Refinancing Order cannot be modified without "*the prior written consent of the*

*[Administrative] Agent*."  (DIP Refinancing Order § 13(b).)

12.     On November 20, 2007, the DIP Lenders agreed to extend the DIP Facility's

maturity date from December 31, 2007 to July 1, 2008 to provide the Debtors with adequate time

to obtain requisite consent for their plan of reorganization.[4]  On May 9, 2008, the DIP Lenders

granted the Debtors a further extension of the DIP Facility's maturity to December 31, 2008 in

order to ensure that the Debtors had sufficient liquidity through the end of 2008 as they

attempted to emerge from chapter 11.[5]  Pursuant to the May 9, 2008 amendment of the DIP

---

[4] Order Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing
Debtors To (I) Extend Maturity Date Of DIP Facility, (II) Enter Into Related Documents, And (III) Pay Fees In
Connection Therewith [Docket No. 10957].

[5] Order (I) Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (A)
Extend Maturity Date Of DIP Facility, (B) Enter Into Related Documents, And (C) Pay Fees In Connection
Therewith And (II) Authorizing Debtors To Enter Into Arrangement With General Motors Corporation Or An
Affiliate [Docket No. 13489].

6

Facility and a supplemental amendment thereto,[6] the Tranche A Loan commitments were decreased to $1.1 billion, the amount of Tranche B Loans was increased to $500 million and the amount of Tranche C Loans was increased to $2.75 billion.  By increasing the amount of Tranche B Loans and Tranche C Loans, the Tranche B Lenders and Tranche C Lenders each provided the Debtors with approximately $250 million of additional liquidity to fund their operations.

**The Accommodation Agreement**

13.    In response to the Debtors' impending inability to repay the principal amounts under the DIP Facility due on December 31, 2008, the DIP Lenders agreed pursuant to an Accommodation Agreement dated as of December 12, 2008 (as amended, the "**Accommodation Agreement**")[7] to permit the Debtors to continue to operate notwithstanding the passing of the maturity date and other specified defaults, and to forbear from exercising remedies under the DIP Facility for up to six months, subject to the Debtors meeting certain milestones.  The Debtors have failed to meet several milestones and have defaulted under the Accommodation Agreement several times since entering into the Accommodation Agreement, and each time the DIP Lenders have worked cooperatively with the Debtors to provide amendments to the Accommodation Agreement in order to continue the forbearance thereunder (including going beyond the initial six-month period) and to provide the Debtors with further access the DIP Lenders' cash collateral.  While the Accommodation Agreement has been in effect, the DIP Lenders have

---

[6] Order Supplementing Second DIP Extension Order (Docket No. 13489) Authorizing Increase In Financing Commitments In Response To Oversubscription Of Debtors' Syndication Of Second DIP Extension [Docket No. 13699].

[7] Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith [Docket No. 14515].

allowed the Debtors to continue to use cash collateral, including by permitting the Debtors on

several occasions to draw from segregated cash collateral accounts maintained for the benefit of

the DIP Lenders.  Currently, there is approximately $230 million in outstanding Tranche A

Loans and $45.6 million of Letter of Credit exposure, $311 million in outstanding Tranche B

Loans and approximately $2.92 billion in outstanding Tranche C Loans (which includes interest

that has accrued, and not been paid, since the effective date of the Accommodation Agreement).

**The GM-Platinum Transaction**

14.    On June 1, 2009, the Debtors' filed the Motion,[8] which contemplates a transaction

(the "**GM-Platinum Transaction**") pursuant to a so-called Master Disposition Agreement (the

"**MDA**") among the Debtors, GM and Parnassus Holdings II, LLC ("**LLC**"), a new company

formed by Platinum, whereby an affiliate of GM will acquire certain North American assets of

the Debtors, and the LLC will acquire the remainder of the Debtors' assets.  The GM-Platinum

Transaction contemplates that the Tranche A and Tranche B Lenders will receive payment in

cash in full, and the Tranche C Lenders will receive cash in the amount of $291 million, an

interest in the LLC in the nominal amount of $145.5 million and the first settlement and other

proceeds from the Debtors' plan investor litigation up to approximately $146 million.  This

represents a nominal recovery to Tranche C Lenders of 20 cents on the dollar, although given the

speculative nature of the interests in the LLC and the plan investor litigation, the value of such

recovery would apparently fall somewhere between 10 and 20 cents on the dollar.

15.    Pursuant to the terms of the MDA, (i) GM has agreed to acquire Delphi's global

steering business and its facilities in Kokomo, Indiana, Rochester, New York, Lockport, New

---

[8] The Administrative Agent filed an objection to the Motion on June 9, 2009 (Docket No. 16897), which
objection is incorporated herein by reference.

