**LATHAM & WATKINS LLP**

885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
　　　mark.broude@lw.com
　　　michael.riela@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS TO THE PROPOSED MODIFICATIONS**
**TO THE DEBTORS' CONFIRMED PLAN OF REORGANIZATION AND**
**TO THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS**
**AS AN ALTERNATIVE TO A PLAN; AND OBJECTION TO**
**DEBTORS' MOTION FOR EXTENSION OF THEIR EXCLUSIVE PERIODS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation, *et al.* (collectively, the "Debtors"), by and through its

counsel, hereby files this Supplemental Objection to the Debtors' proposed modifications to the

chapter 11 plan that this Court confirmed in January 2008 (such plan as the Debtors seek to

modify, the "Proposed Modified Plan") and to the sale of substantially all of the Debtors' assets

as an alternative to the Proposed Modified Plan.  Moreover, the Committee objects to the

Debtors' July 3, 2009 motion for an order extending their exclusive periods (the "Exclusivity

Motion"). This Supplemental Objection supplements the preliminary objection that the

Committee filed on June 17, 2009.[1]

In support of this Supplemental Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Proposed Modified Plan cannot be confirmed and the sale of substantially all

of the Debtors' assets under section 363 of the Bankruptcy Code that is being proposed as an

alternative to the Proposed Modified Plan (the "Alternative 363 Sale") cannot be approved.  This

transaction was contrived by the Automotive Task Force of the United States Treasury (the

"Treasury") and General Motors Corporation ("GM"), without the Debtors' or the Committee's

involvement, and provides enormous value to Platinum Equity Capital Partners, L.P.

("Platinum") while leaving virtually nothing for unsecured creditors.  As the terms of the

transaction clearly reflect, the Treasury's and GM's only concern in negotiating the transaction

with Platinum is the continuation of supply to GM, and not the interests of the Debtors' estates

and creditors.  The only real beneficiary of the sale of the domestic assets would be GM, who

will insure uninterrupted supply of the parts that are critical to its survival.  Having engineered a

transaction that ensures GM's continued survival, GM and the Treasury were content to force the

Debtors to sell their businesses to Platinum for one dollar.

2.      Yet, it did not have to be this way; notwithstanding their dire need for liquidity

the Debtors did not have to slavishly accept the one-sided transaction presented to them.  Since

---

[1]  In connection with the discovery process, the Committee has requested documents from, and has noticed depositions of representatives from, the Debtors, the Treasury, Platinum, and GM.  Through no fault of the Committee's, it has not yet received many of the documents that were requested.  The Debtors and Platinum are not even able to give a date by when their document productions will be complete, and negotiations with GM are ongoing as to the sufficiency of its production.  Due to the egregious delays in document production, the Committee has not been able to schedule or commence depositions.  Accordingly, the Committee reserves the right to file supplemental pleadings further in support of its objection at any time prior to the July 23, 2009 hearing to reflect the information it expects to obtain through discovery.

their creation, the Debtors have had (and still continue to have) enormous leverage over GM. Without supplies from Delphi, GM would be on a one-way road to a shut down – a reality that even GM has finally and publicly acknowledged..  Two affidavits filed in GM's own chapter 11 case note GM and Delphi's "interdependent" relationship.  "[I]n GM's relationship with Delphi, protection of supply is paramount."  That is because GM plants' "just in time" inventory practices mean that failure to receive Delphi parts in a timely fashion could cause those plants to "shut down within a matter of days" given that "[m]ost parts that Delphi manufactures for GM are not readily available from an alternate source."

3.    Moreover, any failure by GM to receive Delphi parts would have a devastating domino effect throughout the entire industry.  As stated in one GM executive's affidavit, the shutdown that would result from failure to receive Delphi parts would cause GM to cease its ordering from over 1,500 other suppliers, who could be "force[d] . . . to seek bankruptcy protection themselves."  "In short," GM executives have concluded, "a prolonged cessation in the supply of parts from Delphi to GM would have a devastating effect on GM, its ability to reorganize, and the communities that depend on employment by GM and its community of parts suppliers."  Rick Westenberg, who is responsible for supporting the restructuring activities related to GM's involvement in the Delphi bankruptcy, has conceded that the GM bankruptcy *could not succeed* without a secure supply of parts from Delphi.

4.    The Debtors' significant leverage could not have been more powerful or more clear.  However, every time the Debtors could have chosen to exercise that leverage against GM for the benefit of their estates and creditors during these chapter 11 cases, they failed to do so. Every time the Debtors were presented the opportunity to stand up to GM, to use their leverage over GM to extract a better deal for their stakeholders, they have instead rolled over and

capitulated to GM's demands.  Unfortunately, today is no different.  After the transaction was negotiated, the Treasury and GM presented it to the Debtors as a "take-it-or-leave-it" proposition, using the Debtors' immediate need for hundreds of millions of cash as leverage. The Debtors were presented with one last chance to do the right thing, to stand up to GM and use their leverage over GM's very survival to extract a reasonable deal from GM and the Treasury. But history repeated itself, and the Debtors gave in to GM yet again.

5.      Based on the Debtors' history of failing to stand up to GM and based on the Debtors' current desperate need for additional liquidity, the Treasury and GM were confident that they could force the Debtors to accept the transaction with Platinum even though the potential returns to Platinum are excessive and general unsecured creditors would receive virtually nothing.  But this did not have to be a Hobson's Choice between capitulation and liquidation.  The Debtors could have, and should have, called the Treasury's bluff by refusing to breach their fiduciary duties by agreeing to a proposal that is facially inadequate for the estate's stakeholders, including the unsecured creditors.  They could have used this last opportunity to stand up for their creditors.  For just as the Debtors were dependent upon GM's liquidity to survive, GM was dependent on the Debtors' parts to survive.  The Debtors could have used their ability to bring GM to a standstill as leverage just this once to obtain a better deal for themselves and their stakeholders.  Treasury's choice, then, would have been to carve out something for the unsecured creditors to whom the Debtors are bound as fiduciaries, or to let GM – one of the most famous and iconic of American auto brands – self-destruct, which Treasury would never have let happen.  But, true to their history, the Debtors capitulated yet again.

6.      Rather than seeking to protect their fiduciaries and to improve the terms of the deal that was presented to them, the record reflects that Debtors' only concern was themselves.

NY\1548044.5

Thus, the Debtors asked for just one thing from Treasury and GM when the transaction was presented to them: releases of all claims and causes of action that might be brought against the Debtors' directors and officers.  In other words, the Debtors did not use their leverage against GM to improve the terms of the deal that was presented to them.  Rather, they used that leverage only to include broad releases for their directors and officers.

7.        In addition to giving away significant value to Platinum and providing for the acquisition of certain assets by GM for no value to the Debtors' estates in return, the Treasury and GM also sought to ensure that unsecured creditors would get virtually nothing under the Proposed Modified Plan.  In recent months, representatives of GM and the Treasury barely deigned to speak with the Committee's professionals, much less negotiate with them when it was absolutely clear that their fiduciaries would not speak on the creditors' behalf.  The terms of the Proposed Modified Plan make it obvious that the Treasury and GM had no regard for the Debtors' unsecured creditors.  It reflects the springing of two separate "death traps" aimed squarely at the Committee's constituents.  The first death trap was sprung during the only time that GM (but not the Treasury) engaged with the Committee professionals.  During a ten minute meeting, GM presented the Committee with a proposal in which general unsecured creditors would receive $5 for every $95 in cash that is actually distributed to Parnassus in excess of $7.2 billion, up to a maximum recovery of $300 million.  The next time GM's representatives spoke with the Committee's professionals was days later, when they announced that the Committee had four hours to accept that proposal or else the general unsecured creditors' recovery would be reduced by almost 50% to the level that is now set forth in the Proposed Modified Plan.   The second death trap is reflected in the proposed Alternative 363 Sale.  If the Proposed Modified Plan cannot be confirmed (presumably as a result of general creditor opposition), the

exact same transactions would be undertaken in connection with the Alternative 363 Sale and the stated recovery to general unsecured creditors would be taken away completely. This is the same tactic that GM and the Treasury employed with the Debtors – demanding that unsecured creditors accept a patently unbalanced transaction or lose everything. Unlike the Debtors, however, the Committee is not prepared to capitulate.

8.      The transaction with Platinum and GM is stunning in its lack of fairness and reason. The Treasury decided that Platinum and GM should have the potential to receive astronomical returns if the Delphi businesses prosper in the future, while the Debtors' unsecured creditors should receive virtually nothing. Any recoveries for unsecured creditors would be based only on the cash that Platinum and GM can extract from Parnassus, and not on the value of Parnassus itself. Thus, even if the value of Parnassus' membership interests are worth tens of billions of dollars in the future, general unsecured creditors would not receive a penny unless and until Parnassus makes distributions to its members of at least $7.2 billion, plus the 8% preferred return payable to holders of Parnassus Class C Interests (as defined in the Proposed Modified Plan), plus whatever return GM receives on account of its $2 billion advance to Parnassus. As an example, if Parnassus were to be sold for $7.2 billion, Platinum would receive a return of over 1200% on its investment in Parnassus, GM also would receive billions of dollars, and holders of general unsecured claims would receive nothing. The Debtors may point to the new money being provided by GM. However, any value that GM provides under this transaction simply benefits itself and the assets it is acquiring.

