Hearing Date: July 23, 2009
Plan Objection Deadline: July 15, 2009 at 4:00 p.m.
Auction Objection Deadline: July 20, 2009 at 12:00 p.m.

DECHERT LLP
Glenn E. Siegel
Charles I. Poret
Daniel C. Malone
James O. Moore
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
*Counsel for Kensington International Limited,
Manchester Securities Corp. and
Springfield Associates, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------X
                                                          :
In re:                                                    :    Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :    Case No. 05-44481 (RDD)
                                                          :
                                    Debtors.              :    Jointly Administered
----------------------------------------------------------X

**OBJECTION OF KENSINGTON INTERNATIONAL LIMITED,
MANCHESTER SECURITIES CORP. AND SPRINGFIELD
ASSOCIATES, LLC TO (A) CONFIRMATION OF DEBTORS' FIRST
AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND
(B) APPROVAL OF DEBTORS' PROPOSED SECTION 363 SALE**

Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC (the "Manchester Entities"), in their capacity as DIP Lenders[1] to the above-captioned debtors (collectively, the "Debtors") under that certain Revolving Credit, Term Loan and Guaranty Agreement among Delphi Corporation, as Borrower, and the Subsidiaries of the Borrower, as Guarantors, and the Lenders, dated January 9, 2007, as amended by the Amended

---

[1]     All capitalized terms not expressly defined shall be construed to have the same meaning as such terms have been defined in the DIP Credit Agreement (as hereinafter defined).

15174562

and Restated Revolving Credit, Term Loan and Guaranty Agreement among Delphi Corporation, as Borrower, and the Subsidiaries of the Borrower, as Guarantors, and the Lenders (as thereafter amended, supplemented or otherwise modified from time to time), dated as of May 9, 2008 (the "**DIP Credit Agreement**"), by and through their undersigned counsel, hereby object (the "**Objection**")[2] to (A) Confirmation of Debtors' First Amended Plan of Reorganization (as Modified) (the "**Modified Plan**") and (B) Approval of Debtors' Proposed Section 363 Sale (the "**363 Sale**"):

**PRELIMINARY STATEMENT**

1.  The consent of the DIP Lenders to the disposition of the estates' assets is an absolute precondition to the implementation of either the Modified Plan or the 363 Sale. Pursuant to explicit provisions of the Court's prior orders, not to mention the Bankruptcy Code and the DIP Credit Agreement, the Manchester Entities and the other DIP Lenders are entitled to object to – and prevent – the Debtors from consummating a transaction that does not repay the DIP Lenders in full. And yet, in flagrant disregard of the Court's governing orders and their own contractual agreements, the Debtors now seek approval of the Modified Plan or the 363 Sale, over the explicit opposition of the DIP Lenders.[3]

2.  The Manchester Entities, as well as like-minded DIP Lenders in all three tranches under the DIP Credit Agreement, including those that comprise the Collective of DIP Lenders

---

[2] This Objection incorporates by reference the earlier objection filed by the Manchester Entities. See Objection of Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC to Debtors' Motion Seeking to Modify Its Plan of Reorganization, June 9, 2009, Docket No. 16895. Further, this Objection is made without prejudice to the Manchester Entities' ability to supplement and expand it, if necessary, at the appropriate time.

[3] Attached as **Exhibit A** hereto is a Notice of Rejection And Disapproval Of Master Disposition Agreement By Required Lenders, delivered by the Agent at the request of the Required Lenders (as defined below).

2

(the "Collective"),[4] oppose the Modified Plan and the 363 Sale and, in their capacity as Required Lenders, have directed the Administrative Agent to reject and disapprove of the Master Disposition Agreement (defined below) and its implementation either under the Modified Plan or the 363 Sale. See Ex. A. Pursuant to the Master Disposition Agreement, the Debtors purport to sell their most valuable assets free and clear of all liens and encumbrances, including the DIP Lenders' superpriority security interests. In exchange, the Tranche C DIP Lenders would receive approximately ten cents on the dollar in cash in "satisfaction" of $2.75 billion of their superpriority administrative claims, as well as certain limited, contingent recoveries that could provide future payments of perhaps an additional ten percent of those claims (resulting in a total possible recovery for the Tranche C Lenders of no more than twenty cents on the dollar).

