Marc Abrams
Michael J. Kelly
Richard Mancino
Brian E. O'Connor
Christopher J. St. Jeanos
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

**Hearing Date: July 23, 2009**

*Counsel to the Collective of DIP Lenders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                                     :
     In re                      :    Chapter 11
                                                     :
DELPHI CORPORATION, et al.,                          :    Case No. 05-44481 (RDD)
                                                     :
                    Debtors.    :    (Jointly Administered)
                                                     :
-----------------------------------------------------x

### FIRST SUPPLEMENTAL OBJECTION OF THE COLLECTIVE OF DIP LENDERS TO (A) CONFIRMATION OF DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND (B) APPROVAL OF DEBTORS' PROPOSED SECTION 363 SALE

A collective of Lenders under the DIP Credit Agreement (together, the

"Collective"[1]), with significant holdings of Tranche A, B, and C loans, by and through their

undersigned counsel, hereby submits this First Supplemental Objection To (A) Confirmation of

Debtors' First Amended Plan of Reorganization (as Modified) and (B) Approval of Debtors'

Proposed Section 363 Sale ("First Supplemental Objection"), and in further support of this First

Supplemental Objection, and without prejudice to the Collective's ability to further supplement

---

[1]     The Collective includes: (i) Double Black Diamond Offshore Ltd.; (ii) Black Diamond Offshore Ltd.; (iii) Monarch Master Funding Ltd.; (iv) Greywolf Capital Partners II LP; (v) Greywolf Capital Overseas Master Fund; (vi) GCOF SPV I; (vii) GCP II SPV I; (viii) Greywolf Structured Products Master Fund, Ltd.; (ix) Greywolf CLO I, Ltd.; and (x) SPCP Group, LLC.

and expand upon this First Supplemental Objection, if necessary, at the appropriate time, the

Collective respectfully represents as follows:[2]

## PRELIMINARY STATEMENT

1.      The members of the Collective are parties to the DIP Credit Agreement.[3]

The DIP Lenders as a group are owed in excess of $3.449 billion in principal, plus accrued

interest.  The DIP Lenders hold superpriority claims secured by liens on substantially all assets

of the Debtors (the "Collateral").  The Collective alone holds well in excess of $800 million in

Tranche A, B and C loans.

2.      For much of the nearly four years Delphi Corporation ("Delphi") and

certain of its subsidiaries and affiliates (collectively, the "Debtors") have been in chapter 11 of

title 11 of the Bankruptcy Code, Delphi's secured DIP Lenders, with significant input from the

Collective, have worked with the Debtors to help them achieve a successful reorganization.  The

DIP Lenders hold unquestioned administrative and superpriority claims and superpriority liens

and, in the Debtors' own words, **"the right to avoid having their claims subjected to

compromise without their consent under a chapter 11 plan of reorganization."**[4]  Even

though they were not paid in full on the maturity date of the DIP financing, the DIP Lenders

have made numerous concessions to assist Delphi in emerging from chapter 11 and to ensure the

---

[2]      The Objection of JPMorgan Chase Bank, N.A. To The Proposed Sale Of All Or Substantially All Of The
Debtors' Assets To Affiliates Of General Motors And Platinum Equity LLC, dated July 15, 2009, and
Objection of Kensington International Limited, Manchester Securities Corp. and Springfield Associates,
LLC to (A) confirmation of debtors' first amended plan of reorganization (as Modified) and (B) approval
of debtors' proposed section 363 sale, dated July 15, 2009, are incorporated by reference as if set forth in
full herein.

[3]      Second Amended and Restated Revolving Credit, Term Loan, and Guaranty Agreement dated as of May 9,
2008, by and among Delphi Corporation, the debtor subsidiaries of the Company, JP Morgan Chase Bank,
N.A. (as Administrative Agent), and the lenders party thereto, as amended.

[4]      Debtors' Omnibus Reply in Support of Accommodation Motion and Response to Tranche C Collective's
Cross-Motion Pursuant to 11 U.S.C. §§ 105(a), 361, 363(e) and 1107(a) For Adequate Protection (the
"Debtors' Omnibus Reply"), Docket 14481 at ¶ 9 (emphasis added).

continuation of supply to the North American automotive industry, including to the new General Motors Corporation ("GM"). Their goal has been, and continues to be, to maximize Delphi's value so that they can obtain a fair recovery consistent with their contractual and legal rights as postpetition secured lenders and their duties to their own investors. As will be further evidenced by the Pure Credit Bid it intends to submit, the Collective continues to be supportive of a transaction by which GM can obtain the North American assets it needs to produce cars and trucks without interruption, but on a basis that ensures that the DIP Lenders are treated fairly and equitably consistent with their legal rights and the value that such rights command.

3.      Currently scheduled to be presented to this Court on July 23, 2009 are the Debtors' Modified Plan of Reorganization ("Modified Plan") and the Master Disposition Agreement (the "MDA"), dated as of June 1, 2009, among Delphi, General Motors Corporation Components Holdings, LLC ("Parent," and together with certain other buyers, the "GM Buyers"), GM, and Parnassus Holdings II, LLC ("Parnassus"), a joint venture between GM and Platinum Capital Equity Partners, L.P. ("Platinum") (for which GM is providing 88% of the equity[5]), as amended by the First Amendment to the Master Disposition Agreement (the "First Amendment"), which the Debtors filed on July 2, 2009. Through either their Modified Plan or an alternative section 363 sale (the "363 Sale"), the Debtors propose to sell at a highly discounted price (1) to GM, Delphi's global steering business and the facilities that the United Auto Workers ("UAW") announced on May 26, 2009 that GM had agreed to acquire,[6] and (2) to Parnassus, substantially all of the rest of its operating businesses (the "Proposed Transaction").

---

[5]      See GM Form 8-K, filed with the U.S. Securities and Exchange Commission on June 5, 2009.

[6]      The UAW announcement preceded by six days the Debtors' filing, on June 1, 2009, of the Plan Modification Motion in which they sought to schedule a hearing on the Modified Plan and an alternative sale hearing date to consider the proposed transaction described above.

The Proposed Transaction further provides for the payment of certain administrative claims and

distributions to certain junior unsecured claimants, while relegating the superpriority

administrative claims of the Tranche C Lenders to only ten cents of cash and non-cash

contingent recoveries – which Debtors' counsel described as "hope certificates"[7] – that at most

amount only to pennies on the dollar.  In addition, the Proposed Transaction will provide

substantial benefits, in the form of indemnification and insurance protection, among others, to

the Debtors' senior management and/or board of directors, as well as extensive releases in favor

of third parties, some of which were only recently disclosed in the First Amendment.

4.      The Collective previously demonstrated how this Proposed Transaction –

secretly negotiated while the parties were supposed to be mediating a settlement – was presented

to the DIP Lenders in the form of a proposed "private sale" under section 363 of the Bankruptcy

Code.[8]  With the exception only of those who would be unfairly benefited by the proposed

"private sale," virtually every major constituency in this chapter 11 proceeding objected to the

Proposed Transaction.[9]  While some of the arguments advanced against the Proposed

---

[7]    See Hr'g Tr. 112:15, June 10, 2009, Docket No. 17011.

[8]    The background of the Debtors' proposed "private sale" is set forth in the Response and Partial Objection
of the Collective of DIP Lenders to Debtors' (A) Supplement to Motion for Order (I) Approving
Modification to Debtors' First Amended Plan of Reorganization (As Modified) and Related Disclosures
and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to First Amended
Plan of Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternative
Sale Hearing Date, filed on June 9, 2009 (Docket No. 16903) ("Collective's Plan Modification Objection")
which is incorporated herein by reference as if set forth in full.

[9]    See, e.g., Objection of Kensington International Limited, Manchester Securities Corp. and Springfield
Associates, LLC to Debtors' Motion Seeking to Modify Its Plan of Reorganization, June 9, 2009, Docket
No. 16895; Objection of JPMorgan Chase Bank, N.A. to the Debtors' Supplement to Plan Modification
Approval Motion, June 9, 2009, Docket No. 16897; Objection of the Official Committee of Unsecured
Creditors to the Debtors' (A) Supplement to Motion for Order (I) Approving Modifications to Debtors'
First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and
(II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of
Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternative Sale
Hearing Date, June 9, 2009, Docket No. 16900; Objection of Wilmington Trust Company, as Indenture
Trustee, to (A) Supplement to Motion for Order (I) Approving Modifications to Debtors' First Amended

Transaction differed, the objectors were of one voice in protesting the coercive and anti-competitive process by which the Debtors were seeking to give away their most valuable operating assets at bargain-basement prices to GM and Parnassus in a transaction that would be financed largely by the U.S. Taxpayer.

5. Indeed, the Debtors have sought every opportunity to preclude the DIP Lenders from being actively involved in the sale process. This began with the very nature of the Proposed Transaction: as stated by Platinum's counsel at the hearing on the Platinum Expense Reimbursement Motion, "the way we set up the MDA, **at the request of the debtors,** was as a private transaction." (Hr'g Tr. 49:25 – 50:2, July 1, 2009, Docket No. 19260) (emphasis added.) Even after this Court opened the sale process up to competitive bidding, the Debtors delayed or outright resisted the DIP Lenders' access to information and tried to restrict the DIP Lenders' rights to bid against the MDA.[10] The Debtors also sought to prevent other, potentially higher bidders from making offers on the Debtors' assets by seeking to add a $30 million expense reimbursement to any bid.

6. The Debtors have announced that no other Alternative Transaction has been qualified (see Delphi Press Release, dated July 10, 2009, available at http://delphi.com/about/news/media/pressReleases/pr_2009_07_10_001 ) ("the deadline for submission by qualified bidders of potential alternative transactions . . . has passed without the submission of any potential alternative transactions from any of the three third-party bidders qualified under supplemental procedures previously approved by the U.S. Bankruptcy Court for

---

Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternate Sale Hearing Date, June 9, 2009, Docket No. 16907.

[10] See, e.g., Letter from Glenn E. Siegel to Honorable Robert D. Drain (June 29, 2009).

the Southern District of New York"), but have not yet disclosed the basis for this determination. The Auction that the Debtors resisted, but which this Court has insisted take place, is currently scheduled to take place on July 17, 2009, two days after the date of this First Supplemental Objection.

7.      The Debtors' assets cannot be sold to any purchaser without the DIP Lenders' consent, and they have already notified the Debtors of their rejection of the Proposed Transaction.[11] Thus, the Modified Plan and the Proposed Transaction fail as a matter of law. Further, the DIP Lenders have given notice to the Debtors and other interested parties of their intention to submit a credit bid.[12] As will be evident on July 17, 2009, the DIP Lenders' credit bid will represent a higher and better offer to Delphi. The consideration to the senior creditors of the Delphi Estate under the absolute priority rule will be greater than the consideration offered under any other proposed transaction. Moreover, the transaction the DIP Lenders will propose will have a much higher likelihood of closing than any other proposed transaction because, among other things, no other transaction has garnered the DIP Lenders' consent. Thus, the DIP Lenders' Proposed Transaction will be executable – it will have the backing of the Required Lenders – whereas the Proposed Transaction will not be susceptible of closing, either as a 363 Sale or in the context of a plan of reorganization, given the DIP Lenders refusal to consent.

