K&L GATES LLP
Edward M. Fox, Esq.
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

Hearing Date: July 23, 2009
10:00 a.m.

Attorneys for Wilmington Trust Company,
as Indenture Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                        :        Chapter 11
                                              :        Case No. 05-44481 (RDD)
DELPHI CORPORATION, *et al.*,                 :        (Jointly Administered)
                                              :
        Debtors.                              :
                                              :
-------------------------------------------------------X

## SUPPLEMENTAL OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO DEBTORS' MOTION FOR AN ORDER (I) APPROVING PLAN MODIFICATIONS OR, IN THE ALTERNATIVE, (II) APPROVING SALE OF ASSETS

Wilmington Trust Company ("WTC"), as indenture trustee for the senior notes

and debentures in the aggregate principal amount of $2 billion (the "Senior Debt") issued by

Delphi Corporation ("Delphi"), by and through its attorneys, K&L Gates LLP, hereby objects[1] to

the motion of Delphi and its affiliated debtors in these jointly administered Chapter 11 cases

(collectively, the "Debtors") for an order (i) approving plan modifications or, in the alternative,

(ii) approving a sale of assets, and in support thereof states as follows:

### PRELIMINARY STATEMENT



---

[1] WTC also joins in the objection of the Official Committee of Unsecured Creditors.

NY-691424 v1

# REDACTED

*John Sheehan*[2]

1.    Yet, despite this belated recognition of the obvious, the Debtors

nevertheless continue to believe that it is the Debtors' obligation "

"[3] The Debtors' obligation is to maximize the value of

their estates for the benefit of their prepetition creditors, however, not to put the interests of their

customers, suppliers or employees ahead of the interests of their creditors.  That, the Debtors

have failed to do.

2.    Indeed, the Debtors fail to even understand the  proper method of valuing

their enterprise in the eyes of General Motors Corporation ("GM") for the Debtors' value in the

current factual circumstance is not properly determined by reference to metrics ordinarily used to

value a business in the marketplace.  Rather, the Debtors must be valued as a monopolist owning

the sole means of production of parts that are absolutely necessary to GM's survival as an

ongoing business enterprise.

3.    The Debtors, however, have failed and refused to use the leverage they

have as a sole source supplier to force GM to agree to a resolution of the Debtors' case that is

acceptable to the Debtors' creditors.  Instead, for fear that they would run out of cash and be

unable to continue to supply parts at a loss to GM, the Debtors have capitulated to a proposal

foisted upon them by GM and the United States Treasury that provides no real return for

unsecured creditors, yet would enable Platinum Equity Capital Partners II, L.P. ("Platinum"), a

---

[2] Email dated April 4, 2009 from Delphi Chief Financial Officer, John Sheehan to Susan Atkins of J.P. Morgan Chase Bank.  DPH-UCCPM 00016916-917

[3] Id.

hedge fund that failed to complete the acquisition of the Debtors' Global Steering Business, and its affiliated shell entity, Parnassus Holdings II, LLC ("Parnassus"), to potentially earn a 1,200% return using taxpayer funds provided by GM to Parnassus courtesy of the U.S. Treasury, before creditors ever see a penny of recovery.

4.      For the more than three and one-half years the Debtors have been in bankruptcy, the Debtors have maintained a consistent course of selling products at a loss to their former corporate parent, General Motors Corporation ("GM"), and then subsidizing the resulting operating losses through the repatriation of funds from their profitable foreign subsidiaries and borrowings from GM on an administrative priority basis.  As a result, the value of the Debtors' estates has diminished significantly over the course of the Debtors' bankruptcy cases, to the point where the Debtors have now agreed to hand their Global Steering Business, four of their UAW staffed plants and litigation claims potentially worth billions of dollars to GM for a small fraction of their value, and sell the balance of their ongoing operations, including their heretofore profitable overseas operations, to Parnassus for a single dollar.

5.      Since the Debtors commenced their bankruptcy cases in October, 2005, they have incurred operating losses of more than $12 billion, or more than $8.8 million per day for every day they have been in bankruptcy.

6.      For the first quarter of 2009, alone, the Debtors reported an operating loss of $454 million and a loss, net of the extraordinary gain of $1.169 billion as a result of the salaried OPEB settlement stemming from the termination of salaried retiree health benefits, of $625 million.  Quarterly Operating Report for the Period Ended:  March 31, 2009 dated May 12, 2009 (Docket No. 16615) (the "QOR") pp. 4, 23.

7.      The Debtors' losses became so great, and its financial situation so dire, that it sought to cannibalize itself earlier this year by transferring its Global Steering Division to GM in return for barely enough liquidity to survive for another month or two, with no better prospect of a reorganization at the end of that period than at the beginning.

8.      Now, for fear of running out of cash altogether, the Debtors have agreed to a sale to GM of their Global Steering Business and four UAW staffed plants and a sale to Parnassus, of four IUE-CWA staffed plants together with the Debtors' Rest of World operations. This is not a proper exercise of the Debtors' business judgment.

9.      In order to staunch the cash hemorrhage that has been killing the Debtors and confirm and consummate a feasible plan of reorganization in order to exit chapter 11, the Debtors should have taken dramatic and immediate action to stabilize their operations by, among other things, rejecting their unprofitable supply contracts with GM, and ceasing to operate money losing domestic operations.  The Debtors' officers and directors refused to take the actions necessary to protect the interests of the Debtors' creditors, however, and the results are now plain to see.

10.     More than two years ago, Delphi recognized that it could not keep selling products to GM at prices that, in the Debtors' own words, "are steadily draining value from the Debtors' estates."[4]  The Debtors stated that they "must . . . take concerted actions to address these issues and cannot continue to supply parts to GM at a loss."[5]

11.     Since April of 2008, the Debtors have known they could not consummate their confirmed First Amended Joint Plan of Reorganization of Delphi Corporation and Certain

---

[4]  GM Rejection Motion, ¶ 56.

[5]  Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation (the "GM Rejection Motion"), ¶ 5.

Affiliates, Debtors and Debtors in Possession (the "Plan"), yet they demonstrated no meaningful progress towards proposing an amended plan that could be confirmed and consummated in a timely fashion.  All the while, Delphi suffered enormous – and much larger than projected -- operating losses that diminished the value of Delphi's estate on a daily basis.  Moreover, Delphi's debtor in possession loan facility (the "DIP Facility") matured in December 2008, and Delphi has had to operate under the terms of an Accommodation Agreement while in default.

12.    Yet even now, the Debtors continue to sell products to GM at a loss, and have allowed themselves to be deliberately bled dry by GM at the direction of the United States Treasury's Auto Task Force.  The Debtors have now capitulated to GM/Treasury for fear of having to close their doors, despite the fact that Delphi's failure would cause catastrophic harm to GM which GM cannot permit to happen.  The Debtors, it appears, have been so consumed with the fate of GM and the rest of the auto industry in the event the Debtors shut down that they have failed to use their position at the center of the auto industry to maximize the value of their estates for the benefit of their creditors.

13.    The Debtors' board and management team have repeatedly proven that they are incapable of using the leverage available to them as a sole source supplier to GM to maximize the value of their assets for the benefit of their creditors.  The Court must, therefore, step in to prohibit a sale of the Debtors' assets on the currently proposed terms as not maximizing value for creditors and not being a proper exercise of the Debtors' business judgment.

## FACTUAL BACKGROUND

14.    On October 8, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, U.S.C. (the "Bankruptcy Code").  Since the

Petition Date, the Debtors have continued to operate their businesses and remained in possession

of their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy

Code.

**A.    Corporate Structure and Organization**

15.    Delphi Corporation is a holding company that directly owns one hundred

percent of the equity of Delphi Automotive Systems, LLC ("DAS"), its principal U.S. operating

subsidiary, and is also the direct or indirect parent of all of the other Debtors.

16.    Delphi Corporation does not own or operate any of the Debtors'

manufacturing facilities in the United States.  Instead, all, or substantially all, of the Debtors

manufacturing facilities are owned and operated directly by DAS.[6]

17.    Likewise, Delphi Corporation does not directly employ any of the

Debtors' unionized workers.[7]  Instead, all, or substantially all, of the Debtors' unionized

employees are employed by Delphi Automotive Systems Human Resources LLC

---

[6]    See Transcript of May 24, 2006 Hearing, at 188, wherein John D. Sheehan testified as follows:

> Q.    Okay.  Now the U.S. operations though are not run directly by Delphi Corporation, correct?
>
> A.    The – Delphi is the parent company and there are – most of the oper – U.S. operations are included in a subsidiary that's owned by Delphi Corporation.
>
> Q.    But Delphi Corporation, itself, does not directly own or operate the U.S. manufacturing operations, correct?
>
> A.    Not directly.
>
> Q.    Okay.  In fact, they're owned and operated by Delphi Automotive Systems LLC, correct?
>
> A.    Largely, that's correct, yeah.

[7]    See Debtors Employee Information (DPH-WTC 000127) (reflecting that Delphi Corporation has no directly-employed employees).

