# ATTACHMENT C
*Excerpt of I.R.S. 2001-8*
*Page 688 & 689*

Internal Revenue



Bulletin No. 2001-8
February 20, 2001

## HIGHLIGHTS
## OF THIS ISSUE
These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.

### INCOME TAX

**Rev. Rul. 2001-9, page 652.**
**UFO; price indexes; department stores.** The December 2000 Bureau of Labor Statistics price indexes are accepted for use by department stores employing the retail inventory and last-in, first-out inventory methods for valuing inventories for tax years ended on, or with reference to, December 31, 2000.

**T.D. 8914, page 653.**
Final regulations under section 988 of the Code relate to when a currency will be considered hyperinflationary. These final regulations are intended to prevent distortions associated with the computation of income and expense arising from section 988 transactions denominated in hyperinflationary currencies.

### EMPLOYEE PLANS

**T.D. 8928, page 685.**
Final regulations provide guidance on various issues arising under the COBRA continuation coverage requirements for group health plans. The issues include those related to business reorganizations, employer withdrawals from multiemployer plans, health flexible spending arrangements, and counting employees for purposes of the exception under the COBRA continuation coverage provisions for plans of small employers.

**REG-209461-79, page 712.**
Partial withdrawal of, and amendments to, the notices of proposed rulemaking that relate to the tax treatment of cafeteria plans under section 125 of the Code.

### EXEMPT ORGANIZATIONS

**T.D. 8920, page 654.**
**REG-246256-96, page 713.**
Temporary and proposed regulations under section 4958 of the Code add details to the definitions and rules of section 4958. Section 4958 imposes excise taxes on excess benefit transactions between a section 501(c)(3) or 501(c)(4) organization (except a private foundation) and a person with substantial influence over the affairs of the organization.

**Announcement 2001-20, page 716.**
A list is provided of organizations that no longer qualify as organizations to which contributions are deductible under section 170 of the Code.

### EMPLOYMENT TAX

**Announcement 2001-16, page 715.**
This announcement provides guidance to federally recognized Indian tribal governments about their Federal Unemployment Tax Act (FUTA) obligations for 2000. Recent legislation changed how FUTA applies to Indian tribal governments. As of December 21, 2000, federally recognized Indian tribal governments are exempt from FUTA. The new law contains a transition rule which eliminates an Indian tribal government's 2000 liability for FUTA taxes for services performed before December 21, 2000, if certain requirements are met. Because the due date for the 2000 Form 940 used to report FUTA tax liability is January 31, 2001, this announcement is made to provide Indian tribal governments options in filing their Forms 940.

Finding Lists begin on page ii.
Announcements of Disbarments and Suspensions begin on page 717.


Department of the Treasury
Internal Revenue Service

retroactive reinstatement of coverage, coverage can be terminated and later reinstated when the election (and, if applicable, payment for the coverage) is made. Thus, under these final regulations, the rules for when coverage must be reinstated and when claims must be paid are the same.

*Maximum Coverage Period*

The 1999 proposed regulations relating to the maximum coverage period are adopted as final regulations with a minor change to a cross-reference.

*Insignificant Underpayments*

The 1999 final regulations prescribe how plans are to treat payments for COBRA continuation coverage that are short by an amount that is not significant. They require the plan to treat the payment as full payment unless the plan notifies the qualified beneficiary of the amount of the deficiency and grants a reasonable period for payment of the deficiency. The regulations provide as a safe harbor that a period of 30 days after the notice is provided is a reasonable period for this purpose.

Many commenters requested that the regulations specify what is considered a significant amount. These final regulations provide that a shortfall is not significant if it is no greater than the lesser of $50 (or another amount specified by the Commissioner in guidance of general applicability) or 10 percent of the required amount.

Several commenters also requested that the regulations specify a period shorter than 30 days for payment of the deficiency to be considered timely, but these final regulations do not adopt this suggestion. The regulations require only that a plan grant a reasonable period for payment of the deficiency. In some circumstances, a period shorter than 30 days may be reasonable. However, in other circumstances, a shorter period might not be reasonable. The IRS and Treasury believe it is useful to provide the certainty of a safe harbor, but they do not believe that a period shorter than 30 days is sufficiently long in all cases.

