## OEM RECEIVER PRODUCTION,

## MARKETING AND LICENSE AGREEMENT

This OEM Receiver Production, Marketing and License Agreement (this "Agreement") is made this 1st day of June 2004, and effective as of the 16th day of April 2004 (the "Effective Date"), by and between:

XM Satellite Radio Inc., a corporation organized and existing under the laws of the State of Delaware, having its principal office at 1500 Eckington Place NE, Washington, DC 20002 ("XM"); and

Delphi Automotive Systems LLC, a limited liability company organized and existing under the laws of Delaware, through its Delphi Electronics & Safety Division, having its principal office at One Corporate Center, P.O. Box 9005, Kokomo, IN 46904 ("Delphi") (each, a "Party" and collectively, the "Parties").

### Recitals

WHEREAS, XM is in the business of providing digital direct radio satellite communication services; and

WHEREAS, the decoding of XM's digital satellite signals requires specially designed satellite and terrestrial receivers incorporating proprietary chipsets; and

WHEREAS, Delphi is a developer and manufacturer of radio receivers for the OEM audio market; and

WHEREAS, Delphi has manufactured and distributed Delphi Products (as defined herein) to its OEM customers for the OEM audio market since XM's commencement of commercial operations in September 2001; and

WHEREAS, XM desires that Delphi continue to design, develop, produce and market receivers compatible with the XM satellite and terrestrial system and is willing to grant a license to Delphi therefore;

WHEREAS, Delphi seeks to continue to design, develop, produce and market such Delphi Products and desires a license therefore; and

WHEREAS, pursuant to separate agreements, Delphi directly or through its Affiliates, is a major distributor of XM Receivers for the plug-n-play market, including the Delphi XM SKYFi, the Delphi XM Roady and the Delphi XM Roady2.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

### 1. Definitions

For purposes of this Agreement, the following capitalized terms will have the following meanings.

1.1. **"Affiliate"** means a corporation, partnership or other entity that, directly or indirectly, controls, is controlled by, or is under common ownership or control with a Party.

1.2. **"Channel Decoder IC"** means an integrated circuit included in the XM Chipset capable of decoding the channels transmitted by satellite and terrestrial repeater on the XM System.

1.3. **"Commercial Audio Coding Technology"** means audio coding technology commercially licensed to XM under a royalty-bearing license from third party providers which can decode the digital bit stream transmitted in the XM System into an audio signal.
REDACTED

1.4. **"Constructive Total Loss"**, with respect to any XM satellite, is deemed to have occurred when the loss ratio of such XM satellite is equal to or greater than fifty percent (50%).

1.5. **"Delphi Information"** means information and knowledge, created solely by Delphi, its employees or Affiliates, relating to Delphi Products, the XM System, the XM Format, the XM Receiver, the XM Chipset, and the XM Patent Rights or Delphi Patent Rights that is not generally known, including, and whether or not patentable, trade secrets, know-how, data, designs, specifications, material lists, drawings, algorithms, formulas, patterns, compilations, programs, samples, devices, protocols, methods, techniques, processes, procedures and results of experimentation and testing.

1.6. **"Delphi Intellectual Property"** means collectively, the Delphi Information, Delphi Patent Rights, Development Information and Development Patent Rights.

1.7. **"Delphi Patent Rights"** means the patents and patent applications anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions thereof, and all supplementary protection certificates, created solely by Delphi, its employees or Affiliates, relating to Delphi Products, the XM Format, the XM System or the XM Receiver technology that Delphi owns. Delphi Patent Rights as of the Effective Date are set forth in Appendix 8 attached hereto, as periodically updated.

1.8. **"Delphi Product"** means any single-mode device (i.e., capable of receiving audio service only) manufactured by or for Delphi under this Agreement that includes an XM Receiver. For the avoidance of doubt, "Delphi Product" does not include any device capable of receiving data service or dual-mode (data-audio or audio-audio) service, or incorporating storage or time shifting functionality, applications using Command Audio or Digital Fountain technologies, or other advanced applications.

1.9. **"Development Information"** means information and knowledge, created solely by Delphi, relating to the incorporation by Delphi of the XM Receiver into Delphi Products under Section 2.1.1 Sectionthat is not generally known, including, and whether or not patentable, trade secrets, know-how, data, designs, specifications, material lists, drawings, algorithms, formulas, patterns, compilations, programs, samples, devices, protocols, methods, techniques, processes, procedures and results of experimentation and testing, excluding (i) the XM Information, (ii) any information or knowledge possessed or obtained by Delphi prior to April 16, 1999, and (iii) any information or knowledge possessed or obtained by XM prior to the Effective Date.

1.10. **"Development Patent Rights"** means the patents and patent applications anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions thereof, and all supplementary protection certificates, created solely by Delphi, relating to the incorporation by Delphi of the XM Receiver into Delphi

Products under Section 2.1Section, excluding (i) XM Patent Rights and (ii) any patents, patent applications and/or rights possessed or obtained by Delphi prior to April 16, 1999.

1.11. **"Marks"** means XM's logos and trademarks as set forth in Appendix 5.

1.12. **"OEM"** means an original equipment manufacturer of land vehicles, watercraft or aircraft.

1.13. **"Preproduction Delphi Product"** means a fully functioning Delphi Product that is not produced in mass-production quantities and is used by Delphi in its marketing activities as set forth herein.

1.14. **"Prototype Delphi Product"** means a prototype model Delphi Product that is used by Delphi in its marketing and sales activities relating to Delphi Products which is similar in its level of development, completion and functionality to the prototype models of new-technology products produced by Delphi approximately one year after the receipt of orders of such products from Delphi's OEM customers.

1.15. **"Technical Specifications"** means the Technical Specifications set forth in Appendix 2 hereto, as amended by XM from time to time.

1.16. **"Term"** means the term of this Agreement as set forth in Section 9.

1.17. **"Total Loss"** with respect to any XM satellite, is deemed to have occurred if such XM satellite is lost or destroyed or its station keeping is impossible.

