Exhibit A

**Morrison**Cohen LLP

Michael R. Dal Lago
Partner
(212) 735-8757
mdallago@morrisoncohen.com

July 17, 2009

**VIA HAND DELIVERY**

Honorable Robert D. Drain
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

Re:   *In re Delphi Corporation, et al.,*
      *Debtors and Debtors-in-Possession,*
      <u>*Chapter 11 Case No. 05-44481 (RDD)*</u>

Your Honor:

This firm, as well as the firm of Miller & Chevalier Chartered, represent Dennis Black, Charles Cunningham, and the Delphi Salaried Retiree Association (collectively, "Salaried Workers") in connection with the above-referenced chapter 11 case.

On Wednesday, July 15, 2009, the Salaried Workers filed their Objection to Debtors' Proposed Modifications to Debtors' First Amended Plan of Reorganization ("Objection").

As Your Honor will note, on page 3 of the Objection the Salaried Workers reference a Complaint to enjoin the Excom (as defined in the Objection), which at the time was being prepared for filing in the United States District Court for the Eastern District of Michigan ("District Court of Michigan"). The Objection goes on to say that once the Complaint is filed in the District Court of Michigan, the Complaint will be filed with this Court.

On July 16, 2009, the Salaried Workers filed the Complaint with the District Court of Michigan. To that extent, enclosed herewith please find a copy of the Complaint. A copy of this letter and the Complaint will also be filed on the Court's Electronic Case Filing System. Furthermore, all parties that received a copy of the Objection will receive a copy of the Complaint by electronic mail, facsimile or overnight delivery.

Respectfully submitted,

Michael R. Dal Lago

MDL:imr
Enc.

#1805746 v1 \021081 \0001

**Morrison**Cohen LLP

Honorable Robert D. Drain
July 17, 2009
Page 2

cc:     Delphi Corporation
        5725 Delphi Drive
        Troy, Michigan 48098
        Att'n: General Counsel

        Counsel for The Debtors
        Skadden, Arps, Slate, Meagher & Flom LLP
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        Att'n: John Wm. Butler, Jr. , Esq.
        Att'n: Ron E. Meisler, Esq.

        Skadden, Arps, Slate, Meagher & Flom LLP
        Four Times Square
        New York, New York 10036
        Att'n: Kayalyn A. Marafioti, Esq.
        Att'n: Gregory W. Fox, Esq.

        United States Trustee
        The Office of the United States Trustee
        33 Whitehall Street, Suite 2100
        New York, New York 10004
        Att'n: Brian Masumoto, Esq.
        Via Facsimile (212) 668-2255

        Counsel for The Creditors' Committee
        Latham & Watkins LLP
        885 Third Avenue
        New York, New York 10022
        Att'n: Robert J. Rosenberg, Esq.
        Att'n: Mitchell A. Seider, Esq.
        Att'n: Mark A. Broude, Esq.

        Counsel for The Postpetition Lenders
        Davis Polk & Wardwell
        450 Lexington Avenue
        New York, New York 10022
        Att'n: Donald S. Bernstein, Esq.
        Att'n: Brian M. Resnick, Esq.

# Morrison Cohen LLP

Honorable Robert D. Drain
July 17, 2009
Page 3

Counsel for The Tranche C Collective
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Att'n: Richard Mancino, Esq.
Att'n: Marc Abrams, Esq.

Counsel for The United States Department of the Treasury
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Att'n: John J. Rapisardi, Esq.
Att'n: Oren B. Haker, Esq.

Counsel for The United States Department of Justice
United States Department of Justice
86 Chambers Street, 3rd Floor
New York, New York 10007
Att'n: Matthew L. Schwartz, Esq.
Att'n: Joseph N. Cordaro, Esq.
Via Facsimile No.: (212) 637-2684

Counsel for General Motors Corporation
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Att'n: Jeffrey L. Tanenbaum, Esq.
Att'n: Robert J. Lemons, Esq.

Counsel for Parnassus Holdings II, LLC
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Att'n: Adam C. Harris, Esq.
Att'n: David J. Karp, Esq.

Case 2:09-cv-12980-SFC-MJH    Document 1    Filed 07/16/2009    Page 5 of 83

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| DENNIS BLACK, CHARLES CUNNINGHAM, ) <br> and THE DELPHI SALARIED RETIREE ) <br> ASSOCIATION, EX REL. THE DELPHI ) <br> RETIREMENT PROGRAM FOR SALARIED ) <br> EMPLOYEES, ) <br> ) <br>            Plaintiff, ) <br> ) <br>    v. ) <br> ) <br> CRAIG G. NAYLOR, DAVID N. FARR, ) <br> MARTIN E. WELCH, and JAMES P. ) <br> WHITSON, IN THEIR PERSONAL ) <br> CAPACITIES AND AS NAMED ) <br> FIDUCIARIES OF THE DELPHI ) <br> RETIREMENT PROGRAM FOR SALARIED ) <br> EMPLOYEES, ) <br> ) <br> ) <br>          Defendant. ) <br> ) | Case No.: |

**COMPLAINT FOR EQUITABLE RELIEF**

Plaintiffs, Dennis Black, Charles Cunningham, and the Delphi Salaried Retiree Association, on behalf of the Delphi Retirement Program for Salaried Employees, allege the following:

1.    This is an action for breach of fiduciary duty and for equitable relief arising under the Employee Retirement Income Security Act ("ERISA" or "the Act"), 29 U.S.C. §§ 1001, *et seq.*

2.       The lawsuit concerns the Delphi Retirement Program for Salaried Employees

("the Plan" or "Plaintiffs' Plan"), a defined benefit retirement plan established and maintained by

Delphi Corporation ("Delphi") for the benefit of its salaried employees.

3.       Plaintiffs Dennis Black and Charles Cunningham are retired salaried employees

of Delphi and participants in the Plan.  The Delphi Salaried Retiree Association is a nonprofit

organization comprising participants in the Plan and dependents of participants who are

beneficiaries in the Plan.

4.       The Plan covers approximately 15,000 workers and retirees.

5.       This action arises from the failure of the Defendants, who are the named

fiduciaries of the Plan and the individuals designated with the responsibility for administering

the Plan, to act solely in the interest of the participants and beneficiaries of the Plan and from the

Defendants' failure to exercise the required care, skill, prudence and diligence in administering

the Plan.

6.       This action is brought on behalf of the Plan and the participants and beneficiaries

of the Plan, pursuant to § 502(a)(2) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132(a)(2), and seeks to enjoin the Defendants, who are Plan fiduciaries

but also officers of Delphi, from continuing to undertake acts and practices in violation of

ERISA and to obtain appropriate equitable relief necessary to redress those acts and practices.

Because the Defendants are in a position where their responsibilities as officers of Delphi

prevent their functioning with the complete loyalty to the Plan demanded of them as ERISA

fiduciaries in matters of Plan administration that are pending or looming, and because the

Defendants have not removed themselves as fiduciaries notwithstanding these competing

loyalties, Defendants have breached their fiduciary duties; accordingly, as their remedy,

Plaintiffs seek Defendants' removal as fiduciaries and the appointment of an independent

fiduciary to serve as the Plan's administrator.  Specifically, Plaintiffs seek the appointment of an

independent fiduciary for purposes of negotiating any intended involuntary termination of the

Plan and the protection of participant and beneficiary rights in any termination proceedings.

## JURISDICTION AND VENUE

7.      The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29

U.S.C. § 1002(35), an employee pension benefit plan within the meaning of ERISA § 3(2), 29

U.S.C. § 1002(2), and is subject to coverage of the Act pursuant to ERISA § 4(a), 29 U.S.C.

§ 1003(a).  Plaintiffs are "participants" within the meaning of ERISA § 3(7), 29 U.S.C.

§ 1002(7), who are authorized pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to bring

the present action on behalf of the Plan and the participants and beneficiaries of the Plan, to

obtain appropriate relief under §§ 502 and 409 of ERISA, 29 U.S.C. §§ 1132 and 1109.

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Venue lies in the Southern Division of the Eastern District of Michigan, pursuant

to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district,

some or all of the fiduciary breaches for which relief is sought occurred in this district, and the

Defendants may be found in this district.

## PARTIES

10.     Plaintiffs Dennis Black and Charles Cunningham are retirees of Delphi with a

right to vested benefits under the Plan.  Plaintiffs are participants of the Plan within the meaning

3

of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiffs bring this action for equitable relief on behalf

of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Plaintiff Delphi Salaried

Retiree Association is a nonprofit organization comprising present and future retirees in the Plan

who are participants in the Plan, as well as their dependents who are beneficiaries in the Plan

within the meaning of ERISA § 3(8), 29 U.S.C. § 1002(8).

11.    The Defendants are the ERISA fiduciaries of the Plan, and more specifically those

fiduciaries vested with the powers and responsibilities of administering the Plan, hereafter

sometimes referred to as the "Plan Administrator." Plaintiffs do not bring this action against

Delphi, which is currently in Chapter 11 bankruptcy proceedings in the United States Bankruptcy

Court for the Southern District of New York, Case No. 05-44481. None of the Defendants are

listed among the forty-two debtor entities in the Delphi bankruptcy proceedings.

12.    Under ERISA, a plan administrator is a separate entity from the plan sponsor, and

performs a separate function. *See* ERISA § 3(16), 29 U.S.C. § 1002(16); *Dupree v. Prudential

Ins. Co. of Am.*, No. 99-8337-CIV-JORDAN, 2007 U.S. Dist. LEXIS 57857, at *116 (S.D. Fla.

Aug. 7, 2007) (while "an individual's status as officer or director of a corporate fiduciary --

without more -- cannot serve to establish fiduciary status," members of the board of directors of

an employer which maintains an employee benefit plan will be fiduciaries to the extent that they

have responsibility for the functions described in section 3(21)(A)) (*citing* 29 C.F.R. § 2509.75-

8, D-4 (1975); *see also Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985)

(once a company appoints responsibility for plan administration to another entity, that entity, and

not the company, is the proper fiduciary for an ERISA suit, despite the fact that the company is

named as the plan administrator in the summary plan description); *Schultz v. Texaco Inc.*, 127 F.

Supp. 2d 443, 452 (S.D.N.Y. 2000) (dismissing suit against corporation and holding that once it

designated a particular individual as plan administrator, she, and not the corporation, was the

proper subject of suit). Under the terms of the Plan, Delphi is designated as the Plan

Administrator. *See* Delphi Retirement Program for Salaried Employees § 15 (Ex. A). Delphi, in

turn, has delegated the functional responsibilities as Plan Administrator to its Executive

Committee, stating that "the Executive Committee of the Corporation's Board of Directors is the

Named Fiduciary with respect to this Program. The Executive Committee may delegate

authority to carry out such of its responsibilities as it deems appropriate in order to carry out the

proper and effective administration of this Program to the extent permitted by ERISA." *Id.* § 14.

The individual members of the Executive Committee are accordingly the "persons" identified as

Plan Administrator under ERISA § 3(a)(1), 29 U.S.C. § 1002(16)(a)(1), and serve as individual

fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

13. Once Delphi delegated the function of Plan Administrator to the members of its

Executive Committee, those individuals assumed the responsibilities of Plan Administrator, and

became the proper subjects for this ERISA suit. This action seeks only equitable relief, and

seeks no monetary relief, either from Delphi or from the fiduciary Defendants; and, furthermore,

the equitable relief sought is only from the fiduciary Defendants, and not from Delphi. Because

this is an action in equity against directors of a corporation in their role as ERISA fiduciaries,

there is nothing in the bankruptcy stay that might prevent this suit. *See In re Nashville Album

Prods., Inc.*, 33 B.R. 123, 124 (M.D. Tenn. 1983) ("A reading of § 362 [of the Bankruptcy Code]

clearly reveals no support for the debtor's position that the stay prohibits entities from

proceeding against officers, directors and/or stockholders of a corporation which has filed a

bankruptcy petition.  Section 362 only stays actions against the debtor or actions seeking to

obtain property of the estate.") (*citing Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314-15 (7th Cir.

1983)); *accord In re Related Asbestos Cases*, 23 B.R. 523, 527-28 (Bankr. N.D. Cal. 1982);

*Royal Truck & Trailer, Inc. v. Armadora Maritima Salvadorena, S.A.*, 10 Bankr. 488, 490-91

(N.D. Ill. 1981); *In re Autobahn Classics, Inc.*, 29 Bankr. 625, 10 Bankr. Ct. Dec. (LRP) 568,

569-70 (Bankr. S.D.N.Y. 1983); *In re Loughnane*, 28 Bankr. 940, 942-43 (Bankr. D. Colo.

1983); *GAF Corp. v. Johns-Manville Corp.*, 26 Bankr. 405, 409-10 (Bankr. S.D.N.Y. 1983);

*Bank Center, Ltd. v. Papariella*, 15 Bankr. 64, 65-66 (Bankr. W.D. Pa. 1981)).

     14.     Upon information and belief, Delphi's Executive Committee is comprised of

certain members of the Delphi Board of Directors, and they are the "named fiduciaries" of the

Plan and exercise discretion or control over the Plan such that they are fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) and ERISA § 409(a), 29 U.S.C.

§ 1109(a).  *See* Ex. A § 14; *see also supra* ¶ 12.

     15.     Upon information and belief, Defendant Craig G. Naylor is a member of the

Executive Committee and the Board of Directors, as well as being the Lead Independent Director

& Chair of the Compensation & Executive Development Committee, and is thus a named

fiduciary of the Plan under ERISA § 3(21(A), 29 U.S.C. § 1002(21)(A), and ERISA § 409(a), 29

U.S.C. § 1109(a).

     16.     Upon information and belief, Defendant David N. Farr is a member of the

Executive Committee and the Board of Directors, as well as being the Chair of the Corporate

Governance & Public Issues Committee, and is thus a named fiduciary of the Plan under ERISA

§ 3(21)(A), 29 U.S.C. § 1002(21)(A), and ERISA § 409(a), 29 U.S.C. § 1109(a).

17.     Upon information and belief, Defendant Martin E. Welch is a member of the Executive Committee and the Board of Directors, as well as being Chair of the Audit Committee, and is thus a named fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and ERISA § 409(a), 29 U.S.C. § 1109(a).

18.     In addition, upon information and belief, James P. Whitson is the Chief Tax Officer of Delphi, and has, at certain times, signed forms as "the individual signing as Plan Administrator," and is thus a fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and ERISA § 409(a), 29 U.S.C. § 1109(a).

## FACTUAL ALLEGATIONS

*A.     Delphi's Bankruptcy and Intention for Involuntary Termination of the Plan*

19.     Delphi, a global manufacturer of automobile components, was originally an operating unit of General Motors Corporation ("GM").  GM was the original sponsor of the Plan. Delphi was incorporated in 1998 and became independent from GM in 1999.  When Delphi was spun off in 1999, it assumed responsibility for maintaining the pension plans for all Delphi employees.

20.     In October 2005, Delphi filed for Chapter 11 bankruptcy.

21.     Delphi's pension obligations have been a consistent obstacle to its ability to emerge from bankruptcy.  Because the Plan is underfunded and therefore is a potential creditor with claims against Delphi and because Defendants, as both executives for Delphi and named fiduciaries of the Plan, have duties both to their employer (on the one hand) and to act in the sole interests of the Plan participants and beneficiaries (on the other), Delphi's financial distress has placed Defendants in a conflicted situation.  In 2006, this conflict prompted the Plan's named

7

Case 2:09-cv-12980-SFC-MJH   Document 1   Filed 07/16/2009   Page 8 of 83

fiduciaries partially to remove themselves in favor of a conflict-free fiduciary, who was appointed for the limited purpose of filing claims against Delphi in the bankruptcy. Upon information and belief, however, this appointment did not delegate to the independent fiduciary the Plan Administrator's obligations concerning any Plan termination proceedings or the method of any Plan termination. Indeed, at the time of the appointment of the independent fiduciary for purposes of filing bankruptcy claims in 2006, Delphi purported to have no intention of terminating the Plan.

22.     In a recent bankruptcy court filing, however, Delphi has indicated it will seek to emerge from bankruptcy by relieving itself of its obligations to the Plan. The bankruptcy filing states that the Plan shall be terminated. More specifically, according to the bankruptcy filing, Delphi expects to enter into an agreement with the Pension Benefit Guaranty Corporation ("PBGC"), whereby the PBGC will initiate involuntary termination proceedings, taking over responsibility for the Plan.

23.     The PBGC administers the federal government's pension termination insurance program. In this capacity, when an underfunded pension plan is terminated, the PBGC is responsible for guaranteeing the benefits of the plan, but (as the PBGC sees its charge) *only* up to certain statutory maximums and subject to various other onerous statutory limitations. Under these restrictions, if the Plan is terminated, as many as 15,000 of the Plan's participants and beneficiaries could lose between 30 to 70 percent of their pensions. While the PBGC has the ability to commence termination proceedings under ERISA § 4042, 29 U.S.C. § 1342, it does not act as a fiduciary for participants when it does so. Nothing in this Complaint should be taken as a critique of the PBGC, which, as courts have recognized, operates under conflicting priorities.

*See, e.g., In re Jones & Laughlin Hourly Pension Plan v. LTV Corp.*, 824 F.2d 197, 201 (2d Cir. 1987) (noting that "while PBGC acts on behalf of all pension plan beneficiaries including the members of the plans at issue here, PBGC's interest in terminating financially unsound plans as quickly as possible to minimize its losses conflicts with the participants' interest in continuing their particular plan").

  B.  *General Mechanics of Plan Termination Under ERISA*

24.  As noted, Delphi has announced in the bankruptcy case an intention to terminate Plaintiffs' pension plan.  Under ERISA, the Plan can be terminated "only by proceedings under 29 U.S.C. Section 1341 or 1342."  *In re UAL*, 443 F.3d 565, 572 (7th Cir. 2006).

25.  The majority of plan terminations occur at the behest of the *plan sponsor* and are subject to ERISA § 4041, 29 U.S.C. § 1341.  These terminations take one of two forms: a "standard termination" under § 1341(b), or a "distress termination" under § 1341(c).  Only a distress termination -- that is, a termination of plan under circumstances where the plan is in "distress" due to serious under-funding -- seems possible under the present facts, but both forms offer a number of procedural safeguards.

26.  For example, § 1341 imposes a mandatory 60-day notice requirement regardless of whether a "standard" or "distress" termination is pursued.  Specifically, the plan administrator -- "[n]ot less than 60 days before the proposed termination date" -- must provide each "affected party . . . a written notice of intent to terminate stating that such termination is intended and the proposed termination date."  29 U.S.C. § 1341(a)(2).  Thus, the very earliest a § 1341 termination can occur is two months after all affected parties have received notice of the plan administrator's intent to terminate.

9

27.     Even with satisfaction of the notice requirement and even if Delphi's executives remained as Plan Administrator, a so-called "standard termination" is unlikely to occur for a very simple reason:  in order to effectuate such a termination, the Plan must be "sufficient for benefit liabilities (determined as of the termination date)," *see* 29 U.S.C. § 1341(b)(1)(D), a criteria that the Plan surely cannot satisfy.

28.     A "distress termination," on the other hand, while not precluded under the facts here, is even more laden with procedural requirements, and likely would result in what is known as an involuntary termination proceeding under § 1342. Apart from notice (29 U.S.C. § 1341(a)(2)) and actuarial certification requirements (§ 1341(c)(2)(A)), the PBGC in a distress termination under § 1341 must determine that one of four "distress criteria" are met, *see* 29 U.S.C. § 1341(c)(2)(B); furthermore, in the case of a Chapter 11 reorganization, the bankruptcy court must hold a contested hearing and find that, "unless the plan is terminated, [the debtor] will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process," *see* 29 U.S.C. § 1341(c)(2)(B)(ii). And even if all of these requirements are satisfied, the PBGC must then determine that the plan is sufficient to pay guaranteed benefits; if it is unable to make such a determination – which would likely be the case here – the PBGC must initiate proceedings under § 1342.  *See* 29 U.S.C. § 1341(c)(3)(B).

29.     In light of the likely unavailability of termination under § 1341, the bankruptcy reorganization plan proffered by Delphi envisions a so-called "involuntary termination" under ERISA § 4042, 29 U.S.C. § 1342.  Section 1342 provides for an adversarial termination process that offers a number of procedural and substantive protections to pension plan participants -- but

each rests on the Plan Administrator exercising its authority in the interests of the participants
and beneficiaries.

30.     The typical involuntary termination requires the PBGC to file an action in federal
district court seeking to terminate a plan.  In order to avail itself of this option, the PBGC, as a
threshold matter, must first determine that one of the following four conditions is satisfied:

- the plan has not met the minimum funding standard required under section
  412 of the Internal Revenue Code of 1986 [26 USCS § 412], or has been
  notified by the Secretary of the Treasury that a notice of deficiency under
  section 6212 of such Code [26 USCS § 6212] has been mailed with
  respect to the tax imposed under section 4971(a) of such Code [26 USCS
  § 4971(a)];

- the plan will be unable to pay benefits when due;

- the reportable event described in section 4043(c)(7) [29 USCS §
  1343(c)(7)] has occurred; or

- the possible long-run loss of the corporation with respect to the plan may
  reasonably be expected to increase unreasonably if the plan is not
  terminated.

29 U.S.C. § 1342(a).

31.     Importantly, the PBGC may not cavalierly make a § 1342(a) finding and expect it
to be honored in court, but rather must develop an administrative record that reflects its careful
consideration of the relevant factors.  *See Pension Benefit Guaranty Corp. v. Rouge Steel Co.*,
2006 U.S. Dist. LEXIS 2685, at *14 (E.D. Mich. Jan. 10, 2006) (vacated PBGC's termination
decision and remanding to agency because "the administrative record [did] not indicate that all
relevant factors [had] been considered"; "without a fully developed administrative record, the
court cannot fully ascertain whether or not it was reasonable for PBGC to anticipate that its

liability would be unreasonably increased, as stated in 29 U.S.C.A. § 1342 and as argued by PBGC in support of their motion").

32.     Assuming the PBGC has undertaken a thorough § 1342(a) analysis and determines that termination is appropriate, the PBGC must then notify *the plan administrator* of its intent to terminate and provide to it a copy of the administrative record.  29 U.S.C. § 1342(c)(1), (3). This notification usually takes the form of a "Notice of Determination" whereby the PBGC states its justification for its termination decision, how it intends to proceed, and the proposed plan termination date.  *See Association of Flight Attendants-CWA, AFL-CIO v. Pension Benefit Guaranty Corp.*, 2006 U.S. Dist. LEXIS 1318, at *13 (D.D.C. Jan. 13, 2006). At this point, either the PBGC or the *plan administrator*, if determined to be in the best interests of the plan participants, may apply to the "the appropriate United States district court" for the appointment of a plan trustee to administer the plan.  *See* 29 U.S.C. § 1342(b).

33.     After having satisfied the statute's notice requirement, and with a trustee in place (if appointed), only then may the PBGC "apply to the appropriate United States *district court* for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund."  29 U.S.C. § 1342(c)(1) (emphasis added). The PBGC's application to the district court, however, in no way guarantees termination.  First, it is subject to challenge by the plan trustee.  *See* 29 U.S.C. § 1342(c)(1) ("If the trustee . . . disagrees with the determination of the [PBGC] [to terminate the plan], he may intervene in the proceeding relating to the decree.").  Second, regardless of whether the trustee mounts a challenge to the PBGC's determination, the court does not simply accord blind deference to the

PBGC's termination findings.  *See In Re UAL Corp.*, 468 F.3d 444, 450 (7th Cir. 2006) (in acting under § 1342, "[a]ll the PBGC does is commence litigation, and its position is no more entitled to control than is the view of the Antitrust Division when the Department of Justice files suit under the Sherman Act").

34.     In short, an involuntary termination under 29 U.S.C. § 1342 can only be effectuated by a district court, is rife with procedural hurdles for the PBGC, and contemplates the *plan administrator* acting to protect the participants and beneficiaries through notice of the termination and working to ensure appointment of a trustee who can then advocate in the termination proceedings on behalf of the participants and beneficiaries.

C.     *Summary Termination Procedures*

35.     Notwithstanding the notice and hearing safeguards normally required by § 1342, the PBGC may, in a narrow circumstance, terminate a plan under § 1342 outside of a formal district court adjudication and adversarial process. The PBGC can utilize so-called "summary termination" procedures if the PBGC and the *plan administrator* agree between themselves to terminate the plan and if they agree on the appointment of a trustee:

> If the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee *without proceeding in accordance with the requirements of this subsection* (other than this sentence) the trustee shall have the power described in subsection (d)(1) and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties described in subsection (d)(3).

29 U.S.C. 1342(c)(1) (emphasis added)

36.     Section 1342(c) thus makes the role of *plan administrator* -- not the plan sponsor -- even more critical in summary proceedings.  In such proceedings, the administrator can

exercise the awesome power to negotiate and to reach an agreement with the PBGC to completely bypass the protections afforded by the district court adjudication process and summarily terminate the plan.

37.     Congress would not have conferred this summary termination power, which, again, does away with the notice and hearing safeguards that apply to a typical § 1342 termination, unless it expected the plan administrator in its decision-making concerning termination procedures and the method of termination to act singly in the interests of the participants and beneficiaries.

D.     *Plan Administrator's Fiduciary Duties with respect to this Plan's Termination*

38.     As previously alleged, Defendants serve as the Plan Administrator and are fiduciaries under the Plan.

39.     Defendants, in their dual roles as members of Delphi's Executive Committee and Plan fiduciaries wear "two hats."  "When employers wear two hats as employers and administrators, they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA."  *Sys. Council EM-3 v. AT&T Corp.*, 972 F. Supp. 21, 30 (D.D.C. 1997) (internal quotation marks and citations omitted).  As such, Defendants have a fiduciary duty in any functions assigned to them as Plan Administrator, but not as employers.

40.     A plan sponsor's decision to terminate a plan is a "settlor function," and, as such, is unconstrained by any fiduciary duties the plan sponsor may owe in its role as plan administrator.  *See Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007) ("It is well established in this Court's cases that an employer's decision *whether* to terminate an ERISA plan is a settlor

function immune from ERISA's fiduciary obligations.") (emphasis in original). By contrast, a plan administrator's selection of a particular *method of plan termination* is a fiduciary function. *Id.; see also Larson v. Northrop Corp.*, 21 F.3d 1164, 1169 (D.C. Cir. 1994) ("Although the decision to terminate a pension plan is generally not subject to the fiduciary responsibility provision of ERISA, the Department of Labor has emphasized that activities undertaken to implement the termination decision are generally fiduciary in nature.") (internal quotation marks omitted); *Waller v. Blue Cross*, 32 F.3d 1337, 1342 (9th Cir. 1994) ("By alleging that Blue Cross breached its fiduciary duty in the selection of annuity providers, plaintiffs attack not the decision to terminate, but rather the implementation of the decision. We believe that this distinction is dispositive and hold that Blue Cross acted in a fiduciary capacity when choosing annuity providers to satisfy plan liabilities.") (internal citations and quotations omitted).

41.     Plaintiffs' lawsuit does not seek to challenge a decision by the employer to terminate a plan; in fact, Delphi's bankruptcy filing clearly states that any termination will be an "involuntary" termination under § 1342. As explained, § 1342 entrusts to the *plan administrator* -- not the employer -- the ability either to contest an involuntary termination in the district court (through the appointment of a plan trustee), or to agree with the PBGC to summarily terminate the Plan and bypass the court adjudication process. Plaintiffs' lawsuit alleges that the current fiduciaries -- given their conflict of interest -- are unfit either (a) to protect the participants' and beneficiaries' rights during any district court involuntary termination proceeding, or (b) to decide with the PBGC to pursue summary termination and thereby waive the significant procedural and substantive protections provided under ERISA to Plan participants and their beneficiaries during Plan termination proceedings.

42.     Indeed, Delphi has itself recognized how a distress situation can compromise its ability to fulfill its fiduciary duties as plan administrator.  In January 2006, in light of the obvious conflict of interest inherent in its Executive Committee retaining fiduciary powers and responsibilities for the Plan while Delphi pursued bankruptcy, Delphi delegated certain limited fiduciary responsibilities to Fiduciary Counselors, Inc. ("Fiduciary Counselors").  Specifically, Delphi delegated to Fiduciary Counselors the limited responsibility to act on behalf of the Plan *solely* with respect to pursuing so called "funding claims" against Delphi.  The agreement between Delphi and Fiduciary Counselors states, in relevant part, as to the "Scope of Engagement":  "The Company hereby retains the Independent Fiduciary to exercise authority of an independent fiduciary and 'investment manager' on behalf of the Plans solely with respect to the determination of whether and how to pursue claims, if any, against the Company that any of the Plans may have if the Company fails to make a legally required contribution to such Plan when due ('Funding Claims')."  Letter Agreement between Delphi and Fiduciary Counselors, ¶ 1(A).

43.     This appointment recognized that when the interests of Delphi conflict with those of the Plan participants, the remedy is to appoint an independent fiduciary to assert and protect the interests of the participants.  However, Defendants expressly limited the scope to "funding claims" matters and retained the significant power to conduct negotiations and make agreements regarding any involuntary termination and the method of such termination.

E.      *Delphi's and the Plan Administrator's Conduct Surrounding the Threatened Termination of the Plan*

44.     As Delphi's bankruptcy proceedings progressed, Delphi apparently decided that it preferred to, and that there might be a path to, unburden itself of its pension obligations.  On

16

information and belief, Delphi then began negotiations with the PBGC regarding the Plan.

