Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DENNIS BLACK, *et al.*, ) | Case No.: 2:09-cv-12810 |
| Plaintiff, ) | Hon. Sean F Cox |
| ) | Magistrate Judge Michael Hluchaniuk |
| v. ) | |
| ) | **Emergency Relief Requested** |
| CRAIG G. NAYLOR, *et al.*, ) | **by 10 A.M. on Thursday,** |
| ) | **July 23, 2009** |
| Defendant. ) | |

### MOTION FOR A TEMPORARY RESTRAINING ORDER AND
### PRELIMINARY INJUNCTION

Plaintiffs respectfully move for a temporary restraining order and preliminary injunction

preventing Defendants from negotiating, signing, or further effectuating any agreement with the

Pension Benefit Guaranty Corporation ("PBGC") to summarily terminate their pension plan

under the Employee Retirement Income Security Act ("ERISA") § 4042(c)(1), 29 U.S.C.

§ 1342(c)(1). The motion is based on the accompanying brief, the declaration of Charles

Cunningham and the other exhibits to the brief, and any evidence presented at a hearing

scheduled by the Court. Plaintiffs also are simultaneously moving for an expedited hearing on

their request, as there is a considerable likelihood that Defendants will seek to complete any

summary termination agreement before 10:00 a.m. on Thursday, July 23, 2009, when their

employer, Delphi Corporation ("Delphi"), has suggested it will place a completed agreement

before the bankruptcy court overseeing Delphi's bankruptcy proceedings in the Southern District

of New York.

The temporary restraining order and preliminary injunction would merely maintain the

status quo while the Court can determine the merits of the Complaint. The Complaint contends

977302.1

that the pension plan's fiduciaries labor under a conflict of interest that prevents them from carrying out their obligations concerning any plan termination. Since they have not removed themselves despite their conflict of interest, the Complaint requests that the Court remove the fiduciaries. If the Court does not enter the temporary restraining order halting the fiduciaries from negotiating and completing an agreement with the PBGC summarily to terminate the plan or to prohibit the effectuation of any agreement already memorialized, then Plaintiffs will suffer the irreparable harm of losing their right to challenge any termination, given that ERISA authorizes a plan fiduciary, who is presumed to act *solely in the best interests of plan participants*, to agree to a summary plan termination.

Counsel for Plaintiffs has spoken with the General Counsel for Delphi, David Sherbin, and notified Mr. Sherbin of this motion. Although Mr. Sherbin did not consent to the relief requested herein, Mr. Sherbin confirmed that he has the authority to, and will, accept service of this motion on behalf of the Defendants.

Respectfully submitted,

Dated: July 21, 2009

JACOB & WEINGARTEN, P.C.

/s/ Howard S. Sher
Howard S. Sher (P38337)
Alan J. Schwartz (P38144)
777 Somerset Place
2301 Big Beaver Road
Troy, Michigan 48084
Telephone: 248-649-1900
Facsimile: 248-649-2920
E-mail: alan@jacobweingarten.com

-and-

Anthony F. Shelley
Timothy P. O'Toole
MILLER & CHEVALIER CHARTERED
655 15th Street, NW

977302.1

Suite 900
Washington, DC  20005
Telephone:  202-626-5800
Facsimile:  202-626-5801
E-mail:  ashelley@milchev.com
        totoole@milchev.com

*Attorneys for Plaintiffs*

977302.1

## <u>INDEX OF EXHIBITS</u>

A.    Declaration of Charles Cunningham

B.    Delphi September 12, 2008 Press Release

C.    Excerpts from Delphi's June 1, 2009 Supplement to Motion for Order Approving
      Modifications to Debtors' First Amended Plan of Reorganization (as Modified)
      and Related Disclosures and Voting Procedures

D.    Delphi June 1, 2009 Press Release

E.    Statement of Pension Benefit Guaranty Corporation in Response to First
      Amended Joint Plan of Delphi Corporation and Certain Affiliates, Debtors and
      Debtor-Possession

F.    Opinion in *Bromley v. Bromley*, Case No. 05-71798, 2006 U.S. Dist. LEXIS
      72398 ( E.D. Mich. Oct. 4, 2006)

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DENNIS BLACK, CHARLES CUNNINGHAM, and THE DELPHI SALARIED RETIREE ASSOCIATION, EX REL. THE DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES,<br><br>   Plaintiffs,<br><br>  v.<br><br>CRAIG G. NAYLOR, DAVID N. FARR, MARTIN E. WELCH, and JAMES P. WHITSON, IN THEIR PERSONAL CAPACITIES AND AS NAMED FIDUCIARIES OF THE DELPHI RETIREMENT PROGRAM FOR SALARIED EMPLOYEES,<br><br>   Defendants. | Case No. : 2:09-cv-12810 |

## DECLARATION OF CHARLES CUNNINGHAM

Pursuant to 28 U.S.C. § 1746, I, Charles Cunningham, declare under penalty of perjury as follows:

1. My name is Charles Cunningham. I am over eighteen years old, and I am competent to make this declaration. Unless otherwise stated herein, the facts set forth below are based on my personal knowledge.

2. I am a former salaried employee of General Motors Corporation ("GM") and Delphi Corporation ("Delphi"). Delphi, a global manufacturer of automobile components, was originally an operating unit of General Motors Corporation ("GM").

3.    GM was the original sponsor of the Plan.  Delphi became independent from

GM in 1999. At that time, it assumed responsibility for maintaining the pension plans for

all Delphi employees.

4.    I began working for GM in January, 1972.  I spent the majority of my

career with GM, much of it as a senior executive for Delphi Packard Electric in Warren,

Ohio.  After its spin-off from GM in 1999, I became an employee of Delphi.  I retired

from Delphi on June 1, 2002.  As a result of my salaried employment with GM and

Delphi, I am a participant in the Delphi Retirement Program for Salaried Employees ("the

Salaried Pension Plan" or "the Plan").  As the name implies, the Salaried Pension Plan

covers all of the salaried employees of Delphi (as opposed to the hourly workers, who are

covered by a separate plan).  My benefits under the Plan take into account my thirty years

of service to both GM and Delphi.

5.    I am a member of the Delphi Salaried Retiree Association ("the

Association"), an association of individuals entitled to pension benefits under the Salaried

Pension Plan, either as participants in the Plan or as dependents of participants.  I have

been involved with the Association since approximately March 1, 2009, when it was

founded.   One of the goals of the Association is to provide members with an

organization dedicated to looking out for the best interests of the participants of the

Salaried Pension Plan.  Through my involvement with the Association, I am familiar with

concerns of many similarly-situated participants and beneficiaries of the Plan.

6.    I have reviewed the Salaried Pension Plan, which states that the Plan's

"named fiduciaries" are the members of the executive committee of Delphi's board of

directors ("the Executive Committee").  I have reviewed Delphi's website, which states

that the Executive Committee is made up of the Lead Independent Director, and the

chairpersons of the "standing committees."  I have identified those people, again by

reference to Delphi's website, as Craig G. Naylor, David N. Farr, and Martin E. Welch.

      7.      Delphi filed for Chapter 11 bankruptcy in October of 2005.

Because Delphi is financially responsible for funding the Plan's pension benefits, many

members of the Association, including myself, are keenly interested in learning all we

can about the financial health of Delphi, especially as pertains to its commitments to the

Plan.

      8.      I have never received any communications (whether by mail, e-mail,

phone call, or any other form of communication), directly from Mr. Naylor, Mr. Farr or

Mr. Welch, in their role as fiduciaries of the Plan, nor, to my knowledge, has any other

member of the Association.   We have also not received any communications on their

behalf or from the Plan Administrator at all with respect to developments about our Plan.

As such, we have had to rely on court filings and press releases for updates, and have

followed Delphi's bankruptcy proceedings as closely as we can, although we are not

trained in the law.

      9.      In its original plan for reorganization, Delphi stated its intention to

continue fulfilling its funding obligations to the Plan.  In its subsequent court filings and

press releases, Delphi reiterated its intention to maintain the Plan, with the most recent

example coming in September 2008, when Delphi again issued a press release which

stated its intention to keep funding the Plan.

10.     Nonetheless, as I understand it, Delphi's pension obligations have been an obstacle to its ability to emerge from bankruptcy because of the Plan's underfunding.  It is my belief that the Plan is a potential creditor with claims against Delphi, and that the Executive Committee has partly recognized the conflict this creates between their obligations to Delphi and its shareholders on the one hand, and their obligations to the participants as fiduciaries on the other.  Thus, the Executive Committee has partially stepped aside in favor of the appointment of a conflict-free Plan fiduciary, but only for the limited purpose of filing claims against Delphi in the bankruptcy.  As I understand it, however, the Executive Committee did not delegate to the independent fiduciary the Plan Administrator's obligations concerning any Plan termination proceedings or the method of any Plan termination.

11.   On June 1, 2009, Delphi filed a document in its bankruptcy case announcing that the Plan shall be terminated. More specifically, according to the bankruptcy filing, Delphi expects to enter into an agreement with the Pension Benefit Guaranty Corporation ("PBGC"), whereby the PBGC will initiate involuntary termination proceedings, taking over responsibility for the Plan.  I, and the other members of the Association, accordingly believe that Delphi is currently in negotiations with the Pension Benefit Guaranty Corporation ("the PBGC"), the purpose of which is to have the PBGC invoke its powers under ERISA to seek the termination of the Salaried Pension Plan.

12.     The financial consequences of termination of the Plan to the Association's members will likely be severe.  The Association has undertaken an analysis of the impact

to its members should the PBGC assume responsibility for the Plan which concluded that the members stand to lose between 30% -70% of their current pension benefits.

13.     The ability of the Association's members to fully evaluate whether the proposed termination is in our best interests is severely hampered by the failure of the Salaried Pension Plan's fiduciaries to disclose the details of their negotiations regarding the Plan's termination, or the material considerations driving it.  We have no confidence that that the termination of the Salaried Pension Plan is either necessary or in the best interests of the participants, and we also have no confidence that the Executive Committee is acting to protect our best interests.

14.  After Delphi's June filing, a Delphi executive informed me that Delphi's change in position toward the Salaried Pension Plan was driven in large part by pressure from U.S. Treasury Department, as was the decision to protect the pensions of Delphi's unionized workforce by transferring responsibility for the hourly workers plan back to GM but to keep the Salaried Plan with Delphi.  Because we have no reason to believe that termination is in our best interests, and because we have no one in the current Delphi-PBGC negotiations who is loyal only to our interests, I, along with the other members of the Association, intend to vigorously contest any attempted termination of the Salaried Pension Plan in a United States District Court of competent jurisdiction.   There are currently over 15,000 participants in the Salaried Pension Plan who could be affected by a decision to terminate the Plan and who might want to challenge any termination proceedings.

15.     It is my understanding that if the PBGC and the Plan Administrator of the Salaried Pension Plan agree that the Plan should be terminated, neither I, nor any other participant, may not have any opportunity to challenge the propriety of the Plan's termination in a court proceeding.  Without the chance to challenge the Plan's termination in a court proceeding, I and the other participants would suffer an irreparable harm, as the Plan will be terminated without any consideration of whether doing so is in our best interests, either by our nominal fiduciary or by the Court in an adversarial proceeding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _18th_ day of July, 2009, in _WARREN_, Ohio.

_____
Charles Cunningham

# EXHIBIT B

05-44481-rdd   Doc 18570-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:09-cv-12811-SFC-MJH   Document 3-5   Filed 07/17/2009   Page 2 of 4
Pt 1 A of 87   Page 1 of 3
Press Release: Delphi and General Motors Enter Into Modified Settlement and Restructur...   Page 1 of 3

# News

## Press Releases

**Delphi and General Motors Enter Into Modified Settlement and Restructuring Agreements; GM to Provide Additional Support for Delphi's Emergence from CH. 11; Substantial Portion of Hourly Pension To Transfer to GM**

**Substantial Progress In Restructuring And Transformation;**
**Court Filings Summarize Reaffirmed 2008-2011 Business Plan;**
**Motion Filed In Support Of Plan to Preserve and Fund Hourly and Salaried Pension Programs;**
**September 23, 2008 Hearing Scheduled to Approve Motions on Pension Plans, GSA and MRA;**
**Actions to Provide Additional Liquidity; Company Stronger and Eager to Emerge**

**Release Date: September 12, 2008**

TROY, Mich. -- Delphi Corp. (PINKSHEETS: DPHIQ) today announced it is taking steps it believes are necessary to complete the successful restructuring of its U.S. operations, transformation of the company on a global basis, and emergence from chapter 11 as soon as practicable. These steps include:

- Reaching agreement with GM on amended settlement and restructuring agreements. Per the agreements, Delphi will receive support from GM that Delphi estimates to be valued at approximately $10.6 billion for its transformation (increased from approximately $6.0 billion in the January 2008 settlement). The agreement will modify the mechanics and expand the amount of Delphi's net hourly pension liability transfer to GM pursuant to section 414(l) of the Internal Revenue Code from $1.5 billion under the original GSA to approximately $3.4 billion;
- Taking action to preserve and fund Delphi's hourly and salaried pension plans;
- Completing the reaffirmation process for the company's 2008-2011 business plan in the Revised Plan of Reorganization (RPOR), a summary of which is included in filings with the U.S. Bankruptcy Court for the Southern District of New York;
- Reporting on material additional progress with respect to Delphi's transformation plan announced in March 2006; and
- Establishing its intent to enter the capital markets with its reaffirmed business plan, and to file in the Bankruptcy Court proposed modifications to its previously confirmed First Amended Joint Plan of Reorganization (POR).

The company will file several expedited motions today with the Bankruptcy Court that will be considered by the Court on September 23, 2008, including:

- A motion to implement an amended and restated Global Settlement Agreement (Amended GSA) and Master Restructuring Agreement (Amended MRA) with GM. The original GSA and MRA were previously approved by the Bankruptcy Court on Jan. 25, 2008. The terms of the proposed amendments would authorize the GSA and MRA to become effective independent of and in advance of the effective date of the company's POR. The filing states that the Amended GSA and Amended MRA reflect GM's continuing and immediate support for Delphi's reorganization efforts -- including the transfer of certain hourly pension obligations - and will enable Delphi to take the next steps in its transformation, including the actions that should allow it to emerge from chapter 11 as soon as practicable.
- A motion to freeze its hourly and salaried defined benefit pension plans and provide, as applicable, replacement cash balance or defined contribution pension benefits, a salaried retirement and equalization savings program, and a supplemental executive retirement plan.

**Considerations in the Amended GSA and Amended MRA**

Implementation of the Amended GSA and Amended MRA at this time is necessary to preserve the substantial progress the Company has made, and to position Delphi to emerge from chapter 11 as soon as practicable. Unlike the original GSA and MRA, in which GM required that its performance under those agreements be tied to Delphi's emergence from chapter 11, the Amended GSA and Amended MRA accelerate substantially all of GM's obligations in the original agreements (estimated by Delphi to be approximately $6.0 billion in value to Delphi's transformation), which will be implemented immediately upon the effective date of the Amended GSA and Amended MRA.

In addition, a substantial portion of GM's incremental net support (estimated by Delphi to be approximately $4.6 billion in value to Delphi's transformation) also will become immediately and unconditionally effective. In exchange for GM's willingness to undertake these obligations, Delphi has agreed to treatment of GM's claims in the chapter 11 cases, and to release GM from certain claims and causes of action upon the effectiveness of the Amended GSA and the Amended MRA.

Under the Amended GSA, GM would assume responsibility for the pensions of certain of Delphi's hourly retirement plan participants. The liabilities would be transferred in two steps, pursuant to section 414(l) of the Internal Revenue Code, and would be increased from $1.5 billion to approximately $3.4 billion. The liability transfers are subject to GM and Delphi receiving consent from a sufficient number of unions to complete the first step of the transfer. Through the implementation of the Amended GSA and Amended MRA, GM's financial support of Delphi - which previously was to be received upon Delphi's emergence from chapter 11 - is being pulled forward to the effectiveness of the amendments. As a result, GM will make payments to Delphi of approximately $1.2 billion in connection with the effectiveness of the Amended GSA and Amended MRA, and through the remainder of 2008. The payments by GM combined with the Company's existing cash on hand - which totaled in excess of $1 billion at June 30, 2008, and amounts available under the Company's DIP revolving credit facility, provide ample liquidity over the course of 2008.

By immediately implementing the Amended MRA, Delphi will be in a position to pursue exit financing in the capital markets, including through an equity-based rights offering, to support what it believes to be a viable, reaffirmed emergence business plan that incorporates current market conditions and increased GM support.

Delphi's Chief Restructuring Officer John Sheehan said that it is in the best interests of the company to seek approval to implement the Amended GSA and Amended MRA independent of and in advance of the effectiveness of the POR. He said the company has been advised by the Creditors' Committee that it may no longer support a settlement with GM and related transactions, if these

05-44481-rdd   Doc 18570-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:09-cv-12803-SFC-MJH   Document 3   Filed 07/07/2009   Page 3 of 14
Pg 15 of 87
Press Release: Delphi and General Motors Enter Into Modified Settlement and Restructur...   Page 2 of 3

transactions are approved in advance of the filing and approval of potential modifications to Delphi's POR which are acceptable to the committee. Absent consensual resolution of the Creditors' Committee concerns, the Committee may file objections to one or more of the motions and seek other relief from the Bankruptcy Court. Sheehan said Delphi will continue working toward a consensus among its principal stakeholders, including the committees, but that the likelihood of achieving consensus is speculative and not assured.

**Pension Plan Modifications**
The motion to modify the pension plans would authorize a freeze of the Delphi hourly pension plan following union consent and a freeze of the U.S. salaried plans. If approved by the Court, Delphi would then provide, subject to the union agreement, replacement cash balance or defined contribution pension benefits to its hourly employees; and for eligible salaried employees, Delphi would provide defined contribution pension benefits, a salaried retirement and equalization savings program, and a supplemental executive retirement plan.

"We have remained committed to fully funding our pension plans and to being well-planned, well organized, and well-financed from the beginning of our chapter 11 cases," said Sheehan. "If approved by the Court, these actions and the additional operating support provided in the Amended GSA and Amended MRA are significant milestones in completing the final phases of the reorganization of our U.S. operations and positioning us to complete the financing required for our emergence from chapter 11 as soon as practicable."

**Transformed Delphi Poised to Complete Plans**
Delphi CEO and President Rodney O'Neal said the company has achieved remarkable progress in its overall transformation, and several elements of the transformation are outlined in the motions being filed today with the Court.

"Despite recent challenges -- including difficult credit markets, the downturn in the U.S. auto industry, and other cost pressures -- our operating performance has improved significantly," O'Neal said. "Our team has accomplished this global transformation in the face of a complete restructuring of a significant portion of our operations."

O'Neal said Delphi is on track to complete its transformation plan by the end of this year. The key tenets of that plan were to modify U.S. labor agreements to create a competitive arena in which to conduct business; conclude Delphi's negotiations with GM to finalize GM's financial support for Delphi's legacy and labor costs and confirm GM's business commitment to the Company; streamline Delphi's global product portfolio to capitalize on its technology and market strengths, and align its manufacturing and engineering footprint and capabilities with this new focus; transform Delphi's salaried workforce to ensure that the company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and devise a workable solution to Delphi's U.S. pension situation. In addition to working to achieve the key tenets of the transformation plan, O'Neal said that Delphi has diversified its customer base by growing its business in Europe, Asia and South America.

A summary of Delphi's Reaffirmed 2008-2011 POR Business Plan (RPOR) is included in today's Court filings. When the closing on Delphi's POR was suspended on April 4, 2008 following Delphi's plan investors refusal to close on their Investment Agreement, Delphi undertook a reaffirmation process with respect to the business plan in the POR as part of Delphi's consideration of potential modifications to the POR in order to emerge from chapter 11 as soon as practicable. The RPOR includes revised actual and expected volumes for the North American automotive market; significant increases in certain commodity costs; changes in the under-funded status of its pension plans as a result of negative plan asset returns; and substantial incremental financial support from GM committed to as part of the modified settlement announced today.

