# MorrisonCohen LLP

Joseph T. Moldovan
Partner
(212) 735-8603
jmoldovan@morrisoncohen.com

July 24, 2009

**VIA E-MAIL**

Honorable Robert D. Drain
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

        Re:    In Re: Delphi Corporation, *et al.*
                Chapter 11, Case No. 05-44481 (RDD)

Honorable Sir:

Despite good faith and sincere efforts the parties were unable to craft an order or stipulation that would resolve all pending issues to the satisfaction of all parties. Consequently, Dennis Black, Charles Cunningham, and the Delphi Salaried Retired Workers Association ("DSRA" and together with Cunningham and Black, the "Salaried Workers") have unilaterally taken the following steps:

    1.    On July 24, 2009, in response to the Court's statements concerning the disclosure required of the DSRA under Bankruptcy Rule 2019, the DSRA withdrew its motion to intervene due to the privacy concerns of its members. ECF Docket # 18626. Concomitantly, Morrison Cohen LLP filed an amended Rule 2019 Statement. ECF Docket # 18627.

    2.    On July 24, 2009, the Salaried Workers, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), will, and may have by the time the Court receives this letter, voluntarily dismissed without prejudice their action commenced for equitable relief ("Michigan Action") in the United States District Court for the Eastern District Of Michigan, Southern Division against Craig G. Naylor, David N. Farr, Martin E. Welch, and James P. Whitson, case #: 2:09-cv-12810-SFC-MJH. As a result of the voluntary dismissal of the Michigan Action, the motion for a temporary restraining order and preliminary injunction against the defendants, tentatively scheduled to be heard on July 27, 2009 ("TRO Action"), will become moot.

#1818968 v1 \021081 \0001

The Salaried Workers have taken this step because on July 22, 2009, subsequent to the commencement by the Salaried Workers of the Michigan Action, the PBGC filed a "Complaint For Pension Plan Termination" against Delphi Corporation as Plan Administrator for the Delphi Retirement Program for Salaried Employees in the United States District Court for the Eastern District of Michigan Southern Division ("Michigan District Court"), Case No: 2:09-cv-12874-AJT-MKM ("PBGC Action").

The filing by the PBGC of the PBGC Action under section 4042(f) of ERISA, 29 U.S.C. § 1342(f), establishes the PBGC Action and the Michigan District Court as the exclusive forum for all litigation concerning the Delphi Retirement Program for Salaried Employees ("Salaried Plan").

1342(f) provides:

> Upon the filing of an application for the appointment of a trustee or the issuance of a decree under this section, the court to which an application is made shall have exclusive jurisdiction of the plan involved and its property wherever located with the powers, to the extent consistent with the purposes of this section, of a court of the United States having jurisdiction over cases under chapter 11 of title 11. Pending an adjudication under subsection (c) of this section such court shall stay, and upon appointment by it of a trustee, as provided in this section such court shall continue the stay of, any pending mortgage foreclosure, equity receivership, or other proceeding to reorganize, conserve, or liquidate the plan or its property and any other suit against any receiver, conservator, or trustee of the plan or its property. Pending such adjudication and upon the appointment by it of such trustee, the court may stay any proceeding to enforce a lien against property of the plan or any other suit against the plan.

The Salaried Workers acknowledge that, until such time as the PBGC Action is resolved, they neither can, nor will, initiate or pursue any claims concerning the Salaried Plan except in the PBGC Action (or in this bankruptcy proceeding, as appropriate).

The Salaried Workers submit that the actions described above have both mooted and obviated the need for a determination by this Court of the Debtors' Emergency Automatic Stay Enforcement Motion (Docket No. 18579), filed on July 23, 2009 ("Stay Motion"). As a result of the withdrawal of the Michigan Action, there is no longer a justiciable controversy.

