**Hearing Date And Time:  July 29, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline:  July 28, 2009 at 5:00 p.m. (prevailing Eastern time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                    :
       In re                        :     Chapter 11
                                    :
DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                                    :
                     Debtors.     :     (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## NOTICE OF SUCCESSFUL BIDDER AT AUCTION

PLEASE TAKE NOTICE THAT on July 26 and 27, 2009, the Debtors conducted an auction pursuant to the Order (A)(I) Approving Modification To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing To Consider Modifications To Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense Claims Bar Date And Alternative Transaction Hearing Date (Docket No. 17032), as amended and supplemented by the Supplemental Modification Procedures Order entered by the Bankruptcy Court on June 29, 2009 (Docket No. 17376), the Second Supplemental Modification Procedures Order (Docket No. 18352), and the Third Supplemental Modification Procedures Order (Docket No. 18551) (collectively, the "Procedures").

PLEASE TAKE FURTHER NOTICE THAT On July 27, 2009, the Debtors' board of directors selected the bid placed by GM Components Holdings, LLC, DIP Holdco 3, LLC, and certain other buyers (together, the "Buyers") as the highest or otherwise best bid at the auction (the "Successful Bid").  A copy of the Master Disposition Agreement marked to show changes from the Master Disposition Agreement filed June 16, 2009, as Exhibit 7.7 to the Debtors' First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (Docket No. 17030) is attached as Appendix A hereto.

PLEASE TAKE FURTHER NOTICE THAT the Debtors will seek entry of an order, pursuant to sections 1123 or 363 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005, approving the sale to the Buyers at a hearing (the "Final Modification Approval Hearing") scheduled for July 29, 2009 at 10:00 a.m. (prevailing Eastern time) before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.  The Final Modification Approval Hearing may be adjourned from time to time by announcing the adjournment in open court without further notice to parties-in-interest.

PLEASE TAKE FURTHER NOTICE THAT any objection to the conduct of the auction or the selection of the Successful Bid must be filed by July 28, 2009 at 5:00 p.m. (prevailing Eastern time) and served in the manner set forth in the Procedures.

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

Dated:    New York, New York
          July 27, 2009

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
    John Wm. Butler, Jr.
    Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois 60606

- and -
    Kayalyn A. Marafioti
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

# Appendix A

<u>**EXECUTION VERSION**</u>

**FREEDOM OF INFORMATION ACT CONFIDENTIALITY REQUESTED**

~~**EXECUTION COPY**~~

**MASTER DISPOSITION AGREEMENT**

**AMONG**

**DELPHI CORPORATION,**

**GM COMPONENTS HOLDINGS, LLC,**

**GENERAL MOTORS** ~~CORPORATION~~**COMPANY**
**(SOLELY WITH RESPECT TO ARTICLE 6 AND SECTIONS** ~~9.11.1, 9.19, AND 9.38~~**3.1.1.C, 9.11, 9.19, 9.37.1, 9.37.2, 9.43, 11.5.1.A AND 12.2.6**),

~~**PARNASSUS HOLDINGS II , LLC,**~~

<u>**MOTORS LIQUIDATION COMPANY (fka GENERAL MOTORS CORPORATION)**</u>
<u>**(SOLELY WITH RESPECT TO SECTIONS 3.1.1.C, 8.1, 9.19 and 11.5.1.A)**</u>

<u>**DIP HOLDCO 3, LLC**</u>

**AND**

**THE OTHER SELLERS AND OTHER BUYERS PARTY HERETO**

**DATED AS OF**

~~**June 1,**~~<u>**July 26,**</u> **2009**

~~**(revised as of June —, 2009)**~~

# TABLE OF CONTENTS

ARTICLE 1. DEFINITIONS.................................................................................23

    1.1 Certain Defined Terms.........................................................................23

    1.2 Other Interpretive Provisions..........................................................2527

ARTICLE 2. PURCHASE AND SALE.............................................................2527

    2.1 Transfers by Sellers and their Affiliates.........................................2527

    2.2 Assumption of Liabilities. ...............................................................3234

    2.3 Retained Liabilities..........................................................................3336

    2.4 JV Companies Liabilities, Sale Company Liabilities. ....................3436

    2.5 Deferred Items. ................................................................................3436

    2.6 Restrictive Covenants.......................................................................3538

    2.7 Allocation Among Buyers. ..............................................................3638

ARTICLE 3. PURCHASE PRICE; ALLOCATION.......................................3639

    3.1 GM Purchase Price...........................................................................3639

    3.2 Company Purchase Price..................................................................3740

    3.3 GM Purchase Price and Company Purchase Price Allocation. ...........3840

ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLERS....................3841

    4.1 Organization.....................................................................................3841

    4.2 Authorization; Enforceability. ........................................................3941

    4.3 Capital Stock of the Sale Companies and JV Companies...............3942

    4.4 No Conflict or Approvals.................................................................4043

    4.5 Sufficiency of Acquired Assets. ......................................................4143

    4.6 Intellectual Property.........................................................................4143

    4.7 Personal Property Assets, Inventory. ..............................................4244

4.8 Real Property. ........................................................................4244

4.9 Financial Statements. ..............................................................4345

4.10    Compliance with Law; Permits. ........................................4446

4.11    Proceedings; Orders. ...........................................................4446

4.12    Tax Matters. ........................................................................4446

4.13    Employee Benefits; Labor. .................................................4547

4.14    Contracts. ............................................................................4850

4.15    Environmental Matters. ......................................................4951

4.16    Insurance. ............................................................................5052

4.17    No Brokers' Fees. ...............................................................5052

4.18    Affiliate Transactions. ........................................................5152

4.19    No Other Representations or Warranties. ...........................5152

4.20    Fair Disclosure; Schedule Data. ........................................5153

ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF GM BUYERS. ............5153

5.1 Organization. ..........................................................................5153

5.2 Authorization; Enforceability. ...............................................5253

5.3 No Conflicts or Approvals. ....................................................5254

5.4 Proceedings. ...........................................................................5354

5.5 Investment Representations. ..................................................5354

5.6 Financial Ability. ...................................................................5355

5.7 Adequate Assurance of Future Performance. ........................5455

5.8 No Brokers' Fees. ..................................................................5455

5.9 Anti-Money Laundering. .......................................................5456

5.10    Compliance with Laws. ......................................................5456

5.11    No Undisclosed Agreements. .............................................5556

**ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF GM** ............................... ~~55~~56

6.1 Authorization; Enforceability. ................................................ ~~55~~56

6.2 No Conflicts or Approvals. ................................................ ~~55~~57

6.3 GM Financing Arrangements. ................................................ ~~56~~57

**ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF COMPANY BUYER.** ~~56~~57

7.1 Organization. ................................................ ~~56~~58

7.2 Authorization; Enforceability. ................................................ ~~56~~58

7.3 No Conflicts or Approvals. ................................................ ~~57~~58

7.4 Proceedings. ................................................ ~~57~~59

7.5 Investment Representations. ................................................ ~~58~~59

~~7.6 Equity Commitment Letter.~~ ................................................ ~~58~~

7.6 Company Financing Agreements. ................................................ 60

7.7 Adequate Assurance of Future Performance. ................................................ ~~59~~60

7.8 No Brokers' Fees. ................................................ ~~60~~61

7.9 Anti-Money Laundering. ................................................ ~~60~~61

7.10    Compliance with Laws. ................................................ ~~60~~61

7.11    No Undisclosed Contracts. ................................................ ~~60~~61

7.12    DIP Direction. ................................................ 61

**ARTICLE 8. ~~INTENTIONALLY OMITTED~~** ................................................ ~~60~~REPRESE

8.1 Authorization, Enforceability. ................................................ 62

**ARTICLE 9. COVENANTS AND AGREEMENTS.** ................................................ ~~61~~62

9.1 Conduct of Business between Signing and Closing. ................................................ ~~61~~62

~~9.2 Bankruptcy Actions.~~ ................................................ ~~63~~

9.2 363 Implementation Terms. ................................................ 65

9.3 Assumed Contracts; Cure Amounts. ................................................ ~~64~~65

9.4 Tax Matters; Cooperation; Preparation of Returns; Tax Elections......................6566

9.5 Employees; Benefit Plans; Labor Matters. ......................................................6768

9.6 Pre-Closing Cooperation; Contact with Customers and Suppliers. ......................7172

9.7 Technical Documentation; Trade Secrets. .......................................................7172

9.8 Corporate Names. ....................................................................................7172

9.9 Information Technology; Intellectual Property Rights and Licenses....................7273

9.10    Shared Items Transferred to Buyers. .....................................................77

9.11    Buyer Guarantee and Acknowledgment of Pure Credit Bid...........................77

9.12    Letters of Credit................................................................................77

9.13    Competition Clearance........................................................................7778

9.14    Further Actions.................................................................................79

9.15    Further Assurances. ..........................................................................7980

9.16    Customs Duties. ...............................................................................7980

9.17    Enterprise Contracts. ........................................................................80

9.18    Confidentiality. ................................................................................8081

9.19    Termination of Certain Agreements.......................................................81

9.20    Certain Mexican Matters.....................................................................8283

9.21    Transfer of Certain Sale Securities. ......................................................84

9.22    Certain Bank Accounts. ......................................................................84

9.23    Certain China Matters. .......................................................................8485

9.24    Certain Poland Matters. ......................................................................85

9.25    Non-GM Customers. ..........................................................................85

9.26    Transfer of Quotas in Saginaw Brazil. ...................................................85

9.27    Transfer of the Brazilian Real Estate. ...................................................86

9.28    Environmental Permits........................................................................86

9.29     Conflict and Privilege Waivers..................................................................86~~87~~

9.30     Preservation of Environmental Records. .....................................87~~88~~

9.31     ~~DIP Transfer Matters~~..................................................................87

~~9.32     Reorganization and Restructuring~~..............................................88

~~9.33~~9.32 ................................................................Certain Other Actions.    88

~~9.34~~9.33 ........................................................................... Retained Plans.    88

~~9.35~~9.34 .................................................................Certain India Matters.    89~~8~~

~~9.36~~9.35 ...................................................................Pending Transactions.    89

~~9.37~~9.36 ...................................................................Delphi FICA Litigation.    89

9.37     Financing. ...........................................................................................89

9.38     ~~GM Financing.~~.................................................................................89

~~9.39     Environmental Matters.~~......................................................................90

~~9.40~~9.39 ................................................................................Non-Solicitation.    90

~~9.41~~9.40Employment, Retirement, Indemnification, and Other Agreements, and Incentive Compen

~~9.42~~9.41 .............................................................................. India Matters.    92~~9~~

~~9.43~~9.42 ...........................................Prosecution and Settlement of Appaloosa Claim.    92

9.43     PBGC Settlement Agreements. .......................................................93

9.44     DIP Priority Payment...................................................................93

ARTICLE 10. CONDITIONS TO CLOSING. ..........................................93~~94~~

10.1     Conditions to Obligations of Sellers and Buyers. .............................93~~94~~

10.2     Conditions to Obligations of Sellers.................................................94~~95~~

10.3     Conditions to Obligations of GM Buyers. ........................................94~~96~~

10.4     Conditions to Obligations of Company Buyer. .................................95~~97~~

ARTICLE 11. CLOSING................................................................................96~~98~~

11.1     Closing Time and Date. ....................................................................96~~98~~

11.2    GM Ancillary Agreements. ..................................................... ~~97~~99

11.3    Company Ancillary Agreements. ............................................... ~~99~~101

11.4    Sellers' Deliveries at Closing. .................................................. ~~100~~102

11.5    Buyers' Deliveries at Closing. .................................................. ~~101~~104

11.6    Post-Closing Deliveries. ........................................................... ~~103~~105

11.7    Post-Closing Transfer of Intellectual Property Rights. ................... ~~103~~105

ARTICLE 12. TERMINATION. ............................................................... ~~104~~106

12.1    Termination. ........................................................................... ~~104~~106

12.2    Procedure and Effect of Termination. ........................................ ~~105~~107

ARTICLE 13. LIABILITY, SURVIVAL. ....................................................... ~~106~~108

13.1    LIMITATIONS OF LIABILITY. ................................................. ~~106~~108

13.2    ~~Termination Fee.~~ ....................................................................... ~~106~~

~~13.3~~    Survival. ............................................................................... ~~106~~108

