São João, in the City of Porto Alegre, State of Rio Grande do Sul, Zip Code, bearer of the Identity Card R.G. No. No. 5.004.573.671 SSP/RG, enrolled with the Brazilian Individual Taxpayers' Register (CPF/MF) under No. 491.466.290-68. As a result of such transfer, Delphi Brazil will become the lawful owner of one hundred percent (100%) of the quotas of Saginaw Brazil.

A.    Simultaneously with the transfer of the sole quota mentioned in this Section 9.26, the applicable GM Sellers will cause Delphi Brazil to execute an amendment to the articles of organization of Saginaw Brazil in accordance with applicable Brazilian Law, pursuant to which the applicable GM Sellers shall become the new owners of one hundred percent (100%) of the quotas in Saginaw Brazil representing 54,639,116 (fifty-four million six hundred and thirty-nine thousand one hundred and sixteen) quotas. As a result, the applicable GM Sellers will become the lawful owners of all, but not less than all, of one hundred percent (100%) of the quotas of Saginaw Brazil. The ~~Applicable~~**applicable** GM Sellers will cause Saginaw Brazil to file the amendment to the articles of organization mentioned above for registration with the competent commercial registry and perform all actions that may be required to obtain such registration as soon as practicable, but in any event no later than thirty (30) days from the date of the execution of the amendment to the articles of organization of Saginaw Brazil, in compliance with applicable Brazilian Law.

B.    Prior to Closing, the applicable GM Sellers intend all the quotas of Saginaw Brazil to be dividended from Delphi Brazil to the applicable GM Sellers. Prior to Closing, Delphi Brazil will take all actions required to register the dividend from Delphi Brazil to the applicable GM Sellers and the foreign investment of the applicable GM Sellers in the capital of Saginaw Brazil before the Brazilian Central Bank in accordance with applicable Brazilian Law.

### 9.27    Transfer of the Brazilian Real Estate.

Delphi Brazil acquired the Brazilian Real Estate on March 3, 1999 and contributed the Brazilian Real Estate to the capital of Saginaw Brazil, on April 1, 2008 as payment-in of its equity interest in the capital of Saginaw Brazil. Notwithstanding the above, Delphi Brazil has not registered the transfer of the Brazilian Real Estate to Saginaw Brazil in the real estate enrollment certificate (matrícula) of the competent real estate register to officer. Promptly following the Closing, the Brazil Sellers will, and will cause Delphi Brazil to (i) perform any and all actions that may be required to transfer the Brazilian Real Estate owned by Delphi Brazil to Saginaw Brazil, free and clear of any Encumbrance, other than Permitted Encumbrances, in accordance with applicable Law; and (ii) execute any and all documents that may be required to perfect the transfer of the Brazilian Real Estate to Saginaw Brazil in accordance with applicable Law, including but not limited to executing and registering a Public Deed for Transfer of Real Property for Corporate Capital Payment (Escritura de Conferência de Bens para Integralização de Capital Social) in the real estate enrollment certificate (matrícula) of the Brazilian Real Estate before the competent real estate register office of the City of Porto Alegre, State of Rio Grande do Sul, Brazil. GM Buyers will be solely responsible for all taxes, costs and expenses in connection with such transfer, in accordance with all applicable Brazilian legal requirements.

### 9.28   Environmental Permits.

On the date of the execution of this Agreement or as soon as reasonably possible thereafter, and following the Closing, Sellers shall cooperate with Buyers in taking all reasonable steps to facilitate the transfer, assignment or procurement of the reissuance of any Environmental Permit necessary to operate the Business.

### 9.29   Conflict and Privilege Waivers.

A.    Effective as of the execution date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates, successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Environmental Law related matter for which any Buyer may be required to respond, involving in each case the applicable Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Facility.  In addition, effective on the execution date of this Agreement, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Environmental Law related matter for which any Buyer may be required to respond, in each case involving the applicable Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Facility.  **Sellers hereby reaffirm the privilege waiver they signed in connection with the June 1 MDA and agree that such waiver remains in full force and effect.** Within fifteen (15) days after the execution date of this Agreement, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form ~~attached as~~**of** Exhibit 9.29.A together with a list of their consultants and advisors.

B.    Effective on the Closing Date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Liability (other than as addressed in subsection (A) above) for which any Buyer may be required to respond, involving in each case the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.   In addition, effective on the Closing Date, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Liability for which any Buyer may be required to respond, in each case involving the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.   At Closing, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form ~~attached as~~**of** Exhibit 9.29.B together with a list of their consultants and advisors.  To the extent that any Liability that is the subject of this Section relates both to any ~~Purchased~~**Acquired** Asset, Business, Sale Company and/or its assets on the one hand, and an

Excluded Asset and/or Retained Liability on the other hand then the applicable Seller and Buyer agree that the waiver set forth herein will be effective only upon execution of a mutually acceptable joint defense agreement which the Parties agree to execute on or before Closing.

### 9.30    Preservation of Environmental Records.

Prior to Closing, Sellers and their respective Affiliates will preserve all Environmental Records and GM Environmental Records and will not damage, destroy or alter any Environmental Records or GM Environmental Records.

### 9.31    ~~DIP Transfer Matters.~~

~~Subject to the terms and conditions herein provided and if required by applicable Law or the DIP Agreement (or the DIP Agent at the direction of the requisite DIP Lenders), upon request of any of the Sellers, the Parties shall permit the Sellers to implement a transaction pursuant to which the Sellers transfer, or cause to be transferred, to the DIP Agent on behalf of the DIP Lenders assets secured under the DIP Agreement in satisfaction of the obligations under the DIP Agreement, and the Sellers or the DIP Agent on behalf of the DIP Lenders, as applicable, simultaneously transfers, or causes to be transferred, all of the GM Acquired Assets to the GM Buyers and all of the Company Acquired Assets to the Company Asset Buyers on terms consistent with this Agreement; provided, that in no event shall any such transaction result in a material economic cost to or material adverse effect on the Business, the Acquired Assets, the Buyers or their respective subsidiaries, or increase the Assumed Liabilities.~~

### 9.31    ~~9.32~~ Reorganization and Restructuring.

Prior to the Closing, the Sellers, the Sale Companies and Buyers shall consider in good faith any and all internal restructuring steps and consider any transactions and elections as may be requested by the Buyers or Sellers in their respective sole discretion (including capital contributions, cross-chain sales, dividend distributions, spin-offs, mergers, redemptions, tax elections, conversions and reincorporations).  Notwithstanding the foregoing, (a) the failure of any such reorganization or restructuring steps to occur shall in no way delay the Closing of the transactions contemplated by this agreement, (b) the applicable Buyers or Sellers, as the case may be, shall bear all costs related to any such reorganization or restructuring including any costs incurred by any the other Parties, ~~and~~ (c) the other Parties shall have no liability for the failure of any such reorganization or restructuring steps to occur**, (d) no Company Buyer shall have any Liability for any such reorganization or restructuring proposed by any GM Buyer and (e) no GM Buyer shall have any Liability for any such reorganization or restructuring proposed by the Company Buyer**.

### 9.32    ~~9.33~~ Certain Other Actions.

Sellers agree to use commercially reasonable efforts to (a) ~~prior to June 30, 2009, reduce any pledge of the stock of the Sale Companies organized outside the United States owned by Filing Affiliates from one hundred percent (100%) to sixty-five percent (65%) and to assure that no assets of the Sale Companies organized outside the United States are pledged, (b)~~ if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of Delphi Technologies, Inc., a Delaware corporation, in order to permit the unencumbered sale of the shares of such corporation instead of the sale of the assets

of such corporation and (e**b**) if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of certain Filing Affiliates that are Company Sellers of Company ~~Sale~~**Sales** Securities in order to permit the unencumbered sale of the shares of such Filing Affiliates instead of the sale of such Company ~~Sale~~**Sales** Securities. At Company Buyer's sole option, the Company Buyer may elect to purchase the shares of one or more Filing Affiliates instead of purchasing the assets or Company ~~Sale~~**Sales** Securities held directly by such Filing Affiliate.

### 9.33    ~~9.34~~ Retained Plans.

The Parties acknowledge that Delphi may, at its sole election, terminate any or all of the Retained Plans . .

### 9.34    ~~9.35~~ Certain India Matters.

Delphi Automotive Systems Pvt. Ltd. ("**Delphi India**") has established a letter of credit (the "**India L/C**") in support of its Steering Business. Delphi will cause Delphi India to keep the India L/C in place for no more than ninety (90) days following Closing (the "**India L/C Period**"). Parent will cause the applicable GM Buyer to establish, as soon as possible after Closing and in no event later than ninety (90) days following Closing, a replacement for the India L/C. Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause the applicable GM Buyer to pay to Delphi India all costs incurred by Delphi India in connection with keeping the India L/C open during the India L/C Period.

### 9.35    ~~9.36~~ Pending Transactions.

**9.35.1.**    In the event that any of the Pending Transactions are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the Pending Transactions under the applicable sale and related agreements, including the **Seller** Transition Services Agreement (subject to Delphi's reimbursement of Company Buyer's actual costs in accordance with the terms of the **Seller** Transition Services Agreement), and pay to Delphi, in U.S. Dollars, ~~the entire purchase price~~**an amount equal to net proceeds** received from the respective buyers under the Pending Transactions, within ten (10) Business Days after receipt, except that funds paid to a non-U.S. Sale Company will be paid to Delphi **(or Parent, as applicable)** as soon as legally permitted under applicable Law, and in advance of amounts paid to other Company Affiliates.

**9.35.2.    In the event that the sales of the brake and suspension business and the exhaust business are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the such transactions under the applicable sale and related agreements, including the Seller Transition Services Agreement (subject to Delphi's reimbursement of Company Buyer's actual costs in accordance with the terms of the Seller Transition Services Agreement), and pay to Parent or its designee, in U.S. Dollars, an amount equal to the Net Proceeds received from the respective buyers in connection with such transactions, within ten (10) Business Days after receipt. Delphi will deposit into an escrow account pursuant to an escrow agreement reasonably acceptable to the GM Buyer and Company Buyer any Net Proceeds received by Delphi or any of its Affiliates in connection with the sales the brake and suspension business or the exhaust business between date hereof and the Closing Date, and such amount will be paid to Parent at Closing.**

**9.36** · ~~9.37~~ **Delphi FICA Litigation.**

Delphi shall timely file any FICA refund claims arising in connection with the collective bargaining agreements in 2007. GM Buyer and Company Buyer shall cooperate in the prosecution of the Delphi FICA Litigation.

**9.37**    ~~9.38  GM~~ **Financing.**

**9.37.1.**    ~~9.38.1.~~ Prior to the Closing or the **earlier** termination of this Agreement, GM shall not (x) terminate the GM Financing Agreements or (y) amend or otherwise modify the terms of the GM Financing Agreements (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the GM Financing Agreements or otherwise in a manner that would ~~materially~~ adversely impact **in a material respect** the ability of GM or the Company Buyer to consummate,— the transactions contemplated by the GM Financing Agreements (including in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.37.2.**    ~~9.38.2.~~ GM shall, prior to or concurrently with the Closing, execute and deliver the Buyer Loan Documents, provide the financing contemplated by the GM Financing **Agreements** on the terms and subject to the conditions described in the GM Financing Agreements and otherwise perform and comply on a timely basis with all of its obligations under the GM Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions and other requirements to the consummation of the financing contemplated by the GM Financing ~~Agreement~~**Agreements**.

