SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
        In re                                 :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY IN SUPPORT OF MODIFIED
PLAN AND MASTER DISPOSITION AGREEMENT

("MODIFIED PLAN AND MASTER DISPOSITION AGREEMENT REPLY")

## TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ...................................................................2

II.    MATERIALS SUBMITTED IN SUPPORT OF THE MODIFIED PLAN AND
       THE ALTERNATIVE SECTION 363 SALE ................................................3

III.   BACKGROUND ........................................................................................5

       A.    Events Leading To The Debtors' Acceptance Of The Pure Credit Bid ..................5

       B.    The Master Disposition Agreement ...................................................13

       C.    Structure And Distributions Under The Modified Plan..........................21

IV.    VOTING ON THE MODIFIED PLAN........................................................26

V.     THE MODIFICATIONS TO THE CONFIRMED PLAN COMPLY WITH
       SECTION 1127 OF THE BANKRUPTCY CODE........................................27

       A.    The Circumstances Warrant The Modifications To The Confirmed Plan
             (Section 1127(b)) ...................................................................28

       B.    The Modified Plan Complies With The Applicable Provisions Of Title 11
             (Section 1129(a)(1), As Incorporated By Section 1127(b))...................33

             1.    The Modified Plan Properly Designates Classes Of Claims And
                   Interests (Section 1122) ...................................................33

             2.    The Modified Plan Includes All Mandatory Items (Section 1123(a)) .......36

                   (a)    The Modified Plan Provides Adequate Means For
                          Implementation (Section 1123(a)(5)) ...........................37

                   (b)    The Modified Plan Prohibits The Issuance Of Non-Voting
                          Securities (Section 1123(a)(6))...................................40

                   (c)    The Modified Plan's Selection Of Officers And Directors
                          Is Consistent With The Interests Of Creditors, Equity
                          Security Holders, And Public Policy (Section 1123(a)(7)) ..........41

             3.    The Discretionary Contents Of The Modified Plan (Section
                   1123(b))...................................................................42

                   (a)    Overview Of Selected Discretionary Provisions ..........................42

i

(b)      The Delphi-PBGC Settlement Agreement ....................................42

C.    The Debtors Have Complied With The Applicable Provisions Of Title
      11 (Section 1129(a)(2), As Incorporated By Section 1127(b), And Section
      1125, As Incorporated By Section 1127(c)) ........................................................53

D.    The Debtors Proposed The Modified Plan In Good Faith (Section 1129(a)(3),
      As Incorporated By Section 1127(b)) ....................................................................56

E.    Payments Covered By Section 1129(a)(4) Have Been Approved Or Are
      Subject To Approval Of The Court (Section 1129(a)(4), As Incorporated
      By Section 1127(b)) ...............................................................................................58

F.    The Debtors' Disclosures Regarding Post-Confirmation Directors,
      Officers, And Insiders (Section 1129(a)(5), As Incorporated By Section
      1127(b)) ...................................................................................................................59

G.    The Modified Plan Does Not Provide For Any Rate Change Requiring
      Regulatory Approval (Section 1129(a)(6), As Incorporated By Section
      1127(b)) ...................................................................................................................61

H.    The Modified Plan Satisfies The Best Interests Test (Section 1127(a)(7),
      As Incorporated By Section 1127(b)) ....................................................................61

I.    Acceptance Of The Modified Plan By Impaired Classes (Section 1127(a)(8),
      As Incorporated By Section 1127(b)) ....................................................................65

J.    The Modified Plan Provides For The Payment Of Administrative And
      Priority Claims (Section 1129(a)(9), As Incorporated By Section 1127(b)) .........65

K.    Five Impaired Non-Insider Classes Accepted The Modified Plan
      (Section 1129(a)(10), As Incorporated By Section 1127(b)) ...............................67

L.    The Modified Plan Is Feasible (Section 1129(a)(11), As Incorporated
      By Section 1127(b)) ...............................................................................................68

M.    The Modified Plan Provides For The Payment Of Fees Payable Under
      28 U.S.C. § 1930 (Section 1129(a)(12), As Incorporated By Section
      1127(b)) ...................................................................................................................72

N.    The Modified Plan Provides For The Continuation Of Retiree Benefits
      (Section 1129(a)(13), As Incorporated By Section 1127(b)) ...............................73

O.    The Modified Plan Satisfies The Cramdown Requirements (Section
      1129(b), As Incorporated By Section 1127(b)) ....................................................74

        1.      The Modified Plan Does Not Unfairly Discriminate ................................74

        2.      The Modified Plan Is Fair And Equitable ...................................75

VI.     RESPONSES TO PRINCIPAL OBJECTIONS ...............................................78

        A.      The DIP Lenders ...........................................................78

        B.      The Creditors' Committee And WTC .........................................79

        C.      Labor Unions .............................................................79

                1.      The UAW .................................................................80

                2.      The IUE-CWA .............................................................82

                3.      The USW, The IUOE, The IBEW, And The IAM ...............................82

        D.      Workers' Compensation Agencies ...........................................84

                1.      The Bankruptcy Code's Priority System Preempts State
                        Workers' Compensation Laws .......................................85

                2.      Confirmation Of The Modified Plan Does Not Depend On Whether
                        The Debtors Or Buyers Qualify To Self-Insure Workers'
                        Compensation Obligations .........................................87

                3.      The Modified Plan Does Not Alter Workers' Ability To Seek
                        Workers' Compensation Payments ...................................88

                4.      28 U.S.C. § 959(b) Does Not Require The Debtors To Pay Prepetition
                        Workers' Compensation Claims In Full And In Cash .................88

                5.      Promissory Estoppel And Equitable Estoppel Do Not Apply ..........89

VII.    THE ALTERNATIVE SECTION 363 SALE SHOULD BE APPROVED
        UNDER SECTION 363 OF THE BANKRUPTCY CODE .............................91

VIII.   CONCLUSION ................................................................97

In accordance with paragraph 4 of the Modification Procedures Order,[1] as modified by paragraph 5 of the Third Supplemental Modification Procedures Order,[2] Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this omnibus reply in support of (i) the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified), the current version of which is attached hereto as Appendix D, (ii) the Pure Credit Bid, including the Master Disposition Agreement among Delphi Corporation, GM Components Holdings, LLC, General Motors Company, Motors Liquidation Company, DIP Holdco 3, LLC, and the other sellers and buyers party thereto, the current version of which was filed with the Court today, and (iii) in the alternative, and only in the event that the Court does not approve the Modified Plan, a sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code pursuant to the Master Disposition Agreement and related documents (the "Alternative Section 363 Sale").  The Debtors will submit a supplemental reply addressing objections, if any, to the conduct of the auction completed on July 27, 2009 and the Debtors' selection of the DIP Lenders as the successful bidder.  Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Modified Plan.

---

[1]    See Order (A)(I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To Confirmed First Amended Plan Of Reorganization And (B) Setting Administrative Expense Claims Bar Date And Alternative Transaction Hearing Date, dated June 16, 2009 (Docket No. 17032).

[2]    See Order Amending And Supplementing Modification Procedures Order (Docket No. 17032), Supplemental Modification Procedures Order (Docket No. 17376), And Second Supplemental Modification Procedures Order (Docket No. 18352), dated July 21, 2009 (Docket No. 18551).

1

I.    PRELIMINARY STATEMENT

Earlier this evening, after the conclusion of the auction held pursuant to this

Court's Supplemental Procedures,[3] Delphi's board of directors met to consider the results of the

auction and selected as the Successful Alternative Transaction the Pure Credit Bid (each as

defined in the Supplemental Procedures) submitted by the DIP Agent on behalf of the Required

DIP Lenders.  Under the Pure Credit Bid, an affiliate of certain DIP Lenders (as assignee of the

DIP Agent) will acquire substantially the same assets that were to be acquired by the Buyers

under the original GM-Platinum Master Disposition Agreement.  The DIP Lenders' affiliate will

then assign to GM Components Holdings, LLC those assets it would have acquired under the

GM-Platinum Master Disposition Agreement.

Delphi's acceptance of the Pure Credit Bid resolves a major obstacle to approval

of Delphi's Modified Plan, because the DIP Agent had previously delivered, on behalf of the

Required DIP Lenders, a notice of rejection and disapproval of the GM-Platinum Master

Disposition Agreement and a notice of intent to exercise remedies under the DIP Credit

Agreement.  The approval of the Pure Credit Bid by Delphi's board of directors is conditioned

upon the parties' agreement to an appropriate form of Modification Approval Order, among other

things.

The transactions contemplated in the Pure Credit Bid are largely consensual as

they reflect settlements among many of the Debtors' stakeholders – including the DIP Agent and

---

3    See Modification Procedures, Exhibit N (Supplemental Procedures For Evaluating Non-Solicited Alternative
     Transactions), as modified by Order Amending And Supplementing (i) Order (A)(I) Approving Modifications
     To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting
     Procedures And (II) Setting Final Hearing Date To Consider Modifications To Confirmed First Amended Plan
     Of Reorganization And (B) Setting Administrative Expenses Claims Bar Date And Alternative Transaction
     Hearing Date (Docket No. 17032) And (ii) The Protective Order Governing Production And Use Of
     Confidential And Highly Confidential Information In Connection With (A) Supplement To Plan Modification
     Approval Motion And (B) Supplement To GM Arrangement Fourth And Fifth Amendment Approval Motion
     (Docket No. 16920), dated June 29, 2009 (Docket No. 17376).

the DIP Lenders, the Creditors' Committee, GM, Platinum, the Pension Benefit Guaranty

Corporation, Wilmington Trust Company, as indenture trustee, and certain other governmental

agencies – and they also incorporate agreements that should resolve objections filed by

numerous terminated salaried employees concerning their separation-related benefits and certain

points raised in objections filed by the Debtors' labor unions.  Moreover, the Pure Credit Bid

addresses the transaction objectives the Debtors established in mid-May 2009 for a Delphi-

sponsored emergence transaction, and implements the transaction structure Delphi hoped to

achieve in negotiations with stakeholders beginning in the first quarter of 2009.

## II.    MATERIALS SUBMITTED IN SUPPORT OF THE MODIFIED PLAN AND THE ALTERNATIVE SECTION 363 SALE

In addition to submitting this omnibus reply, the Debtors are submitting or will

submit the following items, among others, in further support of the Modified Plan:

- Declarations

  - Randall S. Eisenberg of FTI Consulting, Inc., the Debtors' restructuring and financial advisors

  - Evan Gershbein of Kurtzman Carson Consultants LLC, the Debtors' solicitation agent and vote tabulation agent for all creditors except holders of public securities[4]

  - Robert S. Miller, Jr., Delphi's Executive Chairman

  - Craig G. Naylor, Delphi's Lead Independent Director

  - William R. Shaw of Rothschild, Inc., the Debtors' financial advisor and investment banker

  - John D. Sheehan, Delphi's Vice President and Chief Financial Officer

---

[4]    See Declaration Of Evan Gershbein Regarding Tabulation Of Ballots With Respect To Vote On First Amended Joint Plan Of Reorganization (As Modified) Of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates, dated July 20, 2009 (Docket No. 18462); Supplemental Declaration Of Evan Gershbein Regarding Tabulation Of Ballots With Respect To Vote On First Amended Joint Plan Of Reorganization (As Modified) Of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates, dated July 22, 2009 (Docket No. 18577).

- ○ Keith D. Stipp, Delphi's Executive Director in charge of restructuring

- ○ Jane Sullivan of Financial Balloting Group, LLC, the Debtors' solicitation agent and vote tabulation agent for the holders of public securities[5]

- Appendixes

  - ○ Appendix A – chart summarizing legal requirements for approval of Modified Plan under section 1127 of Bankruptcy Code and Debtors' compliance with those requirements

  - ○ Appendix B – chart summarizing objections and Debtors' resolution, response, or proposal, organized by nature of objection

  - ○ Appendix C – current version of Debtors' form of Order Approving Modifications Under 11 U.S.C. § 1127(b) To (I) First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified And (II) Confirmation Order (Docket No. 12359) (the "Modification Approval Order")

  - ○ Appendix D – blackline of current version of First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (the "Modified Plan") marked against First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) as filed on June 16, 2009 (the "June 2009 Modified Plan")

  - ○ Appendix E – current version of the Debtors' form of Order Under 11 U.S.C. §§ 363, 365, And 1146 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 (A) Authorizing And Approving (I) Sale Of Substantially All Of Debtors' Assets Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities (the "Section 363 Sale Approval Order")

- Hearing Exhibits

  - ○ the Debtors intend to introduce into evidence at the hearing a number of exhibits that have been or will be supplied to the Court

---

[5]    See Declaration Of Jane Sullivan Certifying Tabulation Of Ballots Regarding Vote On First Amended Joint Plan Of Reorganization (As Modified) Of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates, dated July 20, 2009 (Docket No. 18464).

4

III.    BACKGROUND

    A.    <u>Events Leading To The Debtors' Acceptance Of The Pure Credit Bid</u>

On January 25, 2008, the Court entered its Findings Of Fact, Conclusions Of Law, And Order Under U.S.C. §§ 1129(a) And (b) And Fed. R. Bankr. P. 3020 Confirming First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (Docket No. 12359) (the "Confirmation Order").  The Confirmation Order has not been revoked pursuant to section 1144 of the Bankruptcy Code, nor has it otherwise been amended, modified, or vacated.

A key component of the exit financing of the Confirmed Plan was the investment agreement (the "Investment Agreement") that the Debtors entered into with A-D Acquisition Holdings, LLC, an affiliate of Appaloosa Management L.P. ("Appaloosa"), Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC, Goldman, Sachs & Co., and Pardus DPH Holdings LLC (collectively, the "Plan Investors"). On the terms and subject to the conditions of the Investment Agreement, as amended, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock of reorganized Delphi.  In addition, the Investment Agreement, as amended, provided for a $1.575 billion discount rights offering that was made available to Delphi's unsecured creditors and holders of Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims.

In the months following the Court's entry of the Confirmation Order, the Debtors satisfied all of the conditions under the Investment Agreement and the Confirmed Plan, including conditions concerning $6.1 billion in exit financing and the rights offering.  By April 4, 2008, the Debtors were prepared to substantially consummate the Confirmed Plan and emerge from these Chapter 11 Cases.  On that date, the Debtors commenced but did not complete a closing at which

5

all of the required parties other than the Plan Investors stated that they were prepared to move forward. The Plan Investors did not, however, participate in the closing, and instead refused to comply with their funding obligations under the Investment Agreement.

The Debtors filed an action against the Plan Investors on May 16, 2008 seeking redress for their unjustified breach of the Investment Agreement and damages arising from the consequent delay of the Debtors' emergence from chapter 11. At the same time, in light of their inability to substantially consummate the Confirmed Plan without the Plan Investors' financial support, the Debtors began to work on alternative options that would allow them to achieve their transformation goals and emerge from these Chapter 11 Cases.

The Debtors received substantial support from GM as they worked toward achieving modifications to the Confirmed Plan. In April 2008, for example, the Court authorized the Debtors to enter into an arrangement under which GM and/or a GM affiliate agreed to advance to Delphi up to $650 million to address the Debtors' need for liquidity (the "GM Arrangement"). (See Docket No. 13489.) In September 2008, Delphi and GM reached agreement on an amended and restated Global Settlement Agreement (the "Amended GSA") and an amended and restated Master Restructuring Agreement (the "Amended MRA") under which GM agreed to contribute additional substantial value to the Debtors and eliminate significant elements of conditionality to the performance of its obligations. Delphi estimated the value of GM's net contributions to the Debtors under the Amended GSA and the Amended MRA to be approximately $10.6 billion, $4.6 billion more than GM's net contributions under the original Global Settlement Agreement and the original Master Restructuring Agreement included in the Confirmed Plan. The Court approved the Amended GSA and the Amended MRA on September 26, 2008 (see Docket No. 14287), and they became effective on September 29, 2008.

6

With the Amended GSA and the Amended MRA in place at the end of September 2008, the Debtors believed that they had developed modifications to the Confirmed Plan that would allow them to emerge from chapter 11.  The modifications included a reaffirmed business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity.  The Debtors filed their Plan Modification Approval Motion setting forth the proposed modifications on October 3, 2008. (See Docket No. 14310.)

After that filing, however, economic conditions severely worsened in the fourth quarter of 2008, including rapidly deteriorating conditions in the capital markets, the automotive industry, and the broader economy.  The Debtors eventually concluded that it would be impossible to move forward under the modifications they had proposed on October 3, 2008. Facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated and reached an agreement with the requisite DIP Lenders that allowed them to maintain access to certain proceeds of the DIP Facility through June 30, 2009 (the "Accommodation Agreement").  The Court approved the Accommodation Agreement in December 2008 (see Docket No. 14515), and it has approved several amendments since then to preserve the continuing availability of those proceeds, including most recently the sixteenth amendment to the Accommodation Agreement, which was approved on July 24, 2009 (see Docket No. 18633).

In addition, GM addressed the Debtors' severe liquidity crisis during this time period by making $600 million in additional liquidity available to the Debtors through amendments to the GM Arrangement and certain advances of trade payables.

7

In the early part of 2009, the Debtors engaged in discussions with GM concerning a potential transaction in which the Debtors would sell certain of their North American assets to GM.  The Debtors also contemplated that the amounts outstanding under Tranche C of the DIP Facility would be converted into equity rather than repaid in cash upon emergence.  In March 2009, the U.S. Treasury Department's Auto Task Force (the "Auto Task Force") became involved in these Chapter 11 Cases and notified GM and the Debtors that it would not permit GM to provide additional advances under amendments to the GM Arrangement or enter into an agreement related to GM's purchase of the Debtors' steering business until it had a further opportunity to review those transactions and various alternatives with respect to Delphi's emergence from chapter 11.

In early April 2009, the Auto Task Force informed Delphi of its preliminary view that it was not prepared to provide emergence funding for Delphi's exit from chapter 11.  Instead, the Auto Task Force was only willing to support GM in acquiring certain Delphi assets, including four sites and the global steering business, to provide supply protection for GM. Delphi reported that information to the DIP Steering Committee and, on the following day, the DIP Steering Committee informed Delphi that the DIP Lenders were not prepared to provide interim or emergence funding and that a self-financed liquidation was the only viable alternative from the DIP Lenders' perspective.

Following those discussions with the Auto Task Force and the DIP Steering Committee in early April 2009, Delphi reached out to Platinum and another potential investor because both of them had shown a consistent interest in entering into a transaction with Delphi. In mid-April 2009, GM, with the support of the Auto Task Force, agreed to support a comprehensive resolution of these Chapter 11 Cases.  This turn of events was a fundamental

change to the landscape of these cases, and it set the stage for the negotiations that eventually led

to the GM-Platinum Master Disposition Agreement and the Master Disposition Agreement based

on the DIP Lenders' Pure Credit Bid.

In the course of discussions with their major stakeholders, Delphi convened a

series of meetings at which it presented its transaction objectives and outlined the elements of a

Delphi-supported emergence transaction.  The objectives were to (i) maximize business

enterprise value and related recoveries for Delphi's stakeholders, (ii) maximize feasibility and

speed of execution, including through the provision of sufficient interim liquidity, (iii) protect

franchise value by ensuring continuity of supply for Delphi's customers, preserving Delphi's

supplier tiers, and preserving Delphi's human capital to the extent possible under the

circumstances, and (iv) provide the opportunity to consummate a modified plan of reorganization

in order to achieve a consensual resolution of these Chapter 11 Cases and achieve Delphi's

transformation objectives to the extent possible under the circumstances.  The Master

Disposition Agreement accomplishes each of these objectives.

In the second quarter of 2009, the Debtors, GM, with the support of the U.S.

Treasury Department, and Platinum Equity Capital Partners II, L.P. ("Platinum") reached

agreement on a Master Disposition Agreement providing for the sale of substantially all of the

Debtors' assets to an affiliate or affiliates of GM and Platinum (the "GM-Platinum Master

Disposition Agreement").  The GM-Platinum Master Disposition Agreement was the cornerstone

of the Debtors' Supplement To Plan Modification Motion filed with the Court on June 1, 2009.

(See Docket No. 16646.)  In that filing, the Debtors' sought the Court's approval of, among other

things, modifications to the Confirmed Plan that provided for distributions made possible by the

consideration received by the Debtors under the GM-Platinum Master Disposition Agreement

9

(the "June 2009 Modified Plan") or, in the alternative, a sale of the Debtors' assets outside the context of a plan of reorganization (the "June 2009 Alternative Section 363 Sale").

In the weeks following the Debtors' filing of the Supplement To Plan Modification Motion, certain DIP Lenders and others expressed concerns about the private nature of the process leading to the GM-Platinum Master Disposition Agreement.  The Court addressed those concerns on June 16, 2009, when it entered a Modification Procedures Order that included a comprehensive set of supplemental procedures for evaluating non-solicited alternative transactions (as supplemented and amended, the "Supplemental Procedures").  (See Docket No. 17032.)  The Modification Procedures Order was supplemented and amended in subsequent orders entered on June 29, July 17, and July 21, 2009.  (See Docket Nos. 17376, 18352, 18551.)  The Supplemental Procedures provided for, among other things, an auction open to Qualified Bidders (as defined therein) and DIP Lenders making a Pure Credit Bid (as defined therein).

Several potential bidders contacted the Debtors and/or their advisors to inquire about potential alternative transactions in June and July 2009, but only three became Qualified Bidders within the meaning of the Supplemental Procedures.  The due diligence provided to the Qualified Bidders and other potential bidders is described in depth in the declaration of John D. Sheehan on this topic.  None of the three Qualified Bidders submitted a bid before the July 10, 2009 deadline established under the Supplemental Procedures.

The DIP Agent did, however, notify Delphi of its intent to submit a Pure Credit Bid.  It also provided notice on July 14, 2009 that it rejected and disapproved of the GM-Platinum Master Disposition Agreement.  The DIP Lenders' unfavorable view of the transaction was an important consideration, given the DIP Lenders' colorable arguments that the Debtors

10

were barred from proceeding with either the June 2009 Modified Plan or the June 2009

Alternative Section 363 Sale without their consent.  (See Docket Nos. 18283, 18296, 18300.)

