# EXHIBIT 1

## TACOMA LICENSE AND TECHNICAL SUPPORT AGREEMENT

This Tacoma License and Technical Support Agreement ("Agreement") dated as of March_*3rd*__, 2005, is made and entered into by and between Delphi Automotive Systems LLC ("Delphi"), a Delaware limited liability company with its principal place of business at 5725 Delphi Drive, Troy, Michigan, and The Furukawa Electric Co., Ltd., a Japanese corporation with its principal place of business at 6-1, Marunouchi 2-chome, Chiyoda-ku, Tokyo, 100-8322 Japan ("Furukawa-Japan"). Delphi and Furukawa-Japan are collectively referred to herein as "Parties" and individually as a "Party."

### RECITALS

WHEREAS, Furukawa-Japan has provided to Delphi technical support in the form of engineering design services and wiring harness drawings for the Toyota Tacoma 635 N (the "Platform") and is willing to grant to Delphi certain rights to use the Licensed Technical Information (as hereinafter defined) in the manufacture of electrical and electronic distribution systems for the Platform to be manufactured from late 2004 through 2009.

; and

WHEREAS, this Agreement is now entered into to stipulate the terms and conditions under which Furukawa-Japan has provided such technical support and grants permission to Delphi to use such Licensed Technical Information and under which Delphi will provide compensation to Furukawa-Japan for such technical support and such permission to use such Licensed Technical Information;

NOW THEREFORE, Furukawa-Japan and Delphi mutually agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1    "Licensed Technical Information" shall mean all information and assistance (including, but not limited to, data, know-how, trade secrets, wiring harness drawings) that Furukawa-Japan has provided, directly or indirectly, to Delphi including any information that has been disclosed or otherwise described, explicitly or implicitly in the drawings or any other technical documentation of the electrical and electronic distribution systems for the Platform.

1.2    "Confidential Information" shall mean information and/or any part thereof including Licensed Technical Information which is confidential and/or proprietary to either Delphi or Furukawa-Japan, and which is identified in writing at the time of disclosure by the disclosing party as being confidential and/or proprietary or which the receiving party reasonably should understand to be considered confidential and/or proprietary by the disclosing party. Any information which is disclosed orally or visually shall be considered Confidential Information only if such disclosure is documented in writing and identified as being confidential and/or proprietary within thirty (30) days of its disclosure.

1.3    "Tacoma Products" means the electrical and electronic distribution systems that Delphi and its affiliates manufactures, distributes, transports, and/ or sells for the Platform.

1.4    "Net Sales" means the total of the invoiced price of Tacoma Products that are manufactured by Delphi, less any sales allowances, customer discounts, and refunds for such Tacoma Products that are damaged or returned.

## ARTICLE 2

### LICENSE GRANT

2.1    Furukawa-Japan grants and agrees to grant to Delphi a nonexclusive license to use the Licensed Technical Information for the duration of the Platform for the purpose of designing, simulating, making, having made, using, and selling Tacoma Products.

2.2    Furukawa-Japan believes that the right to provide the Licensed Technical Information and the right to grant a license to use the Licensed Technical Information reside in Furukawa-Japan.

## ARTICLE 3

### COMPENSATION

3.1    In full compensation for all technical support provided by Furukawa-Japan to Delphi, such as Licensed Technical Information in accordance with the licenses granted herein, beginning at the start of production of the Platform and terminating after a period of five (5) years from such start of production, Delphi shall pay Furukawa-Japan, within 30 days of the end of each quarter (i.e., by January 30, April 30, July 30, and October 30), a royalty of one-half of one percent (0.5%) based on Delphi's Net Sales of Tacoma Products during each preceding quarter.

All payments to Furukawa-Japan shall be made in US dollars by electronic funds transfer direct to:

> THE BANK OF TOKYO-MITSUBISHI LTD.
> HEAD OFFICE
> 7-1, MARUNOUCHI
> 2-CHOME, CHIYODA-KU, TOKYO
> 103-8388 JAPAN

for credit to

> Account #:    Current Deposit 0891099
> THE FURUKAWA ELECTRIC CO., LTD.
> SWIFT CODE        BOTKJPJT

Furukawa-Japan may change this bank account by notice to Delphi, and the Parties may agree on other methods for payment. If at any time, laws or regulation in any way limit, interfere with, or prevent payment to Furukawa-Japan in US dollars, if such laws or

regulations prohibit or prevent the remittance of funds out of the United States, then and in such event, Delphi shall pay, to the extent and in the manner and in the currency permitted by such laws or regulations to the account that Furukawa- Japan may notice to Delphi.

3.2     Delphi shall not be liable or responsible for any payments or other compensation due any Furukawa-Japan employee. Furukawa-Japan shall be solely liable and responsible for all income tax withholdings, all employment withholding or deductions required by law or agreed to between Furukawa-Japan and its employees, and any other employment or fringe benefit to which Furukawa-Japan employees may be entitled, if any.

<h2 style="text-align:center">ARTICLE 4</h2>

<h2 style="text-align:center">WARRANTY</h2>

4.1     Furukawa-Japan represents that it has no reason to believe that any of the wiring harness designs provided as a result of their engineering design work for Delphi on Tacoma Products does not constitute original works of authorship and does not knowingly infringe patents, copyrights, trade secrets or other proprietary rights of third parties but it makes no warrant. Furukawa-Japan agrees that should it later be discovered that the use of the Licensed Technical Information in accordance with the licenses granted herein infringes any intellectual property or other proprietary rights owned by Furukawa-Japan or any of its affiliates, including patents, patent applications or other patent right or copyrights, Furukawa-Japan and its affiliates shall not assert such intellectual property or other proprietary rights so as to interfere with Delphi's use of the Licensed Technical Information in accordance with the licenses granted herein and shall waive any rights to license or royalty fees for such use. Any transfer of such intellectual property rights from Furukawa-Japan to any third party shall be subject to the terms of this agreement. Delphi will not seek patent protection, in the name of Delphi, for any invention first conceived by an employee of Furukawa and disclosed to Delphi.

4.2     Delphi shall have the right to retain its own counsel to defend against, negotiate, settle or otherwise deal with any such legal proceeding, claim or demand and Furukawa-Japan agrees to commercially reasonably co-operate with Delphi to settle it. Delphi shall have the right of prior approval of any settlement or agreement terminating the proceeding, or withdrawing the proceeding, claim or demand unless a complete and unconditional waiver and release of all claims against Delphi is provided to Delphi in a form reasonably acceptable to Delphi.

4.3     Furukawa-Japan and Delphi agree to cooperate to the extent reasonably possible when required to assist the other in defending themselves against disputes relating to employees, unemployment claims or litigation resulting from personnel decisions or job actions relating to Furukawa-Japan employees. Except as prohibited by law, this cooperation shall include, but not be limited to, the completion of reports, if requested, participation in meetings, attendance at hearings as a witness, answering of questions or interrogatories, under oath or otherwise. The Provisions contained in this Article shall survive the termination of this Agreement.

## ARTICLE 5

### CONFIDENTIALITY AND NON-USE

5.1   Furukawa-Japan shall not carry off, use, or disclose to third parties any data, information, documents, equipment, supplies, and other information or materials acquired from Delphi through provision of the technical support for any purpose other than to provide the technical support pursuant to this Agreement.

5.2   Furukawa-Japan agrees to return to Delphi, or, upon receipt of approval from Delphi, attest to the destruction of, any Delphi materials obtained in the course of providing technical support for the Platform.  All such materials shall be considered Confidential Information.

5.3   Furukawa-Japan and Delphi agree to protect any Confidential Information obtained from the other Party with the same standard of care that they would use to safeguard their own confidential information.  Each Party agrees that the obligation not to use for any purpose or any scope not authorized herein or disclose any Confidential Information to any third party shall remain in effect until 5 years after the termination of production of the Tacoma Products, except information that both Parties agree to treat as confidential for a period separately discussed and agreed to by both Parties.

5.4   The obligations of this Article shall not apply to any information (a) which is now available in the public domain generally without the fault or breach of this Agreement by the receiving Party, or (b) after and to the extent that it hereafter becomes available to the public generally without fault of the receiving Party, or (c) which is obtained or acquired by the receiving Party in good faith from a third party that is not in breach of any obligation of confidentiality to the disclosing Party with respect to such information, or (d) which is already known by the receiving Party before its receipt from the disclosing Party, as shown by prior written records, or (e) which is developed by the receiving Party independently of the disclosures made by the disclosing Party hereunder as shown by prior written records, or (f) which is permitted to be disclosed by a prior written consent of the disclosing Party.

5.5   If a receiving Party becomes legally compelled to disclose any of the Confidential Information covered by this Agreement, the receiving Party shall provide the disclosing Party with notice thereof at least five (5) days prior to such disclosure in order to allow the disclosing Party to seek a protective order, take other appropriate measures to assure its interests are protected, or to waive compliance with the provisions of this Agreement.

## ARTICLE 6

### TERM AND TERMINATION

6.1   This Agreement will be effective as of the date of its signing until the termination of production of the Tacoma Products,

## ARTICLE 7

### DISPUTE RESOLUTION

7.1    All disputes arising out of this Agreement shall be submitted for resolution by a representative of each Party, who shall meet to resolve the dispute within ten (10) days of a Party providing notice to the other of the dispute and a request for resolution pursuant to this Section. If the dispute is not resolved to the satisfaction of all Parties within thirty (30) days of the notice of dispute, a Party may invoke arbitration provided pursuant to the following Section 8.2.

7.2    Subject to Section 8.1, all disputes rising out of this Agreement shall be submitted to arbitration in accordance with the Commercial Rules of the American Arbitration Association. The arbitration shall be conducted in New York City, New York. The decision of the arbitrator(s) shall be final and may be entered as a judgment in any court having jurisdiction.

7.3    Any Party may commence arbitration by serving written notice of its claim upon the other Party and initiating arbitration proceedings in accordance with the applicable rules of the American Arbitration Association.

7.4    Any claim for arbitration must be commenced within one (1) year of the date upon which the dispute upon which the claim is based arose.

7.5    Pending final resolution of a dispute, all Parties shall, unless they otherwise agree in writing, continue to perform their respective duties under this Agreement.

7.6    Injunctive Relief. Notwithstanding anything stated in this Agreement to the contrary, the Parties shall, in addition to all other rights and remedies provided by law and/or equity, be entitled to equitable relief, including restraining orders and/or injunctive relief, to enforce Articles 8. The Parties may seek equitable relief from any court having jurisdiction.

## ARTICLE 8

### GENERAL PROVISIONS

8.1    This Agreement constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

8.2    No amendment, supplement, modification, waiver or termination of this Agreement shall be implied or be binding (including, without limitation, any alleged waiver based on a Party's knowledge of any inaccuracy in any representation or warranty contained herein) unless in writing and signed by the party against which such amendment, supplement, modification, waiver or termination is asserted and unless it recites that it amends this Agreement pursuant to this Section 9.2.

8.3     The rights and obligations provided by this Agreement shall not be assignable by any Party without the prior written consent of all Parties hereto, except that no consent of Delphi shall be required for an assignment of this Agreement by Furukawa-Japan to one or more its Affiliates. Except as expressly provided herein, nothing herein is intended to confer upon any person other than the parties (and any Furukawa-Japan Affiliate and Consultants) any rights or remedies under or by reason of this Agreement.  Any purported assignment in violation of this Article shall be void.

8.4     This Agreement shall be governed by and construed under and pursuant to the internal laws of the State of Delaware, without regard to conflict of law principles.

8.5     No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver, unless otherwise expressly therein provided.

8.6     All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, forwarded by overnight air express and receipted for by the recipient or an agent of the recipient or mailed by registered or certified United States mail, postage prepaid and return receipt requested, to the following addresses (or to such other address of a party as shall have been specified to the other parties to this Agreement by notice):

      If to Delphi:

          Delphi Packard Electric Systems

          408 Dana Street

          Warren, Ohio 44486

          Attention:  Business Line Manager E/EDS North America

          Fax No.:  330.373.3524

      with a copy to:

          Delphi Automotive Systems LLC

          5725 Delphi Drive

          Troy, Michigan 48098

          Attention:  General Counsel

          Fax No.:  248.813.2491

      If to Furukawa-Japan:

          The Furukawa Electric Co., Ltd.

          6-1, Marunouchi 2-chome, Chiyoda-ku, Tokyo 100-8322 Japan

Attention:  Automotive Product Division. Admin & Planning Dept.
General Manager

Fax No.:  +81 3.3286.3984


with a copy to:


Furukawa Electric North America APD, Inc.

47677 Galleon Drive Plymouth, MI 48170

Attention:  President

Fax No.:  734.446.2260

8.7     Any notice, report or other communication made in accordance with the provisions of Article 9.6 shall be deemed received, given, or served, if mailed by first class mail, on the fifth (5th) day after the day of mailing, and, if sent by facsimile, overnight delivery service or email, twenty-four (24) hours after the time of dispatch, provided customary confirmation of delivery or receipt has been received.

8.8     This Agreement may be executed in multiple counterparts, each of which shall be deemed an original instrument, and all of which shall constitute one Agreement.  The Agreement may be executed and delivered by facsimile transmission.

8.9     At any time or times, the Parties agree to sign, swear to, or acknowledge any certificate required by the Act, to sign, swear to, or acknowledge any amendment or cancellation as required by law, to sign, swear to, or acknowledge similar certificates or affidavits or certificates of fictitious firm names, trade name, or the like (and to any amendments or cancellations thereof) required by the laws of Delaware or any other jurisdiction in which the Party does, or proposes to do, business, and cause the filing of any of the same for recording wherever such filing shall be required by law.

8.10    The article, Section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.11    Each of the Parties shall pay all of the costs and expenses which such Party incurs incident to the preparation, negotiation, execution and delivery of this Agreement, including, without limitation, the fees and disbursements of counsel, accountants and consultants, without right of reimbursement from any other party or Delphi.

8.12    Delphi and Furukawa-Japan shall, from time to time after the execution of the agreement , upon Furukawa-Japan's reasonable request and without further consideration, execute and deliver such additional papers, instruments and documents and take such other action and give such further assurances as may be necessary, proper or convenient in order to give effect to the agreements contained herein.

8.13    Except for information required to be given by law (including the IRC or state taxation statutes) or by court, administrative or other governmental order, no press release or

other information relating to the transactions contemplated by this Agreement shall be made or given to the public except upon the written agreement of Furukawa-Japan and Delphi.

8.14   This Agreement does not constitute either Party the agent or legal representative of the other Party, and neither party is granted any express or implied right or authority to assume or to create any obligation or responsibility on behalf of or in the name of the other, or to bind the other in any manner.  No employee of either Party shall in any sense be an employee of the other.

8.15   If any Article or provision of this Agreement should in any way contravene a law of any state or country in which this Agreement is effective, the remaining section of this Agreement shall not be affected thereby and this Agreement shall be modified to conform with such law.  Notwithstanding the foregoing, in the event of any such contravention Delphi may terminate this Agreement with mutual written consent with Furukawa-Japan.

Furukawa-Japan and Delphi have caused this Agreement to be executed, in duplicate, by their respective duly authorized representatives on the dates and at the places indicated below.

**The Furukawa Electric Co., Ltd.**

By: _Yasufumi Osada_

Name:   Yasufumi Osada

Title:   Divisional Manager

Date:   March 9, 2005

**Delphi Automotive Systems LLC**

By: _____

Name:   _____

Title:   _____

Date:   _____

# **EXHIBIT 2**

**FURUKAWA ELECTRIC**
THE FURUKAWA ELECTRIC CO., LTD.
2-3, Marunouchi, 2-chome,Chiyoda-ku,Tokyo 100-8322, Japan   Tel : 81-3-3286-3353   Fax : 81-3-3286-3667



Ref.#: NM090526RPED-001
Date : May 26, 2009

Delphi Packard Electric Systems
1265 North River Road E&R Building, M/C 92B
Warren, Ohio 44486 USA

**Attn: Mr. Mike Schuppe / Finance (DFWS)**
**CC: Ms. Elaine Hofius,**

## Request for Payment of Engineering Royalties
### (For Q1 of 2009)

Dear Mr. Schuppe,

In accordance with the **TACOMA LICENSE AND TECHNICAL SUPPORT AGREEMENT**
between Delphi Packard and FEC, we are showing hereunder the invoice of Royalties for the
1st Quarter of 2009 (1/1~3/31/2009), and are requesting you to take an action to effect payment
to us to be received by June 30, 2009 JST.

Royalty

|  |  |  |
|---|---|---|
| 1st Quarter (1/1 – 3/31, 2009) | $ 15,670.37- |
| Total | $ 15,670.37- |

**Total Amount**        <u>**US$ 15,670.37-**</u>

**Payment Method**        By Telegraphic Transfer in US Dollar

**Bank Account**        The Bank of Tokyo-Mitsubishi UFJ Ltd.
Head Office
7-1, Marunouchi 2-Chome,
Chiyoda-ku, Tokyo 103-8388 Japan
Account #: Current Deposit 0153579
THE FURUKAWA ELECTRIC CO., LTD.
SWIFT CODE BOTKJPJT

Sincerely,

Shigenobu Abe
Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.

