# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:** Delphi Corporation, et al. [1]
**Case Number:**  Jointly Administered 05-44481 (RDD)

**Quarterly Operating Report for the Period Ended:**
June 30, 2009

**Debtors' Address:**
5725 Delphi Drive
Troy, Michigan 48098

**Operating Loss for the Three Months Ended June 30, 2009:**  $370 million

**Debtors' Attorneys:**
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:**  August 13, 2009          /S/ THOMAS S. TIMKO
                                     Thomas S. Timko
                                     Chief Accounting Officer and Controller

---

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

## DELPHI CORPORATION, et al.
## QUARTERLY OPERATING REPORT

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, <u>et al.</u>**
**QUARTERLY OPERATING REPORT**
**INDEX**

| <u>Description</u> | <u>Page</u> |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the three and six months ended June 30, 2009 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of June 30, 2009 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the three months ended June 30, 2009 | 6 |
| Notes to Quarterly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 25 |
| Schedule of Payroll Taxes Paid | 26 |
| Schedule of Other Taxes Collected, Incurred and Paid | 28 |
| Schedule of Disbursements | 31 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

| | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
|---|---|---|
| | (in millions) | |
| Net sales: | | |
| General Motors and affiliates ................................................ | $ 402 | $ 911 |
| Other customers ..................................................................... | 539 | 990 |
| Non-Debtor affiliates ............................................................. | 58 | 100 |
| Total net sales ................................................................ | 999 | 2,001 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below ........................... | 1,138 | 2,357 |
| Depreciation and amortization ............................................... | 104 | 188 |
| Selling, general and administrative ........................................ | 127 | 258 |
| Total operating expenses ................................................ | 1,369 | 2,803 |
| | | |
| Operating loss ....................................................................... | (370) | (802) |
| Interest expense ..................................................................... | (163) | (294) |
| Other expense, net ................................................................. | (3) | (7) |
| Reorganization items, net ...................................................... | (3) | 1,156 |
| Income tax benefit ................................................................. | 5 | 57 |
| Equity loss from non-consolidated affiliates, net of tax ......... | (3) | (9) |
| (Loss) income from continuing operations ............................. | (537) | 101 |
| Loss from discontinued operations, net of tax ....................... | (56) | (54) |
| Equity loss from non-Debtor affiliates, net of tax ................. | (10) | (98) |
| | | |
| Net loss .................................................................................. | (603) | (51) |
| Net income attributable to noncontrolling interest ................ | — | — |
| Net loss attributable to Debtors ............................................ | $ (603) | $ (51) |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | June 30, 2009 (in millions) |
|---|---|
| **ASSETS** | |
| Current assets: | |
| Cash and cash equivalents | $        96 |
| Restricted cash | 288 |
| Accounts receivable, net: | |
| General Motors and affiliates | 334 |
| Other third parties | 312 |
| Non-Debtor affiliates | 302 |
| Notes receivable from non-Debtor affiliates | 116 |
| Inventories, net | 415 |
| Other current assets | 115 |
| Assets held for sale | 372 |
| Total current assets | 2,350 |
| Long-term assets: | |
| Property, net | 1,002 |
| Investments in affiliates | 226 |
| Investments in non-Debtor affiliates | 1,003 |
| Notes receivable from non-Debtor affiliates | 1,429 |
| Other long-term assets | 214 |
| Total long-term assets | 3,874 |
| Total assets | $        6,224 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| Current liabilities not subject to compromise: | |
| Short-term debt | $        4,006 |
| Accounts payable | 356 |
| Accounts payable to non-Debtor affiliates | 501 |
| Accrued liabilities | 1,395 |
| Liabilities held for sale | 155 |
| Total current liabilities not subject to compromise | 6,413 |
| Long-term liabilities not subject to compromise: | |
| Employee benefits and other | 663 |
| Total long-term liabilities not subject to compromise | 663 |
| Liabilities subject to compromise | 13,546 |
| Total liabilities | 20,622 |
| Stockholders' deficit: | |
| Total Debtors stockholders' deficit | (14,398) |
| Noncontrolling interest | — |
| Total stockholders' deficit | (14,398) |
| Total liabilities and stockholders' deficit | $        6,224 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, <u>et al.</u>**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended <u>June 30, 2009</u> (in millions) |
| --- | ---: |
| Cash flows from operating activities: | |
| Net cash used in operating activities | $ (207) |
| | |
| Cash flows from investing activities: | |
| Capital expenditures | (18) |
| Proceeds from sale of property | 1 |
| Decrease in restricted cash | 122 |
| Other, net | (1) |
| Discontinued operations | 10 |
| Net cash provided by investing activities | 114 |
| Cash flows from financing activities: | |
| Net repayments of borrowings under amended and restated debtor-in-possession facility | (96) |
| Repayments of borrowings under other debt agreements | (1) |
| Issuance costs related to the Accommodation Agreement | (22) |
| Net borrowings under GM liquidity support agreements | 247 |
| Net cash provided by financing activities | 128 |
| | |
| Increase in cash and cash equivalents | 35 |
| Cash and cash equivalents at beginning of period | 61 |
| Cash and cash equivalents at end of period | $ 96 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**NOTES TO QUARTERLY OPERATING REPORT**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

**1. Background and Organization**

*General* **–** Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

*Chapter 11 Reorganization Cases* **–** On October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively, the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.

*Equity Purchase and Commitment Agreement* **–** Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, as described below, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, General Motors Company, formerly General Motors Corporation ("GM"), and the unsecured creditors' and equity committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination.

On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. Subsequently, the Investors filed motions for summary judgment, which are still pending. A trial date will be set following the Court's ruling on the motions for summary judgment.

***U.S. Labor Agreements –*** On March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As approved and confirmed by the Court, a series of settlement agreements or memoranda of understanding (each, a memorandum of understanding or "MOU") among Delphi, its unions, and GM settled the 1113/1114 Motion with respect to each of Delphi's unions.

***Plan of Reorganization*** – On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because, as noted above, the Investors refused to participate in the closing, which was commenced but not completed on April 4, 2008. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM. The Plan incorporates, approves, and is consistent with the terms of each agreement.

On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity. However, since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization or other consensual resolution of Delphi's chapter 11 cases. Delphi continued comprehensive discussions with all of its stakeholders that have a continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi made further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets.

On June 1, 2009, Delphi filed further proposed modifications to the Plan and related modifications to the Disclosure Statement which set forth the Company's plans to effect its emergence from chapter 11 reorganization through either a modified reorganization plan or sale under section 363 of the Bankruptcy Code pursuant to which Parnassus Holdings, LLC, an affiliate of Platinum Equity LLC ("Parnassus"), and GM Components Holdings, LLC ("GM Components"), an affiliate of GM, would operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the legacy costs associated with the North American sites that are being acquired by GM Components together with Delphi's Steering Business. Certain other residual non-core and non-strategic assets and liabilities were to remain with the Company and were expected to be divested over time.

On June 16, 2009 the Court entered an order (the "Solicitation Order") approving, among other things, procedures with respect to soliciting votes on modifications to Delphi's previously confirmed First Amended Plan of Reorganization (as modified) (the "Modified Plan") and related disclosures and set a final hearing date to consider the proposed modifications. The Solicitation Order authorized and directed Delphi to solicit votes to accept or reject the plan as modified in accordance with specified procedures and also provided for the creation of a process through which other potential buyers could submit a binding offer for the Company. The deadline for submission by qualified bidders of potential alternative transactions to the transaction announced on June 1, 2009 with Parnassus and GM Components passed without the submission of any potential alternative transactions from any of the three third-party bidders qualified under supplemental procedures previously approved by the Court, but the Company did

receive a timely pure credit bid notice from JPMorgan Chase Bank, N.A. (the "Administrative Agent"), in its capacity as administrative agent under the Amended and Restated DIP Credit Facility, on behalf of the lenders under that facility (the "DIP Lenders").

