# EXHIBIT A

LEXSEE



Positive
As of: Aug 19, 2009

In re: EAGLE-PICHER INDUSTRIES, INC., Debtor. CARADON DOORS AND WINDOWS, INC., Respondent-Appellee, - v. - EAGLE-PICHER INDUSTRIES, INC., Movant-Appellant.

No. 04-3747

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

06a0152p.06; 447 F.3d 461; 2006 U.S. App. LEXIS 11360; 2006 FED App. 0152P
(6th Cir.); Bankr. L. Rep. (CCH) P80,515; 46 Bankr. Ct. Dec. 123

January 25, 2006, Argued
May 5, 2006, Decided
May 5, 2006, Filed

**PRIOR HISTORY:**    [**1] Appeal from the United States District Court for the Southern District of Ohio at Cincinnati. No. 02-00589--Sandra S. Beckwith, Chief District Judge.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee manufacturer was named a defendant in a patent infringement case along with appellant debtor. The bankruptcy court agreed with the debtor that the patent infringement claim could not proceed because the confirmation of the 1996 reorganization plan discharged the manufacturer's claim, but the United States District Court for the Southern District of Ohio disagreed and reversed the bankruptcy court's decision.

**OVERVIEW:** The debtor was named a defendant along with the manufacturer in a patent infringement action, but the claim was dismissed against the debtor for lack of venue. After an $ 8 million verdict was assessed against the manufacturer, a second patent infringement case was filed against the manufacturer involving a different door assembly, which again used the debtor's doorskins. The parties settled both claims in December 1996. In the midst of the patent infringement litigation, the debtor filed for Chapter 11 relief, and in November 1996, the reorganization plan was confirmed. The bankruptcy court granted the debtor's motion to stay the proceeding initiated by the manufacturer, but the district court reversed, holding that the manufacturer's claims arose from the debtor's core business and thus amounted to liability incurred in the ordinary course of business. The appellate court noted that the reorganization plan permitted certain administrative expense claims to be filed after the confirmation date of the plan. The court held that the definition of recoverable administrative expense claims in the plan covered the claims raised by the manufacturer under 11 U.S.C.S. § 503.

**OUTCOME:** The court affirmed the decision of the district court.

**CORE TERMS:** administrative expenses, patent-infringement, reorganized, confirmation, door, liabilities incurred, reorganization plan, course of business, ordinary course, skins, lawsuit, plan of reorganization, tort claim, administrative-expense, indebtedness, recoverable, patent, bankruptcy estate, patent infringement, breach of contract, ordinary-course, postpetition, discharged, confirmed, stemming,

Page 1

447 F.3d 461, \*; 2006 U.S. App. LEXIS 11360, \*\*1;
2006 FED App. 0152P (6th Cir.), \*\*\*; Bankr. L. Rep. (CCH) P80,515

day-to-day, Black's Law Dictionary, following language, claims arising, construing

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
[HN1]In a bankruptcy case on appeal from a district court, the appellate court owes no special deference to the district court's decision and reviews the bankruptcy court's legal conclusions de novo and upholds its factual findings unless clearly erroneous.

*Bankruptcy Law > Discharge & Dischargeability > General Overview*
[HN2]Under the Bankruptcy Code, all claims against the debtor are discharged upon the confirmation of a Chapter 11 reorganization plan except as otherwise indicated in the plan of reorganization. 11 U.S.C.S. § 1141(d)(1)(A).

*Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Administrative Expenses > Estate Preservation*
[HN3]The Bankruptcy Code defines administrative expenses incurred during the pendency of the bankruptcy and payable by the debtor as the actual, necessary costs and expenses of preserving the estate. 11 U.S.C.S. § 503(b)(1). A postpetition tort claim against a debtor constituted an actual and necessary cost of the administration of the estate under § 503. Since then, and in reliance on Reading, the United States Court of Appeals for the Sixth Circuit (like many others) has used a two-part test to determine whether a claim is an administrative expense under § 503: A debt qualifies as an actual, necessary administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate.

