1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            July 29, 2009

            3:22 PM



B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

                                                                        2

1

2     HEARING re Doc #16646; Motion to Approve (A) Supplement to

3     Motion for Order (I) Approving Modifications to Debtors' First

4     Amended Plan of Reorganization (As Modified) and Related

5     Disclosures and Voting Procedures and (II) Setting Final

6     Hearing Date to Consider Motion..

7

8     HEARING re Doc #14310; Motion to Approve Motion for Order (I)

9     Approving Modifications to Debtors' First Amended Plan of

10    Reorganization

11

12    HEARING re Doc #18668; Proposed Agenda for Plan Modification

13    Hearing (related document(s) [16646])

14

15    HEARING re Doc#18674; Response

16

17

18

19

20

21

22

23

24    Transcribed By:  Clara Rubin, Esther Accardi and Dena Page

25

3

```
1
2    A P P E A R A N C E S :
3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
4        Attorneys for Debtor, Delphi Corporation
5        333 West Wacker Drive
6        Suite 2100
7        Chicago, IL 60606
8
9    BY:   JOHN (JACK) WM. BUTLER, JR., ESQ.
10        ALBERT L. HOGAN, III, ESQ.
11
12   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13        Attorneys for Debtor, Delphi Corporation
14        Four Times Square
15        New York, NY 10036
16
17   BY:   KAYALYN A. MARAFIOTI, ESQ.
18        THOMAS H. KENNEDY, ESQ.
19
20   GROOM LAW GROUP
21        Attorneys for Debtor, Delphi Corporation
22        1701 Pennsylvania Avenue, N.W.
23        Washington, DC 20006
24
25   BY:   LONIE A. HASSEL, ESQ.
```

4

1

2    ARENT FOX LLP

3          Attorneys for Timken

4          1675 Broadway

5          New York, NY 10019

6

7    BY:   JAMES M. SULLIVAN, ESQ.

8

9

10   BARNES & THORNBURG LLP

11         Attorneys for Autocam Corporation

12         11 South Meridian Street

13         Indianapolis, IN 46204

14

15   BY:   DAVID M. POWLEN, ESQ.

16

17

18   BUCHANAN, INGERSOLL & ROONEY PC

19         Attorneys for Fiduciary Counselors, Inc.

20         1000 West Street

21         Suite 1410

22         Wilmington, DE 19801

23

24   BY:   MARY F. CALOWAY, ESQ.

25

5

```
 1    COHEN, WEISS AND SIMON LLP

 2          Attorneys for UAW

 3          330 West 42nd Street

 4          New York, NY 10036

 5

 6    BY:   BABETTE CECCOTTI, ESQ.

 7

 8    DAVIS POLK & WARDWELL LLP

 9          Attorneys for JPMorgan Chase Bank, N.A., DIP Agent

10          450 Lexington Avenue

11          New York, NY 10017

12

13    BY:   KARIN S. DAY, ESQ.

14          DONALD S. BERNSTEIN, ESQ.

15          JONATHAN E. ARMSTRONG, ESQ. (TELEPHONICALLY)

16

17    DECHERT LLP

18          Attorneys for Kensington International, Manchester

19           Securities, Springfield Associates, LLC

20          1095 Avenue of the Americas

21          New York, NY 10036

22

23    BY:   GLENN E. SIEGEL, ESQ.

24          CHARLES I. PORET, ESQ.

25          DANIEL C. MALONE, ESQ.
```

6

1

2    DUANE MORRIS LLP

3         Attorneys for the ACE Companies

4         30 South 17th Street

5         Philadelphia, PA 19103

6

7    BY:   MARGERY N. REED, ESQ.

8

9

10   GORLICK, KRAVITZ & LISTHAUS, P.C.

11        Attorneys for IBEW and IAM

12        17 State Street, 4th Floor

13        New York, NY 10004

14

15   BY:   BARBARA S. MEHLSACK, ESQ.

16

17

18   K&L GATES LLP

19        Attorneys for Wilmington Trust Company, as Indentured

20         Trustee

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:   EDWARD M. FOX, ESQ.

25

7

1

2    KELLER ROHRBACK P.L.C.

3         Attorneys for MDL ERISA Plaintiffs

4         3101 North Central Avenue

5         Suite 900

6         Phoenix, AZ 85012

7

8    BY:   GARY A. GOTTO, ESQ.

9

10   LATHAM & WATKINS LLP

11        Attorneys for Creditors' Committee

12        53rd at Third

13        885 Third Avenue

14        New York, NY 10022

15

16   BY:   MARK A. BROUDE, ESQ.

17         ROBERT J. ROSENBERG, ESQ.

18

19   MASUDA FUNAI EIFERT & MITCHELL, LTD.

20        Attorneys for American Aikoku

21        203 North LaSalle Street

22        Chicago, IL 60601

23

24   BY:   GARY VIST, ESQ.

25

8

1

2     MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

3          Attorneys for USW Union

4          1350 Broadway

5          Suite 501

6          New York, NY 10018

7

8     BY:   HANAN B. KOLKO, ESQ.

9

10    MILLER & CHEVALIER CHARTERED

11         Attorneys for Delphi Salaried Retirees Association

12         655 Fifteenth Street, N.W.

13         Suite 900

14         Washington, DC 20005

15

16    BY:   ANTHONY F. SHELLEY, ESQ.

17

18    MORRISON COHEN LLP

19         Attorneys for Delphi Salaried Retirees Association

20         909 Third Avenue

21         New York, NY 10022

22

23    BY:   JOSEPH T. MOLDOVAN, ESQ.

24         MICHAEL R. DAL LAGO, ESQ.

25

9

1

2     PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

3           Attorneys for IBEW IAM

4           1555 North River Center Drive

5           Suite 202

6           Milwaukee, WI 53212

7

8     BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

9

10

11    VEDDER PRICE P.C.

12          Attorneys for Export Development Canada

13          1633 Broadway

14          47th Floor

15          New York, NY 10019

16

17    BY:   MICHAEL L. SCHEIN, ESQ.

18

19

20    WEIL, GOTSHAL & MANGES LLP

21          Attorneys for General Motors

22          767 Fifth Avenue

23          New York, NY 10153

24

25    BY:   JEFFREY L. TANENBAUM, ESQ.

10

1

2    WHITE & CASE LLP

3         Attorneys for Appaloosa Management L.P. and A-D

4          Acquisition Holdings

5         1155 Avenue of the Americas

6         New York, NY 10036

7

8    BY:   DOUGLAS P. BAUMSTEIN, ESQ.

9          GLENN M. KURTZ, ESQ.

10

11

12   WILLKIE FARR & GALLAGHER LLP

13        Attorneys for the Collective of DIP Lenders

14        787 Seventh Avenue

15        New York, NY 10019

16

17   BY:   MARC ABRAMS, ESQ.

18         MICHAEL J. KELLY, ESQ.

19         CHRISTOPHER J. ST. JEANOS, ESQ.

20         RICHARD MANCINO, ESQ.

21

22

23   EURGEICE KELLEY, ESQ.

24        Attorney for Texas Taxing Authority

25

11

```
 1

 2    PENSION BENEFIT GUARANTY CORPORATION

 3        1200 K Street NW

 4        Washington, DC 20005

 5

 6    BY:   JOHN A. MENKE, ESQ.

 7

 8    STATE OF NEW YORK

 9        Office of the Attorney General - Andrew M. Cuomo

10        Environmental Protection Bureau

11        120 Broadway

12        New York, NY 10271

13

14    BY:   EUGENE J. LEFF, SECTION CHIEF

15

16    U.S. DEPARTMENT OF JUSTICE

17        United States Attorney's Office

18        86 Chambers Street

19        3rd Floor

20        New York, NY 10007

21

22    BY:   MATTHEW L. SCHWARTZ, AUSA

23        JOSEPH N. CORDARO, AUSA

24

25
```

12

1

2    ARENT FOX LLP

3           Attorneys for Creditor, Audio Mpeg

4           1050 Connecticut Avenue, NW

5           Washington, DC 20036

6

7    BY:   MARY JOANNE DOWD, ESQ. (TELEPHONICALLY)

8

9

10   FROST BROWN TODD, LLC

11          Attorneys for Interested Party, Toyota Motor Corporation

12          Lexington Financial Center

13          250 West Main

14          Suite 2800

15          Lexington, KY 40507

16

17   BY:   ROBERT V. SARTIN, ESQ. (TELEPHONICALLY)

18

19

20   WILLKIE FARR & GALLAGHER LLP

21          Attorneys for Interested Party, Silverpoint

22          787 Seventh Avenue

23          New York, NY 10019

24

25   BY:   KENNETH SICKLICK, ESQ. (TELEPHONICALLY)

13

1

2    WILLKIE FARR & GALLAGHER LLP

3         Attorneys for Creditor, Tranche C Lenders

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:   MEGHAN E. SILHAN, ESQ. (TELEPHONICALLY)

8

9

10   DELPHI CORPORATION

11        For Creditor, Spectrum

12

13   BY:   JEFF P. BULLER (TELEPHONICALLY)

14

15

16   GREYWOLF CAPITAL MANAGEMENT LP

17        Interested Party

18        4 Manhattanville Road, Suite 201

19        Purchase, NY 10577

20

21   BY:   JARED WORMAN (TELEPHONICALLY)

22

23

24

25

14

```
 1

 2     JPMORGAN CHASE & CO.

 3          Creditor

 4          270 Park Avenue

 5          New York, NY 10017

 6

 7     BY:   JACOB POLLACK (TELEPHONICALLY)

 8

 9

10     MONARCH ALTERNATIVE CAPITAL LP

11          Interested Party

12          535 Madison Avenue

13          New York, NY 10022

14

15     BY:   ROBERT BURNS (TELEPHONICALLY)

16

17

18     PENTWATER CAPITAL MANAGEMENT

19          Interested Party

20          Chicago, IL

21

22     BY:   JORDAN FISHER (TELEPHONICALLY)

23

24

25
```

15

1    SILVER POINT CAPITAL

2         Interested Party

3         2 Greenwich Plaza

4         Greenwich, CT 06830

5

6    BY:   JEFF FORLIZZI (TELEPHONICALLY)

7         CHAIM FORTGANG (TELEPHONICALLY)

8

9    WHIPPOORWILL ASSOCIATES, INC.

10        Interested Party

11        11 Martine Avenue

12        8th Floor

13        White Plains, NY 10606

14

15   BY:   ROGER TJONG (TELEPHONICALLY)

16

17   MICHIGAN DEPARTMENT OF ATTORNEY GENERAL

18        Attorneys for Creditor Michigan Department of

19         Environmental Quality

20        G. Mennen Williams Building

21        Sixth Floor

22        525 West Ottawa

23        Lansing, MI 48909

24

25   BY:   CELESTE GILL, AAG (TELEPHONICALLY)

16

1    NEW YORK STATE DEPARTMENT OF TAX AND FINANCE

2         Office of the Attorney General

3         Attorneys for Creditor, New York State Workers'

4          Compensation Board

5         The Capitol

6         Albany, NY 12224

7

8    BY:   NANCY HERSHEY LORD, ESQ. (TELEPHONICALLY)

9

10   JEFF GOLDFARB (TELEPHONICALLY)

11        Interested Party

12

13   JOHN LEFKORT (TELEPHONICALLY)

14        Interested Party

15

16   JOHN PAVELSKI (TELEPHONICALLY)

17        Interested Party

18

19   DAVID SHERBIN, IN PRO PER (TELEPHONICALLY)

20        Interested Party

21

22   JAMES SUMPTER, IN PRO PER (TELEPHONICALLY)

23

24   MIKE ZINDER (TELEPHONICALLY)

25        Interested Party

17

1          P R O C E E D I N G S

2          THE COURT:  Okay, in re:  Delphi Corporation.

3          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

4   along with a number of my colleagues, including my partners,

5   Kayalyn Marafioti, Al Hogan, Ron Meisler, Eric Cochran and John

6   Lyons, here on behalf of Delphi Corporation for its plan

7   modification hearing.

8          Your Honor, today, we are asking you to consider a

9   series of modifications to the plan and confirmation order.  As

10  that confirmation order was entered on January 25, 2008 at

11  docket number 12359.  Your Honor, this hearing represents the

12  culmination of a tremendous amount of work by a tremendous

13  amount of parties.  Since the plan investors did not consummate

14  the original first amended joint plan of reorganization of

15  Delphi Corporation and its affiliated debtors and debtors-in-

16  possession back on April 4th of 2008.  As is customary, Your

17  Honor, in at least these cases, and I think, in Your Honor's

18  court, we are not going to -- the debtors are not going to make

19  any kind of an extensive opening statement.  We have a fair

20  amount of business to transact, in terms of getting things into

21  the record and addressing a variety of issues, including some

22  1900 plus objections that have been filed, many of which have

23  been resolved, but still need to be addressed.  And so I will,

24  Your Honor, at the appropriate time, toward the other end of

25  this hearing, ask for the opportunity to make a closing

18

1    argument and present Your Honor, really, the debtors'

2    perspective on what's transpired in these cases since January

3    25th of last year.

4            THE COURT:  Okay.

5            MR. BUTLER:  Your Honor, before moving to the formal

6    presentation of our case in chief, asking Your Honor to approve

7    these plan modifications under Section 1127 of the Bankruptcy

8    Code, I would like to introduce some of the principals that are

9    here today in court on behalf of the debtors that will be

10   presented as witness in this 1127 hearing.  I'd ask them -- you

11   know many of them, but I'd ask them, please -- the witnesses to

12   please stand when they're introduced.

13           First is Mr. Craig G. Naylor who's been a member of

14   our board of directors since 2005 and is the board's lead

15   independent director.  Mr. Naylor will offer testimony with

16   respect to the board of directors' approval of the modified

17   plan and the underlying transactions.  Is he in the courtroom

18   at the moment?  Our witnesses actually need to come in here, so

19   you should get them.  So Mr. Naylor will be testifying, as

20   well.  And I assume that's where Mr. Miller is, as well?  There

21   he is.

22           Second is Mr. Robert S. Miller, Jr.  Mr. Miller is the

23   executive chairman of the board of directors of Delphi

24   Corporation.  He was the chairman and chief executive of Delphi

25   when Delphi and its subsidiaries filed these Chapter 11 cases

19

1    and continued in that role until December 31, 2006 when the

2    board and he turned the reins of the CEO role over to Rodney

3    O'Neill.  Mr. O'Neill has led the company since that time,

4    together with Mr. Miller in partnership as Mr. Miller has

5    retained the role of executive chair.  And Mr. Miller will

6    testify to a number of issues today, including the major

7    objectives of the debtors' Chapter 11 cases, and the debtors'

8    role in the global automotive industry as well as the business

9    judgments that have been exercised by the debtors.

10           THE COURT:  Okay.

11           MR. BUTLER:  third person I'd like to introduce -- who

12   you know well -- is Mr. Sheehan.  John D. Sheehan is the vice-

13   president and chief financial officer of Delphi Corporation.

14   He's been before this Court on numerous occasions to offer

15   testimony in the past.  Today he will offer testimony with

16   respect to the negotiations and due diligence conducted in

17   connection with the debtors' entry into the MDA and related

18   auction process as well as the results of the auction process

19   that was conducted over two days earlier this week.  And he

20   will offer testimony in support of the various confirmation

21   requirements under Chapter 11 of the Bankruptcy Code as 1129 of

22   the Code is referenced within Section 1127, and therefore,

23   relevant to this hearing.

24           The next witness is Mr. Keith D. Stipp.  Mr. Stipp is

25   Delphi's executive director in charge of restructuring, and he

20

1   will offer testimony with respect to the MDA, the modified

2   plan, and the reorganized debtors' postemergent state

3   operations and feasibility issues associated with that.

4           THE COURT:  Okay.

5           MR. BUTLER:  And our two outside financial advisors

6   who have been involved from the beginning of these cases.

7   First Mr. Shaw, William R. Shaw, is a managing director at

8   Rothschild, Inc., a financial advisor, investment banker to the

9   debtor, to Delphi, and has been the debtors' lead strategic

10  financial advisor.  And he will offer testimony in connection

11  with the debtors' analysis of the transactions that have been

12  considered over the last number of weeks by the debtors.

13          And Mr. Randall S. Eisenberg is the senior managing

14  director at FTI consulting, the debtors' restructuring and

15  financial advisor, and he will offer testimony to, among other

16  things, the best interest test that needs to be revisited under

17  Section 1129 today.

18          Your Honor, what I'd like to do next, if I can, is

19  address the evidentiary record, and then I'm going to come back

20  and talk about voting and a number of other issues.

21          THE COURT:  Okay.

22          MR. BUTLER:  Your Honor, in support of the debtors'

23  case in chief, we have prepared a comprehensive joint exhibit

24  list that has been reviewed with the principal stakeholders and

25  what were formerly the principal objectors to this matter -- to

21

1    this motion, and from most of which we've now resolved their

2    objections.  The exhibit list has 634 documents listed, and the

3    documents are divided into 38 categories, as outlined.  I'm not

4    going to go through each of the categories.  I will offer the

5    declarants whose declarations we're going to put into evidence,

6    I will offer those for cross-examination and any questions that

7    the Court may have.  Before I move entry of these exhibits and

8    determine whether there are any objections to them, I do want

9    to make two statements about today's record.  And this record,

10   this really applies -- well, let me deal with them in order.

11          First, I want to state as follows.  That, if Your

12   Honor approves our 1127 motion, today, and there's a subsequent

13   termination of the MDA, and in connection with the parties'

14   reservation of rights there under, the parties to the MDA will

15   not be prejudiced by their support of the transaction at this

16   hearing or by the evidentiary record established at this

17   hearing, and in that event, all parties reserve their rights to

18   supplement and/or challenge the evidence submitted in any

19   further proceedings.  As Your Honor must surely understand,

20   this is an extraordinarily complex series of transactions.

21   There have been agreements reached and bridges built across

22   disparate interests in this case.  And those agreements all

23   center around the transaction that we're bringing -- the

24   debtors are bringing before the Court today.  If that

25   transaction somehow falls away, people don't want to be

22

1    prejudiced and want to be back to their original positions.

2    And they don't want the debtors, or frankly, anyone else, to

3    use the evidentiary record at today's hearing as a -- either a

4    shield or a sword in whatever might happen in that unlikely

5    event.

6              THE COURT:  Okay.  On the record, also, the debtors

7    have, in their motion, sought an alternative if approval under

8    1127 isn't granted, the alternative being a sale under Section

9    363.  Is it their intention that this record serve as the

10   record for both requests?

11             MR. BUTLER:  Your Honor, it would serve as the record,

12   but the debtor is to be clear.  The debtors are not moving

13   forward on the 363 motion.  And we would view this hearing to

14   really be in two parts, two stages.  We intend to present our

15   1127 motion first and seek Your Honor's approval of that

16   motion.  And if we fail in that effort, we would then ask for a

17   brief recess and we would then proceed with a 363 motion, the

18   alternative relief under this motion.

19             THE COURT:  Okay.

20             MR. BUTLER:  But we're not -- and we would rely on the

21   same exhibits, the same record.

22             THE COURT:  You would?

23             MR. BUTLER:  We would --

24             THE COURT:  Okay.

25             MR. BUTLER:  -- for those matters.

23

1          THE COURT:  All right.

2          MR. BUTLER:  We may actually supplement it in a few

3   ways at that time, that are -- some things that are unique to a

4   363 -- a stand-alone 363 set of transactions.  And certainly

5   some of my argument would be different in that circumstance,

6   but we would apply this evidentiary record to that alternative

7   relief if we have to go there.

8          THE COURT:  Okay.

9          MR. BUTLER:  Similarly, Your Honor, with respect to

10  our plan investors, Appaloosa has filed a limited objection and

11  there are various joinders to that, at docket number 18345,

12  18347, 18348, 18349, 18350, 18675, and 18677, and there may be

13  a few that I didn't note in terms of the filings made on behalf

14  of the plan investors.  I simply want to indicate, Your Honor,

15  the debtors' acknowledgement that this evidentiary record is

16  not to be used as any kind of either sword or shield in the

17  adversary proceedings that are currently before the Court in

18  the adversarial proceeding litigation involving the plan

19  investors.  So that the findings we're asking Your Honor to

20  consider making today and the record today could not, on its --

21  in terms of the record of the findings, be used as findings of

22  the Court in that litigation.

23         THE COURT:  Okay, that's fine.  Before you go on, I

24  know there are a number of people standing here and apparently

25  our overflow room overflowed.  So there's an additional room,

24

1    Room 701, if you -- with audio and video, if you would prefer

2    not to stand and would only be watching, in any event.  Okay.

3            MR. BUTLER:  So, Your Honor, with those two

4    understandings, at this time, Your Honor, the debtors submit to

5    cross-examination on specific witnesses that I will deal with

6    in a few minutes.  But the debtors would move for admission all

7    634 documents listed on the joint exhibit index.

8            THE COURT:  Okay.  Does anyone have any objection to

9    their admission?

10           MR. FOX:  Edward Fox, Your Honor, for K&L Gates on

11   behalf of Wilmington Trust Company as indentured trustee.  Your

12   Honor, with respect to the plan modification motion, Wilmington

13   Trust will not be pursuing its objections, and we have no

14   objection to the introduction of the exhibits.  However, we do

15   reserve our rights, in the event the evidentiary record is

16   going to be used in any other proceeding, including a 363 sale

17   motion, in the event the plan modification is not approved.

18           THE COURT:  Okay, you can raise that at that point.

19           MR. FOX:  Thank you.

20           MR. ROSENBERG:  I assume that goes for the committee,

21   as well, Your Honor --

22           THE COURT:  Yes.

23           MR. ROSENBERG:  -- we can reserve it.  Okay.

24           THE COURT:  That's fine.  All right, I'll admit those

25   documents into evidence, then --

1        MR. BUTLER:  Thank you.

2        THE COURT:  -- subject to all the caveats and

3    reservations that have just been outlined on the record.

4    (634 Various Joint Exhibit Documents were hereby received into

5    evidence, as of this date.)

6        MR. BUTLER:  Thank you, Your Honor.

7        THE COURT:  Given the number of these documents,

8    rather than having me wrestle with them, which is what I've

9    done when there have been fewer binders, I'm going to ask you

10   all to give me copies of the witness book when you have a

11   witness.  That will make things go faster, too, I think.

12       MR. BUTLER:  Okay.

13       MS. MEHLSACK:  Your Honor, if I may.  Barbara Mehlsack

14   for the operating engineers and the IBW and UIM.  We had filed

15   an amended objection --

16       THE COURT:  I read that.

17       MS. MEHLSACK:  -- last night, and we just wanted

18   assurance that that was going to be included in the record, as

19   well.

20       THE COURT:  It's on the docket and I've reviewed it,

21   so yes.

22       MS. MEHLSACK:  Okay, thank you, Your Honor.

23       THE COURT:  Yes.

24       MR. BUTLER:  Can I have just one moment, Your Honor?

25       THE COURT:  Sure.

26

1          MR. BUTLER:  Your Honor, I'd like now, if I could, to

2    proceed to the witness declarations.  One of my colleagues will

3    pass up the declarations to you --

4          THE COURT:  Okay.

5          MR. BUTLER:  -- as we go through them along with the

6    appropriate exhibits.  We're going to start, Your Honor, if we

7    could, by offering Mr. Sheehan.

8          THE COURT:  Okay.

9          MR. BUTLER:  And we'd offer Mr. Sheehan with respect

10   to -- just get my -- we'd offer Mr. Sheehan with respect to

11   three declarations that have been filed that are Joint Trial

12   Exhibits 48, 49, and also Trial Exhibit 48-A dealing with the

13   plan modifications, the auction process, and due diligence

14   efforts.  Two of those declarations were prepared on July 19th.

15   The declaration dealing with the auction process and related

16   business decisions was dated July 28, 2009.  Mr. Sheehan's

17   declarations have been designated by the parties as highly

18   confidential, and they've been provided to the Court on that

19   basis.  And I would offer Mr. Sheehan for cross-examination by

20   any party as part -- and I think, just, I'll start this just

21   try and make it simpler because I can hear more reservations

22   coming.  I'm going to offer him in this morning's sessions for

23   cross-examination in connection with the debtors' request that

24   Your Honor approve the plan modification motion.  If we go into

25   the second phase of this proceeding, and I seek alternative

27

1    relief under the 363 sale, it's my intention to come back and

2    offer them again for purposes of those declarations being

3    considered in that context, and give any party who wants to

4    cross-examine them in that context for that relief, the

5    opportunity to do so, if that's acceptable to the Court.

6        THE COURT:  That's fine.

7        MR. BUTLER:  All right, so with that statement, then,

8    I'd offer Mr. Sheehan and his declarations, again, Joint

9    Exhibits 48, 48-A, and 49 for cross-examination by any party or

10   any questions the Court might have.

11       THE COURT:  Okay, does anyone want to cross-

12   examination Mr. Sheehan on his three declarations?  Okay,

13   hearing no one, I don't have any questions, having reviewed

14   those declarations.

15       MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

16   would next like to present Mr. Keith D. Stipp to be cross-

17   examined with respect to his declaration which is Joint Exhibit

18   50, cross-examination by any party or any question that the

19   Court may have.

20       THE COURT:  Does anyone want to cross-examine

21   Mr. Stipp?  I guess the only question I had, and not

22   necessarily of Mr. Stipp.  It could be of you or another party,

23   is it appears to me the -- I wanted to nail down the likelihood

24   of obtaining the emergence capital which he briefly addresses

25   in his declaration.  You can address it, he could address it

28

1    based on his knowledge.

2            MR. BUTLER:  Your Honor, with respect to the emergence

3    capital that is being dealt with here, there is emergence

4    capital coming in a couple of different ways, and I'm not sure

5    which one you want.  Let me just briefly address each of them.

6    Mr. Sheehan's supplemental declaration, Exhibit 48-A, talks in

7    detail about the capitalization of, what I'm going to call for

8    this hearing, New Delphi, which is that entity that is going to

9    have the assets, substantially all the operating assets that

10   are not either being divested by Old Delphi under DPH Holdings

11   Company or having not been sold to General Motors through its

12   subsidiary.  And Mr. Sheehan has outlined the transactions that

13   have been agreed to by General Motors and by a number of DIP

14   lenders to capitalize that company, and that's described in

15   detail in Mr. Sheehan's declaration.  And when I get into the

16   argument, I'll go through it in some detail.  But the reality

17   is, though, and I think that Mr. Bernstein -- and let me just

18   address a bit of protocol, here.

19           This is the administrative agent's pure credit bid

20   that we'll be talking about a lot today, and so I will, because

21   under the protocol, it is the agent that acts, I will be

22   addressing Mr. Bernstein as the administrative agent.

23   Mr. Bernstein will be quick to remind me that in this

24   particular instance, the administrative agent acts pursuant to

25   directions that it has received from the required lenders under

29

1    the credit agreement that it has determined in its own judgment

2    to be valid directions that directs it to behave in a certain

3    way or conduct itself in a certain way on behalf of the

4    lenders.  And therefore, I fully expect, when I direct certain

5    statements to Mr. Bernstein or I attribute certain things to

6    Mr. Bernstein, that he will, in fact, designate someone on

7    behalf of the, what I would call the principal DIP lenders,

8    those folks who have been the driving forces behind this

9    consensual transaction and who own a very significant part of

10   the DIP facility to speak on their behalf.  And as Your Honor's

11   aware, those firms are represented, either the Tranche C

12   collective and that group of firms represented by Willkie Farr,

13   and Mr. Abrams is here in court with his colleagues to address

14   that, and its funds, and there are various funds that are

15   involved, are represented by Dechert, and Mr. Siegel's here in

16   court with respect to those individuals.

17        So as we go through this, even from the debtors'

18   perspective, this is a pure credit bid and I deal with the

19   administrative agent.  The fact is, the administrative agent

20   deals with the required lenders.  The required lenders are

21   essentially represented by the entities that Mr. Siegel and

22   Mr. Abrams represent.  And so as we go through that process, I

23   should just place that on the record because there will be,

24   from time to time, there will be comments that will be made and

25   Your Honor should understand some basis of why we're dealing

30

1     with this.

2          And in that regard, with respect to the capital

3     commitments I've just discussed, those are outlined in

4     Mr. Sheehan's supplemental declaration in Joint Exhibit 48-A.

5     Attached to Exhibit 48-A is the highly confidential transcript

6     of the auction proceedings that were held over some eighteen

7     hours on this past Sunday and Monday at our law firm which over

8     a hundred people participated starting at 1 o'clock in the

9     afternoon on Sunday and concluding at 7 o'clock in the evening

10    on Monday.

11         And during the course of those proceedings, there was

12    an occasion -- after the pure credit bid was submitted, there

13    was an occasion for the parties to overnight review the pure

14    credit bid, Sunday evening, Monday morning, and there was an

15    extended session on the record in which I asked, on behalf of

16    the debtors, a series of questions to the administrative agent

17    addressing a number of issues.  One of the issues was the issue

18    Your Honor talked about, capitalization.  Mr. Bernstein and the

19    administrative agent designated Mr. Lefkort, who is one of

20    Mr. Abrams' colleagues, to address those issues, and that is

21    both transcribed in the auction record and is discussed in

22    Mr. Sheehan's affidavit.

23         The second piece of capitalization is the

24    capitalization for DPH Holdings.  DPH Holdings capitalization

25    comes from a number of transactions under the proposed MDA.

1    Those would include some funding that comes from the parties

2    including principally from General Motors through a subsidiary

3    -- and when I say General Motors, here, or General Motors

4    Company, I'm talking about new GM to which this transaction has

5    been assigned in Judge Gerber's courtroom, and I am speaking as

6    -- generally, when I say General Motor's, just for the benefit

7    of the GM parties in the room, I'm meaning the particular

8    affiliate or subsidiary or designee under the documents.  I'm

9    not going to try to go up through the precise designations,

10   here.  But generally, under the MDA, there's funding that

11   occurs from the parties to DPH Holdings.  So there's

12   capitalization in that way, there's capitalization in the way

13   that there are retained assets as well as retained liabilities

14   in DPH Holdings, including non-core --

15            THE COURT:  You don't need to go through that.

16            MR. BUTLER:  Okay.

17            THE COURT:  My real concern was, where money is coming

18   from third parties, either DIP lenders or GM, the state of its

19   commitment.

20            MR. BUTLER:  Right.

21            THE COURT:  I know there is second tier level funding

22   that the DIP lenders are going to seek, but in terms of the

23   actual funding --

24            MR. BUTLER:  Right.

25            THE COURT:  -- the level of the commitment.

32

1          MR. BUTLER:  Right.  Let me state it and then

2    Mr. Bernstein can designate Mr. Abrams to respond or

3    Mr. Siegel.  But as it's been represented to the debtors, and

4    the base on which our board of directors exercises business

5    judgment, the commitments associated with all of the GM-related

6    funding are hard and firm, based on the terms of the

7    agreements, and the financing that is being taken on by those

8    parties that are financing the what I'll call New Delphi, those

9    financing transactions have been signed up to and committed to

10   on an initial basis by, essentially, Silver Point and Elliott,

11   and they have -- and I'll talk more about this later, but they

12   have, or they're providing an opportunity for other DIP lenders

13   to participate.

14          THE COURT:  Right.

15          MR. BUTLER:  But one of GM's requirements, and

16   eventually, Delphi was comforted by this, whatever backstop

17   there may be, these commitments, whatever rights offering, if

18   you will, or syndication, if you will, depending on how you

19   want to think about it of these transactions to other DIP

20   lenders to give them the opportunity to participate, the

21   obligations remain hard with the Silver Point and Elliott-

22   related entities.  I think Mr. Siegel and Mr. Abrams can

23   confirm that on the record.

24          MR. BERNSTEIN:  Your Honor, I'm going to -- Allen

25   Bernstein, for the administrative agent.  I am going to pass

33

1     the baton both to Mr. Abrams and Mr. Siegel.

2          THE COURT:  Okay.

3          MR. SIEGEL:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. SIEGEL:  I can confirm that what Mr. Butler said

6     is, in fact, the case, that the Elliott funds have backstopped

7     the financing commitment that have put their own balance sheet

8     at risk, here, but they are offering it on to others.

9          MR. ABRAMS:  Your Honor, Marc Abrams.  The same is

10    true with respect to funds managed by Silver Point Capital.

11    Both Silver Point Cap and Elliott have committed to GM almost

12    900 million dollars in capital that would be utilized to

13    capitalize the New Delphi along with the GM contributions

14    Mr. Butler alluded to.  And then, again, as Your Honor has

15    already grasped, there will be a sell-down mechanism to spread

16    that risk.  But that sell-down mechanism does not impact the

17    commitment.

18         THE COURT:  Okay, thank you.  That was my only

19    question that was raised by the Stipp declaration.

20         MR. BUTLER:  Your Honor, then, moving on, our third

21    witness in support of our plan modification motion would be

22    that of Mr. Miller.  As you know, Steve Miller has been the

23    debtors' executive chairman throughout this process.  His

24    declaration is Joint Exhibit number 46, and I would present him

25    for cross-examination for any party in connection with the plan

34

1    modification motion or any questions the Court might have.

2            THE COURT:  Okay, does anyone wish to cross-examine

3    Mr. Miller on his declaration?  Okay, I don't have any

4    questions of Mr. Miller, either.

5            MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

6    fourth witness the debtors would present in support of our plan

7    modification motion is Mr. Craig G. Naylor, our lead

8    independent director on Delphi's board of directors.  His

9    declaration is set forth as Joint Exhibit number 47.  Again, I

10   present him for cross-examination or any questions the Court

11   might have.

12           THE COURT:  Does anyone want to cross-examine

13   Mr. Naylor?  Okay, again, this probably could have been of

14   Mr. Sheehan, as well, it could be of you, Mr. Butler, also.

15   One feature of this transaction is the agreement by the winning

16   bidders to make a payment to the stalking horse, Platinum.  And

17   I took not only from Mr. Sheehan's supplemental declaration,

18   but from the fact that the board approved the entire

19   transaction, the board concluded that that payment didn't chill

20   the bidding but was made for valid purposes between GM and the

21   bidders on one hand and Platinum on the other.  But it wasn't

22   directly addressed by Mr. Naylor's affidavit.  I just want to

23   make sure that was something that was considered by the debtors

24   in seeking approval of the bid that they've identified as the

25   winning bid.

35

1           MR. BUTLER:  Your Honor, I can confirm that that's one

2      of the factors that we took into consideration.  I would also

3      say -- and I'm going to talk about this later, as well --

4      Platinum Equity has played a critical role in these Chapter 11

5      cases over the last several months, and indeed, in many ways,

6      over the last several years.  And they were absolutely critical

7      to the process over the last two months, two to three months,

8      since early April of this year.  And that will, I think, become

9      even -- if it's not already apparent to Your Honor from the

10     declarations, I hope to make it very apparent in my closing

11     argument.  And that included in participating in this auction

12     process.

13          As Your Honor is aware, when we filed our plan

14     modification motion on June 1st, we filed it in a transaction

15     with Platinum Equity and General Motors when the debtors had

16     concluded, based on the representations then having been made

17     at that time which were relevant at that time, that the lenders

18     weren't prepared to participate in the transaction and the

19     alternative to a deal was liquidation.  And we were able to

20     work out that transaction and then move forward with it, and

21     that has led to this auction process.  And the earlier hearings

22     on June 10th when Your Honor approved a resolicitation and

23     other procedures for this, Your Honor, on the record, at the

24     request of the lenders and the committee and others, Your Honor

25     wanted to make very sure that our duty under the June 1st

36

1   agreement to consider unsolicited alternative transactions in

2   accordance with our fiduciary responsibilities had as much

3   transparency as possible so that parties close to this

4   transaction could see it up close and examine it.  You asked

5   the creditors' committee to monitor that, which they did

6   faithfully throughout this process, and we administered it.

7   Under the supplemental procedures, which were Exhibit N to the

8   original order, the modification procedures order, we qualified

9   three third-party bidders that were being considered and did

10  due diligence and considered transactions.  And none of those

11  bidders, as Your Honor's aware, none of those bidders, by July

12  10th, which was the deadline for the submission of proposed

13  qualified alternative transactions, submitted any proposals.

14  That was one phase of this process, and so while it didn't

15  particularly surprise the debtors in terms of the outcome in

16  connection with that because of the complexity of this process

17  and the various risk allocation, other issues that have to be

18  considered, we ran that part of the process.  And a good

19  portion of, I think, what Your Honor -- at least the debtors'

20  belief of what Your Honor wanted us to do from June 10 forward,

21  was to run a transparent process that would give the parties

22  that are in this case and invest in this case an understanding

23  of whether a third-party would come in and propose a higher or

24  better alternative transaction.  And they would have the

25  information upon which to do that.  We ran that process, July

37

1    10th came, those three qualified bidders did not submit an

2    alternative.

