1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


      Debtor.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        July 30, 2009

        11:52 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re (continue from 7/29/2009) Motion to approve (a)

3    Supplement to motion for order (i) approving modifications to

4    debtors' first amended plan of reorganization (as modified) and

5    related disclosures and voting procedures and (ii) setting

6    final hearing date to consider modifications to confirmed first

7    amended plan of reorganization and (b) Request to set

8    administrative expense claims bar date and alternative sale

9    hearing date.

10

11   HEARING re (continue from 7/29/2009) Agenda for plan

12   modification hearing.

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Penina Wolicki

3

1

2    A P P E A R A N C E S :

3

4    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5        Attorneys for Debtor

6        333 West Wacker Drive

7        Suite 2100

8        Chicago, IL 60606

9

10   BY:   JOHN WM. BUTLER, JR., ESQ.

11

12   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

13       Attorneys for Debtor, Delphi Corporation

14       Four Times Square

15       New York, NY 10036

16

17   BY:   KAYALYN A. MARAFIOTI, ESQ.

18

19   COHEN, WEISS AND SIMON LLP

20       Attorneys for United Auto Workers

21       330 West 42nd Street

22       New York, NY 10036

23

24   BY:   BABETTE CECCOTTI, ESQ.

25

4

1

2      PENSION BENEFIT GUARANTY CORPORATION

3           1200 K Street NW

4           Washington, DC 20005

5

6      BY:   JOHN A. MENKE, ESQ.

7

8      LATHAM & WATKINS LLP

9           Attorneys for Creditors' Committee

10          53rd at Third

11          885 Third Avenue

12          New York, NY 10022

13

14     BY:   MARK A. BROUDE, ESQ.

15

16

17     WHITE & CASE LLP

18          Attorneys for Appaloosa Management, L.P. and A-D

19          Acquisition Holdings

20          1155 Avenue of the Americas

21          New York, NY 10036

22

23     BY:   DOUGLAS P. BAUMSTEIN, ESQ.

24

25

5

1

2    K&L GATES LLP

3         Attorneys for Wilmington Trust Company

4         599 Lexington Avenue

5         New York, NY 10022

6

7    BY:    EDWARD M. FOX, ESQ.

8

9    U.S. DEPARTMENT OF JUSTICE

10        United States Attorney's Office

11        86 Chambers Street

12        3rd Floor

13        New York, NY 10007

14

15   BY:    JOSEPH N. CORDARO, AUSA

16

17

18   DECHERT LLP

19        Elliott Management and Manchester Equities

20        1095 Avenue of the Americas

21        New York, NY 10036

22

23   BY:    GLENN E. SIEGEL, ESQ.

24        JAMES O. MOORE, V, ESQ.

25

6

1

2   WEIL, GOTSHAL & MANGES LLP

3       Attorneys for General Motors

4       767 Fifth Avenue

5       New York, NY 10153

6

7   BY:   JEFFREY L. TANENBAUM, ESQ.

8

9   DAVIS POLK & WARDWELL LLP

10      Attorneys for JPMorgan Chase Bank, N.A., DIP Agent

11      450 Lexington Avenue

12      New York, NY 10017

13

14  BY:   DONALD S. BERNSTEIN, ESQ.

15       JONATHAN E. ARMSTRONG, ESQ. (TELEPHONICALLY)

16

17

18  NEW YORK STATE DEPARTMENT OF TAX AND FINANCE

19      Office of the Attorney General

20      Attorneys for New York State Workers' Compensation Board

21      The Capitol

22      Albany, NY 12224

23

24  BY:   NANCY HERSHEY LORD, ESQ. (TELEPHONICALLY)

25

7

1    WILLKIE FARR & GALLAGHER LLP

2         Attorneys for the Collective of DIP Lenders

3         787 Seventh Avenue

4         New York, NY 10019

5

6    BY:   MARC ABRAMS, ESQ.

7          MICHAEL J. KELLY, ESQ. (TELEPHONICALLY)

8          ROBERT JOSISOVSKI, ESQ. (TELEPHONICALLY)

9          MICHAEL KRAVER, ESQ. (TELEPHONICALLY)

10         MAURICE LESKORT, ESQ. (TELEPHONICALLY)

11         RICHARD MANCINO, ESQ. (TELEPHONICALLY)

12         KEN SICKLICK, ESQ. (TELEPHONICALLY)

13         MEGHAN SILHAN, ESQ. (TELEPHONICALLY)

14         CHRISTOPHER ST. JEANOS, ESQ. (TELEPHONICALLY)

15         MICHAEL ZINDER, ESQ. (TELEPHONICALLY)

16

17

18   FROST BROWN TODD, LLC

19        Attorneys for Toyota Motor Corporation

20        250 West Main

21        Suite 2800

22        Lexington, KY 40507

23

24   BY:   ROBERT V. SARTIN, ESQ. (TELEPHONICALLY)

25

8

1    ALSO PRESENT:

2        JORDAN FISHER, Pentwater Capital Management

3        JEFF FORLIZZI, Silver Point Capital

4        CHAIM FORTGANG, Silver Point Capital

5        JOHN PAVELSKI, Silver Point Capital

6        JOHN W. SPEARS, ESQ., Alston & Bird LLP

7        JARED WORMAN, Greywolf Capital

8        JEFF GOLDFARB, Interested party

9        STANTON RAY, Interested party

10       DAVID SHERBIN, Interested party

11       JAMES SUMPTER, Interested party

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1              P R O C E E D I N G S

2        THE COURT:  Pleased be seated.  Okay.  Good morning.

3   We're back on the record in In re Delphi, on the debtors'

4   motion for approval of plan modification.

5        MR. BUTLER:  Your Honor, good morning.  Jack Butler,

6   Kayalyn Marafioti, here on behalf of the debtors for the second

7   day of the plan modification hearing.  Your Honor, when we left

8   last evening, on the record, the objection or the motion of Mr.

9   James Sumpter for a COBRA motion at docket number 18366 was the

10  matter being considered by the Court.  And we had had oral

11  argument on it with Mr. Sumpter, who, I believe, is on Court

12  Call this morning.

13       THE COURT:  Are you on, Mr. Sumpter?

14       MR. SUMPTER:  Yes, I am.

15       THE COURT:  Okay.  Good morning.

16       MR. SUMPTER:  Good morning.

17       MR. BUTLER:  And, Your Honor, just two matters that

18  the debtors wanted to place into the record.  One, Mr. Sumpter,

19  in the colloquy with the Court yesterday, indicated that he

20  would be submitting some additional information.  He did submit

21  additional information.  It's about 4-, 500 pages of documents

22  over eight tabs.  We've marked it as Joint Exhibit 627.  And I

23  would move its admission into the record so that it's part of

24  the record.

25       THE COURT:  Okay.  That's fine.

10

1    (Documents submitted by Mr. Sumpter were hereby received in

2    evidence as Joint Exhibit 627, as of this date.)

3         MR. BUTLER:  The other thing, Your Honor is, we went

4    back last evening to check the transcript of the March 11th

5    hearing with respect to the COBRA matters that were discussed

6    there.  And that transcript is at Joint Exhibit 502.  And on

7    page 57 of that transcript, there is an exchange between the

8    Court and myself on this subject, in which the Court said,

9    starting at line 8:  "I think it was raised," speaking to the

10   COBRA issues, "and it's something I considered.  And I believe

11   that the debtors' view of the statute and the regs is correct.

12   But I also think that it's not something I should definitively

13   rule on as if it were declaratory judgment in a 363(b)

14   proceeding.  Part of my ruling is premised upon my belief that

15   you're correct, but I think it's actually very similar to the

16   Orion facts, when the Second Circuit said the Court can't be

17   the guarantor of the logic of the motion by actually ruling on

18   something like this.  I'm not even sure who the other side

19   would be here.  It may retirees; it may be someone else, so."

20   Ending at line 18.

21        And while the debtors still believe that arguments and

22   res judicata would -- are legitimate, I think there is this

23   exception that Your Honor mentioned.  And I wanted to put into

24   the record today, just so this record was clear.

25        THE COURT:  Okay.

1          MR. BUTLER:  Those are the only two things we have,

2     Your Honor, on that matter.

3          THE COURT:  All right.  Well, I considered the

4     parties' arguments overnight and this morning on this issue.

5     And the first one I considered was the res judicata argument.

6     But I concluded that, as I did back in March, that although the

7     issue was raised by parties to the litigation over the debtors'

8     OPEB motion, the issue of the duration of the COBRA right was

9     not finally determined by me except insofar as I determined

10    that the debtors have the better view of it for purposes of an

11    action out of the ordinary course, and therefore that I would

12    authorize the action; taking into account the fact that if the

13    issue were actually decided, it might go the other way, but

14    that in the meantime the debtors could implement what they

15    implemented.

16         Even if res judicata did apply, I went on to consider,

17    again, the merits of the argument which had been raised by

18    parties who opposed the OPEB motion, which again, is that the

19    debtors had an obligation to continue to provide coverage for a

20    covered employee's lifetime, which would include, under the

21    regs and statute, retirees, based upon a substantial

22    elimination of coverage.  That's the same issue that Mr.

23    Sumpter seeks to have the Court deny, or at least delay ruling

24    on the plan modification motion so that he can obtain a ruling,

25    the request for which he attaches to his motion, interpreting

12

1    both 29 U.S.C. Section 1163 and 26 U.S.C. Section 4980(b) in

2    the way he seeks to do it, insofar as it applies to retirees,

3    where there's been a substantial elimination of coverage.

4        The statutory issue is apparent from the two sections

5    of the U.S. Code that I've cited.  29 U.S.C. Section 1163

6    provides that:  "The term 'qualified event' means with respect

7    to any covered employee, any of the following events which but

8    for the continuation of coverage required under this part,

9    would result in a loss of coverage of a qualified beneficiary."

10   And then, of those six events, the sixth is:  "A proceeding in

11   a case under Title 11 United States Code commencing on or after

12   July 1, 1986 with respect to the employer from whose employment

13   the covered employee retired at any time."  That qualifying

14   event applies where there is a loss of coverage.  And there's

15   no time limitation on it.

