**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| DENNIS BLACK, CHARLES CUNNINGHAM, KENNETH HOLLIS, and THE DELPHI SALARIED RETIREE ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> THE PENSION BENEFIT GUARANTY CORPORATION, <br><br> Defendant. | No.: |

**COMPLAINT FOR EQUITABLE RELIEF**

Dennis Black, Charles Cunningham, Kenneth Hollis, and the Delphi Salaried Retiree Association (collectively referred to as "the Salaried Workers"), through their undersigned attorneys, hereby submit the following complaint for equitable relief against the Pension Benefit Guaranty Corporation ("PBGC").

**I.  Jurisdiction and Venue**

1.   This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

2.   This Court has jurisdiction to hear this action pursuant to 29 U.S.C. § 1303(f)(2)(B) and 28 U.S.C. § 1331.

3.   Venue properly lies in this judicial district under 29 U.S.C. § 1303(f)(2)(B) and 28 U.S.C. § 1391(e).

## II. Parties

4. The PBGC is a United States government corporation established under 29 U.S.C. § 1302(a) to administer the pension plan termination insurance program established by Title IV of ERISA. The PBGC guarantees the payment of certain, but not all, pension benefits provided by defined benefit pension plans that are covered by Title IV of ERISA.

5. Dennis Black, Charles Cunningham, and Kenneth Hollis are retired salaried employees of Delphi Corporation ("Delphi"). They receive benefits from the Delphi Retirement Program for Salaried Employees (the "Salaried Plan" or the "Plan"), which on information and belief has now been terminated and transferred or imminently will be transferred to the PBGC. As a result of termination, Messrs. Black, Cunningham, and Hollis will lose a substantial portion of their pension income.

6. The Delphi Salaried Retiree Association is a nonprofit organization, comprised of participants in the Salaried Plan and dependents of participants who are beneficiaries in the Salaried Plan.

## III. Factual Allegations

7. Delphi is a global producer of automobile electronics and parts and does business in this judicial district. Until the termination of the Plan, Delphi was the contributing sponsor of the Plan, a defined benefit pension plan designed to provide for the payment of tax-qualified and non tax-qualified pension benefits to eligible Plan participants and beneficiaries.

8. Under the terms of the Plan, Delphi was designated as the Plan Administrator. Delphi, in turn, delegated the functional responsibilities as Plan Administrator to its Executive Committee, stating that "the Executive Committee of the Corporation's Board of Directors is the

2

Named Fiduciary with respect to this Program.  The Executive Committee may delegate authority to carry out such of its responsibilities as it deems appropriate in order to carry out the proper and effective administration of this Program to the extent permitted by ERISA." *See* Delphi Retirement Program for Salaried Employees § 14.  The individual members of the Executive Committee are, accordingly, the "persons" identified as Plan Administrator under 29 U.S.C. § 1002(16)(a)(1), and serve as individual fiduciaries under 29 U.S.C. § 1002(21)(A).[1]

9.      Delphi was originally an operating unit of General Motors Corporation, now known as Motors Liquidation Company ("Old GM"), the original sponsor of the Salaried Plan.  Delphi was incorporated separately in 1998 and was spun-off from Old GM in 1999.  When Delphi was spun off in 1999, it assumed responsibility for maintaining the pension plans for all Delphi employees.  Those plans included the Salaried Plan, as well as plans for unionized workers, which had been negotiated by their unions.  The Salaried Workers were not unionized during their tenures at Old GM and Delphi or currently.  There are currently over 15,000 participants in the Plan.  Most spent the bulk of their careers working for Old GM, but became subject to Delphi's oversight of the Plan at the time of the spin-off in 1999.

10.     In October 2005, Delphi filed for Chapter 11 bankruptcy in the United States District Court for the Southern District of New York.  *See In re Delphi Corp.*, No. 05-44481

---

[1] In prior proceedings between Delphi's Executive Committee and some of the Plaintiffs, *see* ¶ 13 (describing prior action in this District), there has been dispute as to whether the Plan Administrator of the Plan is Delphi or its Executive Committee.  Plaintiffs steadfastly adhere to their position (as stated in the prior proceedings) that the Executive Committee, through delegation from Delphi, is the Plan Administrator.  Delphi has asserted that it, not the Executive Committee, is the Plan Administrator.  For present purposes, it does not make any difference whether the Plan Administrator is actually Delphi or the Executive Committee.  We therefore generally sometimes here use "Delphi" as a shorthand for the Plan Administrator, whether the Plan Administrator is the company itself or the company's Executive Committee.

