**Exhibit A**

 

| **United States Bankruptcy Court**<br>Southern District of New York<br>Delphi Corporation et al. Claims Processing<br>c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue<br>El Segundo, California 90245 | **Administrative Expense Claim Form** |
|---|---|

| Debtor against which claim is asserted :<br>Delphi Corporation, *et al.* 05-44481 | Case Name and Number<br>In re Delphi Corporation., *et al.*, 05-44481<br>Chapter 11, Jointly Administered |
|---|---|

**NOTE:** This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case. This Administrative Expense Claim Form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of the case but prior to June 1, 2009, pursuant to 11 U.S.C. § 503.

| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br><br>Plymouth Rubber Company, LLC<br>Name and Address Where Notices Should be Sent<br>c/o Paul D. Moore, Esq.<br>Duane Morris LLP<br>470 Atlantic Avenue, Suite 500<br>Boston, MA 02210<br>Telephone No.:<br>857-488-4200 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | Claim #19506<br>USBC SDNY<br>Delphi Corporation, et al.<br>05-44481 (RDD)<br><br>THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim ☐ replaces<br>☐ amends a previously filed claim, dated: _____ |
|---|---|

| **1. BASIS FOR CLAIM**<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>XX Other (Describe briefly) See attachments for Description of Claim. | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br>Your social security number _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)        (date) |
|---|---|

| **2. DATE DEBT WAS INCURRED**<br>In or around April, 2008 | **3. IF COURT JUDGMENT, DATE OBTAINED:** |
|---|---|

**4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM:** $ Contingent and unliquidated.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**5.** Brief Description of Claim (attach any additional information): See attachments.

| **6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.<br><br>**7. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Any attachment must be 8-1/2" by 11".<br><br>**8. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY<br><br>**RECEIVED**<br>JUL 30 2009<br>KURTZMAN CARSON CONSULTANTS |
|---|---|

| Date<br><br>July 30, 2009 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>Jeff D. Kahane, Associate     *[signature]* |
|---|---|

☒ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return


05444810907300000000000009



*In re Delphi Corporation, et al.*
*Jointly Administered Case No. 05-44481*
**United States Bankruptcy Court for the Southern District of New York**

## ATTACHMENT TO ADMINISTRATIVE CLAIM OF
## PLYMOUTH RUBBER COMPANY, LLC

Plymouth Rubber Company, LLC ("Plymouth Rubber"), holder of an "Allowed Administrative Claim" of Delphi Automotive Systems, LLC ("Delphi Automotive"), hereby submits this administrative claim form and attachments (collectively, the "Administrative Claim"), out of an abundance of caution and as a protective measure, in order to preserve its rights, remedies, claims and defenses against Delphi Automotive, which are hereby fully reserved.

Plymouth Rubber characterizes the Administrative Claim as a "protective claim" because pursuant to § 2.1 of the *First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession*, Docket No. 11386) (as subsequently modified on January 25, 2008, the "Plan"), Plymouth Rubber's claim already is an "Allowed Administrative Claim," as it arises on account of "liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases." Additionally, for the other reasons detailed below, Plymouth Rubber contests the applicability and/or enforceability of the administrative expense bar date (the "Bar Date") with respect to the Administrative Claim.

**I.      Bankruptcy Case Background.**

  **A.      General Overview of Bankruptcy Case.**

On October 8, 2005 and October 14, 2005 (collectively, the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, title 11 of the United States Code, 11 U.S.C. § 1101 *et seq.*, as amended (the "Bankruptcy Code"). On December 10, 2007, the Debtors filed the Plan, which was confirmed by order (the "Confirmation Order") of the United States Bankruptcy Court for the Southern District of New York (the "Court") on January 25, 2008. *See* Docket No. 12359.

The Plan and Confirmation Order provide, in relevant part, that "requests for payment of an Administrative Claim (other than as set forth in the Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached as Exhibit 10.5 to the Plan, with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than 45 days after the Effective Date." Confirmation Order, ¶ 40; *see also* Plan, § 10.5. As set forth in the plan, such administrative expense requests must be filed if the Debtors do not pay such Administrative Claim in the ordinary course of business, as required pursuant to § 2.1.

  **B.      Events Leading To Plymouth Rubber's Administrative Claim.**

On or around January 30, 2008, Delphi Automotive and Plymouth Rubber entered into a contract (the "2008 Agreement") which obligated Delphi Automotive to purchase certain products (the "Delphi Products") exclusively from Plymouth Rubber. The parties agreed that the

2008 Agreement would remain in effect from January 1, 2008 (retroactive) through and including December 31, 2008, unless otherwise terminated in accordance with the terms thereof.

Subsequently, disputes arose between Delphi Automotive and Plymouth Rubber regarding Plymouth Rubber's rights and duties under the 2008 Agreement as Delphi Automotive's exclusive supplier of the Delphi Products. Delphi Automotive alleged that the price increase instituted by Plymouth Rubber, which was incorporated in the 2008 Agreement, negated Delphi Automotive's contractual obligation to order the Delphi Products from Plymouth Rubber.

In or around May, 2008, Delphi Automotive commenced purchasing the Delphi Products from other sources including, among others, Plymouth Yongle Tape (Shanghai) Co., Ltd. ("Yongle"), a supplier of Plymouth Rubber. Yongle manufactured the Delphi Products using Plymouth Rubber's intellectual property, and, accordingly, Yongle was contractually prohibited from distributing or selling in the Western Hemisphere, among other items, the Delphi Products. On information and belief, Delphi Automotive was aware of the restrictions that limited Yongle's ability to sell the Delphi Product through any entity other than Plymouth Rubber. Notwithstanding this knowledge, Delphi Automotive contracted with Yongle, or one of its agents, to purchase the Delphi Product directly from Yongle, in contravention of its obligations to Plymouth Rubber under the 2008 Agreement.

> C.    *Post-Confirmation Litigation Relating To Plymouth Rubber's Administrative Claim.*

On or around September 12, 2008, Delphi Automotive commenced an action against Plymouth Rubber in the Circuit Court for the County of Oakland, State of Michigan, Case No. 08-094507-CK (the "Michigan Action"). On or around December 8, 2008, Plymouth Rubber filed *Defendant's Answer, Affirmative Defenses, Counterclaim and Jury Demand* (the "Michigan Counterclaim"), in which it asserted counterclaims against Delphi Automotive, seeking an award of damages, legal fees and other costs, arising on account of its alleged contractual breaches of the 2008 Agreement. A true and correct copy of the Michigan Counterclaim (without exhibits) is attached hereto as **Exhibit A**. The facts and allegations asserted by Plymouth Rubber in the Michigan Counterclaim are incorporated by reference as if fully restated herein.

On September 18, 2008, Yongle commenced an action against Plymouth Rubber in the United States District Court for the District of Massachusetts, Case No. 08-11599-JGD (the "Massachusetts Action," and collectively with the Michigan Action, the "Actions"). On or around November 15, 2008, Plymouth Rubber filed *Plymouth Rubber Company, LLC's Amended Answer and Counterclaim to Amended Complaint* (the "Massachusetts Counterclaim," and collectively with the Michigan Counterclaim, the "Counterclaims"), in which Plymouth Rubber asserted claims against both Yongle and Delphi Automotive for various torts that they committed against Plymouth Rubber stemming essentially from transactions which occurred beginning in May, 2008. A true and correct copy of the Massachusetts Counterclaim is attached hereto as **Exhibit B**. The facts and allegations asserted Plymouth Rubber in the Massachusetts Counterclaim are incorporated by reference as if fully restated herein.

2



## II.   Nature and Description of Plymouth Rubber's Administrative Claim.

As more fully set forth in the Counterclaims attached hereto and incorporated by reference, Plymouth Rubber holds an administrative claim against Delphi Automotive on account of: (i) its post-petition (and post-confirmation) breaches under the 2008 Agreement, and (ii) its post-petition (and post-confirmation) tortious conduct arising in connection with Plymouth Rubber's and Yongle's contractual relationship.

Because Plymouth Rubber's claim constitutes a "liabilit[y] incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases," Plymouth Rubber's claim is an Allowed, albeit unliquidated, Administrative Claim.

## III.   Reservation of Rights; No Presumption That Bar Date Applies; Amendment to Informal Proofs of Claim and Relation Back.

### A.   General Reservation of Rights.

Plymouth Rubber expressly reserves all of its rights, remedies, claims and defenses under the Bankruptcy Code and applicable nonbankruptcy law, and nothing herein shall be deemed a waiver of any right, remedy, argument, claim or defense against Delphi Automotive or any of the Debtors.

Plymouth Rubber expressly reserves the right to challenge the jurisdiction of the Court to hear or adjudicate any and all matters relating to this Administrative Claim. Nothing herein shall be deemed: (i) a consent to jurisdiction of this Court over the Administrative Claim and the matters raised in the Actions; and/or (ii) a waiver of Plymouth Rubber's rights to seek abstention or otherwise to seek a jury trial of the disputes raised in the Actions.

