**Exhibit F**

Hearing Date and Time: July 23, 2009 at 10:00 a.m. EDT

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                             :
In re                    :   Chapter 11
                             :
DELPHI CORPORATION, et al.,   :   Case No. 05-44481 (RDD)
                             :
       Debtors.           :   (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### DECLARATION OF KEITH D. STIPP IN SUPPORT OF MODIFICATIONS TO DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION

Keith D. Stipp Declaration
Highly Confidential

I, Keith D. Stipp, declare as follows:

1. I submit this declaration in support of modifications to the First Amended Joint Plan of Reorganization (the "Modified Plan") of Delphi Corporation ("Delphi" or the "Company") and certain affiliates, debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases and, in the alternative, a sale of certain of the Debtors' assets pursuant to section 363 of the Bankruptcy Code in the event the Court does not approve the Modified Plan. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Modified Plan.

2. I am the Executive Director in charge of restructuring of Delphi Corporation ("Delphi"). Before assuming my current position, I was the Divisional Chief Financial Officer of Delphi's Automotive Holdings Group ("AHG") from 2003 to October 2008. Previously, I was Assistant Finance Director for Delphi's Powertrain Division from 2001 to 2003. I was Director of Investor Relations for Delphi from 1999 to 2001. Altogether, I have been an employee of Delphi or its predecessor entities for approximately 25 years. Except as otherwise indicated, all facts and opinions set forth in this declaration are based upon my personal knowledge and experience, my review of relevant documents, my involvement in and knowledge of the Debtors' businesses, and knowledge obtained from Delphi employees reporting to me and upon whom I rely in the regular course of performing my duties.

### The MDA Transaction And Modified Plan

3. [REDACTED]

2



4.

5.

Keith D. Stipp Declaration
Highly Confidential

6. █████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
███████████████████████
████████████████████████████
████████████████████████████
█████████████████████

7. ████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████

8. █████████████████████████
████████████████████████████
████████████████████████████
████

9. █████████████████████████
████████████████████████████
████████████████████████████

4

Keith D. Stipp Declaration
Highly Confidential



10.

11.

12.

13.

5

Keith D. Stipp Declaration
Highly Confidential



14.

15.

6

Keith D. Stipp Declaration
Highly Confidential

16. 

Keith D. Stipp Declaration
Highly Confidential

17. █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

### The Potential Pure Credit Bid

18. █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

8

Keith D. Stipp Declaration
Highly Confidential



19. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Keith D. Stipp Declaration
Highly Confidential



22. ███

23. ███

24. ███

### My Prior Experience With Delphi's Automotive Holdings Group

25. While serving as the Divisional Chief Financial Officer of AHG from 2003 to October 2008 I was involved in the sale and wind-down of a number of AHG businesses. In addition, I was also involved in working with various troubled suppliers. In such situations, Delphi generally funded the applicable production of a troubled supplier to cash flow break even for the interim period required to build up a bank of inventory and resource the business. I used these prior experiences, along with my knowledge of the Debtors' asset base, asset quality, and overall operating environment in connection with preparation of the budget and plan for DPH Holdings under the Modified Plan and MDA, as discussed below. ███

10



) Finally, I used these experiences in assisting Delphi's financial advisors in the development of assumptions regarding a potential liquidation of the Debtors.

The Modified Plan Provides For Payment Of Priority Claims (11 U.S.C. § 1129(a)(9))

26.     The Modified Plan provides that, subject to certain bar date provisions, in accordance with Article 2.1 of the Modified Plan, all Allowed Administrative Claims against the Reorganized Debtors will be paid in full in cash on the Effective Date or as soon thereafter as is practicable unless otherwise agreed to with the claimholder.

27.     In addition, Article 2.2 of the Modified Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Reorganizing Debtor, each holder of an Allowed Priority Tax Claim against a Reorganizing Debtor will receive, in full satisfaction of its Priority Tax Claim, (a) equal cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (b) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors, provided that such treatment is more favorable to the Debtors than the treatment in clause (a), or (c) payment in full in Cash, provided, however, that holders of Priority Tax Claims whose Claims have been assumed by the Buyers pursuant to the Master Disposition Agreement will be treated in the manner set forth therein.

11

### The Modified Plan Is Feasible (11 U.S.C. § 1129(a)(11))

28.  The Debtors and their financial advisors have analyzed the Reorganized Debtors' ability to timely perform all of their obligations under the Modified Plan. To evaluate whether the Modified Plan is feasible, I have examined and evaluated almost all facets of the material provisions of the Modified Plan relating to distributions. I also have worked extensively with other members of the Debtors' senior management and the Debtors' financial advisors to develop a budget for the operations of the Reorganized Debtors.

29.  <u>The Reorganized Debtors</u>. Pursuant to the MDA, and subject to the terms described therein, certain of GM's affiliates will purchase certain of the Debtors' U.S. manufacturing facilities that primarily supply product to GM as well as the assets of the Debtors' global steering business. Concurrently, Platinum will purchase a substantial portion of the remaining business assets, including the equity of the Debtors' non-U.S. subsidiaries. Delphi Corporation will emerge from chapter 11 as Reorganized DPH Holdings Co. and the Debtors will emerge from chapter 11 as the Reorganized Debtors.

