Dennis J. Raterink (P52678)
Michigan Assistant Attorney General
(Pro Hac Vice)
Labor Division
P.O. Box 30736
Lansing, MI 48909
(517) 373-1176

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In Re:                                                                    Chapter 11

DPH HOLDINGS CORP., et al.,                          Case No. 05-44481 (RDD)

       Reorganized Debtors.                                    (Jointly Administered)

_____

**RESPONSE OF MICHIGAN SELF-INSURERS' SECURITY FUND TO
THIRTY-SIXTH OMNIBUS OBJECTION TO THE REORGANIZED DEBTORS
PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007 TO (I) MODIFY
AND ALLOW CLAIM AND (II) EXPUNGE CERTAIN (A) DUPLICATE SERP
CLAIMS, (B) BOOKS AND RECORDS CLAIMS, (C) UNTIMELY
CLAIMS, AND (D) PENSION, BENEFIT AND OPEN CLAIMS**

      Michigan's Self-Insurers' Security Fund (SISF), by and through its counsel, Mike Cox, Attorney General, and Dennis J. Raterink, Assistant Attorney General, hereby responds to the Thirty-Sixth Omnibus Claims Objection filed by DPH Holdings Corp. and certain of its affiliated reorganized debtors in the above-captioned cases (the "Reorganized Debtors") and respectfully represent as follows:

**BACKGROUND**

      1.     In Michigan, all matters pertaining to workers' compensation are governed by the Workers' Disability Compensation Act (WDCA).[1]  The Funds Administration was established by

---

[1] MICH. COMP. LAWS §418.101, *et seq.*

1

statute to create a system for payment of certain classes of workers' compensation claims.[2] The Funds Administration consists of several funds, including the Self-Insurers' Security Fund (SISF). The SISF was established to provide payment of workers' compensation obligations of self-insured employers that become insolvent and unable to continue to make payments to its injured workers.[3] The SISF is authorized to make payments to a disabled employee of a private self-insurer if that employer is insolvent and is unable to continue to make the payments. Once payment is commenced by the SISF, the SISF is subrogated to the rights of the employee to collect benefits from the employer.[4]

2. Debtors were first approved by the Workers' Compensation Agency to be self-insured for their workers' compensation obligations in Michigan in May of 1999.

3. On October 8 and 14, 2005 (the "Petition Date"), the Debtors commenced their cases in this Court under Chapter 11 of the Bankruptcy Code.

4. On the date Debtors filed the chapter 11 petition, they were current on payments to their employees arising from workers' compensation claims in Michigan.

5. On October 13, 2005, this Court issued the "Human Capital Obligations Order," granting Debtors the authority to pay all amounts related to workers' compensation claims and incurred but not reported (IBNR) claims that arose prior to the Petition Date as they became due in the ordinary course of business and to continue paying workers compensation in the ordinary course.

---

[2] MICH. COMP. LAWS §418.501, *et seq.*
[3] MICH. COMP. LAWS §418.537
[4] MICH. COMP. LAWS §418.537

2

6. In its "Human Capital Obligations Motion," Debtors provided the following justification for the relief sought relating to workers compensation claims:[5]

> If the Debtors are unable to pay their prepetition workers' compensation obligations, the Debtors expect that the letters of credit, security deposits, and/or surety bonds will be drawn, resulting in millions of dollars of claims against the estates. Further, the Debtors believe that if they are not permitted to honor their workers' compensation obligations (a) alternative arrangements for workers' compensation coverage would most certainly be more costly, (b) failure to provide coverage may, in some states, subject the Debtors or their officers to severe penalties and possibly a shut down, and (c) the Debtors may have their qualified self-insured employer status revoked in the respective states, resulting in much higher costs to the Debtor's estate. Thus, the Debtors believe that their failure to pay amounts relating to these workers' compensation claims would make it more difficult to successfully reorganize.

7. On March 17, 2006, Debtors filed the "Bar Date Motion." The motion was approved by this Court in an order dated April 12, 2006. The Order established a Bar Date of July 31, 2006.

8. On December 10, 2007, Debtors filed its First Amended Disclosure Statement. Included in the Disclosure Statement was the following clause regarding workers' compensation obligations:[6]

> Under the Plan, all workers' compensation obligations, regardless of whether they arise from prepetition or post-petition events, and regardless of whether a proof of claim has been filed, will flow through the Plan and continue to be paid by the Debtors in the ordinary course.

