GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
Allan S. Brilliant (AB 8455)
abrilliant@goodwinprocter.com
Craig P. Druehl (CD 2657)
cdruehl@goodwinprocter.com
Meagan E. Costello (MC 0962)
mcostello@goodwinprocter.com

        - and -

GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1330
Gina Lynn Martin (GM 1324)
gmartin@goodwinprocter.com

Attorneys for Davidson Kempner
Capital Management LLC; Elliott
Associates, L.P.; Nomura Corporate
Research & Asset Management, Inc; Northeast
Investors Trust; SPCP Group, LLC;
and Whitebox Advisors, LLC,
all in their capacity as Senior Noteholders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                    :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :        Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :         (Jointly Administered)
---------------------------------------------------------x

**APPLICATION BY DAVIDSON KEMPNER CAPITAL MANAGEMENT LLC;
ELLIOTT ASSOCIATES, L.P.; NOMURA CORPORATE RESEARCH & ASSET
MANAGEMENT, INC.; NORTHEAST INVESTORS TRUST; SPCP GROUP, LLC; AND
WHITEBOX ADVISORS, LLC, ON BEHALF OF THEMSELVES AND SENIOR
NOTEHOLDERS PREVIOUSLY REPRESENTED, FOR PAYMENT OF FEES AND
EXPENSES PURSUANT TO 11 U.S.C. § 1129(a)(4) AND BANKRUPTCY RULE 9019**

## SUMMARY

| | |
|---|---|
| **Name of Applicants** | Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Nomura Corporate Research & Asset Management, Inc; Northeast Investors Trust; SPCP Group, LLC; and Whitebox Advisors, LLC, on behalf of themselves and Senior Noteholders previously represented by their professionals in these Cases[1] |
| **Professional Service Rendered By** | Goodwin Procter LLP<br>Klestadt & Winters, LLP<br>Maryann Keller & Associates |
| **Time Period Covered by Application** | September 17, 2007 through January 17, 2008 |

**This is a(n) ___ interim _X_ final Application**

**Current Application:**

| | Fee Amount as Part of Settlement: | Expenses Amount as Part of Settlement: |
|---|---|---|
| Goodwin Procter LLP[2] | $3,412,444.50 | $224,661.30 |
| Klestadt & Winters, LLP | $3,205.00 | $66.56 |
| Maryann Keller & Associates | $329,906.25 | N/A |
| **Subtotal:** | $3,745,555.75 | $224,727.86 |
| **TOTAL:** | **$3,970,283.61** | |
| **Prior Applications:** | **None** | |

---

[1]    Formerly Represented Parties include Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Everest Capital Limited; Gradient Partners, L.P.; and Sailfish Capital Partners, LLC.

[2]    GP has reduced certain amounts of fees and expenses to comply with the applicable guidelines. Therefore, the amounts paid to the professionals by the Senior Noteholders may exceed the amounts set forth herein.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Nomura

Corporate Research & Asset Management, Inc; Northeast Investors Trust; SPCP Group, LLC;

and Whitebox Advisors, LLC, or any respective affiliates thereof or funds and accounts directly

managed by each of the foregoing, (the "Applicants"), on behalf of themselves and parties

previously represented by their professionals in these Cases (the "Formerly Represented Parties"

and, together with the Applicants, "Senior Noteholders"), file this Application (the

"Application") for payment of the Senior Noteholders' fees and expenses in accordance with

paragraph 62 of the Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. §§

1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming First Amended Joint Plan of

Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-

Possession, as Modified (the "Confirmation Order"), approving the settlement (the "Settlement")

of the Applicants' objections to confirmation pursuant to Federal Rule of Bankruptcy Procedure

9019 ("Rule 9019").[3]  In accordance with the terms of the Confirmation Order, the Senior

Noteholders respectfully submit this Application for payment of the fees and expenses of

Goodwin Procter LLP ("GP"), Klestadt & Winters, LLP (as special conflicts counsel) ("K&W"),

and Maryann Keller & Associates ("MKA") (collectively, the "Senior Noteholders'

Professionals").

---

[3]  Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Plan or Disclosure Statement.

**Preliminary Statement**

Two years into the Chapter 11 Cases, the Debtors filed the first iteration of the Plan and

Disclosure Statement.  The Plan, as then filed, and through each of its successive iterations

leading up the Confirmation Hearing, was premised on distributions to the holders of all General

Unsecured Claims, including the Senior Noteholders, in stock that the Debtors at all times

alleged would result in payment in full based on a "negotiated" Total Enterprise Value.  Contrary

to the Plan, the Senior Noteholders were rightfully concerned that the negotiated Total Enterprise

Value represented an inflated valuation of the Debtors and that the stock they were to be

allocated based on such value would result in an incomplete recovery on account of their Claims.

Compounding these concerns, junior creditors and holders of equity interests were to receive a

distribution under the Plan.  As a result, the Senior Noteholders were forced to retain the Senior

Noteholders' Professionals to represent their interests before this Court.  On their behalf, the

Senior Noteholders' Professionals, through objections to the Plan, Disclosure Statement and

related documents, voiced the Senior Noteholders' objections to the Disclosure Statement and

Plan, including, *inter alia*, the erroneous Total Enterprise Value and distributions to junior

Classes, the classification of Senior Notes Claims and TOPrS Claims in the same class and

related voting issues, the failure to subordinate the contractually-subordinated TOPrS claims, and

the substantive consolidation of the Debtors.  After filing and litigating numerous objections, on

the eve of the Confirmation Hearing the Senior Noteholders reached the Settlement with the

Debtors pursuant to which the Debtors agreed to reimburse the Senior Noteholders'

Professionals' fees and expenses.

