# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:** Delphi Corporation, et al., n/k/a DPH Holdings Corp.[1]
**Case Number:** Jointly Administered 05-44481 (RDD)

### Quarterly Operating Report for the Period Ended:
September 30, 2009

### Debtors' Address:
5725 Delphi Drive
Troy, Michigan 48098

### Operating Loss for the Three Months Ended September 30, 2009: $207 million

**Debtors' Attorneys:**
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:** November 17, 2009

/s/: JOHN C. BROOKS
John C. Brooks
President of DPH Holdings Corp.

/s/: THOMAS S. TIMKO
Thomas S. Timko
Chief Accounting Officer and Controller Delphi Corporation

---

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**INDEX**

| Description | Page |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the three and nine months ended September 30, 2009 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of September 30, 2009 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the three months ended September 30, 2009 | 6 |
| Notes to Quarterly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 20 |
| Schedule of Payroll Taxes Paid | 21 |
| Schedule of Other Taxes Collected, Incurred and Paid | 23 |
| Schedule of Disbursements | 27 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

| | Three Months Ended September 30, 2009 | Nine Months Ended September 30, 2009 |
|---|---|---|
| | (in millions) | |
| Net sales: | | |
| Third-Parties | $ 1,207 | $ 3,108 |
| Non-Debtor affiliates | 69 | 169 |
| Total net sales | 1,276 | 3,277 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 1,283 | 3,640 |
| Depreciation and amortization | 77 | 265 |
| Selling, general and administrative | 123 | 381 |
| Total operating expenses | 1,483 | 4,286 |
| | | |
| Operating loss | (207) | (1,009) |
| Interest income (Notes 2 and 3) | 312 | 18 |
| Other income (expense), net | 2 | (5) |
| Reorganization items, net (Note 4) | (2,855) | (1,699) |
| Income tax benefit | 304 | 361 |
| Equity loss from non-consolidated affiliates, net of tax | (25) | (34) |
| Loss from continuing operations | (2,469) | (2,368) |
| Loss from discontinued operations, net of tax | (58) | (112) |
| Equity loss from non-Debtor affiliates, net of tax | (76) | (174) |
| | | |
| Net loss | (2,603) | (2,654) |
| Net income attributable to noncontrolling interest | — | — |
| Net loss attributable to Debtors | $ (2,603) | $ (2,654) |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | September 30, 2009 (in millions) |
|---|---|
| **ASSETS** | |
| Current assets: | |
| Cash and cash equivalents | $ 54 |
| Restricted cash | 199 |
| Accounts receivable, net: | |
| Third-Parties | 853 |
| Non-Debtor affiliates | 332 |
| Notes receivable from non-Debtor affiliates | 128 |
| Inventories, net | 399 |
| Other current assets | 121 |
| Assets held for sale | 390 |
| Total current assets | 2,476 |
| Long-term assets: | |
| Property, net | 934 |
| Investments in affiliates | 211 |
| Investments in non-Debtor affiliates | 916 |
| Notes receivable from non-Debtor affiliates | 1,429 |
| Other long-term assets | 202 |
| Total long-term assets | 3,692 |
| Total assets | $ 6,168 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| Current liabilities not subject to compromise: | |
| Short-term debt | $ 4,154 |
| Accounts payable | 445 |
| Accounts payable to non-Debtor affiliates | 523 |
| Accrued liabilities | 1,013 |
| Liabilities held for sale | 165 |
| Total current liabilities not subject to compromise | 6,300 |
| Long-term liabilities not subject to compromise: | |
| Employee benefits and other | 652 |
| Total long-term liabilities not subject to compromise | |
| Liabilities subject to compromise | 11,329 |
| Total liabilities | 18,281 |
| Stockholders' deficit: | |
| Total Debtors stockholders' deficit | (12,113) |
| Noncontrolling interest | — |
| Total stockholders' deficit | (12,113) |
| Total liabilities and stockholders' deficit | $ 6,168 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended September 30, 2009 (in millions) |
|---|---|
| Cash flows from operating activities: | |
| Net cash used in operating activities | $    (235) |
| | |
| Cash flows from investing activities: | |
| Capital expenditures | (24) |
| Proceeds from sale of property | 1 |
| Decrease in restricted cash | 89 |
| Other, net | 1 |
| Discontinued operations | (20) |
| Net cash provided by investing activities | 47 |
| | |
| Cash flows from financing activities: | |
| Net repayments of borrowings under amended and restated debtor-in-possession facility | (2) |
| Issuance costs related to the Accommodation Agreement | (2) |
| Net borrowings under GM liquidity support agreements | 150 |
| Net cash provided by financing activities | 146 |
| | |
| Increase in cash and cash equivalents | (42) |
| Cash and cash equivalents at beginning of period | 96 |
| Cash and cash equivalents at end of period | $    54 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**NOTES TO QUARTERLY OPERATING REPORT**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

**NOTE**:  Unless otherwise stated, all information is provided as of September 30, 2009.

**1.  Background and Organization**

    *General* **–** Delphi Corporation  ("Delphi" or the "Company"), together with certain of its affiliates (together with Delphi, the "Debtors"), predecessors of DPH Holdings Corp. ("DPH Holdings") and certain of its affiliated reorganized debtors (together with DPH Holdings, the "Reorganized Debtors"), is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

    *Chapter 11 Reorganization Cases* **–** On October 8 and 14, 2005 (each, a "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Court") for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

    On December 10, 2007, the Debtors filed the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (Docket No. 11388).  On January 25, 2008 (the "Confirmation Date"), the Court entered an order confirming the Plan (Docket No. 12359) (the "Confirmation Order"), and the Confirmation Order became final on February 4, 2008.

    On October 3, 2008, the Debtors filed a motion under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related disclosure statement and (ii) related procedures for re-soliciting votes on the Plan, as modified (Docket No. 14310) (the "Plan Modification Approval Motion").  On June 1, 2009, the Debtors filed a supplement to the Plan Modification Approval Motion (Docket No. 16646).  On July 30, 2009 (the "Modification Date"), the Court entered an order approving the Modified Plan (Docket No. 18707), including that certain master disposition agreement (as amended, supplemented, or otherwise modified, and including all schedules and exhibits thereto, the "MDA"), dated as of the Modification Date, among Delphi, on behalf of itself and the other entities set forth on Schedule 1 and Schedule 2 to the MDA; GM Components Holdings, LLC (the "Parent"), on behalf of itself and the other buyers set forth on Schedule 1 to the MDA (each a "GM Buyer," and, collectively with the Parent, the "GM Buyers"); General Motors Company ("GM"); Motors Liquidation Company (f/k/a General Motors Corporation) ("Old GM"); and DIP Holdco 3, LLC (the "DIP Buyer"), on behalf of itself and the other buyers set forth on Schedule 2 to the MDA (together with the DIP Buyers, the "DIP Buyers," and collectively with the GM Buyers, the "Buyer" or "Buyers"), for (i) the sale and purchase of substantially all of Delphi's and its subsidiaries' businesses, and (ii) emergence from chapter 11 in accordance with the Modified Plan.

