David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2236)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway, 22nd Floor
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel to the Delphi Trade Committee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------x

### APPLICATION OF THE DELPHI TRADE COMMITTEE FOR REIMBURSEMENT OF EXPENSES ARISING FROM SUBSTANTIAL CONTRIBUTION MADE IN THESE CASES

The ad hoc committee of creditors holding trade claims against Delphi Automotive Systems LLC and its domestic operating subsidiaries (the "Trade Committee"), by and through its undersigned counsel, hereby submits this application (the "Application")[1] pursuant to Section 503(b)(3)(D), (b)(4) of Title 11 of the United States Code (the "Bankruptcy Code")[2], for payment of the actual, necessary expenses incurred by the Trade Committee in making a substantial contribution to these Chapter 11 cases (the "Cases"). In support hereof, the Trade Committee respectfully states as follows:

---

[1] The Trade Committee also files this Application pursuant to and in accordance with Paragraph 46 of the Final Confirmation Order (as defined below) and Section 10.4 of the plan approved thereby which establishes the deadline and guidelines for filing substantial contribution applications with this Court.

[2] While not directly applicable to substantial contribution applications, Bankruptcy Rule 2016 and Local Rule 2016-1 require certain disclosures for fee applications, which disclosures are included in the Application.

## SUMMARY OF EXPENSES

| **Name of Applicant** | Argo Partners, Inc., ASM Capital, Avenue Capital Management, LLC, Contrarian Capital Management, LLC, Hain Capital Group, King Street Capital Management LLC, Longacre Fund Management LLC and Sierra Liquidity Fund, LLC[3] (herein, the "Trade Committee") |
|---|---|
| **Professional Services Rendered By** | Kasowitz, Benson, Torres & Friedman LLP<br>Ropes & Gray LLP<br>Capstone Advisory Group |
| **Time Period Covered by Application** | June 13, 2006 through November 28, 2008 |

| **Fees & Expenses** | | |
|---|---|---|
| | Incurred<br>(Fee / Expenses) | Requested By Trade Committee |
| Kasowitz, Benson, Torres & Friedman LLP | $1,444,978.09/<br>$78,397.63[4] | $1,500,000<br><br>Used To Pay Outstanding Bills Owed By The Trade Committee And To Reimburse Payments Made To Date |
| Ropes & Gray LLP | $34,012.50 /<br>$89.50 | |
| Capstone Advisory Group | $226,029.00/<br>$1,150.72 | |
| **TOTAL** | **$1,705,019.59 /<br>$79,637.85** | |

---

[3] Former members of the Trade Committee include Bear Stearns and Goldman Sachs.
[4] As set forth below, KBT&F and the Trade Committee have voluntarily adjusted KBT&F's fees and expenses with a $70,443.36 voluntary reduction.

2

## APPLICATION

The Trade Committee seeks reimbursement of its expenses incurred in making a substantial contribution to these Cases, calculated by aggregating the fees and expenses incurred by the Trade Committee for services performed by Kasowitz, Benson, Torres & Friedman LLP ("KBT&F"), Ropes & Gray LLP ("R&G") and Capstone Advisory Group ("Capstone" and together with KBT&F and R&G, the "Trade Committee Firms") from June 13, 2006 through November 28, 2008.

## PRELIMINARY STATEMENT

The Trade Committee made a substantial contribution to these Cases by, among other things (a) providing a unified voice of creditors of the Debtors' domestic subsidiaries with which the Debtors could conduct (and, indeed did conduct) direct and efficient plan negotiations, and (b) obtaining critical plan terms regarding the classification and the treatment of domestic trade creditor that facilitated the progression of these Cases through emergence. The Trade Committee's contribution benefitted the estates, as a whole, by preventing avoidable delays, fees, and litigation uncertainties in the confirmation context. Those savings and confirmation certainty conferred a direct, substantial, and demonstrably positive benefit on these estates as a whole -- as recognized by the Debtors and the Official Committee of Unsecured Creditors (the "UCC") at the December 6, 2007 hearing, at which the Debtors and the UCC agreed not to oppose reimbursing the Trade Committee for up to $1,500,000 of documented fees and expenses. See Exhibit A (excerpt of transcript of hearing). Moreover, the Trade Committee's contribution was unique and not duplicative of any other party in these Cases, including the UCC, some of whose members held interests conflicting with domestic trade creditors and who, despite its efforts in these Cases, did not advocate on behalf of creditors of the Debtors' domestic entities.

