

LEXSEE 2005 U.S. DIST. LEXIS 30811

**James R. Harpster, et al., Plaintiff(s), v. AARQUE Management Corp., et al., Defendant(s).**

**CASE NO. 4:03CV1282**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 30811*; *35 Employee Benefits Cas. (BNA) 2531*

**July 21, 2005, Decided
July 22, 2005, Filed**

**COUNSEL:** [*1] For James R. Harpster, Gordon A. Wilber, Dennis E. McHugh, John H. Watkins, Plaintiffs: Paul C. Morrison, Scott A. Lefelar, Terry E. Lardakis, R. Scot Harvey, Millisor & Nobil, Cleveland, OH.

For AARQUE Management Corp., Defendant: Melinda E. Smith, Mark Hilkert, Scanlon & Gearinger, Akron, OH; R. Scott DeLuca, Underberg & Kessler, Buffalo, NY; Ronald G. Hull, Underberg & Kessler LLP, Rochester, NY.

For R. Quintus Anderson, Heidi A. Nauleau, Raymond P. Torok, Joseph Horvath, Defendants: Melinda E. Smith, Mark Hilkert, Scanlon & Gearinger, Akron, OH; R. Scott DeLuca, Underberg & Kessler, Buffalo, NY; Ronald G. Hull, Underberg & Kessler LLP, Rochester, NY; Scott A. Lefelar, Millisor & Nobil, Cleveland, OH.

For Watson Wyatt & Company, Movant: Joseph P. Rodgers, Squire, Sanders & Dempsey, Cleveland, OH.

For Gordon A. Wilber, James R. Harpster, Dennis E. McHugh, John H. Watkins, Counter-Defendants: Paul C. Morrison, Scott A. Lefelar, Terry E. Lardakis, Millisor & Nobil, Cleveland, OH.

For AARQUE Management Corp., R. Quintus Anderson, Joseph Horvath, Heidi A. Nauleau, Raymond P. Torok, Counter-Claimants: Mark Hilkert, Melinda E. Smith, Scanlon & Gearinger, Akron, [*2] OH; Ronald G. Hull, Underberg & Kessler LLP, Rochester, NY.

**JUDGES:** David D. Dowd, Jr., U.S. District Judge.

**OPINION BY:** David D. Dowd, Jr.

**OPINION**

MEMORANDUM OPINION AND ORDER

(Resolving Doc. No. 101)

**I. Introduction**

Plaintiffs James R. Harpster, Gordon A. Wilber, Dennis E. McHugh, and John H. Watkins (collectively Plaintiffs) have sued Defendants AARQUE Management Corp., R. Quintus Anderson, Heidi A. Nauleau, Raymond P. Torok, and Joseph Horvath (collectively Defendants). Plaintiffs allege that Defendants breached their fiduciary duties owed to ERISA-qualified benefit plans by failing to adequately protect the interests of the defined benefit pension plan (the Plan), by misrepresenting material facts to plan beneficiaries, and by terminating a welfare benefits plan. Before the Court is Defendants' Motion for Summary Judgment on those claims (Doc. No. 101), which has been fully briefed (Doc. Nos. 103, 106).

Because the Court concludes that AARQUE was not fiduciary of the Plan and because the decision to terminate a welfare benefits plan does not implicate ERISA fiduciary duties, Defendants' Motion for Summary Judgment is GRANTED to AARQUE Management Corp. with respect to all counts [*3] and to all Defendants with respect Plaintiffs' claim that they breached their fiduciary duties in terminating the welfare benefits plan. Defendants' Motion for Summary Judgment, how-

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 2 of 12

Page 2

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

ever, is DENIED because material questions of fact remain regarding whether Defendants breached their fiduciary duties to the Plan. Additionally, Plaintiffs have presented evidence indicating that only Torok and Horvath misrepresented material facts to the Plan's beneficiaries. Defendants' Motion for Summary Judgment regarding Plaintiffs' misrepresentation claim, therefore, is DENIED with respect to Torok and Horvath and GRANTED as to all other Defendants.

## II. Background

Plaintiffs James R. Harpster, Gordon A. Wilber, Dennis E. McHugh, and John H. Watkins were management employees of Cold Metal Products (CMP) and beneficiaries of the CMP Pension Plan for Salaried Employees (the Plan). Harpster was named CMP's President and CEO in 1984, and Wilber became CMP's Vice President of Operations in 1987 and its Chief Operating Officer in 1994. McHugh was a Vice President for Technology, and Watkins was a manager in the human relations department.

Defendant R. Quintus Anderson formed CMP in 1980 when he [*4] purchased steel processing facilities from the Jones & Laughlin Steel Company. Anderson managed CMP and other companies that he owned through Defendant AARQUE Management Corp., which Anderson also owned. In 1994, CMP's stock began being publicly traded as part of an initial public offering (IPO). Even after the IPO and at all times relevant to this action, however, Anderson, either personally or through his family and corporate holdings, retained a controlling interest in CMP. As a result, Anderson served as Chairman of CMP's Board of Directors.

### A. Change in management

In September of 1998, Anderson stepped down as Chairman of the Board in favor of his daughter Defendant Heidi Nauleau. Nauleau formally became Chairman of the Board of Directors on September 23, 1998. Nauleau had no formal training in business, finance, or accounting. In October of 1998, Harpster was terminated from his position as President and CEO at CMP, and Defendant Raymond Torok replaced him. At the time, Torok had no experience in the steel industry. Wilber was subsequently terminated in March of 1999. On July 1, 1999, Defendant Joseph Horvath was hired as CMP's Chief Financial Officer.

During this change [*5] in management, CMP created an Executive Committee to manage and oversee the day-to-day operations of the business. The Executive Committee consisted of three members: Anderson as Chairman of the Committee, Nauleau, and Torok. One of the duties the Executive Committee reserved for itself was management and administration of CMP's pension plans, including the Plan.

On March 31, 1999, Anderson entered in a Supplemental Executive Retirement Agreement with CMP. This Agreement created a Supplemental Executive Retirement Plan (the SERP), whose sole beneficiary was Anderson. The SERP required CMP to pay Anderson a monthly benefit based on a hypothetical variable annuity with a one time premium of $ 500,000 over a fixed 15-year term. The SERP, however, was not prefunded; CMP was to pay the benefit out of its general assets.

