TOGUT, SEGAL & SEGAL LLP,
Conflicts Counsel for
 Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, NY 10119
(212) 594-5000
Albert Togut
Neil Berger

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                              :
In re:                                        :        Chapter 11
                                              :
    DPH HOLDINGS CORP., et al.,               :        Case No. 05-44481 (RDD)
                                              :
                    Reorganized Debtors.      :        (Jointly Administered)
                                              :
------------------------------------------------------------X

**SEVENTH AND FINAL APPLICATION OF
TOGUT, SEGAL & SEGAL LLP FOR (A) ALLOWANCE
OF COMPENSATION FOR SERVICES RENDERED
AND FOR REIMBURSEMENT OF EXPENSES INCURRED
AS CONFLICTS COUNSEL FOR THE DEBTORS DURING THE PERIOD
OCTOBER 1, 2007 THROUGH JANUARY 25, 2008 AND (B) FINAL
ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES
FOR SERVICES RENDERED AS CONFLICTS COUNSEL FOR THE DEBTORS
FOR THE PERIOD OF OCTOBER 8, 2005 THROUGH JANUARY 25, 2008**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

                Togut, Segal & Segal LLP (the "Togut Firm" or "Applicant"), as conflicts

counsel for Delphi Corporation ("Delphi") and the other debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors"), respectfully makes

this application (the "Seventh Application") for (A) an allowance of compensation for

professional services rendered during the period of October 1, 2007 through and

including January 25, 2008 (the "Seventh Interim Period"), and for reimbursement of

expenses incurred in connection with such services, and (B) a final allowance of

compensation and reimbursement of expenses for services rendered as conflicts counsel

for the Debtors for the Period of October 8, 2005 through January 25, 2008.[1]  In support

of this Application, Applicant states:

## PRELIMINARY STATEMENT

During the Seventh Interim Period, Applicant continued to expend

considerable effort to assist the Debtors to complete the investigation, identification and

preservation of potential avoidance claims.  TS&S worked closely with the Debtors and

their other retained professionals and representatives of the Official Committee of

Unsecured Creditors (the "Committee") to develop and execute a work plan to preserve

avoidance claims in accordance with the procedures approved by the Court.  TS&S

commenced more than 700 adversary proceedings under seal in accordance with this

Court's approved procedures, and obtained tolling agreements from various parties, all

to preserve avoidance claims in favor of the estate because it was not certain that

confirmation of the Amended Plan would occur before the expiration of the applicable

statute of limitations.

Consummation of the transactions that were contemplated under the

Amended Plan was contingent upon, among other things, the reduction of general

unsecured claims to an amount less than $1.45 billion.  During the Seventh Interim

Period, Applicant resolved contested objections to 103 claims which reduced general

unsecured claims by approximately $31 million.  Applicant also assisted the Debtors in

---

[1]    On January 25, 2008, this Court entered an order (the "Confirmation Order") confirming the First
Amended Joint Plan of Reorganization of the Debtors (the "Amended Plan").  Pursuant to that
Confirmation Order and the Amended Plan, the Debtors were authorized to pay compensation to
retained professionals for periods after January 25, 2008 without further Order of, or application
to, the Court.  On July 30, 2009, this Court entered an order (the "Modification Approval Order")
which approved certain modifications to the Amended Plan that were embodied in the First
Amended Joint Plan of Reorganization of the Debtors (as modified) (the "Modified Plan").
Pursuant to the Modification Approval Order and the Modified Plan, retained professionals are
required to seek final approval of compensation for services rendered and reimbursement of
expenses incurred solely during the period commencing on the Initial Filing Date (defined below)
through the close of the Seventh Interim Period.

opposing a motion that sought the immediate payment of an administrative expense claim of $497,000, which was reduced to $25,000.

Moreover, Applicant assisted the Debtors in the preparation of discreet provisions of the Amended Plan and exhibits and its related Disclosure Statement. Applicant also addressed objections and motions pertaining to the Amended Plan including, without limitation, a motion by SPCP Group, L.L.C. ("SPCP") for an order temporarily allowing 82 claims for voting purposes pursuant to Bankruptcy Rule 3018. If allowed, SPCP's vote could have created a rejecting class that would have required a contested "cram-down" confirmation hearing. Applicant worked closely with the Debtors to demonstrate that SPCP was not entitled to the relief that it sought. The motion was ultimately withdrawn and a "cram-down" confirmation hearing was avoided.

TS&S also continued to provide other legal services to assist the Debtors including, without limitation, the settlement of setoff claims which were asserted by customers and vendors who sought to withhold payments due to the Debtors. As part of Applicant's efforts to resolve those claims setoff during the Seventh Interim Period, Applicant helped the Debtors to identify and collect trade accounts receivable that were being withheld by setoff claimants above the amount of their allowable setoff claims. During the period that commenced on the Initial Filing Date and the close of the Seventh Interim Period, Applicant helped the Debtors collect more than $35.3 million of excess trade accounts receivable from setoff claimants and to settle more than $223 million of setoff claims.

In addition, and as more fully described below, TS&S continued to assist the Debtors with the enforcement of pre-petition supply agreements to ensure continued deliveries of product for the Debtors' "just in time" inventory system.

## I.  FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

### A.    Seventh Interim Period

1.    This Application is made pursuant to sections 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rule 2016(a), the Confirmation Order and the Modification Approval Order for:  (A) an allowance of compensation for services rendered in the amount of $1,671,124.50, and for reimbursement of expenses in the amount of $198,683.39[2] incurred during the Seventh Interim Period;  and (B) final allowance of compensation for services rendered and for reimbursement of expenses incurred in connection with Applicant's representation of the Debtors during the period beginning on the Initial Filing Date through the conclusion of the Seventh Interim Period in the amounts of $6,683,548 and $250,481.84, respectively.

