**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                                       :    **Chapter 11**
                                                             :
DPH HOLDINGS CORP., et al.,                                  :    **Case No. 05-44481 (RDD)**
                                                             :
                    Reorganized Debtors.                     :    **Jointly Administered**
                                                             :
                                                             :
                                                             :
------------------------------------------------------------ x

## FINAL APPLICATION OF ROTHSCHILD INC. FOR
## COMPENSATION AND REIMBURSEMENT OF EXPENSES

| | |
|---|---|
| Name of Applicant: | Rothschild Inc. |
| Authorized to Provide Professional Services to: | DELPHI CORPORATION, et al. |
| Date of Retention: | As of October 8, 2005 |
| Period for which compensation and reimbursement are sought: | October 8, 2005 – January 25, 2008 |
| Amount of compensation sought as actual, reasonable, and necessary: | $27,895,161.29 |
| Amount of expense reimbursement sought as actual, reasonable, and necessary: | $857,653.84 |

This is a(n):       _____ Monthly       _____ Interim       __X__ Final Application

If this is not the first application filed, disclose the following for prior application:

| Date Filed | Period Covered | Requested Fees | Requested Expenses[1] | Approved Fees | Approved Expenses |
|---|---|---|---|---|---|
| May 1, 2006 | 10/08/05 – 1/31/06 | $943,548.39 | $84,007.54 | $943,548.39 | $84,007.54 |
| July 31, 2006 | 2/1/06 – 5/31/06 | $1,000,000.00 | $60,862.23 | $1,000,000.00 | $60,862.23 |
| Nov 30, 2006 | 6/1/06 – 9/30/06 | $1,000,000.00 | $224,982.46 | $1,000,000.00 | $224,982.46 |
| Mar 29, 2007 | 10/1/06 – 1/31/07 | $1,000,000.00 | $207,456.79 | $1,000,000.00 | $203,956.79 |
| July 31, 2007 | 2/1/07 – 5/31/07 | $1,000,000.00 | $145,973.29 | $1,000,000.00 | $145,973.29 |
| Nov 30, 2007 | 6/1/07 – 9/30/07 | $1,000,000.00 | $82,960.93 | $1,000,000.00 | $79,280.93 |
| Dec 30, 2009 | 10/1/07 – 1/25/08 | $21,951,612.90 | $58,590.60 | | |

---

[1] Rothschild has voluntarily agreed to reduce its expenses for the first three interim fee periods by a total of $13,016.19, which was allocated equally among the first three periods, for the fourth interim fee period by $3,500.00, for the fifth interim period by $2,000.00, and for the six interim period $3,680.00

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

In re:                                                  :    **Chapter 11**
                                                        :
DPH HOLDINGS CORP., et al.,                             :    **Case No. 05-44481 (RDD)**
                                                        :
               Reorganized Debtors.                     :    **Jointly Administered**
                                                        :

-------------------------------------------------------------- x


## FINAL APPLICATION OF ROTHSCHILD INC. FOR
## COMPENSATION AND REIMBURSEMENT OF EXPENSES


Rothschild Inc. ("Rothschild"), financial advisor and investment banker for Delphi

Corporation ("Delphi"), together with its affiliated debtors and debtors-in-possession

(collectively, the "Debtors" or the "Company"), makes this final application for compensation

and reimbursement of expenses, and in support thereof respectfully represents as follows:


    1.  This application is made pursuant to (i) Sections 330 and 331 of Title 11 of the United

States Code (the "Bankruptcy Code"), (ii) Rules 2014 and 2016 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) Administrative Order M-150, Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases, (iv) the Order of this Court, dated November 4, 2005, establishing procedures

for interim compensation and reimbursement of expenses of professionals (together with each

Supplemental Order, the "Fee Order") [docket no. 869], (v) the Interim Order of this Court, dated

October 14, 2005, authorizing the employment and retention of Rothschild as financial advisor

and investment banker to the Debtors (the "Interim Retention Order") [docket no. 272], (vi) the

Final Order of this Court, dated November 30, 2005, authorizing the employment and retention

of Rothschild as financial advisor and investment banker to the Debtors (the "Final Retention

Order" and, together with the Interim Retention Order, the "Retention Orders") [docket no.

1363], and (vii) the Supplemental Order of this Court, dated December 18, 2006, authorizing the

amendment of Rothschild's fee structure for merger and acquisition transaction services

involving Debtors' steering and interior divisions (the "Supplemental Retention Order") [docket

no. 6191].  Copies of the Retention Orders and the Supplemental Retention Order are attached

hereto as Exhibit A.

2.  This Court has jurisdiction over this matter pursuant to 23 U.S.C. §§ 157 and 334.

Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RETENTION OF ROTHSCHILD

3.  By letter agreement dated May 1, 2005 (as amended and restated on October 8, 2005,

supplemented on May 17, 2006, and further amended on July 19, 2006, April 14, 2008 and

October 27, 2008, and as modified by the Retention Orders, the "Engagement Letter"), the

Debtors retained Rothschild to assist the Debtors with a possible restructuring.  A copy of the

Engagement Letter, as amended, is attached hereto as Exhibit B.

4.  Rothschild understands that the Debtors chose to retain Rothschild due to Rothschild's

reputation as a leading investment banking firm and financial advisor with substantial experience

advising debtors, creditors' committees and other parties in interest in connection with all aspects

of financial restructurings and Chapter 11 cases, including financial advice regarding mergers,

acquisitions, divestitures, public and private financings and spin-offs, and the evaluation of assets

and liabilities, the formulation and negotiation of plans of reorganization, and the restructuring of

indebtedness.

5.  Rothschild respectfully refers this Court to the Engagement Letter for a full recitation of its terms.  Rothschild was retained by the Debtors to: [2]

(a)    to the extent deemed desirable by the Debtors, identify, review, evaluate and initiate potential Transactions, M&A Transactions, New Capital Raises or other transactions;

(b)  to the extent Rothschild deems necessary, appropriate and feasible, or as the Debtors may request, review and analyze the Debtors' assets and the operating and financial strategies of the Debtors;

(c)  assist the Debtors in developing and evaluating a range of strategic alternatives to restructure the Debtors' legacy liabilities, including without limitation the Debtors' current labor costs, liabilities for pension and other post-employment benefits;

(d)  review and analyze the business plans and financial projections prepared by the Debtors including, but not limited to, testing assumptions and comparing those assumptions to historical company and industry trends;

(e)  evaluate the Debtors' debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Debtors;

(f)  assist the Debtors and their other professionals in reviewing and evaluating the terms of any proposed Transaction, M&A Transaction, New Capital Raise or other transaction, in responding thereto and, if directed, in developing and evaluating alternative proposals for a Transaction, M&A Transaction, New Capital Raise or other transaction, whether in connection with a Plan (as defined below) or otherwise;

(g)  determine values and/or ranges of values (as appropriate) for the Debtors and any securities that the Debtors offer or propose to offer in connection with a Transaction, M&A Transaction, New Capital Raise or other transaction;

(h)  determine and evaluate the risks and benefits of considering, initiating and consummating any Transaction, M&A Transaction, New Capital Raise or other transaction, including, without limitation, the risks and benefits with respect to the Debtors' intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of the Debtors, whether pursuant to a Plan or otherwise;

(i)  review and analyze any proposals the Debtors receive from third parties in connection with a Transaction, M&A Transaction, New Capital Raise or other transaction, including, without limitation, any proposals for debtor-in-possession financing, as appropriate;

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given them in the Engagement Letter.

(j)  assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Debtors and/or their respective representatives in connection with a Transaction, M&A Transaction, New Capital Raise or other transaction;

(k)  advise and attend meetings of the Debtors' Board of Directors, creditor groups, official constituencies and other interested parties, as the Debtors determine to be necessary or desirable;

(l)  participate in hearings before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") or such district or other bankruptcy courts as the Debtors may request and provide relevant testimony with respect to the matters described herein and issues arising in connection with any proposed Plan (as defined below);

(m)  assist the Debtors' internal and external counsel to enable such counsel to provide legal advice to the Debtors; and

(n)  render such other financial advisory and investment banking services as may be reasonably requested by the Debtors in connection with any of the foregoing.

