**Hearing Date And Time: To Be Determined**
**Objection Deadline: To Be Determined**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
       In re                     :     Chapter 11
                                            :
DPH HOLDINGS CORP., et al.,     :     Case No. 05-44481 (RDD)
                                            :
                                          :     (Jointly Administered)
            Reorganized Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SEVENTH AND FINAL APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS AND DEBTORS-IN-POSSESSION,
SEEKING FINAL ALLOWANCE AND PAYMENT OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("SEVENTH AND FINAL SKADDEN FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | October 8, 2005 through January 25, 2008 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | **$90,556,038** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | **$5,756,849** |
| Voluntary Reductions For Final Application Period: | |
|    Monthly Fee Statements: | **$9,170,700** |
|    Prior Interim Fee Applications: | **$556,370** |
|    Final Fee Application: | **$350,789** |
|    Agreed Fee Review Committee Reduction: | **$40,000** |
| Total Voluntary Reductions: | **$10,117,859** |
| Additional Fee Correction on Prior Interim Fee Applications: | **$34,413** |
| Total Voluntary Reduction and Fee Correction: | **$10,152,272** |

This is an/(a): _____ Interim ___X___ Final Application.

Aggregate Amounts Paid to Date: **$92,741,087**

## PRIOR FEE APPLICATIONS

| Prior Fee Application | Date Filed | Period Covered | Interim Fees Requested (Awarded) | Interim Expense Reimbursement Requested (Awarded) |
|---|---|---|---|---|
| First | 05/31/06 | 10/08/05 – 01/31/06 | $9,200,920 ($9,187,586.67) | $622,420 ($622,420) 02/16/07 Docket No. 6986 |
| Second | 07/31/06 | 02/01/06 – 05/31/06 | $11,310,231 ($11,296,897.67) | $825,854 ($825,854) 02/20/07 Docket No. 6997 |
| Third | 11/30/06 | 06/01/06 – 09/30/06 | $10,025,538 ($10,012,204.66) | $848,232 ($848,232) 02/22/07 Docket No. 7019 |
| Fourth | 03/30/07 | 10/01/06 – 01/31/07 | $12,820,504 ($12,820,504) | $708,096 ($708,096) 07/02/07 Docket No. 8450 |
| Fifth | 07/31/07 | 02/01/07 – 05/31/07 | $12,589,501 ($12,589,501) | $678,644 ($678,644) 10/29/07 Docket No. 10752 |
| Sixth | 11/30/07 | 06/01/07 – 09/30/07 | $15,387,189 ($15,387,189) | $837,950 ($837,950) 02/28/08 Docket No. 12908 |

TIME SUMMARY FOR SEVENTH AND FINAL INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
OCTOBER 8, 2005 – JANUARY 25, 2008[1]

| Name | Year Of Admission | Seventh Period Rate[2] | Seventh Period Hours | Seventh Period Amount | Final Application Period Rate[2] | Final Application Period Hours | Final Application Period Amount |
|---|---|---|---|---|---|---|---|
| **PARTNERS** | | | | | | | |
| Butler, Jr., John (Jack) Wm | 1980 | $873 | 1,041.30 | $908,818 | $785 | 7,306.10 | $5,737,831 |
| Marafioti, Kayalyn A. | 1980 | $895 | 779.60 | $697,758 | $824 | 4,566.40 | $3,764,595 |
| Lyons, John K. | 1989 | $789 | 759.70 | $599,659 | $689 | 5,001.30 | $3,443,923 |
| Cochran, Eric L. | 1987 | $920 | 679.00 | $624,680 | $836 | 3,498.70 | $2,923,451 |
| Hogan III, Albert L. | 1997 | $747 | 912.40 | $681,271 | $677 | 3,609.20 | $2,443,341 |
| Panagakis, George N. | 1990 | $830 | 354.60 | $294,365 | $755 | 2,522.90 | $1,905,149 |
| Meisler, Ron E. | 1999 | $685 | 996.90 | $682,595 | $640 | 2,220.20 | $1,420,200 |
| Furfaro, John P. | 1981 | $870 | 106.30 | $92,481 | $773 | 1,287.80 | $995,741 |
| Berlin, Kenneth | 1974 | $895 | 40.00 | $35,802 | $777 | 937.70 | $728,356 |
| Springer, David E. | 1977 | | | | $725 | 965.80 | $700,196 |
| Hiestand, N. Lynn | 1981 | $950 | 13.50 | $12,825 | $826 | 614.40 | $507,768 |
| Gross, Cliff | 1989 | $920 | 102.10 | $93,932 | $814 | 623.90 | $507,670 |
| Berke, Jay S. | 1972 | $870 | 56.70 | $49,329 | $774 | 574.80 | $444,705 |
| Wexler, Marian P. | 1977 | | | | $746 | 518.10 | $386,629 |
| Leff, Neil M. | 1981 | $895 | 78.00 | $69,812 | $805 | 324.40 | $261,178 |
| Frishman, Lawrence D. | 1989 | $870 | 59.00 | $51,330 | $792 | 289.60 | $229,330 |
| Gibson, Marie L. | 1997 | | | | $617 | 349.10 | $215,456 |
| Saggese, Nick P. | 1980 | $950 | 86.20 | $81,890 | $889 | 238.60 | $212,005 |
| Keith D. Krakaur | 1986 | | | | $717 | 231.60 | $166,044 |
| Noel, Gregg A. | 1982 | $920 | 72.10 | $66,332 | $889 | 123.40 | $109,683 |
| Brewster, Jody J. | 1983 | | | | $756 | 110.30 | $83,365 |
| Frost, Jr., Don J. | 1989 | | | | $790 | 40.50 | $31,995 |
| Gunther, Christopher J. | 1992 | | | | $588 | 42.20 | $24,816 |
| LeDuc, Andre | 1978 | | | | $770 | 17.00 | $13,090 |
| Stoll, Neal R. | 1974 | | | | $865 | 14.30 | $12,370 |
| Levi, Stuart D. | 1987 | | | | $785 | 14.40 | $11,304 |
| Atkins, Peter A. | 1969 | | | | $696 | 16.20 | $11,273 |
| **Partner Total** | | | **6,137.40** | **$5,042,879** | | **36,058.90** | **$27,291,464** |

[1]   During the Final Application Period, certain timekeepers were promoted (e.g., promoted from associate to partner). Accordingly, for each timekeeper, the data in this Final Application corresponds to how the timekeeper was actually billed to the Debtors, resulting in certain timekeepers appearing in more than one category. In addition, on prior interim fee applications certain timekeepers were designated as "Law Clerks." Law Clerks are law school graduates who were not yet been admitted to practice. For purposes of billing statistics, Law Clerks are included with associates. As indicated on the chart below, two timekeepers are designated as Law Clerks on this Final Application.

[2]   The blended rates set forth for certain professionals reflect the average billing rate for the Final Application Period and incorporate a reduced billing rate for nonworking travel time.

| Name | Year Of Admission | Seventh Period Rate[2] | Seventh Period Hours | Seventh Period Amount | Final Application Period Rate[2] | Final Application Period Hours | Final Application Period Amount |
|---|---|---|---|---|---|---|---|
| **COUNSEL** | | | | | | | |
| Matz, Thomas J. | 1976 | $665 | 796.60 | $529,751 | $600 | 5,726.80 | $3,434,568 |
| Ramlo, Kurt | 1993 | $651 | 1,009.00 | $656,400 | $625 | 2,634.30 | $1,646,088 |
| Garner, Lee P. | 1995 | $681 | 725.00 | $493,842 | $624 | 1,982.00 | $1,236,473 |
| Shivakumar, Dhananjai | 1998 | | | | $547 | 1,923.30 | $1,051,270 |
| MacDonald, F. Neil | 1997 | $623 | 869.20 | $541,728 | $605 | 1,274.30 | $771,105 |
| Sensenbrenner, Eric B. | 1996 | $695 | 93.90 | $65,261 | $592 | 991.80 | $587,204 |
| Gasaway, Michelle | 1998 | $695 | 367.60 | $255,484 | $645 | 841.60 | $542,488 |
| Amodeo, John A. | 1977 | $695 | 89.30 | $62,064 | $623 | 493.90 | $307,885 |
| Schneider, David A. | 1986 | | | | $589 | 242.70 | $143,057 |
| Jackson, Jerry L. | 1977 | | | | $580 | 28.80 | $16,704 |
| Strobert, Andrew F. | 1993 | | | | $625 | 23.20 | $14,501 |
| Ko, Jonathan B. | 1998 | | | | $595 | 19.30 | $11,484 |
| Ziff, Elaine D. | 1983 | | | | $560 | 20.50 | $11,480 |
| **Counsel Total** | | | **3,950.60** | **$2,604,530** | | **16,202.50** | **$9,774,307** |
| **ASSOCIATES** | | | | | | | |
| Stuart, Nathan L. | 2002 | $561 | 1,241.30 | $696,675 | $483 | 6,253.90 | $3,018,335 |
| Fern, Brian M. | 1996 | $615 | 847.40 | $521,568 | $533 | 5,213.80 | $2,776,825 |
| Wharton, Joseph N. | 1998 | $603 | 1,080.80 | $651,974 | $532 | 4,399.00 | $2,339,083 |
| Meisler, Ron E. | 1999 | | | | $522 | 4,404.70 | $2,297,701 |
| Hardin, Adlai S. | 1998 | $625 | 789.90 | $493,697 | $587 | 3,542.70 | $2,078,979 |
| Reese, Randall G. | 2001 | | | | $445 | 3,923.70 | $1,746,165 |
| Herriott, Allison V. | 2004 | $480 | 659.00 | $316,607 | $394 | 4,320.90 | $1,703,092 |
| Diaz, Lisa B. | 2006 | $432 | 865.00 | $374,095 | $353 | 4,743.20 | $1,673,694 |
| Grant, T. Kellan | 2000 | $526 | 953.90 | $501,606 | $477 | 3,506.60 | $1,671,696 |
| Campanario, Nick D. | 2002 | $576 | 674.70 | $388,662 | $507 | 3,220.80 | $1,632,402 |
| Perl, Michael W. | 2004 | $482 | 902.20 | $435,038 | $432 | 3,672.20 | $1,587,210 |
| Connors, Christopher P. | 1999 | $615 | 819.50 | $503,908 | $589 | 2,398.00 | $1,412,622 |
| Guzzardo, John | 2004 | $476 | 898.00 | $427,534 | $418 | 3,323.80 | $1,389,737 |
| Ganitsky, Daniel I. | 2001 | $625 | 644.40 | $402,755 | $597 | 2,219.80 | $1,324,372 |
| Howe, Eric J. | 2005 | $452 | 833.90 | $377,039 | $400 | 2,946.40 | $1,179,896 |
| Platt, Sarah J. | 2006 | $413 | 945.20 | $389,970 | $369 | 3,133.10 | $1,156,103 |
| Ziegler, Venera E. | 2003 | | | | $510 | 1,958.70 | $998,937 |
| Bolton, Ian S. | 2005 | $455 | 612.40 | $278,576 | $396 | 2,474.90 | $980,200 |
| Toussi, Sina | 1995 | | | | $539 | 1,725.10 | $929,529 |
| Houston, Brent M. | 2003 | | | | $422 | 2,179.80 | $919,445 |
| MacDonald, Neil | 1997 | | | | $536 | 1,693.60 | $907,451 |
| Halper, Adam F. | 2005 | $460 | 877.40 | $403,604 | $419 | 2,114.50 | $886,073 |
| Gartner, Matthew | 2006 | $412 | 931.70 | $383,439 | $378 | 2,169.90 | $819,987 |
| Hill, Laverne F. | 2005 | $457 | 724.50 | $330,809 | $413 | 1,937.20 | $799,921 |
| Kaloudis, Denise | 2003 | $570 | 703.10 | $400,952 | $532 | 1,449.90 | $770,622 |
| Samole, Rena M. | 2000 | $610 | 727.00 | $443,723 | $591 | 1,226.80 | $724,621 |
| Jjingo, M. Janine | 2006 | $460 | 136.10 | $62,606 | $363 | 1,989.00 | $721,571 |
| De Elizalde, Dolores | 2003 | | | | $458 | 1,558.20 | $713,886 |

| Name | Year Of Admission | Seventh Period Rate[2] | Seventh Period Hours | Seventh Period Amount | Final Application Period Rate[2] | Final Application Period Hours | Final Application Period Amount |
|---|---|---|---|---|---|---|---|
| VanLonkhuyzen, Courtney E. | 2004 | | | | $398 | 1,741.00 | $693,181 |
| Wilson, Louis D. | 2000 | | | | $517 | 1,310.90 | $677,254 |
| Kahn, Melissa T. | 2003 | $540 | 528.80 | $285,552 | $492 | 1,263.80 | $622,375 |
| Ogunsanya, Gregory O. | 2004 | | | | $490 | 1,096.00 | $537,393 |
| Gelder, Amy Van | 2003 | $519 | 238.50 | $123,714 | $472 | 1,105.60 | $521,994 |
| Micheli, Matthew J. | 2002 | | | | $419 | 1,234.50 | $517,418 |
| Kohut, Ronald D. | 2004 | $540 | 231.70 | $125,118 | $469 | 1,042.30 | $488,916 |
| Feinberg, Aaron S. | 2002 | $610 | 246.90 | $150,609 | $545 | 803.80 | $437,705 |
| Zaltzman, Haim | 2006 | | | | $313 | 1,192.60 | $373,865 |
| Phillips, Daniel P. | 1998 | | | | $541 | 659.40 | $356,846 |
| Pilkington, Christian | Foreign (1999) | $635 | 40.40 | $25,654 | $557 | 557.00 | $310,511 |
| Danz, Catherine E. | 2001 | | | | $474 | 638.80 | $302,587 |
| Suber, Karen M. | 2007 | $420 | 362.10 | $152,082 | $386 | 750.30 | $289,897 |
| Lederer, J.R. | 2007 | | | | $325 | 786.00 | $255,219 |
| Duncomb, Brandon M. | 2007 | $366 | 567.60 | $207,473 | $362 | 613.40 | $221,900 |
| Tullson, Carl T. | 2007 | $365 | 569.10 | $207,801 | $363 | 596.00 | $216,275 |
| Park, Young M. | 2001 | $612 | 164.90 | $100,878 | $577 | 370.60 | $214,020 |
| Murphy, Mike | 2007 | $363 | 521.50 | $189,508 | $363 | 521.50 | $189,508 |
| Willenken, Karen E. | 2000 | | | | $523 | 338.40 | $176,975 |
| Furman, Erin C. | 2000 | | | | $572 | 292.90 | $167,486 |
| Rohner, William M. | 2002 | | | | $453 | 318.60 | $144,268 |
| Arkuss, Brett | 2007 | $420 | 176.90 | $74,298 | $389 | 342.70 | $133,158 |
| Krebs, Peter E. | 2003 | | | | $410 | 324.50 | $133,045 |
| Louko, Tero | 2000 | $635 | 112.20 | $71,249 | $612 | 209.40 | $128,112 |
| Bouchard, Christopher J. | 2003 | $540 | 228.00 | $123,120 | $540 | 228.00 | $123,120 |
| Newburn, Ryan M. | 2007 | $377 | 319.10 | $120,142 | $377 | 319.10 | $120,142 |
| Carter, P. Gifford | 2002 | | | | $517 | 226.20 | $116,846 |
| Zambrano, Kathy | 2003 | | | | $398 | 292.30 | $116,419 |
| Shih, Jonathan L. | 2007 | | | | $310 | 365.10 | $113,121 |
| Lazarova, Natalia F. | 2002 | | | | $470 | 224.10 | $105,327 |
| Belin, Rita Sinkfield | 1996 | $625 | 123.70 | $77,313 | $616 | 162.20 | $99,836 |
| Pehlke, David R. | 2005 | | | | $338 | 227.20 | $76,773 |
| Schockett, Paul | 2006 | | | | $390 | 190.80 | $74,412 |
| Lozano, Paola | 2002 | | | | $540 | 137.10 | $74,034 |
| Cazers, Paul L. | 2005 | $460 | 152.10 | $69,966 | $460 | 152.10 | $69,966 |
| Hur, Jamie | 2005 | | | | $375 | 170.20 | $63,827 |
| LaPergola, Antonio | 2001 | | | | $565 | 109.40 | $61,812 |
| Olasky, Peter | 2005 | | | | $404 | 146.70 | $59,283 |
| Malone, Elizabeth A. | 2002 | | | | $495 | 101.70 | $50,343 |
| McLeod, John M. | 1999 | | | | $585 | 78.60 | $45,982 |
| Bednarova, Barbora | Law Clerk | $460 | 96.50 | $44,390 | $460 | 96.50 | $44,390 |
| Ketchens, Jason P. | 2000 | | | | $525 | 72.10 | $37,828 |
| Adams, Julie Boden | 2005 | $495 | 15.90 | $7,871 | $436 | 84.50 | $36,855 |

| Name | Year Of Admission | Seventh Period Rate[2] | Seventh Period Hours | Seventh Period Amount | Final Application Period Rate[2] | Final Application Period Hours | Final Application Period Amount |
|---|---|---|---|---|---|---|---|
| Schohn, Erica | 2004 | | | | $414 | 87.10 | $36,073 |
| Stenger, Allen | 2004 | | | | $449 | 79.60 | $35,744 |
| Turman, III, Rossie E. | 1999 | | | | $557 | 57.60 | $32,108 |
| Nash, Jr., Patrick J. | 1996 | | | | $470 | 67.10 | $31,544 |
| Garcia, Kara R. | 2003 | | | | $495 | 56.70 | $28,067 |
| Delphin-Rodriguez, Renee C. | 2006 | $420 | 66.70 | $28,014 | $420 | 66.70 | $28,014 |
| Goetz, Amy J. | 2006 | | | | $355 | 66.10 | $23,466 |
| Heather, Justin L. | 2001 | | | | $465 | 48.90 | $22,739 |
| Tsiros, Dionysios V. | Law Clerk | | | | $295 | 73.80 | $21,773 |
| Katz, Micah G. | 2006 | | | | $390 | 51.40 | $20,046 |
| Smith-Haley, Kelly | 2004 | | | | $375 | 47.60 | $17,850 |
| Fitzgerald, James E. | 2002 | | | | $535 | 29.80 | $15,943 |
| Todryk, Jenelle M. | 2001 | | | | $535 | 28.20 | $15,087 |
| Dickerson, Chris L. | 1998 | | | | $540 | 27.80 | $15,012 |
| Gibson, Marie L. | 1997 | | | | $540 | 27.10 | $14,634 |
| Horstmann, Britta | 2005 | | | | $390 | 35.40 | $13,806 |
| Dale, Sarah S. | 2008 | $375 | 33.60 | $12,601 | $375 | 33.60 | $12,601 |
| Mullin, Joshua A. | 1997 | | | | $540 | 19.90 | $10,746 |
| Vujic, Ivana | 2002 | | | | $535 | 19.80 | $10,593 |
| Silverberg, Bennett S. | 2001 | | | | $485 | 21.50 | $10,428 |
| **Associate Total** | | | **21,663.60** | **$10,982,190** | | **106,139.80** | **$49,176,653** |
| **PARAPROFESSIONALS** | | | | | | | |
| Demma, Jeffrey | | $256 | 714.60 | $182,658 | $241 | 4,244.70 | $1,021,733 |
| Zsoldos, Andrew F. | | $235 | 71.10 | $16,710 | $169 | 3,586.70 | $605,638 |
| Rosen, Ruth | | | | | $238 | 1,851.40 | $441,218 |
| Klimek, Marsha V. | | $257 | 519.10 | $133,310 | $246 | 1,653.20 | $407,477 |
| Salazar, Adriana G. | | | | | $179 | 1,700.80 | $303,951 |
| Chavali, Aruna | | $170 | 208.00 | $35,360 | $161 | 1,742.70 | $280,598 |
| Shrago, Rebecca | | $170 | 554.50 | $94,265 | $167 | 758.70 | $126,937 |
| Worscheck, Toby M. | | $90 | 186.50 | $16,785 | $80 | 1,376.70 | $109,683 |
| Donnelly, Neal P. | | | | | $189 | 561.30 | $105,853 |
| Nowicki, John A. | | $265 | 44.80 | $11,872 | $240 | 430.10 | $103,321 |
| Chow, Pauline P. | | $240 | 53.60 | $12,853 | $228 | 430.00 | $97,935 |
| Rivera, Maira | | $90 | 156.70 | $14,103 | $80 | 1,107.20 | $88,189 |
| Terry, William C. | | $315 | 229.70 | $72,357 | $307 | 282.90 | $86,959 |
| Figueroa, Tracy Jo | | $205 | 416.70 | $85,429 | $205 | 416.70 | $85,429 |
| Jacobson, Susan J. | | | | | $230 | 328.70 | $75,601 |
| Gilchrist, Julie M. | | $265 | 12.00 | $3,180 | $242 | 245.20 | $59,250 |
| Yoeli, Matthew E. | | | | | $145 | 353.90 | $51,316 |
| Zylich, A. Kaitlin | | $170 | 286.10 | $48,637 | $170 | 299.60 | $50,797 |
| DiBella, Joseph B. | | | | | $210 | 195.70 | $41,097 |
| Woodfield, Joseph | | $205 | 71.10 | $14,577 | $185 | 129.90 | $23,985 |
| Buckman, Katherine | | | | | $162 | 129.40 | $20,948 |

| Name | Year Of Admission | Seventh Period Rate[2] | Seventh Period Hours | Seventh Period Amount | Final Application Period Rate[2] | Final Application Period Hours | Final Application Period Amount |
|---|---|---|---|---|---|---|---|
| Roman, Joseph J. | | $80 | 145.50 | $11,640 | $80 | 235.40 | $18,743 |
| Nakai, Karin M. | | $260 | 38.60 | $10,036 | $243 | 76.70 | $18,609 |
| Negron, Angeline M. | | | | | $75 | 238.90 | $17,919 |
| Jin, David | | | | | $161 | 103.50 | $16,678 |
| Hendrick, Daniel | | | | | $145 | 110.50 | $16,023 |
| Czebiniak, Taras M. | | $205 | 77.90 | $15,970 | $205 | 77.90 | $15,970 |
| Millican, Ian S. | | | | | $156 | 96.60 | $15,032 |
| Rosi, Domino A. | | | | | $145 | 97.90 | $14,196 |
| Scher, Shimrit | | | | | $145 | 80.50 | $11,673 |
| Laakko, Catherine A. | | $265 | 40.10 | $10,627 | $265 | 40.10 | $10,627 |
| Park, Bryant H. | | $265 | 38.60 | $10,229 | $265 | 38.60 | $10,229 |
| **Paraprofessional Total** | | | **3,865.20** | **$800,598** | | **23,022.10** | **$4,353,614** |
| **TOTAL ALL PROFESSIONALS** | | | **35,616.80** | **$19,430,197** | | **181,423.30** | **$90,596,038** |
| Previously Agreed To Fee Review Committee Reduction[3] | | | | | | | $40,000 |
| **Total Amount Requested** | | | | **$19,430,197** | | | **$90,556,038** |

This summary excludes voluntary fee reductions of $9,323,587, of which $8,376,439 was reduced on the monthly statements, $556,359 was reduced on Skadden's prior interim fee applications, $350,789[4] is an additional accommodation made to this Final Application, and $40,000 that was previously agreed to with the Fee Review Committee in connection with Skadden's first, second, and third interim fee applications.

---

[3]    In connection with the Fee Review Committee's review of Skadden's first, second, and third interim fee applications, Skadden agreed to an additional accommodation of $40,000. This $40,000 accommodation was divided evenly by reducing the amount of fees awarded in Skadden's first, second, and third interim fee applications, respectively. Because this was an agreed-to accommodation with the Fee Review Committee, the $40,000 does not relate to any particular matter or any particular timekeeper. Accordingly, the detailed matter and timekeeper data included in this Final Application does not account for this $40,000 reduction, but rather the reduction is accounted for in the total amount requested in this Final Application.

[4]    The $350,789 accommodation on this Final Application consists of $182,747 for the seventh interim fee period and $168,042 for prior interim fee periods. In accordance with Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995, Skadden has identified those entries within Exhibits D-1 through D-33 for which accommodations are being provided for the seventh interim fee period pursuant to this Final Application. In prior interim fee applications, Skadden previously identified those entries for which accommodations were provided in those prior interim fee applications. The time entries corresponding to the additional accommodation of $168,042 from prior interim periods can be provided by Skadden upon request.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
OCTOBER 8, 2005 – JANUARY 25, 2008

| Activities | Seventh Period Hours | Seventh Period Fees | Final Application Period Hours | Final Application Period Fees |
|---|---|---|---|---|
| Reorganization Plan / Plan Sponsors | 11,474.50 | $6,754,699 | 30,622.70 | $17,181,865 (19.0%) |
| Claims Administration (General) | 7,258.80 | $3,641,967 | 27,876.70 | $12,982,125 (14.3%) |
| Customer Matters (GM) | 252.10 | $164,496 | 12,030.50 | $6,098,537 (6.7%) |
| Employee Matters (Labor Unions) | 226.50 | $148,444 | 10,803.50 | $5,874,843 (6.5%) |
| Case Administration | 1,569.50 | $570,959 | 14,357.30 | $4,673,265 (5.2%) |
| Asset Dispositions (General) | 2,156.50 | $1,261,688 | 7,829.00 | $4,329,798 (4.8%) |
| Disclosure Statement / Voting Issues | 3,550.10 | $1,956,450 | 6,053.40 | $3,259,595 (3.6%) |
| Creditor Meetings/ Statutory Committees | 182.50 | $99,848 | 6,011.30 | $3,018,877 (3.3%) |
| Supplier Matters | 251.50 | $121,150 | 5,667.20 | $2,721,521 (3.0%) |
| Nonworking Travel Time | 1,463.10 | $457,131 | 8,798.40 | $2,654,031 (2.9%) |
| Tax Matters | 527.20 | $365,014 | 4,310.70 | $2,593,308 (2.9%) |
| Employee Matters (General) | 219.10 | $161,031 | 4,429.80 | $2,451,723 (2.7%) |
| Rights Offering | 1,943.20 | $1,120,975 | 3,931.30 | $2,336,402 (2.6%) |
| Retention / Fee Matters / Objections (Others) | 448.70 | $173,084 | 5,172.00 | $2,083,479 (2.3%) |
| General Corporate Advice | 455.80 | $281,638 | 3,314.70 | $2,063,481 (2.3%) |
| Business Operations / Strategic Planning | 844.40 | $502,500 | 3,009.60 | $1,906,630 (2.1%) |
| Customer Matters (Reviews/Investigations) | 90.50 | $62,043 | 3,166.20 | $1,595,210 (1.8%) |
| Litigation (Insurance Recovery) | 286.30 | $200,305 | 2,273.90 | $1,393,286 (1.5%) |
| Retention / Fee Matters (SASM&F) | 372.70 | $180,471 | 3,030.20 | $1,279,767 (1.4%) |
| Environmental Matters | 126.50 | $94,971 | 1,642.60 | $1,158,475 (1.3%) |
| Global Subsidiaries (Non-U.S.) | 110.20 | $70,712 | 1,787.90 | $1,143,565 (1.3%) |
| Financing (DIP and Emergence) | 758.90 | $453,430 | 1,896.90 | $1,081,965 (1.2%) |
| Automatic Stay (Relief Actions) | 57.90 | $30,685 | 2,132.00 | $989,009 (1.1%) |
| Leases (Real Property) | 32.50 | $17,124 | 1,615.30 | $835,706 (0.9%) |
| Secured Claims | | | 1,509.50 | $700,936 (0.8%) |
| Executory Contracts (Personalty) | 348.90 | $163,630 | 1,308.00 | $615,889 (0.7%) |
| Claims Administration (Reclamation/Trust Funds) | 14.10 | $8,559 | 1,325.70 | $550,822 (0.6%) |
| Employee Matters (Pension) | 267.40 | $182,808 | 841.00 | $519,134 (0.6%) |
| Utilities | | | 1,027.70 | $517,611 (0.6%) |
| Asset Analysis and Recovery | 34.00 | $20,027 | 763.30 | $453,745 (0.5%) |
| Reports and Schedules | 140.00 | $79,361 | 697.00 | $366,254 (0.4%) |
| Intellectual Property | 49.50 | $30,938 | 420.30 | $218,067 (0.2%) |
| Real Estate (Owned) | | | 362.60 | $217,080 (0.2%) |
| Liquidation / Feasibility | 88.50 | $44,667 | 316.60 | $161,290 (0.2%) |
| Litigation (General) | | | 314.50 | $146,841 (0.2%) |
| Customer Matters (General) | 15.40 | $9,392 | 183.60 | $106,784 (0.1%) |
| Insurance | | | 188.10 | $94,940 (0.1%) |
| Regulatory and SEC Matters | | | 159.20 | $94,473 (0.1%) |
| Assets Dispositions (Real Property) | | | 118.70 | $72,552 (0.1%) |
| Employee Matters (Retiree/OPEB) | | | 124.40 | $53,157 (0.1%) |
| **Total** | **35,616.80** | **$19,430,197** | **181,423.30** | **$90,596,038** |
| **Agreed Fee Review Committee Reduction** | | | | **$40,000** |
| **Total Amount Requested** | **35,616.80** | **$19,430,197** | **181,423.30** | **$90,556,038** |

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for DPH Holdings Corp., et al.,
   Reorganized Debtors

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                      :
    In re                :    Chapter 11
                      :
DPH HOLDINGS CORP., et al.,    :    Case No. 05-44481 (RDD)
                      :
                      :    (Jointly Administered)
           Reorganized Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SEVENTH AND FINAL APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS AND DEBTORS-IN-POSSESSION,
SEEKING FINAL ALLOWANCE AND PAYMENT OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("SEVENTH AND FINAL SKADDEN FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for DPH

Holdings Corp. ("DPH Holdings")[5] and certain of its affiliates, reorganized debtors (collectively,

the "Reorganized Debtors") in the above-captioned cases (the "Reorganization Cases"), submits

this seventh and final application (the "Final Application") seeking final allowance and payment of

compensation and reimbursement of expenses under 11 U.S.C. §§ 330 and 331 for the period from

October 8, 2005 through January 25, 2008 (the "Final Application Period").  Skadden submits this

Final Application for (a) allowance of compensation for professional services rendered by

Skadden to Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession (the "Debtors") during the Final Application Period and (b) reimbursement

of actual and necessary charges and disbursements incurred by Skadden in the rendition of

required professional services on behalf of the Debtors.  In support of this Final Application,

Skadden represents as follows:

<u>The Chapter 11 Filings</u>

1.      On October 8 and 14, 2005 (the "Petition Dates"), the Debtors filed

voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors

operated their businesses and managed their properties as debtors-in-possession under Bankruptcy

Code sections 1107(a) and 1108 during the Final Application Period.  This Court ordered joint

administration of these cases.

2.      No trustee or examiner was appointed during the pendency of the

Reorganization Cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

---

[5]      Upon emergence from chapter 11, Delphi Corporation formally changed its name to DPH Holdings Corp.

On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees"), which was disbanded on April 24, 2009.  On February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

3.    This Court has jurisdiction over the Final Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 330 and 331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").  This Final Application has been prepared in accordance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, effective as of December 4, 2009 (the "Local Guidelines"), and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines" and, together with the Local Guidelines, the "Guidelines").  Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is attached hereto as Exhibit A.

### Retention Of Skadden

5.    Upon the commencement of the Reorganization Cases, the Debtors applied to this Court for an order approving the retention of Skadden as their principal restructuring and bankruptcy counsel (the "Retention Application") to perform legal services under a general

3

retainer to advise the Debtors on the execution of their duties as debtors-in-possession.  On

November 4, 2005, this Court entered an order (the "Retention Order")[6] authorizing the Debtors to

employ Skadden as their counsel under the terms set forth in the Retention Application.[7]

6.    In the Retention Application, the Debtors disclosed that Skadden's fees for

professional services are based on its guideline hourly rates, which are periodically adjusted.  The

Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are

invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy

of which is attached to the Engagement Agreement.  As further described in the Retention

Application, certain charges and disbursements are not charged separately under Skadden's

bundled rate structure.  Other than an arrangement between Skadden and its members, there is no

agreement or understanding between Skadden and any person for the sharing of compensation to

be received for services rendered in the Reorganization Cases.

---

[6]    A copy of the Retention Application, the supporting declaration (the "Declaration"), and the Retention Order are attached collectively hereto as <u>Exhibit B</u>.  These materials include factual information regarding the experience and standing at the bar of certain of Skadden's senior attorneys.  Skadden indicated in the Declaration that it would periodically review its connections with entities materially participating in these cases from time to time and would periodically file supplemental declarations, if warranted, contemporaneously with the filing of its professional interim fee applications.  During the Final Application Period Skadden executed and filed six supplemental declarations on the following dates: May 31, 2006 (Docket No. 3973), August 1, 2006 (Docket No. 4810), November 30, 2006 (Docket No. 5999), January 10, 2007 (Docket No. 6542), July 31, 2007 (Docket No. 8830), and November 30, 2007 (Docket No. 11192).  Since the filing of the last supplemental declaration, Skadden has performed additional disclosure research through January 25, 2008.  While Skadden previously determined that it had no material disclosures and therefore a seventh supplemental declaration was not warranted, one of the financial advisors to the Creditors' Committee became a Skadden client on matters wholly unrelated to the Reorganization Cases several weeks prior to confirmation of the Confirmed Plan (as defined below).

[7]    The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement") between Skadden and the Debtors, a copy of which is attached as Exhibit A to the declaration supporting the Retention Application.  As disclosed in the Retention Application, as of the Petition Date. Skadden had a retainer in the amount of $4,033,019.  Skadden previously applied $266,151 of prepetition amount against the retainer, leaving a balance of $3,766,868.

<u>Fee Procedures And Monthly Fee Statements</u>

7.      On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  This order was

subsequently amended on March 8, 2006 (Docket No. 2747), March 28, 2006 (Docket No. 2986),

May 5, 2006 (Docket No. 3630), July 12, 2006 (Docket No. 4545), October 13, 2006 (Docket No.

5310), December 11, 2006 (Docket No. 6145), and January 28, 2008 (Docket No. 12367)

(collectively and together with the Initial Interim Compensation Order, the "Interim Compensation

Order").

8.      To monitor costs to the Debtors' estates and avoid duplicative efforts in the

review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors'

Committee, and the U.S. Trustee negotiated the formation of a committee (the "Fee Review

Committee") to review, comment on, and, if necessary, object to the various fee applications filed

in these Reorganization Cases.  As stated above, on May 5, 2006, this Court authorized the

establishment of the Fee Review Committee and approved a fee review protocol (the "Fee Review

Protocol").  In addition, on August 17, 2006, this Court entered an order authorizing the Fee

Review Committee to retain Legal Cost Control, Inc. ("LCC") as a fee analyst to assist the Fee

Review Committee (Docket No. 4959).

9.      Pursuant to the Bankruptcy Court's orders in connection with the

Confirmed Plan and the Modified Plan (each as defined below), any requirement that professionals

comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or

compensation for services rendered terminated on January 25, 2008, and the Reorganized Debtors

employed and paid professionals in the ordinary course of business thereafter.

5

10.      Pursuant to paragraphs 2(a), 2(j), and 7 of the Interim Compensation Order, as supplemented, the Fee Review Protocol, and Article 10.3 of the Modified Plan, Skadden is submitting this Final Application to the Reorganized Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition credit facility, and the members of the Fee Review Committee.  In addition, notice of the filing of this Final Application will be provided to all parties who have filed a notice of appearance with the Clerk of this Court and requested notice of pleadings in Reorganization Cases.  The Reorganized Debtors will also provide such other notice as may be required by the Federal Rules of Bankruptcy Procedure or as otherwise directed by this Court.

<u>Delphi Overview</u>

11.      As of the Petition Date, Delphi, together with its subsidiaries and affiliates (collectively, the "Company"), was one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology, supplying products to nearly every major global automotive original equipment manufacturer ("OEM").  Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.

6

12.    When Delphi filed its chapter 11 cases in 2005, it was the largest U.S.
auto-related bankruptcy and the then-largest reorganization case ever for a manufacturing
company.  On October 6, 2009, the Effective Date of the Modified Plan occurred and initial
distributions under the Modified Plan were also completed.[8]  Delphi's completed plan of
reorganization marks one of the few successful chapter 11 reorganizations that has occurred during
the current distressed markets cycle.  Delphi's core businesses are now part of a private company
owned by a group of investors, managed by the core management team that filed the 2005
reorganization cases, with more than 100,000 employees and operating in 270 locations in 32
countries.  Delphi's non-core businesses, which employ tens of thousands of additional employees,
were divested successfully as going concerns.

<div align="center">Events Leading To The Chapter 11 Filing</div>

13.    In the first two years following Delphi's separation from GM, the Company
generated approximately $2 billion in net income.  Every year thereafter, however, with the
exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported
a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the
marketplace, Delphi's financial condition deteriorated further in the first six months of 2005.  The
Company experienced net operating losses of $608 million for the first six months of calendar year
2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than

---

[8]    See Notice Of (A) Order Approving Modifications To First Amended Joint Plan Of Reorganization Of Delphi
Corporation And Certain Affiliates, Debtors And Debtors-In-Possession and (B) Occurrence Of Effective Date,
dated October 6, 2009 (Docket No. 18958).  For additional information regarding the amount of cash on hand or
on deposit and the amount and nature of certain accrued unpaid administrative expenses see Closing Report In
Chapter 11 Cases (Docket No. 18994) or Quarterly Operating Report For Delphi Corporation, et al. For Period
Ended September 30, 2009 (Docket No. 19102).

during the same time period in calendar year 2004.[9]  The Company believes that its financial

performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and

operational restrictions preventing the Company from exiting non-profitable, non-core operations,

all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle

production environment for domestic OEMs resulting in the reduced number of motor vehicles

that GM produced annually in the United States and related pricing pressures, and (iii) increased

commodity prices.

14.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,

the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

<u>Significant Events Through Confirmation Of The Plan</u>

15.    From the inception of the Reorganization Cases, the Debtors knew that

significant restructuring of the Debtors' businesses would be necessary to the development of a

feasible reorganization plan.  To that end, on March 31, 2006, Delphi outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations (the "Transformation Plan").  Many of the Debtors' and Skadden's efforts throughout

the Reorganization Cases were focused on developing a reorganization plan, in large part by

meeting the goals outlined in the Transformation Plan, which centered on five key areas for

change:

---

[9]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related
to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

(a) *Labor*:  Modify the Company's labor agreements to create a competitive arena in which to conduct business;

(b) *GM*:  Conclude negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and ascertain GM's business commitment to the Company;

(c) *Product Portfolio And Manufacturing Footprint*:  Streamline the Company's product portfolio to capitalize on its world-class technology and market strengths and make the necessary manufacturing alignment with its new focus;

(d) *Cost Structure*:  Transform the Company's salaried workforce to ensure that the Company's organizational and cost structure was competitive and aligned with its product portfolio and manufacturing footprint; and

(e) *Pension*:  Devise a workable solution to the Company's pension funding situation.

16.    <u>Labor</u>.  From the early days of the Reorganization Cases, Delphi acknowledged its need to transform its labor agreements to provide a competitive labor cost structure and to address non-profitable and non-strategic U.S. operations.  In particular, Delphi's existing labor agreements required modification in three principal respects: (a) obtaining hourly wage and benefit cost levels that were competitive with other U.S. auto parts suppliers, (b) addressing the agreement provisions that limited the Debtors' ability to respond to market forces by selling or winding-down non-core product lines and manufacturing sites or by reducing the Debtors' global workforce, and (c) addressing the Debtors' substantial liabilities for retirement benefits for hourly employees and their uncompetitive retiree health care plans.  The Debtors, with the assistance of Skadden and other advisors, pursued parallel paths to achieving these goals: prosecuting the motion to reject certain collective bargaining agreements and terminate hourly post-retirement health care plans and life insurance pursuant to sections 1113 and 1114 of the Bankruptcy Code (the "1113/1114 Motion") while simultaneously negotiating with the primary U.S. labor unions in an attempt to reach a consensual agreement regarding modifications to certain terms of their collective bargaining agreements.  In an effort to reach a consensual resolution, the

9

Debtors postponed the filing of their 1113/1114 Motion numerous times to allow for continued dialogue.

17.    In addition, after filing and actively litigating the 1113/1114 Motion, including intensive discovery, numerous depositions, and a weeks' worth of hearings before the Bankruptcy Court, the Debtors adjourned the 1113/1114 Motion to facilitate an agreement to be reached with the U.S. labor unions. Achieving the Debtors' labor goals took a substantial amount of both the Debtors' and Skadden's time. Although ultimately memoranda of understanding were reached with substantially all of the Debtors' U.S. unions, it took nearly two years of protracted negotiations to achieve the definitive agreements. After reaching definitive agreements, and subject to the Court's approval thereof, the Debtors withdrew the 1113/1114 Motion.

18.    Prior to the filing of the 1113/1114 Motion, in an effort to facilitate a "soft landing" for its hourly employees who Delphi knew would be affected by the filing of Court papers rejecting their collectively-bargained agreements, Delphi began negotiations with its major unions to develop attrition programs. On March 22, 2006, the first tripartite attrition program agreement was reached by and between the UAW, Delphi, and GM. Significant objections to Delphi's entry into these agreements were filed and substantial litigation followed. The Court approved the relief requested, however, and similar programs were subsequently reached with several other unions during the summer of 2006.

19.    GM. Contemporaneously with the filing of the 1113/1114 Motion, the Debtors, with Skadden's assistance, moved to reject unprofitable supply contracts with GM (the "GM Contract Rejection Motion"). Among the reasons for the GM Contract Rejection Motion was the Debtors' belief that GM should cover a greater portion of the costs of manufacturing products for GM at plants that bore the burden of the Debtors' legacy costs. The Debtors

10

conducted an extensive review of GM contracts and identified thousands of contracts under which the Debtors were providing parts to GM at a financial loss to the Debtors.  In the GM Contract Rejection Motion, the Debtors identified 21 operational sites that generated significant operating losses and primarily produced parts for GM vehicles and requested authority to reject more than 5,000 GM supply contracts related to the 21 operational sites.  The Debtors' initial motion covered approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.

20.    As was the case with the labor actions taken by the Company, the GM Contract Rejection Motion became the launching pad for discussions with GM regarding key business issues than had begun over the previous year.  Beginning in 2006, negotiations with GM centered on reaching a comprehensive agreement with GM that would govern various operational aspects of the Company's and GM's commercial relationship.  As part of those negotiations, the parties contemplated GM's providing forward-looking revenue commitments and economic support with respect to legacy liabilities.  The negotiations with GM on these matters evolved into "framework" discussions with the Creditors' Committee, the Equity Committee, and potential plan sponsors.  After extensive negotiations, the global settlement agreement ("GSA") and master restructuring agreement ("MRA") between the Company and GM first reached in September 2007, and subsequently modified, formed the backbone for both the plan of reorganization that was confirmed in January 2008 and the modifications to the Confirmed Plan (as defined below), which modifications were confirmed and approved in July 2009.

21.    Product Portfolio And Manufacturing Footprint.  To assist the Company in achieving its third transformation goal of streamlining its product portfolio and manufacturing footprint, Skadden facilitated auction proceedings for the sale of many of the Company's non-core

11

businesses that had been identified in the March 31, 2006 Transformation Plan announcement.

During the Reorganization Cases, Skadden filed twelve sale motions for significant businesses of

the Company, eight of which were filed during the Final Application Period and several of which

resulted in auctions.  For example, Skadden hosted auctions (i) for the sale of the assets of

MobileAria at which the successful bidder offered consideration of $11 million, which was $4.5

million more than that offered in the stalking horse bid and (ii) for the assets of the Catalyst

Business, where the successful bidder submitted a bid with a value of $75 million, which was an

increase of approximately $19.4 million from the stalking horse bid.  In addition, Skadden worked

with the Debtors to formulate, receive Bankruptcy Court approval for, and implement procedures

through which it could sell de minimis assets (generally defined as sales of assets for less than $10

million).

        22.    <u>Cost Structure</u>.  As part of the effort to achieve the fourth goal of the

Transformation Plan, the Company developed a plan to reduce its SG&A expenses by as much as

$450 million annually and considered other ways to restructure its business.  Effective July 1,

2006, the Company realigned its business operations to focus its product portfolio on core

technologies for which the Company believed it had significant competitive and technological

advantages.  In late 2006 and 2007, as part of their cost realignment and to ensure that their

organizational and cost structure was competitive, the Debtors obtained orders from this Court

permitting them to enter into IT infrastructure and finance transaction processes outsourcing

agreements.  As part of this business realignment process, the Company significantly reduced its

salaried workforce to levels more commensurate with the realigned business operations.

        23.    Finally, as part of the Company's commitment to be competitive with other

like businesses, the Company designed and implemented competitive benchmark executive and

non-executive compensation programs, portions of which were implemented during the pendency

of the Reorganization Cases.  For many of the programs that were proposed or commenced during

the Reorganization Cases, considerable negotiations with third parties were required.  In several

instances, including the Debtors' motion to implement a key employee compensation program and

the executive compensation programs to be implemented as part of the Confirmed Plan, protracted

litigation with the Creditors' Committee, the unions, and the U.S. Trustee, among others, resulted.

24.    <u>Pension</u>.  To accomplish the last of its five transformation goals, the

Company worked diligently during the Reorganization Cases to devise a workable pension

solution.  A significant part of the Company's pension solution came through agreements with

GM.  In 2007, the Company spent considerable time with GM working to reach an agreement

whereby $1.5 billion of certain pension liabilities would be transferred back to the GM pension

plans, ensuring coverage for certain hourly retirees while lowering Delphi's own pension

liabilities.  This agreement, which provided a substantial benefit to the Debtors' estates, was

memorialized in the Confirmed Plan, defined below.  As a result of the failure of the Confirmed

Plan to be consummated, however, the transfer was not effectuated until September 2008.  At that

time, the Debtors were able to negotiate an even more significant transfer through which

approximately $2.1 billion in net unfunded liabilities was transferred, effective as of September

29, 2008.  Upon consummation of the Modified Plan, defined below, GM agreed to cover

additional liabilities of the hourly pension plan and to "top off" certain benefits to be received by

certain union employees and retirees.  Unfortunately, however, the Debtors were unable to come to

terms with GM regarding a comparable resolution for the salaried pension plan.

25.    As part of the process of devising a workable pension solution, the

Company also negotiated a number of agreements with the Pension Benefit Guaranty Corporation

13

(the "PBGC") and the Internal Revenue Service (the "IRS") and sought and received conditional

waivers of minimum funding requirements for certain of their pension plans, generating

considerable cost savings during the Final Application Period.  In addition, in connection with the

October 2007 efforts to repatriate cash, one of the Debtors, Delphi Automotive Systems (Holding)

Inc. ("DASHI"), planned to accumulate cash balances from certain of its non-U.S. affiliates and

transfer the funds to another Debtor to reduce the Debtors' collective borrowings and, thereby,

their funded interest expense.  The PBGC raised some concerns about the Debtors' plan to

repatriate cash.  Specifically, the PBGC contended that the funds to be repatriated via DASHI

would be subject to pre-existing, extra-territorial PBGC liens and therefore constituted the PBGC's

cash collateral.  To avoid litigation, the Debtors negotiated an agreement with the PBGC to

provide the PBGC with conditional adequate protection.  Despite the significant work of the

Debtors to reach agreement with GM and reduce their overall pension liabilities, in July 2009, the

PBGC assumed trusteeship of all of the Debtors' pension plans.  In connection with the trusteeship

and the Modified Plan, the Debtors were able to reach a settlement agreement with the PBGC

pursuant to which the PBGC released the conditional replacement liens received as part of the

adequate protection package as well as all purported liens over the non-U.S. assets, which satisfied

a condition to closing, thereby facilitating the Debtors' emergence from chapter 11.

    26. <u>Plan Of Reorganization And Claims Reconciliation</u>.  Throughout the period

in which Skadden assisted the Debtors in achieving many of their transformation goals, Skadden

was also working with the Debtors and other parties-in-interest to develop a feasible

reorganization plan.  Discussions regarding the contours of a plan began in earnest in August 2006

with "leveling-up" meetings between the Debtors and the Statutory Committees.  Promptly

thereafter, the Debtors, GM, and the Creditors' Committee began exchanging proposals that

addressed issues such as possible capital structures for the reorganized Debtors, disposition of the

Debtors' legacy obligations, and various aspects of the Debtors' relationship with GM.[10]  By late

September 2006, other stakeholders had joined the discussions.  Specifically, the Debtors and their

advisors met several times with representatives from the Equity Committee and an investor group

led by Appaloosa Management L.P. (acting through its affiliate, A-D Acquisition Holdings, LLC,

"Appaloosa") and Harbinger Capital Partners, both separately and together with GM and the

Creditors' Committee, as well as with representatives of several other potential plan investors.  In

connection with these discussions, the Debtors and their advisors responded to multiple diligence

requests from these groups.  The negotiations continued throughout the fall and early winter and

addressed various matters, including allocation of legacy liabilities, wind-down or divestiture of

non-core North American facilities, GM's contribution and recovery, potential plan treatment for

various stakeholders, the anticipated scope of, and potential limitations on, general unsecured

claims, future capital structure, and corporate governance upon emergence.

         27.     All of the participants in these framework discussions understood that the

parties' ability to reach agreement on a plan for the Debtors' emergence from chapter 11 at that

time was predicated upon a clear understanding of the scope of the prepetition claims against the

Debtors that would ultimately be allowed in these cases.  The scope of the claims was an essential

part of the discussions, particularly for the investor group, because the parties involved in the

framework discussions proposed a plan construct that would pay general unsecured creditors in

full at a negotiated business enterprise plan value.  Accordingly, the Debtors, with Skadden's

assistance, commenced an active claims reconciliation process in September 2006.  More than

---

[10]    These meetings followed the July 28, 2006 motion by the Creditors' Committee seeking authority to prosecute the
Debtors' claims and defenses against GM and certain former officers of the Debtors on Delphi's behalf (also
known as the "STN Motion").  The STN Motion, together with a companion motion filed by the Indenture Trustee,
were withdrawn in connection with consummation of the Modified Plan.

16,500 proofs of claim were filed against the Debtors, some of which asserted unliquidated claims, in whole or in part. Utilizing streamlined, court-approved claims objection and reconciliation procedures, the Debtors diligently analyzed these claims to scope the claims pool. This early work reconciling and estimating claims facilitated the ongoing discussions with potential investors and other interested parties to reach agreement on a framework for the Debtors' restructuring. By late 2007, as a result of the expedited claims process, the Debtors had a reasonably comprehensive understanding of what claims comprised the secured, priority, and unsecured claims pools and the likely allowed amounts of such claims.

28.    The extensive work in the fall and early winter of 2006 resulted in the Debtors' entry into a Plan Framework Support Agreement (the "PSA"), which outlined the economics and structure of a plan framework but was expressly conditioned on reaching consensual agreements with the Debtors' primary unions and GM. Concurrent with their entry into the PSA, the Debtors filed a motion seeking approval of the PSA and an Equity Purchase and Commitment Agreement (the "Original EPCA"), a negotiated agreement under which investors would invest up to $3.4 billion in the reorganized company. The motion received significant opposition from the Statutory Committees and certain other interested parties, resulting in further negotiations and changes to the agreement. In addition, on December 21, 2006, the Debtors received an unsolicited investment proposal from Highland Capital Management, L.P. ("Highland"), a party that had previously had no contact with the Debtors regarding participation in the Debtors' reorganization. The Debtors and their advisors immediately engaged in discussions with Highland to better understand and explore Highland's proposal. Despite significant negotiations and sharing of information over the following three weeks, however, the Debtors concluded that it was in the best interests of the Company and its stakeholders, taken as a whole, to

16

enter into the PSA and Original EPCA and ultimately carry out the terms of those agreements. Subsequently, in January 2007, the PSA and Original EPCA were approved by the Bankruptcy Court. In April 2007, however, as a result of differing views regarding the valuation of the Debtors' enterprises, the Debtors announced that they were anticipating negotiating changes to the Original EPCA and amendments to the PSA and in July 2007, the PSA and Original EPCA were terminated.

29.     In late June and early July 2007, while the Debtors were negotiating potential amendments to the Original EPCA and PSA, the Debtors received an amended draft of the Original EPCA from Appaloosa and a draft of a potential investment agreement from Highland. After lengthy discussions, including separate in-person meetings with Appaloosa and its counsel and Highland and its counsel, Delphi's Board of Directors (the "Board") and a special committee formed by the Board met to consider the two final proposals for a new equity purchase and commitment agreement. On July 18, 2007, Delphi announced that it had accepted a new equity purchase and commitment agreement put forth by a reformulated plan investor group led by Appaloosa (the "Delphi-Appaloosa EPCA" or "Investment Agreement"). Under the Delphi-Appaloosa EPCA, which was later approved by this Court, the new plan investors agreed to invest up to $2.55 billion in cash in exchange for preferred and common equity in reorganized Delphi to support the Company's transformation plan and plan of reorganization.

30.     With the Investment Agreement in place and having reached consensual agreements with their principal U.S. labor unions and GM, the Debtors were able to formulate and file a proposed plan of reorganization and related disclosure statement (the "September 2007 Plan" and "September 2007 Disclosure Statement," respectively). The September 2007 Plan was based upon a series of global settlements and compromises that involved every major group of

17

constituents in the Reorganization Cases, including the Debtors, their principal U.S. labor unions, GM, the Statutory Committees, and the lead plaintiffs in certain securities and ERISA multidistrict litigation. The plan also was based on the stakeholders' and the Debtors' belief that the active capital markets experienced from 2005 to 2007 would continue and the Debtors would be able to access the required exit financing to support the plan. While only nine months earlier the Debtors were able to refinance their then-existing $2 billion debtor-in-possession credit facility and pay off their approximately $2.5 billion then existing prepetition credit facility, confidence in the capital markets had begun to deteriorate at the time of the September 2007 Plan filing, although the Debtors were still optimistic that they would be able to raise the necessary exit financing to proceed with their plan of reorganization.

31.       During the seventh application period, which covered the period from October 1, 2007 through January 25, 2008 (the "Seventh Application Period"), the Debtors were fully focused on emerging from chapter 11 under the September 2007 Plan. Delphi had made significant progress in achieving the objectives of its Transformation Plan and the Debtors were poised for emergence from chapter 11. Despite the efforts of the Debtors and their constituents, however, after filing the September 2007 Plan, the Debtors were forced to consider amendments to the plan because severe dislocation in the capital markets precluded the Debtors from raising the approximately $7.1 billion in funded debt required to finance the plan. Of course, the Debtors were unaware that this dislocation was, in fact, only the harbinger of the severe economic downturn which would lead to the collapse of the global credit markets in 2008 and which would further complicate the Debtors' emergence from chapter 11. Thus, following the filing of the September 2007 Plan and through the fourth quarter of 2007, the Debtors, with Skadden's assistance, began negotiating and drafting potential amendments to the plan, seeking to reach

18

consensus on the revisions with their primary stakeholders. As a result of their efforts to reduce

their exit financing needs while still garnering the support of key constituencies, the Debtors filed

proposed amendments to the plan and related disclosure statement in October, November, and

December 2007. On December 10, 2007, this Court entered an order approving the Debtors'

disclosure statement (the "Disclosure Statement") and shortly thereafter the Debtors commenced

solicitation on the First Amended Joint Plan of Reorganization (the "December 2007 Plan").

   32. When the votes were tallied in January 2008, the plan had achieved

overwhelming acceptance and on January 25, 2008, following a three-day contested confirmation

hearing, this Court entered the order confirming the plan (as then-modified) (Docket No. 12359)

(the "Confirmation Order" and the plan confirmed thereby, the "Confirmed Plan"). The

confirmation of the Confirmed Plan followed an intense 28-month chapter 11 process in which the

Debtors had completed many challenging negotiations with numerous parties with diverse

interests and reached resolutions on their various transformation goals. The Debtors were poised

for emergence as a stronger, more financially sound business and were eager to work with their

new investors to maintain their prominence as one of the world's premier auto suppliers and to

continue to deliver high-quality products to its customers globally.

<center>Significant Post-Confirmation Events[11]</center>

   33. Following the entry of the Confirmation Order, the Debtors turned their

attention to consummating the Confirmed Plan and focused on taking the necessary actions to

achieve the closing of the related transactions. On April 4, 2008, however, despite the Debtors

having satisfied the conditions required to substantially consummate the Confirmed Plan,

---

[11] For additional information regarding events that occurred post-Confirmation, please see the Supplement To First Amended Disclosure Statement With Respect To First Amended Joint Plan of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified), dated June 16, 2009 (Docket No. 17031).

<center>19</center>

including obtaining $6.1 billion of exit financing, Delphi's plan investors refused to participate in

the closing or to fund the Investment Agreement and the Debtors were forced to suspend the

closing of the Confirmed Plan. Thereafter, the Debtors spent considerable efforts reevaluating the

direction they would take to achieve emergence from chapter 11, including meeting with their

investors, lenders, creditors, and others to assess what strategic alternatives the Company could

and should pursue.

34.    In September 2008, this Court approved the Debtors' entry into amended

agreements with GM (the "Amended GSA" and "Amended MRA"), which allowed the Debtors to

accelerate their receipt of the benefits of certain agreements with GM that were not otherwise to

become effective until the effective date of the Confirmed Plan. Through the Amended GSA and

Amended MRA the Debtors addressed, at least in part, two goals of their transformation plan: (i)

obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's

business commitments to Delphi going forward and (ii) working to solve Delphi's pension funding

situation.

35.    In light of the approval of the Amended GSA and Amended MRA, during

early fall 2008, the Debtors were able to formulate certain modifications to the Confirmed Plan to

allow the Debtors to emerge without plan investor participation. On October 3, 2008, Delphi filed

a motion under 11 U.S.C. § 1127 for an order approving these modifications and also sought

approval of a related disclosure statement and procedures for re-soliciting votes on the Confirmed

Plan, as modified (Docket No. 14310) (the "Plan Modification Motion"). Subsequently, however,

substantial uncertainty and a further significant decline in capacity in global debt and equity

markets, the global economic downturn generally, and an unprecedented decline in global

automotive production volumes adversely impacted Delphi's ability to develop a revised

recapitalization plan and successfully consummate the modified plan of reorganization.

Moreover, notwithstanding the positive market response and oversubscription in May 2008 for the

amounts that the Debtors anticipated borrowing under their second amended and restated DIP

credit facility (the "DIP Facility" and the lenders thereunder, the "DIP Lenders"), as a result of this

market turbulence in the fall of 2008, the Debtors were unable to extend the December 31, 2008

maturity date of their DIP Facility on terms reasonably acceptable to the Debtors and their other

stakeholders.  Accordingly, with the support of the administrative agent (the "DIP Agent") and the

requisite lenders under the DIP Facility, the Debtors entered into an accommodation agreement (as

subsequently amended) to allow the Debtors, among other things, to continue using certain of the

proceeds of the DIP Facility through the use of a "collateral action" doctrine advocated by the

Debtors and approved by the Court.

36.    Throughout the first and second quarters of 2009, the Debtors engaged in a

series of complex negotiations in which they sought funding from a variety of sources, including

from GM and certain of the DIP Lenders, considered how to proceed in a manner that would

resolve their significant pension liabilities, and developed additional modifications to the

Confirmed Plan.  In March 2009, the United States Auto Task Force (the "Auto Task Force")

intervened in the cases to prevent GM from immediately consummating certain agreements

reached with Delphi, including providing additional liquidity to the Debtors and acquiring the

Company's global Steering business.  Subsequently, the DIP Lenders indicated that they would not

provide additional interim or emergence funding for Delphi and were not prepared to enter into

other transactions with the Company.  This led to a series of discussions among the Board, the

Debtors' management, and stakeholders in which the Company sought a consensual resolution that

would allow for a reorganization of the businesses and the maximization of value for creditors.

21

37.    Following the events of April 2009, the Debtors continued to seek a consensual resolution to the conclusion of its chapter 11 cases that would result in a reorganization of the estates.  To facilitate the process, in May 2009, the Company met with its stakeholders and the Auto Task Force and delineated principles designed to focus the parties on what Delphi's objectives were and what foundational items it would require for a consensual agreement. Similarly, the Auto Task Force set its own objectives for GM, which included the continuation and protection of supply by Delphi to GM where Delphi was a sole-source supplier – the primary reason that GM was interested in acquiring assets from Delphi.  All of the negotiations held from that point forward were guided by those objectives with a focus on how a restructuring under a plan of reorganization might be achieved.  Although the DIP Lenders were not yet prepared to partner with the Company, Delphi negotiated with a number of companies which were interested in completing a transaction with Delphi.  Ultimately, Delphi and GM negotiated the master disposition agreement with affiliates of Platinum Equity Capital Partners II, L.P. ("Platinum Equity") that was filed on June 1, 2009.  In addition, in the last week of May, while finalizing negotiations with potential purchasers, the Debtors participated in more than 20 hours of judicial mediation (as requested by the DIP Lenders) in an effort to resolve outstanding issues with the stakeholders.  The discussions that took place at the mediation planted certain of the seeds that resulted in the favorable outcome that led to the Modified Plan that was ultimately confirmed.

38.    On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion (the "Motion Supplement") which sought approval of certain additional modifications to the Confirmed Plan (the "Modified Plan") as well as supplemental disclosure and procedures for re-soliciting votes on the Modified Plan.  The Modified Plan contemplated the completion of a sale transaction through an agreement (the "Platinum-GM MDA") with Parnassus Holdings II, LLC

22

("Parnassus"), an affiliate of Platinum Equity, and with the support of GM Components Holdings

LLC ("GM Components"), an affiliate of GM.  The Motion Supplement was approved, with

further modifications, by order entered June 16, 2009 (Docket No. 17032) (the "Modification

Procedures Order").[12]  In addition to authorizing the Debtors to commence solicitation of votes on

the Modified Plan, among other things, the Modification Procedures Order set forth a

comprehensive set of supplemental procedures for evaluating non-solicited alternative

transactions to the Platinum-GM MDA and provided for an auction open to DIP Lenders making a

Pure Credit Bid (as defined therein).  Prior to the Platinum-GM MDA, no other party, including

the DIP Lenders, was prepared to commit the resources necessary to consummate a global

transaction and assume the related liabilities in the manner that had been agreed to under the

Platinum-GM MDA.  As a result, the DIP Lenders were provided with a final opportunity to

determine how they wanted to proceed in light of their significant investment in the Debtors.

        39.    Ultimately, the DIP Lenders concluded that it was in their economic

interests to effectively become the Company's acquirer and plan sponsor.  This was accomplished

at an auction on July 26 and 27, 2009 at which the DIP Agent submitted a Pure Credit Bid on

behalf of the DIP Lenders.  The Pure Credit Bid included a credit bid of 100% of approximately

$3.4 billion in principal and interest due and owing in respect of the DIP Facility under the related

DIP credit agreement, after giving effect to application of any cash collateral, and was based upon

an alternative Master Disposition Agreement (the "Master Disposition Agreement") pursuant to

which an entity controlled by the required lenders under the DIP Facility, would replace Parnassus

as a purchaser.  At the conclusion of the auction, the Board approved the Pure Credit Bid as the

highest or otherwise best bid, subject to the parties' reaching a final agreement on the terms and

---

[12]    The Modification Procedures Order was later supplemented and amended by orders entered June 29 (Docket No.
       17376), July 17 (Docket No. 18352), and July 21, 2009 (Docket No. 18551).

conditions of the order approving the Modified Plan.  Through the consummation of the

transactions underlying the Pure Credit Bid, the Debtors would be deemed to have satisfied their

superpriority secured debt and would receive the DIP Lenders' consent to sell assets otherwise

encumbered by the debt, thereby removing many of the obstacles to effectuating their plan of

reorganization.

40.    After holding a final plan modification hearing on July 29 and 30, 2009, the

Court entered an order on July 30, 2009 approving the Modified Plan (Docket No. 18707).

Following months of closing preparations, on October 6, 2009, the Modified Plan became

effective and was substantially consummated.  Upon the effectiveness of the Modified Plan,

Delphi contemporaneously effectuated the Master Disposition Agreement (as well as other

agreements).  As a result, Delphi Automotive LLP became the operator of certain of Delphi's U.S.

and non-U.S. businesses going forward with $3.6 billion in emergence capital and capital

commitments.  GM Components and Steering Solutions Services Corporation acquired Delphi's

North American sites and Delphi's global steering business, respectively.  DPH Holdings emerged

as a reorganized entity that retains certain residual non-core and non-strategic assets and liabilities

that are expected to be divested over time.

<div align="center">Summary Of Services Rendered By
Skadden During The Final Application Period</div>

41.    Throughout the Final Application Period, Skadden worked closely with the

Debtors and their advisors to administer the estates and maximize the return for parties-in-interest.

These services have been directed toward a myriad of tasks necessary to achieve this result.  To

meet the Debtors' needs, Skadden has provided multi-disciplinary services on a daily basis, often

working nights, weekends, and holidays.  Throughout this process, certain of the principal

Skadden attorneys working on the Reorganization Cases were required, by agreement of the

<div align="center">24</div>

Debtors, to devote the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of the efforts of the Debtors and their professionals during the Final Application Period, the Debtors made substantial progress in evaluating their businesses and pursuing their transformation plan and ultimately confirmed the Confirmed Plan at the end of the Final Application Period.  Negotiating and reaching consensual agreements with its U.S. labor unions and GM and negotiating and continuing to reconcile claims asserted against the Debtors at an intense pace were also vital to confirmation of the Confirmed Plan.

42.    At the commencement of the Reorganization Cases, Skadden created 45 different matter numbers or subject-matter categories (the "Matter Categories") to which its professionals assigned their billed time, all of which are related to the tasks performed by Skadden on the Debtors behalf.[13]  Skadden has kept a contemporaneous record of the time spent rendering such services and, consistent with the Guidelines, separated tasks in billing increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and necessary for the proper administration of the Reorganization Cases.

43.    Skadden devoted approximately 72.2% of its time to the following 11 matters, each of which was responsible for fees in excess of $2,500,000 during the Final Application Period:  Reorganization Plan/Plan Sponsors, Claims Administration (General), Customer Matters (GM), Employee Matters (Labor Unions), Case Administration, Asset Dispositions (General), Disclosure Statement/Voting Issues, Creditor Meetings/Statutory Committees, Supplier Matters, Nonworking Travel Time, and Tax Matters.

---

[13]    There are now 47 Matter Categories because Skadden added two additional matter categories since the Petition Date.  Exhibit C contains a table of all matter numbers used by Skadden in these Reorganization Cases, as well as a description of certain business statistics of Skadden in these Reorganization Cases.

44.    Skadden devoted approximately <u>20.4%</u> of its time in the aggregate to the following <u>11</u> matters, billings for each of which were <u>between $1,000,000 and $2,500,000</u> during the Application Period:  Employee Matters (General), Rights Offering, Retention/Fee Matters/Objections (Others), General Corporate Advice, Business Operations/Strategic Planning, Customer Matters (Reviews/Investigations), Litigation (Insurance Recovery), Retention/Fee Matters (SASM&F), Environmental Matters, Global Subsidiaries (Non-U.S.), and Financing (DIP And Emergence).

45.    The remainder of time billed by Skadden (approximately <u>7.4%</u>) was devoted to the following <u>18</u> matters, each of which accounted for <u>less than $1,000,000</u> during the Application Period:  Automatic Stay (Relief Actions), Leases (Real Property), Secured Claims, Executory Contracts (Personalty), Claims Administration (Reclamation/Trust Funds), Employee Matters (Pension), Utilities, Asset Analysis And Recovery, Reports And Schedules, Intellectual Property, Real Estate (Owned), Liquidation/Feasibility, Litigation (General), Customer Matters (General), Insurance, Regulatory and SEC Matters, Asset Dispositions (Real Property), and Employee Matters (Retiree/OPEB).

<div align="center"><u>Matters Exceeding $2,500,000</u></div>

A.    <u>Reorganization Plan/Plan Sponsors</u>

46.    For more than 13 months during the Final Application Period and beginning in August 2006, the Debtors, with Skadden's assistance, engaged in negotiations with various parties and drafted and negotiated multiple agreements and related documents that ultimately led to the filing of the September 2007 Plan.  Despite the severe dislocation in the credit markets after the filing of the Debtors' plan and the economic downturn that negatively impacted the U.S. automotive industry, the Debtors, with the assistance of Skadden, were able to negotiate necessary revisions that culminated in the Court's confirmation of the Confirmed Plan on January 25, 2008.

47.    <u>The Framework Discussions</u>.  The framework discussions began in earnest
on August 1, 2006 with meetings between the Debtors and its Statutory Committees.  Promptly
thereafter, the Debtors, GM, and the Creditors' Committee began exchanging proposals that
addressed issues such as possible capital structures for the reorganized Debtors, disposition of the
Debtors' legacy obligations, and various aspects of the Debtors' relationship with GM.  On August
3, 2006, the Debtors, GM, the Creditors' Committee, and various professionals held the first of a
series of extended meetings and negotiating sessions at Skadden's offices in New York.  These
discussions led to the exchange of various draft agreements and term sheets which, taken together,
advanced negotiations towards the basis for a plan of reorganization.

48.    By late September 2006, other stakeholders had joined the discussions.
Specifically, the Debtors and their advisors met several times with representatives from the Equity
Committee and an investor group led by Appaloosa and Harbinger Capital Partners, both
separately and together with GM and the Creditors' Committee.  The Debtors and their advisors
also met with representatives from several other potential plan investors.  The Debtors, with
Skadden's assistance, negotiated and executed confidentiality agreements with all of these parties
and responded to multiple diligence requests to advance the framework discussions.

49.    In October 2006, the Debtors, with the assistance of Skadden, entered into
non-disclosure agreements with Cerberus Capital Management, L.P. ("Cerberus") and other
potential plan investors, and then expanded the framework discussions being conducted with the
Statutory Committees and GM to include these potential plan investors as well as Appaloosa,
which had been in discussion with stakeholders for some time.  The framework discussions
involved many implementation ideas for a transformed Delphi, and Skadden professionals assisted
the Debtors in reviewing and evaluating carefully all of these suggestions.  These discussions were

27

intended to provide a basis for developing the eventual framework for a reorganization plan.  The

discussions addressed various matters, including allocation of legacy liabilities, wind-down or

divestiture of non-core North American facilities, GM's contribution and recovery, potential plan

treatment for various stakeholders, the anticipated scope of, and potential limitations on, general

unsecured claims, and the future capital structure and corporate governance for the company upon

emergence.

50.      On November 16, 2006, the Debtors selected the Appaloosa/Cerberus led

group[14] as potential plan investors.  The Debtors, at the direction of the Board, were instructed to

pursue earnest negotiation of definitive documents with the plan investors to determine if there

was a viable transaction that could be accomplished.  By late November 2006, the Debtors and the

plan investors began working on documenting the investment agreements during a series of

drafting sessions.  Prior to that time period, various groups had circulated and commented on draft

term sheets outlining potential framework agreements and discussion points related to the

framework agreements.

51.      The Debtors reached significant milestones in their reorganization when on

December 18, 2006, Delphi announced that it had accepted a proposal for the Original EPCA with

affiliates of Appaloosa, Cerberus, and Harbinger as well as Merrill Lynch and UBS (collectively,

the "Original Plan Investors").  The proposal called for the Original Plan Investors to invest up to

$3.4 billion in preferred and common equity in reorganized Delphi to support the Company's

transformation plan as well as the reorganization plan framework agreement signed by Delphi, the

Original Plan Investors, and GM on December 18, 2006, which was intended to facilitate the

Debtors' emergence from chapter 11.

---

[14]    This group consisted of Appaloosa, Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Cerberus,
Merrill Lynch & Co. ("Merrill Lynch"), and UBS Securities ("UBS").

52.     The Original EPCA, the PSA, and several ancillary instruments (together, the "Original Framework Agreements") were the result of months of intense negotiation among the Debtors, the Statutory Committees, GM, and the Original Plan Investors.  These agreements outlined a framework for a plan of reorganization, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues, and the corporate governance of reorganized Delphi. The PSA, as well as the economics and structure of the plan framework itself, was expressly conditioned on reaching consensual agreements with the Debtors' U.S. labor unions and GM.

53.     The negotiations among the parties, however, did not end after the motion seeking approval of the Original Framework Agreements was filed on December 18, 2006. [15] Over the course of the twenty-four days between the filing of the motion seeking approval of the Framework Agreements and the two-day hearing on the Original Framework Agreements that commenced on January 11, 2007, the Debtors received multiple objections to the relief requested. The Debtors and Skadden conducted numerous "meet-and-confer" conferences with objecting parties, responded to the discovery and deposition requests of the objecting parties, received and evaluated an unsolicited, competing multi-billion dollar investment proposal from Highland, and resolved certain alleged ambiguities in the Framework Agreements.  Ultimately, on January 12, 2007, after two days of testimony and arguments, the Court entered an order (the "Framework Approval Order") authorizing the Debtors to enter into the Framework Agreements.  On January 18, 2007, the Original Framework Agreements were fully executed.

---

[15]    See Expedited Motion for Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code (Docket No. 6179) (the "Framework Approval Motion").

54.    <u>Implementation Of Original EPCA And PSA</u>.  Following the entry of the
Framework Approval Order, the Debtors turned their attention to implementing the terms of the
Original Framework Agreements and developing a plan of reorganization based on the terms of
the agreements.  Two of the Debtors' most significant obligations under the Original Framework
Agreements were to negotiate comprehensive settlement agreements with GM and the Debtors'
U.S. unions.  As a result of the progress achieved in connection with the Original Framework
Agreements, the Debtors determined that the adjourned 1113/1114 Motion[16] and the GM Contract
Rejection Motion[17] should be suspended to permit negotiations to continue.  Accordingly,
following entry of the Framework Approval Order, the Debtors sought, and this Court approved,
an order suspending prosecution of those motions indefinitely, effective January 31, 2007 (Docket
No. 6779).

55.    In connection with the Original EPCA, the Debtors agreed to provide due
diligence materials to the Original Plan Investors.  On December 22, 2006, the Debtors received an
expansive legal due diligence request from counsel to Appaloosa/Harbinger and Cerberus.  In
response to this diligence request, Skadden professionals worked with the Debtors to identify and
provide responsive documents.  Specifically, Skadden professionals conducted numerous
in-person meetings and teleconferences with the various employees of the Debtors to gather
documents to be made available for the Original Plan Investors' review.  Skadden professionals
reviewed and indexed each document that was provided and created a data room in Troy,
Michigan for the Original Plan Investors' attorneys to review.  This data room was in addition to

---

[16]    <u>See</u> Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[17]    <u>See</u> Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

the other data rooms that were established earlier in the Final Application Period with the

assistance of Skadden in response to legal due diligence requests.

56.    Over the next several months, attorneys for Appaloosa/Harbinger and

Cerberus visited the data room on numerous occasions to review documents.[18]  To facilitate this

process, Skadden attorneys were on site in Troy to prepare and update the data room and to

coordinate with counsel to the Appaloosa/Harbinger and Cerberus to ensure an appropriate setting

and schedule for their review of documents.  Throughout this process, Skadden professionals

participated in numerous conference calls and in-person meetings between the Debtors and

counsel for Appaloosa/Harbinger and Cerberus to ensure a timely and efficient flow of

information between the parties.  Following the on-site visits, Skadden also assisted the Debtors in

responding to requests for copies of documents that were reviewed in the data room.

57.    In addition to these due diligence efforts in Troy, Skadden worked with the

Debtors' international legal staff to coordinate due diligence efforts by the Original Plan Investors

outside the United States.  With advice from Skadden, the Debtors set up various data rooms

across the Americas, Asia, and Europe.  Skadden also answered numerous inquires raised by the

Debtors in connection with the foreign diligence efforts.  Finally, Skadden worked closely with the

Debtors' global offices to obtain additional documents to be included in the data room in Troy.

58.    Furthermore, in addition to the legal due diligence, the Original Plan

Investors also conducted financial and other business-related due diligence.  In connection with

these due diligence efforts, the Debtors, with the assistance of their advisors, provided documents

and presentations to the Original Plan Investors.  To maintain coordination between the legal and

business due diligence, Skadden attorneys communicated frequently with the Debtors'

---

[18]    This data room was used on numerous occasions and for various purposes in addition to the due diligence
conducted by attorneys for Appaloosa/Harbinger and Cerberus.

accountants, as well as the Debtors' business personnel, regarding business-side diligence. This

was particularly helpful because many follow-up legal diligence requests resulted from

information received as part of the business diligence process. During May and June 2007, the

Debtors, with the assistance of Skadden, also focused intensely on negotiations with their principal

U.S. labor unions and GM.[19]   During this time period, GM and the Debtors agreed on the

documentation architecture for their settlement and restructuring agreements.

       59.    <u>Termination Of Original EPCA And PSA</u>.   Despite many positive

developments under the Original Framework Agreements, the Debtors determined that they would

be unable to reach definitive agreements with their various constituencies and investors that would

allow the Original Framework Agreements to serve as a basis for the Debtors' plan of

reorganization. Therefore, on July 7, 2007, the Debtors sent a termination notice of the Original

EPCA to the Original EPCA counterparties, and as a result, all obligations of the Original Plan

Investors under the PSA were immediately terminated. On July 9, 2007, the Debtors publicly

disclosed that they had terminated the Original EPCA and the PSA and undertook formal

discussions with Appaloosa regarding its leading an investor group without Cerberus's

participation to support Delphi's emergence from chapter 11 reorganization.

       60.    <u>Consideration Of Delphi-Appaloosa EPCA</u>.   While negotiating with

Appaloosa, the Debtors received a proposal from Highland, including a draft of a potential

investment agreement. The Debtors, with the assistance of Skadden, reviewed and evaluated the

various draft proposals and actively continued discussions with both Appaloosa and Highland

while keeping their key stakeholders, including GM and the Statutory Committees, apprised of the

plan investor developments.

---

[19]    Details about these negotiations are discussed in other sections of this Final Application.

61.     In the weeks leading up to Highland's proposal, Highland engaged in due diligence to consider whether to submit a formal proposal to enter into an investment agreement with the Debtors.  In connection with Highland's due diligence efforts and in addition to the business side diligence that commenced simultaneously, numerous attorneys for Highland visited the previously-established data room in Troy, Michigan on various occasions to review documents.  To facilitate this review process, Skadden professionals were on site in Troy to prepare and update the data room and to coordinate with counsel to Highland to ensure sufficient access to the appropriate documents.  Throughout this process, Skadden professionals participated in numerous conference calls and meetings between the Debtors and counsel to Highland to facilitate a timely and efficient flow of information between the parties.

62.     On July 16 and 17, 2007, the Board met to consider two proposals for a new equity purchase and commitment agreement – one put forward by an investor group led by Appaloosa and the other proposed by Highland.  After significant deliberations, on July 18, 2007, Delphi announced that it had accepted the proposal submitted by the investor group led by Appaloosa.  While the negotiations were taking place, Skadden assisted the Debtors in drafting a motion requesting this Court's approval of the proposal which was referred to as the "Delphi-Appaloosa EPCA."[20]  Under the Delphi-Appaloosa EPCA, the investors (the "New Plan Investors") agreed to invest up to $2.55 billion in cash to support the Company's transformation and reorganization plans in exchange for preferred and common equity in reorganized Delphi. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.[21]

[20]    Expedited Motion For Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) filed on July 18, 2007 (Docket No. 8673).

[21]    Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) (Docket No. 8856).

63.    Development Of Delphi's Original Plan Of Reorganization.  In connection with the Debtors' negotiations with potential plan investors and other parties-in-interest, the Debtors, with Skadden's assistance, also worked to draft and negotiate their plan of reorganization, including researching various related legal issues.  After the Debtors formally entered into the Delphi-Appaloosa EPCA, Skadden assisted the Debtors in updating and revising the draft plan of reorganization in accordance with the terms of the Delphi-Appaloosa EPCA.  On September 6, 2007 – the same date that a settlement was executed with GM – the Debtors filed the September 2007 Plan and September 2007 Disclosure Statement with this Court.  The filing of the September 2007 Plan and announced settlement with GM were milestone events in the Reorganization Cases that resulted from many months of extraordinary work and effort put forth by the Debtors and their professional advisors, including Skadden.

64.    To achieve these milestones, Skadden participated in numerous meetings with representatives and key executives of the Debtors to coordinate the review of the September 2007 Plan and related exhibits.  Additionally, Skadden assisted the Debtors and their financial advisors in evaluating dozens of proposed changes to these documents.  Skadden also worked closely with the Debtors and representatives of the New Plan Investors, GM, and other key parties to negotiate, coordinate, and incorporate the various proposed changes to the September 2007 Plan and related Disclosure Statement.

65.    Development Of Delphi's First Amended Plan Of Reorganization.  After filing the September 2007 Plan, the Debtors were required to consider amendments to the plan when the Debtors concluded that severe dislocation in the capital markets could preclude the Debtors from raising approximately $7.1 billion in funded debt to finance the plan of reorganization.  In addition, Delphi learned that an independent, third-party forecasting service

34

had predicted a material decrease in GM North America production volumes.  These events led the

New Plan Investors to seek an adjustment to the buy-in price for their investment in reorganized

Delphi.  Nevertheless, the hearing on the adequacy of the September 2007 Disclosure Statement

commenced on October 3, 2007 during the Seventh Application Period, but several potential

objectors were granted additional time to evaluate that disclosure statement.  The Debtors also

advised this Court that Delphi was considering certain limited amendments to the September 2007

Plan and September 2007 Disclosure Statement in connection with exit financing and key

stakeholder discussions (the "Potential Amendments").  Several objections to the adequacy of the

September 2007 Disclosure Statement were either resolved, overruled, or withdrawn at the

October 3, 2007 hearing, and the hearing was adjourned to October 25, 2007.

       66.     Seeking to maintain the value of the estates despite the dislocation in the

credit markets, the Debtors, with Skadden's assistance, engaged in discussions with the Statutory

Committees, the New Plan Investors, and GM regarding the Potential Amendments.  To allow

additional time to negotiate, the hearing on the adequacy of the Disclosure Statement was further

adjourned to November 8, 2007.  As a result of those discussions, the Debtors, after consulting

with the Creditors' Committee, proposed an Investment Agreement amendment and filed proposed

amendments to the September 2007 Plan on October 29, 2007.  Throughout this process, Skadden

assisted the Debtors in the negotiations and in drafting the amendments to the Investment

Agreements.

       67.     Unfortunately, the proposed investment agreement amendments were

ultimately not accepted by all of the New Plan Investors, and the proposed amendments terminated

by their own terms on November 6, 2007.  Thereafter the Debtors, with the assistance of Skadden,

continued to negotiate revisions to the Investment Agreement and the September 2007 Plan.  The

Debtors and their advisors believed that it was essential to maintain the momentum gained in the

process and to push the parties, as much as possible, to reach a consensual agreement. This time,

however, the Debtors could reach agreement on the terms of the Potential Amendments only with

GM and the New Plan Investors – the two parties providing more than $10 billion to the Debtors'

reorganization. Thereafter, the Debtors filed the restated proposed Investment Agreement

amendment on November 14, 2007.

68.    On November 21, 2007, certain parties filed supplemental or new

objections to the September 2007 Disclosure Statement. In their ongoing pursuit to reach

consensus of their major stakeholders, the Debtors nevertheless continued their discussions with

the Statutory Committees, GM, and the New Plan Investors. These discussions led to the

December 3, 2007 filing of the second restated proposed Investment Agreement and additional

proposed amendments to the September 2007 Plan. The proposed plan still provided for par plus

accrued interest recovery at Plan value for senior creditors, but contained higher buy-in prices for

the New Plan Investors than under the November 14 amendments and included a lower recovery

for GM.

69.    Confirmation Of Delphi's First Amended Plan Of Reorganization. On

December 5, 2007, the Debtors filed certain proposed changes to the September 2007 Plan and

Disclosure Statement together with their omnibus reply to objections. Following a contested

hearing held December 6, 2007, the Court on December 10, 2007, entered orders approving the

adequacy of the Disclosure Statement, authorizing the Debtors to solicit votes on their plan of

reorganization, and approving the Delphi-Appaloosa EPCA and the PSA. On that same date and

in connection with the Court's December 10 orders, the Debtors filed their First Amended

36

Disclosure Statement (Docket No. 11388) and the First Amended Plan of Reorganization (Docket No. 11386).

70.    Over the course of the next several weeks, the Debtors, with the assistance of Skadden, drafted and filed the exhibits to the December 2007 Plan.  Parties-in-interest filed 53 objections to the December 2007 Plan.  Several of these parties took discovery of the Debtors, which required the Debtors, with Skadden's assistance, to review and produce responsive documents.  In addition, Skadden professionals fielded numerous telephonic and electronic inquiries regarding the terms of the December 2007 Plan.  Skadden professionals researched issues raised by the objections to the plan and prepared a memorandum of law in support of the plan. Moreover, during this time the Debtors, with Skadden's assistance, drafted declarations of 11 witnesses in support of the December 2007 Plan and defended depositions of the various witnesses taken by objectors.  In addition, Delphi and Skadden professionals compiled and coordinated a joint exhibit list of more than 550 exhibits that were entered into evidence at the confirmation hearing.

71.    The Debtors, with the assistance of Skadden, engaged in extensive negotiations with objecting parties in an effort to resolve such parties' objections and negotiated settlements with many of the objecting parties prior to and during the three-day confirmation hearing.  The Debtors succeeded in resolving many of the objections without litigation.  For the remaining objections, the Debtors and Skadden professionals prepared for the hearing before this Court and presented their case for confirmation.  Ultimately, nearly all of the unresolved objections were overruled.  For those that were granted in part, the Debtors, with Skadden's assistance, made the necessary changes to the December 2007 Plan and related exhibits.  Finally, the Debtors and Skadden drafted and negotiated with parties-in-interest the order confirming the

37

December 2007 Plan as amended. This Court entered an order (Docket No. 12359) confirming the plan on January 25, 2008.

72. In addition to the above, throughout the Final Application Period, the Debtors, with the assistance of Skadden, filed five motions, one of which was filed during the Seventh Application Period, to extend their exclusive periods for filing a plan of reorganization and soliciting acceptances thereof. Each such motion was subsequently granted by the Court to allow the Debtors to retain their exclusivity rights throughout the Final Application Period.

73. In connection with the foregoing services, Skadden expended 30,622.70 hours during the Final Application Period for which Skadden seeks compensation of $17,181,865, or 19.0% of the total compensation sought in this Final Application.[22] Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-1. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Eric L. Cochran | $920 | 557.40 | $512,808 | $862 | 1,748.70 | $1,507,551 |
| John (Jack) Wm Butler, Jr. | $950 | 457.70 | $434,815 | $893 | 1,499.80 | $1,338,869 |
| Nathan L. Stuart | $575 | 631.60 | $363,171 | $518 | 2,213.00 | $1,145,968 |
| Kayalyn A. Marafioti | $895 | 416.30 | $372,589 | $849 | 1,182.90 | $1,004,612 |
| George N. Panagakis | $870 | 178.30 | $155,121 | $815 | 1,138.50 | $927,763 |
| Daniel I. Ganitsky | $625 | 514.10 | $321,313 | $600 | 1,356.70 | $814,235 |
| Adlai S. Hardin | $625 | 332.80 | $208,002 | $593 | 1,331.60 | $789,049 |

[22] Of this amount, 11,474.50 hours and $6,754,699 of fees were expended in the Seventh Application Period. This compares to $14,195, or 0.2%; $20,728, or 0.2%; $820,818, or 8.2%; $4,147,192, or 32.3%; $2,515,285, or 20.0%; and $2,925,360, or 19.0%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Albert L. Hogan III | $775 | 578.50 | $448,339 | $742 | 986.80 | $732,109 |
| Thomas J. Matz | $665 | 348.20 | $231,554 | $634 | 1,112.40 | $705,607 |
| Lee P. Garner | $710 | 559.20 | $397,032 | $677 | 907.90 | $614,971 |
| Ian S. Bolton | $460 | 217.40 | $100,004 | $400 | 1,462.80 | $585,710 |
| Adam F. Halper | $460 | 617.90 | $284,234 | $421 | 1,375.90 | $579,854 |
| John Guzzardo | $495 | 680.80 | $336,997 | $469 | 1,208.00 | $566,330 |
| Ron E. Meisler | $710 | 199.20 | $141,432 | $617 | 913.10 | $563,134 |
| Neil MacDonald | $640 | 614.40 | $393,216 | $627 | 829.30 | $520,247 |
| Michael W. Perl | $495 | 185.70 | $91,923 | $444 | 1,140.80 | $506,670 |
| Kellan Grant | $540 | 223.90 | $120,906 | $487 | 749.60 | $364,937 |
| Nick D. Campanario | $610 | 258.90 | $157,929 | $568 | 591.20 | $335,710 |
| Kurt Ramlo | $665 | 262.10 | $174,298 | $640 | 486.90 | $311,451 |
| Christopher P. Connors | $625 | 340.40 | $212,751 | $625 | 340.40 | $212,751 |
| J.R. Lederer | | | | $342 | 600.00 | $205,322 |
| Matthew Gartner | $420 | 27.70 | $11,634 | $359 | 462.60 | $166,025 |
| Allison V. Herriott | $495 | 236.20 | $116,920 | $467 | 350.40 | $163,642 |
| Lisa B. Diaz | $460 | 13.00 | $5,980 | $345 | 443.60 | $152,840 |
| Sarah J. Platt | $420 | 202.60 | $85,092 | $385 | 343.90 | $132,503 |
| Tero Louko | $635 | 110.50 | $70,169 | $612 | 205.20 | $125,569 |
| Brett Arkuss | $420 | 155.30 | $65,226 | $389 | 294.60 | $114,678 |
| Natalia F. Lazarova | | | | $470 | 224.10 | $105,327 |
| Brian M. Fern | $625 | 47.10 | $29,438 | $554 | 181.80 | $100,697 |
| Rita Sinkfield Belin | $625 | 123.70 | $77,313 | $617 | 156.20 | $96,326 |
| Rena M. Samole | $625 | 143.60 | $89,750 | $624 | 145.50 | $90,824 |
| Karen M. Suber | $420 | 97.00 | $40,740 | $391 | 176.50 | $68,964 |
| Marie L. Gibson | | | | $670 | 99.90 | $66,933 |
| Antonio La Pergola | | | | $565 | 109.40 | $61,812 |
| Melissa T. Kahn | $540 | 5.20 | $2,808 | $473 | 127.20 | $60,148 |
| John K. Lyons | $845 | 57.50 | $48,588 | $837 | 64.90 | $54,323 |
| Brent M. Houston | | | | $435 | 118.70 | $51,636 |
| Joseph N. Wharton | $625 | 54.50 | $34,063 | $603 | 85.40 | $51,522 |
| Brandon M. Duncomb | $375 | 133.20 | $49,951 | $375 | 133.20 | $49,951 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Amy Van Gelder | $540 | 89.20 | $48,168 | $540 | 89.20 | $48,168 |
| Eric J. Howe | $460 | 96.30 | $44,298 | $457 | 101.20 | $46,209 |
| Gregory O. Ogunsanya | | | | $489 | 93.60 | $45,806 |
| Barbora Bednarova | $460 | 96.50 | $44,390 | $460 | 96.50 | $44,390 |
| John M. McLeod | | | | $585 | 72.50 | $42,413 |
| Courtney E. VanLonkhuyzen | | | | $435 | 86.70 | $37,715 |
| M. Janine Jjingo | $460 | 5.90 | $2,714 | $395 | 89.20 | $35,201 |
| Mike Murphy | $375 | 81.20 | $30,450 | $375 | 81.20 | $30,450 |
| Kara R. Garcia | | | | $495 | 56.70 | $28,067 |
| Laverne F. Hill | $460 | 55.10 | $25,346 | $460 | 55.10 | $25,346 |
| Peter Olasky | | | | $422 | 58.40 | $24,673 |
| Denise Kaloudis | $575 | 7.60 | $4,371 | $511 | 37.30 | $19,073 |
| Randall G. Reese | | | | $475 | 31.70 | $15,057 |
| Ronald D. Kohut | $540 | 25.90 | $13,986 | $540 | 25.90 | $13,986 |
| Britta Horstmann | | | | $390 | 35.40 | $13,806 |
| Carl T. Tullson | $375 | 35.60 | $13,351 | $375 | 35.60 | $13,351 |
| Neal R. Stoll | | | | $865 | 14.30 | $12,370 |
| Dolores De Elizalde | | | | $488 | 24.50 | $11,968 |
| John P. Furfaro | $870 | 7.00 | $6,090 | $854 | 9.50 | $8,115 |
| Kenneth Berlin | $895 | 3.40 | $3,043 | $827 | 7.40 | $6,123 |
| Paul L. Cazers | $460 | 11.10 | $5,106 | $460 | 11.10 | $5,106 |
| N. Lynn Hiestand | $950 | 4.50 | $4,275 | $950 | 4.50 | $4,275 |
| Michelle Gasaway | | | | $625 | 4.30 | $2,688 |
| Kathy Zambrano | | | | $410 | 5.10 | $2,091 |
| Haim Zaltzman | | | | $295 | 6.50 | $1,918 |
| William M. Rohner | | | | $495 | 3.50 | $1,733 |
| Christian Pilkington | | | | $585 | 1.80 | $1,053 |
| Paraprofessionals Total | | 1,373.30 | $323,005 | | 2,584.60 | $594,144 |
| **Total** | | **11,474.50** | **$6,754,699** | | **30,622.70** | **$17,181,865 (19.0%)** |
| **Voluntary fee accommodation excluded from total** | | | **$401,664** | | | **$936,574** |

40

B.    Claims Administration (General)

74.    Given the vast number of suppliers, employees, labor unions, litigation claimants, stockholders, lenders, bondholders, and other parties-in-interest in the Reorganization Cases and the aggregate amount of claims asserted by claimants, the Debtors, with the assistance of Skadden, were required to devote significant time and resources to matters pertaining to claims filing, review, and administration throughout the Final Application Period.  These claims administration matters required attention in part because a requirement of both the Original EPCA and the Delphi-Appaloosa EPCA was that the allowed or estimated amount for certain "trade and other unsecured claims" not exceed $1.45 billion.  This condition was satisfied by the end of the Final Application Period.  As a result of the considerable efforts expended by the Debtors, Skadden, and other professionals on claims administration matters, by the end of the Final Application Period, the Debtors' claims process was at an advanced stage relative to what is more typical in other large, complex reorganization cases.

75.    As of the end of the Final Application Period, the Debtors had received approximately 16,700 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors had compared proofs of claim received to scheduled liabilities and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, these proofs of claim and scheduled liabilities assert more than $37 billion in liquidated amounts plus certain unliquidated amounts.

76.    During the Final Application Period, Skadden assisted the Debtors in obtaining court approval of a claims bar date and oversaw preparation of notices and customized proof of claim forms to be sent to creditors.  After the passage of the claims bar date on July 31, 2006 (the "Bar Date"), Skadden assisted the Debtors and other professionals, including Kurtzman

41

Carson Consultants LLC ("KCC"), the claims and noticing agent in these cases, FTI Consulting, Inc. ("FTI"), the Debtors' financial advisors, and other outside advisors and service providers in reviewing and reconciling proofs of claim. This review and reconciliation process allowed the Debtors to identify grounds for objecting to those claims.

77.    To streamline the process of obtaining this Court's approval of settlements of disputes, including disputed proofs of claim, Skadden filed a motion to implement procedures for settling claims and controversies outside the Debtors' ordinary course of business without further hearing and notice. Skadden assisted the Debtors in negotiating with Creditors' Committee as well as certain parties who formally objected to this requested relief and were able to reach an agreement on the terms of an order establishing the settlement procedures.

78.    In an effort to reduce the allowed or estimated amount for certain trade and other unsecured claims, among other claims, during the Final Application Period the Debtors, with the assistance of Skadden and other professionals, devoted a significant amount of time to (i) identifying disputed proofs of claim, (ii) objecting to these proofs of claim pursuant to omnibus claims objections, (iii) presenting omnibus objections at omnibus hearings, and (iv) litigating and/or resolving contested claim objections. The Debtors, with the assistance of Skadden and other professionals, filed 25 omnibus claims objections during the Final Application Period, objecting to approximately 13,400 proofs of claim which asserted approximately $10.1 billion in aggregated liquidated amounts plus additional unliquidated amounts. This Court has entered orders disallowing and/or claimants have withdrawn approximately 9,600 of those proofs of claim, which reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, as of the end of the Final Application Period, this Court had entered orders modifying approximately 3,460 claims,

reducing the aggregate amounts asserted with respect to those claims from $720 million to $530 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

79.    Due to the volume of filed claims and the need for an expedited resolution of contested claims matters, Skadden and the Debtors' claims reconciliation team designed a process for streamlining the resolution of such claims.  Skadden assisted the Debtors in obtaining court approval of claims objection procedures that would be applied to claims that became contested when claimants responded to an omnibus claims objection.  These procedures were designed to, among other things, (i) facilitate resolution of claims without resort to evidentiary hearings when unnecessary, (ii) establish a mechanism to adjudicate the legal sufficiency of a claim through abbreviated procedures culminating in a sufficiency hearing in which the parties would litigate only legal questions, and (iii) limit the scope of discovery, the number of witnesses at a hearing, and the time allotted for a hearing.  Pursuant to these procedures, the Debtors scheduled many claims for adjudication in a contested hearing before this Court, held multiple "meet and confer" discussions and mediations, and ultimately resolved many contested claims both prior to and at hearings before this Court.

80.    In addition, at the direction of this Court, Skadden assisted the Debtors in developing a procedure for expunging proofs of claims filed after the Bar Date when the claimant did not file a motion seeking leave of this Court to file an untimely claim.  Pursuant to this procedure, the Debtors would serve a notice on such a claimant requiring the claimant to file a motion within 10 days seeking leave to file an untimely claim or this Court would enter an order disallowing and expunging the untimely claim.  As a result of these procedures, multiple motions were filed by claimants who had filed untimely claims without also seeking leave to file such

43

claims after the Bar Date.  With Skadden's assistance, the Debtors objected to each of these motions, all of which were subsequently denied or withdrawn.

81.    Furthermore, in connection with the Confirmed Plan, Skadden assisted the Debtors in their attempt to quantify the large amount of unliquidated claims by filing a motion to (i) estimate and set a maximum cap amount on these claims solely for the purposes of distribution and voting and (ii) establish certain expedited estimation procedures.  Skadden further assisted the Debtors in analyzing and resolving multiple substantive objections to these estimation procedures. Due to these efforts throughout the Final Application Period, the Debtors were able to satisfy the condition contained in the Delphi-Appaloosa EPCA that trade and other unsecured claims be reduced to $1.45 billion or less.

82.    In connection with the foregoing services, Skadden expended 27,876.70 hours during the Final Application Period for which Skadden seeks compensation of $12,982,125, or 14.3% of the total compensation sought in this Final Application.[23]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-2.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John K. Lyons | $845 | 511.10 | $431,881 | $790 | 1,753.90 | $1,386,457 |
| Joseph N. Wharton | $625 | 808.70 | $505,439 | $587 | 2,233.60 | $1,310,510 |
| Christopher P. Connors | $625 | 437.90 | $273,688 | $595 | 1,827.20 | $1,086,431 |

---

[23]    Of this amount, 7,258.80 hours and $3,641,967 of fees were expended in the Seventh Application Period.  This compares to $31,974, or 0.3%; $151,245, or 1.3%; $467,214, or 4.7%; $2,081,005, or 16.2%; $3,336,137, or 26.5%; and $3,282,362, or 21.3%; of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Lisa B. Diaz | $460 | 741.00 | $340,860 | $396 | 2,661.10 | $1,054,414 |
| Eric J. Howe | $460 | 552.30 | $254,058 | $406 | 2,411.60 | $979,185 |
| Sarah J. Platt | $420 | 434.60 | $182,532 | $366 | 2,130.80 | $780,414 |
| Laverne F. Hill | $460 | 479.30 | $220,478 | $418 | 1,191.30 | $498,158 |
| Albert L. Hogan III | $775 | 51.40 | $39,836 | $701 | 646.90 | $453,711 |
| Michael W. Perl | $495 | 375.40 | $185,824 | $453 | 967.80 | $438,440 |
| Randall G. Reese | | | | $515 | 843.70 | $434,239 |
| Amy Van Gelder | | | | $470 | 817.30 | $384,131 |
| Melissa T. Kahn | $540 | 318.50 | $171,990 | $500 | 731.20 | $365,959 |
| Courtney E. VanLonkhuyzen | | | | $435 | 775.00 | $337,126 |
| Nick D. Campanario | $610 | 188.00 | $114,680 | $561 | 542.00 | $304,072 |
| Ian S. Bolton | $460 | 285.90 | $131,514 | $420 | 666.00 | $279,588 |
| Allison V. Herriott | | | | $415 | 621.40 | $257,923 |
| Thomas J. Matz | $665 | 73.40 | $48,812 | $617 | 368.20 | $227,293 |
| Kurt Ramlo | $665 | 259.40 | $172,502 | $655 | 337.90 | $221,307 |
| Kayalyn A. Marafioti | $895 | 27.50 | $24,614 | $833 | 230.70 | $192,278 |
| Carl T. Tullson | $365 | 500.40 | $182,492 | $362 | 527.30 | $190,966 |
| Matthew Gartner | $420 | 83.10 | $34,902 | $369 | 389.20 | $143,569 |
| Brent M. Houston | | | | $431 | 303.10 | $130,722 |
| Brandon M. Duncomb | $368 | 301.30 | $110,961 | $366 | 316.30 | $115,686 |
| Ron E. Meisler | $710 | 14.30 | $10,153 | $598 | 178.40 | $106,634 |
| John Guzzardo | | | | $434 | 232.80 | $101,066 |
| John (Jack) Wm Butler, Jr. | $950 | 18.60 | $17,670 | $881 | 112.80 | $99,375 |
| Brian M. Fern | $625 | 14.40 | $9,000 | $528 | 148.50 | $78,345 |
| George N. Panagakis | $870 | 2.00 | $1,740 | $812 | 73.40 | $59,574 |
| M. Janine Jjingo | | | | $339 | 136.70 | $46,356 |
| Rena M. Samole | | | | $565 | 60.30 | $34,071 |
| Nathan L. Stuart | | | | $456 | 51.30 | $23,375 |
| Kenneth Berlin | | | | $795 | 28.50 | $22,665 |
| Haim Zaltzman | | | | $323 | 69.10 | $22,341 |
| Adlai S. Hardin | $625 | 16.10 | $10,063 | $603 | 36.40 | $21,940 |
| Mike Murphy | $349 | 45.40 | $15,856 | $349 | 45.4 | $15,856 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Louis D. Wilson | | | | $585 | 20.50 | $11,993 |
| Lee P. Garner | | | | $625 | 16.40 | $10,251 |
| Kellan Grant | $540 | 4.30 | $2,322 | $475 | 20.10 | $9,556 |
| J.R. Lederer | | | | $330 | 22.60 | $7,461 |
| Karen M. Suber | $420 | 17.10 | $7,182 | $420 | 17.10 | $7,182 |
| Matthew J. Micheli | | | | $440 | 15.20 | $6,688 |
| John P. Furfaro | | | | $810 | 7.90 | $6,399 |
| William M. Rohner | | | • | $495 | 12.00 | $5,941 |
| Ronald D. Kohut | $540 | 10.30 | $5,562 | $540 | 10.30 | $5,562 |
| Paul L. Cazers | $460 | 11.60 | $5,336 | $460 | 11.60 | $5,336 |
| Dolores De Elizalde | | | | $460 | 8.40 | $3,861 |
| Dhananjai Shivakumar | | | | $625 | 4.60 | $2,875 |
| Jay S. Berke | | | | $810 | 3.00 | $2,430 |
| Kathy Zambrano | | | | $410 | 4.10 | $1,681 |
| Jenelle M. Todryk | | | | $535 | 2.50 | $1,338 |
| Paraprofessionals Total | | 675.50 | $130,020 | | 3,233.30 | $689,394 |
| **Total** | | **7,258.80** | **$3,641,967** | | **27,876.70** | **$12,982,125 (14.3%)** |
| **Voluntary fee accommodation excluded from total** | | | **$140,773** | | | **$502,575** |

## C.    Customer Matters (GM)

83.    During the Final Application Period, Skadden assisted the Debtors with various matters related to GM, the Debtors' largest customer and former parent.  At the outset of the Reorganization Cases, the Debtors and their advisors negotiated extensively with GM with respect to the application of various first-day orders in the period both before and after the Petition Dates.  This included addressing GM's concerns with respect to setoff rights under the order granting the Debtors' motion for approval of their debtor-in-possession financing (the "DIP Financing Order") as well as customer and vendor matters.  The Debtors, with Skadden's

46

assistance, also met with and discussed with GM comprehensive solutions with regard to human capital matters relating to collective bargaining agreements, pension plans, and OPEB liabilities. Skadden assisted the Debtors in developing strategy and otherwise drafting documentation in an attempt to engender GM's support. In addition, the Debtors met with and negotiated interim support payments from GM by postponing previously agreed-upon price reductions.

84.    Skadden also spent significant time reviewing certain of the Debtors' contracts with GM in preparation for the Debtors' motion to reject contracts under section 365 of the Bankruptcy Code. The Debtors, in conjunction with FTI and Skadden, reviewed contracts where the Debtors were providing goods to GM at a loss. To facilitate this process, Skadden devoted significant time to conducting legal research regarding the rejection of executory contracts, developing a diligence list to ensure the proper review of contracts, and drafting the GM Contract Rejection Motion in the event that a consensual resolution could not be reached. In addition, Skadden assisted the Debtors in reviewing expired contracts between the Debtors and GM and conducted research regarding the Debtors' legal options relating to performance under the expired contracts while negotiating terms for new supply contracts with GM. On March 31, 2006 the Debtors, with the assistance of Skadden, filed the GM Contract Rejection Motion. On the same date, the Debtors delivered to GM a letter regarding commercial agreements that expired between October 1, 2005 and March 31, 2006, the terms of which the Debtors wished to reset if GM were to renew the contracts. In their March 31, 2006 press release, the Debtors stated that they would not unilaterally revise the terms and conditions on which the Debtors were providing interim supply of parts to GM in connection with the expired contracts or file additional contract rejection motions prior to May 12, 2006 so long as GM did not initiate re-sourcing or other hostile commercial initiatives against the Debtors.

47

85.     The GM Contract Rejection Motion was initially scheduled to be heard on May 12, 2006. In early April 2006, the Debtors were served with discovery requests by GM and other constituents related to the motion. In light of the originally scheduled hearing date, Skadden and FTI assisted the Debtors in responding on an expedited basis to GM's discovery requests. Skadden devoted a substantial amount of time to reviewing documents produced by both the Debtors and GM in response to various discovery requests. The Debtors produced more than 50,000 pages of documents in response to GM's discovery requests. In connection with GM's discovery requests, the Debtors also spent a significant amount of time preparing for the depositions of certain Delphi and GM witnesses. The Debtors, FTI, and Skadden spent considerable time preparing for a hearing on the motion, including the filing of the Debtors' response to GM's objection to the GM Contract Rejection Motion, the preparation of trial exhibits, and the preparation of various direct- and cross-examination materials. Nevertheless, as a result of the progress achieved in connection with the Original Framework Agreements, the Debtors ultimately sought, and this Court approved, an order suspending prosecution of the GM Contract Rejection Motion indefinitely, effective January 31, 2007 (Docket No. 6778). The suspension of the GM Contract Rejection Motion continued in effect through the remainder of the Reorganization Cases to allow the Debtors to continue to pursue a consensual resolution of various commercial and structural issues with GM.

86.     In addition, as discussed above, one of the key tenets of the Debtors' transformation plan was finalizing GM's financial support for the Debtors' legacy and labor costs and documenting GM's business commitment to the Company following the Debtors' emergence from chapter 11. Accordingly, in July 2006, the Debtors, with the assistance of Skadden, and GM began to focus on bilateral negotiations concerning operational and structural issues. These

48

negotiations grew into broader framework discussions with the statutory committees and later with several potential plan investors, as discussed above in greater detail.

87.    In connection with these framework discussions, both Delphi and GM devoted significant resources to negotiating the terms of a comprehensive settlement of existing disputes and certain claims.  The culmination of extensive negotiations between both the Debtors and GM was their agreement to enter into two principal agreements: (a) the GSA and (b) the MRA. The GSA addressed primarily those matters for which the Debtors and GM have agreed upon resolutions that can be implemented in the short term.  Accordingly, most obligations set forth in the GSA were to be performed upon, or as soon as reasonably practicable after, the effective date of the Debtors' reorganization plan.  By contrast, resolution of most of the matters addressed in the MRA required a significantly longer period that would extend for a number of years after confirmation of the plan.  Both agreements were integral to the Debtors' financial and commercial transformation, and both were necessary components of the Debtors' plan.

88.    The discussions between the Debtors and GM that ultimately led to the terms set forth in the GSA and the MRA began prior to the Petition Date and intensified after the Debtors filed the GM Contract Rejection Motion.  As part of a joint effort to avoid litigation related to the GM Contract Rejection Motion, during the spring and summer of 2006, the Debtors and GM developed the framework for GM's contributions to the Debtors in support of the Transformation Plan and the guiding tenets for strengthening the parties' business relationship to achieve mutually beneficial commercial and strategic objectives, which are reflected in the GSA and the MRA.

89.    The Debtors' discussions with GM continued through April 2007.  By May 2007, the parties had agreed on the broad outlines of the GSA and the MRA.  Working groups of

49

specialists in various subject matter areas together with senior management of the Debtors and GM

developed comprehensive approaches for addressing a wide range of matters, including the

resolution of issues related to the Debtors' pension and retiree benefit plans, the disposition of

various legacy agreements between the Debtors and GM, the restructuring of the Debtors' U.S.

manufacturing base, and the adoption of guidelines for certain ongoing commercial agreements.

The parties exchanged initial drafts of various sections of the GSA and the MRA in July 2007 and

negotiated specific terms and conditions over the succeeding six weeks.  Both the Settlement

Agreement and the Restructuring Agreement were substantially complete by the end of August

2007.

90.    On September 6, 2007, the Debtors and GM reached a final agreement on

the definitive terms of the GSA and MRA.  On the same day, both agreements, together with their

respective accompanying exhibits, were filed with this Court as exhibits to the September 2007

Plan.  Following the completion of the these negotiations and the filing of the two agreements with

the September 2007 Plan, the Debtors and GM negotiated amendments to both documents.  The

amendments were primarily related to change in consideration that was to be received by GM.

These proposed amendments were filed during the Seventh Application Period on October 29,

November 14, and December 3, 2007, together with additional proposed changes to the September

2007 Plan.

91.    Throughout this process, Skadden professionals provided extensive

assistance to the Debtors in drafting and negotiating the GSA and MRA.  Skadden attorneys from

various disciplines attended and participated in numerous negotiating sessions with GM and its

counsel.  Skadden attorneys also drafted, reviewed, and revised both agreements throughout the

50

negotiation process.  Finally, Skadden attorneys prepared materials related to the agreements for the benefit of various constituencies, including the Board and the Statutory Committees.

92.    On July 31, 2006, GM filed a proof of claim asserting, among other things, unliquidated amounts arising from GM warranty claims, alleging that GM would incur additional costs over time.  During discussions with GM regarding the GSA and MRA, the parties expressed interest in resolving known warranty claims.  Accordingly, the Debtors, with the assistance of Skadden, negotiated with GM to resolve these warranty claims.  During these negotiations, GM advised the Debtors that since July 31, 2006, the aggregate amount of the warranty claims had increased substantially from the amount originally asserted in GM's proof of claim.  After several months of negotiations, the Debtors, with Skadden's assistance, agreed to settle all known outstanding GM warranty claims pursuant to a settlement agreement with GM.  In connection with the settlement agreement, Skadden assisted the Debtors in drafting and prosecuting a motion to approve the settlement agreement, which was approved by this Court at the beginning of the Seventh Application Period, on October 2, 2007 (Docket No. 10408).  In accordance with that order, (a) the liquidated component of GM's claim relating to warranty claims was reduced by $530,081,671, which included, without limitation, the personal injury claims related to warranty claims asserted in GM's proof of claim, and (b) an unliquidated component relating to warranty claims were expunge with prejudice the.

93.    In connection with the foregoing services, Skadden expended 12,030.50 hours during the Final Application Period for which Skadden seeks compensation of $6,098,537, or 6.7% of the total compensation sought in this Final Application.[24]  Detailed time entries of each

---

[24]    Of this amount, 252.10 hours and $164,496 of fees were expended in the Seventh Application Period.  This compares to $458,182, or 5.0%; $1,789,803, or 15.8%; $1,699,180, or 16.9%; 80,818, or 0.6%; $308,254, or 2.4%; and $1,602,592, or 10.4%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

Skadden professional related to these services performed during the Seventh Application Period are attached hereto as <u>Exhibit D-3</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Dhananjai Shivakumar | | | | $560 | 1,169.70 | $655,260 |
| Eric L. Cochran | $920 | 40.60 | $37,352 | $824 | 747.80 | $616,389 |
| Adlai S. Hardin | $625 | 45.40 | $28,375 | $569 | 1,057.30 | $601,628 |
| Nathan L. Stuart | | | | $440 | 1,331.30 | $586,361 |
| John (Jack) Wm Butler, Jr. | $950 | 14.90 | $14,155 | $857 | 562.60 | $482,158 |
| Gregory O. Ogunsanya | | | | $494 | 857.50 | $423,848 |
| Kayalyn A. Marafioti | $895 | 9.60 | $8,592 | $805 | 412.20 | $331,763 |
| Albert L. Hogan III | $775 | 2.60 | $2,015 | $622 | 450.60 | $280,128 |
| Daniel I. Ganitsky | $625 | 49.40 | $30,876 | $590 | 436.20 | $257,155 |
| Courtney E. VanLonkhuyzen | | | | $375 | 677.00 | $253,876 |
| John Guzzardo | | | | $376 | 506.00 | $190,190 |
| Sina Toussi | | | | $540 | 246.80 | $133,272 |
| Rena M. Samole | $625 | 2.10 | $1,313 | $566 | 176.70 | $99,963 |
| Nick D. Campanario | | | | $465 | 209.40 | $97,371 |
| Karen M. Suber | $420 | 28.70 | $12,054 | $362 | 268.70 | $97,255 |
| Thomas J. Matz | | | | $584 | 139.70 | $81,614 |
| Ron E. Meisler | | | | $582 | 138.10 | $80,393 |
| Brian M. Fern | $625 | 19.10 | $11,938 | $571 | 122.70 | $70,090 |
| David E. Springer | | | | $755 | 69.90 | $52,776 |
| Lisa B. Diaz | | | | $295 | 148.20 | $43,720 |
| Lee P. Garner | | | | $565 | 57.70 | $32,608 |
| Venera E. Ziegler | | | | $510 | 62.00 | $31,620 |
| Adam F. Halper | $460 | 28.80 | $13,248 | $418 | 71.90 | $30,057 |
| George N. Panagakis | | | | $767 | 38.80 | $29,756 |

52

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Haim Zaltzman | | | | $313 | 77.90 | $24,393 |
| Laverne F. Hill | | | | $390 | 59.50 | $23,205 |
| Peter E. Krebs | | | | $410 | 56.00 | $22,960 |
| Melissa T. Kahn | | | | $410 | 40.20 | $16,482 |
| Kellan Grant | | | | $415 | 37.80 | $15,690 |
| M. Janine Jjingo | | | | $338 | 46.20 | $15,621 |
| Ronald D. Kohut | | | | $431 | 27.20 | $11,734 |
| William M. Rohner | | | | $440 | 25.10 | $11,044 |
| Peter Olasky | | | | $375 | 29.40 | $11,025 |
| Bennett S. Silverberg | | | | $485 | 21.50 | $10,428 |
| Marie L. Gibson | | | | $540 | 16.10 | $8,694 |
| John K. Lyons | | | | $695 | 12.40 | $8,619 |
| John A. Amodeo | | | | $580 | 13.50 | $7,830 |
| Kurt Ramlo | | | | $625 | 12.50 | $7,813 |
| Jamie Hur | | | | $375 | 17.30 | $6,488 |
| Allison V. Herriott | | | | $403 | 11.60 | $4,669 |
| Brett Arkuss | $420 | 10.90 | $4,578 | $420 | 10.90 | $4,578 |
| Louis D. Wilson | | | | $554 | 7.40 | $4,097 |
| Kathy Zambrano | | | | $410 | 8.20 | $3,362 |
| Randall G. Reese | | | | $465 | 6.10 | $2,837 |
| John P. Furfaro | | | | $810 | 2.60 | $2,106 |
| Michael W. Perl | | | | $375 | 4.90 | $1,838 |
| Kenneth Berlin | | | | $770 | 1.70 | $1,309 |
| Lawrence D. Frishman | | | | $810 | 1.60 | $1,296 |
| Brent M. Houston | | | | $435 | 2.40 | $1,044 |
| Paraprofessionals Total | | | | | 1,521.70 | $310,124 |
| **Total** | | 252.10 | $164,496 | | 12,030.50 | **$6,098,537 (6.7%)** |
| **Voluntary fee accommodation excluded from total** | | | $11,509 | | | **$262,982** |

D.    Employee Matters (Labor Unions)

94.    As of the Petition Date, substantially all of the Debtors' then- approximately

34,750 hourly employees in the United States were represented by three principal unions – the

International Union, United Automobile, Aerospace and Agricultural Implement Workers of

America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and

Furniture Workers-Communications Workers of America (the "IUE-CWA"), and the United Steel,

Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union (the "USW").  The Debtors had master collective bargaining agreements with

each of these three unions as well as "local agreements" with affiliated local unions covering

primarily local issues that are worksite or business specific.  The Debtors also had collective

bargaining agreements with three other unions – the International Association of Machinists and

Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the

"IBEW"), and the International Union of Operating Engineers (the "IUOE") (the six foregoing

unions (the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE), together with their applicable

locals, are collectively referred to herein as the "Unions").

95.    During the Final Application Period, Delphi negotiated with its major

unions to develop an attrition program for hourly employees (with or without a consensual

comprehensive agreement) to facilitate a "soft landing" for then-current employees on an

individual and voluntary basis on account of the expected right-sizing of the business, as

announced on March 31, 2006.  Accordingly, Delphi, with Skadden's assistance, negotiated an

agreement with GM and the UAW to establish an attrition program to provide certain incentives

and benefits for employees to sever their employment.  Skadden drafted a motion seeking approval

of this attrition program, which motion was finalized and filed on March 22, 2006 (Docket No.

2933) – the same day the agreement memorializing the attrition program was signed.  Skadden

responded to objections and discovery requests and prosecuted the motion on behalf of the

Debtors.  Nine days later, Delphi announced the Transformation Plan and outlined the key tenets

that it believed would enable it to return to stable, profitable business operations.  On May 8, 2006,

this Court entered the order approving the motion with certain modifications (Docket No. 3648),

which was subsequently amended on May 12, 2006 (Docket No. 3754).  In addition, on June 19,

2006, the Debtors sought approval of an agreement to implement a similar special attrition

program with the IUE-CWA and a Supplement to the UAW special attrition program (Docket No.

4269).  Skadden represented the Debtors in a contested, evidentiary hearing seeking approval of

these programs, which were approved by the Court on July 7, 2006 (Docket No. 4461).  Both

orders approving the attrition plans were appealed by Wilmington Trust Company as indenture

trustee.  Furthermore, Delphi with the assistance of Skadden, negotiated with the Unions

additional attrition programs, which were instituted in connection with the settlement agreements

that were approved in 2007 as discussed below.

        96.     Modifying the Debtors' labor agreements was one of the key tenets of the

Debtors' transformation plan.  To further this goal, Skadden assisted the Debtors in filing the

1113/1114 Motion (Docket No. 3035) on March 31, 2006.  Skadden worked with the Debtors and

other professionals to provide information to, and engage in discussions and negotiations with, the

Unions and the Debtors' stakeholders to resolve the labor matters forming the basis of the

1113/1114 Motion.  Throughout the Final Application Period, Skadden worked closely (being

mindful not to duplicate efforts) with O'Melveny & Myers, LLP ("O'Melveny"), special labor

counsel retained by the Debtors to advise with respect to the prosecution, continuance, and

ultimate suspension of the Debtors' 1113/1114 Motion.

55

97.    After filing the 1113/1114 Motion, the Debtors continued discussions with the Unions in an effort to reach a consensual resolution of their labor matters. The contested hearing on the 1113/1114 Motion was adjourned following completion of the Debtors' direct case, and the proceedings were subsequently suspended by this Court on January 31, 2007, to facilitate a consensual resolution of the 1113/1114 Motion.

98.    During the Final Application Period, Delphi, its Unions, and GM signed a series of settlement agreements or memoranda of understanding which settled the 1113/1114 Motion. These agreements were a significant milestone in the Debtors' transformation and a major step on the path towards emergence. Among other things, as approved by this Court, these agreements also modified, extended, or terminated provisions of the existing collective bargaining agreements among Delphi and its Unions and addressed issues such as site plans, workforce transition, and legacy pension and other postretirement benefits obligations, as well as other comprehensive transformational issues. Portions of these agreements became effective during the Final Application Period, while other portions did not become effective until substantial consummation of the Modified Plan, which incorporates, approves, and is consistent with the terms of each agreement.

99.    The settlement agreements include those with the UAW dated June 22, 2007; the IUE-CWA, dated August 5, 2007; the IAM and its District 10 and Tool and Die Makers Lodge 78, dated July 31, 2007; the IBEW and its Local 663 relating to Delphi Electronics and Safety, dated July 31, 2007; the IBEW and its Local 663 relating to Delphi's Powertrain division, dated July 31, 2007; the IUOE Local 18S, dated August 1, 2007; the IUOE Local 101S, dated August 1, 2007; the IUOE Local 832S, dated August 1, 2007; the USW and its Local Union 87L

relating to Delphi's operations at Home Avenue, dated August 16, 2007; and the USW and its Local Union 87L relating to Delphi's operations at Vandalia, dated August 16, 2007.

100.    Each respective Union's settlement agreement was subject to this Court's approval as well as ratification by its respective Union's membership, except for the IUOE Local 101S agreement which did not require ratification because there were no active bargaining unit members at the Olathe IUOE Local 101S site.  Therefore, during the Final Application Period, Skadden and O'Melveny drafted and prosecuted motions to approve the various settlement agreements with the Unions.  The UAW settlement agreement was approved by this Court on July 19, 2007 (Docket No. 8685) and ratified by the UAW as of June 28, 2007.  The IUE-CWA, IAM, IBEW, and IUOE settlement agreements were approved by this Court on August 16, 2007 (Docket Nos. 9106 and 9107) and were ratified as follows:  by the IUE-CWA as of August 20, 2007, by the IAM and IBEW as of August 4, 2007, and by the IUOE (relating, respectively, to each of Local 832S and Local 18S) as of August 9 and August 10, 2007.  The USW settlement agreements were approved by the Court on August 29, 2007 and ratified by the USW as of August 30, 2007 for Home Avenue and as of August 31, 2007 for Vandalia.

101.    Subject to these settlement agreements, the existing collective bargaining agreements were modified and extended to September 14, 2011 for the UAW, the IAM, the IBEW, the IUOE Local 18S, the IUOE Local 832S, and the USW; were modified and extended to October 12, 2011 for the IUE-CWA; and were terminated and superseded for the IUOE Local 101S by the settlement agreement for the IUOE Local 101S.

102.    On September 4, 2007, this Court entered an order (Docket No. 9221) which withdrew the 1113/1114 Motion without prejudice, subject to this Court's prior settlement approval orders pertaining to each of Delphi's Unions.

103.    Finally, during the Seventh Application Period, in connection with the Debtors' solicitation of votes on the December 2007 Plan, the Debtors, with the assistance of Skadden, drafted and mailed specialized notices to various employees, including employees represented by the Unions.  Skadden participated in numerous conference calls and discussions to assist the Debtors in developing a strategy for providing notices to employees represented by the Unions.  In addition, certain hourly employees filed a motion to vacate the automatic stay to allow the employees to pursue a cause of action in the Northern District of Alabama court.[25]  During the Seventh Application Period the Debtors, with Skadden's assistance, began drafting an objection to this motion, which was subsequently filed on February 14, 2008.

104.    In connection with the foregoing services, Skadden expended 10,803.50 hours during the Final Application Period for which Skadden seeks compensation of $5,874,843, or 6.5% of the total compensation sought in this Final Application.[26]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-4.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[25]    See Motion to Vacate the Automatic Stay for Cause, Under 11 U.S.C. Section 362(d)(1), Bankruptcy Rule 4001(d)(1) and SDNY LBR 4001-1 for the Purpose of Commencing an Action in the Northern District of Alabama Entitled Jimmy Mueller, David Gargis and Keith Livingston v. Delphi Corporation and Delphi Hourly-Rate Employee Pension Plan Under 29 U.S.C. Sections 1132(a) and 1140 of ERISA dated December 5, 2007 (Docket No. 11350).

[26]    Of this amount, 226.50 hours and $148,144 of fees were expended in the Seventh Application Period.  This compares to $414,991, or 4.5%; $2,590,790, or 22.9%; $1,387,983, or 13.8%; $180,964, or 1.4%; $192,231, or 1.5%; and $975,028, or 6.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

58

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John P. Furfaro | $870 | 76.50 | $66,555 | $787 | 1,139.10 | $896,037 |
| Louis D. Wilson | | | | $514 | 1,249.00 | $642,338 |
| John (Jack) Wm Butler, Jr. | $950 | 1.10 | $1,045 | $848 | 721.90 | $611,821 |
| Thomas J. Matz | | | | $577 | 969.20 | $559,415 |
| Ronald D. Kohut | $540 | 128.10 | $69,174 | $463 | 838.10 | $387,802 |
| Jay S. Berke | | | | $767 | 471.50 | $361,825 |
| Kayalyn A. Marafioti | $895 | 2.60 | $2,327 | $803 | 444.90 | $357,165 |
| Neil MacDonald | $640 | 2.30 | $1,472 | $550 | 458.80 | $252,461 |
| Brian M. Fern | | | | $488 | 397.30 | $193,701 |
| George N. Panagakis | | | | $755 | 251.30 | $189,849 |
| Nick D. Campanario | | | | $470 | 359.40 | $169,091 |
| Ron E. Meisler | | | | $550 | 208.30 | $114,643 |
| Dhananjai Shivakumar | | | | $560 | 201.50 | $112,840 |
| Albert L. Hogan III | | | | $638 | 168.10 | $107,207 |
| Nathan L. Stuart | | | | $451 | 203.40 | $91,670 |
| Kurt Ramlo | | | | $625 | 132.50 | $82,813 |
| Randall G. Reese | | | | $465 | 175.40 | $81,562 |
| David E. Springer | | | | $755 | 89.60 | $67,649 |
| Allison V. Herriott | | | | $378 | 147.00 | $55,553 |
| Courtney E. VanLonkhuyzen | | | | $375 | 133.20 | $49,951 |
| John Guzzardo | | | | $375 | 110.70 | $41,513 |
| Sina Toussi | | | | $540 | 50.20 | $27,108 |
| Adlai S. Hardin | | | | $580 | 40.20 | $23,315 |
| Kellan Grant | | | | $470 | 47.20 | $22,184 |
| Denise Kaloudis | | | | $495 | 33.40 | $16,533 |
| Julie Boden Adams | $495 | 15.90 | $7,871 | $438 | 37.20 | $16,279 |
| Haim Zaltzman | | | | $324 | 40.60 | $13,137 |
| John K. Lyons | | | | $695 | 17.40 | $12,093 |
| Lisa B. Diaz | | | | $369 | 28.50 | $10,516 |

59

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| William M. Rohner | | | | $446 | 22.50 | $10,027 |
| Joseph N. Wharton | | | | $550 | 14.80 | $8,138 |
| M. Janine Jjingo | | | | $320 | 21.10 | $6,757 |
| Eric L. Cochran | | | | $807 | 8.20 | $6,615 |
| Kathy Zambrano | | | | $410 | 7.80 | $3,198 |
| Sarah J. Platt | | | | $355 | 8.60 | $3,053 |
| Brent M. Houston | | | | $375 | 6.40 | $2,400 |
| Daniel I. Ganitsky | | | | $585 | 4.00 | $2,340 |
| Michael W. Perl | | | | $435 | 3.70 | $1,610 |
| Paraprofessional Total | | | | | 1,541.50 | $262,634 |
| **Total** | | **226.50** | **$148,444** | | **10,803.50** | **$5,874,843 (6.5%)** |
| **Voluntary fee accommodation excluded from total** | | **$25,213** | | | | **$332,680** |

E.    Case Administration

105.    During the Final Application Period Skadden devoted time to, among other things, (a) general preparation for and attendance at court hearings, (b) communications with creditors and other parties-in-interest, (c) general case administration, including duties pertaining to service of process and maintenance of pleadings and case documents, (d) general advice with respect to the prosecution of the Reorganization Cases, and (e) general advice with respect to the rights and duties of debtors-in-possession in the administration of the Reorganization Cases.

106.    Skadden devoted significant time preparing for and attending the omnibus and special hearings that this Court established.  The omnibus hearings streamlined the administration of these Reorganization Cases by establishing a schedule known to all parties-in-interest for Court hearings and consolidating multiple matters in a single hearing, thus eliminating unnecessary time and expense spent appearing before the Court on numerous

60

occasions each month regarding disparate matters.  The Debtors have held 27 omnibus hearings during the Final Application Period and five hearings during the Seventh Application Period.  At these five omnibus hearings, 78 discrete matters were heard.  This omnibus hearing schedule requires a carefully coordinated team of Skadden attorneys to attend the hearings, meet with numerous parties-in-interest who appear, and resolve as many issues as possible without litigation.  In fact, it was not unusual for differences to be bridged at the courthouse just prior to the relevant hearing.  Indeed, with the assistance of Skadden and their other professionals, the Debtors have succeeded in presenting the great majority of these matters as uncontested or resolved.  But for the coordinated efforts of Skadden (as well as the Debtors' other retained professionals) in connection with these hearings, this would not have been possible.  To date, there have been relatively few contested matters in these cases, and even fewer matters that actually required contested evidentiary hearings.  Following the hearings, Skadden was sometimes required to modify proposed orders to comply with the Court's rulings and subsequently submit those orders to this Court for entry and docketing.

107.    The internal coordination of motions, responses, objections, witnesses, exhibits, declarations, and other related matters requires close and careful attention by the entire Skadden team.  The omnibus hearing schedule established in these Reorganization Cases is designed to efficiently address nearly all matters arising in these cases but requires that multiple professionals and paraprofessionals assist with various functions with respect to each omnibus hearing.  For example, the monthly omnibus hearing agendas that Skadden prepares require significant attention by Skadden paraprofessionals.  Skadden attorneys are then requested to review and approve the particular matter(s) on the agenda for which they have principal responsibility to ensure that all relevant filings are properly reflected.

61

108.    Moreover, given the size and complexity of these Reorganization Cases, the Debtors and Skadden were presented with a unique set of challenges in managing the process, tracking motions filed by others, responding to inquiries from parties-in-interest, and maintaining organization and control over a case that could quickly have become disorganized if attention were not provided to case administration matters on a continual basis.

109.    Thus, for instance, professionals from Skadden worked closely with the Debtors, this Court's Clerk's Office, representatives of this Court's Chambers, the U.S. Trustee's Office, the Debtors' notice and claims agent (KCC), the Debtors' public relations advisors, and the Debtors' other advisors in coordinating the establishment and maintenance of various procedures and processes to aid in the administration of the Reorganization Cases, including a dedicated website, telephone hotline, and e-mail information sites to assist in responding to the numerous inquiries that this case has generated.  At the commencement of the Reorganization Cases, the Debtors and Skadden established an "800" number telephone "hotline" that provided basic information to callers and allows them to leave messages that Skadden professionals could return.  During the Final Application Period, more than 3,500 messages were submitted to the hotline.  When necessary, Skadden professionals researched responses to more complicated voicemail messages and otherwise responded to inquiries tendered through the hotline.  A considerable amount of time was devoted to these efforts.

110.    To further assist parties involved in the Reorganization Cases, Skadden also established and maintained an electronic mailbox at delphi@skadden.com.  As with the hotline, responses to messages were researched (when appropriate) and responded to by Skadden professionals.  In addition, Skadden paraprofessionals received numerous e-mail inquiries, including document requests and other inquiries.  Skadden also estimates that its professionals

62

received thousands of pieces of written correspondence during the Final Application Period, all of which were routed to appropriate professionals within Skadden and responded to either orally or in writing. Skadden necessarily devoted significant resources to providing these responses. These efforts insured that parties would receive appropriate responses to their inquiries and made it possible for the Debtors and their estates to resolve numerous matters that might otherwise have resulted in contested matters before this Court.

111.    In addition to communications matters, case management materials were maintained by paraprofessionals that were critical to the ability of Skadden and others to promptly address issues that arose during the Final Application Period. Skadden reviewed all pleadings and orders filed during the Final Application Period and worked with KCC to ensure that entities entitled to notice were kept informed of significant events in the Reorganization Cases. The efficient management of administrative matters in a paper-intensive case of this size is a significant task. Each week, the Debtors and Skadden were inundated with correspondence, documents, requests, pleadings, and other papers. During the Final Application Period, approximately 12,359 items were docketed. On average, at least 14 pleadings were filed and docketed each day (including weekends and holidays) during the 28 months covered by the Final Application Period.

112.    Given this volume of activity, Skadden professionals implemented various procedures to create efficiencies in the management of the Reorganization Cases and to avoid unnecessary duplication of effort between Skadden professionals and the Debtors' other advisors. For instance, Skadden kept detailed calendars of future events in the Reorganization Cases and maintained other planning tools to ensure that critical deadlines were met. In addition, Skadden designed notice and case management procedures that limit the notice of certain matters to those

63

parties with the greatest interest in the day-to-day activities of the Reorganization Cases and utilize electronic noticing means when appropriate.  Skadden believes that these notice procedures have saved the estates hundreds of thousands of dollars in photocopying and delivery charges by limiting the notice of such matters while still providing appropriate notice to parties-in-interest.

113.    Despite the streamlined notice procedures authorized by this Court, Skadden professionals were required to devote substantial attention and resources to service and related matters in these cases.  As of the end of the Final Application Period, there were approximately 490 parties on the core service lists, including approximately 63 parties on the Master Service List,[27] and 423 parties who had filed a notice of appearance or request for notice in these cases (the "2002 List Parties").  Skadden, through its paraprofessionals, updated and maintained these lists to ensure proper notice by reviewing each notice of appearance and related pleading filed and updating the entities that firms represent as well as recording relevant addresses, reviewing all electronic and written correspondence to ensure that all lists were accurate, and reviewing all notices of appearance to minimize the chance that a party-in-interest was inadvertently excluded from a mailing.

114.    In addition to communications and service matters, on almost a daily basis, Skadden professionals advised the Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed, permitted, and required conduct.  Skadden frequently advised the Debtors' management with respect to specific business questions posed by management and by events occurring in the Reorganization Cases.  Part of Skadden's advice in this

---

[27]    The "Master Service List" is comprised of (a) the Debtors and their counsel, (b) the U.S. Trustee, (c) the members of and counsel for the Creditors' Committee and the Equity Committee, (d) counsel for the agent under the Debtors' former prepetition credit facility, (e) counsel for the agent under the Debtors' postpetition credit facility, and (f) those parties which may be added to the Master Service List upon written request to the Debtors or as may be otherwise ordered by the Court for good and sufficient cause.

64

regard involved the participation of Skadden in periodic planning and strategy conferences with the Debtors' senior management team.

115.    To assist the Debtors in continuing to perform their fiduciary duties, Skadden worked with the Debtors to implement procedures for the Debtors to operate their businesses in accordance with the requirements of the Bankruptcy Code. Skadden reviewed certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property, and other transactions to aid the Debtors in evaluating whether the contemplated transactions are within the ordinary course of business or are outside the ordinary course of business and require Court approval.

116.    In connection with the foregoing services, Skadden expended 14,357.30 hours during the Final Application Period for which Skadden seeks compensation of $4,673,265, or 5.2% of the total compensation sought in this Final Application.[28] Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-5. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Ron E. Meisler | $710 | 106.50 | $75,615 | $584 | 988.50 | $576,926 |
| Thomas J. Matz | $665 | 120.20 | $79,933 | $595 | 908.70 | $540,819 |
| Kayalyn A. Marafioti | $895 | 52.60 | $47,078 | $817 | 520.00 | $424,725 |
| Laverne F. Hill | $460 | 143.90 | $66,194 | $409 | 522.50 | $213,848 |

---

[28]    Of this amount, 1,569.50 hours and $570,959 of fees were expended in the Seventh Application Period. This compares to $1,136,809, or 12.4%; $603,278, or 5.3%; $604,443, or 6.0%; $613,369, or 4.8%; $628,123, or 5.0%; and $532,746, or 3.5%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Allison V. Herriott | $495 | 15.90 | $7,871 | $386 | 462.50 | $178,434 |
| John (Jack) Wm Butler, Jr. | $950 | 12.10 | $11,495 | $851 | 156.90 | $133,584 |
| Brian M. Fern | $625 | 19.10 | $11,938 | $531 | 210.50 | $111,837 |
| M. Janine Jjingo | | | | $373 | 292.90 | $109,378 |
| Adlai S. Hardin | $625 | 30.80 | $19,251 | $592 | 168.10 | $99,574 |
| John K. Lyons | $845 | 5.30 | $4,479 | $734 | 130.30 | $95,687 |
| Sina Toussi | | | | $540 | 174.30 | $94,122 |
| Venera E. Ziegler | | | | $510 | 176.40 | $89,964 |
| Kurt Ramlo | $665 | 20.80 | $13,834 | $624 | 96.00 | $59,901 |
| Matthew J. Micheli | | | | $440 | 99.40 | $43,736 |
| Dolores De Elizalde | | | | $445 | 97.90 | $43,577 |
| Sarah J. Platt | $420 | 26.30 | $11,046 | $373 | 88.60 | $33,008 |
| Lisa B. Diaz | | | | $319 | 101.40 | $32,301 |
| Nathan L. Stuart | | | | $468 | 64.50 | $30,187 |
| Randall G. Reese | | | | $470 | 63.20 | $29,686 |
| Joseph N. Wharton | $625 | 2.60 | $1,625 | $529 | 51.20 | $27,105 |
| Michael W. Perl | $495 | 18.70 | $9,258 | $448 | 54.80 | $24,526 |
| Lee P. Garner | $710 | 31.60 | $22,436 | $710 | 31.60 | $22,436 |
| Haim Zaltzman | | | | $308 | 70.60 | $21,725 |
| Kellan Grant | | | | $448 | 46.80 | $20,976 |
| Albert L. Hogan III | $775 | 10.30 | $7,983 | $720 | 21.10 | $15,189 |
| Denise Kaloudis | $575 | 13.10 | $7,533 | $548 | 19.70 | $10,800 |
| Kathy Zambrano | | | | $410 | 25.00 | $10,250 |
| George N. Panagakis | | | | $792 | 12.80 | $10,143 |
| Brent M. Houston | | | | $420 | 21.80 | $9,166 |
| Karen M. Suber | $420 | 13.40 | $5,628 | $420 | 13.40 | $5,628 |
| Ian S. Bolton | | | | $390 | 12.70 | $4,953 |
| Jamie Hur | | | | $375 | 12.50 | $4,688 |
| J.R. Lederer | | | | $332 | 12.50 | $4,150 |

66

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Dionysios V. Tsiros | | | | $295 | 10.50 | $3,098 |
| Eric J. Howe | | | | $390 | 7.10 | $2,769 |
| Eric L. Cochran | | | | $845 | 2.10 | $1,775 |
| Melissa T. Kahn | | | | $470 | 3.50 | $1,645 |
| Dhananjai Shivakumar | | | | $625 | 2.30 | $1,438 |
| Rena M. Samole | | | | $565 | 2.20 | $1,243 |
| Matthew Gartner | | | | $355 | 3.20 | $1,136 |
| Jenelle M. Todryk | | | | $535 | 2.10 | $1,123 |
| Paraprofessionals Total | | 926.30 | $167,762 | | 8,595.20 | $1,526,009 |
| **Total** | | **1,569.50** | **$570,959** | | **14,357.30** | **$4,673,265 (5.2%)** |
| **Voluntary fee accommodation excluded from total** | | | **$162,338** | | | **$731,683** |

F.    Asset Dispositions (General)

117.    The Debtors determined that to achieve the necessary cost savings and operational effectiveness envisioned in their transformation plans, a substantial segment of Delphi's U.S. business operations would need to be divested, consolidated, or wound-down through the chapter 11 process.  The Debtors also determined to streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  As part of this effort, the Debtors identified non-core product lines that did not fit into the company's future strategic framework and planned to sell or wind down these product lines.  These non-core product lines included Brake and Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.

118.    During the Final Application Period, Skadden advised the Debtors with respect to various contemplated divestitures of significant assets and drafted and reviewed various

67

pleadings and purchase agreements in connection with the contemplated divestitures, including the sale of the assets of (i) MobileAria, Inc. ("MobileAria"), an affiliate Debtor, to Wireless Matrix USA, Inc.; (ii) the brake hose manufacturing business in Dayton, Ohio to Harco Manufacturing Group, LLC; (iii) the catalyst business to Umicore; (iv) the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico to Robert Bosch LLC and Frenados Mexicanos S.A. de C.V.; (v) the manufacturing equipment and test and development equipment primarily used and located at DAS LLC's chassis facility in Saginaw, Michigan to TRW Integrated Chassis Systems LLC; (vi) the cockpits and interior systems business and integrated closure systems business to Inteva Products, LLC ("Inteva"); (vii) the steering and halfshaft business to an affiliate of Platinum Equity;[29] and (viii) the wheel bearings business to an affiliate of KPS Capital Partners.

119.    In furtherance of these transactions, Skadden worked with the Debtors and their other advisors to draft and file pleadings and other related documents requesting authority to facilitate the respective sales.  Specifically, Skadden (i) advised the Company with respect to sale procedures and the terms of each agreement with stalking horse bidders, (ii) reviewed and revised the proposed forms of asset sale agreement distributed to bidders, (iii) analyzed, reviewed, and revised asset purchase agreements and bids received from potential bidders, (iv) drafted, prepared and filed bidding procedures and filed motions seeking approval of bidding procedures and certain bid protections for the stalking horse bidders, (v) drafted, prepared, and filed notices customary for such transactions, and (vi) negotiated with parties (including union representatives) and drafted proposed orders for submission for approval by this Court.  In addition, with the assistance of their

---

[29]    The sale of the Debtors steering and halfshaft business to an affiliate of Platinum Equity never closed.

advisors, the Debtors analyzed additional assets that might be subject to divestiture, consolidation, or wind-down.

120.    Furthermore, in transactions in which the Debtors received an additional qualified bid through the competitive bidding process, the Debtors held auctions pursuant to the bidding procedures approved by this Court.  Specifically, in connection with the sale of the assets of MobileAria, Skadden hosted an auction at which the successful bidder paid $11 million while the stalking horse bid was $6.5 million.  In addition, Skadden held an auction for the assets of the Catalyst Business, at which the buyer Umicore submitted a bid with a value of $75 million – an increase of approximately $19.4 million from the stalking horse bid.[30]

121.    Certain divestitures also sought approval of the assumption and assignment of certain executory contracts and unexpired leases to the stalking horse bidder or the successful bidder at auction.  Specifically, Skadden drafted, analyzed, and filed (i) assumption and assignment notices and (ii) cure notices with respect to prepetition executory contracts being transferred in connection with the respective sale.  Skadden oversaw the process of analyzing filed objections to these notices and negotiating resolutions to each of these objections.  Skadden negotiated and drafted stipulations resolving numerous objections and obtained court approval of such stipulations.  In instances in which a resolution could not be reached, Skadden would litigate issues raised by the objecting party in a contested hearing before this Court.

122.    In connection with the foregoing services, Skadden expended 7,829.00 hours during the Final Application Period for which Skadden seeks compensation of $4,329,798,

---

[30]    After the Final Application Period, Skadden also ran an auction for the Debtors' wheel bearings business, which resulted in $500,000 more in cash consideration and changes to the underlying agreement that significantly lowered Delphi's risk that the buyer would not close the transaction.

or 4.8% of the total compensation sought in this Final Application.[31]  Detailed time entries of each

Skadden professional related to these services performed during the Seventh Application Period

are attached hereto as Exhibit D-6.  A summary of the hours expended and the corresponding

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Brian M. Fern | $625 | 618.20 | $386,377 | $586 | 1,730.30 | $1,014,716 |
| Denise Kaloudis | $575 | 593.70 | $341,379 | $534 | 1,215.70 | $649,272 |
| John K. Lyons | $845 | 54.80 | $46,307 | $739 | 721.90 | $533,371 |
| Ron E. Meisler | $710 | 115.70 | $82,147 | $606 | 614.10 | $372,084 |
| Joseph N. Wharton | | | | $511 | 483.80 | $247,325 |
| Randall G. Reese | | | | $471 | 371.00 | $174,883 |
| Kellan Grant | $540 | 15.80 | $8,532 | $472 | 329.30 | $155,397 |
| P. Gifford Carter | | | | $535 | 210.60 | $112,673 |
| Adlai S. Hardin | $625 | 160.10 | $100,064 | $623 | 168.10 | $104,744 |
| Eric J. Howe | $460 | 104.90 | $48,254 | $436 | 159.00 | $69,353 |
| Kayalyn A. Marafioti | $895 | 21.60 | $19,333 | $842 | 75.20 | $63,343 |
| Marie L. Gibson | | | | $605 | 88.90 | $53,744 |
| N. Lynn Hiestand | $950 | 1.50 | $1,425 | $876 | 53.40 | $46,770 |
| Venera E. Ziegler | | | | $510 | 86.10 | $43,911 |
| John (Jack) Wm Butler, Jr. | $950 | 20.70 | $19,665 | $900 | 46.70 | $42,017 |
| Brent M. Houston | | | | $381 | 108.90 | $41,444 |
| Rena M. Samole | $625 | 46.30 | $28,938 | $606 | 68.30 | $41,369 |
| Allison V. Herriott | $495 | 7.40 | $3,663 | $384 | 101.90 | $39,101 |
| Michael W. Perl | $495 | 76.50 | $37,869 | $495 | 76.50 | $37,869 |

---

[31]   Of this amount, 2,156.50 hours and $1,261,688 of fees were expended in the Seventh Application Period.  This
compares to $117,199, or 1.3%; $375,042, or 3.3%; $554,644, or 5.5%; $492,762, or 3.8%; $543,556, or 4.3%;
and $984,907, or 6.4%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth,
and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Jason P. Ketchens | | | | $565 | 61.80 | $34,918 |
| Nathan L. Stuart | | | | $448 | 74.10 | $33,204 |
| Albert L. Hogan III | $775 | 4.20 | $3,255 | $633 | 48.30 | $30,597 |
| Eric L. Cochran | | | | $798 | 35.70 | $28,492 |
| Thomas J. Matz | $665 | 5.50 | $3,659 | $588 | 34.60 | $20,359 |
| Melissa T. Kahn | $540 | 27.30 | $14,742 | $515 | 33.80 | $17,407 |
| James E. Fitzgerald | | | | $535 | 29.80 | $15,943 |
| Mike Murphy | $363 | 43.80 | $15,894 | $363 | 43.80 | $15,894 |
| Matthew Gartner | $420 | 35.90 | $15,078 | $420 | 35.90 | $15,078 |
| Sarah J. Platt | $420 | 20.20 | $8,484 | $389 | 38.50 | $14,982 |
| M. Janine Jjingo | | | | $331 | 42.50 | $14,054 |
| Lee P. Garner | $710 | 18.80 | $13,348 | $710 | 18.80 | $13,348 |
| Jenelle M. Todryk | | | | $535 | 23.60 | $12,626 |
| Karen M. Suber | $420 | 29.30 | $12,306 | $420 | 29.30 | $12,306 |
| Paul L. Cazers | $460 | 26.60 | $12,236 | $460 | 26.60 | $12,236 |
| Kurt Ramlo | | | | $565 | 20.90 | $11,815 |
| Christian Pilkington | | | | $585 | 19.70 | $11,525 |
| Jonathan B. Ko | | | | $595 | 19.30 | $11,484 |
| Ian S. Bolton | $460 | 21.10 | $9,706 | $452 | 23.70 | $10,720 |
| Ivana Vujic | | | | $535 | 19.80 | $10,593 |
| Laverne F. Hill | $460 | 22.20 | $10,212 | $460 | 22.20 | $10,212 |
| Sina Toussi | | | | $540 | 16.50 | $8,910 |
| George N. Panagakis | $870 | 2.80 | $2,436 | $827 | 10.10 | $8,349 |
| Lisa B. Diaz | | | | $295 | 22.60 | $6,668 |
| Haim Zaltzman | | | | $305 | 21.60 | $6,597 |
| Marian P. Wexler | | | | $770 | 6.80 | $5,236 |
| Michelle Gasaway | | | | $625 | 8.10 | $5,063 |
| Dionysios V. Tsiros | | | | $295 | 15.80 | $4,661 |
| Kathy Zambrano | | | | $410 | 10.60 | $4,346 |
| Brandon M. Duncomb | $375 | 10.50 | $3,938 | $375 | 10.50 | $3,938 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Ronald D. Kohut | | | | $470 | 8.30 | $3,901 |
| John M. McLeod | | | | $585 | 6.10 | $3,569 |
| Gregory O. Ogunsanya | | | | $440 | 7.50 | $3,300 |
| Kenneth Berlin | $895 | 1.30 | $1,164 | $813 | 3.80 | $3,089 |
| Dolores De Elizalde | | | | $440 | 5.20 | $2,288 |
| J.R. Lederer | | | | $315 | 5.90 | $1,859 |
| Andrew F. Strobert | | | | $625 | 2.90 | $1,813 |
| Adam F. Halper | | | | $390 | 4.10 | $1,599 |
| John Guzzardo | $495 | 3.00 | $1,485 | $495 | 3.00 | $1,485 |
| John P. Furfaro | | | | $810 | 1.60 | $1,296 |
| Matthew J. Micheli | | | | $440 | 2.70 | $1,188 |
| Peter Olasky | | | | $375 | 2.90 | $1,088 |
| Paraprofessional Total | | 46.80 | $9,792 | | 240.00 | $48,376 |
| **Total** | | **2,156.50** | **$1,261,688** | | **7,829.00** | **$4,329,798 (4.8%)** |
| **Voluntary fee accommodation excluded from total** | | | **$76,852** | | | **$237,405** |

G.    Disclosure Statement / Voting Issues

123.    In connection with the development and preparation of the September 2007 Plan, Skadden devoted substantial time to the preparation of the September 2007 Disclosure Statement, which was filed together with the September 2007 Plan. During the Final Application Period, Skadden consulted with the Debtors to gather and review the information necessary to ensure that the September 2007 Disclosure Statement would include all factual and legal content necessary to satisfy the "adequate information" requirement of section 1125 of the Bankruptcy Code. Skadden attorneys were required to review, analyze, research, and prepare adequate disclosures of numerous subjects, including (a) the Debtors' corporate structure and business operations, including historical company information and its prospective business plan, (b) the

prepetition capital structure of the Debtors, (c) objectives achieved in the Debtors' transformation plan, (d) developments in the chapter 11 cases, (e) tax issues, (e) classification issues, (f) securities issues, and (g) notice issues, among others.

124.    Skadden drafted narrative to reflect significant accomplishments of the Reorganization Cases, including settlements with Delphi's Unions and GM and the terms of the Delphi-Appaloosa EPCA.  Moreover, Skadden continuously updated the September 2007 Disclosure Statement to incorporate current events and to accurately reflect revisions to the proposed Plan as a result of negotiated changes.  Skadden worked closely with the Debtors' other retained professionals to incorporate their comments into the September 2007 Disclosure Statement.  Furthermore, Skadden circulated drafts of the September 2007 Disclosure Statement to key stakeholders and conferred with those parties regarding their comments, which Skadden then reviewed and incorporated, as appropriate, into the documents.

125.    In addition, the Debtors, with the assistance of Skadden professionals and the Debtors' balloting agents, developed and reviewed solicitation procedures to form the basis for soliciting votes on the plan of reorganization and addressing various balloting and tabulation issues.  In that regard, Skadden drafted plan solicitation materials including ballots and notices.  On September 6, 2007, with Skadden's assistance, the Debtors filed their motion to approve the September 2007 Disclosure Statement and for approval of the proposed solicitation procedures.  The proposed solicitation documents were attached to this motion.

126.    Following the filing of the September 2007 Disclosure Statement and September 2007 Plan, Skadden professionals continued to confer with key stakeholders regarding the information included in the September 2007 Disclosure Statement and the form in which that information was presented and to refine the September 2007 Disclosure Statement, adjusting the

73

disclosure where necessary to incorporate the most relevant and recent information on the topics covered therein. As discussed above, on October 29, November 14, and November 16, 2007, the Debtors filed notices of potential amendments to the September 2007 Disclosure Statement, and to resolve certain stakeholders' objections, the Debtors submitted certain proposed changes to the Disclosure Statement together with their omnibus reply to objections filed on December 5, 2007.

127.    In addition, in the weeks leading up to contested hearing to approve the Disclosure Statement, the Debtors considered and made several changes to the proposed procedures for soliciting votes on the plan and the notices to be provided to various parties in interest in connection with the solicitation mailing. Following a contested hearing held on December 6, 2007, the Court entered orders on December 10, 2007 approving the adequacy of the Disclosure Statement and authorizing the Debtors to solicit votes on their plan of reorganization. On that same date, the Debtors filed their First Amended Disclosure Statement (Docket No. 11388) and the First Amended Plan of Reorganization (Docket No. 11386).

128.    After this Court approved the Disclosure Statement, Skadden professionals worked closely with the Debtors' voting and balloting agents to finalize the ballots and notices and to commence solicitation of votes on the December 2007 Plan. This involved the preparation of 19 different forms of ballots (including master and beneficial owner ballots for six different groups of noteholders as well as holders of common stock) and the translation and dissemination of certain notices into 13 different languages. In addition, specialized notices were prepared for members of each of the Unions. Moreover, the order approving the Disclosure Statement approved, among other things, specialized notices to be sent to holders of reclamation claims, postpetition interest election notices, and cure amount notices and Skadden assisted the Debtors in drafting these notices and overseeing the solicitation process. Ultimately, more than 450,000 solicitation

74

packages were mailed to holders of claims and interests and, in addition, another 376,000 informational notices were distributed. During the solicitation process, Skadden assisted the Debtors and the Debtors' voting agents in addressing inquires from parties-in-interest, establishing a "hotline" for parties to call with questions, and reviewing and disseminating interim balloting reports. Skadden then assisted the Debtors in drafting declarations of the voting agents which served, in part, as the basis for this Court's approval of the Confirmed Plan.

129.    In connection with the foregoing services, Skadden expended 6,053.40 hours during the Final Application Period for which Skadden seeks compensation of $3,259,595, or 3.6% of the total compensation sought in this Final Application.[32]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-7.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Nathan L. Stuart | $575 | 450.60 | $259,096 | $533 | 947.70 | $505,162 |
| Kellan Grant | $540 | 372.70 | $201,258 | $503 | 799.30 | $401,760 |
| Kurt Ramlo | $665 | 288.20 | $191,655 | $649 | 488.60 | $316,906 |
| Matthew Gartner | $420 | 548.60 | $230,412 | $401 | 775.70 | $311,033 |
| Allison V. Herriott | $495 | 276.00 | $136,621 | $464 | 576.80 | $267,470 |
| George N. Panagakis | $870 | 95.90 | $83,433 | $833 | 247.40 | $206,148 |
| Ron E. Meisler | $710 | 200.50 | $142,355 | $684 | 298.20 | $203,906 |
| Kayalyn A. Marafioti | $895 | 97.80 | $87,533 | $864 | 189.20 | $163,395 |
| Rena M. Samole | $625 | 224.20 | $140,126 | $622 | 234.60 | $146,002 |

---

[32]    Of this amount, 3,550.10 hours and $1,956,450 of fees were expended in the Seventh Application Period. This compares to $62,694, or 0.5%; $165,839, or 1.3%; and $1,074,612, or 7.0%, of the total fees requested for this matter in Skadden's Fourth, Fifth, and Sixth Interim Fee Applications, respectively. Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee Applications.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $950 | 105.50 | $100,225 | $928 | 150.40 | $139,514 |
| Mike Murphy | $368 | 187.90 | $69,218 | $368 | 187.90 | $69,218 |
| Thomas J. Matz | $665 | 59.30 | $39,435 | $650 | 94.30 | $61,311 |
| Sarah J. Platt | $420 | 76.10 | $31,962 | $393 | 131.20 | $51,523 |
| Adlai S. Hardin | $625 | 49.20 | $30,750 | $613 | 71.10 | $43,562 |
| Albert L. Hogan III | $775 | 20.50 | $15,888 | $733 | 42.80 | $31,387 |
| Young M. Park | $625 | 40.90 | $25,563 | $614 | 49.60 | $30,479 |
| Michael W. Perl | $495 | 9.20 | $4,554 | $443 | 68.40 | $30,307 |
| Denise Kaloudis | $575 | 39.40 | $22,655 | $564 | 46.00 | $25,922 |
| Amy Van Gelder | $540 | 40.40 | $21,816 | $540 | 40.40 | $21,816 |
| Paul L. Cazers | $460 | 44.70 | $20,562 | $460 | 44.70 | $20,562 |
| Eric J. Howe | $460 | 17.30 | $7,958 | $427 | 32.80 | $14,003 |
| Ronald D. Kohut | $540 | 18.90 | $10,206 | $520 | 26.60 | $13,825 |
| Lee P. Garner | $710 | 10.00 | $7,100 | $667 | 20.40 | $13,600 |
| Ian S. Bolton | | | | $390 | 31.60 | $12,324 |
| Joseph N. Wharton | $625 | 4.20 | $2,625 | $577 | 20.50 | $11,835 |
| John P. Furfaro | $870 | 2.70 | $2,349 | $822 | 13.40 | $11,016 |
| Brent M. Houston | | | | $435 | 25.00 | $10,875 |
| Neil MacDonald | | | | $595 | 16.10 | $9,580 |
| Nick D. Campanario | $610 | 5.20 | $3,172 | $558 | 16.90 | $9,432 |
| Dolores De Elizalde | | | | $495 | 14.00 | $6,930 |
| Adam F. Halper | $460 | 9.90 | $4,554 | $434 | 15.90 | $6,894 |
| Aaron S. Feinberg | $610 | 10.70 | $6,527 | $610 | 10.70 | $6,527 |
| John Guzzardo | | | | $435 | 13.50 | $5,873 |
| Brian M. Fern | $625 | 2.60 | $1,625 | $582 | 9.40 | $5,468 |
| Karen M. Suber | | | | $355 | 13.00 | $4,615 |
| Laverne F. Hill | | | | $390 | 11.80 | $4,602 |
| Eric L. Cochran | $920 | 4.60 | $4,232 | $920 | 4.60 | $4,232 |
| Daniel I. Ganitsky | $625 | 2.10 | $1,313 | $604 | 4.40 | $2,659 |
| Brandon M. Duncomb | $340 | 6.80 | $2,312 | $340 | 6.80 | $2,312 |
| J.R. Lederer | | | | $315 | 3.50 | $1,103 |
| Paraprofessional Totals | | 227.50 | $47,360 | | 258.20 | $54,507 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| **Total** | | **3,550.10** | **$1,956,450** | | **6,053.40** | **$3,259,595 (3.6%)** |
| **Voluntary fee accommodation excluded from total** | | | **$58,542** | | | **$132,735** |

H.    Creditor Meetings/Statutory Committees

130.    Throughout the Final Application Period, Skadden regularly communicated with the Creditors' Committee and the Equity Committee and their respective advisors regarding the progress and status of the Reorganization Cases.  In addition to day-to-day communications, throughout the course of the Final Application Period, Skadden represented the Debtors at 29 formal meetings of the Creditors' Committee and its advisors and 21 formal meetings of the Equity Committee and its advisors, including three joint meetings during the Seventh Application Period. The formal monthly meetings provided a forum for the Statutory Committees to address general and specific concerns.  These meetings allowed the Debtors to keep the Statutory Committee members and professionals informed as to upcoming issues, such as motions to be heard at the monthly omnibus hearings, the status of the Debtors' transformation plan, development and negotiations concerning the plan of reorganization, and actions to be undertaken in furtherance of the transformation and reorganization plans.  The Debtors believe that by communicating and consulting with the Statutory Committees in advance of filings and anticipated transactions, these efforts likely eliminated potential objections that the Statutory Committees might have filed to some of the relief sought, thus avoiding unnecessary litigation expenses.  Skadden assisted the Debtors in preparing for these meetings, including assisting with the provision of information and status reports.

131.    During the Final Application Period, Skadden devoted resources to motions filed relating to the formation and membership of statutory committees.  For example, in the early part of the Final Application Period, the U.S. Trustee received a number of requests by various parties seeking appointment to the Creditors' Committee.  Skadden worked closely with the Debtors to evaluate these requests and respond to the U.S. Trustee's inquiries regarding the Debtors' position.  One of these requests, that of Law Debenture Trust Company of New York ("Law Debenture"), resulted in litigation.  Skadden worked with the Debtors to evaluate Law Debenture's motion to intervene and request appointment to the Creditors' Committee, drafted and filed an objection to the motion, and appeared at the hearing on the motion.  After the Court denied its motion, Law Debenture filed a motion for leave to appeal pursuant to 28 U.S.C. §§ 158(a)(3) and 1292(b) and the collateral order doctrine (Docket No. 2429).  On March 1, 2006, the Debtors, with the assistance of Skadden, filed a response opposing this motion and subsequently, on April 13, 2006, Skadden represented the Debtors on this matter in a status conference before the District Court for the Southern District of New York.  On July 5, 2006, the District Court denied Law Debenture's motion for leave to appeal.[33]

132.    Skadden also worked closely with the Debtors to respond to requests to form additional committees in these cases, including a retiree committee and an equity committee. The Debtors evaluated the request of Appaloosa for the establishment of an equity committee. When the Debtors determined not to support Appaloosa's request, Skadden drafted and submitted a letter to the U.S. Trustee communicating the Debtors' opposition.  Immediately following this correspondence, and prior to a response from the U.S. Trustee, Appaloosa filed a motion

---

[33]    On February 17, 2006, GM also filed a motion seeking appointment to the Creditors' Committee (Docket No. 2443).  Skadden worked closely with the Debtors to evaluate this request and communicate their views on it to the appropriate parties, including filing a statement in response on March 2, 2006 (Docket No. 2642).  Ultimately, in the face of several objections from the U.S. Trustee, the Creditors' Committee, and others, GM withdrew its motion on March 8, 2006 (Docket No. 2746).

requesting that the Court direct the U.S. Trustee to appoint an equity committee and served an

extensive discovery request on the Debtors.  Skadden spent considerable time participating in

multiple "meet and confers" with Appaloosa and assisting the Debtors with assembling and

reviewing thousands of pages of materials in response to Appaloosa's various discovery requests.

133.    Ultimately, Skadden represented the Debtors in opposing Appaloosa's

motion (Docket No. 1604).  Skadden spent substantial time assisting the Debtors in preparing for

this litigation.  Skadden responded to substantial discovery requests from Appaloosa, including

gathering responsive documents and reviewing the documents for relevance, privilege, and

confidentiality, prepared declarations in support of the Debtors' opposition, prepared and defended

witnesses for three depositions, responded to motions to quash and motions to compel, and

prepared and reviewed expert reports.  The Debtors reviewed and produced 17,244 pages of

documents in connection with the discovery process.  In addition, the Debtors, with Skadden's

assistance, issued discovery requests upon Appaloosa, pursuant to which Skadden received and

reviewed over 3,500 pages of documents.  Skadden also deposed three expert witnesses offered by

Appaloosa.  The Debtors, with Skadden's assistance, prepared exhibits for trial and negotiated the

entry of exhibits with the other parties involved in the litigation.  This Court conducted a two-day

evidentiary hearing on this matter on March 21 and 22, 2006, following which the Court granted

the motion on a limited basis to appoint the Equity Committee.  On March 30, 2006, however, this

Court issued an order directing the appointment of an Equity Committee with a substantially more

limited role than that of the Creditors' Committee or that sought by Appaloosa.  On April 30, 2006,

the U.S. Trustee appointed the Equity Committee.

134.    During the Final Application Period, Skadden responded to informal

information requests by the Creditors' Committee professionals, pursuant to which the Debtors

79

provided additional information about the exercise of the authority granted under first-day orders,

their financial situation, and background on various motions contemplated by the Debtors.

Moreover, with Skadden's assistance, the Debtors, Creditors' Committee, and Equity Committee

negotiated an information sharing protocol designed, among other things, to protect privilege,

which was presented to this Court for its approval.  These efforts by the Debtors and Skadden

fostered a productive working relationship between the Debtors and the Statutory Committees.

      135.    The Debtors also received requests for document production by various ad

hoc committees during the Final Application Period.  In particular,  Skadden assisted the Debtors

in reviewing and analyzing such requests and negotiating non-disclosure agreements, as

applicable, to protect the confidentiality of certain requested documents.

      136.    In connection with the foregoing services, Skadden expended 6,011.30

hours during the Final Application Period for which Skadden seeks compensation of $3,018,877,

or 3.3% of the total compensation sought in this Final Application.[34]  Detailed time entries of each

Skadden professional related to these services performed during the Seventh Application Period

are attached hereto as <u>Exhibit D-8</u>.  A summary of the hours expended and the corresponding

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $950 | 15.40 | $14,630 | $849 | 454.30 | $385,505 |
| Allison V. Herriott | $495 | 71.90 | $35,592 | $402 | 751.20 | $302,028 |

---

[34]    Of this amount, 182.50 hours and $99,848 of fees were expended in the Seventh Application Period.  This compares to $415,954, or 4.5%; $1,527,032, or 13.5%; $341,135, or 3.4%; $215,231, or 1.7%; $258,775, or 2.1%; and $161,985, or 1.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Kayalyn A. Marafioti | $895 | 19.30 | $17,274 | $809 | 356.70 | $288,566 |
| Ron E. Meisler | $710 | 8.40 | $5,964 | $561 | 485.40 | $272,325 |
| Neil MacDonald | | | | $540 | 436.20 | $235,548 |
| Thomas J. Matz | $665 | 12.60 | $8,380 | $581 | 396.90 | $230,480 |
| Sina Toussi | | | | $540 | 349.50 | $188,730 |
| David E. Springer | | | | $755 | 240.80 | $181,805 |
| John Guzzardo | | | | $377 | 451.00 | $169,997 |
| Brian M. Fern | | | | $487 | 251.30 | $122,347 |
| Lisa B. Diaz | | | | $382 | 305.10 | $116,569 |
| Dhananjai Shivakumar | | | | $560 | 156.00 | $87,360 |
| Adlai S. Hardin | | | | $577 | 117.10 | $67,579 |
| Nathan L. Stuart | | | | $440 | 103.80 | $45,672 |
| Haim Zaltzman | | | | $333 | 123.30 | $41,086 |
| M. Janine Jjingo | | | | $318 | 83.40 | $26,535 |
| Randall G. Reese | | | | $465 | 49.40 | $22,973 |
| Venera E. Ziegler | | | | $510 | 35.40 | $18,054 |
| Sarah J. Platt | $420 | 17.10 | $7,182 | $381 | 43.50 | $16,555 |
| Eric L. Cochran | | | | $811 | 18.00 | $14,603 |
| Dolores De Elizalde | | | | $440 | 23.00 | $10,120 |
| Kathy Zambrano | | | | $410 | 22.70 | $9,307 |
| Karen M. Suber | $420 | 13.90 | $5,838 | $404 | 18.40 | $7,436 |
| Gregory O. Ogunsanya | | | | $440 | 16.00 | $7,040 |
| Michael W. Perl | | | | $407 | 17.20 | $6,992 |
| Kellan Grant | | | | $470 | 11.00 | $5,170 |
| George N. Panagakis | | | | $779 | 4.30 | $3,351 |
| Marian P. Wexler | | | | $770 | 3.80 | $2,926 |
| John K. Lyons | | | | $695 | 3.50 | $2,433 |
| Jamie Hur | | | | $375 | 4.40 | $1,650 |
| Joseph N. Wharton | | | | $485 | 2.50 | $1,213 |
| Peter Olasky | | | | $375 | 2.90 | $1,088 |

81

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Marie L. Gibson | | | | $540 | 2.00 | $1,080 |
| Paraprofessional Total | | 23.90 | $4,988 | | 671.30 | $124,754 |
| **Total** | | **182.50** | **$99,848** | | **6,011.30** | **$3,018,877 (3.3%)** |
| Voluntary fee accommodation excluded from total | | | **$15,465** | | | **$129,373** |

I.    Supplier Matters

137.    The Debtors' manufacturing operations depend upon the timely delivery of goods and services from thousands of separate suppliers that are party to more than 96,000 distinct supply agreements.  Management of the Debtors' supply chain issues were further complicated by the Debtors' reliance, consistent with normal automotive industry practice, on "just-in-time" inventory management systems and "sole source" supply methods.  As discussed in detail in motions filed early in these cases,[35] use of the just-in-time supply method means that the Debtors did not maintain a significant inventory of the components supplied by many of their suppliers.  Pursuant to the sole source supply method, the Debtors frequently purchased all their requirements for a particular part from one supplier which was required to meet demanding specifications imposed by both the Debtors and their OEM customers before they could be used in manufacturing the Debtors' products.

138.    The Debtors' use of just-in-time inventory management and sole source supply methods resulted in, among others, the following unique risks to the Debtors' businesses:

---

[35]    See, e.g., Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, dated October 13, 2005 (Docket No. 17);  Motion for Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 18, 2005 (Docket No. 1098).

(a) a failure by a supplier to timely ship goods could force the Debtors' manufacturing facilities

using those parts to shut down less than 24 hours after the missed shipment and the Debtors' OEM

customer's manufacturing facilities to shut down less than 48 hours after the missed shipment and

(b) the Debtors might be unable to re-source parts to another supplier in the short term because the

Debtors purchased sophisticated customized components, each of which require extensive and

time-consuming testing and validation, including contractual approvals from the Debtors'

customers.  The Debtors' post-filing supply chain management was further complicated by the fact

that many of the Debtors' suppliers were facing similar financial pressures to those faced by the

Debtors and were in a tenuous financial position as well.  The financial instability of some such

suppliers was significantly exacerbated by the Debtors' chapter 11 filings and the large prepetition

amounts owed to suppliers at the time of the Debtors' filings.

       139.    On December 12, 2005, this Court entered an order (Docket No. 1494) (the

"SAAP Order") granting the Debtors authority to assume agreements covering the supply of goods

that the Debtors determined were critical to their on-going business operations.  The Debtors

sought entry of the SAAP Order to develop and implement procedures to address effectively and

rapidly issues relating to expiring supply agreements and implementation of the relief granted by

the Court pursuant to the SAAP Order.  During the Final Application Period, Skadden assisted the

Debtors in implementing of the SAAP Order, and the Debtors have assumed numerous agreements

pursuant to the order.  This required the Debtors, with Skadden's assistance, to negotiate a

significant number of assumption agreements with multiple suppliers.  Skadden also spent time

negotiating with suppliers regarding the extension or replacement of expiring supply agreements,

including pursuant to the procedures approved by the Court in the SAAP Order.

140.    In addition, during the Final Application Period, the Debtors also worked with suppliers to consensually resolve the disputes asserted in those motions, including requests for relief from the automatic stay, and motions to compel assumption or rejection of executory contracts.  Skadden also assisted the Debtors in obtaining this Court's authority to reject certain license and supply agreements which freed Delphi Medical Systems Corporation from the burdensome financial commitments required under such agreements and allowed Delphi Medical Systems Corporation to use preferred alternative technology.  Skadden also assisted the Debtors in responding to a complaint filed in state court by one of its suppliers.  With Skadden's assistance, the Debtors successfully removed the case to federal court and negotiated a stay of the action.  The supplier then filed a motion in this Court for payment of an administrative expense claim with respect to the same allegations asserted in the complaint.  Skadden conducted discovery, prepared the matter for trial, and assisted the Debtors in their attempt to resolve the disputes through the use of a formal mediation process.  As a result of these efforts, the Debtors and the supplier engaged in formal mediation and negotiated a settlement agreement that was approved in accordance with the settlement procedures established by this Court.

141.    Finally, during the Seventh Application Period, Skadden assisted the Debtors in finalizing a settlement with a supplier and drafted pleadings to obtain court approval of the settlement.  In addition, during the Seventh Application Period, Automodular Corporation ("Automodular") moved to compel immediate assumption or rejection of its service contracts with the Debtors and also asserted an administrative expense claim for postpetition price increases under its contracts.  In successfully opposing Automodular's motion, the Debtors, with the assistance of Skadden, conducted expedited discovery and drafted an objection on the merits.

After a contested hearing on the motion, this Court agreed with the Debtors and denied substantially all of Automodular's requested relief.

142.    In connection with the foregoing services, Skadden expended 5,667.20 hours during the Final Application Period for which Skadden seeks compensation of $2,721,521, or 3.0% of the total compensation sought in this Final Application.[36]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-9.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John K. Lyons | $845 | 8.20 | $6,930 | $708 | 1,197.20 | $847,747 |
| Randall G. Reese | | | | $469 | 1,486.00 | $697,182 |
| Kurt Ramlo | | | | $624 | 271.30 | $169,415 |
| Ron E. Meisler | $710 | 13.20 | $9,372 | $573 | 151.00 | $86,539 |
| Brent M. Houston | | | | $435 | 193.60 | $84,217 |
| Allison V. Herriott | | | | $380 | 210.40 | $79,856 |
| Joseph N. Wharton | $625 | 10.40 | $6,500 | $571 | 105.00 | $59,951 |
| John (Jack) Wm Butler, Jr. | | | | $836 | 69.70 | $58,261 |
| Kellan Grant | | | | $456 | 119.70 | $54,555 |
| William M. Rohner | | | | $440 | 121.30 | $53,372 |
| Kayalyn A. Marafioti | $895 | 3.40 | $3,043 | $802 | 66.40 | $53,238 |
| Neil MacDonald | $640 | 78.70 | $50,368 | $640 | 78.70 | $50,368 |
| Matthew J. Micheli | | | | $440 | 109.60 | $48,224 |
| Thomas J. Matz | | | | $560 | 71.20 | $39,872 |

---

[36]    Of this amount, 251.50 hours and $121,150 of fees were expended in the Seventh Application Period.  This compares to $1,032,388, or 11.2%; $539,862, or 4.8%; $331,877, or 3.3%; $182,296, or 1.4%; $396,217, or 3.1%; and $117,731, or 0.8%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| David E. Springer | | | | $755 | 52.30 | $39,487 |
| Sina Toussi | | | | $540 | 63.20 | $34,128 |
| Nick D. Campanario | | | | $535 | 54.70 | $29,266 |
| Sarah J. Platt | $420 | 58.90 | $24,738 | $413 | 65.60 | $27,117 |
| Lisa B. Diaz | | | | $295 | 89.70 | $26,462 |
| Albert L. Hogan III | | | | $695 | 34.00 | $23,630 |
| Michael W. Perl | | | | $413 | 48.20 | $19,918 |
| Nathan L. Stuart | | | | $462 | 41.40 | $19,129 |
| Haim Zaltzman | | | | $312 | 37.50 | $11,703 |
| Brian M. Fern | $625 | 13.90 | $8,688 | $625 | 13.90 | $8,688 |
| Mike Murphy | $343 | 16.80 | $5,765 | $343 | 16.80 | $5,765 |
| Eric J. Howe | | | | $390 | 10.60 | $4,134 |
| N. Lynn Hiestand | | | | $835 | 3.70 | $3,090 |
| Dolores De Elizalde | | | | $440 | 5.90 | $2,596 |
| Chris L. Dickerson | | | | $540 | 3.20 | $1,728 |
| Lee P. Garner | $710 | 2.30 | $1,633 | $710 | 2.30 | $1,633 |
| John Guzzardo | | | | $435 | 2.50 | $1,088 |
| Paraprofessional Total | | 45.70 | $4,113 | | 870.60 | $79,162 |
| **Total** | | **251.50** | **$121,150** | | **5,667.20** | **$2,721,521 (3.0%)** |
| **Voluntary fee accommodation excluded from total** | | | **$14,333** | | | **$110,397** |

J.    Nonworking Travel Time

143.    Because of the extensive breadth of services that Skadden provided to the

Debtors in these Reorganization Cases, Skadden drew upon the experience and talent of a number

of professionals from its worldwide organization including offices located primarily in Chicago,

London, Los Angeles, New York, and Washington, D.C.  As this Court is aware, the Debtors were

headquartered in Troy, Michigan, members of the Statutory Committees were based in several

states across the United States, the Debtors' postpetition lenders were based in New York City,

Appaloosa is based in Chatham, New Jersey, and many of the Debtors' other primary

constituencies, including its largest U.S. union and GM, are based in Michigan.  As a consequence

of these disparate locations and the Debtors' expectation and determined need that certain Skadden

partners, counsel, associates, and paraprofessionals be on site in Michigan on a regular basis as

well as in other locations, including New York, for specific events, Skadden professionals were

frequently required to travel among these and other locations.  Among other things, Skadden

professionals traveled to (i) meet with the Board and senior management, creditor and equity

constituencies, and plan investors, (ii) attend Court hearings, and (iii)  participate in other meetings

and mediations.  Skadden's professionals who spend time traveling, but not otherwise working,

allocate their time to this billing category.

144.    In connection with the foregoing services, Skadden expended 8,798.40

hours during the Final Application Period for which Skadden seeks compensation of $2,654,031,

or 2.9% of the total compensation sought in this Final Application.[37]  This amount reflects an

approximate fifty-five percent (55%)[38] reduction from Skadden's guideline hourly rates.  Detailed

time entries of each Skadden professional related to these services performed during the Seventh

Application Period are attached hereto as Exhibit D-10.  A summary of the hours expended and the

corresponding dollar amount of the services performed by each professional during the Seventh

Application Period and the Final Application Period is provided in the following table:

---

[37]    Of this amount, 1,463.10 hours and $457,131 of fees were expended in the Seventh Application Period.  This
compares to $290,270, or 3.2%; $376,303, or 3.3%; $351,261, or 3.5%; $393,436, or 3.1%; $413,181, or 3.3%;
and $372,449, or 2.4%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth,
and Sixth Interim Fee Applications, respectively.

[38]    This reduction is comprised of the following:  the elimination of approximately 1,084.7 hours of billed time
during the Final Application Period as an additional accommodation to the Debtors, and thereafter, a fifty-percent
(50%) reduction to the guideline hourly rates.  The eliminated time charges primarily related to extended travel
time occasioned by weather and air traffic control delays.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $475 | 169.30 | $80,418 | $434 | 1,412.90 | $612,575 |
| John K. Lyons | $422 | 100.10 | $42,292 | $376 | 846.20 | $318,031 |
| Ron E. Meisler | $355 | 71.00 | $25,206 | $291 | 699.50 | $203,327 |
| Randall G. Reese | | | | $241 | 579.70 | $139,933 |
| Joseph N. Wharton | $313 | 75.30 | $23,532 | $276 | 470.20 | $129,809 |
| George N. Panagakis | $435 | 32.50 | $14,138 | $401 | 317.70 | $127,303 |
| Lisa B. Diaz | $230 | 103.50 | $23,805 | $197 | 546.00 | $107,608 |
| Albert L. Hogan III | $388 | 66.70 | $25,847 | $354 | 208.40 | $73,800 |
| Allison V. Herriott | $248 | 38.80 | $9,603 | $198 | 358.10 | $70,903 |
| Nathan L. Stuart | $288 | 59.40 | $17,078 | $251 | 244.60 | $61,280 |
| Nick D. Campanario | $305 | 75.10 | $22,906 | $268 | 204.00 | $54,595 |
| Neil MacDonald | $320 | 45.50 | $14,560 | $292 | 162.90 | $47,637 |
| Brian M. Fern | $312 | 25.80 | $8,062 | $267 | 160.60 | $42,929 |
| Dhananjai Shivakumar | | | | $282 | 151.00 | $42,622 |
| Michael W. Perl | $248 | 46.70 | $11,559 | $225 | 182.10 | $41,009 |
| Lee P. Garner | $355 | 58.90 | $20,911 | $326 | 110.30 | $35,937 |
| John Guzzardo | $248 | 68.60 | $16,979 | $219 | 152.20 | $33,296 |
| David E. Springer | | | | $378 | 76.80 | $28,992 |
| Kellan Grant | $270 | 50.00 | $13,500 | $253 | 112.00 | $28,321 |
| Ian S. Bolton | $230 | 13.60 | $3,128 | $198 | 139.70 | $27,721 |
| Eric J. Howe | $230 | 28.50 | $6,555 | $202 | 136.30 | $27,579 |
| Kurt Ramlo | $333 | 43.90 | $14,598 | $323 | 81.10 | $26,223 |
| Matthew J. Micheli | | | | $220 | 117.10 | $25,762 |
| Eric L. Cochran | | | | $404 | 63.40 | $25,630 |
| Christopher P. Connors | $312 | 26.50 | $8,281 | $299 | 76.80 | $22,994 |
| John P. Furfaro | | | | $385 | 52.70 | $20,292 |
| Kenneth Berlin | | | | $393 | 47.90 | $18,848 |
| N. Lynn Hiestand | | | | $436 | 42.80 | $18,647 |
| Marian P. Wexler | | | | $385 | 39.10 | $15,055 |
| Keith D. Krakaur | | | | $384 | 38.80 | $14,914 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Amy Van Gelder | $270 | 18.80 | $5,076 | $246 | 58.20 | $14,337 |
| Courtney E. VanLonkhuyzen | | | | $195 | 64.90 | $12,686 |
| Rena M. Samole | $313 | 34.10 | $10,657 | $309 | 39.40 | $12,155 |
| J.R. Lederer | | | | $178 | 68.20 | $12,106 |
| Neil M. Leff | | | | $415 | 27.30 | $11,330 |
| Matthew Gartner | $210 | 37.50 | $7,875 | $200 | 54.50 | $10,892 |
| Karen E. Willenken | | | | $274 | 38.30 | $10,476 |
| Sarah J. Platt | $210 | 33.40 | $7,014 | $200 | 48.50 | $9,695 |
| Michelle Gasaway | | | | $313 | 29.60 | $9,250 |
| Kayalyn A. Marafioti | | | | $398 | 21.00 | $8,348 |
| Laverne F. Hill | $230 | 10.70 | $2,461 | $207 | 30.40 | $6,303 |
| Young M. Park | $313 | 7.00 | $2,188 | $294 | 17.90 | $5,267 |
| Erica Schohn | | | | $235 | 20.70 | $4,865 |
| P. Gifford Carter | | | | $268 | 15.60 | $4,173 |
| Eric B. Sensenbrenner | | | | $298 | 13.40 | $3,993 |
| Erin C. Furman | | | | $293 | 13.20 | $3,861 |
| Jay S. Berke | | | | $378 | 9.70 | $3,662 |
| Kathy Zambrano | | | | $205 | 16.70 | $3,423 |
| Denise Kaloudis | $288 | 11.60 | $3,335 | $288 | 11.60 | $3,335 |
| Nick P. Saggese | | | | $438 | 7.40 | $3,238 |
| Christopher J. Gunther | | | | $330 | 9.20 | $3,036 |
| Thomas J. Matz | | | | $280 | 10.40 | $2,912 |
| Jason P. Ketchens | | | | $283 | 10.30 | $2,910 |
| Catherine E. Danz | | | | $232 | 12.50 | $2,906 |
| Patrick J. Nash, Jr. | | | | $255 | 10.50 | $2,678 |
| Melissa T. Kahn | | | | $205 | 12.00 | $2,461 |
| Peter A. Atkins | | | | $418 | 5.40 | $2,255 |
| Haim Zaltzman | | | | $168 | 12.80 | $2,145 |
| Sina Toussi | | | | $270 | 7.50 | $2,025 |
| Mike Murphy | $188 | 9.20 | $1,725 | $188 | 9.20 | $1,725 |

89

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Dolores De Elizalde | | | | $220 | 7.20 | $1,584 |
| Brandon M. Duncomb | $188 | 8.10 | $1,519 | $188 | 8.10 | $1,519 |
| Paraprofessional Total | | 93.00 | $12,323 | | 245.90 | $28,908 |
| Total | | 1,463.10 | $457,131 | | 8,798.40 | $2,654,031 (2.9%) |
| Voluntary fee accommodation excluded from total | | | $577,981 | | | $3,197,520 |

K.    Tax Matters

145.    A significant portion of Skadden's work on tax matters during the Final Application Period initially related to the drafting and negotiation of the interim and final trading orders that established certain restrictions on the trading of equity securities of Delphi and claims against the Debtors to preserve the Debtors' substantial tax attributes.  After entry of the final trading order, Skadden's work involved analyzing filings with the Court and the Securities and Exchange Commission ("SEC") by equity holders and claim holders to ensure compliance with the final trading order, as well as assisting Delphi in connection with its evaluation of its tax attributes and their preservation pursuant to the final trading order.  Skadden also assisted the Debtors in negotiating and filing a joint stipulation with the Court to address and resolve issues that arose from certain securities transactions that violated the final trading order.

146.    Skadden also assisted the Debtors in handling the various tax issues that arose as a result of the filing of the Reorganization Cases, including analysis regarding the application of the Bankruptcy Code and the Court's orders to federal, state, and local tax laws and employment tax issues.  Skadden also reviewed and provided advice with respect to tax provisions of the debtor-in-possession financing agreements.  Additionally, Skadden professionals worked closely with the Debtors to respond to various inquiries by taxing authorities concerning matters

90

relating to payments pursuant to the "first day" order authorizing payment of certain sales, use, and trust-fund taxes.

147.    On March 7, 2006, the PBGC filed liens in excess of $250 million (which amounts increased significantly over time) on non-U.S. affiliates of the Debtors pursuant to section 412(n) of the Internal Revenue Code because the Debtors did not to make the minimum funding payments for its defined pension plans.  Skadden assisted the Debtors by analyzing the PBGC's ability to file such liens and the likely effect of such filings.

148.    In connection with the development and negotiation of the Framework Agreements and to lay the ground work for a potential plan of reorganization and emergence from chapter 11, Skadden worked with the Debtors' tax department in analyzing the tax ramifications of various proposals of what later became the Framework Agreements.  Throughout the Final Application Period, Skadden devoted substantial time to analyzing certain complex tax ramifications in connection with the Framework Agreements and the Delphi-Appaloosa EPCA. For example, Skadden professionals researched the Debtors' ability to utilize certain potentially advantageous tax rules under section 382 of the Internal Revenue Code that could arise under the various scenarios proposed in the Framework Agreements and the Delphi-Appaloosa EPCA. These issues included, among other things, matters related to changes in control and potential limitations on the use of net operating losses and other tax assets after emerging from chapter 11.

149.    During 2007 and 2008, including the Seventh Application Period, Skadden analyzed the United States federal income tax consequences of the September 2007 Plan and December 2007 Plan to various classes of claim holders and prepared the tax disclosure contained in the September 2007 Disclosure Statement, the Disclosure Statement, and the Form S-1 filed in connection with the Rights Offering.  Skadden also assisted the Debtors in analyzing and

91

evaluating issues related to certain restructuring transactions and assisted in the preparation of an exhibit to the Confirmed Plan that described these transactions in detail. In addition, throughout the Final Application Period, Skadden assisted the Debtors in reviewing and analyzing various issues in connection with reconciling proofs of claim filed by various federal, state, and local taxing authorities.

150.    Finally, during the Seventh Application Period, in addition to providing assistance on tax matters in connection with the December 2007 Plan and Disclosure Statement, Skadden also assisted the Debtors with pursuing a Federal Insurance Contributions Act ("FICA") refund claim, by conducting legal research, drafting, and filing a complaint to recover the refund claim.[39] Skadden also assisted the Debtors in analyzing tax related issues in connection with preparation of the sale of the Debtors' steering and halfshaft business.

151.    In connection with the foregoing services, Skadden expended 4,310.70 hours during the Final Application Period for which Skadden seeks compensation of $2,593,308, or 2.9% of the total compensation sought in this Final Application.[40] Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-11. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[39]    In the complaint, three Debtor-plaintiffs, on behalf of themselves and their employees, sought a refund of $26,058,130.00 in overpayments of FICA and related interest. The taxes were imposed on bonuses paid to Union members upon ratification of collective bargaining agreements in 1999 and 2003.

[40]    Of this amount, 527.20 hours and $365,014 of fees were expended in the Seventh Application Period. This compares to $932,086, or 10.1%; $82,775, or 0.7%; $319,866, or 3.2%; $417,360, or 3.3%; $185,480, or 1.5%; and $290,727, or 1.9%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Eric B. Sensenbrenner | $695 | 93.90 | $65,261 | $594 | 915.50 | $544,067 |
| Cliff Gross | $920 | 102.10 | $93,932 | $813 | 613.90 | $499,370 |
| Aaron S. Feinberg | $610 | 203.20 | $123,952 | $541 | 751.90 | $406,661 |
| Daniel P. Phillips | | | | $541 | 653.20 | $353,498 |
| Kayalyn A. Marafioti | $895 | 8.60 | $7,698 | $810 | 154.10 | $124,779 |
| David A. Schneider | | | | $588 | 189.10 | $111,165 |
| Thomas J. Matz | | | | $563 | 140.50 | $79,122 |
| Jody J. Brewster | | | | $754 | 102.10 | $77,010 |
| Michael W. Perl | $495 | 19.60 | $9,702 | $416 | 149.20 | $62,089 |
| Kurt Ramlo | $665 | 42.70 | $28,396 | $643 | 76.00 | $48,865 |
| Paul Schockett | | | | $390 | 110.20 | $42,978 |
| Allen Stenger | | | | $444 | 65.30 | $29,023 |
| David E. Springer | | | | $755 | 38.30 | $28,917 |
| Ron E. Meisler | $710 | 19.20 | $13,632 | $658 | 39.20 | $25,782 |
| Denise Kaloudis | $575 | 34.20 | $19,666 | $555 | 45.50 | $25,260 |
| Adlai S. Hardin | $625 | 1.60 | $1,000 | $587 | 28.10 | $16,503 |
| Joseph N. Wharton | | | | $490 | 30.40 | $14,888 |
| Venera E. Ziegler | | | | $510 | 27.90 | $14,229 |
| Justin L. Heather | | | | $465 | 30.20 | $14,043 |
| Chris L. Dickerson | | | | $540 | 24.60 | $13,284 |
| Andre LeDuc | | | | $770 | 17.00 | $13,090 |
| Matthew Gartner | | | | $355 | 24.60 | $8,733 |
| Eric L. Cochran | | | | $795 | 10.70 | $8,507 |
| M. Janine Jjingo | | | | $335 | 20.50 | $6,868 |
| John (Jack) Wm Butler, Jr. | | | | $845 | 6.60 | $5,580 |
| John K. Lyons | $845 | 2.10 | $1,775 | $743 | 6.60 | $4,903 |
| Sina Toussi | | | | $540 | 7.50 | $4,050 |
| Melissa T. Kahn | | | | $470 | 3.80 | $1,786 |
| Brian M. Fern | | | | $485 | 2.60 | $1,261 |
| Neil M. Leff | | | | $785 | 1.50 | $1,178 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| J.R. Lederer | | | | $355 | 3.20 | $1,136 |
| Haim Zaltzman | | | | $295 | 3.70 | $1,092 |
| Allison V. Herriott | | | | $375 | 2.90 | $1,088 |
| Paraprofessional Totals | | | | | 14.30 | $2,503 |
| **Total** | | 527.20 | $365,014 | | 4,310.70 | **$2,593,308 (2.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | $25,220 | | | $159,664 |

## Matters Between $1,000,000 And $2,500,000

L.    Employee Matters (General)

152.    As of the Petition Dates, the Company employed approximately 180,000 employees worldwide, of whom 50,600 were employees in the United States at approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters. Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition Dates, and 96% of those were Union-represented.  Outside the United States, the Company's foreign entities employed more than 134,000 people on the Petition Dates, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

153.    As part of the Debtors' "first day" relief, this Court authorized the Debtors to pay certain prepetition human capital obligations and to continue the related human capital benefit programs in the ordinary course of business to protect the Debtors' employees.  Skadden worked closely with the Debtors to assist them in implementing this relief including responding to internal and external questions.

154.    The Debtors anticipated positioning the compensation programs of all of their employees at market-competitive levels.  Skadden, along with other advisors to the Debtors,

advised the Debtors in connection with the Debtors' reassessment of the employment proposition

that the Company could offer its executive workforce in light of current U.S. and marketplace

economic realities.  The result of this evaluation led to Skadden's drafting of a motion (the "KECP

Motion") to implement a key employee compensation program based on recommendations made

by the Debtors' outside compensation consultant as adopted by the Compensation Committee of

Delphi's Board of Directors.  The KECP Motion was objected to by 11 parties.  In response to the

parties' various pre-hearing discovery requests, Skadden reviewed and produced more than 5,000

pages of documents related to the KECP.  Skadden also produced the declarations of the Debtors'

supporting witnesses and defended them during depositions.  In addition, Skadden took the

depositions of witnesses from three objectors.

           155.    In addition to preparing for litigation over the KECP Motion, Skadden

worked closely with the Debtors during the course of negotiations with the Creditors' Committee

on the terms of the KECP.  Skadden drafted and negotiated with the Creditors' Committee detailed

and consensual safe harbor or prophylactic measures to escrow any performance-based awards in

the event that the Debtors asserted a claim (or the Creditors' Committee notified the Debtors that

they intended to obtain from the Court within a specified time period authority to file a complaint

against that participant).  Moreover, the agreed upon safe harbor provided that KECP payments

would be forfeited for those participants, if any, against whom it was determined, with respect to

conduct or transactions relating to the participant's employment or affiliation with the Debtors, that

he/she failed to act in good faith and in a manner the Debtors reasonably believed to be in or not

opposed to the best interests of the Debtors.  On February 10, 2006, the Bankruptcy Court

conducted an evidentiary hearing on the Debtors' request to restore a limited portion of the at-risk

compensation opportunities available to the Debtors' executives prepetition by implementing a

95

short-term annual incentive program ("AIP") for the first six months of 2006.  On February 17, 2006 the Court approved the AIP proposed by the Debtors (Docket No. 2441).

156.    At various points throughout the Final Application Period, Skadden assisted Debtors in filing three supplements to the KECP Motion seeking to set new AIP targets and to continue the AIP for the second half of 2006 (Docket No. 4419), the first half of 2007 (Docket No. 7200), and the second half of 2007 (Docket No. 9298).  In connection with those supplements, the Debtors, with Skadden's assistance, prepared supporting declarations and omnibus replies (Docket Nos. 4586, 7373, 9614) and prepared for and participated in contested hearings regarding the supplements.  The Debtors also engaged in discussions with the Creditors' Committee and its advisors, including its compensation consultant, concerning the proposed payout curves and other terms and conditions of the AIP for each six-month performance period and the Creditors' Committee's authority to make certain adjustments to the Debtors' financial performance for AIP purposes at the conclusion of each performance period.  The Court entered orders approving the supplements in July 2006 (Docket No. 4660), March 2007 (Docket No. 7474), and October 2007 (Docket No. 10428).

157.    Skadden also assisted the Debtors in their discussions with the Creditors' Committee on issues related to the at-risk emergence payment program.  Objections to an at-risk emergence performance payment program were filed by the six Unions representing hourly employees working in the domestic U.S. portion of Delphi's business operations.  Skadden devoted a significant amount of time serving discovery requests, deposing witnesses, and producing the declarations of the Debtors' supporting witnesses and defended them during deposition.

158.    In addition, as part of the Debtors' organizational restructuring, the fourth element of its transformation plan, in consultation with its consultant Booz Allen Hamilton Inc., the Debtors expected to reduce their global salaried workforce by as many as 8,500 employees as a result of portfolio and product realizations and initiatives adopted following an analysis of the Debtors' SG&A cost savings opportunities. On May 30, 2006, the Debtors, with Skadden's assistance, obtained Court approval to enter into two agreements with Booz Allen Hamilton Inc. to provide ongoing support for the Debtors' SG&A expenses and organizational transformation (Docket No. 3952).

159.    Finally, during the Seventh Application Period, Skadden advised the Debtors on various matters relating to executive compensation in connection with the December 2007 Plan. Skadden assisted the Debtors in drafting and negotiating various documents, including employment agreements and change in control agreements as well as a new supplemental executive retirement plan and salaried retirement equalization savings program. Skadden also assisted the Debtors in working with the plan investors to finalize these documents so that they could be filed as exhibits to the Disclosure Statement and December 2007 Plan. Given the nature of these executive compensation documents, Skadden also assisted the Debtors in drafting a Form 8-K to be filed with the SEC in connection with these matters.

160.    In connection with the foregoing services, Skadden expended 4,429.80 hours during the Final Application Period for which Skadden seeks compensation of $2,451,723, or 2.7% of the total compensation sought in this Final Application.[41]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period

---

[41]    Of this amount, 219.10 hours and $161,031 of fees were expended in the Seventh Application Period. This compares to $879,786, or 9.6%; $359,097, or 3.2%; $308,544, or 3.1%; $127,626, or 1.0%; $294,905, or 2.3%; and $340,268, or 2.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

are attached hereto as Exhibit D-12.  A summary of the hours expended and the corresponding

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Neil MacDonald | $640 | 10.20 | $6,528 | $555 | 661.40 | $366,899 |
| Nick D. Campanario | | | | $481 | 761.30 | $366,021 |
| Brian M. Fern | | | | $502 | 719.30 | $360,736 |
| David E. Springer | | | | $755 | 300.50 | $226,879 |
| John (Jack) Wm Butler, Jr. | $950 | 16.20 | $15,390 | $857 | 255.80 | $219,226 |
| Neil M. Leff | $895 | 68.20 | $61,040 | $844 | 254.40 | $214,596 |
| Young M. Park | $625 | 96.50 | $60,314 | $585 | 282.60 | $165,461 |
| Albert L. Hogan III | $775 | 3.60 | $2,790 | $656 | 191.20 | $125,463 |
| John Guzzardo | | | | $375 | 167.10 | $62,664 |
| Ron E. Meisler | $710 | 9.40 | $6,674 | $575 | 92.90 | $53,389 |
| Allison V. Herriott | | | | $375 | 116.70 | $43,764 |
| Kayalyn A. Marafioti | $895 | 1.80 | $1,611 | $811 | 43.30 | $35,105 |
| Thomas J. Matz | | | | $578 | 59.90 | $34,625 |
| Erica Schohn | | | | $470 | 59.80 | $28,106 |
| Kelly Smith-Haley | | | | $375 | 47.60 | $17,850 |
| Eric J. Howe | | | | $390 | 31.50 | $12,285 |
| Joshua A. Mullin | | | | $540 | 19.90 | $10,746 |
| John K. Lyons | $845 | 3.20 | $2,704 | $800 | 8.80 | $7,044 |
| Ronald D. Kohut | | | | $424 | 15.60 | $6,612 |
| Sina Toussi | | | | $540 | 11.80 | $6,372 |
| Rena M. Samole | | | | $565 | 10.50 | $5,933 |
| John P. Furfaro | | | | $810 | 4.70 | $3,807 |
| Nathan L. Stuart | | | | $440 | 7.10 | $3,124 |
| Matthew J. Micheli | | | | $440 | 6.60 | $2,904 |
| Haim Zaltzman | | | | $295 | 9.60 | $2,832 |
| Sarah S. Dale | $375 | 7.30 | $2,738 | $375 | 7.30 | $2,738 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Eric L. Cochran | | | | $821 | 2.70 | $2,217 |
| Dolores De Elizalde | | | | $440 | 4.30 | $1,892 |
| Kurt Ramlo | | | | $560 | 3.00 | $1,680 |
| Brent M. Houston | | | | $435 | 3.80 | $1,653 |
| Louis D. Wilson | | | | $510 | 2.90 | $1,479 |
| Joseph N. Wharton | | | | $565 | 2.50 | $1,413 |
| Adam F. Halper | $460 | 2.70 | $1,242 | $460 | 2.70 | $1,242 |
| Paraprofessional Totals | | | | | 260.70 | $54,966 |
| **Total** | | **219.10** | **$161,031** | | **4,429.80** | **$2,451,723 (2.7%)** |
| **Voluntary fee accommodation excluded from total** | | | **$23,920** | | | **$169,119** |

M.    Rights Offering

161.    In contemplation of a rights offering in connection with the September 2007 Plan and December 2007 Plan, the Debtors, with Skadden's assistance, devoted time to the discussion and negotiation of revisions to the rights offering contemplated by the Delphi-Appaloosa EPCA with the New Plan Investors and the Statutory Committees.  Skadden professionals also assisted the Debtors with respect to ongoing diligence in connection with the registration statement and dedicated time to drafting the registration statement to reflect the agreed upon revisions to the rights offerings contemplated thereby and researching certain related issues, including tax and securities law issues.

162.    Skadden continued to assist the Debtors with the rights offering during the Seventh Application Period.  In connection with the securities offered by the Debtors pursuant to the rights offering and warrants issued under the September 2007 Plan and December 2007 Plan, Skadden prepared the necessary documentation, including the registration statement, a registration rights agreement, prospectuses, and other related documents.  These documents were the product

99

of extensive discussions between the Debtors, the New Plan Investors, the SEC, and other key stakeholders.

163.    To implement the distribution of discount rights to claimants with claims that had not yet been allowed, including contingent, unliquidated, disputed, or unreconciled claims, Skadden also prepared and filed a motion on December 28, 2007 (Docket No. 11606) (the "Rights Offering Estimation Motion") to temporarily allow such claims, in an amount estimated by the Debtors for the sole purpose of participation in the rights offering.  After sending out approximately 1,700 individualized notices reflecting the provisionally allowed amounts of the claims, the Debtors received 35 objections to the Rights Offering Estimation Motion.  The Debtors worked diligently to resolve the objections, and only three objections remained contested at the hearing held January 22, 2008.  The Court granted the Rights Offering Estimation Motion by entry of its order entered January 24, 2008 (Docket No. 12334) thereby overruling the outstanding objections.

164.    In connection with the foregoing services, Skadden expended 3,931.30 hours during the Final Application Period for which Skadden seeks compensation of $2,336,402, or 2.6% of the total compensation sought in this Final Application.[42]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as <u>Exhibit D-13</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[42]    Of this amount, 1,943.20 hours and $1,120,975 of fees were expended in the Seventh Application Period.  This compares to $444,341, or 3.5%; $661,516, or 5.3%; and $127,644, or 0.8%, of the total fees requested for this matter in Skadden's Fourth, Fifth, and Sixth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee Applications.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Michelle Gasaway | $695 | 360.90 | $250,827 | $658 | 776.50 | $510,580 |
| Nick P. Saggese | $950 | 86.20 | $81,890 | $903 | 231.20 | $208,767 |
| Erin C. Furman | | | | $585 | 279.70 | $163,625 |
| Nathan L. Stuart | $575 | 75.90 | $43,644 | $514 | 313.60 | $161,307 |
| Kellan Grant | $540 | 225.60 | $121,824 | $538 | 231.50 | $124,597 |
| Christopher J. Bouchard | $540 | 226.10 | $122,094 | $540 | 226.10 | $122,094 |
| Ryan M. Newburn | $377 | 319.10 | $120,142 | $377 | 319.10 | $120,142 |
| Gregg A. Noel | $920 | 72.10 | $66,332 | $889 | 123.40 | $109,683 |
| George N. Panagakis | $870 | 41.80 | $36,366 | $838 | 89.90 | $75,327 |
| Kayalyn A. Marafioti | $895 | 12.30 | $11,009 | $839 | 86.60 | $72,678 |
| Adam F. Halper | $460 | 54.30 | $24,978 | $415 | 153.80 | $63,783 |
| Joseph N. Wharton | $625 | 92.20 | $57,625 | $625 | 92.20 | $57,625 |
| Eric L. Cochran | $920 | 1.90 | $1,748 | $847 | 67.50 | $57,181 |
| Daniel I. Ganitsky | $625 | 15.00 | $9,376 | $591 | 93.20 | $55,124 |
| Adlai S. Hardin | | | | $585 | 91.30 | $53,411 |
| Eric B. Sensenbrenner | | | | $625 | 60.30 | $37,688 |
| Thomas J. Matz | | | | $625 | 49.50 | $30,938 |
| Paul Schockett | | | | $390 | 75.80 | $29,562 |
| Ron E. Meisler | $710 | 30.90 | $21,939 | $679 | 41.70 | $28,329 |
| Renee C. Delphin-Rodriguez | $420 | 66.70 | $28,014 | $420 | 66.70 | $28,014 |
| John (Jack) Wm Butler, Jr. | $950 | 3.60 | $3,420 | $884 | 30.60 | $27,046 |
| Amy J. Goetz | | | | $355 | 66.10 | $23,466 |
| Brandon M. Duncomb | $375 | 62.10 | $23,288 | $375 | 62.10 | $23,288 |
| Aaron S. Feinberg | $610 | 29.30 | $17,873 | $594 | 37.50 | $22,260 |
| Micah G. Katz | | | | $390 | 51.40 | $20,046 |
| John K. Lyons | $845 | 13.20 | $11,154 | $845 | 13.20 | $11,154 |
| Young M. Park | 625 | 17.70 | $11,063 | $625 | 17.70 | $11,063 |
| Marie L. Gibson | | | | $670 | 16.30 | $10,921 |
| Sarah S. Dale | $375 | 26.30 | $9,863 | $375 | 26.3 | $9,863 |
| Cliff Gross | | | | $830 | 10.00 | $8,300 |

101

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Ronald D. Kohut | $540 | 12.70 | $6,858 | $540 | 12.70 | $6,858 |
| Eric J. Howe | $460 | 14.60 | $6,716 | $460 | 14.60 | $6,716 |
| Mike Murphy | 375 | 13.60 | $5,100 | $375 | 13.60 | $5,100 |
| Neil M. Leff | $895 | 5.10 | $4,565 | $895 | 5.10 | $4,565 |
| Lisa B. Diaz | $460 | 7.50 | $3,450 | $460 | 7.50 | $3,450 |
| John P. Furfaro | | | | $810 | 3.90 | $3,159 |
| Nick D. Campanario | | | | $535 | 5.90 | $3,157 |
| Sarah J. Platt | $420 | 7.30 | $3,066 | $420 | 7.30 | $3,066 |
| Tero Louko | $635 | 1.70 | $1,080 | $605 | 4.20 | $2,543 |
| Louis D. Wilson | | | | $585 | 3.70 | $2,165 |
| Kurt Ramlo | $665 | 2.60 | $1,730 | $665 | 2.60 | $1,730 |
| Albert L. Hogan III | $775 | 2.10 | $1,628 | $775 | 2.10 | $1,628 |
| Gregory O. Ogunsanya | | | | $495 | 2.20 | $1,089 |
| Ian S. Bolton | $460 | 2.30 | $1,058 | $460 | 2.30 | $1,058 |
| Melissa T. Kahn | $540 | 1.90 | $1,026 | $540 | 1.90 | $1,026 |
| Michael W. Perl | | | | $435 | 2.30 | $1,001 |
| Paraprofessional Totals | | 38.60 | $10,229 | | 38.60 | $10,229 |
| **Total** | | **1,943.20** | **$1,120,975** | | **3,931.30** | **$2,336,402 (2.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$110,337** | | | **$192,258** |

N.    Retention/Fee Matters/Objections (Others)

165.    Reorganization cases as large and complex as these require the coordinated efforts of a number of restructuring advisors and professionals.  To this end, during the Final Application Period, Skadden assisted the Debtors in preparing retention and supplemental retention applications for other professional firms, which applications the Debtors filed during the Final Application Period.  Furthermore, Skadden advised the Debtors regarding the retention, pursuant to the Ordinary Course Professionals Order (Docket No. 883), of more than 100 ordinary

102

course professionals who provided the Debtors with a host of non-restructuring legal, accounting, and other professional services.  Because the Ordinary Course Professional Order required any ordinary course professional to file an affidavit prior to being retained and compensated by the Debtors, Skadden assisted the Debtors in tracking which professionals had filed such affidavits and when the expiration of the individual objection periods had occurred,[43] permitting the Debtors then to pay such ordinary course professionals.

166.    During the Final Application Period, Skadden assisted the Debtors in connection with retention applications for, among others, Deloitte & Touche LLP as auditors and accountants for fiscal year 2005; DLA Piper LLP as an advisor to and representative of an affiliate Debtor; Downer & Company LLC as financial advisor and investment banker with regard to the divestiture and other strategic alternatives; Dykema Gossett PLC as special counsel; Ernst & Young LLP as Sarbanes-Oxley, valuation, and tax services providers; FTI Consulting, Inc. as restructuring and financial advisors; Groom Law Group Chartered as special employee benefits counsel; Jones Lang LaSalle Americas, Inc. as real estate transaction and services providers; KCC as claims, noticing, and balloting agent; KeyBanc Capital Markets Inc. as financial advisor and investment banker with regard to the divestiture and other strategic alternatives relating to the Debtors' bearings business; Mayer, Brown, Rowe and Maw as special counsel; PricewaterhouseCoopers LLP as a provider of certain services in connection with Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services to the Debtors; O'Melveny & Myers, LLP as special labor counsel; Rothschild Inc. as financial advisors and investment bankers; Shearman & Sterling LLP ("Shearman") as special counsel; Togut, Segal & Segal LLP ("Togut") as conflicts counsel; Wilmer, Cutler, Pickering, Hale & Dorr LLP as special

---

[43]    The Ordinary Course Professional Order provided a 10-day objection period for certain parties-in-interest to object to the retention of an ordinary course professional.

regulatory counsel; and W.Y. Campbell & Company as a provider of services in connection with the formulation, analysis; negotiation, and implementation of the divestiture or other strategic alternatives relating to certain of the Debtors' non-core business lines.

167.    The Interim Compensation Order that was entered at the outset of the Final Application Period required the formation of the Fee Review Committee.  Accordingly, Skadden assisted the Debtors and worked together with the U.S. Trustee and the Creditors' Committee to reach a consensus regarding the formation of a Fee Review Committee and to develop the Fee Review Protocol, which was later approved by this Court.  To facilitate and centralize the review by the Fee Review Committee of the six interim applications that were filed by various professionals throughout the Final Application Period, Skadden, at the Fee Review Committee's request and direction, coordinated with various professionals and arranged in-person or telephonic meetings with the Fee Review Committee to review, and as necessary to negotiate, certain additional fee accommodations.  Skadden also drafted and filed notices of hearing for all the professionals' fee applications and provided relevant information to the Court, as requested. Skadden also assisted the Debtors and the various professionals in preparing for the hearings to consider approval of the interim fee applications for the first six interim fee periods.  In conjunction with those hearings and at the direction of this Court, Skadden drafted proposed orders approving all interim fee applications (in the amounts recommended by the Fee Review Committee).

168.    In connection with the foregoing services, Skadden expended 5,172.00 hours during the Final Application Period for which Skadden seeks compensation of $2,083,479, or 2.3% of the total compensation sought in this Final Application.[44]  Detailed time entries of each

---

[44]    Of this amount, 448.70 hours and $173,084 of fees were expended in the Seventh Application Period.  This compares to  $377,176, or 4.1%; $431,545, or 3.8%; $241,482, or 2.4%; $384,393, or 3.0%; $280,261, or 2.2%;

Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-14.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Dolores De Elizalde | | | | $465 | 984.30 | $457,541 |
| Thomas J. Matz | $665 | 63.50 | $42,229 | $601 | 606.60 | $364,387 |
| M. Janine Jjingo | | | | $362 | 868.10 | $314,195 |
| Venera E. Ziegler | | | | $510 | 293.30 | $149,583 |
| Haim Zaltzman | | | | $311 | 370.40 | $115,310 |
| Ron E. Meisler | | | | $562 | 104.40 | $58,678 |
| Kayalyn A. Marafioti | $895 | 1.40 | $1,253 | $811 | 56.10 | $45,498 |
| John K. Lyons | | | | $726 | 48.80 | $35,413 |
| Rena M. Samole | $625 | 24.00 | $15,001 | $589 | 59.10 | $34,833 |
| Adlai S. Hardin | $625 | 54.90 | $34,313 | $625 | 54.90 | $34,313 |
| John (Jack) Wm Butler, Jr. | | | | $847 | 40.10 | $33,980 |
| Melissa T. Kahn | $540 | 44.10 | $23,814 | $523 | 58.10 | $30,394 |
| Allison V. Herriott | $495 | 5.30 | $2,624 | $425 | 69.70 | $29,615 |
| Marian P. Wexler | | | | $770 | 35.70 | $27,489 |
| Brian M. Fern | $625 | 3.30 | $2,063 | $566 | 43.20 | $24,440 |
| Joseph N. Wharton | | | | $565 | 43.20 | $24,408 |
| Catherine E. Danz | | | | $465 | 43.10 | $20,042 |
| Sina Toussi | | | | $540 | 27.80 | $15,012 |
| Dionysios V. Tsiros | | | | $295 | 41.40 | $12,214 |
| Lisa B. Diaz | | | | $295 | 19.40 | $5,723 |
| Michael W. Perl | | | | $435 | 10.10 | $4,395 |

---

and $195,538, or 1.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Nathan L. Stuart | | | | $440 | 9.70 | $4,268 |
| Denise Kaloudis | | | | $495 | 6.20 | $3,069 |
| Sarah J. Platt | | | | $355 | 6.90 | $2,450 |
| Randall G. Reese | | | | $465 | 4.40 | $2,047 |
| Gregory O. Ogunsanya | | | | $440 | 3.50 | $1,540 |
| Brent M. Houston | | | | $375 | 3.70 | $1,388 |
| Kellan Grant | $540 | 2.10 | $1,134 | $540 | 2.10 | $1,134 |
| Kurt Ramlo | | | | $625 | 1.60 | $1,000 |
| Paraprofessional Totals | | 250.10 | $50,653 | | 1,256.10 | $229,120 |
| Total | | 448.70 | $173,084 | | 5,172.00 | $2,083,479 (2.3%) |
| Voluntary fee accommodation excluded from total | | | $30,898 | | | $166,854 |

O.    General Corporate Advice

169.    During the Final Application Period, Skadden professionals attended numerous meetings of the Board which required, among other things, working with the Debtors' various professionals and the Debtors' senior management to prepare detailed materials for distribution and discussion.  In connection with these meetings and in the course of the Debtors' daily operations, in addition to general restructuring advice, Skadden devoted a significant amount of time to advising the Debtors' management and Board on other general corporate governance matters as they related to the reorganization.

170.    Also during the Final Application Period, Skadden professionals advised the Debtors in connection with the preparation of the Debtors' regulatory filings with the SEC, including Forms 10-K for the years ending December 31, 2005, 2006, and 2007 and various Forms 10-Q for the respective and quarters during the Final Application Period.  Skadden also assisted the Debtors with their other regulatory filings with the SEC, including the Debtors' Forms 8-K,

which are issued in connection with disclosure issues on matters such as material agreements,
financial matters, and the Debtors' monthly operating reports.  Skadden also advised the Debtors
with respect to other regulatory issues, including matters relating to the delisting of its common
stock with the New York Stock Exchange and the liquidation of the Debtors' Trust Preferred
Securities.

171.    In addition, during the Final Application Period, Skadden assisted the
Debtors on various matters relating to their trust preferred securities.  Delphi was a party to two
declarations of trust pursuant to which two series of trust preferred securities, the 8.25%
Cumulative Trust Preferred Securities and the Adjustable Rate Trust Preferred Securities, were
issued in 2003.  Pursuant to the declarations of trust, the trusts that issued these preferred securities
were liquidated during the Final Application Period as a result of the filing of these chapter 11
cases.  In exchange for their book-entry interests in the global certificates issued pursuant to the
declarations of trust, holders of the preferred securities received pro rata interests in two global
notes issued by Delphi.  Skadden assisted in connection with the liquidation of the trusts and the
exchange of the preferred securities for interests in the global notes.

172.    In connection with the foregoing services, Skadden expended 3,314.70
hours during the Final Application Period for which Skadden seeks compensation of $2,063,481,
or 2.3% of the total compensation sought in this Final Application.[45]  Detailed time entries of each
Skadden professional related to these services performed during the Seventh Application Period
are attached hereto as <u>Exhibit D-15</u>.  A summary of the hours expended and the corresponding

---

[45]    Of this amount, 455.80 hours and $281,638 of fees were expended in the Seventh Application Period.  This
compares to $340,687, or 3.7%; $249,312, or 2.2%; $161,208, or 1.6 %; $253,853, or 2.0%; $475,902, or 3.8%;
and $312,176, or 2.0%; of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth,
and Sixth Interim Fee Applications, respectively.

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $950 | 72.00 | $68,400 | $871 | 548.10 | $477,530 |
| Eric L. Cochran | $920 | 35.30 | $32,476 | $822 | 464.80 | $381,905 |
| Adam F. Halper | $460 | 155.80 | $71,668 | $413 | 468.80 | $193,738 |
| Daniel I. Ganitsky | $625 | 42.60 | $26,626 | $591 | 285.10 | $168,492 |
| Kayalyn A. Marafioti | $895 | 14.50 | $12,978 | $824 | 133.10 | $109,716 |
| Marie L. Gibson | | | | $576 | 136.00 | $78,385 |
| Adlai S. Hardin | $625 | 11.70 | $7,313 | $573 | 126.30 | $72,325 |
| Paola Lozano | | | | $540 | 99.30 | $53,622 |
| Gregory O. Ogunsanya | | | | $475 | 111.50 | $52,922 |
| Ron E. Meisler | | | | $570 | 92.80 | $52,911 |
| Jamie Hur | | | | $375 | 123.50 | $46,313 |
| Thomas J. Matz | $665 | 2.10 | $1,397 | $609 | 70.70 | $43,052 |
| Karen M. Suber | $420 | 52.30 | $21,966 | $393 | 90.00 | $35,350 |
| Nathan L. Stuart | $575 | 11.40 | $6,556 | $505 | 65.20 | $32,957 |
| Sina Toussi | | | | $540 | 57.50 | $31,050 |
| Neil M. Leff | $895 | 4.70 | $4,207 | $825 | 29.30 | $24,171 |
| Peter Olasky | | | | $403 | 53.10 | $21,409 |
| Michelle Gasaway | $695 | 6.70 | $4,657 | $645 | 23.10 | $14,907 |
| Brett Arkuss | $420 | 10.70 | $4,494 | $374 | 37.20 | $13,902 |
| Louis D. Wilson | | | | $561 | 23.60 | $13,244 |
| Kenneth Berlin | | | | $802 | 15.80 | $12,670 |
| Kellan Grant | $540 | 16.40 | $8,856 | $519 | 23.40 | $12,146 |
| George N. Panagakis | | | | $792 | 12.40 | $9,824 |
| Lawrence D. Frishman | | | | $766 | 12.40 | $9,495 |
| Ronald D. Kohut | $540 | 4.10 | $2,214 | $485 | 19.10 | $9,264 |
| Peter A. Atkins | | | | $835 | 10.80 | $9,018 |
| Lisa B. Diaz | | | | $378 | 22.90 | $8,646 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Allison V. Herriott | | | | $404 | 13.80 | $5,579 |
| Neil MacDonald | | | | $588 | 9.30 | $5,468 |
| Randall G. Reese | | | | $480 | 11.10 | $5,330 |
| Brian M. Fern | | | | $485 | 10.80 | $5,239 |
| Joseph N. Wharton | | | | $565 | 9.20 | $5,199 |
| Dolores De Elizalde | | | | $495 | 10.30 | $5,099 |
| M. Janine Jjingo | | | | $390 | 11.90 | $4,641 |
| Kathy Zambrano | | | | $410 | 10.40 | $4,264 |
| Rita Sinkfield Belin | | | | $585 | 6.00 | $3,510 |
| Marian P. Wexler | | | | $770 | 4.40 | $3,388 |
| Erica Schohn | | | | $470 | 6.60 | $3,102 |
| Sarah J. Platt | $420 | 6.60 | $2,772 | $420 | 6.60 | $2,772 |
| John K. Lyons | | | | $775 | 3.40 | $2,635 |
| John P. Furfaro | | | | $810 | 2.90 | $2,349 |
| Paul Schockett | | | | $390 | 4.80 | $1,872 |
| Young M. Park | $625 | 2.80 | $1,750 | $625 | 2.80 | $1,750 |
| Denise Kaloudis | | | | $495 | 3.40 | $1,683 |
| Albert L. Hogan III | | | | $695 | 2.20 | $1,529 |
| Christian Pilkington | $635 | 2.00 | $1,270 | $635 | 2.00 | $1,270 |
| John Guzzardo | | | | $435 | 2.60 | $1,131 |
| Christopher J. Bouchard | $540 | 1.90 | $1,026 | $540 | 1.90 | $1,026 |
| Ian S. Bolton | $460 | 2.20 | $1,012 | $460 | 2.20 | $1,012 |
| Paraprofessional Total | | | | | 20.30 | $4,669 |
| **Total** | | 455.80 | $281,638 | | 3,314.70 | $2,063,481 (2.3%) |
| **Voluntary fee accommodation excluded from total** | | | $44,214 | | | $209,357 |

P.    Business Operations/Strategic Planning

173.    During these Reorganization Cases, Skadden professionals met regularly

with the Debtors' senior management, investment bankers, financial advisors, and other business

109

and legal advisors to consider restructuring strategies and initiatives.  Among other matters, at the

Debtors' direction, senior Skadden lawyers participated in weekly meetings at the Company's

headquarters, including meetings with the Delphi transformation committee.  Skadden also

participated in numerous strategy sessions, meetings, and calls to consider such major case issues

as the Debtors' development of (a) their transformation plan, (b) their 2007-2011 preliminary

restructuring business plan, (c) the plan-related discussions, and (d) additional strategic

considerations impacting all aspects of the Reorganization Cases.  Furthermore, Skadden assisted

the Debtors with respect to operational issues as they relate to these Reorganization Cases.

Skadden frequently advised the Debtors' management with respect to specific business questions

posed by management that arose from events occurring in the Reorganization Cases.  Part of

Skadden's advice in this regard involved the participation of Skadden professionals in periodic

planning and strategy conferences with the Debtors' senior management team.

174.    To assist the Debtors in continuing to perform their fiduciary duties,

Skadden worked with the Debtors in implementing procedures for the Debtors to operate their

businesses in accordance with the requirements of the Bankruptcy Code.  Skadden reviewed

certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property,

and other transactions to aid the Debtors in evaluating whether the contemplated transactions were

within or outside the ordinary course of business and whether such action would require Court

approval.  In instances in which transactions were outside of the ordinary course of business,

Skadden drafted and filed motions seeking approval of such transactions.

175.    In furtherance of the Debtors' transformation plan, during these

Reorganization Cases the Debtors, with the assistance of Skadden and other outside counsel,

entered into several agreements for the outsourcing of certain information technology services (the

"IT Outsourcing Agreements").  Among other things, the IT Outsourcing Agreements provided for

the outsourcing of (i) global desktops, service desks, and mainframe systems hosting, (ii) server

systems hosting, (iii) engineering systems support, (iv) system support of SAP,[46] commercial,

supply chain, and manufacturing services, and (v) network support services.  Additionally, the

Debtors, with the assistance of Skadden and other outside counsel, entered into an agreement that

provides for the outsourcing of certain of the Debtors' accounts receivable, accounts payable, fixed

assets, travel and expense reporting, general ledger, and contract administration processes (the

"Finance Outsourcing Agreement").  Skadden assisted in drafting and preparing the necessary

motions to obtain this Court's approval of the IT Outsourcing Agreements and the Finance

Outsourcing Agreements and assisted the Debtors throughout the process to apprise the Debtors'

key constituencies of the facts so as to minimize litigation risk in the Debtors' pursuit of this

Court's approval.

       176.    In addition, during the Seventh Application Period, Skadden assisted the

Debtors in drafting and prosecuting a motion to permit the Debtors to transfer certain accumulated

cash balances from Delphi Automotive Systems (Holding), Inc. ("DASHI") to Delphi Automotive

Systems LLC ("DAS LLC") in accordance with the Cash Management Order (Docket No. 882).

The purpose of the proposed transaction was to provide a definitive source of liquidity during a

time of uncertainty in the capital markets, without the inherent transactions costs – including,

among other things, borrowing fees and closing costs – of obtaining funds from external sources in

the marketplace.  The additional liquidity also provide certain tax efficiencies and allowed the

Debtors to reduce their borrowings and thus reduce their funded interest expense, saving the

Debtors tens of millions of dollars of interest under their DIP financing facility.

---

[46]    SAP is a leading international inter-enterprise software company that provides enterprise resource planning
software to integrate accounting, distribution, human resources, and manufacturing, among other functions.

177.    The liquidity transactions proposed by the Debtors were initially objected to by Wilmington Trust Company ("WTC"), which filed a preliminary objection to the motion and served discovery requests on the Debtors.  Skadden assisted the Debtors in evaluating and responding to the discovery requests and reviewing various responsive documents.  Skadden also assisted the Debtors in drafting a declaration and responsive pleading in support of their motion. The efforts of the Debtors and Skadden ultimately led to a consensual resolution of WTC's objection and allowed the Debtors to transfer $650 million from DASHI to DAS LLC to provide the Debtors with additional liquidity.  In addition, the PBGC raised some concerns regarding the motion because the PBGC had asserted pre-existing liens on the foreign assets of the Debtors. Through discussions and negotiations between the PBGC and the Debtors, with Skadden's assistance, the parties reached a consensual resolution and averted an objection to the motion by the PBGC, which resolution included providing conditional, junior replacement liens to the PBGC, but only to the extent that the PBGC had valid, perfected, enforceable, and non-avoidable liens in the funds to be transferred under the motion.

178.    In connection with the foregoing services, Skadden expended 3,009.60 hours during the Final Application Period for which Skadden seeks compensation of $1,906,630, or 2.1% of the total compensation sought in this Final Application.[47]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-16.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[47]    Of this amount, 844.40 hours and $502,500 of fees were expended in the Seventh Application Period.  This compares to $258,753, or 2.8%; $192,132, or 1.7%; $304,824, or 3.0%; $188,290, or 1.5%; $358,708, or 2.8%; and $101,423, or 0.7%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $950 | 43.90 | $41,705 | $859 | 573.40 | $492,316 |
| Eric L. Cochran | $920 | 22.60 | $20,792 | $825 | 281.10 | $231,774 |
| Brian M. Fern | | | | $533 | 379.90 | $202,672 |
| Ron E. Meisler | $710 | 81.80 | $58,078 | $604 | 267.60 | $161,513 |
| Rena M. Samole | $625 | 196.10 | $122,563 | $623 | 204.60 | $127,366 |
| Kayalyn A. Marafioti | $895 | 9.70 | $8,682 | $814 | 107.00 | $87,054 |
| Thomas J. Matz | $665 | 7.60 | $5,055 | $590 | 139.80 | $82,488 |
| Neil MacDonald | $640 | 118.10 | $75,584 | $640 | 118.10 | $75,584 |
| John Guzzardo | $495 | 124.90 | $61,826 | $495 | 124.90 | $61,826 |
| Kellan Grant | $540 | 3.90 | $2,106 | $467 | 78.80 | $36,769 |
| Kurt Ramlo | $665 | 35.70 | $23,741 | $647 | 53.20 | $34,408 |
| John K. Lyons | | | | $719 | 45.60 | $32,766 |
| George N. Panagakis | | | | $785 | 34.70 | $27,256 |
| Albert L. Hogan III | $775 | 23.20 | $17,980 | $750 | 33.60 | $25,209 |
| Nathan L. Stuart | | | | $465 | 48.20 | $22,414 |
| Daniel I. Ganitsky | $625 | 14.70 | $9,188 | $603 | 31.90 | $19,251 |
| Allison V. Herriott | $495 | 3.70 | $1,832 | $385 | 46.00 | $17,696 |
| Melissa T. Kahn | | | | $470 | 32.70 | $15,369 |
| Matthew J. Micheli | | | | $440 | 22.50 | $9,900 |
| Denise Kaloudis | $575 | 3.50 | $2,013 | $511 | 17.70 | $9,042 |
| Christopher P. Connors | $625 | 12.20 | $7,625 | $625 | 12.20 | $7,625 |
| Brandon M. Duncomb | $340 | 22.10 | $7,514 | $340 | 22.10 | $7,514 |
| Randall G. Reese | | | | $465 | 15.80 | $7,349 |
| Michael W. Perl | | | | $375 | 19.00 | $7,126 |
| Adam F. Halper | $460 | 2.90 | $1,334 | $402 | 16.30 | $6,560 |
| Sina Toussi | | | | $540 | 12.00 | $6,480 |
| Adlai S. Hardin | | | | $585 | 11.00 | $6,436 |
| Mike Murphy | $340 | 18.30 | $6,222 | $340 | 18.30 | $6,222 |
| Marie L. Gibson | | | | $642 | 8.50 | $5,457 |
| David E. Springer | | | | $755 | 6.80 | $5,135 |

113

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Venera E. Ziegler | | | | $510 | 9.80 | $4,998 |
| Carl T. Tullson | $340 | 13.00 | $4,420 | $340 | 13.00 | $4,420 |
| Lisa B. Diaz | | | | $315 | 13.30 | $4,190 |
| Marian P. Wexler | | | | $770 | 4.80 | $3,696 |
| Kathy Zambrano | | | | $410 | 7.00 | $2,870 |
| Brent M. Houston | | | | $375 | 6.70 | $2,512 |
| Jay S. Berke | | | | $810 | 3.00 | $2,430 |
| Haim Zaltzman | | | | $295 | 6.00 | $1,770 |
| John P. Furfaro | | | | $770 | 1.70 | $1,309 |
| Paraprofessional Totals | | 86.50 | $24,240 | | 161.00 | $39,858 |
| **Total** | | **844.40** | **$502,500** | | **3,009.60** | **$1,906,630 (2.1%)** |
| **Voluntary fee accommodation excluded from total** | | | **$47,264** | | | **$159,292** |

Q.    Customer Matters (Reviews/Investigations)

179.    On January 20, 2006, the Debtors filed their Schedules of Assets and Liabilities (Docket No. 1854) and their Statement of Financial Affairs (Docket No. 1855) listing certain unliquidated claims that the Debtors held against GM.  Additionally, on March 24, 2006, the Creditors' Committee filed a Motion For An Order Compelling The Production Of Documents By General Motors Corporation Pursuant To Rule 2004 Of The Federal Rules Of Civil Procedure (Docket No. 2961), requesting that this Court direct GM to turn over certain documents to the Creditors' Committee so that the Creditors' Committee could evaluate certain purported claims between GM and the Debtors.  The Debtors did not object to the Creditors' Committee's motion, which resulted in the Creditors' Committee and GM entering into a stipulation and agreed order on April 11, 2006, whereby the Creditors' Committee and GM agreed that the Creditors' Committee

114

was authorized to seek document production from GM and that GM would produce certain documents.

180.    On March 28, 2006, the Debtors, with the assistance of Skadden, filed their Motion For Approval Of Joint Interest Agreement Between the Debtors And The Official Committee Of Unsecured Creditors, Implementation Of Protective Order, And Approval Of Procedures To Protect Information In Fee Statements (Docket No. 3000). In that motion, the Debtors sought this Court's authority to share certain confidential information with the Creditors' Committee to facilitate the Creditors' Committee's ability to participate in various ongoing investigations.

181.    On May 11, 2006, the Creditors' Committee sent a letter (the "Demand Letter") and subsequently a draft complaint (the "Draft Complaint") to Delphi's Board demanding that the Debtors promptly pursue certain claims and defenses against GM.  The Draft Complaint, which contained 408 numbered paragraphs and 19 separate causes of action, was based in part on documents provided to the Creditors' Committee under a joint interest agreement previously approved by this Court.

182.    In addition, shortly after the formation of the Equity Committee, the Debtors solicited the Equity Committee's views regarding potential estate claims against GM.  On July 29, 2006, the Debtors, with the assistance of Skadden, entered into a Joint Interest Agreement with the Equity Committee and, during August 2006, shared confidential information with the Equity Committee concerning claims and defenses against GM.  On August 24, 2006, the Equity Committee delivered a letter (the "Equity Committee Letter") to the Debtors setting forth the Equity Committee's view of the Debtors' claims and defenses against GM.

183.    During the Final Application Period, Skadden professionals spent a significant amount of time reviewing and analyzing the allegations included in the Demand Letter, Draft Complaint, and Equity Committee Letter, including extensive legal analysis and research regarding the claims and defenses asserted in the Demand Letter and Draft Complaint.  Skadden also participated in numerous meetings with representatives of the Debtors, the Creditors' Committee, and the Equity Committee at which the respective representatives discussed these claims.

184.    On July 28, 2006, the Creditors' Committee filed its motion seeking court authority to prosecute the Debtors' claims and defenses against GM and certain former officers of the Debtors on Delphi's behalf (also known as the "STN Motion") (Docket No. 4718).  Skadden evaluated the merits of this motion and researched, drafted, and filed a preliminary objection to the motion on August 4, 2006 (Docket No. 4859).  On September 5, 2006, the Equity Committee filed its objection to the STN Motion (Docket No. 5070).  After numerous adjournments of the hearing on the STN Motion throughout the Final Application Period, the hearing was suspended in connection with the Debtors' entry into a tolling agreement with GM.

185.    In light of the various filings and demand letters throughout the Final Application Period, Skadden assisted the Debtors in conducting a detailed factual inquiry and assisted the Debtors and the Board in evaluating the legal merits of potential claims and defenses against GM.  In conducting the factual inquiry, Skadden reviewed thousands of documents, conducted thirty-two interviews, and kept detailed records of the inquiries.  Finally, in December 2007 and January 2008, and continuing beyond the Final Application Period, Skadden assisted the Debtors and their financial advisors in analyzing and evaluating potential damages recoveries in various potential litigation scenarios.

186.    In connection with the foregoing services, Skadden expended 3,166.20 hours during the Final Application Period for which Skadden seeks compensation of $1,595,210, or 1.8% of the total compensation sought in this Final Application.[48]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-17.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Lee P. Garner | $710 | 42.10 | $29,891 | $602 | 803.90 | $483,572 |
| Karen E. Willenken | | | | $555 | 300.10 | $166,499 |
| Keith D. Krakaur | | | | $784 | 192.80 | $151,130 |
| John Guzzardo | $495 | 20.70 | $10,247 | $439 | 299.10 | $131,353 |
| George N. Panagakis | | | | $773 | 155.60 | $120,268 |
| Jonathan L. Shih | | | | $310 | 365.10 | $113,121 |
| Peter E. Krebs | | | | $410 | 268.50 | $110,085 |
| Albert L. Hogan III | $775 | 15.50 | $12,013 | $678 | 113.80 | $77,198 |
| David R. Pehlke | | | | $338 | 227.20 | $76,773 |
| John (Jack) Wm Butler, Jr. | $950 | 3.40 | $3,230 | $867 | 35.40 | $30,693 |
| Christopher J. Gunther | | | | $660 | 33.00 | $21,780 |
| Nick D. Campanario | | | | $535 | 31.80 | $17,013 |
| Nathan L. Stuart | | | | $446 | 36.30 | $16,203 |
| Kellan Grant | | | | $410 | 17.00 | $6,970 |
| Kayalyn A. Marafioti | $895 | 4.30 | $3,849 | $853 | 7.40 | $6,314 |
| Thomas J. Matz | | | | $560 | 9.90 | $5,544 |

---

[48]    Of this amount, 90.50 hours and $62,043 of fees were expended in the Seventh Application Period.  This compares to $743,110, or 7.4%; $661,440, or 5.2%; $66,985, or 0.5%; and $68,731, or 0.4%, of the total fees requested for this matter in Skadden's Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively. Skadden did not request compensation for this matter in its First or Second Interim Fee Applications.

117

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Allison V. Herriott | | | | $435 | 10.60 | $4,611 |
| Adlai S. Hardin | $625 | 4.50 | $2,813 | $625 | 4.50 | $2,813 |
| Lisa B. Diaz | | | | $295 | 8.90 | $2,626 |
| J.R. Lederer | | | | $315 | 5.30 | $1,670 |
| Michael W. Perl | | | | $375 | 3.10 | $1,163 |
| Paraprofessional Totals | | | | | 236.90 | $47,811 |
| **Total** | | **90.50** | **$62,043** | | **3,166.20** | **$1,595,210 (1.8%)** |
| **Voluntary fee accommodation excluded from total** | | | **$1,954** | | | **$90,117** |

R.    Litigation (Insurance Recovery)

187.    Before the commencement of the Reorganization Cases, Delphi, Delphi Trust I, Delphi Trust II, current and former directors of Delphi, certain current and former officers and employees of Delphi or its subsidiaries, and others were named as defendants in several lawsuits following Delphi's announced intention to restate certain of its financial statements (the "Multidistrict Litigation" or "MDL").  The Judicial Panel on Multidistrict Litigation entered an order transferring each of theses related federal actions to the United States District Court for the Eastern District of Michigan (the "Michigan District Court").  One group of class action lawsuits (the "Securities Litigation") alleged, among other things, that Delphi and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws with respect to the sale of both debt and equity securities.  A second group of class actions, which are purportedly brought on behalf of participants in certain of Delphi's and its subsidiaries' defined contribution employee benefit pension plans who invested in Delphi common stock (the "ERISA Actions"), was brought under ERISA.  The ERISA Actions alleged, among other things, that the plans suffered losses as a result of alleged breaches of

fiduciary duties under ERISA.  During the Final Application Period, the Debtors agreed to provide

certain discovery to the lead plaintiffs in the Securities Litigation (the "Lead Plaintiffs") and the

plaintiffs in the ERISA Actions.[49]

188.    During the Final Application Period, on July 11, 2007, the Michigan

District Court appointed the Honorable Layn R. Phillips, former United States District Judge, as a

special master for settlement discussions.  Through mediated settlement discussions, on August

31, 2007, representatives of Delphi, Delphi's insurance carriers, and certain other defendants

involved in the MDL proceedings reached agreements with the lead plaintiffs in the Securities

Litigation and the named plaintiffs in the ERISA Actions resulting in settlement of the

Multidistrict Litigation (the "MDL Settlement").  Throughout this process, Skadden assisted the

Debtors by participating in mediation sessions in New York and Detroit, some of which were held

at Skadden's New York offices, analyzing and providing advice to the Debtors concerning the

bankruptcy law and general legal implications of the MDL Settlement and negotiating and drafting

portions of the agreements constituting the MDL Settlement.

189.    On September 7, 2007, the Debtors filed a Motion For Order Approving

Multidistrict Litigation And Insurance Settlements (Docket No. 9296) (the "MDL And Insurance

Settlement Approval Motion") seeking this Court's approval of the MDL Settlement and related

matters.[50]  During the Seventh Application Period, this Court held a hearing on the MDL And

---

[49]    Shearman represented the Debtors in the MDL in the Michigan District Court.  Skadden represented the Debtors
with respect to MDL related matters in the Bankruptcy Court  and assisted with the mediation and settlement of
the MDL claims (being mindful not to duplicate efforts with Shearman).

[50]    On October 19, 2007, during the Seventh Application Period, two objections to the MDL And Insurance
Settlement Approval Motion were filed: (i) an Objection By Castlerigg Master Investments Ltd.; CR Intrinsic
Investors, LLC; Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; and SPCP Group, LLC To
Motion By The Debtors For Order Approving Multidistrict Litigation And Insurance (Docket No. 10687) and (ii)
a Limited Objection Of Castlerigg Master Investments Ltd; CR Intrinsic Investors, LLC; Davidson Kempner
Capital Management LLC; Elliot Associates, L.P.; And SPCP Group, LLC To Order Preliminarily Approving
Multidistrict Litigation And Insurance Settlement (Docket No. 10689).  The Debtors filed a Reply In Support Of

Insurance Settlement Approval Motion on October 25, 2007 and entered an Order Preliminarily Approving Multidistrict Litigation And Insurance Settlement (Docket No. 10746) on October 29, 2007. Skadden assisted the Debtors by preparing the MDL And Insurance Settlement Approval Motion, including the form of Order Approving Multidistrict Litigation And Insurance Settlements attached thereto, and conducted discussions with a number of parties, including the lead plaintiffs in the Securities Litigation, the named plaintiffs in the ERISA Actions, and other parties to the MDL Settlement, concerning the matters to be included in the MDL And Insurance Settlement Approval Motion and the form of Order Approving Multidistrict Litigation And Insurance Settlements.

190.    After the preliminary approval of the MDL Settlement, the Debtors, with the assistance of Skadden, negotiated further modifications to the MDL Settlement during the Seventh Application Period. Once the negotiations were completed and the modifications were memorialized, Skadden assisted in filing the Debtors' Supplemental Reply To Objection To Motion For Order Approving Multidistrict Litigation And Insurance Settlements on January 16, 2008 (Docket No. 12153) seeking final approval of the MDL Settlement, as modified, in connection with the confirmation of the Confirmed Plan. At the end of the Final Application Period, this Court entered an order granting its final approval of the MDL Settlement, as modified (Docket No. 12358).

191.    In connection with the foregoing services, Skadden expended 2,273.90 hours during the Final Application Period for which Skadden seeks compensation of $1,393,286,

Motion For Order Approving Multidistrict Litigation And Insurance Settlements (Docket No. 10714) on October 24, 2007 (the "MDL And Insurance Settlement Approval Reply").

or 1.5% of the total compensation sought in this Final Application.[51]   Detailed time entries of each

Skadden professional related to these services performed during the Seventh Application Period

are attached hereto as Exhibit D-18.  A summary of the hours expended and the corresponding

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Albert L. Hogan III | $775 | 89.80 | $69,596 | $711 | 455.90 | $324,039 |
| Nick D. Campanario | $610 | 114.20 | $69,662 | $560 | 347.70 | $194,585 |
| John (Jack) Wm Butler, Jr. | $950 | 12.90 | $12,255 | $872 | 171.20 | $149,324 |
| Dhananjai Shivakumar | | | | $625 | 234.00 | $146,250 |
| Nathan L. Stuart | $575 | 7.60 | $4,370 | $478 | 209.30 | $99,977 |
| Neil MacDonald | | | | $581 | 146.80 | $85,338 |
| Kurt Ramlo | $665 | 2.10 | $1,397 | $626 | 98.30 | $61,523 |
| Ron E. Meisler | | | | $554 | 76.20 | $42,188 |
| David E. Springer | | | | $755 | 51.50 | $38,883 |
| Matthew J. Micheli | | | | $440 | 76.60 | $33,704 |
| Kayalyn A. Marafioti | $895 | 14.30 | $12,799 | $848 | 39.70 | $33,665 |
| Rena M. Samole | | | | $565 | 44.80 | $25,313 |
| George N. Panagakis | $870 | 1.30 | $1,131 | $813 | 26.10 | $21,219 |
| Thomas J. Matz | $665 | 5.40 | $3,591 | $617 | 33.70 | $20,778 |
| Michael W. Perl | | | | $435 | 46.30 | $20,141 |
| Brian M. Fern | | | | $491 | 30.10 | $14,784 |
| Kellan Grant | $540 | 2.40 | $1,296 | $476 | 29.00 | $13,798 |
| Brandon M. Duncomb | $340 | 7.30 | $2,482 | $320 | 38.10 | $12,184 |
| Jay S. Berke | $870 | 9.30 | $8,091 | $870 | 9.30 | $8,091 |

---

[51]   Of this amount, 286.30 hours and $200,305 of fees were expended in the Seventh Application Period.  This
compares to $193,530, or 1.1%; $280,759, or 2.2%; $220,208, or 1.7%; and $483,475, or 3.1%, of the total fees
requested for this matter in Skadden's First, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.
Skadden did not request compensation for this matter in its Second or Third Interim Fee Applications.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| John P. Furfaro | $870 | 8.00 | $6,960 | $870 | 8.00 | $6,960 |
| Venera E. Ziegler | | | | $510 | 13.50 | $6,885 |
| Lisa B. Diaz | | | | $295 | 19.60 | $5,782 |
| Amy Van Gelder | $540 | 9.60 | $5,184 | $540 | 9.60 | $5,184 |
| Lee P. Garner | $710 | 2.10 | $1,491 | $647 | 8.00 | $5,179 |
| John Guzzardo | | | | $435 | 9.90 | $4,307 |
| Laverne F. Hill | | | | $390 | 9.40 | $3,666 |
| Sarah J. Platt | | | | $325 | 8.00 | $2,600 |
| Melissa T. Kahn | | | | $470 | 4.60 | $2,162 |
| Courtney E. VanLonkhuyzen | | | | $435 | 4.20 | $1,827 |
| Paraprofessional Totals | | | | | 14.50 | $2,950 |
| **Total** | | **286.30** | **$200,305** | | **2,273.90** | **$1,393,286 (1.5%)** |
| **Voluntary fee accommodation excluded from total** | | | **$7,568** | | | **$51,430** |

S.    Retention/Fee Matters (SASM&F)

192.    Skadden is one of the largest law firms in the world, with more than 1,900 attorneys located in 24 offices in 13 countries. Because of the number of the Debtors' business relationships and the number of Skadden's business clients, Skadden has been required to devote time to retention and fee issues since the commencement of the Reorganization Cases. In particular, Skadden conducted an extensive relationship and disclosure search in connection with being retained as Debtors' counsel. In addition, as new parties have become involved in aspects of these cases, Skadden conducted supplementary disclosure searches and has also periodically refreshed its searches to ensure the disclosure of new clients when warranted. When appropriate, Skadden prepared and filed supplemental declarations disclosing certain significant relationships that Skadden might have with a party-in-interest. As required by the Interim Compensation Order, Skadden prepared detailed monthly compensation packages for distribution, was required to

122

prepare and file interim fee applications in accordance with the established procedures, and

appeared before the Fee Review Committee.  During the Final Application Period Skadden

drafted, filed, and received this Court's approval of six interim fee applications, one for each of the

six prior interim fee periods in the Reorganization Cases.  In addition, as discussed above, during

the Final Application Period, the Fee Review Committee retained LCC to serve as its fee analyst.

Throughout the Final Application Period, LCC issued summary reports which included

recommendations to the Fee Review Committee on Skadden's six interim fee applications.

Skadden professionals were required to review, analyze, and reconcile the fee data and

recommendations proposed by LCC to effectively respond to the Fee Review Committee.

      193.    In connection with the foregoing services, Skadden expended 3,030.20

hours during the Final Application Period for which Skadden seeks compensation of $1,279,767,

or 1.4% of the total compensation sought in this Final Application.[52]  Detailed time entries of each

Skadden professional related to these services performed during the Seventh Application Period

are attached hereto as Exhibit D-19.  A summary of the hours expended and the corresponding

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Michael W. Perl | $495 | 81.40 | $40,293 | $433 | 635.30 | $275,141 |
| John (Jack) Wm Butler, Jr. | $950 | 23.40 | $22,230 | $871 | 180.80 | $157,562 |
| Matthew Gartner | $420 | 98.60 | $41,412 | $376 | 305.90 | $115,005 |
| Ron E. Meisler | $710 | 21.60 | $15,336 | $587 | 180.70 | $106,048 |

---

[52]    Of this amount, 372.70 hours and $180,471 of fees were expended in the Seventh Application Period.  This
compares to $58,023, or 0.6%; $191,088, or 1.7%; $134,152, or 1.3%; $284,463, or 2.2%; $223,508, or 1.8%; and
$214,878, or 1.4%, of the total fees requested for this matter in Skadden's First, Second, Third , Fourth, Fifth, and
Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Joseph N. Wharton | $625 | 4.30 | $2,688 | $529 | 135.60 | $71,683 |
| Sarah J. Platt | $420 | 34.00 | $14,280 | $370 | 145.40 | $53,828 |
| Allison V. Herriott | | | | $385 | 128.80 | $49,545 |
| Lisa B. Diaz | | | | $308 | 153.30 | $47,176 |
| Brent M. Houston | | | | $435 | 103.20 | $44,892 |
| Dolores De Elizalde | | | | $464 | 83.40 | $38,709 |
| Kayalyn A. Marafioti | $895 | 3.30 | $2,954 | $827 | 41.60 | $34,415 |
| Ian S. Bolton | $460 | 67.00 | $30,820 | $460 | 67.00 | $30,820 |
| Haim Zaltzman | | | | $322 | 81.90 | $26,394 |
| Kathy Zambrano | | | | $410 | 54.50 | $22,345 |
| Nathan L. Stuart | | | | $490 | 34.70 | $17,001 |
| Thomas J. Matz | | | | $608 | 26.20 | $15,941 |
| Adlai S. Hardin | | | | $585 | 13.90 | $8,132 |
| Brian M. Fern | | | | $544 | 13.60 | $7,405 |
| Kellan Grant | | | | $470 | 13.60 | $6,392 |
| Melissa T. Kahn | | | | $470 | 13.40 | $6,298 |
| M. Janine Jjingo | | | | $370 | 13.70 | $5,063 |
| Sina Toussi | | | | $540 | 9.30 | $5,022 |
| Randall G. Reese | | | | $465 | 9.00 | $4,185 |
| Karen M. Suber | $420 | 8.90 | $3,738 | $420 | 8.90 | $3,738 |
| Eric J. Howe | | | | $390 | 9.50 | $3,705 |
| Daniel P. Phillips | | | | $540 | 6.20 | $3,348 |
| Ronald D. Kohut | | | | $410 | 5.70 | $2,337 |
| Louis D. Wilson | | | | $510 | 3.80 | $1,938 |
| Venera E. Ziegler | | | | $510 | 3.40 | $1,734 |
| Kurt Ramlo | | | | $625 | 2.60 | $1,625 |
| Matthew J. Micheli | | | | $440 | 3.60 | $1,584 |
| J.R. Lederer | | | | $315 | 5.00 | $1,575 |
| Eric B. Sensenbrenner | | | | $560 | 2.60 | $1,456 |
| Nick D. Campanario | | | | $465 | 3.00 | $1,395 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Paraprofessional Total | | 30.20 | $6,720 | | 531.10 | $106,330 |
| **Total** | | **372.70** | **$180,471** | | **3,030.20** | **$1,279,767 (1.4%)** |
| **Voluntary fee accommodation excluded from total** | | | **$70,155** | | | **$347,590** |

T.    <u>Environmental Matters</u>

194.    During the Final Application Period, Skadden professionals assisted the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code.  Therefore, throughout the Final Application Period, Skadden assisted the Debtors regarding potential alternatives for addressing potential environmental liabilities in connection with planning for emergence from chapter 11 and analyzing the legal issues that might arise from implementation of such strategies, which covered many sites, claims, and related issues.  This required numerous telephone conferences and meetings with the Debtors, review and analysis of many documents, including purchase, sale and lease agreements, and analysis of certain environmental claims.  Analysis of Debtors' potential environmental liabilities raised particularly complex factual issues because, among other reasons, a large portion of those liabilities arose from actions or operations that took place before the Debtors' separation from GM.  As a result, research regarding many legal issues was required.

195.    In addition, Skadden also advised the Debtors in connection with a proposed settlement with the state of New Jersey's environmental agency for environmental remediation at the Debtors' battery manufacturing facility in New Brunswick, New Jersey which the Debtors sold to JCI pursuant to a Transfer Agreement dated May 26, 2006.  Skadden assisted the Debtors in preparing a notice of that settlement and serving that notice on certain stakeholders as required under the Settlement Procedures Order.

125

196.    Skadden also advised the Debtors regarding a settlement with certain affiliates of TRW Automotive Inc. ("TRW") resolving, among other things, certain disputes concerning the respective obligations of each of TRW and certain affiliate Debtors under an environmental deed providing primarily for remediation of environmental contamination at certain facilities that were transferred by TRW to Delphi with Delphi's purchase of the global diesel business from TRW in 1999.

197.    Throughout the Final Application Period, Skadden assisted the Debtors in analyzing various environmental claims in connection with the ongoing claims review and reconciliation process. Specifically, Skadden analyzed claims by neighboring property owner CSX Realty Development LLC alleging damages resulting from environmental contamination at a plant operated by the Debtors in Vandalia, Ohio. Skadden assisted the Debtors in preparing and drafting briefs objecting to the claims and participated in settlement negotiations with respect to those claims, and during the Seventh Application Period, finalized a settlement agreement with respect to those claims. In addition, Skadden assisted the Debtors in (a) analyzing claims under an environmental indemnification agreement entered into as part of a sale/leaseback transaction, (b) reviewing and analyzing environmental conditions associated with the Debtors' properties in certain states and developed provisions for resolving potential environmental liabilities in connection with possible property sales, lease rejections, or other transactional agreements, and (c) negotiating with regulatory authorities to obtain a consent order for the remediation of environmental conditions at the Debtors' plant in Anaheim, California. Skadden also assisted the Debtors in analyzing various environmental related issues in connection with the September 2007 Plan and December 2007 Plan.

126

198.    In connection with the foregoing services, Skadden expended 1,642.60 hours during the Final Application Period for which Skadden seeks compensation of $1,158,475, or 1.3% of the total compensation sought in this Final Application.[53]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-20.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Kenneth Berlin | $895 | 33.40 | $29,894 | $797 | 829.00 | $660,642 |
| John A. Amodeo | $695 | 89.30 | $62,064 | $627 | 460.40 | $288,455 |
| Elizabeth A. Malone | | | | $495 | 101.70 | $50,343 |
| Marian P. Wexler | | | | $770 | 55.40 | $42,658 |
| Don J. Frost, Jr. | | | | $790 | 40.50 | $31,995 |
| Ron E. Meisler | $710 | 2.10 | $1,491 | $573 | 48.10 | $27,560 |
| Jerry L. Jackson | | | | $580 | 28.80 | $16,704 |
| Joseph N. Wharton | | | | $556 | 29.90 | $16,631 |
| Brian M. Fern | | | | $565 | 10.20 | $5,763 |
| Kayalyn A. Marafioti | $895 | 1.70 | $1,522 | $846 | 6.80 | $5,755 |
| Sina Toussi | | | | $540 | 7.10 | $3,834 |
| John (Jack) Wm Butler, Jr. | | | | $875 | 2.80 | $2,450 |
| Kathy Zambrano | | | | $410 | 3.60 | $1,476 |
| Paraprofessional Total | | | | | 18.30 | $4,209 |
| **Total** | | **126.50** | **$94,971** | | **1,642.60** | **$1,158,475 (1.3%)** |
| **Voluntary fee accommodation excluded from total** | | | **$16,786** | | | **$107,537** |

---

[53]    Of this amount, 126.50 hours and $94,971 of fees were expended in the Seventh Application Period.  This compares to $163,396, or 1.8%; $140,142, or 1.2%; $129,158, or 1.3%; $211,507, or 1.6%; $254,016, or 2.0%; and $184,183, or 1.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

U.      Global Subsidiaries (Non-U.S.)

199.    During the Final Application Period, Skadden professionals advised the Company on matters relating to its non-U.S. global subsidiaries including divestitures, commercial and corporate transactions, and cash management matters that arose in the Company's overseas operations.  Skadden professionals advised the Company in relation to corporate law and chapter 11 issues related to various proposed strategic arrangements aimed at increasing the Company's market share in certain of its global businesses and evaluated various global setoff issues, including setoffs between non-U.S. global subsidiaries and international suppliers.  In connection with these matters, Skadden attorneys reviewed the structure of certain of the transactions from a corporate and bankruptcy perspective and advised the Debtors' global management accordingly.

200.    For example, Skadden professionals provided advice regarding (a) the Company's Austrian subsidiaries; (b) the sale of Shanghai Delco Electronics & Instrumentation Company Ltd., a Chinese joint venture, to the joint venture partner; (c) analysis of supply relationships with certain of its Mexican affiliates; (d) the sale by Delphi Deutschland GmbH of certain of its operations in Germany; (e) ongoing U.K. pension issues related to a branch office owned by an Affiliate Debtor; and (f) its Spanish affiliate, DASE, in the filing of its "Concurso" application (similar to a bankruptcy petition) in Spanish court.[54]  Throughout the Final Application Period, Skadden liaised with the Statutory Committees, keeping them apprised of the transpiring events and responding to questions related to global proceedings.

---

[54]    DASE filed its Concurso on March 20, 2007 and on July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan for a separation allowance of approximately 45 days of salary per year of service to each employee.  At that time, Delphi and DASHI concluded that it was in their best interests to voluntarily assist DASE in funding payment of certain claims of DASE's suppliers and other non-labor creditors.  Subsequently, with Skadden's assistance, the Debtors filed a motion authorizing DASHI to provide funds to DASE for these purposes.  This Court granted that motion on July 19, 2007.

201.    In connection with the foregoing services, Skadden expended 1,787.90 hours during the Final Application Period for which Skadden seeks compensation of $1,143,565, or 1.3% of the total compensation sought in this Final Application.[55]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-21.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| N. Lynn Hiestand | $950 | 5.70 | $5,415 | $854 | 474.90 | $405,469 |
| Christian Pilkington | $635 | 34.80 | $22,098 | $556 | 522.50 | $290,381 |
| Rena M. Samole | $625 | 36.40 | $22,750 | $580 | 142.10 | $82,471 |
| Ron E. Meisler | $710 | 8.90 | $6,319 | $605 | 118.50 | $71,696 |
| Brian M. Fern | | | | $565 | 78.20 | $44,184 |
| John (Jack) Wm Butler, Jr. | $950 | 1.20 | $1,140 | $874 | 49.40 | $43,154 |
| Sina Toussi | | | | $540 | 69.90 | $37,746 |
| Allison V. Herriott | | | | $410 | 91.80 | $37,666 |
| Kayalyn A. Marafioti | $895 | 1.30 | $1,164 | $813 | 27.20 | $22,119 |
| Kellan Grant | | | | $470 | 44.80 | $21,056 |
| Venera E. Ziegler | | | | $510 | 40.80 | $20,808 |
| Nathan L. Stuart | | | | $440 | 46.20 | $20,328 |
| Melissa T. Kahn | $540 | 21.90 | $11,826 | $540 | 21.90 | $11,826 |
| Thomas J. Matz | | | | $572 | 15.60 | $8,918 |
| Albert L. Hogan III | | | | $695 | 8.90 | $6,186 |
| Amy Van Gelder | | | | $470 | 10.40 | $4,888 |

[55]    Of this amount, 110.20 hours and $70,712 of fees were expended in the Seventh Application Period.  This compares to $330,534, or 3.6%; $205,234, or 1.8%; $32,906, or 0.3%; $46,676, or 0.4%; $186,086, or 1.5%; and $271,417, or 1.8%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| John K. Lyons | | | | $744 | 5.10 | $3,793 |
| Rossie E. Turman III | | | | $540 | 6.10 | $3,294 |
| Dolores De Elizalde | | | | $472 | 6.60 | $3,113 |
| Paola Lozano | | | | $540 | 4.30 | $2,322 |
| Eric L. Cochran | | | | $795 | 2.70 | $2,147 |
| **Total** | 110.20 | **$70,712** | | | 1,787.90 | **$1,143,565 (1.3%)** |
| **Voluntary fee accommodation excluded from total** | | **$19,592** | | | | **$98,187** |

V.      Financing (DIP And Emergence)

            202.    In the days prior to the Petition Dates, Skadden devoted substantial time to

assisting the Debtors' senior management team, finance personnel, and the Debtors' other business

advisors and special counsel, Shearman, in evaluating the size of the debtor-in-possession credit

facility (the "Original DIP Credit Facility") and considering their options in obtaining such

financing.  Skadden and Shearman were well coordinated with respect to tasks to be completed

and worked carefully to avoid duplicating efforts.  As a result of these efforts, at the "first day"

hearing, the Debtors were granted approval by this Court, pursuant to an interim order, to use up to

$950 million of the Original DIP Credit Facility.  Because some of the loan documentation was not

finalized prior to the hearing, the Debtors were involved in negotiations and drafting sessions with

their lenders.  Although Shearman was primarily responsible for the documentation related to the

Original DIP Credit Facility as well as closing the facility, Skadden provided assistance to

Shearman, in particular with respect to the overall legal case strategy, and worked with the Debtors

and their lenders in negotiating the terms of the facility and assisted in preparing certain of the

related documents.  In addition, Skadden was primarily responsible for drafting related pleadings

during the Final Application Period.

203.    The Original DIP Credit Facility was subsequently amended by the First Amendment to the DIP Credit Facility, dated October 27, 2005 (the "First Amended DIP Credit Facility").  This credit facility provided the Debtors with the ability to borrow up to $2.0 billion from a syndicate of lenders arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., for which JPMorgan Chase Bank, N.A. was the administrative agent (the "Administrative Agent") and Citicorp USA, Inc. was syndication agent (together with the Administrative Agent, the "Agents").  Specifically, the DIP credit facility consisted of a $1.75 billion revolving facility and a $250 million term loan facility (collectively, the "Amended DIP Loans").  Similar to the Original DIP Credit Facility, while Shearman had primary responsibility for documenting the amendments, Skadden assisted the Debtors in negotiating the terms of these amendments and provided some assistance with respect to reviewing and drafting related documents.

204.    Leading up to the hearing for final approval of the Debtors' original DIP credit facility, Skadden assisted the Debtors and their other professionals, including Shearman, in resolving more than three dozen objections.  Despite the number and varied nature of objections, the Debtors, with the assistance of their professionals, including Skadden and Shearman, succeeded in negotiating resolutions to all these matters and Skadden professionals presented to this Court an agreed final order for entry.  Accordingly, on October 28, 2005, the Court granted, on a final basis, the Debtors' motion for approval of the DIP financing order, which approved the First Amended DIP Credit Facility, providing the Debtors access to $2 billion in DIP financing subject to the terms and conditions set forth in the DIP financing documents, as amended, and an adequate protection package for the lenders to the prepetition credit facilities as well as to those parties asserting rights of setoff against the Debtors (the "DIP Financing Order").

131

205.    On April 13, 2006, in accordance with the DIP Financing Order, the Debtors further amended their DIP credit facility by entering into that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated November 21, 2005 (the "Second Amended DIP Facility").  The Second Amended DIP Facility, among other things, added new lenders to the DIP Credit Facility, increased the interest rate that was provided under the DIP Credit Facility, and altered the provisions regarding future amendments.  The documents evidencing the Original DIP Credit Facility, the First Amended DIP Credit Facility, and the Second Amended DIP Facility, including the final order entered by this Court on October 28, 2005, were especially voluminous and complex, including borrowing base and financial covenant provisions.  These provisions were the focus of significant attention and input by the Debtors and other parties in interest and Skadden attorneys assisted the Debtors with their analysis.  The Debtors also entered into the Third Amendment to the Amended and Restated Credit Agreement, dated May 26, 2006, which provided Delphi with additional time to deliver both the audited financial statements for the year ended December 31, 2005 and the quarterly financial statements for the periods ended March 31 and June 30, 2006.  Although Shearman had primary responsibility for documenting the amendments, Skadden provided assistance to the Debtors with respect to reviewing and drafting related documents.  During the Final Application Period, Skadden also periodically advised the Debtors with respect to whether, and in what manner, various issues arising in the Reorganization Cases might be affected by the terms of the DIP facility.

206.    In late December 2006, after reviewing then robust conditions in the capital markets and assessing then positive momentum of the Reorganization Cases, the Debtors concluded that they could replace their existing prepetition and postpetition financing on more favorable terms.  Accordingly, the Debtors conducted a search for replacement financing and

132

determined that it was in their best interests to refinance their existing DIP credit facility of $2 billion and their approximately $2.5 billion existing prepetition credit facility. Skadden, working with Shearman, assisted the Debtors in negotiating and documenting the terms of a replacement financing facility (the "Replacement Financing Facility") submitted by a syndicate of lenders led by JPMorgan Chase Bank, N.A.[56] The Replacement Financing Facility provided interest rate reductions on the Debtors' secured financing that ultimately resulted in financing savings of approximately $9 million per month for the balance of the Final Application Period. Skadden drafted, and on December 18, 2006 filed, an expedited motion (Docket No. 6180) seeking authority to refinance its original DIP credit facility. Only one objection to this motion was filed, and the Debtors, with Skadden's assistance, were able to resolve this objection consensually. Subsequently, this Court entered an order approving the motion on January 5, 2007 (Docket No. 6461).

207.    On January 9, 2007, the Debtors, with the assistance of Skadden and Shearman, finalized the Replacement Financing Facility, which consisted of a $1.75 billion first priority revolving credit facility, a $250 million first priority term loan, and an approximate $2.5 billion second priority term loan. Under the Replacement Financing Facility, the interest rate for the revolving facility was reduced by 25 basis points and the interest rate for the first priority term loan was reduced by 50 basis points. By refinancing the prepetition secured debt with the second priority term loan, the interest rate was reduced by 125 to 275 basis points. Under the Replacement Financing Facility, the maturity date for the Debtors' DIP facility was also extended from October 8 to December 31, 2007.

---

[56]    To avoid duplication of effort, Shearman was primarily responsible for documenting the transaction and Skadden took primary responsibility for the related motion practice.

133

208.    In the second quarter of 2007, the Debtors initiated an extensive canvass of potential lenders to ascertain the best available terms and conditions for their exit financing facility.  Skadden, working with Shearman, assisted the Debtors in: (i) creating a master term sheet of preferred terms and conditions for their exit financing documentation and (ii) evaluating the responses of various lenders to the master term sheet.  When it became evident that the Debtors would not be able to raise the aggregate amount of funded debt previously anticipated, the Debtors, with the assistance of both Skadden and Shearman, began discussions with potential lenders concerning "market-clearing" alternatives that would result in lower aggregate funded debt.  In addition, during the Seventh Application Period, Skadden assisted the Debtors in obtaining this court's approval to amend their DIP credit facility, including the extension of the term of the existing facility.  On November 16, 2007, this Court entered an order which, among other things, extended the maturity of the current DIP credit facility to June 30, 2008 and increased the interest rate on tranche A borrowings by 25 basis points and on tranche B and tranche C borrowings by 50 basis points, respectively.  In addition, the amendment increased the global EBITDAR requirement by $100 million when compared to the highest required EBITDAR prior to the amendment.

209.    Furthermore, the Debtors initially anticipated raising $7.1 billion in funded debt and a $1.6 billion asset-based revolving loan to emerge from chapter 11.  Because of a constriction of the capital markets that began in the third quarter of 2007, however, the Debtors reduced the proposed debt levels under the September 2007 Plan by $1.9 billion to facilitate an emergence financing package that could be executed under then-existing market conditions.  Based on certain improvements in the capital markets by November 2007, the Debtors, after consultation with the Creditors' Committee, the Plan Investors, and GM, planned to move

134

forward to obtain $6.8 billion in exit financing and entered into a "commercially reasonable best efforts" engagement with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. to arrange a syndicate of lenders to provide such exit financing arrangements.[57]  Accordingly, during the Seventh Application Period, the Debtors, with Skadden's assistance, filed a motion (Docket No. 10854) seeking authority to enter into certain exit financing engagement and fee letter, which was granted on November 16, 2007 over the objection of the Creditors' Committee and certain other parties-in-interest.  In addition, during the Seventh Application Period, the Debtors, with the assistance of Skadden, began discussions and negotiations in an effort to obtain the necessary exit financing to permit the Debtors to emerge from chapter 11.  On January 3, 2007, Skadden assisted the Debtors in filing a motion requesting authority to allow members of the Creditors' Committee and Equity Committee to participate in the syndication of the exit financing (Docket No. 11691).  Although the U.S. Trustee objected to this relief, Skadden assisted the Debtors in prosecuting the motion and this court entered an order on January 10, 2007 approving the motion.  Throughout the remainder of the Final Application Period, Skadden continued to assist the Debtors in seeking to secure exit financing, including participation in numerous meetings and strategy sessions.

210.   In connection with the foregoing services, Skadden expended 1,896.90 hours during the Final Application Period for which Skadden seeks compensation of $1,081,965, or 1.2% of the total compensation sought in this Final Application.[58]  Detailed time entries of

---

[57]   On January 9, 2008, Delphi announced that the syndication of its exit financing package to support the company's planned emergence from chapter 11 reorganization commenced with potential lenders' meetings in New York City (held on January 9) and London (held on January 10).  Based on operating performance and year-end liquidity above the company's 2007 business plan, Delphi reduced its planned exit facilities from the previously announced $6.8 billion authorized by the Bankruptcy Court to approximately $6.1 billion.

[58]   Of this amount, 758.90 hours and $453,430 of fees were expended in the Seventh Application Period.  This compares to, $296,608, or 3.2%; $20,973, or 0.2%; $267,852, or 2.1%; and $45,574, or 0.3%, of the total fees

each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-22. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Lawrence D. Frishman | $870 | 59.00 | $51,330 | $793 | 273.00 | $216,433 |
| Ron E. Meisler | $710 | 42.50 | $30,175 | $602 | 195.40 | $117,570 |
| John (Jack) Wm Butler, Jr. | $950 | 44.40 | $42,180 | $889 | 118.60 | $105,491 |
| Kellan Grant | $540 | 12.30 | $6,642 | $474 | 199.80 | $94,767 |
| M. Janine Jjingo | $460 | 124.30 | $57,178 | $450 | 144.30 | $64,978 |
| Kayalyn A. Marafioti | $895 | 23.00 | $20,587 | $837 | 58.50 | $48,960 |
| Michael W. Perl | $495 | 89.00 | $44,056 | $495 | 89.00 | $44,056 |
| Thomas J. Matz | $665 | 57.40 | $38,172 | $655 | 64.70 | $42,390 |
| Adlai S. Hardin | $625 | 67.50 | $42,189 | $625 | 67.50 | $42,189 |
| Patrick J. Nash, Jr. | | | | $510 | 56.60 | $28,866 |
| Rossie E. Turman III | | | | $563 | 43.30 | $24,386 |
| Sina Toussi | | | | $540 | 45.10 | $24,354 |
| Eric L. Cochran | $920 | 15.10 | $13,892 | $869 | 25.40 | $22,081 |
| J.R. Lederer | | | | $315 | 59.80 | $18,837 |
| Christopher P. Connors | | | | $585 | 28.30 | $16,556 |
| Karen M. Suber | $420 | 31.00 | $13,020 | $420 | 31.00 | $13,020 |
| Kurt Ramlo | $665 | 19.20 | $12,768 | $665 | 19.20 | $12,768 |
| Brian M. Fern | $625 | 19.10 | $11,938 | $625 | 19.10 | $11,938 |
| Rena M. Samole | $625 | 17.60 | $11,000 | $625 | 17.60 | $11,000 |
| Sarah J. Platt | $420 | 21.80 | $9,156 | $408 | 26.60 | $10,860 |
| Albert L. Hogan III | $775 | 14.00 | $10,850 | $775 | 14.00 | $10,850 |
| Amy Van Gelder | $540 | 19.90 | $10,746 | $540 | 19.90 | $10,746 |

requested for this matter in Skadden's First, Second, Fourth, and Sixth Interim Fee Applications, respectively. Skadden did not request compensation for this matter in its Third or Fifth Interim Fee Applications.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Paola Lozano | | | | $540 | 19.70 | $10,638 |
| Paul L. Cazers | $460 | 22.00 | $10,120 | $460 | 22.00 | $10,120 |
| Matthew J. Micheli | | | | $440 | 16.90 | $7,436 |
| Ian S. Bolton | | | | $390 | 18.70 | $7,293 |
| Jamie Hur | | | | $375 | 12.50 | $4,688 |
| Mike Murphy | $357 | 11.70 | $4,178 | $357 | 11.70 | $4,178 |
| Daniel I. Ganitsky | $625 | 6.50 | $4,063 | $625 | 6.50 | $4,063 |
| Kenneth Berlin | $895 | 1.90 | $1,701 | $836 | 3.60 | $3,010 |
| Allison V. Herriott | | | | $375 | 5.40 | $2,026 |
| David E. Springer | | | | $755 | 2.40 | $1,812 |
| George N. Panagakis | | | | $810 | 1.80 | $1,458 |
| Paraprofessional Total | | 39.70 | $7,489 | | 159.00 | $32,147 |
| **Total** | | **758.90** | **$453,430** | | **1,896.90** | **$1,081,965 (1.2%)** |
| **Voluntary fee accommodation excluded from total** | | | **$41,434** | | | **$103,404** |

Matters Under $1,000,000

W.    Automatic Stay (Relief Actions)

211.    As of the Petition Dates, the Debtors were parties to more than 200 active

and threatened lawsuits.  During the Final Application Period, the Debtors have received

numerous requests, including more than 50 motions that were filed seeking modification of the

stay under section 362 of the Bankruptcy Code.  Skadden worked with the Debtors to reach

consensual resolutions to these lift stay relief matters.  During the Final Application Period,

Skadden professionals worked with the Debtors' legal department, other employees of the

Debtors, and the Debtors' insurers to develop procedures (the "Lift Stay Procedures") for

consensually modifying the automatic stay to permit cost-effective and timely liquidation and

settlement of certain prepetition litigation claims that are covered under the Debtors' general, product, and automobile liability insurance policies.  This Court approved the implementation of the Lift Stay Procedures on June 26, 2006 (Docket No. 4366).

212.    Throughout the Final Application Period, Skadden continued to advise the Debtors frequently regarding the application of the Lift Stay Procedures approved by this Court to various claims, strategies for facilitating settlements thereunder, and proper documentation of such settlements.  Skadden worked with the Debtors' legal department and other employees of the Debtors to reach a consensual resolution in response to many of the requests for modification of or relief from the stay.  In certain cases, however, the Debtors and the movant were unable to resolve their differences, and on those occasions Skadden (and in certain instances Togut) drafted objections to these lift stay motions.

213.    In addition, Skadden created guidelines to aid the Debtors' legal department and other employees of the Debtors in determining whether a particular claim would qualify for reconciliation and settlement under the Lift Stay Procedures.  During the Final Application Period, Skadden continued to assist the Debtors' legal department regarding the application of these Lift Stay Procedures to various claims and to advise the Debtors regarding strategies for facilitating and ultimately implementing strategies with respect to settlements.  Throughout the Final Application Period, Skadden also responded to the Debtors' questions about the information that is to be included in certain reports, which the Debtors were required to provide to the Creditors' Committee and its financial advisors under this Court's order approving the Lift Stay Procedures.  Finally, during the Seventh Application Period, Skadden assisted the Debtors in reviewing, analyzing, and resolving (including drafting a stipulation) certain lift stay motions that were filed during the Seventh Application Period.

138

214.    In connection with the foregoing services, Skadden expended 2,132.00 hours during the Final Application Period for which Skadden seeks compensation of $989,009, or 1.1% of the total compensation sought in this Final Application.[59]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-23.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Brent M. Houston | | | | $415 | 924.20 | $383,790 |
| Brian M. Fern | | | | $489 | 281.90 | $137,795 |
| Kurt Ramlo | | | | $592 | 225.50 | $133,465 |
| Ron E. Meisler | $710 | 2.40 | $1,704 | $550 | 97.00 | $53,328 |
| Matthew J. Micheli | | | | $440 | 120.00 | $52,800 |
| Kathy Zambrano | | | | $410 | 101.00 | $41,410 |
| Kayalyn A. Marafioti | | | | $805 | 41.20 | $33,169 |
| Nathan L. Stuart | | | | $440 | 65.00 | $28,600 |
| Thomas J. Matz | $665 | 2.30 | $1,530 | $570 | 37.60 | $21,428 |
| John K. Lyons | $845 | 1.20 | $1,014 | $780 | 18.70 | $14,578 |
| Kellan Grant | | | | $448 | 29.30 | $13,123 |
| Michael W. Perl | | | | $435 | 30.10 | $13,094 |
| Lisa B. Diaz | | | | $295 | 43.70 | $12,892 |
| Eric J. Howe | $460 | 16.90 | $7,774 | $460 | 16.90 | $7,774 |
| Melissa T. Kahn | $540 | 14.10 | $7,614 | $540 | 14.10 | $7,614 |
| Paul L. Cazers | $460 | 15.70 | $7,222 | $460 | 15.70 | $7,222 |

---

[59]    Of this amount, 57.90 hours and $30,685 of fees were expended in the Seventh Application Period.  This compares to $64,079, or 0.7%; $140,233, or 1.2%; $356,684, or 3.6%; $248,725, or 1.9%; $53,883, or 0.4%; and $100,396, or 0.7%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John (Jack) Wm Butler, Jr. | | | | $835 | 7.40 | $6,180 |
| Albert L. Hogan III | | | | $646 | 6.10 | $3,940 |
| Adlai S. Hardin | $625 | 3.20 | $2,000 | $625 | 3.20 | $2,000 |
| John P. Furfaro | $870 | 2.10 | $1,827 | $870 | 2.10 | $1,827 |
| Allison V. Herriott | | | | $375 | 4.60 | $1,725 |
| M. Janine Jjingo | | | | $335 | 3.60 | $1,206 |
| Paraprofessional Total | | | | | 43.10 | $10,049 |
| **Total** | | **57.90** | **$30,685** | | **2,132.00** | **$989,009 (1.1%)** |
| **Voluntary fee accommodation excluded from total** | | | **$5,907** | | | **$106,801** |

X.    Leases (Real Property)

215.    The Debtors were lessors or lessees with respect to approximately 90 leases of real property.  Skadden worked closely with the Debtors on matters related to such real property leases including (a) advising the Debtors regarding negotiating the renewal or amendments of certain leases, (b) reviewing proposed new leases and negotiating entry into certain new leases, (c) preparing and servicing notices under the Order Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew Real Property Leases Without Further Court Approval, entered on January 6, 2006 (Docket No. 1777), (d) assisting the Debtors with their decision-making process regarding the rejection of leases, including advising the Debtors regarding lease rejection claims and lease rejection strategies, (e) researching and advising the Debtors on the effect of a leasehold assignor's liability for a rejection, (f) reviewing and advising the Debtors with respect to environmental issues concerning the Debtors' nonresidential real property leases, and (g) researching, advising, and resolving various mechanics' lien claims with respect to the Debtors' leased real property.

140

216.    During the Final Application Period, Skadden professionals devoted time to preparing and prosecuting motions relating to nonresidential real property leases including: (a) three motions to extend the deadline to assume or reject leases initially to June 7, 2007 (the "Section 365(d)(4) Extension Motion"), then to the earlier of the date on which the Court confirmed a plan of reorganization and September 30, 2007, and subsequently to the earlier of the date on which the Court confirmed a plan of reorganization and February 29, 2008, (b) a motion approving procedures for the future rejection of leases or subleases and authorizing the Debtors to abandon certain personal property associated with such leases without further Court approval, and (c) a motion approving procedures to enter into new leases or subleases or renew existing leases or subleases without further Court approval.

217.    Skadden also assisted the Debtors in resolving an objection by a lessor, Universal Tool & Engineering Co., Inc. ("UTE"), which objected to the Debtors' rejection of an Indianapolis, Indiana lease (Docket No. 3462).  Specifically, UTE expressed concerns regarding (a) possible unremediated environmental issues at the leased site and (b) the abandonment of hazardous and/or burdensome property at the leased site by the Debtors after April 30, 2006, the proposed effective date of lease rejection.  Although the Debtors prepared to litigate the matter, the Debtors, with Skadden's assistance, were able to consensually resolve the issue without the need for a contested hearing.

218.    In addition, the Debtors, with Skadden's assistance, successfully objected to a motion by Cherokee North Kansas City LLC ("Cherokee") which sought to compel an assumption or rejection of a Missouri lease.  The Debtors, with the assistance of Skadden, conducted discovery regarding Cherokee's motion, including reviewing and producing hundreds of pages of documents in response to Cherokee's document requests, reviewing documents

141

produced by Cherokee, taking the depositions of Cherokee's two witnesses in Kansas City,

Missouri and Denver, Colorado, and preparing for and defending the deposition of Delphi's Chief

Restructuring Officer in Troy, Michigan.  After a contested hearing on the motion, on April 11,

2006, this Court denied Cherokee's motion (Docket No. 3199).

219.    Furthermore, Orix Warren, LLC ("Orix"), a lessor, was the sole objector to

the Section 365(d)(4) Extension Motion.  To resolve this objection, the order approving the

Section 365(d)(4) Extension Motion (Docket No. 5178) provided Orix with an opportunity to file

a notice of objection on or before October 1, 2006.  If Orix failed to file an objection by that date,

the Debtors deadline to assume or reject Orix's lease would have been extended to June 7, 2007.

On September 21, 2006, Orix filed a notice of a supplemental objection to the extension of the

Debtors' deadline to assume or reject their unexpired lease of nonresidential real property in

Warren, Ohio (Docket No. 5178).  Skadden assisted the Debtors in filing reply to Orix's objection

(Docket No. 5590) and drafting a declaration in support of their reply (Docket No. 5590).

Skadden subsequently assisted the Debtors in commencing discovery and then negotiating with

Orix to consensually resolve the objection.  As a result of these efforts, Orix agreed to withdraw

its objection (Docket No. 5940) and the Debtors' six-month extension (to June 2007) to assume or

reject the Orix Lease became effective.

220.    The Debtors, with Skadden's assistance, also completed the negotiation of a

sale-leaseback of a facility comprised of 347,800 square feet of office space and 90,000 square

feet of lab space situated on approximately 35 acres located in Auburn Hills, Michigan.  Skadden

assisted the Debtors with the development of their strategic plan to accomplish the proposed

consolidation and implementation of that plan by negotiating with brokers, sellers, investors, and

other related parties regarding the numerous issues that arose in connection with the proposals to

142

consolidate these sites. Ultimately, the Debtors secured an investor to purchase the property for

$33 million and lease it to the Debtors for a 10-year term. Following the conclusion of these

negotiations, on March 2, 2007, Skadden filed a motion authorizing the Debtors to enter into the

proposed transaction, including the rejection of two leases (Docket No. 7111). Skadden assisted

the Debtors in resolving an objection to this motion and this Court approved the transaction on

March 27, 2007 (Docket. No. 7425), and the Debtors closed the transaction on April 30, 2007.

221. In connection with the foregoing services, Skadden expended 1,615.30

hours during the Final Application Period for which Skadden seeks compensation of $835,706, or

0.9% of the total compensation sought in this Final Application.[60] Detailed time entries of each

Skadden professional related to these services performed during the Seventh Application Period

are attached hereto as Exhibit D-24. A summary of the hours expended and the corresponding

dollar amount of the services performed by each professional during the Seventh Application

Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Catherine E. Danz | | | | $484 | 432.90 | $209,472 |
| Marian P. Wexler | | | | $777 | 152.10 | $118,161 |
| Kellan Grant | $540 | 14.10 | $7,614 | $474 | 206.40 | $97,815 |
| Matthew J. Micheli | | | | $440 | 218.00 | $95,920 |
| Ron E. Meisler | | | | $556 | 100.70 | $55,986 |
| Joseph N. Wharton | | | | $562 | 78.00 | $43,798 |
| Dolores De Elizalde | | | | $440 | 66.20 | $29,128 |
| Neil MacDonald | | | | $585 | 38.20 | $22,347 |

---

[60]    Of this amount, 32.50 hours and $17,124 of fees were expended in the Seventh Application Period. This
compares to $143,190, or 1.6%; $290,834, or 2.6%; $81,111, or 0.8%; $145,356, or 1.1%; $133,549, or 1.1%; and
$24,542, or 0.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and
Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Kayalyn A. Marafioti | | | | $816 | 27.30 | $22,286 |
| David E. Springer | | | | $755 | 25.40 | $19,178 |
| Sina Toussi | | | | $540 | 27.10 | $14,634 |
| Laverne F. Hill | $460 | 13.30 | $6,118 | $417 | 35.00 | $14,581 |
| Melissa T. Kahn | | | | $410 | 29.00 | $11,890 |
| John A. Amodeo | | | | $580 | 20.00 | $11,600 |
| Nick D. Campanario | | | | $464 | 21.80 | $10,123 |
| Kurt Ramlo | $665 | 5.10 | $3,392 | $638 | 15.40 | $9,830 |
| M. Janine Jjingo | | | | $324 | 21.10 | $6,833 |
| Randall G. Reese | | | | $465 | 14.50 | $6,744 |
| Haim Zaltzman | | | | $295 | 21.70 | $6,402 |
| Michael W. Perl | | | | $435 | 14.30 | $6,221 |
| John (Jack) Wm Butler, Jr. | | | | $858 | 6.20 | $5,318 |
| Albert L. Hogan III | | | | $695 | 7.40 | $5,144 |
| Venera E. Ziegler | | | | $510 | 5.20 | $2,652 |
| Allison V. Herriott | | | | $375 | 5.30 | $1,987 |
| Thomas J. Matz | | | | $625 | 2.30 | $1,438 |
| Denise Kaloudis | | | | $495 | 2.40 | $1,188 |
| Paraprofessional Total | | | | | 21.40 | $5,030 |
| **Total** | | 32.50 | $17,124 | | 1,615.30 | **$835,706 (0.9%)** |
| **Voluntary fee accommodation excluded from total** | | | $4,575 | | | **$59,388** |

## Y.    Secured Claims

222.    In the days following the Petition Dates, Skadden devoted substantial time to assisting the Debtors' senior management team and finance personnel and the Debtors' other business advisors in connection with preparing for the October 27, 2005 hearing on the Debtors' DIP credit facility.  Specifically, in connection with the dozens of objections received to the relief requested in the Debtors' DIP financing motion, including an objection by an ad hoc committee of

144

prepetition lenders (the "Ad Hoc Prepetition Lenders"), Skadden attorneys assisted the Debtors in reviewing the issues raised by the objecting parties.  The Debtors, with the assistance of Skadden, devoted a significant amount of resources to working with the advisors for the ad hoc prepetition lenders as well as their prepetition and postpetition lenders in negotiating and resolving these objections.

223.    In connection with resolving the objection filed by the Ad Hoc Prepetition Lenders, the Debtors and their advisors were involved in extensive discovery, including the taking and defending of numerous depositions.  To resolve the objection, Skadden attorneys assisted the Debtors in their negotiation of a mutually acceptable adequate protection package, which was approved by this Court pursuant to the DIP Financing Order entered on October 28, 2005.  In the early stages of the Final Application Period, the Debtors, with the assistance of Skadden professionals, continued to work and meet with their prepetition lenders to keep them reasonably informed with respect to these Reorganization Cases.

224.    Skadden professionals also devoted significant amounts of time after entry of the DIP Financing Order on setoff claims.  Paragraph 18 of the DIP Financing Order set forth comprehensive procedures by which customers and suppliers of the Debtors could exercise and resolve their setoff rights without having to file motions to lift the automatic stay.  Accordingly, the Debtors and their advisors devoted significant amounts of time to analyzing and resolving the numerous requests by customers and suppliers who sought to exercise setoff rights under the DIP Financing Order.  In seeking to resolve these setoff claims, Skadden professionals, working together with Togut (being mindful not to duplicate efforts), dedicated time to tracking the setoff claims, researching their validity and ultimately negotiating their resolution.

225.    Skadden attorneys also dealt with a number of issues regarding the assertion

of liens against the Debtors.  In particular, the Debtors, with Skadden's assistance, analyzed

whether certain claimants could properly assert tooling liens or other statutory liens against certain

of the Debtors' assets.  As part of this analysis, Skadden worked with the Debtors to evaluate and

track complaints filed by numerous alleged lien claimants.  Specifically, on January 16, 2006, four

complaints were filed to establish the validity, extent, and priority of liens, three of which were

resolved consensually.  With respect to the fourth complaint, filed by L&W Engineering, Co. and

Southtec, LLC (the "L&W Plaintiffs"), the Debtors, with Skadden's assistance, reviewed the

allegations, researched the legal issues raised by the complaint, and on June 2, 2006 filed an

answer and counterclaim.  After the L&W Plaintiffs filed their answer to the Debtors'

counterclaim, both the Debtors and the L&W Plaintiffs filed dispositive motions and related

pleadings for a ruling on the merits, including, without limitation, motions for judgment on the

pleadings, statements of material facts, responses, and replies.  Skadden professionals also

participated in several discussions with the L&W Plaintiffs' attorneys about the prospects for

settling this matter.  Ultimately, Skadden's discussions with the L&W Plaintiffs' attorneys

concluded in a consensual resolution of the adversary proceeding as well as a reconciliation of the

prepetition claim filed by L&W Engineering, Co. and Southtec, LLC.

226.    In connection with the foregoing services, Skadden expended 1,509.50

hours during the Final Application Period for which Skadden seeks compensation of $700,936, or

0.8% of the total compensation sought in this Final Application.[61]  Skadden is not seeking

compensation for this matter for the Seventh Application Period.  A summary of the hours

---

[61]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to
$236,983, or 2.6%; $266,437, or 2.4%; $153,028, or 1.5%; and $44,488, or 0.3%; of the total fees requested for
this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.  Skadden did not
request compensation for this matter in its Fifth or Sixth Interim Fee Applications.

146

expended and the corresponding dollar amount of the services performed by each professional

during the Seventh Application Period and the Final Application Period is provided in the

following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Sina Toussi | | | | $540 | 454.90 | $245,646 |
| Venera E. Ziegler | | | | $510 | 192.10 | $97,971 |
| Dolores De Elizalde | | | | $440 | 159.90 | $70,356 |
| William M. Rohner | | | | $463 | 134.20 | $62,151 |
| Ron E. Meisler | | | | $545 | 100.20 | $54,563 |
| Haim Zaltzman | | | | $310 | 87.80 | $27,200 |
| Albert L. Hogan III | | | | $635 | 34.00 | $21,583 |
| M. Janine Jjingo | | | | $314 | 67.90 | $21,308 |
| Thomas J. Matz | | | | $560 | 27.60 | $15,456 |
| John (Jack) Wm Butler, Jr. | | | | $835 | 18.00 | $15,031 |
| Kellan Grant | | | | $410 | 36.50 | $14,965 |
| Allison V. Herriott | | | | $375 | 37.50 | $14,064 |
| Lisa B. Diaz | | | | $295 | 22.50 | $6,637 |
| Rossie E. Turman III | | | | $540 | 8.20 | $4,428 |
| John K. Lyons | | | | $695 | 5.30 | $3,684 |
| Randall G. Reese | | | | $465 | 7.80 | $3,627 |
| Matthew J. Micheli | | | | $440 | 7.00 | $3,080 |
| Dionysios V. Tsiros | | | | $295 | 6.10 | $1,800 |
| Brent M. Houston | | | | $375 | 3.00 | $1,125 |

147

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Paraprofessional Total | | | | | 99.00 | $16,261 |
| **Total** | | | | | **1,509.50** | **$700,936 (0.8%)** |
| Voluntary fee accommodation excluded from total | | | | | | **$29,989** |

Z.    Executory Contracts (Personalty)

227.    The Debtors estimate that, as of the Petition Dates, they were parties to 347,000 scheduled executory contracts and unexpired leases which collectively involved billions of dollars of liabilities.  Throughout the Final Application Period the Debtors, with the assistance of Skadden professionals, responded to numerous requests from counterparties to compel the assumption or rejection of their contracts.  In addition, counterparties to various contracts filed motions for assumption or rejection of their contracts during the Final Application Period and many more threatened to do the same.  Skadden professionals drafted objections to these motions and litigated the merits of such requests to, among other things, protect the Debtors' right to maintain "breathing room" during the Reorganization Cases.  In addition, during the Final Application Period, Skadden professionals consulted with the Debtors regarding the assumption and rejection of certain executory contracts.  This led to, among other things, the drafting and filing of several motions requesting authority to assume or reject various contracts.  Skadden also assisted the Debtors during the Seventh Application Period in seeking a resolution of an equipment purchase dispute with a financial institution, including negotiation of a valuation procedure in an attempt to avoid costly litigation.  In addition, Skadden assisted the Debtors in negotiating a potential lease for the Debtors' fleet vehicles.

228.    Skadden also assisted the Debtors with the review of various executory contracts and, together with the Debtors' senior management and business advisors, evaluatation

148

of contracts and leases for assumption or rejection pursuant to the plan of reorganization. In that regard, during the Final Application Period, Skadden researched various issues relating to assumption and rejection of executory contracts that may arise in connection with a plan. In addition, Skadden worked closely with business personnel and external representatives of the Debtors to facilitate a reconciliation of allegedly outstanding invoices with the Debtors' internal records to determine the Debtors' postpetition payment obligations.

229.    Finally, in connection with the approval of the Disclosure Statement and Solicitation Procedures Order (Docket No. 11389), the Debtors obtained this Court's authority to serve counterparties to material supply agreements with notice designed to establish cure amounts for material supply agreements that were to be assumed under the December 2007 Plan. Skadden professionals worked closely with the Debtors, FTI, and KCC in connection with reviewing these material supply agreements to determine if they were executory contracts requiring cure. In response to these notices, Skadden received numerous inquires as well as certain objections, all of which required a response by an appropriate Skadden professional.

230.    In connection with the foregoing services, Skadden expended 1,308.00 hours during the Final Application Period for which Skadden seeks compensation of $615,889, or 0.7% of the total compensation sought in this Final Application.[62] Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-25. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[62]    Of this amount, 348.90 hours and $163,630 of fees were expended in the Seventh Application Period. This compares to $153,055, or 1.7%; $38,078, or 0.3%; $69,027, or 0.7%; $50,562, or 0.4%; $107,072, or 0.9%; and $34,465, or 0.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Ron E. Meisler | $710 | 21.80 | $15,478 | $583 | 137.40 | $80,085 |
| Brent M. Houston | | | | $435 | 125.80 | $54,724 |
| Kellan Grant | $540 | 10.40 | $5,616 | $458 | 102.80 | $47,070 |
| Matthew Gartner | $420 | 100.30 | $42,126 | $420 | 100.30 | $42,126 |
| Venera E. Ziegler | | | | $510 | 82.00 | $41,820 |
| Brian M. Fern | | | | $547 | 72.40 | $39,596 |
| Melissa T. Kahn | $540 | 62.00 | $33,480 | $540 | 62.00 | $33,480 |
| Matthew J. Micheli | | | | $440 | 70.40 | $30,976 |
| Joseph N. Wharton | $625 | 20.00 | $12,501 | $541 | 52.40 | $28,360 |
| Mike Murphy | $375 | 69.40 | $26,025 | $375 | 69.40 | $26,025 |
| Thomas J. Matz | | | | $563 | 39.20 | $22,069 |
| Haim Zaltzman | | | | $302 | 61.40 | $18,555 |
| Kayalyn A. Marafioti | | | | $808 | 22.20 | $17,948 |
| M. Janine Jjingo | | | | $328 | 49.70 | $16,311 |
| Ian S. Bolton | | | | $390 | 32.80 | $12,792 |
| Kurt Ramlo | $665 | 2.60 | $1,729 | $631 | 18.70 | $11,793 |
| Sina Toussi | | | | $540 | 20.50 | $11,070 |
| Michael W. Perl | | | | $415 | 26.00 | $10,795 |
| Nathan L. Stuart | | | | $440 | 23.10 | $10,164 |
| Paul L. Cazers | $460 | 20.40 | $9,384 | $460 | 20.40 | $9,384 |
| Karen M. Suber | $420 | 10.40 | $4,368 | $383 | 23.90 | $9,161 |
| Carl T. Tullson | $375 | 20.10 | $7,538 | $375 | 20.10 | $7,538 |
| Kathy Zambrano | | | | $410 | 15.60 | $6,396 |
| Eric J. Howe | $460 | 3.10 | $1,426 | $404 | 15.30 | $6,184 |
| Dolores De Elizalde | | | | $440 | 10.00 | $4,400 |
| Denise Kaloudis | | | | $495 | 8.80 | $4,356 |
| Allison V. Herriott | | | | $375 | 7.10 | $2,663 |
| Sarah J. Platt | $420 | 6.30 | $2,646 | $420 | 6.30 | $2,646 |
| Rena M. Samole | | | | $565 | 4.10 | $2,317 |
| David E. Springer | | | | $755 | 2.10 | $1,586 |

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Adlai S. Hardin | $625 | 2.10 | $1,313 | $625 | 2.10 | $1,313 |
| John K. Lyons | | | | $775 | 1.50 | $1,163 |
| Randall G. Reese | | | | $465 | 2.20 | $1,023 |
| Total | | 348.90 | $163,630 | | 1,308.00 | $615,889 (0.7%) |
| Voluntary fee accommodation excluded from total: | | | $12,226 | | | $105,276 |

AA.    Claims Admin. (Reclamation/Trust Funds)

231.    Because of the exceptionally large number of suppliers that shipped

products to the Debtors on a continuous basis, at the beginning of the Reorganization Cases, the

Debtors received more than 850 reclamation demands containing nearly 100,000 lines of data and

asserting an aggregate face amount of more than $285 million in priority claims pursuant to section

546(c) of the Bankruptcy Code.  Skadden worked with the Debtors and their financial advisors to

develop global procedures for receiving, reviewing, responding to, and resolving reclamation

demands.  The Debtors successfully obtained final approval of these procedures on November 4,

2005.  In implementing these procedures, the Debtors, with Skadden's assistance, reviewed

hundreds of reclamation claims and drafted a significant amount of correspondence, including

reclamation response statements and settlement letters.  Skadden also and worked with the Debtors

and their financial advisors to design training materials and process protocols for on-going

negotiations with suppliers.  After reviewing numerous invoices and billing records, the Debtors

identified total reclamation claims of approximately $17.5 million.  On February 21, 2006, the

Debtors sent reclamation response statements to all 855 claimants.  Throughout the Final

Application Period, Skadden continued to work with the Debtors and their business advisors in

negotiating with suppliers regarding disagreements over the amount of individual reclamation claims.

232.    To further the Debtors' goal of resolving reclamation claims, during the Final Application Period, Skadden assisted the Debtors by researching and analyzing certain defenses to priority treatment of reclamation claims, including a defense against such priority treatment based on the presence of liens on the Debtors' assets held by the Debtors' prepetition secured lenders (the "Prior Lien Defense").  In connection with the filing of the December 2007 Plan, Skadden assisted the Debtors in obtaining authority to send an election notice to reclamation claimants, offering them the option to elect to have their reclamation claims treated as if they were general unsecured claims.  If reclamation claimants were to elect to pursue priority treatment, then after emergence from chapter 11, the Debtors would assert the Prior Lien Defense.

233.    In connection with the foregoing services, Skadden expended 1,325.70 hours during the Final Application Period for which Skadden seeks compensation of $550,822, or 0.6% of the total compensation sought in this Final Application.[63]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-26.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Joseph N. Wharton | $625 | 8.60 | $5,376 | $497 | 437.90 | $217,630 |

---

[63]    Of this amount, 14.10 hours and $8,559 of fees were expended in the Seventh Application Period.  This compares to $134,926, or 1.5%; $142,265, or 1.3%; $217,669, or 2.2%; $10,623, or 0.1%; and $36,780, or 0.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Sixth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Fifth Interim Fee Application.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Matthew J. Micheli | | | | $440 | 337.30 | $148,412 |
| John K. Lyons | | | | $703 | 54.00 | $37,972 |
| Ron E. Meisler | | | | $550 | 32.70 | $17,991 |
| M. Janine Jjingo | | | | $335 | 53.30 | $17,856 |
| Kayalyn A. Marafioti | | | | $800 | 15.50 | $12,400 |
| Thomas J. Matz | $665 | 1.70 | $1,131 | $577 | 18.80 | $10,850 |
| Melissa T. Kahn | $540 | 3.80 | $2,052 | $487 | 15.50 | $7,551 |
| Allison V. Herriott | | | | $375 | 19.20 | $7,201 |
| John (Jack) Wm Butler, Jr. | | | | $835 | 6.10 | $5,094 |
| Albert L. Hogan III | | | | $620 | 8.00 | $4,960 |
| Christian Pilkington | | | | $540 | 7.40 | $3,996 |
| George N. Panagakis | | | | $810 | 3.10 | $2,511 |
| Kurt Ramlo | | | | $625 | 1.70 | $1,063 |
| Paraprofessional Total | | | | | 315.20 | $55,335 |
| **Total** | | **14.10** | **$8,559** | | **1,325.70** | **$550,822 (0.6%)** |
| **Voluntary fee accommodation excluded from total** | | | **$4,294** | | | **$60,464** |

BB.    Employee Matters (Pension)

234.    Skadden assisted the Debtors during the Application Period in connection

with bankruptcy and restructuring matters related to the Debtors' seven defined benefit pension

plans covered by termination insurance programs administered by the PBGC.  Among other

things, during the Final Application Period, Skadden communicated with the PBGC regarding

pension matters and responded to certain diligence requests regarding the pension plans.  Skadden

also assisted the Debtors in connection with the filing of their Form 5330.  In addition, during the

Final Application Period Skadden worked with the Debtors in negotiating two separate pension

plan funding waivers from the IRS for their hourly and salaried pension and seeking this Court's

153

approval of same.  On May 11, 2007 the Debtors with the assistance of Skadden, filed a motion

(Docket No. 7932) seeking approval of the first funding waiver which was approved by this Court

on May 31, 2007 (Docket No. 8117).  Furthermore, during the Seventh Application Period, the

Debtors, with the assistance of Skadden, filed a motion seeking the approval of the second funding

waiver, and on October 26, 2007, the Debtors received this Court's approval to comply with the

terms of the waiver (Docket No. 10726).

      235.    In connection with the foregoing services, Skadden expended 841.00 hours

during the Final Application Period for which Skadden seeks compensation of $519,134, or 0.6 %

of the total compensation sought in this Final Application.[64]  Detailed time entries of each Skadden

professional related to these services performed during the Seventh Application Period are

attached hereto as <u>Exhibit D-27</u>.  A summary of the hours expended and the corresponding dollar

amount of the services performed by each professional during the Seventh Application Period and

the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Kayalyn A. Marafioti | $895 | 18.10 | $16,201 | $832 | 96.70 | $80,495 |
| Jay S. Berke | $870 | 47.40 | $41,238 | $846 | 78.30 | $66,267 |
| Albert L. Hogan III | $775 | 23.70 | $18,368 | $728 | 58.00 | $42,207 |
| David A. Schneider | | | | $595 | 53.60 | $31,892 |
| Venera E. Ziegler | | | | $510 | 61.50 | $31,365 |
| John P. Furfaro | $870 | 10.00 | $8,700 | $827 | 36.00 | $29,760 |
| Kellan Grant | | | | $470 | 53.60 | $25,192 |
| Brian M. Fern | $625 | 15.30 | $9,563 | $586 | 42.90 | $25,158 |

---

[64]    Of this amount, 267.40 hours and $182,808 of fees were expended in the Seventh Application Period.  This
compares to $58,190, or 0.5%; $28,202, or 0.3%; $77,033, or 0.6%; $57,919, or 0.5%; and $121,920, or 0.8%, of
the total fees requested for this matter in Skadden's Second, Third, Fourth, and Fifth Interim Fee Applications,
respectively.  Skadden did not request compensation for this matter in its First Interim Fee Application.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Ronald D. Kohut | $540 | 31.70 | $17,118 | $519 | 45.10 | $23,416 |
| Michael W. Perl | | | | $375 | 55.70 | $20,888 |
| Julie Boden Adams | | | | $435 | 47.30 | $20,576 |
| Nick D. Campanario | $610 | 33.30 | $20,313 | $610 | 33.30 | $20,313 |
| Melissa T. Kahn | $540 | 30.00 | $16,200 | $526 | 37.80 | $19,866 |
| Ron E. Meisler | $710 | 18.80 | $13,348 | $659 | 26.80 | $17,668 |
| Adlai S. Hardin | | | | $585 | 17.50 | $10,238 |
| Kurt Ramlo | $665 | 14.90 | $9,909 | $665 | 14.90 | $9,909 |
| Thomas J. Matz | | | | $580 | 13.20 | $7,652 |
| Allen Stenger | | | | $470 | 14.30 | $6,721 |
| Jody J. Brewster | | | | $775 | 8.20 | $6,355 |
| Brandon M. Duncomb | $340 | 16.20 | $5,508 | $340 | 16.20 | $5,508 |
| Sarah J. Platt | | | | $315 | 12.10 | $3,812 |
| N. Lynn Hiestand | $950 | 1.80 | $1,710 | $883 | 4.30 | $3,798 |
| John (Jack) Wm Butler, Jr. | $950 | 2.50 | $2,375 | $924 | 3.80 | $3,513 |
| Aaron S. Feinberg | $610 | 3.70 | $2,257 | $610 | 3.70 | $2,257 |
| Lawrence D. Frishman | | | | $810 | 2.60 | $2,106 |
| Eric L. Cochran | | | | $795 | 1.40 | $1,113 |
| Nathan L. Stuart | | | | $495 | 2.20 | $1,089 |
| **Total** | | **267.40** | **$182,808** | | **841.00** | **$519,134 (0.6%)** |
| **Voluntary fee accommodation excluded from total** | | | **$16,653** | | | **$70,823** |

CC.    Utilities

236.    As of the Petition Dates, the Debtors obtained utility service from

approximately 162 utilities nationwide.  Together, the utilities provided service to the Debtors

under roughly 850 separate billing accounts.  During the Final Application Period, Skadden

professionals worked to ensure that the Debtors would have uninterrupted utility service at each of

the Debtors' locations throughout the country in accordance with section 366 of the Bankruptcy

155

Code.  To this end, Skadden (a) obtained entry of an interim and a final order (the "Final Utilities

Order") prohibiting the utilities from disconnecting service and establishing global procedures for

addressing adequate assurance demands, (b) engaged in extensive negotiation with the objecting

utilities, (c) reviewed and responded to every adequate assurance request, (d) engaged in

negotiations with utility companies, (e) advised the Debtors as to the proration of bills to

distinguish between prepetition claims and the Debtors' postpetition payment obligations, (g)

fielded and responded to telephone calls, e-mail messages, shut-off notices, service

discontinuations, notices of lien, and other enforcement mechanisms in contravention of the Final

Utilities Order, and (h) successfully prevented interruption of the Debtors' utility service.

           237.    In addition, during the Final Application Period, Skadden spent time

drafting and successfully prosecuting the Debtors' Motion for Order under 11 U.S.C. §§ 362, 363,

and 365 Authorizing Debtors To (I) Obtain Significant Improvement In Energy Costs By

Modifying Agreements With Lockport Energy Associates L.P. ("Lockport Energy") And New

York State Electric And Gas Corporation, (II) Assume Modified Agreement With Lockport

Energy Associates L.P., And (III) Consent To Relief From Automatic Stay For Limited Purpose

Of Allowing Lockport Energy Associates L.P. To Record Modified Easements, which the Debtors

believed would result in significant ongoing cost savings at the affected locations (Docket No.

2444).  Indeed, as a result of these efforts, the Debtors anticipated approximately $13.5 million in

cost savings for the Debtors and Lockport Energy agreed to share certain profits with the Debtors,

which was estimated to be $6 million.  This Court entered an order granting this relief on March

17, 2006 (Docket No. 2856).  Finally, during the Final Application Period, Skadden assisted the

Debtors in reviewing and negotiating the terms of an energy contract for one of the Debtor entities.

238.    In connection with the foregoing services, Skadden expended 1,027.70 hours during the Final Application Period for which Skadden seeks compensation of $517,611, or 0.6% of the total compensation sought in this Final Application.[65]  Skadden is not seeking compensation for this matter for the Seventh Application Period.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Venera E. Ziegler | | | | $510 | 802.70 | $409,377 |
| Thomas J. Matz | | | | $560 | 70.50 | $39,480 |
| Ron E. Meisler | | | | $560 | 25.50 | $14,288 |
| Michael W. Perl | | | | $435 | 22.70 | $9,876 |
| Haim Zaltzman | | | | $319 | 30.30 | $9,680 |
| Dolores De Elizalde | | | | $440 | 21.50 | $9,460 |
| Kayalyn A. Marafioti | | | | $795 | 10.20 | $8,110 |
| Sina Toussi | | | | $540 | 13.70 | $7,398 |
| M. Janine Jjingo | | | | $335 | 17.00 | $5,696 |
| Kellan Grant | | | | $410 | 4.80 | $1,968 |
| Lisa B. Diaz | | | | $295 | 3.90 | $1,151 |
| Paraprofessional Total | | | | $230 | 4.90 | $1,127 |
| **Total** | | | | | **1,027.70** | **$517,611 (0.6%)** |
| **Voluntary fee accommodation excluded from total** | | **$66** | | | | **$13,675** |

---

[65]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $295,549, or 3.2%; $192,060, or 1.7%; $13,398, or 0.1%; and $16,604, or 0.1%, of the total fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Fifth or Sixth Interim Fee Applications.

DD.    Asset Analysis And Recovery

239.    Under Bankruptcy Code sections 108(a)(2) and 546(a)(1)(A), the Debtors had until two years after the entry of the order for relief to commence (i) avoidance and other causes of action under chapter 5 of the Bankruptcy Code and (ii) various causes of action under applicable bankruptcy and non-bankruptcy law for which the applicable statute of limitations, but for the chapter 11 filings, would otherwise have expired (collectively, the "Adversary Proceedings").  To preserve these causes of action, the Debtors arguably had to commence them no later than two years after the Petition Dates, or by October 8, 2007 or October 14, 2007, as applicable, or consensually toll the Debtors' respective deadlines to file these actions.

240.    Complex chapter 11 cases such as the Debtors' can result in the filing of thousands of Adversary Proceedings.  Simply identifying potential Adversary Proceedings required a diligent review of tens of thousands of prepetition transactions by the Debtors and their advisors.  The Debtors analyzed relevant financial information and payment histories to identify those causes of action which they believed warranted preservation and which might yield value to the Debtors.

241.    During the Final Application Period, the Debtors intended to emerge from chapter 11 under a reorganization plan consistent with the framework attached to the Delphi-Appaloosa EPCA.  Under such a plan, most avoidance actions would have been unnecessary because all allowed claims would have been satisfied in full.  But because the statutory deadlines for filing the Adversary Proceedings would have passed before the Debtors emerged from chapter 11, the Debtors had to consider in the exercise of their fiduciary duties how to preserve the Adversary Proceedings in the event that the Debtors ultimately emerged from chapter 11 under a plan that did not satisfy all allowed claims in full.

158

242.    The Debtors examined permissible alternatives to filing the Adversary Proceedings before the statutory deadlines and developed proposed procedures to minimize any negative impact that might arise from the filing of those Adversary Proceedings.  Skadden played a principal role in helping the Debtors develop a comprehensive strategy for preparing and filing the Adversary Proceedings and, to the extent possible, effectively obviating any need to file or serve, as applicable, Adversary Proceedings during the Final Application Period.

243.    Skadden coordinated with the Debtors and their other advisors to draft and successfully prosecute a motion for an order authorizing the Debtors to enter into a form tolling agreement with respect to avoidance and other causes of action, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action. To prevent interference with the Debtors' valuable relationships with their contract parties, the procedures permitted the Debtors to file the actions under seal and extend the time for service of the complaints.  Although Skadden assumed the principal role with respect to designing the framework of the procedures, Togut took the lead role in drafting and filing the Adversary Proceedings and tolling agreements.

244.    In connection with the foregoing services, Skadden expended 763.30 hours during the Final Application Period for which Skadden seeks compensation of $453,745, or 0.5% of the total compensation sought in this Final Application.[66]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-28.  A summary of the hours expended and the corresponding dollar

---

[66]    Of this amount, 34.00 hours and $20,027 of fees were expended in the Seventh Application Period.  This compares to $113,719, or 0.9%, and $319,999, or 2.1%, of the total fees requested for this matter in Skadden's Fifth and Sixth Interim Fee Application.  Skadden did not request compensation for this matter in its First, Second, Third, or Fourth Interim Fee Applications.

amount of the services performed by each professional during the Seventh Application Period and

the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Kurt Ramlo | $665 | 9.70 | $6,451 | $628 | 143.80 | $90,264 |
| Christopher P. Connors | $625 | 2.50 | $1,563 | $586 | 113.10 | $66,265 |
| George N. Panagakis | | | | $810 | 77.50 | $62,775 |
| Adlai S. Hardin | | | | $585 | 100.80 | $58,969 |
| Albert L. Hogan III | $775 | 2.60 | $2,015 | $701 | 35.80 | $25,091 |
| Thomas J. Matz | $665 | 8.60 | $5,719 | $634 | 36.70 | $23,282 |
| Nathan L. Stuart | | | | $495 | 44.10 | $21,830 |
| Brent M. Houston | | | | $435 | 42.80 | $18,619 |
| John Guzzardo | | | | $435 | 40.50 | $17,618 |
| John (Jack) Wm Butler, Jr. | $950 | 2.50 | $2,375 | $886 | 17.30 | $15,326 |
| Kayalyn A. Marafioti | | | | $830 | 14.50 | $12,035 |
| Nick D. Campanario | | | | $535 | 20.80 | $11,128 |
| Rena M. Samole | | | | $565 | 14.40 | $8,136 |
| Sarah J. Platt | | | | $355 | 14.70 | $5,219 |
| Kellan Grant | | | | $470 | 6.30 | $2,961 |
| Lee P. Garner | | | | $625 | 4.70 | $2,938 |
| Melissa T. Kahn | | | | $470 | 6.00 | $2,820 |
| Ron E. Meisler | | | | $630 | 4.10 | $2,583 |
| Denise Kaloudis | | | | $495 | 2.20 | $1,089 |
| Paraprofessional Total | | 8.10 | $1,904 | | 23.20 | $4,797 |
| Total | | 34.00 | $20,027 | | 763.30 | $453,745 (0.5%) |
| Voluntary fee accommodation excluded from total | | | $3,875 | | | $36,690 |

EE.    Reports And Schedules

245.    Under the Bankruptcy Code, the Debtors had to prepare separate sets of

Schedules of Assets and Liabilities and Statements of Financial Affairs (together "Schedules and

160

Statements") for each of the 42 Debtors.  The Debtors and their numerous non-debtor affiliates

have historically reported their financial information on a consolidated basis.  Given the diverse

assets, liabilities, and operations of the various Debtors and the need to provide precise

information concerning their financial and operational condition, Skadden assisted the Debtors'

financial, legal, operational, tax, and other personnel and the Debtors' financial advisors to prepare

separate sets of Schedules and Statements for each of the Debtors.  In the aggregate, the Schedules

and Statements for the 42 Debtors included more than 20,000 scheduled liabilities and nearly

347,000 scheduled executory contracts and unexpired leases, which collectively comprised

roughly 22,000 pages of information.  In addition, contemporaneously with the filing of their

Schedules and Statements, the Debtors, with the assistance of Skadden and FTI, filed Global Notes

and Statements of Limitations, Methodology and Disclaimer Regarding Debtors' Schedules and

Statements which set forth the Debtors' assumptions and preparation methodology with respect to

the Schedules and Statements.

          246.    Skadden also worked closely with the Debtors and their financial advisors

following the filing of the Debtors' Schedules and Statements to resolve certain discrete issues

which resulted in the Debtors' filing of certain amendments to the Schedules and Statements.  On

February 1, 2006, the Debtors filed amendments to Schedule F for certain Debtors, to reflect

aggregate debits reflected in the Debtors' cross-charge accounts and to identify certain claims

related to cross-charge accounts as unliquidated.  On April 18, 2006, the Debtors filed further

amendments to the Schedules and Statements to update the Schedules to reflect current prepetition

balances and to make certain modifications to the Schedules and Statements based upon the

Debtors' further review and verification of the information contained therein.  During the Seventh

Application Period, on October 12, 2007, the Debtors filed additional amendments to certain of the Schedules and Statements relating to the supplemental executive retirement program.

247.    In addition, throughout the Final Application Period the Debtors were required to submit Monthly Operating Reports which provided detailed information regarding the Debtors' assets, liabilities, and operations.  Accordingly, Skadden worked with the Debtors' finance and accounting personnel, as well as the Debtors' financial advisors, to review and file Monthly Operating Reports beginning with the report filed on November 30, 2005 and for each subsequent month through December 2007, which was finalized after the Final Application Period.

248.    In connection with the foregoing services, Skadden expended 697.00 hours during the Final Application Period for which Skadden seeks compensation of $366,254, or 0.4% of the total compensation sought in this Final Application.[67]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-29.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Thomas J. Matz | $665 | 28.80 | $19,154 | $604 | 142.50 | $86,132 |
| Randall G. Reese | | | | $465 | 174.60 | $81,190 |
| Kayalyn A. Marafioti | $895 | 14.60 | $13,068 | $838 | 47.30 | $39,657 |
| Allison V. Herriott | | | | $375 | 95.70 | $35,888 |

[67]    Of this amount, 140.00 hours and $79,361 of fees were expended in the Seventh Application Period.  This compares to $187,152, or 2.0%; $22,844, or 0.2%; $8,325, or 0.1%; $7,546, or 0.1%; $14,268, or 0.1%; and $46,758, or 0.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| John K. Lyons | $845 | 3.00 | $2,535 | $707 | 37.40 | $26,443 |
| Karen M. Suber | $420 | 60.10 | $25,242 | $420 | 60.10 | $25,242 |
| Adlai S. Hardin | $625 | 10.00 | $6,251 | $598 | 31.70 | $18,946 |
| John (Jack) Wm Butler, Jr. | | | | $835 | 19.60 | $16,366 |
| Ron E. Meisler | | | | $561 | 18.50 | $10,378 |
| Nathan L. Stuart | $575 | 4.80 | $2,760 | $542 | 8.10 | $4,394 |
| Ronald D. Kohut | | | | $470 | 7.70 | $3,619 |
| M. Janine Jjingo | $460 | 5.90 | $2,714 | $460 | 5.90 | $2,714 |
| Adam F. Halper | $460 | 5.10 | $2,346 | $460 | 5.10 | $2,346 |
| Christian Pilkington | $635 | 3.60 | $2,286 | $635 | 3.60 | $2,286 |
| Rena M. Samole | $625 | 2.60 | $1,625 | $625 | 2.60 | $1,625 |
| Eric L. Cochran | $920 | 1.50 | $1,380 | $920 | 1.50 | $1,380 |
| Marie L. Gibson | | | | $540 | 2.10 | $1,134 |
| Daniel I. Ganitsky | | | | $585 | 1.80 | $1,053 |
| Paraprofessional Total | | | | | 31.20 | $5,461 |
| **Total** | | **140.00** | **$79,361** | | **697.00** | **$366,254 (0.4%)** |
| **Voluntary fee accommodation excluded from total** | | **$12,208** | | | | **$47,145** |

FF.    <u>Intellectual Property</u>

249.    Throughout the Final Application Period, Skadden provided legal advice

regarding bankruptcy-related issues affecting the Debtors' intellectual property – particularly

patents and licenses.  Skadden's professionals spent considerable time analyzing the Debtors'

intellectual property contracts and the law regarding assignability of such contracts in the Second

Circuit under section 365 of the Bankruptcy Code.  In addition, Skadden assisted the Debtors in

other intellectual property matters by (a) analyzing the potential sale of certain of the Debtors'

intellectual property, (b) obtaining an order of this Court on May 30, 2006 authorizing and

approving certain licensing agreements between certain of the Debtors and Denso Corporation,

163

which settled a patent infringement lawsuit between the parties (Docket No. 3950), (c) reviewing and advising the Debtors with respect to the relevant terms affecting intellectual property rights implicated in the agreement for the sale of substantially all of the assets of Affiliate Debtor, MobileAria, Inc., (d) researching, tracking, and analyzing legal issues related to the potential intellectual property claims that could be asserted against the Debtors, including, but not limited to, the possible priority status of such potential claims, and (e) assisting the Debtors in reviewing and assessing the legal implications of entering into several intellectual property licensing agreements.

250.    In addition, during the Final Application Period, Skadden performed a specialized review of numerous intellectual property documents in connection with the due diligence performed by the Plan Investors.  To facilitate these efforts, Skadden professionals participated in numerous conference calls with the Debtors to ensure a timely and efficient flow of information between Skadden, the Debtors, and the Plan Investors.  Finally, during the Seventh Application Period, Skadden assisted the Debtors in reviewing various issues in connection with certain intellectual property agreements because of complications in the law regarding the assumption and assignment of such contracts.  Skadden conducted legal research and assisted the Debtors in drafting a settlement agreement to resolve these issues.

251.    In connection with the foregoing services, Skadden expended 420.30 hours during the Final Application Period for which Skadden seeks compensation of $218,067, or 0.2% of the total compensation sought in this Final Application.[68]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are

---

[68]    Of this amount, 49.50 hours and $30,938 of fees were expended in the Seventh Application Period.  This compares to $22,186, or 0.2%; $65,656, or 0.6%; $32,050, or 0.3%; $47,649, or 0.4%; $12,688, or 0.1%; and $14,028, or 0.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

attached hereto as Exhibit D-30. A summary of the hours expended and the corresponding dollar

amount of the services performed by each professional during the Seventh Application Period and

the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Brian M. Fern | $625 | 49.50 | $30,938 | $601 | 83.30 | $50,035 |
| Brent M. Houston | | | | $417 | 107.30 | $44,698 |
| Venera E. Ziegler | | | | $510 | 66.60 | $33,966 |
| Ron E. Meisler | | | | $558 | 22.80 | $12,727 |
| Andrew F. Strobert | | | | $625 | 20.30 | $12,688 |
| Elaine D. Ziff | | | | $560 | 20.50 | $11,480 |
| Stuart D. Levi | | | | $785 | 14.40 | $11,304 |
| Dolores De Elizalde | | | | $440 | 25.60 | $11,264 |
| Sina Toussi | | | | $540 | 17.50 | $9,450 |
| Joseph N. Wharton | | | | $485 | 12.20 | $5,917 |
| Ian S. Bolton | | | | $390 | 12.50 | $4,875 |
| Thomas J. Matz | | | | $560 | 8.60 | $4,816 |
| Kayalyn A. Marafioti | | | | $795 | 4.20 | $3,339 |
| Haim Zaltzman | | | | $335 | 4.50 | $1,508 |
| **Total** | | **49.50** | **$30,938** | | **420.30** | **$218,067 (0.2%)** |
| **Voluntary fee accommodation excluded from total** | | **$1,377** | | | | **$58,600** |

GG.    Real Estate (Owned)

252.    During the Final Application Period, Skadden professionals assisted the

Debtors in undertaking a comprehensive review of the Debtors' owned real estate and working

closely with employees of the Debtors in coordinating (a) resolution of claims related to

mechanics' liens, (b) sale of de minimis real estate parcels,[69] and (c) analysis of tax issues.

---

[69]    Skadden professionals also billed time to the "Asset Dispositions (Real Property)" matter code when providing services related to the sale of de minimis real estate.

Specifically, through the sale of real property located in Foley, Alabama and in Burton, Michigan,

the Debtors, with Skadden's assistance, realized approximately $5 million for assets that were

otherwise non-performing and were cash-flow negative.  In addition, Skadden assisted the Debtors

in considering the potential purchase of real property related to the Debtors' contemplated

consolidation of certain office and research facilities.  Finally, Skadden worked with the Debtors

in resolving claims related to alleged statutory real property liens and entering into agreements to

list properties that the Debtors intended to sell.

253.    In connection with the foregoing services, Skadden expended 362.60 hours

during the Final Application Period for which Skadden seeks compensation of $217,080, or 0.2%

of the total compensation sought in this Final Application.[70]  Skadden is not seeking compensation

for this matter for the Seventh Application Period.  A summary of the hours expended and the

corresponding dollar amount of the services performed by each professional during the Seventh

Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Marian P. Wexler | | | | $781 | 159.10 | $124,207 |
| Catherine E. Danz | | | | $468 | 88.50 | $41,428 |
| Kellan Grant | | | | $470 | 52.30 | $24,581 |
| Ron E. Meisler | | | | $580 | 26.00 | $15,080 |
| Lisa B. Diaz | | | | $299 | 34.50 | $10,310 |
| Marie L. Gibson | | | | $670 | 2.20 | $1,474 |
| **Total** | | | | | **362.60** | **$217,080 (0.2%)** |
| **Voluntary fee accommodation excluded from total** | | | **$1,436** | | | **$11,056** |

[70]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $63,413, or 0.7%; $44,502, or 0.4%; $31,005, or 0.3%; $42,465, or 0.3%; and $35,695, or 0.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Sixth Interim Fee Application.

HH.    Liquidation/Feasibility

254.    During the Final Application Period, Skadden provided legal advice in connection with preparation of a liquidation analysis which was attached as an exhibit to the Disclosure Statement.  The liquidation analysis was used for the Debtors to demonstrate that the Confirmed Plan was in the best interest of the creditors and interest holders under the Bankruptcy Code.  As part of this work, Skadden conducted legal research regarding various issues to assist the Debtors and their financial advisors in formulating appropriate assumptions for any such analysis.  In addition, in connection with preparing for the confirmation hearing on the Debtors' plan of reorganization, Skadden assisted the Debtors by drafting a declaration to support the feasibility requirement under the Bankruptcy Code.

255.    In connection with the foregoing services, Skadden expended 316.60 hours during the Final Application Period for which Skadden seeks compensation of $161,290, or 0.2% of the total compensation sought in this Final Application.[71]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-31.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[71]    Of this amount, 88.50 hours and $44,667 of fees were expended in the Seventh Application Period.  This compares to $64,538, or 0.5%, and $10,139, or 0.1%, of the total fees requested for this matter in Skadden's Fifth and Sixth Interim Fee Applications, respectively.  Skadden did not seek compensation for this matter in its First, Second, Third, or Fourth Interim Fee Applications.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|------|------|------|------|------|------|------|
| Amy Van Gelder | $540 | 60.60 | $32,724 | $540 | 60.60 | $32,724 |
| Kellan Grant | | | | $470 | 55.60 | $26,132 |
| Randall G. Reese | | | | $465 | 52.50 | $24,413 |
| George N. Panagakis | | | | $810 | 27.50 | $22,275 |
| Allison V. Herriott | | | | $375 | 42.30 | $15,863 |
| Mike Murphy | $375 | 24.20 | $9,075 | $375 | 24.20 | $9,075 |
| Kayalyn A. Marafioti | | | | $822 | 9.00 | $7,397 |
| Matthew Gartner | | | | $355 | 18.00 | $6,390 |
| Nathan L. Stuart | | | | $495 | 9.70 | $4,802 |
| Kurt Ramlo | | | | $625 | 7.40 | $4,625 |
| John (Jack) Wm Butler, Jr. | | | | $875 | 3.60 | $3,151 |
| Albert L. Hogan III | $775 | 3.70 | $2,868 | $775 | 3.70 | $2,868 |
| Ron E. Meisler | | | | $630 | 2.50 | $1,575 |
| **Total** | | **88.50** | **$44,667** | | **316.60** | **$161,290 (0.2%)** |
| **Voluntary fee accommodation excluded from total** | | | **$4,115** | | | **$11,034** |

## II.    Litigation (General)

256.    During the Final Application Period, Skadden was required to devote resources to various litigation matters not within the purview of other project categories. Skadden assisted the Debtors in negotiations relating to some of the non-bankruptcy litigation matters, including the resolution of litigation against the Debtors, and obtaining approval of a motion authorizing and approving various settlement agreements to resolve certain antitrust litigation, and advising the Debtors on the implications of the chapter 11 cases on litigation pending in other, non-bankruptcy venues. Skadden also assisted the Debtors in drafting and prosecuting four motions to extend the period within which the Debtors could seek removal of certain actions from the Bankruptcy Court. At the end of the Final Application Period, pursuant to an order entered by

this Court on August 16, 2007 (Docket No. 9108), the period within which the Debtors could seek

removal of certain actions from the Bankruptcy Court was extended from September 30, 2007 to

and including the later of (i) February 29, 2008 and (ii) 30 days after entry of an order terminating

the automatic stay with respect to the action.

257.    In connection with the foregoing services, Skadden expended 314.50 hours

during the Final Application Period for which Skadden seeks compensation of $146,841, or 0.2%

of the total compensation sought in this Final Application.[72]  Skadden is not seeking compensation

for this matter for the Seventh Application Period.  A summary of the hours expended and the

corresponding dollar amount of the services performed by each professional during the Seventh

Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Brent M. Houston | | | | $435 | 79.40 | $34,540 |
| Kellan Grant | | | | $470 | 46.20 | $21,714 |
| Haim Zaltzman | | | | $326 | 55.40 | $18,077 |
| Kurt Ramlo | | | | $612 | 22.70 | $13,896 |
| Justin L. Heather | | | | $465 | 18.70 | $8,696 |
| Albert L. Hogan III | | | | $620 | 13.80 | $8,556 |
| Ron E. Meisler | | | | $553 | 15.10 | $8,348 |
| Sina Toussi | | | | $540 | 14.00 | $7,560 |
| Nick D. Campanario | | | | $535 | 13.50 | $7,223 |
| Matthew J. Micheli | | | | $440 | 11.60 | $5,104 |
| Joseph N. Wharton | | | | $485 | 8.50 | $4,123 |
| Neil MacDonald | | | | $585 | 6.30 | $3,686 |

---

[72]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $21,112, or 0.2%; $33,598, or 0.3%; $11,076, or 0.1%; $37,702, or 0.3%; $30,997, or 0.2%; and $12,356, or 0.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, Fifth, and Sixth Interim Fee Applications, respectively.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Brian M. Fern | | | | $485 | 4.80 | $2,328 |
| Kayalyn A. Marafioti | | | | $795 | 2.00 | $1,590 |
| Thomas J. Matz | | | | $560 | 2.50 | $1,400 |
| **Total** | | | | | **314.50** | **$146,841 (0.2%)** |
| **Voluntary fee accommodation excluded from total** | | **$11,783** | | | | **$127,217** |

JJ.   <u>Customer Matters (General)</u>

258.   Although every company which seeks chapter 11 relief must work to maintain its customer relationships, this was particularly true in the Debtors' Reorganization Cases. The short time frame in which a disruption in the supply chain can affect an OEM's production capabilities and the Debtors' constant process of bidding for and winning new business from OEMs (a process which takes place several years in advance of production) were inherent in the nature of the Debtors' businesses. Accordingly, maintaining the communication between the Debtors and their customers regarding the chapter 11 process and reassuring customers that the Debtors had the resources to continue to operate and meet production deadlines was vital. As a result, Skadden professionals assisted the Debtors by, among other things, responding to questions and working with the Company to draft and periodically revise presentations for customers. In addition, Skadden assisted the Debtors in responding to various requests and motions filed by customers seeking to lift the automatic stay to effect setoff of prepetition amounts. By facilitating negotiations with the customers and working with the Debtors as they reconcile their books and records, Skadden was able to help the Debtors avoid litigation in many instances. Finally, during the Final Application Period and Seventh Application Period, Skadden assisted the Debtors by, among other things, responding to questions and working with the Company to address issues

170

arising in connection with potential settlements with customers, collection of outstanding accounts receivable, reconciliation of their books and records, and resolving outstanding warranty issues.

259.    In connection with the foregoing services, Skadden expended 183.60 hours during the Final Application Period for which Skadden seeks compensation of $101,784, or 0.1% of the total compensation sought in this Final Application.[73]  Detailed time entries of each Skadden professional related to these services performed during the Seventh Application Period are attached hereto as Exhibit D-32.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| N. Lynn Hiestand | | | | $835 | 30.80 | $25,719 |
| Ron E. Meisler | $710 | 8.70 | $6,177 | $597 | 26.10 | $15,573 |
| Allison V. Herriott | $495 | 3.80 | $1,881 | $389 | 32.20 | $12,532 |
| Sina Toussi | | | | $540 | 21.40 | $11,556 |
| Eric L. Cochran | | | | $795 | 12.40 | $9,859 |
| Randall G. Reese | | | | $465 | 20.80 | $9,673 |
| Paola Lozano | | | | $540 | 13.80 | $7,452 |
| Brian M. Fern | | | | $485 | 7.60 | $3,686 |
| John K. Lyons | | | | $695 | 5.20 | $3,614 |
| Marie L. Gibson | | | | $540 | 4.20 | $2,268 |
| Gregory O. Ogunsanya | | | | $440 | 4.20 | $1,848 |
| John (Jack) Wm Butler, Jr. | | | | $835 | 2.00 | $1,670 |
| Ian S. Bolton | $460 | 2.90 | $1,334 | $460 | 2.90 | $1,334 |
| **Total** | | **15.40** | **$9,392** | | **183.60** | **$106,784** |

---

[73]    Of this amount, 15.40 hours and $9,392 of fees were expended in the Seventh Application Period.  This compares to $72,901, or 0.8%; $9,186, or 0.1%; and $15,305, or 0.2%, of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Fourth, Fifth, or Sixth Interim Fee Applications

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| | | | | | | (0.1%) |
| **Voluntary fee accommodation excluded from total** | | | **$639** | | | **$17,697** |

KK.    <u>Insurance</u>

260.    During the Final Application Period, Skadden assisted the Debtors in connection with the extension and renewal of the Debtors' casualty insurance program, including obtaining the Court's approval for entry into and renewal of the casualty insurance program. Skadden assisted the Debtors in analyzing the conditions requested by each prospective insurer and negotiated certain terms with respect to the prospective renewal insurance programs.  In addition, during the Final Application Period, Skadden assisted the Debtors in analyzing their director and officer insurance policies, including, without limitation, reviewing what expenses may be counted when calculating the deductible component under the policies.

261.    In connection with the foregoing services, Skadden expended 188.10 hours during the Final Application Period for which Skadden seeks compensation of $94,940, or 0.1% of the total compensation sought in this Final Application.[74]  Skadden is not seeking compensation for this matter for the Seventh Application Period.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional during the Seventh Application Period and the Final Application Period is provided in the following table:

---

[74]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $83,523, or 0.9%, and $11,417, or 0.1%, of the total fees requested in Skadden's First and Third Interim Fee Applications for this matter, respectively.  Skadden did not seek compensation for this matter in its Second, Fourth, Fifth, or Sixth Interim Fee Applications.

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Case Period Rate | Case Period Time | Case Period Amount |
|------|------|------|------|------|------|------|
| Brian M. Fern | | | | $485 | 135.60 | $65,767 |
| Ron E. Meisler | | | | $540 | 31.70 | $17,118 |
| Albert L. Hogan III | | | | $620 | 5.20 | $3,224 |
| Kayalyn A. Marafioti | | | | $795 | 4.00 | $3,180 |
| Randall G. Reese | | | | $465 | 4.80 | $2,232 |
| Nick D. Campanario | | | | $465 | 4.10 | $1,907 |
| Thomas J. Matz | | | | $560 | 2.70 | $1,512 |
| **Total** | | | | | **188.10** | **$94,940 (0.1%)** |
| **Voluntary fee accommodation excluded from total** | | **$61** | | | | **$19,569** |

## LL.  Regulatory And SEC Matters

262.    During the early part of the Final Application Period, Skadden prepared for and represented the Debtors in meetings with the Creditors' Committee to discuss matters relating to formal ongoing investigations by several governmental agencies and various securities actions. On October 30, 2006, the SEC commenced and simultaneously settled with Delphi a lawsuit alleging violations of federal securities laws.  This concluded the SEC's ongoing investigation of Delphi regarding the adequacy of disclosures for a number of transactions dating from Delphi's separation from GM.  Under the agreement approved by the SEC, Delphi agreed, without admitting or denying any wrongdoing, to be enjoined from future violations of the securities laws. No civil monetary penalties were imposed against Delphi.  On November 10, 2006, the Debtors, with Skadden's assistance, filed their Motion For Order Authorizing Entry Into Settlement With The Securities And Exchange Commission (Docket No. 5520).  The Court entered an order approving the Debtors' settlement with the SEC on December 11, 2006 (Docket No. 6140).

263.    In connection with the foregoing services, Skadden expended 159.20 hours during the Final Application Period for which Skadden seeks compensation of $94,473, or 0.1%

173

of the total compensation sought in this Final Application.[75]  Skadden is not seeking

compensation for this matter for the Seventh Application Period.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional

during the Seventh Application Period and the Final Application Period is provided in the

following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Nathan L. Stuart | | | | $495 | 56.30 | $27,869 |
| John (Jack) Wm Butler, Jr. | | | | $853 | 20.00 | $17,065 |
| Ron E. Meisler | | | | $585 | 25.70 | $15,035 |
| Kayalyn A. Marafioti | | | | $812 | 11.70 | $9,498 |
| David E. Springer | | | | $755 | 9.40 | $7,097 |
| Albert L. Hogan III | | | | $695 | 8.50 | $5,908 |
| Neil MacDonald | | | | $585 | 5.80 | $3,393 |
| Dhananjai Shivakumar | | | | $625 | 4.20 | $2,625 |
| Michael W. Perl | | | | $435 | 4.70 | $2,045 |
| Thomas J. Matz | | | | $625 | 1.90 | $1,188 |
| Paraprofessional Total | | | | | 11.00 | $2,750 |
| **Total** | | | | | **159.20** | **$94,473 (0.1%)** |
| **Voluntary fee accommodation excluded from total** | | | **$16,195** | | | **$31,367** |

MM.   Asset Dispositions (Real Property)

        264.    During the Final Application Period, Skadden attorneys provided advice to

the Debtors regarding the sale or potential sale of certain assets including excess real property

assets.  Asset dispositions were conducted in accordance with this Court's order approving

---

[75]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $12,245, or 0.1%; $8,624, or 0.1%; and $77,033, or 0.6%, of the total fees requested for this matter in Skadden's First, Second, and Fourth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Third, Fifth, or Sixth Interim Fee Applications.

procedures for the sale of de minimis assets.  In connection with this effort, Skadden assisted the

Debtors with drafting sale disclosure materials, analyzing environmental matters, reviewing

purchase agreements, and evaluating the offers received.

265.   In connection with the foregoing services, Skadden expended 118.70 hours

during the Final Application Period for which Skadden seeks compensation of $72,552, or 0.1%

of the total compensation sought in this Final Application.[76]  Skadden is not seeking

compensation for this matter for the Seventh Application Period.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional

during the Seventh Application Period and the Final Application Period is provided in the

following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Marian P. Wexler | | | | $770 | 56.90 | $43,813 |
| Catherine E. Danz | | | | $465 | 61.80 | $28,739 |
| Total | | | | | 118.70 | $72,552 (0.1%) |
| Voluntary fee accommodation excluded from total | | | $1,049 | | | $7,013 |

NN.    Employee Matters (Retirees/OPEB)

266.   Skadden assisted the Debtors during the Final Application Period in

connection with matters related to retiree benefits.  Among other things, in 2005, Skadden

reviewed motions filed by salaried, non-hourly retirees seeking to vacate an order appointing the

Unions as authorized representatives for union-represented retirees and requesting appointment of

---

[76]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $36,866, or 0.4%; $14,196, or 0.1%; and $21,490, or 0.2%, of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Fourth, Fifth, or Sixth Interim Fee Applications.

an official committee of retirees consisting of former salaried employees receiving retiree benefits

independent of a collective bargaining agreement.  Skadden drafted and filed objections to the

motions and ultimately was successful in consensually resolving this matter.  Accordingly, the

movants voluntarily withdrew their motions.

267.    In connection with the foregoing services, Skadden expended 124.40 hours

during the Final Application Period for which Skadden seeks compensation of $53,157, or 0.1%

of the total compensation sought in this Final Application.[77]  Skadden is not seeking

compensation for this matter for the Seventh Application Period.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional

during the Seventh Application Period and the Final Application Period is provided in the

following table:

| Name | Seventh Period Rate | Seventh Period Time | Seventh Period Amount | Final Application Period Rate | Final Application Period Time | Final Application Period Amount |
|---|---|---|---|---|---|---|
| Brian M. Fern | | | | $485 | 52.00 | $25,220 |
| Lisa B. Diaz | | | | $295 | 47.50 | $14,013 |
| Melissa T. Kahn | | | | $410 | 15.10 | $6,191 |
| Neil M. Leff | | | | $785 | 6.80 | $5,338 |
| John P. Furfaro | | | | $770 | 1.70 | $1,309 |
| John (Jack) Wm Butler, Jr. | | | | $835 | 1.30 | $1,086 |
| **Total** | | | | | **124.40** | **$53,157 (0.1%)** |
| **Voluntary fee accommodation excluded from total** | | | **$7,320** | | | **$13,749** |

---

[77]    Skadden is not requesting compensation for this matter for the Seventh Application Period.  This compares to $21,019, or 0.2%, and $32,138, or 0.3%, of the total fees requested for this matter in Skadden's First and Second Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Third, Fourth, Fifth, or Sixth Interim Fee Applications.

176

Relief Requested

268.    Skadden has submitted monthly fee statements for the period from

October 8, 2005 through January 25, 2008 and, in accordance with the Interim Compensation

Order and the Modified Plan, now submits this Final Application covering the Final Application

Period, including the Seventh Application Period.  Based on the firm's customary billing practices,

the Debtors ordinarily would be billed a total of $99,914,037[78] for fees for the Final Application

Period (of which $21,460,240 constitute fees for the Seventh Application Period) and $6,551,121

for charges and disbursements for the Final Application Period (of which $1,410,619 constitute

charges and disbursements for the Seventh Application Period).  In keeping with Skadden's

commitment to self-policing its fees, charges, and disbursements, and based on various

accommodations to the Debtors, Skadden, as part of its monthly fee statements, voluntarily

reduced its fees by $8,376,439, or approximately 8.4%, and its charges and disbursements by

$794,261[79], or approximately 12.1% for the Final Application Period.  During the Seventh

Application Period, on its monthly statements, Skadden voluntarily reduced its fees by

$1,847,296, or approximately 8.6%, and its charges and disbursements by $174,966, or

approximately 12.4%.  As a result, the actual amount billed to the Debtors on the monthly

statements was $91,537,598[80] for fees for the Final Application Period (of which $19,612,944

constitute fees for the Seventh Application Period) and $5,756,860 for charges and disbursements

for the Final Application Period (of which $1,235,653 constitute charges and disbursements for the

Seventh Application Period).

---

[78]    Skadden has previously provided a credit in the amount of $34,413 to remedy certain discrete billing errors during
        the Final Application Period.  The $99,914,037 is before the application of the  $34,413 credit.

[79]    This amount includes $391 of an internal accommodation for certain charges and disbursements that were not
        reflected on the monthly statements.

[80]    This amount includes the $34,413 adjustment described in the footnote above.

177

269.     Moreover, as an additional accommodation, Skadden has voluntarily reduced the amount sought in this Final Application by $350,789 to reflect, among other accommodations, the elimination of (i) fees related to any timekeeper who billed fewer than ten total hours during the Seventh Application Period, (ii) fees related to any timekeeper who billed less than $1,000 during the Seventh Application Period, (iii) fees related to any instance in which a timekeeper billed less than $1,000 to a particular matter during the Seventh Application Period, (iv) fees related to any matter to which fewer than ten hours were billed during the Seventh Application Period, and (v) fees related to any timekeeper who billed less than $10,000 during the Final Application Period.  As a result, the actual amount sought herein is $90,556,038 for fees. This represents a total reduction with respect to fees, charges, and disbursements of $10,117,859, or approximately 9.5%, from those amounts that Skadden would customarily charge.

270.     The Interim Compensation Order provides that, when seeking interim compensation, professionals must submit monthly fee statements to the Debtors, counsel to the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition credit facility, and members of the Fee Review Committee.  Each person receiving a statement has at least 15 days after its receipt to review it.  If no objection to a monthly fee statement is made within 45 days after the end of the applicable billing period, the Debtors are authorized to pay 80% of the fees requested (with the remaining 20% of the fees requested referred to herein as the "Holdback") and 100% of the charges and disbursements requested.  Skadden has submitted monthly fee statements as described above for each of the months covered by the Final Application Period.

178

271.    Skadden has received $86,984,238 on account of billed fees and $5,756,849 on account of billed charges and disbursements and has accrued a Holdback in the amount of $3,922,589.  After application of an additional client accommodation of $350,789, Skadden is requesting payment of the Holdback in the amount of $3,571,800.

A.    Allowance Of Professional Fees

272.    During the Final Application Period, professionals at Skadden billed an aggregate of 181,423.30 hours reflected in this Final Application working on matters concerning the Debtors' Reorganization Cases.[81]  Of that time spent, 36,058.90 hours were spent by partners, 16,202.50 hours were spent by counsel, 106,139.80 hours were spent by associates, and 23,022.10 hours were spent by legal assistants.  A summary showing the name and position of each such partner, counsel, associate, and legal assistant, together with that person's date of admission to the bar (as applicable), net hours for which compensation is being sought during the Final Application Period and the Seventh Application Period, and blended hourly billing rate, is provided in the Summary of Services found at the beginning of this Final Application.[82]

B.    Reimbursement Of Charges And Disbursements

273.    As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases.  The charges and disbursements charged to clients include, among other things, charges for messenger services, photocopying, court fees, travel expenses, postage, long distance telephone charges, computerized legal research,

---

[81]    Skadden maintains records of the time it expended in the rendition of all professional services, which time records are made concurrently with providing professional services.

[82]    In addition to the matter list, Exhibit C also sets forth the blended hourly rate and certain other business statistics associated with the Reorganization Cases.

investigative searches, and other charges customarily billed by law firms.  Certain charges and

disbursements are not separately charged for under the bundled rate structure as described in the

Engagement Agreement.

274.    Skadden has attempted to minimize the charges and disbursements

associated with the Debtors' Reorganization Cases, particularly for items such as reproduction and

delivery.  These charges have been reduced as a result of the restricted service list and the ability to

serve the 2002 List Parties electronically, which Skadden proposed and this Court approved.

During the Final Application Period and Seventh Application Period, respectively, Skadden

disbursed the following sums for actual and necessary charges and disbursements in the rendition

of professional services in the Reorganization Cases, and requests that it be reimbursed therefor:

| Charged And Disbursements Incurred[83] | Seventh Application Period | Final Application Period |
|---|---|---|
| Travel Expenses | $458,391 | $2,383,911 |
| Reproduction And Document Preparation | $428,137 | $1,824,019 |
| Computer Legal Research | $141,697 | $866,789 |
| Electronic Document Management | $101,583 | $187,405 |
| Court Reporting | $40,242 | $174,484 |
| Courier, Express Delivery, And Postage | $28,149 | $143,536 |
| Telecommunications | $9,450 | $71,405 |
| Outside Research | $13,063 | $71,390 |
| Professional Fees | $9,959 | $17,848 |
| Filing/Court Fees | $4,982 | $15,649 |
| UCC Research/Opinion | | $413 |
| **TOTAL** | **$1,235,653** | **$5,756,849** |

275.    The charges and disbursements listed above are reasonable and are

consistent with those incurred by other bankruptcy practitioners in other large, complex chapter 11

reorganization cases in this and other districts.  Moreover, the size and complexity of these cases,

---

[83]    The details relating to the charges and disbursements for the Seventh Application Periods can be found in <u>Exhibits D-1</u> through <u>D-32</u> on a matter-by-matter basis.

including compliance with the terms of this Court's case management order, as amended, warrant

reimbursement of the foregoing charges and disbursements.

<u>Reasonableness Of Fees, Charges, And Disbursements</u>

276.    Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award

to a professional employed by the estates "reasonable compensation for actual, necessary services"

rendered by the professional, plus "reimbursement for actual, necessary expenses." <u>See</u> 11 U.S.C.

§ 330(a)(1); <u>see generally</u> <u>In re Cenargo Int'l</u>, 294 B.R. 571 (Bankr. S.D.N.Y. 2003); <u>In re Child</u>

<u>World, Inc.</u>, 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

277.    In determining the amount of "reasonable compensation," the Court must

consider the nature, extent, and value of the services, taking into account all the relevant factors,

including the time spent on such services, the rates charged for such services, whether the services

were necessary and beneficial, whether the services were performed in a reasonable amount of

time commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed, and whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

<u>See</u> 11 U.S.C. § 330(a)(3).

278.    In assessing attorneys' fees, courts use several different approaches.  The

Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method,

which is a determination as to the number of hours of service reasonably devoted to the case

multiplied by the attorney's reasonable rates.  <u>See</u> <u>Savoie v. Merchants Bank</u>, 166 F.3d 456, 460

(2d Cir. 1999) (applying lodestar approach to non-bankruptcy case); <u>Masterwear Corp. v. Angel &</u>

<u>Frankel, P.C.</u> (In re Masterwear Corp.), 233 B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When

applying the lodestar approach, courts in this district incorporate the familiar factors set forth in

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).[84]  See, e.g., Betancourt

v. Giuliani, 325 F. Supp. 2d 330, 332 n.3 (S.D.N.Y. 2004) ("In adjusting the lodestar, courts

generally consider the . . . factors set forth in Johnson v. Georgia Highway Express, Inc."); Sucre

v. MIC Leasing Corp. (In re Sucre), 226 B.R. 340, 351-52 (Bankr. S.D.N.Y. 1998) ("To determine

the 'lodestar fee' the Court must make an initial objective determination as to the number of hours

reasonably expended and the reasonable hourly rate.  After multiplying the two, the Court may

adjust the product by consideration of [the Johnson] factors." (citation omitted)).

          279.    In awarding attorneys' fees, courts will also consider whether the services

rendered were reasonably likely to benefit the debtor's estate.  See, e.g., In re Ames Dep't Stores,

Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. U.S. Trustee, 540 U.S. 526

(2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997); In re Drexel

Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).  Thus, the Court should

focus on what a reasonable lawyer would have done at the time and not invoke a hindsight

analysis.

> [I]t is important for a court to maintain "a sense of overall proportion," and not
> "become enmeshed in meticulous analysis of every detailed facet of the
> professional representation."  It is easy to speculate in retrospect that the work
> could have been done in less time or with fewer attorneys or with an associate
> rather than a partner.  On the other hand, it is also possible that [the debtor] would
> not have enjoyed the success it did had its counsel managed matters differently.

Boston & Maine Corp. v. Moore (In re Boston & Maine Corp.), 776 F.2d 2, 10 (1st Cir. 1985)

(citations omitted).

---

[84]    The twelve Johnson factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  Johnson, 488 F.2d at 717-19.

280.    In accordance with the factors enumerated in 11 U.S.C. § 330 and

applicable case law, the amount requested herein by Skadden is fair and reasonable in light of (a)

the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization

Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations

imposed by the Reorganization Cases, (e) the nature and extent of the services rendered, (f)

Skadden's experience, reputation, and ability, (g) the value of Skadden's services, and (h) the cost

of comparable services other than in a case under the Bankruptcy Code.

C.    Nature, Complexity, And Duration Of Cases

281.    As should be evident from the summary of Skadden's services as described

above in this Final Application, the Debtors' chapter 11 reorganization presented a particularly

unique set of circumstances.  Unquestionably, these were large and complex cases.  The nature and

complexity of the Reorganization Cases required Skadden to develop and undertake case

management and staffing solutions at every stage of the proceedings.  These tasks were

particularly complex in light of the Debtors' widespread operations and the relative sophistication

of other parties-in-interest.  Skadden assisted the Debtors by employing a streamlined case

management structure that generally consists of relatively small, core teams, and assigned various

attorneys to other discrete tasks to avoid the performance of duplicative or unnecessary work.

282.    Given the size of these Reorganization Cases and the number of matters that

continually needed to be addressed simultaneously, there were occasions when a number of

Skadden attorneys needed to be present and participate in the discussions and negotiations.  This

was particularly true of meetings with the Creditors' Committee and the Equity Committee and

also with respect to the monthly omnibus hearings.  Skadden believes that, as is evident from the

summaries contained in this Final Application and the time entries attached hereto with respect to

183

the Seventh Application Period, it has articulated specific reasons for attendance by multiple

attorneys on such occasions.

D.    Experience Of Skadden

283.    The experience of Skadden also benefited the estates.  Skadden is among

the largest firms and has one of the largest restructuring groups in the world.  As more fully set

forth in the Retention Application, Skadden's restructuring attorneys and attorneys from other

practice areas have extensive knowledge and experience in dealing with the fast-paced needs of

similar chapter 11 cases.  Accordingly, Skadden's depth of experience in chapter 11 matters has

ensured that a number of pressing matters could be addressed promptly.  In addition, Skadden's

commitment to monitoring the administrative expenses of the estates, including its own legal fees,

has been a constant element of its representation of the Debtors.  Indeed, this emphasis has been

manifested in Skadden's careful review of its fees, charges, and disbursements and a voluntary

client accommodation of $10,117,859, including a voluntary aggregate accommodation of

$9,170,700 on Skadden's monthly fee statements, an additional $907,159 voluntary reduction on

its prior interim fee applications and this Final Application, and an additional $40,000

accommodation agreed to with the Fee Review Committee in connection with Skadden's First,

Second, and Third Interim Fee Applications.

E.    Comparable Services

284.    An award of compensation also must be based on the cost of comparable

services other than in a bankruptcy case.  Skadden's rates are consistent with rate structures

charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed

clearly in its Retention Application, which this Court approved and to which none of the major

constituencies objected.  The amounts sought by Skadden are consistent with the fees, charges, and

disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and

duration.  Accordingly, the cost of comparable services supports the Final Application, and the

nature of the services performed during the Final Application Period, more than warrant the

allowance of the requested compensation, particularly in view of the results achieved.

F.      Compliance With Guidelines

        285.    Skadden believes that this Final Application, together with the attachments

hereto, substantially complies in all material respects with the Guidelines.  The Debtors have paid

all quarterly fees currently due and payable to the U.S. Trustee. To the extent that the Application

does not comply in every respect with the requirements of such guidelines, Skadden respectfully

requests a waiver for any such technical non-compliance.


                                        Notice

        286.    In compliance with the Order Under 11 U.S.C. § 331 Establishing

Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals,

entered by this Court on November 4, 2005 (Docket No. 869) and the Seventh Supplemental Order

Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement

Of Expenses Of Professionals, entered by this Court on January 28, 2008 (Docket No. 12367),

notice of the filing of this Final Application will be provided to all parties who have filed a notice

of appearance with the Clerk of this Court and requested notice of pleadings in these chapter 11

cases.  In addition, the Final Application in its entirety will be served on the following parties: (i)

DPH Holdings Corp., 5725 Delphi Drive, Troy, Michigan 48098, Att'n: John Brooks, David M.

Sherbin, Esq., and John D. Sheehan, (ii) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004, Att'n: Brian

S. Masumoto, Esq., (iii) counsel for the former Creditors' Committee, Latham & Watkins LLP,

885 Third Avenue, New York, New York 10022-4802, Att'n: Robert J. Rosenberg, Esq., (iv)

counsel for the agent under the Debtors' former prepetition credit facility, Simpson Thacher &

Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Att'n: Kenneth S. Ziman, Esq.

and Robert H. Trust, Esq., (v) counsel for the agent under the Debtors' former postpetition credit

facility, Davis Polk & Wardell, 450 Lexington Avenue, New York, New York 10017, Att'n:

Donald S. Bernstein, Esq. and Brian M. Resnick, Esq., and (vi) Valerie Venable, SABIC

Innovative Plastics, 9930 Kincey Avenue, Huntersville, North Carolina 28078.  The Reorganized

Debtors will also provide such other notice of hearing as may be required by the Federal Rules of

Bankruptcy Procedure or as otherwise directed by this Court after the Court determines the hearing

schedule for final fee applications.  In light of the nature of the relief requested, the Reorganized

Debtors submit that no other or further notice is necessary.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing final compensation in the sum of $90,556,038 to Skadden for professional services rendered as attorneys for the Debtors during the Final Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $5,756,849, (b) authorize and direct Skadden to apply $3,571,800 from the account retainer in satisfaction of the Holdback (less the accommodations provided herein), with the remaining $195,068 of the account retainer being applied as a credit by DPH Holdings in its post-emergence engagement agreement with Skadden for post-emergence services, (c) authorize and direct the Reorganized Debtors to release back to the Reorganized Debtors $155,721 from the professional fee escrow allocated to Skadden, and (d) grant it such other and further relief as is just.

Dated:    New York, New York
          December 30, 2009

                          SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                          By:  /s/ John Wm. Butler, Jr.
                               John Wm. Butler, Jr.
                               John K. Lyons
                               Ron E. Meisler
                          155 North Wacker Drive
                          Chicago, Illinois 60606

                               - and -

                          By:  /s/ Kayalyn A. Marafioti
                               Kayalyn A. Marafioti
                          Four Times Square
                          New York, New York 10036

                          Attorneys for DPH Holdings Corp., et al.,
                            Reorganized Debtors

187