1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DPH HOLDINGS CORPORATION, ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        U.S. Bankruptcy Court

        300 Quarropas Street

        White Plains, New York


        December 18, 2009

        10:17 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1   Order signed on 12/14/2009 Shortening Notice with Respect to

2   Retire Committee's Motion to Expand Voluntary Employee Benefit

3   Association Benefits to Hourly Employee Retirees.

4

5   Motion to Approve to Expand Voluntary Employee Benefit

6   Association Benefits to Hourly Employee Retirees filed on

7   behalf of Official Committee of Eligible Salaried Retirees.

8

9   Motion to Extend Time for Service filed on behalf of Official

10   Committee of Eligible Salaried Retirees.

11

12   Reorganized Debtors' Supplemental Reply to Responses of Certain

13   Claimants to Debtors' Objections to (A) Proofs of Clam Nos.

14   13663 and 13730 Filed By The International Union Of Operating

15   Engineers, Local 101-S

16

17   Notice of Sufficiency Hearing With Respect to Debtors'

18   Objection to Proofs of Claim Nos. 1374, 1375, 1376, 1377, 1378,

19   1379, 1380, 1381, 1382, 1383, 1384, 1385, 1386, 1387, 2539,

20   3175, 5408, 6468, 6668, 7269, 9396, 10570.

21

22   Response Reorganized Debtors' Supplemental Reply to Response of

23   Jane M. Duffy to Debtors' Objections to Proof of Claim No. 3175

24   Filed By Jane M. Duffy

25

3

1   Response Reorganized Debtors' Supplemental Reply To Responses

2   Of Certain Claimants To Debtors' Objections To (A) Proof Of

3   Claim Nos. 10570 And 10571 Filed By TK Holdings Inc.,

4   Automotive Systems, Inc., And Takata Seat Belts, Inc.

5

6   Response Reorganized Debtors' Supplemental Reply To Responses

7   Of Certain Claimants To Debtors' Objections To (A) Proof Of

8   Claim No. 6468 Filed By Barbara Burger, (B) Proof Of Claim No.

9   13464 Filed By Paul Pickles

10

11   Response Reorganized Debtors' Supplemental Reply To Responses

12   Of Certain Claimants To Debtors' Objections To Proofs Of Claim

13   Nos. 15513, 15515, 15519, 15520, 15521, 15524, And 15532 Filed

14   By Johnson Controls, Inc. And Affiliates

15

16   Response Reorganized Debtors' Supplemental Reply to Responses

17   of Sharyl Y. Carter to Debtors' Objections to Proofs of Claim

18   Nos. 16849 and 16850 Filed By Sharyl Y. Carter

19

20   Response Reorganized Debtors' Supplemental Reply To Responses

21   Of Certain Claimants To Debtors' Objections To (A) Proofs Of

22   Claim Nos. 1374, 1375, 1376, 1377, 1378, 1379, 1380, 1381,

23   1382, 1383, 1384, 1385, 1386, And 1387 Filed By American

24   Insurance Group

25

4

1    Objection Reorganized Debtors' Objection to Motion of Michigan

2    Self-Insurers' Security Fund To Permit Late Filed Claim

3    Pursuant To Fed. R. Bank. P. 9006(b)

4

5    Notice of Hearing

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

5

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4         Attorneys for DPH Holdings

5         155 N. Wacker Drive

6         Chicago, IL 60606

7

8    BY:   JOHN K. LYONS, ESQ.

9          JOSEPH N. WHARTON, ESQ.

10         ALBERT L. HOGAN, III, ESQ. (TELEPHONICALLY)

11

12

13   STATE OF MICHIGAN, ATTORNEY GENERAL'S OFFICE,

14   LABOR DIVISION, WORKERS' COMPENSATION UNIT

15         Attorneys for Michigan Self-Insurers' Security Fund

16         525 West Ottawa Street

17         5th Floor

18         Lansing, MI 48909

19

20   BY:   DENNIS J. RATERINK, AAG, ESQ.

21

22

23

24

25

6

1

2    ALSTON + BIRD LLP

3         Attorneys for ACE American Insurance Company

4         90 Park Avenue

5         New York, NY 10016

6

7    BY:   MARTIN G. BUNIN, ESQ.

8

9

10   DUANE MORRIS LLP

11        Attorneys for ACE Insurance Group and Pacific Employers'

12           Insurance

13        30 South 17th Street

14        Philadelphia, PA 19103

15

16   BY:   LEWIS R. OLSHIN, ESQ.

17        MARGERY N. REED, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

7

1

2   FARELLA BRAUN & MARTEL LLP

3         Attorneys for Official 1114 Committee of Eligible

4             Salaried Retirees

5         235 Montgomery Street

6         17th Floor

7         San Francisco, CA 94104

8

9   BY:   DEAN M. GLOSTER, ESQ. (TELEPHONICALLY)

10

11

12   GORLICK, KRAVITZ & LISTHAUS, P.C.

13         Attorneys for International Union of Operating Engineers

14             Locals

15         17 State Street

16         4th Floor

17         New York, NY 10004

18

19   BY:   BARBARA S. MEHLSACK, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

8

1

2    PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

3         Attorneys for IBEW and IAM

4         1555 N. Rivercenter Drive

5         Suite 202

6         Milwaukee, WI 53212

7

8    BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ. (TELEPHONICALLY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1                    P R O C E E D I N G S

2          THE COURT:  Okay, everyone else is here on DPH

3    Holdings, Delphi?  Yes?  Okay, so we can take that.

4          MR. GLOSTER:  Good morning, Your Honor.  This is Dean

5    Gloster, Farella Braun & Martel, representing the official 1114

6    committee of eligible salaried retirees.

7          THE COURT:  Okay.  All right, shall we deal with that

8    one first before we deal with all the claim issues?

9          MR. LYONS:  Sure.  This is John Lyons on behalf of DPH

10   Holdings.  Your Honor, I have my colleague, Al Hogan, on the

11   line who will deal with that matter.

12         THE COURT:  Okay.  Good morning, Mr. Hogan.

13         MR. HOGAN:  Good morning, Judge, how are you?

14         THE COURT:  Good, thanks.  So this is the first matter

15   I'm going to take in this case is the unofficial (sic) salaried

16   retiree committees request, which I scheduled by order to show

17   cause.  Is there any opposition to it?

18         MR. HOGAN:  No, Judge, there's not.  I've had several

19   discussions with Mr. Gloster, and I'm not sure if the proposed

20   order that the DSI is going to seek has been submitted to Your

21   Honor, but there are a couple of provisions of that order that

22   are important to the debtors.  One is that there are two

23   previous orders with respect to this matter, and there is a

24   paragraph making clear that the VEBA established by the

25   retirees' committee is sufficient to satisfy the debtors'

10

1   obligations under the prior orders, with respect to the VEBA.

2   And the second is that nothing in this order will place new or

3   additional obligations on the debtor or any successor purchaser

4   of assets.  And so with that, the debtors have no objection and

5   are pleased that the DSRA continues to seek creative ways to

6   help out the debtors' former employees.

7           THE COURT:  Okay.  Well, certainly, the motion itself

8   was consistent with those two points.

9           MR. GLOSTER:  Yes, and we ran a form of order by the

10  attorney for the debtor to make sure that we had that language

11  in there that would satisfy them.

12          THE COURT:  Okay, and is that -- I just want to make

13  sure -- has that form been submitted to chambers yet?

14          MR. GLOSTER:  No, Your Honor, because we wanted to run

15  it by the debtors' lawyer first --

16          THE COURT:  Okay.

17          MR. GLOSTER:  -- and get any comments --

18          THE COURT:  All right.

19          MR. GLOSTER:  -- from them.

20          THE COURT:  Okay.  Otherwise, it's consistent with the

21  relief that you had previously sought?

22          MR. GLOSTER:  Yes, Your Honor.

23          THE COURT:  Right.

24          MR. GLOSTER:  We simply added the paragraph that it

25  does create no additional obligation from the debtor --

11

 1            THE COURT:  Okay.

 2            MR. GLOSTER:  -- or any successor.

 3            THE COURT:  All right, well, when I received this, it

 4    seemed to me that it was appropriate to put on on short notice

 5    since it was really a matter that, economically, the debtor and

 6    its acquirer would be neutral over.  And I didn't see anything

 7    in what was being proposed that would step on any other party

 8    in interest's toes or position.  So having heard from no

 9    opponent to the relief, and based on my review of the motion,

10    I'll grant the relief requested.

11            MR. GLOSTER:  Thank you, Your Honor.  We'll make sure

12    that the debtor is happy with the form of order, then submit it

13    to the Court.

14            THE COURT:  Okay, and I know the timing is important,

15    so my hope is that you could submit it either today or Monday

16    so that you can get notice out to the people so they can make

17    their elections before year end.

18            MR. GLOSTER:  Thank you, Your Honor.

19            THE COURT:  Okay, thank you.

20            MR. GLOSTER:  And now --

21            THE COURT:  You can sign off, that's fine.

22            MR. GLOSTER:  Thank you, Your Honor.

23            MR. HOGAN:  Thank you, Judge.

24            THE COURT:  Thank you.

25            MR. HOGAN:  Okay.

12

1          THE COURT:  Okay.  So now we'll move on to the claims

2    sufficiencies?

3          MR. LYONS:  Yes, Your Honor.  Before we do that, I'd

4    like to actually bring up, if we could, the sufficiency hearing

5    relating to what I'll call the splinter unions' claims.

6          THE COURT:  Okay.

7          MR. LYONS:  We have counsel on the phone, and we

8    understand that Your Honor wanted to have a status conference

9    today.

10         THE COURT:  Well, it just wasn't clear to me where

11   this matter stood at this point.  There were really two aspects

12   to the objection.  There was the waiver aspect or the

13   settlement aspect, and then there was the accrued pension

14   liability aspect.  It just wasn't clear to me from papers --

15   particularly given that the unions' objection or filings in

16   support of their claims were filed back before the acquisition

17   became effective -- where we stood as far as the remaining

18   issues.

19         MR. LYONS:  Your Honor, last night, we filed a reply

20   brief which we think may illuminate the issues and address Your

21   Honor's questions.

22         THE COURT:  Okay.

23         MR. LYONS:  And we have no objection, certainly, to

24   the splinter unions' ability to file a surreply.

25         THE COURT:  Okay.

13

1        MR. LYONS:  And then what I would propose, Your Honor,

2    is you could rule on the papers, or if you'd like to have oral

3    argument, you can let us know --

4        THE COURT:  All right.

5        MR. LYONS:  -- and we'd be happy to appear.

6        THE COURT:  Well, I mean, let me tell you what I think

7    the state of play is, and then you can correct me.  By the way,

8    are -- counsel for the unions, are you able to hear me?

9        MS. ROBBINS:  Yes, Your Honor.  This is Marianne

10   Robbins, IBEW and IAM.

11       THE COURT:  Okay.  Is Ms. Mehlsack on, also?

12       MS. ROBBINS:  She was earlier, Your Honor.

13       THE COURT:  Okay.

14       MS. ROBBINS:  You can't --

15       MS. MEHLSACK:  Your Honor?

16       THE COURT:  Oh, there you are.

17       MS. MEHLSACK:  Yes.

18       THE COURT:  Good morning, Ms. Mehlsack.

19       MS. MEHLSACK:  Okay, good morning, Your Honor.

20       THE COURT:  As I understood it, the only issues

21   remaining are the pension issues, is that right?  That the

22   other matters have been settled, because of the --

23       MS. MEHLSACK:  Your Honor, as far as grievances are

24   concerned, I am just -- I am actually trying to get

25   confirmation from -- and those would be, it's my understanding,

14

1    that the effect of all the orders is to say those are to be

2    resolved in the ordinary course of business.  And I am just --

3    I have been trying to get confirmation from my clients that

4    that either is in the course of happening or already has

5    happened.  I'm having a bit of difficulty with that, but that's

6    just a logistical problem.  I don't think it's a legal issue.

7    And I hope to be able to do that in the next few days.

8         THE COURT:  Okay, but it's not really a claim

9    objection issue, right?  It would be dealt with in terms of the

10   settlements?

11        MS. MEHLSACK:  That's -- I believe that that's

12   correct, Your Honor --

13        THE COURT:  Okay.

14        MS. MEHLSACK:  -- for the Operating Engineers' Locals.

15        THE COURT:  And is that your understanding, also, Ms.

16   Robbins, for your client?

17        MS. ROBBINS:  Yes, Your Honor.  What we were looking

18   for was confirmation that the debtors were still willing to

19   address the grievances we listed in our proof of claim that

20   have not been resolved, that they would be continuing to be

21   willing to resolve them in the ordinary course.  A plant --

22        THE COURT:  But when you say the debtors --

23        MS. ROBBINS:  -- has closed, and I just wanted to

24   obtain confirmation on that.

