HONORABLE ROBERT D. DRAIN
United States Bankruptcy Judge
United States Bankruptcy Court
For the Southern District of New York
One Bowling Green
Room 632
New York, New York 10004


Delphi Corporation
5725 Delphi Drive
Troy, MI 48098
Att'n: General Counsel


Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, Illinois 60606
Att'n: John Wm. Butler, Jr.,
John K. Lyons,
Joseph N. Wharton

*United States
Bankruptcy Court
for the Southern
District of New York

300 Quarropas St.
Room 118
White Plains, NY
10601 - 4140

*sent disc and hard copy.


Re: 18826

Objection to: "THIRTY-FIFTH OMNIBUS CLAIMS OBJECTION"
Delphi Corporation, et al
Chapter 11
Case No. 05-44481 (RDD)

From: Steven D. Streeter
4210 Crosby Road
Flint, MI 48506
Claim No. 12251

FILED
DEC 18 2009
U.S. BANKRUPTCY COURT
SO. DIST OF NEW YORK

sent with copy
of comp. judgement
9-11-09.

September 8, 2009

Sirs,

This letter is in response to the Chapter 11 Case No. 05-44481

(RDD), In re  DELPHI CORPOATION, et al.  "THIRTY-FIFTH OMNIBUS

CLAIMS OBJECTION".

I, Steven D. Streeter, Claim Number 12251, disagree with the Thirty-

Fifth Omnibus Claims Objection. I am presently receiving a weekly Workers

& Unemployment Compensation check after being awarded a judgment for

disability ordered by Michael T. Harris, Magistrate (199G) at Flint, Genesee

County, Michigan on the 2nd of December, 2003.  Delphi was ordered to pay

compensation at the rate of $589.83 per week and would be responsible for

all medical expenses.

According to Delphi Corporation they have identified my Claim as

having a Basis For Objection of "Individual Workers' Compensation Books

And Records Claims". They would have you Disallow and Expunge the

Claim.

I believe that my claim should not be disallowed and expunged. I

continue to suffer pain, numbness, and loss of strength in both of my injured

hands. My brittle diabetes continues to be uncontrolled. The diabetes is

greatly affected by stress and has become much less manageable in the last

year or so. In the last few months I have again been having severe insulin

reactions. With no change in my general health, diet or exercise I am in the

belief that this is directly related to the stress of my present situation with

the impending loss of my Delphi pension check and Workers Compensation

benefits. I am still not able to return to work, with my disabilities and

diabetes, being a major factor in being hired by another employer.

If I am to be understanding the information that I received correctly,

you need an asserted claim amount. Considering that I am not

knowledgeable with the laws of the Workers Compensation or the laws of

the Bankruptcy courts, I will do my best to explain the dollar amount I have

arrived at. I presently receive $589.83. Times that by 52 weeks in a year =

$30,671.16. Multiply that by 44 years (life expectancy of age 95 minus

present age of 51) it would be $1,349,531. Take this figure and subtract the

difference of the pension and social security reduction after age 65 and it

would probably put us at around $600,000.

To the extent that the Claim is contingent or fully or partially

unliquidated, the amount that I believe would be the allowable amount of

the Claim upon liquidation of the Claim would be $600,000. This figure

does not even include any future medical expenses that they would be

responsible for. I fully believe that this is an appropriate amount for

compensation.


I am enclosing a copy of the Workers' Disability Compensation award

with this objection letter. If any further information is needed or required

please contact me.


Steven D. Streeter
4210 Crosby Road
Flint, MI 48506-1463
Phone # 810-736-4361
Claim # 12251

STEVEN D. STREETER
G 4210 CROSBY RD
FLINT                    MI      48506

```
STEVEN D. STREETER
SSN: �OOOOO1698      CASE:  1
PAGE:    1
```

```
STEVEN D. STREETER                    DELPHI AUTOMOTIVE SYSTEMS CORPORATION
G 4210 CROSBY RD                      INTEGRATED DISABILITY ACTIVITY
FLINT  MI  48506                      PO BOX 5053
                                      SOUTHFIELD  MI  48086-5053

R.DUNCAN  MACDONALD
200 MCKINNON BUILDING                 DELPHI AUTOMOTIVE SYSTEMS CORPORATION
FLINT  MI  48502                      EVELYN NARTELSKI MC485-801-340
                                      300 N CHEVROLET AVENUE
                                      FLINT  MI  48555

                                      JOHN D. RESEIGH
                                      LB KING BLDG
                                      1274 LIBRARY STE 500
                                      DETROIT MI  48226
```

CW4700

RECEIVED

DEC. 4 - 2003

WORKERS' & UNEMPLOYMENT COMPENSATION
LANSING, MICHIGAN

# OPINION/ORDER
## Michigan Department of Consumer & Industry Services
Bureau of Workers' Disability Compensation/Board of Magistrates
P O Box 30016, Lansing, MI 48909

121103030

| | |
|---|---|
| Claimant's Social Security Number ▓▓▓ 1698 | Plaintiff Name(s) Steven Streeter |

