# EXHIBIT C

## [First Amended Complaint]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DENNIS BLACK, CHARLES CUNNINGHAM, KENNETH HOLLIS, and THE DELPHI SALARIED RETIREE ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) ) ) | Case No. 2:09-cv-13616 Hon. Denise P. Hood Magistrate Judge Mark A. Randon |
| v. | ) ) | |
| THE PENSION BENEFIT GUARANTY CORPORATION; THE U.S. TREASURY DEPARTMENT; THE PRESIDENTIAL TASK FORCE ON THE AUTO INDUSTRY; TIMOTHY GEITHNER, STEVEN RATTNER, RON BLOOM, and DOES 1-50, individually and in their official capacities; and GENERAL MOTORS COMPANY, | ) ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Dennis Black, Charles Cunningham, Kenneth Hollis, and the Delphi Salaried Retiree

Association (collectively referred to as "the Salaried Workers"), through their undersigned

attorneys, hereby submit this first amended complaint against the Pension Benefit Guaranty

Corporation ("PBGC"), the United States Treasury Department, the Presidential Task Force on

the Auto Industry, Timothy F. Geithner, Steven Rattner, Ron Bloom, DOES 1-50 and General

Motors Company.

## I.  Jurisdiction and Venue

1.      This case arises under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, the First and Fifth Amendments to the U.S. Constitution,

and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2.      This Court has jurisdiction to hear this action pursuant to 29 U.S.C.

§ 1303(f)(2)(B), 28 U.S.C. § 1331, and 5 U.S.C. § 702.

3.      Venue properly lies in this judicial district under 29 U.S.C. § 1303(f)(2)(B) and

28 U.S.C. § 1391(b), (c) & (e).

## II.  Parties

4.      The PBGC is a United States government corporation established under 29 U.S.C.

§ 1302(a) to administer the pension plan termination insurance program established by Title IV

of ERISA.  The PBGC guarantees the payment of certain, but not all, pension benefits provided

by defined benefit pension plans that are covered by Title IV of ERISA.  Its board of directors

includes, among its three members, the Secretary of the Treasury.  ERISA § 4002(d), 29 U.S.C.

§ 1302(d).

5.      Dennis Black, Charles Cunningham, and Kenneth Hollis are retired salaried

employees of Delphi Corporation ("Delphi").  They receive benefits from the Delphi Retirement

Program for Salaried Employees (the "Salaried Plan" or the "Plan"), which on information and

belief has now been terminated and transferred or imminently will be transferred to the PBGC.

As a result of termination, Messrs. Black, Cunningham, and Hollis will lose a substantial portion

of their pension income.

6.      The Delphi Salaried Retiree Association is a nonprofit organization, comprised of participants in the Salaried Plan and dependents of participants who are beneficiaries in the Salaried Plan.

7.      Defendant U.S. Department of the Treasury is the executive agency responsible for promoting economic prosperity and ensuring the financial security of the United States.

8.      Defendant Presidential Task Force on the Auto Industry (the "Auto Task Force") is a cabinet level group appointed by the President to oversee the administration's efforts to support and stabilize the domestic automotive industry.  It is co-chaired by Secretary of the Treasury Timothy Geithner and National Economic Council Director Larry Summers.

9.      Defendant Timothy F. Geithner ("Geithner") is the Secretary of the Treasury, a co-chair of the Auto Task Force, and one of three directors of the PBGC.  At all relevant times, Defendant Geithner was acting under color of law.  He is sued in his individual and official capacities.

10.      Defendant Steven Rattner ("Rattner") was, at times relevant to this case, the lead advisor to the Secretary of the Treasury on the automotive industry and a member of the Auto Task Force.  At all relevant times, Defendant Rattner was acting under color of law.  He is sued in his individual and official capacities.

11.      Defendant Ron Bloom ("Bloom") is a senior advisor on the auto industry at the Treasury Department and replaced Defendant Rattner as the lead advisor of the Auto Task Force.  At all relevant times, Defendant Bloom was acting under color of law.  He is sued in his individual and official capacities.

12.     Defendant General Motors Company ("New GM") became the successor entity to General Motors Corporation (who was the original sponsor of the Plan and is now known as "Motors Liquidation Company" and hereinafter referred to as "Old GM") when it purchased substantially all of the assets of Old GM.  New GM is one of the world's largest automakers and maintains its global headquarters in Detroit.  New GM's majority owner is the Defendant U.S. Department of the Treasury, who owns 60.8% of the common stock.  Plaintiffs allege that the actions undertaken by New GM complained of herein were the result of overt government coercion in connection with governmental policies, such that it was a governmental actor whose actions are subject to the guarantees of the United States Constitution.

