UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:  :  Chapter 11
 :
DELPHI CORPORATION, et al.  :  Case No. 05-44481 (RDD)
 :
 Debtors.  :  (Jointly Administered)
 :

---

## RIDER TO PROOF OF CLAIM

ONTARIO SPECIALTY CONTRACTING, INC. ("OSC" and/or "Claimant") hereby asserts claims against certain debtors in the above captioned bankruptcy cases, as set forth in the attached official proof of claim form, this Rider and the exhibits thereto (collectively, the "Proof of Claim").

1. On October 8, 2005 (the "Filing Date"), the Debtors commenced proceedings under chapter 11 of the Bankruptcy Code by filing chapter 11 petitions with this Court. Upon information and belief, Delphi Automotive Systems, LLC is a subsidiary of, affiliate of or otherwise associated with Delphi Corporation and subject to this jointly administered bankruptcy proceeding (hereinafter Delphi Automotive Systems, LLC is referred to as "Delphi" and/or "Debtor").

2. The Debtor bankruptcy cases are jointly administered for procedural purposes under *In re Delphi Corporation, et al.* Case No. 05-44481 (RDD) (Bankr. S.D.N.Y.).

3. Post bankruptcy petition, Delphi issued several requests for quotations ("RFQ") for the demolition of its Rochester Die Casting Building (the "Project"). The RFQs contained a target price calling for payment from the contractor to Delphi, on the basis that the value of the scrap metals at the Project site were believed to exceed the costs incurred by a contractor in

performing the demolition work. The RFQ forms established by Delphi, expressly required the contractor to identify the total amount of "material reclamation/savage value" credited to Delphi against the Project costs. The "material reclamation/savage value" attributable to the scrap metals derived from the Project site was material to funding the demolition work on the Project.

4. On or about July 9, 2008, OSC responded to Delphi's final RFQ seeking a target price of "($305,000 USD) or better proposal", with a response of ($271,033). Attached hereto as **Exhibit A** is a copy of the OSC's July 7, 2008 response to Delphi's RFQ. The line items within that response include a $1,189,999 credit to Delphi for "material reclamation/savage value."

5. Based on asbestos disclosure documents provided to OSC by Delphi (which are required by New York law), OSC's response included a line item of $35,265 in costs for asbestos abatement.

6. On or about July 24, 2008, Delphi issued a Purchase Order (the "Purchase Order") to OSC based on the above RFQ and accepting OSC's July 7, 2008 response. Attached hereto as **Exhibit B** is a true and correct copy of the Purchase Order, including General Terms and Conditions incorporated by reference.

7. Under the terms of the Purchase Order, OSC was to make four (4) separate progress payments to Delphi of $67,758.25 each. OSC made the first payment of $67,758.25 at or about the start of work on the Project.

8. The original project completion date under the Purchase Order was December 15, 2008. Certain work, which included asbestos abatement and utility related work, was required to be completed prior to demolition of the physical structures on the Project site. The scrap metals could not be removed from the physical structures on the Project site until the asbestos abatement and other pre-demolition work was completed.

2

9. OSC immediately mobilized and began pre-demolition work during the week of August 4, 2008. The pre-demolition work was scheduled to be complete on or before September 1, 2008.

10. Due to an error within the asbestos disclosure documents provided by Delphi, certain pre-demolition asbestos abatement work on the Project went from a quantity of 1,600 s.f. to 15,600 s.f. of asbestos containing materials. In other words, there was almost ten (10) times more asbestos containing materials present than represented by Delphi. Delphi has acknowledged this extra asbestos abatement work in writing and agreed to pay OSC at least $42,000.00 for the performance of such work.

11. There was also extra pre-demolition utility work required on the Project. Delphi has acknowledged this extra utility work in writing and agreed to pay OSC at least $7,315.00 for the performance of such work.

