# Equity Investment and Transfer Agreement
## By and between
## Awesome Profits Limited
## and
## Plymouth Rubber Co., Inc.,

## December 2004

# Equity Investment and Transfer Agreement

EQUITY INVESTMENT AND TRANSFER AGREEMENT dated as of December 22, 2004 ("Agreement"), by and between

(1)     Awesome Profits Limited, a corporation organized and existing under the laws of British Virgin Islands, having its legal office at Room 1004, Bank of America Tower, Central District, Hong Kong ("Party A"),

   Legal representative:
   Name: Wong Fung
   Position: President
   Nationality: Hong Kong, China

(2)     Plymouth Rubber Co., Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts, USA, having its registered office at 104 Revere Street, Canton, MA 02021 ("Party B") each of the parties being individually referred to as a "Party" and collectively referred to as the "Parties"),
   Legal representative:
   Name: Maurice J. Hamilburg
   Position: CEO
   Nationality: U.S.A.

in accordance with the Provisional Regulations on Foreign Acquisition of Chinese Enterprises, the Interim Provisions on the Change of Equity Interests in Foreign Invested Enterprises and the PRC Law on Foreign Invested Enterprises, as well as other applicable PRC laws and regulations.

## INTRODUCTION

Party A, as a foreign company with the status of a limited company, established Chengji Chemical (Shanghai) Co., Ltd. (hereinafter referred to be as the "Company") and owned 100% of the equity interests of the Company; CHT (Holdings) Ltd., the parent company of Party A (hereinafter referred to as the "Parent Company"), is a listed company on the Singapore Exchange.

The Company is a foreign invested enterprise duly established and validly existing under the People's Republic of China (hereinafter referred to be as the "PRC");

Hebei Huaxia Enterprise Co. Ltd. is a company organized and existing under the laws of the PRC, with its registered office at No.88 Yongle Avenue, Zhuozhou City, Hebei Province, PRC, and its principal products being PVC tapes (hereinafter referred to as "Huaxia').

1

As a part of their long-term commitment to the Chinese market, Party A and Party B desire to further expand their investment and business in China and to promote the development of the Chinese PVC tapes industry, and after friendly consultation on the basis of equality and mutual benefit, the Parties have agreed to jointly invest in the Company;

In consideration of the premises and the mutual covenants and agreements contained in this Agreement, the Parties agree as follows:

## CHAPTER 1
## INCREASE OF THE COMPANY'S TOTAL INVESTMENT AND REGISTERED CAPITAL

**Article 1**

In accordance with the agreement between Party A and Party B and pursuant to a unanimous resolution of the Board of Directors of the Company, the Company's existing total investment shall be increased to US$29.5 million and its existing registered capital shall be increased to US$19.12 million ("Registered Capital Increase").

**Article 2**

Party A shall cause the Company to complete all relevant procedures required to effect the Registered Capital Increase in compliance with all relevant Chinese rules and requirements applicable to the Registered Capital Increase; Parent Company will make publication and disclosure regarding the Registered Capital Increase in compliance with all regulations provided in Singapore Exchange Listing Manual. At the meanwhile, Party B will provide reasonable and necessary assistance to the foregoing procedures and disclosures.

## CHAPTER 2
## EQUITY INVESTMENT

**Article 3**

Simultaneous with the Registered Capital Increase, Party A's investment in the registered capital of the Company shall be increased to US$15.296 million accounting for 80% of the Company's registered capital, and Party's B's investment in the Company's registered capital shall be US$3.824 million accounting for 20% of the Company's registered capital (collectively referred as the "Equity Investment") .

**Article 4**

Party A's investment will consist of land use rights (See Schedule 1 hereof), plants (See Schedule 1 hereof), and equipment including 6 coating lines, 2 calenders and all related production and laboratory equipment (including ovens, slitters, packaging equipment, etc.) necessary for manufacturing the PVC tapes as contemplated by the Parties (See Schedule 1 hereof)

**Article 5**

Party B's investment will consist of technology including technical information and know-how (See Schedule 2 hereof). Both Parties shall make their investment contribution in accordance

with the requirements of applicable Chinese laws and regulations as well as the Investment Contribution Schedule specified in Schedule 3 hereof.

## Article 6

After the technology contribution by Party B to the Company, during the approved term of operation, the Company shall have the right to use the technology for rubber-based adhesives, primers, PVC films, formulations, vendors, technical standards, inspection methods, etc. ("Party B Technologies") and Party B Technologies shall be jointly owned by Party B and the Company, and shall include the following:

- PVC wire harness tape
- PVC electrical tape
- PVC degaussing coil tape
- PVC aisle marking tape
- PVC pipe wrapping protective tape
- PVC wire harness tape without adhesive

Party B will enter into a Technology Transfer Agreement with the Company substantially in the form and substance attached hereto as Appendix A to govern the transfer of Party B Technologies to the Company.

## Article 7

To enable the Company to manufacture the products as contemplated by the Parties, Party A shall, or cause its Affiliates (defined below) to, provide all their technologies relating to PVC tapes ("Party A Technologies") to the Company for use by the Company free of charge during the term of the Company. Such Party A Technologies shall include the following:

- PVC wire harness tape
- PVC electrical tape
- PVC degaussing coil tape
- PVC aisle marking tape
- PVC pipe wrapping protective tape
- PVC wire harness tape without adhesive
- Paper Roll glue and roll manufacturing technique

## Article 8

Party B shall be responsible for obtaining the product qualification approvals from harness companies and/or automobile companies for products of the Company, and shall secure at least three (3) tape product approvals per year for the first three (3) years commencing from the date of first commercial production of the Company.    For purpose of this Agreement, "First Commercial Production" shall mean the date when the relevant product is first manufactured that meets the customers' specifications, which shall be confirmed by both Parties.

