**Execution Copy**

[Appendix A to the Equity Investment and Transfer Agreement]

# TECHNOLOGY TRANSFER AGREEMENT

## BY AND AMONG

## PLYMOUTH RUBBER CO. INC.

## AND

## PLYMOUTH YONGLE TAPE (SHANGHAI) CO.,LTD.

## AND

## AWESOME PROFITS LIMITED

Dated as of December 22,2004

## TECHNOLOGY TRANSFER AGREEMENT

This TECHNOLOGY TRANSFER AGREEMENT (this "**Agreement**"), dated as of December 2L, 2004, is by and among PLYMOUTH YONGLE TAPE (SHANGHAI) CO., LTD., a limited liability company organized under the laws of the People's Republic of China (the "**Company**"), PLYMOUTH RUBBER CO. INC., a corporation organized under the laws of the Commonwealth of Massachusetts, USA ("**Plymouth**"), and AWESOME PROFITS LIMITED, a corporation organized and existing under the laws of British Virgin Islands ("**Awesome**"). Notwithstanding anything to the contrary contained herein, this Agreement shall not be effective until Effective Date (as defined below).

WHEREAS, the Company was formed pursuant to an equity investment and transfer agreement between Plymouth and Awesome, dated as of December 2L, 2004 (as the same may be amended from time to time in accordance with its terms, the "**Equity Investment Agreement**"), for the purpose of manufacturing and selling PVC tape products ("Products", as defined below) on the terms and subject to the conditions of the Equity Investment Agreement and any other written agreements that the Company enter into with any other relevant parties; and

WHEREAS, pursuant to the Equity Investment Agreement, as its contribution to the Company's registered capital, Plymouth agrees to provide the Company with certain technology relating to manufacture and process of the Products, on the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, promises, representations, warranties and agreements set forth in this Agreement and the Equity Investment Agreement, Plymouth, the Company and Awesome agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1**   *Certain Definitions.*   Initially capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings assigned such terms in the Equity Investment Agreement. As used in this Agreement, the following terms shall have the meanings set forth below:

"*Agreement*" means this Technology Transfer Agreement, as the same may be amended from time to time in accordance with its terms.

"*Awesome*" has the meaning set forth above.

"*Business*" means any business contemplated in Article 20 of the Equity Investment Agreement.

"*Company*" has the meaning set forth above.

"*Effective Date*" means the date that the Business License of the Company is re-issued pursuant to the Equity Investment Agreement.

"*Equity Investment Agreement*" has the meaning set forth above.

*"Force Majeure"* has the meaning set forth in Article 84 of the Equity Investment Agreement.

*"Huaxia"* means Hebei Huaxia Enterprise Co., Ltd., with its office address at 88 Yongle Boulevard, Zhuozhou City, Hebei Province, China.

*"Plymouth"* has the meaning set forth above.

*"PRC"* means the People's Republic of China, excluding for purposes hereof Hong Kong, Macao and Taiwan.

*"Products"* shall mean any and all kinds of PVC tapes to be produced by the Company in accordance with the Equity Investment Agreement.

*"Technology"* shall have the same meaning as "Party B Technologies" as provided in <u>Articles 5</u> and <u>6</u> in the Equity Investment Agreement, as described in more detail in <u>Exhibit A</u>, which is to be provided to the Company in accordance with this Agreement.

      *Section 1.2   Rules of Construction.* The terms defined herein shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The headings used herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Unless the context shall otherwise require, any reference to any agreement or other instrument, statute or regulation is to such agreement, instrument or regulation as amended and supplemented from time to time (and, in the case of a statute or regulation, to any successor provision). Any reference in this Agreement to a "day" or number of days (without the explicit qualification of "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

## ARTICLE 2 - TECHNOLOGY TRANSFER

      *Section 2.1   Transfer.* Plymouth shall transfer the Technology to the Company in accordance with the provisions of <u>Article 6</u> of the Equity Investment Agreement, in accordance with the delivery procedures set forth in <u>Article 4</u> of this Agreement and otherwise on the terms and subject to the conditions set forth herein.

      *Section 2.2   Use.* Anyone of Plymouth, Huaxia and the Company may use the Technology but may not sublicense the Technology to any fourth party unless otherwise specified in this Agreement.

      *Section 2.3   Ownership after Transfer.* The Technology after the transfer hereunder is completed shall be considered jointly owned by Plymouth and the Company, and unless otherwise specified in this Agreement, neither Plymouth nor the Company may grant any license or sublicense of the Technology to any third party without the other party's written consent.

2

Notwithstanding the foregoing, Plymouth and the Company may license and continue to license the Technology to its respective wholly-owned subsidiaries without the other's consent.

