**Execution Copy**

[**Appendix** B to the Equity Investment and Transfer Agreement]

# SALES AND DISTRIBUTION AGREEMENT

## BY AND AMONG

## PLYMOUTH RUBBER CO. INC.

### AND

## HEBEI HUAXIA ENTERPRISE CO., LTD.

### AND

## PLYMOUTH YONGLE TAPE (SHANGHAI) CO., LTD.

### AND

## AWESOME PROFITS LIMITED

Dated as of December 22, 2004

## SALES AND DISTRIBUTION AGREEMENT

**This Sales and Distribution Agreement** (this "Agreement") is made this December 22, 2004, by and among Plymouth Rubber Co. Inc., a corporation existing under the laws of the Commonwealth of Massachusetts, United States of America, with a place of business at 104 Revere St., Canton, MA 02021 ("Plymouth"), Hebei Huaxia Enterprise Co., Ltd., a company established under the laws of the People's Republic of China, with a place of business at 88 Yongle Boulevard, Zhuozhou City, Hebei Province, China, Postal Code: 072750 ("Huaxia"), Plymouth Yongle Tape (Shanghai) Co., Ltd., a foreign invested enterprise under the PRC laws (the "JVC"), and Awesome Profits Limited, a corporation organized and existing under the laws of British Virgin Islands ("Awesome").

**WHEREAS**, the JVC was formed pursuant to an equity investment and transfer agreement between Plymouth and Awesome, dated as of December 22, 2004 (as the same may be amended from time to time in accordance with its terms, the "**Equity Investment and Transfer Agreement**"), for the purpose of manufacturing and selling PVC tape products ("Products", as defined below) on the terms and subject to the conditions of the Equity Investment and Transfer Agreement and any other written agreements that the Company enter into with any other relevant parties;

**WHEREAS**, pursuant to the Equity Investment and Transfer Agreement, the parties thereto intend to enter into and cause their applicable Affiliates to enter into an agreement to regulate the sale and purchase of the Products by the Parties and their Affiliates;

**WHEREAS**, both Plymouth and Huaxia possess and control certain know-how, technology, experience and expertise relating to the design, manufacturing and marketing of the Products (as defined below);

**WHEREAS**, Plymouth and Huaxia desire to jointly operate the JVC to design, manufacture and market the Products;

**WHEREAS**, it is the intent of the Parties that they will use their best efforts to benefit from collaboration in technology and marketing expertise rather than competing with each other in the Markets (as defined below); and

**WHEREAS**, the Parties desire to enter into this Agreement to set forth their agreement of collaboration and non-competition among each other.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and of other good and lawful consideration, the Parties hereto agree as follows:

### Section I     Definitions

In this Agreement, the following capitalized words and expressions have the following meanings, whether used in the singular or plural.

1

1.1    **Affiliate** shall have the same meaning as such term is defined in the Equity Investment and Transfer Agreement.

1.2    **Automotive Market** includes companies who produce wire harnesses for any vehicles including cars, trucks, motorcycles, or any other motorized vehicle. This does not include the car companies themselves unless the car companies also make wire harnesses.

1.3    **Confidential Information** includes but without limitation, all technical, economic, financial and marketing information, however embodied, owned or controlled by either Party, hereunder supplied to or obtained by the other Party whether in writing, orally or by observation, and whether or not marked as confidential, relating generally to the Products or to the proprietary aspects of the business of a Party that may have been disclosed in connection with the negotiation or the implementation of this Agreement, or that is, for any reason, identified by a Party as confidential.

1.4    **Direct Sales** means sales made by Huaxia, Plymouth, or the JVC directly to the user of the Products. For instance, sales from the JVC to Delphi are direct sales.

1.5    **Effective Date** means the date that the business license of the JVC is reissued pursuant to the Equity Investment and Transfer Agreement.

1.6    **Equity Transfer** shall mean the transfer of the equity interest in the JVC from Awesome Profits Limited to Plymouth pursuant to the Equity Investment and Transfer Agreement between the parties.

1.7    **Huaxia** means Hebei Huaxia Enterprise Co., Ltd., including its Affiliates but excluding the JVC.

1.8    **Indirect Sales** means sales made by Huaxia, Plymouth, or JVC to a distributor of any type who resells the product to the user of the tape. This includes sales to companies who cut and pack the tape and then sell it to the user of the tape. We call companies who cut and pack tape "converters". If Huaxia sold tape to a distributor who resold the tape to Delphi, this would be an indirect sale to the automotive market. The distributor may or may not be in the same region as the end-user. This includes trading companies who may buy from Huaxia, Plymouth, or JVC and sell to distributors or end-users.

1.9    **JVC** means Plymouth Yongle Tape (Shanghai) Co., Ltd., a foreign invested enterprise to be jointly owned by Plymouth and Awesome Profits Limited.

1.10    **Markets** refer to the markets for the Products, including Automotive and Non-Automotive Markets in Region 1, Region 2 and Region 3.

1.11    **Non-Automotive Market** includes all customers who are not wire harness manufacturers. It includes companies such as degaussing coil manufacturers, construction

2

companies, power companies, telecommunication companies, electrical contractors, industrial factories (excluding wire harness factories), etc.

1.12    **Party(ies)** shall mean as the case may be, Plymouth, Huaxia, Awesome and the JVC, individually, two, three or all four collectively.

1.13    **Plymouth** shall mean Plymouth Rubber Co. Inc., including its Affiliates but excluding the JVC.

1.14    **Region 1** includes all of North America, Central America and South America.

1.15    **Region 2** includes all countries in Europe plus all of Russia, all of Turkey, all of Africa, and the Middle East.

1.16    **Region 3** includes all of Asia with the exception of the Middle East and Turkey. It also includes Australia and New Zealand and countries normally included in "Oceania".

1.17    **Products** include any and all PVC tape products manufactured or sold by Huaxia, Plymouth and the JVC.

1.18    **Technology** shall mean all technical information related to the design and production of the Products possessed by a Party, including without limitation, formulations, concepts, product designs, engineering data, drawings, schematics, and other documents, operating experience, methods and techniques, material specifications, cost data, performance data and other specifications, quality control, training procedures and any other business secrets, information and documents, in each and every case in any form (including oral disclosures) and whether or not patentable or susceptible to any other form of legal protection, relating in any way to the Products.

