Hearing Date and Time: February 25, 2010 at 10:00 a.m., E.T.
Objection Deadline: February 18, 2010 at 4:00 p.m., E.T.

JACOB & WEINGARTEN, P.C.
2301 W. Big Beaver, Ste 777
Troy, Michigan 48084
Telephone: (248) 649-1900
Facsimile: (248) 649-2920
Howard S. Sher (*admitted pro hac vice*)
Alan J. Schwartz (*admitted pro hac vice*)

MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Ste. 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Anthony F. Shelley(*admitted pro hac vice*)
Timothy P. O'Toole(*admitted pro hac vice*)
Michael N. Khalil

Attorneys for Dennis Black, Charles Cunningham, Kenneth Hollis and The Delphi Salaried Retiree Association

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DPH HOLDINGS CORP., *et al.*, | : | Case No. 05-44481(RDD) |
| Reorganized Debtors. | : | (Jointly Administered) |

**OBJECTION OF THE SALARIED RETIREES TO MOTION OF GENERAL MOTORS LLC (F/K/A GENERAL MOTORS COMPANY) TO ENFORCE MODIFIED PLAN AND PLAN MODIFICATION ORDER**

**TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF EXHIBITS ........................................ ii

TABLE OF AUTHORITIES ........................................ iii

INTRODUCTION ........................................ 1

BACKGROUND ........................................ 4

ARGUMENT ........................................ 11

I. The Court Should Exercise Its Discretion To Abstain From Deciding Whether The Claims Asserted Against New GM In The Amended Complaint Were Released Pursuant To The Modified Plan And The Plan Modification Order ........ 11

II. If The Court Determines The Merits Of The Motion, The Court Should Deny The Motion Because The Claims Asserted Against New GM In The Amended Complaint Are Not Barred By The Exculpation And Release Provisions Of The Modified Plan And The Plan Modification Order ..... 20

A. The Salaried Retirees' Claims Asserted Against New GM Fall Outside The Scope Of The Exculpation And Release Provisions ........................ 21

1. The Exculpation Provision - Section 11.11 Of The Modified Plan, Does Not Apply Because The Claims Asserted Do Not Relate To Actions Taken In Connection With The Bankruptcy Case ... 21

2. The Release Provision - Section 11.8 Of The Modified Plan (And Section 4.01(c) Of The GSA), Do Not Apply Because The Claims At Issue Were Not In Existence On The Effective Date Of The GSA ........................ 23

B. Even If The Releases Provided For In Sections 11.8 and 11.11 Encompass The Claims Against New GM, Such Claims Would Not Be Released Because The Plan Modification Order Exempts From The Releases Claims Constituting Willful Misconduct ............. 26

CONCLUSION ........................................ 30

**TABLE OF EXHIBITS**

**EXHIBIT**

September 1, 2009, IUE-CWA Press Release ...................... A

*For Delphi Pensioners, the Union Label Helps,* NEW YORK TIMES, October 27, 2009, ............................................ B

**TABLE OF AUTHORITIES**

**CASES** **Page**

Anthony H. Murray, Jr. v. Warren County Sherriff's Dept. (In re Avtex Fibers-Front Royal, Inc.), 1991 WL 254680 (E.D. Penn. 1991) .......... 19

Barrett v. United States, 689 F.2d 324 (2d Cir. 1982) .......... 25

Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468 (1980) .......... 18

In re DBSD N.Am., Inc., Case No. 09-13061, 2009 Bankr. LEXIS 3341 (Bankr. S.D.N.Y. Oct. 26, 2009) .......... 21

In re Bradlees Stores, Inc., 311 B.R. 29 (Bankr. S.D.N.Y. 2004) .......... 13

In re Granite Broad, Corp., 389 B.R. 120 (Bankr. S.D.N.Y. 2007) .......... 22

In re Portrait Corp. of Am., Inc., 406 B.R. 637 (Bankr. S.D.N.Y. 2009) .......... 12, 13, 15, 20

In re VWE Group, Inc., 359 B.R. 441 (S.D.N.Y. 2007) .......... 19

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) .......... 25

Manfield v. Air Line Pilots Association International, No. 06 C 6869, 2007 WL 2048664 (N.D. Ill. January 29, 2007) .......... 28, 29

Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726 (1998) .......... 7

Renaissance Hosp. Grand Prairie, Inc. v. State of Texas-Workforce Comm'n (In re Renaissance Hosp. Grand Prairie, Inc., No. 08-43775, 2009 WL 398963, at *3 (Bankr N.D. Tex. Feb. 17, 2009) .......... 13

Rosetta Res. Operating LP Calpine Corp. v. Pogo Producing Co. (In re Calpine Corp.), 361 B.R. 665 (Bankr. S.D.N.Y. 2007) .......... 12

Sabella v. Scantek Med., Inc., No. 08 Civ 453, 2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009) .......... 27

Simmons v. 22 Acquisition Corp, Case No. 05-CV-169,

2005 WL 30182726 (E.D. Tex. Nov. 10, 2005) ............... 22

Snowden v. Hughes, 321 U.S. 1 (1944) ......................... 27

Veal v. Geraci, 23 F.3d 722 (2d Cir. 1994) ..................... 25

Wayte v. United States, 470 U.S. 598 (1985) ................... 27

**STATUTES**

11 U.S.C. §157(d) .......................................... 18, 19

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

Dennis Black, Charles Cunningham, Kenneth Hollis and The Delphi Salaried Retiree Association (collectively, the "Salaried Retirees")[1] respectfully submit the following objection (the "Objection") to the Motion of General Motors LLC (f/k/a General Motors Company) To Enforce Modified Plan And Plan Modification Order (the "Motion").

**INTRODUCTION**

1. The Salaried Retirees have initiated litigation (the "Michigan Litigation") against several federal government agencies and officials and General Motors LLC ("New GM"), formerly known as General Motors Company, pending before the United States District Court for the Eastern District of Michigan (the "Michigan Court"). The Michigan Litigation is complex and involves numerous claims, one of which is against New GM. In the claim against New GM, the Salaried Retirees allege that New GM, acting at the direction of the federal government and thus as a state actor, has intentionally engaged in unconstitutional discrimination against the Salaried Retirees by topping-up the pensions of certain union-affiliated Delphi

[1] The Salaried Retirees are former salaried employees of Delphi Corporation ("Delphi") and are participants in the Delphi Retirement Program for Salaried Employees (the "Salaried Plan").

retirees while at the same time refusing to afford the Salaried Retirees the same treatment.[2]

2. In the Motion, New GM argues that the Salaried Retirees are precluded by the Modified Plan and the Plan Modification Order (as those terms are defined below) from pursuing the claims that they have asserted against New GM in the Michigan Litigation. Specifically, New GM argues that the claims were released pursuant to: (1) the exculpation (the "Exculpation") provision of the Modified Plan set forth in Section 11.11 of the Modified Plan and discussed in paragraph 20 of the Plan Modification Order; and (2) the release (the "Release") provision of the Modified Plan set forth in Section 11.8 of the Modified Plan (which incorporates Section 4.01(c) of the Amended and Restated Delphi-GM Global Settlement Agreement (the "GSA")) and also discussed in paragraph 20 of the Plan Modification Order.

3. The Salaried Retirees' allegations in the Michigan Litigation concern actions completely unrelated to the Modified Plan and taken long after the effective date of the releases granted to New GM by this Court (the top-ups are believed to have begun in 2010, and were committed to in November 2009), and, in any event, implicate a cause of action outside the scope

[2] A top-up is a supplemental payment to a retiree who is receiving pension benefits from the PBGC. By definition, the amount of the top-up payment is the difference between what the retiree was entitled to receive under the term of his pension plan and the reduced amount he actually receives from the PBGC.

of the releases because their claims involve allegations of willful misconduct.