York, and Grand Rapids, Michigan, and (ii) the LLC has agreed to acquire Delphi's remaining

assets (the "**ROW Assets**").  In exchange for these assets,

> A.    GM will pay Delphi the following consideration:
>
> - $900 million to be paid to the DIP Lenders and hedging counterparties;
>
> - Assumption of $200 million of administrative expenses; and
>
> - Assumption of $1.6 billion of pension-plan funding liabilities.
>
> B.    The LLC will pay Delphi the following consideration for the ROW Assets:
>
> - A Class C Membership Interest in the face amount of $145.5 million.
>
> C.    GM and Platinum commit to invest in the LLC, presumably to support its business after the closing, the following amounts:
>
> - GM will invest (i) $2 billion in a Class A Membership Interest in the LLC, and (ii) $500 million in a delayed draw term loan facility.
>
> - Platinum will invest (i) $250 million in a Class B Membership Interest in the LLC, and (ii) $250 million in a delayed draw term loan facility.

16.    The Debtors propose that the GM-Platinum Transaction be implemented either

pursuant to the a modified plan of reorganization for the Debtors[9] or, if the Modified Plan can

not be confirmed, pursuant to a sale pursuant to section 363 of the Bankruptcy Code.

Consummation of the transaction pursuant to the Modified Plan would required the

Administrative Agent to either (1) initiate a strict foreclosure under the Uniform Commercial

Code or (2) foreclose on the assets and purchase them at a foreclosure sale pursuant to a credit

bid.  (Modified Plan § 7.8.)  Recognizing the likelihood that the Modified Plan would not be

---

[9] The Debtors filed their Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession [Docket No. 9263] on September 6, 2007 and filed an amendment thereto on December 20, 2007 (such plan, as amended, the "**Confirmed Plan**"). On January 25, 2008, the Court entered an order confirming the plan, which order became effective on February 4, 2008.  Under the Confirmed Plan, all outstanding amounts due in respect of the Tranche A Loans, Tranche B Loans and Tranche C Loans were to be paid in full in cash on the effective date of the Confirmed Plan.  Unfortunately, however, the Debtors have been unable to consummate the Confirmed Plan.

confirmable, the Debtors have proposed an alternative:  a sale pursuant to section 363 of the

Bankruptcy Code.  The original MDA between Debtors, GM and the LLC—a privately

negotiated contract—contemplated a private, closed sale transaction.  However, based on

objections from a number of parties, including the Administrative Agent, certain significant DIP

Lenders, and the Committee of Unsecured Creditors, the Court determined that there should be a

competitive bidding process for the Debtors' assets to allow for additional bids, including credit

bids pursuant to section 363(k) of the Bankruptcy Code.  (*See* Modification Procedures Order

§ 46).[10]

17.    As contemplated by the Motion, the Debtors, GM and the LLC entered into an

agreement to implement a sale transaction under section 363 of the Bankruptcy Code, which

provides for the transfer of the Debtors' assets to GM and Parnassus free and clear of the DIP

Lenders' liens.  (*See* First Amendment to Master Disposition Agreement, dated July 2, 2009

[Docket No. 17558-2] § 3(f)(ii).)

18.    While the objectors hoped the changes to the Modification Procedures Order

providing for a competitive bidding process would elicit third-party bids, the bid deadline came

and went on July 10 without the submission of any third-party bids.  An obvious question is

whether a "competitive" process could play out fully and fairly given its lateness and the

captivity of any workable third-party transaction with Delphi to arrangements with the "stalking-

horse bidder" GM.

---

[10] Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date To Consider Modification To Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims Bar Date and Alternative Transaction Hearing Date dated June 16, 2009 [Docket No. 17032] (the "**Modification Procedures Order**").

19.    In any event, pursuant to the separate Supplemental Modification Procedures Order[11] entered by the Court on June 29, 2009, there remains the possibility that a credit bid will be submitted on behalf of the DIP Lenders.  The deadline for such a credit bid under the Supplemental Modification Procedures Order is July 17, 2009.

20.    While there remains the possibility that a credit bid will be submitted or that some other, fully consensual resolution will be reached by the parties, this objection is being submitted by the Administrative Agent at this time because the Modification Procedures Order sets a deadline of July 15 for objections to the Motion.  The Administrative Agent may, after conclusion of the auction, file further objections to the Motion or to the results of the auction.