9.      Recognizing that a private sale would be harmful to the Debtors' estates, during the June 10, 2009 hearing to approve the disclosure statement, this Court (over the Debtors' objection) ordered that a public sale process be implemented. While the Debtors may have

6

orchestrated a public sale process *after* June 10, the damage that had been done in the months prior to June 10 was too great to overcome. Indeed, the public sale process this Court ordered was doomed to fail based on the Debtors' failure to utilize their ability to shut down GM in an effort to reach a deal that provides tangible benefits to their estates and creditors. The Debtors simply permitted the Treasury and GM to decide the Debtors' fate without their involvement, which the Treasury and GM certainly did. Because of the Debtors' inaction and the tainted private sale process that the Treasury and GM orchestrated, long before the Master Disposition Agreement and the Proposed Modified Plan were even drafted, any public sale process this Court could have ordered would have been a failure.

10.    The Treasury and GM (with the Debtors' acquiescence) have done everything they could to ensure that no other party would ever make a better offer for the Debtors' businesses, despite this Court's efforts to ensure a fair and public sale process. As one example of this, at least one other party approached the Debtors with a proposal to purchase the Debtors' businesses in late May 2009. That proposal was contingent on that party conducting three weeks of due diligence. Either voluntarily or in compliance with the Treasury's demand, the Debtors rebuffed that party's entreaties, telling that party it had but one week to conduct its due diligence.[2]  That party withdrew its proposal as a result. The Committee does not know if other potential purchasers received the same response and declined to pursue a transaction with the Debtors.

11.    Unfortunately, the Treasury, GM and Platinum succeeded in keeping other potential bidders away, and no other parties have submitted bids for the Debtors' assets. The

---

[2]  Obviously, many more than three weeks had passed since the proposal was made in late May 2009, and no sale has been consummated. There was no good reason for the Debtors to restrict this potential purchaser's due diligence period to fewer than three weeks.

NY\1548044.5

Debtors may argue that this proves that no other party is willing to purchase the Debtors' assets on better terms than those offered by Platinum; however, all that the absence of competing bids proves is that no other potential purchaser was able to overcome the obstacles to a fair auction that were put in place because of the Debtors' decision not to flex their muscles in the months before June 10.

12.    The Debtors, the Treasury and GM now want this Court to approve the sale of the Debtors' assets over the objections of the major creditors in these cases.  If either the Proposed Modified Plan is confirmed or the Alternative 363 Sale is approved, then GM and the Treasury would have arranged the sale of the Debtors' assets for a song.  This Court needs to intervene at this time to protect the Debtors' estates and creditors, and deny both the confirmation of the Proposed Modified Plan and the request for approval of the Alternative 363 Sale.  In agreeing to pursue this transaction under the threat of liquidation, the Debtors were unable to exercise their independent judgment and act in accordance with their fiduciary duties to creditors, thus precluding any finding that the Proposed Modified Plan was proposed in good faith or that the "business judgment" standard should apply in this Court's review of the Alternative 363 Sale. Furthermore, as discussed below, in seeking to do the bidding of GM and the Treasury, the Debtors have concocted a plan of reorganization that completely fails to satisfy a number of statutory requirements for confirmation.

13.    The Debtors have continually refused to use their leverage over GM to obtain an appropriate deal for their estates and stakeholders.  The Debtors are once again acting as if they are the only party at risk, as if GM holds all the cards; yet GM is every bit as much at risk as the Debtors if the Debtors had finally had the strength to call the Treasury's and GM's bluff.  In the final act of these cases, this Court is uniquely positioned to make sure that just this once the

8

Debtors do the right thing, and take advantage of their leverage to make a fair and appropriate deal with GM and the Treasury.

## BACKGROUND

14.     On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, the three remaining Debtors also filed voluntary petitions.

15.     The Committee was appointed nine days after the Petition Date, on October 17, 2005.[3]  The Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. and Moelis & Company LLC as its co-investment bankers.

## I.     The Failed Plan of Reorganization and the Debtors' Declining Value

16.     On December 10, 2007, the Debtors filed their amended chapter 11 plan and an accompanying disclosure statement.  On January 25, 2008, this Court entered an order confirming that plan, as modified (the "Confirmed Plan").  The Confirmed Plan provided for a "par plus accrued" recovery for general unsecured creditors at an agreed-upon total enterprise value for the Debtors.  The consummation of the Confirmed Plan hinged upon a multi-billion equity investment in the reorganized company by a group of "plan investors."  However, on April 4, 2008, those plan investors purported to terminate that certain Equity Purchase and Commitment Agreement, and the Confirmed Plan has not become effective.

17.     The plan investors' refusal to make their $2.5 billion investment, together with the economic decline generally (and in the automotive industry in particular) and the collapse of the

---

[3]  The current members of the Committee are: (a) Freescale Semiconductor, Inc.; (b) IUE-CWA; (c) Wilmington Trust Company, as Indenture Trustee and (d) Tyco Electronics Corporation.  The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

NY\1548044.5

credit markets after the termination of the Equity Purchase and Commitment Agreement,

significantly reduced the Debtors' total enterprise value.  In addition, the Debtors faced serious

liquidity constraints.

18.    To help address the Debtors' liquidity constraints, GM provided up to $650

million in advances to the Debtors under a liquidity support agreement among the Debtors and

GM, dated on or about May 9, 2008 (the "GM Arrangement").  GM agreed to make these

advances in respect of payments it would otherwise have made upon the effectiveness of the

Global Settlement Agreement (the "GSA") and the Master Restructuring Agreement (the

"MRA") between the Debtors and GM.  Upon the effectiveness of the amendments to the GSA

and the MRA in September 2008, this commitment terminated and the amounts advanced were

set off against amounts to be paid by GM or its affiliates for the benefit of the Debtors under the

GSA and the MRA.  GM and the Debtors entered into a first amendment to the GM Arrangement

as of October 6, 2008, pursuant to which GM agreed to make available to the Debtors an

additional $300 million in advances under the terms and conditions set forth therein.  A second

amendment to the GM Arrangement extended the availability of the existing $300 million

liquidity support from December 31, 2008 to June 30, 2009.[4]  On June 1, 2009, the Debtors filed

a supplemental motion for an order authorizing the increase in that liquidity support to $550

million.  That motion was approved by final order dated June 17, 2009.

---

[4] As part of the order approving the second amendment to the GM Arrangement, this Court also approved the
Debtors' entry into a Partial Temporary Accelerated Payment Agreement with GM (as amended, the "Pull-Forward
Agreement"), which provided for GM to accelerate the payment of up to $300 million in trade accounts payable to
the Debtors over a defined period beginning in March 2009.  On January 30, 2009 the Debtors reached an agreement
with GM with respect to a third amendment to the GM Arrangement, which generally contained amendments that
conform the GM Arrangement to the amended terms of the Pull-Forward Agreement and the amended terms of the
Accommodation Agreement.

NY\1548044.5

19.     Meanwhile, the Debtors were unable to extend the December 31, 2008 maturity date of the DIP Credit Agreement on reasonably acceptable terms.  Accordingly, with the support of the administrative agent and the requisite lenders to the DIP credit facility, the Debtors entered into that certain Accommodation Agreement among the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, and the DIP Lenders party thereto (as amended, the "Accommodation Agreement").  Under the Accommodation Agreement, the Debtors could continue using certain of the proceeds of the DIP Facility through June 30, 2009 or such later date as may be agreed to among the Debtors and the requisite DIP lenders (the "Accommodation Period"), subject to the terms and conditions set forth in that agreement.

## II.     The Proposed Modified Plan and the Alternative 363 Sale

20.     The Treasury, with the Debtors' acquiescence, has orchestrated a sale to GM of the Debtors' domestic business.  The ultimate goal of this sale is ensuring that GM's supply from the Debtors continues, without regard to maximizing the value of the Debtors' estates.  GM is the true, and essentially only, beneficiary of that sale.  The Treasury also is forcing a sale of the rest of the Debtors' business to Platinum for one dollar, while making sure that unsecured creditors get nothing.