3.  This fractional recovery is not satisfactory to the DIP Lenders, whose collateral is worth far more than the payments to be distributed pursuant to the Master Disposition Agreement. Accordingly, the Manchester Entities, in coordination with other DIP Lenders, are prepared to exercise their right to credit bid (the "Credit Bid") at the auction scheduled for July 17, 2009, in accordance with the procedures approved by the Court to allow the DIP Lenders to exercise their rights under section 363(k) of the Bankruptcy Code. See Supplemental Modification Procedures Order [Docket No. 16920]. In furtherance of the Credit Bid, the DIP Lenders have assembled a management team to operate the Debtors' businesses, conducted negotiations with GM and lined up financing to assume and cure executory contracts. The DIP

---

[4] Both the Collective and the Administrative Agent will also be filing separate objections to the Modified Plan and the 363 Sale, and the Manchester Entities join the arguments made therein.

3

Lenders are therefore ready to implement a business plan to be conducted with their collateral following the closing of the Credit Bid.

4.  As a consequence of the maturity of the DIP Credit Agreement and the Debtors' numerous uncured defaults, the DIP Lenders also have the right to foreclose on their collateral. Although a foreclosure sale is not the optimal means of disposing of the Debtors' assets, the liquidation value of the assets far exceeds the DIP Lenders' proposed recovery under the Modified Plan or the 363 Sale. As a result, in the event that the Credit Bid is unsuccessful, the Manchester Entities and other DIP Lenders would foreclose on the Debtors' assets before consenting to the Modified Plan or 363 Sale.

## BACKGROUND

5.  The Debtors amended their then-existing DIP financing facility when they were unable to consummate their first confirmed plan of reorganization. On January 5, 2007, the Court entered the DIP Refinancing Order (as amended, the "DIP Order"), which approved the DIP Credit Agreement and granted the DIP Lenders superpriority security interests in substantially all assets of the Debtors (the "Collateral") and superpriority claims against each Debtor. The findings within the DIP Order recognized the need of the additional financing to permit "the orderly continuation of the operation of [the Debtors'] businesses" and called the financing "vital to the preservation and enhancement of the going concern values of the Debtors and to the successful reorganization of the Debtors." DIP Order ¶ 3(b).

6.  The DIP Order provides: "all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations, Replacement Liens and Junior Adequate

4

Protection Liens and all other claims against the Debtors, now existing or hereafter arising." DIP Order ¶ 5. The DIP Order further provides: "No claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Agent and the DIP Lenders or to the Setoff Claims, respectively, shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the Commitments thereunder or the DIP Obligations remain outstanding…." Id. ¶ 13(a). The DIP Order also vacated the automatic stay in the event of the occurrence of an Event of Default under the DIP Credit Agreement. See id. ¶ 7(b).

7.   On December 31, 2008, the DIP Credit Agreement matured, and Debtors failed to pay the amounts due thereunder. Since that date, an Event of Default has existed under the Credit Agreement, and the DIP Lenders have had the unfettered right to exercise their remedies and foreclose on the Collateral. Instead of immediately foreclosing on the Collateral, however, the DIP Lenders have made good faith efforts to provide the Debtors with the financial breathing room to orchestrate an emergence plan. As of the date of this Objection, the DIP Lenders have negotiated thirteen iterations of the Accommodation Agreement among Delphi Corporation, the DIP Lenders and JPMorgan Chase Bank, N.A. (as amended) (the "Accommodation Agreement"), agreeing each time to forbear for specific periods of time from exercising remedies. In the process, they have permitted the dissipation of hundreds of millions of dollars in their cash collateral from the estates.