---

[11]    See Notice of Rejection and Disapproval of Master Disposition Agreement By Required Lenders, dated July 14, 2009.

[12]    See Notice of Intent to Credit Bid, from JPMorgan Chase Bank, N.A., as Administrative Agent under the Credit Agreement to Delphi Corporation and the other Persons set forth on Schedule 1, July 9, 2009 ("The undersigned Administrative Agent hereby notifies you ... that the Administrative Agent (acting at the request of the Required Lenders) may (but shall not be required to by the terms of this notice) submit a credit bid in accordance with the Modification Procedures Order and the Supplemental Modification Procedures Order, without limitation of any and all other rights and remedies, on or about July 17, 2009.").

8.      The DIP Lenders of course would prefer to receive payment, in full, in cash, for their superpriority administrative claims. But in the absence of such payment and the unwillingness of GM to offer the Lenders the same potential transaction that it offered to Platinum or otherwise negotiate a reasonably acceptable transaction with them, the DIP Lenders (many of whom are themselves fiduciaries for other investors including school endowments and pension funds) have been left with no option other than to object to the Proposed Transaction and to submit a credit bid. For all the reasons previewed above, the DIP Lenders' credit bid should prevail at the auction.

9.      Nevertheless, the Collective does not now know what the outcome of the Auction will be. The Collective harbors some hope that the Debtors will conduct this auction – and themselves – properly. But if past is prologue, there is a strong likelihood that Delphi will persist in its misguided scheme of undervaluing its business so as to benefit its former parent GM and GM's hand-picked "guys in suits" (Hr'g Tr. 84:15, June 10, 2009, Docket No. 17011), while continuing to violate their fiduciary obligations to their senior-most creditors in order for the board of directors and senior management to secure releases and compensation that would not be received in a credit bid. At the same time that this First Supplemental Objection is being prepared and filed, the parties have begun discovery, and that discovery is currently ongoing and far from complete. Accordingly, the Collective submits this First Supplemental Objection as a precautionary measure and without prejudice to further supplementing or amending it depending on what happens at the Auction or its aftermath or based upon evidence developed during discovery.

10.     As will be discussed in detail below, and as demonstrated in the Collective's objections to the Debtor's Plan Modification Motion, the Modified Plan cannot be

confirmed because it is premised upon a fundamentally flawed series of transactions that strip

away the unassailable superpriority liens of secured postpetition debtor-in-possession lenders and

would divert the collateral securing those liens without the consent – and over the objections of –

those lenders.[13]  That same transaction cannot be approved even if reconfigured, as Debtors

promise to do, as a stand-alone sale under section 363 of the Bankruptcy Code.  Neither the

Modified Plan nor the 363 Sale will garner the consents required under the DIP Credit

Agreement and DIP Order and, without those consents, they are incapable of being confirmed or

implemented.  As the DIP Credit Agreement and section 1129 of the Bankruptcy Code make

clear – and as the Debtors have themselves acknowledged – the DIP Lenders have the

unconditional right to consent – or, as regards the Proposed Transaction, withhold their consent –

to the sale of their Collateral, or to take control of their Collateral through other means, including

foreclosure proceedings.  (See, e.g., DIP Order ¶¶ 7 and 13.)

11.    Therefore, the Collective objects to the Modified Plan and the 363 Sale for

the following reasons.  First, the Modified Plan violates sections 1129(a)(9), 524(e) and the

absolute priority rule of the Bankruptcy Code.  Second, the DIP Credit Agreement and this

Court's DIP Order prohibit Delphi from selling all or substantially all of its assets without the

requisite consent of the DIP Lenders, whether the sale is to be effectuated through the Modified

Plan or the 363 Sale, and the DIP Lenders have not consented.  Third, the Collective objects to

the 363 Sale because it is by design and in effect an improper *sub rosa* plan that violates the

absolute priority rule.  Fourth, the Proposed Transaction cannot be approved under section 363

---

[13]    The treatment of pre-petition lenders in the Chrysler and GM bankruptcies is not precedent here because, unlike the pre-petition creditors in those cases, the DIP Lenders here provided post-petition loans with superior protections under the Bankruptcy Code and court-approved rights, and, importantly, they are proposing a viable alternative to liquidation.

because it does not reflect an exercise of the Debtors' sound business judgment. Finally, the

Collective objects to the Modified Plan and the 363 Sale as illusory because the MDA is highly

conditional, and at least some of those conditions cannot be satisfied.[14]  For all these reasons, but

principally because without the DIP Lenders' consent the Proposed Transaction cannot be

approved, the Collective respectfully requests that the Court deny confirmation of the Plan and

withhold approval of the 363 Sale.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      **First Confirmed Plan**

12.     Delphi has been in chapter 11 since 2005.  Throughout this chapter 11

proceeding the DIP Lenders have supported the Debtors, financing their operations and allowing

the Debtors to continue to use their cash collateral even after their default under the DIP Credit

Agreement.

13.     While the Debtors' initial Plan of Reorganization was confirmed in early

2008, it was not consummated, and in recognition of the many uncertainties surrounding the

viability of the Debtors' Plan, the Court reserved to itself the right to revoke the Confirmation

Order.  (See Hr'g Tr., 45, 67-68, Jan. 17, 2008, Docket No. 12476.)

B.      **DIP Credit and Security Agreements; DIP Financing Order**

14.     The Debtors' inability to consummate the Confirmed Plan required that

they amend their then-existing debtor-in-possession credit facility.  The DIP facility at that time

included a first priority revolving loan and letter of credit facility ($1.75 billion) ("Tranche A"),

---

[14]      The Collective incorporates by reference the objections made in its Modification Motion Objection (Docket
No. 16903).

a first-priority term loan ($250 million) ("Tranche B") and a second-priority term loan (approximately $2.496 billion) ("Tranche C").

15.    On or about May 9, 2008, the Debtors amended the existing facility, entering into the DIP Credit Agreement. Under the DIP Credit Agreement, the three Tranches were modified: The Total Tranche A Commitments decreased to $1.1 billion (from $1.75 billion), the Total Tranche B Commitments increased to $500 million (from $250 million), and the Total Tranche C Commitments increased by an additional $250 million to $2.75 billion (from approximately $2.496 billion). The lenders in each Tranche are defined in the Credit Agreement as the "Tranche A Lenders," the "Tranche B Lenders" and the "Tranche C Lenders," respectively (collectively, the "Lenders," and each, a "Lender").

16.    The Debtors used the proceeds of the Tranche A Loans and Tranche B Loans to refinance their existing DIP facility and for working capital and other general corporate purposes. The Debtors used the proceeds of the Tranche C Loans to refinance the indebtedness under their secured pre-petition facility dated as of June 14, 2005, thereby saving as much as $8 million per month in financing costs.[15] Although some of the Tranche C Lenders were lenders under the pre-petition facility, over half of the Tranche C Loans were provided by DIP Lenders who were not pre-petition lenders or represent increases in exposure by pre-petition lenders who provided capital to the Debtors in amounts exceeding their previously outstanding pre-petition loans.[16]

---

[15]    Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors to Obtain Postpetition Financing and (II) Authorizing Debtors to Refinance Secured Postpetition Financing and Prepetition Secured Debt ¶ 14 (Docket No. 6180).

[16]    See Objection of JPMorgan Chase Bank, N.A. to the Debtors' Supplement to Plan Modification Approval Motion, June 9, 2009, Docket No. 16897; ¶ 2.

17.    Each Lender also is a "Secured Party" under the related Security and Pledge Agreement (as amended, the "Security Agreement") pursuant to which the Debtors pledged virtually all their tangible and intangible assets (the "Collateral") to secure their obligations under the DIP Credit Agreement.

18.    The DIP Credit Agreement provided for significant benefits to the Debtors, extending to them $3.25 billion in principal (not including accrued interest) at a time when turbulence in the capital markets prevented them from obtaining financing through normal channels. In return, the DIP Lenders were granted perfected superpriority liens on substantially all assets of the Debtors under the DIP Credit Agreement, the Security Agreement and the DIP Order, as well as allowed administrative expense claims superior to all but certain specified administrative expense categories under the DIP Order.

(1).    **DIP Credit Agreement**

19.    Section 7.01 of the DIP Credit Agreement provides that following an Event of Default, "at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court, *the Administrative Agent may, and at the request of the Required Lenders, shall, . . .take one or more of the following actions...(v) exercise any and all remedies under the Loan Documents and under applicable law* available to the Administrative Agent and the Lenders." (§ 7.01) (emphasis added).

20.    Under Section 7.01 of the DIP Credit Agreement, the Administrative Agent is bound to act at the request of the Required Lenders to, among other things, exercise any and all remedies and has no discretion to disregard a valid direction to do so.

- 11 -

21.     Under the DIP Credit Agreement, each of the "Lenders . . . irrevocably appoints each Agent[17] as its agent and authorizes such Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms hereof, *together with such actions and powers as are reasonably incidental thereto*." (§ 8.01) (emphasis added).

22.     Under the DIP Credit Agreement, the Lenders' remedies *are not exclusive*. (See § 10.07 ("No failure on the part of the Administrative Agent or any of the Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy. *All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law*.") (emphasis added.)

(2).     **Security Agreement**

23.     The Security Agreement provides, in part, that:

> If any Event of Default shall have occurred and be continuing . . . (a) [t]he Agent may exercise in respect of the Collateral, *in addition to other rights and remedies provided for herein or otherwise available to it*, and without application to or order of the Bankruptcy Court, *all the rights and remedies of a secured party on default under the Uniform Commercial Code* and also may . . . (ii) without notice except as provided in the following sentence, *sell the Collateral or any part thereof in one or one or more parcels at public or private sale*, at any of the Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices upon such other terms as the Agent may deem commercially reasonable . . .. The Agent may adjourn any public or private sale from time to time by announcement at the time or place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(§15(a)) (emphasis added).

---

[17]     "Agent" is defined to include the Administrative Agent. See Credit Agreement at § 1.01 ("Agents" definition).

(3).    **DIP Order**

24.    The DIP Order grants the Lenders superpriority claims (over all other

administrative expenses (with certain limited exceptions)) and first priority liens on all the

Debtors' assets (with certain limited exceptions).  (See DIP Order ¶ 5 ("Pursuant to section

364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims

against the Debtors with priority over any and all administrative expenses . . . and all other

claims against the Debtors, now existing or hereinafter arising, of any kind whatsoever"); id. ¶ 6

(granting first priority liens pursuant to sections 364(c)(2), 364(d)(1) and 364(c)(3) of the

Bankruptcy Code).)