("DASHRLLC") or Delphi Automotive Systems Services LLC ("DASSLLC") which, in turn, leases employees to DAS for the purpose of operating DAS' manufacturing facilities.[8]

## B.    Foreign Operations

18.    As reflected in the corporate organizational chart annexed hereto as Exhibit A, Delphi Corporation also owns 87% of the equity of Delphi Automotive Systems (Holding), Inc. ("DASHI"), which in turn owns 100% of the equity interests in the Debtors' heretofore highly-profitable foreign affiliates.

19.    These foreign affiliates "generally are separate legal entities under the direction of local management" and "are generally competitive with their peers, generating an estimated operating income of $800 million in 2003, $1.1 billion in 2004, and $700 million in 2005."[9]

## C.    Financial Performance

20.    Notwithstanding the financial success of Delphi's foreign subsidiaries, "as a result of steadily increasing losses in the U.S., Delphi has not had a net profit on a consolidated basis since 2002."[10]

21.    From 2005 to 2007, Delphi suffered losses totaling more than $10 billion on a consolidated basis: (i) $3.065 billion in 2007; (ii) $5,464 billion in 2006; and (iii) $2.357

---

[8]  See Employee Leasing Agreement between DASHRLLC and DAS; Employee Leasing Agreement between DASSLLC and DAS.

[9]  Affidavit of John D. Sheehan in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), ¶ 25.

[10]  Disclosure Statement, p. 28; see also Delphi's Amended and Restated Schedules of Assets and Liabilities which reflect that Delphi Corporation holds a $3.637 billion intercompany claim against DAS.

billion in 2005 (including a net loss of approximately $743 million for the three-month, postpetition portion of 2005).[11]

22.     Delphi's financial situation hardly improved in 2008. During the first half of 2008, Delphi incurred losses totaling $1.140 billion[12] -- almost as much as Delphi expected to lose for all of 2008 based on the financial projections set forth in its Disclosure Statement.[13]

23.     Delphi acknowledged that it expected these losses to continue, and that its North American operations would continue to generate negative cash flows during the second half of 2008.[14] Delphi did not disappoint in these expectations. Excluding the Debtors' one time gain from its settlement of litigation claims and resolution of other matters with GM in September, 2008, the Debtors lost $2.295 billion in 2008. See Delphi 10-K dated March 3, 2009 (the "2008 Annual Report") pp. 69, 113, and 141.

24.     Although the Debtors' net cash flow for 2008 was a positive $236 million, this includes "net cash received from GM totaling $1.1 billion as a result of the effectiveness of the Amended GSA and the Amended MRA . . . ." 2008 Annual Report at 96. Accordingly, the Debtors had negative cash flow from operations of $864 million. Moreover, the Debtors state in their 2008 Annual Report that "[w]e expect that our operating activities will continue to use, not generate, cash." Id.

25.     The Debtors further noted that they:

---

[11] See Delphi 10-K dated February 19, 2008 ("2007 Annual Report"), p. 100.

[12] See Delphi 10-Q dated August 8, 2008, p. 61.

[13] Disclosure Statement, Apx. C, p. 11.

[14] See Delphi 10-Q dated August 8, 2008, p. 77 ("Cash flow from operating activities continues to be negatively impacted by operating challenges due to lower North American production volumes, related price pressures stemming from increasingly competitive markets, and continued commodity price increases, and we expect that our operating activities will continue to use, not generate, cash.") (emphasis added).

> believe revenue in the first and second quarter of 2009 will be
> significantly lower compared to revenue in 2008, reflecting lower
> sales globally, primarily as a result of lower forecast production
> volumes, including significant volume decreases being forecast by
> GM in North America and Europe.

2008 Annual Report at 98.

26.     As the Debtors predicted in the 2008 Annual Report, they have continued to burn cash in 2009.  For the first quarter of 2009, the Debtors reported an operating loss of $454 million on total net sales of $1.029 billion, and a loss, net of the extraordinary gain of $1.168 billion as a result of the settlement stemming from the termination of retiree health benefits to salaried employees, of $625 million.  QOR at 4, 23.

## D.    Repatriation of Funds and Supplemental Borrowings

27.     In order to cover these staggering and continuing losses, Delphi repatriated more than $1.4 billion in cash from its foreign subsidiaries,[15] and made arrangements to borrow more than $950 million from GM,[16] to continue financing DAS' operations, despite the fact that DAS has continued to hemorrhage cash and had no ability to repay those loans at any point in the foreseeable future.

---

[15] See Order Under 11 U.S.C. §§ 363(c), 1107, and 1108, and Cash Management Order, and Alternatively, Under 11 U.S.C. §§ 363(b)(1) and 364(c), Confirming Authority of Delphi Automotive Systems (Holding), Inc. to Complete Intercompany Transfer of Funds (Docket No. 10725) (authorizing Delphi to repatriate and loan up to $650 million to DAS); Supplemental Order Under 11 U.S.C. §§ 361 AND 363, Fed. R. Bankr. P. 9019, and Cash Management Order Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfers of Repatriated Funds (Docket No. 13733) (authorizing Delphi to repatriate and loan up to an additional $750 million to DAS, subject to the continuing right of the Creditors Committee and WTC to object on a prospective basis).

[16] See Motion for Order Authorizing Amendment to Arrangement with General Motors Corporation Approved Pursuant to Second DIP Extension Order (Docket No. 14031) (the "GM Motion"), ¶ 25 ("Under the GM Arrangement Amendment, GM has agreed to increase the aggregate principal amount available under the GM Arrangement by a maximum of $300,000,000 to a total aggregate amount of $950,000,000.").

E.    **The Plan**

28.    On December 10, 2007, the Debtors filed their Plan.

29.    On January 25, 2008, the Court issued its Findings of Fact, Conclusions of Law, and Order under 11 U.S.C. §§ 1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors in Possession, as Modified (the "Confirmation Order").

30.    The Confirmation Order confirmed, and authorized the Debtors to consummate, the Plan (¶¶ 1, 49).

31.    Pursuant to Paragraph 39(b) of the Confirmation Order, the Debtors are required to pay "in full in Cash on or before the Effective Date" the fees and expenses of WTC, including, without limitation, the fees and disbursements of its counsel, incurred between the Petition Date and the Confirmation Date, together with WTC's fees and expenses, including, without limitation, the fees and disbursements of its counsel, incurred between the Confirmation Date and the Effective Date.

32.    On April 4, 2008, Delphi announced that "although it ha[d] met the conditions required to substantially consummate its [Plan] . . . Delphi's plan investors refused to participate in a closing . . . and refused to fund their investment agreement with the Company."[17]

33.    Delphi has since acknowledged that it cannot consummate the Plan without the financing provided by their plan investors, and that "[u]nless a decree of specific performance is issued by the Court, there is no possibility that the Plan can be consummated."[18]

---

[17]    Delphi Press Release dated April 4, 2008, p. 1.

[18]    Memorandum of Law of Plaintiff Delphi Corporation in Opposition to Defendants' Motion to Dismiss the Complaint in Adversary No. 08-1232 (RDD), p. 9.

**F.    Proposed Amendments to the Plan**

34.    On October 3, 2008, the Debtors filed a Motion for Order: (I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization (the "Plan Modification Motion").

35.    The Plan Modification Motion proposed a number of material changes to the Plan, including a reduction in the recovery for unsecured creditors, including the Senior Debt, from 100% under the Plan (as confirmed) to approximately 38.8% under the Plan as modified by the Plan Modification Motion.[19]

36.    By multiple notices of adjournment, the Debtors have adjourned the hearing with respect to the Plan Modification Motion, which, most recently, was scheduled to take place on June 2, 2009.

**G.    Defaults under the DIP Agreement**

37.    The Debtors' DIP Facility matured on December 31, 2008, and has not been paid out or refinanced.

> "Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008 . . . ."

QOR at 12.

38.    On November 7, 2008, the Debtors filed an Expedited Motion for Order (I) Supplementing January 5, 2007 DIP Refinancing Order and Authorizing Debtors to Enter Into and Implement Accommodation Agreement with Agent and Participating Lenders, and

---

[19]  Delphi Press Release dated October 3, 2008, p. 2.

(II) Authorizing Debtors to (A) Enter into Related Documents and (B) Pay Fees in Connection

Therewith (the "Accommodation Motion"), which, among other things, sought approval for the

Debtors to enter into an Accommodation Agreement with their DIP Lenders that would permit

the Debtors to retain their outstanding DIP Financing even after the Debtors fell into default

following the passage of the DIP Financing's stated maturity on December 31, 2008.

39.    On December 3, 2008, the Court entered an Order (I) Supplementing

January 5, 2007 DIP Refinancing Order and Authorizing Debtors to Enter Into and Implement

Accommodation Agreement with Agent and Participating Lenders and (II) Authorizing Debtors

to (A) Enter Into Related Documents and (B) Pay Fees in Connection Therewith (the "DIP

Accommodation Order"), and thereby approved the Accommodation Agreement.

40.    On February 4, 2009, the Debtors filed a Motion for Order Authorizing

Debtors to (I) Enter Into Amendment to Accommodation Agreement with Certain Participating

DIP Lenders and (II)(A) Enter Into Related Documents and (B) Pay Fees and Expenses in

Connection Therewith (the "Accommodation Amendment Motion").

41.    In the Accommodation Amendment Motion, the Debtors noted that due to

"unprecedented volume declines, certain of the provisions and covenants contained in the

Accommodation Agreement are no longer practical," (¶ 22), and thus requested permission to

enter into certain amendments to the Accommodation Agreement designed to preserve the

Debtors' ability to access the DIP Facility.