*Business Reorganizations*

The 1999 proposed regulations relating to business reorganizations are adopted as final regulations with two clarifications. The proposed regulations provide that, in an asset sale (which is defined as the sale of substantial assets such *as a* plant or division or substantially all the assets of a trade or business), a purchaser of assets is considered a successor employer if the seller ceases to provide any group health plan to any employee in connection with the sale and if the buyer continues the business operations associated with those assets without substantial change or interruption. Several inquiries raised the question whether this rule applies if the assets are purchased as part of a bankruptcy proceeding. The final regulations clarify this rule for assets purchased in bankruptcy by providing that a buying group does not fail to be a successor employer in connection with an asset sale merely because the sale takes place in connection with a bankruptcy proceeding. Thus, the general rule for determining whether a buyer is a successor employer applies in bankruptcy the same way that it does outside of bankruptcy.

These final regulations also clarify that asset sale includes not only sales but other transfers as well.

Comments were received about other aspects of the proposed rules for business reorganizations. Several commenters requested additional guidance on the amount of assets that would constitute "substantial assets" for purposes of the asset sale rules. The final regulations retain the definition in the proposed regulations. This definition is intended to be flexible enough to apply reasonably to the myriad situations in which this issue arises. The asset sale rules, including the definition of asset sale, are similar to the various formulations of successor employer rules that have been fashioned by the courts for various labor law purposes, adapted to the peculiar circumstances that the COBRA continuation coverage requirements create. In those cases, as in the final rule, a case-by-case approach is favored. See, for example, *Golden State Bottling Co. v. NLRB,* 414 U.S. 168 (1973); *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union,* 417 U.S. 249 (1974); *John Wiley & Suns, Inc. v. Livingston,* 376 U.S. 543 (1964); *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272 (1972); *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27 (1987); *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086 (6th Cir. 1974); *In re National Airlines, Inc.,* 700 F.2d 695 (11th Cir. 1983); *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323 (7th Cir. 1990); *Central States, Southeast & Southwest Areas Pension Fund v. PYA/Monarch of Texas, Inc.,* 851 F.2d 780 (5th Cir. 1988).

One commenter requested clarification that the cessation of a plan shortly before an asset sale is in connection with the sale (and thus that the buying group would be responsible for making COBRA continuation coverage available to M&A qualified beneficiaries in connection with the sale if the buying group is a successor employer). The regulations have not been modified for this request. In many circumstances, cessation of a plan shortly before an asset sale would be considered to be in connection with the sale. However, there may be cases in which the plan was being terminated for an unrelated reason. The application of this rule in any particular case depends on all the relevant facts and circumstances.

The preamble to the 1999 proposed regulations included a description of a potential rule that the IRS and Treasury were considering adopting and solicited comments on that potential rule. The rule would have provided that no loss of coverage occurs, and thus no qualifying event occurs, if a purchaser of assets maintains substantially the same plan for continuing employees for what would otherwise be the maximum coverage period (generally 18 months). The IRS and Treasury also acknowledged in the 1999 preamble concerns about protecting the rights of qualified beneficiaries in this situation. After consideration of the comments, the IRS and Treasury have determined not to adopt such a special rule. Thus, under these final regulations, in an asset sale, employees who terminate employment with the seller and who no longer get health coverage from the seller experience a qualifying event with respect to the seller's plan even though they are employed by the buyer at the same jobs they had with the seller and have the same health coverage through the buyer.

Like the 1999 proposed regulations, these final regulations do not address how

the obligation to make COBRA continuation coverage available is affected by the transfer of an ownership interest in a noncorporate entity. However, it is intended that, in general, the principles reflected in the rules in the final regulations for transfers of ownership interests in corporate entities should apply in a similar fashion in analogous cases involving the transfer of ownership interests in noncorporate entities.

*Employer Withdrawals from Multiemployer Plans*

The 1999 proposed regulations relating to employer withdrawals from a multiemployer plan are adopted with two changes and two additional examples to illustrate the rules as changed. The general approach of the 1999 proposed regulations is retained. However, the proposed rule renders an employer who stops contributing to a multiemployer plan responsible for making COBRA continuation coverage available to qualified beneficiaries associated with that employer only if the employer establishes a new plan to cover active employees formerly covered under the multiemployer plan. Several commenters suggested that the employer should also be responsible for COBRA if the coverage provided to employees formerly covered under the multiemployer plan comes from an existing plan of the employer (rather than from a new plan). The final rules have been revised to apply the general approach to existing plans as well as to new plans.