1.18. **"Work"** means the whole of Delphi's performance of its obligations and exercise of its rights under this Agreement, including the design, development, production, promotion, distribution, marketing, and sales relating to the incorporation of XM Receivers into Delphi Products. Where the context so permits or requires, "Work" includes any part or parts of the Work.

1.19. **"XM Chipset"** means a set of integrated circuits composed of:



1.20. **"XM Format"** means the TDM and MCM bitstream structures used by XM in the XM System, subject to refinements by XM or its affiliated companies. The XM Format will be attached upon execution of this Agreement as Appendix 1 hereto.

1.21. **"XM Information"** means information and knowledge, excluding Delphi Information, relating to the XM System, the XM Format, the XM Receiver, the XM Chipset, and the XM Patent Rights that is not generally known, including, and whether or not patentable, trade secrets, know-how, data, designs, specifications, material lists, drawings, algorithms, formulas, patterns, compilations, programs, samples, devices, protocols, methods, techniques, processes, procedures and results of experimentation and testing.

1.22. **"XM Patent Rights"** means the patents and patent applications anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions thereof, and all supplementary protection certificates, relating to the

3

XM Format, the XM System or the XM Receiver technology that XM owns or will own, or is licensed or will be licensed to XM, during the Term. XM Patent Rights as of the Effective Date are set forth in Appendix 4 attached hereto, as periodically updated.

1.23. **"XM Receiver"** means an XM Chipset or equivalent (including but not limited to components developed or manufactured by Delphi pursuant to Sections 4.1.1(b) or 4.1.1(c)) capable of receiving XM's SDARS programming which conforms to the XM Format and meets or exceeds the Technical Specifications.

1.24. **"XM RF IC Tuner"** means the integrated circuit that performs all radio frequency signal processing functions prior to digital signal processing by XM's baseband chips (CDEC and SDEC).

1.25. **"XM Service Area"** means the United States and its territorial waters (other than Alaska and Hawaii).

1.26. **"XM System"** means a digital audio, visual imaging and/or data broadcasting system using time division multiplex ("TDM") downlink and PSK (phase shift key) modulation from two satellites and multicarrier modulation ("MCM") from terrestrial repeaters used by XM to provide an S-band Satellite Digital Audio Radio Service ("SDARS") in the United States pursuant to a license from the Federal Communications Commission.

1.27. **"XM's Test"** means XM's standard test of prototype receivers commonly applicable to all receiver manufacturers that produce devices incorporating XM Receivers for the OEM audio market in the United States.

1.28. Forms of the word "include" mean "including, without limitation;" references to Sections and Appendices refer to Sections and Appendices of this Agreement; and references to "hereunder," "herein," "hereof," and the like, refer to this Agreement, including all Appendices hereto.

## 2. Receiver Development and Production

### 2.1  Development of Delphi Products.

2.1.1  *Performance and Timing.*  Delphi will design, develop and produce Delphi Products in accordance with commercial demand.  Except as otherwise provided herein, Delphi will supply all personnel, materials, facilities and other resources necessary to perform the Work.

2.1.2  *Chipsets and Test Equipment.* Delphi will either (i) ⸻    ⸻    ⸻ ⸻  ⸻  REDACTED  ⸻    ⸻  ⸻  fabricate its own XM Chipsets solely for installation in its own XM Receivers, to the extent Delphi is so licensed under Section 4.1.1(b) hereof, or (iii) effectuate a combination of clause (i) and clause (ii) of this Section 2.1.2.

Delphi will negotiate and purchase radio test equipment at market competitive prices from the licensed test equipment manufacturer listed in Appendix 3.

4

2.1.3  *Subcontracts.* Delphi and its Affiliates may subcontract the performance of all or part of the Work. Any failure by a subcontractor to meet its obligations will not relieve Delphi of any of its obligations hereunder.

2.1.4  *Access to Work.* XM will have reasonable access to the Work relating to incorporation of XM Receivers into Delphi Products. Delphi will, at XM's request, deliver to XM copies of designs and data generated in the course of performing the Work, including calculations and/or estimates of the final bill of material and Delphi Product prices, in accordance with the confidentiality provisions of Section 6 of this Agreement. The Parties will schedule regular meetings to review the progress of the Work. One of the subjects of such meetings may be, for example, the total quantity and description (including model names or other product identification) of all such Delphi Products.

**2.2  Transfer of XM Information and Technical Assistance.** At Delphi's request, XM will furnish Delphi with such XM Information and technical assistance as is reasonably necessary for Delphi's performance of the Work, except with respect to Section 4.1.1(c), at no cost to Delphi and will cooperate with the field testing of Delphi Products. All technical assistance will be conducted at such times and places as the Parties may agree. As part of such technical assistance, XM shall on a regular basis share XM's plan for the direction of future modifications and improvements of the XM Chipset and XM Receivers. Delphi may at any time suggest to XM modifications of the Technical Specifications, and XM may in its sole discretion determine whether or not incorporate such suggestions.

**2.3  Production of Delphi Products.** Delphi and/or its Affiliates will produce working Delphi Products for the OEM market(s). Upon receiving production orders, Delphi and/or its Affiliates will mass produce Delphi Products for the OEM audio market in a quantity sufficient to meet customer demand. Delphi will use its commercially reasonable efforts to produce Delphi Products that are of high quality, appropriately priced, and fulfill Delphi's customers' needs. This Agreement only grants Delphi the right to produce Delphi Products for the markets described herein, and specifically does not grant Delphi the right to produce Delphi Products for any other market.