45.    In September 2008, Delphi announced that it had struck a deal with GM and the PBGC, under which the interests of both Delphi and a different pension plan for Delphi's hourly workers ("the Hourly Plan") were placed ahead of the interests of the Plan. The hourly workers in the Hourly Plan were, during their GM and Delphi tenures, unionized; the participants in Plaintiffs' Plan, however, were not. Under the deal concerning the Hourly Plan, Delphi could potentially transfer up to $3.4 billion in net pension liabilities from its Hourly Plan to a GM pension plan. The first part of that transfer was made on September 29, 2008, when GM assumed $1.7 billion of pension liability for the hourly workers from Delphi. The remaining amount is contingent on Delphi's emergence from bankruptcy.

46.    In contrast, none of the liability for Plaintiffs' Plan was transferred or funded or in any other way alleviated through agreements or negotiations with GM and the PBGC. Upon information and belief, Defendants did not seek any funding from GM for the Plan during these negotiations.

47.    In a September 12, 2008 press release, Delphi's Chief Restructuring Officer stated that Delphi "remained committed to fully funding our pension plans." Defendants have failed to explain to the Plan's participants and beneficiaries why they believe the Plan's termination now is necessary, what steps they have taken in order to try to avoid termination, and when they finally decided that Plan termination was necessary.

48.    On June 1, 2009, Delphi announced, through a bankruptcy filing, that it had developed "a workable pension solution for its defined benefit plans." *See* Delphi June 1, 2009 Press Release, *Delphi Reaches Agreements to Emerge From Chapter 11 Reorganization*. While

17

Delphi has not revealed the precise details of this "solution," at the center of this purported

"solution" is a deal whereby the Defendants assure that Delphi emerges from bankruptcy, the

PBGC gets a pre-petition claim against Delphi, and the pensions of Delphi's unionized workers

are protected through a transfer to GM.  The bankruptcy filing indicates that the Plan will,

through involuntary termination, devolve to the PBGC, with the attendant loss in benefits (*see*

*supra* ¶ 23) to the Plan's participants and beneficiaries.

49.     To the extent Defendants have engaged in negotiations with the PBGC with

regard to the method of any involuntary termination of the Plan or any other matters concerning

the Plan's termination, Defendants have failed to disclose to Plan participants and beneficiaries

the contents and nature of its negotiations with the PBGC regarding the Plan.

## CLAIM FOR RELIEF

### Breach of Fiduciary Duty in Violation of ERISA,
### 29 U.S.C. § 1104(a)(1)(A)&(B)

50.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

51.     At all relevant times, Defendants acted as fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to

the administration of the Plan.

52.     ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest
of the participants and beneficiaries and --

(A)     for the exclusive purpose of

(i)     providing benefits to participants and their beneficiaries; and

(ii)     defraying reasonable expenses of administering the plan;

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

53.     "The duties charged to an ERISA fiduciary are 'the highest known to the law.'" *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 841 (6th Cir. 2003) (*quoting Chao v. Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002)).  Among these duties is a "'duty of loyalty' pursuant to which 'all decision regarding an ERISA plan must be made with an eye single to the interests of the participants and beneficiaries.'"  *Id.* at 840 (*quoting Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995)).  Also, fiduciaries are charged with the "prudent man" standard, under which they have an "'unwavering duty' to act both 'as a prudent person would act in a similar situation' and 'with single-minded devotion' to those same plan participants and beneficiaries."  *Id.* at 840 (*quoting Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)).  ERISA further requires that a fiduciary " 'act for the exclusive purpose' of providing benefits to plan beneficiaries."  *Id.* at 841 (*quoting Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

54.     Courts have consistently recognized that fiduciaries have an obligation under ERISA "to avoid placing themselves in a position where their acts as directors or officers of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees."  *McMahon v. McDowell*, 794 F.2d 100, 110 (3d Cir. 1986) (*quoting Donovan*, 680 F.2d at 271).  "This duty may, in some circumstances, require the fiduciary to step aside in favor of a neutral referee, or at the least, to conduct an explicit inquiry into the potential for a conflict of interest."  *Id.*

55.     This is a "rigorous standard," taken from the "common-law conception of a

trustee."  *Id.*  (*citing* Raymond, ERISA Trusts and Tender Offers, 13 Sec. Reg. L. Rev. 253, 257-

59 (1985)).  Where a fiduciary fails to remove himself, but his conduct has caused the

beneficiaries to doubt his fealty, a court should remove him. The Supreme Court has stated:

> The power of a court of equity to remove a trustee, and to substitute another in his
> place, is incidental to its paramount duty to see that trusts are properly executed,
> and may properly be exercised whenever such a state of mutual ill feeling,
> growing out of his behavior, exists between the trustee, or between the trustee in
> question and the beneficiaries, that his continuance in office would be detrimental
> to the execution of the trust, even if for no other reason than that human infirmity
> would prevent the co-trustee or the beneficiaries from working in harmony with
> him, and although charges of misconduct against him are either not made out, or
> are greatly exaggerated.

*May v. May*, 167 U.S. 310, 320-21 (1897).

56.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them

promptly when they occur.  A fiduciary must always administer a plan with single-minded

devotion to the interests of the participants and beneficiaries, regardless of the interests of the

fiduciaries themselves, or the plan sponsor.

57.     Defendants have breached their duty of loyalty, in particular their duty to avoid

conflicts of interest, by continuing to act as fiduciaries upon Delphi's announcement of an

intention to terminate the Plan and to negotiate an agreement with the PBGC to prompt an

involuntary termination.  In such termination proceedings, the Plan Administrator plays a critical

role:  it determines whether to agree with the PBGC on summary termination and the

appointment of a trustee; and, if summary procedures are not invoked, it has the authority to seek

the appointment of a trustee who can intervene to challenge in a district court adjudication the

PBGC's determination that the Plan must be involuntarily terminated.  Defendants' interests as

Delphi officers necessarily favor an agreement for summary termination and, in a non-summary adjudication, disfavor the appointment of a trustee or at least disfavor the appointment of an independent trustee who may challenge the PBGC's determination that involuntary termination is warranted.  In contrast, Defendants' interests as Plan fiduciaries necessarily must disfavor an agreement for summary termination or, in a non-summary adjudication, may favor the appointment of an independent trustee who may challenge the PBGC's determination that termination is warranted.  Because Defendants are inescapably conflicted in their corporate interests and Plan fiduciary interests with respect to termination issues, they needed to remove themselves as fiduciaries with respect to termination issues.  Having failed to do so, they have breached their fiduciary duties and must be removed as fiduciaries in favor of an independent fiduciary.

58.     That Defendants have, in fact, failed zealously to guard the participants' and fiduciaries' interests, to the benefit of corporate interests, as is evidenced as well in other conduct, including:  (a) Defendants have provided no indication to the participants and beneficiaries that Defendants have sought, as with the Hourly Plan, a resolution to the Plan's underfunding through agreement with GM, as opposed to through Plan termination; (b) Defendants have provided no indication to the participants and beneficiaries that Defendants have sought to use international assets associated with Delphi to resolve the Plan's underfunding, as opposed to through Plan termination; and (c) Defendants have failed to keep participants and beneficiaries apprised of any negotiations with the PBGC concerning Plan termination or other significant events concerning the Plan's benefits.

59.     In addition to breaching their fiduciary duties by failing to remove themselves as fiduciaries when they are laboring under a conflict of interest with respect to termination issues, Defendants failure to disclose to participants and beneficiaries information regarding negations with the PBGC and the Plan's possible termination constitutes, even on its own, a breach of fiduciary duties warranting Defendants removal as fiduciaries.  A plan fiduciary's duties of loyalty and prudence also includes a duty not to make affirmative, material, untruthful representations to a plan participant or beneficiary and affirmatively to disclose to them significant events affecting plan benefits and its administration.  *See, e.g.*, *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 548 (6th Cir. 1999) ("the 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'") (*quoting Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)); *see also* Restatement Third of Trusts § 82(1) (Tentative Draft No. 4, 2005) (a trustee has a duty to inform beneficiaries of basic information concerning the trusteeship, significant changes in their beneficiary status, and to keep beneficiaries reasonably informed of changes involving the trusteeship and about other significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests); *cf. Beck*, 551 U.S. at 101 (the common law of trusts "serves as ERISA's backdrop") (*citing Pegram v. Herdrich*, 530 U.S. 211, 224 (2000); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)).

60.     As a direct and proximate result of Defendants' breaches of fiduciary duty, negotiations are ongoing or imminent over the Plan's termination without any representation of

the participants' and beneficiaries' best interests.  Moreover, as a result of Defendants' breaches

of fiduciary duty in potentially seeking to have the PBGC involuntarily terminate the plan

without the necessary procedural protections, failing to fully and completely disclose its

negotiations with the PBGC, and failing to appoint an independent fiduciary for the Plan, the

Plan's participants and beneficiaries face imminent harm in the potential catastrophic loss of

significant pension benefits without procedural protections to which they are entitled.

61.     Pursuant to ERISA § 502(a)(3)(A), 29 U.S.C. § 1132(a)(3)(A), Plaintiffs are

entitled to bring this action, requesting that the Court enjoin Defendants from continuing to

violate their fiduciary duties under ERISA.  Pursuant to ERISA § 502(a)(2), 29 U.S.C.

§ 1132(a)(2), and ERISA § 409(a), 29 U.S.C. 1109(a), the Court is authorized to remove the

current fiduciaries and appoint an independent fiduciary to function as Plan Administrator until

such time as Defendants no longer face a conflict of interest.

WHEREFORE, Plaintiffs respectfully request that this Court issue:

A.      A judgment enjoining Defendants from any act or practice that violates ERISA or

the terms of the Plan.

B.      A Temporary Restraining Order or Preliminary Injunction maintaining the status

quo pending resolution of this complaint, thereby prohibiting Defendants from making any

agreement to terminate the Plan under 29 U.S.C. § 1342(c); a separate motion seeking such relief

likewise will be filed.

C.      The appointment of an independent fiduciary for the Plan for purposes of

negotiating any Plan termination and protecting participants' and beneficiaries' rights in any

termination proceedings.

D.      Any other equitable relief that is available and appropriate.

E.      Attorneys fees and other expenses and costs pursuant to 29 U.S.C. § 1132(g).

Respectfully submitted,

Dated: July 16, 2009             JACOB & WEINGARTEN, P.C.


/s/ Howard S. Sher
Howard S. Sher (P38337)
Alan J. Schwartz (P38144)
777 Somerset Place
2301 Big Beaver Road
Troy, Michigan  48084
Telephone:  248-649-1900
Facsimile:  248-649-2920
E-mail:  alan@jacobweingarten.com

-and-

Anthony F. Shelley
Timothy P. O'Toole
MILLER & CHEVALIER CHARTERED
655 15th Street, NW
Suite 900
Washington, DC  20005
Telephone:  202-626-5800
Facsimile:  202-626-5801
E-mail:  ashelley@milchev.com
         totoole@milchev.com

*Attorneys for Plaintiffs*

# Exhibit A

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

# DELPHI CORPORATION

# Delphi Retirement Program
# for Salaried Employees

## (Restated October 1, 2008)

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

The Delphi Retirement Program for Salaried Employees ("Program") provides:

(a)     non-contributory benefits, as described in Part A, of this Program which are applicable to all salaried employees who have a length of service date prior to January 1, 2001,

(b)     contributory benefits, as described in Part B, of this Program, which are available to salaried employees who have a length of service date prior to January 1, 2001, and who contribute under the Program while eligible, and

(c)     non-contributory benefits, as described in Part C of this Program, which are applicable to all salaried employees who have a length of service date on or after January 1, 2001.

Provisions applicable to Part A, Part B and Part C, including certain defined terms used throughout the Program, are included in the General Provisions which immediately follow Part C.  References to the "Corporation" or "Delphi"  mean General Motors Corporation, ("GM") through January 1, 1999, and Delphi Automotive Systems Corporation  on and after January 1, 1999 and prior to March 15, 2002 and Delphi Corporation on and after March 15, 2002.

Except as expressly provided in Sections 7 and 8 of Article I of Part A, Section 7 of Article I of Part B, and Sections 2 and 7 of General Provisions, the provisions set forth in this Program are applicable only to employees of Delphi who retire with benefits payable commencing on or after October 1, 2004, or who have credited service on or after October 1, 2004.  Employees retired with benefits payable commencing prior to October 1, 2004 or who lost credited service prior to October 1, 2004, or eligible surviving spouses, contingent annuitants and beneficiaries of such employees, will be entitled to the benefits, if any, under the Program as it existed immediately prior to the amendments which became effective as of October 1, 2004.

# ELIGIBILITY FOR RETIREMENT

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Any separation from service, other than by death, will be considered, for purposes of this Program, as a retirement if the separation occurs:

(a)    (1)    at or after age 55 and prior to age 65 and the employee has 10 or more years of credited service; or

        (2)    prior to age 55 and the employee has 30 or more years of credited service, and the employee's most recent date of hire is prior to January 1, 1988; or

        (3)    at or after age 55 and prior to age 60 where age and years of credited service total at least 85, and the employee's most recent date of hire is prior to January 1, 1988.

        except that an employee to whom this subsection (a) applies who is separated in a layoff classification, prior to June 1, 2002, will not be considered a retirement until the employee loses credited service,

(b)    at age 65 or over, or

(c)    prior to age 65 because of total and permanent disability and the employee has 10 or more years of credited service and is eligible to receive total and permanent disability benefits under Part A.

For an employee hired or rehired on or after January 1, 2001, only (a)(1) and (b) apply.

Effective September 30, 2008, the Program has been frozen for all future benefit accruals. The SRP will be "frozen" as of 11:59 EST on September 30, 2008.

-     <u>Part A Credited Service</u>: Participants will not be allowed to acquire additional credited service for purposes of benefit calculations after September 30, 2008.  Credited service will continue to be accrued after September 30, 2008 for eligibility purposes only.

3

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

- ▪ <u>Part B Contributions</u>: Participants will not be allowed to make any contributions after the September 30, 2008 payroll.

- ▪ <u>Part B Credited Service</u>: Participants will not be able to accrue any additional Part B credited service for purposes of benefit calculations after September 30, 2008. Credited service will continue to be accrued after September 30, 2008 for eligibility purposes only.

- ▪ <u>Average Base Salary</u>: Average Base salary will be based on the highest 60 months out of the last 120 months immediately preceding September 30, 2008. Participants who were divested where the sale agreement provides that the average base salary is calculated as of the sale date and then increased by 3% per anniversary year will also be frozen as of September 30, 2008.

- ▪ <u>Future eligibility</u> for both retirement and retirement type will be based on provisions in effect as of September 30, 2008 and be determined by the total Part A credited service accrued for eligibility up to the date of retirement.

  - ➢ Employees hired prior to January 1, 1988 may still grow into voluntary retirement upon attaining 30 years of Part A credited service at any age or at or after age 55 when combined years of age and credited service totals 85 or more.
  - ➢ Employees with service dates on or before December 31, 2000 may grow into voluntary retirement if they attain age 55 or older with 10 or more years of Part A credited service.

  - ➢ Employees with service dates on or before December 31, 2000 may grow into eligibility for a Total and Permanent

4

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Disability retirement at any age once they have accrued 10 years of Part A credited service provided they meet the disability requirements contained in the SRP and receive Corporate approval.

- <u>Early Retirement Supplement (ERS)</u>:   Employees hired prior to January 1, 1988 who attain 30 total years of Part A credited service will be eligible for the full amount of the ERS as set forth in the SRP, even if attainment of 30 years of Part A credited service is on or after October 1, 2008.

- <u>Interim Supplement and Temporary Benefit</u>:  These supplements are payable based on the retirement type (which is determined using total Part A credited service through the date of retirement), but the amount payable is based on the years of Part A credited service accrued as of September 30, 2008.

- <u>Benefit Schedules</u>: The various benefit schedules in the SRP as of September 30, 2008 remain in effect.

- <u>Benefit Class Code</u>:  The determination of the Benefit Class Code for the Part A Basic Benefit will be based on an employees classification level as of September 30, 2008.  Promotions or demotions that occur on or after October 1, 2008 will not impact the determination of the Benefit Class Code.

- <u>Part C (Cash Balance Plan)</u>:  Employees hired on or after January 1, 2001 who are participating in Part C, will receive contributions related to base pay through September 30, 2008.  These accounts will continue to receive annual interest at the end of each plan year (the end of the plan year is September 30).

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

> ■ <u>Immediate Vesting:</u> Employees will be immediately and fully vested for any accrued benefit as of September 30, 2008 regardless of total accrued credited service. Employees who separate prior to September 30 must meet the 5.0 years of credited service vesting requirements. However, employees who were separated with less than 5.0 years of credited service as a part of any divestiture that occurred between August 1, 2006 and September 30, 2008 will be deemed to be vested.

## Section 1. Automatic Retirement For Bona Fide Executive At Age 65

An employee will be retired automatically on the first day of the month coinciding with or next following the employee's attaining age 65 if that employee is, for the two-year period immediately before retirement, employed in a bona fide executive or high policy-making position and if that employee is entitled to immediate nonforfeitable annual retirement benefits attributable to Corporation contributions under this Program of at least $44,000, or such other amount that may be set forth in applicable regulations.

Such employee may continue in service beyond automatic retirement age only upon invitation of the Corporation. This invitation requires action by the Committee of the Board of Directors having jurisdiction over the activity by which the employee is employed, or by the Board of Directors if the employee is a member of the Board of Directors. Such invitation to continue work will not be for a period of more than one year at a time.

## Section 2. Normal Retirement At or After Age 65

An employee may retire at or after age 65. Any employee or former employee who elects to continue to work full time (i.e., 40 or more hours per month) for the Corporation or a successor company beyond age 65 will be notified that, while such employee has entitlement to a normal retirement benefit at age 65, such

6

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

benefit is suspended and will not be paid while such employee or former employee works for the Corporation or a successor company beyond age 65. This notification will not be provided to those employees with a length of service date on or after January 1, 2001.

## Section 3.  Retirement Between Ages 60 and 65

An employee may retire voluntarily at or after age 60 and prior to age 65, with 10 or more years of credited service.

## Section 4.  Retirement Prior to Age 60

(a)    An employee who has 10 or more years of credited service and who is separated from service at or after age 55 and prior to age 60 for any reason other than death or total and permanent disability, is entitled to retirement benefits determined under the provisions of this Program which are applicable to an employee who retires voluntarily.

(b)    An employee who (i) was hired prior to January 1, 1988, (ii) has 30 or more years of credited service, and (iii) is separated from service prior to age 55 for any reason other than death or total and permanent disability, is entitled to retirement benefits determined under the provisions of this Program which are applicable to an employee who retires voluntarily.

## Section 5.  Retirement Prior to Age 65 Due to
##                     Total and Permanent Disability

An employee who has 10 or more years of credited service may be retired prior to age 65 for total and permanent disability.  An employee will be deemed to be totally and permanently disabled only if such employee makes application for total and permanent disability retirement on a form approved by the Corporation

7

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

and (i) the employee is not engaged in regular employment or occupation for remuneration or profit, and (ii) on the basis of medical evidence satisfactory to the Corporation the employee is found to be wholly and permanently prevented from engaging in regular employment or occupation with the Corporation at the location where the employee last worked for remuneration or profit as a result of bodily injury or disease, either occupational or non-occupational in cause, but excluding disabilities resulting from service in the armed forces of any country unless the employee becomes totally and permanently disabled after accumulating at least 5 years of credited service following separation from service in the armed forces. An individual who is not an employee is not eligible to apply for total and permanent disability retirement.

(a)    Employees with unbroken length of service may apply for a total and permanent disability retirement on form SRP-15, "Application for Total and Permanent Disability Benefits". Such forms are available through the Corporation's pension administrator.

(b)    The employee will supply a physician's statement and other necessary information on form SRP-15 and submit the form to the Corporation's pension administrator.

(c)    An employee with unbroken length of service who has a terminal condition may apply immediately for T&PD retirement as provided in paragraphs (a) and (b) above. In the event such employee has been on leave at least one month and the cause of death is directly or indirectly a result of the terminal condition which gave rise to the disability leave of absence, and who has applied for retirement prior to death, shall not disqualify an otherwise eligible surviving spouse from receiving a benefit. Not withstanding the foregoing, effective October 1, 1999, (a) in the case of an occupational injury or disease incurred in the course of employment with the Corporation resulting in death, neither the one-month period nor the leave of absence requirement shall apply, and (b) in the case of a terminal condition as such term is used and qualified in this paragraph, the one-month period will not apply.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## Section 6. Retirement Under Section 9 of the General Provisions

An employee who has 10 or more years of credited service may retire prior to age 62 under provisions set forth in Section 9 of the General Provisions of this Program.

## Section 7. Employees Not in Active Service

The absence of an employee (or former employee) from active service at the time such employee would be (or would have been) eligible to retire under the Program will not preclude such employee's retirement without return to active service, provided that there has been no loss of credited service.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## PART A -- NON-CONTRIBUTORY BENEFITS

The benefits described in this Part A are not applicable to credited service accrued on or after January 1, 2001 for any employee whose length of service date is after December 31, 2000.

## ARTICLE I
## BENEFIT AMOUNTS

### Section 1.  Retirement At or After Age 65

    (a)    Any employee who has attained the age of 65, has accumulated credited service as provided in Section 1 of Article II of this Part A, and ceases active service is entitled to receive a retirement benefit under this Part A.

    (b)    The monthly benefit payable to an employee retired pursuant to the provisions of Section 1(a) of this Article I with benefits payable commencing on or after October 1, 2004 will be a basic benefit for each year of credited service that the employee had at the first of the month coinciding with or next following the employee's retirement, determined by the applicable Benefit Class Code in accordance with (c) below and based on the month for which payment is being made as set forth in the table immediately following:

| Retirement With Benefits Payable Commencing | Benefit Class Code | Basic Benefit Rate Per Year of Credited Service For Months Commencing |
|---|---|---|
| | | $ |
| October 1, 2004 and After | A<br>B<br>C<br>D | 48.8049.0549.3049.55 |

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(c)      As set forth below, a Benefit Class Code is established for the purpose of this Article I for each salaried position on the basis of the following salaried position levels:

| Salaried Position Level | Benefit Class Code |
|---|---|
| 1 and 2 | A |
| 3 | B |
| 4 | C |
| 5 and Above | D |

The Benefit Class Code applicable to an employee is the Benefit Class Code for the salaried position level held by the employee for the greatest number of calendar days during the 24 consecutive months immediately preceding the last day worked.

In the event an employee is transferred to a lower salaried position level, which results in a lower Benefit Class Code, such employee's vested retirement benefit, if any, will not be less than the amount of such employee's accrued retirement benefit on the date of such transfer plus benefits earned in the 12 consecutive months following the date of transfer.

(d)      The amount of any monthly retirement benefit otherwise payable to the employee at retirement, or earlier commencement, will be reduced by the Actuarial Value of any past and future benefits paid or payable to any alternate payee(s) under a Qualified Domestic Relations Order ("QDRO") within the meaning of the Internal Revenue Code of 1986 ("the Code") Section 414(p).  The Actuarial Value of the combined benefits payable to the employee and any alternative payee(s) shall in no event exceed the Actuarial Value of the employee's accrued benefit under this Program.

11

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## Section 2.  Early Retirement

(a)    (1)    An employee who retires voluntarily after attainment of age 55 but not age 65 and who has 10 or more years of credited service will be entitled to receive a retirement benefit under this Part A.

(2)    An employee who (i) was hired prior to January 1, 1988, (ii) retires voluntarily before attainment of age 55, and (iii) has 30 or more years of credited service  will be entitled to receive a retirement benefit under this Part A.

(b)    (1)    The monthly basic benefit payable to an employee who retires voluntarily with benefits payable commencing on or after October 1, 1999 will be the basic benefit set forth in Section 1(b) of this Article I but adjusted as set forth in (2) below.

(2)    (i)    For an employee retired (1) pursuant to Section 2(a)(1) above after age 60, or (2) after age 55 but not age 60 and whose combined years of age and years of credited service (to the nearest 1/12th in each case) at retirement total 85 or more, or (3) pursuant to Section 2(a)(2) above and, in the case of either (2) or (3) of this subparagraph, the employee was hired prior to January 1, 1988, such benefit  will commence on the first day of the month coinciding with or next following the employee's attaining age 62 (or, if later, the first day of the month coinciding with or next following the employee's first day of absence because of retirement) or, in lieu thereof, the employee may elect to receive the benefit commencing on the first day of any month coinciding with or following the employee's first day of absence because of retirement and prior to age 62 in an amount equal to the

12

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

benefit payable at age 62, multiplied by a percentage as set
forth in the following table:

| Age When Benefit Commences | Percentage* |
|---|---|
| 42 | 21.0% |
| 43 | 22.6 |
| 44 | 24.3 |
| 45 | 26.1 |
| 46 | 28.2 |
| 47 | 30.4 |
| 48 | 32.8 |
| 49 | 35.4 |
| 50 | 38.3 |
| 51 | 41.5 |
| 52 | 45.0 |
| 53 | 48.9 |
| 54 | 53.2 |
| 55 | 57.9 |
| 56 | 63.5 |
| 57 | 69.4 |
| 58 | 75.2 |
| 59 | 80.8 |
| 60 | 86.7 |
| 61 | 93.3 |
| 62 or Over | 100.0 |

*\* Prorated for intermediate ages
computed on the basis of the number of
complete calendar months by which the
employee is under the age attained at
the employee's next birthday.*

If an employee hired prior to January 1, 1988 (i) with 30 or
more years of credited service retires voluntarily, or
(ii) whose combined years of age and years of credited
service (to the nearest 1/12th in each case) at retirement
total 85 or more retires voluntarily, with benefits payable
commencing on or after October 1, 1999, the monthly basic
benefits otherwise payable to such employee after age 62
and one month shall be redetermined without reduction for
commencement prior to age 62.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(ii)  For an employee retired pursuant to Section 2(a)(1) above after age 55 but not age 60, and whose combined years of age and years of credited service at retirement total less than 85, or an employee who elects to retire prior to age 60 and was hired on or after January 1, 1988, such benefit will commence on the first day of the month coinciding with or next following the employee's attaining age 65, or, in lieu thereof, the employee may elect to receive the benefit commencing on the first day of any month coinciding with or following the employee's first day of absence because of retirement, in which case the benefit, if elected to commence prior to age 65,  will be multiplied by a percentage as set forth in the following table:

| Age When Benefit Commences | Percentage* |
|---|---|
| 55 | 46.0% |
| 56 | 49.6 |
| 57 | 53.2 |
| 58 | 56.8 |
| 59 | 60.4 |
| 60 | 64.0 |
| 61 | 71.2 |
| 62 | 78.4 |
| 63 | 85.6 |
| 64 | 92.8 |
| 65 | 100.0 |

*Prorated for intermediate ages computed on the basis of the number of complete calendar months by which the employee is under the age attained at the employee's next birthday.*

(iii)  The basic benefit payable in any month will not be reduced below an amount which results in the early retirement supplement paid to a participant in such month, under Section 7(a)(1) of this Article I, exceeding the old age insurance benefits, unreduced on account of age, payable under Title II of the Social Security Act, as amended.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(c)     An employee discharged for cause after such employee is eligible to retire voluntarily pursuant to Section 2(a) of this Article I will be entitled to the benefits provided under Sections 2(b)(1) and 2(b)(2) of this Article I.

## Section 3.  Automatic Retirement For Bona Fide Executive At Age 65

A bona fide executive employee retired on or after the executive's automatic retirement date will be entitled to the benefits provided under Section 1 of this Article I.

## Section 4.  Total and Permanent Disability Retirement

(a)     An employee who is totally and permanently disabled prior to age 65, and has 10 or more years of credited service, and who retires on or after October 1, 2004, will be eligible for a monthly disability retirement benefit as follows:

(i)     A monthly basic benefit for each year of credited service as set forth in Section 1(b) of this Article I and determined by the applicable Benefit Class Code as set forth in Section 1(c) of this Article I, and

(ii)    A temporary benefit for each year of credited service, up to 30, as set forth in the table immediately following:

| Retires With Benefits Payable | Monthly Temporary Benefit Amount | |
|---|---|---|
| | Per Year of Credited | |

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

| Commencing | Service | Maximum |
|---|---|---|
| October 1, 2004 and After | 47.05 | 1,411.50 |

The monthly temporary benefit will be payable until the earlier of (1) age 62 and one month, or (2) the age at which the employee becomes, or could have become, eligible for a Social Security benefit for disability or an unreduced Social Security benefit for age. At such age the temporary benefit will cease to be payable.

(iii) Such benefits will be payable in accordance with Section 2 of the General Provisions to the disability retiree during the continuance of total and permanent disability.

(b) Any disability retiree may be required to submit to medical examination at any time during retirement prior to age 65, but not more often than semi-annually, to determine whether the retiree is eligible for continuance of the disability retirement benefit.  If on the basis of such examination it is found that the retiree is no longer disabled or if the retiree engages in gainful employment, except for purposes of rehabilitation as determined by the Corporation, the retiree will be deemed recovered and such disability retirement benefit will cease.  In the event the disability retiree refuses to submit to medical examination, the retirement benefit will be discontinued until the retiree is examined.

(c) Notwithstanding the provisions of Section 11(a) of the General Provisions, the provisions of this Section 4 will not apply to employees of any wholly-owned or substantially wholly-owned domestic subsidiary of the Corporation unless specifically approved by the Corporation's Board of Directors.