Assuming that the Bankruptcy Court approves Delphi's modified settlement with GM and the pension plan modification motion at a hearing scheduled to begin on September 23, 2008, Delphi expects to enter the capital markets later this year with the RPOR and anticipates filing a motion seeking approval of modifications to the POR.

"Our progress throughout this transformation has been tremendous and could not have been achieved without the diligence and commitment of our employees, suppliers and customers," O'Neal said. "We have maintained uninterrupted supply to our customers, and have booked record business with many of them. The approval of these amended agreements will help us continue our solid march toward becoming a completely transformed and more competitive company."

**ABOUT DELPHI'S CHAPTER 11 CASE**
Delphi's chapter 11 cases were filed on Oct. 8, 2005, in the U.S. Bankruptcy Court for the Southern District of New York and were assigned to the Honorable Robert D. Drain under lead case number 05-44481 (RDD).

More information on Delphi's U.S. restructuring and access to Court documents is available at www.delphidocket.com and www.delphi.com.

Information on the case can also be obtained on the Bankruptcy Court's website with Pacer registration: http://www.nysb.uscourts.gov. For more information about Delphi and its operating subsidiaries, visit Delphi's website at www.delphi.com.

**FORWARD LOOKING STATEMENTS**
This press release as well as other statements made by Delphi may contain forward-looking statements that reflect, when made, the Company's current views with respect to current events and financial performance. Such forward-looking statements are and will be, as the case may be, subject to many risks, uncertainties and factors relating to the Company's operations and business environment which may cause the actual results of the Company to be materially different from any future results, express or implied, by such forward-looking statements. In some cases, you can identify these statements by forward-looking words such as "may," "might," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue," the negative of these terms and other comparable terminology. Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, the following: the ability of the Company to continue as a going concern; the ability of the Company to operate pursuant to the terms of the debtor-in-possession financing facility and its advance agreement with GM, to obtain an extension of term or other amendments as necessary to maintain access to such facility and advance agreement; the Company's ability to obtain Court approval with respect to motions in the chapter 11 cases prosecuted by it from time to time (including the motions announced in this press release); the ability of the Company to achieve all of the conditions to the

05-44481-rdd    Doc 18579-2    Filed 07/23/09    Entered 07/23/09 03:06:52    Exhibit B
Case 2:09-cv-12808-SFC-MJH    Document 3-5    Filed 07/23/09    Page 4 of 4
Pg 16 of 87

Press Release: Delphi and General Motors Enter Into Modified Settlement and Restructur...    Page 3 of 3

effectiveness and/or final consummation of the Amended and Restated Global Settlement Agreement and Amended and Restated Master Restructuring Agreement with General Motors; the ability of the Company to consummate its amended plan of reorganization which was confirmed by the Court on January 25, 2008, any subsequent modifications to the confirmed plan or any other subsequently confirmed plan of reorganization; risks associated with third parties seeking and obtaining Court approval to terminate or shorten the exclusivity period for the Company to propose and confirm one or more plans of reorganization, for the appointment of a chapter 11 trustee or to convert the cases to chapter 7 cases; the ability of the Company to obtain and maintain normal terms with vendors and service providers; the Company's ability to maintain contracts that are critical to its operations; the potential adverse impact of the chapter 11 cases on the Company's liquidity or results of operations; the ability of the Company to fund and execute its business plan (including the transformation plan described in Item 1. Business "Plan of Reorganization and Transformation Plan" of the Annual Report on Form 10-K for the year ended December 31, 2007 filed with the SEC) and to do so in a timely manner; the ability of the Company to attract, motivate and/or retain key executives and associates; the ability of the Company to avoid or continue to operate during a strike, or partial work stoppage or slow down by any of its unionized employees or those of its principal customers and the ability of the Company to attract and retain customers. Additional factors that could affect future results are identified in the Annual Report on Form 10-K for the year ended December 31, 2007 filed with the SEC, including the risk factors in Part I. Item 1A. Risk Factors, contained therein, and the Company's quarterly periodic reports for the subsequent periods, including the risk factors in Part II. Item 1A. Risk Factors, contained therein, filed with the SEC. Delphi disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events and/or otherwise. Similarly, these and other factors, including the terms of any reorganization plan ultimately confirmed, can affect the value of the Company's various prepetition liabilities, common stock and/or other equity securities.

For more information contact:

Delphi - Media Contact
Lindsey Williams
1.248.813.2528

Delphi - Investor Contact
Matt Fortunak
1.248.813.2498

# EXHIBIT C

Hearing Date And Time: TBD
Objection Deadline: TBD

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                       :
        In re                                          :        Chapter 11
                                                       :
DELPHI CORPORATION, et al.,                            :        Case No. 05-44481 (RDD)
                                                       :
                              Debtors.                 :        (Jointly Administered)
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

(A) SUPPLEMENT TO MOTION FOR ORDER (I) APPROVING MODIFICATIONS TO DEBTORS'
FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND RELATED
DISCLOSURES AND VOTING PROCEDURES AND (II) SETTING FINAL HEARING DATE TO
CONSIDER MODIFICATIONS TO CONFIRMED FIRST AMENDED PLAN OF
REORGANIZATION AND (B) REQUEST TO SET ADMINISTRATIVE EXPENSE CLAIMS BAR
DATE AND ALTERNATIVE SALE HEARING DATE

("SUPPLEMENT TO PLAN MODIFICATION APPROVAL MOTION")



0544481090601000000000001

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors")[1],

hereby submit this (A) supplement (the "Motion Supplement") to the Motion for Order (I)

Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and

Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider

Modifications to Confirmed First Amended Plan of Reorganization (Docket No. 14310) (the

"Plan Modification Approval Motion") under 11 U.S.C. § 1127[2] and (B) request to set

administrative expense claims bar date and alternative sale hearing date (the "Alternative Sale

Hearing").  By this Motion Supplement, the Debtors seek an order an order (a) approving certain

modifications to the confirmed First Amended Joint Plan of Reorganization of Delphi

Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, as amended on January

25, 2008 (the "Confirmed Plan"), related disclosure statement (Docket No. 11388) (the

"December 10 Disclosure Statement"), and voting procedures as set forth in the December 10

Solicitation Procedures Order[3] (Docket No. 11389) and (b) setting a final hearing date on

---

[1]     On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

[2]     Section 1127 of the Bankruptcy Code provides, in relevant part:

   (b)     The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

   (c)     The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

   (d)     Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

[3]     See Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII)

approval of the Debtors' proposed plan modifications for July 23, 2009. The Debtors also request the setting of a bar date for filing proofs of administrative expense for postpetition claims arising before June 1, 2009 and an Alternative Sale Hearing date of July 23, 2009 to be used, only if necessary, to consider the sale of substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code if the Court does not approve the Debtors' proposed plan modifications on that date.

As further described herein, the Debtors are proposing further modifications to the Confirmed Plan (the "Modified Plan") that the Debtors believe require resolicitation. On October 3, 2008, the Debtors filed the Plan Modification Approval Motion to approve certain modifications to the Confirmed Plan, related disclosures, and certain voting procedures and to set a final hearing on the motion. The hearing on the Plan Modification Approval Motion was originally scheduled for October 23, 2008 but was subsequently adjourned several times, most recently to June 2, 2009 (see docket numbers 14351, 14376, 14429, 14580, 16403, 16562, 16616, and 16643). Since the filing of the Plan Modification Approval Motion, a number of events have propelled the Debtors to propose further modifications to the Confirmed Plan. This Motion Supplement supplements the adjourned Plan Modification Approval Motion. Because the proposed modifications to the Confirmed Plan require resolicitation and court approval, the Debtors propose the following schedule for resolicitation and approval of such modifications:

| Date | Event |
|---|---|
| June 16, 2009 | Deadline to publish notice of hearing to approve modifications to Confirmed Plan |

---

Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures, entered on December 10, 2007 (Docket No. 11389) (the "December 10 Solicitation Procedures Order").

3

| | |
|---|---|
| | Deadline to commence mailing of solicitation packages |
| July 2, 2009 | Rule 3018(a) motion deadline |
| | Modified Plan exhibit filing deadline, including deadline to file the 363 implementation agreement (the "363 Implementation Agreement") |
| | Deadline to file Notice of Non-Assumption of Executory Contracts |
| July 9, 2009 | Deadline to file announcement of Article 9 Purchaser (if necessary) |
| July 10, 2009 | Bar date for filing proofs of administrative expense for administrative expenses for postpetition claims arising before June 1, 2009 |
| July 14, 2009 | Deadline to object to modifications to the Confirmed Plan and the 363 Implementation Agreement |
| July 14, 2009 | Voting deadline |
| July 20, 2009 | Ballot report certification and filing deadline at 4:00 p.m. (prevailing Eastern time) |
| July 21, 2009 | Deadline to file reply in support of the Modified Plan and the Master Disposition Agreement and in support of the transactions set forth in the Master Disposition Agreement, as modified by the 363 Implementation Agreement and file any proposed revisions to the Final Modification Approval Order and to submit a proposed alternative form of sale order under section 363 of the Bankruptcy Code |
| July 23, 2009 | Hearing to approve modifications to the Confirmed Plan and to approve such plan as Modified (the "Final Modification Hearing") or, in the alternative, to approve the Master Disposition Agreement (defined below) pursuant to section 363 of the Bankruptcy Code (the "Alternative Sale Hearing") |

In further support of this Motion Supplement, the Debtors respectfully represent as follows:

4

<u>Preliminary Statement</u>

1.  Delphi is on the brink of emergence from chapter 11.  The Debtors have accomplished their stated reorganization goals, maintained their business despite a global economic recession and the failed promises of would-be investors, and persevered in the face of unprecedented challenges that have flooded the automotive industry.  The relief that Delphi now seeks – an expedited hearing for the Court to approve this Motion Supplement to modify the Confirmed Plan – will enable the Debtors to complete the final phase of their reorganization.  Due to the nature of this transaction, there is no time to spare.  The Debtors need to act now to effectuate the Modified Plan and the transactions incorporated therein to allow them to maximize value to their stakeholders.  Without the requested relief, Delphi would be unable to effectuate a plan of reorganization.

2.  In March 2006, approximately six months after the commencement of these chapter 11 cases, the Debtors announced the five key tenets of their transformation plan that they believed would enable them to return to stable, profitable business operations.  Thereafter, over the next 18 months, the Debtors worked diligently with their stakeholders to achieve these goals.  By September 2007, the Debtors had negotiated an investment agreement with a group of plan investors and had filed a plan of reorganization designed to allow Delphi to emerge from chapter 11 as a viable entity with significant recoveries for its stakeholders.  Although the plan of reorganization and investment agreement were ultimately amended, in January 2008, this Court approved the Confirmed Plan and the Debtors' hope for emergence from chapter 11 was within reach.

3.  During February and March 2008, the Debtors succeeded in obtaining $6.1 billion in exit financing commitments and by April 4, 2008 the Debtors had satisfied the conditions required to substantially consummate the Confirmed Plan.  The plan investors,

however, refused to participate in the closing and refused to fund their investment agreement with Delphi. This devastating move by the plan investors precluded the Debtors from emerging from chapter 11, and Delphi was required to reevaluate and retool its business plan and emergence strategy.

4.     Over the next six months, the Debtors revised their go-forward business plan and developed certain modifications to the Confirmed Plan so that Delphi could emerge on an standalone basis, without plan investor support. The lack of the plan investors' $2.5 billion investment, together with the overall economic decline, particularly in the automotive industry, and the total collapse of the credit markets in the later half of 2008 significantly reduced the Debtors' enterprise value. In addition, the Debtors were unable to secure necessary exit financing, forcing the Debtors to remain in chapter 11. Despite these challenges, on October 3, 2008, the Debtors filed certain proposed modifications to the Confirmed Plan that incorporated a significantly lower enterprise value and recoveries to creditors that were lower than those approved by the Court in the Confirmed Plan. As a result of the lack of available credit in the credit markets, the Debtors were unable to secure necessary emergence capital and thus were not able to obtain approval of the modifications to the Confirmed Plan.

5.     Their unexpected prolonged stay in chapter 11 posed yet another challenge to the Debtors because their DIP credit facility was set to mature on December 31, 2008. Because of the collapse of the credit markets, the Debtors were unable to extend the maturity date of their DIP credit facility on reasonably acceptable terms. Accordingly, in December 2008, the Debtors and their debtor-in-possession lenders (the "DIP Lenders") entered into an accommodation agreement, as subsequently amended, to allow the Debtors, among other things, to continue using certain of the proceeds of the DIP credit facility through June 30, 2009. In

addition, and in connection with certain amendments to the accommodation agreement with the

DIP Lenders, General Motors Corporation ("GM") agreed to provide the Debtors with additional

liquidity and to accelerate payment of certain receivables to allow the Debtors to maintain

ongoing operations in this challenging economic environment.

6.     In the interim, the U.S. government's well-publicized involvement with

the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into

the automotive industry, including GM, added yet another layer of complexity to the Debtors'

emergence plan. Indeed, in March 2009, in connection with a proposed amendment to the

accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an

additional $150 million in liquidity under an amendment to the previously-approved liquidity

arrangement between Delphi and GM. The Treasury Department, however, acting pursuant to its

authority under GM's loan agreement with the U.S. government, notified the Debtors and GM

that it objected to the parties' seeking approval of these amendments and requested additional

time to consider these agreements and various alternatives with respect to the Debtors'

emergence from chapter 11. Since that time, the Debtors, GM, and the Treasury Department

have been working on and negotiating a global solution to allow the Debtors to emerge from

chapter 11. As part of that solution, the Treasury Department has now agreed to allow GM to

provide up to an additional $250 million to support Delphi as it seeks approval of its Modified

Plan and emergence from chapter 11.

7.     This process has resulted in agreements with necessary parties that will

enable the Debtors to emerge from chapter 11 and will allow the Debtors to continue to deliver

high-quality products to their customers with the support of their supply base. The Debtors have

reached an agreement with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum

7

Capital Equity Partners, L.P., and, with support from the Treasury Department, GM Components

Holding, LLC ("GM Components"), an affiliate of GM, whereby the Debtors would sell certain

of their North American assets to GM Components and contemporaneously effectuate

transactions through which Parnassus would operate certain of Delphi's U.S. and non-U.S.

businesses going forward with emergence capital commitments of approximately $3.6 billion

and without the legacy costs associated with the North American sites that are being acquired by

GM Components together with Delphi's global Steering business. The Debtors must proceed on

an expedited basis to solicit votes on the Modified Plan. Failure to move forward now on this

accelerated time frame could seriously jeopardize the Debtors' ability to emerge from chapter 11.

<u>Summary Of Proposed Modifications To The Confirmed Plan</u>

8.　　Section 14.3 of the Confirmed Plan, to which no party objected and which

was approved by a substantial majority of creditors who voted on the Confirmed Plan, remains in

effect and provides that only the Debtors may seek modifications of the Confirmed Plan pursuant

to section 1127(b) of the Bankruptcy Code. Moreover, the Debtors previously obtained an

extension, subject to certain exceptions described below, of their exclusive right under section

1121 of the Bankruptcy Code to file one or more reorganization plans until 30 days after

substantial consummation of the Confirmed Plan or any modified plan and the exclusive right to

solicit and obtain acceptances for such plans until 90 days after substantial consummation of the

Confirmed Plan or any modified plan.[4] The Debtors' exclusive right to file a plan, solely as

between the Debtors and the official committee of unsecured creditors (the "Creditors'

Committee") (the "Plan Proposal Period"), has been extended through and including July 31,

---

[4]　<u>See</u> Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit
Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483) (the "Postconfirmation
Exclusivity Order").

2009 and the right to solicit a plan, solely as between the Debtors and the Creditors' Committee (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods"), through and including September 30, 2009.[5]

      9.    Because the Debtors have the exclusive right to propose modifications to the Confirmed Plan or file and solicit a new plan, the Debtors have taken into consideration all of the factors described above and are proposing the following modifications to the Confirmed Plan for approval by this Court:

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **Plan Investor** | Plan Investors' commitment to invest up to $2.55 billion | Acquisition of the Company's operating businesses by Parnassus Holdings II, LLC, an affiliate of Platinum Equity Capital Partners II, L.P., and of certain North American operations and the global Steering business by certain affiliates of General Motors Corporation |
| **Rights Offering** | $1.75 billion discount rights offering | No rights offering |
| **Emergence Capital and Capital Commitments** | $4.7 billion | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>Parnassus Holdings II, LLC has obtained approximately $3.6 billion in emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Revolver** | $1.4 billion | Not applicable |

---

[5]    <u>See</u> Order, Solely As To Creditors' Committee, Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan Under 11 U.S.C. § 1121(d), dated May 21, 2009 (Docket No. 16631) (together with the Postconfirmation Exclusivity Order, the "Postconfirmation Exclusivity Orders").