However, because the Court questioned certain actions of the Salaried Workers[1], the Salaried Workers feel it necessary to (i) explain the reasoning for the necessary steps that were taken in connection with the Michigan Action, as well as the filing of the Objection To Debtors' Proposed Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) with this court ("Objection") and (ii) provide some responses to those comments and concerns expressed by the Court at the hearing held on July 23, 2009, to demonstrate to this Court that at

---

[1] In the event, that despite the Salaried Workers belief that the Debtors' Stay Motion has been rendered moot, that this Court requires a response to the Stay Motion, this letter shall constitute said response.

2

all times the Salaried Workers have acted in good faith and engaged in no improper or prohibited conduct.

Throughout this case, the Salaried Workers have been very mindful and sensitive to automatic stay issue in choosing in which venue to seek certain relief. At no time did the Salaried Workers take any action that could be characterized as "gamesmanship" or engage in forum shopping. Nor did the Salaried Workers seek identical or even similar relief from this Court and the district court in Michigan. Rather, the dual filings in Michigan and New York were necessitated by the jurisdictional mandates of each of the respective Courts involved.

A crucial component in analyzing the Salaried Workers filings in this case and the Michigan Action is the chronology of events that led up to the filing of the Objection, the commencement of Michigan Action, and the seeking of a TRO. Until approximately June 1, 2009, the Salaried Workers had no reason to believe that the Debtors were not assuming the liabilities of the Salaried Workers' Plan. On June 1, 2009, Delphi indicated its intention to terminate the Salaried Workers' Plan when it filed its (A) Supplemental Motion for Order (I) Approving Modifications to Debtors' First Amended Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization; and (B) the Request to Set Administrative Expense Claims Bar Date and Alternative Sale Hearing Date ("Modification Motion"). More than likely the Salaried Workers and the members of the DSRA actually became aware of the Plan termination after the parties were served with the "Modifications Procedures Order," sometime after June 16, 2009.

However, because the Modified Plan referenced a PBGC Settlement Agreement that was to be filed as an Exhibit to the Modified Plan, and the Exhibit was not filed with the Plan, the Salaried Workers knew nothing about the details of the proposed termination or its effect upon them. This Exhibit was supposed to be filed pursuant to the Modification Procedures Order, no later than July 2, 2009. On that date, the Debtors did file their July 2, 2009 Notice Of Filing Of Plan Exhibits With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified), but they did not file the PBGC Settlement Agreement. In fact – notwithstanding the Modification Procedures Order – the PBGC Settlement Agreement was not filed until July 22, 2009. Thus, the Salaried Workers were uncertain (and still remain uncertain because the PBGC Settlement Agreement still contains placeholders and missing information) of the type of treatment they were to receive under the Modified Plan. Simply stated, the Salaried Workers did not know precisely how their rights were being affected because the Debtors did not file the PBGC Agreement until 2 days ago.

Notwithstanding that the relevant document had not been filed, the deadline to file an objection to the Modified Plan was scheduled for July 15, 2009. The Salaried Workers, therefore, were forced to respond to a Modified Plan that – on its face – was defective because it referenced an agreement, so seemingly material that is was deemed a condition to the Effective Date of the Modified Plan, which was (i) non-existent, and (ii) completely tentative and speculative under ERISA.

3

The Objection that was ultimately filed was made solely on this basis and, consequently, requested that the Modified Plan not be approved: an issue that is squarely before this Court and no other. To be clear, the Objection was not seeking any other form of relief. It did not seek to have this Court take any action against the Salaried Workers' Plan fiduciaries. It simply stated that whether the plan would ultimately be terminated was contingent on so many factors – many beyond the purview of this Court – that it rendered the Plan Modification Motion too speculative and asked the Court to deny the Debtors' motion for that reason only. The substance of the Objection is summarized in its penultimate numbered paragraph 42 of the Objection:

> The Excom, however, has, as noted, an inherent conflict of interest that prevents it from acting with undivided loyalty to the Salaried Workers in connection with any negotiations over the precise method and circumstances of the Salaried Workers Plan termination. To remedy this conflict, the Salaried Workers seek in the other action to replace the Excom with an administrator who is independent, and, as a result, will agree to termination only if doing so is in the best interests of the participants. But even apart from the Salaried Workers action, this Court – in light of the procedural barriers to plan termination – should not accept at face value any suggestion or implication by the Debtors that termination of the Salaried Workers Plan is either assured or imminent, since even other routes to termination are lengthy, require notice and participation, and will likely be challenged. Given that, under all of the circumstances, Delphi's assumption in the Modified Reorganization Plan that the Salaried Workers Plan shall be involuntarily terminated is not presently imminent and indeed may not occur at all, the Court should not approve the Modified Reorganization Plan.

Simultaneously, the Salaried Workers commenced the Michigan Action on July 16, 2009, just as they had expressly informed this Court they would do. By such action, the Salaried Workers were seeking the replacement of the Executive Committee of Delphi ("Excom") as the plan administrator for the Salaried Workers Plan ("Plan Administrator") on the basis of an inherent conflict of interest that prevented the Excom from fulfilling its fiduciary duties as Plan Administrator. This relief was not available from this Court. The only way a party can remove an ERISA fiduciary is to commence an action in a United States District Court under ERISA, not in the Bankruptcy Court, because the district court has exclusive jurisdiction over general ERISA matters, such as the question of whether an ERISA plan fiduciary should be removed based on a conflict of interest in carrying out a fiduciary function. ERISA, Section 502(e)(1), 29 U.S.C. Section 1132(e)(1) (providing "district courts of the United States" with "exclusive jurisdiction of civil actions under this title brought by . . . a participant"). Thus, the relief requested in the Michigan Action was properly brought before the United States District Court. It was not, and could not be, brought before this Court. The removal of the Plan Administrator and replacement of the Plan Administrator with an independent fiduciary was the sole relief sought in the complaint filed in the Michigan Action. Pending a determination of the complaint, the Salaried Workers also sought to enjoin the current plan fiduciaries from doing anything that would prejudice the ultimate relief sought – their removal. The Michigan Action is also very clear in

4

what it is not attempting to do – as stated in paragraph 41 of the Complaint, "Plaintiff's lawsuit does not seek to challenge a decision by the employer to terminate a plan."

The Michigan Action was filed before the PBGC Agreement occurred or was filed. It sought to stay the Excom as Plan Administrator from negotiating, signing, or further effectuating any agreement with the PBGC that would summarily terminate the Salaried Plan under Section 4042(c), 29 U.S.C. § 1342(c). This was not an attempt in any way to affect the estate or property of the estate or challenge the right of the Debtor to give a direction to Excom. It is irrefutable that the Salaried Workers Plan is not property of the estate and that the Excom are not debtors under the Bankruptcy Code. The Michigan Action was commenced because of the inherent conflict of interest in the Excom's exercise of its fiduciary duty, and it was commenced in the Eastern District of Michigan because that is where the Plan is located. While this discussion was relevant and necessary background in the explanatory section of the Objection, it was not in any manner part of the relief sought in the Objection.

Thus, the Salaried Workers were in no way attempting to forum shop. The relief sought in the Objection and the Michigan Action are two very different forms of relief and were brought in the Courts that had specific jurisdiction and venue to grant such relief. Neither Court could – or was asked to – do what the other Court was asked to do.

Although the Salaried Workers submit that the Debtor's Stay Motion is now moot, the Salaried Workers want to take this opportunity to address several of the comments made with respect to the automatic stay by the Court and the Debtors because the Salaried Workers believe that their actions did not violate the automatic stay in any fashion.