ARTICLE 14. MISCELLANEOUS. ........................................................... ~~107~~108

14.1    Fees and Expenses. ................................................................ ~~107~~108

14.2    Bulk Sales Laws. ................................................................... ~~107~~108

14.3    Payments in Dollars. .............................................................. ~~107~~108

14.4    Amendment. ......................................................................... ~~107~~108

14.5    Assignment. ......................................................................... ~~107~~109

14.6    No Successor Liability. ............................................................ ~~108~~109

14.7    Waiver. ................................................................................ ~~108~~110

14.8    Notices. ................................................................................ ~~109~~110

14.9    Entire Agreement. .................................................................. ~~110~~112

14.10    Counterparts. ...................................................................... ~~111~~112

14.11    Publicity. ........................................................................... ~~111~~112

14.12    Headings. ................................................................................ ~~111~~112

14.13    Severability. ............................................................................ ~~111~~113

14.14    Third Parties. .......................................................................... ~~111~~113

14.15    Governing Law. ...................................................................... ~~111~~113

14.16    Venue and Retention of Jurisdiction. .................................... ~~111~~113

14.17    Risk of Loss. ........................................................................... ~~112~~114

14.18    Enforcement of Agreement. ................................................... ~~112~~114

14.19    Sellers' Obligations. ............................................................... ~~112~~114

14.20    Bankruptcy Court Approval. ................................................. ~~112~~114

14.21    Reasonably Equivalent Value. ............................................... ~~113~~114

14.22    Identification of Exhibits and Schedules to be Filed Under Seal. ........... ~~113~~114

## MASTER DISPOSITION AGREEMENT

THIS MASTER DISPOSITION AGREEMENT (this "**Agreement**"), dated as of ~~June 1, 2009 (revised as of June      , 2009),~~**July 26, 2009,** is among DELPHI CORPORATION, a Delaware corporation ("**Delphi**") on behalf of itself and the other entities set forth on Schedule 1 and Schedule 2; GM COMPONENTS HOLDINGS, LLC, a Delaware limited liability company ("**Parent**"), on behalf of itself and the other buyers set forth on Schedule 1, which is to be provided by Parent to Delphi as provided in this Agreement (each a "**GM Buyer**," and, collectively with Parent and the Australian Buyer (as defined below), the "**GM Buyers**"); GENERAL MOTORS ~~CORPORATION~~**COMPANY**, a Delaware ~~Corporation~~**corporation** ("**GM**") (solely with respect to ARTICLE 6 and Sections ~~9.11.1, 9.19, 9.38.1 and 9.38.2);~~ ~~PARNASSUS HOLDINGS II,~~**3.1.1.C, 9.11, 9.19, 9.37.1, 9.37.2, 9.43, 11.5.1.A and 12.2.6),** **MOTORS LIQUIDATION COMPANY (fka GENERAL MOTORS CORPORATION), a Delaware corporation (solely with respect to Sections 3.1.1.C, 8.1, 9.19 and 11.5.1.A) ("Old GM"); DIP HOLDCO 3,** LLC, a Delaware limited liability company**,** on behalf of itself and the other buyers that may later be set forth on Schedule 2 as provided in this Agreement ("**Company Buyer**," and collectively with the GM Buyers, the "**Buyer**" or "**Buyers**").

WHEREAS, Parent is a direct or indirect subsidiary of GM;

~~WHEREAS, Company Buyer is an Affiliate of Platinum Equity Capital Partners II, L.P.;~~

**WHEREAS, Company Buyer is an entity newly-formed on behalf of certain of the DIP Lenders[1] which entity will be the assignee of the rights of the DIP Agent, as bidder in connection with the Credit Bid, to receive the Company Acquired Assets for which the Credit Bid is being made;**

WHEREAS, Delphi, through certain of its Affiliates referred to in this Agreement, is engaged in the Steering Business and the business conducted at the UAW Sites (but excluding the business **(but not the assets)** conducted at the **Kokomo** technical ~~centers included in the UAW Sites other than~~**center and the thermal business conducted at** the Lockport technical center) (together~~, the~~ **"GM Business")** ~~and the Company Business (as hereinafter defined)~~;

WHEREAS, the GM Securities Sellers ~~(as hereinafter defined)~~ own, directly or indirectly, the GM ~~Sale~~**Sales** Securities ~~(as hereinafter defined)~~, and the Company Securities Sellers ~~(as hereinafter defined)~~ own, directly or indirectly Company ~~Sale~~**Sales** Securities ~~(as hereinafter defined)~~;

WHEREAS, the GM Asset Sellers ~~(as hereinafter defined)~~ own the GM Acquired Assets ~~(as hereinafter defined)~~, and the Company Asset Sellers ~~(as hereinafter defined)~~ own the Company Acquired Assets ~~(as hereinafter defined)~~;

WHEREAS, on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates ~~(as hereinafter defined)~~ filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter

---

**[1]** Each capitalized term used in the recitals but not yet defined in this Agreement shall have the meaning ascribed to such term below.

11 of Title 11, U.S.C. §§ 101-1330 (as then amended) (the **"Bankruptcy Code"**), in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**);

WHEREAS, this Agreement shall be an Exhibit to the Plan of Reorganization (as hereinafter defined);

WHEREAS, **the DIP Agent, on behalf of the DIP Lenders, is the holder of a first priority lien on substantially all of the assets of the Filing Affiliates (subject to certain exceptions) securing the DIP Loan Parties' obligations under the DIP Documents, including the Acquired Assets, the Sale Securities and the Steering JV Companies;**

**WHEREAS, the Required Lenders under the DIP Agreement have provided the DIP Direction to the DIP Agent;**

**WHEREAS, pursuant to the DIP Direction, the DIP Agent has been instructed by the Required Lenders to and will credit bid 100% of the principal and interest due and owing in respect of the DIP Loans under the DIP Agreement (after giving effect to the application of any cash collateral to the DIP Loans) for the Company Acquired Assets (subject to the Company Assumed Liabilities), Company Sales Securities, the GM Acquired Assets (subject to the GM Assumed Liabilities) and GM Sales Securities pursuant to the terms and conditions of this Agreement, the DIP Assignment Agreement and the DIP Direction;**

**WHEREAS, pursuant to the DIP Direction, the DIP Agent has been instructed to and, pursuant to the DIP Assignment Agreement, has (a) assigned to Company Buyer the DIP Agent's right to receive, pursuant to the Credit Bid, the Company Acquired Assets (subject to the Company Assumed Liabilities) and the Company Sales Securities pursuant and subject to the terms and conditions of this Agreement, the DIP Assignment Agreement and the DIP Direction, and Company Buyer accepted such assignment from the DIP Agent, and (b) assigned to GM Buyer the DIP Agent's right to receive, pursuant to the Credit Bid, the GM Acquired Assets (subject to the GM Assumed Liabilities) and the GM Sales Securities pursuant and subject to the terms and conditions of this Agreement, the DIP Assignment Agreement and the DIP Direction, and GM Buyer accepted such assignment from the DIP Agent, in each case, in exchange for the agreements of Company Buyer and the GM Buyer contained in this Agreement, the consideration payable hereunder will be distributed in accordance with the DIP Documents, and in recognition of such assignment, the Parties have executed this Agreement effective as of the date set forth in the first paragraph hereof;**

**WHEREAS, in connection with such assignment and in accordance with the terms hereof, at the Closing (a)(i) Company Sellers will transfer the Company Acquired Assets and Company Sales Securities, and assign the Company Assumed Liabilities to Company Buyer, (ii) Company Buyer will acquire the Company Acquired Assets and Company Sales Securities, and (iii) Company Buyer will assume the Company Assumed Liabilities, and (b)(i) GM Sellers will transfer the GM Acquired Assets and GM Sales Securities and assign the GM Assumed Liabilities to GM Buyer, (ii) GM Buyer will acquire the GM Acquired Assets and GM Sales Securities, and (iii) GM Buyer will assume the GM Assumed Liabilities, in each case on the terms and conditions set forth herein;**

**WHEREAS,** Delphi and the applicable Sellers desire to sell ~~substantially all of their~~**specified** assets and specified liabilities with respect to the GM Business and the Company Business to the applicable Buyers and the Buyers desire to acquire ~~substantially all of such~~**specified** assets and the specified liabilities as set forth in this Agreement; and

WHEREAS, in furtherance of that desire and as contemplated by Sections 365, 1123 and 1146 of the Bankruptcy Code and in furtherance of the Filing Affiliates' plan of reorganization, the GM Securities Sellers, Company Securities Sellers, the GM Asset Sellers and **the** Company Asset Sellers desire to sell or cause the sale to the applicable Buyers all of their respective right, title and interest in and to the GM ~~Sale~~**Sales** Securities, the Company ~~Sale~~**Sales** Securities, **the** GM Acquired Assets ~~(as hereinafter defined)~~ and the Company Acquired Assets ~~(as hereinafter defined)~~, and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree as follows:

## ARTICLE 1.
## DEFINITIONS.

### 1.1     Certain Defined Terms.

As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

**"Access Agreement" means the Access Agreement by and among the GM Buyers and Company Buyer, executed contemporaneously with this Agreement.**

**"Accounts Receivable"** means all trade accounts receivable, including intercompany trade receivables, and other rights to payment from customers and all other accounts or notes receivable from third parties and Affiliates and the full benefit of all security for such accounts or notes that are not received prior to the Closing Date.

**"Acquired Assets"** means the GM Acquired Assets and the Company Acquired Assets.

**"Acquired Contracts"** means all Contracts that relate to the GM Business or the Company Business, as the case may be, _provided_ that in the case of Pre-Petition Contracts, the Acquired Contracts include only the Assumed and Assigned Contracts.

**"Administrative Assets"** of an Asset Seller, means books, records and instruments relating to the business, operations, condition of (financial or other), or results of operations of such Asset Seller with respect to the applicable Business and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, computer files, operating data and plans, sales materials and records, purchasing materials and records, personnel records of employees, billing records, sale order files, accounting records, other financial records, and related work papers that relate to the applicable Acquired Assets, budgets, pricing guidelines, ledgers, journals, deeds and title policies; _provided, however_, that Administrative Assets do not

include Intellectual Property, Technical Documentation, Environmental Records or GM Environmental Records.

"**Administrative Claims**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, claims arising under the DIP Agreement, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the estates and operating the business of Delphi, including wages, salaries, or commissions for services rendered after the Petition Date, professional claims, all fees and charges assessed against the estates under chapter 123 of title 28, United States Code, and all allowed claims that are to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

"**Affiliate**" means, with respect to any Person, any Person which directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" for purposes of this definition, means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person. For the purpose of applying this definition to GM under Section 9.13.2, "control" means ownership of more than twenty percent (20%) of the shares or other equity interests of such Person.

"**Agreement**" – Recitals.

"**Ancillary Agreements**" means the GM Ancillary Agreements or the Company Ancillary Agreements, as applicable.

"**Appaloosa Claim**" means Delphi's claims against Appaloosa Management L.P. or any other plan investors or other parties arising from or relating to the Equity Purchase and Commitment Agreement, dated as of August 3, 2007, as amended, including that certain litigation against Appaloosa Management L.P. and other plan investors who were party to such Equity Purchase and Commitment Agreement, as amended, and styled Delphi Corporation v. Appaloosa Management L.P., et al., filed in the U.S. Bankruptcy Court S.D.N.Y. on May 16, 2008 (Case No. 05-44481), including any settlements, modifications or claims related thereto.

"**Asset Sellers**" means the GM Asset Sellers and the Company Asset Sellers, as applicable.

"**Assumed Administrative Liabilities**" means the Administrative Claims excluding Liabilities under the DIP Agreement, with respect to the categories set forth on Schedule 1.1.A and, with respect to the GM Buyers, ~~those~~**the Assumed** Hedging Agreements ~~which they assume~~.

"**Assumed and Assigned Contracts**" – Section 9.3.

"**Assumed Hedging Agreements**" shall mean (i) Hedging Agreements (in effect as of the Closing Date) that pursuant to their terms may be assumed by a GM Buyer without the consent of the applicable counterparty thereunder, provided that a GM Buyer shall have agreed to the terms and conditions specified in such agreement with respect to its

assumption, including to the extent required by the DIP Documents in order to allow the $291,020,079 portion of the DIP Payment to be paid to the C Lenders to (a) cash collateralize its obligations under each such Hedging Agreement in the amount of 105% of the Swap Exposure (as defined in the DIP Agreement) in respect thereof at the Closing Date (or such earlier date as shall be required) unless such requirement is waived, on or prior to the Closing Date, by the applicable counterparty thereunder) and (b) such other terms and conditions specified in such Hedging Agreement with respect to its assumption and (ii) any other Hedging Agreements (in effect as of the Closing Date) with respect to which the counterparty to such Hedging Agreement and a GM Buyer has agreed in writing to permit such Hedging Agreement to be assumed by the applicable GM Buyer.