**9.37.3.**    ~~9.38.3.~~ Prior to the Closing or the **earlier** termination of this Agreement, the Company Buyer shall not (x) terminate the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** or (y) amend or otherwise modify the terms of the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** or otherwise in a manner that would ~~materially~~ adversely impact **in a material respect** the ability of the Company Buyer to consummate the transactions contemplated by the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.37.4.**    ~~9.38.4.~~ The Company Buyer shall, prior to or concurrently with the Closing, execute and deliver the ~~Buyer Loan Documents~~**Company Financing Agreements** and otherwise perform and comply on a timely basis with all of its obligations under the ~~PE~~**Company** Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions and other requirements to the consummation of the financing contemplated by the ~~PE~~**Company** Financing Agreements.

**9.38**    9.39 **Environmental Matters.**

Notwithstanding anything in this Agreement to the contrary, neither Sellers and their Affiliates, on the one hand, nor any Buyer, on the other hand, assumes any Liability under Environmental Laws of the other. Nothing in this Agreement is intended to nullify any Liability to any federal, state or local environmental agency under Environmental Laws that either Seller and/or their Affiliates or any Buyer may have as a result of their status as an owner or operator of any property or facility, or as an arranger for disposal of any Hazardous Materials generated at any property or facility. At Closing, Seller and its Affiliates shall discharge in the pending Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have. After the Closing neither Sellers and their Affiliates, on the one hand, nor any Buyers, on the other hand, shall assert or pursue any Claim against the other under any Environmental Law for any Liability for Hazardous Materials contamination located on a GM Real Property or, a Company Real Property **or any real property relating to the Excluded Assets**.

**9.39**    9.40 **Non-Solicitation.**

Each of Delphi and the Sellers agree, severally, that until the earlier of (i) when this Agreement is terminated under the terms hereof and (ii) the Closing (the "**Non-Solicitation Period**"), Delphi and the Sellers, as applicable, shall not, and shall not knowingly permit Delphi, the Seller or any of their respective officers, directors, agents or Affiliates to solicit or initiate any inquiries or the making of any proposal with respect to the sale (whether by sale of stock, merger, consolidation, sale of assets or other disposition) of all or any part of the GM Business and the Company Business or any significant portion of their consolidated assets or issued or unissued capital stock; provided, however, that nothing in this Agreement shall prevent or restrict Delphi's Board of Directors from taking actions (or directing management to take actions) which (i) the Board reasonably believes are required by their fiduciary duties (taking into account the advice of counsel in appropriate circumstances) or (ii) are in accordance with paragraph 46 of the Modification Procedures Order**, as amended**. From and after the execution of this Agreement, Delphi and the Sellers shall immediately advise the Buyers of the receipt, directly or indirectly, of any inquiries, discussions, negotiations, or proposals relating to a Competing Transaction**transaction described in this Section 9.39** (including the specific terms thereof and the identity of the other individual or entity or individuals or entities involved) and promptly furnish to the Buyers a copy of any such written proposal in addition to a copy of any information provided to or by any third party relating thereto, in each case only to the extent discussed or provided to Delphi's Board of Directors.

**9.40**    9.41 **Employment, Retirement, Indemnification, and Other Agreements, and Incentive Compensation Programs.**

Prior to Closing, the Company Asset Buyers shall take all actions necessary to enter into or assume (at the Company Asset Buyer's sole discretion) the agreements, obtain insurance coverage and undertake or assume the obligations, in connection with the Specified Director, Officer and Employee Related Liabilities that in the aggregate provide substantially similar economic benefits to the applicable directors, officers and employees as currently exist under existing agreements and policies **in effect on the date of this Agreement** with respect to Delphi's directors, officers and employees other than with respect to change in control agreements. "**Specified Director, Officer and Employee Related Liabilities**" means (i)

employment and incentive agreements and policies (which shall ~~includes~~**include** equity, supplemental retirement benefits, bonus and other incentive plans and policies to be paid to executives after the ~~effective date of the Plan of Reorganization~~**Closing Date**) with substantially all of Delphi's current, eligible executives who continue to be employed after the ~~effective date of the Plan of Reorganization~~**Closing Date**, (ii) the obligation to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of a director, officer, or employee pursuant to the applicable Delphi and Affiliate of Delphi certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against any director, officer, or employee of the debtors who were in that role as of the date of October 3, 2007 based upon any act or omission related to a director's, officer's or employee's service with, for, or on behalf of Delphi or an Affiliate of Delphi, (iii) the obligation to maintain directors' and officers' insurance providing coverage for those directors, officers, and employees currently covered by such policies for the remaining term of such policy and to maintain tail coverage under policies in existence as of the ~~effective date of the Plan of Reorganization~~**Closing Date** for a period of six years after the ~~effective date of the Plan of Reorganization~~**Closing Date**, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such persons based upon any act or omission related to such person's service with, for, or on behalf of the debtors in at least the scope and amount as currently maintained by Delphi and Affiliates of Delphi, and (iv) the obligation to indemnify current or former directors, officers, and employees who were not employed in such capacity by Delphi or an Affiliate of Delphi as of October 3, 2007, solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the insurance coverage referred to in section (~~iii~~**ii**) or any prior similar policy in an aggregate amount not to exceed $10 million.

## **9.41** ~~9.42~~**India Matters.**

The applicable Delphi Asset Seller in India shall use commercially reasonable efforts to prior to Closing (A) procure a "no objection letter" from the appropriate authority pursuant to section 281(1) of the Income Tax Act, 1961 of India to the proposed transfer of the Acquired Assets of the GM Business conducted in India from the Seller to the Buyer with no conditions included in such objection letter, other than those as are reasonably acceptable to the applicable Seller and applicable GM Buyer and (B) establish proper, clear and valid leasehold rights in favor of the applicable GM Buyer to the premises forming part of the lease for the premises situated in the State of Haryana, India and subject to the Seller furnishing all necessary permission(s) and authorization(s) obtained by AJS Associates and/or individual allottees of the premises forming part of the leases from the Haryana Urban Development Authority for the purpose of creating valid leasehold rights in favor of the GM Buyer.

## **9.42** ~~9.43~~**Prosecution and Settlement of Appaloosa Claim.**

Prior to the Closing, Delphi shall continue to control the prosecution and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution and, subject to applicable law, shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer which shall not be unreasonably withheld. Following the Closing, (i) GM, GM Buyer and Delphi agree to take appropriate actions and enter into appropriate agreements such that subject to applicable law, GM or GM Buyer shall control the prosecution

and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution, and Delphi shall cooperate with GM and GM Buyer in any such prosecution; provided, however, if requested by GM or GM Buyer in writing, Delphi shall prosecute such Claim at the direction of GM or GM Buyer, as applicable, and GM or GM Buyer, as applicable, shall reimburse Delphi for any reasonable, external, out-of-pocket costs and expenses incurred by Delphi in connection with any such prosecution; provided, further, however, that if GM or GM Buyer has requested that Delphi prosecute such Claim as provided above, Delphi shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer; (ii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto, in each case for an amount that would be less than ~~the maximum distribution to the C Lenders provided by Article 7.8(e)(iii) of the Plan~~**$145.5 million** (the "**Threshold**"), without the prior written consent of ~~Delphi~~**Company Buyer** which shall not be unreasonably withheld; provided, that ~~Delphi~~**Company Buyer** may not withhold its consent unless it agrees within 20 days of the request for consent to pay all costs and expenses associated with of the continuing prosecution of the Appaloosa Claim and demonstrates to GM's and GM Buyer's reasonable satisfaction the ability to fund such costs and expenses; provided, further, that ~~Delphi~~**Company Buyer** shall not have any right to consent to the entry of any judgment with respect to the Appaloosa Claim or any settlement with respect thereto if the ~~C Lenders would receive an~~ amount ~~from~~**of** such **judgment or** settlement **would result in proceeds** equal to or greater than the Threshold; (iii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto unless such judgment or settlement (A) contains a full release of all counter, cross or similar claims by the defendants and (B) does not contain non-economic relief detrimental to Delphi's current or former officers, directors, or employees; and (iv) GM and GM Buyer shall consult with Delphi regarding any request by Delphi for GM or GM Buyer to consent to the entry of any judgment with respect to the Appaloosa Claim or entry into any settlement. Delphi and GM and/or the GM Buyer will enter into an agreement in mutually acceptable form for the purpose of facilitating communications regarding the Appaloosa Claim and, to the maximum extent permissible, protecting confidential and privileged information shared in connection therewith.

## 9.43    PBGC Settlement Agreements.

**Delphi shall not amend, modify, or terminate the Delphi-PBGC Settlement Agreement without the prior written consent of each of GM and the Company Buyer, which consents shall not be unreasonably withheld; provided, however, that Delphi shall not amend the Delphi-PBGC Settlement Agreement in any manner that (i) will cause GM or the Company Buyer to pay any amounts, incur any Liabilities or transfer any assets or (ii) modify in any manner any releases of any claims or liens for the benefit of GM or the Company Buyer. GM shall not amend, modify, or terminate the GM-PBGC Settlement Agreement without the prior written consent of each of Delphi and the Company Buyer, which consents shall not be unreasonably withheld; provided, however, that GM shall not amend the GM-PBGC Settlement Agreement in any manner that (i) will cause Delphi or the Company Buyer to pay any amounts, incur any Liabilities or transfer any assets or (ii) modify in any manner any releases of any claims or liens for the benefit of Delphi or the Company Buyer.**

**9.44    DIP Priority Payment.**

**9.44.1.    Not more than 20 Business Days but not less than 15 Business Days prior to the date on which Delphi and the Buyers shall have agreed in good faith is the anticipated Closing Date, Delphi shall notify the DIP Agent in writing (with a copy to the Buyers) of such anticipated Closing Date.  If, at any time subsequent to the delivery of such notification, Delphi and the Buyers determine in good faith that they anticipate that the Closing Date will be different from the one set forth in such notification, Delphi shall notify the DIP Agent in writing (with a copy to the Buyers) of the updated anticipated Closing Date.**

**9.44.2.    At least 15 Business Days prior to the Closing Date, (I) the DIP Agent will prepare in good faith and deliver to Delphi and the Buyers (a) the aggregate amount of all invoices received by DIP Agent at such time to be paid at the Closing pursuant to clause (i) of the definition of DIP Priority Payment and (b) a categorized estimate of the DIP Priority Payment under clauses (ii) and (iii) of the definition thereof as of the Closing Date and (II) Delphi will provide to the Buyers the mark-to-market exposure under the Hedging Agreements as of such date, calculated in accordance with the relevant Hedging Agreements.  At least 4 Business Days prior to the Closing Date, the DIP Agent will deliver to Delphi and the Buyers the calculations of the obligations owing under the Hedging Agreements as of the Closing Date that have been provided to the DIP Agent by the counterparties to the Hedge Counterparties as of such date.  On or prior to the Closing Date, the DIP Agent will deliver to Delphi and the Buyers a letter (the "DIP Priority Payment Letter") setting forth in reasonable detail the calculation of the amount of the DIP Priority Payment to be paid on the Closing Date.**