After the Debtors' filing of the June 2009 Modified Plan and the GM-Platinum

Master Disposition Agreement on June 1, 2009, Delphi engaged in extensive discussions with

GM, the Auto Task Force, Platinum, the DIP Lenders, and the Creditors' Committee (which had

also objected to the June 2009 Modified Plan and the June 2009 Alternative Section 363 Sale)

concerning potential transactions within the parameters of the Supplemental Procedures.  As the

discussions moved into July 2009, the auction that was originally scheduled for July 17, 2009

was adjourned a number of times to allow the parties to continue their constructive discussions

and work toward a consensual resolution.  (See Docket Nos. 18352, 18551.)

The Debtors commenced the auction on July 26, 2009 and held an additional

auction session today.  At the commencement of the auction, the DIP Agent, on behalf of the

DIP Lenders, submitted a Pure Credit Bid that was supported by at least a majority of the two

most senior tranches of the DIP Facility (the "Required DIP Lenders") and involved a credit bid

of 100% of the principal and interest due and owing in respect of the DIP Facility under the DIP

Credit Agreement (after giving effect to the application of any cash collateral to the DIP Facility).

The DIP Agent, on behalf of the DIP Lenders, submitted the Pure Credit Bid in accordance with

the Supplemental Procedures and section 363(k) of the Bankruptcy Code.  At the conclusion of

the auction, Delphi's board of directors (the "Board") considered the Pure Credit Bid, determined

that it is superior to the GM-Platinum Master Disposition Agreement, and approved the Pure

Credit Bid and related transactions, subject to the parties' reaching a final agreement as to the

terms and conditions of the Modification Approval Order and other items.

The Board considered quantitative and qualitative factors in comparing the GM-Platinum transaction with the Pure Credit Bid. With respect to quantitative factors, the Board evaluated the transactions within the parameters established in the Court's Supplemental Procedures and concluded that the amount of consideration provided under the GM-Platinum transaction was higher than the amount provided under the Pure Credit Bid (without taking into account qualitative factors outside those parameters).[6] As to qualitative factors, however, the Board determined that the Pure Credit Bid was the more attractive alternative. This determination was based in part on the speed and certainty of execution of the Pure Credit Bid, which is supported by the Required DIP Lenders, as compared with the risks associated with the GM-Platinum transaction, which, as the Required DIP Lenders stated in writing in mid-July 2009 and reaffirmed on the record at the auction, the Required DIP Lenders do not support. Without the Required DIP Lenders approval, the Debtors could not move forward with modifications to the Confirmed Plan. This would result in a number of negative consequences, including the elimination of the potential distributions to holders of General Unsecured Claims provided under the Modified Plan.

The Debtors filed the current version of the Master Disposition Agreement earlier today. The current version of the Debtors' proposed Modification Approval Order and a blackline of the current version of the Modified Plan marked against the June 2009 Modified Plan are attached to this Reply as Appendix C and Appendix D, respectively. The Debtors note that neither the Master Disposition Agreement, the Modification Approval Order, nor the Modified Plan have been finalized as of this filing, and they remain subject to further review and

---

[6]    Although the Board was not asked to consider the buyers' assumption of liabilities as part of the Pure Credit Bid, the provisions for assumption of liabilities are substantially similar under each transaction.

comment by the Debtors and the parties to the Master Disposition Agreement.  The Debtors

intend to present final versions of those documents and any related transaction documents at of

before the Final Modification Hearing scheduled for July 29, 2009.

B.    The Master Disposition Agreement

The following chart sets forth some of the principal differences between the GM-

Platinum Master Disposition Agreement and the current version of the Master Disposition

Agreement involving the DIP Lenders.[7]  Capitalized terms used but not defined in the chart have

the meanings set forth in the agreements.

| Topic | GM-Platinum Master Disposition Agreement | DIP Lenders' Pure Credit Bidt |
|---|---|---|
| **Form of Transaction** | GM Components Holdings, LLC ("GM Buyer") and Parnassus Holdings II, LLC ("Parnassus") would acquire substantially all of the assets and liabilities of Delphi as described below. | GM Buyer and DIP Holdco 3, LLC, a newly-formed entity by certain DIP Lenders ("DIP Lenders"), would similarly acquire substantially all of the assets and liabilities of Delphi through a credit bid, whereby the DIP Lenders (i) would be the assignee of the rights of the DIP Agent, as bidder in connection with the credit bid, to the Company's acquired assets for which the bid is made and (ii) assign their rights to the GM Acquired Assets to the GM Buyers, as described below: |
| **Securities and Assets to be Acquired** | • **GM Sale Securities & GM Acquired Assets -** GM Buyer would acquire all of the equity and assets primarily related to Delphi's Steering Business and certain UAW Sites, including certain of those facilities located in Grand Rapids, Michigan; Rochester, New York; Kokomo, Indiana; and Lockport, New York. (§2.1.3)<br><br>• **Company Sale Securities & Company Acquired Assets -** Parnassus would acquire all of the | Substantially similar to PE MDA.<br><br><br><br><br><br><br><br><br><br><br>• **Company Sale Securities & Company Acquired Assets -** DIP Lenders would acquire all of the Sellers' remaining business after the |

---

[7]    There are also differences related to post-closing governance and the allocation of distributions by the non-GM buyers that are not reflected in the chart.

| Topic | GM-Platinum Master Disposition Agreement | DIP Lenders' Pure Credit Bidt |
|-------|------------------------------------------|-------------------------------|
| | equity and assets primarily related to Delphi's business, other than the GM Business, specified excluded assets, and the business relating to certain pending transactions. (§2.1.4) | wind-down, up to a maximum of $500 million after GM has recovered all amounts advanced as wind-down costs. (§2.1.4.W) |
| | • **Excluded Assets** - Certain Delphi assets are specifically excluded from the assets to be acquired by the Buyers, including without limitation, third party assets, certain insurance policies, books and records required to be retained, all of the rights and claims of Delphi and its subsidiaries available under the Bankruptcy Code, personnel records, certain scheduled excluded facilities, tax refunds relating to the excluded assets, inventory disposed of prior to the Closing and in the Ordinary Course of Business, cash pledged for the benefit of Senior DIP Lenders, pending transactions, certain intercompany receivables and wage escrow accounts for certain excluded employees. (§2.1.5) | |
| | • **Proceeds from Brakes, Suspension and Exhaust Businesses** – GM Buyer to receive all proceeds received by any Seller in respect of the sale of the brakes and suspension and exhaust businesses. (§2.1.3(iii)) | • **Proceeds from Brakes, Suspension and Exhaust Businesses** - GM Buyer has clarified that it will acquire both pre- and post-Closing Net Proceeds (defined to exclude post-closing indemnity adjustments or payments received by Sellers for capital expenditures for respective buyers benefit) in respect of the brakes and suspension and exhaust businesses. (§2.1.3(iii)) |
| **Liabilities to be Assumed** | • **GM Assumed Liabilities** –<br><br>• Substantially all administrative liabilities relating to the GM Business, hedging agreements and certain specified prepetition liabilities.<br><br>• Prepetition liabilities are limited to cure amounts relating to assumed contracts and certain taxes to the extent not | Substantially similar to the GM-Platinum Master Disposition Agreement. |

| Topic | GM-Platinum Master Disposition Agreement | DIP Lenders' Pure Credit Bidt |
|---|---|---|
| | discharged pursuant to the Modified Plan, in each case relating to the GM Acquired Assets.  (§2.2.1) | |
| | • **Parnassus Assumed Liabilities** –<br><br>    • Substantially all administrative liabilities relating to the Company Business as well as specified director, officer, and employee related liabilities, which include assuming employment agreements or entering into new agreements (at Parnassus' discretion), obtaining insurance and undertaking other obligations under Delphi's policies that in the aggregate provide substantially similar economic benefits to Delphi's directors, officers and executives as currently in existence.<br><br>    • Prepetition liabilities are limited to cure amounts relating to assumed contracts and certain taxes to the extent not discharged pursuant to the Modified Plan, in each case relating to the Company Buyer Acquired Assets.  (§2.2.2)<br><br>• **Retained Liabilities-** Delphi would retain liability for all Excluded Assets and Excluded Facilities, certain Administrative Claims not assumed by Buyers, retained benefit plans, intercompany payables to Filing Affiliates and liabilities related to the DIP Agreement.  (§2.3) | |
| **Purchase Price** | The purchase price would be comprised of the following:<br><br>• **GM Purchase Price (§3.1)** –<br><br>    • The DIP Priority Payment Amount (i.e., the amount necessary to pay outstanding fees, expenses, accrued and unpaid interest, the outstanding | Substantially similar to the GM-Platinum Master Disposition Agreement: |

15

| Topic | GM-Platinum Master Disposition Agreement | DIP Lenders' Pure Credit Bidt |
|---|---|---|
| | principle amounts on Tranche A and B Loans and up to $350 million of Swap Exposure) to Delphi; | |
| | • $291,020,079 to Delphi; | |
| | • Certain post-Closing expenses of Delphi up to an aggregate of $50 million; | |
| | • A proportional post-closing payment to Delphi based on recoveries from the Appaloosa Claim as provided by the Plan of Reorganization; and | |
| | • Waiver of GM's prepetition claims and administrative clams in Bankruptcy Cases. | |
| | • **Parnassus Purchase Price (§3.2) –** | • **DIP Lender Purchase Price –** To the extent payable post-Closing, DIP Lenders will pay up to $300,000,000 to the unsecured creditors.  In addition, the Official Committee of Unsecured Creditors, pre-Closing, and DPH Holding Co., post-Closing, are express third party beneficiaries with respect to this payment to the unsecured creditors.  (§3.2) |
| | • One dollar; | |
| | • Issuance of Parnassus Class C Interest (i.e., membership interest in Parnassus in the nominal amount of $145.5 million having an annual cash dividend rat of 8%) to Delphi; and | |
| | • To the extent payable post-Closing, up to $180 million to the unsecured creditors. | |
| | • **Additional Consideration –** | |
| | • Buyers would each assume the Assumed Liabilities and Cure Amounts applicable to their respective Businesses for Acquired Contracts and pay 50% of professional fees (in an amount not to exceed $15,000,000 per Buyer, or $30,000,000 in total) that are Administrative Claims required to be paid by certain affiliates. (§3.1 and §3.2) | |
| | • GM Buyer will pay solicitation costs for approval of the Plan of | |

| Topic | GM-Platinum Master Disposition Agreement | DIP Lenders' Pure Credit Bidt |
|---|---|---|
| | Reorganization that are Administrative Claims (in an amount not to exceed $12,000,000). (§3.1) | |
| **Reps and Warranties** | • **Sellers Representations and Warranties** - Delphi, jointly, would provide representations relating to themselves and the applicable Sale Companies, which are generally standard for a transaction of this type. Significantly, all Seller's representations and warranties are qualified by Delphi's reports filed with the SEC and many contain materiality qualifiers or exceptions for matters that would not have a MAE on the businesses being sold. (Article 4)<br><br>• **Buyers Representations and Warranties** – Parnassus and GM also make standard representations and warranties.  The representations and warranties do not survive Closing and no party would have any liability to the other parties after the Closing for any breaches of the representations and warranties. (Articles 5-8) | Substantially similar to the GM-Platinum Master Disposition Agreement. |
| **Financing Arrangements** | The transaction will be consummated in connection with an equity commitment letter, stock purchase agreement, credit agreement and other related ancillary agreements, which establish the financing arrangements between GM and Parnassus for the purchase price.  Under the GM-Platinum Master Disposition Agreement Buyers are restricted from terminating or amending the financing arrangements that would materially adversely impact the ability of GM or Parnassus to consummate the transaction, without the consent of Delphi.  (§7.6) | Similar to the GM-Platinum Master Disposition Agreement, financing arrangements are contemplated under the GM-DIP Lenders Master Disposition Agreement, under which the DIP Lenders will enter a loan agreement, note agreement and investment agreement. Elliott Associates, L.P. (including its affiliates) and one or more investment funds managed by Silver Point Capital L.P. serve as the Commitment Parties in connection with such arrangements. Substantially similar representations for the financing arrangements are included in the GM-DIP Lenders Master Disposition Agreement.  (§7.6) |

| **Employee Matters** | | Substantially similar to the GM-Platinum Master Disposition Agreement except: |
|---|---|---|
| | • **Employees –** <br>  • At Closing, the applicable Buyer generally would assume the employment contracts for all Non-U.S. Employees, would employ all active and inactive U.S. Hourly Employees, may offer employment to the U.S. Salaried Employees on Buyer's terms, and would assume the applicable collective bargaining agreements.  (§9.5.1 and §9.5.2) <br>  • Buyers will assume the terms and conditions of the applicable U.S. CBAs in effect at the relevant businesses, except with respect to pre-Closing Liabilities under such CBAs.  (§ 9.5.3.A) <br><br> • **Pension Liabilities -** Pension liabilities would be transferred pursuant to certain transfer agreements for foreign Sellers, and the Buyers would continue to provide benefit plans to the extent required by law and would assume the sponsorship of certain contribution plans. (§9.5.4) <br><br> • **Severance -** Severance payments for U.S. employees terminated (i) after June 1, 2009 will cease at Closing and (ii) after Closing will be made pursuant to a formula set forth in the PE MDA. (§ 9.5.11) | • **Employees –** Buyers will assume the terms and conditions of the applicable U.S. CBAs in effect at the relevant businesses, except with respect to pre-Closing Liabilities under such CBAs.  (§ 9.5.3.A) <br><br><br><br><br> • **Severance -** <br>  • Company Buyer will offer employment to all U.S. Salaried Employees not offered employment by GM Buyer. Immediately after closing, Company Buyer may sever such Transferred U.S. Salaried Employees.  (§9.5.2) <br>  • U.S. Salaried Employees severed prior to June 1, 2009 would be offered a lump sum equal to 75% of their outstanding severance payable immediately before Closing.  Further, Company Buyer would be responsible for paying all |

| | | severance owed after Closing to Previously Severed Employees who do not accept the 75% payment (GM would pay Company Buyer $16,800,000 at Closing in consideration of such assumption of severance obligations by Company Buyer). (§9.5.11) |
|---|---|---|
| **Conditions** | **General -** The respective obligations of each party to effect the transactions would be subject to the satisfaction or waiver of Closing conditions, including an effective plan of reorganization, Bankruptcy Court and other governmental approvals and regulatory matters (including certain competition filings), as well as an amendment of the DIP Credit Agreement as necessary to permit the consummation of the transactions.  (§10.1) | Substantially similar to the GM-Platinum Master Disposition Agreement except: |
| | **Sellers Conditions** – The obligation of the Sellers to consummate the transactions contemplated by the GM-Platinum Master Disposition Agreement would be subject to the fulfillment at or prior to the Closing of certain conditions, which could be waived by the Sellers, including:<br><br>• the assumption by Buyers of applicable U.S. collective bargaining agreements and the receipt of certain related consents; and<br><br>• the satisfaction by Delphi that the hourly pension plans would not be an obligation of Delphi after the Closing. (§10.3 and §10.4) | **Sellers Conditions -** The condition relating to the Hourly Pension Plan has been deleted, in addition to other conditions that are no longer applicable given the nature of the DIP Lender transaction. |
| | **Buyers Conditions -** The obligation of each of the Buyers to consummate the transactions contemplated by the GM-Platinum Master Disposition Agreement would be subject to the satisfaction, or waiver by such Buyer, at or prior to the Closing, of certain conditions, including:<br><br>• the assumption of the relevant US CBAs (other than the assumption of pre-Closing Liabilities) and union | **Buyers Conditions** –<br><br>• The financing condition has been revised to allow the DIP Lenders and GM to avoid closing the transaction if the debt and equity financing is not obtained unless such failure is due to an actual or threatened breach by the DIP Lenders or the Commitment Parties or GM, respectively (§§10.3.5 and 10.4.6). |

|  |  |  |
|---|---|---|
|  | consent;<br><br>• Company Buyer's receipt of the requisite financing from each of PE and GM Buyer contemplated in financing agreements being entered into concurrently with the GM-Platinum Master Disposition Agreement; and<br><br>• the transfer of Environmental Permits. (§10.2) | • The following conditions were added:<br><br>  • all material environmental permits in the U.S. shall have been transferred to Company Buyer or reissued prior to Closing (or other satisfactory acknowledgement from a Governmental Authority regarding authority to continue operations post-Closing) and Sellers shall use commercially reasonable efforts with respect to same outside of the U.S. (§10.4.5); and<br><br>  • certain provisions of the Operating Agreement relating to, among other things, [consideration to the PBGC and] tax structure shall have been implemented. (§10.4.7) |
| **Closing** | Closing will occur on a month end. (§11.1.1) | GM Buyer has the ability to delay Closing by 15 days if it disputes the amount of the DIP Priority Payment delivered by the DIP Agent and, as a result, Closing may not occur on a month end. (§§11.1.1 and 9.44.3) |
| **Termination** | In addition to other termination provisions that have already lapsed, the GM-Platinum Master Disposition Agrement would be terminable prior to Closing as follows:<br><br>• upon mutual written consent of the Sellers and the Buyers;<br><br>• by any non-breaching party if the Closing has not occurred by September 30, 2009, subject to an automatic 60-day extension if all of the Closing conditions are met except for governmental approvals; and<br><br>• by GM or Parnassus if (i) the Modification Approval Order is not entered by July 30, 2009, or (ii) such Modification Approval Order has not become a Final Order within ten days of its entry. (§12.1) | Substantially similar to the GM-Platinum Master Disposition Agreement except:<br><br>• the "drop-dead" date was extended from September 30 to October 2, 2009 subject to a 15 day extension option by GM if a GM Buyer has disputed the amount of the DIP Priority Payment Amount (§12.1.1); and<br><br>• GM or Company Buyer may terminate if the Plan Modification Order is not entered on or prior to August 7, 2009. (§12.1.4) |

| Remedies | If a Termination Fee (as defined in the Securities Purchase Agreement) is payable under the Equity Commitment Letter or the Securities Purchase Agreement to GM, then GM would either fulfill Parnassus' obligations under the GM-Platinum Master Disposition Agreement or make a certain specified payment to Delphi.  (§13.2) | Delphi is not a third party beneficiary to the financing arrangements. |
|---|---|---|

C.    The Pure Credit Bid And The Modified Plan

Under the DIP Credit Agreement, in the event of a default by the Debtors, the Required DIP Lenders can instruct the DIP Agent to exercise remedies, which is binding upon all lenders to the DIP Facility.[8]  The "Pure Credit Bid" is a manifestation of this mechanism contained in the DIP Credit Agreement.  To implement the Pure Credit Bid, the Required DIP Lenders have instructed the DIP Agent (the "DIP Direction") to credit bid 100% of the principal and interest due and owing in respect of the DIP Loans under the DIP Credit Agreement (after giving effect to the application of any cash collateral to the DIP Loans), which amount shall be payable solely as an offset against the claims of the DIP Lenders in respect of the loans (including interest) under the DIP Credit Agreement and which is being paid in consideration for the Company Acquired Assets (subject to the Company Assumed Liabilities), Company Sales Securities, the GM Acquired Assets (subject to the GM Assumed Liabilities) and GM Sales Securities (the "Pure Credit Bid").

---

[8]    In negotiating the DIP Credit Agreement, the Debtors, the DIP Agent, and the DIP Lenders agreed to certain provisions that authorized the DIP Agent to act upon the instruction of the Required DIP Lenders, for the benefit of all the DIP Lenders.  This negotiated provision was consented to by all the DIP Lenders. Accordingly, individual lenders do not have the right to enforce remedies individually under the DIP Credit Agreement, and remedies can only be enforced through collective action.  Because the DIP Lenders have all consented to the intercreditor arrangement among themselves, either through direct consent or by purchasing a portion of the debt covered by the DIP Credit Agreement, all DIP Lenders are bound by the DIP Agent's exercise of remedies.  The Court generally endorsed the Debtors' collective action interpretation of the DIP Credit Agreement when it approved the Accommodation Agreement over the objection of certain DIP Lenders in December 2008.  (See Docket No. 14515.)

Moreover, pursuant to the DIP Direction and an assignment agreement the DIP Agent has assigned to DIP Holdco 3 (as defined below) the DIP Agent's right to receive, pursuant to the Pure Credit Bid, the Company Acquired Assets (subject to the Company Assumed Liabilities) and the Company Sales Securities pursuant and subject to the terms and conditions of this Master Disposition Agreement, the assignment agreement and the DIP Direction, and (b) assigned to GM Buyer the DIP Agent's right to receive, pursuant to the Credit Bid, the GM Acquired Assets (subject to the GM Assumed Liabilities) and the GM Sales Securities pursuant and subject to the terms and conditions of the Master Disposition Agreement, the DIP Assignment Agreement and the DIP Direction.  The consideration payable under the Master Disposition Agreement and to be received by the DIP Agent will be distributed to the DIP Lenders in accordance with the waterfall and interecreditors arrangements set forth in the DIP Credit Agreement and the Security Pledge Agreement.  The remaining obligations under the DIP Credit Agreement will be addressed in the Modification Approval Order.

At closing (i) Delphi and its affiliates will transfer the Company Acquired Assets and Company Sales Securities, and assign the Company Assumed Liabilities to DIP Holdco 3, LLC ("DIP Holdco 3"), a new entity formed on behalf of certain of the DIP Lenders and (ii) Delphi and its affiliates will transfer the GM Acquired Assets and GM Sales Securities and assign the GM Assumed Liabilities to GM Buyer.

The consideration provided by GM Buyer includes:

- The assumption of the GM Assumed Liabilities; The assumption or payment of the applicable Cure Amounts associated with the contracts and leases to be assigned to GM;

- The waiver by each of New GM and Old GM of its pre-petition Claims, Administrative Claims and future Claims in the Bankruptcy Cases including without limitation any such Claims pursuant to that certain Global Settlement

22

Agreement, as amended, effective as of September 29, 2008, and each of the GM-Delphi Liquidity Agreements;

- The payment to the DIP Agent of an amount approximately equal to $291 million plus "DIP Priority Payments,"[9] as defined in the Master Disposition Agreement.;

- The payment to Delphi of up to $50 million to cover certain expenses consistent with a wind down budget attached as an exhibit to the Master Disposition Agreement;

- Up to $15 million of professional fees (excluding the costs of solicitation of approval for the Modified Plan), plus the costs of solicitation of approval for the Modified Plan not to exceed $12 million; provided, that the sum of (x) the the foregoing fees, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148 million.