**FURUKAWA ELECTRIC**
⌂ THE FURUKAWA ELECTRIC CO. LTD.
2-3, Marunouchi, 2-chome,Chiyoda-ku,Tokyo 100-8322, Japan    Tel : 81-3-3286-3353    Fax : 81-3-3286-3667



Ref.#: NM090528RPED-001
Date : May 28, 2009

Delphi Packard Electric Systems
1265 North River Road E&R Building, M/C 92B
Warren, Ohio 44486 USA

**Attn: Mr. Mike Schuppe / Finance (DFWS)**
**CC: Ms. Elaine Hofius,**

## Request for Payment of Engineering Royalties
(For April of 2009)

Dear Mr. Schuppe,

**In accordance with the TACOMA LICENSE AND TECHNICAL SUPPORT AGREEMENT
between Delphi Packard and FEC, we are showing hereunder the invoice of Royalties for April
(4/1~4/30/2009), and are requesting you to take an action to effect payment to us to be received
by June 30, 2009 JST.**

Royalty

| | | |
|---|---|---|
| April (4/1 – 4/30, 2009) | $ 9,026.82- |
| Total | $ 9,026.82- |

Total Amount              **US$ 9,026.82-**

Payment Method            By Telegraphic Transfer in US Dollar

Bank Account              The Bank of Tokyo-Mitsubishi UFJ Ltd.
                          Head Office
                          7-1, Marunouchi 2-Chome,
                          Chiyoda-ku, Tokyo 103-8388 Japan
                          Account #: Current Deposit 0153579
                          THE FURUKAWA ELECTRIC CO., LTD.
                          SWIFT CODE BOTKJPJT

Sincerely,

Shigenobu Abe
Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.

# **EXHIBIT 3**

## TACOMA - COROLLA CONSULTING AND TECHNICAL SUPPORT AGREEMENT

This Tacoma-Corolla Consulting and Technical Support Agreement ("Agreement") dated as of June ___ , 2005, is made and entered into by and between Delphi Automotive Systems LLC ("Delphi"), a Delaware limited liability company with its principal place of business at 5725 Delphi Drive, Troy, Michigan, and The Furukawa Electric Co., Ltd. ("Furukawa-Japan"), a Japanese corporation with its principal place of business at 6-1 Marunouchi 2-chome, Chiyoda-ku, Tokyo, 100-8322 Japan. Delphi and Furukawa-Japan are collectively referred to herein as "Parties" and individually as a "Party."

### RECITALS

WHEREAS, Furukawa-Japan employs certain personnel who possess specialized expertise that is necessary or useful in the manufacture of Electrical and Electronic Distribution Systems and can provide, directly or indirectly, certain assistance to Delphi;

WHEREAS, Furukawa-Japan owns or controls know-how, trade secrets and other proprietary technical information necessary or useful in the manufacture of electrical and electronic distribution systems and licenses the use of same to Delphi;

WHEREAS, Delphi desires to obtain from Furukawa-Japan certain technical information and assistance to support Delphi's manufacture of electrical and electronic distribution systems for the Toyota Corolla and Tacoma platforms in Delphi's Rio Bravo IX facilities;

WHEREAS, All Parties agree that the work contemplated by this Agreement is highly confidential and proprietary in nature to Parties. All work product and work-in-progress developed at Delphi's Rio Bravo Mexico facility for this Project shall be owned and utilized in accordance with Sections 8, 10, and 16 of this Agreement; and

WHEREAS, this Agreement is necessary to define the terms and conditions under which Furukawa-Japan will provide technical information and assistance to Delphi;

NOW THEREFORE, Furukawa-Japan and Delphi mutually agree as follows:

### ARTICLE I

### DEFINITIONS

1.1     Delphi and Furukawa-Japan are hereunder commonly referred to as "Parties" in singular and plural usage, as required by the context.

1.2     "DRBM" means the Rio Bravo Mexico facility of Delphi located at Av. Tecnologico y Juan Kepler 6915Cd. Juarez, Chihuahua, 32320 Mexico.

1.3     "Project(s)" means those work products identified on Schedule A, individually or collectively. Project shall include any additional work products that the Parties, by mutual agreement, designate in an amendment to Schedule A.

1.4     "Assistance" shall mean services, information, and any other forms of assistance, including consulting and technical support services, provided by Furukawa-Japan to Delphi in accordance with and subject to the terms and conditions of this Agreement.

1.5     "Consulting Engineer" means an employee of Furukawa-Japan who shall be designated by Furukawa-Japan and approved by Delphi, and who will be assigned from time to time (on either a full-time or part-time basis) to provide Assistance to Delphi, in accordance with and subject to the terms and conditions of this Agreement.

1.6     "Services" means all time and effort expended by Furukawa-Japan and Consulting Engineers to provide Assistance required by Projects and/or requested by Delphi pursuant to this Agreement.

1.7     "Delphi Manufacturing Engineering Requirements" means the processes, systems, manufacturing and process engineering, equipment, other resources, and standards which Delphi designates as applicable to the Services and Furukawa-Japan's performance of this Agreement. "Delphi Manufacturing Engineering Requirements" may be changed or modified from time to time at Delphi's sole discretion.

1.8     "Licensed Technical Information" shall mean all information and assistance (including, but not limited to, data, know-how, trade secrets and patent applications) which Delphi obtains from Furukawa-Japan that is necessary or useful in the manufacture of Electrical and Electronic Distribution Systems for the Toyota Corolla and Tacoma Products. Such Licensed Technical Information shall not include the process information to manufacture equipment, tooling and jigs, unless otherwise agreed by both Parties. Licensed Technical Information shall be used only for the Products.

1.9     "Furukawa-Japan's Patents" means any and all patent applications, if any, which have been filed prior to or during the period of this Agreement by Furukawa-Japan within the Electrical and Electronic Distribution Systems, and all patents, if any, which have been issued or may be issued to Furukawa-Japan as the result thereof and the patents, and applications for patents, which is related to the Licensed Technical Information to which rights are granted to Delphi under this Agreement and which are now or hereafter owned or controlled by Furukawa-Japan

1.10     "Confidential Proprietary Information" shall mean information and/or any part thereof which is confidential and/or proprietary to either Delphi or Furukawa-Japan, which is identified in writing at the time of disclosure by the disclosing party as being confidential and/or proprietary, should reasonably be known by the receiving party to be considered confidential and/or proprietary, or which, if disclosed orally or visually, is documented in writing and identified as being confidential and/or proprietary within thirty (30) days of its disclosure.

1.11     "Corolla Products" means the Electrical and Electronic Distribution Systems that Delphi manufactures at DRBM and sells to Toyota for 330N Corolla platform, including annual minor change vehicle, but ending with a major model change (MC Corolla).

1.12     "Tacoma Products" means the Electrical and Electronic Distribution Systems that Delphi manufactures at DRBM and sells to Toyota for 635N Tacoma platform, including annual minor change vehicle, but ending with a major model change which is expected in 2009 but may vary.

1.13    "Net Sales" means the total of the invoiced price of Corolla Products and Tacoma Products that are manufactured by Delphi, less any sales allowances, less components purchased from Furukawa-Japan or its Affiliates, customer discounts, and refunds for Products damaged or returned.

1.14    "Technical Service Fees" shall mean the quantity determined by multiplying the number of Consulting Engineer work-days by the daily fee of $400 per work day.

1.15    "Associated Travel Expenses" shall mean the reasonable and necessary travel expenses that are actually incurred by Consulting Engineers pursuant to the provision of Services pursuant to this Agreement.

1.16    "Electrical & Electronic Distribution Systems" shall mean those systems that are wiring harnesses and not electronic components.

1.17    "Affiliate" shall mean any corporation, association, partnership or other entity directly or indirectly owning or owned by a Party or under direct or indirect common ownership with a Party. For purposes of this definition, "own" means ownership of more than 50% of shares having the right to vote or the right to appoint a majority of the directors.

1.18    Products" shall mean Corolla Products and Tacoma Products, individually or collectively.

1.19    Project Completion Dates means the target date defined in Schedule A.

## ARTICLE 2

### SCOPE OF WORK

2.1    Delphi may require, from time to time, certain Assistance from Furukawa-Japan relating to the manufacture of Tacoma and/or Corolla Products. Such required Assistance may be based upon Toyota's direct feedback to Delphi or may arise from a specific need identified by Delphi.

2.2    Furukawa-Japan shall provide Technical Support through pre-planned bi-monthly visits, lasting one week in duration as outlined in Schedule A. Such visits in Schedule A may be extended or shortened or changed by mutual agreement prior to scheduled visits.

## ARTICLE 3

### CONSULTING ENGINEERS

3.1    Furukawa-Japan shall nominate Consulting Engineers, in the numbers, described in the Schedule A, requested by Delphi, with sufficient education, experience and know-how to properly and timely provide the required Assistance. Furukawa-Japan shall notify Delphi of the identity and relevant background information regarding each nominated Consulting Engineer.

3.2    Delphi may ask Furukawa-Japan to replace any nominated Consulting Engineer that Delphi deems unacceptable due to non-performance, problem with behavior or other reason. In such case, Furukawa-Japan shall immediately solve such problem(s), or otherwise shall nominate a replacement Consulting Engineer pursuant to this Article.

3.3    Furukawa-Japan agrees that continuity of Consulting Engineers is critical to the proper and timely completion of Services under this Agreement. It is anticipated that the Consulting

Engineers assignments may vary from one to several weeks at a time. Nothing in this provision shall be deemed to limit or modify Furukawa-Japan's unilateral right as the employer of the Consulting Engineers, to discipline the Consulting Engineers, up to and including termination of employment, in accordance with Furukawa-Japan's policies and procedures.

3.4    Consulting Engineers shall remain at all times the employees of Furukawa-Japan and/or its controlled Affiliates, not Delphi. Furukawa-Japan and its Affiliates shall retain the sole rights to direct the daily work activity of Consulting Engineers.


## ARTICLE 4

## INDEMNIFICATION AND COOPERATION

4.1    Furukawa-Japan shall indemnify, defend and hold Delphi, its directors, officers, employees, independent contractors and agents harmless from and against damages, losses, attorneys fees, costs, expenses, liabilities and settlement amounts with respect to any actual or threatened disputes, claims, actions, lawsuits or proceedings asserted or commenced, and whether or not well founded in law or fact, which arise out of any acts or omissions of any Consulting Engineers occurring during the term of this Agreement. Such claims shall not include any claims arising from Delphi's manufacture and sale of Tacoma and Corolla Products, but shall include, without limitation

   (a)    any claim made against Delphi with respect to any liability of Consulting Engineers;

   (b)    any noncompliance or violation of statutes, ordinances or laws applicable to Consulting Engineers whether arising under statute or common law;

   (c)    any claims for personal injury, including emotional distress or death, or property damage brought by any Consulting Engineer (1)arising out of or related directly to the Furukawa-Japan's supervision of the Consulting Engineer's performance of Services hereunder or (2)caused by Furukawa-Japan or any third party doing business with Furukawa-Japan; and

   (d)    all actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, incident to any of the matters specified in subsections (a) through (c) of this Section 4.1.

4.2    In the event that any legal proceedings shall be instituted or any claim or demand shall be asserted by any person in respect of which indemnification may be sought by Delphi under the provisions of Section 4.1, Delphi shall, to the extent of its knowledge thereof, provide written notice of the commencement of such proceedings or the assertion of such claim or demand to Furukawa-Japan. Delphi shall have the right to retain its own counsel to defend against, negotiate, settle or otherwise deal with any such legal proceeding, claim or demand and Furukawa-Japan agrees to indemnify and promptly reimburse Delphi for all such expenses. Likewise, Furukawa-Japan shall have the right, to the extent of its indemnification, at its option and at its own expense, to be represented by counsel of its choice and to defend against, negotiate, settle or otherwise deal with any such legal proceeding, claim or demand. Delphi has the right of prior approval of any settlement or agreement terminating the proceeding, or

withdrawing the proceeding, claim or demand unless a complete and unconditional waiver and release of all claims against Delphi is provided to Delphi in a form reasonably acceptable to Delphi. Notwithstanding the provisions of Section 4.1 and 4.2 above to the contrary, the amount which shall be borne, paid or reimbursed by Furukawa-Japan during or after the term of this Agreement pursuant to the provisions of Section 4.1 or 4.2 above shall in no way exceed One Million U.S. dollars (US$1,000,000).

4.3    Furukawa-Japan and Delphi agree to cooperate to the extent reasonably possible when required to assist the other in defending themselves against disputes relating to employees, unemployment claims or litigation resulting from personnel decisions or job actions relating to Furukawa-Japan Employees performance. Except as prohibited by law, this cooperation shall include, but not be limited to, the completion of reports, if requested, participation in meetings, attendance at hearings as a witness, answering of questions or interrogatories, under oath or otherwise. The Provisions contained in this Section 4.1 shall survive the termination of this Agreement.

## ARTICLE 5

## PERFORMANCE OF SERVICES

5.1    Consulting Engineers may, at Delphi's option, be provided office space and supplies at the DRBM consistent with such office space and supplies provided to Delphi engineers. Such system, office space and supplies shall be used strictly to provide Services and for no other purpose. Should Consulting Engineers ask Delphi to provide office space and supplies at DRBM, Delphi shall reasonably try to provide office space and supplies provided Delphi engineers.

5.2    Furukawa-Japan shall provide Assistance in a timely and competent manner consistent with the professional standards generally required of professional engineers and in compliance with Delphi Manufacturing Engineering Requirements.

5.3    Delphi may furnish, but shall not be obligated to furnish, Furukawa-Japan or Consulting Engineers with information pertaining to Assistance to be performed.

5.4    Consulting Engineers shall be notified of all rules and regulations of the Premises of DRBM by Delphi, where practical. Consulting Engineers shall be, and shall agree to be, subject to security stops, searches and inspections of their person and possessions while entering, exiting and while within DRBM. Furukawa-Japan and Consulting Engineers' access throughout DRBM shall be limited to those areas specifically identified by Delphi. Consulting Engineers shall not use or be permitted access to copy or facsimile machines at DRBM, except those copy or facsimile machines, which Delphi permits Consulting Engineers to use, or to which Delphi permits Consulting Engineers have access. Furukawa-Japan and Consulting Engineers shall promptly comply with any additional security measures initiated by Delphi at the DRBM during the term of this Agreement.

5.5    Neither Furukawa-Japan nor Consulting Engineers will remove any Delphi materials from DRBM without the specific written approval of Delphi. All removed materials shall be considered Confidential Proprietary Information and must be logged out by a representative of Delphi, which representative shall have been designated as such in writing by Delphi. Only a Consulting Engineer specifically authorized by Delphi in writing to remove materials pursuant to this Section 5.5 may do so.

5.6     Project Completion Dates shall be strictly met.  Time is of the essence in providing Assistance to Delphi in completing the Projects.  Furukawa-Japan shall direct the Consulting Engineers' work schedule within the normal operating hours of DRBM so as to provide Assistance in a timely manner. A Delphi Engineer will be assigned during the Consulting Engineer's stay to facilitate and host the Consulting Engineer.

5.7     Delphi may review from time to time the effectiveness of the Consulting Engineers assigned to Delphi and their functions in Delphi.  If Delphi finds the performance of any Consulting Engineer to be deficient, in the sole discretion of Delphi, Delphi may so notify Furukawa-Japan.  Furukawa-Japan may replace the Consulting Engineers at any time after consultation with Delphi and with prior written notice to Delphi.  Furukawa-Japan shall take into consideration Delphi's reasonable requests regarding the selection or the replacement of Consulting Engineers, or any other changes to the services provided by Consulting Engineers.

## ARTICLE 6

### EXPENSES

6.1     Delphi shall not be liable or responsible for any payments or other compensation due any Consulting Engineer.  Furukawa-Japan shall be solely liable and responsible for all income tax withholdings, all employment withholding or deductions required by law or agreed to between Furukawa-Japan and Consulting Engineer, and any other employment or fringe benefit to which Consulting Engineer may be entitled, if any.

6.2     Furukawa-Japan shall indemnify, hold harmless and defend Delphi from all claims, demands, injuries, actions, debts or other liability, including attorney's fees and court costs, arising from the wrongful failure of Furukawa-Japan to timely or properly report, pay or deliver any applicable tax (including income and employment taxes), withholding, deduction or payment of any kind, regardless of its nature or the manner in which it was levied or become due.

## ARTICLE 7

### PROJECT PROGRESS

7.1     Each Project shall be completed pursuant to the project schedule defined in Schedule A.

7.2     All Consulting Engineers shall meet as deemed needed by Delphi to discuss the progress and status of the Projects and shall report such status as requested by Delphi.

## ARTICLE 8

### OWNERSHIP AND USE OF WORK PRODUCT

8.1     Delphi and Furukawa-Japan agree that nothing in this Agreement shall be construed as transferring or agreeing to transfer any right or interest in, or title to, any data, information, documents, equipment, supplies, and other information or materials which Delphi makes available to Furukawa-Japan, whether tangible or intangible, including patents, patent rights, copyrights, trademarks, trade secrets, and all other intellectual property and proprietary rights.

8.2     If either Furukawa-Japan or Consulting Engineers become aware of the existence of a third party's patent or patent applications on any product to be used in the performance of any obligations hereunder, such Party shall notify Delphi of such discovery.

8.3     If, in providing Assistance to Delphi, Furukawa-Japan or Consulting Engineer develops any new information, creates any original works, or conceives any new invention or device, Furukawa-Japan or Consulting Engineers shall promptly inform Delphi and Delphi shall own any newly created information, works and inventions or devices; however Furukawa-Japan shall continue to own any part of the Licensed Technical Information that Furukawa-Japan developed, created, or conceived independently from Assistance. Provided that Furukawa-Japan and/or its Affiliate(s) compensate(s) Delphi in accordance Section 8.8. herein, and provided that Furukawa-Japan and/or its Affiliate obtain(s) the prior written consent of Delphi, Furukawa-Japan and/or its Affiliate(s) may use, but not to be obligated to use, such invention for any Delphi-Agreed Purpose. As used herein, the term Delphi-Agreed Purpose shall mean those activities that Delphi may, in Delphi's sole discretion, grant permission to Furukawa-Japan and/or its Affiliate(s) to conduct. Furukawa-Japan and its Affiliate(s) agree that it shall not use any such invention for any purpose other than a Delphi-Agreed Purpose.