On July 27, 2009, following a two-day auction process, Delphi's Board of Directors, following consultation with Delphi's official committee of unsecured creditors (the "Creditors' Committee") and its largest U.S.-based union, designated the pure credit bid received from the Administrative Agent on behalf of the DIP Lenders as the "Successful Bid."  Delphi also reached agreements with the Creditors' Committee and Wilmington Trust Corporation, the indenture trustee for several series of unsecured notes, to withdraw their objections to, and support, the Modified Plan, whether based on the transaction involving Parnassus and GM or the pure credit bid submitted by the Administrative Agent on behalf of Delphi's DIP Lenders.  On July 30, 2009, the Court confirmed Delphi's Modified Plan, which incorporated the master disposition agreement (including all schedules and exhibits thereto, the "MDA") among Delphi on behalf of itself and other affiliated entities, GM, Motors Liquidation Company ("Old GM"), and DIP Holdco 3, LLC ("DIP Holdco") on behalf of itself and other affiliated buyers (the "DIP Buyers," together with the GM Buyers, the "Buyers"), for the sale and purchase of substantially all of Delphi's and its subsidiaries' businesses.  Refer to Note 21. Subsequent Events, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2009 for the terms of the MDA.

A summary of certain terms of the Modified Plan follows:

| | **Modified Plan** |
|---|---|
| **Investors** | Acquisition of the Company's operating businesses by DIP Holdco 3, LLC, and of certain North American operations and the Steering Business by certain affiliates of GM |
| **Emergence Capital and Capital Commitments** | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>DIP Holdco 3, LLC has obtained, or will obtain, emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Defined Benefit Pension Plans** | 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008<br><br>PBGC has initiated the termination process for Delphi's U.S. hourly and salaried pension plans and the other U.S. "subsidiary" plans |
| **GM** | GM will purchase certain North American operations and the Steering Business from the Company pursuant to an assignment of rights from the Administrative Agent.  GM will not receive any distribution on account of its allowed claims |
| **DIP Facility Revolver Claim** | Satisfied in full on the effective date |

|  | **Modified Plan** |
|---|---|
| **DIP Facility First Priority Term Claim** | Satisfied in full on the effective date |
| **Senior Secured Hedge Obligations** | Satisfied pursuant to the terms of the MDA |
| **DIP Facility Second Priority Term Claim** | Satisfied in full on the effective date |
| **Secured Claims (Excluding DIP Claims)** | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury Bill rate on the effective date, plus 200 basis points; (ii) receive their collateral free and clear of liens; or (iii) receive such other treatment agreed upon by the parties as is more favorable to the Debtors |
| **Unsecured Creditors** | Pro rata share of deferred consideration under the Master Disposition Agreement (in amount not to exceed $300 million) |
| **Post-petition Interest** | No postpetition interest will be accrued or paid on General Unsecured Claims |
| **MDL Litigation Claims** | No recovery |
| **Equity** | No recovery |

Additionally, pursuant to an order entered by the Court on July 24, 2009, the Debtors' exclusive period for filing a plan of reorganization, solely as to the Creditors' Committee, has been extended through and including September 30, 2009 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, solely as to the Creditors' Committee, has been extended through and including November 30, 2009.

Delphi will not emerge from bankruptcy as a going concern unless and until Delphi is able to consummate the Modified Plan. There can be no assurances that all conditions necessary to consummate the Modified Plan will be satisfied. For a discussion of certain risks and uncertainties related to the Debtors' chapter 11 cases and reorganization objectives refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008, and in the Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009 and June 30, 2009. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder its ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers. Accordingly, no assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. The Modified Plan was confirmed notwithstanding its deemed rejection by the Company's equity security holders and certain classes of creditors and notwithstanding the fact that such equity security holders and such classes of creditors will not receive or retain any property under the Modified Plan on account of their equity or creditor interests and the fact that distributions to holders of unsubordinated allowed general unsecured claims, if any, are contingent on a number of factors. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in its common stock or other equity securities, or any claims relating to prepetition liabilities.

The cost related to the remaining components of the transformation plan will be recognized in the Company's consolidated financial statements as each other element of the Modified Plan becomes effective, including the remaining portions of the U.S. labor agreements and the MDA. The confirmation and consummation of a plan of reorganization and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

***GM Settlement* –** Delphi and GM have entered into comprehensive settlement agreements consisting of the Global Settlement Agreement, as amended (the "GSA") and the Master Restructuring Agreement, as amended (the "MRA"). The GSA and the MRA, as amended through January 25, 2008, comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and the MRA provided that such agreements were not effective until and unless Delphi emerges from chapter 11. However, as part of Delphi's overall negotiations with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi agreed with GM and filed further amendments to the GSA and MRA (the "Amended MRA") with the Court on September 12, 2008 and subsequently entered into an additional amendment to the GSA as of September 25, 2008 (as so amended, the "Amended GSA"). On September 26, 2008, Delphi received the consent of its labor unions to implement certain aspects of the agreements as described in more detail below. The Court approved such amendments on September 26, 2008 and the Amended GSA and Amended MRA became effective on September 29, 2008. These amended agreements include provisions related to the transfer of certain legacy pension and other postretirement benefit obligations and became effective independent of and in advance of substantial consummation of an amended plan of reorganization. The effectiveness of these agreements resulted in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs. If the Modified Plan becomes effective, it is anticipated that, except as set forth in the MDA, the MRA will be terminated and the MDA and certain ancillary agreements will govern the relationship among (i) GM, (ii) reorganized Delphi, and (iii) DIP Holdco, as purchaser of substantially all of Delphi's and its subsidiaries' businesses.

The Amended GSA resolved outstanding issues between Delphi and GM including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under a Delphi plan of reorganization; and various other legacy U.S. hourly workforce benefit issues. Except for the second step of the transfer of a substantial portion of the assets and liabilities (the "Second Pension Transfer") under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan"), the obligations under the Amended GSA were not conditioned on the effectiveness of an amended plan of reorganization. In July 2009, GM advised Delphi that it would not assume the Hourly Plan and would not complete the Second Pension Transfer. GM and the Pension Benefit Guaranty Corporation (the "PBGC") negotiated a separate release and waiver agreement regarding a possible initiation by the PBGC of the plan termination process for Delphi's Hourly Plan and provides consideration to the PBGC for certain releases to be granted to, among others, GM, Delphi, and Delphi's global affiliates. On July 22, 2009, the PBGC initiated the process to terminate Delphi's Hourly Plan and the U.S. salaried and subsidiary pension plans. Delphi does not believe that a PBGC-initiated termination of the Hourly Plan would violate Delphi's existing collective bargaining agreements or prior Court orders. Nevertheless, Delphi would not acquiesce to a termination of the Hourly Plan and would not enter into a trusteeship agreement with the PBGC to take over the Hourly Plan absent a Court finding that doing so is not a violation of Delphi's collective bargaining agreements or a federal district court issues an order terminating the Hourly Plan. On July 30, 2009, the Court approved the Delphi-PBGC Settlement Agreement (defined in Note 2. Basis of Presentation, Pension and OPEB Matters) and made the finding that such agreement did not violate Delphi's collective bargaining agreements, and accordingly, the PBGC and Delphi will execute a termination and trusteeship agreement with respect to the Pension Plans. For additional information regarding the termination of Delphi's Hourly Plan, refer to Note 21. Subsequent Events, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009.