*Bankruptcy Law > Discharge & Dischargeability > Reorganizations*
[HN4]Most confirmed Chapter 11 plans, if not all of them, provide mechanisms by which the reorganized company will assume the administrative expenses of the debtor that arose during the bankruptcy and that were not paid upon confirmation of the plan. 11 U.S.C.S. § 503. While the Bankruptcy Code does not have a provision that sets a date for the general discharge of administrative-expense claims, it does permit the parties to establish a bar date by which time all administrative expenses must be asserted against the debtor or face discharge, and it permits the parties to define the kinds of administrative expenses that are recoverable after confirmation.

*Tax Law > Federal Income Tax Computation > Deductions for Losses > Net Operating Loss (IRC secs. 172, 382) > Changes in Corporate Ownership*
[HN5]The administrative rules of the Internal Revenue Service for companies in Chapter 11 bankruptcy define ordinary course indebtedness as arising in the ordinary course of the loss corporation's trade or business only if the indebtedness is incurred by the loss corporation in connection with the normal, usual, or customary conduct of business. For example, indebtedness (other than indebtedness acquired for a principal purpose of being exchanged for stock) arises in the ordinary course of the loss corporation's trade or business if it is trade debt; a tax liability; a liability arising from a past or present employment relationship, a past or present business relationship with a supplier, customer, or competitor of the loss corporation, a tort, a breach of warranty, or a breach of statutory duty. 26 C.F.R. § 1.382-9(d)(2)(iv).

**COUNSEL:** ARGUED: Debra A. Dandeneau, WEIL, GOTSHAL & MANGES, New York, New York, for Appellant.

Audrey S. Trundle, GIBSON, DUNN & CRUTCHER, New York, New York, for Appellee.

ON BRIEF: Debra A. Dandeneau, WEIL, GOTSHAL & MANGES, New York, New York, Iris S. Rogatinsky, WEIL, GOTSHAL & MANGES, Miami, Florida, Matthew J. Calvert, HUNTON & WILLIAMS, Atlanta, Georgia, for Appellant.

Audrey S. Trundle, GIBSON, DUNN & CRUTCHER, New York, New York, Christopher H. Buckley, Jr., GIBSON, DUNN & CRUTCHER, Washington, D.C., Henry E. Menninger, Jr., WOOD & LAMPING, Cincinnati, Ohio, John L. Taylor, Jr., Celeste McCollough, CHOREY TAYLOR & FEIL, Atlanta, Georgia, for Appellee.

447 F.3d 461, *; 2006 U.S. App. LEXIS 11360, **1;
2006 FED App. 0152P (6th Cir.), ***; Bankr. L. Rep. (CCH) P80,515

**JUDGES:** Before: SILER, SUTTON, and COOK, Circuit Judges.

**OPINION BY:** SUTTON

**OPINION**

[*462] [***1] SUTTON, Circuit Judge. Eagle-Picher Industries emerged from Chapter 11 bankruptcy in November 1996, and in this case seeks to stay a $20 million patent-infringement action filed by Caradon Doors and Windows against it in May 1997. After considerable collateral skirmishing, the [***2] [**2] merits of the stay motion focused on the following disagreement. Eagle-Picher contends that the patent-infringement claim cannot proceed because the confirmation of the 1996 reorganization plan discharged Caradon's claim. Caradon responds that the patent-infringement claim arose in the ordinary course of doing business with the debtor and that the plan by its terms excepted this kind of claim from discharge. The bankruptcy court agreed with Eagle-Picher while the district court agreed with Caradon. We agree with the district court and affirm.

I.

Caradon manufactures artificial-wood doors. In 1989, Caradon (in truth, its [*463] predecessor) began purchasing fiberglass door skins (the exterior paneling used on artificial-wood doors) from Eagle-Picher for use in its door assemblies. On October 12, 1989, soon after this arrangement began, Therma Tru Corporation sued Caradon, claiming that Caradon's doors infringed a patent held by Therma Tru. Therma Tru also named Eagle-Picher in the lawsuit, but the district court dismissed the claim against Eagle-Picher for lack of venue. After the district court entered an $8 million verdict against Caradon in 1995, Therma Tru filed a second patent-infringement [**3] lawsuit against Caradon involving a different door assembly, which again used Eagle-Picher doorskins. The parties settled both claims in December 1996.