3         At the same time we were going through this process,

4    as Your Honor is also intimately aware of, we had any number of

5    chamber conferences and discussions between the parties about

6    how a pure credit bid might be submitted.  And Your Honor

7    recognized, as the debtors did, that a pure credit bid is

8    different.  It's different in terms of the kinds of remedy it

9    is, it is different under 363(k), and Your Honor concluded in

10   the Court's judgment that some but not all of the supplemental

11   procedures should apply to a pure credit bid.  And Your Honor

12   crafted with the parties and entered orders, supplemental

13   orders that laid forth procedures to address that pure credit

14   bid.  So when we got to the auction process, we ended up in the

15   auction process in, really, as our press release and others

16   indicated, really running a process between the original June

17   1st transaction in which General Motors was a party along with

18   Platinum, and a pure credit bid, in which the lenders had taken

19   advantage of paragraph 46 of the modification procedures order

20   which had set forth the ability, specifically, for General

21   Motors to negotiate with third parties and to participate in

22   transactions with them.  Relief, Your Honor, that could not, as

23   Your Honor, I think, recognized at a prior hearing involving

24   Platinum, could not have been put in place without Platinum's

25   consent.  There was an arrangement put in that allowed,

1    essentially, GM to play, if you will, on both teams.  And that

2    made for a difference in the dynamics for the auction process.

3    And would that Your Honor had been in our auction room over the

4    weekend where these 125 people, all told, participated at one

5    point, you would have seen that, in fact, the various tables

6    were around, the bidder tables, there was Platinum on the one

7    hand, there were the administrative agent on the other with the

8    DIP lenders behind him, and right in the middle was General

9    Motors at its own table because it, in fact, was negotiating

10    with both sides and was parties to both and actually had

11    committed to the company and committed to the Court, and

12    commits here, today -- because we've designated the Platinum

13    transaction as the alternate transaction -- that it would

14    fulfill its responsibilities under either, and the modification

15    procedures already gave it that ability.  That dynamic, set up

16    by the modification procedures order, and in light of the fact

17    that there were the three third-party, if you will, sort of,

18    independent qualified bidders chose not to continue to

19    participate in the process really led from July 10th through, I

20    believe, this morning, a series of negotiations and discussions

21    which the company has encouraged that would cause the bids to

22    be presented to be the highest and best bids on both sides, but

23    also encouraged the parties to try to work together to come to

24    a consensual transaction.  It really was a continuation of the

25    efforts Judge Morris had begun both quite capably in the

1    judicial mediation to try to bring these parties together.  And

2    so I -- well, I can assure you that up until the minutes before

3    the auction was closed, I think Mr. Rosenberg would agree with

4    me as the monitor of the auction, there was no chilling of the

5    bidding going on between those parties, but there was -- and I

6    need to say on this record -- there was the unusual dynamic of

7    having General Motors involved in both bids, and there was the

8    desire of the debtors, and I think others, the people involved

9    in the auction of trying to have an environment where we ended

10   up at the end of the auction with the best MDA that did not

11   involve the DIP lenders, and the best pure credit bid MDA that

12   involved the DIP lenders.  So we'd have those two transactions

13   to look at.  I think we accomplished that.  As part of those

14   discussions -- and these discussions, by the way, did not

15   include the debtors, but we knew that they were going on --

16   Platinum, General Motors, and the DIP lenders that constituted

17   the required lenders had a series of discussions, and then they

18   placed an agreement on the record -- and it is on the auction

19   record, it is attached and described; we had it transcribed --

20   it is attached to Exhibit 48-A -- set forth in detail this

21   understanding that had been reached, and we did, both with the

22   monitors of the auction, which are the creditors' committee,

23   the UAW and the IUE -- although the IUE did not participate --

24   but with the monitors that did participate, and then

25   ultimately, with the board of directors, we reviewed all of the

40

1   events that had transpired at the auction, including the

2   agreement by those two parties to pay 30.5 million dollars in

3   expense reimbursement and other payments to Platinum.  And

4   coupled with that was an understanding that those parties would

5   continue to work with each other about Platinum's potential

6   involvement in the pure credit bid.  And as I understand it,

7   those discussions have been continuing over the last several

8   days.  We may have something to say about that before the

9   record, here, today, is closed.  The debtors viewed that

10  statement, and we consulted with Mr. Rosenberg about this.  The

11  cofiduciaries of the case viewed those payments as implicating

12  1129(a)(4) and believe that they needed to be publicly

13  disclosed and brought to Your Honor's attention, and we believe

14  they need to be approved under the Bankruptcy Code.

15          THE COURT:  Even though they're coming from a third --

16          MR. BUTLER:  Correct.

17          THE COURT:  -- party source, or two third-party

18  sources?

19          MR. BUTLER:  And the reason for that, Your Honor, is

20  because those two party sources, if Your Honor approves this

21  transaction, will actually be acquiring property of the estate.

22  And I think a literal reading of 1129(a)(4) says if you're a

23  party who's acquiring property of the estate, and you make

24  payments in connection with the consummation of the plan, those

25  fall, arguable, within the Court's purview.  And therefore, we

41

1    wanted there to be -- and particularly in light of Your Honor's

2    prior ruling when the debtors had brought an expense

3    reimbursement motion that was contested by some of these

4    parties for an amount that was not -- that's substantially

5    similar to what was agreed to, we believe that this needed to

6    have the transparency and light of day.  The debtors,

7    obviously, if we -- from a business judgment perspective, as

8    Your Honor knows, the debtors believed, under all the

9    circumstances, the prior motion was reasonable.  So you can

10   understand the board of directors, when they considered this

11   and added to it the support of the DIP lenders and General

12   Motors and the lack of opposition of the monitors at the

13   auction to this transaction, although Mr. Rosenberg agreed with

14   me that this needed to come forward under 1129(a)(4), we

15   believe that it was appropriate and do believe it's

16   appropriate, and do believe Your Honor should approve it as

17   part of this transaction.

18        THE COURT:  Okay.  All right.  I don't have any other

19   questions of Mr. Naylor.

20        MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

21   fifth witness in support of our plan modification motion that

22   we'd like to present is William R. Shaw, the managing director

23   of Rothschild.  His declaration is Joint Exhibit 51.  And we're

24   presenting him for cross examination or for any questions the

25   party -- that Your Honor may have.

42

1          THE COURT:  Okay.  Does anyone want to cross examine

2     Mr. Shaw?

3          (Pause)

4          THE COURT:  Okay.  I don't have any questions of

5     Mr. Shaw.

6          MR. BUTLER:  Thank you, Your Honor.  Your Honor, our

7     sixth witness is Randall S. Eisenberg, who is a senior managing

8     director of FTI Consulting.  His declaration is at Exhibit 52.

9     I do want to point out, Your Honor, that this testimony, as we

10    have indicated in our plan modification order, is intended to

11    be introduced in connection with Your Honor's findings with

12    respect to the best interest test under Section 1129, and not

13    for other purposes.  And the findings we've asked you to make

14    in your order are limited to that purpose as it relates to

15    certain of the declarations -- certain aspects of

16    Mr. Eisenberg's declaration.

17         With that statement, Your Honor, I would offer

18    Mr. Eisenberg for cross examination or for any questions the

19    Court might have.

20         THE COURT:  Okay.  Does anyone want to question

21    Mr. Eisenberg?

22         (Pause)

23         THE COURT:  All right.  I have no question of him

24    either.

25         MR. BUTLER:  Your Honor, I'd like to move to voting,

43

1    then, and the voting declarations and address voting issues at

2    this time.

3           We start with the declaration of Evan Gershbein.

4    There are three declarations.  They are at Joint Exhibits 39,

5    40 and 41.  Mr. Gershbein is the senior managing consultant of

6    Kurtzman Carson Consultants LLC.  And --

7           THE COURT:  You don't need to give me those.  You

8    don't need to give me those.

9           MR. BUTLER:  Okay.  And I also, at the same time,

10   would present the declaration of Jane Sullivan, which is Joint

11   Exhibit number 42.  Ms. Sullivan is the executive director of

12   Financial Balloting Group LLC.  In connection with presenting

13   those declarations, Your Honor, I would call your attention to

14   Exhibit C to the declaration of Ms. Sullivan, which is also

15   contained in the demonstratives.

16          If I may, Your Honor, I have a couple of the

17   demonstrative books I could pass up, if I may --

18          THE COURT:  Okay.

19          MR. BUTLER:  -- for easier reference.  And Joint

20   Exhibit 53 has in it, which is -- and it's Chart 43 is the

21   proper reference, for the record -- shows the voting summary by

22   class.  And for purposes of today's hearing, there are five

23   classes that were impaired that voted in favor of the plan.

24   The balance of the classes voted against the plan.

25          And the parties that voted in favor of the plan, in

44

1    addition to three tax collectors -- in fact it was the same tax

2    collector with secured claims voting in three different

3    classes -- there was also classes of 1C-2 through 12C-2,

4    involving the PBGC claims.  The PBGC is by far the largest

5    prepetition creditor of these cases.  And they voted in favor.

6    And General Motors voted all of its claim in favor as well, at

7    1D to 12D.

8        I'm going to address a matter with the creditors'

9    committee in just a moment, but before I do that, Your Honor,

10   I'd like to get this evidence into the record.  And so I

11   present both Mr. Gershbein and Ms. Sullivan for cross

12   examination by any party or for any questions the Court might

13   have.

14       THE COURT:  Okay.  Does anyone want to cross examine

15   Mr. Gershbein on his voting declaration?  All right.  Does

16   anyone wish to cross examine Ms. Sullivan on her voting

17   declaration?  All right.  I don't have any questions of them,

18   either.

19       MR. BUTLER:  Thank you.  Your Honor, let me again

20   refer to Joint Exhibit 53, Chart 43, which is this large chart

21   that's in the demonstrative.  And obviously, one of the groups

22   of creditors that voted against this was class 1C-1, the Delphi

23   DAS debtors.  And while there are other classes that voted

24   against it, that is the class that had the most voting going

25   on, the most ballots cast, in connection with this.  And

45

1    Mr. Gershbein and Ms. Sullivan summarized those.  This

2    particular exhibit has only the percentages, but there were a

3    large number that voted against the plan.

4         I believe that there was a direct correlation to that

5    vote with the then recommendation of the creditors' committee,

6    which, as Your Honor knows, under the consideration that had

7    then been allocated to them, the creditors' committee

8    determined, in their good-faith deliberations, that they could

9    not recommend, notwithstanding what their assessment of where

10   they fall in the absolutely priority waterfall, they could not

11   recommend that the modifications be approved.

12        That has led to what I was confident would be --

13   hopeful that that was going to be the case, which was further

14   negotiations among the stakeholders.  There was, as we've

15   reported, and I indicated now -- there were resolutions of

16   objections reached, both with the creditors' committee and

17   Wilmington Trust to resolve the objections by the creditors'

18   committee, at docket 17034 and at 18291; and with Wilmington

19   Trust at dockets 17169, 18313 and 18471.

20        And that has -- with respect to the potential

21   distribution to holders of general unsecured claims and the

22   PBGC general unsecured claims under what I'll call the

23   waterfall schedule and the master disposition agreement, there

24   was an increase in the maximum from 180 million to 300 million.

25   And there was an agreement that starting at distributions in

46

1    excess of 7.2 billion, there would be for every -- I gather the

2    way I'm supposed to say this now is, for every sixty-seven and

3    a half cents of distributions under the waterfall, thirty-two

4    and a half cents would also be distributed to the holders of

5    those claims, which are -- and to emphasize them, those are

6    unsubordinated general unsecured claims.

7         Based on those negotiations, I think, based frankly on

8    the creditors' committee's role as a monitor of these

9    transactions since June 10th and their participation in the

10   assessment of all the due diligence activities that went on,

11   the conduct of the parties, their involvement in overseeing the

12   auction, all the things that weighed into this, I believe that

13   the conclusion of the creditors' committee now, is that in fact

14   they believe the plan modification motion -- and Wilmington

15   Trust as indenture trustee, believes the plan modification

16   motion should be approved and that I believe Mr. Rosenberg is

17   going to stand and confirm that he believes and the committee

18   believes that that approval -- it would be appropriate for the

19   Court to invoke the cram-down provisions of 1129(b) to

20   accomplish that result, as it relates to the class that they

21   represent.

22        THE COURT:  Okay.  Mr. Rosenberg, do you want to state

23   your views?

24        MR. ROSENBERG:  Your Honor, obviously, this is a

25   rather unusual situation where the creditors' committee urged a

47

1    negative vote.  The negative vote was overwhelmingly obtained.

2    But significant substantial increases in consideration were

3    subsequently negotiated, such that the creditors' committee now

4    feels that the result meets the lowest bounds of

5    reasonableness, I suppose is the best way to put it.

6         So it is an unusual situation where the committee has

7    withdrawn its objection to the plan amendment motion, not, I

8    would add, to the 363, if we get to that.  Because the

9    creditors' committee feels that the renegotiated consideration

10   is, as I suggest, within the lowest bounds of reasonableness.

11        So it is unusual, but -- and it obviously would have

12   been far better to have negotiated a result for a vote that the

13   creditors' committee could have recommended.  That didn't

14   happen.  But standing here today, we do withdraw our opposition

15   to the amended plan.

16        THE COURT:  Okay.  Thank you.

17        MR. BUTLER:  Your Honor, I believe that Mr. Fox will

18   stand to confirm that Wilmington Trust, being one of the

19   principal members of the committee, and having participated in

20   virtually all the same aspects of this proceeding that Mr.

21   Rosenberg did, similarly has agreed to withdraw their

22   objections and support requested of the modified plan.  There

23   is a mechanism that would call for a capped amount of their

24   fees and expenses to be paid.  It's -- that cap, actually, in

25   some respects is lower than the cap under the prior

48

1    confirmation order.  But that that cap amount be paid to them

2    invoking the reasonableness review that is set forth in the

3    prior confirmation order.

4            THE COURT:  Okay.

5            MR. FOX:  Edward Fox from K&L Gates for Wilmington

6    Trust, Your Honor.  Mr. Butler is correct.  I'd just join in

7    the comments that Mr. Rosenberg made with respect to the stance

8    that we're in.  But we believe at this time it is appropriate

9    to withdraw the objection, with respect to the plan

10   modification, not with respect the separate 363.

11           THE COURT:  Right.

12           MR. BUTLER:  Your Honor, let me just comment on the

13   current status of the modified plan and of the proposed plan

14   modification order.  The plan itself was first filed on June

15   1st -- excuse me -- filed on June 1st, that's correct.  But the

16   plan, after it had been reviewed by Your Honor at the June 10th

17   hearing, the plan that Your Honor ordered resolicitation of

18   certain classes on to check their -- to resolicit acceptances

19   or rejections of the plan modifications, that was filed

20   publically at docket number 17030 and is Joint Exhibit 1 to

21   this record.

22           The debtors then made further modifications to the

23   plan in connection with negotiations with its stakeholders.  It

24   included those modifications in an appendix to its omnibus

25   reply to objections that were filed.  It was filed on July 27th

49

1    at docket number 18659.  And those modifications are Joint

2    Trial Exhibit 632.

3          There have been further negotiations that have

4    occurred with respect to the modified plan.  And that black

5    line is set forth in Joint Exhibit 8.  And Joint Exhibit 8 is

6    the current form of the modified plan.  Prior to closing this

7    record, I'll want to consult with the principal parties to make

8    sure that there's nothing else to go in with respect to that.

9    But the current state of the modifications is Joint Trial

10   Exhibit 8.

11         With respect to the proposed form of plan modification

12   order, the order as originally proposed by the debtors after

13   consultation, but not acceptance -- but consultation with many

14   of its stakeholders, was also filed as an exhibit or an

15   appendix to our omnibus reply on July 27th.  Again, at docket

16   number 18659.  And it's also been marked Joint Trial Exhibit

17   632.

18         Since that time, over the last couple of days, we have

19   made further progress on obtaining a consensual form of order.

20   The state of that progress as of midnight last night is set

21   forth in Joint Trial Exhibit 11.  And there's a black-line at

22   Joint Trial Exhibit 9.

23         THE COURT:  And that's the one dated July 28th?

24         MR. BUTLER:  Correct.

25         THE COURT:  Okay.

50

1       MR. BUTLER:  And that one -- that actually represents

2   the state of the order as of midnight, getting ready for

3   today's hearing.

4       Your Honor, I'm not going to address those matters in

5   this morning's session any further.  There are continued

6   discussions that are going on between the parties into the form

7   of those, and we will address those in the afternoon session,

8   as it relates to those matters.  But that's the current -- I

9   just wanted to make sure we had the current state of those

10  documents on the record.

11      THE COURT:  Okay.  And the plan is -- the modification

12  is the one dated July 28th also, right?

13      MR. BUTLER:  Correct.

14      THE COURT:  Okay.

15      MR. BUTLER:  Your Honor, what I'd like to do now is

16  move to an overview of objections, and make some statements

17  about those objections, and find out if we can let some of

18  these folks go home, if they want to, unless they want to stay

19  to the end of the day or whenever this record is completed.

20      We have, Your Honor, filed a summary of the objections

21  by nature of objection.  Those are listed at Appendix B to our

22  reply at that same document filed at docket number 18659, and

23  at Joint Exhibit 32, which listed by category the objections as

24  the debtors understood them, after having reviewed all of the

25  objections.

51

1          And we also filed as a joint trial exhibit, the

2     objection-by-objection summary which is quite long, because

3     there were a lot of objections that were filed to the plan.

4     And those are set forth at Joint Trial Exhibits 215 and 216.

5     There were, in total, some 1,900-plus objections filed to the

6     plan, because we construed each of the letter objections

7     written either by severance parties or by pensioners, who wrote

8     Your Honor and complained about various elements of actions

9     that have occurred in this case -- any of those letters that

10    were filed subsequent to the -- that were docketed subsequent

11    to the 10th of June, we have deemed to be an objection to this

12    hearing.

13         It's the debtors' position, based on interpreting Your

14    Honor's order, that any of the letter objections that were

15    filed prior to June 10th, were subsumed within Your Honor's

16    order of June 16th, relating back to June 10th, which overruled

17    all objections as it related to those at that time.  So there

18    are some 1,900-plus objections.

19         First let me deal with contract-specific objections.

20    There were sixty-four objectors that filed a total of ninety-

21    two contract-related objections, regarding the assumption and

22    assignment, notices of nonassumption and assignment, cure

23    notices and related matters, that were, after consultation with

24    Your Honor previously, adjourned summarily to the August -- to

25    a hearing at 10 a.m. on Monday, August 17, 2009, and Your

52

1    Honor's findings in today's hearing with respect to those

2    objections -- or with the contracts that those objections

3    relate to, will be subject to those objections; and Your

4    Honor's resolution of those objections, if they're not

5    consensually resolved, on August 17th.

6            And therefore, we're not proceeding on any of those

7    objections today.

8            THE COURT:  And you've provided notice to all of those

9    parties of that?

10           MR. BUTLER:  We did, Your Honor.  We provided notice

11   in a number of different ways, including having people call

12   them up -- people on the telephone and send e-mails.  We

13   filed -- and our notice of when the auction results were

14   completed, we were required to send out another notice relating

15   to the fact that there's a new company buyer under the proposed

16   transaction.  We had to send notice out to everybody.  As Your

17   Honor recalls, from your prior procedures, that gives these

18   parties the right to file a supplemental objection, but only as

19   to the new company buyer, not as to cure other matters for

20   which objection deadline -- and in that notice, we told

21   everybody it was August 17th.

22           THE COURT:  Okay.

23           MR. BUTLER:  We sent e-mails it was on August 17th.

24   We've actually negotiated with a lot of people and said you

25   don't need to come today.  Some of those people are still here

53

1    because I think they wanted to hear me say what I'm saying on

2    the record.

3            THE COURT:  Okay.

4            MR. BUTLER:  So I'm saying on the record now at the

5    front end of the hearing so that they can take comfort that

6    their objections will be considered by Your Honor if they are

7    not otherwise resolved, on August 17th.

8            Your Honor, I also --

9            THE COURT:  Well, before you move on to the next

10   category.  I guess, if anyone is present who falls into that

11   category feels they need to say something now, as opposed to on

12   August 17th, this is the time to do it.

13           MR. MEARS:  Your Honor, I'm not planning to say

14   anything else.  This is Patrick Mears on behalf of Autocam

15   Corporation.  But we have had a number of discussions with

16   Mr. Butler and his colleagues, which I thank Mr. Butler for

17   arranging.

18           There are a number of contractual issues involved

19   here, just to briefly state, whether or not the purchase orders

20   can be considered separately from the long-term contracts, and

21   if they are, are they to be treated as post-petition contracts

22   not subject to Section 363, and also the adequate assurance of

23   future performance issues.

24           There are two contracts of ours that have been sought

25   to be assumed and assigned.  We understand that maybe more will

54

1    be coming, so that's a concern of ours as well.  We just want

2    to make sure of the following:  that all other Section 365

3    objections, and if applicable, state law objections, to

4    assignment are preserved.  And I think they are, based on what

5    I heard Mr. Butler say.

6           Secondly, if assignment notices are sent in the

7    future, we would have, obviously, the right to object to those.

8    There's some language that --

9           THE COURT:  You mean with regard to a new cont -- a

10   different contract?

11          MR. MEARS:  A different contract.  There's some

12   language in the order that if you read it one way it creates an

13   ambiguity, at least as I saw it.  And we would be able to

14   object on all the panoply of grounds that may be applicable.

15   And that if some or all of the remaining purchase orders are

16   sought to be assigned by Autocam as severable contracts, post-

17   petition contracts not subject to 365(f), then we would have

18   the right to object to those assignments in whatever court

19   would be entitled to hear it.  It could be this Court; it could

20   be some other Court.  And those issues would really involve,

21   most likely, nonseverability and adequate assurance of future

22   performance.  The severability, just briefly, relates to post-

23   petition purchase orders that relate to pre-petition contracts.

24   And there may be some reason that the debtor wants to sever

25   them.

55

1        So in light of all that, we have no problem with

2   adjourning the hearings to the 17th.  You've already done it,

3   but I did want to say that on the record.

4        THE COURT:  Okay.

5        MR. MEARS:  With respect to the sale order, there are

6   some problematic provisions in them.  We've discussed that with

7   Mr. Butler's colleagues, but right now we understand that

8   that's not before the Court.  This is kind of a two-step

9   process.

10        THE COURT:  That's right.

11        MR. MEARS:  Thank you.

12        THE COURT:  Thank you.

13        MR. BUTLER:  Your Honor, Mr. Mears and I have known

14   each other for many, many, many years, and I understand the

15   reservation of rights he's put on the record.  Obviously, the

16   debtors and other parties reserve their rights to the various

17   positions he might make.  I don't think we need to debate them

18   today, and we'll deal with them on August 17th.

19        THE COURT:  Okay.

20        MR. POWLEN:  Your Honor, you're getting a bit of a tag

21   team.  David Powlen, also from Barnes & Thornburg.  And

22   Mr. Mears spoke to Autocam.  The firm has also appeared and

23   filed objections on behalf of five other parties related to the

24   assumption and assignment of their contracts.  And Mr. Butler

25   and I also had a chance to visit, prior to the commencement of

56

1    this hearing, with respect to paragraph 35 on page 66 of the

2    proposed order.

3           THE COURT:  This is the sale order or the plan

4    modification order?

5           MR. POWLEN:  This is the sale order, Your Honor.

6           THE COURT:  All right.  But that's -- okay.

7           MR. POWLEN:  And it --

8           THE COURT:  I don't want to -- we don't need to get

9    into that one.

10          MR. POWLEN:  I understand, but we've confirmed and

11   he's willing to agree on the record that nothing in paragraph

12   35 is intended to impact in any way on the parties' objections

13   with respect to the assumption and assignment of contracts.

14          THE COURT:  Okay.

15          MR. BUTLER:  I'll just say, Your Honor, I don't

16   believe -- based on how we have taken Your Honor's guidance

17   about this hearing, I don't think we could adjourn the

18   assumption and assignment objections to August 17th and then

19   prejudice those objections by either of the two orders that

20   might be entered today.

21          THE COURT:  Okay.

22          MR. BUTLER:  Thank you.

23          MR. VIST:  Good morning, Judge.  Gary Vist on behalf

24   of American Aikoku.  We have filed three objections.  Two of

25   them are objections to notices of assumption and

57

1    nonassumption that we got in the past couple of weeks.  I

2    understand those will be adjourned.

3        The third objection that we filed is actually an

4    objection to the plan itself.  And the gist of the objection is

5    that the plan allows the debtor to violate the stipulation that

6    we have entered into about a year and a half ago.  And I would

7    like some guidance as to whether that objection will be heard

8    today or whether it will be postponed as well.

9        THE COURT:  I think it would be heard today.

10        MR. VIST:  Thank you, Judge.

11        THE COURT:  Okay.  All right.  Well, is there anyone

12    else?  No.  All right.  Anyone on the phone, or the gentleman

13    from Barnes & Thornburg or anyone else who's here just on a

14    contract issue, you can be excused.  And that would go for any

15    witness that doesn't want to stay around too.

16        MR. BUTLER:  Your Honor, I also would like to address

17    the letter objections that were dealing with some -- there were

18    some 600 plus severance related letter objections filed with

19    respect to the modified plan.  And the concern expressed by

20    those parties was that they might not receive all of the

21    installment severance that they were entitled to.

22        Just by way of reference, Your Honor, back in 2005

23    when these cases were filed, Your Honor entered a first-day

24    order that allowed us -- that authorized us but did not direct

25    us to be able to continue our human capital policies, but it

58

1    was clear in that order that we couldn't -- by continuing them

2    we couldn't create any administrative claims in the case,

3    necessarily.

4         There is, however, as Your Honor knows, a Second

5    Circuit precedent here as to parties severed in a -- persons

6    severed in a Chapter 11 case.  Absent any other determination

7    that might be case-specific, the Second Circuit's given pretty

8    specific guidance that those are administrative claims, that --

9    there are some exceptions to it, I believe, but there has

10   been -- and I think, frankly, in recent years, a number of

11   courts have been seeking to interpret the guidance from the

12   Second Circuit as to how it applies in today's world.  But

13   nonetheless --

14        THE COURT:  It's an issue.

15        MR. BUTLER:  -- that's been hanging out there.

16        THE COURT:  Okay.

17        MR. BUTLER:  The parties had -- the principal parties

18   to this transaction had negotiated with each other and have

19   agreed that those objections need not be considered by Your

20   Honor because the terms of this transaction, if you approve it,

21   will provide the wherewithal for those obligations to be

22   continued to be paid because the new Delphi would essentially

23   assume the payment of those obligations.  But there would be an

24   option -- and that would be over time, over installment basis

25   time -- but there's also going to be an option for parties to

59

1    receive seventy-five percent of the remaining severance

2    obligations in a lump sum now, prior to the effective date of a

3    modified plan.

4         And so parties that want the full pay-out and want to

5    assume the risks of a full pay-out, because as we've all

6    learned in this case and in other cases, the future is never

7    assured in any transaction.  And if people want to have the

8    comfort now, the parties have agreed to make capital available

9    to pay out seventy-five percent of any future payment stream on

10   a lump sum basis.  And that agreement and the agreement to

11   otherwise assume these liabilities, I think eliminates any

12   potential objection by those 600 objectors.

13        THE COURT:  All right.  Let me just address the early

14   payment option.  That would then be a provision of the MDA that

15   would go into effect prior to the effective date of the plan?

16        MR. BUTLER:  Right.  Yes, Your Honor.  We

17   essentially -- and another way of thinking about it is we

18   actually have -- I don't know if it's necessarily the MDA

19   they're going to effect prior to the plan, but I think I'm

20   saying this correctly and I will get help I know, today, if I

21   say things incorrectly.  But I believe the way in which that

22   particular matter will be implemented is that the debtors would

23   essentially --

24        THE COURT:  It wouldn't violate the MDA --

25        MR. BUTLER:  Right.

60

1          THE COURT:  -- for them to make that type of payment.

2          MR. BUTLER:  Correct.  The debtors will make those

3      payments prior to the effective date.  Our source of capital

4      for that will be the bridge financing that are being provided

5      by the DIP lenders under the DIP credit agreement through the

6      use of cash collateral accounts and by General Motors under the

7      GM arrangement.  Both of those would -- if Your Honor approved

8      these plan modifications, we will have three sources of funding

9      in -- the debtors, to bridge ourselves to emergence.  It will

10     be use of cash collateral accounts that we previously couldn't

11     use that are for the benefit of the DIP lenders; use of the

12     remaining funding under the LSA or the GM arrangement, as it's

13     known in this Court, with General Motors; and the repatriation

14     of excess global liquidity that we would then be able to

15     repatriate and use.  And there's a series of agreements that

16     have been worked out with the DIP lenders.  And this would not

17     be on the MDA side; this is actually on the administrative

18     agent side in agreements that will be documented.

19          In fact, there's an exhibit, accommodation agreement

20     amendment number 19, that does that, and there's, I believe, an

21     amended and restated GM arrangement on the GM side that deals

22     with how that will all work and how that fits together.  And

23     the only thing left to be done is to continue those

24     arrangements by further amendment to be coterminous with the

25     MDA.  And that would happen after -- presumably promptly after

61

1      Your Honor entered a plan modification, if Your Honor was

2      prepared to do that.

3          So that will be the source of our liquidity.  One

4      important feature of this transaction is that we will have

5      bridge liquidity to bridge us through a closing date which we

6      hope to be before the end of the third quarter of this year

7      and -- the quarter that we're currently in or we will soon be

8      in -- that we're currently in.  And it will be sufficient to

9      fund the settlements, among other things, Your Honor.

10         THE COURT:  Okay.  Does anyone who filed one of these

11     letter objections want to be heard on them?  All right.  I

12     agree with the debtors that these objections, given their

13     undertakings and agreements in connection with the MDA, are

14     moot.  To the extent they would not be, they're overruled.  I

15     believe there's sufficient funding as well as contractual

16     commitments for these obligations to be paid.

17         MR. BUTLER:  Thank you, Your Honor.  All right.

18     Continuing, Your Honor, with a summary of the sort of groups of

19     objections.  We obviously had objections filed in addition,

20     those filed by the creditors' committee and Wilmington Trust as

21     indenture trustee.  We had comprehensive objections filed by

22     the administrative agent and two groups of DIP lenders at

23     dockets number 18283, 18296, and 18300.  Several of those

24     objectors have filed supplemental statements in the last

25     twenty-four hours, and essentially, I think the best way to

62

1    summarize those is, assuming Your Honor enters the plan

2    modification order that approves the debtor's recommendation

3    accepting the pure credit bid on terms that are mutually

4    acceptable to the parties, including to those parties, they

5    will not pursue these objections, which I think is probably a

6    foregone conclusion to everyone, but I still need to check that

7    box and move on.

8              THE COURT:  Okay.

9              MR. BUTLER:  Now, if you look at the rest of the

10   objections, Your Honor, and we're focused on the objections

11   we've classified in various areas now.  I'll come back to them.

12   First I'd just like to summarize them and I'll come back to

13   individual objections.

14              In addition to the contract related objections,

15   there's nine other basic groups of objections, and this is

16   filing the groupings that we put in Joint Exhibits 215 and 216

17   and attached to our reply which is Joint Exhibit 632.  And

18   they're as follows.  There is some objections to the exercise

19   of business judgment by the debtors -- objecting to our

20   business judgment.  Mr. Kennedy in the IUE, for example, has

21   raised that objection in his objection.  So have a number of

22   the letter objectors.  And so I'm going to come back to that in

23   a few minutes.

24              The second broad category of objections are objections

25   by current and former employees, including the unions, and many

63

1    of those are pension related objections.  In fact, there are

2    well over 1,000 letter objections that are from pensioners that

3    object to what the debtors have done to date and what we are

4    proposing to do in connection with pension related matters.

5    And I'm going to come back to that because that, I think, is an

6    area of focus in this hearing.

7         The next category are government agency objections.

8    There were many agencies we had to work through, both federal

9    and state, in connection with preparing for this plan

10   modification hearing.  But the only surviving objection is that

11   of the Michigan's Workers' Compensation Agency at docket number

12   18264.  And while I'll address that down the line, my

13   understanding, as I've been advised, is that the state of

14   Michigan is going to rely on their pleadings that they filed on

15   their objection and are not going to present argument today.

16   Counsel's here and if I said it wrong they should tell me, but

17   I believe that's what I've been advised.  So we'll have to deal

18   with -- in category three we'll have to deal with Michigan

19   Workers' Comp.

20        In connection with the fourth category, which are

21   taxing authorities -- we had a lot of taxing authorities to

22   talk about in a lot of places.  We have resolved, I believe,

23   the objection -- there are only two remaining objections, one

24   of Howard County, Indiana at docket number 18218, which I

25   believe we have resolved, and one of the Texas taxing

64

1    authorities which is at docket number 18194, which I think at

2    the moment may not be resolved, but I have to sort that out in

3    a few minutes with some of our colleagues.

4        THE COURT:  Okay.

5        (Pause)

6        MR. BUTLER:  I'm advised, Your Honor, that Howard

7    County may want to address the Court on a limited aspect of its

8    objection, so we may have two of those objections to deal with

9    under taxing authorities.

10        With respect to areas that have been settled, there

11   are no remaining objections on four broad areas that would, I

12   think, otherwise have been contentious by parties.  There are

13   no longer any objections outstanding to release and discharge

14   obligations and mechanics under the plan.  There are no

15   outstanding objections to classification, impairment, or voting

16   issues, which is category 6.  There's no objections remaining

17   to the substantive consolidation mechanics of the plan.  And

18   there are no longer any objections to the 1129(a)(9) mechanics

19   and operation of that under the plan.

20        There are some miscellaneous objections -- that's

21   category 9 -- which we'll have to come back and deal with.  And

22   perhaps the most -- while we think it can be rather easily

23   dealt with by the Court, on the face of the papers the most

24   consequential of that is an objection filed by James Sumpter,

25   who filed both -- who actually filed it in the form of a COBRA

65

1    motion at docket number 18366.  And we filed an opposition at

2    docket number 16457.  But it's actually -- it's been construed

3    for these purposes as an objection to the plan.

4            So Your Honor, when we look at the various categories

5    of objections, there are a few individual objectors, you know,

6    an objector in governmental agency objections, two objectors in

7    taxing authorities, some miscellaneous objections dealing with

8    the COBRA matter.  And then there is, I guess, under

9    miscellaneous objections, I would add -- because I don't know

10   that it has been resolved yet -- is we do have a series of

11   objections filed by our former plan investors.  And I need, on

12   a break, to see where those discussions are before I address

13   the Court on those.

14           Our approach, Your Honor, would be to take those

15   objections -- I'd like, Your Honor, to ask for a brief recess

16   to consult with some of the parties, principal parties in this

17   case about where we are on some of these objections, and then I

18   would propose to go through the categories and take them

19   category by category and go through, if it's all right with

20   Your Honor, and litigate the objections and deal with them.

21           THE COURT:  Okay.

22           MR. BUTLER:  And then after we get through all those

23   objections, and at least get them on the record, Your Honor may

24   want to obviously -- you know, if we could just get argument on

25   the record at least from both sides.  We're going to want to

66

1    take a break and deal with any final issues relating to the

2    form of order and the form of the plan.  And then I don't know

3    if the other parties do, but the debtors certainly have a

4    closing argument we want to present.

5         THE COURT:  Okay.  Well, I may well rule on the

6    objections seriatim, which may affect the length of closing

7    argument.

8         MR. BUTLER:  Right.

9         THE COURT:  So how much -- I can give you half an

10   hour.  I can give you an hour.  I can give you ten minutes.

11   How -- what are you looking for here to consult with some of

12   the people who may have --

13        MR. BUTLER:  Can I have just a minute, Your Honor?

14        THE COURT:  Sure.

15     (Pause)

16        MR. BUTLER:  Your Honor, seeing as I have a track

17   record in this Court and in the board room of giving time lines

18   that people no longer have great confidence in, I will tell

19   Your Honor that I've decided, as I always have all along in

20   this case -- I've always decided that the shortest time line is

21   the best because you try to push people to it with no assurance

22   that we'll hit the mark.  And so I think, Your Honor, I'd like

23   to take a fifteen minute adjournment.  We'd advise --

24        THE COURT:  Okay.

25        MR. BUTLER:  -- chambers if we need any more time.

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

67

1        THE COURT:  That's fine.  Let me just -- is there

2   anyone else who thinks they have another objection that wasn't

3   summarized by category, just in case the debtors may want to

4   talk to you as well?  Okay.  So I'll be back at 12:15 unless

5   you notify chambers otherwise.

6        MR. BUTLER:  Thank you, Your Honor.

7        THE COURT:  And obviously you can leave all of your

8   materials here.

9      (Recess from 12:00 p.m. until 12:38 p.m.)

10        THE COURT:  Please be seated.  Okay, we're back on the

11   record in In re Delphi Corporation.

12        MR. BUTLER:  Thank you, Your Honor.  A couple of

13   housekeeping matters, if we could, Your Honor.

14        With Your honor's permission, the debtors would like

15   to release Ms. Sullivan and Mr. Gershbeim as witnesses?

16        THE COURT:  That's fine.  I said that any witnesses

17   who were not going to be testifying now are free to leave.

18        MR. BUTLER:  The other witnesses we've indicated are

19   subject to recall because if this flips to a 363 we'll need

20   them back.