16       However, the following sentence of the same statute

17   states:  "In the case of an event described in paragraph 6,"

18   i.e., a bankruptcy case that started after July 1, 1986, "a

19   loss of coverage includes a substantial elimination of coverage

20   with respect to a qualified beneficiary described in Section

21   607(3)(c) 29 U.S.C. Section 1167(3)(c)," which would be a

22   person who retired -- would include a person who retired before

23   the substantial elimination of coverage.  And here's the key

24   language:  "Within one year before or after the date of

25   commencement of the proceeding."

13

1          The debtors have argued consistently that the phrase

2     "within one year before or after the date of the commencement

3     of the proceeding" creates a twenty-four month window for there

4     to be a qualifying event, not only for loss of coverage, but

5     also for a substantial elimination of coverage, which is what

6     pertains here.  Therefore, if the substantial elimination of

7     coverage occurs within twelve months before or twelve months

8     after the date of the start of their bankruptcy case, then the

9     statute would be triggered, either it would be a qualifying

10    event resulting from a substantial elimination of coverage

11    during that twenty-four month period, but not thereafter.

12          Mr. Sumpter, as did other objectors to the OPEB

13    motion, but Mr. Sumpter here, would read the language to state

14    that the event occurs in the period beginning twelve-months

15    before the commencement of the case under Title 11, but that

16    the event -- if the event occurs any time after the

17    commencement of the Chapter 11 case, then a substantial

18    elimination of coverage would qualify as a loss -- a full loss

19    of coverage.

20          I've reviewed the language of the statute, first and

21    foremost, and believe that, as I did in March, that to construe

22    it as Mr. Sumpter would like, there would either have to be

23    commas around the phrase "or after", or it would have to say

24    "one year before or at any time after", i.e., that the two

25    words or the three words "at any time" would have to be added

14

1   to the statute to separate the concept of a postpetition

2   substantial elimination of coverage from the one year

3   antecedent clause.

4        To the extent that there is any ambiguity in the

5   statute, I do not believe that any of the legislative history

6   or quasi-legislative history in the form of Congressional

7   research reports, either that I've located or that Mr. Sumpter

8   has provided, which I've reviewed and which are now in

9   evidence, sheds additional light, in any meaningful way, on

10  this interpretation issue.  As I had read them, they don't

11  discuss this issue, they simply repeat the language "within one

12  year before or after the date of the commencement of the

13  proceeding."  They do note that wherever there's a loss of

14  coverage, the mere fact of the commencement of the case is a

15  qualifying event.  But that's, I think, here, neither here nor

16  there.

17       The typical language that you see appears, for

18  example, in H.R.Rep. 99-727 at 464, 465 1986 U.S.C.C.A.N. 3607,

19  3861 through 3862, where the report states:  "In the case of

20  such a qualifying event, a loss of coverage includes a

21  substantial elimination of coverage with respect to a qualified

22  beneficiary, as described below, within one year before or

23  after the commencement of the Title 11 proceeding.  For

24  example, an employer contemplating filing for Title 11

25  bankruptcy proceedings, may not, in the year before, or after

15

1    filing for Title 11 reduce the health insurance coverage so

2    that it offers minimal coverage.  Such a reduction in health

3    insurance coverage for retirees, their spouses and dependent

4    children and widows, would trigger the continuation of coverage

5    provision, included in this legislation," i.e., it just repeats

6    the statutory phrase.  That's also what Colliers does at

7    paragraph 114.103, where it again, simply repeats this phrase.

8            I believe, again, without the commas, the plain

9    meaning of the statute is that the one year reference refers to

10   both the one year before or after language in the statute.

11   That is also the interpretation by the only authority, which

12   albeit is somewhat limited, on this issue, that specifically

13   discusses this issue, which appears in the Employee Benefits

14   Handbook Database, updated May 2009 by Jeffrey Mamorsky,

15   editor, part 4, chapter 39, "COBRA Healthcare Continuation" by

16   Jack Helitzer (ph.), which states at section 39.20, "If as a

17   result of a Chapter 11 bankruptcy, a retiree's health care

18   coverage terminates or is substantially eliminated within one

19   year before or after the start of the Chapter 11 proceedings

20   (i.e., at any time during the two-year period), the retiree and

21   the retiree's spouse and/or dependent children, may elect COBRA

22   continuation coverage for life."

23           I've also considered another statute that I'm familiar

24   with that was originally phrased in the same way as this

25   statute, which is a former provision of the Internal Revenue

16

1    Code, 26 U.S.C. Section -- I'm sorry, not of Internal Revenue

2    Code -- former provision found at 26 U.S.C. Section 118, which

3    stated -- which covered loss deductions for sale of stock or

4    securities, and it stated, "In the case of any loss claimed to

5    have been sustained at any or other disposition of shares of

6    stock or securities, where it appears that within thirty days

7    before or after the date of such sale or other disposition, the

8    taxpayer has acquired otherwise than by bequest or inheritance,

9    or has entered into a contract or option to acquire

10   substantially identical property, and the property so acquired

11   is held by the taxpayer for any period after such sale or other

12   disposition, no deduction for the loss shall be allowed."

13        That language, which in essence, contains the same

14   concept, although there it's thirty days before or after the

15   event, was subsequently amended to read, "In the case of any

16   loss claimed to have been sustained from any sale or other

17   disposition of shares of stock or securities, where it appears

18   that within a period beginning thirty days before the date of

19   such sale or disposition and ending thirty days after such

20   date, the taxpayer has acquired," etcetera, etcetera.

21        I don't believe any change in the statute was

22   intended, but rather the language, which would be consistent

23   with Delphi's interpretation of 26 U.S.C. 4980(b) and 29 U.S.C.

24   Section 1163 was that the time limitation applied to both the

25   before and after periods.

17

1          The argument was made by Mr. Sumpter that these

2    provisions grew out of the LTV case, which is true.  But in

3    that case, LTV eliminated retiree benefits on the first day of

4    its case, which would constitute a total loss.  I don't believe

5    it's inconsistent with that context for Congress to have

6    limited the scope of continuation coverage for less than a

7    total loss to the twenty-four month window that is provided in

8    the statute.  And it is, I guess, odd or inconsistent with Mr.

9    Sumpter's interpretation that the lesser elimination, but still

10   an elimination, for substantial losses, would go back twelve

11   months before the filing, but not for a total loss, would

12   suggest, again, that Congress intended, where there was a

13   substantial elimination but not a complete loss, to have a more

14   proscribed period on the back end to equal the greater twelve-

15   month period on the front end.

16          So for those reasons, I continue to believe that the

17   plan or the modification of the plan is not premised upon an

18   improper application of COBRA and OBRA, O-B-R-A, and that

19   certainly I should not wait for an interpretation of these

20   provisions that could well be a long time coming, particularly

21   given all of the time pressures that these debtors and their

22   creditors are under, and the likely expiration of financing

23   being the primary one.

24          I also note, and I don't know whether this is the

25   case, and I recognize that the record is closed, but it was

18

1    stated that the reorganized debtor intends to have no actual

2    employees, but rather only consultants and professionals to

3    enable it to liquidate its assets and make distributions.  On

4    that score, it appears to me that this issue might, in any

5    event, be moot, given that it's not clear to me whether the

6    debtor will continue to pay premiums or will be providing any

7    further group health plan, given they won't be having

8    employees.  If that is the case, then under 26 U.S.C.

9    4980(b)(3)(ii) and (iii) the right to coverage would end in any

10   event.  But that doesn't change in any way my primary reason

11   for denying this objection, which is that I believe the time

12   limitation in the statute should be interpreted as the debtors

13   have interpreted it.

14          MR. BUTLER:  Thank you, Your Honor.

15          MR. SUMPTER:  Your Honor, if I could just ask a few

16   points of clarification?

17          THE COURT:  Sure.

18          MR. SUMPTER:  Is it your ruling that there was only

19   partial loss of coverage and not complete loss of coverage?

20          THE COURT:  Well, the requests and the motion deals

21   with partial or not partial but substantial loss as opposed to

22   total loss.  And that's what I've focused on.  If there had

23   been a total loss, I think that would be a different result.

24   But that's not what I focused on.  But if it is a total loss in

25   the sense of there being no coverage for any employees, then

19

1    the provisions that I just referenced, I think, would render

2    the issue moot in any event.  Because once there's no coverage,

3    then there's no right to continuation, i.e., no coverage for

4    any employees, no maintenance available.

5         MR. SUMPTER:  Can I - I definitely understand the

6    ruling, and I'm not challenging that.  But I was kind of -- am

7    I to understand that these correcting some substantial loss

8    from that motion.  Retirees lost all their coverage.  But the

9    retirees still have a claim, for any type of COBRA that was

10   available.  But if the employer from Europe had no coverage,

11   then COBRA wouldn't be available.

12        THE COURT:  Well, again, the premise then the request

13   that you wanted to make for a ruling for the regulatory agency

14   was premised on there being a substantial loss of coverage, and

15   that's what I focused on.  So anything beyond that would really

16   be an advisory ruling.

17        MR. SUMPTER:  I just don't see how I can get that

18   meaning.

19        THE COURT:  Okay.

20        MR. SUMPTER:  All right.  I was -- I was including --

21   I guess what I thought was to my mind, total loss of coverage

22   or partial loss.  I was including all of that in my mind in the

23   loss.

24        THE COURT:  All right.  Now, I will note from the

25   order approving the OPEB modifications, the debtors kept open

20

1    and gave to parties a right to purchase coverage for -- I

2    forget the exact amount of time, but it was about sixty days.

3            MR. SUMPTER:  Oh, right.  Yes.

4            THE COURT:  So I'm not making a finding on this, but

5    it seems to me that there was not a total loss because --

6            MR. SUMPTER:  Well, OPEB --

7            THE COURT:  -- that was all.

8            MR. SUMPTER:  Well, in other words, there's some

9    standard to the fact that I was required to pay one hundred per

10   cent of the cost of the policy, but that can still be a partial

11   loss as you see it.

12           THE COURT:  That's my understanding.  But again, I'm

13   premising this on what you had filed in the form of your

14   objection.

15           MR. SUMPTER:  Okay.

16           THE COURT:  Okay.  Thank you, Mr. Sumpter.

17           MR. SUMPTER:  Thanks.  I really appreciate you taking

18   the time to really give it a thorough review.