(RDD) (S.D.N.Y. Bankr., filed Oct. 8, 2005). Because the Plan was a potential creditor with claims against Delphi, and because Delphi (*i.e.*, its Executive Committee) was also a fiduciary of the Plan, Delphi's financial distress placed Delphi in a conflicted situation -- namely, it obligated Delphi to file creditor claims against itself in the bankruptcy. In January 2006, in recognition of the obvious conflict of interest inherent in retaining fiduciary powers along with its corporate offices, Delphi delegated the fiduciary responsibility to file claims (though no other responsibilities) to Fiduciary Counselors, Inc.

11. In September 2008, Delphi announced that it had concluded a deal with Old GM and the PBGC in which Delphi could potentially transfer billions of dollars in pension liabilities from the plans for unionized workers (but not the Salaried Plan) to existing plans of Old GM. Although it did not appear at the time of the September 2008 deal that Delphi had attempted to secure a similar deal to protect the Salaried Workers, such a deal was, according to Delphi, unnecessary. In this regard, in a September 8, 2008 press release, Delphi reiterated a commitment it had made since the start of the bankruptcy proceedings that it would itself continue the Salaried Plan, stating that Delphi "remained committed to fully funding our pension plans."

12. The situation changed beginning June 1, 2009, with Old GM filing for bankruptcy, the sale of Old GM's assets to General Motors Company ("GM"), and the federal government becoming the majority shareholder of GM. At that time, Delphi announced, in conjunction with a filing in its own bankruptcy proceeding, that it had developed "a workable pension solution for its defined benefit plans." The bankruptcy filing stated that Delphi expected to enter into an agreement with the PBGC, whereby the PBGC would initiate involuntary

4

termination proceedings concerning the Plan. Upon the Salaried Plan's termination, responsibility for paying out benefits owed under the Salaried Plan would transfer from Delphi to the PBGC, and the benefits would be subject to the statutory maximums provided for under ERISA.

13. On July 16, 2009, the Salaried Workers filed a complaint for equitable relief against the named fiduciaries of the Salaried Plan, seeking, *inter alia*, the appointment of an independent fiduciary for the Salaried Plan for purposes of negotiating any plan termination and protecting participants' and beneficiaries' rights in any termination proceedings. *See Black v. Naylor*, Case No. 2:09-cv-12810 (E.D. Mich.). The complaint alleged that the named fiduciaries were in a position where their responsibilities as officers of Delphi prevented their functioning with the complete loyalty to the Salaried Plan's participants and beneficiaries that is demanded as ERISA fiduciaries in matters of Plan administration. On July 21, 2009 the Salaried Workers filed a motion for a temporary restraining order and a preliminary injunction against the named fiduciaries of the Salaried Plan, which sought to prohibit the Plan Administrator from negotiating, signing, or effectuating an agreement with the PBGC summarily to terminate the Salaried Plan, pending determination of the underlying complaint.

14. In later proceedings on the Salaried Workers' complaint, Delphi's executives plainly admitted that they did not treat the decision to enter any agreement to terminate the Plan as a fiduciary function but as a "settlor" function and that they therefore could or would make any decision in the best interests of the company, not the Plan's participants and beneficiaries. On information and belief, Delphi (including its Executive Committee) was under strong pressure by the federal government to agree to the termination of the Plan, which at the time was

5

underfunded, because termination of the Plan would further the government's interest in restructuring the auto industry at the lowest cost to the government and expediently, notwithstanding that termination would not be in the best interests of the Plan's participants and beneficiaries. Delphi executives communicated to the Salaried Workers that the federal government was pressuring or did pressure Delphi to consent to termination of the Plan.

15. Also on July 21, 2009, and unbeknownst at the time to the Salaried Workers, the PBGC signed a settlement agreement with Delphi. Under the settlement agreement, it was anticipated that the PBGC would initiate involuntary termination procedures to terminate Delphi's pension plans, and Delphi was obligated to direct the Plan Administrator to agree to summary termination of all of those plans, including the Salaried Plan. Additionally, the PBGC would release all of its liens against Delphi entities, and also unconditionally release Delphi, Old GM, and the successor entities, as well as all of their current and former officers, directors, and employees from any and all suits and causes of action "upon any legal or equitable theory, (whether contractual, common law, statutory, federal, state, local or otherwise)."