### B.   Inapplicability of Bar Date to Plymouth Rubber's Claim.

Plymouth Rubber contests the application or enforceability of the Bar Date to the Administrative Claim on several grounds. First, as set forth above, the Administrative Claim has been allowed pursuant to the terms of the Plan and the Confirmation Order, and the Debtors have not sought, nor has the Court entered, an order disallowing Plymouth Rubber's Allowed Administrative Claim. Thus, until the Administrative Claim has been properly disallowed, the Bar Date does not and cannot apply to Plymouth Rubber.

Additionally, although the Court entered the *Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Claims Bar Date and Alternative Transaction Hearing Date*, Docket No. 17032 (the "Modification Procedures Order") which purports to establish the Bar Date as July 15, 2009, the Court failed to modify, alter or amend the Confirmation Order, which establishes separate, conflicting procedures relating to the filing of administrative expense claims. Because the Confirmation Order remains binding unless and until it is superseded by another confirmation order entered pursuant to § 1127 of the

Bankruptcy Code, the Modification Procedures Order cannot impair the rights of Plymouth Rubber under the Confirmation Order.

Third, the Bar Date does not apply to Plymouth Rubber because the Debtors failed to provide Plymouth Rubber with "notice reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections [or claims]," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (emphasis added); *see also In re Grand Union Co.*, 204 B.R. 864, 881 (Bankr. D. Del. 1997). In this case, notwithstanding Delphi Automotive's involvement in the Actions, Delphi Automotive failed to serve a copy of the *Notice of Bar Date for Filing Proofs of Administrative Expense* upon Plymouth Rubber's known counsel of record in the Actions.

Fourth, after Plymouth Rubber learned of the Bar Date, Plymouth Rubber immediately notified the Debtors of the Administrative Claim. On July 20, 2009, Delphi Automotive, Plymouth Rubber and Yongle participated in a mediation session to determine whether the parties could reach a settlement of, among other things, the Counterclaims. As a result of Delphi Automotive's post-Bar Date conduct, Delphi Automotive is estopped from asserting the Bar Date as a defense to the Counterclaims and/or to otherwise relieve it of its obligation to pay the Administrative Claim once it is liquidated in the Actions or otherwise fixed to a sum certain pursuant to a compromise.

Finally, if and to the extent that the Bar Date is deemed to apply to the Administrative Claim, Plymouth Rubber submits that the Bar Date may be extended by the Court pursuant to Fed. R. Bankr. P. 9006(b). *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Specifically, Plymouth Rubber did not learn of the Bar Date until after it had passed, and such circumstances, in light of all of the other issues raised above, evidence "excusable neglect."

### C.   *Amendment to Informal Proofs of Claim.*

Plymouth Rubber filed informal proofs of claim with the Debtors prior to the Bar Date. Specifically, on November 15, 2008, Plymouth Rubber filed the Massachusetts Counterclaim which established the grounds and nature of its post-confirmation tort-related claims against Delphi Automotive. On December 8, 2008, Plymouth Rubber filed the Michigan Counterclaim which established the grounds and nature of its post-confirmation contract-related claims against Delphi Automotive. The Counterclaims constitute informal proofs of claim which were timely filed. Any procedural or technical deficiencies with respect to those informal proofs of claim are hereby cured by this Administrative Claim, which is a consolidation of, and amendment to, the Counterclaims, in their capacities as informal proofs of claim in the Debtors' bankruptcy case.

### IV.   *Additional Information*

Exhibits attached hereto submitted in support of this claim include:

|  |  |
|---|---|
| Exhibit A | Michigan Counterclaim |
| Exhibit B | Massachusetts Counterclaim |
| Exhibit C | Power of Attorney |

DM3\1096099.1

Additional information and/or supporting documentation relating to this proof of claim is available upon request to Plymouth Rubber's counsel (contact information below). Plymouth Rubber expressly reserves the right to refuse to provide additional information and/or supporting documentation if it deems, in its sole discretion, that the party seeking such material would not otherwise be authorized to review such material, under the Bankruptcy Code or otherwise, and/or that the underlying bases for such request are improper.

### V.    Notices

Any and all notices to be provided in connection with this Administrative Claim should be provided to:

> Paul D. Moore, Esq.
> Duane Morris LLP
> 470 Atlantic Avenue, Suite 500
> Boston, Massachusetts 02210-2600
> Email: pdmoore@duanemorris.com
> Tel:    857-488-4200
> Fax:    857-488-4201

DM3\1096099.1

# EXHIBIT A

135573.2

F-1
1-2

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

DELPHI AUTOMOTIVE SYSTEMS, LLC, )
a Delaware limited liability company, )
        Plaintiff/Counter-Defendant, )
                                        )
        v. )          Hon. Fred M. Mester
                                        )    Case No. 08-094507-CK
PLYMOUTH RUBBER COMPANY, LLC, )
a Delaware limited liability company )
                                        )
        Defendant/Counter-Plaintiff. )
_____ )

Thomas S. Bishoff (P53753)
Jeffrey R. Miller (P69838)
Dykema Gossett PLLC
400 Renaissance Center
Detroit, Michigan 48243
(313) 568-5341
Attorneys for Plaintiff

James G. Derian (P33580)
Delphi Automotive Systems
MC 480-410-254
5825 Delphi Drive
Troy, Michigan 48098
(248) 813-3367
Co-Counsel for Plaintiff

Matthew J. Lund (P48632)
Mary K. Deon (P63019)
Pepper Hamilton LLP
100 Renaissance Center, Suite 3600
Detroit, MI 48243
(313) 259.7110
Attorneys for Defendant

_____/

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM AND JURY DEMAND

Defendant/Counter-Plaintiff Plymouth Rubber Company, LLC ("Defendant" or

"Plymouth"), by and through its attorneys, Pepper Hamilton LLP, submits it Answer and



Affirmative Defenses to Plaintiff's Complaint, Counterclaim and Jury Demand, and states as

follows:

## NATURE OF THE ACTION

1.    Defendant admits only that it did stop delivery of Parts for a short period of time,

but denies that its conduct was in breach of any contract.  Defendant is without information

sufficient to form a belief as to whether or not Delphi had an "excess or bank of Parts or

significant inventory on hand" or whether or not Delphi would have "run out of Parts within days

if not hours."  Defendant denies the remaining allegations contained in this paragraph as untrue.

2.    Defendant admits the allegations contained in this paragraph.

3.    Defendant is without information sufficient to form a belief as to the allegations

contained in this paragraph.

4.    To the extent the allegations in this paragraph state legal conclusions, no response

is required.  To the extent they are deemed factual, Defendant admits only that Delphi agreed to

pay price increases.

5.    Defendant admits only that Delphi claims it has been damaged and seeks a

declaratory judgment regarding warranty obligations.  Defendant denies that it is liable to Delphi

in any amount and denies that Delphi is entitled to a declaration that "the Parts were purchased

by Delphi pursuant to warranty obligations set forth in Delphi's General Terms and Conditions

and under governing law."

6.    Defendant admits only that Delphi seeks return of a $410,000.00 deposit.

Defendant denies that Delphi is entitled to any funds it remitted to Plymouth Rubber.

## PARTIES, JURISDICTION, AND VENUE

7.    Defendant is without information sufficient to form a belief as to the allegations

contained in this paragraph.

8.     Defendant admits the allegations contained in this paragraph.

9.     Defendant admits only that Plaintiff claims to be damaged in excess of $25,000 exclusive of interest and costs.  Defendant specifically denies that it is liable to Plaintiff in any amount.

10.     Defendant neither admits nor denies the allegations contained in this paragraph as they assert conclusions of law to which no response is required.

11.     Defendant neither admits nor denies the allegations contained in this paragraph as they assert conclusions of law to which no response is required.

## GENERAL ALLEGATIONS

12.     Defendant is without information sufficient to form a belief as to the allegations contained in this paragraph.

13.     Defendant denies the allegations as stated in this paragraph for the reason that they are not true.

14.     Defendant admits the allegations contained in this paragraph.

15.     Defendant is without information sufficient to form a belief as to whether or not "without timely supply of the Parts, the OEMs cannot produce certain of their automobiles." Defendant admits the remaining allegations contained in this paragraph.

16.     Defendant is without information sufficient to form a belief as to the allegations contained in this paragraph.

17.     Defendant is without information sufficient to form a belief as to the allegations contained in this paragraph.

18.     Defendant is without information sufficient to form a belief as to whether or not "without the Parts and the assemblies (into which the Parts are incorporated), the aforementioned



vehicles cannot be manufactured, assembled, shipped to automobile dealerships and sold to the
public." Defendant admits the remaining allegations contained in this paragraph.

19.    Defendant is without information sufficient to form a belief as to the allegations
contained in this paragraph.

20.    Defendant admits the allegations contained in this paragraph.

21.    Defendant denies that it "demanded" higher prices and that it "threatened to stop
shipping the Parts unless Delphi paid the demanded price increases." Defendant is without
information sufficient to form a belief as to why "Delphi agreed to pay requested price
increases." Defendant admits the remaining allegations contained in this paragraph.

22.    Defendant denies the allegations contained in this paragraph as untrue.

23.    Defendant admits only that Delphi "began the process of re-sourcing some, but
not all, of the Parts by lining up new Tier Two suppliers and validating parts through PPAP."
Defendant denies the remaining allegations contained in this paragraph as untrue.