30.  The Reorganized Debtors will hold (a) cash for payment of Allowed Administrative Claims (excluding such claims to be assumed by third parties), (b) proceeds of Avoidance Actions, if any, (c) proceeds from wind-down activities, and (d) payments due under the MRA. In addition, following the Effective Date, the Reorganized Debtors will own approximately 20 sites. (One of these sites, the warehouse in Columbia, Tennessee, is subject to a lease that is being rejected by the Debtors pursuant to the Modified Plan and is included on Exhibit 8.1 thereto.) In addition, the Reorganized Debtors will retain liabilities for long-term inactive U.S. salaried employees for all sites and inactive U.S. hourly employees for idled sites.

12

31.     Under the MDA, the Debtors will receive consideration from the purchasers comprised of cash, the assumption of liabilities, assumption of certain administrative claims and/or cash to fund payment of certain administrative claims, and certain deferred consideration. Additionally, GM will provide consideration comprised of the waiver of its multi-billion dollar claims at closing, including its administrative expense claim under the GM Arrangement, its administrative expense claim under Section 4.04(a)(i) of the Amended GSA, and its prepetition claim.

32.     <u>Post-Confirmation Reorganized DPH Holdings Share Trust</u>. On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, will execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the Post-Confirmation Reorganized DPH Holdings Share Trust pursuant the Post-Confirmation Trust Agreement, substantially in the form attached as Exhibit 7.9 to the Modified Plan. On the Effective Date, and in accordance with and pursuant to the terms of the Modified Plan, the Post-Confirmation Reorganized DPH Holdings Share Trust will become the sole shareholder of Reorganized DPH Holdings Co. Reorganized DPH Holdings Co. would make distributions to holders of secured, priority, and unsecured claims, as set forth in detail below.

33.     <u>Emergence Capital</u>. On the Effective Date, pursuant to the MDA, the Reorganized Debtors will receive the Emergence Capital sufficient to make payments as may be required on the Effective Date and conduct their post-reorganization operations.

34.     <u>Revenue Plan</u>. Except as otherwise provided in the Modified Plan, the Confirmation Order, or the Modification Approval Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Modified Plan will be obtained from the Emergence Capital, existing Cash balances, the proceeds of the wind-down activities of the Debtors and the

13

Reorganized Debtors, and payments due under the MRA. Certain of the identified revenue opportunities for the Reorganized Debtors are known because they are derived from emergence transactions or agreements with third parties. Other revenue opportunities are prospective, based on proceeds the Company believes it may receive from the sale of retained assets such as the idled sites and transactions that are pending as of the closing. I have evaluated the Reorganized Debtors' potential revenues based on historical trends and industry knowledge, in particular my experience with the Debtors' wind-down of assets in AHG.

35. As of the Effective Date, the Reorganized Debtors' assets would include:

(a) a $50 million funding commitment from GM, with (i) $10 million in immediately available funds to be paid to Delphi at the Closing and (ii) up to an additional $40 million to be made available to Delphi from the time following the Closing until December 31, 2013 upon written request by Delphi in no less than $1 million increments;

(b) approximately $26 million in receivables from GM;

(c) 20 sites that are estimated by the Debtors to have $30 million in value;

(d) approximately $8 million in a cash escrow account to cover administrative claims for hourly employees pre-retirement program participants ("PRPs")

(e) certain intellectual property assets; and

(f) the proceeds from the prosecution of the Debtors' avoidance actions.

36. The estimated recoveries for the idled sites are based on the Debtors' recent experience in selling vacant plants and related land within the AHG division.

37. I believe operating Reorganized DPH under the Modified Plan will be less challenging than a wind-down in the context of an immediate conversion to chapter 7. Because the operations will not require the supply of materials, the Reorganized Debtors will not face

14

liquidity shortfalls caused by suppliers demanding accelerated payments. In addition, the Reorganized Debtors will be relying on the sources of revenue described herein rather than relying on customers to provide interim liquidity

38.     <u>Assessment Of Costs</u>. I have estimated that costs of operations for DPH Holdings including costs of professionals and employees, and one time events such as necessary demolition costs for certain facilities. The Reorganized Debtors' costs would decline throughout 2009-2013 as the Reorganized Debtors dispose of idled sites. In addition, under the Modified Plan and MDA, certain transition services will be provided free by GM or the Buyers, thus lowering the overhead costs of the Reorganized Debtors operations.

39.     I believe that the budget we developed represents a reasonable projection of the Reorganized Debtors' future performance, and it demonstrates that the Reorganized Debtors will have the ability to meet future obligations under the Modified Plan. The reliability of the budget is supported by the Debtors' proven track record of winding down assets of the AHG division.

40.     Based upon the foregoing and my additional work with the Debtors' other senior management throughout these Chapter 11 Cases, I believe that the Modified Plan is feasible and that confirmation of the Modified Plan is not likely to be followed by the liquidation of the Reorganized Debtors or by the need for a further reorganization of the Reorganized Debtors under chapter 7 of the Bankruptcy Code.

<u>The Alternative Sale Under Section 363 Of The Bankruptcy Code</u>

41.     [REDACTED]

15



42. ██████████████████████████████

43. ██████████████████████████████

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on July 18, 2009.

                                                    /s/ Keith D. Stipp
                                                  KEITH D. STIPP

Keith D. Stipp Declaration
Highly Confidential