---

[5] Debtor's Motion for order under 11 U.S.C. §105(a), 363, 507, 1107 and 1108 (I) authorizing debtors to pay prepetition wages and salaries to employees and independent contractors, (II) authorizing debtors to pay prepetition benefits and continue maintenance of human capital benefit programs in the ordinary course, and (III) directing banks to honor prepetition checks for payment of prepetition human capital obligations. (October 8, 2005)
[6] Debtors' First Amended Disclosure Statement with Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (pgs DS-159-160) (December 10, 2007)

3

9. Also on December 10, 2007, Debtors filed their First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession.

10. On January 25, 2008, this Court entered an Order confirming the Plan. The Plan treated all workers' compensation claims as "Flow Through Claims." The Plan defined "Flow Through Claims," in part, as follows:[7]

> A claim arising from . . . (c) an Employee-Related Obligation (including worker compensation and unemployment compensation claims) asserted by a hourly employee that is not otherwise waived pursuant to the Union Settlement Agreements, (d) any Employee-Related Obligation asserted by a salaried, non-executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement (e) any Employee Related Obligation asserted by a salaried executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement and has entered into a new employment agreement . . . .

11. The Plan described the treatment for "Flow-Through Claims":[8]

> The legal, equitable, and contractual rights of each holder of a Flow-Through claim, if any, shall be unaltered by the Plan and shall be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto), which shall be fully preserved.

---

[7] Debtors' First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession, ¶ 1.86

[8] Debtors' First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession, Article V, ¶ 5.2

4

12. On January 25, 2008, Debtors sent a letter to Michigan Workers' Compensation Agency Deputy Director Bruno Czyrka responding to concerns raised by the Agency. The letter indicates:[9]

> In connection with Delphi's emergence from chapter 11 pursuant to its amended plan of reorganization, First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession, as Modified, as confirmed by the United States Bankruptcy Court for the Southern District of New York, **Delphi intends to abide by all applicable laws of the State of Michigan respecting workers' compensation obligations, and intends to continue to provide its Michigan-based employees with workers' compensation in accordance with Michigan law on a self-insured basis**.

13. On October 3, 2008, Debtors filed a motion to modify their confirmed plan.[10] On October 17, 2008, Debtors sent another letter, this time to Michigan Workers' Compensation Agency Director Jack Nolish. In this letter, Debtors announced:[11]

> **[T]he modifications to the Plan of Reorganization do not include any changes in regards to workers' compensation nor change any aspect of the letter I sent on January 25, 2008** letter to the State of Michigan Workers' Compensation Agency. To reiterate, in connection with Delphi's emergence from Chapter 11, Delphi intends to abide by all applicable laws of the State of Michigan regarding workers' compensation obligations and **intends to continue to provide its Michigan-based employees with workers' compensation in accordance with Michigan law on a self-insured basis**.

---

[9] Defendant's Exhibit 1: Letter from Delphi to Bruno Czykra, Deputy Director, Workers' Compensation Agency of January 25, 2008 (emphasis added)

[10] Debtors' Motion For Order (I) Approving Modifications To Debtors' First Amended Plan Of Reorganization (As Modified) And Related Disclosures And Voting Procedures And (II) Setting Final Hearing Date To Consider Modifications To Confirmed First Amended Plan Of Reorganization

[11] Defendant's Exhibit 2: Letter from Delphi to Jack Nolish, Director, Workers' Compensation Agency of October 17, 2008 (emphasis added)

5

14. On June 1, 2009, Debtors filed a motion to further modify the confirmed plan.[12] These modifications were approved by this Court on July 30, 2009. Through this Modified Plan, Debtors announced – <u>for the first time</u> - that the definition of "Flow-Through Claims" had been completely changed, to the detriment of Debtors' employees and the SISF. The positive treatment of workers' compensation claims (except for Administrative Expense Claims) was removed under the Modified Plan. Debtors simply walked away from their statutory obligations. Moreover, in the Modified Plan Debtors created new opportunities for holders of some "Employee-Related Obligations" the ability to file claims after the Effective Date of the Plan, but did not allow the same recourse to its injured workers.