This Court approved the Settlement pursuant to Bankruptcy Rule 9019 on the record at

the Confirmation Hearing, finding, among other things, that "the settlement is fair and in the best

interest of the estate."  Confirmation Hearing Tr., Jan. 17, 2008 at p. 31.  This Court also

included its approval of the Settlement in the Confirmation Order.  *See* Confirmation Order ¶ 62

(determining that notice of the Settlement "was adequate" and terms of the Settlement, as

described on the record, were "appropriate and in the best interests of the Debtors and their

estates").  The Confirmation Order approves and directs payment, up to an aggregate maximum

of $5 million, of the Senior Noteholders' Professionals' fees and expenses incurred in connection

with the representation of the Applicants in these Cases, subject to Court review for

reasonableness based on the totality of the circumstances and approval pursuant to section

1129(a)(4) of the Bankruptcy Code.  *See* Confirmation Order ¶ 62(c).  The Confirmation Order

further allows the Senior Noteholders' Professionals  to seek reimbursement on behalf of the

Formerly Represented Parties to the extent the Applicants benefited from the work product

performed on behalf of Formerly Represented Parties.  Confirmation Order ¶ 62(c)(ii); *see also*

Confirmation Hearing Tr., Jan. 17, 2008 at p. 31-32 (explaining the Court's ruling with respect to

reimbursement of fees and expenses of Formerly Represented Parties). The Applicants submit

that the Senior Noteholders' Professionals' fees and expenses detailed below and in the

accompanying exhibits are reasonable, based on the totality of the circumstances, and that the

Applicants benefited from the work product performed on behalf of Formerly Represented

Parties.

The composition of the Senior Noteholders that request reimbursement pursuant to this

Application at times held more than $601 million in principal amount of the outstanding Senior

Notes of Delphi Corporation.  The Senior Noteholders' Professionals expended thousands of

hours and countless resources toward the goal of achieving a fair recovery for all holders of

Senior Notes.  To that end, the Senior Noteholders' Professionals drafted numerous and

comprehensive objections to each iteration of the Plan, Disclosure Statement, Investment

Agreement, MDL Settlements and various other pleadings leading up to the Confirmation Order. The Senior Noteholders' Professionals further engaged in extensive litigation and discovery, reviewing countless documents, deposing many of the Debtors' key witnesses, and repeatedly appearing before the Court for argument or examination.

In spite of the constantly moving deadlines, repeated amendments to the Debtors' key documents, and the downward-spiraling economy, the Senior Noteholders' Professionals met their clients' demands in an efficient and timely manner, achieving many requested changes to the Plan, Disclosure Statement and other key documents, including more fullsome disclosure on a number of issues, changes in recovery to the TOPrS, and a decrease in the discount afforded to the Plan Investors. Although events which have occurred subsequent to Confirmation have resulted in a substantially reduced recovery to the Senior Noteholders as well as other Claimants, the Senior Noteholders submit that many of the changes continue to benefit the Senior Noteholders in the successive iterations of the Plan. The remainder of the Applicants' objections to confirmation of the Plan were resolved by the consensual resolution among the Senior Noteholders and the Debtors pursuant to the Settlement.

The Applicants hereby file this Application in compliance with the procedures set forth in the Professional Fee Order as required by the Confirmation Order. As such, concurrently with the filing of this Application, the Applicants are providing reasonable documentation of each of their Professionals' fees and expenses to: (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Att'n: General Counsel, (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606, Att'n: John Wm. Butler, Jr., Esq., (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10044, Att'n: Alicia M. Leonhard, Esq., (iv) counsel

for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue,

New York, New York 100224, Att'n: Robert J. Rosenberg Esq., (v) counsel for the agent under

the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue,

New York, New York 10017, Att'n: Marissa Wesley, Esq., and (vi) counsel for the agent under

the Debtors' postpetition credit facility, Davis Polk & Wardell, 450 Lexington Avenue, New

York, New York 10017, Att'n: Marlane Melican, Esq.  In addition, the documentation was also

served on the following members of the Fee Committee not included above: (i) John D. Sheehan,

Vice President and Chief Restructuring Officer, Delphi Corporation, 5725 Delphi Drive, Troy,

Michigan 48098; and (ii) Valeria Venable, Credit Manager, GE Plastics, Americas, 9930 Kincey

Avenue, Huntersville, North Carolina 28078 (together with the aforementioned parties, the

"Reviewing Parties").

### Jurisdiction and Venue

1.      This Court has jurisdiction over these cases and this Application pursuant

to 28 U.S.C. §§ 157 and 1334.  Venue of these proceedings and this Application is proper in this

district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought

herein are sections 105(a) and 1129(a)(4) of the Bankruptcy Code and Bankruptcy Rules 2016

and 9019.  As stated, the Confirmation Order provided the substantive relief.

### General Background

2.      On October 8 and 14, 2005, Delphi Corporation and certain affiliates (the

"Debtors") commenced these cases (the "Cases") under chapter 11 of title 11, United States

Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

3.      On July 18, 2007, the Debtors filed their Motion for Order Authorizing

and Approving Delphi-Appaloosa Investment Equity Purchase and Commitment Agreement

Pursuant to 11 U.S.C. §§105(a), 363(b), 503(b), and 507(a), dated July 18, 2007 [Docket No. 8673] (the "Delphi-Appaloosa EPCA").

4.      On September 6, 2007, the Debtors filed the first versions of the Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (the "Plan") and the Disclosure Statement With Respect to the Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (the "Disclosure Statement") and the Motion for Order Approving (I) Disclosure Statement, (II) Record Date, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures.  Thereafter, certain of the Senior Noteholders retained GP to represent them in connection with the Debtors' filing of the first iterations of the Plan and Disclosure Statement.

5.      On September 7, 2007, the Debtors' filed the Motion for Order Approving Multidistrict Litigation and Insurance Settlements [Docket No 9296].

6.      On October 19, 2007, certain of the Senior Noteholders filed the Limited Objection of Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; and SPCP Group, LLC to Order Preliminarily Approving Multidistrict Litigation and Insurance Settlement [Docket No. 10689]. Also on October 19, 2007, certain of the Senior Noteholders filed the Objection By Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; And SPCP Group, LLC to Motion by the Debtors for Order

Approving Multidistrict Litigation and Insurance Settlements [Docket No 10687] (the "MDL Objection").