    October 6, 2009 (the "Effective Date"), the Debtors substantially consummated the Modified Plan, the Effective Date occurred, and the transactions under the MDA and related agreements closed.  <u>See</u> Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective Date (Docket No. 18958).  The Reorganized Debtors have emerged from chapter 11 as DPH Holdings and affiliates and remain responsible for the post-Effective Date administration, including, without limitation, the disposition of certain retained assets and payment of certain retained liabilities as provided for under the Modified Plan, and the eventual closing of the chapter 11 cases.

    Through the Effective Date, the Debtors operated their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.  Delphi's non-U.S. subsidiaries did not file for chapter 11 relief, continued their business operations without supervision from the Court, and were not subject to the requirements of the Bankruptcy Code.

    *Master Disposition Agreement* **–** On the Effective Date, under the terms of the MDA, DIP Holdco LLP (subsequently renamed Delphi Automotive LLP ("Delphi Automotive")), as assignee of the DIP Buyer, through various subsidiaries and affiliates, acquired substantially all of the Debtors' global core businesses, and the GM Buyers and Steering Solutions Services Corporation acquired certain U.S. manufacturing plants and the Debtors'

non-core steering business, respectively.   The acquisition of certain businesses remains subject to pending transactions, and certain specified assets were excluded from the sale.  The employees at each acquired facility have transferred to the Buyer that acquired such facility.  In addition, DPH Holdings has retained certain idled or soon-to-be-idled sites as well as certain liabilities and other assets.

In consideration of the sales under the MDA: (i) each Buyer assumed certain enumerated liabilities and cure amounts for contracts related to their respective acquired businesses; (ii) the Parent and the DIP Buyer each paid 50% of professional fees (in an amount not exceeding $15 million each, or $30 million in total) that were administrative claims required to be paid by the Debtors in connection with their emergence from chapter 11 pursuant to the Modified Plan; (iii) the Parent paid the costs of solicitation that were administrative claims not exceeding $12 million; (iv) GM and Old GM waived their prepetition, administrative, and future claims in the bankruptcy cases; (v) the Parent (a) paid specified amounts with respect to the Amended and Restated DIP Credit Facility (defined below), (b) advanced funds for anticipated wind-up costs of the Reorganized Debtors (including the advancement of funds on the closing date as well as periodic requests for post-closing advances), and (c) will pay to Delphi Automotive the proceeds of the Plan Investor Litigation, which the parties settled for $135 million on October 23, 2009 and which has been subsequently received by Delphi Automotive (net of costs and expenses of Delphi incurred prior to closing or subsequently by DPH Holdings and GM); and (vi) all principal and interest under the Amended and Restated DIP Credit Facility (defined below) was fully discharged, released, terminated, and if necessary, waived.  In addition, based on the terms set forth in the operating agreement of the DIP Buyer (the "Operating Agreement"), the DIP Buyers will make a payment (to the extent payable after Closing) for the benefit of the unsecured creditors of Delphi in an amount not to exceed $300 million in the aggregate.

*Summary of Modified Plan* – A summary of certain terms of the Modified Plan follows:

| | Modified Plan |
|---|---|
| **Investors** | Acquisition of Delphi's operating businesses by DIP Buyer, and of certain North American operations and the Steering Business (defined below) by certain affiliates of GM |
| **Emergence Capital And Capital Commitments** | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>DIP Buyer has obtained, or will obtain, emergence capital and capital commitments to support Delphi's operating businesses going forward |
| **Defined Benefit Pension Plans** | 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008<br><br>The PBGC terminated the U.S. pension plans effective July 31, 2009 |
| **GM** | Acquisition by GM of Delphi's North American operations and the Steering Business (defined below) pursuant to an assignment of rights from JPMorgan Chase Bank, N.A., as administrative agent under the Amended and Restated DIP Credit Facility (defined below).  GM will not receive any distribution on account of its allowed claims |
| **DIP Facility Revolver Claim** | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Satisfied in full on the Effective Date |
| **Senior Secured Hedge Obligations** | Satisfied pursuant to the terms of the MDA |

|  | Modified Plan |
|---|---|
| **DIP Facility Second Priority Term Claim** | Satisfied in full on the Effective Date |
| **Secured Claims (Excluding DIP Claims)** | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury yield rate on the Effective Date, plus 200 basis points; (ii) receive their collateral free and clear of liens, claims, and encumbrances; or (iii) receive such other treatment agreed upon by the parties as is more favorable to the Debtors or the Reorganized Debtors |
| **Unsecured Creditors** | Pro rata share of deferred consideration under the MDA (in amount not to exceed $300 million) |
| **Postpetition Interest** | No postpetition interest will be accrued or paid on General Unsecured Claims |
| **MDL Litigation Claims** | No recovery |
| **Equity** | No recovery |

The substantial consummation of the Modified Plan and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among other things. Such adjustments will have a material impact on Delphi's future financial statements.

*GM Settlement –* Delphi and GM entered into a global settlement agreement (the "GSA") and a master restructuring agreements (the "MSA") on December 7, 2007. These comprehensive settlement agreements, which comprised part of the Plan and were approved by the Court in the Confirmation Order, were not to become effective until and unless Delphi emerged from chapter 11. Subsequently, on September 12 and 25, 2008, Delphi and GM agreed upon amendments to the GSA (as so amended, the "Amended GSA") and the MRA (as so amended, the "Amended MRA"). On September 26, 2008, the Court entered an order (Docket No. 14287) authorizing Delphi to implement certain aspects of the Amended MRA and Amended GSA as described in detail below. On September 29, 2008, the Amended GSA and Amended MRA became effective, resulting in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs.

The Amended GSA resolved outstanding issues between Delphi and GM, including: (i) U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("Hourly OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases; (ii) all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; (iii) the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; (iv) GM's treatment under a Delphi plan of reorganization; and (v) litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM. Except for the second step of the transfer of a substantial portion of the assets and liabilities (the "Second Pension Transfer") under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan"), as specifically noted below in Note 2, Basis of Presentation, Pension, the obligations under the Amended GSA were not conditioned on the effectiveness of an amended plan of reorganization.