3

While the Trade Committee has expended in excess of $1,780,000 for its efforts in these Cases, by this Application the Trade Committee seeks payment of $1,500,000, which would be allocated to pay approximately $156,000 of outstanding bills owed to professionals, with the remaining approximately $1,344,000 repaid to members of the Trade Committee in their aliquot share of payments made to date.

For the reasons set forth below, the Trade Committee's substantial contribution expenses should be reimbursed by the estates.

## JURISDICTION AND VENUE

1.  The Court has jurisdiction to consider the Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Application is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for relief sought in the Application is Section 503(b)(3)(D), (b)(4) of the Bankruptcy Code.

## FACTUAL BACKGROUND[5]

2.  On December 18, 2006, the Debtors filed their *Expedited Motion for Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code* [Docket No. 6179] (the "EPCA Motion").

3.  On December 21, 2006, the Trade Committee filed its preliminary objection to the EPCA Motion [Docket No. 6254]. Among other things, the Trade Committee opposed terms of the proposed "Plan Framework Support Agreement" which seemed to classify trade claims

---

[5] The Court has familiarity with the background of these Cases. Below is a brief summary of certain facts germane to this Application.

4

separately from other unsecured claims, and to treat them in an uneven fashion. The Trade Committee then commenced discovery relating to the Plan Framework Support Agreement and its terms.

4. On January 9, 2007, following extensive efforts by the Trade Committee and its advisors (both litigation and negotiation) the Debtors, the UCC, and the proposed plan investors under the Plan Framework Support Agreement agreed to revise that agreement to classify trade claims with other general unsecured claims and consenting to paying trade claims post-petition interest. Moreover, in resolution of the Trade Committee's objection to the Plan Framework Support Agreement, in addition to the beneficial deal changes described, the Debtors and the UCC agreed they would not object to any substantial contribution claim filed by the Trade Committee, up to $750,000.

5. Accordingly, and pursuant to those settlement terms, on January 9, 2007, the Trade Committee withdrew its preliminary objection to the EPCA Motion [Docket No. 6501] and filed a statement in support thereof [Docket No. 6508].

6. On January 12, 2007, the Court entered its Order granting the EPCA Motion, on an interim basis [Docket No. 6589] (the "Interim EPCA Order"). That Order reflected the agreement among the parties as follows:

> [T]he Plan Investors, the Debtors, and the Creditors' Committee shall not oppose any application by the Committee of Delphi Trade Claim Holders for the payment of fees and expenses of their professionals pursuant to Section 503(b) of the Bankruptcy Code provided that the Plan Investors, the Creditors' Committee and the Debtors may oppose the reimbursement of fees and expenses in excess of $750,000.

(Paragraph 8).

5

7.      On September 6, 2007, the Debtors filed the first versions of their proposed Chapter 11 plan and disclosure statement [Docket Nos. 9263, 9264]. On October 29, 2007, the Debtors filed a notice of potential amendments to same [Docket No. 10759].

8.      On October 30, 2007, the Debtors filed the *Expedited Motion for Order Under 11 U.S.C. Sections 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and Commitment Agreement* [Docket No. 10760] (the "EPCA Amendment Motion").

9.      On November 10 and 14, 2007, the Debtors filed *Notice*[s] *Of Further Proposed Amendments To Certain Appendices To Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession* [Docket Nos. 10932, 10964].

10.     On November 21, 2007, the Trade Committee filed objections to the EPCA Amendment Motion [Docket No. 11042] and to the Debtors' proposed disclosure statement [Docket No. 11049]. Among other things, the Trade Committee argued that the EPCA Amendment Motion vitiated the original Plan Framework Support Agreement and impermissibly transferred value from unsecured creditors to would be investors, and that the proposed disclosure statement provided incorrect valuations and the plan was unconfirmable. The Trade Committee and its professionals expended extensive time and resources analyzing, investigating and researching issues raised in these pleadings.

11.     Between November 21, 2007 and December 6, 2007, the Trade Committee (through its professionals) and the Debtors engaged in extensive negotiations regarding the Trade Committee's objections. On December 6, 2007, at the hearing on the EPCA Amendment Motion and approval of the disclosure statement, counsel for the Debtors announced a settlement reached with the Trade Committee which resolved its objections to the disclosure statement and EPCA

6

Amendment Motion, which settlement included the Debtors' agreement to increase the $750,000 fee agreement reflected in the Interim EPCA Order to $1,500,000, such that the Debtors would not object to the Trade Committee's request for payment of fees and expenses up to $1,500,000. (Exhibit A, 11:11-16).  Counsel for the UCC also agreed.  (*Id.* 12:25-13:4).