On September 30, 1999, Nauleau retained Anderson as a consultant for CMP. Under the Consulting Agreement, CMP would compensate Anderson at the rate of $ 15,000 per month. Anderson, however, had the status of an independent contractor and, therefore, did not participate in any pension benefit plans with CMP through the Consulting Agreement.

### B. CMP's profitability

 [*6] While Harpster was President and CEO of CMP, CMP generated profits for sixteen consecutive years.[1] After he was terminated, however, CMP did not fare as well. For the fiscal year ending March 31, 1999, CMP reported a pre-tax loss of $ 14.9 million. The following year, CMP experienced a pre-tax profit of $ 8.5 million and, on October 21, 1999, declared a quarterly cash dividend for the first time ever. For that fiscal year (the year ending March 31, 2000), CMP paid dividends of $ 638,000, and Torok received a bonus of $ 256,000. CMP continued to pay the quarterly dividend during the following fiscal year through the October 2000 payment, paying cash dividends during that year totaling $ 958,000. The dividends then were suspended because CMP was no longer turning a profit, and, for the fiscal year ending March 31, 2001, CMP reported a pre-tax loss of $ 11.2 million. Despite this loss, Torok and Nauleau each received bonuses of $ 70,000. For the following fiscal year, CMP experienced another pre-tax loss in the amount of $ 7.38 million.

> 1   It should be noted that prior to Hapster's termination, the Board of Directors was dissatisfied with the profits CMP actually realized.

[*7] ### C. The Plan

While Harpster and Wilber were officers of CMP, they also served as fiduciaries to the Plan. During their tenure, CMP made the regular required minimum contributions to the Plan, and funding was sufficient to cover expected benefits. They invested the Plan's assets with PNC Bank, which provided a steady return on the Plan's investments. For the Plan year ending July 31, 1998, the

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 3 of 12

Page 3

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

Plan had assets valued at $13 million and estimated liabilities of $8.6 million.

In 1997, Anderson sought to add himself and Heidi Nauleau as participants of the Plan. Apparently, Anderson and Nauleau were Plan participants according to the definitions in the Plan's documents, but they were not actually participating in the Plan. Anderson had been removed from participation in the Plan in 1988 because he had reached the IRS limit due to his participation in other plans, and it is unclear to the Court whether Nauleau ever participated in the Plan prior to 1997.

On November 12, 1997, Anderson received a memorandum from Robert Freeburg, an AARQUE employee, and Nauleau received a carbon copy of this memorandum. (Doc. No. 105, Exh. 62.) Freeburg indicated that the Plan may have been underfunded [*8] in previous years because the actuaries did not consider Anderson's and Nauleau's participation in the Plan when making their funding calculations. Freeburg, however, further indicated that "any prior year underfunding in this type of case can be corrected by a minor change in actuarial assumptions such as interest rates to show that the plans were correctly funded." (Doc. No. 105, Exh. 62.) Freeburg concluded by recommending "that [they] let the actuaries and attorneys sort out the issues but stick with [their] position of [Anderson's] legal right to these benefits and that the adjustments must be done." (Doc. No. 105, Exh. 62.) Anderson indicated that he agreed with this recommendation.

On December 22, 1997, Anderson requested that he be included in the Plan "for [his] full service and compensation within applicable limits." (Doc. No. 105, Exh. 61.) He also indicated that Nauleau should be included in the Plan "for her full service and compensation." (Doc. No. 105, Exh. 61.) Prior to adding himself and Nauleau to the Plan, Anderson took no steps to ensure that he did not breach a duty of loyalty to the Plan or to ensure that the Plan had been fully compensated in prior years.

[*9] On October 21, 1999, the Executive Committee formed an advisory Pension Committee. The Pension Committee was to make recommendations to the Executive Committee regarding (1) possible amendments to the Plan, (2) the Plan's funding policy, (3) the adjudication of benefit claims, and (4) changes in professionals serving the Plan. Freeburg was among the individuals appointed to the Pension Committee and the only non-CMP employee appointed. The Executive Committee, however, retained fiduciary authority to manage the Plan.

In December of 2000, the Executive Committee decided to remove PNC Bank as the Plan's investment manager because, after reviewing actuarial evaluations, it believed that PNC was underperforming on its investment returns. To avoid putting all of its eggs in one basket, the Committee replaced PNC Bank with two investment managers, U.S. Bank and National City Bank. At the same time, Defendants increased the Plan's anticipated rate of return on investments from 8.5 to 9 percent per year.

Because no minimum contributions were required, CMP made no contributions to the Plan for the Plan years ending July 31, 2000 and July 31, 2001. In December of 2001, the Plan's actuary [*10] indicated that the Plan had become underfunded and that an ERISA mandated minimum contribution would be due from CMP to the Plan for the Plan year ending July 31, 2002. On August 30, 2002, the Plan's actuary issued its final report for the Plan year ending July 31, 2002, which indicated that a minimum contribution of $354,615 was required for the Plan year. This contribution, however, would not become due until April 15, 2003. Although CMP never received, or even applied for, a waiver of the minimum funding requirements, CMP never made the contribution.

In March of 2002, Horvath had sought guidance on obtaining a waiver of the minimum funding contribution from the IRS because CMP was facing a cash shortfall. In January of 2002, CMP had contacted Scott King, a distressed business consultant to assist CMP in negotiations with lending institutions for additional funding. CMP needed $3-5 million in additional funding to stay in operation, and between March and July of 2002, CMP negotiated with several lending institutions to obtain that additional funding. By July, however, the lending institutions were insisting that they would fund CMP only through a Chapter 11 bankruptcy filing. [*11] During its negotiations and in preparation for the bankruptcy filing, CMP made clear that it would not be making the scheduled contribution to the Plan. On August 16, 2002, CMP filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

On November 7, 2002, Torok sent a letter, in question and answer format, to CMP's salaried retirees regarding the impact that CMP's bankruptcy would have on their pension benefits. Horvath reviewed the letter before Torok distributed it to the beneficiaries. The letter indicated that CMP had contributed all of the required annual amounts to the pension trusts. It stated as follows:

> Q - Are the current assets of the pension trust adequate to pay all of the benefit to which I am entitled?
>
> A - At the present time, the trust is underfunded. This means that the projected value of the trust assets is less than the amount required to pay all of the

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 4 of 12

Page 4

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

pension benefits that must be paid in the future. Cold Metal Products is required to make contributions to the pension trust each year in order to reduce the underfunding. The amount of the contribution is calculated by an actuary according to rules established by the government. [*12] *To date, Cold Metal Products has contributed all of the required annual amounts to the pension trust.*

(Doc. No. 105, Exh. 12 (emphasis added).) The letter, however, did not indicate that CMP intended not to make the required minimum contribution that was due on April 15, 2003.