2.    Pursuant to the Court's November 4, 2005 Order under 11 U.S.C. §331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (as amended) (the "Administrative Fee Order"), Applicant submitted four monthly invoices during the Seventh Interim Period:  (i) for October 1, 2007 through October 31, 2007 in the amounts of $425,423 for fees and $186,596.53 for expenses;  (ii) for November 1, 2007 through November 30, 2007 in the amounts of $411,443.50 for fees and $6,892.31 for expenses;  (iii) for December 1, 2007 through December 31, 2007 in the amounts of $320,865 for fees and $1,761.46 for expenses;  and (iv) for January 1, 2008 through January 25, 2008 in the amounts of $513,393 for fees and $3,433.09 for expenses.

---

[2]    This amount includes filing fees for Avoidance Claims (defined below) that Applicant commenced on behalf of the Debtors.

3.      As of the date hereof and in accordance with the Administrative Fee Order, the Togut Firm has received payment from the Debtors representing 80% of its fees and 100% of its expenses during the Seventh Interim Period.  The Togut Firm has not yet received payment of amounts held back by the Debtors for the Seventh Interim Period, totaling $334,224.90.

4.      Applicant's attorneys and paraprofessionals expended a total of 3,624.5 hours during the Seventh Interim Period.  A schedule setting forth the number of hours expended during the Seventh Interim Period by the firm's partners, counsel, associates and paraprofessionals, their respective hourly rates, and the year in which each attorney was admitted to practice is attached as Exhibit "1."  A schedule specifying the type of expenses for which Applicant is seeking reimbursement and the total amount of each category is attached as Exhibit "2."

5.      The Togut Firm maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer generated detailed itemization of the expenses incurred, have been filed electronically with the Clerk of the Bankruptcy Court for the Southern District of New York (the "Court") as a supplement to this Application and furnished to the service parties who are identified in the Administrative Fee Order.

6.      This Court has not previously allowed any compensation or reimbursement of expenses for professional services rendered by the Togut Firm during the Seventh Interim Period covered by this Application.  Other than the payments described below that were made in accordance with the terms of the Administrative Fee

Order, the Togut Firm has not received payment of any additional compensation or reimbursement of expenses in connection with its representation of the Debtors during the Seventh Interim Period.

       **B.**    **Prior Application Periods**

       7.    On April 26, 2006, the Togut Firm filed its first application (the "First Application") for an award of interim compensation in the amount of $789,874 and reimbursement of expenses of $14,531.15 for the period of October 8, 2005 through and including January 31, 2006 (the "First Interim Period").

       8.    On July 27, 2006, the Togut Firm filed its second application (the "Second Application") for an award of interim compensation in the amount of $1,045,443.50 and reimbursement of expenses of $13,940.08 for the period of February 1, 2006 through and including May 31, 2006 (the "Second Interim Period").

       9.    On December 5, 2006, the Togut Firm filed its third application (the "Third Application," together with the First Application and the Second Application, the "Prior Applications") for an award of interim compensation in the amount of $776,175.50 and reimbursement of expenses of $4,879.63 for the period of June 1, 2006 through and including September 30, 2006 (the "Third Interim Period," together with the First and Second Interim Periods, the "Prior Interim Periods").

       10.    Pursuant to an Order of the Court dated December 11, 2006, the Debtors were authorized to pay all amounts held back during the Prior Interim Periods to applicants once they resolved objections and/or comments that were made to their respective fee applications by the Joint Fee Review Committee (the "Fee Committee") in this case.  The Togut Firm reached such a resolution with the Fee Committee.

       11.    Pursuant to an Order dated February 15, 2007, the Togut Firm was awarded:  (i) $781,058 for legal fees and $14,531.15 for reimbursement of expenses

requested in the First Application;  (ii) $1,036,627.50 for legal fees and $13,940.08 for

reimbursement of expenses requested in the Second Application;  and (iii) $767,359.50

for legal fees and $4,879.63 for reimbursement of expenses requested in the Third

Application.

   12. On March 30, 2007, the Togut Firm filed its fourth application (the

"Fourth Application") for an award of interim compensation in the amount of $593,308

and reimbursement of expenses of $5,790.70 for the period of October 1, 2006 through

and including January 31, 2007 (the "Fourth Interim Period").  Pursuant to an Order of

the Court dated June 27, 2007, the Togut Firm was awarded $566,308 for legal fees and

$5,790.70 for reimbursement of expenses requested in the Fourth Application.[3]

   13. On July 31, 2007, the Togut Firm filed its fifth application (the "Fifth

Application") for an award of interim compensation in the amount of $804,365.50 and

reimbursement of expenses of $7,223.62 for the period of February 1, 2007 through and

including May 31, 2007 (the "Fifth Interim Period").  Pursuant to an Order of the Court

dated October 29, 2007, the Togut Firm was awarded $795,265.50 for legal fees and

$6,160.62 for reimbursement of expenses requested in the Fifth Application.[4]

   14. On November 30, 2007, the Togut Firm filed its sixth application

(the "Sixth Application") for an award of interim compensation in the amount of

$1,070,869 and reimbursement of expenses of $6,996.27 for the period of June 1, 2007

through and including September 30, 2007 (the "Sixth Interim Period").  Pursuant to an

---

[3] The amount awarded by the Court reflects a voluntary reduction of $27,000 by Applicant after consultation with the Fee Committee.  Pursuant to the June 27, 2007 Order, holdbacks for the Fourth Interim Period were released.

[4] The amount awarded by the Court reflects a voluntary reduction of $10,163 by Applicant after consultation with the Fee Committee.  Pursuant to the October 29, 2007 Order, the Debtors were authorized to release holdbacks for the Fifth Interim Period.