## COMPENSATION

6.  Pursuant to the Engagement Letter, in consideration for the services provided to the Debtors, the Debtors have agreed to pay Rothschild the following amounts, pursuant to Section 328 of the Bankruptcy Code, and subject to the final approval of the Bankruptcy Court:

(a)  Commencing as of May 1, 2005, and whether or not a Transaction is proposed or consummated, an advisory fee (the "Monthly Fee") of $250,000 per month.

(b)  A fee (the "Completion Fee") of $15 million, due upon the earlier of (i) the effective date of a Plan that provides for, pursuant to the terms of a binding written agreement, the consummation of a Transaction or (ii) the closing of another Transaction.

(c)  In the case of any M&A Transaction for which Rothschild is designated by the Debtors as the Debtors' primary advisor and investment banker,[3] and which does not arise out of a Transaction for which a Completion Fee is due, a fee (the "M&A Fee") equal to the product of (i) the Aggregate Consideration or Consolidated

---

[3] The Debtors confirmed on May 17, 2006, that Rothschild would serve as the Debtors' primary financial advisor and investment banker in connection with the Debtors' proposed sale, transfer or other disposition in one or more transactions of all or a portion of its equity interests, assets and/or liabilities of the Debtors' (i) Steering Division which included the Debtors' Steering Systems and Halfshafts businesses and (ii) Interior Division which included the Debtors' Instrument Panels and Consoles, Cockpits, Door Modules and Latching Systems businesses.

Aggregate Consideration, as applicable, as provided in Exhibit D to the Engagement Letter, times (ii) the applicable M&A Fee Percentage, each as specified in Exhibit D to the Engagement Letter, due upon the closing of such M&A Transaction.[4]

(d)  A new capital fee (the "New Capital Fee") equal to (i) 1.0% of any senior secured debt raised; (ii) 3.0% of the face amount of any junior secured or senior or subordinated unsecured debt (including any convertible debt) raised and (iii) 5.0% of any equity or hybrid capital raised (each, a "New Capital Raise"), in each case, in which Rothschild is designated by the Debtors as the Debtors' primary advisor and investment banker.  The Engagement Letter provides that the New Capital Fee is due at the closing of any New Capital Raise; provided, that no New Capital Fee is due in respect of any new capital raised (x) with respect to any debtor-in-possession financing arrangements; (y) from an entity not otherwise participating in or having expressed an interest in participating in a Transaction; or (z) from an Acquirer or an entity having expressed an interest in becoming an Acquirer in connection with the consummation of a Transaction which is intended to occur simultaneously with or within a reasonable period after the closing of such New Capital Raise.[5]

(e)  such additional fees as mutually agreed upon by Rothschild and the Debtors, in writing, in advance.

---

[4]  Pursuant to the July 19, 2006 amendment, as approved by this Court, the Engagement Letter provides that notwithstanding anything to the contrary in the initial October 8, 2005 Engagement Letter, the applicable M&A Fee for any M&A Transaction involving the Debtors' Steering Division (which includes the Debtors' Steering Systems and Halfshafts businesses) shall not be less than (i) $5 million, if such M&A Transaction involves both the Debtors' Steering Systems and Halfshafts businesses and is consummated in a single transaction; (ii) $3.5 million, if such M&A Transaction involves only the Debtors' Steering Systems business; or (iii) $1.5 million, if such M&A Transaction involves only the Debtors' Halfshafts business.  In addition, pursuant to the July 19, 2006 amendment, notwithstanding anything to the contrary in the Engagement Letter, the applicable M&A Fee for any M&A Transaction involving the Debtors' Interior division (which includes the Debtors' Instrument Panels and Consoles, Cockpits, Door Modules and Latching Systems businesses), shall not be less than (a) $4 million, if such M&A Transaction involves all four of the Debtors' Interior Division business lines in a single transaction; (b) $3 million, if such M&A Transaction involves any three of the Debtors' Interior Division business lines in a single transaction; (c) $2 million, if such M&A Transaction involves any two of the Debtors' Interior Division business lines in a single transaction; and (d) $1 million, if such M&A Transaction involves any one of the Debtors' Interior Division business lines in a single transaction.  Rothschild earned and was paid a fee of $4.0m on March 4, 2008 upon the closing of the sale of the Interior Division to Inteva Products LLC.  In addition, Rothschild earned a fee of $2.5 million, after accounting for applicable credits, from the sale of the Steering business to General Motors pursuant to the Debtors' Plan of Reorganization consummated on October 6, 2009.  However, as an accommodation to the Debtors, Rothschild agreed to reduce its Steering M&A fee by $500,000 for a total of $2 million.  In connection with General Motor's purchase of the Steering business, General Motors agreed to reimburse the Debtors for 50% of Rothschild's Steering M&A fee, resulting in a net expense to the Debtors of $1 million.

[5]  Based upon the deal structures contemplated in early 2008, the Debtors determined that the New Capital Fee as provided for under the Engagement Letter would produce an extremely high fee.  The Debtors requested, and Rothschild agreed, to cap the New Capital Fee in the April 14, 2008 amendment, in consideration of which the Debtors agreed to, among other things, remove the 50% credit applicable in any M&A Transaction involving the Debtors' Interior Division and add a fee not to exceed $2 million payable in the event of any extension, material amendment or refinancing of the Debtors' DIP financing in existence on April 14, 2008.

7.  The Engagement Letter also provides for reimbursement by the Debtors of Rothschild's reasonable out-of-pocket expenses incurred in connection with the provision of services under the Engagement Letter.

8.  Pursuant to the terms of the Final Retention Order and the Fee Order, Rothschild has submitted monthly statements of fees and disbursements for the purpose of reviewing fees and expenses to ($\underline{i}$) the Debtors, ($\underline{ii}$) counsel for the Debtors, ($\underline{iii}$) counsel for the official committee of unsecured creditors, ($\underline{iv}$) counsel for the official committee of equity holders, ($\underline{v}$) the Office of the United States Trustee, ($\underline{vi}$) counsel for the agent under the Debtors' prepetition credit facility and ($\underline{vii}$) counsel for the agent under the Debtors' post-petition credit facility.  Pursuant to the Fee Order, Rothschild has been paid, or anticipates that it will be paid, 80% of the fees and 100% of the expenses identified in each monthly statement to which no objection has been served and the remaining 20% of the fees upon approval of interim fee applications.  The monthly fee statements delivered by Rothschild, and amounts received in respect thereof, are summarized in the following table:

| Statement Period | Statement Amount | | Payments Received | |
|---|---|---|---|---|
| | **Fees** | **Expenses** | **Fees** | **Expenses** |
| October 2005[6] | $193,548.39 | $13,888.45 | $193,548.39 | $872.26[7] |
| November 2005[6] | $250,000.00 | $13,888.45 | $250,000.00 | $13,888.45 |
| December 2005 | $250,000.00 | $20,261.81 | $250,000.00 | $20,261.81 |
| January 2006 | $250,000.00 | $40,307.56 | $250,000.00 | $40,307.56 |

---

[6] October and November monthly fee statements were filed together pursuant to the Fee Order.  Thus, for illustrative purposes in this table, expenses were evenly distributed.