25        THE COURT:  Okay, but when you say the debtors,

15

1    because the debtors are, you know --

2            MS. ROBBINS:  DPH.

3            THE COURT:  DPH?  Or the -- because DPH is just a -- I

4    thought, well, my impression was that there was another entity,

5    now, that would be dealing with those claims, an ongoing

6    entity.

7            MS. ROBBINS:  Your Honor, my understanding of the plan

8    of reorganization is that closed plants -- and our plant in Oak

9    Creek, Wisconsin, is a closed plant -- remained with DPH.

10           THE COURT:  Oh, okay.  You're right.  I didn't

11   recognize that distinction.  I think you're right.  Do you have

12   anything to say on that?

13           MS. ROBBINS:  And that was one reason for us wanting

14   to clarify --

15           THE COURT:  Right.

16           MS. ROBBINS:  -- the circumstance, because there is no

17   one here in Oak Creek.  It's a matter of finding someone to

18   address them.

19           THE COURT:  Okay.

20           MR. LYONS:  And Your Honor, if I may propose, the DPH

21   believes that all the employees have signed releases pursuant

22   to various attrition plans.  And what I suggest we do is we'll

23   work offline with counsel --

24           THE COURT:  Okay.

25           MR. LYONS:  -- to see which grievances they believe

16

1    are still outstanding, and we'll see if a release has already

2    been signed of that grievance, or if it's been resolved.

3            THE COURT:  And if they haven't been signed and it's

4    not a plant that's been taken over, then I guess I should deal

5    with it in the claims process.

6            MR. LYONS:  And then we'll deal with it in the claims

7    process.

8            THE COURT:  All right.

9            MR. LYONS:  There may be other release.  But again, I

10   think, before you get to the hearing on the claims objection,

11   we will reach out to counsel --

12           THE COURT:  Okay.

13           MR. LYONS:  -- and try to confirm what grievances.

14           MS. ROBBINS:  And that's exactly why we raised that,

15   Your Honor.

16           THE COURT:  Okay.

17           MS. ROBBINS:  And that's fine.

18           THE COURT:  All right, so it seems to me we should

19   bifurcate -- it still seems to me we should bifurcate the

20   issues that were raised by the claim objection.  That set of

21   issues that we've just been talking about, it seems to me that

22   the debtor, well -- let me stop saying the debtor -- DPH

23   Holdings and the two unions should meet and confer, find out

24   what the releases are, confirm that for the plants that were

25   taken over, it's now someone else's issue in the ordinary

17

1    course.  For the plants that were shut down or not taken over,

2    DPH will be dealing with it.  And to the extent that the claims

3    weren't specifically released by the employees, then it'll be

4    on a separate track.  It'll be dealt with at another hearing,

5    that set of claims.  So then we have the accrued -- and I think

6    it's limited to the accrued pension liabilities, right?

7            MR. LYONS:  Well, Your Honor --

8            MS. ROBBINS:  That's --

9            MR. LYONS:  -- I don't want to speak for counsel --

10   they may want to articulate their theory -- but I believe they

11   also have a breach of fiduciary duty claim in there, as well,

12   as opposed to just -- in addition to the lost pension claim

13   that they have.  Now, we obviously have our views as to whether

14   that claim survives or whether --

15           THE COURT:  Well, the issue is whether that's been

16   settled or not, I guess.

17           MR. LYONS:  Settled, and also in connection with the

18   PBGC settlement, Your Honor.  We believe a lot of these

19   arguments were raised, and Your Honor ruled on that.

20           THE COURT:  All right, well that -- I have to say that

21   that didn't -- I think we do need additional briefing on those

22   issues, because what, to me, came through as live issues -- as

23   a live issue, was simply to what extent the unions' pension-

24   related claims survived.  And I do need some clarification on

25   what the union is still asserting, and what, alternatively, now

18

1    that the plan has gone effective and the MOUs are effective,

2    has been covered by the MOU.  I understand that the

3    committee -- I'm sorry, that the two unions take the view that

4    the MOU did not specifically settle certain aspects of the

5    pension-related claim.  But since the objections were made at a

6    time when the MOUs and the plan had not gone final, I think

7    that the unions also preserved other objections.  So Ms.

8    Robbins and Ms. Mehlsack, at this point, what pension related

9    claims are still being asserted by the unions?

10          MS. MEHLSACK:  Wait, Your Honor -- go on, Marianne,

11   then I'll --

12          MS. ROBBINS:  Your Honor, the MOUs provided extensive

13   pension benefits that were not covered by the release.  Now, we

14   understand that the Court's order is that the PBGC would, in

15   fact, be able to terminate the plan.  But we do not believe

16   that those claims that relate to our agreement with Delphi,

17   which in our case, now, go to DPH, are, therefore, released.

18          THE COURT:  Okay, so --

19          MS. ROBBINS:  We also have raised fiduciary claims.

20          THE COURT:  -- let -- I'm sorry, let me interrupt you,

21   just for a second.  So issue number one, then, for the parties

22   to address is what was not released under the MOUs.

23          MS. ROBBINS:  I think, Your Honor, that's right.

24          THE COURT:  That's issue number one.  Okay?

25          MS. ROBBINS:  That's right, Your Honor.

19

1        THE COURT:  Okay.  So, then, issue number two is, I

2   guess, what, as a legal matter, may be precluding the unions

3   from asserting those claims.  Is that issue number two, and

4   that's the issue of the termination of the plans and the

5   settlement with the PBGC?

6        MS. MEHLSACK:  Well, Your Honor, one way of looking at

7   it is that -- and this is Barbara Mehlsack, Your Honor, for the

8   Operating Engineers -- is -- from the debtors' perspective, is

9   that the termination and the takeover by the PBGC, their view

10   is that that precludes the unions from asserting claims.

11        THE COURT:  Right.

12        MS. MEHLSACK:  It is our view that there are two kinds

13   of claims.  One is brief of fiduciary duties, claims, and the

14   debtor has raised standing issues, and there are standing

15   issues that need, I believe, to be briefed.

16        And then there's a question, Your Honor, of the

17   unions' right to claim that, as a result of events, the

18   termination combined with -- conduct by the debtor in

19   connection with the termination combined with the promises that

20   were made in those MOUs, that there have been breaches of the

21   debtors' obligations under ERISA that the unions remain with

22   the authority to claim against the debtors.  And I wish I could

23   make it simpler than I have, but I don't think it is simple,

24   Your Honor.  I think it arises from a combination of both

25   statutory issues, contractual issues, and conduct both pre-plan

20

1    termination and in the course of the termination.  So those are

2    all the issues that I think probably would benefit from

3    additional briefing.

4              THE COURT:  Do you agree with that, Ms. Robbins?

5              MS. ROBBINS:  Your Honor, I think that I would

6    probably state it as, one is the question of what was and was

7    not released, as the Court indicated.  Then DPH is saying then

8    there is the question of what is precluded by events that have

9    transpired, I would say, a little more broadly.  And then there

10   is the status of a breach of fiduciary claim and the issues

11   related to that as they would -- in some cases, that overlaps

12   with one and two, but I think it's a distinct issue.

13             THE COURT:  Okay.  Mr. Lyons, do you have anything to

14   add to that?

15             MR. LYONS:  Well, yes and no, Your Honor.  I would

16   say, I mean, obviously --

17             THE COURT:  I mean, not on the merits.  I know the

18   debtors disagree, but --

19             MR. LYONS:  Exactly.  I'm not arguing the motion right

20   now.

21             THE COURT:  Right.

22             MR. LYONS:  And I understand that.

23             THE COURT:  Right.

24             MR. LYONS:  Your Honor, also, I think we add to that

25   mix the effect of Your Honor's order approving the PBGC

21

1    settlement.  I mean, obviously, it's the debtors' view that

2    once the plan has been terminated, the PBGC, in essence, owns

3    all these claims.  And that claim was settled, pursuant to that

4    settlement agreement.

5        THE COURT:  Okay.  Well, so this is what I would

6    propose.  And I do -- I appreciate the debtors did file a

7    supplemental pleading that added additional, or filled out

8    their arguments.  But I think that I would like the briefing to

9    go in this order.  I would like the debtors to file the first

10   brief, and it would be a short one, except where it would

11   address new points that were not addressed in the supplemental

12   response.

13       MR. LYONS:  Okay.

14       THE COURT:  And then certainly can be longer.  I see

15   the issues as three-fold.  First, what was released under the

16   MOUs and what survives under the MOUs.  Just a contract

17   interpretation issue.  I'm not sure the debtors really -- I'm

18   not sure DPH really dealt with that in its supplement.  So, you

19   know, I wouldn't be upset if you added more on that.

20       The second issue, also, I don't think was dealt with

21   it in the supplement, which is the issue of claim or issue

22   preclusion, in light of either the approval of the PBGC

23   settlement, or perhaps other orders I've entered, including the

24   confirmation order.  That's different than the MOU issue

25   because it deals with the effect of other orders that I've

22

1    entered as opposed to agreements between the parties.

2         And then third, and the debtors have briefed this to

3    some extent, as has the union, but I think it should be -- it

4    can be fleshed out more, given the discussion we've just had --

5    is a legal, well, actually, probably two legal issues tying

6    into the proper interpretation of ERISA and the unions' ability

7    both as a standing matter and as a substantive legal matter --

8    that's why I think they're two issues, one is standing and one

9    is substance -- to assert the two types of claims, the breach

10   of fiduciary claim and the pension-related claim, which I agree

11   is somewhat hard to articulate, and I'm not going to suggest

12   that the debtors try to speculate what that claim is, which is

13   why I'm going to give them a chance to file a reply.

14        But in the first instance, I would like the debtors to

15   deal with, in particular, the standing issue for breach of

16   fiduciary duty claim, and then I'm not going to expect them to

17   anticipate the unions' articulation of what the other claim is.

18   Ms. Mehlsack, I think, correctly stated it.  It's somewhat hard

19   to articulate, but I gather it's based on conduct of the

20   debtors leading up to the deal with the PBGC, in some way,

21   shape, or form, and I'm not sure that's different from,

22   ultimately, a breach of fiduciary duty claim or not.  But I

23   think, probably, in laying out their view of the law on ERISA

24   and preemption and standing, they can, maybe, touch on that

25   point.

23

1          But then I would look for a responsive brief by the

2     unions on those three points.  And frankly, I would look to

3     them to clearly articulate what the claim is, other than the

4     breach of fiduciary duty claim.  And then the debtors would

5     have a chance to reply.  And my belief is that most of the

6     reply would be taken up in dealing with that second type of

7     pension-related claim.  And the rest of the reply would only be

8     if -- to cover things that were just -- whether the DPH felt

9     that the unions were raising a new issue or that they'd really

10    gone off the deep end.

11         But hopefully, that will lay out all the issues.  I

12    may -- based on the papers at that point, I may call you up and

13    ask you to have an oral argument on it.

14         I don't know how long this will take you all to do.

15    When do you think the debtors would be prepared to -- or, DPH

16    would be prepared to file the first brief?

17         MR. LYONS:  Well, yes, and what I suggest Your Honor

18    is we'll look at the next omnibus hearing and kind of adjust

19    the briefing schedule.  I believe our next omnibus hearing is

20    January 21st.

21         THE COURT:  Okay.

22         MR. LYONS:  And maybe I'm wrong.

23         MS. MEHLSACK:  I'm sorry; I didn't hear you, John.

24         MR. LYONS:  What I suggest is that we set our briefing

25    schedule based upon the January 21st hearing.  If Your Honor

24

1    would like oral argument, then at least we'll be ready to go on

2    the January 21st.  So backing up from --

3            THE COURT:  All right, it seems a little tight, to me,

4    but --

5            MS. ROBBINS:  Your Honor, yeah, that would be too

6    tight for me.  I have several other litigations.

7            THE COURT:  Maybe we should look to the next omnibus

8    hearing after that.

9            MR. LYONS:  All right, well, why don't I reach out to

10   counsel, Your Honor?

11           THE COURT:  Okay.

12           MR. LYONS:  And I'm sure we'll be able to work it out.

13           THE COURT:  All right.

14           MS. ROBBINS:  Yeah.  And I guess -- this is Marianne

15   Robbins -- I guess my concern would be that tying the briefing

16   schedule to the omnibus hearing means that we have a very, very

17   short time to do what I think the Court is indicating has to be

18   a real legal doc -- I mean, a document that really has some

19   content.

20           THE COURT:  Well, that's why -- I think that I would

21   tie it to not the next one, but the one after that.