## MAILED

**Defendant(s)/Carrier(s)**
A. Delphi Automotive Systems Inc
B.
C.
D.

DEC 1 1 2003

WORKERS' & UNEMPLOYMENT COMPENSATION
LANSING, MI

**Type of Claim** (For statistical purposes only)

A. ☒ General Disability   B. ☐ Partial Wage Loss   C. ☐ Specific Loss   D. ☐ Permanent Total   E.☐ Death   F.☐ Misc.

**Award Entered**

1. ☒ Granted-Open   3. ☐ Denied   5. ☐ Voluntary Payment   7. ☐ Stipulated-Open   9. ☐ Withdrawn   11. ☐ Penalty Only

2. ☐ Granted-Closed   4. ☐ Medical Only   6. ☐ Voluntary Payment-115   8.☐ Stipulated-Closed   10.☐ Dismissed   12.☐ Other

| Injury Date(s) Established | Average Weekly Wage | Discontinued Fringes | Date Discontinued |
|---|---|---|---|
| 8/25/97 | $ comp rate $458.66 | $ | |
| 10/19/01 | $ comp rate 589.83 | $ | |
| | $ | $ | |

**IRS Filing Status**   A. ☐ Single   B. ☐ Single/Head of Household   C. ☒ Married/Joint   D. ☐ Married/Separate

**Dependents - Date of Marriage/Birth**

| Name | Date | Name | Date | Name | Date |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**IT IS FOUND** that the employee is disabled and compensation shall be paid as follows:

| Defendant/Carrier | At the weekly rate of | From | Through |
|---|---|---|---|
| | $ 589.83 | 1020/01 | 12/17/03 |
| | $ | | |
| | $ | | |

**IT IS FURTHER FOUND** that the employee is still disabled and therefore it is ordered that defendant/carrier <u>Delphi</u> shall pay compensation at the rate of $ <u>589.83</u> per week, until further order. Interest is owed in accordance with Section 801(6) from date each payment was due until paid.

**IT IS FURTHER ORDERED** that defendant/carrier _____ shall be responsible for medical expense(s) pursuant to Section 315 as follows: All.

**IT IS FURTHER ORDERED** that the maximum authorized attorney fee shall not exceed <u>30</u> percent of the compensation accrued. (Subject to the provisions of Section 858 (418.858) and Rule 14, R408.44)

**IT IS FURTHER ORDERED** that: This order is incorporated into the attached opinion by reference, and the opinion is incorporated into this order. IT IS SO ORDERED.

Michael T. Harris, Magistrate (199G)
at Flint, Genesee County, Michigan

Signed on 12/2/03

Unless a Claim for Review is filed by either party within 30 days from the date stamped on this Opinion/Order as "mailed Date", this order shall become final. The Claim for Review should be filed with the Workers' Compensation Appellate Commission, P O Box 30016, Lansing, MI 48909.

BWC-200 (3-98)     Authority: Workers' Disability Compensation Act 418.847(2). R418.54(1) Completion Mandatory.

**STATE OF MICHIGAN**
**DEPARTMENT OF LABOR & ECONOMIC GROWTH**
**BOARD OF MAGISTRATES**

STEVEN STREETER
SS # ▆▆▆▆ 1698
    Plaintiff,

       V.

GM AC ROCHESTER FLINT (DELPHI AUTOMOTIVE SYSTEMS),

    Defendant.

_____/

*OPINION*

<u>APPEARANCES</u>

    <u>THE PLAINTIFF</u>

    Duncan MacDonald for Plaintiff P 16917.

    <u>THE DEFENDANTS</u>

    John Reseigh for Defendant, P 24801.

<u>THE TRIAL</u>

    Trial was held on October 22 2003 in Flint, Genesee County, Michigan. Briefs were to be submitted on or before 10/31/03.

<u>THE CLAIM</u>

    Plaintiff claims disability benefits, and medical treatment as a result of alleged work injuries on 8/25/97 and 10/19/01.

<u>STIPULATIONS:</u>

*Steven Streeter v Delphi Automotive Systems Inc*
*SS 3█████7698*

1. The employer and employee were subject to the Michigan Workers Compensation laws.

2. Plaintiff met with personal injury, arising out of and in the course of his employment on both dates alleged, 8/25/97 and 10/19/01.

3. That as to the injury of 10/19/01 there is a disability due to the injury.

4. The relationship of employer and worker existed.

5. Defendant self-insures.

6. Notice was received and claim was made within the statutory period.

7. There is no dual employment.

8. There is coordination for S & A benefits paid and continuing.

9. Tax status is single, head of household with minor dependents.

10. Benefit rates for the injury dates are $458.66 for the 8/25/97 injury and $589.83 for the 10/19/01 injury date.

**ISSUES:**

1. Whether plaintiff's diabetes was aggravated or accelerated as a result of either or both of the work injuries.

2. Whether plaintiff has a disability resulting from the 8/25/97 injury.

3. Whether plaintiff refused a reasonable employment offer and thereby became ineligible for disability benefits from and after that date.