13.     At all relevant times, Defendants DOES 1-50 (also "DOE Defendants") were agents, employees, or otherwise representatives of the Treasury Department and/or the Auto Task Force.  At all relevant times, DOES 1 through 50 were acting under color of law.  Upon information and belief, Plaintiffs allege that DOES 1 through 50, among others, are legally responsible for the wrongs committed against Plaintiffs described in this First Amended Complaint.  When Plaintiffs become aware of the true identities of one or more DOE Defendants, Plaintiffs will amend this First Amended Complaint to add or substitute them as named Defendants.

### III.  Factual Allegations

14.     Delphi is a global producer of automobile electronics and parts and does business in this judicial district.  Until the termination of the Plan, Delphi was the contributing sponsor of the Plan, a defined benefit pension plan designed to provide for the payment of tax-qualified and non tax-qualified pension benefits to eligible Plan participants and beneficiaries.

4

15.     Under the terms of the Plan, Delphi was designated as the Plan Administrator. Delphi, in turn, delegated the functional responsibilities as Plan Administrator to its Executive Committee, stating that "the Executive Committee of the Corporation's Board of Directors is the Named Fiduciary with respect to this Program.  The Executive Committee may delegate authority to carry out such of its responsibilities as it deems appropriate in order to carry out the proper and effective administration of this Program to the extent permitted by ERISA."  *See* Delphi Retirement Program for Salaried Employees § 14.  The individual members of the Executive Committee are, accordingly, the "persons" identified as Plan Administrator under 29 U.S.C. § 1002(16)(a)(1), and serve as individual fiduciaries under 29 U.S.C. § 1002(21)(A).[1]

16.     Delphi was originally an operating unit of Old GM, the original sponsor of the Salaried Plan.  Delphi was incorporated separately in 1998 and was spun-off from Old GM in 1999.  When Delphi was spun off in 1999, it assumed responsibility for maintaining the pension plans for all Delphi employees.  Those plans included the Salaried Plan, as well as plans for unionized workers, which had been negotiated by their unions.  The Salaried Workers were not unionized during their tenures at Old GM and Delphi or currently.  There are currently over 15,000 participants in the Plan.  Most spent the bulk of their careers working for Old GM, but became subject to Delphi's oversight of the Plan at the time of the spin-off in 1999.

---

[1] In prior proceedings between Delphi's Executive Committee and some of the Plaintiffs, *see* ¶ 26 (describing prior action in this District), there has been dispute as to whether the Plan Administrator of the Plan is Delphi or its Executive Committee.  Plaintiffs steadfastly adhere to their position (as stated in the prior proceedings) that the Executive Committee, through delegation from Delphi, is the Plan Administrator.  Delphi has asserted that it, not the Executive Committee, is the Plan Administrator.  For present purposes, it does not make any difference whether the Plan Administrator is actually Delphi or the Executive Committee.  We therefore generally sometimes here use "Delphi" as a shorthand for the Plan Administrator, whether the Plan Administrator is the company itself or the company's Executive Committee.

17.     In October 2005, Delphi filed for Chapter 11 bankruptcy in the United States

District Court for the Southern District of New York.  *See In re Delphi Corp.*, No. 05-44481

(RDD) (S.D.N.Y. Bankr., filed Oct. 8, 2005).  Because the Plan was a potential creditor with

claims against Delphi, and because Delphi (*i.e.*, its Executive Committee) was also a fiduciary of

the Plan, Delphi's financial distress placed Delphi in a conflicted situation -- namely, it obligated

Delphi to file creditor claims against itself in the bankruptcy.  In January 2006, in recognition of

the obvious conflict of interest inherent in retaining fiduciary powers along with its corporate

offices, Delphi delegated the fiduciary responsibility to file claims (though no other

responsibilities) to Fiduciary Counselors, Inc.

18.     In September 2008, Delphi announced that it had concluded a deal with Old GM

and the PBGC in which Delphi could potentially transfer billions of dollars in pension liabilities

from the plans for unionized workers (but not the Salaried Plan) to existing plans of Old GM.

When the PBGC learns that an employer has not made required minimum funding contributions,

and unpaid amounts total more than $1 million, the PBGC can perfect and enforce a statutory

lien on behalf of the pension plan against property of the plan sponsor.  The use of these

statutory liens is the PBGC's primary tool to prevent a plan's termination or to mitigate potential

losses.  In return for Old GM's assumption of the hourly pension liabilities, the PBGC released

more than $1.2 billion in liens that it had filed against Delphi's non-debtor foreign affiliates on

behalf of the pension plan for unionized hourly workers.