12. Delphi is additionally liable for the delays, interference and impact costs resulting from this extra work. As a result of the extra asbestos and utility work, and the time it took Delphi to address and respond to said issues, OSC's progress on the Project was delayed, interfered with and impacted. As a result of the extra asbestos and utility work, and the time it took Delphi to address and respond to said issues, OSC was delayed in its ability to sell and remove the scrap metals from the Project site to fund the Project work.

13. During the period of Delphi's delays, the scrap metal market took an unprecedented and unanticipated decline from approximately $460/ton at the start of the Project to a low of approximately $80/ton.

14. On or about September 1, 2008, when OSC would have been able to sell and

3

establish dealer pricing arrangements for the Project under the original schedule, and thereafter begin immediate delivery of scrap metals, the market price under established scrap metal pricing indexes was $405/ton. By approximately November 18, 2008, when OSC was able to begin selling scrap metals on account of the above extras and delays, the market price under established scrap metal pricing indexes had dropped to only $80/ton and many scrap dealers would not even place orders or take materials.

15. On account of the extra work directed by Delphi, interference and delays, at least $424,708 in Project funding was lost and not paid to OSC.

16. The terms of the Purchase Order, provide at General Term and Condition number 3:

### 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

> Buyer [Delphi] may at any time require Seller [OSC] to implement changes to the specifications or design of the goods or to the scope of any service or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer [Delphi] will endeavor to discuss any such changes will Seller [OSC] as early as practical, Seller [OSC] will promptly implement such changes. ***Buyer [Delphi] will equitably determine any adjustment in price*** or delivery schedules ***resulting from such changes***, including Buyer's [Delphi's] payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller [OSC] will, as requested, provide information to Buyer [Delphi], including documentation of changes in Seller's [OSC's] cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer [Delphi] and Seller [OSC] will work to resolve the disagreement in good faith, provided, however, that Seller [OSC] will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer [Delphi], while Buyer [Delphi] and Seller [OSC] resolve any disagreement arising out of such changes.

Exhibit B (emphasis added).

4

17. Moreover, the Purchase Order does not contain a no-damages-for-delay clause. In breach of the Purchase Order, Delphi has failed and refused to equitably adjust the contract price between the parties. Although it has been acknowledged that additional pre-demolition work was directed by Delphi, it refused make adjustment to the contract price to account for the impact of such extra work and delays.

18. On or about November 3, 2008, as the pre-demolition work was coming to a close, OSC wrote to Delphi. OSC pointed out the delays attributable to Delphi, and sought an equitable adjustment of the contract price. Attached hereto as **Exhibit C** is a copy of a letter issued by OSC on or about November 3, 2008. On or about December 3, 2008, OSC again wrote to Delphi on this subject. Delphi representatives, repeatedly assured OSC that an equitable adjustment of the contract price would be made and requested that OSC continue performance.

19. On or about January 12, 2009, OSC again wrote to Delphi on this subject. Attached hereto as **Exhibit D** is a copy of OSC's January 12, 2009 letter.

20. On February 3, 2009, Delphi responded in writing stating, in essence, that it was discussing the matter internally and would get back to OSC shortly. OSC was expressly asked for its "patience and understanding." Attached hereto as **Exhibit E** is a copy of the February 3, 2009 email received from Delphi. During the time period that Delphi was discussing this subject internally, OSC continued its performance per Delphi's request.

21. On March 17, 2009, Delphi requested further information relating to the extra work that it required OSC to perform and asked OSC to "accept [its] apologies for the delay on the Delphi formal reply to your request to change the existing contract to the Rochester Die Cast demolition project." Attached hereto as **Exhibit F** is a copy of Delphi's March 17, 2009 email.

22. Meanwhile, Delphi continued to request that OSC continue performance and

informally advised that an equitable adjustment would be forthcoming. OSC provided the additional information requested by letter dated April 22, 2009. Attached hereto as **Exhibit G** is a copy of OSC's April 22, 2009 letter. On May 7, 2009, Delphi sent an email stating that it would respond shortly. Attached hereto as **Exhibit H** is a copy of Delphi's May 7, 2009 email.