## CHAPTER 3
## EQUITY TRANSFER

**Article 9**

Simultaneous with or immediately after the Equity Investment by the Parties hereto, Party A shall transfer 5% of the Company's registered capital that it owns to Party B including, without limitation, the right to receive any and all dividends and other distributions arising from, or in connection with, the ownership of such transferred registered capital, and Party B shall assume the ownership thereof ("Equity Transfer").

**Article 10**

As a result of the Equity Transfer provided herein, Party A shall own 75% of the registered capital and Party B shall own 25% of the registered capital of the Company.

**Article 11**

In consideration for the Equity Transfer, Party B agrees to purchase, and to procure the purchase of, PVC tape products from the Company and to assist the Company without compensation to market and sell its products to the customers in Asian countries ("Guaranteed Purchase") as follows:

(i)  At least $30 million of PVC tapes during the first 24 months of the Company's factory operations. The starting date of such operations will be the first successful manufacturing date of the Company as confirmed by both Parties;

(ii)  At least $30million of PVC tapes during months 25-36 of the Company's factory operations; and

(iii)  At least $30million of PVC tapes during months 37-48 of the Company's factory operations.

The PVC tapes purchased by Party B from Party A or any of its Affiliates shall be deemed purchases for the purpose of, and shall be included in, the Guaranteed Purchase above.

In the event that Party B fails to make the Guaranteed Purchase due to the lack of sufficient capacity on the part of the Company to manufacture the PVC tape products for the relevant period, Party B's responsibility shall be reduced according to the actual quantity of products manufactured and provide by the Company to Party B.

**Article 12**

In the event that Party B fails to make the Guaranteed Purchase for any of the above-specified periods, a portion of Party B's equity interests in the Company will be forfeited in accordance with the formula specified below ("Forfeited Equity Interests"):

$$F = ((30,000,000 - S)/30,000,000) \times 4.167\%$$

Where F: percentage of equity interests in the Company to be forfeited by Party B for failing to procure the Guaranteed Purchase for the relevant periods.

S: actual purchases made by, procured by, or assisted by Party B in the agreed period as discussed in Article 11 above.

4

**Article 13**

In the event that Party B fails to make or procure the Guaranteed Purchase for any of the above-specified periods and the portion of the equity interests held by Party B in the Company is forfeited as provided in the proceeding Article, the Forfeited Equity Interests will belong to Party A. The Parties shall cooperate with each other to deal with procedures of change of company registration. In addition, Party B will then not be entitled to the distribution of dividend or profit by the Company, which is based on or associated with the Forfeited Equity Interests, and Party A will be entitled to such distribution of dividend or profit as set out in the formula below:

$$C = F \times P$$

Where C: distribution to be paid to Party A out of the net profits of the Company available for distribution to Party A based on the Forfeited Equity Interests if Party B fails to procure the Guaranteed Purchase.

P: actual net profit after tax and statutory reserves of the Company for the immediately preceding period prior to any adjustment to be made pursuant to this provision

And F bears the meanings assigned in Article 12 hereof.

In order to implement the Guaranteed Purchase and to regulate the sale and purchase of the products of the Company by the Parties and their Affiliates, the Company shall enter into a Sales and Distribution Agreement with the Parties and their Affiliates substantially in the form and substance attached hereto as Appendix B.

For the purpose of this Agreement, "Affiliate" shall mean, with respect to any Party, any person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Party. Any person will be deemed to control an entity if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise. For the purpose of this Agreement, and to supplement but not to limit the foregoing, any person's ownership of 20% or more of equity interests of any entity, directly or indirectly, shall be conclusively deemed in control of such entity. For the purpose of this Agreement, "Person" shall mean any corporation, other juridical entity, partnership, other business enterprise as well as any individual.

## CHAPTER 4
## OPTION TO PURCHASE ADDITIONAL EQUITY INTERESTS

**Article 14**

Party B shall have the right and option to purchase additional equity interest of the Company from Party A sufficient to bring its ownership to 49% of the Company's registered capital within eight (8) years by way of cash, the Company's distributed dividend/profit to Party B and/or equipment after Party A's evaluation and acceptance. The purchase price for the additional equity interest shall be based on the net asset value of such equity interest at the time of the purchase. This option right to purchase additional equity interest will expire by 33.333% at the end of years six, seven and eight after the re-issuance date of the business license.   Party A

5

hereby agrees to such option right and shall cause the Company's Board of Directors to approve any equity transfer necessary to giving effect to this provision when it is necessary and to complete all required procedures therefor. The exercise and implementation of the option provided hereunder shall comply with applicable Chinese laws as well as the relevant requirements of applicable laws and regulations governing any stock exchange on which the shares of the parent company of any of the Parties hereto are listed.

### CHAPTER 5
### CONDITIONS TO THE CONSUMATION OF EQUITY INVESTMENT AND TRANSFER

**Article 15**
The consummation of the Equity Investment and Equity Transfer shall be subject to the satisfaction of the following conditions:

(i)     The Company's existing articles of association shall have been amended and restated to reflect the agreement of the Parties ("Amended and Restated Articles of Association");

(ii)    The Board of Directors of the Company shall have duly passed a unanimous resolution approving the Equity Investment, Equity Transfer and the Amended and Restated Articles of Association;

(iii)   Both Party A and Party B shall have completed their internal corporate authorization whether in the form of a board or shareholder resolution approving the Agreement and the Equity Investment and Equity Transfer contemplated hereby;

(iv)    The competent government examining and approval authority ("Approval Authority") shall have approved this Agreement, the Equity Investment and Equity Transfer contemplated hereby, and the Amended and Restated Articles of Association;

(v)     The Company shall have been issued a new business license;

(vi)    The representations and warranties of the Parties shall be true and correct in all material respects as of the date of issuance of the Company's business license.