## ARTICLE 3 - CONTRIBUTION TERMS

*Section 3.1    Contribution Terms.*  Pursuant to the terms of <u>Article 6</u> of the Equity Investment Agreement, Plymouth shall deliver the Technology to the Company in consideration of equity participation in the registered capital of the Company in the amount of US$3.824 million, accounting for 20% of the Company's registered capital as set forth in <u>Article 3</u> of the Equity Investment Agreement.

*Section 3.2    Acknowledgement of Sufficiency.*  Awesome hereby acknowledges that Plymouth's contribution of the Technology and its compliance with the terms and conditions hereof and those of the Equity Investment Agreement shall constitute sufficient consideration for Plymouth's equity participation in the in the registered capital of the Company as provided in <u>Section 3.1</u> hereof.

## ARTICLE 4 - DELIVERY

*Section 4.1    Delivery.*  Plymouth shall deliver to the Company all of the documents described in <u>Exhibit A</u> hereto in accordance with this <u>Article 4</u>.  Plymouth shall notify the Company in writing in advance of the manner in which the documents described in <u>Exhibit A</u> hereto are being delivered to the Company and the estimated date of arrival.  The notification shall specify a listing of the documentation to be delivered in sufficient detail for the Company to identify the documentation to be delivered.

*Section 4.2    Missing Documents.*  In the event that the documents described in <u>Exhibit A</u> are incomplete when checked by the Company against the documentation list, the Company shall immediately notify Plymouth, identifying the missing documentation, and Plymouth shall supply such missing documentation free of charge within 30 days after notification by the Company.  Failure by Plymouth to supply such missing documentation within such 30-day period shall be deemed to constitute a late contribution of capital.

## ARTICLE 5 - WARRANTY AND INFRINGEMENT

*Section 5.1    Warranties.*  Plymouth hereby represents and warrants to the Company as follows:

(a)    As of the Effective Date, Plymouth owns or controls, or otherwise has the valid right to use, the Technology and has the right to transfer the Technology to the Company under the terms and conditions of this Agreement.

(b)    The Technology that constitutes Plymouth's Separate Intellectual Property, as provided for use under this Agreement, does not infringe upon or constitute a misappropriation of any copyright, trademark, patent, trade secret or other Intellectual Property right of any unaffiliated third party.

3

(c)    Plymouth warrants that it will thoroughly and completely deliver its most efficient and updated Technology as part of its capital contribution.

**Section 5.2    Disclaimer.**  EXCEPT AS SPECIFICALLY SET FORTH IN SECTION 5.1 ABOVE, NEITHER PLYMOUTH NOR ANY OF ITS AFFILIATES MAKES ANY WARRANTY, EITHER EXPRESS, IMPLIED OR STATUTORY, NOR SHALL ANY WARRANTY ARISE BY COURSE OF CONDUCT OR BY PERFORMANCE, CUSTOM OR USAGE IN THE TRADE, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE TECHNOLOGY.

**Section 5.3    Indemnification in Respect of Technology.**

(a)    Plymouth agrees to indemnify and hold harmless the Company and its respective Affiliates, directors, officers, employees and agents against and in respect of any and all actions, suits, proceedings, hearings, investigations or claims by a third party that the Technology violates, infringes or otherwise conflicts with any intellectual property rights of an unaffiliated third party (each, a "*Claim*"), and pay those damages or costs related to the defense and/or settlement of any such Claim or finally awarded in any such Claim (including without limitation reasonable attorneys' fees and expenses), provided that the party claiming indemnity hereunder: (i) promptly notifies Plymouth of any such Claim (provided that the failure to give notice shall not relieve Plymouth of its obligations under this Section 5.3 except to the extent (if any) that Plymouth shall have been actually prejudiced thereby); (ii) gives Plymouth full authority, information and assistance to defend such Claim; and (iii) gives Plymouth sole control of the defense of such Claim and all negotiations for the compromise or settlement thereof; provided, further, that Plymouth shall have no obligation with respect to any Claim to the extent the same results from: (x) the modification of any tangible embodiment of Plymouth's Separate Intellectual Property by anyone other than Plymouth or its Representatives; (y) any combination, operation or use of the Separate Intellectual Property or any tangible embodiment thereof with devices, data or programs not furnished by Plymouth or its Representatives; or (z) use of the Separate Intellectual Property not permitted by this Agreement.