1.19    **Technology Transfer Agreement** shall mean the Technology Transfer Agreement that Plymouth will enter into with the JVC and under the terms and conditions of which Plymouth agrees to transfer its Technology to the JVC as its contribution of registered capital.

## Section II    General Principles

The Parties acknowledge that it is their intent to collaborate with each other as partners, not to compete with each other as competitors, and they agree to the following general principles (hereinafter "General Principles"):

2.1    **Non-Competition:**

(i)     While Plymouth and Huaxia each has substantial sales of the Products, the worldwide market for the Products is very large, and the Parties will concentrate on expanding sales as partners, not on competing with each other.

(ii)    Plymouth, Huaxia and the JVC will use their best efforts to avoid competing with each other. Competition will be directed at other manufacturers of same or similar products such as 4 Pillars, Globe, Nitto, Achem, 3M, etc.

(iii)   Plymouth, Huaxia and the JVC will respect each other's customers and avoid competing directly or indirectly at each other's existing customers. Plymouth, Huaxia and the JVC agree to coordinate their marketing activities and openly exchange information on customer inquiries or opportunities to avoid competing with each other.

(iv)    Plymouth, Huaxia and the JVC will use their best efforts to insure that their quotations or sales do not disrupt the profitability of the existing sales and markets of the other parties.

(v)     Whenever a conflict arises, Plymouth, Huaxia and/or the JVC will use their best efforts to resolve such conflicts in a fair and reasonable manner.

2.2   **Technology.**  The Parties agree that they shall have the right to use each other's Technology.  However, none of the Parties shall have the right to sublicense the right to use such Technology of the other Party to any other party. The right of Plymouth and Huaxia to use the Technology of each other shall expire in the event of the expiration or termination of the JVC for any reason.

### Section III    Sales of the Products

The parties agree to the following outline for sales of the Products subject to the General Principles specified in Section II above.

3.1   **Automotive Market in Region 1**

(i)     Plymouth may sell to this Market/Region without restrictions except those in the "General Principles".

(ii)    Huaxia cannot sell directly or indirectly to any harness company. If such sales, including sales through Chinese trading companies, are discovered, Plymouth and Huaxia will meet to discuss the situation and find an acceptable solution to avoid any further competitive situations.

(iii)   Periodically Plymouth will provide Huaxia a list of companies it considers to be indirect sellers to the automotive industry to help Huaxia avoid accidental violations of this section.

(iv)    If Huaxia receives an inquiry from a customer, other than harness companies or distributors to harness companies, for a product that appears by its physical properties and/or packaging and/or specification to be intended for the automotive market, it will contact Plymouth to clarify whether or not this is for the automotive market.

(v)     The JVC cannot sell any Product directly or indirectly to this Market/Region except through Plymouth.

4

3.2    **Automotive Market in Region 2**

(i)     Both Plymouth and Huaxia can sell to this Market/Region without restrictions except those in the "General Principles."

(ii)    Plymouth and Huaxia agree to notify the other of any special products and/or specifications where they are the only or dominant supplier to avoid accidentally selling to the other's customers.

(iii)   The JVC cannot sell any product directly or indirectly to this Market/Region except through Plymouth.

3.3    **Automotive Market in Region 3**

(i)     Plymouth cannot sell any Products directly or indirectly to this Market. All Plymouth sales to this Market/Region will be through the JVC. Plymouth will use its best efforts, but will be allowed a reasonable amount of time, to transfer its business with its existing customers to the JVC as soon as practical. If any conflicts arise, the parties will meet to resolve the issues fairly. If Plymouth has used its best efforts to move the customer to the JVC, but such customer refuses, Plymouth may continue to sell to the customer without this restriction. Plymouth must continue to use its best efforts to transfer the customer to the JVC.

(ii)    Huaxia cannot sell any Product directly or indirectly to this Market/ Region for customers listed on **Exhibit A** attached hereto, and the Parties shall notify each other of any changes to the list as it is adjusted from time to time, if necessary, to reflect changes in the market, mergers, acquisitions, spin-offs, or corporate or divisional name changes involving the companies listed therein. Huaxia will use its best efforts, but will be allowed a reasonable amount of time, to transfer its business from the customers listed on **Exhibit A** to the JVC as soon as practical. If any conflicts arise, the parties will meet to resolve the issues fairly. If Huaxia has used its best efforts to move the customer to the JVC, but the customer refuses, Huaxia may continue to sell to the customer without penalty. Huaxia must continue to use its best efforts to move the customer to the JVC.

(iii)   Huaxia can sell its Products, either directly or indirectly to other wire harness customers not listed on **Exhibit A.**

(iv)    Subject to the General Principles, the JVC can sell its Products to this Market/Region without restrictions.

3.4    **Non-Automotive Market in Region 1**

(i)     Plymouth can sell its Products to this Market/Region without restrictions except those in the "General Principles."

(ii)    Huaxia can sell its Products to this Market/Region without restrictions except those in the "General Principles" and except in regard to the Plymouth Products known as Premium 37, Premium 111 or Premium 85. If Huaxia's existing Technology and Plymouth's existing Technology are NOT substantially the same in respect of formulation, specifications and performance, Huaxia cannot use

5

Plymouth Technology to produce these Products under any customer's brand name.

(iii) The JVC cannot sell its Products to this Market/Region except through Plymouth. In regard to Plymouth Products known as Premium 37, Premium 111 or Premium 85, the JVC cannot use Plymouth Technology to produce these Products under any customer's brand name.

3.5 **Non-Automotive Market in Region 2**

(i) Plymouth can sell its Products to this Market/Region without restrictions except those in the "General Principles".

(ii) Huaxia can sell its Products to this Market/Region without restrictions except those in the "General Principles" and except in regard to the Plymouth products known as Premium 37, Premium 111 or Premium 85. If Huaxia's existing Technology and Plymouth's existing Technology are NOT substantially the same in respect of formulation, specifications and performance, Huaxia cannot use Plymouth Technology to produce these Products under any customer's brand name.

(iii) The JVC can sell to this Market/Region without restriction except those in the "General Principles" and except in regard to the Plymouth Products known as Premium 37, Premium 111 or Premium 85. The JVC may not use Plymouth Technology to produce these Products under any customer's brand name.

3.6 **Non-Automotive Market in Region 3**

(i) Plymouth can sell its Products to this Market/Region without restrictions except those in the "General Principles."