4. Moreover, New GM's assertion that it has been released from the constitutional claim asserted against it is an affirmative defense that it can and should raise in the Michigan Litigation, if it is to be litigated anywhere.[3] Further, the Michigan Court has already rejected New GM's efforts to postpone proceedings against it there while its Motion is pending here, illustrating -- the Salaried Retirees believe -- the Michigan Court's desire to deal with all relevant issues of all parties in that single forum. The Salaried Retirees believe that New GM's decision to initiate these collateral proceedings is patent forum shopping, designed to select a forum it believes will be more sympathetic to its position, while at the same time forcing the Salaried Retirees to litigate issues in multiple forums in an attempt to drain their financial resources.

5. As discussed below, the Court should either: (1) abstain from ruling on the Motion in favor of the Michigan Court; or (2) deny the Motion because the claims asserted in the Michigan Litigation against New GM were not released pursuant to

[3] On February 16, 2010, New GM filed a dispositive motion in the Michigan Litigation, seeking a dismissal of the claims asserted against it pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion to Dismiss"). In the Motion to Dismiss, New GM declined to assert the merits of its claims of release and exculpation, but noted to the Michigan Court that this Motion was pending, and argued that it was "related to the viability of Plaintiffs' claims against GM." The Salaried Retirees note that there is no apparent impediment that would keep New GM from raising the claims of exculpation and release in the Michigan Litigation at some later date.

the Exculpation or Release provisions set forth in the Modified Plan and Plan Modification Order.

**BACKGROUND**

6. These Chapter 11 bankruptcy cases began in October 2005 when Delphi Corporation and certain of its affiliates (collectively, "Debtors") filed voluntary petitions for relief in this Court.

7. On June 1, 2009, Debtors filed a motion that, among other things, sought approval of modifications to the plan of reorganization that was previously confirmed by the Court (the "Modified Plan").

8. On July 22, 2009, the Pension Benefit Guaranty Corporation (the "PBGC") filed a number of complaints against Delphi in the Eastern District of Michigan, initiating termination proceedings concerning Delphi's pension plans (including the Salaried Plan).

9. On July 30, 2009, the Court entered an order (the "Plan Modification Order") approving the Modified Plan.

10. The PBGC dismissed its complaints on August 7, 2009 and terminated Delphi's pension plans by agreement with Delphi on August 10, 2009. The agreement retroactively terminated the pension plans effective as of July 31, 2009.

11. In the fall of 2009, rumors began to circulate that New GM, at the direction of the federal government, was

contemplating topping-up the pensions of certain union-affiliated retirees. In fact, on September 1, 2009, the International Union of Electrical Workers (the "IUE") announced that it had reached a "tentative" agreement with New GM, pursuant to which, among other things, Delphi retirees that had been affiliated with the IUE would receive a pension "top-up" from New GM.[4] The IUE press release indicated that the top-up agreement was not final, and would not be so unless and until it received court approval.[5] The press release intimated that the tentative agreement was the direct result of the union's exercise of political pressure on the White House and the Treasury Department. The details of the top-up agreement were not provided in the press release.

12. On September 14, 2009, the Salaried Retirees filed a complaint with the Michigan Court asserting claims against the PBGC.

13. The Modified Plan was substantially consummated and the "Effective Date" (as that term is defined in the Modified Plan) occurred on October 6, 2009.

14. On October 26, 2009, the New York Times published an article on New GM's agreement to provide top-ups to union

[4] See September 1, 2009 IUE press release attached hereto as Exhibit A.

[5] The press release did not specify exactly what court's approval was necessary.

retirees but not non-union salaried retirees.[6] The article suggested that retirees who had been represented by the United Steel Workers Union (the "USW") might also be benefiting from a top-up agreement and that the decision regarding which retirees would receive top-ups was ultimately made by government officials for political reasons.

15. At the time, it was uncertain when the Salaried Retirees' pensions would be reduced (or when the top-ups of the union-affiliated retirees might begin), but press reports were in circulation which suggested that the PBGC planned to begin reducing the pension benefits of Delphi retirees (both salaried and hourly) on or about January 1, 2010.

16. Thus, by November 2009, because the information available indicated that the decision to top-up the pension benefits of Delphi retirees was a governmental decision made on the basis of union-affiliation, the Salaried Retirees became convinced that there was an imminent threat that they would suffer an unconstitutional harm as a result of the loss of their pension benefits -- namely, that government actors would deny them equal treatment in comparison to union affiliated retirees. On November 5, 2009, believing that a reduction in their pension benefits without a top-up might be imminent, the Salaried Retirees filed a first amended complaint (the "Amended

[6] A copy of the article is attached hereto as Exhibit B.

Complaint")[7] in the Michigan Litigation, adding additional claims and additional parties, including New GM.[8]

17. On November 12, 2009, the United States Bankruptcy Court, Southern District of New York, entered an order in the General Motors Corporation bankruptcy proceeding approving New GM's agreement to top-up the pensions of IUE and USW retirees. See In re: Motors Liquidation Company et. al., U. S. Bankruptcy Court, Southern District of New York, Case No: 09-50026 (REG) (Dkt. No.4433).

18. On February 1, 2010, the PBGC began reducing the pension benefits of the Salaried Retirees. New GM presumably began making top-up payments to the union affiliated retirees either on January 1, 2010, or February 1, 2010.

19. In Count 5 of the Amended Complaint in the Michigan Litigation, the Salaried Retirees assert claims against various defendants, including New GM, arising out of the termination of the Salaried Plan and the top-ups. More specifically, in Count 5 the Salaried Retirees allege that, because of the government's sponsorship of New GM and directives to it, New GM is a governmental actor and that, as a governmental actor subject to the Equal Protection component of the Fifth Amendment, New GM's

---

[7] The Amended Complaint is attached to the Motion as Exhibit C and, therefore, a copy has not been attached hereto.

[8] See Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 734 (1998) (claim for declaratory relief may be brought when harm is imminent and reasonably certain).

selective provision of pension top-ups based on union-affiliation is constitutionally impermissible. The Salaried Retirees seek both damages and specific relief from New GM in Count 5. The Michigan Litigation has already progressed substantially: the Michigan Court, after a hearing on December 22, 2009 on a preliminary injunction request, issued orders on January 26, 2010 and February 18, 2010 requiring the PBGC to hold in escrow all disputed benefits while the Michigan Court adjudicates the legality of the termination of the Salaried Plan. The Michigan Court likewise is conducting a status and settlement conference for February 18, 2010, and numerous substantive motions are pending in the Michigan Litigation.

20. In the Motion, New GM argues that the claims asserted by the Salaried Retirees against New GM in Count 5 of the Amended Complaint cannot be pursued because they fall within the Exculpation and Release provisions contained in the Modified Plan and Plan Modification Order (i.e., Sections 11.11 and 11.8 of the Modified Plan and paragraph 20 of the Plan Modification Order).[9]

21. Section 11.11 of the Modified Plan states:

> 11.11 **Exculpation And Limitation Of Liability**. Subject to Article 11.13 of this Plan, the Debtors . . . GM **and [New GM]** . . . . **are hereby released from, any claim**, obligation, Cause of Action, or liability

[9] The Plan Modification Order (with Modified Plan) and the GSA were attached to the Motion as Exhibits A and B, respectively, and therefore, copies have not been attached hereto.

> to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, **relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan**, the Disclosure Statement, the Credit Bid, the Plan Exhibits, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, **except for their willful misconduct and gross negligence** . . . .

(Emphasis added).

22. Section 11.8 of the Modified Plan states:

> 11.8 **Release of GMCo. By Debtors And Third Parties. On the Effective Date, GMCo [i.e., New GM] shall receive the same releases provided for GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) in Section 4.01 of the Delphi-GM Global Settlement Agreement as though it were a party thereto**, which provisions are incorporated by reference herein in their entirety; provided, however, that for purposes of Section 4.02 of the Delphi-GM Global Settlement Agreement, GMCo. shall grant to the Debtors the same releases provided by GM and the GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement).