## ARGUMENT

### I.    The Debtors Cannot Consummate the Proposed GM-Platinum Transaction, Either Through a Plan of Reorganization or Through a Section 363 Sale, Absent Required Lender Consent

21.    The plain and unambiguous terms of the DIP Refinancing Order and the DIP Documents prohibit the Debtors from consummating the GM-Platinum Transaction—whether through a plan of reorganization or through a section 363 sale—absent consent of the requisite Lenders.

22.    As the Debtors themselves acknowledge, they cannot consummate the proposed GM-Platinum Transaction through a plan of reorganization absent requisite DIP Lender consent. Section 1129(a)(9)(A) of the Bankruptcy Code requires that no plan of reorganization may be

---

[11] Order Amending and Supplementing (i) Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims Bar Date and Alternative Transaction Hearing Date (Docket # 17032) and (ii) the Protective Order Governing Production and Use of Confidential and Highly Confidential Information in Connection With (A) Supplement to Plan Modification Approval Motion and (B) Supplement to GM Arrangement Fourth and Fifth Amendment Approval Motion [Docket No. 16920] (the "**Supplemental Modification Procedures Order**").

confirmed unless these claims are paid in full in cash or unless the DIP Lenders agree to a

different treatment of their claims.  The Debtors' proposal to consummate the GM-Platinum

Transaction pursuant to the Modified Plan contemplates that the Administrative Agent will either

(1) initiate a strict foreclosure under the Uniform Commercial Code and thereafter sell the assets

to GM and Parnassus or (2) foreclose on the assets, purchase the assets at a foreclosure sale

pursuant to a credit bid and thereafter sell the assets to GM and Parnassus.  (Modified Plan

§ 7.8.)  As the Debtors acknowledge, however, the Administrative Agent cannot undertake any

of the contemplated actions unless the Required Lenders[12] authorize it do so.  (Modified Plan

§ 7.8(a).)

       23.     Consummation of the proposed GM-Platinum Transaction through a section 363

sale likewise cannot be accomplished absent consent of the Required Lenders.[13]  In particular,

consummation of the GM-Platinum Transaction pursuant to section 363 would entail a sale of

substantially all of the Debtors' assets to GM and Platinum free and clear of the DIP Lenders'

liens.  The DIP Refinancing Order and DIP Documents, however, expressly and unequivocally

prohibit any sale of the Debtors' assets or any action that would impair the DIP Lenders' security

interests in those assets unless and until the Debtors' DIP obligations are satisfied in cash and in

full.  The DIP Refinancing Order and DIP Documents also provide that the prohibitions above

---

[12] The term "**Required Lenders**" is defined in the DIP Credit Agreement as Lenders holding a majority in amount of Tranche A Loans (and LC Exposure) and Tranche B Loans.  Although the Tranche C Loans are not included in the definition of "Required Lenders," the views of the Tranche C Lenders are very relevant to any matter that involves a determination by the Required Lenders under the DIP Credit Agreement due to the substantial overlap of holdings among the three tranches.

[13] There are certain modifications, amendments or waivers to the DIP Documents that require the consent of more Lenders than just the Required Lenders, including some that require the consent of all of the Lenders.  (DIP Credit Agreement § 10.09(a)).  References herein to obtaining Required Lender consent to the Section 363 Sale Alternative are applicable to the particular aspects of the GM-Platinum Transaction (in its current form), and do not speak to what level of consent may be required for approval of any other form of transaction, as to which the Administrative Agent reserves all of its rights.

may not be modified, amended or waived without the Administrative Agent's prior, written

consent.

24.    Section 6.10 of the Credit Agreement unambiguously prohibits the Debtors'

proposed sale of substantially all of their assets while the DIP obligations remain unpaid.  It

provides that, subject to certain enumerated exceptions, none of which applies here:

> "*So long as . . . any amount shall remain outstanding or unpaid under this
> Agreement, the Borrower. . . will not . . . (and will not apply . . . to the
> Bankruptcy Court for authority to) . . . [s]ell or otherwise dispose of any
> assets . . . , whether now owned or hereafter acquired.*"

25.    The DIP Refinancing Order and DIP Documents are no less unequivocal in their

prohibition of any action that would impair the DIP Lenders' security interests—much less any

action that would deprive the DIP Lenders of their security interests, as the Section 363 Sale

Alternative proposes to do.