21.     This transaction was negotiated among the Treasury, GM and Platinum only.  The Debtors were effectively removed from negotiations, and were only brought in when it was time for the Treasury and GM to issue their "take it or leave it" ultimatum.  The Treasury and GM told the Debtors that they had to accept this transaction, otherwise the Treasury would not permit GM to provide the Debtors with the hundreds of millions of dollars they so desperately needed.  Consistent with their past practice, the Debtors needlessly buckled under GM's pressure.  They did not even attempt to negotiate better terms for their estates and creditors.  Rather, all the

Debtors appeared to negotiate was a release of claims and causes of action against their directors

and officers.  Instead of fighting for their creditors, the Debtors simply sought to take care of

themselves through a release.

22.     The Treasury, GM and Platinum have done their best to make sure that the

Debtors' assets could not be sold to another bidder, and they have succeeded.  For several

months, it was clear that the Treasury and GM were planning to decide the Debtors' fate through

a sale transaction they would negotiate with potential buyers, such as Federal-Mogul Corporation

and Platinum.  The Debtors could have engaged with the Treasury and GM and had been a part

of that process, using as a stick their ability to cripple GM by refusing to provide goods.  The

Debtors failed to do so.  One result of the Debtors' failure to engage the Treasury and GM was

Section 9.40 of the Master Disposition Agreement, which is a "non-solicitation" clause that was

originally so stringent that this Court noted that "the language here is broader than any language

I've ever seen in a provision like this."  Transcript of June 10, 2009 hearing, p. 82:9-11.[5]

23.     While Section 9.40 of the Master Disposition Agreement was one of the many

ways in which the Treasury, GM and Platinum sought to chill a public sale process, any auction

process was doomed to fail long before the Master Disposition Agreement and the Proposed

Modified Plan were drafted as a result of the Debtors standing idly by while the Treasury and

GM negotiated the sale transaction.  Indeed, at least one other potential purchaser approached the

Debtors in late May 2009 with a proposal to purchase the Debtors' businesses that was

contingent on that party conducting three or more weeks of due diligence.  After expressing

---

[5] This Court continued on to note that "[i]n addition to saying, 'The debtor shall not solicit or initiate', it says 'The debtor shall not respond to, continue, encourage, or facilitate or furnish or disclose nonpublic information in furtherance of any inquiries or the making of any proposal with respect to, or enter into or continue in any negotiations or discussion with any person regarding the possibility of a competing transaction.'"  Transcript of June 10, 2009 hearing, p. 82:11-17.

some initial interest, the Debtors rebuffed that party's entreaties, and refused to provide it with

the minimal time needed to conduct the requested due diligence.  The Treasury effectively turned

this deal into a non-starter by indicating that it would not provide financing for the purchase of

Delphi by this potential purchaser.  Through their actions, the Treasury, GM, Platinum and the

Debtors have ensured that nobody other than the "guys in suits" at Platinum would purchase the

Debtors' assets, despite this Court's best efforts to open the sale process to other potential

buyers.[6]

24.    While the Confirmed Plan had provided for a "par plus accrued" recovery for

general unsecured creditors at an agreed-upon total enterprise value, under the Proposed

Modified Plan general unsecured creditors are to receive effectively nothing.  The Proposed

Modified Plan provides for general unsecured creditor to receive $3 for every $97 in cash that is

actually distributed to Parnassus, but only after Parnassus has actually distributed $7.2 billion to

its members, plus the 8% preferred return payable to holders of Parnassus Class C Interests (as

defined in the Proposed Modified Plan), to the holders of its equity, plus some undisclosed rate

of return to GM on account of its $2 billion advance to Parnassus.  In no event would general

unsecured creditors' recovery exceed $180 million in the aggregate.  Thus, the value of the

Parnassus assets is completely irrelevant to whether the general unsecured creditors receive any

distribution – Parnassus must actually generate and distribute substantially more than $7.2 billion

in actual cash returns to its equity and GM must receive payment in full of its $2 billion loan plus

an unknown (and presumably healthy) return on that amount before the unsecured creditors

---

[6]  During the June 10, 2009 hearing, this Court appropriately observed: "I don't understand why -- and particularly from what's been disclosed, what's so special about Platinum? I mean, they probably have a lot of money.  They have good lawyers.  Other people have a lot of money and have good lawyers.  As far as I'm concerned, they're just guys in suits. … I mean, why can't other guys in suits pay more?"  Transcript of June 10, 2009 hearing, p. 84:10-18. That is a question to which the Treasury has ensured no answer could be given.

NY\1548044.5

receive even a penny.  For the unsecured creditors to reach the $180 million cap, the cash return

to Parnassus' equity must be well in excess of $13 billion.

25.    It is clear that the unsecured creditors will never receive a single distribution.

This, of course, is in stark contrast to the $300 million carve-out from GM's administrative

expense claim that the Committee negotiated with the Debtors and GM in connection with the

amendments to the GSA and the MRA.  Thus, the effect of the Proposed Modified Plan or the

Alternative 363 Sale is that GM, having already received a full release in September 2008, now

administers the *coup de grace* by acquiring the Debtors' domestic plants, thereby guaranteeing

itself a continued source for its parts.  Parnassus acquires all the remaining significant assets

almost for free and the unsecured creditors get nothing.

26.    Platinum and GM stand to receive astronomical returns under the Proposed

Modified Plan.  For example, if Parnassus is sold for $7.2 billion, general unsecured creditors

would receive nothing under the terms of the Proposed Modified Plan, but Platinum would

receive billions of dollars on account of its equity interest in Parnassus.[7]  Thus Platinum would

contribute at most $250 million plus one dollar in equity to Parnassus, and would receive a return

of over 1200% if Parnassus is sold for $7.2 billion, while the unsecured creditors still receive

nothing.  In that scenario, GM would also receive billions of dollars, plus whatever return it

receives on account of its $2 billion loan.  As another example, if Parnassus is sold for $13

billion, general unsecured creditors would receive a distribution somewhat less than $180

million.  However, Platinum would receive over $6.7 billion on account of its equity interest in

Parnassus, while GM would receive almost $6.0 billion, plus the return it receives on account of

its $2 billion loan.  Parnassus' and GM's potential recoveries are not being capped in any way

---

[7]  This example does not even take into account the return to GM and Platinum on account of its their loans to
Parnassus, more value that goes to GM and Platinum.

NY\1548044.5

under the Proposed Modified Plan.  These are extraordinary returns for Parnassus and GM, and

begs the question of why the Debtors are proposing a chapter 11 plan that provides a private

equity fund and its former parent these levels of returns, while general unsecured creditors

receive a mere pittance (if they receive anything at all).

27.    To add insult to injury, GM and the Treasury insisted on (and the Debtors agreed

to include) two separate and distinct "death trap" provisions in the Proposed Modified Plan

aimed squarely at the Committee's constituents.  First, GM presented the Committee with a

proposal during a ten minute meeting between those parties during the recent mediation.[8]  GM

refused to engage the Committee in discussions during the remainder of the mediation, and the

Treasury never met with the Committee during that mediation.  After days of silence after the ten

minute meeting, GM informed the Committee that it had four hours to accept that proposal, or

else the general unsecured creditors' recovery would be reduced to the level that is now set forth

in the Proposed Modified Plan.  Because the Committee did not accept the proposal, GM, the

Treasury and the Debtors reduced the general unsecured creditors' stated potential recovery

under the Proposed Modified Plan by 40 percent.  Under the second death trap provision, if the

Proposed Modified Plan cannot be confirmed (presumably as a result of general unsecured

creditor opposition), the exact same transactions would be undertaken in connection with the

Alternative 363 Sale and the stated recovery to general unsecured creditors would be explicitly

be taken away.  In other words, the Debtors are demanding that general unsecured creditors

---

[8]  GM's proposal provided for the general unsecured creditors to receive $5 for every $95 in cash that is actually
distributed to Parnassus in excess of $7.2 billion, excluding the 8% preferred return payable to holders of Parnassus
Class C Interests (as defined in the Proposed Modified Plan), up to a maximum recovery of $300 million.

support a chapter 11 plan where they get *de facto* nothing, or else there would be a section 363

sale in which general unsecured creditors truly get nothing.[9]

## **OBJECTION**

28.    The Proposed Modified Plan is unconfirmable because (a) it is not being proposed

in good faith and (b) it cannot comply with section 1129(a)(10) of the Bankruptcy Code if all

truly impaired, non-gerrymandered classes of claims reject it.  Because the Proposed Modified

Plan cannot be confirmed, the only way the Debtors could proceed with their proposed

transactions is through the Alternative 363 Sale.  However, the Alternative 363 Sale cannot be

analyzed under the "business judgment" standard under these facts and circumstances, and

cannot be approved.  Finally, the Exclusivity Motion must be denied because cause to extend the

Debtors' exclusive periods does not exist.