8.   On June 1, 2009, the Debtors filed the Debtors' (A) Supplement To Motion For Order (I) Approving Modification To Debtors' First Amended Plan Of Reorganization And (B) Request To Set Administrative Expense Claims Bar Date And Alternative Sale Hearing Date (the "Plan Modification Motion"). The Plan Modification Motion disclosed for the first time the

5

Master Disposition Agreement, dated June 1, 2009, among the Debtors, GM Components Holdings, LLC, General Motors Corporation ("GM"), Parnassus Holdings II, LLC ("Parnassus") and the Other Sellers and Other Buyers Party Thereto (the "Master Disposition Agreement").

9. Under the Master Disposition Agreement, the Debtors would transfer substantially all of their assets to GM and Parnassus in exchange for a package of value for the Tranche C DIP Lenders to which the Debtors ascribe an aggregate value of twenty cents on the dollar, much of which is contingent. Platinum Capital Equity Partners, L.P. ("Platinum") would contribute only $1 in cash to the estates, but obtain a majority equity interest in Parnassus. Platinum's proposed post-sale $250 million investment under the Master Disposition Agreement would benefit only Parnassus, a company that Platinum would own under the agreement. This post-emergence funding by Platinum would contribute no value to the estates.[5] Under the Master Disposition Agreement, GM would provide approximately $900 million to the estates. This amount neither exceeds the liquidation value of the estates nor comes close to satisfying the DIP Loans.[6]

10. At the hearing on June 10, 2009, the Court blocked the Debtors' efforts to force a private sale under the Master Disposition Agreement upon the estates' stakeholders and directed the Debtors to conduct a fair and open public auction. The Court subsequently entered the Modification Procedures Order and the Supplemental Modifications Procedures Order to provide

---

[5] The Manchester Entities reserve all rights to object to the value and form of Platinum's bid upon the conclusion of the auction.

[6] While not relevant to their rights under the DIP Credit Agreement, the Manchester Entities are prepared to provide testimony at the hearing on the auction results on July 23, 2009 in support of their argument that the value to the estates achieved in an orderly liquidation exceeds the value offered under the Master Disposition Agreement.

for bidding procedures and otherwise govern such an auction. On June 16, 2009, the Debtors filed with the Court the First Amended Plan of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors and Debtors-in-Possession (As Modified) [Docket No. 17030] (the "<u>Modified Plan</u>"). The Modified Plan constitutes a request to authorize and approve the Master Disposition Agreement. Modified Plan § 7.7(a). On July 2, 2009, the Debtors filed with the Court an agreement with the parties to the Master Disposition Agreement to implement a sale transaction under section 363 of the Bankruptcy Code (the "<u>363 Implementation Agreement</u>") [Docket No. 17557] in the event that the Bankruptcy Court does not approve the Modified Plan. The 363 Implementation Agreement includes 19 pages of amendments to the Master Disposition Agreement, none of which reflect any attempt by the Debtors to address the concerns of the DIP Lenders or to achieve their consent to the transaction.

## **OBJECTION**

### I. **The Modified Plan Cannot Be Confirmed Without the Consent of the DIP Lenders.**

11. A plan of reorganization cannot be confirmed unless allowed administrative expense claims are paid in full in cash on the effective date, unless the holders of such claims consent. <u>See</u> 11 U.S.C. § 1129(a)(9)(A); <u>In re Boston Post Rd. Ltd. P'ship.</u>, 21 F.3d 477, 484 (2d Cir. 1994); <u>In re Teligent, Inc.</u>, 282 B.R. 765, 770 (Bankr. S.D.N.Y. 2002).

12. Accordingly, because the Manchester Entities and the other DIP Lenders have not and will not provide such consent, the Debtors absolutely cannot confirm the Plan under section 1129 of the Bankruptcy Code.