25.    Paragraph 7(b) of the DIP Order further provides, with respect to defaults,

that:

> The automatic stay provisions of section 362 of the Bankruptcy Code are vacated
> and modified to the extent necessary to permit the Agent and the DIP Lenders to
> exercise, (i) immediately upon the occurrence of an Event of Default, all rights
> and remedies under the DIP Documents other than those rights and remedies
> against the Collateral as provided in clause (ii) below, and (ii) upon the
> occurrence and during the continuance of an Event of Default and the giving of
> five business days prior written notice to the extent provided for in the DIP Credit
> Agreement (promptly upon receipt of such notice, the Debtors shall provide a
> copy of such notice to counsel for the Creditors' Committee), all rights and
> remedies against the Collateral provided for in the DIP Documents (including,
> without limitation, the right to setoff monies of the Debtors in accounts
> maintained with the Agent or any DIP Lender).

26.    Additionally, Paragraph 13(d) of the DIP Order states that the DIP Liens,

Superpriority Claims and other rights and remedies of the DIP Lenders shall survive and cannot

be impaired by any act or omission until paid in full.

27.    The DIP Credit Agreement, the Security Agreement and the DIP Order

enable the Required Lenders to direct the Administrative Agent to exercise remedies following a

default, and those remedies include credit bidding as authorized pursuant to section 363(k) of the Bankruptcy Code.[18]

C.    **Accommodation Agreement**

28.    On October 3, 2008, the Debtors moved to modify and re-solicit the First Confirmed Plan (the "First Plan Modification Approval Motion").  The modifications to the First Confirmed Plan (the "Proposed Second Plan"), among other things, addressed the reduced enterprise value ascribed to the reorganized company and the resulting diminution in creditor recoveries.[19]  According to the Debtors, however, "the lack of available credit in the credit markets" prevented them from securing the necessary emergence capital to pursue confirmation of the Proposed Second Plan.

29.    The DIP Credit Agreement initially matured on December 31, 2008.  Unable to implement the Proposed Second Plan, and facing the December 31, 2008 Maturity Date, the Debtors asked the Lenders to consent to an extension of the Maturity Date.  The Unanimous Lender consent required under the DIP Credit Agreement for Maturity Date extensions, however, was not in prospect.[20]

---

[18]    Section 363(k) of the Bankruptcy Code provides that '[a]t a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

[19]    Delphi filed a hypothetical liquidation analyses with the Bankruptcy Court on December 10, 2007 and on October 3, 2008.  These analyses assumed a consensual liquidation that would provide sufficient funding to wind-down the U.S. operations, resource customer business and sell the foreign operations in an orderly manner.  Both of these analyses presented a 100% recovery for all secured claims.

[20]    See DIP Credit Agreement (§ 10.09(a)) ("No modification, amendment or waiver of any provision of this Agreement ... shall in any event be effective unless the same shall be in writing and signed by the Required Lenders....*provided, however, that no such modification or amendment shall without the written consent of ....(ii) the Lender affected thereby ....(B) ...extend the final maturity of the Borrower's obligations hereunder....*") (emphasis added).

30.     Unable to obtain unanimous, DIP Lender support for a Maturity Date extension, the Debtors instead pursued an "accommodation agreement" with the support only of the Required Lenders, specifically the Accommodation Agreement, dated as December 12, 2008, by and among, <u>inter alia</u>, Delphi and JPMorgan Chase Bank, N.A. as administrative agent (the "Accommodation Agreement").

31.     Under the Accommodation Agreement as originally executed, (a) the Debtors conceded that an Event of Default would occur by virtue of the passing Maturity Date but (b) the Participant Lenders (as defined therein) agreed to forbear from, <u>inter alia</u>, directing the Administrative Agent to exercise remedies in light of the default and taking any action with respect to the Collateral through a specified period of time (initially through May 5, 2009) (hereinafter, the "Accommodation Period").

32.     Under the Accommodation Agreement, following termination of the Accommodation Period, the Administrative Agent could exercise remedies and foreclose against Collateral.  (<u>See</u> § 2(c) ("[t]he Administrative Agent and the Participant Lenders may at any time thereafter proceed to exercise any and all of their respective rights and remedies under any or all of the Loan Documents and/or applicable law, including, without limitation, their respective rights and remedies in connection with any or all of the defaults and Events of Default").)

33.     Certain of the Tranche C Lenders opposed the Accommodation Agreement, arguing it effectuated an extension of the DIP Loan's maturity and therefore was an "end-run" around the requirement that Maturity Date extensions require unanimous Lender consent.  The Court overruled their objection and approved the Accommodation Agreement on December 3, 2008.  The Court found, among other things, that under the DIP Credit Agreement, the Required Lenders possessed the sole ability to direct the Administrative Agent to exercise

remedies and that absent such a direction, Lenders other than the Required Lenders have little or

no recourse.[21]

34.    As of the date hereof, the Debtors have executed 13 different amendments

to the Accommodation Agreement which, among other things, extended the expiration date for

the Accommodation Period through and including July 15, 2009.

### D.    The DIP Lenders' Concessions Before and During the Accommodation Period

35.    The DIP Lenders have made many concessions to help Delphi emerge

from chapter 11. These have included, among others:  (i) extending the Maturity Date of the DIP

Credit Agreement; (ii) agreeing through the Accommodation Agreement to forbear from

exercising remedies even after the maturity of the indebtedness and Delphi's default in repaying

their loans; (iii) allowing Delphi to continue to use their cash collateral to continue operations,

thereby ensuring an uninterrupted supply of product to GM and the Debtors' other customers;

and (iv) agreeing to numerous extensions of the Accommodation Period.

36.    Delphi has taken advantage of these concessions by, among other things,

using the DIP Lenders' cash collateral to finance their operations.  In fact, in just the period

between December 8, 2008 and today, the Debtors have spent over $1.0 billion of operating cash

---

[21]    See Hr'g Tr. 154:7-156:15, Dec. 1, 2008, Docket No. 14582 ("I believe that under New York law, having been given the right that I just quoted [under section 7.01 of the Credit Agreement to 'exercise any and all remedies under the loan documents and under applicable law], the administrative agent, in its discretion and mandatorily at the request of the 'required lenders,' has the right to exercise such remedies or forbear in respect of such remedies, as a matter of contract under the DIP credit agreement, which, I believe, is what it is doing, having been so instructed, in the accommodation agreement. The objectors contend that, given the anticipated maturity of the loans at the end of this month, they individually have the right to act to enforce Delphi's payment obligation, but I conclude that the agreement itself does not provide them with that right. And, under New York law, the remedy provision of the agreement provides, instead, that right to be exercised by the agent, either in its discretion or at the direction of the required lenders.... It also appears to me that, having been accorded the right to exercise remedies, including in respect of a default of payment on the maturity date, the agent, at the direction of the required lenders, also has the authority either to compromise or forbear in respect of those remedies, except as expressly precluded by the agreement, and that the forbearance here is not expressly precluded by the agreement.").

flows to support their U.S. operations, including the supply of critical component parts on uneconomic terms to GM.

37.    The Collective has also provided significant assistance to the Debtors. The Collective has been instrumental in obtaining support for the Debtors' requests to extend the Accommodation Period. And, as discussed below, the Collective's automotive industry consultants have assisted Delphi in convincing the U.S. Treasury's (the "UST") Auto Task Force that Delphi is integral to GM's successful reorganization.

E.    **Delphi's Abandonment of Its Fiduciary Obligations Toward the DIP Lenders**

38.    With these concessions and assistance, Delphi had the so-called "liquidity runway" it repeatedly told the Court it needs to reach a consensual resolution of its chapter 11 case. The events of recent months demonstrate, however, that Delphi has squandered, perhaps irretrievably, the opportunity the DIP Lenders afforded it to obtain a successful outcome in this case. Rather than using the Accommodation Period to maximize its value as an independent player in the global automotive market, and bring together its DIP Lenders, GM and the UST in a consensual deal, Delphi has burned through more than $160 million of operating cash per month over the past six months and remains locked in a death-embrace with GM. These events have highlighted as well the extent to which Delphi's management and board have sacrificed their independence, becoming mere tools of GM and the UST, and in the process losing sight of their paramount fiduciary duties to their secured creditors.

39.    It did not have to be this way. At the time the Accommodation Agreement was entered into, Delphi claimed to be close to agreeing with GM on a **global** transaction that would maximize the value of the estate, fulfill its duties to the DIP Lenders as Delphi's fulcrum creditors, and ultimately emerge from chapter 11. The DIP Lenders – even those who opposed

- 17 -

the Accommodation Agreement – were ready, willing and able to support Delphi in attaining this goal.

### (1).    **The Steering Motion**

40.    A first indication Delphi was not committed to reaching a mutually acceptable resolution with its DIP Lenders was the Steering Motion. This motion, filed without warning on March 4, 2009, purported to permit GM to exercise prematurely its option to buy the Global Steering Business, on the basis of a claim that Platinum had elected not to close on its existing agreement to purchase that business. Delphi at this time represented to the Court that a term sheet reflecting a global agreement with GM was just days away.[22]

41.    The Collective objected to the Steering Motion. It argued that Steering was critical to GM's operations and should not be given away to GM except as part of a global deal where its value to GM could be realized. The Collective also noted the absence of any discernible effort to re-market Steering after Platinum mysteriously backed away from the deal.[23]

42.    Delphi ultimately did not go forward with the Steering Motion. On the strength of its $ 50 billion investment in GM, the UST announced, on the eve of the hearing, that it would not consent to GM's purchase of the Global Steering Business, nor would it allow GM to increase its existing funding commitment to Delphi.[24] The UST's lawyers said at the hearing

---

[22]    See Debtors' Motion for Order Under 11 U.S.C. § 363 and Fed R. Bankr. P. 6004 Authorizing and Approving Option Exercise Agreement with General Motors Corporation, Mar. 4, 2009, ¶ 31, Docket No. 16410.

[23]    See Limited Objection of the Tranche C Collective to Debtors' Motion for Order Under 11 U.S.C. § 363 and Fed R. Bankr. P. 6004 Authorizing and Approving Option Exercise Agreement with General Motors Corporation, Mar. 20, 2009, Docket No. 16492.

[24]    Letter from John J. Rapisardi to Jeffrey L. Tanenbaum (March 23, 2009) ("By this letter, I write to inform you that the UST likewise objects to the agreement between GM and Delphi to sell Delphi's steering business to GM, an objection that the UST will reconsider upon further review of the terms of the transaction.")

- 18 -

that the Auto Task Force needed more time to get up to speed on the Delphi-GM relationship and

expressed a preference for addressing these matters as part of an overall resolution of Delphi's

chapter 11 proceedings. (See Hr'g Tr. at 20:9, Apr. 2, 2009, Docket No. 16579).

### (2).    The UST Intervenes; Delphi Purports to Play the Role of An "Honest Broker"

43.    The UST's intervention dramatically altered the direction of the case –

unfortunately not for the better. Whereas before there were reasonable prospects of negotiations

among Delphi, GM and the DIP Lenders toward a mutually satisfactory resolution, the UST's

intervention chilled such negotiations. On the basis of purported ethical constraints on two

advisors to the UST Auto Task Force – Matt Feldman and Harry Wilson – the UST steadfastly

refused to engage in any substantive way with the DIP Lenders either in private discussions or in

the mediation that this Court ordered. That absolute refusal by the UST to engage with the DIP

Lenders – even with those lenders as to whom the two advisers' ethical constraints do not apply

– has continued to this day.[25]

44.    Faced with a situation in which they could not deal directly with the UST,

and therefore not GM, the DIP Lenders reluctantly went along with Delphi's claim that it had

been asked by the UST and GM to act as intermediary between them and the DIP Lenders. With

little choice, the DIP Lenders allowed this process to play itself out. In the meantime, the

Collective's automotive consultants – OHorizons LLC[26] – assisted Delphi in making the case to

the UST Auto Task Force representatives that Delphi was so critically integral to GM's ability to

manufacture cars that it would be catastrophically costly to GM to try to re-source the many

---

[25]    See Letter from Josh Gotbaum (an advisor to Silver Point Capital) to Ron Bloom, (Senior Advisor, UST Auto Task Force), (July 10, 2009.