42.    The proposed amendments to the Accommodation Agreement also

required the Debtor to show concrete progress towards consummating a plan of reorganization

by, among other things, filing a plan of reorganization acceptable to the Debtors' DIP Lenders no

later than February 27, 2009. See Accommodation Amendment Motion, ¶ 27.

43.     Since that time, several additional amendments to the Accommodation

Agreement have been entered into between the Debtors and the DIP Lenders.

**H.    Treasury/GM Plot Delphi's Demise**

44.     As the Debtors ran out of cash, they sought additional liquidity from GM

to permit them to continue to operate their business.  The Debtors sought to sell their global

steering business to GM in return for (i) a payment by GM to the DIP Lenders of $150-200

million, (ii) forgiveness of a working capital true-up repayment, and (iii) assumption of certain

agreements and payment of related cure costs.  In addition, GM promised to lend the Debtors an

additional $150 million in connection with the steering sale.[20]

45.     The Creditors Committee, the DIP Lenders and WTC all objected to the

proposed steering sale, as did Treasury, which prohibited GM from proceeding with the

transaction until a complete solution to Delphi could be reached.

46.     Thereupon, GM and Treasury embarked on a process to resolve Delphi's

bankruptcy case in order to insure a secure supply of parts for GM.  Although Delphi sought to

negotiate with GM, Treasury and the DIP Lenders, GM and Treasury began by framing a

proposal which was satisfactory to GM and Treasury.  Therefore, they presented the DIP Lenders

with their proposal.  Delphi only found out about the proposal from the DIP Lenders.  See GM-

MDA-E-000000538-542.  When that proposal was rejected, GM and Treasury began

negotiations with Platinum and another potential purchaser.

47.     When ultimately presented with the GM/Treasury proposal, the Debtors,

initially insisted that the proposed transaction be structured as a plan rather than as a sale of

---

[20]  See Motion for Order under 11 U.S.C. § 363 and Fed. R. Bankr. P. 6004 Authorizing and Approving
Option Exercise Agreement With General Motors Corporation dated March 4, 2009.

assets under 11 U.S.C. § 363. The Debtors eventually agreed, however, to pursue a sale if the transaction could not be approved as part of a plan.

## I.    **The Plan Modification and Supplement**

48.    On June 1, 2009, the Debtors filed their (A) Supplement to Motion for Order (I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to First Amended Plan of Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternative Sale Hearing Date (the "Plan Modification Supplement").

49.    Pursuant to the Plan Modification Supplement, the Debtors sought authority to amend the Plan (the "Modified Plan") to provide for the sale of substantially all of the Debtors' assets to GM and Parnassus pursuant to the Master Disposition Agreement (the "MDA") in exchange for, among other things: (i) a $1 cash payment from Parnassus, together with the assumption of specified liabilities, and a Class C membership interest in Parnassus; and (ii) cash payments from GM in an amount sufficient to satisfy the A and B tranches of the Debtors' DIP Facility and a small portion of the C Tranche of the DIP Facility, together with the assumption of specified liabilities.[21]

50.    The Plan Modification Supplement also requested that the Debtors be authorized to conduct a private sale of substantially all of their assets to GM and Parnassus in the even the Plan could not be confirmed as modified, with no opportunity for competitive bidding by other interested parties, and subject to an affirmative prohibition on the Debtors seeking out

---

[21]    MDA, § 3.1 (GM Purchase Price) and 3.2 (Company Purchase Price).

or even cooperating with the development of any competing transaction that might provide greater value to the Debtors' estates.[22]

51.    On June 10, 2009, at the Court's insistence, the Debtors reluctantly agreed to consider competing bids with respect to their assets and conduct an auction if one or more qualified bids were received, notwithstanding the overbearing non-solicitation provisions of the MDA.

## J.    Overiew of GM-Parnassus Deal

52.    As part of the proposed transaction, concurrently with the closing of the MDA, GM has agreed to purchase $2 billion worth of Class A membership interests in Parnassus pursuant to the terms of a Securities Purchase Agreement dated as of June 1, 2009 (the "SPA").[23]

53.    Parnassus Holdings I, LLC ("Parnassus Holdings"), another affiliate of Platinum and the founder and only current member of Parnassus, will simultaneously purchase an additional $250 million worth of Class B membership interests in Parnassus.

---

[22] MDA, § 9.40, p. 90, which provides, in pertinent part, as follows:

> Each of Delphi and the Sellers agree, severally, that until the earlier of (i) when this Agreement is terminated under the terms hereof and (ii) the Closing (the "Non-Solicitation Period"), Delphi and the Sellers, as applicable, shall not, and shall not knowingly permit Delphi, the Seller or any of their respective officers, directors, agents or Affiliates to, directly or indirectly: (A) enter into any written or oral agreement or understanding with any Person (other than the Buyers) regarding the sale (whether by sale of stock, merger, consolidation, sale of assets or other disposition) of all or any part of the GM Business and the Company Business or any significant portion of their consolidated assets or issued or unissued capital stock (a "Competing Transaction"); (B) solicit, initiate, respond to, continue, encourage or facilitate, or furnish or disclose nonpublic information in furtherance of, any inquiries or the making of any proposal with respect to, or enter into or continue any negotiations or discussion with any Person (other than the Buyers) regarding the possibility of Competing Transaction . . .

[23] SPA, § 2(b), p. 5.

54.    In addition to their capital contributions, GM and Parnassus Holdings have also agreed to extend loans to Parnassus in the amount of $500 million (GM) and $250 million (Parnassus), respectively.  This $750 million loan must be repaid in full before Parnassus makes any distributions to its members, who must, in turn, receive $7.2 billion in distributions before any payments will be made to the Debtors' unsecured creditors.[24]

55.    Parnassus' Operating Agreement further contemplates the issuance of an unspecified number of Class C membership interests to the Debtors' Tranche C lenders.[25]

56.    Under the terms of the Operating Agreement, any sums available for distribution by Parnassus will be divided among the holds of Class A, B, and C interests as follows:[26]

1.    The first $1 billion of distributions shall be divided: (i) 69.9134% to the Class A Holders (ie. GM); (ii) 25% to the Class B Holders (ie. Parnassus Holdings); and (iii) 5.0866% to the Class C Holders (ie. the Debtors' Tranche C Lenders);

2.    The next $1,641,757,563 of distributions shall be divided: (i) 79.2352% to the Class A Holders (ie. GM); (ii) 15% to the Class B Holders (ie. Parnassus Holdings); and (iii) 5.7648% to the Class C Holders (ie. the Debtors' Tranche C Lenders);

3.    The next $1 billion of distributions shall be divided: (i) 30% to the Class A Holders (ie. GM); (ii) 70% to the Class B Holders (ie. Parnassus Holdings;

---

[24]  Amended and Restated Operating Agreement of Parnassus Holdings II, LLC (the "Operating Agreement"), § 5.5, p. 23.

[25]  Operating Agreement, § 3.1, p. 15.

[26]  Operating Agreement, § 5.1(a), p. 21-22.

4.    Any additional amounts from $3,641,757,564 to $7,200,000,000 shall be divided: (i) 40% to the Class A Holders (ie. GM); and (ii) 60% to the Class B Holders (ie. Parnassus Holdings).

57.    Finally, if and when Parnassus ever makes $7.2 billion of distributions to its members -- by which time Parnassus Holdings will have received distributions totalling more than $3.3 billiion and realized a more than 1,200% return on its equity investment -- the Operating Agreement obligates Parnassus to pay 3% of any subsequent distributions to Delphi's unsecured creditors, up to a maximum amount of $180 million.[27]

58.    It appears that Treasury's refusal to provide further liquidity to the Debtors, and the Debtors' fear of liquidation and the concommitant effect on the auto industry as a result, caused the Debtors to agree to the transaction GM/Treasury negotiated for the Debtors, just as GM/Treasury intended.  The Debtors' fears were completely unjustified, however, and seemingly recognized by the Debtors' management as such, because the Debtors knew that their failure to supply GM would cause GM to incur billions of dollars in losses, making it far more economically attractive for GM to reach an acceptable arrangement with Delphi than to incur massive losses from a Delphi shutdown.  See DPH-UCCPM 00136593-DPH-UCCPM 00136629.

59.    GM has publicly validated Delphi's view.

60.    According to Randall L. Pappal, Executive Director, HVAC and Mexico-Global Purchasing and Supply Chain for GM, "Delphi is a sole-source, just-in-time, supplier of many crucial parts to GM, including parts that are used in essentially every GM product line in

---

[27] Operating Agreement, § 5.9, p. 24.

North America."[28]  "[I]f Delphi ever ceases shipping even a small fraction of production parts to

GM, the GM plants relying on such shipments may run out of inventory of such parts and have

to shut down within a matter of days."[29]

> 61.    According to Mr. Pappal:

> Most parts that Delphi manufactures for GM are not readily
> available from an alternate source due to, among other things,
> capacity issues within the automotive parts supply industry, the
> length of time it takes to validate and obtain safety regulatory
> approval of a new supplier's parts, and lead time to develop and
> build tools for manufacture.  While GM can accelerate efforts to
> resource Delphi parts in the event of a supply interruption, the
> sheer magnitude of the parts to be resources and revalidation
> required would take at least several months to achieve.[30]

> *  *  *

> In short, a prolonged cessation in the supply of parts from Delphi
> to GM would have a devastating effect on GM, its ability to
> reorganize, and the communities that depend on employment by
> GM and its community of parts suppliers.[31]

> 62.    GM's Director of Business Development, Rick Westenberg, echoed Mr.