The 1999 proposed regulations also place a threshold condition on the obligation of an employer or subsequent multiemployer plan to make COBRA coverage available to existing qualified beneficiaries associated with the withdrawing employer. That threshold is that the employer or subsequent multiemployer plan must cover a significant number of the employer's employees formerly covered under the multiemployer plan. Several commenters requested further guidance on what a significant number was in this context. Some of them also wanted to know what purpose this threshold condition serves. The intent in imposing this threshold condition in the proposed regulations was to leave responsibility for COBRA compliance with the existing multiemployer plan in a case where, for example, only one or two of the employees formerly covered under the multiemployer plan were transferred into management and became covered under a plan of the employer for which union employees were not eligible. The final rule has been revised to more clearly accomplish this intent. This threshold condition has been revised so that the employer plan or subsequent multiemployer plan has responsibility for COBRA compliance once coverage under the plan is available to a class of employees formerly covered under the multiemployer plan. New examples illustrate the application of this standard.

Several commenters expressed concern that the proposed regulations would require multiemployer plans to begin investigating why an employer stops contributing to the multiemployer plan and to determine whether the withdrawing employer subsequently covered union (or former union) employees under a single employer plan. Concern was also expressed that the proposed regulations would require the multiemployer plan to keep employer-by-employer data for qualified beneficiaries receiving COBRA continuation coverage. The IRS and Treasury recognized when they proposed these rules that in many industries it is impracticable for multicmployer plans to determine whether an employer that stops contributing to a multiemployer plan covers union employees under its own plan and that it is impracticable to maintain employer-specific data on employees and qualified beneficiaries. If a multiemployer plan finds it easier to make COBRA coverage available for the maximum coverage period, these final regulations do not require the plan to start gathering information that is difficult to assemble. Such a plan can comply with the COBRA continuation coverage requirements by making COBRA continuation coverage available to existing qualified beneficiaries in accordance with the general rules for the duration of COBRA continuation coverage (in §54.4980B-7).

One commenter requested clarification of the proposed rules if an employer establishes a plan for employees formerly covered under the multiemployer plan but applies a waiting period before the employees are eligible for coverage under that plan. These final regulations clarify that the employer's obligation does not arise until the employer makes coverage available. Thus, the multiemployer plan would be responsible for COBRA coverage until the waiting period under the employer's plan had expired for a class of employees formerly covered under the multiemployer plan.

Several commenters submitted substantially similar comments requesting that the rules be revised so that a multiemployer plan no longer receiving contributions from a certain employer would not be required to make COBRA continuation coverage available to any qualified beneficiaries affiliated with that employer. Such an approach, however, would not resolve the problem of qualified beneficiaries not having access to COBRA coverage, and the statutory basis for such a position is questionable in situations in which none of the statutory reasons for ending a plan's obligation to make COBRA coverage available to a particular qualified beneficiary is present. The final regulations do not adopt this suggestion.

The IRS and Treasury received an inquiry about who has the obligation to make COBRA continuation coverage available to existing qualified beneficiaries in a situation that reverses the situation addressed in the proposed rules, one in which employees cease to be covered under a plan maintained by their employer and commence to be covered under a multiemployer plan. In such a situation, the existing qualified beneficiaries should get the same coverage that similarly situated nonCOBRA beneficiaries are receiving, that is, the coverage under the multiemployer plan. The 1999 final regulations suggest this result in describing what COBRA continuation coverage is. However, the language used in the 1999 final regulations can be read to suggest that this is the result only when coverage is under the same plan: "If coverage *under the plan* is modified for similarly situated nonCOBRA beneficiaries, then the coverage made available to qualified beneficiaries is modified in the same way." (Q&A-1(a) of §54.4980B-5; emphasis added.) These final regulations delete the phrase "under the plan" from the quoted language to make clear that if coverage for the similarly situated nonCOBRA beneficiaries is modified by switching from one plan to another, then