**2.4  Approval of Delphi Products.**

2.4.1  *Type Approval.* Prior to commencing mass production of any Delphi Products, Delphi will submit to XM for its inspection: (i) three (3) Prototype Delphi Products of each basic model of a receiver that Delphi proposes to manufacture, so that XM may confirm that such prototype receiver performs in accordance with the XM Format and the Technical Specifications; and (ii) the preliminary design specifications for such products, including all circuit diagrams, blueprints (or equivalents thereof), component specifications (if XM requests) and overall specifications of such prototype product as it relates to the XM System. If such prototype product successfully passes XM's Test, it will be deemed a "Delphi Product" under this Agreement. Successfully passing XM's Test does not constitute any guaranty or warranty by XM of the actual performance of such Delphi Product. After a receiver has been qualified as a Delphi Product, only those changes may be made to the Delphi Product which are cosmetic in nature or which do not affect its function or quality, unless the receiver is resubmitted to XM for testing and XM confirms that this modified receiver continues to

5

qualify as a Delphi Product. All testing will be performed at XM's then current testing rates. As of the Effective Date, XM's standard rates are as set forth in Appendix 7 attached hereto, but XM reserves the right to make reasonable changes to its rates with prior notification to Delphi.

2.4.2 *Requests for Testing.* All requests for testing will be accompanied by payment in full of XM's testing fee, prototypes of the applicable receiver and all test data and schematics pertaining thereto. XM will endeavor in good faith to test, or have its authorized agent test, all prototype receivers submitted for testing within thirty (30) days from the date XM or such authorized agent has received such prototype and all test data and schematics pertaining thereto; *provided, however,* that for any Delphi Product scheduled to be included in new vehicles from July 1 of any year (the commencement of the upcoming model year) (a) the deadline for submission of all materials required for testing shall be the immediately preceding April 15, and (b) XM may, in its discretion on a case-by-case basis, agree to accept a request for testing after April 15, subject to an expedite fee as determined by XM. Delays in testing will not entitle Delphi to cancel a testing order or to claim damages.

## 3. Receiver Marketing

### 3.1  Marketing the Delphi Products.

3.1.1 *Licensed Manufacturer* Delphi shall have the nonexclusive right to manufacture Delphi Products, and to distribute and market Delphi Products to OEMs and their authorized dealers for such OEMs' and authorized dealers' sales.  Delphi shall have no right to manufacture, distribute or market Delphi Products for any other market without the prior written consent of XM. Notwithstanding anything herein contained to the contrary, if any conflict occurs between the conditions herein and a procurement policy of Delphi's OEM audio customers, XM and Delphi agree to negotiate in good faith in order to find a reasonable solution.

3.1.2 *Requirement to Market.* Delphi will market Delphi Products to OEMs producing vehicles for use anywhere in the XM Service Area. Delphi agrees to market Delphi Products to all of its current OEM customers, as well as additional potential OEM customers it hopes to acquire. Delphi agrees to develop and implement a plan to market directly to OEMs. Delphi agrees to coordinate its marketing efforts with those of XM.

3.1.3 *Marketing Support.* If requested by Delphi, XM will assist Delphi, at no cost to Delphi, in marketing Delphi Products to Delphi's current and potential customers. This support shall include XM's own marketing efforts to OEMs, assisting Delphi with presentations, and providing XM promotional material. XM will provide Delphi with the results of any market research related to devices incorporating XM Receivers conducted by XM at no cost to Delphi.

3.2    *RFP/RFQ Responses.* For Delphi Products to be produced for model year 2006 (from July 1, 2005) and all subsequent model years, prior to responding to any request for proposal ("RFP") or request for quotation ("RFQ"), Delphi shall confirm with XM the applicable XM Chipset pricing and cost reduction amount (if any). At the time of such confirmation, XM shall inform Delphi whether the XM Chipset pricing provided by XM is

firm (i.e., XM has obtained a binding commitment from the manufacturer) or targeted based on engineering estimates. For any targeted pricing, XM shall notify Delphi of the firm price promptly after receiving a binding commitment from the manufacturer. Delphi shall not include in any RFP or RFQ response a commitment to provide Delphi Products that will incorporate XM Chipsets or XM Receivers that are not yet in mass production, without XM's prior written consent. In the event that XM grants its consent pursuant to the immediately preceding sentence, such consent shall not be valid unless and until the Parties have agreed in writing on the means by which expenses arising directly or indirectly as a result of Delphi's use of XM Chipsets or XM Receivers that are not yet in mass production shall be shared by the Parties.

### 4. Intellectual Property Licenses

**4.1   XM Information License, XM Patent Rights License and Marks License.**

    **4.1.1   *License and Sublicense Grant.***

    (a) During the Term, XM hereby grants to Delphi and its Affiliates a non-exclusive, non-transferable, revocable (to the extent set forth herein), indivisible license under the XM Information, the XM Patent Rights and the Marks to perform, and have performed, the Work. Delphi will have no right to sublicense the rights granted in this Section 4.1.1 to any third party, in whole or in part, without XM's prior written approval.

    (b) Subject to the consent of   REDACTED   (to the extent applicable), XM hereby grants to Delphi and its Affiliates a non-exclusive, non-transferable, revocable, indivisible license under the XM Information and the XM Patent Rights (insofar as such XM Information and XM Patent Rights relate to the Channel Decoder IC and RF IC set forth in the XM Receiver architecture provided to Delphi) to perform, and have performed, the fabrication by Delphi of such Channel Decoder IC portion of the XM Chipsets to be installed in Delphi Products manufactured or to be manufactured by Delphi. Delphi will have no right to sublicense the rights granted in this Section 4.1.1(b) to any third party without XM's prior written approval.

    (c) Subject to required third party consents (to the extent applicable), XM hereby grants to Delphi and its Affiliates a non-exclusive, non-transferable, revocable, indivisible license under the XM Information and the XM Patent Rights (insofar as such XM Information and XM Patent Rights relate to the RF IC set forth in the XM Receiver architecture provided to Delphi) to perform, and have performed, the fabrication by Delphi of such RF IC portion of the XM Receiver to be installed in Delphi Products manufactured or to be manufactured by Delphi; provided however, that to the extent Delphi exercises the rights granted under this Section 4.1.1(c), Delphi shall not be permitted to use or incorporate XM's RF IC mask works, drawings, design or technical specifications. Delphi will have no right to sublicense the rights granted in this Section 4.1.1(c) to any third party without XM's prior written approval.