16

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## Section 5.  Surviving Spouse Coverage

(a)  In lieu of the monthly basic benefit otherwise payable, an employee who retires, or who loses credited service and is eligible for a deferred retirement benefit pursuant to the provisions of Article III of this Part A, will be deemed to have elected automatically a reduced amount of monthly basic benefit to provide that, if the designated spouse  is living at the employee's death after such election has become effective, a  survivor benefit shall  immediately be payable  to such spouse commencing on the first of the month following the employee's death and such survivor benefit will be payable during the spouse's  lifetime.  In the event (1) such spouse predeceases such employee, or (2) they are divorced by court decree and (i) a QDRO so provides, or (ii) written consent of the former spouse which acknowledges the effect of the cancellation and is witnessed by a notary public is obtained, such employee may cancel the survivor benefit election with respect to the monthly basic retirement benefit and have such benefit restored to the amount payable without such election, effective the first day of the month following the month in which the Corporation receives evidence satisfactory to the Corporation of the spouse's death or written revocation of the election because of divorce, on a form approved by the Corporation.  For deaths occurring on or after October 1, 2004, restoration of the monthly basic benefit will be effective the first day of the month following the date of the death upon receipt by the Corporation, of notice satisfactory to the Corporation, of the spouse's death.

The automatic election provided in this subsection (a) becomes effective on the latest of (i) the commencement date of the employee's monthly basic benefit, (ii) the first day of the month coinciding with or next following the employee's attaining age 55 (except that this item (ii) shall not apply to an employee with 30 or more years of credited service who was hired prior to January 1, 1988 or to an employee who has elected and commences

17

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

deferred retirement benefits prior to age 55), or (iii) one-year anniversary of the marriage; except that, in the case of a bona fide executive employee who has reached automatic retirement date but whose basic benefit has not commenced, the effective date of any such coverage  will be the later of such automatic retirement date or the date determined in (iii) of this paragraph and the basic benefit payable to such employee after the effective date  will be reduced in accordance with the coverage.

An employee may prevent the automatic election provided in this subsection (a) during the 180-day period prior to the effective date of such automatic election by executing a specific written rejection of such election, which includes the written consent of the employee's spouse that acknowledges the effect of the rejection, and that is witnessed by a notary public, on a form approved by the Corporation and filing it with the Corporation.  An employee may revoke a written rejection of this automatic election, without the consent of the spouse, at any time prior to commencement of benefits.

Within the time period set forth in Section 2(i) of the General Provisions, each participant will be provided a written explanation of:  (i) the terms and conditions of the surviving spouse coverage; (ii) the participant's right to make and the effect of an election to waive the surviving spouse coverage; (iii) the rights of the participant's spouse; and (iv) the right to make and the effect of revocation of a previous selection to waive the surviving spouse coverage.

(b)     The beneficiary of a survivor benefit election under subsection (a) of this Section 5 only will be the person who is the employee's spouse at such time and who has been such spouse for at least one year immediately prior to the effective date of such election.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(c)     Except as provided in subsections (g) and (h) below, a survivor benefit
election will be revoked automatically upon the death of the employee or
the designated spouse, or both, prior to the effective date of the election.

(d)     Once the election has become effective it cannot be rescinded, except as
otherwise provided under subsection (a) of this Section 5, without the
submission of evidence, satisfactory to the Corporation, of the good health
of the designated spouse.  Moreover, the employee's right to rescind the
election is contingent on the written consent of the designated spouse.
The benefit will be restored the first of the month following the month the
required proofs are received by the Corporation.

(e)     For an employee who does not prevent the automatic election provided in
this Section 5, the reduced amount of the monthly basic benefit will be
equal to an amount determined by multiplying the monthly basic benefit
payable to the employee by 95%; except that, in the case of an employee
whose monthly basic benefit is subject to redetermination at age 62 and
one month, the amount of reduction in the monthly basic benefit for the
survivor benefit election before the employee attains the age at which the
monthly benefit is redetermined  will be based on the monthly benefit
payable to such employee after the monthly benefit is redetermined.  Such
percentage will be (i) increased by one-half of one percent (1/2%) (up to a
maximum of 100%) for each 12 months in excess of five (5) years that the
spouse's age exceeds the employee's age, and (ii) decreased by one-half
of one percent (1/2%) for each 12 months in excess of five (5) years that
the spouse's age is less than the employee's age.

Notwithstanding the above, for a former employee who has elected and
commences deferred retirement benefits prior to age 55 pursuant to
General Provision 2(g) of this Program, the reduced amount of monthly
basic benefit will have no reduction for survivor coverage.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(f)     Effective October 1, 2004, the survivor benefit payable to the surviving
spouse of a retired employee who has the automatic election provided in
this Section 5, and who retires or loses credited service on or after
October 1, 2004 and is eligible for a deferred retirement benefit pursuant
to the provisions of Article III of this Part A, and who dies after such
election becomes effective, will be a monthly benefit for the lifetime of
such surviving spouse equal to 65% (50% in the case of a former
employee who has elected and commences deferred retirement benefits
prior to age 55) of the reduced amount of such employee's monthly basic
benefit; except that (i) the survivor benefit payable to the surviving spouse
of an employee whose monthly basic benefit is subject to redetermination
at age 62 and one month  will be based on the monthly basic benefit
payable to such employee after the monthly basic benefit is redetermined,
and (ii) surviving spouses of retirees who died prior to age 55 and who are
receiving, or are eligible to receive, benefits in accordance with subsection
(i) of this Section 5 are not covered by this provision.

(g)     The death of an otherwise eligible employee who has retired under
Section 4 of this Article I, occurring on or after age 55, but before the first
day of the month following the date on which such employee dies, will not
disqualify an otherwise eligible surviving spouse from receiving a benefit
hereunder.

(h)     The surviving spouse of an employee

(1)     who dies (i) on or after age 55 with 10 or more years of credited
service, or (ii) at any age with 30 or more years of credited service
and the employee's date of hire is prior to January 1, 1988, but
before the first day of the month coinciding with or next following
the first day of absence because of retirement (or, if later, the
commencement date of the monthly basic benefit in the case of an
employee who defers the receipt of the monthly benefit under

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Section 2(b)(2) of this Article I), who had not reached the normal retirement date, and

(2)     who, if the employee had retired at the date of death, would have been eligible for the election under subsection (a) of this Section 5, will immediately be entitled to a monthly benefit during such spouse's lifetime, terminating with the last monthly payment before such spouse's death.  The monthly benefit payable to the surviving spouse will be the amount such spouse would have been entitled to receive under subsection (f) of this Section 5, if the employee had retired on the date of death with benefits payable under Section 1(a) or 2(a), whichever is applicable, of this Article I commencing the first of the following month and had effectively made the election under subsection (a) of this Section 5; provided, however, that for the sole purpose of this subsection (h), the benefits which would have been payable to the employee by reason of such retirement  will be determined on the basis of the table set forth in Section 2(b)(2)(i) of this Article I.  The surviving spouse of an employee who had been separated from service in a layoff classification prior to June 1, 2001, but who had not lost credited service at the date of death will be entitled to the benefit payable under this subsection (h), if otherwise eligible.

(i)     Joint and survivor coverage for disability retirements

(1)     In lieu of the monthly basic benefit otherwise payable, an employee who retires pursuant to the provisions of Section 4 of this Article I who is under age 55 and (i) has less than 30 years of credited service, or (ii) has 30 or more years of credited service and was hired on or after January 1, 1988 will be deemed to have elected automatically a reduced amount of monthly basic benefit, up to and including the month in which the retired employee dies or attains age 55, whichever occurs first, and a monthly survivor's benefit,

21

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

beginning on the first day of the month after the retired employee would have reached age 55  will be payable to the designated spouse during the lifetime of the spouse.

(2)     This automatic election will be deemed to have been made at the time the employee applies for a disability retirement benefit (with the election being effective the first day of the month for which the first benefit under the Program is payable).

(3)     The automatic election provided in this subsection (i) will be applicable only with respect to a spouse to whom the employee is married on the date of such election and only if the retired employee and spouse were married throughout the one-year period ending on the date of the retired employee's death.

(4)     An employee may prevent the automatic election provided in this subsection (i) during the 180-day period prior to the effective date as set forth in paragraph (2) of this subsection (i), by specific written rejection which includes the written consent of the employee's spouse that acknowledges the effect of the rejection and that is witnessed by a notary public, on a form approved by the Corporation.  An employee may revoke a written rejection of this automatic election, without the consent of the spouse, at any time prior to commencement of benefits.

(5)     In any event, the election automatically will be cancelled:

(i)     if the employee's disability retirement status terminates other than by death prior to the first day of the month after the retired employee attains age 55, or

(ii)     if the retired employee survives on a disability retirement status until the first day of the month after the attainment of

22

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

age 55, at which time the coverage described in Section 5(a) through (h) of this Article I becomes applicable.

(6)   The amount of the monthly basic benefit payable to an employee deemed to have made the election provided hereunder will be determined by reducing actuarially the amount of such benefit for the cost of the survivor benefit payable in the event of the retired employee's death before the first of the month following age 55. The actuarial reduction will be based on the age of the retired employee and spouse (the age of each being determined as their age at the birthday nearer the date on which the benefits commence) and reflect the higher mortality associated with being disabled.  Reduction factors at selected ages for disability survivor coverage before age 55 are set forth in the following table:

| Age of Employee When Benefits Commence | Age Difference Between Disabled Employee and Spouse | | | | |
| | Spouse Is: | | | | |
| | 10 Years Younger | 5 Years Younger | Same Age | 5 Years Older | 10 Years Older |
| --- | --- | --- | --- | --- | --- |
| 30 | 8.6% | 8.1% | 7.5% | 6.7% | 5.9% |
| 35 | 10.4 | 9.9 | 9.2 | 8.3 | 7.2 |
| 40 | 12.5 | 11.8 | 11.0 | 10.0 | 8.8 |
| 45 | 14.3 | 13.5 | 12.7 | 11.6 | 10.3 |
| 50 | 13.9 | 13.2 | 12.4 | 11.4 | 10.2 |
| 51 | 13.1 | 12.5 | 11.7 | 10.8 | 9.7 |
| 52 | 10.4 | 9.9 | 9.3 | 8.6 | 7.7 |
| 53 | 3.4 | 3.2 | 3.0 | 2.8 | 2.5 |
| 54 | 3.4 | 3.3 | 3.1 | 2.8 | 2.5 |

**NOTE**:  *Actuarial reduction factors for ages not shown will be calculated on the same basis as the factors shown.*

(7)   The amount of the monthly benefit payable to the surviving spouse of a retired employee deemed to have made the election specified

23

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

hereunder will be 50% of the amount of the monthly basic benefit payable to the retired employee after the reduction provided in paragraph (6) of this subsection (i).

(8)    Anything in the Program to the contrary notwithstanding, if the designated spouse of a retired employee deemed to have made the election provided hereunder (1) predeceases such retired employee, or (2) they are divorced by a court decree and (i) a QDRO so provides, or (ii) written consent of the former spouse which acknowledges the effect of the cancellation and is witnessed by a notary public is obtained, such retired employee may cancel the survivor benefit election only with respect to the monthly basic retirement benefit and have such benefit restored to the amount payable without such election, effective the first day of the month following the month in which the Corporation receives evidence satisfactory to the Corporation of the spouse's death or written revocation of the election because of divorce, on a form approved by the Corporation.  For spousal deaths occurring on and after October 1, 2004, restoration of the monthly basic benefit will be effective the first day of the month following the date of the death upon receipt by the Corporation, of notice satisfactory to the Corporation, of the spouse's death.

(9)    No benefit is payable under this subsection (i) for any month for which benefits are payable under Section 5(a), (h), or (j) of this Article I.

(10)     Within the time period set forth in Section 2(i) of the General Provisions, each participant will be provided a written explanation of: (i) the terms and conditions of the surviving spouse coverage; (ii) the participant's right to make and the effect of an election to waive the surviving spouse coverage; (iii) the rights of the participant's spouse; and (iv) the right to make and the effect of a

24

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

revocation of a previous selection to waive this surviving spouse coverage.

(j)    Pre-retirement survivor coverage provided under Part A of the Program to comply with the Retirement Equity Act of 1984

(1)    An employee who:

(i)    has either 5 or more years of credited service, or 5 years of "service" as provided under Article II, Section 10, and who is credited with one or more hours of credited service or "service" accrued on or after January 1, 1989, or

(ii)    loses credited service on or after October 1, 1999  and who is eligible for a deferred retirement benefit under Article III,

and in either case is not eligible for the regular surviving spouse coverage provided under subsection (h) of this Section 5, will have the pre-retirement survivor coverage described herein.

Such coverage will remain in effect until the date on which the employee or former employee becomes eligible for the regular surviving spouse coverage provided under subsection (h) of this Section 5, at which time the pre-retirement survivor coverage described herein ceases to be effective.

In the event the employee or former employee predeceases the designated spouse while the pre-retirement survivor coverage is in effect, the designated spouse will be eligible, during the lifetime of such spouse, for a monthly benefit commencing on the first of the month following the month in which the employee or former employee dies.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

The amount of any such monthly survivor benefit is determined by the basic benefit rate in effect for the employee on the date of death of such employee, or the date credited service was broken for a former employee.

(2)    The survivor coverage provided for an employee or former employee will be effective on the date the employee or former employee attains 5 years of credited service or "service" as provided under Article II, Section 10, and provided that such employee is credited with one hour or more of credited service or "service" accrued on or after January 1, 1989.

(3)    The survivor coverage provided will be effective with respect to a spouse to whom the employee or former employee is married, but only if the couple was married throughout the one-year period ending on the date of the employee's or former employee's death.

(4)    Subsections (j)(2) and (j)(3) notwithstanding, if an employee or former employee marries or remarries, such coverage will be in effect in favor of the spouse upon such marriage or remarriage, unless, in the case of remarriage, a QDRO requires such coverage to remain in effect for the former spouse.  The effective date of any such coverage will be determined in accordance with item (3) of this subsection (j).

(5)    In the event of divorce, the employee or former employee can revoke the coverage provided without consent of the former spouse, unless a QDRO provides to the contrary.

(6)    The coverage provided will be canceled automatically on the date when any employee or former employee becomes eligible for the regular surviving spouse coverage under the provisions of Article I, Section 5(h) of the Program.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(7) The monthly benefit amount payable to any eligible surviving spouse will be 50% of the monthly amount of the basic benefit as determined in Article III otherwise payable at the (i) date of death of the employee, or (ii) date credited service broke for a former employee, after any reduction provided in Article III.

(8) No benefit is payable under this subsection (j) for any month for which benefits are payable under Article I, Section 5 or Section 6 of Part A of this Program.

(k) In no event may an election for survivor benefits be made or changed after the death of the participant.

## Section 6.  Joint and Survivor Option

(a) In lieu of the monthly basic benefit otherwise payable, an employee who retires or who loses credited service and is eligible for a deferred retirement benefit pursuant to the provisions of Article III of this Part A, may elect to receive during the employee's lifetime a reduced amount of monthly basic benefit to provide that, if the contingent annuitant (who may be any person designated by the employee) is living at the employee's death after such election becomes effective, a survivor benefit  will be payable to such contingent annuitant during the lifetime of such contingent annuitant; provided that the employee completes the election on a form approved by the Corporation and files it with the Corporation within the time period set forth in Section 2 of the General Provisions.

If married, and the designated contingent annuitant is not the spouse, the written consent of the spouse, acknowledging the effect of the election and witnessed by a notary public, on a form approved for this purpose by the Corporation and filed with the Corporation, will be required.  The

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

written consent of the spouse is limited to a benefit for the designated alternate beneficiary only.

(b) The death of an otherwise eligible employee who has retired under Section 4 of this Article I, occurring on or after age 55, but before the first day of the month following the date on which such employee dies, will not disqualify an otherwise eligible surviving spouse from receiving a benefit.

(c) Except as provided in (b) above, the option will be revoked automatically upon the death of the employee or the designated contingent annuitant, or both, prior to the effective date of the election.

(d) Once the option becomes effective it cannot be rescinded without the submission of evidence, satisfactory to the Corporation, of the good health of the designated spouse or contingent annuitant. Moreover, the employee's right is reserved to rescind the election, except that the written consent of the designated contingent annuitant is required only if such annuitant is the employee's spouse. In the event the employee becomes divorced by court decree from such designated spouse and (i) a QDRO so provides, or (ii) written consent of the designated former spouse which acknowledges the effect of the cancellation and is witnessed by a notary public is obtained, such retired employee may cancel the survivor benefit option with respect to the monthly basic retirement benefit and have such benefit restored to the amount payable without such election, effective the first day of the month following the month in which the Corporation receives evidence satisfactory to the Corporation of the spouse's written revocation of the election because of divorce, on a form approved by the Corporation.

(e) The amount of monthly benefit payable to such contingent annuitant if such contingent annuitant is living at the death of the employee will equal any designated percentage, up to a maximum of 100%, of the employee's reduced monthly basic benefit, except that, in the case of an employee

28

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

whose monthly benefit is subject to redetermination at age 62 and one month, the amount of reduction in the monthly benefit for the survivor benefit election before the employee attains the age at which the monthly benefit is redetermined  will be based on the monthly benefit payable to such employee after the monthly benefit is redetermined and the benefit payable to the contingent annuitant  will be based on the monthly benefit payable to such employee after the monthly benefit is redetermined.

The amount of monthly benefit will be determined so that the actuarial value of the reduced amount of monthly benefit payable to the employee and the actuarial value of the amount of monthly benefit to be continued to the designated contingent annuitant is as follows:

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

| Joint and Survivor Option Rate Table | | | |
|---|---|---|---|
| Full Years Contingent Annuitant is Older (+) or Younger (-) Than Employee | Factors to Convert Normal Form of Retirement to Joint and Survivor Option for Indicated Percentage Payable to Contingent Annuitant* | | |
| | 100% | 75% | 50% |
| +20 | 95.50 | 96.00 | 100.00 |
| +19 | 95.00 | 95.50 | 99.50 |
| +18 | 94.50 | 95.00 | 99.00 |
| +17 | 94.00 | 94.50 | 98.50 |
| +16 | 93.50 | 94.00 | 98.00 |
| +15 | 93.00 | 93.50 | 97.50 |
| +14 | 92.50 | 93.00 | 97.00 |
| +13 | 92.00 | 92.50 | 96.50 |
| +12 | 91.50 | 92.00 | 96.00 |
| +11 | 91.00 | 91.50 | 95.50 |
| +10 | 90.50 | 91.00 | 95.00 |
| + 9 | 89.75 | 90.50 | 94.50 |
| + 8 | 89.00 | 90.00 | 94.00 |
| + 7 | 88.25 | 89.50 | 93.50 |
| + 6 | 87.50 | 89.00 | 93.00 |
| + 5 | 86.75 | 88.50 | 92.50 |
| + 4 | 86.00 | 88.00 | 92.00 |
| + 3 | 85.25 | 87.50 | 91.50 |
| + 2 | 84.50 | 87.00 | 91.00 |
| + 1 | 83.75 | 86.50 | 90.50 |
| 0 | 83.00 | 86.00 | 90.00 |
| - 1 | 82.25 | 85.50 | 89.50 |
| - 2 | 81.50 | 85.00 | 89.00 |
| - 3 | 80.75 | 84.50 | 88.50 |
| - 4 | 80.00 | 84.00 | 88.00 |
| - 5 | 79.25 | 83.50 | 87.50 |
| - 6 | 78.50 | 83.00 | 87.00 |
| - 7 | 77.75 | 82.50 | 86.50 |
| - 8 | 77.00 | 82.00 | 86.00 |
| - 9 | 76.25 | 81.50 | 85.50 |
| -10 | 75.50 | 81.00 | 85.00 |
| -11 | 75.00 | 80.50 | 84.50 |
| -12 | 74.50 | 80.00 | 84.00 |
| -13 | 74.00 | 79.50 | 83.50 |
| -14 | 73.50 | 79.00 | 83.00 |
| -15 | 73.00 | 78.50 | 82.50 |
| -16 | 72.50 | 78.00 | 82.00 |
| -17 | 72.00 | 77.50 | 81.50 |
| -18 | 71.50 | 77.00 | 81.00 |
| -19 | 71.00 | 76.50 | 80.50 |
| -20 | 70.50 | 76.00 | 80.00 |

*Other whole percentage levels may be elected.*

Notwithstanding any of the above, where the contingent annuitant is other than the employee's spouse, the actuarial value of the benefit payable to the employee as of the employee's actual

30

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

retirement date must be more than 50% of the actuarial value of the benefit payable to the employee and their contingent annuitant.

## Section 7.  Supplements

(a)    An employee who retires with benefits payable under Section 2 of this Article I (other than an employee (i) discharged for cause, (ii) hired on or after January 1, 1988, or (iii) referred to in Section 2(b)(2)(ii) of this Article I who retires voluntarily after age 55 but not age 60 and whose combined years of age and years of credited service at retirement total less than 85) or who retires with benefits payable under Section 4 of this Article I, and who retires within five years of the last day worked for the Corporation will receive, in addition to retirement benefits, certain supplements as set forth below:

(1)    If the employee retires under Section 2 or 4 of this Article I with 30 or more years of credited service at the date of retirement and such employee's date of hire was prior to January 1, 1988, such employee will be entitled to a monthly early retirement supplement until age 62 and one month in an amount which when added to the monthly retirement benefit under this Part A and any supplementary benefits under Part B, prior to reduction for survivor coverage, will equal the amount of total monthly benefit provided in the table set forth below, subject to subsequent provisions of this Section 7:

| Retires With Benefits Payable Commencing | Total Monthly Benefit Rate For Determining Monthly Early Retirement Supplement For Retirements With 30 or More Years of Credited Service |
|---|---|
| October 1, 2004 and After | $2,875 |

31

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(2)    If the employee retires voluntarily after age 55 with less than 30 years of credited service, such employee will be entitled to a monthly interim supplement until age 62 and one month equal to the amount provided immediately below for each year of credited service that such employee had at the date of retirement, subject to subsections (b), (e), and (g) of this Section 7:

| Monthly Amount* and Effective Date of Interim Supplement Payable Prior to Age 62 and One Month for Each Year of Credited Service | |
| --- | --- |
| Age at Retirement | Retires With Benefits Payable Commencing On or After October 1, 2004 |
| | $ |
| 55 | 20.70 |
| 56 | 24.45 |
| 57 | 29.50 |
| 58 | 34.60 |
| 59 | 38.60 |
| 60 | 44.70 |
| 61 | 44.70 |

* *Prorated for intermediate ages computed on the basis of the number of complete calendar months by which the employee is under the age attained at the employee's next birthday.*

This provision does not apply to an employee who has attained age 55 but not age 60 and whose combined years of age and years of credited service (to the nearest 1/12th in each case) at retirement total less than 85.

(3)    Any interim supplement described above will be reduced by any supplementary benefits under Part B of this Program prior to reduction for survivor coverage.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(b)    The early retirement supplement under subsection (a)(1) of this Section 7 for an employee who retires voluntarily will be calculated assuming that the basic benefit commences immediately after retirement, and such early retirement supplement and the interim supplement under subsection (a)(2) of this Section 7 will be reduced for any month prior to age 62 and one month for which the employee becomes or could have become eligible for a Social Security benefit, by an amount equal to the amount of the temporary benefit to which the employee would have been entitled if retired under Section 4 of this Article I.

(c)    The early retirement supplement under subsection (a)(1) of this Section 7 for an employee who retires under Section 4 of this Article I will be calculated on the assumption that the employee will receive a temporary benefit until age 62 and one month even if such temporary benefit is not received by the employee until such age because of earlier entitlement to Social Security benefits.

(d)    The early retirement supplement under subsection (a)(1) of this Section 7 for an employee who does not prevent the automatic election of the surviving spouse coverage provided under Section 5(a) of this Article I will be calculated on the basis of the monthly retirement benefit the employee would have received if the employee had prevented such automatic election.

(e)    Any of the supplements will commence on the first day of the month coinciding with or next following the employee's first day of absence because of retirement and will be payable monthly until and including the first day of the month in which the employee (1) dies, (2) has the retirement benefit cease for any other reason, (3) is reemployed by the Corporation, or (4) attains age 62 and one month, whichever occurs first.

(f)    If a retired employee (i) has been receiving disability retirement benefits under this Part A and has been receiving a supplement and, on the basis

33

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

of medical evidence satisfactory to the Corporation, it is found that such employee is no longer totally and permanently disabled and credited service is reinstated, or (ii) is reemployed by the Corporation, such employee does not forfeit any right to receive a supplement if such employee retires under this Program.

(g)     If the total of the employee's monthly benefits under this Part A and under the supplementary benefit provisions of Part B and the monthly early retirement supplement or interim supplement as computed above would exceed 70% of the employee's final base salary, such monthly supplement will be reduced to the extent required so that such monthly benefits plus the supplement will equal 70% of the employee's final base salary.

For this purpose, an employee's "final base salary" means the employee's highest monthly base salary rate during the last 60 months preceding the employee's last day of work prior to retirement.

## ARTICLE II

34

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES
# CREDITED SERVICE
## (Applicable to Benefits Under Part A and
## Supplementary Benefits Under Part B)

## Section 1.  General

(a)   For purposes of determining "credited service" as used in this Program, the word "employment" includes all employment prior to an employee's retirement, or termination of employment, whichever is earlier, whether on salary or hourly-rate, with Delphi or its directly or indirectly wholly-owned or substantially wholly-owned domestic or foreign subsidiaries in accordance with Section 414(b), (c), (m), (n), and (o), of the Code as specifically approved by the Corporation's Board of Directors.

(b)   Credited service, wherever used in this Program, will also include credited service recognized under the General Motors Retirement Program for Salaried Employees ("GM SRP") for eligibility and benefits for employees who transitioned directly from GM to Delphi pursuant to the procedure agreed to by Delphi and GM for such transfers before January 1, 2002.

(c)   For the purposes of this Program, credited service is generally considered automatically broken by a quit or discharge; provided that if, after a quit or discharge, an employee has been or is rehired, such employee's credited service will be reinstated as provided in Section 4(a) of this Article II. However, the period during which such employee is absent from service because of such quit or discharge will not be included in the calculation of the amount of credited service, unless the employee was or is absent from service at the request of, or with the approval of, the Corporation for the purpose of employment with a company affiliated with the Corporation and, upon termination of such employment with such affiliate, returns to the service of the Corporation as such employee's first employment following employment with the affiliate.

35

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Notwithstanding the above, the credited service of an employee who has been rehired and who previously received a single-sum payment of deferred vested benefits in accordance with Section 2(g) of the General Provisions shall not be reinstated, except as required under Section 10 of this Article II.

(d)     Credited service will be computed to the nearest full month and shall be the sum of the number of years (and months thereof) of (i) credited service prior to October 1, 1950, and (ii) credited service on or after October 1, 1950.  Provisions regarding credited service prior to October 1, 1950, are set forth in the General Motors Retirement Program for Salaried Employees as amended through October 1, 1984.

## Section 2.  Credited Service Subsequent to October 1, 1950

(a)     Credited service consists of the number of years (to the nearest 1/12 thereof) represented by:

(1)     All periods of regular employment subsequent to October 1, 1950, for which an employee receives compensation.  No credited service accrues for an employee classified as a Flexible Service employee except as provided in subsection (f) of this Section 2.

(2)     All periods of absence prior to (i) an employee's retirement, or (ii) termination of employment, whichever is earlier, under a compensable Disability Leave of Absence, as defined in Section 8 of this Article II.

(3)     All periods of absence prior to (i) an employee's retirement, or (ii) termination of employment, whichever is earlier, under an approved Military Leave of Absence provided the employee is reemployed in accordance with the terms of such leave of absence. However, credited service cannot exceed four years, or such longer

36

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

period during which the employee has reemployment rights pursuant to any Federal law, and provided, further, that the employee is reemployed in accordance with the terms of such leave of absence or, if reemployed by the Corporation at a location other than the location from which the leave was granted, within 90 days from the date of discharge from the armed forces.

All periods of absence during any calendar year after December 31, 1967 and prior to an employee's retirement under a layoff or an approved noncompensable Disability Leave of Absence provided the employee receives compensation for periods totaling at least one month during such calendar year, and provided that if such layoff or Disability Leave of Absence commences in a calendar year after December 31, 1969 and continues after that year, credited service will be granted for each calendar month of such absence, ("bank credited service") not to exceed eleven months of bank credited service for all such absence related to receipt of such compensation from the Corporation in the first year. For purposes of this subparagraph (a)(4) only, an employee who is laid off and whose first day of absence due to such layoff is the first regularly scheduled work day in January will be deemed to have been laid off on December 31 of the year in which the employee last worked. An employee who returns to work on or after October 1, 1979 and receives pay for a period of less than one month and who returns to such layoff or Disability Leave of Absence, will not be disqualified, solely because of the receipt of such pay, from receiving any such credit for which the employee otherwise would be eligible.

(b)     An employee who is at work on or after March 1, 1982, and

(1)     is laid off on or after March 1, 1982, and prior to June 1, 2001 and

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(2)    has 10 or more years of credited service at the time such layoff commences, and

(3)    while on such layoff receives the maximum eleven months of credited service for absence due to layoff or Disability Leave of Absence in accordance with subparagraph (a)(4) above, and

(4)    continues to be absent due to such layoff,

will be granted bank credited service for each additional month of such absence, not to exceed a maximum of twelve months of credit.