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **Total Enterprise Value** | Agreed plan value of $12.8 billion | Not applicable as a result of the Master Disposition Agreement and related transactions |
| **Defined Benefit Pension Plans** | - $1.5 billion 414(l) Transfer of hourly pension plan to GM<br>- All salaried pension plans and remaining hourly pension plans assumed | - 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008.<br><br>- Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM. The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim |
| **GM** | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the 414(l) assumption | GM will purchase from Delphi for additional consideration certain assets of the Company and will be subject to certain obligations as set forth in the Master Disposition Agreement (which will supersede the Amended Master Restructuring Agreement that will be terminated), including providing certain funding, waiving certain claims and assuming various liabilities. GM will not receive any distribution on account of its Allowed Claim |
| **DIP Facility Revolver Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **Senior Secured Hedge Obligations** | Paid in the ordinary course of business | Paid in the ordinary course of business with agreed collateralization upon emergence |
| **DIP Facility Second Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date through consummation of a transaction that provides for the cash payment of approximately $291 million, interest in Parnassus Holdings II, LLC in the nominal amount of $145.5 million with a preferred return at a per annum rate of interest of 8% and to be paid pursuant to a waterfall formula as part of the equity distribution of Parnassus Holding LLC and any unpaid balance to be paid ten years after the effective date of Modified Plan, and the first settlement or other proceeds from the Corporation's plan investor litigation up to approximately $146 million |
| **Secured Claims (Excluding DIP Claims)** | Paid in Cash in full or reinstated | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury Bill rate on the effective date, plus 200 basis points; (ii) receive their collateral free and clear of liens; or (iii) receive such other treatment agreed upon by the parties that is more favorable to the Debtors |

|  | Confirmed Plan | Modified Plan |
|---|---|---|
| **Unsecured Creditors** | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br> -78.6% in new common stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Pro rata share of deferred consideration under the Master Disposition Agreement |
| **Post-petition Interest** | Post-petition Interest to be paid on certain General Unsecured Claims | No post-petition interest will be accrued or paid on General Unsecured Claims under the Modified Plan |
| **MDL Litigation Claims** | Allowed claims with same treatment as General Unsecured Claims | No recovery under the Modified Plan |
| **Equity** | Direct grant of new common stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | No recovery under the Modified Plan |

<u>Relief Requested</u>

10.     By this Motion Supplement, the Debtors request entry of an order (the

"Proposed Order") (a) approving certain modifications to the Confirmed Plan, the December 10

Disclosure Statement, and voting procedures as set forth in the December 10 Solicitation

Procedures Order and (b) setting a final hearing date on approval of the Debtors' proposed plan

12

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -x
                         :
       In re                :    Chapter 11
                         :
DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                         :
            Debtors.    :    (Jointly Administered)
                         :
- - - - - - - - - - - - - - - - - - - - - - - - - -x

### FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Toll Free: (800) 718-5305
International: (248) 813-2698
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Debtors and Debtors-in-Possession

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
(248) 813-2000
David M. Sherbin
Sean P. Corcoran
Karen J. Craft

Dated:     December 10, 2007

As Modified: January 25, 2008
             June 1, 2009
             New York, New York

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION
OF TIME .................................................................................................................4

   A.   Scope Of Definitions..................................................................................4

   B.   Definitions..................................................................................................4

| | |
|---|---|
| 1.1 | "503 Deadline" .................................................................................4 |
| 1.2 | "Administrative Claim" ...................................................................4 |
| 1.3 | "Administrative Claims Bar Date"...................................................4 |
| 1.4 | "ADR Procedures"...........................................................................4 |
| 1.5 | "Affiliate Debtors" ..........................................................................4 |
| 1.6 | "Affiliates".......................................................................................5 |
| 1.7 | "Allowed Claim"..............................................................................5 |
| 1.8 | "Allowed Class . . . Claim" or "Allowed Class . . . Interest" .........5 |
| 1.9 | "Allowed Interest"...........................................................................5 |
| 1.10 | "Article 9 Notice" ...........................................................................5 |
| 1.11 | "Article 9 Objection Deadline" .......................................................6 |
| 1.12 | "Avoidance Claims".........................................................................6 |
| 1.13 | "Ballot" ............................................................................................6 |
| 1.14 | "Bankruptcy Code" ..........................................................................6 |
| 1.15 | "Bankruptcy Court" .........................................................................6 |
| 1.16 | "Bankruptcy Rules" .........................................................................6 |
| 1.17 | "Bar Date".........................................................................................6 |
| 1.18 | "Bar Date Order"..............................................................................6 |
| 1.19 | "Beneficiaries" .................................................................................6 |
| 1.20 | "Business Day" .................................................................................6 |
| 1.21 | "Buyers"............................................................................................6 |
| 1.22 | "Cash"................................................................................................6 |
| 1.23 | "Cash Reserve" .................................................................................7 |
| 1.24 | "Causes of Action"...........................................................................7 |
| 1.25 | "Certificate" .....................................................................................7 |
| 1.26 | "Certificate of Incorporation and Bylaws" .....................................7 |
| 1.27 | "Chapter 11 Cases" ..........................................................................7 |
| 1.28 | "Claim"..............................................................................................7 |
| 1.29 | "Claims Agent" .................................................................................7 |
| 1.30 | "Claims/Interests Objection Deadline"............................................7 |
| 1.31 | "Class"...............................................................................................7 |
| 1.32 | "Confirmation Date" ........................................................................7 |
| 1.33 | "Confirmation Hearing"....................................................................7 |
| 1.34 | "Confirmation Order".......................................................................7 |
| 1.35 | "Connection Systems Debtors"........................................................8 |
| 1.36 | "Contingent PBGC Secured Claim" .................................................8 |
| 1.37 | "Continuing Indemnification Rights" ..............................................8 |
| 1.38 | "Controlled Affiliate".......................................................................8 |
| 1.39 | "Creditors' Committee" ....................................................................8 |
| 1.40 | "Cure" ...............................................................................................8 |
| 1.41 | "Cure Amount Notice".....................................................................8 |

i

| | | |
|---|---|---|
| 1.42 | "Cure Amount Proposal" | 8 |
| 1.43 | "DASHI Debtors" | 9 |
| 1.44 | "Debtor" | 9 |
| 1.45 | "Debtors" | 9 |
| 1.46 | "Delphi" | 9 |
| 1.47 | "Delphi-DAS Debtors" | 9 |
| 1.48 | "Delphi-GM Arrangement" | 9 |
| 1.49 | "Delphi-GM Definitive Documents" | 9 |
| 1.50 | "Delphi-GM Global Settlement Agreement" | 9 |
| 1.51 | "Delphi-GM Master Restructuring Agreement" | 9 |
| 1.52 | "Delphi HRP" | 9 |
| 1.53 | "Delphi-PBGC Settlement Agreement" | 9 |
| 1.54 | "DIP Accommodation Agreement" | 10 |
| 1.55 | "DIP Accommodation Agreement Order" | 10 |
| 1.56 | "DIP Agent" | 10 |
| 1.57 | "DIP Claims" | 10 |
| 1.58 | "DIP Credit Agreement" | 10 |
| 1.59 | "DIP Facility" | 10 |
| 1.60 | "DIP Facility First Priority Term Claim" | 10 |
| 1.61 | "DIP Facility Order" | 10 |
| 1.62 | "DIP Facility Revolver Claim" | 10 |
| 1.63 | "DIP Facility Second Priority Term Claim" | 11 |
| 1.64 | "DIP Lenders" | 11 |
| 1.65 | "DIP Lenders Steering Committee" | 11 |
| 1.66 | "DIP Loan Documents" | 11 |
| 1.67 | "DIP Priority Payment Amount" | 11 |
| 1.68 | "DIP Transfer" | 11 |
| 1.69 | "Disallowed Claim" | 11 |
| 1.70 | "Disallowed Interest" | 11 |
| 1.71 | "Disbursing Agent" | 12 |
| 1.72 | "Disclosure Statement" | 12 |
| 1.73 | "Disposition Transactions" | 12 |
| 1.74 | "Disputed Claim" or "Disputed Interest" | 12 |
| 1.75 | "Distribution Date" | 12 |
| 1.76 | "Distribution Reserve" | 12 |
| 1.77 | "Effective Date" | 12 |
| 1.78 | "Emergence Capital" | 12 |
| 1.79 | "Employee-Related Obligation" | 12 |
| 1.80 | "Equity Committee" | 12 |
| 1.81 | "ERISA" | 12 |
| 1.82 | "ERISA Plaintiffs" | 13 |
| 1.83 | "ERISA Settlement" | 13 |
| 1.84 | "Estates" | 13 |
| 1.85 | "Exchange Act" | 13 |
| 1.86 | "Exhibit" | 13 |
| 1.87 | "Exhibit Filing Date" | 13 |
| 1.88 | "Existing Common Stock" | 13 |
| 1.89 | "Existing Securities" | 13 |

| | | |
|---|---|---|
| 1.90 | "Face Amount" | 13 |
| 1.91 | "Final Modification Hearing" | 13 |
| 1.92 | "Final Order" | 13 |
| 1.93 | "Flow-Through Claim" | 14 |
| 1.94 | "General Unsecured Claim" | 14 |
| 1.95 | "General Unsecured MDA Distribution" | 14 |
| 1.96 | "GM" | 14 |
| 1.97 | "GM Acquired Assets" | 14 |
| 1.98 | "GM 414(l) Administrative Claim" | 14 |
| 1.99 | "GM Administrative Claim" | 14 |
| 1.100 | "GM Arrangement Administrative Claim" | 14 |
| 1.101 | "GM Assumed Contracts" | 14 |
| 1.102 | "GM Assumed Liabilities" | 14 |
| 1.103 | "GM Buyer(s)" | 14 |
| 1.104 | "GM Unsecured Claim" | 14 |
| 1.105 | "Holdback Amount" | 15 |
| 1.106 | "Holdback Escrow Account" | 15 |
| 1.107 | "IAM" | 15 |
| 1.108 | "IAM Memorandum of Understanding" | 15 |
| 1.109 | "IBEW" | 15 |
| 1.110 | "IBEW E&S Memorandum of Understanding" | 15 |
| 1.111 | "IBEW Powertrain Memorandum of Understanding" | 15 |
| 1.112 | "Impaired" | 15 |
| 1.113 | "Indemnification Rights" | 15 |
| 1.114 | "Indemnitee" | 15 |
| 1.115 | "Indenture Trustees" | 16 |
| 1.116 | "Indentures" | 16 |
| 1.117 | "Insurance Coverage" | 16 |
| 1.118 | "Insurance Settlement" | 16 |
| 1.119 | "Intercompany Claim" | 16 |
| 1.120 | "Intercompany Executory Contract" | 16 |
| 1.121 | "Intercompany Unexpired Lease" | 16 |
| 1.122 | "Interest" | 16 |
| 1.123 | "Investment Agreement" | 16 |
| 1.124 | "IRC" | 16 |
| 1.125 | "IRC Section 414(l) Transfer" | 16 |
| 1.126 | "IUE-CWA" | 16 |
| 1.127 | "IUE-CWA 1113/114 Settlement Approval Order" | 16 |
| 1.128 | "IUE-CWA Benefit Guarantee" | 17 |
| 1.129 | "IUE-CWA Benefit Guarantee Term Sheet" | 17 |
| 1.130 | "IUE-CWA-Delphi-GM Memorandum of Understanding" | 17 |
| 1.131 | "IUOE" | 17 |
| 1.132 | "IUOE Local 18S Memorandum of Understanding" | 17 |
| 1.133 | "IUOE Local 101S Memorandum of Understanding" | 17 |
| 1.134 | "IUOE Local 832S Memorandum of Understanding" | 17 |
| 1.135 | "IUOE-IBEW-IAM OPEB Term Sheet" | 17 |
| 1.136 | "IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order" | 18 |
| 1.137 | "Lead Plaintiffs" | 18 |

1.138 "Management Compensation Plan" ................................................................18
1.139 "Master Disposition Agreement" ................................................................18
1.140 "Material Supply Agreement" ...................................................................18
1.141 "MDA Assumption And Assignment Notice" ....................................................18
1.142 "MDL Actions" ...............................................................................18
1.143 "MDL Court" .................................................................................18
1.144 "MDL Settlements" ...........................................................................18
1.145 "Modification Approval Date" ...............................................................18
1.146 "Modification Approval Order" ..............................................................19
1.147 "Modification Procedures Order" ............................................................19
1.148 "New Common Stock" .........................................................................19
1.149 "Non-Represented Term Sheet" ...............................................................19
1.150 "Omitted Material Supply Agreement Objection Deadline" .....................................19
1.151 "OPEB" .....................................................................................19
1.152 "Ordinary Course Professionals Order" ......................................................19
1.153 "Other Executory Contract" .................................................................19
1.154 "Other Interests" ..........................................................................19
1.155 "Other MDA Assumed Contracts" ..............................................................19
1.156 "Other Unexpired Lease" ....................................................................19
1.157 "Parnassus" ................................................................................19
1.158 "Parnassus Acquired Assets" ................................................................19
1.159 "Parnassus Assumed Contracts" ..............................................................19
1.160 "Parnassus Assumed Liabilities" ............................................................19
1.161 "Parnassus Class C Interest" ...............................................................20
1.162 "PBGC" .....................................................................................20
1.163 "PBGC Claims" ..............................................................................20
1.164 "PBGC General Unsecured Claim" .............................................................20
1.165 "Pension Plans" ............................................................................20
1.166 "Periodic Distribution Date" ...............................................................20
1.167 "Person" ...................................................................................20
1.168 "Petition Date" ............................................................................20
1.169 "Plan" .....................................................................................20
1.170 "Plan Investors" ...........................................................................21
1.171 "Plan Objection Deadline" ..................................................................21
1.172 "Platinum" .................................................................................21
1.173 "Post-Confirmation Reorganized DPH Holdings Share Trust" ...................................21
1.174 "Post-Confirmation Trust Agreement" ........................................................21
1.175 "Post-Confirmation Trust Plan Administrator" ...............................................21
1.176 "Prepetition Employee-Related Obligation" ..................................................21
1.177 "Prepetition Employee-Related Obligations Bar Date" ........................................21
1.178 "Priority Tax Claim" .......................................................................21
1.179 "Pro Rata" .................................................................................21
1.180 "Professional" .............................................................................22
1.181 "Professional Claim" .......................................................................22
1.182 "Professional Fee Order" ...................................................................22
1.183 "Reinstated" or "Reinstatement" ............................................................22
1.184 "Released Parties" .........................................................................22
1.185 "Reorganized . . . " .......................................................................23

iv

1.186    "Reorganized Debtor" or "Reorganized Debtors" ............................... 23
1.187    "Reorganized DPH Holdings" ............................................................ 23
1.188    "Restructuring Debtors" .................................................................... 23
1.189    "Restructuring Transaction(s)" ......................................................... 23
1.190    "Restructuring Transaction Notice" .................................................. 23
1.191    "Retained Actions" ............................................................................ 23
1.192    "Retained Assets" .............................................................................. 23
1.193    "Scheduled" ...................................................................................... 23
1.194    "Schedules" ....................................................................................... 23
1.195    "Section 510(b) Equity Claim" ......................................................... 23
1.196    "Section 510(b) ERISA Claim" ........................................................ 24
1.197    "Section 510(b) Note Claim" ............................................................ 24
1.198    "Section 510(b) Opt Out Claim" ....................................................... 24
1.199    "Section 510(b) Opt Out Equity Claim" ........................................... 24
1.200    "Section 510(b) Opt Out Note Claim" ............................................... 24
1.201    "Secured Claim" ................................................................................ 24
1.202    "Securities Act" ................................................................................ 24
1.203    "Securities Settlement" ..................................................................... 24
1.204    "Security" .......................................................................................... 24
1.205    "Security And Pledge Agreement" .................................................... 24
1.206    "Senior Notes" ................................................................................... 25
1.207    "Senior Notes Claim" ........................................................................ 25
1.208    "Senior Notes Indenture" .................................................................. 25
1.209    "Senior Notes Indenture Trustee" ..................................................... 25
1.210    "SERP" .............................................................................................. 25
1.211    "SERP Claim" ................................................................................... 25
1.212    "Servicer" .......................................................................................... 25
1.213    "Solicitation Procedures Order" ........................................................ 25
1.214    "Specialty Electronics Debtors" ........................................................ 25
1.215    "Statutory Committees" ..................................................................... 25
1.216    "Subordinated Notes" ........................................................................ 25
1.217    "Subordinated Notes Holder" ............................................................ 25
1.218    "Subordinated Notes Indenture" ........................................................ 25
1.219    "Subordinated Notes Indenture Trustee" ........................................... 25
1.220    "Supplemental Distribution Account" ............................................... 25
1.221    "Transferred Assets" .......................................................................... 26
1.222    "TOPrS" ............................................................................................. 26
1.223    "TOPrS Claim" .................................................................................. 26
1.224    "UAW" ............................................................................................... 26
1.225    "UAW 1113/1114 Settlement Approval Order" ................................ 26
1.226    "UAW Benefit Guarantee" ................................................................ 26
1.227    "UAW Benefit Guarantee Term Sheet" ............................................. 26
1.228    "UAW-Delphi-GM Memorandum of Understanding" ....................... 26
1.229    "UCC" ................................................................................................ 26
1.230    "Unimpaired" ..................................................................................... 26
1.231    "Union Settlement Agreements" ........................................................ 26
1.232    "Unions" ............................................................................................ 27
1.233    "USW" ................................................................................................ 27

| 1.234 | "USW 1113/1114 Settlement Approval Order" | 27 |
| 1.235 | "USW Benefit Guarantee" | 27 |
| 1.236 | "USW Benefit Guarantee Term Sheet" | 27 |
| 1.237 | "USW-Delphi-GM Memoranda of Understanding" | 27 |
| 1.238 | "USW-Home Avenue Memorandum of Understanding" | 27 |
| 1.239 | "USW-Vandalia Memorandum of Understanding" | 27 |
| 1.240 | "Voting Deadline" | 27 |
| C. | Rules Of Interpretation | 27 |
| D. | Computation Of Time | 28 |
| E. | References To Monetary Figures | 28 |
| F. | Exhibits | 28 |

ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................... 29
| 2.1 | Administrative Claims | 29 |
| 2.2 | Priority Tax Claims | 29 |
| 2.3 | GM Administrative Claim. | 29 |

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS ................... 30
| 3.1 | The Debtors. | 30 |
| 3.2 | Classification Of Claims And Interests. | 31 |

ARTICLE IV IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN. ................... 32
| 4.1 | Classes Of Claims That Are Unimpaired. | 32 |
| 4.2 | Impaired Classes Of Claims And Interests. | 32 |

ARTICLE V PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS ................... 32
| 5.1 | Class 1A-1 and Class 6A-1 (Secured Claims) | 32 |
| 5.2 | Class 1B through Class 12B (Flow-Through Claims) | 33 |
| 5.3 | Class 1C-1 through Class 12C-1 (General Unsecured Claims) | 33 |
| 5.4 | Class 1C-2 through Class 12C-2 (PBGC Claims) | 33 |
| 5.5 | Class 1D through Class 12D (GM Unsecured Claim) | 34 |
| 5.6 | Class 1E (Section 510(b) Note Claims) | 34 |
| 5.7 | Class 1F through Class 13F (Intercompany Claims) | 34 |
| 5.8 | Class 1G-1 (Existing Common Stock) | 34 |
| 5.9 | Class 1G-2 (Section 510(b) Equity Claims) | 34 |
| 5.10 | Class 1H and Class 8H (Section 510(b) ERISA Claims) | 34 |
| 5.11 | Class 1I (Other Interests) | 34 |
| 5.12 | Class 1J through Class 12J (Interests In Affiliate Debtors) | 34 |

ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS ................... 35
| 6.1 | Impaired Classes Of Claims Entitled To Vote | 35 |
| 6.2 | Classes Deemed To Accept The Plan | 35 |
| 6.3 | Acceptance By Impaired Classes | 35 |
| 6.4 | Classes Deemed To Reject The Plan | 35 |
| 6.5 | Prior Acceptances Or Rejections Of The Plan. | 35 |
| 6.6 | Approval of Modifications Subject To Sections 1127 And 1129(b) Of The Bankruptcy Code | 35 |

ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN ................... 36
| 7.1 | Continued Corporate Existence | 36 |
| 7.2 | Substantive Consolidation | 36 |

vi

7.3   Restructuring Transactions. ...............................................................37
7.4   Certificate Of Incorporation And Bylaws..........................................38
7.5   Directors And Officers Of Reorganized DPH Holdings And
      Affiliate Debtors. ..............................................................................38
7.6   Consummation Of Disposition Transactions ....................................38
7.7   Master Disposition Agreement. .........................................................39
7.8   Transfer Of Collateral. ......................................................................39
7.9   Post-Confirmation Reorganized DPH Holdings Share Trust ...................41
7.10  Emergence Capital. ...........................................................................41
7.11  Management Compensation Plan. .....................................................41
7.12  Procedures For Asserting Certain Claims .........................................41
7.13  Cancellation Of Existing Securities And Agreements.............................42
7.14  Sources of Cash For Plan Distributions ............................................43
7.15  Establishment Of A General Unsecured Distribution Account. ...............43
7.16  Collective Bargaining Agreements. ...................................................43
7.17  Pension Matters And PBGC Settlement. ...........................................44
7.18  Salaried OPEB Settlement .................................................................45
7.19  Preservation Of Causes Of Action ....................................................45
7.20  Reservation Of Rights........................................................................45
7.21  Exclusivity Period ..............................................................................46
7.22  Dismissal Of Complaints. ..................................................................46
7.23  Corporate Action................................................................................46
7.24  Effectuating Documents; Further Transactions .................................46
7.25  Consummation Of Divestiture Transactions......................................46
7.26  Exemption From Certain Transfer Taxes And Recording Fees.................46
ARTICLE VIII UNEXPIRED LEASES AND EXECUTORY CONTRACTS.........................47
8.1   Assumed And Rejected Contracts And Leases...................................47
8.2   Cure Procedures and Payments Related To Assumption Of
      Executory Contracts And Unexpired Leases .....................................48
8.3   Assignment Pursuant To Restructuring Transaction. ........................52
8.4   Rejection Damages Bar Date .............................................................53
8.5   Assumption and Assignment of Divestiture-Related Executory
      Contracts and Unexpired Leases. ......................................................53
ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS .......................................53
9.1   Time Of Distributions. .......................................................................53
9.2   No Interest On Disputed Claims ........................................................53
9.3   Disbursing Agent. ..............................................................................53
9.4   Surrender Of Securities Or Instruments.............................................54
9.5   Services Of Indenture Trustees, Agents, And Servicers.....................54
9.6   Claims Administration Responsibility................................................54
9.7   Delivery Of Distributions ..................................................................55
9.8   Procedures For Treating And Resolving Disputed And Contingent
      Claims ................................................................................................56
9.9   Section 510(b) Opt Out Claims..........................................................58
9.10  Allocation Of Plan Distributions Between Principal And Interest. ..........58
ARTICLE X ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE
CLAIMS    ........................................................................................................58
10.1  DIP Facility Claims............................................................................58

vii

10.2    Pre-Confirmation Administrative Claim Procedures ............................... 59
10.3    Professional Claims ....................................................................... 59
10.4    Substantial Contribution Compensation And Expenses Bar Date ............ 60
10.5    Other Administrative Claims ........................................................... 60
ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ........................ 61
11.1    Revesting Of Assets ...................................................................... 61
11.2    Discharge Of The Debtors ............................................................... 61
11.3    Compromises And Settlements ......................................................... 61
11.4    Release By Debtors Of Certain Parties ............................................... 61
11.5    Release By Holders Of Claims And Interests ....................................... 62
11.6    Release By Unions. ....................................................................... 63
11.7    Release Of GM By Debtors And Third Parties. ..................................... 63
11.8    Reserved. ................................................................................... 63
11.9    Setoffs ...................................................................................... 63
11.10   Subordination Rights ..................................................................... 63
11.11   Exculpation And Limitation Of Liability ............................................ 64
11.12   Indemnification Obligations ............................................................ 65
11.13   Exclusions And Limitations On Exculpation, Indemnification, And
        Releases. .................................................................................... 66
11.14   Injunction .................................................................................. 66
ARTICLE XII CONDITIONS PRECEDENT ........................................................ 66
12.1    Confirmation ............................................................................... 66
12.2    Conditions To The Effective Date Of The Plan ..................................... 66
12.3    Waiver Of Conditions Precedent ....................................................... 67
ARTICLE XIII RETENTION OF JURISDICTION ................................................. 67
ARTICLE XIV MISCELLANEOUS PROVISIONS ................................................. 70
14.1    Binding Effect ............................................................................. 70
14.2    Payment Of Statutory Fees ............................................................. 70
14.3    Modification And Amendments ........................................................ 70
14.4    Reserved. ................................................................................... 70
14.5    Withholding And Reporting Requirements ........................................... 70
14.6    Committees ................................................................................. 70
14.7    Revocation, Withdrawal, Or Non-Consummation. ................................. 71
14.8    Notices ...................................................................................... 71
14.9    Term Of Injunctions Or Stays .......................................................... 73
14.10   Governing Law ............................................................................ 73
14.11   No Waiver Or Estoppel ................................................................... 73
14.12   Conflicts .................................................................................... 73

# EXHIBITS

| | |
|---|---|
| Exhibit 7.3 | **Restructuring Transactions Notice** |
| Exhibit 7.4(a) | **Certificate Of Incorporation For Reorganized DPH Holdings** |
| Exhibit 7.4(b) | **Bylaws Of Reorganized DPH Holdings** |
| Exhibit 7.7 | **Master Disposition Agreement** |
| Exhibit 7.9 | **Post-Confirmation Reorganized DPH Holdings Share Trust Agreement** |
| Exhibit 7.11 | **Management Compensation Plan** |
| Exhibit 7.17 | **Delphi-PBGC Settlement Agreement** |
| Exhibit 7.19 | **Retained Causes Of Action** |
| Exhibit 8.1(a) | **Executory Contracts And Unexpired Leases To Be Rejected** |
| Exhibit 10.5 | **Administrative Claim Request Form** |

Exhibit 2 – Supplement to Disclosure Statement



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:   Chapter 11
In re   :
:   Case No. 05-44481 (RDD)
DELPHI CORPORATION, et al.,   :
:   (Jointly Administered)
:  
Debtors.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUPPLEMENT TO FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION
AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION**

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

                                     Of Counsel
                 DELPHI CORPORATION
                      5725 Delphi Drive
                 Troy, Michigan 48098
                      David M. Sherbin
                     Sean P. Corcoran
                       Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated:   New York, New York
          June 1, 2009

---

**DISCLAIMER**

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF ANY MODIFICATIONS
TO THE PLAN CONFIRMED BY THE BANKRUPTCY COURT ON JANUARY 25, 2008. THE
BANKRUPTCY COURT WILL DETERMINE UNDER 11 U.S.C § 1127 WHETHER ACCEPTANCES
OR REJECTIONS OF THE MODIFICATIONS WILL BE SOLICITED, AND ANY ACCEPTANCES
OR REJECTIONS OF THE MODIFICATIONS MAY NOT BE SOLICITED UNTIL THE
BANKRUPTCY COURT HAS APPROVED THIS SUPPLEMENT TO THE DISCLOSURE
STATEMENT. THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT IS BEING SUBMITTED
FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.

---

THE INFORMATION CONTAINED IN THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT (HEREAFTER, THE "SUPPLEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) (THE "MODIFIED PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE MODIFIED PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS SUPPLEMENT, REGARDING THE MODIFICATIONS TO THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE MODIFIED PLAN.

ALL CLAIM AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS SUPPLEMENT AND THE MODIFIED PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE MODIFIED PLAN. SUMMARIES AND STATEMENTS REGARDING THE MODIFIED PLAN MADE IN THIS SUPPLEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE MODIFIED PLAN AND THE EXHIBITS ANNEXED TO THE MODIFIED PLAN AND THIS SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS SUPPLEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS SUPPLEMENT AND THE TERMS OF THE MODIFIED PLAN, THE TERMS OF THE MODIFIED PLAN SHALL GOVERN.

THIS SUPPLEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1127 OF THE UNITED STATES BANKRUPTCY CODE, AS IT INCORPORATES SECTION 1125 AND OTHER PROVISIONS OF THE BANKRUPTCY CODE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS SUPPLEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS SUPPLEMENT AND THE MODIFIED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS SUPPLEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS SUPPLEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE MODIFIED PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, DEBTORS AND DEBTORS-IN- POSSESSION IN THESE CASES.

## EXECUTIVE SUMMARY

This section provides an executive summary of:

- Events affecting Delphi's reorganization efforts since January 25, 2008, including the deterioration of the capital markets in general and the automotive industry in particular, and the commencement of a chapter 11 reorganization for Chrysler LLC and preparations for a potential chapter 11 reorganization of General Motors Corporation

- The organization of the Supplement

- The background of Delphi's restructuring cases

- Material modifications to Delphi's confirmed plan of reorganization including the transfer of substantially all of the Company's operating businesses to an affiliate of Platinum Equity Capital Partners II, L.P. and the transfer of certain North American operations and the global steering operations to an affiliate of General Motors Corporation

- A hypothetical liquidation analysis

- Material modifications to the distributions to be made under the Confirmed Plan, which under the Modified Plan includes the elimination of consideration to classes other than Classes A-1, C-1, and C-2

On October 8 and 14, 2005, Delphi Corporation ("Delphi") and 41 of its direct and indirect United States subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), filed petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization that proposes how to treat claims against, and shareholder interests in, such a debtor company. A plan of reorganization must be voted on by holders of claims and interests, to the extent the class to which such holder belongs is impaired and receives or retains property under the plan on account of such claims or interests. In addition, the plan of reorganization must meet various standards to be approved (or confirmed) by the Bankruptcy Court. Consummation of a confirmed plan of reorganization is necessary for a debtor to emerge from chapter 11.

On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "September 2007 Plan"), together with a proposed Disclosure Statement with respect to the September 2007 Plan (the "September 2007 Disclosure Statement"). After a series of hearings in the Bankruptcy Court that concluded on December 7, 2007, on December 10, 2007, the Debtors filed the First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Disclosure Statement") and the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "December 2007 Plan").

On December 10, 2007, the Bankruptcy Court entered an order approving the Disclosure Statement, and the Debtors commenced solicitation of acceptance or rejection of the December 2007 Plan. On January 16, 2008, Delphi announced that the voting results with respect to the December 2007 Plan illustrated broad-based support for the plan. Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan (excluding ballots cast by GM, plaintiffs in the certain multi-district securities class action litigation (the "MDL"), and holders of equity security interests). One hundred percent of the ballots cast in the GM and MDL classes voted to accept the December 2007 Plan. Seventy-eight percent of voting shareholders voted to accept the December 2007 Plan.

On January 17, 2008, the Bankruptcy Court commenced the confirmation hearing (the "Confirmation Hearing") on the December 2007 Plan. The December 2007 Plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008 (the "Confirmed Plan"), and the confirmation order became final on February 4, 2008.

A key component of the exit financing of the Confirmed Plan was the investment agreement (the "Investment Agreement") that the Debtors entered into with A-D Acquisition Holdings, LLC ("ADAH"), an affiliate of Appaloosa Management L.P. ("Appaloosa"), Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, UBS Securities LLC, Goldman, Sachs & Co., and Pardus DPH Holding LLC (collectively, the "Plan Investors"). On the terms and subject to the conditions of the Investment Agreement, as amended, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized Delphi. In addition, the Investment Agreement, as amended, provided for a $1.575 billion discount rights offering that was made available to Delphi's unsecured creditors and holders of Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate the Confirmed Plan, including obtaining $6.1 billion of exit financing and conducting the discount rights offering, the Plan Investors refused to participate in the closing that was commenced and attended by all required parties other than the Plan Investors. On that same date, Appaloosa delivered a letter purportedly terminating the Investment Agreement. On May 16, 2008, Delphi filed complaints against the Plan Investors and related parties seeking redress of the unjustified breach of the Investment Agreement as well as damages related to the consequent delay of the Debtors' emergence from chapter 11.

Although the Debtors are pursuing actions against the Plan Investors, during the time since the Plan Investors' breach, the Debtors have worked diligently with their parties-in-interest, including their postpetition lenders, GM, the official committee of unsecured creditors (the "Creditors' Committee), the official committee of equity security holders (prior to its dissolution) (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees"), and other third parties to take actions that would allow the Debtors to formulate modifications to its Confirmed Plan and to emerge from chapter 11 without waiting for the full resolution of the Debtors' claims against the Plan Investors. The Debtors have now reached agreements with necessary parties that will enable them to emerge from chapter 11 and, through the transactions described herein with affiliates of Platinum Equity Capital Partners II, L.P.

("Platinum") and General Motors Corporation ("GM"), will be able to continue to deliver high-quality products to their customers with the support of their supply base.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both Statutory Committees, to develop modifications to the Confirmed Plan that would allow Delphi to emerge from chapter 11 on a standalone basis, without the support of plan investors. In September 2008, Delphi reached critical agreements with GM that resulted in an expected net contribution from GM in the approximate amount of $10.6 billion and provided a partial solution to certain of the Debtors' pension funding obligations. During this same period, however, the U.S. economy continued to weaken and vehicle production forecasts were lowered for the periods covered by the Debtors' business plan, both by third-party forecasting services as well as by the original equipment manufacturers themselves.

Following the effectiveness of the GM agreements on September 29, 2008, and having reaffirmed its business plan to contemplate the anticipated, reduced, automotive production volumes that resulted in reduced emergence funding needs, the Debtors believed they had developed modifications to the Confirmed Plan which would allow the Debtors to emerge from chapter 11. Thus, on October 3, 2008, the Debtors filed the Plan Modification Approval Motion setting forth the proposed modifications to the Confirmed Plan and the Disclosure Statement, which included a reaffirmed business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity.

That same day, the United States House of Representatives approved the federal bailout plan, now known as the Troubled Asset Relief Program or "TARP." On the following Monday, October 6, 2008, however, and for much of the rest of the month of October, the global credit markets seized up and the global capital markets experienced one of the five worst bear markets in their history. On December 19, 2008, the White House announced that the federal government would lend $17.4 billion of the TARP funds to GM and Chrysler, portions of which GM and Chrysler received in December 2008 and the first half of 2009.

Despite the efforts of the federal government to provide stability to the capital markets and banks and to assist the financial viability of the domestic automotive industry, the markets remained extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors to successfully attract emergence capital funding for its modifications to the Confirmed Plan. Moreover, in the fourth quarter of 2008 and the first quarter of 2009, forecasted and actual production volumes and sales at the U.S. original equipment manufacturers precipitously declined. For example, the financial projections set forth in Delphi's business plan filed on October 3, 2008 were based on, among other factors, then-projected United States light vehicle sales of 14.2 million vehicles in 2009 and up to 16.3 million vehicles in 2011, with U.S. sales representing approximately 85% of North American sales. Just three months later, on January 12, 2009, GM announced that its forecast for 2009 U.S. light vehicle sales would constitute only 10.3 million units, a staggering 3 million fewer units than were sold in 2008 and 6 million fewer units than were sold in 2007. A more recent U.S. light vehicle sales forecast by third party forecasting service, IHS/Global Insight DRI, has projected an even further reduced sales outlook of 9.6 million units for 2009, while predicting that sales

will rise to 15.6 million units by 2012. Similarly, as of May 14, 2009, GM projected a downside of 9.3 million light vehicle units will be sold in the United States. Other OEM projections are similarly reduced. As shown on the chart below, the U.S. automotive industry has experienced the most precipitous drop in U.S. vehicle sale volumes in half a century.



Annual U.S. Light Vehicle Historical Demand

Source: 1950-1996 AN 100YR Almanac; 1996-1999 & 2008-2012 IHS/Global Insight DRI Sales AI 5-25-09; 2000-2007 Automotive News          - - - - - Projected

As a result of the lack of available credit in the capital markets, the Debtors were unable to secure necessary emergence capital and thus were not able to obtain approval of the modifications to the Confirmed Plan. As a result, the Debtors were forced to remain in chapter 11. The collapse of the credit markets also made it difficult for the Debtors to refinance or extend the maturity of their DIP credit facility, which matured on December 31, 2008, on terms reasonably acceptable to the Debtors and their other stakeholders. Accordingly, in December 2008, the Debtors and the DIP Lenders entered into an accommodation agreement, as subsequently amended, to allow the Debtors to continue using certain of the proceeds of the DIP credit facility through June 30, 2009, among other things. In addition, and in connection with certain amendments to the accommodation agreement with the DIP Lenders, GM agreed to provide the Debtors with additional liquidity and to accelerate payment of certain GM receivables to allow the Debtors to maintain ongoing operations in this challenging economic environment.

During this time, the U.S. government's well-publicized involvement with the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into the

automotive industry, including GM, added yet another key stakeholder to the negotiations with the Debtors regarding their emergence plan. Indeed, in March 2009, in connection with a proposed amendment to the accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an additional $150 million in liquidity under an amendment to the previously-approved liquidity arrangement between Delphi and GM. The U.S. Treasury Department (the "U.S. Treasury"), however, acting pursuant to its authority under GM's loan agreement with the U.S. government, notified the Debtors and GM that it did not approve of the parties' seeking approval of these amendments at that time and requested additional time to consider these agreements and various alternatives with respect to the Debtors' emergence from chapter 11. Since that time, the Debtors and GM have been working on and negotiating a global solution to allow the Debtors to emerge from chapter 11. As part of that solution, the U.S. Treasury has now agreed to allow GM to provide up to an additional $250 million to support Delphi as it seeks approval of its Modified Plan and emergence from chapter 11.

The formulation of the Modified Plan, the provisions of which are summarized more fully below, was the result of significant diligence on the part of the Debtors, their key stakeholders, and certain additional third parties. These results have all been achieved during a tremendously difficult time in the automotive industry. Because of the debilitating conditions in the automotive industry, more than 75 companies directly related to the automotive industry have sought chapter 11 protection in 2009 including, among others, Fleetwood Enterprises, Hayes-Lemmerz Incorporated, Mark IV Industries, Inc., Metaldyne Corporation, Milacron, Inc., Monaco Coach Corporation, Noble International Ltd., and Visteon Corporation. Moreover, even original equipment manufacturers are struggling, as evidenced by the chapter 11 filing of Chrysler LLC on April 20, 2009 and the May 27, 2009 8-K filing by GM with the Securities and Exchange Commission, which outlined a structure for the sale of GM's assets that could be expected as part of a chapter 11 filing in early June 2009.

Against this backdrop, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, the Debtors have determined to implement their emergence from chapter 11 through a transaction with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum, and GM Components Holdings, LLC ("GM Components"), an affiliate of GM. Ultimately, the emergence structure is similar to that which was contemplated in the Confirmed Plan, but rather than having a plan investor sponsoring their plan and emerging as the majority owner of the continuing business enterprise, the Debtors intend to sell certain North American sites and their global Steering business to GM Components and contemporaneously effectuate a transaction through which Parnassus will then operate Delphi's U.S. and non-U.S. businesses without the labor-related legacy costs associated with the North American sites that are transferred back to GM.

In the exercise of the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all of their creditors, the Debtors have executed an agreement to reflect the foregoing transactions through a plan of reorganization. The Debtors will emerge with certain residual assets and liabilities which they intend to operate upon emergence but divest over time. Consummation of these transactions through the Modified Plan, which embodies concessions made by all parties-in-interest allowing for the resolution of these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a distribution to holders of general unsecured claims, as described further

herein. Moreover, Delphi's emerging businesses will continue to develop technology and products and produce them for the benefit of their customers under the guidance of Platinum, a company with experience providing operational support to companies to help them create long term value.

The Debtors are seeking to modify the Confirmed Plan pursuant to section 1127 of the Bankruptcy Code. The Confirmed Plan, with the modifications described herein, will be referred to herein as the "Modified Plan," and this Modified Plan supersedes in its entirety the October 3, 2008 proposed Plan modifications. The purpose of this Supplement is to provide to the holders of Claims against the Debtors adequate information to make an informed judgment about the Modified Plan, which is annexed to this document as Appendix A.

This Supplement contains, among other things, descriptions and summaries of provisions of the Modified Plan. Certain of Delphi's U.S. affiliates are not debtors in these chapter 11 cases (the "Chapter 11 Cases") and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of the Delphi affiliates located outside the U.S. has commenced chapter 11 cases or similar proceedings in any other jurisdictions. Certain provisions of the Modified Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified. Such modifications, however, are not anticipated to have a material adverse effect on the distributions contemplated by the Modified Plan.