The Debtors concede that the Salaried Workers Plan is not property of the estate. However, they attempt to make the argument that "the Debtors rights' as Plan Administrator are property of the estate." *See* ¶ 22 of the Stay Motion. They cite no authority for this proposition and it is patently clear that if this were true, there would be no point to the various provisions of ERISA discussed above. This is precisely why ERISA requires plan fiduciaries to have no allegiance except to the plan participants. Plan fiduciaries, such as Excom, have an unwavering fiduciary duty to the Salaried Workers Plan's participants to act for their exclusive benefit, see 29 U.S.C. § 1104(a), a duty that entails doing everything in their power to maintain the Salaried Workers Plan or, at the very least, to preserve as many of the rights the participants have in the Salaried Workers Plan as possible. The Debtors' rights as settlor of the Salaried Workers' Plan may be property of the estate, but those rights are not in question here and the Salaried Workers have sought no relief with respect to those rights and have acknowledged that the Debtors are free as settlors to do as they wish and are not bound by the strictures of ERISA. The plan fiduciaries, however, are. And their actions can only be judged by reference to ERISA because it is that statute that gives them life, power, and rights. The Debtors also try to argue that the right to decide whether the Excom should remain the Plan Administrators is also property of the estate. This is also not true and again, if true, would vitiate those sections of ERISA that expressly allow a plan participant to challenge in an action that can only take place in a district court, issues of conflict and breaches of fiduciary duty. Thus, these "property of the estate" arguments are totally without merit.

MorrisonCohen LLP

The Second Circuit has explained that the automatic stay under section 363 (a) (1) of the title 11 of the Unites States Bankruptcy Code ("Bankruptcy Code") is generally limited to debtors and does not encompass nonbankrupt entities. *Gucci, America, Inc.* v. *Duty Free Apparel, Ltd*, 328 F.Supp.2d 439, 441 (S.D.N.Y. 2004) (*citing Teachers Ins. & Annuity Ass'n* v. *Butler*, 803 F .2d 61, 65 (2d Cir. 1986)). Specifically, the filing of a petition for relief pursuant to the Bankruptcy Code automatically stays "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding <u>against the debtor</u> that was or could have been commenced before the commencement of the case under this title." (emphasis added). Generally, the requirement that an action be against a debtor in order for the automatic stay to apply is strictly construed, and even codefendants in the same action may not be protected by the automatic stay if they have not filed for bankruptcy protection themselves. *Teachers Ins.* at 65 (2d Cir. 1986); *see also* 2 Collier on Bankruptcy ¶ 362.03 (15th ed. rev. 2008) ("[the automatic stay] does not protect separate legal entities, such as corporate directors, officers or affiliates"). There are, however, limited exceptions to this general principle, which the Debtors are attempting to assert herein.

First, the Debtors argue that the automatic stay applies to the Michigan Action because of the presence of "unusual circumstances." This exception to the general rule concerning the automatic stay was first articulated in *A.H. Robins Co.* v. *Piccinin*, 788 F.2d 994 (4th Cir. 1986), *cert. denied*, 479 U.S. 876 (1986). There the court held that "in order for relief for . . . non-bankrupt defendants to be available under [section 362(a)(1) of the Bankruptcy Code], there must be 'unusual circumstances.'" *A.H. Robins*, 788 F .2d at 999 (quoting *Johns Manville Corp.* v. *Asbestos Litig. Group (In re Johns-Manville Corp.)*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984). These "unusual circumstances" exist when "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins*, 788 F.2d at 999. *See Queenie, Ltd.* v. *Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003) (noting that automatic stay applies to litigation against a non-debtor includes actions where "there is such an identity between the debtor and the third party defendant that the debtor may be said to be the real party defendant").

The facts herein do not rise to the level of an "unusual circumstance" under the applicable case law. Specifically, although there may be identity between the Debtors and the Excom in their capacity as directors and officers of Delphi, the Excom were being sued by the Salaried Workers only in their capacity as Plan Administrators for the Salaried Workers Plan. Thus, the Excom are essentially one level removed from the typical case where the automatic stay is extended under Section 105 of the Bankruptcy Code to a Debtors' directors and officers that are being sued in connection with their specific role as directors and officers. That is not the case herein, and because of that, the cases relied upon must be distinguished.