"**Assumed Liabilities**" – GM Assumed Liabilities or Company Assumed Liabilities, as applicable.

"**Australian Assets**" means the GM Acquired Assets located or taken to be located in Australia.

"**Australian Buyer**" means the Australian Buyer of the Australian Assets, Rhodes Automotive manufacturing Pty Limited ABN 41 129 320 494.

"**Australian Seller**" means the Australian Seller of the Australian Assets, Delphi Automotive Systems Australia Limited ABN 31 065 439 885.

"**Backstop Parties**" **means Elliott Associates, L.P. and one or more of its Affiliates and one or more investment funds managed by Silver Point Capital L.P. or one or more of its Affiliates.**

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Brazilian Real Estate**" means the fraction of the condominium stated as being owned by Delphi Brazil and enrolled under the real estate certificate (matrícula) No. 76.477 registered before the real estate register office of the City of Porto Alegre, State of Rio Grande do Sul.

"**Business**" means the GM Business or the Company Business, as applicable.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer Loan Documents**" means the loan documents to be executed on or prior to the Closing pursuant to which GM and ~~an Affiliate of Company Buyer~~the DIP Lenders have agreed to make certain loans and provide certain financial accommodations to Company Buyer.

"**Buyer(s)**" – Recitals.

"**Buyer Transition Services Agreement**" means the Transition Services Agreement **substantially** in the form ~~attached hereto as Exhibit 11.3.2~~**set forth in Exhibit 11.3.2 (with such limited changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date)** to be entered between GM Buyers and Company Buyer.

"**C Lenders**" ~~means all~~ **has the meaning ascribed to the term "**Tranche C Lenders ~~(as defined"~~ in the DIP Agreement~~)~~.

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits at Closing and less all outstanding checks and electronic payments of the **applicable** Business, in each case as determined in accordance with GAAP.

"**China Entities**" means Delphi Saginaw Lingyun Drive Shaft Co. Ltd., Saginaw Lingyun Drive Shaft (Wuhu) Co., Ltd. and Saginaw Steering (Suzhou) Co., Ltd.

"**China L/C**" – Section 9.23.1.

"**China L/C Period**" – Section 9.23.1.

"**Claims**" mean all bankruptcy claims (as defined in Section 101 of the Bankruptcy Code), other claims, written notices, causes of actions, proceedings, complaints, investigations and Proceedings, of any nature whatsoever.

"**Closing**" – Section 11.1.1.

"**Closing Date**" – Section 11.1.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union, works council or other representatives of Transferred Employees (including local agreements, amendments and supplements, and material letters and memoranda of understanding of any kind) that are in effect as of the date of this Agreement.

"**Commercial Agreement**" means the Commercial Agreement **executed contemporaneously with this Agreement by and** among the GM Buyers and Company ~~Buyers of even date herewith~~**Buyer**.

"**Company Acquired Assets**" – Section 2.1.4.

"**Company Ancillary Agreements**" means the Transfer Agreements and other agreements referred to in Section 11.3.

"**Company Asset Buyer(s)**" means the Buyers **(as assignees of the rights of the DIP Agent to the Company Acquired Assets in connection with the Credit Bid)** set forth on Schedule 2, which Company Buyer will use commercially reasonable efforts to provide to Delphi ten (10) Business Days after the date of this Agreement, with respect to the assets set forth opposite their names.

"**Company Asset Sellers**" means Sellers set forth on Schedule 2, with respect to the assets set forth opposite their names.

"**Company Assumed Liabilities**" – Section 2.2.2

"**Company Business**" means all businesses of Delphi and its subsidiaries, other than the GM Business, the businesses solely conducted at the Excluded Assets and the businesses to be sold as part of the Pending Transactions.

"**Company Buyer**" – Recitals.

~~"**Company Confidentiality Agreement**" means the confidentiality agreement between Platinum Equity and Delphi, dated September 5, 2008.~~

"**Company Financing Agreements**" **means the Buyer Loan Documents, and the Securities Purchase Agreement (together, and including, without limitation, any and all exhibits, annexes, schedules, and other ancillary documents).**

"**Company IP License Agreement**" – Section 9.9.3.

"**Company JV Companies**" **means joint ventures other than the Steering JV Companies to which any Seller is a party.**

"**Company Licensed Intellectual Property**" means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is used or held for use in the Company Business.

~~"**Company Owned Real Property**" means the Real Property owned by any of the Company Sale Companies or Company Asset Sellers as of the date of this Agreement or which constitute Company Acquired Assets, excluding any real property that constitutes GM Owned Real Property.~~ "**Company Purchase Price**" – Section 3.2.1.

"**Company Purchased Intellectual Property**" means any Seller's and/or any of their respective Affiliate's right, title and interest in Intellectual Property other than the Steering Purchased Intellectual Property and subject to rights granted to GM Buyers hereunder.

"**Company Real Property**" means the **owned and leased** real property relating to the Company Business.

"**Company Sale Companies**" mean the Sale Companies being transferred to **the** Company Buyer, directly or indirectly, under this Agreement.

"**Company** ~~Sale~~**Sales Securities**" mean**, with respect to each of the entities set forth under the heading "Sale Companies" on Schedule 2 to this Agreement,** all of the outstanding shares ~~of the Sale Companies, and all of the outstanding shares of the~~**or other equity interests of such Sale Companies, and, with respect to each of the Company JV Companies set forth on Schedule 2 to this Agreement, all of the outstanding shares or other equity interests of the Company** JV Companies that are owned by Sellers ~~as set forth on Schedule 2 to this Agreement.~~

"**Company Securities Buyers**" means the Buyers set forth on <u>Schedule 2</u>, which Company ~~Buyers~~**Buyer** will use their commercially reasonable efforts to provide to Delphi, ten (10) Business Days ~~before Closing~~**after the date of this Agreement** but, in any event, in sufficient time to complete filings under Competition/Investment Laws, with respect to the Sale Companies set forth opposite their names.

"**Company Securities Seller(s)**" means the securities sellers set forth on <u>Schedule 2</u> to this Agreement, with respect to the Company ~~Sale~~**Sales** Securities set forth opposite their names.

"**Company Sellers**" means the Company Securities Sellers and Company Asset Sellers, as applicable.

"**Company Transfer Agreements**" means any agreements which govern the transfer of Company Acquired Assets under the laws of jurisdictions outside the United States.

"~~**Competing Transaction**~~" ~~Section 0.~~"**Competition/Investment Law**" means any Law that is designed or intended to prohibit, restrict or regulate: (i) foreign investment; or (ii) antitrust, monopolization, restraint of trade or competition.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

"**Controlled Group**" means any trade or business (whether or not incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sale Companies; or (ii) which together with any of the Sale Companies is treated as a single employer under Section 414(t) of the Code.

"**Copyrights**" mean: (i) all copyrights, works of authorship or copyrightable works existing anywhere (registered, published, unpublished, protected by statutory law or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for copyright registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefor; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**Credit Bid**" – **Section 3.2.1.C.**

"**CSC**" – <u>Section 9.9.12</u>.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of and/or assignment to Buyers of the Pre-Petition Contracts included within the Assumed and Assigned Contracts under the Plan Modification Order.

"**Data Room**" means the virtual data room maintained by Merrill Corporation in which the documents and information related to the Steering Business were disclosed to Parent's representatives and counsel and the virtual data rooms maintained by Delphi in which documents and information related to the other Acquired Assets, Sale Companies and applicable JV Companies were disclosed to Parent's and Company Buyer's representatives and counsel.

"**Day 1**" means work commenced among the Sellers, the GM Buyers and the Company ~~Buyers~~**Buyer** to separate the information technology systems required to run the GM Business from the Sellers' and the Company ~~Buyers'~~**Buyer's** systems on the Closing Date or at a mutually agreed upon post-Closing Date.

"**Day 2**" means logical and physical separation such that the information technology systems required to run the GM Business in a stand-alone application environment, a stand alone database environment and a stand-alone physical data center environment, including, for example, in cases where a physical move of the application may be required, such as a move from a Delphi-wide environment to a GM Business dedicated environment.

"**Debt Obligations**", as applied to any Person, mean obligations (i) for borrowed money, (ii) evidenced by bonds, debentures, notes, and similar instruments, (iii) under financing or capital (as opposed to operating) leases (determined in accordance with GAAP) and other similar instruments, and (iv) all accrued interest, fees and charges in respect of any of the foregoing.

"**Deferred Item(s)**" – Section 2.5.1.

"**Delphi**" – Recitals.

"**Delphi Brazil**" means Delphi Automotive Systems do Brasil Ltda., a Brazilian limited liability company, with head office at Avenida Goiás, No. 1820 / 1860, in the City of São Caetano do Sul, State of São Paulo, enrolled with the Brazilian General Taxpayers' Registration (CNPJ/MF) under No. 00.857.758/0001-40.

"**Delphi FICA Litigation**" means the FICA refund claim being litigated in Delphi Corporation, Delphi Automotive Systems LLC, and Delphi Automotive Systems Services LLC v. United States of America, (Case ~~no~~**No.** 08 Civ 04487 (PKC) in the U.S. District court of the Southern District of New York) in which Delphi et. al. is seeking a refund of employment taxes relating to payments made to certain union members upon ratification of collective bargaining agreements in 1999 and 2003 together with any other similar claims relating to other pre-Closing periods.

"**Delphi HRP**" means the Delphi Hourly-Rate Employees Pension Plan.

"**Delphi India**" means Delphi Automotive Systems Pvt. Ltd.

"**Delphi-PBGC Settlement Agreement**" **means that certain Settlement Agreement between Delphi and the Pension Benefit Guaranty Corporation dated as of July 21, 2009.**

"**Delphi Polska**" means Delphi Polska Automotive Systems Sp.z.o.o., a Polish company.

"**DEOC**" – Section 9.5.4.A.

"**DIP Agent**" means JPMorgan Chase Bank, N.A. in its capacity as the administrative agent under the DIP Agreement.

"**DIP Agreement**" means that certain Amended and Restated Revolving Credit, Term and Guaranty Agreement, dated as of May 9, 2008, among Delphi, the subsidiaries of Delphi named therein, the lenders party thereto and the DIP Agent, as amended through ~~May 21, 2009.~~ **the date hereof.**

"**DIP Assignment Agreement**" **means an assignment agreement of even date herewith among Parent, Company Buyer and the DIP Agent.**

"**DIP Direction**" **means a written direction by the Required Lenders to the DIP Agent to, among other things, (i) credit bid 100% of the principal and interest due in respect of the DIP Loans under the DIP Agreement (after giving effect to the application of any cash collateral to the DIP Loans) toward the purchase of the Company Acquired Assets (subject to the Company Assumed Liabilities) and GM Acquired Assets (subject to the GM Assumed Liabilities) on the terms and subject to the conditions contained herein, in the DIP Assignment Agreement and in such written direction; (ii) assign its right to receive the Company Acquired Assets (subject to the Company Assumed Liabilities) to Company Buyer on the terms and subject to the conditions contained herein, in the DIP Assignment Agreement and in such written direction; and (iii) assign its right to receive the GM Acquired Assets (subject to the GM Assumed Liabilities) to GM Buyer on the terms and subject to the conditions contained herein, in the DIP Assignment Agreement and in such written direction.**

"**DIP Documents**" **has the meaning ascribed to the term "Loan Documents" in the DIP Agreement.**

"**DIP Lenders**" **has the meaning ascribed to the term "Lenders" in the DIP Agreement.**

"**DIP Letters of Credit**" **means (i) Letters of Credit (as defined in the DIP Agreement) and (ii) any letters of credit that have been extended or issued to replace such Letters of Credit, in each case, on or before the Closing Date.**

"**DIP Letters of Credit Cash Collateral**" **means (i) cash collateral held in the Letter of Credit Account (as defined in the DIP Agreement) and (ii) cash collateral securing letters of credit that have been extended or issued to replace letters of credit issued pursuant to the DIP Agreement, in each case, as of the Closing Date on account of any DIP Letters of Credit.**

"**DIP Loan Parties**" has the meaning ascribed to the term "Loan Parties" in the DIP Agreement.

"**DIP Loans**" has the meaning ascribed to the term "Loans" in the DIP Agreement.