**9.44.3.    If a GM Buyer disputes any amount or calculation under clause (i) of the DIP Priority Payment or the estimate of such amount, to the extent such dispute cannot be resolved by consent or by order of the Bankruptcy Court prior to Closing, at its option in its sole discretion, the GM Buyers may elect to either (i) delay the Closing for a period not to exceed 15 days in order to seek to resolve such dispute, or (ii) proceed with the Closing and pay such disputed amount, subject to the following procedures if applicable:**

**A.    if the portion of the DIP Priority Payment in dispute is owed to a Backstop Party, GM Buyer will pay the disputed amount to the DIP Agent who will deposit such disputed amount in a non-interest bearing escrow account pursuant to an escrow agreement in form and substance reasonably acceptable to the DIP Agent, GM Buyer and the applicable Backstop Party, which escrow agreement shall authorize the DIP Agent to distribute the escrowed amount as specified in a joint notice by a GM Buyer and the applicable Backstop Party or as ordered by the Bankruptcy Court;**

**B.    if the portion of the DIP Priority Payment in dispute is owed to any third party other than a Backstop Party, GM Buyer shall pay such amount to the DIP Agent and the DIP Agent will distribute such disputed amount to the applicable third party; provided that in providing such payment, GM Buyer does not waive any rights it may have to dispute the amount paid to such third party hereunder; or**

**C.    if the portion of the DIP Priority Payment in dispute is owed to any third party other than a Backstop Party, and such third party agrees to permit such disputed amount to be retained by the DIP Agent subject to an escrow, GM Buyer will pay the disputed amount to the DIP Agent who will deposit such disputed amount in a non-**

interest bearing escrow account pursuant to an escrow agreement in form and substance reasonably acceptable to the DIP Agent, which escrow agreement shall authorize the DIP Agent to distribute the escrowed amount as specified in a joint notice by a GM Buyer and the applicable third party or as ordered by the Bankruptcy Court.

9.44.4.   If a GM Buyer disputes any amount or calculation under clause (iv) of the DIP Priority Payment, to the extent such dispute cannot be resolved by consent or by order of the Bankruptcy Court prior to Closing, the GM Buyers shall so notify Delphi and the counterparty to the relevant Hedging Agreement of such dispute, proceed with the Closing and pay such disputed amount to such counterparty at the Closing, and, upon the making of such payment at the Closing, Delphi shall assign to the GM Buyers the right to enforce against the counterparty (subject to all defenses that could be asserted by the counterparty against Delphi) any right Delphi may have to reimbursement of the disputed amount under the relevant Hedging Agreement. If the DIP Agent does not perform the provisions of this Section 9.44 applicable to it, the Parties will use their respective commercially reasonable efforts to enter into an alternative arrangement which provides GM Buyers protections and rights equivalent to those provided by this Section 9.44.

9.44.5.   At Closing, Company Buyer shall reimburse Parent an amount equal to 50% of aggregate amount of success fees included in the DIP Priority Payment incurred after June 1, 2009 and paid by Parent or a GM Buyer. Alternatively, Parent may assign its rights to such payment to one of its Affiliates and Parent or such Affiliate may offset such right to such payment against the GM Buyers' obligations under Section 9.5.11.B.

# ARTICLE 10.
## CONDITIONS TO CLOSING.

**10.1**   **Conditions to Obligations of Sellers and Buyers.**

The respective obligations of each Party to effect the **Sales and the other** transactions contemplated by this Agreement will be subject to the satisfaction or waiver by each Party at or prior to the Closing Date of the following conditions precedent.

**10.1.1.**   Plan of Reorganization.  The**, Plan Modification Order. If the transactions contemplated by this Agreement are consummated pursuant to the Plan of Reorganization, the** conditions to the effectiveness of the Plan of Reorganization**thereof** shall have been satisfied or waived pursuant to the terms of the Plan of Reorganization**thereof**, and the Plan of Reorganization does not contain any changes from the draft version delivered to GM and the Buyers**filed with the Bankruptcy Court** on June 1,**16,** 2009 that would have a material adverse impact on the Sale**Sales (except as contemplated under Section 3.2.3 of this Agreement)** without the consent of GM and the Company Buyer or an adverse impact on**, an adverse impact on** GM without the consent of GM. Any **or an adverse impact on Company Buyer without the consent of Company Buyer. If the transactions contemplated by this Agreement are consummated pursuant to the Plan of Reorganization, any** exhibits and schedules to the Plan of Reorganization**thereto** not delivered to the Buyers prior to the date of this Agreement, must not have a material adverse impact on the Sale**Sales** without the consent of GM and the Company Buyer, a material adverse impact on GM without the consent of GM or a material adverse impact on Company Buyer without the consent of Company Buyer. The Plan Modification Order shall have been entered and become a Final Order in form and substance satisfactory to GM**, the**

DIP Agent and the Company Buyer **and shall include, among others, the terms set forth on Schedule 10.1.1, and shall be an Unstayed Order**.

10.1.2.    Governmental Approvals: ~~Plan Modification Order~~.    All required Governmental Approvals (including approvals under any Competition/Investment Law, as identified on Schedule 10.1.2) regarding the ~~Sale~~Sales will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated; provided that to the extent such consent, approval, order, authorization, registration, declaration or filing has not been obtained or completed with respect to an immaterial Acquired Asset, Parent **or Company Buyer** may elect in its sole discretion to cause the applicable Buyer to consummate the acquisition of those Acquired Assets for which such consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and defer the acquisition of all remaining Acquired Assets until such remaining consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and provided further that the full Purchase Price for such assets is paid.

10.1.3.    No Order.    There shall not be in effect any Governmental Order by ~~a~~ Governmental ~~Body~~**Authority** of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

~~10.1.4.    DIP Amendment.~~

~~The DIP Agreement shall have been amended or otherwise modified to the extent necessary to permit the consummation of the transactions contemplated hereby, and such amendment or other modification shall be in full force and effect and not be subject to any unsatisfied condition precedent or condition subsequent not otherwise waived by the DIP Lenders.~~

**10.2    Conditions to Obligations of Sellers.**

The obligation of Sellers to consummate the **Sales and the other** transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

10.2.1.    Accuracy of Warranties.    The representations and warranties of **the GM** Buyers ~~contained in Articles 4 and 7 and of GM in Article 6~~**in ARTICLE 5 of this Agreement, of GM in ARTICLE 6 of this Agreement and of the Company Buyer in ARTICLE 7** of this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of date of the Agreement and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on ~~Buyer's~~**Buyers'** ability to consummate the transactions contemplated by this Agreement.

10.2.2.    Performance of Covenants.    Each of the Buyers and their Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by them at or prior to the Closing.

**10.2.3.**    Delivery of Ancillary Agreements.  Buyers will have delivered duly executed copies of each of the applicable Ancillary Agreements.

**10.2.4.**    Collective Bargaining Agreements.  ~~GM Buyer~~**Parent** and Company Buyer will assume **the terms and conditions of** their respective Seller U.S. CBAs, including all amendments and supplements thereto, **in each case, as contemplated by this Agreement**.

**10.2.5.**    ~~Hourly Pension Plan.  Delphi and its Affiliates shall be satisfied that the Delphi HRP will not be an obligation of Delphi following the Closing and Delphi shall have been relieved of all obligations with respect thereto.~~**PBGC Settlement Agreements.  The PBGC Settlement Agreements shall have gone effective and be in full force and effect.**

**10.2.6.**    Consents.  The UAW, IUE- CWA and the USW will have waived **(to the extent such waiver is required)** Seller U.S. CBA restrictions upon the ~~sale of operations~~**Sale** in a form reasonably satisfactory to Seller.

## 10.3    Conditions to Obligations of GM Buyers.

The obligation of GM Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by GM Buyers):

**10.3.1.**    Accuracy of Warranties.  The representations and warranties of Sellers made to all Buyers or the GM Buyers, but, for the avoidance of doubt, not the representations and warranties of Sellers made exclusively to the Company Buyer, contained in this Agreement (without taking into account any materiality**, material adverse effect** or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a ~~Material Adverse Effect on any Seller's~~**material adverse effect on Sellers'** ability to consummate the transactions contemplated by this Agreement.

**10.3.2.**    Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the GM Buyers.

**10.3.3.**    Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the GM Ancillary Agreements. **Company Buyer will have delivered duly executed copies of the GM/Company Ancillary Agreements to which they are a party.**

**10.3.4.**    ~~Release of Certain Liens.  The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the GM Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the GM Sales Securities.~~**PBGC Settlement Agreements.  The PBGC Settlement Agreements shall have gone effective and be in full force and effect.**

**10.3.5.**    Financing.  The Company Buyer shall have **(or shall receive concurrently with the Closing)** received the ~~Class B Purchase Price under the Securities Purchase Agreement; PE~~

~~and its Affiliates~~**debt and equity financing contemplated by the Company Financing Agreements (unless the failure to receive such financing is a result of an actual or threatened breach of the Company Financing Agreements by any GM Buyer).  The Backstop Parties** shall not be in breach or default of any material obligations ~~it has~~**they have** under the ~~PE~~**Company** Financing Agreements and ~~PE and its Affiliates~~ shall have executed and delivered the ~~Buyer Loan Documents~~**Company Financing Agreements to which they are a party** and the Operating Agreement, which ~~Buyer Loan Documents~~**Company Financing Agreements and Operating Agreement** shall be in full force and effect.

10.3.6.    Transfer of Environmental Permits and Approvals.  All material Environmental Permits shall have been transferred, assigned or reissued to **GM** Buyers or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, **GM** Buyers have received written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by **GM** Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

10.3.7.    Property Transfer Obligations.  All obligations required under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3 shall have been satisfied.

~~10.3.8.    DIP Payoff Letters.  The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to GM.~~

**10.4    Conditions to Obligations of Company Buyer.**

The obligation of Company Buyer to consummate the **Sales and the other** transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by the Company Buyer):

10.4.1.    Accuracy of Warranties.  The representations and warranties of Sellers made to all Buyers or the Company Buyer, but, for the avoidance of doubt, not the representations and warranties of Sellers made exclusively to the GM Buyers, contained in this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a ~~Material Adverse Effect on any Seller's~~**material adverse effect on Sellers'** ability to consummate the transactions contemplated by this Agreement.

10.4.2.    Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the Company Buyer.