The consideration to be provided by DIP Holdco 3 includes:

- The assumption of the Company Assumed Liabilities;

- The assumption or payment of the applicable Cure Amounts associated with the contracts and leases to be assigned to DIP Holdco 3;

- The Credit Bid;

- Up to $15 million of of professional fees (excluding the costs of solicitation of approval for the Modified Plan); and

- Deferred cash consideration, to the extent payable following the effective date of the Modified Plan and pursuant to the DIP Holdco 3 operating agreement, to the holders of allowed general unsecured claims, in an amount not to exceed $300 million.

---

[9]    Under the Master Disposition Agreement, "DIP Priority Payment" means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the Closing Date, in dollars: (i) (x) all outstanding and unpaid fees and expenses then due (A) under Section 10.05 of the DIP Agreement with respect to the Backstop Parties, and/or (B) pursuant to any expense letters entered into between Delphi and any Backstop Parties copies of which have been delivered to GM (the portion of the DIP Priority Payment represented by this clause (B) shall be forwarded by the DIP Agent to the applicable parties); and (y) all other outstanding and unpaid fees and expenses then due under Section 10.05 of the DIP Agreement (ii) accrued and unpaid interest on account of Tranche A Loans (as defined in the DIP Agreement) outstanding as of the Closing Date, and on account of Tranche B Loans (as defined in the DIP Agreement) outstanding as of the Closing Date and any outstanding fees owing in respect of DIP Letters of Credit; (iii) the then outstanding principal amounts of the Tranche A Loans and Tranche B Loans; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Agreement) that is required, pursuant to the DIP Documents, to be applied to the obligations owing under Hedging Agreements.

Under the terms of the Amended GSA approved by the Court on September 25, 2008, GM holds an allowed administrative claim of $1.628 billion and an allowed general unsecured claim in the amount of $2.5 billion, each of which claims was to be satisfied with preferred stock if certain conditions were met. In addition, GM agreed to subordinate recoveries on its general unsecured claim until other holders of Allowed General Unsecured Claims had received a distribution equal to 20% of their Allowed General Unsecured Claims, if ever. Pursuant to the Master Disposition Agreement, GM has agreed to waive its administrative and prepetition claims. As part of its agreement with the Debtors, in connection with the Modified Plan, GM will receive releases from various parties, including holders of claims against the Debtors and holders of Existing Common Stock.

Pursuant to the Modified Plan, holders of prepetition secured claims may be paid in full in Cash but will be impaired because the payments will be made in equal installments over a period of seven years from the Effective Date rather in a lump sum on the Effective Date. To the extent a secured claim is entitled to postpetition interest under section 506 of the Bankruptcy Code, such interest will accrue at the rate equal to the closing seven-year Treasury Bill rate on the Effective Date of the Modified Plan, plus 200 basis points. Alternately, holders of secured claims, at the Debtors' election, may receive their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral was property of the estate. Finally, in certain circumstances, holders of secured claims may receive other treatment as agreed to by the parties if it is more favorable to the Debtors than the treatment described above.

As required by section 1129(a)(9) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code, priority tax claims will not be impaired but will also receive deferred cash payments over a period of six years. Certain states have filed claims in the

24

event that the Debtors do not make workers' compensation payments in those states in which the

Debtors are self-insured.  In the event that such obligations must be covered by the states, certain

states may have claims that could be entitled to priority treatment.  To the extent the claims are

administrative claims, they will be satisfied under the Master Disposition Agreement or by

Reorganized DPH Holdings.  Any prepetition claims will be satisfied through application of

existing letters of credit, treatment under one of the priority classes, or as general unsecured

claims.  To the extent no timely claim has been filed, such liabilities will be discharged.  To the

extent there are any priority claims other than priority tax claims, holders of any such allowed

claims will receive payment in full in cash, unless the holder agrees to alternate treatment.

In addition, pursuant to Delphi's settlement agreement with the PBGC (the

"Delphi-PBGC Settlement Agreement"), the PBGC will receive a $3 billion allowed general

unsecured nonpriority claim which will receive the same treatment given to holders of General

Unsecured Claims under the Modified Plan, as well as additional consideration from GM.  In

exchange, the Debtors will receive, among other things, a full release of all causes of action,

claims, and liens, the PBGC will assume liability related to the possible termination of the U.S.

salaried pension plan, the U.S. hourly pension plan, and the U.S. subsidiary pension plans, and

the PBGC will withdraw all notices of liens against Delphi's global non-U.S. affiliates.

As mentioned above, holders of unsubordinated Allowed General Unsecured

Claims (including the Allowed PBGC Claims) will receive their pro rata share of deferred

consideration in accordance with the Master Disposition Agreement.  Pursuant to Section 3.2.3

of the agreement, certain distributions will be made to holders of General Unsecured Claims if

the transfer of assets as contemplated in the Master Disposition Agreement is implemented

pursuant to the Debtors' Modified Plan.  The distributions to holders of General Unsecured

25

Claims will commence once an aggregate amount of $7.2 billion has been distributed to holders

of interests in DIP Holdco 3.  The operating agreement of DIP Holdco 3 governs the terms of

distributions made to holders of interests.  When the $7.2 billion distribution level is reached,

32.5% of the additional distributions will be made to holders of General Unsecured Claims.  The

maximum amount that will be distributed to the holders of General Unsecured Claims is $300

million.

Holders of TOPrS Claims will receive no distribution because of their

subordinated status.  Also, as discussed above, although GM received certain claims in

connection with the Amended GSA, those claims will be waived under the terms of the Master

Disposition Agreement and GM will receive no distribution on those claims pursuant to the

Modified Plan, and thus unsecured creditors will not receive any distributions on account of such

claims pursuant to section 4.04 of the Amended GSA.

Because of production declines in the automotive industry that have led to a

deterioration in the Debtors' enterprise value, the Modified Plan provides no distribution to

holders of Existing Common Stock or holders of Section 510(b) Note Claims, Section 510(b)

Equity Claims, or Section 510(b) ERISA Claims.

IV.    VOTING ON THE MODIFIED PLAN

The certified voting results with respect to the Modified Plan show that two

impaired classes and three impaired subclasses voted to accept the Modified Plan.  The two

impaired classes were Class C-2 and Class D, which include the PBGC Claims and the GM

Unsecured Claim, respectively.  (See Gershbein Decl. Ex. 2; Sullivan Decl. Ex. C.)  The three

impaired subclasses were within Class A-1, which includes separate subclasses of Secured

Claims other than the Contingent PBGC Claims.[10]  (See Gershbein Decl. Ex. 2; Sullivan Decl.

Ex. C.)  All other impaired classes and subclasses rejected the Modified Plan or were deemed to

reject the Modified Plan pursuant to section 1126 of the Bankruptcy Code and the terms of the

Modified Plan.  (See Gershbein Decl. Ex. 2; Sullivan Decl. Ex. C.)

V.      THE MODIFICATIONS TO THE CONFIRMED PLAN COMPLY WITH SECTION
        1127 OF THE BANKRUPTCY CODE

                A proposal to modify a confirmed plan of reorganization that has not been

substantially consummated is governed by section 1127 of the Bankruptcy Code.  See Fla. Dep't

of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2333 (2008) (explaining that "§ 1127

governs modifications to a Chapter 11 plan").[11]  Under section 1127(b), "[t]he proponent of a

plan or the reorganized debtor may modify such plan at any time after confirmation of such plan

and before substantial consummation of such plan, but may not modify such plan so that such

plan as modified fails to meet the requirements of sections 1122 and 1123 of this title."  11 U.S.C.

§ 1127(b).  Section 1127(b) further provides that "[s]uch plan as modified under this subsection

becomes the plan only if circumstances warrant such modification and the court, after notice and

a hearing, confirms such plan as modified, under section 1129 of this title."  Id.  In addition,

under section 1127(c), "[t]he proponent of a modification shall comply with section 1125 of this

title with respect to the plan as modified."  Id. § 1127(c).

---

[10]    The same creditor is the sole member of each of the accepting subclasses, and each of the creditor's claims is
        secured by property in the same county.

[11]    Under the Bankruptcy Code, "substantial consummation" means (i) "transfer of all or substantially all of the
        property proposed by the plan to be transferred," (ii) assumption by the debtor or by the successor to the debtor
        under the plan of the business or of the management of all or substantially all of the property dealt with by the
        plan," and (iii) "commencement of distribution under the plan."  11 U.S.C. § 1101(2).  It is undisputed that the
        Debtors have not satisfied these requirements with respect to the Confirmed Plan.

As summarized in Appendix A to this Reply and as explained more fully below, the Debtors' proposal to modify the Confirmed Plan complies with each of the requirements set forth in section 1127 of the Bankruptcy Code.

A.    The Circumstances Warrant The Modifications To The Confirmed Plan (Section 1127(b))

Although the Debtors met all of the conditions required to substantially consummate the Confirmed Plan, the Plan Investors refused to participate in the closing that was commenced but not completed on April 4, 2008 and refused to perform their obligations under the Investment Agreement, preventing the Debtors from moving forward under the Confirmed Plan.  Since the attempted closing, the Debtors have worked with their stakeholders to develop an alternative path to emergence from chapter 11.  That work has taken place in the context of challenging conditions in the capital markets, the automotive industry, and the broader economy that placed the Debtors under high pressure with respect to their short-term liquidity and made it impossible to provide the level of recoveries contemplated by the Confirmed Plan.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both Statutory Committees, to develop modifications to the Confirmed Plan that would allow Delphi to emerge from chapter 11 on a standalone basis, without the support of plan investors.  In September 2008, Delphi reached critical agreements with GM that resulted in an expected net contribution from GM in the approximate amount of $10.6 billion and provided a partial solution to certain of the Debtors' pension funding obligations.  During this same period, however, the U.S. economy continued to weaken and vehicle production forecasts were lowered for the periods covered by the Debtors' business plan, both by third-party forecasting services and by the original equipment manufacturers.

28

Following the effectiveness of the Amended GSA and the Amended MRA in September 2008, and having reaffirmed its business plan to contemplate the anticipated, reduced, automotive production volumes that resulted in reduced emergence funding needs, Delphi believed it had developed modifications to the Confirmed Plan which would allow the Debtors to emerge from chapter 11.  Thus, on October 3, 2008, the Debtors filed the Plan Modification Approval Motion.  That same day, the United States House of Representatives approved the TARP.  Three days later, on October 6, 2008, however, and for much of the rest of the month of October, the global credit markets seized up and the global capital markets experienced one of the five worst bear markets in their history.  On December 19, 2008, the White House announced that the federal government would lend $17.4 billion of the TARP funds to GM and Chrysler, portions of which GM and Chrysler received in December 2008 and the first half of 2009.

Despite the efforts of the federal government to provide stability to the capital markets and banks and to assist the financial viability of the domestic automotive industry, the markets remained extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors to successfully attract emergence capital funding for its modifications to the Confirmed Plan.  Moreover, in the fourth quarter of 2008 and the first quarter of 2009, forecasted and actual production volumes and sales at the U.S. original equipment manufacturers precipitously declined.  For example, the financial projections set forth in Delphi's business plan filed on October 3, 2008 were based on, among other factors, then-projected United States light vehicle sales of 14.2 million vehicles in 2009 and up to 16.3 million vehicles in 2011, with U.S. sales representing approximately 85% of North American sales.

Just three months later, on January 12, 2009, GM announced that its forecast for 2009 U.S. light vehicle sales would constitute only 10.3 million units, a staggering 3 million

fewer units than were sold in 2008 and 6 million fewer units than were sold in 2007.  A more

recent U.S. light vehicle sales forecast by third party forecasting service, IHS/Global Insight DRI,

has projected an even further reduced sales outlook of 9.6 million units for 2009, while

predicting that sales will rise to 15.6 million units by 2012.  Similarly, as of May 14, 2009, GM

projected that a downside of 9.3 million light vehicle units will be sold in the United States.

Other OEM projections are similarly reduced.  As shown on the chart below, the U.S.

automotive industry has experienced the most precipitous drop in U.S. vehicle sale volumes in

half a century.



As a result of the lack of available credit in the capital markets, the Debtors were

unable to secure necessary emergence capital and thus were not able to obtain approval of the

modifications to the Confirmed Plan.  As a result, the Debtors were forced to remain in chapter

30

11.    The collapse of the credit markets also made it difficult for the Debtors to refinance or

extend the maturity of their DIP Facility, which matured on December 31, 2008, on terms

reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, in December

2008, the Debtors and the DIP Lenders entered into the Accommodation Agreement to allow the

Debtors to continue using certain of the proceeds of the DIP Facility through June 30, 2009,

among other things.  In addition, and in connection with certain amendments to the

Accommodation Agreement with the DIP Lenders, GM agreed to provide the Debtors with

additional liquidity and to accelerate payment of certain GM receivables to allow the Debtors to

maintain ongoing operations in this challenging economic environment.

During this time, the U.S. government's well-publicized involvement with the U.S.

automotive industry and the U.S. Treasury's infusion of billions of dollars into the automotive

industry, including GM, added yet another key stakeholder to the negotiations with the Debtors

regarding their emergence plan.  Indeed, in March 2009, in connection with a proposed

amendment to the Accommodation Agreement, GM was to provide the Debtors with an

additional $150 million in liquidity under an amendment to the previously-approved liquidity

arrangement between Delphi and GM.  The U.S. Treasury, however, acting pursuant to its

authority under GM's loan agreement with the U.S. government, notified the Debtors and GM

that it did not approve of the parties' seeking approval of these amendments at that time and

requested additional time to consider these agreements and various alternatives with respect to

the Debtors' emergence from chapter 11.  Since that time, the Debtors and GM have been

working on and negotiating a global solution to allow the Debtors to emerge from chapter 11.

As part of that solution, the U.S. Treasury has now agreed to allow GM to provide up to an

additional $250 million to support Delphi as it seeks approval of its Modified Plan and emergence from chapter 11.

The formulation of the Modified Plan was the result of significant diligence on the part of the Debtors, their key stakeholders, and certain additional parties. These results have all been achieved during a tremendously difficult time in the automotive industry. Because of the debilitating conditions in the automotive industry, more than 75 companies directly related to the automotive industry have sought chapter 11 protection in 2009 including, among others, Fleetwood Enterprises, Hayes-Lemmerz Incorporated, Mark IV Industries, Inc., Metaldyne Corporation, Milacron, Inc., Monaco Coach Corporation, Noble International Ltd., Lear Corporation, and Visteon Corporation. Original equipment manufacturers are also struggling, as evidenced by the chapter 11 filing of Chrysler on April 20, 2009 and the chapter 11 filing by GM on June 1, 2009.

Against this backdrop, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, the Debtors have determined to implement their emergence from chapter 11 through the Master Disposition Agreement and the Modified Plan. Ultimately, the emergence structure is similar to that which was contemplated in the Confirmed Plan, but instead of plan investors emerging as the majority owner of the continuing business enterprise through sponsorship of the Confirmed Plan, Delphi has agreed to contemporaneously effectuate transactions through which DIP Holdco 3 will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that, together with Delphi's global steering business, are being acquired by GM Components.

In light of these circumstances, the modifications to the Confirmed Plan reflected in the Modified Plan are warranted under section 1127(b) of the Bankruptcy Code.

B.   The Modified Plan Complies With The Applicable Provisions Of Title 11 (Section 1129(a)(1), As Incorporated By Section 1127(b))

Section 1129(a)(1) requires that a plan comply with the "applicable provisions" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  "Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans," such as sections 1122 and 1123 of the Bankruptcy Code.  Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-49 (2d Cir. 1988); accord In re Dana Corp., No. 06-10354, 2007 WL 4589331, at *2 (Bankr. S.D.N.Y. 2007) (concluding that plan satisfied section 1129(a)(1) because the plan "compl[ied] with the requirements of sections 1122 and 1123 of the Bankruptcy Code").  Section 1127(b) of the Bankruptcy Code likewise provides that a plan as modified must "meet the requirements of sections 1122 and 1123 of this title."  11 U.S.C. § 1127(b).

1.   The Modified Plan Properly Designates Classes Of Claims And Interests (Section 1122)

Section 1122 of the Bankruptcy Code provides, in relevant part:

(a)   Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  "A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar."  In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); accord In re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (stating that "plan proponent has substantial flexibility" under section 1122(a)).  As explained by the Second Circuit, "classification is constrained by two straight-forward rules:

33

Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996); accord Quigley, 377 B.R. at 116 (same).

Under Article III of the Modified Plan, Claims against and Interests in each of the Debtors are divided into the following lettered Classes:

- Class A-1 consists of separate subclasses for all Secured Claims, other than the Contingent PBGC Secured Claims, against the applicable Debtor or consolidated group of Debtors

- Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors

- Class C-1 consists of all General Unsecured Claims, other than the PBGC General Unsecured Claims, against the applicable Debtor or consolidated group of Debtors

- Class C-2 consists of all PBGC Claims against the applicable Debtor or consolidated group of Debtors

- Class D consists of the GM Unsecured Claim against the applicable Debtor or consolidated group of Debtors

- Class E consists of all Section 510(b) Note Claims against Delphi

- Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors

- Class G-1 consists of all Existing Common Stock of Delphi

- Class G-2 consists of all Section 510(b) Equity Claims against Delphi

- Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors

- Class I consists of all Other Interests in Delphi

- Class J consists of all Interests in the Affiliate Debtors

- Class K consists of all Other Priority Claims

34

Under this classification scheme, no dissimilar Claims are classified together, and, to the extent similar Claims are classified separately, the Debtors have legitimate reasons for the separate classifications.  With respect to General Unsecured Claims and the PBGC General Unsecured Claim, those Claims are classified in separate Classes because of the unique nature of the PBGC General Unsecured Claim.  As described in greater detail in Part V.B.3(b), below, the Debtors are requesting that the Court grant the PBGC the Allowed PBGC General Unsecured Claim in the face amount of $3.0 billion pursuant to the Delphi-PBGC Settlement Agreement. That agreement resolves a host of unique issues between the Debtors and the PBGC, including, for example, issues related to the PBGC's liens and lien notices as to Delphi's non-Debtor affiliates and the Contingent PBGC Secured Claim, and the PBGC's assumption of liabilities related to the Debtors' defined benefit pension plans.  Furthermore, under the Delphi-PBGC Settlement Agreement, the PBGC will receive consideration from GM that will not be shared with the holders of General Unsecured Claims.

In light of the unique attributes of the PBGC General Unsecured Claim, the Debtors have legitimate reasons – none of which are related to voting considerations – for separating that Claim from other General Unsecured Claims.  See In re Kaiser Aluminum Corp., No. 02-10429, 2006 WL 616243, at *6 (Bankr. D. Del. Feb. 6, 2006) (endorsing separate classification of PBGC claims, in part because "the PBGC Claims are allowed against each of the Reorganizing Debtors and receiving the treatment negotiated in the PBGC Settlement Agreement").  Indeed, courts in this district and elsewhere have confirmed plans that segregate claims held by the PBGC from other general unsecured claims on a number of occasions.  See, e.g., In re Oneida Ltd., Case No. 06-10489 (Bankr. S.D.N.Y. July 10, 2006); Kaiser Aluminum, 2006 WL 616243, at *6; In re UAL Corp., Case No. 02-B-48191 (Bankr. N.D. Ill. Jan. 20, 2006);

35

In re US Airways, Inc., Case No. 04-13819 (Bankr. E.D. Va. Sept. 16, 2005); In re J.A. Jones,

Inc., Case No. 03-33532 (Bankr. W.D.N.C. Aug. 19, 2004); In re Nat'l Steel Corp., Case No. 02-

08699 (Bankr. N.D. Ill Oct. 23, 2003); In re US Airways, Inc., Case No. 02-83984 (Bankr. E.D.

Va. Mar. 18, 2003); In re Singer Co. N.V., Case Nos.: 99-10578 through 99-10607, 99-10613,

99-10616 through 99-10629 and 00-10423 (Bankr. S.D.N.Y Aug. 24, 2000).

Because there is a reasonable basis for the classifications established under

Article III of the Modified Plan and all Claims within each Class are substantially similar, the

Modified Plan complies with section 1122(a) of the Bankruptcy Code, as incorporated by section

1127(b) of the Bankruptcy Code.

2.    The Modified Plan Includes All Mandatory Items (Section 1123(a))

Section 1123(a) of the Bankruptcy Code identifies the items that must be included

in a plan.  11 U.S.C. § 1123(a); accord In re Adelphia Commc'ns Corp., 368 B.R. 140, 223

(Bankr. S.D.N.Y. 2007) (explaining that "section 1123(a) discusses what a plan must contain").

Under that section, the plan must:  (i) designate classes of claims and interests, (ii) specify any

unimpaired class of claims or interests, (iii) specify the treatment of any impaired class of claims

or interests, (iv) provide the same treatment for each claim or interest of a particular class (unless

the holder of a particular claim or interest agrees to less favorable treatment), (v) provide

adequate means for the plan's implementation, (vi) provide for the inclusion in the debtor's

charter a provision prohibiting the issuance of nonvoting equity securities and providing an

appropriate distribution of voting power among the classes of securities possessing voting power,

and (vii) contain only provisions that consistent with the interests of creditors, equity security

holders, and public policy with respect to the manner of selection of any officer, director, or

trustee under the plan and any successors thereto.  11 U.S.C. § 1123(a).

The Modified Plan contains each of these items.  Article III of the Modified Plan designates Classes of Claims and Interests, in accordance with section 1123(a)(1) of the Bankruptcy Code.  Article 4.1 of the Modified Plan specifies the Classes of Claims and Interests that are unimpaired, as required under section 1123(a)(2) of the Bankruptcy Code.  Article V of the Modified Plan specifies the treatment of the Classes of Claims and Interests that are impaired, in accordance with section 1123(a)(3) of the Bankruptcy Code.  As provided in Article V of the Modified Plan, and as required under section 1123(a)(4) of the Bankruptcy Code, each Claim or Interest of a particular Class will receive the same treatment, unless the holder of a particular Claim or Interest agrees to a less favorable treatment.