8.4     Subject to patent rights of the respective Parties, and confidentiality obligations provided in Article 16, Delphi may use Licensed Technical Information disclosed to it by Furukawa-Japan during the term of this Agreement. Furukawa-Japan shall not use any data, information, documents, equipment, supplies, and other information or materials acquired through provision of the Assistance for any purpose other than to provide the Assistance pursuant to this Agreement

8.5     In full consideration of the mutual promises defined herein and compensation recited in Article 8 and 11, Furukawa-Japan grants and agrees to grant to Delphi a nonexclusive license to use the Licensed Technical Information and a nonexclusive license under the Furukawa-Japan Patents for the purpose of manufacturing, having manufactured, using, and selling the Products for the life of any program supporting Corolla Products or Tacoma Products. Furukawa-Japan hereby waives its right to any claim or any action against Delphi, its customers and its subcontractors under any of Furukawa-Japan's Patents as to infringing such patent or patents in order to exercise the license and right under the Electric and Electronic Distribution Systems herein granted.

8.6     Nothing contained in this Agreement shall constitute, or be construed to be, a limitation or restriction upon any right otherwise possessed by Delphi or Furukawa-Japan to make, use or sell any product, or parts thereof, including Electrical and Electronic Distribution Systems, in any country.

8.7     Furukawa-Japan warrants that the right to provide the Licensed Technical Information and the right to grant a license to use the Licensed Technical Information reside in Furukawa-Japan.

8.8     In relation to the use of the invention previously noted in Article 8.3, within 30 days of the end of each quarter, Furukawa-Japan and/or its Affiliate(s) shall pay Delphi a royalty of one-half of one percent (0.5%) based on the total of the invoiced price, less any sales allowances, less components purchased from Delphi or its Affiliates, customer discounts, and refunds for Products damaged or returned, of any products that are manufactured by Furukawa-Japan and/or its Affiliate(s) in connection with any such Delphi-Agreed Purpose during such quarter. Such payment shall be calculated from when Furukawa-Japan and/or its Affiliate(s) obtain the written consent from Delphi to use such invention.

## ARTICLE 9

### WARRANTY

9.1    Furukawa-Japan shall not knowingly produce any work product and work-in-process pursuant to this Agreement that:  (1) is not an original work of authorship and creation; and (2) infringes patents, copyrights, trade secrets or other proprietary rights of third parties. Notwithstanding the above, in the event that such infringement should arise from or in connection with the Licensed Technical Information and Furukawa-Japan's Patents, Furukawa-Japan shall co-operate with Delphi and endeavor to settle it. Any transfer of such intellectual property rights from Furukawa-Japan and its Affiliates to any third party shall be subject to the terms of this Agreement.

9.2    Furukawa-Japan represents it has no reason to believe that all Assistance and work product delivered to Delphi shall not meet Delphi Product Engineering Requirements and shall not meet or exceed all applicable federal, state or local laws, statutes, rules and regulations of the United States and Mexico.

9.3    Furukawa-Japan represents it has no reason to believe that all Assistance shall not comply with the engineering and design standards generally applicable to professional engineers and designers.

## ARTICLE 10

### TECHNICAL INFORMATION

10.1    Delphi shall be entitled to receive, and Furukawa-Japan shall provide or cause to be provided, Licensed Technical Information (e.g. data, know-how and assistance) as set forth in Schedule B hereto.  Furukawa-Japan shall use its best efforts to provide Delphi with accurate information.

10.2    All Licensed Technical Information and Assistance shall be requested and provided through Consulting Engineers. Furukawa-Japan, through Consulting Engineers, shall be responsible for providing engineering support and information in answer to reasonable technical inquiries received from Delphi relating to Licensed Technical Information.

## ARTICLE 11

### COMPENSATION

11.1    Within 30 days of the end of each quarter, Delphi shall pay Furukawa-Japan a royalty of one-half of one percent (0.5%) based on Delphi's Net Sales of Tacoma Products and Corolla Products during such quarter. Such payment shall be calculated from January 1, 2005.

11.2    Following the full execution of this Agreement, Delphi shall reimburse Furukawa-Japan for those Technical Service Fees and Associated Travel Expenses that result from the provision of Assistance under this Agreement to the extent that the sum of such Technical Service Fees and Associated Travel Expenses exceeds one hundred and fifty thousand dollars ($150,000 US) from

July 2004. The sum of Technical Service Fees and Associated Travel Expenses, however, expires on the day of next generation Corolla product SOP, deemed August 2007 or after the last consulting or technical support trip listed in Schedule A, even if it does not exceed one hundred and fifty thousand dollars ($150,000 US) on that day.

11.3   Furukawa-Japan shall provide Delphi with monthly invoices detailing the Consulting Engineer work-days and the individual expenditures that combine to form the Technical Service Fees and Associated Travel Expenses (1) after the sum of such Technical Service Fees and Associated Travel Expenses exceeds one hundred and fifty thousand dollars ($150,000 US) calculated from July 2004 or (2) after expiration of such one hundred and fifty thousand dollars ($150,000 US) described in the section 11.2. Delphi shall make any payments due under Section 11.2 and 11.3 within 30 days of Delphi's receipt of such invoices.

## ARTICLE 12

### TERM AND TERMINATION

12.1   This Agreement will be effective as of the date of its signing until the termination of production of the Tacoma Products, scheduled for mid-2009, and Corolla Products, scheduled for mid-2007, unless terminated earlier by Delphi in accordance with the provisions of Article 13.3 or as otherwise agreed by the Parties.

12.2   Upon expiration or termination of this Agreement for any reasons, the following Articles shall survive and remain in force; 4, 6, 8, 9, 14, 15, 16, 17, and 18 for the periods respectively specified therein.

## ARTICLE 13

### DEFAULT

13.1   The following events shall constitute a default of this Agreement:

(a)   the failure of Furukawa-Japan to provide the requisite Assistance outlined in Schedule A, including providing the requisite number of Consulting Engineers or acceptable Consulting Engineers;

(b)   the failure of a Party, including Consulting Engineers to preserve the confidentiality of, or any instance of a Party, including Consulting Engineers using for their own benefit or the benefit of others, the other Party's information, data or documents, or the disclosure to third parties by a Party, including Consulting Engineers not based on the nature of the Services performed under this Agreement;

(c)   the failure of Furukawa-Japan or Consulting Engineers to strictly comply with such security directives as are or may be issued by Delphi;

    (d)    A Party's solicitation of the other Party's employees to become employed by the Party or by third parties;

    (e)    the filing of an involuntary petition for bankruptcy against Furukawa-Japan; and

    (f)    the failure to comply with any one or more material term and / or condition of this Agreement.

13.2    A default under Section 13.1 shall constitute a breach if the defaulting Party fails to cure the default within a specified time following receipt of notice of the default. The specified cure periods are: zero (0) days for a default under Articles 13.1 (b), (c), or (d); a reasonable period of time not to exceed 30 days under Section 13.1 (a); thirty (30) days for a default under Section 13.1 (f); and sixty (60) days for a default under Section 13.1 (e).

13.3    Delphi may terminate this Agreement immediately upon the occurrence of a breach under Section 13.2.

13.4    The waiver of a default or breach of this Agreement by Parties shall not constitute a waiver of future defaults or breaches of the same or similar nature.

## ARTICLE 14

### DAMAGES UPON BREACH

14.1    Upon the occurrence of a default hereunder, which is not cured during the applicable cure period described in the Article 13, the non-breaching Party shall have the rights and remedies available at law and in equity and may institute arbitration and/or legal proceedings in accordance with Article 17 hereof with respect to any damages or losses incurred by the non-defaulting Party.

14.2    For a breach under Section 13.1 (b), (c) or (d), Delphi shall, in addition to all other rights and remedies provided at law or equity, be entitled to equitable relief in the form of restraining orders and/or injunctions, preventing the continued or further breach. Furukawa-Japan stipulates to Delphi's right to such equitable relief and waives any requirement of the posting of a bond as a precondition to such relief. For any other breach by Furukawa-Japan, Delphi shall be entitled to those damages allowed by law and/or equity.

## ARTICLE 15

### NONSOLICITATION

15.1    During the term of this Agreement and for a period of one (1) year following termination of this Agreement, neither Party shall solicit or make offers of employment to employees of the other Party.

## ARTICLE 16

### CONFIDENTIALITY

16.1    Delphi and Furukawa-Japan agree to protect Confidential Proprietary Information obtained from the other Party with the same standard of care that they would use to safeguard their own confidential information. For this Project, each Party agrees that the obligation not to use or disclose any Confidential Proprietary Information shall remain in effect until 5 years after the date of its disclosure, except information that both Parties agree to treat as confidential for a period separately discussed and agreed to by both Parties.

16.2    The obligations of Section 16.1 shall not apply to any information (a) which is now available in the public domain generally without the fault or breach of this Agreement by the receiving Party, or (b) after and to the extent that it hereafter becomes available to the public generally without fault of the receiving Party, or (c) which is obtained or acquired by the receiving Party in good faith from a third party that is not in breach of any obligation of confidentiality to the disclosing Party with respect to such information, or (d) which is already known by the receiving Party before its receipt from the disclosing Party, as shown by prior written records, or (e) which is developed by the receiving Party independently of the disclosures made by the disclosing Party hereunder as shown by prior written records, or (f) which is permitted to be disclosed by a prior written consent of the other Party.

16.3    If the receiving Party becomes legally compelled to disclose any of the information covered by this Agreement, the receiving Party shall provide the disclosing Party with notice thereof at least five (5) days prior to such disclosure in order to allow the disclosing Party to seek a protective order, take other appropriate measures to assure its interests are protected, or to waive compliance with the provisions of this Agreement.

16.4    Except as provided in Section 5.5, neither Furukawa-Japan nor Consulting Engineers shall photograph, copy, remove or transmit any Confidential Information from DRBM. Furukawa-Japan shall employ reasonable measures to protect and keep the Confidential Information within its permitted work areas at DRBM.

16.5    All Delphi materials removed from DRBM pursuant to Section 5.5 shall be returned to Delphi at the earlier of (1) the termination of this Agreement, or (2) as stated in the removal authorization issued by Delphi.

16.6    Furukawa-Japan agrees to obtain from each Consulting Engineer performing any Services under this Agreement, and to deliver to Delphi, a fully executed copy of the document attached as Schedule C, by which each Consulting Engineer agrees to comply with Article 16.

16.7    The Parties agree: (a) not to use or permit use of any Confidential Information except in accordance with the licenses herein granted; (b) not to disclose any Confidential Information to others except to the extent such disclosure is absolutely necessary to that Party's operations under this Agreement and only then if such disclosure is subject to the same limitations on the recipient of such disclosure as on the receiving Party; and (c) not to use, permit use of or disclose to others any Confidential Information after termination of this Agreement except information which is in the public domain through no fault of receiving Party.

# ARTICLE 17

## DISPUTE RESOLUTION

17.1   All disputes arising out of this Agreement except those arising from a default under Section 13 (b), (c) or (d), shall be submitted for resolution by a representative of each Party, who shall meet to resolve the dispute within ten (10) days of a Party providing notice to the other of the dispute and a request for resolution pursuant to this Section. If the dispute is not resolved to the satisfaction of all Parties within thirty (30) days of the notice of dispute, a Party may invoke arbitration provided pursuant to Section 17.2.

17.2   Subject to Section 17.1, all disputes rising out of this Agreement shall be submitted to arbitration in accordance with the Commercial Rules of the American Arbitration Association. The arbitration shall be conducted in New York City, New York. The decision of the arbitrator(s) shall be final and may be entered as a judgment in any court having jurisdiction.

17.3   Any Party may commence arbitration by serving written notice of its claim upon the other Party and initiating arbitration proceedings in accordance with the applicable rules of the American Arbitration Association.

17.4   Any claim for arbitration must be commenced within one (1) year of the date upon which the dispute upon which the claim is based arose.

17.5   Pending final resolution of a dispute, all Parties shall, unless they otherwise agree in writing, continue to perform their respective duties under this Agreement.

17.6   Injunctive Relief. Notwithstanding anything stated in this Agreement to the contrary, Parties shall, in addition to all other rights and remedies provided by law and/or equity, be entitled to equitable relief, including restraining orders and/or injunctive relief, to enforce Articles 8, 15, and 16 and to prevent or limit breaches of Section 13.1 (b), (c) or (d) of this Agreement. A Party may seek equitable relief from any court having jurisdiction.

# ARTICLE 18

## GENERAL PROVISIONS

18.1   This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

18.2   No amendment, supplement, modification, waiver or termination of this Agreement shall be implied or be binding (including, without limitation, any alleged waiver based on a Party's knowledge of any inaccuracy in any representation or warranty contained herein) unless in writing and signed by the Party against which such amendment, supplement, modification, waiver or termination is asserted and unless it recites that it amends this Agreement pursuant to this Section 18.2.

18.3    The rights and obligations provided by this Agreement shall not be assignable by any Party without the prior written consent of all Parties hereto, except that no consent of Delphi shall be required for an assignment of this Agreement by Furukawa-Japan to one or more its Affiliates. Except as expressly provided herein, nothing herein is intended to confer upon any person other than the Parties (and any Furukawa-Japan Affiliate and Consulting Engineer) any rights or remedies under or by reason of this Agreement.  Any purported assignment in violation of this Article shall be void.

18.4    This Agreement shall be governed by and construed under and pursuant to the internal laws of the State of Delaware, without regard to conflict of law principles.

18.5    No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver, unless otherwise expressly therein provided.

18.6    All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, forwarded by overnight air express and receipted for by the recipient or an agent of the recipient or mailed by registered or certified United States mail, postage prepaid and return receipt requested, to the following addresses (or to such other address of a party as shall have been specified to the other parties to this Agreement by notice):


If to Delphi:

    Delphi Packard Electric Systems

    408 Dana Street

    Warren, Ohio  44486

    Attention:  Business Line Manager E/EDS North America

    Fax No.:  330.373.3524


with a copy to:

    Delphi Automotive Systems LLC

    5725 Delphi Drive

    Troy, Michigan 48098

    Attention:  General Counsel

    Fax No.:  248.813.2491


If to Furukawa-Japan:

    The Furukawa Electric Co., Ltd.

    6-1, Marunouchi 2-chome, Chiyoda-ku, Tokyo 100-8322 Japan

    Attention:  General Manager

/ Administrative & Planning Dept. Automotive Product Division

Fax No.:  +81 3.3286.3984


with a copy to:

Furukawa Electric North America APD, Inc.

47677 Galleon Drive Plymouth, MI 48170

Attention:  President

Fax No.:  734.446.2260


18.7    Any notice, report or other communication made in accordance with the provisions of Section 18.6 shall be deemed received, given, or served, if mailed by first class mail, on the fifth (5th) day after the day of mailing, and, if sent by facsimile, overnight delivery service or email, twenty-four (24) hours after the time of dispatch, provided customary confirmation of delivery or receipt has been received.

18.8    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original instrument, and all of which shall constitute one Agreement.  The Agreement may be executed and delivered by facsimile transmission.

18.9    At any time or times, the Parties agree to sign, swear to, or acknowledge any certificate required under this Agreement, to sign, swear to, or acknowledge any amendment or cancellation as required by law, to sign, swear to, or acknowledge similar certificates or affidavits or certificates of fictitious firm names, trade name, or the like (and to any amendments or cancellations thereof) required by the laws of Delaware or any other jurisdiction in which the Party does, or proposes to do, business, and cause the filing of any of the same for recording wherever such filing shall be required by law.

18.10    The Article, Section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

18.11    Each of the Parties shall pay all of the costs and expenses which such Party incurs incident to the preparation, negotiation, execution and delivery of this Agreement, including, without limitation, the fees and disbursements of counsel, accountants and consultants, without right of reimbursement from any other party or Delphi.

18.12    Delphi and Furukawa-Japan shall, from time to time after the signing date, upon Furukawa-Japan's reasonable request and without further consideration, execute and deliver such additional papers, instruments and documents and take such other action and give such further assurances as may be necessary, proper or convenient in order to give effect to the agreements contained herein.

18.13    Except for information required to be given by law (including the JRC or state taxation statutes) or by court, administrative or other governmental order, no press release or other

information relating to the transactions contemplated by this Agreement shall be made or given to the public except upon the written agreement of Furukawa-Japan and Delphi.

18.14   This Agreement does not constitute either party the agent or legal representative of the other and neither Party is granted any express or implied right or authority to assume or to create any obligation or responsibility on behalf of or in the name of the other, or to bind the other in any manner.  No employee of either party shall in any sense be an employee of the other.

18.15   If any Article or provision of this Agreement should in any way contravene a law of any state or country in which this Agreement is effective, the remaining section of this Agreement shall not be affected thereby and this Agreement shall be modified to conform with such law. Notwithstanding the foregoing, in the event of any such contravention Delphi may at its option terminate this Agreement forthwith by giving to Furukawa-Japan written notice of termination.

Furukawa-Japan and Delphi have caused this Agreement to be executed, in duplicate, by their respective duly authorized representatives on the dates and at the places indicated below.

The Furukawa Electric Co., Ltd.

By: _____

Name: Yasuhiro Useda

Title: Divisional Manager

Date: July 4, 2005

Delphi Automotive Systems LLC

By: _____

Name: STEPHEN V DUCA

Title: DIRECTOR, GLOBAL ENGINEERING

Date: 28 June 2005

## SCHEDULE A

- Improve manufacturing systems, quality systems, through put, and support of electrical and electronic distribution systems for the Toyota Corolla and Tacoma platform at DRBM.