The Amended GSA addresses commitments by Delphi and GM regarding other U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases. During the three and six months ended June 30, 2009, GM funded an additional $3 million and $28 million, respectively, of OPEB payments made to the hourly workforce. An additional $13 million and $32 million were recorded as a receivable from GM during the three and six months ended June 30, 2009, respectively. As of June 30, 2009, $13 million is recorded as a

receivable from GM.  As of June 30, 2009, Delphi also has a receivable from GM related to the funding of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") buydown arrangements under the 2007 U.S. hourly workforce special attrition programs of $52 million.

The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship since filing for chapter 11 and following Delphi's emergence from chapter 11.  The Amended MRA addresses the scope of GM's existing and future business awards to Delphi and related pricing and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing U.S. hourly workforce labor costs, the disposition of certain Delphi facilities, and the treatment of existing commercial agreements between Delphi and GM.  The obligations under the Amended MRA generally are not conditioned on the effectiveness of an amended plan of reorganization.  The MDA, which was approved by the Court as part of the Modified Plan, will supersede the Amended MRA, and the Amended MRA will be terminated (except as set forth in the MDA).  The following details the activity under the Amended MRA during the three and six months ended June 30, 2009:

- *Keep Site Facilitation Fee* - On March 31, 2009 and June 30, 2009, Delphi received quarterly installments of the annual Keep Site Facilitation Fee of $27.5 million, of which approximately $21 million and $46 million were recorded as revenue in the three and six months ended June 30, 2009, respectively, and approximately $9 million remains recorded as a deferred liability at June 30, 2009.
- *Reimbursement of Hourly Labor Costs* - During the three and six months ended June 30, 2009, Delphi received $37 million and $75 million, respectively, of reimbursement from GM of hourly labor costs in excess of $26 per hour.  Delphi recorded $36 million and $74 million as a reduction to cost of sales during the three and six months ended June 30, 2009, respectively.  As of June 30, 2009, $21 million is recorded as receivable from GM.
- *Production Cash Burn Breakeven Reimbursement* - During the three and six months ended June 30, 2009, Delphi received $47 million and $103 million, respectively, of production cash burn breakeven reimbursement from GM.  Delphi recorded $27 million and $106 million in income from discontinued operations during the three and six months ended June 30, 2009, respectively.  An additional $3 million and $4 million were recorded as a reduction to cost of sales during the three and six months ended June 30, 2009, respectively.  As of June 30, 2009, $49 million is recorded as receivable from GM.
- *Reimbursement of Hourly Workers' Compensation and Other Benefits* – During the three and six months ended June 30, 2009, Delphi received reimbursement from GM of $12 million and $15 million.  Delphi recorded $13 million and $23 million as a reduction to cost of sales during the three and six months ended June 30, 2009, respectively.  As of June 30, 2009, $8 million is recorded as receivable from GM.

The following table details changes during the six months ended June 30, 2009 in the GM and affiliates accounts receivable balance attributable to the Amended GSA and the Amended MRA, recorded in GM and affiliates accounts receivable in the accompanying consolidated balance sheet at June 30, 2009:

|  | (in millions) |
| --- | --- |
| Balance at December 31, 2008 | $    141 |
| GM obligations recognized | 175 |
| Payments received from GM | (150) |
| Balance at March 31, 2009 | $    166 |
| GM obligations recognized | 103 |
| Payments received from GM | (126) |
| Balance at June 30, 2009 | $    143 |

As of June 30, 2009, $123 million of the Amended GSA and Amended MRA accounts receivable was included in accounts receivable from General Motors and affiliates and $20 million was included in assets held for sale on the consolidated balance sheet.

The following table details the GM obligations recognized during the three and six months ended June 30, 2009:

|  | Three Months Ended June 30, 2009 | Six Months Ended June 30, 2009 |
| --- | --- | --- |
|  | (in millions) | |
| Pre-tax earnings | $          73 | $          147 |
| Discontinued operations | 27 | 106 |
| Pass-through OPEB reimbursement | 13 | 32 |
| Buydown true-up | (16) | (16) |
| Deferred liability | 6 | 9 |
| Total | $          103 | $          278 |

Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 for more information on the effectiveness of the Amended GSA and the Amended MRA.

## 2. Basis of Presentation

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. In addition, the financial statements and supplemental information contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements, and as such, their net income is included as "Equity loss from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, among other disclosures, it does require that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

The unaudited combined financial statements have been derived from the books and records of the Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment), the Debtors believe that the financial information could be subject to changes, and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with U.S. GAAP. Included in these financial statements is the impact of Delphi's adoption of Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51.*, which resulted in adjustments to the presentation of the accompanying financial statements. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. Therefore, this report should be read in conjunction with the Company's consolidated financial statements and notes thereto included in its Annual Report on Form 10-K for the year ended December 31, 2008 and its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009 and June 30, 2009 filed with the U.S. Securities and Exchange Commission ("SEC").

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the consolidated results of operations, financial position, and cash flows of the Debtors in the future.

*Going Concern –* The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement and related accommodation agreement (as amended, the "Accommodation Agreement") as well as the liquidity support agreement with GM (the "GM Advance Agreement"), refer to Note 3. Debtor-in-Possession ("DIP") Financing for more information regarding the terms; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) consummate the transactions under the Modified Plan of which the MDA is an exhibit, including the sale of substantially all of its core business to the Buyers, who will then operate such businesses going forward and need to maintain sufficient liquidity to wind down, sell or otherwise dispose of the retained assets in an orderly fashion.

Delphi is in default of the terms of the DIP financing agreement (the "Amended and Restated DIP Credit Facility") and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008 (the effective date of the Accommodation Agreement). Under the Accommodation Agreement, the lenders under the Amended and Restated DIP Credit Facility have agreed, among other things, to allow Delphi to continue

using the proceeds of such facility and to forbear from the exercise of certain default-related remedies, in each case
until August 13, 2009, subject to continued compliance with the provisions of the Amended and Restated DIP Credit
Facility (as amended and modified by the Accommodation Agreement, as amended). The covenants include being
able to timely meet the conditions to closing and effectuate the transactions outlined in the revised Modified Plan of
which the MDA is an exhibit. There can be no assurance that Delphi will continue to comply with the terms and
conditions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation
Agreement). These matters create substantial uncertainty relating to the Company's ability to continue as a going
concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the
recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. The
Court, on July 30, 2009 (the "Modification Approval Date"), confirmed Delphi's Modified Plan. The Modified Plan
provides for no distribution to holders of the Company's common stock and a contingent pro rata distribution to
holders of allowed general unsecured claims in an amount not to exceed $300 million. Refer to the Plan of
Reorganization in Note 1. Background and Organization, Plan of Reorganization, for more information. Pending
consummation of the Modified Plan, Delphi and certain of its U.S. subsidiaries will continue as "debtors-in-
possession" in chapter 11. There can be no assurances as to when Delphi will consummate the Modified Plan or
other consensual resolution of Delphi's chapter 11 cases. Consummation of a confirmed plan of reorganization
often materially changes the amounts reported in a company's consolidated financial statements, which do not give
effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a
consequence of consummation of a confirmed plan of reorganization. Upon consummation of the Modified Plan, all
of Delphi's outstanding common stock will be cancelled and Delphi's stock will be delisted from the Pink Sheets,
LLC, a quotation service for over the counter securities and Delphi will no longer be a publicly held corporation.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial
statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not
been eliminated in the Debtors' financial statements. During the three and six months ended June 30, 2009, the
Debtors received $10 million in dividends from non-Debtor affiliates. Dividends from non-Debtor affiliates are not
eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were
recorded in equity income from non-Debtor affiliates, net of tax.