Meanwhile, in the midst of this patent-infringement litigation, Eagle-Picher filed for Chapter 11 bankruptcy relief on January 7, 1991. Five and a half years later, on November 18, 1996, the bankruptcy court confirmed Eagle-Picher's reorganization plan. The bankruptcy court entered the confirmation order roughly one month before Caradon and Therma Tru settled their patent-infringement lawsuit in December 1996.

On May 8, 1997, Caradon filed a lawsuit against Eagle-Picher in the District Court for the Northern District of Georgia, claiming contributory patent infringement and breach of contract (among other claims) and seeking contribution and indemnity arising from the settlement of Therma Tru's patent-infringement claims. Caradon confined its prayer for relief to postpetition damages, which is to say damages stemming from sales between Caradon and Eagle-Picher after Eagle-Picher petitioned for bankruptcy relief in 1991. On June 6, 1997, Eagle-Picher moved for a stay of Caradon's action in the Bankruptcy Court for the Southern District [**4] of Ohio, claiming that the reorganization plan and confirmation order discharged the claim.

On December 24, 1997, the bankruptcy court concluded that Caradon had abandoned any right to assert a prepetition or preconfirmation claim by not raising the claim before confirmation of the reorganization plan. The district court, however, reversed the bankruptcy court's decision, holding that Caradon did not abandon its claim. The case then underwent lengthy discovery and several additional hearings before the bankruptcy court.

On May 9, 2002, the bankruptcy court granted the stay motion on the independent ground that Caradon did not have a cognizable claim to bring in the Northern District of Georgia. Construing § 2.1 of the reorganization plan, which preserves administrative expenses for "liabilities incurred in the ordinary course of business by any of the Debtors in possession," JA 104, the bankruptcy court reasoned that "claims for contributory patent infringement, breach of contract and warranty of non-infringement, common law contribution and common law indemnification were not part of [the] day-to-day interaction" between the parties and thus "are not within the exception of [§ [**5] ] 2.1 of the Plan." Bankr. Ct. Op. at 30. The district court reversed. As it saw the matter, Caradon's claims arose from Eagle-Picher's core business and thus amounted to "liabilities incurred in the ordinary course of business." D. Ct. Op. at 12-13.

[***3] II.

[HN1]In a bankruptcy case on appeal from a district court, we owe no special deference to the district court's decision and review "the bankruptcy court's legal conclusions de novo and uphold its factual findings

unless clearly erroneous." *Crowell v. United States*, 305 F.3d 474, 476 (6th Cir. 2002). There is some debate between [*464] the parties about the application of this legal/factual dichotomy to a bankruptcy court's interpretation of a reorganization plan over which it presided and about what *Terex Corp. v. Metropolitan Life Insurance Co.* (*In re Terex Corp.* ), 984 F.2d 170, 172 (6th Cir. 1993), requires in this context. Because the appropriate standard of review does not affect our analysis of this appeal, we will assume without deciding that we must give the bankruptcy court's interpretation of the confirmed reorganization plan the same "full deference" we gave it in *Terex Corp*. [**6]

The parties appear to share considerable common ground in their framing of this dispute. First, [HN2]under the Bankruptcy Code, all claims against the debtor are discharged upon the confirmation of a Chapter 11 reorganization plan except as otherwise indicated in the plan of reorganization. *See* 11 U.S.C. § 1141(d)(1)(A) ("Except as otherwise provided . . . in the plan . . . the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . ."); *CPT Holdings v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405, 407 (6th Cir. 1998); *Holstein v. Brill*, 987 F.2d 1268, 1270 (7th Cir. 1993).