21        THE COURT:  Okay.

22        MR. BUTLER:  Okay, thank you.

23      (Pause)

24        MR. BUTLER:  Your Honor, also, in connection with the

25   MDL litigation settlement that Your Honor approved at the July

68

1    23rd omnibus hearing, we've been asked to read a statement into

2    the record just for the abundance of caution, avoidance of

3    doubt that things we're doing here today aren't intended to

4    affect that settlement that was approved by you separately.

5    The settlement's been delinked from the plan.

6        THE COURT:  I thought the settlement was approved to

7    enable what you're doing today.

8        MR. BUTLER:  That's exactly right, Your Honor.

9        But I've been asked to read the following into the

10   record, and I shall as follows:

11       "With respect to the MDL plaintiffs, as the Court is

12   aware, the debtors have recently entered into modifications to

13   the MDL settlement that among other things delink the effective

14   date of the MDL settlement from substantial consummation of a

15   plan of reorganization.  This Court approved the modifications

16   in an order entered last week at the July 23rd omnibus hearing.

17   and the debtors are moving to a separate approval process in

18   the United States District Court for the Eastern District of

19   Michigan.

20       The releases of the debtors and any non-debtors

21   provided in the modified plan of reorganization are not

22   intended and shall not be construed to extend to the claim

23   asserted in the MDL actions, rather the releases of those

24   claims shall be as provided for in the MDL settlement as

25   modified as previously agreed to by Your Honor, approved by

69

1    Your Honor."

2           And the debtors agreed to that, Your Honor.

3           THE COURT:  Okay.

4           MR. BUTLER:  Your Honor, what we'd like to do before

5    what we hope would be a late lunch break is we'd like to be

6    able to take three or four of the categories of objections that

7    have one or two objectors in them and address them.

8           THE COURT:  All right.

9           MR. BUTLER:  We're going to deal with the business

10   judgment objections and the unions and pension-related

11   objections after the lunch break.

12          THE COURT:  Okay.

13          MR. BUTLER:  There are some unions that have indicated

14   they may have settled, and I'm going to try and confirm that,

15   and if there are I'll announce those before the lunch break,

16   but otherwise, we'll deal with any live objections, if it's all

17   right, Your Honor, after the lunch break.

18          I'm going to go to, sort of, category three under our

19   Exhibits 215 and 216, nature of objections.  Category 3 was

20   governmental agency objections.  I indicated to Your Honor that

21   the only objection is the State of Michigan Workers

22   Compensation Agency and Funds Administration.  The Michigan

23   agency which has filed its objection at docket number 18264.

24   I've just spoken to counsel during the break, I've spoken to

25   counsel to the agency and have confirmed with them that they

70

1        want to rest on the pleadings before you.

2               With respect to the debtors, Your Honor, I'd like   to

3        -- I would like to make an argument on their objection at this

4        time if that's acceptable.

5               THE COURT:  Okay.

6               MR. BUTLER:  Your Honor, by its objection, the agency

7        objects to the modified plan and the debtors' alternative

8        request to sell substantially all of its assets free and clear

9        of liens because the debtors estimate outstanding workers'

10       compensation obligations in Michigan account to a little more

11       than 121 million dollars with yearly payments of approximately

12       twenty-four million.  And the modified plan in the MDA do not

13       create in the agency's mind a sufficient commitment on behalf

14       of the purchasers to assume the workers -- the debtors'

15       workers' compensation obligations in Michigan.  They make the

16       following arguments:

17              First, they argue that the modified plan violates

18       1129(a)(3) because pre-petition workers' compensation claims

19       will not be paid in full from distributions under the modified

20       plan.

21              Second, they assert that these transactions could

22       leave injured workers without a source of benefit payment since

23       approval of the modified plan would render the estate's

24       security fund insolvent.

25              Finally, they assert that the modified plan and MDA if

1    approved could result in the debtors or purchasers lacking any

2    method to comply with their workers' compensation obligations

3    in Michigan, and that that would result in a violation of 28

4    U.S.C. Section 959(b).  And, therefore, also would cause us to

5    not be non-compliant with 1129 among other statutes -- parts of

6    the Bankruptcy Code because we wouldn't be complying with

7    applicable laws.

8            In essence, Your Honor, what the Michigan agency is

9    saying to the Court, to the debtors and other stakeholders,

10    that their unfulfilled claims are superior to claims of all the

11    creditors because they assert that state regulatory

12    requirements compel the debtors to honor those obligations.

13            We believe that that's not how it works in bankruptcy.

14    The priority scheme under Section 507 of the Bankruptcy Code

15    and this Court's bar date orders govern the rights and remedies

16    of all creditors, private and governmental, including as Judge

17    Lifland ruled in the Olga Coal case at 194 B.R. 741 page 746, a

18    1996 case in this district, "That a claimant's right to

19    recovery on account of workers' compensation claims arises out

20    of pre-petition injuries.  And estate's contingent claim for

21    reimbursement of workers' compensation benefits unpaid by a

22    debtor is one such claim and is subject to the requirements and

23    discharge provisions of the Bankruptcy Code notwithstanding any

24    state statutes to the contrary."

25            Now, it is a fact, Your Honor, that the Michigan

72

1    agency never filed any proofs of claim on a timely basis, never

2    filed a motion to file an untimely claim and you have a right

3    to file a tardy claim.  And, therefore, it's not to receive a

4    distribution under the modified plan as to the discharge of any

5    pre-petition liabilities.

6          I don't believe the Michigan agency is asserting that

7    they can file an untimely claim.  Although, I was advised prior

8    to the commencement of this hearing that they may have filed

9    such a claim in the last several days.  But I've not been able

10   to confirm it myself.

11         Just on that point, Your Honor, the Michigan Agency

12   was served, these are indisputable facts, I believe.  The

13   Michigan Agency was served with the bar date notice almost

14   three years ago but did not file a claim.  It hasn't sought to

15   file a late claim.  It hasn't made a requisite showing of

16   excusable neglect.  Other comparable agencies around the

17   country did file proofs of claims.  So it's not as though

18   workers' comp agencies around the country didn't realize that

19   it needed to do so.  And I don't believe that the agency can be

20   surprised by the outcome that is occurring in this case, vis-a-

21   vis the agency.  And, obviously, to the extent that the claim

22   was filed in the last couple of days, the debtors will

23   vigorously oppose that attempt on the grounds, among other

24   things, that their failure to file a proof of claim was a

25   conscious and a willful decision, and was without, at minimum,

73

1    excusable neglect.

2         Your Honor, we have been in conversation and dialogue

3    with regulatory authorities across the country about this case,

4    including most affected workers' compensation agencies.  And

5    what we shared with them and every agency had a different set

6    of facts, some filed claims, some didn't.  Some had letters of

7    credit, some didn't.  Some had insurance policies, some didn't.

8    Some had issues where they were substantially resolved and

9    others had issues that had to be dealt with.  But we have

10   consistently addressed a common theme.  That if a regulatory

11   agency for workers' comp had not filed a proof of claim before

12   the bar date that state would not be entitled to a distribution

13   under the modified plan and we would oppose any attempt to file

14   a late claim.

15        It's also I think very clear, Your Honor, especially

16   as Your Honor considers bar date orders, and this I don't think

17   we need to deal with in any detail in this hearing, but all

18   creditors, whether they're private or governmental, have to

19   abide by bar date orders, unless they forfeit distributions

20   under a plan, and I can't think of anything more compelling at

21   this point in time, then a claim that would intend to undue the

22   fabric of the compact that's been agreed to among stakeholders

23   in this case that will permit this company to complete a

24   modified plan of reorganization.

25        I also point out, Your Honor, that Michigan has

74

1    previously filed several proof of claims relating to taxes and

2    other matters, and Your Honor, actually adjudicated some of the

3    State of Michigan's claims in other hearings.

4         The argument the Michigan agency makes that its claims

5    are superior to the claims of all other creditors because of

6    state regulatory requirements, and therefore, the debtors are

7    compelled to honor workers' compensation obligations, simply

8    doesn't pass muster, particularly the focus of the preemption

9    concepts in federal law.  To the extent that this statue in

10   Michigan purports to establish the priority of their claims

11   over all other claims that statute is preempted by the

12   Bankruptcy Code and is of no further force and affect.  And in

13   our papers we have quoted to a number of cases, including In re

14   Law Corp. at 162 Bankruptcy 234, a 1993 Bankruptcy Court

15   decision in the District of Minnesota.  In re Redford Roofing

16   Company, an Illinois case in the Northern District, a 1995

17   case, it's 54 B.R. 254, 255.  And we tried to make clear that

18   to all the agencies we worked with and in Michigan that,

19   frankly, this Court is not going to use, and we believe in all

20   respects, absent a consent which does not exist here in the

21   plan or otherwise, is not going to use its equitable powers or

22   other principles to alter the Bankruptcy Code's priority

23   scheme.  And we have looked to U.S. v. Nolan, the Supreme Court

24   case at 517 U.S. 535, 1996 case, which I think addresses that

25   concept.

75

1          Your Honor, I think that the -- in terms of the

2     argument here that there's a violation of 1129(a)(3) of the

3     plan because they will not be paid in full.  Because the

4     agency's unfiled pre-petition workers' comp claims aren't

5     entitled to receive distributions under the Bankruptcy Code,

6     the conclusion that we think is inevitable from that that the

7     modified plan comports with 1129(a)(3) of the code.

8          They also point to an argument which is I think a bit

9     confusing.  They basically say that neither New Delphi, the

10    company buyer, or General Motors' subsidiary that's acquiring

11    four of the KEIP sites in Michigan plus the steering business,

12    that they can't -- they won't be able to qualify self-insurers

13    following confirmation of the modified plan and they won't be

14    able to comply with state law as it relates to fulfilling

15    workers' compensation obligations.  And, therefore, that's a

16    further violation of 1129(a)(3).

17         I don't understand that because in Michigan there are

18    multiple paths to be able to comply with that statute.  Self-

19    insurance is only one of them.  You can pool your workers'

20    compensation obligations.  There are other ways you can meet

21    the requirements.  And I don't believe there's anything they've

22    introduced in their objection, or anything in this record, that

23    would establish that there is no ability of either a General

24    Motors or the company buyer, to comply on a post-effective day

25    basis with the laws of the State of Michigan.

76

1          THE COURT:  And what about the reorganized debtor,

2     that the assets that remain behind?

3          MR. BUTLER:  I think that's the same situation, Your

4     Honor, particularly -- and we'll get to that.  The fact of the

5     matter is, that our reorganized DPH Holdings which is going to

6     hold assets that are going to be wound down is going to have

7     actually no employees.  It's going to have an authorized

8     representative which I'm going to identify in this hearing, as

9     part of the hearing.  And it's going to contract out on a

10    management services basis the activities it needs to undertake

11    to complete that.  And so I don't believe that that particular

12    activity, and reorganized DPH Holdings, may last for any period

13    of years while it undertakes its work, but it's not going to

14    have anyone, I think, going to necessarily be subject to those

15    laws.  To the extent that the company --

16         THE COURT:  If it did it would be a very small number

17    of people.

18         MR. BUTLER:  It would be a very small number of people

19    and the company would -- obviously, reorganized Delphi,  DPH

20    Holdings, expects to comply with all laws that are applicable

21    to it.

22         The other thing that they argue is that there's a

23    violation here.  I addressed it briefly before.  There's a

24    violation here under 28 U.S.C. 959(b) because they say that we,

25    as debtor-in-possession, won't comply with those applicable

77

1    laws.  But, again, I don't believe -- they've used that statute

2    and the argument to basically say that because the pre-

3    petition, what I believe will be discharged workers' comp

4    claims, aren't going to be paid that that is somehow a

5    violation of the Bankruptcy Code and of 28 U.S.C. 959(b).  And

6    I don't think you can basically turn the Bankruptcy Code on its

7    head and say okay, I didn't file a claim I'm going to be

8    discharged, those workers' comp claims aren't going to be paid

9    and, therefore, that's an independent basis under 959 to argue

10   that there's a violation.  Because that gets you sort of in the

11   circular -- a circulatory of argument I don't think the Court

12   should sustain.

13        State law may well establish priorities for the

14   benefit of workers' compensation claimants outside of

15   bankruptcy, but as I said before the Bankruptcy Code in our

16   view, clearly preempts conflicting state statutes as discussed.

17        And I think the only other thing I'd like to address,

18   Your Honor, is their reliance on Bickford v. Load Star Energy

19   Inc. at 310 B.R. 70 at page 76.  This was an Eastern District

20   of Kentucky case decided in 2004.  And that's a case that

21   apparently required payment of a pre-petition claim in full.

22   In Bickford a district court reversed a bankruptcy court order

23   enjoining state officials for enforcing a post-petition bonding

24   requirement against holders of surface mining permits in the

25   ground that bonding requirements served, not only the state's

78

1    pecuniary interest, but also protect the state's citizens

2    against dangers of unreclaimed land and came within the police

3    power exception of the automatic stay.

4         In contrast, here, the Michigan Agency is not

5    challenging the debtors' post-petition compliance with the

6    state workers' compensation statutes and regulations because

7    we, in fact, are in compliance and will remain in compliance

8    with the post-petition obligations imposed on us.

9         Rather, they're asking the Court to say because we are

10   not prepared to pay or to find a way through the MDA parties to

11   pay pre-petition claims that for which no proof of claim was

12   filed, that we are -- and because -- and notwithstanding the

13   preemption provisions that are applicable here, our failure to

14   do that somehow brings us back under -- apparently, under their

15   argument, the police power exception, and makes the Bickford

16   case applicable.

17        We simply believe it is not.  We ask Your Honor to

18   find that the objection is without merit and to overrule it.

19        THE COURT:  Okay.  I understood that the agency wanted

20   to rest on its papers, but having heard the argument does it

21   have anything further to say?

22        Okay.  I'm going to overrule this objection to

23   approval of the plan modification motion.

24        First, I seriously question the standing of the

25   Michigan Workers' Compensation Agency, given that it did not

79

1    file a claim by the bar date established in this case, and has

2    not sought over the last -- I guess it's over three years since

3    the bar date was established, to do so under Rule 9006.

4         But even assuming that the agency did have standing to

5    protect that hypothetical and currently barred claim, I believe

6    that the objection is not well taken.  As I read it, the

7    objection is focused upon the debtors' obligations with respect

8    to pre-petition workers' compensation claims which under the

9    Bankruptcy Code's priority scheme are not entitled to payment

10   in full given the value of these debtors as established by the

11   exhibits, including Mr. Shore's.

12        The federal priority scheme under the Bankruptcy Code

13   cannot be modified by state action.  In that regard, I agree

14   with the debtors and their citation to In Re Olga Coal Company,

15   194 B.R. 741 at 746 (Bankr. S.D.N.Y.), as well as In re Redford

16   Roofing Company, 54 B.R. 254, 255 (Bankr. M.D. Illinois 1985).

17        The argument that Michigan made by regulation override

18   the priority scheme of the Bankruptcy Code, I believe also is

19   inaccurate, at least as it applies to these claims.  This is, I

20   believe, a true pecuniary claim seeking payment of pre-petition

21   obligations.  And, therefore, I believe does not run afoul of

22   28 U.S.C. 959(b).  If it did, then the amounts would have been

23   sought and paid years ago.

24        The objection also, although, not that clearly, raises

25   perhaps an issue as to the payment of performance of workers'

1   compensation obligations going forward, that is after the

2   closing of the transactions contemplated by the plan

3   modification motion.  The debtors have confirmed their

4   agreement as the reorganized debtor to comply with their

5   obligations under the Michigan regulations with regard to

6   workers' compensation post-closing, based upon the exhibits and

7   the underlying agreements before me.  I believe that the

8   debtors are correct that those obligations will be minimal and

9   that the debtors will lack sufficient resources to perform the.

10          As far as the performance by GM, that is New GM, and

11  the DIP lender acquirers going forward, to the extent that is

12  an issue before me, I believe that they are (a) sufficiently

13  incentivized to perform their obligations in respect of workers

14  compensation going forward, and, secondly, have sufficient

15  wherewithal to do so.  Again, based upon the record before me.

16          The last basis for the objection is an argument that

17  the payment under the confirmed Chapter 11 plan of these

18  obligations or the provisions for their payment under the

19  confirmed Chapter 11 plan now estop the debtors under various

20  estoppel theories from treating them as a claim subject to the

21  priority rules of the Bankruptcy Code.  I conclude that there

22  is not a basis for estoppel on those facts.  The plan

23  modification exhibits make crystal clear that the debtors

24  financial circumstances have drastically changed between the

25  confirmation of the present plan on file and the plan

81

1    modification, such that clearly the debtors' resources are not

2    sufficient to pay a "par plus accrued recovery" to unsecured

3    creditors, as the original plan provided.  And, instead, the

4    debtors' estates have the value as detailed in the declarations

5    that have been submitted, and as borne out by the auction

6    process that provides for greatly reduced ability to pay pre-

7    petition claims.  Therefore, if the debtors today in fact tried

8    to pay these claims in full or a par plus accrued recovery,

9    they would be violating the Bankruptcy Code.

10         Clearly, the confirmed plan had as a condition to its

11   going effective, the closing of the EPCA or investor agreement,

12   which did not occur.  The plan obviously since it had that

13   condition to its going effective contemplated the possibility

14   of its not going effective, including the breach or termination

15   of the EPCA.  Consequently, I don't see a basis for estoppel

16   given that the document upon which estoppel is asserted

17   contemplates the possibility of the treatment that is currently

18   being afforded to the claims of the agency, to the extent it

19   has an assertible claim, as well as all other unsecured

20   creditors.

21         Moreover, as far as equitable estoppel is concerned,

22   as I said it would be highly inequitable to elevate these

23   claims which are substantially similar to other unsecured

24   claims over those claims.

25         So for those reasons, I'll deny the objection.

82

1          MR. BUTLER:  Thank you, Your Honor.

2          Your Honor, the next category of objections we'd like

3     to address is the taxing authority objections.  The are the

4     objections of Howard County Indiana, at docket number 18218.

5     And the Texas Taxing Authorities objection at docket number

6     18194.

7          I should indicate to the Court that both of these

8     objectors hold allowed claims.  In the case of Howard County I

9     believe it's an allowed priority claim and allowed secured

10    claim in different proportions.  In the case of Texas, the

11    Texas Taxing Authority is making a primarily allowed secured

12    claim.

13         The Howard Count taxes involved here relate, I

14    believe, to the Kokomo, Indiana facility, which is under the

15    proposed plan and under the master disposition agreement, going

16    to go to the General Motors subsidiary.  And he Texas Taxing

17    Authorities taxes go to, I believe, assets that will be

18    retained in DPH Holdings Inc.

19         With respect to Howard County, my understanding is

20    that they have received the appropriate assurances that make it

21    crystal clear that to the extent that they hold an allowed

22    priority and secured claim and notwithstanding any discharge of

23    claims under the plan, that a General Motors subsidiary will

24    take those claims and pay them in accordance with the plan

25    treatment proposed.  I believe that their remaining objection

83

1    is now focused on whether or not the fact that they don't like

2    our proposed plan treatment in terms of the stretch out or

3    either the impairment of the secured claim by how we propose to

4    treat it or the stretch out of the priority claim which we

5    think this is a pre-BAPCPA case is permitted as we have

6    proposed.

7        And I believe that the Texas Taxing Authorities' claim

8    is similarly based on the objections to the treatment that we

9    propose.

10       So we should deal with those first, and I think

11   counsel for, both Howard County and Texas, are here to argue

12   their objections.

13       MR. POWLEN:  Thank you, Your Honor.  For the record,

14   my name is David Powlen with the law firm of Barnes and

15   Thornburg for the Taxing Authority Howard County Indiana.  Also

16   referred to under the MDA as Kokomo, Indiana.  We can think

17   about those two descriptions as one and the same, Your Honor.

18       Mr. Butler teed this up very well.  We have had the

19   good fortune this morning to have conversations with, both

20   debtors' counsel and counsel for the GM buyers, and have

21   confirmed that the GM buyers are picking up all three aspects

22   of the county's tax claims.  We have a post-petition

23   administrative claims, with respect to which we filed an

24   administrative expense claim form on July the 14th in the

25   amount of 11,369,193 dollars, which includes an estimated

84

1    component.  We also have, as Mr. Butler alluded to, both a pre-

2    petition secured claim which will be treated under Section 5.1

3    of the plan, and also, an unsecured priority claim to be

4    treated under Section 2.2 of the plan.

5         Now, that we've confirmed that it's the GM buyers

6    picking up these taxes, Your Honor, we would like to be heard

7    very briefly on the issue of the timing of the payment.  And as

8    a little bit of background, Howard County not only has the

9    Delphi bankruptcy impacting on its ability to collect taxes,

10   but also has been impacted by the Chrysler bankruptcy.  The

11   facilities for Chrysler in this county and the Delphi

12   facilities are literally just down the road from each other.

13        The proposed treatment, as I'm sure the Court is

14   aware, under Section 5.1 of the plan with respect to the

15   secured claim, is for a payment over seven years at an interest

16   rate, which is essentially based on the concept that the Till

17   case provided, with respect to a Chapter 13 case and with

18   respect to a party that's in the business of lending money.  We

19   respectfully submit, Your Honor, that the county is not in the

20   business of lending money.  We are completely different and

21   should be distinguished from the teachings of the Till case.

22   We are a tax collector.  And we're not in the business of

23   having our taxes strung out, potentially in this situation, up

24   to eleven years from March 1, 2005 for eleven years under

25   Section 5.1 of the plan with respect to our secured --

85

1          THE COURT:  Can you remind me, does 5.1 actually

2    specify a rate?

3          MR. POWLEN:  It provides a treasury bill rate, plus, I

4    believe, 200 basis points for a so-called risk, Your Honor.  We

5    would suggest that in lieu of that, Indiana provides a post-

6    judgment tax rate under Indiana Code 24-4.6-1-101(2).  It

7    provides for an interest rate of eighth percent on post-

8    judgment sums.  We would submit, Your Honor, that by analogy

9    the plan confirmation order, would equal a judgment with

10   respect to the Indiana Code provision.  And would ask that both

11   our secured claim and our priority unsecured tax claim in

12   Section 2.2 of the plan be treated with an eight percent

13   interest rate as opposed to what the plan has otherwise

14   provided.

15         THE COURT:  And the priority claim, that rate is not

16   specified, right.  It just says whatever rate is appropriate?

17         MR. POWLEN:  I believe that's the case, under

18   applicable -- I think it may be a reference to a statute or

19   other applicable law, that's correct.

20         Now, we also have a difficulty here, Your Honor, and

21   I'd like to introduce the legal basis for our argument for just

22   a moment.  Under 1127(b), the plan as modified becomes the plan

23   only if two things happen.  Number 1, if circumstances warrant

24   such modification and the debtor, otherwise, complies with all

25   the confirmation requirements under 1129.  We believe that with

86

1    respect to Howard County's unique circumstances that

2    Circumstances do not warrant a change.  Under the original

3    plan, as confirmed by this Court, Your Honor, there was a

4    provision that the secured portion of our tax claim would be

5    treated no worse than the payment period with respect to the

6    priority unsecured claims under Section 2.2 of the plan.

7    Translating that into specific dates, because the -- we're

8    dealing with the prior version of the code, we're dealing with

9    the pre-'05 amendments here in this case.  It's essentially

10   equal payments over not more than six years from the date of

11   assessments.  In this case the date of assessment was March 1

12   of 2005.  So with respect to the priority unsecured tax claims

13   that we have, the last installment would have to be paid to us

14   no later than March 1 of 2011.

15       Under the plan with respect to -- in contrast, with

16   respect to our secured claim, we are looking at seven years,

17   the last installment being paid to us up to seven years after

18   confirmation -- after the effective date, I should say, of this

19   plan.

20       We would respectfully ask, Your Honor, that the

21   debtors be required, because circumstances do not warrant it,

22   and also because it's not really fair and equitable under

23   1129(b) and the Court is well aware that 102 of the Bankruptcy

24   Code refers to the word "includes" as not limiting.  So we have

25   a mixed argument here that circumstances do not warrant, and

87

1    it's simply not fair and equitable for our secured claim to be

2    strung out much longer than our priority unsecured claim.  And

3    especially given that the original plan here, as confirmed by

4    this Court, provided for the same treatment for our secured tax

5    claim as it did for the priority unsecured tax claim.

6         Otherwise, Your Honor, we would reset on our written

7    submission, document number 18218.

8         THE COURT:  How does the eight percent satisfy Till?

9         MR. POWLEN:  Well, Your Honor, we would just say that

10   Till is distinguishable.  We are not in the business of lending

11   money.  We're in the business of collecting --

12        THE COURT:  No.  But the analysis that the Supreme

13   Court said to undertake in Till?

14        MR. POWLEN:  Well, again, I think it was in the

15   circumstance of a party that's in the business of lending money

16   that can adjust its -- the interest rate that are otherwise

17   charges to all of its borrowers based on the statistical

18   certainty that certain of those contracts will go under

19   default.  There's that risk factor that the Court, of course,

20   refers to in Till.  In this case we're a taxing authority,

21   we're not in the business to adjusting for anything to

22   accommodate for the possibility of default.  We would, again,

23   simply ask the Court to take us back to the default rate of

24   eight percent provided by the Indiana Code for post-judgment

25   interest.

VERITEXT REPORTING COMPANY

88

1        As a further background, Your Honor, under the Indiana

2   Code, if we were outside of bankruptcy there would be a ten

3   percent penalty each six months that these installments of

4   taxes would not be paid.  We understand that that's obviously a

5   penalty that this Court is not going to allow that, but we're

6   simply asking for the next best thing, which would be a simple

7   interest rate of eight percent.

8        THE COURT:  Okay.

9        MS. KELLEY:  Eurgeice Kelley for the Texas Taxing

10  Authority.

11       THE COURT:  Can you speak up louder?

12       MS. KELLEY:  Sure.  The Texas Taxing Authorities are

13  dozens of municipal taxing authorities who are fully secured ad

14  valorem tax creditors holding unavoidable first priority

15  statutorily perfected liens.  We rely on timely payment of

16  taxes to meet budgets and provide vital services.

17       As such, we negotiated long and hard to reach an

18  agreement under the current plan to receive a superpriority

19  above other secured creditors, as reflected in paragraph 63 of

20  the confirmation order.

21       Under the modified plan we lose this special status

22  and are treated identically to other secured creditors,

23  uniquely penalizing us under the modified plan.  The proposed

24  seven-year payout for our 2005 taxes is unreasonable.  Our 2005

25  taxes won't be paid until 2015.   And we have liens on the

89

1    debtors' personal property and giving the deteriorating nature

2    of the collateral we object to such a lengthy payout.

3         The proposed modified plan violates Section 506

4    because it does not ensure payment of the Texas statutory rate

5    of post-petition interest of twelve percent.  The modified plan

6    failed to provide adequate post-confirmation interest.  You

7    were just discussing Till, and I think this situation is

8    distinct because we are not similarly situated as other secured

9    creditors.  As my colleague was just saying, we're not in the

10   business of lending money, we're municipalities providing

11   services.

12        We also want to confirm that if there's a 363 sale

13   that our liens would attach to the sold property in the order

14   and priority that they presently have.  And we understand

15   everyone is taking a haircut under the modified plan, but the

16   modified plan should, at least, maintain the same structure and

17   priorities that there were under the current plan and the

18   taxing authorities should not be treated as other secured

19   creditors.

20        We otherwise rest on what's in our papers.

21        THE COURT:  Well, ultimately, we're focused on 1129,

22   right, 1129(b), which applies to all secured creditors.  So

23   what distinguishes your client's right to get the present value

24   in the interest of the collateral over this time from anyone

25   else.  You know, why is twelve percent the right number when

90

1    the focus is on the requirement to provide you with deferred

2    cash payments totaling, at least, the amount of such claim of a

3    value as of the effective date of the plan, of the at least the

4    value of such holders interest in the estate's interest in such

5    property?

6          MS. KELLEY:  Section 506.  And I must admit, Your

7    Honor, I'm a local counsel.  So I can't provide the arguments

8    that the lead counsel would have.  But our argument is that

9    it's violating Section 506.

10         THE COURT:  Okay.  Mr. Powlen, you want to --

11         MR. POWLEN:  Yes, Your Honor.  I guess my analogies

12   we're asking for eight percent.  If I may --

13         THE COURT:  No, I understand.  It kind of cuts both

14   ways.

15         MR. POWLEN:  I'm happy to speak also --

16         THE COURT:  I mean, ultimately -- I appreciate that a

17   delay in payment may affect the counties' budgets and their

18   ability to deliver services.  But the requirement in the code

19   doesn't really talk about the impact on the creditors, so much

20   as preserving the present value interest rate, the value of the

21   collateral --

22         MR. POWLEN:  Your Honor, there's a strong policy here

23   that's evident under, both the current provisions of the

24   code -- you'll recall that under the current provisions of the

25   code a secured tax claim cannot be paid out over any longer

91

1    period of time than a priority unsecured tax claim.  If this

2    case had been filed a few days later we wouldn't be having this

3    argument right now.  Defaulting back again to our argument that

4    circumstances don't warrant, the debtors' original plan in this

5    case --

6            THE COURT:  No, I understand that point.  I just want

7    to focus on the Till argument and 1129.

8            MR. POWLEN:  Understand.  And, again, as we said

9    before, at least in my argument, the tax authorities are not in

10   the business of lending money.

11           THE COURT:  I understand that distinction.  But,

12   ultimately, we're looking at preserving the present value of

13   the collateral through these payments.  And why is eight

14   percent right, why is twelve percent right, why is T bills plus

15   2 right?  It's hard for me to know without having some facts

16   behind it.

17           MR. POWLEN:  Understand, Your Honor.  And the best

18   thing we can do is the Indiana post-judgment rate of eight

19   percent.  And I assume that the taxing authorities from

20   Texas --

21           THE COURT:  But that applies to anybody.  That could

22   apply to, you know, someone's old clunker pickup truck.

23           MR. POWLEN:  That's true.  But in that situation that

24   party was in the interest of lending money --

25           THE COURT:  No, I'm talking about -- that was a bad

92

1    analogy.  Say you got a lien on someone's house.  There house

2    is different to value and the risk on a house is different to

3    value, I assume, then a Kokomo plan run by GM.  I mean, how do

4    you propose that I determine how to preserve the present value

5    of Howard County's interest in this Kokomo plant, which is I

6    think probably unique, right?

7         MR. POWLEN:  Very good, Your Honor, yes.

8         THE COURT:  And it's operated by GM?

9         MR. POWLEN:  Yes.

10        THE COURT:  Not being shut down.

11        MR. POWLEN:  Yes.

12        THE COURT:  So why is the twelve percent interest rate

13   -- I mean, is there any correlation to anything there, are

14   there any secured financings secured by the Kokomo plant

15   currently?

16        MR. POWLEN:  I believe there would be pre-confirmation

17   and post-confirmation.  But I honestly can't address that rate,

18   Your Honor, I apologize.

19        THE COURT:  I have the same question as far as the

20   facilities in Texas.

21        MS. KELLEY:  Our argument is that the risk factor

22   described in Till is as applied to a taxing authority was built

23   into the statutory rate.

24        THE COURT:  But that can't be, right, because you have

25   all sorts of different pieces of collateral that would be

93

1    covered by a tax lien, that are a different risk.

2         MS. KELLEY:  Well, unlike other --

3         THE COURT:  Well, you could have a lien on a piece of

4    property that's just been warehoused and not being maintained

5    and falling apart.  You can have a lien on the most gleaming

6    new factory built.  You can have a lien on, you know, an

7    environmentally challenged facility, or a nuclear power plant.

8    All of those I think would have different rates on them,

9    wouldn't they?

10        MS. KELLEY:  Right.  But we didn't have an

11   underwriting process where we selected which property we were

12   going to have a lien on.  It's, you know, a statutory --

13        THE COURT:  Okay.

14        MR. BUTLER:  Your Honor, responding first to Howard

15   County.  The -- and, again, with respect to their secured

16   claim, I do think that we have met the requirements under

17   Section 3.2 of the modified plan.  We separately classified all

18   secured claims, and we have provided their liens will continue

19   on that property.  And we have provided that they will get

20   paid, you know, we believe an appropriate interest rate, that

21   certainly complies we think with Till v. SEC Credit Corp.  I

22   don't think you just have to be a lender of money to have the

23   Till concepts apply.

24        We --

25        THE COURT:  But how do I know that the T bill plus 2

94

1    is the right rate?

2           MR. BUTLER:  Your Honor, I mean, other than -- I don't

3    think there's any -- I think that's a good question in the

4    sense there's no magic to this.  I think that ultimately I

5    think the guidance from Till is that there be -- that the rate

6    of interest there was a base rate plus an interest rate

7    adjustment in accordance of the risk.  I don't think that

8    either of these objectors have introduced any competent

9    evidence to suggest that there's any special risk associated

10   with their collateral that would cause the Court to make an

11   adjustment from what the debtors' proposed in terms of its

12   treatment under the plan.

13          And it seems to me that the -- you know, certainly

14   saying we'd like to have the rate in our own state applies for

15   post-judgment rates, and it sounds like it's a default rate, by

16   the way, in the way it's constructed --

17          THE COURT:  Well, I don't know about Texas, the other

18   one I don't think is, right, because there's a penalty on top

19   of it, for Howard.

20          MR. BUTLER:  Right.

21          THE COURT:  Texas I'm not sure.

22          MR. BUTLER:  And, Your Honor --

23          THE COURT:  Twelve percent is pretty high.

24          MR. BUTLER:  Your Honor, we selected -- we

25   basically -- our plan is premised on the concept that the

95

1    seven-year treasury rate was appropriate as we stretched these

2    out for seven years.  When you look you just sort of say,

3    what's the premise of maintaining value, which is the

4    requirement when you're cramming down?  What is the requirement

5    of maintaining value?  And we thought, and I still believe,

6    that looking at the seven-year treasury rate is as good a proxy

7    for that as appropriate as possible.  And then we assigned a

8    premium to that recognizing the guidance in Till and the --

9    and, you know, Till talked about some type of adjustment.  And

10    I think we picked sort of in the middle of the fairway in 200

11    basis points.  But I don't think there's anything more magical

12    than that.  That was the assessment we put in the plan, I think

13    it's a reasonable basis for it.  And I think an objector comes

14    before you they have to provide competent testimony and

15    evidence which suggests that that is an unreasonable rate.  Not

16    that you should just pick some other rate.

17            THE COURT:  So you think that the burden shifts to

18    them?

19            MR. BUTLER:  Well, I think my only burden, Your Honor,

20    in a plan is to propose a reasonable rate.  And I think it's --

21    I think the Court can sort of draw its own conclusions, but if

22    you're stretching something over seven years, you say what's a

23    reasonable base rate to apply, looking at the seven-year

24    treasury rate is as reasonable rate as any other rate I can

25    think of to think about that.  And then applying a premium to

96

1    it.  And we applied a premium.

2         And what's happening is Howard County is saying gee,

3    you applied a 200 basis point premium, I want a 500 basis point

4    premium, which is, essentially, how they worked out.  And you

5    say well, how come, 500 basis points as opposed to 200 basis

6    points?  And they don't really have the answer to that, we like

7    500 basis points because that equates to what our statute says.

8         And, essentially, Texas says give us 900 basis points

9    because we like twelve percent.  But there's no evidence in the

10   record to suggest that that's adjusting for some risk to the

11   collateral that the liens are attaching to.  And that's my only

12   point, Your Honor.  I mean, we've tried on that basis to

13   address things we think appropriately under the plan.

14        THE COURT:  And what about the point that Mr. Powlen

15   made about 1127, what circumstances require this change in the

16   plan?

17        MR. BUTLER:  I'm sorry, in terms of modifying what?

18        THE COURT:  Modifying the treatment of the taxing

19   authorities?

20        MR. BUTLER:  Your Honor, that I think is fairly simple

21   in terms of trying to sort out an overall transaction here that

22   was -- that meet the requirements of 1127 and would have the

23   support of all stakeholders to -- and as I think counsel for

24   Texas acknowledged, everybody here has had to sacrifice

25   something.  The conclusions that the debtors reached that we

97

1    need to impair pre-petition secured classes but still meet our

2    requirements which was to provide them the value of their

3    liens, to maintain the value of their liens over -- in this

4    case, we're proposing to pay the actual balance over time and

5    to pay them an interest rate to measure it with, we think, the

6    risk associated with it.  But it's nothing more than trying to

7    develop in a case where we've had to work very hard to provide

8    for administrative claims, and in a case where DIP lenders are

9    bidding in 3.4 billion dollars worth of debt, and not on the

10   effective date receiving anywhere near that, certainly in cash.

11   The construction of this modified plan was designed, Your

12   Honor, to take into account what was happening on the entire

13   waterfall.  And I'll talk about the waterfall later.  But

14   there's, in fact -- in fact, I can -- it's in  your -- let me

15   just go to that plan exhibit.  And if I can   ask -- it's in

16   your book, Your Honor, it's Exhibit 31.