19           THE COURT:  Okay.  Fair enough.  Thank you, sir.

20           MR. SUMPTER:  All right.

21           MR. BUTLER:  Your Honor, as a procedural matter, this

22   was filed as a motion.  Should I submit a separate order for

23   the motion as well, or just --

24           THE COURT:  I think it's a good idea.  I had scheduled

25   it for this hearing, because it seemed to be the fastest way to

1    get it heard.  Mr. Sumpter wanted expedited relief, and it

2    essentially could be heard in this context as well as in the

3    context of a separate motion.  So, but I think you could -- I

4    don't think I necessarily need a separate order, because I'm

5    treating it -- I guess you could say that for the reasons

6    stated, because of the ruling on it as far as it constitutes a

7    plan objection, the motion is moot.

8            MR. BUTLER:  Okay.

9            THE COURT:  So I guess will want a separate order.

10           MR. BUTLER:  All right, Your Honor.  Thank you.

11           THE COURT:  Thank you.

12           MR. SUMPTER:  Thanks again.

13           THE COURT:  All right.  So leaves the order.  And I

14   don't know whether you've finished on that or not.  I saw some

15   people going up and down the hallway still.

16           MR. ABRAMS:  Your Honor --

17           THE COURT:  But also, if you -- I think you wanted to

18   make some closing remarks as well.

19           MR. BUTLER:  I do, Your Honor.  And I plan to make

20   those closing remarks and then to ask for a brief recess so I

21   can consult with all the people who have been working on the

22   final form of order.

23           THE COURT:  Okay.  All right.  But you don't need to

24   make it a filibuster.  I'll give you the recess anyway to let

25   them keep working.

22

1        MR. ABRAMS:  Don't tempt fate.

2        MR. BUTLER:  I hadn't intended to do that.  In fact,

3   Your Honor, as I --

4        THE COURT:  I didn't think you did.

5        MR. BUTLER:  We do have an abbreviated close, in light

6   of all of the objections having been resolved at this point.

7        THE COURT:  Okay.

8        MR. BUTLER:  But there are some matters that the

9   debtors want to place on the record.  And one of the -- among

10  other things, and I did consult with some counsel in describing

11  the transactions, much of what the Court has taken into

12  consideration for good reasons has been marked highly

13  confidential and is not publically available.  And part of what

14  I wanted to do in these closing remarks is to at least give an

15  overview of the transactions that are before the Court.

16       THE COURT:  Okay.  Before you do that, there was

17  something I meant to do yesterday that I didn't do, given the

18  lateness of the hour.

19       As you noted, most of the objections to this motion

20  were filed pro se by individual employees and former employees

21  of the debtors.  I've expressly dealt with about 600 of them

22  that focused on one particular issue, which was the severance

23  related ones, which are moot.  But the other ones all dealt

24  with termination of the pension plans.  And I did not address

25  them specifically, however, in looking at them, I concluded

23

1    that the arguments made by the three union objectors as well as

2    Messrs. Cunningham and Black really did the best job of raising

3    the arguments against approval of the PBGC settlement and the

4    plan modification order.

5         And so, when I addressed those two objections, I was

6    also addressing the 1,200 or so pro se individual objections.

7    Each of those objections, like the unions' objections and like

8    Mr. Cunningham and Mr. Black's objection, clearly state the

9    personal cost and disruption caused by the termination of

10   pension plans.  But as a legal matter, the legal arguments they

11   raised, to the extent that they did raise them beyond simply

12   noting their personal cost, were all subsumed by those two

13   objections that I considered at length yesterday.  So in

14   dealing with those two objections I also overruled or denied

15   the other pro se ones.

16        MR. BUTLER:  Thank you, Your Honor.  Your Honor, first

17   some housekeeping business, and then some closing remarks and

18   perspective on this plan modification hearing.

19        In terms of housekeeping, one of the things that we're

20   obligated to do under Section 1123(a)(7) is adequately disclose

21   at this hearing the identities and affiliations of individuals

22   proposed to serve on or after the effective date as officers,

23   directors of reorganized DPH Holdings, as set forth in section

24   7.5 of the modified plan.

25        Under the terms of the organization of that entity,

24

1    the debtors have designated John C. Brooks, B-R-O-O-K-S, as the

2    authorized representative of DPH Holdings.  Mr. Brooks has been

3    a long-time employee of Delphi, first hired by General Motors

4    in 1971, and has been an executive since 1977.  He spent the

5    entirety of his thirty-eight years with the company in the

6    company's finance area, and has served in a variety of finance

7    capacities at the company.  Currently, he's the finance

8    director of North America for the DEEDS (ph.) product line, for

9    Delphi's electrical and electronics architecture division.  And

10   he is resident in Troy, Michigan.  And I needed to make that

11   designation formally on the record today.

12          THE COURT:  Okay.

13          MR. BUTLER:  Your Honor, I would also indicate that we

14   have provided in our omnibus reply, at docket number 18659, at

15   Appendix A to that, and it's also Joint Trial Exhibit 632, a

16   detailed chart that goes through the 1127 factors and

17   incorporates the 1129 factors and addresses each of those

18   factors.  We prepared that chart so I would not need to

19   necessarily, in the context of the Court having, perhaps,

20   addressed objections, go through those on the record.  I would

21   just simply point those out to the Court and incorporate those

22   as part of my closing argument.

23          THE COURT:  Okay.

24          MR. BUTLER:  The debtors believe that we have complied

25   with 1127 and 1129 as set forth in that appendix.

1         Your Honor, in terms of the final form of plan

2    modifications and the final form of order, again, just, I want

3    to briefly outline the record and the appropriate exhibit

4    designations so that the record is clear on that.

5         In terms of the form of plan modifications, those were

6    originally filed in connection with the June 16th order that

7    allowed -- the plan modifications that we resolicited

8    acceptances and rejections of, at docket number 17030, and as

9    Joint Exhibit 1.  There have been iterative versions filed at

10   Joint Exhibit 632 and Joint Exhibit 8.  And the final form of

11   plan modifications have been marked Joint Exhibit 4.  And we'll

12   be providing those to the Court at the conclusion of this

13   hearing.

14        THE COURT:  Okay.

15        MR. BUTLER:  And those modifications, I believe, have

16   been agreed to by all the relevant parties that needed to

17   review them.

18        With respect to the final form of plan modification

19   order that we're submitting for Your Honor's review --

20        THE COURT:  And I'm sorry, that final form, is that

21   still the July 28th, or is that --

22        MR. BUTLER:  No, it's -- there are some --

23        THE COURT:  Okay.

24        MR. BUTLER:  -- we did a little work overnight.  But

25   there are some -- we'll be providing the -- a black-line to

26

1    Your Honor.  But those are -- there are a couple of additional

2    changes.  They are mostly knits.

3            THE COURT:  Okay.

4            MR. BUTLER:  But there are some clarifications that

5    parties wanted, and we accommodated them.

6            THE COURT:  Okay.

7            MR. BUTLER:  With respect to the final form of plan

8    modification order, which we understand is still subject to

9    Your Honor's review and comment, the parties originally

10   submitted a form of that, again, with our replies, the first

11   time that was publically released, at docket number 18659 at

12   Joint Exhibit 632.  We updated it based on negotiations

13   immediately prior to the commencement of this hearing.  And

14   that was filed at Joint Exhibit 11 with a black-line to what

15   had been publically released marked as Joint Exhibit 9.

16           We are in the process of completing that order now.

17   It is a requirement that the order be mutually satisfactory to

18   the parties of the MDA including to the debtors, as to the

19   basis upon which we obtained the board of directors' support

20   for designation this transaction.  The pure credit bid is the

21   successful transaction.  That document, which I'm advised is

22   something we'll be hopefully done with very shortly this

23   morning, or early this afternoon, now, is going to be marked

24   Joint Exhibit 12 with a black-line back to Joint Exhibit 10 --

25           THE COURT:  Okay.

27

1      MR. BUTLER:  -- so that those will be the exhibits

2  numbers, and we will hope to furnish those shortly.

3      THE COURT:  On the plan, you say there are a couple

4  provisions that are more than knits, or --

5      MR. BUTLER:  No, the plan -- I don't believe, and I

6  don't --

7      THE COURT:  They're clarifying.  There's nothing

8  that's new --

9      MR. BUTLER:  -- I believe the plan modification is

10  all -- everything is clarifying.  And it's been the debtors' --

11  as I think Your Honor knows, since we -- all of the editorial

12  changes since the modified plan that was filed on June 16th,

13  from the debtors' perspective, all of these have been

14  clarifying modifications, not -- they're nonsubstantive and

15  nonmaterial, but are viewed to clarify the intent of the

16  parties.

17      THE COURT:  Okay.

18      MR. BUTLER:  I should also just indicate, Your Honor,

19  I'm not going to dwell on this, that we are, as we indicated in

20  our plan modification motion, we are seeking to invoke the

21  cram-down provisions of Section 1129(b) of the Bankruptcy Code.

22  And that is because, as you know from the earlier discussion on

23  voting, while there were five classes that voted -- impaired

24  classes that voted to accept the plan, there were other classes

25  that did not.

1          Mr. Rosenberg spoke on behalf of the creditors'

2     committee as to the committee's recommendation regarding cram-

3     down.  And obviously, we need to demonstrate, and we believe

4     this record does demonstrate, that the plan does not

5     discriminate unfairly, and is fair and equitable with respect

6     to the nonaccepting impaired classes.  We think we've been able

7     to demonstrate that, and I will discuss that -- we discussed

8     that in length in our brief, and I'm not going to go through

9     the legal arguments here, now, other than to formally request

10    that we invoke the cram-down provisions, pursuant to the terms

11    of our motion and as set forth in our response reply papers.

12          THE COURT:  Okay.

13          MR. BUTLER:  Your Honor, that leads us to some closing

14    remarks, and maybe just a few minutes of perspective.  This has

15    been, in some respects, I think, an extraordinary proceeding

16    for the participants involved, and perhaps for the Court

17    itself.  Your Honor yesterday commented about the occasional

18    case where unresolved contingencies in the confirmation order

19    actually end up being not resolved.  It doesn't happen often.

20    The world in which we live in today is itself extraordinary,

21    and the fact that the parties have been able to navigate

22    through these last months since January of 2008, I think, has,

23    from the debtors' perspective, really is somewhat remarkable.

24    And I think that is tempered only by the fact that the parties

25    recognize that everybody's had to sacrifice expectations from

1    what was in the plan back in January of 2008.

2         What we have -- when we thought about this, we

3    prepared a few exhibits.  These are all part of Joint Trial

4    Exhibit 53.  These have formally been marked "Highly

5    Confidential". And as to these slides only that I'm going to

6    use in my closing, the debtors are removing the designation of

7    "Highly Confidential" from them.  And we use them in these

8    closing remarks.