16. Consistent with the settlement agreement, on July 22, 2009, the PBGC filed a complaint against Delphi, seeking, *inter alia*, the termination of the Salaried Plan and the appointment of the PBGC as statutory trustee of the Plan. *See PBGC v. Delphi Corp.*, Case No. 2:09-cv-12876 (E.D. Mich.). Under ERISA, in order for a plan to be involuntarily terminated, the PBGC must initiate an action in a district court and must prove that certain statutory conditions for termination exist. *See* 29 U.S.C. § 1342. The only exception to the requirement of district court adjudication is for "small plans," which potentially can be terminated in a

6

streamlined manner, but only if the PBGC makes special provision for safeguarding the interests of beneficiaries. *Id.*

17. In response to the PBGC's lawsuit, the Salaried Workers voluntarily dismissed their complaint on July 23, 2009, noting that they intended to intervene in the PBGC's lawsuit to protect their interests. ERISA provides that the PBGC's filing of an action to initiate termination of a plan automatically stays all other pending cases against that plan. *See* 29 U.S.C. § 1342(f).

18. On July 30, 2009, the bankruptcy court overseeing Delphi's bankruptcy approved a modified reorganization plan that included the PBGC-Delphi settlement agreement calling for involuntary termination of the Plan. *See In re Delphi Corp.*, No. 05-44481 (RDD), Dkt. No. 18707 (S.D.N.Y. Bankr. July 30, 2009). In addition, the bankruptcy court approved the sale of Delphi's assets, a sale in which GM is a principal participant and through which the purchaser of Delphi's assets will be a chief parts supplier to GM.

19. On August 6, 2009, the Salaried Workers contacted the PBGC and Delphi to seek their consent to the Salaried Workers' proposed intervention in the termination action.

20. On August 7, 2009, the PBGC filed a notice of voluntary dismissal of its termination action.

21. The PBGC has since posted an announcement on its website stating that "[o]n August 10, 2009, the Pension Benefit Guaranty Corporation assumed responsibility for the pension plans of Delphi Corp. The plans ended as of July 31, 2009." As such, it appears that the PBGC and the Plan Administrator of the Salaried Plan have entered into an agreement summarily to terminate the Plan and that the PBGC is attempting to terminate the Plan without adjudication by or even the consent of a United States District Court. Nor has the PBGC in any

7

manner attempted to safeguard the interests of Plan beneficiaries through notice or opportunity for comment or participation with respect to termination.

22. The financial consequences to the Salaried Workers of the Plan's termination will likely be severe. The Salaried Workers had undertaken an analysis of the impact to them should the PBGC assume responsibility for the Plan, and that analysis concludes that they stand to lose between 30% and 70% of their current pension benefits. The PBGC concedes as well that the Salaried Workers will suffer losses in pension benefits. *See* PBGC Press Release (July 22, 2009). The losses in benefits stem, in part, from various statutory limits placed on distribution of a terminated plan's remaining assets and the manner in which the PBGC interprets its obligation to guarantee benefits for a terminated plan. *See, e.g.*, 29 U.S.C. § 1344(a) (containing various limitations on distribution of remaining Plan assets); *id.* § 1322(b) (PBGC maximum guarantee); *see also* PBGC Press Release (July 22, 2009) ("The PBGC will pay pension benefits up to the limits set by law. In 2009, the maximum benefit for a 65-year-old is $54,000 per year. The maximum is lower for those who retire earlier or elect survivor benefits. In addition, certain early retirement subsidies and supplements are generally not insured, and benefit increases made within the past five years may not be fully insured").