24.    Defendant admits only that the contract referenced in this paragraph governed the
parties' relationship until it was breached and/or terminated by Delphi.

25.    Defendant admits only that the Purchase Order requires Delphi to purchase 100%
of its requirements from Plymouth, and that the document speaks for itself. Defendant is without
knowledge as to whether the Purchase Order is "consistent with industry standards."

26.    Defendant admits only that it made shipments to Delphi.

27.    Defendant admits that the referenced terms and conditions address several issues,
and that the document speaks for itself.

28.    Defendant admits only that the referenced terms and conditions contain a section
entitled "Remedies and Injunctive Relief" and that the document speaks for itself.



29.     Defendant admits that the referenced clauses are contained in the terms and conditions, and that the document speaks for itself.

30.     Defendant denies the allegations contained in this paragraph for the reason that they are untrue.

31.     Defendant admits the allegations contained in this paragraph.  In further response, Defendant states that Exhibit C to the Complaint does not incorporate all of the letters and proposals exchanged between the Parties.

32.     Defendant denies the allegations contained in this paragraph as untrue.

33.     Defendant admits only that Exhibit D contains the July 30, 2008 letter from Delphi.  Defendant denies Plaintiff's characterization of that letter as untrue.

34.     Defendant admits only that Exhibit E contains the July 31, 2008 letter from Plymouth.  Defendant denies Plaintiff's characterization of that letter as untrue.

35.     Defendant admits the allegations contained in this paragraph.

36.     Defendant admits only that Exhibit F contains the August 19, 2008 letter from Plymouth.  Defendant denies Plaintiff's characterization of that letter as untrue.

37.     Defendant admits only that it stopped shipping Parts to Delphi on August 20, 2008.  Defendant denies the remaining allegations contained in this paragraph as untrue.

38.     Defendant admits only that Exhibit G contains the August 21, 2008 letter from Delphi.  Defendant denies Plaintiff's characterization of that letter as untrue.

39.     Defendant admits only that Exhibit H contains the August 21, 2008 letter from Plymouth's outside counsel.  Defendant denies Plaintiff's characterization of that letter as untrue.

40.     To the extent the allegations contained in this paragraph state a legal conclusion, no response is required.  To the extent they are deemed factual, Defendant admits only that Delphi paid for several subsequent shipments of the Parts.

41.     Defendant denies the allegations contained in this paragraph.

42.     Defendant is without information sufficient to form a belief as to the allegations contained in this paragraph.

43.     Defendant is without information sufficient to form a belief as to the allegations contained in this paragraph.

44.     Defendant admits only that Exhibit I appears to contain an executed agreement, and that the document speaks for itself.

45.     Defendant denies the allegations contained in this paragraph as untrue.

46.     Defendant admits only that Delphi has made a demand for return of the deposit.

47.     Defendant admits only that it did not return the $410,000.00 dollar deposit as a lump sum.  Defendant denies the remaining allegations contained in this paragraph as untrue.

## COUNT I – BREACH OF CONTRACT – THE CONTRACT FOR THE PARTS

48.     Defendant incorporates by reference the preceding paragraphs of this Answer as if fully set forth herein.

49.     Defendant neither admits nor denies the allegations contained in this paragraph to the extent they are conclusions of law to which no response is required.

50.     Defendant denies the allegations contained in this paragraph as untrue.

51.     Defendant denies the allegations contained in this paragraph as untrue.

52.     Defendant denies the allegations contained in this paragraph as untrue.

53.     Defendant denies the allegations contained in this paragraph as untrue.

## COUNT II – BREACH OF CONTRACT – THE DEPOSIT AGREEMENT

54.     Defendant incorporates by reference the preceding paragraphs of this Answer as if fully set forth herein.

55.    Defendant neither admits nor denies the allegations contained in this paragraph to the extent they are conclusions of law to which no response is required.

56.    Defendant denies the allegations contained in this paragraph as untrue.

57.    Defendant denies the allegations contained in this paragraph as untrue.

58.    Defendant denies the allegations contained in this paragraph as untrue.

59.    Defendant denies the allegations contained in this paragraph as untrue.

## COUNT III – DECLARATORY RELIEF

60.    Defendant incorporates by reference the preceding paragraphs of this Answer as if fully set forth herein.

61.    Defendant admits the allegations contained in this paragraph.

62.    Defendant denies the allegations contained in this paragraph as untrue.

63.    Defendant denies the allegations contained in this paragraph as untrue.

WHEREFORE, Defendant respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice and award Defendants whatever other relief this Court deems appropriate including attorney fees and costs.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent each fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel, waiver, laches and/or unclean hands.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of frauds or otherwise, to the extent it fails to include a quantity term.

-7-

## FOURTH AFFIRMATIVE DEFENSE

To the extent Plaintiff sustained any damages, it has failed to reasonably mitigate such damages.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff committed the first material breach of the parties' agreement, thereby excusing further performance by Defendant.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the contract at issue is void for lack of mutuality and/or consideration.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff terminated the contract, thereby excusing further performance by Plymouth.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to act in accordance with its duty of good faith and fair dealing in exercising the contract's terms.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff acquiesced to Defendant's conduct.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendant does not waive any of the affirmative defenses delineated in the Michigan Court Rules.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff is entitled to set off any funds allegedly owed to Delphi against Delphi's

debt to Plymouth.

## RESERVATION OF RIGHTS

Defendant reserves its right to assert any and all additional Affirmative Defenses as may

be determined during the course of discovery.

WHEREFORE, Defendant respectfully request that this Court dismiss Plaintiff's

Complaint with prejudice and award Defendant whatever other relief this Court deems

appropriate including attorney fees and costs.

## COUNTERCLAIM

Defendant/Counter-Plaintiff Plymouth Rubber Company, LLC. ("Plymouth"),

through its attorneys, Pepper Hamilton LLP for its Counterclaim states as follows:

1.      Defendant/Counter-Plaintiff Plymouth is a Delaware limited liability

company with its principal place of business in Canton, Massachusetts.

2.      Plaintiff/Counter-Defendant Delphi Automotive Systems LLC ("Delphi")

is a Delaware limited liability company with its principal place of business located in Troy,

Michigan.

3.      The amount in controversy exceeds Twenty-Five Thousand Dollars

($25,000), and is otherwise within the jurisdiction of this Court.

4.      This Court is the proper venue for adjudication of this controversy.

## COMMON ALLEGATIONS

5.      On August 30, 2006, Delphi issued purchase order P6850008 to Plymouth

for the supply of certain vinyl tape products (the "Products") which are incorporated into

Delphi's electric wire harness assemblies.

-9-

6.    At all times relevant to this dispute, Plymouth obtained the Products through an exclusive distribution agreement with its supplier, Plymouth Yongle Tape (Shanghai) Co. Ltd. ("PYT").

7.    In late 2007, in the course of annual price negotiations, the parties agreed upon a price increase and, on January 30, 2008, Delphi re-issued the purchase order reflecting the agreed upon price increase, retroactive to January 1, 2008 ("Purchase Order"). *See Exhibit 1, Purchase Order.*

8.    The Purchase Order required Delphi to purchase 100% of its requirements for the Product from Plymouth. *Id. at 2* ("This requirements contract is for 100% unless otherwise specified.").

9.    The Purchase Order was set to expire, by its own terms, on December 31, 2008.

10.    According to the Terms and Conditions incorporated by reference, Delphi could terminate the Purchase Order for its own convenience at any time:

> In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any and all raw materials, work-in-process and finished goods... .

***

*See Exhibit 2, Terms and Conditions at* ¶11.

11.    The Agreement is a fully integrated document which, by its express terms, provides that it sets forth the entire agreement of the parties, and supersedes all prior oral or written representations and agreements. *Exhibit 2 at ¶29* ("This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters

-10-

contained in this Contract and supersedes all prior oral or written representations and agreements.").

       12.    Neither the 2008 Purchase Order nor the governing Terms and Conditions (collectively, "Agreement") provides Delphi the right to re-source any portion of the 100% requirements that it committed to purchase from Plymouth. *See Exhibits 1 and 2.*

       13.    In the second quarter of 2008, Plymouth approached Delphi to discuss certain issues related to the Parties' supply relationship.

       14.    In June 2008, Delphi advised Plymouth that it was no longer purchasing 100% of its requirements for the Products from Plymouth but, instead, had re-sourced 40% of its requirements to a different supplier, and further indicated that it would continue to purchase the remaining 60% from Plymouth only until it found a new supplier.

       15.    Through re-sourcing 40% of its requirements for the Products, Delphi breached the Agreement, which obligated Delphi to purchase 100% of its requirements for the Products from Plymouth.

       16.    At all pertinent times prior to Delphi's re-sourcing breach, Plymouth fully performed its supply obligations under the Agreement.

       17.    Also during that time period, a series of correspondence was exchanged between the parties regarding pricing of the Products.