15. On July 29, 2009, the SISF filed two proofs of claim. The first claim is priority tax claim based on excise taxes for unpaid workers' compensation obligations in the amount of $25,460,432.50.[13] The second claim is a general unsecured claim for unpaid workers' compensation obligations for $36,293,480.00.[14]

16. During the course of Debtors' chapter 11 case they continued to pay their workers' compensation obligations, regardless of the date when the claims arose, until the occurrence of the Effective Date on October 6, 2009.[15] On that date, Debtors ceased making any workers' compensation payments.

---

[12] Debtors' (A) Supplement to Motion for Order (I) Approving Modifications to Debtors' First Amended Joint Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternative Sale Hearing Date.
[13] Claim Number 19502 (Claim number 19542 is a duplicate claim)
[14] Claim Number 19501 (Claim number 19541 is a duplicate claim)
[15] Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and (B) Occurrence of Effective Date.

## ARGUMENT

17.     Debtors have objected to the SISF claims #19501 and #19502 on the basis that they are Untimely Claims and have asked that the claims be disallowed and expunged.

18.     The SISF requested leave to file claims #19501 and 19502 under Bankruptcy Rule 9006(b) on November 9, 2009.[16] This rule states that when an act is required to be done within a specified period, "the court for cause shown may at any time in its discretion . . . (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect."

19.     The SISF hereby repeats the arguments raised in that motion in response to debtors' request for disallowance and expungement.

20.     The U.S. Supreme Court addressed this rule in *Pioneer Investment Services Co. v Brunswick Associates Limited Partnership.*[17] The Court held that to determine what constitutes "excusable neglect" courts have to take into account the totality of the circumstances surrounding the party's omission, and should specifically review the following factors: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."[18]

---

[16] Michigan Self-Insurers' Security Fund's Motion to Allow Late Filed Claims (11/09/2009)
[17] *Pioneer Investment Services Co. v Brunswick Associates Limited Partnership,* 507 U.S. 380; 113 S. Ct. 1489; 123 L. Ed. 2d 74 (1993)
[18] *Pioneer,* 507 U.S. at 395

7

21.     Leave to file the SISF claims is warranted based on the absence of prejudice to the Debtors, the lack of impact to the judicial proceedings, the reason for the delay and the SISF's good faith.[19]

22.     <u>Prejudice to the Debtor</u>.  Debtors would not be prejudiced by the SISF claims.  In determining whether a debtor has been prejudiced by a late-filed claim this Court has considered several factors, including: "the size of the late claim in relation to the estate, whether a disclosure statement or plan has been filed or confirmed with knowledge of the existence of the claim, the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated."[20]

23.     The SISF claims are significant in size, but not in relation to the economies of this case.  The SISF claims in the aggregate exceed $61 million, in comparison the total remaining unsecured claims of $3.4 – 3.62 billion[21] and the overall size of the estate.   Further, Debtors were eminently aware of their own workers' compensation obligations at the time the disclosure statement and plan were originally confirmed as well as when the modifications to the Plan were approved, as evidenced in their first day motion regarding the continuation of workers'

---

[19] *See Pioneer,* 507 U.S. at 398 ("the lack of any prejudice to the debtor or to the interest of efficient judicial administration, combined with the good faith of respondents and their counsel, weigh strongly in favor of permitting the tardy claim.")

[20] *In re Keene Corp.,* 188 B.R. 903, 910 (Bank. S.D.N.Y. 1995)

[21] Debtors' Motion to Approve (A) Supplement to Motion for Order (I) Approving Modifications to Debtors' First Amended Joint Plan of Reorganization (As Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Request to Set Administrative Expense Claims Bar Date and Alternative Sale Hearing Date [Supplement to Disclosure Statement] (June 1, 2009)

8

compensation benefits.[22] Lastly, there is no true concern that allowing the SISF late filings would open the door to other late claimants, as few other creditors, if any, would present similar justifications for the late filings.