7.    On October 29, 2007, the Debtors filed the Notice of Potential Amendments To Debtors' Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and Certain Appendices and Exhibits Related Thereto [Docket No. 10759].  Also on October 29, 2007, this Court preliminarily approved the MDL Settlements for voting purposes only subject to final consideration by the Court at the Confirmation Hearing.  See Order Preliminarily Approving Multidistrict Litigation and Insurance Settlement [Docket No. 10746].

8.    On October 30, 2007, the Debtors filed the Expedited Motion for Order Under 11 U.S.C. sections 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and Commitment Agreement [Docket No. 10760].  Attached thereto was the First Amendment to the Equity Purchase and Commitment Agreement.

9.    On November 2, 2007, certain of the Senior Noteholders filed the Objection of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Gradient Partners, L.P.; Sailfish Capital Partners, LLC; and Whitebox Advisors, LLC to Motion to Approve (A) Proposed Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, and (B) Motion for Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI)

Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition

Interest, and (VIII) Reclamation Claim Procedures [Docket No. 10803]. Also on November 2,

2007, certain of the Senior Noteholders filed the Objection by Caspian Capital Advisors, LLC;

Castlerigg Master Investments Ltd.; Davidson Kempner Capital Management LLC; Elliott

Associates, L.P.; Gradient Partners, L.P.; Sailfish Capital Partners, LLC; and Whitebox

Advisors, LLC to Expedited Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b) and

507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and

Commitment Agreement [Docket No. 10800].

      10.    On November 14, 2007, the Debtors filed the Notice Of Further Proposed

Amendments To Certain Appendices To Debtors' Disclosure Statement With Respect To Joint

Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession [Docket No. 10932].

      11.    On November 16, 2007, the Debtors filed the Notice Of Further Proposed

Amendments To Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession [Docket No.

10964]. Attached thereto as Exhibit A were marked changed pages to the First Amended

Disclosure Statement.

      12.    On November 21, 2007, certain of the Senior Noteholders filed the

Supplemental Objection of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.;

Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Gradient Partners, L.P.;

Sailfish Capital Partners, LLC; and Whitebox Advisors, LLC to Motion to Approve (A)

Proposed Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi

Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, and (B) Motion for

Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures

for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of

Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on

Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to

Postpetition Interest, and (VIII) Reclamation Claim Procedures [Docket No. 11045].

13.     At the December 6, 2007 hearing, the Court considered the approval of the

Amended Investment Agreement.  The hearing was continued to December 7, 2007, at which

time the Court also considered the approval of the Disclosure Statement.

14.     On December 10, 2007, the Court entered the Order Under 11 U.S.C.

§§ 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Delphi-Appaloosa Equity

Purchase and Commitment Agreement Amendment [Docket No. 11382], and the Order

Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for

Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan,

(IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan,

(VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition

Interest, and (VIII) Reclamation Claim Procedures [Docket No. 11389].

15.     On December 14, 2007, certain of the Senior Noteholders filed the

Preliminary Objection of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.;

CR Intrinsic Investors, LLC; Davidson Kempner Capital Management LLC; Elliott Associates,

L.P.; Everest Capital Limited; Nomura Corporate Research & Asset Management, Inc.;

Northeast Investors Trust; and Whitebox Advisors, LLC to Confirmation of First Amended Joint

Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-

Possession [Docket No. 11471].

16.     On January 11, 2008, certain of the Senior Noteholders filed the Memorandum of Law and Supplemental Objection of Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Nomura Corporate Research & Asset Management, Inc.; Northeast Investors Trust; and Whitebox Advisors, LLC to Confirmation of the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Debtors and Debtors-in-Possession [Docket No. 11951] (the "Confirmation Objection").

17.     On January 25, 2008, this Court entered the Confirmation Order [Docket No. 12359].  Included in that order at paragraph 62 was the approval of the settlement of the Senior Noteholders' objections pursuant to Rule 9019.  Under the terms of the Order and settlement, the Noteholders' Professionals fees and expenses "are subject to Court review for reasonableness, based on the totality of the circumstances."  Confirmation Order ¶ 62.

### Summary and Background of Services Rendered and Expenses Incurred

18.     Set forth below are the amounts that the Applicants are requesting the Debtors (or the Reorganized Debtors) pay in accordance with the standard set forth in the Confirmation Order.  Pursuant to the Confirmation Order, the Applicants (and all of the Senior Noteholders to the extent the Applicants benefited from the work product performed on behalf of the Formerly Represented Parties) are entitled to payment of all of the actual, reasonable and documented fees and expenses of the Senior Noteholders' Professionals up to an aggregate maximum amount of $5 million.

| Professionals | Fees | Expenses |
|---|---|---|
| Goodwin Procter LLP | $3,412,444.50 | $224,661.30 |
| Klestadt & Winters, LLP | $3,205.00 | $66.56 |
| Maryann Keller & Associates | $329,906.25 | N/A |

| | | |
|---|---|---|
| **Subtotal:** | $3,745,555.75 | $224,727.86 |
| **Total:** | **$3,970,283.61** | |

## I.  Goodwin Procter LLP

19.     During the period to which this Application pertains, GP rendered services as legal counsel to the Senior Noteholders.  Pursuant to its engagement agreements with each of the Senior Noteholders, GP charged the Senior Noteholders for fees, based on the hourly rates it charges for similar services and for similar matters, and for its actual out of pocket expenses.

20.     Among the services provided to the Senior Noteholders, GP professionals drafted pleadings, researched and analyzed legal issues, engaged in discovery and litigation surrounding the MDL Settlements, Plan, Disclosure Statement and Investment Agreement, made court appearances on behalf of the Senior Noteholders and ultimately negotiated resolutions of the Senior Noteholders' objections to the Plan, Disclosure Statement, and certain other matters. During the course of these Cases, GP attorneys devoted approximately 6,560.5 hours of service on behalf of the Senior Noteholders during these cases for total fees of $3,412,444.5.  Consistent with the terms of the engagement agreements, GP billed the Senior Noteholders periodically on a pro rata basis, based on the individual Senior Noteholders' holdings of Senior Notes relative to other Senior Noteholders represented by GP during that period.   While, under the terms of the retention, GP professionals billed the Senior Noteholders full cost for non-working travel time, GP has, consistent with the usual practice in this Court, reduced those fees by one-half for the purposes of this application.[4]

21.     GP has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional

---

[4]     Reduced non-working travel time is designated in the accompanying exhibits with an asterisk.

services rendered in these cases.  No promises have been received by GP or any member thereof

as to compensation in connection with these cases other than in accordance with the provisions

of the Bankruptcy Code.