In July 2009, GM advised Delphi that it would neither assume the Hourly Plan nor complete the Second Pension Transfer. GM and the Pension Benefit Guaranty Corporation (the "PBGC") negotiated a separate release and waiver agreement (the "Waiver and Release Agreement") regarding a possible initiation by the PBGC of the plan termination process for Delphi's Hourly Plan. The Waiver and Release Agreement provided consideration to the PBGC for certain releases to be granted to, among others, GM, Delphi, and Delphi's global affiliates. On July 22, 2009, the PBGC initiated the process to terminate Delphi's Hourly Plan and the U.S. salaried and subsidiary pension plans (collectively, the "Pension Plans"). On the Modification Date, the Court approved the Delphi-PBGC Settlement Agreement (defined below in Note 2. Basis of Presentation, Pension Matters). On August 10, 2009, the

PBGC and Delphi executed a termination and trusteeship agreement, retroactive to July 31, 2009, with respect to the Pension Plans.  For additional information regarding the termination of the Pension Plans, refer to Note 2. Basis of Presentation, Pension Matters, and Salaried OPEB Settlement.

During the three and nine months ended September 30, 2009, GM funded an additional $13 million and $41 million, respectively, of Hourly OPEB payments made to the hourly workforce.  As of September 30, 2009, Delphi also had a $51 million receivable from GM related to the funding of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") buydown arrangements under the 2007 U.S. hourly workforce special attrition programs.

The Amended MRA was intended to govern certain aspects of Delphi's and GM's commercial relationship.  Upon the Effective Date, the Amended MRA was terminated  (except as set forth in the MDA), and the MDA and certain ancillary agreements now govern the commercial relationship among GM,  DPH Holdings, and  the DIP Buyer, as purchaser of substantially all of Delphi's and its subsidiaries' businesses.

The following details the activity under the Amended MRA during the three and nine months ended September 30, 2009:

- *Keep Site Facilitation Fee* - On March 31, 2009, June 30, 2009 and September 30, 2009, Delphi received quarterly installments of the annual Keep Site Facilitation Fee of $27.5 million, of which approximately $29 million and $75 million were recorded as revenue in the three and nine months ended September 30, 2009, respectively, and approximately $8 million remains recorded as a deferred liability at September 30, 2009.

- *Reimbursement of Hourly Labor Costs* - During the three and nine months ended September 30, 2009, Delphi received $31 million and $106 million, respectively, of reimbursement from GM of hourly labor costs in excess of $26 per hour.  Delphi recorded $14 million and $50 million as a reduction to cost of sales during the three and nine months ended September 30, 2009, respectively.  As of September 30, 2009, $5 million is recorded as receivable from GM.

- *Production Cash Burn Breakeven Reimbursement* - During the three and nine months ended September 30, 2009, Delphi received $47 million and $150 million, respectively, of production cash burn breakeven reimbursement from GM.  Delphi recorded $18 million and $86 million in income from discontinued operations during the three and nine months ended September 30, 2009, respectively.  An additional $2 million was recorded as a reduction to cost of sales during the nine months ended September 30, 2009.  As of September 30, 2009, $16 million is recorded as receivable from GM.

- *Reimbursement of Hourly Workers' Compensation and Other Benefits* – During the three and nine months ended September 30, 2009, Delphi received reimbursement from GM of $13 million and $28 million, respectively.  Delphi recorded $12 million and $35 million as a reduction to cost of sales during the three and nine months ended September 30, 2009, respectively.  As of September 30, 2009, $7 million is recorded as receivable from GM.

The following table details changes during the nine months ended September 30, 2009 in the accounts receivable balance attributable to the Amended GSA and the Amended MRA, recorded in accounts receivable, net in the accompanying condensed combined balance sheet at September 30, 2009:

|  | (in millions) |
|---|---|
| Balance at December 31, 2008 | $     141 |
| GM obligations recognized | 175 |
| Payments received from GM | (150) |
| Balance at March 31, 2009 | $     166 |
| GM obligations recognized | 103 |
| Payments received from GM | (126) |
| Balance at June 30, 2009 | $     143 |
| GM obligations recognized | 68 |
| Payments received from GM | (132) |
| Balance at September 30, 2009 | $       79 |

Case Number:  05-44481 (RDD) (Jointly Administered)

As of September 30, 2009, $73 million of the Amended GSA and Amended MRA accounts receivable was included in accounts receivable, net and $6 million was included in assets held for sale on the condensed combined balance sheet.

The following table details the GM obligations recognized during the three and nine months ended September 30, 2009:

|  | Three Months Ended September 30, 2009 | | Nine Months Ended September 30, 2009 | |
|  | (in millions) | | | |
|---|---|---|---|---|
| Pre-tax earnings | $ | 55 | $ | 162 |
| Discontinued operations | | 18 | | 86 |
| Pass-through OPEB reimbursement | | — | | 110 |
| Buydown true-up | | (4) | | (20) |
| Deferred liability | | (1) | | 8 |
| Total | $ | 68 | $ | 346 |

## 2. Basis of Presentation

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. In addition, the financial statements and supplemental information contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements, and as such, their net income is included as "Equity loss from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.

Financial Accounting Standards Board Accounting Standard Codification ("FASB ASC") 852-10, *Reorganizations*, the general accounting guidance applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in FASB ASC 852-10.

The unaudited condensed combined financial statements have been derived from the books and records of the Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment) the Debtors believe that the financial information could be subject to changes, and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with U.S. GAAP. Certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted.

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the results of operations, financial position, and cash flows of the Debtors in the future.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements. The Debtors received $94 million and $104 million in dividends from non-Debtor affiliates during the three and nine months ended September 30, 2009, respectively. Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in equity income from non-Debtor affiliates, net of tax.

*Restricted Cash* – At September 30, 2009, the Debtors had $199 million in restricted cash, primarily related to cash collateral required under the debtor-in-possession credit facility. Refer to Note 3. Debtor-in-Possession ("DIP") Financing for more information. Additionally, restricted cash includes cash for use for the pre-retirement

portion of the U.S. employee workforce transition programs and balances on deposit at financial institutions that have issued letters of credit in favor of Delphi.

*Property* – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

*Long-Lived Asset Impairment Charges* – Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets. Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets. The fair value of the assets was determined based on the "held for use" classification. Delphi recorded long-lived asset impairment charges totaling $3 million and $21 million related to Delphi's Electronics and Safety segment and the exit of its occupant protection systems business in North America during the three and nine months ended September 30, 2009, respectively, in depreciation and amortization. In addition, as a result of continuing depressed volumes and earnings during 2009, Delphi recorded a $23 million impairment charge related to an investment in a non-consolidated affiliate in equity (loss) income, net of tax in the condensed combined statements of operations for the three and nine months ended September 30, 2009.

*Discontinued Operations* – A business component that disposed of or classified as held for sale is reported as discontinued operations if (i) the cash flows of the component have been or will be eliminated from the ongoing operations of Delphi and (ii) Delphi will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and various non-core product lines and plant sites that do not fit Delphi's future strategic framework (the "Automotive Holdings Group"). While the historical results of operations of the Steering Business and the Automotive Holdings Group include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to discontinued operations in the statements of operations. Certain employee pension and other postretirement benefit liabilities for the Steering Business were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans were allocated to discontinued operations in the statements of operations. Allocations have been made based upon a reasonable allocation method. Refer to Note 7. Divestitures for more information.