12. On January 25, 2008, this Court entered its Order [Docket No. 12359] confirming the *First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified* (the "Confirmed Plan").

13. Subsequently, the Debtors made various modifications to the Confirmed Plan, its disclosure statement, and solicitation procedures for the same.  On July 30, 2009, this Court entered its *Order Approving Modifications Under 11 U.S.C. § 1127(b) To (I) First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified And (II) Confirmation Order* [Docket No. 18707] (the "Final Confirmation Order"), which approved the final iteration of the Confirmed Plan.  On October 6, 2009, the Confirmed Plan went effective.

## ARGUMENT

**I.     Legal Basis For The Relief Requested.**

14. Section 503(b) of the Bankruptcy Code provides for the allowance, as an administrative expense, of the actual and necessary expenses of a creditor, including reasonable compensation for professional services rendered by a creditor's attorney, where a "substantial contribution" to a Chapter 11 case has been made.[6]  *See* 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4);

---

[6]    Specifically, section 503(b) of the Bankruptcy Code provides, in relevant part, that after notice and a hearing, administrative expenses shall be allowed, including:

> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by . . .

7

*see also In re Texaco, Inc.*, 90 B.R. 622, 627 (Bankr. S.D.N.Y. 1988) (discussing 11 U.S.C. § 503(b)); *In re McLean Indus., Inc.*, 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988) (discussing 11 U.S.C. § 503(b)(4)).

15. The reimbursement of fees and expenses pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code is designed to encourage meaningful participation by creditors and other parties-in-interest in a debtor's reorganization. *See In re Consolidated Banc Shares, Inc.*, 785 F.2d 1249 (5th Cir. 1986) ("the policy aim of authorizing fee awards to creditors is to promote meaningful creditor participation in the reorganization process") (internal citation omitted); *Law Offices of Neil Vincent Wake v. Sedona Institute* (*In re Sedona Institute*), 220 B.R. 74 (9th Cir. B.A.P. 1998) (the language of section 503(b)(3) reveals a policy of encouraging creditor participation); *In re Richton Int'l Corp.*, 15 B.R. 854, 856 (Bankr. S.D.N.Y. 1981).

16. Although the Bankruptcy Code does not define the term "substantial contribution," courts in this and other jurisdictions have generally looked to see whether the actions of the party seeking reimbursement pursuant to sections 503(b)(3)(D) and 503(b)(4) have rendered an actual and demonstrable benefit to the debtor's estate and its creditors. *Lebron v. Mechem Fin., Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (applicable test for determining whether a creditor has made a substantial contribution is whether there has been an actual and demonstrable benefit to the debtor's estate and creditors); *In re Villa Luisa, L.L.C.*, 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) (courts have looked to "whether there has been a contribution that is

---

(D) a creditor, an indenture trustee, an equity holder, or a committee representing creditors or equity holders other than a committee appointed under section 1102 of this title, in making a *substantial contribution* in a case under chapter 9 or 11 of this title;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. § 503(b) (emphasis added).

8

considerable in amount, value and worth, which directly, demonstrably and materially contribute to the debtor's reorganization" in determining whether a substantial contribution has been made within the meaning of section 503(b)).

17.     Generally, "[s]ervices which substantially contribute to a case are those which foster and enhance, rather than retard or interrupt the progress of reorganization." *Richton Int'l Corp.*, 15 B.R. at 856.  In particular, "substantial contribution" fee requests have been granted where a creditor has facilitated the progress of the debtor's reorganization and has taken an active role in the negotiation and successful confirmation of the debtor's plan. *See, e.g.*, *Id.* (awarding reimbursement of fess and expenses to creditor-banks because creditor's lawyer facilitated the progress of the bankruptcy cases by, among other things, organizing a large group of the debtors' creditors into a single group and aiding in the negotiation and consummation of the plan or reorganization); *see also In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) (awarding substantial contribution reimbursement where creditor took an active role in facilitating the negotiation and successful confirmation of the plan).  Furthermore, "[a] committee purporting to speak for a group…has a better chance of meeting the 'substantial contribution' test [for purposes of section 503(b)(3)(D)] than an individual." *In re Northwest Airlines Corp.*, 363 B.R. 701, 703 (Bankr. S.D.N.Y. 2007).