In 2003, CMP terminated the Plan. The parties dispute whether the Plan was terminated in March of 2003 or on November 10, 2003. Regardless, at the time of termination, the Plan was underfunded, and, as a result, the Pension Benefit Guaranty Corp. (PBGC) assumed control of the Plan as the statutory trustee. According to the PBGC, the Plan is approximately $ 10 million short of funds to cover all benefits guaranteed under the Plan. As a result of this underfunding and the Plaintiffs' length of qualifying service with CMP, the PBGC notified Plaintiffs that they will be receiving benefits that are lower that they would have otherwise received under the Plan. With the approval of the Bankruptcy Court, CMP also terminated its Welfare Benefits Plan that provided employees with life and health insurance benefits.

**D. Procedural history**

Plaintiffs filed this suit on June 26, 2003, alleging that Defendants [*13] breached their fiduciary duties to the Plan. (Doc. No. 1.) Plaintiffs seek recovery for the Plan due to the underfunding condition of the Plan and an amount sufficient to provide the benefits they would have received from the Welfare Benefits Plan. (Doc. No. 1.) Defendants have now moved for summary judgment. (Doc. No. 101.)

**III. Legal Standard**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56.* When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).* However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

The Rule requires the nonmoving party [*14] who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in *Rule 56(c)*, except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. See *Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).* Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." *Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986)* (citing *Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984))*; but see *Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004)* (noting that a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit"). Further, "'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence [*15] on which the jury could reasonably find for the plaintiff.'" *Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989)* (quoting *Anderson v. Liberty Lobby, 477 U.S. at 252).*

In sum, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, 477 U.S. at 250.* Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 251-52.* See also *Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003)* ("the conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

**IV. Standing**

Defendants first argue that they are entitled to summary judgment because Plaintiffs lack standing to bring [*16] this suit. Under ERISA, "a civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under *section 1109.*" *29 U.S.C. § 1132(a)(2). Section 1109* renders

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 5 of 12

Page 5

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

fiduciaries personally liable for a breach of their fiduciary duties.

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . .

*29 U.S.C. § 1109(a)*. Thus, ERISA authorizes participants and beneficiaries to bring civil actions against fiduciaries for a breach of their fiduciary duties. Indeed, "there can be no disagreement with the . . . conclusion that *§ [1132](a)(2)* authorizes a beneficiary to bring an action against a fiduciary who has [breached a fiduciary duty]." *Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)*.

ERISA also provides that, when a plan has been terminated, "the trustee shall have the power. . . to commence, prosecute, or defend on behalf of [*17] the plan any suit or proceeding involving the plan." *29 U.S.C. § 1342(d)(1)(B)(iv)*. In *Paulsen v. CNF, Inc., 2003 U.S. Dist. LEXIS 21700, No. C 03-03960 JW, 2003 WL 22971080, *3-4 (N.D. Cal. Nov. 24, 2003)*, the court held that the Plan's trustee (PBGC) had the sole power to bring a lawsuit on behalf of the plan to recover plan assets, not the individual beneficiaries of a class of beneficiaries. The court reasoned that "in order to avoid a select group of plan participants usurping a potential benefit owed to all Plan Participants that obtain non-guaranteed benefits, Congress has vested the sole power to initiate such lawsuits." *2003 U.S. Dist. LEXIS 21700 at *13*. The court, therefore, dismissed the complaint because the plaintiffs lacked standing. Id.

Such a conclusion, however, contravenes *§ 1132(a)(2)*. Section 1132(a)(2) explicitly authorizes suits by individual plan participants against fiduciaries for a breach of fiduciary duty. Indeed, it authorizes suits against fiduciaries for a breach of their fiduciary duties by "a participant, beneficiary or fiduciary." Thus, the statute clearly contemplates that *either* a plan participants or beneficiaries, like Plaintiffs here, *or* [*18] a plan fiduciary, like the PBGC, would bring a suit for a breach of fiduciary duty. *Section 1342(d)(1)(B)(iv)* does not state that the trustee has the sole power to bring suits, but merely "the power." Thus, the power to bring suits bestowed by *§ 1342(d)(1)(B)(iv)* does not preempt or preclude suits by individuals whom the statute elsewhere expressly gives the power to bring such suits.

Furthermore, recovery under *§ 1132(a)(2)* for breach of fiduciary duty inures to the benefit of the plan as a whole, not the individual plan participants. *Bauer v. RBX Indus., Inc., 368 F.3d 569, 582, n.6 (6th Cir. 2004)* (quoting *Adcox v. Teledyne, Inc., 21 F.3d 1381, 1390 (6th Cir.1994))*. Consequently, the court's concern in Paulsen that allowing a private cause of action will circumvent Congress's detailed provisions for the disbursement of nonguaranteed benefits is irrelevant to suits under *§ 1132(a)(2)*. This Court, therefore, concludes that, by the express language of *§ 1132(a)(2)*, plan participants have standing to bring suits against plan fiduciaries for a breach of fiduciary duty.

Defendants argue that the Sixth Circuit in *United Steelworkers of Am. v. United Eng'g, Inc., 52 F.3d 1386 (6th Cir. 1995)*, [*19] determined that individual plan participants lack standing to bring any suit to recover nonguaranteed benefits. In United Eng'g, however, the court merely held that ERISA preempted federal common law actions directly against the employer under *§ 301 of the Labor Management Relations Act* for payment of nonguaranteed pension benefits. *Id. at 1389-90*. In determining that Congress had occupied the field for benefit recovery, the Court reasoned that the "detailed provisions [by which the PBGC disburses non-guaranteed benefits] seem to allocate responsibility for disbursement of nonguaranteed benefits to the PBGC, strongly suggesting that suits against plan sponsors to recover those same benefits are precluded." *Id. at 1393*. The court further reasoned that Congress had occupied the field through the use of those detailed provisions because "to allow a private right of action against the employer would contravene Congress's intent to disburse guaranteed benefits before nonguaranteed benefits." *Id. at 1394*. Consequently, the court concluded that ERISA precluded the *§ 301* actions. Id.