Order of the Court dated February 25, 2008, the Togut Firm was awarded $1,065,805 for legal fees and $6,496.27 for reimbursement of expenses requested in the Sixth Application.[5]

### C.    Final Allowance of Compensation and Expenses

15.    In addition to seeking approval of the compensation earned and expenses incurred during the Seventh Interim Period, Applicant seeks a final allowance of compensation and reimbursement of expenses incurred in connection with Applicant's professional services on behalf of the Debtors during the period commencing on the Initial Filing Date through and including the end of the Seventh Interim Period in the aggregate amounts of $6,683,548 and $250,481.84, respectively. These amounts consist of:  (i) $5,012,423.50 for professional services rendered on behalf of the Debtors and $51,798.45 for expenses incurred during the period beginning on the Initial Filing Date through the Sixth Interim Period, which were previously allowed pursuant to prior interim fee orders of the Court;  and  (ii) $1,671,124.50 for professional services rendered on behalf of the Debtors and $198,683.39 for expenses incurred during the Seventh Interim Period.

## II.    BACKGROUND[6]

16.    On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries filed with this Court voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S.

---

[5]    The amount awarded by the Court reflects a voluntary reduction of $5,564 by Applicant after consultation with the Fee Committee.  Pursuant to the February 25, 2008 Order, the Debtors were authorized to release holdbacks for the Sixth Interim Period.

[6]    A more expansive description of the Debtors' business and the procedural history of their Chapter 11 case is contained in other pleadings filed by the Debtors in this case, and those descriptions are incorporated herein.

subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief.

On the Initial Filing Date and October 19, 2005, this Court entered Orders directing the

joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404).

17.     The Debtors continued to operate their businesses and manage

their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

18.     No trustee or examiner was appointed in the Debtors' cases.  On

October 17, 2005, the United States Trustee appointed the Committee pursuant to

section 1102 of the Bankruptcy Code.  Pursuant to an Order of the Court dated March

30, 2006, the United States Trustee appointed an Equity Committee pursuant to section

1102 of the Bankruptcy Code.

19.     On September 6, 2007, the Debtors filed the Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In

Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan

Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-

In Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed

the Amended Plan (Docket No. 11386) and the First Amended Disclosure Statement

with respect to the Plan  (Docket No. 11388).  The Court entered an order approving the

adequacy of the Disclosure Statement and granting the related solicitation procedures

motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court

entered the Confirmation Order, which became a final order on February 4, 2008

20.     On July 30, 2009, the Court entered the Modification Approval

Order")(Docket No. 18707).  The Modified Plan became effective on October 6, 2009.

III.    **RETENTION OF THE TOGUT FIRM**

21.    The Togut Firm was retained by the Debtors just prior to the Initial
Filing Date in October 2005 to serve as conflicts counsel and to work with the Debtors'
lead bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  The
Togut Firm was responsible for handling all bankruptcy-related matters where Skadden
had an actual or perceived conflict, and discrete tasks assigned by Skadden that could
be more efficiently handled by the Togut Firm.  The Togut Firm did not receive a
retainer.

22.    By an Order dated November 4, 2005, the Debtors were authorized
to retain the Togut Firm on a final basis (Docket No. 1034).[7]

23.    Throughout the period ending at the conclusion of the Seventh
Interim Period, the Togut Firm and Skadden carefully coordinated their efforts and
their work was complementary, not cumulative.

24.    All of the work summarized in this Seventh Application for which
the Togut Firm seeks compensation was performed efficiently, at the lowest cost to the
Debtors' estates, and with minimal duplication of services in an effort to keep the
administration expenses to a minimum.  The Togut Firm staffed its projects in a manner
that would permit it to bill fewer hours than would have otherwise been possible.

IV.    **SERVICES RENDERED BY THE TOGUT FIRM**
       **DURING THE SEVENTH INTERIM PERIOD**

25.    All of the professional services provided by the Togut Firm are set
forth in the Togut Firm's computerized time records, and the Court is respectfully
referred to those records for the details of all of the work performed.

---

[7]    A description of TS&S' qualifications to provide services to the Debtors is set forth at length in its
First Application, and that description is incorporated herein by reference.

26.     Prior to the filing of the Debtors' Chapter 11 cases, the Debtors and
Skadden determined that a clear division of duties was necessary to avoid potential
conflicts that might have arisen had Skadden had been responsible for the resolution of
all such matters

27.     Rather than burden the Court with an overly detailed or lengthy
recitation of each and every matter the Togut Firm addressed during these Chapter 11
cases, the following is a summary description of the primary services rendered by the
Togut Firm during the Seventh Interim Period only, which highlights the benefits
conferred upon the Debtors, their estates and creditors as a result of the Togut Firm's
efforts.  All of the professional services rendered by the Togut Firm on behalf of the
Debtors and their estates are discussed in the fee applications previously filed with the
Court in respect of the First through Seventh Interim Periods, and are set forth in the
computerized time records maintained by the Togut Firm, and the Court is respectfully
referred to those documents for the details of all of the work performed by Applicant.

28.     The Togut Firm rendered extensive professional services on behalf
of the Debtors and their estates in fulfilling its professional responsibilities during the
pendency of these Chapter 11 cases.  These large and extremely complex Chapter 11
cases required thoughtful effort by the members, counsel, associates and
paraprofessionals of the Togut Firm.  Whenever possible, potential disputes were
resolved without resort to the Court.  Where necessary, the Togut Firm actively
represented the Debtor's interests before the Court.  The Togut Firm submits that it has
achieved the foregoing in an expeditious and efficient manner, always mindful of the
costs to the Debtors' estates.

29.    During the Seventh Interim Period, the Togut Firm addressed a wide array of matters that could not be addressed by Skadden including, without limitation:

    (a)    completion of the identification and preservation of more than 700 Avoidance Claims (defined below);

    (b)    resolution of objections to proofs of claim filed in the Debtors' cases where Skadden conflicts were an issue or it was determined that the Togut Firm was better suited for a particular objection.  As described below, efforts to reduce claims were especially intensive during the Seventh Interim Period because confirmation of the Amended Plan was conditioned upon, among other things, the reduction of allowed general unsecured claims;

    (c)    assistance in the confirmation of the Amended Plan including, without limitation, assisting the Debtors in the preparation of portions of the Amended Plan, the Disclosure Statement and exhibits, and responses to objections thereto and motions for temporary allowance of claims for voting purposes pursuant to Bankruptcy Rule 3018;

    (d)    motions and demands made by creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and this Court's DIP Financing Orders dated October 28, 2005 and January 5, 2007 (together, the "DIP Orders");

    (e)    issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors;  and

    (f)    efforts to collect amounts due to the Debtors.