[7] Rothschild voluntarily agreed to reduce its expenses by $13,016.19 for the first three interim fee periods.  For illustrative purposes in this table, $13,016.19 has been deducted from the October 2005 expense reimbursement.

| February 2006 | $250,000.00 | $17,107.09 | $250,000.00 | $17,107.09 |
| March 2006 | $250,000.00 | $14,329.55 | $250,000.00 | $14,329.55 |
| April 2006 | $250,000.00 | $23,202.39 | $250,000.00 | $23,202.39 |
| May 2006 | $250,000.00 | $10,561.93 | $250,000.00 | $10,561.93 |
| June 2006 | $250,000.00 | $52,607.43 | $250,000.00 | $52,607.43 |
| July 2006 | $250,000.00 | $44,100.79 | $250,000.00 | $44,100.79 |
| August 2006 | $250,000.00 | $87,794.72 | $250,000.00 | $87,794.72 |
| September 2006 | $250,000.00 | $44,818.25 | $250,000.00 | $44,818.25 |
| October 2006 | $250,000.00 | $66,183.88 | $250,000.00 | $66,183.88 |
| November 2006 | $250,000.00 | $17,585.02 | $250,000.00 | $17,585.02 |
| December 2006 | $250,000.00 | $78,537.46 | $250,000.00 | $78,537.46 |
| January 2007 | $250,000.00 | $45,150.43 | $250,000.00 | $41,650.43[8] |
| February 2007 | $250,000.00 | $26,193.33 | $250,000.00 | $26,193.33 |
| March 2007 | $250,000.00 | $107,212.16 | $250,000.00 | $107,212.16 |
| April 2007 | $250,000.00 | $8,776.76 | $250,000.00 | $8,776.76 |
| May 2007 | $250,000.00 | $5,791.04 | $250,000.00 | $3,791.04[9] |
| June 2007 | $250,000.00 | $9,624.03 | $250,000.00 | $9,624.03 |
| July 2007 | $250,000.00 | $17,152.10 | $250,000.00 | $17,152.10 |
| August 2007 | $250,000.00 | $35,283.95 | $250,000.00 | $35,283.95 |
| September 2007 | $250,000.00 | $20,900.85 | $250,000.00 | $17,220.85[10] |

[8] Rothschild voluntarily agreed to reduce its expenses by $3,500.00 for the fourth interim period. For illustrative purposes in this table, $3,500.00 has been deducted from the January 2007 expense reimbursement.

[9] Rothschild voluntarily agreed to reduce its expenses by $2,000.00 for the fifth interim period. For illustrative purposes in this table, $2,000.00 has been deducted from the May 2007 expense reimbursement.

[10] Rothschild voluntarily agreed to reduce its expenses by $3,680.00 for the sixth interim period. For illustrative purposes in this table, $3,680.00 has been deducted from the September 2007 expense reimbursement.

| | | | | |
|---|---|---|---|---|
| October 2007 | $250,000.00 | $24,657.13 | $200,000.00 | $24,657.13 |
| November 2007 | $250,000.00 | $10,833.31 | $200,000.00 | $10,833.31 |
| December 2007 | $250,000.00 | $10,930.32 | $200,000.00 | $10,930.32 |
| 1/1/08 – 1/25/08 | $201,612.90 | $12,169.84 | $161,290.32 | $12,169.84 |
| M&A Fee – Interior Division | $4,000,000.00 | $0.00 | $4,000,000.00 | $0.00 |
| Completion Fee | $15,000,000.00 | $0.00 | $15,000,000.00 | $0.00 |
| M&A Fee – Steering | $2,000,000.00 | $0.00 | $0.00 | $0.00 |

## RELIEF REQUESTED

9.   By this Application, Rothschild seeks an Order (i) granting final allowance and
approval of (A) compensation for services rendered during the period October 8, 2005 through
and including January 25, 2008 (the "Retention Period") as investment banker and financial
advisor to the Debtors in the amount of $27,895,161.29 (the "Final Fee Amount") and (B)
reimbursement of reasonable and necessary expenses incurred by Rothschild during the
Retention Period in the amount of $857,653.84,[11] (ii) ratifying and confirming any amounts
previously received by Rothschild pursuant to the fee procedures approved by this Court, (iii)
authorizing and directing the Reorganized Debtors to pay to Rothschild $2,190,322.58,
representing the portion of the Final Fee Amount not yet received by Rothschild in respect of the
Retention Period, and (iv) granting such other and further relief as this Court deems just and
proper.

---

[11] The Debtors' First Amended Joint Plan of Reorganization provides that, upon the Confirmation Date, any
requirements that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention
or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and
pay Professionals in the ordinary course of business.  Rothschild therefore only seeks approval of compensation for
services rendered through January 25, 2008.

10. All services for which compensation is sought were performed for and on behalf of the Debtors. Rothschild has not entered into any agreement, express or implied, with any party in interest for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.

11. Annexed hereto as <u>Exhibit C</u> are invoices for the total compensation and expenses sought by Rothschild for the period October 1, 2007 through and including January 25, 2008 (the "<u>Final Application Period</u>") and a breakdown of Rothschild's expenses incurred during the Final Application Period. Attached hereto as <u>Exhibit D</u> are daily time logs detailing the activities and services performed by Rothschild on behalf of the Debtors during the Final Application Period. Invoices for total compensation and expenses sought by Rothschild during the prior six interim periods as well as daily time logs detailing the activities and services performed by Rothschild on behalf of the Debtors during the prior six interim periods were filed with the prior Interim Fee Applications. The resumes of key professionals of Rothschild providing services to the Debtors are attached hereto as <u>Exhibit E</u>.

## <u>LEGAL BASIS FOR REQUESTED COMPENSATION</u>

12. Rothschild is entitled to receive the fees it has requested in accordance with the express terms of the Engagement Letter and the provisions of Section 328(a) of the Bankruptcy Code. Section 330 of the Bankruptcy Code provides for the award of compensation to professionals. *See* 11 U.S.C. § 330. Section 330, by its terms, is "subject to" the provisions of Section 328 of the Bankruptcy Code. *Id*. Section 328(a) permits a debtor, with the Court's approval, to employ a professional person "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." *See* 11 U.S.C. § 328(a).

13.   Section 328 represents a departure from the practice that prevailed prior to the

enactment of the Bankruptcy Code in 1978.  The purpose of Section 328 was to permit the pre-

approval of compensation arrangements as a method of insuring that the most competent

professionals would be available to provide services in bankruptcy cases.  *See In re Westbrooks*,

202 B.R. 520, 521 (Bankr. N.D. Ala. 1996) (percentage fee arrangements "comport with the

Bankruptcy Code's goal of attracting highly qualified professionals to the bankruptcy forum");

*In re Olympia Holding Corp*., 176 B.R. 962, 964 (Bankr. M.D. Fla. 1994).

14.   Once the terms of a professional's retention have been approved under Section

328(a), the agreed-upon compensation cannot be altered unless the agreed terms "prove to have

been improvident in light of developments not capable of being anticipated at the time of the

fixing of such terms and conditions."  11 U.S.C. § 328(a); *see also In re Reimers*, 972 F.2d 1127,

1128 (9th Cir. 1992) (compensation agreement approved under Section 328(a) must be enforced

in the absence of unforeseeable circumstances, and is not subject to a "reasonableness" review

under Section 330); *In the Matter of National Gypsum Company*, 123 F.3d 861 (5th Cir. 1997)

(same); *In re Olympia Holding Corp*., 176 B.R. at 964 (same).  As the Court explained in

*National Gypsum*:

> If the most competent professionals are to be available for
> complicated capital restructuring and the development of
> successful corporate reorganization, they must know what they will
> receive for their expertise and commitment.  Courts must protect
> those agreements and expectations, once found to be acceptable.

15.   Pursuant to the Final Retention Order, this Court approved the retention of

Rothschild under the terms of the Engagement Letter, subject to the standard of review provided

under Section 328(a).[12]  *See* Final Retention Order at pages 2-3.

---

[12]  While this Court previously approved virtually all of the fees sought by Rothschild pursuant to the Engagement
Letter, the amendments dated April 14, 2008 and October 27, 2008 were not filed with the Court.  The Company

16.    The compensation for services rendered during the Retention Period has been earned and is due and payable in full under the terms of the Engagement Letter.  Accordingly, Rothschild submits that the fees and expense reimbursements sought herein should be allowed and approved by this Court pursuant to Sections 328(a) and 330 of the Bankruptcy Code.