22           MS. ROBBINS:  I guess --

23           THE COURT:  Which I think is in Febru --

24           MS. ROBBINS:  Excuse me, Your Honor, what I'm

25   suggesting is --

25

1        THE COURT:  -- some time in February.

2        MS. ROBBINS:  -- that there'd be adequate time between

3    the debtors' brief and our responsive brief.

4        THE COURT:  Oh, abs -- no, clearly, clearly there

5    would have to be --

6        MS. ROBBINS:  And that it not follow the normal --

7        THE COURT:  No, no, it's not --

8        MS. ROBBINS:  -- schedule where ours comes right on

9    top of the hearing.

10       THE COURT:  No, definitely not.  The one that would

11   come a few days before the hearing would be the reply.  So

12   you'd have to leave each side -- I mean, obviously, you're

13   thinking about these issues in the meantime and researching it,

14   but as far as writing the brief --

15       MS. ROBBINS:  Um-hum.

16       THE COURT:  -- you're going to need, I'd say, three

17   weeks.

18       MS. ROBBINS:  I think that --

19       THE COURT:  -- from the debtors --

20       MS. ROBBINS:  Thank you, Your Honor.

21       THE COURT:  -- from the debtors providing their brief.

22   And I'm happy to give them three weeks for their first brief,

23   too, you know.

24       MS. ROBBINS:  Your Honor, in that line, I think we

25   will confer with debtors' counsel and work out a schedule.

26

1          THE COURT:  Okay.

2          MR. LYONS:  That works for us.

3          THE COURT:  Okay.  All right.  So is there anything

4    more on the two union claim issues, then?

5          MR. LYONS:  No, Your Honor.

6          MS. ROBBINS:  No, Your Honor.

7          MS. MEHLSACK:  No, Your Honor.

8          THE COURT:  So, you two don't need to stay on, unless

9    you want to.

10          MS. MEHLSACK:  No, thank you, Your Honor.

11          MS. ROBBINS:  Thank you, Your Honor.  Thank you for

12    excusing us.  Thank you, Your Honor, and happy New Year.

13          THE COURT:  Okay.

14          MS. MEHLSACK:  Yes, happy holidays.  Bye.

15          THE COURT:  Same to you.  Okay.

16          MR. LYONS:  Okay, shall I proceed with the rest of the

17    agenda?

18          THE COURT:  Yes.

19          MR. LYONS:  Your Honor, the first two items are being

20    adjourned, so I will not spend much time.  There are a number

21    of sufficiency matters in item number 2 that we've adjourned

22    indefinitely, and we'll notice those up for hearing once

23    we've -- at the appropriate time.

24          THE COURT:  Okay.

25          MR. LYONS:  Item number -- the next item matter,

27

1    number 13 (sic) through 14, are uncontested, agreed, or settled

2    matters.  Pursuant to the claims procedures, Your Honor, we did

3    notice out a number of claims for sufficiency hearing, and we

4    only received, well, certainly, we received the splinter

5    unions' response.  We received the response of Ms. Sharyl

6    Carter.  And then, we've also worked informally with Takata,

7    Takata Corporation and Takata Seatbelts and Highland

8    Industries, which are matters number 3 through 6.  So we have a

9    number of what we believe are uncontested matters.  They did

10   not file a responsive brief, and I can briefly go through the

11   claims that are subject to these sufficiency matters.  So Your

12   Honor --

13         THE COURT:  All right, why don't you go through them

14   by name?

15         MR. LYONS:  Okay, very good.  Okay, well, first of

16   all, Your Honor, the Takata Holdings, Takata Corporation,

17   Takata Seatbelts and Highland Industries, this is, in essence,

18   a protective claim in the event that we were to reject those

19   contracts.  Because we have not, they do not have a claim.  So

20   we worked out a consensual form of order which we'll submit to

21   Your Honor.

22         THE COURT:  Okay.

23         MR. LYONS:  So that one is not contested.

24         THE COURT:  That's fine.  I'll enter that when you

25   submit it.

28

1          MR. LYONS:  Okay, next, Your Honor, matter number 7,

2     which is the claim filed by Jane M. Duffy, Your Honor, that is

3     a claim relating to equity.  You know, again, we believe this

4     is a very straightforward matter.  Equity claims are, of

5     course, not claims, as defined under the Code, and therefore,

6     we would seek an order expunging her purported claim which is

7     filed based upon an equity interest.

8          THE COURT:  Right, well, that's, I mean, when -- I

9     agree with that.  The original basis for the objection was

10    insufficient documentation, but it's clear from the

11    documentation that was provided that the claim is based on an

12    equity interest, and therefore, wouldn't be getting a

13    distribution in the case.  So I'll grant that objection.

14         MR. LYONS:  Thank you, Your Honor.  Items number 8

15    through 11 which, by name, were filed by Barbara Burger, Paul

16    Pickles, Hubert Noel Morgan (ph.), and Patricia Wineman (ph.),

17    Your Honor, these all related to salaried OPEB claims, as well

18    as pension claims.  As Your Honor has ruled, previously, the

19    salaried OPEB plan was terminable at will and was, in fact,

20    terminated.  And therefore, no claim arises from the

21    termination of the salaried OPEB plans.  And also, the

22    pensions, Your Honor, were also terminated, and again, the

23    PBGC, as the insurer for the pensions under applicable ERISA

24    law, now, in essence, owns those claims.  So we've sought to

25    have those claims listed on agenda items 8 through 11 expunged.

29

1          THE COURT:  Okay.  I've reviewed the responses that

2     were filed by these individual claimants, as well as the

3     debtors' supplement in response and support of the objection.

4     And I don't see anyone here representing the claimants, or on

5     the phone, the list of parties on the phone.  Is there anyone

6     here on behalf of those claimants?  Okay.

7          Based on my review of the claimants' responses, as

8     well as their claims, first, they appear to be relying upon the

9     OPEB benefits that I have previously determined, by a final

10    order, are terminable at will, and therefore, their claims

11    which are not for liquidated benefit claims but for breach

12    claims, are not supportable, given that the benefits were

13    terminatable at will.

14          As far as the pension claims are concerned, again,

15    these claims are by individual beneficiaries of the Delphi

16    pension plans which were the subject of the settlement with the

17    PBGC, including the PBGC's claim in relation thereto.  I don't

18    believe that any of these claims assert claims other than

19    claims for benefits, pension benefits under those plans.  And

20    consequently, under the case law that the debtors have cited

21    and the commentary, including in Collyer, I think the debtors

22    have sustained their burden in this sufficiency hearing context

23    of showing that the claimants don't have a right to assert a

24    claim in addition to, or to supplement, their benefits that

25    they would be getting, now, through the PBGC.

30

1    So I will enter an order granting the debtors' claim

2  objections to the claims filed by Barbara Burger, Paul Pickles,

3  Patricia Wineman, and Hubert Noel Morgan.

4    MR. LYONS:  Thank you, Your Honor.  Item number 12 on

5  the agenda relates to proofs of claim filed by Johnson

6  Controls, Inc. and affiliates.  One of those claims, we've

7  actually adjourned because it relates to a claim for set-off,

8  which we couldn't reconcile at this point.  But all of the

9  others are, in essence, protective claims, potential breach of

10  contract --

11    THE COURT:  Okay.

12    MR. LYONS:  -- claims.

13    THE COURT:  Was this -- this contract wasn't rejected?

14    MR. LYONS:  This contract --

15    THE COURT:  Or these contracts; I guess it's more than

16  one.

17    MR. LYONS:  You know, I believe, Your Honor, that they

18  may not have been executory.  They may well have -- I believe

19  it was just an asset sale.

20    THE COURT:  Have they expired?

21    MR. LYONS:  Yeah, exactly.

22    THE COURT:  Okay.

23    MR. LYONS:  These were asset sale agreements, asset

24  purchase agreements.  So these were prospective claims that,

25  if -- in essence, indemnities, I believe.

1          THE COURT:  Oh, okay.

2          MR. LYONS:  That if there were --

3          THE COURT:  Well, then they would -- and there've been

4    no liquidated -- there was no response saying that they're now

5    liquidated amounts in respect to the indemnities, so they would

6    be disallowable under 502(e).

7          MR. LYONS:  Correct.  That was our alternative basis,

8    yes.

9          THE COURT:  Okay.

10         MR. LYONS:  And again, just a back up for all these,

11   Your Honor, we served out the notice of sufficiency hearings,

12   they got our briefs.  I mean, these all clearly identified the

13   claims --

14         THE COURT:  Right.

15         MR. LYONS:  -- and claim numbers.

16         THE COURT:  Right.

17         MR. LYONS:  So they did have notice.

18         THE COURT:  Okay.  Well, again, there's nothing in the

19   record to suggest that the contracts have either been rejected

20   or are not -- or are still -- or that there's any liquidated

21   amount owing under them.  So given that, and given the lack of

22   objection, I'll grant the objection with the one exception on

23   the set-off claim.

24         MR. LYONS:  Thank you, Your Honor.  Item number 13 is

25   the claim of AIG.  AIG provided certain insurance to the

32

1    debtors.  Again, this was also an, in essence, a protective

2    claim in case there were some claims that would be subject to

3    reimbursement.  Your Honor, as far as the debtors are

4    concerned, there have been no claims that triggered any kind of

5    claims against the debtors.  And also, these policies were

6    never rejected, so there are no rejection damages, either.

7            THE COURT:  Right.

8            MR. LYONS:  We did serve it, and there has been no

9    response.

10           THE COURT:  Okay, so I'll grant this objection.  I

11   guess it should reflect that it doesn't modify any affirmative

12   rights that AIG has under the stipulation that you have with

13   them.

14           MR. LYONS:  The estimation stipulation?

15           THE COURT:  Yeah.  But that -- I guess there was

16   nothing else remaining under that.

17           MR. LYONS:  No, it was estimated at zero.

18           THE COURT:  But all I remember is there was a

19   stipulation with them, but it doesn't provide for any ongoing

20   relationship, or does it?

21           MR. LYONS:  No, it --

22           THE COURT:  Or does it deal with any ongoing

23   relationship?

24           MR. LYONS:  Your Honor, I guess we'd have to check the

25   estimation stipulation.

33

1           THE COURT:  Well, just take a look at it.

2           MR. LYONS:  We will.

3           THE COURT:  I think that as far as the claims are

4    concerned, clearly the debtors have set forth the basis for

5    their disallowance, and there's been no response on that basis.

6    So I'll grant their disallowance.  I just didn't want there to

7    be an implication that something in that order disallowing

8    their claim changed any other rights that you -- either DPH had

9    in respect to the insurance or AIG had in respect to the

10   insurance.

11          MR. LYONS:  We will make sure that's the case, Your

12   Honor.

13          THE COURT:  Okay.  And then the same with RLI.

14          MR. LYONS:  Very good.  And the same, again, the same

15   thing with RLI, you know, no claims have been -- this is, in

16   essence, our customs bonding company.

17          THE COURT:  Right.

18          MR. LYONS:  And there were no claims against it since

19   the companies had paid customs duties in the ordinary course.

20          THE COURT:  Right.  So I'll grant that objection on

21   the same basis.  There's no stipulation there, so that's easy.

22          MR. LYONS:  Okay, Your Honor.  Finally, we come to our

23   contested matters, which --

24          THE COURT:  Well, I'm sorry, have we dealt with Sharyl

25   Carter?

34

1          MR. LYONS:  That was one of the contested matters.

2          THE COURT:  Oh, okay.

3          MR. LYONS:  Shall we deal with that now and then turn

4    to the Michigan --

5          THE COURT:  Sure.

6          MR. LYONS:  Okay, I'd like to turn the podium over to

7    my colleague, Joe Wharton.

8          THE COURT:  Okay.

9          MR. WHARTON:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. WHARTON:  Joseph Wharton of Skadden Arps on behalf

12    of DPH Holdings.  Before us, we have claims numbers 16849 and

13    16850 filed by Sharyl Carter, a former employee of the debtors.

14    We had objected to those on the thirty-fourth omnibus

15    objection.  Both of these claims are duplicates of each other,

16    each one asserting 50 million dollars plus interest arising

17    from employment litigation between Ms. Carter and the debtors.

18          THE COURT:  Right.

19          MR. WHARTON:  Your Honor, we've brought this up at the

20    sufficiency hearing because, in our view, nothing in our proof

21    of claim or her responses state any sort of cognizable claim.

22    There are no facts stated in her claim supporting a claim

23    against the debtors.  And as we stated in our papers, we

24    request that the Court disallow and expunge these on the

25    grounds that Ms. Carter has not met her burden of proof to

1    allege sufficient facts to support her claim.

2         THE COURT:  Okay, is Ms. Carter present or on the

3    phone?  No.