## SUMMARY OF THE EVIDENCE

**SUSANNA STREETER**, the wife of plaintiff, has been married to plaintiff for 26 years. He was a diabetic when they married. She works outside the home part-time and always has.

2

*Steven Streeter v Delphi Automotive Systems Inc*
*SS 3████7698*

So far as controlling the diabetes she makes sure his meals are on time, and if he
has an insulin reaction she takes care of it. He can get giddy or angry or grow silent and
she knows he is beginning to have a problem. If he doesn't eat on time his blood sugar
goes too low. Plaintiff regularly left home around 6 AM and got home about 3:30 PM.
She worked from mid morning to mid afternoon. Plaintiff's home life was pretty normal
up through the mid 1990's.

Around 1996 plaintiff started coming home angry and frustrated from dropping
things at work and he would say his hands hurt. Missing an exact mealtime used to not
be a problem—there was about an hour window they could play with. After this problem
started they had to have a meal ready around 3 if he would come in frustrated. At home
she would see him check his "insulin level" about 6 times. Now, he checks it between 10
and 12 times a day. He also exercised to keep his insulin level appropriate. Since 1996
his anger and other reactions have gotten much worse.

**STEVEN STREETER**, plaintiff, is 45 years old, and was born 5/25/58. He has a
high school diploma and hired in at GM in 1977 at the age of 19. Before going to work
for AC, he worked in construction labor for the city of Flint for a short time. Plaintiff has
been diabetic since age 14, and has been injecting insulin since that time. He could do
nearly anything from that time on, engaging in sports and other activities.

Plaintiff would inject himself in the mornings, would eat his meals on time, and
would exercise to bring his sugar level down, jumping rope or jogging. This was a
consistent routine from the 1970's to the mid-1990's.

Plaintiff always worked at AC, now Delphi. Plaintiff's exhibit 2 is the job
descriptions of the various jobs he did at Delphi/AC. The last job he did at Delphi was
the stock chaser job. He then had surgery to the right hand, middle finger, performed by

3

Dr. Dass. He had to be awake during the surgery to see if the hand could be moved properly. He could move the finger, but it still locked.

Defendant's exhibit C is a job offer made to plaintiff. He received it. This was a job offer to go to Dept 1489, which is where he worked as a stock chaser. He then went in to see if stock chaser was the job he was offered, and it was. The stock chaser job was described in Plaintiff's exhibit 2, pp. 66-69. It was the same job offered in Defendant's exhibit C.

His sugar problems started about the time he started having surgeries. His levels would jump all around after that. First were the carpal tunnel surgeries by Dr. Dass. Plaintiff would drive home from work and would find himself getting lost. He would eat something out of his lunch pail and recover enough thoughts to find his way home. At work he would begin to think about the fact that he would need another surgery and this affected his levels too. The types of jobs they had him on were line work, reaching, pulling, grasping, pushing buttons all day long, and pulling and pushing parts out of fixtures. His hands would act up and he would grow apprehensive that he would have to go back to Dr. Dass for more surgery.

Plaintiff's hands would go numb while mowing his yard at home and he had to strap the safety hold-down handle down to operate it. At work he had to pick up heavy boxes of material. He dropped things at work, things like skids and paperwork. This embarrassed him and "pissed me off" which caused his sugar to go off. It was the frustration that he couldn't do the things he had always done that did this he says.

Between 1997 and 2001 his blood sugar was all over the place and he couldn't keep control of it. In the beginning he went to first aid and they gave him glucose that raised his level but made it too high for several days. So, he didn't go to first aid after that. He would take a glucose lozenge instead. He also carried juice in his lunch pail. His co-workers would administer juice to him as well, maybe 2 to 3 times a week during the time between 1997 and 2001. Before 1997 there were no such problems.

4

*Steven Streeter v Delphi Automotive Systems Inc*
*SS* ●●●● *7698*

Plaintiff tries to keep his sugar under control due to the possible effects of not doing it—blindness, amputations, etc.

It is important for a diabetic to eat on time. He stays on a 2600-calorie diet a day. When workload fluctuated in the plant and the temperatures grew hot, that was when he would have a diabetic reaction. Once he went to the hospital from work for a diabetic reaction, in 1999.

Dr. Singer was given a job description that plaintiff says was not accurate. Dr. Schuchter's deposition has a more accurate job description. The only thing not in that description is that there is a manifest that comes in with every truck, and the stock chaser had to move the stock around to check that everything on the manifest was there when it came in. Plaintiff says this involved hard, two-handed gripping of skids that they had to slide around so that they could see the labels on the skids and make sure they received what the paper says they got.

As a departmental stock chaser he had to take the parts that were stacked in racks, open up the boxes, and raise up the layers to count the parts in a box, to see how many were left. Squeezing with both hands was occasionally required when the boxes were very heavy. They also had to remove the labels from the boxes and take them to a scanner, squeezing the scanner to make sure it was working right. If the label wouldn't scan it had to be entered by hand into the computer. If the stack was large he might be holding the scanner for 15 to 20 minutes at a time.