19.     Although it did not appear at the time of the September 2008 deal that Delphi had

attempted to secure a similar arrangement to protect the Salaried Workers, such an arrangement

was, according to Delphi, unnecessary.  In this regard, in a September 8, 2008 press release,

Delphi reiterated a commitment it had made since the start of the bankruptcy proceedings that it would itself continue the Salaried Plan, stating that Delphi "remained committed to fully funding our pension plans."

20.     One month later, in November 2008, Old GM sought and received billions of dollars in emergency secured financing from the U.S. Government, through the Department of Treasury.  In order to secure this financing, the Treasury Department required Old GM to submit a proposed viability plan to Congress.  The Treasury Department continued to offer massive financial assistance to Old GM, but required it to submit a proposed business plan that required, among other things, the restructuring of employee benefits and work rules.  *See In re General Motors Corp.*, 407 B.R. 463, 478 (S.D.N.Y. Bankr. 2009).

21.     On February 15, 2009, the President appointed the Auto Task Force to oversee the administration's efforts to support and stabilize the domestic automotive industry.  The President appointed Treasury Secretary Geithner and National Economic Council Director Larry Summers as co-chairs of the Auto Task Force.

22.     On March 30, 2009, the government announced that the viability plan proposed by Old GM was not satisfactory, however the United States would provide substantial assistance to Old GM if it took certain steps to justify such assistance, including restructuring its relationship with the United Auto Workers union ("UAW").  *Id*. at 479.

23.     At this point the Treasury Department was Old GM's largest secured creditor and was poised to become its majority owner after an expedited bankruptcy sale.  The U.S. government had invested enormous amounts of capital (both financial and political) in the effort

to reorganize the auto industry and would face severe political consequences if its efforts with respect to Old (and New) GM were not successful.

24.     On information and belief, beginning in the spring of 2009, the United States, acting through the Treasury Department and the Auto Task Force, began to enter into discussions with officials from Delphi, the PBGC, and Old GM regarding the future of Delphi's pension plans.  During these negotiations, a number of factors become clear to the Treasury Department: (1) an interruption in the supply of parts from Delphi to Old GM would be devastating to the latter; (2) Delphi's lenders could seek to foreclose on all or some portion of Delphi's assets as early as July 10, 2009, resulting in a significant interruption of supplies; (3) the best way to avoid the possibility of an interruption of Delphi supplies to Old (or New) GM required that Delphi's assets be sold to a stable entity; (4) Delphi's assets were currently subject to significant PBGC liens asserted on behalf of the Salaried Plan, and as of April 25, 2009, could be subject to still more PBGC liens; and (5) there were no potential purchasers willing to purchase Delphi's assets while they were subject to the threat of the PBGC liens.

25.     The facts began to emerge to the public beginning June 1, 2009, with Old GM filing for bankruptcy, the sale of Old GM's assets to New GM (*i.e.*, General Motors Company), and the federal government becoming the majority shareholder of New GM.  At that time, Delphi announced, in conjunction with a filing in its own bankruptcy proceeding, that it had developed "a workable pension solution for its defined benefit plans."  The bankruptcy filing stated that Delphi expected to enter into an agreement with the PBGC, whereby the PBGC would initiate involuntary termination proceedings concerning the Salaried Plan.  Upon the Salaried Plan's termination, responsibility for paying out benefits owed under the Salaried Plan would

transfer from Delphi to the PBGC, and the benefits would be subject to the statutory maximums provided for under ERISA.

26.     On July 16, 2009, the Salaried Workers filed a complaint for equitable relief against the named fiduciaries of the Salaried Plan, seeking, *inter alia*, the appointment of an independent fiduciary for the Salaried Plan for purposes of negotiating any Plan termination and protecting participants' and beneficiaries' rights in any termination proceedings.  *See Black v. Naylor*, Case No. 2:09-cv-12810 (E.D. Mich.).  The complaint alleged that the named fiduciaries were in a position where their responsibilities as officers of Delphi prevented their functioning with the complete loyalty to the Salaried Plan's participants and beneficiaries that is demanded as ERISA fiduciaries in matters of Plan administration.   On July 21, 2009 the Salaried Workers filed a motion for a temporary restraining order and a preliminary injunction against the named fiduciaries of the Salaried Plan, which sought to prohibit the Plan Administrator from negotiating, signing, or effectuating an agreement with the PBGC summarily to terminate the Salaried Plan, pending determination of the underlying complaint.