23. On May 11, 2009, Delphi responded. While offering additional time to allow the scrap metal market to recover, Delphi stated "Because Delphi itself is experiencing great financial difficulty, as a result of being in Chapter 11 since 2005 and due to current economic conditions, it is impossible for Delphi to commit any payments to Ontario Specialty Contracting." Attached hereto as **Exhibit I** is a copy of Delphi's May 11, 2009 letter.

24. By the time Delphi finally responded on May 11, 2009, substantially all of the scrap metals had been sold (in the depressed market) and, shortly thereafter, OSC was also substantially complete with the Project work. The May 11, 2009 Delphi letter expressly acknowledges the extra asbestos and utility work directed by Delphi.

25. Despite demand, OSC has not received remuneration for at least $474,023.00 of work performed at Delphi's request.

26. Delphi breached its contract with OSC. Under the terms of the contract, Delphi is liable to and obligated to pay OSC an amount not less than $288,751.25, plus interest. Alternatively, in quantum meruit, Delphi is obligated to OSC in an amount not less than $474,023.00, plus interest.

27. On account of Delphi's conduct, a subcontractor on the Project filed a mechanic's lien. Said mechanic's lien, prompted Delphi to commence an action on August 28, 2009 within the New York State Supreme Court, Erie County (Index No. I 2009-010438). Attached hereto as **Exhibit J** is a copy of Delphi's Complaint in the New York action.

28. On account of Delphi's, upon information and belief, waiver of jurisdiction as to the dispute between these parties by filing suit within the New York State Court, OSC asserted counterclaims demanding the same monetary relief requested herein in that action and additionally filed this administrative claim. Attached hereto as **Exhibit K** is a copy of OSC's Answer to Delphi's Complaint in the New York action (Note that the sub-exhibits have been excluded as they are duplicative of the exhibits provided herein).

29. Upon information and belief, Delphi waived the jurisdiction within this Court as to the dispute between these parties by filing suit within the New York State Court system, and thus, OSC asserted counterclaims demanding the same monetary relief requested herein in that action and additionally filed this administrative claim. (See Exhibit K to OSC Administrative Claim).

30. OSC reserves the right to (a) amend, update, or supplement this Proof of Claim (including, without limitation, to add additional amounts due and owing) at any time and in any respect; (b) file additional proofs of claim; and (c) file a request for payment of administrative or priority expenses in accordance with Bankruptcy Code sections 503 and 507. OSC reserves the right to amend this Proof of Claim (and any other proofs of claims it may file in the Debtors' chapter 11 cases) by virtue of its right to offset or recoup the amount thereof under Bankruptcy Code section 553 against any claims, defenses, or offsets the Debtor may assert against OSC.

31. By filing this Proof of Claim, OSC (a) does not submit to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim, (b) does not waive (and expressly reserves) all of its procedural and substantive defenses to any claim that may be asserted against it by the Debtors, their estates, any successor entities, or any other person, including, without limitation, any defense based upon the lack of jurisdiction of this Court to

entertain any such claim, (c) does not waive (and expressly reserves) any right to any security, held by or on behalf of OSC or any right of OSC to claim specific assets or any other claim, right, or right of action that OSC has or might have against the Debtors, their estates, any successor entities, or any other person, whether such claim, right, or action arises prior to, upon, or after the Petition Date, and (d) does not waive (and expressly reserves) any and all other rights that OSC may have pursuant to applicable law or agreement.

WHEREFORE, for the foregoing reasons, Claimant respectfully requests that this Court allow him an administrative priority claim in an amount not less than $288,751.25, plus interest, pursuant to 11 U.S.C. §§ 503 and 507, and grant such other and further relief as may be just and appropriate under the circumstances.

Dated: Buffalo, New York
October 29, 2009

Respectfully submitted,

Ontario Specialty Contracting, Inc.

By: _____
James F. Williams, its Vice President
333 Ganson Street
Buffalo, New York 14203

Notice Address:
Ontario Specialty Contracting, Inc.
c/o 1800 Main Place Tower
350 Main Street
Buffalo, New York 14202

8