### CHAPTER 6
### REPRESENTATIONS AND WARRANTIES OF THE PARTIES

**Article 16**
Party A represents and warrants to Party B as follows:

(i)     Party A is a corporation duly incorporated, validly existing and in good standing under the laws of British Virgin Islands.

(ii)    Party A has the requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. Party A has taken all corporate action required by its certificate of incorporation and by-laws to authorize

6

the execution and delivery of this Agreement to authorize the consummation of the transactions contemplated hereby.

(iii)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (i) conflict with or violate any provision of the certificate of incorporation or by-laws of Party A or the articles of association of the Company or (ii) conflict with or violate any material judgment, order or decree or any material statute, law, rule, regulation or ordinance, applicable to Party A or the Company or their respective properties or assets.

(iv)    No material consent, approval or authorization of, or registration, declaration or filing with, any court of competent jurisdiction, governmental agency, authority or regulatory body is required to be obtained or made by or with respect to Party A or the Company in connection with the execution, delivery and performance of this Agreement by Party A or the consummation by Party A of the transactions contemplated by this Agreement, other than (i) the approval of the Approval Authority as provided in this Agreement, (ii) those that may be required solely by reason of Party A's (as opposed to any other third party's) participation in the transactions contemplated by this Agreement and (iii) those the failure of which to obtain or make would not reasonably be expected to have a material adverse effect on the ability of Party A to consummate the transactions contemplated by this Agreement.

(v)    Party A has good and valid title to the equity interests to be transferred to Party B as provided herein, free and clear of any liens or encumbrances. The equity interests so transferred are not subject to any restrictions or other commitment or arrangement, including any such restriction, arrangement or commitment restricting or otherwise relating to the voting, dividend rights or disposition of such equity interests, except those provided in or required by the PRC laws.

**Article 17**

Party B represents and warrants to Party A as follows:

(i)    Party B is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation.

(ii)    Party B has the requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. Party B has taken all corporate action required by its certificate of incorporation and by-laws to authorize the execution and delivery of this Agreement to authorize the consummation of the transactions contemplated hereby.

(iii)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (i) conflict with or violate any provision of the certificate or articles of incorporation or by-laws of Party B or (ii) conflict with or violate any judgment or law applicable to Party B.

(iv)    No consent, approval or authorization of, or registration, declaration or filing with, any governmental entity is required to be obtained or made by or with respect to Party B in connection with the execution, delivery and performance of this Agreement by Party B or the consummation by Party B of the transactions contemplated by this Agreement, other

7

than (A) the approval of the Approval Authority as provided in this Agreement: (B) those that may be required solely by reason of Party B's (as opposed to any other third party's) participation in the transactions contemplated by this Agreement and (C) those the failure of which to obtain or make would not reasonably be expected to have a material adverse effect on the ability of Party B to consummate the transactions contemplated by this Agreement.

# CHAPTER 7
## COMPANY'S CONTINUING OPERATION
## AS A FOREIGN INVESTED ENTERPRISE

### Article 18

Upon the completion of the Registered Capital Increase, the Equity Investment and the Equity Transfer, the Company shall continue to exist and operate as a foreign invested enterprise in accordance with the "Law of People's Republic of China on Foreign Invested Enterprise" and other relevant laws and regulations, as well as this Agreement and the Company's Amended and Restated Articles of Association.

### Article 19

The name of the Company shall be 普利茂斯永乐胶带（上海）有限公司 in Chinese and "Plymouth Yongle Tape (Shanghai) Co., Ltd." in English. The legal address of the Company is South of Min Ta Road, Shi Hu Dang Branch of Songjiang Industry Park, Songjiang District, Shanghai, China.

### Article 20

The business scope of the Company shall be manufacturing, marketing, sale and research and development of PVC tapes and related materials as agreed between the Parties. The Company is projected to have the capacity of manufacturing and selling 115 million square meters of PVC tapes annually three years after commencing business operations. All business activities of the Company shall comply with the laws and regulations of the PRC.

### Article 21

The Company shall be organized as a limited liability company under the laws of China. The liabilities and obligations of the Parties to each other and to the Company shall be limited to their respective agreed investment contribution to the registered capital of the Company. The difference between the total investment and registered capital of the Company will be funded by bank borrowings and other types of debt financing all to be secured by and in the name of the Company. In the event that the Company needs additional funding for its business operations and in the event when no debt or other financing is available to the Company, the Parties may be called upon to provide additional capital to the Company in proportion to each Party's equity holding in the Company pursuant to the resolution of the Company's Board of Directors. However, both Parties shall not be deemed as bound to such additional funding obligation.

### Article 22

If any Party intends to transfer all or part of its equity interest in the Company to a third party, such Party must get the consent from the other Party in the Company. Each Party in the

8

Company has the priority to buy the equity interest offered to be acquired by the other Party. The terms and conditions of transfer offered to the third party shall not be more preferential than those offered to the other Party in the Company.

Neither Party's equity interest shall be subject to any third party interest or rights of any type whatsoever (whether as security or otherwise including charge, option, lien, assignment, pledge, mortgage etc.) howsoever arising.  Neither Party shall pledge all or part of its equity interest in the Company as collateral unless approved by `the Company's Board of Directors and with the written consent from the other Party.

## CHAPTER 8
## RESPONSIBILITIES OF THE PARTIES

**Article 23**
The Parties hereto shall undertake the following responsibilities respectively:

(i)     The responsibilities of Party A are:

    a.   To obtain all necessary approvals from and registrations with the Approval Authority for the transactions contemplated by this Agreement;

    b.   To complete its investment contribution to the registered capital of the Company as provided in this Agreement;

    c.   To assist the Company obtain all approvals, registrations, permits and licenses from the relevant government authorities necessary for the business operations of the Company;

    d.   To assist the Company in recruiting management, technical and other necessary personnel and employees; and

    e.   To handle other work and matters the Company may entrust it to do.