(b)    If a Claim subject to indemnification pursuant to this Section 5.3 has occurred, or in Plymouth's opinion is likely to occur, Plymouth, at its option and expense, may either: (i) procure for the Company the right to continue using the Technology subject to the Claim; (ii) replace or modify the same so that it becomes non-infringing; or (iii) if neither of the foregoing alternatives is reasonably available, immediately terminate the Company's rights to use the allegedly infringing Technology under this Agreement.  In the event of a termination of the Company's rights as contemplated by the foregoing clause (iii), either (x) the amount then credited by the Company as Plymouth's capital contribution in respect of the Technology under Article 3 of the Equity Investment Agreement shall be reduced by an amount equal to the value of the allegedly infringing Technology(the "*Reduction*") or (y) Plymouth shall contribute to the Company's registered capital in cash, or other property as mutually agreed by the shareholders of the Company, an amount equal to that Reduction.  This Section 5.3(b) is in addition to the provisions of Section 5.3(a) above.

4

(c)    For purposes of this Section 5.3, the term "Separate Intellectual Property" of Plymouth includes any technology or intellectual property provided by Plymouth (or its Affiliates) to the Company under this Agreement, regardless of whether such technology or intellectual property is owned by or licensed to Plymouth (or its Affiliates).

(d)    Notwithstanding anything to the contrary herein, in no event shall Plymouth settle or compromise any Claim without the Company's prior consent (which shall not be unreasonably withheld or delayed).

**Section 5.4    Right to Enforce the Technology.**  In the event Plymouth or the Company has reason to believe that a third person may be infringing any of the Technology in the PRC, such party shall promptly notify the other party.  Plymouth may, in its discretion and at its sole expense, elect to enforce the Technology, through legal action or otherwise, and the Company shall reasonably cooperate with Plymouth, at Plymouth's expense, in such enforcement.

## ARTICLE 6 - CONFIDENTIALITY OF INFORMATION

The terms of Article 80 of the Equity Investment Agreement (including any related definitions) shall apply to this Agreement as if they were set forth herein and as if they were applicable to the parties to this Agreement.

## ARTICLE 7 - FORCE MAJEURE

**Section 7.1    Force Majeure Notice.**  If any event of force majeure is claimed by any party hereto, the party making such claim shall orally notify each other party as soon as reasonably possible after the occurrence of such event of force majeure and, in addition, shall provide each other party with written notice of such event of force majeure within five (5) days after the occurrence of such event of force majeure.

**Section 7.2    Performance Failures or Delays.**  No party shall be liable to any other party for any nonperformance or delay in performance of its obligations under this Agreement when such failure or delay is caused by an event of force majeure.  Upon the occurrence of an event of force majeure, the affected party will, so far as possible, use commercially reasonable efforts to cure any resultant nonperformance or delay.  It is understood and agreed that nothing in this Section 7.2 shall require the settlement of strikes, lockouts, or industrial disputes or disturbances by acceding to the demands of any opposing party therein when such course is inadvisable in the discretion of the party having the difficulty.

## ARTICLE 8 - DISPUTE RESOLUTION

In an effort to resolve informally and amicably any claim or controversy arising out of or related to the interpretation or performance of this Agreement (including without limitation, issues of arbitrability, disqualifications, statutes of limitations, existence, validity and termination) (a **"Dispute"**), without resorting to litigation, the terms of Article 86 of the Equity Investment Agreement (including any related definitions) shall apply to this Agreement and any

5

Dispute hereunder as if they were set forth herein and as if they were applicable to the parties to this Agreement.

## ARTICLE 9 - MISCELLANEOUS

*Section 9.1    Binding Effect; Assignment; Certain Notices.* This Agreement shall be binding upon and inure to the benefit of the parties and their respective permitted successors and permitted assigns. The Company may not assign, sublicense or otherwise transfer (directly or indirectly, by operation of law or otherwise) any of its rights or obligations under this Agreement without the prior written consent of Plymouth and any other purported transfer shall be null and void.

*Section 9.2    Notice.* Any notice required or permitted to be given under this Agreement shall be given in writing and delivered by personal delivery, public or private overnight mail service, or by facsimile, telex or telegraph addressed to the then current mailing address of such party, as the same are set forth below and may be modified from time to time upon notice to the other parties:

If to the Company:

> Plymouth Yongle Tape (Shanghai) Co. Ltd.
> Minta South, Shihudang Sub-zone, Songjian Industrial Zone, Shanghai, PRC
> Facsimile:
> Attn: Xiao Wenlong

If to Plymouth:

> Plymouth Rubber Co. Inc.
> 104 Revere Street
> Canton, MA 02021
> USA
> Facsimile: 781-828-9142
>
> Attn: Maurice J. Hamilburg

With a copy to:

> Jun He Law Offices, LLC
> 500 Fifth Avenue, Suite 1930
> New York, NY 10110
> Attn: Xiaolin Zhou, Esq.
> Facsimile: (212) 703-8720

If to Awesome:

6

Awesome Profits Limited
88 Yongle Blvd., Zhuozhou, Hebei, PRC
Attention: Wong Fung
Facsimile: （86）3123975999

The deemed date of delivery of the notice shall be decided as follows:

1.    By messenger or overnight courier service, deemed to have arrived on the date of delivery; or

2.    By confirmed telex, facsimile, telegram or telegraph, deemed to have been delivered on the first working day after the date of sending.