(ii) Huaxia can sell its Products to this Market/Region without restrictions except those in the "General Principles" and except in regard to the Plymouth Products known as Premium 37, Premium 111 or Premium 85. If Huaxia's existing Technology and Plymouth's existing Technology are NOT substantially the same in respect of formulation, specifications and performance, Huaxia cannot use Plymouth Technology to produce these Products under any customer's brand name.

(iii) The JVC can sell to this Market/Region without restrictions except those in the "General Principles" and except in regard to the Plymouth Products known as Premium 37, Premium 111 or Premium 85. The JVC cannot use Plymouth Technology to produce these Products under any customer's brand name.

3.7 If the JVC fails to sell at least US$40 million of the Products for any two consecutive years beginning in Year 5 of its establishment, the following restrictions shall be removed:

(i) On the JVC – all restrictions shall be removed except those related to Plymouth Premium tapes in all regions.

(ii)    On Huaxia – all restrictions shall be removed for Regions 2 and 3 except those related to Plymouth Premium tapes. All restrictions for Regions 1 will remain in place.

3.8    Plymouth shall make payment for any Products sold to Plymouth by the Company within 60 days of the shipment of such Products, with the shipment date determined by the date that the particular shipment leaves the port as advised by carrier. Specific provisions for the payment of the Products are provided separately in the Sales and Payment Agreement among the Parties.

### Section IV    Purchases of the Products

4.1    **Huaxia.** Huaxia is under no obligation to purchase any Products from the JVC. Huaxia may purchase Products from the JVC under the following circumstances:

(i)    The JVC has available capacity;

(ii)    Such purchases will not interfere in any way with the JVC's sales to Plymouth or any of its own customers;

(iii)    The price shall be based on the same formula as sales to Plymouth (reference made to Sections 4.2(i) and (ii)); and

(iv)    Sales of these Products do not conflict with the Market/Region restrictions above.

4.2    **Plymouth**

(i)    Plymouth may purchase up to 100% of its requirements of the Products at a price based on the formula (material cost plus 50%)

(ii)    If the above formula yields prices to Plymouth that are uncompetitive in the marketplace, and Plymouth can demonstrate by reasonable evidence or intelligence that other manufacturers are selling at lower prices, the JVC will reduce its price to the competitive level, but no less than a price equal to material costs plus 40%.

(iii)    The parties agree to use their respective best efforts to continuously lower material costs so as to keep the JVC and Plymouth competitive in the marketplace.

(iv)    In the event that the JVC is unable to satisfy Plymouth's requirements, Plymouth may purchase tapes from Huaxia at the same price as from the JVC.

4.3    **The JVC**

Until JVC is able to produce tape in acceptable quantity and quality, the JVC may purchase the Products from Plymouth and/or Huaxia at the price to be agreed upon among the Parties.

7

### Section V     Confidentiality

5.1   The Parties understand and acknowledge that in effecting the arrangements in furtherance of the business relationship contemplated hereunder, the Parties may disclose and make available certain Confidential Information to each other.

5.2   The Parties acknowledge that the Confidential Information contains valuable trade secrets and is not generally available to the public and each of the Parties agrees to maintain the confidentiality of the Confidential Information of the other Parties in the same manner as it protects its own confidential information.

5.3   The provisions of this Section V shall not apply to confidential information to the extent that:

(i)   such information was generally known or otherwise in the public domain prior to disclosure hereunder, or becomes so known subsequent to such disclosure through no fault of the receiving Party;

(ii)   such information was received without restriction from a third party not under an obligation to the non-receiving Party not to disclose it and otherwise not in violation of the non-receiving Party's rights; or

(iii)   such information is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that the disclosing Party shall provide prompt notice thereof to the non-disclosing party to enable such Party to seek a protective order or otherwise prevent such disclosure.

(iv)   such information was developed independently by the Parties without use of the confidential information of the disclosing Party.

(v)   such information was known by a Party prior to its disclosure by the other Party.

5.4   The Parties shall safeguard the Confidential Information and any copies thereof in its possession during this Agreement against unauthorized disclosure and use. The Parties shall take all reasonable steps to ensure that the provisions of this Agreement are not violated by any person under its control or in its service. Upon request, all copies of the Confidential Information in written, graphic or other tangible form, including all computer programs however stored or filed, shall be returned to the disclosing Party or destroyed by the receiving Party.

5.5   The undertakings in this Section V shall survive expiration or any termination of this Agreement and shall remain effective for two (2) years after any expiration or termination of this Agreement.

### Section VI  Trademarks and Logos

6.1    The Parties acknowledge that the trademarks are owned respectively by the Party listed in **Exhibit B**, as amended and supplemented from time to time. Except as provided in this Section VI, none of the Parties shall, without the prior written consent of the other Party, use in advertising, publicity, promotional materials or otherwise, any trademark, service mark, symbol, or any abbreviation, contraction or simulation thereof owned by the other Party.

6.2    For the Products that the JVC supplies to Plymouth or sells through Plymouth, Plymouth hereby grants to the JVC, and the JVC accepts from Plymouth, a non-exclusive, royalty-free right and license, during the term of this Agreement, to apply to such Products as designated by Plymouth the trademarks and trade names that Plymouth may adopt from time to time ("Plymouth Trademarks"). Nothing herein shall grant to the JVC any right, title, or interest in Plymouth Trademarks, subject to the foregoing limited license. Upon termination of this Agreement, the JVC shall cease using all Plymouth Trademarks. The JVC shall use Plymouth Trademarks only in the manner authorized by Plymouth.

6.3    Except for the above, the Parties shall enter into separate Trademark Agreements with respect to any Products that a Party manufactures and/or sells under the trademarks of another Party.


### SECTION SEVEN   INDEMNIFICATION; DISCLAIMERS OF LIABILITY

7.1    Notwithstanding any other provisions of this Agreement, a Party shall indemnify and hold harmless the other and its affiliated companies, and their respective officers, directors, employees, agents, subdistributors and customers (collectively, the "Indemnitees"), from and against all costs, expenses, claims, demands, causes of action, damages and judgments, including without limitation attorney's fees whether or not suit is actually commenced, which might be imposed upon or brought against an Indemnitee as a result of the manufacture, distribution, import, promotion, marketing, sale or offering for sale of the Products in breach of the obligations contained in Sections II to VI herein or as permitted hereunder, including but not limited to: 1) any product liability for personal injuries or death and/or property damages, or 2) any infringement of any third party's intellectual property rights. The Parties hereto further agree that the Indemnitee shall bear all costs, expenses, claims, demands, causes of action, damages and judgments, including without limitation attorney's fees whether or not suit is actually commenced, if the foregoing were caused by the Indemnitee, and the manufacturer shall have no obligation to indemnify the Indemnitee hereunder.