(Emphasis added).

23. Section 4.01(c) of the GSA states:[10]

> (c) Any Delphi Plan shall provide (and no modification or supplement thereto shall abrogate such provision) that effective as of the Emergence Date, **the GM-Related Parties shall be forever released** by the Additional Releasing Parties **from any and all claims**, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Additional Releasing Parties ever had, now have, or hereafter may have . . . **existing as of the Effective Date**, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related Parties, **including** without limitation **claims based in whole or in part upon any act or omission**, transaction, agreement, event, action, or other occurrence **taking place or failing to take place on or before the Effective Date** related to: . . . (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties . . . . .

(Emphasis added).

24. The "Effective Date" used in 4.01(c) of the GSA refers to the effective date of the GSA, which was September 29, 2008. (See Motion ¶10.)[11]

25. Paragraph 20 of the Plan Modification Order states:

> **Discharge, Releases, Limitations Of Liability, And Indemnification.** Pursuant to applicable law, including sections 105(a) and 1123(b)(3) and (6) of the Bankruptcy Code, the discharge of the Debtors and any of their assets or properties provided in Article 11.2 of the Modified Plan, as approved herein, the releases set forth in Articles 11.4, 11.5, 11.6, and 11.7 of the Modified Plan and the exculpation and limitation of liability provisions set forth in Article 11.11 of the Modified Plan, are deemed incorporated in this order as if set forth in full

[10] As set forth in paragraph 34 of the Motion, New GM relies upon Section 4.01(c) of the GSA as being the applicable section of the GSA with respect to its alleged Release.

[11] The definition of "Effective Date" as used in the GSA is discussed in more detail in paragraph 25 below.

> herein and are hereby approved as an integral part of the Modified Plan and are fair, equitable, reasonable and in the best interests of the Debtors, their estates, and holders of Claims and Interests; **provided, however, notwithstanding anything in this order, the exculpation provisions or releases provided pursuant to Article 11 of the Modified Plan shall have no effect on the liability of any entity that otherwise would result from any action or omission to the extent that such action or omission is determined in a final order to have constituted intentional fraud or willful misconduct**.

(Emphasis added).

## ARGUMENT

### I. THE COURT SHOULD EXERCISE ITS DISCRETION TO ABSTAIN FROM DECIDING WHETHER THE CLAIMS ASSERTED AGAINST NEW GM IN THE AMENDED COMPLAINT WERE RELEASED PURSUANT TO THE MODIFIED PLAN AND THE PLAN MODIFICATION ORDER

26. In the Motion, New GM argues that the claims asserted against it by the Salaried Retirees in the Michigan Litigation are barred or released by the Exculpation and Release provisions contained in Sections 11.11 and 11.8 of the Modified Plan and paragraph 20 of the Plan Modification Order. As discussed below, the Court should abstain from considering the Motion. The Michigan Court is more than capable of determining whether the claims asserted by the Salaried Retirees against New GM in the Amended Complaint have been released pursuant to such provisions.

27. The Court has authority to abstain in matters over which it has jurisdiction in certain circumstances:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district

> court in the interest of justice, or in the interest of comity with State courts or respect to state law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1).

28. When determining whether to exercise discretionary abstention, bankruptcy courts generally look to the following twelve factors:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which [non-bankruptcy] law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable [non-bankruptcy] law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. §1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing non-bankruptcy- law claims from core bankruptcy matters to allow judgments to be entered in [non-bankruptcy] court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

In re Portrait Corp. of Am., Inc., 406 B.R. 637, 641-42 (Bankr. S.D.N.Y. 2009), quoting Rosetta Res. Operating LP Calpine Corp. v. Pogo Producing Co. (In re Calpine Corp.), 361 B.R. 665, 669 (Bankr. S.D.N.Y. 2007). A court, however, need not consider all twelve factors. Id.

29. Here, the majority of these factors decidedly balance in favor of the Court abstaining with respect to the current Motion.

(a) *Effect on Efficient Administration of the Bankruptcy Estate.* Abstention will not have any impact on the administration of Debtor's estate. The Modified Plan has been substantially consummated and the majority (if not all) of Debtor's assets have been sold. Further, none of the claims in the Michigan Litigation are asserted against Debtor or its bankruptcy estate. See, e.g., Portrait Corp. Of Am., 406 B.R. at 642-43 (abstaining in dispute between non-debtors where plan had already been confirmed and dispute would not have any impact on administration of bankruptcy case); In re Bradlees Stores, Inc., 311 B.R. 29, 33 (Bankr. S.D.N.Y. 2004) (abstaining where "dispute is between two nondebtors, the outcome of which will have no effect on the Debtors' estates"); Renaissance Hosp.-Grand Prairie, Inc. v. State of Texas-Workforce Comm'n (In re Renaissance Hosp.-Grand Prairie, Inc.), No. 08-43775 2009 WL 398963, at *3 (Bankr. N.D. Tx. Feb. 17, 2009) (abstaining from dispute involving non-debtors and stating that "[g]iven the lack of impact on Debtor's rehabilitation, the court does not consider this adversary proceeding an appropriate matter of which it should exercise its jurisdiction").

(b) *Extent To Which Bankruptcy Issues Predominate.* As discussed in more detail in section II.B below, if this Court were to decide the merits of the Motion, **and if** the Court determined that the claims actually fell within the ambit of the Exculpation and Release provisions (which they do not), **then** the Court would need to determine whether New GM's refusal to top up the Salaried Plan after agreeing to top up the union affiliated pension plans constituted willful misconduct. This is because paragraph 20 of the Plan Modification Order specifically provides that the Exculpation and Release provisions contained in Article 11 of the Modified Plan shall **NOT** act to release claims for willful misconduct. Therefore, if the Salaried Retirees prove that the actions or omissions of New GM constitute willful misconduct, irrespective of whether the Exculpation and Release provisions covered the claims in the first instance, the release provisions of the Modified Plan could not be a defense to the Salaried Retirees' claims. Stated another way, the Court could not rule in favor of New GM on the Motion without determining that: (1) the claims fall within the Release or Exculpation provisions; and (2) the acts or omissions of New GM did not constitute willful misconduct.

The issue of whether the actions or omissions of New GM constitute willful misconduct is better resolved by the Michigan Court because such question will be front and center in the

Michigan Litigation.[12] In order to prevail on its equal protection claim against New GM, the Salaried Retirees will need to prove that New GM acted with a discriminatory purpose or intent, which, as discussed below, is the equivalent of willful misconduct. Given that the Michigan Court is going to have to resolve the question of willful misconduct when it ultimately rules on the merits of the claims asserted in Count 5 of the Amended Complaint against New GM's co-defendants (regardless of this Court's decision on the Motion), it makes much more sense for that Court to determine whether the actions or omissions of New GM constitute willful misconduct. In fact, given the factual overlap between the question of whether the actions or omissions of New GM constitute willful misconduct and purposeful discrimination and whether the actions or omissions of New GM's co-defendants in Count 5 constitute purposeful discrimination, there would be a potential for inconsistent rulings if both this Court and the Michigan Court took on such issues. See Portrait Corp. Of Am., 406 B.R. at 642-43 (abstaining from deciding whether the terms of a sale order barred certain claims brought against the purchaser of the assets in order to avoid making

[12] In fact, the Michigan Court will be trying not only the question of whether the actions or omissions of New GM constitute willful misconduct, but also whether the actions or omissions of New GM's co-defendants in Count 5 constitute unconstitutional acts. Irrespective of this Court's decision on the Motion, the Michigan Court will have to resolve whether the actions or omissions of New GM's co-defendants in Count 5 violate the constitution and therefore are tantamount to willful misconduct.

overlapping factual findings with the court before which the claims were brought).