> (1)    Section 18 of the Security and Pledge Agreement provides that "[a]ll rights of the
> Agent and security interests hereunder, and all obligations of each of the Grantors
> hereunder, *shall be absolute and unconditional, irrespective of any
> circumstance* which might constitute a defense available to, or a discharge of, any
> guarantor or other obligor in respect of the Secured Obligations *other than
> payment in full of all Secured Obligations and the termination of all
> Commitments.*"

> (2)    Section 22 of the Security and Pledge Agreement further provides that the DIP
> Lenders' liens shall "*remain in full force and effect until the* . . . *payment in full
> in cash of the* . . . *Secured Obligations*" and shall remain binding on both the
> Debtors and any of their "*successors and assigns.*"

26.    The DIP Refinancing Order and DIP Documents provide that the provisions

above may not be modified, amended or waived except with requisite lender consent, and that

such consent must be express and in writing and may not be implied by any other action or

omission.

> Section 10.09 of the Credit Agreement provides: "*No modification, amendment
> or waiver of any provision of this Agreement or the Security and Pledge*

13

*Agreement, and no consent to any departure by the Borrower . . . therefrom, shall . . . be effective unless the same shall be in writing and signed by the Required Lenders*, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given."

27.     Indeed, section 13(b) of the DIP Refinancing Order prohibits the Debtors from *seeking* any modification of their obligations under the Order absent the prior written consent of the Administrative Agent:

> Unless all DIP Obligations shall have been paid in full . . . , *the Debtors shall not seek . . . any modifications or extensions of this Order without the prior written consent of the Agent,* and *no such consent shall be implied by any other action, inaction or acquiescence by the Agent* . . . .

28.     Section 13(d) of the DIP Refinancing Order provides that, "[e]xcept as expressly provided in this Order or in the DIP Documents, *the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by . . . any . . . act or omission*."  The consummation of the MDA would plainly constitute an "act," and therefore, even if the MDA were consummated, the DIP Refinancing Order would require that the DIP Liens remain attached to the assets until the DIP Facility is paid in full.[14]

29.     Further underscoring the inviolable character of the DIP Lenders' liens, section 13(c) of the DIP Order provides that even if "*any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation*

---

[14] It should be noted that the DIP Credit Agreement and Security and Pledge Agreement both expressly provide that the DIP Liens are automatically released in connection with any sale of assets that is permitted by the DIP Documents.  (DIP Credit Agreement § 10.09(a); Security and Pledge Agreement § 22.)  As mentioned above, section 6.10 of the DIP Credit Agreement (the negative covenant regarding asset dispositions), does not currently permit the asset dispositions contemplated by the MDA, but may be amended or waived by the Required Lenders. (DIP Credit Agreement §§ 6.10, 10.09(a)).

*shall not affect . . . the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations*."

30.     In light of the foregoing provisions of the DIP Documents and the DIP Refinancing Order, it is beyond peradventure that the authorization and consummation of the Section 363 Sale Alternative requires the consent of the Required Lenders.

**II.     The DIP Lenders Have Not Consented to the GM-Platinum Transaction, and Have Vigorously Objected to the Debtors' Proposal to Consummate that Transaction**

31.     Just as the GM-Platinum Transaction plainly cannot be consummated absent the consent of the DIP Lenders, it is no less plain that the DIP Lenders have not supplied the Debtors with the requisite consent.  Instead, the DIP Lenders—together with the Creditors' Committee— have vehemently objected to the Debtors' proposal to consummate the GM-Platinum Transaction.  Indeed, on July 14, 2009, the Administrative Agent, upon the authorization and direction of the Required Lenders, informed the Debtors in writing that such Lenders reject and disapprove of the GM-Platinum Transaction, whether effectuated through a plan of reorganization or section 363 sale.  While the Administrative Agent and the DIP Lenders remain committed to effecting a disposition of the Debtors' assets that will minimize disruption to the Debtors' business operations, the Administrative Agent and the DIP Lenders are not willing to stand idly by if the Debtors attempt to proceed with the transfer of the DIP Lenders' collateral to GM and Platinum without the DIP Lenders' consent.

32.     Even if the Administrative Agent's and DIP Lenders' objections to the proposed GM-Platinum Transaction were not so unequivocal, any argument that the Administrative Agent or DIP Lenders had somehow consented to consummation of the GM-Platinum Transaction would be foreclosed by the DIP Refinancing Order and the DIP Documents, which make clear that such consent must be express and in writing.  As section 10.09 of the Credit Agreement

15

provides, "[n]o modification, amendment or waiver of any provision of this Agreement or the

Security and Pledge Agreement, and no consent to any departure by the Borrower . . . therefrom,

shall . . . be effective unless the same shall be ***in writing and signed by the Required Lenders***."[15]

Furthermore, Section 13(b) of the DIP Refinancing Order provides that such order cannot be

modified without the "***prior written consent***" of the Administrative Agent.  (DIP Refinancing

Order § 13(b).)