## I.    **The Proposed Modified Plan is Not Being Proposed in Good Faith**

29.    This Court may confirm the Proposed Modified Plan only if "[t]he plan has been

proposed in good faith and not by any means forbidden by law."  11 U.S.C. 1129(a)(3).  The

Proposed Modified Plan fails this standard because the transactions contemplated by the

Proposed Modified Plan and the Alternative 363 Sale were dictated to the Debtors and their

creditors by the Treasury and GM.  The Debtors failed to use their considerable leverage against

GM to negotiate better terms for their estates and creditors.  Rather, all the Debtors appeared to

negotiate was a release of claims and causes of action against their directors and officers.  The

Debtors thus failed to exercise their independent judgment and act in accordance with their

fiduciary duties to creditors.

---

[9] As discussed herein, Alternative 363 Sale is by definition and by structure a *sub rosa* plan.  The Alternative 363
Sale would result the exact same outcome as the Proposed Modified Plan, but for the distribution to unsecured
creditors.

NY\1548044.5

30.    Section 1129(a)(3) of the Bankruptcy Code speaks more to the process of plan development than to the content of the plan itself. *See, e.g.*, *In re Bush Indus., Inc.*, 315 B.R. 292, 304-05 (Bankr. W.D.N.Y. 2004) (stating that "other provisions of 11 U.S.C. § 1129(a) speak to the content of a plan, subdivision (a)(3) imposes a strict mandate for proper process and methodology").  The good faith standard requires that a plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code. *See, e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001); *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997).  In evaluating the totality of circumstances surrounding a plan a court has considerable judicial discretion in finding good faith, "with the most important feature being an inquiry into the 'fundamental fairness' of the plan." *Coram Healthcare*, 271 B.R. at 234, citing *In re American Family Enterprises*, 256 B.R. 377, 401 (D. N.J. 2000).

31.    The Bankruptcy Code does not define the term "good faith," but courts have interpreted the term as requiring that (a) the plan be consistent with the objectives of the Bankruptcy Code; (b) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (c) there was fundamental fairness in dealing with the creditors. *See, e.g.*, *Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods. N.V.)*, 308 B.R. 672, 675 (D. Del. 2004).  The good faith requirement is satisfied where a chapter 11 plan is proposed with a legitimate and honest purpose to reorganize and has a reasonable hope of success. *See, e.g.*, *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

NY\1548044.5

32.    The good faith requirement originates in the nature of the fiduciary relationship between the debtor in possession and the creditors of the estate.  Accordingly, the Debtors bear the burden of proof on the issue of good faith by a preponderance of the evidence.  *See, e.g.*, *In re Texaco, Inc.*, 84 B.R. 889, 891 (Bankr. S.D.N.Y. 1988); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986).

33.    Like they have done throughout these chapter 11 cases, the Debtors have yet again failed to exercise the extraordinary leverage they had over GM.  That the Debtors continue to have this leverage over GM even to this day cannot be disputed, and indeed has recently been publicly acknowledged by GM itself.  In his July 8, 2009 declaration in support of GM's motion in its own bankruptcy case for approval of the Master Disposition Agreement, Randall L. Pappal (the Executive Director, HVAC and Mexico – Global Purchasing and Supply Chain for GM) stated the following:

> "8.    Most parts that Delphi manufactures for GM are not readily available from an alternate source due to, among other things, capacity issues within the automotive parts supply industry, the length of time it takes to validate and obtain safety regulatory approval of a new supplier's parts, and lead time to develop and build tools for manufacture.  While GM can accelerate efforts to resource Delphi parts in the event of a supply interruption, the sheer magnitude of the parts to be resourced and revalidation required would take at least several months to achieve.
>
> 9.    The shutdown of GM plants as a result of termination of deliveries of affected parts from Delphi could idle tens of thousands of GM workers, and it is estimated that GM's revenues would decrease significantly.  GM would also incur costs related to expedited resourcing efforts, including, but not limited to, hundreds of millions of dollars for duplicate tooling, premiums and price increases paid to alternative suppliers, and the continued costs of maintaining idled plants (such as plant overhead and other fixed costs).
>
> 10.    Moreover, because GM purchases parts from many other automotive parts suppliers, a GM shutdown will likely affect many of its other suppliers. In the event of a shutdown of its North American facilities, GM would have no need for parts from its other suppliers and would be forced to stop purchasing all other parts used in the shut-down facilities, which include parts from over 1,500 other suppliers.  Such a loss of revenue could force those suppliers to seek bankruptcy

protection themselves, thus creating a broader risk to GM's and other motor
vehicle manufacturers' future sources of parts supply.

11.      In short, a prolonged cessation in the supply of parts from Delphi to GM
would have a devastating effect on GM, its ability to reorganize, and the
communities that depend on employment by GM and its community of parts
suppliers."

Declaration of Randall L. Pappal in Support of Debtors' Motion for Entry of Order Approving

(I) Master Disposition Agreement for Purchase of Certain Assets of Delphi Corporation, (II)

Related Agreements, (III) Assumption And Assignment of Executory Contracts, (IV) Agreement

With Pension Benefit Guaranty Corporation, and (V) Entry Into Alternative Transaction in Lieu

Thereof (Case No. 09-50026, Docket No. 3052) at ¶¶ 8-11.  A copy of Mr. Pappal's declaration

is annexed hereto as Exhibit A.

34.      In addition, in his declaration pursuant to Local Bankruptcy Rule 1007-2  that was

filed upon the commencement of the GM chapter 11 cases, Frederick A. Henderson stated:

"As an example, Delphi Corporation ("Delphi"), which is struggling as a debtor in
possession in a chapter 11 case pending in this Court, currently provides over 60% of
GM's North American steering columns -- almost three million per year.  That volume
simply cannot be replaced quickly as there is not currently enough excess capacity to
accommodate GM's needs or time to validate the parts.  The Delphi situation confirms
the critical implications to the Debtors of a shutdown of a major supplier."

Declaration of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2 (Case No. 09-

50026, Docket No. 21) at ¶ 27.

35.      Because they failed to exercise that leverage on or before the time the Treasury

and GM began working toward a sale transaction involving the Debtors' assets, the Debtors

found themselves in a position in which they are desperate for liquidity.  The Treasury (through

GM) is the only party that will provide that cash, so the Treasury and GM sought to use that to

their advantage by informing the Debtors that they had to agree to the sale transaction as a

condition to receiving $250 million of desperately needed cash.  The Debtors could have

NY\1548044.5

resisted, and could have use their ability (which still exists) to shut down GM as leverage to

obtain a better deal for their estates and creditors.  Yet the record shows that the response of the

Debtors' board of directors was purely self-interested.  When faced with the "take it or leave it"

proposal from GM and the Treasury and recognizing that its adherence to its fiduciary duties

would be called into question, the board of directors responded not by trying to make the deal

better for the Debtors and their creditors (as they should have done), but instead by insisting that

the Proposed Modified Plan include broad releases for the Debtors' directors and officers.  It was

the Debtors that insisted on these provisions; rather than trying to protect the estates and their

stakeholders, the board sought only to protect itself.

36.     As the Treasury, GM and Platinum negotiated and agreed to a transaction behind

the Debtors' backs, and the Debtors did nothing when presented with the transaction except to

procure a release for their directors and officers, Delphi's board of directors failed to exercise

their independent judgment and failed to discharge their fiduciary duties to creditors.  This

precludes the Court from making the finding of good faith that is required under section

1129(a)(3) of the Bankruptcy Code.  *See, e.g.*, *Bush Indus.*, 315 B.R. at 305-06 (holding that

section 1129(a)(3) of the Bankruptcy Code was not satisfied when the debtor's CEO and

chairman of the board breached his fiduciary duties by negotiating a "golden parachute" as a

component of a lockup and voting agreement relating to the chapter 11 plan); *Coram Healthcare*,

271 B.R. at 240 (denying confirmation of a plan where the debtor's president and CEO had a

disabling conflict of interest with one of the debtor's major creditors).

37.     A further indication of the Debtors' bad faith is their resort, discussed at greater

length below, to blatant "artificial impairment" and gerrymandering in an attempt to satisfy the

standards for confirmation.  Courts have stated that such action supports a finding of bad faith in

20

violation of section 1129(a)(3) of the Bankruptcy Code.  *See, e.g.*, *In re Sandy Ridge Dev. Corp.*,
881 F.2d 1346, 1353 (5th Cir. 1989); *Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel
Assocs. of Tucson)*, 165 B.R. 470 (B.A.P. 9th Cir. 1994) (remanding to the Bankruptcy Court for
findings on whether a confirmed plan that had provided for the impairment of a class of general
unsecured claims was proposed in good faith, where the plan was rejected by the debtor's
secured creditor and where the plan provided for payment general unsecured claims in full in
cash, but delayed payment for thirty days).