### II. **The 363 Sale Cannot Be Approved Without the Consent of the DIP Lenders.**

13. Pursuant to the DIP Credit Agreement, the Debtors agreed to repay more than $3.25 billion in post-petition loans. Among the protections negotiated by the DIP Lenders was a covenant by the Debtors not to sell estate assets (except under certain limited circumstances) while obligations to the DIP Lenders remain outstanding. DIP Credit Agreement § 6.10 ("[f]rom the Closing Date and for so long as . . . any amount shall remain outstanding or unpaid under this Agreement., the Borrower and each of the Guarantors will not … [s]ell or otherwise dispose of any assets (including the sale or issuance of any capital stock of any Subsidiary), whether now owned or hereafter acquired").

14. The Court approved the DIP Credit Agreement when it entered the DIP Order. The DIP Order provides that "[t]he DIP Documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms," DIP Order ¶ 4(c), and that "[t]he terms and provisions of [the DIP] Order and the DIP Documents shall continue in these cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code," id. ¶ 13(d). The DIP Order further prohibits the Debtors (or any party in interest) from using cash Collateral or any borrowings to "seek to modify any of the rights granted to the Agent [or] the DIP Lenders . . . under [the DIP] Order . . . or under the DIP Documents." Id. ¶ 15.

15. The Master Disposition Agreement, if implemented, would unquestionably breach these provisions because it provides for the sale and disposition of virtually all of the estate assets in which the DIP Lenders have superpriority security interests. The Debtors, therefore, must obtain the consent of the DIP Lenders in order to implement the Master Disposition Agreement. As of the filing of this Objection, the Debtors have failed to solicit the DIP Lenders'

8

consent, and the DIP Lenders categorically have rejected implementation of the Master Disposition Agreement.  See Ex. A;  cf. In re Chrysler LLC, et al., 405 B.R. 84, 100-104 (Bankr. S.D.N.Y. 2009) (recognizing that first lien lenders in a situation comparable to that of the DIP Lenders could have legally exercised their rights under their credit documents, through their administrative agent, to refuse to consent to that section 363 transaction).

16. The DIP Order also bars the Debtors from effectuating the Master Disposition Agreement.  The DIP Order provides that "[n]o obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim."  DIP Order ¶ 4(c).

17. Pursuant to the Master Disposition Agreement, the Debtors agree to sell the estates' assets free and clear of all encumbrances, except certain permitted encumbrances that do not include the DIP Lenders' liens on the Collateral.  See Master Disposition Agreement § 2.1.2. In this respect, the Master Disposition Agreement is in direct violation of the Court's DIP Order, a final and binding order on which the DIP Lenders relied in extending billions of dollars of credit to the Debtors.

### III. The DIP Lenders Have Not Waived Their Rights Under the DIP Credit Agreement and the DIP Order.

18. During the hearing before the Court on July 1, 2009, counsel for the Debtors suggested that the rights of the DIP Lenders under the DIP Credit Agreement are void because the DIP Lenders have agreed to forbear from exercising remedies over the last six months. Debtors' counsel stated:

9

> "As you know, the lenders are taking the position that this Court can neither confirm a plan nor approve any sale without their consent. . . . That is their position. We don't agree with it. We intend to litigate that on the 23rd as it relates to the overall transaction. We don't believe that the credit agreement – the covenants in the credit agreement can, in fact, hold this estate completely hostage to the whims of the DIP lenders, when they're unwilling to exercise remedies."[7]

July 1, 2009 Transcript at 19:9-18. Counsel's inflammatory characterization notwithstanding, the DIP Credit Agreement and the DIP Order do in fact provide that the DIP Lenders must consent to a disposition of substantially all of the Debtors' assets or be paid in full.