[26]    OHorizons LLC is a global strategic investment and operational advisory firm, specializing in automotive industry consulting.

thousands of components Delphi supplies to GM on a worldwide basis. The point was that this

dependence upon Delphi was of significant value to GM, which value should be reflected in any

transaction between GM and Delphi.

(3).    **The HLA**

45.    Delphi proved, however, not to be an "honest broker." This became

crystal clear when the Debtors released a "Hypothetical Liquidation Analysis" (the "HLA"),

which posited an unreliable and counter-factual liquidation value for Delphi's assets. The

HLA's shockingly low liquidation values are based on an unrealistic "cold shutdown" of the

entire North American automotive industry – that is, the notion that GM would shutdown its

North American facilities rather than negotiate a fair price for the Delphi facilities it needs to

continue manufacturing cars and trucks, and that Delphi would be forced to discontinue

operations, permanently shut down its North American facilities, and dispose of its assets

piecemeal in a fire-sale liquidation process.

46.    This methodology differed from what Delphi used in its prior liquidation

analyses in December 2007 and October 2008. Delphi's HLA was also at odds with every other

supplier bankruptcy, where the OEMs work with, not against, their suppliers to ensure continuity

of supply and a non-disruptive wind-down of operations. It was contrary to what Delphi – with

OHorizons' LLC assistance – had previously shown the UST Auto Task Force was GM's

dependence upon Delphi.[27] Any remaining foundation for the assumption disappeared when the

---

[27]    GM recently filed a motion in its chapter 11 proceeding seeking authority to proceed with the MDA.
There, GM confirms everything OHorizons LLC has told Delphi and the UST, as these excerpts attest:

• "GM and Delphi have a complex history arising from their interdependent relationship. ... Since
the spin-off, Delphi has been, and continues to be, GM's largest component parts supplier,
accounting for approximately 11.3% of GM's North American purchases and 9.6% of GM's
global purchases in 2008. Delphi is a sole-source, just-in-time supplier of many critical parts to
GM, *including parts that are used in essentially every GM product line in North America.*"
(Motion of Debtors [GM] for Entry of Order Approving (I) Master Disposition Agreement for

UAW later prematurely announced that GM would be acquiring the UAW Keepsites and the Global Steering Business. Clearly, given the extent to which GM relies on Delphi (see, e.g., fn 27), it is patently absurd to assume that GM – or the UST – would play Russian roulette with GM's business survival instead of paying fair value for assets it unquestionably covets. But that is precisely what Delphi did, and it was wrong in doing so.

47.    Delphi then compounded its perfidy by disclosing to the UST and to GM the position that, if a negotiated settlement were not reached with the DIP Lenders, it viewed the liquidation values generated by its HLA, which just happened to coincide with perceptions of the Tranche C's market value, as the ceiling on any recovery by the DIP Lenders. Delphi thereby chose sides and un-leveled the playing field, to the decided advantage of GM and the UST and to the detriment of its secured lenders.

---

Purchase of Certain Assets of Delphi Corporation, (II) Related Agreements, (III) Assumption and Assignment of Executory Contracts, (IV) Agreement with Pension Benefit Guaranty Corporation, and (IV) Entry into Alternative Transaction in Lieu Thereof ("GM Motion to Approve MDA"), 09-50026, Bankr. S.D.N.Y., June 20, 2009, ¶ 4, Docket No. 2096.

- "[S]ince the spin-off, GM has been, and continues to be, Delphi's largest customer. . . . Thousands of Delphi's employees work at plants whose production is primarily dedicated to production for GM or GM's suppliers." (Id. ¶ 5.)

- "Consistent with industry practice, GM operates on a 'just-in-time' inventory delivery system. . . . Because GM operates on a just-in-time inventory delivery system, it generally maintains little or no inventory of parts on site, and relies instead upon frequent and regular shipments of parts from its suppliers, including Delphi. *Consequently, if Delphi ever ceases shipping even a small fraction of production parts to GM, the GM plants relying on such shipments may run out of inventory of such parts and have to shut down within a matter of days.*" (Id. ¶ 6.)

- "*Most parts that Delphi manufactures for GM are not readily available from an alternate source due to, among other things, capacity issues within the automotive parts supply industry, the length of time it takes to validate and obtain safety regulatory approval of a new supplier's parts, and lead time to develop and build tools for manufacture.* While GM can accelerate efforts to resource Delphi's parts in the event of a supply interruption, the sheer magnitude of the parts to be resourced and revalidation required would take at least several months." (Id. ¶ 7.)

- "The shutdown of GM plants as a result of termination of deliveries of affected parts from Delphi could idle tens of thousands of GM workers, and it is estimated that GM's revenues would decrease significantly." (Id. ¶ 8.)

(4).    **The ALA**

48.    In response to the Debtor's HLA, both the DIP Agent's financial

consultants (The Blackstone Group and Alvarez & Marsal) and OHorizons LLC prepared

separate alternative liquidation analyses of Delphi.  The ALAs were premised on historical

automotive precedents where various stakeholders would act rationally to effectuate a consensual

liquidation that avoids significant costs, eliminates unnecessary product/consumer risk and

achieves the most economic outcome, instead of on a cold shut-down.  The ALAs also ascribed

value absent from the HLA, such as recognizing the value in Delphi's Rest of the World

segment, which value Delphi itself later acknowledged existed.

49.    Each of these analyses demonstrated (on an assumed liquidation basis)

that the value of the Estates' assets can be maximized through an orderly wind-down and sales

process through which GM could obtain the assets it needs while Delphi has sufficient capital to

restructure, operate or sell its remaining businesses, and thereby provide the DIP Lenders with a

substantially greater recovery than that postulated in the HLA.

50.    Although each of these analyses was presented to Delphi's Board of

Directors, Delphi has, in continuing to advocate for the Proposed Transaction, elected to ignore

the conclusions advanced by well-respected industry specialists.

F.    **The Court Orders the Parties to Mediation**

51.    Continuing to rely on Delphi as their intermediary in trying to negotiate

with the UST and GM proved to be impossible.  Rather than facilitating negotiations, Delphi

was, through the HLA and other actions, putting its thumb on the scales to tip the balance against

the DIP Lenders.  Accordingly, the DIP Lenders requested that the Court appoint a mediator to

assist the parties in negotiating a fair and equitable settlement.  By an Order dated May 20, 2009,

the Court appointed the Honorable Cecilia Morris as mediator and directed the parties to participate in the mediation effort.

52.    Judge Morris presided over mediation sessions in Poughkeepsie, New York commencing on May 26, 2009, and later in New York. Again, however, the DIP Lenders' ability to engage directly with the UST and GM was frustrated by the UST's refusal to meet with the DIP Lenders or even to appoint representatives who were conflict-free for that purpose. Despite Judge Morris's best efforts, and for reasons discussed below, the mediation was not successful.

G.    **The Plan Modification Motion**

53.    While mediation was ongoing, the Debtors filed their Plan Modification Motion on June 1, 2009, seeking to schedule a hearing on the Modified Plan and related disclosures and voting procedures, and seeking an alternative sale hearing date to consider the Proposed Transaction. While the parties were supposed to be engaged in mediation, Delphi was secretly negotiating the sale (by means of an artificially integrated MDA) of substantially all of its productive assets to the GM Buyers and Parnassus for shockingly low value in exchange for their assumption of specified liabilities and certain other consideration.[28] Even worse, as

---

[28]    Specifically, Delphi proposed to sell to the GM Buyers the Global Steering Business and the UAW Keep Sites, proceeds from the sale of the brakes and suspension and exhaust businesses, and rights relating to Delphi's lawsuit against Appaloosa Management L.P. In exchange for these and certain other assets, the GM Buyers will (i) pay Delphi $291,020,079 in cash, certain fees under the DIP Agreement and 50% of the chapter 11 administrative claims to be paid by Delphi's filing affiliates, (ii) pay accrued and unpaid interest and outstanding principal amounts of the Tranche A Loans and Tranche B Loans, (iii) waive its pre-petition, administrative and future bankruptcy claims, and (iv) assume certain liabilities relating to the acquired assets, including cure amounts for pre-petition contracts assumed by the GM Buyers. The MDA also provides that most of Delphi's remaining assets – including the extremely valuable non-U.S. ("RoW") businesses – will be sold to Parnassus for a purchase price consisting primarily of a Class C membership interest in Parnassus in the nominal amount of $145.5 million, with an annual 8% cash dividend and subject to mandatory redemption ten years after issuance. Parnassus also agrees to assume certain liabilities relating to the acquired assets, including cure amounts for pre-petition contracts assumed by Parnassus, and specified director, officer and employee related liabilities, including employment and incentive agreements for eligible executives, indemnification obligations with respect to current and former directors, officers

Platinum's counsel later acknowledged in open court (see ¶ 5, supra), it was Delphi that insisted that the Proposed Transaction be a private sale under section 363 of the Bankruptcy Code. Rather than encouraging an open auction process, Delphi structured the transaction to try to prevent the consideration of higher or better offers, and in such a way as to ensure that its senior management and board were taken care of through an assumption of specified director, officer and employee related liabilities, including employment and incentive agreements for eligible executives, indemnification obligations with respect to current and former directors, officers and executives and the obligation to maintain D & O insurance.

54.    The Collective, along with all major parties to the case except for the Debtors, GM and the UST, objected to the Debtors' Modified Plan. The Collective argued, among other things, that Delphi should not be permitted to pursue a plan or private 363 sale because neither would satisfy the superpriority liens of the DIP Lenders. Instead, the Collective argued, the Court should instead institute procedures for competitive bids for the Debtors' assets.

55.    The Court agreed that a sale of substantially all of the Debtors' assets should be exposed to the light of a competitive process, and subsequently, on June 16, 2009, entered the Modification Procedures Order and Supplemental Procedures, outlining a mechanism designed to maximize the value of the Debtors' assets through a plan or, in the alternative, a 363 sale. The Court further clarified this Order on June 29, 2009.

H.    **Bidding Procedures and Due Diligence**

56.    Following the June 10th hearing on the Plan Modification Motion in which this Court directed the Debtors to open up the sale process and to work with the DIP

---

and executives and the obligation to maintain D & O insurance. Certain other assets and liabilities will remain with Delphi.