Pappal's concerns stated above.  According to Mr. Westenberg:

> A cessation of operations by Delphi, whether due to liquidity
> constraints or foreclosures by the Delphi DIP Lenders, could shut
> down GM's production and lead to the attendant consequences
> described in the Declaration of Randall L. Pappal in support of

---

[28]  Declaration of Randall L. Pappal in Support of Debtors' Motion for Entry of Order Approving (I)
Master Disposition Agreement for Purchase of Certain Assets of Delphi Corporation, (II) Related
Agreements, (III) Assumption and Assignment of Executory Contracts, (IV) Agreement with Pension
Benefit Guaranty Corporation, and (V) Entry into Alternative Transaction in View Thereof dated July 8,
2009 (the "Pappal Dec'l.") ¶ 5, filed in In re General Motors Corp., et al., Case No. 09-50026 (REG)
pending in this District.  Copy annexed hereto as Exhibit A.

[29] Pappal Dec.l. ¶ 7.

[30]  Pappal Dec'l. ¶ 8.

[31]  Pappal Del'l. ¶ 11.

the Motion, filed contemporaneously herewith (the "Pappal Declaration").[32]

63.    According to Mr. Westenberg, "in GM's relationship with Delphi, protection of supply is paramount."[33]  Accordingly, "it is imperative that the [GM] immediately secure the supply of parts from Delphi in order for GM's own reorganization to succeed."[34]

64.    Delphi is so important to GM that "GM has been forced to spend billions of dollars and incur billions of dollars of additional liabilities primarily to protect its supply base by supporting Delphi."[35]

65.    GM also seeks to acquire certain of Delphi's assets because of the importance of GM's relationship with the UAW.

> GM has decided to obtain control of Delphi's global steering business and Delphi's U.S. plants that employ workers represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**") because those plants supply parts primarily to GM and, in the case of U.S. UAW plants, are important to GM's relationship with the UAW.[36]

---

[32]  Declaration of Rick Westenberg in Support of Debtors' Motion for Entry of Order Approving (I) Master Disposition Agreement for Purchase of Certain Assets of Delphi Corporation, (II) Related Agreements, (III) Assumption and Assignment of Executory Contracts, (IV) Agreement with Pension Benefit Guaranty Corporation, and (V) Entry into Alternative Transaction in Lieu Thereof dated July 8, 2009 ("Westenberg Dec'l.") ¶ 6, filed in In re General Motors Corp., et al., Case No. 09-50026 (REG) pending in this District.  Copy annexed hereto as Exhibit B.

[33]  Westenberg Dec'l. ¶ 7.

[34]  Id.

[35]  Westenberg Dec'l. ¶ 6.

[36]  Westernberg Dec'l. ¶ 10.

## ARGUMENT

### I.    THE PLAN MODIFICATION SHOULD NOT BE APPROVED

#### A.    The Plan Fails to Provide for the Disposition of All of the Property of the Debtors Estates

66.    Pursuant to 11 U.S.C. § 1129(a)(1), the Modified Plan must comply with the applicable provisions of Title 11, which include 11 U.S.C. § 1123.  11 U.S.C. § 1123(a) requires that the Modified Plan provide adequate means for the Modified Plan's implementation, 11 U.S.C. § 1123(a)(5).  Here, however, the Modified Plan fails to provide for the disposition of proceeds of avoidance actions.

67.    Pursuant to Section 2.1.5 of the MDA, certain assets, including avoidance actions under Article 5 of the Bankruptcy Code, are excluded from the Debtors' proposed sale of their assets.  Under Section 5.3 of the Plan, however, holders of allowed General Unsecured Claims are only entitled to receive their pro rata share of the proceeds of the General Unsecured MDA Distribution.  Accordingly, if there are additional assets in the Debtors' estates, there appears to be no mechanism for their distribution to unsecured creditors or other disposition. Consequently, the Plan does not contain adequate means for its implementation and may not be confirmed.

#### B.    The Debtors Fail to Maximize the Value of Their Estates

68.    Pursuant to 1129(a)(1) and (3), the Modified Plan must comply with the applicable provisions of Title 11 and the Plan may not be proposed by any means forbidden by law.  A debtor is required to manage the estate's assets in a way that maximizes the estate's value.  In re Smart World Technologies, LLC, 423 F.3d 166, 175 (2d Cir. 2005); Louisiana World Exposition v. Federal Insurance Company, 858 F.2d 233, 246 (5th Cir. 1988); In re Centennial Textiles, Inc., 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1988).

69.    Pursuant to Section 7.19 of the Plan, the Debtors waive available avoidance actions unless specifically listed on Exhibit 7.19 to the Plan.  The Debtors provide no bases on which they waive of causes of action which may be of value to the estate and their failure to preserve these causes of action is inconsistent with the Debtors' obligation to maximize the value of their estates.

70.    To the extent the Debtors do reserve avoidance and other causes of action, in Section 7.19 of the Modified Plan the right to determine whether to bring, settle, compromise or enforce such actions, or decline to do so is given to the Debtors, sole and absolute discretion. Although Section 7.19 of the Plan also states that the Debtors "may" preserve such litigation claims in accordance with the best interests of the reorganized Debtors, this is not only purely discretionary but also inconsistent with the prior sentence of the same section granting the Debtors sole and absolute discretion to pursue these claims or not.  Moreover, the entire provision is inconsistent with the Debtors' obligation to maximize the value of their estates. Consequently, the Plan violates 11 U.S.C. § 1129(9)(1) and (3) and may not be confirmed.

**C.    The Plan Does Not Satisfy the Best Interests of Creditors Test**

71.    Section 1129(a)(7) of the Bankruptcy Code provides that a plan may only be confirmed if:

(7) With respect to each impaired class of claims or interests –

(A)    each holder of a claim or interest of such class –

(i)    has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount

that such holder would so receive or retain if the debtor

were liquidated under chapter 7 of this title on such date.

11 U.S.C. 1129(a)(7)(A).  See also In re Leslie Fay Companies, Inc., 207 B.R. 764, 787 (Bankr.

S.D.N.Y. 1997) ("The test requires that each holder of a claim or interest either accept the plan

or receive or retain property having a present value, as of the effective date of the plan, not less

than the amount such holder would receive or retain in a hypothetical liquidation under chapter 7

of the Bankruptcy Code.") (citations omitted).

72.     In an effort to satisfy this requirement, the Debtors have proffered an

updated liquidation analysis prepared by FTI Consulting, Inc. (Plan, Apx. C), which purportedly

shows that the creditors of Delphi Corporation would receive no recovery in a liquidation

scenario, meaning that whatever value unsecured creditors receive under the Modified Plan is

necessarily better than what they would receive in a liquidation.

73.     The Debtors' revised liquidation analysis is fundamentally flawed,

however, because it fails to take account of the value inherent in the Debtors' status as a just-in-

time, sole-source supplier to GM. This status gives Delphi substantial leverage to extract

economic concessions from GM and increases the true value of the Debtors' assets since, as

reflected in the Pappal and Westenberg Declarations referenced above, GM would not be able to

continue its own operations if, for any reason, Delphi were to cease supplying parts to GM.

74.     The liquidation analysis also appears to ascribe no value to the Debtors'

pending claims against the plan investors under the original Plan.

75.     WTC respectfully submits that the Debtors have not offered any credible

evidence to satisfy the best interest of creditors test, and that the Debtors' request for

confirmation of their Amended Plan must therefore be denied.

**D.**     **The Plan is Not Feasible**

76.     Section 1129(a)(11) of the Bankruptcy Code requires that, before a plan
can be confirmed, the court must find that, "[c]onfirmation of the plan is not likely to be
followed by liquidation, or the need for further financial reorganization of the debtor or any
successor to the debtor under the plan, unless such liquidation or reorganization is proposed in
the plan." 11 U.S.C. § 1129(a)(11).

77.     This feasibility requirement "prevent[s] confirmation of visionary schemes
which promise creditors and equity security holders more under a proposed plan than the debtor
possibly can attain after confirmation." In re Union Fin. Servs. Group, Inc., 303 B.R. 390, 427
(Bankr. E.D. Mo. 2003); In re Ralph C. Tyler, P.E., P.S., Inc., 156 B.R. 995, 997 (Bankr. N.D.
Ohio 1993) (holding plan was not feasible because debtor did not have a firm commitment in
place for the financing required under the plan).

**1.**     **There is No Date Certain by Which the MDA Must Close and the Plan Will Become Effective**

78.     The definition of Effective Date under the Modified Plan is completely
circular and may never occur. Pursuant to Section 7.6 of the Modified Plan, the Debtors will
consummate the Disposition Transactions on the Effective Date. Pursuant to Section 1.77 of the
Modified Plan, the Effective Date is the Business Day on which all conditions to the
consummation of the Modified Plan set forth in Article 12.2 of the Modified Plan have been
satisfied or waived, one of which is that "all conditions precedent to the consummation of the
Master Disposition Agreement shall have been waived or satisfied in accordance with the terms
thereof." Modified Plan § 12.2(b).