    **4.1.2   *Licensed and Sublicensed Territory.*** Pursuant to Section 4.1.1, Delphi and its Affiliates may design, develop and/or manufacture, and have designed, developed, and/or manufactured, Delphi Products anywhere in the world for initial consumer sale and usage in

the United States; *provided, however,* that Delphi will not use or authorize any public use, direct or indirect, of the Marks outside the XM Service Area; notwithstanding the foregoing, Delphi may exhibit, make presentations, introduce and/or demonstrate Delphi Products (with the Marks thereon) produced by Delphi worldwide for the purpose of technical and commercial promotion.

4.1.3   *Land Vehicle and Watercraft OEM Royalty.*

REDACTED

(a) **Recoup of Third Party Royalties paid by XM on Delphi's Behalf.**

REDACTED

. . . a portion of costs associated with co-development of mutually agreed-upon projects.

(b) **XM Royalty Through End of Model Year 2006 (HCMOS8/HCMOS9).**

(i)   REDACTED

(ii) I   REDACTED

(iii)   REDACTED

(iv)   REDACTED

(c) **XM Royalty for Model Year 2007 and Beyond (HCMOS90).**

(i) REDACTED

(ii) REDACTED

(d) **Additional Third Party Royalties.**

(i) REDACTED

(ii) **Through the End of Model Year 2006.**

REDACTED

To end of
MY 2006:

(iii) **Model Year 2007 to End of Initial Term.**

REDACTED

REDACTED

of Term:

(iv)  Subject to Section 4.1.3(e), REDACTED

REDACTED

(e)  **Delphi Right to Negotiate and Pay Third Party Royalties Directly.**

REDACTED

(f)  **Third Party Royalties after Initial Term.**  Delphi acknowledges and agrees that after expiration of the initial five (5) year term of this Agreement, subject to Section 4.1.3(e), all Thir REDACTED

(g)  **Unexpended Development Account Amounts.**  Any amounts remaining in the Development Account upon the termination or expiration of this Agreement (including any renewals) shall be paid by Delphi to XM within sixty (60) days after such termination or expiration.

(h)  **No Less Favorable Royalty.**  During the Term, Delphi will not be required to pay a royalty to XM in respect of XM Receivers incorporated into Delphi Products produced for automotive OEM customers on less favorable terms than those applicable to any other manufacturers of products incorporating XM Receivers produced for automotive OEM customers.

4.1.4  *Aircraft OEM Royalty.*  Prior to Delphi marketing any Delphi Product to aircraft OEM customers the parties shall agree in writing on the REDACTED Product to be marketed and sold to Delphi's aircraft OEM customers.

4.2. **Delphi Intellectual Property.** XM or an Affiliate of XM may, in its sole discretion, elect to incorporate Delphi Intellectual Property into the XM System, the XM Receiver and/or the XM Chipset, either with respect to Delphi Products only or with respect to all or some products incorporating an XM Receiver or XM Chipset. In the event that XM elects to so incorporate any Delphi Intellectual Property that (i) includes or improves upon XM Information or XM Patent Rights, or (ii) requires modification of the XM System the XM Receiver and/or the XM Chipset in order to achieve such incorporation. ⁻ʰᵉ REDACTED . Should XM or an Affiliate of XM elect to utilize the Delphi Intellectual Property with respect to all or some products incorporating an XM Receiver or XM Chipset (other than Delphi Products), Delphi agrees to license such use to XM and its authorized manufacturers of devices incorporating XM Receivers on the basis of a non-discriminatory, reasonable compensation therefor and pursuant to other reasonable terms and conditions. Should Delphi and XM be unable to agree as to a reasonably royalty rate, the matter of determination of an appropriate royalty rate shall be subject to the terms of Section 12 ("Settlement of Disputes"), below. The Parties agree that any royalties, revenue or other consideration received by Delphi from XM as compensation for any license under Delphi Intellectual Property shall first be satisfied from amounts contained in the Development Account.

D REDACTED

**4.3  Use of the Marks.**

4.3.1 *Proper Use.* Delphi will in a permanent manner affix the Marks to all Delphi Products (as permitted by the applicable OEM customer) and will use the Marks in all advertising and promotional literature concerning the Delphi Products. The Marks will be affixed to the Delphi Products, and used in any advertising and promotional material, in such a manner as to allow a person with normal vision to recognize the Marks, and will be at least as prominent in location and size as any other logo or mark of similarly licensed technology in similar products or similar advertising. Delphi will cause notice of XM's ownership of the Marks to be used in any advertising or promotional materials for Delphi Products in such a manner and at least as frequently as Delphi uses said proprietary notice or equivalent with respect to any other logo or mark of similarly licensed technology in similar products or similar advertising. The following notice (or such other notice as XM may hereafter reasonably require) is an example of an appropriate notice:

*XM and the XM logos are registered trademarks of XM Satellite Radio Inc.*

4.3.2 *Benefit of Use.* Delphi's use of the Marks will inure to the benefit of XM, and Delphi will not at any time acquire any rights in such Marks or any trademarks or trade dress similar thereto by virtue of any use it may make of any such Marks.

4.3.3 *Good Will.* All of the good will now or to be associated with the Marks belongs exclusively to XM and all good will associated with the Marks pursuant to Delphi 's use thereof will inure exclusively to XM's benefit.

4.3.4 *Use of Similar Marks.* Delphi will not adopt or use any name, trademark or servicemark confusingly similar to any of the Marks.

11

**4.4   Quality of Delphi Products.**

4.4.1   *Quality Control.* In order to ensure the protection of the Marks and the good will pertaining thereto, Delphi will manufacture Delphi Products of a quality approved by XM, and the following procedures shall be implemented:

(a) Delphi will submit to XM, free of charge, a production sample of each model Delphi Product to be manufactured by Delphi;

(b) XM shall approve the quality of such production sample Delphi Products;

(c) Delphi shall implement and use reasonable quality control procedures to assure that its Delphi Products meet the quality standards approved by XM; and

(d) XM shall verify that such quality control procedures are implemented and used by Delphi in the manufacture of such Delphi Products.