(c)    For an employee who has at least five years of credited service:

(1)    as of December 31, 1967 and who was absent under a layoff during any calendar year after December 31, 1955 and prior to January 1, 1963, or

(2)    as of December 31, 1973 and who was absent under a layoff during any calendar year after December 31, 1950 and prior to January 1, 1956, or

(3)    as of October 1, 1979 and who was absent under a layoff during any calendar year after December 31, 1962 and prior to January 1, 1968, or

(4)    as of October 1, 1984 and who was absent under a layoff during any calendar year after December 31, 1978 and prior to January 1, 1984, or

(5)    as of October 1, 1993 and who was absent under a layoff during any calendar year after December 31, 1973 and prior to January 1, 1977, or

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(6)   as of October 1, 1996 who was absent under a layoff during any calendar year after December 31, 1983 and prior to January 1, 1986, or

(7)   as of October 1, 1999 who was absent under a layoff during any calendar year after December 31, 1978 and prior to January 1, 1984,

credited service will be granted for each calendar month of such absence, not previously credited under this Section 2 during which such employee remained on layoff status and retained credited service, the amount of credited service to be granted per year being the months of such absence in such year multiplied by a percentage as set forth in the following table:

| Employee's Credited Service on December 31, 1967 in the Case of (1) Above or December 31, 1973 in the Case of (2) Above or October 1, 1979 in the Case of (3) Above or October 1, 1984 in the Case of (4) Above or October 1, 1993 in the Case of (5) Above or October 1, 1996 in the Case of (6) Above or October 1, 1999 in the Case of (7) Above | % |
|---|---|
| 20 years or more | 100 |
| 15 years but less than 20 years | 75 |
| 10 years but less than 15 years | 50 |
| 5 years but less than 10 years | 25 |

provided that the employee makes proper application.

(d)   Credited Service includes all periods worked by a laid off employee who receives compensation and is classified as a regular employee-temporary assignment during the layoff period.  The credited service received for the temporary assignment will be in lieu of any credited service otherwise

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

creditable for the same period by reason of the employee's last layoff from a regular job assignment.

(e)     Credited Service includes all periods on an approved leave of absence as provided for in certain collective bargaining agreements pursuant to policy and rules that may be established by the Corporation.

(f)     Credited Service includes all hours worked and compensated while classified as a Flexible Service employee on and after August 7, 1984, except that no credited service will accrue prior to the later of:

(1)     one year of employment, or

(2)     attainment of age 21 (age 25 prior to October 1, 1985).

Credited service during Flexible Service employment will be based on compensated hours worked and will accumulate only if the employee works 750 or more hours during the calendar year, as follows:

| Compensated Hours | Equivalent Months of Credited Service |
|---|---|
| Less than 750 | None |
| 750 but less than   895 | 6 |
| 895 but less than 1040 | 7 |
| 1040 but less than 1185 | 8 |
| 1185 but less than 1330 | 9 |
| 1330 but less than 1475 | 10 |
| 1475 but less than 1615 | 11 |
| 1615 or more | 12 |

(g)     Notwithstanding any other section of this Article II, in the case of an employee who retires after January 1, 1999, the employee's credited service for the period before January 1, 1966 will not be less than the employee's length of service as of December 31, 1965.

40

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## Section 3.  Loss of Credited Service

Subject to the provisions of Section 10 of Article II of this Part A and Article III of this Part A, unless otherwise provided by the Named Fiduciary or its delegate, credited service will be broken, and all prior credited service will be lost, notwithstanding the provisions of Sections 1 and 2 above, if the employee:

(a)     Quits,

(b)     Is discharged for cause,

(c)     Is paid a separation allowance because of refusal to accept a salaried position or an hourly-rate job in accordance with Corporation policy,

(d)     Is laid off or is given an approved leave of absence (excluding Military and compensable Disability Leave of Absence) if the period of continuous absence is one year or more and is equal to or in excess of the employee's credited service prior to such layoff or approved leave of absence,

(e)     Fails to report for work in accordance with the terms of a Military or compensable Disability Leave of Absence,

(f)     Is given a final release or a mutually satisfactory release, or

(g)     Is separated under any classification other than those specifically covered above.

For the purposes of this Section 3, credited service will not be broken and prior credited service will not be lost as a result of any separation if the period following immediately thereafter is a period during which compensation by the Corporation or its directly or indirectly wholly-owned or substantially wholly-owned domestic or foreign subsidiaries was on a commission basis and

41

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

such period is followed immediately thereafter by salaried or hourly-rate employment.

## Section 4.  Reinstatement of Credited Service

(a)     Any employee who loses credited service under the provisions of Section 3 immediately above and is later reemployed by the Corporation will have such credited service reinstated upon making proper application.

(b)     Any employee retired under the total and permanent disability provisions of this Program who subsequently is deemed recovered and whose disability benefit then ceases will have reinstated the credited service the employee had at the time of disability retirement, provided the employee is reemployed, or is granted a leave of absence or otherwise given the status of an inactive employee, by the Corporation.

(c)     Any employee retired under the provisions of this Program, except total and permanent disability retirement, who subsequently is reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned subsidiaries will have reinstated the credited service the employee had at the time of retirement.

(d)     If a former employee who is entitled to a deferred retirement benefit under Part A and, if applicable, a deferred supplementary retirement benefit under Part B (or a deferred pension under the Delphi Hourly-Rate Employees Pension Plan) is reemployed by the Corporation prior to the commencement of such deferred retirement benefits, such employee  will, upon making proper application, have reinstated, in lieu of such deferred retirement benefits, the credited service lost at the time the employee became entitled to such deferred retirement benefits; provided that if an employee with 10 or more years of credited service:

42

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(1)    is reemployed by, and works for, the Corporation within 36 months of the date the employee lost credited service under Section 3 of this Article II, and

(2)    becomes disabled while employed by the Corporation for less than 5 months, and such disability is continuous for a period of 5 months during which the employee makes proper application and submits medical evidence satisfactory to the Corporation of total and permanent disability,

such employee will be deemed eligible for a disability retirement benefit under Section 4 of Article I of this Part A and such benefit will be payable pursuant to Section 2 of the General Provisions of this Program, as though such employee had been an employee throughout such disability period.

## Section 5. Credited Service of Employees Formerly on the Hourly Roll

Any employee transferred from the hourly roll to the salary roll, or hired as a salaried employee following the loss of credited service as an hourly-rate employee, will, upon making proper application, receive credit to the nearest 1/10th of a year for credited service as recognized under the Delphi Hourly-Rate Employees Pension Plan.  Employment while covered under The GM Special Pension Plan (for former "Frigidaire" employees) will not be credited, except for an employee with seniority on March 1, 1988, who has not received a cash payment representing such employee's accrued benefit under The GM Special Pension Plan.

## Section 6. Service With a Foreign Subsidiary

An employee whose employment as an hourly or salaried employee with a directly or indirectly wholly-owned or substantially wholly-owned foreign subsidiary of the Corporation has been terminated by the foreign subsidiary other than by retirement, as a result of a transfer by the Corporation to its domestic

43

### DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

operations that are covered under the Program, and such transfer was effective prior to September 30, 2008, will be granted credited service under this Program for any periods of active service with such foreign subsidiary or, if greater, the amount of service credited to such employee under any pension or retirement plan of the foreign subsidiary at the time of such employee's termination, , provided such service was prior to such employee's most recent period of active service credited under this Program.

Any monthly Part A benefits or supplementary benefits under Part B payable under this Program to a retired employee who has received credited service under this Section 6 will be reduced by an amount equivalent to the total of any monthly benefits (or lump-sum payment) that could be payable to such employee under any other retirement plan to which the foreign subsidiary has contributed, excluding, however, any retirement benefits or portion purchased by employee contributions.  Any survivor benefits payable under this Program to a survivor of such an employee will be subject to similar reduction by monthly survivor benefits payable under any other plan to which the foreign subsidiary has contributed. This Article II, Section 6 to the contrary notwithstanding, an employee with a length of service date on or after January 1, 2001 who has employment as an hourly or salaried employee with a directly or indirectly wholly owned or substantially wholly owned foreign subsidiary of the Corporation will have benefits as provided under Part C of the Program, unreduced by any monthly benefits that could be payable to such employee under any other retirement plan to which the foreign subsidiary has contributed.

## Section 7.  No Duplication of Credited Service

There will be no duplication of credited service and no more than a year's credit will be given for any calendar year except as otherwise provided in Section 11 of this Article II with respect to asbestos service.

## Section 8.  Compensable Disability Leave of Absence

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

The term "compensable Disability Leave of Absence" means an absence from work because of occupational injury or disease incurred in the course of employment, and on account of which absence the employee receives Workers Compensation while on an approved leave of absence.

## Section 9. Temporary Employment

A regular employee, with periods of temporary or part-time -- less than half-time -- employment prior to the date last worked as a regular employee, will be granted credited service for actual time paid while working on any temporary employment immediately preceding regular employment.

## Section 10. Hours, Years and Breaks in Service to Comply With ERISA

(a)   An employee who breaks credited service who would be eligible for a deferred benefit under Article III of this Part A, except solely for the fact that the employee does not have at least 5 years of credited service under the Program, will be eligible for a deferred benefit under the provisions of Article III of this Part A, if at the time the employee breaks credited service, such employee has 5 years of service as determined under this Section 10.

(b)   The monthly amount of any such deferred benefit will be based solely on the credited service that the employee had under the Program when the employee broke credited service.

(c)   No employee will be covered under this Section 10 until such employee (i) attains age 21, or (ii) completes one year of service under this Section 10, whichever is later.  Rehired employees participate immediately.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(d)     An employee completes one year of service when such employee completes 750 hours of service in the 12 consecutive month period beginning with the employee's employment commencement date.  If an employee fails to complete 750 hours of service in such period, such employee will complete one  year of service in the first 12 consecutive month period in which the employee completes 750 hours of service, measured from each succeeding anniversary of the employment commencement date.  Thereafter, an employee will complete one year of service during each 12 consecutive month period in which such employee completes 750 hours of service, measured from the anniversary of the employment commencement date.  A year of service under this Section 10 includes service (i) with affiliated group members accrued subsequent to acquisition, (ii) rendered to the Corporation as a former leased employee (but only upon employee application with substantiation of such service satisfactory to the Corporation), and (iii) rendered to the Corporation as an hourly-rate employee in accordance with Section 414(b), (c), (m), (n), and (o) of the Code.

(e)     An employee who satisfies the eligibility requirements of Section 10(c), and who is otherwise entitled to participate in the Program, will commence participation under this Program if the employee satisfied such requirements (i) between April 1 and September 30, on the first day of the plan year beginning after the date on which such requirements are satisfied, or (ii) between October 1 and March 31, on the first day of the plan year that includes the date such requirements are satisfied, but in no event  will any employee participate  if such employee breaks length of service prior to such commencement date.

(f)     An employee completes an hour of service under this Section 10 for each hour paid by the Corporation for working or for having been entitled to work.  Any hours for which an employee receives pay for having been entitled to work, irrespective of mitigation of damages, will be credited to the period or periods so entitled, rather than to the period in which such

46

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

pay is received.  There will be no duplication of any hours of service under this Section 10.

(g)     To determine years of service for vesting under this Program, all of the employee's years of service will be taken into account except the following:  (i) years of service before age 18 (age 22 prior to October 1, 1985); (ii) years of service before January 1, 1971, unless the employee has at least 3 years of service after December 31, 1970; (iii) years of service prior to any one-year break in service as defined herein, until the employee completes a year of service after such break; (iv) for non-vested participants under this Section 10, years of service prior to any one-year break in service if the number of such consecutive breaks equals or exceeds the aggregate number of years of service prior to such break, for a non-vested participant at work on or after October 1, 1985, years of service prior to any one-year break in service if the number of such consecutive breaks equals or exceeds the greater of five, or the aggregate number of years prior to such break (such aggregate number of years of service before such break  will not include any years of service not required to be taken into account under this Section 10 by reason of any prior break in service); (v) years of service before October 1, 1976, if such service would have been disregarded under rules of the Program as in effect on October 1, 1976, regarding breaks of service; and (vi) any year in which the employee completes less than 750 hours of service.

(h)     An employee incurs a one-year break in service under this Section 10 in any 12 consecutive month period during which the employee does not complete more than 375 hours of service, measured from the anniversary of the employment commencement date.  To determine whether an employee has incurred a one-year break in service, in addition to hours worked which are paid by the Corporation, any hours which an employee does not work but for which such employee is paid by the Corporation for vacation, sickness or disability, or is entitled to be so paid, will be taken into consideration.  For any absence from work commencing on or after

47

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

October 1, 1985 by reason of pregnancy of the individual, childbirth, placement of a child related to an adoption, or for child care purposes immediately following such birth or placement or for any absence from work commencing on or after October 1, 1993 for which the employee is entitled to a leave under the Family and Medical Leave Act of 1993, the employee will be credited with the hours of work for which the employee otherwise would have been scheduled, or, if unable to determine such scheduled hours, 8 hours for each work day of such absence, not to exceed a total of 501 hours for any such absence. Such hours will be credited in the year in which the absence commences if necessary to prevent incurring a one-year break in service, otherwise such hours will be credited in the immediately following year.

(i)     Notwithstanding any of the foregoing provisions of this Section 10, effective March 1, 1998, an employee will be credited with 95 hours of service for each semi-monthly pay period in which the employee works and is compensated at any time during each such semi-monthly pay period. Such service will be counted solely for eligibility for a deferred benefit as described in (a) immediately above.

## Section 11.   Asbestos Service

An employee with credited service who at retirement has over 10 years of credited service which was accrued while employed in certain salaried positions in specified asbestos operations as set forth in Appendix A will receive additional credited service for purposes of this Part A. Total credited service for any such employee will be the sum of (i) credited service otherwise credited to the employee, and (ii) any such additional credited service in accordance with the following table:

| Years of Credited Service | Additional |
|---|---|

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

| Credited on Asbestos Jobs | Credited Service |
|---|---|
| For years 1 through 10 | 0 |
| For 10 years, 1 month through 25 | 33-1/3% |
| For years over 25 | 20% |

Such additional credited service will be accrued when earned and in no event will any such additional credited service be provided pursuant to this section which would result in duplication of such service.

**Section 12.  Service of Employees Transferred From Electronic Data Systems, Hughes Electronics Corporation or Domestic Subsidiaries Within the Delphi Control Group**

The service accrued at Electronic Data Systems, Hughes Electronics Corporation or domestic subsidiaries within the Delphi Control Group by an employee who has been transferred to Delphi from either subsidiary while either subsidiary was within the Delphi control group of companies, or a domestic subsidiary while such subsidiary was within the Delphi Control Group will be used as service in the determination of such employee's eligibility to retire under this Program.  The actual benefit payable to any such employee under this Program will be based solely on the credited service the employee has accrued under the previous sections of this Article II.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## ARTICLE III

# RETENTION OF DEFERRED RETIREMENT BENEFIT IF SEPARATED

(a)   Any employee who loses accumulated credited service under the provisions of Article II of this Part A is eligible for a deferred retirement benefit under this Part A if such employee is not retired and eligible for benefits pursuant to Article I of this Part A, and provided the credited service of such employee at separation is at least 5 years, or such employee satisfies the service requirements of Section 10 of Article II of this Part A, or such employee has attained the Normal Retirement Age as defined in Section 1(f) of the General Provisions.

(b)   The monthly amount of any deferred retirement benefit will be a basic benefit for each year of credited service, determined by the employee's Benefit Class Code as set forth in Section 1(c) of Article I of this Part A when such employee lost credited service, as set forth in the table immediately following:

| Date of Loss of Credited Service | Benefit Class Code | Basic Benefit Rate |
|---|---|---|
| October 1, 2004 and After | A | 48.80 |
| | B | 49.05 |
| | C | 49.30 |
| | D | 49.55 |

(c)   A former employee who is eligible for a deferred retirement benefit may at the election of such former employee receive either

(1)   a monthly benefit commencing at age 65 in accordance with subsection (b) above, or

(2)   a monthly benefit commencing after age 55 and prior to age 65 in accordance with subsection (b) above, multiplied by a percentage as set forth in the following table:

50

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

| Age When Benefit Commences | Percentage* |
|---|---|
| 55 | 42.8 |
| 56 | 46.8 |
| 57 | 51.2 |
| 58 | 55.5 |
| 59 | 59.6 |
| 60 | 64.0 |
| 61 | 71.2 |
| 62 | 78.4 |
| 63 | 85.6 |
| 64 | 92.8 |
| 65 | 100.0 |

\* Prorated for intermediate ages computed on the basis of the number of complete calendar months by which the employee is under the age attained at the employee's next birthday.

(3)    a monthly benefit commencing prior to age 55 in accordance with (b) above, multiplied by a percentage as set forth in the following table:

| Age When Benefit Commences | Percentage* |
|---|---|
| 25 | 3.5 |
| 30 | 5.1 |
| 35 | 7.5 |
| 40 | 11.0 |
| 45 | 16.4 |
| 50 | 24.8 |
| 51 | 27.0 |
| 52 | 29.4 |
| 53 | 32.1 |
| 54 | 35.0 |

\* Actuarial reduction factors for ages not shown will be calculated on the same basis as the factors shown.

(4)    Notwithstanding the foregoing, the monthly deferred retirement benefit for a former employee who participated in a Corporation

51

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

approved Career Transition Program with 20 or more years' credited service will be payable on an unreduced basis at or after age 60 upon application for such benefit at or after age 60.  For any such former employee who elects to commence the monthly deferred retirement benefit between ages 55 and 60, the benefit will be calculated from the age 65 benefit in accordance with the table set forth in (c)(2) above and, if elected to commence prior to age 55, the benefit will be calculated in accordance with the table set forth in (c)(3) immediately above.

(d)      The deferred retirement benefit will be payable commencing the first day of the month coinciding with or next following the employee's attainment of age 65 or, if earlier, the first day of the month following the month in which the Corporation receives a request from such former employee with such benefit determined in accordance with subsections (c)(2) or (c)(3) of this Article III; provided that such request is valid and effective only if it is filed with the Corporation not more than 180 days and not less than 30 days prior to commencement of such benefit.  For any such employee who broke credited service prior to October 1, 1976, the deferred retirement benefit shall not be payable at any time prior to the first of the month following the month in which the Corporation receives a request from such former employee to commence such benefit.

(e)      The amount of any monthly retirement benefit otherwise payable to a former employee eligible for a deferred retirement benefit will be reduced by the value of any past and future benefits paid or payable to any alternate payee(s) under a QDRO.

The actuarial value will be used to determine any amount of benefits paid or payable to any such payee(s), if applicable, and the remaining benefit entitlement of the employee.

## PART B -- CONTRIBUTORY BENEFITS

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

The benefits described in this Part B are not applicable to credited service accrued on or after January 1, 2001 for any employee whose length of service date is after December 31, 2000.

# ARTICLE I

## PROVISIONS RELATING TO PRIMARY BENEFITS

## AND SUPPLEMENTARY BENEFITS

## Section 1.  Eligibility Requirements

(a)     **For Primary Benefits**

Each salaried employee will be eligible to commence contributing under Part B on the first day of any month provided that at the time such employee commences to contribute all of the following conditions are met:

(1)     Such employee has reached age 21; and

(2)     Such employee has at least six months of continuous service; and

(3)     Such employee's base salary rate is greater than $4,200, per month effective January 1, 2008.

For purposes of this Section if, after termination of employment, an employee is rehired, such employee will immediately be eligible to contribute if such employee had at least six months of continuous service prior to termination of employment and meets the current age and salary requirements.

(b)     **For Supplementary Benefits**

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(1)    An employee who has 5 or more years of credited service as determined under Article II of Part A, or an employee who satisfies the "service" requirements of Section 10 of Article II of Part A, or an employee retired as a normal retirement on or after October 1, 2004 and in any case is eligible to receive benefits under Part A, will be entitled to receive supplementary benefits under this Part B, if otherwise eligible based upon such employee's average monthly base salary, for the following periods:

       (i)    any period of credited service prior to October 1, 1950, provided that on and after October 1, 1950 the employee contributes at all times while eligible and does not withdraw contributions prior to termination of employment;

       (ii)    the continuous period of credited service during which the employee contributes under Part B at all times while eligible to do so and does not withdraw contributions prior to termination of employment; and

       (iii)    any period, not credited under (i) or (ii) immediately above, prior to the earliest date on which the employee was eligible to contribute or age 30, if later, provided that such period does not exceed the number of years and fractions credited under (ii) above.

(2)    For the purpose of making the computation described in paragraph (1) immediately above, if the employee:

       (i)    failed to contribute (aa) while temporarily absent and receiving salary at a reduced rate, or (bb) for a period of absence during which contributions are permitted under Section 4 of Article II of this Part B, or (cc) while under age 30, such employee will not be considered to have

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

broken the continuous period during which such employee contributed while eligible;

(ii)    withdrew contributions while on layoff which did not result in loss of credited service prior to such layoff, such employee will not be considered to have withdrawn contributions prior to termination of employment; and

(iii)    withdrew contributions under this Program, or any other retirement plan maintained by a foreign subsidiary, while employed by any wholly-owned or substantially wholly-owned subsidiary whose employees are excluded from participation under this Program, the employee will forfeit any monthly Part B benefits for which such employee otherwise would have been eligible at retirement except as provided under Article II, Section 1(a)(2) of this Part B.

## Section 2.  Retirement Benefits

(a)    **Retirement At or After Age 65**

Retirement benefits, if any, under Part B for an employee who retires at or after age 65 will commence on the first day of the month coinciding with or next following the employee's first day of absence because of retirement.

(1)    **Primary Benefits**

The annual rate of primary retirement benefits payable after retirement under Part B at age 65 or after will be equal to the sum of:

(i)    60% of the total of the employee's own contributions made prior to July 1, 1977;

55

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(ii)     75% of the total of such contributions made on and after July 1, 1977 and prior to October 1, 1979; and

(iii)    100% of the total of such contributions made on and after October 1, 1979.

(2)    **Supplementary Benefits**

The monthly supplementary retirement benefits will be 1% of the employee's average monthly base salary in excess of the amount indicated below times the number of years and months of the employee's credited service, as determined under Article II of Part A, or as may be adjusted under Section 1(b) above:

| Retires With Benefits Payable Commencing | Part B Supplementary Benefit Based on Average Monthly Base Salary In Excess Of: |
|---|---|
| October 1, 2004 and After | $4,745.00 |

(b)    **Retirement Between Ages 60 and 65**

(1)    If an employee retires voluntarily at or after age 62 and prior to age 65, there will be payable any primary and supplementary benefits to which the employee may be entitled on account of service rendered up to the date of retirement commencing on the first day of the month coinciding with or next following the employee's first day of absence because of retirement or the employee may elect to receive either the primary benefit or supplementary benefit, or both, on a reduced basis commencing on

56

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

the first day of any month coinciding with or following such employee's first day of absence because of retirement and prior to age 62, with such reduction as set forth in the table in Part A, Article I, Section 2(b)(2)(i).

(2)    An employee discharged for cause at or after age 60 and prior to age 65 will be entitled to the benefits described in Section 2(b)(1) above.

(c)    **Retirement Prior to Age 60 Other Than for Total and Permanent Disability**

(1)    If an employee who has 10 or more years of credited service retires voluntarily (i) at or after age 55 and prior to age 60 and whose combined years of age and years of credited service (to the nearest 1/12th in each case) at retirement total 85 or more, or (ii) prior to age 55 with 30 or more years of credited service, and in either case was hired prior to January 1, 1988, the employee will be entitled to primary and supplementary retirement benefits on account of service rendered up to the date of retirement commencing on the first day of the month coinciding with or next following the employee's attainment of age 62, or the employee may elect to receive either the primary benefit or supplementary benefit, or both, commencing on the first day of any month coinciding with or following such employee's first day of absence because of retirement and prior to age 62 in which case any benefits will be reduced from the amount that would otherwise be payable commencing at age 62 multiplied by a percentage as set forth in the table in Part A, Article I, Section 2(b)(2)(i).

(2)    If an employee who has 10 or more years of credited service retires voluntarily at or after age 55 and prior to age 60 and (i) whose combined years of age and years of credited service (to the nearest 1/12th in each case) at retirement total less than 85, or (ii) who was

57

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

hired on or after January 1, 1988, the employee will be entitled to primary and supplementary retirement benefits on account of service rendered up to the date of retirement commencing on the first day of the month coinciding with or next following such employee's attainment of age 65, or the employee may elect to receive either the primary benefit or supplementary benefit, or both, commencing on the first day of any month coinciding with or following such employee's first day of absence because of retirement and prior to age 65 in which case any benefits will be reduced from the amount that otherwise would be payable commencing at age 65 multiplied by a percentage as set forth in the table in Part A, Article I, Section 2(b)(2)(ii).

(3)     An employee (i) who has 10 or more years of credited service and who is discharged for cause at or after age 55 and prior to age 60, or (ii) who has 30 or more years of credited service, was hired prior to January 1, 1988, and who is discharged for cause prior to age 55, will be entitled to the benefits described in Sections 2(c)(1) or 2(c)(2) above, whichever is applicable.

(d)     **Retirement Prior to Age 65 for Total and Permanent Disability**

If an employee is retired prior to age 65 for total and permanent disability and commences to receive total and permanent disability benefits under Part A, any supplementary benefits to which the employee may be entitled on account of service rendered up to the date of retirement which are payable at age 65 will be payable commencing at the same time as benefits payable under Part A without reduction in amount because of such earlier commencement.  Any primary benefits to which the employee may be similarly entitled and which are payable at age 65 will be payable commencing on the first day of the month with respect to which the initial benefit payment is made under Part A without reduction in amount because of such earlier commencement.

58

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(e)     **Reemployment**

If a retired employee who is receiving retirement benefits is reemployed by
the Corporation or one of its directly or indirectly wholly-owned or
substantially wholly-owned domestic or foreign subsidiaries, payment of
such retired employee's Part B benefits will cease and such retired
employee will be treated for the purposes of this Program as though not
previously retired, except that:

(1)     for the purpose of (aa) the death benefit provisions of
Section 5(c)(4) and 6(a)(1) of this Article I, and (bb) the provisions
of Section 1(a)(2) of Article II of this Part B relating to the return of
an employee's contributions, and solely with respect to the
employee's contributions made prior to the date primary benefits
commenced because of retirement, no interest will be credited on
the employee's contributions for the period during which the
employee received such primary benefits and upon reemployment
the employee's contributions will be deemed to have been reduced
by the amount of such primary benefits (but with such reduction not
to exceed the amount of the employee's contributions plus interest);
and

(2)     the amount of any death benefit otherwise subsequently payable
under Section 6(a)(2) of this Article I will be reduced by an amount
equal to the amount of reduction specified in the preceding item (1).

# Section 3.  Employee Contributions

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(a)     Each employee participating in Part B for primary benefits will contribute 1.25% of the amount of monthly base salary in excess of $4,200 effective January 1, 2008.

(b)     An employee may accrue Part B primary benefits for no more than 35 years under this Program and the GM SRP. However, an otherwise eligible employee who remains at work for Delphi after contributing for 35 years, may continue to contribute, while otherwise eligible to do so, except that the employee's contributions made in the earliest months of Program participation, commencing with the first month of participation and continuing sequentially thereafter, will be used to reduce, on a dollar-for-dollar basis, the gross amount of each current monthly contribution that otherwise might be made, as determined by the employee's most recent monthly base salary. The full amount of all such prior contributions used in any such reduction will be used to determine the employee's monthly amount of Part B primary benefits, but at the updated Part B benefit accrual rate. The overall effect of this treatment is to limit to 35 years the period in which any employee may accrue Part B primary benefits, but to maximize the monthly Part B primary benefit generated by such contributions.

(c)     An employee may continue to contribute from the date first eligible until such employee (1) ceases to be eligible, or (2) retires, any provisions of the preceding paragraph to the contrary notwithstanding. An employee may withdraw any or all of the employee's Part B contributions at anytime and for any reason by submitting a form approval by the Corporation.

(d)     If an employee withdraws contributions, such employee will not be entitled to any primary retirement benefits under Part B with respect to any period of service prior to the date of such withdrawal of contributions, except as otherwise provided in Sections 1(a)(1) and (2) and 2(c)(2) of Article II of this Part B, or in subsections (e) and (g) of this Section 3.

60

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(e)     If an employee with 5 or more years of credited service, as determined
under Article II of Part A, withdraws contributions, such employee will be
entitled to receive future benefits in an amount not less than the benefits
which are attributable to the Corporation's contributions made up to the
time of such withdrawal of contributions.

(f)     If an employee withdraws contributions, such employee will not be entitled
to make any additional withdrawal of contributions for a period of
two years from the date of such withdrawal of contributions.

(g)     In the event an employee withdraws contributions such employee will not
have any right to repay the amount withdrawn.  Such employee, if vested,
will be entitled to a Corporation provided benefit which will not be less than
an amount determined under (i) Article III of Part A, and (ii) this Part B,
less an amount attributable to the employee contributions withdrawn, as
may be determined in accordance with applicable Treasury regulations.

(h)     An employee who does not elect to make Part B contributions when first
eligible and who subsequently elects to contribute may only make such
contributions prospectively.

## Section 4.   Optional Forms of Retirement Benefits

(a)     **Surviving Spouse Coverage**

In lieu of any primary or supplementary benefits payable an employee who
retires or who loses credited service and is eligible for a deferred
retirement benefit pursuant to the provisions of Articles II or III of this
Part B, will be deemed to have elected automatically a reduced amount of
primary and/or supplementary benefits to provide surviving spouse
coverage in accordance with the provisions of Part A, Article I,
Section 5(a) through (g).  An employee may prevent this automatic
election during the 180-day period prior to the effective date by executing

61

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

a specific written rejection of such election, which includes the written consent of the employee's spouse that acknowledges the effect of the rejection and that is witnessed by a notary public, on a form approved by the Corporation and filing it with the Corporation. An employee may revoke a written rejection of this automatic election, without the consent of the spouse, at any time prior to payment of benefits.