## A.    Summary Of Material Modifications To The Confirmed Plan

As set forth above, the Plan Investors' failure to meet their obligations under the Investment Agreement delayed the Debtors' emergence from chapter 11. The loss of this investment, and the resultant exposure to the continued uncertainty of the global capital markets, the current economic climate in the U.S., the depressed state of the global automotive industry, and the combined effect of these factors to depress valuation metrics, have led to a significant decrease in the Debtors' business enterprise value. This result, combined with the Debtors' liquidity issues and the unfavorable economic environment, necessarily has led to significantly reduced recoveries under the Modified Plan for more senior classes and the elimination of recoveries for more junior classes but still maximizes recovery for stakeholders relative to any other alternative explored by the Debtors. The chart below briefly summarizes some of the material modifications to the Confirmed Plan as reflected in the Modified Plan attached hereto as Appendix A, but the Modified Plan and the remainder of this Supplement should be reviewed in their entirety.

|  | Confirmed Plan | Modified Plan |
|---|---|---|
| **Plan Investor** | Plan Investors' commitment to invest up to $2.55 billion | Acquisition of the Company's operating businesses by Parnassus Holdings II, LLC, an affiliate of Platinum Equity Capital Partners II, L.P., and of certain North American operations and the global Steering business by certain affiliates of General Motors Corporation |
| **Rights Offering** | $1.75 billion discount rights offering | No rights offering |
| **Emergence Capital and Capital Commitments** | $4.7 billion | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>Parnassus Holdings II, LLC has obtained approximately $3.6 billion in emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Revolver** | $1.4 billion | Not applicable |
| **Total Enterprise Value** | Agreed plan value of $12.8 billion | Not applicable as a result of the Master Disposition Agreement and related transactions |
| **Defined Benefit Pension Plans** | - $1.5 billion 414(l) Transfer of hourly pension plan to GM<br>- All salaried pension plans and remaining hourly pension plans assumed | - 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008.<br><br>- Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM. The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim |

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **GM** | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the 414(l) assumption | GM will purchase from Delphi for additional consideration certain assets of the Company and will be subject to certain obligations as set forth in the Master Disposition Agreement (which will supersede the Amended Master Restructuring Agreement that will be terminated), including providing certain funding, waiving certain claims and assuming various liabilities.  GM will not receive any distribution on account of its Allowed Claim |
| **DIP Facility Revolver Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **Senior Secured Hedge Obligations** | Paid in the ordinary course of business | Paid in the ordinary course of business with agreed collateralization upon emergence |
| **DIP Facility Second Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date through consummation of a transaction that provides for the cash payment of approximately $291 million, interest in Parnassus Holdings II, LLC in the nominal amount of $145.5 million with a preferred return at a per annum rate of interest of 8% and to be paid pursuant to a waterfall formula as part of the equity distribution of Parnassus Holding LLC and any unpaid balance to be paid ten years after the effective date of Modified Plan, and the first settlement or other proceeds from the Corporation's plan investor litigation up to approximately $146 million |

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **Secured Claims (Excluding DIP Claims)** | Paid in Cash in full or reinstated | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury Bill rate on the effective date, plus 200 basis points; (ii) receive their collateral free and clear of liens; or (iii) receive such other treatment agreed upon by the parties that is more favorable to the Debtors |
| **Unsecured Creditors** | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br>-78.6% in new common stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Pro rata share of deferred consideration under the Master Disposition Agreement |
| **Post-petition Interest** | Post-petition Interest to be paid on certain General Unsecured Claims | No post-petition interest will be accrued or paid on General Unsecured Claims under the Modified Plan |
| **MDL Litigation Claims** | Allowed claims with same treatment as General Unsecured Claims | No recovery under the Modified Plan |
| **Equity** | Direct grant of new common stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | No recovery under the Modified Plan |

## B.     Description Of Organization Of This Supplement And The Modified Plan

The Supplement is divided into this executive summary and an additional 12 sections, each of which is sub-divided further under descriptive headings to aid in the understanding of the information contained herein. The beginning of each section of the Supplement contains a summary of the information in the section and highlights certain modifications made since the approval of the Disclosure Statement. The paragraphs that follow provide a brief overview of the contents of the Supplement.

The introduction and executive summary contain a general overview of the Debtors, and the events that have occurred since the confirmation of the Confirmed Plan in January 2008, including a summary of the terms of the Modified Plan. The executive summary is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Supplement, the Appendices to the Supplement, including the Modified Plan, and in certain instances, the Disclosure Statement as filed in December 2007. The Modified Plan is attached to the Supplement as Appendix A. All capitalized terms not defined in this Supplement have the meanings ascribed to them in the Modified Plan, unless otherwise noted.

Sections I and II of this Supplement explain the chapter 11 process and provide an overview of voting procedures to accept or reject the Modified Plan.

Section III of this Supplement provides an overview of major events that have occurred during the Chapter 11 Cases since the solicitation of votes on the Confirmed Plan, including a description of various orders entered by the Bankruptcy Court, the debtor-in-possession financing obtained and used, the sales of assets, and the litigation between the Debtors and the Plan Investors. This section also describes the claims process and the Debtors' progress in reconciling claims. To provide information about Delphi's financial performance, historical financial results of the Company are attached to this Supplement as Appendix B.

Section IV of this Supplement contains a summary of the Modified Plan including, among other things, an explanation of the potential substantive consolidation of certain Debtors, the treatment of claims and interests under the Modified Plan, and the releases and exculpations provided by the Modified Plan to the Debtors and certain third parties.

Section V of this Supplement describes general considerations and risk factors to be evaluated in conjunction with the description of the Debtors' Modified Plan.

Sections VI and VII of this Supplement provide information on securities law matters and federal income tax consequences of distributions to be made under the Modified Plan.

Section VIII of this Supplement discusses certain bankruptcy law principles that the Debtors must meet for the Modified Plan to be confirmed by the Bankruptcy Court, including that the Modified Plan is feasible and meets the "best interests" test set forth in the Bankruptcy Code. This section also contains an analysis of the hypothetical liquidation of the Debtors performed in conjunction with the formation of the Modified Plan. Liquidation analyses

showing likely recoveries to creditors under a hypothetical case under chapter 7 of the Bankruptcy Code are attached as <u>Appendix C</u>.

Finally, <u>Sections IX-XII</u> of this Supplement explain, among other things, the process by which confirmation of the Modified Plan may occur, conditions to confirmation and consummation of the Modified Plan and the Effective Date, voting requirements, and details about the hearing on the Modified Plan.

Creditors may vote to accept or reject the Modified Plan. In addition, the modifications must be approved by the Bankruptcy Court before Delphi can consummate the Modified Plan. The Modified Plan is the document that effectuates, among other things, distributions to creditors and shareholders and the releases of certain parties.

## C.   Commencement Of Chapter 11 Cases

Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company. Delphi's separation from GM was completed in May 1999.

Precipitating Delphi's entry into chapter 11 was a series of significant net losses for the Company. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses, both during the prepetition and postpetition periods.

- In calendar year 2004, the Company reported a net loss of approximately $4.8 billion. The reported net loss in calendar year 2004 reflects a $4.1 billion income tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in 2004 was $482 million.
- In 2005, the Company incurred net losses of approximately $2.4 billion (with a net operating loss of $2.0 billion).
- In 2006 the Company incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs. Net operating losses in calendar year 2006 were $4.5 billion.
- In 2007, the Company incurred a net loss of $3.1 billion. Net operating losses in calendar year 2007 were $1.9 billion.
- In 2008, although the Company recorded net income of $3.0 billion in 2008, which included a gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.
- In the first quarter of 2009, although the Company recorded net income of $556 million, which included a gain of $1.2 billion in connection with the termination of the salaried OPEB plan, the Company's net operating loss of the first quarter was $534 million.

Delphi believes that the Company's financial performance deteriorated in the period prior to the chapter 11 filing because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for U.S. OEMs resulting in the reduced number of motor vehicles that such OEMs, including GM, produce annually in the United States and related pricing pressures, and (c) increasing commodity prices.

In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these Chapter 11 Cases for its U.S. businesses to preserve value for its stakeholders.

**D.      Overview Of Delphi's Transformation**

On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations (the "Transformation Plan"). During the course of its Chapter 11 Cases, including the period following April 4, 2008, Delphi implemented many of its key transformation goals, despite the harsh economic climate that began in 2007 and led to the current depressed global capital and equity markets. Delphi's transformation activities during its Chapter 11 Cases produced an enterprise with more flexibility and a greater capability to respond to changing markets because of its more streamlined enterprise with a more focused product portfolio, reduced U.S. employment costs, the ability to adjust U.S. manufacturing with volume, a significant reduction in high cost production capacity, increasingly shared business processes and IT platforms between operating units, a simplified organizational structure, greater business diversification by customer, and greater business diversification by region.

The Company's stated goals for transforming five key areas of its business and its progress in realizing those goals throughout the cases is summarized below.

S-xiv



| | |
|---|---|
| **Labor**<br>Modify the Company's labor agreements to create a competitive arena in which to conduct business | Agreements with all principal U.S. labor unions that:<br>• modified, extended, or terminated provisions of the Company's U.S. existing collective bargaining agreements with its unions;<br>• provided that GM would undertake certain financial obligations to Delphi's union-represented retirees; and<br>• modified retiree welfare benefits for union-represented retirees<br>Negotiated attrition programs with certain of Delphi's unions, implemented with the assistance of GM<br>These agreements will be assumed and assigned under the Master Disposition Agreement |
| **GM**<br>Conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company | • The Global Settlement Agreement, which became effective in September 2008, provided a comprehensive resolution of the claims between Delphi and GM (other than ordinary course claims) in consideration for the 414(l) transaction, GM's assumption of financial responsibility for traditional U.S. hourly OPEB, and GM's commitments to Delphi<br>• The Master Restructuring Agreement, which became effective in September 2008, addressed GM's forward business commitments to Delphi and the parties' continuing obligations to each other; this agreement will be superseded by the Master Disposition Agreement<br>• The Master Disposition Agreement, which will become effective upon the Debtors' emergence, pursuant to which an affiliate of GM will acquire certain of the Debtors' North American operations and will assume certain liabilities in accordance therewith |
| **Product Portfolio And Manufacturing Footprint**<br>Streamline the Company's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus | • Effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it had competitive and technological advantages<br>• The Company developed a revised operating structure that consisted of the following core business segments:<br>  - Electrical/Electronic Architecture<br>  - Powertrain Systems<br>  - Electronics and Safety<br>  - Thermal Systems<br>  - Delphi Product and Service Solutions<br>• The Company also identified non-core product lines and plants which have been held for sale or wind-down by Automotive Holdings Group<br>• During 2006-2008, the Company has worked to maximize the value of non-core assets for all stakeholders, commenced and/or completed the sale of certain bearings, brakes, chassis, catalyst, interiors and closures, power products, and steering businesses<br>• The Company identified eight core automotive sites in the United States and streamlined its global manufacturing footprint; both the "core" sites and the global operations will now be transferred pursuant to the Master Disposition Agreement |
| **Cost Structure**<br>Transform the Company's salaried workforce and reduce general and administrative expenses to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint | • The Company made significant progress to ensure that its organizational and cost structure was competitive by entering into various outsourcing agreements, including outsourcing certain of its accounts receivable, accounts payable, and contract administration processes, which significantly reduced the Company's SG&A expenses<br>• The Company reduced the size of its salaried workforce and implemented benefit reductions for both active salaried employees and retirees<br>• The Company developed a competitive benchmark executive and non-executive compensation program |
| **Pension**<br>Devise a workable solution to the Company's pension funding situation | • The Company froze all but one of its defined benefit programs as of November 30, 2008, but will provide alternative defined contribution programs and will reach an agreement with GM or the PBGC regarding the frozen programs<br>• On September 29, 2008, the Company effectuated the first transfer under Section 414(l) of the Internal Revenue Code of certain hourly pension liabilities to GM with a subsequent transfer of assets and liabilities related to the hourly plan scheduled to occur upon the effective date of the Modified Plan. These transfers, combined with contributions upon emergence, has assisted the Company in addressing its hourly pension funding situation<br>• While the defined benefit programs were to be assumed under the Confirmed Plan, the salaried and subsidiary plans are no longer capable of assumption because of the deterioration of the capital markets in 2008 and 2009 and accordingly such plans may be involuntarily terminated by the PBGC |

Although the realization of the Debtors' Transformation Plan has not led to an emergence structure that provides value to nearly all stakeholders as originally contemplated, the significant progress the Debtors made in streamlining their businesses throughout the Chapter 11 Cases has resulted in the willingness of third parties to invest in the Debtors' underlying business assets, including significant portions of its operations, through the transactions contemplated in the disposition agreement among the Debtors, Parnassus, GM Components, and certain affiliates thereof (the "Master Disposition Agreement"). The Debtors expect that the go-forward business will maintain its prominence as one of the world's premier automotive suppliers under the ownership of Parnassus as it continues to supply customers around the world.

### E.    Key Emergence Issues

Following the inability of the Debtors to implement their proposed modifications to the Confirmed Plan in October 2008, the Debtors undertook steps in three primary areas which the Debtors believe have been critical to completing their transformation and positioning the Company to emerge from chapter 11: (i) reaching an agreement with Parnassus and GM Components for the disposition of the Debtors' primary business assets, (ii) resolving the Debtors' financing issues, and (iii) resolving the Debtors' pension issues. Critical to achieving resolution of each of these issues has been garnering the support of the U.S. Treasury for Delphi's plan of reorganization. As a result of GM accepting TARP funds from the U.S. government, GM's use of capital is subject to significant governmental oversight, particularly for transactions valued at more than $100 million. Because support from GM in a variety of forms was central to the resolution of each of these three issues, it was essential for the Debtors to attain U.S. Treasury support as well. Having garnered that support in light of the Debtors' significant relationship with GM, the Debtors have been able to reach a consensual resolution with their parties-in-interest to Delphi's outstanding issues, which discussions have resulted in the agreements underlying the Modified Plan.

#### *1.    Master Disposition Agreement*

In September 2008, the Debtors reached agreements with GM to accelerate the effectiveness of certain agreements among the Debtors and GM that provided for the settlement of claims between the parties and proscribed the nature of the relationship between the Company and GM going forward. These agreements contained many benefits inuring to the Debtors and were initially to become effective concurrently with the consummation of the Confirmed Plan. When the effectiveness of the Confirmed Plan was delayed, the Debtors sought and, on September 25, 2008 the Bankruptcy Court approved, the implementation of an Amended and Restated Global Settlement Agreement (the "Amended GSA") and Amended and Restated Master Restructuring Agreement (the "Amended MRA") with GM. Through the Amended GSA and Amended MRA, the Debtors addressed, at least in part, two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) working to solve Delphi's pension funding situation. Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations. Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the original global settlement agreement and master restructuring agreement with GM approved in connection with the Confirmed Plan (the "Original GSA" and "Original MRA," respectively). This estimate included the value of two 414(l) transfers of pension assets and liabilities to GM and the consideration provided by Delphi for both transfers. The Amended GSA and Amended MRA became effective on September 29, 2008.

When the Amended GSA and Amended MRA were consummated, the Debtors believed that they were on the path to emergence, but due to the increasingly severe global economic downturn and the deterioration in forecasted production volumes from original equipment manufacturers, the Debtors found themselves in need of further liquidity. Thus, the Company

was required to continue exploring strategic alternatives. To facilitate the Debtors' emergence from chapter 11 pursuant to the Modified Plan, during the first quarter of 2009, Delphi and GM engaged in extensive discussions with respect to GM's acquisition of Delphi's global steering business as well as certain of Delphi's North American facilities that employ hourly workers represented by the UAW and that are dedicated principally to supplying product to GM.

As the decline of the U.S. automotive industry continued, culminating with the chapter 11 filing of Chrysler LLC and potential chapter 11 filing of GM, the Debtors continued to negotiate with GM regarding the terms of a potential sale of assets. As a result of this process, certain other potential purchasers also engaged in dialogue with GM and the Debtors. These expanded discussions raised the possibility of a well-capitalized third party purchaser acquiring substantially all of the Debtors' assets, other than those to be purchased by GM, and certain additional assets to remain with a reorganized company, to move the company forward. As a result of these discussions, the Debtors secured the support of Platinum and GM and were able to negotiate the Master Disposition Agreement with GM Components and Parnassus.

Pursuant to Master Disposition Agreement, and subject to the terms described therein, certain of GM's affiliates would purchase certain of the Debtors' U.S. manufacturing facilities that primarily supply product to GM as well as the assets of the Debtors' global Steering business. Concurrently, Parnassus would purchase a substantial portion of the remaining business assets, including the equity of the Debtors' non-U.S. subsidiaries.



From the purchasers, the Debtors would receive, among other things, cash, the assumption of liabilities, assumption of certain administrative claims and/or cash to fund payment of certain administrative claims, and certain deferred consideration. Additionally, as part of the consideration GM would provide, at closing GM would waive its administrative

expense claim under the GM Arrangement, its administrative expense claim under Section 4.04(a)(i) of the Amended GSA, and its prepetition claim.



The Master Disposition Agreement contains typical representation and warranties and sets forth certain covenants relating to bankruptcy actions, employees, intellectual property, operations, and taxes, among others. One of the bankruptcy covenants provides that under certain conditions, in lieu of the sale transactions contemplated under the Master Disposition Agreement being consummated as part of the Debtors' plan of reorganization, such sale transactions would proceed pursuant to section 363 of the Bankruptcy Code. Entry into the Master Disposition Agreement and the conditions precedent to the consummation thereof having been waived or satisfied are conditions to the effectiveness of the Modified Plan.

### 2. *Funding Issues*

Since April 4, 2008, the Debtors have sought to bolster their liquidity and to obtain commitments to fund their emergence from chapter 11 despite the frozen credit markets. To that end, the Debtors implemented a number of cash conservation measures, including temporary lay-offs and salaried benefit cuts for both active employees and retirees, delay of capital and other expenditures, and permanent salaried work-force reductions, among other cost saving measures, to ensure adequate liquidity for operations while the Company engaged in further restructuring efforts in response to changes in the global automotive industry. In addition, the Debtors have sought additional sources of short-term and long-term funding through their postpetition lenders, GM, the U.S. government, and other third parties, including through legal action against the Plan Investors.

In April 2008, the Debtors amended their postpetition credit facility and extended the maturity to December 31, 2008, which amendment became effective on May 9, 2008. Due to a

positive market response and oversubscription for all three tranches of debt, the Debtors were able to increase the principal amount of the tranche C term loan by $254 million. As a result, the Debtors' postpetition credit facility consists of a $1.1 billion first priority revolving credit facility ("Tranche A"), a $500 million first priority term loan ("Tranche B"), and a $2.75 billion second priority term loan ("Tranche C," and collectively with Tranche A and Tranche B, the "DIP Loans," and the lenders thereto, the "DIP Lenders"). The obligations and rights of the Debtors and DIP Lenders are as set forth in the Second Amended and Restated Credit Agreement, which became effective on May 9, 2008 (the "DIP Credit Agreement"). Following the filing of the October 3, 2008 modifications to the Confirmed Plan, when it became clear that the Debtors would not be able to emerge prior to the December 31, 2008 maturity date, the Debtors sought another amendment of the postpetition credit facility. As a result of the market turbulence, however, the Debtors were unable to extend the maturity date on terms reasonably acceptable to them and their other stakeholders. Accordingly, with the support of the administrative agent (the "Administrative Agent") and the requisite lenders to the postpetition credit facility, the Debtors entered into an accommodation agreement (the "Accommodation Agreement") which allowed the Debtors, among other things, to continue using certain of the proceeds of the postpetition credit facility through June 30, 2009, subject to certain milestones, but prevented the further borrowing of funds under the DIP Credit Agreement. The Accommodation Agreement was amended from time to time as the result of delays in meeting the milestones set forth in the Accommodation Agreement, as amended. Absent a further amendment, which the Debtors are currently negotiating, the Debtors anticipate that on June 2, 2009, the Accommodation Agreement will terminate. In such event, the Debtors will seek to negotiate further accommodations under the DIP Credit Agreement with the Required Lenders under the agreement.

To further support the Debtors' liquidity, since May 2008, GM has provided advances to the Debtors in amounts ranging from $50 million to $650 million (the "GM Arrangement") and to accelerate payment of up to $300 million in certain payables to the Debtors through May 2009 (the "Pull-Forward Agreement"). In February 2009, Delphi sought and, subject to U.S. Treasury consent, GM agreed to provide an additional $150 million of advances to Delphi, which would have increased the total advances extended to Delphi to $450 million. On March 23, 2009, however, U.S. Treasury notified GM and the Debtors in writing that U.S. Treasury did not approve the parties' seeking approval of these agreements until U.S. Treasury had a further opportunity to review the details of those transactions and the various alternatives for Delphi's emergence from chapter 11. Thus, since the end of March, the Debtors have been constantly negotiating with their DIP Lenders to maintain needed liquidity while negotiating agreements that would enable them to bring their reorganization to a successful conclusion.

In mid-May, in resolution of U.S. Treasury's earlier objections, Delphi was informed that GM would be permitted to provide interim DIP financing to the Debtors to assist with their operations pending the closing of the Master Disposition Agreement as well as the reimbursement of certain post-closing expenses, in each case in amounts and on terms to be agreed between GM and Delphi. This financing is being provided as an amendment to the GM Arrangement and will provide for an aggregate $550 million in advances from GM. In addition, U.S. Treasury has agreed to provide funding to GM for GM Components' acquisition of certain of the Debtors' assets as provided in the Master Disposition Agreement. Finally, the agreement by Parnassus and GM Components to provide liquidity for the payment of (or the assumption of)

certain of the Debtors' administrative claims has allowed the Debtors to present a feasible Modified Plan to the Bankruptcy Court for approval.