Moreover, if in fact there is an identity of interest between the Debtors and the Excom, then the Excom clearly cannot act and should not act as the Plan Administrator in a fiduciary capacity. The Debtors are in essence arguing the identical point that the Salaried Workers attempted to raise in the Michigan Action. For example, assuming *arguendo* that the Debtors are successful in their argument, they would be conceding that the Excom is so intertwined with the interests of the Debtors that the Excom cannot possibly be deemed to be acting independently from the

Debtors' interest in a fiduciary manner. Under these circumstances the simplest solution and one that would have eliminated all the extant litigation and controversy would have been for Delphi to replace Excom with an indepenant fiduciary, which is precisely what Delphi did when it became apparent that Excom could not, free of conflict, file claims against Delphi in the bankruptcy; in that instance, it entered a limited agreement to delegate its fiduciary obligation to pursue claims against Delphi to an independent fiduciary (which is Fiduciary Counselors, Inc.). Upon realization of its conflict in connection with any plan termination negotiation at issue here, it should have taken an identical course.

The Debtors also cite to *Queenie Ltd. v. Nygard Int 'l, supra,* as support for the proposition that the automatic stay can apply to non-debtors, but that case makes clear that it only may be extended when a claim against the nondebtor "will have an immediate adverse economic consequence for the debtor's estate." *Queenie at 287.* The *Queenie* Court listed several examples of immediate adverse economic consequences including: (1) a claim against a non-debtor for an obligation for which the debtor was a guarantor, (2) a claim against debtor's insurer, and (3) actions where there is an identity between the debtor and third-party defendant that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. *See Memorandum Decision Denying Debtors Application to Extend Automatic Stay to His Limited Liability Corporation,* In re Donald J. McCormick, Chapter 13 Case No. 07-37064, SDNY, February 8, 2008, Honorable Cecelia G. Morris. Although this list is not exclusive, it is noteworthy that none of these examples are present herein.

The fact is the Debtors' assertion that the Michigan Action would have had an adverse input on the estate is simply a red herring. Specifically, had the Michigan Action proceeded, it would not have impacted the Debtors' estate. Rather, if the relief sought had been ultimately granted, only the names of the players and their allegiances would have changed – conflicted fiduciaries would have been replaced by non conflicted fiduciaries. That is all. Nothing would have happened to the Salaried Workers' Plan because no relief relative to the plan was requested. The replacement of the Excom would not have any affect on the Debtors' ability to proceed with its Modified Plan because under the Modified Plan issues relating to termination of the Salaried Workers' Plan would still have to be heard – and could only be heard – by a district court. Simply stated, the Salaried Workers were not seeking to "break-up" the Modified Plan in any fashion. Their goal was to have any agreement with the PBGC summarily to terminate the Plan negotiated by an independent fiduciary. Such request was certainly reasonable and would not have an impact on the estate in an unfavorable manner. For this reason, the Debtors' argument that the Michigan Action would have had an adverse impact on the estate is similarly unavailing.

At all times it was easily within the power of the Debtors to remedy Excom's obvious conflict, but for reasons that are unknown to the Salaried Workers, Delphi chose a path that necessitated litigation. All the Salaried Workers wanted was a level playing field and an advocate that would truly seek to zealously represent the over 15,000 men and women whose rights and livelihoods were being affected.

Though these issues are now moot, nothing the Salaried Workers did violated the automatic stay, nor do we believe that anything the Salaried Workers did would have justified extending the automatic stay over non debtors. In filing the Michigan Action and the Objection, the Salaried Workers strictly separated the relief being requested from each Court and only sought relief that could be granted by each Court. They kept both courts informed at all times of what they doing in the other court. They did not engage in forum shopping – they filed their papers in the only courts empowered to grant the precise form of relief being sought – or any form of gamesmanship. And at all times they acted in complete good faith and with respect to this and all Courts.

Yours sincerely,

Joseph T. Moldovan

cc: Anthony F. Shelley, Esq.
Timothy P. O'Toole, Esq.
Albert L. Hogan III, Esq.
All other parties required to be served