"**DIP Payment**" shall mean the ~~Senior DIP Lenders and the C Lenders~~**DIP Priority Payment plus $291,020,079 in cash**.

"**DIP Priority Payment**" means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the Closing Date, in dollars: (i) **(x)** all outstanding and unpaid fees and expenses then due **(A)** under Section 10.05 of the DIP Agreement ~~(including any counsel and advisor fees payable~~**with respect to the Backstop Parties, and/or (B) pursuant to any expense letters entered into between Delphi and any Backstop Parties copies of which have been delivered to GM (the portion of the DIP Priority Payment represented by this clause (B) shall be forwarded by the DIP Agent to the applicable parties); and (y) all other outstanding and unpaid fees and expenses then due** under Section 10.05 of the DIP Agreement)~~;~~ (ii) accrued and unpaid interest ~~and fees then due~~ on account of Tranche A Loans (as defined in the DIP Agreement) ~~and~~**outstanding as of the Closing Date, and on account of** Tranche B Loans (as defined in the DIP Agreement) **outstanding as of the Closing Date and any outstanding fees owing in respect of DIP Letters of Credit**; (iii) the then outstanding principal amounts of the Tranche A Loans and Tranche B Loans; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Agreement) ~~that are not Assumed Liabilities for those Hedging Agreements (as defined in the DIP Agreement) that are not Assumed Liabilities; provided that any such amount under this subsection (iv) shall be reduced by the amount of the Hedging Agreements that are Assumed Liabilities~~**is required, pursuant to the DIP Documents, to be applied to the obligations owing under Hedging Agreements**.

"**EC Merger Regulation**" means Council Regulation of the European Community No. 139/2004 of January 20, 2004 on the control of concentrations between undertakings.

"**EDS**" – Section 9.9.12.

"**Encumbrance**" means: (i) with respect to the Sale Securities, any voting trust, shareholder agreement, proxy, preemptive right, right of first refusal, or other similar restriction; and (ii) with respect to the Acquired Assets (including the Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates) or any other property or asset, any lien, charge, claim, pledge, security interest, conditional sale agreement or any other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over Personal Property).

"**Enterprise Contracts**" – Section 9.17.

"**Enterprise Providers**" – Section 9.17.

"**Environment**" means the following media (whether individually or commingled): air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground)

and ground (whether at the surface or below the surface) and all organisms, ecosystems, flora and natural resources.

"**Environmental Law**" means any and all statutes, rules, regulations, ordinances, directives, decrees, treaties, provisions of any constitution and principles (including principles of the common law) and Governmental Orders applicable to the conduct and the operation of the Business, and relating to pollution or the protection of the Environment or protection of human health from environmental hazards, excluding workplace health and safety laws (including OSHA and similar foreign laws).

"**Environmental Permits**" mean any licenses, permits, authorizations and approvals issued by any Governmental Authority and required to be obtained by the Business in respect of the Acquired Assets under Environmental Laws.

"**Environmental Records**" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, relating to: (i) the use, management, handling, transportation, release, storage, treatment or disposal of any Hazardous Material in, about or under any Real Property; (ii) the environmental condition of the Real Property; and (iii) compliance with Environmental Laws by the Business; whether located at a Real Property or in the possession of Delphi's Legal Staff or Operations Support Group at Delphi's Troy headquarters or otherwise provided to the GM Buyers or the Company Buyer for Real Property relating to the GM Business or the Company Business, respectively; excluding, however, any such records which are subject to the attorney-client, attorney work product or similar privilege because such records contain confidential communications, mental impressions, conclusions, opinions or legal theories of Sellers' counsel ("**Privileged Environmental Records**"); provided, however, that Sellers shall ensure that any material factual or technical information or data regarding the environmental condition or compliance status of any property or facility of the Business or the Real Property is otherwise contained in the Environmental Records.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Excepted Shared Intellectual Property**" means the Shared Intellectual Property listed in Schedule 9.9.1.A.

"**Excluded Assets**" – Section 2.1.5.

"**Excluded Facilities**" – Section 2.1.5.F.

"~~**Existing GM Assets**~~" – ~~Section 12.1.6.~~"**Facilities Separation & Relocation Plan**" – Section 9.9.10.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and are Asset Sellers and/or Securities Sellers: Delphi Automotive Systems LLC, Delphi China LLC, Delphi Automotive Systems (Holding), Inc. and Delphi Technologies, Inc., and the Affiliates identified on Schedule 1.1.F.

"**Final Order**" means an order of the Bankruptcy Court or any court with jurisdiction, or findings and conclusions relating to an order of the Bankruptcy Court or any court with jurisdiction, as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Federal Rule of Civil Procedures 60(b)) or a petition for a writ of certiorari has expired and no such appeal, motion or petition is pending.

"**Final Plan Modification Hearing**" means the Bankruptcy Court hearing to approve the Plan Modification Order.

"**French Plant" means the manufacturing facility owned or operated by the Steering Business located at Strasbourg, France.**

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period, unless otherwise noted or disclosed herein.

"**GM**" – Recitals.

"**GM Acquired Assets**" – Section 2.1.3.

"**GM Ancillary Agreements**" —means the Transfer Agreements and other agreements referred to in Section 11.2.

"**GM Asset Buyer(s)**" means the Buyers set forth on Schedule 1, which ~~GM~~**Parent** will use commercially reasonable efforts to provide ~~by Parent~~ to Delphi not less than ten (10) Business Days after the date of this Agreement (it being understood that such Buyers identified after the date of this Agreement must agree in writing to be bound by all of the terms, conditions, and provisions in this Agreement and no other GM Buyer is released from its obligation hereunder), with respect to the assets set forth opposite their names and the Australian Buyer in respect of the Australian Assets.

"**GM Asset Sellers**" means Sellers set forth on Schedule 1, with respect to the assets set forth opposite their names and the Australian Seller in respect of the Australian Assets.

"~~**GM Assumed Contracts**" – Section 12.1.6~~"**GM Assumed Liabilities**" – Section 2.2.1.

"**GM Business**" – Recitals.

"**GM Buyer(s)**" – Recitals.

"**GM/Company Ancillary Agreements**" means this Agreement, the Buyer Transition Services Agreement, the Supply Agreement, the Commercial Agreement, the Access Agreement, the Securities Purchase Agreement and any other agreement executed and delivered in connection therewith.

"**GM Confidentiality Agreement**" means the confidentiality agreement between GM and Delphi dated September 12, 2005, as amended.

"**GM-Delphi Agreement**" means the Agreement dated as of May 9, 2008 among GM, Delphi and the Filing Affiliates, as amended by Amendment No. 1 dated October 6, 2008,

Amendment No. 2 dated November 7, 2008, and Amendment No. 3 dated January 30, ~~2009 and~~**2009,** as amended and restated in its entirety pursuant to the Interim Financing Amendment.

"**GM-Delphi Liquidity Agreements**" mean (i) the GM-Delphi Agreement and (ii) the Partial Temporary Accelerated Payment Agreement dated as of December 12, 2008 (as amended through January 30, 2009.

"**GM Environmental Records**" mean any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, relating to: (i) the use, management, handling, transportation, release, storage, treatment or disposal of any Hazardous Material; (ii) environmental site conditions; and (iii) compliance with Environmental Laws, in each case concerning the GM Business or any GM Real Property, so long as such records were provided by **Old** GM to any of Sellers or Delphi Automotive Systems Corporation, a Delaware corporation, or their respective Affiliates, and which are still in the possession of Delphi's Legal Staff or Operations Support Group at Delphi's Troy headquarters or located at any GM Real Property. Privileged Environmental Records shall not include any GM Environmental Records.

"**GM Financing**" – Section 6.3.

"**GM Financing Agreements**" – Section 6.1.

"**GM Leased Real Property**" – Section 4.8.1.

"**GM IP License Agreement**" – Section 9.9.1.

"**GM Licensed Intellectual Property**"— means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is used or held for use in the GM Business, including such rights in associated Contracts listed on Schedule 4.14.1.

"**GM Owned Real Property**" – Section 4.8.2.

"**GM-PBGC Settlement Agreement" means that certain Waiver and Release Agreement between GM and the Pension Benefit Guaranty Corporation, in the form attached as Exhibit 3B.**

"**GM Purchase Price**" – Section 3.1.1.

"**GM Real Property**" – means the GM Leased Real Property and the GM Owned Real Property.

"**GM Sale Companies**" mean the Sale Companies being transferred to GM ~~Buyer~~**Buyers**, directly or indirectly, under this Agreement.

"**GM Sales Securities**" mean**, with respect to each of the entities set forth under the heading Sale Companies set forth on Schedule 1 to this Agreement,** all of the outstanding shares ~~of the Sale Companies and all of the outstanding shares of the~~**or other equity interests of**

such Sale Companies, and, with respect to each of the Steering JV Companies set forth on Schedule 1 to this Agreement, all of the outstanding shares or other equity interests of the Steering JV Companies that are owned by Sellers as set forth on Schedule 1 to this Agreement.

"**GM Securities Buyers**" means the Buyers set forth on Schedule 1, which GM Buyers will use their commercially reasonable efforts to provide to Delphi, ten (10) Business Days before Closing, but in any event, in sufficient time to complete filings under Competition/Investment Laws, with respect to the Sale Companies set forth opposite their names.

"**GM Securities Seller(s)**" means the securities sellers set forth on Schedule 1 to this Agreement, with respect to the GM Sale Sales Securities set forth opposite their names.

"**GM Sellers**" means the GM Securities Sellers and GM Asset Sellers, as applicable.

"**GM Transfer Agreements**" – Section 11.2.3.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states such as the European Union.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**GSA**" means the Global Settlement Agreement, as amended, effective as of September 29, 2008, between Delphi and GM.

"**Hazardous Materials**" means any element, mixture, chemical, hazardous substance, constituent, waste, pollutant, contaminant or material including petroleum or petroleum-based or petroleum-derived substances, polychlorinated biphenyls, asbestos-containing materials, noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous), which are regulated, or can give rise to Losses under an Environmental Law or an Environmental Permit.

"**Hearing Date**" — Section 9.2.2. "**Hedging Agreements**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic financial or pricing indices or measures of economic, financial or pricing risk or value, any similar transaction or any combination of the foregoing transactions.

"**HP**" – Section 9.9.12.

"**HSR Act**" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Income Tax**" or "**Income Taxes**" means any and all United States or non-United States federal, national, state or local Tax based on or measured in whole or in part by income or profits, including any interest, penalties or other additions thereto.

"**India L/C**" – Section ~~9.35~~ **9.34.**

"**India L/C Period**" – Section ~~9.35~~ **9.34.**

"**Information Tax Returns**" – Section 9.4.3.

"**Insurance Policies**" means all insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Interim Financing Amendment**" means that certain amended and restated GM-Delphi Liquidity Agreement, dated ~~the date hereof,~~**June 1, 2009, as amended,** by and among GM and Delphi and the Filing Affiliates, that, among other things, provides up to $250 million of additional liquidity to Delphi through the Closing Date~~,~~ **and as further amended by Amendment No. 1 dated July 23, 2009, and Amendment No. 2 dated July 26, 2009.**

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, office supplies, parts, packaging materials and other inventory and accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted or located at customers' premises on consignment, or wherever else located, which are used or held for use by Sellers or the Sale Companies in the conduct of the Business (together with all rights of Sellers against suppliers of such inventories).

"**IP License Agreements**" means collectively the GM IP License Agreement, the Company IP License Agreement and the Pending Transactions IP License Agreements.

"**IUE-CWA**" means the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its Local Unions 717 (Warren), 83698 (Clinton) and 83718 (Brookhaven).

"**June 1 MDA**" **means the Master Disposition Agreement, among Delphi, GM Components Holdings, LLC, Old GM, Parnassus Holdings II, LLC and the other sellers and other buyers party thereto, dated as of June 1, 2009, as amended.**

"**JV Companies**" means the Steering JV Companies and the Company JV Companies.

"**KDAC**" means Korea Delphi Automotive Systems Corporation.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and

production techniques, technologies, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, formulae, algorithms, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential together with the rights to sue or recover and retain damages and costs and attorneys' fees for present, past and future misappropriations or otherwise of any of the foregoing.

"**Knowledge**" means Knowledge of Company Buyer, Knowledge of GM Buyer or Knowledge of Sellers, as applicable.

"**Knowledge of Company Buyer**" or "**Company Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Delphi**" or "**Delphi's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Buyers**" or "**Buyers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of GM Buyer**" or "**GM Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order, but not including Environmental Laws.