10.4.3.    Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the ~~GM/Company~~ Ancillary Agreements, which shall be in full force and effect.  **GM Buyers will have delivered duly executed copies of the GM/Company Ancillary Agreements to which they are a party.**

**10.4.4.** ~~Release of Certain Liens. The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the Company Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the Company Sales Securities.~~**PBGC Settlement Agreements. The PBGC Settlement Agreements shall have gone effective and be in full force and effect.**

**10.4.5.** **Transfer of Environmental Permits and Approvals. All material Environmental Permits relating to Company Purchased Assets located in the United States shall have been transferred, assigned or reissued to Company Buyer or, with respect to any such material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, Company Buyer shall have received written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Company Buyer pending transfer, assignment or reissuance of any such material Environmental Permit is permissible, and Sellers shall have used their respective commercially reasonable efforts to have transferred, assigned or reissued to Company Buyer all material Environmental Permits relating to Company Purchased Assets located outside of the United States, or to receive written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Company Buyer pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.**

**10.4.6.** ~~10.4.5.~~ **Financing**. The Company Buyer shall have received ~~the Class A Purchase Price under the Securities Purchase Agreement and the amount of Loans (as defined in the Buyer Loan Documents) requested by the Company Buyer to be made by GM under the Buyer Loan Documents on the Closing Date, GM and its Affiliates~~**(or shall receive concurrently with the Closing) the debt and equity financing contemplated by the Company Financing Agreements (unless the failure to receive such financing is a result of an actual or threatened breach of the Company Financing Agreements by any Company Buyer or any of the Backstop Parties).** GM shall not be in breach or default of any material obligations it has under the ~~GM~~**Company** Financing Agreements and ~~GM and its Affiliates~~ shall have executed and delivered the ~~Buyer Loan Documents~~**Company Financing Agreements to which it is a party** and the Operating Agreement, which ~~Buyer Loan Documents~~**Company Financing Agreements and Operating Agreement** shall be in full force and effect.

~~**10.4.6.** **DIP Payoff Letters.** The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to Company Buyer.~~

**10.4.7.** **LLC Agreement. The Amended and Restated Operating Agreement of Company Buyer in the form included as an Exhibit to the Securities Purchase Agreement as of the date hereof shall have been implemented consistent with Section 8(a) of the Securities Purchase Agreement.**

## ARTICLE 11.
## CLOSING.

### 11.1    Closing Time and Date.

**11.1.1.** Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of all of the transactions contemplated by this Agreement to occur at Closing will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New

York, 10036, at 10:00 a.m. at~~on~~ the ~~month-end-following~~date which is two (2) Business Days ~~of~~after the date that all of the conditions set forth in ARTICLE 10 have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may otherwise agree (the "**Closing Date**"). For Tax and accounting purposes, the parties shall use their commercially reasonable efforts to cause the effective time of the transaction to be 11:59 p.m., local time, on the accounting month end following the Closing Date. The Closing of the ~~GM~~ Transfer Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

**11.1.2.**    In the event any condition to Closing contained in Section 10.1.2 or 10.3 has not been satisfied with respect to an immaterial Acquired Asset, GM Buyer may elect to delay the Closing with respect to such immaterial Acquired Asset or Sale Company (~~a~~the "**Temporarily Excluded Assets**"), and shall be required to proceed to Closing with respect to the rest of the transactions contemplated by this Agreement. In such event, (i) GM Buyers will not be deemed to have assumed any Liabilities which relate to the Temporarily Excluded Assets, (ii) the full Purchase Price will be paid at Closing notwithstanding that the Temporarily Excluded Assets have not been transferred, and (iii) Sellers will continue to operate the Temporarily Excluded Assets and will supply GM Buyers and the Sale Companies and perform the other obligations in the same manner as prior to the Closing, except that GM Buyers will be responsible for paying Sellers, in advance, for all of their direct and indirect costs and expenses reasonably incurred in operating the Temporarily Excluded Assets to the extent they exceed revenues generated from operating such Temporarily Excluded Assets until they can be transferred to GM Buyers. Sellers and GM Buyers will continue to use their respective commercially reasonable best efforts to cause the satisfaction of all unsatisfied conditions precedent to the transfer of the Temporarily Excluded Assets as soon as practicable. The GM Buyers may elect to close on the transfer of the Temporarily Excluded Assets at any time upon notice to Delphi ~~and~~**. Until any such closing on the transfer of the Temporarily Excluded Assets,** the provisions of this Agreement will continue to apply to the Temporarily Excluded Assets as if no Closing under this Agreement had yet taken place.

**11.2    GM Ancillary Agreements.**

At or prior to the Closing, the applicable Sellers **and/or Company Buyer** will duly execute and deliver to the **applicable** GM Buyers, and the **applicable** GM Buyers will duly execute and deliver to ~~GM~~**the applicable** Sellers **and/or the Company Buyer**, each of the following agreements to which they are to be a party:

**11.2.1.**    The following lease agreements:

A.    Assignment and Assumption Agreement regarding Building 1 at the Somerton, Australia Real Property, substantially in the form of ~~Exhibit 11.2.1.A~~**the Previously Filed Version Exhibit 11.2.1.A (with such changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date).**

B.    Sublease regarding the **Paris** Technical Center ~~located at Paris, France~~, substantially in the form of ~~Exhibit 11.2.1.B~~**the Previously Filed Version Exhibit 11.2.1.B (with such changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date).**

C.    Sublease regarding the lease located at 1230 West Gila Bend Highway, Valley Industrial Park, Casa Grande, Arizona, substantially in the form of ~~Exhibit 11.2.1.C~~**the Previously Filed Version Exhibit 11.2.1.C (with such changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date)**.

D.    The applicable GM Buyer and applicable Company Buyer will enter into a lease for a portion of the Lockport, New York technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things, for Company **Buyer** to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years, providing for a mutually acceptable allocation of use of ~~personal property~~**Personal Property** during the term of such lease.  **During the term of such lease, the applicable GM Buyer shall not sell or otherwise dispose of any of such Personal Property.  The applicable GM Buyer and applicable Company Buyer will use commercially reasonable efforts to develop and implement a reasonable, mutually agreed upon, cost effective separation plan for their respective businesses conducted at Lockport, New York and following such separation during the remainder of the term of the lease, the applicable Company Buyer shall have an option to purchase the real property and related Personal Property for the price of $1.00 and the assumption by such Company Buyer of all Liabilities directly relating to such technical center and not the remainder of the facility retained by GM Buyer, it being understood that Company Buyer shall not assume liabilities relating to UAW employees, subject to a lease back to the applicable GM Buyer of the portion of the real property that will continue to be occupied by the applicable GM Buyer and the provision for the use by the applicable GM Buyer of the relevant related Personal Property.  Company Buyer must exercise its option to acquire the real property in order to purchase the Personal Property.  The lease back to the GM Buyer shall provide for the applicable GM Buyer to pay its pro rata share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by such parties.  Company Buyer will pay all costs associated with the separation of the Lockport, New York technical center and all capital investment needed in connection with separation of the Lockport, New York technical center and other capital expenditures; provided that any shared capital expenditures required with respect to any shared Personal Property or Real Property shall be equitably allocated between the parties as mutually agreed to between the parties.**

E.    The applicable GM Buyer and applicable Company Buyer will enter into a lease for **a portion of** the Kokomo, Indiana technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for Company **Buyer** to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years**, providing for a mutually acceptable allocation of use of Personal Property during the term of such lease**.  During the term of such lease, the applicable GM Buyer shall not sell or otherwise dispose of any of such Personal Property.  The applicable GM Buyer and applicable Company Buyer will use commercially reasonable efforts to develop and implement a **reasonable, mutually agreed upon, cost effective** separation plan for their respective businesses conducted at Kokomo, Indiana and following such separation **during remainder of the term of the lease**, the applicable Company Buyer shall have an option to purchase the real property and~~/or~~ related Personal Property for the price of ~~$1.00,~~**1.00 and the assumption by such Company Buyer of all Liabilities directly relating to such**

technical center and not the remainder of the facility retained by GM Buyers, it being understood that Company Buyer shall not assume liabilities relating to UAW employees, subject to a lease back to the applicable GM Buyer of the portion **of the real property** that will continue to be occupied by the applicable GM Buyer and the provision for the use by the applicable GM Buyer of the relevant related Personal Property. **Company Buyer must exercise its option to acquire the real property in order to purchase the Personal Property.** The lease back to the GM buyer shall provide for the applicable GM Buyer to pay its pro ~~rate~~**rata** share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by such parties. **Company Buyer will pay all costs associated with the separation of the Kokomo, Indiana technical center and all capital investment needed in connection with separation of the Kokomo, Indiana technical center and other capital expenditures; provided that any shared capital expenditures required with respect to any shared Personal Property or Real Property shall be equitably allocated between the parties as mutually agreed to between the parties.**

**11.2.2.**   Patent Rights assignments by the applicable GM Sellers to the applicable GM Buyer substantially in the form of Exhibits 11.2.2.A.1 through 11.2.2.A.16, a Trademark Assignment by the applicable GM Seller to the applicable GM Buyer substantially in the form of Exhibit 11.2.2.B, and a Copyright Assignment by the applicable GM Seller to the applicable GM Buyers substantially in the form of Exhibit 11.2.2.C, whereby recorded title to the Purchased Intellectual Property may be recorded as being transferred from the applicable GM Seller to the applicable GM Buyers, as well as any other deeds, bills of sale, endorsements, assignments, affidavits and other instruments of sale, conveyance, transfer and assignment relating to the Purchased Intellectual Property, including an assignment to the applicable GM Sellers' rights in and to the "Saginaw Steering" name and trademark, any assignment of rights to Intellectual Property under any employment or independent contractor agreements and any necessary releases of security interest in forms appropriate for releasing any security interests filed in any patent offices.

**11.2.3.**   The following agreements (collectively the "**GM Transfer Agreements**"):

A.   France Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.A.

B.   Australia Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.B.

C.   India Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.C.

D.   Germany Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.D.

E.   Italy Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.E.

F.   Korea Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.F.

G.    Japan Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.G.

H.    Share Transfer Agreement with respect to ~~Delphi Polska~~**Fidass II, B.V**, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.H.

**11.2.4.**    The ~~Bill~~**bill** of ~~Sale~~**sale**, substantially in the form set forth in Exhibit 11.2.4.

**11.2.5.**    The Assignment and Assumption Agreement, substantially in the form set forth in Exhibit 11.2.5.

**11.2.6.**    The GM IP License Agreement.

**11.2.7.**    The applicable Seller Transition Services Agreement between Delphi and GM substantially in the form set forth in Exhibit 11.2.7.

**11.2.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3    Company Ancillary Agreements.**

At or prior to the Closing, the applicable ~~Company~~ Sellers **and/or GM Buyers** will duly execute and deliver to the **applicable** Company Buyer, and the **applicable** Company Buyer will duly execute and deliver to the applicable ~~Company~~ Sellers **and/or the GM Buyers**, each of the following agreements to which they are to be a party:

**11.3.1.**    Assignments, in recordable form, with respect to each of the Copyrights, Patent Rights, Trademark Rights included within the Purchased Intellectual Property, duly executed by each Seller, as applicable, and in form and substance reasonably satisfactory to Buyer.

**11.3.2.**    The Buyer Transition Services Agreement substantially in the form set forth in Exhibit ~~11.3.2;~~**11.3.2.**

**11.3.3.**    The transition services agreement between Delphi and the Company Buyer, substantially in the form set forth in Exhibit 11.3.3 (the **"Seller Transition Services Agreement"**).