The Modified Plan also complies with sections 1123(a)(5), (6), and (7), as discussed below.

(a)    The Modified Plan Provides Adequate Means For Implementation (Section 1123(a)(5))

Section 1123(a)(5) of the Bankruptcy Code requires that the Modified Plan provide "adequate means" for its implementation.  11 U.S.C. § 1123(a)(5).  The adequate means for implementation of the Modified Plan are set forth in Article VII of the Modified Plan and described in the Supplemental Disclosure Statement.  Article VII of the Modified Plan includes provisions concerning:

- the continued corporate existence of the Debtors following their emergence from chapter 11 (see Modified Plan art. 7.1; Supplemental Disclosure Statement at S-58 to S-59);

- the substantive consolidation of certain of the Debtors' Estates for purposes of voting on the Modified Plan and making distributions to holders of Claims and

37

Interests under the Modified Plan (see Modified Plan art. 7.2; Supplemental Disclosure Statement at S-46 to S-48);[12]

- the effectuation of Restructuring Transactions involving the dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate directly owned by a Debtor merges with or transfers some or substantially all of its assets and liabilities to a Reorganized Debtor or its Affiliates on or following the Modification Approval Date (see Modified Plan art. 7.3; Supplemental Disclosure Statement at S-59);

- the Certificate of Incorporation and Bylaws of Reorganized DPH Holdings and the certification of incorporation, charter, bylaws, or applicable organizational documents of each Affiliate Debtor (see Modified Plan art. 7.4; Supplemental Disclosure Statement at S-59 to S-60);

- the officers and directors of Reorganized DPH Holdings and the Affiliate Debtors after the Effective Date (see Modified Plan art. 7.5; Supplemental Disclosure Statement at S-60);

- the consummation of the Disposition Transactions described in the Master Disposition Agreement on the Effective Date (see Modified Plan art. 7.6; Supplemental Disclosure Statement at S-60);

- approval of the Master Disposition Agreement and the transfer of certain assets, contracts, and liabilities to the GM Buyer and DIP Holdco 3 thereunder (see Modified Plan art. 7.7; Supplemental Disclosure Statement at S-60 to S-61);

- approval of the DIP Transfer and the transfer of collateral to the DIP Agent pursuant to the DIP Transfer (see Modified Plan art. 7.8; Supplemental Disclosure Statement at S-61 to S-62);

- the Post-Confirmation Reorganized DPH Holdings Share Trust, which will become the sole shareholder of Reorganized DPH Holdings on the Effective Date (see Modified Plan art. 7.9; Supplemental Disclosure Statement at S-62 to S-63);

- the Reorganized Debtors' receipt of the Emergence Capital sufficient to make payments as may be required on the Effective Date and conduct their post-reorganization operations (see Modified Plan art. 7.10; Supplemental Disclosure Statement at S-63);

---

[12] The Court approved the Debtors' request for substantive consolidation in connection with the Confirmed Plan (see Docket No. 12359 ¶ 41), and there are no new facts or circumstances that would warrant a different result here. Furthermore, in light of the distributions that will be provided to creditors under the Modified Plan, substantive consolidation will have a de minimis impact on creditors.

- the Management Compensation Plan (see Modified Plan art. 7.11; Supplemental Disclosure Statement at S-63);

- the procedures for asserting certain claims related to pension or other post-employment benefits arising out of the SERP and Prepetition Employee-Related Obligations (see Modified Plan art. 7.12; Supplemental Disclosure Statement at S-63 to S-64);

- the cancellation of certain securities and agreements on the Effective Date (see Modified Plan art. 7.13; Supplemental Disclosure Statement at S-64);

- the sources of cash for distributions under the Modified Plan, including the Emergence Capital, existing Cash balances, and the operations of the Debtors and the Reorganized Debtors (see Modified Plan art. 7.14; Supplemental Disclosure Statement at S-65);

- the establishment of a distribution account for the purpose of holding the proceeds of the General Unsecured MDA Distribution, if any, to be distributed to holders of General Unsecured Claims (see Modified Plan art. 7.15; Supplemental Disclosure Statement at S-65);

- the assumption and assignment of collective bargaining agreements with the UAW, the IUE-CWA, the USW, the IUOE, the IBEW, and the IAM (see Modified Plan art. 7.16; Supplemental Disclosure Statement at S-65 to S-66);

- the Delphi HRP, the Salaried and Other Pension Plans, and the Delphi-PBGC Settlement Agreement (see Modified Plan art. 7.17; Supplemental Disclosure Statement at S-66 to S-67);

- the Debtors' continuing obligations under the settlement reflected in the Court's Salaried OPEB Settlement Order[13] (see Modified Plan art. 7.18; Supplemental Disclosure Statement at S-67);

- the Reorganized Debtors' retention of the Retained Actions (see Modified Plan art. 7.19; Supplemental Disclosure Statement at S-67 to S-68);

- the Debtors' and the Reorganized Debtors' reservation of rights with respect to avoidance causes of action that will be abandoned pursuant to Article 7.19 of the Modified Plan (see Modified Plan art. 7.20; Supplemental Disclosure Statement at S-68);

- the Debtors' retention of the exclusive right to amend or modify the Modified Plan, and to solicit acceptances of any amendments to or modifications of the Modified

---

[13]  See Order Pursuant To 11 U.S.C. § 363 And Fed. R Bankr. P. 9019 For Order Approving Debtors' Compromise And Settlement With Committee Of Eligible Salaried Retirees And Delphi Salaried Retirees' Association, dated April 2, 2009 (Docket No. 16545).

Plan, through and until the Effective Date (<u>see</u> Modified Plan art. 7.21;
Supplemental Disclosure Statement at S-68);

- the dismissal of the complaints filed by the Creditors' Committee and the Senior
  Notes Indenture Trustee seeking the revocation of the Confirmation Order (<u>see</u>
  Modified Plan art. 7.22; Supplemental Disclosure Statement at S-68);

- the corporate action to be taken by the Debtors and the Reorganized Debtors
  under the Modified Plan (<u>see</u> Modified Plan art. 7.23; Supplemental Disclosure
  Statement at S-68);

- the authority of certain Delphi officers to take such action as may be necessary or
  appropriate to effective and further evidence the terms and conditions of the
  Modified Plan or to otherwise comply with applicable law (<u>see</u> Modified Plan art.
  7.24; Supplemental Disclosure Statement at S-69);

- the closing of the sale of assets subsequent to Effective Date free and clear of
  liens, Claims, and encumbrances pursuant to sections 363 and 1123 of the
  Bankruptcy Code (<u>see</u> Modified Plan art. 7.25; Supplemental Disclosure
  Statement at S-69); and

- an exemption from stamp taxes and any other similar tax or governmental
  assessment to the full extent contemplated by section 1146(c) of the Bankrutpcy
  Code (<u>see</u> Modified Plan art. 7.26; Supplemental Disclosure Statement at S-69).

Based on these provisions, the Modified Plan provides adequate means for its

implementation, as required under section 1123(a)(5) of the Bankruptcy Code.

    (b)    <u>The Modified Plan Prohibits The Issuance Of Non-Voting
Securities (Section 1123(a)(6))</u>

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate

constituent documents prohibit the issuance of nonvoting equity securities and provide for an

appropriate distribution of voting power among voting classes of securities.  11 U.S.C.

§ 1123(a)(6).  In accordance with this requirement, Article 7.4 of the Modified Plan provides:

The Certificate of Incorporation of Reorganized DPH Holdings . . . shall
be adopted and amended as may be required so that they are consistent with the
provisions of this Plan and otherwise comply with section 1123(a)(6) of the
Bankruptcy Code.  Each Affiliate Debtor shall amend its certification of
incorporation, charter, bylaws, or applicable organizational documents to
otherwise comply with section 1123(a)(6).

The form of Certificate of Incorporation attached to the Modified Plan as Exhibit 7.4(a) includes

a provision prohibiting the issuance of nonvoting equity securities, and allocates the voting

power among the classes of voting securities in an appropriate manner.  (Modified Plan Ex. 7.4(a)

art. 4; <u>see</u> <u>also</u> Sheehan Decl. ¶ 102.)  The Modified Plan therefore complies with section

1123(a)(6) of the Bankruptcy Code.

> (c)　　　<u>The Modified Plan's Selection Of Officers And Directors Is
> Consistent With The Interests Of Creditors, Equity Security
> Holders, And Public Policy (Section 1123(a)(7))</u>

Under section 1123(a)(7) of the Bankruptcy Code, a plan must "contain only

provisions that are consistent with the interests of creditors and equity security holders and with

public policy with respect to the manner of selection of any officer, director, or trustee under the

plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  The

Debtors stated in the July 2, 2009 Notice Of Filing Plan Exhibits[14] that they will announce the

names of the officers and directors of Reorganized DPH Holdings on the record at the Final

Modification Hearing.  (Docket No. 17557 ¶ 6.)  Furthermore, as provided in the form of Bylaws

of Reorganized DPH Holdings attached to the Modified Plan as Exhibit 7.4(b), directors of

Reorganized DPH Holdings will be elected by the stockholders of Reorganized DPH Holdings at

annual meetings (<u>see</u> Modified Plan Ex. 7.4(b) art. II, § 1, art. III, § 1), and the officers of

Reorganized DPH Holdings will be chosen by the board of directors (<u>id.</u> art. V, § 1).  As for the

Affiliate Debtors, the existing directors and officers shall continue to serve in their current

capacities after the Effective Date, as provided in Article 7.5 of the Modified Plan.  These

---

[14]　<u>See</u> July 2, 2009 Notice Of Filing Of Plan Exhibits With Respect To First Amended Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As
Modified), dated July 2, 2009 (Docket No. 17557).

selection procedures are consistent with the interests of creditors, equity security holders, and

public policy, as required by section 1123(a)(7) of the Bankruptcy Code.

    3.    <u>Discretionary Contents Of The Modified Plan (Section 1123(b))</u>

    Section 1123(b) of the Bankruptcy Code provides that a plan "may" include a

range of provisions in addition to the mandatory provisions required under section 1123(a) of the

Bankruptcy Code.  11 U.S.C. § 1123(b); <u>accord</u> <u>Adelphia</u>, 368 B.R. at 223 (explaining that

"section 1123(b) discusses what [a plan] <u>may</u> contain").

    (a)    <u>Overview Of Selected Discretionary Provisions</u>

    The Modified Plan contains a number of discretionary provisions, including,

without limitation, the following:

- Article IV of the Modified Plan impairs or leaves unimpaired certain classes of Claims and Interests, as permitted by section 1123(b)(1) of the Bankruptcy Code;

- Article VII of the Modified Plan address the assumption, rejection, and assignment of executory contracts, as contemplated by section 1123(b)(2) of the Bankruptcy Code;

- the Modified Plan provides for a settlement of the PBGC Claims in Article 7.17 (discussed in greater detail in Part V.B.3(b), below) and a number of releases in Article XI, in accordance with section 1123(b)(3)(A) of the Bankruptcy Code;

- under Article 7.19 of the Modified Plan, the Reorganized Debtors retain certain causes of action, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code;

- as contemplated by section 1123(b)(4) of the Bankruptcy Code, Article 7.7 of the Modified Plan provides for the sale of substantially all of the Debtors' assets pursuant to the Master Disposition Agreement; and

- Article V of the Modified Plan modifies the rights of holders of certain secured claims, as permitted by section 1123(b)(5) of the Bankruptcy Code.

    (b)    <u>The Delphi-PBGC Settlement Agreement</u>

    Article 7.17(c) of the Modified Plan provides that, "[p]ursuant to section

1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan constitutes the Debtors'

request to authorize and approve the Delphi-PBGC Settlement Agreement. Delphi and the

PBGC executed the Delphi-PBGC Settlement Agreement on July 21, 2009, and the Debtors filed

the Notice Of Filing Of Delphi-PBGC Settlement Agreement,[15] which included the Delphi-

PBGC Settlement Agreement, later that day. The Delphi-PBGC Settlement Agreement

addresses the PBGC's claims in this case, releases by the PBGC needed to effectuate the Master

Disposition Agreement, and the potential involuntary termination of the Delphi pension plans,

including the Delphi HRP.

Article 7.17(a) of the Modified Plan provides that on "the Effective Date, the

Delphi HRP shall no longer be the responsibility of the Debtors and will be addressed by GM."

This provision of the Modified Plan corresponds to Section 10.2.5 of the Master Disposition

Agreement, which provides that, as a closing condition, "The [Delphi]-PBGC Settlement

Agreements shall have gone effective and be in full force and effect." When negotiating the

Master Disposition Agreement, Delphi anticipated that GM would assume the Delphi HRP,

although it understood that GM was not expressly obligated to do so. Delphi recently learned

that GM will not assume the Delphi HRP. Thus, the likely way that Article 7.17(a) of the

Modified Plan will be satisfied is through an involuntary termination of the Delphi HRP pursuant

to the Delphi-PBGC Settlement Agreement.

Both Article 7.17(c) of the Modified Plan and section 6(a) of the Delphi-PBGC

Settlement Agreement provide that the Delphi-PBGC Settlement Agreement is subject to

approval by the Court. Section 3(b)(i) of the Delphi-PBGC Settlement Agreement also provides

that if the PBGC decides to proceed with an involuntary termination of the Delphi HRP, Delphi

will consent to a termination and trusteeship agreement pursuant to section 4042 of ERISA, 29

---

[15]    See Notice Of Filing Of Settlement Agreement Between Delphi Corporation And The Pension Benefit Guaranty
Corporation, dated July 21, 2009 (Docket No. 18559).

U.S.C. § 1342, only if the Court finds that doing so does not violate either the Labor MOUs[16] or

the Court's orders approving the Union 1113/1114 Settlement Approval Orders.[17]

As set forth below in Part VI.C, below, each of Delphi's principal U.S. unions has

filed objections to the Modified Plan implicating the Delphi-PBGC Settlement Agreement or has

reserved the right to object, on the basis that the Labor MOUs require Delphi to maintain the

Delphi HRP and that failure to do so constitutes a violation of section 1113(f) of the Bankruptcy

Code.[18]  Section 1113(f) provides that a debtor may not "unilaterally terminate or alter any

provisions of a collective bargaining agreement" except through compliance with the section

1113 process, and the unions argue that the Modified Plan cannot be confirmed because it does

not require Delphi to maintain the Delphi HRP.  (See, e.g., Docket No. 18258 ¶ 11.)  All of these

objections should be overruled, and the Delphi-PBGC Settlement Agreement should be approved,

for the reasons set forth below.

The question whether the Delphi HRP can, should, or will be terminated is not

before the Court.  Under section 4042 of ERISA, 29 U.S.C. § 1342, the PBGC has discretion to

commence an involuntary termination of a pension plan, which may be implemented by an order

---

[16]    As defined in the PBGC Settlement Agreement, the "Labor MOUs" collectively include the:  UAW-Delphi-GM Memorandum of Understanding, the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding, the USW-Vandalia Memorandum of Understanding, the IUOE Local 832S Memorandum of Understanding, the IUOE Local 18S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding, each as defined in the Modified Plan**.**

[17]    The "Union 1113/1114 Settlement Approval Orders" collectively include the Court's orders relating to the:  (a) UAW (Docket No. 8693), (b) IUE-CWA (Docket No. 9106), (c) IAM, the IBEW, and the IUOE (Docket No. 9107), and (d) USW (Docket No. 9169).

[18]    Delphi received objections or limited objections to the Modified Plan from the UAW, the IUE-CWA, the USW, the IUOE, the IAM, and the IBEW.  The USW, the IUOE, the IAM, and the IBEW, expressly object to the Modified Plan on section 1113(f) grounds.  The IUE-CWA made only a preliminary objection that the Modified Plan is not authorized by the Bankruptcy Code or in the best interests of the estates or creditors.  The UAW, on the other hand, was generally supportive of the Modified Plan and a settlement with the PBGC but reserved its rights to object based on the specific terms of any settlement agreement.

of a United States District Court or by agreement with the plan administrator.  See Ass'n of

Flight Attendants-CWA, AFL-CIO v. PBGC, No. Civ.A. 05-1036ESH, 2006 WL 89829, at *7

(D.D.C. Jan. 13, 2006).  During a chapter 11 case the PBGC may implement an involuntary

termination without approval of the Bankruptcy Court, see 29 U.S.C. § 1342(e) (PBGC may seek

termination in district court notwithstanding pending bankruptcy case), and without regard to

whether a collective bargaining agreement or section 1113(f) of the Bankruptcy Code would

otherwise require the employer to maintain the plan, see 29 U.S.C. § 1341(a)(3) (PBGC may

implement an involuntary termination under 29 U.S.C. § 1342 even though "termination would

violate the terms and conditions of an existing collective bargaining agreement").  If the PBGC

successfully implements an involuntary termination during a chapter 11 case, any requirement to

maintain the plan under any labor agreement has no further effect, and the bankruptcy court may

approve a plan of reorganization.  See In re UAL Corp., Docket No. 14829 (Bankr. N.D. Ill. Jan.

20, 2006) (approving debtors' plan of reorganization after involuntary termination of AFA

pension plan).

         The Court is also not being asked to decide – and, in fact, has no jurisdiction to

decide – the propriety of any involuntary termination under section 4024 of ERISA, 29 U.S.C.

§ 1342.  The unions have the right to intervene in any district court action filed by the PBGC to

terminate the HRP or to file an independent action under section 4003(f) of ERISA, 29 U.S.C.

§ 1303(f), challenging the PBGC's right to implement an involuntary termination.  See UAL, 428

F.3d at 684 ("It should also be noted that [the union] will have its day in court.  By enacting §

1303(f), Congress has provided an avenue for challenging PBGC action, and [the union] has

taken full advantage of that § 1303(f) opportunity through its lawsuit against the PBGC."); Jones

& Laughlin Hourly Pension Plan v. LTV Corp., 824 F.2d 197 (2d Cir. 1987) ("Any party aggrieved by an act of PBGC may bring suit against it [under section 1303(f)].").

        The issue before the Court is whether the Delphi-PBGC Settlement Agreement should be approved as a proper exercise of the Debtors' business judgment.  See In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006) (in determining whether to approve settlement, the court "need only canvass the issues to determine if the settlement falls below the lowest point in the range of reasonableness").  The Delphi-PBGC Settlement Agreement does not require the PBGC to terminate the Delphi HRP.  Rather, it simply requires the PBGC to follow its normal procedures for determining whether to implement an involuntary termination and resolves the claim and lien issues that would otherwise have to be litigated before the Court in a mutually satisfactory manner.

        With regard to the non-union pension plans, if the PBGC decides to implement an involuntary termination, Delphi is obligated to execute a termination and trusteeship agreement with the PBGC.  With regard to the Delphi HRP, however, Delphi has no such obligations unless the Court makes a specific finding that Delphi may execute a termination and trusteeship agreement without violating the Labor MOUs or the Union 1113/1114 Settlement Approval Orders.  (See Delphi-PBGC Settlement Agreement § 3(b)(i).)[19]  The union arguments, or potential arguments, that the Modified Plan and the Delphi-PBGC Settlement Agreement violate section 1113(f) are groundless because Delphi will take no action unless the Court first finds that such action is permissible, and the Delphi-PBGC Settlement Agreement does not permit the PBGC to take any action it could not otherwise take unilaterally as a matter of law.

---

[19]    This statement also generally applies to the Packard-Hughes Interconnect Bargaining Retirement Plan, which relates to the Local Agreement Between Delphi Connection Systems (formerly Packard-Hughes Interconnect) And Electronic And Space Technicians Local 1553.

These facts fall squarely within the holding of In re UAL Corp., 428 F.3d 677 (7th

Cir. 2005), in which the Seventh Circuit affirmed decisions of the bankruptcy court and the

district court approving a substantially similar settlement agreement between debtor United Air

Lines, Inc. ("United") and the PBGC over the objections of one of United's unions, the

Association of Flight Attendants ("AFA").  In that case, AFA argued that the settlement

agreement was a violation of section 1113(f), and therefore should not be approved, because

AFA's collective bargaining agreement with United required it to maintain a pension plan for

AFA-represented employees that under the settlement agreement would be subject to termination

by the PBGC.   All three courts that considered the case soundly rejected AFA's arguments

because the settlement agreement did not require termination of the pension plan.  Like the

Delphi-PBGC Settlement Agreement under consideration here, the United agreement provided

only that the PBGC would initiate its process for considering an involuntary termination and

resolved the claim and lien issues that an involuntary termination, if implemented, would present

in the bankruptcy case.  Because the PBGC has authority to implement an involuntary

termination notwithstanding any labor contract requirements, the courts reasoned, United's

agreement to terms that would apply in the event PBGC exercised its statutory authority did not

violate either the AFA labor agreement or section 1113(f) of the Bankruptcy Code.

The circumstances of this case present a much stronger basis for rejecting the

union's arguments than the UAL case for several reasons.  First, AFA did not challenge an

employer's right to consent to an involuntary termination initiated in good faith by the PBGC.

Rather, the premise of the AFA's argument in the UAL case was that United, to avoid a contested

motion to reject the pension plan under section 1113, improperly persuaded the PBGC to initiate

an involuntary termination through the promise of consideration much larger than what the

47

PBGC could have recovered pursuant to a litigated claim in the bankruptcy court.[20]  Here, on the

other hand, there is no such allegation.  The PBGC had begun consideration of an involuntary

termination of the Delphi HRP on its own initiative well before the parties began settlement

discussions, and Delphi and the PBGC began negotiations over a settlement agreement to

address the Delphi HRP only after GM recently informed the Debtors that it would not assume

the Delphi HRP and proposed to "address" the liability through an involuntary termination.

Under these circumstances, the only prudent course available to Debtors was to seek to fix the

liability arising from such a termination in a manner that would allow the Modified Plan to be

confirmed on schedule.  Moreover, the amount of the claim provided in the Delphi-PBGC

Settlement Agreement is less than half of the $7 billion that PBGC believed it could seek on a

litigated basis.  Thus, there is no basis here for an allegation of bad faith or misuse of the

involuntary termination process.