- Bi-Monthly Consulting and Technical Support Schedule as of June 23, 2005

| Date | Number of Days | Agenda | Consulting Engineer |
|---|---|---|---|
| 6/20 /05 | 5 | Quality | Matsutani |
| 7/6/05 | 5 | IE | Hatakenaka |
| 7/25/05 | 5 | ALRO Holder/PFC | TBD |
| 9/12/05 | 5 | STD Work | TBD |
| 10/ /05 | 5 | FTQ & PPR Procedures | TBD |
| 12/ /05 | 5 | Process Validation | TBD |
| 2/ /06 | 5 | Eng. Change Management | TBD |
| 4/ /06 | 5 | 064 Guide Pull ahead | TBD |
| 6/__/06 | 5 | Quality Audit -- Visit Prep & Quarterly Summary | TBD |
| 7/__/06 | 5 | SAM Pull ahead | TBD |
| 8/__/06 | 5 | 2006 Corolla Line Quality Deep Dive | TBD |
| 12/__/06 | 5 | Quality Audit – Visit Prep & Quarterly Summary | TBD |
| 4/__/07 | 5 | TBD | TBD |
| 6/__/07 | 5 | Quarterly Audit – Visit Prep & Quarterly Summary | TBD |
| 8/__/07 | 5 | TBD | TBD |

- For Agendas that are TBD, Delphi will provide Furukawa-Japan with prior written notice defining such required Assistance, including information and/or any other specific consulting and technical support required pursuant to this Agreement. Such notice shall include the requisite number of Consulting Engineers, their area of expertise, the length of time required and project schedule, based on 1 week trips with 1-2 Consultant(s). Delphi and Furukawa-Japan will discuss and agree upon the support and time within the month of the request. Delphi's request for Assistance, including information and Services, shall not be unreasonably denied. Time is of the essence.

- The above schedule may be adjusted with the mutual consent of both Parties.

## SCHEDULE B

## LICENSED TECHNICAL INFORMATION

Furukawa-Japan shall provide or cause to be provided the following Licensed Technical Information to Delphi in accordance with the provisions of Article 1.8, 1.9, 1.10 and Article10.

- Engineering systems – information and training in such detail as to enable Delphi manufacturing engineers to understand, interpret, and draw reasonable inferences from information communicated in Toyota drawings and specifications, consistent with the definition in Article 1.

- Manufacturing systems - information and training in such detail as to enable Delphi engineers to understand and practice Japanese manufacturing methods, standards, processes, and management techniques such as those used by Furukawa to manufacture and supply wiring harnesses to Toyota, consistent with the definition in Article 1.

- Quality control systems – information and training in such detail as to enable Delphi engineers to understand and practice Japanese quality control methods, standards, processes, and management techniques such as those used by Furukawa in the manufacture and supply of wiring harnesses to Toyota, consistent with the definition in Article 1.

e.g.

| Area | Timing | 1/2 Tolerance (if Applicable) | Product Quality Improvement |
|---|---|---|---|
| Standard. Criteria | By SOP | Assy Board Assembling Methods, Maintenance Instructions | Work Standards & Equipment Maintenance Standards for Quality Improvement |
| | | | Furukawa Standard Procedures: Specifications, Way of thinking & Requirements necessary for meeting the customer required quality |
| | In case Jigs Applied | Maintenance Standards, and Instruction Manuals for Drilling Machine | Instruction Manuals, Service Part List for Equipments and Jigs that Furukawa Provided |
| | | Service Part List | |
| Documented Material | When Jigs being studied | List for Jigs required | General Specification and Instruction for Equipments provided |
| Instruction Manuals Other | When Delphi request | | Methods of Quality Data Aggregation |
| | Time to time when the Delphi requests | | Know-how for the countermeasures pointed in Quality Audits, Internal or External |

## SCHEDULE C

## CONFIDENTIALITY AGREEMENT

This Agreement is made by and between Delphi Automotive Systems LLC ("Delphi"), a Delaware limited liability company, and Consulting Engineer, an individual, identified below.

### R E C I T A L S

**WHEREAS,** Consulting Engineer's Employer The Furukawa Electric Co., Ltd. ("Employer"), has executed an agreement to provide certain technical assistance which is TACOMA - COROLLA CONSULTING AND TECHNICAL SUPPORT AGREEMENT ("Engineering Agreement"); and

**WHEREAS,** Consulting Engineer has been selected by Employer to provide Services under the Engineering Agreement; and

**WHEREAS,** Delphi has requested that Consulting Engineer acknowledge his/her responsibilities and obligations regarding certain confidential information and ownership of his/her work product in addition to other matters.

**NOW, THEREFORE,** in consideration of the premises stated above and in return for Delphi allowing Consulting Engineer to provide engineering services pursuant to the Engineering Agreement, Consulting Engineer agrees as follows:

1.    **Employment Status.** Consulting Engineer acknowledges and agrees:

   a)    He/She is an employee of Employer and not of Delphi;

   b)    Delphi may reject Consulting Engineer at any time, for any reason or no reason at all, resulting in Consulting Engineer ceasing to perform any further services pursuant to the Engineering Agreement;

   c)    Delphi is not liable to him/her and shall make no payments directly to him/her for services performed by Consulting Engineer for Delphi or pursuant to the Engineering Agreement;

   d)    All salary, wages, dues, insurance premiums, fringe benefits or employment benefits or any other form of compensation to which Consulting Engineer may be entitled on account of performing services shall be paid to Consulting Engineer by Employer, and not Delphi;

   (e)    He/She shall not use any copy or facsimile machines at Delphi's facilities and will not enter areas to which he/she have not been specially permitted to enter.

   (f)    He/She shall be subject to the security measures instituted by Delphi for non-Delphi employees having access to Delphi's facilities and such security measures may include stopping and inspecting Consulting Engineer's person and possessions while entering and exiting and within Delphi's facilities.

**2. Confidential Information.** Consulting Engineer acknowledges that, in the course of providing services at DRBM, he/she will be given access to information that is confidential and proprietary to Delphi and that was developed and created at great expense, time and effort by Delphi. Such information is deemed "Confidential Information" and consists of any information, not in the public domain, conveyed to, received by or created or developed by Consulting Engineer pursuant to this Agreement, including, but not limited to, wiring harness system and component designs and/or engineering specifications, evaluation and manufacturing processes and techniques, files, lists, books, records, literature, data, drawings, business methods, procedures and processes, and know-how, whether in oral, documentary, electronic or computerized form, and whether or not specifically designated as Confidential Information and shall also include Projects, Services and the results of Services, including the terms of this Agreement. Consulting Engineer agrees that he/she shall not:

    (a)    use Confidential Information for his/her own benefit or the benefit of others but only for the purpose of providing the services stated in the Engineering Agreement;

    (b)    disclose Confidential Information to others, except Delphi personnel, and other Consulting Engineers which require access to the Confidential Information; and

    (c)    remove or transmit any Confidential Information from Delphi's facilities without the specific prior express written permission of Delphi.

The obligations to not use or disclose Confidential Information, except as provided above, does not apply to any:

    (a)    information that is now available in the public domain without the fault or breach of this Agreement by Consulting Engineer;

    (b)    information that hereafter becomes available to the public generally without the fault of Consulting Engineer;

    (c)    information that is obtained or acquired by Consulting Engineer in good faith from a third party that is not in breach of any obligation of confidentiality to the disclosing Party;

    (d)    information that is already known by Consulting Engineer before its receipt from Delphi, as shown by prior written records;

    (e)    information that is developed by Consulting Engineer independently of the disclosures made by Delphi hereunder, as shown by prior written records; or

    (f)    information that is permitted to be disclosed by Consulting Engineer through a prior written consent form authorized by Delphi.

**3. Surrender of Confidential Information.** Consulting Engineer acknowledges that all Confidential Information shall be and all times remain the sole and exclusive property of Delphi and that upon termination of Consulting Engineer providing services at DRBM that Consulting Engineer shall immediately deliver to Delphi, in good condition, all Confidential Information in its possession or control.

4.    **Intellectual Property**.  Consulting Engineer assigns, conveys and transfers to Delphi all right, title, interest and ownership which he/she has in the work product, work-in-progress or other materials resulting from Consulting Engineer providing services at Delphi's facility pursuant to the Engineering Agreement, including without limitation, any existing or future patents, patent rights, copyrights, trademarks, trade secrets, intellectual property or other proprietary rights. Consulting Engineer agrees to execute such additional documents and otherwise assist Delphi to more fully or formally reflect Delphi's ownership in Consulting Engineer's work product, work-in-progress or such other materials resulting from Consulting Engineer providing services.

5.    **Injunctive Relief**.  Consulting Engineer agrees that its breach of this Agreement will cause substantial and irreparable harm to Delphi for which money damages may not provide adequate compensation and Consulting Engineer agrees that Delphi shall, in addition to all other rights and remedies available to Delphi by law or equity, be entitled to equitable relief, including restraining orders and injunctive relief, to prevent a breach or continued breach of this Agreement, without the requirement that Delphi post a bond.

6.    **Survival Following Termination**.  Consulting Engineer agrees that the duties of confidentiality under this Agreement and the other duties of Consulting Engineer shall continue past the last day of providing services under the Engineering Agreement and shall survive until when the Engineering Agreement defines.

7.    **Miscellaneous**.

7.1.    This Agreement constitutes the complete Agreement between the parties with respect to its stated subject matter and replaces and supersedes all previous agreements, understandings, representations and statements.

7.2.    This Agreement shall be governed and construed according to the laws of the State of Delaware.

7.3    This Agreement shall not be construed to make Consulting Engineer the agent, employee, partner or joint venture of Delphi.

**I have read this entire Agreement, understand its content and, by executing it below, signify my intent to be bound by its terms and conditions.**

Date: _____    Name: _____

# **EXHIBIT 4**

**FURUKAWA ELECTRIC**
THE FURUKAWA ELECTRIC CO. LTD.
2-3, Marunouchi, 2-chome, Chiyoda-ku, Tokyo 100-8322, Japan   Tel : 81-3-3286-3353   Fax : 81-3-3286-3657



Ref.#: NM09526PED-002
Date : May 26, 2009

Delphi Packard Electric Systems
1265 North River Road E&R Building, M/C 92B
Warren, Ohio 44486 USA

**Attn: Mr. Mike Schuppe / Finance (DFWS)**
**CC: Ms. Elaine Hofius,**

## <u>Request for Payment of Consulting Support Royalties</u>
(For Q1 of 2008)

Dear Mr. Schuppe,

In accordance with the **TACOMA-COROLLA CONSULTING AND TECHNICAL SUPPORT AGREEMENT** between **Delphi Packard and FEC**, we are showing hereunder the invoice of Royalties for the 1st Quarter of 2009 (1/1~3/31/2009), and are requesting you to take an action to effect payment to us to be received by June 30, 2009 JST.

Royalty for Tacoma manufacturing support royalty

| | | |
|---|---|---|
| Tacoma (1/1~3/31, 2009) | $ 15,670.37- | |
| Total | $ 15,670.37- | |

Total Amount                     <u>US$ 15,670.37-</u>

Payment Method                  By Telegraphic Transfer in US Dollar
Bank Account                     The Bank of Tokyo-Mitsubishi UFJ Ltd.
                                 Head Office
                                 7-1, Marunouchi 2-Chome, Chiyoda-ku, Tokyo
                                 103-8388 Japan
                                 Account #: Current Deposit 0153579
                                 THE FURUKAWA ELECTRIC CO., LTD.
                                 SWIFT CODE BOTKJPJT

Sincerely,

Shigenobu Abe
Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.

**FURUKAWA ELECTRIC**
THE FURUKAWA ELECTRIC CO., LTD.
2-3, Marunouchi, 2-chome,Chiyoda-ku,Tokyo 100-8322, Japan    Tel : 81-3-3286-3353    Fax : 81-3-3286-3687



Ref.#: NM09528PED-002
Date : May 28, 2009

Delphi Packard Electric Systems
1265 North River Road E&R Building, M/C 92B
Warren, Ohio 44486 USA

**Attn: Mr. Mike Schuppe / Finance (DFWS)**
**CC: Ms. Elaine Hofius,**

### Request for Payment of Consulting Support Royalties
(For April of 2008)

Dear Mr. Schuppe,

In accordance with the **TACOMA-COROLLA CONSULTING AND TECHNICAL SUPPORT
AGREEMENT** between **Delphi Packard** and **FEC**, we are showing hereunder the invoice of
Royalties for April of 2009 (4/1~4/30/2009), and are requesting you to take an action to effect
payment to us to be received by June 30, 2009 JST.

Royalty for Tacoma manufacturing support royalty

| | |
|---|---|
| Tacoma (4/1~4/30, 2009) | $ 9,026.82- |
| Total | $ 9,026.82- |

Total Amount                               US$ 9,026.82-

Payment Method          By Telegraphic Transfer in US Dollar
Bank Account              The Bank of Tokyo-Mitsubishi UFJ Ltd.
                               Head Office
                               7-1, Marunouchi 2-Chome, Chiyoda-ku, Tokyo
                               103-8388 Japan
                               Account #: Current Deposit 0153579
                               THE FURUKAWA ELECTRIC CO., LTD.
                               SWIFT CODE BOTKJPJT

Sincerely,

Shigenobu Abe
Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.

# **EXHIBIT 5**

**Execution Copy**

### INTELLECTUAL PROPERTY LICENSE, RESTRICTED USE, AND TECHNICAL ASSISTANCE AGREEMENT

This INTELLECTUAL PROPERTY LICENSE, RESTRICTED USE, AND TECHNICAL ASSISTANCE AGREEMENT (the "Agreement") is entered into effective as of December 8, 2004 (the "Effective Date") by and among Delphi Technologies, Inc., a Delaware corporation ("DTI"), Delphi Automotive Systems LLC, a Delaware limited liability company ("DASLLC"), (hereinafter collectively referred to as "Delphi"), The Furukawa Electric Co., Ltd., a Japanese corporation ("Furukawa-Japan"), and Delphi Furukawa Wiring Systems LLC, a Delaware limited liability company (the "Company").

### RECITALS

WHEREAS, Furukawa Electric North America A.P.D., Inc. ("Furukawa"), wholly owned by Furukawa Electric North America, Inc., which is a subsidiary of Furukawa-Japan, and DASLLC, as members of the Company, have executed the Operating Agreement of the Company on the date hereof (the "Operating Agreement") creating a joint venture between DASLLC and Furukawa (capitalized terms not defined herein shall have the meaning ascribed to them in the Operating Agreement);

WHEREAS, Furukawa-Japan owns or controls certain information, know-how, trade secrets and other intellectual property necessary or useful in the Company's Business (as such term is defined in the Operating Agreement) and is willing to license the use of same to the Company for use in the Company's Business;

WHEREAS, DASLLC owns and controls DTI and owns or controls certain information, know-how, trade secrets and other intellectual property necessary or useful in the Company's Business (as such term is defined in the Operating Agreement) and is willing to license the use of same to the Company for use in the Company's Business;

WHEREAS, the Company, in furtherance of the Company's Business, may acquire, develop or conceive certain information, know-how, trade secrets and other intellectual property, and is willing to license the use of same to Delphi and Furukawa-Japan;

WHEREAS, the Parties desire to enter into this Agreement to provide certain rights for the Company, Delphi and Furukawa-Japan and to provide for the protection of confidential information, whether licensed or not;

NOW, THEREFORE, for good and valuable consideration including the mutual promises contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Execution Copy**

ARTICLE 1
DEFINITIONS

1.1. "Products" shall mean wiring harness assemblies designed and manufactured by the Company, as defined in the Operating Agreement, Article 1.4(a) and Exhibit A of the Operating Agreement.

1.2. "Intellectual Property" shall mean all technology, know-how, design standards, trade secrets, trademarks, licenses, copyrights, copyrightable materials, non-patentable inventions, patentable inventions, patents and patent applications (including United States, international and foreign patents and patent applications, United States provisional applications, and all PCT patent applications, and any and all patents issuing therefrom or otherwise corresponding thereto, and all divisional applications, continuations, continuations-in-part, reissues, reexamination certificates and extensions thereof, describing and/or claiming Technology, and all mask works, industrial design registrations and applications for such registrations), and all other proprietary rights, covering or otherwise related to Technology and/or processes for manufacture and/or use of Products embodying Technology.

1.3. "Technology" shall mean technological developments principally covering or principally used in the Company's Business, including the technology described on Schedule A hereto, ideas, concepts, inventions, processes, principles of operation, formulae, patterns, drawings, prints, proposals, devices, software, compilations of related information, records, specifications and the know-how arising before or during the term of this Agreement. Technology shall not include existing or future technological developments or Intellectual Property of Delphi or Furukawa-Japan or their Affiliates covering those technologies specifically mentioned in Schedule E or any other product not specified in Article 1.1.

1.4. "Improvement" shall mean (i) any alteration, modification, or enhancement to Technology or Intellectual Property which improve the effectiveness, efficiency, performance, produceability, reliability, availability, cost, or other attribute of Products or Technology, or any element thereof, or (ii) any new product or material which performs substantially the same function as Technology or Intellectual Property rights but does so through a different method or process.

1.5. "Furukawa-Japan Background Intellectual Property" shall mean all of the Intellectual Property that Furukawa-Japan has acquired, developed or conceived prior to the Effective Date that is necessary to the Company's Business, including all Furukawa-Japan Intellectual Property necessary to support the assembly of wiring harnesses and the design, simulation, engineering, management, manufacturing, supply chain, and logistics relating to the automobile wiring harnesses to be supplied to Toyota during the term of the Company for the Company's Business. Furukawa-Japan Background Intellectual Property includes Sub-Assembly Machine (SAM) technology. In addition, Furukawa-Japan Background Intellectual Property includes output from Furukawa-Japan Digital Assembly (FDA) system, Ohmi Electric CAD (OEC) system, and HIT data translation system as described in Schedule A. As described in Article 1.3, Furukawa-Japan Background Intellectual Property shall not include any Intellectual Property covering those technologies specifically mentioned in Schedule E or any other product not specified in Article 1.1.

2

**Execution Copy**

1.6."Delphi Background Intellectual Property" shall mean all of the Intellectual Property that Delphi has acquired, developed or conceived prior to the Effective Date that is necessary to the Company's Business, including all Delphi Intellectual Property necessary to support the assembly of wiring harnesses and the design, simulation, engineering, management, manufacturing, supply chain, and logistics relating to the automobile wiring harnesses to be supplied to Toyota during the term of the Company for the Company's Business. As described in Article 1.3, Delphi Background Intellectual Property shall not include any Intellectual Property covering those technologies specifically mentioned in Schedule E or any other product not specified in Article 1.1.