*General Motors and Affiliates* – Includes activity with GM and its consolidated subsidiaries. Activity with
GM's non-consolidated affiliates (such as GM Shanghai) and activity with other Tier 1 suppliers which sell directly
to GM is classified as other (non-GM) customer activity.

*Restricted Cash* – At June 30, 2009, the Debtors had $288 million in restricted cash, primarily related to cash
collateral required under the debtor-in-possession credit facility. Refer to Note 3. Debtor-in-Possession ("DIP")
Financing for more information. Additionally, restricted cash includes cash for use for the pre-retirement portion of
the U.S. employee workforce transition programs and balances on deposit at financial institutions that have issued
letters of credit in favor of Delphi.

*Property* – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

*Long-Lived Asset Impairment Charges* – Delphi evaluates the recoverability of long-lived assets whenever
events or changes in circumstances indicate that the carrying amount may not be recoverable. Estimates of future
cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows
expected to arise from the use and eventual disposition of the assets. Where estimated future cash flows are less
than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying
value exceeds the fair value of the assets. The fair value of the assets was determined based on the "held for use"
classification. Delphi recorded long-lived asset impairment charges totaling $18 million related to Delphi's
Electronics and Safety segment and the exit of its occupant protection systems business in North America during the
three and six months ended June 30, 2009 in depreciation and amortization.

Additionally, during the second quarter of 2009, Delphi's Electrical/Electronic Architecture segment recognized
a charge of $7 million in cost of sales related to assets held for sale of a certain facility in North America that it
intends to sell. The sale is expected to occur during the third quarter of 2009.

*Discontinued Operations* – A business component that is disposed of or classified as held for sale is reported as
discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing
operations of the Company and the Company will no longer have any significant continuing involvement in the
business component. The results of discontinued operations are aggregated and presented separately in the
consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the

discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and various non-core product lines and plant sites that do not fit Delphi's future strategic framework (the "Automotive Holdings Group"). While the historical results of operations of the Steering Business and the Automotive Holdings Group include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to discontinued operations in the statements of operations. Certain employee pension and other postretirement benefit liabilities for the Steering Business were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans were allocated to discontinued operations in the statements of operations. Allocations have been made based upon a reasonable allocation method. Refer to Note 9. Divestitures for more information.

**Securities and ERISA Litigation Charges** – Delphi, along with certain of its subsidiaries, current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. One consolidated class action complaint alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws (the "Securities Action"). Another group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under Employee Retirement Income Security Act ("ERISA"). On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action"). Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the Securities Action, the ERISA Action, and shareholder derivative actions in consolidated proceedings (the "Multidistrict Litigation" or "MDL") reached an agreement with the lead plaintiffs in the Securities Actions (the "Lead Plaintiffs") and named plaintiffs in the amended ERISA Action (the "ERISA Plaintiffs") resulting in a settlement of the Multidistrict Litigation (the "MDL Settlements"). Pursuant to the MDL Settlements, the class claimants will receive cash and allowed claims in the chapter 11 cases that, when valued at the face amount of the allowed claims, is equivalent to approximately $351 million. On December 4, 2007, the U.S. District Court for the Eastern District of Michigan (the "District Court") held a hearing to consider proposed modifications to the MDL Settlements (the "Modified MDL Settlements") and tentatively approved the Modified MDL Settlements, after determining that the modifications were at least neutral to the Lead Plaintiffs and potentially provide a net benefit to the Lead Plaintiffs. The District Court approved the Modified MDL Settlements in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered final orders and judgments dated January 23, 2008 with respect to the securities and ERISA actions. On January 25, 2008, the Court approved the Modified MDL Settlements. The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

In connection with the Modified Plan, the parties to the MDL settlements reached agreement on modifications to the MDL Settlements that allow for the MDL Settlements, as modified, to become effective in advance of or separately from the resolution of Delphi's chapter 11 cases and absent the payment of the $15 million amount to be provided by a third party. Additionally, the modifications provide for no recovery under the resolution of Delphi's chapter 11 cases. The modifications were approved by the Court on July 23, 2009 and are still subject to approval by the District Court.

As a result of the Modified MDL Settlements, as of June 30, 2009, Delphi has a liability of $351 million recorded for this matter. Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million. As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage. In conjunction with the Modified MDL Settlements, Delphi expects recoveries of approximately $130 million for the

settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

*Warranty Matters* – Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

During 2007, Delphi observed higher than normal warranty claims on engine electronic control units supplied for certain 2005-2007 vehicle models by Delphi's Powertrain Systems segment and recorded $93 million of additional warranty expense in cost of sales in 2007. In July 2009, Delphi negotiated an agreement in principle with its customer on this matter for $73 million. Including approximately $11 million of warranty costs already incurred by Delphi to date, the remaining amount will be paid over the product life of the supplied control units or approximately eight years.

*Environmental Matters* – Delphi is subject to the requirements of U.S. federal, state and local environmental and occupational safety and health laws and regulations. As of June 30, 2009 our reserve for environmental investigation and remediation was approximately $88 million. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the separation of Delphi from GM in 1999. Addressing contamination at various sites, including facilities designated as non-core and slated for closure or sale, is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent management's best estimate of the cost to complete such actions. Management believes that its June 30, 2009 accruals will be adequate to cover the estimated liability for its exposure with respect to such matters and that these costs will be incurred over the next 20 years. However, as we continue the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. We cannot ensure that environmental requirements will not change or become more stringent over time or that our eventual environmental remediation costs and liabilities will not exceed the amount of our current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology. Estimates are made on an undiscounted basis and exclude the effects of inflation. If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range. At June 30, 2009, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $86 million.

*Contractual Interest Expense and Interest Expense on Unsecured Claims* – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Contractual interest expense for the three and six months ended June 30, 2009 was $188 million and $349 million, respectively. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008. The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims. At June 30, 2009, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 1.Background and Organization, Plan of Reorganization, on July 30, 2009, the Court confirmed Delphi's Modified Plan, which upon its effectiveness, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Therefore, Delphi anticipates that it will be relieved of this liability and anticipates reversing such liability in the third quarter of 2009.

*Taxes* – Delphi recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws. Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result does not recognize income tax benefits for net operating losses for its U.S. entities.

The Debtors have received Court authorization, but not direction, to pay sales, use, trust fund, and certain other taxes in the normal course. Accordingly, the Debtors have paid the applicable taxes when due. See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

During the six months ended June 30, 2009, Delphi recognized a $52 million tax benefit in continuing operations related to the elimination of the disproportionate tax effects in other comprehensive income related to the salaried OPEB obligation which was settled during the same period, as detailed below under Salaried OPEB Settlement.