Second, [HN3]the Bankruptcy Code defines administrative expenses incurred during the pendency of the bankruptcy and payable by the debtor as the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1). In *Reading Co. v. Brown*, 391 U.S. 471, 485, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968), the Supreme Court held that a postpetition tort claim against a debtor constituted an "actual and necessary cost[]" of the administration [**7] of the estate under § 503. Since then, and in reliance on *Reading*, this circuit (like many others) has used a two-part test to determine whether a claim is an administrative expense under § 503: "[A] debt qualifies as an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997); *see, e.g., In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984).

Applying *Reading* and this two-part test, courts have concluded that the following claims fall within the Code's definition of administrative expenses: tort, *Reading*, 391 U.S. at 485; trademark infringement, *Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.)*, 188 B.R. 347, 356 (Bankr. S.D.N.Y. 1995); patent infringement, *Carter--Wallace, Inc. v. Davis--Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2d Cir. 1971); and breach of contract, *United Trucking Serv. v. Trailer Rental Co. (In re United Trucking Serv.)* ,851 F.2d 159, 162-63 (6th Cir. 1988); [**8] *Nostas Assocs. v. Costich (In re Klein Sleep Prods.)*, 78 F.3d 18, 26 (2d Cir. 1996). Under these precedents, Caradon's claims satisfy the traditional definition of "administrative expenses" so long as they arose from transactions that occurred between it and Eagle-Picher after the petition for bankruptcy -- which indeed they did. *See Pension Benefit Guar. Corp.*, 126 F.3d at 816 (noting that a claim must arise "from a transaction with the bankruptcy estate" to be an administrative expense).

Third,[HN4] most confirmed Chapter 11 plans, if not all of them, provide mechanisms by which the reorganized company will assume the administrative expenses of the debtor that arose during the bankruptcy and that were not paid upon confirmation of the plan. *See* 11 U.S.C. § 503. While the Bankruptcy Code does not have a provision that sets a date for the general [*465] discharge of administrative-expense claims, *see United States v. Ginley (In re Johnson)*, 901 F.2d 513, 517 (6th Cir. 1990); *Tex. Comptroller of Pub. Accounts v. Megafoods Stores (In re Megafoods Stores)*, 163 F.3d 1063, 1071 (9th Cir. 1998), it does [**9] permit the parties to establish a bar date by which time all administrative expenses must be asserted against the debtor or face discharge and it permits the [***4] parties to define the kinds of administrative expenses that are recoverable after confirmation, *see, e.g. ,Highlands Ins. Co. v. Alliance Operating Corp.* (*In re Alliance Operating Corp.* ), 60 F.3d 1174, 1177 (5th Cir. 1995); *Langel v. Kmart Corp. (In re Kmart Corp. )*, No. 03C7091, 2004 U.S. Dist. LEXIS 3149 (N.D. Ill. Feb. 27, 2004).

In this instance, § 2.1 of the Eagle-Picher reorganization plan permits certain administrative-expense claims to be filed after the confirmation date of the plan. Rather than set an explicit bar date for the payment of all such claims, § 2.1 says that they must be "assumed and paid" by the "Reorganized Debtor[]" "in accordance with the terms and conditions of the particular transactions." JA 104.

Section 2.1 reads in relevant part:

> The Allowed Amount of each Allowed Administrative Expense shall be paid in full, in cash, on the Effective Date; provided, however, that (i) Administrative Expenses representing (a) *liabilities incurred* [**10] *in the ordinary course of business* by any of the Debtors in Possession . . . shall be assumed and paid by the respective Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto . . . .

*Id.* (emphasis removed and added).

The rub in this case is whether the definition of recoverable administrative-expense claims in § 2.1 covers Caradon's claims. We think that it does. The provision says that "Administrative Expenses representing (a) liabilities incurred in the ordinary course of business by any of the Debtors in Possession" will be assumed by the reorganized debtors. It thus incorporates the plan's general definition of "administrative expense," which covers "any Claim constituting a cost or expense of administration in the Chapter 11 Cases under section 503 of the Bankruptcy Code." § 1.1.1, JA 99. It then says that so long as the administrative expenses amount to "liabilities incurred in the course of business," they must be paid by the reorganized companies.