17        (Pause)

18        MR. BUTLER:  Your Honor, Plan Exhibit 31 -- it's

19   actually Joint Exhibit 53, Slide 31 -- basically has the fabric

20   of the distributions under the modified plan in this pure

21   credit bid.  It says the scenario; it's actually the pure

22   credit bid transactions before the Court.  And everything

23   above -- this is a waterfall that includes both post-petition

24   and pre-petition liabilities.  And as was -- I think Your Honor

25   understands, there was not enough cash or enough value to

98

1    actually pay everything above the line, all the post-petition

2    liabilities in this case.  And they've all been negotiated on a

3    consensual basis.  And that consent was based on a transaction

4    structure that dealt with everything below the line getting

5    value where it might not otherwise have received value.  And I,

6    frankly, think it may very well be that the liens in the case

7    of Texas, in particular, the value of the liens of that

8    property may be highly speculative but it didn't matter for our

9    purposes because we're in the ones -- and frankly, I think the

10   value of the liens for Howard County absent a transaction where

11   Kokomo was actually operated by somebody as opposed to being

12   closed was also quite speculative.  And so, we tried to come up

13   with an overall transaction that worked.

14        As Your Honor sees in terms of the post-petition

15   liabilities here, there are some that are being dealt with in

16   cash or being paid a hundred cents.  But in the case of carve-

17   out claims, those are being paid cash.  The tranche A, B and C

18   claims are getting -- being treating under the pure credit bid.

19   The hedge obligations that are secured or cash are assumed by

20   General Motors.  If you go down the post-petition waterfall,

21   superpriority claims are being dealt with under the -- in cash

22   or assumed by GM under MDA.

23        If you look at administrative claims, they're being

24   dealt with either by cash being rolled over or assumed on a

25   very carefully negotiated structure.  General Motors has waived

99

1    the 1.7 billion dollar claim.  It's an administrative claim.

2    It's in order to make this work.  And those parties help the

3    debtors work out the structure of what would flow through on

4    the pre-petition side.  And the first one that you get is pre-

5    petition secured claims and priority claims.  And people

6    recognize the obligations under the Code if we're going to do

7    this through a plan as opposed to a sale.  And therefore, there

8    had to be value that was allocated to those.

9         In the case of the priority claims, there otherwise

10   would have been no value allocated to those at all.  They were

11   not secured; they had no property; they had no lien rights.

12   And the treatment you have under the plan, as we've described

13   it, using the stretch out and the applicable statutory --

14   applicable rate that would apply to that obligation.  And I

15   think, by the way, I take the point on priority claim one, Your

16   Honor, that the plan does not have a specific rate applicable

17   across all the claims because the intention was that it would

18   be the lowest applicable rate state by state that you could

19   look to to find what the applicable rate was as to that

20   particular treatment of that claim.

21        With respect to secured claims, we had an obligation

22   under Till to find a way to maintain an appropriate structure

23   and the structure for that, as I've described to you, was to

24   allow those holders to maintain their lien interests to pay the

25   balance debt on their -- to stretch them out over seven years

100

1    and use the seven year T-bill rate plus 200 basis points.  And

2    then I can go further down.  Obviously, Your Honor is aware of

3    the settlement with the general unsecured creditors.  I'm going

4    to get to the PBGC settlement in a few minutes.  And everything

5    else gets wiped out which was the effect of the MBL settlement

6    Your Honor approved last week, the revised settlement.

7            So the answer to the question, Your Honor, from the

8    debtors' perspective, as laid out in this exhibit, is in order

9    to provide value below the black line to pre-petition holders

10   of claims, except whatever nominal value a secured tax claim

11   could have had in property that might not have had much use in

12   a liquidation, the fabric of the deal above the line where we

13   had to deal with a hundred percent claims led to this overall

14   consensual transaction and we believe that the construct with

15   respect to pre-petition liabilities is entirely consistent with

16   the Bankruptcy Code and should be approved by Your Honor.

17           THE COURT:  Okay.  Under the original -- under the

18   plan that's currently confirmed, these claims -- the secured

19   claims were not cashed out, were they ?

20           MR. BUTLER:  No.  Under the -- well, on the effective

21   date of the plan, the secured claims would have been paid in

22   accordance with their terms.  There was no stretch-out.

23           THE COURT:  Okay.

24           MR. POWLEN:  We understand the Court's very familiar

25   now with our arguments, Your Honor.  We would just simply go

101

1   back to under 1127(b).  It's clearly the debtors' burden to

2   show that circumstances warrant.  It's also their burden to

3   show that our treatment is fair and equitable.  And we would

4   like to be excused, Your Honor, once this aspect of the hearing

5   is closed.

6           THE COURT:  Okay.  I'm still -- there's one issue --

7           MS. KELLEY:  We also just want to reiterate that

8   circumstances aren't warranted under 1127 and we would like to

9   be excused when this portion is over.

10          THE COURT:  Okay.

11          MS. KELLEY:  And even if we do not get twelve percent,

12  we certainly need more than the proposed rate,.  The Treasury

13  rate plus the premium work out to approximately five percent

14  per annum.  Our collateral are car parts in Texas and no

15  reasonable lender in the world would lend on mufflers and

16  transmissions for cars that may or may not be discontinued at

17  that rate.

18          THE COURT:  You don't cite any cases that -- I'm not

19  familiar with cases pre-BAPCPA that impose a BAPCPA type

20  requirement in this context.

21          MR. POWLEN:  I believe that may be the case, Your

22  Honor.  Honestly, I did not come fully briefed on that issue.

23  But we also have the debtors own plan here.  Again the repeat.

24  Their plan, as confirmed, as it sits right now before this

25  Court that it now wants to modify essentially mirrored the

102

1   concepts of the current Code provisions.  Again, that's

2   evidencing this policy that we're referring to, we again

3   respectfully submit that you have provisions in the Code with

4   accept taxing authority, some from the Till analysis just on

5   that basis.

6           THE COURT:  But not the Code, in effect, for this

7   case.

8           MR. POWLEN:  Right.  But again, it's the debtors' own

9   plan that mirrors the Code provisions here -- that are now in

10  effect for cases that get filed currently.  And they're now

11  changing.  They're now changing our treatment to the seven-year

12  stretch-out.  Otherwise, we'd have to get paid on the same time

13  frame as our priority unsecured claims which would make sense

14  since our secured claim obviously has a higher priority in the

15  absolute priority rule.

16          MR. BUTLER:  That just absolutely -- I got to say,

17  Your Honor, the last argument just makes no sense to me.  The

18  debtors -- and, Your Honor, I think the record in this case is

19  very clear.  The debtors have never assumed in this case any of

20  the burdens -- I guess some people think they're benefits but I

21  think they're mostly burdens -- of the amendments in 2005 with

22  respect to a debtor-in-possession.  And there's nothing in our

23  prior disclosure documents, the confirmation or anything else,

24  that imposes or assumes the burdens of the 2005 amendments

25  here.

1          What happened was that case was a case where in that

2     world we lived in when the unsecured creditors were getting

3     something at par plus accrued at a negotiated plan value of

4     north of twelve billion dollars that there was -- the secured

5     creditors across the board, not just taxing authorities, were

6     paid in accordance with their terms at that time.  I think

7     that -- at least, I certainly think the Court's already

8     recognized, but I would urge the Court to recognize based on

9     the uncontroverted testimony in the record from the debtors'

10    witnesses that the debtors have complied with 1127 in changed

11    circumstances.  There are extraordinary changed circumstances

12    in this case.  And I would again point to --

13          THE COURT:  No.  That's okay.  You don't need to do

14    that.

15          MR. BUTLER:  Okay.

16          THE COURT:  That's okay.

17          MS. KELLEY:  If I may, Your Honor, you were asking

18    about pre-BAPCPA cases.  The case we cited to, In re Marfin

19    Ready Mix Corp., 220 B.R. 148, Judge Cyganowski out on Long

20    Island found that tax claims got post-confirmation statutory

21    rate.

22          THE COURT:  No.  But I was focusing on any -- that

23    didn't really address my question which is whether BAPCPA was

24    simply implementing case law that existed before its enactment

25    on its treatment of secured claims, secured tax claims as

1    opposed to the priority claims.  I don't think that that case

2    really addresses that point.

3         All right.  I have two objections to the plan

4    modification motion by taxing authorities, Howard County in

5    Indiana and various Texas taxing authorities leading off with

6    Angelina County and ending with Valley View ISD.  Both

7    objectors raised similar issues although -- and I was just

8    looking through the objections again.  I think one of the

9    issues that was raised in oral argument today wasn't raised in

10   either of the objections.

11        Let me deal with that issue first which is that the

12   modification of the confirmed plan under 1127 to provide for a

13   uniform stretched out treatment of secured and priority tax

14   claims is not justified under the circumstances.

15   (Audio technical problem)

16        -- the Texas counties if you looked at them in

17   isolation.  Given the size of the Howard County tax claims, I

18   doubt that even if one were to look at Howard County in

19   isolation, that would be the case.  But I don't believe that I

20   should look at just the two objectors here in determining

21   whether circumstances warrant.  Instead, I should look at all

22   of the similarly situated creditors because I believe that the

23   circumstances that apply here are the fact that notwithstanding

24   the very adverse condition of the debtors' industry as well as

25   the condition of the capital markets, the debtors have been

105

1  able to negotiate a transaction that apparently will enable

2  them to exit Chapter 11 that involves a significant input of

3  new money and the assumption of liabilities so that the -- by

4  and large, except for the excluded assets, the assets subject

5  to liens including the liens of these two objectors (audio

6  technical problem) -- plant that secures the Howard County's

7  tax lien and the facility subject to the Texas County tax lien,

8  I'm told, although that neither the objection nor the reply

9  specifies the exact collateral will be in facilities acquired

10 by the DIP lender acquirer vehicle.

11         However, it appears clear to me that given the

12 difficulty of achieving those two transactions, neither GM nor

13 the DIP lenders have an open wallet and that their agreement to

14 operate these plants or these facilities is conditioned upon

15 the treatment under the plan of those having liens on them, at

16 least as far as GM is concerned.  And therefore, they're very

17 focused on the amount that would need to be paid in connection

18 therewith.  That also goes for the priority claims that GM is

19 assuming in connection with the Howard County facility.

20         So I believe circumstances do warrant the treatment

21 here of other secured claims and priority claims as differing

22 from the very -- from the treatment under the confirmed plan

23 which was confirmed under very different and far more

24 economically plushy circumstances.  So I believe that this plan

25 modification is warranted under Section 1127.

106

1       That leaves the issue of the appropriate period for

2   the payment of the claims and the appropriate rate to reflect

3   that the claims are being paid over time.  As far as the

4   appropriate period is concerned, I see nothing unreasonable in

5   connection with these objections related to the period that is

6   provided for in the plan.  It's true that Congress amended data

7   to address -- (audio technical problem) -- rate is appropriate

8   and there's no testimony that the collateral will disintegrate

9   or disappear or otherwise be affected sometime before the

10  period expires that the debtors can pick any appropriate

11  period.  And the period here, I believe, is appropriate in the

12  absence of any evidence to the contrary and assuming GM wants

13  the Kokomo plant because it wants to continue making cars there

14  for several years.

15      That leaves the amount of the rate.  And the Court

16  really is directed here to Section 1129(b)(2)(A)(i)(1) and (2)

17  in determining what the appropriate rate is for secured claims

18  that's not paid in full on the confirmation date in a cram down

19  situation.  And I am guided somewhat by Till v. SCS Credit

20  Corporation, 541 U.S. 465 (2004) in determining the proper

21  post-confirmation rate to apply in finding that the deferred

22  cash payments totaled at least the allowed amount of the

23  secured claim with a value as of the effective date of the plan

24  of at least the value of such holder's interest in the estate's

25  interest in the property.

1        The debtors propose a T-bill rate equal to the seven-

2    year payment period plus two percent as a risk factor.  That

3    certainly fits the general guidelines of Till which stated that

4    the Court should apply a formula which entails a

5    straightforward familiar and objective inquiry and minimizes

6    the need for potentially costly additional evidentiary

7    proceedings.  And stated however, in connection with that

8    directive that the Court should consider the state of financial

9    markets, the circumstances of the bankruptcy estate and the

10    characteristics of the loan, in extension of involuntary

11    credit.

12        Both the taxing authorities simply say that their own

13    statutory rate should apply.  However, I believe those

14    statutory rates -- they're little, if any, relationship to the

15    factors that I just outlined.  They don't fluctuate with the

16    economy.  They're fixed.  They apply to all collateral as

17    opposed to the debtors' property that serves as collateral for

18    these taxing authorities.  And they don't take into account

19    that this collateral will be operated by the respective

20    acquirers as a going concern.  And -- unless it's to be sold in

21    which case obviously the lien can be asserted.

22        So under all of those circumstances, it appears to me

23    that absent any additional evidence that the rate chosen across

24    the board by the debtors is appropriate here.  And therefore

25    I'll overrule the objection on that basis.

108

1          MR. POWLEN:  Your Honor, just one matter of

2     clarification.  You'll recall that Howard County also has the

3     unsecured priority --

4          THE COURT:  Well, that I view as -- I mean, I'm not

5     really --

6          MR. POWLEN:  I understand.

7          THE COURT:  There's no rate.  It's just the rate

8     proper under applicable law.  So --

9          MR. POWLEN:  We were seeking your guidance.

10          THE COURT:  And what Mr. Butler said, I think your

11     eight percent is the lowest rate.  Now maybe they'll find

12     another one for Howard County somewhere in the books but --

13          MR. POWLEN:  Fair enough.

14          MR. POWLEN:  Thank you.

15          MR. BUTLER:  Your Honor, can I have just one moment,

16     please?

17          THE COURT:  Yes.

18          MR. POWLEN:  And if we may be excused, Your Honor?

19          THE COURT:  Yes.  Oh, ma'am, I think the microphone

20     didn't pick up your name.  Could you state it again for the

21     transcript?

22          MS. KELLEY:  Eurydice, E-U-R-Y-D-I-C-E, Kelley with an

23     E-Y.

24          THE COURT:  Thank you.

25          MR. BUTLER:  Your Honor, one thing I want, if I can

109

1    bring to the Court's attention 'cause I do want the record to

2    be accurate.  I thought I said this during my argument but I

3    just want to make sure it doesn't change Your Honor's views.

4    With respect to Howard County, Howard County does, in fact --

5    this does reply to Kokomo.  Kokomo is moving under the proposed

6    transaction.  But I thought I'd said, and I want to say it

7    again, that DPH Holdings will retain the Texas tax liabilities.

8           THE COURT:  You did.  And I --

9           MR. BUTLER:  Okay.

10          THE COURT:  And I think I said that, too.

11          MR. BUTLER:  Okay.  I'm sorry.  I thought I heard

12   something different.  That's why I want --

13          THE COURT:  GM's doing Kokomo and the DIP acquirer is

14   doing Texas facilities.

15          MR. BUTLER:  Well, no.  That's why I want to be clear.

16   DPH Holdings Co. is going to be old Delphi as we sit and

17   describe --

18          THE COURT:  Oh, I'm sorry.

19          MR. BUTLER:  -- old Delphi.

20          THE COURT:  Okay.

21          MR. BUTLER:  And new Delphi at the moment is called

22   DIP Co. 3 or something.

23          THE COURT:  Well, in that case, it's --

24          MR. BUTLER:  It's going to get a different name.

25          THE COURT:  -- likely to be sold.

110

1          MR. BUTLER:  That's right.  It is, Your Honor.

2          THE COURT:  So then they can assert their lien

3    probably a lot faster than seven years from now.

4          MR. BUTLER:  That's probably correct, Your Honor.

5          THE COURT:  All right.  I don't think that changes my

6    ruling.

7          MR. BUTLER:  Okay.  I just wanted the record to be

8    clear.

9          THE COURT:  I appreciate that clarification.

10         MR. BUTLER:  Thank you, Your Honor.

11         THE COURT:  Okay.

12         MR. BUTLER:  Thank you.  Your Honor, what I'd like to

13   do now, if I can is, with the Court's permission, is I'd like

14   to address some settlements that have been reached.

15         THE COURT:  Okay.

16         MR. BUTLER:  So those parties can do it.  And then if

17   we can take a lunch break, Your Honor, that would be great.

18         THE COURT:  Okay.

19         MR. BUTLER:  So let me deal with the --

20        (Pause)

21         MR. BUTLER:  Just one moment, please.

22        (Pause)

23         MR. BUTLER:  Okay.  Your Honor, the first one we want

24   to deal with is in the miscellaneous bucket and it deals with

25   the objections filed by various of the former plan investors at

111

1    dockets number 18345, 18347, 18348 18349, 18350, 18675, 18677

2    and 18678.  These objections have been resolved based on an

3    agreement between General Motors Company and the plan investors

4    to language that we would be proposed to include as a new

5    paragraph in the plan modification order that we're working on.

6    And I'll read that section.  It says "Nothing in this order,

7    the modified plan, the MDA documents, or any supporting papers

8    shall (i)foreclose or otherwise prejudice or impair any claims,

9    defenses, or positions that any plan investors (other than

10   Goldman Sachs) (the "Objecting Plan Investors") have or may

11   have in the adversary proceedings number 08-01232 and 08-01233

12   (the "Plan Investor Litigation"), including, without

13   limitation, any alleged right of setoff against any party

14   asserting claims against the objecting plan investors

15   (collectively, the "Potential Defenses"), or (ii)foreclose or

16   otherwise prejudice GM Co and GM buyers' rights to object to

17   any such potential defenses.  This paragraph is not intended

18   to, nor shall it, create any liability in the part of Motors

19   Liquidation Company, GM Co., or the GM buyer with respect to

20   any counterclaims that the Objecting Plan Investors have

21   asserted or may assert in the Plan Investor Litigation against

22   any of the debtors."

23          The debtors agree that the inclusion of this language

24   is appropriate and this, along with my earlier comments on the

25   record at this hearing about not causing any prejudice in the

112

1   factual findings of this hearing and the adversary proceedings

2   resolves, we believe, all the objections.

3            MR. KURTZ:  Good afternoon, Your Honor.

4            THE COURT:  Good afternoon.

5            MR. KURTZ:  Glenn Kurtz of White & Case on behalf of

6   ADHH and AMLP.  I can confirm on behalf of each of the plan

7   investors, other than Goldman Sachs our consent to that

8   stipulation.

9            THE COURT:  Did Goldman Sachs file an objection?

10           MR. KURTZ:  They did not --

11           THE COURT:  Okay.

12           MR. KURTZ:  -- and they haven't been heard one way or

13  the other.

14           THE COURT:  All right.

15           MR. KURTZ:  And I just wanted to be sure that nobody

16  thought that we were authorized to represent anything.

17           THE COURT:  Okay.

18           MR. KURTZ:  I was not here unfortunately when Mr.

19  Butler confirmed the factual findings matter.  We were

20  resolving this with GM.  We had filed an objection.  This was

21  the language that we had suggested.  If there is no objection

22  after I read it then I'll sit.  If there's not, perhaps I can

23  address it.

24           "No statement contained in any of Delphi's

25  declarations or testimony offered in support of the plan

113

1    confirmation shall be used for purposes of supporting or

2    establishing any fact in adversary proceedings 08-01232 and 08-

3    1233 and no finding made by the Court in support of the plan

4    confirmation shall be final, binding or conclusive or be given

5    any weight for purposes of the adversary proceeding.  Nothing

6    in this order shall prejudice or waive the rights of any plan

7    investor to raise or assert any claims, defenses or positions

8    in the adversary proceeding."  And again, I'll clarify --

9            THE COURT:  He said that.

10           MR. KURTZ:  Okay.

11           THE COURT:  But that's fine.  Okay.

12           MR. KURTZ:  Thank you, Judge.

13           THE COURT:  Now, I want to make sure I understand --

14   this is for Mr. Butler.  The -- who acquires the litigation or

15   is it acquired?  I know that some of the proceeds are clearly

16   allocated, what, up to 145 million, is that right?

17           MR. BUTLER:  I just want to be very sure, Your   Honor

18   --

19           THE COURT:  All right.

20           MR. BUTLER:  -- I say this correctly.

21       (Pause)

22           MR. BUTLER:  I just want to be precise, Your Honor.

23   So Article 2.1.3 --

24           THE COURT:  If you want to confirm that after --

25           MR. BUTLER:  Yeah.  I know.  I just wanted to find it.

114

1    It is the GM buyer that obtains the right to any settlement

2    litigation in connection with the plan investor litigation.

3    And it set forth specifically in Article 2 of the MDA.

4        THE COURT:  Okay.  But then there's some -- isn't

5    there some amount that goes somewhere else?

6        UNIDENTIFIED SPEAKER:  That was a relic, Your Honor,

7    of the --

8        THE COURT:  Oh.  All right.

9        UNIDENTIFIED SPEAKER:  -- prior plan.

10       THE COURT:  Very well.  Okay.

11       MR. BUTLER:  May I proceed, Your Honor?

12       THE COURT:  Sure.

13       MR. BUTLER:  Okay.  The other settlements I wanted to

14   place on the record have to do with a sort of bucket number two

15   of objections dealing with the unions and some of the other

16   former employee objections.  And I believe that, if I have this

17   correct, and hopefully counsel will confirm it for me, but I

18   believe that we have a resolution with the UAW, the IUE-CWA and

19   the USW.  With respect to the UAW, the UAW -- I've been asked

20   to state on the record that the UAW CBAs are carved out of the

21   notice and cure procedures with the parties reserving their

22   rights to the extent of any issues.  The -- General Motors

23   and -- who is assuming the UAW contracts and the UAW would

24   rather address those issues between themselves outside of this

25   process.

115

1          THE COURT:  Okay.

2          MR. BUTLER:  I got that right?

3          UNIDENTIFIED SPEAKER:  Yes, you did.

4          THE COURT:  Okay.

5          MR. BUTLER:  That's all I need to say, right, on the

6     record?

7          UNIDENTIFIED SPEAKER:  Excuse me?

8          MR. BUTLER:  That's all I needed to say on the record,

9     right?

10         UNIDENTIFIED SPEAKER:  Yes.

11         THE COURT:  Okay.

12         MR. BUTLER:  With respect, Your Honor, to the IUE-CWA

13    and the USW, I'm advised that those unions agree to withdraw

14    their objections at dockets number 18258, 17793 and 18370 and

15    have confirmed with the buyers that it will assume any -- with

16    the company buyer that it will assume any existing

17    pre-closing --

18         (Audio technical problem)

19         MR. BUTLER:  It will assume any pre-closing

20    obligations under their collective bargaining agreements for,

21    among other things, grievances, accrued benefits including

22    vacation and sick pay, but excluding any obligations under

23    retained plans as that term is defined in Article 2.3.3 of the

24    MDA.  And I'd like Mr. Lefkort on behalf -- or Mr. Abrams on

25    behalf of Willkie Farr to acknowledge that and Mr. Tanenbaum on

116

1    behalf of General Motors if Mr. Tanenbaum is here or Mr. Lemons

2    to acknowledge the fact.  Well, Mr. Lemons is here.  I just

3    need someone from both groups.

4         MR. LEFKORT:  Maurice Lefkort, Willkie Farr &

5    Gallagher, Your Honor.  I think Mr. Butler added, if I may have

6    the paper, some two extra words, "among other things".  It was

7    for grievances and accrued benefits, not among other things.

8    But subject to that --

9         MR. BUTLER:  Well, I'm sorry.  You are assuming that

10   it's like the bargaining agreements, right?

11        MR. LEFKORT:  We are assuming going forward the terms

12   and conditions and we have agreed with them that we will assume

13   the pre-closing grievances and accrued benefits but excluding

14   the retained plans.

15        MR. BUTLER:  Right.

16        MR. LEFKORT:  You added the words "among other

17   things".  That was not part of our agreement with them.

18        MR. BUTLER:  So the debtors are aware, is there

19   anything other than the retained plans that you're not assuming

20   under the CBAs?

21        MR. LEFKORT:  We have expressly agreed to assume those

22   two categories of items.  I am not aware of other items.  It

23   doesn't mean that there aren't other items.

24        THE COURT:  But if you assume the agreement --

25        MR. LEFKORT:  This is my --

117

1           THE COURT:  -- you assume it subject to all of its

2     obligations, right?

3           MR. LEFKORT:  This is my understanding of the

4     settlement that we've reached with the unions.  If that's not

5     acceptable to the unions, I'm happy to discuss it further.

6           THE COURT:  Okay.

7           MR. BUTLER:  I'm sorry.  Let me get Mr. Lemons for GM.

8     Someone needs to speak for GM.

9           MR. LEMONS:  GM was fine with the settlement that was

10    agreed to by company buyers and the IUE.

11          MR. BUTLER:  Okay.

12          MR. LEMONS:  You said Mr. Lefkort --

13          MR. BUTLER:  Can you just say it on the record so they

14    can -- sorry.  But I need the --

15          MR. LEMONS:  Good afternoon.  Robert Lemons from Weil

16    Gotshal & Manges on behalf of the General Motors buyers.  GM

17    was fine with the language that Mr. Butler read as modified by

18    Mr. Lefkort.

19          MS. ROBBINS:  Excuse me.  Could you, for the benefit

20    of the other unions here, read that language again please?

21          MR. BUTLER:  Sure.

22          MR. KENNEDY:  I was just going to do that, Jack --

23          MR. BUTLER:  Okay.

24          THE COURT:  Okay.

25          MR. KENNEDY:  -- since we wrote it.  "The IUE-CWA and

1    USW agree to withdraw their objections, docket number 18258,

2    17793 and 18370, and have confirmed with Buyer that it will

3    assume any existing pre-closing obligations under their

4    collective bargaining agreements for grievances, accrued

5    benefits including vacation and sick pay, but excluding any

6    obligations under 'retained plans' as that term is defined in

7    Section 2.3.3 of the MDA."

8            MS. ROBBINS:  2.3.3?

9            MR. KENNEDY:  Yes.  2.3.3.  And we regard that as

10   being encompassing of the collective bargaining agreements with

11   the exception, of course, of the nonretained plans.  And we

12   agree to it as written.

13           THE COURT:  Okay.

14           MS. ROBBINS:  I apologize.  I heard both retained and

15   nonretained --

16           MR. BUTLER:  Okay.  Well, you know what?  Ms. Robbins,

17   I'm happy to tell you off the record what it is --

18           MR. KURTZ:  Well, I think if it's --

19           MR. BUTLER:  Your union hasn't settled.  And I'm happy

20   to do it with you off the record.

21           MS. ROBBINS:  Mr. Butler, we're talking about the

22   record.  And what I said is that I heard on the record both

23   retained and unretained plans.  And I would think you would

24   want that clear on the record so that the agreement is clear.

25   I'm not talking about us.  I'm talking about understanding

119

1    this.

2            MR. BUTLER:  Judge, do you want us to read it again?

3            THE COURT:  Well, does it say -- just the last part

4    about the plans.

5            MR. BUTLER:  It says "but excluding any obligations

6    under 'retained plans' as that term is defined in Article

7    2.3.3. of the master disposition agreement."

8            THE COURT:  Okay.  That's what I heard, too, I

9    confess.

10           MR. BUTLER:  Mr. Kennedy, will you also confirm   that

11   -- I did not read the docket number for your supplemental

12   objection that was filed last evening under seal.  Would you

13   indicate that's also withdrawn, please?

14           MR. KENNEDY:  Yes, It is.  It was our intent to

15   withdraw all of our pending objections.

16           THE COURT:  Okay.

17           MR. KENNEDY:  I just have one other thing I want to

18   add after Mr. Kolko speaks, Your Honor.

19           MR. KOLKO:  Your Honor, Hanan Kolko of the firm Meyer

20   Suozzi English & Klein on behalf of the USW.  And the agreement

21   that Mr. Kennedy and Mr. Butler both read is accurate and we

22   agree to it.  Thank you.

23           THE COURT:  Okay.  Thank you.

24           MR. KENNEDY:  Your Honor, just as a report to the

25   Court, as you know, we've had many sessions concerning the

120

1   post-retirement health obligations and the pension obligations

2   which have been involved both in this proceeding and others

3   that are payable to IUE-CWA represented employees.  And,

4   obviously, there's been substantial changes in those benefits

5   because of the bankruptcy of General Motors.  Just to report to

6   you that we are in discussions with General Motors about steps

7   to ameliorate the losses that have been sustained.  We're

8   making progress on those but we have not yet completed doing

9   that.  That's essentially in the context of the GM proceeding.

10          THE COURT:  Okay.  Thank you.

11          MS. CECCOTTI:  Good afternoon, Your Honor.  Babette

12  Ceccotti for the UAW.  The UAW filed a limited objection and

13  reservation of rights at number 18279 on the docket.  The

14  subject matter covered by the UAW's limited objection regarding

15  assumption of the UAW labor agreement, is addressed in proposed

16  plan modification order which, I believe, has been identified

17  as Joint Exhibits 9 and 11 in clean and blackline.  I'm not

18  sure which form corresponds to those exhibit numbers.  But in

19  any event, at paragraph 59 of Exhibits 9 and 11, as well as in

20  certain conforming revisions elsewhere in the order that either

21  have been made or are in progress.  The subject matter of the

22  limited objection is also addressed by the statement that Mr.

23  Butler just placed on the record regarding the notice and cure

24  process.

25          Assuming that paragraph 59 and the conforming changes

121

1    are, in fact, included in the modification approval order

2    entered by the Court, and, frankly, we have one other language

3    issue that I'm told we can't finalize now but it's sufficiently

4    discreet for me to be able to stand at this time.  But

5    assuming, I guess, the final form of that aspect of the order

6    is also resolved to our satisfaction and based on Mr. Butler's

7    representation regarding the notice and cure process, subject

8    to all of the foregoing, the UAW is prepared to withdraw its

9    limited objection and to waive to any extent a waiver is

10   required any UAW CBA restriction upon the sale.

11          I would like to just note that this statement is made

12   for the purpose of the current hearing that we're having which

13   is the plan modification hearing.  And although I believe it is

14   clear from my statement if for any reason that motion is not

15   approved and the debtors commence a 363 hearing, we'd obviously

16   have to readjust these issues.

17          THE COURT:  Okay.  Very well.  Thank you.

18          MS. CECCOTTI:  Thank you.

19          MR. BUTLER:  Your Honor, I think this would be an

20   appropriate time to take a lunch break if we could.

21          THE COURT:  There's some movement behind you.

22          MR. BUTLER:  Someone else may disagree with me.

23       (Pause)

24          MR. BUTLER:  Mr. Kelly reminded me of a provision of

25   the master disposition agreement and some of the ancillary

122

1    agreements that might further inform Your Honor the exchange

2    that you had with Mr. Abrams about the relics and the plan

3    investor litigation of what goes where.  Mr. Abrams'

4    statements, I think, were correct that there is no further

5    distribution of plan investor litigation to, if you will,

6    creditors of this estate, either pre-petition or post-petition.

7    But there is a sharing arrangement between the company buyer

8    and the GM buyer regarding that litigation.

9             THE COURT:  Okay.  That's what I was remembering.

10            MR. BUTLER:  And so -- but it's not --

11            THE COURT:  But the --

12            MR. BUTLER:  It's not used --

13            THE COURT:  But the GM buyer is, in effect, getting

14   assigned in a litigation.

15            MR. BUTLER:  Correct.

16            THE COURT:  Okay.

17            MR. BUTLER:  It is, Your Honor.  And there is a

18   sharing provision but it's not -- it's a sharing provision

19   between those entities.

20            THE COURT:  Right.  Okay.

21            MR. BUTLER:  All right.

22            THE COURT:  All right.  So I'll come back in an hour,

23   3:15.

24            MR. BUTLER:  Thank you, Judge.

25            THE COURT:  Thank you.

123

1          (Recess from 2:10 p.m. until 3:22 p.m.)

2          THE COURT:  Please be seated.  Okay, we're back on the

3     record in Delphi Corporation.

4          MR. BUTLER:  Good afternoon, Your Honor.  Jack Butler

5     again for the debtors, for the continuation of our plan

6     modification hearing.  Your Honor, prior to commencing this

7     next phase of the hearing to deal with remaining objections,

8     what I'd like to do is just do a little bit of checking to make

9     sure that I understand what's still at issue from objectors.

10    And our plan, Your Honor, would be to proceed in the following

11    order this afternoon after doing that.  I would first bring on

12    for determination by Your Honor, pursuant to Article 7.17(c) of

13    the modified plan, approval of the Delphi-PBGC settlement

14    agreement.  There are elements of the objections filed by the

15    three remaining unions that have not withdrawn their objections

16    that go to the PBGC settlement.  In addition, there are --

17    Charles Cunningham and Dennis Block have filed an objection

18    along with the Delphi Salaried Retirees Association at docket

19    number 18277.  DSRA has withdrawn that objection as it pertains

20    to the association, but it's still maintained by Mr. Block and

21    Mr. Cunningham.  Mr. Block and Mr. Cunningham -- there is an

22    objection of fiduciary counselors at 18282, and there's an

23    objection of Mr. Paul Dobosz, D-O-B-O-S-Z, at docket number

24    18458, which raises certain jurisdictional matters, all of

25    which would go, I think, to the PBGC settlement.  So in a

124

1    moment I'm going to ask whether counsel for those parties or

2    the parties themselves are prepared to press those objections

3    so I understand who's -- how we're going to be dealing with the

4    PBGC settlement.

5           Following the PBGC settlement motion, we would propose

6    to then take up the remaining objections of the unions, of the

7    three unions, that are not resolved and that don't go to the

8    PBGC settlement issues; followed by the objection of James

9    Sumpter, docket number 18366, as it relates to COBRA; followed

10   by the objections of Gary Cook and Cheryl Carter at dockets

11   number 18002 and 17951.  And I think those are the only

12   objections that haven't otherwise been resolved.

13          So one of my questions is, and I'm going to ask about

14   these individuals as well, and these entities, but other than

15   ones I have just described, the three remaining unions, James

16   Sumpter, Mr. Black and Mr. Cunningham, fiduciary counsels

17   Mr. Dobosz, Mr. Cook, Ms. Carter, and of course subsumed within

18   this PBGC discussion will also be the letter objections filed

19   by the pensioners as well, but other than those, I'd ask if

20   anyone in the courtroom is planning to prosecute any objection

21   to the plan modification motion.  If you are planning to do so,

22   would you please stand and identify yourself?

23          UNIDENTIFIED SPEAKER:  Stand over there.

24          MR. BUTLER:  Oh, yeah, excuse me.  Thank you.

25          That would be -- there are a couple others, I'm sorry,

125

1    I should have mentioned.  We've got to deal with American

2    Aikoku at docket number 18277 that we'll have to deal with.

3    And I think there's also -- let me just ask if there's anyone

4    else.

5            Yes?

6            MS. REED:  We have a stipulation resolving an

7    objection put on the record with Ace Companies.

8            MR. BUTLER:  With Ace, yeah.  I understand that that's

9    resolved.

10           MS. REED :  Correct.

11           MR. BUTLER:  Right.  Anyone else?

12           Okay.  Then let me just quickly look through these

13   objections.  I know that Ms. Mehlsack and Ms. Robbins are here

14   for the three unions and prepared to proceed.

15           Is Mr. Sumpter here and prepared to proceed with his

16   objection, or counsel for Mr. Sumpter here?

17           MR. SUMPTER:  I'm on the phone call --

18           MR. BUTLER:  Okay.  Thank you, sir.

19           MR. SUMPTER:  -- CourtCall.

20           MR. BUTLER:  Thank you, sir.  Is -- are Mr. Black and

21   Mr. Cunningham here and prepared to proceed with respect to

22   their objection of counsel?

23           UNIDENTIFIED SPEAKER:  They are here and represented

24   by counsel.

25           MR. BUTLER:  And counsel is, please?

126

1          UNIDENTIFIED SPEAKER:  Morrison Cohen and Miller &

2     Chevalier.

3          MR. BUTLER:  Thank you.

4          Fiduciary counselors, are you proceeding with your

5     objection?

6          UNIDENTIFIED SPEAKER:  Yes.

7          MR. BUTLER:  Thank you.  And Mr. Dobosz, D-O-B-O-S-Z?

8     Mr. Dobosz or counsel for Mr. Dobosz present?  Is Mr. Dobosz

9     present on CourtCall?

10         Your Honor, Mr. Dobosz's objection is summarized at

11    objection number 14 on the summary of objections by nature of

12    objection on page 7.  And it's an assertion that the bankruptcy

13    court lacks jurisdiction, and phrasing it in his words, "to

14    direct or approve a sale or forfeiture of assets allegedly

15    belonging to the beneficiaries of a vested pension plan, and

16    the termination of a vested defined benefit pension plan is a

17    violation of ERISA".  We filed our response to that, but if

18    Mr. Dobosz is not here and prepared to assert his objection,

19    I'd ask that it be overruled for lack of prosecution.

20         THE COURT:  Well, it raises a jurisdictional point,

21    which I'll address, notwithstanding his not being present.