9         Essentially, and I think much to the -- and I think

10   the parties and the Court will appreciate this -- nobody wants

11   to do a blow-by-blow of what's happened over the last fifteen

12   months.  But there are, sort of, seven moments that, from the

13   company's perspective and from that of the company's board and

14   directors, a board by the way, that met twenty-eight times in

15   the latter part of 2008, and so far this year, has met twenty-

16   two times in session to address the issues that they needed to

17   address in carrying out their fiduciary responsibilities.

18        There were really seven moments.  And I'm going to use

19   the major events timeline that we have here as Charts 4 and 5

20   as part of Exhibit 53, and then some additional charts that my

21   colleague will help me with, in a few minutes.

22        But we started out with Your Honor's confirmation

23   order on January 25th.  And the first real extraordinary event

24   for us, or number one of the seven, was following April 4th

25   when the transaction did not close as the plan investors walked

1   away.  It caused a summer of reflection.  And it caused a lot

2   of work to be done by the company, its creditors' committee,

3   General Motors, and others.  And the first chart I'll point out

4   to you is Chart 13, the "Range of Strategic Alternatives".

5        By the summer of 2008, the company had sat down with

6   its investors and with its lenders, with its creditors and

7   others, and said sort of, what do we do now.  The confirmed

8   plan with the plan investors litigation had been commenced for

9   specific performance.  We understood that we needed the

10  liquidity support from General Motors.  They had begun to

11  provide it.  As the record has indicated, they provided almost

12  a billion dollars over the course of the summer, leading up to

13  September of 2008.  And while they were repaid much of that,

14  today they have lent another 850 million dollars to the company

15  to support its operations since April 4th of last year.

16       And the first moment really was sort of saying what

17  are the alternatives we had.  And the company sat down and

18  thought about what all of its strategic alternatives might be.

19  Could it do a standalone plan through plan modifications?  Was

20  there a rights offering available?  Because when the

21  transaction didn't work, we basically said we should go back to

22  our creditors at the bottom of the waterfall and work up and

23  see who will provide capital to the company.

24       We worked first with the creditors' committee trying

25  to sort out whether or not bondholders -- prepetition

31

1    bondholders could be that source.  That turned out not to be

2    the case.  And we continued to move up the waterfall, trying to

3    find a party that was prepared to provide capital to the

4    company.  We said we would remain in Chapter 11 until the

5    capital markets improve.  Could we reorganize without ex-North

6    America, without the North American operations, or would we

7    have to sell some or all of the assets either in a plan or in a

8    363 sale?

9         These alternatives were not only reviewed by our major

10   stakeholders, but they gave us input.  Some of the boxes on

11   this chart were suggested by them and were reviewed carefully

12   by the parties over the course of that summer.  The summer of

13   2008 led to a determination that the company would, in fact,

14   reaffirm its business plan, seek to renegotiate its agreements

15   with General Motors, seek to move forward to modify the plan,

16   and then to obtain emergence capital.

17        And Chart 14 really talks about the decision tree that

18   the board of directors went through, in the next month, in

19   August of 2008, with its stakeholders.  And these are the kind

20   of charts that each month we would sit with the creditors'

21   committee and walk through with the senior management of the

22   company and say let's think about what should we do and how

23   should we do this.  And Chart 14 simply says, look, we need to

24   go through a decision tree to say is a revised plan feasible?

25   Should we do a pension transfer?  Or should we terminate

32

1    pensions?  Is revising the GSA and MRA on a consensual basis

2    preferable to getting into litigation with General Motors?  Can

3    you do a standalone plan versus other alternatives?  Is, in

4    fact, a standalone plan feasible in light of what people even

5    in August recognized would be DIP maturity by the end of 2008,

6    because it became apparent, even at that time, that it was

7    unlikely that our DIP lenders would find a hundred percent of

8    the vote required to extend the DIP.  And is execution of the

9    standalone plan feasible in light of the capital markets?  And

10   if not, then all the alternatives you saw on the previous page

11   were sort of in the decision tree to think about how we would

12   operate.

13        And that was how the company thought about it, and

14   that's how we thought about it and discussed it with our

15   stakeholders.  That led to a series of events in September.  As

16   Your Honor is aware, we ended up amending the GSA and MRA.  We

17   worked through that decision tree and concluded that we should

18   execute the GSA and the MRA amendments and complete the first

19   of the 414(L) transfers, which addressed a fair amount of the

20   HRP at that point in time.  And we moved forward.  That was

21   really the first major set of events.

22        The second major set of events occurred at the end of

23   September and beginning of October.  Shortly after Your Honor

24   approved the amended GSA and MRA and also approved our

25   determination to freeze the salaried and subsidiary pension

1    plans, the capital markets were in considerable flux.  It was

2    on October 2nd that Congress passed TARP for the first time.

3    And we filed our plan modification motion, back on October 3rd,

4    the motion that's before the Court today, albeit it has been

5    substantially modified and changed since that time.  And on

6    October 3rd, the company believed that it had solved the issues

7    that it needed to go with the support of its creditors and

8    lenders and General Motors, only to have what was an

9    unprecedented change in the world occur in the fourth quarter

10   of 2008.

11            And so we found that that second phase leading up to

12   the filing of the plan modification motion was almost

13   immediately obviated by what had changed with the changes in

14   the capital markets.  Not to dwell on them, but there were

15   unprecedented changes in the capital markets and in the

16   automotive industry, reflected by some of the next charts.  On

17   Chart 7, one only needs to look at some of these graphs for

18   about two seconds to understand what's happened to the S&P

19   index, what that is reflective of the capital markets on Chart

20   7.  On Chart 8, you take a look at the leverage loans.  This is

21   a company that needs leveraged capital, prior to the

22   transaction we put in today.  And you look, ultimately what

23   happened to the discount spread of leveraged loans.  It

24   basically shows you the market closed.  That's a spike that's

25   unprecedented over almost -- a long period of time, from '97 to

34

1    '09 this is this chart.

2         The next chart shows you what happened to the average

3    bid of leveraged loans.  Just as the price our debt plummeted,

4    so did the price of debt on virtually every company in America

5    and in the leveraged loan business.  And there is some recovery

6    today, but it's only the beginning of the recovery that we're

7    expecting.

8         If you look at the automotive industry.  Why did

9    General Motors and Chrysler end up in Chapter 11 in their

10   transactions, and why have most of the top suppliers commenced

11   Chapter 11 cases recently?  And you only have to look at Chart

12   10 and understand the events that have occurred and look at

13   annual U.S. light vehicle historical demand, and look at,

14   again, the unprecedented stock drop from what had been north of

15   16 million vehicles being produced to something in the range of

16   something south of 10 million.  For any industry to be able to

17   adjust itself to that change in capacity and demand in a very,

18   very short period of time is, again, unprecedented.  It was

19   unprecedented in the fifty-year or sixty-year history -- recent

20   history of the automotive markets.

21        And that, obviously, led to the crisis that has been

22   affecting this case and affecting most other cases, and

23   indicated on Chart 11.  And you'll look at the number of OEMs,

24   financial companies related to the OEMs and auto suppliers that

25   have been in serious distress, either reflected by their credit

35

1   ratings or by the fact that they've actually had to reorganize

2   under the bankruptcy laws here in the United States.

3          All of that activity was beginning.  Some of it

4   occurred in 2009, but all of it was really focused in the last

5   half of 2008, and in the fourth quarter.  The real question for

6   the people in these cases were, would there be any governmental

7   support of the sector, and how would that support come?  And

8   that determination really was what led to the third memorable

9   event in the last really major series of events in the last

10  period of time since our confirmed plan, and that was in

11  December.

12         In December of 2008, while we all waited to find out

13  whether the government would provide any financing to the

14  automotive sector, our DIP matured.  We needed more money from

15  General Motors.  And the stakeholders came together in what

16  also was an unprecedented series of agreements, by fashioning

17  what we all came to call an accommodation agreement, an

18  agreement that Your Honor approved in December, which allowed

19  us to operate what has now been seven months past the maturity

20  of our DIP financing, with the support of our stakeholders and

21  our DIP lenders, in order to be able to try to find an

22  appropriate resolution of these cases.

23         So we ended -- I think we ended the year almost in a

24  stage of paralysis here in the automotive sector, waiting for

25  the answer that finally came from the then-Bush administration

36

1    at the very end of the year, closing their curds just before

2    New Years, in which the government decided -- the

3    administration decided to provide TARP money to General Motors,

4    basically indicating it was unlikely they were going to

5    directly support the supply sector, but at least opened the

6    door for there being some financial support of an industry that

7    was in major crisis and an industry that affects so much of the

8    American economy and the global economy, in ways that I think

9    people don't fully appreciate.

10            So much time was spent last year working and worrying

11    about, as they should have, the financial sector and the

12    systemic failures in that sector, that I don't think people

13    fully appreciated the systemic collapse in this sector and what

14    the implication of that was for companies across -- and

15    governments and communities across the country.  I think you

16    only have to think about some of the objections Your Honor

17    dealt with yesterday, when we were talking about how long we'd

18    make payments to certain taxing authorities and others; and

19    that brought them here from their locales to be concerned about

20    payments being made; how about no payments being made, because

21    of just a complete collapse of major companies.

22            That brings us, at the end, to the beginning of this

23    year, after we understood that there was at least an

24    opportunity for there to be some funding, because there was no

25    funding in the capital markets available to address this.  And

37

1    that really led to a series of discussions the company had and

2    presentations that our stakeholders now have, because we've

3    dealt with them over the last number of months.  But it was in

4    January where the company developed a deal structure that

5    included the sale of certain sites to General Motors.  And this

6    was a structure that the company came up with.

7         So much has been said about how different parties

8    tried to force the debtors to do different things.  And the

9    fact is, while this has been a hotly negotiated and hotly

10   contested and difficult process, it has been more of a

11   collaborative process, I think, than people publically, at

12   least, understand.  And it was the company who came up with the

13   deal structure back in late January that said we should sell

14   some key sites to General Motors and then figure out how we can

15   move forward with the transaction that was fundamentally

16   supported by our DIP lenders through a conversion of capital.