### IV. Claims for Relief

**COUNT 1**
**Failure to Comply with ERISA's Requirements Regarding**
**the Adjudication of Plan Terminations**

23. In order for the PBGC to terminate a pension plan, it must obtain a court decree to that effect. 29 U.S.C. § 1342(a), (c). Any allowance in ERISA for termination via a summary agreement between the PBGC and a Plan Administrator applies, if at all, only to small plans and,

8

even then, only when the PBGC has made special provision for adequate procedural safeguards for the interests of participants and beneficiaries. 29 U.S.C. § 1342(a) ("The corporation may prescribe a simplified procedure to follow in terminating small plans as long as that procedure includes substantial safeguards for the rights of the participants and beneficiaries under the plans, and for the employers who maintain such plans (including the requirement for a court decree under subsection (c)).")

24. The Salaried Plan is not a small plan and therefore cannot be terminated through summary agreement between the PBGC and Plan Administrator, and the termination of the Salaried Plan through agreement between the PBGC and the Plan Administrator therefore violates ERISA. Moreover, in summarily terminating the Plan through agreement with the Plan's Plan Administrator, the PBGC made no provision for substantial safeguards of the interests of Plan participants and beneficiaries; therefore, for this reason as well, the termination of the Salaried Plan through agreement between the PBGC and the Plan Administrator violates ERISA.

25. For these reasons, the PBGC's termination of the Plan through summary agreement is null and void and illegal.

**COUNT 2**
**Failure to Comply with ERISA's Requirement that Any Summary Termination Agreement Be with a Plan Administrator Properly Acting in that Capacity**

26. Under ERISA, a Plan Administrator is an ERISA fiduciary with respect to any discretionary functions, and an ERISA fiduciary must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries of the plan. 29 U.S.C. §§ 1002(21)(A), 1104(a). As a result, the Plan Administrator of the Salaried Plan, at least prior to and at the time

9

of the signing of any agreement with the PBGC terminating the Plan, owed a fiduciary duty to the Plan's participants and beneficiaries in deciding whether to enter into and execute a termination agreement.

27. In entering an agreement summarily to terminate the Plan, the PBGC unlawfully entered into an agreement with a Plan Administrator who -- in violation of ERISA -- did not act as a fiduciary of the Plan. Instead, Delphi and its executives have stated that the decision, through the Plan Administrator, to enter into an agreement with the PBGC summarily to terminate the Plan involves a "settlor" function to be done in the corporate interest, rather than in the Plan participants' and beneficiaries' interests.

28. The PBGC's summary termination of the Plan based on an agreement with the Plan's Plan Administrator, when the Plan Administrator acted in the corporate interest as a settlor rather than as a fiduciary in the participants' and beneficiaries' best interests, violates ERISA, which requires that any such agreement (if at all allowable) be entered with a Plan Administrator properly acting in its fiduciary capacity.

29. In addition, even in the absence of any showing that the Plan Administrator entered a summary termination agreement based on the corporate interest rather than Plan participants' and beneficiaries' interests, the PBGC's termination of the Plan based on such an agreement violates ERISA because the agency entered the agreement with a Plan Administrator laboring under a conflict of interest. ERISA fiduciaries have an obligation under ERISA to avoid placing themselves in a position where their acts as directors or officers of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as fiduciaries. This duty requires that fiduciaries avoid conflicts of interest and that they resolve

them promptly whenever they occur. This duty of loyalty requires the fiduciary to step aside in favor of a neutral fiduciary whenever it labors under a conflict of interest.

30. The Plan's Plan Administrator, whether that is Delphi or its Executive Committee, faced an irreconcilable conflict of interest that required it to step aside in favor of a neutral fiduciary with respect to any termination issues. Delphi and its executives' corporate interest necessarily favored a rapid termination of the Plan under the terms pressed by the federal government, including the PBGC. For one thing, those terms included the release of liens against Delphi assets; in addition, the terms included a release of any and all causes of action the PBGC might have against Delphi and its executives associated with the Plan, including mismanagement. Furthermore, Delphi and its executives were being pressured by the federal government to terminate the Plan as part of an orchestrated effort on the federal government's part to restructure the auto industry as expediently and cheaply as possible; compliance with the government's will was in the furtherance of the corporate interest to emerge from bankruptcy immediately. To that end, Delphi has stated that its settlement with the PBGC is vital to its reorganization and that the summary termination agreement is a necessary element of that settlement.

31. In contrast, the interests of the Salaried Plan's participants and beneficiaries, who have vested and accrued benefits due to them under the Plan was, and is, in seeing the Plan maintained and fully funded or at least not terminated under the conditions the PBGC pursued. As fiduciaries of the Plan, the Plan's Plan Administrator should have favored careful consideration of any issues of Plan termination, a judicial adjudication of termination (as is the norm), and even rejection altogether of termination.