       18.    On July 2, 2008, Plymouth made a request to Delphi which included a 10% price increase over 2007 pricing and mandated that Delphi resume purchase of 100% of its requirements from Plymouth. *See Exhibit 3, July 2, 2008 Letter.*

       19.    On July 17, 2008, Delphi responded offering Plymouth, among other things, "100% of the North America business except for [the] following spec M4037, M4042 and part number M2147001." *See Exhibit 4, July 17, 2009 Letter.*

20.    On July 21, 2008, Plymouth sought to clarify its position with respect to its request for price relief and its possible future course of action as a result of Delphi's material breach through re-sourcing. *See Exhibit 5, July 21, 2008 Letter.*

21.    By letter dated July 22, 2008, Delphi unilaterally terminated its Agreement with Plymouth, unequivocally expressing its intent to discontinue the supply relationship and requesting that Plymouth provide a plan to wind down the relationship in an orderly manner:

> We will like to inform you that based on Plymouth's response Delphi decided to exit 100% of the NA business with your company.
>
> We are kindly requesting a contact from your company to work with us to review inventories and define the course of action.

*Exhibit 6, July 22, 2008 letter.*

22.    Delphi's exercise of its right to terminate the contract for convenience was in bad faith and/or inconsistent with commercial standards of fair dealing.

23.    On July 25, 2008, Plymouth responded to this termination notice suggesting a plan for winding down the relationship. *See Exhibit 7, July 25, 2008 Letter.*

24.    Five days later, Delphi wrote to Plymouth claiming that the Agreement was still in effect. *See Exhibit 8, July 30, 2008 Letter.*

25.    On August 13, 2008, the parties met to discuss possible resolution of their differences.

26.    On August 19, 2008, Plymouth sent a counter-proposal to the proposal verbally presented to it by Delphi at the meeting. *Exhibit 9, August 19, 2008.*

27.    On August 20, 2008, having no contractual obligation to supply Delphi, Plymouth ceased shipping the Products. That same day, Plymouth provided Delphi with information regarding Plymouth's existing stock of Products in connection with the transition plan outlined in the August 19, 2008 letter.

28.    The next day, Delphi agreed to pay the increased prices "under protest" and again emphasized that it believed the Agreement was still in effect. *See Exhibit 10, August 21, 2008 Letter.*

29.    Later that day, Plymouth agreed to resume shipping while specifically denying that the Agreement remained in force and effect. *See Exhibit 11, August 21, 2008 Letter* ("Suffice to say, it is Delphi which has both breached the parties' Agreement and terminated the same and the duress, if any, is solely of its own making.").

30.    Plymouth also emphasized that it reserved its rights to cease shipping if the parties do not in good faith attempt to resolve their differences. *Id.*

31.    On October 27, 2008, Delphi sent correspondence purportedly to officially terminate the Agreement. *See Exhibit 12, October 27, 2008 Letter.*

## COUNT I
### BREACH OF CONTRACT – RE-SOURCING

32.    Plymouth repeats and realleges the preceding allegations as though fully set forth herein.

33.    The parties entered into a requirements contract related to the Products effective January 1, 2008 and expiring on December 31, 2008.

34.    The express terms of the Agreement required Delphi to purchase 100% of its requirements from Plymouth.

35.    The parties' fully integrated Agreement did not provide Delphi any right to re-source any of its requirements for the Products.

-13-

36.     Delphi breached the agreement by re-sourcing its requirements beginning in June 2008.

37.     At all times prior to Delphi's re-sourcing breach, Plymouth fully performed its supply obligations under the Agreement.

38.     At no time prior to its re-sourcing breach did Delphi exercise its right to terminate the contract for convenience.

39.     As a consequence of Delphi's re-sourcing of its requirements, Plymouth has sustained damages, including, without limitation, consequential and incidental damages.

## COUNT II
## BREACH OF CONTRACT – BAD FAITH TERMINATION

40.     Plymouth repeats and realleges the preceding allegations as though fully set forth herein.

41.     The parties entered into a 100% requirements agreement related to the Products effective January 1, 2008 and expiring on December 31, 2008.

42.     Under the terms of the Agreement Delphi had the right to terminate the contract for convenience upon written notice to Plymouth.

43.     Under Michigan law, Delphi was required to exercise its right to terminate for convenience in good faith.

44.     On July 22, 2008, in bad-faith or inconsistent with commercial standards of fair dealing, Delphi unilaterally terminated the agreement.

45.     As a consequence of Delphi's termination of the agreement, Plymouth has suffered damages, including, without limitation, consequential and incidental damages.

WHEREFORE, Plymouth respectfully requests that this Court order an award of damages, legal fees, and other costs arising out of Delphi's breaches of the agreement, as well as all other such relief as this Court may deem just, equitable and appropriate under the

circumstances including exemplary or special damages due to Delphi's malicious, willful, and wanton conduct.

## JURY DEMAND

Defendant/Counter-Plaintiff Plymouth Rubber Company, LLC hereby demands a trial by jury for all claims which are so triable.

Respectfully submitted,

/s/ Matthew J. Lund
Matthew J. Lund (P48632)
Mary K. Deon (P63019)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, MI 48243-1157
(313) 259-7110

December 8, 2008          Attorneys for Defendant/Counter-Plaintiff

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND


DELPHI AUTOMOTIVE SYSTEMS, LLC,

Plaintiff

vs.                                                    Case No. 08-094507-CK

PLYMOUTH RUBBER COMPANY, LLC,

Defendant.

_____/

| | |
|---|---|
| Thomas S. Bishoff (P53753) | Matthew J. Lund (P48632) |
| Jeffrey R. Miller (P69839) | Mary K. Deon (P63019) |
| Dykema Gossett PLL | Pepper Hamilton LLP |
| 400 Renaissance Center | 100 Renaissance Center, 36th Floor |
| Detroit, MI  48243 | Detroit, MI  48243 |
| 313-568-5341 | 313-259-7110 |
| Attorneys for Plaintiff | Attorneys for Defendant |

_____/


## CERTIFICATE OF SERVICE


        I hereby certify that on the 8th of December, 2008, a copy of a Defendant's
Answer, Affirmative Defenses, Counterclaim and Jury Demand and this Certificate of Service
were filed electronically with the Oakland County Circuit Court e-filing system and notice will
be sent by operation of the Court's electronic filing system to all ECF participants.  Participants
may access this filing through the Court's system.

                        Respectfully submitted,



                         /s/ Matthew J. Lund_____
                        Matthew J. Lund (P48632)
                        Pepper Hamilton LLP
                        100 Renaissance Center, 36th Floor
                        Detroit, MI  48243
                        313-259-7110
                        lundm@pepperlaw.com

Dated:  December 8, 2008            Attorneys for Defendant

#10309203 v2 (999922.2006)

# EXHIBIT B

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PLYMOUTH YONGLE TAPE (SHANGHAI) CO., LTD., | ) | |
| | ) | Civil Action No. 08-11599-MLW |
| Plaintiff and Defendant-in-Counterclaim, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PLYMOUTH RUBBER CO., INC., | ) | |
| PLYMOUTH RUBBER COMPANY, LLC. | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| PLYMOUTH RUBBER COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff-in-Counterclaim, | ) | |
| v. | ) | |
| | ) | |
| DELPHI AUTOMOTIVE SYSTEMS, LLC, | ) | |
| | ) | |
| Defendant-in-Counterclaim. | ) | |

## PLYMOUTH RUBBER COMPANY, LLC.'S AMENDED ANSWER AND COUNTERCLAIM TO AMENDED COMPLAINT

## INTRODUCTION

1.     Defendant admits that this purports to be an action for the recovery of sums owed on account of goods delivered to defendants and for an accounting, but otherwise denies the allegations contained in paragraph 1 of the Amended Complaint.

2.     Defendant admits that Plaintiff is a Chinese company but otherwise denies the allegations contained in paragraph 2 of the Amended Complaint.

DM3\864859.1

## THE PARTIES

3.      Admitted.

4.      Defendant admits that Plymouth Rubber Company, Inc. was a Massachusetts corporation, with a principal place of business at 104 Revere Street, Canton, Massachusetts 02021, which no longer exits as a Massachusetts corporation as a result of the succession by conversion to Plymouth Rubber Company, LLC..

5.      Admitted.

6.      Paragraph 6 does not require a response.

## JURISDICTION AND VENUE

7.      Admitted.

8.      Admitted.

## FACTUAL BACKGROUND

### The Formation of PY

9.      Plymouth lacks sufficient information and knowledge to form a belief with respect to the allegations contained in paragraph 9 of the Amended Complaint.

10.     Plymouth admits that it invested in Yongle and that it has provided technical and marketing services, but otherwise denies the allegations contained in paragraph 10 of the Amended Complaint.  Further answering, Defendant asserts that the Equity Investment and Transfer Agreement, the Technology Transfer Agreement and the Sales and Distribution Agreement, all dated December 22, 2004, document a comprehensive business deal pursuant to

2

which the Defendant ultimately closed its United States manufacturing facility, and contributed

certain of its intellectual property for, among other things, rubber-based adhesives, primers, PVC

films, formulations, vendors, technical standards, inspection methods to the Plaintiff in exchange

for the exclusive right in the Western Hemisphere to purchase and sell the proprietary products

manufactured by the Plaintiff in China using and incorporating Plymouth's intellectual property.