24.  Length of Delay. The SISF concedes that the delay between the Proof of Claim deadline and the SISF filing is long – almost three years. However, more importantly, the length of time between the Debtors' announcement that they were abandoning their Michigan workers' compensation claims to the filing of the SISF claims is short – less than sixty days.[23]

25.  Reason for the Delay. The SISF erroneously believed that it did not possess a claim against Debtors as of the Bar Date. As Debtors had paid all benefits due to its workers' compensation claimants as of the Bar Date, the SISF was not required to pay any benefits to Debtors' injured workers. Not having made any payments, the SISF had not become subrogated to the rights of the employee to collect benefits from the employer.[24]

26.  All information available to the SISF indicated that Debtors' were continuing to pay all of their workers' compensation obligations both before and after the bankruptcy filing. Debtors were continually approved for self-insurance by the Workers' Compensation Agency, both pre- and post-bankruptcy. Debtors' obtained authority from this Court to continue paying all workers' compensation claims. Debtors made several representations that they planned to remain self-insured for workers' compensation upon exiting bankruptcy. Debtors' original plan of reorganization, confirmed on January 25, 2008, made arrangements for all Michigan workers'

---

[22] Debtor's Motion for order under 11 U.S.C. §105(a), 363, 507, 1107 and 1108 (I) authorizing debtors to pay prepetition wages and salaries to employees and independent contractors, (II) authorizing debtors to pay prepetition benefits and continue maintenance of human capital benefit programs in the ordinary course, and (III) directing banks to honor prepetition checks for payment of prepetition human capital obligations. (October 8, 2005)
[23] Debtors' motion to further modify plan: June 1, 2009 – SISF claims: July 29, 2009
[24] MICH. COMP. LAWS §418.537

9

compensation payments to continue to be paid in the ordinary course of business and did not require a proof of claim to be filed by the SISF. Debtors' proposed modifications to it plan, filed on October 3, 2008, also made arrangements for the payment of Michigan workers' compensation obligations and did not require a proof of claim to be filed by the SISF. It was not until Debtors motion for further modifications, filed June 1, 2009, that the SISF learned, <u>for the first time</u>, that Debtors would walk away from their statutory obligations in Michigan.

27.     <u>Good Faith of the Movant</u>. As stated above, based on the information available at the time, the SISF reasonably believed that it was not required to file its claims before the Bar Date. There is no indication that the SISF has not filed its claims in good faith.

28.     While not a factor in determining "excusable neglect" it must be noted that the impact to the SISF and the State of Michigan will be severe if these claims are not allowed. If the SISF is required to pay the claims of Debtors' injured workers, it will have insufficient financial resources to do so. The sole source of revenue for the SISF is statutory assessments levied against private Michigan self-insured employers.[25] Even if the SISF levies the full statutory amount, the anticipated revenue would be less than $9 million dollars each year. Without payment from these claims, the SISF may be forced into insolvency.

29.     The concern of the source of payment of Debtors' workers' compensation benefits is not limited to Debtors' former employees, but to all injured workers in Michigan entitled to benefits from a former self-insured employer. If the SISF is required to pay the benefits in question and does not obtain additional revenues, it will become insolvent, leaving all eligible injured workers of Michigan's self-insured employers without a source of benefits.

---

[25] MICH. COMP. LAWS §418.551(4)

10

**PRIOR REQUEST**

30.   No prior motion for the relief requested herein has been made to this or any other Court.

**CONCLUSION AND RELIEF SOUGHT**

The SISF should be allowed to file its claims tardily.  The SISF meets the criteria required for a showing of "excusable neglect."  Allowing the SISF claims to be filed will not prejudice the Debtors, the claims were made timely after the impact of the Debtors' shift in legal position was made known, and the claims were made in good faith.

    Respectfully submitted,

    Michael A. Cox
    Attorney General

    /s/ Dennis J. Raterink
    Assistant Attorney General

    Attorneys for Self-Insurers' Security Fund

    Labor Division
    P.O. Box 30736
    Telephone: (517) 373-1176
    raterinkd@michigan.gov
    (P52678)

Dated:  November 10, 2009

**CERTIFICATE OF SERVICE (efile)**

I hereby certify that on November 10, 2009, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

A courtesy copy of the aforementioned document was placed in UPS receiving box labeled for overnight delivery to:

| | |
|---|---|
| Hon. Robert D. Drain<br>US Bankruptcy Court<br>Southern District of New York<br>One Bowling Green, Rm 632<br>New York, NY 10004 | John Wm Butler; John Lyons<br>Skadden Arps Slate Meagher<br>155 N Wacker Dr<br>Chicago, IL 60606 |

ATTN: President
DPH Holdings Corp.
5725 Delphi Dr
Troy, MI 48098

/s/ Dennis J. Raterink
Assistant Attorney General

Attorneys for Self-Insurers' Security Fund

Labor Division
P.O. Box 30736
Telephone: (517) 373-1176
raterinkd@michigan.gov
(P52678)