22.     As detailed by the following explanations of the work performed by

Project Category, the Applicants submit that the fees and expenses of GP are appropriate and

reasonable under the totality of the circumstances and the enormity of the litigation the Senior

Noteholders were required to undertake to adequately represent their interests in these Cases.

23.     Set forth below are detailed descriptions of each of the project categories

in which GP rendered services to the Senior Noteholders, as well as an explanation of the various

expenses incurred by GP during these cases.

> (A)     *Project Category 1 — Disclosure Statement and Investment
> Agreement* (Total Fees: $1,655,614.00 Total Hours:  3119.40)
> (Exhibit C)

24.     In September 2007, after GP's retention, GP professionals devoted

substantial time to reviewing and researching the details of the Debtors' Plan and the adequacy

of the information provided in the Disclosure Statement.  Throughout this period, GP consulted

with the Senior Noteholders on a frequent basis, and, through concerted effort, identified

numerous issues of concern and began drafting a comprehensive objection to the Disclosure

Statement.  In addition to arguing for additional disclosure, this objection raised issues

concerning the Debtors' classification of claims and interests, the unequal treatment of claims

placed in a single class, the inability of the Debtors to meet the standard for substantive

consolidation, and the Plan's failure to recognize the contractual subordination of TOPrS.  GP

also argued for enhanced disclosure on a number of issues, including the manner in which the

Debtors arrived at their Total Enterprise Value, the implications of the negotiated value of the

New Common Stock and the range of recoveries afforded to General Unsecured Creditors under

the Plan, the neccessity of the various third-party releases provided by the Plan, the

circumstances surrounding the settlement of GM's and the MDL Plaintiffs' claims, the possible

ramifications if the Debtors were unable to secure exit financing, and several other issues.

25.    In late October 2007, less than 24 hours prior to the deadline for filing the

objection to the Disclosure Statement, the Debtors' filed an amended Plan and Disclosure

Statement, which altered the Negotiated Enterprise Value of Reorganized Delphi, the form of

consideration to be received by General Unsecured Creditors, and the value of the New Common

Stock.  As a result, GP professionals were required to devote substantial resources to reviewing

the terms of the new Plan and Disclosure Statement and, where necessary, revising the objection

to address the new economic terms of the Plan and Disclosure Statement.  The revised Total

Enterprise Value contained in the new Plan and Disclosure Statement raised serious concerns

over the ability of the Senior Noteholders to receive a full recovery under the Plan.  Accordingly,

GP devoted further time to researching and investigating these issues.

26.    The filing of the new Plan and Disclosure Statement was also

accompanied by substantive amendments to the Delphi-Appaloosa EPCA, upon which the

feasibility of the Plan was dependent.  While the Senior Noteholders had not opposed the Delphi-

Appaloosa EPCA in the form previously approved by the Court in August 2007, the amendments

allowed the Plan Investors to purchase shares of New Common Stock at a steep discount when

compared to the terms of the original agreement.  The Senior Noteholders believed that these

discounts, when combined with the altered terms of the distributions to General Unsecured

Creditors, lessened the likelihood of a full recovery to holders of Senior Notes.  Further, the

Senior Noteholders believed that the amendments to the Delphi-Appaloosa EPCA permitted too

much "optionality" to the Plan Investors and allowed the Plan Investors to assert a

disproportionate amount of control over the terms of the Plan. The Senior Noteholders argued that given the infirmities of the Delphi-Appaloosa EPCA, the Debtors should have explored other options. GP professionals devoted substantial time and resources to reviewing and researching the terms of the amendments to the Delphi-Appaloosa EPCA and ultimately drafting an objection thereto.

27.    In November 2007, subsequent to the filings of the original objections to the amended disclosure statement and the amendments to the Delphi-Appaloosa EPCA, the Debtors again altered the terms and filed several successive iterations of the Disclosure Statement, Plan, and the Investment Agreement, requiring GP professionals to devote more time and resources to researching, analyzing and assessing these matters. Once again, these documents altered the form and amount of recovery afforded the General Unsecured Creditors.

28.    Despite the fact that the salient terms and economic impact of these documents kept changing, each successive iteration of the Disclosure Statement, as a result of the efforts of the Senior Noteholders and GP professionals, provided further information on those areas of concerns that had been identified by GP professionals in their previous objections. Substantive changes to the Plan also addressed to some degree those concerns raised by the Senior Noteholders. Specifically, the final iteration of the proposed Disclosure Statement provided a reduced recovery to the holders of TOPrS in order to address concerns over the failure of the original Plan to give effect to the subordination agreement. Additionally, the Senior Noteholders' objections to the increasingly steep discounts provided to the Plan Investors in each successive iteration of the Investment Agreement—objections which eventually garnered the support of the statutory committees and resulted in the filing of objections from those

constituencies—resulted in a reduction to the discount in the final iteration of the Investment

Agreement.

29.    However, despite the amelioration of some of the Senior Noteholders'

concerns, the Senior Noteholders continued to believe that further disclosure, as well as complete

subordination of the TOPrS, was warranted, if not required, by applicable bankruptcy law.

Additionally, the Senior Noteholders believed that the prospect of a full recovery was reduced by

each successive iteration of the Plan.  Ultimately, GP professionals drafted and filed restated and

amended Disclosure Statement and Investment Agreement objections, as well as second

amendments to each objection.  As a result of these continued differences, a contested hearing on

the adequacy of the Disclosure Statement and the viability of the Investment Agreement was

necessary.