*Securities and ERISA Litigation Charges* – Delphi and certain of its subsidiaries and other persons were named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. One consolidated class action complaint alleged that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws (the "Securities Action"). Another class action, which was purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, was brought under Employee Retirement Income Security Act of 1974, as amended ("ERISA"). On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action" and together with the Securities Action and certain other consolidated shareholder derivative actions, the "Multidistrict Litigation" or "MDL").

On August 31, 2007, representatives of Delphi and other defendants and parties-in-interest (the "MDL Defendants") reached a settlement agreement to resolve the litigation, and on January 10, 2008, the U.S. District Court for the Eastern District of Michigan (the "District Court") approved the agreement with the lead plaintiffs, resulting in a settlement of the MDL Litigation (the "MDL Settlements"). According to the MDL Settlements (i) the class claimants will receive cash and allowed claims in the chapter 11 cases that, when valued at the face amount of the allowed claims, are equivalent to approximately $351 million, (ii) the ERISA Action and Securities Action were subsequently dismissed with prejudice, and (iii) certain claims against certain named of the named defendants in the MDL Litigation were released.

On the Confirmation Date, the Court approved modifications to the MDL Settlements (the "Modified MDL Settlements"). In connection with the Modified Plan, on July 23, 2009, the Court approved an agreement between the parties to the Modified MDL Settlements to permit the Modified MDL Settlements to be effective separately from the resolution of Delphi's chapter 11 cases and absent the payment of the $15 million amount to be provided by a third party. Additionally, the modifications provided for no recovery under the resolution of Delphi's chapter 11 cases. A fairness hearing in the District Court occurred on November 16, 2009 at which the judge approved the Second Modification to the Securities Settlement and the Modified ERISA settlement.

As a result of the Modified MDL Settlements, as of September 30, 2009, Delphi had a liability of $351 million recorded for this matter and expects to recover approximately $130 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

*Warranty Matters* – Delphi recognized expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

During 2007, Delphi observed higher than normal warranty claims on engine electronic control units supplied for certain 2005-2007 vehicle models by Delphi's Powertrain Systems segment and recorded $93 million of additional warranty expense in cost of sales in 2007. In July 2009, Delphi negotiated an agreement in principle with its customer on this matter for $73 million. Including approximately $11 million of warranty costs already incurred by Delphi to date, the remaining amount will be paid over the product life of the supplied control units or approximately eight years.

*Contractual Interest Expense and Interest Expense on Unsecured Claims* – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of FASB ASC 852-10. Contractual interest expense for the three and nine months ended September 30, 2009 was $126 million and $475 million, respectively. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on the Confirmation Date. The Plan also provided that certain holders of allowed unsecured claims against Delphi would be paid postpetition interest on their claims, calculated at the contractual non-default rate from the applicable Petition Date through the Confirmation Date, when the Company ceased accruing interest on these claims. At December 31, 2008, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 1. Background and Organization, on the Modification Date, the Court approved the Modified Plan, eliminating postpetition interest on prepetition debt and allowed unsecured claims. Therefore, the reversal of the $415 million of accrued interest was included as a reduction of interest expense in the condensed combined statements of operations for the three and nine month periods ended September 30, 2009.

*Taxes* – Delphi recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws. Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result does not recognize income tax benefits for net operating losses for its U.S. entities.

Pursuant to Court authorization, the Debtors have paid applicable sales, use, trust fund, and certain other taxes in the normal course when due. See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

Delphi recorded income tax benefit of $304 million and $361 million for the three and nine months ended September 30, 2009, respectively.

During the nine months ended September 30, 2009, Delphi recognized $306 million and $52 million tax benefit in continuing operations related to the elimination of the disproportionate tax effects in other comprehensive income

related to the salaried pension and Salaried OPEB (defined below) obligations, respectively, which were settled during the same period, as detailed below in the Pension Matters and Salaried OPEB Settlement sections.

*Pension Matters*– Prior to the PBGC termination of the Pension Plans, Delphi sponsored pension plans covering unionized employees in the U.S., which generally provided benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualified for retirement before normal retirement age. In addition, certain collectively bargained hourly employees continued earning accruals under the Hourly Plan's Individual Retirement Plan formula (a cash balance benefit providing an annual pay credit accrual of 5.4% of base wages). Delphi also sponsored defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participated in non-qualified pension plans covering executives, which were based on targeted wage replacement percentages and were unfunded.

Effective September 30, 2008, Delphi froze the Salaried Plan, the Supplemental Executive Retirement Program (the "SERP"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program and the PHI Non-Bargaining Retirement Plan.

On July 21, 2009, Delphi announced that the PBGC was expected to make a determination whether to initiate the termination process for the Pension Plans. Also on July 21, 2009, Delphi reached agreement with the PBGC to settle the PBGC's various claims against Delphi and its global affiliates (the "Delphi-PBGC Settlement Agreement"). Pursuant to that settlement agreement, the PBGC received a $3 billion allowed general unsecured non-priority claim which will receive the same treatment given to holders of general unsecured claims as set forth in the Modified Plan. The PBGC will receive additional consideration from GM which, together with the PBGC's allowed unsecured claim, is in consideration for, among other things, a full release of all causes of action, claims, and liens; the liability to be assumed by the PBGC related to the possible termination of the Pension Plans; and the withdrawal of all notices of liens filed by the PBGC against Delphi's global non-U.S. affiliates. On the Modification Date, the Court approved the Delphi-PBGC Settlement Agreement. On August 10, 2009, the PBGC and Delphi executed a termination and trusteeship agreement, retroactive to July 31, 2009, with respect to the Pension Plans. Accordingly, Delphi recognized a pension curtailment and settlement loss of $2.8 billion included in reorganization items in the condensed combined statements of operations for the three and nine month periods ended September 30, 2009. This loss included the reversal of $5.2 billion of liabilities subject to compromise related to the Pension Plans offset by the recognition of $5.0 billion of related unamortized losses previously recorded in accumulated other comprehensive income and the recognition of a $3.0 billion allowed general unsecured non-priority claim granted to the PBGC.

Delphi did not make certain minimum required contributions to the Pension Plans, and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million, $226 million and $1.2 million for plan years ended September 30, 2006, September 30, 2007 and September 30, 2008, respectively. Additional excise taxes could be assessed with respect to the subsidiary plans if the minimum required contributions to those plans for the plan year ended December 31, 2008 are not paid.

Delphi believes that, under the Bankruptcy Code, the Company was not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments. Accordingly, management has concluded that an unfavorable outcome is not currently probable, and as of September 30, 2009, no amounts have been recorded for any potential excise tax assessment.