18.     Courts generally consider the following factors in deciding whether a substantial contribution has been made: (1) whether the services were provided to benefit solely the client or all the parties in the case; (2) whether the services conferred a direct, significant, and demonstrably positive benefit upon the estate; and (3) whether the services were duplicative of services performed by others. *See In re Best Prods. Co., Inc.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994); *In re Gurley*, 235 B.R. 626, 636 (Bankr. W.D. Tenn. 1999).  Courts have found that substantial contributions have been made by ad hoc groups of trade creditors where those

9

groups worked to protect the plan treatment of all trade creditors and, in some circumstances, other unsecured creditors as well. *See, e.g., In re Mirant Corp.*, 354 B.R. 113, 135 (Bankr. N.D. Tex. 2006) (granting 503(b) application of convenience class creditors who litigated postpetition interest issue, noting that "by eliminating one of the issues that might have required attention at the confirmation hearing, the Convenience Creditors have saved costs and time; the latter savings provided special benefit to all parties by ensuring an earlier effective date").

## II. The Trade Committee Made A Substantial Contribution To These Cases And Is Entitled To Fee Reimbursement.

19. Applying the foregoing standards, the Trade Committee has unquestionably made a substantial contribution to these Cases and has conferred a direct, significant, and demonstrable benefit to the Debtors' estates and their creditors entitling it to be reimbursed for its fees and expenses.

20. As a general matter, the Trade Committee provided a singular voice to all holders of domestic trade debt (and other creditors of the Debtors' domestic operating subsidiaries), thereby streamlining negotiations and avoiding the Debtors the time, expense, and uncertainty inherent in multifarious negotiation with disparate creditors.

21. The Trade Committee became active in June 2006, as the Debtors started to formulate a plan of reorganization and it became apparent that creditors at certain entities could be severely impaired. Among other things, these negotiations resulted in (i) large blocks[7] of consenting votes on the Confirmed Plan (as first solicited) and (ii) negotiating resolutions of significant confirmation issues relating to classification and treatment of claims.[8] In addition to

---

[7] *See Verified Second Amended Statement of Kasowitz, Benson, Torres &Friedman LLP Pursuant to Bankruptcy Rule 2019(a)* (Docket No. 5340) (showing substantial holdings by Trade Committee members at nine (9) of the Debtor entities).

[8] *See Declaration of Jane Sullivan Certifying Tabulation of Ballots Regarding Vote on First Amended Plan of Reorganization of Delphi Corporation and Certain of Its Subsidiaries and Affiliates.* (Docket No. 12163).

10

its members, the Trade Committee and its advisors had numerous conversations with other creditors and parties in interest in the Cases.

22. Concerned about the rights of domestic trade creditors, the Trade Committee retained KBT&F and R&G as counsel and Capstone as financial advisor, to analyze potential issues and provide a focused voice for the group and other similarly situated creditors. The Trade Committee then instructed its professionals to investigate the Debtors' restructuring alternatives and dialogue with the Debtors' professionals, the UCC, and other parties in interest. The Trade Committee's professionals negotiated and executed confidentiality agreements providing them access not only to plan discussions, but also to relevant financial information.

23. In the course of discussions with the Debtors leading up to the EPCA Motion, the Trade Committee learned that the Debtors' proposed plan would contain two terms that were potentially violated the absolute priority rule.

24. First, the proposed plan accorded different treatment for trade creditors as compared with other unsecured creditors, and the Debtors intended to pay their senior subordinated unsecured notes, who were creditors of Delphi Corporation, ahead of domestic trade debt. Through its objection to the EPCA Motion and extensive negotiations that ensued thereof, the Trade Committee successfully obtained amendments to the Plan Framework Support Agreement which, among other things, included agreements by the Debtors, the UCC, and the proposed plan sponsors under the Plan Framework Support Agreement to classify trade creditors (along with all other unsecured creditors of the domestic subsidiaries), with the senior subordinated unsecured notes, and to treat them all the same. This was a significant change from prior iterations which inured to the benefit of numerous creditors and rendered the Confirmed Plan confirmable.

25.     <u>Second</u>, the Trade Committee was instrumental in addressing another absolute priority problem by ensuring that the Debtors pay post-petition interest to unsecured creditors, which was not provided for in the original Plan Framework Support Agreement, despite that it offered to pay junior classes.  Through the Trade Committee's litigation relating to the EPCA Motion, as well as extensive negotiations, the Debtors, the UCC, and the proposed plan sponsors under the Plan Framework Support Agreement agreed to pay post-petition interest to all unsecured creditors.[9]  This resolution fixed an overwhelming absolute priority rule issue in the Debtors' plan.  Otherwise, the Debtors would have encountered extensive confirmation hurdles leading to protracted litigation and potentially insurmountable confirmation risks from both the Trade Committee and other parties in interest.