The court, however, did not address the present [*20] situation where plan participants seek to sue under ERISA, not federal common law, the fiduciaries, not the employer, for the recovery of nonguaranteed benefits. Thus, contrary to Defendants' assertion, United Eng'g did not settle the law in this circuit that plan participants lack standing to sue for nonguaranteed benefits. Rather, United Eng'g stresses the importance of examining the statutory framework to determine whether a cause of action exists under ERISA. *Section 1132(a)(2)* clearly authorizes suits by beneficiaries against plan fiduciaries for breach of their fiduciary duties. Consequently, Plaintiffs do have standing to assert claims against Defendants for the purported breach of their fiduciary duties.

**V. Breach of fiduciary duties to the Plan**

Defendants contend that they are entitled to summary judgment because they did not breach any of their ERISA fiduciary duties. "ERISA requires a fiduciary to 'discharge his duties with respect to a plan solely in the

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 6 of 12

Page 6

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

interest of the participants and beneficiaries.'" *Best v. Cyrus*, 310 F.3d 932, 935 (6th Cir. 2003) (quoting 29 U.S.C. § 1104(a)(1)). Furthermore, a fiduciary must [*21] discharge his duties "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *29 U.S.C. § 1104(a)(1)(A)*. "In doing so, a fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Best, 310 F.3d at 935* (quoting *29 U.S.C. § 1104(a)(1)(B)*).

Unlike a common law trustee, however, an ERISA trustee may wear more than one hat. *Pegram v. Herdrich*, 530 U.S. 211, 225, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000). An ERISA fiduciary "may have financial interests adverse to beneficiaries. Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers . . . or even as plan sponsors." Id. "ERISA does require, however, that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." Id. (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-444, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999); [*22] *Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)). Furthermore, when conflicts of interests exist, fiduciaries must take precautions to ensure that their duty of loyalty is not compromised. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "To ensure that actions are in the best interests of plan participants and beneficiaries, fiduciaries under certain circumstances may have to 'at a minimum' undertake an 'intensive and scrupulous independent investigation of [the fiduciary's] options.'" *Id.* (alteration in original) (quoting *Leigh v. Engle*, 727 F.2d 113, 125-26 (7th Cir. 1984)).

However, "ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants." *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990), as quoted in *Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995). "It is neither the purpose nor the domain of ERISA to regulate purely corporate behavior that is adequately covered elsewhere." *Akers, 71 F.3d at 230.* [*23] A mere business decision, therefore, is not subject to ERISA's fiduciary obligations even though it may have an effect on the plan. *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998); see also *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000). "Thus we must examine the conduct at issue to determine whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan." *Hunter, 220 F.3d at 718* (internal quotations and alterations omitted) (quoting *Sengpiel, 156 F.3d at 665*).

When a plan is not receiving all of the funds to which it is entitled trustees have a duty to act in the interests of the plan's beneficiaries. *Best, 310 F.3d at 936*. Consequently, "[a] trustee's failure to attempt to collect contributions owed to a plan [is] a breach of the duty to ensure that the plan receives the funds to which it is entitled." Id. (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 918 (2d Cir. 1989). "Indeed, whenever an employer seeks to avoid making [*24] its pension plan payments . . . trustees have a duty to investigate the relevant facts, to explore alternative courses of action and, if in the best interests of the plan participants, to bring suit against the employer." *McMahon v. McDowell*, 794 F.2d 100, 112 (2d Cir. 1986), quoted in *Morse v. Adams*, 857 F.2d 339, 344 (6th Cir. 1988). Furthermore, "these duties, and the overriding obligation to maintain a primary loyalty to the fund are heightened, if anything, when the trustees also serve as officers of the employer company, as here." *McMahon, 794 F.2d at 112*, quoted in *Morse, 857 F.2d at 344*.

### A. AARQUE

AARQUE argues that it was not a fiduciary to the Plan, and, therefore, did not owe it any fiduciary duties. Under ERISA, a person is a plan fiduciary to the extent that he meets one of the following three criteria:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect [*25] to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*29 U.S.C. § 1002(21)(A)*. Here, AARQUE's only connection with the Plan after 1994 was the participation of Freeburg (AARQUE employee representative at CMP) on CMP's Pension Committee. The Pension Committee, however, was purely advisory; CMP's Executive Committee had the authority and control of the administration of the Plan. Plaintiffs present no evidence suggesting that the Pension Committee was anything more than an advi-

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 7 of 12

Page 7
2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

sory committee. Thus the Pension Committee had no discretionary authority over the Plan. Conseuqently, Freeburg's participation on the Pension Committee is insufficient to subject AARQUE to ERISA fiduciary obligations. Plaintiffs do not contend that AARQUE was involved with the Plan in any way other than Freeburg's relationship to the Plan. AARQUE, therefore, is not a Plan fiduciary and, accordingly, is entitled to summary judgment on all of Plaintiffs' claims.

**B. Heading into bankruptcy**

Plaintiffs assert that Defendants [*26] breached their fiduciary duties by failing to act in the interests of the Plan as CMP headed toward bankruptcy. In Morse, the court affirmed the district court's granting of summary judgment to the defendants on the plaintiffs' breach of fiduciary duty claim. *857 F.2d at 344*. There, the defendants were officers of an employer who had applied for and received a waiver of ERISA's minimum funding requirements from the IRS. *Id. at 340*. The court noted that plan trustees have a duty to investigate and explore alternative courses of action "whenever an employer seeks to avoid making its pension plan payments." *Id. at 344*. The Court, however, concluded that even though the defendants had not explored alternative courses of action they were not liable for a breach of fiduciary duty because the employer "was genuinely in dire financial straits, and . . . there is no allegation that the application for a waiver was in bad faith. Nor . . . have plaintiffs come forward with any evidence that a collection action by the defendants would have produced any results." Id. Consequently, the court affirmed the district court's dismissal of the action. [*27] Id.