## A.    <u>Avoidance Claims</u>

30.    On August 16, 2007, this Court entered its Order:  (i) Authorizing Debtors to Enter Into Stipulations Tolling Statute of Limitations With Respect to Certain Claims, (ii) Authorizing Procedures to Identify Causes of Action That Should Be Preserved, and (iii) Establishing Procedures for Certain Adversary Proceedings

Including Those Commenced by Debtors Under 11 U.S.C. §§ 541, 544, 545, 547, 548 or 553 (the "Avoidance Claims Procedures Order").

31.    During the second half of the Sixth Interim Period, Applicant was required to conduct factual and legal research concerning various issues that were presented concerning avoidance claims.  Applicant worked closely with the Debtor's other retained professionals to help identify avoidance claims to be preserved and/or abandoned in accordance with the Avoidance Claims Procedures Order.

32.    During the Seventh Interim Period, Applicant worked closely with the Debtors, their financial advisors and the Committee to refine the identification of Chapter 5 causes of action (the "Avoidance Claims") to be preserved and those to be abandoned.  Those efforts included, without limitation, the preparation and presentation of reports to the Debtors and the Committee, and extensive conferences with the Debtors.

33.    Pursuant to the Avoidance Claims Procedures Order, the Debtors were authorized to preserve the Avoidance Claims by, among other things, commencing sealed adversary proceedings and obtaining tolling agreements to toll the applicable statutes of limitation (the "Statute of Limitations") with various transferees.

34.    The Debtors estimated that they had more than 11,000 potential preference claims arising from transfers of billions of dollars (before taking into account defenses such as transfers made in the ordinary course of business and subsequent new value).  The constructively fraudulent transfer reach-back period, made applicable by Bankruptcy Code section 544(b) and state law, is generally six years under Michigan and New York state law.  Consequently, with a company of Delphi's size, there were hundreds of thousands of transactions that occurred during the constructively fraudulent transfer reach-back period.  Under the Bankruptcy Code, the Debtors had

13

until two years after the Petition Date to commence adversary proceedings to assert avoidance causes of action, as well as to certain causes of action where the applicable Statute of Limitations had been tolled by the Bankruptcy Code during the initial two years of these Chapter 11 cases.

35.    Applicant worked cooperatively with the Clerk of this Court to make certain that the seal provisions of the Avoidance Claims Procedures Order were complied with in a way that protected the Debtors' ongoing business operations:  the Debtors and parties in interest expressed significant concern that disclosure of the identity of the defendants in the Avoidance Claims could cause an interruption in the Debtors' "just in time" supply chain and business operations.

36.    During the Seventh Interim Period, and prior to the expiration of the applicable Statute of Limitations in this case, Applicant preserved more than 700 Avoidance Claims by commencing sealed adversary proceedings and entering into tolling agreements with the parties, all without interruption to the Debtors' supply chain.  The preservation of the Avoidance Claims was necessary because there was no certainty that the Amended Plan could be confirmed and consummated before the two year anniversary of the Initial Filing Date.

**B.**    **Objections to Proofs of Claim**

**1.**    **Overview**

37.    One of the important components of the framework to facilitate the consummation of the Amended Plan was reduction of the aggregate of pre-petition general unsecured claims to $1.45 billion or less.  As of January 31, 2007, more than 16,500 proofs of claim and scheduled liabilities sought liquidated and unliquidated amounts from the Debtors in excess of $1.7 billion.  Before and during the Seventh

Interim Period, the Debtors asked the Togut Firm to assist them and their other retained professionals in the claims objection and resolution process.

38.    During the Seventh Interim Period, the need for resolution of claim objections was heightened and the Togut Firm helped resolve objections to 103 claims asserted by parties (a) with whom Skadden had a conflict and (b) with whom the Togut Firm negotiated setoff and other settlements.  As part of that process, the Togut Firm (i) regularly communicated with the Debtors' personnel to facilitate the firm's ability to obtain and analyze data needed to reduce and expunge claims;  (ii) assisted in the claim objection/reconciliation process;  (iii) engaged in settlement negotiations with counsel for claimants;  (iv) prepared for possible litigation if settlement negotiations failed;  (v) conducted necessary legal and factual research regarding issues raised by claimants; and (vi) participated in claims administration and strategy calls with the Debtors and Skadden to monitor developments in the claims process and to avoid duplication of services.

39.    The Togut Firm assisted the Debtors and negotiated settlement agreements and Joint Stipulations and Agreed Orders with claimants to (a) disallow and expunge duplicative claims, (b) withdraw contingent, unliquidated and protective claims, (c) migrate claims asserted against incorrect Debtors to appropriate Debtor estates, and (d) reduce claims.  During the Seventh Interim Period, Applicant was responsible for the resolution of objections to 103 claims, which sought more than $121.3 million.  Applicant resolved all of those claim objections and those claims were reduced to approximately $85.7 million, representing a reduction of approximately $31 million.  All of those claim reductions were negotiated and achieved by the Togut Firm without the need for Court intervention.

40.      Applicant worked with the Debtors throughout this case to achieve numerous settlements pursuant to which claims were expunged, reduced and/or disallowed.  As a result of Applicant's efforts, more than $176 million of asserted claims were eliminated.

**2.      Objection to Motion by Verizon Services Corp. for Payment of Administrative Expense Claim**

41.      On June 6, 2006, the Debtors moved (the "MobileAria Sale Motion") for an order to, among other things, assume and assign certain executory contracts and to sell substantially all of the assets of MobileAria, Inc., one of the Debtors.

42.      Verizon objected to the proposed MobileAria Sale Motion and asserted various claims for damages.  The parties were unable to resolve all of Verizon's objections prior to the hearing to reconsider the MobileAria Sale Motion.  Consequently, the Debtors and Verizon negotiated a provision in the MobileAria sale order which permitted Verizon to seek payment of amounts up to $700,000.