## SUMMARY OF SERVICES RENDERED

17.    Senior level professionals with extensive experience in the area of investment banking and bankruptcy services directed Rothschild's team.  During the Retention Period, the investment banking services set forth above were performed primarily by David L. Resnick, Managing Director; William R. Shaw, Managing Director; Slava Brin, Vice President; Nicole Torraco, Associate; Rebwar Berzinji, Associate; Eric Irion, Associate; Michael J. Stein, Analyst; William Wang, Analyst; and Marc Frenkel, Analyst as well as other professionals and paraprofessionals, as needed.  Rothschild's general staffing policy is to assign senior bankers, experienced junior bankers and financial analysts to each restructuring assignment.  The senior banker, in this case, David L. Resnick, had overall responsibility for the case.  He was primarily responsible for developing strategy with respect to the case, directing negotiations and interfacing with the other senior professionals involved with the case.  The additional senior bankers, in this case William Shaw and Slava Brin, were responsible for day-to-day coordination of the case and the review of all financial analyses.  The experienced junior bankers, in this case Nicole Torraco, Rebwar Berzinji and Eric Irion, assisted in the day-to-day coordination of the case and performed with the financial analysts, Michael Stein, William Wang and Marc Frenkel, extensive financial

---

indicated that since these amendments were executed subsequent to the Confirmation Date, they were done so in the ordinary course of business.  As stated in footnote 5 above, Rothschild agreed in the April 14 amendment to a cap on the New Capital Fee, in consideration of which the Debtors agreed to, among other things, remove the 50% credit applicable in any M&A Transaction involving the Debtors' Interior Division and add a fee not to exceed $2 million payable in the event of any extension, material amendment or refinancing of the Debtors' DIP financing in existence on April 14, 2008.

analyses.  The senior bankers, the experienced junior bankers and the financial analysts

coordinated their actions so as not to duplicate efforts.  Given that the senior bankers, the

experienced junior banker and the financial analysts had different roles in the case but had

overlapping responsibilities, there were often times in which it was appropriate for two or more

bankers to be present at a meeting.

18.  In addition to the bankers noted above, Rothschild staffed two separate teams of

bankers responsible for the Steering and Interior sale processes.  The Steering sale process was

executed by Christopher Lawrence, Vice Chairman; William R. Shaw, Managing Director; Nigel

Bell, Director; Alysa Kurganska, Vice President; Irene Fayn, Associate; Ali Akbar, Analyst;

Elana Caplan, Analyst; Jason Hahn, Analyst; and Laura Pei, Analyst.  The Interior sale process

was executed by Christopher Lawrence, Vice Chairman; Michael Barr, Managing Director;

William D. Cannon, Vice President; Colin Savage, Associate; Alexander Ridings,

Associate/Analyst; and Ryan Chorazy, Analyst.

19.  The amount of fees and expenses sought in this application and Rothschild's billing

processes are consistent with market practices for investment banking firms both in and out of a

bankruptcy context.  Rothschild's policy for all engagements, in or out of bankruptcy, is to

dedicate the appropriate number of professionals to the assignment to complete the work as

efficiently as possible.

20.  Rothschild does not bill its clients based on the number of hours expended by its

professionals.  It bills clients on a retainer basis (generally monthly), plus a transaction fee or fees

based upon completion.  Accordingly, Rothschild does not have hourly rates for its professionals

and Rothschild's professionals generally do not maintain time records for the work performed for

its clients.  Consistent with the terms of the Final Retention Order, however, Rothschild has

maintained a daily time log detailing the activities and services performed by Rothschild on

behalf of the Debtors, in half-hour increments, during the Retention Period.  A copy of these records for the Final Application Period is attached hereto as <u>Exhibit D</u>.

21.  All services rendered by Rothschild during the Retention Period were performed at the request or direction of the Debtors or legal professionals of Skadden, Arps, Slate, Meagher & Flom LLP ("<u>Skadden</u>") or O'Melveny & Myers LLP ("<u>O'Melveny</u>"), counsel to the Debtors. Rothschild has provided a broad range of necessary financial advisory services.  On March 31, 2006, the Debtors outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  Rothschild assisted the Debtors in developing a reorganization plan to achieve the Debtors' stated goals for transforming five key areas of their business: (i) modify their labor agreements to create a competitive arena in which to conduct business; (ii) conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Debtors; (iii) streamline the Debtors' product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignments; (iv) transform the Debtors' salaried workforce and reduce general and administrative expenses; and (v) devise a workable solution to the Debtors' pension funding situation.  Rothschild played a central role and dedicated significant resources throughout the Retention Period in assisting Delphi analyze various alternatives, engage in stakeholder negotiations, implement resolutions and achieve these stated goals, as described in detail below.  Major areas of effort performed by Rothschild during the Retention Period can be summarized into the following general categories, which have been arranged generally in chronological order:

A.      Debtor-In-Possession Financing ("DIP Facility")

22.  Rothschild assisted the Debtors in obtaining the DIP Facility at the commencement

of the cases, including, but not limited to sizing the potential financing need, evaluating

proposals received from several potential lead banks, participating in the lender negotiations,

resolving objections from pre-petition lenders and reviewing draft credit agreements.

23.  On January 9, 2007, following an assessment of the state of the capital markets and

the refinancing opportunities available to the Debtors, Delphi obtained post-petition financing to

refinance its existing DIP Facility.  Rothschild assisted the Debtors in the refinancing process,

including but not limited to evaluating proposals and associated interest savings, assisting with

the lender negotiations, advising the Board on potential considerations and timing, and

preparing expert testimony.  Rothschild also assisted the Debtors in late 2007 negotiate an

extension of the DIP Facility maturity to June 30, 2008.


B.      Financial Analysis and Due Diligence

24.  Rothschild's initial due diligence involved numerous meetings and telephone calls

with officers of the Debtors.  The subjects reviewed included the reasonableness of the

assumptions underlying the projections, the operating structure and historical financial results of

the Debtors, the financial reporting, legal and tax structures of the Debtors and their

subsidiaries, both international and domestic, and numerous other matters.

25.  Throughout the Retention Period, as the Debtors reported actual results and updated

their financial outlook, Rothschild reviewed detailed quarterly and annual operating data and

forecasts as part of its continuing due diligence regarding the Debtors' long-term business

prospects.  Rothschild helped challenge and vet the assumptions underlying these projections,

which required frequent meetings and telephone calls with the Debtors' officers and finance
team.

C.    Development of the "Steady State" Business Plan

26.  In the initial stages of the cases, Rothschild worked extensively with the Debtors'
management and FTI to develop and review the Debtors' detailed and comprehensive operating
and financial projections for years 2006 through 2010 (the "Steady State").  The Steady State
business plan was a critical component of the Debtors' assessment of its strategic alternatives, as
it provided the baseline financial projections for analyzing the impact of various potential
alternatives.  As part of the Steady State review, Rothschild assisted the Debtors in assessing
different rationalization strategies for certain of the Debtors' product lines.  Throughout the
development of the Steady State, Rothschild's team members traveled on several occasions to
Troy, Michigan to meet with various employees, including Finance, Treasury and Corporate
M&A personnel.  Rothschild also participated in each division's business review meetings with
corporate management.  The assumptions underlying the Steady State were developed to take
into consideration the various external factors impacting the Debtors, their industry and their
customers, and Rothschild assisted in vetting these assumptions and assessing them in light of
industry competitors.

27.  Rothschild worked with the Debtors and FTI to assess historical and projected
financial information and assumptions from the divisions as the Debtors developed a
consolidated financial model based on the Steady State (the "Steady State Model").  Rothschild
performed due diligence on the Steady State and reviewed the Steady State under various
sensitivities with the Debtors.

28.  Rothschild assisted the Debtors' management in presenting the Steady State to the Debtors' various creditor constituencies (collectively, the "Creditors"), including the Unsecured Creditors Committee (the "UCC").


D.    Transformation Model

29.  Rothschild developed a model (the "Transformation Model") that allowed the Debtors to analyze the impact of various operational transformation scenarios (i.e., product line winddowns, headcount changes, labor modifications, and other operational sensitivities) on the Debtors' underlying Steady State.  The Transformation Model was initially utilized to sensitize numerous variables including, but not limited to, revenue assumptions, SG&A savings initiatives, labor cost savings, and transformation costs.  Rothschild used the Transformation Model to help Delphi assess labor modification scenarios, which resulted in a labor proposal to the unions.  The Transformation Model was subsequently used by the Debtors and FTI to develop the revised business plan projections and transformation scenarios.  Rothschild assisted in analyzing and vetting various labor and transformation scenarios and working with the Debtors and FTI to develop and prepare presentations on such scenarios.  Rothschild participated in numerous calls and meetings with the Debtors and FTI to review the projections and underlying assumptions, and also participated in calls and meetings with stakeholder advisors.