4         MR. WHARTON:  Not that I'm aware of, Your Honor.

5         THE COURT:  She did -- there was a -- I received the

6    one hand-written response to the objection from July of 2009.

7    Have you received anything else?

8         MR. WHARTON:  He did file and sent to us a response

9    that we, I think, we received yesterday in response to the

10   supplemental reply we filed yesterday.

11        THE COURT:  Oh, yes, I'm sorry.  There's one -- I'm

12   sorry, there's one dated December 11th, as well, which I read,

13   as well.

14        MR. WHARTON:  And that's on the docket as well.

15        THE COURT:  Right, the thirteen-pager.  It seemed to

16   me that clearly the duplicate claim should be expunged.  I had

17   the following two issues on the remaining claim, or the non --

18   what is now the only claim -- in the context, again, of this

19   sufficiency hearing, which is, in essence, a motion to dismiss

20   type of burden.  As I understand it, first, the claim was filed

21   late, after the bar date.

22        MR. WHARTON:  That is correct.

23        THE COURT:  Her December 11 response states that she

24   didn't get notice of the bar date until, basically, she got the

25   objection.  I don't think I have with the -- correct me if I'm

36

1    wrong -- with the -- did the original omnibus objection contain

2    an affidavit by the claims agent showing that the proof of

3    claim bar date had been mailed to her address?

4            MR. WHARTON:  I don't believe that the objection would

5    have stated that, but she was served with a notice of the bar

6    date.

7            THE COURT:  But how do I know that?  Again, this is --

8    unless it's clearly in the record, I don't know if I can rule

9    on that today.

10           MR. WHARTON:  Understood.

11           THE COURT:  Okay.

12           MR. WHARTON:  There is an affidavit of service that

13   KCC had filed in connection with the bar date notice, and we

14   would have to --

15           THE COURT:  Show me that.

16           MR. WHARTON:  -- show you that.

17           THE COURT:  And compare it to her address and the

18   like.  So I don't think I can rule on this particular context

19   on that portion of the claim objection.

20           Secondly, as far as the other portion is concerned,

21   which is really on the merits, that the proof of claim,

22   basically, just says it's a discrimination claim, it's

23   acknowledged that there was -- and it's a reasonable inference

24   to make -- that the claim is premised upon the same facts to

25   the extent there are facts, that were dealt with in the

37

1    district court litigation where the Ohio district court,

2    Southern District of Ohio District Court, granted DAS, LLC's

3    motion for summary judgment.  But there are two issues that I

4    have with that.  One is I don't have the motion for summary

5    judgment -- I don't know -- I don't have the ruling or the

6    underlying -- I don't know what the ruling just -- I don't know

7    whether it lays out or if it just says for the reasons stated

8    in the motion it's granted.  So I can't really tell, based on

9    what's before me, whether I could grant the objection based on

10   that.  It's not a final order because she appealed it.  An

11   appeal is pending when the case was filed and the stay hasn't

12   been lifted.  So it seems to me that there's -- even though the

13   claim is sketchy, it does relate back to something that the

14   debtor actually litigated.  And the debtor prevailed, but it's

15   on appeal.  If I had the opinion, I might be able to rule based

16   on just looking at the opinion and saying that for the reasons

17   stated in the opinion, it's clear that there's no claim.  But

18   it's not res judicata because it's on appeal.

19          So I think you should adjourn this to the next omnibus

20   date.  You can supplement the record, if you wish, with either

21   or both of the affidavit of service of mailing of the bar date

22   notice and a copy of the District Court's summary judgment

23   order and anything that you also believe would be relevant,

24   such as your motion for summary judgment.  Obviously, you'd

25   serve those on Ms. Carter.  And then on those documents, I can

deal with the claim, I think. I mean, I may not rule in your favor, but that would give me a basis, I think. If they show the lack of merit of a claim or the fact that notice was timely delivered, that the claim would either be disallowed as not supported by the law and the facts or disallowed as time bar.

MR. WHARTON: With that information, you could address the time limits --

THE COURT: Yeah.

MR. WHARTON: -- and the lack of sufficiency.

THE COURT: On both of them. Yeah.

MR. WHARTON: Okay, Your Honor, we will take that approach.

THE COURT: Okay. And if you want to give me the order on the duplicate, you can do that Monday or today.

MR. WHARTON: We'll do so on Monday.

THE COURT: Okay.

MR. LYONS: So just to be clear on that, Your Honor, because, again, if we would submit the District Court opinion as well as the affidavit of service, so it would still be in connection with this sufficiency hearing?

THE COURT: I think so.

MR. LYONS: Okay, and we'll --

THE COURT: I don't know. I haven't read the opinion, yet, so I don't know. If the District Court says that there are no documents and nothing to support this, then it would be

39

1    a sufficiency hearing, because that's what her claim relies on,

2    is that litigation.

3            MR. LYONS:  Correct.

4            THE COURT:  So if that Court's already said there's

5    nothing there, then there's nothing there for me, either.

6            MR. LYONS:  So --

7            THE COURT:  If the Court says there is something

8    there, you'd probably have to set up a regular hearing on it.

9            MR. LYONS:  Very good.  And we'll give her a week

10   before the hearing is scheduled to file from the response?

11           THE COURT:  That's fine.

12           MR. LYONS:  I mean, we're kind of deviating from the

13   procedures so --

14           THE COURT:  That's fine.

15           MR. LYONS:  -- we'll give her a week --

16           THE COURT:  Yeah.

17           MR. LYONS:  -- after we submit it.

18           THE COURT:  Yeah.

19           MR. LYONS:  Okay, very good, Your Honor.  The last

20   matter is the Michigan Self-Insurer Securities Funds motion for

21   leave --

22           THE COURT:  Okay.

23           MR. LYONS:  -- to file late claim, so I'll yield the

24   podium to Mr. Raterink.

25           THE COURT:  Well, before I -- just on this last one,

40

1   again, I'm not limiting what you should file to just those two

2   things.  I don't know what, you know, how long or how self-

3   explanatory the District Court's order will be, but you're

4   certainly free to file other pleadings such as the summary

5   judgment motion.  And I would encourage you to do that if, in

6   fact, all the District Court order says is the summary judgment

7   motion is granted for the reasons set forth in the summary

8   judgment motion.

9         MR. LYONS:  Um-hum.  Okay, I understand.  Thank you,

10  Your Honor.

11        THE COURT:  Okay.

12        MR. RATERINK:  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. RATERINK:  Dennis Raterink appearing on behalf of

15  the Michigan Attorney General's Office, representing the

16  Michigan Self-Insurers' Security Fund.  I think right off the

17  bat, as a point of clarification, earlier in this bankruptcy, I

18  had filed an appearance on behalf of the Michigan Workers'

19  Compensation Agency, back in 2005.  At that time, I was

20  representing both the Workers' Compensation Agency and the

21  Michigan Funds Administration, as had been my office protocol

22  at that time.  Subsequently, after a reorganization in my

23  office, those duties are split, and we have filed new

24  appearances in the case with myself representing only the

25  Michigan Funds Administration, which includes the Self-

41

1    Insurers' Security Fund, and a colleague of mine, Susan

2    Przekop-Shaw, representing the Michigan Workers' Compensation

3    Agency.

4         I will point out that there is no notice issue on the

5    bar date in this case.  It was served -- I received a copy of

6    the bar date, and we're not claiming any issues regarding the

7    service of the bar date.

8         THE COURT:  Okay.

9         MR. RATERINK:  The motion we have filed is a motion to

10   permit late-file claims pursuant to Rule 9006(b) in this case,

11   as has been interpreted by the pioneer case.  The two claims in

12   detail, one is a priority tax claim in the amount of over 25

13   million dollars; the other is a general unsecured claim in the

14   amount of over 36 million dollars.  Both of these claims deal

15   specifically with potential liabilities that the Self-Insurers'

16   Security Fund may face for past workers' compensation claims,

17   those incurred prior to the petition date.

18        THE COURT:  Can I just -- this is mostly just for

19   background edification.

20        MR. RATERINK:  Yes.

21        THE COURT:  When you say potential liability for past

22   claims, how do you calculate this.  Is it -- do you see what's

23   in the pipeline, or how do you come up with --

24        MR. RATERINK:  Yeah, when I say potential --

25        THE COURT:  And I'm not asking you to be specific in

42

1    the numbers, but just what's the methodology?

2        MR. RATERINK:  In this particular case, what we had

3    done was communicate with the third party administrator for

4    Delphi, which I don't recall the name of the administrator at

5    this point.  Sedgewick James, yes.  They had provided us with

6    information regarding their estimates, their reserves of the

7    values of the claims, if they would be paid out over time.

8    Those assessments are a combination of looking at the age of

9    the claimant, the amount of weekly benefits they're entitled

10   to, and the prospects of them becoming ineligible for benefits

11   before the end of their lifetime.

12       THE COURT:  So it's kind of -- there's a -- a big

13   element of it is a kind of an actuarial --

14       MR. RATERINK:  Correct.

15       THE COURT:  -- set of assumptions?

16       MR. RATERINK:  Correct.  Now, our actual claim amounts

17   are not strict actuarial amounts.  We put in our claims that we

18   believe that debtor may possess those type of accounts, and

19   we've requested those, but we don't -- that's not what the

20   claims are based on at this time.

21       THE COURT:  Okay.

22       MR. RATERINK:  Okay.

23       THE COURT:  So at any one time, then, whether it's --

24   well, assume the debtors' operating.

25       MR. RATERINK:  Um-hum.

43

1      THE COURT:  And you don't have a cut-off where people

2    are -- either become employees of a new company because the

3    debtor's been sold, or because the debtor shut down, and

4    therefore, a lot of people are unemployed.  So leaving that

5    aside, assume it's an ongoing business, at any one time, you

6    can make this calculation?

7      MR. RATERINK:  The calculation -- we're not always

8    privy to the information that we have in this case.

9      THE COURT:  Right.

10      MR. RATERINK:  So in cases, it may have to be an

11    unliquidated amount that that would be filed.

12      THE COURT:  Okay.

13      MR. RATERINK:  That would be common in some of the

14    past cases.

15      THE COURT:  But if you did have -- if you were privy

16    to the administrator of it, like here --

17      MR. RATERINK:  Yes.

18      THE COURT:  -- so for example, Ford or Chrysler, you

19    know, in 2000 -- well, in the summer of 2009 for Chrysler, you

20    could do it, or in 2005 or whenever, you could do it.

21      MR. RATERINK:  Correct.  As long as there are reserves

22    that have been calculated, those could be passed on as claim

23    amounts.

24      THE COURT:  Okay.

25      MR. RATERINK:  The other part of the potential -- the

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

44

1    reason I use the word potential obligations is the fact that

2    while we have listed these specific amounts in these two

3    claims, it should be noted for the record that, in fact,

4    assuming that the judge would approve our motion today, we may

5    have to amend the claims to address another situation which I

6    believe you are aware of.  There is an adversary proceeding

7    that's been filed at this point by ACE American Insurance and

8    Pacific Employers' Insurance.  Because there's another issue

9    pending in the Michigan Workers' Compensation Agency regarding

10   exactly who is liable for those remaining DPH/Delphi benefits.

11   If, in the end, there's a determination that ACE is, in fact,

12   liable for any or all of the claimed time periods, that would

13   reduce the amounts of the Self-Insurers' Security Fund's

14   claims, here.  So there may be a portion that is contingent.

15        The Self-Insurers' Security Fund is run by a board of

16   trustees.  That board of trustees has accepted liability for

17   two periods of time, two periods of time for which there is no

18   other potential payor.  So these two claims also incorporate

19   those time periods, so there may need to be an amended claim.

20        THE COURT:  Okay.  And remind me on that, because I

21   know we had a conference on that.

22        MR. RATERINK:  Yes.

23        THE COURT:  What's the status of that litigation at

24   this point?

25        MR. RATERINK:  In this court?  Or in the Michigan

45

1        Workers' Compensation Agency?

2              THE COURT:  Well, both.

3              MR. RATERINK:  The most recent update in the Workers'

4        Compensation Agency is that the Workers' Compensation Agency

5        has scheduled a, what's termed a Rule 5 hearing for the first

6        week of January.  A Rule 5 is a hearing that's reserved for

7        cases in which there's an assertion that a party is not being

8        compliant with the act.  The Michigan Self-Insurers' Security

9        Fund is not a direct party to that claim.  My understanding is

10       it's the director of the Workers' Compensation Agency against

11       ACE and Pacific.  However, I have filed an appearance in that

12       case as an interested party.

13             In the adversary proceeding, we have a motion hearing

14       for that same week, I believe it's January 8th, for the joint

15       motion from the Michigan Workers' Compensation Agency and Fund

16       Administration to dismiss the adversary complaint, or, in the

17       alternative, hold for the Court to abstain from hearing the

18       case.