The receiving stock chaser job also required breaking loose and ripping off shrink-wrap that is stuck to all the containers that come in. It is wadded up with your hands afterward.

Plaintiff is currently drawing Total and Permanent Disability Pension, backdated to 11/1/2002. Plaintiff has been upset about being put back on the jobs that were causing

5

his problems and he doesn't want more surgeries. His blood sugar levels are still fluctuating even though he is retired. His hands have gotten some better, though still with locking on the one finger.

CROSS: Plaintiff's last job was that of a stock chaser and he began doing that after his carpal tunnel surgery in order to accommodate his restrictions. Most of the dropping of objects began AFTER his carpal tunnel rather than before. He had the carpal tunnel release because his fingers were falling asleep and hurting and aching all the time. He couldn't grip things well after surgery and began dropping things. He also has trouble taking the cap off his needles for insulin injections. Strapping the handle to the mower was also something he had to do after the surgery.

Work ambient air temperatures were a problem for his sugar if they got too high. At home, if he got too hot he could take a break. He couldn't always do that at work. After the carpal tunnel surgeries he did not want to go back to Dr. Dass. Dr. Walters' records show that plaintiff felt he was being jerked around by Dr. Dass. He denies it was because of Dass' opinion that his carpal tunnel was related to diabetes. He says this didn't upset him because Dr. Dass had no clue about diabetes.

It is fair to say that plaintiff's main concern is the fact that he might need more surgeries if he did so. Even the thought of additional surgery upsets him, and when he gets upset his blood sugar goes out of control. Plaintiff denies being upset in the same way when he is around home. Some things bother him at home but he doesn't let it get to him.

He has prepared with his wife's help a list of most of his jobs. He has broken down the stock chaser job into different types of work it involves. He listed departmental stock chaser, receiving stock chaser and labeling stock chaser. If assigned to stock chasing, he would on a normal day go to a certain job and would do that until he moved or was no longer needed. Labeling would only be for a short period of time a day. When he spoke to Jason Smith he was told that the stock-chasing job offered would be any one

6

*Steven Streeter v Delphi Automotive Systems Inc*
*SS       7698*

of those. Mr. Smith knew he was under restrictions. This was a job he had when he left, so he didn't try it, and instead just left the plant.

The job descriptions introduced represent something that Mr. MacDonald asked him to fill out. He does not know if the official company job description matches his, but he says it is "real close." He has read the actual description. His wife filled out the job descriptions and he told her what to write.

Using the scanner, he squeezes real hard because he doesn't know if it is working. There's no indicator on the scanner that says if it is working or not. The scanner is a handheld scanner like you sometimes see in stores. It emits an infrared light. The light is visible when scanning a label. Just because the light was working would not mean it was reading the SKU number on the label.

Plaintiff says he didn't have many blood sugar fluctuations until "all this started." He has been rigorous in monitoring his blood sugar levels and strict in his diet and exercise. Since the surgeries it took some time to get it back under control due to the medications from the surgery.

Plaintiff has a locking middle finger but he doesn't remember whether he uses that finger or not in using the gun. He identifies a scanning gun marked as exhibit E. He uses his trigger finger to activate it. That is not his locking finger.

Redirect: Plaintiff has had surgeries on the index, middle finger and little finger on the right hand. When the finger locks he has to actually grip it and pop it back into an unlocked position.

Plaintiff says that the reason he was upset with Dr. Dass was that he knew he needed another surgery but comp wouldn't pay for it. It was around the same time that he started having carpal tunnel that he began developing the trigger fingers.

7

*Steven Streeter v Delphi Automotive Systems Inc*
*SS▓▓▓▓ 7698*

**JASON SMITH** is a supervisor for Delphi Automotive and is a production supervisor. He has been 8 years at this plant.

In his capacity as a receiving supervisor, which he had taken over about when plaintiff went on sick leave, he would have been plaintiff's supervisor had he come back. Mr. Smith recalls seeing plaintiff and talking to medical, to a nurse, prior to that time. They had called and said Plaintiff was coming back with restrictions and asked if there was a position for him. The witness said it was his understanding that plaintiff couldn't do any lifting or anything of that nature. He doesn't remember if Plaintiff told him of his restrictions when they visited.

Plaintiff was offered the job of stock chaser. The witness says he had an obligation to place an individual within his restrictions. He thinks he may have talked with plaintiff about doing inventory counts in the receiving area and maybe using the scanner. To do a warehouse inventory you have a check sheet and a clipboard, checking the skids, doing a physical check off of these parts. They take this to P C and L persons who are schedulers so that they know how many parts to build that day. The inventory person/stock chasers report to the scheduler or to a floor supervisor, depending on how they do it. He doesn't know whether they have a hard copy or what. They go through and physically count the parts. A skid usually has either 36 or 60 pieces and then they would multiply that figure times the number of skids. In the "partial area" there are totes with 3 or 5 pieces and so you just count the number of totes. You don't have to lift anything in this job. You might have to slide something to the side to count it, but not to lift it up. There is no production quota in this job. You would be using the pencil and checking off up to 500 different part numbers. The physical inventory would take a couple of hours and the rest of the time they would be chasing "hot parts," that would be coming in receiving and needed to go right to the line. These would be toted to the line in carts.