27.     In later proceedings on the Salaried Workers' complaint, Delphi's executives plainly admitted that they did not treat the decision to enter any agreement to terminate the Plan as a fiduciary function but as a "settlor" function and that they therefore could or would make any decision in the best interests of the company, not the Plan's participants and beneficiaries. On information and belief, Delphi (including its Executive Committee) was under strong pressure by the federal government to agree to the termination of the Plan, which at the time was underfunded, because termination of the Plan would further the government's interest in restructuring the auto industry at the lowest cost to the government and expediently,

notwithstanding that termination would not be in the best interests of the Plan's participants and
beneficiaries.  Delphi executives communicated to the Salaried Workers that the federal
government was pressuring or did pressure Delphi to consent to termination of the Plan.

28.     Also on July 21, 2009, and unbeknownst at the time to the Salaried Workers, the
PBGC signed a settlement agreement with Delphi.  Under the settlement agreement, it was
anticipated that the PBGC would initiate involuntary termination procedures to terminate
Delphi's pension plans, and Delphi was obligated to direct the Plan Administrator to agree to
summary termination of all of those plans, including the Salaried Plan.  Under the agreement, the
PBGC agreed to release all of its statutory liens against Delphi.  On information and belief, the
vast bulk of these liens were held on behalf of the Salaried Plan, and in fact the PBGC no longer
held any statutory liens on behalf of the plan for unionized hourly workers, despite the fact that
hourly workers' plan's under-funding was significantly greater than that of the Salaried Plan.
Despite the obvious benefit the release of these liens provided to New GM, and the fact that the
liens were the most significant tool available to ensure additional funding for the Salaried Plan,
New GM did not top-up any benefits for participants and beneficiaries of the Salaried Plan in
exchange for the release of the liens.  Additionally, the PBGC unconditionally released Delphi,
Old GM, and the successor entities, as well as all of their current and former officers, directors,
and employees from any and all suits and causes of action "upon any legal or equitable theory,
(whether contractual, common law, statutory, federal, state, local or otherwise)."

29.     Consistent with the settlement agreement, on July 22, 2009, the PBGC filed a
complaint against Delphi, seeking, *inter alia*, the termination of the Salaried Plan and the
appointment of the PBGC as statutory trustee of the Plan.  *See PBGC v. Delphi Corp.*, Case No.

2:09-cv-12876 (E.D. Mich.). Under ERISA, in order for a plan to be involuntarily terminated,
the PBGC must initiate an action in a district court and must prove that certain statutory
conditions for termination exist. *See* 29 U.S.C. § 1342. The only exception to the requirement
of district court adjudication is for "small plans," which potentially can be terminated in a
streamlined manner, but only if the PBGC makes special provision for safeguarding the interests
of beneficiaries. *Id.*

30.     In response to the PBGC's lawsuit, the Salaried Workers voluntarily dismissed
their complaint on July 23, 2009, noting that they intended to intervene in the PBGC's lawsuit to
protect their interests. ERISA provides that the PBGC's filing of an action to initiate termination
of a plan automatically stays all other pending cases against that plan. *See* 29 U.S.C. § 1342(f).

31.     On July 30, 2009, the bankruptcy court overseeing Delphi's bankruptcy approved
a modified reorganization plan that included the PBGC-Delphi settlement agreement calling for
involuntary termination of the Plan. *See In re Delphi Corp.*, No. 05-44481 (RDD), Dkt. No.
18707 (S.D.N.Y. Bankr. July 30, 2009). In addition, the bankruptcy court approved the sale of
Delphi's assets, a sale in which New GM is a principal participant and through which the
purchaser of Delphi's assets will be a chief parts supplier to New GM.

32.     On August 6, 2009, the Salaried Workers contacted the PBGC and Delphi to seek
their consent to the Salaried Workers' proposed intervention in the termination action.

33.     One day later, on August 7, 2009, the PBGC filed a notice of voluntary dismissal
of its termination action.

34.     The PBGC has since posted an announcement on its website stating that, "[o]n
August 10, 2009, the Pension Benefit Guaranty Corporation assumed responsibility for the

pension plans of Delphi Corp.  The plans ended as of July 31, 2009."  As such, it appears that the

PBGC and the Plan Administrator of the Salaried Plan have entered into an agreement

summarily to terminate the Plan and that the PBGC is attempting to terminate the Plan without

adjudication by or even the consent of a United States District Court.  Nor has the PBGC in any

manner attempted to safeguard the interests of Plan beneficiaries through notice or opportunity

for comment or participation with respect to termination.