(ii)    The responsibilities of Party B are:

    a.   To complete its investment contribution to the registered capital of the Company as provided in this Agreement;

    b.   To assist the Company in marketing its products.

    c.   To assist the Company obtaining approvals for various PVC tapes from automotive harness companies and/or automobile companies;

    d.   To assist the Company in recruiting necessary management personnel; and

    e.   To handle other work and matters the Company may entrust it to do.

## CHAPTER 9
## MARKETING AND SALE OF PRODUCTS

**Article 24**

The Company will market and sell its products in both Chinese and international markets in accordance with the Sales and Distribution Agreement provided for in Article 13 hereof.

**Article 25**

The trademark registered for the Company's products shall be "永乐·普利茂斯' in Chinese and "Yongle Plymouth" in English. Other trademarks, service marks and logo to be developed by the Company and used in its business shall be determined by the Board of Directors.

## CHAPTER 10
## THE BOARD OF DIRECTORS

**Article 26**

The Company shall have a re-constructed Board of Directors on the date on which the Company's business license is re-issued. In accordance with the ratio of capital investment by both Parties, the Board of Directors shall comprise of six (6) Directors of whom four (4) shall be appointed by Party A and two (2) shall be appointed by Party B, which after increasing its investment to the Company shall be entitled to appoint additional Director(s) in accordance with the adjusted ratio of investment. The Chairman of the Board shall be nominated by Party A and the Deputy Chairman of the Board by Party B. Each Director, including the Chairman and the Deputy Chairman of the Board, shall be appointed for a term of three (3) years, but any Director may serve consecutive terms if re-appointed by the party which originally appointed him. Party A shall have the sole power to remove at any time any Director appointed/elected by it. Party B shall have the sole power to remove at any time any Director appointed/elected by it. The party removing any Director shall have the sole power to fill the vacancy created by such removal, or the death, incapacity, or resignation by the Director appointed by it. Each Director shall have one vote.

**Article 27**

The Board of Directors shall be the highest authority of the Company and shall decide all major issues of or concerning the Company except as otherwise specified in this Agreement. The Board of Directors shall at all times act in accordance with the Amended and Restated Articles of Association.

Unanimous approval of all Directors of the Board shall be required for any decisions concerning the following issues:

(1)   Any increases, decreases, alteration, transfer, sale or other disposition of the registered capital of the Company, save as otherwise provided expressly in these Articles of Association;

(2)   Amendment of these Articles of Association, including the alteration of the scope of business of the Company;

(3)    Any liquidation or dissolution of the Company;

(4)    The Company's merger with another entity;

(5)    Decision on the Company itself to go public and seek a listing of the Company's shares on a stock exchange;

(6)    Provision of guarantee by the Company for the debt or obligations of third parties or creation of pledge or mortgage over any important assets of the Company or sale of substantially all of the assets of the Company;

(7)    Filing for debtor relief or other related protection by or on behalf of the Company under Chinese bankruptcy law or analogous laws or regulations;

(8)    Establishment of branch offices and/or subsidiaries;

(9)    Appointment and dismissal of the General Manager, two (2) Deputy General Managers, Chief Financial Officer and Chief Technology Officer as well as the approval of their remuneration and benefits; and

(10)   Borrowing of any shareholder loan and entry or amendment by the Company of any contract or agreement with Party A or Party B or any of the Affiliates of either, excluding those entered into by the Company in its normal course of business operation in the interest of the Company.

**Article 28**
All other matters other than those stipulated in Article 27 above may be decided by a resolution of the Board passed by a simple majority of the Board.

**Article 29**
The Chairman of the Board is the legal representative of the Company. Whenever the Chairman is unable to perform his responsibilities for any reason, the Deputy Chairman or a Director as authorized by the Chairman may act as the legal representative of the Company temporarily.

**Article 30**
The Board of Directors shall convene at least one Board meeting every year. Upon the written request of not less than one third (1/3) of the total number of Directors, the Chairman shall convene a special Board meeting.

**Article 31**
The Chairman of the Board shall give notice of a Board meeting to all Directors which shall be received by them at least forty (40) days before the date of any regular Board meeting and 15 days before the date of any special Board meeting. All such notices referred to in this Article may, however, be waived by the unanimous consent of all Directors prior, after or at the meeting. .

**Article 32**
The Board meeting shall be called and presided over by the Chairman. If the Chairman is unable to preside over such meeting on account of ill health or other incapability, he may authorize the Deputy Chairman to call and preside at a Board meeting. If the Deputy Chairman is not available, then the Chairman may authorize a Director to call and preside at a Board meeting.

**Article 33**

The annual meeting of the Board shall be held within four (4) months after the end of each fiscal year.

**Article 34**

A Board meeting shall not be held unless a quorum of five (5) Directors are present. In the event when a quorum is not formed due to any Director after receiving the notice of Board meeting sent as prescribed in Article 31 hereof, followed by another notice sent fifteen (15) days prior to the meeting, fails to attend the schedule Board meeting without cause, the requirement of quorum shall be deemed as satisfied. A Director may appoint a proxy to attend and vote on his behalf at any Board meeting.  Such person shall present the written power of attorney to the Chairman at or before the beginning of the meeting.

**Article 35**

The Board shall keep complete and accurate Board minutes (including all Board meeting notices) and the resolutions decided thereat.  Board minutes and resolutions shall be prepared in Chinese and English and signed by all Directors (or their proxy) attending such meetings immediately after a Board meeting is held. Within fifteen (15) days of each meeting, a photocopy of the signed minutes and resolutions of the Board meeting shall be sent to all Directors for inspection.

**Article 36**

A resolution in writing signed by all of the Directors shall be as valid and effective as of the date the last Director executes it as if it had been passed at a Board meeting duly convened and held.