Each of the parties hereto shall have the right to change its address upon ten (10) days advance notice to the other Parties.

**Section 9.3    *Entire Agreement; Waiver; Modification; Counterparts*.**  This document and its exhibit set forth the entire agreement and understanding among the parties relating to the subject matter contained herein and merge all prior discussions among them.  It is agreed that:

(a)    no party has entered into this Agreement in reliance upon any representation, warranty or undertaking of another party which is not expressly set out or referred to in this Agreement or the Equity Investment Agreement;

(b)    no party shall have any rights or remedies with respect to the subject matter hereof otherwise than under this Agreement or as provided in the Equity Investment Agreement; and

(c)    this clause shall not exclude liability for any fraud or fraudulent misrepresentation of any party.

No amendment to this Agreement shall be effective unless it is in writing and executed by the parties hereto and approved by any applicable governmental authority (to the extent necessary).  No failure or delay on the part of a party in the exercise of any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude other or further exercise thereof or of any other right or power; provided, however, that any party may by an instrument in writing executed by it: (i) extend the time for the performance of any of the agreements or covenants of another party under this Agreement; (ii) waive any inaccuracies in the warranties of another party contained in this Agreement or in any document delivered pursuant hereto; (iii) waive the performance by another party of any of the agreements or covenants to be performed by such other party under this Agreement; or (iv) waive the satisfaction of any conditions precedent to its obligations under this Agreement.  The waiver by any party or parties hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach hereunder.  This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7

**Section 9.4    Compliance with Laws.**   The parties hereto agree to comply with all applicable laws and regulations applicable to their respective performance of this Agreement.

**Section 9.5    Language.**   This Agreement shall be written in Chinese and English. Both versions shall be equally authentic.  In the event of any discrepancy between the two aforementioned versions, the parties shall try to resolve such discrepancy through friendly discussions.  If such friendly discussions do not resolve such discrepancy, the discrepancy shall be submitted for resolution under Article 8 of this Agreement.  Each party shall keep one original in each language version.

**Section 9.6    Applicable Law.**   This Agreement shall be construed and governed in accordance with the laws of the People's Republic of China.

**Section 9.7    Export Control**   The parties acknowledge that the Technology provided pursuant to this Agreement and each of the party's respective obligations and hereunder may be subject to the export control laws and regulations of the country of incorporation of Plymouth.

Each of the parties to this Agreement has caused this Agreement to be executed on its behalf by its duly authorized representative, all as of the day and year first above written.

Plymouth Yongle Tape (Shanghai) Co. Ltd.

By:_____
Name:_____
Title:_____

Plymouth Rubber Co. Inc.

By:_____
Name:
Title:

Awesome Profits Limited [with respect to Section 3.2]

By:_____
Name:
Title:

8

EXHIBIT A

TECHNOLOGY

1.    **Overall Description.**  The Technology to be transferred by Plymouth hereunder includes all technical information related to the design and production of the following products possessed by Plymouth, including without limitation, formulations, concepts, product designs, engineering data, drawings, schematics, and other documents, operating experience, methods and techniques, material specifications, cost data, performance data and other specifications, quality control, training procedures and any other business secrets, information and documents, in each and every case in any form (including oral disclosures)  and whether or not patentable or susceptible to any other form of legal protection, relating in any way to the following products:

- PVC wire harness tape
- PVC electrical tape
- PVC degaussing coil tape
- PVC aisle marking tape
- PVC pipe wrapping protective tape
- PVC wire harness tape without adhesive

2.    **Deliverables and Delivery Schedule.**

Plymouth will provide to the Company information relevant to the production of the Products including the following:

**A. Raw Material Technology:** (within 14 days of the Effective Date)
- Approved Vendor List
- Raw materials list used for the manufacture of:
  - o  Flexible PVC films
  - o  Primers
  - o  Adhesives
  - o  Vinyl Protective Sheets
- Raw material specifications
- Material safety data sheets
- Incoming raw material testing procedures

**B. All of the formulations covering the following:** (within 14 days of the Effective Date)
- PVC films
- Primers
- Adhesives

**C. Process specifications covering the manufacture of:** (within 14 days of the Effective Date)
- PVC films
- Primers
- Adhesives

A-1

- Various PVC tapes –
  - Pressure Sensitive PVC tapes
  - PVC Dry Automotive Tapes
  - PVC Protective Sheets
- In-process testing procedures for all the manufacturing processes.