7.2    The Parties shall not be obligated to indemnify an Indemnitee unless:

(i)  the Party seeking indemnification gives the indemnifying Party prompt written notice of any claim for which it seeks indemnification;

9

(ii) the Party seeking indemnification cooperates with the indemnifying Party in the defense of the claim;

(iii) the indemnifying Party shall have the sole right to manage the defense of any such claim in the manner it deems advisable, including using counsel of its choice, and;

(iv) the indemnifying Party shall have the sole right to settle any such claim provided any such settlement completely releases the parties seeking indemnification, and requires no action by, or financial participation from, the party seeking indemnification.

7.3    NONE OF THE PARTIES SHALL HAVE ANY LIABILITY OF ANY KIND FOR ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGES UNDER OR AS A RESULT OF THIS AGREEMENT, EVEN IF SUCH PARTY SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE.

7.4    The provisions of this Section VII shall survive any termination or expiration of this Agreement.

## Section VIII    Term and Termination

8.1    This Agreement shall become effective upon the execution by authorized representatives of all Parties, and the re-issuance of the business license of the JVC ("Effective Date").

8.2    Unless sooner terminated in accordance with this Section VIII or by mutual written consent of the Parties, this Agreement shall continue in full force and effect so long as the JVC is in existence and Plymouth and Huaxia or any of its Affiliates are parties to the JVC ("Term").

8.3    In addition to any other rights or remedies the Parties may have under this Agreement or at law or in equity, this Agreement may be terminated prior to the expiration of its Term, by prior written notice to the other Party as follows:

(i)    By a Party, without the need for legal proceedings, in the event another Party should commit any material breach under this Agreement and should fail to remedy such breach within thirty (30) calendar days after receiving written demand therefor. If any such breach is not remedied by the end of the cure period or for any subsequent breach of the same obligation, the non-breaching Party shall have the right (but not the obligation) to terminate this Agreement forthwith, upon written notice to the breaching Party; or

(ii)    By a Party, effective immediately and without the need for legal proceedings, if any other Party should become the subject of any voluntary or involuntary bankruptcy, receivership or other insolvency proceedings except reorganization or

10

make an assignment or other arrangement for the benefit of its creditors.  In any such events, no interest shall vest in the creditors or in any court or officer that may be appointed or authorized to liquidate the affairs of such other Party.

8.4    Upon expiration or termination of this Agreement for any reason, all of the licenses of Plymouth and Huaxia granted to each other hereunder shall terminate forthwith and the licensee shall refrain from using the Trademark, Technology and the Confidential Information of the licensor, and shall return to the licensor all documents or materials relating to or containing the Confidential Information that the licensee has received from the licensor.

## Section IX    Governing Law and Dispute Settlement

9.1    This Agreement shall be governed by the laws of the People's Republic of China.

9.2    Any disputes arising from the implementation of, or in connection with, this Agreement shall be settled through friendly consultations among the Parties.  In case no settlement can be reached through consultations, the dispute shall be submitted to the Hong Kong International Arbitration Centre ("HKIAC") to be arbitrated according to its rules for international arbitration.  Such arbitration shall be held in the Special Administration Region of Hong Kong, P.R. China.  Any party may, without waving any remedy under this Agreement, seek from any court of competent jurisdiction any interim or provisional relief to protect its Confidential Information or intellectual property rights.  For purpose of this Agreement, the Parties further confirm that the foregoing provision to grant a party to seek interim or provisional relief from a court of competent jurisdiction shall not be deemed as any plan, intent, acknowledgment or agreement among the Parties to resolve their dispute arising out of or in connection with this Agreement through court litigation.

9.2    The arbitral award is final and binding on the Parties.  The Parties undertake to carry out the resulting award without delay.

9.3    During the arbitration, this Agreement except for the obligations under arbitration shall continue to be observed by the Parties.

## Section X    Miscellaneous Provisions

10.1    Awesome acknowledges that it is an Affiliate of Huaxia and any restrictions applicable to Huaxia hereunder shall equally be applicable to Awesome.

10.2    This Agreement is written in both English and Chinese languages.  Both versions shall be equally authentic.

11

10.3    None of the Parties shall assign this Agreement or any part of it to any third party without the written approval of the other Parties.

10.4    Waiver or failure by a Party to exercise any remedy for a default or breach on the part of the other Party shall not in any event be deemed a waiver of any subsequent default or breach on the part of the other Party.

10.5    This Agreement, when signed by the authorized representatives of the Parties, shall constitute the only Agreement among the Parties with respect to the subject matter, superseding all prior discussions, negotiations and agreements among the Parties. Huaxia and Plymouth shall ensure compliance with the Agreement by their respective Affiliates and violation hereof by any of their respective Affiliate shall be deemed violation by such Party. Huaxia and Plymouth shall cause the JVC to execute this Agreement immediately after the Equity Transfer takes effect.

10.6    No Amendment to this Agreement shall be effective unless reduced in writing and signed by the authorized representatives of all Parties. Should any provision of this Agreement be declared null and void for any reason whatsoever, the remaining part of this Agreement shall continue to be in full force and effect as if the voided provisions had never been written into the Agreement.

10.7    The Section headings contained in this Agreement are for reference purpose only and shall not affect in any way the meaning or interpretation of this Agreement.

10.8    This Agreement may be executed in four or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

IN WITNESS THEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.


Plymouth Rubber Co. Inc.                          Hebei Huaxia Enterprise Co., Ltd.