(c) *Presence of Related Proceedings.* As already discussed, the Salaried Retirees' claims against New GM are pending in front of the Michigan Court. There is no doubt that the Michigan Court has jurisdiction to resolve the issues raised in the Motion and is more than capable of determining whether the claims against New GM have been released.[13]

Moreover, there has already been a great deal of activity in the Michigan Litigation and the Michigan Court is moving the case along. Both New GM and New GM's co-defendants in count 5 of the Amended Complaint filed motions with the Michigan Court requesting an extension of time to file an answer or otherwise respond to the Amended Complaint until 30 days after this Motion is resolved. The Michigan Court denied both motions. As of the date hereof, New GM and its co-defendants in Count 5 of the Amended Complaint have each filed extensive dispositive motions in response to the claims made by the Salaried Retirees.

---

[13] New GM insinuates in its Motion that this Court retained "exclusive" jurisdiction to determine the claims raised in the Motion. (Motion at n.4.) That is incorrect. The Court only retained exclusive jurisdiction with respect to New GM "to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents and the Master Disposition Agreement." Modified Plan at Art.XIII (k) and (u). This dispute does not arise in connection with the interpretation, implementation or enforcement of the Delphi-GM Definitive Documents or the Master Disposition Agreement. Rather, it arises in connection with the interpretation, implementation and enforcement of the Modified Plan and this Court did not retain exclusive jurisdiction as to disputes involving New GM over such issues. Id.

(d) *Degree of Relatedness or Remoteness of the Proceeding to the Main Bankruptcy Case.* This proceeding is only tangentially, if at all, related to the main bankruptcy proceedings and will not affect any creditor's recovery from Debtors.

(e) *Substance Rather Than Form of Asserted "Core" Proceeding.* The nature of this dispute involves constitutional claims, not bankruptcy related claims.

(f) *The Burden of the Bankruptcy Court's Docket.* There is no need for this Court to burden its docket with this dispute between non-debtors that does not impact Debtors' bankruptcy estate.

(g) *Likelihood of Forum Shopping.* New GM, by bringing the Motion before this Court, is engaging in forum shopping. If this Court abstains and the Michigan Court denies the motion to dismiss New GM recently filed in the Michigan Litigation, then New GM can assert the defense of release in the Michigan Litigation and request a decision on the issue from the Michigan Court.

(h) *Existence of Right to Jury Trial.* As discussed below, if the Court determines not to abstain and finds in the first instance that the Exculpation or Release provisions encompass the claims against New GM, then the determination of whether the claims asserted in Count 5 of the Amended Complaint

are barred will hinge on whether or not New GM purposefully discriminated against the Salaried Retirees in violation of their constitutional rights. This is the case because Paragraph 20 of the Plan Modification Order excludes claims involving willful misconduct from the Exculpation and Release provisions and a purposeful violation of constitutional rights equates to willful misconduct. See supra §II.B.

The Salaried Retirees are entitled to and have demanded a trial by jury with respect to the issue of whether New GM purposefully discriminated against the Salaried Retirees in violation of their constitutional rights. See, e.g., Carlson v. Green, 446 U.S. 14, 22, 100 S.Ct. 1468, 1473 (1980) (noting that there is a right to a jury trial in a Bivens action seeking damages to remedy constitutional violations). Such a trial by jury, however, cannot be conducted by this Court because the Salaried Retirees' do not consent to the Court conducting a jury trial. Specifically, Section 157(d) of the Bankruptcy Code provides for the withdrawal of the reference to this Court where "cause" exists. Courts routinely find that cause exists to withdraw the reference where there is a right to a jury trial and where the parties have not consented to such a jury trial

being held by the bankruptcy court. See, e.g., In re VWE Group, Inc., 359 B.R. 441, 451 (S.D.N.Y. 2007).[14]

Therefore, if the Court does not abstain and finds that the claims against New GM fall within the scope of the Release and Exculpation, then it will be necessary to hold a jury trial to determine whether New GM intentionally discriminated against the Salaried Retirees in violation of their constitutional rights. Because this Court cannot hear such a jury trial, in such circumstances, the Salaried Retirees would request that the reference be withdrawn to the district court. The potential for the withdrawal of the reference in this case based upon the right to a jury also strongly weighs in favor of abstention. Further, the Michigan Court, which is a federal district court, is already poised to hold a jury trial as to New GM's constitutional violations.

(i) *Presence in Proceeding of Nondebtor Parties.* As is discussed above, this dispute is solely between two nondebtor

[14] It is important that there is also a case here for mandatory withdrawal of the reference pursuant to Section 157(d) of the Bankruptcy Code, which requires mandatory withdrawal of the reference "if the court determines resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Here, the ultimate non-Code law that would need to be considered in order to determine whether willful misconduct exists in this case is the United States Constitution. Courts have previously withdrawn the reference under the mandatory withdrawal provision of Section 157(d) where resolution of an action was dependent upon the application of the United States Constitution. See Anthony H. Murray, Jr. v. Warren County Sheriff's Dept. (In re Avtex Fibers-Front Royal, Inc.), 1991 WL 25460, at *2 (E.D. Penn. 1991) (stating that "cause exists for withdrawal of the reference in this case because of the nature of the proceedings and the constitutional questions involved").

parties. See Portrait Corp. Of Am., 406 B.R. at 643 (abstaining from motion to enforce sale order and stating "[a]lthough this Court has jurisdiction, this is a dispute between two non-debtors in which the Debtors' estates apparently have no financial interest").

30. Accordingly, given the overlapping factual issues with the Michigan Litigation, as well as the fact that this dispute does not even involve the Debtor or the Debtor's estate, the Salaried Retirees respectfully request that the Court abstain from ruling on the Motion.

**II. IF THE COURT DETERMINES THE MERITS OF THE MOTION, THE COURT SHOULD DENY THE MOTION BECAUSE THE CLAIMS ASSERTED AGAINST NEW GM IN THE AMENDED COMPLAINT ARE NOT BARRED BY THE EXCULPATION AND RELEASE PROVISIONS OF THE MODIFIED PLAN AND THE PLAN MODIFICATION ORDER**

31. New GM argues that the Modified Plan prohibits the Salaried Retirees from pursuing the constitutional claims set forth in the Amended Complaint against New GM. New GM's argument that the Salaried Retirees are enjoined from pursuing such claims is premised on Modified Plan Sections 11.11 (the Exculpation provision) and 11.8 (the Release provision - which, New GM argues provides it with the benefits of Section 4.01(c) of the GSA). None of those sections, however, cover the claims asserted against New GM in the Amended Complaint. Further, even if the releases set forth in Sections 11.11 and 11.8 encompass the claims asserted against New GM in the Amended Complaint,

such claims would still not be barred because Paragraph 20 of the Plan Modification Order exempts claims arising from actions or omissions that constitute willful misconduct.[15]

**A. The Salaried Retirees' Claims Asserted Against New GM Fall Outside The Scope Of The Exculpation And Release Provisions**

**1. The Exculpation Provision - Section 11.11 Of The Modified Plan - Does Not Apply Because The Claims Asserted Do Not Relate To Actions Taken In Connection With The Bankruptcy Case**

32. New GM argues that the Salaried Retirees are barred from pursing the claims asserted against New GM in the Amended Complaint by virtue of Section 11.11 of the Modified Plan.