33.    Finally, counsel for the Debtors has suggested that the provisions of the DIP

Documents do not permit the DIP Lenders to withhold consent to a sale transaction "when

they're unwilling to exercise remedies."  (July 1, 2009 Hr'g Tr. 19:9–18.)  The DIP Documents

themselves, however, flatly contradict counsel's assertion.  (DIP Credit Agreement § 10.07 ("No

failure on the part of the Administrative Agent or any of the Lenders to exercise, and no delay in

exercising, any right, power or remedy hereunder or any of the other Loan Documents shall

operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or

remedy preclude any other or further exercise thereof or the exercise of any other right, power or

remedy.").(

**III.    The Right of the DIP Lenders' To Pursue Their Remedies Was Expressly
    Recognized By This Court In the Modification Procedures Order And Such Rights
    Were Not Waived Because No Lender Submitted Required Alternative Transaction
    Documents with Respect to an Alternative Transaction**

34.    At the June 10 hearing to approve the Modification Procedures Order, this Court

expressly recognized the Lenders' right to withhold consent to the sale, and in the Modification

---

[15] In *In re Ocean Power Corp.*, No. 02-15989 (REG), 2006 Bankr. LEXIS 4044 (Bankr. S.D.N.Y. Mar. 26,
2006), a DIP financing order and DIP loan agreement likewise provided the DIP lender "an indefeasible right to
repayment of its loan absent its *express consent* to waive that right" (emphasis added).  Relying on this provision,
Judge Gerber rejected a creditors' committee's argument that the DIP lender had impliedly waived its right to
repayment by entering into an agreement to acquire the debtors' assets.  Had the debtors and DIP lender intended "to
supersede the terms of the meticulously drafted DIP Order and to waive their duties to pay the DIP loan," Judge
Gerber held, they would have expressly provided for such a result.  *Id.* at *21.

Procedures Order and the Supplemental Modification Procedures Order provided clear and

unambiguous guidance as to what types of actions by the Lenders in connection with the auction

would cause such Lenders to waive their consent rights.

35.     The Court, at that hearing, refused to permit the Debtors to proceed with a

privately-negotiated sale transaction, and instead required the Debtors to conduct an auction.[16]

The DIP Lenders' possible participation in the auction was expressly contemplated by the

Modification Procedures Order, and this Court required that any DIP Lender who participates in

the auction (except in connection with what was defined in the Supplemental Modification

Procedures Order to be a "**Pure Credit Bid**"), would waive its rights to withhold its consent to

the ultimate winner of the auction.  Specifically, paragraph 46 of the Modification Procedures

Order reads in relevant part as follows:

> To the extent that any DIP Lender directly or indirectly delivers (or causes to be
> delivered) Required Alternative Transaction Documents with respect to an
> Alternative Transaction (as each such term is defined in the Supplemental
> Procedures) that is not a Pure Credit Bid, such DIP Lender shall be deemed to
> have irrevocably consented to the transactions contemplated by the Supplemental
> Procedures and ultimately approved by this Court for all purposes under the DIP
> Credit Agreement and applicable law (with the exception of disputing whether the
> Supplemental Procedures were, in fact, followed).

36.     It is undisputed that no DIP Lender directly or indirectly delivered (or caused to

be delivered) Required Alternative Transaction Documents with respect to an Alternative

Transaction that is not a Pure Credit Bid, and the deadline for having done so has passed, so the

DIP Lenders retain their right to withhold consent to the GM-Platinum Transaction.

---

[16] Should the Debtors select the GM-Platinum Transaction as the highest and best bid at the July 17
auction, the Administrative Agent reserves the right to object to the GM-Platinum Transaction on the basis that it is
not the highest and best bid or on any other basis, as contemplated by paragraph 45 of the Modification Procedures
Order (as amended by the Supplemental Procedures Order).

17

37.    Importantly, it should also be noted that among the rights retained by the DIP Lenders is one of the most fundamental protections in the DIP Refinancing Order.  The DIP Refinancing Order provides that, "[i]n any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors . . . hereby waive . . . the right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents." (DIP Refinancing Order ¶ 7(b).)

38.    Importantly, because the DIP Lenders have not waived, and indeed continue to assert, their rights and remedies with respect to the Collateral, in the event that the Administrative Agent submits a Pure Credit Bid and the Court determines such Pure Credit Bid is an exercise of remedies (an issue on which the Administrative Agent reserves all rights), the subject of the hearing could well become the relative merits of the credit bid compared to the GM-Platinum Transaction.  While not the subject of this objection, it is notable that Debtors may well be precluded from prosecuting approval of the GM-Platinum Transaction because to do so would require the Debtors to raise issues in opposition to such credit bid that are foreclosed from being raised "[i]n any hearing regarding any exercise of rights or remedies" by Paragraph 7(b) of the DIP Refinancing Order.  The Administrative Agent reserves its right to seek enforcement of Paragraph 7(b) of the DIP Refinancing Order at the sale hearing in the event a credit bid is made.