**II      The Proposed Modified Plan Artificially Impairs the Classes of
        Secured Claims and Gerrymanders the Class Consisting of the PBGC's Claim**

        38.     As described below, the Proposed Modified Plan impairs the classes of secured
claims for no apparent reason other than the creation of an impaired consenting class of creditors.
Moreover, the Debtors seek virtually to guarantee that one class of impaired creditors would
accept the Proposed Modified Plan by reserving their right to assert during the July 23
confirmation hearing that if no claim holder in a particular class submits a vote to accept or reject
the Modified Plan, such class would be deemed to have accepted that plan.  For the same
apparent reason, the Debtors have also classified the claims of the Pension Benefit Guaranty
Corporation (the "PBGC") separately from the claims of general unsecured creditors, even
though the Proposed Modified Plan provides for the PBGC to receive a general unsecured claim,
which claim would receive the same treatment as the claims of other unsecured creditors under
that plan.

        39.     In the face of what the Committee expects to be overwhelming creditor opposition
to the Proposed Modified Plan, the Debtors cannot be permitted to resort to artificial claim
impairment and gerrymandering to manufacture compliance with section 1129(a)(10) of the
Bankruptcy Code, so to permit them to pursue cramdown of that plan on dissenting classes.  The

21

Debtors can only satisfy section 1129(a)(10) of the Bankruptcy Code if a truly impaired, non-gerrymandered class of impaired claims affirmatively votes to accept the Proposed Modified Plan.

A.    **The Artificial Impairment of Secured Claims is Inappropriate.**

40.    In the Proposed Modified Plan, the Debtors have deemed Classes 1A-1 and 6A-1 (the classes of secured claims) to be impaired.[10]  Under the Confirmed Plan, these same claims were treated as unimpaired. The Debtors have not articulated a valid, good-faith reason for impairing these claims now.  Since each secured creditor is classified in its separate subclass pursuant to section 3.2(b) of the Proposed Modified Plan, the Debtors have reserved the right to argue that the failure of a single secured creditor to vote must be deemed an acceptance by that creditor (thus permitting the Proposed Modified Plan to comply with section 1129(a)(10) of the Bankruptcy Code, even if all other classes of creditors vote to reject that plan).  This is inappropriate.

41.    The classes of secured claims should be deemed to be unimpaired under the Proposed Modified Plan.  Courts have held that, for purposes of section 1129(a)(10) of the Bankruptcy Code, a class of claims is not impaired if the impairment of that class arises solely from the debtor's discretion.  In other words, "artificial impairment" is prohibited.  In *Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 131-32 (8th Cir. 1993), a creditor held a secured claim against the debtor in the amount of approximately $10 million, and the debtor had approximately $13,000 of unsecured trade claims (which it classified in "class 3") and a disputed claim by an individual (which it

---

[10]    The Debtors assert that these classes of creditors are "impaired," because the Proposed Modified Plan provides for these creditors to receive distributions over several years' time (and not immediately on the effective date) and because the Proposed Modified Plan caps the rate at which the Debtors would pay interest on account of these claims.

separately classified in "class 2"). The proposed plan in that case provided for the payment of

the allowed unsecured trade claims and the disputed claim 60 days after the plan's effective date,

and deemed classes 2 and 3 "impaired." The secured creditor objected to the plan. The lower

court disallowed the class 2 claim, but confirmed the plan over the objection of the secured

creditor because class 3 had accepted the plan (thus ruling that section 1129(a)(10) of the

Bankruptcy Code was satisfied). *See Windsor*, 7 F.3d at 129-30.

42.    The Eighth Circuit reversed the confirmation order and took the unusual step of

dismissing the bankruptcy case. While the appeals court noted that a delay in payment may

constitute "impairment," it stated that if that impairment had been "manufactured," then the plan

must be regarded as having circumvented the purpose of section 1129(a)(10) of the Bankruptcy

Code – consensual reorganization. *See id.* at 132. The appeals court found that the proposed

plan "clearly shows that the unsecured trade creditors' claims of Class 3 and the disallowed

Class 2 claim were arbitrarily and artificially impaired. Simple re-manipulation of the plan

demonstrates this. Had Debtor's plan allowed for a smaller payment to [the secured creditor],

say, $400,000 instead of $500,000, Debtor could have paid both the Class 2 and Class 3

claimants on the effective date." *Id.*

43.    In *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004), the Third

Circuit noted that:

> "'[a]rtificial' impairment occurs when a plan imposes an insignificant or
> *de minimis* impairment on a class of claims to qualify those claims as
> impaired under § 1124. The chief concern with such conduct is that it
> potentially allows a debtor to manipulate the Chapter 11 confirmation
> process by engineering literal compliance with the Code while avoiding
> opposition to reorganization by truly impaired creditors. While there is
> nothing in either §§ 1129(a)(10) or 1124 expressly prohibiting a debtor
> from 'artificially impairing' the claims of creditors, courts have found this
> practice troubling."

NY\1548044.5

In that case, the debtor made a pre-petition side arrangement with a favored group of asbestos

claimants, who as a consequence represented a voting majority despite holding, in many cases,

only slightly-impaired "stub claims." *See id.* at 244.  There, the debtors had already made or

would make distributions to certain current asbestos claimants, such that those claimants would

receive as much as 95% of the full liquidated value of their claims.  Other asbestos claimants that

were not part of the side arrangement stood to receive a much smaller recovery under the plan.

The Third Circuit noted that an estimated 99,000 of the approximately 115,000 confirmation

votes appeared to have been "stub claim" votes, and thus the plan may have lacked the requisite

"indicia of support" among creditors.  The Third Circuit remanded the case for further

consideration of whether the plan artificially impaired the "stub claims."

44.    In *In re Dunes Hotel Assocs.*, 188 B.R. 174 (Bankr. D. S.C. 1995), a secured

creditor held a claim against the debtor in excess of $48.5 million.  The only unsecured creditor

of the debtor was a law firm, which filed a proof of claim in the amount of $2,139.57.  The

debtor filed a proposed plan that purportedly paid the secured creditor's claim in full, and

provided that the law firm's claim was impaired.  *See id.* at 182.  The court concluded that the

law firm's claim was either artificially created or preserved by the Debtor for purposes of

preserving its ability to cram down a plan on the secured creditor, and observed that the debtor's

impairment of the unsecured creditor class constituted an abuse of section 1129(a)(10) of the

Bankruptcy Code.  *See id.* at 184-85.  The court also concluded that the proposed treatment of

the law firm's claim under the plan and its utilization by the debtor to achieve confirmation

demonstrated a lack of good faith, and was done to improperly manipulate and achieve

confirmation of the debtor's plan.  *See Dunes*, 188 B.R. at 181.

**B.**    **The Court Should Not Deem Impaired Classes in Which
No Members Vote to Have Accepted the Proposed Modified Plan**

45.    Pursuant to the Procedures Order, the Debtors are reserving their right to assert at the July 23 confirmation hearing that if no claim holder in a particular class submits a vote to accept or reject the Modified Plan, such class would be deemed to have accepted the Modified Plan. *See* Procedures Order ¶ 22. The Proposed Modified Plan provides that the holders of secured claims are impaired (while they were unimpaired under the Confirmed Plan), and each secured creditor is classified in its separate subclass pursuant to section 3.2(b) of the Proposed Modified Plan.  If classes in which no members vote are deemed to accept the Proposed Modified Plan and a single secured creditor fails to submit a ballot, then the Debtors technically would have satisfied section 1129(a)(10) of the Bankruptcy Code.

46.    In light of the significant creditor opposition to the Proposed Modified Plan, it would be inappropriate for such classes to be deemed to have accepted the Proposed Modified Plan.  It is possible that no truly impaired, non-gerrymandered class of creditors will vote to accept it.  In essence, the Debtors are asking this Court to find that section 1129(a)(10) of the Bankruptcy Code has been satisfied based solely on the fact that one or more creditors did not vote.  That result would be a travesty of justice.

47.    The Committee's position that classes in which no member submits a ballot should *not* be deemed to accept the Proposed Modified Plan is supported by the language of section 1126(c) of the Bankruptcy Code, which states that a class of claims accepts a plan when the plan "has been accepted" by holders of at least two-thirds in amount and more than one-half in number of the allowed claims of such class that "have accepted or rejected" the plan.  That language suggests that for a class to accept a plan, at least one creditor in that class must affirmatively accept that plan.

NY\1548044.5

48.     While some courts have deemed impaired classes to have accepted a chapter 11

plan where none of the members of the classes submitted ballots, the Committee believes that

those courts misread section 1126(c) of the Bankruptcy Code.  Moreover, the facts of those cases

are distinguishable from the facts here.  In *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266-67

(10th Cir. 1988), the Tenth Circuit affirmed the lower courts' ruling that the holders of a single

claim in a separate subclass of secured creditors that failed to vote and failed to object to plan

confirmation was deemed to have accepted the plan.  In that case, creditors who had not voted

sought, after the confirmation hearing, to challenge the confirmation of a plan, arguing that their

class should not have been deemed to have accepted.  The court found it important that the

holders of the secured claim did not bother to object to the plan in a timely manner, nor did they

raise their objections to the treatment of non-voting classes of claims until *after* the plan was

confirmed.  *See id.* at 1264-65.[11]  In addition, fifty-three classes of secured creditors *did* vote on

the plan in that case.  *See id.* at 1267.  The court expressed its concern that "a creditor may sit

idly by, not participate in any manner in the formulation and adoption of a plan in reorganization

and thereafter, subsequent to the adoption of the plan, raise a challenge to the plan for the first

time.  Adoption of the [objecting claim holders'] approach would effectively place all

reorganization plans at risk in terms of reliance and finality."  *Id.* at 1266-67.