19. The DIP Lenders' voluntary forbearance from exercising remedies – and without consideration from any of the Debtors in exchange for the forbearance – in no way constitutes a waiver of the DIP Lenders' rights under the DIP Credit Agreement or the DIP Order. See Accommodation Agreement §§ 2(f), 39(i). The DIP Credit Agreement itself specifically provides that "[n]o failure on the part of the Administrative Agent or any of the [DIP] Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof." DIP Credit Agreement § 10.07.

20. The DIP Lenders, along with most parties in interest in these cases, consider foreclosure an option of last resort. As a result, the DIP Lenders have waited patiently and agreed to a series of amendments to the Accommodation Agreement to allow the Debtors time and flexibility to facilitate a successful emergence that benefits all stakeholders and would be

---

[7] This argument is contrary to the admission made by Debtors' counsel at the June 10, 2009 hearing that "if at the end of the day the DIP lenders conclude that the transaction is not in their best economic interests, they have remedies that they can pursue. There is always the alternative here of the DIP lenders foreclosing on these assets." Tr. at pages 102:23-103:3.

10

superior to foreclosure and liquidation. There is no conceivable basis for concocting a waiver from this restraint.

21. Indeed, the Court's most recent ruling in these cases refuted the Debtors' view that the DIP Lenders' forbearance from exercising remedies waives their rights under the DIP Credit Agreement. In denying the Debtors' Expedited Motion for Order Under 11 U.S.C. § 363 and Fed. Bankr. Pr. 2002, 6004, and 9014 Authorizing Debtors to Provide Expense Reimbursement to Platinum Equity Advisors, LLC in Connection With Sale of Debtors' Assets Pursuant to Master Disposition Agreement [Docket No. 17317], the Court held that the terms of the DIP Credit Agreement remain in force and prohibit payment out of estate funds without the DIP Lenders' consent, notwithstanding the Debtors' attempt to make such payments over the DIP Lenders' objection. See July 1, 2009, Transcript at 67-68.

22. Nevertheless, the DIP Lenders still forbear from immediately foreclosing in favor of pursuing the Credit Bid. In the event, however, that the DIP Lenders are unsuccessful in the Credit Bid, and the Debtors continue to seek implementation of the Master Disposition Agreement, the Manchester Entities believe that it would be in their best interests to direct the Administrative Agent to foreclose on the Collateral and conduct an auction for the Debtors' assets pursuant to state law.

**IV.    The Manchester Entities Reserve All of Their Rights.**

23. The Manchester Entities reserve all of their rights under the DIP Credit Agreement, the Security Agreement, the DIP Order and applicable law, including the right to credit bid, the right to foreclose and their rights against any party. Nothing in this Objection

constitutes a consent under or a waiver of rights with respect to the DIP Credit Agreement, the Security Agreement, the DIP Order or otherwise.

24. The Manchester Entities reserve their rights to object to the Supplemental Modification Procedures Order should the Debtors interpret paragraph 46 therein to mean that a credit bid that includes certain assumptions of liability or executory contracts constitutes an Alternate Transaction (as defined in the Supplemental Modification Procedures Order).

25. The Manchester Entities also expressly reserve any and all rights not to consent to, to object to or to reject the Modified Plan, the 363 Sale or any other transaction the Debtors may enter into that does not provide the benefits necessary to ensure a successful and consensual emergence from chapter 11, as well as to any section 363 sale eventually put before the Court. In addition, the Manchester Entities reserve their right to supplement or amend this Objection at any time prior to or at the hearing currently scheduled for July 23, 2009 on the basis of evidence disclosed during discovery or otherwise.

[*The remainder of this page is intentionally left blank.*]

WHEREFORE, the Manchester Entities respectfully request that the Court denies the Modified Plan and the 363 Sale and grant such other relief that it deems just and proper.

Dated: July 15, 2009
       New York, New York

/s/ Glenn E. Siegel
Glenn E. Siegel
Charles I. Poret
Daniel C. Malone
James O. Moore
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for Kensington International Limited, Manchester Securities Corp. and Springfield Associates, LLC*

On Brief: Bret Harper