Lenders to craft appropriate sale procedures, the DIP Lenders attempted to engage in a cooperative process with the Debtors. Despite repeated requests to be involved in the drafting of the sale procedures, the Debtors refused to include the DIP Lenders and only provided them with the "courtesy" of reviewing the procedures at the same time they were submitted to the Court.[29] The Supplemental Procedures were not entered by motion and the DIP Lenders did not have an opportunity to submit a formal objection to the Procedures.[30] Because the DIP Lenders did not have this opportunity, the DIP Lenders and Debtors debated for weeks over the import of various provisions in the Procedures including Paragraph 46 of the Procedures, which provided that the DIP Lenders waived their right to object to the auction result in the event they even considered submitting an alternative transaction. Because of the dispute over the interpretation of this provision, the DIP Lenders could not submit NDAs and were delayed from receiving necessary due diligence for weeks. The Administrative Agent, with the support of the DIP Lenders, sought clarification on the effect of these Procedures and procedures which specifically addressed how a credit bid would be submitted and considered. Had the Debtors included the DIP Lenders in the process from the beginning, these delays could have been avoided.

57.    The Court held a Chambers Conference on June 25 to discuss the Agent's Order to Show Cause and Motion for Credit Bid Procedures. During this Conference, this Court

---

[29]    See, e.g., email from John Butler to Donald Bernstein (June 12, 2009).

[30]    On June 16, the Elliot Funds' counsel requested a chambers conference on the form of the NDA and the modifications necessary to comport with this Court's statements at the June 10th hearing. Specifically, the DIP Lenders sought to remove the ethical wall barriers that were unnecessary and to make it possible for DIP Lenders to speak to each other and financing sources about a credit bid. Debtors asked the court not to hold a chambers conference while they negotiated the provisions of the NDA with the DIP Lenders stating that "Delphi heard Your Honor's guidance and is working towards agreeing to further modifications of the standard NDA in an effort to accommodate" the DIP Lenders. See email from John Butler to Honorable Robert D. Drain (June 16, 2009). The Court held a Chambers' Conference and made it clear that the only information that required an ethical wall between DIP Lenders receiving information under the Protective Order and the NDA was limited to Platinum and Delphi's internal analyses of the consideration being provided under the MDA.

made it clear that Paragraph 46 did not apply to "Pure Credit Bids" and outlined the characteristics of qualifications for a pure credit bid. The Court's clarification made it possible for the DIP Lenders to participate in the sale process without waiving their contractual and court-approved rights and provided the clarity the DIP Lenders had been seeking from the Debtors for weeks.

58.    Certain DIP Lenders signed NDAs following this conference and expected to obtain access to the due diligence necessary to form a bid that was due in three weeks. Unfortunately, they were met with more delays and unnecessary obstacles in the form of missing MDA schedules and exhibits, restrictions on access to highly confidential information, and sparsely populated and disorganized data rooms that lacked both a functional index and many material contracts. Of the documents provided, descriptive titles and filenames were missing. On June 29, the Elliott Funds' counsel wrote the Court addressing these due diligence impediments and seeking the Court's assistance in removing these barriers.[31] In the hearing on July 1, this Court directed the Debtors to conduct this auction as a public sale and to ensure that their advisors are available to meet with the DIP Lenders' due diligence teams and provide them with information on material contracts and intercompany agreements and leases. (Hr'g Tr. 73:8-75:15 July 1, 2009 Hearing, Docket No. 19260.) Despite this instruction by the Court, the Debtors' delay in providing access to information has made it extremely difficult for the DIP Lenders to exercise their rights under the Bankruptcy Code to credit bid on the assets they own. The Collective is playing by the rules set by the Court and intends to participate via its credit bid in the Auction.

---

[31]    See, e.g., Letter from Glenn E. Siegel to Honorable Robert D. Drain (June 29, 2009),

I.     **The First Amendment to the MDA**

59.     On July 2, 2009, the Debtors filed the First Amendment to the MDA
which contains amendments that become effective "if and when" the Court conducts a hearing
on the sale of the Debtors' assets and enters a section 363 sale order, instead of approving the
MDA as a plan modification. (Exhibit A to Notice of Section 363 Implementation Agreement in
Accordance with First Amended Joint Plan of Reorganization of Delphi Corporation and Certain
Affiliates, Debtors and Debtors-In-Possession (As Modified) and Master Disposition Agreement,
Docket No. 19022, § 3.) In the event this Court approves the Proposed Transaction pursuant to a
section 363 sale order, the MDA will be modified by a section 363 implementation agreement
("363 Implementation Agreement") without further action by any of the parties, while the
structure of the MDA will remain intact.[32]

60.     Importantly, the First Amendment provides for broad releases between
Delphi and Parnassus (and their affiliates and related parties) from all liabilities related to (i) the
Chapter 11 cases; and (ii) the formulation, negotiation, confirmation and consummation of
Delphi's Plan of Reorganization, Disclosure Statement, MDA and related agreements. (See First
Amendment § 9.44.) These releases cover current and future claims brought by related parties
and other parties legally entitled to assert claims on their behalf. By including such self-serving
releases – in which Delphi and Parnassus indemnify each other for their actions specifically
related to the negotiation and consummation of the MDA – the Debtors further evidence their
failure to discharge their fiduciary duties in good faith.

---

[32]     In addition to modifying the MDA to account for the sale of the assets pursuant to a section 363 sale order
rather than a Plan Modification Order, the amendment includes minor changes such as the acquisition by
Parnassus of additional assets -- for example, pending transactions (other than the sale of the brakes and
suspension and exhaust businesses), filing affiliate receivables, tax refunds and returns and bankruptcy
rights.

61.     Accordingly, the Collective now lodges the following objections to

confirmation of Debtors' Modified Plan and 363 Sale.

## SUPPLEMENTAL OBJECTION

### I. THE MODIFIED PLAN VIOLATES THE COLLECTIVE'S RIGHTS UNDER THE BANKRUPTCY CODE.

#### A.     The Modified Plan Violates Section 1129(a)(9) Of The Bankruptcy Code

62.     Under section 1129(a)(9) of the Bankruptcy Code, a plan cannot be

confirmed unless all administrative expense priority claims are paid in cash, in full, unless such

claimholders agree to different treatment. See 11 U.S.C. § 1129(a)(9)(A). The DIP lenders have

"administrative and superpriority claims and superpriority liens and, accordingly, the right to

avoid having their claims subjected to compromise without their consent under a chapter 11 plan

of reorganization." (Debtors' Omnibus Reply ¶ 9.) However, under the Modified Plan, the DIP

Lenders' administrative expense priority claims will not be paid in cash, in full. The Required

Lenders will not consent to – and in fact have rejected – such treatment.[33] Therefore, pursuant to

sections 1129(a)(9) of the Bankruptcy Code, the Modified Plan cannot be confirmed.

63.     Section 7.8 of the Modified Plan seeks to circumvent section 1129 (a)(9)

by providing that the proposed transaction will be affected through a transfer of the Transferred

Assets (as defined in the Modified Plan) under the DIP Credit Agreement to the DIP Agent and

that such transfer will be deemed a consensual foreclosure in full satisfaction of the DIP Claims.

This provision either reflects the Debtors' naïve belief that they could persuade the Required

Lenders under the DIP Credit Agreement to accept a wholly unreasonable and unfair transaction,

---

[33]     See Notice of Rejection and Disapproval of Master Disposition Agreement By Required Lenders, dated July 14, 2009 ("Notice of Rejection").

or an attempt by the Debtors to side-step the DIP Credit Agreement in violation of the DIP Lenders' rights. In either case, the DIP Lenders do not consent to the foreclosure, nor have they directed the Agent to foreclose on the assets in furtherance of the Proposed Transaction. The Court cannot order such foreclosure to go forward, nor can it order the waiver of the DIP Lenders' residual claims, without the consent of the Required Lenders. See 11 U.S.C. § 1129(a)(9)(A). Accordingly, section 7.8 of the Modified Plan does not comport with section 1129's requirements.

64.     Perhaps the Debtors will argue that the Lenders are somehow deemed to consent under the Modified Plan. That argument would be unavailing – under no circumstance have the Lenders consented to the foreclosure contemplated by the Modified Plan or their treatment therein. As postpetition lenders, the DIP Lenders are not afforded the right to accept or reject the plan – instead, they are protected by, and are required to be paid in full pursuant to, section 1129 of the Bankruptcy Code. To allow the DIP Lenders' rights to be abrogated without their consent is a clear violation of this provision, and cannot be permitted.

B.     **The Modified Plan Violates the Absolute Priority Rule Of The Bankruptcy Code.**

65.     Not only will the DIP Lenders not be paid in full under the Modified Plan, but general unsecured creditors will be receiving distributions under it. Specifically, the Modified Plan contemplates paying amounts to junior creditors and transferring valuable assets to third parties favored by the Debtors, GM and the Auto Task Force, while the DIP Lenders – holding not only secured, but court-approved postpetition superpriority claims – are to receive

mere pennies on the dollar.[34]  As such, the Modified Plan represents a clear violation of the

absolute priority rule.

66.    Additionally, the sale under the Modified Plan has been structured so that

GM and Parnassus are providing as consideration for the assets they are purchasing non-

operating administrative liabilities (see MDA §§ 3.1.1.G and 3.2.4) and Parnassus is assuming

non-operating "Specified Director, Officer and Employee Related Liabilities," which includes

indemnification rights for senior management and the board.[35]  Under the absolute priority rule

and the DIP Order, the senior secured claims of the DIP Lenders must be satisfied in full before

other stakeholders can receive proceeds from the sale.  (See, e.g., DIP Order ¶ 13(a).)  By asking

this Court to consider GM's or Parnassus's assumption of certain extraordinary liabilities as

value being given to the Estate, the Debtors are violating the absolute priority rule as they self-

deal.

C.    **The Releases Contemplated By The Modified Plan Violate
Section 524(e) Of The Bankruptcy Code.**

67.    Section 524(e) of the Bankruptcy Code provides that, "except as provided

by subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability

of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).

Non-debtor releases are appropriate only in rare cases upon a finding of truly unusual

circumstances that render the release critical to the success of the plan.  See Deutsche Bank AG

---

[34]    At the July 1, 2009 hearing on the Platinum Expense Reimbursement Motion, counsel for Platinum
admitted that billions of dollars of what he claimed is consideration being "provided" as part of the MDA
are "not going in their [the DIP Lenders'] pockets."  (Hr'g Tr. 51:5-14, July 1, 2009, Docket No. 19260).

[35]    Notably, this Court recognized in the hearing on the Platinum Expense Reimbursement Motion and in the
Supplemental Modification Procedures Order that the assumption of certain liabilities is not consideration
that should be valued in deciding the "highest and best" bid.  (Hr'g Tr. 51:4-54:10, July 1, 2009, Docket
No. 19260; Supplemental Modification Procedures Order, Docket No. 18840, ¶ 5.)

v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141-43

(2d Cir. 2005); In re Transit Group, Inc., 286 B.R. 811, 820 (Bankr. M.D. Fla. 2002) ("Non-

debtor releases are extraordinary and should be reserved for unusual circumstances. These types

of requests seeking to insulate the debtor's officers and directors should not be routinely included

in every Chapter 11 plan of reorganization filed by a corporation. The debtor has failed to

establish that the non-debtor release as to current officers is necessary or fair.").