79.     Consequently, the Debtors are to consummate the MDA on the Effective
Date, but the Effective Date does not occur until the MDA is consummated.

80.     Article 10 of the MDA contains the conditions for closing under the agreement which are, presumably, the conditions precedent to consummation referred to in Section 12.2 of the Modified Plan.  There is no way of knowing when, if ever, the conditions to closing of the MDA will be satisfied.  For instance, certain representations and warranties must be true, §§ 10.2.1, 10.3.1, 10.4.1, certain covenants must have been performed and complied with, §§ 10.2.2, 10.3.2, 10.4.2, Platinum must have funded Parnassus, which is presumably a shell entity, § 10.3.5, and other events must have taken place.  Pursuant to Section 11.1.1 of the MDA, however, there is no fixed date by which these conditions must be satisfied.  Indeed, the Closing Date only occurs if, and when, the conditions to closing have been satisfied.  Accordingly, there can be no assurance when, if ever, the MDA will close and the Modified Plan will become effective.

81.     Given the Debtors' track record in consummating a plan, as well as Platinum's failure to close on the sale of the Debtors' Global Steering Business, the Court should not approve the Plan Modification unless and until all parties to the MDA have waived all conditions to closing, escrowed the funds needed to close and a date certain within 10 days of approval of the Plan Modification has been fixed on which the MDA is to close and the Modified Plan is to become effective.

## 2.     <u>Matters Involving the PBGC Have Apparently Not Been Resolved</u>

82.     Pursuant to Section 12.2(d) of the Modified Plan, the Modified Plan may not become effective until the Debtors have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof have been satisfied or waived.  Moreover, pursuant to Section 17.7(a) of the Modified Plan, "upon the Effective Date, the Delphi HRP shall no longer be the responsibility of the Debtors and will be addressed by

GM." Modified Plan § 7.17(a).  As of July 8, 2009, "no PBGC agreement has yet been reached .

. . ." Westenberg Dec'l. ¶ 16.  Since that time, WTC is not aware that such an agreement has

been reached and none was filed in the GM bankruptcy prior to July 13, 2009.  Accordingly, the

MDA cannot be consummated and the Modified Plan cannot become effective.

### E.    The Plan Fails to Provide for Full and Timely Payment of Administrative Claims as Required by 11 U.S.C. § 1129(a)(9)(A)

83.    Section 1129(a)(9) of the Bankruptcy Code provides that a plan may only

be confirmed if, among other things, it provides that each holder of an administrative expense

claim "on the effective date of the plan . . . will receive on account of such claim cash equal to

the allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A).

84.    WTC holds an administrative expense claim against the Debtors by virtue

of paragraph 39(b) of the Confirmation Order, which expressly provides that the Debtors are

required to pay "in full in Cash on or before the Effective Date" the fees and expenses of WTC

and its counsel.[37]

85.    Despite these clear and unambiguous legal requirements, the Debtors have

repeatedly refused to acknowledge that they have any obligation or intention to reimburse

WTC's fees and expenses on ore before the Effective Date of the Modified Plan.  Moreover,

Article 2.2 of the Debtors' Modified Plan purports to qualify the Debtors' obligation to pay all

---

[37] The Confirmation Order became final and nonappealable more than a year ago, and is no longer
subject to challenge by the Debtors or anyone else.  See Travelers Indemnity Co. v. Bailey, __ U.S. __,
129 S.Ct. 2195, 2205 (2009) ("But once the 1986 Orders became final on direct review (whether or not
proper exercises of bankruptcy court jurisdiction and power), they became res judicata. . .").
Accordingly, while the Debtors could theoretically seek to vacate the Confirmation Order pursuant to
Fed. R. Bankr. P. 9024, if they were to succeed in doing so, they would also need to undo the various
actions the Debtors and their professionals have undertaken in apparent reliance on the Confirmation
Order, including, without limitation: (i) reversing the corporate restructuring transactions effected
pursuant to article 7.3 of the Plan and (ii) correcting the failure by the Debtors' professionals to obtain
approval for the payment of their fees and expenses over the course of the past 18 months.

administrative expense claims in full on the effective date, providing instead that the payment of

Administrative Claims is "[s]ubject to the Master Disposition Agreement . . . ."

      86.     While it is unclear precisely what this reference to the MDA is intended to

mean, it is clear that the plain language of the Bankruptcy Code does not permit the Debtors to

impose *any* extra-statutory conditions on the payment of administrative expense claims.  Section

1129(a)(9)(A) expressly provides that such claims must be paid in full, in cash, on the Effective

Date as a condition to confirmation.

      87.     Accordingly, to the extent the Modified Plan imposes any conditions on

the Debtors' obligation to pay administrative expense claims, including WTC's claim for

reimbursement of its fees and expenses under the Confirmation Order, in full, in cash, on the

Effective Date, it cannot be confirmed.

**F.**      **The Debtors' Are Not Entitled to a Discharge**

      88.     Section 11.2 of the Modified Plan purports to grant the Debtors a

discharge.  Pursuant to 11 U.S.C. § 1141(d)(3), however, unless the Debtors engage in business

after consummation of the Modified Plan, they are not entitled to a discharge because the

Modified Plan provides for the liquidation of their assets.  Accordingly, the Modified Plan

appears to violate 11 U.S.C. §§ 1129(a)(2) and 1141(d)(3) and may not be confirmed.

**G.**      **The Administrative Bar Date in the Modified Plan is Incorrect.**

      89.     Section 10.2 of the Modified Plan provides that requests for payment of

administrative expense claims must be filed with the claims agent and served on counsel to the

Debtors and their statutory committees no later than July 10, 2009.  This provision is inconsistent

with the Modification Procedures Order entered June 16, 2009, which provides that

administrative claims must be filed with the claims agent by July 15, 2009 and does not require

that they be served on any counsel.

## II. THERE IS NO JUSTIFICATION FOR THE SUBSTANTIVE CONSOLIDATION OF THE DEBTORS' ESTATES

90.     The Plan provides for the substantive consolidation of certain of the

Debtors' estates, including the estates of Delphi and certain of its North American operating

subsidiaries, collectively referred to as the "Delphi-DAS Debtors."  (Plan, § 1.44).

91.     Substantive consolidation is an extraordinary remedy, and the Second

Circuit has cautioned that it "is no mere instrument of procedural convenience . . . but a measure

vitally affecting substantive rights . . . to be used sparingly."  Union Savings Bank v.

Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir.

1988) (internal citations omitted).

### A. Alleged Creditor Confusion Does Not Justify Substantive Consolidation

92.     In considering whether to permit substantive consolidation, the Second

Circuit has identified two key factors: "(i) whether creditors dealt with the entities as a single

economic unit and 'did not rely on their **separate identity** in extending credit' . . . . or (ii)

whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."

Id. (internal citations omitted) (emphasis added).

93.     In Augie/Restivo, the Second Circuit further noted that:

> Where, as in the instant case, creditors . . . knowingly made loans
> to **separate entities** and no irremediable commingling of assets
> has occurred, a creditor cannot be made to sacrifice the priority of
> its claims against *its* debtor by fiat based on the bankruptcy court's
> speculation that it knows the creditor's interests better than does
> the creditor itself.

Id. at 520 (emphasis added); accord In re Owens Corning, 419 F.3d 195, 210 (3d Cir. 2005) ("If

an objecting creditor relied on the separateness of the entities, consolidation cannot be justified

*vis-à-vis* the claims of that creditor.").

94.    The Debtors assert that they have considered all of the relevant factors concerning the propriety of substantive consolidation, including the likely benefits and harms of substantive consolidation, and have "determined that on balance, substantive consolidation . . . is appropriate and in the best interests of the Company's creditors." (Disclosure Statement, p. 167).

95.    The Debtors appear to have placed particular emphasis on several facts in determining that Delphi should be substantively consolidated with DAS, including the fact that: (i) Delphi routinely files consolidated financial statements; (ii) Delphi and DAS both use the name "Delphi" in their marketing materials and press releases; (iii) Delphi is the sole shareholder of DAS; (iv) there is significant overlap between the officers and directors of the two entities; (v) DAS relies on Delphi to obtain financing; (vi) Delphi and DAS share a number of corporate services; and (vii) a significant number of trade creditors filed proofs of claim against the wrong Debtor-entity, suggesting that they may have been confused about the legal distinction between Delphi and DAS.

96.    WTC respectfully submits that the facts relied upon by the Debtors, which are present in virtually every corporate family in America, are manifestly insufficient to justify disregarding the legal separateness of Delphi and DAS, particularly where holders of $2 billion of Senior Notes purchased those notes issued under an Indenture that clearly and unambiguously identifies Delphi (f/k/a Delphi Automotive Systems Corporation) as the sole issuer and the financial press clearly and unambiguously identifies the issuer as Delphi.