4.4.2   *Design and Evaluation Sample Review.* Delphi agrees prior to finalization of the design for each basic model of a Delphi Product to furnish XM, free of cost, for XM's prior written approval and comment as to quality and appearance for compliance with requirements to protect the Marks under applicable trademark law, the following: (i) testing procedures to be undertaken for such basic model of Delphi Product (as specified in Section 2.4.1) and all applicable performance standards and quality review procedures to be applied; (ii) sketches, drawings, mock-ups, photographs, or equivalents thereof of the exterior of such basic model of Delphi Product showing detail including the placement of all Marks and other trademarks, text, notices, symbols, designs and markings; and (iii) a sample of each basic model of a Delphi Product when it becomes available. XM's approval hereinabove will not be unreasonably withheld.

4.4.3   *Review of Promotional Materials and Production Samples.* If XM reasonably requests, Delphi will furnish XM, free of cost, for prior comment and written approval, any advertising or promotional materials or any production samples.

## 5. Audit Rights; Chipset Price Protection; Payment Terms

**5.1.   Audit Rights.** During the Term and for a period of one year thereafter, XM and Delphi or their respective authorized representatives shall have the right at its expense, to inspect, audit, and copy any books and records of the other Party, at such other Party's offices, during normal business house upon reasonable written notice, that relate to the performance of such other Party's obligations hereunder. In the event any such audit indicates a discrepancy between amounts previously paid and the amounts determined by such audit to be due and payable at such time, or a discrepancy regarding any information reported to the auditing Party hereunder, the Party being audited shall have ten (10) days from the date of receipt of notice of the discrepancy from the auditing Party to correct the discrepancy or object to the audit results. If the audited Party objects to the results of the audit, such Party shall, within twenty (20) days of such objection, provide documentation to the auditing Party in support of the initial payment(s) or information disclosed. Disputes shall be resolved in accordance with Section 12 hereof.

**5.2    XM Chipset Cost Protection.**

(a)    **Chipset Maximum Price.**  In accordance with this Section 5.2, with respect to each Shipped Receiver, XM hereby agrees that it will reimburse Delphi f̶ REDACTED r that Delphi must pay to authorized XM Chipset manufacturers to obtain such XM Chipset as follows:  If the net aggregate cost to Delphi of XM Chipsets installed in Shipped Receivers for any calendar quarter

REDACTED

ice referred to in Section 5.2(b).

(b)    **Quarterly Certificates By Delphi.**  On the tenth Business Day of January, April, July and October of each year during the Term, Delphi shall deliver to XM a certificate, with an attached invoice, signed by an officer of Delphi certifying: (i) REDACTED t purchased by Delphi from an authorized XM Chipset manufacturer during the preceding calendar quarter; and (ii) the number of XM Chipsets purchased by Delphi and installed in Shipped Receivers during the preceding calendar quarter.  Such certificate shall be accompanied by evidence, which shall be reasonably satisfactory to XM, regarding the

REDACTED

(c)    **Limitations of Price Protection.**  Except as provided in Section 5.2(d) below, the REDACTED

).  No later than May 1, 2005, Delphi shall provide XM with a written transition plan for moving its OEM customers to Delphi Products incorporating

(d)    **Exceptions.**  The provisions of Section 5.2(c) above shall not apply with respect to situations where Delphi's OEM customer refuses to move to Delphi Products incorporating newer generations of the XM Chipset, provided that Delphi shall promptly notify XM in writing of any such situation.  REDACTED 5.2(c).

(e)    In the event that De̶ REDACTED

13

XM after the manufacturer c  REDACTED _____  nd provide complete documentation of invoices and pa *rt* REDACTED  :. In the event that Delphi's actual purchase price from the manufacturer for XM Chipsets for which XM quoted a targeted price pursuant to Section 3.2 is higher than such quoted targeted price, Delphi shall bear such additional cost.

**5.3  Intentionally Omitted.**

**5.4 Information Reporting by Delphi and OEMs.**  (a) In order to assist XM in its sales and marketing efforts and the implementation of its subscriber activation and deactivation system, Delphi shall deliver to XM on the fifth Business Day of each month, a report regarding the number of Shipped Receivers shipped during the preceding calendar month, which report shall include:

(i)    a list of the electronic serial number and keys installed in each XM Receiver incorporated into a Delphi Product manufactured by or for Delphi;

(ii)    the publicly identifiable serial number of each XM Receiver incorporated into a Delphi Product manufactured by or for Delphi;

(iii)    the production date and, if available, any other identifying information of each XM Receiver and XM Chipset installed in each Delphi Product manufactured by or for Delphi; and

(iv)    such other information as XM may reasonably request.

All such information shall be provided to XM in both written and electronic, computer readable form.

(b) In order to assist XM in its sales and marketing efforts and the implementation of its subscriber activation and deactivation system, Delphi shall use reasonable commercial efforts to ensure that each automobile manufacturer which installs a Delphi Product manufactured by or for Delphi delivers to XM, on or before the fifth Business Day of each month, a report which shall include:

(i)    the serial number of each XM Receiver incorporated into a Delphi Product and the serial number, or vehicle identification number, of the vehicle in which such Delphi Product was installed;

(ii)    the name, address, email address, date of purchase and method of payment of any person purchasing or leasing a vehicle with an installed Delphi Product; and

(iii)    such other information as to the owner or lessee of a vehicle with an installed Delphi Product as XM may reasonably request.

14

All such information obtained shall be provided to XM in both written and electronic, computer readable form.

**5.5    Payment Terms.** All payments under this Agreement by either XM or Delphi to the other Party shall be paid in U.S. dollars payable to Delphi by certified check or wire transfer in immediately available funds and free of any bank charges.