(b) **Joint and Survivor Option**

Under this option, any person may be designated by the employee as the contingent annuitant. The amount of monthly benefits payable to such contingent annuitant if such contingent annuitant is living at the death of the employee will equal any designated percentage, up to a maximum of 100%, of that portion of the employee's reduced monthly benefits (which are in lieu of benefits otherwise payable as primary benefits, supplementary benefits, or both, as the case may be) as to which the coverage is elected. Benefits will be provided in accordance with the provisions of Part A, Article I, Section 6.

(c) **Employee Death prior to retirement**

The surviving spouse of an employee who:

(1)      dies on or after attaining age 55 with 10 or more years of credited service, or at any age with 30 or more years of credited service and the employee's date of hire was prior to January 1, 1988, but before the first day of the month coinciding with or next following the first day of absence because of retirement (or, if later, the commencement date of the monthly basic benefit in the case of an employee who defers the receipt of the monthly benefit under Part A, Article I, Section 2(b)(2)); and

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

(2)  if the employee had retired on the date of death, would have been eligible for the coverage under Part A, Article I, Section 5(a); and

(3)  is not covered by this Article I, Section 5 will be entitled to any primary or supplementary benefits otherwise payable in accordance with the provisions of Part A, Article I, Section 5(h).

## Section 5. Benefits for Surviving Spouse In Event of an Employee's Death Prior to Retirement

(a)  **Election of Coverage**

An employee who is participating for primary benefits under this Part B will be deemed to have automatically elected, subject to all the conditions thereof, to provide, in the event of an employee's death prior to retirement, a monthly benefit for the lifetime of the employee's designated surviving spouse.

(b)  **Benefits Payable**

(1)  The monthly benefit payable to such spouse following the employee's death while this coverage is, or is assumed to be, in effect will be an amount equal to 65% of the employee's accrued primary and supplementary benefits under Part B for service rendered up to the date of death which would otherwise have been payable under this Part B upon retirement of the employee at age 65.  The 65% will be increased by one-quarter of one percent (1/4%) for each 12 months in excess of five (5) years that the spouse's age exceeds the employee's age or decreased by one-quarter of one percent (1/4%) for each 12 months in excess of five (5) years that the spouse's age is less than the employee's age.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(c)    **General Provisions**

    (1)    Payment of the monthly benefit to the surviving spouse following an employee's death will be in lieu of any death benefits otherwise payable to such spouse under Part B.

    (2)    The benefit payable to an eligible surviving spouse under subsection (b) of this Section 5 will include a benefit related to the employee's accrued supplementary benefit even though the employee's credited service is less than 5 years on the date of death.

    (3)    Payment of the monthly benefit to the surviving spouse following the employee's death while this coverage is in effect will commence on the first day of the month following the month in which the death of the employee occurs and will continue during the lifetime of such surviving spouse.

    (4)    Upon the death of the designated surviving spouse following the employee's death while this coverage was in effect, there will be paid to the beneficiary designated by the employee (or, if the employee has designated no beneficiary, to the estate of such spouse) an amount equal to the excess, if any, of (i) all of the employee's contributions under Part B plus interest to the date of the employee's death over (ii) the total of any amounts paid to such spouse under this coverage.

    (5)    No additional contributions under Part B will be required of an employee by reason of this coverage.

(d)    **Effective Date of Coverage**

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

This coverage will be effective the first day of the month coinciding with the employee's commencement of participation in Part B, except that in the case of an employee who marries or remarries subsequent to age 21, the effective date of the coverage with respect to the spouse by such marriage or remarriage will be one-year anniversary of such marriage or remarriage.

(e)     **Duration of Coverage**

Once the coverage becomes effective, it will remain in effect (and benefits will become payable thereunder to the designated surviving spouse in the event of the employee's death) up to but excluding the earliest of the following dates:

(1)     the date of the final dissolution of the employee's marriage other than by the employee's death, unless a QDRO provides to the contrary;

(2)     the first day of the month coinciding with or next following the employee's first day of absence because of retirement, except that in the case of an employee who retires for total and permanent disability with less than 30 years of credited service, the coverage may remain in effect until the first day of the month coinciding with or next following the employee's attainment of age 55; or

(3)     the first day of the month coinciding with or next following 12 successive months from the effective date of layoff which occurred prior to June 1, 2001, special leave of absence without pay or transfer to the hourly rolls, except that in the case of an employee who has 10 or more years of credited service, the coverage may remain in effect until the first day of the month coinciding with or next following 24 successive months from such effective date.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

(f)     **Alternative Coverage**

In the event the coverage described in this Section 5 ceases to be effective, and the employee has 5 or more years of credited service, or satisfies the "service" requirements of Section 10 of Article II of Part A, survivor coverage as described in Part A, Article I, Section 5(j) is provided with respect to any accrued Part B benefits.

## Section 6.  Death Benefits

(a)     Upon the death of the employee or, if later, the death of any contingent annuitant designated by the employee if either of the coverages provided under Section 4 of this Article I has become effective with respect to primary benefits otherwise payable under this Part B, an amount, if any, will be paid to the beneficiary designated by the employee or, if the employee has designated no beneficiary, to the estate of such employee, determined in accordance with the following items (1) or (2), whichever is applicable:

(1)     **Death of the Employee Prior to Retirement** -- an amount equal to the excess of (i) all of the employee's contributions plus interest to the date of the employee's death over (ii) the sum of all payments, if any, made to the employee, to any such designated contingent annuitant of benefits under either of such coverages which are in lieu of primary benefits otherwise payable under this Part B, and to any alternate payee subject to a QDRO.

(2)     **Death of the Employee At or After Retirement** -- an amount equal to the greater of:

(i)     the total of

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(aa)    125% of the employee's contributions made prior to July 1, 1971 under Section 3 of Article I of this Part B (or, if greater, 30 times the amount of monthly primary retirement benefits accrued prior to July 1, 1971 that would have been payable under this Part B if neither of such coverages with respect to primary benefits otherwise payable under this Part B had become effective), and

(bb)    125% of the employee's contributions made on and after July 1, 1971 under Section 3 of Article I of this Part B (or, if greater, the total of such contributions plus interest to the date of the employee's retirement), or

(ii)    all of the employee's contributions under Section 3 of Article I of this Part B plus interest to the date of the employee's retirement,

less the sum of all payments, if any, made to the employee and to any such designated contingent annuitant of primary benefits provided under this Part B, or of benefits under either of such coverages which are in lieu of primary benefits otherwise payable under this Part B, and to any alternate payee subject to a QDRO.

In the case of an employee whose death occurs while the coverage in Section 5 above is in effect this Section 6 is subject to and limited by the conditions of such coverage.

(b)    Except as provided in Sections 4 and 5 of this Article I, which describe optional benefits that may be related to, or in lieu of, supplementary benefits under this Part B, no benefit related to an employee's accrued

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

supplementary benefit is payable following the death of an employee or retired employee.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

# ARTICLE II

# PROVISIONS RELATING SPECIFICALLY TO PRIMARY BENEFITS

## Section 1.  Separation From Service Prior to Age 60

(a)     Except as otherwise provided under subsections (b) and (c) of this Section 1, an employee upon separating from service prior to age 60 for any reason except death or retirement must either:

(1)     if the employee has contributed for at least five years or has five or more years of credited service as determined under Article II of Part A, leave contributions in Part B and receive, commencing on the first day of the month coinciding with or next following the employee's attainment of age 65 (or, on a reduced basis pursuant to paragraph (c)(2) or (c)(3) of Article III of Part A, on the first day of any month prior to the employee's attainment of age 65), the deferred primary retirement benefit which will have accrued under Part B by such employee's own contributions and the Corporation's contributions; or

(2)     elect to have returned all of such employee's own contributions under Section 3 of Article I of this Part B plus interest to the date of such election and, if the employee has five or more years of credited service as determined under Article II of Part A, the employee will receive a deferred benefit related to the Corporation contributions made up to the time of such withdrawal of contributions, commencing on the first day of the month coinciding with or next following the employee's attainment of age 65 (or, on a reduced basis pursuant to paragraph (c)(2) or (c)(3) of Article III of Part A, on the first day of any month prior to the employee's attainment of age 65).  Any return of contributions must include the

69

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

written consent of the employee's spouse that acknowledges the effect of the election and that is witnessed by a notary public, on a form approved by the Corporation and filing it with the Corporation. Upon any subsequent reemployment, the employee will be considered as a new employee for purposes of the provisions of this Part B relating to primary benefits except as otherwise provided in Section 2 of this Article II.

(b)   An employee who is separated from service in a layoff classification prior to June 1, 2001 (1) at or after age 55 with 10 or more years of credited service, (2) prior to age 55 with 30 or more years of credited service and whose date of hire was prior to January 1, 1988, or (3) prior to age 55 with 10 but less than 30 years of credited service at the time of such separation, provided that the employee's credited service at such time is sufficient so that the employee will retain credited service until age 55, will not be required to make either election described in (a) immediately above.

(c)   An employee who is separated from service and who, as a consequence of such separation, elected to receive a deferred primary retirement benefit under Part B as described in subsection (a)(1) of this Section 1, may upon reemployment reinstate the primary retirement benefit accrued at the time such election was made provided that the employee (1) contributes under Part B from the date of such reemployment, and (2) returns to the Corporation any annuity notice or other certificate of entitlement related to such deferred primary retirement benefit.

(d)   For purposes of Section 6 of Article I of this Part B, an employee to whom this Section 1 applies (other than such an employee who elects to have contributions returned with interest) will be considered to have retired on the date the payment of primary benefits commences under this Part B.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## Section 2. Temporary Absence

(a) **Temporary Absence but Receiving Full Salary**

If an employee is temporarily absent from active duty but is receiving full salary, monthly contributions under Part B will be deducted in the usual way and retirement benefits will be accrued as if the employee were at work.

(b) **Temporary Absence but Receiving Salary at Reduced Rate or No Salary**

No contributions will be required from an employee who is temporarily absent and receiving salary at a reduced rate or no salary, and no primary retirement benefits will be accrued under this Part B for the period during which no contributions are made.  This will not affect retirement benefits previously accrued.  Contributions, if made, will be based upon the reduced salary except that contributions, if made, by an employee on Disability Leave of Absence will be based upon the employee's full monthly base salary rate.

(c) **Layoffs and Certain Separations**

This subsection(c) is applicable to employees laid off prior to June 1, 2001 and employees separated on and after June 1, 2001 and eligible for benefits under the Separation Allowance Plan.

(1) No contributions will be permitted and no primary retirement benefits will be accrued under this Part B.

(2) Subject to General Provision 2(a)(2) an employee, may leave contributions in the Program, in which event the employee's primary retirement benefits previously accrued under this Part B will remain

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

to the employee's credit subject to the provisions of subsection (4) of this Section 2(c). If such an employee is reemployed within twelve months from the date of layoff or separation (24 months in the case of an employee who has 10 or more years of credited service), such employee will resume contributions under Part B.

(3)    If an employee withdraws contributions and is reemployed within twelve months after the date of layoff or separation (24 months in the case of an employee with 10 or more years of credited service) and elects to contribute under Part B from the date of such reemployment, the employee may then, at the employee's election, return the amount which had been withdrawn and become eligible to receive the primary retirement benefits, covered by contributions made prior to the date of layoff or separation for which the employee would have been eligible if the employee had not withdrawn contributions.

(4)    If an employee is not rehired within twelve months of the date of layoff or separation (24 months in the case of an employee who has 10 or more years of credited service), the employee will be treated as retired under the Program, or separated with the rights provided in the "Eligibility for Retirement" section of this Program or under Section 1 of this Article II, whichever is applicable.

(d)    **Military Leave of Absence**

(1)    In the event an employee is rehired following qualified military service, as defined in the Uniformed Services Employment and Reemployment Rights Act of 1994, effective December 15, 1994, such employee will be entitled to make contributions under this Part B that will be attributable to the time period contributions were not allowable due to military service.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

    (2)    Additional contributions made under this subsection will be based on the monthly base salary that the employee would have received from the Corporation but for the military service, and such contributions will be subject to the Program's terms and conditions in effect during the applicable period of military service.  Such contributions will be made during the period that begins upon reemployment and extends for the lesser of five years or the employee's period of military service multiplied by three.

## Section 3. Interest Credits

Employee contributions will accrue interest at a rate of 120% of the annual federal mid-term rate in effect under Section 1274 of the Code for the first month of the plan year.

## Section 4. Treatment of Employees Returning From Leave of Absence or Layoff In Connection with a National Emergency

(a)    An employee who is granted a Military Leave of Absence, or other leave of absence in connection with a national emergency, or who is laid off prior to June 1, 2001 as a result of declining volume of business related to such emergency, may contribute and accrue primary retirement benefits under Part B for the period for which the employee would have been eligible if the employee had remained actively in the employ of the Corporation, or one of its subsidiaries, under such rules as the Named Fiduciary or its delegate may establish, provided:

    (1)    the employee returns to work following the termination of the employee's leave of absence or reenters the employ of the Corporation, or one of its subsidiaries, within such period and in accordance with the rules established by the Named Fiduciary or its delegate; and

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

(2)    the employee participates for primary benefits under Part B, if eligible, upon return to work following the termination of the employee's leave of absence or upon reemployment by the Corporation or one of its subsidiaries.

(b)    The salary to be used in determining an employee's eligibility for contributions, and the amount of contribution, under this Section 4 will be the base salary of such employee at the time of the employee's leave of absence or layoff prior to June 1, 2001 from the Corporation, or one of its subsidiaries.

(c)    The Named Fiduciary or its delegate may adopt rules to carry out the provisions of this Section in conformity with the objectives of this Program.

(d)    Notwithstanding the provisions of Section 1(b) of Article I of this Part B, an employee who may have become eligible to make contributions in accordance with this Section 4 and who does not so elect will be eligible nevertheless for supplementary retirement benefits under Part B.

## Section 5. Treatment of Former Salaried Employees Who Retire Under The Delphi Hourly-Rate Employees Pension Plan

An hourly-rate employee who has contributions in Part B and who retires under the provisions of "The Delphi Hourly-Rate Employees Pension Plan", "Delphi HRP" will be eligible to receive primary benefits under this Part B based upon the amount of the employee's contributions.  Solely for the purpose of determining the basis upon which such primary benefits are payable, such employee will be treated as a retirement under this Program on the basis which most closely corresponds to the employee's retirement under the Delphi HRP.

## Section 6. Treatment of Former Salaried Employees Who Retire Under the Electronic Data Systems (EDS) Pension Plan

74

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

A salaried employee who has contributions in Part B, and who retires under the "EDS Pension Plan", will be eligible to receive primary benefits under this Part B based upon the employee's contributions.  Solely for the purpose of determining the basis upon which any such primary benefits may be payable to any salaried employee who transitioned to EDS from GM prior to September 1, 1985, or to those identified 43 salaried employees who transitioned to EDS shortly after September 1, 1985, and who were provided EDS stock grants in a manner identical to those employees who transitioned prior to September 1, 1985, retirements from EDS (i) prior to age 60 will be deemed to be voluntary, and (ii) at or after age 60 will be deemed to be as provided under Section 9(b) of the General Provisions.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

# ARTICLE III
## PROVISIONS RELATING SPECIFICALLY
## TO SUPPLEMENTARY BENEFITS

## Section 1. Retention of Deferred Supplementary Retirement Benefits if Separated

An employee who loses accumulated credited service under Article II of Part A, who is not retired and who is eligible for a deferred retirement benefit under Article III of Part A will, subject to Section 1(b) of Article I of this Part B, be entitled to receive deferred supplementary benefits, with the payment of such benefits to commence at the same time and under the same provisions as applicable to the employee's deferred retirement benefit under Part A.

## Section 2. Treatment of Former Salaried Employees Who Retire Under The Delphi Hourly-Rate Employees Pension Plan

An hourly-rate employee with five or more years of credited service who has accrued supplementary benefits under Part B and who retires under the Delphi HRP will be eligible to receive supplementary benefits, if any, as determined in Article I, Section 2(a)(2) of this Part B, based upon the employee's credited service and average monthly base salary in effect immediately prior to the employee's transfer to the hourly payroll.  Solely for the purpose of determining the basis upon which any supplementary benefits may be payable, such employee will be treated as retired under this Program on the basis which most closely corresponds to the employee's retirement under the Delphi HRP.

## Section 3. Treatment of Former Salaried Employees Who Retire Under the EDS Pension Plan

A salaried employee with 10 or more years of credited service who has contributed to this Program while eligible, does not withdraw such contributions

76

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

while employed by EDS and who retires under the provisions of the "EDS Pension Plan", will be eligible to receive any supplementary benefits for which the employee may be eligible under this Part B, using the employee's base salary at EDS and Delphi to determine "average monthly base salary".  Solely for the purpose of determining the basis upon which any such supplementary benefits may be payable to any salaried employee who transitioned to EDS from GM prior to September 1, 1985, or to those identified 43 salaried employees who transitioned to EDS shortly after September 1, 1985 and who were provided EDS stock grants in a manner identical to those employees who transitioned prior to September 1, 1985, retirements from EDS (i) prior to age 60 will be deemed to be voluntary, and (ii) at or after age 60 will be deemed to be as provided under Section 9(b) of the General Provisions.

A salaried employee with less than 10 years of credited service at the date of the employee's transition to EDS prior to September 1, 1985 will not be eligible to receive any supplementary benefits, since all of the assets and liabilities related to any and all supplementary benefits to which any such employee may have been entitled have been transferred from the Program trust to EDS in connection with the transition of certain GM employees to EDS.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## PART C – RETIREMENT ACCUMULATION PLAN
## ARTCILE I
## ELIGIBILITY

This Part C applies to all individuals who become salaried employees and have a length of service date on or after January 1, 2001.  Notwithstanding any provision to the contrary, an individual will not participate in this Part C until the first day of the second month following the employee's length of service date.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

# ARTICLE II
## ACCOUNT BALANCE

## Section 1.  Establishment of Account Balance

A notional account balance ("account balance") under this Retirement Accumulation Plan of the Program will be established for each employee who is eligible under this Part C.  The account balance equals the sum of the employee's pay credits and interest credits, as described in the following Sections 2 and 3.

## Section 2.  Pay Credits

(a)    An employee's account balance will be credited with pay credits as of the end of each plan year during which the employee is paid a base salary; provided that, in the case of a flex service employee (as defined under the Corporation's policies), the employee completes at least 750 hours of service under Section 10 of Article II of Part A during the calendar year.

(b)    Pay credits equal 4.7% of the base salary paid to an employee during the plan year.  For this purpose, base salary shall be <u>limited under Section 401(a)(17) the Code, as adjusted for cost of living.</u>

(c)    Notwithstanding Section 2(a) of this Article II, during the calendar year in which an employee separates from service, the employee's account balance will be credited with pay credits as of the date of separation from service instead of the end of such calendar year; provided that, in the case of a flex service employee (as defined under the Corporation's policies), the employee has completed at least 750 hours of service under Section 10 of Article II of Part A during such calendar year prior to such separation from service.

79

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

If such employee is rehired during such calendar year, whether or not such employee had accumulated 750 hours of service prior to separation, the employee's account balance will be credited with pay credits as of the end of such calendar year; provided that, in the case of a flex service employee, the employee has completed at least 750 hours of service, in total, under Section 10 of Article II pf Part A during such calendar year. The pay credits will equal the pay credits that would have been credited if the employee did not separate from service during such calendar year minus the pay credits credited upon separation from service.

(d)     For purposes of this Section 2:

(1)     If an employee becomes totally disabled within the meaning of Article IV, Section 4.07(a) of the Delphi Life and Disability Benefits Program for Salaried Employees, the employee will be treated as receiving monthly base salary equal to the monthly base salary the employee received during the month preceding such disability for:

(i)     up to six months for a continuous period of total disability for any single cause, regardless of whether such disability is continuous; and

(ii)    up to six months for successive periods of total disability due to the same or related cause or causes

(2)     In no event will an eligible employee be credited with months of base salary for time worked plus total disability under this provision, equal to an amount in excess of 12 months of monthly base salary during any calendar year.  In the event an employee's continuous period of total disability or successive periods of total disability, set forth in (i) and (ii) above, occur in more than one calendar year, the pay credit for total disability for months of base salary in all calendar years may not exceed six months.

80

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(3)     If an employee receives workers' compensation while on a compensable disability leave of absence within the meaning of Section 8 of Article II of Part A, the employee will be treated as receiving monthly base salary equal to the monthly base salary the employee received during the month preceding such compensable disability leave of absence until the earliest of the day before the employee's Benefit Commencement Date, the end of the month during which such compensable disability leave of absence ends, or the date the employee otherwise ceases employment with Delphi.

(4)     If an employee has a Military Leave of Absence within the meaning of Section 2(a)(3) of Article II of Part A and the employee is reemployed during the period during which the employee has reemployment rights pursuant to federal law, the employee will be treated as receiving monthly base salary equal to the monthly base salary the employee received during the month preceding such Military Leave until the end of the period the employee would receive credited service under Section 2(a)(3) of Article II of Part A.

(5)     In no event will an employee be credited with an amount in excess of 12 months of monthly base salary during any calendar year

## Section 3.  Interest Credits

(a)     An employee's account balance will be credited with interest credits as of the end of each plan year, following the initial year of participation.

(b)     Interest credits equal the account balance as of the end of the previous calendar year times the annual interest rate.  The account balance as of the end of the previous calendar year will be determined after any pay

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

credits and interest credits have been credited for the previous calendar year.

(c)   The annual interest rate is the annual interest rate on 30-year Treasury securities, or such other rate, as specified by the Commissioner of the Internal Revenue Service for the third full month of prior to the first day of the plan year during which interest credits are being credited.

## Section 4.  Account Balance After Separation

(a)   The employee's account balance will not be credited with pay credits after the end of the calendar year in which the employee, for any reason, separates from service.

(b)   If an employee's account balance is vested at the time of the employee's separation from service, the account balance will continue to be credited with interest credits until the end of the calendar year preceding the employee's Benefit Commencement Date (or the Benefit Commencement Date of a surviving spouse, designated beneficiary, or estate in the case of a pre-retirement survivor benefit under Article V of this Part C).  An employee's account balance will be vested if the employee has at least five years of credited service (three years of credited service or ERISA service if separated on or after October 1, 2008) or satisfies the service requirements of Section 10 of Article II of Part A, or the employee ceases active service after attaining Normal Retirement Age, as that term is defined in General Provision 1(f).

(c)   If an employee's account balance is not vested at the time of the employee's separation from service, the account balance will be deemed, upon separation, to be zero.  If such employee is reemployed before the employee has five consecutive one-year breaks in service under Section 10 of Article II of Part A, the employee's account balance will be restored

82

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

to the account balance on the date immediately preceding separation from service and will be credited with interest credits it would have received under Section 3 of this Article II of Part C for the period during which service was broken.

(d)     An employee's account balance will equal zero on and after the employee's Benefit Commencement Date (or the Benefit Commencement Date of a surviving spouse, designated beneficiary, or estate in the case of a pre-retirement survivor benefit under Article V of this Part C).

(e)     The account balance of an individual who ceases to be an employee but who has not separated from service:

(1)     will be credited with pay credits as of the date the individual ceases to be an employee with respect to Base Salary earned during the calendar year prior to the date the individual ceases to be an employee; provided that, in the case of a flex service employee (as defined under the Corporation's policies), the employee has completed at least 750 hours of service under Section 10 of Article II of Part A during such calendar year prior to such separation from service; and

(2)     will continue to be credited with interest credits until the end of the calendar year preceding the Benefit Commencement Date if the account balance is vested, or until separation from service if the account balance is not vested

## ARTICLE III
## AMOUNT OF BENEFIT

## Section 1. Amount of Benefit

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(a)   <u>An employee's accrued benefit under the</u> Retirement Accumulation Plan of the Program as of any given date shall equal the value of the employee's account balance as of the <u>such</u> date (the date on which the account is valued), plus interest credits at the current interest crediting rate for the period (if any) from the <u>such d</u>ate to the participant's Normal Retirement Age, expressed in the form of a single life annuity commencing at Normal Retirement Age with equivalent Actuarial Value.

(b)   An employee will be entitled to:

    (1)   a monthly benefit beginning on the employee's Benefit Commencement Date that has the same Actuarial Value as the employee's vested accrued benefit as of such Benefit Commencement Date if the benefit is payable in the normal form of payment described in Section 1 of Article IV of this Part C or the optional form of payment described in Section 2(a) or (b) of Article IV of this Part C; or

    (2)   a lump-sum payment payable as of the Benefit Commencement Date equal to the <u>present value as the employee's accrued benefit (i.e., the</u> employee's vested account balance) as of the Benefit Commencement Date if the benefit is payable in the optional form of payment described in Section 2(c) of Article IV of this Part C.

(b)   The amount of any benefit otherwise payable to an employee (or a designated beneficiary) will be reduced by the actuarial value of any past and future benefits paid or payable to any alternate payee(s) under a QDRO.  The actuarial value will be used to determine any amount of benefits paid or to be payable to any payee(s), if applicable, and the remaining benefit entitlement of the employee.

## Section 2.  Benefit Commencement Date

(a)   An employee's Benefit Commencement Date is as follows:

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(1)    If the employee separates from service before Normal Retirement Age, the earlier of (i) the first day of the month coincident with or next following the employee's attainment of Normal Retirement Age or, (ii) the first day of any month following separation from service and following the month in which the Corporation receives a request from the employee provided the request is filed on a form approved by the Corporation not more than 180 days and not less than 30 days prior to the Benefit Commencement Date;

(2)    if the employee separates from service at Normal Retirement Age, the first day of the month next following Normal Retirement Age; or

(3)    if the employee separates from service after Normal Retirement Age, the first day of the month next following the employee's separation from service.

(b)    Notwithstanding Sections 1(a) and 2(a) of this Article III, if an employee's vested account balance is $1,000 or less when the employee separates from service, the employee will receive a lump sum distribution of the employee's vested account balance as soon as administratively practicable.

## ARTICLE IV
## FORMS OF PAYMENT

## Section 1.  Normal Form of Payment

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

The normal form of payment will be a life annuity payable monthly for the life of the employee continuing through the month in which the employee dies, with the survivor benefit described in Section 4 of this Article IV.

## Section 2.  Optional Forms of Payment [add 75 and 50%]

Instead of the normal form of payment, an employee may elect to receive one of the following optional forms of payment, which will be calculated to have the same Actuarial Value as the employee's vested accrued benefit:

(a)     If the employee is married on the employee's Benefit Commencement Date, a joint and 100% surviving spouse annuity will be payable monthly for the life of the employee, with 100% of such monthly payments continuing after the employee's death for the life of the employee's spouse if such spouse survives the employee, with the survivor benefit described in Section 4 of this Article IV. Such a designated beneficiary must be an individual;

(b)     A joint and 100% surviving beneficiary annuity payable monthly for the life of the employee, with 100% of such monthly payments continuing after the employee's death for the life of the employee's individual designated beneficiary if such designated beneficiary survives the employee, with the survivor benefit described in Section 4 of this Article IV; or

(c)     A single lump-sum payment.

86

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

## Section 3.  Automatic Joint and Surviving Spouse Annuity

An employee who is married on the employee's Benefit Commencement Date will automatically receive the joint and 100% surviving spouse annuity described in Section 2(a) of this Article IV unless, during the 180-day period prior to the Benefit Commencement Date, the employee elects the normal form of payment or another optional form of payment and the employee's spouse consents to such election. The spouse's consent must be in writing, must acknowledge the effect of such consent, and must be witnessed by a notary public, on a form approved by the Corporation and filed with the Corporation.  An employee may revoke a written election not to take the joint and 100% surviving spouse annuity, without the consent of the spouse, at any time prior to the Benefit Commencement Date.

Within the time period set forth in Section 2(i) of the General Provisions, each employee will be provided a written explanation of:  (i) the terms and conditions of the surviving spouse coverage; (ii) the employee's right to make and the effect of an election to waive the surviving spouse coverage; (iii) the rights of the employee's spouse; and (iv) the right to make and the effect of revocation of a previous selection to waive the surviving spouse coverage.

Section 4.  Survivor Benefit

An employee covered under this Part C will be deemed to have automatically elected surviving spouse coverage.  If an employee dies (in the case of the normal form of payment described in Section 1 of this Article IV), an employee and survivor spouse or employee and designated beneficiary die (in the case of the optional forms of payment described in Section 2(a) or (b) of this Article IV) before the sum of monthly payments equal the employee's vested account balance as of the benefit commencement date, a Survivor Benefit will be paid.  The Survivor Benefit will equal a lump-sum payment equal to the employee's vested account balance as of the benefit commencement date minus the sum of monthly payments made to the employee, the employee and surviving spouse or the employee and the designated

87

Case 2:05-cv-12890-BFS-MJH    Document 1    Filed 07/16/2009    Page 1 of 188

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

beneficiary.  The Survivor Benefit will be paid to the employee's designated beneficiary or designated beneficiaries of such Survivor Benefit, or if there is no surviving designated beneficiary, to the employee's estate.  If payment under Section 2(c) is elected, the lump sum payment will be issued jointly to the employee and spouse.  The designated beneficiary or designated beneficiaries or estate will receive a lump-sum payment as soon as practicable following the employee's date of death (in the case of the normal form of payment described in Section 1 of this Article IV) or the surviving spouse's or designated beneficiary's date of death (in the case of the optional form of payment described in Section 2(a) or (b) of this Article IV).

An employee may reject the automatic election provided in this Section by executing a specific written rejection of such election which includes the written consent of the employee's spouse that acknowledges the effect of the rejection, and is witnessed by a Notary Public, on a form approved by the Corporation and filing it with the Corporation.  The form must be filed with the Corporation prior to the Benefit Commencement Date.