### 3.    *Resolution Of Pension Issues*

To emerge from chapter 11, the Debtors have also diligently worked to resolve their pension issues through negotiations with GM, U.S. Treasury, and the Pension Benefit Guaranty Corporation ("PBGC") and by taking action to implement certain cost-saving aspects of their pension transformation.  First, in September 2008, the Debtors received Bankruptcy Court approval to freeze their U.S. hourly and salaried pension plans, with the exception of one relatively small defined benefit plan that remains unfrozen.  Concurrently, through the effectiveness of the Amended GSA and Amended MRA, Delphi transferred a large portion of the hourly pension plan to GM's hourly pension plan by executing a section 414(l) transfer under the Internal Revenue Code (the "IRC"), to which the Debtors have attributed a value of $2.1 billion in net unfunded liabilities.  Further, because the Debtors were making every effort to preserve their pension plans, in December 2008, Delphi filed with the IRS a pension funding waiver request for their salaried pension plan for the plan year ended September 30, 2008 to assist the Debtors in continuing to conserve cash.

In addition, GM has agreed to make certain arrangements, the details of which are still being finalized, such that Delphi will no longer have responsibility for the remainder of its hourly pension plan.  Although the Debtors have explored numerous alternatives for its salaried pension plan and other "subsidiary" plans, none are feasible.  Thus, in connection with the Modified Plan, the PBGC will explore initiating an involuntary termination of those plans.  In light of this outcome, the Debtors, GM, U.S. Treasury, and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims against the Debtors and members of the Debtors' "controlled group" as defined IRC and/or ERISA.  Pursuant to that settlement agreement and as set forth in the Modified Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.4 of the Modified Plan and the PBGC will receive a cash payment in the amount of $30 million, all of which is in consideration for (a) the discharge of the Contingent PBGC's Secured Claims, i.e., the conditional junior replacement liens in DASHI's assets that were already encumbered by the DIP Facility, which conditional liens were granted to the PBGC in connection with the transfer of repatriated funds from certain non-Debtor global affiliates, as described more fully in Section III.A – Post-Confirmation Agreements With GM and The Postpetition Lenders, (b) the liability to be assumed by the PBGC related to the termination of the Salaried Plan and the Subsidiary Plans, (c) the PBGC's waiver of any and all liens and claims not otherwise discharged by this Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (d) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise.

consummation of a plan of reorganization that satisfied certain conditions set forth in the Amended MRA. Due to the state of the economy and the rapid deterioration in the automotive sector, the Debtors could not satisfy those conditions. Nevertheless, GM has agreed to make certain arrangements, the details of which are still under discussion, such that the Debtors shall no longer have responsibility for the Hourly Plan.

Despite the Debtors' effort to preserve their other pension plans, the Debtors were unable to secure sufficient capital to achieve that objective. Consequently, it is expected that the PBGC will terminate the Salaried Plan and the Subsidiary Plans. As a result, participants in those Pension Plans would collect their pension benefits from the PBGC as provided by law.

The Debtors and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims against the Debtors and members of the Debtors' "controlled group" as defined by the IRC and/or ERISA. Pursuant to that settlement agreement and as set forth in the Modified Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.3 of the Modified Plan, and the PBGC will receive a cash payment in the amount of $30 million, all of which is in consideration for (a) the discharge of the Contingent PBGC's Secured Claims, i.e., the conditional junior replacement liens in DASHI's assets that were already encumbered by the DIP Facility, which conditional liens were granted to the PBGC in connection with the transfer of repatriated funds from certain non-Debtor global affiliates, as described more fully in Section III.A – Post-Confirmation Agreements With GM and The Postpetition Lenders, (b) the liability to be assumed by the PBGC related to the expected involuntary termination of the Salaried Plan and the Subsidiary Plans, (c) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by this Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (d) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise. A copy of the PBGC Settlement Agreement is attached to the Modified Plan substantially in the form of Exhibit 7.17. Except as provided in the PBGC settlement agreement and as set forth in Article V of the Modified Plan, on the Effective Date, all liens arising from or relating to the Pension Plans will be terminated and discharged.

### C. Significant Confirmation And Post-Confirmation Events

#### 1. Confirmation Of The Confirmed Plan

After a hearing on December 7, 2007 on the adequacy of the proposed disclosure statement (including modifications proposed after September 6, 2007), on December 10, 2007, Delphi filed the December 2007 Plan and the Disclosure Statement. The Court entered an order approving the adequacy of the December 2007 Disclosure Statement that same day. Thereafter, Delphi began solicitation of votes on the December 2007 Plan.

On January 16, 2008, Delphi announced the voting results on the December 2007 Plan, which illustrated broad-based support for the plan. Eighty-one percent of all voting general

## B.   Conditions To Confirmation And Consummation Of The Modified Plan

### 1.   Confirmation

The Confirmation Order was entered on January 25, 2008 and became a final order on February 4, 2008.

### 2.   Conditions To The Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of the Modified Plan, as described in Section IX.C. – Waiver Of Conditions To Confirmation And Consummation Of The Modified Plan below:

- The Bankruptcy Court must have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Confirmed Plan. (Article 12.2(a) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, must have entered into the Master Disposition Agreement, and all conditions precedent to the consummation of the Master Disposition Agreement must have been waived or satisfied in accordance with the terms thereof. (Article 12.2(b) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, and the DIP Agent must have effectuated the DIP Transfer.  (Article 12.2(c) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, must have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof must have been waived or satisfied in accordance with the terms thereof.  (Article 12.2(d) of the Modified Plan)

- The Bankruptcy Court must have entered one or more orders, which may include the Modification Approval Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of the Modified Plan. (Article 12.2(e) of the Modified Plan)

- Each Exhibit, document, or agreement to be executed in connection with the Modified Plan must be in form and substance reasonably acceptable to the Debtors. (Article 12.2(f) of the Modified Plan)

## C.   Waiver Of Conditions Precedent

The conditions set forth in 12.2(e) and 12.2(f) of the Modified Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied

Exhibit 7.17

Delphi-PBGC Settlement Agreement

[To be filed on or before the Exhibit Filing Date]

# EXHIBIT D

05-44481-rdd   Doc 18570-2  Filed 07/23/09  Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-1299-STO-MJH   Document 3-7   Filed 07/23/2009   Page 2 of 5
                                               Pg 65 of 87
Press Release: Delphi Reaches Agreements to Emerge From Chapter 11 Reorganization        Page 1 of 4

# News

## Press Releases

**Delphi Reaches Agreements to Emerge From Chapter 11 Reorganization**

**Company Filing Modifications to 2008 Confirmed Plan of Reorganization; Final Transaction Approval Hearing Scheduled for July 23, 2009**

**Platinum Equity Will Acquire Transformed Delphi Business Operation with Emergence Capital and Capital Commitments of $3.6 Billion**

**General Motors Will Acquire Global Steering Division and Select U.S. Operations**

**General Motors Will Provide up to $250 Million Subordinated DIP Financing To Support Delphi's Chapter 11 Cases to Closing; Final Financing Hearing Scheduled for June 16, 2009**

**Release Date: June 01, 2009**

Troy, Mich. — Delphi Corp. (PINKSHEETS:DPHIQ) announced it is filing today further modifications to its confirmed First Amended Joint Plan of Reorganization and a Supplement to its First Amended Disclosure Statement with the U.S. Bankruptcy Court for the Southern District of New York. Copies of these documents, which remain subject to approval by the Bankruptcy Court as part of the reorganization plan modification process, will be posted on www.delphidocket.com.

Delphi will effect its emergence from Chapter 11 reorganization through a transaction with Parnassus Holdings II, LLC, an affiliate of Platinum Equity, and with the support of GM Components Holdings LLC, an affiliate of General Motors Corporation. The emergence structure is similar to that contemplated in the Company's previously Confirmed Plan. However, instead of plan investors emerging as the majority owner of the continuing business enterprise through sponsorship of the Confirmed Plan, Delphi has agreed to contemporaneously effectuate transactions through which Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that are being acquired by GM Components Holding LLC together with Delphi's global Steering business. Certain other residual non-core and non-strategic assets and liabilities will be retained by a reorganized entity emerging as DPH Holdings Co., which are expected to be divested over time.

"After an extended period of complex and challenging discussions with a wide range of stakeholders, we are confident that these modifications to our confirmed Plan of Reorganization will provide a resolution that will allow Delphi to emerge from Chapter 11," said Rodney O'Neal, Delphi CEO and president. "We are grateful for the patience of our customers, who have placed their trust in Delphi's ability to provide world-class products and uninterrupted supply, and the support of our suppliers who have contributed broadly to our efforts. We are also thankful for the dedicated Delphi employees who have remained focused on our customers and to the communities in which we operate for their unwavering support during the most challenging period in our history."

According to O'Neal, Delphi's emerging businesses will continue to develop technology and products and produce them for the benefit of its customers under the guidance of Platinum, a company with experience providing operational support to companies to help them create long term value.

O'Neal said that Delphi had worked diligently to obtain support from Platinum, GM and the Company's lenders and other stakeholders to effect Delphi's emergence from Chapter 11 through the plan modifications filed today with the Bankruptcy Court but has also committed to complete these transactions through a sale of the Company to GM Components and Parnassus if sufficient stakeholder support is not obtained to promptly achieve confirmation and substantial consummation of the modified plan of reorganization. The final approval hearing on the emergence transactions announced today has been scheduled by the Bankruptcy Court for July 23, 2009. A final hearing on the incremental $250 million subordinated DIP facility has been set for June 16, 2009. Delphi expects preliminary hearings previously scheduled for June 2, 2009 to be rescheduled by the Bankruptcy Court to later this week or next week.

**Platinum Equity / Parnassus Purchase of Emerged Delphi Business Operations**
Platinum Equity will acquire and operate the emerged Delphi U.S. and non-U.S. business operations through its Parnassus affiliate.

"A healthy, sustainable supply base is the best foundation for any effort to revitalize the auto industry," said Platinum Equity Chairman and CEO Tom Gores. "Automakers need strong suppliers in order to rebuild their own businesses and return to profitability. It starts from the ground up and we look forward to contributing to that process."

Platinum's M&A&O® approach to investing focuses on acquiring businesses that need operational support and can benefit from Platinum's expertise in transition, integration and operations.

Platinum has substantial knowledge of Delphi's operations and a strong working relationship with the company, its stakeholders and its global OEM customer base.

"We know the business very well and understand its potential," added Mr. Gores. "Despite the obvious challenges facing the auto industry, we are excited at the opportunity to be a part of its renewal. Our top priority is working together with customers, employees, and suppliers to ensure long-term success for Delphi."

05-44481-rdd   Doc 18579-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:09-cv-12908-SFC-MJH   Document 3   Filed 07/23/2009   Page 3 of 5
Pg 66 of 87
Press Release: Delphi Reaches Agreements to Emerge From Chapter 11 Reorganization          Page 2 of 4

**Sale of Certain U.S. Sites and Global Steering Business to General Motors**
Under the provisions of the modified Plan, Delphi will sell certain U.S. plants to certain affiliates of GM, including: Delphi's global steering operations, and the U.S. manufacturing sites located in Kokomo, Ind.; Wyoming, Mich.; Lockport, NY; and Rochester, NY. The Steering operations include manufacturing, engineering and customer service sites in the United States and other locations outside the U.S. Today's agreed transaction with GM Components Holdings LLC supersedes the prior GM Steering Option Exercise Agreement, which had been pending Bankruptcy Court approval and will be withdrawn by Delphi.

**Confirmed Plan and Modified Plan Comparison**
John Sheehan, Delphi vice president and chief financial officer said that significant challenges in the global automotive and financial sectors - as well as the delay in emergence caused by the actions of the former plan investors in refusing to close on their Investment Agreement in April, 2008 - have caused the business enterprise value of the company to be substantially less than in the previous plan. "Accordingly, distributions to be received by our stakeholders and the currency of such distributions have significantly changed for more senior stakeholders, or have been eliminated for more junior stakeholders, since the confirmation of the Confirmed Plan," Sheehan said.

Proposed modifications to the Confirmed Plan being filed today are outlined below:

| | Confirmed Plan | Modified Plan |
|---|---|---|
| **Plan Investor** | Plan Investors' commitment to invest up to $2.55 billion | Acquisition of the Company's operating businesses by Parnassus Holdings II, LLC, an affiliate of Platinum Equity Capital Partners II, L.P., and of certain North American operations and the global Steering business by certain affiliates of General Motors Corporation |
| **Rights Offering** | $1.75 billion discount rights offering | No rights offering |
| **Emergence Capital and Capital Commitments** | $4.7 billion | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>Parnassus Holdings II, LLC has obtained approximately $3.6 billion in emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Revolver** | $1.4 billion | Not applicable |
| **Total Enterprise Value** | Agreed plan value of $12.8 billion | Not applicable as a result of the Master Disposition Agreement and related transactions |
| **Defined Benefit Pension Plans** | - $1.5 billion 414(l) Transfer of hourly pension plan to GM<br><br>- All salaried pension plans and remaining hourly pension plans assumed | - 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008.<br><br>- Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM. The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim |
| **GM** | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the 414(l) assumption | GM will purchase from Delphi for additional consideration certain assets of the Company and will be subject to certain obligations as set forth in the Master Disposition Agreement (which will supersede the Amended Master Restructuring Agreement that will be terminated), including providing certain funding, waiving certain claims and assuming various liabilities. GM will not receive any distribution on account of its Allowed Claim |
| **DIP Facility Revolver Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **Senior Secured Hedge Obligations** | Paid in the ordinary course of business | Paid in the ordinary course of business with agreed collateralization upon emergence |
| **DIP Facility Second Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date through consummation of a transaction that provides for the cash payment of approximately $291 million, interest in Parnassus Holdings II, LLC in the nominal amount of $145.5 million with a preferred return at a per annum rate of interest of 8% and to be paid pursuant to a waterfall formula as part of the equity distribution of Parnassus Holding LLC and any unpaid balance to be paid ten years after the effective date of Modified Plan, and the first settlement or other proceeds from the Corporation's plan investor litigation up to approximately $146 million |
| **Secured Claims (Excluding DIP** | Paid in Cash in full or reinstated | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the |

| (Claims) | | closing seven-year Treasury Bill rate on the effective date, plus 200 basis points; (ii) receive their collateral free and clear of liens; or (iii) receive such other treatment agreed upon by the parties that is more favorable to the Debtors |
|---|---|---|
| Unsecured Creditors | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br>-78.6% in new common stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Pro rata share of deferred consideration under the Master Disposition Agreement |
| Post-petition Interest | Post-petition interest to be paid on certain General Unsecured Claims | No post-petition interest will be accrued or paid on General Unsecured Claims under the Modified Plan |
| MDL Litigation Claims | Allowed claims with same treatment as General Unsecured Claims | No recovery under the Modified Plan |
| Equity | Direct grant of new common stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | No recovery under the Modified Plan |

**Pre-Emergence Funding By GM**
Under the provisions of an Amended and Restated Delphi-GM Arrangement (which will supersede two prior amendments which had provided for $150 million in pre-emergence liquidity and had been pending Bankruptcy Court approval), GM will be providing Delphi with up to $250 million of pre-emergence liquidity through July 31, 2009 to support Delphi's transformation plan and its plan of reorganization.

**Termination of Salaried and Certain Hourly Pension Plans**
Sheehan noted that Delphi had achieved its earlier Transformation Plan objective of developing a workable pension solution for its defined benefit plans, which were to have been assumed and preserved under the prior Confirmed Plan. However, the delay in emergence caused by the actions of our former plan investors in refusing to close on their Investment Agreement in April, 2008 -- followed by subsequent historic deterioration in the capital markets and global automotive industry -- have prevented Delphi from being able to fund its defined benefit pension plans for existing retiree and active hourly and salaried employees following emergence from Chapter 11 reorganization. Accordingly, Delphi's U.S. Hourly Pension Plan will be addressed by GM. Although the Company explored numerous alternatives for its salaried pension plan and other "subsidiary" plans, none were determined to be feasible. Thus, in connection with the Modified Plan, the U.S. Pension Benefit Guaranty Corporation (PBGC) may initiate an involuntary termination of the salaried pension plan and the other "subsidiary" plans and is expected to enter into a settlement with Delphi that will result in the PBGC receiving certain consideration including an allowed prepetition unsecured claim in connection with resolving its claims and other asserted global liens.

**Wind-down of Remaining Idled Sites**
Delphi will continue the wind-down and disposition of several discontinued operations, primarily located in the United States, through a reorganized entity expected to be called DPH Holdings Co. The sites include: Athens, Ala.; Fitzgerald, Ga.; New Castle, Ind.; Olathe, Kan.; select sites in Flint and Saginaw, Mich.; Clinton, Miss.; select sites in Columbus, Cortland, Dayton, Kettering and Warren, Ohio; a leased facility in Columbia, Tenn.; and Oak Creek Wisc.

**ABOUT DELPHI'S CHAPTER 11 CASE**
Delphi's Chapter 11 cases were filed on Oct. 8, 2005, in the United States Bankruptcy Court for the Southern District of New York and were assigned to the Honorable Robert D. Drain under lead case number 05-44481 (RDD).

More information on Delphi's U.S. restructuring and access to court documents is available at www.delphidocket.com.

Information on the case can also be obtained on the Bankruptcy Court's website with Pacer registration: http://www.nysb.uscourts.gov. For more information about Delphi and its operating subsidiaries, to include Court filings discussed in this release, visit Delphi's website at www.delphi.com.

**FORWARD-LOOKING STATEMENTS**
This press release as well as other statements made by Delphi may contain forward-looking statements that reflect, when made, the Company's current views with respect to current events and financial performance. Such forward-looking statements are and will be, as the case may be, subject to many risks, uncertainties and factors relating to the Company's operations and business environment which may cause the actual results of the Company to be materially different from any future results, express or implied, by such forward-looking statements. In some cases, you can identify these statements by forward-looking words such as "may," "might," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue," the negative of these terms and other comparable terminology. Factors that could cause actual results to differ materially from these forward-looking

05-44481-rdd   Doc 18570-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Pg 68 of 87
Case 2:09-cv-12950-SFC-MJH   Document 3-7   Filed 07/24/2009   Page 5 of 5

Press Release: Delphi Reaches Agreements to Emerge From Chapter 11 Reorganization        Page 4 of 4

statements include, but are not limited to, the following: the ability of the Company to continue as a going concern; the ability of the Company to operate pursuant to the terms of the partial temporary accelerated payments agreement and Advance Agreement with GM, its debtor-in-possession financing facility, and to obtain an extension of term or other amendments as necessary to maintain access to such Advance Agreement and facility; the Company's ability to obtain Court approval with respect to motions in the Chapter 11 cases prosecuted by it from time to time, including the ability of the Company to obtain Court approval of the interim Liquidity Support Agreement with GM and approval to modify the Plan which was confirmed by the Court on January 25, 2008, to confirm such modified plan or any other subsequently filed plan of reorganization and to consummate such plan or other consensual resolution of Delphi's Chapter 11 cases; risks associated with third parties seeking and obtaining Court approval to terminate or shorten the exclusivity period for the Company to propose and confirm one or more plans of reorganization, for the appointment of a Chapter 11 trustee or to convert the cases to Chapter 7 cases; the ability of the Company to obtain and maintain normal terms with vendors and service providers; the Company's ability to maintain contracts that are critical to its operations; the potential adverse impact of the Chapter 11 cases on the Company's liquidity or results of operations; the ability of the Company to fund and execute its business plan as described in the proposed modifications to its Plan as filed with the Court and to do so in a timely manner; the ability of the Company to attract, motivate and/or retain key executives and associates; the ability of the Company to avoid or continue to operate during a strike, or partial work stoppage or slow down by any of its unionized employees or those of its principal customers and the ability of the Company to attract and retain customers. Additional factors that could affect future results are identified in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 filed with the United States Securities and Exchange Commission, including the risk factors in Part I. Item 1A. Risk Factors, contained therein and in Part II. Item 1A. Risk Factors in the Quarterly Report on Form 10-Q for the quarter ended March 31, 2009. Delphi disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events and/or otherwise. Similarly, these and other factors, including the terms of any reorganization plan ultimately confirmed, can affect the value of the Company's various prepetition liabilities, common stock and/or other equity securities. It is possible that Delphi's common stock may have no value and claims relating to prepetition liabilities may receive no value.