"**Leases**" – Section 4.8.1.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet or otherwise, or due or to become due, including Debt Obligations and those arising under any Law, Environmental Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means the GM Licensed Intellectual Property and the Company Licensed Intellectual Property.

"**Losses**" mean any and all Claims, Liabilities, losses, damages, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Manufacturing Facilities**" means the manufacturing facilities owned or operated by the Steering Business located at Saginaw, Michigan; Queretaro, Mexico; Juarez, Mexico; Sabinas Hidalgo, Mexico; ~~Strasbourg, France;~~ Somerton, Australia; Bangalore, India; Suzhou, China; Porto Alegre, Brazil; Gliwice, Poland; Gurgaon, India; and Tychy, Poland **and the French Plant**.

"**Material Adverse Effect**" means any change, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers hereunder), results of operations or financial condition of the GM Business or the Company Business, as applicable, taken as a whole, but excludes any effect: (i) resulting from general economic or business conditions (except to the extent such change, occurrence or development has a significantly disproportionate adverse effect on such Business); (ii) affecting companies in its industry or its markets generally (except to the extent such change, occurrence or development has a significantly disproportionate adverse affect on such Business); (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) that is cured before the date of any termination of this Agreement by Parent pursuant to Section 12.1 hereof; (v) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of such Business; (vi) resulting from any act or omission of any Seller taken with respect to the Company Business or the GM Business, as applicable, with the prior written consent of GM or the Company Buyer, as applicable; (vii) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (viii) resulting from the regulatory status of any Buyer; (ix) resulting from acts of war or terrorism, whether or not directed at such Business or Buyer; or (x) resulting from the financial condition of **Old** GM or any voluntary or involuntary filing of bankruptcy involving **Old** GM.

"**Material Contracts**" – Section 4.14.1.

"**Mexican VAT Amount**" – Section 9.20.1.

"**Mexico Deposit**" – Section 9.20.2.

"**Mexico LTAs**" – Section 9.20.1.

"**Modification Procedures Order**" means that certain Order (A)(I) Approving Modifications ~~to~~**To** Debtors' First Amended Plan ~~of~~**Of** Reorganization (as~~As~~ Modified) ~~and~~**And** Related Disclosures ~~and~~**And** Voting Procedures ~~and~~**And** (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan ~~of~~**Of** Reorganization ~~and~~**And** (B) Setting Administrative Claims Bar Date ~~and~~**And** Alternative Hearing Date, as entered by the Bankruptcy Court on ~~June____~~**or about June 12, 2009, as amended and supplemented by the Order Amending And Supplementing (i) Order (A)(I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date to Consider Modifications to**

<u>Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expenses Claims Bar Date And Alternative Transaction Hearing Date (Docket # 17032) And (ii) The Protective Order Governing Production And Use Of Confidential And Highly Confidential Information In Connection With (A) Supplement To Plan Modification Approval Motion And (B) Supplement To GM Arrangement Fourth And Fifth Amendment Approval Motion (Docket No. 16920), entered by the Bankruptcy Court on June 29, 2009 And Second Supplemental Modification Procedures Order dated July 17,</u> 2009.

"**MRA**" means the Amended and Restated Restructuring Agreement dated September 12, 2008 between <u>Old</u> GM and Delphi.

"**Net Proceeds**" <u>means with respect to the sales of the brake and suspension business and the exhaust business of Delphi and its Affiliates, the gross proceeds of such sales minus taxes and expenses directly related to such sales incurred by any Asset Sellers or any Sale Companies plus or minus any purchase price adjustments unrelated to indemnification claims. Net Proceeds shall not include any adjustments for post-closing indemnity claims or other Liabilities related to the sale or the assets or business sold or payments which a Sale Company received for capital expenditures made for the benefit of the buyer of the brake and suspension business.</u>

"**New York Courts**" – <u>Section 14.16</u>.

"**Non-Solicitation Period**" – <u>Section 0.**9.39.**</u>

"**Non-U.S. Benefit Plan**" – <u>Section 4.13.13</u>.

"**Non-U.S. Employees**" means the employees (salaried and hourly) who are employed by Asset Sellers or Seller Affiliate in, and dedicated to, the Business in a country other than the United States immediately prior to the Closing and identified on <u>Schedule 4.13.1</u>.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – <u>Section 5.9</u>.

"**Old GM**" – <u>Introductory Paragraph.</u>

"**Operating Agreement**" means the operating agreement contemplated in the Buyer Loan Documents substantially in the form of <u>Exhibit 1.2</u>.

"**Option Exercise Agreement**" means the Option Exercise Agreement dated March 3, 2009 between GM and Delphi.

"**Ordinary Course of Business**" means the usual, regular and ordinary course of a business consistent with the past practice thereof (including with respect to quantity and frequency); <u>provided</u>, <u>however</u>, that where the Sellers' practices are modified to address the effects of economic conditions affecting the automotive and automotive supply industry or current economic conditions, such term means practices consistent with the practices of Sellers and its Affiliates used in managing Delphi's business in general; and, <u>provided</u> <u>further</u>, that the Sellers' usual, regular and ordinary course of business shall be deemed to include practices

which are consistent with the practices of the Sellers from and after the Petition Date to the extent consistent with the Bankruptcy Code or orders issued by the Bankruptcy Court.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Other Services**" – Section 9.17.

"**Other Steering Business Liabilities**" means the Liabilities of Non-Filing Affiliate Sellers ~~that are~~**to the extent** attributable to the Steering Business other than Liabilities with respect to Income Taxes and Debt Obligations ~~or~~**and** Liabilities arising under any Environmental Law.

"**Other Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of Sellers used but not primarily used in the Business.

"**Parent**" – Recitals.

~~"**Parnassus Class C Interest**" means Class C membership interests in Parnassus in the nominal amount of $145.5 million, having an annual cash dividend at the rate of 8% (payable quarterly in arrears), and subject to mandatory redemption at the conclusion of the tenth year after issuance; and (1) being subject to mandatory redemption in such amounts as set forth in the operating agreement and at such times as distributions are made to the holders of the Class A and Class B interests of Parnassus, and (2) ranking pari passu in right of distribution with the holders of the Class A and Class B interests of Parnassus in the percentages set forth in the operating agreement. The Parnassus Class C Interest may be issued by Parnassus Holdings II, LLC or such other entity as may be the "Company Buyer" under this Agreement, and shall be held by either Sellers, a trust or an agent as determined by Sellers, provided, however, that regardless of the issuer or form, the Parnassus Class C Interest shall have substantially the same terms, conditions and economic entitlements as set forth herein.~~

"**Paris Technical Center**" means the technical center and customer support center of the Business located in Tremblay, France.

"**Party(ies)**" means the Sellers and/or Buyers.

"**Patent Rights**" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational invention and design registrations or applications, patents and patent applications, provisionals, substitutions, reissues, divisionals, continuations, continuations-in-part, extensions and reexaminations and all rights, in each case provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"~~PE Financing Agreements~~" ~~means the Buyer Loan Documents, and Securities~~ ~~Purchase Agreement (together, and including, without limitation, any and all exhibits, annexes,~~ ~~schedules, fee letters and other ancillary documents).~~"**Pending Transactions**" means Seller's pending transactions set forth on Schedule 2.1.5.J.

"**Pending Transactions IP License Agreement**" – Section 9.9.4.

"**PBGC Settlement Agreements** " means the Delphi-PBGC Settlement Agreement and the GM-PBGC Settlement Agreement.

"**Permits**" means licenses, consents, approvals, permits and other Governmental Approvals, but not including Environmental Permits.

"**Permitted Encumbrance**" means:  (i) security interests relating to vendor tooling arising in the Ordinary Course of Business and not delinquent; (ii) any Encumbrance that may be created by or on behalf of GM or its Affiliates with respect to the GM Acquired Assets or the GM ~~Sale~~**Sales** Securities, or by or on behalf of Company Buyer or its Affiliates with respect to the Company Acquired Assets or the Company ~~Sale~~**Sales** Securities ~~or Buyers~~; and (iii) in relation to Real Property:  (a) Encumbrances relating to any current real estate or ad valorem taxes, proceedings or assessments not yet due and payable or delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged prior to the Closing Date; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose (other than the failure of the applicable Buyer to own the relevant property); (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; and (e) easements, covenants, restrictions and other encumbrances of public record (provided that, in the event any such Encumbrance relates to a sum owed, the applicable Seller shall indemnify GM and the applicable Buyer against any costs or expenses arising therefrom); (iv) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the underlying asset to which such Encumbrances relate; and (v) in the case of Sale Securities of the JV Companies, restrictions contained in the joint venture agreement or shareholders agreement or related agreements affecting such Sale Securities.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere primarily used or held for use in the conduct of the applicable Business; provided, however, that the Personal Property does not include Intellectual Property.

"**Petition Date**" – Recitals.

"~~Plan Modification Motion~~" ~~Section 9.2.1.~~"**Plan Modification Order**" means the order entered by the Bankruptcy Court approving the modifications to the Filing Affiliates' Plan of Reorganization under section 1127 of the Bankruptcy Code, including all transactions contemplated by this Agreement**, or, as applicable, an alternative order entered by the Bankruptcy Court under Section 363 of the Bankruptcy Code approving all transactions contemplated by this Agreement, including those findings of fact, conclusions of law and orders set forth in Schedule 10.1.1 hereto and the exhibit thereto**.

"**Plan of Reorganization**" or "**Plan**" means Delphi's joint plan of reorganization, including all schedules and exhibits thereto, as confirmed by the Bankruptcy Court on January 25, 2008, as modified by the Plan Modification Order entered by the Bankruptcy Court approving modifications to Delphi's joint plan of reorganization under section 1127 of the Bankruptcy Code.

"**Plan of Reorganization Documents**" means those documents that are to be filed by the Filing Affiliates with the Bankruptcy Court seeking modifications to the Plan of Reorganization.

"**Post-Closing Mexico Utilities**" – Section 9.20.2.

"**Post-Petition Contracts**" mean the Acquired Contracts of the Filing Affiliates relating to the applicable Business entered into by such Filing Affiliates on or after the Petition Date.

"**Pre-Petition Contracts**" mean the Acquired Contracts of the Filing Affiliates relating to the applicable Business entered into by such Filing Affiliates before the Petition Date.

"~~**President's Designee**~~" ~~has the meaning given to such term in that certain Loan and Security Agreement by and between GM and The United States Department of the Treasury, dated as of December 31, 2008, as may be amended from time to time.~~

"**Previously Filed Version**", **when used in connection with an Exhibit to this Agreement, refers to the version of the relevant exhibit filed with the Bankruptcy Court on or about July 8, 2009, with such limited changes as the Parties may reasonably agree upon between the date of this Agreement and the Closing Date.**

"**Privileged Environmental Records**" is defined within the definition of Environmental Records.

"**Proceeding**" means any action, claim, charge, complaint, grievance, demand, suit, proceeding, arbitration, citation, summons, subpoena, inquiry, or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority or any arbitrator or arbitration or grievance panel.

"**Product(s)**" means the UAW Site Products and the Steering Products.

"**PRP**" – Section 9.5.3.

"**Purchase Price**" means the GM Purchase Price and the Company Purchase Price.

"**Purchase Price Assumed Debt**" – Section 9.20.1.

"**Purchased Intellectual Property**" means the Steering Purchased Intellectual Property and the Company Purchased Intellectual Property.

"**Real Property**" means the GM Owned Real Property and theGM Leased Real Property.

"**Required Lenders" has the meaning assigned to such term in the DIP Agreement**.

"**Retained Liabilities**" – Section 2.3.

"**Retained Plans**" – Section 2.3.3

"**Saginaw Brazil**" means Saginaw Indústria e Comércio de Auto Peças Ltda., a Brazilian limited liability company, with head office at Rua Giuseppe Mandelli, No. 118, Bairro São João, in the City of Porto Alegre, State of Rio Grande do Sul, enrolled with the Brazilian General Taxpayers' Registration (CNPJ/MF) under No. 08.762.025/0001-34.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets and Sale Securities from applicable Sellers to applicable Buyers in accordance with this Agreement and the relevant Transfer Agreements.

"**Sale Companies**" mean the Affiliates of Delphi engaged in the applicable Business, the stock or other equity of which is being transferred to Buyer, directly or indirectly, under this Agreement, as indicated on Schedule 1 and Schedule 2 (excluding the JV Companies), Delphi Polska and Steeringmex.