**11.3.4.**    The bills of sale, substantially in the form set forth in Exhibit 11.3.4.

**11.3.5.**    The assignment and assumption agreements, substantially in the form set forth in Exhibit 11.3.5.

**11.3.6.**    The Company IP License Agreements.

**11.3.7.**    Lease by GM to Company Buyer of technical centers at ~~Kokomo, Indiana and~~ Lockport, New York **and Kokomo, Indiana** pursuant to Sections 11.2.1.D and 11.2.1.E~~.~~**, respectively.**

**11.3.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3.9.** ~~The Operating Agreement.~~**Delphi, as lessor, and the applicable Company Buyer, as tenant, will enter into a month-to-month lease for a minimum term of three months and a maximum term of three years for the Rootstown, Ohio and Plant 43 in Flint, Michigan manufacturing facilities (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for the Company Buyer to pay its pro rata share of costs on a triple net basis, plus $41,666.67 per month in the case of Rootstown and $125,884 per month in the case of Plant 43 in Flint, Michigan. During the term of such lease, the applicable Company Buyer shall not sell or otherwise dispose of any of such Personal Property.**

~~**11.3.10.** Other Ancillary Agreements.~~

**11.4    Sellers' Deliveries at Closing.**

At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the applicable Buyer:

**11.4.1.** To the extent that equity interests of Sale Companies or the JV Companies are represented by stock certificates, original certificates evidencing the Sale Securities (to the extent applicable in the respective jurisdiction), which certificates will be duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of the relevant Buyer or its permitted assigns.

**11.4.2.** Quitclaim deeds (or non U.S. equivalent) for the GM Owned Real Property and the Company ~~Owned~~ Real Property **which is owned**, substantially in the form **of the Previously Filed Version** of Exhibit 11.4.2 or such other form of conveyance in substance equivalent to such form of deed.

**11.4.3.** Copies of the resolutions (or local equivalent) of the boards of directors **or similar governing body** of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby.

**11.4.4.** Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Plan Modification Order.

**11.4.5.** The minutes and other partnership or limited liability company record books of the Sale Companies and all stock transfer ledgers and other records evidencing the equity ownership of the Sale Companies.

**11.4.6.** Resignations of all directors (or equivalent) and officers of the Sale Companies and of any Seller representatives in similar positions with the JV Companies, except as otherwise requested by ~~Parent~~**the applicable Buyer** no less than ten (10) Business Days prior to the Closing Date.

**11.4.7.** A non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445(b) of the ~~Internal Revenue~~ Code so that Buyers are exempt from withholding any portion of the Purchase Price thereunder.

**11.4.8.**    All other documents and papers reasonably requested by Buyers to transfer title to the Acquired Assets or Sale Securities in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**11.4.9.**    A certificate signed by ~~each  Seller~~**Delphi**, dated the date of the Closing Date (in form and substance reasonably satisfactory to **Parent and Company** Buyer), certifying that the conditions specified in Section 10.3 **and Section 10.4** have been satisfied as of the Closing.

**11.4.10.**    Written acknowledgements from the applicable Governmental Authorities that all material Environmental Permits have been transferred, assigned or reissued to Buyer or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

**11.4.11.**    Environmental Records and GM Environmental Records without redaction or deletion.  Environmental Records and GM Environmental Records located at the **applicable** Real Property immediately following the Closing will be deemed to be delivered for purposes of this Section 11.4.

**11.4.12.**    Copies of all documents required to effect the transfer of ownership and possession of any Real Property under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3.

**11.4.13.**    The ~~applicable~~**Buyer** Transition Services Agreements **and the Seller Transition Services Agreement** substantially set forth ~~in~~ Exhibits ~~11.2.7 and 11.3.3~~**11.2.7, 11.3.2 and 11.3.3, respectively (with such limited changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date).**

**11.4.14.**    Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (A) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (B) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

**11.4.15.**    Amendments to the Rhodes I and Rhodes II Operating Agreements in the forms previously provided to Sellers.

~~**11.4.16.**    DIP Agreement payoff letter in customary form or reasonably acceptable to Buyers.~~

**11.5**    **Buyers' Deliveries at Closing.**

**11.5.1.**    At or prior to the Closing, GM Buyers **and Old GM (solely with respect to Clause A below)** will deliver or cause to be delivered the following:

A.    The waiver by **Old GM, and** GM of ~~its~~**their respective** pre-petition Claims, Administrative Claims, and future Claims in the Bankruptcy Cases including without limitation any such Claims pursuant to the Global Settlement Agreement, as amended, effective

as of September 29, 2008, between Delphi and ~~GM and~~**Old GM and the waiver by GM and Old GM of their respective Claims with under** each of the GM-Delphi Liquidity Agreements;

B.    The payment to ~~Delphi~~**the DIP Agent** of the DIP ~~Priority~~ Payment;

C.    The ~~payment to Delphi of $291,020,079 in cash;~~

~~D.    The~~ assumption or payment of the applicable Cure Amounts for the GM Business~~;~~ **that are GM Assumed Liabilities;**

**D.**    ~~E.~~The payment to Delphi of certain expenses of Delphi and its Filing Affiliates following the Closing as set forth on Exhibit 3.1.1.~~F~~**E**.

**E.**    ~~F.~~Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors **or similar governing body** of each **GM** Buyer and, where required, the stockholders/owners of each **GM** Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

**F.**    ~~G.~~An officer's certificate, dated as of the Closing Date, executed on behalf of ~~each of the Buyers~~**Parent**, certifying that the conditions specified in Section 10.2 have been fulfilled;

**G.**    ~~H.~~Each GM/Company Ancillary Agreement to which a GM ~~Buyers~~**Buyer** is a party **and which was not executed and delivered contemporaneously with the execution of this Agreement**; and

**H.**    ~~I.~~50% of professional fees (not to exceed $15,000,000 as the payment ~~from~~**by** the GM Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation of approval for the Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to ~~this~~ Section 3.1.1.~~G~~**E**, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

**11.5.2.**    At or prior to the Closing, Company Buyer will deliver or cause to be delivered the following;

~~A.    $1.00 (one dollar);~~

~~B.    The payment to Delphi of the Parnassus Class C Interest of Company Buyer, either directly or indirectly through one or more intermediaries, which shall be held either by Sellers, a trust or an agent, as determined by Sellers.~~

**A.**    ~~C.~~50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization)~~;~~**;**

**B.**    D. The assumption or payment of the **applicable** Cure Amounts for the Company Business **that are Company Assumed Liabilities**;

**C.**    E. Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors **or similar governing body** of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

**D.**    F. Each GM/Company Ancillary Agreement to which a Company Buyer is a party **and which was not executed and delivered contemporaneously with the execution of this Agreement**;

**E.**    G. An officer's certificate, dated as of the Closing Date, executed on behalf of each of the Buyers**Company Buyer**, certifying that the conditions specified in Section 10.2 have been fulfilled; and

**F.**    H. Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (i) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (ii) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

### 11.6    Post-Closing Deliveries.

Promptly following the Closing, the Sale Companies will deliver to the applicable Buyer signature cards from all banks or financial institutions with which the Sale Companies have any account, designating signatures approved by the applicable Buyer.

### 11.7    Post-Closing Transfer of Intellectual Property Rights.

**11.7.1.**    If, after the Closing, either**any** Party identifies any Intellectual Property right, including any application or registration for the Intellectual Property that such Party believes should have been included in its Purchased Intellectual Property, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in such party Purchased Intellectual Property and assigned to such Buyer.  If the Parties agree that such Intellectual Property right should have been included in the Purchased Intellectual Property and assigned to another Buyer, Sellers or Buyer or their respective Affiliate, as applicable, shall assign or cause to be assigned such Intellectual Property right to Buyers at no additional cost to Buyers.  The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute at no additional cost to Buyers all documents reasonably requested by the other Party to effect such transfer and/or assignment.

**11.7.2.**    If, after Closing, a Buyer identifies any Intellectual Property right, including any patent or patent application that it believes should have been included in the Shared Intellectual Property licensed under the GM IP License Agreement or the Company IP License Agreement, as applicable, but which is reasonably within the scope of Excepted Shared Intellectual Property identified in the GM IP License Agreement or the Company IP License Agreement, as applicable, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in the Shared Intellectual Property licensed to Buyers hereunder.  If the Parties agree that such Intellectual Property right should have been included in the Shared Intellectual Property licensed to

Buyers hereunder, the Parties shall amend Schedule 9.9.1.A to specifically exclude such Intellectual Property right from the Excepted Shared Intellectual Property, and Buyers shall receive, via amendment to this Agreement, a license under such Intellectual Property right with terms identical to those of the license granted in Section 9.9.1. The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute all documents reasonably requested by the other Party to effect such license. All amendments, covenants and agreements to be provided under this Section shall be at no additional cost to Buyers.

**11.7.3.** **If, after the Closing, any Buyer identifies any property, asset, right, title or interest owned by an Affiliate of Delphi that such Buyer believes should have been included in the Acquired Assets, the Parties shall cooperate to determine in good faith whether such property, asset, right, title or interest should have been included in the Acquired Assets and assigned, transferred and delivered to Company Buyer or any other Buyer. If the Parties agree that such property, asset, right, title or interest should have been included in the Acquired Assets and assigned, transferred and delivered to Company Buyer or any other Buyer, Delphi shall cause the Filing Affiliates and/or their subsidiaries, as applicable, to assign, transfer and deliver such property, asset, right, title or interest to such Buyer at no additional cost to any Buyer. The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute at no additional cost to any Buyer all documents reasonably requested by the other Party to effect such.**

## ARTICLE 12.
## TERMINATION.

### 12.1    Termination.

This Agreement may be terminated at any time prior to the Closing:

**12.1.1.**    By the mutual written consent of Delphi, ~~Parent~~**GM** and Company Buyer.

**12.1.2.**    By any Party if the Closing has not occurred by ~~September  30,~~**October 2,** 2009, provided such date shall be extended until November 30, 2009 in the event that all conditions to Closing are satisfied or capable of being satisfied on the Closing Date, other than the condition set forth in Section 10.1.2**; provided further, that if a GM Buyer makes the election set forth in Section 9.44.3, each of the above dates will be extended by the period specified by such GM Buyer up to 15 days;** and provided further that the terminating party will not have the right to terminate this Agreement if it is in material default hereunder.

**12.1.3.**    By Delphi if (a) the ~~Interim  Financing  Amendment  shall  not  have  been executed and delivered by GM on or prior to June 1, 2009, (b) the Interim Financing Amendment have not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders in form and substance reasonably satisfactory to Delphi, (c) the~~ GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after ~~June 10,~~**July 26,** 2009 or (~~d~~**b**) GM breaches any of its material covenants, obligations or agreements under either of the GM-Liquidity Agreements (as modified by the Interim Financing Amendment).