    Second, the settlement agreement at issue in the UAL case required United to

execute a termination and trusteeship agreement with the PBGC if it decided to initiate an

involuntary termination.  Here, on the other hand, Delphi took the position, out of an abundance

of caution, that it would only execute a termination and trusteeship agreement with regard to the

Delphi HRP if the Court made a prior finding that doing so did not violate its Labor MOUs or

the Union 1113/1114 Settlement Approval Orders.  If the Court were to decline to make such a

finding, and the PBGC decides to proceed with an involuntary termination, the PBGC will seek a

District Court order approving the termination pursuant to ERISA Section 4042.  That process,

---

[20] Following approval of the settlement agreement, the PBGC issued a notice of intent to seek an involuntary termination, and the AFA filed an action in the United State District Court for the District of Columbia pursuant to 29 U.S.C. § 1303(f) challenging the PBGC's decision on the basis that PBGC was influenced to seek an involuntary termination and that the requirements of ERISA Section 4202 were not satisfied.  The district court in that action found, as a factual matter, that PBGC was influenced but upheld the PBGC's actions on the basis that it would have reached the same conclusion even without such influence.  See Ass'n of Flight Attendants-CWA, AFL-CIO v. PBGC, 372 F. Supp. 2d 91 (D.D.C. 2005).

however, would take significantly longer than a consent termination, potentially delaying the Debtors' ability to emerge from bankruptcy and the risks inherent therein.

Third, the courts in the UAL case concluded that an involuntary termination by the PBGC did not violate the AFA collective bargaining agreement even though the agreement, by its terms, unconditionally required United to maintain the AFA pension plan. Because the PBGC has authority under Section 4042 to involuntarily terminate a plan regardless of restrictions under the employer's collective bargaining agreements, the courts reasoned, an involuntary termination cannot be construed as a violation of the labor agreements. In the present case, on the other hand, the Labor MOUs contain express provisions governing the potential termination of the Delphi HRP. While the logic of the UAL decisions is clearly sufficient to conclude that an involuntary termination by the PBGC does not violate a collective bargaining agreement, the fact that Delphi's unions negotiated specific provisions governing the possibility of a plan termination make it even more clear that Delphi's consent to an involuntary termination cannot be construed as a violation of the Labor MOUs or the Union 1113/1114 Settlement Approval Orders.[21, 22]

---

[21]    There is one union-negotiated pension plan that was not subject to prior section 1113 negotiations. The Debtors ask that Delphi Connection Systems (formerly Packard-Hughes Interconnect) be allowed to consent to an involuntary termination under the rationale set forth in UAL.

[22]    See Section F.2.b. of the UAW-Delphi-GM Memorandum of Understanding; Attachment B, Section 11 of the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding and the USW-Vandalia Memorandum of Understanding; Section D.2.b. of the IUOE Local 832S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding; Section C.1.b. of the IUOE Local 18S Memorandum of Understanding; Attachment C, Section 3.c. of the UAW-Delphi-GM Memorandum of Understanding, the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding, the IUOE Local 832S Memorandum of Understanding, the IUOE Local 18S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding; Section C.8.b. of the USW-Vandalia Memorandum of Understanding.

49

As the Court is aware, portions of Labor MOUs were negotiated following an extended hearing under sections 1113 and 1114 of the Bankruptcy Code. The collective bargaining modifications set forth in the Labor MOUs reflected the Debtors' best judgment under the circumstances at that time that the modifications would be sufficient to allow the Debtors successfully to reorganize but the parties recognized that circumstances could change and additional modifications could be necessary.[23] Accordingly, all of the Labor MOUs, as well as the Court orders approving them, expressly provide that the Labor MOUs did not constitute an assumption of the collective bargaining agreements and that the parties retained all rights in connection with these Chapter 11 Cases.[24]

The Court's orders approving the Labor MOUs also expressly provide that the Court would retain jurisdiction "to hear and determine all matters arising from the implementation and performance of this Order and the [MOUs]."[25] The fact that the Labor MOUs could be modified by later actions in the Chapter 11 Cases is, by itself, significant. If, as the unions would presumably concede, the Debtors retained the right to seek rejection of the labor agreements under a section 1113 motion and a distress termination of the Delphi HRP, there is no legal or logical basis for concluding that Delphi would be prohibited from consenting to an involuntary termination initiated by the PBGC.

A distress termination under Section 4041 of ERISA, 29 U.S.C. § 1341, and an involuntary termination under Section 4042, 29 U.S.C. § 1342, are simply two alternative

---

[23]    See, e.g., MOU approval motions relating to the (a) UAW (Docket No. 8445), (b) IUE-CWA (Docket No. 8907), (c) IAM, the IBEW, and the IUOE (Docket No. 8906), and (d) USW (Docket No. 9119).

[24]    See, e.g., MOU approval orders: (a) decretal paragraph 10 of UAW order (Docket No. 8693), (b) decretal paragraph 12 of IUE-CWA order (Docket No. 9106), (c) decretal paragraph 16 of IAM, the IBEW, and the IUOE order (Docket No. 9107), and (d) decretal paragraph 11 of USW order (Docket No. 9169).

[25]    See, e.g., MOU approval orders: (a) decretal paragraph 12 of UAW order (Docket No. 8693), (b) decretal paragraph 13 of IUE-CWA order (Docket No. 9106), (c) decretal paragraph 18 of IAM, the IBEW, and the IUOE order (Docket No. 9107), and (d) decretal paragraph 12 of USW order (Docket No. 9169).

procedures for reaching the same result – one that must be initiated by the employer and one that must be initiated by the PBGC. The proposition that Delphi can initiate termination of the Delphi HRP itself, but cannot consent to an involuntary termination initiated by the PBGC, is utterly illogical, and has no basis in the Labor MOUs. Forcing Delphi to incur the time and expense to contest an involuntary termination – especially where, as here, the ultimate outcome is a foregone conclusion – would put form over substance, and is inconsistent with the basic policies of the Bankruptcy Code. If the unions believe there are legitimate grounds to challenge the PBGC's actions, they have the right to initiate a challenge under section 4003(f) of ERISA, 29 U.S.C. § 1303(f).

The specific provisions of the Labor MOUs, moreover, establish Delphi's right to terminate the Delphi HRP even more clearly. For the three unions covered by a GM Benefit Guarantee – the UAW, IUE-CWA, and USW – the MOUs contemplate that if the Delphi HRP is terminated, then the applicable Benefit Guarantee will become effective.[26] By virtue of these Benefit Guarantee extensions, each of these unions sought and obtained a specific right or benefit that did not otherwise exist in the event the Delphi HRP was terminated. Having obtained these rights, the unions cannot claim that their Labor MOUs prohibit termination of the Delphi HRP.

The IAM, IBEW, and IUOE MOUs contain an explicit reservation of rights to terminate the Delphi HRP. Each of those MOUs indicates that the union "agrees that Delphi reserves its right to seek termination of the Delphi HRP consistent with applicable law."[27]

---

[26]    See Section F.2.b. of the UAW-Delphi-GM Memorandum of Understanding; Attachment B, Section 11 of the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding; and the USW-Vandalia Memorandum of Understanding.

[27]    See Section D.2.b. of the IUOE Local 832S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain

*(cont'd)*

Finally, Attachment C of each Labor MOU (except for IUOE Local 101S, which did not have an Attachment C) specifically indicates that the agreement was without prejudice to Delphi "in any pension termination proceeding under ERISA and/or the Bankruptcy Code."[28]An involuntary termination by the PBGC pursuant to the Delphi-PBGC Settlement Agreement certainly falls within this definition.  There can be no unilateral modification of a collective bargaining agreement under section 1113(f) of the Bankruptcy Code when the agreement specifically provides that the actions complained of may be taken.  See, e.g., Bowen Enters., Inc. v. United Food & Commercial Workers Int'l Union, Local 23, AFL-CIO-CLC, 196 B.R. 734, 745 (Bankr. W.D. Penn. 1996) (union claim of unilateral modification for failure to make payments was "groundless" when employer was not obligated to make payments).

The USW, the IUOE, the IBEW, and the IAM argue that termination of the HRP would also violate Implementation Agreements executed following the Labor MOUs.  The Implementation Agreements, however, simply accelerated the existing rights and obligations under the MOUs.  Section 7 of those agreements provides that "[o]ther than as adjusted, conformed, or modified by this Implementation Agreement, or as required to carry out this Implementation Agreement, the other terms and conditions of" the MOUs with the USW, the

_____

*(cont'd from previous page)*
    Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding, and see Section C.1.b. of the IUOE Local 18S Memorandum of Understanding (this MOU contains a typo leaving out "HRP" in an otherwise identical iteration of this sentence).

[28]    See Attachment C, Section 3.c. of the UAW-Delphi-GM Memorandum of Understanding, the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding, the IUOE Local 832S Memorandum of Understanding, the IUOE Local 18S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding, see Section C.8.b. of the USW-Vandalia Memorandum of Understanding,.  The IUOE Local 101S Memorandum of Understanding did not contain an Attachment C, relating to an attrition program, because there were no active bargaining members at that union site.

IUOE, the IBEW, and the IAM remain unchanged.  Thus, the Implementation Agreements did not alter Delphi's rights with respect to termination of the Delphi HRP.

For the foregoing reasons, the Court should approve the Delphi-PBGC Settlement Agreement, overrule the union objections to the Modified Plan under section 1113(f) of the Bankruptcy Code, and make an express finding that Delphi may consent to a termination and trusteeship agreement with the PBGC without violating the Labor MOUs or the Union 1113/1114 Settlement Approval Orders or section 1113 of the Bankruptcy Code.

C.    The Debtors Have Complied With The Applicable Provisions Of Title 11 (Section 1129(a)(2), As Incorporated By Section 1127(b), And Section 1125, As Incorporated By Section 1127(c))

Pursuant to section 1129(a)(2) of the Bankruptcy Code, the proponent of a plan must comply with the applicable provisions of title 11 of the United States Code.  11 U.S.C. § 1129(a)(2).  "The legislative history to § 1129(a)(2) explains that this provision embodies the disclosure and solicitation requirements under §§ 1125 and 1126."  Drexel Burnham Lambert, 138 B.R. at 759; accord In re Texaco Inc., 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("The principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan.").  "Thus, the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with Code §§ 1125 and 1126."  In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); accord Texaco, 84 B.R. at 907 (quoting Toy & Sports Warehouse).  Along the same lines, section 1127(c) of the Bankruptcy Code provides that "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."  11 U.S.C. § 1127(c).

In these Chapter 11 Cases, the Court approved the Debtors' Supplemental Disclosure Statement in the Modification Procedures Order entered on June 16, 2009.  (See

53

Docket No. 17032.)  In that order, the Court determined that the Supplemental Disclosure

Statement complied with sections 1125 and 1127(b) of the Bankruptcy Code and the Federal

Rules of Bankruptcy Procedure, and it approved certain procedures with respect to solicitation,

notice, and voting concerning the Modified Plan.  (See id.)

The Debtors complied in all respects with the solicitation and voting procedures

set forth in the Modification Procedures Order.  With respect to solicitation and notice, the

Debtors' compliance is evidenced by (i) the Affidavit Of Service, dated June 23, 2009 (Docket

No. 17267), executed by Evan Gershbein of Kurtzman Carson Consultants LLC, (ii) the

Affidavit Of Service Of Financial Balloting Group LLC Of Solicitation Packages On Holders Of

Public Securities, dated June 23, 2009 (Docket No. 17268), (iii) the Affidavit Of Service Of

Financial Balloting Group LLC Of Master Ballots On Voting Nominees, dated June 29, 2009

(Docket No. 17390), and (iv) the various affidavits filed by the publications identified in the

Modification Procedures Order.[29]

With respect to voting, the Debtors' compliance is demonstrated by (i) the

Declaration Of Evan Gershbein Regarding Tabulation Of Ballots With Respect To Vote On First

Amended Joint Plan Of Reorganization (As Modified) Of Delphi Corporation And Certain Of Its

Subsidiaries And Affiliates, dated July 20, 2009 (Docket No. 18462), (ii) the Declaration Of Jane

Sullivan Certifying Tabulation Of Ballots Regarding Vote On First Amended Joint Plan Of

Reorganization (As Modified) Of Delphi Corporation And Certain Of Its Subsidiaries And

Affiliates, dated July 20, 2009 (Docket No. 18464), and (iii) the Supplemental Declaration Of

Evan Gershbein Regarding Tabulation Of Ballots With Respect To Vote On First Amended Joint

---

[29]   See Docket Nos. 17407 (Wall Street Journal (National and Global)), 17408 (USA Today (National)), 17409
(USA Today (International)), 17410 (New York Times), 17411 (Detroit News and Free Press), 17412 (Wall
Street Journal (National and Global)), 17413 (New York Times), 17414 (USA Today (International)), 17415
(USA Today (National)), 17617 (Detroit News and Free Press).

Plan Of Reorganization (As Modified) Of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates, dated July 22, 2009 (Docket No. 18577).

As set forth above, the Debtors have complied with the applicable provisions of title 11 of the United States Code, including sections 1125, 1126, and 1127(c) of the Bankruptcy Code, and they have therefore satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.  The Debtors have proposed changes to the Modified Plan since the Supplemental Disclosure Statement was distributed and voting on the Modified Plan was completed, but they submit that no further disclosure, solicitation, or voting is required given that the changes are immaterial and do not adversely alter the treatment of the Claim of any creditor or the Interest of any equity security holder under the Modified Plan.  See Dana, 2007 WL 4589331, at *2 ("The Modifications do not materially and adversely affect or change the treatment of any Claim against or Interest in any Debtor.  Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan as Filed with the Court."); In re Calpine Corp., No. 05-60200, 2007 WL 4565223, at *6 (Bankr. S.D.N.Y. Dec. 19, 2007) ("Except as provided for by law, contract, or prior order of the Bankruptcy Court, none of the modifications made since the commencement of solicitation adversely affects the treatment of any Holder of a Claim or Interest under the Plan . . . .  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code, none of the modifications require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code.").

D.    The Debtors Proposed The Modified Plan In Good Faith (Section 1129(a)(3), As Incorporated By Section 1127(b))

Section 1129(a)(3) of the Bankruptcy Code is satisfied when "[t]he plan has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "[A] plan will be found in good faith if it 'was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected.'"  Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.), 528 F.3d 162, 174 (2d Cir. 2008) (quoting Koebl v. Glessing (In re Koebl), 751 F.2d 137, 139 (2d Cir. 1984)).  In considering this requirement, courts look to "the totality of the circumstances surrounding confirmation."  In re Oneida Ltd., 351 B.R. 79, 85 (Bankr. S.D.N.Y. 2006) (internal quotation marks omitted); accord In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (same).

The Modified Plan in these Chapter 11 Cases is the result of complex and extensive arms'-length discussions among Delphi and its various stakeholder groups, including the Creditors' Committee, the Equity Committee (before it was disbanded), GM, the DIP Lenders, Platinum and other potential bidders, the Auto Task Force, and the PBGC.  The Debtors have proposed the Modified Plan in the exercise of their fiduciary duties to maximize the value of their Estates for the benefit of all stakeholders, and they believe that the Modified Plan accomplishes that objective.

Some parties-in-interest have suggested that the Debtors should have shut down GM's operations in an effort to maximize their negotiating leverage and potentially obtain a more favorable transaction.  In taking that position, the parties-in-interest fail to appreciate the high level of risk associated with that approach, and they likewise assume without an adequate foundation that shutting down GM would have led to a better outcome than the discussions that resulted in the Master Disposition Agreement and the Modified Plan.  With demand in the

56

automotive industry down and the federal government and its resources standing behind GM, it

is far from certain whether a Delphi-initiated shutdown would have caused GM to make a better

offer, as opposed to, for example, taking an extended shutdown and using the downtime to

engage in widespread re-sourcing.  The Debtors are aware that GM depends on Delphi as its sole

supplier for a number of parts, and they have evaluated and considered their full range of

strategic options with respect to GM at various points throughout these Chapter 11 Cases.  In

deciding to negotiate and enter into the Master Disposition Agreement, the Debtors made the

business judgment that, on balance, that course of action would maximize the value of their

estates for the benefit of all of their stakeholders.  Although some parties-in-interest might

disagree with that business judgment, they cannot establish that it was unsound or unreasonable

for the Debtors to move forward in that manner.

In addition, some parties-in-interest have asserted that the terms of the Modified

Plan were dictated by GM and the Auto Task Force and rubber-stamped by Delphi.  That is not

the case.  To the contrary, during the negotiations, Delphi's management and the Board

developed guiding principles for a Debtor-sponsored emergence transaction that included:

(i) maximizing business enterprise value and related recoveries for Delphi's stakeholders, (ii)

maximizing feasibility and speed of execution (including provision of sufficient interim

liquidity), (iii) protecting franchise value by ensuring continuity of supply for Delphi's customers,

preserving Delphi's supplier tiers, and preserving Delphi's human capital, and (iv) providing the

opportunity to consummate a modified plan of reorganization in order to achieve a

comprehensive resolution of Delphi's chapter 11 cases and achieve Delphi's transformation

objectives.  Delphi's management and the Board would not have supported a proposal from GM,

the Auto Task Force, or anyone else that did not address these principles.  Through the Modified

Plan, the Debtors will achieve each of their transaction objectives in the most favorable manner possible in light of difficult circumstances.

Because the Debtors have proposed the Modified Plan with honesty and good intentions and with a basis for expecting that a reorganization can be effected, the Modified Plan complies with section 1129(a)(3) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

E.    Payments Covered By Section 1129(a)(4) Have Been Approved By Or Are Subject To Approval Of The Court (Section 1129(a)(4), As Incorporated By Section 1127(b))

To satisfy section 1129(a)(4) of the Bankruptcy Code, a debtor must show that:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  With respect to past payments covered by this section, the Debtors have made all such payments pursuant to the Court's orders, including the Interim Compensation Order,[30] as supplemented by subsequent orders, and paragraph 33 of the Confirmation Order. (See Sheehan Decl. ¶ 121.)  As for future payments covered by this section, all such payments are subject to the Court's approval as provided in Article X and the Article XIII of the Modified Plan and the Court's prior orders.  (See id.)  The Debtors have therefore complied with section 1129(a)(4) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

In addition to the payments described above, Platinum or its affiliate will receive $30.5 million in cash from DIP Holdco 3 and GM or its affiliate pursuant to an agreement

---

[30]    See Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, dated November 4, 2005 (Docket No. 869).

reached in connection with the auction.  The Debtors requests that this payment be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.

F.    The Debtors' Disclosures Regarding Post-Confirmation Directors, Officers, And Insiders (Section 1129(a)(5), As Incorporated By Section 1127(b))

To satisfy Section 1129(a)(5) of the Bankruptcy Code, the proponent of a plan must (i) disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan" and (ii) "the appointment to, or continuance in, such office of such individual, [must be] consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. § 1129(a)(5)(A).  In addition, the proponent of the plan must disclose "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."  Id. § 1129(a)(5)(B).

Article 7.5 of the Modified Plan provides that the Debtors will file a notice listing the directors and officers of Reorganized DPH Holding, and that, absent the filing of a notice on or before the Final Modification Hearing stating otherwise, the existing directors and officers of the Affiliate Debtors will continue to serve in their current capacities.  In the July 2, 2009 Notice Of Filing Plan Exhibits the Debtors gave further notice that they will announce the names of the directors and officers of Reorganized DPH Holdings on the record at the Final Modification Hearing.  (Docket No. 17557 ¶ 6; see also Sheehan Decl. ¶ 103.)  The July 2, 2009 Notice Of Filing Plan Exhibits also included Exhibit 7.11 to the Modified Plan, which describes, among other things, the Management Compensation Plan with respect to the directors and officers of the Reorganized DPH Holdings.  (Id. Ex. 7.11.)

In sum, as to disclosure, the Debtors have disclosed the information covered by section 1129(a)(5) of the Bankruptcy Code to the extent such information is known.  See In re Bally Total Fitness of Greater N.Y., Inc., No. 07-12395, 2007 WL 2779438, at *6 (Bankr. S.D.N.Y. Sept. 17, 2007) (concluding that debtor complied with section 1129(a)(5) by disclosing required information "to the extent such information [was] available"); In re Parkway Hosp., Inc., No. 05-14876, 2007 WL 2230916, at *3 (Bankr. S.D.N.Y. July 31, 2007) (concluding that debtor complied with section 1129(a)(5) by disclosing required information "to the extent known"). And they will disclose the remaining information covered by that section no later than the Final Modification Hearing.  See In re Armstrong World Indus., Inc., 348 B.R. 136, 166 (D. Del. 2006) (concluding that debtor satisfied section 1129(a)(5), in part through information provided at confirmation hearing); In re J T Thorpe Co., 308 B.R. 782, 787 (Bankr. S.D.N.Y. 2003) (same).

With respect to the interests of creditors, equity security holders, and public policy, the continued service of the existing directors and officers of the Affiliate Debtors pursuant to Article 7.5 of the Modified Plan is consistent with those interests because those directors and officers are experienced and competent, and there is no evidence that would support their disqualification from continued service.  See Leslie Fay, 207 B.R. at 787 (concluding that continuing service of debtor's current management was proper given absence of "sufficient evidence to demonstrate current management's alleged wrongdoing"); Toy & Sports Warehouse, 37 B.R. at 149-50 (permitting continuing service of debtors' current management when "[t]here [was] no evidence that the continued service of the debtors' current management [was] inconsistent with the interests of creditors, equity security holders or public policy").

For these reasons, the Debtors have complied with section 1129(a)(5) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

60

G.    The Modified Plan Does Not Provide For Any Rate Change Requiring Regulatory
Approval (Section 1129(a)(6), As Incorporated By Section 1127(b))

The requirement set forth in section 1129(a)(6) of the Bankruptcy Code is

satisfied when "[a]ny governmental regulatory commission with jurisdiction, after confirmation

of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or

such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  The

Modified Plan does not provide for any rate change over which any regulatory commission has

or will have jurisdiction.  (See Sheehan Decl. ¶ 122.)  As such, the Modified Plan satisfies

section 1129(a)(6) of the Bankruptcy Code, as incorporated by section 1127(b) of the

Bankruptcy Code.  See In re Lionel L.L.C., No. 04-17324, 2008 WL 905928, at *6-7 (Bankr.