1.7."Company Intellectual Property" shall mean the Intellectual Property that the Company acquires, develops or newly conceives in furtherance of the Company's Business, but shall not include any part of Furukawa-Japan Background Intellectual Property or any part of Delphi Background Intellectual Property.

1.8."Joint Intellectual Property" shall mean: (i) the Intellectual Property that Delphi and Furukawa-Japan jointly acquire, develop or conceive after January 1, 2004 and prior to formation of the Company in anticipation of the formation of the Company, including, but not limited to, all of the Intellectual Property jointly acquired, developed, or conceived in connection with the so-called "engineering alliance" (Obeya room) activities in Japan and elsewhere; and (ii) the Intellectual Property that both Delphi and Furukawa-Japan jointly acquire, develop or conceive after formation of the Company in furtherance of the Company's Business, including but not limited to the Obeya room activities.

1.9.In this Agreement, DTI, DASLLC, Furukawa-Japan and the Company are collectively referred to as "Parties" and are individually referred to as "Party."

ARTICLE 2
LICENSE GRANT BY DTI

2.1.Grant of Licenses. DTI hereby grants, and agrees to grant, unto the Company: (i) a non-exclusive royalty bearing license to use the Delphi Background Intellectual Property for the exclusive purposes of designing and simulating Products in pursuit of the Company's Business for the term described in Article 11 of this Agreement; and (ii) an exclusive license to use the Joint Intellectual Property for the exclusive purposes of designing and simulating Products in pursuit of the Company's Business for the term described in Article 11 of this Agreement.

2.2.Sublicenses. The Company shall not have the right to grant permission to any other party to use in any way any of the Delphi Background Intellectual Property without Delphi's prior written consent, except that the Company may grant a non-exclusive, non-transferable right to use the Delphi Background Intellectual Property for the purposes of fulfilling any obligations arising under the Dedicated Manufacturing Agreement.

2.3.No limitation. Nothing contained in this Agreement shall constitute, or be construed to be, a limitation or restriction upon any right otherwise possessed by Delphi to use its Intellectual Property or to make, use or sell any product, or parts therefore, in any country.

3

## ARTICLE 3
## LICENSE GRANT BY FURUKAWA-JAPAN

3.1. <u>Grant of Licenses</u>. Furukawa-Japan hereby grants, and agrees to grant, unto the Company: (i) a non-exclusive royalty bearing license to use the Furukawa-Japan Background Intellectual Property for the exclusive purposes of designing, simulating, making, having made, using, and selling Products in pursuit of the Company's Business for the term described in Article 11 of this Agreement; and (ii) an exclusive license to use the Joint Intellectual Property for the exclusive purposes of designing and simulating Products in pursuit of the Company's Business for the term described in Article 11 of this Agreement.

3.2. <u>Sublicenses</u>. The Company shall not have the right to grant permission to any other party to use in any way any of the Furukawa-Japan Background Intellectual Property without Furukawa-Japan's prior written consent, except that the Company may grant a non-exclusive, non-transferable right to use the Furukawa-Japan Background Intellectual Property for the purposes of fulfilling any obligations arising under the Dedicated Manufacturing Agreement.

3.3. <u>No limitation</u>. Nothing contained in this Agreement shall constitute, or be construed to be, a limitation or restriction upon any right otherwise possessed by Furukawa-Japan to use its Intellectual Property or to make, use or sell any product, or parts therefore, in any country.

## ARTICLE 4
## LICENSE GRANT BY THE COMPANY

4.1. <u>License Grant</u>. The Company hereby grants, and agrees to grant, unto Delphi a perpetual, worldwide, paid-up, non-exclusive license to use the Company Intellectual Property and the right to sublicense it to any third party for any purpose not in pursuit of the Company's Business as such Company's Business is defined at the time of the execution of this Agreement. The foregoing grant shall not be construed to include a license under the Furukawa-Japan Background Intellectual Property.

4.2. <u>License Grant</u>. The Company hereby grants, and agrees to grant, unto Furukawa-Japan a perpetual, worldwide, non-exclusive license to use the Company Intellectual Property and the right to sublicense it to any third party for any purpose not in pursuit of the Company's Business, as such Company's Business is defined at the time of the execution of this Agreement. The foregoing grant shall not be construed to include a license under the Delphi Background Intellectual Property.

## ARTICLE 5
## TECHNICAL ASSISTANCE

5.1. <u>Delphi Technical Assistance</u>. Delphi shall provide reasonable assistance in the use of the Delphi Background Intellectual Property licensed by DTI under this Agreement to the extent such assistance is reasonably necessary for the Company to use such intellectual property in accordance with the rights granted in Article 2.1. Such assistance shall not be of

4

a nature or duration so as to constitute a permanent establishment of Delphi in a jurisdiction outside the United States.  Such assistance shall include the following:

    (a)    Partner Engineering, including wire harness design, routing and packaging, schematic development, and electrical functionality analysis:

        (i)    Resident engineering at Toyota, as required;

        (ii)    Release of Blueprints and Bill of Material to manufacturing with format consistent with data standards (ref. Data Standards Document):

            (A)    Designs verified for harness coverings;

            (B)    Design verified for cable, terminal, locks, seals and other added-on components;

            (C)    Design analysis and recommendations based on Delphi's lessons learned and JV DFM guidelines;

    (b)    Development Back-up Engineering, including engineering supervision, goal setting, mentoring, engineering research, and problem solving;

    (c)    Component application and integration into the wiring harness design;

    (d)    Component testing and validation support for Delphi components and to meet application requirements of purchased components;

    (e)    Manufacturing Engineering, including industrial and process engineering, wire harness build process development, and automated equipment evaluation, e.g., terminal crimp application design and validation;

    (f)    Production Engineering, including board tooling and equipment engineering to assist Furukawa during the development process with the development of the assembly boards, jigs and fixtures;

    (g)    Continuous improvement support to continue throughout the JV production;

    (h)    Other engineering services including program management, engineering IT support, quality engineering, and cost analysis:

        (i)    Lead time reduction and support, e.g., timely delivery of data to meet lead time requirements;

        (ii)    Program management, e.g., Key program interface with TTC and on behalf of the Company in the North America, as needed;

(iii)    Providing harness samples, based on Obeya direction;

(iv)    Quality leadership, e.g., Preparation of data necessary for identifying gaps and recommending solutions in areas where the Company does not meet Toyota's quality expectations, cooperating with Furukawa and the Company.

     5.2.<u>Furukawa-Japan Technical Assistance</u>.  Furukawa-Japan shall provide reasonable assistance in the use of the Furukawa-Japan Background Intellectual Property licensed by Furukawa-Japan under this Agreement to the extent such assistance is reasonably necessary for the Company to use such intellectual property in accordance with the rights granted in Article 3.1.  Such assistance shall include the following:

(a)    Partner Engineering, including wire harness design, routing and packaging, schematic development, and electrical functionality analysis:

    (i)    Resident engineering at Toyota, as required;

    (ii)    Delivery of required Blueprints and Bills of Material with format consistent with data standards (the wire harness Cable & Items Requirements and the Wire Harness build board requirements):

    (iii)    Design information and optimization, including all:

        (A)    harness coverings;

        (B)    cable;

        (C)    terminals;

        (D)    connection systems;

        (E)    routing aids (clips, clamps, locks, seals, etc.);

        (F)    Design completed for cable, terminals, locks, seals and other added-on components;

(b)    Design analysis including based on output from Furukawa-Japan's FDA and HIT CAD (computer aided manufacturing) systems;

(c)    Development Back-up Engineering, including engineering supervision, goal setting, mentoring, engineering research, and problem solving;

(d)    Component Design & Control, including component design, localization, and testing/validation requirement analysis for Furukawa and/or Furukawa-Japan component;

**Execution Copy**

(e)    Component application and integration into the wiring harness design for the other components;

(f)    Manufacturing Engineering, including industrial and process engineering, wire harness build process development, and automated equipment evaluation, e.g., Manufacturing engineering related to SAM processing including:

    (i)    Definition of process standards;

    (ii)    Definition of process requirements;

(g)    Production Engineering, including board tooling and equipment engineering information (Production engineering related to Board Tooling includes, if Engineering Alliance decides to use Furukawa engineered board tooling:

    (i)    Board layout and Bill of Material,

    (ii)    Board assembling process definition,

    (iii)    Board maintenance definition and supporting documents,

    (iv)    Supply of board jigs and fixtures;

(h)    Other engineering services including program management, engineering IT support, quality engineering, and cost analysis. Included are:

    (i)    Lead time reduction and support - timely delivery of data to meet lead-time requirements with certain data format the Parties mutually agree upon;

    (ii)    Program management - Key program interface between TMC and the Company on behalf of the Company in Japan, in case needed;

    (iii)    Providing harness samples, based on Obeya room direction;

    (iv)    Quality Leadership - Identify gaps and recommend solutions in areas where the Company does not meet Toyota's quality expectations with Delphi and the Company support;

    (v)    The services of the Manufacturing and Engineering Consultant, as defined in the Furukawa Electric North America ASSISTANCE AGREEMENT, until January 1, 2007;

    (vi)    The services of the Quality Control Consultant, as defined in the Furukawa Electric North America ASSISTANCE AGREEMENT, until July 1, 2006.

7

ARTICLE 6
COMPENSATION

6.1.Compensation.  As consideration for the licenses granted under this Agreement,
the Company shall pay DTI a royalty as set forth in Schedule B based on the Company's Net
Sales of Products, and the Company shall pay Furukawa-Japan a royalty as set forth in
Schedule B based on the Company's Net Sales of Products.  The term "Net Sales" means the
total of the invoiced price of Products that are manufactured by or for the Company, less any
sales allowances, customer discounts, and refunds for Products damaged or returned.  The
royalty rate specified in Schedule B will apply to all Net Sales of Products unless otherwise
agreed upon between Delphi and Furukawa-Japan.

6.2.As consideration for the assistance provided under Article 5 of this Agreement,
the Company shall pay DTI a fee as set forth in Schedule C, and the Company shall pay
Furukawa-Japan a fee as set forth in Schedule D.  Schedule s C and D may be amended from
time to time as the Business Plan is updated.

6.3.The Company shall furnish written reports to DTI and Furukawa-Japan within
fifteen (15) days after the end of each calendar quarter during the term of this agreement.
Each report shall set forth the Company's Net Sales of each Product sold during the
preceding calendar quarter and the royalties due thereon.  The reports to Delphi shall be sent
to:

> Delphi Technologies, Inc.
> P.O. Box 5052
> Troy, Michigan  48007
> Attention:  Finance Manager
> Facsimile:  248.813.1211

Delphi may change this address by notice to the Company.

The reports to Furukawa-Japan shall be sent to:

> The Furukawa Electric Co., LTD.
> 6-1, MARUNOUCHI 2-CHOME, CHIYODA-KU, TOKYO
> 100-8322 Japan
> Attention:      General Manager of Administration & Planning
>                 Dept. / Automotive Products Division /
>                 Electronics & Automotive Systems Co.
> Facsimile:  +81-3-3286-3984

Furukawa may change this address by notice to the Company.

6.4.The Company shall pay the royalties, as designated in Schedule B, due for a
calendar quarter within 30 days after the end of such calendar quarter. Royalties computed in
a currency other than US dollars shall be converted to US dollars at the spot rate in effect on
the last day of the calendar quarter.  The assistance fees for each year, as designated in
Schedule C and Schedule D, shall be paid to DTI and to Furukawa-Japan by the Company in

8

4 quarterly installments due by the end of each calendar quarter for the applicable year. All payments to Delphi shall be made in US dollars by electronic funds transfer directly to:

> J.P. Morgan Chase & Co.
> One Chase Manhattan Plaza
> New York, New York 10081, U.S.A.
> ABA# 021000021

> for credit to:    Account Number 323022537
> Delphi Technologies, Inc.

Delphi may change this bank account by notice to the Company, and the Parties may agree on other methods for payment.

All payments to Furukawa-Japan shall be made in US dollars by electronic funds transfer direct to:

> THE BANK OF TOKYO-MITSUBISHI LTD.
> HEAD OFFICE
> 7-1, MARUNOUCHI
> 2-CHOME, CHIYODA-KU, TOKYO
> 103-8388 JAPAN

> for credit to:    Account #: Current Deposit 0891099
> THE FURUKAWA ELECTRIC CO., LTD.
> SWIFT CODE: BOTKJPJT

Furukawa-Japan may change this bank account by notice to the Company, and the Parties may agree on other methods for payment. If at any time, laws or regulation in any way limit, interfere with, or prevent payment to Furukawa-Japan in US dollars, if such laws or regulations prohibit or prevent the remittance of funds out of the United States, then and in such event, the Company shall pay, to the extent and in the manner and in the currency permitted by such laws or regulations to the account that Furukawa-Japan may notice to the Company.

    6.5. Records. The Company shall keep accurate records in sufficient detail to calculate the royalties due. The Company shall preserve the records relating to a calendar year for six years after the end of that year, and shall allow Delphi's and/or Furukawa-Japan's representatives to audit the records during usual business hours to the extent necessary to establish the royalties due. If the audit establishes that any royalties due have not been paid, the Company shall pay the unpaid royalties within four weeks after the audit results are submitted to the Company. If the unpaid royalties exceed 3% of the royalties due for the period audited, the Company shall reimburse Delphi and/or Furukawa-Japan for expenses incurred by Delphi and/or Furukawa-Japan in performing the audit. If the Company does not pay any amount by the due date set forth in this Agreement, the Company shall pay Delphi and/or Furukawa-Japan interest on that amount from the due date to the date actually paid at 2% above the London Interbank Offered Rate (LIBOR).

9

## ARTICLE 7
## ACQUISITION AND MAINTENANCE OF RIGHTS IN INTELLECTUAL PROPERTY

7.1._Acquisition and Maintenance of Rights by Delphi_.  Delphi shall retain the right (but shall not be obligated) to seek and/or maintain any rights it may deem necessary or appropriate with respect to the Delphi Background Intellectual Property licensed by Delphi to the Company pursuant to Article 2 of this Agreement.

7.2._Acquisition and Maintenance of Rights by Furukawa-Japan_.  Furukawa-Japan shall retain the right (but shall not be obligated) to seek and/or maintain any rights it may deem necessary or appropriate with respect to the Furukawa-Japan Background Intellectual Property licensed by Furukawa-Japan to the Company pursuant to Article 3 of this Agreement.

7.3._Maintenance by the Company_.  The Company shall retain the right (but shall not be obligated) to seek and/or maintain, at its expense, any rights it may deem necessary or appropriate with respect to any Company Intellectual Property it may acquire, develop or conceive in furtherance of the Company's Business.

7.4._Waiver by Company_.  In the event the Company elects to either abandon any proprietary right it may seek or receive, or to forego its right to pursue any proprietary right it could pursue, in any Company Intellectual Property, the Company shall notify Delphi and Furukawa-Japan of its intent (e.g., to cease prosecution or payment of maintenance fees of any of such Intellectual Property Rights in any country) at least sixty (60) days prior to the date of any abandonment of any right or the date of any required payment or filing that the Company does not intend to make or file.  Delphi and Furukawa-Japan shall have the right to seek and/or maintain, at its expense, any such potentially abandoned right in such Company Intellectual Property.  With respect to any right acquired by Delphi and/or Furukawa-Japan pursuant to this Article 7.4, Delphi and/or Furukawa-Japan grants unto the Company a royalty-free, paid-up, worldwide, non-exclusive license to use such Intellectual Property.

## ARTICLE 8
## COOPERATION AND CONFIDENTIALITY

8.1._Exchange of Information_.  During the term of these licenses granted pursuant to this Agreement, Furukawa-Japan, Delphi, and the Company will exchange information concerning all Company Intellectual Property.  Furukawa-Japan will defend, hold harmless and indemnify the Company against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other reasonable professional fees and disbursements) arising from or in connection with claims or demands to recover for personal injury or death, property damage or economic loss arising from any processes, products, or parts for those products, which arise through use, by Furukawa-Japan, of Company Intellectual Property in accordance with the license granted in Article 4.2.  Delphi will defend, hold harmless and indemnify the Company against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other reasonable professional fees and disbursements) arising from or in connection with any claims or demands to recover for personal injury or death, property damage or economic loss arising from any processes, products, or parts for those products, which arise through use, by

Delphi, of Company Intellectual Property in accordance with the license granted in Article 4.1.

8.2. Delphi Information. Delphi agrees to use its best efforts to provide the Company with accurate information concerning the Delphi Background Intellectual Property to which rights are granted in Article 2.1. The Company will defend, hold harmless and indemnify Delphi against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other reasonable professional fees and disbursements) arising from or in connection with any claims or demands to recover for personal injury or death, property damage or economic loss arising from any process, products, or parts for those products, which arise through use by the Company of Delphi Background Intellectual Property or Joint Intellectual Property in accordance with the licenses granted in Article 2.1.

8.3. Furukawa-Japan Information. Furukawa-Japan agrees to use its best efforts to provide the Company with accurate information concerning the Furukawa-Japan Background Intellectual Property to which rights are granted in Article 3.1. The Company will defend, hold harmless and indemnify Furukawa-Japan against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other reasonable professional fees and disbursements) arising from or in connection with any claims or demands to recover for personal injury or death, property damage or economic loss arising from any process, products, or parts for those products, which arise through use by the Company of Furukawa-Japan Background Intellectual Property or Joint Intellectual Property in accordance with the licenses granted in Article 3.1.