**Pension and OPEB Matters**– Since entering chapter 11, Delphi had generally limited its contributions to the Hourly Plan, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan (together, the "Pension Plans") to "normal cost" contributions, which are less than the minimum funding requirements established by the IRC and ERISA. Following the Court's approval of the Hourly and Salaried Pension Program Modification Motion on September 23, 2008, the Salaried Plan, the Mechatronic Plan, the ASEC Plan, and the PHI Non-Bargaining Plan were frozen effective September 30, 2008. The Hourly Plan was frozen on November 30, 2008. By freezing the Pension Plans, Delphi halted the accrual of normal cost payments going forward thereby preserving liquidity. Certain collectively bargained hourly employees continued earning accruals under the Hourly Plan's Individual Retirement Plan formula (a cash balance benefit providing an annual pay credit accrual of 5.4% of base wages) prior to the Hourly Plan's termination by the PBGC. Pursuant to the provisions of the Modified Plan, the remaining assets and liabilities of the Hourly Plan would no longer be the responsibility of Delphi. Delphi has indicated that it will be unable to satisfy its U.S. pension funding obligations for those plans covering its salaried employees and certain U.S. subsidiary employees. On July 21, 2009, Delphi announced that the PBGC was expected to make a determination whether or not to initiate the termination process for Delphi's Pension Plans. On July 22, 2009, the PBGC initiated the process to terminate Delphi's Pension Plans. Delphi does not believe that a PBGC-initiated termination of the Hourly Plan would violate Delphi's existing collective bargaining agreements or prior Court orders. Nevertheless, Delphi would not acquiesce to a termination of the Hourly Plan and would not enter into a trusteeship agreement with the PBGC to take over the Hourly Plan absent a Court finding that doing so is not a violation of Delphi's collective bargaining agreements or a federal district court issues an order terminating the Hourly Plan. On July 21, 2009, Delphi reached agreement with the PBGC to settle the PBGC's various claims against Delphi and its global affiliates (the "Delphi-PBGC Settlement Agreement"). Pursuant to that settlement agreement, the PBGC will receive a $3 billion allowed general unsecured nonpriority claim which will receive the same treatment given to holders of General Unsecured Claims under the Modified Plan. The PBGC will receive additional consideration from GM which, together with the PBGC's allowed unsecured claim, is in consideration for, among other things, a full release of all causes of action, claims, and liens; the liability to be assumed by the PBGC related to the termination of the Pension Plans; and the withdrawal of all notices of liens filed by the PBGC against Delphi's global non-U.S. affiliates. On July 30, 2009, the Court approved the Delphi-PBGC Settlement Agreement and made the finding that such agreement did not violate Delphi's collective bargaining agreements, and accordingly, the PBGC and Delphi will execute a termination and trusteeship agreement with respect to the Pension Plans, in accordance with the Delphi-PBGC Settlement Agreement. On August 10, 2009 the PBGC assumed responsibility of all of Delphi's Pension Plans and moved the termination date to July 31, 2009.

As stated above, Delphi has not made certain minimum required contributions to the Pension Plans and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million, $226 million and $1.2 million for plan years ended September 30, 2006, September 30, 2007 and September 30, 2008, respectively. If these asserted assessments are not paid, the IRS could increase the assessments that relate to the Salaried Plan to 100% of any Salaried Plan contributions considered by the IRS to be due and unpaid. However, because the September 29, 2008 414(l) Net Liability Transfer to the GM hourly plan avoided an accumulated funding deficiency in the Delphi Hourly Plan for the plan year ended September 30, 2008, exposure to the 100% excise tax related to the Delphi Hourly Plan has been eliminated for the plan year ended September 30, 2008. Assuming Delphi is assessed excise taxes for all plan years through 2007, the total exposure to date could approximate $383 million, plus interest and penalties, which could be substantial. Additional excise taxes could be assessed with respect to the subsidiary plans if the minimum required contributions to those plans for the plan year ended December 31, 2008, are not paid. To the extent unpaid contributions are not corrected by Delphi, any such excise tax assessments might be increased to 100% of any Salaried Plan and subsidiary plan contributions considered by the IRS to be due and unpaid.

Although the IRS has asserted certain of the excise tax assessments described above and might seek to assess additional excise taxes, plus interest and penalties, related to the Pension Plans, Delphi believes that under the

Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments. Accordingly, management has concluded that an unfavorable outcome is not currently probable and, as of June 30, 2009, no amounts have been recorded for any potential excise tax assessment.

*Salaried OPEB Settlement* – On March 11, 2009, the Court issued a final order approving Delphi's motion to terminate retiree medical and life insurance benefits (collectively "OPEB") in retirement to salaried employees, retirees, and surviving spouses after March 31, 2009 based on the Court's finding following consideration of materials provided by the retirees' committee appointed by the U.S. Trustee (the "Retirees' Committee"), which committee was established to review whether it believes that any of the affected programs involved vested benefits (as opposed to "at will" or discretionary, unvested benefits), that the Company had met its evidentiary burdens. The Court also approved a settlement agreement (the "Settlement"), between Delphi and the Retirees' Committee and the Delphi Salaried Retirees' Association (the "Association") settling any and all rights for the parties to appeal the Court's March 11, 2009 final order authorizing Delphi to terminate salaried OPEB benefits to the U.S. District Court for the Southern District of New York (the "District Court"). Refer to Delphi's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 for the details of the Settlement. Delphi recognized a salaried OPEB settlement gain from reorganization of $1,168 million during the six months ended June 30, 2009.

### 3. Debtor-in-Possession ("DIP") Financing

**Amended and Restated DIP Credit Facility and Accommodation Agreement**

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to amend and extend its Amended and Restated DIP Credit Facility, which amendments and extension became effective in May 2008. As a result, the Amended and Restated DIP Credit Facility was the aggregate size of $4.35 billion (as compared to $4.5 billion), consisting of a $1.1 billion first priority revolving credit facility (the "Tranche A Facility" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan") and a $2.75 billion second priority term loan (the "Tranche C Term Loan").

On December 12, 2008, Delphi entered into the Accommodation Agreement allowing Delphi to retain the proceeds of its Amended and Restated DIP Credit Facility. Under the Accommodation Agreement, the lenders under the Amended and Restated DIP Credit Facility have agreed among other things to allow Delphi to continue using the proceeds of such facility and to forbear from the exercise of certain default-related remedies in each case until June 30, 2009 subject to continued compliance of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement, as amended).

Throughout the first and second quarters of 2009 and through August 11, 2009, Delphi entered into several further amendments and supplements to the Accommodation Agreement (the "Accommodation Agreement Amendments"), which further extended certain milestone dates in the Accommodation Agreement and ultimately extended the accommodation period under the Accommodation Agreement to August 13, 2009 until 8:00 p.m. (Eastern time). Additionally, pursuant to the Accommodation Agreement Amendments, among other things, (i) the lenders have postponed Delphi's obligations to make current payments of interest in respect of the Tranche C Term Loan, (ii) Delphi has the ability to access certain cash collateral baskets to make certain distributions consistent with the MDA and the Modified Plan, and (iii) to the extent that such cash is used in a manner consistent with the MDA and the Modified Plan, Delphi is permitted to access certain cash from its foreign subsidiaries without using the proceeds thereof to repay the DIP loans (as was previously required under the Accommodation Agreement). For a full description of each of the amendments, see Delphi's Annual Report on Form 10-K for the year ended December 31, 2008 and Delphi's Quarterly Report on Form 10-Q for the period ended March 31, 2009 and Delphi's Current Reports on Form 8-K filed with the United States Securities and Exchange Commission on June 2, 2009, June 9, 2009, June 18, 2009, June 22, 2009, June 24, 2009, July 1, 2009, July 8, 2009, July 13, 2009, July 20, 2009, July 22, 2009, July 30, 2009, July 30, 2009, August 3, 2009, August 5, 2009, August 7, 2009 and August 10, 2009. The following description of the Accommodation Agreement reflects all amendments through the date hereof.