The problem for Eagle-Picher, it seems to us, is that any narrowing of the definition of recoverable administrative [**11] expenses accomplished by § 2.1 does not apply to Caradon's claims. While the provision says that recoverable administrative expenses must be ordinary-course liabilities, Eagle-Picher fails to explain why contract, tort or patent-infringement claims arising from postpetition sales would exceed the scope of that requirement. The sales between Caradon and Eagle-Picher arose from the ordinary course of the debtor's business-selling door skins. And the liabilities at issue arose directly from those ordinary-course sales, whether because the products were defective, whether because the terms of the contracts were not followed or whether because the products infringed an existing patent.

In reaching a contrary conclusion, the bankruptcy court determined "that matters not part of the day-to-day interaction between the parties are not within the exception of [§ ] 2.1 of the Plan" and held that Caradon's claims did not amount to day-to-day expenses. Bankr. Ct. Op. at 30. As support for this conclusion, the court invoked Black's Law Dictionary's definition of "ordinary course of business" -- [*466] "any matter which transpires as a matter of daily custom in business," Bankr. Ct. Op. at 29 -- then [**12] reasoned that § 2.1 permits only claims stemming from the daily expenses Eagle-Picher incurred in making and selling door skins, among other products, *see id.* at 30 ("Thus, the ordinary course of business between Eagle-Picher and Caradon was the on-going ordering, shipping and paying for, the goods sold by Eagle-Picher to Caradon.").

But this analysis reads the "liabilities incurred in" language out of § 2.1, artificially limits qualifying claims to the immediate expenses of the transactions themselves and in the end leaves us with the "firm conviction that a mistake has been committed," *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985). While "ordinary course of business" may indeed refer to the daily transactions [***5] between the parties, "liabilities incurred in" those transactions extends not just to Eagle-Picher's duty to deliver these goods to Caradon but also to any failure on its part to perform its explicit and implicit obligations under the contracts governing these transactions. *See* Black's Law Dictionary 925 (7th ed. 1999) (defining "liability" as "the quality or state of being legally obligated or accountable; legal [**13] responsibility to another . . . enforceable by civil remedy"). While in one sense it was not part of the daily business of the parties to infringe patents, patent-infringement liability plainly represents a legal responsibility that may arise from that daily business -- and no one disputes that this claim arose from the door skins that Eagle-Picher sold to Caradon on a daily basis.

In *Reading*, when the Supreme Court determined that a negligence claim falls within the Bankruptcy Code's general definition of administrative expenses, it held that tort claims were "costs ordinarily incident to operation of a business." 391 U.S. at 483. Even to the extent § 2.1 narrows the general definition of administrative expenses found in § 503 of the Bankruptcy Code, it thus does not do so in a way that excludes tort, contract or patent-infringement claims incurred during ordinary-course sales. To the contrary, the language of § 2.1 mirrors the language that *Reading* determined

covered tort claims arising from transactions with a bankruptcy estate.

Other courts, construing language from a plan that defined administrative expenses in the way that § 2.1 [**14] does, have reached similar conclusions. *See Fieber's Dairy, Inc. v. Purina Mills, Inc.*, 331 F.3d 584, 587 n.1 (8th Cir. 2003) (concluding that the following language -- "Administrative Claims based on liabilities incurred by a debtor in the ordinary course of its business. . . will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims" -- may encompass tort claims and remanding the case to allow the district court to interpret this phrase in the bankruptcy plan which it had not done previously); *Goldman, Sachs & Co. v. Esso Virgin Island, Inc. (In re Duplan Corp.)*, 212 F.3d 144, 155 (2d Cir. 2000) (concluding that the following language -- "Administrative claims representing the Trustee's liabilities incurred in operating the business of the Debtors in the ordinary course," *In re Duplan Corp.*, 209 B.R. 324, 331 (Bankr. S.D.N.Y. 1997) -- covered claims for contribution stemming from joint responsibility for environmental fines).