22    What you are asking me to approve is a settlement agreement

23    between the debtors and the PBGC.  And, I believe, under

24    Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, I

25    clearly have jurisdiction to consider the propriety of the

127

1    debtors' entry into that settlement agreement.  This issue was

2    addressed -- this issue of conflicting jurisdiction allegedly

3    was addressed by the Seventh Circuit in In re UAL Corporation,

4    428 F.3d 677 at 681 (7th Cir. 2005) which reached the same

5    conclusion.  So I would overrule that objection and find that I

6    have jurisdiction to consider the debtors' request for approval

7    of entry into the PBGC settlement agreement.

8           MR. BUTLER:  Thank you, Your Honor.  Your Honor, just

9    for efficiency and the record, I heard counsel for Ace indicate

10   they had a settlement they wanted to put on the record.  I

11   don't want them to have to stay through a further contested

12   hearing if --

13          Are we ready for that?

14          THE COURT:  Counsel for Ace?

15          UNIDENTIFIED SPEAKER:  I'm sorry.

16          THE COURT:  We're going to put your settlement on the

17   record.

18          MR. BUTLER:  Are we ready for that?  Is there --

19          UNIDENTIFIED SPEAKER:  Shall I get Mr. Wharton?

20          MR. BUTLER:  Yes, I think, if we're ready for it.  I

21   didn't realize we were putting it on the record, but if we are,

22   that's fine.

23          While we're doing that, Your Honor, let me just try

24   and address a couple of other -- let me just address a couple

25   of other issues, Your Honor, while I'm waiting to do that.

128

1          Your Honor, there are a series of objections that

2    Toyota Motor Corporation and affiliates filed in connection

3    with the assignment of their contracts or dealing with them as

4    customers, at dockets number 18271, 18484, 18485 and 18486.

5    And I was asked to confirm on the record that, to the extent

6    they're not already resolved, those objections would be

7    adjourned to the August 17th hearing, subject to further

8    objection in accordance with the mechanisms that I've

9    previously placed on the record on how we're going to be

10   dealing with executory contracts.

11         THE COURT:  Okay.  All right, I think counsel for Ace

12   is behind you.

13         MR. BUTLER:  So that takes care of Toyota.

14         MS. REED:  Good afternoon, Your Honor.  Margery Reed

15   with Duane Morris.  I represent the ACE Companies.  And I'm

16   pleased to report we do have a settlement as to our plan

17   objection.  The settlement does preserve our objection to the

18   assignment of a ACE's policies and insurance agreements, which

19   will be heard at a later date.

20         In essence, Your Honor, the settlement preserves the

21   prior agreement with the debtors that the ACE Companies' claims

22   arising under their policies, both the assumed policies as well

23   as the post-petition policies and agreements, will flow through

24   as administrative expense claims that are allowed under the

25   modified plan and will be paid in the ordinary course either by

129

1   the debtors, the reorganized debtors or the buyers if the

2   policies and agreements are assigned to the buyers.

3          THE COURT:  Okay.

4          MS. REED:  There are some other provisions in the

5   stipulation, but that's the gist of it.  And we are in

6   agreement on the wording and have signed off on it and will be

7   submitting it to chambers today for Your Honor to approve and

8   enter it as an order.

9          THE COURT:  Okay.

10         Is that correct?

11         MS. REED:  Thank you.

12         THE COURT:  On the debtors' behalf, is that correct?

13         MR. BUTLER:  Yes, Your Honor, subject to the terms of

14  the stipulation that have been agreed to --

15         THE COURT:  All right.

16         MR. BUTLER:  -- and as it will be submitted to

17  chambers.

18         THE COURT:  Okay, that's fine.  Thank you.

19         MS. REED:  Thank you.

20         MR. BUTLER:  Your Honor, that was docket number 18216,

21  the ACE matter.

22         THE COURT:  Okay.

23         MR. BUTLER:  I guess I'd also like to find out if

24  either Mr. Cook or Ms. Carter are here with respect to dockets

25  number 18002 or 17951.

130

1        Let me just briefly address that, Your Honor.  One

2    moment, please.

3        THE COURT:  Okay.

4    (Pause)

5        MR. BUTLER:  Your Honor, these objections are

6    summarized -- no, not ACE, sorry.  One second.

7        Not ACE.  There they are.

8        Your Honor, they're described on page 30 of the

9    summary of objections that was provided to the Court

10   previously.  This is -- Mr. Cook and Ms. Carter objected to the

11   treatment of individual workers' compensation claims asserted

12   in the amounts of 311,850 million, plus interest.  Mr. Cook

13   argues his claim can't be modified under the modified plan

14   because it would violate a 2003 order issued by the Michigan

15   Department of Consumer Industry Services Bureau of the Workers'

16   Disability Compensation Board of Magistrates.

17       Our response, as we indicated, is that the plan does

18   not alter the debtors' injured employees' ability to seek

19   workers' compensation payments.  Those workers who would timely

20   file the claim will be entitled to a distribution under the

21   modified plan in accordance with the priority scheme under

22   Section 507 of the Bankruptcy Code.  To the extent that claim

23   has not already been paid following the petition date, pursuant

24   to the claims adjudication process, Your Honor's already

25   authorized in these cases.  To the extent that an individual

1    claim was not timely filed, that workers' compensation claim is

2    already barred by the bar date order entered by this Court.

3         Your Honor has dealt with Ms. Carter's claims on prior

4    occasions.  This is the latest, I guess, version of that claim.

5    But it's similar to the prior claims that had been dealt with

6    in the claims administration track.

7         And, Your Honor, as it relates to the plan

8    modification motion and hearing, we'd ask that Your Honor

9    overrule these objections.

10        THE COURT:  All right, well, and the debtors are

11   representing that Mr. Cook's claim was dealt with in connection

12   with the thirty-fourth omnibus claim objection and is now --

13        MR. BUTLER:  Yes, Your Honor.

14        THE COURT:  -- now allowed at zero dollars?

15        MR. BUTLER:  Right.  Mr. Cook's claim -- both of these

16   have been dealt with in the past.  Mr. Cook filed a proof of

17   claim at number 5408; it was modified in the debtors' thirty-

18   fourth omnibus claims objection from an unliquidated claim to a

19   general unsecured claim in the amount of zero.  And

20   Ms. Carter's proof of claim, 17951, was objected to on the

21   thirty-fourth omnibus claims objection.  She filed a response,

22   and the hearing on that objection has been adjourned under the

23   claims objection procedures authorized by this Court in the

24   earlier claims track procedures.

25        THE COURT:  Okay.  Well, again, I have serious

132

1    questions as to Mr. Cook's standing given the treatment of his

2    claim which was allowed at zero dollars.  But to the extent he

3    does have standing, and with regard to Ms. Carter's objection,

4    I overrule those objections for the same reasons that, assuming

5    for the moment that the Michigan agency had a claim, I

6    overruled the Michigan agency's objections, which is that the

7    objections are premised upon payment in full of the claims as

8    opposed to treatment of the claims under the Bankruptcy Code's

9    priority scheme, which I believe the plan follows.

10           So those two objections are overruled.

11           MR. BUTLER:  Thank you, Your Honor.  Your Honor, I'd

12   like now, I think, to turn to the PBGC settlement and the

13   various objections that are either directly or indirectly

14   related to that settlement.  The PBGC settlement has been filed

15   publicly in a series of public docket numbers and is also in

16   the trial exhibits.  The actual Delphi-PBGC settlement

17   agreement was filed at docket number 18559; it's Joint Trial

18   Exhibit 131.  It had two exhibits to it:  One was a true-up

19   agreement that the PBGC agreement required be entered into to

20   true up some of the prior transfers between Delphi and General

21   Motors.  That was filed at docket number 18682 and is Joint

22   Trial Exhibit 132A; that was Exhibit A to the Delphi-PBGC

23   settlement agreement.  And Exhibit B to the Delphi-PBGC

24   settlement agreement is the settlement separate agreement

25   between -- it's called a waiver and release agreement -- that

133

1    has been entered into by General Motors Company, Motors

2    Liquidation Company and PBGC.  Delphi's not a party to that.

3         We did condition moving forward with the settlement on

4    the public disclosure of that agreement as part of the

5    settlement proceeding.  And it's set forth as Exhibit B.  It

6    was filed as docket number 18657 and is Joint Trial Exhibit

7    132B.

8         As indicated, Your Honor, under our prior -- our plan

9    modification motion as supplemented, and pursuant to Article

10   7.17C of the modified plan, we are asking -- and the modified

11   plan constitutes our request to authorize and approve the

12   Delphi-PBGC settlement agreement pursuant to Section 1123(b)(3)

13   of the Bankruptcy Code and Bankruptcy Rule 9019.

14        Delphi and PBGC executed the settlement agreement on

15   July 21, 2009, and the debtors filed the notice of that filing

16   later that day.  That included the Delphi-PBGC settlement

17   agreement.  This agreement addresses the PBGC's claims in this

18   case, releases by PBGC needed to effectuate the master

19   disposition agreement and the potential involuntary termination

20   of the Delphi pension plans, including the Delphi HRP.

21        While the debtors were negotiating the original master

22   disposition agreement, which has now been designated the

23   alternative transaction, Delphi anticipated that GM would

24   address the Delphi HRP and believed that that meant that GM

25   would assume that obligation, although it understood that GM

134

1    was not expressly obligated to do so.

2         And I should emphasize on this record, Your Honor,

3    that the commitment that GM had undertaken to assume the second

4    transfer of the 4140, under the prior global settlement

5    agreement and master restructuring agreement Your Honor

6    approved last September, had a series of conditions in it.

7    Those conditions were not met when that -- based on events

8    subsequent that Your Honor's all too familiar with in terms of

9    what happened in the capital markets and in the automotive

10   sector, and the inability of Delphi to satisfy those

11   conditions.

12        So it is not the case that GM had a contractual

13   undertaking that they could be, if you will, forced to take the

14   second half of the 4140, although it was, at the time we made

15   our disclosures in late May/early June, at least the debtors'

16   understanding that that's what likely "addressed" meant. Your

17   Honor may recall, however, that you asked me those questions at

18   an earlier hearing back on June 10th when you approved the

19   supplement to the disclosure statement, and I was, I think,

20   candid with you that I did not know what "addressed" actually

21   meant.  And we actually amended the supplement to say that we

22   didn't know what "addressed" actually meant but that we would

23   find out and we would disclose that.

24        But what was clear, what we meant in our earlier

25   disclosure, was that it was clear Delphi, the debtors, would

1    have absolutely no obligation for the HRP when the transaction

2    that was then contemplated, the June 1st transaction, was

3    complete.  And we made it very clear in our announcements at

4    that time -- both the June 1st and again in the supplement that

5    Your Honor approved, and it was entered in the docket on June

6    16th and ultimately pursuant to which we re-solicited

7    acceptances, rejections of the modifications of the plan under

8    1127 -- that agreement and that disclosure made it clear that

9    this company, the debtors, had no financial wherewithal to be

10   able to continue to fund any of the defined benefit plans and

11   made it very clear that the company buyer had absolutely no

12   intention of assuming in any way, directly or indirectly, any

13   of the obligations associated with the defined benefit plans.

14   And it said that GM had no obligation to assume of the other

15   plans either -- although it would address the Delphi HRP.

16        When those -- as negotiations progressed -- and by the

17   way, there was one other, I think, not insignificant event,

18   which is, as we made those disclosures on or about June 1st,

19   General Motors -- the Old General Motors Corporation filed

20   Chapter 11.  They eventually sold their assets to the New

21   General Motors Company, Motors Liquidation Corporation or

22   Company -- I guess it's Corporation -- remains a debtor here in

23   the Southern District, and is addressing various liabilities

24   that it had.  And there's nothing with respect to the Delphi

25   HRP that in any way implicates General Motors Company, the new

136

1    entity, NewGM, and there was no obligation -- contractual

2    obligation with Delphi Corporation that Motors Liquidation

3    Company -- that would be enforceable against Motors Liquidation

4    Company as a result of Delphi's inability to meet the

5    conditions under the prior global settlement agreement and

6    master restructuring agreement.

7         Nonetheless, discussions ensued between Delphi and the

8    PBGC.  And ultimately a separate path of discussions ensued

9    between General Motors -- the two General Motors entities and

10   PBGC about what the effects on these various companies might be

11   in the event that PBGC took action based on all of the public

12   statements that had been made by both companies, both by

13   Delphi, that we had no longer had the financial wherewithal to

14   support these plans, and by General Motors, both Motors

15   Liquidation and General Motors Company, that they did not

16   intend to effectuate any further transfers of these assets.

17        And it was as a result of those discussions, and why

18   they were bilateral and not trilateral, we believed it was

19   important and we appreciated GM's willingness to acquiesce to

20   our request that their agreements be disclosed immediately in

21   these cases.  And we did so.

22        Once we learned of those events, the debtors made

23   additional public disclosure of that in a press release that

24   was released on July 21st of this year in which we announced,

25   among other things, that the U.S. hourly pension plan would not

137

1    be assumed by GM on the Delphi and PBGC-reached settlement on

2    the PBGC claims as they related to Delphi's estates.

3         We did not make -- we commented on what we believed

4    would ultimately be a settlement between GM and PBGC, and I

5    believe that GM issued a separate statement, but that agreement

6    wasn't completed until very recently and it was filed when it

7    was executed.

8         Your Honor, I think it is important, because I know

9    people have tried very hard to characterize this in ways that

10   the debtors believe are completely inappropriate, but Delphi,

11   in the discussions we had with PBGC, were very familiar with

12   the law, very familiar with In re UAL Corporation and the

13   decisions made in the Sixth Circuit with respect to these

14   matters, and approached these discussions at all time with an

15   understanding that PBGC would have to make its own independent

16   assessments of what it was going to do.  And the PBGC

17   settlement agreement between Delphi only addresses what would

18   happen in the event that PBGC made those determinations.

19        Obviously, there is a statement in here that provides

20   in our agreement -- that provides that in the event this Court,

21   in connection with this hearing, made a determination, which we

22   believe Your Honor should make, that under the United decision,

23   among others, but particularly relying on United, that PBGC's

24   unilateral decision to proceed with an involuntary termination

25   of the Delphi HRP is not in any way an abrogation by Delphi of

138

1    any of its collective bargaining agreements and, therefore, are

2    prepared -- the Court is prepared to make the findings that

3    we've requested in the plan modification order to that effect.

4         There is our provisions of the PBGC-Delphi settlement

5    agreement that would take into account the steps to be taken

6    after that fact.  Specifically, Your Honor, Section 3(B)(i) of

7    the Delphi-PBGC settlement agreement provides that if PBGC

8    decides to proceed with an involuntary termination of the

9    Delphi HRP, Delphi will consent to a termination and

10   trusteeship agreement, pursuant to Section 4042 of ERISA, only

11   if the Court finds that doing so does not violate either the

12   labor MOUs or the Court's orders approving the 1113/1114

13   settlement approval orders earlier in these cases.

14        To my knowledge, the only unions that are pursuing

15   objections now with respect to these matters are the three

16   remaining unions:  the IAM IBEW and the IOUE.

17        Now, I'm sorry, I get the letters wrong when I say it.

18   I think I got to correct it.

19        Those three unions may have comments to this

20   agreement.

21        In addition, Your Honor, there are a series of other

22   parties including pensioners, who've written letters, who

23   objected to the settlement agreement.  I believe the settlement

24   agreement and the benefits of the settlement agreement speak

25   for themselves.  We put them in our papers and I'm prepared to

139

1    address them at length in any response to the objections.  But

2    I think that's -- if it's all right with the Court, I think, is

3    a sufficient introduction to this matter.  And I then would ask

4    any objectors to the settlement to raise their objections,

5    unless Your Honor has questions of me.

6           THE COURT:  The form of voluntary termination and

7    trusteeship agreement --

8           MR. BUTLER:  Yes?

9           THE COURT:  -- that appears to me to be sort of a

10   standard form.  Is there anything --

11          MR. BUTLER:  Your Honor, you're speaking as to the

12   agreement for appointment --

13          THE COURT:  This is Exhibit C?

14          MR. BUTLER:  Right.  Correct.  It is very much --

15          THE COURT:  It has blanks for the sponsors.  This --

16          MR. BUTLER:  Yes.

17          THE COURT:  Could you give any background on the

18   origin of this form?

19          MR. BUTLER:  Your Honor, this is, I believe, a

20   standard form that would be used in the event that --

21   Ms. Hassel's here with me in the court, who's actually spent

22   more time on it than I have.  And I don't know if you want to

23   address the Court's point.

24          MS. HASSEL:  Your Honor, Lonie Hassel, Groom Law

25   Group, for Delphi.  This is a standard form that PBGC uses in

140

1    virtually all its terminations by agreement.  The names are

2    changed, obviously; the dates change.  But it's a very short

3    and simple document.

4              THE COURT:  Okay.  Thank you.

5              MR. BUTLER:  So, Your Honor, in terms of introduction,

6    I think I will stop there, unless the Court has other questions

7    of me, and ask the objectors to present their objections.

8              THE COURT:  Okay.

9              MS. MIEHLSACK:  Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.

11             MS. MIEHLSACK:  Barbara Miehlsack for the operating

12   engineers Locals 18S, 101S and 832S.  And I'm here jointly with

13   Marianne Robbins who's representing the International

14   Brotherhood of Electrical Workers and the International

15   Association of Machinists and their district lodges and locals,

16   all collectively representatives of participants in the Delphi

17   HRP.

18             And we will be appearing jointly.  We've divided up

19   the issues that we have.  I will address, Your Honor, primarily

20   the settlement agreement and Exhibit B to the settlement

21   agreement and how it conflicts with the Employee Retirement

22   Income Security Act, and particularly Title IV of the Act.  And

23   Ms. Robbins will address the issues that are raised by the

24   agreement on the plan in connection with the MOUs that were

25   entered into by the unions and approved of by Your Honor, as

1    well as the implementation agreement.

2         Your Honor, collectively the three unions represent a

3    sum total of 120 participants in the Delphi HRP.  They are both

4    active employees, retirees and to-be retired employees.  The

5    active employees actually are currently employees at the

6    Rochester facility, which is one of the UAW keep sites that

7    will be acquired by General Motors, and those employees will be

8    working side by side with UAW employees will be provided

9    substantially different benefits than the operating engineer

10   represented employees.

11        In addition, all of the participants of the HRP who

12   are represented by the three unions are the same individuals

13   who've been affected by General Motors' determination not to

14   provide post-retirement health insurance and life insurance

15   under the terms of the term sheets and implementation

16   agreements that Your Honor approved in this case.

17        MS. MEHLSACK:  As a result, Your Honor, those

18   employees are suffering not just devastating cuts, likely

19   devastating cuts in their pension benefits, when the PBGC

20   terminates the plan, but in addition to that, substantial

21   reductions in their health insurance and their life insurance

22   and increases in the cost to them and their beneficiaries of

23   providing health insurance.  As a result of what we -- we have

24   asked, Your Honor, both Delphi and the PBGC under Title IV of

25   ERISA which governs the -- which is the plan termination

142

1    provisions of ERISA, we've asked both Delphi and the PBGC to

2    provide us with information.  The PBGC is obligated to provide

3    the administrative record of its termination decision and

4    Delphi is obligated to provide information that it provided the

5    PBGC in connection with the termination decision.  Delphi was

6    very cooperative, and last night, provided us with a

7    substantial amount of information that we've not had a chance

8    to digest yet.  The PBGC has fifteen days from the date of our

9    request to provide us with information.  So that we don't know,

10   Your Honor, the extent to which a PBGC termination will reduce

11   nonguaranteed benefits.  We are fairly certain, Your Honor,

12   that what's called the early retirement supplement in the plan

13   which persists until age sixty-two and results in, depending on

14   how many years of service the individual has, could result in

15   an individual maintaining a 3000 dollar a month benefit until

16   age sixty-two, and eligibility for Social Security.  That

17   benefit will go so that putting the best face on it, Your

18   Honor, a participant who has had a substantial number of years

19   of service in the Delphi plan and is earning an average benefit

20   of about 1600 dollars a month will end up, because of the

21   changes to the GM healthcare plan, paying close to if not more

22   than fifty percent, as the retirement benefit goes down, the

23   likelihood that that participant will be paying more than fifty

24   percent of their annual retirement benefit out of pocket for

25   healthcare until GM picks up any costs.  That's because the

143

1    healthcare befit that is going to be provided by GM required

2    7000 dollars out of pocket for a family participant.  So that

3    what we're looking at, Your Honor, is a devastating impact on

4    the 120 individuals who are represented by the three unions and

5    participants in the HRP.

6           You heard Mr. Kennedy say, earlier, that GM is in the

7    process of negotiating with the IUE to ameliorate the effects

8    of those two changes, the diminution in healthcare benefits and

9    the reduction in pension benefits that will come about as a

10   result of a termination.  No one, Your Honor, is negotiating

11   with the three splinter unions:  the IUOE, the IBW, and the

12   IAM.  And Ms. Robbins will address the fundamental inequities

13   of the structure that's been proposed by the plan, the MDA, and

14   the settlement agreement and Exhibit B of the settlement

15   agreement in violation of what we believe were the promises of

16   equitable treatment to all participants in the HRP under the

17   MOUs.

18          What I'm going to address, Your Honor, is the fact

19   that we believe there are irreconcilable conflicts between the

20   settlement agreement and Exhibit B of the settlement agreement

21   and certain provisions of Title IV of ERISA, provisions that

22   were not addressed, Your Honor, by the United Airlines case

23   because they didn't, apparently, come into play in the United

24   Airlines case.

25          Mr. Butler said, interestingly enough, that Exhibit B

144

1    is not an agreement with Delphi.  It's an agreement between the

2    PBGC and GM New -- both New and Old GM.  However, Exhibit B

3    provides for releases from the PBGC to Delphi, the Delphi group

4    and to all of the purchasers, not just the GM purchasers.  And

5    we believe those releases are simply irreconcilable with Title

6    IV.  And with all due respect, Your Honor, we do not believe

7    that you can grant the relief that's requested by Delphi today,

8    because if you do, you will disturb what the district court

9    called in the flight attendants' case in United Airlines a

10   finely tuned balance that Title IV affects between the aim to

11   protect employees' benefits and the aim to preserve employer

12   assets.  We don't think, Your Honor, that you can approve this

13   settlement without affecting that delicate balance in a way

14   that seriously undermines, if not totally impedes, the rights

15   of the unions and participants in the plan, and effectively the

16   rights of the PBGC under two provisions of Title IV.  Those

17   provisions, Your Honor, are Section 13 -- it's Act Section 4003

18   29 U.S.C 1303 and Act Section 4047, it's 29 U.S.C. 1347.

19         Your Honor, the United Airlines case, United Airlines

20   said to the flight attendants that -- the Court said a

21   settlement between the PBGC and United Airlines didn't violate

22   the voluntary termination provisions of Title IV.  Those are

23   the provisions of Title IV that require adherence to a

24   collective bargaining agreement.  And what the Court said is

25   first of all, nothing in this agreement mandates that the PBGC

145

1    terminate the plan, and so there's no violation.  And the

2    flight attendants had their rights under Section 1303

3    preserved.  Section 1303 provides that a participant in the

4    plan or a union representing participants in a plan may sue the

5    PBGC for equitable relief if the participant is adversely

6    affected by conduct of the PBGC or if the union is represented

7    in connection with its collective bargaining rights as a result

8    of the adverse effect on the participants.

9          Your Honor, we believe that the plan itself, the MDA

10   that provides that Delphi will have no obligation after the

11   closing, no obligation whatsoever in connection with the

12   plan -- not just no funding obligation but no obligation -- in

13   combination with the settlement agreement which implements,

14   which is, as Mr. Butler has acknowledged, as everybody has

15   acknowledged, once GM refused to accept responsibility for the

16   Delphi HRP, the implementing mechanism for relieving Delphi of

17   the responsibility is the agreement with the PBGC and the, we

18   believe, also, especially important are the waiver and release

19   provisions contained in Exhibit B, even though Mr. Butler says

20   Delphi's not a party to Exhibit B.  We --

21         THE COURT:  How does any of this violate 1303?

22         MS. MEHLSACK:  Under 1303, Your Honor, you can get

23   equitable relief, the kind of --

24         THE COURT:  As against the PBGC?

25         MS. MEHLSACK:  As against the PBGC, the kind of

146

1    equitable relief, for example, is the right to have the PBGC to

2    restore a plan.

3            THE COURT:  Okay, but how does this violate 1303?

4            MS. MEHLSACK:  The settlement provides that the PBGC

5    releases Delphi from any obligation founded on any conceivable

6    theory, legal or equitable.  What the effect of this would be,

7    Your Honor, is if we had a basis for going in and saying to the

8    PBGC you have to restore this plan, arguably Delphi can turn

9    around and say PBGC, you can't restore this plan and you can't

10   restore the plan because the settlement agreement, the waiver

11   and release provision specifically says you may not -- you may

12   not on any legal or equitable theory, impose any kind of

13   liability on Delphi for this plan.

14           THE COURT:  The Second Circuit in Revco said that the

15   bankruptcy court reviews the settlement agreement from the

16   perspective of the debtor and its creditors, not from the

17   perspective of the other party and its creditors.  So why do I

18   even look at the PBGC?

19           MS. MEHLSACK:  Because the debtor is here asking you,

20   Your Honor, to approve an agreement that effectively -- why is

21   the debtor asking you to approve this agreement?

22           THE COURT:  Because it's a good deal for the debtor.

23   That's why they're asking me.  That's what they're telling me,

24   and that's what the Second Circuit and the Revco matter

25   involving the settlement with Sphinx said I should look at and

147

1    nothing else.

2              MS. MEHLSACK:  But the -- but Your Honor --

3              THE COURT:  To determine whether it is a good

4    agreement or not to the debtor.

5              MS. MEHLSACK:  -- this is a proposal that impedes --

6    the Court also said in UAL that looking -- you need to look at

7    ERISA, as well.  The bankruptcy at Code does not supersede

8    Title IV of ERISA.  And in fact --

9              THE COURT:  Does anything in this agreement do that?

10             MS. MEHLSACK:  Yes, Your Honor, it supersedes Section

11   4047.  What the United Court said was there's nothing wrong

12   with this agreement because the PBGC under 4067 has the right

13   to give up claims, pre-termination claims against the debtor.

14   There's absolutely nothing in 4047 that gives the PBGC the

15   right to waive its right to restore a plan.

16             THE COURT:  But I'm not authorizing the PBGC to enter

17   into this agreement.  The PBGC is already entered into it.  I'm

18   authorizing the debtor to enter into it and perform this

19   agreement.

20             MS. MEHLSACK:  But you're giving this agreement your

21   imprimatur, Your Honor, the bankruptcy court's imprimatur.

22             THE COURT:  As far as the law permits, which is,

23   again, from the debtors' perspective.

24             MS. MEHLSACK:  Your Honor, what we believe is you

25   can't approve the other terms of this agreement.  If Delphi is

148

1    prepared to go ahead with this transaction and GM is prepared

2    to go ahead with this transaction, without your approval for

3    those released in Exhibit B, then that's a decision that the

4    debtor has to make.  But what we're saying, Your Honor, is the

5    debtor has chosen to present that -- put that agreement before

6    you and is asking for your approval of the agreement.  We don't

7    think you can approve the agreement without creating a

8    structure that violates Title IV.  If you're saying I don't

9    have to approve that agreement and Delphi and GM are prepared

10   to go ahead with these transactions without that agreement,

11   then we're in a different transaction, Your Honor.  Our concern

12   --

13           THE COURT:  How does this agreement violate 1347?

14           MS. MEHLSACK:  If you look at Exhibit B, Your Honor,

15   to the settlement agreement at page 5, it says "release of

16   claims relating to pension plan termination" and it provides

17   the Delphi releasees, GMC, Old GM, all of the purchasers, and

18   going on, it's at subsection B, if you read down to the bottom,

19   toward the bottom of the page, "from any and all disputes,

20   controversies, suits, actions, judgments, liabilities,

21   obligations of any kind whatsoever upon any legal or equitable

22   theory, whether known or unknown that PBGC ever had, now has,

23   or hereafter can, shall, or may have from the beginning of

24   time, by reason of any matter, cause, or thing, whatever

25   relating to all pension plans that have terminated".  What

149

1    effectively this does, Your Honor, is -- and let me back up

2    because the Second Circuit --

3          THE COURT:  So this is a release by the PBGC --

4          MS. MEHLSACK:  To Delphi.

5          THE COURT:  -- of those parties.

6          MS. MEHLSACK:  That's right.

7          THE COURT:  Okay.

8          MS. MEHLSACK:  And what it says is, we, the PBGC,

9    can't come in and say to you, Delphi, we're going to restore

10   your plans.  And it means that we, the unions -- in effect, it

11   does what United said -- what the Court in United said that

12   agreement didn't do.  It does mandate the PBGC to maintain the

13   plan as a terminated plan even though the PBGC might find that

14   there were reasons to restore the plan.  And what it also does,

15   Your Honor, the Second Circuit, when it was considering the LTV

16   settlement found that the -- and this is PBGC v. LTV, 824 F.2nd

17   197, and the Court was considering the due process rights of

18   the participants and it made three points.  It said first of

19   all, the participants -- as to why the termination in LTV did

20   not violate the rights of the participants.  It said the

21   participants are free to make -- file claims against LTV for

22   not continuing the plan.  It's the position of the debtor that

23   we are not free to file claims against Delphi for their not

24   continuing the plan.

25         THE COURT:  Delphi or -- I'm sorry.

150

1          MS. MEHLSACK:  The Second Circuit said the

2     participants are free to file claims against LTV for not

3     continuing the plan.

4          THE COURT:  Okay, right.

5          MS. MEHLSACK:  The participants have their rights,

6     under a 1303 action, that was the second point.  And the third

7     point was the PBGC can always restore the plan under 4047.  We

8     don't have any of those protections, Your Honor.  It's the

9     position of Delphi we have no right to claims against Delphi

10    for not continuing the plan.  It's their position under -- and

11    that's something we will be addressing in the claims

12    disallowance.  It's their position that under United

13    Engineering, the Sixth Circuit case, once the plan is taken

14    over by the PBGC, we don't have any right to claim against

15    Delphi.

16         THE COURT:  But I'm not deciding that today, right?

17         MS. MEHLSACK:  No, I understand that, Your Honor.

18    That's one of the provisions.  The second and third issue --

19         THE COURT:  And if I do decide it, it will be based

20    under applicable law as to whether you have a claim or not.

21         MS. MEHLSACK:  But the second and third provisions,

22    what I'm saying, Your Honor, is none of the --

23         THE COURT:  Well, let me -- Mr. Butler, does this

24    release by the PBGC and the order you're asking me to enter

25    give the PBGC immunity under 1303?

1          MR. BUTLER:  Not to my knowledge, Your Honor.  The --

2     first of all, we're not asking Your Honor to approve Exhibit B.

3     We insisted that it be disclosed.  We're asking Your Honor only

4     to approve the Delphi-PBGC agreement.  There are benefits in

5     the General Motors-PBGC agreement that are newer to Delphi

6     because of payments that General Motors is making.  But that

7     agreement is an agreement between GM, General Motors Company,

8     Motors Acquisition Corporation, and PBGC that's effective in

9     accordance with its terms.  We're a beneficiary of some of the

10    releases there, but that's not before the Court today.  All

11    that's before the Court today that we're asking you to approve

12    is the Delphi-PBGC agreement.  That was very clear in our

13    motions.

14          THE COURT:  Okay.

15          MS. MEHLSACK:  Your Honor, the Exhibit B is an exhibit

16    to the settlement agreement.  It's an exhibit in the documents

17    that are before the Court today.  There's been absolutely no

18    indication, and to the contrary, every indication what's being

19    sought today is an approval of Exhibit B.  If the debtor is

20    withdrawing Exhibit to the settlement agreement from its

21    motion, then that puts this case in a somewhat different

22    posture.  It doesn't end the issue, but if Mr. Butler is saying

23    we're withdrawing Exhibit B, Your Honor.

24          THE COURT:  No, I don't understand, still, how the

25    order that the debtors are asking me to enter would give the

152

1        PBGC a free pass under Section 1303.

2               MS. MEHLSACK:   What it does, Your Honor --

3               THE COURT:   I don't see -- I mean, I don't quite see

4        how I would have jurisdiction to do that anyway.

5               MS. MEHLSACK:   Well, Your Honor, we don't think you

6        have -- let me -- we don't think you have jurisdiction to

7        decide -- 1313 --

8               THE COURT:   Well, let me ask you a different question.

9        Where, in the relief they're seeking, do you believe that that

10       relief is included?

11              MS. MEHLSACK:   Well, let me ex -- Your Honor, what we

12       believe is included is the fact that these releases, first of

13       all, would prevent the PBGC from proceeding under 1347 to

14       restore the Delphi plan because the PBGC is precluded from

15       proceeding on any legal or equitable basis against Delphi in

16       connection with this plan.

17              THE COURT:   Let's focus -- let's get to the real

18       world, now, on this.   I mean, where the PBGC has restored plan

19       is where there's a follow-on plan.   I mean, where the debtor is

20       playing fast and loose with the shifting obligations under the

21       PBGC and then turning around and immediately entering into a

22       new plan.   This debtor's not even going to have any employees.

23       They're going to be contract people.   So what are we talking

24       about, here?

25              MS. MEHLSACK:   Your Honor, we believe that there are

1    the equivalent -- and this goes to the issues that are raised

2    by another provision of this agreement which references the

3    benefit guarantee and other contractual arrangements that are

4    being discussed.  We believe, Your Honor, and we know that the

5    consideration of benefit guaranty -- the PBGC considers a

6    benefit guaranty to be a follow-on plan.  And there are issues

7    that are raised by this agreement, raised by the negotiations

8    that are going on today, Your Honor, that effectively deny to

9    our clients the benefits of what are being called the top-ups,

10   what other people have called follow-on plans.  And

11   effectively, that would be -- you're absolutely right, Your

12   Honor -- that would be one basis upon which conceivably there

13   would be an action for restoration of the plan.

14        The other is, Your Honor, we don't know yet --

15        THE COURT:  But with the debtors as the sponsor?

16        MS. MEHLSACK:  Well, Your Honor, that -- this is a

17   very intricate transaction, Your Honor, and what the debtor has

18   done is present agreements to you that tie in and place before

19   you all of these transactions as one, you know, they're all

20   here, Your Honor, as exhibits, they're part of what the debtor

21   is asking you to approve.

22        THE COURT:  Can I interrupt you for a second?

23        MS. MEHLSACK:  Sorry?

24        THE COURT:  Can I interrupt you just for a second?

25        (Pause)

154

1        MR. BUTLER:  Judge, while there's that brief

2   interruption, could I just simply rise to point out one thing,

3   and that is -- because maybe this will help with the argument

4   and Ms. Mehlsack can focus on what we propose.  The proposed

5   order that we filed with this Court, Your Honor, has, as it

6   relates to the PBGC settlement agreement which is paragraph 56

7   (a) and (b) in the order we filed to you attached to our reply.

8   And it's paragraph 58 (a) and (b) in connection with the

9   modified order that we -- that's a trial exhibit.  We say very

10  clearly that we're asking the Court to find quote, and this is

11  56(b) of what was filed with the omnibus replay, quote, "the

12  Court finds that the debtors may enter into such agreements

13  with respect to the Delphi HRP or the bargaining plan as

14  defined in the Delphi-PBGC settlement agreement without

15  violating the labor MOUs or other applicable collective

16  bargaining units, the union 1113, 1114 approval orders, Section

17  1113(f) of the Code or any other applicable law, and the Court

18  expressly authorizes the debtors to do so.  Nothing in this

19  order prohibits employees or unions adversely affected by any

20  plan termination from (a) seeking to intervene in any district

21  court action filed by PBGC under Section 4042 of ERISA at 29

22  U.S.C. Section 1342 to terminate the plans or (b) pursuing any

23  independent action against the PBGC regarding the termination

24  of the plan under Section 4003(f) of ERISA, 29 U.S.C. 1303(f)"

25  end quote.  Those rights are specifically preserved under the

155

1    proposed modification plan order.

2         MS. MEHLSACK:  Your Honor, that's not, I believe,

3    responsive to what we are saying.  I know that --

4         THE COURT:  Well, it's certainly responsive on the

5    1303 point.

6         MS. MEHLSACK:  No, it's responsive to our right to go

7    and ask for relief under 1313.  It's not responsive to the

8    issue that Exhibit B effectively cripples the ability of the

9    PBGC to seek relief or to respond to a claim for equitable

10   relief.

11        THE COURT:  Well, what is the PBGC?  They're a potted

12   plant?  I mean, come on, they have the right to settle under

13   1367.

14        MS. MEHLSACK:  But this is not 3067, Your Honor.  3067

15   is very limited.

16        THE COURT:  They can't give a release?

17        MS. MEHLSACK:  3067 does not talk about equitable

18   relief.  3047 is very specific and 3067 reads very differently

19   than 3047.  3047 says whenever the corporation determines that

20   a plan which is to be terminated or which is in the process of

21   being terminated should not be terminated as a result of such

22   circumstances as the corporation determines to be relevant, the

23   corporation is authorized to cease any activities undertaken to

24   terminate the plan --

25        THE COURT:  No, you misheard me.  I'm saying 29 U.S.C.

156

1    1367 which gives the PBGC the authority to settle.