17        When we did that, we identified a few issues that had

18   to be resolved.  This chart here, number 21, basically

19   indicated that, look, we've got a very tight time frame to deal

20   with our issues.  Your Honor, I think will remember, we had a

21   chambers conference with most of the major players here in

22   January where we described the issues we were trying to solve,

23   and we had an accommodation agreement that said that it needed

24   to be solved in February.  And Your Honor gave advice to all of

25   us, saying you better figure out whether you can find ways to

38

1    work with each other over a slightly longer period of time, and

2    that obviously, is what we all ended up having to do.

3         But we had to sort out emergence funding, pension,

4    solutions, and we had to figure out our relationship with

5    General Motors.  On Chart 22, this next chart, there were just

6    a wide variety of subjects that had to be reviewed and

7    considered and ultimately, now, are part of the master

8    disposition agreement and related agreements; all of these

9    issues, which had to be renegotiated for the second, third,

10   fourth time, with General Motors.  And again, people can choose

11   to -- and somehow in their papers are being highly critical of

12   General Motors Company.  And I believe that company, like all

13   of us, all of our clients do, and everyone in this case does,

14   they take actions that are in their own best interests.  But

15   they also try to figure out how to merge those best interests

16   and find points of common ground.

17        And this debtor, over the last eighteen months, has

18   gone back almost three times, just about three times to GM and

19   said the answer you gave us on this issue or that issue or the

20   other issue, which was okay four months ago, just isn't okay

21   anymore.  And we need to think about it again.  A very complex

22   series of discussions.

23        That also led to some stark realities, which are

24   distributed or highlighted on Chart 23, which is, we came to

25   understand in January that in order for us to be able to

39

1    finance plan modifications, there were only certain buckets of

2    financing or capital that would be available to us.  Trying to

3    get some financial support from our Tranche A and B lenders was

4    one area that we explored.  At the far end of that, we

5    indicated in the green box, we needed to resolve administrative

6    claims and DIP lender claims through cash, rollover debt, and

7    conversion to equity.  Sitting down and talking to your DIP

8    lenders, even those lenders who had, in some respects, been

9    converted from prepetition debt, that you expect them to

10   finance the company through equity contributions as they don't

11   get paid back what they were expecting, is a difficult

12   conversation.  And the fact that we're here on a consensual

13   basis through a pure credit bid to accomplish that, I think

14   really exemplifies the process that all of us worked closely

15   together on.

16        Other sources of funding were GM paying and assuming

17   making more payments and assuming more liabilities; some

18   support from the U.S. Treasury, directly or indirectly.  We all

19   understand now that the Treasury chose not to directly support

20   the automotive supply group, but we did get, and this

21   transaction does involve a significant amount of funding from

22   General Motors, and it was part of the solutions that General

23   Motors Company dealt with in its transactions.

24        And then, obviously, the plan investor litigation

25   proceeds.  That matter is still pending in the court.  Whether

40

1   there will be proceeds or not from that through settlement or

2   otherwise, is to be determined.  And the parties had to come to

3   some agreement about how to address those issues.

4        And then finally, something that I think it's

5   important that we all talk about, which is the third leg of the

6   stool, was pension.  I said yesterday that one of the things

7   the company had preferred from the beginning was a consensual

8   arrangement that would address pensions.  We wanted to try to

9   preserve that which had been accomplished back under the

10   confirmed plan and chose to do that.  Our preferred route was

11   trying to reach an agreement with GM to assume the hourly and

12   salaried pension assets and liabilities.  There were some

13   avenues to think about that.  But obviously, GM had its own

14   Chapter 11 case and the realities of its own situation to deal

15   with, and that no longer became possible.  I think there's been

16   a fair amount of criticism of General Motors about those

17   determinations, and I'm not here to either add or detract from

18   that debate.  But I am here to add some reality to it, and

19   again say on this record, that GM, after having taken the first

20   414(L) transfer, had no further obligations to Delphi to do

21   anything beyond what it had done.

22        And that was because we could not meet all the

23   conditions to the agreements we'd entered into with them.  And

24   so while it was our preferred route, for reasons that were

25   outside of our control, we weren't able to accomplish that.

41

1     And therefore we recognized that there had to be a negotiated

2     transaction with the PBGC that would resolve from the GM side,

3     their benefit guarantee issues, resolve their follow-on plan

4     issues, because those had been alleged -- that's all public,

5     those statements have been filed publically by the PBGC -- and

6     release PBGC asserted liens on Delphi's nondebtor assets.

7          These are things that we had hotly contested as to

8     whether those liens are actually valid.  But that didn't change

9     the fact that they had to be resolved consensually.  And the

10    PBGC-Delphi settlement agreement with Delphi resolved that

11    latter point yesterday, among others.

12         All of those things were contemplated in January and

13    February of this year, as we worked with each other to try to

14    figure out how to solve that problem.  As we moved into more

15    recent months, there were just a few other -- two other, maybe

16    three other memorable events to us.  One of them was the period

17    at the end of March, beginning of April.  Very significant for

18    us in these reorganization cases.

19         As Your Honor knows, the Auto Task Force intervened in

20    this cases, on March 23rd, to block agreements that Delphi had

21    reached with General Motors, which was their right, because

22    they were the lender to General Motors at the time, and they'd

23    retained that right.  And that led to a series of conversations

24    involving directly and indirectly and in different groups, the

25    company, the Auto Task Force, General Motors, the creditors'

42

1    committee and the DIP representatives of the DIP lenders.  And

2    it led to some very tough discussion and decisions in the first

3    week of April, when the General Motors and the Auto Task Force

4    took the view that they were not interested in supporting, at

5    that point, Delphi's emergence, but rather wanted to acquire

6    some assets on a liquidation basis, for fair value, but at

7    least I read fair value at the time to be at liquidation

8    values.

9         And our DIP lenders called us and indicated they felt,

10   under the circumstances that then existed, they would not

11   provide additional interim or emergence funding for Delphi, and

12   weren't prepared to enter into transactions with us; and that

13   really the route that the company ought to take was a route to

14   liquidate itself through some form of self-financed

15   liquidation.

16        That was a very tough week for the company, probably

17   one of the toughest weeks the company's had in this entire

18   reorganization process.  It was also, in my mind, in that week

19   and the weeks after that, a textbook, in my view at least,

20   textbook case of corporate governance and how it should work.

21   The directors met for many occasions at that time, and

22   ultimately concluded with management that they did not believe

23   that that approach was value maximizing, and that the company

24   had to figure out what an alternative would be that might work.

25        That led to a series of discussions, a lot of tenacity

43

1    and persistence by the company management, on trying to push

2    its stakeholders towards a reorganization.  And that really led

3    to meetings in May, which is the next group of events.  There

4    was a series of events from May 12th to June 1st, kind of the

5    sixth major area, in which the company met with the Auto Task

6    Force, with our stakeholders, and basically set down

7    principles.  We were asked by our stakeholders:  what does

8    Delphi want?  What would Delphi do?  What are Delphi's

9    objectives?  How, with all these problems going on, what do you

10   want us to take into consideration?  And the task force had set

11   out its own objectives in terms of what it wanted for General

12   Motors and General Motors wanted for General Motors.

13        And we sat down with the parties and talked about

14   these objectives.  I'm not going to go through them at length.

15   You've heard testimony or read testimony about them.  But this

16   document of the -- set forth here, in terms of the

17   objectives -- and I'm just going to deal with Chart 17 here --

18   those objectives were the objectives that guided everything the

19   company did from then until now.

20        At that time, the company ended up providing the

21   hypothetical liquidation analysis to its stakeholders that Your

22   Honor has seen.  It provided analysis of administrative

23   liabilities.  It indicated that this needed to be resolved

24   through a plan; that we needed to sort these transactions out.

25   And ultimately, faced with the prospect of that, the lenders

44

1    were not then prepared to enter into a transaction with Delphi.

2    Delphi needed to find someone who would.

3        And we worked with a number of different companies to

4    come to that conclusion, ultimately filing the transaction we

5    filed on June 1st, but not before engaging in some twenty hours

6    of judicial mediation, requested by the DIP lenders, with Judge

7    Morris, whom Your Honor appointed, who really, as we all look

8    back and reflect, many of the kernels of the solutions that we

9    all talked about today, were in fact, dealt with in that

10   mediation.  And so we moved forward.  And we solved -- we've

11   tried to solve those problems, and maintained a desire to

12   fulfill those objectives.

13       That really brings us to the June 1st transaction,

14   which was the best transaction the company could come up with,

15   assuming all of the things we had been told in April and May

16   were, in fact, true.  And they were true at the time.  But one

17   of the things that I think people needed to see was that there

18   was a solution other than liquidation that was feasible.  And

19   the company was able to put forth that in June.  And then, in

20   the last six weeks, what we've really seen, is our

21   stakeholders, those to whom we owe a fiduciary duty, come to

22   the company and say, you've demonstrated a way to be able to

23   move forward with this transaction.  You've found a solution

24   that is better than liquidation, and we want it.  And that's

25   something that we worked with very carefully.

45

1        So let's move to Chart 30 ,if we could?  And again, I

2    show this chart only to Your Honor for a little bit of levity

3    in these closing remarks, because this was the -- there were

4    five or six versions of this chart.  We spent time trying to

5    sort out how it was that we would execute this transaction in a

6    manner that was consistent with the requirements of the

7    Bankruptcy Code, Uniform Commercial Code, and our various

8    agreements that we're involved with.  And this is really the

9    transaction, the form of which was in our supplement.  This has

10   been adjusted differently.

11       The levity part of this is to tell you that Mr.

12   Sheehan had indicated to me that if Your Honor ever required

13   that he testify about this, he was going to bring up all the

14   advisors, because he was unwilling to sort of have to walk

15   through all these steps.  But this, in fact, the transaction

16   we're doing.  And we wanted to give some degree of transparency

17   as to the pure credit bid and how it operates.  And this is the

18   chart that does that.

19       And on Chart 31 it addresses all of the claims in the

20   waterfall, postpetition and prepetition, in a manner that is

21   consistent with the Bankruptcy Code and addresses those various

22   categories in a manner that has been accepted by our DIP

23   lenders, by other administrative creditors, and provides the

24   opportunity for recovery for holders of some of our prepetition

25   liabilities.