32. Delphi's and its executives' interests in selling Delphi's assets as quickly as possible and in terminating the Salaried Plan consistent with the government's will directly conflict with the interests of the Plan's participants and beneficiaries against termination. As such, the Plan's Plan Administrator labored under a conflict of interest with respect to termination and lacked capacity to sign a summary termination agreement with the PBGC (if any such agreement is otherwise allowable). By terminating the Plan based on a summary agreement with a Plan Administrator who labored under a conflict of interest, and therefore was incompetent to make fiduciary determinations, the PBGC has violated ERISA.

33. For these reasons, the PBGC's termination of the Plan through summary agreement is null and void and illegal.

## COUNT 3
### Violation of the Due Process Clause

34. If an agreement summarily to terminate the Plan between the PBGC and the Plan Administrator is otherwise allowable and authorized under ERISA, ERISA's authorization for summary plan termination is unconstitutional in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution. In all instances, the Salaried Workers, because they have a cognizable property interest in their vested pension benefits, are entitled to meaningful notice of any Plan termination and the opportunity for a hearing prior to the Plan's termination. Because any ERISA provisions allowing for summary plan termination deprive the Salaried Workers of protected interests without adequate procedural safeguards, the provisions violate the Due Process Clause.

35. For these reasons, The PBGC's termination of the Plan through summary agreement is null and void and illegal.

### COUNT 4
### Plan Termination in Violation of ERISA

36.     If the Plan is to be terminated, it may only be terminated consistent with ERISA and Due Process after the full adjudication set forth in 29 U.S.C. § 1342(a) and (c) and compliance with the substantive standards for termination there set forth.

37.     The PBGC cannot satisfy the standards for termination of the Plan under 29 U.S.C. § 1342(a) and (c) with the current termination terms it has negotiated and put in place. The termination of the Plan pursuant to the current termination terms is (i) unsupported by fact; (ii) not in accordance with 29 U.S.C. § 1342(a) and (c); (iii) unsupported by the law; (iv) the result of the PBGC's clear error in judgment and consideration of irrelevant factors; and (iv) otherwise arbitrary and capricious.

### V.  Prayer for Relief

WHEREFORE, the Salaried Workers request a judgment in their favor and against the PBGC:

A.     Declaring that, under ERISA, the Salaried Plan cannot be terminated summarily by agreement between the PBGC and the Plan Administrator and therefore that the PBGC has unlawfully terminated the Salaried Plan;

B.     Declaring that, under the Due Process Clause, the Salaried Plan cannot be terminated summarily by agreement between the PBGC and the Plan Administrator and therefore that the PBGC has unlawfully terminated the Salaried Plan;

C.     Declaring that the PBGC's termination of the Salaried Plan, on the terms put in place by the PBGC, violates ERISA;

  D. Permanently enjoining the PBGC from terminating the Salaried Plan on the termination conditions and terms currently in place and otherwise setting aside the PBGC's termination of the Plan;

  E. Awarding appropriate equitable relief to undo the Plan's termination and to place the parties in the position they were prior to termination of the Plan.

  F. Awarding costs and attorney fees and other expenses pursuant to 29 U.S.C. § 1303(f)(3), or under the Equal Access to Justice Act, 5 U.S.C. § 2412.

  G. Awarding such other relief as the Court deems necessary and proper.

         Respectfully submitted,

         JACOB & WEINGARTEN, P.C.

         _____
         Howard S. Sher (P38337)
         Alan J. Schwartz (P38144)
         777 Somerset Place
         2301 Big Beaver Road
         Troy, Michigan  48084
         Telephone:  248-649-1900
         Facsimile:  248-649-2920
         E-mail:  alan@jacobweingarten.com

         -and-

         Anthony F. Shelley
         Timothy P. O'Toole
         Michael N. Khalil
         MILLER & CHEVALIER CHARTERED
         655 15th Street, NW, Suite 900
         Washington, DC  20005
         Telephone:  202-626-5800
         Facsimile:  202-626-5801
         E-mail:  ashelley@milchev.com
             totoole@milchev.com

         *Attorneys for Plaintiffs*