As part of the inducement for Plymouth providing its intellectual property and know how for use

by Yongle to produce the proprietary products, Plaintiff is not free to use Defendant's

intellectual property to make these products or sell these products in the Western Hemisphere

other than for sale through the Defendant.

### The Consignment Agreement

11.     Defendant admits that subject to and in connection with the comprehensive

business deal between the parties and the Equity Investment and Transfer Agreement, the

Technology Transfer Agreement and the Sales and Distribution Agreement, it subsequently

entered into an ancillary subsidiary agreement entitled Consignment Agreement with Plaintiff,

which document speaks for itself and otherwise denies the allegations contained in Paragraph 11

of the Amended Complaint. In further answering, Defendant states that Plaintiff failed to perfect

its security interest in any goods shipped in connection with the Consignment Agreement and

that subsequent to the execution of the Consignment Agreement the Plaintiff and Defendant

entered into three Memorandum of Understandings, which superseded the terms of the

Consignment Agreement and provided that purchases from October 1, 2006 through April 1,

2008 would be done on open terms. Moreover, after April 2008, Yongle and Plymouth agreed

that all purchases were to be done on a cash on delivery basis, with Defendant wiring the money

DM3\864859.1

for the goods to Plaintiff prior to Plaintiff's shipment of the goods and, therefore, the

Consignment Agreement was inapplicable to the sales and is of no force or effect.

12.     Defendant states the Consignment Agreement speaks for itself and otherwise

denies the allegations contained in Paragraph 12 of the Amended Complaint.

13.     Defendant states the Consignment Agreement speaks for itself and otherwise

denies the allegations contained in Paragraph 13 of the Amended Complaint.  In further

answering, Defendant states that commencing with invoices dated October 1, 2006, the parties

agreement was that goods would be shipped on open terms and that after April 1, 2008, goods

were shipped only after Plaintiff received payment for the goods.

14.     Defendant states the Consignment Agreement speaks for itself and otherwise

denies the allegations contained in Paragraph 14 of the Amended Complaint.

15.     Defendant states the Consignment Agreement speaks for itself and otherwise

denies the allegations contained in Paragraph 15 of the Amended Complaint.

16.     Defendant states the Consignment Agreement speaks for itself and otherwise

denies the allegations contained in Paragraph 16 of the Amended Complaint.

17.     Defendant states the Consignment Agreement speaks for itself and otherwise

denies the allegations contained in Paragraph 17 of the Amended Complaint.

### Plymouth's Failure To Pay For Goods

18.     Defendant admits that it received goods from Plaintiff but otherwise denies the

allegations contained in Paragraph 18 of the Amended Complaint.

4

19.    Denied.

20.    Denied.

21.    Defendant admits that it had discussions with Plaintiff regarding their business relationship but otherwise denies the allegations contained in Paragraph 21 of the Amended Complaint.

22.    Defendant admits that it did inform Plaintiff that it was engaged in discussions with its customer Delphi but otherwise denies the allegations contained in Paragraph 22 of the Amended Complaint.

23.    Denied.

24.    Denied.

**Plymouth's Failure To Account And Return Goods**

25.    Defendant admits that Plaintiff sent a letter on September 4, 2008 and that the letter speaks for itself

26.    Denied.

## CLAIMS FOR RELIEF

### FIRST CLAIM

#### (Declaratory Relief)

27.    Defendant incorporates herein by references its foregoing responses to paragraphs 1 through 26 of the Amended Complaint as if fully set forth herein.

5

28.     Denied.

## SECOND CLAIM

### (Conversion)

29.     Defendant incorporates herein by references its foregoing responses to paragraphs 1 through 28 of the Amended Complaint as if fully set forth herein.

30.     Denied.

31.     Denied.

## THIRD CLAIM

### (Breach of Contract)

32.     Defendant incorporates herein by references its foregoing responses to paragraphs 1 through 31 of the Amended Complaint as if fully set forth herein.

33.     Denied.

34.     Denied.

## FOURTH CLAIM

### (Breach of Fiduciary Duty)

35.     Defendant incorporates herein by references its foregoing responses to paragraphs 1 through 34 of the Amended Complaint as if fully set forth herein.

36.     Denied.

37.     Denied.

6

38.     Denied.

## FIFTH CLAIM

### (Accounting, Inspection and Return of Goods)

39.     Defendant incorporates herein by references its foregoing responses to paragraphs 1 through 38 of the Amended Complaint as if fully set forth herein.

40.     Defendant states that the Consignment Agreement speaks for itself and otherwise denies the allegations of Paragraph 40 of the Amended Complaint.

41.     Denied.

42.     Denied.

## SIXTH CLAIM

### (Violation of M.G.L. c. 93A)

43.     Defendant incorporates herein by references its foregoing responses to paragraphs 1 through 42 of the Amended Complaint as if fully set forth herein.

44.     Denied.

45.     Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of waiver.

7

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of estoppel.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because it has already received payment for the goods.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the failure of consideration.

**WHEREFORE,** Defendant respectfully prays that the Court:

1.      Dismiss Plaintiff's Amended Complaint;

2.      Award Defendants their attorneys' fees and costs, and

3.      Order such other and further relief as may be just and proper.

8

## AMENDED COUNTERCLAIMS

## PARTIES

1.           Plaintiff-in-Counterclaim Plymouth Rubber Company, LLC is a limited liability company organized under the laws of Delaware and having a place of business at 500 Turnpike Street, Suite 100, Canton, MA.  Plymouth is the successor by conversion to Plymouth Rubber Company, Inc. (collectively referred to herein as "Plymouth").

2.           Defendant-in-Counterclaim Plymouth Yongle Tape (Shanghai) Co, Ltd. ("Yongle") is a limited company organized under the laws of the People's Republic of China, with its principal place of business at 1369 Guinan Road, Shihudang Branch of Songjiang Industrial Zone, Shanghai, China.

3.           Defendant-in-Counterclaim Delphi Automotive Systems, LLC ("Delphi") is a limited liability company organized under the laws of the state of Delaware and having a principal place of business located in Troy, Michigan.

## JURISDICTION AND VENUE

4.           This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because this action is between a citizen of the Commonwealth of Massachusetts and the State of Delaware and citizens of a foreign state.  The amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.           Venue is proper in this Court pursuant to the provisions of 28 U.S.C. §1391 because Plymouth has its place of business here and a substantial part of the events and omission giving rise to the claims stated herein occurred in this District.

9

DM3\864859.1



6.          This Court has personal jurisdiction over Yongle because it has purposely availed itself to jurisdiction of this Court by filing this action. In addition, this Court has personal jurisdiction over Yongle pursuant to M.G.L. ch. 223A §3 because Yongle has caused tortious injury within the Commonwealth both by its actions inside the Commonwealth as well as its actions outside of the Commonwealth in connection with the business it transacts with Plymouth within the Commonwealth.

7.          This Court has personal jurisdiction over Delphi pursuant to M.G.L. ch. 223A, §3 because Delphi has caused tortious injury within the Commonwealth both by its actions inside the Commonwealth as well as its action outside of the Commonwealth in connection with the business it transacts with Plymouth within the Commonwealth.

## FACTUAL BACKGROUND

8.          Plymouth and Yongle entered into a comprehensive business deal whereby Plymouth ultimately closed its United States manufacturing facility and contributed certain of its intellectual property for, among other things, rubber-based adhesives, primers, PVC films, formulations, vendors, technical standards, and inspection methods to Yongle in exchange for the exclusive right in the Western Hemisphere to purchase and sell proprietary products, which were made with and incorporated the intellectual property and were manufactured by Yongle in China ("Proprietary Product Line").

9.          In connection therewith, Awesome Profits Limited ("Awesome") and Plymouth executed an Equity Investment and Transfer Agreement dated December 22, 2004 (the "Equity Agreement") for the purpose of, among other things, increasing their investment in Yongle.

10

10.         Pursuant to Article 3 of the Equity Agreement, Awesome's investment would consist of land use rights, plants, and equipment, and laboratory equipment necessary for manufacturing the PVC tapes.

11.         Despite that it was Awesome's obligation under the Equity Agreement, to provide the plant and equipment to Yongle, a portion of the cost of building the plant was not listed as an equity investment by Awesome on Yongle's books, but rather was listed on Yongle's books as a debt of Yongle.  The decision to list this as a debt of Yongle was not made by the board of directors of Yongle, but rather was made unilaterally by Awesome and those in control of Awesome's parent company, CHT, (Holdings), Inc. ("CHT") and its chairman Wong Fung.

12.         Pursuant to Article 4 of the Equity Agreement, Plymouth's investment consisted of technology including technical information and know-how as set forth on Schedule 2 of the Equity Agreement (the "Proprietary Information").  On information and belief, prior to Plymouth providing the Proprietary Information, neither Yongle nor Awesome nor CHT had the technical expertise to manufacture or produce either the Proprietary Products or products performing similar functions to the Proprietary Products.

13.     Pursuant to Article 6 of the Equity Agreement, upon Plymouth's contribution of the Proprietary Information, Yongle would have the right to use it during the approved term of operation of Yongle, but was not free to use the Proprietary Information to make the Proprietary Product Line or sell these products in the Western Hemisphere other than for sale through Plymouth.