30.    GP professionals devoted substantial resources preparing for litigation

concerning the Disclosure Statement and Investment Agreement.  GP professionals reviewed

thousands of documents, prepared and conducted depositions of each of the Debtors' key

witnesses, and prepared for cross-examinations to be conducted at the hearing to approve the

Investment Agreement and Disclosure Statement.

31.    Given the inter-related issues and the fact that confirmation of the Plan

would likely be predicated on the consent (or lack thereof) by various groups of creditors, the

Senior Noteholders believed that clear and appropriate disclosure would be necessary to ensure a

fair vote on the Plan.  Additionally, the Senior Noteholders believed that it was imperative that

holders of TOPrS and General Unsecured Claims against Debtor entities other than Delphi

Corporation not be allowed to vote in a single class and thereby waive the contractual

subordination of TOPrS claims.  Accordingly, GP professionals began to research and prepare

for an interlocutory appeal of that issue.  Such preparations were necessary to best serve the

needs of the Senior Noteholders given the speed at which these Cases were moving and the

constant state of flux of the terms of the underlying documents.  Moreover, the right to

contractual subordination was unique to the Senior Noteholders and, therefore, of paramount

concern.

        32.     GP professionals represented the Senior Noteholders at the contested

hearing to approve the Investment Agreement and Disclosure Statement, conducted on

December 6 and 7, 2007.  At the hearing, GP professionals conducted cross-examinations of the

Debtors' and the Plan Investors' key witnesses.  Additionally, GP professionals presented oral

argument in opposition to the Investment Agreement and Disclosure Statement, voicing the

Senior Noteholders' concerns with the Disclosure Statement listed above as well as their valid

concerns over the Plan Investors' willingness to consummate the Investment Agreement.

Ultimately, GP professionals were able to obtain several changes to the Disclosure Statement

which benefited the holders of Senior Notes.  Specifically, while the Senior Noteholders did not

obtain separate classification, the Court ensured that the Disclosure Statement stressed the

importance of the General Unsecured Creditors' vote and that the ballots could be calculated on

a detailed basis, allowing the Court, if need be, to separately classify certain claims at the

Confirmation Hearing if it was later determined to be necessary.  Many of the other issues raised

in the Disclosure Statement Objection, such as classification of claims, substantive consolidation,

and the appropriateness of the various third-party releases, were found to be more properly

considered by the Court at the Confirmation Hearing.

        *(B)    Project Category 2 — Confirmation of the Plan*
            (Total Fees:  $1,474,121.00 Total Hours:  2946.20) (Exhibit D)

33.     As noted above, given the fast-paced nature of this case, GP was constantly addressing not only the issues currently facing the Debtor, but also the matters that were on the horizon.  In late October 2007, GP professionals began limited preparations for opposing confirmation of the Plan prior to approval of the Disclosure Statement, researching substantive law on, inter alia,  substantive consolidation, cram-down, and the designation of votes, much of which was also utilized in the Disclosure Statement Objection.  Additionally, because the time between approval of the Disclosure Statement and the Confirmation Hearing was less than 40 days, GP professionals began interviewing potential experts on the valuation of the Debtors so as to allow any expert ultimately retained sufficient time to prepare a report prior to the Confirmation Hearing.  Ultimately, the Senior Noteholders hired Maryann Keller & Associates as their industry expert.

34.     Before discovery related to the Confirmation process could formally begin, GP professionals were engaged in numerous negotiations involving the breadth and the manner in which discovery was to be conducted.  At least one discovery issue, surrounding the timing and length of depositions, required GP professionals to seek the Court's assistance in resolving the dispute.  GP professionals engaged in extensive discovery on numerous issues that were ultimately raised in the confirmation objection, including substantive consolidation, the feasibility of the Plan, exit financing, and all matters related to the valuation of Reorganized Delphi.  To accomplish this task in the most efficient manner possible, GP professionals divided in to "fact teams," each responsible for developing arguments and identifying relevant documents for a particular issue.  Discovery was conducted on a rolling basis over ten separate productions from the Debtors, with documents being delivered until the eve of the Confirmation Hearing.  Utilizing its most junior associates to keep costs down, GP professionals reviewed

thousands of documents and identified those which were relevant to the disputed issues.  At the same time, GP professionals prepared documents concerning valuation and other matters for production to the Debtors.  The hours and resources expended during discovery proved invaluable to focusing and improving the arguments presented in the Senior Noteholders' objection to confirmation.  Discovery further enhanced and focused the questions presented during the subsequent depositions, as described below.

35.    GP professionals devoted substantial resources to the drafting of the Confirmation Objection.  Because the results of the Debtors' solicitation were not known until the eve of the Confirmation Hearing, the Confirmation Objection had to address not only the numerous reasons the Plan should fail on its face, but also the contingencies associated with the vote and various "cram-down" scenarios that could have been presented by the Debtors.

36.    Additionally, to refute the Debtors' valuation, preparation of the Confirmation Objection required detailed research involving sales and production forecasts of the automotive industry, macroeconomic indicators, and the accuracy of the Debtors' past sales projections, all of which had to be synthesized with a coherent legal argument.

37.    GP professionals prepared for and conducted eight depositions of the Debtors' proposed witnesses, the last of which were scheduled less than 15 hours prior to the start of the Confirmation Hearing.  Additionally, GP defended the Senior Noteholders' witness, Maryann Keller, at a deposition conducted by Debtors' counsel.

38.    Because the settlement was not reached until late into the night on the eve of the Confirmation Hearing, GP professionals were fully prepared to present their arguments before the Court.  In the days and hours prior to the Confirmation Hearing, the Debtors finalized hundreds of trial exhibits; prepared for direct examination, cross-examination and opening and

closing arguments; and drafted several motions in limine.  Simultaneously, GP successfully

negotiated to resolve the Senior Noteholders' disputes and appeared before the Court to request

approval of the settlement, minutes before the Confirmation Hearing began.