*Salaried OPEB Settlement* – On March 11, 2009, the Court entered a final order (the "Termination Order") approving Delphi's motion to terminate, as soon as practicable after March 31, 2009, post-retirement health and life insurance benefits to salaried retirees and their surviving spouses (collectively, "Salaried OPEB") after consideration of materials provided by the retirees' committee (the "Retirees' Committee"). The Retirees' Committee was appointed by the U.S. Trustee to review whether it believed that any of the affected programs involved vested benefits (as opposed to "at will" or discretionary, unvested benefits) and that the Company had met its evidentiary burdens. The Court also approved a settlement agreement (the "Salaried OPEB Settlement Agreement") among Delphi, the Retirees' Committee, and the Delphi Salaried Retirees' Association (the "Association") which, among other things, settled any and all rights to appeal the Termination Order to the U.S. District Court for the Southern District of New York (the "District Court"). Refer to Delphi's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 for the details of the Salaried OPEB Settlement Agreement. Delphi recognized a Salaried OPEB Settlement Agreement gain from reorganization of $1,168 million during the nine months ended September 30, 2009.

### 3. Debtor-in-Possession ("DIP") Financing

*DIP Credit Facility* – During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to amend and extend, effective in May 2008, the Revolving Credit, Term Loan and Guaranty Agreement, dated as of January 9, 2007, and as amended and restated as of November 20, 2007 (the "DIP Credit Facility"). On May 9, 2008, the Debtors entered into the Amended and Restated DIP Credit Facility, pursuant to which the amount available to the Debtors was reduced from $4.5 billion under the DIP Credit Facility to $4.35 billion, consisting of a $1.1 billion first priority revolving credit facility (the "Tranche A Facility" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan"), and a $2.75 billion second priority term loan (the "Tranche C Term Loan") (the "DIP Loans").

*Accommodation Agreement* – On December 12, 2008, Delphi entered into an accommodation agreement (the "Accommodation Agreement") which allowed Delphi to retain the proceeds of the Amended and Restated DIP Credit Facility. Under the Accommodation Agreement, the lenders under the Amended and Restated DIP Credit Facility agreed, among other things, to allow Delphi to continue using the proceeds of the Amended and Restated DIP Credit Facility and to forbear from the exercise of certain default-related remedies, in each case until June 30, 2009, subject to continued compliance of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement, as amended). Notwithstanding the Accommodation Agreement, Delphi was in default of the terms of its Amended and Restated DIP Credit Facility and, as a result, as of December 12, 2008, the effective date of the Accommodation Agreement, Delphi was no longer able to make additional draws under the facility.

*Amendments to Accommodation Agreement* – Throughout 2009, Delphi entered into numerous further amendments and supplements to the Accommodation Agreement (the "Accommodation Agreement Amendments"), which further extended certain milestone dates in the Accommodation Agreement and ultimately extended the accommodation period under the Accommodation Agreement through the Effective Date. Pursuant to the Accommodation Agreement Amendments, among other things, (i) the lenders postponed Delphi's obligations to make current payments of interest in respect of the Tranche C Term Loan, (ii) Delphi had access to certain cash collateral baskets to make certain distributions consistent with the MDA and the Modified Plan, and (iii) to the extent that such cash was used in a manner consistent with the MDA and the Modified Plan, Delphi was permitted to access certain cash from its foreign subsidiaries without using the proceeds thereof to repay the DIP loans (as was previously required under the Accommodation Agreement).

*Terms of the Amended and Restated DIP Credit Facility and Accommodation Agreement* – The facilities bore interest at the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent, as detailed in the table below, and the amounts outstanding (in millions) and rates effective as of September 30, 2009 were:

| | ABR plus | Borrowings as of September 30, 2009 (in millions) | Rates effective as of September 30, 2009 |
|---|---|---|---|
| Tranche A............................ | 5.00% | $230 | 9.25% |
| Tranche B ............................ | 5.00% | $310 | 9.25% |
| Tranche C ............................ | 6.25% | $2,750 | 10.5% |

The Tranche A, Tranche B, and Tranche C facilities included an ABR floor of 4.25%.

The Company had $46 million in letters of credit outstanding under the Revolving Facility as of September 30, 2009. The amount outstanding at any one time under the First Priority Facilities was limited by a borrowing base computation as described in the Accommodation Agreement. Under the Accommodation Agreement, Delphi was required to provide weekly borrowing base calculations to the bank lending syndicate. Based on the borrowing base computation in effect at September 30, 2009, Delphi's borrowing base was reduced by a deduction of $53 million for unrealized losses related to Delphi's hedging portfolio, which as of September 30, 2009 resulted in net losses included in accumulated other comprehensive income ("OCI") of $152 million pre-tax, primarily related to copper and Mexican Peso hedges.

The Amended and Restated DIP Credit Facility and the Accommodation Agreement included affirmative, negative and financial covenants that imposed restrictions on Delphi's financial and business operations, including

Delphi's ability, among other things, to incur or secure other debt, make investments, sell assets, and pay dividends or repurchase stock.

The Amended and Restated DIP Credit Facility also contained certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest, or other amounts due under the Amended and Restated DIP Credit Facility, interest on all such outstanding amounts was payable on demand at 2% above the then applicable rate.  The Accommodation Agreement contained further defaults and events of default, the occurrence of which (absent a waiver or cure thereof within the applicable grace period) could have resulted in the termination of the accommodation period under the Accommodation Agreement.  Delphi was in compliance with the Amended and Restated DIP Credit Facility and Accommodation Agreement covenants as in effect on September 30, 2009.

In the three and nine months ended September 30, 2009, the Company received authority from the Court to pay applicable fees to various lenders in conjunction with certain amendments and paid approximately $2 million and $40 million in fees to the consenting lenders for all amendments, respectively.  Delphi also paid arrangement and other fees to various lenders associated with the amendments.

***Advance Agreement and Liquidity Support from General Motors and Related Matters*** – Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement").  The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA, and the date on which a plan of reorganization becomes effective.  The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement.  The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis.  The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, as more fully described in Note 1. Background and Organization, and Delphi was not able to redraw the original $650 million facility amount.

On September 26, 2008, the Court granted Delphi's motion to amend the original GM Advance Agreement to provide for a $300 million facility, which Delphi could draw against from time to time as necessary for it to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement, signed on August 7, 2008, and to give GM an administrative claim for all unpaid advances under such additional facility.  As of September 30, 2009, GM had accelerated payment of $300 million under such agreement; therefore, no amounts remain to be accelerated thereunder.