26.     The Trade Committee's contribution was recognized by the parties in these cases including the Debtors and the UCC.  In the Interim EPCA Order and the agreement read into the record at the December 6, 2007 hearing, the Debtors and the UCC agreed they would not challenge the Trade Committee's request for reimbursement of up to $1,500,000 of documented fees and expenses.  See Exhibit A (excerpt of transcript of hearing).

27.     While due to various economic factors with which the Court is aware, the Debtors were forced to amend their Confirmed Plan and alter the treatment of domestic trade creditors, the Trade Committee's contribution, nonetheless, remains real and appreciable.  <u>First</u>, the Confirmed Plan provided the platform for the Debtors' ultimate emergence from bankruptcy, including the equal treatment for all unsecured creditors of the Debtors which carried through all further iterations of the plan.  Indeed, the Debtors progressed through modifications to the Confirmed Plan -- which was highly advantageous for them -- rather than starting from scratch.

---

[9]     Moreover, whereas the Debtors proposed originally paying only the Michigan statutory rate of 4.845%, the Trade Committee successfully sought a mechanism for claimants to demonstrate higher rates where contemplated in the underlying transaction documents.

<u>Second</u>, without the Trade Committee's efforts and success negotiating with the Debtors, the Debtors would have faced real risks of not confirming the Confirmed Plan including, among other reasons, that the Trade Committee delivered large blocks of accepting votes on certain Debtors and that, otherwise, the Confirmed Plan faced absolute priority rule issues rendering potentially unconfirmable. While the modifications to the Confirmed Plan eliminated post-petition interest, the Trade Committee's contribution of having the Debtors fix absolute priority rule concerns remained through emergence. Failure to confirm that plan would have been disastrous to the Debtors' estates, possibly triggering extensive defaults under financing arrangements, loss of supplier confidence, labor negotiations disruption, not to mention massive fees, costs, and delays.

28.    The Trade Committee's substantial contribution benefited all parties in these Cases. In addition to those items described above, throughout the course of the Cases, the Trade Committee allowed the estates to save fees, uncertainty, and delays from having to negotiate with multiple parties of potentially divergent views. Moreover, as in precedent cited above, the Trade Committee's involvement greatly minimized confirmation risk by delivering accepting votes under the Confirmed Plan at multiple Debtors, and addressing critical confirmation issues regarding the absolute priorities in the Bankruptcy Code. *See In re Granite Partners, L.P.*, 213 B.R. at 446; *In re Mirant Corp.*, 354 B.R. at 135.

29.    Finally, the Trade Committee's services were not duplicative of services performed by others. The Trade Committee played a vital role, one that no other entity played, by providing a voice to a large block of the Debtors' creditors who were previously fragmented. Indeed, the Trade Committee's involvement was essential considering the membership of the UCC which included not only unions with widely diverging interests, but also Wilmington Trust, the Indenture Trustee for the senior subordinated unsecured notes, and the Pension Benefit

13

Guaranty Company. Thus, despite the UCC's best efforts, they could not advocate for certain domestic trade creditors.

### III. The Firms' Services Relating To The Trade Committee's Contribution.

#### A. KBT&F

30. KBT&F, as the Trade Committee's counsel, performed an array of legal services in connection with these Cases. Chiefly, KBT&F analyzed legal issues surrounding the treatment of trade creditors under the Plan Framework Support Agreement, EPCA, and plan iterations. Through pleadings filed, legal research conducted, discovery taken and extensive negotiations, KBT&F's attorneys represented the Trade Committee's legal interests.

31. KBT&F directly billed certain members of the Trade Committee $1,431,715.62 for its fees and expenses. Through a fee sharing arrangement, certain other members of the Trade Committee were obligated to pay an additional $91,660.11 indirectly to KBT&F for its fees and expenses. Thus, in total, the members of the Trade Committee were billed $1,523,375.73 for all of KBT&F's fees and expenses. Of that, $1,432,195.46 was previously paid by members of the Trade Committee, leaving a balance of $91,180.27 which the members of the Trade Committee remain obligated to pay.