Here, CMP was required to make a minimum contribution to the Plan on April 15, 2003. On August 16, 2002, however, CMP filed for Chapter 11 bankruptcy. Defendants first learned that CMP would be required to make the minimum contribution in December of 2001. Defendants contend that, as in Morse, they are not liable because CMP was in dire financial straights and that Plaintiffs have presented no evidence that any other course of action would have produced results. Unlike the employer in *Morse*, however, CMP neither applied for nor received a waiver of the minimum contribution. Consequently, the minimum contribution would have still become due had CMP not filed for bankruptcy. Prior to CMP's filing for bankruptcy, Defendants were negotiating with CMP's lenders. Defendants, however, did not attempt to engage in any negotiation with the lenders on behalf of the Plan to secure payment for the Plan of the future contribution, or at least a portion of that contribution. On the contrary, Defendants indicated to the lenders that they would not be making the contribution to the Plan. An independent fiduciary would have been able to negotiate with CMP to ensure that the Plan received [*28] the required contribution, or at least a portion of that contribution. Consequently, unlike Morse, material questions of fact remain regarding whether Defendants' failure to explore alternative courses of action in securing payment to the Plan constituted a breach of ERISA fiduciary duties.

**C. The dividends**

Plaintiffs next contend that Defendants breached their fiduciary duty to the plan by declaring a dividend. "Whether or not dividends are to be paid is always a matter of corporate policy which the corporation through its board of directors must consider and decide." 12 O. Jur. 3d, Bus. Relationships § 731 (citing *Lamb v. Lehmann, 110 Ohio St. 59, 2 Ohio Law Abs. 245, 143 N.E. 276 (1924))*. Such a decision is "largely a matter of discretion with the board of directors." *Schuckman v. Rubenstein, 164 F.2d 952, 957, 55 Ohio Law Abs. 65 (6th Cir. 1947)*. In Sengpiel, the court held that the employer's decision to spin off one of its corporate divisions and divide its retirement plan into four separate plans was a corporate decision not subject to ERISA's fiduciary duty requirements. *156 F.3d at 665-66*. The decision whether to pay dividends, like the decision to spin off a corporate [*29] division, is a corporate decision. Thus, as in Sengpiel, paying a dividend is the type of corporate transaction that ERISA does not require to be performed solely in the interests of plan participants. Consequently, Defendants' decision to declare a dividend alone does not constitute a breach of their fiduciary duties.

However, if the plan is entitled to contributions and the declaration of a distribution will prevent the plan from receiving those distributions, the trustee is under a duty to ensure that the plan receives the funds to which it is entitled. See *Best 310 F.3d at 936*. Here, CMP paid a quarterly cash dividend during the fiscal years ending March 31, 2000, and March 31, 2001. CMP terminated the quarterly dividend after the October, 2000 payment. It was not until December of 2001, however, that the Plan's actuary first indicated to Defendants that a minimum contribution would need to be made to the Plan. Thus, during the period when CMP was paying a quarterly dividend, the Plan was not entitled to any contributions from CMP. Indeed, when the quarterly dividend was initially declared, the Plan was funded at a rate of 140%. Moreover, the Plan's actuary [*30] did not even notify Defendants that the Plan would require a minimum contribution until over one year after the last quarterly dividend payment. Consequently, Defendants's decision to declare a dividend did not prevent the Plan from receiving contributions to which it was entitled. Defendants, therefore, did not breach their fiduciary duty to the Plan by declaring the quarterly dividend.

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 8 of 12

Page 8

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

#### D. Hiring and compensation of officers and directors

Plaintiffs further argue that Defendants breached their fiduciary duties by hiring inexperienced corporate officers and directors and paying them excessive bonuses. ERISA does not regulate "purely corporate behavior that is adequately covered elsewhere." *Akers, 71 F.3d at 230*. "Only actions respecting the *administration* or *management* of plan 'assets' are subject to fiduciary standards." *Akers, 71 F.3d at 230* (citing *Musto v. Am. Gen'l Corp., 861 F.2d 897, 911 (6th Cir. 1988))*. Here, Anderson appointed Nauleau, his daughter, Chairman of CMP's Board of Directors in September, 1998, even though she had no formal business training. In October of 1998, Torok was hired as CMP's CEO despite [*31] having no experience in the steel industry at that time. In fiscal year 2000, Torok received a bonus of $ 256,000, and in fiscal year 2001, Torok and Nauleau received bonuses of $ 70,000 each. Plaintiffs argue that these hiring and compensation decisions constituted a breach of ERISA fiduciary duties.

The election of directors is a corporate decision entrusted to a corporation's shareholders. Likewise, the hiring of corporate officers is a corporate decision entrusted to the directors. Thus, the selection of corporate directors and officers is a truly corporate decision that ERISA does not regulate. Furthermore, it is clear that a corporation's directors have the authority to establish reasonable compensation for services rendered to the corporation by directors and officers, *Ohio Rev. Code § 1701.60(A)(3)*; and the directors may agree to pay reasonable bonuses, 12 O. Jur. 3d, Bus. Relationships § 464 (citing *Holmes v. Republic Steel Corp., 84 Ohio App. 442, 53 Ohio Law Abs. 192, 84 N.E.2d 508 (Ohio Ct. App. 1948))*. Disputes over officers' and directors' compensation and bonuses are resolved through shareholder derivative suits. See *Mlinarcik v. E.E. Wehrung Parking, Inc., 86 Ohio App. 3d 134, 620 N.E.2d 181 (Ohio Ct. App. 1993)* [*32] (resolving shareholder's derivative suit alleging that officers received excessive compensation). Thus decisions regarding the compensation of corporate officers and directors is also a corporate decision that ERISA does not regulate. Defendants' selection of Nauleau as Chairman of CMP's Board of Directors and Torok as its CEO and paying them bonuses, therefore, do not implicate ERISA fiduciary obligations. Consequently, those selections and those compensation decisions cannot constitute a breach of ERISA fiduciary duties.

#### E. The SERP

Plaintiffs also challenge the creation of the SERP for Anderson. An employer acts as an employer and not as a plan fiduciary when performing such functions as establishing, funding, amending, and terminating the trust. *Hunter, 220 F.3d at 718*. Thus an employer's decision to establish a retirement plan is the type of corporate decision to which ERISA's fiduciary obligations do not apply. On March 31, 1999, CMP and Anderson entered into a Supplemental Executive Retirement Agreement under which CMP would fund a Supplemental Executive Retirement Plan (SERP) for Anderson. The decision to establish the SERP was merely an employer's [*33] decision to establish a retirement plan. Furthermore, payments for the SERP were payable by CMP out of its general assets. Thus the establishment of the SERP did not dispose of the Plan's assets. Consequently, any role that Defendants had in the establishment of the SERP did not breach their fiduciary duties to the Plan.