43.      After entry of the MobileAria sale order, Verizon asserted various disputed cure amounts against the Debtors totaling approximately $497,000 (the "Verizon Administrative Claim").  In its Original Motion, for immediate payment of the Verizon Administrative Claim, Verizon explained that it incurred additional charges as a result of MobileAria having caused more data to be transmitted over the parties' GPS system than was permitted under the applicable data usage plan (collectively, the "Overage Charges"), and that those Overage Charges were caused by MobileAria having initially selected the wrong usage plan for GPS Units.  In its Original Motion, its subsequent reply, and at the November 29, 2007 hearing to consider Verizon's demand,

Verizon repeatedly argued that MobileAria was liable because MobileAria initially
failed to select the appropriate data usage plan for the GPS Units.

44.    MobileAria spent considerable time and resources after entry of the
MobileAria sale order and it concluded and asserted that, among other things, Verizon
had never provided any evidence to support its allegations that MobileAria was
somehow contractually or otherwise responsible to arrange the wireless service plans
with Verizon Wireless Corporation, and that Verizon had failed to identify any
contractual or legal basis that could give rise to Verizon's Overage Charges.

45.    Skadden was unable to represent MobilAria in response to
Verizon's motion because of a conflict of interest with Verizon.  Consequently, the
Debtors asked Applicant to oppose Verizon's Motion.  Applicant worked closely with
the Debtors to understand the factual, technical and legal issues presented by Verizon's
motion.  Applicant prepared and filed an objection to Verizon's motion, and argued in
support of the Debtors' objection at the November 29, 2007 omnibus hearing.  At that
hearing, the Court observed that Verizon's original motion failed because it failed to
specify the contractual basis for the Overage Charges and that Verizon failed to support
it's allegations with an affidavit or a declaration.  At the conclusion of that hearing, the
Court authorized Verizon to file an amended motion, to include factual support for the
Verizon Administrative Claim.

46.    Verizon failed to follow the Court's direction.  Instead, Verizon
asserted an entirely new claim in its amended motion, but labeled it "Overage
Charges."

47.    Because Verizon asserted new theories of recovery, Applicant was
required to conduct extensive factual and legal research to assist the Debtors in their
opposition to Verizon's amended motion.  Applicant also worked extensively with the

17

Debtors to understand how the complex nature of the transactions surrounding the Mobilearia-Verizon contract and the Debtors' prior satisfaction of their obligations thereunder operated to defeat Verizon's new theories of liability. On January 16, 2008, Applicant filed and served the Debtors' objection to Verizon's amended motion.

48.     The objection that Applicant prepared on behalf of the Debtors demonstrated that virtually all of the administrative expense claims sought by Verizon could not be allowed. Applicant initiated settlement negotiations with Verizon which culminated in a settlement pursuant to which Verizon's demand for immediate payment of $497,000 was settled for an allowed $25,000 administrative claim, which was to be paid pursuant to the terms of the Amended Plan.

49.     During the Seventh Interim Period, Applicant also continued to assist the Debtors in their objection to Proof of Claim No. 12347 filed by Furukawa Electric North America APD, Inc. ("Furukawa") in the amount of $2,589,684.56 (the "Furukawa Claim"). In connection therewith, Applicant prepared, filed and served the Debtor's Claim for Affirmative Relief against Furukawa pursuant to Bankruptcy Rule 3007 and asserted a claim against Furukawa of not less than $24 million dollars (the "Counterclaim").

50.     Furukawa challenged the Debtors' ability to assert the Counterclaim and the jurisdiction of this Court to adjudicate the controversies subject to the objection to the Furukawa Claim and the Counterclaim. Consequently, Applicant was required to conduct legal and factual research concerning those matters to confirm this Court's ability to adjudicate those matters. Moreover, Applicant continued settlement negotiations with Furukawa as part of the Debtors' attempts to settle these contested matters. The Debtors' objection to the Furukawa Claim and the Counterclaim were ultimately settled and Applicant prepared a stipulation which was approved by

18

this Court after the close of the Seventh Interim Period pursuant to which, among other things, the Furukawa Claim was withdrawn and Furukawa paid $16.5 million dollars to the Debtors.

## V.    Confirmation Issues

51.    During the Seventh Interim Period, the Debtors worked to finalize the terms of their agreements for the transactions that central to the Amended Plan.  As part of that process, Applicant was asked to assist in the preparation of certain discreet portions of the Debtor's disclosure statement and Amended Plan, and the exhibits thereto, particularly concerning the Avoidance Claims, set-offs, claim objections and certain contract assumption matters.

52.    Moreover, as the confirmation process for the Amended Plan moved forward, the Togut Firm was asked to respond to motions and objections that could not be addressed by Skadden because of actual conflicts.

### A.    Motions for Temporary Allowance of Claims
### Pursuant to Bankruptcy Rule 3018

53.    On December 10, 2007, this Court entered its Order Approving (i) Disclosure Statement, (ii) Record Date, Voting Deadline and Procedures for Temporary Allowance of Certain Claims, (iii) Hearing Date to Consider Confirmation of Plan, (iv) Procedures for Filing Objections to Plan, (v) Solicitation Procedures for Voting on Plan, (vi) Cure Claim Procedures, (vii) Procedures for Resolving Disputes Relating to Post-Petition Interests, and (viii) Reclamation Claim Procedures (the "Solicitation Procedures Order").

54.    Pursuant to the Solicitation Procedures Order, only those claimants who had either filed proofs of claim or Notices of Transfer on or before November 26, 2007 (the "Record Date") were entitled to vote on the Amended Plan.

55.     On January 2, 2008, SPCP Group, L.L.C. ("SPCP") filed its motion pursuant to Bankruptcy Rule 3018(a) requesting temporary allowance of 82 claims (the "SPCP Claims") to vote to accept or reject the Amended Plan (the "SPCP Motion").  In its Motion, SPCP asserted that it was the record owner of the SPCP Claims.  SPCP also asserted that neither it nor the original owners of the SPCP Claims received ballots to vote on the Amended Plan.  Moreover, SPCP made clear that it intended to vote to reject the Amended Plan.