E.    Business Plan Financial Due Diligence

30.  Rothschild worked closely with the Debtors to conduct financial and operational due diligence on Delphi as it developed multiple iterations of its strategic business plan over the

course of the Retention Period.  Delphi's business plans were developed at the divisional level

and then reviewed by corporate management.  Rothschild reviewed each of the respective

division's presentations describing its strategies and financial projections.  Rothschild's reviews

included sessions with each of the division heads and finance directors at Delphi headquarters

covering such topics as revenue growth, manufacturing costs, SG&A, engineering, capital

spending, and working capital management.  Rothschild evaluated Delphi's divisional

projections vis-à-vis the publicly available operating results of Delphi's key competitors.

31.  Rothschild participated in both in-person and telephonic sessions with key corporate

management and the strategic planning group to understand the build-up of financials in the

business plan projections from the divisional to the enterprise level, including corporate level

overlays, allocations and adjustments.  Rothschild also held telephonic sessions with and

reviewed materials prepared by Delphi's other advisors, which had responsibility for certain

aspects of the business plan at the corporate level, including Booz Allen Hamilton (regarding

SG&A) and Watson Wyatt (regarding pension and OPEB).

F.    Recapitalization Model

32.  Rothschild developed a consolidated detailed recapitalization model (the "Recap
Model"), which was used throughout the Retention Period to analyze the Debtors' business plan

under various capital structure scenarios.  Throughout the Retention Period, Rothschild updated

and modified its Recap Model and analysis for each iteration of the Debtors' strategic business

plan projections released by the Debtors.  Rothschild worked closely with Delphi's finance staff

and FTI to ensure seamless synchronization between the Debtors' projection models and the

Recap Model.

33. Using the Recap Model, Rothschild performed various financial analyses and assessed numerous scenarios in conjunction with the negotiations among Delphi, General Motors ("GM"), the statutory committees, the unions, and potential investors in a plan of reorganization.

34. Rothschild utilized its Recap Model to assess and present illustrative plan of reorganization ("POR") framework scenarios, which were instrumental in advancing the POR framework negotiations with Delphi's stakeholders. Rothschild held numerous meetings and calls with the various stakeholders to review the scenarios and underlying assumptions. These analyses were used as a common baseline as stakeholders engaged in negotiations over POR framework structure. Major variables included, but were not limited to, the form and amount of stakeholder recoveries, the timing and amount of pension and 414(l) contributions, GM contributions, labor cost savings, emergence capital structures, and potential investment amounts and financing structures.

G.      Creditor Committee / Equity Committee / UAW Due Diligence Processes

35. Throughout the Retention Period, Rothschild assisted the Debtors in coordinating the extensive due diligence of Jefferies and Co. ("Jefferies"), as advisor to the Official Committee of Unsecured Creditors, Lazard Ltd. ("Lazard"), as advisor to the UAW and Compass Advisers LLP ("Compass"), as advisor to the Pension Benefit Guaranty Corporation (PBGC). Similarly, Rothschild assisted the Debtors in coordinating the due diligence process of the Official Committee of Equity Security Holders and their financial advisors Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan").

36.   Rothschild coordinated and facilitated the Debtors' responses to numerous due diligence requests of each of Jefferies, Lazard, Compass and Houlihan regarding operations, financial results, projections, Transformation and Recap Models, labor cost structure, court motions, and other topics.  Throughout the period, Rothschild held numerous discussions to answer questions, clarify requests, and coordinate the process.  Additionally, Rothschild professionals coordinated and participated with the Debtors in numerous due diligence meetings and conference calls requested separately by Jefferies, Lazard, Compass or Houlihan throughout the Retention Period regarding such topics as the POR framework discussions, Plan Investor negotiations and business plan updates.

H.    Labor Negotiations / Motion for Relief Under Sections 1113 and 1114

37.   Rothschild supported the Debtors' in their labor discussions with the unions. Rothschild participated in numerous regularly scheduled calls and meetings with the Debtors' management to assess strategy, alternatives, status of labor negotiations and next steps. Specifically, Rothschild utilized the Transformation and Recap Models to assess the impact of various labor proposals on the Debtors' projections and assisted in the preparation of presentations on these labor proposals.  In response to the unions' requests and as part of the negotiations, the Debtors prepared certain analyses and presentations, which Rothschild assessed and vetted.  Rothschild assisted the Debtors in analyzing the costs and benefits of the Special Attrition Program negotiated with their unions, and in assessing strategy and alternatives.

38.   On March 31, 2006, the Debtors filed a Motion for Authority to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. Section § 1113(C) and Modification of Retiree

Welfare Benefits Under 11 U.S.C., § 1114(G) ("<u>Section 1113 / 1114 Motion</u>"), in support of
which David Resnick submitted an expert declaration.  In order to prepare this expert
declaration, Mr. Resnick and his team extensively evaluated and assessed the then current state
of the automotive industry, the particular labor-related challenges facing Delphi, the Debtors'
financial projections, among other factors and analyses.

39.  Subsequently, in April 2006, the UAW submitted its objection to the Section 1113 /
1114 Motion along with declarations by senior members of its advisor, Lazard.  In response,
David Resnick and Bill Shaw prepared and submitted expert testimony and rebuttal
declarations.  Rothschild reviewed draft Section 1113 / 1114 filings and participated in regular
calls and meetings with the Debtors' counsel (Skadden and O'Melveny) and Delphi
management to review the Section 1113 / 1114 process and next steps to prepare for trial and
prepare expert testimony and declarations.  Rothschild also participated in the Section 1113/
1114 court hearings as well as in numerous meetings and calls to discuss trial status and
strategy.

I.       <u>Pensions</u>

40.  The Debtors identified resolution of their U.S. pension funding obligations as one
of their five transformation goals.  Rothschild assisted the Debtors is assessing various
alternatives with respect to their pensions' significant underfunding status, and participated
with Delphi, its counsel and pension experts in analyzing pension funding costs under various
scenarios, the requirements for a 414(l) transaction with GM, and the ability to achieve
necessary waiver relief.  Rothschild participated in numerous sessions with Delphi to review
strategy and status with respect to discussions with the PBGC and the IRS.  Rothschild also

participated in negotiations with GM regarding the structure of and consideration for the

transfer of pension obligations to GM via a 414(l) transfer.


J.    GM Analysis / Negotiations

41.    Throughout the Retention Period, Rothschild worked extensively with the Debtors

and was a key player in their negotiations with GM over financial support, POR structure and

consensual resolution of both U.S. labor costs and GM claims, which were critical components

to a successful reorganization of Delphi.  These negotiations resulted in the Global Settlement

Agreement and Master Restructuring Agreement (the "GSA/MRA").  This work encompassed

numerous regularly scheduled conference calls and in-person meetings between Delphi and GM

in Detroit and New York throughout the Retention Period, as well as numerous sessions with

the Debtors' senior management to assess strategy and status of negotiations.  Rothschild

interfaced regularly with GM senior management as well as GM's financial advisors, Greenhill

& Co., Inc. ("Greenhill") and Bear, Stearns & Co. Inc. ("Bear Stearns"), and prepared a number

of presentations on various alternatives for GM participation in Delphi's reorganization.

42.    Rothschild, utilizing its Recap Model, was responsible during the negotiations for

assessing the financial impact of various scenarios involving potential support from GM.

Rothschild also assisted Delphi management in generating and analyzing the financial

projections implied by the scenarios and the resulting capital structure and cash flows.

Rothschild, with Delphi's management, prepared presentations and various analyses of GM

contributions and the quantification of negotiating positions.  Rothschild's Recap analyses were

frequently shared with the Debtors' various stakeholders and potential plan investors and their

respective financial advisors as part of each of their respective diligence processes. These materials helped facilitate consensual resolution between the parties on key economic issues.

43. Rothschild also participated in numerous due diligence calls with the Debtors, GM and their advisors to review topics such as Delphi's projections and assumptions, GM revenue contracts, Delphi's portfolio footprint and matters relating to these Chapter 11 cases.

44. Through these negotiations, Delphi and GM developed and heavily negotiated a draft working document (the "Framework Agreement") that encompassed GM's participation in key aspects of Delphi's restructuring, including, among other items, GM support through a revenue plan, employee attrition program, pension & OPEB obligations, U.S. labor rates, and preliminary plans for sale / wind-down of non-continuing businesses. The Framework Agreement would form the basis for the subsequent Plan Framework Support Agreement ("PSA") and GSA/MRA entered into between Delphi and GM.