19             THE COURT:  Okay, and then, as I remember, there was

20       also, I thought, going to be some potential action by a state

21       court of Michigan on not this set of issues, but a very closely

22       related set of issues that didn't involve Delphi or ACE, but

23       other -- very similar set of facts.  Do you know whether that

24       ruling's come down?

25             MR. RATERINK:  I'm not aware of anything pending.

46

1          THE COURT:  Or maybe I'm not remembering it correctly.

2          MR. OLSHIN:  Your Honor, I'm Lew Olshin.  I represent

3     ACE and Pacific and when Your Honor feels it's appropriate, I

4     can answer some of these questions.

5          THE COURT:  Well, do you know the answer to that one?

6          MR. OLSHIN:  I do know the answer to that.

7          THE COURT:  Okay.

8          MR. OLSHIN:  There has been no ruling in that case.

9          THE COURT:  All right.

10         MR. OLSHIN:  It's still pending.  And just to make a

11    clarification for the record, the proceeding that Mr. Raterink

12    makes reference to, our clients just received notice of three

13    or four days ago.

14         THE COURT:  Okay.

15         MR. OLSHIN:  And one of the things we want to discuss

16    with Your Honor when it's appropriate is we believe this is an

17    attempt to circumvent the jurisdiction of this court prior to

18    your determination on January the 8th.  And we realize the time

19    of year it is.  We are contemplating, perhaps, filing a Rule

20    105 motion for injunctive relief because we believe that --

21         THE COURT:  Okay, but that's a separate --

22         MR. OLSHIN:  It is separate, but I would like, at an

23    appropriate point to just --

24         THE COURT:  Okay.

25         MR. OLSHIN:  -- raise that with Your Honor --

47

1          THE COURT:  All right.

2          MR. OLSHIN:  -- and how to deal with it because it

3     relates to this interconnection that Mr. Raterink has drawn.

4          THE COURT:  But the matter that I think was sub judice

5     or maybe it was going to be soon sub judice, when we last

6     talked about this with the -- on a related -- not a related,

7     but a similar issue, hasn't been ruled on, yet.

8          MR. OLSHIN:  It has not been ruled on.

9          THE COURT:  Okay, all right.

10         You can go ahead.

11         MR. RATERINK:  Okay, thank you, Your Honor.  I will

12    ask, did you retain the copy of the reply that was sent?

13         THE COURT:  Yes.

14         MR. RATERINK:  You did, okay.  I just wanted to make

15    sure of that.  In short, Your Honor, I think, looking at the

16    Pioneer factors, while we recognize that the Second Circuit and

17    the courts take a hard-line stance in terms of motions of this

18    type, we feel that the facts and the totality of the

19    circumstances in this case do justify the relief sought.  If we

20    look specifically at the first factor of what the courts have

21    determined to be the most important factor, the reason for the

22    delay, the reason for the delay in this case was an erroneous

23    determination made prior to the bar date regarding whether the

24    Self-Insurers' Security Fund had a claim or could have a claim

25    at that time.  Under the Michigan Workers' Compensation Act,

48

1    the Self-Insurers' Security Fund does not become subrogated to

2    the employees' claims until they have actually paid out on

3    those claims.  So if you will, there's almost -- there's the

4    contingency that the employee doesn't get paid, and then at

5    that point, we would pay, and then we would have a claim.  That

6    action has been described by debtors in a couple different ways

7    as being something that was consciously chosen, a calculated

8    decision, or a wagering that the claim would prove unnecessary.

9    I think that's incorrect only to the extent that this was not a

10   situation where there was an analysis done and pros and cons

11   weighed as to whether to file the claim.  It was simply a

12   miscalculation as to whether the fund even possessed any type

13   of claim at that time.

14        THE COURT:  On that score, there, I mean, there have

15   been lots of bankruptcies over the years involving Michigan

16   businesses.  Are you telling me that the claimants, here, never

17   filed a proof of claim in those cases for --

18        MR. RATERINK:  No, I'm not.  I'm not saying that at

19   all, Your Honor.  What I would tell you is that the normal

20   course of action in these cases is that we would usually have a

21   case where the -- right at the outset of the bankruptcy, that

22   the payments have stopped, or before the proof of claim

23   deadline has stopped, where the self-insurance -- the authority

24   to practice as a self-insured employer has stopped prior to the

25   bar date, or that we have full security to cover the losses

49

1    that are intended.  In this case, in Delphi, there was no

2    security that was possessed that would help defer those costs.

3    The debtor was allowed to continue to be self-insured

4    throughout the pendency of the bankruptcy, and there was no

5    stoppage of payment until the very late -- very recently, in

6    regards to that.

7          So while I can't say that a contingent claim had never

8    been filed, myself had never done that on behalf of this

9    particular client under this particular statute.  I realize now

10   that that was a miscalculation, looking at the law more

11   recently and deeper, that it should have been done at that

12   point.  But that's why we're arguing that it was -- that this

13   was done due to excusable neglect.

14         THE COURT:  A related point that the debtors or that

15   DPH makes, is that the -- you can look at the timing of the

16   filing of the claim, not only in terms of the length from the

17   date of the bar date to the date it was filed, but also the

18   fact that it was filed only basically on the eve of the

19   confirmation hearing for the modified plan.  So therefore,

20   people had negotiated and in essence -- not the confirmation

21   hearing, the objection date for the modified plan -- that

22   people had negotiated the deal and dealt with the modified plan

23   without expecting this claim to be out there, particularly the

24   priority one, because cash was very important, obviously.

25         MR. RATERINK:  I understand, Your Honor.  I guess I

50

1    would respond to it as number one, to say that as we've stated

2    in the briefs, that the first indication that my client had

3    that the benefits were not going to be paid in an ongoing

4    manner was in the June -- early June notification that there

5    was a change in the previously filed plans.  And at that point,

6    the emphasis had been in attempting to get -- work out some

7    type of arrangement where those benefits would be picked up by

8    some entity, whether it would Delphi or General Motors as it

9    may be, or one of the new buyers.  It was also spent

10    accumulating that information that we included in the claims

11    file.

12            Should it have been filed quicker, in retrospect?

13    Yes, we should have filed it.

14            THE COURT:  But wasn't it common knowledge that Delphi

15    was in a real perilous state?

16            MR. RATERINK:  Oh --

17            THE COURT:  I mean, including real concerns about

18    being able to pay its administrative expenses and might have to

19    liquidate?  I mean they were even --

20            MR. RATERINK:  Post-June or prior to June?

21            THE COURT:  No, no.  For several months before June.

22    I mean, there was as motion, for example, to -- there was

23    considerable litigation in the spring over whether the DIP

24    agreement, which expired at the end of the year, could be --

25    there could be forbearance on it.  And there was a set of -- I

51

1    forget how many they got up to -- it was like eighteen or

2    nineteen extensions, usually on sort of a one-week, two-week

3    basis thereafter of forbearance.  I mean, so -- of course, I

4    was presiding over the case, so I was seeing it firsthand, but

5    it seemed to me that that was sort of general knowledge out

6    there in the world.

7            MR. RATERINK:  All I can say, Your Honor, in response

8    is, pursuant to the matters, conversations, the communication

9    received from debtors, specifically in regards to the workers'

10   comp obligations, was that there was no indication that there

11   was going to be anything other than a full adoption of the

12   obligations and a continuation of the self-insurance programs.

13           THE COURT:  Okay.

14           MR. RATERINK:  Okay.  I would make another

15   distinction, Your Honor, which I did raise in my reply brief,

16   and you pointed out as well.  When you're talking about the

17   lateness of the filing, you talk about -- you're talking about

18   prejudice, I believe, at that point.  And you pointed out

19   especially as it pertains to the priority claim.  And, Your

20   Honor, we would just argue that if in fact Your Honor would

21   find that the priority claim -- the excise tax claim is too

22   prejudicial to debtors in this case, that we would ask that

23   that claim be converted to a general unsecured claim.

24           And in regards to the prejudice issue, debtors really

25   don't raise an issue to the general unsecured claim, other than

52

1    the idea that this may lead to open up the floodgates.  And

2    that argument, I think, that because of the unique

3    circumstances involved with the Michigan Self-Insurers'

4    Security Fund, the risk of opening up the floodgates, having

5    other similarly situated claimants, is very low and highly

6    speculative.

7            So with no other prejudice listed, other prejudice

8    that may be discussed is there may be prejudice to the other

9    creditors in the general unsecured class, but that doesn't --

10   is not something that the Pioneer case discusses.  It discusses

11   prejudice to the debtor.  So we would argue, Your Honor, that

12   if, in fact, that the Court would find that there was an

13   untenable amount of prejudice to the debtor with a priority

14   claim, that that be converted then to a general unsecured

15   claim.

16           THE COURT:  Well, I have one question on that.  But

17   before I forget, I just want to make -- you referred to your

18   reply a couple times.

19           MR. RATERINK:  Yes.

20           THE COURT:  Were there exhibits to that, because I did

21   not see exhibits?

22           MR. RATERINK:  There was one exhibit, Your Honor.

23           THE COURT:  All right.

24           MR. RATERINK:  It was a one-page document of filing

25   that Delphi had made with the Self-Insurers' Security Fund.  I

53

1    have a copy of it here if you'd like.

2          THE COURT:  Could I see that?

3      (Pause)

4          MR. RATERINK:   This exhibit just went to the notion

5    that Delphi was unawares, or the parties that were negotiating

6    were unawares of the obligations, and the other parties may

7    have a claim in that regard.  Delphi itself, obviously, was

8    aware of its own Workers' Compensation obligations and

9    routinely was asked to submit its loss numbers to the Self-

10   Insurers' Security Fund, and had more awareness of what their

11   obligations were than we did.  So I think it may be

12   disingenuous if they're to claim the lack of notice as to the

13   amount of the claims.

14         THE COURT:  Okay.

15         MR. RATERINK:  As to the other factors, Your Honor,

16   the length of the --

17         THE COURT:  I'm sorry.  On the prejudice point --

18         MR. RATERINK:  Sure, yes.

19         THE COURT:  -- the unsecured creditors aren't getting

20   very much in this case, unfortunately.  Is part of your concern

21   on this a belief that somehow the allowance of this claim

22   affects the liability versus ACE?

23         MR. RATERINK:  No, I don't think so, Your Honor,

24   because --

25         THE COURT:  Because, I wouldn't think so either,

54

1    but --

2        MR. RATERINK:  -- it goes back to the contingent

3    nature of the claim.

4        THE COURT:  All right.

5        MR. RATERINK:  I think that the ACE v. Self-Insurers'

6    Security Fund and General Motors et al. has to be resolved.

7        THE COURT:  It's a separate issue?

8        MR. RATERINK:  Correct.

9        THE COURT:  All right.  Okay.

10        MR. RATERINK:  The other two factors stated by the

11   Pioneer Court, the length of the delay.  We cannot deny that

12   the length, beyond the proof of claim deadline to the time that

13   the claim was filed was extremely long, three years.  But

14   again, if it's taken in the context of the reasons why the

15   claim was not filed, when we became aware of the situation that

16   Delphi was, in fact, terminating its obligations to its

17   Workers' Compensation claimants, it was less than sixty days by

18   the time the claim was actually filed.  And lastly, the good-

19   faith standard.  I believe debtor is not contesting that

20   portion of the claim.

21        All in all, Your Honor, based on the type of benefits

22   that we're talking about here, trying to protect the ongoing

23   Workers' Compensation benefits of Delphi's injured workers,

24   taking into account the reason for the delay and the lack of

25   prejudice, we would ask that the claims be allowed to be filed

55

1   lately.

2          THE COURT:  Okay.  Let me just think.  I think I've

3   asked you the questions I want to ask.  But let me just --

4   well, as far as the priority tax claim, there's been no

5   refinement of that number?  It still is in the roughly the

6   twenty-five million range?

7          MR. RATERINK:  That's what -- yes, we've not amended

8   that claim since it was first filed.  Again, I think if the

9   claims are allowed to proceed at this point, there will be an

10  amended filing to reflect the dual nature of it; number one to

11  sort out the liability that the Self-Insurers' Security Fund

12  has already accepted versus those that are contingent going

13  forward.

14         THE COURT:  Right.

15         MR. RATERINK:  The excise tax claim is based on Second

16  Circuit law that holds that Workers' Compensation claims three

17  years prior to the petition date are elevated to the status of

18  excise tax.  So that period of time, from roughly October of

19  '02 to October of '05, does incorporate both SISF liability and

20  potentially others' as well.

21         THE COURT:  So, but the remaining contingent amount,

22  which is the bulk of the claim, I guess, at this point, right?