He doesn't have anyone currently working in this job with carpal tunnel. These are real jobs and not made up jobs, or at least parts of real jobs. If a person can't be placed in a regular job, they go to an alternate work department, where they are worked

8

*Steven Streeter v Delphi Automotive Systems Inc*
*SS     7698*

up for restrictions and then put to doing jobs like visual inspection, putting springs on trip stems and the like.

The witness doesn't recall offering or talking about a specific job. He doesn't recall what they talked about for ten to fifteen minutes that day. After finding a specific job, they have to meet with the union to get an okay, and then put them on it. If a person fails that job then they go to alternative work department placement.

Defendant's exhibit E is a similar scanner to what plaintiff would have used. It came from the scan desk at receiving. There is a slot on the back that says it is reading and scanning. The witness says if the gun is acting intermittently you might have to press the trigger more than once. If it is scanning there is a light across the bar code. The witness is familiar with trigger pull on a hunting rifle and the trigger pull pressure is about the same on the scanner. He does not think plaintiff has ever offered to come back to work.

CROSS: The scanner here is not necessarily the same one plaintiff used. He says that sometimes someone will continue pulling the trigger even if it isn't scanning. A full box of appliqués could weigh upwards of 10 pounds.

The physical counting of inventory is done for part of the day and then they go to something else, like hot parts chaser. That's when parts are coming in from an outside supplier and they watch for them and move them to the line.

Stock chasing consists of tasks taken from several jobs, unless the worker has restrictions. If there are restrictions the worker cannot be put on a job that would hurt him. The jobs he has been describing here are regular jobs within Delphi.

**PLAINTIFF IS RECALLED**: He is asked if he is aware that he can't return to work as long as he is T & P. [Totally and Permanently disabled] He acknowledges that fact.

*Steven Streeter v Delphi Automotive Systems Inc*
*SS█████ 7698*

PLANT MEDICAL RECORDS are introduced as plaintiff's exhibit 1. They
show that plaintiff was hired with full knowledge of the diabetic condition. They also
contain a letter from Dr. Walter dated 2/8/78 that informs defendant medical department
that plaintiff is a brittle diabetic and that "we have had difficult time controlling his
frequent episodes of hyperglycemia and diabetic acidosis," and requesting first shift work
for plaintiff due to this. The doctor made this same request multiple times thereafter.

JOB DESCRIPTIONS are plaintiff's exhibit 2.

COLLECTIVE BARGAINING AGREEMENT clauses pertaining to total and
permanent disability retirement are introduced as plaintiff's exhibit 3.

JAMES WALTER, M.D., testified by deposition for plaintiff on 8/20/03
[Plaintiff's exhibit 4.]  He is an internal medicine specialist, teaches resident physicians
in family practice, lectures on diabetes, and treats patients with the disease.

Dr. Walter's records are introduced. They chronicle treatment for his diabetes, for
trigger and locking fingers, carpal tunnel, epicondylitis, depression, skin lesions and
related problems from 1998 through 2002.

Dr. Walter filled out an employee's physician report in March 2002 indicating
that plaintiff could perform jobs that don't require significant or repetitive use of either
upper extremity. This was due to the bilateral carpal tunnel syndrome, trigger fingers and
bilateral lateral epicondylitis.

There is a report of 6/11/02 that indicates that the doctor was informed of the
intent to return plaintiff to the position of stock chaser, that the physical requirements are
not consistent with the restrictions plaintiff needs, and that since plaintiff is a brittle
diabetic, the problems with the extremities are creating a great deal of physical and

10

*Steven Streeter v Delphi Automotive Systems Inc*
*SS    7698*

emotional stress that is significantly aggravating plaintiff's underlying diabetes condition. The doctor recommended that plaintiff not return to work in these circumstances.

On 8/2/02 the doctor submitted a new report of employee's physician. It noted that the plaintiff had finger locking, constant pain, widely fluctuating glucose measurements and emotional lability. He then indicated that the approximate date on which gainful employment of any kind may be expected is never.

The doctor also testified that the long term complications of diabetes are mainly to the vascular system, causing vascular damage in various parts of the body, including eyes, heart, kidneys, and brain blood flow.

The doctor noted that the plaintiff is different than he was originally due to the emotional stress aggravating the underlying diabetes condition. He is vigilant, high strung, and has wide swings and more fluctuations in his blood sugar than he had in early years. The doctor says the plaintiff's blood sugar goes up whenever he has meetings with his lawyer or court dates. The doctor also says that stress for a diabetic, whatever the reason, is going to cause more fluctuations in blood sugar levels.