      35.     The financial consequences to the Salaried Workers of the Plan's termination will

be severe.  The Salaried Workers had undertaken an analysis of the impact to them should the

PBGC assume responsibility for the Plan, and that analysis concludes that they stand to lose

between 30% and 70% of their current pension benefits.  The PBGC concedes as well that the

Salaried Workers will suffer losses in pension benefits.  *See* PBGC Press Release (July 22,

2009).  The losses in benefits stem, in part, from various statutory limits placed on distribution of

a terminated plan's remaining assets and the manner in which the PBGC interprets its obligation

to guarantee benefits for a terminated plan.  *See, e.g.*, 29 U.S.C. § 1344(a) (containing various

limitations on distribution of remaining Plan assets); *id.* § 1322(b) (PBGC maximum guarantee);

*see also* PBGC Press Release (July 22, 2009) ("The PBGC will pay pension benefits up to the

limits set by law.  In 2009, the maximum benefit for a 65-year-old is $54,000 per year.  The

maximum is lower for those who retire earlier or elect survivor benefits.  In addition, certain

early retirement subsidies and supplements are generally not insured, and benefit increases made

within the past five years may not be fully insured").

      36.     As a result of unlawful government discrimination, only the salaried retirees of

Delphi will suffer these pension losses.  On information and belief, after becoming the majority

owner of New GM, the United States government, acting through Defendants Treasury Department, Auto Task Force, Geithner, Rattner, Bloom, and DOES 1-50, exercised considerable control over the actions of New GM, using New GM to carry out governmental policies.  One such example occurred in July 2009, when, in response to the Delphi-PBGC settlement agreement, New GM announced that it would "top-up" the pension benefits for "certain limited groups" of Delphi retirees, specifically the hourly workers represented by the United Auto Workers union.  As a result of the "top-up," benefits that would otherwise be lost because of the PBGC's limits and exclusions would be made up by New GM.  On information and belief, this decision was made at the direction of the United States, acting through the Treasury Department and the Auto Task Force.

37.    This unlawful discrimination was repeated on September 1, 2009, when, at the direction of the United States government, acting through the Treasury Department and the Auto Task Force, New GM agreed to "top-up" the pension benefits and provide health benefits to additional union-affiliated Delphi retirees, but not to the salaried retirees of Delphi.  On information and belief, New GM's discriminatory decision was the result of significant pressure by the United States, carried out in connection with governmental policies that were politically motivated, and the result of the Treasury Department's management and control of New GM. As a result of these actions, Plaintiffs have been denied the benefit of a top-up solely on the basis of their choice not to associate with a union, in violation of the First and Fifth Amendments to the United States Constitution.

## IV.  Claims for Relief

### COUNT 1
### Failure to Comply with ERISA's Requirements Regarding
### the Adjudication of Plan Terminations
### (Against Defendant PBGC)

38.     Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

39.     In order for the PBGC to terminate a pension plan, it must obtain a court decree to that effect.  29 U.S.C. § 1342(a), (c).  Any allowance in ERISA for termination via a summary agreement between the PBGC and a Plan Administrator applies, if at all, only to small plans and, even then, only when the PBGC has made special provision for adequate procedural safeguards for the interests of participants and beneficiaries.  29 U.S.C. § 1342(a) ("The corporation may prescribe a simplified procedure to follow in terminating small plans as long as that procedure includes substantial safeguards for the rights of the participants and beneficiaries under the plans, and for the employers who maintain such plans (including the requirement for a court decree under subsection (c)).")

40.     The Salaried Plan is not a small plan and therefore cannot be terminated through summary agreement between the PBGC and Plan Administrator, and the termination of the Salaried Plan through agreement between the PBGC and the Plan Administrator therefore violates ERISA.  Moreover, in summarily terminating the Plan through agreement with the Plan's Plan Administrator, the PBGC made no provision for substantial safeguards of the interests of Plan participants and beneficiaries; therefore, for this reason as well, the termination of the Salaried Plan through agreement between the PBGC and the Plan Administrator violates ERISA.

14

41.    For these reasons, the PBGC's termination of the Plan through summary

agreement is null and void and illegal.

### COUNT 2
**Failure to Comply with ERISA's Requirement that Any Summary Termination Agreement
Be with a Plan Administrator Properly Acting in that Capacity
(Against Defendant PBGC)**

42.    Plaintiffs incorporate by reference the allegations in the paragraphs above as

though fully set forth here.