**Article 37**

Unless otherwise agreed, the cost and expenses of the Directors for attending Board meetings, including traveling, accommodation, food and transportation expenses shall be borne by the Company.  The Company shall not pay any fees to Directors in connection with the activities they carry out in their capacity as Directors, unless the Parties otherwise mutually agree.  If a Director also assumes a position as a manager or staff employee in the Company, he shall be compensated by the Company according to that position.

**CHAPTER 11**
**MANAGEMENT OFFICE**

**Article 38**

The Company shall establish a Management Office, which shall be responsible for the day to day operation of the Company. The Management Office shall have the following initial management personnel ("Management Personnel"):

- A General Manager, to be nominated by Party A
- Two Deputy General Managers, to be nominated by Party A and Party B respectively. The DGM nominated by Party A will be in charge of all management and operation affairs of the Company except sales, marketing and technology, while the DGM nominated by Party B will be in charge of sales and marketing.

- A CFO (Chief Financial Officer) to be nominated by Party A
- A CTO ( Chief Technical Officer ) to be nominated by Party B

The appointment and dismissal of the above positions will require the approval by the Board of Directors. Each Management Personnel shall serve for a term of three years and may serve successive terms subject to the re-nomination by the relevant nominating Party and approval of the Board.

### Article 39
The General Manager shall be responsible for the operation of the Company. The responsibility of the General Manager is to carry out the decisions of the Board of Directors, and organize and conduct the daily management of the Company. The Deputy General Managers shall assist the General Manager in his work.

### Article 40
The duties and responsibilities of each Management Personnel and the functions of each department shall be decided by the Board. The remuneration and benefits will be decided by the Board by reference to the prevailing standards and practices in the Shanghai region.

### Article 41
The Chairman and Deputy Chairman of the Board and any director may concurrently hold any managerial position in the Company.

### Article 42
The Company shall enter into an employment contract with each member of the Management Office stipulating their responsibilities, remuneration as well as other terms and conditions of their employment.

### Article 43
In case of graft or serious dereliction of duty on the part of the General Manager and other member of Management Office, the Board of Directors shall have the power to dismiss them at any time and reserve the right to investigate and affix the legal liabilities for them.

### Article 44

None of the General Manager, Deputy General Managers and other Management Personnel shall in any way serve for, or act for the benefit or interests of, any other person, company, unit, entity or organization or participate in any activity conducted by such person, company, entity, unit or organization which may, directly or indirectly, conflict or compete with the interests or business of the Company.

All management personnel of the Company shall be forbidden from concurrently serving for or working at any other company, unit, entity or organization whatsoever unless authorized or approved by the Board. Any Management Personnel in violation of such prohibition shall be subject to immediate dismissal by the Board.

## CHAPTER 12
## LABOR MANAGEMENT

**Article 45**

The Company shall formulate its labor management rules in accordance with the PRC Labor Law, the Regulations on Labor Management in Enterprises Using Foreign Investment and other relevant rules and regulations. The employment and dismissal, wages, labor insurance, welfare, awards and fines of the Company's workers and staff shall be based on the above regulations and rules implemented by the Company according to policies set forth by the Board of Directors.

**Article 46**

The Company is entitled to lay off staff and workers in the event that the Company decreases its business operations or the business conditions have changed. The General Manager shall propose to the Board any substantial variation in the number of staff and workers required for the scale of business at the time in question.

**Article 47**

The Company shall take all necessary measures for work safety and labor protection in its production and business activities. The Company shall provide appropriate level of insurance to cover its staff and workers against personal accident by insuring with authorized insurance companies.

**Article 48**

The salary and remuneration, social insurance, welfare and business travel expense standard for the staff and employees shall be decided by the Board of Directors.

**Article 49**

The employees of the Company shall be recruited by the Company directly. They shall be selected based on their professional qualifications and the Company's standard for the selection of qualified personnel. The Company shall sign labor contracts with those who are engaged. The Company shall have the right to employ and dismiss any staff members and workers in accordance with relevant laws and regulations as well as the labor management rules of the Company.

**Article 50**

All employees of the Company shall be required to agree in writing to a Code of Conduct prepared by the General Manager and approved by the Board of Directors and to uphold the business practices of the Company including but not limited to protection of the intellectual property and confidential information of the Company in accordance with the rules and regulations as may be formulated by the Board of Directors from time to time.

## CHAPTER 13
## FOREIGN EXCHANGE

14

**Article 51**

All matters concerning foreign exchange of the Company shall be handled in accordance with the "Regulations on the Foreign Exchange Management of the People's Republic of China" and other pertinent regulations of the PRC.

**Article 52**

The Company shall adopt Renminbi as the standard currency for its statutory accounts and books.

**Article 53**

The Company shall open accounts in Renminbi and US dollars with appropriate bank(s) in China. According to its business needs, the Company may open foreign exchange deposit accounts outside the PRC with the permission from the State Administration of Foreign Exchange or its local branch.

**Article 54**

The Company shall strive to maintain a balance of its income and expenditures in foreign exchange.

## CHAPTER 14
## TAXES, FINANCIAL AFFAIRS, AUDITING

**Article 55**

The Company shall comply with all applicable tax and accounting requirements under PRC laws and regulations. The Board of Directors shall cause the Company to comply with all applicable PRC tax and accounting requirements, and shall obtain and/or file any documents required to be filed and provide copies of the same to the Parties as required.

**Article 56**

The Company is an independent accounting unit. It shall pay taxes in accordance with the relevant laws and regulations of the PRC. The Company shall apply to the relevant tax authorities for any and all preferential tax treatment it may be entitled to.

**Article 57**

The Parties agree that they shall not be obliged, by virtue of their interests in the Company, to provide loans, guarantees, credits or any similar advances to the Company, except as otherwise provided for herein or by agreement of the Parties.