**D. Technical support during initial manufacturing of the following:** (as mutually agreed by the parties, but not more than 90 days from the Effective Date):
- PVC films
- Primers
- Adhesives
- PVC Dry Automotive tapes
- PVC Protective Sheets

**E. Customer Specifications:** (within 14 days of the Effective Date)

**F. Finished Product Testing Procedures and Product Specifications:** (within 14 days of the Effective Date)

**G. Equipment Technology covering:** (During the visit to Plymouth by Huaxia or the Company's personnel but not later than 60 days from the Effective Date)
- Adhesive mixing
- Primer mixing
- Manufacturing PVC Dry Automotive Tapes
- Manufacturing PVC Protective Sheets
- Manufacture of notched tape
- Drawings of notched tape machine, if available
- Drawings of adhesive machine, if available
- Laboratory equipment
- Diagrams of annealing ovens and conditions for temperature control

**H. Technical Documents for Quality Control Systems** (within 14 days of the Effective Date)

2

签字本

（股权投资和转让协议之附件一）

# PLYMOUTH RUBBER CO. INC.

## 与

## 普利茂斯永乐胶带（上海）有限公司

## 与

## 雅利有限公司

## 之

## 技术转让协议

日期：2004 年 12 月 22 日

*技术转让协议书·签字本*

# 技术转让协议

　　本技术转让协议（本"协议"）由普利茂斯永乐胶带（上海）有限公司，一家根据中华人民共和国法律成立的有限责任公司（"公司"）和 PLYMOUTH RUBBER Co. INC.，一家根据美利坚合众国麻萨诸塞州法律成立的公司（"普利茂斯"）和雅利有限公司，一家根据英属维京群岛法律成立并续存的公司（"雅利"）于2004年12月22日签订。即使本协议中有相反的规定，本协议应于生效日（定义见下文）生效。

　　鉴于，公司依据普利茂斯和雅利于2004年12月 22 日签订的《股权投资和转让协议》（可能根据其相关条款不时修订，"《股权投资协议》"）成立，并依据股权投资的条款和条件和其他有关方达成的书面协议从事生产和销售 PVC 胶带产品（"产品"，定义见下文）；以及

　　鉴于，根据《股权投资协议》的条款和条件，普利茂斯同意向公司提供关于产品的制造和加工方法方面的某些技术，作为其对公司的注册资本出资。

　　因此，鉴于本协议和《股权投资协议》中所包含之共同约定承诺、陈述、保证、契约和协议，普利茂斯、公司和雅利达成一致协议如下：

## 第一章　定义

1.1　**特定定义。** 本协议中使用的黑体术语，除非本协议另有定义，具有《股权投资协议》中相同术语的含义。在本协议中，下列术语应具有以下的含义：

　　"协议"指本技术转让协议，其有可能根据相关条款不时修订。

　　"雅利"含义如上规定。

　　"业务"指《股权投资协议》第二十条所述之任何业务。

　　"公司"含义如上规定。

　　"生效日"指根据《股权投资协议》规定重新颁发公司营业执照之日。

　　"股权投资协议"含义如上规定。

　　"不可抗力"含义见《股权投资协议》第八十四条的规定。

　　"华夏"指河北华夏实业有限公司，办公地址为河北省涿州市永乐大道8号。

　　"普利茂斯"含义如上规定。

　　"中国"指中华人民共和国，但在本协议项下不包含香港、澳门和台湾。

1

*技术转让协议书- 签字本*

"产品"指根据《股权投资协议》由公司生产的任何 PVC 胶带产品。

"技术"含义和《股权投资协议》中第五条和第六条所定义的"乙方技术"一致，指附件 A 中提及的根据本协议向公司提供的技术。

**1.2 解释规则。**本协议中的定义应同等适用于所定义术语的单数和复数形式。只要上下文有此等要求，则任何代词均应包括该词相应的阳性、阴性和中性形式。"包括"一词应被视为"包括但不限于"。本协议中使用标题仅以便于参考为目的，该等标题并非本协议的一部分且不应影响对本协议的理解和解释。除非上下文另有规定，任何提及的协议或其他文件、法令或法规系指不时经过修订或补充的该等协议、文件、法令或法规（就任何法令或法规而言，还应指其继承性规定）。本协议中提及的任何一"天"或数天（除非被明确说明为营业日）应被解释为公历的一天或公历的数天。如果本协议规定的任何行动或通知应在一个特定的公历日或该特定公历日之前作出，且该公历日并非营业日，那么该行动或通知可予推迟直到下一个营业日，或在下一个营业日采取行动或发出通知。