By: _____                             By: _____
Title: _____                          Title: _____


Plymouth Yongle Tape (Shanghai) Co., Ltd.         Awesome Profits Limited


By: _____                             By: _____
Title: _____                          Title: _____


12

**Exhibit A**

## Multinational Harness Companies

Delphi
Yazaki
Sumitomo
Lear
Leoni
AFL
Fujukura
Draxlmeier
VW
Valeo
Kromberg and Schubert

Including all subsidiaries, joint ventures, and affiliates

13

**<u>Exhibit B</u>**

**Trademarks**

**Plymouth Trademarks:**

Plymouth

Plymouth Rubber
Plymouth Bishop
Plymouth Electrical Tapes

[See more trademarks and logos in the following page]

**Huaxia Trademarks:**        See logos below.



**JVC Trademarks:**

"Yongle Plymouth" in English
and "永乐普利茂斯"in Chinese

14

# Plymouth Rubber Company
# Logos and Trademarks

**Plymouth**RubberEuropa

**Plymouth**RubberCompany

 





 





**Corporate:**
Bishop
Brite-Line
Nuñez
Plymouth
Plymouth Rubber Company
Plymouth Tape

**Products:**
ASR
Cambridge
Columbia
ColdTerm
Deltaline
GLF
Patriot
Plyarc
Plycast
Plycom
Plyduct
Plyflex
Plyglas
Plymark
Plysafe
Plyseal
Plyshield
Plysil
Plytuff
Plyvolt
Plywrap
Revere
Slipknot
Stress-Wrap

（股权投资和转让协议之附件二）

PLYMOUTH   RUBBER   CO. INC

与

河北华夏有限公司

与

普利茂斯永乐胶带（上海）有限公司

与

雅利有限公司

之

# 销售和经销协议

日期：2004 年 12 月 22 日

# 销售和经销协议

　　本销售和经销协议(下称"本协议")是由 Plymouth Rubber Co. Inc., 一家根据美国麻萨诸塞州法律组建并续存的公司，其办公地址为美国 104 Revere St., Canton, MA 02021（以下简称"普利茂斯"）和河北华夏实业有限公司，一家根据中华人民共和国法律组建并续存的公司，其办公地址为中国河北省涿州市永乐大道 88 号，邮编 072750（以下简称"华夏"），普利茂斯永乐胶带(上海)有限公司，一家根据中华人民共和国法律成立的外商投资公司(以下简称"合资公司")和雅利有限公司，一家根据英属维京群岛法律成立并续存的公司（"雅利"），于二零零四年十二月廿二 日签订。

　　鉴于，合资公司依据普利茂斯和雅利于 2004 年 12 月 22 日签订的《股权投资和转让协议》（可能根据其相关条款不时修订，"《股权投资和转让协议》"）成立，并依据《股权投资和转让协议》的条款和条件和其他有关方达成的书面协议从事生产和销售 PVC 胶带产品（"产品"，定义见下文）；

　　鉴于，根据《股权投资和转让协议》的条款和条件，《股权投资和转让协议》的双方为规范双方及其关联方对产品的销售和购买意欲达成并促使各自有关关联方达成一项协议；

　　鉴于，普利茂斯和华夏掌握和控制了某些有关设计、生产和销售产品（定义见下文）的专业技巧、技术、经验和专业知识；

　　鉴于，普利茂斯和华夏希望共同经营合资公司；

　　鉴于，本协议各方愿意精诚合作，利用各方技术和市场经验的结合实现互利互惠，而不在市场（定义见下文）上相互竞争；和

　　鉴于，本协议各方愿意签定本协议，确定各方的合作和非竞争协定。

　　因此，基于各方在此共同商定的承诺和协议以及其他良好合法的对价，各方达成协议如下：

## 第一章　　　　定义

本协议中出现的下列黑体词语，无论是以单数或复数形式，均应具有如下含义：

1.1　　**关联方** 与《股权投资和转让协议》中的"关联方"定义相同。

1.2　　**汽车市场** 包括为汽车(包括小轿车、卡车、摩托车和任何其他引擎驱动车辆)生产线束的公司。不包括汽车公司本身，除非该公司内部也生产线束。

2

1.3 保密信息 包括但不限于，根据本协议规定被提供给一方或由一方获得的，书面、口头或观察到的另一方所储存、拥有或控制的技术、经济、财务和市场信息，无论该信息是否已注有保密标志。该信息主要是指在本协议的协商和实施过程中被一方以某种原因确认为保密信息的，与产品或对方的商业专有信息有关的信息。

1.4 直接销售 指华夏、普利茂斯或合资公司直接销售产品给最终用户。例如，合资公司直接销售给DELPHI公司。

1.5 生效日 指根据《股权投资和转让协议》，合资公司营业执照重新签发之日。

1.6 股权转让 指根据《股权投资和转让协议》，雅利有限公司将其在合资公司的部分股权转让给普利茂斯。

1.7 华夏 指河北华夏实业有限公司，包括其关联方，但不包括合资公司。

1.8 间接销售 指华夏、普利茂斯或合资公司销售产品给任何形式的经销商，经销商再转售产品给最终用户。包括销售产品给经销商，再由经销商对产品进行切割和再包装，并转售给最终用户。此类经销商又称为"转换人"。如果华夏将胶带卖给经销商，经销商再卖给DELPHI，则应视为在汽车市场的间接销售。经销商与最终用户可以不在同一地区，经销商包括从华夏、普利茂斯或合资公司购买产品再销售给最终用户的贸易公司。

1.9 合资公司 指普利茂斯永乐胶带（上海）有限公司，一家根据中华人民共和国法律由普利茂斯和雅利有限公司将共同拥有的外商投资企业。

1.10 市场 指产品的市场，包括在第一区、第二区和第三区的汽车和非汽车市场。

1.11 非汽车市场 包括所有非线束生产商的顾客。包括消磁线圈生产商、建筑商、电力公司、通讯公司、电业承包商、工业工厂等等（不包括线束工厂）。

1.12 一方（各方）在不同场合可以指普利茂斯、华夏、雅利和合资公司中单一方、任两方、任三方或全部四方。

1.13 普利茂斯 应指Plymouth Rubber Co. Inc.，包括其关联方，但不包括合资公司。

1.14 第一区 包括北美、中美和南美洲所有国家。

1.15 第二区 包括欧洲所有国家和俄罗斯、土耳其、非洲和中东所有国家。

1.16 第三区 包括亚洲所有国家，除土耳其和中东。也包括澳大利亚、新西兰和通常所说的太平洋岛国。

1.17 产品 指任何和所有的由华夏、普利茂斯和合资公司生产的PVC胶带产品。

3

1.18　技术 指由一方拥有的与产品设计和制造有关的所有技术信息，包括但不限于，与产品有关的配方、概念、产品设计、工程数据、图纸、图表和其他文件，运营经验、方法、技巧、生产工序和流程，物料规格、成本数据、性能数据、其他规格、质量控制、培训程序和其他商业秘密、信息和文件，无论上述信息是以何种方式体现（包括口头披露），也无论其是否获得/或能够获得专利或其他形式的法律保护。