33. As New GM itself states, Section 11.11 only provides New GM with a release "**relating to [its] actions taken in connection with the Modified Plan and corresponding documents.**" (Motion at 11.) New GM's interpretation of Section 11.11 is correct because, as is true with exculpation clauses historically, such clauses only release a participant in a bankruptcy proceeding from liability with respect to acts taken in connection with the bankruptcy case. See, e.g., In re DBSD N. Am., Inc., Case No. 09-13061, 2009 Bankr. LEXIS 3341, at *104

[15] New GM argues that the Michigan Litigation is an improper collateral attack on the releases set forth in the Modified Plan. The Salaried Retirees agree that if they were arguing in the Michigan Litigation that the releases contained in the Modified Plan are unenforceable, such arguments may constitute an improper collateral attack. The Salaried Retirees, however, are not arguing that the releases are unenforceable. Rather, the Salaried Retirees are arguing that the claims against New GM in the Amended Complaint fall outside the scope of the releases and that ultimately the Michigan Court will issue a final order that the liability of New GM to the Salaried Retirees arises from acts or omissions of New GM that constitute unconstitutional acts and therefore willful misconduct.

(Bankr. S.D.N.Y. Oct. 26, 2009) ("No release is provided for gross negligence, willful misconduct, fraud, or criminal conduct, and the release covers only conduct in connection with the Chapter 11 cases. The language of the exculpation clause substantially conforms to the language that has become standard in this Circuit."); In re Granite Broad. Corp., 369 B.R. 120, 139-40 (Bankr. S.D.N.Y. 2007) (noting that exculpation clause only relates to acts or omissions in connection with the plan and the bankruptcy case, not other claims).

34. For example, although Section 11.11 releases New GM from liability arising out of any "employee benefit plan," such release is limited only to any employee benefit plan "created, modified, amended or entered into in connection with the [Modified Plan.]"

35. Section 11.11 of the Modified Plan does not preclude the Salaried Retirees claims asserted against New GM in the Amended Complaint because, to again quote New GM, such claims do not relate to "actions taken in connection with the Modified Plan or corresponding documents." See Simmons v. 22 Acquisition Corp., Case No. 05-CV-169, 2005 WL 30182726, at *2-3 (E.D. Tex. Nov. 10, 2005) (holding that exculpation clause that extended to non-debtor only released the non-debtor from actions undertaken in connection with the bankruptcy case).

36. Indeed, New GM's discriminatory conduct of refusing to top up the Salaried Plan while agreeing to top up the union affiliated pension plans did not take place within the context of these Chapter 11 cases. In fact, New GM's obligation to top up the pension benefits of IUE and USW retirees was not even incurred until well after the entry of the Plan Modification Order and the actual discriminatory top-ups only began in January or February of this year. Nor was such conduct in furtherance of the Modified Plan or any document entered into in connection with the Modified Plan. As such, the Exculpation Provision does not preclude the Salaried Retirees' claims against New GM.

**2. <u>The Release Provision - Section 11.8 Of The Modified Plan (And Section 4.01(c) Of The GSA), Do Not Apply Because The Claims At Issue Were Not In Existence On The Effective Date Of The GSA</u>**

37. As previously indicated, New GM argues that Section 11.8 of the Modified Plan provides it with the benefit of the release provision set forth in Section 4.01(c) of the GSA.

38. Section 11.8 of the Modified Plan provides that New GM shall receive the same releases provided for GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) in Section 4.01 of the Delphi-GM Global Settlement Agreement as though it were a party thereto. Section 4.01(c) of the GSA

provides a release with respect to claims existing as of the "Effective Date" as that term is defined in the GSA.[16]

39. The GSA defines "Effective Date" in Section 1.36, which states that "Effective Date shall mean the first business day on which all conditions to the effectiveness of this Agreement as set forth in Article VI hereof have been satisfied." As New GM states in paragraph 34 of the Motion, the "Effective Date" of the GSA is September 29, 2008.

40. New GM received exactly what the GM parties to the GSA received, and such parties only received a release of claims in existence as of September 29, 2008.

41. Thus, the claims set forth in the Amended Complaint against New GM are not released because such claims did not exist as of September 29, 2008.

42. It is undisputed that the claims asserted against New GM in Count 5 of the Amended Complaint did not come into existence until long after September 29, 2008. In fact, New GM did not actually make its first discriminatory top-up until sometime in 2010 (most likely on February 1, 2010, which was

[16] In addition to the language of the release provisions themselves, the preamble language to Article IV of the GSA also makes clear that the releases provided therein are only releases as to claims in existence as of the Effective Date. Such preamble states: "In partial consideration for the promises and agreements made by the Debtors and GM pursuant to this Agreement . . . Delphi and GM agree to the following terms to resolve claims **in existence as of the Effective Date** that each of the Delphi-Related Parties or Delphi Affiliate Parties, on the one hand, and the GM Related Parties, on the other hand, have or may have against each other, and that each of the Additional Releasing Parties . . . have or may have against the GM-Related Parties."

when the PBGC began reducing the pension benefits of the retirees in the various pension plans). Moreover, New GM's obligation to top-up the pension benefits of the IUE and USW retirees was not final (and thus not enforceable) until November 12, 2009, when the General Motors Corporation bankruptcy court approved New GM's settlement agreement with these unions (which agreement obligated New GM to make the top-ups). Thus, even assuming, *arguendo*, that New GM's wrongful assertion that the effective date of the Modified Plan (October 6, 2009) was somehow relevant to this inquiry, the harm associated with the claim did not even come to fruition until after that date. See, e.g., Klehr v. A.O. Smith Corp., 521 U.S. 179, 198 (1997) (a cause of action accrues when a defendant commits an act that causes an injury); Veal v. Geraci, 23 F.3d 722, 724 (2d Cir. 1994)(a constitutional civil rights claim "accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm")(citing Barrett v. United States, 689 F.2d 324, 333 (2d Cir. 1982).

43. Accordingly, the constitutional claims asserted in the Amended Complaint against New GM were not released as a result of Section 11.8 of the Modified Plan.

**B. Even If The Releases Provided For In Sections 11.8 and 11.11 Encompass The Claims Against New GM, Such Claims Would Not Be Released Because The Plan Modification Order Exempts From The Releases Claims Constituting Willful Misconduct**

44. As discussed above, neither Section 11.11 nor Section 11.8 encompass the Salaried Retirees' claims against New GM. However, even if the Court disagrees, the claims would not be barred by such provisions because the Plan Modification Order exempts claims for willful misconduct.

45. As previously indicated, paragraph 20 of the Plan Modification Order provides that: "notwithstanding anything in this order, the exculpation provisions or releases provided in Article 11 of the Modified Plan **shall have no effect** on the liability of any entity that otherwise would result from any action or omission **to the extent that such action or omission is determined in a final order to have constituted intentional fraud or willful misconduct**." (Emphasis added.)

46. The Salaried Retirees have asserted claims against New GM constituting willful misconduct and, therefore, such claims fall outside the coverage of the Exculpation and Release provisions provided for in Article 11 of the Modified Plan.

47. The term willful misconduct is not defined in the Modified Plan. The ordinary meaning, however, of willful misconduct is misconduct committed voluntarily and

intentionally. Sabella v. Scantek Med., Inc., No. 08 civ 453, 2009 WL 3233703, at *31 (S.D.N.Y. Sept. 25, 2009).

48. In the Amended Complaint, the Salaried Retirees allege that New GM, acting at the direction and control of the government, chose to unlawfully discriminate against the Salaried Retirees when New GM refused to top up the Salaried Plan after agreeing to top up the pension benefits for the union affiliated pension plans. The Amended Complaint further alleges that by engaging in such "unlawful discrimination," New GM, among other things, violated the Equal Protection component of the Fifth Amendment of the U.S. Constitution.

49. In order to prevail on their claims for violation of the equal protection component of the Fifth Amendment, the Salaried Retirees will be required to prove the element of **"intentional or purposeful"** discrimination by New GM. See Snowden v. Hughes, 321 U.S. 1, 8, (1944); see also Wayte v. United States, 470 U.S. 598, 608 (1985) (in order to claim a violation of the equal protection component of the Fifth Amendment, one must prove "purposeful discrimination"). As such, because the Salaried Retirees can only succeed on their claims against New GM in the Amended Complaint by proving a discriminatory purpose or intent (i.e., willfulness), the claims are exempted from the Exculpation and Release provided for in Section 11 of the Modified Plan.