**IV.    The Court Cannot Approve the Proposed GM-Platinum Transaction Where Consummation of That Transaction Would Contravene the Terms of the DIP Refinancing Order**

39.    As discussed above, the proposed GM-Platinum Transaction cannot be consummated, consistent with the DIP Refinancing Order, absent support of the DIP Lenders.

18

Moreover, the DIP Lenders have not consented, but have instead expressly objected, to the

proposed GM-Platinum Transaction.  As to whether the Debtors should be authorized to

consummate the proposed GM-Platinum Transaction, these uncontestable facts "end[] the issue."

(July 1, 2009 Hr'g Tr. 69:11–12.)

40.     As discussed below, any action authorizing the GM-Platinum Transaction over

the DIP Lenders' objection and in contravention of the DIP Refinancing Order would violate

relevant provisions of the Bankruptcy Code and have far-reaching and grave consequences for

the continued vitality of reorganization under chapter 11.

41.     As the Second Circuit and other federal appellate courts have recognized, parties

to a court-approved, post-petition agreement "must be able to rely on the plain language of such

an agreement," at least in cases where a party has reasonably relied on the agreement and cannot

be restored to its preexisting position.  *IBI Sec. Serv., Inc. v. Chapter 7 Trustee for IBI Sec. Serv.,

Inc.*, 133 F.3d 205, 208–09 (2d Cir. 1998) (explaining that while "[a] bankruptcy court

[ordinarily] has the power to reverse its prior orders pursuant either to its general equitable

powers or Bankruptcy Rule 9024," exercise of these powers is inequitable and impermissible in

these circumstances).

42.     This principle applies with special force in the context of DIP financing orders.

*See generally Keltic Fin. Partners, LC v. Foreside Mgmt. Co.* (*In re Foreside Mgmt. Co.*), 402

B.R. 446, 452 (B.A.P. 1st Cir. 2009) (collecting cases) (observing that, once a DIP lender has

disbursed funds in reliance on a DIP financing order, "those eggs cannot be unscrambled").  In

that context, section 364(e) of the Bankruptcy Code and companion provisions "instantiate[] the

principle that bankruptcy judges may make *binding* commitments" to post-petition creditors and

"disable courts from backtracking on promises in the absence of bad faith."  *Kham & Nate's*

19

*Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990) (Easterbrook, J.)
(emphasis in original).  As the Seventh Circuit has explained, although section 364(e) and
companion provisions "speak[] only of modification on appeal," they instantiate a broader
principle that applies with equal force to "[a] bankruptcy court's modification of its own orders."
*Id.*  As such, "a lender that extends credit in reliance on a financing order is entitled to the benefit
of that order"—"even if it turns out to be legally or factually erroneous."  *Id.*; *accord United
States v. Sterling Consulting Corp.* (*In re Indian Motorcycle Co.*), 289 B.R. 269, 283 (B.A.P. 1st
Cir. 2003) (same); *cf. In re Pine Coast Enters., Ltd.*, 147 B.R. 30, 33 (Bankr. N.D. Ill. 1992)
(holding that section 363(m) similarly "disable[s] courts from backtracking on promises with
respect to bankruptcy sales in the absence of bad faith").

43.    Indeed, the public policy protecting lien holders is so strong that appellate courts
have overturned provisions of a sale order improperly stripping a secured creditor of its liens,
notwithstanding the statutory mootness provision in section 363(m) of the Bankruptcy Code.  *See
Clear Channel Outdoor, Inc. v. Nancy Knupfer*, 391 B.R. 25, 35–37 (B.A.P. 9th Cir. 2008).

44.    Any order authorizing the sale of substantially all of the Debtors' assets in
violation of the express terms of the DIP Refinancing Order would not only violate the principle
embodied in section 364(e) and companion provisions, but also have a chilling effect on DIP
lending that would persist long after these chapter 11 cases have concluded.  *See, e.g.*, *In re Fla.
W. Gateway, Inc.*, 147 B.R. 817, 820 (Bankr. S.D. Fla. 1992) (recognizing that DIP lenders
disburse funds in reliance on orders authorized by section 364 and that actions by courts that
would, "in effect, undo those orders" would "cause a chilling effect on DIP lending").