49.     The court in *In re Adelphia Communs. Corp.*, 368 B.R. 140, 224 (Bankr.

S.D.N.Y. 2007) also held that classes of claims in which no member voted would be deemed to

accept the plan.  In that case, 84% of the claims ($10.7 billion of the $12.7 billion of total debt)

---

[11]  The plan in that case provided that the lien on real property that secured the claimants' claim would be transferred
to unsold timeshare intervals, whereby the claimants would realize a small portion of their claim when each interval
was sold.  The plan also provided that the claimants would receive the entire amount of their claim, with interest,
within the first forty-eight months following confirmation of the Plan.  The claimants failed to object to the plan in a
timely manner, but later objected to the plan during a subsequent hearing on the distribution of the proceeds of the
sale of the property on which they had their lien.  *See id.* at 1264.

NY\1548044.5

in the case and all thirty of the thirty impaired voting classes accepted the plan. However, there
were six small classes, with aggregate claims entitled to vote of less than $50,000, in which no
creditors voted. *See id.* at 147 & n.3. The court stated that in a case where the vast majority of
creditors (and all impaired classes) voted to accept the plan, a rule that treats classes in which no
member votes as rejecting the plan "subjects those who care about the case to burdens (or worse)
based on the inaction and disinterest of others." *Id.* at 261-62. Indeed, the court stated that "In
the *Adelphia* cases, *and under these facts*, I believe that *Ruti-Sweetwater* should be followed."
*Id.* at 263 (emphasis added).[12]

        50.     The facts, and importantly the context, of both the *Ruti-Sweetwater* case and the
*Adelphia* case are readily distinguishable from the present situation. Unlike *Ruti-Sweetwater*, the
Debtors are not faced with a creditor who failed to object to the plan in a timely manner, failed to
appear at the confirmation hearing, and sprung its objection to the plan post-confirmation. The
evils that the court in *Ruti-Sweetwater* sought to avoid simply are not present here. Unlike
*Adelphia*, the Proposed Modified Plan will not be accepted by all voting classes. In fact, it is
possible that the Proposed Modified Plan will be rejected by each truly impaired, non-
gerrymandered class of creditors. In *Adelphia*, the Court's holding permitted confirmation
without resort to cramdown. Here, the only way the Proposed Modified Plan could ever be
confirmed is by cramdown.

---

[12]  The court in *Adelphia* believed that the language of section 1126(c) supported its holding in the case. The
Committee respectfully submits that section 1126(c) does not support that holding. *See id.* at 262 & n.280. Section
1126(c) states that "[a] class of claims has accepted a plan *if such plan has been accepted by* creditors … that hold at
least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors …
that have accepted or rejected such plan." (emphasis added). This statute thus requires at least *one* creditor vote in
favor of the plan if such plan were to be accepted by the class. *See, e.g.*, *M. Long Arabians*, 103 B.R. at 215-16;
*Townco Realty,* 81 B.R. at 708. That the former Bankruptcy Act specifically deemed failures to vote to be
rejections, while the Bankruptcy Code is silent on that issue, is not particularly relevant.

51.     Consistent with the courts' holdings in *In re Friese*, 103 B.R. 90, 92 (Bankr.

S.D.N.Y. 1989), *In re M. Long Arabians*, 103 B.R. 211, 215-16 (B.A.P. 9th Cir. 1989); *In re*

*Townco Realty, Inc.*, 81 B.R. 707 (Bankr. S.D. Fla. 1987), classes in which no members vote

should be deemed to reject the Proposed Modified Plan.  Otherwise, the Debtors may use the

"acceptance" by such classes to try to cram down the Proposed Modified Plan on the holders of

billions of dollars of debt that reject that plan.  In *Friese*, despite the lack of objections to the

plan, the court denied confirmation because an impaired class of claims existed and did not

accept the plan.  Noting that the purpose of section 1129(a)(10) of the Bankruptcy Code was to

"prevent recourse to the 'cramdown' powers of section 1129(b) in circumstances where no

impaired class of claims has accepted the plan," the court stated that "to adopt the debtor's

proposal [that the impaired class be deemed to have accepted the plan] would be to subvert the

plan confirmation process."  *Id.* at 92, citing *In re Douglas Hereford Ranch, Inc.*, 76 B.R. 781

(Bankr. D. Mont. 1987).  Such may be the case here, if impaired classes in which members failed

to vote are deemed to accept the Proposed Modified Plan.

### C.     The Gerrymandering of the Class of the PBGC's Claim is Inappropriate

52.     The Debtors also should not be permitted to use the separate classification of the

PBGC's claim to engineer a consenting impaired class for purposes of section 1129(a)(10) of the

Bankruptcy Code.  The PBGC's vote with respect to the Proposed Modified Plan should be

included with the votes of the other general unsecured creditors for purposes of section

1129(a)(10) of the Bankruptcy Code.

53.     Courts in the Second Circuit have held that separate classification of substantially

similar unsecured claims is permissible only when there is a reasonable basis for doing so or

when the decision to separately classify "does not offend one's sensibility of due process and fair

NY\1548044.5

play." *In re One Times Square Assocs. Ltd. P'ship,* 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993);

*see also Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477,

483 (2d Cir. 1994); *In re Adelphia Communications Corp.*, 368 B.R. 140, 246-47 (Bankr.

S.D.N.Y. 2007).  When considering assertions of gerrymandering, courts have inquired whether

a plan proponent has classified substantially similar claims in separate classes for the sole

purpose of obtaining at least one impaired assenting class.  *See Boston Post Rd. Ltd. P'ship*, 21

F.3d at 483 (stating that "separate classification of unsecured claims solely to create an impaired

assenting class will not be permitted"); *see also Phoenix Mut. Life Ins. Co. v. Greystone III Joint

Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) (holding that

classification of substantially similar claims in different classes may only be undertaken for

reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class

of claims, and stating that "[there is] one clear rule that emerges from otherwise muddled

caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order

to gerrymander an affirmative vote on a reorganization plan.").

        54.    To overcome the appearance of gerrymandering, the Debtors must "adduce

credible proof of a legitimate reason for separate classification of similar claims."  *Boston Post

Rd. Ltd. P'ship*, 21 F.3d at 483 (finding that a debtor was attempting to gerrymander a separate

accepting class by classifying one unsecured claim in a different class than other unsecured

claims where the debtor had not offered any business justification that would warrant separate

classification and the separate classification was not essential to the debtor's ultimate

reorganization.)  The Debtors have not done so, and cannot do so, in this case.

NY\1548044.5

III.    **The Proposed Releases of the Debtors' Directors and Officers are Impermissible**

55.      Section 11.5 of the Proposed Modified Plan provides for the release of the

Debtors' directors and officers by all creditors and interest holders "to the fullest extent

permissible under applicable law, as such law may be extended or interpreted subsequent to the

Effective Date" (the "Non-Consensual D&O Release").  It is inappropriate for creditors that vote

against the Proposed Modified Plan to be deemed to have released the Debtors' directors and

officers, because no circumstances exist to warrant the Non-Consensual D&O Release.  The

Debtors have not met their burden of establishing that any Non-Consensual D&O Release is

appropriate here.

56.      Section 524(e) of the Bankruptcy Code provides: "[e]xcept as provided in

subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of

any other entity on, or the property of any other entity for, such debt."  Certainly, the Debtors'

directors and officers are not debtors in these chapter 11 cases.  Though courts have some

authority to grant non-consensual third party releases in limited circumstances pursuant to

section 105(a) of the Bankruptcy Code in extraordinary cases, section 105(a) does not give a

bankruptcy court unfettered discretion to discharge a non-debtor from liability.  *See, e.g.*, *LTV*

*Corp. v. Aetna Casualty and Surety Co. (In re Chateaugay Corp.)*, 167 B.R. 776, 780 (S.D.N.Y.

1994); *see also In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) ("enjoining a non-

consenting creditor's claim is only appropriate in 'unusual circumstances.'").