      68.    In seeking to discharge non-debtors, it is the debtor's burden to

demonstrate that unusual circumstances exist that justify such protections. See In re Metromedia

Fiber Network, Inc., 416 F.3d at 142 ("No case has tolerated nondebtor releases absent the

finding of circumstances that may be characterized as unique."); In re Transit Group, Inc., 286

B.R. at 817-18 ("[I]n order for a debtor to confirm a plan of reorganization containing a non-

debtor release, the debtor must demonstrate that unusual circumstances exist, and that the non-

debtor release is fair and necessary . . . . A case by case analysis is required. Moreover,

allowing non-debtor releases is the exception, not the norm. Debtors should not automatically

expect to release officers, directors, insurers, or creditors from future liability, unless some

extraordinary reason is proven.").[36]

---

[36]    In deciding whether to sustain non-debtor releases, courts consider the following factors:

> (1) Whether the debtor and the third party share an identity of interest, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) Whether the non-debtor has contributed substantial assets to the reorganization; (3)Whether the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) Whether the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) Whether the plan provides a mechanism to pay for all, or substantially all, of the class, or classes, affected by the injunction; (6) Whether the plan provides an opportunity for those claimants who choose not to settle to recover in full, and; (7) Whether the bankruptcy court made a record of specific factual findings that support its conclusions.

In re Transit Group, 286 B.R. at 817 (citing Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002)); Gillman v. Continental Airlines (In re Continental

69.     Here, while the Modified Plan includes very broad releases for the Debtors' officers, directors, employees, Parnassus and Platinum, among others,[37] the Debtors have not met their burden of demonstrating the existence of any unusual circumstances to justify their inclusion in the Modified Plan other than these parties' complicity in creating the aberrant process leading to this First Supplemental Objection. Accordingly, the Collective objects to the overly broad release clauses as set forth in the Modified Plan on the grounds that they discharge non-debtor parties in violation of section 524(e) of the Bankruptcy Code, when there are no unusual circumstances warranting such protections for non-debtors.

## II.     THE DIP CREDIT AGREEMENT AND THE DIP ORDER REQUIRE THE CONSENT OF THE DIP LENDERS BEFORE THE DEBTORS' ASSETS MAY BE TRANSFERRED VIA THE MODIFIED PLAN OR THE 363 SALE.

70.     The DIP Lenders' consent, through the Required Lenders, to the Proposed Transaction is mandatory. Such consent has not – and will not – be obtained, however, regardless of whether the Debtors' attempt to implement the transaction via a Modified Plan or a 363 Sale. (See Direction to Send Notice of Required Lenders' Rejection and Disapproval of Master Disposition Agreement, Exhibit A to Notice of Rejection, dated July 14, 2009.) Therefore, the Proposed Transaction cannot be approved.

---

Airlines), 203 F.3d 203 (3rd Cir. 2000); In re Specialty Equip. Co., 3 F.3d 1043 (7th Cir. 1993); SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285 (2nd Cir. 1992); Anderson v. Official Unsecured Creditors Comm. of A.H. Robins Co. (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989).

[37]     Specifically, section 11.4 of the Modified Plan releases, among others, the Debtors' officers, directors, employees, Parnassus and Platinum, from claims relating to the Debtors, any transaction or event giving rise to any claim or interest treated in the Plan, the business arrangements between any Debtor and Released Party, the restructuring of claims and interests in the Chapter 11 cases, or any act related to any claim, interest, restructuring or the Chapter 11 cases. The reorganized debtors, reorganized DPH Holdings and newly formed entities continuing the business will be bound by the release. The release does not relieve the Debtors, GM and/or the Unions, as applicable, from their respective obligations under the Delphi-GM Definitive Documents (except as set forth in the MDA), Union Settlement Agreements, MDA or Investment Agreement.

A.    **The Modified Plan and 363 Sale Violate the Collective's
Rights Under The DIP Credit Agreement.**

71.    Any sale contemplated by the Debtors, whether as part of the Modified
Plan or pursuant to section 363 of the Bankruptcy Code, is unlawful because the DIP Credit
Agreement, as approved by this Court, prohibits Delphi from proceeding with its plan to sell all
or substantially of its assets without the consent of the DIP Lenders.

72.    Section 6 of the DIP Credit Agreement sets out the Debtors' promise not
to take certain actions (the "Negative Covenants"). Section 6.10, entitled "Disposition of
Assets," prohibits the sale of the Debtors' assets except in specific circumstances, none of which
is present here. These provisions state, in pertinent part, that "[f]rom the Closing Date and for so
long as . . . any amount shall remain outstanding or unpaid under this Agreement, the Borrower
and each of the Guarantors will not, and will not permit any of their respective Subsidiaries
to . . . [s]ell or otherwise dispose of any assets (including the sale or issuance of any capital
stock of any Subsidiary), whether now owned or hereafter acquired [with certain exceptions not
applicable here]." (DIP Credit Agreement § 6.10.)

73.    The Proposed Transaction is precisely the sort of asset disposition
expressly prohibited by the DIP Credit Agreement, unless the DIP Lenders consent through
collective action. This consent has not been obtained. Nor will the Debtors succeed in obtaining
their consent to a transaction that is based upon a reckless assessment of the Estates' value, was
not negotiated in good faith, fails to realize the significant values embedded in the company's
operations, especially in the RoW segment, and discriminates against the DIP Lenders. Thus,
without the DIP Lenders' support, the Modified Plan (or any 363 sale which that plan may seek
to implement) can never be approved. (See Notice of Rejection, dated July 14, 2009.)

- 33 -

74. Even the Debtors acknowledge that the Modified Plan requires, at a minimum, consent of the Required Lenders under the DIP Credit Agreement. This consent is an integral feature of the structure of the Modified Plan itself. According to the Plan Modification Motion, the Debtors' intend the Modified Plan to be effectuated by the Required Lenders directing the Agent to strictly foreclose on substantially all of the Debtors' assets. As the Required Lenders' consent is necessary to make the Agent foreclose, the Modified Plan itself assumes that the Required Lenders' consent is necessary.

75. Similarly, the obligations of the "GM Buyers" and the "Company" under the MDA are conditioned upon either (a) receipt of payoff letters under the DIP Agreement (which based on the Notice of Rejection, will not be forthcoming), (b) the requisite DIP Lender Consent (which, again, based on the Notice of Rejection, will not be forthcoming), or (c) a sale order transferring the assets free and clear of, among other things, the lien of the DIP Agreement (which based on Section II.B. below will not be forthcoming). MDA Sections 10.3.8 and 10.4.6.

76. As the DIP Lenders will not consent to the sale of the Debtors' assets pursuant to the Proposed Transaction, either as part of a plan of reorganization or pursuant to a 363 sale, the Modified Plan cannot be confirmed and the 363 Sale cannot be approved.

B. **The Modified Plan and 363 Sale Violate the Collective's Rights Under The DIP Order.**

77. The DIP Order expressly provides that "the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases *or by any other act or omission*, or (ii) the entry of an order confirming a plan of reorganization in any

- 34 -

of the Cases . . . [and] all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full." (DIP Order ¶ 13(d) (emphasis added).) Clearly, a sale of substantially all the assets would be considered an "act" under this provision, and the Order directly states that the DIP Lenders' interests will survive until paid in full.

78.    The DIP Order provides further that "[n]o obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim." (Id. ¶ 4(c).) Pursuant to these provisions, any sale that would eliminate, reduce or effect the DIP Lenders' interests would be a direct violation of the DIP Order.

79.    Moreover, pursuant to paragraph 7 of the DIP Order, the automatic stay has been vacated to allow the Agent and the DIP Lenders to exercise "all rights and remedies against the Collateral provided for in the DIP Documents" in the event of the occurrence of an Event of Default under the DIP Credit Agreement. (Id. ¶ 7(b).) The DIP Order goes on to provide that, "[i]n any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing," and that the parties waive any right to seek relief, including under section 105 of the Bankruptcy Code, that "would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents." (Id.)

80.    As an Event of Default has clearly occurred, the DIP Lenders have an express, court-authorized right to exercise any and all of their remedies, including that of foreclosure (subject only to the forbearance embodied in the Accommodation Agreement) and the Debtors have waived any right to intervene or to contest or seek to impair such remedy. As this Court recognized in the hearing on the Platinum Expense Reimbursement Motion, the DIP Lenders have unconditional rights to any consideration from the sale of the Debtors' assets, and no third party may receive proceeds until the DIP Lenders have been satisfied in full. (Hr'g Tr. 68: 2 – 19, July 1, 2009, Docket No. 19260; see DIP Order ¶ 13(a).) Accordingly, any relief that would strip the DIP Lenders of their superpriority liens on the Collateral would violate the terms of the DIP Order as entered by this Court.

## III.    THE CONTEMPLATED 363 SALE IS AN IMPROPER SUB ROSA PLAN.

81.    Recognizing that the Modified Plan may not be confirmable, the Debtors have built in the option of cramming through the very same, deeply flawed Proposed Transaction that forms the basis of their Modified Plan without having to comply with Code requirements for the confirmation of a plan of reorganization. As such, the 363 Sale is by definition an improper *sub rosa* plan.

82.    The Debtors have scheduled an "Alternative Sale Hearing" on July 23, 2009 as a placeholder for a hearing on the propriety of the Debtors' transferring substantially all of their assets to GM and Parnassus, or the highest bidder at the Auction, pursuant to a Section 363(b)(1) sales transaction. Additionally, the Debtors have filed the First Amendment to the MDA, which automatically seeks to modify the MDA with a 363 Implementation Agreement "if and when" this Court conducts a hearing on the sale of the Debtors' assets and enters a section 363 sale order instead of approving the MDA as a plan modification. (First Amendment § 3.)

83.    When a debtor proposes to sell substantially all of its assets without the

structure of a chapter 11 disclosure statement and plan, courts apply greater scrutiny than they do

to other sales. This heightened scrutiny is necessary because such sales constitute an essential

termination of the debtor's on-going business, leaving only the orderly distribution of the sale

proceeds to be performed under the law governing the priority of creditors. See, e.g., In re

Channel One Commc'ns, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing In re Indust.

Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)

(the transaction "must be closely scrutinized, and the proponent bears a heightened burden of

proving the elements necessary for authorization.")); In re Wilde Horse Enters., Inc., 136 B.R.

830, 841 (Bankr. C.D. Cal. 1991); Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage

Indus., Inc.), 43 F.3d 714, 720 n.9 (1st Cir. 1994) (order confirming a chapter 11 liquidation sale

warrants special "bankruptcy court scrutiny"); 3 COLLIER ON BANKRUPTCY, ¶ 363.02[3].

84.    The Debtors' own papers establish, quite clearly, that they are simply

asking the Court to effect via a 363 Sale the very same plan modifications they know cannot be

accomplished through plan confirmation.[38] This is the very definition of a *sub rosa* plan, and it

cannot be permitted.