97.    While some trade creditors may have been confused about the precise legal entity with which they were dealing, anyone purchasing Senior Notes, either from Delphi at issuance, or in the marketplace, would know that the Senior Notes were issued by Delphi alone,

and would have had no reason to expect that they could be forced to share the assets of Delphi

with the creditors of Delphi's subsidiaries and affiliates, including DAS.[38]

98.      Moreover, even if individual creditors were confused, there is no evidence

that the Debtors are similarly confused about the proper locus for their liabilities.  Instead, as

reflected in the Supplemental Settlement Procedures Motion, the Debtors are perfectly capable of

determining whether claims have been asserted against the appropriate Debtor-entity, at least

when it suits their purposes to do so.

99.      Under Augie/Restivo, since the holders of Senior Debt relied on the legal

separateness of Delphi, they cannot be forced to sacrifice the priority of their claims against

Delphi Corporation even if, as the Debtors claim, some of the creditors of DAS may have been

confused about the legal distinctions between Delphi and its subsidiaries.  Rather, to the extent a

creditor, supposedly confused about the legal entity with which it was dealing, can establish it

holds a claim against Delphi, that creditor can participate as a creditor in distributions from

Delphi.  Augie/Restivo, 860 F.2d 519 ("Given these circumstances, the fact that the trade

creditors may have believed that they were dealing with a single entity does not justify

consolidation.  Upon a proper showing, the interests of the trade creditors can be protected by

their participating in Augie's case as creditors of that entity."  Id.)

**B.      The Debtors Are Not Hopelessly Entangled**

100.     Likewise, there is no evidence that the affairs of the Debtor are so

hopelessly entangled that consolidation will benefit all of the Debtors' creditors.  In fact, the

Debtors have affirmatively demonstrated to this Court on several occasions that they have the

---

[38]  Delphi has supported DAS throughout the bankruptcy case and DAS must repay those advances on an administrative expense basis to Delphi before any distributions may flow to the unsecured creditors of DAS.

ability to segregate and account for the separate assets and liabilities of each of the various Debtor entities and the Debtors now propose to separate their assets in connection with their proposed sale.

101.   In support of their first day motions, the Debtors affirmatively represented to the Court that their cash management system "includes the necessary accounting controls to enable the Debtors, as well as their creditors and this Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable."[39]

102.   Similarly, in connection with the Debtors' requests for debtor in possession financing, the Debtors have committed, and been ordered, to "use their reasonable best efforts to ensure that Debtors that receive the benefit of funds advanced under the Financing repay their share thereof on a dollar for dollar basis."[40]

103.   Unless the Debtors have been willfully ignoring the provisions of the DIP Refinancing Order, they must have some means of determining how the various liabilities generated by the Debtors' collective operations are distributed among the various members of their corporate family.  Indeed, the Debtors supply WTC with reports on a monthly basis setting forth Debtor Entity Loan Balances and Activity, as well as aggregate DIP borrowings by DAS and committed to report to the DIP lenders on a legal entity basis.

104.   The Debtors filed separate schedules and statements of financial affairs for each of the Debtors, which identified the separate assets and liabilities of each Debtor entity, including a $3.637 billion intercompany claim by Delphi Corporation against DAS.  The Debtors have further identified their U.S. manufacturing plants as owned by DAS and have provided the

---

[39]  See Miller Affidavit, ¶ 238.

[40]  See DIP Financing Order, ¶ 19.

Court with plant level financial data.  These facts certainly indicate that the Debtors have the ability to segregate and identify the specific assets and liabilities that are properly associated with each Debtor entity.

105.    Finally, the Debtors' suggestion that their affairs are hopelessly entangled is undermined by the fact that the Modified Plan provides for substantive consolidation "only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan."  (Plan, § 7.2(a)).

106.    If the Debtors affairs were genuinely entangled, it is difficult to fathom why it would be appropriate for the Debtors to retain their separate legal identities for all purposes other than voting and distributions, which would only lead to further confusion and prejudice to creditors post-confirmation.

107.    The evidence is clear that the Debtors can and do exist as independent, albeit affiliated, legal entities, whose affairs are carefully tracked and can be easily sorted out, to the extent they can even be shown to be entangled.  Consequently, the Debtors' proposed substantive consolidation appears to be nothing more than a "mere instrument of procedural convenience," Augie/Restivo, 860 F.2d at 518, which is not justified by the available evidence and is not permissible under the controlling law of this circuit.

108.    Accordingly, the Modified Plan, which is premised on the substantive consolidation of certain of the Debtors' estates, cannot be confirmed.

## III.    THE DEBTORS' REQUEST TO SELL THEIR ASSETS PURSUANT TO SECTION 363 OUTSIDE OF A PLAN SHOULD BE DENIED

109.    In the event the Debtors are unable to obtain approval of their Modified Plan, the Debtors seek approval to sell their assets outside of a Plan pursuant to 11 U.S.C. § 363. Although the Debtors state that it is their business judgment that they would need to sell their

assets, their only justification for such a sale is that "the economics of the transactions contemplated in the Master Disposition Agreement maximizes the value of the Debtors' estates." Motion ¶¶ 68 and 69. This argument is absurd.

110.    Under the MDA, the Debtors propose to sell their IUE staffed plants and the Rest of World operations (other than Global Steering) to Parnassus for one dollar. Thus, there is no value to be maximized and the Debtors have nothing to lose by waiting until the economy improves before seeking to sell their assets.

111.    As for the sale of the four UAW staffed plants and the Global Steering business to GM, the Debtors have no basis on which to allege that a sale to GM now maximizes the value of these assets. The sale of the assets was arranged by GM/Treasury for GM's benefit, not the Debtors. The Debtors do not appear to have made any concerted effort this year to sell these assets and only entertained inquiries after the Court ordered them to do so.

112.    More importantly, however, an auction process will not maximize the value of the Debtors' assets. The Debtors have continuously refused to use the leverage they have over GM as a sole source supplier to maximize the value of their assets. A shutdown of GM could cost GM billions of dollars because the Debtors are the only source from which GM can presently obtain the Delphi produced parts. Accordingly, value is not maximized through a normal Section 363 auction sale process. The Debtors' value is maximized by shutting down the delivery of parts to GM, which has just emerged from a bankruptcy sale process of its own and has been capitalized with tens of billions of taxpayer dollars, but may nevertheless die an early death, to the embarrassment of the U.S. Treasury, and bring the global auto industry to a grinding halt.

WHEREFORE, WTC respectfully requests that the Court enter an order denying

approval of the Modified Plan, denying Debtors' request for approval to sell their assets, and

granting such other and further relief as this Court deems just.


Dated: New York, New York
        July 15, 2009

                                K&L GATES LLP

                                By:    /s/ Edward M. Fox
                                    Edward M. Fox
                                    A Member of the Firm
                                Attorneys for Wilmington Trust Company,
                                as Indenture Trustee
                                599 Lexington Avenue
                                New York, NY 10022
                                (212) 536-3900

Exhibit A

Hearing Date:  July 13, 2009, at 9:45 a.m. (Eastern Time)
Objection Deadline:  July 8, 2009, at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Jeffrey L. Tanenbaum
Joseph H. Smolinsky
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
In re                       :          Chapter 11 Case No.
:
**GENERAL MOTORS CORP.,** *et al.*,   :          09-50026 (REG)
:
**Debtors.**   :          (Jointly Administered)
:
-------------------------------------------------------------x

### DECLARATION OF RANDALL L. PAPPAL
### IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING
### (I) MASTER DISPOSITION AGREEMENT FOR PURCHASE OF CERTAIN
### ASSETS OF DELPHI CORPORATION, (II) RELATED AGREEMENTS,
### (III) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,
### (IV) AGREEMENT WITH PENSION BENEFIT GUARANTY CORPORATION,
### AND (V) ENTRY INTO ALTERNATIVE TRANSACTION IN LIEU THEREOF

I, Randall L. Pappal, declare as follows:

1.      I am the Executive Director, HVAC and Mexico – Global Purchasing and

Supply Chain for General Motors Corporation (together with its direct and indirect subsidiaries,

"**GM**"). I have personal knowledge of the facts set forth herein or have conducted a reasonable

inquiry to determine that such statements are true and correct.

2.      I have a bachelors degree in industrial engineering, received in 1983, from the Rochester Institute of Technology.  I also have an MBA from the University of Michigan, received in 1992.

3.      I was hired by GM in 1983 and I have been employed by GM continuously since then.  During my employment at GM I have held several positions in the GM organization focusing on purchasing and supply chain operations, both domestic and international.  I am currently the Executive Director, HVAC and Mexico – Global Purchasing and Supply Chain and have held this position since 2008.   In my current position as Executive Director, HVAC and Mexico – Global Purchasing and Supply Chain, I am responsible for purchasing for global HVAC and electrical commodity, as well as purchasing and supply chain activities for Mexico.  In this position, I am also responsible for providing oversight for the Delphi[1] relationship within GM's purchasing organization.

4.      I make this declaration in support of GM's motion to approve (i) the purchase, and guarantee of purchase, of certain assets of Delphi pursuant to the MDA, (ii) entry into the SPA, the Operating Agreement, the Loan Agreement, the Commercial Agreements, and Ancillary Agreements with Parnassus in connection with Parnassus's purchase of substantially all of the remaining operating assets of Delphi, (iii) assumption of certain executory contracts in connection with the sale of certain of Delphi's assets and assignment of such contracts and leases to Vehicle Holdings, (iv) entry into an agreement with the PBGC in connection with such transaction, and (v) entry into an Acceptable Alternative Transaction with the successful bidder, if applicable, in the auction of Delphi's assets (the "**Motion**").