## 6. Confidentiality and Nondisclosure of Proprietary Information

**6.1    Non-Disclosure and Non-Use.** All information furnished or disclosed by either XM or Delphi (a "Disclosing Party") to the other (a "Receiving Party") which is marked with a restrictive notice or otherwise tangibly designated as proprietary (hereinafter "Information") shall be deemed the property of the Disclosing Party and shall be returned to the Disclosing Party promptly upon request. Unless such Information: (i) was previously known to the Receiving Party free of any obligation to keep it confidential, or (ii) has been or is subsequently made public by the Disclosing Party or a third party under no obligation of confidentiality, or (iii) is independently developed by the Receiving Party, then the Receiving Party shall for a period ending three (3) years after the termination or expiration of this Agreement, use the same degree of care, but no less than a reasonable standard of care, as it uses with regard to its own proprietary information to prevent disclosure, use or publication thereof. Information furnished hereunder may be used by Receiving Party solely for performance of its obligations under this Agreement and may be used for other purposes only upon such terms and conditions as may be agreed upon by the Disclosing Party. The Receiving Party shall be responsible for any breach of this Agreement by the Receiving Party or any director, officer, employee or other representative of the Receiving Party.

**6.2    Survival Upon Termination.** Absent written release by Disclosing Party, the Receiving Party's obligations under this Section 6 will terminate eight (8) years after the date of disclosure, and will survive any earlier termination of this Agreement under Section 9 hereof.

**6.3    Remedies for Breach.** The Receiving Party agrees that money damages would not be sufficient remedy for any breach of this Section 6 by the Receiving Party or any director, officer, employee, agent or other representative of the Receiving Party, and that in addition to any other rights or remedies which it may have, the Disclosing Party will be entitled to seek equitable relief, including injunction and specific performance, as a remedy for such breach.

**6.4    Confidentiality of Agreement.** Neither Party will disclose the contents of this Agreement without the prior written consent of the other Party, except (i) as may be required by pertinent national or local laws and regulations including the rules and regulations of the SEC, applicable regulatory agencies and securities exchanges, in each case with five day's prior notice to the other Party, or (ii) in connection with *bona fide* financing activities.

## 7. Representations and Warranties

**7.1    Authority.** Each Party represents that it has the necessary corporate authority, and has taken the necessary steps, to enter into and fulfill its obligations under this Agreement.

**7.2    Intellectual Property Representations.**

(a) **XM.** XM represents that it owns and will own all right, title and interest or have a license to XM Information, XM Patent Rights, and Marks; that it has the right to grant the rights granted under this Agreement; that the granting of such rights does not require the consent of any third party; and, that there are and will be no agreements inconsistent with the provisions of this Agreement.

(a) **Delphi.** Delphi represents that it owns and will own all right, title and interest or have a license to Delphi Intellectual Property; that it has the right to grant the rights granted under this Agreement; that the granting of such rights does not require the consent of any third party; and, that there are and will be no agreements inconsistent with the provisions of this Agreement.

**7.3    No Knowledge of Infringement.**

**7.3.1 XM.** As of the Effective Date, XM represents that (i) it is unaware of any third party patent or other intellectual property right that would be infringed by the use of the XM Information, the XM Patent Rights, or the Marks, as contemplated by this Agreement, and (ii) it is unaware of any claim for infringement relating to the XM System, except as has been identified to Delphi as of the date hereof. Except for the condition stated in the previous sentence in this Section, XM does not represent that the XM Receiver or the use of the XM Patent Rights, the XM Information, and the Marks does not infringe any patent or any other intellectual property right owned by any third party. Notwithstanding the foregoing, the Commercial Audio Coding Technology included in the XM Information is licensed by XM from a third party.

**7.3.2 Delphi.** As of the Effective Date, Delphi represents that (i) it is unaware of any third party patent or other intellectual property right that would be infringed by the use of the Delphi Intellectual Property, as contemplated by this Agreement, and (ii) it is unaware of any claim for infringement relating to the Delphi Intellectual Property, except as has been identified to XM as of the date hereof. Except for the condition stated in the previous sentence in this Section, Delphi does not represent that the Delphi Products or the use of the Delphi Intellectual Property does not infringe any patent or any other intellectual property right owned by any third party.

**7.4    Nonreliance.** Delphi represents that it will not rely solely upon technical information provided by XM, but will independently test, analyze, and evaluate Delphi Products before manufacturing and marketing them.

**7.5    Performance of Work.** Delphi represents that the Work will be performed in a timely and professional manner by qualified personnel of Delphi, Delphi's Affiliates or agents.

**7.6    Limitations.**

7.6.1 Except as otherwise provided herein, XM makes no representations, extends no warranties or indemnification of any kind, expressed or implied, nor assumes any

16

responsibilities whatsoever with respect to the manufacture, use, sale or other disposition of Delphi Products by or for Delphi, OEMs or consumers.

7.6.2  XM makes no representations or warranties as to the commercial utility of the XM Information or the XM Patent Rights.

7.6.3.  Except as otherwise provided herein, Delphi makes no representations, extends no warranties or indemnification of any kind, express or implied, nor assumes any responsibilities whatsoever with respect to the use of Delphi Intellectual Property by XM.

7.6.4.  Delphi makes no representations or warranties as to the commercial utility of the Delphi Intellectual Property.

7.6.5  THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 7 ARE EXCLUSIVE OF, AND EACH OF XM AND DELPHI SPECIFICALLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR RESPECTING THE RESULTS TO BE OBTAINED FROM USE OF THE XM INFORMATION, XM PATENT RIGHTS, THE XM SYSTEM OR THE DELPHI INTELLECTUAL PROPERTY. NEITHER PARTY WILL BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, LOST PROFITS, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE, WHETHER BASED IN CONTRACT, IN TORT OR OTHERWISE, THAT MAY ARISE IN CONNECTION WITH THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 8. Indemnification

**8.1  Delphi Product Indemnification.** Delphi will defend, indemnify and hold harmless XM, its Affiliates, and their respective officers, employees, and other representatives ("XM Indemnitees") from and against any and all suits, actions, claims, judgments, debts, obligations or rights of action of any nature or description arising from product liability laws, tort, contract or common law with respect to Delphi Products manufactured by or for Delphi and all reasonable costs, including attorneys' fees, incurred by the XM Indemnitees with respect thereto. This indemnity provision will impose no obligation upon Delphi to the extent that the risk indemnified against hereunder arises from the acts or omissions of XM or is otherwise attributable to XM under product liability laws, tort, contract or common law.