If payment under Section 1 is selected and the participant dies before the sum of the monthly payments equal the vested account balance as of the Benefit Commencement Date, a Survivor Benefit will be paid.  The survivor benefit will equal a lump sum payment equal to the participant's vested account balance as of the Benefit Commencement Date minus the sum of monthly payments made to the participant if payment under Section 2(a) or 2(b) is selected and the participant and surviving spouse or surviving beneficiary in the case of Section 2(b) both die before the sum of monthly payments equal the vested account balance as of the Benefit Commencement Date, the remaining balance will be paid to the designated beneficiary or designated beneficiaries, or if there is no surviving designated beneficiary, to the participant's estate.  The lump sum payment will equal the vested account balance as of the Benefit Commencement Date minus the sum of monthly payments made to the participant and the surviving spouse or surviving beneficiary in the case of Section 2(b).  If payment

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

under Section 2(c) is selected, the lump sum payment will be issued jointly to the participant and spouse.

An employee may reject the automatic election provided in this Section by executing a specific written rejection of such election which includes the written consent of the employee's spouse that acknowledges the effect of the rejection, and is witnessed by a Notary Public, on a form approved by the Corporation and filing it with the Corporation.  The form must be filled with the Corporation prior to the Benefit Commencement Date.

## Section 5.  Account Balance Upon Death

If benefits have not commenced, the vested account balance will equal the employee's account balance as of the first day of the month following the employee's date of death.  If benefits have commenced, the account balance will equal the account balance at the Benefit Commencement Date minus the sum of monthly payments made to the employee and surviving spouse or surviving beneficiary.  The account balance will be paid in a lump sum to the surviving spouse or if the surviving spouse option was rejected, to the beneficiary or beneficiaries or, if there is no surviving designated beneficiary, to the employee's estate.  The payment will be made as soon as practical following the employee's date of death.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

# ARTICLE V
# PRE-RETIREMENT SURVIVOR BENEFITS

## Section 1.  Eligibility

If an employee dies prior to the employee's Benefit Commencement Date but after the employee's account balance is vested as described in Section 4(b) of Article II of this Part C, a pre-retirement survivor benefit will be paid.

## Section 2.  Amount of Benefit

(a)    The pre-retirement survivor benefit will be paid to the employee's surviving spouse provided the employee and the spouse have been married at least one year at the time of the employee's death.  The surviving spouse may elect to receive (i) a monthly benefit payable beginning as of the surviving spouse's Benefit Commencement Date for the surviving spouse's lifetime that has the same actuarial value as the employee's vested account balance as of such Benefit Commencement Date, or (ii) a lump-sum payment payable as of the surviving spouse's Benefit Commencement Date equal to the employee's vested account balance as of such Benefit Commencement Date.  The surviving spouse's Benefit Commencement Date will be the first day of the month coincident with or next following the month the employee would have attained Normal Retirement Age (but not earlier than the first day of the month following the employee's death) or, if earlier, the first day of the month following the employee's death and following the month in which the Corporation receives a request from such surviving spouse; provided that such request will be valid and effective only if it is filed with the Corporation on a form approved by the Corporation not later than 180 days and not less than 30 days prior to the Benefit Commencement Date.  Notwithstanding the preceding, if the employee's vested account balance is $1,000 or less as of the first day of the month following the employee's death, the employee's

90

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

surviving spouse will receive a lump-sum payment equal to the employee's vested account balance as of such date as soon as administratively practicable after such employee's death.

(b)     If the employee does not have a surviving spouse at the employee's date of death or the employee and the employee's spouse have been married for less than one year at the time of the employee's death, the pre-retirement survivor benefit will be paid to the employee's designated beneficiary or designated beneficiaries or, if there is no surviving designated beneficiary, to the employee's estate.  The designated beneficiary or designated beneficiaries or estate will receive a lump-sum payment as soon as practicable following the employee's date of death.  The lump-sum payment equals the employee's vested account balance as of the first day of the month following the employee's date of death.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

# ARTICLE VI
# REEMPLOYMENT

## Section 1.  Employee with Account Balance

If a previously separated employee who has an account balance under this Part C is reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries before the employee's Benefit Commencement Date, upon reemployment such employee will have an account balance equal to the employee's account balance at the initial separation from service plus interest credits until the employee's reemployment.

## Section 2.  Employee with Prior Service under Part A or Part B

(a)     Vested Benefit:  If an employee who has entitlement to a deferred retirement benefit under Part A or Part B of this Program is reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries before the employee's Benefit Commencement Date, upon reemployment with a length of service date on or after January 1, 2001, the employee will continue to have a retirement benefit under Part A or Part B of this Program and such employee will be treated as a newly hired employee, and will have an initial account balance of zero under this Part C.  Such an employee will not be treated as earning credited service under Article II of Part A after such reemployment for purposes of eligibility for early retirement under Section 2(a)(2) or (b)(2)(i)(3) of Article I of Part A or early retirement under Section 2(c)(1)(ii) of Article I of Part B.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(b)     Non-Vested Benefit:  If an employee who has non-vested service under Part A or Part B is reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries, upon reemployment with a length of service date or adjusted length of service date on or after January 1, 2001, the employee will be treated as a newly hired employee, and will have an initial account balance of zero under this Part C.  The employee's prior service will count toward vesting under this Program and upon becoming vested will be eligible for a benefit under Part A, B or C as applicable.  The employee will not earn credited service under Article II of Part A after such re-employment for purposes of eligibility for early retirement under Section 2(a)(2) or (b)(2)(i)(3) of Article I of Part A or early retirement under Section 2(c)(1) of Article I of Part B.

## Section 3.  Employee Who Has Received a Lump-Sum Payment

If an employee who has received a lump-sum payment is subsequently reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries, upon reemployment with a length of service date on or after January 1, 2001, such employee will be treated as a newly hired employee, and will have an account balance of zero.

## Section 4.  Employee Receiving Monthly Benefits Under Part A or Part B

If a retired employee who is receiving monthly benefits from this Program is reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries or any company or joint venture which has been divested from the Corporation, such employee will cease to receive such benefits during reemployment.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Upon reemployment with a length of service date on or after January 1, 2001, the employee will be treated as a newly hired employee, and will have an account balance equal to zero. Upon the employee's subsequent separation from service, the monthly benefits the employee was previously receiving under Part A and/or Part B will recommence in accordance with the provisions of Part A and Part B without any actuarial adjustment. Additionally, the time and form of distribution of the employee's new account balance will be governed by the provisions of this Part C. The employee will not earn credited service under Article II of Part A after such re-employment for purposes of eligibility for early retirement under Section 2(a)(2) or (b)(2)(i)(3) of Article I of Part A or early retirement under Section 2(c)(1)(ii) of Article I of Part B.

## Section 5.  Employee Receiving Annuity Payments under Part C

If a retired employee who is receiving annuity payments under Part C is re-employed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries or any Company or joint venture which has been divested from the Corporation (where termination of employment with the Corporation to work for such company or joint venture is not considered termination of employment for purposes of this Program), the employee will cease to receive such benefits during re-employment. Upon re-employment with a length or service date on or after January 1, 2001, the employee will be treated as a newly hired employee and will have an account balance equal to zero. Upon the employee's subsequent separation from service, the annuity payments the employee was previously receiving under Part C will recommence and will be paid in the same amount and in the same form as they were prior to re-employment. The Benefit Commencement Date and form of distribution of the employee's new account balance, formed during the period of re-employment, will be governed by the provisions of this Part C.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

## GENERAL PROVISIONS

## Section 1.  Definition of Certain Terms Used in This Program

    (a)    **Employees**

    (1)    Unless the context indicates otherwise, the term "employees" as used in this Program means salaried employees of the Corporation and its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries in accordance Sections 414(b), (c), (m), (n), and (o) of the Code, including eligible employees of Delco Electronics Corporation, (i) who are working in the United States, or (ii) who are citizens of or domiciled in the United States and who  are hired in the United States by the Corporation or its subsidiaries and who are sent out of the United States by the Corporation or its  subsidiaries to work in foreign operations, and whose services, , would be discontinued by recalling such employees to the United States and terminating their services in the United States . Employees classified by the Corporation as (i) part-time employees, i.e. (employees who work one-half or more of the employing unit's work week), or (ii) "Flexible Service" employees (employees hired on an indefinite basis who are regularly scheduled to work between 50% and 80% of the employing unit's base work week) will be regarded as "employees", provided; however, that the provisions of Part A, Article II, Section 2(e) of this Program will apply to "Flexible Service" employees.

The term "employees" also includes represented salaried employees who are placed on an unpaid International Union Leave of Absence under Paragraph 71 of the Salaried Master Agreement

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

between the Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

(2)    The term "employees" does not include employees who are (i) employees of any wholly owned or substantially wholly-owned subsidiary of the Corporation unless specifically approved by the Corporation's Board of Directors (for example, the Board of Directors has specifically approved the inclusion of Delco Electronics Corporation) (ii) classified as "temporary employees", including per diem employees, or (iii) "part-time employees" -- less than half-time (employees who work less than one-half of the employing unit's work week)  or (iv) assigned to operations in Canada after 1970 and before 1993. The above notwithstanding, the provisions of Part A, Article II, Section 10 will apply with respect to (ii) and (iii) above.

(3)    The term "employees" does not include employees represented by a labor organization who are covered by a collective bargaining agreement which incorporates:

(i)    this Program as amended by the collective bargaining agreement;

(ii)    a program or plan similar in purpose to this Program;

(iii)    some other plan or program acknowledged by the Corporation and the employees' bargaining agent to be a substitute for,  benefits provided by this Program; or

(iv)    an understanding that this Program will cease prospectively to be available, applicable, or operative with respect to each salaried employee covered by such agreement.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Such employees will cease to be eligible for participation in this Program as of the effective date of, or at such other time as may be specified in, such collective bargaining agreement.  If such collective bargaining agreement expires or is terminated, and the employee remains a represented employee, such employee will continue to be ineligible for participation in this Program during the period required to conclude a new collective bargaining agreement.

(4)     The term "employees" does not include members of the Corporation's Board of Directors, or its directly or indirectly wholly-owned or substantially wholly-owned subsidiaries, or of Committees appointed by any such Board of Directors, who are not officers or regular employees of the Corporation or its subsidiaries.

(5)     The term "employees" does not include leased employees as defined under Section 414(n) of the Code.  The term "leased employee" means any person who, pursuant to an agreement between the Corporation and any leasing organization, has performed services for the Corporation on a substantially full-time basis for a period of at least one year, and such services are performed under the primary direction or control of the Corporation. Contributions or benefits provided a leased employee by the leasing organization which are attributable to services performed for the Corporation will be treated as provided by the Corporation. A leased employee will not be considered an employee of the Corporation if such employee is covered by the safe harbor requirements of Section 414(n)(5) of the Code.

(6)     The term "employees" does not include contract employees, bundled services employees, consultants, individuals who have represented themselves to be independent contractors, persons who the Corporation does not consider to be employees or other

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

similarly situated individuals, regardless of whether the individual is a common law employee of the Corporation.  The purpose of this provision is to exclude from participation in the Program all persons who may actually be common law employees of the Corporation, but who are not paid as though they were employees of the Corporation regardless of whether that exclusion is correct.

(b) **Base Salary**

(1)  The term "base salary" as used in this Program means the salary paid for a month of work, exclusive of any other compensation.  An employee's annual base salary is limited to $200,000 or as adjusted under Section 401(a)(17) of the Code

(2)  An employee's base salary for purposes of determining benefits and contributions paid under this Program includes election deferrals pursuant to Section 401(k), Section 125 and Section 132 (f)(4) of the Code.

(3)  For employees who transferred to EDS prior to June 6, 1996 while EDS was a member of the GM controlled group, "base salary" as used in this Program includes the monthly base salary paid by EDS to any such employee preceding termination of employment.

(4)  For employees who transferred to Hughes Electronics Corporation prior to December 18, 1997 while Hughes Electronics Corporation was a member of the GM controlled group, "base salary" as used in this Program includes the monthly base salary paid by Hughes Electronics Corporation to any such employee preceding termination of employment.

(c) **Average Monthly Base Salary**

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(1)     The term "average monthly base salary" as used in this Program means the monthly average of the employee's base salary for the highest 60 of the 120 months immediately preceding the employee's termination of employment or transfer to the hourly rolls.

(2)     For purposes of determining "average monthly base salary" the following provisions apply:

(i)     "Average monthly base salary" may include base salary recognized under the GM SRP for service within the 120 months immediately preceding the employee's termination of employment or transfer to the hourly rolls.  To be so recognized, an employee must have transferred directly from GM to Delphi pursuant to the procedure agreed to by Delphi and GM for such transfers prior to January 1, 2002.

(ii)    Base salary as indicated in the table below will be used for any month, referred to in subsection (c)(1) above, preceding termination of employment, or transfer to the hourly rolls, for which the employee's full monthly base salary rate was less than the amounts shown below:

| Retires With Benefits Payable Commencing | Base Salary |
|---|---|
| October 1, 2004 and After | $4,955.00 |

(iii)   For any month referred to in subsection (c)(1) above, preceding termination of employment, or transfer to the

99

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

hourly rolls, for which the employee received base salary at less than the employee's full monthly base salary rate, the employee's full monthly base salary rate last received preceding such month will be used for such month.

(iv)    For any month referred to in subsection (c)(1) above, preceding an employee's termination of employment, or transfer to the hourly rolls, during which the employee was on the hourly payroll and subsequent to which the employee commenced service as a salaried employee, the employee's monthly base salary rate immediately following the commencement of such service as a salaried employee will be used for such month.

(3)    Notwithstanding the foregoing provisions of this subsection, the "average monthly base salary" for employees who participate in a Corporation approved Career Transition Program (CTP) with 20 or more years of credited service and who are not otherwise eligible to retire following expiration of the CTP leave of absence will be increased by 3% (non-compounded) for each full year following expiration of the CTP leave of absence to the earlier of age 60, commencement of monthly deferred retirement benefits under Article III of Part A and Article III, Section 1 of Part B, or death. The above does not apply to the 2002 Executive Separation Program (ESP).

(d)    **Continuous Service
(Applicable to Primary Benefits Under Part B)**

(1)    The term "continuous service" as used in this Program shall include all employment, whether on salary or hourly-rate, with the Corporation and its directly or indirectly wholly-owned or

100

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

substantially wholly-owned domestic or foreign subsidiaries, as well as service with any company (including service with any directly or indirectly wholly-owned or substantially wholly-owned subsidiary of such company) of which substantially all the assets have been or are acquired by the Corporation or its subsidiaries.

(2)    Any period during which an employee is absent from service under an approved leave of absence with pay, as well as any period not in excess of one month during which an employee is absent from service under such leave of absence without pay, will be included in the calculation of the amount of continuous service.  In the case of any employee absent from service in excess of one month under an approved leave of absence without pay, the period during which the employee is absent from service under such leave will be excluded in the calculation of the amount of continuous service, but such employee's continuous service will not be broken.  An employee who leaves the service of the Corporation without a Military Leave of Absence to enter the Armed Forces of the United States or of Canada or to accept employment with the Government of the United States or with the Government of Canada and who is rehired after termination of such military or governmental service within such period and under such rules as the Named Fiduciary or its delegate has or may establish, will be treated in the same manner as an employee who has received an approved leave of absence without pay.

(3)    For the purposes of this Program if, after a quit or discharge, an employee is rehired, the employee's continuous service commences from the date of rehiring.

(4)    In cases of employees who are released and who are not returned to work within 12 months from the date of such release, such employees will have the same status as if they had quit.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(5) In cases of employees who were laid off prior to June 1, 2001 and who are not returned to work within five years (or, if less, a period equal to the employee's continuous service prior to such layoff) from the date of such layoff, such employees will have the same status as if they had quit.

(e) **Social Security Benefit**

(1) A Social Security benefit for disability or an unreduced Social Security benefit for age means a benefit determined and payable under Title II of the Social Security Act, as amended, without any reduction based on the age of the recipient.

(2) Old age benefit payments or disability benefit payments, other than those payable on a basis of "need" or because of military service, under any future federal legislation amending, superseding, supplementing, or incorporating the Social Security Act, as amended, or benefits provided therein, will be considered as benefits for age or disability under the Social Security Act for purposes of this Program.

(3) If an employee is eligible for a Social Security benefit for disability or an unreduced Social Security benefit for age at the time of retirement or thereafter, such employee must advise the Corporation of the effective date of entitlement to such benefit.

(f) **Normal Retirement Age**

The Normal Retirement Age for any employee is the later of age 65 or the fifth anniversary of the date the employee commenced participation in this Program. An employee who ceases active service after Normal Retirement Age will be entitled to receive a nonforfeitable retirement

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

benefit under Article III of Part A, Section 1 of Articles II and III of Part B and Article II, Section 4 of Part C, if applicable.

(g)     **Actuarial Value**

(1)   Effective October 1, 2008, the actuarial value of any benefit as of any date shall be calculated based on the mortality table described in Revenue Ruling 2001-62 and the annual interest rate on 30-year Treasury securities as specified by the Commissioner for the third full month prior to the first day of the plan year preceding such date.

(2)   Notwithstanding subsection (1), effective on and after October 1, 2008, the present value of any benefit payable under the Plan shall be calculated based on the applicable mortality table prescribed by the Commissioner of the Internal Revenue Service under Section 417(e)(3) of the Code and the applicable interest rate prescribed under Section 417(e)(3) of the Code for the third full month prior to the first day of the plan year.

(3)   Notwithstanding subsections (1) and (2), for participants who have a Benefit Commencement Date on or after October 1, 2008 and before October 1, 2010, the present value of any benefit payable under the Plan shall be the greater of the amounts calculated under subsections (1) and (2).

(4)   Notwithstanding any other provision of this Program, both the "Actuarial Value" and "present value" of an employee's accrued benefit under the Retirement Accumulation Plan of this Program as of any given date shall equal the value of the employee's account balance.

(h)     **Length of Service Date**

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Length of service date means the date recognized under Delphi policy utilizing date of hire and periods of employment with the Corporation or its subsidiaries which are considered unbroken under Delphi Policies.

## Section 2.  Payment of Retirement Benefits and Supplements

(a)   (1)   Except as otherwise provided in subsection (g) of this Section 2, retirement benefits and supplements will be paid monthly and commence not sooner than 30 days following receipt of the required written explanations of distribution options, provided; however, an employee may affirmatively elect in writing to commence the retirement benefits and supplements in less than 30 days (but not less than 7 days).  This Section 2(a)(1) does not apply to Part C of this Program.

(2)   Monthly payments of an employee's retirement benefits other than for total and permanent disability become payable with the employee's consent commencing on the first day of the month coinciding with or next following the employee's first day of absence because of retirement and the benefits will be payable monthly for the employee's lifetime; however this provision does not apply to Part C of this Program.  No consent is required where the present value of benefits is $1,000, or less, as determined in accordance with Section 411(a)(11) of the Code.

(3)   (i)   Total and permanent disability retirement benefits will be payable monthly during the continuance of total and permanent disability and while the retiree otherwise remains eligible for such benefits.  Such payments begin the latest of:

(aa)   the first day of the month which includes the date the required proof of disability is received by the Corporation;

104

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(bb)    the first day of the month which includes the date the
employee has been continuously and totally disabled
for a period of five months; or

(cc)    the first day of the third month following the date the
required proof of disability is received by the
Corporation.

This subsection (cc) does not apply (a) if the
employee dies prior to such date, or (b) where net
Extended Disability Benefits under the Delphi Life and
Disability Benefits Program are less than the benefits
payable under this Program.  Successive periods of
absence due to the same disability as that upon which
claim for total and permanent disability retirement
benefits is based and aggregating at least five months
will be considered the same as one continuous
absence provided that the aggregate will not include
any absence which precedes the last day at work by
more than one year.

(ii)    The death of an otherwise eligible employee who has been
on disability leave for at least one month but prior to being
continuously and totally disabled for a period of five months,
and whose death was directly or indirectly the result of the
terminal condition which gave rise to the disability leave of
absence (excluding death as a result of homicide, suicide, or
accidental death), and who has applied for retirement under
Section 5 of the Eligibility for Retirement section of this
Program, except that, effective October 1, 1999, (a) in the
case of an occupational injury or disease incurred in the
course of employment with the Corporation resulting in

### DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

death, neither the one-month period nor the leave of absence requirement shall apply, and (b) in the case of a terminal condition as such term is used and qualified in this paragraph, the one-month period does not apply and does not disqualify an otherwise eligible surviving spouse from receiving a benefit under Section 5 of Article I of Part A. This Section 2(a)(3) does not apply to Part C of this Program.

(4)     Any supplement is payable as provided in Section 7 of Article I of Part A.  This Section 2(a)(4) does not apply to Part C of this Program.

(5)     Part A benefits and supplementary benefits under Part B are not payable for any period in which any layoff payments, salary payments, or any sickness and accident benefits are payable to the employee by the Corporation or under any plan to which the Corporation has contributed, including Separation Allowance Plan Payments.  If any layoff payment, separation allowance payment, salary payment, or sickness and accident benefit payment during any month is payable for a period of less than a complete month, a proportionate amount of any monthly Part A benefits and supplementary benefits under Part B will be paid for that portion of the month for which the retiree receives no layoff payments, separation allowance payments, salary payments, or sickness and accident benefits.  Any primary benefits payable under Section 2 of Article I of Part B will be payable commencing on the first day of the month a Part A benefit is payable.

(6)     Where a benefit is payable under a QDRO:

(i)     the form or duration of payment may not be changed once the benefit is in payment status;

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

      (ii)     an Alternate Payee's entitlement to a benefit actuarially adjusted to be payable on the life of the Alternate Payee under the QDRO will not revert to the employee even if the Alternate Payee dies prior to commencement of the benefit.

    (b)     If a retired employee who is receiving retirement benefits is reemployed by the Corporation or one of its directly or indirectly wholly-owned or substantially wholly-owned domestic subsidiaries, or any company or joint venture which has been divested from the Corporation (where termination of employment with the Corporation to work for such company or joint venture is not considered termination of employment for purposes of this Program), such employee will cease to receive such benefits during reemployment. Such an employee, if otherwise entitled pursuant to the provisions of this Program, will accrue additional credited service under this Program or the Program of the subsidiary where the employee has been reemployed and, if otherwise eligible, will be permitted to make contributions. This Section 2(b) does not apply to Part C of this Program.

    (c)     If a retired employee receives a retroactive Social Security Disability Insurance Benefit (SSDIB) award resulting from a reconsideration or hearing before an administrative law judge, the amount of retirement benefits to be repaid will be reduced by an amount equal to any attorney fees, paid by the retired employee, associated with the award, provided the retiree makes such repayment within 30 days of the date of notification by the Corporation of the amount to be repaid. This reduction applies only to attorney fees associated with a successful appeal of a denial of SSDIB, and includes only that portion of such fees associated with the period of time the retired employee was entitled to receive retirement benefits. Any reimbursement for any such fees may not exceed 25% of the amount of any overpayment as of the first of the

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

month immediately following the month in which the retiree is notified by Social Security of the retiree's SSDIB award.  Attorney fees incurred for services received prior to denial of the initial application for SSDIB will not reduce the amount of repayment due.

The above provision is to be coordinated with a similar provision in the Delphi Life and Disability Benefits Program to ensure the retired employee does not receive credit for more than the actual amount of eligible attorney fees incurred in securing the award, and any reduction, as specified above, first will be taken as a reduction to any overpayment due from the employee under the Delphi Life and Disability Benefits Program.  This Section 2(c) does not apply to Part C of this Program.

(d)     To retire under this Program, an employee must have unbroken credited service at the time of retirement, except that a person who is eligible for benefits under the Separation Allowance Plan and is not being paid retirement benefits under this Program or the Delphi HRP will not be precluded from retiring without return to employment, even though such person has incurred a break in credited service as a result of such separation from the Corporation.

(e)     If any retiree, surviving spouse or contingent annuitant to whom a benefit is payable is unable to care for their affairs because of illness or accident, any monthly benefit payment and supplement or survivor benefit due (unless prior claim has been made by a duly qualified guardian or other legal representative) may be paid to the spouse, parent, brother, sister, or other person or party (including private or public institutions) deemed by the Corporation to have incurred expense for such retiree or survivor otherwise entitled to payment.  Any such payment will be a payment for the account of

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

the retiree or survivor and will be a complete discharge of any liability of the Program.

(f) (1)  All distributions of benefits will be determined and made in accordance with section 401(a)(9) of the Code and the regulations thereunder.

(2)  The required beginning date of a participant is the later of the April 1 of the calendar year following the calendar year in which the participant attains age 70-1/2 or retires except that benefit distributions to a 5-percent owner must commence by the April 1 of the calendar year following the calendar year in which the participant attains age 70-1/2.  An employee attaining age 70-1/2 on or after January 1, 1999 who is not a 5-percent owner will not commence monthly receipt of accrued benefits under this Program until such employee actually retires.  The employee's accrued benefit at age 70-1/2 will be actuarially increased to take into account the period after age 70-1/2 in which such employee was not receiving benefits under this Program, such increase to be recognized as additional benefit accruals to the extent described in Code § 411(b)(1)(H)(iii)(II).  However, there will be no actuarial increase taken into account under Part C of this Program.

(g) Notwithstanding any other provision of this Section 2, where the sum of the present value of a former employee's or surviving spouse's monthly deferred retirement benefit commencing at age 65 under Part A, when combined with the present value of any accrued monthly deferred retirement benefit commencing at age 65 under Part B, is $1,000, or less, the total amount of any accrued monthly benefit otherwise payable to such former employee, or to the surviving spouse of such deceased former employee, will be

109

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

paid in a single sum as soon as administratively practicable. In the case of a former employee who is not vested in the retirement benefits described in the preceding sentence, such former employee will be deemed, upon termination of Program participation, to have constructively received the total amount of such nonvested benefit. Where the present value of such benefit is more than $1,000 an otherwise eligible former employee, or surviving spouse, will have an option to receive a single-sum payment, but only with spousal consent, where applicable. Any single-sum payment will be determined based on the actuarial value as set forth in General Provision 1(g), and will be in full satisfaction of any benefit entitlement under this Program, and is irrevocable when paid.

In the event any such former employee who receives a single-sum payment is subsequently reemployed by the Corporation, such former employee will be treated as a newly-hired employee, with no entitlement to the reinstatement of any previous credited service, in recognition of earlier receipt of a single-sum payment representing the present value of the lifetime monthly benefit otherwise related to all such prior years of service. Notwithstanding the preceding sentence, if any such former employee who if not vested at the time of the employee's separation from service, and is subsequently reemployed before five consecutive one-year breaks in service under Section 10 of Article II of Part A, the employee's previous credited service will be reinstated, upon application.

In lieu of a single-sum payment which has a present value of more than $1,000, a former employee or surviving spouse under age 55 may elect to receive lifetime monthly benefits that are the actuarial equivalent of such former employee's or surviving spouse's monthly deferred retirement benefits under Part A and Part B, if any.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

In the event a single-sum payment of $1,000, or less cannot be made because the identity or location of the former employee or surviving spouse cannot be determined after reasonable efforts to do so have been made, and the payment remains undeliverable for a period of one year from the date of mailing of such notification by certified mail or registered mail with return receipt requested to the last known address of the former employee, or an equivalent method, such payment will be forfeited and applied to reduce Corporation contributions to the Program; provided, however, in the event the identity or location of the former employee or surviving spouse is subsequently determined, such payment will be made in a single sum.

(h)     Notwithstanding any other provision of this Section 2, the payment of retirement benefits under this Program to an employee or former employee who has accepted employment with a company, all as set forth in Section 10 or 11 of these General Provisions, cannot commence under this Program until such employee has terminated employment with such company .

(i)     In the event an employee or former employee becomes eligible to receive benefits under this Program, such employee or former employee will be provided with a written explanation of the available payment options.  This explanation will be provided not more than 180 days and not less than 30 days prior to the annuity starting date.

(j)     Notwithstanding any provision of the Program to the contrary, in the event the Program pays a participant an eligible rollover distribution (as defined by Section 402(c)(4) of the Code), the participant may elect at the time and in the manner prescribed by the Plan Administrator, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan (as defined by Section

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

402(c)(8)(B) of the Code) specified by the distributee in a direct rollover.  For purposes of this subsection (j) of Section 2 of the General Provisions, a participant includes a spousal and non-spousal beneficiary. In no event will this Program accept a direct rollover payment from a participant.

(k)    Notwithstanding any other provision of this General Provision, the payment of retirement benefits under this Program to an employee or former employee who has accepted employment with a successor company through a sale, divestiture or joint venture transaction, cannot commence a benefit under this Program until such employee or former employee has terminated employment with the successor company.

(l)    Retroactive Benefit Commencement.  Under certain circumstances described below, payments under this Program may be made retroactively where the explanation described in Section 2(i) above is provided on or after the participant's scheduled benefit commencement date, in which case the benefit commencement date will be called a "Retroactive Annuity Starting Date" subject to modified procedures and benefit calculations as described in (1) and (2) below.

Benefit payments may also be made retroactively where the explanation described in Section 2(i) above is provided before the employee's scheduled benefit commencement date. This may occur where actual benefit payments are delayed as a result of administrative or participant delay or error, but benefits are paid retroactively to the employee's scheduled Benefit commencement date. The rules of this Section 2(l) will not apply in this case.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(1)     Procedures.

        (aa)     Explanation and Election.  The 180-day period described in Section 2(i) above will end on the employee's Actual Payment Date, rather than the annuity starting date.

        (bb)     Employee consent.  Employee consent, in a manner prescribed by the Plan Administrator, is required for a Retroactive Annuity Starting Date.

        (cc)     Spousal consent.  Spousal consent is required for a Retroactive Annuity Starting Date, in accordance with the Program's spousal consent rules above.  For purposes of this subparagraph (cc), the spouse is determined as of the Actual Payment Date.