For more information contact:

Delphi - Media Contact
Lindsey Williams
1.248.813.2528

Delphi - Investor Contact
Eric Creech
1.248.813.2498

Platinum Equity
Dan Whelan
1.310.282-9202

# EXHIBIT E

Hearing Date and Time: July 23, 2009 at 10:00 a.m.
Objection Deadline: July 15, 2009 at 4:00 p.m.

| | |
|---|---|
| PENSION BENEFIT GUARANTY CORPORATION | KELLEY DRYE & WARREN LLP |
| Israel Goldowitz, Chief Counsel | Merrill B. Stone |
| Karen L. Morris, Deputy Chief Counsel | Craig A. Wolfe |
| John A. Menke, Assistant Chief Counsel | 101 Park Avenue |
| Ralph L. Landy, Attorney | New York, NY  10178 |
| C. Wayne Owen, Jr., Attorney | Tel:  (212) 808-7800 |
| 1200 K Street, N.W. | Fax: (212) 808-7897 |
| Washington, D.C.  20005 | |
| Tel:  (202) 326-4020 | KELLEY DRYE & WARREN LLP |
| Fax: (202) 326-4112 | Joseph A. Boyle |
| | 200 Kimball Drive |
| Attorneys for Pension Benefit Guaranty Corporation | Parsippany, NJ  07054 |
| | Tel:  (973) 503-5920 |
| | Fax: (973) 503-5930 |
| | |
| | Attorneys for Pension Benefit Guaranty Corporation |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, *et al.*, | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Docket No. 17030 and 17032 |

**STATEMENT OF PENSION BENEFIT GUARANTY CORPORATION IN
RESPONSE TO FIRST AMENDED JOINT PLAN OF DELPHI CORPORATION
AND CERTAIN AFFILIATES, DEBTORS AND DEBTOR-IN-POSSESSION**

Pension Benefit Guaranty Corporation ("PBGC") hereby responds to the above-

captioned debtors' (the "Debtors" or "Delphi") First Amended Joint Plan of Delphi Corporation

and Certain Affiliates, Debtors and Debtor-in-Possession, which is found at Docket No. 17030

(the "Plan").  PBGC respectfully represents as follows:

## STATEMENT

The Debtors' Plan contains several references to a settlement between Delphi and

PBGC. *See, e.g.*, Plan, §§ 1.53, 7.17. While PBGC and the Debtors are working toward a

consensual resolution of the treatment of Delphi's pension plans, as no agreement has yet been

reached on the terms set forth in the Motion or otherwise, PBGC hereby expressly reserves its

rights with respect to any such settlement, including the specific terms upon which settlement

may be possible.

PBGC also expressly reserves all of PBGC's claims, defenses, liens, and rights to

assert further objections to any proposed modifications to the Debtors' plan of reorganization,

the disposition of the Debtors' pension plans, and the treatment of PBGC's secured and

unsecured claims against the Debtors.

Dated:   Washington, D.C.
         July 15, 2009

PENSION BENEFIT GUARANTY
CORPORATION

By: /s/ John A. Menke
      Israel Goldowitz, Chief Counsel
      Karen L. Morris, Deputy Chief Counsel
      John A. Menke, Assistant Chief Counsel
      Ralph L. Landy, Attorney
      C. Wayne Owen, Jr., Attorney
1200 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 326-4020
Fax: (202) 326-4112

-and-

Dated:   New York, New York    KELLEY DRYE & WARREN LLP
    July 15, 2009

              By: _/s/ Craig A. Wolfe_____
                Merrill B. Stone
                Craig A. Wolfe
              101 Park Avenue
              New York, NY 10178
              Tel: (212) 808-7800
              Fax: (212) 808-7897

              Attorneys for Pension Benefit Guaranty
              Corporation

## CERTIFICATE OF SERVICE

I, Marie Vicinanza, certify that on the 15th day of July, 2009, I caused to be

served to the parties listed below, a true and correct copy of the foregoing *Statement Of Pension*

*Benefit Guaranty Corporation In Response To First Amended Joint Plan Of Delphi Corporation*

*And Certain Affiliates, Debtors And Debtor-In-Possession,* via hand delivery and/or electronic

mail as indicated.

| | |
|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP, John Wm. Butler, Jr. 333 West Wacker Drive Suite 2100 Chicago, Illinois 60606 **Via Electronic Mail** jack.butler@skadden.com | Kayalyn A. Marafioti Thomas J. Matz Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square New York, New York 10036 **Via Electronic Mail and Hand Delivery** kayalyn.marafioti@skadden.com thomas.j.matz@skadden.com |
| Office of the United States Trustee Brian Masumoto, Esq. 33 Whitehall Street New York, New York 10004 **Via Hand Delivery** | Honorable Robert D. Drain United States Bankruptcy Court Southern District of New York One Bowling Green New York, NY 10004 **Via Hand Delivery** |

Dated: July 15, 2009　　　　　　　*/s/ Marie Vicinanza*
　　　　New York, New York　　　　Marie Vicinanza

# EXHIBIT F



LEXSEE 2006 U.S. DIST. LEXIS 72398

**JOSEPH C. BROMLEY, JOSEPH V. CLEMENTE, and DEAN J. CLEMENTE, individually and as directors of National Semi-Trailer Corp., a Michigan corporation; RENEE SUCHARA, and individual; OMNI VENTURES, INC., A Michigan corporation, and CHURCHILL TRAILERS, INC., a Michigan corporation, Plaintiffs, v. RANDALL BROMLEY, individually and as Trustee of The RANDALL BROMLEY FIRST AMENDED AND RESTATED REVOCABLE LIVING TRUST, JOHN VERDON and SCOTT MACKEY, individually and in their capacity as officers and directors of National Semi-Trailer Corp., a Michigan Corporation; JOSEPH C. BROMLEY, II as an officer and direction of NATIONAL SEMI-TRAILER CORP., Defendants.**

**CASE NO. 05-71798**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2006 U.S. Dist. LEXIS 72398*

**September 28, 2006, Argued**
**October 4, 2006, Decided**
**October 4, 2006, Filed**

**PRIOR HISTORY:** *Bromley v. Bromley, 2006 U.S. Dist. LEXIS 37022 (E.D. Mich., June 7, 2006)*

**COUNSEL:** [*1] For Joseph C. Bromley, Individually and as a Director of National Semi-Trailer Corporation, Joseph V. Clemente, Individually and as a Director of National Semi-Trailer Corporation, Dean J. Clemente, Individually and as a Director of National Semi-Trailer Corporation, Renee Suchara, Omni Ventures, Incorporated, Churchill Trailers, Incorporated, Plaintiffs: Gregory P. DeGraff, LEAD ATTORNEY, Sullivan & Leavitt (Northville), Northville, MI; Martin J. Leavitt, LEAD ATTORNEY, Sullivan & Leavitt (Northville), Northville, MI; Paul E. Robinson, LEAD ATTORNEY, Sullivan & Leavitt (Northville), Northville, MI.

For Randall Bromley, Individually and as Trustee of Randall Bromley First Amended and Restated Revocable Living Trust, John Verdon, Individually and as a Director of National Semi-Trailer Corporation, Scott Mackey, Individually and as a Director of National Semi-Trailer Corporation, Richard Purvis, Transland Holdings, L.L.C., Joseph C. Bromley, II, as an officer and Director of National Semi-Trailer Corporation, Defendants: Daniel F. Berry, LEAD ATTORNEY, Howard & Howard (Detroit), Detroit, MI; Mary C. Dirkes, LEAD ATTORNEY, Howard & Howard, Bloomfield Hills, MI;

Matthew B. Woodworth, [*2] LEAD ATTORNEY, Howard & Howard, Bloomfield Hills, MI; Stephanie N. Olsen, LEAD ATTORNEY, Howard & Howard (Bloomfield Hills), Bloomfield Hills, MI.

**JUDGES:** HON. LAWRENCE P. ZATKOFF, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** LAWRENCE P. ZATKOFF

**OPINION**

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse, in the City of Port Huron, State of Michigan, on September 28, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF

UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is presently before the Court upon Plaintiffs' Motion for a Preliminary Injunction. The preliminary injunction hearing was held on September 28, 2006.

05-44481-rdd   Doc 18579-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-72904-SFC-MJH   Document 3-5   Filed 07/24/2009   Page 3 of 9
Pg 76 of 87

Page 2

2006 U.S. Dist. LEXIS 72398, *

For the reasons set forth below, Plaintiffs' motion will be GRANTED.

## II. BACKGROUND

Plaintiffs filed their complaint in state court on April 1, 2005, in their individual capacities, and as directors and shareholders of National Semi-Trailer Corp ("National"). Plaintiffs all reside in Michigan and National is a Michigan corporation in the business of leasing semi-trailers for use in interstate commerce. By their Complaint, Plaintiffs have asserted claims for minority shareholder oppression, removal of directors, accounting, inspection [*3] of records, and conspiracy. In essence, Plaintiffs object to a number of expenses National has incurred on Defendants' behalf and object to the way Defendants are managing National. Defendants removed the case to federal court based on diversity of citizenship. A bench trial is scheduled for May 2007.

In their current motion, Plaintiffs seek to enjoin Defendants from taking action pursuant to a number of recent amendments to National's bylaws, which they claim Defendants could use to oppress them as minority shareholders. Among the objectionable provisions, which are covered below, are sections regarding attendance at shareholder's meetings, proxies, issuance of stock and other rights in National, directors' duties, ratification of conflicted transactions, and indemnity.

### A. Randall Bromley

Defendant Randall Bromley, as the Trustee of the Randall Bromley First Amended and Revocable Living Trust and sole shareholder of NST Corp. III ("NST"), owns the majority of the voting stock in National, and is the central figure in this litigation. Plaintiffs allege that Randall Bromley, as the majority shareholder and as a director of National, controls the corporation and the other [*4] directors, and has used his position for his own personal gain. Plaintiffs contend that Randall Bromley has been joined in this abuse of power by the other named Defendants, and a National employee, Rick Purvis, [1] who Randall Bromley hired as National's corporate pilot.

> 1   The Court dismissed Plaintiffs' claims against Rick Purvis because the Court lacked personal jurisdiction over him.

Essentially, Randall Bromley is National. As the controlling shareholder and CEO, he dictates corporate action. Moreover, the governing documents permit him to act unilaterally, with no checks on his power and without notice to other shareholders. For example, National's bylaws provided that they could be amended upon the affirmative vote of those shareholders holding a majority of the stock entitled to vote, i.e. Randall Bromley. Further, such action could be taken without a meeting, without prior notice, and without a vote if all of the shareholders consented, unless a lesser number is permitted by the articles of incorporation. [*5]  Not surprisingly, National's articles of incorporation only required the consent of a majority of the shareholders entitled to vote, i.e. Randall Bromley, to waive the meeting, notice, and voting provisions. In other words, Randall Bromley, as the majority shareholder, was able to waive all notice, meeting and voting requirements, and amend National's bylaws as he saw fit. His position as the majority shareholder made it possible for other corporate action as well, including electing directors and entering into commercial transactions.

In 1998, National's directors approved a $ 300,000 base salary for Randall Bromley and certain incentives tied to corporate performance. According to corporate records, National did not meet the specified level of performance for the years 2001, 2002, and 2003. However, in May 2005, the board of directors, upon Randall Bromley's request, ratified all corporate salaries for the previous five years, which allegedly included unearned bonuses. Another of the salaries was that of Rick Purvis, the corporate pilot. Mr. Purvis had been hired by Randall Bromley, despite having never flown an airplane. Further, so that Mr. Purvis could fulfill his duties as the [*6] corporate pilot, National paid for his flight training and pilot's license.

Plaintiffs allege Randall Bromley engaged in numerous other abuses of his majority and control position. One area of concern for Plaintiffs involved Randall Bromley's personal use of corporate assets, including club memberships, automobiles, homes, and the corporate jet. Plaintiffs allege that Randall Bromley used corporate memberships at various country clubs and resorts for personal, rather than business purposes. Plaintiffs also questioned Defendants' trips to the Caribbean using the corporate jet, specifically to locations where National did no business. Finally, National leased a corporate residence in Orlando to Randall Bromley that was previously used solely for business purposes.

Defendants' questionable conduct also allegedly extends to their other businesses. As part of its business, National operates several branch locations throughout the eastern United States. Plaintiffs allege that Randall Bromley used these locations to enter into self-interested transactions. National's lease for its Ellenwood, Georgia, branch contained an option to purchase the property for $ 775,000. According to an appraisal,  [*7]  the land was worth $ 910,000. National did not exercise its option to purchase the land; however, the property was eventually purchased by Transland Holdings, LLC ("Transland"), [2] which leased the property back to National. Coinciden-

2006 U.S. Dist. LEXIS 72398, *

tally, Mr. Bromley and two other Defendants own interests in Transland. A similar transaction involved National's Memphis branch, where National passed on an option to purchase property valued at $ 775,000 for $ 325,000. Again, Transland purchased the underlying property and leased it back to National.

>    2   The Court dismissed Plaintiffs' claims against Transland because the Court lacked personal jurisdiction over the company.

Furthermore, another of National's landlords, NST, of which Randall Bromley is the sole shareholder, has increased National's rent at several other branches beyond the consumer price index contrary to the leases, in one instance raising the rent by 33%. Additionally, National has made numerous loans to NST, which has carried a balance as high as $ 900,000.

## [*8] B. Unpaid Dividends

In 2003, National ceased paying dividends on preferred stock as a result of debt refinancing. As a condition of the refinancing, National agreed to refrain from paying distributions without lender approval. As provided in National's articles of incorporation, its preferred stock is the only class which is entitled to dividends. At the time of the refinancing, Plaintiffs were the only shareholders who owned preferred stock. Consequently, Plaintiffs were the only shareholders impacted by National's failure to pay dividends. Furthermore, Plaintiffs' allege that undisclosed dividends were paid to other shareholders, corporate books were misstated to hide misappropriation of corporate assets, and that Defendants denied Plaintiffs access to corporate records. Defendants deny these allegations and have presented evidence to the contrary.

## C. Ejection of Plaintiffs from National's Board of Directors

In April 2005, National's board consisted of seven directors, including Plaintiffs. After the lawsuit began, Randall Bromley, as majority shareholder caused the bylaws to be amended to decrease the number of directors from seven to four, thereby excluding [*9] Plaintiffs. One month after he removed Plaintiffs, Randall Bromley proposed that National's bylaws be amended. One of the proposed amendments increased the number of directors from four back to seven. As majority shareholder, Randall Bromley approved these bylaws in December 2005, and caused the board of directors to do the same. As a result, Randall Bromley, as majority shareholder was then able to elect three directors of his choice to replace Plaintiffs on the board.

## D. Amended Bylaws

National's bylaws were first adopted in 1989 ("1989 bylaws") and had not been amended since. According to minutes at the director's meeting held on May 15, 2005, the amendments were necessary to conform to the Michigan Business Corporation Act ("the Act"), and to address subjects not covered in the 1989 by laws. Using the procedure discussed above, Randall Bromley amended National's by laws.

The amended bylaws affected Plaintiffs in a number of ways. First, the amended bylaws changed the attendance policy for shareholder's meetings, requiring in-person attendance only and preventing Plaintiffs from participating via telephone. Second, the amended bylaws allow meetings to be adjourned without [*10] providing notice to persons not in attendance. Third, the amended bylaws allow National to notify its shareholders of upcoming meetings ten days before the scheduled date, which is also the same day shareholders must tender their proxies to the corporate secretary. Fourth, as stated above, the amended bylaws increased the number of directors from four to seven. Fifth, the amended bylaws provide that self-interested transactions by directors can be ratified by a vote of disinterested directors or shareholders. Sixth, the amended bylaws allow National to issue stock as payment for promises to provide services evidenced by a written contract. Seventh, the amended bylaws allow for National to issue promissory notes as dividends. Eighth, the amended bylaws allow National's directors to issue options and warrants for National's stock. Finally, the amended bylaws provide for the indemnification of parties affiliated with National in the event of litigation. These changes became effective on December 20, 2005.

## III. LEGAL STANDARD

Regarding preliminary injunctions, the Sixth Circuit has held that:

>    To determine whether to grant a preliminary injunction, a district court must [*11] consider:

>        (1) the plaintiffs' likelihood of success on the merits;

>        (2) whether the plaintiff may suffer irreparable harm absent the injunction;

>        (3) whether granting the injunction will cause substantial harm to others; and

05-44481-rdd   Doc 18570-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-12908-SFC-MJH   Document 3-5   Filed 07/21/2009   Page 3 of 11
Pg 78 of 87

Page 4

(4) the impact of an injunction upon the public interest.

None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them.

*Abney v. Amgen, Inc., 443 F.3d 540, 547 (6th Cir. 2006)* (citations omitted). These four criteria simply guide the discretion of the court and are meant to serve as factors to be balanced, rather than rigid and unbending requirements to be met in every case. *See Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003); Michigan Bell Tel. Co. v. Engler, 257 F.3d 587, 592 (6th Cir. 2001).* A stronger showing of likelihood of success is required as the other factors militate against granting relief, but less likelihood of success is required when they do support granting relief. *Performance Unlimited, Inc. v. Questar Publ'rs, Inc., 52 F.3d 1373, 1385-86 (6th Cir. 1995).*

## IV. ANALYSIS

### [*12] A. Plaintiffs' Likelihood of Success on the Merits

Plaintiffs' cause of action is based on several counts. The crux of Plaintiffs' case is count I, alleging oppressive conduct by the majority shareholders under *MICH. COMP. LAWS § 450.1489.*

#### 1. Minority Oppression

The Michigan Business Corporation Act provides that:

(1) A shareholder may bring an action in the circuit court of the county in which the principal place of business or registered office of the corporation is located to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder. If the shareholder establishes grounds for relief, the circuit court may make an order or grant relief as it considers appropriate, including, without limitation, an order providing for any of the following:

(a) The dissolution and liquidation of the assets and business of the corporation.

(b) The cancellation or alteration of a provision contained in the articles of incorporation, an amendment of the articles of incorporation, or the bylaws of the corporation. [*13]

(c) The cancellation, alteration, or injunction against a resolution or other act of the corporation.

(d) The direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action.

(e) The purchase at fair value of the shares of a shareholder, either by the corporation or by the officers, directors, or other shareholders responsible for the wrongful acts.

****

(3) As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder. The term does not include conduct or actions that are permitted by an agreement, the articles of incorporation, the bylaws, or a consistently applied written corporate policy or procedure.