"**Sale Securities**" mean the GM SaleSales Securities and the Company SaleSales Securities, as applicable.

"**SDN List**" – Section 5.9.

"~~Section 363 Implementation Agreement~~" – ~~Section 9.2.2.~~

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Purchase Agreement**" means that certain ~~Securities Purchase~~Investment Commitment Agreement dated the date hereof among the Backstop Parties, Company Buyer, an Affiliate of Company Buyer and GM.

"**Securities Seller(s)**" means the GM Securities Sellers and the Company Securities Sellers.

"**Seller Employee Benefit Plans**" means Sellers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written policies, practices or understandings relating to employment as applicable to Transferred Employees whether or not collectively bargained.

"**Seller Transition Services Agreement**" – <u>Section 11.3.3</u>.

"**Seller U.S. CBAs**" means the nationally and locally negotiated Collective Bargaining Agreements between Sellers and the applicable union with respect to the U.S. Hourly Employees and, at the Lockport and Rochester sites, the represented U.S. Salaried Employees, including any letter agreements, memorandums of understanding, supplemental agreements and employee benefit plan agreements applicable to represented employees that were in effect immediately prior to the date of this Agreement and which are included on <u>Schedule 4.13.11</u>.

"**Sellers**" means the GM Securities Sellers with respect to the GM ~~Sale~~**Sales** Securities, the GM Asset Sellers with respect to the GM Acquired Assets, Company Securities Sellers with respect to the Company ~~Sale~~**Sales** Securities and the Company Asset Sellers with respect to the Company Acquired Assets, in each case including Filing Affiliates and non-Filing Affiliates that are Sellers. Seller means any one of such Sellers, as applicable.

~~"**Senior DIP Lender**" means collectively the Tranche A Lenders and Tranche B Lenders (as such terms are defined in the DIP Agreement).~~

"**Separation & Relocation Activities**" – <u>Section 9.9.10</u>.

"**Shared Intellectual Property**" means Intellectual Property owned by any Seller and/or any Seller's Affiliates that is used by more than one of the GM Business, the Company Business or the business of a Pending Transaction and includes customizations, interfaces, enhancements and other modifications to Software licensed from Third Parties, but not used primarily for such Business.

"**Shared Licensed Intellectual Property**" means any Seller's and/or any Seller's Affiliates' rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party and that is used by the applicable Business, excluding Licensed Intellectual Property and, except in the case of Software licensed from GM or EDS, Software.

"**Shared Software Licenses**" means all shared licenses of Software that are currently used in the applicable Business under Delphi-wide Contracts but which are not primarily used by such Business.

"**Software**" means computer software and programs, including source code, object code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, development programs and systems, testing programs and systems, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto, in each case including all customizations, interfaces, enhancements and other modifications related to the foregoing.

"**Specified Director, Officer and Employee Related Liabilities**" – <u>Section ~~9.41.~~**9.40.**</u>

"**Steering Business**" means the global steering and halfshaft businesses operated by Delphi and its Affiliates, throughout the Delphi Steering Systems Division, including the design, testing, manufacture, development, marketing, sale and distribution of the Products, and all of the business conducted at the Manufacturing Facilities and the Delphi Steering Systems Division related business conducted at the Technical Centers and Sales Offices, except for (i) all assets,

business lines, rights, Contracts and Claims of KDAC, wherever located, whether tangible or intangible, real, personal or mixed and (ii) all computer hardware, equipment, Software, Contracts, and other assets listed on Schedule 2.1.5.K

"**Steering Excluded Products**" means products identified in Schedule 9.9.1.B.

"**Steering JV Companies**" means the following joint ventures which are engaged in the manufacture, development and sale of Products: Delphi Saginaw Lingyun Drive Shaft Co. Ltd and Saginaw Lingyun Drive Shaft (Wuhu) Co., Ltd.

"**Steering Licensed Intellectual Property**" means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is primarily used or held for use in or primarily related to, the Steering Business, including such rights in associated Contracts listed on Schedules 1.1.D.1, 1.1.D.2 and 1.1.D.3.

"**Steering Products**" means the Products set forth in Schedule 1.1.C.

"**Steering Purchased Intellectual Property**" means any Seller's and/or any of their respective Affiliate's right, title and interest in Intellectual Property that is primarily used or held for use in, or primarily related to, the Steering Business, including the Intellectual Property listed in Schedules 1.1.D.1, 1.1.D.2 and 1.1.D.3; subject to Sections 2.1.3.H and 2.1.4.IH in the case of Intellectual Property relating to the UAW Sites and subject to the rights granted to Company Buyer hereunder.

"**Steering (Suzhou)**" – Section 9.23.1.

"**Steering Technology**" means the Patent Rights, Copyrights, Trade Secrets and Know-How initially developed primarily for use in the Products used in the Steering Business ,—and which constitutes a critical manufacturing, design or engineering element specific to the Products as compared to comparable products manufactured by competitors of the Steering Business.

"**Steeringmex**" – Section 9.20.1.

"**Supply Agreement**" means the Supply Agreement **executed contemporaneously with the execution of this Agreement** among the GM Buyers and Company ~~Buyers of even date herewith~~**Buyer**.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"**Technical Centers and Sales Offices**" means the technical and customer support centers of the Steering Business located at Casa Grande, Arizona; Dearborn, Michigan; Saginaw, Michigan; Milford, Michigan; Russelsheim, Germany; Torino, Italy; Paris, France; Beijing, China; Shanghai, China; Hachioji, Japan; Krakow, Poland; SeongNam-si, Korea; Melbourne, Australia; Pune, India; Sao Caetano, Brazil; Bursa, Turkey and Eisenach, Germany, **and the Paris Technical Center,** including **in each case** any satellite offices thereto.

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or primarily used in the Business.

"**Temporarily Excluded Assets**" – Section 11.1.2.

"**Threshold**" – Section 9.43**9.42.**

"**Trade Secrets**" means: (i) all forms and types of information, financial, business, scientific, technical, economic, manufacturing and/or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulae, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, program devices, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the information is the subject of efforts that are reasonable under the circumstances to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the other persons who can obtain economic value from its disclosure or use; (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present, future and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean trademarks, service marks, trademark and service mark applications and registrations, Internet domain name registrations, trade names, trade dress, fictitious names, assumed names, logos and slogans, including those listed on Schedule 1.1.D.2 together with all goodwill related to the foregoing and all rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**Transfer Agreements**" means the GM Transfer Agreements and the Company Transfer Agreements.

"**Transfer Regulation**" means any Law pursuant to which the employment of any employee of an Asset Seller (or any employee of any other Affiliate of Delphi, except for the Sale Companies, who is working for the applicable Business) will transfer to a Buyer in connection with the transactions contemplated by this Agreement, including pursuant to Directive 77/187/EC of the European Parliament and council and any Law adopted pursuant

thereto, and any Law, works council or registered or enforceable union agreement or written contract of employment.

"**Transfer Taxes**" – Section 9.4.5.

"**Transferred Account(s)**" – Section 9.22.

"**Transferred Asset Seller Employees**" means: all U.S. Employees and Non-U.S. Employees who are employees of any Asset Seller or Seller Affiliate who become Buyers' employees pursuant to Section 9.5 hereof. No individual who has retired or otherwise terminated employment with Sellers prior to Closing will be deemed to be a Transferred Asset Seller Employee.

"**Transferred Employees**" means: (i) all Transferred Asset Seller Employees; and (ii) all employees of the Sale Companies.

"**Transferred Insurance Policies**" means all Insurance Policies which are primarily related to the GM Business, GM Acquired Assets or the GM Assumed Liabilities including those set forth on Schedule 1.1.E, but excluding those set forth on Schedule 1.1.D.

"**Transferred Non-U.S. Employees**" means all Transferred Asset Seller Employees who are Non-U.S. Employees.

"**Transferred U.S. Employees**" means all Transferred Asset Seller Employees who are either Transferred U.S. Hourly Employees or Transferred U.S. Salaried Employees.

"**Transferred U.S. Hourly Employees**" – Section 9.5.3.

"**Transferred U.S. Salaried Employees**" – Section 9.5.2.

"**UAW**" means the International Union, United Automobile, Aerospace and Agricultural Works of America and its Local Unions 699 (Saginaw), 686 (Lockport – Hourly), 686 (Lockport – salaried), 1097 (Rochester – hourly), 1097 (Rochester – salaried), 292 (Kokomo), 167 (Grand Rapids).

"**UAW Sites**" means the manufacturing facilities owned or operated by Sellers and located in Grand Rapids, Michigan, Rochester, New York (excluding the Henrietta technical center); Kokomo, Indiana (including the Cuneo Warehouse, and including the technical center); and Lockport, New York (including the technical center).

"**UAW Site Products**" means products produced at the UAW Sites on or before the Closing Date and the additional products that GM and any Seller have agreed will be produced at the UAW Sites but does not include products which are manufactured at the ~~Technical Centers~~**technical centers** at the UAW Sites if such products are not actually manufactured at the UAW Sites outside of ~~the Technical Center.~~**such technical centers.**

   **"Unstayed Order" means an order of the Bankruptcy Court or any court with jurisdiction, or findings and conclusions relating to an order of the Bankruptcy Court or any court with jurisdiction, as to which, at the applicable time: (a) no stay pursuant to Bankruptcy Rules 7062 or 8005, or any other applicable rule or statutory provision is in**

**effect, and (b) there shall be no pending appeal by the United States Department of Treasury.**

"**U.S.**" means the United States of America.

"**U.S. Employees**" means U.S. Hourly Employees and U.S. Salaried Employees.

"**U.S. Hourly Employees**" means the hourly employees of Asset Sellers or a Seller Affiliate who are employed at or are bargaining unit members of the relevant Business in the United States immediately prior to the Closing and who are identified on Schedule 4.13.1 (as the same may be amended prior to the Closing Date with Buyer's prior written consent, not to be unreasonably withheld).

"**U.S. Income Taxes**" mean any Income Taxes due to the United States or to any state or locality in the United States.

"**U.S. Salaried Employees**" means the salaried employees who are employed by Sellers or a Seller Affiliate in or primarily assigned to the relevant Business in the United States as of the Closing and who are identified on Schedule 4.13.1 (as the same may be amended prior to the Closing Date with the applicable  Buyer's prior written consent, not to be unreasonably withheld).

"**USA PATRIOT Act**" – Section 5.9.

"**WARN ACT**" means the Worker Adjustment and Retraining Notification Act and any similar applicable foreign, state or local law, regulation or ordinance.

### 1.2    Other Interpretive Provisions.

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation."  The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America, and all references to "euros" or "€" are deemed references to the lawful money of the European Economic and Monetary Union.  References to undertakings by the "Buyer(s)" or the "Seller(s)" are understood to be undertakings by Parent to cause the relevant Buyer(s) to perform, and by Delphi to cause the relevant Seller(s) to perform, as the case may be.

### ARTICLE 2.
### PURCHASE AND SALE.

### 2.1    Transfers by Sellers and their Affiliates.

2.1.1.    Purchase and Sale of the GM SaleSales Securities.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer

Agreement, at the Closing, **in accordance with the Credit Bid,** the GM Securities Sellers will sell, transfer, assign, convey and deliver to the GM Buyers, and the GM Buyers will purchase, accept and acquire, the GM ~~Sale~~**Sales** Securities free and clear of all Encumbrances except Permitted Encumbrances **(provided that the definition of the term "Permitted Encumbrances" for this purpose shall exclude clauses (i) and (iv) of such definition)**.

2.1.2.    Purchase and Sale of the Company ~~Sale~~**Sales** Securities.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, **in accordance with the Credit Bid,** the Company Securities Sellers will sell, transfer, assign, convey and deliver to the Company Buyer, and the Company Buyer will purchase, accept and acquire, the Company ~~Sale~~**Sales** Securities free and clear of all Encumbrances except Permitted Encumbrances **(provided that the definition of the term "Permitted Encumbrances" for this purpose shall exclude clauses (i) and (iv) of such definition)**; provided that the Sellers will consider in good faith any request of a Company Buyer to, in lieu of purchasing the Company ~~Sale~~**Sales** Securities, instead purchase the assets and assume the related liabilities of any Sale Company pursuant to a mutually agreeable asset purchase agreement with such Sale Company.