**~~12.1.4.    By GM if (a) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders; (b) the~~**

~~GM Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after June 10, 2009; or (c) Delphi breaches any of its material covenants, obligations or agreements under the GM Liquidity Agreements (as modified by the Interim Financing Amendment), or an event of default has occurred and is continuing under the Interim Financing Amendment; or (d) the Interim Financing Amendment has otherwise been terminated in accordance with its terms.~~

**12.1.4.**    ~~12.1.5.~~ This Agreement may be terminated by either of GM or Company Buyer if ~~(x)~~ the Plan Modification Order in form and substance satisfactory to GM ~~or~~**and** Company Buyer, as applicable, has not been entered by the Bankruptcy Court on or prior to ~~July 23, 2009, or (y) such Plan Modification Order in form and substance satisfactory to GM or Company Buyer, as applicable, has not become a Final Order within ten (10) days of such order's entry.~~ **August 7, 2009.**

~~**12.1.6.**    This Agreement will automatically terminate, without any further action by any party hereto, on July 15, 2009 (or such later date as may be mutually agreed upon by GM, Company Buyer and Delphi in writing) if GM is the subject of a case under the Bankruptcy Code and (a) federal court approval of GM's entry into, and performance under, this Agreement and all Ancillary Agreements to which GM is or is to be a party has not been obtained, (b) federal court authority to assume all purchase orders and commercial agreements between Sellers and GM the Ancillary Agreement to which GM is or is to be a party and the Securities Purchase Agreement, (the "**GM Assumed Contracts**"), upon the closing of this Agreement has not been obtained, (c) if GM has received federal court authorization to transfer assets (including the stock of subsidiaries) related to the GM Assumed Contracts to any other person that will then hold substantially all of the Existing GM Assets, GM has not received authority to assign such contracts to such transferee, or (d) GM, or if substantially all of the existing GM Assets have been transferred, the entity that then holds substantially all of the Existing GM Assets, has not agreed in writing to assume the GM Assumed Contracts upon the closing of this Agreement. For purposes of this Section 12.1.6, "**Existing GM Assets**" means the assets of GM as of the time immediately prior to one of the events set forth in clauses (a), (b), (c) or (d) of the preceding sentence, as applicable.~~

## 12.2    Procedure and Effect of Termination.

In the event of the termination of this Agreement pursuant to Section 12.1, written notice thereof will forthwith be given to all other Parties. If this Agreement is terminated:

**12.2.1.**    Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**12.2.2.**    The provisions of the GM ~~or Company~~ Confidentiality Agreement~~, as applicable,~~ will continue in full force and effect; and

**12.2.3.**    The following Sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: **Section 9.11.2,** ARTICLE 12 (Termination)~~;~~ **Section 13.1 (Limitations of Liability)** and; Sections 14.1 (Fees and Expenses), 14.5 (Assignment), 14.7 (Waiver), 14.8 (Notices), 14.9 (Entire Agreement), 14.11 (Publicity), **14.14 (Third Parties),** 14.15 (Governing Law) and 14.16 (Venue and Retention of Jurisdiction).

**12.2.4.**    No party to this Agreement will have any Liability under this Agreement to any other except: **(a) as provided in Section 12.2.3 above and Section 12.2.6 below and (b)** that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and no Party waives any Claim with respect thereto.

**12.2.5.**    The MRA, including Section 4.06(c) and related provisions, shall be unaffected by such termination.  For avoidance of doubt, under no circumstances shall a default under this Agreement constitute a default under the MRA.

**12.2.6.**    **In the event this Agreement is terminated under Sections 12.1.2 or 12.1.3 at a time when either (a) any GM Buyer or an affiliate of a GM Buyer is in material breach of this Agreement and the Securities Purchase Agreement and, at such time, no other Party (other than GM, Parent or any other GM Buyer) to this Agreement is in material breach of this Agreement and no Backstop Party is in material breach of the Securities Purchase Agreement, or (b) the condition contained in Section 10.2.6 or Section 10.4.7 has not been satisfied, and the DIP Lenders have released to Delphi any amounts (the "Released Funds") from the Borrowing Base Cash Collateral Account or the Incremental Borrowing Base Cash Collateral Account (as such terms are defined in the DIP Documents), then GM shall deposit an amount equal to the Released Funds into the applicable cash collateral account within five (5) Business Days of such termination; provided however, with respect to clause (b) only, if GM Buyers have materially complied with their obligations under Section 9.13, but any of the Competition/Investment Law Governmental Approvals listed on Schedule 9.13.1 (as it may be amended to add any additional required Competition/Investment Law Governmental Approvals identified in writing by any of the Parties) have not been obtained as of the date of termination of this Agreement, GM will not be required to deposit the Released Funds as provided herein.  Such deposited funds shall be deemed to be additional advances by GM to Delphi pursuant to the Interim Financing Amendment.**

## ARTICLE 13.
### LIABILITY, SURVIVAL.

**13.1    LIMITATIONS OF LIABILITY.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL HAVE ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT. OR PUNITIVE DAMAGES.—IN NO EVENT WILL THE COMPANY BUYER OR ANY OF ITS AFFILIATES HAVE ANY LIABILITY PRIOR TO THE CLOSING FOR DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ACTUAL, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES. TO ANY PARTY OR ANY OF THE PARTIES' RESPECTIVE AFFILIATES OR TO ANY OTHER PERSON WITH RESPECT TO THIS AGREEMENT EXCEPT TO THE EXTENT OF THE TERMINATION FEE SET FORTH IN THE EQUITY COMMITMENT LETTER AND THEN SOLELY TO THE PARTIES THERETO TO THE EXTENT PROVIDED THEREIN.

13.2    ~~Termination Fee.~~

~~In the event that a Termination Fee (as defined in the Securities Purchase Agreement) is payable under the Equity Commitment Letter or the Securities Purchase Agreement to GM, and GM receives such termination fee in full, then GM shall either (i) agree to consummate all of the transactions under this Agreement in accordance with the terms thereof, including fulfilling the obligations of Company Buyer hereunder, as if this Agreement were not terminated if applicable, or (ii) if GM elects not to so consummate such transactions, then GM shall pay to Delphi an amount equal to the positive difference, if any, equal to (a) the total amount of such Termination Fee less (b) the amount advanced under the Interim Financing Amendment after the date of this Agreement as Tranche C Advances.~~

Nothing in **this** Section 13.1 ~~or 13.2~~ shall limit a Party's rights under <u>Section 14.18</u> of this Agreement.

**13.2**    ~~13.3~~ <u>Survival</u>.

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any ~~liability~~**Liability** to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder until fully performed, and each party hereto shall be liable to the other **Parties** after the Closing for any breach thereof.

# ARTICLE 14.
## MISCELLANEOUS.

### 14.1    <u>Fees and Expenses</u>.

Except as may otherwise be specifically provided in this Agreement, each of the Parties will be responsible for its own costs and expenses related to this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby.

### 14.2    <u>Bulk Sales Laws</u>.

Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

### 14.3    <u>Payments in Dollars</u>.

Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. dollars in same day or immediately available funds.

### 14.4    <u>Amendment</u>.

This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of ~~the Parties~~**each of the Parties and, with respect to any of the provisions affecting the DIP Agent, the DIP Loans, the DIP Letters of Credit, the Hedging Agreements and any**

**of the DIP Documents, the duly authorized representative or officer of the DIP Agent.** The Parties acknowledge and agree, however, that the **following** Schedules and the Exhibits, other than Schedule 1.1.A "Assumed Administrative Liabilities", Schedule 2.1.5.F "Excluded Facilities", Schedule 2.1.5.J "Pending Transactions", and Exhibit 3.1.1.F "Wind Up Costs", the IP License Agreements and the GM Company Ancillary Agreements, which are not executed on the date hereof, are in draft form and will be revised and finalized in a manner consistent with this Agreement to the mutual satisfaction of the Parties each acting reasonably, prior to Closing: **Schedules 4.5, 4.13.2, 9.9.1.A, 9.9.9, 9.12A, 9.12B, 9.12C, 9.12D and 9.12E. The following Schedules are being filed with the Bankruptcy Court with this Agreement: Schedules 1.1.A, 1.1.B, 2.1.5.F, 4.4, 9.1.1, 9.13.1, 10.1.1. The remaining Schedules to this Agreement not referred to herein are in the form most recently filed with the Bankruptcy Court in Connection with the June 1 MDA.**

#### 14.5    Assignment.

This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party and their Affiliates, provided, that except as otherwise provided in this Section 14.5, no assignment of any rights or obligations hereunder will be made by any Buyer without the written consent of Delphi, or by any Seller hereto without the written consent of one or both of GM and Company Buyer based on which Buyer is impacted by the request, except in connection with a Pending Transaction. Any GM Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) (i) to GM or any of its Affiliates (including any Affiliate formed after the date hereof that may be a corporation or limited liability company), (ii) to the applicable Buyer's lenders or (iii) in connection with the direct or indirect sale, merger, consolidation or similar reorganization of all or a substantial portion of GM's business; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party**Party** is released from its obligations hereunder. Upon any such permitted assignment, the references in this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires. Any Company Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) to any Affiliate or other designee of Company Buyer; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party is released from its obligations hereunder. Upon any such permitted assignment, the references in this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires.

#### 14.6    No Successor Liability.

Except where expressly prohibited under applicable law , upon the Closing, the Buyers shall not be deemed to:  (a) be the successor of the Filing Affiliates; (b) have, de facto, or otherwise, merged with or into the Filing Affiliates; (c) be a mere continuation or substantial continuation of the Filing Affiliates or the enterprise(s) of the Filing Affiliates; or (d) be liable for any acts or omissions of the Filing Affiliates in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Buyers shall not be liable for any Claims against the Filing Affiliates or any of their predecessors or affiliates,

and the Buyers shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Filing Affiliates arising prior to the Closing Date, including, but not limited to, Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date, except as expressly provided in this Agreement. The Buyers acknowledge and agree that this <u>Section 14.6</u> shall not in any be deemed to expand or modify Sellers' indemnification obligations under this Agreement or any Ancillary Agreement. Nothing in this provision shall preclude the application of the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53.