S.D.N.Y. Mar. 31, 2008) (determining that debtors satisfied section 1126(a)(6) when plan did not

provide for rate changes requiring regulatory approval); Dana, 2007 WL 4589331, at *8 (same).

H.    The Modified Plan Satisfies The Best Interests Test (Section 1129(a)(7), As
Incorporated By Section 1127(b))

Section 1129(a)(7) of the Bankruptcy Code sets forth the best interests test, under

which "each holder of an impaired claim or interest [must] either accept the plan or receive under

the plan not less than it would receive in a Chapter 7 liquidation." ReGen Capital I, Inc. v.

Halperin (In re Wireless Data, Inc.), 547 F.3d 484, 495 (2d Cir. 2008); accord Telecom

Argentina, 528 F.3d at 173 ("Section 1129(a)(7), commonly known as the 'best interest of

creditors' requirement, establishes that a creditor must receive no less in a reorganization than it

would in liquidation.").  The Modified Plan satisfies the best interests test, as demonstrated by

the liquidation analysis attached to the Supplemental Disclosure Statement as Exhibit C (the

"Liquidation Analysis") and summarized below.

The Debtors' updated Liquidation Analysis reflects the Debtors' progress in

transforming its business operations since the Debtors filed the First Amended Disclosure

Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Disclosure Statement") in December 2007, which also included a liquidation analysis (the "December 2007 Liquidation Analysis"), as well as changes in the macroeconomic environment and automotive industry.  The December 2007 Liquidation Analysis was prepared assuming a December 31, 2007 liquidation date and was based on unaudited book values as of March 31, 2007.  The updated Liquidation Analysis assumes a liquidation date of June 30, 2009 and is based on unaudited book values as of December 31, 2008, with the exception of cash and working capital balances which have been estimated as of June 30, 2009.

Since December 2007, numerous events occurred that have impacted the Liquidation Analysis, including but not limited to following:  (i) the continued wind-down of the AHG Division, (ii) the Debtors' divestitures of Catalyst, Interiors and Closures, North American Brake Product Assets, Brake Product Lines, Bearings Business Products, and Global Suspension Assets, (iii) the effectiveness of the Amended GSA and the Amended MRA, (iv) the repatriation of dividends to DASHI under the DASHI Intercompany Transfer Order and subsequent loan of such monies to Delphi Automotive Systems LLC, (v) Corporate Restructuring Transactions involving DASHI and certain of its non-Debtor subsidiaries, (vi) refinements to the claim estimates, and, most significantly, (vii) the unprecedented decline of the global automotive market.

Many factors have contributed to a degradation of the net proceeds available for distribution in a hypothetical liquidation scenario.  The decline in net proceeds available for distribution between the December 2007 Liquidation Analysis and the updated Liquidation Analysis primarily attributable to a decline in estimated recoveries associated with the Debtors'

investment in foreign subsidiaries, as well as other net reductions to recoverable assets, offset by

a decrease in projected wind-down costs, professional fees, and trustee fees.  The following chart

summarizes the changes in estimated net proceeds available for distribution under the December

2007 Liquidation Analysis and the updated Liquidation Analysis.

| ($ Billions) | Low Scenario | High Scenario |
|---|---|---|
| Net Proceeds Available for Distribution (Confirmed Plan) | 7.5 | 10.4 |
| Change in Recovery Values: | | |
| Reduction in Net Proceeds Related to Investment in Foreign Subsidiaries | (4.5) | (5.8) |
| Other Net Reductions Including Cash Operating Losses | (3.7) | (4.0) |
| Sub-Total | (8.2) | (9.8) |
| Reduction in Wind-Down Costs and Professional and Trustee Fees | 1.7 | 1.2 |
| Total Change | (6.6) | (8.6) |
| Net Proceeds Available for Distribution (Modified Plan) | 0.9 | 1.8 |

The Debtors believe that any liquidation analysis is speculative.  Notwithstanding

the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that,

taking into account the liquidation analysis and the valuation analysis of the Reorganized

Debtors, the members of each Impaired Class will receive at least as much under the Modified

Plan as they would in a liquidation in a hypothetical chapter 7 case.  Holders of Claims will

receive a better recovery through the distributions contemplated by the Modified Plan because it

is unlikely that any holders of Claims would receive any distribution under a hypothetical

chapter 7 case due to the liquidation value of the Debtors' assets and the size of the DIP Lenders'

Claims.

The following chart summarizes the range of creditor recoveries under the

Debtors' updated Liquidation Analysis consistent with substantive consolidation as provided in

the Modified Plan as well as the substantive consolidation of all Debtors.  Under either scenario,

the general unsecured creditors receive no recovery.  The chart below also sets forth the

hypothetical recoveries under the December 2007 Liquidation Analysis.

63

| ($Millions)<br>Debtor(s) | Net Proceeds Available For Distribution — Lower $ | Higher $ | All Secured Recovery[1] — Lower % | Higher % | DIP[2] Recovery — Lower % | Higher % | Setoff and Other Secured Recovery[1] — Lower % | Higher % | Post IC Recovery[1] — Lower % | Higher % | Admin & Priority Recovery[1] — Lower % | Higher % | General Unsecured, and PBGC Recovery — Lower % | Higher % | GM GUC, TOP/S, and Equity Recovery — Lower $ | Higher $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Substantive Consolidation Under The Plan** | | | | | | | | | | | | | | | | |
| **Delphi-DAS Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,781 | 5,338 | 76% | | 100% | 100% | | | 0% | 30% | 0% | 30% | 0% | 0% | - | - |
| Modified Plan | 837 | 1,294 | 18% | 33% | 24% | 49% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (2,944) | (4,044) | -58% | -67% | -76% | -51% | 0% | -100% | 0% | -30% | 0% | -30% | 0% | 0% | - | - |
| **DASHI Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,564 | 5,036 | 100% | | NA | NA | NA | NA | 100% | 100% | 100% | 100% | 55% | 83% | - | - |
| Modified Plan | 1 | 397 | 1% | 44% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (3,563) | (4,639) | -99% | NA | -76% | NA | NA | NA | -100% | -100% | -100% | -100% | -55% | -83% | - | - |
| **Delphi Medical Systems Colorado Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 15 | 20 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 9 | 22 | 15% | 33% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (6) | 2 | -85% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Medical Systems Texas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 4 | 6 | 100% | NA | 100% | NA | NA | NA | 0% | 78% | 0% | 78% | 0% | 0% | - | - |
| Modified Plan | - | 0 | 0% | 0% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (4) | (6) | -100% | NA | -76% | NA | NA | NA | 0% | -78% | 0% | -78% | 0% | 0% | - | - |
| **Delphi Medical Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 0 | 5 | 100% | NA | 100% | NA | NA | NA | 0% | 19% | 0% | 19% | 0% | 0% | - | - |
| Modified Plan | 0 | 0 | 0% | 0% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (0) | (5) | -100% | NA | -76% | NA | NA | NA | 0% | -19% | 0% | -19% | 0% | 0% | - | - |
| **Connection Systems Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 14 | 18 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 5 | 12 | 11% | 25% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (9) | (7) | -89% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Diesel Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 105 | 137 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 1% | - | - |
| Modified Plan | 10 | 28 | 9% | 23% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (95) | (109) | -91% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | -1% | - | - |
| **Delphi Mechatronic Systems, Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 22 | 29 | 100% | NA | 100% | NA | NA | NA | 0% | 42% | 0% | 42% | 0% | 0% | - | - |
| Modified Plan | 3 | 9 | 2% | 5% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (18) | (20) | -98% | NA | -76% | NA | NA | NA | 0% | -42% | 0% | -42% | 0% | 0% | - | - |
| **Specialty Electronics Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 6 | 7 | 100% | NA | 100% | NA | NA | NA | 100% | 100% | 100% | 100% | 0% | 0% | - | - |
| Modified Plan | 6 | 6 | 24% | 48% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (0) | (1) | -76% | NA | -76% | NA | NA | NA | -100% | -100% | -100% | -100% | 0% | 0% | - | - |
| **Delco Electronics Overseas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 42 | 47 | 100% | NA | 100% | NA | NA | NA | 12% | 100% | 12% | 100% | 0% | 0% | - | - |
| Modified Plan | 3 | 13 | 16% | 40% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (39) | (34) | -84% | NA | -76% | NA | NA | NA | -12% | -100% | -12% | -100% | 0% | 0% | - | - |
| **MobileAria Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3 | 3 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 5 | 5 | 24% | 49% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | 2 | 2 | -76% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Furukawa Wiring Systems LLC** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 5 | 6 | 100% | NA | 100% | NA | NA | NA | 50% | 85% | 50% | 85% | 0% | 0% | - | - |
| Modified Plan | 12 | 14 | 16% | 26% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | 8 | 8 | -84% | NA | -76% | NA | NA | NA | -50% | -85% | -50% | -85% | 0% | 0% | - | - |
| **Substantive Consolidation - All Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 7,459 | 10,434 | 100% | 100% | 100% | 100% | 100% | 100% | 65% | 100% | 65% | 100% | 0% | 18% | - | - |
| Modified Plan | 889 | 1,799 | 23% | 46% | 24% | 49% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (6,569) | (8,635) | -77% | -54% | -76% | -51% | -100% | -100% | -65% | -100% | -65% | -100% | 0% | -18% | - | - |

NA - Not applicable due to $0 estimated allowed claims in the creditor class.

1 - The Confirmed Plan "All Secured Recoveries" reflect recoveries against DIP Facility and Setoff Claims, whereas the Modified Plan "All Secured Recoveries" represent recoveries against the DIP Facility, Secured Hedging Obligations, Pre-Petition Non-GM Setoff, and Other Secured Claims, which include postpetition intercompany claims. "Post IC Recoveries" reflect postpetition intercompany claims as Administrative Claims in the Confirmed Plan and as Junior Secured Claims in the Modified Plan.

2 - The Confirmed Plan "DIP Recovery" reflects recoveries against DIP Facility outstandings, whereas the Modified Plan "DIP Recovery" represents blended recoveries against DIP Tranche A and B outstandings, Secured Hedging Obligations (which are pari passu to DIP Tranche A and B claims), DIP Tranche C outstandings, and DIP Tranche C Non-GM Setoffs (which are pari passu to DIP Tranche C claims).  Modified Plan recoveries specific to each of these four types of claimants are provided in Exhibit E.

As the updated Liquidation Analysis shows, the recoveries to holders of impaired Claims and Interests under the Modified Plan are not less than the recoveries to those holders under a hypothetical chapter 7 liquidation.  Accordingly, the Modified Plan passes the best interests test under section 1129(a)(7) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

I.      Acceptance Of The Modified Plan By Impaired Classes (Section 1129(a)(8), As
        Incorporated By Section 1127(b))

Section 1129(a)(8) of the Bankruptcy Code addresses the acceptance of a plan by

impaired classes of claims and interests.  11 U.S.C. § 1129(a)(8).  Although the Debtors have not

satisfied this section because not all of the impaired classes accepted the Modified Plan, that does

not defeat the Modified Plan, but rather merely triggers the cramdown provisions of section

1129(b) of the Bankruptcy Code.  See 11 U.S.C. § 1129(b)(1); Coltex Loop Cent. Three Partners,

L.P. v. BT/SAP Pool C Assocs., L.P. (In re Coltex Loop Cent. Three Partners, L.P.), 138 F.3d 39,

42 (2d Cir. 1998) ("If an impaired class of creditors rejects a plan, however, the plan, nonetheless,

may be confirmed if the other requirements of confirmation are met and the plan is 'fair and

equitable' [under section 1129(b)].").  As explained in Part V.O, below, the Modified Plan does,

in fact, satisfy the cramdown requirements.

J.      The Modified Plan Provides For The Payment Of Administrative And Priority
        Claims (Section 1129(a)(9), As Incorporated By Section 1127(b))

Section 1129(a)(9) of the Bankruptcy Code establishes three requirements.  First,

allowed administrative claims that fall within section 507(a)(1) or 507(a)(2) of the Bankruptcy

Code must be paid in cash on the effective date of the plan unless the administrative claimant

consents to different treatment.  See 11 U.S.C. § 1129(a)(9)(A); In re New 118th, Inc., 398 B.R.

791, 798 (Bankr. S.D.N.Y. 2009) (explaining that, under section 1129(a)(9)(A), "administrative

claims [must] be paid on the effective date unless the claimant consented to different treatment").

Second, holders of allowed priority claims specified in sections 507(a)(3)-(7) of the Bankruptcy

Code must receive deferred cash payments of a value equal to the allowed amount of such claims

or cash equal to the allowed amount of such claims on the effective date of the plan, depending

on whether each such holder's class has accepted the plan.  See 11 U.S.C. § 1129(a)(9)(B).  Third,

the holders of allowed priority tax claims covered by section 507(a)(8) of the Bankruptcy Code

as of the effective date of the plan must be paid in cash within six years after the date of

assessment of their claims.  See 11 U.S.C. § 1129(a)(9)(C); Skouras v. United States, 854 F.

Supp. 962, 970 (S.D.N.Y. 1993) ("Under 11 U.S.C. § 1129(a)(9)(C), a debtor must be allowed

six years from the date of assessment in which to pay priority tax claims.").

The Modified Plan meets each of these requirements.  Subject to the Master

Disposition Agreement and Article X of the Modified Plan, a holder of an Allowed

Administrative Claim will receive, on the Effective Date or as soon thereafter as is reasonably

practicable, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or

(ii) such other less favorable treatment which the Debtors or the Reorganized Debtors and the

holder agree upon in writing.[31]  (Modified Plan art. 2.1; see Sheehan Decl. ¶ 123; Stipp Decl.

¶ 26.)

As for the second and third requirements, the treatment of Priority Tax Claims

(including the claims addressed in section 1129(a)(9)(B) of the Bankruptcy Code) and Other

Priority Claims (including the claims addressed in section 1129(a)(9)(C) of the Bankruptcy Code)

is set forth in Article 2.2 of the Modified Plan and Article 5.13 of the Modified Plan.  (See

Modified Plan arts. 1.156, 1.179, 2.2, 5.13.)

Under Article 2.2 of the Modified Plan, a holder of an Allowed Priority Tax

Claim will generally receive (i) equal Cash payments during a period not to exceed six years

after the assessment of the tax on which such Claim is based, totaling the aggregate amount of

such Claim, plus simple interest at the rate required by applicable law on any outstanding

balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing

---

[31]    The Administrative Claims do not include the GM Administrative Claim because GM is waiving and releasing
the GM Administrative Claim upon the Effective Date and the consummation of the Master Disposition
Agreement.  (See Modified Plan arts. 1.2, 1.99, 2.3.)

authority, (ii) such other treatment as is agreed to by the holder and is on more favorable terms to

the Debtors or the Reorganized Debtors, or (iii) payment in full in Cash.[32]  (Id. art. 2.2.)

 With respect to Other Priority Claims, Section 5.13 of the Modified Plan

establishes that, except as otherwise agreed by a holder of an Allowed Other Priority Claim, "on

the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall

receive . . . an amount in Cash equal to the Allowed amount of such Claim."  (Modified Plan art.

5.13.)

 For the reasons set forth above, the Modified Plan meets the three requirements of

section 1129(a)(9) of the Bankruptcy Code, as incorporated by section 1127(b) of the

Bankruptcy Code.

 K. Five Impaired Non-Insider Classes Accepted The Modified Plan (Section
   1129(a)(10), As Incorporated By Section 1127(b))

 Section 1129(a)(10) of the Bankruptcy Code requires that, "[i]f a class of claims

is impaired under the plan, at least one class of claims that is impaired under the plan [must

accept] the plan, determined without including any acceptance of the plan by any insider."  11

U.S.C. § 1129(a)(10).  There are a number of impaired classes of claims under the Modified Plan.

(See Modified Plan art. 4.2.)  Among them is Class A-1, a grouping of 120 separate subclasses of

Secured Claims (excluding the Contingent PBGC Secured Claims) against the Delphi-DAS

Debtors and Delphi Diesel Systems Corp.  (See Modified Plan arts. 3.1, 3.2(b), 4.2, 5.1.)  Three

of the subclasses within Class A-1 voted to accept the Modified Plan.[33]  (See Gershbein Decl. Ex.

2; Sullivan Decl. Ex. C.)

---

[32] Holders of Priority Tax Claims assumed by the Buyers pursuant to the Master Disposition Agreement will be
treated in the manner set forth therein, rather than the manner set forth in Article 2.2 of the Modified Plan.
(Modified Plan art. 2.2.)

[33] "Commonly, each secured claim is placed in a separate class . . . because usually each such claim is secured by
distinct rights to property of the estate."  In re Keck, Mahin & Cate, 241 B.R. 583, 589-90 (Bankr. N.D. Ill.

*(cont'd)*

The impaired classes under the Modified Plan also include Class C-2 and Class D, which hold the PBGC Claims and the GM Unsecured Claim, respectively, as to the various Debtors and consolidated Debtor groups.  (See Modified Plan arts. 3.2(b), 4.2.)  Class C-2 and Class D both voted to accept the Modified Plan.  (See Gershbein Decl. Ex. 2; Sullivan Decl. Ex. C.)  Based on these certified voting results, the Modified Plan complies with section 1129(a)(10) of the Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

L.    The Modified Plan Is Feasible (Section 1129(a)(11), As Incorporated By Section 1127(b))

Under section 1129(a)(11) of the Bankruptcy Code, the Debtors must establish that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  As the Second Circuit explained in addressing this section in Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636 (2d Cir. 1988), "the feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."  Id. at 649.  Thus, "a bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed.  All it needs to know is that the plan has a reasonable likelihood of success."  In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003).  This is a "'relatively low threshold,'" Mercury Capital Corp. v. Milford Conn. Assocs., L.P., 354 B.R. 1, 9 (D. Conn. 2006) (quoting Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 191 (9th Cir. B.A.P. 2003)), and one that is easily satisfied here.

---

(cont'd from previous page)

1999); accord In re Bugg, 172 B.R. 781, 784 (E.D. Pa. 1994) (explaining that "secured claims secured against different properties are each entitled to separate classification," and that "secured creditors on different pieces of property are not similar").  In this case, each subclass within Class A-1 includes one secured claim against a particular Debtor or consolidated Debtor group.  The same holder was the sole member of each of the three accepting subclasses, and the holder's claims were secured by property located in the same county.

The Debtors and their financial advisors analyzed the Reorganized Debtors' ability to perform in a timely manner their obligations under the Modified Plan, and have concluded that the Modified Plan is feasible, as described below.  (See Sheehan Decl. ¶¶ 126-27; Stipp Decl. ¶¶ 28-40.)

Reorganized Debtors.  The Modified Plan contemplates Delphi's emergence from chapter 11 as Reorganized DPH Holdings and the Debtors' emergence from chapter 11 as the Reorganized Debtors.  (Stipp Decl. ¶ 29.)  The Reorganized Debtors will hold (i) cash for the payment of allowed Administrative Claims (excluding such claims to be assumed by third parties), (ii) the proceeds of avoidance actions, if any, (iii) the proceeds from wind-down activities, and (iv) the payments due under the Amended MRA.  (Id. ¶ 30.)  In addition, following the Effective Date, the Reorganized Debtors will own approximately 20 sites[34] and will retain liabilities for long-term inactive U.S. salaried employees for all sites and inactive U.S. hourly employees for idled sites.  (Id.)  With respect to environmental matters, Reorganized DPH Holdings intends to comply with all environmental laws, regulations, and governmental orders, without abandoning any of its real property.  (Sheehan Decl. ¶ 127.)

Under the Master Disposition Agreement, the Debtors will receive consideration from the purchasers that includes cash, the assumption of liabilities, the assumption of certain administrative claims and/or cash to fund the payment of certain administrative claims, and certain deferred consideration.  GM will also provide consideration comprised of the waiver of its multibillion dollar claims at closing, including its administrative expense claim under the GM Arrangement, its administrative expense claim under section 4.04(a)(i) of the Amended GSA, and its prepetition claim.

---

[34]    One of these sites, a warehouse in Columbia, Tennessee, is subject to a lease that is included on Exhibit 8.1 to the Modified Plan and is being rejected by the Debtors pursuant to the Modified Plan.

Post-Confirmation Reorganized DPH Holdings Share Trust. On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, will execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the Post-Confirmation Reorganized DPH Holdings Share Trust pursuant to the Post-Confirmation Trust Agreement, substantially in the form attached to the Modified Plan as Exhibit 7.9. (Id. ¶ 32.) On the Effective Date, and in accordance with and pursuant to the terms of the Modified Plan, the Post-Confirmation Reorganized DPH Holdings Share Trust will become the sole shareholder of Reorganized DPH Holdings. (Id.) Reorganized DPH Holdings will make distributions to holders of secured, priority, and unsecured claims. (Id.)

Emergence Capital. On the Effective Date, pursuant to the Master Disposition Agreement, the Reorganized Debtors will receive the Emergence Capital sufficient to make payments as may be required on the Effective Date and to conduct their post-reorganization operations. (Id. ¶ 33.)

Revenue Plan. Except as otherwise provided in the Modified Plan, the Confirmation Order, or the Modification Approval Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Modified Plan will be obtained from the Emergence Capital, existing Cash balances, the proceeds of the wind-down activities of the Debtors and the Reorganized Debtors, and payments due under the Amended MRA. (Sheehan Decl. ¶ 127; Stipp Decl. ¶ 34.) Certain of the identified revenue opportunities for the Reorganized Debtors are known because they are derived from emergence transactions or agreements with third parties. (Stipp Decl. ¶ 34.) Other revenue opportunities are prospective, based on proceeds Delphi believes it may receive from the sale of retained assets such as the idled sites and transactions pending as of the closing. (Id.)

As of the Effective Date, the Reorganized Debtors' assets will include:

- a $50 million funding commitment from GM, with (i) $10 million in immediately available funds to be paid to Delphi at the Closing and (ii) up to an additional $40 million to be made available to Delphi from time to time following the Closing until December 31, 2013 upon written request by Delphi in no less than $1 million increments;

- approximately $26 million in receivables from GM;

- 20 sites that the Debtors estimate to have $30 million in value based on the Debtors' recent experience in selling vacant plants and related land within the AHG division;

- approximately $8 million in a cash escrow account to cover administrative claims for hourly employees pre-retirement program participants;

- certain intellectual property assets; and

- the proceeds from the prosecution of the Debtors' avoidance actions.  (Id. ¶¶ 35-36.)