8.4. Confidentiality. The Parties acknowledge that some of the information exchanged pursuant to this Agreement, may include information that the disclosing Party considers proprietary and confidential and that is not publicly available ("Confidential Information"), including, without limitation: (i) information exchanged pursuant to Articles 5.1 and 5.2 hereof; (ii) the Technology listed or described in Schedule A; (iii) any Company Intellectual Property; (iv) any Joint Intellectual Property; (v) information marked with "Confidential," "Restricted," or "Proprietary Information" or another similar marking; (vi) information known by the Parties to be considered confidential and proprietary; or (vii) information that, from all the relevant circumstances, should reasonably be assumed to be confidential and proprietary. The Parties acknowledge that such Confidential Information is to be supplied, developed, and maintained in confidence solely for the use by the receiving Party under the terms of this Agreement and shall remain the sole and exclusive property of the disclosing Party. No Party shall have any interest in, nor any right to use (including, without limitation, any use resulting in disclosure to any third party) the Confidential Information of another Party except as specifically provided for by this Agreement or as otherwise permitted and specified by separate written agreement executed by the disclosing Party. Each Party agrees to take all reasonable steps to ensure that the Confidential Information of each other Party is not disclosed or distributed in violation of the provisions of this Agreement. Each Party shall take reasonable steps to ensure that its employees, agents, subcontractors and consultants are permitted access to each other Party's Confidential Information on a need-to-know basis only and are under a duty of confidentiality no less restrictive than those contained in this Agreement. After termination of this Agreement, the Parties shall promptly return, to each disclosing Party, or upon written instruction from the disclosing Party, promptly destroy all documented Confidential Information (including all copies).

8.5.<u>Confidentiality Exceptions</u>. Notwithstanding the provisions of Article 8.4, Confidential Information shall not include (i) information that is known, or becomes known, to the public or is, or becomes, generally known within the industry or business, by any means other than a breach of the obligations of a receiving Party or other unlawful act, (ii) information that was previously known to the receiving Party or rightly received by the receiving Party from a third party; (iii) information that is independently developed by the receiving Party without reference to information derived from the other Party; (iv) information that a Party is required to disclose pursuant to law or order of a court having jurisdiction (provided that the Party offers Delphi and Furukawa-Japan an opportunity to obtain an appropriate protective order or administrative relief against disclosure of such Confidential Information), and (v) information that was legally acquired by the Party from a third party in good faith, provided that such disclosure by the third party was not in breach of any agreement between such third party and the other Party hereto.

8.6.<u>Use of Information</u>. The Parties agree: (a) not to use or permit use of any Confidential Information except in accordance with the licenses herein granted; (b) not to disclose any Confidential Information to others except to the extent such disclosure is absolutely necessary to that Party's operations under this Agreement and only then if such disclosure is subject to the same limitations on the recipient of such disclosure as on the receiving Party; and (c) not to use, permit use of or disclose to others any Confidential Information after termination of this Agreement except information which is in the public domain through no fault of receiving Party.

8.7.<u>Protection of Rights</u>. The Parties hereto agree that it shall be the policy of the Company to protect the Intellectual Property rights and not to infringe upon the intellectual property rights of third parties. Furukawa-Japan, Delphi, and the Company, together with their employees and agents, shall cooperate with each other to secure appropriate legal protection of the Company Intellectual Property, whether or not patentable, by providing, upon request, technical information and data in an appropriate form relating to the subject matter or any pending or issued applications and/or improvements.

## ARTICLE 9
## WARRANTY AND INDEMNIFICATION

9.1.<u>Delphi Representation and Warranty</u>. Delphi does not make any representation regarding the scope or enforceability of any patent or other exclusive right associated with the Delphi Background Intellectual Property or the Joint Intellectual Property. Delphi represents and warrants: (i) that it has the authority to enter into this Agreement; (ii) that the right to provide the Delphi Background Intellectual Property and the Joint Intellectual Property reside in Delphi; (iii) that the right to grant the above licenses to use the Delphi Background Intellectual Property and the Joint Intellectual property reside in Delphi.

9.2.<u>Delphi Patent Infringement</u>. Delphi represents that it has no reason to believe and does not believe that the use and practice of Delphi Background Intellectual Property in accordance with the licenses granted in Article 2.1 will infringe any patent, license, or other intellectual property right of any third party. Notwithstanding the above, in the event that such infringement should arise from or in connection with Delphi Background Intellectual Property, Delphi shall co-operate with the Company and endeavor to settle it. Such co-

**Execution Copy**

operation shall include Delphi's reasonable efforts to assist both Furukawa-Japan and the Company in developing design, methods, process and devices to avoid such infringement.

9.3. Furukawa-Japan Representation and Warranty.  Furukawa-Japan does not make any representation regarding the scope or enforceability of any patent or other exclusive right associated with the Furukawa-Japan Background Intellectual Property or the Joint Intellectual Property.  Furukawa-Japan represents and warrants: (i) that it has the authority to enter into this Agreement; (ii) that the right to provide the Furukawa-Japan Background Intellectual Property and the Joint Intellectual Property reside in Furukawa-Japan; (iii) that the right to grant the above licenses to use the Furukawa-Japan Background Intellectual Property and the Joint Intellectual property reside in Furukawa-Japan.

9.4. Furukawa-Japan Patent Infringement.  Furukawa-Japan represents that it has no reason to believe and does not believe that the use and practice of Furukawa-Japan Background Intellectual Property in accordance with the licenses granted in Article 3.1 will infringe any patent, license, or other intellectual property right of any third party.  Notwithstanding the above, in the event that such infringement should arise from or in connection with Furukawa-Japan Background Intellectual Property, Furukawa-Japan shall co-operate with the Company and endeavor to settle it.  Such co-operation shall include Furukawa-Japan's reasonable efforts to assist both Delphi and the Company in developing design, methods, process and devices to avoid such infringement.

9.5. Company Representation & Warranty.  The Company does not make any representation regarding the scope or enforceability of any patent or other exclusive right associated with the Company Intellectual Property.  The Company represents and warrants: (i) that it has the authority to enter into this Agreement; (ii) that the right to provide the Company Intellectual Property resides in the Company; (iii) that the right to grant the above licenses to use the Company Intellectual Property resides in the Company.  The Company shall not indemnify Delphi or Furukawa-Japan against, or assume any responsibility for, any claim of infringement by any third party relating to or arising out of any exercise by Delphi or Furukawa-Japan of any right or license granted by the Company to Delphi or Furukawa-Japan pursuant to this Agreement.

9.6. Company Patent Infringement.  The Company represents that it has no reason to believe and does not believe that the use and practice of the Company Intellectual Property in accordance with the licenses granted in Articles 4.1 and 4.2 will infringe any patent, license, or other intellectual property right of any third party. Notwithstanding the above, in the event that such infringement should arise from or in connection with the Company Intellectual Property, the Company shall co-operate with the other Parties hereto and endeavor to settle it.  Such co-operation shall include the Company's reasonable efforts to assist both Delphi and Furukawa-Japan in developing design, methods, process and devices to avoid such infringement.


ARTICLE 10
THIRD PARTY INFRINGEMENT OF LICENSED INTELLECTUAL PROPERTY
RIGHTS

10.1.  Action by the Company Regarding Delphi Intellectual Property.  The Company shall have the right, but shall not be obligated, to institute proceedings in its own

13

**Execution Copy**

name or in the name of Delphi against any third party infringer (in the field of use of Products) of any rights in Intellectual Property licensed by Delphi to the Company in accordance with Article 2 hereof. If Delphi or the Company becomes aware of any actual, threatened, or apparent infringement, by any third party of any rights in Intellectual Property licensed by Delphi to the Company in accordance with Article 2 hereof, such Party agrees to provide the other Party with written notice prior to suit of such actual, threatened, or apparent infringement and agrees to furnish to the other Party any available evidence of such actual, threatened, or apparent infringement. Delphi agrees to cooperate in any such proceedings instituted by the Company against third party infringers and to provide information relating to any such proceedings that the Company may reasonably request. In the event that the Company determines that it lacks standing to commence such a proceeding, Delphi agrees to execute such documents and take such actions as the Company may reasonably request for the purpose of commencing such infringement proceedings. The Company shall have the right to control prosecution of such proceedings regardless of whether the proceedings are commenced in Delphi's name or in the name of the Company; provided, however, that in the event of a counterclaim against Delphi, the litigation shall be jointly managed by Delphi and the Company.

10.2.   Nothing in this Agreement shall be construed so as to limit any right otherwise owned by Delphi to grant unto any third party licenses in either the Delphi Background Intellectual Property or the Company Intellectual Property.

10.3.   Action by Delphi. In the event Delphi notifies, or receives notice from, the Company of actual, threatened, or apparent infringement, by a third party, of any Intellectual Property licensed by Delphi to the Company pursuant to this Agreement, and the Company does not institute proceedings against such a third party within sixty (60) days of notification, then Delphi may institute proceedings against such a third party, at Delphi's expense, and in the Company's name (if necessary). The Company agrees to cooperate fully with Delphi in such proceedings. Any recovery awarded in such proceedings shall be retained by Delphi.

10.4.   Action by the Company Regarding Furukawa-Japan Intellectual Property. The Company shall have the right, but shall not be obligated, to institute proceedings in its own name or in the name of Furukawa-Japan against any third party infringer (in the field of use of Products) of any rights in Intellectual Property licensed by Furukawa-Japan to the Company in accordance with Article 3 hereof. If Furukawa-Japan or the Company becomes aware of any actual, threatened, or apparent infringement, by any third party of any rights in Intellectual Property licensed by Furukawa-Japan to the Company in accordance with Article 3 hereof, such Party agrees to provide the other Party with written notice prior to suit of such actual, threatened, or apparent infringement and agrees to furnish to the other Party any available evidence of such actual, threatened, or apparent infringement. Furukawa-Japan agrees to cooperate in any such proceedings instituted by the Company against third party infringers and to provide information relating to any such proceedings that the Company may reasonably request. In the event that the Company determines that it lacks standing to commence such a proceeding, Furukawa-Japan agrees to execute such documents and take such actions as the Company may reasonably request for the purpose of commencing such infringement proceedings. The Company shall have the right to control prosecution of such proceedings regardless of whether the proceedings are commenced in the name of Furukawa-Japan or in the name of the Company; provided, however, that in the event of a counterclaim against Furukawa-Japan, the litigation shall be jointly managed by Furukawa-Japan and the Company.

14

10.5.   Nothing in this Agreement shall be construed so as to limit any right otherwise owned by Furukawa-Japan to grant unto any third party licenses in either the Furukawa-Japan Background Intellectual Property or the Company Intellectual Property.

10.6.   Action by Furukawa-Japan.   In the event Furukawa-Japan notifies, or receives notice from, the Company of actual, threatened, or apparent infringement, by a third party, of any Intellectual Property licensed by Furukawa-Japan to the Company pursuant to this Agreement, and the Company does not institute proceedings against such a third party within sixty (60) days of notification, then Furukawa-Japan may institute proceedings against such a third party, at Furukawa-Japan's expense, and in the Company's name (if necessary).  The Company agrees to cooperate fully with the Furukawa-Japan in such proceedings.  Any recovery awarded in such proceedings shall be retained by Furukawa-Japan.

ARTICLE 11
TERM AND TERMINATION

11.1.   Licenses granted by Members.   The licenses granted in Articles 2.1 and 3.1 hereunder shall continue for only so long as:  (a)  At least one of Furukawa or DASLLC is a Member of the Company, and (b) the Company continues to operate in such Company Business as is defined at a time when both Furukawa and DASLLC are Members of the Company.  Any licenses granted in or pursuant to Article 2.1 hereunder shall terminate as soon as both: (a) DASLLC ceases to be a Member of the Company and (b) the Company ceases to operate in such Company Business as is defined at a time when both Furukawa and DASLLC are Members of the Company.  Any licenses granted in or pursuant to Article 3.1 hereunder shall terminate as soon as both: (a) Furukawa ceases to be a Member of the Company and (b) the Company ceases to operate in such Company Business as is defined at a time when both Furukawa and DASLLC are Members of the Company.

11.2.   Assistance.   The obligation of DASLLC to provide Technical Assistance pursuant to Article 5.1 shall continue for only so long as both:  (a) the Company continues to operate in such Company Business as is defined at a time when both Furukawa and Delphi are Members of the Company, and (b) the Company continues to provide compensation to the DTI pursuant to Article 6.1.  The obligation of Furukawa-Japan to provide Technical Assistance pursuant to Article 5.2 shall continue for only so long as both:  (a) the Company continues to operate in such Company Business as is defined at a time when both Furukawa and Delphi are Members of the Company, and (b) the Company continues to provide compensation to the Furukawa-Japan pursuant to Article 6.1.

11.3.   Confidentiality.   The obligations of the Parties to protect Confidential Information pursuant to Article 8.4 and to limit use and disclosure of Confidential Information pursuant to Article 8.6 shall indefinitely survive expiration of the Term of this Agreement unless otherwise set forth in such Articles.

11.4.   Licenses granted by the Company.   The obligation to grant licenses under Article 4.1 hereunder shall continue for only so long as DASLLC is a Member of the Company and shall terminate as soon as DASLLC ceases to be a Member of the Company.

11.5.   Licenses granted by the Company. The obligation to grant licenses under Article 4.2 hereunder shall continue for only so long as Furukawa is a Member of the Company and shall terminate as soon as Furukawa-Japan ceases to be a Member of the Company.

11.6.   Compensation. The obligations of the Company to pay Compensation to DTI pursuant to Article 6.1 shall continue until the termination of all licenses granted pursuant to Article 2.1. The obligations of the Company to pay Compensation to Furukawa-Japan pursuant to Article 6.1 shall continue until the termination of all licenses granted pursuant to Article 3.1. Such termination of the obligation to pay compensation shall in no way affect any reporting, payment, reimbursement, billing, or auditing rights or obligations that may have accrued prior to such termination.

11.7.   Default. If any Party fails to comply with any of its obligations hereunder, and after notice from another Party such failure continues for sixty (60) days, such action shall constitute a default hereunder and breach of the Delphi Furukawa Limited Liability Company Agreement; provided, however, if a default under this Agreement cannot reasonably and with due diligence and good faith be cured within said 60-day period, and if the defaulting Party promptly commences and proceeds to complete the cure of such default with due diligence and in good faith, the 60-day period, with respect to such default, shall be extended to include such additional period of time as may be reasonably necessary to cure such default.

11.8.   Remedies on Default. Upon the occurrence of a default hereunder, which is not cured during the applicable cure period, the non-breaching Parties shall have the rights and remedies available at law and in equity and may institute arbitration and/or legal proceedings in accordance with Article 12.11 hereof with respect to any damages or losses incurred by the non-defaulting Party. If the default is by a Member, and the default is a Material Breach (as defined in the Operating Agreement), the other Member shall also have all rights provided in the Operating Agreement, including that contained in Article 11.1(d) thereof.

11.9.   Term. This Agreement shall continue in force until the termination of all licenses granted pursuant to this Agreement, or until the expiration of all Intellectual Property rights granted pursuant to such licenses, or until terminated by agreement of the Parties, whichever shall occur first.

ARTICLE 12
CONSTRUCTION

12.1.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any applicable principles of conflicts of laws.

12.2.   Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when delivered: (i) in person, (ii) to the extent receipt is confirmed, by telecopy, facsimile, or other electronic transmission service, (iii) by a nationally-recognized overnight courier service, or (iv) by registered or certified mail (postage prepaid return receipt requested), to the Parties at the following addresses:

16

**Execution Copy**

To Delphi:                  Delphi Automotive Systems LLC
                            5725 Delphi Drive
                            Troy, MI  48098
                            Attention:  Intellectual Property Counsel
                            Phone:  248-813-1202
                            Fax:  248-813-1222

With a copy to:             Delphi Packard Electric Systems
                            408 Dana Street
                            Warren, OH  44486
                            Attention:  Business Line Manager E/EDS
                                        North America
                            Fax: 330-373-3524

To Furukawa-Japan:          The Furukawa Electric Co., Ltd.
                            6-1, Marunouchi 2-Chome, Chiyoda-Ku, Tokyo
                            100-8322 JAPAN
                            Attention:  Administrative & Planning
                                        Department General Manager /
                                        Automotive Products Division
                                        Electronics & Automotive System
                                        Co.
                            Phone:  +81-3-3286-3350

With a copy to:             Furukawa Electric North America APD, Inc.
                            47677 Galleon Drive
                            Plymouth, MI  48170
                            Phone: 734-446-2200
                            Fax:  734-446-2260

To the Company:             Delphi Furukawa Wiring Systems LLC
                            408 Dana Street
                            Warren, OH  44486
                            Attention:  President
                            Phone: 330-373-2665
                            Fax: 330-373-3524

12.3.  Severability.  If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

12.4.  Binding Effect.  Except as otherwise provided herein, this Agreement shall inure to the benefit or, and be binding upon, the Parties, their respective successors, legal representatives, and permitted assigns.

12.5.  No Third-party Rights.  This Agreement is intended to create enforceable rights between the Parties hereto only and creates no rights in, or obligations to, any other persons whatsoever.

17

**Execution Copy**

12.6.  <u>Time is of the Essence</u>.  Time is of the essence in the performance of each and every obligation herein imposed.

12.7.  <u>Schedule s Included in Exhibits; Incorporation by Reference</u>.  Any reference to an Exhibit to this Agreement contained herein shall be deemed to include any Schedule s to such Exhibit.  Each of the Exhibits referred to in this Agreement, and each Schedule to any such Exhibits, is incorporated by reference in this Agreement as if such Schedule s and Exhibits were set out in full in the text of this Agreement.

12.8.  <u>Amendments</u>.  This Agreement may not be amended except by written agreement executed by duly authorized officers of all of the Parties hereto.

12.9.  <u>Entire Agreement; Section Headings</u>.  This Agreement, the Operating Agreement and the agreements contemplated by the Operating Agreement constitute the entire agreement among the Parties hereto relating to the subject matter hereof and supersede all prior agreements, understandings, and arrangements, oral or written, among the Parties with respect to the subject matter hereof.  The Section headings in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

12.10.  <u>Assignment</u>.  Except as otherwise specifically provided in this Agreement, neither this Agreement nor any rights or obligations hereunder shall be assignable or be delegated directly or indirectly by any Party hereto to a third party (other than an Affiliate of the Member) without the prior written consent of all the Parties to this Agreement.