In connection with an amendment entered on March 31, 2009, Delphi applied all previously collected interest payments in respect of the Tranche C Term Loan, approximately $86 million, ratably as repayments of principal outstanding under the Tranche A Facility and the Tranche B Term Loan. In conjunction with the effectiveness of this amendment, $25 million of amounts in a cash collateral account were ratably applied to pay down principal

amounts outstanding under the Tranche A Facility and Tranche B Term Loan.  In addition, the amendment entered on April 22, 2009 provides that all future Tranche C interest payments will be applied ratably to repayments of principal amounts outstanding under the Tranche A Facility and the Tranche B Term Loan until paid in full.  Delphi continues to recognize the contractual accrued interest on the Tranche C Term Loan.

<u>Termination Date of the Accommodation Agreement</u>
   Under the Accommodation Agreement (as amended through the date of this report), Delphi may continue using the proceeds of the Amended and Restated DIP Credit Facility and the lenders have agreed, among other things, to forbear from the exercise of certain default-related remedies, in each case until the earlier to occur of (i) August 13, 2009 at 8:00 p.m. (Eastern time), (ii) Delphi's failure to comply with its covenants, including the milestone dates described below, under the Accommodation Agreement or the occurrence of certain other events set forth in the Accommodation Agreement, and (iii) an event of default under the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions).  To date, Delphi has been successful in obtaining short-term extensions to the termination date of the Accommodation Agreement and will continue to seek such extensions until such time as the Modified Plan is effective, however, there can be no assurances that it will continue to be successful in obtaining such extensions as needed.

   Additionally, the accommodation period under the Accommodation Agreement will terminate on August 14, 2009, in the event that a majority of the Tranche A and Tranche B lenders who have signed the Accommodation Agreement and a majority of all lenders who signed the Accommodation Agreement have not notified Delphi that a detailed term sheet, which has been agreed to by both GM and the U.S. Treasury and which sets forth the terms of a global resolution of matters relating to GM's contribution to the resolution of Delphi's chapter 11 cases, including, without limitation, all material transactions between Delphi and GM relevant to such resolution, delivered by Delphi to the agent under the Amended and Restated DIP Credit Facility, is satisfactory on or before August 13, 2009.

<u>Requirements of the Accommodation Agreement</u>
   Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, as of December 12, 2008, the effective date of the Accommodation Agreement, Delphi is no longer able to make additional draws under the facility.  However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement), in addition to the provisions of the Accommodation Agreement.  To date, Delphi has been able to maintain sufficient liquidity to continue operations, however, there can be no assurances this will continue to be the case, (refer to Liquidity Outlook in Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009.

<u>Terms of the Amended and Restated DIP Credit Facility and Accommodation Agreement</u>
   The facilities currently bear interest at the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent, as detailed in the table below, and the amounts outstanding (in millions) and rates effective as of June 30, 2009 were:

|  | **ABR plus** | **Borrowings as of June 30, 2009** (in millions) | **Rates effective as of June 30, 2009** |
|---|---|---|---|
| Tranche A | 5.00% | $230 | 9.25% |
| Tranche B | 5.00% | $311 | 9.25% |
| Tranche C | 6.25% | $2,750 | 10.50% |

The Tranche A, Tranche B and Tranche C facilities include an ABR floor of 4.25%.

   The Company had $46 million in letters of credit outstanding under the Revolving Facility as of June 30, 2009. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Accommodation Agreement.  Under the Accommodation Agreement, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate.  Based on the borrowing base computation in effect at June 30, 2009, as defined in the Accommodation Agreement, Delphi's borrowing base was reduced by a deduction of $116 million for unrealized losses related to Delphi's hedging portfolio, which as of June 30, 2009 resulted in net losses included in accumulated other comprehensive income ("OCI") of $219 million pre-tax, primarily related to copper and Mexican Peso hedges, as further described in Note 16. Financial Instruments, Derivatives and Hedging Activities and Fair Value Measurements, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009.

The Amended and Restated DIP Credit Facility and the Accommodation Agreement include affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability, among other things, to incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.  The Accommodation Agreement contains further defaults and events of default, the occurrence of which (absent a waiver or cure thereof within the applicable grace period) could result in the termination of the accommodation period under the Accommodation Agreement.  Delphi was in compliance with the Amended and Restated DIP Credit Facility and Accommodation Agreement covenants as in effect on June 30, 2009.

In the three months ended June 30, 2009, the Company received authority from the Court to pay applicable fees to various lenders in conjunction with certain amendments entered into during the second quarter of 2009, and paid approximately $22 million in fees to the consenting lenders for all amendments.  Delphi also paid arrangement and other fees to various lenders associated with the amendments.

**Advance Agreement and Liquidity Support from General Motors and Related Matters**

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement").  The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective.  The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement.  The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis.  The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, as more fully described in Note 2. Transformation Plan and Chapter 11 Bankruptcy, and Delphi was not able to redraw the original $650 million facility amount.

On September 26, 2008, the Court granted Delphi's motion to amend the original GM Advance Agreement to provide for a $300 million facility, which could be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement signed on August 7, 2008 and to give GM an administrative claim for all unpaid advances under such additional facility.

On June 10, 2009, the Court granted Delphi's motion to further amend and restate the original GM Advance Agreement between Delphi and GM.  The effectiveness of the amendment and restatement was subject to certain conditions precedent which were fully satisfied on June 16, 2009.  Pursuant to the amendment and restatement of the GM Advance Agreement, GM agreed to furnish a $250 million credit facility (the "Tranche C Facility") to Delphi subject to certain conditions specified therein.  The following description of the terms of the Tranche C Facility is qualified by reference to the full text of the GM Advance Agreement (as so amended and restated through the date hereof).  The GM Advance Agreement did not materially alter the terms and conditions of the original GM Advance Agreement with respect to the previously agreed to $300 million facility (the "Tranche B Facility"), however, the commitments under the Tranche B Facility have expired and all loans under the Tranche B Facility are required to be repaid concurrently with the repayment of the loans under the Tranche C Facility.  Between July 23, 2009 and August 11, 2009, Delphi entered into further amendments to the GM Advance Agreement.  The combined effect of these amendments was to extend the deadline for Delphi to satisfy certain milestones, which if not met, would prevent Delphi from continued access to the Tranche C Facility.  To date, Delphi has been successful in obtaining short-term extensions of the deadline concurrent with the extensions of the termination date of the Accommodation Agreement and will continue to seek such extensions until such time as the Modified Plan is effective, however, there can be no assurances that it will continue to be successful in obtaining such extensions as needed.  For more details regarding the GM Advance Agreement and the various amendments, refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009.

Additionally, GM agreed, subject to certain conditions, to accelerate payment of certain payables up to $300 million to Delphi, pursuant to the Partial Temporary Accelerated Payments Agreement ("PTAP").  As of June 30, 2009, GM had accelerated payment of $300 million under such agreement and therefore no amounts remain to be accelerated thereunder.  The PTAP provides that GM will generally recoup these accelerated payments from its September 2009 MNS-2 payment to Delphi.

The GM Advance Agreement (as amended and restated) currently has a targeted cash balance amount of $25 million and Delphi is required to use any free cash flow above the targeted cash balance amount (as determined in accordance with the GM Advance Agreement) to repay from time to time (in accordance with the GM Advance Agreement) any amounts outstanding thereunder.  As of June 30, 2009, $400 million was outstanding pursuant to the GM Advance Agreement and $150 million was available for future advances.  As of July 31, 2009, the remaining $150 million was outstanding pursuant to the GM Advance Agreement and there were no amounts available for future advances.  There can be no assurances, however, that GM will have sufficient liquidity to continue to advance amounts under the GM Advance Agreement. Refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and Part II. Item 1A. Risk Factors in the Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009 and June 30, 2009 for risks and uncertainties related to Delphi's business relationship with GM.