Bolstering this interpretation, [HN5]the administrative rules of the Internal Revenue Service for companies in [**15] Chapter 11 bankruptcy define "ordinary course indebtedness" as

> [*467] arising in the ordinary course of the loss corporation's trade or business only if the indebtedness is incurred by the loss corporation in connection with the normal, usual, or customary conduct of business . . . . For example, indebtedness (other than indebtedness acquired for a principal purpose of being exchanged for stock) arises in the ordinary course of the loss corporation's trade or business if it is trade debt; a tax liability; a liability arising from a past or present employment relationship, a past or present business relationship with a supplier, customer, or competitor of the loss corporation, a tort, a breach of warranty, or a breach of statutory duty . . . .

26 C.F.R. § 1.382-9(d)(2)(iv). That definition squarely applies here.

In addition to the bankruptcy court's rationale for its decision, Eagle-Picher makes several other arguments for holding that § 2.1 does not apply to Caradon's claims. It notes for example that "administrative expenses" under § 2.1 must be paid "in accordance with the terms and conditions of the particular transactions and agreements relating [**16] thereto," language that Eagle-Picher submits is inconsistent with Caradon's claims. But why that is so remains to be seen. The "terms and conditions" of most sales transactions explicitly and implicitly contemplate that the products will be paid for (a contract claim), that the products will not be defective (a tort claim) and that the products will not violate another's patent (a patent-infringement claim). And surely to the extent further legal proceedings prove that any of these claims against Eagle-Picher are valid, Caradon at [***6] a minimum will have the right to the return of one of the terms and conditions of the sales -- the price it paid for the door skins.

Eagle-Picher further argues that Caradon has not shown that its claims constitute "allowed" administrative expenses. We agree with two premises of this argument but not its conclusion. It is true, for example, that § 2.1 refers to the payment of "allowed" administrative expenses. And it is true that § 1.1.6 of the plan defines "allowed" expenses in a way that does not apply to Caradon's claims because it requires that they be approved by the bankruptcy court before the confirmation of the plan. The problem, however, [**17] is that § 2.1 specifies several exceptions to the payment of allowed administrative expenses on the effective date, one of which applies here. Namely: "administrative expenses representing liabilities incurred in the ordinary course of business . . . shall be assumed and paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions." *Id*. Debts falling within this exception need not have been paid on the effective date and are assumed by the reorganized debtor. And, most importantly, this exception says nothing about being "allowed." In fact, it would not make sense if it had because excepted expenses are no longer the responsibility of the bankrupt estate but are liabilities of the reorganized company. Instead of requiring the bankruptcy court to approve the recovery of these expenses, the plan specifies that they are to be dealt with like all other debts of non-bankrupt companies -- "in accordance with the terms and conditions of the particular

05-44481-rdd    Doc 18807-1    Filed 08/19/09    Entered 08/19/09 10:43:42    Exhibit A
Pg 8 of 8

447 F.3d 461, *467; 2006 U.S. App. LEXIS 11360, **17;
2006 FED App. 0152P (6th Cir.), ***6; Bankr. L. Rep. (CCH) P80,515

transactions."

Finally, and quite understandably, Eagle-Picher argues that the assumption of potential liability for these claims could pose an acute problem for the reorganized company. No [**18] doubt, in a Chapter 11 case in which the working capital provided for in the 1996 plan of reorganization for the reorganized company is $15 million, a $20 million claim (even one that has yet to be [*468] litigated) is far from inconsequential. But Eagle-Picher cannot fairly claim that it was unaware of this risk. Eagle-Picher was included in the original patent-infringement lawsuit; it worked with Caradon in defending the litigation; and it listed Caradon as the holder of an unsecured, unliquidated, contingent litigation claim in its original schedules of creditors. Nor does the Bankruptcy Code preclude a debtor from managing these risks. The plan of reorganization did not set a bar date on administrative-expense claims, and it made administrative expenses like Caradon's the responsibility of the reorganized debtor. Because in the final analysis the plan of reorganization by its terms permitted the filing of these claims, the district court properly determined that their resolution should not be stayed.

III.

For these reasons, we affirm the judgment of the district court.