2          MS. MEHLSACK:  But not to settle 3040 -- not to settle

3    the right to restore a plan, Your Honor.  Because 1367 only

4    talks about pre-termination liabilities.  1367 says, it's

5    titled recovery of liability for plan termination.  The

6    corporation is authorized --

7          THE COURT:  What language in Exhibit B is raising this

8    restoration issue with you?

9          MS. MEHLSACK:  The language that says the PBGC is

10   precluded from seeking any kind of equitable relief against

11   Delphi.  It's, again, at -- that's the settlement -- on page 5,

12   section 2(b), the PBGC -- the relief of claims relating to

13   pension plan terminations which precludes the PBGC from

14   asserting any and all disputes, controversies -- if you go

15   down, Your Honor, it's about, sort of, almost -- a little bit

16   more than halfway.  It says "the PBGC" -- it starts out "the

17   PBGC unconditionally and forever releases and discharges (1)

18   the Delphi group, (2) the sales companies, the JV companies,

19   GMC, Old GM, and all other purchasers or transferees of assets

20   pursuant to the MDA" and then it goes on together "in each

21   case" -- go down about ten lines -- "from any and all disputes,

22   controversies" -- I won't read of all shows and action --

23   "liens and obligations" --

24         THE COURT:  This is the release in the agreement

25   between, again, between PBGC and GM, right?

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

157

1          MS. MEHLSACK:  But it's a release to Delphi, Your

2     Honor.

3          THE COURT:  Right, okay.

4          MS. MEHLSACK:  And it says for -- "upon any legal or

5     equitable theory".

6          THE COURT:  Okay.

7          MS. MEHLSACK:  Your Honor, right now, it's my under --

8     first of all, the PBGC has issued a notice of termination

9     already.  If the -- were Your Honor to find that what the

10    PBGC's agreement with Delphi violates our MOUs or Your Honor

11    were to not find that it doesn't violate the MOUs, then the

12    settlement agreement provides that the PBGC must go in and seek

13    termination in the district court.  That, by the way, we think,

14    Your Honor, makes this mandatory in a way that the United

15    termination wasn't mandatory.  But it also means, Your Honor,

16    we believe, that were we to challenge that termination, and the

17    PBGC notice of termination provides that it's one of the bases

18    for the termination is that the plan liabilities are likely to

19    increase unreasonably, were we to challenge that termination,

20    okay, arguably, the PBGC, okay, is saying we don't have the

21    right -- we have released Delphi from any obligations under

22    this agreement.  And we don't have the right to go back in and

23    say Delphi, we're going to restore the plan.  Our calculations

24    are wrong.  Or for any other kind of equitable relief.

25         THE COURT:  And what court has put its imprimatur on

158

1    that position?

2          MS. MEHLSACK:  I think, Your Honor, by approving this

3    settlement agreement with Exhibit B, that you're putting an

4    imprimatur on the PBGC saying we don't have the right, any

5    more, to seek any kind of equitable relief against Delphi.

6          THE COURT:  Okay.

7          MS. MEHLSACK:  Your Honor, we also believe that the --

8    and Ms. Robbins will address the equities of the structure and

9    its implications for the MOUs.  We believe that by foreclosing

10   the PBGC from seeking equitable remedies against Delphi, GM --

11   Your Honor raised the question of follow-up plans.  Arguably

12   this -- Exhibit B certainly forecloses the PBGC from seeking

13   any kind of legal or equitable remedies from GM.  In other

14   words, GM -- the former sponsor of the Delphi HRP, knew --

15         THE COURT:  We're going -- I mean, as long as you

16   believe that the only basis for your argument is that I am

17   blessing the PBGC's actions instead of the debtors' actions if

18   I grant this motion, then you don't need to go further.

19         MS. MEHLSACK:  Well, I think you're blessing both,

20   Your Honor.  You're also --

21         THE COURT:  I'm not.  It's that simple, I'm not.  The

22   Second Circuit said so in 2007.

23         MS. MEHLSACK:  Your Honor, Ms. Robbins will address

24   the issues of the debtors' conduct in connection with the

25   collective bargaining agreement.  But we believe, Your Honor,

159

1    that the debtor has mandated that, unlike in the United case,

2    the agreement here effectively operates as a mandate on the

3    PBGC.  Thank you, Your Honor.

4         THE COURT:  Well, how is that?

5         MS. MEHLSACK:  Because it says to the PBGC you can't

6    go in and do anything else but terminate this plan.  If --

7         THE COURT:  But where does it say that?

8         MS. MEHLSACK:  It says -- Your Honor, first of all it

9    says if Your Honor doesn't find that our agreements are not

10   violated, it says the PBGC has to go to the District Court.

11        THE COURT:  No, no, no.  Let's read the provision, all

12   right?  Because that's obviously important.  It's 3(b) of the

13   agreement.

14        MS. MEHLSACK:  Now we're talking about the settlement

15   agreement?

16        THE COURT:  Right.  It says, "As soon as is reasonably

17   practical after entry of an order approving the modified plan

18   or a sale transaction at the alternative sale hearing, PBGC

19   staff will determine whether to initiate and/or proceed with

20   the involuntary termination under 29 U.S.C. Section 1342 of the

21   bargaining plan and/or the hourly plan, which termination shall

22   be effective on the termination date.  If and when PBGC issues

23   a notice of determination pursuant to 29 U.S.C. Section 1342

24   that the bargaining plan and/or the hourly plan shall terminate

25   on the termination date, PBGC shall seek termination of the

160

1    bargaining plan and/or the hourly plan pursuant to 29 U.S.C.

2    Section 1342(c)", which sort of makes sense since they've made

3    the determination at that point.

4         Then it says -- and I think this is the language

5    you've been referring to, "In connection with seeking

6    bankruptcy court approval of the agreement as contemplated

7    under Section 6(a) hereof, Delphi shall seek a finding by the

8    bankruptcy court that such termination, if and when determined

9    by the PBGC, is not in violation of the labor MOUs, the union

10   1113, 1114 settlement approval orders, or the local agreements.

11   In the event that the bankruptcy court approves this agreement

12   and makes the foregoing finding PBGC and Delphi shall execute

13   it."

14        So it's all conditioned upon the PBGC staff making the

15   determination and then the PBGC taking the action consistent

16   with the determination.

17        MS. MEHLSACK:  Your Honor, I actually was referring --

18   that termination -- I believe that such termination is a

19   termination in which the PBGC seeks the consent of the debtor.

20   That's the notice that's attached to the settlement agreement

21   and the PBGC has already actually issued that notice to

22   Delphi --

23        THE COURT:  Okay.

24        MS. MEHLSACK:  -- in which Delphi signs on to a

25   voluntary trusteeship and agrees to the appointment of the

161

1      PBGC --

2             THE COURT:  Right.

3             MS. MEHLSACK:  -- as the trustee without the PBGC

4      having -- and the PBGC has no requirement to go into the

5      District Court.  In fact, that was the -- I believe it was LTV

6      where the Court said there is absolutely no need for the PBGC

7      to seek any kind of relief in the District Court.

8             THE COURT:  If there's an agreement with --

9             MS. MEHLSACK:  If there's an agreement.  But then the

10     next provision says that if Your Honor doesn't make that

11     ruling, then the PBGC has to go into the District Court and

12     get --

13            THE COURT:  If they've decided to do it.

14            MS. MEHLSACK:  But then, Your Honor, going back to --

15     they, in effect, are then required to -- they have no option to

16     seek to restore that plan or do anything else other than to

17     continue to seek the termination.  And in that sense, Your

18     Honor, we believe that it's mandatory in a way that the UAL

19     agreement was not mandatory.  We think that that's a

20     distinction with a difference.  But we believe that far more

21     important are the restrictions on 4047 and 1303, in terms of

22     the conflict with Title IV.

23            THE COURT:  Okay.

24            MS. MEHLSACK:  Thank you, Your Honor.

25            THE COURT:  Okay.

162

1          MS. ROBBINS:  Good afternoon, Your Honor.  I am not

2     going to talk on the ERISA action, but let me just start out by

3     pointing out to the Court the documents that you have in your

4     exhibit binders that relate to our agreements with Delphi that

5     we believe are violated by this plan of reorganization.

6          And most specifically -- certainly it's not the only

7     issue but it's so central that I will be talking about both the

8     plan and the PBGC agreement because for our issues they are so

9     intertwined.  Those exhibit numbers are 122 for the MOUs that

10    were entered into in July and August of 2007, and the

11    implementation agreement for our three unions is found at

12    Exhibit number 126.

13         As Ms. Mehlsack has indicated, the reason that we're

14    here is that our unions have members who worked for a very long

15    time for General Motors and then continued on the spin-off that

16    was Delphi from about 1999 until this bankruptcy proceeding.

17    And in the case of the members that my client represents, those

18    workers worked during the bankruptcy and negotiated these

19    closure agreements and lost their job sometime by January of

20    2008.  They had negotiated at that time -- as had

21    Ms. Mehlsack's client's represented employees -- agreements

22    which gave up a lot of their employment security but at least

23    provided some security for these long term workers in

24    retirement.

25         And that is particularly true for early retirees who

163

1    now find themselves with no employment and in a market where

2    it's very hard to get employment.  As she mentioned, these

3    workers have already lost eighty-five percent of the OPEB

4    benefit that was provided by these agreements.  That OPEB

5    responsibility was transferred to General Motors, and New

6    General Motors has only provided such a minimal benefit that I

7    think it was costed at about fifteen percent of what a full

8    health benefit would be.

9           Now we're faced in a situation where those same

10   workers will find that their pension benefit is cut in half,

11   these early retirees who are not yet sixty-two, because there's

12   a supplement that's not guaranteed by the Pension Benefit

13   Guaranty Corporation.

14          THE COURT:  And that's for people who retire between

15   the age of fifty and sixty-two?  Is that --

16          MS. ROBBINS:  Yes.  Yes.

17          THE COURT:  Okay.

18          MS. ROBBINS:  And of course, most of our clients had

19   no choice in that matter.  In a better economy they may have

20   had more choices, but at the present time if you're an older

21   person you're the first one gone if you ever find that job.

22   In any case, we find that they're stripped twice of their

23   health benefits and their pension benefits if this

24   reorganization goes through.  I'm just explaining to you why

25   we're here and why this is so important.

164

1            In terms of what our agreements provide, if you look

2    at Exhibit 122, d(2) of each of these agreements, you will see

3    that there is --

4            THE COURT:  Could you give me those -- 122 and 126?

5            MS. ROBBINS:  It's in the same binder.

6            THE COURT:  The fellow behind you is going to do it.

7        (Pause)

8            THE COURT:  Thanks.  Okay, you can go ahead.

9            MS. ROBBINS:  For the IBEW agreement, I'm looking --

10   unfortunately they're just all sort of put together.

11           THE COURT:  I have it.

12           MS. ROBBINS:  I'm looking at page 7 of 32, and it's

13   probably --

14           THE COURT:  I have it.

15           MS. ROBBINS:  -- ranked page in each of the

16   agreements.

17           THE COURT:  Right.

18           MS. ROBBINS:  And what you see in item number 1 is

19   that participants will be eligible for all benefits, including

20   but not limited to all applicable supplements.  And it

21   basically says that those benefits are as of the date

22   immediately preceding the effective date.  The applicable

23   supplements are mentioned again and again, as are a number of

24   specific benefits that were of concern, given the potential

25   shutdown.  So there is no question that pension benefits were a

165

1    central part of these agreements.

2         Now, initially, I think, there was some suggestion

3    that somehow we might have released our claims for these

4    agreements, but it's very clear that the release in Section E,

5    I believe, specifically excludes vested pension benefits.  And

6    the final release is very clear that benefits that are

7    explicitly provided for, explicitly not waived, are not

8    released.  So these unions have pension benefits, not just what

9    PBGC might have by statute guaranteed, but they have all of

10   their pension benefits as they existed right before the

11   effective date, and that includes the supplements that are not

12   guaranteed by PBGC.

13        Now, what Delphi is saying is, "In direct

14   contradiction to the MOUs, we just want to ignore those

15   benefits that we promised to provide you."  And one of the

16   things that Delphi says is "Well, you know, we didn't assume

17   those agreements."  And that was one of the arguments raised in

18   their response brief.

19        And they cite to (f)(4).  What they don't indicate to

20   the Court is that in (f)(3) the parties agreed that "the order

21   of the bankruptcy court approving this agreement shall provide

22   that any plan of reorganization consistent with this agreement

23   and any confirmation order entered into and with respect to

24   such plan shall include the following provisions."  And the

25   last one is this agreement, "And the agreements referenced in

166

1    Attachment A shall be assumed under 11 U.S.C. Section 365."

2         So this was an agreement that does provide for

3    assumption of our agreements, although it happens at the time

4    of the plan.  And the plan is to be consistent with these

5    agreements.  And if the plan is not consistent with these

6    agreements, then at that point there would have to be an 1113

7    proceeding.  A unilateral change of these agreements would be

8    in direct violation of 1113(f) which says you cannot alter

9    terms of a collective bargaining agreement without going

10   through 1113(f).

11        Now, Delphi's next position is "Well, we said in a

12   provision that we could seek a termination of the plan in

13   accordance with applicable law."  But the applicable law, 29

14   U.S.C. Section 1341(a)(3), says that they cannot terminate a

15   plan that violates a collective bargaining agreement.  And as

16   we've seen, this collective bargaining agreement provides for

17   these pension benefits.

18        So then the debtors say, "Well, there's some language

19   in the transformation agreement with GM that mentions that this

20   is only between the parties and it doesn't bind third parties

21   one way or the other", but that certainly doesn't mean that an

22   agreement that terminates these benefits violates this

23   agreement.  It has nothing to do with that.  It has to do with

24   rights outside this agreement.  This agreement says we have our

25   pension benefits.  And that's not what's happening, Your Honor.

167

1    They're being cut in half at the best.

2         THE COURT:  Well, Delphi says it's not seeking

3    termination and that the PBGC is, under 1342.

4         MS. ROBBINS:  Delphi has entered an agreement that

5    says the PBGC has to do this.

6         THE COURT:  We've already been through that.

7         MS. ROBBINS:  Yes.

8         THE COURT:  You're not going to win on that one.

9         MS. ROBBINS:  Well, I have to watch it in the sense

10   that I do -- I will say one thing about that issue, only in

11   response to a question about Mr. Butler's comment about well,

12   this doesn't involve Exhibit B, this just involves the other

13   parts of the agreement.  That PBGC agreement is very clear that

14   it is completely nonseverable.  Every piece relates to

15   everything else.

16        THE COURT:  I'm not particularly bothered by

17   Exhibit B.  I mean, I --

18        MS. ROBBINS:  Well, all I'm saying is you can't --

19   whether you're bothered about it or not, I know the Court will

20   make a determination.  What I'm saying is it can't be approved

21   on the basis that you look at only half the agreement --

22        THE COURT:  I'm looking at the whole thing.

23        MS. ROBBINS:  -- because it involves the whole thing.

24   And by its terms, it involves the whole item.

25        THE COURT:  But I think Delphi's argument is first,

168

1    PBGC is doing this under 1342, and we know from the LTV case

2    that it can.  And secondly, that, you know, the union

3    acknowledged there was a possibility that it could be

4    terminated.  I think that --

5            MS. ROBBINS:  It doesn't mean it doesn't violate this

6    agreement.

7            THE COURT:  I think that the second point is sort of a

8    gravy argument that they're making.  The first one is that this

9    is being done under 1342, not by Delphi but by the PBGC.

10           MS. ROBBINS:  It still violates what they have

11   committed to these unions.

12           THE COURT:  How does it do that?

13           MS. ROBBINS:  Because they promised us pension

14   benefits we're not going to get.

15           THE COURT:  But if --

16           MS. ROBBINS:  And --

17           THE COURT:  If the PBGC terminates it, then what's --

18   I mean, you know, I guess at best you have a claim, right?

19           MS. ROBBINS:  Well --

20           THE COURT:  If you have a claim.

21           MS. ROBBINS:  -- we do have a claim and we'll probably

22   be back seeing you about that claim.  But this says we get

23   these benefits.  And I want to --

24           THE COURT:  Well, the debtor can't give you benefits

25   that it can't give because the PBGC's taken the plan away.  How

VERITEXT REPORTING COMPANY

169

1    can the debtor continue to administer a plan that the PBGC has

2    determined to terminate?

3            MS. ROBBINS:  Your Honor, all we know is that at this

4    point this debtor and General Motors believe that this plan --

5    and let me just address that for a moment since it goes to the

6    implementation agreement.  The only modification to the

7    agreements we're talking about was the implementation agreement

8    that was entered into in September of 2008.  And what that

9    implementation agreement did was it provided one basis on which

10   Delphi would not provide these pension benefits, and that was

11   that they were transferred through a 414(l) transfer to General

12   Motors.  That was what it provided for.  So there was one way,

13   in terms of our agreements, that Delphi wouldn't be

14   responsible --

15           THE COURT:  That you expressly consented to -- your

16   clients did.

17           MS. ROBBINS:  That we entered a binding agreement, and

18   it was binding on both parties.  And General Motors also signed

19   that agreement, Your Honor.  And here we are today in a

20   situation where both General Motors and Delphi are not abiding

21   by that agreement.

22           THE COURT:  Well, I don't see any contention in your

23   papers that GM breached that agreement.  I mean, the debtor has

24   rights against GM for breach of that agreement.

25           MS. ROBBINS:  Well, I think it's obvious that General

170

1    Motors has breached that agreement, Your Honor.

2         THE COURT:  Why is it obvious?   In fact, the debtor

3    says that GM was entitled not to perform the second half of the

4    assumption because of the conditions in the agreement.  And

5    there's been -- I mean, the objection doesn't say that the

6    debtors shouldn't be entering into this settlement because GM

7    should be forced to perform its agreement.  That's not said in

8    your objection, so --

9         MS. ROBBINS:  I think the point that I wanted to make,

10   Your Honor, is that GM was a party to the agreement.  It's not

11   separate from this.  GM is a party to our agreements.  And

12   whether or not Delphi sees GM as having breached those

13   agreement, we would like to point the Court to a provision in

14   our agreements and that deals with equitable treatment that

15   Ms. Mehlsack mentioned a moment ago which goes directly to the

16   pension benefits.  Excuse me, Your Honor, it's D(2)(b) --

17        THE COURT:  I'm sorry, which agreement is this in?

18        MS. ROBBINS:  This is in the MOU.

19        THE COURT:  Okay.  And what page of your client's one?

20        MS. ROBBINS:  Of our client's agreement?

21        THE COURT:  Yes, which page is it?  No, no, what --

22        MS. ROBBINS:  It's 6 of 32, Your Honor.

23        THE COURT:  Okay.

24        MS. ROBBINS:  At the bottom of the page.  And --

25        THE COURT:  So what -- I'm sorry, it's paragraph what?

1    2(b)?

2         MS. ROBBINS:   2(b).   And this deals with an

3    eventuality that benefits would be reduced, Your Honor.   "These

4    benefits will not be reduced from levels in effect as of the

5    date immediately preceding the effective date unless they are

6    similarly reduced for other retired Delphi HRP participants."

7    Now, that's not what's happening, Your Honor.   If you will

8    note, at the present time the larger unions are not here, and

9    their treatment, even though they have participants in the

10   Delphi HRP, is not the same as ours.

11        And if you look at Exhibit B to the PBGC settlement

12   agreement, the Court can see why that is true.   Among the

13   provisions -- and this is in Exhibit B -- excuse me, Your

14   Honor, I lost my place -- page 7, it's in paragraph 4(b).   It

15   basically allows -- and this is very unusual for a PBGC

16   agreement -- it basically allows that notwithstanding PBGC's

17   valuation and allocation of recoveries policy, PBGC's operating

18   manual, section 8.21, in spite of those provisions, General

19   Motors can provide the missing benefits for unions that it

20   determines it wants to do that for.

21        So there are follow-up plans on here -- selective

22   follow-up plans, but PBGC is allowing those.   And so what we

23   have is we have a circumvention of our contractual provision

24   that all Delphi HRP participants are going to be treated the

25   same.

172

1          THE COURT:  But --

2          MS. ROBBINS:  We are small unions, and that language

3    that we would not be treated differently was absolutely

4    critical.  And now we are in a situation where our members, the

5    IAM and the IBEW and IUOE members who worked right alongside

6    UAW members, are going to have entirely different pension

7    benefits even though they participate in the very same Delphi

8    HRP.

9          THE COURT:  But let me go back to the contractual

10   argument for a second.

11         MS. ROBBINS:  That is part of the contractual argument

12   because that's a contractual clause, Your Honor.

13         THE COURT:  Well, I want to focus on the whole

14   provision.  And this is 2(b), again, on page 6 of 32?  It says

15   "With regard to such amendment and freeze of the Delphi HRP,

16   Delphi will cause the frozen Delphi HRP to pay benefits in

17   accordance with the terms of the Delphi HRP and applicable law.

18   These benefits will not be reduced."  And then there's the

19   sentence after that that says, "The IBEW agrees that Delphi

20   reserves its right to seek termination consistent with

21   applicable law."

22         But doesn't "applicable law" include, in the first

23   sentence, 1342?  I mean, how can you continue to pay benefits

24   under a plan that under applicable law has been terminated?  It

25   just doesn't work, right?  There's no plan anymore.  There's no

173

1   benefit committee.  There's no administrator.  There's no

2   assets, other than as taken over by the PBGC.

3           MS. ROBBINS:  So you have the PBGC -- and we'll get to

4   the PBGC's agreement in just a moment and what that agreement

5   looks like, but what we have is the PBGC saying "Oh, we'll take

6   (indiscernible due to technical problem)."  And so it certainly

7   doesn't seem like (indiscernible due to technical problem).

8           THE COURT:  The "you" you're referring to here is GM,

9   right, not the debtor?  The debtors' not subsidizing payments

10   to the steelworkers or the autoworkers, right?  It's GM, which

11   has always been careful to say that it guaranteed certain of

12   their benefits but not the other unions.

13           MS. ROBBINS:  General Motors signed our implementation

14   agreement.  General Motors signed attachments to the MOUs, and

15   in signing the implementation agreement signed the MOU.

16   General Motors, everyone thought, had agreed to take the Delphi

17   HRP.  The MDA says General Motors will address the Delphi HRP.

18   General Motors had to negotiate a settlement with the PBGC as

19   part of an integrated document.  And until General Motors'

20   exhibit with its contribution was signed, there was no release

21   for these debtors.

22           General Motors is getting all of the assets it wants

23   from Delphi.  Even though the PBGC has a seven million dollar

24   claim, liens, and priority claims, what's happening is General

25   Motors is getting those benefits out from under the Pension

174

1    Benefit Guaranty Corporation and the benefit rights that our

2    clients have.

3             And then, after the PBGC basically walks away with

4    virtually nothing for all of its claims, it releases everybody

5    from having any responsibility for any of the pension plans.

6    And we're supposed to believe that this was PBGC's idea?

7             THE COURT:  Well, they signed it.

8             MS. ROBBINS:  And they're not here, are they?

9             MR. BUTLER:  Actually, they are in the courtroom.

10            MS. ROBBINS:  Well --

11            THE COURT:  But again --

12            MS. ROBBINS:  -- that's good.

13            THE COURT:  -- unless the debtor had the right to

14   force GM to do this -- what you want to have -- I don't see how

15   this is relevant to what's before me.

16            MS. ROBBINS:  We have an agreement that's being

17   violated, Your Honor.

18            THE COURT:  No, what -- I'm focusing now on the GM

19   part of it where you're saying -- are you saying GM violated an

20   agreement with you?

21            MS. ROBBINS:  I'm saying, Your Honor, there is such an

22   identity between these institutions.  General Motors was the

23   former owner of Delphi and is the future owner of Delphi.

24   General Motors employed our clients for more years than

25   Delphi did.  General Motors is not some third party entity that

175

1    can  be evaluated short of this entire enterprise and this

2    entire bankruptcy.  It hasn't from the very beginning to the

3    very end.

4         THE COURT:  Okay.  But it seems to me that point goes

5    to what Mr. Butler has described as sort of the judgment of the

6    debtors to enter into this agreement in the first place, as

7    opposed to -- and I don't mean just the PBGC settlement, I mean

8    the whole MDA.

9         MS. ROBBINS:  Right.

10        THE COURT:  Okay.

11        MS. ROBBINS:  I mean, not right, but I mean, I agree.

12        THE COURT:  Okay.

13        MS. ROBBINS:  I mean, from the very beginning the idea

14   was General Motors was taking over this pension plan.  It was

15   getting the assets.  It was going to take the remainder of the

16   pension plan.  And now it's, like, no, we'll take the assets

17   and now PBGC step in and take over the pension plan but don't

18   get any assets for it.

19        I wanted to talk for a moment -- I was going to give

20   the Court a cite on this idea that normally add-on plans are

21   not allowed, but in this case there's a special provision right

22   in the PBGC agreement for some of those plans.  And that's the

23   PBGC v. LTV Corp., 496 US 633 (1990) decision.

24        One thing I wanted to follow up on, and I've referred

25   to it, but without really any factual information.  In this

176

1    case, we know that PBGC has proofs of claim for seven billion

2    dollars.  More than a billion of those -- and I think the Court

3    could take judicial notice of this through the claims

4    registered -- were for priority claims.  They had liens as

5    well.  But instead, PBGC is taking the pension plan with only a

6    general unsecured claim of three billion dollars.  Even if you

7    add in the amount that General Motors is paying in, it's, like,

8    one percent of the PBGC claim.

9           And it seems to us that that's a huge violation of the

10   priority scheme that was established in this agreement, that

11   you have secured interests, priority interests being given away

12   for a general unsecured claim for the benefit of a purchaser.

13   And it is the pensioners who have been promised equal

14   treatment, through the provision I just mentioned, with all

15   others that will be paying the price.  And they will be paying

16   the price exclusively since the PBGC and all parties to that

17   have agreed that other people can have top-ups and only a few

18   people will be suffering the consequences.

19          THE COURT:  Well, let's parse that out just briefly.

20   First of all, this isn't the PBGC's bankruptcy case, right?

21   It's Delphi's?

22          MS. ROBBINS:  That's right, Your Honor.

23          THE COURT:  All right.  Then --

24          MS. ROBBINS:  And it's Delphi's responsibility to

25   provide our pension benefits.  And we would rather the PBGC

177

1    weren't part of it.

2              THE COURT:  Okay.  And --

3              MS. ROBBINS:  That is what we're arguing.

4              THE COURT:  And the second point, although I'm not

5    sure it's necessary, is as far as the priority aspect of PBGC's

6    claim, in terms of the payments that are being made to your

7    clients and the other participants in the plan by the PBGC,

8    don't those cash payments exceed the amount of the priority

9    claim?

10             MS. ROBBINS:  Excuse me, Your Honor, I didn't

11   understand --

12             THE COURT:  Doesn't the --

13             MS. ROBBINS:  -- first cash payments to our clients.

14             THE COURT:  The payments by the PBGC in taking over

15   the plan and guaranteeing the plan.  I understand the PBGC

16   won't be paying out over time the full benefits under the plan,

17   but the amounts that will be paid, don't they exceed the

18   priority claim of the PBGC?

19             MS. ROBBINS:  I would not know for sure, Your Honor,

20   but I would tend to doubt it.

21             THE COURT:  Why?  On what basis?

22             MS. ROBBINS:  Because I think that the PBGC's -- I'll

23   start with the first reason I would doubt it is that I would

24   not think that the existence of priority claims versus general

25   unsecured claims would have anything to do with the amount of

178

1   guaranteed benefits.

2          THE COURT:  I'm just talking about the -- never mind.

3          MS. ROBBINS:  I --

4          THE COURT:  It's not worth arguing this point.

5          MS. ROBBINS:  In terms of the question that I think

6   was asked of Ms. Mehlsack, whether there has ever been a

7   decision under ERISA that would prohibit what is going on here,

8   I don't believe there are any decisions that have allowed the

9   kind of global releases that exist here in this kind of

10  situation, or there's ever been a court that's been asked to

11  agree to those kinds of releases at this kind of stage.

12         THE COURT:  I didn't ask Ms. Mehlsack that question?

13         MS. ROBBINS:  Oh, then maybe it was Mr. Butler; my

14  apologies.

15         THE COURT:  Okay.

16         MS. ROBBINS:  Your Honor, just to conclude, we think

17  that this is a travesty.  And the fact that we represent 120

18  former Delphi employees rather than a larger number doesn't

19  make it any less a travesty.

20         THE COURT:  I don't -- I mean, every person who's

21  adversely affected by this counts.  So I agree with you that

22  the number of people doesn't matter.

23         MR. BUTLER:  Your Honor, do you want the debtors to

24  respond to these objectors first, or do you want to hear from

25  the other objectors?

179

1        THE COURT:  Let me hear from everyone.

2        MR. BUTLER:  So on my list, the next party I have --

3        THE COURT:  They're making their way up.

4        MR. BUTLER:  Mr. Black and Mr. Cunningham?

5        THE COURT:  Yes.

6        MR. MOLDOVAN:  Good afternoon, Your Honor, Joseph

7   Moldovan from Morrison Cohen.  Also with me is Michael Dal Lago

8   at the back of the court.  Allow me to introduce Anthony

9   Shelley --

10       MR. SHELLEY:  Good afternoon, Your Honor.

11       MR. MOLDOVAN:  -- from the firm of Miller & Chevalier,

12  who has been admitted pro hac into this case.  We are both here

13  on behalf of Dennis Black and Charles Cunningham who are also

14  present in the back of the court.  Mr. Black is also the

15  interim chair of the Delphi Salaried Retiree Association.

16       I know from our prior two experiences before Your

17  Honor that Your Honor is somewhat familiar with our issues, but

18  if Your Honor would permit, Mr. Shelley will continue and

19  present our objection brief to the Court.

20       THE COURT:  Okay.  That's fine.

21       MR. MOLDOVAN:  Thank you, Your Honor.

22       MR. SHELLEY:  Good afternoon.  Thank you, Your Honor.

23  I'm Anthony Shelley, here on behalf of objectors Dennis Black

24  and Charles Cunningham.  They are two participants in Delphi's

25  pension plan for salaried workers.  Workers in this plan,

180

1    during their careers, were not unionized.  The only entities

2    protecting their rights in the pension plan are they

3    themselves and, in an ideal world, the fiduciaries of the

4    plan.

5            They bring this objection solely because of their

6    interests in the pension plan.  The objection is a procedural

7    one in a sense.  We object to the modified reorganization plan

8    because it assumes the lawful termination of this plan because

9    that termination is not completed and will be challenged, in

10   fact, by us in termination proceedings.  The termination, in

11   our view, is speculative, and a reorganization plan with a

12   speculative provision such as this should not be approved in

13   our view.

14           THE COURT:  Is there any support for that?  I mean,

15   plans are conditioned on other events happening all of the

16   time.

17           MR. SHELLEY:  Correct, Your Honor.  Yes, a couple of

18   cases that there needs to be reasonable assurance that the plan

19   can be effectuated.  For instance, a Tenth Circuit case,

20   Ames v. Sundance 973 F.2d 849.  A case from the Eastern

21   District of Pennsylvania, In re Lakewood Partners, 1994 Bankr.

22   LEXIS 1291 (Bankr. E.D. Pa. 1994).  A third case I'd like to

23   mention, Crestar Bank v. Walker, 165 B.R. 994, where that Court

24   said that the provisions must be reasonably specific, can't

25   rely on specific and indefinite plans or they won't be

181

1    approved.

2         Obviously, it's a matter of discretion in the Court's

3    point of view, but our point is to just say there are

4    proceedings that are going to be going on in the Eastern

5    District of Michigan which affect this and make this plan

6    termination -- our salary plan termination not a done deal, and

7    as a result, a reorganization plan that rests on it being

8    terminated should not be approved.

9         We don't seek any substantive ruling from the Court on

10   the propriety of the termination.  Obviously the Court doesn't

11   have jurisdiction for that.  That's for the Eastern District of

12   Michigan.  It has exclusive jurisdiction.  And as the Court

13   knows, the salaried retirees intend to intervene in that

14   action, but will certainly come to you first before doing so to

15   make sure no stay provisions are violated.

16        Because our objection rests on the speculative nature

17   of the termination, I'd like to just talk a little bit about

18   the termination proceeding itself and why we think there are

19   substantial arguments to challenge the termination, therefore

20   making it an onerous and likely lengthy proceeding in the

21   Eastern District of Michigan that this reorganization plan

22   depends on.

23        There are two types of terminations under ERISA.

24   There are summary terminations and those that require full

25   adjudication.  The summary termination, I suspect, is the type

182

1     that the PBGC and Delphi are intending on pursuing because they

2     talk about the plan administrator entering an agreement to

3     terminate the plan.

4          It's our view that the plan administrator is a

5     fiduciary in that capacity and can only sign such an agreement

6     in the event that it's in the employee's best interest.  That

7     has to be the case because otherwise there's no one protecting

8     the employee's interests in such a transaction.

9          And we believe we'll be able to convince the Eastern

10    District of Michigan that because Delphi is actually treating

11    this issue as a corporate decision as opposed to a fiduciary

12    decision, that any agreement that is signed in that capacity

13    would be null and they have to go then to the second type of

14    plan termination which is the adjudicatory type.

15         In that instance, the PBGC will take on the role as a

16    plaintiff.  It has to prove its case in the District Court.  It

17    has to prove it by a preponderance of evidence.  It doesn't get

18    deference under a Chevron or an arbitrary and capricious type

19    of standard.

20         It will have to prove that the termination is in the

21    beneficiaries' best interests; that there will be unreasonable

22    risk to the PBGC's funds without a termination; that it

23    considered and reasonably rejected all reasonable options to

24    termination; and that the conditions associated with the

25    termination, including any amount kicked in by Delphi or GM or

183

1    whatever, are reasonable.

2         Again, we don't seek to litigate any of those

3    conditions or the propriety of termination.  We don't even know

4    what the conditions are, in a sense, because the PBGC has not

5    yet presented the administrative record in the Eastern District

6    of Michigan.  But we suspect that there will be substantial

7    arguments to challenge any effort to terminate.

8         We suspect there's discrimination against our

9    nonunionized workers in favor of unionized plans.  PBGC will

10   have to explain that.  The PBGC will have to prove that it was

11   reasonable to release the liens on other assets.  It'll have to

12   prove that it wasn't pressured by another part of the executive

13   branch to do this deal, instead it was only guided by the

14   standards in ERISA Section 1342, and that the releases were

15   reasonable.

16        All of those things are to be determined by the

17   District Court.  We don't think that it is clear that those

18   will be -- that the PBGC's termination effort will be approved,

19   and that the plan, therefore, under the terms currently as

20   presented in the various agreements and as we've heard through

21   the press -- because we don't get any actual information from

22   the fiduciaries of the plan at this point -- we think that

23   under those plans the termination will not be approved.  We

24   think it will be an arduous and long and complicated process.

25   And because of that, we don't think that the reorganization

184

1    plan that depends on it should be approved at this time.

2         THE COURT:  Okay.

3         MR. SHELLEY:  Thank you, Your Honor.

4         THE COURT:  Thank you.

5         MS. CALOWAY:  Good afternoon, Your Honor.  Mary

6    Caloway, Buchanan, Ingersoll & Rooney on behalf of Fiduciary

7    Counselors, Inc. or FCI.  FCI was appointed as the independent

8    fiduciary for the debtors' pension plans for the purpose of

9    pursuing, in these bankruptcy cases, claims for unpaid minimum

10   contributions.  And in that capacity, FCI has filed a number of

11   claims in these cases, including most recently claims seeking

12   administrative expense status for those unpaid minimum

13   contributions.  I suspect I will probably --

14        THE COURT:  Going back to something in one of the

15   earlier arguments, what's the amount of those claims, the

16   priority administrative claims?

17        MS. CALOWAY:  We have filed for the full amount of the

18   unpaid minimum contributions, which is in excess of 250 or 60

19   million dollars.

20        THE COURT:  Okay.  Thank you.

21        MS. CALOWAY:  And I think, Your Honor, my focus is a

22   little bit more in line with the counsel who spoke just before

23   me in that pointing to the fact that the PBGC settlement

24   agreement reached with the debtors, while it contemplates

25   potential -- I think Mr. Butler used that word or even Your

185

1    Honor used that word -- the potential termination of these

2    pension plans, as of today and, you know, as of tomorrow even,

3    if the settlement is approved, the pension plans are not yet

4    terminated.  And until the pension plans are terminated and

5    until -- or unless and until the pension plans are terminated

6    and the PBGC becomes the statutory trustee, FCI has a

7    continuing fiduciary obligation and duty to pursue its claims

8    for the minimum unpaid contributions, which I understand the

9    debtors and even the PBGC have included as sort of a subset, I

10   think, of that seven billion dollar claim that the PBGC has

11   filed.

12           But those claims belong to the plans.  They've never

13   been addressed other than in connection with the PBGC.  But the

14   PBGC does not have those minimum contribution claims yet,

15   except to the extent that they had the right to file for the

16   statutory liens.  And because FCI's obligation and duty

17   continues, as I said, until and unless the plans are

18   terminated, this reorganization plan doesn't contemplate those

19   claims.  It never treated them separately.  It never identified

20   them any separately.  It doesn't anticipate that there would be

21   any administrative expense priority for any or all of a portion

22   of those claims.