46

1          I think this is a transaction that is, I think,

2    remarkable in that respect, that while the opportunity to

3    really reap the benefits of the future profits of this company

4    is something that our DIP lenders have taken on and will enjoy

5    those benefits as we move forward, the fact of the matter is,

6    they had to give up their expectations to be repaid in cash as

7    DIP lenders, by and large, and they had to agree that they

8    would address all of the various boxes on this waterfall, as

9    did General Motors.  And they did that, and that is what this

10   plan is about.

11          As we have indicated, Your Honor, and again, you've

12   seen these before, and I'm not going to dwell on these either,

13   Charts 32 and 33 indicate how the assets and liabilities are

14   being allocated.  These are updated from what was in the

15   supplement.  And in the final transaction, as we have GM

16   Components Holding LLC, Reorganized DPH Holding Company, and

17   what's now called DIP Holdco 3 LLC, although Mr. Bernstein's

18   colleagues promised me they'll come up with a better name for

19   that before we close.  But that's the current legal name of

20   that holding company which currently exists.

21          Last, in just terms of trying to assess the -- to go

22   through the assessment the company has gone through over the

23   last number of weeks and in connection with the auction, I

24   would just point to Chart 37, if I can, as the qualitative

25   factors -- or excuse me, the quantitative factors, and then the

47

1    qualitative factors that led to the board of directors'

2    recommendations to Your Honor.  This is an assessment of the

3    consideration to the estate that was existing under the

4    Platinum GM MDA.

5         And as Your Honor knows, we believe that there was a

6    range of between 5.4 to 5.67 billion dollars, was the value of

7    that transaction.  Quantitatively, when the pure credit bid

8    came in, as Your Honor knows, because you instructed us,

9    quantitatively, the company was able to only count

10   quantitatively the 3.44 billion, roughly, that was

11   consideration to the estate in connection with the transaction,

12   that was a reduction in secured debt.  That's how pure credit

13   bids work.

14        However, our lenders, we spent time with the lenders

15   giving them advice and counsel and guidance as they considered

16   their bids, as we had with the Platinum and GM parties, and had

17   encouraged them to try to mirror the transaction that had been

18   put together as the transaction of preference on June 1st.  And

19   to their credit, they agreed to do that.  And that is why

20   what's before the Court is essentially the master disposition

21   agreement that had been put before the Court on June 1st, with

22   amendments that were agreed to between the parties.  But it's

23   the same basic structure, and we're seeking to execute this

24   through a confirmed plan.

25        And even though the pure credit bid, quantitatively,

1    had to be limited to 3.4 billion, because of the way your order

2    is read, that's what they had to say to us -- the

3    administrative agent had to say please don't consider more than

4    that, the company did faithfully look at that and follow Your

5    Honor's instruction; we also recognized that all of the other

6    major attributes, quantitatively, of the pure credit bid, exist

7    in the pure credit bid, so that even though we couldn't add

8    them up and say they are there, the fact is they were there.

9         What really led to the business judgment that's before

10   the Court today are the qualitative factors.  And these go back

11   to the objectives that the company had sat down with the

12   government, General Motors, DIP lenders, the creditors'

13   committee and the other stakeholders back in early May and

14   said, these are things that we need to consider.  These are the

15   objectives we have and the factors that we think make sense.

16   And they were simple, but they were important.

17        We needed to maximize business enterprise value and

18   related recoveries for stakeholders.  We needed to assess the

19   ability to perform the obligations under the transaction

20   documents.  We wanted the operations of the business to

21   continue on a going-concern basis.  We needed to evaluate the

22   ability to achieve that.  We needed to look at speed of

23   consummation of the agreement and the certainty of

24   consummation.  We wanted to consummate through a plan to

25   achieve comprehensive resolutions of these cases.  And as

49

1    importantly, we needed to have a sufficient liquidity runway

2    toward substantial consummation of the modified plan.

3           As you can see, the pure credit bid meets all of these

4    factors.  And the original MDA meets only certain of the

5    factors.  And the gating issue between those two, obviously, is

6    that the parties behind the pure credit bid also happen to be

7    the DIP lenders, and their opposition to the MDA, if they were

8    not able to be the sponsors of the MDA, simply affected the

9    qualitative balance as I think should be of no surprise to

10   anyone.

11          And so, Your Honor, we've moved through what's been a

12   very dynamic eighteen months or so, as we have gone from the

13   last confirmation hearing to this plan modification hearing.  I

14   think these comments are intended just simply to provide some

15   perspective in this record about the six or seven sort of

16   moments of truth that the company had to deal with over the

17   last eighteen months and the way in which it navigated through

18   them.

19          With that, Your Honor, from the company's perspective,

20   and subject to the submission of the final form of order, the

21   company would ask Your Honor to approve the plan modification

22   motion as presented to the Court.

23          THE COURT:  Okay.  Does anyone else have anything to

24   say?

25          MR. SIEGEL:  Good afternoon, Your Honor.  Glenn Siegel

50

1    on behalf of the Elliot Associates entities.

2        THE COURT:  Good afternoon.

3        MR. SIEGEL:  The proposed plan modification which

4    approves the sale of the debtors' assets after an open sales

5    process, reconciles the rights of creditors with the needs of

6    two very important parts of the United States auto industry.

7    The closing of the pure credit bid, the transaction proposed in

8    the pure credit bid, would lead to the infusion by DIP lenders,

9    of almost 900 million dollars of committed capital to New

10   Delphi, as well as substantial participation and financial

11   assistance by General Motors.

12       We believe that this sale, if approved, will send

13   Delphi on its way to recovery as a successful business

14   enterprise and urge the Court to approve the transaction.

15   Thank you.

16       THE COURT:  Okay.  Thank you.  Okay.  I will grant the

17   debtors' motion for modification of the plan and approval of

18   the relevant agreements, i.e., the agreement with GM and the

19   DIP lender entity.  It's clear from the evidence as summarized

20   by Mr. Butler, that the plan satisfies the good faith

21   requirement of 1129(a)(3), both in terms of the narrow view of

22   that section, which focuses on good faith in proposing and

23   seeking approval of the amendment or modification, and also in

24   terms of a broader view of good faith.

25       The debtors were obviously presented with a colossal

51

1    problem when the effective date of the plan didn't occur upon

2    the refusal of most of the plan investors to close in April of

3    2008.   That problem was very clearly exacerbated by a series of

4    remarkable events over the following months, that involved both

5    frightening turmoil in the capital markets as well as

6    unprecedented difficulty in the debtors' industry, the auto

7    industry, and in particular, the travails of its largest

8    customer and likely source of substantial funding for the plan,

9    GM Corporation.

10          Nevertheless, it is clear to me that the debtors, led

11   by an extremely active board, but also through the work of all

12   of their employees, consistently addressed these problems in a

13   responsible and good-faith manner, which culminated,

14   notwithstanding, as Mr. Butler said, the fact that their

15   debtor-in-possession loan facility matured seven months ago

16   without a replacement, in an auction process that resulted, I

17   believe fairly, in the choice of a winning combined bid that

18   I'm approving today.

19          The plan, I believe, as modified, meets the

20   requirements of 1127, in particular, although I won't go

21   through all of those requirements, I believe that the debtors'

22   properly sought voting on that plan modification, and that the

23   debtors classified the voting classes properly, including

24   specifically, separately classifying the PBGC, given the

25   complex issues with regard to the PBGC's claims that were

52

1    presented, i.e., the unsecured nonpriority, priority, and

2    asserted secured claims by the PBGC.

3            I also conclude, as I did with the original plan, and

4    as supported by FTI's analysis, that the plan properly provides

5    for plan purposes, a substantive consolidation.  I also find,

6    based upon not only the affidavits that were submitted, but the

7    fact of the auction process itself and the plain terms of the

8    plan modification, that the plan may be crammed down on

9    dissenting classes.

10           I'd note further that with the exception of the two

11   objections by taxing authorities, in respect of the treatment

12   of their secured claims, there has been no objection to cram

13   down that's been pursued since the announcement of the winning

14   bid of the settlement with the unsecured creditors' committee

15   and Wilmington Trust.

16           The most difficult issue for me, as well as I believe

17   for the creditors of these debtors, was the issue that usually

18   doesn't matter in connection with a Chapter 11 plan that's

19   being pursued in good faith, which is the 1129(a)(7) best

20   interest analysis, which compares a liquidation to the

21   reorganization plan.  That's because of the unique

22   circumstances of this case.  It was asserted in plan objections

23   and I'm sure in negotiations that because of the unique role

24   that these debtors play in the auto industry, and in particular

25   for GM, that these debtors may be worth more, at least with the

53

1    threat of liquidation, which conceivably could inspire

2    additional contributions by GM and perhaps others to the

3    creditors than if the debtors continued to operate.

4         Obviously the debtors play a major and critical role

5    in the auto industry.  But I am satisfied that the debtors made

6    the correct decision not to push that threat beyond the extent

7    that it was pushed in this case.  And that includes, as I'm

8    sure the debtors understood, the fact that it would be pushed

9    further by the creditors before resolution.  Particularly given

10   the difficulties that the industry faces and therefore the

11   necessary support by the U.S. government, any such threat, the

12   outcome of which would be -- or the goal of which would be

13   destructive of the rest of the auto industry, or at least of

14   significant sectors of it in the U.S., was a threat that would

15   likely elicit very unpredictable responses, including from

16   those in Congress and in the administration who, I'm sure, do

17   not respond well to such threats.

18        So, it seems to me, that while recognizing the

19   dynamics of their particular role in the auto industry, not

20   only the debtors but the DIP lenders have properly mediated or

21   moderated the urge to obtain the last dollar through a

22   destruction by proposing what's on the table today.

23        Finally, I conclude that therefore the 1129(a)(7) test

24   is satisfied, that is, if the debtors in fact did liquidate, I

25   believe that Mr. Eisenberg's analysis is reasonable and proper,

54

1    and that it would be imprudent to assume that the one ultimate

2    source of financing that is available beyond what's on the

3    table, i.e., the U.S. government, would have responded to such

4    a threat in a way that would have increased the values from

5    those set forth in Mr. Eisenberg's analysis.

6           I also find, consistent with my previous remarks, that

7    the plan is feasible.  It does represent and include a very

8    significant commitment to continue funding by the two primary

9    DIP lenders, Elliot Associates and Silver Point, as well as by

10   GM, and also reflects, I believe, a realistic analysis, as set

11   forth in the declarations filed in support of the modification,

12   with regard to the other assets retained by the reorganized

13   debtor.