14.         It is this Proprietary Information that enables Yongle to manufacture its Proprietary Product Line.

DM3\864859.1

15.         In connection with the Equity Agreement, also on December 22, 2004,

Awesome, Plymouth and Yongle executed a Technology Transfer Agreement, which was

Appendix A to the Equity Agreement, and was an integral part of the Equity Agreement and the

comprehensive business deal.

16.         The Technology Transfer Agreement confirmed that Plymouth was

providing the Proprietary Information to Yongle as part of a comprehensive business deal

whereby Plymouth contributed the Proprietary Information in exchange for the exclusive right in

the Western Hemisphere to purchase and sell the Proprietary Product Line manufactured by

Yongle in China.

17.         Also in connection with the comprehensive business deal and the Equity

Agreement and also on December 22, 2004, Awesome, Hebei Huaxia Enterprise Co., Ltd

("Huaxia") Plymouth and Yongle executed a Sales and Distribution Agreement, which was

Appendix B to the Equity Agreement.  The Sales and Distribution Agreement was an integral

part of the Equity Agreement because, among other things, it set forth the parties' understanding

with respect to the sale and distribution of the Proprietary Product Line and confirmed their

agreement to work collaboratively and not in competition with each other as part of a

comprehensive business deal whereby Plymouth contributed the Proprietary Information in

exchange for the exclusive right in the Western Hemisphere to purchase and sell the Proprietary

Product Line manufactured by Yongle in China.

18.         Specifically, pursuant to Section II of the Sales and Distribution

Agreement, the parties to the agreement confirmed, among other things, that they would  work as

12



partners and not compete with one another and "to respect each other's customers and avoid competing directly or indirectly at each other's existing customers."

19.     Pursuant to Section III of the Sales and Distribution Agreement, Plymouth has the exclusive right to sell the Proprietary Product Line in North America, Central America and South America and neither Awesome, Huaxia nor Yongle can sell the Proprietary Product Line directly or indirectly in these regions.

20.     Following execution of the various agreements, Plymouth through its sales representative Staffco sold the Proprietary Product Line to automotive manufacturers in the Western Hemisphere. Included in Plymouth's customers in the Western Hemisphere was Delphi, Lear Corporation ("Lear"), Condumex, and certain electrical products distributors and utilities and mining companies.

21.     Throughout 2007 and increasing in 2008, Plymouth and Yongle engaged in a series of discussions concerning their business relationship and a number of disputes that had arisen between them. These disputes include the following:

A.  Yongle listed a portion of the cost of building the facility, which was Awesome's equity investment in Yongle as a debt of Yongle rather than equity, which is detrimental to Plymouth because that amount would be paid back to Awesome prior to Plymouth receiving its percentage of profit.

B.  Yongle failed to obtain unanimous approval as required by Article 27 of the Equity Agreement with respect to securing certain bank loans as well as, on information and belief, debt financing provided by affiliates of Awesome.

C.  Upon information and belief, Yongle made a negative pledge of its assets to secure financing for CHT. This action by Awesome and CHT was for the benefit of CHT and was detrimental to Yongle and Plymouth. Indeed, as a result of these actions, it has made it difficult, if not impossible, for Yongle to obtain financing that it needed for its own operation.

13



D. On information and belief, Yongle provided the Proprietary Product Line to Huaxia at prices that do not include a mark-up and/or do not provide for any profit to be made by Yongle and/or permitted Huaxia to manufacture its product at Yongle's facility at favorable terms.

E. During 2006 and early 2007, Yongle sent six containers of product to Plymouth that Plymouth had not ordered. There were quality issues with this product and Plymouth objected to the shipment. However, because of customer need, Plymouth reworked some of the product and returned the remainder to Yongle. Yongle has failed to issue appropriate credits to Plymouth with respect to these goods.

F. Yongle failed to implement the parties agreement to reduce the price on 3755 tape by approximately $100,000.00.

22.        As these discussions were ongoing, during May 2008, Yongle informed Plymouth that it had been contacted directly by Plymouth's largest customer, Delphi, to discuss pricing and supply. On information and belief, Yongle's communication with Delphi continued from May 2008 forward in violation of the Equity Agreement and Sales and Distribution Agreement , as well as Delphi's contractual obligations with Plymouth, and led to an agreement between Yongle and Delphi whereby they wrongfully excluded Plymouth from knowledge of, and participation in, sales of the Proprietary Product Line by Yongle to Delphi in violation of their respective obligations to Plymouth.

23.        Upon information and belief, at all relevant times, Delphi was aware of the restrictions in the Sales and Distribution Agreement which prohibited Yongle from selling the Proprietary Product Line within the Western Hemisphere and gave Plymouth the exclusive right to do so and that Plymouth had an exclusive sales arrangement with Staffco.

24.        Upon information and belief, Delphi was also aware that Yongle used the Proprietary Information to manufacture the Proprietary Product Line.

14

25.          During the Summer of 2008, Plymouth fielded concerns from Delphi about the pricing of the Proprietary Product Line in connection with the requirements contract that Delphi had with Plymouth Rubber.  Plymouth engaged in extensive discussions with Delphi in a good faith effort to attempt to resolve these pricing issues.

26.          Upon information and belief, however, around approximately the same time that Plymouth was negotiating price issues with Delphi, unbeknownst to Plymouth, Delphi was in discussions with Staffco and Yongle to arrange for Delphi to purchase the Proprietary Product Line directly from Yongle and/or Staffco, without Plymouth Rubber's knowledge, and in violation of the Sales and Distribution Agreement.

27.          As part of this scheme and plan on August 24, 2008, Yongle sent Plymouth and Huaxia a letter purporting to immediately terminate the Sales and Distribution Agreement (the "August 24th Letter") due to an alleged material breach by Plymouth resulting from its alleged failure to make payments to Yongle.

28.          However, pursuant to Section VIII of the Sales and Distribution Agreement immediate termination is only available in certain circumstances that do not exist here.  Furthermore, termination of the Sales and Distribution Agreement requires the vote of the board of directors, which did not occur here.

29.          On August 25, 2008, Plymouth sent Yongle a letter responding to the August 24th Letter and denied that there was any basis for immediate termination and stating that the agreements were in full force and effect and that Plymouth expected that they would be honored.  Plymouth also reiterated that there were number of disputes between the parties that needed to be resolved.

DM3\864859.1

30.          In addition, Plymouth learned that on or about August 28, 2008, only 4 days after its purported termination of the Sales and Distribution Agreement, Yongle also began to work directly with Plymouth's sales representative Staffco in breach of their respective agreements with Plymouth. Yongle's work with Staffco was directed at, among other things, arranging for the sale of the Proprietary Product Line to Delphi, without notice or compensation to Plymouth. Yongle's actions were in breach of the non-competition provision in the Sales and Distribution Agreement, which provided Plymouth with the exclusive right to sell in the Western Hemisphere, which is where Delphi is located.

31.          Specifically, on information and belief, in or about late August 2008 or early September 2008 and continuing through today, Yongle shipped products from the Proprietary Product Line into at least North America and sold them to Delphi, Staffco and/or and others in breach of the agreements outlined herein.

32.          On information and belief, Delphi has purchased the Proprietary Product Line from Yongle even though it was fully aware of the restriction on Yongle's ability to sell the Proprietary Product Line in the Sales and Distribution Agreement.

33.          Also, on information and belief, Yongle has begun to sell its product directly to Plymouth's customer, Lear who is also located in the Western Hemisphere.

34.          By its actions as set forth above, and in concert with Delphi and Staffco, Yongle has completely abrogated and disregarded the comprehensive business deal and its obligations under the Equity Agreement, Sales and Distribution Agreement, and Technology Transfer Agreement, and therefore, Yongle can no longer use the Proprietary Information to manufacturer the Proprietary Product Line or sell the Proprietary Product Line.

16

35.     By its actions as set forth above, and in concert with Yongle and/or Staffco, Delphi has intentionally interfered with and disrupted the contractual relationships that Plymouth enjoyed with Yongle and/or Staffco, causing Yongle and/or Staffco to breach their respective agreements with Plymouth and violate their duties to Plymouth with respect to the Proprietary Information and Proprietary Product Line.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT ONE**
<u>**BREACH OF CONTRACT AGAINST YONGLE**</u>

36.     Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 35, as if the same were set forth fully herein.

37.     The Equity Agreement, Technology Transfer Agreement and Sales and Distribution Agreement are valid and enforceable agreements.

38.     By its actions, as set forth above, Yongle has breached these agreements by, among other things, selling the Proprietary Product Line in at least North America and entering into an agreement with Delphi and Lear whereby they wrongfully excluded Plymouth from knowledge of, and participation in, sales of the Proprietary Products by Yongle to Delphi and Lear in violation of their respective obligations to Plymouth; pledging assets of Yongle on loans without unanimous board approval; manufacturing and shipping the Proprietary Product Line to Plymouth with quality issues; recording a portion of the cost of construction of the plant as a debt on Yongle's books; failing to provide a pricing discount to Plymouth as agreed to; selling the Proprietary Product Line to Huxaia at cost; purporting to terminate the Sales and Distribution Agreement with out approval of the board of directors.

DM3\864859.1



39.        As a result of Yongle's breach of the agreements, Plymouth has been

damaged at an amount to be determined at trial.