> *(C)      Project Category 3 — Multi-District Litigation Settlement*
> (Total Fees:  $107,779.50 Total Hours:  223.10) (Exhibit E)

39.      In connection with the Motion by the Debtors for Order Approving

Multidistrict Litigation and Insurance Settlements, GP professionals reviewed and drafted an

objection to the settlement on the basis that the settlement violated the absolute priority rule and

Federal Rule of Bankruptcy Procedure 9019.  Although this objection was initially filed in

October, the resources devoted to this project category were later encompassed in the Senior

Noteholders' objections to the Disclosure Statement and confirmation of the  Plan.  If such work

had not been performed and an objection to the MDL Settlements timely logged, it is likely that a

substantial component of the Senior Noteholders' confirmation argument would have been

waived.  Specifically, the failure to prosecute an objection to the MDL Settlements could have

affected the Senior Noteholders' argument that, because the holders of Senior Notes would not

receive a full recovery under the Plan and the claims of the MDL Plaintiffs were subordinate to

the Senior Notes Claims under section 510(b), the MDL Plaintiffs were not entitled to a recovery

under the Plan.

40.      While, initially, GP drafted the objection of the Senior Noteholders as a

stand-alone substantive objection, the Debtors subsequently proposed that the settlement be

approved on a preliminary basis, allowing the substantive relief to be considered in connection

with confirmation.  GP opposed this procedure on the Senior Noteholders' behalf, arguing that

approval of the settlement on a preliminary basis would be wasteful as the settlement could not,

in any event, be approved under applicable law.  To that end, GP professionals drafted and filed

objections to both the substantive and procedural relief requested by the Debtors.  GP further attended and presented argument at a hearing to consider the preliminary relief.  GP professionals were prepared to argue against approval of the MDL Settlement at the Confirmation Hearing.

(D)    *Project Category 4 — Alternative Investment Agreement*
(Total Fees:  $123,324.50 Total Hours:  173.20) (Exhibit F)

41.    In connection with their opposition to the Delphi-Appaloosa Investment Agreement and the amendments thereto, certain Senior Noteholders believed that an alternative investment agreement, sponsored in part by certain of the Senior Noteholders, would provide a fuller recovery to holders of claims against, and interests in, the Debtors.

42.    Against a constrained time-frame, GP professionals worked around the clock at the request and direction of certain of the Senior Noteholders, engaging in the drafting of, and negotiations surrounding, the alternative investment agreement.  Specifically, GP professionals provided advice to certain Senior Noteholders regarding the structure of the proposal, drafted certain portions of necessary legal documents, conducted legal research regarding the tax and securities laws applicable to the proposal, and reviewed the various agreements on behalf of certain Senior Noteholders.

43.    While the proposal was ultimately not submitted to the Debtors, the resources devoted to the project provided support to the Senior Noteholders' primary argument in opposition to the Delphi-Appaloosa EPCA: that the Debtors had not adequately sought out alternatives to that agreement which could have preserved estate resources and provided better recoveries to the holders of claims and interests.

(E)    *Project Category 5 — Case Administration*
(Total Fees:  $31,491.50 Total Hours:  65.40) (Exhibit G)

44.    In order to provide complete representation to the Senior Noteholders, GP professionals rendered services relating to general case administration, including, among other things: (i) reviewing, organizing and responding to various documents received; (ii) preparing for and attending omnibus hearings; (iii) reviewing Committee professionals' reports and summaries; (iv) maintaining a case calendar; (v) monitoring press reports relating to the Debtors' cases; (vi), monitoring the docket in these cases; (vii) monitoring the status of various matters and (viii) analyzing and summarizing critical documents filed in these Cases and various issues related thereto.  In light of the size of these Cases and the number of parties involved, general case administration was enormously time-consuming, requiring GP professionals to review the hundreds of pleadings that may have been filed on any given day.

*(F)    Project Category 6 — Claims  Estimation*
(Total Fees:  $20,114.00 Total Hours:  33.2) (Exhibit H)

45.    Given the classification and voting structure under the Plan, it was necessary for GP professionals to review various motions by creditors to temporarily allow claims for the purposes of voting on the Plan and identified those which were objectionable.  The services rendered in connection with this project category were minimal, though necessary to ensure that the votes of the Senior Noteholders were not diluted by objectionable claims.  Where necessary, the Senior Noteholders utilized special conflicts counsel, K&W, to review and file potential pleadings where GP could not due to conflict.

*(G)    Explanation of Expenses Incurred* (Exhibit I)

46.    GP has incurred a total of $224,661.30 in expenses in connection with its representation of the Senior Noteholders during these Cases.  GP's expenses are reflected herein at actual cost and at the rates generally charged to clients by GP for such services and, as such reflects the actual usage of such services by GP employees on behalf of the Senior Noteholders.

GP's usual rates are below the maximum allowed under the applicable guidelines. For instance,

GP's in-house vendor charges $0.15 per copy, which is below the $0.20 maximum allowable

under the Guidelines. Similarly, outgoing facsimiles are charged at actual toll cost, normally

below the $1.25 maximum under the Guidelines.[5] Only where absolutely necessary, GP utilized

secretarial services late into the evenings and were reimbursed for the actual cost of the overtime

paid to these employees.

       47.     Consistent with the policies of GP, attorneys, para-professionals, and other

employees of GP who worked late into the evenings were reimbursed for their reasonable meal

costs and their cost for transportation home.[6] GP's regular practices are not to include

components for those charges in overhead when establishing billing rates, but rather to charge

their clients for these and all other out-of-pocket disbursements incurred during the regular

course of the rendition of services. GP has been aware of cost considerations and has tried to

minimize the expenses it incurred. GP has reduced certain of its actual expenses in this

Application consistent with guidelines set forth by the United States Trustee and the United

States Bankruptcy Court for the Southern District of New York.[7]

**I.  Maryann Keller & Associates**

       48.     In connection with certain of the Senior Noteholders' opposition to

confirmation of the Debtors' Plan (Project Category 2) (Exhibit D), Maryann Keller and her

colleague Kenneth A. Elias rendered a total of 576.75 hours and $329,906.25 in services. MKA

---

[5]    GP reduced the facsimile charges in one instance for the purposes of this application by $0.25 to comply with
the applicable guidelines.