On June 10, 2009, the Court granted Delphi's motion to further amend and restate the original GM Advance Agreement between Delphi and GM.  The effectiveness of the amendment and restatement was subject to certain conditions precedent which were fully satisfied on June 16, 2009.  Pursuant to the amendment and restatement of the GM Advance Agreement, GM agreed to furnish a $250 million credit facility (the "Tranche C Facility") to Delphi subject to certain conditions specified therein.  The following description of the terms of the Tranche C Facility is qualified by reference to the full text of the GM Advance Agreement (as so amended and restated through the date hereof).  The GM Advance Agreement did not materially alter the terms and conditions of the original GM Advance Agreement with respect to the previously agreed to $300 million facility (the "Tranche B Facility"); however, the commitments under the Tranche B Facility have expired and all loans under the Tranche B Facility were required to be repaid concurrently with the repayment of the loans under the Tranche C Facility.  Between July 23, 2009 and the Effective Date, Delphi entered into further amendments to the GM Advance Agreement.  The combined effect of these amendments was to extend the deadline for Delphi to satisfy certain milestones, which if not met, would prevent Delphi from continued access to the Tranche C Facility.  For more details regarding the GM Advance Agreement and the various amendments, refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009 and June 30, 2009.

The GM Advance Agreement (as amended and restated) had a targeted cash balance amount of $25 million, and Delphi was required to use any free cash flow above the targeted cash balance amount (as determined in accordance with the GM Advance Agreement) to repay from time to time (in accordance with the GM Advance Agreement) any amounts outstanding thereunder.  As of September 30, 2009, $550 million was outstanding pursuant to the GM Advance Agreement and no amounts were available for future advances.  Refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 and Part II. Item 1A. Risk Factors

in the Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009 and June 30, 2009 for risks and uncertainties related to Delphi's business relationship with GM.

## 4. Reorganization Items

The accounting guidance in FASB ASC 852-10 requires separate disclosure of reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business.  The Debtors' reorganization items consist of the following:

| | Expense Three Months Ended September 30, 2009 | (Income)/Expense Nine Months Ended September 30, 2009 |
|---|---|---|
| | (in millions) | |
| PBGC Termination of Pension Plans | $ 2,818 | $ 2,818 |
| Salaried OPEB settlement | — | (1,168) |
| Professional fees directly related to reorganization | 29 | 68 |
| Interest income and other | 8 | (19) |
| Total Reorganization items | $ 2,855 | $ 1,699 |

Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions. Professional Fees also include $11 million during the nine months ended September 30, 2009, for certain legal advisors to GM.  Professional Fees for the three and nine months ended September 30, 2009 were estimated by the Debtors and will be reconciled to actual invoices when received.

## 5. Liabilities Subject to Compromise

As of September 30, 2009, the Debtors had received approximately 16,880 proofs of claim, a portion of which asserted, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, as of September 30, 2009, total proofs of claim and scheduled liabilities asserted approximately $34.4 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time, as of September 30, 2009, the Debtors had objected to approximately 15,000 proofs of claim which asserted approximately $10.7 billion in aggregate liquidated amounts plus additional unliquidated amounts.  The Court has entered orders disallowing, and/or claimants have withdrawn, approximately 10,700 of those claims.  These orders reduced the amount of asserted claims by approximately $9.6 billion in aggregate liquidated amounts plus additional unliquidated amounts.  In addition, the Court has entered an order allowing or modifying approximately 4,050 claims, reducing the aggregate amounts asserted on those claims by $356.5 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced.  The determination of how these liabilities are to be settled and treated is set forth in the Modified Plan. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with the Modified Plan.

The accounting guidance in FASB ASC 852-10 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims,

the values of any collateral securing such claims, or other events.  Liabilities subject to compromise consist of the following:

|  | September 30, 2009 |
|---|---|
|  | (in millions) |
| Pension obligations | $       177 |
| Postretirement obligations other than pensions | 25 |
| PBGC claim | 3,000 |
| Allowed GM general unsecured claim | 2,500 |
| Allowed GM administrative claim | 1,628 |
| Allowed IUE-CWA and USW claims | 129 |
| Debt and notes payable | 1,984 |
| Accounts payable | 810 |
| Junior subordinated notes due 2033 | 391 |
| Securities and ERISA litigation liability | 351 |
| Supplemental executive retirement program | 117 |
| Other | 217 |
| Total Liabilities Subject to Compromise | $      11,329 |

## 6.  Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and, as of September 30, 2009, were being paid under agreed-upon payment terms.

## 7.  Divestitures

*Discontinued Operations* – The Court's approval of Delphi's plan to dispose of the Steering Business and the Interiors and Closures Business triggered held for sale accounting in 2007.  The Court approval of bidding procedures for the sale of the remaining assets of the chassis business on April 23, 2009 and subsequent approval of the sale triggered held for sale accounting for the Automotive Holdings Group in the second quarter of 2009.

*Steering and Halfshaft Business* - In the fourth quarter of 2007, Delphi executed (i) a Purchase and Sale Agreement (the "Purchase Agreement") with Steering Solutions Corporation, an affiliate of Platinum Equity, LLC ("Platinum"), for the sale of the Steering Business and, in connection therewith, (ii) a Transaction Facilitation Agreement with GM (the "Transaction Agreement").  In February 2008, the Court entered an order authorizing Delphi to dispose of its Steering Business.  Pursuant to the Amended MRA, GM agreed that ownership of the Steering Business would transfer to GM if it was not sold to a third party by December 31, 2010.  On March 3, 2009, Delphi and Platinum reached an agreement under which the Purchase Agreement was terminated (the "Termination Agreement"), and Delphi and GM reached an agreement (the "Option Exercise Agreement"), subject to GM's receiving U.S. Treasury and GM board of directors approval and Delphi's receiving Court approval.  Under the Options Exercise Agreement, GM would exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM  to purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances.  GM had agreed to guaranty the payment and performance of its wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.  In conjunction with the substantial consummation of the Modified Plan and the closing of the MDA and related transactions, Delphi sold certain of its plants, including the Steering Business, to the Parent.  These transactions superseded the Option Exercise Agreement, which had been pending Court approval and was ultimately withdrawn by Delphi.  Refer to Note 1. Background and Organization, Master Disposition Agreement for further information.

On September 30, 2008, in conjunction with the effectiveness of the Amended MRA, Delphi received and recorded as a deferred liability a $210 million advance on working capital recovery from GM related to the Steering Business.  During the three and nine months ended September 30, 2009 Delphi recorded a loss of $46 million and $23 million, net of tax, respectively, due to the results of operations and adjustment of assets held for sale to fair value of the Steering Business and the effectiveness of the Amended MRA.

*Automotive Holdings Group* - The Automotive Holdings Group included various non-core product lines and plant sites that did not fit Delphi's future strategic framework.  The sales and wind-downs of the various Automotive Holdings Group sites effectively began in the third quarter of 2007 and will be substantially completed with the divestiture of the Global Suspension and Brakes Business.  As mentioned above, the Court approval of bidding

procedures for the sale of the remaining assets of the chassis business on April 23, 2009 and the subsequent sale approval triggered held for sale accounting for the Automotive Holdings Group in the second quarter of 2009. During the three and nine months ended September 30, 2009 Delphi recorded a loss of $4 million and $59 million, net of tax, respectively, due to the results of operations and adjustment of assets held for sale to fair value of the Automotive Holdings Group.