32. For purposes of this Application, the Trade Committee and KBT&F, have agreed to reduce the amount of fees and expenses sought to be paid. Although there is no obligation to do so, the Trade Committee and KBT&F have decided to reduce their fees and expenses subject to this Application from $1,523,375.73 to $1,452,932.37, a 5% reduction. Among other things, this reduction eliminates certain fees and expenses incurred by members of the Trade Committee in connection with cure claim issues litigated in early 2008.[10]

---

[10] KBT&F separately billed individual members for claims resolution issues; none of which is included in the $1,523,375.73 of fees and expenses billed to the Trade Committee.

14

33. KBT&F's fees, of $1,376,776.50, account for approximately 2,290 attorney and paraprofessional hours rendering services for the Trade Committee.[11] KBT&F's expenses, of $76,155.87, are its actual out of pocket expenses incurred in rendering services for the Trade Committee, and are consistent with the U.S. Trustee fee guidelines as well as KBT&F's standard billing practices for all clients.

B. **R&G**

34. The Trade Committee also retained R&G as its co-counsel. R&G's role, while minimal in time and scope, was critical to ensuring that the Trade Committee could represent as broad a group as possible and certain entities (i.e., Goldman Sachs and Bear Stearns).

35. The members of the Trade Committee were billed $34,102.00 for R&G's fees and expenses. Of the $34,102.00 billed by R&G, $34,012.50 was previously paid by members of the Trade Committee, leaving a balance of $0.00.

36. R&G's fees, of $34,012.50, account for approximately 65 attorney and paraprofessional hours rendering services for the Trade Committee. R&G's expenses, of $89.50, are its actual out of pocket expenses incurred in rendering services for the Trade Committee, and R&G believes are consistent with the U.S. Trustee fee guidelines as well as R&G's standard billing practices for all clients.

C. **Capstone**

37. Capstone was retained as the Trade Committee's financial advisor in September 2006 to analyze integral financial issues keyed to trade creditors' recoveries. Among other things, Capstone performed extensive diligence of the Debtors' books and records to determine potential valuation issues. Capstone's involvement was essential for the Trade Committee's

---

[11] The Trade Committee will separately file Schedules supporting the fees and expenses set forth for all professionals in this Application.

15

understanding of the Debtors' highly complex capital and debt structures, including large intercompany obligations and its global business presence and understanding the interrelates of the Delphi enterprise. Capstone spent much time reviewing the Debtors data room and interacted with the financial advisors from the Debtors and the UCC.

38. The members of the Trade Committee were billed $227,179.72 for all of Capstone's fees and expenses. Of the $227,179.72 billed by Capstone, $162,332.99 was previously paid by members of the Trade Committee, leaving a balance of $64,846.73.

39. Capstone's fees, of $226,029.00, account for approximately 500 professional and paraprofessional hours rendering services for the Trade Committee. Capstone's expenses, of $1,150.72, are its actual out of pocket expenses incurred in rendering services for the Trade Committee, and are consistent with the U.S. Trustee fee guidelines as well as Capstone's standard billing practices for all clients.

* * *

40. The following chart summarizes the fees and expenses incurred by the Trade Committee, separated as paid and outstanding, and the amounts sought herein:

| Firm | Paid | Outstanding | Incurred | Reduction | Adjusted Fees & Expenses Sought in Application |
|---|---|---|---|---|---|
| KBT&F | $1,432,195.46 | $91,180.27 | $1,523,375.73 | ($70,443.36) | $1,452,932.37 |
| R&G | $34,102.00 | $0.00 | $34,102.00 | - | $34,102.00 |
| Capstone | $162,332.99 | $64,846.73 | $227,179.72 | - | $227,179.72 |
| | | | | Total Adjusted | **$1,714,214.09** |
| | | | | | ($214,214.09) |
| | | | | **Requested** | **$1,500,000.00** |

16

## **CONCLUSION**

WHEREFORE, the Trade Committee respectfully requests entry of an Order awarding payment of its administrative expense claim pursuant to 11 U.S.C § 503(b)(3)(D) and (b)(4) in the amount of $1,500,000, and awarding the Trade Committee such other and further relief deemed just and proper.

Dated: New York, New York
November 20, 2009

                                              KASOWITZ, BENSON, TORRES
                                               &FRIEDMAN LLP

                                              */s/ David S. Rosner*
                                              David S. Rosner (DR-4214)
                                              Adam L. Shiff (AS-7571)
                                              Daniel N. Zinman (DZ-7562)
                                              Daniel A. Fliman (DF-2336)
                                              1633 Broadway
                                              New York, New York 10019
                                              (212) 506-1700
                                              (212) 506-1800 (facsimile)