#### F. Adding Anderson and Nauleau as Plan beneficiaries

Plaintiffs also assert that Anderson and Nauleau breached their fiduciary duties to the Plan by having themselves named as beneficiaries of the Plan. "The functional definition of fiduciary does not include decisions concerning plan design; such as . . . what benefits will be provided [and] who will be entitled to receive them[.]" *Gard v. Blankenburg, 33 Fed. Appx. 722, 729 (6th Cir. 2002)* (citing *Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)*; *Lockheed Corp. v. Spink, 517 U.S. 882, 890, 116 S. Ct. 1783, 135 L. Ed. 2d 153 (1996))*. Here, the decision to include Anderson and Nauleau as beneficiaries of the Plan was merely a decision concerning who would be entitled to benefits. Thus merely adding them as Plan beneficiaries does not implicate ERISA fiduciary duties.

The decision [*34] to add a new beneficiary to an ERISA plan, however, does not abrogate the fiduciary duty to ensure that the plan is receiving all of the funds to which it is entitled. See *Best, 310 F.3d at 936*. When a conflict of interests exists in the adding of a new beneficiary, fiduciaries must take precautions to ensure that their duty of loyalty is not compromised, which under certain circumstances will require them to undertake an "intensive and scrupulous independent investigation of the fiduciary's options." *Bussian, 223 F.3d at 299* (internal quotations and alterations omitted) (quoting *Leigh v. Engle, 727 F.2d 113, 125-26 (7th Cir. 1984))*. However, "in some instances the only open course of action may be to appoint an independent fiduciary." Id. (citing *Leigh, 727 F.2d at 125*; *Donovan v. Bierwirth, 680 F.2d 263, 271-72 (2d Cir. 1982))*.

In *Walsh v. Northrop Grumman Corp., 871 F. Supp. 1567 (E.D. N.Y. 1994)*, employees sued their employer and the employer's officers who were the trustees of an ERISA plan. There, the employer merged with another company following a tender offer. *Id. at 1569-70.* [*35]

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 9 of 12

Page 9
2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

Prior to the merger, the plan held approximately one-third of the employer's outstanding stock. *Id. at 1570*. The plan's trustees, who were also officers of the employer, would receive "golden parachutes" in the form of generous "Special Severance Agreements" and also stood to profit from the sale of their personal shares of the employer's stock if the merger went through. *Id. at 1570-71*. In light of these benefits, the court concluded that the trustees "not only had substantial fiduciary duties to uphold, but also should have acted affirmatively to deflect the foreseeable criticism that they acted primarily in their self interest." *Id. at 1572*. The court noted that the trustees should have considered other options in order to undertake the requisite independent investigation, including investigating and computing the financial impact on the beneficiaries and appointing an independent trustee. *Id. at 1572-73*. The trustees, however, took no adequate precautions and announced to the plan's beneficiaries that they had decided to tender all of the plan's stock in the employer to the acquiring company. [2] *Id. at 1571-72*. [*36] Consequently, the court held that the plaintiffs had asserted a meritorious claim for breach of ERISA fiduciary duties. *Id. at 1573-74*.

> 2   The Court notes that the defendants in Walsh asserted that they had consulted an independent investment advisor before deciding to tender the plan's stock. *871 F. Supp. at 1571*. The court there, however, indicated that "it is very doubtful whether the Trustees' reliance on [the advisor's] opinion would even start to satisfy the strict fiduciary duties under ERISA." *Id. at 1572*. Because the trustees in Walsh undertook no other precautions, the Court here indicates that they undertook no adequate precautions to avoid the conflict of interest.

Here, prior to Anderson adding Nauleau and himself to the ERISA plan, he received a memo from Freeburg indicating that the Plan may have been underfunded in previous years because the actuaries had not considered them in their calculations. The memo also indicated that the underfunding [*37] problem could likely be resolved through the adjustment of actuarial assumptions. It concluded with the recommendation that Anderson allow the actuaries and attorneys to sort out the issues and that he maintain his position that he was legally entitled to benefits under the Plan. Anderson wrote on the memo that he agreed with the recommendation. At this point Anderson had a duty to ensure that the Plan received any funding to which it was entitled. He, however, was also subjected to conflicting interests: to himself, to CMP, and to the Plan. Thus, as in Walsh, Anderson also had a duty to ensure that his duty of loyalty to the Plan was not compromised.

Like the trustees in Walsh, however, Anderson presents no evidence that he undertook any precautions to maintain the required singular loyalty to the Plan. Indeed, despite warnings about potential underfunding, Anderson later added Nauleau and himself to the Plan but could not recall how any potential underfunding issues were resolved. Consequently, there are material questions of fact regarding whether Anderson breached his duty of loyalty to the Plan and whether he acted as a prudent man would act when he added Nauleau and [*38] himself as beneficiaries of the Plan. Anderson, therefore, is not entitled to summary judgment.

Additionally, Nauleau was carbon copied on the memo Anderson received from Freeburg. Because she was a Plan fiduciary, Nauleau, like Anderson, had a duty to ensure that the Plan received all funding to which it was entitled and, therefore, also had a conflict of interest. Nauleau, however, also did not take any precautions to maintain her loyalty to the Plan. Consequently, there are also material questions of fact regarding whether Nauleau breached her fiduciary duties to the Plan.

**G. Investment decisions**

Plaintiffs challenge Defendants' decision to change investment managers. "Under ERISA, a person is a fiduciary with respect to a plan to the extent that 'he . . . exercises any authority or control respecting management or disposition of its assets.'" *Best, 310 F.3d at 934-35* (quoting *29 U.S.C. § 1002(21)(A)*). Thus, ERISA fiduciary duties apply to the management of plan assets. Consequently, those duties extend to the selection of investment managers for the Plan and the instructions the fiduciaries provide to those managers. See *Chao v. Hall Holding Co., Inc., 285 F.3d 415, 430 (6th Cir. 2002)* [*39] (when relying upon an expert's advice, fiduciary must investigate the expert's qualifications); *Fink v. National Sav. & Trust Co., 249 U.S. App. D.C. 33, 772 F.2d 951, 956 (D.C. Cir. 1985)* ("Even where an investment manager has been appointed, trustees' fiduciary duties are not abrogated."). Plan fiduciaries, therefore, must choose investment managers and instruct those managers for the exclusive purpose of providing benefits to participants and their beneficiaries with the care, skill, prudence, and diligence that a prudent man would exercise under the circumstances. See *29 U.S.C. § 1104(a)(1)*; *Best, 310 F.3d at 935*.