56.     The Debtors asked Applicant to respond to the SPCP Motion because a rejection vote by SPCP threatened to cause a contested confirmation hearing that would have required the Debtors to seek a confirmation of the Amended Plan under the "cram-down" provisions of Bankruptcy Code § 1129.  Applicant conducted extensive factual research and determined that SPCP was not the registered holder of the SPCP Claims and that it did not file any Notices of Transfer to evidence that it owned those claims on or before the Record Date.  Moreover, the SPCP Motion did not contain any evidence of ownership of those claims.

57.     Applicant made informal discovery demands upon SPCP for documents or other evidence to confirm SPCP's ownership of the SPCP Claims, but SPCP could not produce documents to establish its ownership of those claims.  Moreover, Applicant determined that certain of the claims subject to the SPCP Motion were previously voted by the original claimholders, with ballots for those claims already having been submitted by parties who were the registered holders on the Record Date.

58.     Notwithstanding the foregoing, SPCP asserted that it was entitled to vote the SPCP Claims by virtue of a power of attorney provision contained in its claim assignment agreements with the original claimholders.  Applicant conducted

necessary legal research and determined that such power of attorney provision failed to
provide SPCP with sufficient authority to vote the SPCP Claims, especially in light of its
failure to have filed Notices of Transfer on or before the Record Date.

59.     Consistent with the Debtors' instructions, Applicant prepared and
filed the Debtor's Objection to Motion by SPCP Group L.L.C. for Temporary Allowance
of Proofs of Claim Pursuant to Bankruptcy Rule 3018, dated January 16, 2008.

60.     That evening, Applicant successfully negotiated a resolution of the
SPCP Motion pursuant to which SPCP agreed to withdraw the SPCP Motion as to all
but two of the SPCP Claims.  Based upon that agreement, the class within which SPCP
sought to vote was determined to be an accepting class, and the cost, delay and expense
of a contested "cram-down" confirmation hearing was avoided.

**B.     Confirmation Objection**

61.     In addition to the SPCP Motion, Bank of America, N.A. ("Bank of
America") filed a motion for the temporary allowance of potential lease rejection claims
for voting purposes regarding the Amended Plan (the "Bank of America Rule 3018
Motion").

62.     Applicant had been responsible for all of the Bank of America
matters in the Debtors' case because of a Skadden conflict.  As part of those
responsibilities, Applicant had previously negotiated and obtained a Stipulation and
Order pursuant to which, among other things, Bank of America withdrew its lease
rejection claims.

63.     Notwithstanding, Bank of America sought provisional allowance of
those rejection claims pursuant to Bankruptcy Rule 3018 to cast a ballot to reject the
Amended Plan.  In its ballot, Bank of America asserted that it believed that it had a
secured claim to vote regarding the Amended Plan.

64.    Consistent with the Debtors' instructions, Applicant prepared an objection to the Bank of America Rule 3018 Motion and shared a draft of that objection with Bank of America.  In response thereto, Bank of America withdrew its Motion for temporary allowance of its rejection claims.

65.    Bank of America also filed a limited objection to the Amended Plan. Bank of America asserted that the Amended Plan could not be confirmed because it:  (a) provided for the automatic assumption of certain Bank of America leases on the confirmation date without sufficient provision for a cure or adequate assurance of future performance and (b) did not clearly enough state that the liens asserted by Bank of America would not be extinguished by confirmation, all in violation of Bankruptcy Code § 1123(b).  Applicant prepared a Response to Bank of America's objection to establish that Bank of America's Limited Plan Objection was infirm because the Amended Plan adequately addressed each of the objections asserted by Bank of America, including, without limitation, adequate provisions for cure objections and the continuation of the Bank of America liens without impairment.

66.    Applicant engaged in negotiations with Bank of America which culminated in an agreement by Bank of America to withdraw its objections to confirmation.

67.    Applicant's efforts in this part of the Debtors' case helped the Debtors to avoid the cost, expense and delay of contested matters during its confirmation process.

## VI.    Setoff Issues

68.     As part of their negotiations regarding post-petition financing, the
Debtors included a detailed mechanism in the DIP Orders to enable the Debtors'
suppliers to exercise setoff claims and/or recoupment rights regarding their pre-
petition payables, subject to certain conditions.  Following the procedures contained in
the DIP Orders, a supplier was able to seek to exercise a setoff right that arose during
the Debtors' ordinary course of business without such assertion being subject to section
362 of the Bankruptcy Code.  Setoffs that were subject to the DIP Orders included
claims that arose out of, for example, pre-petition warranty and/or product recall,
customer adjustments, customer rebates and allowances, overpricing, short shipments
and credits for damaged goods.

69.     Any claimant that sought to exercise setoff rights was required to
submit a written request with supporting documentation to the Debtors and the
Committee (with a copy to JPMorgan Chase Bank, N.A., as Administrative Agent for
the DIP lenders).  If within ten business days after sending such request, the Debtors
and any particular claimant failed to agree on the allowed amount of a requested setoff,
they could seek resolution of the matter through an agreed-upon mediator or the Court.
If the mediator could not resolve the dispute within 30 days, the parties could submit
the matter to binding arbitration.

70.     At the end of the Seventh Interim Period, more than 100 non-
General Motors claimants had asserted one or more setoff claims.  During the Seventh
Interim Period, and the Togut Firm continued to devote substantial time assisting the
Debtors with the continued resolution of the setoff and/or recoupment requests.

71.     During the Seventh Interim Period, Applicant worked with the
Debtors and FTI to resolve setoff demands which sought an aggregate of approximately

23

$3.9 million.  None of the resolutions that the Togut Firm negotiated during the Seventh Interim Period required Court intervention, mediation or arbitration.