K.    Potential Plan Investor Due Diligence

45. A key component to the Debtors' reorganization was raising the necessary capital to fund emergence. During the Retention Period, Rothschild assisted Delphi in establishing and coordinating the due diligence processes of several potential investors in a plan of reorganization. This due diligence included, among other things, sessions with the potential investors and their respective advisors to review, among other topics, the Debtors' operations, historical performance, and financial projections under various iterations of the Debtors' strategic business plan projection, including the various underlying sales, costs, balance sheet and cash flow assumptions.

46.  As the various iterations of the Debtor's strategic business plan were developed, Rothschild worked with Delphi to establish a due diligence review process for a potential plan of reorganization.  Rothschild helped coordinate and facilitate sessions with the potential investors, their advisors and the Debtors to provide updates and feedback on the diligence process.  Rothschild also coordinated with the Debtors regarding the review of information to be disseminated.  The potential investors also held reviews with each of the Debtors' divisional leaders.

L.    Original EPCA and POR Framework Negotiations

47.  Rothschild was a key participant in Delphi's POR framework negotiations with each of the statutory committees, GM and potential plan investors.  Primary topics included, among other items, structure and amount of GM participation, stakeholder consideration and recoveries, capital structure, GM claims and potential plan sponsor proposals.  The negotiations entailed Rothschild's extensive participation in numerous meetings and calls with constituency principals and their advisors as well as with potential plan sponsors and their respective advisors.

48.  These negotiations resulted in Delphi entering into the Equity Purchase and Commitment Agreement ("EPCA") on December 18, 2006 with Cerberus Capital Management, L.P. ("Cerberus"), Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Merrill Lynch, Pierce, Fenner & Smith ("Merrill"), UBS Securities LLC ("UBS") (collectively, "AHC" or the "Plan Investors") and GM.  Delphi, GM and the Plan Investors also entered into the Plan Framework Support Agreement (the "PSA"),

which outlined a summary of GM's potential participation and the proposed financial recoveries of the Debtors' stakeholders.

49.  During the negotiations, which ultimately resulted in the EPCA and PSA, Rothschild participated in numerous meetings and calls with the Debtors and their advisors to review the status of negotiations and develop strategy.  Rothschild also assisted the Debtors in reviewing and analyzing the various proposals received from potential plan investors. Rothschild prepared side-by-side analyses to compare both the economic and non-economic terms of the proposals, evaluated the recoveries to the constituencies and stakeholders, and assessed the impact on the Debtors' financial projections.

50.  Rothschild also developed an analysis to evaluate the economics to each of the respective stakeholders in the POR framework negotiations, including but not limited to GM, Plan Investors, Unsecured Creditors and Common Equity (the "Economic Analysis").  The Economic Analysis was used as a common basis for all stakeholders to assess the negotiations and was utilized in conjunction with the Recap Model to analyze the potential ranges of value, ownership and recoveries of the various stakeholders.

51.  During the Retention Period, Rothschild prepared and reviewed a number of databases to assist in evaluating the economics and deal structures of different proposals made during the EPCA negotiations.  Rothschild evaluated relevant precedent rights offerings using a number of variables including, size, offering price, fees, and timing.  As each of the rights offerings had a number of unique characteristics, Rothschild assembled detailed descriptive overviews on each of the respective transactions.  Rothschild evaluated the terms of precedent convertible preferred issuances, including size, conversion terms and call provisions. Rothschild also assessed a series of topping fees and breakup fees in the context of bankruptcies.

M.     Highland Proposal

52.  On December 21, 2006, in response to the EPCA, Highland Capital Management LP ("Highland Capital") submitted its own proposal and commitment letter (the "Highland Proposal") committing up to $4.7 billion in emergence capital and challenging certain aspects of the EPCA, including, but not limited to, recoveries to current equity holders, structure of the post-reorganization Board of Directors, structure and terms of the convertible preferred securities and the rights offering.  Rothschild assessed both the qualitative and quantitative aspects of the Highland Proposal.

53.  Rothschild evaluated and presented to the Delphi Board of Directors a comparison of the EPCA to the Highland Proposal.  Rothschild's comparative assessment included, among other considerations, execution risk, timing constraints and financial impacts.  Rothschild participated in a meeting with Highland Capital and Delphi senior management in Troy.

54.  Highland Capital filed an objection to the Debtors' EPCA and, in support of the Objection, Patrick Daugherty of Highland Capital provided testimony and declarations.  Rothschild evaluated and assessed the contents of these Court submissions and David Resnick submitted a declaration and provided testimony in response.  With respect to the Highland Capital Objection, Mr. Resnick and his team held numerous internal meetings, and meetings and telephone calls with Delphi management and Skadden.

N.     EPCA and DIP Refinancing Court Hearings / Testimony

55.  In connection with the EPCA and the DIP refinancing, Rothschild bankers, in particular David Resnick and Bill Shaw, as well as Delphi senior management, provided

depositions and / or testimony.  Preparation for hearings on these matters involved numerous

meetings among Rothschild, Skadden and the Debtors.  Rothschild also worked with Skadden in

drafting declarations, responding to discovery requests and in developing and preparing analyses

and charts that would be used during the hearings.  David Resnick was deposed and provided

expert testimony at the hearing to approve the EPCA.

O.    <u>Amended EPCA and Plan of Reorganization Framework Negotiations</u>

56.  Following this Court's approval of the EPCA and the PSA on January 11, 2007,

Delphi announced publicly on April 19, 2007 that it anticipated negotiating changes to the

EPCA and PSA, and that it expected Cerberus Capital Management, L.P. would likely not

continue to participate as a plan investor.  Delphi subsequently filed in July 2007, and received

this Court's approval of, an amended EPCA led by Appaloosa (the "<u>Amended EPCA</u>").

Rothschild assisted the Debtors and Skadden in reviewing and negotiating the Amended EPCA

with the plan investors, GM and statutory committees.  Rothschild was a lead player in the

extensive negotiations among the parties regarding, among other items, structure and amount of

GM participation, stakeholder consideration and recoveries under a plan of reorganization, and

potential plan sponsor and emergence financing structures.  The negotiations entailed a number

of meetings and calls with constituency principals and their advisors as well as with potential

plan sponsors and their respective advisors.

57.  Rothschild participated in numerous meetings and calls with the Debtors and their

advisors to review the status of negotiations and develop strategy.  In addition to the EPCA plan

sponsors, several parties, including Pardus and Highland Capital Management, expressed

potential interest in becoming an alternative plan sponsor.  Rothschild participated in meetings

and calls with these parties and their advisors and assisted Delphi in facilitating extensive due

diligence.  Rothschild also assisted the Debtors in reviewing and analyzing potential structures

received from Appaloosa and the other potential plan investors.  Rothschild prepared side-by-

side analyses to compare both the economic and non-economic terms of the structures,

evaluated the recoveries to the constituencies and stakeholders, and assessed the impact on the

Debtors' financial projections.  These analyses were presented to Delphi's senior management

and Board of Directors.

58.  Following this Court's approval of the Amended EPCA in July 2007, as a result of

the declining automotive outlook and capital markets, Delphi, the Plan Investors, GM and the

statutory committees engaged in further negotiations regarding modifications to the terms of the

Amended EPCA and PSA.  Rothschild played a critical role in the negotiations to achieve an

acceptable resolution and modifications to the Amended EPCA and PSA, which formed the

basis of the consensual POR confirmed by this Court on January 25, 2008.

59.  Rothschild participated in the hearing to approve the Amended EPCA.  In

connection with this hearing, David Resnick prepared a declaration and provided a deposition in

support of the motion.


P.    Exit Financing Process


60.  During the summer of 2007, Rothschild assisted the Debtors in structuring and

managing a competitive process to raise exit financing to allow the Debtors to finance their

emergence from Chapter 11 and fund operations post-emergence.  Rothschild held numerous

calls and meetings with Delphi to review the process and feedback received from lenders.

Specifically, Rothschild assisted in coordinating the process, assessing potential exit financing

structures, developing proposed terms and conditions, identifying participants, preparing due

diligence materials, and engaging in discussions and due diligence with such lenders along with

the Debtors. Rothschild also participated in numerous meetings and calls with potential lenders.