23         MR. RATERINK:  The separate claim, you mean?

24         THE COURT:  Yes.

25         MR. RATERINK:  The thirty-six million dollar claim?

56

1          THE COURT:  Yes.  Why wouldn't tho -- those are

2     contribution or indemnity claims, right?

3          MR. RATERINK:  Those are the same type of claims as is

4     the excise tax claim.  Those are based, again, on reserves

5     that --

6          THE COURT:  But why wouldn't --

7          MR. RATERINK:  -- have been placed on --

8          THE COURT:  -- that be disallowable under 502(e) as

9     contingent on liquidated claim for contribution or indemnity?

10          MR. RATERINK:  They're in the process -- these cases

11     are either in the process of being liquidated at this point --

12          THE COURT:  I know, but they have -- it's --

13          MR. RATERINK:  I guess, Your Honor, I would ask the

14     ability to brief that issue in a separate matter.  I don't

15     think this has been raised for this particular hearing.

16          THE COURT:  Well, I think that's true.  And 502(e) is

17     subject to 502(j), which is reconsideration for cause.  But the

18     purpose of it is so that debtors don't have to keep reserves

19     and they can make distributions if the time comes to make

20     distributions.

21          MR. RATERINK:  And to answer that question, to the

22     extent -- some of these claims have been liquidated.  Some of

23     these are cases that have already been adjudicated in the

24     agency, and there can be a further refinement.

25          THE COURT:  Well, that would be a different issue, I

57

1    mean, if it's fixed.  I understand that.  So the priority tax

2    claim is under what section of the Code, then?  It's under --

3         MR. RATERINK:  Your Honor, I don't think I have that

4    in front of me at the moment, sorry.  I can tell you in general

5    that it is based on at least case law and the Second Circuit's

6    interpretation that that -- those Workers' Compensation claims,

7    within the three years prior to the filing of the petition date

8    can be elevated to the excise tax status.

9         THE COURT:  But I guess that's -- that was my question

10   on how this is calculated.  I mean, the petition date was 2005.

11        MR. RATERINK:  Correct.

12        THE COURT:  And --

13        MR. RATERINK:  So that time period --

14        THE COURT:  -- I don't understand why people haven't

15   made their claims by now for those amounts.

16        MR. RATERINK:  A lot -- well, it goes to the nature of

17   the system, I think, Your Honor.  And let me see if this

18   answers your question.  The time period in question runs from

19   '02 to '05.  So the claims, under Michigan statute, it's if you

20   were injured during those periods of time, obviously.

21        THE COURT:  Right.

22        MR. RATERINK:  If you were injured in those periods of

23   time, you may already be receiving benefits, you may have a

24   case that's pending, or you may have a case that's already been

25   adjudicated.  There's no statute of limitations in the State of

58

1   Michigan for Workers' Compensation claims.  Claims can be filed

2   at any point.  So you can have a new claim filed in 2009

3   relating back to that time period.  There definitely -- I would

4   estimate at this point, and make the representation to the

5   Court, that there's a large amount of those -- the claims

6   within that time period are unliquidated.

7           And even when there is an adjudication by the Court,

8   it doesn't necessarily liquidate it in terms of the overall

9   value of the case.  It still would leave a reserving or an

10  estimation process as to what the value of that case is going

11  to be over time.  But if the workers' comp agency has made a

12  determination that the individual is eligible for benefits, it

13  would still be then -- all we would know is what they're

14  entitled to on a weekly basis.  There would still have to be an

15  estimation process to say what that person -- the value of that

16  claim over time would be.

17          THE COURT:  So they could be paid out on such a claim

18  over --

19          MR. RATERINK:   Their lifetime.

20          THE COURT:  -- decades?

21          MR. RATERINK:  Yes.  So the reserve process isn't only

22  for preliquidated claims or preadjudicated claims.  There's

23  also a reserve process for those that have never been

24  challenged or those that have been through the court process.

25          THE COURT:  All right.  I have to say, given the size

59

1    of the claims here and the extended tail, if you will, for the

2    claim, it's a little surprising that a proof of claim wasn't

3    filed.

4              MR. RATERINK:  Understood.  Trust me, our internal

5    policies have changed as a direct reflection of what has

6    occurred in this case.

7              THE COURT:  Well, I guess that's -- there is no

8    internal -- I mean there was no written policy, right?  There

9    was no -- it was sort of -- it was more ad hoc?

10             MR. RATERINK:  Correct.  Case-by-case basis.

11             THE COURT:  Okay.  And as far as you know, claims may

12   have been or have been filed in other cases?

13             MR. RATERINK:  Claims -- I'm not sure of the question.

14             THE COURT:  Claims like this or -- not this size or

15   specifically like this -- but claims based on the same theory

16   have been filed in other bankruptcy cases?

17             MR. RATERINK:  We have filed general unsecured claims

18   in other cases, for sure.  I have never participated in the

19   Second Circuit before.  And my understanding is that particular

20   elevation to excise tax status is something that's not

21   available in most jurisdictions, but is in the Second Circuit.

22   So I can't say for sure that the Self-Insurers' Security Fund

23   has filed this type of specific claim before.

24             THE COURT:  Okay.  All right.

25             MR. RATERINK:  Thank you.

60

1          THE COURT:  Thanks.

2          MR. LYONS:  And, Your Honor, just to answer the one

3    point, I believe it's 507(a)(8) --

4          THE COURT:  Okay.

5          MR. LYONS:  -- that is the excise tax.

6          THE COURT:  That's one that goes back three years?

7          MR. LYONS:  Exactly.

8          THE COURT:  Yes.

9          MR. LYONS:  And the Southern District of New York,

10   they hold that you look at the date of injury to determine when

11   it occurs, within the three-year window, or outside of it, or

12   postpetition.

13         Your Honor, I think this is -- it's a very

14   straightforward legal analysis here.  The bar date notice was

15   clear and unambiguous.  Contingent claims were required to be

16   filed.  And that -- I know Your Honor has ruled several times.

17   You've been affirmed in applying that.  It is the Second

18   Circuit under Midland Cogeneration, as very strongly adhered --

19   adheres to that rule that if there is a clear dictate in a

20   rule, especially when counsel gets it, that it's going to be

21   very difficult for that party to ever get past the excusable

22   neglect requirements under Pioneer as interpreted by the Second

23   Circuit.

24         Again, you look at the control of the movant.  I mean,

25   the bar date was July of 2006.  The disclosure statement, where

61

1   they first argued that well, they thought that workers' comp

2   claims were going to be paid, which was the debtors' intent, I

3   mean, that wasn't filed until a year and a half after the bar

4   date.

5           Looking at the prejudice, no doubt, as Your Honor has

6   seen in the Plymouth Rubber case, a twenty-five million dollar

7   priority claim is severely prejudicial to DPH.  And frankly, to

8   just let in -- and frankly, just letting in an unsecured claim

9   as well is prejudicial to this estate.  Parties negotiated the

10  economics of the plan modification based upon a number of

11  things, including what the amount of the unsecured pool was.

12  So to let in unsecured claims, in derogation of the bar date

13  order, again, would be prejudicial to the debtors.

14          And also one other point.  Proofs of claim were

15  actually filed July 29th, which was the first day of the plan

16  modification hearing.  So again, the proof of claim wasn't even

17  filed in advance of the plan modification hearing, it was filed

18  at the plan modification hearing.  So for all the reasons, Your

19  Honor ,we believe that when you apply Midland Cogeneration,

20  other Second Circuit law, and other orders Your Honor has ruled

21  on in this case, we believe that this motion should be denied.

22          THE COURT:  Did the debtors get claims from workers

23  themselves for workers' comp, proofs of claim?

24          MR. LYONS:  Yes, we did.  And if Your Honor may

25  recall, they were subject to an omnibus objection.  Our view

62

1    was, when amounts were paid out, postpetition, these Workers'

2    Compensation claimants, that cash would be applied first to the

3    priority portion of the claim.  So actually, we have, for

4    Workers' Compensation claimants who did file proofs of claims,

5    I believe we have -- and I can look at Mr. Unru (ph.), but I

6    believe we have liquidated some of those claims on a general

7    unsecured basis for those claimants who had filed claims.

8            And again, similarly, other states have filed Workers'

9    Compensation claims, and we are working with those states to

10   liquidate the amounts of their reimbursement claims for

11   Workers' Compensation, including:  New Jersey, Ohio, Alabama.

12           THE COURT:  Okay.  Okay.

13           MR. LYONS:  Thank you.

14           THE COURT:  Anything else?

15           MR. RATERINK:  One -- just briefly, Your Honor.  In

16   response, as it relates specifically to the general unsecured

17   claim.  The idea of prejudice, I guess, is raised as to the

18   debtors.  However, the debtor has a confirmed plan.  The debtor

19   has a confirmed plan.  There was a set amount in terms of

20   unsecured claims.  It's going to dilute that pool, no question.

21   But that prejudice would go to the other creditors not to the

22   debtors in this case.  And we think that those claims, at a

23   minimum, should be allowed.  And again, if Your Honor finds

24   that the priority claim is too prejudicial, we would ask that

25   that be converted as well.

63

1          THE COURT:  But I guess on that point, I know that

2     there are cases that talk about prejudicing the debtor, having

3     the debtor deal with a whole host of claims like this.  But I

4     had always thought that the prejudice was sort of to the case

5     in general.  And one of the factors was the parties'

6     negotiations.  I didn't think that --

7          MR. RATERINK:  I think --

8          THE COURT:  -- it's --

9          MR. RATERINK:  -- I did cite a case in my reply brief,

10    Your Honor, that it goes to that issue specifically.  And it's

11    an interpretation.  Pioneer doesn't talk about prejudice -- it

12    only talks about prejudice to the debtors in the wording of

13    Pioneer.

14         THE COURT:  Okay.  All right.

15         MR. RATERINK:  I'd be happy to brief that more, Your

16    Honor, if you'd like.

17         THE COURT:  No, that's okay.  I think that that's

18    fine.

19         MR. RATERINK:  Okay.  Thank you.

20         THE COURT:  Okay.  All right.  I have before me a

21    motion by the Michigan Self-Insurers' Security Fund or the

22    Fund, for leave to file a late proof of claim under Bankruptcy

23    Rule 9006(b).  It filed a claim on July 29, 2009.  The claim is

24    in two parts.  It asserts a priority tax claim under Section

25    507(a)(8) in the current amount of $25,460,432.50.  It also

64

1    asserts a general unsecured claim for 36,293 dollars --

2    36,293,480 dollars.  Both claims are premised upon the Fund's

3    statutory obligation to pay unsatisfied Workers' Compensation

4    claims.

5        Here, the debtors, the Delphi debtors, established a

6    bar date for filing claims of July 31, 2006.  Therefore the

7    claim was filed almost three years late after the bar date.

8    The Fund asserts that the claim still should be permitted to be

9    filed based upon its asserted excusable neglect under Rule

10   9006(b)(1).  And primarily it bases that assertion, at least as

11   far as its neglect is concerned and the excuse for it, on the

12   assertion that it believed that it did not have to file a proof

13   of claim, given that first, in the very early stages of this

14   case, the debtors were authorized by the Court to pay certain

15   wages and other amounts owing to employees, including Workers'

16   Compensation, which the debtors, by and large did, starting

17   with the commencement of the case; and second, that the

18   original plan filed in this case and the disclosure statement,

19   therefore, provided that Workers' Compensation claims would

20   flow through the case and would be dealt with in the ordinary

21   course, as if the bankruptcy case hadn't happened.

22       The Fund contends that shortly after learning that

23   Delphi's plan would be modified, in light of Delphi's and the

24   automotive industry's changed circumstances, to include a

25   provision that would -- to delete, among other changes, the

65

1   flow-through provision, it did file its proof of claim in a

2   timely basis, roughly a month after learning of that fact.

3        Delphi, now known as DPH Holdings Corp. after the

4   confirmation and consummation of its modified Chapter 11 plan,

5   has objected to the request, stating that the Fund has not

6   satisfied its burden of showing excusable neglect.  In doing

7   so, it points out several facts that are relevant to the

8   Court's determination.  First, and this is not disputed, the

9   Fund did get timely notice of the bar date.  Second, it's clear

10  from reviewing the bar date notice as well as the bar date

11  order that the notice and order clearly covered contingent

12  claims of the kind asserted in the Fund's proof of claim.

13  Third, DPH Holdings points out that the so-called human capital

14  obligations order entered by the Court at the commencement of

15  the Chapter 11 cases in 2005, authorized the debtor to pay

16  prepetition wages and benefits, including continuation of

17  payment of Workers' Compensation claims, whether pre- or

18  postpetition.  The order did not direct the debtors to do so.