The doctor testified that plaintiff should avoid any activity that causes triggering, and basically should do no activity with his hands that requires repetition. This would include operating the scanner, handwriting, pulling shipping tape from boxes, gripping with his hands. He also said [p 27] that the activity *per se* would not necessarily affect the diabetes control unless it made him stressed, which would cause his sugar to go up.

Dr. Walters testified that he last saw plaintiff on 8/16/03 for a skin lesion.

**PLAINTIFF'S EXHIBIT 4A** is the office records of Dr. Walter.

**PLAINTIFF'S EXHIBIT 5** is cross-examination of Dr. Singer, set out below.

11

**RICHARD SINGER, M.D.**, an orthopedic surgeon with a specialty in hand surgery and treatment, testified for Defendant that he examined plaintiff on 2/28/02 and noted that plaintiff had a lengthy history with the defendant, had been on restrictions for his hand problems since 1997, had a left carpal tunnel release in 10/97 and a right release in 1/98. In 2/98 he had a left index trigger finger release, and in June a right index trigger finger release. In 9/98 there was a left 5th finger trigger release and in 11/98 a right 5th finger release. Plaintiff was placed on stock-chasing and in 10/01 he developed a right long finger triggering and had been off since then.

Exam showed the right middle finger clicking, and impressions were synovitis of the flexor tendon of the right long finger, and rule out ulnar nerve entrapment of the left elbow. EMGS were ordered and they showed postoperative conduction abnormalities of the median nerve but no findings of cubital tunnel syndrome. The doctor noted that the middle finger triggering was more likely associated with the diabetes than the work. The doctor noted that diabetes is a "major confounding factor for all cumulative trauma disorders," since all can be seen heavily occurring in the diabetic population.

Though the doctor asked to see a job description, apparently none was provided. In lieu of the description itself, the doctor was asked to assume that the job involved receiving stock, separating stock and placing paperwork into a computer, and did not involve any forceful gripping or use of vibratory tools. To that hypothetical question the doctor responded that the flexor tenosynovitis would not have been caused or aggravated by those activities, rather that the diabetes "is the culprit here." P. 13.

The doctor recommended restrictions of no forceful gripping and no high torque vibrating tools, with anti-shock gloves as well.

On cross-examination the doctor stated that his EMG results did not show any evidence of a diabetic neuropathy. The doctor also reiterated his statements that these kinds of conditions, the so-called "cumulative trauma" disorders occur more often in the diabetic population than others. The doctor concedes that, "depending on the job," the

12

*Steven Streeter v Delphi Automotive Systems Inc*
*SS ████ 7698*

hand intensive work can be a cause or significant aggravating factor of a diabetic's carpal tunnel syndrome. He says it depends on the position of the hand and that forceful gripping with the wrist flexed, or twisting with the wrist flexed can aggravate or cause carpal tunnel syndrome. He would not concede that gripping a pencil or pressure on the palms could cause carpal tunnel or trigger finger.

The transcript then takes a tour down the road of epidemiology studies of carpal tunnel syndrome, and why and how certain terms such as "overuse syndrome" and/or "cumulative trauma disorders" are no longer used. The doctor notes that the "gold standard" as far as the detection and treatment of such conditions is the physical exam versus the results of an EMG.

**SIDNEY SCHUCHTER, M.D.**, a board-certified practitioner of Internal Medicine in Michigan since 1958[1] testified for defendant that he saw and examined the plaintiff on 1/14/03 at request of the defendant.

The exam history disclosed a 30-year history of insulin-dependent diabetes, currently requiring injections of varying amounts at various times of the day. Though plaintiff's diabetes has always been somewhat brittle he has never been in a coma.

Plaintiff has some numbness in his hands that he associates with carpal tunnel.

The doctor concluded that the plaintiff has diabetes and that it is unrelated to his Delphi employment. The doctor says that brittleness does not relate to mental, emotional or physical factors but is inherent in the disease. He then goes on to say that strenuous exertion will influence the amount of insulin and food needed to maintain homeostasis, and that some individuals notice that with acute emotional stress their blood sugar counts tend to rise due to the increase in adrenalin and other hormones.

---

[1] Dr. Schuchter stopped active practice in 1969 and has done nothing but examinations since that time. P. 16.

13

*Steven Streeter v Delphi Automotive Systems Inc*
*SS ▓▓▓▓7698*



In response to a reasonable hypothetical, the doctor offered an opinion that the work had no effect on the plaintiff's diabetes.

In cross-examination the doctor explains what is meant by the term "brittle diabetic." He also does not concede that chronic emotional stress would have any long-term effect on the diabetic state, though he does say that it may cause fluctuation in the blood sugar levels.

The doctor does concede that a statement in the literature that diabetic blood sugar levels go up in response to emotional upset is accurate. [P 22-3.]