43.    Under ERISA, a Plan Administrator is an ERISA fiduciary with respect to any

discretionary functions, and an ERISA fiduciary must discharge his duties with respect to a plan

solely in the interest of the participants and beneficiaries of the plan.  29 U.S.C. §§ 1002(21)(A),

1104(a).  As a result, the Plan Administrator of the Salaried Plan, at least prior to and at the time

of the signing of any agreement with the PBGC terminating the Plan, owed a fiduciary duty to

the Plan's participants and beneficiaries in deciding whether to enter into and execute a

termination agreement.

44.    In entering an agreement summarily to terminate the Plan, the PBGC unlawfully

entered into an agreement with a Plan Administrator who -- in violation of ERISA -- did not act

as a fiduciary of the Plan.  Instead, Delphi and its executives have stated that the decision,

through the Plan Administrator, to enter into an agreement with the PBGC summarily to

terminate the Plan involves a "settlor" function to be done in the corporate interest, rather than in

the Plan participants' and beneficiaries' interests.

45.    The PBGC's summary termination of the Plan based on an agreement with the

Plan's Plan Administrator, when the Plan Administrator acted in the corporate interest as a

settlor rather than as a fiduciary in the participants' and beneficiaries' best interests, violates

15

ERISA, which requires that any such agreement (if at all allowable) be entered with a Plan

Administrator properly acting in its fiduciary capacity.

46.     In addition, even in the absence of any showing that the Plan Administrator

entered a summary termination agreement based on the corporate interest rather than Plan

participants' and beneficiaries' interests, the PBGC's termination of the Plan based on such an

agreement violates ERISA because the agency entered the agreement with a Plan Administrator

laboring under a conflict of interest.  ERISA fiduciaries have an obligation under ERISA to

avoid placing themselves in a position where their acts as directors or officers of the corporation

will prevent their functioning with the complete loyalty to participants demanded of them as

fiduciaries.  This duty requires that fiduciaries avoid conflicts of interest and that they resolve

them promptly whenever they occur.  This duty of loyalty requires the fiduciary to step aside in

favor of a neutral fiduciary whenever it labors under a conflict of interest.

47.     The Plan's Plan Administrator, whether that is Delphi or its Executive

Committee, faced an irreconcilable conflict of interest that required it to step aside in favor of a

neutral fiduciary with respect to any termination issues.  Delphi and its executives' corporate

interest necessarily favored a rapid termination of the Plan under the terms pressed by the federal

government, including the PBGC.  For one thing, those terms included the release of liens

against Delphi assets; in addition, the terms included a release of any and all causes of action the

PBGC might have against Delphi and its executives associated with the Plan, including

mismanagement.  Furthermore, Delphi and its executives were being pressured by the federal

government to terminate the Plan as part of an orchestrated effort on the federal government's

part to restructure the auto industry as expediently and cheaply as possible; compliance with the

government's will was in the furtherance of the corporate interest to emerge from bankruptcy immediately.  To that end, Delphi has stated that its settlement with the PBGC is vital to its reorganization and that the summary termination agreement is a necessary element of that settlement.

48.     In contrast, the interests of the Salaried Plan's participants and beneficiaries, who have vested and accrued benefits due to them under the Plan was, and is, in seeing the Plan maintained and fully funded or at least not terminated under the conditions the PBGC pursued. As fiduciaries of the Plan, the Plan's Plan Administrator should have favored careful consideration of any issues of Plan termination, a judicial adjudication of termination (as is the norm), and even rejection altogether of termination.

49.     Delphi's and its executives' interests in selling Delphi's assets as quickly as possible and in terminating the Salaried Plan consistent with the government's will directly conflict with the interests of the Plan's participants and beneficiaries against termination.   As such, the Plan's Plan Administrator labored under a conflict of interest with respect to termination and lacked capacity to sign a summary termination agreement with the PBGC (if any such agreement is otherwise allowable).  By terminating the Plan based on a summary agreement with a Plan Administrator who labored under a conflict of interest, and therefore was incompetent to make fiduciary determinations, the PBGC has violated ERISA.

50.     For these reasons, the PBGC's termination of the Plan through summary agreement is null and void and illegal.

## COUNT 3
### Violation of the Due Process Clause of the Fifth Amendment
### (Against Defendant PBGC)

51.     Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

52.     If an agreement summarily to terminate the Plan between the PBGC and the Plan Administrator is otherwise allowable and authorized under ERISA, ERISA's authorization for summary plan termination is unconstitutional in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  In all instances, the Salaried Workers, because they have a cognizable property interest in their vested pension benefits, are entitled to meaningful notice of any Plan termination and the opportunity for a hearing prior to the Plan's termination.  Because any ERISA provisions allowing for summary plan termination deprive the Salaried Workers of protected interests without adequate procedural safeguards, the provisions violate the Due Process Clause.