**Article 58**

The staff members and workers employed by the Company shall pay individual income tax according to the Individual Income Tax Law of the People's Republic of China.

**Article 59**

The Company shall keep its books and records in accordance with generally accepted international accounting principles and with PRC laws and regulations. Such records and supporting documentation shall accurately reflect its financial affairs and shall be, at all times,

available for inspection by any of the Parties or their designees during normal business hours and without interfering with the normal course of business of the Company. Either Party may, at any time, procure a special audit of the Company's books and records, the pertinent costs being solely borne by the requesting party. The Parties agree that any accounting and/or auditing requirements which may be requested by the Parties for the US or Chinese accounting or tax purposes shall be fulfilled by the Company at the requesting Party's expense.

### Article 60
The Parties agree that the Company's books and records will, at the end of every fiscal year, be audited by an internationally known auditing company (registered in the PRC) to be determined by the Board. All costs and expenses incurred in connection with such annual audit shall be borne by the Company.

### Article 61
The Board of Directors shall cause the Company to prepare during the third quarter of each year an Annual Budget and Business Plan for the following fiscal year, to be submitted for review and approval by the Board of Directors. The Annual Budget and Business Plan shall set out, in reasonable detail, all proposed expenditures, investments, products to be developed by the Company, employment and indebtedness levels, as well as such other information as may be necessary to establish more precisely the operating expenses and financial resources required for that fiscal year.

### Article 62
The management of the Company shall submit to the Parties quarterly reports in English and Chinese, which shall be given in sufficient detail to identify any deviation or any proposed deviation from the Annual Budget and Business Plan in effect for the current fiscal year. The Parties agree that the Company shall not permit any significant deviation from the Annual Budget and Business Plan without the prior consent of the Board of Directors.

### Article 63
It is agreed that the dividend policy of the Company shall be consistent with the objective of providing the Company with maximum security and growth. The distribution of profits shall comply with the applicable provisions of the Company's Articles of Association.

### Article 64
The Parties specifically agree that compliance with and payment of all taxes due by the Company shall be the responsibility of the Company.

### Article 65
The Company shall adopt Renminbi as the standard currency in keeping accounts. The bookkeeping of transactions in foreign currency shall be done in accordance with the laws and regulations of the PRC from time to time.

### Article 66
The Company shall draw reserve funds, bonuses and welfare funds for staff and workers after payment of taxes in accordance with relevant laws and regulations. The annual proportion of

allocations shall be decided by the Board of Directors according to the requirements of the PRC laws.

**Article 67**
After paying taxes and making allocations to the statutory funds in accordance with the relevant laws and regulations, the Company's remaining profits shall be distributed to the Parties according to their respective equity holding and the dividend policy as approved by the Board of Directors.

**Article 68**
The fiscal year of the Company shall be from January 1 to December 31 annually. All vouchers, receipts and reports, account books shall be written in Chinese, and English language versions will be prepared upon the request of any Party.

**Article 69**
The Company shall prepare the statement of assets and liabilities, the profit and loss accounts and the profit distribution plan of the past year within the first three months of each fiscal year, and submit the same to the Board of Directors for examination and approval.

## CHAPTER 15
## DURATION OF THE COMPANY

**Article 70**
The duration of the Company shall be thirty (30) years commencing from the date on which the business license of the Company is re-issued.

**Article 71**
If both Parties agree to an extension of the duration of the Company and the Board of Directors will have so decided, then an application for the extension of the duration of the Company shall be submitted to the original examining and approval authority two hundred and forty (240) days prior to the expiry date of the term of the Company.

## CHAPTER 16
## TERMINATION AND LIQUIDATION

**Article 72**
If the Parties fail to mutually agree to extend the term of the Company, the Company shall be terminated and dissolved automatically upon expiration of the 30-year term of the Company.

**Article 73**
Upon the occurrence of any of the following events, the indicated Party shall have the right to request the early termination of the Company and the Company shall be terminated or reorganized accordingly unless the Parties agree otherwise:

17

(1)    If there has occurred a material breach of this Agreement and such breach is not cured within thirty (30) days of written notice thereof from the non-breaching party, then the non-breaching party shall have such right;

(2)    If all or a significant part of the assets of the Company are expropriated, then any party shall have such right; and

(3)    If total or partial performance of this Agreement is prevented by an event of force majeure for more than one hundred and eighty (180) days, then any party whose performance is not so prevented shall have such right.

In the event of premature termination of the Company's term according to the foregoing paragraphs except paragraph (1), neither Party shall be liable to the other for any expenses, losses or damages eventually incurred by same in connection with this Agreement. In the event of premature termination according to the foregoing paragraph numbered (1), the party which has failed to fulfill its obligations prescribed in this Agreement or the Company's Articles of Association shall be liable for the damage or losses caused to the other Party by such failure.

**Article 74**
After a Party has exercised its right to request termination and dissolution of the Company as provided in Article 73, the Parties shall consult each other at the Board level with a view to make mutually acceptable arrangements (including a buy out of the Party who wants to dissolve the Company) with regard to disposition of the Company's operations. In the event that no such agreement is reached within three (3) months of the date of the request, the Parties shall cause the Board to pass a unanimous resolution to dissolve the Company within thirty (30) days following such three (3) month period, upon which the Board shall submit an application for dissolution of the Company to the original examination and approval authority. Failure by any Party to do so shall constitute a material breach of this Agreement.

**Article 75**
On expiration or premature termination, the Board shall formulate the procedure for liquidation and the principles for forming a liquidation committee, and appoint members of the committee in accordance with the Articles of Association of the Company and the applicable regulations. The committee shall liquidate the Company accordingly and after completion of liquidation and payment of debts of the Company, distribute the proceeds of the liquidation and any remaining assets of the Company according to the Parties' ratio of Equity Interests in the Company. The list of members of the liquidation committee shall be filed with the government authority in charge of the Company.