## 第二章 技术转让

**2.1 转让。**普利茂斯应根据《股权投资协议》中第六条的规定、本协议第四章规定的交付程序以及本协议规定的其他条款和条件向公司转让技术。

**2.2 使用。**公司、普利茂斯和华夏每一方均有权使用本协议项下约定的技术，但除本协议许可外，任何一方不得将该技术分许可给三方之外的第四方。

**2.3 转让后的所有权。**技术在按本协议规定转让完成后应被视为公司和普利茂斯共同拥有。除非本协议另有明确规定，普利茂斯和公司均不能在未得到对方书面同意的情况下向第三方提供任何授权或再授权。无论此前如何规定，公司和普利茂斯均无需对方同意有权将技术授权及继续授权给各自的全资子公司。

## 第三章 出资条款

**3.1 出资条件。**根据《股权投资协议》第六条的规定，普利茂斯应向公司交付技术，作为普利茂斯依据《股权投资协议》第三条规定向公司的注册资本注资三百八十二万四千美元，占公司注册资本的百分之二十。

**3.2 足价对价。**雅利在此认可，普利茂斯的技术出资和其对本协议和《股权投资协议》的条款条件的遵守构成普利茂斯按照本章第 3.1 条规定所进行的对公司注册资本注资的足价对价。

2

*技术转让协议书 签字本*

## 第四章 交付

4.1 **交付。**普利茂斯应根据本第四章的规定向公司交付<u>附件 A</u>所述全部文件。普利茂斯应当提前通知公司<u>附件 A</u>所述文件运送交付的方式以及预计到达的时间。该通知应注明足够详细的交付文件清单以便公司查验所交付的文件。

4.2 **文件缺失。**如果公司根据文件清单查验时发现<u>附件 A</u>所述文件并不完整，则应立即通知普利茂斯，并指出缺失的文件，普利茂斯应在公司发出通知后 30 日内免费提供缺失的文件。若普利茂斯未能在上述 30 日内补齐文件应被视为延迟出资。

## 第五章 保证与侵权

5.1 **保证。**普利茂斯在此向公司作出如下陈述和保证：

    （a）  在生效日，普利茂斯有权根据本协议的条款和条件向公司转让该技术。

    （b）  本协议项下的技术不侵犯任何第三方的版权、商标、专利、商业秘密或其他知识产权，亦不构成对上述知识产权的盗用。

    （c）  普利茂斯保证完整、全面地转让其最有效和最新的技术作为出资。

5.2 **免责。**除上述第 5.1 条中的特别规定，就技术而言，普利茂斯及其关联方没有以明示、暗示或法定的方式作出任何保证，而且任何行动或实际履行的行为以及习惯或交易惯例，包括但不限于任何以特定目的作出的商业性默示保证或者适当性保证，均不构成任何保证的内容。

5.3 **与技术有关的补偿。**

    （a）  若普利茂斯提供给公司使用的技术违反、侵犯、或以其他方式抵触任何第三方的知识产权，且该等第三方提起了起诉、诉讼、程序、庭审、调查或索赔请求（任一项，"索赔请求"），普利茂斯同意补偿公司和其相应的关联方、董事，负责人，雇员和代理的损失并使上述各方不受损失，并支付因对索赔请求进行抗辩及/或对方和解，或法庭最终裁决的赔偿金或成本费用（包括但不限于合理的律师费和开支）。上述补偿的条件是主张补偿的一方应(i)尽快就索赔请求向普利茂斯发出通知（但未能通知并不代表解除普利茂斯在<u>第 5.3 条</u>中的义务，除非普利茂斯已实际受到该等义务的影响)；(ii)给予普利茂斯全部授权、所有资料和协助以抗辩索赔请求；及(iii)给予普利茂斯抗辩以及为达成妥协和解所进行的谈判的控制权；但是，若索赔请求是由于如下原因发生的，则普利茂斯不对索赔请求承担责任：(x)普利茂斯或其代表以外的其他人员对普利茂斯单独知识产权的有形载体的修改；或(y)单独知识产权或其有形载体与非由普利茂斯或其代表提供的装置、数