1.19　技术转让协议 应指普利茂斯将与合资公司签订的《技术转让协议》，根据此协议的条款条件普利茂斯同意将其技术转让给合资公司，以作为其注册资本出资。

## 第二章　　　通行原则

协议各方确认，彼此都意于与他方合作而非竞争，并就此目的达成通行原则如下（以下简称"通行原则"）：

2.1　不竞争：

　　　(i)　尽管普利茂斯和华夏均销售大量的产品，但该产品的世界市场容量巨大，两家公司应集中资源组成合作关系扩大各方的销售额，而不是彼此竞争。

　　　(ii)　普利茂斯、华夏和合资公司将尽量避免彼此之间的竞争。竞争应转向针对相同或相似产品的其他制造商，例如 4 Pillars, Globe, Nitto, Achem, 3M 等等。

　　　(iii)　普利茂斯、华夏和合资公司将尊重彼此的客户资源，避免直接或间接地销售给对方的现有客户。普利茂斯、华夏和合资公司同意将协调各自的营销活动，公开交换彼此收到的客户询问和商业机会，以避免彼此之间的竞争。

　　　(iv)　普利茂斯、华夏和合资公司将尽最大努力保证其各自向客户所提的报价不损害其他方现有的市场和销售的利润率。

　　　(v)　如果出现利益冲突，普利茂斯、华夏和/或合资公司将尽量以合理和公平的方式解决问题。

2.2　技术。各方在此同意，每一方均有权使用其他方的关于 PVC 胶带的技术，但任何一方不得将该技术分许可给三方之外的第四方。普利茂斯与华夏之间在此相互使用对方技术的权力将随合资公司的终止（无论是何种原因）而结束。

## 第三章　　　产品的销售

根据第二章所规定的通行原则，各方同意遵守如下的产品销售方案：

3.1　第一区的汽车市场

　　　(i)　只要符合通行原则的规定，普利茂斯可以在本市场/地区内自由销售。

4

    (ii)    华夏不能直接或间接地销售给任何线束公司。如果发现存在这类销售，包括通过中国贸易公司的销售，普利茂斯和华夏将进行面议，寻找解决办法，避免进一步的竞争发生。

    (iii)   普利茂斯将不时向华夏提供一份其认为属于对汽车市场间接销售的公司的名单，以帮助华夏避免发生违反本章规定的情况。

    (iv)   如果华夏从非线束公司亦非其经销商的客户处接到物理性能和/或外观和/或规格类似汽车产品的询问，华夏应立即通知普利茂斯以澄清该产品是否属于汽车市场。

    (v)    合资公司不能直接或间接地销售产品给本市场/地区，所有销售必须经过普利茂斯。

### 3.2    第二区的汽车市场

    (i)    只要符合通行原则的规定，普利茂斯和华夏均可以在本市场/地区内自由销售。

    (ii)   普利茂斯和华夏同意如果其属于某一特定产品在本市场/地区唯一或最大的供应商，则其应该将该特定产品或规格告知对方，以避免将产品销售给对方的客户。

    (iii)   合资公司不能直接或间接地销售产品给本市场/地区，所有销售必须经过普利茂斯。

### 3.3    第三区的汽车市场

    (i)    普利茂斯不能直接或间接对本市场/地区销售产品，其所有销售必须经过合资公司。普利茂斯将尽在一段许可的时间内将它与现存的客户的业务尽快转移给合资公司。如果出现任何利益冲突，各方将进行面议，寻找公平的解决办法。如果普利茂斯已经尽力将客户转移给合资公司，但客户拒绝该转移，普利茂斯可以继续向该客户照常供货。普利茂斯必须继续努力将该客户转移给合资公司。

    (ii)   华夏不能直接或间接销售产品给附件一中所列的本市场/地区的客户，该客户如果发生并购重组、分拆、公司或部门名字的变更，各方有义务将变更的客户名单通知他方。华夏将尽量在一段许可的时间内将它与附件一中现存的客户的业务尽快转移给合资公司。如果出现任何利益冲突，各方将进行面议，寻找公平的解决办法。如果华夏已经尽力将客户转移给合资公司，但客户拒绝该转移，华夏可以继续向该客户照常供货。华夏必须继续努力将该客户转移给合资公司。

    (iii)   华夏可以向未列入附件一的线束客户直接或间接地销售产品。

    (iv)   只要符合通行原则的规定，合资公司可以自由地在本市场/地区内销售其产品。

### 3.4    第一区的非汽车市场

(i)　　　只要符合通行原则的规定，普利茂斯可以在本市场/地区内自由地销售产品。

(ii)　　只要符合通行原则的规定，华夏可以在本市场/地区内自由地销售除普利茂斯 Premium 37、 Premium 111 和 Premium 85 以外的产品。如果华夏现有的技术和普利茂斯现有的技术在配方、规格和性能上有实质上的差别，则华夏不能用普利茂斯技术生产任何其他品牌的代加工产品。

(iii)　合资公司只能在本市场/地区内通过普利茂斯销售产品。对于普利茂斯 Premium 37、 Premium 111 和 Premium 85 产品，合资公司不能利用普利茂斯技术生产任何品牌的代加工产品。

3.5　　第二区的非汽车市场

(i)　　　只要符合通行原则的规定，普利茂斯可以在本市场/地区自由地销售产品。

(ii)　　只要符合通行原则的规定，华夏可以在本市场/地区内自由地销售除普利茂斯 Premium 37、 Premium 111 和 Premium 85 以外的产品。如果华夏现有的技术和普利茂斯现有的技术在配方、规格和性能上有实质上的差别，则华夏不能用普利茂斯技术生产任何其他品牌的代加工产品。

(iii)　只要符合通行原则的规定，合资公司可以在本市场/地区内自由地销售除普利茂斯 Premium 37、 Premium 111 和 Premium 85 以外的产品。合资公司不能用普利茂斯技术生产任何其他品牌的代加工产品。