50. The decision in Mansfield v. Air Line Pilots Association International, No. 06 C 6869, 2007 WL 2048664 (N.D. Ill. July 29, 2007), is instructive on this point. The plaintiffs in that case were current and former pilots of United Airlines, Inc. ("United"). The plaintiffs alleged that their union breached its duty of fair representation by the manner in which it distributed certain convertible notes that the union received as part of United's bankruptcy. Id. at *1. The union moved to dismiss, arguing that the exculpation clause contained in United's plan of reorganization barred the pilots' claims. Such exculpation clause named the union as an exculpated party and stated that such exculpated parties could not be held liable for "exculpated claims," defined as any claim related to any act or omission in connection with United's restructuring or plan of reorganization. The exculpation clause, like the one here, stated, however, that such release does not extend to claims for "gross negligence or willful misconduct." Id. at *3.

51. The Mansfield court held that the claims against the union fell within the exception of the exculpation clause. The court came to such conclusion because in order for the pilots to prevail on their claim against the union for breach of duty of fair representation, the pilots were required to show some type of intentional misconduct. The court concluded that because the words "intentional" and "willful" are synonyms for all practical

purposes, the releases provided for in the exculpation clause did not apply. Id. at *4. The Amended Complaint specifically alleges that New GM, acting at the direction of the government, made a choice to unlawfully discriminate against the Salaried Retirees when it violated their constitutional rights.

52. Here, because the Salaried Retirees' claims against New GM require the element of a discriminatory intent, such claims are excepted from coverage of both Sections 11.8 and 11.11 of the Modified Plan.

53. In addition, it should also be noted that paragraph 20 of the Plan Modification Order itself contemplates that courts other than this Court will make determinations regarding whether any act or omission constituted willful misconduct. Paragraph 20 provides that the exculpation provisions and releases shall have "no effect on the liability of any entity that otherwise would result from any action or omission to the extent that such action or omission **is determined in a final order** to have constituted intentional fraud or willful misconduct." (Emphasis added). This provision encompasses, and anticipates, final orders of any court, not just final orders of this Court. Thus, this exception will apply even if it is the Michigan Court, and not this Court, that determines that the actions or omissions of New GM constitute willful misconduct.

## CONCLUSION

54. As set forth above, the Court should exercise its discretion and abstain from ruling on the Motion. If, however, the Court does not exercise its discretion to so abstain, the Court should deny the Motion because: (i) the Exculpation provision in Section 11.11 of the Modified Plan only relates to claims pertaining to actions taken in connection with the bankruptcy case and the claims against New GM do not involve such actions; and (ii) the Release provision in Section 11.8 of the Modified Plan only relates to claims existing as of the GSA Effective Date (September 29, 2008), and it should be undisputed that the claims against New GM arose after that date. In addition, even if the Court determines that the Exculpation provision in Section 11.11 and the Release provision in Section 11.8 cover the claims asserted against New GM, the Motion should still be denied. That is because in the Amended Complaint the Salaried Retirees have asserted claims involving willful misconduct against New GM and paragraph 20 of the Plan Modification Order provides that, notwithstanding anything in the Plan Modification Order, the exculpation provisions or releases provided in Article 11 of the Modified Plan shall have no effect on the liability of any entity that otherwise would result from any action or omission to the extent that such action or

omission is determined in a final order to have constituted intentional fraud or willful misconduct.

Respectfully submitted,

Dated: February 18, 2010 /s/ Howard S. Sher

Howard S. Sher (*admitted pro hac vice*)
Alan J. Schwartz (*admitted pro hac vice*)
JACOB & WEINGARTEN, P.C.
2301 W. Big Beaver, Ste. 777
Troy, Michigan 48084
Telephone: (248) 649-1900
Facsimile: (248) 649-2920

Anthony F. Shelley
Timothy P. O'Toole
Michael N. Khalil
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Ste. 900
Washington, DC 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801

Attorneys for Dennis Black, Charles Cunningham, Kenneth Hollis and The Delphi Salaried Retiree Association

# Exhibit A




# IUE-CWA Negotiates Agreement on GM Health Care, Delphi Pensions

**Dayton, Ohio**

On September 1, IUE-CWA reached a tentative agreement with new General Motors to provide baseline security for retirees who were facing the loss of health care and pensions.

The agreement was announced three months after GM filed for bankruptcy and launched one of the Division's largest mobilizations in recent years.

In filing for bankruptcy protection, GM made it be known that it would use a process known as a 363 sale to essentially sell the profitable parts of the company back to itself and the federal government and leave liabilities — including retiree health care, worker buyout payments and Delphi pension backstops — in the old, bankrupt GM.

IUE-CWA was concerned about a pattern being set for how companies could further exploit bankruptcy law to shed obligations to workers.

With the June 1 bankruptcy announcement, GM officially closed the door on any hope IUE-CWA had of forcing GM to live up to the VEBA, or voluntary employee beneficiary agreement, it had reached with the Division in December 2008.

That agreement would have provided $2.4 billion in a VEBA to provide health care coverage for GM retirees and their families. Some 41,000 found their benefits at risk since GM agreed to back stop health and life benefits for IUE-CWA retirees from Delphi Corp., which has been in bankruptcy court since October 2005.

GM had backed away from the VEBA after receiving U.S. Treasury Department funding, claiming the government deal precluded any changes in its pension plan.

New GM offered a high-deductible plan for pre-65 retirees and wanted to eliminate any benefits for post-65 or Medicare eligible retirees. The proposal was much less than that received by United Auto Workers retirees whose VEBA was funded, though renegotiated to be 50 percent stock.

IUE-CWA fought back hard with a series of major newspaper ads, outreach on Capitol Hill and to the Obama administration, picketing in front of the bankruptcy court and at appearances of President Obama and Vice President Joe Biden, and a massive email and phone campaign to the White House and Treasury Department.

A bi-partisan group of members from Ohio's congressional delegation sent two letters demanding justice for the IUE-CWA retirees. Rep. Mike Turner (R-Ohio) spoke out against the unjust treatment of non-UAW retirees from the floor of the House, and Rep. Tim Ryan introduced legislation to fund a VEBA to improve health care options for the retirees. That bill is still under consideration.

Another huge source of support was Sen. Sherrod Brown, whose office stayed on top of talks and who repeatedly called the Treasury Department himself throughout the process to seek a fair hearing for union concerns.

Much of the focus of political activities centered on Ohio because the vast majority of those impacted live there, primarily in the Dayton and Warren areas.

In the end, IUE-CWA made clear improvements to GM's original proposal but was not able to move the company or its new owner, the U.S. government, into restructuring the deal.

Under the final agreement, which still must be approved by the bankruptcy court, pre-65 retirees covered by GM insurance will be offered an improved package with an extra $50 million in payments. Post-65 retirees will retain a $1 billion claim with old GM, now known as Motors Liquidation Co.

The agreement also secures a "top-up" from new General Motors for Delphi retirees whose pension was surrendered to the Pension Benefit Guaranty Corporation. Because of that action the former Delphi workers stood to lose half of their income without this agreement.

"We were faced with very difficult decisions," said IUE-CWA President Jim Clark. "Everyday we hear from severely ill retirees who would literally face a death sentence with the loss of health care and from retirees who would face bankruptcy if their pensions were slashed.

"Though this package falls short of what our retirees worked years to gain, under these circumstances with two major employers in bankruptcy we are pleased in what we were able to accomplish," Clark continued. "This was the best we could get in a dreadful situation."