45.    Section 364 is premised on the strong public policy of encouraging post-petition
investments in bankrupt companies.  *See In re Ellingsen MacLean Oil Co.*, 834 F.2d 599, 603

20

(6th Cir. 1987); *accord In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1493 (11th Cir. 1992); *In re*

*Adams Apple, Inc.*, 829 F.2d 1484, 1488 (9th Cir. 1987).  "Lenders and suppliers are

understandably reluctant to do business with a debtor who is in bankruptcy and who has few, if

any, unencumbered assets to offer as collateral."  *Ellingsen*, 834 F.2d at 603.  By protecting good

faith lenders and making the bankruptcy court's authorization unreviewable absent a stay

pending appeal, Congress intended to encourage investors to take a chance on a failing company

and thereby enhance its potential to reorganize.  *See Adams Apple*, 829 F.2d at 1488.

46.    Any order authorizing the Debtors to dispose of substantially all their assets in a

manner flatly inconsistent with the provisions of the DIP Refinancing Order would thwart the

congressional intent to foster investment in troubled companies.  The continued vitality of

chapter 11 reorganization depends on the willingness of creditors to extend financing to the

debtor in possession.  *Kham & Nate's Shoes*, 908 F.2d at 1355; *cf. IBI Sec. Serv.,* 133 F.3d at 210

(explaining that bankruptcy court orders that effectively rewrite the terms of post-petition

agreements among debtors and their creditors are not only inequitable, but unwise, because they

"have a damaging effect on future creditors' willingness" to enter into such agreements and

"cooperate with the bankruptcy process").  It is precisely for these reasons that courts have held

that, absent a finding that the creditor acted in bad faith, courts—whether bankruptcy courts,

district courts or courts of appeals—lack the power to undo the priorities and other protections

granted by a DIP financing order.  *Kham & Nate's Shoes*, 908 F.2d at 1355.

47.    These sentiments are echoed by bankruptcy court opinions that the Second Circuit

has cited with approval:  if a bankruptcy court were, in effect, to undo its DIP refinancing order

by, for instance, "placing administrative claims ahead of the superpriority which [DIP lenders]

bargained for," "[t]he Chapter 11 process would be undermined."  *In re Am. Res. Mgmt. Corp.*,

21

51 B.R. 713, 722 (Bankr. D. Utah 1985), *cited with approval*, *IBI Sec. Serv.*, 133 F.3d at 210; *see also* July 1, 2009 Hr'g Tr. 69:11–12.  Instead, bankruptcy courts should "expect[] negotiated post-petition agreements to be adhered to . . . .  Enforcement of . . . orders of the Court [approving such agreements] is important for the continued efficiency and integrity of the bankruptcy reorganization process."  *In re Evanston Beauty Supply, Inc.*, 136 B.R. 171, 178 (Bankr. N.D. Ill. 1992) (explaining that to authorize actions in contravention of negotiated DIP financing orders "would eviscerate the effect of the negotiations and the enforcement of those Orders"), *cited with approval*, *IBI Sec. Serv.*, 133 F.3d at 210.

48.    Given the inviolable status of DIP financing orders in bankruptcy, it is unsurprising that, in the thirty years that have elapsed since the enactment of the modern Bankruptcy Code, reported opinions evidence only a handful of *attempts* by parties to contravene the express terms of a DIP financing order.  It is also unsurprising that none of these attempts, to the Administrative Agent's knowledge, has been successful.  *See, e.g.*, *In re Lockwood Corp.*, No. BK93-80133, 1998 Bankr. LEXIS 2019, at *16–17 (Bankr. D. Neb. Jan. 29, 1998) (rejecting attempt to surcharge expenses in violation of DIP financing order, and citing the Second Circuit's opinion in *IBI* and the Seventh Circuit's "highly persuasive" analysis in *Kham & Nate's Shoes*).

49.    If there ever was a case where the protections of a DIP financing should be honored, this is the case.  It is exceedingly rare that DIP lenders suffer a loss on a loan.  For this to occur, the Debtor must be so administratively insolvent that even superpriority administrative expenses go unpaid.   As all parties acknowledge, the Delphi chapter 11 proceedings unfortunately present this Court with just such a case.  If the priorities provided for in the DIP Order are honored, but for the carve-out protecting certain professional fees, the DIP Lenders

hold the sole economic stake in the Delphi estates.  It was for just such circumstances that the

protections afforded DIP Lenders were devised.  As the sole economic stakeholders, the DIP

Lenders have the right to determine the fate of their collateral, and if they choose to withhold

consent to its sale and desire to retain their liens, the requirement that the DIP Refinancing Order

and the DIP Documents be enforced in accordance with their terms, borrowing the Court's own

words, "ends the issue."