57.      Courts have engaged in a fact specific review in determining whether to grant a

third party release, weighing the equities of each case.  *See In re Master Mortgage Inv. Fund,*

*Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).  Consistent with the principle that courts may

grant non-consensual releases to non-debtors in unusual or extraordinary cases, the Second

NY\1548044.5

Circuit has endorsed third party releases only when such releases were necessary to the debtor's

reorganization.  *See, e.g.*, *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re*

*Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) (stating that non-consensual

releases are proper only in "rare cases"); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d

285, 293 (2d Cir. 1992); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,

837 F.2d 89, 93 (2d Cir. 1998).  In addition to being necessary to the debtor's reorganization, a

non-consensual third party release must be fair to the releasing parties.  *See, e.g.*, *In re*

*Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) (noting that the "hallmarks of permissible

non-consensual releases" are "fairness, necessity to the reorganization and specific factual

findings to support these conclusions").

       58.    The Second Circuit has explained that "[a]t least two considerations justify the

reluctance to approve non-debtor releases.  First, the only explicit authorization in the

[Bankruptcy] Code for non-debtor releases is [section] 524(g), which authorizes releases in

asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy

future claims.  *Metromedia*, 416 F.3d at 142.  Although recognizing that section 105(a)

authorizes the bankruptcy court to issue any order, process or judgment that is necessary or

appropriate to carry out provisions of the Bankruptcy Code, the Second Circuit found that

section 105(a) does not allow the bankruptcy court "to create substantive rights that are

otherwise unavailable under applicable law."  *Id.* (citing *New England Dairies, Inc. v. Dairy*

*Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d

Cir. 2003)).  Second, "a non-debtor release is a device that lends itself to abuse.  By it, a non-

debtor can shield itself from liability to third parties.  In form, it is a release, in effect, that may

NY\1548044.5

operate as a bankruptcy discharge arranged without a filing and without the safeguards of the

[Bankruptcy] Code." *Metromedia,* 416 F.3d at 142.

59.    Courts have approved non-debtor releases in situations when: (a) the estate

received substantial consideration from the beneficiaries of the release (*see Drexel*, 960 F.2d at

293), (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished

(*Johns-Manville,* 837 F.2d at 93-94), (c) the enjoined claims would indirectly impact the debtor's

reorganization by way of indemnity or contribution (*Menard-Sanford v. Mabey* (*In re A.H.*

*Robins Co.*), 880 F.2d 694, 701 (4th Cir. 1989)), and (d) the plan otherwise provides for the full

payment of the enjoined claims (*Metromedia*, 416 F.3d at 142).

60.    None of the circumstances that have led courts in other cases to approve non-

consensual releases of non-debtors is present here.  The Proposed Modified Plan provides for

virtually no recovery for unsecured creditors, and none of the enjoined claims are being

channeled into a settlement fund.  In addition, the Debtors' reorganization efforts were a

resounding failure, so there is no possible way that the Debtors' estates received substantial

consideration from their directors and officers in exchange for a release.  There is also no

evidence that the success of the Proposed Modified Plan (however "success" might be defined)

depends upon the absence of suits against parties that would have indemnity or contribution

claims against the directors and officers.  For these reasons, this Court should not approve any

Non-Consensual D&O Release.

**IV.    The Proposed Modified Plan May Violate**
**Section 1129(a)(9) of the Bankruptcy Code**

61.    Section 1129(a)(9) of the Bankruptcy Code provides that

"The court shall confirm a plan only if all of the following requirements
are met:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that — (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim; ..."

11 U.S.C. § 1129(a)(9).  The fees and expenses of the professionals retained in these

chapter 11 cases are administrative expenses pursuant to section 507(a)(2).  Thus, to be

confirmed, the Proposed Modified Plan must provide for the payment of all of the fees

and expenses of the professionals retained in these cases on the effective date, unless the

affected holder of an administrative expense claim agrees to a different treatment.  *See,*

*e.g.*, *In re Digital Impact, Inc.*, 223 B.R. 1, 6 (Bankr. N.D. Okla. 1998).

62.    There are significant unpaid professional fees and expenses in these chapter 11

cases, as a result of "holdbacks" this Court required in connection with its approval of the

interim fee applications as well as fees incurred after the confirmation of the Confirmed Plan.

Under the Proposed Modified Plan and the Master Disposition Agreement, GM and Parnassus

have collectively agreed to pay up to $30 million of unpaid professional fees.  However, it is by

no means clear that that amount will be sufficient to pay in full all unpaid professional fees.

While there will be a few assets remaining with the Debtors upon consummation of the Proposed

Modified Plan, the value of those assets is likely insignificant.  The Debtors bear the burden of

proving compliance with the requirements of section 1129(a); thus they must prove that there

will be sufficient liquidity available to the estate to pay al unpaid professional fees and expenses

in full.  Without such proof, the Proposed Modified Plan fails to satisfy section 1129(a)(9) and

confirmation must be denied.

V.    **The Alternative 363 Sale Cannot Be Approved**

A.    **The Alternative 363 Sale is an Impermissible *Sub Rosa* Plan**

63.    The Debtors seek approval of the Alternative 363 Sale in case the Proposed

Modified Plan is not confirmed.  Under the proposed Alternative 363 Sale, the same transactions

would be undertaken and creditors would receive the same recoveries as under the Proposed

Modified Plan, *except* that the stated recovery to general unsecured creditors would explicitly be

taken away.

64.    The Alternative 363 Sale is an impermissible *sub rosa* plan because the Debtors'

businesses would be terminated upon the consummation of the Alternative 363 Sale, and the

only thing left to do is to distribute the value derived from the sale to creditors in accordance

with the terms of the Master Disposition Agreement.  Indeed, if the Alternative 363 Sale is

consummated, the Master Disposition Agreement specifies how much would be distributed to

the DIP lenders and how much would be distributed to general unsecured creditors (*i.e.*, zero).

The mechanism for the payment of administrative expense claims (including the unpaid fees of

retained professionals in these cases) by GM and Platinum, as well as the treatment of the

Debtors' employee benefit plans, are also specified in the Master Disposition Agreement.

65.    Section 9.2.3 of the Master Disposition Agreement provides, in relevant part, as

follows:

> "Delphi and Buyers agree that the transaction pursuant to section 363 of
> the Bankruptcy Code will be on terms which result in (a) Buyers
> purchasing the same assets, and assuming the same liabilities, as provided
> in Article 2 hereof, and (b) Delphi receiving the same consideration,
> including the financial support for Delphi estates' wind-down
> requirements, as provided in Article 3 hereof; provided, however, that the
> amounts payable under   Section 3.2.3 of this Agreement shall not be

included in the consideration paid under the section 363 sale transaction.
…"[13]

66.    Moreover, in paragraph 54 of its June 1, 2009 supplemental motion to approve the

Proposed Modified Plan, the Debtors stated that:

> "GM Components and Parnassus have committed to the Debtors that
> completion of the transactions contemplated by the Master Disposition
> Agreement through a section 363 sale instead of under the Modified Plan
> will not materially change the economics of the transactions, except that
> GM Components would no longer commit to provide holders of allowed
> General Unsecured Claims (as defined in the Modified Plan) with a pro
> rata share of deferred consideration.    For greater certainty, GM
> Components and Parnassus have agreed that should the transactions be
> consummated pursuant to a section 363 sale order rather than under the
> Modified Plan, GM Components and Parnassus would nonetheless
> purchase the same assets and assume the same liabilities as provided in the
> Master Disposition Agreement.  Also, with the exception of the deferred
> compensation that would have been paid to holders of allowed General
> Unsecured Claims under the Modified Plan, the Debtors would receive the
> same consideration from GM Components and Parnassus, including the
> financial support for the Delphi estates' wind-down requirements, as
> provided in Article 3 of the Master Disposition Agreement."

67.    In short, the Debtors would accomplish through a section 363 sale almost

precisely what it would be unable to accomplish through the Proposed Modified Plan (because it

would not have been confirmed).  The Alternative 363 Sale is part of a multi-faceted transaction

that would allocate the value of the sale of the Debtors' assets among creditor classes, without a

chapter 11 plan.

68.    The law is clear that a debtor cannot enter into a transaction that "would amount

to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for

confirmation of a plan of reorganization.  *See, e.g.*, *Motorola v Comm. of Unsecured Creditors*

*(In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (citing *Pension Benefit Guar.*

---

[13]  Section 3.2.3 of the Master Disposition Agreement is the section that contemplates the potential payments to
unsecured creditors.

*Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc)*, 700 F.2d 935, 940 (5th Cir. 1983)).

In *Braniff*, the Court noted that "[t]he debtor and the Bankruptcy Court should not be able to

short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by

establishing the terms of the plan *sub rosa* in connection with a sale of assets." *Braniff*, 700 F.2d

935, 940 (5th Cir. 1983).[14]

69.    The fact that a proposed transaction, including a section 363 sale of assets, may

ultimately be in the best economic interests of a debtor's various constituencies does not

authorize the court to ignore the creditors' rights and procedural requirements of chapter 11.