85.    It is settled that a section 363 sale that contravenes the Bankruptcy Code's

plan requirements *sub rosa* is "beyond the scope of section 363(b) and should not be approved

under that section." Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens

Inc.), 333 B.R. 30, 52 (S.D.N.Y. 2005). See also Inst. Creditors of Cont'l Air Lines, Inc. v.

---

[38]    The language of the First Amendment assumes that this Court will approve the very same agreement as a
363 sale. (See First Amendment §3) (stating "the following amendments to the Agreement will become
effective without any further action by any of the parties if and when the Bankruptcy Court, instead of
approving the Agreement as a plan modification under section 1127 of the Bankruptcy Code, (a) conducts a
hearing on the sale . . . and (b) enters a section 363 sale order. . . ") (emphasis added).)

Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1226-28 (5th Cir. 1986).  The

proposed sale, which challenges the fundamental tenets of the Bankruptcy Code and usurps the

DIP Lenders' constitutional property interests, would effectively "short circuit" the requirements

of chapter 11, "run roughshod over disfavored creditors' rights," and improperly "sidestep"

creditor protections afforded in the Bankruptcy Code.  Pension Benefit Guar. Corp. v. Braniff

Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983); In re Westpoint

Stevens Inc., 333 B.R. at 49-50.

        86.     The Debtors' proposed 363 Sale goes beyond the sort of treatment of

secured creditors that was found in Westpoint Stevens to be improper:

> The Bankruptcy Court pointed to no authority, nor has this court despite the extensive
> research efforts of counsel and the undersigned's own chambers found any, standing for
> the proposition that an action in derogation of a senior creditor's contractual rights can be
> forced upon that creditor for the purpose of providing 'adequate protection' to a junior
> creditor . . . .  Taken to its logical extreme, the Bankruptcy Court's notion of adequate
> protection would allow a powerful creditor and a debtor anxious to achieve some value
> for its favored constituencies to run roughshod over disfavored creditors' rights, so long
> as a section 363(b) asset sale transaction could be defended as an exercise of reasonable
> business judgment in the context of dire economic circumstances.

333 B.R. at 49-50.  Clearly, the proposed 363 Sale the Debtors will pursue seeks to do precisely

what the court in Westpoint Stevens held the Code will not permit – allow Delphi, GM and the

Auto Task Force to arrogate the Collective's rights and property interests in order to benefit at

the Collective's expense their favored constituencies, albeit in the context of an automotive

industry that is still in difficult economic straits.  But that context does not excuse departures

from precedent and statutory directives that the Court is bound to follow here.

        87.     Further, the Westpoint Stevens decision confirms that, in these

circumstances, secured creditors like the DIP Lenders are entitled to the rights they bargained for

before making their loans, by either:  payment in full under a plan as required by section 1129 of

the Code; a 363 sale conducted through a competitive process in which the proceeds are applied

in accordance with the absolute priority rule that is not a *sub rosa* plan; or credit bidding all or

part of their Loan.  To allow treatment pursuant to a sale that explicitly is not permitted under a

plan would turn the Bankruptcy Code on its head, and is the exact situation the *sub rosa* doctrine

is meant to protect against.

88.    The <u>Westpoint Stevens</u> court also found unacceptable that the transaction

at issue there would permanently impair certain of the objecting lenders' rights. <u>Id.</u> at 49.  Here,

the 363 Sale contemplated by the Debtors would significantly impair the DIP Lenders' court-

ordered rights, including their right to foreclose on the assets to which their liens are attached

and the right to retain a deficiency claim regarding the unpaid portion of the indebtedness.

89.    Finally, <u>Westpoint Stevens</u> makes clear that a debtor cannot use section

363 to end-run a cramdown under section 1129 when the required consent to a plan is not

attained.  The court explained that:

> This is a Chapter 11 case.  Chapter 11 authorizes the alteration of objecting creditors'
> rights through the plan confirmation process.  As the Bankruptcy Court acknowledged
> in its June 29, 2005, oral opinion, the First Lien Lenders' insistence on cash satisfaction
> of their claim would have rendered the Debtors unable to confirm consensually a plan
> incorporating the challenged features of the . . . transaction. . . . [The] utilization of
> sections 363(b) and 105(a) to overcome Appellants' anticipated objections to an attempt
> to cram down an equity-based plan of reorganization must be rejected.

<u>Id.</u> at 54.  To allow treatment pursuant to a sale that explicitly is not permitted under a plan

would be improper under the Bankruptcy Code, and is the exact situation the *sub rosa* doctrine is

meant to protect against.

90.    As shown, Delphi's proposed procedure itself concedes that its 363 Sale is

nothing more than a *sub rosa* plan, by contemplating a Proposed Transaction that cannot be

confirmed, and then attempting to circumvent the creditors' exercise of their statutory rights to

reject a plan by cramming through the exact same transaction under section 363.

91.     Finally, it is no answer to this objection to point to the GM or Chrysler bankruptcy cases. Neither involves the contractual, court-ordered and legal rights of postpetition secured lenders with superpriority allowed administrative expense claims. Further, the circumstances of this case stand in stark contrast to what happened in Chrysler. There, Judge Gonzalez overruled the objection of first-lien lenders (i.e., the Indiana Funds) to the Fiat sale when the administrative agent had secured the approval of the required lenders to direct the collateral trustee (holding the liens) to consent to the sale. In re Chrysler LLC, 405 B.R. 84, 103 (Bankr. S.D.N.Y. 2009). Here, unlike in Chrysler, the Required Lenders have not consented to a 363 Sale through collective action or otherwise, and in fact have rejected it. And, to further distinguish this case from Chrysler or GM, the DIP Lenders are proposing an alternative to liquidation, a credit bid by which they would acquire substantially all of the Debtors' businesses as a going concern.

## IV.    THE PROPOSED TRANSACTION IS NOT A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT AND SHOULD NOT BE APPROVED.

92.     As demonstrated, the Proposed Transaction – whether in the form of a Modified Plan or a 363 Sale – cannot be approved for the fundamental reason that the DIP Lenders have not consented to it. That lack of consent, without more, is fatal to the Proposed Transaction. But even if there were occasion to consider the propriety of the Proposed Transaction on its merits, it could not be approved for several reasons, including that, regardless of what alternatives are ultimately before this Court on July 23, the Proposed Transaction as set forth by Debtors is not a sound exercise of the Debtors' business judgment.

93.     The non-exclusive list of factors that courts generally consider in determining whether to approve a proposed transaction under Section 363(b) before a confirmation order include: (i) the proportionate value of the asset as compared to the estate as a

- 40 -

whole; (ii) the likelihood that a plan will be proposed and confirmed in the near future; (iii) the

effect of the proposed sale on future plans of reorganization; (iv) the proceeds to be obtained

from the disposition vis-à-vis any appraisal; and (v) whether the asset is increasing or decreasing

in value. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel), 722 F.2d 1063, 1071

(2d Cir. 1983); In re Thomas McKinnon Secs., Inc., 120 B.R. 301, 308 (Bankr. S.D.N.Y. 1990).

94.    A court will not approve a 363 sale where the debtor can offer no

"business justification" for the sale other than the appeasement of major creditors. See In re

Lionel, 722 F.2d at 1070. In Lionel, "the only reason advanced for granting the request to sell

[the subject property] was the Creditors' Committee's insistence on it," and the court found this

reason "insufficient as a matter of fact because it is not a sound business reason and insufficient

as a matter of law because it ignores the equity interests required to be weighed and considered

under Chapter 11." Id. at 1071.

95.    When a debtor proposes to sell substantially all of its assets without the

structure of a chapter 11 disclosure statement and plan, courts impose higher scrutiny than they

impose on other sales. In re Channel One Commc'ns, Inc., 117 B.R. at 496 (citing In re Indus.

Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)

(the transaction "must be closely scrutinized and the proponent bears a heightened burden of

proving the elements necessary for authorization.")); In re Wilde Horse Enters., Inc., 136 B.R. at

841; In re Savage, 43 F.3d at 720 n.9 (1st Cir. 1994) (order confirming a chapter 11 liquidation

sale warrants special "bankruptcy court scrutiny"); 3 COLLIER ON BANKRUPTCY, ¶ 363.02[3].

96.    Here, however, even stricter scrutiny of the Debtors' exercise of business

judgment is warranted. Delphi's board long ago allowed its independence to lapse. The board

and management are clearly acting at the behest of, and as evidenced by the self-dealing

- 41 -

elements of the Proposed Transaction are being benefited by, GM, which itself is advancing the
agenda of the UST.  Under applicable Delaware corporate law, a court will not provide to the
directors of a Delaware corporation the benefits of the "business judgment rule" in a self-dealing
transaction, absent certain procedural protections that were not used here.  See Mann v. GTCR
Golder Rauner, L.L.C. 483 F. Supp. 2d 884 (D. Ariz. 2007) (Under Delaware law, business
judgment rule does not apply if directors appear on both sides of transaction or expect to derive
any personal financial benefit from it in sense of self-dealing, as opposed to benefit that devolves
upon corporation or all stockholders generally); Aronson v. Lewis, 473 A.2d 805, 812 (Del.
1984) (rev'd on other grounds) (same).

   97. The assumption of indemnification obligations and management
compensation obligations make the MDA a self-interested transaction that should be subject to
the "entire fairness" standard.  In these circumstances, Delphi should be required to establish the
entire fairness of this Proposed Transaction.  See, e.g., U.S. v. Skeddle, 940 F. Supp. 1146, 1151
(N.D. Ohio, 1996) ("The general rule is that the burden of proof is on the officer ... who engages
in self-dealing with the corporation to prove the good faith of the transaction and its inherent
fairness. The inherent fairness to the corporation is to be judged by an objective standard.")
(internal citations omitted); see also Carlson v. Hallinan, 925 A.2d 506, 529 (Del. Ch. 2006)
("[W]here directors stand on both sides of a transaction, they have the burden of establishing its
entire fairness, sufficient to pass the test of careful scrutiny by the courts.") (internal citation
omitted); In re Adelphia, 323 B.R. 345, 384-85 (Bankr. S.D.N.Y. 2005) (applying entire fairness
standard as dictated by state law in the bankruptcy context); In re Bidermann Indus., 203 B.R.
547, 551 (Bankr. S.D.N.Y. 1997) (noting that sales to insiders in a chapter 11 case are
"necessarily subjected to heightened scrutiny because they are rife with the possibility of

- 42 -

abuse."). As shown throughout this First Supplemental Objection, that is a burden the Debtors cannot meet.

98.    Under any standard, the Proposed Transaction cannot qualify as an exercise of the Debtors' business judgment. The proposed sale price is the result of a flawed process and falls short of a fair and reasonable value, the Proposed Transaction was structured in a way as to preclude competitive bidding, the Proposed Transaction and the process by which the Debtors are seeking to have it approved is premised upon a violation of the DIP Lenders' contractual and legal rights and of the Bankruptcy Code, and Delphi's board and management are self-interested in the outcome of the proposed transaction.