---

[1] Capitalized terms not defined herein have the meaning ascribed to such terms in the Motion.

**I.**    *Commercial Relationship Between GM and Delphi*

5.    GM and Delphi have a complex history arising from their interdependent relationship. Delphi consisted of divisions and subsidiaries of GM until GM's divestiture of Delphi in 1999. Since the spin-off, Delphi has been, and continues to be, GM's largest component parts supplier, accounting for approximately 11.3% of GM's North American purchases and 9.6% of GM's global purchases in 2008. Delphi is a sole-source, just-in-time, supplier of many critical parts to GM, including parts that are used in essentially every GM product line in North America.

6.    In turn, since the spin-off, GM has been, and continues to be, Delphi's largest customer. Although Delphi's sales to GM have declined over the years, in 2008, Delphi's sales to GM aggregated approximately $6.8 billion, or approximately 33% of Delphi's revenues. Thousands of Delphi's employees work at plants whose production is primarily dedicated to production for GM or GM's suppliers.

**II.**    *Affect on GM of Termination of Deliveries of Parts by Delphi*

7.    Consistent with industry practice, GM operates on a "just-in-time" inventory delivery system, in which component parts from suppliers are typically assembled onto vehicles by GM within a few hours of the delivery of the parts to the vehicle assembly facility. Because GM operates on a just-in-time inventory delivery system, it generally maintains little or no inventory of parts on site, and relies instead upon frequent and regular shipments of parts from its suppliers, including Delphi. Consequently, if Delphi ever ceases shipping even a small fraction of production parts to GM, the GM plants relying on such shipments may run out of inventory of such parts and have to shut down within a matter of days.

8.    Most parts that Delphi manufactures for GM are not readily available from an alternate source due to, among other things, capacity issues within the automotive parts supply industry, the length of time it takes to validate and obtain safety regulatory approval of a new supplier's parts, and lead time to develop and build tools for manufacture. While GM can accelerate efforts to resource Delphi parts in the event of a supply interruption, the sheer magnitude of the parts to be resourced and revalidation required would take at least several months to achieve.

9.    The shutdown of GM plants as a result of termination of deliveries of affected parts from Delphi could idle tens of thousands of GM workers, and it is estimated that GM's revenues would decrease significantly. GM would also incur costs related to expedited resourcing efforts, including, but not limited to, hundreds of millions of dollars for duplicate tooling, premiums and price increases paid to alternative suppliers, and the continued costs of maintaining idled plants (such as plant overhead and other fixed costs).

10.    Moreover, because GM purchases parts from many other automotive parts suppliers, a GM shutdown will likely affect many of its other suppliers. In the event of a shutdown of its North American facilities, GM would have no need for parts from its other suppliers and would be forced to stop purchasing all other parts used in the shut-down facilities, which include parts from over 1,500 other suppliers. Such a loss of revenue could force those suppliers to seek bankruptcy protection themselves, thus creating a broader risk to GM's and other motor vehicle manufacturers' future sources of parts supply.

11.    In short, a prolonged cessation in the supply of parts from Delphi to GM would have a devastating effect on GM, its ability to reorganize, and the communities that depend on employment by GM and its community of parts suppliers.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  July 8, 2009
        New York, New York

                                        /s/ Randall L. Pappal
                                        RANDALL L. PAPPAL

Exhibit B

Hearing Date:  July 13, 2009, at 9:45 a.m. (Eastern Time)
Objection Deadline:  July 8, 2009, at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Jeffrey L. Tanenbaum
Joseph H. Smolinsky
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **GENERAL MOTORS CORP.**, *et al.*, | : | **09-50026 (REG)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

------------------------------------------------------------x

**DECLARATION OF RICK WESTENBERG**
**IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING**
**(I) MASTER DISPOSITION AGREEMENT FOR PURCHASE OF CERTAIN**
**ASSETS OF DELPHI CORPORATION, (II) RELATED AGREEMENTS,**
**(III) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,**
**(IV) AGREEMENT WITH PENSION BENEFIT GUARANTY CORPORATION,**
**AND (V) ENTRY INTO ALTERNATIVE TRANSACTION IN LIEU THEREOF**

I, Rick Westenberg, declare as follows:

1.      I am a Director of Business Development for General Motors Corporation

(together with its direct and indirect subsidiaries, "**GM**").  I have personal knowledge of the facts

set forth herein or have conducted a reasonable inquiry to determine that such statements are true

and correct.

2.      I received a Bachelor of Business Administration degree in 1996 from the

University of Notre Dame.  After graduating from college, I spent five years working as an

auditor and financial consultant at Ernst & Young LLP.  Thereafter I attended the University of

Chicago and received an MBA.

3.      I was hired by GM in 2003 and have been employed continuously since

then.  During my employment at GM I have held several positions in the New York Treasurer's

Office focusing on different aspects of corporate finance.  I am currently Director of Business

Development and have held this position since 2008.  As Director of Business Development,

I am responsible for supporting the restructuring activities related to GM's involvement in the

chapter 11 cases of Delphi Corporation ("**Delphi**"), which has operated under chapter 11

protection since October 2005.  I previously supported these same restructuring activities as

Manager of Business Development in 2005 through 2006.

4.      I have been integrally involved in the negotiations between Delphi, GM

and Parnassus Holdings II, LLC ("**Parnassus**") in connection with the purchase by each of GM

and Parnassus of certain of Delphi's assets (the "**Proposed Transaction**").

5.      I make this declaration in support of GM's motion to approve (i) the

purchase, and guarantee of purchase, of certain assets of Delphi pursuant to the MDA[1], (ii) entry

into the SPA, the Operating Agreement, the Loan Agreement, the Commercial Agreements, and

the Ancillary Agreements with Parnassus in connection with Parnassus's purchase of

substantially all of the remaining operating assets of Delphi, (iii) assumption of certain executory

contracts in connection with the sale of certain of Delphi's assets and assignment of such

---

[1] Capitalized terms not defined herein have the meaning ascribed to such terms in the Motion.

contracts and leases to Vehicle Holdings, (iv) entry into an agreement with the PBGC in

connection with such transaction, and (v) entry into an Acceptable Alternative Transaction with

the successful bidder, if applicable, in the auction of Delphi's assets (the "**Motion**").

**I.**      *GM's Support to Date to Delphi's Chapter 11 Cases*

        6.      During the Delphi Cases, GM has been forced to spend billions of dollars

and incur billions of dollars of additional liabilities primarily to protect its supply base by

supporting Delphi.  The following are some of the most significant contributions made by GM in

the Delphi Cases:

- *Labor Solutions During Delphi's Cases.* GM made several critical contributions to facilitate Delphi's implementation of new agreements with its unions in 2006, 2007, and 2009, including paying or assuming billions of dollars of liabilities to allow Delphi to implement special attrition programs for certain of its hourly employees, providing opportunities for certain hourly employees to flow back to work for GM, the transfer of significant pension and post-retirement health care obligations to GM, and entering into memoranda of understanding with Delphi's unions to subsidize certain payments that GM believes Delphi would otherwise have had to make to its hourly employees.

- *Global Settlement Agreement/Master Restructuring Agreement.* To resolve many of the issues between GM and Delphi and increase Delphi's ability to exit chapter 11, GM and Delphi entered into a Global Settlement Agreement (as amended, the "**GSA**") and a Master Restructuring Agreement (as amended, the "**MRA**"), both of which have been amended several times during the Delphi Cases.[2] The GSA and the MRA both became effective in the fall of 2008.  Pursuant to the GSA and the MRA, GM agreed, among other things:

  o  to assume post-retirement health care and basic life insurance benefits for the vast majority of Delphi's U.S. hourly retirees (beyond such assumptions already contemplated in the labor contributions described above);

---

[2] All summaries in this Declaration of any agreements are qualified in their entirety by the terms of such agreements and, in the event of any conflict between any summary and the applicable agreement, the terms of such agreement control.

- o that the GM hourly pension plan would assume $2.1-2.4 billion of net liability of Delphi's hourly pension plan in exchange for an allowed administrative expense claim equal to 77.5% of the transferred net liability;[3]

- o to subsidize through 2015 Delphi's U.S. hourly labor costs and, until closure or sale, the costs of operating several of Delphi's U.S. facilities;

- o to a revenue plan to provide Delphi with a substantial, long-term book of GM business (in some cases, at pricing GM believes to be higher than market competitive levels) and enhanced opportunities to win future GM business; and

- o to reduce GM's unsecured claims against the Delphi Debtors from an asserted amount in excess of $13 billion to an allowed claim of $2.7 billion.

- *Liquidity Support.* While looking for alternatives to exit chapter 11, Delphi sought support from GM in the spring of 2008 to address Delphi's liquidity issues and avoid a shut down. As a result, GM agreed to advance Delphi up to $650 million in exchange for claims with a priority junior to the claims of the Delphi DIP Lenders (as amended, the "**GM-Delphi Financing Agreement**"). Since then, GM has made certain amendments to the GM-Delphi Financing Agreement such that GM's commitment to fund loans to Delphi thereunder is currently $550 million (inclusive of outstanding loans). In addition, GM accelerated the payment of $300 million in trade payables to Delphi over a three month period beginning in the first quarter of this year.