**8.2  Delphi Intellectual Property Indemnification.**

8.2.1  If XM, its Affiliates, or their respective officers, employees, and other representatives ("XM IP Indemnitees") are charged with infringement of a third party's intellectual property rights, including patent rights, as a result of the use of Delphi Intellectual Property within the XM Service Area, Delphi will, at no expense to the XM IP Indemnitees: (i) defend and indemnify the XM IP Indemnitees against any expenses and liabilities relating to such charge or claim, including expenses and liabilities incurred by the XM IP Indemnitees to satisfy indemnification obligations to any of its customers or licensees, and charges and claims for past infringement; and (ii) to the extent appropriate, either, (a) procure for XM the right to continue such use, or (b) modify the

17

Delphi Intellectual Property so that it no longer infringes, provided that such modification can be done without substantially impairing its functionality or performance.

8.2.2   XM will promptly notify Delphi in writing of any claim of infringement or indemnification and will provide Delphi with the authority, information and assistance necessary to defend or settle such claim; provided, however, that XM will have the right to participate in such defense and to approve in advance any proposed settlement requiring payment of money damages by XM. XM will have the right to take over from Delphi the defense of a claim at any time, provided that the XM IP Indemnitees release Delphi in writing from any further obligation of defense or indemnification in connection with such claim unless otherwise mutually agreed.

8.2.3   XM's obligation of indemnification under this Section 8.2 is limited to
[ REDACTED ]

## 8.3   XM Intellectual Property Indemnification.

8.3.1   If Delphi, its Affiliates, or their respective officers, employees, and other representatives ("Delphi Indemnitees") are charged with infringement of a third party's intellectual property rights, including patent rights, as a result of the incorporation of the XM Receiver into Delphi Products within the XM Service Area, and if such alleged infringement arises from an aspect or function of the XM Chipset, the XM Format, the Marks or any other element or feature of the XM Receiver that was required pursuant to the Technical Specifications, XM will, at no expense to the Delphi Indemnitees: (i) defend and indemnify the Delphi Indemnitees against any expenses and liabilities relating to such charge or claim, including expenses and liabilities incurred by the Delphi Indemnitees to satisfy indemnification obligations to any of its OEM customers, and charges and claims for past infringement; and (ii) to the extent appropriate, either, (a) procure for Delphi the right to continue such development, manufacture and/or marketing, or (b) modify the design of the XM Receiver so that it no longer infringes, provided that such modification can be done without substantially impairing its functionality or performance.

8.3.2   Delphi will promptly notify XM in writing of any claim of infringement or indemnification and will provide XM with the authority, information and assistance necessary to defend or settle such claim; provided, however, that Delphi will have the right to participate in such defense and to approve in advance any proposed settlement requiring payment of money damages by Delphi. Delphi will have the right to take over from XM the defense of a claim at any time, provided that the Delphi Indemnitees release XM in writing from any further obligation of defense or indemnification in connection with such claim unless otherwise mutually agreed.

8.3.3   XM's obligation of indemnification under this Section 8.2 is limited to
[ REDACTED ]

18

**8.4   Survival.** The obligations of XM and Delphi under this Section 8 will survive termination of this Agreement with respect to Delphi Products manufactured or sold before the date of such termination.

## 9. Term and Termination

**9.1   Term.** This Agreement will be effective as of the Effective Date for a term of five (5) years, unless earlier terminated pursuant to this Section 9.   Absent such earlier termination, the Parties agree to renegotiate this Agreement in good faith on or before the end of the Term.

**9.2   Termination for Cause.** If a Party substantially fails to comply with any of its obligations under this Agreement, and does not remedy the failure of performance within sixty (60) days after it has been notified in writing thereof, the other Party may terminate this Agreement at the end of such period, without prejudice to any damages or additional remedies that may be available at law or in equity. Any such termination will not affect any payments that have previously come due hereunder, or the furnishing of statements contemplated hereunder.

**9.3   Insolvency.** Either Party may terminate this Agreement upon written notification to the other Party if the other Party becomes the subject of (i) a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation or composition for the benefit of creditors; or (ii) an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, and such petition or proceeding is not dismissed within sixty (60) days of filing.

**9.4   Intellectual Property Disputes.** If Delphi files any action against any of the XM Patent Rights for which XM has filed a patent application as of the Effective Date, including any revocation or nullity action, XM may immediately terminate this Agreement. The Parties agree that all disputes relating to ownership or validity of XM Information, XM Patent Rights or Delphi Intellectual Property, or otherwise disputing the validity of any of the foregoing, including on the basis of revocation or nullity thereof, shall be handled in accordance with the provisions of Section 12 below..

**9.5   Assignment.** Either Party may immediately terminate this Agreement if the other Party attempts to assign it in violation of Section 11.

**9.6   Force Majeure.** Either Party may terminate this Agreement for Force Majeure in accordance with Section 13.9.

## 10. Post-Termination

**10.1   Cessation of Use.** Following any expiration or termination of this Agreement, Delphi will (i) stop using the Marks, and will not use or register any mark confusingly similar to the Marks, and (ii) stop using any of the XM Information; provided that Delphi may continue to exercise its rights hereunder to the extent reasonably necessary to fulfill any binding commitments existing as of the date of expiration or termination, or to otherwise liquidate Delphi's inventory of Delphi Products on hand as of the date of expiration or termination, subject in all cases to Delphi's obligation to abide by the quality standards imposed by this Agreement, and to pay royalties as provided herein.

**10.2 Accrued Liability.** Following any expiration or termination of this Agreement, neither Party will have any further rights or obligations hereunder except that: (i) such expiration or termination will not relieve either Party of any liability accrued prior to such expiration or termination; and (ii) such expiration or termination will not affect the continued operation or enforcement of any provision of this Agreement which by its express terms is to survive any expiration or termination, including, but not limited to, XM's obligation to pay a royalty to Delphi for the use of certain Delphi Intellectual Property as contemplated by Section 4.2.1.

## 11. Assignment

Neither Party will assign this Agreement without the other Party's prior consent, which will not be unreasonably withheld, except that either Party may freely assign this Agreement to any of its Affiliates.