(2)     Benefit Calculations

    In general, benefits commencing on the Retroactive Annuity Starting Date will be calculated using the actuarial assumptions applicable for this date (rather than the Actual Payment Date) (i.e., determinations of Actuarial Equivalence are made as of the Retroactive Annuity Starting Date). See below for special rules.

        (aa)     Actuarial Assumptions. A benefit payable in a form subject to Code section 417(e)(3) will be the greater of the amount calculated using the definition of Actuarial Equivalence applicable to the Actual Payment Date and the amount calculated using the definition of Actuarial Equivalence applicable to the Retroactive Annuity Starting Date.

113

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(bb)   Make-up Payments. Make-up payments will be provided for any missed payments due to the delay between the Retroactive Annuity Starting Date and the Actual Payment Date, with an adjustment for interest to the extent required.

(cc)   415 Limits. In general, a benefit payable under this Section will be subject to the requirements of Section 16 below (Code section 415 limits) as applicable for the year of the Retroactive Annuity Starting Date.

However, the following benefits payable under this Section will be subject to the requirements of Section 16 as applicable for the year of the Actual Payment Date (in lieu of the year of the Retroactive Annuity Starting Date):  A benefit payable in a form subject to Code section 417(e)(3); or a benefit payable in any other form, where the Actual Payment Date is more than twelve months after the Retroactive Annuity Starting Date.

(3)   Definitions

For purposes of this Section 2(l), the following definitions apply:

(aa)   A "Retroactive Annuity Starting Date" is an annuity starting date affirmatively elected by an employee that occurs on or before the date the written explanation described in Section 2(i) is provided, subject to the limitations in (3) above.  In no event will a Retroactive

114

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Annuity Starting Date be earlier than an employee's termination of employment

    (bb)    The "Actual Payment Date" is the date benefit payments actually commence.

## Section 3.  Deductions for Workers Compensation

In determining the monthly benefits payable under Part A, Part C, and any supplementary benefits payable under Part B of this Program, a deduction will be made, unless prohibited by law, equivalent to all or any part of workers compensation (including compromise or redemption settlements) payable to such employee by reason of any law of the United States, or any political subdivision thereof; provided, however, that the deductions may only be made if the workers compensation was provided by premiums, taxes, or other payments paid by or at the expense of the Corporation, except that no deduction will be made for the following:

    (a)    workers compensation payments specifically allocated for hospitalization or medical expense, fixed statutory payments for the loss of any bodily member, or 100% loss of use of any bodily member, or payments for loss of industrial vision; or

    (b)    compromise or redemption settlements payable prior to the date monthly retirement benefits first become payable.

## Section 4.  Assignments and Loans

    (a)    No right or interest of any participant or of any beneficiary of any participant under the Program is assignable or transferable, in whole or in part, either directly or by operation of law or otherwise, including, but not by way of limitation, execution, levy, garnishment, attachment, pledge,

115

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

bankruptcy or in any other manner, but excluding devolution by death or mental incompetency, and no right or interest of any such participant or beneficiary will be liable for, or subject to, any obligation or liability of such participant or beneficiary except in accordance with provisions of a QDRO provided, however, that any retired employee or eligible survivor:

(1)     who elects health care coverages or life insurance made available by the Corporation may, insofar as it is consistent with the regulations governing the plans providing such coverages, participate in such coverages and have deducted, pursuant to the retired employee's or survivor's authorization and direction acceptable to the Corporation, the required contribution for such coverages as it may be established from time to time;

(2)     will have federal and state income tax withheld pursuant to federal and state statutes or regulations unless, only with respect to federal income tax, elected otherwise by submitting to the Corporation authorization and direction acceptable to the Corporation; or

(3)     who submits to the Corporation written authorization and direction acceptable to the Corporation may have amounts of not less than $40.00 per month, but in no event more than 10% of the retired employee's monthly benefit, withheld to repay any outstanding overpayment owing to the Corporation or to any benefit plan of the Corporation.

(a)     An employee may not borrow against employee contributions under this Program.

## Section 5.  Corporation Contributions

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(a)    While the Corporation does not guarantee to do so, it expects to provide, over such period as it may determine, the cost of the benefits described in Part A, Part C, and the primary benefits accrued after December 31, 1984 described in Part B, to the extent not covered by employee contributions made after December 31, 1984, and the supplementary benefits described in Part B (including the optional benefits described in Sections 5, 6, and 8 of Article I of Part A and in Sections 4 and 5 of Article I of Part B to the extent such optional benefits are in lieu of, or related to, such benefits), either through placing funds in a retirement trust or through a contract with one or more insurance companies, or both.  Such funds will include employee contributions made after January 1, 1985.  The Named Fiduciary may appoint an investment manager or managers, as defined under ERISA to manage any assets of the Program.

(b)    Benefits under Part A, Part C, and primary benefits accrued after December 31, 1984 under Part B and supplementary benefits under Part B (including the aforementioned optional benefits) will be paid only to the extent that they are provided for by the assets of such retirement trust or under such contract with one or more insurance companies.

(d)    The Corporation will comply with all funding requirements of ERISA and the Code as they apply to this Program.

(e)    The Corporation may charge to the fund expenses necessary for the proper administration of the Program and investment of the funds, including, but not limited to, the direct cost of benefit administration performed by, or on behalf of, the Corporation for the Program, the cost of consultant and actuarial services, and Pension Benefit Guaranty Corporation ("PBGC") premiums for participants.

## Section 6.  Amendment, Modification, Suspension, or Termination, Merger, Consolidation, or Transfer of Assets of Program by Corporation

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(a) The Corporation reserves the right, by and through its Board of Directors, to amend, modify, suspend, or terminate the Program in the future. Absent a written delegation of authority from the Board of Directors, no one has any authority whatsoever to commit to the provision of any retirement benefit, or benefit provision, not otherwise provided expressly under the written terms of this Program, or to change any eligibility criteria, or any other provision or criteria of this Program as constituted herein.

(b) (1) If the Corporation, in accordance with this Section 6, or the PBGC, partially or totally terminates the Program, the amount of the assets, which are available to provide benefits, and which are held by the trustees or insurance companies as of the termination date, will be allocated, after deducting expenses for administration or liquidation, in the following manner and order to the extent of the sufficiency of such assets, and in accordance with any regulations for such determinations as may be issued by the PBGC:

  (aa) first, to that portion of each individual's accrued benefit which is derived from the participant's mandatory contributions.

  (bb) second, in the case of benefits payable as an annuity :

   (i) In the case of the benefit of a participant or beneficiary which was in pay status as of the beginning of the 3-year period ending on the termination date of the Program, to each such benefit, based on the provisions of the Program (as in effect during the 5-year period ending on such date) under which such benefit would be the least; and

   (ii) In the case of a participant's or beneficiary's benefit (other than a benefit described in subparagraph (bb)(i) above) which would have been in pay status as

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

of the beginning of such 3-year period if the participant had retired prior to the beginning of the 3-year period and if benefits had commenced (in the normal form of annuity under the Program) as of the beginning of such period, to each such benefit based on the provisions of the Program (as in effect during the 5-year period ending on such date) under which such benefit would be the least.

For purposes of subparagraph (bb)(i) above, the lowest benefit in pay status during a 3-year period will be considered the benefit in pay status for such period:

(cc)   third, to all other benefits (if any) of individuals under the Program which are guaranteed under the plan termination insurance provisions of ERISA determined without regard to Section 4022(B)(a);

(dd)   fourth, to all other nonforfeitable benefits under the Program; and

(ee)   fifth, to all other benefits under the Program.

(2)   (aa)   The amount allocated under any of the preceding paragraphs with respect to any benefit will be properly adjusted for any allocation of assets with respect to the benefit under a prior paragraph of this Section 7.

(bb)   If the assets available for allocation under any of the preceding paragraphs (other than paragraphs (b)(1)(dd) and (b)(1)(ee)) are insufficient to satisfy in full the benefits of all individuals which are described in such paragraphs, the assets will be allocated pro rata among such individuals on

119

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

the basis of the present value (as of the termination date) of their respective benefits described in such paragraphs.

(cc) If the assets available for allocation under paragraph (b)(1)(dd) are insufficient to satisfy in full the benefits of individuals described in that paragraph:

(i) Except as provided in subparagraph (b)(2)(cc)(ii) below, the assets will be allocated to the benefits of individuals described in subparagraph (b)(1)(dd) on the basis of the benefits of individuals which would have been described in such subparagraph (b)(1)(dd) under the Program as in effect at the beginning of the 5-year period ending on the date of the Program's termination; and

(ii) If the assets available for allocation under subparagraph (b)(2)(cc)(i) above are sufficient to satisfy in full the benefits described in such subparagraph (without regard to this subparagraph), then for purposes of subparagraph (b)(2)(cc)(i), benefits of individuals described in such subparagraph will be determined on the basis of the Program as amended by the most recent Program amendment effective during such 5-year period under which the assets available for allocation are sufficient to satisfy in full the benefits of individuals described in subparagraph (b)(2)(cc)(i) and any assets remaining to be allocated under such subparagraph will be allocated under subparagraph (b)(2)(cc)(i) on the basis of the Program as amended by the next succeeding Program amendment effective during such period.

120

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(3)     In the event of any termination or partial termination of the Program, the right of all affected employees to benefits accrued to the date of such termination or partial termination, to the extent funded as of such date, is nonforfeitable.

(4)     If any assets of the Program attributable to employee contributions remain after all liabilities of the Program to participants and their beneficiaries have been satisfied, such assets will be equitably distributed to the employees who made such contributions (or their beneficiaries) in accordance with their rate of contributions.  Any residual assets of the Program may be distributed to the Corporation if all liabilities of the Program to participants and their beneficiaries have been satisfied.

(5)     For purposes of this Section 6(b), the term "mandatory contributions" means amounts contributed to the Program by a participant which are required as a condition of participation in the Program, or as a condition of obtaining benefits under the Program attributable to employer contributions.  For this purpose, the total amount of mandatory contributions of a participant is the amount of such contributions reduced (but not below zero) by the sum of the amounts paid or distributed to the participant under the Program before its termination.

(6)     If the Secretary of the Treasury determines that the allocation made pursuant to this Section 6 results in discrimination prohibited by Section 401(a)(4) of the Code, then, if required to prevent the disqualification of the Program (or any trust under the Program) under Section 401(a) or 403(a) of the Code, the assets  will be reallocated to avoid such discrimination.

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(c)     In the event of any merger or consolidation with, or transfer of assets or liabilities to, any other plan or program, each participant in the Program would, if the Program then terminated, receive a benefit immediately after the merger, consolidation, or transfer which is at least equal to the benefit such participant would have been entitled to receive immediately before the merger, consolidation, or transfer, if the Program had then terminated.

## Section 8.  Non-Duplication of Benefits

Except as provided in Section 6 of Article II of Part A, no employee of the Corporation or its subsidiaries eligible to accrue benefits under this Program will be eligible to accrue benefits under any separate plan under the Delphi controlled group.  Nor will any employee, while accruing benefits under any plan of the controlled group, be eligible to accrue benefits under any other retirement or pension plan of the controlled group.

## Section 9.  Treatment of Certain Employees Under Limited Early Retirement Provisions and Prior Program Provisions

(a)     **Limited Early Retirement Provisions**

Pursuant to authority granted by the Corporation's Board of Directors, the Corporation may, from time-to-time and in its sole discretion, adopt limited early retirement provisions to provide retirements (i) during a specified period of time, (ii) at a specified level of benefits, and (iii) for identified salaried employees.  Any such early retirement provisions that may be adopted by the Corporation in compliance with the authority granted earlier by its Board of Directors, are made a part of this Program as though set out fully herein.

(b)     **Provisions of Past Programs to Honor Prior Commitments**

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

To implement various commitments made, prior to October 1, 1987, by General Motors to certain otherwise eligible employees with respect to the availability to each of them of unreduced retirement benefits commencing as early as their attainment of age 55, Program provisions in effect at the time such commitments were made shall continue to apply to such employees.

The provision immediately above is limited in applicability solely to otherwise eligible employees from the following units, and any special conditions relevant to the commitment to each such group of employees are shown:

(1)    Employees who were working at facilities which had been announced, as of August 31, 1987, to be closed or phased-out, as follows:

| Division/Unit | Facilities |
|---|---|
| **Fisher Guide** | Elyria<br>Fort Street |
| **Harrison** | Buffalo |
| **Inland** | Livonia<br>Tecumseh |
| **New Departure-Hyatt** | Bristol |

(2)    Otherwise eligible employees who are absent at date of retirement from any unit due to layoff which commenced prior to October 1, 1987, whose age plus credited service totaled 55 or more on the date of layoff.

(3)    Otherwise eligible employees for whom credited service has been continued as a result of such things as (i) the sale of operations, (ii) a joint venture, or (iii) other similar-type transactions, such as

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

acquisitions and mergers, as specifically set forth in Section 10 and 11of General Provisions.

## Section 10.  Treatment of Certain Employees

(a)    **Delco Electronics Division**

An employee who at the request of GM terminated employment with Delco Electronics Division to accept employment with Tau Laboratories will not be considered as having terminate demployment for purposes of this Program provided such employee (i) on such employee's last day worked for Delco Electronics Division had 10 or more years of credited service and age plus credited service totaled 55 or more, and (ii) such employee remained employed by Tau Laboratories through:

(1)    December 31, 1987; or

(2)    December 31, 1984, and is terminated by Tau Laboratories other than as a discharge (i.e., for cause).

For any month in which the employee is employed by Tau Laboratories, or any other employer, an employee to whom this Section 10 (a) applies who was under age 54 on the last day worked for Delco Electronics Division and who subsequently retires under this Program will not be entitled to receive the temporary benefit that otherwise may be payable under Part A of this Program.

(b)    **Saginaw Division's Actuator Products Group**

In connection with the sale of Saginaw Division's Actuator Products Group to Thomson Industries, Inc., termination of employment with GM, other than by death or retirement, will not be considered as having terminated employment for purposes of this Program, provided such employee

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(i) who on April 30, 1987 had 10 or more years of credited service and whose years of age plus credited service totaled 55 or more, and

(ii) whose termination of employment with GM occurs after such employee has been employed by Thomson Industries, Inc., through:

(1)    April 30, 1990; or

(2)    a date prior to April 30, 1990, and is terminated by Thomson Industries, Inc., other than as a discharge (i.e., for cause).

(c)    **AC Rochester Products Division**

In connection with the sale of the fuel injection business of the AC Rochester Products Division, Grand Rapids, to Penske Transportation, Inc., and Detroit Diesel Corporation, hereinafter referred to as Diesel Technology Corporation (DTC), an employee who accepted employment with DTC was placed on a special leave of absence for up to three years. During the three-year period which commenced November 1, 1988, any such employee will (i) participate in the DTC Pension Plan, (ii) will not be eligible to accrue credited service under Part A or continuous service under Part B, and (iii) will not be eligible to contribute under Part B.

All of the Program assets attributable to any Part A and Part B benefits accrued by any employee who accepted employment at DTC were transferred to DTC.  As a result of such transfer of assets, all prior benefit entitlement, of whatever nature, ceased on the date of such transfer, and the total responsibility and liability was assumed by DTC, which has assumed concurrently the sole responsibility to provide entirely for any retirement benefit entitlement of any such employee.  The sales agreement executed earlier between the parties provides that DTC will remain liable under its pension plan for any benefits attributable to such a rehired employee's service at DTC during any employment period at DTC.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

In view of the prior transfer of assets to DTC representing the full and fair value of any accrued benefit entitlement under this Program at date of such transfer, in the event that any such employee who accepts employment at DTC is reemployed by the Corporation after (i) expiration of the three year leave of absence period, or (ii) voluntarily terminated employment at DTC within the three year leave of absence period, such employee will be treated under this Program as a newly-hired employee, with no entitlement to any benefits or credited service related to all such prior participation .

(d)     **Delco Chassis Division's Machine Control Systems Group**

In connection with the sale of the Delco Chassis Division's Machine Control Systems Group to the Dayton-Phoenix Group, Inc., termination of employment with GM, other than by death or retirement, will not be considered as having terminated employment for purposes of this Program with respect to an employee (i) who on October 31, 1992 had 10 or more years of credited service and whose years of age plus credited service totaled 55 or more, and (ii) whose termination of employment with GM occurs after such employee has been employed by the Dayton-Phoenix Group, Inc., through October 31, 1995.

(e)     **Saginaw Division's Final Drive and Forge Business Unit**

In connection with the sale, dated February 28, 1994, of the Saginaw Division's Final Drive and Forge Business Unit to American Axle and Manufacturing, Inc. (AAM), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to an employee who became an employee of AAM in accordance with the terms of the sales agreement between GM and AAM.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Notwithstanding the above, the benefits payable under this Program to an employee who became an employee of AAM will be based on the provisions of this Program and the applicable terms and conditions of Article V, Section 5.4.1.(i) through 5.4.1.(vii) of the sales agreement which is incorporated by reference.

(f)     **Delco Chassis Division's Motors and Actuators Business Unit**

In connection with the joint venture, dated March 31, 1994, between the Delco Chassis Division's Motors and Actuators Business Unit and ITT Automotive Electrical Systems, Inc., (ESI – subsequently Valeo Inc.), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to an employee who became an employee of ESI in accordance with the terms of the sales agreement between GM and ESI.

Notwithstanding the above, the benefits payable under this Program to an employee who became an employee of ESI will be based on the provisions of this Program and the applicable terms and conditions of Article V, Section 5.6.1(i). through 5.6.1.(vii). of the sales agreement which is incorporated by reference.

(g)     **Delco Remy Division's Starter Motor and Generator Business Units**

In connection with the sale, dated July 31, 1994, of the Delco Remy Division's Starter Motor and Generator Business Units to Delco Remy America, Inc., (DRA), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to an employee who became an employee of DRA in accordance with the terms of the sales agreement between GM and DRA.

127

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Notwithstanding the above, the benefits payable under this Program to an employee who became an employee of DRA will be based on the provisions of this Program and the applicable terms and conditions of Article VII, Section 7.5.B. of the sales agreement which is incorporated by reference.

(h)     **Delphi Energy and Engine Management System Division's Magnequench Business Unit**

In connection with the sale, dated September 30, 1995, of the Delphi Energy and Engine Management System Division's Magnequench Business Unit, to Magnequench International, Inc. (MQI), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to an employee who became an employee of MQI in accordance with the terms of the sales agreement between GM and MQI.

Notwithstanding the above, the benefits payable under this Program to an employee who becomes an employee of MQI will be based on the provisions of this Program and the applicable terms and conditions of Article 5, Section 5.5.2. of the Assets Purchase Agreement which is incorporated by reference.

(i)     **Delphi Interior and Lighting Systems' Flint and Livonia Plants**

In connection with the sale, dated December 31, 1996, of the Delphi Interior and Lighting Systems' Flint and Livonia Plants to Peregrine Incorporated (Peregrine), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to an employee who became an employee of Peregrine in accordance with the terms of the sales agreement between GM and Peregrine.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Notwithstanding the above, the benefits payable under this Program to an employee who became an employee of Peregrine will be based on the provisions of this Program and the applicable terms and conditions of Article 5, Section 5.6.2. of the sales agreement which is  incorporated by reference.

Additionally, the Delphi SRP will pay the pro-rata portion of the Early Retirement Supplement (ERS) that otherwise would have been payable under the Peregrine U.S., Inc. (Peregrine) Salaried Retirement Program for employees who transferred to Peregrine and who had 30 years of GM credited service on the date of the sale or who returned to Delphi and accrued 30 or more years of Delphi credited service and retired after January 1, 1999.  This provision applies only to those employees hired by GM prior to January 1, 1988.  The ERS payments would continue until the retiree reaches age 62 and one month.

(j)     **Delphi Chassis Systems – Livonia Plant**

In connection with the sale, dated August 31, 1998, of the Delphi Chassis Systems' Livonia Plant to Chasco Systems, Inc. (Chasco), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to a GM employee who became an employee of Chasco in accordance with the terms of the sales agreement between GM and Chasco.

Notwithstanding the above, the benefits payable under this Program to a GM employee who became an employee of Chasco will be based on the provisions of this Program and the applicable terms and conditions of Article 5, Section 5.6.2 of the sales agreement which is incorporated by reference.

(k)     **Delphi Interior and Lighting Systems' Auburn Hills and Grand Rapid Plants**

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

In connection with the sale, dated August 31, 1998, of the Delphi Interior and Lighting Systems' Auburn Hills and Grand Rapid Plants to Lear Corporation (Lear), termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to a GM employee who became an employee of Lear in accordance with the terms of the sales agreement between GM and Lear.

Notwithstanding the above, the benefits payable under this Program to a GM employee who became an employee of Lear will be based on the provisions of this Program and the applicable terms and conditions of Article 5, Section 5.5.2 of the sales agreement which is incorporated by reference.

**(l)     Delphi Interior and Lighting Systems' Anderson and Monroe Plants**

In connection with the sale dated September 29, 1998, of the Delphi Interior and Lighting Systems' Anderson, Indiana and Monroe, Louisiana Plants to Light source Parent Corporation and PEP Guide, LLC, termination of employment with GM will not be considered as having terminated employment for purposes of this Program with respect to a GM employee who became an employee of PEP Guide, LLC in accordance with the terms of the sales agreement between GM and PEP Guide, LLC.

Notwithstanding the above, the benefits payable under this Program to a GM employee who became an employee of PEP Guide, LLC will be based on the provisions of this Program and the applicable terms and conditions of Article 6, Section 6.6.2 of the sales agreement which is incorporated by reference.

(m)    Divestiture of Inteva

In connection with the "Master Sale and Purchase Agreement Among Delphi Corporation and Inteva Products, LLC" dated as of October 15, 2007,("Inteva

130

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Sales Agreement") of the Delphi Interior plants at Adrian MI, Cottondale, AL, and Gadsten, AL, termination of employment with Delphi will not be considered as having terminated employment for purposes of this Program with respect to a Delphi employee who became an employee of Inteva in accordance with the terms of the Inteva Sales Agreement.

Notwithstanding the above, the benefits payable under this Program to a Delphi employee who became an employee of Inteva will be based on the provisions of this Program, are contingent upon Inteva's reimbursement of certain costs in accordance with Section 6.6.4.E of the Inteva Sales Agreement, and the following terms and conditions:

- Employees who are not vested under the Program as of the date of sale may become vested after the date of sale due to the coordination of service provisions.
- Vesting and retirement eligibility under the Program will be determined by adding Part A and/or Part C credited service accrued under the Program as of the date of the sale to the credited service accrued at Inteva between the date of sale and the employee's separation from Inteva.
- Any salaried employee who becomes an Inteva employee and who is or becomes vested under the Program prior to separating their employment with Inteva, shall be entitled to payment from the Program.
- The coordination provision will only apply while the participant is continuously employed at Inteva (or within the Inteva controlled group of companies).  Any separation of employment from Inteva will cause the coordination of service to cease (regardless of a subsequent future re-hire by Inteva). A separation includes any involuntary and voluntary separation, retirement, death, or the sale of the business by Inteva to a successor company.
- Employees who transfer to Inteva will not be eligible to commence or receive a Program benefit while working for Inteva in any capacity.  If an employee separates from Inteva, commences a Delphi retirement benefit, and is subsequently reemployed by Inteva (or within the Inteva controlled

131

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

group of companies) on a regular, contract, or other basis, the benefit will be suspended until the employee terminates his or her employment.  If the rehire occurs more than one year after the initial separation, the Program benefit will not be suspended.

- Participants in Part C, the Retirement Accumulation Plan (RAP), will be covered by these provisions, meaning that their service at Inteva will be recognized for purposes of vesting and eligibility.  They may take a distribution in accordance with the terms of the RAP upon separation from Inteva.

- Basic benefit rate, temporary benefit rates, interim supplement rates and early retirement supplement amount will be determined on the basis of the earlier of the date of the freeze of the Program or the employee's separation date from Inteva.

- Participants with service dates before January 1, 2001, who separate from Inteva and qualify for a normal, early voluntary or a total and permanent disability retirement under the Program on the basis of combined service will be eligible for Part A benefits.

  - Part A Basic benefits  will be calculated using the SRP credited service accrued through the date of the sale.

  - Participants with a continuous service date before 1-1-1988, may qualify for a Part A Supplement.  A Interim Supplement or a Temporary Benefit will be calculated using the credited service accrued through the earlier of the date of the sale.  If eligible for a Voluntary Retirement with 30 or more years of combined Delphi and Inteva credited service, the  Early Retirement Supplement will be payable in full, regardless of the actual years of credited service accrued under the SRP.

- Participants who separate from Inteva and qualify for a normal, early voluntary or a total and permanent disability retirement under the Program and who were participating in Part B of the Program as of date of sale and whose contributions remain in the Program until their date of separation from Inteva (Note: a withdrawal of Part B contributions while employed with Inteva will be considered an in-service withdrawal) will receive;

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

- Part B Primary benefits based on contributions accrued as of the date of sale.

- Part B Supplementary Benefits based on the average base salary and Part B credited service as of the date of the sale.

- Participants who separate from Inteva and are vested on the basis of combined credited service retain all the payment options in accordance with the applicable Program provisions.

- Survivor benefits are payable if as of the date of death the participant is vested on the basis of combined Delphi and Inteva credited service. The pre-retirement automatic survivor provisions will be based on the combined Delphi and Inteva credited service and the age of the participant on the date of death.

(n)     **Divestiture of Saginaw Steering**

In connection with the "Master Sale and Purchase Agreement Among Delphi Corporation, Buyer Parent, and the Other Sellers Party Hereto" (still undated as of this report) (" Sales Agreement") of the Delphi Steering plants in Athens AL, and Saginaw MI, termination of employment with Delphi will not be considered as being a separation of service for purposes of this Program with respect to a Delphi employee who became an employee of  in accordance with the terms of the  Sales Agreement.   The Program will recognize the post-divestiture service of salaried employees, who are transferred to Platinum as part of the sale, for the purposes of vesting and retirement eligibility (which includes retirement type) but not benefit accrual.

Notwithstanding the above, the benefits payable under this Program to a Delphi employee who became an employee of Platinum will be based on the provisions of this Program and the following terms and conditions:

- Employees who are not vested under the Program as of the date of sale may become vested after the date of sale due to the combination of

133

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Program credited service and credited service earned at Platinum between the date of the sale and the employee's separation from the buyer.

- Vesting and retirement eligibility under the Program will be determined by adding Part A and/or Part C credited service accrued under the Program as of the date of the sale to the credited service earned at Platinum between the date of sale and the employee's separation from Platinum.

- Any salaried employee who transfers to Platinum as part of the sale and who is vested at the date of the sale or becomes vested under the Program based on combined credited service (credited service accrued prior to the date of the sale plus credited service granted for time worked at the Platinum) prior to separating their employment with Platinum, shall be entitled to future benefit under the Program.

- The coordination provision will only apply while the participant is continuously employed at Platinum (or within the Platinum controlled group of companies).  Any separation of employment from Platinum will cause the coordination of service to cease (regardless of a subsequent future re-hire by Platinum). A separation includes any involuntary and voluntary separation, retirement, death, or the sale of the business by Platinum to a successor employer.

- Employees who transfer to Platinum will not be eligible to commence or receive a Program benefit until they separate their employment with Platinum.  Furthermore, if a transferred employee separates from the Platinum, commences their bona fide retirement and then is subsequently employed by Platinum in any capacity within one year, Delphi will suspend the SRP benefit and recommence a recalculated SRP benefit when the term of employment ends.

- SRP participants in Part C, the Retirement Accumulation Plan (RAP), will be covered by these provisions, meaning that their service at Platinum will

134

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

be recognized for purposes of vesting and eligibility. They may take a distribution in accordance with the terms of the RAP upon separation from Platinum.

- Basic benefit rate, temporary benefit rates, interim supplement rates and early retirement supplement amount will be determined on the basis of the earlier of the date of the freeze of the Program or the employee's separation date from Platinum.

- Participants with a continuous length of service dates before January 1, 2001, who separate from Platinum and qualify for a normal, early voluntary or a total and permanent disability retirement under the Program on the basis of combined service will be eligible for Part A benefits.

  - ➢ Part A Basic benefits will be calculated using the SRP credited service accrued through the date of the sale.

  - ➢ Participants with a continuous service date before January 1, 1988, may qualify for a Part A Supplement. An Interim Supplement or a Temporary Benefit will be calculated using the credited service accrued through the date of the sale. If eligible for a Voluntary Retirement with 30 or more years of combined Delphi and Platinum credited service, the Early Retirement Supplement will be payable in full, regardless of the actual years of credited service accrued under the SRP.

- Participants with a continuous length of service dates before January 1, 2001 who separate from Platinum and qualify for a normal, early voluntary or a total and permanent disability retirement under the Program and who were participating in Part B of the Program as of date of sale and whose contributions remain in the Program until their date of separation from Platinum (Note: a withdrawal of Part B contributions while employed with Platinum will be considered an in-service withdrawal) will receive:

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

- Part B Primary benefits based on contributions accrued as of the date of sale.

- Part B Supplementary Benefits based on the average base salary and Part B credited service as of the date of the sale.

- Participants with a continuous length of service dates before January 1, 2001, who transfer to Platinum as part of the sale, and who have 10 or more years of combined credited service are eligible to apply for a Total and Permanent Disability (T&PD) retirement. An application is valid only if it is made prior to the employee separating their employment from Platinum.

- Participants who separate from Platinum and are vested on the basis of combined credited service retain all the payment options in accordance with the applicable Program provisions.