*MICH. COMP. LAWS § 450.1489.* [3] Accordingly, to succeed on this claim, Plaintiffs must demonstrate that Defendants' conduct was "illegal, fraudulent, or willfully unfair and oppressive" such that it interfered with Plaintiffs' rights as shareholders. *Id.* The Michigan court of appeals [*14] clarified the meaning of shareholder's rights, stating "[s]hareholder's rights are typically considered to include voting at shareholder's meetings, electing directors, adopting bylaws, amending charters, examining the corporate books, and receiving corporate dividends." *Franchino v. Franchino, 263 Mich. App. 172, 184, 687 N.W.2d 620 (2004).*

3 *Section 3* of the statute has been amended to include the sentence "Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other shareholder interests disproportionately as to the affected shareholder." *MICH. COMP. LAWS § 450.1489(3).*

05-44481-rdd   Doc 18579-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-72803-SFC-MJH   Document 3-5   Filed 07/24/2009   Page 8 of 11
Pg 79 of 87

Page 5

2006 U.S. Dist. LEXIS 72398, *

Michigan courts have consistently held that the purpose of § 450.1489 is to protect minority shareholders, particularly in close corporations, from overreaching and heavy handed actions by the majority. *See Estes v. Idea Engineering & Fabrications, 250 Mich. App. 270, 284, 649 N.W.2d 84 (2002)* [*15] (citing an amicus brief filed by the Corporation Law Committee of the Business Law Section of the State Bar of Michigan). Furthermore, the provisions of the Act should be liberally construed to "give special recognition to the legitimate needs of close corporations." *MICH. COMP. LAWS § 450.1103*. When addressing such claims, the *focus is on the majority's conduct*, rather than the minority's expectations. *See Franchino, 263 Mich. App. at 188* (emphasis added). Finally, "a shareholder who would be likely to prevail under this statute is one who presented an *ongoing pattern of oppressive misconduct*." *Estes, 250 Mich. App. at 281* (emphasis added).

The court in *Estes*, adopting Judge Hoekstra's characterization of the relationship between shareholders in a close corporation, recognized a higher standard of fiduciary duties between majority and minority shareholders. *See Estes, 250 Mich. App. at 281*. Judge Hoekstra stated

> [T]he relationship among those in control of a closely held corporation requires a higher standard of fiduciary responsibility, a standard more akin to partnership law. [*16] The Legislature highlighted this special duty of care in the language of § 489(1) when it chose the words "illegal, fraudulent, or willfully unfair and oppressive" to describe the acts of the defendants.

*Id. at 281* (internal citations omitted). Moreover, Michigan courts have historically held such shareholders to a higher degree of fiduciary duties, stating "[t]he law requires of the majority the utmost good faith in the control and management of the corporation as to the minority, and it is the essence of this trust that it must be so managed as to produce to each stockholder the best possible return upon his investment." *Veeser v. Robinson Hotel Co., 275 Mich. 133, 138, 266 N.W. 54 (1936)*.

This view is reasonable in light of the statutory directive to liberally construe the Act to better serve the unique needs of close corporations, and the distinct standard of care the majority owes to the minority provided for in § 450.1489. *See Estes, 250 Mich. App. at 278*. Therefore, it is reasonable to conclude that the type of conduct amounting to a breach of fiduciary duties in close corporations is the type of conduct prohibited by § 450.1489. [*17] Examples of such conduct include investments deemed not to be in the corporation's best interest, denying access to corporate books and records, diverting corporate opportunities and assets to other entities, removing minority shareholders from positions in management, refusing to declare dividends, and diluting minority equity interests. *See 19 AM. JUR. 2d Corporations § 2372* (citing cases from numerous jurisdictions). *See also 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS § 3.11*. It is also clear that conduct need not be illegal or fraudulent to be willfully unfair and oppressive under § 450.1489. *See Moore v. Carney, 84 Mich. App. 399, 269 N.W.2d 614 (1978)*. Thus, actions that may be permissible under the Act may nevertheless constitute willfully unfair and oppressive acts towards the minority.

## 2. Oppression in the Present Case

The record in the case thus far reveals ample evidence of unfair and oppressive conduct. In his position as majority shareholder, Randall Bromley has caused National to expend exorbitant amounts of money in transactions to which he had an interest. Further, Mr. Bromley [*18] has superficially ratified these deals as the majority shareholder. Most importantly, however, Mr. Bromley, making use of National's favorable governing documents, ejected Plaintiffs from National's board of directors and amended National's bylaws after this lawsuit began. The substance of the bylaw amendments sheds light on the merit of Plaintiffs' claims. Particularly troubling are the amendments relating to attendance at shareholder meetings, proxy voting, ratification of conflicted transactions, and indemnification of corporate affiliates. While Defendants maintain that the amended bylaws simply track the provisions of the Michigan statute, this is not entirely correct, and the circumstances surrounding the amendments look suspiciously like a corporate freeze-out.

First, requiring in-person attendance at shareholder's meetings is legal and Defendants claim the change was made to protect corporate information. *See MICH. COMP. LAWS § 450.1405*. Likewise, the provisions allowing adjournments without providing notice is also legal. *See MICH. COMP. LAWS § 450.1404*. Further, Defendants maintain that the proxy provisions [*19] were added to provide guidance on proxy procedures since the 1989 bylaws did not contain like provisions. Yet in-person attendance at meetings requires Plaintiffs to travel from Michigan to Florida on ten days notice. Therefore, notice of a shareholder meeting could be given on the same day proxy notices would be due with the corporate secretary. Moreover, Defendants would not be required to give notice of adjourned meetings to those persons who did not attend in-person. When read together and in light of the timing and other circumstances

05-44481-rdd   Doc 18579-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-1291-SFC-MJH   Document 3-5   Filed 07/31/2006   Page 7 of 10
Pg 80 of 87

Page 6

2006 U.S. Dist. LEXIS 72398, *

of the case, the amendments give the appearance that Defendants are using their majority and control position to keep Plaintiffs out of corporate affairs. Individually, the amendments are legal, yet collectively they could be used oppressively. This substantially affects Plaintiffs' rights as shareholders.

Second, the amended bylaws make it possible for interested shareholders to ratify transactions where a director has a conflict of interest. While the language appears to be the same as the statute, the amended bylaw provision does not contain the full language of the statutory provision. The statute allows disinterested shareholders to ratify [*20] conflicted transactions. *See MICH. COMP. LAWS § 450.1545a(3).* The statute provides that "a transaction is authorized, approved, or ratified if it receives the majority of votes cast by the holders of shares *who did not have an interest in the transaction.*" *Id.* (emphasis added). In contrast, the amended bylaws specifically allow interested shareholders to ratify conflicted transactions, stating that a conflicted transaction could be ratified if it is disclosed to "a majority of the shareholders *(irregardless [sic] of interest or disinterest)* entitled to vote and they authorize, approve or ratify such contract or transaction by majority vote or written consent ...." Restated Bylaws 2.11(b) (emphasis added). Thus, Randall Bromley, in his capacity as majority shareholder, could ratify transactions despite his interest. Accordingly, National's dealings with Randall Bromley, including his leased home and the leases with his other corporations, could be easily ratified by interested shareholders at the minority's expense.

Third, the amended bylaws would allow the corporation to indemnify affiliates of the corporation for losses incurred [*21] due to lawsuits. The bylaws' definition of affiliate appears tailored specifically to Defendants' other corporations: "An affiliate shall include ... any entity formed by officers, employees, Directors, or shareholders of the Corporation [National] to own assets leased to the Corporation [National]." Restated Bylaws 9.01. This provision goes beyond the statutory indemnification provision in that the statute does not allow indemnification for persons or entities who are not agents of National. *See MICH. COMP. LAWS § 450.1561.*

Finally, the amended bylaws increase the number of directors from four to seven. This amendment appears innocuous on its own, but in context it is disturbing. At one time, National had seven directors, three of whom are Plaintiffs in the current action. Following the commencement of this action, the bylaws were amended to decrease that number from seven to four, excluding Plaintiffs. Now the bylaws have been amended again, according to Defendants to add three independent business people to the board. However, the timing of this change in management, combined with the other

amendments to the bylaws, closely resembles tactics [*22] in a classic freeze-out attempt. Defendants have removed Plaintiffs from management positions, made it more difficult for them to exercise rights as shareholders, siphoned corporate assets to other organizations which they own, and hindered access to corporate books and information. After hearing the parties' arguments and reviewing their briefs and other documents, the Court concludes that Plaintiffs have demonstrated a strong likelihood of success on the merits.

**B. Irreparable Harm to Plaintiffs Absent an Injunction**

Plaintiffs argue that they will be irreparably harmed if an injunction is not issued. Plaintiffs assert they will be harmed in that the amended bylaws make it possible for Defendants to hinder their voting rights, dilute Plaintiffs' equity interest in National and act without regard to their fiduciary duties while simultaneously indemnifying themselves for any asserted breach.

Defendants respond that Plaintiffs' claims of irreparable harm are purely speculative. Principally, Defendants argue that the amended bylaws were duly enacted and comply with the Michigan Business Corporation Act. Additionally, Defendants point out that if any harm was irreparable, [*23] Plaintiffs would not have waited more than six months after the effective date of the amended bylaws to seek injunctive relief.

A party's injury is considered irreparable if it is not fully compensable by money damages. *See Performance Unlimited, Inc., 52 F.3d at 1382; Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992).* Mere injuries, no matter how substantial, in terms of money, time, and energy necessarily expended to comply with an injunction are not enough to show irreparable injury.*See United States v. Edward Rose & Sons, 384 F.3d 258, 264 (6th Cir. 2004).* Likewise, a party's harm is not fully compensable if the nature of the loss would make damages difficult to calculate, as is the case with the loss of goodwill or breach of a covenant not to compete. *See Basicomputer Corp., 973 F.2d at 511-12.* Conversely, "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 154 (6th Cir. 1991).* [*24]

A party seeking an injunction must demonstrate more than an unfounded fear of harm; rather, there must be a showing that the asserted harm is likely to occur. *See 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (1995).* While a party need not show that a harm is certain to

05-44481-rdd   Doc 18579-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-72908-SFC-MJH   Document 3-5   Filed 07/24/2009   Page 8 of 13
Pg 81 of 87

Page 7

2006 U.S. Dist. LEXIS 72398, *

occur, there must be a showing of a substantial threat of harm. *See id.*; *Michigan Coalition, 945 F.2d at 153* (stating "the harm alleged must be both certain and immediate, rather than speculative or theoretical").

In this case, Plaintiffs have given numerous examples of how Defendants could act to harm them under the amended bylaws. Notably, Defendants' actions taken prior to amending the bylaws, specifically removing Plaintiffs from National's board of directors, have put Defendants in a position to oppress Plaintiffs and render their investments in National worthless. With no dissenting view on the board of directors, the amended bylaws would allow Defendants to severely dilute Plaintiffs' equity interest in National. Based on counsel's representations at oral argument, Defendants could issue stock, options, and warrants, at their discretion and to people of their choosing, [*25] leaving Plaintiffs' original investment a fraction of its original worth.

This harm cannot be easily calculated, nor could it be remedied. While it may be possible to calculate the difference in value between Plaintiffs' equity now and some value in the future, the value of Plaintiffs' loss of control and input in the management of National, in which they invested substantial sums of money, cannot be appraised. Furthermore, if Defendants were to issue stocks or other equity interests, the Court would be required to cancel countless transactions with potentially innocent third parties and force them to sell back the equity in order to return Plaintiffs' to the status quo. This would present an undesirable and unmanageable task.

Defendants still argue that Plaintiffs' fears are speculative. The Court is not persuaded. Based on the record so far, there is ample evidence justifying Plaintiffs' concerns. Defendants also state that Plaintiffs admitted that no harm is likely while the case is pending before the Court. However, Defendants fail to see the significance of their own actions to date. While this case was pending, Defendants removed Plaintiffs from the board of directors in order [*26] to insert friendly members and amended National's bylaws. If Defendants were willing to take such action under the Court's supervision, it is not unlikely that they would be willing to take additional adverse actions against Plaintiffs. Consequently, Plaintiffs' fear is not unfounded or mere speculation; rather, it is concrete and an injunction is proper to prevent further harm to Plaintiffs until a trial on the merits.

## C. Burden on Defendants if Injunctive Relief is Granted

When deciding whether or not to issue an injunction, the Court must compare the burden on Plaintiffs if an injunction is not issued to the burden on Defendant if an injunction is issued. *See* 11A WRIGHT, MILLER &

KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.2. When this comparison is made, this factor favors Plaintiffs. Defendants have not presented any evidence to demonstrate that they will be significantly burdened if the Court issues an injunction.

Conceivably, Defendants' business could be harmed if its directors are not permitted to act with the full authority provided by their bylaws. However, the Court fails to see how Defendants will be burdened by conducting business under bylaws they used [*27] for sixteen years. Defendants claim it will be burdensome for corporate officials to become reacquainted with the 1989 bylaws. This argument lacks merit. National's directors are sufficiently familiar with the 1989 bylaws, which they used until December 2005, and are fully capable of acting under those bylaws until trial in May 2007. Accordingly, the Court finds that Defendants will not be significantly burdened if an injunction is issued.

## D. Impact of an Injunction upon the Public Interest

The Court must also consider the impact an injunction may have on the public interest. By preventing Defendants from acting under the amended bylaws, the Court will ensure that directors and majority shareholders in close corporations abide by their fiduciary duties to the minority shareholders. On the other hand, the Court should ordinarily not interfere with corporate decision making. Thus, it could be argued that the Court should refrain from preliminarily enjoining corporate directors from acting under properly enacted bylaws. This result would facilitate corporate decision making and thereby promote business and economic interests.

Nevertheless, the balance of the public interest [*28] in this case weighs in favor of Plaintiffs. National is a close corporation and such corporations have received special treatment under Michigan law. Michigan's public policy discourages oppressive and unfair actions in close corporations, which may be accomplished by technically legal means. Furthermore, *§ 450.1489* specifically grants the Court authority to intervene in the inner workings of a corporation to remedy oppressive conduct. Based on the fact that the public interest favors enforcing fiduciary duties, and the fact that the Michigan legislature has acted with close corporations in mind, the public interest weighs in favor of issuing an injunction.

## E. Bond

Plaintiffs contend that the Court should not require a bond in this case because they have demonstrated a strong likelihood of success on the merits. Defendants argue otherwise. Neither party has made a suggestion as to a bond amount. The Sixth Circuit allows the district court discretion on the issue of bond. *See Moltan Co. v.*

05-44481-rdd   Doc 18570-2   Filed 07/23/09   Entered 07/23/09 03:06:52   Exhibit B
Case 2:05-cv-12908-LPZ-MKM   Document 3   Filed 07/24/2006   Page 9 of 9
Pg 82 of 87

Page 8

2006 U.S. Dist. LEXIS 72398, *

*Eagle-Picher Industries, 55 F.3d 1171, 1176 (6th Cir. 1995).* In light of the Court's findings that Plaintiffs have a substantial likelihood of succeeding on the merits [*29] and that Defendants would not be significantly burdened by the injunction, the Court concludes that a bond is not necessary in this case.

## V. CONCLUSION

After hearing the parties' arguments and weighing the traditional factors for granting or denying a preliminary injunction, the Court concludes that Plaintiffs are entitled to injunctive relief. The Court is satisfied that Plaintiffs have shown a strong likelihood of success on the merits and a sufficient threat of irreparable harm if an injunction is not issued. Finally, the Court finds that Defendants will not be substantially burdened if an injunction is issued and that the public interest will be served by enjoining further action under National's amended bylaws. Accordingly, Plaintiffs' Motion for a Preliminary Injunction is GRANTED. The Court HEREBY ORDERS that Defendants are hereby enjoined

(i) From requiring shareholders to appear in-person at annual or special shareholder's meeting pursuant to Sections 1.01 and 1.02 of the Restated Bylaws.

(ii) From adjourning annual or special shareholder's meetings without providing notice to those shareholders not in attendance under Section 1.05 of the Restated Bylaws. [*30]

(iii) From requiring proxies to be tendered to the Corporate secretary no later than 10 days prior to any annual or special shareholder's meeting under Section 1.10 of the Restated Bylaws.

(iv) From acting inconsistently with the duties of Directors as stated in *MICH. COMP. LAWS § 450.1541* under Section 2.04 of the Restated Bylaws, including actions as a committee under Section 2.12 of the Restated Bylaws.

(v) From authorizing, approving, or ratifying any contract or other transaction between the Corporation and one or more of its directors or any other corporation, firm, association or entity in which one or more of the directors are directors or officers or are financially interested under Section 2.11 of the Restated Bylaws. Furthermore, any such authorization, approval, or ratification shall be consistent with *MICH. COMP. LAWS § 450.1545a.*

(vi) From causing National to issue additional shares of the common stock of National under Section 4.01 of the Restated Bylaws.

(vii) From allowing the CEO of National to contract for the indebtedness of the Corporation separate from the Board of Directors [*31] under Section 5.02 of the Restated Bylaws.

(viii) From causing National to issue promissory notes as dividends in lieu of cash under Section 7.01 of the Restated Bylaws.

(ix) From causing National to issue rights, options and/or warrants for National's stock under Section 7.03 of the Restated Bylaws.

(x) From causing National to provide indemnification for any party inconsistent with *MICH. COMP. LAWS §§ 450.1561-65* under Section 9.01 of the Restated Bylaws.

This order shall remain in effect until May 31, 2007, or until further order of the Court.

**IT IS SO ORDERED.**

s/ LAWRENCE P. ZATKOFF

UNITED STATES DISTRICT JUDGE

Dated: October 4, 2006

Case 2:09-cv-12610-SFC-MJH    Document 3-10    Filed 07/27/2009    Page 1 of 2

# Proposed Order

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| DENNIS BLACK, *et al.*,       ) | |
| )  | Case No.: 2:09-cv-12810 |
| Plaintiff,       ) | Hon. Sean F Cox |
| )  | Magistrate Judge Michael Hluchaniuk |
| v.       ) | |
| )  | **Emergency Relief Requested** |
| CRAIG G. NAYLOR, *et al.*,       ) | **by 10 A.M. on Thursday,** |
| )  | **July 23, 2009** |
| Defendant.       ) | |

## TEMPORARY RESTRAINING ORDER

The Court, having concluded that Plaintiffs have a likelihood of success on the merits of this action and will suffer irreparable injury in the absence of immediate injunctive relief, and having determined that the balance of harms and public interests favors Plaintiffs, hereby enters a TEMPORARY RESTRAINING ORDER preventing Defendants from negotiating, signing, or further effectuating any agreement with the Pension Benefit Guaranty Corporation to summarily terminate Plaintiffs' pension plan under the Employee Retirement Income Security Act, 29 U.S.C. § 1342(c)(1), until further order of this Court.

IT IS SO ORDERED, this ___ day of July, 2009.

_____

Sean F. Cox
United States District Judge

# Proof Of Service

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DENNIS BLACK, et al., | ) | Case No.: 2:09-cv-12810 |
| | ) | Hon. Sean F Cox |
| Plaintiff, | ) | Magistrate Judge Michael Hluchaniuk |
| | ) | |
| v. | ) | **Emergency Relief Requested** |
| | ) | **by 10 A.M. on Thursday, July 23, 2009** |
| | ) | |
| CRAIG G. NAYLOR, et al., | ) | |
| | ) | |
| Defendant. | ) | |

## PROOF OF SERVICE

I, Teri Breaugh, state that on July 21, 2009, I did electronically file the foregoing paper with the Clerk of the Court using the ECF system.

I also state that on July 21, 2009, I did hand deliver a copy of the foregoing paper to:

Craig G. Naylor
c/o David M. Sherbin, Esq.
VP/General Counsel
Delphi Corporation
5725 Delphi Dr Fl 6
Troy, MI 48098

David N. Farr
c/o David M. Sherbin, Esq.
VP/General Counsel
Delphi Corporation
5725 Delphi Dr Fl 6
Troy, MI 48098

Martin E. Welch
c/o David M. Sherbin, Esq.
VP/General Counsel
Delphi Corporation
5725 Delphi Dr Fl 6
Troy, MI 48098

James P. Whiteson
c/o David M. Sherbin, Esq.
VP/General Counsel
Delphi Corporation
5725 Delphi Dr Fl 6
Troy, MI 48098

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

05-44481-rdd   Doc 18579-2   Filed 07/23/09

Executed: July 21, 2009                    /s/ Teri Breaugh
                                          Teri Breaugh
                                          JACOB & WEINGARTEN, P.C.
                                          2301 W. Big Beaver Road, Suite 777
                                          Troy, Michigan 48084
                                          (248) 649-1900
                                          howard@jacobweingarten.com