2.1.3.    Purchase and Sale of the GM Acquired Assets.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, **in accordance with the Credit Bid,** the GM Asset Sellers will sell, transfer, assign, convey and deliver to the GM Asset Buyers, and the GM Asset Buyers will purchase, accept and acquire from the GM Asset Sellers, free and clear of all Encumbrances, except Permitted Encumbrances:

(i)    in respect of the Australian Assets, Delphi will procure and cause the Australian Seller to transfer, assign, convey and deliver to the Australian Buyer and the Parent will procure and cause the Australian Buyer to purchase, accept and acquire from the Australian Seller, free and clear of all Encumbrances except Permitted Encumbrances, all properties, assets, rights, titles and interests of every kind and nature, owned by the GM Asset Sellers primarily used or held for use in, or primarily related to, the GM Business, whether tangible or intangible, real or personal and wherever located and by whomever possessed,

(ii)    the technical centers included in the UAW Sites;

(iii)    all ~~proceeds~~**rights to the Net Proceeds** received ~~by any Seller~~**before or after the Closing** in respect of the sale of (x) the brakes and suspension business and (y) the exhaust business**, whether or not such sales are pursuant to existing sale agreements**;

(iv)    all rights to sue, or to benefit from any lawsuit or settlement relating to the Appaloosa Claim; ~~and~~

(v)    ~~The~~**the Assumed** Hedging Agreements ~~other than any Hedging Agreement that may be terminated at Closing~~;

(vi)    50% of the net proceeds from the Delphi FICA Litigation;

(vii)    The Mexico Deposit and the utility contracts referred to in Section 9.20.2;

(viii)    all properties, assets, rights, titles and interests of every kind and nature, owned by the GM Asset Sellers, whether tangible or intangible, real or personal and wherever

located and by whomever possessed, (including, without limitation, all assets related to the GM Business, including, without limitation, all of the following assets **of the type listed below)**, in each case primarily related to the GM Business but excluding Excluded Assets pursuant to Section 2.1.5 (all of the assets to be sold, assigned, transferred and delivered to GM Asset Buyers hereby are called the "**GM Acquired Assets**"):

    A.    All Accounts Receivable (including **(A)** Accounts Receivable owed by Affiliates of Sellers), but excluding**, and (B) Accounts Receivable of Sellers from the GM Sale Companies, the Steering JV Companies or the GM Business (except to the extent constituting Company Acquired Assets); provided that** intercompany receivables due from Filing Affiliates to Filing Affiliates (other than trade receivables)**will not be included as a GM Acquired Asset unless such intercompany receivable is a trade receivable**;

    B.    Real Property, which such Real Property shall be subject to the Company Buyer's lease rights **and purchase rights** with respect to the technical centers located in the Kokomo, Indiana and Lockport, New York;

    C.    Personal Property (including the personal property, machinery and other assets located at the technical centers located in Lockport, New York and Kokomo, Indiana**included in the UAW Sites**);

    D.    Inventory;

    E.    All of GM Asset Sellers' Acquired Contracts and rights under the Acquired Contracts, including any rights under tax abatements, incentive agreements, or other similar tax credit arrangements with any Taxing Authority, that are primarily related to the GM Business or the GM Acquired Assets;

    F.    Administrative Assets;

    G.    Permits used or held for use in, or related to, the conduct of the GM Business or in the operations at the GM Real Property;

    H.    Steering Purchased Intellectual Property and Steering Licensed Intellectual Property;

    I.    Technical Documentation;

    J.    Prepaid expenses, deposits and advances;

    K.    Tax credits and Tax refunds related to the GM Business and the GM Acquired Assets, including Delphi's New York investment tax credit refund claim and any property tax refund related to the GM Business;

    L.    Cash that is held by Filing Affiliates in the U.S.;

    M.    Motor vehicles owned or leased by Sellers (in each case, to the extent transferable pursuant to the terms of such leases or financing documents);

N.    All Transferred Insurance Policies, and including all rights to the benefits, coverages and proceeds under such Transferred Insurance Policies; provided, however, that Sellers and Company Buyer will be named as additional named insureds on any such Transferred Insurance Policies to the extent they cover any of the Excluded Assets or Company Acquired Assets or relate to any Retained Liabilities or any Company Assumed Liabilities or to any Sale Company acquired by the Company Buyer, in each case, as applicable, and Seller and Company Buyer will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Excluded Asset, Company Acquired Asset, Retained Liability or Company Assumed Liability or to any Sale Company acquired by the Company Buyer, as applicable; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured;

O.    All goodwill as a going concern and all other intangible properties other than Intellectual Property (which is covered in Section ~~2.1.3~~**2.1.3.**H above);

P.    All warranties and Claims;

Q.    Environmental Permits;

R.    Environmental Records;

S.    GM Environmental Records;

T.    Wage escrow accounts applicable to Transferred U.S. Hourly Employees who are PRPs at the UAW Sites; ~~and~~

U.    Other books and records relating to the GM Business~~;~~**; and**

**V.    The DIP Letters of Credit Cash Collateral pursuant to Section 9.12.B.**

**2.1.4.**    Purchase and Sale of the Company Acquired Assets.    Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing **in accordance with the Credit Bid,** the Company Asset Sellers will sell, transfer, assign, convey and deliver to the Company Asset Buyers, and the Company Asset Buyers will purchase, accept and acquire from the Company Asset Sellers, free and clear of all Encumbrances, except Permitted Encumbrances, all properties, assets, rights, titles and interests of every kind and nature, owned by the Company Asset Sellers, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all assets related to the Company Business , including, without limitation, **all of** the ~~following~~ assets **of the type listed below**, but excluding the GM ~~Sale~~**Sales** Securities, the GM Acquired Assets, and the Excluded Assets pursuant to Section 2.1.5 (all of the assets to be sold, assigned, transferred and delivered to Company Asset Buyers hereby are called the "**Company Acquired Assets**"):

A.    All Accounts Receivable ~~(including~~ **(i)** Accounts Receivable owed by Affiliates of Sellers~~), but excluding~~**, and (ii) Accounts Receivable of Sellers from the Company Sale Companies, the Company JV Companies or the Company Business (except**

to the extent constituting GM Acquired Assets); provided that intercompany receivables due from Filing Affiliates to Filing Affiliates (other than trade receivables);

B.    The Company Sale Securities**will not be included as a Company Acquired Asset unless such intercompany receivable is a trade receivable**;

**B.**    C. Company Real Property;

**C.**    D. Personal Property;

**D.**    E. Inventory;

**E.**    F. all of Company Asset Sellers' Acquired Contracts and rights under the Acquired Contracts, including any rights under tax abatements, incentive agreements, or other similar tax credit arrangements with any Taxing Authority that are not primarily related to the GM Business or the GM Acquired Assets;

**F.**    G. Administrative Assets;

**G.**    H. Permits used or held for use in, or related to, the conduct of the Company Business or in the operations at the Company Real Property;

**H.**    I. Company Purchased Intellectual Property and Company Licensed Intellectual Property;

**I.**    J. Technical Documentation;

**J.**    K. Prepaid expenses, deposits and advances;

**K.**    L. Motor vehicles owned or leased by Sellers (in each case, to the extent transferable pursuant to the terms of such leases or financing documents);

**L.**    M. All Insurance Policies **(other than Transferred Insurance Policies)**; provided, however, that Sellers and GM Buyers will be named as additional named insureds on any such Insurance Policies to the extent they cover any of the Excluded Assets or GM Acquired Assets or relate to any Retained Liabilities or any GM Assumed Liabilities, in each case as applicable, and Seller and GM Buyers receive the benefit of all such claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Excluded Asset, GM Acquired Asset, Retained Liability or GM Assumed Liability, as applicable; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured;

**M.**    N. All Trademark Rights of any of the Sellers, including the name "Delphi" or any related or similar Trademark Rights to the extent the same incorporate the name "Delphi" or any variation thereof;

**N.**    O. All goodwill as a going concern and all other intangible properties other than Intellectual Property (which is covered in Section 2.1.4.H above);

**O.**    P. All warranties and Claims;

**P.**    Q. Environmental Permits;

**Q.**    R. Environmental Records;

**R.**    S. Tax credits and Tax refunds related to the Company Business, including Delphi's Michigan MEGA tax credit entitlements and any property tax refunds related to the Company Business, as well as any other Tax credit or refund not covered by Sections 2.1.3.K or 2.1.5.G;

**S.**    T. 50% of the net proceeds from the Delphi FICA Litigation; and

**T.**    U. Wage escrow accounts applicable to Transferred U.S. Hourly Employees who are PRPs at the sites included in the Company Acquired Assets.;

**U.**    V. Other books and records relating to the Company Business.;

**V.**    **DIP Letters of Credit Cash Collateral pursuant to Section 9.12.C; and**

**W.**    **All assets of the Sellers remaining after the wind-down of the remaining business of Sellers up to a maximum amount of $500,000,000 in the aggregate, any such assets constituting cash in excess of Sellers' estimated obligations remaining shall be payable quarterly; provided, however, that no such assets shall transfer to the Company Buyer unless and until the GM Buyers have recovered all amounts advanced to Sellers (up to a maximum amount of the amount paid by Parent pursuant to Section 3.1.1.E in the aggregate) in order to fund such wind-down and GM Buyers have no further obligations to fund Liabilities of Sellers including under Section 3.1.1.E.**

**2.1.5.**    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties, assets, rights, title and interests of the Asset Sellers will not be included in the GM Acquired Assets or the Company Acquired Assets (the "**Excluded Assets**"):

**A.**    Third Party Assets.  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third party, including third party bailed assets, provided, however, that any Contracts, rights or licenses pertaining to such bailed assets will be transferred**and defined** as part of the Acquired Assets **will be transferred as such**.

**B.**    Insurance Policies.  All Insurance Policies related solely to the other Excluded Assets or listed on Schedule 1.1.D; provided, however, that Buyers and Sellers will be named as an additional named insured on any such Insurance Policies to the extent they cover any of the Acquired Assets of such Buyer or relate to any Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer and Buyers will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Acquired Assets of such Buyer or Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer; and provided further

that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured.

C.    Records.  Any books, records (including Tax records) and other materials primarily relating to Excluded Assets or Retained Liabilities, or that any Asset Seller is required by Law to retain (provided that the Asset Sellers shall provide Buyers with copies of the same), all Tax Returns of any Asset Seller for time periods prior to Closing, and related work papers.

D.    Bankruptcy Rights.  All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions including avoidance actions and arising under such Sections by operation of law or otherwise, including without limitation**, except as provided in Section 2.1.4.W** any and all proceeds of the foregoing.

E.    Personnel Records.  All work histories, personnel and medical records of employees and former employees of any Asset Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, at the election of the applicable Buyer(s) the appropriate Buyer(s) will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if the Asset Sellers so elect.  Upon written request of the Asset Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to the Asset Sellers (or an Affiliate of the Asset Sellers as directed) at which time the Asset Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer(s) with copies of the personnel and medical records to such Buyer; provided, no such records will be provided unless the Asset Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local Law without material adverse consequences to the Asset Sellers or to any Affiliate of the Asset Sellers.

F.    Excluded Facilities.  All Real Property (including any improvements located thereon) listed in Schedule 2.1.5.F (the "**Excluded Facilities**") and personal property and other assets located at the Excluded Facilities.

G.    Tax Refunds.  All refunds, credits, prepayments or deferrals of or against any Taxes, including deferred Taxes of any nature, in each case that relate to Excluded Assets and relate to periods or portions thereof prior to the Closing; provided that, in no event, shall any Buyer be required to make a payment to a Seller with respect to any of the foregoing other than providing to the applicable Seller any Tax refunds received by such Buyer with respect to Taxes paid by a Seller or its Affiliates or refundable tax credits with respect to a period prior to the Closing.

H.    Inventory and Other Assets.  All Inventory of the GM Business and the Company Business disposed of by Sellers prior to Closing in the Ordinary Course of Business, and not in violation of this Agreement;

I.    Cash Collateral.  Cash collateral ~~pledged for the benefit of the Senior DIP Lenders~~**held in the Borrowing Base Cash Collateral Account or the Incremental Borrowing Base Cash Collateral Account (as such terms are defined in the DIP Documents), 100% of which shall be paid to the DIP Agent at the Closing, and cash collateral for DIP Letters of Credit listed on Schedule 9.12.E**.

J.    Pending Transactions.  All of Sellers' **rights with respect to the** Pending Transactions as set forth on Schedule 2.1.5.J, other than the proceeds relating to the brakes and suspension business and exhaust business.