### 14.7    <u>Waiver.</u>

Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

### 14.8    <u>Notices.</u>

Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

If to any GM Buyer <u>or</u>    c/o General Motors ~~Corporation~~**Company**
<u>Old GM</u>:            767 Fifth Avenue
                14th Floor
                New York, NY 10153
                Attn: Director of Business Development
                Fax: (212) 418-3623


                and


                General Motors ~~Corporation~~**Company**
                300 GM Renaissance Center
                Detroit, MI 48265

Attn:  General Counsel
Fax:  313-665-4960

| | |
|---|---|
| With a copy to: | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Ave.<br>Detroit, MI 48226<br>Attn:  Robert B. Weiss<br>Tel.:  (313) 465-7596<br>Fax.:  (313) 465-7597 |
| If to ~~any~~ Company Buyer: | ~~Parnassus Holdings II.~~**DIP Holdco 3,** LLC<br>c/o ~~Platinum Equity~~<br>~~360 North Crescent Drive~~<br>~~South Building~~<br>~~Beverly Hills, CA 90210~~<br>~~Attn:~~<br>~~Tel.:~~<br>~~Fax:~~<br>**Elliott Management Corporation**<br>**712 Fifth Avenue**<br>**New York, NY 10019** |
| With a copy to: | ~~Schulte Roth & Zabel LLP~~<br>~~919 Third Avenue~~<br>~~New York, NY 10022~~<br>~~Adam Harris, Marc Weingarten~~<br>~~and David E. Rosewater;~~<br>~~Tel.: (212)-756-2000~~<br>~~Fax: (212) 593-5955~~**Silver Point Capital, L.P.**<br>**Two Greenwich Plaza**<br>**Greenwich, Connecticut 06830**<br>**Attn:  Michael Gatto**<br>**Tel.:  203-542-4031**<br>**Fax:   203-542-4131** |
| **With a copy to:** | **Dechert LLP**<br>**1095 Avenue of the Americas**<br>**New York, NY 10036**<br>**Attn:  Glenn E. Siegel, Esq.**<br>**    Charles I. Weissman, Esq.**<br>**    Scott M. Zimmerman , Esq.**<br>**Tel:    (212) 698-3500**<br>**Fax:   (212) 698-3599** |

<table>
<tr><td><u>With a copy to:</u></td><td><u>Willkie Farr & Gallagher LLP</u><br><u>787 Seventh Avenue</u><br><u>New York, NY 10019</u><br><u>Attn: Marc A. Abrams, Esq.</u><br><u>Maurice M. Lefkort, Esq.</u><br><u>Tel.: (212) 728-8000</u><br><u>Fax: (212) 728-8111</u></td></tr>
</table>

If to Delphi:        DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
Attn: Executive Director of Restructuring
Fax: (248) 813-2612

With a copy to:     DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
Attn: Deputy General Counsel -
      Transactional & Restructuring
Fax: (248) 813-2491

With a copy to:     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Attn: Eric Cochran
      Marie Gibson
Fax: (212) 735-2000

provided, however, if ~~either~~**any** Party will have designated a different addressee by notice **to all of the other Parties**, then to the last addressee so designated.

### 14.9    <u>Entire Agreement.</u>

This Agreement, including all agreements incorporated by reference herein, the Ancillary Agreements and the GM Confidentiality Agreement ~~or the Company Confidentiality Agreement, as applicable~~, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, provided, however that existing commercial agreements between GM and Delphi **and the DIP Documents** which are otherwise addressed in this agreement shall not be ~~superceded~~**superseded**. This Agreement is the product of negotiations between the Parties and represents the Parties' intentions. In any action to enforce or interpret this Agreement, this Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, shall be construed more or less

favorably to any Party.  **In the event of a conflict between the terms of this Agreement and the terms of the Plan, the terms of this Agreement shall govern.**

### 14.10   Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

### 14.11   Publicity.

Except for statements by Delphi in connection with the Bankruptcy Cases or as otherwise required by Law, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without consulting with the other Party.

### 14.12   Headings.

The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

### 14.13   Severability.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable:  (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

### 14.14   Third Parties.

~~Nothing~~**Except as set forth in Section 3.2.3, nothing** expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.  **Notwithstanding the foregoing, the DIP Agent shall be a third party beneficiary of this Agreement and shall have the right to enforce any of the provisions affecting the DIP Agent, the DIP Loans, the DIP Letters of Credit (including in its capacity as issuing bank under DIP Letters of Credit that have replaced "Letters of Credit" as defined under (and issued pursuant to) the DIP Agreement), and any other obligations secured under the DIP Documents.**

### 14.15   Governing Law.

This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.

### 14.16    Venue and Retention of Jurisdiction.

By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; provided, however, that after the second (2nd) anniversary of the date of this Agreement, the Bankruptcy Court and the Supreme Court of New York, New York County and the United States District Court for the Southern District of New York (the "**New York Courts**") shall have non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; and, provided, further, that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement shall terminate upon the fourth (4th) anniversary of the date of this Agreement and the New York Courts shall have exclusive jurisdiction after the fourth (4th) anniversary of the date of this Agreement. Each Party further agrees to waive any objection based on forum non conveniens. **To the extent that the Bankruptcy Court no longer has jurisdiction on or before the fourth (4th) anniversary of the date of this Agreement, the New York Courts shall have exclusive jurisdiction over all matters related to this Agreement.**

### 14.17    Risk of Loss.

Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

### 14.18    Enforcement of Agreement.

The Parties acknowledge and agree that the covenants and undertakings contained in this Agreement and the Ancillary Agreements relate to matters which are of a special, unique and extraordinary character and that a violation of any of the terms of this Agreement or any Ancillary Agreement will cause irreparable injury to the other Parties and that the amount of such injury will be extremely difficult, if not impossible, to estimate or determine and may not be adequately compensated by monetary damages alone. Therefore, each Party acknowledges that the other Party will be entitled, in addition to all other rights and remedies available under this Agreement, and Ancillary Agreement, and applicable law, as a matter of course, to an injunction, order of specific performance, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation of any terms of this Agreement or any Ancillary Agreement without proof of actual damages and without any requirement for the securing or posting of any bond.

### 14.19    Sellers' Obligations.

Nothing contained in any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agreement and the Plan Modification Order. The Filing Affiliates' obligations under this Agreement (including all Exhibits and Ancillary Agreements) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Filing Affiliates, and the reorganized or reconstituted Filing Affiliates, as the case may be, after the effective date of the confirmed plan or plans in the Filing Affiliates' cases.

**14.20    Bankruptcy Court Approval.**

Notwithstanding anything to the contrary herein, the Parties' obligations **to consummate the Sales** under this Agreement are expressly subject to entry of the Plan Modification Order.

**14.21    Reasonably Equivalent Value.**

As set forth in the Recitals to this Agreement, consideration under the Agreement was provided by all Parties to the Agreement. This Agreement is not the product of collusion among the Parties and is the result of arms' length negotiations. Each of the Parties hereto acknowledge and agree that it received reasonably equivalent value for the consideration provided by such Party.

**14.22    Identification of Exhibits and Schedules to be Filed Under Seal.**

(i)    The parties agree that certain documents attached as Exhibits and Schedules hereto contain sensitive and confidential business terms which, if publicly disclosed, could detrimentally affect the parties. Certain of these documents contain detailed proprietary information describing certain aspects of the business relationship between the parties and the parties believe these documents contain sensitive and confidential information of a type not typically disclosed to the public or made available in the automotive industry. Moreover, certain of these documents contain confidentiality provisions which compel the parties to maintain the confidentiality of the terms of such agreements.

(ii)    The parties hereto agree to use commercially reasonable efforts to obtain approval by the Bankruptcy Court of an order authorizing the parties to file the following Exhibits and Schedules hereto under seal:

Schedules

| | |
|---|---|
| Schedule 1 | Detail of Sellers and GM Buyers |
| Schedule 1.1.A | Assumed Administrative Liabilities |
| Schedule 1.1.B | GM Buyers' Knowledge, Company ~~Buyers'~~ **Buyer's** Knowledge and Sellers' Knowledge |
| Schedule 1.1.C | Steering Products |
| Schedule 1.1.D | Excluded Insurance Policies |
| Schedule 1.1.D.1 | Patents **and Patent Applications** |
| Schedule 1.1.D.2 | Trademarks Rights |
| Schedule 1.1.D.3 | Copyrights |
| Schedule 1.1.E | Transferred Insurance Policies |
| Schedule 2 | Details of Sellers and Company Buyer |
| Schedule 2.1.5.F | Excluded Facilities |

| | |
|---|---|
| Schedule 2.1.5.J | Pending Transactions |
| Schedule 2.1.5.K | Other Excluded Assets |
| Schedule 2.3.1 | Administrative Claims |
| Schedule 4.3.1 | Sale Companies and JV Companies |
| Schedule 4.3.2 | Capital Stock |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6.2 | Licenses to Affiliates |
| Schedule 4.6.3 | Infringement and Allegations of Infringement of Third Party Intellectual Property |
| Schedule 4.6.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.6.5 | Intellectual Property Notices |
| Schedule 4.8.1 | GM Leased Real Property |
| Schedule 4.8.2 | GM Owned Real Property |
| Schedule ~~4.9.1~~ **4.9.1** | Historical Financial Statements |
| Schedule 4.9.2 | Financial Statement Exceptions |
| Schedule 4.10 | Compliance with Laws |
| Schedule 4.12.1 | Tax Returns |
| Schedule 4.12.3 | Tax Deficiencies |
| Schedule 4.12.5 | Tax Liens |
| Schedule 4.12.6 | Tax Waivers or Extensions |
| Schedule 4.13.1 | Employee List |
| Schedule 4.13.5 | Proceedings Relating to Employee Benefit Plan |
| Schedule 4.13.6 | Employee Benefit Plan/No Material Liability or Encumbrance under Title IV of ERISA |
| Schedule 4.13.8 | Welfare Benefits |
| Schedule 4.13.9 | Contributions to Seller Employee Benefit Plan |
| Schedule 4.13.12 | No Threatened Labor Stoppage |
| Schedule 4.14.1 | Material Contracts |
| Schedule 4.14.2 | Default/Post-Petition Contracts |
| Schedule 4.15 | Environmental Matters |
| Schedule 4.16 | Insurance Policies |
| Schedule 9.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |

| | |
|---|---|
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |
| Schedule 9.9.1.B | Steering Excluded Products |
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| Schedule 9.12**(A)** | **Delphi** Letters of Credit |
| Schedule ~~9.20.1(i)~~**9.12(B)** | ~~Mexico LTA — Rio Bravo Electricos S.A. de C.V.~~**GM Buyer Assumed DIP Letters of Credit** |
| Schedule ~~9.20.1(ii)~~**9.12(C)** | ~~Mexico LTA — Alambrados y Circuitos Electricos, S.A. de C.V.~~**Company Buyer Assumed DIP Letters of Credit** |
| Schedule ~~9.20.3(iii)~~**9.12(D)** | ~~Mexico LTA — Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V.~~**Letters of Credit to be Allocated among Sellers and Buyers** |
| **Schedule 9.12(E)** | **Letters of Credit Retained by Delphi** |
| Schedule 9.20.2 | Post-Closing Mexico Utility Contracts |