Operating Reorganized DPH Holdings under the Modified Plan will be less challenging than a wind-down in the context of an immediate conversion to chapter 7.  (Id. ¶ 37.) Because the operations will not require the supply of materials, the Reorganized Debtors will not face liquidity shortfalls caused by suppliers' demands for accelerated payments.  (Id.)  In addition, the Reorganized Debtors will be relying on the sources of revenue described above, rather than relying on customers to provide interim liquidity.  (Id.)

Assessment Of Costs.  Delphi's management has estimated that the cost of operations for Reorganized DPH Holdings, including costs associated with professionals and employees and one-time events such as necessary demolition costs for certain facilities.  (Id. ¶ 38.)  The Reorganized Debtors' costs would decline throughout 2009-2013 as the Reorganized Debtors dispose of idled sites.  (Id.)  In addition, under the Modified Plan and the Master Disposition Agreement, certain transition services will be provided free of charge by GM or the other buyers, thereby lowering the overhead costs of the Reorganized Debtors' operations.  (Id.)

71

The Debtors' management team has evaluated the budget of Reorganized DPH

Holdings as compared with the anticipated needs of Reorganized DPH Holdings and believes

that the budgeted amounts are sufficient to fund its operations.  (Sheehan Decl. ¶ 127.)  The

budget developed by the Debtors represents a reasonable projection of future performance, and it

demonstrates that the Reorganized Debtors will have the ability to meet future obligations under

the Modified Plan.  (Stipp Decl. ¶ 39.)  The reliability of the budget is supported in part by the

Debtors' proven track record of winding down assets of the AHG division.  (Id.)

In sum, there is ample evidence that confirmation of the Modified Plan is not

likely to be followed by the liquidation or the need for further financial reorganization.  The

Modified Plan therefore meets the feasibility requirement under section 1129(a)(11) of the

Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

M.    The Modified Plan Provides For The Payment Of Fees Payable Under 28 U.S.C.
§ 1930 (Section 1129(a)(12), As Incorporated By Section 1127(b))

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable

under section 1930 of title 28, as determined by the court at the hearing on confirmation of the

plan, have been paid or the plan provides for the payment of all such fees on the effective date of

the plan."  11 U.S.C. § 1129(a)(12).  The Debtors have paid or will pay all fees payable pursuant

to 28 U.S.C. § 1930 on or before the Effective Date, and as and when due thereafter.  (Sheehan

Decl. ¶ 128.)  Article 14.2 of the Modified Plan provides that "[a]ll fees payable pursuant to

section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as

determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective

Date."  Article 14.2 further provides that "[t]he Reorganized Debtors shall continue to pay fees

pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are

72

closed." (See Sheehan Decl. ¶ 128.) Thus, the Modified Plan satisfies section 1129(a)(12) of the

Bankruptcy Code, as incorporated by section 1127(b) of the Bankruptcy Code.

      N.    <u>The Modified Plan Provides For The Continuation Of Retiree Benefits (Section 1129(a)(13), As Incorporated By Section 1127(b))</u>

Section 1129(a)(13) of the Bankruptcy Code is satisfied when:

The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in [11 U.S.C. § 1114], at the level established pursuant to [11 U.S.C. § 1114(e)(1)(B) or (g)], at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13). The retiree benefits available to the Debtors' hourly employees are set

forth in a series of Court-approved memorandums of understanding (the "MOUs") and

implementation agreements among Delphi and its labor unions. (See Sheehan Decl. ¶¶ 130-31.)

Under Article 7.16 of the Modified Plan, the MOUs will be assumed and assigned as set forth in

the Master Disposition Agreement and pursuant to an order to be entered by the Court. (See also

Sheehan Decl. ¶ 133.)

Salaried employees' retiree benefits are governed by the settlement agreement

approved by the Court in the Salaried OPEB Settlement Order. (See Docket No. 16545; Sheehan

Decl. ¶ 132.) Article 7.18 of the Modified Plan provides that "[t]he Debtors will continue the

payments on the schedule authorized under the [Salaried OPEB Settlement Order]." (See also

Sheehan Decl. ¶ 132.)

Through Article 7.16 and Article 7.18, the Modified Plan provides for the

continuation of retiree benefits in compliance with section 1129(a)(13) of the Bankruptcy Code,

as incorporated by section 1127(b) of the Bankruptcy Code.

O.    The Modified Plan Satisfies The Cramdown Requirements (Section 1129(b), As Incorporated By Section 1127(b))

Under the cramdown provisions of section 1129(b)(1) of the Bankruptcy Code, a plan may be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes:

> [I]f all of the applicable requirements of . . . section [1129(a) of the Bankruptcy Code] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  A plan will be confirmed under this section "so long as the court determines that the plan 'does not discriminate unfairly' and is 'fair and equitable' to each impaired class that has not accepted."  Manville Corp. v. Equity Security Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62 (2d Cir. 1986).

1.    The Modified Plan Does Not Unfairly Discriminate

With respect to unfair discrimination, it is well-established that the Bankruptcy Code "does not forbid a plan from classifying claims differently, even if the claims share similar attributes." Mercury Capital Corp., 354 B.R. at 10.  Instead, it "only prohibits discrimination between classes if the discrimination is unfair" – i.e., "if similar claims are treated differently without a reasonable basis for the disparate treatment." Id.; accord In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) ("Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.").

The Modified Plan does not involve any unfair discrimination under this standard. There is no unfair discrimination against holders of General Unsecured Claims in Class C-1 because there is a rational basis for treating those classes in a manner that is different from the

74

PBGC Claims in Class C-2 and the GM Unsecured Claim in Class D.  As described in more

detail in Part V.B.1, above, the Debtors placed the PBGC Claims in a separate class because of

the exceptional issues related to those claims and their unique treatment under the Delphi-PBGC

Settlement Agreement.  With respect to the GM Unsecured Claim, GM will waive the General

Unsecured Claim on the closing date of the Master Disposition Agreement pursuant to Section

3.1.1 of that agreement.  GM therefore will not receive a distribution under the Modified Plan on

account of the GM Unsecured Claim, but instead will receive the benefit of the remaining

releases provided for in section 4.01 of the Amended GSA.  (Modified Plan art. 5.5.)

Similarly, the Classes that have been deemed to reject the Modified Plan are being

treated in the same manner as one another.  They are not receiving distributions under the

Modified Plan.  (Modified Plan art. 6.4.)  Accordingly, the Modified Plan does not unfairly

discriminate against any of the Classes that have voted or are deemed to have voted against the

Modified Plan.

2.    The Modified Plan Is Fair And Equitable

Section 1129(b)(2) of the Bankruptcy Code provides the standards for

determining whether a plan is fair and equitable to dissenting impaired classes of secured claims,

11 U.S.C. § 1129(b)(2)(A), unsecured claims, id. § 1129(b)(2)(B), and interests, id.

§ 1129(b)(2)(C).  In this case, all of the impaired classes other than three subclasses within Class

A-1 (Secured Claims other than the Contingent PBGC Secured Claims), all of Class C-1

(General Unsecured Claims), and all of Class C-2 (PBGC Claims) either rejected or were

deemed to reject the Modified Plan.  The Modified Plan is fair and equitable to each of those

dissenting classes and subclasses.

With respect to the dissenting impaired subclasses of Secured Claims in Class A-1,

the Modified Plan provides that each holder of an Allowed Secured Claim will receive

(i) distributions of Cash payments in equal installments over a period not to exceed seven years

from the Effective Date plus interest, with all valid, enforceable, and perfected prepetition liens

on the Debtors' property with respect to such Claims surviving the Effective Date or (ii) its

collateral free and clear of liens, Claims, and encumbrances, provided that such collateral was

property of the Estate as of the day prior to the Effective Date.[35]  (See Modified Plan art. 5.1(i)-

(ii).)

       The former treatment – under which the holder will receive cash plus interest and

retain its liens – satisfies section 1129(b)(2)(A)(i) of the Bankruptcy Code, which provides that a

plan is fair and equitable to a dissenting impaired class of secured claims when it provides:

> (I)     that the holders of such claims retain the liens securing such claims,
> whether the property subject to such liens is retained by the debtor or transferred
> to another entity, to the extent of the allowed amount of such claims; and

> (II)    that each holder of a claim of such class receive on account of such claim
> deferred cash payments totaling at least the allowed amount of such claim, of a
> value, as of the effective date of the plan, of at least the value of such holder's
> interest in the estate's interest in such property[.]

11 U.S.C. § 1129(b)(2)(A)(i).  The latter treatment – which provides the holder with its collateral

– is fair and equitable pursuant to section 1129(b)(2)(A)(iii) of the Bankruptcy Code because it

results in "the realization by [the holders of Secured Claims] of the indisputable equivalent of

such claims."  See Arnold & Baker Farms v. United States (In re Arnold & Baker Farms), 85

F.3d 1415, 1423 (9th Cir. 1996) (explaining that "a creditor necessarily receives the indubitable

equivalent of its secured claim when it receives the collateral securing that claim, regardless of

how the court values the collateral"); Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy

Ridge Dev. Corp.), 881 F.2d 1346, 1350 (5th Cir. 1989) ("The current plan provides that [the

---

[35]    The Modified Plan allows the Debtors or the Reorganized Debtors and the holders of Allowed Secured Claims
to agree to other treatment that is more favorable to the Debtors or the Reorganized Debtors.  (See Modified
Plan art. 5.1(iii).)

secured claimholder] will receive [the collateral] itself, and since common sense tells us that property is the indubitable equivalent of itself, this portion of the current plan satisfies the 'indubitable equivalent' requirement.").

   The Modified Plan is also fair and equitable to dissenting impaired classes of unsecured claims.  Under section 1129(b)(2)(B)(ii) of the Bankruptcy Code, a plan is fair and equitable to such classes when "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii).  Class C-1 (General Unsecured Claims) is the senior dissenting impaired Class of unsecured claims.  Although the holders of General Unsecured Claims are not being paid in full, no holder of Claims or Interests junior to the General Unsecured Claims will receive or retain any property under the Modified Plan on account of their junior Claims or Interests.  (See Modified Plan art. V.)  Thus, the Modified Plan complies with the absolute priority rule as codified by section 1129(b)(2)(B)(ii) of the Bankruptcy Code. See In re Gaston & Snow, Nos. 93 Civ. 8517, 93 Civ. 8628, 1996 WL 694421, *6 (S.D.N.Y. Dec. 4, 1996) (explaining that "[t]he absolute priority rule [in section 1129(b)(2)(B)(ii)] prohibits those with junior interests from receiving property 'on account of such junior claims or interest[s],' before those with more senior claims"); Leslie Fay, 207 B.R. at 790 ("The rule provides that . . . the holder of any claim or interest junior to that of the dissenting class may not 'receive or retain under the plan on account of such junior claim or interest any property.'").

   Finally, with regard to dissenting impaired Classes of Interests, the Modified Plan is fair and equitable in that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property," in accordance with section 1129(b)(2)(C)(ii) of the Bankruptcy Code.  Indeed, no holder of an

impaired Interest will receive any property under the Modified Plan on account of its impaired

Interest.  (See Modified Plan art. V.)

As set forth above, the Modified Plan is fair and equitable as to all dissenting

impaired classes of Claims and Interests, and does not discriminate unfairly between or among

impaired classes.  The Modified Plan therefore satisfies the cramdown requirements of section

1129(b) of the Bankruptcy Code and should be confirmed despite the fact that a number of

impaired classes and subclasses of Claims and Interests rejected or were deemed to reject the

Modified Plan.

VI.    RESPONSES TO PRINCIPAL OBJECTIONS

Several parties-in-interest objected to the June 2009 Modified Plan and the GM-

Platinum Master Disposition Agreement, which are treated here as though they were objections

to the Modified Plan and the Master Disposition Agreement.  The objections and the Debtors'

resolution, response, or proposal as to each objection are summarized on the chart attached to

this omnibus reply as Appendix B.  As indicated in the chart, the Debtors have resolved a

number of stakeholder objections, including, for example, those filed by the DIP Agent, certain

DIP Lenders, the Creditors' Committee,and WTC, among others.  The principal objections are

discussed below.

A.    The DIP Lenders

The DIP Agent and two groups of DIP Lenders filed objections (see Docket Nos.

18283, 18296, 18300), but those objections have been resolved through the Debtors' acceptance

of the Pure Credit Bid submitted by the DIP Agent, on behalf of the Required DIP Lenders, at

the auction.  The fact that the Required DIP Lenders have consented or will consent to the

Modified Plan and the Master Disposition Agreement precludes any other DIP Lender from

presenting a viable challenge to those transactions.  As explained in Part III, above, and as the

Court determined in approving the Accommodation Agreement over the objections of certain

DIP Lenders in December 2008 (see Docket No. 14515), the DIP Credit Agreement authorizes

the DIP Agent to act on behalf of all DIP Lenders upon instructions from the Required DIP

Lenders.  Thus, without conceding any of the points raised in the objections filed by the DIP

Agent or the objecting DIP Lenders, the Required DIP Lenders' support for the Modified Plan

and the Master Disposition Agreement makes it unnecessary to consider those objections.

B.    The Creditors' Committee And WTC

The Creditors' Committee's preliminary and supplemental objections to the

Modified Plan and the Master Disposition Agreement (see Docket Nos. 17034, 18291) have been

resolved pursuant to an agreement among the Debtors, the Creditors' Committee, GM, and the

required DIP Lenders.  Under the agreement, the potential distribution to holders of General

Unsecured Claims and the PBGC General Unsecured Claim under the waterfall schedule in the

Master Disposition Agreement will be increased from a maximum of $180 million to a

maximum of $300 million, and the distributions will be based on 32.5% of all waterfall

distributions in excess of $7.2 billion, as compared with 3.1% of those distributions under the

GM-Platinum Master Disposition Agreement.  The Debtors have also resolved the preliminary

and supplemental objections filed by WTC, a member of the Creditors' Committee, through an

agreement concerning professional fees and expenses.  (See Docket Nos. 17169, 18313, 18471.)

As part of the settlements, the Creditors' Committee and WTC agreed to withdraw their

objections and support the Debtors' request for approval of the Modified Plan.

C.    Labor Unions

Delphi received objections to the Modified Plan from each of its principal U.S.

unions.  Generally, each union has objected to the Modified Plan to the extent that the union

perceives certain provisions of the Modified Plan to be inconsistent with the union's respective

Labor MOUs.  As discussed above with regarding to the Delphi-PBGC Settlement Agreement and explained below with regard to the other union objections, all of the union objections should be overruled because the Modified Plan and the Master Disposition Agreement are entirely consistent with the Labor MOUs.

       1.     <u>The UAW</u>

By its objection (Docket No. 18279), the UAW has generally objected to approving the Modified Plan to the extent the Master Disposition Agreement effects a unilateral change in the UAW collective bargaining agreements ("CBAs").  The UAW incorrectly asserts that the Master Disposition Agreement makes two specific unilateral changes:  (i) in Section 9.5.7, the Master Disposition Agreement does not provide for the administration of grievances that pre-date (or are based on occurrences that pre-date) the closing and (ii) Delphi may waive the Master Disposition Agreement closing conditions in Section 10.2.4, relating to assumption of the UAW CBAs, and in Section 10.2.6, relating to waiver of sale of operations restrictions in the UAW CBAs.

With respect to grievances, the Debtors' proposed Modification Approval Order negates the UAW's objection by providing that:

> Pursuant to the Modified Plan, upon the Effective Date and notwithstanding any other provisions of the Master Disposition Agreement, the Labor MOUs, as modified (which shall include all related collectively bargained agreements and obligations, <u>including grievances</u>), shall be assumed and assigned, as applicable . . . .

(Modified Approval Order ¶ 49(c) (emphasis added).)  Although the Debtors do not concede that the assignment of a collective bargaining agreement must in all cases include the assignment of pre-closing liabilities arising under the agreement, the Court need not consider that issue here because the Modification Approval Order makes clear that grievances fall within the assignment.

80

The UAW's argument relating to Delphi's ability to waive Master Disposition Agreement Sections 10.2.4 and Section 10.2.6 is presumably based on the alleged requirements contained in the UAW CBAs that (i) the UAW CBAs must be assumed in connection with a sale such as the Master Disposition Agreement and (ii) the UAW must consent to any such sale.  The UAW argues that if Delphi does not abide by these requirements in having the UAW CBAs assumed under the Master Disposition Agreement or the Modified Plan, Delphi will violate section 1113 of the Bankruptcy Code by effecting an impermissible unilateral modification to the CBAs.  With regard to the condition in the Master Disposition Agreement that requires the buyers to assume collective bargaining agreements (see Master Disposition Agreement § 10.2.4), the language from paragraph 49(c) of the proposed Modification Approval Order quoted above ensures that the collective bargaining agreements "shall" be assumed and assigned "notwithstanding any other provisions of the Master Disposition Agreement."  This provision was driven in part by the UAW's waiver argument, and it sufficiently addresses any concerns the UAW may have on that point.

As for the condition related to the UAW's consent to the sale contemplated by the Master Disposition Agreement (see Master Disposition Agreement § 10.2.6), the UAW has consented to the sale through its ratification in May 2009 of an agreement with GM that provides for GM's assumption of the operations at issue.[36]  Thus, the condition set forth in Section 10.2.6 of the Master Disposition Agreement has already been satisfied.[37]

---

[36]    See UAW General Motors Modifications to 2007 Agreement And Addendum to VEBA Agreement (May 2009); UAW Press Release, May 29, 2009, "UAW members ratify General Motors settlement agreement."  Both of these documents are included in the joint exhibits to be presented at the Final Modification Hearing.

[37]    In footnote four of its objection, the UAW alludes to potential inaccuracies or discrepancies in certain schedules to the Master Disposition Agreement.  The UAW has not, however, identified any actual inaccuracies or discrepancies, and any objection on this point should therefore be overruled.

2.      The IUE-CWA

The IUE-CWA has filed its objection (Docket No. 17793), "in order to create a

contested matter and permit it to take discovery."  The single contention in the IUE-CWA's

objection states that the "relief requested by the Debtor's Motion is not authorized by the

Bankruptcy Code, and is not in the best interest of the Debtors' estates and creditors."  For the

reasons stated in the Motion and in this Memorandum, the Debtors respectfully disagree and

submit that the Bankruptcy Code entitles Debtors to the relief they seek and that such relief is in

the best interests of the Debtors' estates and creditors.

3.      The USW, The IUOE, The IBEW, And The IAM

By their objection (Docket No. 18110), the IUOE, the IBEW, and the IAM argue

that "it appears the Modified Plan violates 11 U.S.C. § 1113 and the existing collective

bargaining agreements between Debtors and the Unions, as modified by the post-petition

Memoranda of Understanding (MOUs) dated July 31, 2007 and August 1, 2007, and the

Implementation Agreements, dated September 25, 2008, between the Unions, Delphi and GM"

on the basis that the Modified Plan provides that Delphi will have no responsibility for the

Delphi Hourly Rate Pension Plan ("Delphi HRP").  See Docket No. 18110 ¶ 9.  The IAM, IBEW

and IUOE argue that their MOUs[38]  and Implementation Agreement[39] require Delphi to either

retain Delphi HRP liabilities or transfer them to the GM Hourly Rated Pension Plan and because

---

[38]    As incorporated and defined in the Modified Plan, see the IUOE Local 832S Memorandum of Understanding,
the IUOE Local 18S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding,
the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and
the IAM-Delphi Memorandum of Understanding.

[39]    The IAM, IBEW and IUOE Implementation Agreement dated September 25, 2008 was the form of union
consent necessary to, among other things, freeze the Delphi HRP pursuant to the Hourly And Salaried Pension
Program Modification Order (Docket No. 14258), and allow for the transfers contemplated by the GSA And
MRA Amendment Order (Docket No. 14287), of certain assets and liabilities from the Delphi HRP to the GM
HRP pursuant to section 414(l) of the Internal Revenue Code of 1986, as amended.  Such Implementation
Agreement is defined to be part of the IAM, IBEW and IUOE MOUs by definition of such MOUs in the
Modified Plan.

the Modified Plan does not specifically call for transfer of Delphi HRP liabilities to GM, it violates the MOUs and Implementation Agreements and therefore Section 1113 of the Bankruptcy Code. See Docket No. 18110 ¶¶ 9, 11.

By its objection (Docket No. 18258), with respect to its MOUs[40] and Implementation Agreement,[41] the USW joins in the objection of the IAM, IBEW and IUOE (Docket No. 18110), and additionally asserts that the USW has not agreed to modify any rights under its CBAs with respect to the proposed Delphi-PBGC Settlement Agreement pursuant to Article VII of the Modified Plan. The USW, IAM, IBEW and IUOE apparently take issue with Article 7.17 of the Modified Plan, which provides that on "the Effective Date, the Delphi HRP shall no longer be the responsibility of the Debtors and will be addressed by GM," and the condition in Section 10.2.5 of the Master Disposition Agreement. As set forth in Part V.B.3(b), above, these conditions are satisfied by the Delphi-PBGC Settlement Agreement, which was executed after the unions filed their objections.

The USW and the IUOE, the IBEW, and the IAM also object on the basis that their respective cure amounts are listed as zero dollars in the Debtors' notices of assumption and assignment with respect to certain executory contracts to be assumed and assigned under the Modified Plan. In general terms, the unions argue that cure amounts are owed to the extent that pre-closing obligations, including grievances and Delphi HRP obligations, are not assumed and assigned under their respective collective bargaining agreements. For the reasons discussed

---

[40]    As incorporated and defined in the Modified Plan, see the USW-Home Avenue Memorandum of Understanding and the USW-Vandalia Memorandum of Understanding.

[41]    The USW Implementation Agreement dated September 25-26, 2008 achieved the same union consents with respect to the USW as described above with respect to the IAM, IBEW and IUOE Implementation Agreement. This Implementation Agreement is defined to be part of the USW MOUs by definition of such MOUs in the Modified Plan.

above, these objections are negated by the language set forth in the proposed Modification

Approval Order.