12.11.  <u>Arbitration</u>.  Any dispute, controversy or claim (hereinafter "Dispute") between the Parties of any kind or nature whatsoever based on or arising from a claimed breach of this Agreement by either Member, or by any Manager or Officer nominated by either Member (and excluding "Deadlocks" on matters subject to Section 9 of the Delphi Furukawa Wiring Systems Limited Liability Company Agreement), and whether arising in contract, tort or otherwise, shall be resolved according to the following procedure.  If such a Dispute is not resolved by good faith negotiations between the Parties, then such Dispute, upon 30 days' prior notice from one Member to the other of its intent to arbitrate (an "Arbitration Notice"), shall be submitted to and settled by arbitration; *provided, however,* that nothing contained herein shall preclude any Party hereto from seeking or obtaining (a) injunctive relief, or (b) equitable or other judicial relief to enforce the provisions hereof or to preserve the status quo pending resolution of disputes hereunder.  Such arbitration shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association existing at the time of submission by one arbitrator.  The Members shall attempt to agree upon an arbitrator.  If one cannot be agreed upon, the Member which did not give the Arbitration Notice may request the Chief Judge of the United States District Court for the Eastern District of Michigan to appoint an arbitrator.  If he or she will not, the arbitrator shall be appointed by the American Arbitration Association.  If an arbitrator so selected becomes unable to serve, his or her successor shall be similarly selected or appointed.  All arbitration hearings shall be conducted on an expedited Schedule , in the English language, and all proceedings shall be confidential.  Either Member may at its expense make a stenographic record thereof.  The arbitrator shall apportion all costs and expenses of arbitration (including the arbitrator's fees and expenses, the fees and expenses of experts, and the fees and expenses of counsel of the Parties), between the prevailing and nonprevailing Member as the arbitrator deems fair and reasonable.  Any arbitration award shall be binding and enforceable against

18

the Parties hereto and judgment may be entered thereon in any court of competent jurisdiction.  The arbitration will take place at in New York City, New York.

*Remainder of Page Intentionally Left Blank*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE FURUKAWA ELECTRIC CO., LTD.,
a Japanese company

By: _Yasufumi Osada_

Print Name: _YASUFUMI OSADA_

Its: _A.P.D. Divisional Manager_

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By: _DGuar_

Print Name: _DOUGLAS GRUBER_

Its: _EEos BUSINESS LINE EXECUTIVE_

DELPHI FURUKAWA WIRING SYSTEMS LLC,
a Delaware limited liability company

By: _James W. Bozzi_

Print Name: _JAMES W. BOZZI_

Its: _EEos Business Line Director, etc._

DELPHI TECHNOLOGIES, INC.,
a Delaware corporation

By: _Thomas N Twomey_

Print Name: _Thomas N Twomey_

Its: _Vice President_

## SCHEDULE A

### INCLUDED TECHNOLOGIES

- Output information of Furukawa-Japan Digital Assembly (FDA) system.

- Output information of Furukawa-Japan Ohmi Electric CAD (OEC) system.

- Output information of Furukawa-Japan HIT data translation system.

- Use of Furukawa-Japan Sub-Assembly Machine (SAM) technology.

- Design information regarding the assembly board and assembly board fixtures which are approved by the engineering alliance (Obeya) to be produced in North America.

- Design information regarding the electrical test holders jointly designed through the engineering alliance (Obeya) which: (i) Furukawa-Japan does not own and/or had not started developing prior to January 1, 2004, (ii) was exclusively developed for the Company's Business, and (iii) has not been developed including any part of Furukawa-Japan Background Intellectual Property or any part of Delphi Background Intellectual Property. In such case, the specification shall be provided by the engineering alliance (Obeya) to the Company. Based on the condition previously noted, the Company's Manufacturing & Engineering Consultant and Operations Consultant shall make the final decision on the local procurement of the electrical test holders, based upon the quality criteria established by the Company.

## SCHEDULE B

**ROYALTY RATES FOR TOYOTA MC & F PLATFORMS**

| Compensation | Payee | Royalty Rate | Basis |
|---|---|---|---|
| As per Article 6.1 | DTI | 1% | Company's Net Sales of Products |
| As per Article 6.1 | Furukawa-Japan | 1% | Company's Net Sales of Products |

Royalty Rate for future programs shall be determined by mutually agreement by the Members.

22

## SCHEDULE C

### ASSISTANCE FEE TO DELPHI

| Year | $US millions |
|------|--------------|
| 2006 | $0.053 |
| 2007 | $0.233 |
| 2008 | $0.586 |
| 2009 | $0.567 |
| 2010 | $0.564 |
| 2011 | $0.561 |
| 2012 | $0.569 |
| 2013 | $0.577 |
| 2014 | $0.584 |
| Total | **$4.294** |

The amounts above, for the years of 2013 and 2014, are based on the assumption that the Company's Business will include the next generation of MC and F platforms based on current MC & F business assumptions. The fees listed above may be amended from time to time as the Business Plan is updated per Article 4.7 of the Operating Agreement.

## SCHEDULE D

### ASSISTANCE FEE TO FURUKAWA-JAPAN

| Year | $US millions |
|------|-------------|
| 2005 | $1.855 |
| 2006 | $0.576 |
| 2007 | $0.445 |
| Total | **$2.876** |

The fees listed above may be amended from time to time as the Company's Business is updated and/or expanded by mutually agreement by the Members.

**Execution Copy**

## SCHEDULE E

## EXCLUDED TECHNOLOGIES

- The process information for manufacturing SAM or other equipment.

- The system configuration or constitution of computer software of OEC, FDA, HIT.

- The electrical connectors.

- The connection systems.

- The electric cables or wires.

- The other components of wiring harness assemblies.

- The manufacturing engineering information and/or manufacturing specification regarding any equipment, tooling, fixtures and jigs, except which is defined in Schedule A.

25

# <u>EXHIBIT 6</u>



# FURUKAWA ELECTRIC
⟡ THE FURUKAWA ELECTRIC CO., LTD.

2-3, Marunouchi, 2-chome, Chiyoda-ku, Tokyo 100-8322, Japan
Tel : 81-3-3286-3230        Fax : 81-3-3286-3984

Ref.#:  NM081219DF

Date :   December 19, 2008

Delphi Furukawa Wiring Systems LLC
48 Walter Jones Boulevard
El Paso TX, 79906

Attn: Mr. Mike L. Schuppe

## **Request for Payment**

Dear Mr. Schuppe,

In accordance with the AGREEMENT made by and between Delphi Automotive Systems and The
Furukawa Electric Co., Ltd. for the joint venture, Delphi Furukawa Wiring Systems LLC, we are
sending the invoice for the related activities to DFWS business and are requesting DFWS to take an
action to effect payment to us by January 31st, 2009 in our time.

| | | |
|---|---|---|
| **July 2008** | US$ | **103,694.55** |
| **August 2008** | US$ | **105,257.14** |
| **September 2008** | US$ | **92,733.26** |
| **The Amount for Royalty Q3-20008** | US$ | **301,684.95** |

| | |
|---|---|
| **Payment Method** | By Telegraphic Transfer in US Dollar |
| **Bank Account** | The Bank of Tokyo-Mitsubishi Ltd. |
| | Head Office |
| | 7-1, Marunouchi 2-Chome, Chiyoda-ku, Tokyo |
| | 103-8388 Japan |
| | Account #: Current Deposit 0153579 (for USD) |
| | THE FURUKAWA ELECTRIC CO., LTD. |
| | SWIFT CODE BOTKJPJT |

*B. P*

Shigenobu Abe / Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.



# FURUKAWA ELECTRIC
△ THE FURUKAWA ELECTRIC CO., LTD.

2-3, Marunouchi, 2-chome, Chiyoda-ku, Tokyo 100-8322, Japan
Tel : 81-3-3286-3230        Fax : 81-3-3286-3984

Ref.#:  NM090126DF
Date :  January 26, 2009

Delphi Furukawa Wiring Systems LLC
48 Walter Jones Boulevard
El Paso TX, 79906

Attn: Mr. Mike L. Schuppe

## Request for Payment

Dear Mr. Schuppe,

In accordance with the AGREEMENT made by and between Delphi Automotive Systems and The Furukawa Electric Co., Ltd. for the joint venture, Delphi Furukawa Wiring Systems LLC, we are sending the invoice for the related activities to DFWS business and are requesting DFWS to take an action to effect payment to us by April 30th, 2009 in our time.

| | | |
|---|---|---|
| October 2008 | US$ | 114,546.06 |
| November 2008 | US$ | 95,771.39 |
| December 2008 | US$ | 85,572.38 |
| The Amount for Royalty Q4-20008 | US$ | 295,889.84 |

**Payment Method**        By Telegraphic Transfer in US Dollar

**Bank Account**          The Bank of Tokyo-Mitsubishi Ltd.
                          Head Office
                          7-1, Marunouchi 2-Chome, Chiyoda-ku, Tokyo
                          103-8388 Japan
                          Account #: Current Deposit 0153579 (for USD)
                          THE FURUKAWA ELECTRIC CO., LTD.
                          SWIFT CODE BOTKJPJT

Shigenobu Abe / Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.



**FURUKAWA ELECTRIC**
△─ THE FURUKAWA ELECTRIC CO., LTD.
2-3, MARUNOUCHI, 2-CHOME, CHIYODA-KU, TOKYO 100-8322, JAPAN
TEL : 81-3-3286-3230          FAX : 81-3-3286-3984

Ref.#: NM090422DF
Date : April 22, 2009

Delphi Furukawa Wiring Systems LLC
48 Walter Jones Boulevard
El Paso TX, 79906

Attn: Mr. Mike L. Schuppe

## Request for Payment

Dear Mr. Schuppe,

In accordance with the AGREEMENT made by and between Delphi Automotive Systems and The
Furukawa Electric Co., Ltd. for the joint venture, Delphi Furukawa Wiring Systems LLC, we are
sending the invoice for the related activities to DFWS business and are requesting DFWS to take an
action to effect payment to us by April 30th, 2009 in our time.

| | | |
|---|---|---|
| **January 2009** | US$ | 61,476.75 |
| **February 2009** | US$ | 77,063.34 |
| **March 2009** | US$ | 72,868.71 |
| **The Amount for Royalty Q1-2009** | US$ | 211,400.80 |

**Payment Method**                    By Telegraphic Transfer in US Dollar

**Bank Account**                      The Bank of Tokyo-Mitsubishi Ltd.
                                      Head Office
                                      7-1, Marunouchi 2-Chome, Chiyoda-ku, Tokyo
                                      103-8388 Japan
                                      Account #: Current Deposit 0153579 (for USD)
                                      THE FURUKAWA ELECTRIC CO., LTD.
                                      SWIFT CODE BOTKJPJT

Shigenobu Abe / Senior Manager
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.

# **EXHIBIT 7**

## Main Identity

| | |
|---|---|
| **From:** | "Schuppe, Mike L" <Michael.l.Schuppe@delphi.com> |
| **To:** | "Shuji Hayashida" <hayasida@fenaapd.com>; "Naoki Matsuura" <matsuura.naoki@furukawa.co.jp> |
| **Cc:** | "Cassudakis, Nick G" <nick.cassudakis@delphi.com>; "Quackenbush, Philip L" <philip.l.quackenbush@delphi.com> |
| **Sent:** | Thursday, October 09, 2008 8:14 PM |
| **Subject:** | RE: DFWS Forecast Update |

Hello Hayashida-san & Matsuura-san,

Nick, Phil & I have been spending a great deal of time discussing the state of the DFWS business and what we all can do to improve the 2008 financials. We have a potential solution that we would like Furukawa to consider. This plan would minimize the 2008 injections and keep the total injections within the amounts agreed to in Exhibit C of the JV Agreement. Here is a summary of our proposal:

> **Royalties** – Suspense the 2008 royalty for Delphi, Suspend the July – December Royalty for Furukawa.
> **Payments for Services** – As a result of the significant volume reductions we are requesting that Delphi reduce the amounts that it charges DFWS for commercial & IT services.

This proposal would result in reductions that would maintain the current 80 / 20 split between the partners. We are in the process of putting together the detailed financial plan for this proposal and will send both partners the details as soon as they are available.

We believe that this is a reasonable request in light of the significant losses that Delphi is experiencing as a result of having an under utilized plant during the 3 month period that Toyota is not building Tundra's & Sequoia's. I would also like to mention that this plan will only address 2008; based on the current financial markets we can be assured that 2009 will bring additional challenges that Delphi & Furukawa will need to work together to solve.

I am sure that you will have many questions; please feel free to contact me if you would like to discuss this proposal.


***Thanks,***
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax

---

**From:** Schuppe, Mike L
**Sent:** Wednesday, September 24, 2008 10:44 AM
**To:** 'Shuji Hayashida'
**Cc:** 'Naoki Matsuura'; Cassudakis, Nick G
**Subject:** DFWS Forecast Update

Hello Hayashida-san,

Attached is a file containing the updated forecast for DFWS; additionally, I have also included a file containing portions of a presentation that Delphi shared with Toyota relative to the increased freight cost.
I apologize for the delay in providing this detail; after we met on the 17th we received the 2008-2 Toyota planning volumes and unfortunately the volumes for the DFWS programs dropped further; resulting in an additional decrease in revenue. The attached forecast reflects the financial affects of these decreases.
To help explain the differences between this forecast & the budget that was prepared in April I prepared a variance analysis.

Please let me know if you have any questions.

**Thanks,**
Mike Schuppe
**Delphi Furukawa Wiring Systems LLC**
(915)783-4953 office
(915)782-6163 fax

7/23/2009

# **EXHIBIT 8**

## Main Identity

**From:**  "Naoki Matsuura" <matsuura.naoki@furukawa.co.jp>
**To:**  "Schuppe, Mike L" <Michael.l.Schuppe@delphi.com>; "Cassudakis, Nick G"
<nick.cassudakis@delphi.com>; "Shuji Hayashida" <hayasida@fenaapd.com>; "Gruber, Douglas
R" <douglas.r.gruber@delphi.com>
**Cc:**  "FEC 海事室 Ms.Yamamoto(NOTES)" <mr930105@mr.furukawa.co.jp>; "FEC 海事室 Mr.Abe
(NOTES)" <mr851361@mr.furukawa.co.jp>; "FEC 海事室 Ms.Yamamoto"
<yamamoto.yuko@furukawa.co.jp>; "FEC 海事室 Mr.Abe" <sabe@ho.furukawa.co.jp>
**Sent:**  Wednesday, December 03, 2008 7:10 AM
**Subject:**  Re: DFWS JV Cash Flow review

All it may concerned,

As the result of our review and internal discussion of DFWS proposal,
we would like to inform of Furukawa's position on this issue.


1. Suspension of payment in 2008
Furukawa's request includes not only the suspension of payment
of shutdown cost from DFWS to Delphi until the receipt of TEMA's
reimbursement, but also the postponement of it to DFWS until
confirming the amount of TEMA's reimbursement as a result of
the negotiation with TEMA.
The compensation of shutdown cost should be negotiated with
TEMA by Delphi, under its obligation as the majority shareholder
of DFWS. Any portion of the cost which is not approved by TEMA
as the shutdown cost should not be charged to DFWS, i.e., the
amount exceeding the compensation by TEMA should not be
invoiced to DFWS but borne by Delphi.
We will not agree to any other means of funding, such as suspension
of royalty payment, except the funding by both parents in proportion
to the shareholding ratio.
In case of royalty payment suspension apportioned to the parents
according to the shareholding ratio, our agreement is subject to the
receipt of royalty amount data and invoicing to DFWS in a timely manner.


2. Suspension of payment in 2009
Since the market situation, especially in North America, is unpredictable
in 2009 and 2010, it is too early for both parents to discuss how to deal
with the cash requirement of DFWS in 2009 4Q and 2010, at this moment.
We believe that it should be discussed around the middle of 2009 at the
earliest, after confirming the outlook in 2009 and 2010.


Best Regards,
Naoki Matsuura
The Furukawa Electric Co., Ltd.
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.
TEL : +81-3-3286-3230
FAX : +81-3-3286-3667
Mail : matsuura.naoki@furukawa.co.jp


| ----- Original Message -----
| **From:** Schuppe, Mike L

**To:** Cassudakis, Nick G ; Shuji Hayashida ; Gruber, Douglas R ; matsuura.naoki@furukawa.co.jp
**Sent:** Tuesday, December 02, 2008 10:55 AM
**Subject:** RE: DFWS JV Cash Flow review

To All,
Attached is a file containing the details for our cash flow discussion.


***Thanks,***
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax

-----Original Appointment-----
**From:** Cassudakis, Nick G
**Sent:** Tuesday, November 25, 2008 9:36 AM
**To:** Cassudakis, Nick G; Schuppe, Mike L; Shuji Hayashida; Quackenbush, Philip L; Gruber, Douglas R; Ward, Robert W; matsuura.naoki@furukawa.co.jp
**Subject:** DFWS JV Cash Flow review
**When:** Wednesday, December 03, 2008 6:00 PM-7:00 PM (GMT-07:00) Mountain Time (US & Canada).
**Where:** MML 706.679.1028 or 888.816.1052 / PC 330.373.5622

Meeting time and date:
8:00pm EST Wednesday Dec 3
10:00am JPN Thursday Dec 4

Purpose:
Decide how to keep the JV operational- follow up to today's JV BOD meeting

Agenda:
Review monthly cash position of the JV
Describe impact of suspending the royalty payments and reimbursement of other expenses

## Main Identity

| | |
|---|---|
| **From:** | "Schuppe, Mike L" <Michael.l.Schuppe@delphi.com> |
| **To:** | "Naoki Matsuura" <matsuura.naoki@furukawa.co.jp> |
| **Cc:** | "FEC 海事室 Ms.Yamamoto" <yamamoto.yuko@furukawa.co.jp>; "Cassudakis, Nick G" <nick.cassudakis@delphi.com> |
| **Sent:** | Wednesday, January 21, 2009 9:38 PM |
| **Attach:** | Q4 08 Furukawa Royalty Payment.xls |
| **Subject:** | RE: Royalty Calculation (DFWS 4Q & Delphi PKD Dec.) |

Matsuura-san,

Attached is the calculation for the Q4 Royalty.