## 4. Reorganization Items

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed.  Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors, and unions.  The Debtors' reorganization items consist of the following:

| | (Income)/Expense Three Months Ended June 30, 2009 | (Income)/Expense Six Months Ended June 30, 2009 |
|---|---|---|
| | | (in millions) |
| Salaried OPEB settlement | $ — | $ (1,168) |
| Professional fees directly related to reorganization | 16 | 39 |
| Interest income and other | (13) | (27) |
| Total Reorganization Items | $ 3 | $ (1,156) |

Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions. Professional Fees also include $7 million and $11 million during the three months and six months ended June 30, 2009, respectively, for certain legal advisors to GM.  Professional Fees for the three and six months ended June 30, 2009 were estimated by the Debtors and will be reconciled to actual invoices when received.

## 5. Assets

Other current assets consisted of the following:

| | June 30, 2009 |
|---|---|
| | (in millions) |
| Taxes other than income | $ 12 |
| Prepaid insurance and other expenses | 62 |
| Deposits to vendors | 28 |
| Other | 13 |
| Total | $ 115 |

Case Number:  05-44481 (RDD) (Jointly Administered)

Other long-term assets consisted of the following:

|  | June 30, 2009 (in millions) |
|---|---|
| Long-term notes receivable | $  18 |
| Spare parts | 52 |
| Income taxes receivable | 45 |
| Goodwill | 37 |
| Intangible assets | 14 |
| Deferred charges | 10 |
| Other investments | 16 |
| Other | 22 |
| Total | $  214 |

## 6. Liabilities

Accrued liabilities consisted of the following:

|  | June 30, 2009 (in millions) |
|---|---|
| Payroll related obligations | $  28 |
| Employee benefits, including current pension obligations | 77 |
| Taxes other than income | 27 |
| Warranty obligations | 66 |
| U.S. employee workforce transition program | 81 |
| Employee termination benefits and other exit costs | 70 |
| Interest on prepetition claims | 415 |
| Working capital backstop – Steering Business | 210 |
| Derivative financial instruments | 139 |
| Accrued interest | 170 |
| Other | 112 |
| Total | $1,395 |

Employee benefits and other consisted of the following:

|  | June 30, 2009 (in millions) |
|---|---|
| Workers compensation | $  303 |
| Environmental | 79 |
| Extended disability benefits | 62 |
| Warranty obligations | 95 |
| Other long-term debt | 19 |
| Accrued income taxes | 17 |
| Other | 88 |
| Total | $  663 |

## 7. Liabilities Subject to Compromise

The Debtors have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim is filed.  In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time, as of June 30, 2009, the Debtors had objected to approximately 14,000 proofs of claim which asserted approximately $10.6 billion in aggregate liquidated amounts

plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,800 of those claims, which orders reduced the amount of asserted claims by approximately $9.5 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order allowing or modifying approximately 4,000 claims, reducing the aggregate amounts asserted on those claims by $352 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced. The determination of how these liabilities are to be settled and treated is set forth in the Plan, which was approved by the Court on January 25, 2008. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events. Liabilities subject to compromise consist of the following:

|  | June 30, 2009 |
| --- | ---: |
|  | (in millions) |
| Pension obligations | $      5,383 |
| Postretirement obligations other than pensions | 24 |
| Allowed GM general unsecured claim | 2,500 |
| Allowed GM administrative claim | 1,628 |
| Allowed IUE-CWA and USW claims | 129 |
| Debt and notes payable | 1,984 |
| Accounts payable | 813 |
| Junior subordinated notes due 2033 | 391 |
| Securities and ERISA litigation liability | 351 |
| Supplemental executive retirement program | 117 |
| Other | 226 |
| Total Liabilities Subject to Compromise | $      13,546 |

## 8. Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and are being paid under agreed-upon payment terms.

## 9. Divestitures

### Discontinued Operations

The Court approval of Delphi's plan to dispose of the Steering Business and the Interiors and Closures Business triggered held for sale accounting in 2007. The Court approval of bidding procedures for the sale of the remaining assets of the chassis business on April 23, 2009 and subsequent approval of the sale triggered held for sale accounting for the Automotive Holdings Group in the second quarter of 2009.

***Steering and Halfshaft Business*** - In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Pursuant to the Amended MRA, GM has agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010. On March 3, 2009, Delphi and Platinum reached an agreement under which the Purchase Agreement was terminated (the "Termination Agreement") and Delphi and GM reached an agreement (the "Option Exercise Agreement"), subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM would exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM to

purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances.  GM had agreed to guaranty the payment and performance of its wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.  In conjunction with the proposed modifications to Delphi's Plans filed on June 1, 2009, Delphi will sell certain plants to GM Components Holding LLC, and affiliate of GM, including the Steering Business.  The agreed transaction with GM Components Holding LLC supersedes the Option Exercise Agreement, which had been pending Court approval and was withdrawn by Delphi.  As part of the transactions under the MDA, an affiliate of GM is expected to acquire the Steering Business, refer to Note 21. Subsequent Events, to the consolidated financial statements in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 for further information.

On September 30, 2008, in conjunction with the effectiveness of the Amended MRA, Delphi received and recorded as a deferred liability a $210 million advance on working capital recovery from GM related to the Steering Business.  During the three and six months ended June 30, 2009 Delphi recorded a loss of $24 million, net of tax, and income of $1 million, net of tax, respectively, due to the results of operations and adjustment of assets held for sale to fair value of the Steering Business.

*Automotive Holdings Group -* The Automotive Holdings Group includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.  The sales and wind-downs of the various AHG sites effectively began in the third quarter of 2007 and will be substantially completed with the divestiture of the Global Suspension and Brakes Business as discussed below.  As mentioned above, the Court approval of bidding procedures for the sale of the remaining assets of the chassis business on April 23, 2009 and the subsequent sale approval triggered held for sale accounting for the Automotive Holdings Group in the second quarter of 2009.  During the three and six months ended June 30, 2009 Delphi recorded a loss of $32 million, net of tax, and a loss of $55 million, net of tax, respectively, due to the results of operations and adjustment of assets held for sale to fair value of the Automotive Holdings Group.

**DELPHI CORPORATION, <u>et al.</u>**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**THREE MONTHS ENDED JUNE 30, 2009**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $        298,730,904 | $             77,656,824 | $            24,514,561 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**THREE MONTHS ENDED JUNE 30, 2009**