23           But as I have said, and I don't want to belabor the

24   point, as of today, those claims belong to FCI to assert on

25   behalf of the pension plans and for the benefit of the pension

186

1    plan's participants and we would suggest that a plan that does

2    not contemplate that should not be confirmed.

3         THE COURT:  Okay.

4         MS. CALOWAY:  Thank you, Your Honor.

5         THE COURT:  Can we deal with the last point first?

6         MR. BUTLER:  Sure.  Can we just -- one moment, Your

7    Honor.  I'm just going to set up something.

8         THE COURT:  Okay.

9    (Pause)

10        MR. BUTLER:  First, Your Honor, the last point raised

11   by Fiduciary Counselors is at docket number 18282.  And their

12   objection is Joint Trial Exhibit number 244.  I respect the

13   fact that Fiduciary Counselors, Inc. appears today, and I agree

14   with them that until the PBGC effectuates termination, they

15   remain -- FCI remains a player here.  And therefore, I respect

16   that fact that they were here.  It's one of the reasons we

17   didn't oppose their 3018 --

18        THE COURT:  But is the effectiveness of the plan

19   modification not conditioned upon the PBGC settlement and

20   termination, or --

21        MR. BUTLER:  No, the effect of the -- the modified

22   plan has as a condition to it that the PBGC settlement

23   agreement -- the Delphi-PBGC settlement agreement shall become

24   effective.  All right?  And that is true.  And that's one of

25   the reasons we're here seeking approval of that so that it

187

1    would become effective.  And what the PBGC has agreed to do is

2    to compromise the claims -- its seven billion dollar claim for

3    a three billion dollar claim -- as part of that agreement.

4        THE COURT:  Okay.  So as I take it, though, Fiduciary

5    Counselors' argument is that even though the settlement may be

6    approved and go effective, the condition under which the PBGC

7    would take over the claims hasn't necessarily occurred on the

8    effective date.

9        MR. BUTLER:  Well, on the --

10       THE COURT:  And therefore--

11       MR. BUTLER:  It won't occur --

12       THE COURT:  -- you need to show at least how the 100

13   cent dollar claims are provided for in the plan.

14       MR. BUTLER:  It won't have occurred on the plan

15   modification date, Your Honor, if Your Honor is to approve a

16   plan modification today.  But the fact of the matter is, this

17   current plan, as a plan as opposed to a 363 sale, would be

18   difficult to consummate unless the PBGC settlement agreement

19   was implemented and unless the PBGC reached an independent

20   determination about what it was going to do with the plans.

21       I think Your Honor can take notice -- it was already

22   introduced by others here and the PBGC is present in the

23   courtroom -- they've already -- and I'll address this in my

24   argument in a few minutes -- they've already made their

25   determination.  That determination was made in advance of

1    today.  And I can report it and the PBGC can report to you on

2    the determinations they've reached independently.

3          But as the debtors had indicated in our prior

4    disclosures, including in the disclosure supplement, we don't

5    have the wherewithal to fund these plans.  So if these plans

6    were not terminated, it is difficult to imagine that the

7    effective date here would occur under a plan.

8          But I do recognize, Your Honor, and we really haven't

9    been much at odds with Fiduciary Counselors, Inc.  They have a

10   role to play here at this point in time in terms of raising

11   these issues as a fiduciary.  We respect that.  But we believe

12   that their objection ought to be overruled because ultimately

13   Your Honor, I think, can take judicial notice of the

14   determination made by the PBGC.  And I also believe that this

15   modified plan could not become effective on a different

16   separate track.  We'd have to come back and propose something

17   else if these plans weren't ultimately terminated.

18          THE COURT:  Okay.  So you can address the other two

19   objections however you want to.

20          MR. BUTLER:  Okay.  Thank you, Your Honor.  First,

21   Your Honor, I just want to ground this discussion and this

22   response in a couple of, I think, important imperatives.  Your

23   Honor knows, I think as well as anyone in this courtroom, that

24   one of Delphi's five transformation objectives was to develop a

25   workable solution to our pension plans, which we did in

189

1    connection with the confirmed plan, and which involved, under

2    the confirmed plan, the assumption of our defined benefit plans

3    by Delphi.  And the world that's changed since January of 2008

4    now prevents Delphi from being in a financial position to do

5    that.

6          One of the great regrets in this case, I think, for

7    those of us who've worked on it so hard, is that we could not

8    have found a different solution.  The fact that we were able to

9    address some of the pension plans in the initial 414(l)

10   transfer is some solace, but the reality is we tried very hard

11   to be able to address these plans in a way that would have

12   avoided the real human suffering that will go on as a result of

13   what is, I think, inevitably at this point, based on

14   independent actions taken by the PBGC, as a hardship on many,

15   many people.  And I deeply regret that, but it is a reality of

16   the world that we are in now that we are not able to finance

17   these.

18         Having said that, then we need to sort of look at the

19   basic fabric of these objections.  And I want to address them

20   sort of together.  I guess I'll deal with -- because many of my

21   comments will address both.

22         But let me just also say, just so the record is clear,

23   in the United case, which Ms. Mehlsack tried to distinguish

24   because somehow in our agreement or in the GM-PBGC agreement

25   she reads into that some waiver of restoration rights.  I just

190

1    want Your Honor to know that I have the settlement agreement by

2    and between -- among UAL Corporation and its direct and

3    indirect subsidiaries and the PBGC in my hands, the one that

4    all of the case law is predicated on.

5         And at paragraph 6 of that agreement is a complete

6    waiver by the PBGC of all of its restoration rights.  I knew

7    that.  I knew it when Ms. Mehlsack was talking about it,

8    because working with our special counsel we tried to get that

9    same waiver in our agreements and were unable to.  But the fact

10   of the matter is that Ms. Mehlsack has it reversed.  The United

11   agreement had a full waiver or restoration rights.  The PBGC-

12   Delphi agreement does not.

13        The second thing I wanted to point out -- just to make

14   sure the record is clear on some of these points -- a lot has

15   been said about the Exhibit B to the agreement.  And I am,

16   frankly, glad that we exercised the judgment that we did to

17   insist that this agreement be publicly disclosed in these

18   proceedings so that it can be transparent and discussed here in

19   the light of this case.

20        The reality is -- I will say what I did before -- that

21   is, I'm not asking Your Honor to approve Exhibit B.  Yes, there

22   is benefits Delphi gets under it, but it is an independent

23   agreement between General Motors Company, the Motors

24   Liquidation Corporation, and PBGC that has been signed and

25   executed between them.  And we believe it ought to be

191

1    disclosed, in part because -- and I acknowledge this -- the

2    ultimate effectiveness of that agreement and the agreement

3    we're asking you to approve is cross-conditioned on both of

4    them becoming effective.  And we believed it ought to be

5    disclosed.

6        But there were a number of things said about the GM-

7    PBGC agreement that just, frankly, I'd ask Your Honor to read

8    the full provisions that were cited just so that the record is

9    clear here.  I don't believe that 4(b) of that agreement on

10    page 6 in fact is a follow-on agreement, but let me just read

11    the second sentence of 4(b).  Ms. Robbins spent some time and I

12    think Ms. Mehlsack spent some time talking about the first part

13    of that sentence which, by the way, wasn't dealing with a whole

14    bunch of unions, it was dealing with the UAW.

15        And it is true that New GM assumed and assigned from

16    Old GM the benefit guarantee agreement between Old GM and the

17    UAW.  That is a fact.  It's been publicly disclosed.  It's also

18    been publicly disclosed that New GM did not assume any other

19    similar benefit guarantees, a decision that has made many

20    stakeholders in this case, and perhaps even Delphi, not

21    particularly thrilled with that decision, but that is the

22    decision that they made.

23        But the provision in 4(b) says, and I quote,

24    "Notwithstanding the provisions of paragraphs 2(a) and 2(b) and

25    paragraph 3 hereof, none of PBGC, GMC, or any of its

192

1    subsidiaries or Old GM shall release or discharge any disputes,

2    controversies, suits, actions, causes of action, claims,

3    assessments, demands, debts, sums of money, damages, judgments,

4    liabilities, liens, and obligations of any kind whatsoever,

5    upon any legal or equitable theory, whether contractual, common

6    law, statutory, federal, state, local or otherwise, whether

7    known or unknown, that any of them ever had, now have, or

8    hereafter can, shall or may have, from the beginning of time,

9    by reason of any manner, cause, whatsoever against each other

10   relating to the calculation of the amount of or the ERISA title

11   for coverage of the GM UAW benefit guarantee or any similar

12   contractual guarantee by GMC or any of its subsidiaries."  And

13   it excepts out the validity and application of certain of

14   PBGC's recovering policies.

15        But that was read to you and argued that in fact this

16   was a release.  I think it's exactly the opposite.  I think

17   PBGC made the determination, as I read the agreement, not to

18   release those issues but to preserve them for whatever that may

19   be.  And I just want the record here of what's being argued to

20   be clear.

21        Now, in connection with -- I want to go back now and

22   address, if I can, first I'm going to address in substance the

23   objection that was made by Mr. Black and Mr. Cunningham, the

24   former DSRA objection at docket number 18277.  One of the

25   fundamental mistakes, I think, made in the premises of that

193

1    objection is that continued assertion by Mr. Black and

2    Mr. Cunningham that someone other than Delphi is the plan

3    administrator of the salaried plan.  In fact, Delphi is the

4    plan administrator of the salaried plan.  And I'm not talking

5    about the salaried plans or the nonbargained plans.  It's very

6    important to make that distinction.

7        THE COURT:  But I think they went further and said

8    even if Delphi is the plan administrator and the committee is

9    it just its agents, that Delphi can't act because it's

10   conflicted.  So I think they're extending it to Delphi as plan

11   administrator.  They may not be waiving their rights that there

12   are these other people that should be replaced too, but they're

13   basically saying that because of a conflict of interest Delphi

14   can't act.

15       MR. BUTLER:  Your Honor, I'm not sure what the

16   conflict of interest is because I think you have to look to the

17   salaried plan documents themselves.  Article 6(a) of those

18   documents provides that the decision to terminate the salaried

19   plan is a decision that Delphi is entitled to make under the

20   terms of the plan.  And in making the decision, Delphi acts as

21   in a settler or nonfiduciary capacity.

22       And there is case law on this and we cited the case

23   law in our responsive papers.  They include Curtiss Wright v.

24   Schoonejongen, 514 U.S. 73, 78 (1995);  Lockheed Corp. v.

25   Spink, 517 U.S. 882, 890 (1996); and Hughes Aircraft Co. v.

194

1    Jacobson, 525 U.S.. 432, 444 (1999).

2         Termination of the salaried plan, Your Honor, under

3    the case law, simply does not raise the fiduciary issues

4    described in the objection.  It's just a misreading or

5    mis-assertion of the law.  Pursuant to the authority that

6    Delphi has -- Delphi -- under Section 6 of the salaried plan,

7    Delphi's board of directors has directed the plan

8    administrator, which is Delphi, to enter into the PBGC-Delphi

9    settlement agreement, and upon Your Honor's approval of it, to

10   execute a termination and trusteeship agreement if that

11   agreement is proposed by the PBGC.

12        So with respect to the non-negotiated, the

13   nonbargained plans, the way in which this settlement agreement

14   that's before you is set up is to the extent Your Honor

15   approves it and authorizes it and enters the modification

16   order, Delphi -- and PBGC reaches its unilateral determination

17   to terminate the plans, then in that instance Delphi will

18   execute a termination and trusteeship agreement if the PBGC

19   proposes it.

20        And I would simply say to Your Honor, as a basic, I

21   think, Supreme Court precedent, it is inconsistent to me that

22   their statement in their objections that somehow an independent

23   fiduciary needs to be appointed to consider whether this should

24   be terminated, I think it's simply inconsistent with precedent

25   which provides that it is the settler, the nonfiduciary, the

195

1    plan administrator, who makes the decisions to terminate a

2    pension plan in these circumstances.

3         Now, here are the facts.  Your Honor said earlier in

4    this argument we should get into the real world.  Here are the

5    facts.  The salaried plan is underfunded by almost three

6    billion dollars and has contributions totaling more than 200

7    million dollars that are due and unpaid.  There is no doubt,

8    frankly, not a scintilla of doubt in my mind and I think in any

9    reasonable person's mind, that Delphi cannot maintain the

10   salaried plan.  We do not have the financial wherewithal to do

11   so.

12        PBGC made an independent assessment of this.  On July

13   21st of this year PBGC determined, in accordance with 29 U.S.C.

14   1342(a)(1),(2) and (4) that the salaried plan had not met the

15   minimum funding standard under Section 412 of the Internal

16   Revenue Code; that the salaried plan will be unable to pay

17   benefits when due under its terms; that the possible long run

18   loss of the PBGC with respect to the salaried plan may

19   reasonably be expected to increase if the plan is not

20   terminated, and that therefore the salaried plan must be

21   terminated and PBGC appointed statutory trustee.

22        Under ERISA, upon making such finding, PBGC is

23   authorized to enter into an agreement with the plan

24   administrator terminating the plan and appointing PBGC

25   trustee of the plan without further procedural or

196

1     substantive safeguards for plan participants.  That is the law.

2     And that is the law in LTV v. United Steelworkers of America

3     824 F.2d 197, 200 (2d Cir. 1987), that I know Your Honor is

4     aware of.

5           The facts are that whenever PBGC makes a determination

6     under 1342(a) that a pension plan should or must be terminated,

7     as it has already done with the salaried plan, as we stand here

8     today, the PBGC is authorized, as a matter of statute under

9     Section 1342, to apply to the United States District Court in

10    order to terminate or to enter into an agreement with the plan

11    administrator.  Again, the LTV cite.

12          Here they have done both.  They have entered into a

13    provisional agreement with us that says that as to the salaried

14    plan and as to the subsidiary plans that are nonbargained, that

15    if in fact Your Honor authorizes us as a debtor-in-possession

16    to effectuate the agreement, that we will enter into the

17    trusteeship agreement with PBGC and that will be the end of it.

18    And I think it's irrefutable in these circumstances, under the

19    case law and under the statute, that a plan may be terminated

20    without any further court proceedings upon agreement with the

21    plan administrator.

22          So when I deal with the salaried plan or the

23    subsidiary plans, I go to 3(a) of the PBGC-Delphi agreement and

24    I look at the terms there, and I'm asking Your Honor for

25    permission, for your authority, based on the real facts of this

197

1   case, to approve the PBGC-Delphi settlement agreement as part

2   of the plan modification order and to allow us to implement it,

3   and we will implement it, with respect to the five plans that

4   are nonbargained.

5        And that's my response to Mr. Black and

6   Mr. Cunningham.  It's not a response I say with any degree of

7   satisfaction.  I've spent three and a half years with the team

8   here trying to get an alternative to this, but this is what is

9   here, this is what is necessary, and this is what will allow

10  Delphi to reorganize and to move forward.  And I wish we could

11  have come to a different result, but the capital markets and

12  the state of the auto industry does not permit it.

13       Now, talking about the bargain --

14       THE COURT:  No, afterwards -- sorry, I'm just telling

15  counsel for Black and Cunningham he can speak after you're

16  done.

17       MR. BUTLER:  Okay.

18       THE COURT:  But finish your argument on the other

19  objectors.

20       MR. BUTLER:  Okay.  With respect to the bargain plan,

21  here -- and I'm not going to focus this argument on the United

22  case.  We believe it's on all points with what we're doing.  We

23  believe, in fact, that we structured this to follow carefully

24  the requirements in United.  And Your Honor, our papers address

25  that in detail and I'm not going to make a further United

198

1    argument here unless Your Honor wants me to.  I'll be happy to

2    go into it.

3          THE COURT:  No, you don't need to.

4          MR. BUTLER:  What I would rather do here is focus on

5    certain aspects of the settlement, and then I'll focus on

6    Ms. Robbins' argument that somehow we have violated the labor

7    MOUs in violation of 1113(f).

8          I think Your Honor, having watched it stew in over an

9    almost fifteen-month period, I think Your Honor is aware of how

10   the labor MOUs came into being after an extended hearing under

11   Sections 1113, 1114 of the Bankruptcy Code.  And it's also

12   clear under those orders that Your Honor retained jurisdiction

13   to hear and determine all matters arising from the

14   implementation and performance of that order in the MOUs.

15         So Your Honor clearly has jurisdiction expressly

16   retained to make the findings we're asking Your Honor to make

17   today.  And we believe that the specific provision of the labor

18   MOUs establish Delphi's right to terminate the Delphi HRP even

19   more clearly.

20         And I agree, every person counts.  And the reality is

21   we need to address the IAM, IBEW, and IUOE objections with

22   their own merits.  I will note that the UAW, the IUE-CWA, and

23   the USW no longer contest -- they had contested on this

24   record -- no longer contest the determinations we're asking

25   Your Honor to make in the court order -- the plan modification

199

1    order today.

2           With respect to the IAM, IBEW, and IUOE MOUs, the

3    facts are that they contain explicit reservation of rights to

4    terminate the Delphi HRP.  Counsel acknowledged that each of

5    the MOUs has an agreement in it that agrees and acknowledges

6    that Delphi reserves its right to seek termination of the

7    Delphi HRP consistent with applicable law.

8           If that was all there was, we could be having a debate

9    here about whether we're seeking termination and whether that

10   alone was sufficient to give the Court comfort.  But the fact

11   is, Attachment C to the labor MOUs also indicates that the

12   agreement was without prejudice to Delphi, quote, "in any

13   pension termination proceeding under ERISA and/or under the

14   Bankruptcy Code."

15          An involuntary termination by the PBGC pursuant to the

16   Delphi-PBGC settlement agreement -- they make their unilateral

17   determination -- has to fall within this definition.  There can

18   be no reasonable argument that there's a unilateral

19   modification of these CBAs under Section 1113 of the Code when

20   the agreement specifically provides that the actions complained

21   of can be taken.

22          And here, in addition to the assertion that Delphi

23   reserves it right -- or agreement that Delphi reserves its

24   right to seek termination, there's a further agreement in

25   Attachment C which says that the agreement is without prejudice

200

1    to Delphi in any pension termination proceeding under ERISA

2    and/or under the Bankruptcy Code.  I don't think it could be

3    any more explicit than that.

4          Now, the IUOE, IBEW, and IAM further argue that

5    termination of the HRP would somehow violate the implementation

6    agreements executed following the labor MOUs.  And Ms. Robbins

7    pointed out to Your Honor the exhibit that applied to her union

8    was Joint Exhibit 126 was the implementation --

9          THE COURT:  I'm sorry, before you -- could you just --

10   where does that appear in Attachment C?

11         MR. BUTLER:  Let me get it.  Let me get it, Your

12   Honor.

13      (Pause)

14         MR. BUTLER:  I've got to pull it, Your Honor.  One

15   second.

16         THE COURT:  Okay.

17         MR. BUTLER:  Your Honor, can I -- I gave you our only

18   binder --

19         THE COURT:  You can come back to that -- oh --

20         MR. BUTLER:  Can I get your binder back for just one

21   minute?

22         THE COURT:  Sure.  It had Attachment C, so --

23         MR. BUTLER:  Your Honor, we've been at this for almost

24   two and a half hours.  Can we take a five-minute recess and

25   I'll --

201

1           THE COURT:  That's fine.

2           MR. BUTLER:  Thank you.

3       (Recess from 5:36 p.m. until 5:54 p.m.)

4           THE COURT:  Okay.  We're back on the record in --

5           MR. BUTLER:  Thanks, Judge.  We've put the annotated

6   provision on your -- provided it to Your Honor.  It's paragraph

7   3(c), the bottom part of paragraph 3(c) of each of Attachment

8   C.  We also laid these all out in footnote 28 in our reply

9   brief as they are described there.

10      (Pause)

11          THE COURT:  Okay.  Thanks.

12          MR. BUTLER:   Moving on, Your Honor, to the

13  implementation argument, I believe that Ms. Robbins made the

14  argument that the IUOE, IBEW and IAM believe that termination

15  of the HRP would violate the implementation agreements executed

16  following the labor MOUs.  I don't understand that argument

17  because if you look at the implementation agreement, I was

18  making the point that Ms. Robbins identified Joint Exhibit 126

19  as the relevant implementation agreement.  All they did was

20  accelerate certain existing rights and obligations under the

21  MOUs.  Section 7 of those agreements provided, and I quote,

22  "other than as adjusted, conformed or modified by this

23  implementation agreement, or as required to carry out this

24  implementation agreement, the other terms and conditions of",

25  end quote, the MOUs with the unions remain unchanged.  So the

202

1   implementation agreements didn't alter in any respects Delphi's

2   rights with respect to termination of the HRP.  More

3   importantly, the acknowledgement of the three unions that the

4   termination of the HRP, either through a Delphi initiated

5   termination or through a pension termination proceeding, was

6   contemplated by those agreements.

7        For those reasons, Your Honor, we believe that the

8   Delphi PBGC Settlement Agreement should be approved, and Your

9   Honor should overrule the union objections to the modified plan

10  under Section 1113(f) of the Bankruptcy Code.  We believe that

11  Your Honor should make an express finding that Delphi may

12  consent to a termination and trusteeship agreement with the

13  PBGC without violating the labor MOUs, or the Section 1113,

14  1114 settlement approval orders, or Section 1113 of the

15  Bankruptcy Code.

16       I should point out, Your Honor, just so the record is

17  clear as to the UAW, USW and IUE-CWA, the record shouldn't be

18  construed that they've consented to this relief.  They have

19  simply withdrawn their objections to the relief, and then they

20  take no position on the relief.

21       THE COURT:  Okay.

22       MR. BUTLER:  And the record should be clear in that

23  respect.

24       THE COURT:  All right.  Okay.  I know that counsel for

25  Mr. Black and Mr. Cunningham wanted to say a brief report too.

1          MR. SHELLEY:  Thank you, Your Honor.  Just a few brief

2     points.  Most of the material Mr. Butler raised about settlor

3     functions and the administrative, the plan administrator's

4     obligations, those are really matters for the Eastern District

5     of Michigan to decide.  Those are substantive matters.  Our

6     only point is that there are arguments being made on both sides

7     that make the plan termination not inevitable, and, therefore,

8     speculative.  But I --

9          THE COURT:  Well, it may not be inevitable, but, I

10    mean, if you're raising an objection at all it's a feasibility

11    objection.  So I do have to consider feasibility --

12         MR. SHELLEY:  Sure.

13         THE COURT:  -- and so --

14         MR. SHELLEY:  Yes, and I do want to get to the more

15    substantive issue then.

16         THE COURT:  All right.

17         MR. SHELLEY:  The idea of a settlor function, this

18    being a settlor function to terminate this plan that Delphi is

19    exercising, it makes no sense.  They're not even terminating

20    it.  It's an involuntary termination.  It's PBGC versus Delphi.

21    So the idea that this would be a settlor function, we don't

22    think holds up.  It also is, under the statute, a function

23    that's given to someone called the plan administrator.  And,

24    typically, it's not given to the sponsor.  ERISA talks about

25    sponsors.  It's not given to the employer.  ERISA talks about

204

1    those too.  It's given to the plan administrator, and under

2    ERISA it's a fiduciary function if the plan administrator is

3    exercising any kind of discretion.  The idea that the plan

4    administrator would agree to a termination in one way, as

5    opposed to another, is a discretionary matter, and cases hold

6    that the method of termination, even if termination isn't -- is

7    a settlor function, is not, is itself a fiduciary function.

8            THE COURT:  But that didn't seem to be much of an

9    issue for the Courts in LTV, including the Supreme Court --

10           MR. SHELLEY:  Well, and the reason --

11           THE COURT:  -- or the Seventh Circuit in UAL.

12           MR. SHELLEY:  The Supreme Court cases that talk about

13   settlor functions, they aren't involuntary terminations.  There

14   are other types of terminations when everyone's made whole --

15           THE COURT:  No, but in LTV they agreed not to enter

16   it.  Once the PBGC had decided to terminate LTV agreed to the

17   procedure under 1142(c), the fourth sentence of it, and --

18           MR. SHELLEY:  Yes.

19           THE COURT:  -- that was LTV as plan administrator.  It

20   didn't seem to bother anyone.

21           MR. SHELLEY:  And it all makes sense if the plan

22   administrator is acting with an eye towards what's in the best

23   interest of the employees.  You can have a summary termination,

24   because those people who are harmed by it are being protected

25   by the usual fiduciary function that the plan administrator is

1    exercising.  But if they're conflicted, or they're thinking

2    about the corporate interest as opposed to the employee's

3    interest, then there's no question that in all the papers that

4    have been filed Delphi is saying plan administrator equals

5    Delphi.  That they're not taking it on as a fiduciary function.

6    So these are arguments we're going to make in --

7           THE COURT:  But why isn't 1303 the issue there?  I

8    mean isn't that the remedy --

9           MR. SHELLEY:  To go after the PBGC --

10          THE COURT:  -- 1303?

11          MR. SHELLEY:  -- for instance?

12          THE COURT:  Yes.

13          MR. SHELLEY:  Well, the plan has to be terminated

14   first.  It has not been terminated, and so we will go through a

15   1303 into the Eastern District of Michigan and raise our

16   arguments that this plan cannot be properly terminated, at

17   least it can't be summarily terminated, and that through an

18   adjudication we'll make all the arguments on the merits that we

19   think are appropriate as to why the termination standard itself

20   cannot be satisfied and a district court shouldn't approve

21   that.

22          The last point I'd like to make is that we very much

23   understand the real world, and that this plan has been run into

24   the ground, and that there isn't enough money, and it's likely

25   to be terminated in the end.  But it being terminated based on

206

1     the current terms and with the current strings attached or the

2     current conditions is one thing, and being terminated in

3     another way that the Eastern District of Michigan might say

4     complies with all of the standards of termination is quite

5     another thing.  So if this plan is terminated down the road,

6     that may happen, but that it will be terminated on the terms

7     and conditions that are expected right now is quite another

8     thing.  So our argument is that the termination should play out

9     before the Court should approve the modified reorganization

10    plan.

11            THE COURT:  Okay.

12            MR. SHELLEY:  Thank you.

13            MS. ROBBINS:  Your Honor, I wanted to just --

14            THE COURT:  I think you have to come closer to a

15    microphone.

16            MS. ROBBINS:  Two very quick points just on

17    interpretation of language, Your Honor.  If you look at 3(c) on

18    page 29 of the various MOUs that, first of all, only applies to

19    the SAPT, which is that attachment.  It does not apply to the

20    entire agreement.  It does not apply to the section on pension

21    we referred to earlier.  But the other point that I want to

22    point out to the Court is this is a reservation of rights for

23    all parties.  It is not something that provides a specific

24    right for Delphi.  It's basically saying we can continue to

25    take our positions so they can continue to take their positions

1     as to the SAPT, which is this attachment.  It's not something

2     that provides any rights or acknowledges any rights.

3            The other point that I would just make is that in that

4     section of the Attachment B to the PBGC agreement 4(b), while

5     there is a discussion about maintaining rights to address

6     calculations with respect to certain add-ons.

7            The very last reference that I made was excepting the

8     validity in the application.  Not accepting, E-X excepting the

9     validity and application of the PBGC policies.  Now, we haven't

10    gotten the discovery materials from the PBGC to know everything

11    about how this was negotiated or what it means, but it looks

12    like that last provision is excluded from the reservation of

13    rights, just looking at the language.  Thank you.

14           THE COURT:  Okay.

15           MS. MEHLSACK:  Your Honor?  Just briefly.  Mr. Butler

16    mentioned that the agreement in the United case had a broader

17    waiver with respect to the PBGC's rights than was able to be

18    obtained in this case.

19           THE COURT:  Well, actually a more specific waiver.

20           MS. MEHLSACK:  A more specific waiver.  Sorry.

21           MS. MEHLSACK:  Whatever it was, Your Honor, it was

22    clearly not raised before the United Court, and nor were the

23    4047 issues or 1303 issues that we raised, so that the United

24    case is not dispositive in this regard, because the issues

25    simply weren't raised before the Court.

208

1          The other is, Your Honor, that, again, the provisions

2    that Mr. Butler cites with respect to Exhibit C do nothing to

3    derogate from the rights of the unions and the participants

4    under the collective bargaining agreement that provide that any

5    kind of a reduction in benefits shall be equitable when it

6    comes to all participants in the HRP, and the effective of

7    what, the consequences of what's happening here are there is

8    not such an equitable reduction.  I know that Mr. Butler said

9    well, that's GM's issue, not Delhi's issue, but the overall

10   purchase price of the assets that Delphi is transferring to GM

11   are what this plan is all about.  And so the question of how

12   much might be allocated to what are being called to-ups for the

13   other unions who are, yes, have withdrawn their objections and

14   who, as Mr. Kennedy acknowledged, are in the process of

15   negotiations, those are all issues that Delphi had the

16   opportunity to negotiate.  We haven't had that opportunity, nor

17   does it look like we will be getting that opportunity.  Thank

18   you, Your Honor.

19          THE COURT:  Okay.  All right.  We've been addressing

20   three objections to the plan modification motion and the

21   debtors' request for approval of an integral settlement to that

22   motion, which is the debtors' agreement with the PBGC dated as

23   of July 21, 2009.  The objection I'll deal with first is by

24   Messrs. Black and Cunningham, who are individuals who are

25   covered by the Salaried Workers' Pension Plan.  They contend

209

1    that the agreement between the debtors and the PBGC is one that

2    I shouldn't approve because the benefits of that agreement

3    which flow from the ultimate termination of the pension plans

4    and their being taken over by the PBGC, are too speculative for

5    me to consider that the plan itself is feasible in light of

6    that contention.  It's also contended that the agreement itself

7    is too indefinite.  To the extent that objection was originally

8    raised when it pertained to the original terms of the

9    modification that stated that the plans would be addressed by

10   GM, and the language in the disclosure statement that made it

11   clear that no one really knew from the debtors' perspective

12   what that meant, would have some real merit.  But since that

13   time the debtors entered into the PBGC settlement agreement,

14   and I believe that those terms are clear at this point and not

15   indefinite.  So, really, the only objection that is even

16   colorable is the feasibility objection.

17         On that score, the objection is somewhat coy in that

18   it raises for the Court the issue of the PBGC not being able to

19   terminate the plans, notwithstanding its authority under 29

20   U.S.C. 1342, but at the same time doesn't really provide me

21   with a lot of reasoning as to why that would not be the case.

22   To the extent that there have been arguments raised by the

23   objectors I have considered them, and I believe that for

24   purposes of determining feasibility of the plan as modified and

25   whether the debtors are entering into an agreement that is

210

1    illusory, I conclude that the objection should be denied.

2        The debtors do not ask for a determination that they

3    are authorized to enter into the termination agreement with the

4    PBGC under Section 3(b)(i) of the settlement agreement for all

5    purposes, but only that such termination would not be a

6    violation of the labor MOUs, the Union 1113, 1114 settlement

7    approval orders or the local agreement between Delphi,

8    Connection Systems, and Electronic and Space Technicians Local

9    1553.  So I'm not determining and not being asked to determine

10   whether Delphi as plan administrator would have the right to

11   enter into the termination and trusteeship agreement in the

12   form attached as Exhibit C to the settlement agreement

13   otherwise.

14       But I conclude that, there's certainly a reasonable

15   likelihood in my mind that a) that the PBGC's termination, to

16   terminate these plans will be upheld, and, b) that Delphi will

17   be able to enter into the termination and trusteeship agreement

18   to expedite that termination and reduce the costs thereof.

19       The record is clear and uncontroverted that these

20   plans are both seriously underfunded and that the debtors have

21   very substantial unpaid post-petition contributions to the plan

22   in the nature of hundreds of millions of dollars, and, more

23   importantly, that the debtors lack the cash to continue to make

24   post-petition contributions to these plans, given the fact that

25   they have no source of ongoing funding except as been agreed to

211

1    by GM and the DIP lenders in connection with facilitating the

2    transactions before me, all of which are an outgrowth of a

3    several month period where the debtor was living on week to

4    week and sometimes day-to-day extensions of forbearance under a

5    terminated DIP facility without any ability to obtain

6    replacement financing.

7         So it appears to me that it is reasonable to assume

8    that the PBGC settlement agreement is not illusory, that, in

9    fact, the determination by the PBGC to terminate the pension

10   plan under 29 U.S.C. Section 1142 is appropriate in that the

11   debtors will be enabled to facilitate that implementation

12   through the termination and trusteeship agreement referenced in

13   paragraph 3(b)(i).

14        So, again, without ultimately deciding the underlying

15   issues, including whether the only remedy for parties aggrieved

16   by such a determined by the PBGC is under 29 U.S.C. Section

17   1303, I conclude that the plan modification is feasible and

18   that the agreement is not illusory and that the debtors,

19   therefore, are exercising proper business judgment to enter

20   into it.

21        The objection by Fiduciary Counselors Inc. also,

22   ultimately, in my mind, is a feasibility objection, other than

23   simply a statement by FCI that it continues to protect the

24   rights of the plans for unpaid contributions unless and until

25   the PBGC takes over those rights upon a termination.  The

212

1    debtors candidly acknowledge that if, in fact, after approval

2    of the PBGC settlement agreement the PBGC is somewhat stymied

3    in terminating the pension plans, the debtors would not be able

4    to implement the plan as modified, and, therefore, that if that

5    condition occurred the plan would not be feasible.  I am

6    painfully aware of the consequences of confirming a plan, i.e.

7    this plan, the one that's currently in place for the debtors,

8    when there is an open contingency as to feasibility in that

9    ultimately the current plan in effect was rendered infeasible

10   by the determination of the plan investors not to close.

11           However, again, for the reasons that I previously

12   stated with regard to Messrs. Black and Cunningham's objection,

13   it appears reasonable to me to conclude that the PBGC's

14   determination to terminate these plans which are, again, very

15   seriously underfunded and, more importantly, cannot be funded

16   going forward by the debtor, will stand up, and, consequently,

17   I believe that based on that reasonable assumption this plan

18   modification is feasible.  Obviously, FCI has reserved all of

19   its rights in the event that the plan is not terminated, and

20   I'm sure will be back pursuing its claims if that is the case,

21   although at that point one would wonder, and, frankly, given

22   the FTI liquidation analysis, which is uncontroverted, one

23   would assume that there would be no recovery on that claim at

24   that point, which is another reason why I believe that this

25   plan, to the extent it hinges upon the PBGC's termination of

213

1    these plans is feasible, in that that liquidation scenario with

2    no recovery beyond secured creditors is avoided.  So I will

3    overrule the FCI objection.

4         Finally, three of the debtors' unions have objected to

5    the plan modification and the PBGC's settlement.  The IUOE, the

6    IBEW and the IAM, those unions contend the settlement violates

7    their memorandums of understanding and the related agreements

8    to those that appear in Exhibits 122 and 126 in the record.

9    And, further, that the Court cannot make the finding sought by

10   the debtors, which, again, appears at paragraph 3(b)(i) of the

11   PBGC settlement, that the termination by the PBGC under 29

12   U.S.C. Section 1342 is not a violation of the agreements that

13   the debtors have with them.  The law I believe is clear that

14   the PBGC may terminate a pension plan under Section 1342

15   notwithstanding that a collective bargaining agreement has

16   within it as a provision that the plan be maintained.  See

17   Pension Benefit Guaranty Corporation v. LTD Corporation, 496

18   U.S. 633 at 639 (1990) in which the Supreme Court said, "The

19   PBGC may terminate a plan involuntarily notwithstanding the

20   existence of a collective bargaining agreement."  See also In

21   re Jones & Rothland Hourly Pension Plan in Pension Benefit

22   Guaranty Corporation v. LTD Corporation 824 F.2d 197 (2d Cir.

23   1987).  Which stands for the same proposition, and further

24   states that -- or stands for the proposition that under the

25   four-sentence subsection 1342(c) of 29 U.S.C. the PBGC need not

214

1    comply with the other requirements of the subsection and,

2    therefore, does not need to go through a pre-termination court

3    adjudication that would give a union a right to notice where

4    there has been an agreement following that determination to

5    terminate to enter into a termination and trusteeship agreement

6    with the plan sponsor and administrator such as is contemplated

7    by paragraph 3(b)(I) of the PBGC settlement.

8         So it appears to me clear that the action of the PBGC

9    under the PBGC settlement agreement, which is the termination

10   that is referred to in that subparagraph of paragraph 3 does

11   not violate the union agreements, or require determination

12   under Section 1113 or 1114 of the Bankruptcy Code.

13        This very issues was addressed relatively recently by

14   the Seventh Circuit in In re UAL Corporation, 428 F.3d 677 (7th

15   Cir. 2005).  And, frankly, based on my review of the PBGC

16   settlement agreement and the language of the agreement between

17   the PBGC and United Airlines quoted in the Seventh Circuit

18   opinion I've just cited, it appears to me that the relief the

19   debtors are seeking is on all fours with the Seventh Circuit's

20   determination that entry into such a settlement agreement by a

21   debtor does not violate Section 1113 or 1114 of the Bankruptcy

22   Code.  It's clear to me from reading the settlement agreement

23   that the termination under Section 1142 of the pension plans

24   described therein is left to the determination of the PBGC.