14          Obviously, the goal of this transaction is to have a

15   feasible and continuing business preserved as a going concern,

16   and I believe that will occur through this transaction.  I also

17   believe that those who are acquiring the assets will acquire

18   them free and clear, to the fullest extent contemplated, not

19   only by the recent rulings in the Chrysler and GM cases, but

20   also going back to the TWA and Leckie Coal cases, and while I

21   haven't seen the ultimate version of the order, I believe my

22   ruling will be consistent with what I've seen on that score.

23          So, I will approve confirmation of the plan as

24   modified.

25          MR. BUTLER:  Thank you very much, Your Honor.

55

1          THE COURT:  Do you have the order now?

2          MR. SIEGEL:  We are very hopeful of having the order

3     shortly.

4          THE COURT:  Okay.

5          MR. SIEGEL:  If we can take a break and see --

6          THE COURT:  That's fine.

7          MR. SIEGEL:  -- if we can achieve that.

8          THE COURT:  I'm going to have lunch, so if that's all

9     right?  Unless the break is going to be like ten minutes, I'll

10    wait.  Otherwise, I'll eat lunch.

11         MR. SIEGEL:  I wouldn't want to unnecessary delay your

12    lunch.

13         THE COURT:  All right.

14         MR. BUTLER:  Thanks, Judge.

15         MR. SIEGEL:  Thank you, Judge.

16        (Recess from 1:18 p.m. to 4:25 p.m.)

17         THE COURT:  Please be seated.  Okay.  We're back on

18    the record in Delphi Corporation.  The parties have given me a

19    black-lined order approving the plan modifications and related

20    agreements, and I've been through it.  They're not extensive

21    changes.  But I did have a few points on the order that this

22    supersedes.  And I think these changes only address one of

23    those.  So I thought I'd go through them with you and make sure

24    we're all on the same page with this order.  So I apologize for

25    this.  My mark-up is on the penultimate version of this, so

56

1    I'll refer to the paragraphs.

2              On page 33, paragraph DD, there's a reference to --

3              MR. BUTLER:  I'm sorry, Your Honor, I just need to

4    find it --

5              THE COURT:  Sure.

6              MR. BUTLER:  -- because unfortunately --

7              THE COURT:  It's paragraph DD.

8          (Pause)

9              MR. BUTLER:  Paragraph DD.  I see it, Your Honor.

10             THE COURT:  Okay.  There's -- this is the first

11   time -- well, there's a reference to the contracts and leases

12   that are being assumed by the debtors or the buyers, pursuant

13   to the modified plan of the MDA documents.  That's then defined

14   as the assumed contracts and leases.  And then there are

15   provisions starting at page 58 and going on, dealing with the

16   assumed contracts and leases.  And some of them, obviously, are

17   not -- some of them are being assumed later, after August 17th,

18   if they're to be assumed.  I just wanted to make sure you've

19   gone through it -- I think you have -- and made sure that I'm

20   not, because of this defined term, directing the assumption or

21   authorizing the assumption and assignment of those through this

22   order.  I don't think that's the case, but I would ask someone

23   to check that.  Because the defined term is very broad.

24             MR. BUTLER:  I think, Your Honor, the answer -- the

25   way I think we can do it, I think the parties acknowledge that

57

1    the findings you're making today with respect to adequate

2    assurance and the assumed contracts and leases, is subject to

3    the resolution of objections that have been made that are

4    scheduled for the August 17th hearing.

5            THE COURT:  Okay.

6            MR. BUTLER:  I think all the parties would agree with

7    that.  I'm looking for --

8            THE COURT:  Okay.  That's another way to do it.  I

9    mean, I know that's the intent.  I just wanted to make sure

10   that --

11           MR. BUTLER:  Mr. Siegel, can we all agree with that?

12   So I think, what I would suggest is that in paragraph DD we

13   simply say, "subject to the Court's resolution of objections to

14   be heard at the August 17th hearing," or something like that.

15           THE COURT:  Okay.  That's fine.

16           MR. BUTLER:  So.

17           THE COURT:  Okay.  And then, you guys have dealt with

18   this, I see.  Paragraph 3, which is on page 41 of the prior

19   draft, says that the MDA that was submitted on July 26th will

20   be the governing one.  And now you've added, the fully signed

21   one.

22           MR. BUTLER:  Correct.  Unless superseded by the filing

23   of an executed version.

24           THE COURT:  That's fine.  But that's going to be

25   subject, of course, to the material modification provisions

1   that --

2          MR. BUTLER:  Yes.  Your Honor, the fully executed

3   version is only intended to carry forward all of the comments

4   over the course of the last couple of days.  It just hasn't

5   been -- that's what the final form and signed.

6          THE COURT:  That's fine.  Then the next page.  This

7   is, I guess, the most substantive comment I have.  This is --

8   the proviso at the end of paragraph 4, which says, "provided,

9   however, that after the occurrence of the effective date, if

10  this order is revoked then the MOU's," I'm sorry, "then the MDA

11  and the related transactions shall be severable from this order

12  and be deemed approved."  And at least, based on the record of

13  the hearing, I mean, I don't think that's what I've done.  I

14  haven't approved any sale, right?

15         MR. ABRAMS:  This order is revoked and --

16         THE COURT:  Right.  But I just think that should come

17  out, that proviso should come out.  I mean, the unions reserved

18  their objections under 363.  The creditors had been --

19         MR. SIEGEL:  Your Honor, I think -- I'm pretty sure I

20  know what the Court's referring to.

21         MR. ABRAMS:  Here it is.  Right here.

22         MR. BUTLER:  The point here is that this is a -- these

23  transactions are sales that are occurring under this plan.  And

24  what we must be assured of is that if, in fact, for whatever

25  reason the confirmation order is no longer effective, there is

59

1    no ability for those sales -- to sort of unscramble the egg and

2    say that the sales, in fact, did not occur, and that --

3              THE COURT:  Well, there's a separate 363(m) and (n)

4    finding elsewhere.  And I think that's sufficient for you all.

5    I just -- this seems to be going beyond that and having like a

6    separate approval of your 363.

7              MR. ABRAMS:  I was thinking of -- that's fine, Your

8    Honor.  I'm sorry, Your Honor.

9              THE COURT:  Okay.  That's fine.

10             MR. BUTLER:  Your Honor, just so I'm clear.  The last

11   sentence of paragraph 4 would remain in?  Is that correct?

12             THE COURT:  Yes.  It's this proviso part --

13             MR. BUTLER:  Right.

14             THE COURT:  -- the "provided however" language.

15             MR. BUTLER:  Yes.

16             THE COURT:  So the 363(m) protection is still --

17             MR. BUTLER:  Yes.

18             THE COURT:  -- is still there.

19             MR. BUTLER:  The last sentence would stay in?

20             THE COURT:  Right.  It's the proviso that would come

21   out.  Okay?

22             MR. BUTLER:  Okay.

23             THE COURT:  On the next page, paragraph 9 and 10, I

24   think you've left out some language.  I think it's just kind

25   of -- it doesn't make sense to me.  It says, "Pursuant to the

60

1    terms of the MDA documents, Sections 363 and 1123(a)(5) of the

2    Bankruptcy Code as applicable in this order, on the effective

3    date the debtor shall consummate the transfer free and clear of

4    any claims liens and encumbrances, pursuant to the terms of the

5    MDA documents of this order, to the purchasing entities of the

6    acquired assets, the sales securities, the assumed contracts,"

7    and then I think this is where language is missing, "the

8    assumed liabilities and any other liabilities specifically

9    assumed under the MDA or assumed and assigned pursuant to

10   paragraphs 38 and 61, in accordance with the MDA documents."

11           Are you really saying you're going to transfer -- this

12   is free and clear.  So I think what you're saying is, it's free

13   and clear, except for the assumed liabilities etcetera.  I

14   think that language is just left out.

15           MR. BUTLER:  Right.

16           THE COURT:  And then it is in the next paragraph.  So

17   I think maybe you just bring it up.  Because the next paragraph

18   would say it again.  But then I think it says, "And the DIP

19   agent shall have no liability."  Anyway, I think that's okay.

20   I just think that language before, "and the DIP agent shall

21   have no liability," should also be in front of "assumed

22   liabilities" in the prior paragraph.

23           And then because everyone wants to have this "free and

24   clear" language about six or seven times in the order, there

25   are a couple of places where -- and one of them is in 11(b) and

61

1    11(a); 11(a) says, "except with respect to assumed liabilities,

2    permitted encumbrances"; 11(b) says, "except with respect to

3    assumed liabilities" and leaves out permitted encumbrances.

4    And both of them leave out this other language about any other

5    liabilities specifically assumed under the MDA or assumed and

6    assigned pursuant to paragraphs 38, 39, 61. And I think if

7    you're going to have -- if you're going to say it several

8    places, you ought to say it the same place each time as far as

9    what's the carve-out from the free and clear. I think that's

10   just in 11(a) and (b). I think that's the only place it comes

11   up is 11(a) and (b).

12           In paragraph 17, towards the bottom of 51, it says

13   that "the retained property will revest in the reorganized

14   debtor that owns such property or interest in property as of

15   the effective date, free and clear of all claims, liens,

16   charges, encumbrances, rights and interests of creditors and

17   interest holders." I've added here, because I think this is

18   right, "except as provided in the modified plan." Because

19   there's some -- I mean, some people are -- the secured

20   creditors are retaining their liens on their collateral. The

21   taxing authorities are retaining their liens. So I've added

22   that language.

23           MR. BUTLER: Okay.

24           THE COURT: I think that's right. And then, paragraph

25   20, there's a proviso at the end of it which says, "provided,

62

1    however, notwithstanding anything in this order, the

2    exculpation provisions or releases provided pursuant to Article

3    XI shall no have no effect on the liability of any entity that

4    otherwise would result from any action or omission, to the

5    extent that such action or omission is determined in a final

6    order to have constituted intentional fraud or willful

7    misconduct."  One of those provisions in the plan also includes

8    gross negligence.  So the intention of this paragraph was to

9    limit the scope of those releases so that they wouldn't include

10   intentional fraud or willful misconduct --

11             MR. BUTLER:  Yes.

12             THE COURT:  -- but one of them actually broadens the

13   release, insofar as -- I forget the provision.  I'll find it.