## COUNT TWO
## BREACH OF CONTRACT – SPECIFIC PERFORMANCE AGAINST YONGLE

40.        Plymouth restates and incorporates herein by reference its allegations set

forth in paragraphs 1 through 39, as if the same were set forth fully herein.

41.        The Equity Agreement, Technology Transfer Agreement and Sales and

Distribution Agreement are valid and enforceable agreements.

42.        By its actions, a set forth above, Yongle has breached these agreements.

43.        As a direct and proximate result of Yongle's breach of its contractual

duties, Plymouth suffered and continues to suffer irreparable harm and loss for which damages will

not adequately compensate it, including, but not limited to, the destruction of its business and

goodwill, the misappropriation of its Proprietary Information and Proprietary Product Line.

44.        Due to the type of damage that Plymouth has suffered and continues to

suffer as a result of Yongle's actions, a significant portion of Plymouth's actual damages are not

easily measured or fully compensable, and therefore, Plymouth seeks an order that Yongle can not

ship or sell the Proprietary Product Line nor can it use the Proprietary Information to manufacture

the Proprietary Product Line or any other products.

## COUNT THREE
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING AGAINST YONGLE

45.        Plymouth restates and incorporates herein by reference its allegations set

forth in paragraphs 1 through 44, as if the same were set forth fully herein.

DM3\864859.1

46.        Under applicable law, there is a covenant of good faith and fair dealing implied in the Equity Agreement, Technology Transfer Agreement and Sales and Distribution Agreement.

47.        By engaging in the conduct described above, Yongle has breached the implied covenant of good faith and fair dealing that is an inherent and integral part of the Equity Agreement, Technology Transfer Agreement and Sales and Distribution Agreement.

48.        As a direct and proximate result of Yongle's conduct as described above, Plymouth has suffered and continues to suffer irreparable harm as well as monetary loss.

**COUNT FOUR**
**TORTIOUS INTERFERENCE WITH**
**ADVANTAGEOUS AND CONTRACTUAL RELATIONS AGAINST YONGLE**

49.        Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 48, as if the same were set forth fully herein.

50.        As a result of many years of sales efforts, the excellent quality of its Proprietary Product Line, the specialization of its products to fit specific customer needs, its favorable pricing, and its excellent customer service, Plymouth had entered into contracts with and developed economic relationships with its sales representative Staffco, and Plymouth's customers, including, but not limited to, Delphi and Lear.

51.        As a result Plymouth's involvement with Yongle, Yongle was aware of these advantageous contractual and economic relationships.

52.        On information and belief, Yongle entered into business relations with Staffco and Delphi in order to facilitate a purchase of the Proprietary Product Line to Delphi.  Also on information and belief, Yongle has been selling product directly to Lear.

19

53.        Yongle's conduct constitutes intentional and improper interference with Plymouth's contractual and advantageous relationships with Staffco and Delphi and Lear. Moreover, Yongle is poised to continue to interfere with Plymouth's advantageous and contractual relationships with its supplier, customers and prospects.

54.        Yongle's intentional and wrongful conduct has caused and will continue to cause Plymouth irreparable harm and loss and monetary damages.

**COUNT FIVE**
**TORTIOUS INTERFERENCE WITH**
**ADVANTAGEOUS AND CONTRACTUAL RELATIONS AGAINST DELPHI**

55.        Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 54, as if the same were set forth fully herein.

56.        As a result of Plymouth's involvement and history with Delphi, one of Plymouth largest customers, Delphi was aware of the advantageous contractual and economic relationships which Plymouth enjoyed with Yongle and Staffco, including Plymouth's and Yongle's respective rights regarding sales of the Proprietary Product Line within the Western Hemisphere pursuant to the Sales and Distribution Agreement and the various joint venture agreements.

57.        On information and belief, Delphi entered into business relations with Staffco and/or Yongle in order to facilitate a purchase of the Proprietary Product Line to Delphi in the Western Hemisphere.

58.        By this conduct, Delphi caused Yongle and/or Staffco to breach their respective agreements with Plymouth.

59.        Delphi's conduct constitutes intentional and improper interference with Plymouth's contractual and advantageous relationships with Staffco and/or Yongle.

20

DM3\864859.1

60.        Delphi's intentional and wrongful conduct has caused and will continue to cause Plymouth irreparable harm and loss and monetary damages.

**COUNT SIX**
**MISAPPROPRIATION OF THE PROPRIETARY INFORMATION AND**
**PROPRIETARY PRODUCT LINE AGAINST YONGLE**

61.        Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 60 as if the same were set forth fully herein.

62.        Plymouth has taken reasonable measures under the circumstances to maintain the secrecy of the Proprietary Information, which includes, but is not limited to, technical information and know-how regarding PVC tape, its Proprietary Product Line, by obtaining assurances in the Equity Agreement, Technology Transfer Agreement and Sales and Distribution Agreement that Yongle would safe guard the Proprietary Information and not disclosed same without Plymouth's consent.

63.        The Proprietary Product Line products, including those that Yongle shipped into North America in September 2008, are manufactured by Yongle using the Proprietary Information.

64.        Yongle's use of the Proprietary Information and Proprietary Product Line including, but not limited to, technical information and know-how regarding PVC tape, information about Plymouth's customers and their usage and needs and the Proprietary Product Line was limited to proper business dealings by Yongle, which did not include such dealings with Delphi, Staffco, Lear, or any other customer in the Western Hemisphere.

65.        Yongle's actions, as set forth above, constitute misappropriation, misuse and conversion of, Plymouth's Proprietary Information and Proprietary Product Line.

66.        As a consequence of the foregoing, Plymouth has suffered and will continue to suffer irreparable harm and loss.

21



## COUNT SEVEN
## MISAPPROPRIATION AND MISUSE OF THE PROPRIETARY
## INFORMATION AND PROPRIETARY PRODUCT LINE PURSUANT
## TO M.G.L. c. 93 § 42 AGAINST YONGLE

67.         Plymouth restates and incorporates herein by reference its allegations set

forth in paragraphs 1 through 66, as if the same were set forth fully herein.

68.         Upon information and belief, Yongle has used, disclosed and/or otherwise

misappropriated the Proprietary Information, which includes, Plymouth's scientific, technical,

merchandising, production or management information, design, process, procedure, formula,

invention or improvement for the Proprietary Product Line, all in violation of M.G.L. c. 93 §42.

69.         Yongle has acknowledged in the Equity Agreement, Technology Transfer

Agreement and Sales and Distribution Agreement the existence of the Proprietary Information and

that it was obligated to safeguard this information and was not allowed to disclose it to anyone

without Plymouth's consent.

70.         The Proprietary Product Line that Yongle shipped into and sold to Delphi

Staffco and Lear was manufactured using the Proprietary Information.

71.         Yongle's right to use Plymouth's scientific, technical, merchandising,

production or management information, design, process, procedure, formula, invention or

improvement for the Proprietary Product Line, was limited to its business dealings with Plymouth

and did not include direct dealings in the Western Hemisphere with Staffco, Delphi, Lear and

others.

72.         The Proprietary Information and Proprietary Product Line that Yongle has

used, disclosed and/or otherwise misappropriated has substantial independent actual and/or

potential value because the information is not generally known or readily ascertainable through

independent development by persons, or anyone else participating with them, directly or indirectly,

22

individually or by or through any affiliates, who and/or which can obtain, and has obtained, economic value from its disclosure and/or use.

73.     Plymouth has taken measures and made efforts that are reasonable under the circumstances to maintain the secrecy of the Proprietary Information and Proprietary Product Line that Yongle has misappropriated from Plymouth.

74.     Yongle's actions, as set forth above, constitutes a conversion of Plymouth's Proprietary Information and Proprietary Product Line, its corporate opportunities and its actual and/or prospective business relations in violation of M.G.L. c. 93 §42.

75.     As a consequence of the foregoing, Plymouth has suffered and will continue to suffer irreparable harm and loss, and therefore pursuant to M.G.L. ch. 93 §42A an injunction should enter.

**COUNT EIGHT**
**INDUCEMENT OF MISAPPROPRIATION OF PROPRIETARY**
**INFORMATION AND PROPRIETARY PRODUCT LINE AGAINST YONGLE**

76.     Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 75, as if the same were set forth fully herein.

77.     Yongle was aware that the Proprietary Product Line it manufacturers incorporates and uses the Proprietary Information.

78.     Yongle was also aware that Plymouth has the exclusive right to import and sell the Proprietary Product Line into the Western Hemisphere and that Yongle does not have the right to ship or sell such product into the Western Hemisphere.

79.     Notwithstanding, on information and belief, Yongle shipped the Proprietary Product Line into the Western Hemisphere for sale to Staffco, Delphi, Lear and others.

DM3\864859.1

80.     Yongle's actions, as set forth above, have induced Staffco, Delphi, Lear and others to misappropriate Plymouth's Proprietary Information and Proprietary Product Line.

81.     As a result, Plymouth has suffered and will continue to suffer irreparable harm and loss.

## COUNT NINE
## INDUCEMENT OF MISAPPROPRIATION OF PROPRIETARY INFORMATION AND PROPRIETARY PRODUCT LINE AGAINST DELPHI

82.     Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 81, as if the same were set forth fully herein.