[6]    Although GP was reimbursed at actual cost for overtime meals, GP has voluntary reduced these amounts for the
purposes of this Application to comply with the applicable guidelines.

[7]    Given the voluminous nature of the invoices and other documentation regarding expenses incurred, we have
filed a summary of expenses. The back-up is, however, available should a party in interest want to review
specific invoices.

devoted substantial time to reviewing documents provided by the Debtors through discovery, as well as independent research concerning the valuation of Reorganized Delphi.  Additionally, MKA prepared a report detailing the results of the aforementioned research and providing an expert opinion concerning the valuation of the Debtors.

49.    Maryann Keller also prepared for and appeared for a deposition conducted by the Debtors concerning the methods utilized and research supporting the expert opinion.  In connection with discovery, MKA prepared documents utilized in the preparation of the expert opinion for production to the Debtors.  Maryann Keller also prepared to appear before the Court for cross-examination by the Debtors in connection with confirmation of the Plan.

50.    MKA proved to be an invaluable asset to the Senior Noteholders in opposition to confirmation of the Plan and the Debtors' own valuation.  Specifically, Maryann Kelller's more than 30 years' experience in valuation and, specifically, her expertise in the automobile manufacturing field provided needed support to the Senior Noteholders' arguments.  Additionally, MKA's research assisted the Senior Noteholders' other professionals in opposing the methodology utilized by the Debtors' professional, Rothschild Inc., in preparing its valuation of Reorganized Delphi.

## II.  **Klestadt & Williams, LLP**

51.    In connection with the claims estimation process (Project Category 6) (Exhibit H), K&W served as conflicts counsel for the Senior Noteholders and reviewed and filed an objection on behalf of the Senior Noteholders to the Motion of Bank of America, N.A. ("BoA") for Entry of Order Temporarily Allowing Claims for Voting on Plan Pursuant to Federal Rule of  Bankruptcy Procedure 3018(a).  K&W attorneys devoted approximately 8.7 hours of service on behalf of the Senior Noteholders during these Cases for total fees of $3,205.  Pursuant to its engagement agreements with the Senior Noteholders, K&W charged the Senior

Noteholders for fees, based on the hourly rates it charges for similar services and for similar matters, and for its actual out of pocket expenses. Consistent with the terms of the retention, K&W billed the Senior Noteholders on pro rata basis, based on the Senior Noteholders' relative holdings of Senior Notes.

52.    The services rendered by K&W with respect to this matter were necessary to ensure that the votes of the Senior Noteholders were not diluted by an objectionable claim. BoA's claim was derived from two aircraft leases, which, under the Plan, would have been expressly assumed on the effective date. Accordingly, BoA had no right to vote on the Plan and its vote would have only diluted the votes of the Senior Noteholders which were placed in the same class.

53.    K&W has incurred a total of $66.56 in expenses in connection with its representation of the Senior Noteholders during these Cases. K&W's expenses are reflected herein at actual cost and at the rates generally charged to clients by K&W for such services and, as such reflects the actual usage of such services (express delivery) by K&W employees on behalf of the Senior Noteholders. K&W has been aware of cost considerations and has tried to minimize the expenses it incurred.

54.    K&W has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases. No promises have been received by GP or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## Argument

55.    In accordance with paragraph 62 of the Confirmation Order, the Senior Noteholders' Professionals fees and expenses are subject to Court review for reasonableness,

based on the totality of the circumstances, and approval pursuant to section 1129(a)(4) of the

Bankruptcy Code.   While there is little caselaw examining the reasonableness standard set forth

in section 1129(a)(4) or the amended standard set forth in the Confirmation order, at least one

court has stated that a "common sense approach dictates that 'reasonableness' cannot be

ascertained without reference to the time required to perform the services for which payment is

requested, the benefit or result achieved, the skill required under the circumstances, the ability or

expertise of the applicant, and the customary fee for similar services." In re Southern Industrial

Banking Corp., 41 B.R. 606, 612 (Bankr. D. Tenn. 1984).  The Senior Noteholders believe that

the fees and expenses set forth above are reasonable based on the totality of the circumstances.

56.     The above summary of services and the attached exhibits evidence the

enormity of the discovery and litigation undertaken throughout these Cases, the complexity of

the issues, the necessity of filing amended pleadings, and the importance of the issues presented

by the Senior Noteholders' professionals.   Indeed, these Cases, as consolidated, represented one

of the largest bankruptcies in the history of the United States with billions of dollars at stake.

The outstanding Senior Notes alone amounted to approximately $2 billion in principal amount.

The Senior Noteholders' Professionals, at any particular point of time in these Cases, represented

between $360 million and $601 million in principal amount of the outstanding Senior Notes.

57.     As described above, the work performed by the Senior Noteholders'

Professionals was necessary as a result of the filing of a Plan which was premised on faulty

assumptions.  Specifically, the Senior Noteholders rightfully believed that the "negotiated" Total

Enterprise Value vastly overvalued the Debtors, thus failing to provide a full recovery to the

holders of Senior Notes Claims, and, further, that there was a substantial risk that the Investment

Agreement and, consequently, the Plan would not be consummated.  Additionally, the Senior

Noteholders had valid concerns over other plan-related issues such as the proposed distributions to junior Classes in violation of the absolute priority rule, the improper classification of Senior Notes Claims and TOPrS Claims in the same class and related voting issues, the failure to subordinate the contractually-subordinated TOPrS Claims (held in large part by Plan Investors) and statutorily subordinated Claims arising out of the MDL Settlements, the treatment of insiders, and the substantive consolidation of the Debtors.  These along with several other pertinent issues required the Senior Noteholders' Professionals to dedicate substantial resources to representing the Senior Noteholders' interests.