**DELPHI CORPORATION, <u>et al.</u>**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**THREE MONTHS ENDED SEPTEMBER 30, 2009**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $      281,310,586 | $          73,039,277 | $          21,596,162 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**THREE MONTHS ENDED SEPTEMBER 30, 2009**

| Payee | Payroll Taxes Paid |
|---|---|
| Internal Revenue Service | $ 81,418,398 |
| State of Michigan | 4,693,808 |
| City of Detroit, MI | 75,928 |
| City of Saginaw, MI | 55,577 |
| City of Flint, MI | 17,783 |
| City of Grand Rapids, MI | 9,006 |
| City of Walker, MI | 1,142 |
| City of Pontiac, MI | 389 |
| City of Lansing, MI | 57 |
| State of New York | 2,911,595 |
| State of Indiana | 2,681,454 |
| Bartholomew County, IN | 200 |
| State of Ohio | 1,283,095 |
| City of Vandalia, OH | 82,309 |
| City of Kettering, OH | 67,049 |
| City of Moraine, OH | 40,975 |
| City of Dayton, OH | 40,619 |
| City of Warren, OH | 24,154 |
| City of Elyria, OH | 18,937 |
| City of Rita, OH | 13,523 |
| Ohio School District | 12,536 |
| City of Niles, OH | 8,959 |
| City of Hubbard, OH | 3,891 |
| City of Lordstown, OH | 1,681 |
| City of Trotwood, OH | 1,188 |
| City of Columbus, OH | 789 |
| City of Springfield, OH | 505 |
| City of Dublin, OH | 458 |
| City of Toledo, OH | 417 |
| City of Canton, OH | 381 |
| City of Newton Falls, OH | 319 |
| City of Akron, OH | 236 |
| City of Norwalk, OH | 104 |
| City of Lorain, OH | 73 |
| City of Port Clinton, OH | 52 |
| City of Xenia, OH | 44 |
| City of Troy, OH | 44 |
| City of Parma, OH | 21 |
| City of Huron, OH | 3 |
| City of Cincinatti, OH | 1 |
| State of Alabama | 569,249 |
| State of Wisconsin | 145,731 |
| State of Mississippi | 120,345 |
| State of California | 77,966 |
| State of Colorado | 60,837 |
| City of Denver, CO | 4,882 |
| State of Pennsylvania | 24,951 |
| City of Towamencin, PA | 125 |
| City of Philadelphia, PA | 7 |
| State of Kansas | 21,084 |
| State of Illinois | 14,136 |
| State of South Carolina | 13,860 |
| State of Georgia | 12,055 |
| State of Texas | 8,214 |
| State of New Mexico | 7,055 |

Case Number:  05-44481 (RDD) (Jointly Administered)

| Payee | Payroll Taxes Paid |
|---|---|
| State of Oregon | $ 6,297 |
| State of Virgina | 6,183 |
| State of North Carolina | 6,178 |
| State of Arizona | 5,710 |
| State of New Jersey | 3,481 |
| State of Louisiana | 3,063 |
| State of Kentucky | 2,920 |
| City of Elizabethtown, KY | 683 |
| City of Bowling Green, KY | 442 |
| State of Missouri | 2,694 |
| State of Arkansas | 1,486 |
| State of Iowa | 1,194 |
| State of Utah | 981 |
| State of Maryland | 763 |
| State of West Virginia | 379 |
| State of Massachusetts | 180 |
| State of Tennessee | 168 |
| Internal Revenue Service (UK) | 1,225,931 |
| Total | $ 95,816,930 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED SEPTEMBER 30, 2009**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Troy, MI | Real Property | $ 1,060,301 | $ 1,060,301 |
| Buena Vista, MI | Real Property | 800,139 | 800,139 |
| Lockport , NY | Real Property | 700,580 | 700,580 |
| Montgomery County, OH | Real Property | 571,198 | 571,198 |
| Wyoming , MI | Real Property | 467,486 | 467,486 |
| Trumbull County, OH | Real Property | 464,603 | 464,603 |
| Saginaw, MI | Real Property | 316,051 | 316,051 |
| Rochester, NY | Real Property | 232,683 | 232,683 |
| Henrietta, NY | Real Property | 228,927 | 228,927 |
| Portgage County, OH | Real Property | 22,990 | 22,990 |
| Henry County, IN | Real Property | 18,696 | 18,696 |
| Starpoint CSD, NY | Real Property | 2,335 | 2,335 |
| Buena Vista, MI | Personal Property | 808,825 | 808,825 |
| Wyoming , MI | Personal Property | 735,584 | 735,584 |
| Flint, MI | Personal Property | 136,557 | 136,557 |
| Auburn Hills, MI | Personal Property | 113,483 | 113,483 |
| Troy, MI | Personal Property | 60,910 | 60,910 |
| Shelby, MI | Personal Property | 47,760 | 47,760 |
| Saginaw, MI | Personal Property | 23,720 | 23,720 |
| City of Detroit, MI | Personal Property | 14,808 | 14,808 |
| Alma, MI | Personal Property | 12,627 | 12,627 |
| Bay City, MI | Personal Property | 8,608 | 8,608 |
| Orange County , CA | Personal Property | 7,753 | 7,753 |
| Riverside County , CA | Personal Property | 7,735 | 7,735 |
| Allen County, IN | Personal Property | 6,223 | 6,223 |
| Parker County , TX | Personal Property | 5,788 | 5,788 |
| Burton, MI | Personal Property | 5,441 | 5,441 |
| Dearborn, MI | Personal Property | 5,003 | 5,003 |
| Los Angeles, CA | Personal Property | 4,225 | 4,225 |
| Brighton, MI | Personal Property | 4,200 | 4,200 |
| Fenton, MI | Personal Property | 3,955 | 3,955 |
| Johnson County, IN | Personal Property | 3,473 | 3,473 |
| Santa Clara County, CA | Personal Property | 3,352 | 3,352 |
| Warren, MI | Personal Property | 2,880 | 2,880 |
| Clio City, MI | Personal Property | 2,725 | 2,725 |
| Wixom, MI | Personal Property | 2,723 | 2,723 |
| Henry County, IN | Personal Property | 2,244 | 2,244 |
| Milford, MI | Personal Property | 1,874 | 1,874 |
| Wayne County, IN | Personal Property | 1,782 | 1,782 |
| Tipton County , IN | Personal Property | 1,770 | 1,770 |
| Noble County, IN | Personal Property | 1,748 | 1,748 |
| St Clair Shores, MI | Personal Property | 1,400 | 1,400 |
| Cleveland County, NC | Personal Property | 1,374 | 1,374 |
| Davison, MI | Personal Property | 1,338 | 1,338 |
| Monitor, MI | Personal Property | 1,316 | 1,316 |
| Santa Clara County,CA | Personal Property | 1,247 | 1,247 |
| Madison Heightsr, MI | Personal Property | 1,197 | 1,197 |
| Wake County, NC | Personal Property | 1,066 | 1,066 |
| Green Oak, MI | Personal Property | 1,045 | 1,045 |
| Oxford, MI | Personal Property | 929 | 929 |