In December of 2000, the Executive Committee, dissatisfied with the rate of return on the Plan's investments, decided to remove PNC Bank as the Plan's investment manager and to replace it with U.S. Bank and National City Bank. At the same time, Defendants increased the Plan's anticipated rate of return on investments from 8.5 to 9 percent. Plaintiffs claim that this amounted to a breach of fiduciary duty. Plaintiffs, how-

05-44481-rdd Doc 19190-1 Filed 12/16/09 Entered 12/16/09 15:33:31 Supplement
Harpster Case Pg 10 of 12

Page 10

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

ever, present no evidence indicating that the course of action taken by either the Executive Committee or Defendants as a whole deviated from the course of action [*40] that a prudent man would have taken in similar circumstances. They do not present evidence that PNC was not underperforming nor do they attempt to establish that the anticipated rate of return was imprudent. Plaintiffs point out that had the Plan achieved the higher rate of return, CMP would have needed to contribute less money to the Plan. They, however, present no evidence that reducing CMP's contributions was a factor Defendants considered in selecting investment managers or in raising the anticipated rate of return. Thus Plaintiffs have not presented any evidence to create a question of fact regarding whether Defendants breached their fiduciary duty regarding the selection of the Plan's investment managers and the instructions they provided to those managers.

**H. Misrepresentation**

Plaintiffs also claim that Torok and Horvath breached their fiduciary duties by misrepresenting the likely future of plan benefits. "A fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002)* [*41] (quoting *Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 547 (6th Cir. 1999))*. To establish this claim, a plaintiff must show three things: "(1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to their detriment." *Id*. (citing *Ballone v. Eastman Kodak Co., 109 F.3d 117, 122, 126 (2d Cir. 1997)*; *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 57 F.3d 1255, 1266 (3d Cir. 1995)*; *McMunn v. Pirelli Tire, LLC, 161 F. Supp. 2d 97, 120 (D. Conn. 2001))*.

Defendants first argue that Torok was not operating in his fiduciary capacity when he issued the letter, but rather that he was operating as the CEO of CMP. "An employer is said to act in a fiduciary capacity when it communicates with employees about their benefits because, in essence, the employer puts on its plan administrator hat and undertakes action designed to carry out an important purpose of the plan." *Sengpiel, 156 F.3d at 666*. Here, Torok's letter is addressed to salaried retirees [*42] and is styled as a series of answers to frequently asked questions. The questions deal with the effect that CMP's bankruptcy will have on pension benefits. Thus Torok was communicating with former employees about their benefits. He, therefore, was acting in a fiduciary capacity when he sent the letter.

Furthermore, Horvath reviewed the letter prior to Torok distributing it. A fiduciary is liable for another fiduciary's breach of his fiduciary duties "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." *29 U.S.C. § 1105(a)(3)*. Horvath had knowledge of the contents of Torok's letter. Consequently, if Torok's letter constitutes a breach of his fiduciary duties because it contains materially misleading information, then Horvath likewise subject to liability for breach of his fiduciary duties.

Defendants next argue that the statement was not a material misrepresentation because the statement did not misrepresent any facts and, even if it did, such misrepresentation was not material. A fiduciary's failure to provide information that the beneficiary does not know constitutes a misleading [*43] statement. See *Gregg v. Transp. Workers of Am. Int'l, 343 F.3d 833, 847-48 (6th Cir. 2003)*. "The basic concept of a fiduciary duty [is that it] 'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *James, 305 F.3d at 455* (quoting *Krohn, 173 F.3d at 548*). Consequently, "once an ERISA fiduciary begins affirmatively providing information not required by statute, the fiduciary may not mislead, even if it means disclosing information that the fiduciary would not otherwise need to disclose." *Gregg, 343 F.3d at 847*; see also *James, 305 F.3d at 453*. In Gregg, the court held that the defendants misled the plaintiffs, who were deciding whether to enroll in a life insurance program, when they failed to disclose that the group master life insurance policy contained a minimum participation requirement. *Id. at 847-48*. Because the minimum participation requirement would have affected whether the plaintiffs enrolled in the plan, the court held that the omission was misleading. Id.

Here, Torok's letter to plan beneficiary's stated that "to date, Cold Metal Products [*44] has contributed all of the required annual amounts to the pension trust." This statement could have reasonably been construed as indicating that CMP had made all required contributions of which it was aware, including the April 15, 2003 contribution. Torok sent the letter on November 7, 2002. At that time, CMP had already determined that it was not going to pay the required annual contribution that was due April 15, 2003. The statement, however, did not acknowledge that CMP had a required minimum contribution that it did not intend to pay. Nor does the letter indicate anywhere else that CMP intended not to pay the minimum contribution. Indeed, statements elsewhere could be construed as indicating that CMP intended to make all future contributions to the Plan. [3] The intention

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement
Harpster Case    Pg 11 of 12

Page 11

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

not to pay the required minimum contribution was information that the beneficiaries did not know. Consequently, when Torok began discussing CMP's obligations to the Plan, he had a fiduciary duty to provide that information, and his failure to do so resulted in a misleading statement.

> 3    The letter contained the following exchange:
>
> > Q-Will the chapter 11 bankruptcy have an effect on Cold Metal Products' obligation to contribute to the pension trust?
> >
> > A- *No.* During the pendency of the bankruptcy, Cold Metal Products remains obligated to contribute to the pension trust. Contributions that accrue for service earned after August 15, 2002, are treated as administrative claims by the Bankruptcy Court. This generally means that such contributions must be paid before the claims of pre-petition creditors. However, *if* Cold Metal Products doesn't have the money to pay its post-petition administrative claims, it won't be able to make the required contributions to the pension trust and this will ultimately negatively affect the ability of the trust to pay all of the promised pensions.

(Doc. No. 105, Exh. 12 (emphasis added).) This statement indicating that CMP remains obligated to the trust is subject to the interpretation that CMP intends to fulfill its obligations to the trust.