72.    Moreover, Applicant assisted the Debtors in identifying setoff claimants who had been holding accounts payable for amounts exceeding their setoff demands.  Applicant obtained agreements with those setoff claimants and facilitated the collection of certain accounts receivable, while preserving all of the Debtors' rights to challenge such claimants' setoff rights and to pursue additional accounts receivable claims.

73.    To effectively resolve these setoff demands, the Togut Firm continued to (i) regularly communicate with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reconcile the amounts of the receivables against the payables owed to the setoff claimants;  (ii) assist in the claim objection/reconciliation process;  (iii) develop strategies for responding to setoff motions and prepare for possible litigation if settlement negotiations failed;  (iv) engage in negotiations with counsel for the setoff claimants;  and (v) conduct necessary legal and factual research regarding issues raised in the motions and letter demands.

74.    The Togut Firm also continued to work with the Debtors to ensure that mutuality existed to prevent setoffs.  In instances where the amounts to be setoff have involved a pre-petition overpayment by the Debtors, the Togut Firm conducted necessary forensic/factual and legal research.

75.    During the Seventh Interim Period, the Togut Firm continued to have primary responsibility for all of the unresolved setoff claims that have been asserted pursuant to the DIP Orders, except those made by General Motors. Recognizing the number and size of setoff demands made by vendors and the relationship that setoff claims have to other areas of the Debtors' cases (such as claims

reconciliation), it was necessary for the Debtors, the Togut Firm, Skadden and FTI to continue to communicate with each other regularly to know the status of the setoff demands. Additionally, the Togut Firm provided periodic status reports to the Debtors, FTI, Skadden and the Committee concerning progress made in the resolution of setoff claims.

76.      Throughout the Seventh Interim Period, the Debtors, the Togut Firm and FTI participated in periodic status calls with the Debtors to review pending setoff demands and to help coordinate the participants' efforts. During these calls, among other things, the parties: (i) discussed new demands that the Debtors received (including an analysis of the merits of each new demand); (ii) monitored the status of the Debtors' and setoff claimant's exchange of information to reconcile the accounts; (iii) analyzed the factual and legal issues implicated by the demands; and (iv) developed uniform strategies on behalf of the Debtors regarding each of the demands. These calls proved to be essential in safeguarding the Debtors' interests because they permitted the Togut Firm to efficiently address the setoff demands without duplicating the efforts of Skadden or the Debtors.

77.      During the period from the Initial Filing Date to the end of the Seventh Interim Period, TS&S assisted in the collection of approximately $35.3 million of accounts receivable from setoff claimants.

VII.    **Automatic Stay Issues**

78.      During the Seventh Interim Period, the Togut Firm continued to share responsibility in addressing demands by parties-in-interest for relief from the Automatic Stay. To resolve these requests, the Togut Firm: (i) had telephone conferences with the Debtors' in-house attorneys and business representatives to discuss strategy for settlement and/or potential responses to the motions;

25

(ii) communicated with counsel for movants to discuss legal issues that were implicated by their clients' motions and attempted to negotiate consensual resolutions;

(iii) reviewed documents provided by the Debtors and counsel to the movants (e.g., term sheets, contracts, related pleadings, *etc.*);  and (iv) performed legal research, when necessary.

## VIII.    Injunction Issues

79.    During the Seventh Interim Period, Applicant continued to prepare pleadings at the request of the Debtors and Skadden to enjoin suppliers who threatened to stop shipping parts, despite enforceable "sole source" contracts with the Debtors.

80.    Generally, the Debtors contracted with their suppliers to purchase parts at a specific time, which is often tied directly to the production run of a particular Original Equipment Manufacturer ("OEM") vehicle.  Those requirements contracts generally take the form of purchase orders, which constitute the Debtors' requirements for a particular product over a specified period of time.  The Debtors' standard General Terms and Conditions (the "Terms and Conditions") are incorporated into these contracts.  The Terms and Conditions provide that if a supplier "commences any of the work or services which are the subject of this Contract, [supplier] will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification."  The Terms and Conditions also contain the supplier's acknowledgment that in the event of an actual, anticipatory or threatened breach of the contract, the Debtors would be entitled to specific performance and injunctive or other equitable relief.

81.    During the Seventh Interim Period, certain suppliers threatened to stop shipping parts to the Debtors.  Those suppliers asserted, among other things, that the price increases in raw materials made it unprofitable for them to continue to meet

the Debtors' requirements.  The consequences of a supplier unilaterally stopping shipment of parts would have been catastrophic.  The Debtors' manufacturing facilities would have been forced to shut down within a matter of days after the missed shipment.  Within one to two days after a shutdown of one of the Debtors' facilities, the Debtors' OEM customers would have likely been forced to halt production of their products on one or more of their assembly lines.  A shutdown of even one assembly line of an OEM could have caused the manufacturer millions of dollars of damages which would have been asserted against the Debtors.

82.    Consequently, when it was required, Applicant prepared comprehensive pleadings against several suppliers that had threatened to stop shipments.  Those pleadings sought temporary, preliminary and permanent relief to: (i) enjoin the suppliers from breaching, terminating, or attempting to terminate the pre-petition requirements contracts between the suppliers and the Debtors;  and (ii) direct the suppliers to continue to perform under those contracts.  For each supplier, Applicant was prepared to file those documents with the Court in the event that the Debtors were not able to negotiate acceptable business solutions with their suppliers and in that regard, litigation support was unavoidable.

83.    The Debtors' negotiations with suppliers who threatened to stop shipments, with assistance from Applicant, were successful.  No injunction pleadings had to be filed, in part because the suppliers knew that the Debtors and the Togut Firm were prepared to seek expedited relief from this Court.

## IX.    Accounts Receivable

84.    During the Seventh Interim Period, the Debtors asked the Togut Firm to continue to assist them in the collection of accounts receivable from various customers and shippers.  The Togut Firm worked with the Debtors to review and

27

analyze foundation documents and information in support of accounts receivable claims and sent demand letters to account debtors.

85.    The Togut Firm engaged in telephone conferences with numerous parties from whom the Debtors sought payment, and participated in status calls and conferences with the Debtors regarding those negotiations.