61. Rothschild assisted the Debtors in reviewing and analyzing the various preliminary

proposals received from lenders. In light of changing dynamics and dislocations in the capital

markets, the Debtors and Rothschild explored several alternative structures and levels of

financing with lenders. Rothschild assisted the Debtors in their preparation of side-by-side

analyses to compare the proposed terms and utilized its Recap Model to analyze the impact of

the proposed exit financing structures on the Debtors' financial projections. Throughout the

process, the Debtors and Rothschild reviewed the proposals with, and sought feedback from, the

statutory committees, the EPCA Plan Investors, GM and their respective advisors, and assisted

Delphi in preparing presentations for their review.

62. During the period leading to confirmation, Delphi continued discussions with

potential lenders regarding exit financing for the POR. Rothschild assisted the Debtors in

assessing exit financing structures and terms. This included negotiations with potential lenders,

extensive discussions with GM, the Debtors' statutory committees, the Plan Investors and rating

agencies, and participation in the syndication process.


Q.    Going Concern Valuation and Debt Capacity Analysis

63. Delphi directed Rothschild to develop a going concern valuation and key

assumptions including appropriate industry comparables for each division. Rothschild performed

and updated preliminary research and detailed analysis on going concern valuation and operating

metrics of these industry comparables. Rothschild utilized these metrics to benchmark Delphi's

operating performance against that of selected competitors.  Rothschild also developed an

analysis of historical precedent industry transactions to assess the associated valuation multiple

statistics.

64.  Rothschild completed a detailed valuation analysis on a going-concern basis based on

the Debtors' 2007 – 2011 Final Budget Business Plan ("2007 Final BBP").  In preparing its

analysis, Rothschild (i) prepared discounted cash flow analyses based on the 2007 Final BBP,

utilizing various discount rates, and separately valued and accounted for the Debtors' NOLs;

(ii) considered the market value of certain publicly-traded companies in businesses reasonably

comparable to the operating businesses of the Debtors; (iii) considered the value assigned to

certain precedent change-in-control transactions for businesses similar to the Debtors; (iv)

separately valued and accounted for the minority interests of third parties in consolidated joint

ventures of the Debtors; (v) separately reviewed and accounted for the values estimated for

Delphi's ownership interests in unconsolidated joint ventures prepared for the Debtors' fresh

start accounting; (vi) separately valued and accounted for the warrants being issued utilizing the

standard Black-Scholes methodology; and (vii) conducted such other analyses as Rothschild

deemed necessary under the circumstances.  Rothschild presented its detailed going concern

valuation analysis to the Delphi Board of Directors on September 5, 2007 based on the 2007

Final BBP and on October 24, 2007 based on the updated 2007 Final BBP.

65.  Throughout the Retention Period, Rothschild performed comprehensive analyses of

the Debtors' debt capacity by examining the credit statistics (both historical and current) of

selected automotive suppliers and credit rating agency standards for assessing possible

recapitalization alternatives.

R.    Plan of Reorganization and Disclosure Statement Preparation Process

66.  Rothschild assisted the Debtors and Skadden in preparing the plan of reorganization and disclosure statement documents.  This included providing mark-ups and participating in numerous Delphi meetings and work sessions to review documentation.  Rothschild also participated in numerous meetings and calls with the Plan Investors, statutory committees and GM to negotiate the plan and disclosure statement documentation and resolve outstanding issues.

67.  Rothschild provided expert testimony at confirmation in support of the Debtors' POR, the EPCA and valuation.  This included the preparation of expert declarations, participation in depositions and preparation for and delivery of court testimony.  Rothschild also played an integral role in reaching the settlement with the ad hoc committee of bondholders, including participation in negotiations, analysis and rebuttal of their expert valuation report and participation in the deposition of their expert witness.

S.    M&A Activity – Steering Divestiture

68.  Delphi mandated Rothschild on May 17, 2006 to sell the Steering businesses, which ultimately resulted in this Court's approval of the 363 sale to Steering Solutions Corporation, a subsidiary of Platinum Equity, LLC, on February 19, 2008.  The sale of Steering was a critical component of Delphi's broader restructuring as it represented a significant portion of the UAW workforce and GM parts supply.  It was anticipated that resolution of Steering would help address both UAW and GM issues and allow Delphi to narrow the scope of restructuring negotiations with those constituents.  Rothschild augmented its Delphi team with several M&A bankers for the Steering assignment, who, together, spent approximately 7,600

hours on the transaction: 2,300 hours for Managing Directors/Directors, 2,600 hours for Vice

Presidents/Associates, and 2,700 hours for Analysts.

69.  Rothschild led the efforts to prepare the Steering business for sale, worked

extensively with the division's management to prepare marketing materials and management

presentations for both Steering businesses (steering and halfshafts), and assisted in diligence

preparation.  Given the length of the process and the changes in the auto industry, this effort

required multiple revisions to the business plan and associated analysis.

70.  Due to the interplay with the UAW and GM and the restructuring process, in

addition to interacting with third-party buyers, the Rothschild team spent significant time with

GM regarding structuring the sale process (e.g., buyers list, terms of supply relationship with

GM, facilities included in the sale), assisted the Debtors in addressing UAW considerations,

updated the statutory committees and coordinated within Delphi between the sale and

restructuring efforts.

71.  The Steering engagement included what effectively were two sales processes, along

with a 363 auction process and a third-party financing process.  Rothschild went to market in

mid-2006 and contacted 85 potential buyers around the world, utilizing its relationships with

both strategic and financial parties.  Delphi received 9 letters of intent.  The second round

resulted in competitive bidding between Platinum and one other bidder.  Delphi, with the

support of GM and the Unsecured Creditors Committee ("UCC"), selected Platinum, and

Rothschild spent considerable time assisting Delphi in negotiating definitive documentation and

resolving issues with both GM and the UAW.

72.  After completing key definitive documentation in July 2007, Platinum and GM

could not agree on the remaining economic terms.  Several third parties expressed renewed

interest, and Delphi determined that re-testing the market was the best path to maximizing

value.  In August 2007, Rothschild initiated a second full sale process focused on approximately

15 of the most likely parties.  Delphi received 5 indications of interest, and Platinum and two

other bidders competed in a second round.  Delphi, with the support of GM and the UCC,

selected Platinum as the winning bidder, completed definitive documentation and filed a 363

motion with the Court in December 2007.  As part of the 363 process, Rothschild ran a further

auction solicitation process, contacting approximately 25 potential bidders.  The Court approved

the sale to Platinum on February 19, 2008 and the parties targeted closing in early Q2 2008.

73.  In addition, Rothschild ran a third-party financing process as part of the second sale

process in 2007, soliciting "staple/paperclip" proposals from several lenders interested in

providing exit financing to Delphi.  Rothschild had recommended this approach as a means to

facilitate buyer financing for the acquisition which would help minimize conditionality and

accelerate the sale process.

74.  The Rothschild team was directly involved in the extensive negotiations with GM

regarding the financial support/backstop it would provide in the Steering sale to Platinum.  The

Platinum proposal itself provided for essentially zero consideration to the Delphi estate given

the Steering value and the liabilities to be assumed by Platinum.  Delphi and Rothschild instead

negotiated with GM to provide the estate over $200 million for the transaction and fund certain

additional costs, as well as provide a financial backstop in the event the transaction did not

close.

75.  In connection with the GSA/MRA agreements negotiated in the Fall of 2007, to

address the importance of resolving the UAW workforce and GM parts supply, Delphi and GM

negotiated a mechanism to ensure that a sale of the Steering business could occur irrespective of

whether a transaction with Platinum or another third-party closed.  GM received the right to

purchase the Steering business if a sale did not close with another buyer.  While Delphi had

executed definitive documentation with Platinum and had received an order from this Court for

the 363 sale, Platinum and GM continued to negotiate the terms of the supply contract

throughout 2008 as the auto industry and financing markets deteriorated.  After resolution could

not be reached between the parties, Delphi determined on March 3, 2009 to terminate the sale to

Platinum, and GM exercised its option to purchase the Steering business.  Rothschild was

integrally involved with Delphi in structuring and negotiating the sale to GM, similar to its

involvement in the Platinum transaction.  The sale of the Steering business to GM closed on

October 6, 2009 in connection with the consummation of Delphi's plan of reorganization.