19  Therefore there was always a risk that based upon changed

20  circumstances, and the debtors' exercise of its business

21  judgment, the debtors would not make such payments.

22        Moreover, there was no exception, either in that order

23  or in any other order, from the requirements of the bar date

24  order or the -- and any exceptions to that order were set forth

25  in the bar date notice, which clearly did not include an

1    exception for this type of claim.

2         In addition, the debtors point out that the plan and

3    disclosure statement upon which the Fund relied were not filed

4    until approximately a year and a half after the bar date.  In

5    addition to that, the disclosure statement for that plan set

6    forth a number of risk factors describing potential

7    contingencies or conditions under which the plan would not

8    proceed to confirmation or consummation, including among other

9    things, the potential that the transaction with third-party

10   investors upon which the plan was premised, would not close.

11        It turned out, as was very widely reported, that in

12   fact, the transaction upon which the plan was premised did not

13   close.  And there was a period preceding the filing of the

14   Fund's proof of claim of approximately a year, in which there

15   was substantial doubt as to the Delphi debtors' future,

16   including the prospect of the debtors' debtor-in-possession

17   financing maturing by its terms and not being renewed, and

18   ultimately the prospect of the debtors' potential liquidation.

19        Ultimately, with among other things, the assistance of

20   the United States government to the debtors' primary creditor,

21   GM, the debtor was able to propose a modified Chapter 11 plan

22   which has since been, as I said, confirmed and consummated,

23   that involved a complex set of agreements, pursuant to which

24   GM, a group of the debtors' debtor-in-possession lenders, would

25   take respective assets of the debtors; and the debtors'

67

1    remaining assets would be left with DPH Holdings Corporation.

2         Part of the negotiations relating to that plan which

3    proceeded from significant court-sanctioned mediation before

4    Bankruptcy Judge Morris, involved a compromise with the

5    unsecured creditors' committee which, notwithstanding the

6    assertion by the DIP lenders that the debtors were

7    administratively insolvent, negotiated successfully a

8    relatively modest recovery for unsecured creditors under the

9    modified plan.

10        The claim of the Fund was filed at the start of the

11   hearing on confirmation of the modified plan.  It clearly

12   raised an issue at that time that needed to be dealt with in

13   the context of the confirmation hearing, because of, in

14   particular, the priority portion of the claim, which would have

15   seriously jeopardized the prospect of the plan being declared

16   feasible, given the cash impact of such a claim.  And at the

17   time, I determined that the claim being over three years late,

18   would not, in all likelihood, have such an impact, because it

19   would be disallowed.  However, I did not, at the time, disallow

20   the claim, because that was not before me.  The only issue

21   being before me being whether the plan would be feasible for

22   purposes of Section 1129 of the Bankruptcy Code.

23        The Fund, at this point, is also pursuing rights

24   against the debtors' insurers, ACE and Pacific, asserting that

25   they had agreed to cover any shortfall in the debtors' payment

68

1    of these claims.  That litigation is proceeding in this Court

2    and may also be proceeding elsewhere in Michigan.

3         The debtors contend that nothing has changed -- or DPH

4    contends that nothing has changed with regard to its cash

5    position, and that if allowed in the amount asserted, the

6    Fund's priority claim would far exceed the aggregate amount of

7    priority tax claims estimated to be paid pursuant to the

8    modified plan.

9         Based upon all of the foregoing, the debtors or DPH

10   contends that, first, the late filing of the claim is not truly

11   termed neglectful, and in addition, would not be excusable

12   under the case law interpreting Bankruptcy Rule 9006(b).  That

13   rule permits a claimant to file a late proof of claim, if the

14   failure to file it was due to "excusable neglect".  The burden

15   of proving excusable neglect is on the claimant seeking to

16   extend the bar date, In re R.H. Macy & Co., 161 B.R. 355, 360

17   (Bankr. S.D.N.Y. 1993).

18        The Supreme Court has developed a two-step test for

19   determining whether a late filing was due to excusable neglect

20   in Pioneer Investment Services Company v. Brunswick Associates

21   Limited Partnership, 507 U.S. 380 (1993).  First, the movant

22   must show that its failure to file the claim timely constituted

23   neglect as opposed to willfulness or a knowing omission.

24   Neglect generally being attributed to a movant's inadvertence,

25   mistake, or carelessness (ibid., 387-88).

69

1           After establishing neglect, as opposed to willfulness

2     or knowledge of the bar date and a failure to show any

3     unknowing basis for neglecting it, the movant must show, by a

4     preponderance of the evidence, that the neglect was excusable.

5     That analysis is to be undertaken on a case-by-case basis,

6     based on the particular facts; although the Court is to be

7     guided by and make the determination by balancing the following

8     factors:  the danger of prejudice to the debtor; the length of

9     the delay, and whether or not it would impact the case; the

10    reason for the delay, in particular whether the delay was in

11    the control of the movant; and whether the movant acted in good

12    faith (ibid., 395).

13          However, it's recognized in the Second Circuit, based

14    upon the Second Circuit's analysis of Pioneer that,

15    "Inadvertence, ignorance of the rules or mistakes construing

16    the rules, do not usually constitute excusable neglect."

17    Midland Cogeneration Venture LP v. Enron Corporation, In re

18    Enron Corporation 419 F.3d. 115, 126 (2nd Cir. 2005), citing

19    Pioneer 507 U.S. 392.

20          In Midland Cogeneration the Second Circuit further

21    stated, "We have taken a hard line in applying the Pioneer

22    test," Silivanch v. Celebrity Cruises Inc., 333 F.3d. 355, 368

23    (2nd Cir. 2003).  "In a typical case, three of the Pioneer

24    factors:  the length of the delay, the danger of prejudice, and

25    the movant's good faith, usually weigh in favor of the party

70

1   seeking the extension (ibid., 366).  We noted, though, that we

2   and other circuits have focused on the third factor, the reason

3   for the delay, including whether it was within the reasonable

4   control of the movant (ibid. to quoting Pioneer, 507 U.S. 395)

5   and we cautioned that the equities will rarely if ever favor a

6   party who fails to follow the clear dictates of a court rule,

7   and that where the rule is entirely clear we continue to expect

8   that a party claiming excusable neglect will, in the ordinary

9   course, lose under the Pioneer test (ibid., 366-367)."  Again,

10  that's all the quote from Midland at 419 F.3d 122-23.

11       See also In re Musicland Holding Corporation, 2006

12  Bankr. LEXIS 3315 at pages 10-11 (Bankr. S.D.N.Y. 2006),

13  emphasizing and noting that the Second Circuit emphasizes the

14  reason for the delay in determining excusable neglect and

15  stating that, "The other factors are relevant only in close

16  cases."

17       The reasons behind the Second Circuit's hard line

18  under 9006 and with regard to excusable neglect, should be

19  noted as applied in particular in the bankruptcy context to

20  requests to extend the claims bar date.  "The bar date serves

21  the important purpose of enabling the parties-in-interest to

22  ascertain with reasonable promptness the identity of those

23  making claims against the estate and the general amount of the

24  claims, a necessary step in achieving the goal of successful

25  reorganization," In re Calpine Corporation 2007 U.S. Distr.

71

1    LEXIS 86514 at pages 14-15 (S.D.N.Y. November 21, 2007), citing

2    In re Best Products Company Inc., 140 B.R. 533, 357 (Bankr.

3    S.D.N.Y. 1992).  See also In re Asia Global Crossing Ltd., 324

4    B.R. 503, 508 (S.D.N.Y. 2004).

5         Part of the logic behind the importance of the bar

6    date is to recognize that bankruptcy cases are multiparty

7    cases, where the other parties-in-interest, who don't have

8    access to the debtors' books and records, at least have access

9    to the claims that have been filed timely and can therefore do

10   their calculations for purposes of their analysis of potential

11   recoveries in the case and their negotiations, based upon the

12   timely filed claims.  See In re Drexel Burnham Lambert Group

13   Inc. 148 B.R. 1002, 1008-10 (Bankr. S.D.N.Y. 1993).

14        Allowing late filed claims, especially after a

15   debtor's plan is confirmed, subjects the debtor to prejudice,

16   because it would have to renegotiate settlements reached in

17   contemplation of the known claims against the estate (ibid.).

18   And also it's the case that allowing a late claim after a plan

19   has been confirmed, materially alters the distribution to

20   creditors that would prejudice the creditors who relied on the

21   disclosed distributions when voting to accept or reject the

22   plan (ibid.).  I believe that that consideration, while not

23   necessarily applying to factor number one stated in the Pioneer

24   case, which is the prejudice to the debtor, since the plan has

25   already been confirmed, would relate to factor number two,

72

1   which is not only the length of the delay, but whether or not

2   it would impact the case.  Clearly it would not seem fair if

3   parties negotiated a particular resolution in reliance on one

4   set of claims, only then to be asked to live with a diluted

5   distribution based upon a late claim.

6        Here the rationale for not filing the claim on a

7   timely basis ultimately comes down to a mistake, I believe, of

8   law, as opposed to the claimant either being reasonably

9   confused by the facts or other actions taken by the debtor.  As

10  I noted, the bar date as well as the Bankruptcy Code itself,

11  are clear that contingent unliquidated claims are claims that

12  are dealt with in a bankruptcy case, and may be, and in this

13  case were, subject to the bar date; thus putting the onus on

14  the claimant to file a timely proof of claim, even if the claim

15  is contingent and unliquidated.

16       Here, based on the colloquy at oral argument, at least

17  a substantial portion of these claims, even today, are

18  contingent and unliquidated.  However, since they go back at

19  least three years for the priority claim, and perhaps more for

20  the unsecured claim -- indeed more for the unsecured claim,

21  there was, it appears to me, at least some portion of these

22  relatively large claims that were not contingent and

23  unliquidated, at least not unliquidated as far as the original

24  holder was concerned, the Delphi employee.  Therefore, it would

25  seem to me, given the time when these claims would be said to

73

1    arise, which again, could go back several years before the

2    petition date, that it would be normal to file a proof of claim

3    on behalf of the Fund, having received the bar date.

4        The Fund cannot tell me that it has never not filed a

5    claim in these circumstances.  And the implication I took away

6    from counsel's candid remarks, is that the Fund has filed

7    claims for -- at least on an unsecured basis, not on a priority

8    basis -- in bankruptcy cases for these types of purposes.

9        Clearly, the debtor did not mislead the Fund in that

10   no order directed the debtor to pay these amounts.  And in

11   addition, the plan upon which the Fund says it relies, was not

12   filed until well over a year after the bar date passed.  In

13   addition, as I said, the plan itself had a number of risk

14   factors in it.  And finally, that plan itself, went by the

15   boards, again, well over a year before the claim was filed.

16       So it appears to me that there is an issue here as

17   to -- a serious question here as to whether the claim's late

18   filing was within the reasonable control of the claimant.  I

19   believe it was, given the claimant's proffered excuses here

20   being ultimately excuses of a legal nature, where the law and

21   the bar date and the claim notice are clear in laying out the

22   legal requirement to file the proof of claim.  In addition,

23   although again, in the Second Circuit the foregoing analysis is

24   the primary analysis to be undertaken, the other factors do not

25   particularly help the claimant here.

74

1        The length of the delay is obviously quite

2   significant.  Not only the three years short a couple of days

3   between the bar date and the filing of the claim; but also the

4   fact that the claim was filed well after the risk of Delphi not

5   paying unsecured creditors, including Workers' Compensation

6   claimants, having to shut down substantial parts of its

7   business and potentially having to liquidate, all were, I

8   believe, a matter of common knowledge.

9        Secondly, the fact that the claim was filed after the

10  proposal of the modified plan that had been negotiated with the

11  DIP lenders, GM, and the creditors' committee, and indeed on

12  the eve of the confirmation hearing for that plan, meant that

13  those very sensitive negotiations which had proceeded for

14  months, were at that point, or would be at that point, have

15  been significantly jeopardized by the filing of the late claim.

16       That is most clear for the priority claim, which would

17  impose a significant tax -- a significant cash obligation on

18  the cash-strapped estate, but also in respect of the unsecured

19  claim, in that it would alter the calculus on behalf of the

20  unsecured creditors that had underlined the negotiation of the

21  plan by the creditors' committee, and in addition, raised the

22  specter of other similarly-situated unsecured creditors

23  asserting late claims, particularly claims for contingent and

24  unliquidated debts at the time of the bar date that had since

25  become liquidated; again, all based upon a legal

75

1    misconstruction of the bar date notice order and code.

2           The movant, I recognize, acted in good faith.  But as

3    noted by Judge Bernstein in the Musicland Holding Corporation,

4    that factor on its own, won't outweigh the other factors that I

5    have discussed.