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. **CREDIBILITY OF LAY WITNESSES**: Mr. Streeter is a credible witness. His perspective is obviously not unbiased, and he does seem to be a bit too emotionally fragile for one who has worked so hard over the years to try to live a normal life in spite of a challenging disease. Nonetheless, I do have the impression that he is being truthful and forthcoming about the facts of the work, his limitations, and his experiences after the diabetes became uncontrolled. His wife, Susanna Streeter, largely a background witness, is found to be credible. Jason Smith is credible, though without some critical information about whether a specific offer of employment was made, and the exact job that was offered, his testimony was not all that helpful to Defendant.

14

*Steven Streeter v Delphi Automotive Systems Inc*
*SS* ▓▓▓▓*698*

2. **CREDIBILITY OF THE EXPERTS:** Dr. Walter is entirely credible and persuasive in this matter, with respect to his opinions concerning diabetes, and the hand injuries as well. Dr. Singer possesses impressive qualifications but I find him less credible for several reasons. These are the specific reasons I give Dr. Walter's testimony controlling weight: A. He is the treating physician and has been since plaintiff began with GM as a teenager. B. As a treater, Dr. Walter is going to be compensated without regard to his opinions concerning worker's compensation issues. He has no natural bias nor does he have any reason to render an opinion other than the best interests and health status of his patient. C. The record is replete with examples of Dr. Walter's excellent care of plaintiff over the years and of his in depth knowledge of diabetes as an active practitioner. D. Both Dr. Singer and Dr. Schuchter are hired as one-time examiners by defendant. Not to say that this renders them untruthful, but certainly they are not well-acquainted with plaintiff, generally have less of a complete medical history, and of course are retained with the hope that their opinions will be favorable to the corporation. E. Dr. Schuchter has not engaged in active practice and care of diabetics or any other patients for 34 years, a time longer than the entire time plaintiff has worked for GM/Delphi. Dr. Singer was never provided a job description though he asked for it more than once. The hypothetical he was asked to assume concerning the job duties was at best without detail, and perhaps even incomplete. For these reasons I give Dr. Walter's testimony and opinions controlling weight to the extent they are at variance with those of Dr. Schuchter and Dr. Singer.

3. **INJURY AND DISABILITY:** These customary issues are stipulated to for this litigation. My thanks to Delphi and counsel for this concession that helped make this litigation much more focused and succinct.

4. **REASONABLE EMPLOYMENT:** Subject to the issue of the T & P pension, dealt with below, the paramount issue in this case is the offer of reasonable employment. If plaintiff has refused reasonable employment, then he is entitled to

15

no compensation during that period of unreasonable refusal. In other words, the issue here is: Is plaintiff avoiding work he can perform? See *Mayse v Wirt Transport Co*, 1997 ACO #528, and *Theodorakis v Edward C Levy Company*, 2002 ACO #258.

5. **THE REASONABLE EMPLOYMENT OFFER**: Defendant offered to plaintiff in writing on 5/22/02 the job of Stock chaser, starting 5/29/02 in Department 1489. The offer also states that the "duties of the position offered are consistent with the recommendations and restrictions issued by Dr. Singer and Dr. Woodworth." Defendant's Exhibit C. The letter contains no further detail, and the testimony of Mr. Smith is insufficient to establish that any additional detail was contemplated. He simply does not remember the conversation with Mr. Streeter with any precision at all. He only said repetitively that he would not work an employee in violation of his restrictions.

6. **THE RESTRICTIONS**: Dr. Singer's initial report, without any kind of job description, established restriction recommendations of no forceful gripping, and no high-torque, vibratory tool use. He also recommended use of an anti-shock glove. The doctor, in his deposition, was asked to assume that the job did not involve forceful gripping or vibratory tools, but only that of "receiving stock, separating stock and placing paperwork into a computer." [Dep., P 13.] As to Dr. Woodworth, the shop doctor, I am unfortunately not clear on what restrictions he placed for plaintiff. There IS a plant medical record with some restrictions on it, dated 5/2/01 that show plaintiff is to limit gripping with either hand to less than 5 minutes for one year. However, this is an appendage to plaintiff's brief, not an exhibit admitted into evidence. Further, it makes no sense whatsoever. I can't tell whether it means plaintiff couldn't grip forcefully, or whether he couldn't grip for a total of five minutes for the whole year, or at a time, or during a day! The exhibit isn't admitted, and it doesn't say who placed that rather unclear restriction, and so the only restrictions I have are those of Dr. Singer.

16



7. **DEFENDANT'S BURDEN**: The law is clear that once plaintiff establishes a
disability, the burden shifts to defendant to show an offer of reasonable
employment was made and that it was refused. See *Jackson v Budd Co,* 1993
ACO #630. Then, plaintiff must show why the offer was refused and if the
refusal is unreasonable then benefits may be suspended. *Pulver v Dundee Cement
Co*, 445 Mich 68 (1994), a Michigan Supreme Court case, provides the factors
that should be looked at in determining whether an offer is unreasonable. Good
and reasonable cause to refuse must be applied and evaluated on a case by case
basis, considering such factors as: the timing of the offer; whether the employee
has moved and why; the diligence of the employee in trying to return to work;
whether the employee has gone to work for another employer; and whether the
effort, risk, sacrifice, or expense is such that a reasonable person would not accept
the offer.