53.     For these reasons, the PBGC's termination of the Plan through summary agreement is null and void and illegal.

## COUNT 4
### Plan Termination in Violation of ERISA
### (Against Defendant PBGC)

54.     Plaintiffs incorporate by reference the allegations in the paragraphs above as though fully set forth here.

55.     If the Plan is to be terminated, it may only be terminated consistent with ERISA and Due Process after the full adjudication set forth in 29 U.S.C. § 1342(a) and (c) and compliance with the substantive standards for termination there set forth.

56.     The PBGC cannot satisfy the standards for termination of the Salaried Plan under
29 U.S.C. § 1342(a) and (c) with the current termination terms it has negotiated and put in place.
The termination of the Plan pursuant to the current termination terms is (i) unsupported by fact;
(ii) not in accordance with 29 U.S.C. § 1342(a) and (c); (iii) unsupported by the law; (iv) the
result of the PBGC's clear error in judgment and consideration of irrelevant factors; and (iv)
otherwise arbitrary and capricious.  Contrary to the statutory requirements, the PBGC's
termination of the Plan was politically motivated; the fact that the PBGC's decision was the
result of political expediency rather than relevant statutory criteria is evidenced by the
allegations described in this First Amended Complaint, including among other things:  the
PBGC's release of its liens against Delphi's foreign assets, its failure to place additional liens
against Delphi's foreign assets despite the under-funding of the Salaried Plan; its waiver of
actions against Delphi and GM entities, and its failure to obtain additional funding from Old and
New GM for the Salaried Plan in exchange for the release of the liens.

## COUNT 5
### Violation of the Equal Protection Component of the Fifth Amendment
### (First and Fifth Amendments, APA, and *Bivens*)
### (Against Defendants Treasury Department, Auto Task Force, and Bloom,
### Geithner, Rattner, DOES 1-50 and New GM)

57.     Plaintiffs incorporate by reference the allegations in the paragraphs above as
though fully set forth here.

58.     Plaintiffs allege that Defendant New GM's decision to top-up the pension benefits
of union-affiliated Delphi retirees was made at the direction of Defendants Treasury, Auto Task
Force, Bloom, Geithner, Rattner and DOES 1-50.

59.     GM's decision to provide to Delphi retirees pension top-ups has benefited union-affiliated retirees.  Plaintiffs allege that the decision was made on the basis of union affiliation -- and indeed on the basis of affiliation with a particular union or particular unions -- and not on the basis of any relevant extenuating circumstances.  As described in this First Amended Complaint, the government's decision to terminate Plaintiffs' pension benefits but to maintain intact those of union-affiliated retirees or retirees affiliated with certain unions was not rationally related to any legitimate public purpose.

60.     The decision to discriminate against similarly situated retirees based directly on associational status violates the Equal Protection component of the Fifth Amendment to the U.S. Constitution and the First Amendment's associational and speech guarantees, particularly in light of the lack of relevant extenuating circumstances to support the decision.  The termination of these vested benefits is a permanent and severe economic penalty based entirely on the Plaintiffs' decision not to affiliate with a union.  This decision has directly and substantially interfered with Plaintiffs' associational rights, in that, as a direct consequence of their decision not to associate with a union, Plaintiffs have been forced to forfeit a significant portion of their pension benefits.  Through New GM's top-ups, the government has injected undue favoritism into private labor relationships, and in doing so it has unconstitutionally burdened Plaintiffs' right to choose freely how and with whom to associate.

61.     Plaintiffs seek specific relief against Defendants Treasury Department and Auto Task Force, as well as against Defendants Bloom, Geithner, Rattner and DOES 1-50 in their *official* capacities, such that the Court should direct them to afford the salaried retirees the same benefits afforded to the union-affiliated retirees either by:

    a.   directing Defendant New GM to "top-up" the Salaried Plan in the same manner as it is topping up the union-affiliated plans, providing additional loan assistance to New GM if necessary; or

    b.   by requiring Defendant New GM to distribute the funds it has allocated to the union-affiliated plans in equal measure with the Salaried Plan; or

    c.   through such other relief as this Court deems appropriate.