**Article 76**
The tasks of the liquidation committee shall be as follows:

(1)    to identify and inspect the assets of the Company, to ascertain the creditors of the Company, and to figure out the liabilities of the Company;

(2)    to prepare a balance sheet and a detailed list of assets of the Company on the date fixed by the Board;

(3)     to formulate a plan/schedule for the completion of various stages of liquidation of the Company; and

(4)     to evaluate the assets in accordance with their then market value.

The liquidation schedule shall be implemented upon approval by the Board.

## CHAPTER 17
## INSURANCE

**Article 77**

Insurance policies of the Company on various kinds of risks shall be procured according to the Company's needs. The kinds, values, periods and terms of insurance shall be determined by the Board of Directors.

## CHAPTER 18
## INTELLECTUAL PROPERTY AND CONFIDENTIALITY

**Article 78**

During its operation, the Company shall fully respect the technologies and patents, copyrights, software, trade names, trademarks, know-how, trade secrets, or other intellectual property rights ("IP Rights") of both Parties. A system for strict control shall be implemented by the Company. The Parties recognize and agree that the right of the Company to use any of either Party's technologies or IP rights is solely by virtue of, and strictly subject to, the provisions of this Agreement, the Technology Transfer Agreement to be entered by the Company and Party B and Party A as well as the terms and conditions established in any other agreement between the Company and either of the Parties.

**Article 79**

The Parties agree that they and Huaxia shall have the right to use each other's and Huaxia's technologies relating to the PVC tapes. However, neither Party nor Huaxia shall sublicense the right to use such technologies of the other Party to any party other than the Parties and Huaxia. The right of Plymouth or Huaxia to use the technologies of the other Party shall expire in the event of the expiration or termination of the Company for any reason.

Notwithstanding the foregoing, Party A and its Affiliates shall not use Party B's technologies to produce products known as Premium 37, Premium 111 or Premium 85 under any customer's brand name if Party A's and its Affiliates' technologies and Party B's technologies are not substantially the same in respect of formulation, specifications and performance relating to such products.

**Article 80**

Neither of the Parties or any of their Affiliates is allowed to disclose to any third parties or make public unrevealed managerial, business and technical information ("Confidential Information") of the Company or the other Party without the permission from the other Party (exclusive of any information available in public domain). The Parties agree to take all necessary measures to maintain in secrecy and not to disclose, furnish or make accessible to any third party any

Confidential Information and to prevent its unauthorized publication, disclosure and use. The Parties agree that they will continue to provide technical support and service to the Company during its term of operation and the IP rights developed by itself shall belong to the Company.

### Article 81
Each Party undertakes that during the term of the Company, neither Party nor any of its Affiliates shall enter into any joint venture arrangement with any other entity to engage in the manufacture of PVC tapes anywhere in the world. Both Parties agree that they shall cause their respective Affiliates to observe the obligations contained in this Chapter 18.

## CHAPTER 19
## AMENDMENT OF AGREEMENT

### Article 82
No changes, alterations, or modifications hereto shall be effective unless they are in writing and are signed by authorized representatives of the Parties hereto.

## CHAPTER 20
## LIABILITY FOR BREACH OF AGREEMENT

### Article 83
If any Party fails to make its investment contribution within the time limits according to the provisions of this Agreement, or otherwise materially breaches this Agreement, the non-breaching party has the right to terminate this Agreement and the Company and/or seek damages from the breaching party in accordance with this Agreement. The breaching party shall be liable for the direct economic losses and damages suffered by the other Party.

## CHAPTER 21
## FORCE MAJEURE

### Article 84
Should any of the Parties to this Agreement be prevented from or delayed in performing this Agreement by force majeure, such as earthquake, typhoon, flood, fire, riots, war, warlike situations, embargoes, strike, lockout, acts or omissions of any governmental authority, civil unrest and other unforeseen events, the happening and consequences of which are unpreventable and unavoidable, the affected Party shall notify the other Party by facsimile as soon as practicable after the happening of the force majeure, and within fifteen (15) days thereafter provide detailed information of the event and certifying documents evidencing the occurrence of the event of force majeure. Such certifying documents should explain the reason for such Party's inability to perform, or delay in performing, all or part of this Agreement. Depending on the extent of the effect of the force majeure, the Parties shall, through consultations, decide whether to terminate the Agreement, or to exempt or postpone the performance of that part of the obligations affected by the force majeure, provided however, that no such event of force majeure shall be deemed to be a breach of this Agreement.

# CHAPTER 22
# APPLICABLE LAWS

**Article 85**

The formulation, validity, explanation and implementation of this Agreement shall be governed by the laws of the People's Republic of China.

# CHAPTER 23
# SETTLEMENT OF DISPUTES

**Article 86**

Any dispute arising out of or in connection with this Agreement, including any questions regarding its existence, validity or termination, shall be settled through friendly consultations between Party A and Party B. In case no settlement can be reached through such consultation, the dispute shall be submitted to the Hong Kong International Arbitration Centre ("HKIAC") to be arbitrated according to the Rules of Arbitration of the HKIAC. Such arbitration shall be held in the Special Administration Region of Hong Kong, P.R. China.

The arbitral award shall be final and binding upon all Parties. The costs of the arbitration shall be as fixed by the arbitration tribunal. Application may be made by either Party to a court having jurisdiction for a judicial recognition of the award rendered by the arbitration tribunal or any order of enforcement thereof.

**Article 87**

Except for matters in dispute and under arbitration, the Parties shall continue to carry out other provisions stipulated in this Agreement.

# CHAPTER 24
# LANGUAGE

**Article 88**

The Agreement hereof shall be executed by the Parties hereto in both Chinese version and English version. Both versions shall have equal force and effect.