3

*技术转让协议书- 签字本*

据或程序进行的组合、运行或使用。

(b)    若本第 5.3 条规定的应予补偿的索赔请求已经发生，或普利茂斯认为上述索赔请求可能发生，则普利茂斯可自付费用: (i)根据索赔请求，为公司取得继续使用技术的权利; (ii)替换或修改技术，以使不再侵权; 或(iii)如果上述选择并不合理可行，则立即终止公司使用本协议项下的被指控的技术。如果发生上述第(iii)款规定的公司使用技术权利的终止，则或者(x) 减少当时依据《股权投资协议》第三条作为普利茂斯技术出资的金额，该减少金额（"减资金额"）应等于被指控侵权的技术的价值; 或者(y) 普利茂斯应以现金或公司股东一致同意的其他资产向公司缴付相当于减资金额的出资。本第 5.3(b)条是对第 5.3(a)条的补充。

(c)    以本第 5.3 条为目的，普利茂斯的单独知识产权包括普利茂斯（或其关联方）在本协议项下为合资项目提供的任何技术及其他知识产权，无论普利茂斯或其关联方是否拥有或被许可使用该等技术及其他知识产权。

(d)    即使本协议有相反规定，若未得到公司的事先同意（公司不可不合理拒绝或拖延答复），普利茂斯在任何情况下不得就任何索赔请求与对方达成和解或妥协。

5.4    保护技术。如果普利茂斯或公司有理由相信第三方在中国境内可能对技术构成侵权，则应当立即通知另一方。普利茂斯可以自主决定并自付费用选择通过法律诉讼或其他手段保护技术，公司应合理地与普利茂斯合作，其费用由普利茂斯负担。


第六章 信息保密

《股权投资协议》第八十条的规定（包括相关定义）应适用于本协议，如同本协议中已作出相同规定且对本协议当事人适用。


第七章 不可抗力

7.1.    不可抗力通知。主张不可抗力事件的一方应在发生不可抗力事件后以口头方式尽早通知对方，除此之外，还应在发生不可抗力事件后五（5）天内向对方发出书面通知。

7.2.    不能或延迟履行。若一方不能或延迟履行本协议是由于不可抗力事件造成的，则该方对另外一方不承担责任。若发生不可抗力事件，受影响的一方应尽合理的商业努力以避免履行不能或延迟履行。双方理解并同意，本 8.2 条的规定并不要求遇有困难的一方在其认为失策时，以同意反对方的要求的方式来平息罢工、停工或产业纠纷或骚乱，即使该方拥有此等同意的权

4

*技术转让协议书·签字本*

利。

## 第八章 争议解决

为以非正式的友好的方式解决因本协议的解释或履行（包括但不限于以下事项：可仲裁性、剥夺资格、时效、存续、有效期及终止）而产生的或与解释或履行本协议有关的任何主张或争议（简称"争议"），《股权投资协议》第八十六条的规定（包括任何相关的定义）应适用于本协议及本协议规定的争议，如同其也是本协议的条款，适用于本协议各方，而不是诉诸诉讼方式。

## 第九章 其他条款

9.1. 约束力；转让；特定通知。本协议应对各方和各方各自的继承者，许可的受让人具有约束力。未得到普利茂斯事先书面同意之前，公司不得转让、再许可或以其他方式转让（直接或间接地，通过法律规定操作或其他方式）其在本协议项下的任何权利或义务，否则任何该等转让均属无效。

9.2. 通知。本协议所要求或允许作出的通知应是书面的并且通过专人送达，公共或私人昼夜邮递服务或通过传真，电传或电报交付至收件方如下通信地址，直至不时更改并通知对方：

如寄至公司：

普利茂斯永乐胶带（上海）有限公司
地址：上海市松江工业区石湖荡分区闵塔南侧
传真：
联系人：肖文龙

如寄至普利茂斯：

Plymouth Rubber Co., Inc.