3.6　　第三区的非汽车市场

(i)　　　只要符合通行原则的规定，普利茂斯可以在本市场/地区自由地销售产品。

(ii)　　只要符合通行原则的规定，华夏可以在本市场/地区内自由地销售除普利茂斯 Premium 37、 Premium 111 和 Premium 85 以外的产品。如果华夏现有的技术和普利茂斯现有的技术在配方、规格和性能上有实质上的差别，则华夏不能用普利茂斯技术生产任何其他品牌的代加工产品。

(iii)　只要符合通行原则的规定，合资公司可以在本市场/地区内自由地销售除普利茂斯 Premium 37、 Premium 111 和 Premium 85 以外的产品。合资公司不能用普利茂斯技术生产任何其他品牌的代加工产品。

3.7　　如果合资公司在成立后第五年起连续两年产品销售额达不到四千万美元，如下的销售限制条款应解除：

(i)　　　针对合资公司——除了保留对普利茂斯 Premium 产品在所有市场/地区的限制，合资公司可以不受限制地销售产品。

(ii)　　针对华夏——除了保留对普利茂斯 Premium 产品的限制，华夏可以不受限制地在第二区和第三区销售产品。第一区的所有限制将保留。

3.8   公司向普利茂斯销售的产品，普利茂斯应在公司货物发运之日起 60 日内付款，发运
日期以货运公司提供的该批货物离港日期为准。有关货款支付的具体约定参见各方另行签
订的《销售付款协议》。

第四章      购买产品

4.1   华夏。华夏没有任何向合资公司购买产品的义务。华夏在如下情况下可以向合资公
司购买产品：

(i)      合资公司尚有剩余生产能力；
(ii)     该购买不影响合资公司向普利茂斯或其自身的顾客销售产品；
(iii)    该购买的定价模式与合资公司卖给普利茂斯同类产品的定价模式一致（参见
         第 4.2 条(i)款和(ii)款）；和
(iv)     该购买不违反上述市场/地区销售限制条件。

4.2   普利茂斯。

(i)      普利茂斯可以按原材料价格再加百分之五十的定价完成其所被要求的全部产
         品购买额度。
(ii)     如果按上述定价模式所给予普利茂斯的产品价格在市场上没有竞争力，且普
         利茂斯能拿出合理证据或情报表明其他生产商正以低于该定价的价格销售产
         品，则合资公司将降低其卖给普利茂斯的产品价格到同等程度，但在任何情
         况下都不应少于其原材料价格再加上百分之四十。
(iii)    各方同意持续尽力降低其原材料成本，以保证合资公司和普利茂斯在市场具
         有竞争力。
(iv)     如果合资公司不能满足普利茂斯的要求，普利茂斯可以向华夏以同样的价格
         购买产品。

4.3   合资公司。

在合资公司自身可以生产在数量和质量上都可被接受的胶带产品前，合资公司可以
向普利茂斯和/或华夏以各方确认的价格购买产品。

第五章      保密义务

5.1   各方理解并承认在实施和深化本协议所架构的业务关系过程中，各方都可能向其他
方透露或提供某些保密信息。

5.2   各方承认保密信息包含某些通常不为公众所知悉的有价值的商业机密，各方同意将
以保护自己的保密信息的方式保护其他方的保密信息。

5.3   本第五章的规定不适用以下保密信息：

7

(i)    在根据本协议被透露前已经被公众知悉的资料和并非由于接受方的过错而被公众知悉的资料；

(ii)   接受方从不受保密义务限制的第三方处合法获得或知晓的资料；

(iii)  根据法院、政府机关或其他政府部门的要求而披露的信息，但条件是披露方立即通知被披露方，以便其申请保护令以防止该披露发生。

(iv)   接受方在没有使用任何本协议下获得的信息的情况下预先已经开发的资料；

(v)    在披露方披露给接受方以前已经被第三方知悉的信息。

5.4    协议各方应对其在本协议其间保管的保密信息和其复印件尽保密之责任，不发生任何未授权的披露和使用。各方对保密信息应采取所有合理的措施以保证本协议的条款不被任何其雇佣或控制的人违背。在披露方要求的时候，接受方应将所有以书面的、图表的或其他有形载体记录的保密信息文件，包括所有以各种方式保存或归档的计算机程序归还给披露方，或将上述文件销毁。

5.5    本第五章义务在本协议有效期结束或本协议终止后两（2）年内保持有效。

第六章       商标和公司标识

6.1    协议各方同意各方对商标的所有权按不时修改和增补的附件二中所列为准。除非在本条中有其他规定，任何一方都不得在没有获得对方书面许可前在广告、公关材料、促销材料或其他地方使用对方的商标、服务标识、代号和缩写、简写和拟称。

6.2    对合资公司供应给普利茂斯或通过普利茂斯销售的产品，普利茂斯在此授予合资公司，合资公司在此接受该授予，一项非独家的、免使用费的权利和授权，在本协议有效期内在普利茂斯指定的产品上使用普利茂斯不时采纳的商标和商业名称（以下简称"普利茂斯商标"）。除了该有限授权外，此条款不应被视为授予合资公司任何针对普利茂斯商标的权利、所有权和权益。在本协议终止时，合资公司应立即停止使用所有普利茂斯商标。合资公司仅能以普利茂斯同意授权的方式使用普利茂斯商标。

6.3    除上述规定外，协议各方应单独签订针对一方以另一方名义生产和/或销售的产品的商标授权合同。

第七章       免责条款

8

7.1 无论本协议其他条款如何规定，如果在产品的生产、经销、进口、推广、市场营销、销售或兜售过程中出现违反本协议第二至第四章规定的义务的情况，包括但不限于：1）任何人身伤害或死亡和/或财产损害的产品责任；2）对任何第三方知识产权的侵犯，制造商应对经销商、其关联方以及两者各自的高级职员、董事、雇员、代理人、转销商和客户（统称"受偿方"）因上述情形引起的开销、费用、主张、要求、诉因、损害及判决，包括但不限于律师费（不论诉讼是否已经开始进行）作出赔偿，不使受偿方受到损害。但各方进一步同意，由于可归咎于受偿方的原因引起的开销、费用、主张、要求、诉因、损害及判决，包括但不限于律师费（不论诉讼是否已经开始进行）等，由受偿方自行全额承担，制造商并无义务向受偿方作出任何赔偿。