With the accord, new GM will honor its 1999 Benefit Guarantee and the 2007 tri-partite Memorandum of Understanding to ensure that eligible retirees at Delphi are made whole if the PBGC reduces their pensions. Reductions could be made because the PBGC is not required to pay early retirement supplements or benefit increases made within the last five years.

The top-up also covers Delphi retirees in the process of growing into a pension benefit from a mutual retirement or the special pre-retirement package offered in the 2007 MOU.

GM had originally offered $417 million to provide health care coverage to eligible non-UAW pre-65 retirees and their dependents – and wanted to keep any unused money due to attrition for itself. Union negotiators won the additional $50 million and a commitment that the entire amount will be spent on health care for union retirees.

The current health care plan, including dental and vision benefits, remains in effect for all current participants until Dec. 31, 2009. Eligible pre-65 retirees will start to receive information on the cost of the modified-high deductible plan and forms to elect whether they want to take it in early fall. IUE-CWA intends to offer a one-time buy-out option for those pre-65 retirees who opt not to take the plan. Once retirees reach 65, and for those already over 65, GM-provided coverage will be eliminated.

Those over 65 or otherwise Medicare eligible could receive benefits or proceeds from a $1 billion claim that will remain against Motors Liquidation Co. in the bankruptcy court. The amount and timing of any liquidation are impossible to estimate. IUE-CWA will remain on the unsecured creditors committee to maximize recovery for those retirees.

Retaining any claim was a huge battle that new GM fiercely opposed.

IUE-CWA is working with locals to provide a service to Medicare-eligible retirees to help them select supplemental insurance that is best for their personal medical and financial situations.

The $467 million and the $1 billion claim are monies that cover not just IUE-CWA retirees, but all of the union retirees who were excluded in the UAW-GM deal.

"We deliberately proceeded in these talks with a goal of being inclusive of those in other unions. We believe we had a moral obligation not to leave those brothers and sisters out in the cold," said Clark. "Whatever slim leverage we had, they had little or none. Our talks were the only way to win some measure of health care coverage for those retirees."

Other union retirees who could receive health care benefits under the deal include the Electrical Workers, Operating Engineers, Machinists, Teamsters, Carpenters and Steelworkers. The USW was a partner with IUE-CWA in the negotiations.

The agreement also provides $10,000 life insurance coverage that does not reduce with age.

Further, the agreement also provides that new GM will assume IUE-CWA Local 798's closing agreement for the Moraine Truck and Bus plant and fulfill obligations for buy-out payments. In order to secure movement of the agreement to new GM, the company insisted that IUE-CWA accept the UAW concession to cut supplemental unemployment benefits in half the second year.

Clark stated that the union will continue to pressure the government to improve the health care coverage of the GM and Delphi retirees.

"These workers earned high quality health care coverage and the government has now allowed for it to be taken away," he stated. "There is nothing in this agreement that precludes the Treasury Department and the Obama Administration from recognizing the injustice they have caused and correcting the situation – either on their own or as directed through congressional action. We will continue to pursue justice through every avenue available to us."

© 2008 IUE-CWA - 2701 Dryden Road, Dayton, OH 45439 USA



# Exhibit B

Welcome to TimesPeople
Get Started

TimesPeople recommended: Global Weirding Is Here

11:53 AM

Recommend

Get Home Delivery Log In Register Now

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

The New York Times

Business

Search All NYTimes.com

WORLD U.S. N.Y. / REGION BUSINESS TECHNOLOGY SCIENCE HEALTH SPORTS OPINION ARTS STYLE TRAVEL JOBS REAL ESTATE AUTOS

Search Business
News, Stocks, Funds, Companies

Financial Tools
Select a Financial Tool

More in Business »
Global Business | Markets | Economy | DealBook | Media & Advertising | Small Business | Your Money | Energy & Environment

But...

Advertise on NYTimes.com

# For Delphi Pensioners, the Union Label Helps

More Articles in Business »

Have you joined? It's free.
nytimes.com | LinkedIn
The New York Times and LinkedIn have teamed up to give you customized industry news. Automatically.



David Maxwell

Bruce Gump, a retired senior engineer and salaried employee at Delphi, in the parking lot of the auto supplier's plant in Warren, Ohio.

By MARY WILLIAMS WALSH
Published: October 26, 2009

SIGN IN TO RECOMMEND
TWITTER
SIGN IN TO E-MAIL
PRINT
REPRINTS
SHARE

WARREN, Ohio — Bruce Gump and his neighbors feared for their retirement checks when the federal government took over the pension plans at Delphi, the big auto parts maker where they once worked.

But four months later, Mr. Gump finds himself in a far more perilous condition than his neighbors.

Related
After 4 Years, Delphi Exits Bankruptcy With Sale of Assets to Lenders and G.M. (October 7, 2009)

Add to Portfolio
Delphi Corp
Go to your Portfolio »

Enlarge This Image




On his street, he is the only Delphi worker whose pension benefits may be cut. His neighbors all belong to unions and have received a lifeline in an unprecedented deal related to the government-supervised bankruptcy of General Motors, the onetime parent of Delphi. (G.M. spun off the parts division as a separate company 10 years ago.)

Mr. Gump and some 21,000 other salaried workers and

Politics E-Mail
Keep up with the latest news from Washington with the daily Politics e-mail newsletter.
Sign Up
See Sample | Privacy Policy

Ads by Google what's this?

MetLife Life Insurance
MetLife as Low as $18 per Month for $500,000 of Coverage - Get a Quote!
MetLife.com

Are you "PM" Certified?
Villanova Project Management Certification 8 weeks - Enroll Now.
www.VillanovaU.com

Retirees Health Care
Find affordable health insurance! Compare offers. Easy online form.
www.HealthQuoteExpert.com

Don't Declare Bankruptcy
Don't Declare Business Bankruptcy Until You've Seen This Alternative!
www.CompanyRecovery.com

You Can Avoid Bankruptcy
Reduce Debt & Get Relief. Become Debt Free Fast.
FreedomDebtRelief.com

Wall St Retirment Secret
Ever Wonder How Fat Cat Bankers Work Only A Fews To Retire Rich?
SpeedRetirementSystem.com

Advertise on NYTimes.com

Breaking News Alerts by E-Mail
Sign up to be notified when important news breaks.
Sign Up
Privacy Policy

MOST POPULAR - BUSINESS



David Maxwell for The New York Times

Bruce Gump says Delphi's retired union workers are getting pensions that he is. "They've been relatively well taken care of," he said. "But I'm being thrown out with yesterday's trash."

retirees are furious that their roughly 46,000 union co-workers at Delphi have had their benefits restored, apparently with government largesse, and they have not.

"They've been relatively well taken care of," he said. "But I'm being thrown out with yesterday's trash."

The Pension Benefit Guaranty Corporation, which insures pension plans, caps the amount of benefits it will pay, using a formula based on age and the type of benefits an employee earned. But in a side arrangement, G.M. is agreeing to pay special supplements, called top-ups, so that Delphi's union retirees get everything they were promised.

The automaker is drawing the money from its own pension fund, according to a person familiar with the arrangement. In a sense, the G.M. pension fund is being weakened to help the Delphi union members.

Mr. Gump and others suspect the Treasury Department told G.M. to pay the supplements. The federal government is both the company's largest shareholder and the financier of its restructuring, through the Troubled Asset Relief Program. Obama administration officials confirmed that they brought the parties together to negotiate a resolution of Delphi's pension failure but said they did not dictate the outcome.

The difference between the haves and have-nots at Delphi is not between the highly paid and lower-wage earners. As a senior engineer, Mr. Gump simply did not belong to a union. Neither did Delphi's thousands of other engineers, bookkeepers, clerks, quality controllers, purchasing agents and other white-collar employees. They may have earned more in some cases, but they did not have the chance to earn paid overtime as union members did in good years. Records show the average pay for a nonunion worker just shy of 50 years old, with 20 to 24 years' service, was about $96,000.