50.    For this reason, if for no other, the Debtors' largely unprecedented and illegal

attempt to renege on their commitments under the DIP Refinancing Order and DIP Documents

should not be countenanced.[17]

## OBJECTIONS TO THE MODIFIED PLAN

51.    The Modified Plan contemplates a consensual foreclosure by the Administrative

Agent in full satisfaction and discharge of the DIP Claims pursuant to section 9-620 of the UCC,

or in the alternative a credit bid of the full amount of the Debtors' outstanding obligations that

are due and owing under the DIP Credit Agreement in a sale conducted pursuant to section 9-610

of the UCC.  (Modified Plan § 7.8.)  Each of these mechanisms would purportedly have the

effect of fully discharging the DIP Claims and waiving the deficiency claims in respect of the

Tranche C Loans as well as the contingent obligations that pursuant to the DIP Refinancing

Order and the DIP Credit Agreement expressly survive the repayment of the Loans (as defined in

the DIP Credit Agreement) and the termination of the DIP Credit Agreement (notably the fee and

expense reimbursement provisions and indemnity provisions of the DIP Credit Agreement).

---

[17] The Administrative Agent understands that under the GM-Platinum Transaction the hedging obligations that are secured under the DIP Facility (the "**Secured Hedging Obligations**") will be terminated and paid in cash in full or otherwise treated in a manner satisfactory to each hedging counterparty in the sole discretion of the hedging counterparty.  The Administrative Agent reserves the right to object to the treatment of the Secured Hedging Obligations to the extent such treatment is not definitely resolved by the time of the July 23 hearing or to the extent such treatment is not consistent with the rights of the hedging counterparties.

(DIP Refinancing Order ¶ 13(d); DIP Credit Agreement § 10.12.)  The Debtors have not

established that these mechanisms can, under the DIP Credit Agreement, the DIP Refinancing

Order and applicable law, discharge such deficiency claims.

52.    The Modified Plan does not address the treatment of letters of credit issued under

the DIP Credit Agreement (the "**Letters of Credit**"), for which Tranche A Lenders retain an

obligation to reimburse the Issuing Bank (as defined in the DIP Credit Agreement) in the event a

Letter of Credit is drawn and the Debtors fail to reimburse the Issuing Bank.  (*Id*. § 2.03(e).)

Moreover, under the DIP Credit Agreement, the DIP Lenders (including the Tranche A, Tranche

B and Tranche C Lenders) retain an obligation to reimburse the Administrative Agent for any

fees and expenses or indemnification claims with respect to which the Debtors fail to reimburse

the Administrative Agent.  (DIP Credit Agreement § 8.04.)  Thus, the DIP Lenders of all

tranches would be subject to further exposure in respect of fees and expenses, indemnification

and Letters of Credit after the effectiveness of the Modified Plan, and the claims of the DIP

Lenders (and the Administrative Agent) in respect of these amounts are not appropriately

addressed in the Modified Plan.

## CONCLUSION

53.    The Debtors' attempt to secure this Court's approval of the GM-Platinum

Transaction over the objections of the DIP Lenders, as well as the Committee of Unsecured

Creditors, is in contravention of the express and unequivocal terms of the DIP Refinancing Order

and violates bedrock principles of bankruptcy law.

54.    Federal appellate courts have recognized that section 364(e) and companion

provisions embody a principle that bankruptcy courts must be able to make *irrevocable and*

*binding* commitments to a debtor-in-possession's post-petition secured creditors because

attempts to backtrack on these commitments will have dire consequences on lenders' willingness to extend post-petition financing and on the vitality of chapter 11 reorganization as a whole.

55.    Because the express terms of the DIP Refinancing Order and the DIP Documents prohibit consummation of the GM-Platinum Transaction absent requisite DIP Lender support and because the Administrative Agent and DIP Lenders in fact object to the proposed transaction in its current form, the Court should decline to approve the GM-Platinum Transaction.  It is, of course, possible that the GM-Platinum transaction could be modified prior to the hearing to gain the requisite consent of the DIP Lenders, but, from the current vantage point, there unfortunately remains a very high likelihood that such consent will not be obtained by the time the Motion is presented for decision to this Court.

New York, New York
Dated: July 15, 2009

By:    /s/ Donald S. Bernstein
       Donald S. Bernstein
       Benjamin S. Kaminetzky
       Rajesh S. James
       Brian M. Resnick

       DAVIS POLK & WARDWELL LLP
       450 Lexington Avenue
       New York, New York 10017
       Telephone: (212) 450-4000
       Facsimile:  (212) 450-6501

       *Counsel to JPMorgan Chase Bank, N.A.*