Thus, where it is clear that the terms of a proposed section 363 sale would pre-empt or dictate the

terms of a chapter 11 plan, the proposed sale is beyond the scope of section 363 of the

Bankruptcy Code and should not be approved.  *See Contrarian Funds, LLC v. Westpoint Stevens,*

*Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 52 (Bankr. S.D.N.Y. 2005), citing *Clyde*

*Bergemann, Inc. v. The Babcock & Wilcox Co. (In re The Babcock & Wilcox Co.)*, 250 F.3d 955,

960 (5th Cir. 2001).  Moreover, courts do not approve terms of a sale that would render a plan

unconfirmable, if those terms were included in a plan.  *See, e.g.*, *In re On-Site Sourcing, Inc.*,

No. 09-10816-RGM, 2009 WL 1789331 at *9-*10 (June 22, 2009).

70.    Courts do not view a sale outside of a chapter 11 plan as appropriate under

circumstances: (a) which dictate the terms of a plan; (b) where the sale process or proceeds

benefit one creditor; (c) when no apparent reason dictates haste; or (d) when the sale appears to

be in bad faith.  *See, e.g.*, *In re Encore Healthcare Assocs.*, 312 B.R. 52 (Bankr. E.D. Pa. 2004);

---

[14]  In *Braniff*, the terms of the proposed sale included (a) the issuance of scrip that would only be used in a plan and only to fund obligations to former employees and shareholders, (b) that debt would be required to vote a portion of its deficiency claims in favor of any future plan approved by a majority of the creditors' committee, and (c) releases in favor of Braniff and its directors and officers.  *See id.* at 939-40.  The court recognized the potential for mischief if a section 363 sale of substantially all of a debtor's assets is not closely scrutinized.  The court stated that "any future attempts to specify the terms whereby a reorganization plan is to be adopted, the parties and the district court must scale the hurdles erected in Chapter 11."  *Id.* at 940.

*In re Beker Industries Corp.*, 64 B.R. 900 (Bankr. S.D.N.Y. 1986), *order rev'd on other grounds*,

89 B.R. 336 (S.D.N.Y. 1988) (rejecting sale because there were insufficient business reasons to

support it, proposed proceeds were not significant and there was a possibility of reorganizing the

business).

71.     Most courts that grapple with the issue of whether a proposed sale is an

impermissible *sub rosa* plan, have to do so before a plan is even filed.  In this case, however, no

such grappling is required – it is actually, and amazingly, explici*t* that the Alternative 363 Sale is

*intended* to be a *sub rosa* plan.  The Debtors are actually asking this Court to approve a sale

precisely because this Court will have ruled that the same transaction could not be accomplished

under a plan of reorganization.  If the Proposed Modified Plan fails for whatever reason, the

Debtors cannot rely on the Alternative 363 Sale to effect the exact same transaction.

### B.    The "Good Business Reason" Standard Does Not Apply to the Alternative 363 Transaction

72.     In *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

1063 (2d Cir. 1983), the Second Circuit eschewed a literal interpretation of section 363(b) of the

Bankruptcy Code which would have permitted unfettered use, sale and lease of estate property

outside of the ordinary course of a debtor's business.  *See id.* at 1069-70.  Instead, the court held

that "there must be some articulated business justification, other than appeasement of major

creditors, for using, selling or leasing property out of the ordinary course of business before the

bankruptcy judge may order such disposition under section 363(b)." *Id.* at 1070.

73.     Before approving a motion under section 363(b) of the Bankruptcy Code, the

court must expressly find from the evidence presented a good business reason to grant such an

application.  *See, e.g.*, *United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel

Corp.)*, Case No. 02 Civ. 2854**,** 2003 WL 21738964, *10 (S.D.N.Y. 2003).  Indeed, "a judge

NY\1548044.5

determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application. … In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."[15]  *Lionel*, 722 F.2d at 1071.

74.    The debtor's duty to act in the best interests of the estate is owed to its creditor body as a whole.  *See, e.g.*, *Unsecured Creditors Comm. of STN Enterprises, Inc. v. Noyes (In re STN Enterprises, Inc.)*, 779 F.2d 901, 904 (2d Cir. 1985).  Many courts have stated that a proposed transaction should be in the best interests of the debtor's estate.  *See, e.g.*, *In re G.S. Distribution, Inc.*, 331 B.R. 552, 560 (Bankr. S.D.N.Y. 2005); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 982-83 (Bankr. N.D.N.Y. 1988).

75.    The "good business reason" standard cannot apply in this case, because the Treasury, GM and Platinum negotiated the sale transaction without any significant involvement by the Debtors or the Committee, and other parties that expressed interest in purchasing the Debtors' assets were turned away.  Once the Treasury, GM and Platinum had their deal, the Treasury and GM presented it to the Debtors as a "take it or leave it" proposition, stating that the Debtors would receive their $250 million of liquidity only if the Debtors accepted the transaction.  The only thing the Debtors apparently requested was a release of their directors and officers.  This Court should not ratify this badly flawed process by approving the Alternative 363 Sale.

---

[15]  In *Lionel*, the debtor's CEO had testified that the sole reason for the debtor's application to sell valuable property was the creditors' committee's insistence upon it.  The Second Circuit held that that reason was insufficient as a matter of fact because it is not a sound business reason, and insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under chapter 11.  *Id.* at 1071.

NY\1548044.5

76.     Because Delphi's board of directors have failed to exercise any business judgment in agreeing to the sale, this Court should substitute its own judgment, and deny the request for approval of the Alternative 363 Sale.  This Court should not countenance the Treasury's and GM's tactics, particularly given that GM desperately needs the goods that are manufactured by the Debtors.  The Debtors consistently have failed to use the leverage that gives them over GM and the Treasury (and they have done so once again), so this Court must intervene at this time to protect the Debtors' estates and creditors.

## VI.    The Exclusivity Motion Must be Denied

77.     In the Exclusivity Motion, the Debtors seek entry of an order further extending (a) their exclusive period to file a chapter 11 plan through and including September 30, 2009 and (b) their exclusive period to solicit votes on a plan through and including November 30, 2009.  That motion must be denied.

78.     Section 1121(d) of the Bankruptcy Code, as applicable to the Debtors' chapter 11 cases,[16] provides: "[o]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, *the court may for cause* reduce or increase the 120-day period or 180-day period referred to in this section."  11 U.S.C. § 1121(d) (emphasis added).  Section 1121 of the Bankruptcy Code represents a departure from the procedure under the former Bankruptcy Act where only the debtor could file a plan.  The policy goal reflected in section 1121 of the Bankruptcy Code, in allowing other interested parties to file a plan of reorganization after the expiration of the debtor's exclusivity period, was predicated on the theory that there should be a relative balance of negotiating strength between debtors and

---

[16]  These chapter 11 cases are not subject to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Thus, these cases are not subject to the 18-month and 20-month limitations on plan filing and solicitation exclusivity.

NY\1548044.5

creditors during the reorganization process.  *See, e.g.*, *In re Texaco, Inc.*, 76 B.R. 322, 325-26 (Bankr. S.D.N.Y. 1987) (citing *Teachers Insurance and Annuity Association of America v. Lake in The Woods (In re Lake in the Woods)*, 10 B.R. 338, 343 (E.D. Mich. 1981)).

79.    The burden of demonstrating cause rests with the party seeking the extension, and a "debtor must make a clear showing of 'cause' to support an extension of the exclusivity period."  *In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992); *see also In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989); *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990).  The mere recitations of allegations deemed by a debtor to constitute cause for an extension of the exclusive periods is insufficient to allow such an extension.  *See In re Ravenna Indus., Inc.*, 20 B.R. 886, 889 (Bankr. N.D. Ohio 1982).

80.    Here, "cause" cannot be shown to further extend the Debtors' exclusive periods. The Debtors have proposed a chapter 11 plan that provides essentially no recovery to unsecured creditors while providing GM and Platinum with the potential for extraordinary returns.  If the Proposed Modified Plan is not confirmed (and it should not be confirmed), extension of the Debtors' exclusive periods would not be in the best interests of the estates and the Debtors' creditors.  The Debtors have had the benefit of exclusivity for nearly four years.  Since the Debtors were unable to effectuate a feasible chapter 11 plan within that timeframe, the Committee should be given the opportunity to try to do so.

NY\1548044.5

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny

confirmation of the Proposed Modified Plan, (b) deny the Debtors' motion to approve the

Alternative 363 Sale, (c) deny the Exclusivity Motion, and (d) grant the Committee such relief

that it deems just and proper.

Dated:  July 15, 2009
      New York, New York

                        **LATHAM & WATKINS LLP**

                        By: /s/ Robert J. Rosenberg
                            Robert J. Rosenberg (RR-9585)
                            Mark A. Broude (MB-1902)
                            Michael J. Riela (MR-7829)
                            885 Third Avenue, Suite 1000
                            New York, New York 10022
                            Telephone:  (212) 906-1200

                        Counsel for the Official Committee
                        of Unsecured Creditors

NY\1548044.5