A.    **The Proposed Sale Price Falls Short of a Fair and Reasonable Value.**

99.    One threshold obstacle to approval of the Proposed Transaction is that the purchase price does not even approach a fair valuation of these assets. The HLA, which Delphi relies on to support the proposed price, is predicated on a non-consensual "cold-shutdown" of Delphi North America. This "cold-shutdown" would result in major disruptions to the automotive industry, and the analysis departs from the methodology Delphi used in two previous liquidation analyses filed with the Bankruptcy Court in December of 2007 and October of 2008, respectively. Nonetheless, Delphi now contends that the HLA presents a realistic valuation of Delphi's assets, and relies on that valuation to support a section 363 sale.

100.    First, the liquidation valuation method is not appropriate where, as here, the Debtors' assets are being sold as a going concern. Even assuming, *arguendo*, that a liquidation valuation method might theoretically be appropriate, Delphi's liquidation analysis

simply ignores the realities of the automotive industry. That precedent[39] establishes that OEMs –

like GM – who rely on suppliers to meet their just-in-time supply needs invariably agree to

provide interim financing to suppliers that can no longer produce parts without financial

assistance in order to ensure that their supply chains go uninterrupted. It would be suicidal to do

anything else; the customers cannot survive if their supply chains are interrupted before they

have had a chance to re-source. GM of course knows this; it made the same point to Judge

Gerber in seeking approval to enter into the MDA: "The shutdown of GM plants as a result of

termination of deliveries of affected parts from Delphi could idle tens of thousands of GM

workers, and *it is estimated that GM's revenues would decrease significantly*. GM would also

incur costs related to expedited resourcing efforts, including, but not limited to, *hundreds of*

*millions of dollars for duplicate tooling, premiums and price increases paid to alternative*

*suppliers, and the continued costs of maintaining idled plants* (such as plant overhead and other

fixed costs)." (GM Motion to Approve MDA ¶ 8 (emphasis added).) It is to avoid these

devastating costs and consequences of a supplier shutdown that OEMs like GM regularly

provide support and financing to their troubled suppliers. Delphi itself has had this very same

experience with GM this during its four-year reorganization process.[40]

---

[39]    See the discussion of the Ford-Visteon transaction described in the Collective's Plan Modification
Objection, Docket No. 16903. In addition, the Collins & Aikman and Plastech Engineered Products
transactions are also applicable here.

[40]    The HLA fails to consider a number of other critical factors, as well. For example, it ignores the fact that
the RoW could still operate even without GM and generate substantial case flow, making it unnecessary to
liquidate. Also, a cold shutdown would cause GM to incur "hundreds of millions of dollars" in resourcing
costs (see GM Motion to Approve MDA ¶ 8). Without question, GM needs Delphi's cooperation
throughout the transition process, and therefore a premium should be paid for obtaining a consensual
agreement. For all of these reasons, even if liquidation value were an applicable standard, the HLA,
incorrectly premised on a "cold shutdown" occurring, cannot be relied upon to reflect such value.

B.      **The Proposed Transaction Was Not Structured in Good Faith.**

101.    The Debtors also failed to exercise sound business judgment by structuring the Proposed Transaction in order to deter competitive bidding that would maximize the value of the estate. The MDA contemplates two separate and distinct transactions – one with the GM Buyers and one with Parnassus – whereby different assets are acquired and different liabilities are assumed by the GM Buyers and by Parnassus, and each pays a separate purchase price. Yet, these disparate transactions were combined together into a single agreement (the MDA). The only reasonable explanation for combining them together was a desire to preclude competitive bidding by giving the appearance that a potential bidder could only be competitive if its offer was comparable to the purchases by the GM Buyers and Parnassus taken as a whole. Further evidence of the Debtors' failure to exercise business judgment is revealed by their request that Platinum and GM structure the MDA as a private sale. (See Hr'g Tr. 49:25 – 50:2, July 1, 2009, Docket No. 19260) (Platinum admitted that Debtors requested the transaction be set up as a private sale.)  In addition, the fairness of the process is called into question by the Debtors' stiff-arming of a potential bidder who could have provided substantial value to the DIP Lenders and repeated efforts to deny the DIP Lenders access to necessary diligence (followed by an unorganized, undifferentiated data dump of wheat and chaff in an electronic data room).

102.    Thus, by structuring the MDA to deter competitive bidding, the Debtors not only failed to properly exercise their business judgment in accordance with the standards set forth above, but they failed to conduct the fair process necessary in order to fulfill their fiduciary duty to maximize value for the estates. See, e.g., In re Bakalis, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (debtors have a clear "duty . . to maximize the value obtained from a sale, particularly in liquidation cases").

- 45 -

C.    **The Delphi Board and Management Are Interested in the
Proposed Transaction.**

103.    Finally, the Proposed Transaction cannot pass muster as a sound exercise
of business judgment because both the Delphi board and its senior management stand to benefit
from the transaction.

104.    As shown, key features of the Proposed Transaction are the requirement
that Parnassus provide indemnification protection to Delphi's board and senior management, as
well as insurance coverage. These decision-makers are also to benefit from releases. Further,
senior management will continue to benefit from the management incentive compensation
program if the transaction is consummated.

105.    Delphi management's and the board's receipt of these benefits makes
them clearly interested in seeing the GM/Parnassus transaction succeed. That self-interest
renders their purported exercise of sound business judgment illusory. For this reason as well, the
Proposed Transaction should not be approved.

V.    **THE MODIFIED PLAN AND ALTERNATE 363 SALE ARE ILLUSORY, AS CONSUMMATION
OF THE MDA IS CONDITIONAL.**

106.    Courts disfavor bids that are subject to material contingencies. See, e.g.,
In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (approving lower bid because it lacked
many of the conditions to consummate transaction that were inherent in higher bid, including
approval of merger agreement by the board and time constraints for obtaining such approval); In
re Broadmoor Place Invs., L.P., 994 F.2d 744, 745 (10th Cir. Kan. 1993) (approving lower bid
where court found that "it provided fewer contingencies and facilitated a more immediate
closing"). See also In re Financial News Network, 126 B.R. 152, 156 (S.D.N.Y. 1991) (finding
bankruptcy court erred in refusing to consider merits of appellant's bid in chapter 11 sale of
substantially all of debtor's assets which appeared less likely than other bid to result in delay or

injunction resulting from antitrust enforcement proceedings); In re After Six, Inc., 154 B.R. 876,

882 (Bankr. E.D. Pa. 1993) ("[a] Bankruptcy Court sitting in Third Circuit as well as Second

Circuit could appropriately award bid to lower bidder at sale conducted pursuant to 11 USCA §

363 when that lower bidder has other factors, including even element as lacking in direct

economic impact as 'societal needs,' in its favor."). Further, the value offered in a bid for a sale

of collateral should not be illusory. Courts require that "the valuation of what is offered not be

speculative, contingent, or uncertain." In re BMW Group I, Ltd., 168 B.R. 731, 752 (Bankr.

W.D. Okla. 1994).

107. The obligation of "GM Buyers" and "Parnassus" to consummate the

Proposed Transaction pursuant to the MDA is conditional on the satisfaction of several

conditions. These include the Pension Benefit Guaranty Corporation's ("PBGC") agreement to

release certain of its asserted liens. (See MDA §§ 10.03, 10.3.4, 10.4, 10.4.4. (entitled "Release

of Certain Liens": "[t]he obligation of GM Buyers to consummate the transactions contemplated

by this Agreement will be subject to the fulfillment at or prior to the Closing of the following

conditions (which may be waived in whole or in part by GM Buyers) . . . The Pension Benefit

Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit

Guaranty Corporation on the GM Acquired Assets and the assets of the Sale Companies and the

assets of the entities that issued the GM Sales Securities.").) The GM Buyers and Parnassus thus

have the option of walking away before the July 23, 2009 hearing.[41]

---

[41]    Moreover, because GM and Parnassus are at most only liable for a $250 million termination fee that will be
offset against Delphi's obligation to repay the Amended and Restated GM-Delphi Agreement, dated June
1, 2009 (the "Liquidity Support Agreement" or "LSA"), which payment will not be made unless the DIP is
paid in full, GM and Parnassus functionally have a free option on Delphi. GM's obligations under the
MDA are conditioned on Parnassus receiving equity funding. (See MDA §10.3.8.) If Parnassus does not
receive the funding, on information and belief an affiliate of Platinum will owe GM a $250 million
termination fee. At that point, GM has the option to either consummate the entire MDA (including

108.    Similarly, the obligations of the "GM Buyers" and the "Company" under the MDA are conditioned upon either: (a) receipt of payoff letters under the DIP Agreement (which, based on the Notice of Rejection, will not be forthcoming), (b) the requisite DIP Lender Consent (which, based on the Notice of Rejection, will not be forthcoming), or (c) a sale order transferring the assets free and clear of, among other things, the lien of the DIP Agreement (which, as discussed above, will not be forthcoming). (See MDA §§ 10.3.8 and 10.4.6.)

109.    Furthermore, the Proposed Transaction is also conditional on the European Commission's competition approval. Such approval is by no means certain in light of GM's competitive position in the European automotive industry. Moreover, the European Commission will not complete its review until August 17, 2009, at the earliest.

## RESERVATION OF RIGHTS

110.    The Collective reserves all of its rights under the DIP Credit Agreement, the Security Agreement, the DIP Order and applicable law, including the right to credit bid and the right to foreclose.

111.    To the extent the Debtors interpret or seek to apply paragraph 46 of the Supplemental Modification Procedures Order to mean that a credit bid that includes certain assumption of liabilities or executory contracts constitutes an Alternate Transaction, thereby resulting in a waiver of the Collective's right to object to the results of the Auction, the Collective objects to the Supplemental Modification Procedures Order, and reserves all of its rights under the DIP Credit Agreement, the DIP Order and applicable law.

---

Paranssus's portion) or to pay to Delphi the amount by which the termination fee actually received exceeds the LSA balance. (See MDA § 13.2.)

112.    The Collective expressly reserves any and all rights not to consent to, to object to or to reject the Modified Plan, the Proposed Transaction or any other transaction the Debtors may enter into that does not provide the benefits necessary to ensure a successful and consensual emergence from chapter 11, as well as to any section 363 sale eventually put before the Court. In addition, the Collective reserves its right to supplement or amend this First Supplemental Objection at any time prior to or at the hearing currently scheduled for July 23, 2009, on the basis of evidence disclosed during discovery or otherwise. The Collective also joins in the objections filed on behalf of the Administrative Agent and the Elliott Funds.

113.    The Collective also reserves its rights against any other parties. Nothing in this First Supplemental Objection constitutes consent under or a waiver of rights with respect to the DIP Credit Agreement, the Security Agreement, the DIP Order or otherwise.

**WHEREFORE,** the Collective respectfully requests that the Court deny confirmation of the Modified Plan, deny any motion seeking authority to enter into a 363 Sale, reject the Proposed Transaction, however it may be presented to the Court, and grant the Collective such other and further relief as it deems just and proper.

Dated:  July 15, 2009
        New York, New York

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Richard Mancino
            Richard Mancino
            (A Member of the Firm)

            Marc Abrams
            Michael J. Kelly
            Brian E. O'Connor
            Christopher J. St. Jeanos

787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

*Counsel to the Collective of DIP Lenders*