Notwithstanding the billions of dollars of support GM has already provided to Delphi, Delphi continues to need further liquidity support. In addition, Delphi's postpetition financing loans (the "**Delphi DIP Loans**") – in the current principal amount of approximately $3.3 billion – matured on December 31, 2008 and are currently in default. Delphi's DIP Lenders entered into a series of forbearance agreements, but the forbearance may expire as early as July 10, 2009, at which point the Delphi DIP Lenders may seek to foreclose on all or some portion of Delphi's

---

[3] GM also agreed that if Delphi could consummate a reorganization plan meeting certain criteria, (i) the GM hourly pension plan would assume an additional approximately $3.2 billion of net liability (based on current estimated liabilities and asset values) of Delphi's hourly pension plan, (ii) GM would accept preferred stock in reorganized Delphi in lieu of repayment of GM's administrative and general unsecured claims against Delphi, and (iii) GM would, under certain conditions, share a portion of such preferred stock with Delphi's unsecured creditors. Due to the state of the Delphi Cases, GM strongly believes that Delphi will not be able to consummate a reorganization plan meeting such criteria.

assets. The chaos that could ensue as a result of such foreclosures could lead to a cessation of

some or all of Delphi's operations. A cessation of operations by Delphi, whether due to liquidity

constraints or foreclosures by the Delphi DIP Lenders, could shut down GM's production and

lead to the attendant consequences described in the Declaration of Randall L. Pappal in support

of the Motion, filed contemporaneously herewith (the "**Pappal Declaration**").

## II.    *The Need for the Proposed Transaction*

7.      For the reasons set forth in the Pappal Declaration, in GM's relationship

with Delphi, protection of supply is paramount. GM must take measures to secure continuity of

supply. Due to Delphi's current liquidity crisis and the potential for foreclosure by Delphi's

postpetition secured lenders (the "**Delphi DIP Lenders**") in the absence of a consensual

resolution, it is imperative that the Debtors immediately secure the supply of parts from Delphi

in order for GM's own reorganization to succeed. In light of current circumstances, GM can

only obtain confidence that its supply of Delphi's parts will not be threatened by obtaining

control of certain of Delphi's assets and/or through a transfer of Delphi's assets to an entity that

GM is comfortable will be a stable and well-capitalized long-term supplier of parts to GM.

## III.    *Search for Other Alternatives to the Proposed Transaction*

8.      Over the past several months, GM and Delphi have discussed with various

parties, including the Delphi DIP Lenders and another potential purchaser of Delphi's assets,

potential transactions to resolve the Delphi Cases. Platinum Equity Capital Partners II, L.P.

("**Platinum**") was the only party to present a viable business, operating, and restructuring plan,

including stability of supply to GM, and to commit to a binding transaction on the expedited

timeline required by the current situation. Accordingly, after extensive negotiations with Delphi

and Platinum, GM determined that its most reliable and cost-effective option to secure the supply

of parts from Delphi's facilities would be to enter into agreements with Delphi, Parnassus (which was formed by Platinum), Platinum, and certain of Platinum's affiliates to provide for Delphi's sale of substantially all of its operating assets to GM (including to certain of GM's non-debtor affiliates) and Parnassus.

**IV.**    *The Benefits of the Proposed Transaction*

9.    Accordingly, to stabilize and secure for itself the supply of essential parts, GM has entered into the Proposed Transaction with Delphi and Parnassus, which would be partly owned by GM, whereby GM (primarily through wholly-owned non-debtor affiliates) would purchase certain of Delphi's assets used primarily to manufacture parts for GM, and Parnassus would purchase substantially all of Delphi's remaining operating assets (which are also used to produce parts for GM and other customers).

10.    More specifically, GM has decided to obtain control of Delphi's global steering business and Delphi's U.S. plants that employ workers represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**") because those plants supply parts primarily to GM and, in the case of the U.S. UAW plants, are important to GM's relationship with the UAW.  Operating assets of other Delphi businesses where GM is generally either not the principal customer or where the components are not as critical to GM production interests will be transferred to a third party.  Because no other party has been willing to provide sufficient capital to fully reorganize these other assets, GM has agreed to provide significant funding to the entity that will own these assets under the Proposed Transaction to allow such entity to reorganize the assets and become a stable supplier to GM.

11.    The Proposed Transaction would meet GM's goal of stabilizing the supply of parts currently manufactured by Delphi.  While acquiring certain critical assets directly, the

other assets used to produce parts for GM would be transferred to a stable entity that would be
well-capitalized and controlled by Platinum, which has the experience necessary to successfully
operate the assets.[4]  In the unlikely event that Parnassus encounters financial difficulties, GM
will have greater means to protect itself due to enhanced rights it is obtaining under commercial
agreements with Parnassus.  Finally, because Parnassus will be properly capitalized and GM has
confidence in Parnassus's business, operating, and restructuring plan, GM believes that it will
eventually be able to recover most, if not all, of the funds that it will invest in and loan to
Parnassus.

## V.    *Consideration to Be Paid by GM*

12.    Under the Proposed Transaction, GM is providing the following
consideration for the GM Purchased Assets:

- Assumption of certain ordinary course of business liabilities associated with the GM
  Purchased Assets;

- Assumption or payment of amounts necessary to cure defaults under Delphi's
  executory contracts that are to be assigned to GM (GM estimates this amount will be
  no more than $90 million);

- Payment to Delphi of approximately $900 million in cash;
- Payment to Delphi of up to $50 million to fund certain expenses of winding down the
  Delphi Debtors' estates;

- Payment of 50% of Delphi's professional fees (such payment is capped at $15
  million), plus the costs of solicitation of votes for Delphi's Modified Plan  (such
  payment is capped at $12 million); and

---

[4] Platinum has a successful track record of investing in and operating, among other types of companies,
manufacturing and industrial companies.  More importantly, Platinum has been doing due diligence on
Delphi's assets for more than three years and has devised a comprehensive business plan for Parnassus
that is not dependent for success on the automotive industry returning to pre-recessionary sales levels and
that GM believes will result in the financial and operational success of Parnassus.

- Payment to Delphi of up to approximately $145.5 million of the first net proceeds of the Plan Investor Litigation.

## VI.    *Involvement of U.S. Treasury*

13.    The United States Department of Treasury (the "**U.S. Treasury**") is the Debtors' largest prepetition secured creditor and their postpetition secured lender.  As such, the U.S. Treasury was kept abreast of and participated in the negotiations over the Proposed Transaction and approved GM's entry into the Proposed Transaction.

14.    Additionally, GM's postpetition secured loan will enable GM to fund the Proposed Transaction or an Acceptable Alternative Transaction that requires funding by GM.  To that end, with the approval of the U.S. Treasury, GM's anticipated expenditures with respect to Delphi were built into the initial 13-week budget submitted to the Court as part of approval of GM's postpetition financing (the "**DIP Budget**") and the final DIP Budget reflects all of the projected expenditures to be paid by GM or the other GM Buyers, including funding of capital to Parnassus under the SPA, in connection with the Proposed Transaction or an Acceptable Alternative Transaction.

## VII.    *The PBGC Discussions*

15.    Delphi's hourly and salaried pension plans are currently significantly underfunded (the hourly plan has a net underfunded liability of approximately $3.2 billion and the salaried plan has a net underfunded liability of approximately $2.1 billion).  The PBGC has asserted liens against the assets of Delphi's non-debtor affiliates (which include the foreign assets under the Proposed Transaction) to attempt to secure certain of the PBGC's pension-related claims against Delphi's ERISA control group.  Although Delphi has disagreed that these asserted liens are valid or enforceable, neither GM nor Parnassus (nor presumably any other

potential purchaser) is willing to purchase the assets (or shares in the non-debtor affiliates that own the assets) while they are subject to the threat of the PBGC liens. As a result, conditions precedent to the obligations of GM and Parnassus under the MDA are that the PBGC shall have agreed to remove its alleged liens on the assets subject to the Proposed Transaction. Additionally, Delphi's obligations under the MDA are conditioned on Delphi not being subject to liability in respect of its hourly pension plan after the closing of the MDA.

16.    GM, Delphi, the PBGC, and the U.S. Treasury have engaged in discussions regarding an agreement to satisfy these conditions and render saleable the assets subject to the PBGC's asserted liens (a "**PBGC Agreement**"). Although no PBGC Agreement has yet been reached, as part of any PBGC Agreement that may be ultimately reached, GM may agree to make a cash payment to the PBGC and/or assume all or some portion of the net underfunded liability of Delphi's hourly pension plan. GM will only agree to make these contributions if they are necessary to enable the Proposed Transaction or any Acceptable Alternative Transaction to proceed and the contributions are clearly outweighed by the benefits GM would receive from the Proposed Transaction or an Acceptable Alternative Transaction. In such circumstances, the GM contributions would be a sound exercise of GM's business judgment. Additionally, as with the other aspects of the Proposed Transaction, any GM contributions under a PBGC Agreement will be subject to U.S. Treasury consent.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Dated:  July 8, 2009
        New York, New York

/s/ Rick Westengerg
RICK WESTENBERG