## 12. Settlement of Disputes

**12.1 Amicable Resolution.** The Parties will endeavor to resolve amicably any dispute arising out of this Agreement within thirty (30) days of receipt of notice of such dispute. If the Parties are unable to resolve such dispute within such 30-day period, then they may refer the dispute to their respective senior management who will, during the 30-day period following such referral, review the dispute and attempt to negotiate a mutually acceptable resolution. If the Parties are unable to agree upon a resolution within such additional 30-day period, then the dispute will be resolved in accordance with the provisions of Section 12.2.

## 12.2 Formal Arbitration.

12.2.1 All disputes arising in connection with this Agreement which are not resolved pursuant to Section 12.1 will be submitted to arbitration. Either Party may initiate arbitration following completion of the negotiation process set forth in Section 12.1. The arbitration will be administered according to the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes ("CPR"). In the event of any conflict between the CPR and this Agreement, the provisions of this Agreement will govern.

12.2.2 The arbitration proceedings will take place in a location mutually agreed upon by the Parties and will be conducted in English. In the event that the Parties cannot agree upon a location within thirty (30) days of the initiation of the arbitration process, the arbitration will take place in Chicago, Illinois.

12.2.3 The Parties will jointly determine the appropriate number of arbitrators and will jointly appoint a mutually acceptable arbitrator(s). If, within thirty (30) days of the initiation of the arbitration process, the Parties are unable to agree on the appropriate number of arbitrators and/or the appointment of said arbitrator(s), the Parties will seek assistance in such regard from the CPR.

12.2.4 Arbitration under this Section 12.2 is subject to the Federal Arbitration Act, 9 U.S.C.A. Section 1 et. seq., and judgment upon the award of the arbitrator(s) may be entered by any U.S. Court having jurisdiction thereof.

12.2.5 The arbitrator(s) shall not award any exemplary or punitive damages.

12.2.6 Nothing in this Section 12 will preclude either Party from seeking equitable relief from a court for the other Party's breach of its obligations set forth in Section 6.

12.2.7 Pending a decision by the arbitrators as referred to in this Section 12, each Party will, unless the other Party otherwise directs, fulfill all of its obligations hereunder, including, to the extent reasonably practical, the obligation to take steps necessary during the arbitration proceedings to ensure that the Work will be delivered within the time stipulated or within such extended time as may be allowed.

### 13. General Provisions

**13.1  Required Permits and Licenses.** Delphi will obtain and pay for any permits and the like relating to the sale of the Delphi Products; provided that XM will cooperate as necessary in such efforts. The Parties will comply with all applicable export compliance laws, including the obtaining of any export licenses required under the laws or regulations of the United States or any other applicable jurisdiction for the export of technical information, XM Receivers or Delphi Products. The Parties will cooperate wherever necessary to obtain any such export licenses.

**13.2  Notices.** All communications hereunder will be given in English by e-mail or facsimile, with a copy by U.S. mail, directed, in respect of XM to:

XM Satellite Radio Inc.

REDACTED

Tel:  REDACTED
Fax:
e-mail:

and in respect of Delphi to:

Delphi Electronics & Safety Division
Attn: (

REDACTED

Fax:

And with a copy to:

Delphi Technologies, Inc.

REDACTED

21

or such other addresses as either Party may have previously specified in the manner set forth above.

**13.3 Amendment.** Except as otherwise specifically provided herein, this Agreement may be modified only by the Parties' duly authorized representatives in a writing stating that the modification is an "Amendment to the OEM Receiver Design, Development, Production, Marketing and License Agreement."

**13.4 Non-Waiver.** If at any time a Party elects not to assert its rights under any provision of this Agreement, it will not be construed as a waiver of any of its rights hereunder.

**13.5 Governing Law.** This Agreement will be governed by the laws of New York, without giving effect to its conflicts of law provisions.

**13.6 Severability.** Should any part of this Agreement be held unenforceable in any jurisdiction, the validity of the remaining parts will not be affected.

**13.7 Entire Agreement.** This Agreement embodies the Parties' entire understanding related to the subject matter hereof and supersedes any prior agreements or understandings between the Parties relating hereto.

**13.8 Force Majeure.** Any delay or failure of either Party to perform its obligations under this Agreement shall be excused if, and to the extent that it is caused by an event or occurrence beyond the reasonable control of the Party and without its fault or negligence, such as, by way of example and not by way of limitations, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor, labor, equipment or transportation, or court injunction or order, or a Total Loss or Constructive Total Loss; *provided* that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected Party within five (5) days. If the delay lasts more than thirty (30) days or the affected Party does not provide adequate assurance that the delay will cease within thirty (30) days, the Party not claiming Force Majeure may terminate this Agreement by written notice to the other Party.

**13.9 Attorney's Fees.** If a dispute arises regarding this Agreement, the prevailing Party will be entitled to reasonable attorney's fees and costs incurred.

**13.10 Captions.** The captions contained in this Agreement are inserted for convenience of reference only and will not affect the interpretation of the provisions captioned.

**13.12 Execution.** This Agreement may be executed in two signed counterparts, each of which will constitute an original, but which together shall constitute one and the same document.

**13.13 Press Releases.** Neither Party will issue a press release related to the subject matter hereof without the other Party's prior written consent.

[signature page follows]

**WHEREUPON** the Parties, intending to be legally bound, have executed this Agreement effective as of the Effective Date.

**XM Satellite Radio Inc.**

By: _____

Name: Dr. Stell Patsiokas

Title: Executive VP, Technology & Engineering

**Delphi Automotive Systems LLC**

By: _____

Name: Robert W. Schumacher

Title: Business Line Executive, Wireless

**List of Appendices**

| | |
|---|---|
| Appendix 1 | XM Format |
| Appendix 2 | Technical Specifications |
| Appendix 3 | Licensed XM Chipset Manufacturers |
| Appendix 4 | XM Patent Rights |
| Appendix 5 | Licensed Marks |
| Appendix 6 | Intentionally Omitted |
| Appendix 7 | Standard Testing Rates |
| | |