- Survivor benefits are payable if, as of the date of death, the participant is vested on the basis of combined Delphi and Platinum credited service. The pre-retirement automatic survivor provisions will be based on the combined Delphi and Platinum credited service and the age of the participant on the date of death.

## Section 11.    Treatment of Certain Employees

(a)    **Electronic Data Systems (EDS)**

(1) In connection with the transition of certain GM employees to EDS, the provisions of Part A, Article II, Section 3 which otherwise serve to break credited service under such circumstances, will not apply to any such transition employee who has 10 or more years of credited service on the last day worked prior to such transition.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

However, no additional credited service will accrue under this Program for any such transitioning employee.

(2) Each transitioned employee who on the date of transfer to EDS had completed less than 30 years of credited service, or whose years of age and years of credited service totaled less than 85, and who thereafter retires (a) prior to age 62 and one month with 30 or more years of combined service with GM/Delphi and EDS, or (b) between ages 55 and 61 and the total of whose years of age and years of combined service with GM/Delphi and EDS equals or exceeds 85, shall be entitled to receive the following described benefits, while otherwise eligible:

(a)    With respect to any monthly payment falling prior to age 62 and one month, at which time any such benefit will cease to be payable, a monthly Subsidized Early Retirement Benefit, defined as and amount equal to the Part A normal retirement benefit, based upon credited service under this Program as of the earlier of the date of transfer or March 1, 1989, and the basic benefit rate in effect on March 1, 1989, actuarially reduced from age 62, in accordance with Part A, Article I, Section 2(b)(2)(i). Such Subsidized Early Retirement Benefit is reduced by the sum of the following monthly amounts, each of which includes any post retirement increases granted on benefits accrued both prior to and subsequent to March 1, 1989:

(i)    any Part A basic benefit determined without regard to this section,

(ii)    any Part B benefits accrued after March 1, 1989, and

(iii)    any benefit payable under the EDS Retirement Plan attributable to benefit accruals after March 1, 1989.

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(b) Upon attainment of age 62 and one month, a monthly Minimum Guaranteed Benefit amount, determined by multiplying the credited service under this Program as of the earlier of the date of transfer or March 1, 1989 by the Part A basic benefit rate in effect on March 1, 1989, reduced by the sum of the following monthly amounts, each of which includes any post retirement increases granted on benefits accrued both prior to and subsequent to March 1, 1989:

(i) any Part A basic benefit determined without regard to this section,

(ii) any Part B benefits accrued after March 1, 1989,

(iii) any benefit payable under the EDS Retirement Plan attributable to benefit accruals after March 1, 1989, and

(iv) the total of retirement offsets described in subsections 2(a)(i), (ii) and (iii) above for any month prior to age 62 and one month, to the extent such offsets exceed the amount of the Subsidized Early Retirement Benefit.  Any such excess will be expressed as a life annuity commencing at age 62 and one month.

(3) Each transitioned employee who on the date of transfer to EDS had completed less than 30 years of credited service, and who thereafter retires prior to age 62 and one month with 30 years or more of combined service with GM/Delphi and EDS, is entitled to receive, if otherwise eligible, with respect to any monthly payment failing prior to age 62 and one month, at which time any such benefit will cease to be payable, a monthly Incremental Benefit, as defined hereafter.  The Incremental Benefit is $1,400.00, multiplied by the Service Factor, as defined hereafter, and reduced by the sum of the following monthly amounts, subsections, (b) and (c) of which include any post retirement increases: (a) the Subsidized Early Retirement Benefit,

138

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

    (b) the Part B supplementary benefit, and

    (c) the maximum primary Social Security Benefit payable unreduced because of age.

The Service Factor is a fraction, the numerator of which is years of credited service under this Program as of the earlier of the date of transfer to EDS, or March 1, 1989, and the denominator of which is 30.

(4)    In determining the amount of any benefit payable under the EDS Retirement Plan attributable to benefit accruals after March 1, 1989, as may be necessary under subsection 2(a)(iii) and (2)(b)(iii) above, in the event the EDS Retirement Plan fails to provide such benefit entitlement, any such reduction in benefits will be deemed to reduce benefits accrued after March 1, 1989, before reducing the benefits accrued prior to such date.

(5)    Payment under this section, if any, will be made without regard to whether an otherwise eligible transitioned employee retires before, on or after March 1, 1989.

(6)    For purposes of determining any benefits payable under subsections 2(a)(iii), 2(b)(iii), 2(b)(iv) and paragraph 3 of subsection (a), the basis for actuarial equivalence will be the 1984 Unisex Pension Mortality Table and eight percent interest.

(7)    Notwithstanding the provisions of this Program defining Eligibility For Retirement, any separation from EDS prior to attainment of age 55, on or after February 1, 1990, by a transitioning employee with thirty or more years of combined service with GM/Delphi and EDS, will be considered a retirement under this Program, with benefits payable commencing the first of the month following the date of such separation.  Any benefits that may be payable hereunder to such an employee will be based solely upon GM/Delphi credited service, and will be calculated in accordance with all of the applicable provisions of this Program.  For an eligible transitioned

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

employee separated (i) from EDS prior to February 1, 1990, with thirty or more years of combined service with GM/Delphi and EDS, and (ii) prior to age 55, benefits will be payable commencing the first of the month following the date of such separation.  In any such case, the monthly amount of Subsidized Early Retirement Benefit, the Minimum Guaranteed Benefit Amount, and the Incremental Benefit would be based upon benefit rates in effect at the earlier of (i) the date of separation, or (ii) March 1, 1989.

(b)     **Of Any Domestic Subsidiary Within the Corporation Controlled Group**

In connection with the transfer of employees to any domestic subsidiary within the Corporation control group, the provisions of Part A, Article II, Section 3, which otherwise serve to break credited service under such circumstances, will not apply to any such transferring employee.  Moreover, "base salary" as used in this Program includes the monthly base salary paid by the domestic subsidiary within the Corporation control-group.  However, no additional credited service will accrue under this Program for any such transferring employee for any period while an employee of any domestic subsidiary within the Corporation control group.

(c)     **Who transferred from Hughes to GM and Now are Employed by Delphi**

Employees who transferred from Hughes to GM under the GM-Hughes Transfer Procedure prior to May 28, 1999, who subsequently became Delphi employees under the terms of the May 28, 1999 GM spin-off of Delphi will continue to have:

(1)     retirement eligibility and vesting based on combined Delphi and Hughes credited service;

(2)     benefits under Part B, Article I, Section 2(a)(2) will be based on Delphi, GM and Hughes salary history; and

140

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(3)     benefits will be based solely on Delphi credited service.

If an employee is eligible to retire, and if Hughes or a successor company does not provide a retirement benefit based on time worked at Hughes in accordance with the provisions of the GM-Hughes Transfer Procedure (with the exception of a change that affects all participants in the Hughes Non-Bargaining Retirement Plan), the employee's Hughes "benefit accrual service" will be combined with the Delphi credited service and the combined credited service will be used to determine eligibility and all benefits. Any retirement benefit from Hughes or a successor company will be handled in accordance with the provisions of Part A, Article II, Section 6. The amount used to reduce the Delphi retirement benefit will be the immediate retirement benefit payable under the Hughes or successor retirement plan as a single life annuity, regardless of the pay-out option selected. If after the reduction, the Delphi retirement benefit is less than what the benefit would be with only Delphi credited service used in the computation, then the Hughes credited service will not be used in computing the Delphi retirement benefit and there will be no reduction in the Delphi benefit.

(d)     Effective January 1, 2008, credited service at a successor employer in connection with the sale of certain Delphi business units will be recognized for purposes of eligibility and vesting. Such agreements are incorporated herein by reference.

(e)     In connection with the sale dated February 29, 2008 of Delphi's interiors business, eligible transferred employees who, as of the effective date of the sale, have a continuous service date on or before December 31, 1992, will remain active participants in accordance with section (d) above until they separate from service with the successor employer.

## Section 12.  Treatment of Certain Employees

141

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(a)     **Who Participate in the President's Executive Interchange Program**

Notwithstanding any other provision of this Program, an employee who is on an approved special leave of absence in order to participate in the President's Executive Interchange Program (or a program comparable in scope and effect as determined by the Corporation) will be eligible to participate in this Program during the period of such leave of absence. Such employee will be granted credited service under Part A and continuous service under Part B of this Program for the period of such leave and will be eligible to contribute under Part B of this Program on the basis of such employee's base salary rate in effect on the last day of work preceding such absence. For purposes of determining "average monthly base salary", the monthly base salary rate in effect immediately preceding such leave of absence will be used for any month of such leave during the 60 months immediately preceding termination of employment.

(b)     **Who Return to the Service of the Corporation
After Government Service**

Notwithstanding the provisions of the definition of "Continuous Service" in General Provision 1 and the credited service provisions of Article II of Part A, the continuous service or the credited service of an employee who left or leaves the service of the Corporation or one of its subsidiaries without an approved leave of absence to accept employment with the Government of the United States or with the Government of Canada, and who returned or returns to the service of the Corporation or one of its subsidiaries as the first employment following such government employment, will not be broken. In no event, however, will the period during which such employee is absent from service because of such government employment be included in the calculation of the amount of continuous service or credited service.

(c)     **Who are Employed By Foreign Business Entities in Which
the Corporation Has a Substantial Ownership Interest**

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Notwithstanding any other provision of this Program, an employee who at the request of the Corporation accepts an assignment with a foreign business entity in which the Corporation has an ownership interest equal to or greater than 80% will be eligible to participate in this Program during the period of such assignment.  The employee will be granted credited service under Part A and continuous service under Part B of this Program for the period of such assignment and will be eligible to contribute under Part B of this Program for the period of such assignment and will be eligible to contribute under Part B of this Program on the basis of the employee's base salary rate that would otherwise be in effect in the absence of such assignment.  Such salary also will be used for purposes of determining "average monthly base salary" for any month of such assignment during the 60 months immediately preceding termination of employment.

## Section 14.  Named Fiduciary

Except as set forth below, the Executive Committee of the Corporation's Board of Directors is the Named Fiduciary with respect to this Program.  The Executive Committee may delegate authority to carry out such of its responsibilities as it deems appropriate in order to carry out the proper and effective administration of this Program to the extent permitted by ERISA.

General Motors Investment Management Corporation (GMIMCo) is the Named Fiduciary of this Program for purposes of investment of Program assets.  The Named Fiduciary for purposes of investment of Program assets is authorized to:

(a)     designate persons other than Named Fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the Program;

(b)     establish or amend the terms of one or more trusts for the purpose of investing Program assets;

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(c)     designate, appoint, and remove the trustees of the trusts created with respect to the Program provided that the Named Fiduciary for purposes of investment of Program assets does not have the authority to establish trusts or appoint and terminate trustees with respect to trusts, the sole purpose of which is the administration of payment of plan benefits;

(d)     appoint an investment manager or mangers to manage any assets of the Program

(e)     make direct investments of any assets of the Program; and

(f)     take such other actions as may be necessary to carry out its duties as Named Fiduciary for purposes of investment.

The Named Fiduciary may delegate authority to carry out such of its responsibilities as it deems proper to the extent permitted by ERISA

The Investment Policy Committee of the Corporation (IPC) may, acting as employer on behalf of the Corporation, remove the existing Named Fiduciary for purposes of investment of Program assets and appoint any person or entity, including the IPC, as the Named Fiduciary for the purpose of investment of Program assets.

## Section 15.  Plan Administrator and Review Procedure

(a)     The Corporation is the Plan Administrator and has full authority to construe, interpret, make factual determinations regarding the Program, and administer the Program.

(b)     A claim for benefits under the Program must be presented in writing to the Plan Administrator.  The Plan Administrator will provide adequate notice to the person making the claim ("Claimant") in

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

writing granting or denying the claim no later than 90 days, 45 days in the case of a claim for total and permanent disability benefits, after the date on which the claim is made. If special circumstances require a longer period, the Claimant will be notified in writing, prior to the expiration of the 90-day period, 45 days in the case of a claim for total and permanent disability benefits, of the reasons for an extension of time; provided, however, that no extensions will be permitted beyond 90 days, 60 days in the case of a claim for total and permanent disability benefits, after expiration of the initial 90-day period, 45 days in the case of a claim for total and permanent disability benefits.

(c)     If the claim is granted, the appropriate modification will be made.

(d)     If the claim is denied in whole or in part, the Plan Administrator will provide the Claimant with a dated and signed written notice of such denial signed by the Plan Administrator. The notice will set forth, in a manner calculated to be understood by the Claimant:

(i)     the specific reason or reasons for the denial;

(ii)    specific reference to pertinent Program provisions on which the denial is based;

(iii)   a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)    an explanation of the review procedure set forth below and a statement of Claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review; and

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(v)    in the case of a claim for total and permanent disability benefits, the specific rule, guideline, protocol, or other similar criterion relied upon, if any, in making the adverse benefit determination or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse benefit determination and that a copy of such rule, guideline, protocol, or other similar criterion will be provided free of charge to the Claimant upon request.

(e)    If no written determination is furnished to the Claimant within the 90 day period, 45 days in the case of a claim for total and permanent disability benefits, then the claim will be deemed denied and the review procedure described below will become available to the Claimant.

(f)    A Claimant may obtain review of an adverse benefit determination by filing a written notice of appeal with the Employee Benefit Plans Committee ("EBPC") within 60 days after the account determination date, 180 days in the case of a claim for total and permanent disability benefits, or, if later, within 60 days, 180 days in the case of a claim for total and permanent disability benefits, after the receipt of a written notice denying the claim.  The Corporation's Board of Directors has delegated to the EBPC the authority necessary to construe, interpret, and administer the Program, including the authority to consider and decide all questions (of fact or otherwise) in connection with claims arising under the Program. The EBPC will conduct a full and fair review, which will provide for the Claimant's rights to:

(i)    be represented by an individual whom the Corporation determines has been properly authorized to act on Claimant's behalf;

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

        (ii)     present written comments, documents, records, and any other information relating to the Claimant's claim for benefits under the Plan;

        (iii)    receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits; and

        (iv)    have all comments, documents, records, and other information submitted by the Claimant relating to the claim reviewed.

(g)     The EBPC's decision will be rendered no more than 60 days, 45 days in the case of a claim for total and permanent disability benefits, after the request for review, except that such period may be extended for an additional 60 days, 45 days in the case of a claim for total and permanent disability benefits, if the EBPC determines that special circumstances require such extension.

(h)     If the claim is granted, the appropriate modification will be made.

(i)     If the claim is denied in whole or in part, the EBPC, or its delegate, will promptly provide a Claimant with a written decision in a manner calculated to be understood by the Claimant setting forth:

        (i)     the findings of fact;

        (ii)    the specific reason or reasons for the denial;

        (iii)   specific reference to pertinent Program provisions on which the denial is based;

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

(iv) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits;

(v) a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA; and,

(vi) in the case of a claim for total and permanent disability benefits the specific rule, guideline, protocol, or other similar criterion relied upon, if any, in making the adverse benefit determination or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse benefit determination and that a copy of such rule, guideline, protocol, or other similar criterion will be provided free of charge to the Claimant upon request.

(j) A Claimant must follow the claims and review procedures described in this Section 15 before taking action in any other forum regarding a claim for benefits under the Program.  Any suit or legal action initiated by a Claimant under the Program must be brought no later than one year following a final decision on the claim by the EBPC. This one-year limitation period on suits for benefits applies in any forum where a Claimant initiates such suit or legal action.

**Section 16. Certain Provisions Required to Comply With Section 415 of the Internal Revenue Code**

(a) Notwithstanding any provision of the Program to the contrary, the total annual benefit payable to any employee under this Program and all other qualified defined benefit plans maintained by the Corporation shall not exceed the limitations on benefits payable under Section 415 of the

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Internal Revenue Code.  The limitations and other provisions of Section 415 of the Code with respect to benefits and annual additions, including any permissible grandfather and transition rules under the Code and Treasury regulations, hereby are incorporated by reference.

(b)     For purposes of this section, the term "Limitation Year" means the calendar year.

(c)     For purposes of this section, all defined benefit plans or programs of the Corporation will be treated as one defined benefit plan or program and all defined contributions plans. If the benefits under this Program are aggregated with benefits under another defined benefit plan for purposes of Section 415 of the Code, any reductions required by section 415 will be made first with respect to the plan in which the employee most recently accrued benefits.

(d)     For purposes of this section, the term "Compensation" means an employee's compensation as evidenced by the Internal Revenue Service Form W-2, or its equivalent, plus amounts not currently includable in income by reason of Sections 125, 132(f)(4) or 402(e)(3) of the Code; subject to the limitation imposed by Section 401(a)(17) of the Code.

(e)     An employee's annual benefit accrued under the Program (excluding any benefits attributable to employee contributions) during any Limitation Year will not exceed the lesser of the defined benefit dollar limitation in effect for such Limitation Year (as adjusted under Section 415(d) for cost of living increases) or the defined benefit Compensation limitation set forth in Section 415(b)(1)(B) of the Code, both adjusted where required in accordance with Section 415 and Treasury regulations thereunder.  In the case of an employee who had credited service prior to October 3, 1973, the limitation described in the preceding sentence will not be less than the employee's benefit (excluding any benefit attributable to

149

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

employee contributions) based on the terms of the Program as in effect on October 2, 1973 and based on the continuation of such employee's Compensation at the rate in effect on October 2, 1973. The limitation applicable to an employee who broke credited service before October 3, 1973 will be the deferred retirement benefit payable to the employee determined as of the date credited service was broken.  In the case of an employee who was a participant in this Program prior to January 1, 1983 or January 1, 1987, the limitation will not be less than the employee's accrued benefit as of December 31, 1983 or December 31, 1987 respectively, under the terms and conditions of this Program as in effect on such date.

## Section 17.   Certain Provisions Required to Comply With Section 416 of the Internal Revenue Code

In any Plan Year in which the Program is a "Top-Heavy Plan", as defined in Section 416 of the Code, the requirements of this section are applicable and must be satisfied.

(a)      **Definitions**

(1)      "Cumulative Account" means the sum of an employee's accounts under a defined contribution plan (for an unaggregated plan), or under all defined contribution plans included in an aggregation group (for aggregated plans), determined as of the most recent plan valuation date within a 12-month period ending on the Determination Date, increased by any contributions due after such valuation date and before the Determination Date.

(2)      "Cumulative Accrued Benefit" means the sum of benefits under a defined benefit plan (for an unaggregated plan) determined under the actuarial assumptions set forth in such plan, or the sum of benefits under all defined benefit plans included in an aggregation

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

group (for aggregated plans) determined under the same actuarial assumptions, calculated as of the most recent plan valuation date within a 12-month period ending on the Determination Date as if the employee voluntarily terminated service as of such valuation date.

(3)     "Determination Date" means the last day of the preceding Plan Year.

(4)     "Valuation Date" means the last day of a Plan Year as of which date participants' accounts will be valued at fair market value and as of which date the present value of accrued benefits will be valued.

(5)     "Key Employee" means any employee described in Section 416(i)(1) of the Code.

(6)     "Top-Heavy Plan" means for any plan year beginning after 1983, this Program is top-heavy if any of the following conditions exist:

(a)     if the top-heavy ratio for this Program exceeds 60%and this Program is not part of any required aggregation group or permissive aggregation group of plans;

(b)     if this Program is a part of a required aggregation group of plans (but which is not part of a permissive aggregation group) and the top-heavy ratio for the group of plans exceeds 60%; or

(c)     if this Program is a part of a required aggregation group of plans and part of a permissive aggregation group and the top-heavy ratio for the permissive aggregation group exceeds 60%.

151

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(7)     **Top-Heavy Ratio**

(a)     If the Corporation maintains one or more defined benefit plans and the Corporation maintains one or more defined contribution plans which during the 12-month period ending on the Determination Date(s) has any account balances, the top-heavy ratio for any required or permissive aggregation group, as appropriate, is a fraction, the numerator of which is the sum of the present value of accrued benefits determined in accordance with (b) below, and the sum of account balances under the aggregated defined contribution plan or plans for all key employees as of the Determination Date(s), and the denominator of which is the sum of the present values of accrued benefits under the aggregated defined benefit plan or plans, determined in accordance with (b) below, for all participants and the sum of the account balances under the aggregated defined contribution plan or plans for all participants as of the Determination Date(s), all determined in accordance with Section 416 of the Code . The account balances under a defined contribution plan in both the numerator and denominator of the top-heavy ratio are adjusted to include any distribution of an account balance made in the 12-month period ending on the Determination Date.

(b)     For purposes of (a) above, the value of account balances and the present value of accrued benefits will be determined as of the most recent valuation date that falls within or ends with the 12-month period ending on the Determination Date. The account balances and accrued benefits of a participant

(i)     who is not a Key Employee but who was a Key Employee in a prior year, or

152

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

(ii) who has not received any compensation from any employer maintaining the plan at any time during the 12-month period ending on the Determination Date will be disregarded. The calculations of the top-heavy ratio, and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Section 416 of the Code. Deductible employee contributions will not be taken into account for purposes of computing the top-heavy ratio. When aggregating plans, the value of account balances and accrued benefits will be calculated with reference to the Determination Dates that fall within the same calendar year.

The accrued benefit of a participant other than a Key Employee will be determined under (aa) the method, if any, that uniformly applies for accrual purposes under all defined benefit plans maintained by the employer, or (bb) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Section 411(b)(1)(C) of the Code.

(8) "Permissive Aggregation Group" means the required aggregation group of plans plus any other plan or plans of the Corporation which, when considered as a group with the required aggregation group, would continue to satisfy the requirements of Sections 401(a)(4) and 410 of the Code.

(9) "Required Aggregation Group" means: (i) each qualified plan of the Corporation in which at least one key employee participates or participated any time during the determination period and (ii) any other qualified plan of the Corporation which enables a plan

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

> described in (i) to meet the requirements of Sections 401(a)(4) or
> 410 of the Code.

(b)     **Minimum Accrued Benefit**

(1)     Notwithstanding any other provision in this Program except (3) and
(4) below, for any Plan Year in which this Program is top-heavy,
each participant who is not a Key Employee and has completed
1,000 hours of service will accrue a benefit (to be provided solely
by employer contributions and expressed as a life annuity
commencing at Normal Retirement Age) of not less than 2% of the
highest average Compensation for the five consecutive years for
which the participant had the highest Compensation.  The minimum
accrual is determined without regard to any Social Security
contribution.  The minimum accrual applies even though under
other Program provisions the participant would not otherwise be
entitled to receive an accrual, or would have received a lesser
accrual for the year because (i) the non-Key Employee fails to
make contributions under Part B of the Program, (ii) the non-Key
Employee's Compensation is less than a stated amount, (iii) the
non-Key Employee is not employed on the last day of the accrual
computation period, or (iv) the Program is integrated with Social
Security.

(2)     For purposes of computing the minimum accrued benefit,
Compensation will include all Compensation, as that term is defined
for Section 415 of the Code and limited by Section 401(a)(17) of the
Code.

(3)     No additional benefit accruals will be provided pursuant to (1)
above to the extent that the total accruals on behalf of the
participant attributable to employer contributions will provide a
benefit expressed as a life annuity commencing at Normal

# DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

Retirement Age that equals or exceeds 20% of the participant's highest average Compensation for the five consecutive years for which the participant had the highest Compensation.

(4)     All accruals of an employer derived benefit, whether or not attributable to years for which the Program is top-heavy, may be used in computing whether the minimum accruals requirements of paragraph (3) above are satisfied.

(c)     **Maximum Compensation**

Annual Compensation of any employee will not be taken into account under the Program in excess of $200,000 or as adjusted under Section 401(a)(17) of the Code.

(d)     **Minimum Vesting**

(1)     For any plan year in which this Program is top-heavy, the following minimum vesting schedule will automatically apply:

(a)     20% vesting after 2 years of service;

(b)     40% vesting after 3 years of service;

(c)     60% vesting after 4 years of service;

(d)     80% vesting after 5 years of service; and

(e)     100% vesting after 6 years of service.

The minimum vesting schedule applies to all accrued benefits within the meaning of Section 411(a)(7) of the Code except those attributable to employee contributions.  Further, no reduction in

155

## DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES

vested benefits may occur in the event the Program's status as top-heavy changes for any plan year. However, this section does not apply to the accrued benefits of any employee who does not have an hour of service after the Program has initially become top-heavy and such employee's accrued account balance attributable to employer contributions and forfeitures will be determined without regard to this section.

(2)     The minimum accrued benefit required (to the extent required to be nonforfeitable under Section 416(b) of the Code) may not be forfeited under Sections 411(a)(3)(B) or 411(a)(3)(D) of the Code.

(e)     **Distributions for Certain Key Employees**

Notwithstanding any other provision of this Program, if a Key Employee is a 5% owner (as defined in Section 416 of the Code) in the plan year in which the employee attains age 70-1/2, benefit distributions will commence no later than April 1 of the following plan year (whether or not the employee has retired).

(f)     **Determination of Super Top Heaviness**

The Program will be super top-heavy if it would be a top-heavy plan under the provisions of (a)(6), but substituting "90%" for "60%" in such provisions.

(g)     **Adjustments in Section 415 Limits**

For any plan year in which the Program is top-heavy, for purposes of the limitations on contributions and benefits under Section 415 of the Code in effect before January 1, 2002, the dollar limitations in the defined benefit plan fraction and the defined contribution plan fraction will be multiplied by 1.0 rather than 1.25.

156

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**

(h)    **Account Balances and Accrued Benefits**

Account balances and accrued benefits will be calculated to include all amounts attributable to both Corporation and employee contributions.

## Section 18.    Funding-Based Limits on Benefits and Benefit Accruals

Notwithstanding any provision of the Program to the contrary, effective October 1, 2008, the Program shall comply with the limits set forth in Section 436 of the Code and final regulations thereunder.

**DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES**


# APPENDIX A


For the sole purpose of Part A, Article II, Section 11 of this Program, the following salaried positions are designated asbestos jobs in each listed plant location under the conditions specifically set forth herein.  No other salaried position is designated as an asbestos job.

>As of April 1, 1991, no Delphi unit or salaried position is involved in the blending and processing of raw asbestos.

>Prior to April 1, 1991, the plant records at the Delphi E/C Wisconsin-Needmore plant will determine the positions that are subject to the provisions of Part A, Article II, Section 11.

**Miscellaneous:**

05-44481-rdd Delphi Corporation

**U.S. Bankruptcy Court**

**Southern District of New York**

Notice of Electronic Filing

The following transaction was received from Joseph Thomas Moldovan entered on 7/17/2009 at 4:32 PM and filed on 7/17/2009

| | |
|---|---|
| **Case Name:** | Delphi Corporation |
| **Case Number:** | 05-44481-rdd |
| **Document Number:** | 18393 |

**Docket Text:**
Letter *to Honorable Robert D. Drain dated July 17, 2009* (related document(s)[18277]) filed by Joseph Thomas Moldovan on behalf of Dennis Black, Charles Cunningham, and Delphi Salaried Retiree Association. (Attachments: # (1) Complaint)(Moldovan, Joseph)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Documents and Settings\mwiatrak\My Documents\ltr to judge drain 7-17-09.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=7/17/2009] [FileNumber=7855339-0]
[95d5ae985f2c1597b9083dc9c91ddbb3bd0d2ec7215f920fef691c5c54f94072a5ea8
6c450a80b8418d6dafe78998453543a9c7a0240e0f40d567f1fcb6715a9]]
**Document description:** Complaint
**Original filename:**C:\Documents and Settings\mwiatrak\My Documents\Complaint for Equitable Relief.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=7/17/2009] [FileNumber=7855339-1]
[29d50a48356 1e30df763bdd2bc892b1636d3aad06c144924956005f21079e5bc98a72
bd5e03d0222d781bd4cfb8878b33aa5f671ac262627bcc3116b92a06258]]

**05-44481-rdd Notice will be electronically mailed to:**

David B. Aaronson on behalf of Attorney Drinker Biddle & Reath LLP
david.aaronson@dbr.com

Anne Marie Aaronson on behalf of Attorney Pepper Hamilton LLP
aaronsoa@pepperlaw.com

Elizabeth Abdelmasieh on behalf of Creditor Riverside Claims LLC
elizabeth@regencap.com

Marc Abrams on behalf of Attorney Counsel for Certain Tranche C DIP Lenders
maosbny@willkie.com, mabrams@willkie.com

Franklin C. Adams on behalf of Unknown Solid State Stamping
franklin.adams@bbklaw.com

Jennifer L. Adamy on behalf of Attorney Shipman & Goodwin LLP
bankruptcy@goodwin.com

David J. Adler on behalf of Creditor Energy Conversion System
dadler@mccarter.com

Michael J. Alerding on behalf of Creditor M.G. Corporation
malerding@binghammchale.com

Joseph W. Allen on behalf of Spec. Counsel Jaeckle Fleischmann & Mugel,LLP
jallen@jaeckle.com

Christopher A. Andreoff on behalf of Creditor Laura Marion
candreoff@jaffelaw.com, ckelley@jaffelaw.com

Philip D. Anker on behalf of Unknown Wilmer Cutler Pickering Hale and Dorr LLP
philip.anker@wilmerhale.com

Joel D. Applebaum on behalf of Creditor 1st Choice Heating & Cooling, Inc.
japplebaum@clarkhill.com

Bruce D. Atherton on behalf of Unknown Direct Sourcing Solutions, Inc.
batherton@bathertonlaw.com

Allison R. Bach on behalf of Financial Advisor W.Y. Campbell & Company
abach@dickinsonwright.com

Stephen M. Bales on behalf of Interested Party Tremco Incorporated
sbales@zieglermetzger.com

C. David Bargamian on behalf of Creditor RBS Asset Finance, Inc.