K.    Other Excluded Assets.  The assets listed on Schedule 2.1.5.K.

L.    Filing Affiliate Receivables.  Intercompany receivables due from Filing Affiliates to other Filing Affiliates (other than trade receivables).

M.    Wage Escrow Accounts.  Wage escrow accounts applicable to ~~Non~~**non**-Transferred Hourly Employees at the sites included in the Excluded Facilities.

At any time prior to Closing, upon notice by **the applicable** Buyer to Delphi, Delphi will consider in good faith a request to exclude from the transactions contemplated by this Agreement, *de minimis* additional assets or real property **that would otherwise be Acquired Assets of such applicable Buyer**.  In the event Delphi agrees to do so, the applicable definitions of Acquired Assets, and/or Real Property will be amended as set forth in such notice to remove the additional excluded assets or real property and the definition of Excluded Assets and/or Excluded Facilities, if applicable, may be amended as provided in such notice to include such additional excluded assets or real property or Manufacturing Facilities.

At any time prior to Closing, upon **formal written** notice to Delphi, **the** GM Buyers, or any of them, may elect to exclude from the transactions contemplated by this Agreement the assets and related Liabilities related to the Manufacturing ~~Facilities~~**Facility** located in ~~Strasbourg, France and/or~~ Gurgaon, India **or the French Plant and the Paris Technical Center**.  In such event, ~~the applicable definitions of Purchased Assets, Sale Companies, Securities Sellers, Manufacturing Facilities, Products and/or~~**in the case of the exercise of such option (1) the applicable definitions including, as applicable, the definitions of "Acquired Assets", "GM Assumed Liabilities", "Sale Companies", "Securities Sellers", "Manufacturing Facilities", "Technical Centers and Sales Offices", and/or "GM** Real Property~~"~~**"** will be amended as set forth in such notice to **take into account such exclusion to** remove the additional excluded assets, real property, ~~Sale Companies or Manufacturing Facilities~~**Sale Companies, Manufacturing Facilities, Technical Center and Sales Office, as applicable** and the definition of ~~"~~**"**Excluded Assets~~"~~**"** and/or ~~"~~**"**Excluded Facilities~~"~~**"**, if applicable, may be amended as provided in such notice to include such additional excluded assets, real property ~~or Manufacturing Facilities.  In the event GM Buyers elect to exclude either such Manufacturing Facilities,~~**Technical Center and Sales Office or Manufacturing Facility, (2) the definitions of "Steering Licensed Intellectual Property," "Steering Purchased Intellectual Property", and "Steering Technology" shall be deemed modified to include the businesses conducted at such Manufacturing Facility and/or Technical Center and Sales Office so excluded and the definition of "Other Steering Business Liabilities" shall be deemed modified to exclude any Liabilities to the extent attributable to the such Manufacturing Facility and/or Technical Center and Sales Office, and (3)** GM Buyers will

increase the aggregate amount of the expenses it**they** will be required to fund under Section 3.1.1.F**E** by the amount of the net actual incremental costs incurred by **the GM** Sellers as a result of GM Buyers excluding such Manufacturing Facilities**Facility** in an amount mutually agreed to by the parties**Sellers and GM Buyers prior to the Closing** acting reasonably.

### 2.1.6.    Post-Closing Deliveries.

A.    Should Sellers or Buyers, in their reasonable discretion, determine after the Closing that any Acquired Assets are still in the possession of Sellers or any of their Affiliates, Sellers will or will cause such Affiliates to promptly deliver such Acquired Assets to the appropriate Buyers at such Buyer's cost (limited to expenses paid to third parties in compliance with a request from such Buyer and not including any internal fee, cost or overhead of the Sellers). Should Buyers, in their reasonable discretion, determine after the Closing that an asset was delivered to the wrong Buyer or an Excluded Asset was delivered to a Buyer, such receiving Buyer will promptly provide them**it** to **the** correct the Buyer or return it to the appropriate Seller, with any related costs to be split evenly between such Buyers or by the Buyer transferring to the Seller.

B.    After the Closing, Sellers shall permit, and hereby authorize, Buyers to collect, in the name of Sellers, all Accounts Receivable constituting part of such Buyers' Acquired Assets and to endorse with the name of any applicable Seller for deposit in such Buyers' accounts any checks or drafts received in payment thereof. Sellers shall promptly deliver to the applicable Buyers any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of such Buyers' Acquired Assets.

## 2.2    **Assumption of Liabilities.**

### 2.2.1.    GM Assumed Liabilities.

Subject to the terms and conditions set forth herein the GM Buyers will assume only the following Liabilities, and no other Liabilities of Sellers (collectively, the "**GM Assumed Liabilities**"):

A.    Assumed Administrative Liabilities with respect to the GM Acquired Assets;

B.    the **Assumed** Hedging Agreements;

C.    the Other Steering Business Liabilities; **and**

D.    the following, and only the following, pre-petition Liabilities as they relate to the GM Acquired Assets:

(i)    Cure Amounts for Pre-Petition Contracts included among the Assumed and Assigned Contracts assumed by the GM Buyers in accordance with Section 9.3; and

(ii)    To the extent not discharged pursuant to the Plan of Reorganization, for each GM Buyer, (i) the real and personal property Taxes with respect to the GM Acquired Assets to be acquired by it, (ii) any other Taxes with respect to the GM

Business **(excluding such business to the extent conducted at the Excluded Facilities)** to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, including withholding, FICA and FUTA Taxes related to the employees of the GM Business, and (iii) to the extent that payroll services were provided by or through GM and the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, withholding, FICA and FUTA Taxes related to the employees of the Company Business; **and**

   **(iii)**  **The DIP Letters of Credit set forth on Schedule 9.12(B) and, as applicable, Schedule 9.12(D).**

  **2.2.2.**  Subject to the terms and conditions set forth herein, the Company ~~Buyers~~**Buyer** will assume only the following Liabilities, and no other Liabilities ~~of Sellers~~ (collectively, the "**Company Assumed Liabilities**"):

    A.  Assumed Administrative Liabilities with respect to the Company Acquired Assets;

    B.  the Specified Director, Officer and Employee Related Liabilities; and

    C.  the following and only the following pre-petition Liabilities as they relate to the Company Acquired Assets:

    (i)  Cure Amounts for Pre-Petition Contracts included among the Assumed and Assigned Contracts assumed by the Company ~~Buyers~~**Buyer** in accordance with Section 9.3; and

    (ii)  To the extent not discharged pursuant to the Plan of Reorganization, for the Company Buyer, (i) real and personal property Taxes with respect to the Company Acquired Assets, and (ii) to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, any other Taxes with respect to the Company Business, including withholding, FICA and FUTA Taxes related to the employees of the Company Business, unless such Taxes are assumed pursuant to Section 2.2.1.D(ii)~~.~~**; and**

    **(iii)**  **The DIP Letters of Credit set forth on Schedule 9.12(C) and, as applicable, Schedule 9.12(D).**

  **2.3**  **Retained Liabilities.**

  All Liabilities of the Sellers which are not Assumed Liabilities are herein collectively referred to as the "**Retained Liabilities**~~:~~**,**" including without limitation:

  **2.3.1.**  Those Sellers who are Filing Affiliates will remain responsible for and shall pay, perform or discharge (or cause to be paid, performed or discharged) the Administrative Claims set forth on Schedule 2.3.1 and except as set forth in Sections 2.2.1.D(ii) and 2.2.2.C(ii), post-petition Liabilities for all Taxes~~;~~**.**

**2.3.2.**    The applicable Sellers will remain responsible for and shall pay, perform or discharge (or cause to be paid, performed or discharged) all Liabilities relating to:

   A.    the Excluded Assets; and

   B.    the Excluded Facilities.

**2.3.3.**    ~~The~~**Subject to Section 9.5.4.E the** applicable Sellers will remain responsible for and shall pay, perform or discharge their obligations under the Delphi Retirement Program for Salaried Employee, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan ~~and,~~ the Packard-Hughes Interconnect Non-Bargaining Retirement Plan, **Delphi Salaried Retirement Savings Program for Salaried Employees in the United States, Personal Retirement Income Plan, PHI Non-Bargaining Retirement Plan, Delphi Diesel 401(k) Plan, Delphi Medical Systems Savings Plan, PHI Retirement Savings Plan, The Delphi Hourly-Rate Employees Pension Plan, The Delphi Personal Savings Plan for Hourly-Rate Employees in the United States, Delphi Income Security Plan for Hourly-Rate Employees, and any other defined benefit or defined contribution plans in Seller's Controlled Group with respect to which any U.S. Employees participated from time to time** (collectively, the "**Retained Plans**").

**2.3.4.**    Intercompany payables due to Filing Affiliates from Filing Affiliates (other than trade payables).

**2.3.5.**    All **Obligations (as defined under the DIP Agreement) that survive repayment of the DIP Loans pursuant to Section 10.12 of the DIP Agreement.**

**2.3.6.**    All Liabilities relating to the ~~DIP Agreement and the~~ Interim Financing Amendment (~~in each case~~**and** any supplement, amendment, modification thereto or any agreement(s) or instrument that is in replacement or substitution therefor).

### 2.4    JV Companies Liabilities, Sale Company Liabilities.

Notwithstanding anything to the contrary herein, the Liabilities of the JV Companies and the Sale Companies will not be affected by ~~the~~**this** Agreement, and the Sellers will have no obligations for such Liabilities.

### 2.5    Deferred Items.

**2.5.1.**    Non-Assignability.  To the extent that any Contract, Permit or Environmental Permit included in the Acquired Assets is not capable of being assigned, transferred or reissued (whether pursuant to the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable Law) to **a** Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (including a Governmental Authority) ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained or the applicable Buyer specifically indicates in writing (with specific reference to this Section 2.5.1 and the Deferred Item at issue) at Closing that it desires such Deferred Item be transferred notwithstanding such restriction and indemnifies the applicable Seller for any liability relating to such transfer; provided that Sellers may not assign such right to indemnity to any Person.

**2.5.2.**    Efforts to Obtain Necessary Consents.  At the applicable Buyer's request, the applicable Seller will, at the requesting Buyer's sole cost and expense, use commercially reasonable efforts, and take such other commercially reasonable actions as such Buyer may request, and such applicable Buyer will, at its expense, cooperate with such Seller, to obtain the necessary Consents and to resolve the impracticalities of assignment, transfer or reissuance referred to in Section 2.5.1 before or after the Closing.

**2.5.3.**    If Consents Cannot be Obtained.  To the extent that the Consents referred to in Section 2.5.1 are not obtained by the applicable Seller, or until the impracticalities of assignment, transfer or reissuance referred to therein are resolved, such Sellers' sole responsibility with respect to such matters, notwithstanding Sections 2.1.3 and 2.1.4, will be to appoint the applicable Buyer as its agent **and** to use such Buyer's commercially reasonable efforts during the twelve (12) month period commencing with the Closing to: (i) provide to the applicable Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to such Buyer, without incurring a financial obligation to such Buyer; and (iii) enforce for the account of such Buyer and at the cost of such Buyer any rights of such Seller arising from any Deferred Item referred to in Section 2.5.1 against such issuer thereof or other party or parties thereto; provided, however, that any such efforts shall be made with the consent of such Buyer.  Such Buyer will pay such Seller or the Buyer acting as Seller's agent the cost (including the cost of any internal resources) of providing the benefits of any Deferred Item.

**2.5.4.**    Obligation of Buyer to Perform.  To the extent that any Buyer is provided the benefits pursuant to Section 2.5.3 of any Deferred Item, such Buyer will perform, on behalf of the applicable Seller, for the benefit of the issuer thereof**of the Deferred Item** or the other party or parties thereto (including payment obligations) the obligations of such Seller thereunder or in connection therewith and if such Buyer fails to perform to the extent required herein, such Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 2.5.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or upon such Buyer's request, such Seller will perform, at such Buyer's sole cost and expense, in which case such Buyer will reimburse such Seller's costs of such performance immediately upon receipt of an invoice therefor.

**2.5.5.**    Standard of Care.  Sellers will have no Liability to any Buyer arising out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyers; provided such gross negligence or willful misconduct standard**qualification** shall not apply with respect to the remittance of any collected Accounts Receivable to Buyers under any deferred items**Deferred Items**. Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

## 2.6    Restrictive Covenants.

To the extent that the GM Acquired Assets include a contract or other obligation, including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit the GM Buyers from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Sellers shall at the request of the GM Buyers use commercially reasonable efforts to terminate such contract or obligations and, at the election of the GM Buyers, such contract or obligation shall be