## Exhibits

| | |
|---|---|
| 1.2 | Operating Agreement |
| 3.1.1.~~F~~**E** | Wind ~~Up~~**Down** Costs |
| **3** | **GM-PBGC Agreement** |
| 9.9.1 | GM IP License Agreement |
| 9.9.3 | Company IP License Agreement |
| 9.9.4 | Pending Transaction IP License Agreement |
| 9.22 | Novation Letter |
| **9.29.A** | **Form of Environmental Privilege Waivers** |
| ~~9.29~~**9.29.B** | Form of Privilege Waivers |
| ~~11.2.1.A~~ | ~~Somerton, Australia Transfer and Variation of Lease (Assignment and Assumption Agreement)~~ |
| ~~11.2.1.B~~ | ~~Paris Technical Center Sublease~~ |
| ~~11.2.1.C~~ | ~~Casa Grande Sublease~~ |
| 11.2.2.A.1 | U.S. Patent Assignment (Delphi Technologies) |
| 11.2.2.A.2 | EP Jointly Held Patent Applications Assignment (Delphi Technologies) |
| 11.2.2.A.3 | EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies) |
| 11.2.2.A.4 | DE Patents Assignment (Delphi France) |

| | |
|---|---|
| 11.2.2.A.5 | ES Patents Assignment (Delphi France) |
| 11.2.2.A.6 | FR Patents Assignment (Delphi France) |
| 11.2.2.A.7 | GB Patents Assignment (Delphi France) |
| 11.2.2.A.8 | IT Patents Assignment (Delphi France) |
| 11.2.2.A.9 | U.S. Patent Assignment (Delphi France) |
| 11.2.2.A.10 | AU Patent Assignment (Delphi Technologies) |
| 11.2.2.A.11 | BR Patent Assignment (Delphi Technologies) |
| 11.2.2.A.12 | CN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.13 | HK Patent Assignment (Delphi Technologies) |
| 11.2.2.A.14 | IN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.15 | JP Patent Assignment (Delphi Technologies) |
| 11.2.2.A.16 | KP Patent Assignment (Delphi Technologies) |
| 11.2.2.B | Omnibus Trademark Assignment (Delphi Technologies) |
| 11.2.2.C | Copyright Assignment (Delphi Technologies) |
| ~~11.2.3.A~~ | ~~France Asset Sale Agreement*~~ |
| ~~11.2.3.B~~ | ~~Australia Asset Sale Agreement*~~ |
| ~~11.2.3.C~~ | ~~India Asset Sale Agreement*~~ |
| ~~11.2.3.D~~ | ~~Germany Asset Sale Agreement*~~ |
| ~~11.2.3.E~~ | ~~Italy Asset Sale Agreement*~~ |
| ~~11.2.3.F~~ | ~~Korea Asset Sale Agreement*~~ |
| ~~11.2.3.G~~ | ~~Japan Asset Sale Agreement*~~ |
| ~~11.2.3.H~~ | ~~Netherlands Asset Sale Agreement~~ |
| 11.2.7 | ~~GM/Delphi Seller~~ Transition Services Agreement **between Delphi and GM Buyers** |
| 11.3.2 | ~~Buyers~~**Buyer** Transition Services Agreement |
| **11.3.3** | **Seller Transition Services Agreement between Delphi and Company Buyer** |

[Remainder of the page left intentionally blank.]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION


By: _____
          Name:
          Title:

GM COMPONENTS HOLDINGS, LLC


By: _____
    Name:
    Title:

GENERAL MOTORS ~~CORPORATION~~**COMPANY** (solely with respect to ARTICLE 6 and Sections ~~9.11.1,~~**3.1.1.C, 9.11,** 9.19, **9.37.1, 9.37.2, 9.43, 11.5.1.A** AND ~~9.38~~**12.2.6**)

By: _____
    Name:
    Title:

~~PARNASSUS HOLDINGS II, LLC~~

~~By: _____~~
~~Name:~~
~~Title:~~

**MOTORS LIQUIDATION COMPANY (fka GENERAL MOTORS CORPORATION) (solely with respect Sections 3.1.1.C 8.1, 9.19 and 11.5.1.A)**

By: _____
    Name:
    Title:

**DIP HOLDCO 3, LLC**


**By:** _____
        **Name:**
        **Title:**

## SCHEDULES

Schedule 1              Detail of Sellers and GM Buyers

Schedule 1.1.A          Assumed Administrative Liabilities

Schedule 1.1.B          GM Buyers' Knowledge, Company ~~Buyers'~~ **Buyer's** Knowledge and
                        Sellers' Knowledge

Schedule 1.1.C          Steering Products

Schedule 1.1.D          Excluded Insurance Policies

Schedule 1.1.D.1        Patents **and Patent Applications**

Schedule 1.1.D.2        Trademark Rights

Schedule 1.1.D.3        Copyrights

Schedule 1.1.E          Transferred Insurance Policies

Schedule 1.1. F         Filing Affiliates

Schedule 2              Detail of Sellers and Company Buyer

Schedule 2.1.5.F        Excluded Facilities

Schedule 2.1.5.J        Pending Transactions

Schedule 2.1.5.K        Other Excluded Assets

Schedule 2.3.1          Administrative Claims

Schedule 4.3.1          Sale Companies and JV Companies

Schedule 4.3.2          Capital Stock

Schedule 4.4            No Conflicts or Approvals

Schedule 4.5            Sufficiency of Acquired Assets

Schedule 4.6.2          Licenses to Affiliates

Schedule 4.6.3          Infringement and Allegations of Infringement of Third Party
                        Intellectual Property

Schedule 4.6.4          Infringement of the Purchased Intellectual Property

Schedule 4.6.5          Intellectual Property Notices

Schedule 4.8.1          GM Leased Real Property

Schedule 4.8.2          GM Owned Real Property

Schedule 4.9.1          Historical Financial Statements

Schedule 4.9.2          Financial Statement Exceptions

| | |
|---|---|
| Schedule 4.10 | Compliance with Laws |
| Schedule 4.12.1 | Tax Returns |
| Schedule 4.12.3 | Tax Deficiencies |
| Schedule 4.12.5 | Tax Liens |
| Schedule 4.12.6 | Tax Waivers or Extensions |
| Schedule 4.13.1 | Employee List |
| Schedule 4.13.2 | Employee Benefit Plans |
| Schedule 4.13.4 | ERISA Compliance |
| Schedule 4.13.5 | Proceedings Relating to Employee Benefit Plan |
| Schedule 4.13.6 | Employee Benefit Plan/No Material Liability or Encumbrance under Title IV of ERISA |
| Schedule 4.13.8 | Welfare Benefits |
| Schedule 4.13.9 | Contributions to Seller Employee Benefit Plan |
| Schedule 4.13.11 | Collective Bargaining Agreements |
| Schedule 4.13.12 | No Threatened Labor Stoppage |
| Schedule 4.14.1 | Material Contracts |
| Schedule 4.14.2 | Default/Post-Petition Contracts |
| Schedule 4.15 | Environmental Matters |
| Schedule 4.16 | Insurance Policies |
| Schedule 9.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 9.3 | Assumed and Assigned Contracts |
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |
| Schedule 9.9.1.B | Steering Excluded Products |
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| **Schedule 9.12(A)** | **Delphi** Letters of Credit |
| **Schedule 9.12(B)** | **GM Buyer Assumed DIP Letters of Credit** |
| **Schedule 9.12(C)** | **Company Buyer Assumed DIP Letters of Credit** |
| **Schedule 9.12(D)** | **Letters of Credit to be Allocated among Sellers and Buyers** |
| **Schedule 9.12(E)** | **Letters of Credit Retained by Delphi** |
| Schedule 9.13.1 | Competition Clearance/Governmental Approvals |

Schedule 9.17            Other Services
~~Schedule 9.20.1(i)      Mexico LTA – Rio Bravo Electricos S.A. de C.V.~~
~~Schedule 9.20.1(ii)     Mexico LTA – Alambrados y Circuitos Electricos, S.A. de C.V.~~
~~Schedule 9.20.1(iii)    México LTA – Delphi Ensamble de Cables y Componentes, S. de R.L. de CV.~~
Schedule 9.20.2          Post-Closing Mexico Utility Contracts
**Schedule 10.1.1**      **Plan of Modification Order Terms**
Schedule 10.1.2          Approvals under Competition or Investment Law
**Schedule 10.2.4**      **Seller U.S. CBAs**

**S-4**

## EXHIBITS

| | |
|---|---|
| Exhibit 1.2 | Operating Agreement |
| Exhibit 3.1.1.~~F~~E | Wind ~~Up~~Down Costs |
| ~~Exhibit 3~~ | ~~GM-PBGC Agreement~~ |
| ~~Exhibit 9.2~~ | ~~Form of 363 Implementation Agreement~~ |
| Exhibit 9.9.1 | GM IP License Agreement |
| Exhibit 9.9.3 | Company IP License ~~Agreements~~Agreement |
| Exhibit 9.9.4 | Pending Transactions IP License Agreement |
| Exhibit 9.22 | Novation Letter |
| Exhibit 9.29.A | Form of Environmental Privilege Waivers |
| Exhibit 9.29.B | Form of Privilege Waivers |
| ~~Exhibit 11.2.1.A~~ | ~~Somerton, Australia Assignment and Assumption Agreement~~ |
| ~~Exhibit 11.2.1.B~~ | ~~Paris Technical Center Sublease~~ |
| ~~Exhibit 11.2.1.C~~ | ~~Casa Grande Sublease~~ |
| Exhibit 11.2.2.A.1 | U.S. Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.2 | EP Jointly Held Patent Applications Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.3 | EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies) |
| Exhibit 11.2.2.A.4 | DE Patents Assignment (Delphi France) |
| Exhibit 11.2.2.A.5 | ES Patents Assignment (Delphi France) |
| Exhibit 11.2.2.A.6 | FR Patents Assignment (Delphi France) |
| Exhibit 11.2.2.A.7 | GB Patents Assignment (Delphi France) |
| Exhibit 11.2.2.A.8 | IT Patents Assignment (Delphi France) |
| Exhibit 11.2.2.A.9 | U.S. Patent Assignment (Delphi France) |
| Exhibit 11.2.2.A.10 | AU Patent Assignment (Delphi Technologies) |

**E-1**

| | |
|---|---|
| Exhibit 11.2.2.A.11 | BR Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.12 | CN Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.13 | HK Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.14 | IN Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.15 | JP Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.A.16 | KP Patent Assignment (Delphi Technologies) |
| Exhibit 11.2.2.B | Omnibus Trademark Assignment (Delphi Technologies) |
| Exhibit 11.2.2.C | Copyright Assignment (Delphi Technologies) |
| Exhibit 11.2.3.A | France Asset Sale Agreement |
| Exhibit 11.2.3.B | Australia Asset Sale Agreement |
| Exhibit 11.2.3.C | India Asset Sale Agreement |
| Exhibit 11.2.3.D | Germany Asset Sale Agreement |
| Exhibit 11.2.3.E | Italy Asset Sale Agreement |
| Exhibit 11.2.3.F | Korea Asset Sale Agreement |
| Exhibit 11.2.3.G | Japan Asset Sale Agreement |
| Exhibit 11.2.3.H | ~~Netherlands (Poland)~~ Share Transfer Agreement |
| Exhibit 11.2.4 | GM Bill of Sale |
| Exhibit 11.2.5 | GM Assignment and Assumption Agreement |
| Exhibit 11.2.7 | GM ~~and~~ /Delphi ~~Seller~~ Transition Services Agreement |
| Exhibit 11.3.2 | Buyer Transition Services Agreement |
| Exhibit 11.3.3 | Seller Transition Services Agreement |
| Exhibit 11.3.4 | Company Bills of Sale |
| Exhibit 11.3.5 | Company Assignment and Assumption Agreements |
| Exhibit 11.4.2 | ~~Form of Quit Claim~~ Quitclaim Deeds |

<u>DETROIT.3763067.18</u>

<u>E-2</u>

**E-3**