        D.    <u>Workers' Compensation Agencies</u>

        The State of Michigan Workers' Compensation Agency and Funds Administration

(the "Michigan Agency") and the New York State Workers' Compensation Board (the "New

York Board") object to the Modified Plan because neither the Modified Plan, the proposed

Modification Approval Order, nor the Master Disposition Agreement specifically sets forth any

commitment to pay the Debtors' workers' compensation obligations.  (<u>See</u> Docket Nos. 18264,

18294.)  Specifically, the Michigan Agency asserts that the relief proposed by the Debtors (i)

violates the Debtors' workers' compensation self-insurance authority in Michigan, (ii) leaves the

Debtors' injured workers without a source of workers' compensation benefit payments, (iii)

decimates Michigan's self-insurance fund for employers, and (iv) violates 28 U.S.C. § 959(b) by

causing the Debtors to violate Michigan state law relating to the operation of businesses.

        The New York Board argues that (i) any workers' compensation issues created by

the Modified Plan and the Master Disposition Agreement must be resolved pursuant to New

York's workers' compensation statute and the statutory process implemented pursuant to that law,

(ii) the Debtors should be precluded by principles of promissory estoppel and/or equitable

estoppel from excluding workers' compensation claims from Flow-Through Claims under the

Modified Plan, and (iii) the Master Disposition Agreement fails to address how the buyers will

fulfill continuing workers' compensation obligations.  None of these arguments are valid, as

discussed below.

1.      The Bankruptcy Code's Priority System Preempts State Workers'
        Compensation Laws

The Bankruptcy Code, its priority scheme under section 507, and applicable

orders of this Court, including bar date orders, govern the rights and remedies of creditors –

whether private or government units – to recover distributions on account of claims, including

workers' compensation reimbursement obligations, arising out of injuries that occurred before

the Petition Date.  See In re Olga Coal Co., 194 B.R. 741, 746 (Bankr. S.D.N.Y. 1996).  In Olga

Coal, Judge Lifland ruled that payments due postpetition for injuries that occurred prepetiton are

prepetition claims.  Furthermore, a state's contingent claim against a debtor – that is,

reimbursement for the state paying benefits if the debtor is unable to do so – is triggered before

the petition date and is also a prepetition claim.  Here, the contingent prepetition claims of the

Michigan Agency and the New York Board, like the claims of all other prepetition creditors, are

subject to the requirements and discharge provisions of the Bankruptcy Code, notwithstanding

state statutes to the contrary.  Moreover, because the State of Michigan and the State of New

York neither filed timely proofs of claim by the July 31, 2006 bar date established by this Court

nor sought leave of Court to file untimely claims, neither will receive a distribution under the

Modified Plan, and such liabilities will be discharged.

Faced with no distribution under the Modified Plan, the Michigan Agency and the

New York Board argue, in essence, that their claims are superior to claims of all other creditors

because state regulatory requirements compel the Debtors to honor workers' compensation

obligations.  To the extent that a state statute purports to establish the priority of a claim over

other claims, that statute is preempted by the Bankruptcy Code and is of no effect in a chapter 11

case.  See, e.g., In re Lull Corp., 162 B.R. 234, 240-41 (Bankr. D. Minn. 1993) (state statute

allowing state-created workers' compensation fund to step into shoes of employees for purposes

85

of priority is invalid in bankruptcy); In re Redford Roofing Co., 54 B.R. 254, 255 (Bankr. N.D.

Ill. 1985) (state statute granting priority to workers' compensation claims not effective in

bankruptcy).  Courts are not free to use their equitable powers or other principles to alter the

Bankruptcy Code's priority system.  See, e.g., U.S. v. Noland, 517 U.S. 535, 540-41 (1996)

(bankruptcy courts may not, under the guise of equitable subordination, categorically deny

noncompensatory, postpetition tax penalties the first priority given to other administrative

expenses); see also Collier ¶ 507.02[3] (collecting cases).

       Moreover, even if the Michigan Agency or the New York Board had a claim that

was entitled to priority treatment, neither has filed a proof of claim in these Chapter 11 Cases or

made the necessary showing of excusable neglect under Rule 9006(b)(1) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), which is the well-settled standard for

permitting a claimant to file a proof of claim after a bar date.  See Pioneer Inv. Servs. Co. v.

Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993) (interpreting general standard for

determining motions under Bankruptcy Rule 9006(b)(1)); Midland Cogeneration Venture Ltd.

P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115 (2d Cir. 2005) (interpreting and

applying Pioneer standard).

       As this Court has consistently ruled on motions under Bankruptcy Rule 9006(b)(1)

seeking leave to file an untimely proof of claim, a movant must first show that its failure to file a

timely claim constituted "neglect," as opposed to willfulness or a knowing omission.  Then, a

movant must show by a preponderance of the evidence that the neglect was "excusable."  See

e.g., Order Pursuant to 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 (I) Denying United States

Of America's Motion For Leave To File Late Claim And (II) Disallowing And Expunging Proof

Of Claim Number 16727, dated March 25, 2009 (Docket No. 16515) at Exh. A p. 2 (citing

86

Pioneer and Midland Cogeneration cases).  Courts in the Second Circuit have "taken a hard line"

in applying the Pioneer test and focus on the reason for the delay, including whether it was

within the reasonable control of the movant.  Silivanch v. Celebrity Cruises Inc., 333 F.3d 355,

368 (2d Cir. 2003).  "[T]he equities will rarely if ever favor a party who fails to follow the clear

dictates of a court rule ... [and] where the rule is entirely clear, we continue to expect that a party

claiming excusable neglect will, in the ordinary course, lose under the Pioneer test."  Midland

Cogeneration, 419 F.3d at 122-23.

> Accordingly, the Bankruptcy Code, the priority provisions under section 507 of

the Bankruptcy Code, and the Court's bar date order negate the Michigan Agency's and the New

York Department's request to be paid ahead of all other creditors on account of unfiled,

prepetition state workers' compensation reimbursement claims.

> 2.    Confirmation Of The Modified Plan Does Not Depend On Whether The
> Debtors Or Buyers Qualify To Self-Insure Workers' Compensation
> Obligations

The Michigan Agency and the New York Board argue that the Modified Plan

violates section 1129(a)(3) of the Bankruptcy Code because prepetition workers' compensation

obligations will not be paid in full from distributions under the Modified Plan.  This is incorrect.

As discussed above, the unfiled, prepetition[42] workers' compensation reimbursement claims are

not entitled to receive distributions under the Bankruptcy Code and, accordingly, the Modified

Plan fully comports with 1129(a)(3) of the Bankruptcy Code.

> Nor does GM's or DIP Holdco 3's supposed inability to qualify as self-insurers

following confirmation of the Modified Plan violate section 1129(a)(3) of the Bankruptcy Code.

As both objectors noted, self-insurance is only one of three ways to fulfill workers' compensation

---

[42]    The Modified Plan does, however, provide for the payment in full of postpetition workers' compensation claims
that are entitled to administrative priority treatment.  (See Modified Plan art. 2.1.)

obligations.  In Michigan, employers may obtain workers' compensation insurance coverage or

join with other employers to pool their workers' compensation obligations.  (See Docket No.

18264 ¶ 2.)  In New York, employers may obtain workers' compensation insurance coverage

from either a state-authorized insurance company or a quasi-public carrier.  (See Docket No.

18294 ¶ 4.)  Thus, the ability of a debtor or a purchaser of a debtor's assets to self-insure post-

effective date workers' compensation obligations is not a condition to confirming a plan of

reorganization or approving sale of assets under section 363 of the Bankruptcy Code.

3.    The Modified Plan Does Not Alter Workers' Ability To Seek Workers'
Compensation Payments

The Michigan Agency further argues that the Modified Plan would leave the

Debtors' injured workers without a source of workers' compensation benefit payments and as a

result would compromise the Michigan Agency's ability to support other self-insured employers

in Michigan.  This argument is irrelevant to whether the Modified Plan should be confirmed and,

moreover, is without merit.  Each individual worker who filed a timely claim will be entitled to a

distribution under the Modified Plan in accordance with the priority scheme under section 507 of

the Bankruptcy Code to the extent such claim has not been paid already following the Petition

Date.  To the extent that an individual Delphi employee failed to file a timely claim, that

employee's workers' compensation claim is barred by the bar date order entered by this Court.

The Bankruptcy Code does not require a debtor to pay reimbursement claims simply because

non-payment might impact the viability of a state fund.

4.    28 U.S.C. § 959(b) Does Not Require The Payment Of Prepetition
Workers' Compensation Claims In Full And In Cash

The Michigan Agency's final argument is that the Modified Plan violates 28

U.S.C. § 959(b), which requires a debtor-in-possession to manage and operate the property in its

possession according to the requirements of the laws of the state in which the property is situated

in the same manner the owner or possessor thereof would be bound to do.  The Michigan Agency

misses the mark.  This statute requires the Debtors, as debtors-in-possession, to comply with

applicable laws after the Petition Date, which the Debtors have done.  The statute cannot be read,

however, to require a debtor-in-possession to pay unfiled, prepetition workers' compensation

claims in clear violation of the priority system established by Congress under section 507 of the

Bankruptcy Code and applicable bar date orders simply because such payment is necessary to

comply with a state's laws and regulations.  Although state law may establish priorities for the

benefit of workers' compensation claimants outside of bankruptcy, the Bankruptcy Code

preempts conflicting state statutes as discussed above.  Redford Roofing, 54 B.R. at 255.

The Michigan Agency's reliance on Bickford v. Lodestar Energy, Inc., 310 B.R.

70, 76 (E.D. Ky. 2004), to require payment of a prepetition claim in full is inapposite.  In

Bickford, a district court reversed a bankruptcy court order enjoining state officials from

enforcing a postpetition bonding requirement against holders of surface mining permits on the

grounds that bonding requirements served not only the states' pecuniary interests but also

protected the state's citizens against dangers of unreclaimed land and came within the "police

power" exception to the automatic stay.  In contrast, the Michigan Agency is not challenging the

Debtors' postpetition compliance with that state's workers' compensation statutes and regulations.

Rather, the Michigan Agency is asking this Court to force the Debtors to pay the Michigan

Agency's unfiled, prepetition claims in full.

5.    Promissory Estoppel And Equitable Estoppel Do Not Apply

The New York Board argues that the Debtors should be precluded by principles

of promissory estoppel or equitable estoppel form excluding workers' compensation claims from

the class of Flow-Through Claims under the Modified Plan.  This argument is in error.

One species of equitable estoppel is promissory estoppel.  Eastern Air Lines, Inc. v Ins. Co. of State of Pa. (In Re Ionosphere Clubs, Inc.), 85 F.3d 992, 999 (2d Cir. 1996).  Under New York law, to establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (i) an oral promise that is sufficiently clear and unambiguous, (ii) reasonable and foreseeable reliance on the promise by a party, and (iii) an injury caused by the reliance.  See, e.g., In re Cairns & Assocs., Inc., 372 B.R. 637 (Bankr. S.D. N.Y. 2007) (applying New York law).

In this instance, any reliance on the Confirmed Plan or any other communication regarding treatment of claims under the Confirmed Plan was not reasonable because the effectiveness of the Confirmed Plan was subject to satisfaction of several conditions that, unfortunately, were never met.  Moreover, the Confirmed Plan was subject to modification by the Debtors under the express terms of the Confirmed Plan (see Confirmed Plan art. 14.3), and section 1127 of the Bankruptcy Code permits a debtor to modify a plan after its confirmation if it has not been substantially consummated.  11 U.S.C. § 1127(b).  Because the Confirmed Plan was not substantially consummated, parties-in-interest such as the New York Board cannot rely on the enforceability of the Confirmed Plan.  To allow otherwise would arguably permit all unsecured creditors and other parties-in-interest to enforce the terms of the Confirmed Plan, an obviously absurd result.  For example, holders of rights under the rights offering pursuant to the Confirmed Plan could petition the Court for the rights they purchased.  Creditors could demand distributions at rates offered them under the Confirmed Plan.  Other holders of claims that were classified as flow-through claims under the Confirmed Plan but are classified as general unsecured non-priority claims under the Modified Plan could insist on flow-through treatment

instead.  Accordingly, the New York Board's argument that the doctrines of promissory or

equitable estoppel warrant flow-through treatment of its unfiled claims is untenable.

VII.    THE ALTERNATIVE SECTION 363 SALE SHOULD BE APPROVED UNDER
        SECTION 363 OF THE BANKRUPTCY CODE

                In the event that the Court does not approve the modifications to the Confirmed

Plan, the Debtors request in the alternative that the Court approve the sale of substantially all of

their assets under the Master Disposition Agreement pursuant to section 363 of the Bankruptcy

Code.

                Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property

of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C.

§ 363(b)(1).  Use of estate property outside the ordinary course of business may be authorized if

the debtor demonstrates a sound business justification for it.  See Comm. of Equity Sec. Holders

v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule

requires finding that good business reason exists to grant debtor's application under section

363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del. 1991).

Authority to sell assets under section 363 of the Bankruptcy Code includes the ability to sell

substantially all assets of the Debtors' estates.  Fla. Dep't of Revenue v. Piccadilly Cafeteria, Inc.,

128 S. Ct. 2326, 2331 n.2 (2008) (recognizing that debtors often sell "substantially all of [their]

assets as a going concern" and later "submit[] for confirmation a plan of liquidation . . .

providing for the distribution of the proceeds resulting from the sale").

                The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

91

F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's section 363(b) motion is

a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's

decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the

time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

Once the debtor articulates a valid business justification, a presumption arises that

"in making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'"

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res.), 147

B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).  Thereafter, "[p]arties opposing the proposed

exercise of a debtor's business judgment have the burden of rebutting the presumption of

validity." Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an

objection. Rather, an objector "is required to produce some evidence respecting its objections."

Lionel Corp., 722 F.2d at 1071.  As a rule, the debtor's business judgment "should be approved

by the court unless it is shown to be "so manifestly unreasonable that it could not be based upon

sound business judgment, but only on bad faith, or whim or caprice." In re Aerovox, Inc., 269

B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).

The Debtors have sound business justifications for pursuing a sale process at this

time.  Although the Debtors have marketed their businesses to potential investors throughout the

bankruptcy, the sale contemplated by the Pure Credit Bid is the best transaction that has become

available since the Plan Investors failed to honor their commitments under the Confirmed Plan in

April 2008.  Furthermore, the Debtors now face a significant liquidity crisis.  GM has continued

to provide the Debtors with interim financing while the Debtors seek the Court's approval of the

Master Disposition Agreement, but GM has also made it clear that no additional liquidity support

92

will be forthcoming without a full and final global resolution to the Chapter 11 Cases.  If the sale

under the Master Disposition Agreement, or an alternative transaction with a successful bidder at

the auction, is not approved, it is unlikely that the Debtors will have sufficient liquidity to

continue their operations and will face imminent liquidation, causing significant erosion to the

value of the Debtors' estates.

        The Master Disposition Agreement presents the best available alternative for the

Debtors' and their many stakeholders.  The sale allows the Debtors' businesses to continue

operating, thereby preserving going-concern value for the benefit of the Debtors' creditors, and

the participation of DIP Holdco 3 in the transaction will give non-GM suppliers and customers

confidence in their future relationships with the Debtors knowing that corporate governance

control will reside in a non-GM third party.  The Debtors' exercise of business judgment in

executing the Master Disposition Agreement is reinforced by the fact that no competing third-

party bids were received under the Supplemental Procedures approved by the Court.  Thus, the

transaction proposed under the Master Disposition Agreement will maximize for the Debtors'

estates and demonstrates that the Debtors have properly exercised their business judgment.

        Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell

property free and clear of any lien, claim, or interest in such property if, among other things, (i)

applicable nonbankruptcy law permits sale of such property free and clear of such interest,

(ii) such entity consents, (iii) such interest is a lien and the price at which such property is sold is

greater than the aggregate value of all liens on such property, (iv) such interest is in bona fide

dispute, or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest.  11 U.S.C. § 363(f).

Here, section 363(f) of the Bankruptcy Code permits the Debtors to sell the transferred assets free and clear of all liens, claims (including successor liability claims), and encumbrances, other than the permitted encumbrances.  See, e.g., In re Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . .successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress."), aff'd, 332 F.3d 283 (3d Cir. 2003).  This Court and other courts in the Second Circuit have approved sale approval orders authorizing the sale of assets free and clear of all interests and claims, including successor liability claims.  See In re Refco, Inc., Case No. 05-60006 (Nov. 15, 2006) (authorizing certain debtors to sell customer lists free and clear of interests and claims, including successor liability claims); In re Refco, Inc., Case No. 05-60006  (Nov. 14, 2005) (authorizing debtors to sell regulated commodities futures merchant business free and clear of interests and claims, including successor liability claims); In re PSINet Inc., Case No. 01-13213 (Jan. 15, 2002) (authorizing debtors to sell certain shares free and clear of liens and claims, including claims otherwise arising under doctrines of successor liability).

To the extent that any holder of a secured interest is found not to have consented to the proposed sale, the transferred assets may still be sold free and clear of liens, claims, and encumbrances under section 363(f)(3) and 363(f)(5).  Although there is a split among courts as to the meaning of the "aggregate value of all liens" under section 363(f)(3), courts in this jurisdiction[43] have construed the provision to require a sale price greater than the economic value

---

[43]    Courts in other jurisdictions have reached the same conclusion.  In re WBQ P'ship, 189 B.R. 97. 105-06 (Bankr. E.D. Va. 1995); In re Collins, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995); In re WPRV-TV, Inc., 143 B.R. 315, 320 n.14 (D.P.R. 1991); (2)    In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990); In re Terrace Gardens Park P'ship, 96 B.R. 707, 712-13 (Bankr. W.D. Tex. 1989); In re Microwave Prods. of Am., Inc., 102 B.R. 659, 660-61 (W.D. Tenn. 1989).

94

of the liens securing collateral, rather than the face amount of all claims secured by the collateral.

In re Beker Indus., 63 B.R. 474, 476-77 (Bankr. S.D.N.Y. 1986).  To approve a sale under

section 363(f)(3) for a price that is less than the full amount of the secured claims, the court need

only find the price is justified under the circumstances; for example, a debtor received the best

price available or the sale is necessary to avoid rapid declines in the value of the collateral.

Oneida, 114 B.R. at 357; Beker, 63 B.R. at 477-78.  The successful bid selected by the Debtors

at the conclusion of the auction will be the culmination of the Debtors marketing efforts

throughout their Chapter 11 Cases, more than a year of negotiations since the Plan Investors

failed to close in April 2008, scrutinized by the markets through the alternative-transaction

procedures approved by the Court, and unmistakably will represent the best transaction available

to the Debtors.  Moreover, the Debtors' only alternative to completing a sale is liquidation, an

alternative that would significantly deplete the value of the Debtors' estates.  Moreover, at the

completion of a 363 sale, parties with security interests in the transferred assets could be

compelled to accept a money satisfaction of their interests as a result of their liens against the

proceeds of the sale.

Accordingly, each lien, claim, or encumbrance that is not the result of an assumed

liability satisfies at least one of the five conditions of section 363(f), and the Debtors submit that

any such lien, claim, or encumbrance would be adequately protected by attachment to the net

proceeds of the sale, subject to any claims and defenses that the Debtors may possess with

respect thereto.  The Debtors, therefore, request that the transferred assets be sold to the

successful bidder or bidders at the auction free and clear of all liens, claims, and encumbrances –

except for any assumed liabilities or permitted encumbrances – with such liens, claims, and

encumbrances to attach to the proceeds of the sale of the transferred assets.

95

Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former Bankruptcy

Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc. v. Pan Am

Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992);

In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n).

The Debtors submit that the Master Disposition Agreement reflects an intensely

negotiated, arm's length transaction.  Throughout the negotiations, all of the parties have at all

times acted in good faith.  Moreover, to the extent that the transferred assets are sold to an

alternative transaction at the auction, it will be because of a well-planned competitive process

96

and intense negotiations at arm's length.  As described above, the consideration received by the

Debtors under the Master Disposition Agreement represents the best offer received as a result of

extensive marketing, negotiations, and the competitive bidding procedures approved by the

Court, and will be subject to further competitive bidding by the Administrative Agent at the

auction.

        As a result of the foregoing, the Debtors request that the court make a finding that

the purchase price paid by the buyers under the Master Disposition Agreement is fair and

reasonable, is the highest or otherwise best offer for the transferred assets, and constitutes

reasonably equivalent value and fair consideration under any applicable law and that the buyers

under the Master Disposition Agreement have purchased the transferred assets and assumed

certain liabilities and contracts in good faith within the meaning of the Bankruptcy Code

(including but not limited to section 363(m) of the Bankruptcy Code) or in similar applicable

state law.  Because a key element of a good faith finding is that the buyer's successful bid is not

the product of fraud or collusion between the purchaser and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders, the Debtors further request that this

Court make a finding that the transactions contemplated by the Master Disposition Agreement

are not avoidable under section 363(n) of the Bankruptcy Code.

VIII.   CONCLUSION

        WHEREFORE, the Debtors respectfully request that this Court overrule the

objections to the Modified Plan and the Master Disposition Agreement, approve the

modifications to the Confirmed Plan embodied in the Modified Plan, enter an order in

substantially the same form as the Modification Approval Order attached to this omnibus reply

as <u>Appendix C</u>, and grant the Debtors such other and further relief as is just.  In the alternative,

and only in the event that the Court does not grant the relief stated above, the Debtors

respectfully request that the Court overrule the objections to the Alternative Section 363 Sale,

enter an order in substantially the same form as the Section 363 Sale Approval Order attached to

this omnibus reply as <u>Appendix E</u>, and grant the Debtors such other and further relief as is just.

Dated:  July 27, 2009
      New York, New York


                    SKADDEN, ARPS, SLATE, MEAGHER &
                      FLOM LLP

              By:   /s/ John Wm. Butler, Jr.
                    John Wm. Butler, Jr.
                    Albert L. Hogan III
                    Ron E. Meisler
              155 North Wacker Drive
              Chicago, Illinois 60606
              (312) 407-0700


                        - and -


              By:   /s/ Kayalyn A. Marafioti
                    Kayalyn A. Marafioti
              Four Times Square
              New York, New York 10036
              (212) 735-3000

              Attorneys for Delphi Corporation, <u>et al</u>.,
               Debtors and Debtors-in-Possession