**Thanks,**
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax

**From:** Naoki Matsuura [mailto:matsuura.naoki@furukawa.co.jp]
**Sent:** Tuesday, January 20, 2009 9:28 PM
**To:** Schuppe, Mike L
**Cc:** FEC 海事室 Ms.Yamamoto; Cassudakis, Nick G
**Subject:** Re: Royalty Calculation (DFWS 4Q & Delphi PKD Dec.)

Mike-san,

Please don't misunderstand that my request in this time is for
the purpose of the request for payment of royalty.

In this time, in order to grasp the amount of royalty and fix our
account, we would like ask you to provide us of the royalty information,
same as the royalty in 2008 3Q.

I understand that the payment issue of DFWS Royalty has not been
settled in the board meeting, and we have to carefully keep on
discussing this based on DFWS financials for the November & December
which you will send in the next couple days.

Thank you.

Naoki Matsuura
The Furukawa Electric Co., Ltd.
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.
TEL : +81-3-3286-3230
FAX : +81-3-3286-3667
Mail : matsuura.naoki@furukawa.co.jp

| ----- Original Message -----
| **From:** Schuppe, Mike L
| **To:** Naoki Matsuura
| **Cc:** FEC 海事室 Ms.Yamamoto ; Cassudakis, Nick G
| **Sent:** Wednesday, January 21, 2009 1:04 PM
| **Subject:** RE: Royalty Calculation (DFWS 4Q & Delphi PKD Dec.)

Matsuura,

Regarding the DFWS royalty payments there is no change to what we discussed during the board meeting.  I will update the DFWS financials for the November & December actuals and send them in the next couple days.

We are working on the Tacoma royalty calculation and will send the data to you tomorrow.

Please let me know if you have any questions.

*Thanks,*
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax

---

**From:** Naoki Matsuura [mailto:matsuura.naoki@furukawa.co.jp]
**Sent:** Monday, January 19, 2009 9:51 PM
**To:** Schuppe, Mike L
**Cc:** FEC 海事室 Ms.Yamamoto
**Subject:** Re: Royalty Calculation (DFWS 4Q & Delphi PKD Dec.)

Dear Mike-san,

Please let me remind you of this request.

Best Regards,
N. Matsuura/FEC

----- Original Message -----
**From:** Naoki Matsuura
**To:** DFWS Mr.Mike L Shuppe
**Cc:** FEC 海事室 Ms.Yamamoto
**Sent:** Thursday, January 15, 2009 11:54 AM
**Subject:** Royalty Calculation (DFWS 4Q & Delphi PKD Dec.)

Dear Mike-san,

Please provide us the Royalty calculation sheet
of DFWS in 2008 Q4 and Delphi PKD in Dec. 2008,
by January 20.

Thank you.

Naoki Matsuura
The Furukawa Electric Co., Ltd.
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.
TEL : +81-3-3286-3230
FAX : +81-3-3286-3667
Mail : matsuura.naoki@furukawa.co.jp

7/23/2009

| DFWS | October | November | December | Q4 Total |
|---|---|---|---|---|
| Revenue | 11,454,606.42 | 9,577,138.95 | 8,557,238.38 | 29,588,983.75 |
| Royalty | 114,546.06 | 95,771.39 | 85,572.38 | 295,889.84 |

## Main Identity

| | |
|---|---|
| **From:** | "Schuppe, Mike L" <Michael.l.Schuppe@delphi.com> |
| **To:** | "Naoki Matsuura" <matsuura.naoki@furukawa.co.jp> |
| **Cc:** | "FENAAPD Mr.Hayashida" <hayasida@fenaapd.com>; "Cassudakis, Nick G" <nick.cassudakis@delphi.com> |
| **Sent:** | Tuesday, April 14, 2009 5:32 PM |
| **Attach:** | Q1 09 Furukawa Royalty Payment.xls |
| **Subject:** | RE: Royalty calculation (DFWS 1Q 2009, Delphi-Tacoma) |

Matsuura-san,
Sorry for the delay in responding, please see responses below each question.

***Thanks,***
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax

**From:** Naoki Matsuura [mailto:matsuura.naoki@furukawa.co.jp]
**Sent:** Thursday, April 09, 2009 12:59 AM
**To:** Schuppe, Mike L
**Cc:** FENAAPD Mr.Hayashida; FEC 海事室 Mr.Abe; Cassudakis, Nick G
**Subject:** Royalty calculation (DFWS 1Q 2009, Delphi-Tacoma)

Dear Mike-san,

1. Royalty Calculation (DFWS 1Q 2009)
Please provide us the calculation sheet of DFWS Royalty
in Q1 2009, by April 17 2009.
 See Attached file
2. Royalty payment (DFWS 3Q&4Q 2008)
As we discussed in last December, we would like to remind
you to settle the remittance of the amount of royalty of
3Q&4Q 2008, by April 30, 2009 in JST. Please refer attachment
of relative invoices which we sent before.
 This will not be possible; the condition for making the royalty payments was predicated on Toyota paying DFWS for the
cost associated with the plant shutdown expenses.  To date TEMA has refused to reimburse DFWS for these costs.
DFWS ended 2008 with liabilities exceeding assets by $4.5mil; the only way for DFWS to pay royalties at this point would
be for the partners to inject cash.  Delphi has told DFWS that cash injections are not possible at this time.
3. Tacoma Royalty calculation
As I requested some times, please provide us the royalty
summary of Tacoma in January, February and March 2009,
by April 17, 2009.
According to agreement, Engineering Royalty of License
and Technical Support Agreement should be paid for 5year
from first selling (it means until August 2009), and Manufacturing
Support Royalty of Consulting and Technical Support Agreement
should be paid until the end of Tacoma production.
 We will provide the Q1 data by the 17th.  However, no 2009 payments will be made until Delphi completes a review the
two agreements between Delphi & Furukawa pertaining to the Tacoma program to determine when the royalties should
end.

Best Regards,

Naoki Matsuura

7/23/2009

The Furukawa Electric Co., Ltd.
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.
TEL : +81-3-3286-3230
FAX : +81-3-3286-3667
Mail : matsuura.naoki@furukawa.co.jp
**********************************************************************************
Note:   If the reader of this message is not the intended recipient, or an employee or agent responsil
**********************************************************************************

**********************************************************************************
Note:   If the reader of this message is not the intended recipient, or an employee or agent responsil
**********************************************************************************

|  | January | February | March | Q1 Total |
|---|---|---|---|---|
| **Revenue** | 6,147,674.94 | 7,706,333.75 | 7,286,870.77 | 21,140,879.46 |
| Royalty | 61,476.75 | 77,063.34 | 72,868.71 | 211,408.80 |

## Main Identity

**From:**     "Naoki Matsuura" <matsuura.naoki@furukawa.co.jp>
**To:**       "Cassudakis, Nick G" <nick.cassudakis@delphi.com>; "Shuji Hayashida"
              <hayasida@fenaapd.com>; "Schuppe, Mike L <Michael.I.Schuppe@delphi.com>
**Cc:**       "FEC ??? Mr.Toji" <toji.naoki@furukawa.co.jp>; "FEC ??? Mr.Nakao"
              <nakao.tomoki@furukawa.co.jp>; "FEC ??? Mr.Abe" <sabe@ho.furukawa.co.jp>
**Sent:**     Sunday, April 19, 2009 10:52 PM
**Attach:**   Letter to DFWS 090420.pdf
**Subject:**  Re: 2009 DFWS Budget 4-15-09

Dear Nick-san,

On behalf of Mr. Abe, I'm sending the letter to the budget of
DFWS sent by Mike-san on April 17 in JST.
Please find attachment and reply to our requests by letter.


Best Regards,
Naoki Matsuura
The Furukawa Electric Co., Ltd.
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.
TEL : +81-3-3286-3230
FAX : +81-3-3286-3667
Mail : matsuura.naoki@furukawa.co.jp


----- Original Message -----
From: Schuppe, Mike L
To: Naoki Matsuura ; Shuji Hayashida ; Cassudakis, Nick G
Sent: Friday, April 17, 2009 4:26 AM
Subject: 2009 DFWS Budget 4-15-09

To All,

Attached is a preliminary 2009 budget for DFWS.  Based on the negative capital position, it appears that DFWS
will not be able to pay royalties during all of 2009.  Additionally, the H2 royalty for 2008 will not be paid.  Nick
will be in El Paso from the 28 – 30 of April & we will be available to discuss this budget.  Please let us know
your availability and I will set up a phone conference.


***Thanks,***
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax


```
*************************************************************************
Note:  If the reader of this message is not the intended recipient, or an employee
*************************************************************************
```

## Main Identity

**From:**   "Schuppe, Mike L" <Michael.I.Schuppe@delphi.com>
**To:**   "Naoki Matsuura" <matsuura.naoki@furukawa.co.jp>; "Cassudakis, Nick G"
<nick.cassudakis@delphi.com>; "Shuji Hayashida" <hayasida@fenaapd.com>
**Sent:**   Thursday, April 23, 2009 2:57 PM
**Attach:**   DFWS Response to Furukawa Questions - April 20 2009.pdf
**Subject:**   RE: 2009 DFWS Budget 4-15-09

Matsuura-san,

Attached is a file containing the responses to your inquiries; Nick & I will be meeting with Hayashida-san on the 28th.  We will be happy to discuss any questions / concerns at that time.

Please let me know if you have any questions.

*Thanks*,
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax

---

**From:** Naoki Matsuura [mailto:matsuura.naoki@furukawa.co.jp]
**Sent:** Sunday, April 19, 2009 8:52 PM
**To:** Cassudakis, Nick G; Shuji Hayashida; Schuppe, Mike L
**Cc:** FEC ??? Mr.Toji; FEC ??? Mr.Nakao; FEC ??? Mr.Abe
**Subject:** Re: 2009 DFWS Budget 4-15-09

Dear Nick-san,

On behalf of Mr. Abe, I'm sending the letter to the budget of
DFWS sent by Mike-san on April 17 in JST.
Please find attachment and reply to our requests by letter.


Best Regards,
Naoki Matsuura
The Furukawa Electric Co., Ltd.
International Business Development
Automotive Products Division
Electronics & Automotive Systems Co.
TEL : +81-3-3286-3230
FAX : +81-3-3286-3667
Mail : matsuura.naoki@furukawa.co.jp

> ----- Original Message -----
> **From:** Schuppe, Mike L
> **To:** Naoki Matsuura ; Shuji Hayashida ; Cassudakis, Nick G
> **Sent:** Friday, April 17, 2009 4:26 AM
> **Subject:** 2009 DFWS Budget 4-15-09
>
> To All,
>
> Attached is a preliminary 2009 budget for DFWS.  Based on the negative capital position, it appears that DFWS will not be able to pay royalties during all of 2009.  Additionally, the H2 royalty for 2008 will not be paid.  Nick will be in El Paso from the 28 – 30 of April & we will be available to discuss this budget.  Please let us know your availability and I will set up a phone conference.

*Thanks,*
Mike Schuppe
Delphi Furukawa Wiring Systems LLC
(915)783-4953 office
(915)782-6163 fax


**********************************************************************************
Note:  If the reader of this message is not the intended recipient, or an employee
**********************************************************************************


**********************************************************************************
Note:  If the reader of this message is not the intended recipient, or an employee o
**********************************************************************************
**********************************************************************************
Note:  If the reader of this message is not the intended recipient, or an employee o
**********************************************************************************

# DELPHI FURUKAWA WIRING SYSTEMS LLC

Furukawa Question #1

*Explain the current financial status of DFWS.*

DFWS Response

Since the inception of DFWS the losses have amounted to $11.6 mil.  2005 - 2007 was a start up period and losses were expected.  The losses in 2008 were not expected; lower volumes & higher cost associated with the increased cost of oil coupled with Toyota's decision to shutdown the Tundra & Sequoia plants for 3 months had a significant affect on the operating results of 2008.  The 1st quarter of 2009 was worse then expected due to issues with Yazaki on a junction block that they provided.  We expect this issue to get corrected in 2009, but due to the low Toyota volumes we anticipate that 2009 will be breakeven at best.  Here is a summary of the historical financials of DFWS:

| Income Statement ($000) | 2005 Actual | 2006 Actual | 2007 Actual | 2008 Actual | 2009 Q1 Actual | DFWS Total |
|---|---|---|---|---|---|---|
| Sales | 0 | 579 | 34,723 | 133,383 | 21,141 | 189,826 |
| | | | | | | |
| Material | 0 | 493 | 28,782 | 118,330 | 20,182 | 167,786 |
| Manufacturing | 0 | 372 | 1,805 | 1,472 | 104 | 3,753 |
| Engineering | 2,308 | 1,146 | 2,331 | 2,151 | 332 | 8,267 |
| Commercial | 786 | 442 | 1,561 | 4,816 | 828 | 8,433 |
| IT | 0 | 60 | 500 | 3,149 | 503 | 4,212 |
| Warehousing Expense | 0 | | 370 | 1,028 | 113 | 1,511 |
| Delphi Royalties | | 6 | 346 | 1,334 | 211 | 1,897 |
| Furukawa Royalties | | 6 | 346 | 1,334 | 211 | 1,897 |
| Plant Shutdown Expense | | | | 2,633 | | 2,633 |
| Additional Freight Cost | | | | 1,074 | | 1,074 |
| Total Cost | 3,094 | 2,524 | 36,042 | 137,320 | 22,484 | 201,464 |
| Operating Income / (Loss) | (3,094) | (1,945) | (1,319) | (3,937) | (1,343) | (11,638) |
| | | | | | | |
| **Capital Contributions** | | | | | | |
| Delphi | 2,320 | 1,966 | 320 | | | 4,606 |
| Furukawa | 580 | 492 | 80 | | | 1,152 |
| Cash Injection | 2,900 | 2,458 | 400 | | | 5,758 |
| | | | | | | |
| Cash Deficit | | | | | | (5,880) |

Furukawa Question #2

*Inform us of the reason why DFWS can not settle the payment of the royalties in 2nd – Half of 2008 and whole 2009-year, including the explanation to the situation that the cash at the end of 2009 in the budget is enough to pay the suspended royalties to FEC.*

DFWS Response

During the 2008 Board of Directors meeting DFWS explained that due to the 2008 losses the royalties would need to be suspended; at the time we had hoped that Toyota would reimburse DFWS for the expenses associated with the 3 month shutdown of the Tundra & Sequoia plants.  Toyota has refused DFWS's requests for reimbursement and therefore DFWS does not have sufficient cash to pay royalties to either partner.  As documented in the financial analysis above the cash deficit (liabilities exceed assets) is $5.8 mil.  Here is a summary of the balance sheet and large unpaid liabilities:

Corporate Headquarters
48 Walter Jones Blvd.
El Paso, TX 79906

# DELPHI FURUKAWA WIRING SYSTEMS LLC

| ASSETS | March 2009 | |
|---|---|---|
| Cash | 5,208,542 | |
| Accounts Receivable | 7,841,526 | |
| Inventory | 1,764,112 | |
| Prepaids | (688,544) | |
| **Total Assets** | **14,125,636** | |
| | | |
| **PAYABLES** | | |
| Accounts Payable | 0 | |
| Accrued Liabilities | 0 | |
| Delphi Payable | 19,049,345 | |
| Furukawa Payable | 888,166 | |
| Pre-Petition Payables | 68,060 | |
| **Total Liabilities** | **20,005,570** | |
| | | |
| Excess Liabilities over Assets | (5,879,935) | |
| | | |
| ***Major unpaid items*** | | |
| **Packard** | | Partner % |
| Q3 2008 Royalties | 301,684.96 | |
| Q4 2008 Royalties | 295,889.84 | |
| Q1 2009 Royalties | 211,408.80 | |
| Tundra / Sequoia Plant Shutdown Expense | 2,632,824.00 | |
| Sub Total | 3,441,807.60 | 81% |
| **Furukawa** | | |
| Q3 2008 Royalties | 301,684.95 | |
| Q4 2008 Royalties | 295,889.84 | |
| Q1 2009 Royalties | 211,408.80 | |
| Sub Total | 808,983.59 | 19% |
| Grand Total | 4,250,791.19 | |

As you can see DFWS is maintaining an 80% Packard 20% Furukawa ratio on the large unpaid liabilities.

Regarding the statement that DFWS has cash at the end of 2009 to pay royalties to FEC royalties; DFWS does not agree with this statement. The cash balance at the end of 2009 will be needed to pay the Q4 services to Packard and the anticipated inventory balance at year end. DFWS has always paid the partners for services and intends to maintain this practice. Here is a summary of the year-end cash along with the outstanding obligations that DFWS plans to pay:

| | | |
|---|---|---|
| 2009 Ending Cash | | 3,251,059 |
| Q4 Delphi Services | 2,330,215 | |
| DFWS Inventory | 955,306 | |
| Obligations | | 3,285,520 |
| Cash Deficit | | (34,461) |

Furukawa Question #3

*Inform us of the excepted timing and / or schedule to settle the suspended payment of royalties to FEC.*

DFWS Response

Based on the 2009 financials, DFWS will not be able to pay either partner for H2 2008 & 2009 royalties during 2009. Do to the volatility of the world economy we can not speculate when DFWS will have sufficient funds to pay the outstanding obligations for royalties at this time.

Corporate Headquarters
48 Walter Jones Blvd.
El Paso, TX 79906