| Payee | Payroll Taxes Paid |
|---|---:|
| Internal Revenue Service | $  89,320,873 |
| State of Michigan | 7,740,522 |
| City of Saginaw, MI | 100,973 |
| City of Flint, MI | 24,090 |
| City of Grand Rapids, MI | 7,864 |
| City of Detroit, MI | 6,757 |
| City of Walker, MI | 880 |
| City of Pontiac, MI | 556 |
| City of Lansing, MI | 87 |
| State of New York | 4,759,889 |
| State of Indiana | 3,555,104 |
| Bartholomew County, IN | 200 |
| State of Ohio | 1,793,854 |
| City of Kettering, OH | 93,347 |
| City of Vandalia, OH | 92,026 |
| City of Dayton, OH | 56,674 |
| City of Moraine, OH | 40,674 |
| City of Warren, OH | 23,618 |
| City of Rita, OH | 14,306 |
| City of Elyria, OH | 14,245 |
| Ohio School District | 14,015 |
| City of Niles, OH | 9,447 |
| City of Hubbard, OH | 4,287 |
| City of Lordstown, OH | 1,784 |
| City of Columbus, OH | 857 |
| City of Springfield, OH | 773 |
| City of Trotwood, OH | 687 |
| City of Dublin, OH | 532 |
| City of Toledo, OH | 495 |
| City of Newton Falls, OH | 367 |
| City of Canton, OH | 339 |
| City of Akron, OH | 246 |
| City of Norwalk, OH | 58 |
| City of Xenia, OH | 44 |
| City of Huron, OH | 31 |
| City of West Carrollton, OH | 7 |
| City of Cincinnati, OH | 5 |
| City of Troy, OH | 5 |
| State of Alabama | 729,077 |
| State of Mississippi | 324,183 |
| State of Wisconsin | 266,876 |
| State of California | 100,819 |
| State of Colorado | 54,475 |
| City of Denver, CO | 4,839 |
| State of Texas | 49,183 |
| State of Pennsylvania | 27,842 |
| City of Towamencin, PA | 111 |
| State of Kansas | 21,139 |
| State of South Carolina | 16,929 |
| State of Georgia | 15,873 |
| State of Illinois | 15,436 |
| State of Oregon | 8,139 |
| State of Virginia | 7,807 |
| State of North Carolina | 7,335 |
| State of Arizona | 7,178 |

Case Number:  05-44481 (RDD) (Jointly Administered)

| Payee | Payroll Taxes Paid |
|---|---|
| State of Kentucky | $        5,924 |
| City of Elizabethtown, KY | 637 |
| City of Bowling Green, KY | 355 |
| State of New Jersey | 4,537 |
| State of Louisiana | 4,152 |
| State of Missouri | 4,176 |
| State of Maryland | 3,024 |
| State of Arkansas | 2,267 |
| State of Iowa | 1,258 |
| State of Utah | 1,199 |
| State of Massachusetts | 601 |
| State of West Virginia | 423 |
| State of Washington | 306 |
| State of Tennessee | 63 |
| State of Florida | 8 |
| Internal Revenue Service (UK) | 905,284 |
| Total | $    110,271,973 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED JUNE 30, 2009**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Howard County, IN | Personal Property | $ 2,366,258 | $ 2,366,258 |
| Hinds County, MS | Personal Property | 192,827 | 192,827 |
| Weld County, CO | Personal Property | 53,649 | 53,649 |
| Knox County, TN | Personal Property | 17,495 | 17,495 |
| Marion County, IN | Personal Property | 2,929 | 2,929 |
| Boulder County, CO | Personal Property | 1,020 | 1,020 |
| San Diego County Tax Collector, CA | Personal Property | 935 | 935 |
| Kosciusko County, IN | Personal Property | 695 | 695 |
| Adams County, IN | Personal Property | 520 | 520 |
| Ripley County, IN | Personal Property | 434 | 434 |
| Salisbury, CT | Personal Property | 319 | 319 |
| Scott County, IN | Personal Property | 256 | 256 |
| Whitley County, IN | Personal Property | 245 | 245 |
| Lynchburg, VA | Personal Property | 215 | 215 |
| Dubois County, IN | Personal Property | 194 | 194 |
| Hawkins County, TN | Personal Property | 154 | 154 |
| Franklin County, IN | Personal Property | 119 | 119 |
| Yakima County, WA | Personal Property | 117 | 117 |
| Vanderburgh County, IN | Personal Property | 104 | 104 |
| Southington, CT | Personal Property | 98 | 98 |
| King County, WA | Personal Property | 80 | 80 |
| Dearborn County, IN | Personal Property | 31 | 31 |
| Monroe County, IN | Personal Property | 30 | 30 |
| Jay County, IN | Personal Property | 27 | 27 |
| Wabash County, IN | Personal Property | 14 | 14 |
| Switzerland County, IN | Personal Property | 5 | 5 |
| Howard County, IN | Real Property | 1,403,145 | 1,403,145 |
| Monroe County, NY | Real Property | 167,496 | 167,496 |
| Franklin County, OH | Real Property | 114,851 | 114,851 |
| Henrietta, NY | Real Property | 83,376 | 83,376 |
| Oak Creek, WI | Real Property | 58,588 | 58,588 |
| State of Michigan | Use | 588,862 | 588,862 |
| State of Indiana | Use | 360,821 | 360,821 |
| State of New York | Use | 254,633 | 254,633 |
| State of Texas | Use | 75,815 | 75,815 |
| Limestone County, Alabama  (Pay to: Alabama Department of Revenue) | Use | 64,297 | 64,297 |
| State of Ohio | Use | 42,351 | 42,351 |
| Colorado Dept of Revenue | Use | 1,972 | 1,972 |
| State of Wisconsin | Use | 996 | 996 |
| Texas Comptroller of Public Accounts | Franchise | 913,000 | 913,000 |
| Delaware Secretary of State | Franchise | 101,775 | 101,775 |
| Kentucky State Treasurer | Franchise | 92,000 | 92,000 |
| Alabama Department of Revenue | Franchise | 3,520 | 3,520 |
| Oklahoma Tax Commission | Franchise | 100 | 100 |
| Ohio Treasurer of State | Commercial Activity | 162,678 | 162,678 |
| State of Alabama | Seller's Use | 101,139 | 101,139 |
| California Franchise Tax Board | Income | 27,680 | 27,680 |
| State of Alabama | Income | 25,000 | 25,000 |
| State of New Jersey Division of Taxation | Income | 2,525 | 2,525 |
| Treasurer City of Bowling Green | Income | 30 | 30 |
| State of Ohio | Kilowatt Hour | 42,780 | 42,780 |
| U.S. Treasury/IRS | Federal Excise | 24,048 | 24,048 |
| U.S. Treasury/IRS | Withholding (non-payroll) | 15,491 | 15,491 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| State of Washington | Business & Occupation | $ 4,749 | $ 4,749 |
| Colorado Department of Revenue | Utility | 730 | 730 |
| South Carolina Department of Revenue | Sales & Use | 194 | 194 |
| Colorado Department of Revenue | Sales | 111 | 111 |
| Michigan Department of Treasury | Single Business | 1 | 1 |
| Total | | $ 7,373,524 | $ 7,373,524 |

## DELPHI CORPORATION, et al.
### SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID
### THREE MONTHS ENDED JUNE 30, 2009

Note 1:   The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:   Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

## DELPHI CORPORATION, et al.
### SCHEDULE OF DISBURSEMENTS
### THREE MONTHS ENDED JUNE 30, 2009

| Debtor Name | Case Number | Amount [1] |
|---|---|---:|
| Delphi NY Holdings Corporation | 05-44480 | $ — |
| Delphi Corporation | 05-44481 | — |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 13,258,002 |
| Delphi Medical Systems Texas Corporation | 05-44511 | — |
| Delphi Medical Systems Corporation | 05-44529 | 2,303,229 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 1,592,657 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 3,544,260 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 19,202,875 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | — |
| Delphi China LLC | 05-44577 | — |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 361,096 |
| Delphi International Services, Inc. | 05-44583 | 17,351,078 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | — |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | — |
| Delco Electronics Overseas Corporation | 05-44610 | 15,202,822 |
| Delphi Diesel Systems Corporation | 05-44612 | 75,642,681 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 453,043 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 217,698 |
| Delphi Connection Systems | 05-44624 | 12,172,074 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 208,920,153 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 368,918,595 |
| Delphi Automotive Systems LLC | 05-44640 | 1,563,463,026 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 32,640,549 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | — |

(1) Operating expenses for the three months ended June 30, 2009 were used as a proxy for disbursements.