25   And it is only if and when the PBGC issues a notice of

1    determination pursuant to Section 29 U.S.C. 1342 that any

2    obligation of the debtors kicks in.  That's, I believe, on all

3    fours with the agreement at issue in the United Airlines case.

4    All of the language in the PBGC settlement agreement pertaining

5    to the determination by the PBGC is expressed in terms of a

6    condition occurring later or in precatory language, or as

7    stated to the extent that the PBGC so acts.

8         So the agreement insofar it deals with termination of

9    the pension plan hinges upon the PBGC's actions under 1142 and

10   not the debtors.

11        Further, I don't believe there's anything pretextual

12   or underhanded in the way that right of the PBGC is recognized

13   here.

14        It is also argued by the two unions that the

15   settlement agreement locks in the PBGC to actions that the PBGC

16   should not be locked into if the PBGC were acting properly.  It

17   is not my function or jurisdiction to evaluate whether the PBGC

18   is acting properly or not in the context of this motion.  I'm

19   not being asked to approve the PBGC's actions.  Rather, as the

20   Bankruptcy Code and case law is clear, I am supposed to

21   evaluate a settlement from the perspective of the debtors'

22   estate and creditors.  That point was made on a jurisdictional

23   basis in the UAL case as I previously ruled in dealing with the

24   jurisdictional objection made earlier in this hearing.

25        But it's also a principle of substantive law that my

216

1    review is based on what's in the best interest of the estate

2    and whether the settlement is fair and reasonable as far as the

3    debtors' estate and creditors are concerned.  Indeed, as

4    potential creditors of the PBGC under Section 1303, I think

5    it's -- it would be doubly improper for me to evaluate those

6    objections raised by the union that goes to the PBGC's

7    determination to enter into this agreement.  See generally In

8    re Refco Inc., 505 F.3d 109 (2d Cir. 2007).

9         It was also suggested, I think, that by compromising

10   the PBGC's claims which include potential secured claims as

11   well as priority administrative claims for post-petition

12   contributions the settlement would alter the priority rules of

13   the Bankruptcy Code.  I believe that was a backhanded reference

14   to the Second Circuit's Iridium decision.  However, that

15   decision addressed settlements that purported to alter the

16   rights of creditors who are not party to the settlement.  The

17   PBGC, once the plans are terminated, would have the claims,

18   itself, and is prepared and capable under 29 U.S.C. 1367 to

19   settle those claims which are contingent at this point

20   conditioned upon plan termination.  So I don't believe that

21   there's any question of violation of the fair and equitable

22   aspect of approval of a settlement as articulated by the Second

23   Circuit in In re Iridium.

24        I'd also note, that the PBGC, while not pursuant to

25   its statutory mandate, liable for paying all of the benefits

1    that are provided for under the plan's pre-termination will be

2    paying substantially more over time than the priority or

3    administrative claim benefits.  So under any argument, I don't

4    believe that the debtors by entering into this settlement are

5    somehow skewing anyone's rights to recover as a priority or

6    administrative creditor.

7         Finally, it was argued that the settlement agreement

8    would give this Court's blessing to actions by the PBGC as

9    opposed to authorizing the debtor to perform the settlement.

10   I've already addressed that point, I believe, including this

11   citation to the Refco case.  But I do note further that for

12   purposes of clarity the order that the debtors have asked me to

13   enter specifically reserves parties rights under 29 U.S.C.

14   Section 1303.

15        Other than that, all I can say is that it appears

16   reasonable to me for the PBGC to have acted in the way it did

17   sufficient for me to find, as I said previously, the

18   modification of the plan is feasible insofar as it depends upon

19   the termination of the pension plan.  And that to the extent

20   the PBGC actions in entering into that agreement are subject to

21   review, my order approving the settlement does not preclude

22   such review as a matter of law.  Although, if indeed, the

23   debtors enter into the termination and trustee agreement, the

24   degree of review may be significantly curtailed as set forth in

25   the Second Circuit LTD case that I've previously cited.

218

1          The debtors have further stated that various

2     provisions of their agreements with these unions in the -- in

3     particular paragraph 2(b) of the MOU at page 6 of 32 and

4     attachment C acknowledged the debtors' rights under the MOU to

5     seek termination of the plan or the plans.  But I believe

6     that's unnecessary to rely upon, given that the undertakings to

7     maintain the benefits under the plans are subject to applicable

8     law and I see no basis for the debtor to be compelled to

9     maintain an agreement that is terminatable by the PBGC without

10    any reference to whether the agreement is in a collective

11    bargaining agreement or not.

12          So for those reasons, I'll overrule the three unions'

13    objections to the modification motion and to the PBGC

14    settlement.

15          MR. BUTLER:  Your Honor, I was asked by counsel for

16    American Aikoku Alpha Inc., their objection is at docket number

17    17773, whether we could take up his objection next because of

18    some travel commitments that he has.

19          THE COURT:  Okay.

20          MR. BUTLER:  So I will turn to that objection and then

21    go back to some other matters.

22          THE COURT:  Okay.

23          MR. VIST:  Thank you, Mr. Butler.  Good evening,

24    Judge.  Gary Vist for American Aikoku.

25          The gist of our objection -- as I said it earlier, we

219

1    have three objections, two are specific to assumption -- non-

2    assumption notices.  I don't want to take up the Court's time

3    with these today.

4         The third objection is the objection to the plan,

5    itself.  Basically, my client and Delphi have entered into a

6    stipulation in May of 2008 under which my client is supposed to

7    get approximately 414,000 dollars upon the sale of the steering

8    and half shaft business.  The stipulation that we have entered

9    into also provides that to the extent that any order related to

10   the sale of the steering and half shaft business alters,

11   conflicts with, or derogates from the provision of this

12   stipulation this stipulation shall control.

13        Our understanding is that the steering and half shaft

14   business is being sold to GM as a part of this modification

15   plan.  It is the debtors' position that the plan allows them to

16   basically not pay the stipulation amount in full but to

17   basically make a partial payment under it.  We believe that the

18   language of the stipulation is clear and that the plan has to

19   be modified to provide that if there's any agreement between

20   the debtor and the creditor, that where a statutory agreement

21   says that the agreement would supersede any future order

22   conflicting with it, that the plan has to be modified to

23   provide that such agreement does take precedent over any

24   provision set forth, or any proceeding allowed by the plan.

25        And that is the gist of our objection.

220

1     (Pause)

2         MR. BUTLER:  Your Honor, just give me one moment.

3     (Pause)

4         MR. BUTLER:  Your Honor, as counsel indicated, two of

5     their three objections have been adjourned to the August 17th

6     hearing.

7         The objection that they're trying to assert now

8     somehow is that the stipulation attaches Exhibit C to the

9     objection, is somehow enforceable in the context of the

10    modified plan.  That objection resolved an objection to a sale

11    that later failed.  And if you look at the title of the

12    objection the title was, "A stipulation agreed order resolving

13    assumption or assignment of the executor contractor or

14    unexpired lease to the buyers in connection with the sale of

15    steering or half shaft."  That sale failed, it never went

16    forward.  And they've now asserted new objections with respect

17    to the current modified plan.  Those objections have moved

18    forward to the August 17th hearing.  And I don't believe that

19    you can interpret this order as suggesting that under every

20    circumstance in these cases if the sale that they were settling

21    in did not proceed, and, in fact, did not go forward, that they

22    ought to be able to get the kind of relief that they addressed

23    here.

24        I also would point out to Your Honor, that in addition

25    to this agreement being solely in the context of the selling of

1    Steering Solutions to what was actually Platinum at the time,

2    there is no obligation set forth anywhere in this stipulation

3    that obligates us to assume their contracts.  And these

4    involved to a certain extent, I believe expired purchase

5    agreements at this point.  And so I think that just in

6    referring to the overall objection as it relates to the plan, I

7    believe that the plan objection, Your Honor, should be

8    overruled.

9           MR. VIST:  Let me just briefly, Your Honor.

10          I believe most of the issues will be addressed on

11   August 17th with respect to the contracts, whether it expired

12   or not, et cetera.  But our position is that the stipulation is

13   not specific to the sale of Platinum.  Both pages 6 and 7 of

14   the stipulation which provide that we are going to get paid

15   upon the sale of the steering and half shaft business do not

16   state that we're going to get paid only if that business is

17   sold to Platinum.  The capital letters are not used, it's a

18   generic language.  And, again, therefore, we believe that we're

19   entitled to be paid whenever this division is sold to anyone,

20   and we believe the obligation is absolute.  And we believe that

21   paragraph 5 thus provides that the stipulation controls

22   vis-a-vis any future order that conflicts with it.

23          THE COURT:  But it refers to a cure payment, right?  I

24   mean, that's a 365 term, right, where a contract's assumed?

25          MR. VIST:  It does refer to a cure payment, but it

222

1    doesn't specifically address assumption or non-assumption.  And

2    in negotiations over it there were actually no assumption or

3    non-assumption discussions.  And, obviously, again, I don't

4    know how to bifurcate that with what we're going to argue or

5    maybe not argue on August 17th.  But, at least, with respect to

6    the plan we've tried to limit it where if the plan does allow

7    the debtor to basically neglect to follow through on its

8    obligations under a prior agreement we believe the plan should

9    be modified to reflect that.

10          MR. BUTLER:  Your Honor --

11          THE COURT:  But that presumes that the debtor has

12    obligations under the agreement?

13          MR. VIST:  Yes.

14          MR. BUTLER:  Your Honor, that's precisely our point.

15    If you actually read the terms at page 7 of the stipulation it

16    basically says as soon as reasonably practical upon the closing

17    of the sale.  It doesn't say any sale, it's "the sale," the

18    sale that was part of the 365 agreements pursuant to which this

19    cure was entered into they should receive a cure payment.  No

20    sale occurred, they didn't receive a cure payment.  Paragraph

21    2, "Upon payment of the cure amount their claim shall be

22    disallowed and expunged."  No cure occurred, no payment was

23    made, their claims were not expunged.

24          The steering objection's irrelevant because that sale

25    never closed.  "And, similarly, upon payment of the cure amount

223

1    paragraph 4 American Aikoku shall be deemed to have withdrawn

2    with prejudice the reclamation demand, the cure proposal, the

3    response, the amended claim motion," none of which are deemed

4    withdrawn because they were not paid the cure amount.  And

5    what's happened since 2008 to now, I believe, when we'll find

6    out -- we'll deal with this on August 17th, is their contracts

7    have expired.  And I don't believe that they're going to be

8    able to assert, we'll determine at that point in time.  I think

9    this argument is in part because they received, I believe, a

10   notice of non-assumption for one of the contracts that expired,

11   and is no longer subject to cure, because it expired in

12   accordance with its terms.

13        And paragraph 5 says to the extent that any order

14   related to "the sale" of the steering -- "the sale" has to mean

15   this sale not any sale.  This was a 365 agreement that was

16   reached in the context of the assumption and assignment of this

17   contract to Platinum.  That assumption and assignment never

18   occurred, is not going to occur.  And just like all of the

19   other assumption and assignment agreements that were reached

20   back then in terms of the actual assignment over in connection

21   with steering, there are because of the passage of time and the

22   change in agreements, and I think counsel would acknowledge

23   that as to his own clients, the contracts have expired unless

24   he wants to argue they haven't at the time of the hearing on

25   August 17th, they don't exist anymore.  And you can't now go

224

1    back and get another pre-petition payment on something under

2    these circumstances.

3            But I'm not here to argue the cure issues, just to say

4    to Your Honor that as -- their general objection is somehow

5    this plan can't be confirmed because we're somehow violating

6    the Bankruptcy Code or violating prior orders of the Court, I

7    would ask Your Honor to find that there's no violation of this

8    order because this sale never closed, therefore no cure was

9    ever due and owing with respect to the sale.

10           THE COURT:  Okay.

11           MR. VIST:  If I may, just for the record, we are going

12   to argue that the contracts are still in existence on their

13   face, they're expiring in 2011.  But, again, we'll take that up

14   on August 17th.

15           THE COURT:  All right.  But as far as this objection

16   goes, I just don't read this stipulation and order, which is

17   attached as Exhibit C to Aikoku's objection, as requiring

18   payment of money other than in the context of a request to

19   assume the contract by the debtors.  The phrase used is "as

20   soon a reasonably practicable upon the closing of the sale of

21   the steering and half shaft business, American Aikoku shall

22   receive a cure payment of $413,908.96 to cure all default under

23   the purchase orders."  The word "cure" is a term of art under

24   the Bankruptcy Code, it's used in Section 365(b) in connection

25   with the right of a debtor to assume an executory contract or

225

1   unexpired lease.  The debtor has to cure all pre-petition

2   defaults or provide adequate assurance of prompt cure.

3   Otherwise, if the debtor is not assuming a contract, the debtor

4   is not authorized to pay pre-petition debt except in

5   extraordinary circumstances.  And, certainly, submission of a

6   stipulation and order like this under the circumstances under

7   which this was entered on May 28th, would not count as

8   extraordinary circumstances.

9        Furthermore, the introductory clauses putting the

10  order in context note that in connection with the request by

11  the debtors to approve a specific transaction, they filed as

12  was contemplated, an assumption notice and a notice of cure

13  amount, giving nondebtor parties to contracts an opportunity to

14  object to the proposed assumption of the contracts.  And, in

15  fact, the recital on page 5 states that American Aikoku filed

16  its notice of cure claims of American Aikoku Alpha Inc., docket

17  number 13010, the cure proposal asserting a cure amount of

18  415,761 dollars to cure defaults under the purchase orders.

19       So it appears to me clear from both the context and

20  plain language of the agreement as well as the obligations of

21  the debtor under the Bankruptcy Code, that the only reason

22  interpretation of this paragraph 1 is that it applies to a

23  specific request to assume the contracts.  So unless the

24  debtors are moving to assume this agreement, I don't believe

25  this is enforceable.

226

1          MR. VIST:  Thank you, Judge.

2          THE COURT:  Frankly, I think I've ruled that in this

3    case before in connection with someone else's arguments in

4    respect of an executory contract that was assumed, assuming

5    that the plan would be confirmed and go effective.

6          So to the extent it's not law of the case it is now.

7          MR. VIST:  Okay.

8          MR. BUTLER:  Your Honor, I don't see Ms. Robins and

9    Ms. Mehlsack here.  They had arguably some other objections in

10   their pleadings, and I'll need to check with them to see if

11   they intend to pursue them.

12         THE COURT:  I think it's the business judgment --

13         MR. BUTLER:  Right.

14         THE COURT:  -- of entering into these agreements in

15   the first place, or whatever standards you apply whether it was

16   appropriate to enter into these agreements.

17         MR. BUTLER:  And I'll be addressing those, Your Honor,

18   at the end, in what I think will be an abbreviated close.

19         With respect to the last objection that I think an

20   objector has indicated they wish to pursue, it would be Mr.

21   Sumpter who is on the telephone I believe, who filed a COBRA

22   motion under docket number 18366.  We filed an opposition to

23   that under docket number 16457.  And I would just say, Your

24   Honor, that the initial -- Mr. Sumpter is participating today

25   on a pro se basis.  I did want to say, Your Honor, at the

227

1    outset of this that this particular objector participated in

2    and was an objector in the OPEB termination litigation at which

3    these issues were addressed.  And we believe that the OPEB

4    termination order which Mr. Sumpter did not appeal acts on a

5    res judicata basis, his motion.  We do not believe that there

6    is a COBRA benefit that exists, this is -- Your Honor, may

7    recall we had that technical discussion on the record --

8              THE COURT:  The twelve-month issue?

9              MR. BUTLER:  Twelve month either way.  Twelve month

10   before you file, twelve month after you file, about a twenty-

11   four month window.  And this is occurring outside of the

12   window.  We had that -- that was discussed at length, and there

13   were pleadings filed at length on all sides as it relates to

14   those issues in the OPEB termination matters.

15             So I think, initially, Your Honor, the debtors believe

16   this would be barred by principle of res judicata.  And I

17   understand that Mr. Sumpter is appearing pro se.  So just --

18   and I think -- but I do think I have an obligation to raise it,

19   and I think Mr. Sumpter should acknowledge to the Court that he

20   was an objector to that hearing and probably recalls that these

21   issues were, in fact, discussed at that hearing and were part

22   of the record at that hearing.  I don't expect Mr. Sumpter

23   necessarily would understand the principles of res judicata and

24   I'm not trying to use a lot of fancy words in defending against

25   his objection, but I do have an obligation to raise that.

1        THE COURT:  Okay.  Mr. Sumpter, you still on the

2    phone.

3        MR. SUMPTER:  Yes, I am.

4        THE COURT:  All right.  You were a party -- you did

5    object to that earlier motion, correct?

6        MR. SUMPTER:  I objected to the termination of

7    benefits without the 1114 committe.

8        I received a notice I think around February 5th.  And

9    I think it was a hearing -- they mailed the schedule for the

10    17th and then later -- but that is what I objected to.

11        THE COURT:  Okay.  All right.  Well, do you have

12    anything to add to the objection that you filed, which I know

13    my chambers had told you effectively this issue would be dealt

14    with as an objection to the plan.  And so that's why it's being

15    heard now, which I guess is -- in my view it was on all fours

16    with the other relief that you had sought.

17        MR. SUMPTER:  I'm sorry, I don't understand that.

18        THE COURT:  Do you have anything to add to the

19    objection -- to the pleading that you filed?

20        MR. SUMPTER:  Yes.  Yes, I do.

21        THE COURT:  Okay.

22        MR. SUMPTER:  First, if it's permitted, I'd like to

23    comment on the comments here.  The person just may not have

24    (indiscernible) had the same.

25        But in terms of discussing this part of the statute,

229

1    what I have in my information is that the debtors' attorney

2    started off with a response to a request for a stay.  And in

3    that comment or in that section it mentioned that you had ruled

4    before.  But there was no motion on to it and no ruling on it

5    from any source that I have.

6         But I did -- before I submitted this motion, I thought

7    it was important that I try to get a ruling from the Internal

8    Revenue Service and the Department of Labor because part of the

9    statutes say that they have to agree on certain determinations

10   and rulings.  And I've -- and the reason that I originally

11   asked for a stay was because I thought that we might have a

12   chance to get it done in a timely fashion.

13        I heard back from the Internal Revenue Service

14   yesterday, and they haven't taken action yet because there is

15   some discrepancy about how much the fee should be.  So that's

16   not resolved yet.

17        But I also heard back from the Department of Labor and

18   a gentleman from the Department of Labor, a Mr. Kevin Horahan,

19   he's Senior Employee Benefits Law Specialist and he appears to

20   be an attorney.  He suggested that perhaps we didn't need a new

21   ruling, and what he did was send me a copy and referred me to

22   what is 26 CFR 54.4980B.  And I sent a copy of this to Mr. Carl

23   Tullson, who I believe also is one of the attorneys; he's the

24   one I've been in contact with for Delphi.  Because I -- the

25   language in this is quite specific.  And I don't -- is it

230

1    possible they have a copy of this in the courtroom there, so

2    that I wouldn't necessarily burden the Court with my reading it

3    all?

4              THE COURT:  Well, I don't have a copy of this.

5              MR. SUMPTER:  Okay.

6              MR. BUTLER:  Can I have one moment, Your Honor?

7              THE COURT:  They're looking for it.

8              MR. SUMPTER:  Okay.

9        (Pause)

10             MR. BUTLER:  We're trying to locate it, Your Honor,

11   just give me one minute.

12             THE COURT:  Okay.  If they can't find it, I'll ask you

13   to read it.

14             MR. SUMPTER:  Okay.

15             THE COURT:  But they're looking for it.  Give it a

16   little more time.

17             MR. SUMPTER:  Okay.

18        (Pause)

19             MR. BUTLER:  Your Honor --

20             MR. SUMPTER:  If you have it, turn to page 295-296.

21             MR. BUTLER:  Right.  Your Honor, what we have is --

22   Your Honor, the -- just for the record, the exhibit number has

23   been marked Exhibit 342.  And it is the regs which we we'll

24   present to you and is the specific page he wants to refer to.

25             THE COURT:  Okay.  And so you, sir, you said it was

231

1    what page?  What, 2 --

2                MR. SUMPTER:  295.

3                THE COURT:  Okay.

4                MR. SUMPTER:  And it's an objection at 54.4980B-4.

5                THE COURT:  Right, I have that in front of me now.

6                MR. SUMPTER:  Okay.  And so then there's a part of

7    interest, it's under question and answer one, but down a bit

8    further than 6 which is near the bottom of the page.

9                THE COURT:  Right.  "A proceeding in bankruptcy under

10   Title 11 of the United States Code"?

11               MR. SUMPTER:  Yes.

12               THE COURT:  "With respect to an employer from whose

13   employment a covered employee retired at any time"?

14               MR. SUMPTER:  Yes.  And then goes on to talk about it

15   and it ends on page 296.  But there is no time limit on this

16   employee -- this event, a lot's been covered after this

17   bankruptcy.  The twelve months, according to Mr. Horahan is a

18   safe harbor for retirees, it kind of covers another situation

19   which continues on and is in the objection, I think it's on

20   page -- from 295 on to page 296.  But I contend that Delphi has

21   misread that statute and I think that the history of that

22   statute would support that.  I -- you know, if you get a chance

23   to read that detail I think you'd perhaps see what Mr. Horahan

24   was talking about.

25               But I also went back and found some legislative

232

1    history, and some congressional reports, and this you don't

2    have, I'm just going to mention it by reference, that this

3    (indiscernible) to provide whatever else.  But there's a CRF

4    issue brief, which is ID 87182, which is essentially

5    contemporaneous with the time that these laws were being

6    written in 1986 through '88.  And primarily responds to the LTV

7    bankruptcy.  And these -- there were three laws were written to

8    address the protection of employee and retirees particular

9    benefits in bankruptcy circumstances.

10        And I also have Senate report number 105-31, Report on

11   Aging.  And I also have a -- I guess a congressional record

12   which is defined as 133 Congressional Record H-8519, which was

13   on October 13, 1987, page 62 of that document.  It was actually

14   a comment by Congressman Rodino that introduced -- in

15   particular related to 100-334.  And he has a similar role also

16   in Public Law 99-509, which stipulated the COBRA benefits for

17   bankrupt retirees.  And he gave the motivation for Congress in

18   that respect.  And there are a number of others --

19        THE COURT:  But do any of those deal with the time

20   issue?

21        MR. SUMPTER:  Yes.  They say -- a couple of them

22   repeat the clause just as you have in there.  But others simply

23   say that if the benefit is reduced or terminated in a

24   bankruptcy then it results in lifetime COBRA benefits for

25   retirees.

233

1          THE COURT:  Okay.

2          MR. SUMPTER:  And another point I wanted to make and I

3     did make it in the motion that I filed, it was in fact that the

4     debtor asserts that it was only for twelve months before the

5     proceeding and then twelve months after the proceeding, then it

6     will provide no protection for retirees at all because a debtor

7     could wait until one day past twelve months and not have any

8     kind of obligation.  These events took place at a time when

9     Congress was dealing with the LTV bankruptcy, I think there was

10    a temporary law that was passed and extended three times.  And,

11    in fact, it expired before, I think it was -- I'm not sure --

12    100-344 was passed -- I'm not sure about the length of time

13    before Public Law 100-344 was passed.  And that had to be a

14    time that was far beyond the twelve months that the debtor

15    talked about.  And it would have made these COBRA protections

16    moot.

17          But I think there's a history of it.  But, also the he

18    documentation of what the congressional intent was and they --

19    continue to try to globally cover the retirement benefits and

20    expand as well.

21          And, so, the debtors' interpretation is contrary to

22    that.  And so I believe that they are still responsible for

23    their COBRA obligations.  And to the extent that they still

24    mark to the company or transfer assets, there is another

25    regulation with I cite in my document that says that those

234

1    COBRA obligations go the successor.  So that's why I've asked

2    the Court to enforce Delphi's obligations for retroactive COBRA

3    responsibilities back to April 1st and continuing on and to

4    make all those companies that are involved in these

5    transactions aware that there is this COBRA liability out

6    there, which makes me think that some parts of these agreements

7    may have to be reworked.  And that was my concern that if it's

8    comprehended in the -- somehow in this modified plan.

9         THE COURT:  Okay.

10        MR. SUMPTER:  And then I propose further that from a

11   retiree perspective that I have an exhibit in my -- but see

12   where I did is show what the -- what I project the value of

13   this COBRA expenses to be based on what the current non-COBRA

14   expenses are versus the current COBRA expenses.  And I show my

15   assumptions in this also, so I'm assuming that each retiree has

16   the -- the average life expectancy from this point for each

17   retirees is thirty years.  And so I recognize that there are

18   assumptions that could be negotiated.  But based on that, the

19   future value for these COBRA healthcare benefits is 532 million

20   dollars and probably change -- another 159,000 plus added to

21   that.

22        And I also wanted to point out there's 100 dollar a

23   day per retiree charge or excise tax that's been set by the

24   IRS.  So that, basically, Delphi I think, is accumulating a

25   600,000 dollar excise tax liability for not providing COBRA

235

1    benefits.  And by my calculations it's around seventy-two

2    million dollars as of today.

3            THE COURT:  Okay, Mr. Butler?

4            MR. BUTLER:  Your Honor, question answer A-1 of

5    Treasury Regulation Section 54.4980B-4, which is the section

6    that was given to you by Mr. Sumpter, page 295 -- starting page

7    295.  If you look at the beginning of that section, the

8    beginning of the answer A-1, it sets forth details about what

9    constitutes a qualifying event and describes and I quote "as an

10   event that satisfies paragraphs B, C and D of this question and

11   answer A-1".

12           Mr. Sumpter pointed Your Honor to the bottom of page

13   294 and to bankruptcy being a qualifying event.  That would

14   satisfy paragraph B.  What he did not talk about was the

15   paragraphs C and D, both of which have to be dealt with as Q

16   answers A-1 indicates.  Paragraph C describes an event that is

17   a loss of coverage which is quote "An increase in the premium

18   or contribution must be paid by a covered employee that results

19   from the occurrence of one of the events listed in paragraph B

20   of this Q and A-1, which would be a termination of employment."

21           Paragraph C goes on on the top of page 296, "To

22   clarify that a loss of coverage need not occur immediately

23   after the event, so long as the 'loss of coverage occurs before

24   the end of the maximum coverage period.'  The maximum coverage

25   period for a retiree with a loss of coverage outside of the

1    twenty-four month period is eighteen months from the date of

2    retirement."  And if you look at what would give rise to a

3    lifetime claim, both the section in the middle of the left-hand

4    column of page 296, that paragraph C language as well as the

5    actual statute, Code Section 4980(f)(3)(b) provides That loss

6    of coverage for a retiree means "a substantial limitation of

7    coverage that occurs 'within one year' before or after the date

8    of commencement of a bankruptcy proceeding," i.e., the twenty-

9    four month period."  So the reg here, and you can see that

10   reference, Your Honor, right in the middle of -- it's about

11   twelve lines down in the left-hand column on page 296 of the

12   reg.  So as you would expect, the reg does tack the code

13   section.  And it would provide that if you had a qualifying

14   event relating to bankruptcy proceeding there would be the

15   potential for lifetime coverage, or at least the assertion

16   there would be the potential for lifetime coverage.  But if

17   you're outside of that twenty-four month window, there is an

18   eighteen month limitation in toto.  And, so, Your Honor, I

19   think, again, we've argued all of this at the OPEB termination

20   motion, but the reality here is that the OPEB termination here

21   occurred outside of the twenty-four month window as

22   contemplated by the statute, as also contemplated by these

23   regs.  And I believe that Mr. Sumpter's objection is without

24   merit.

25         The debtors believe, first, it's barred under the

1    principles of res judicata.  Second, as I pointed out to you by

2    both the statute and the reg, including the reg that

3    Mr. Sumpter chose to call to your attention.  Unfortunately,

4    these -- the fact pattern of this case simply doesn't qualify.

5              THE COURT:  Okay.  Anything else?

6              MR. SUMPTER:  Your Honor, if I could just make one

7    comment?

8              THE COURT:  Sure.

9              MR. SUMPTER:  I take exception with the interpretation

10    that the debtor has about that twelve month before or after.  I

11    thought that's a convenient or useful interpretation for the

12    debtor.  But that's not what that clause means; it's not what's

13    been reflected in the congressional record, that's not what was

14    told to me by the Department of Labor.  I thought that

15    (indiscernible) the evidentiary stands.

16              But that twelve months only modifies the prepositions

17    before, it does not modify the preposition after.  And so it

18    means the twelve month before bankruptcy or anytime after.  And

19    then according to the Department of Labor all that is a safe

20    harbor for retirees, and it does not put the constraints he

21    insists, as I read it to that any loss of coverage, which

22    includes this reduction during bankruptcy, is a qualifying

23    event.

24              So I'm going through the process of having the

25    Internal Revenue issue a more definitive order, even though the

238

1    Department of Labor may not find that necessary.  But as I

2    pointed out in court as you look at this, I don't think that

3    from my understanding the -- this obligation will continue and

4    the excise tax is going to continue to accrue.  I think it's a

5    benefit to Delphi to address this matter, make those

6    retroactive payments and stop the bleeding.

7            THE COURT:  Okay.  I'll rule on this in the morning.

8            MR. BUTLER:  Okay.

9            THE COURT:  I understand your argument, Mr. Sumpter, I

10   just want to look at the statute again one last time before I

11   rule.

12           MR. SUMPTER:  All right.

13           MR. BUTLER:  Your Honor, I believe that's the last of

14   the objections that people are pressing today unless somebody

15   is raising another objection.  I did hear Your Honor indicate a

16   ruling tomorrow morning.  We are continuing to work on the form

17   of order and the final form of plan modifications as indicated

18   earlier.  My authority by the board of directors and I believe

19   by the parties to the MDA both require that the form be

20   mutually agreeable to them.  We're close but we're not finished

21   yet.  I've been on the record now, as Your Honor has, for nine

22   hours or something like that.

23           THE COURT:  I thought this would give you some time to

24   finish that up.

25           MR. BUTLER:  So I take indication from Your Honor that

1    we should get that completed before Your Honor rules on this

2    objection.  And we'd like to make a --

3             THE COURT:  Well, I could rule on the objection.  I

4    don't want to close everything until you have it completed.

5             MR. BUTLER:  Right.

6             THE COURT:  Until you have the order completed.

7             MR. BUTLER:  And, Your Honor, there are few matters

8    left including business judgment, a couple of other showings we

9    need to make under 1127.  And at least one item on 1129 that I

10   need to address.  But I'll do that in an abbreviated close.

11            THE COURT:  All right.  I mean, I have reviewed the

12   declarations again.  And am certainly familiar with the

13   debtors' financial condition.  I'm also familiar as set forth

14   in Mr. Sheehan's declarations with the debtors' efforts to

15   market themselves, including the auction process.  So I don't

16   think you're going to have to say much more, if anything, on

17   the debtors' determination to enter into this agreement with GM

18   and the DIP lenders.  To me it seems a valid exercise of

19   business judgment under the circumstances.  But if you want to

20   have anything more on the record, that's fine.  But I believe

21   the description by Mr. Sheehan and Mr. Shore of the debtors'

22   consideration of alternatives and of the sale process of the

23   mediation process and of the auction, is sufficient to show

24   that the debtors are pursing a path that's consistent with good

25   business judgment.

240

1          MR. BUTLER:  Thank you, Your Honor.  What time do you

2    want us back?

3          THE COURT:  Well, it's kind of up to you.  I know you

4    all have a propensity to work through the night even on

5    Sundays.  And I'm not encouraging that you do that.  So just

6    give me a sense.  I don't have anything else scheduled for

7    tomorrow, so I can begin at 10, I can begin at 11, I can begin

8    at 9:30, it's up to you.

9          MR. BUTLER:  Can you just give us a moment, Your

10   Honor?

11         MR. SUMPTER:  Your Honor, this is James Sumpter.  Can

12   I ask --

13         THE COURT:  You can appear by phone tomorrow so that

14   you can hear my ruling.

15         MR. SUMPTER:  Okay.

16         THE COURT:  So you should contact the same number or

17   the same -- you should go through the same process that you did

18   today --

19         MR. SUMPTER:  All right.

20         THE COURT:  -- to get on the phone for tomorrow.

21         MR. SUMPTER:  Okay.

22         THE COURT:  Okay.

23         MR. SUMPTER:  Could I ask one other question?

24         THE COURT:  Sure.

25         MR. SUMPTER:  I've referenced a couple of documents

241

1  that I have not had opportunity to make available to the Court.

2  Is it useful or proper that I submit those --

3          THE COURT:  Well, if the documents are matters of

4  public record, like the congressional record or Senate report

5  you can e-mail those to me.

6          MR. SUMPTER:  Yes.

7          THE COURT:  That's fine.  You should also e-mail them

8  to whoever you've been sending them to at Skadden Arps.

9          MR. SUMPTER:  Right.

10         THE COURT:  Okay.

11         MR. SUMPTER:  Okay.  All right.  Let me confirm one

12  thing on that e-mail address.  I had sent those letters to

13  Mr. Lightner before --

14         THE COURT:  Yeah, that's fine.

15         MR. SUMPTER:  Okay.  You can give me --

16         THE COURT:  Well, let me give you that

17  rdd.chambers@nysb.uscourts.gov.

18         MR. SUMPTER:  Okay.

19         THE COURT:  Thanks.

20         MR. SUMPTER:  All right.  Thank you.

21         MR. BUTLER:  Your Honor, I consulted with counsel.  I

22  think we'd like to tentatively recess until 10 o'clock tomorrow

23  morning.  If for some reason we can't be ready by 10 we'll

24  advise chambers.  But I think people would like to be concluded

25  with this and we'll endeavor to have everything finished by

242

1     that time.

2          One point that I'd like to do tonight, which I think I

3     can do unless someone thinks that I'm making a mistake, but I

4     think this is the correct thing to do.  Which is our

5     evidentiary record is complete.  And all the objections are in.

6     An, so, Your Honor, the only thing I have left is a reservation

7     of rights by our board that requires that we get a suitable

8     form of order.

9          THE COURT:  Okay.

10         MR. BUTLER:  And that's the only thing I've got left.

11    So unless Your Honor has some reason that you think we

12    shouldn't do this, I think I'd like to close the evidentiary

13    record tonight so we've got a complete record, and we'll deal

14    with argument tomorrow, if there is any, if that makes sense.

15         THE COURT:  Well, there's conceivably an evidentiary

16    record on this order, that's the only thing that would remain

17    open as far as I can se.

18         MR. BUTLER:  Right.  Aside from that, Your Honor, I

19    think --

20         THE COURT:  Mr. Abrams?

21         MR. ABRAMS:  Your Honor, I just rose to indicate that

22    we would support Mr. Butler's approach subject to Your Honor's

23    limited qualification with respect to the order itself.

24         THE COURT:  All right.  I agree, I think that's

25    appropriate.  The evidentiary record is closed.  The only thing

243

1    I'm reserving on is my ruling on Mr. Sumpter's objection and

2    review of the final version of the -- final proposed version of

3    the order.

4           MR. BUTLER:  Right.  As I said, Your Honor, I also

5    will give and I take Your Honor's guidance to heart, I may have

6    a few closing comments, but they will be abbreviated.

7           THE COURT:  All right, that's fine.  Thank you.

8           MR. BUTLER:  Thanks, Judge.

9           THE COURT:  And, again, you can leave your exhibits

10   and charts.

11          MR. BUTLER:  Thank you.

12          THE COURT:  Mr. Sumpter, I'll be back on the record at

13   10 tomorrow.

14          MR. SUMPTER:  All right, thank you.

15       (Proceedings concluded at 7:21 PM)

16

17

18

19

20

21

22

23

24

25

244

1

2                              I N D E X

3

4                           E X H I B I T S

5   PARTY   NO    DESCRIPTION                      ID.      EVID.

6                  634 Various Joint Exhibit                25

7                  documents

8

9                          R U L I N G S

10  DESCRIPTION                                   PAGE      LINE

11

12  Objection by Michigan Workers Compensation     78        22

13  Agency and Funds Administration to plan,

14  overruled

15  Objections by Howard County Taxing            107        22

16  Authorities and Texas Taxing Authorities

17  to plan, overruled

18  IBEW and IAM's objection to feasibility       210         1

19  of plan denied

20  FCI's objection overruled                     213         3

21  Objections of the three unions to the         218        12

22  modification motion and PBGC settlement

23  overruled

24  Motion of American Aikoku to enforce          225        24

25  settlement agreement denied

245

1

2                           C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7       _____

8       Clara Rubin

9       AAERT Certified Electronic Transcriber (CET**D-491)

10      Also Transcribed By:    Esther Accardi (CET**D-485)
                                Dena Page

11

12

        Veritext LLC

13

        200 Old Country Road

14

        Suite 580

15

        Mineola, NY 11501

16

17

        Date: July 30, 2009

18

19

20

21

22

23

24

25