14             MR. BUTLER:  Your Honor, I think, actually the way

15   this is written, it doesn't change what's in the plan.  It just

16   simply --

17             THE COURT:  Well, no, but it does, I think, because it

18   said notwithstanding anything --

19             MR. BUTLER:  In this order and not --

20             THE COURT:  -- no, in the plan.  Notwithstanding

21   anything in this order -- well maybe that's right.  You're

22   right.  I mean, that's true.  Because this order doesn't repeat

23   all of the releases --

24             MR. BUTLER:  No, it does not, Your Honor.

25             THE COURT:  -- you're right.  You're right.  Oh, yes.

63

1    The last comment I had -- well, actually, the next to last

2    comment, I'm sorry.  On page 75, paragraph 47 -- I'm sorry,

3    paragraph 46, there's a similar provision in 47, sets up a bar

4    date for substantial contribution claims and other

5    administrative claims.  And each time it gives the date as

6    running after the effective date.  In one case it's forty-five

7    days after; and in the other it's thirty days after.  I've just

8    put in that it's on or before the forty-fifth day after notice

9    of the effective date is filed on the docket.

10        And then, I had a question on 47.  Didn't we set up a

11   separate other administrative claims bar date?  Isn't there a

12   separate one already in place?

13        MR. BUTLER:  Yes.  This is a supplemental bar date for

14   claims prior -- running from June 1st -- I believe it's June 1,

15   2009 forward.  The prior bar date ran out on May 31st.  So this

16   would just be for -- and I think that's as it's -- that was the

17   intention, Your Honor.

18        THE COURT:  Okay.  So that's the parenthetical, "other

19   than as set forth in the modified plan"?

20        MR. BUTLER:  Correct.  Yes.  But it's to cover

21   administrative claims incurred on and after June 1st.

22        THE COURT:  I think, since people will be reading

23   this --

24        MR. BUTLER:  Right.

25        THE COURT:  -- you might want to put, then, "i.e.,

64

1    other than for claims arising after June 1st or May 31st."

2            MS. CECCOTTI:  Your Honor, while we're on this,

3    actually, I just focused on this, if I could just ask a

4    clarifying question?  Would the same exclusion -- there were a

5    bunch of exclusions to the administrative bar date --

6            THE COURT:  Right.

7            MS. CECCOTTI:  -- that Mr. Butler had just mentioned.

8    Are they going to apply, as well, I guess, would be the

9    question?  It would seem like they would have to be, if all

10   you're doing is carrying it forward.  Have we made that clear

11   anywhere?  There's an exclusion for employee claims.  There's

12   an exclusion for goods and services; that sort of thing.  I

13   just wanted to make sure, if we're carrying it forward, that

14   it's --

15           MR. BUTLER:  I'll ask the people who were working on

16   this.

17           MS. CECCOTTI:  -- we understand.

18           THE COURT:  Well, there was this term "other

19   administrative claim."

20           MR. BUTLER:  I think there was a definition.  I don't

21   know that it was -- I think there was a definition that was

22   carried forward.

23           THE COURT:  Well, this just says "administrative

24   claim"?

25           MR. BUTLER:  Yes.

65

1          THE COURT:  This says -- if the definition of -- well,

2     I think the bar date used the term "other administrative

3     claim."

4          MR. BUTLER:  Correct.  And this does too, as well -- I

5     think --

6          THE COURT:  No, this one just says, "All requests for

7     payment of an administrative claim."  The heading says "Other

8     administrative claims" --

9          MR. BUTLER:  Right.

10          THE COURT:  -- but so maybe we should add the word

11     "other" before "administrative" to make that work.

12          MR. BUTLER:  All right.  But I think there was

13     actually an administrative claim request form -- there was a

14     form of this claim attached to the modified plan at Exhibit

15     10.5, I believe.  So I think the form -- to Ms. Ceccotti's

16     point, I think the form is already part of the plan.  I'd have

17     to go back and look.  I don't have it in front of me here.

18          THE COURT:  But I think it would be --

19          MS. CECCOTTI:  That may be, but I'm not sure it

20     answers my question.  Because it would just be the form, not

21     the -- unless you're saying the form includes the instructions

22     which would also incorporate the --

23          THE COURT:  Well, there's this defined term, "other

24     administrative claims".

25          MR. BUTLER:  Right.

66

1          THE COURT:  But I think you should put the word

2     "other" in, in front of "administrative claims."

3          MR. BUTLER:  Okay.  I need a moment, Your Honor.

4          THE COURT:  Okay.

5          MR. BUTLER:  Because I didn't realize that Ms.

6     Ceccotti was going to raise this.

7          MS. CECCOTTI:  Well, I didn't either.

8          MR. BUTLER:  But this paragraph hasn't changed, and --

9          THE COURT:  It's a good point, though.

10         MR. BUTLER:  -- I would have expected it, frankly, for

11    the final administrative expense claim to be broader not less

12    broad.  Because the estate needs finality on administrative

13    expense claims.

14         THE COURT:  All right.  But you're not going to

15    have -- but there's certain exclude -- ordinary course you're

16    not going to have --

17         MR. BUTLER:  No, we're not having ordinary course.

18    And I think that's included in the form of the -- in 10.5,

19    which everyone's reviewed.  I just don't have it sitting here

20    in front of me.

21         THE COURT:  But the definition of administrative claim

22    in the plan covers everything, I think.  Right?

23         MR. BUTLER:  I'll take just a minute, Your Honor.  I

24    just don't have it.

25         (Pause)

67

1          THE COURT:  Actually, the plan provision -- there's a

2     definition of administrative claims bar date in the plan.

3          MR. BUTLER:  Right.

4          THE COURT:  So this is consistent with that.

5          MR. BUTLER:  Right.  I'm looking at 10.5 as well, Your

6     Honor --

7          THE COURT:  Yes.

8          MR. BUTLER:  -- which spells it out.  I think it's

9     fine.

10         THE COURT:  Okay.  All right.  You could, I guess,

11    confirm separately with the UAW as to whether they have to file

12    a claim or not.

13         MS. CECCOTTI:  That's fine with us.

14         THE COURT:  But, yes, the definition of administrative

15    claim is part of it, so that's fine.  Okay.  The last comment I

16    had was on the PBGC settlement, page 81 paragraph 60.  The

17    third sentence there says, "All parties are authorized to enter

18    into such other documentation," and consistent with my ruling

19    yesterday, I'm not really authorizing the PBGC to enter into

20    anything.  So --

21         MR. BUTLER:  It's the debtors.

22         THE COURT:  -- so I've said -- I've just made this one

23    sentence.  So it says, "The debtors are authorized but not

24    directed to enter into the Delphi PBGC settlement agreement for

25    and in accordance with its terms, including to enter into or

68

1   cause the entry into such other documentation as may be

2   reasonably necessary," etcetera.

3        MR. BUTLER:  Understood, Your Honor.

4        THE COURT:  And then I don't think this was the

5   intention, but just to make it clear, the last sentence says,

6   "Upon the effectiveness of the Delphi PBGC settlement

7   agreement, all liabilities relating to unpaid contributions to

8   the pensions plans, shall be released or discharged."  And I've

9   added "as set forth therein" so it's not sort of a general

10  discharge.

11       MR. BUTLER:  Okay.  Yes, Your Honor.

12       THE COURT:  So, subject to having those changes made,

13  I am prepared to enter the order that was handed to me in

14  black-line form.  I didn't have any issues with the changes

15  made in the black-line.

16       MR. BUTLER:  Your Honor, two things.  First, I would

17  like to just briefly -- it's a requirement that this form of

18  order be mutually acceptable, and the debtors affirm on the

19  record that it's mutually acceptable to the debtors.  I'd like

20  to make sure that it's also mutually acceptable to the

21  administrative agent and the required lenders, please?

22       MR. BERNSTEIN:  Don Bernstein, from Davis, Polk and

23  Wardwell, LLP, for the administrative agent.  It's acceptable

24  to the administrative agent.

25       MR. SIEGEL:  Glenn Siegel for the Elliot Management --

69

 1          MR. BUTLER:  You have to speak in the microphone.

 2          MR. SIEGEL:  Glenn Siegel for Elliot Management and

 3     the Manchester entities.  It's acceptable to us.

 4          MR. ABRAMS:  Your Honor, Marc Abrams.  The order is

 5     acceptable to the Silver Point entities as well.

 6          MR. BUTLER:  And the last point, Your Honor, is --

 7          MR. TANNENBAUM:  And the collective, Your Honor.

 8          MR. BUTLER:  -- I'm sorry.  I almost forgot.  He was

 9     hiding in the back of the room.  Mr. Tannenbaum, would care to

10     come up and speak into the microphone so we can all hear you.

11          MR. TANNENBAUM:  Jeff Tannenbaum, Weil Gotshal, Your

12     Honor, for General Motors.  The order is acceptable --

13          THE COURT:  Which General Motors?

14          MR. TANNENBAUM:  The New General Motors.

15          THE COURT:  Okay.

16          MR. BUTLER:  Your Honor, one last point.  There was an

17     effort to add this since we could.  Would it be Your Honor's

18     intention to have chambers make the changes that you've written

19     out and just enter the order -- docket the order, or how would

20     you like us to proceed, given the -- if it's possible for

21     chambers to do that --

22          THE COURT:  I guess, we could do that.

23          MR. BUTLER:  Thank you, Your Honor, very much.

24          THE COURT:  Okay.  Do we have it on a -- yes, we can

25     do that.

70

1          MR. BUTLER:  Thank you, Judge.

2          THE COURT:  Okay.  Thank you.

3          MR. BUTLER:  We appreciate it.

4          IN UNISON:  Thank you, Your Honor.

5      (Proceedings concluded at 4:48 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

71

1

2

3                          I N D E X

4

5                      E X H I B I T S

6    JOINT              DESCRIPTION          PAGE

7    627                Documents            10

8                       submitted by Mr.

9                       Sumpter

10

11                          RULINGS

12                       Page      Line

13   Objection of Mr. Sumpter,  18       10

14   denied

15   Debtors' motion for        54       22

16   modifications to

17   debtors' first amended

18   plan of reorganization

19   as modified, granted

20

21

22

23

24

25

72

1

2

3                        C E R T I F I C A T I O N

4

5    I, Penina Wolicki, certify that the foregoing transcript is a

6    true and accurate record of the proceedings.

7

8    _____

9    Penina Wolicki

10

11   Veritext LLC

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  August 3, 2009

17

18

19

20

21

22

23

24

25