83.     Delphi was aware that the Proprietary Product Line was manufactured by Yongle using the Proprietary Information.

84.     Delphi was also aware that Plymouth has the exclusive right to import and sell the Proprietary Product Line into the Western Hemisphere and that Yongle does not have the right to ship or sell such product into the Western Hemisphere.

85.     Notwithstanding, on information and belief, Delphi entered into business arrangements to purchase the Proprietary Product Line through Yongle and/or Staffco, without the knowledge or participation of Plymouth Rubber.

86.     As a result of Delphi's actions, Yongle manufactured the Proprietary Product Line and shipped it to the United States for sale to Delphi.

87.     Delphi's actions, as set forth above, have induced Staffco and/or Yongle to misappropriate Plymouth's Proprietary Information and Proprietary Product Line.

88.     As a result, Plymouth has suffered and will continue to suffer irreparable harm and loss.

24

## COUNT TEN
## CIVIL CONSPIRACY AGAINST DELPHI

89.         Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 88, as if the same were set forth fully herein.

90.         Delphi and Yongle were aware that Plymouth had the exclusive right to sell the Proprietary Product Line into the Western Hemisphere and Yongle could not sell the Proprietary Product Line into the Western Hemisphere pursuant to the joint venture agreements between Plymouth and Yongle, including the Sales and Distribution Agreement.

91.         Delphi and Yongle, by entering into business arrangements with each other, formed a conspiracy which continues to operate between Delphi and Yongle to *inter alia*, misappropriate the Proprietary Product Line and Proprietary Information and arrange for Yongle to sell the Proprietary Product Line directly into the Western Hemisphere for purchase by Delphi and to bypass Plymouth, violating the Sales and Distribution Agreement.

92.         Delphi substantially assisted in and furthered the conspiracy between it and Yongle by agreeing to purchase the Proprietary Product Line directly from Yongle and/or Staffco, with knowledge that doing so violated both Yongle's and Staffco's duties to Plymouth under their respective agreements with Plymouth.

93.         In furtherance of the conspiracy, Delphi breached duties to Plymouth by interfering with Plymouth's contractual and economic relationships and by inducing others to misappropriate Plymouth's proprietary information.

94.         On information and belief, Delphi's actions have been intentional and willful.

95.         As a direct and proximate result of this conspiracy, Plymouth has been damaged in an amount to be determined at trial.

DM3\864859.1

## COUNT ELEVEN
## CIVIL CONSPIRACY AGAINST YONGLE

96.      Plymouth restates and incorporates herein by reference its allegations set

forth in paragraphs 1 through 95, as if the same were set forth fully herein.

97.      Delphi and Yongle were aware that Plymouth had the exclusive right to

sell the Proprietary Product Line into the Western Hemisphere and Yongle could not sell the

Proprietary Product Line into the Western Hemisphere pursuant to the joint venture agreements

between Plymouth and Yongle, including the Sales and Distribution Agreement.

98.      Delphi and Yongle, by entering into business arrangements with each

other, formed a conspiracy which continues to operate between Delphi and Yongle to *inter alia*,

misappropriate the Proprietary Product Line and Proprietary Information and arrange for Yongle to

sell the Proprietary Product Line directly into the Western Hemisphere for purchase by Delphi and

bypassing Plymouth.

99.      Yongle assisted in and furthered the conspiracy between it and Delphi by

agreeing to sell the Proprietary Product Line directly into the United States for purchase by Staffco

and/or Delphi, and also by purporting to wrongfully terminate the Sales and Distribution

Agreement with Plymouth.

100.      In furtherance of the conspiracy, Yongle breached duties to Plymouth by,

among other things, breaching its various agreements with Plymouth, interfering with Plymouth's

contractual and economic relationships, misappropriating and misusing Plymouth's proprietary

information and by inducing others to misappropriate Plymouth's proprietary information.

101.      On information and belief, Yongle's actions have been intentional and

willful.

26





102.        As a direct and proximate result of this conspiracy, Plymouth has been damaged in an amount to be determined at trial.

## COUNT TWELVE
## INJUNCTIVE RELIEF AGAINST YONGLE

103.        Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 102, as if the same were set forth fully herein.

104.        Plymouth has been and, absent injunctive relief, will continue to be irreparably harmed as a result of Yongle's actions as set forth above, including but not limited to the destruction of its business and harm to its goodwill as well as by the theft of its goodwill, Proprietary Information and Propriety Product Line.

105.        Plymouth is likely to succeed on the merits of this lawsuit and the balance of the equities between Plymouth and Yongle favors Plymouth.

106.        The harm Plymouth will suffer greatly outweighs any harm that Yongle may suffer as a result of issuing the injunction.

107.        Public policy favors enforcement of the terms of bargained-for contracts and protection of proprietary and trade secret information and products.

108.        Consequently, Plymouth seeks injunctive relief enjoining Yongle, from using the Proprietary Information to manufacture the Proprietary Product Line or any other products, and/or from shipping or selling the Proprietary Product Line to anyone including, but not limited, to Plymouth's customers, including, but not limited to Delphi, Lear, and Condumex, Inc..

## COUNT THIRTEEN
## INJUNCTIVE RELIEF AGAINST DELPHI

109.        Plymouth restates and incorporates herein by reference its allegations set forth in paragraphs 1 through 108, as if the same were set forth fully herein.

27

110.     Plymouth has been and, absent injunctive relief, will continue to be irreparably harmed as a result of Delphi's actions as set forth above, including but not limited to the destruction of its business and harm to its goodwill as well as by the theft of its goodwill, Proprietary Information and Propriety Product Line.

111.     Plymouth is likely to succeed on the merits of this lawsuit and the balance of the equities between Plymouth and Delphi favors Plymouth.

112.     The harm Plymouth will suffer greatly outweighs any harm that Delphi may suffer as a result of issuing the injunction.

113.     Public policy favors enforcement of the terms of bargained-for contracts and protection of proprietary and trade secret information and products. Consequently, Plymouth seeks injunctive relief enjoining Delphi, from purchasing products made by using the Proprietary Information to manufacture the Proprietary Product Line from anyone or except from Plymouth.

**WHEREFORE**, Plaintiff-in-Counterclaim, Plymouth Rubber Company LLC respectfully requests that this Court:

1.     Enjoin Yongle and those acting in concert with them from directly or indirectly (a) using the Proprietary Information to manufacture the Proprietary Product Line or any other products and (2) from shipping or selling the Proprietary Product Line to anyone including, but not limited, to Plymouth's customers, such as Delphi Corporation, Lear Corporation, and Condumex, Inc.;

2.     Enjoin Yongle from using the Proprietary Information

3.     Enjoin Delphi, from purchasing products made by using the Proprietary Information to manufacture the Proprietary Product Line from anyone or except from Plymouth.

DM3\864859.1

4.     Award Plymouth damages on Counts One and Counts Three though Eleven;

5.     Award Plymouth up to double damages on Count Seven;

6.     Award Plymouth its attorneys' fees and costs;

7.     Grant Plymouth such other and further relief as the Court deems just and proper.

## PLYMOUTH RUBBER DEMANDS A JURY TRIAL

Dated: November 25, 2008                          PLYMOUTH RUBBER COMPANY, LLC
                                                  By its attorneys,


                                                  _____ /s/ *Michael R. Gottfried* _____
                                                  Michael R. Gottfried (BBO # 542156)
                                                  Patricia R. Rich (BBO#640578)
                                                  DUANE MORRIS LLP
                                                  470 Atlantic Avenue, Suite 500
                                                  Boston, MA 02110
                                                  Tel: 857-488-4200
                                                  Fax: 857-488-4201
                                                  MRGottfried@duanemorris.com

29

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of electronic filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael R. Gottfried*
Michael R. Gottfried

30

# EXHIBIT C

## POWER OF ATTORNEY

By my signature below, I, Thomas A. Kennedy, Esq., a duly authorized representative of

Plymouth Rubber Company, LLC ("Plymouth Rubber"), an administrative claimant of Delphi

Automotive Systems, LLC (the "Delphi"), an affiliated debtor of Delphi Corporation (the "Debtor")

in the jointly administered bankruptcy case of *In re Delphi Corporation, et al.*, Case No. 05-44481,

pending in the United States Bankruptcy Court for the Southern District of New York, do hereby

authorize the attorneys of the law firm Duane Morris LLP, including, without limitation, the

following attorneys: (i) Paul D. Moore, Esq., (ii) Jeffrey D. Sternklar, Esq., (iii) James J.

Vincequerra, Esq., (iv) Jeffrey D. Kahane, Esq., and (v) Kara M. Zaleskas, Esq., to execute and file,

on behalf of Plymouth Rubber and as its agent and attorney-in-fact, an administrative expense claim

in the Debtor's jointly administered bankruptcy case.

This Power of Attorney may be executed by facsimile and any facsimile signature shall be

binding and have the same legal effect as the original.

PLYMOUTH RUBBER COMPANY, LLC

By:  Versa Capital Management, Inc., its
manager,

By: _____
Name:  Thomas A. Kennedy
Title:  Secretary

Dated:  July 30, 2009