58.    While ultimately the class of General Unsecured Creditors voted to accept the Plan, rendering several of the Senior Noteholders' arguments moot, the changes that were made to the Plan and Disclosure Statement, as a result of the positions taken by the Senior Noteholders, benefited all holders of claims and interests.  Specifically, as discussed above, the Senior Noteholders obtained further disclosure on the manner in which the Debtors arrived at their Total Enterprise Value, the implications of the negotiated value of the New Common Stock and the range of recoveries afforded to General Unsecured Creditors under the Plan, the neccessity of the various third-party releases provided by the Plan, the circumstances surrounding the settlement of GM's and the MDL Plaintiffs' claims, the importance of the vote of General Unsecured Creditors, and the possible ramifications if the Debtors were unable to secure exit financing.  Further, the Senior Noteholders obtained a partially enhanced recovery under the Plan by forcing the Debtors to reduce the recovery to the holders of TOPrS, addressing concerns over the failure of the original Plan to give effect to the subordination agreement. Finally, the Senior Noteholders' objections to the discount provided to the Plan Investors, which eventually garnered the support of the statutory committees, resulted in a reduction to the

discount in the final iteration of the Investment Agreement.  Although the current iteration of the

Plan has changed substantially from that confirmed by the Court pursuant to the Confirmation

Order, many of the changes described above continue to benefit the Senior Noteholders, albeit in

connection with a substantially reduced recovery.

59.    The Senior Noteholders' professionals have made a conscious effort in

these cases to provide the Senior Noteholders with quality services without allowing costs to

spiral out of control.  Specifically, the Senior Noteholders' professionals made a conscious effort

to the limit the number of professionals staffed on the Delphi matter, to utilize the lower billing

rates of junior associates and assistants wherever possible, and, further, to draw upon the

considerable expertise of partners.  Wherever possible, the Senior Noteholders' Professionals

utilized work product developed in previous matters to reduce unnecessary research and drafting.

60.    Although the settlement upon which this application is based only

resolved the objections of the Applicants, the Senior Noteholders believe that the fees and

expenses incurred by the Formerly Represented Parties should be reimbursed as reasonable

based on the totality of the circumstances.  The Senior Noteholders' Professionals undertook

efforts on behalf of all the Senior Noteholders at various times during the engagement and lent a

necessary voice to their interests through these Cases.[8]  Further, the services rendered by the

Senior Noteholders' Professionals with respect to the Disclosure Statement objection and other

earlier matters informed and provided a basis for the Senior Noteholders' confirmation objection

---

[8]  Indeed, while the holders of Senior Notes actively involved in these Cases at any particular time fluctuated, no
motivation can be inferred from such.  For instance, information available in the public domain, including
pleadings filed in these Cases which set forth valuation and recovery prospects, may have motivated many of the
Formerly Represented Parties to dispose of their holdings, necessitating a withdrawal from active participation in
these Cases.   Moreover, the overall changes in the general economic and industry climates—many of which were
the same factors that led the Debtors to revise the economics of the Plan—may have led certain institutions to
make decisions regarding their holdings not only of Delphi, but also of other companies in this sector.  As none of
the Senior Noteholders were restricted in their capacities as such, no inference can properly be drawn from a
changing client group.

and, through such cumulative efforts, achieved needed changes to the Plan.  Indeed, the MDL
Settlements, Investment Agreement and the matters raised in the Disclosure Statement objection
were all at issue during the Confirmation process. Without the earlier efforts of the Senior
Noteholders' Professionals with respect to those matters, the fees and expenses incurred in
preparing the confirmation objection would have grown exponentially.

61.    Moreover, none of the services provided to the Formerly Represented
Parties were duplicative.  The Senior Noteholders' Professionals delivered only those services
necessary to adequately represent all of their clients and ensured that the work performed
consistently met the approval of each holder of Senior Notes represented by the professionals at
any particular point in these Cases.   As such, in light of the pro rata nature of the billing
practices of the Senior Noteholders' Professionals, the total fees and expenses would have been
borne solely by the Applicants had the Formerly Represented Parties never retained the Senior
Noteholders' Professionals' services.

62.    Finally, the Applicants submit that the Senior Noteholders' Professionals'
expenses are reasonable in light of breadth of research, discovery (including duplication of
several hundred thousand pages of documents produced only in electronic format), required
travel, and exhibit production necessitated by the enormity of these Cases and the level of
services required to adequately represent the Senior Noteholders.  Moreover, the Applicants
submit that the expenses sought in these cases substantially comply with guidelines set forth by
the United States Trustee and the United States Bankruptcy Court for the Southern District of
New York.  Accordingly, the Applicants respectfully submit that the fees and expenses sought
through this Application are reasonable under the totality of the circumstances.

## <u>Wavier of Memorandum of Law</u>

Because the Application is a requirement of the Confirmation Order, presents no novel issues of law, and seeks no relief other than determination of whether the fees and expenses sought are reasonable based on the totality of the circumstances, the Applicants request that the Court waive the requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York for the filing of a separate memorandum of law.

## <u>Notice</u>

Notice of this Application has been served by CM/ECF and first class mail to (i) Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606, Att'n: John Wm. Butler, Jr., Esq., (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10044, Att'n: Alicia M. Leonhard, Esq., and (iii) counsel for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 100224, Att'n: Robert J. Rosenberg Esq. In light of the nature of the relief requested herein, the Applicants submit that no other or further notice is required.

## Conclusion

WHEREFORE, the Applicants respectfully request that this Court approve the payment

of those fees and expenses requested by this Application.

Dated: New York, New York
November 16, 2009

GOODWIN PROCTER LLP

By:  */s/ Allan S. Brilliant*
Allan S. Brilliant (AB 8455)
abrilliant@goodwinprocter.com
Craig P. Druehl (CD 2657)
cdruehl@goodwinprocter.com
Meagan E. Costello (MC 0962)
mcostello@goodwinprocter.com
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

- and -

GOODWIN PROCTER LLP
Gina Lynn Martin (GM 1324)
gmartin@goodwinprocter.com
Exchange Place
Boston, Massachusetts  02109
(617) 570-1330

Attorneys for Davidson Kempner
Capital Management LLC; Elliott
Associates, L.P.; Nomura Corporate
Research & Asset Management, Inc; Northeast
Investors Trust; SPCP Group, LLC;
and Whitebox Advisors, LLC,
all in their capacity as Senior Noteholders