| | | | | | |
|---|---|---|---|---|---|
| Taylor, MI | Personal Property | $ | 802 | $ | 802 |
| Huntington County Treasurer, IN | Personal Property | | 659 | | 659 |
| Dekalb County Treasurer, IN | Personal Property | | 610 | | 610 |
| Cass, MI | Personal Property | | 581 | | 581 |
| Cabarrus County, NC | Personal Property | | 351 | | 351 |
| Novi, MI | Personal Property | | 319 | | 319 |
| Stanly County , NC | Personal Property | | 286 | | 286 |
| Sturgis, MI | Personal Property | | 275 | | 275 |
| Delaware County, IN | Personal Property | | 273 | | 273 |
| San Bernardino County, CA | Personal Property | | 256 | | 256 |
| Commerce, MI | Personal Property | | 251 | | 251 |
| Cass County, IN | Personal Property | | 243 | | 243 |
| Shelby County, TN | Personal Property | | 223 | | 223 |
| Memphis, TN | Personal Property | | 177 | | 177 |
| Van Buren, MI | Personal Property | | 176 | | 176 |
| Plymouth, MI | Personal Property | | 149 | | 149 |
| Placer County, CA | Personal Property | | 141 | | 141 |
| Tawas, MI | Personal Property | | 137 | | 137 |
| Steuben County Treasurer, IN | Personal Property | | 131 | | 131 |
| Tuscola County, MI | Personal Property | | 125 | | 125 |
| Woodstock , MI | Personal Property | | 115 | | 115 |
| Blackford Countyr, IN | Personal Property | | 102 | | 102 |
| Addison Village , MI | Personal Property | | 92 | | 92 |
| Washington County, IN | Personal Property | | 92 | | 92 |
| Bridgeport, MI | Personal Property | | 79 | | 79 |
| Johnston County, NC | Personal Property | | 79 | | 79 |
| Southfield , MI | Personal Property | | 63 | | 63 |
| Macon County, NC | Personal Property | | 60 | | 60 |
| Lawrence County, IN | Personal Property | | 47 | | 47 |
| Newaygo, MI | Personal Property | | 46 | | 46 |
| Lee County , NC | Personal Property | | 42 | | 42 |
| Lagrange County, MI | Personal Property | | 27 | | 27 |
| Forsyth County, NC | Personal Property | | 25 | | 25 |
| Blissfield Village, MI | Personal Property | | 23 | | 23 |
| Jasper County Treasurer, IN | Personal Property | | 19 | | 19 |
| Blissfield Twp, MI | Personal Property | | 18 | | 18 |
| Clinton, MI | Personal Property | | 17 | | 17 |
| Holly, MI | Personal Property | | 17 | | 17 |
| Osceola County, MI | Personal Property | | 17 | | 17 |
| Guilford County, NC | Personal Property | | 14 | | 14 |
| Hersey, MI | Personal Property | | 14 | | 14 |
| Rochester, MI | Personal Property | | 14 | | 14 |
| Marshall County Treasurer, IN | Personal Property | | 12 | | 12 |
| Oak Park, MI | Personal Property | | 7 | | 7 |
| Hinds County, MS | Personal Property | | 5 | | 5 |
| State of Michigan | Use | | 303,773 | | 303,773 |
| State of Indiana | Use | | 133,153 | | 133,153 |
| State of New York | Use | | 106,349 | | 106,349 |
| State of Ohio | Use | | 97,154 | | 97,154 |
| State of Texas | Use | | 38,389 | | 38,389 |
| State of Mississippi | Use | | 15,225 | | 15,225 |
| Limestone County, Alabama  (Pay to: Alabama Department of Revenue) | Use | | 3,452 | | 3,452 |
| Colorado Dept of Revenue | Use | | 1,864 | | 1,864 |
| State of Wisconsin | Use | | 359 | | 359 |
| Ohio Treasurer of State | Commercial Activity | | 159,481 | | 159,481 |

| | | | | | |
|---|---|---|---|---|---|
| Orange County Tax Collector | Property | $ | 94,650 | $ | 94,650 |
| Kentucky Department of Revenue | Franchise | | 46,000 | | 46,000 |
| Delaware Secretary of State | Franchise | | 33,000 | | 33,000 |
| State of Ohio | Kilowatt Hour | | 26,937 | | 26,937 |
| US Treasury/IRS | Withholding (non-payroll) | | 12,101 | | 12,101 |
| State of Alabama | Seller's Use | | 4,745 | | 4,745 |
| US Treasury/IRS | Heavy Highway Vehicle Use | | 1,794 | | 1,794 |
| Colorado Dept of Revenue | Utility | | 713 | | 713 |
| South Carolina Department of Revenue | Sales & Use | | 334 | | 334 |
| Colorado Dept of Revenue | Sales | | 162 | | 162 |
| Total | | $ | 8,021,523 | $ | 8,021,523 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED SEPTEMBER 30, 2009**

Note 1:   The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:   Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF DISBURSEMENTS**
**THREE MONTHS ENDED SEPTEMBER 30, 2009**

| Debtor Name | Case Number | Amount [1] |
|---|---|---|
| Delphi NY Holdings Corporation | 05-44480 | $ — |
| Delphi Corporation | 05-44481 | (55,943) |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 12,395,780 |
| Delphi Medical Systems Texas Corporation | 05-44511 | — |
| Delphi Medical Systems Corporation | 05-44529 | 4,557,112 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 1,193,399 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 3,862,556 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 21,253,354 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | — |
| Delphi China LLC | 05-44577 | 736,970 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 293,459 |
| Delphi International Services, Inc. | 05-44583 | 14,817,506 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | 105 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | 359,027 |
| Delco Electronics Overseas Corporation | 05-44610 | 13,965,395 |
| Delphi Diesel Systems Corporation | 05-44612 | 76,208,311 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 658,400 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 217,698 |
| Delphi Connection Systems | 05-44624 | 13,038,480 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 208,920,153 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 368,918,595 |
| Delphi Automotive Systems LLC | 05-44640 | 1,698,269,476 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 29,568,957 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | — |

(1) Operating expenses for the three months ended September 30, 2009 were used as a proxy for disbursements.