[*45]    "A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision" regarding what course of action to take. *James, 305 F.3d at 449* (internal quotations omitted) (quoting *Krohn, 173 F.3d at 547*; *Fischer v. Phila. Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993))*. Defendants contend that "whether or not the anticipated $ 354,615.00 contribution was 'due' but not paid would not amount to a material misrepresentation of future plan benefits in view of the overall assets of the Plan, and certainly not in light of the PBGC's estimate of a $ 10 million shortfall for a fully funded termination." (Doc. No. 106.) Defendants are confusing whether the amount that was misrepresented was material with whether the misrepresentation was material. A misrepresentation is material under ERISA if it would affect a reasonable employee in making a decision regarding what action to take. Thus the issue is whether Defendant's failure to disclose that CMP intended not to pay the April 15, 2003 contribution would have impacted a reasonable CMP employee's decision regarding [*46] what course of action to take, not whether the amount of the contribution was material. CMP's intention not to make the April 15, 2003 contribution could have led an employee to attempt other means of securing payment. Consequently, it is at least a question of fact whether the letter constituted a material misrepresentation in breach of Defendants' fiduciary duties.

In their Response, Plaintiffs only assert that Torok and Horvath are liable for the misrepresentation (Horvath reviewed Torok's letter). The Court, therefore, grants Defendants' Motion for Summary Judgment on the misrepresentation claim with respect to all Defendants other than Torok and Horvath. The Motion, accordingly, is denied with respect to Torok and Horvath. [4]

> 4    Defendants also contend that they are entitled to summary judgment because Plaintiffs Harpster and Wilber waived any ERISA related claims in their severance agreements. This argument, however, is directed only at alleged misrepresentations that may or may not have occurred during the negotiations of the severance agreements. Because Plaintiffs do not assert any misrepresentations arising from those negotiations, the waiver issue is irrelevant.

[*47] **VI. The Welfare Benefits Plan**

Defendants also move for summary judgment on Plaintiffs' allegation that they breached their fiduciary duties when CMP terminated the Welfare Benefits Plan. "It is firmly established . . . that 'a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan.'" *Sengpiel, 156 F.3d at 666* (quoting *Sutter v. BASF Corp., 964 F.2d 556, 562 (6th Cir. 1992)*; citing *Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995)* ("Employers or other plan sponsors are generally free under ERISA for any reason at any time, to adopt, modify, or terminate welfare plans.")). See also *Coomer v. Bethesda Hosp., Inc., 370 F.3d 499, 508 (6th Cir. 2004)*. Plaintiffs assert no argument that this case should differ from the general rule. The Court, therefore, grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' allegation that they breached their fiduciary duties when CMP terminated the Welfare Benefits Plan.

**VII. Conclusion**

05-44481-rdd    Doc 19190-1    Filed 12/16/09    Entered 12/16/09 15:33:31    Supplement Harpster Case    Pg 12 of 12

Page 12

2005 U.S. Dist. LEXIS 30811, *; 35 Employee Benefits Cas. (BNA) 2531

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 101) is GRANTED with respect [*48] to Defendant AARQUE Management Corp. on all counts and to all Defendants with respect Plaintiffs' claim that they breached their fiduciary duties in terminating the welfare benefits plan. Defendants' Motion for Summary Judgment, however, is DENIED on Plaintiffs' claims that Defendants' breached their fiduciary duties towards the Plan. Although this portion of the Motion for Summary Judgment is denied, the Court will *not* consider or entertain evidence at trial as to whether Defendants breached their fiduciary duties in the following areas: (1) declaring dividends, (2) the hiring and compensating of officers and directors, (3) establishing the Supplemental Executive Retirement Plan, and (4) their investment decisions. Additionally, Defendants' Motion for Summary Judgment regarding Plaintiffs' misrepresentation claim is DENIED with respect to Torok and Horvath and GRANTED as to all other Defendants.

IT IS SO ORDERED.

July 21, 2005

Date

David D. Dowd, Jr.

U.S. District Judge

ORDER

(Resolving Doc. No. 107)

The parties have filed a Joint Motion to Vacate and Reset Discovery Cut-off and Trial Dates (Doc. No. 107). This Motion is GRANTED with respect to the discovery cutoff [*49] and DENIED with respect to the trial date.

The Court indicated that, if this matter survived summary judgment, the Court would allow a limited period for discovery on the issue of damages which would close on August 5, 2005. (Doc. No. 53.) The Court has now decided Defendants' Motion for Summary Judgment. Discovery, therefore, is now open on the issue of damages.

The parties have now moved the Court to reset the discovery cutoff. The Motion is GRANTED. Discovery on the issues of damages shall be completed by Tuesday, August, 30, 2005, at 4:00 p.m.

The parties have also moved the Court to vacate and reset the trial date. This matter is currently scheduled for trial during the two-week standby period beginning September 12, 2005. The Court is determined to bring this matter to trial by the end of 2005. The Court's schedule, however, does not allow a trial at any time other than the currently scheduled September 12, 2005 standby period. The Motion to vacate and reset the trial date, therefore, is DENIED.

The Court finds that the trial in this matter shall be conducted on the clock. Consequently, the parties shall notify the Court how many minutes they will need to present their case [*50] on the issue of liability by Friday, August 19, 2005. When making their determinations, the parties are advised that a party's time shall be running whenever that party's counsel is examining or cross-examining a witness. The Court then will issue a determination of the actual amount of time that each party shall have to present its case.

The Court also finds that this matter justifies interim argument. Each side, therefore, shall be entitled to thirty (30) minutes of interim argument.

The parties shall file a joint submission of proposed jury instructions on the issue of liability by Friday, August 19, 2005. If the parties cannot reach an agreement on the jury instructions, then each party shall file its own proposed jury instructions by that same date, Friday, August 19, 2005.

The Court will conduct a status conference in this matter on Thursday, September 1, 2005, at 1:00 p.m., in Chambers, 402 United States Courthouse and Federal Building, 2 South Main St., Akron, Ohio.

Lastly, if the parties intend to utilize depositions for trial, as opposed to deposition for discovery, those depositions shall be completed by Thursday, September 8, 2005, at 4:00 p.m.

IT IS SO ORDERED.

 [*51] July 21, 2005

Date

David D. Dowd, Jr.

U.S. District Judge