## X.    Miscellaneous Matters Addressed by the Togut Firm

86.    In addition to the matters discussed above, the Togut Firm rendered services for, or on behalf of, the Debtors in connection with other miscellaneous matters during the Seventh Interim Period, such as:

(a)    reviewing various motions and other pleadings filed with the Court regarding case and project strategy;

(b)    participating in numerous (i) "task" and senior strategy calls;  and (ii) status and strategy meetings with the Debtors, the Debtors' professionals, and the Committee;

(c)    attending omnibus hearings and addressing various matters at such hearings;

(d)    attending meetings with the Debtors and the statutory committees in these cases;

(e)    preparing and regularly updating status charts for the Debtors regarding assorted matters;

(f)    conferring with Skadden regarding the delegation of responsibilities of certain matters to the Togut Firm to ensure no duplication of effort between the two firms; and

(g)    frequently communicating with various third parties, including the Court, the United States Trustee, the Committee and individual creditors and other parties-in-interest concerning the status, conduct and administration of the Debtors' chapter 11 cases.

## XI.    THE COMPENSATION REQUESTED

87.    There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g.*, *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

88.    The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.    Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled.    Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

89.    In awarding compensation pursuant to section 330 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

> i.    reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person; and
>
> ii.    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

90.    As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case.  One could posit other situations or cases where a presumption of prior informed judgment might not be as strong.  Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost.  To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate.

*Drexel*, 133 B.R. at 20-21.

91.    The professional services rendered by the Togut Firm have

required expenditure of substantial time and effort.  During the Seventh Interim Period,

the Togut Firm professionals and paraprofessionals recorded 3,624.5 hours in providing

the required professional services for which the Togut Firm seeks compensation.

92.     Time and labor devoted is only one of many factors to be

considered in awarding attorney compensation.  The number of hours expended must

be considered in light of (i) the amount involved and the results achieved to date,

(ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to

perform properly the legal services, (iv) the preclusion of other employment on behalf

of other clients, (v) the customary fee charged to a private client for the services

rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies

of the case, including the frequency and amount of time required to be devoted other

than during regular business hours, (viii) the experience, reputation and ability of the

attorneys rendering services, and (ix) the nature and length of the professional

relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway

Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys'

fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp.

of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

93.     The majority of the Johnson Factors are codified in section 330(a) of

the Bankruptcy Code, and have been applied by various courts in making

determinations that requested attorneys' fees constitute reasonable compensation.  It is

well settled that the "lodestar method,"[8] as opposed to an application solely of the

---

[8]     Application of the "lodestar method" involves multiplying the number of hours reasonably
expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw
v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of
calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which
serves as a starting point, permitting Bankruptcy Courts, in their own discretion, to consider
other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and
their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[9]
The Supreme Court, however, has clearly articulated that the "lodestar method" is
presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy
Code. *Delaware Valley I*, 478 U.S. at 563; *Cena's Fine Furniture*, 109 B.R. at 581.

94.    The Togut Firm respectfully submits that application of the
foregoing criteria more than justifies the compensation requested in this Seventh
Application.  The professional services rendered in these Chapter 11 cases have been
performed by attorneys with broad expertise and high levels of skill in their practice
areas or specialty.

95.    At all times throughout the Seventh Interim Period, the Togut Firm
successfully avoided expensive litigation by brokering reasonable settlements among
the parties.  The Togut Firm's efforts have therefore been of significant value to the
Debtors and the creditors of these estates.

96.    The Togut Firm has not sought to burden this Court by setting
forth all of the services rendered to the Debtors and for the benefit of creditors.  The
Togut Firm has reviewed all of its office files which indicate numerous legal situations
and problems resolved over and above those detailed in this Seventh Application, and
which are more fully summarized in the time sheet entries and made a part hereof
which were contemporaneously prepared when the services were rendered.

---

[9]    *See, e.g., Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987); *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*"); *United States Football League v. National Football League*, 887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990); *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

97.     The Togut Firm has devoted 3,624.5 hours of actual recorded time during the Seventh Interim Period resulting in time charges of $1,671,124.50.

98.     Throughout the Seventh Interim Period, the Togut Firm sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them.  The Togut Firm respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

99.     In addition to the fees sought for legal services, the Togut Firm has incurred $198,683.39 in out-of-pocket expenses during the Seventh Interim Period directly attributable to the representation of the Debtors.

100.    As confirmed by the Certification of Neil Berger, a member of the Togut Firm, attached as Exhibit "3," all of the services rendered by the Togut Firm during the case for which interim compensation is sought herein were rendered for and on behalf of the Debtors in connection with their Chapter 11 cases.

101.    No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by the Togut Firm.

102.    Copies of this Application have been given to:  (i) the Debtors; (ii) counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  (v) counsel for the agent under the Debtors' pre-petition credit facility; (vi) counsel for the agent under the Debtors' post-petition credit facility;  and (vii) the Fee Committee.

33

## CONCLUSION

**WHEREFORE**, the Togut Firm respectfully requests that the Court (A) allow compensation for services rendered in the amount of $1,671,124.50, and for reimbursement of expenses in the amount of $198,683.39 incurred during the Seventh Interim Period;  (B) allow final allowance of compensations for services rendered and for reimbursement of expenses incurred in connection with Applicant's representation of the Debtors during the period beginning on the Initial Filing Date through the conclusion of the Seventh Interim Period in the amounts of $6,683,548 and $250,481.84, respectively;  and (c) authorize and direct the Debtors to pay such amounts not already paid, together with such other relief as may be just and proper.

Dated:    New York, New York
          December 30, 2009

                              TOGUT, SEGAL & SEGAL LLP,
                              Conflicts Counsel for the Debtors
                              and Debtors in Possession
                              By:

                              _____/s/ Albert Togut_____
                              ALBERT TOGUT
                              NEIL BERGER
                              Members of the Firm
                              One Penn Plaza, Suite 3335
                              New York, New York 10119
                              (212) 594-5000