T.    M&A Activity – Interior Division Divestiture

        76.  Delphi mandated Rothschild on May 17, 2006 to sell the Interior businesses, which

ultimately resulted in the Court-approved 363 sale to Inteva Products, LLC, a wholly-owned

subsidiary of the Renco Group, on December 21, 2007.  Rothschild augmented its Delphi team

with several M&A bankers for the Interior assignment, who, together, spent approximately

3,300 hours on the transaction: 450 hours for Managing Directors/Directors, 1,600 hours for

Vice Presidents/Associates, and 1,250 hours for Analysts.

        77.  Rothschild performed detailed financial and operational due diligence on the

businesses, which included numerous meetings and phone calls with Delphi management and

site visits.  Rothschild developed the Confidential Information Memoranda ("CIMs"), potential

sale process timelines, lists of potential financial and strategic buyers, and summary business

teasers.  Rothschild also coordinated the preparation of a confidentiality agreement with counsel

and participated in the preparation of Interior's pro forma financial projections.

78.  Rothschild contacted 183 potential buyers, participated in management presentations and assisted the Debtors in developing key criteria to assess bids.  Rothschild assessed and analyzed 25 first round proposals received, held sessions with the bidders to clarify offer terms and advised the Debtors on selecting the bidders to participate in the second round process.  Rothschild established and coordinated the second round diligence process, which included, among other items, detailed financial reviews and facility visits.  Rothschild assisted the Debtors in assessing and negotiating the six final bids received, and in selecting the stalking horse based on a number of considerations, including, but not limited to, valuation, structure, financing, further due diligence requirements and UAW and GM considerations.  Rothschild also participated in discussions with Delphi and GM regarding potential GM support for the business transaction.

79.  Rothschild participated in numerous calls and meetings to review process status and next steps with the Debtors' management, including the preparation of presentations. Rothschild regularly updated the statutory committees and Plan Investors, preparing presentations and hosted meetings and calls regarding the status of the Interior Division sale process.  Topics covered included sales process timeline and status, potential buyers, proposals received, and selection criteria.

80.  After selection of Inteva as the stalking horse bidder, Rothschild conducted a 363 auction sale process, contacting potential buyers and coordinating due diligence.  Subsequent to this Court's approval on December 21, 2007 of the sale to Inteva, the transaction closed on February 29, 2008.

U.    Board Meetings and Discussions

81.  Rothschild, along with the Debtors' management and Skadden, met regularly with the Board to keep its members informed of all relevant developments in the Debtors' bankruptcy proceedings.  Rothschild participated in frequent conference calls and meetings with the Board and sought its members' input, direction and approval on all relevant matters.

V.    Creditor / Equity Meetings & Discussions

82.  Rothschild participated in regularly scheduled meetings/calls with the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders and their respective advisors to report on and respond to questions concerning, among other topics, the financial implications of current operating results; current liquidity; the Debtors' strategic business plan; status of discussions with potential plan investors, the unions and GM; due diligence topics and other matters concerning the Chapter 11 cases.  Rothschild assisted in preparing detailed presentations and discussion materials.

W.    Miscellaneous

83.  During the Retention Period, Rothschild advised the Debtors on a number of miscellaneous matters.  Rothschild participated in regular conference calls and meetings with the Debtors at the Debtors' headquarters to discuss the Debtors' Chapter 11 cases, financial situation and various related issues.  Rothschild coordinated and participated in weekly conference calls with officers of the Debtors and other advisors to the Debtors to discuss current strategic and other issues relating to the Chapter 11 process.

## EXPENSES INCURRED DURING THE RETENTION PERIOD

84.  Rothschild incurred reasonable and necessary out-of-pocket expenses aggregating $857,653.84 during the Retention Period.

85.  Rothschild's charges for expenses to the Debtors are determined in the same manner as for clients in non-bankruptcy matters.  Out-of-pocket expenses incurred by Rothschild are charged to a client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client.  Rothschild does not factor general overhead expenses into disbursements charged to clients in connection with Chapter 11 cases. Rothschild has followed its general internal policies with respect to out-of-pocket expenses billed to the Debtors as set forth below, with any exceptions fully explained:

(a)  Rothschild's general policy permits its employees to bill lunch or dinner meals to a client if the employee is required to provide services to the client during such mealtime due to extreme time constraints.  Rothschild's employees are permitted to order meals in the office if the Rothschild's employee is required to work after 8:00 p.m. on weekdays or more than five (5) consecutive hours on weekends or holidays.  Meal expenses incurred during meetings which employees and other meeting participants are required to attend are billed at cost.

(b)  Messengers and couriers are used by Rothschild to deliver hard copy documents relating to a client matter, which require receipt on an expedited basis; otherwise, Rothschild uses the regular postal system.  Any charges for either messengers or couriers are billed to the client at cost.

(c)  All airfare and other transportation charges incurred by Rothschild's employees directly in connection with services to the client are billed to the client at cost.

(d)  The research/database category consists of the cost of using databases (e.g., Securities Data Corporation, Thomson Financial, Factiva, etc.) to which Rothschild subscribes to search for and obtain information used in Rothschild's financial analyses. Rothschild pays the vendor's standard rate for such database services.  In certain instances, Rothschild has determined that paying a flat annual or monthly fee for such services is less costly than contracting for such services on a per use basis.  Such annual or monthly services are allocated to clients based on such clients' use of each service. The research category also consists of charges from outside services, which supply, for a fee, financial documents from regulatory agencies, which cannot be obtained from

databases subscribed to by Rothschild.

(e)  Rothschild bills photocopying charges at the rate of $.10 per page for black and white copies and $1.00 per page for color copies.

(f)  With respect to local travel, Rothschild's general policy enables employees to travel by taxi or, in certain circumstances, by private car service, to and from meetings while rendering services to a client on a client related matter, for which the client is charged.  This policy is based on Rothschild's determination that travel by taxi or private car service is the most efficient use of a professional's time.  Rothschild's employees are not permitted to charge personal commuting expenses to a client unless the employee is traveling after 8:00 p.m. and has been required to work late as a result of the time exigencies of that client's matters.

(g)  Telephone expenses are charged based on Rothschild's actual cost of telephone charges with respect to client matters.  Cellular phone charges are based on vendor's actual invoices.

(h)  Word processing charges represent actual costs incurred by Rothschild's in-house vendor and actual cost of overtime secretarial support in connection with client matters.

86.  Details of the expenses incurred during the Final Application Period are provided in Exhibit C.  Rothschild submits that all such expenses were necessarily incurred, are reasonable in amount and represent only the actual costs incurred.

## CONCLUSION

87.  Rothschild respectfully submits that the services it has rendered to the Debtors have been necessary and in the best interest of the Debtors and their estates and have furthered the goals of all parties in interest.  The services summarized by this application and rendered by Rothschild to the Debtors during the Retention Period were substantial, professional and instrumental to the Debtors in furtherance of their restructuring efforts.  Rothschild further submits that the compensation requested for the Retention Period for services rendered by Rothschild to the Debtors is fully justified and reasonable based on the following: (a) the degree of activity during the Retention Period and the high level of services rendered by Rothschild to

the Debtors; (b) the complexity of the issues presented; (c) the skills necessary to perform the

investment banking services properly; (d) the preclusion of other employment; (e) customary fees

charged in non-bankruptcy situations for similar services rendered; (f) time constraints required

by the exigencies of the cases; and (g) the experience, reputation and ability of the professionals

rendering services.


*[remainder of page left blank by intention]*

WHEREFORE, Rothschild respectfully requests that this Court enter an Order (i) granting final allowance and approval of (A) compensation for services rendered during the Retention Period as investment banker and financial advisor to the Debtors in the amount of $27,895,161.29 and (B) reimbursement of reasonable and necessary expenses incurred by Rothschild during the Retention Period in the amount of $857,653.84, (ii) ratifying and confirming any amounts previously received by Rothschild pursuant to the fee procedures approved by this Court, (iii) authorizing and directing the Reorganized Debtors to pay to Rothschild $2,190,322.58, representing the portion of the Final Fee Amount not yet received by Rothschild in respect of the Retention Period, and (iv) granting such other and further relief as this Court deems just and proper.

* * *

Dated:  New York, New York
        December 30, 2009

                        ROTHSCHILD INC.


                        By: /s/ William R. Shaw
                            William R. Shaw
                            Managing Director