6           I will note, obviously, that there is clearly some

7    prejudice to the Fund here, although the Fund is actively

8    pursuing other sources, namely the insurance carriers, whose

9    litigation is also before me.  So again, weighing all of these

10   factors, I conclude that the Fund has not carried its burden to

11   establish excusable neglect here in respect of its proof of

12   claim.

13          So DPH's counsel should submit an order consistent

14   with my ruling.  You don't need to settle that order, but you

15   should provide a copy of it to counsel for the Fund no later

16   than when you submit it to chambers, so he can make sure that

17   it's consistent with my ruling.

18          MR. LYONS:  We will, Your Honor.  And we'll be

19   consistent with some of the other orders --

20          THE COURT:  Okay.

21          MR. LYONS:  -- on the bar date as well.

22          THE COURT:  All right.  Thank you.

23          MR. LYONS:  Your Honor, we just have -- I'm sorry, Mr.

24   Raterink?

25          MR. RATERINK:  Did you want to talk with us today,

76

1    Your Honor?

2           THE COURT:  Well, I'll hear you briefly.  I don't want

3    to get too much into it, because really have -- you can tell

4    from my questions, I was only generally familiar with our prior

5    discussions.

6           But, Mr. Lyons, before we do that, do you have

7    anything else on this?

8           MR. LYONS:  Well, I do have on -- the practice we have

9    engaged with the Court in submitting stipulations, we typically

10   would serve them out on other parties on a seven-day notice.

11   Under the plan, there is no need for, we believe -- any need

12   for further notice to parties.  I mean, again, we still may

13   want to have the Court enter them to just coincide with the

14   claims register.

15          THE COURT:  Well, I amended the case management order

16   to take out various parties who were on the notice list.  I

17   don't know if you've -- that was submitted by Ms. Marafioti.  I

18   don't know if you've seen that or not?

19          MR. LYONS:  Yes.  But even this, I don't believe we

20   need to -- because again, it's a -- we can settle claims,

21   frankly, without approval of the Court.

22          THE COURT:  Right.

23          MR. LYONS:  We may, as a matter of cleaning up the

24   docket and to make sure that it coincides with our claims

25   register, still have the Court enter those stipulations.

77

1          THE COURT:  Right.

2          MR. LYONS:  So we would just request that -- and

3  unless Your Honor has an issue -- just dispense with the

4  noticing of these stipulations which are --

5          THE COURT:  I don't think you need notice unless

6  there's something in the stipulation that clearly affects some

7  third party's rights.

8          MR. LYONS:  Very good.  And we'll certainly serve --

9          THE COURT:  And I doubt you'll have that.  But you

10  know, the type of thing where you settled at someone else's

11  expense, something like that --

12          MR. LYONS:  Sure.

13          THE COURT:  -- obviously you'll need to.

14          MR. LYONS:  Understood.  Your Honor, on this last

15  matter, again, Mr. Hogan has primarily been representing DPH

16  Holdings in the --

17          THE COURT:  This is the ACE Insurance?

18          MR. LYONS:  -- in the ACE matter.

19          THE COURT:  Okay.

20          MR. LYONS:  So, although I'm certainly happy to listen

21  and hear what everybody has to say, I guess I have to kind of

22  reserve the debtors' response --

23          THE COURT:  All right.

24          MR. LYONS:  -- if you need something substantive from

25  us, until we --

78

1              THE COURT:  Well, I don't think we're going to have

2     anything substantive today.  This is really just an update for

3     me.

4              MR. BUNIN:  All I was going to say, Your Honor is that

5     I don't think we can have a conversation without counsel for

6     the agency being here, as they are the moving party in that

7     particular motion.

8              THE COURT:  Because you, at this point there's two

9     different counsel?

10             MR. BUNIN:  Complete separation.

11             THE COURT:  All right.

12             MR. BUNIN:  All I would say, Your Honor --

13             THE COURT:  So I think, you should just give me a

14    heads-up, maybe, and that's about it.

15             MR. BUNIN:  I'm not going to speak to anything on the

16    merits.

17             THE COURT:  Okay.

18             MR. BUNIN:  All I'm going to suggest to Your Honor, if

19    I might, is we have a motion to dismiss that was filed against

20    us that will be fully briefed as of this coming Monday.  Your

21    Honor scheduled a hearing date on January the 8th.  We, as I

22    said, received a few days ago, this hearing notice for

23    something which I can only say attempted to beat Your Honor's

24    hearing date by a few days.

25             And what I would propose is that perhaps we could

79

1    submit a letter to Your Honor, requesting some type of a

2    conference call so that we could see whether we could schedule

3    a date to hear this motion to dismiss more quickly than the

4    January 8th date.  Because as Your Honor just alluded to in the

5    opinion you just read, you talked about the interplay of what's

6    taking place.  And we think it's important that as this matter

7    was filed with Your Honor, that Your Honor's jurisdiction be

8    determined, as you previously indicated you would, on January

9    the 8th.  And now I think we need a more expedited hearing to

10   avoid some situation where the parties need to engage in

11   collateral litigation.

12        THE COURT:  Well, you know, I don't really want to get

13   into sort of -- you're certainly free to make whatever request

14   you want to make.  I think it would be unlikely that I would

15   backdate the hearing to get a leap on the state court -- it's

16   not a state court, it's a --

17        MR. BUNIN:  No, it's --

18        THE COURT:  -- an administrative body.

19        MR. BUNIN:  -- Workers' Compensation Agency who

20   appointed somebody who's not even a judge --

21        THE COURT:  Well --

22        MR. BUNIN:  -- to hear something to determine a

23   coverage case.

24        THE COURT:  -- well, it seems to me that you all

25   should be talking to that person and pointing out to that

80

1    person that there's something before me that's been brought by

2    the plaintiff in that case.  I'm reluctant -- I don't think

3    it's seemly for me to move the -- I mean, you could convince me

4    otherwise, but it just -- it doesn't seem seemly for me to be

5    jumping ahead of someone.

6             MR. BUNIN:  Well, I would say --

7             THE COURT:  On the other hand, you have a right to

8    seek an injunction.  You have a right to try to persuade me

9    otherwise.  My general experience is that the state courts and

10   administrative agencies, just like the federal courts, like to

11   do things in an orderly way, and don't like to have forum

12   shopping.  And if something was scheduled and has long been

13   scheduled, generally, if they're made aware of that, they

14   realize that their schedule switcher, usually set

15   automatically, can be reset.

16            I have no indication, for example, that the

17   administrative officer involved with this matter even knows

18   about what's before me or any timing issues, and --

19            MR. BUNIN:  Well, we can make that claim, because the

20   same lawyer represents them, and it's a defendant here in the

21   adversary proceeding.

22            THE COURT:  Well, no, that's the lawyers.  But the

23   person presiding over it may not know that.  And it would seem

24   to me, in the first instance you should focus on that

25   proceeding, which is the subsequently commenced one, and make

81

1    it clear that it's -- to the extent you think it is somehow

2    itself somewhat of an unseemly end run or attempt to end run

3    what's been teed up in front of me for some time now.

4         MR. BUNIN:  That is my concern.

5         THE COURT:  Well, generally speaking, as I said, all

6    courts, whether they be state courts or federal courts, are

7    responsive to those concerns.  And rather than me sort of take

8    the bit in my teeth without the courtesy of letting the other

9    tribunal know -- having the parties tell the other tribunal

10   what's going on, I think is premature.

11        MR. BUNIN:  I understand Your Honor's --

12        THE COURT:  But it's not a ruling.  I mean, this is

13   like an off-the-cuff request.  And you're going to get my off-

14   the-cuff response.  And you're certainly free, again, to ask

15   for an injunction of the parties and/or some other relief.  But

16   I would -- I could tell you the first question I'd ask, which

17   is has anyone talked to the administrative officer, because --

18        MR. BUNIN:  Well, we just got the hearing notice --

19        THE COURT:  I know.  So --

20        MR. BUNIN:  -- a couple days ago.

21        THE COURT:  -- I mean, that's what you ought to do

22   first.  That's what I -- if I were in the other position,

23   generally speaking, the one thing that might really get me

24   crosswise is if one of the parties went, before talking to me,

25   and went to the other court and just tried to do an end run

82

1    around me.  We're all protective of our jurisdiction first and

2    foremost, but we're equally -- when that's recognized, we're

3    all equally sensitive to races to the courthouse and forum

4    shopping.  And as long as our jurisdiction's suitably

5    recognized, the latter policy generally wins out, so.

6              MR. BUNIN:  Understood, Your Honor.

7              THE COURT:  Okay.

8              MR. LYONS:  Your Honor, one other matter, because I

9    did want to mention something.  I mean, we do have the plan

10   injunction, and we actually made it very clear to the State of

11   Michigan --

12             THE COURT:  Well, that's a separate issue.  If there's

13   an existing stay or injunction, then people can -- again,

14   people can ask for injunctive relief on all sorts of grounds.

15   But I'm just not -- my initial reaction is negative to moving

16   up the hearing.

17             MR. LYONS:  I guess my point is somewhat different,

18   Your Honor --

19             THE COURT:  I know.  You're saying that Michigan may

20   be proceeding at its peril.

21             MR. LYONS:  Because we got a notice of hearing and we

22   respectfully said the claims are to be adjudicated through the

23   bankruptcy court under the plan.  So please direct your --

24             THE COURT:  Well, but they just have been, right?

25             MR. LYONS:  I'm sorry?

83

1          THE COURT:  They just have been?

2          MR. LYONS:  They've been conducting -- I don't know

3     what they've been doing with notices of the hearing.  Frankly

4     we just --

5          THE COURT:  But we just did adjudicate the claim.

6          MR. LYONS:  Yes, but some of the underlying --

7          MR. BUNIN:  I think Mr. Lyon is referring to the same

8     hearing that I'm referring to.

9          MR. LYONS:  -- the underlying Workers' Compensation

10    claims, Your Honor, they -- we had routine notice of hearing,

11    because that's what we received in the past.

12         THE COURT:  Oh, okay.

13         MR. LYONS:  But again, we made it clear that if it's a

14    claim that affects the estate and the claims, they need to do

15    it through this Court's process, and you can't make a ruling

16    that's going to change the priority of a claim --

17         THE COURT:  I guess I was -- maybe -- again, because

18    this is off-the-cuff.  My impression was that -- maybe I'm

19    wrong about this -- that the proceeding that was -- had just

20    been scheduled or recently scheduled, wasn't really a claim

21    adjudication proceeding, but it was trying to determine the

22    same issue that's before me, which is, is the insurer

23    responsible for this?

24         MR. BUNIN:  Which that impacts on the --

25         THE COURT:  If that --

84

1          MR. BUNIN:  -- administrative claim --

2          THE COURT:  -- well, I don't know --

3          MR. BUNIN:  -- of ACE and Pacific.

4          THE COURT:  -- I -- it's a little different than the

5     point Mr. Lyons was making.  But obviously, if whatever is

6     being sought to be determined is contrary to an injunction that

7     I have previously issued, or the plan, then obviously Michigan

8     is proceeding at its peril, and that is something, if that's in

9     fact the case, that I would be amenable to issuing a further

10    injunction on.  Although I don't like to issue injunctions in

11    furtherance of injunctions, since the first injunction should

12    control.

13         MR. LYONS:  Understood.

14         THE COURT:  Okay.

15         MR. LYONS:  Your Honor, we have nothing further.

16         THE COURT:  Okay.

17         MR. LYONS:  Thank you.

18         (Proceedings concluded at 12:42 p.m.)

19

20

21

22

23

24

25

85

```
 1
 2                         I N D E X
 3
 4                          RULINGS
 5                                      Page      Line
 6    Official Committee of Eligible      10        10
      Employee Retirees' Motion for
 7    Relief Granted
 8    Debtors' Claim Objection to         27        13
      Claims File by Jane Duffy Granted
 9
      Debtors' Claim Objection to         29         3
10    Claims Filed by Barbara Burger,
      Paul Pickles, Patricia Wineman,
11    and Hubert Noel Morgan Granted
12    Debtors' Objection to Proofs of     30        23
      Claim Filed by Johnson Controls,
13    Inc. and Affiliates Granted
14    Debtors' Motion to Disallow         32         6
      Claims by AIG Granted
15
      Debtors' Motion to Disallow         32        21
16    Claims Made by RLI Granted
17    The Fund has not Carried its        74        10
      Burden to Establish Excusable
18    Neglect in Respect of its Proof
      of Claim
19
20
21
22
23
24
25
```

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

86

1

2                        C E R T I F I C A T I O N

3

4       I, Dena Page, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7       _____

8       Dena Page

9

10      Veritext

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  December 22, 2009

16

17

18

19

20

21

22

23

24

25