8. **FACTORS TO BE CONSIDERED IN DETERMINING REASONABLE
REFUSAL**: Defendant's job offer is in writing; it was not clarified at the
interview with Jason Smith; the timing is certainly not suspect, except perhaps in
the sense that the plaintiff was receiving a Total & Permanent Disability Pension
at the time. The only other factor that comes into play here is whether the effort,
risk, sacrifice or expense are such that the so-called reasonable person would not
accept the offer. The effort is no more than plaintiff's erstwhile work efforts.
Likewise with regard to sacrifice or expense. The only question that remains is the
risk. I take it here that the Supreme Court intended to include risk to a person's
health and safety to the person and others.

9. **RISK IN THE REASONABLE EMPLOYMENT**: As to risk, given the fact
that the job description of parts chaser includes tasks that apparently caused
plaintiff's hand and finger problems in the past, it seems to me that there is
substantial risk of re-injury. Those tasks are the forceful and tight gripping
required to rip off plastic or nylon strapping from pallets, using hands or a knife,
all in the receiving phase of the stock chasing job. They also include the lifting

17

and moving of boxes on the floor and on overhead racks, and the moving of parts within boxes to count them by hand. [See plaintiff's exhibit 2.] There are other repetitive tasks as well, but these seem to be the major problems that keep Mr. Streeter from safely accepting and performing all of the job duties of a stock chaser. Indeed, it was in the performance of some of these duties I just mentioned that the plaintiff became disabled. This is all without regard to the risk of aggravating plaintiff's brittle diabetes.

10. As to the diabetes, according to the testimony of Dr. Walter, which I find persuasive and give controlling weight, the plaintiff's problems are currently likely to increase due to the pressures of this job. Indeed, they already have as he performed this job in the recent past. Under these circumstances, plaintiff's reasons for refusal to accept and perform the "reasonable employment offer" are good ones. He is entitled to reinstatement of benefits from and after the date of their suspension until further order of the Bureau. I do not find that plaintiff can **never** return to employment with defendant, or that there is **no work** that could be made available for him. Nor do I find that his condition regarding his diabetes is necessarily going to remain in its current status. Indeed, Dr. Walter's testimony indicates that a large part of the stress was caused as much by the litigation as by the workplace problems. Perhaps in the cooling off period after this decision is rendered, Mr. Streeter's physical condition will return to a status that will enable him to work. Nor do I find that plaintiff's receipt of Total and Permanent Disability benefits operates to relieve him of the requirements of all other workers so far as complying with a reasonable employment offer is concerned. Plaintiff's argument is ingenious, but he cites no authority, nor can I find one, in support of his position.[2] Yes, he would have to forfeit his entitlement to the T & P pension, by its terms, if he were to return to work, but that is the case with any other

---

[2] Plaintiff cites and appends to his Post-trial Brief the case of *Hope v Welch Grape Juice Company*, 46 Mich App 128 (1973). However, it would stretch that decision much farther than I am willing in order to apply it to the facts at hand! There, the Court held that the so-called favored work offer was not made unconditionally since the offeror had not yet sought and obtained union approval, a condition precedent to making it a bona fide offer. Here, Mr. Smith had the apparent authority to offer reasonable employment as a stock-chaser.

disability, wage replacement program I am aware of. Last, I do not find that there are disability benefits due for the injury date of 8/25/97. The last day worked of 10/19/01 is established as the injury date here for purposes of awarding of benefits.

11. **COORDINATION:** Defendant may coordinate to the extent allowed by law all the benefits awarded here, subject to Section 354 of the Act.

12. **BENEFITS: MEDICAL TREATMENT EXPENSES:** Plaintiff is entitled to payment for all medical bills associated with treatment.

13. **ATTORNEY FEES:** Plaintiff's attorneys are entitled to a fee not to exceed 30% of the amounts recovered, all in accordance with applicable rules and statutes.

**THE ABOVE FINDINGS ARE INCORPORATED BY REFERENCE INTO AN ORDER ISSUED THIS DATE AND THE ATTACHED ORDER IS ALSO INCORPORATED HEREIN BY REFERENCE.**

**IT IS SO ORDERED.**

**WORKERS' COMPENSATION BOARD OF MAGISTRATES**

**Michael T. Harris, MAGISTRATE, 199**

Dated and issued this 2d day of December 2003 at Flint, Genesee County, Michigan.

19

12-11-09

Dear Sirs,

We are sending a CD-disc instead
of the 3.5 disc. Our lawyer is trying to make
the 3.5 disc's to send. We have attempted all other
resources we could think of to accomplish the 3.5 disc
but no one has them any more. So to comply with
what is needed to be sent in we substituted the CD for
the 3.5 disc. We also included the paper format
just to cover all bases!

Thank You,

Steven D. Streeter
4210 Crosby Rd.
Flint, MI 48506
810-736-4361

Case # 05-44481 (RDD)
Claim # 12251
(proof of claim — W/ Delphi
Bankruptcy.)