62.    Plaintiffs also allege that in providing pension top-ups to only union-affiliated Delphi retirees, New GM was acting as a governmental actor such that its actions are subject to Constitutional standards.  As described in this First Amended Complaint, the federal government is the majority shareholder of New GM and its largest creditor, and was extensively involved in questions related to the outcome of pension benefits to Delphi's retirees.  As such it exercised significant coercive power and provided significant encouragement to New GM in connection with the benefits decision such that New GM's ultimate decision in the regard must be deemed to be that of the government, or at least that the government was a joint participant in the decision. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522 (1987).  Moreover, because the Treasury Department was extensively entwined with New GM's management and control in making the decision, New GM must be deemed a governmental actor.  *See Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

63.    Plaintiffs seek specific relief against New GM as a governmental actor, directing it:

    a.   to "top-up" the Salaried Plan in the same manner as it is topping up the union-affiliated plans; or

    b.   to distribute the funds it has allocated to the union-affiliated plans in equal measure with the Salaried Plan; or

    c.   through such other relief as this Court deems appropriate.

64.    Plaintiffs seek compensatory and punitive damages against Defendants New GM and Defendants Bloom, Geithner Rattner and DOES 1-50 in their *personal* capacities, for denying Plaintiffs the same benefits provided to the similarly situated union-affiliated retirees on the basis of their non-union affiliation, in violation of their rights to equal protection under the Fifth Amendment of the Untied States Constitution.  In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court authorized a federal cause of action for monetary damages against individual federal officers alleged to have violated constitutional rights.  In *Davis v. Passman*, 442 U.S. 228 (1979), the Court recognized the availability of a *Bivens* action for an alleged violation of the equal protection component of the Fifth Amendment.

65.    Plaintiffs do not seek damages from the Treasury Department or the Auto Task Force under this claim, or from Defendants Geithner, Bloom or Rattner in their *official* capacities.  Rather, Plaintiffs seek these damages against these individuals in their individual capacities, as authorized by *Bivens* and its progeny.

### V.  Prayer for Relief

WHEREFORE, the Salaried Workers request a judgment in their favor:

A.      Declaring that, under ERISA, the Salaried Plan cannot be terminated summarily by agreement between the PBGC and the Plan Administrator and therefore that the PBGC has unlawfully terminated the Salaried Plan;

B.      Declaring that, under the Due Process Clause, the Salaried Plan cannot be terminated summarily by agreement between the PBGC and the Plan Administrator and therefore that the PBGC has unlawfully terminated the Salaried Plan;

C.      Declaring that the PBGC's termination of the Salaried Plan, on the terms put in place by the PBGC, violates ERISA;

D.      Permanently enjoining the PBGC from terminating the Salaried Plan on the termination conditions and terms currently in place and otherwise setting aside the PBGC's termination of the Plan;

E.      Awarding appropriate equitable relief to undo the Plan's termination and to place the parties in the position they were prior to termination of the Plan;

F.      Ordering Defendants Treasury Department, Auto Task Force, Geithner, Rattner and Bloom to direct Defendant New GM to "top-up" the Salaried Plan in the same manner as it is topping up the union-affiliated plans, providing additional loan assistance to New GM if necessary;

G.      Ordering Defendants Treasury Department, Auto Task Force, Geithner, Rattner and Bloom to require Defendant New GM to distribute the funds it has allocated for the top-up

of the union-affiliated plans in equal measure with the Salaried Plan such that it will be equally topped-up;

      H.     Directing Defendant New GM to "top-up" the Salaried Plan in the same manner as it is topping up the union-affiliated plans;

      I.     Directing Defendant New GM to distribute the funds it has allocated for the top-up of the union-affiliated plans in equal measure with the Salaried Plan such that it will be equally topped-up;

      J.     Awarding compensatory and punitive damages for violation of Plaintiffs' First and Fifth Amendment rights, except that no damages are sought against Defendants PBGC, Treasury Department, or the Auto Task Force.

      K.     Awarding costs and attorney fees and other expenses pursuant to 29 U.S.C. § 1303(f)(3), or under the Equal Access to Justice Act, 5 U.S.C. § 2412.

      L.     Awarding such other relief as the Court deems necessary and proper.

## **JURY DEMAND**

A jury is demanded on all issues triable by a jury.

Respectfully submitted,

JACOB & WEINGARTEN, P.C.

By:     /s/ Alan J. Schwartz
     Alan J. Schwartz (P38144)
     Steven P. Schubiner (P34671)
     2301 Big Beaver Road, Suite 777
     Troy, Michigan  48084
     Telephone:  248-649-1900
     Facsimile:  248-649-2920
     E-mail:  alan@jacobweingarten.com
       **-and-**

Anthony F. Shelley
Timothy P. O'Toole
Michael N. Khalil
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington, DC  20005
Telephone:  202-626-5800
Facsimile:  202-626-5801
E-mail:  ashelley@milchev.com
        totoole@milchev.com

*Attorneys for Plaintiffs*