# CHAPTER 25
# MISCELLANEOUS

**Article 89**

Neither this Agreement nor any rights or obligations hereunder shall be assignable directly or indirectly by any Party without the prior written consent of the other Party.

**Article 90**

Failure, tolerance or indulgence of any Party hereto to insist upon the strict and punctual performance of this Agreement shall not constitute a waiver of the right to require such performance, nor shall a waiver in one instance constitute a waiver with respect to a later breach of a similar nature or otherwise. If any provision of this Agreement is deemed invalid or

unenforceable in accordance with its terms, all other provisions, to the largest extent permitted by applicable laws, shall be and continue to be valid and enforceable in accordance with their terms.

**Article 91**
All Appendices ("Appendices") to this Agreement are inseparable components of this Agreement. The Agreement and its Appendices shall require the approval by the Approval Authority and come into force upon such approval.

**Article 92**
The Parties hereto shall bear their own expenses in connection with the negotiation and conclusion of this Agreement.  To the extent that reasonable expenses are incurred by Party A in connection with handling the application for approval of this Agreement and related matters such as the travel expense, government charges for approval and issuance of the business license, etc., such expenses may be reimbursed by the Company.

**Article 93**
All written notices, requests, demands and other communications hereunder or in connection herewith shall be given by courier or facsimile transmission with confirmed receipt which shall be addressed to the parties as follows:

If to Party A:
88 Yongle Blvd., Zhuozhou, Hebei, PRC
Attention: Wong Fung
Facsimile:  （86）3123975999

If to Party B:
104 Revere Street, Canton, MA 02021 USA
Attention: Maurice J. Hamilburg
Facsimile: 781-828-9142

IN WITNESS WHEREOF, this Agreement is signed in Shanghai on 22nd day of December, 2004 by the authorized representatives of the Parties.


**Awesome Profits Limited**

By: _____
　　　Name:
　　　Title:


**Plymouth Rubber Co. Inc.**

By: _____
　　　Name:
　　　Title:


22

**APPENDIX A**

**Technology License Agreement**

# APPENDIX B

## Sales and Distribution Agreement

24

## SCHEDULE 1

| Project | Quantity | Estimated Completion Time |
|---|---|---|
| Land Use Right（50 years） | 57994.2m² | Land Lease Agreement obtained Land Use Right Certificate in process |
| Manufacturing Plants | 16520 m²（construction completed，Property Ownership Certificate in process） | Completed in October 2004（Done） |
| | 2835 m²（Under construction） | Estimated to be completed in August 2005 |
| Office Building | 4210 m²（construction completed, Property Ownership Certificate in process） | Completed in October 2004（Done） |
| Plumbing、Walls、Roads | | Completed in October 2004（Done） |
| Electricity Supply | | Completed in October 2004（Done） |
| Boilers | 2 Units | Completed in October 2004（Done） |
| Compressors | 2 Units (under installation) | Estimated to be completed in January 2005 |
| PVC coating lines, with a width of 1.3m；production speed of 40m/min | 6 Lines（2 lines under installation） | 2 start production in January 2005 2 start production in July 2005 2 start production in June 2006 |
| TOLUENE recycling equipment | 3 Sets | 1 starts production in January 2005 1 starts production in July 2005 1 starts production in June 2006 |
| Adhesive Manufacturing Equipment including adhesive mixers, primer mixers, and tanks（胶粘剂生产设备，包括面胶搅拌机、底胶搅拌机和储罐） | 6 Units | 3 completed in June 2005 3 completed in December 2005 |
| 4-Roll Inverted "L" PVC Calenders with 24" x72" rolls 四滚 L 型 24" x 72" 压延线设备 | 2 complete Lines | 1 completed in October 2005 1 completed in October 2006 |
| Two-mandrel slitters 双管切台 | 8 Units（4 are under installation） | 4 installed in January 2005 4 start production in December 2005 |
| Packaging lines | 2 Units | 2 start production in January 2005 |
| Paper Core Cutter | 2 Units（1 Installed） | 1 starts production in May 2005 1 starts production in June 2005 |
| Paper Cutter | 1 Set (ordered, yet to be installed) | Production in February 2005 |
| Testing Equipment including lab ovens, tensile testers, unwind testers, adhesion testers, etc. 实验设备，包括实验室烘箱，张力测试设备，解卷测试设备，粘度测试设备， | 1Set（ordered, yet to be installed） | Completed in May 2005 |

| Project | Quantity | Estimated Completion Time |
|---|---|---|
| Heat Treatment Oven | 8 Units<br>(ordered, yet to be installed) | 2 completed in February 2005<br>6 completed in October 2005 |
| Rubber Granulator 橡胶颗粒机 | 1 Unit<br>(not ordered) | 1 completed in June 2005 |
| Notching Machine 无划痕设备 | 1 Unit<br>(not ordered) | 1 completed in June 2005 |
| Pinracks 熟成胶带架 | To be determined | As needed |
| Storage | 3 Units（1 installed, 2 ordered） | 1 completed in December 2004<br>2 completed in October 2005 |
| Water Supply System | | Completed in November 2004（done） |
| Fire Safety Equipment | | Completed in November 2004（done） |
| Lighting and Air-conditioning system | | Completed in November 2004（done） |
| Forklift | 4 Units（1 ordered） | The rest will be planned as necessary |
| Transportation | 3 automobiles（1 purchased） | 1 purchased in April 2003<br>12 purchased in October 2005 |
| Office Supplies | Purchased | Office furniture purchased in November 2004, the rest will be purchased as necessary |
| Dry Vinyl Machine （干拭 PVC 设备） | 1 Line | Completed in June 2005 |

The above equipment list might be adjusted as necessary to produce tapes contemplated in this agreement. In addition to the above list, additional related equipment may be necessary to produce tapes accepted by both parties.