地址：    104 Revere Street
         Canton, MA 02021, USA

传真：781-828-9142

联系人：Maurice J. Hamilburg

并寄一份复印件至：

君合律师事务所纽约分所

Jun He Law Offices

5

*技术转让协议书 签字本*

500 Fifth Avenue, Suite 1930

New York, NY 10110

联系人：周晓林律师

传真：212-703-8720

如寄至雅利：

Awesome Profits Limited

地址：□□□□□□□□□□88□

传真：(86) 3123975999

联系人：王凤

视为通知送达的日期应按如下规定确定：

1.　通过信使或昼夜邮递服务，则交付的日期即视为送达日期；或

2.　通过确认的电传，传真或电报的方式，则发出日后的第一个工作日被视为送达的时间。

每一方都有权经事先提前十(10)日书面通知其他方变更其地址。

9.3.　全部协议；弃权；修订；副本。本文件及其附件阐明了各方就本协议所涉及内容达成的全部协议和一致谅解，且包括了各方在此之前的所有讨论。各方达成一致如下：

（a）　没有一方系因依赖于另一方未在本协议或《股权投资协议》中明述或引述的声明、保证或承诺而达成本协议；

（b）　任何一方不应就本协议的内容享有本协议或《股权投资协议》所没有规定的权利或救济；及

（c）　本条款不排除因一方的欺骗或虚假声明而应承担的责任。

任何有关本协议的修订须以书面形式完成，并由协议各方签字，并提交审批机关批准（如需要）。一方未能行使或延迟行使本协议项下的权利不代表其放弃权利，一方单独或部分行使该权利也不排除其进一步行使其他权利；但是，任何一方可以其签字生效的书面形式(i)延长另一方执行任何协议、契约项下义务的履行期限；(ii)对另一方在本协议项下或根据本协议送达文件中所作担保的任何错误放弃权利；(iii)放弃对本应由另一方履行的本协议项下协议或契约的义务的主张；或(iv)放弃成就其在本协议项下义务的先决条件。协议任何一方或各方放弃对协议条款一项违约的权利并不代表或被

6

*技术转让协议书 签字本*

认为放弃对其他任何或随后违约的权利。本协议可同时签署多份副本，每份副本均被视为原件，但所有副本构成同一个文本。

**9.4.** 遵守法律。协议各方同意在其各自履行本协议过程中遵守所有对其适用的法律和法规。

**9.5.** 语言。本协议分别用中文和英文书就。两种文本具有同等法律效力。若上述两种文本存在差异，各方应尽力通过友好协商的方式解决。如果友好协商不能解决，应按本协议第八章的规定处理。各方应各持每种文本的一份原件。

**9.6.** 适用法律。本协议受中华人民共和国法律管辖，并根据中华人民共和国法律进行解释。

**9.7.** 出口控制。各方同意依据本协议提供的技术和各方各自的义务可能会受到普利茂斯注册地国家有关出口控制的法律和法规的限制。

本协议各方已于本协议文首列明之日期由正式授权代表正式签署本协议。

普利茂斯永乐胶带（上海）有限公司

签字：

姓名：王凤

职务：董事长

**Plymouth Rubber Co. Inc.**

签字：

姓名：

职务：

雅利有限公司（就第 3.2 条）

签字：

姓名：王凤

职务：董事长

7

*技术转让协议书·签字本*

## 附件 A

## 技术

1. **综述。**按本协议将由普利茂斯转让给公司的技术包括其所有与设计和生产 PVC 胶带有关的技术信息，包括但不限于：配方、概念、产品设计、工程数据、图纸、图表和其他文件，运营经验、方法、技巧，物料规格、成本数据、性能数据、其他规格、质量控制、培训程序和其他管理技能、销售、营销项目、和其他商业秘密、信息和文件，无论上述信息是以何种方式体现（包括口头披露），也无论其是否获得/或能够获得专利或其他形式的法律保护：

   - PVC 汽车线束胶带
   - PVC 电工胶带
   - PVC 消磁线圈胶带
   - PVC 标识胶带
   - PVC 管路胶带
   - PVC 无胶汽车线束胶带

2. **转让物和转让时间表**
   普利茂斯将提供给公司与生产如下产品相关的信息：
   A. 原材料技术：（生效日后 14 天内）
      - 批准的供应商名单
      - 生产如下产品的原材料清单：
         o 弹性 PVC 膜
         o 底胶
         o 面胶
         o 乙烯保护纸
      - 原材料规格
      - 材料的安全数据单
      - 进厂原材料测试工序
   B. 如下产品的所有配方：（生效日后 14 天内）
      - PVC 膜
      - 底胶
      - 面胶
   C. 如下产品的生产工艺规范：（生效日后 14 天内）
      - PVC 膜
      - 底胶
      - 面胶
      - 不同 PVC 胶带：
         o 压敏 PVC 胶带
         o PVC 无胶汽车线束胶带
         o PVC 保护片

8

*技术转让协议书 签字本*

- 所有生产程序在线测试方法

D. 如下产品的初期生产中的技术支持：（按双方协定的期限，但不超过生效日后 180 天）
   - PVC 膜
   - 底胶
   - 面胶
   - PVC 无胶汽车线束胶带
   - PVC 保护片

E. 客户指定：（生效日后 14 天内）

F. 成品测试工序和产品规格：（生效日后 14 天内）

G. 如下产品的设备技术：（在华夏或公司的员工访问普利茂斯期间，但最迟不超过生效日后 60 天）
   - 面胶合成
   - 底胶合成
   - 生产 PVC 无胶汽车线束胶带
   - 生产 PVC 保护片
   - 生产开槽胶带
   - 开槽胶带机械的图纸，如果有
   - 面胶机械的图纸，如果有
   - 实验室设备
   - 高温炉结构图以及控制条件

H. 质量控制系统的技术资料（生效日后 14 天内）