7.2 除非满足以下条件，协议各方无义务对受偿方作出赔偿：

(i) 寻求赔偿方以书面形式即时通知赔偿方其要求赔偿的主张；

(ii) 寻求赔偿方协助赔偿方进行抗辩；

(iii)赔偿方享有独有的权利采用其认为明智的方式组织抗辩，包括自行选择法律顾问。

(iv)赔偿方享有独有的权利进行和解，条件是和解协议完全解除寻求赔偿一方的责任且不要求寻求赔偿一方采取行动或承受经济负担。

7.3 任何一方不负责在本协议下或由本协议引起的任何惩罚性的、特殊的、间接的、附带的或后续性的损失或损害，尽管该方已被告知该等潜在损害的可能性。

7.4 本第七章之条款在本协议期满或终止后仍然有效。

## 第八章　　　　期限和终止

8.1 本协议经各方有权代表签字后，在合资公司营业执照重新签发之日生效（以下简称"生效日"）。

8.2 除非本协议按本第八章规定或经各方书面同意提前终止，只要合资公司一直存在，并且普利茂斯和华夏或其各自的关联方皆为合资公司的股东，本协议将一直有效（"有效期"）。

8.3 除本协议或法律或基于公平原则赋予各方的其他权利和救济外，本协议可以在有效期结束前由一方向其他两方提出事先书面通知予以终止：

(i) 一方发生严重违反本协议的行为，并且在接到书面要求三十（30）天内未采取措施纠正该违约行为，另一方不需要提起任何法律程序。如果该违约行为

9

在纠正期结束时仍然没有被纠正，或同样的违约行为再次发生，非违约方有权（但没有义务）书面通知对方终止本协议；

(ii)     一方如果发生自愿的和/或被迫的破产、接收或其他资不抵债的程序(公司重组除外)或作出有利于债权人的转让或其他安排，另一方可以立即终止本协议，无需提起任何法律程序。在此情况下，任何债权人或法庭或被指派/授权的官员均无权对另一方的财产主张拥有任何权益。

8.4     在本协议到期或因其他原因终止时，所有普利茂斯与华夏之间在此相互授与给对方的许可将立即终止，被许可方应不再使用授予方的技术和保密信息，并将所有从授予方获得的有关或包含保密信息的文件和材料交还给授予方。

## 第九章        管辖法律和争议的解决

9.1     本协议受中华人民共和国的法律管辖。

9.2     任何由本协议的执行所引起的或与本协议有关的争议应通过各方友好协商解决。如果协商不能达成协议，应将争议交给香港国际仲裁中心（"Hong Kong International Arbitration Centre"），按其国际仲裁规则进行仲裁。仲裁应在中国香港特别行政区进行。在等待仲裁庭组建及其对每一权利主张作出裁决的期间内，协议任何一方在不放弃其在本协议救济的条件下，可向任何有管辖权的法庭寻求临时救济法令，以保护其保密信息及知识产权等权利。为本协议之目的，协议各方进一步确认，该等向任何有管辖权的法庭寻求临时救济法令之约定，不应被视为协议各方计划、企图、确认或同意通过诉讼途径解决由本协议的执行所引起的或与本协议有关的争议。

9.3     仲裁裁决是终局的，对各方都具有约束力。各方应立即执行最后的仲裁裁决。

9.4     仲裁期间，各方应继续履行其除在争议事项外的其在本协议下的义务。

## 第十章        其他条款

10.1    雅利在此承认其为华夏之关联方，本协议项下所有适用于华夏之限制同样适用于雅利。

10.2    本协议以中、英两种文字书写，两种文字版本具有同样的法律效力。

10.3    除非得到另一方的书面同意，任何一方不得将本协议或其一部分转让给第三方。

10.4    一方对另一方的违约行为没有采取或放弃采取追究措施，不应被视为对另一方将来的违约行为放弃采取追究措施。

10

10.5 本协议由各方的授权代表签署，构成各方针对题述事项达成的唯一的协议，并取代双方之前的所有讨论、协商和协议。华夏和普利茂斯应促使其各自的关联方遵守本协议的条款，其关联方对本协议的违反应视为该方本身对本协议的违反。华夏和普利茂斯应令合资公司在股权转让生效后立即签订本协议。

10.6 未经各方的授权代表在书面合同修订稿上签字，所有对本协议的修订均无效。如果本协议的某条款由于某种原因被宣告无效，合同的其他条款将继续保持原有的效力，如同被确定无效的条款从未写入本协议。

10.7 本协议的标题仅为参考之目的，不影响对合同内容的理解和解释。

10.8 本协议一式肆份，或多份，每份均为原件，但所有各份共同组成一份完整的合同。

兹此，各方各自授权代表于文首列明的日期签署本协议。

Plymouth Rubber Co. Inc.

签字: _____

职位: _____

普利茂斯永乐胶带（上海）有限公司

签字: _____

职位: _____

河北华夏实业有限公司

签字: _____

职位: _____

雅利有限公司

签字: _____

职位: _____

11

附件一：

## 跨国线束公司

Delphi
Yazaki
Sumitomo
Lear
Leoni
AFL
Fujukura
Draxlmeier
VW
Valeo
Kromberg and Schubert

包括上述公司所有的子公司、合资公司和关联方。

# Plymouth Rubber Company
# Logos and Trademarks

**Plymouth**RubberEuropa

**Plymouth**RubberCompany

 





 





**Corporate:**
Bishop
Brite-Line
Nuñez
Plymouth
Plymouth Rubber Company
Plymouth Tape

**Products:**
ASR
Cambridge
Columbia
ColdTerm
Deltaline
GLF
Patriot
Plyarc
Plycast
Plycom
Plyduct
Plyflex
Plyglas
Plymark
Plysafe
Plyseal
Plyshield
Plysil
Plytuff
Plyvolt
Plywrap
Revere
Slipknot
Stress-Wrap

附件二：

# 商标

普利茂斯商标：

Plymouth 普利茂斯

Plymouth 普利茂斯橡胶
Plymouth Bishop
Plymouth Electrical Tapes 普利茂斯电工胶带

[见下页更多商标及图像标志]

华夏商标：          见下文图像标志。



合资公司商标：

英文："Yongle Plymouth"
中文："永乐·普利茂斯"