"Why did the hourly folks get what they needed and the salaried folks get nothing, if the bankruptcy process is supposed to be fair?" asked Paul Beiter, who retired as finance manager of a Delphi plant in Rochester. "The U.S. government is taking care of a select group of people and tossing the rest of us under the bus."

Mr. Beiter estimated that slightly fewer than half of Delphi's white-collar retirees would have their pensions cut, by 30 to 70 percent. One woman in his area who had earned a pension of $2,925 a month checked with the Guaranty Corporation and was told her retirement check would be pared to $390. But others will have smaller losses, and some will not lose at all.

The wide-ranging losses occur because of the way Congress devised the pension insurance program. It gave the biggest protection to the elderly, so that in practice, people in their 50s take the biggest hits.

Congress also wanted to discourage companies from promising rich benefits, then sticking the pension agency with the bills. For that reason, the program does not cover high dollar amounts, pension sweeteners granted just before a bankruptcy, and certain early-retirement benefits.

At Delphi, both the union members and the white-collar workers earned valuable supplements if they retired early, and Delphi raised basic benefits for both groups while it was in Chapter 11. The government insurance will not cover any of those extras. But only

E-MAILED BLOGGED



1. Payback Time: Party Gridlock in Washington Feeds Fear of a Debt Crisis
2. U.S. Supports New Nuclear Reactors in Georgia
3. Slow Trip Across Sea Aids Profit and Environment
4. Elders of Wall St. Favor More Regulation
5. Drug Firms Apply Brand to Generics
6. Economic Scene: Judging Stimulus by Job Data Reveals Success
7. DealBook: Walgreen to Buy Duane Reade for $1.1 Billion
8. Energy Company Mergers Are Expected to Rise
9. India Worries as China Builds Ports in South Asia
10. Cities Prepare for Life With the Electric Car

Go to Complete List »



Complete coverage of Fashion Week
ALSO IN STYLE »
Ralph Rucci adds some strut
Photos of the moment: faces of fashion
nytimes.com STYLE

ADVERTISEMENTS




Get your small business big-time attention.
Self-Service Advertising on NYTimes.com







Advertise on NYTimes.com

the white-collar retirees will feel the pain, because G.M. has agreed to top up the union retirees anyway.

"A bunch of men in dark glasses in a smoke-filled room tossing dice to determine thousands of people's fates is what this feels like," said the woman, 50, who will get a $390 monthly check. The Pension Benefit Guaranty Corporation's limits depend on whether each person was qualified to retire on the date the plan failed; at 29 years and 11 months, she missed the cut-off for more favorable treatment by one month. Because she still works at Delphi, she asked that her name not be used for fear of retaliation.

Ads by Google what's this?

**Ask a Lawyer: Pension Law**
13 Employment Lawyers Are Online Ask a Question. Get an Answer ASAP.
Law.JustAnswer.com/Pension-Law

**Long Term Care Quotes**
Free Long Term Care Insurance Quotes. Affordable Plans.
www.LTCconnects.com

**Federal Retirement**
Cut FEGLI Option "B" costs 30-80%. Add $300-$500/Month in Retirement
www.fegli.net

The idea that G.M. might back up Delphi's pensions emerged in 1999, during the spinoff. Companies that spin off subsidiaries are supposed to shift adequate pension assets to the new company, and the automaker did this for its white-collar workers.

But it did not have enough money to cover the benefits of the Delphi union workers, who are represented by the United Auto Workers, the United Steelworkers and the International Union of Electrical Workers.

The unions threatened to block the spinoff. To appease them, G.M. promised that if the pension fund for the hourly workers at Delphi ever collapsed, it would restore any benefits that the government refused to pay.

White-collar workers did not get such a promise. They said they did not expect to need one; their pensions were fully funded.

What they did not take into account was how quickly a pension surplus can evaporate. A big chunk of the money disappeared in the bear market that followed. An emergency financing rule eventually forced Delphi to pump more money into the pension fund — but by then the company was in trouble. Delphi declared bankruptcy in 2005, to avoid having to spend precious cash on more pension contributions.

Once in Chapter 11 bankruptcy proceedings, it could defer contributions.

Delphi spent four years in bankruptcy and contributed only a fraction of the amounts owed to its white-collar pension fund in that time. Meanwhile, the fund was paying out about $150 million a year. By the time the pension agency stepped in, the plan for salaried workers was $2.5 billion short. The union plan was $4.3 billion short.

With the recession taking its toll, G.M. needed government financing to survive and wound up in a controlled bankruptcy, closing plants, shedding dealerships and trying to cut costs. Initially, it was going to pay supplements only to Delphi's retirees who belong to the U.A.W., because that was the only union representing its workers after the bankruptcy. But the steelworkers' and electrical workers' unions cried foul, and they got the top-ups from G.M. too.

The white-collar workers cried foul — to no avail.

Administration officials said it would be wrong to think politics had any role in the outcome at Delphi. They said G.M. paid top-ups to the union retirees because it had promised to do so in 1999. The white-collar retirees got nothing because G.M. had not promised them anything.

A spokesman for G.M., Tom Wilkinson, said he was sympathetic to the white-collar retirees' plight. But the fate of their pensions in bankruptcy "isn't something that G.M. has any control over," he said. "G.M. doesn't have the legal obligation, nor does it have the money to re-fund those pensions."

Of course, G.M. does not really have the money to pay the top-ups to Delphi's union retirees either. It is operating with $53 billion in assistance from the Treasury after failing to find financing anywhere else.

Officials of the pension agency said there was no precedent for the Delphi situation but declined to comment further. In another time, the agency might have argued that if G.M. had enough money to pay top-ups, the automaker should transfer that money to the government pension insurer to help cover its costs. The insurance is provided by premiums paid by companies, but that funding is proving inadequate in an age of industry-wide restructurings and giant failures.

**Sign in to Recommend**

A version of this article appeared in print on October 27, 2009, on page B1 of the New York edition.

**More Articles in Business »**

**Times Reader 2.0: Daily delivery of The Times - straight to your computer. Subscribe for just $3.45 a week.**

SIGN IN TO E-MAIL

PRINT

REPRINTS

Ads by Google what's this?

**Federal Retirement**
Cut FEGLI Option "B" costs 30-80%. Add $300-$500/Month in Retirement
www.fegli.net

**Retire On $660 Per Month**
Free Report: The 6 Best Places To Retire In Style Overseas Today
www.LiveandInvestOverseas.com

**Verizon Retirement-EISP**
You've Got EISP, We've Got Answers (800) 281-3980
www.gatfrate.com

**Past Coverage**

Delphi to Send Pension Obligations to G.M. (September 26, 2008)
G.M. Agrees to Increase Backing of Delphi's Pensions (September 13, 2008)
U.S. Is Pressuring Delphi Over Pension Obligations (August 15, 2008)
G.M. Expects to Take a $1 Billion Charge for Delphi Costs (May 25, 2007)

**Related Searches**

Pensions and Retirement Plans — Get E-Mail Alerts
Delphi Corp — Get E-Mail Alerts
General Motors — Get E-Mail Alerts
Pension Benefit Guaranty Corp — Get E-Mail Alerts

WORLD »



Iraqi Women Are Seeking More Political Influence

FASHION & STYLE »



American Style, Way Up High

DINING & WINE »



Restaurant Review: Motorino

OPINION »

Editorial Observer

There is talk about how the Internet is driving culture ever lower, but it also makes a wealth of serious thinking available, writes Adam Cohen.

THEATER »



Musings on Gay Identity, Then and Now

OPINION »



Room for Debate: Is Nuclear Energy Back?

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2009 The New York Times Company | Privacy Policy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map