Hearing Date and Time:  February 25, 2010 at 10:00 a.m., E.T.
Objection Deadline:  February 18, 2010 at 4:00 p.m., E.T.

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Lisa G. Laukitis

JONES DAY
51 Louisiana Avenue NW
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Andrew M. Kramer

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox
Robert S. Walker

Attorneys for General Motors LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                            :
In re                                       :   Chapter 11
                                            :
DPH HOLDINGS CORP., *et al.,*               :   Case No. 05-44481 (RDD)
                                            :
                        Reorganized Debtors. :   (Jointly Administered)
                                            :
------------------------------------------------------------------x

## REPLY OF GENERAL MOTORS LLC (F/K/A GENERAL MOTORS COMPANY) TO OBJECTION TO MOTION TO ENFORCE MODIFIED PLAN AND PLAN MODIFICATION ORDER

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement .................................................................................................... 1

Facts Relating to the Top-Up Decisions ........................................................................ 4

    The 1999 Benefit Guarantees ..................................................................................... 4

    The 2007 MOUs ........................................................................................................ 5

    The 2008 Delphi-GM Global Settlement Agreement ................................................ 6

    The 2009 Modified Plan and Plan Modification Order .............................................. 7

    Old GM's 2009 Bankruptcy ....................................................................................... 8

The Exculpation and Release Provisions of the Modified Plan and the Plan Modification
    Order Apply to the Michigan Civil Action ................................................................ 10

    The Exculpation Clause in Section 11.11 of the Modified Plan Covers the Top-Up
        Decisions ............................................................................................................. 10

    The Release in Section 11.8 of the Modified Plan Covers the Top-Up Decisions .......... 13

    The Top-Up Decisions Do Not Constitute Willful Misconduct .................................... 15

The Court Should Not Abstain from Enforcing Its Plan Confirmation Order ............................ 19

    Permissive Abstention Should be Used Sparingly by the Court ...................................... 19

    The Relevant Factors Greatly Favor the Denial of Permissive Abstention in this
        Case ..................................................................................................................... 20

Conclusion ..................................................................................................................... 28

## TABLE OF EXHIBITS

**Exhibit**

1999 Benefit Guarantees.................................................................................................. A

GM Sale Order................................................................................................................B

Master Disposition Agreement .......................................................................................C

USW-IUE-CWA Settlement Agreement ........................................................................ D

# TABLE OF AUTHORITIES

**Page**

C**ASES**

Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,
    403 U.S. 388 (1971)................................................................................................26, 27

CCM Pathfinder Pompano Bay, LLC v. Compass Financial Partners LLC,
    396 B.R. 602 (S.D.N.Y. 2008)............................................................................20

Correctional Servs. Corp. v. Malesko,
    534 U.S. 61 (2001)................................................................................................27

Delaware State College v. Ricks,
    449 U.S. 250 (1980)..............................................................................................13

Eastern Air Lines, Inc. v. International Assoc. of Machinists & Aerospace Workers (In re
    Ionosphere Clubs, Inc.),
    108 B.R. 951 (Bankr. S.D.N.Y. 1989)...................................................................20

First National Bank v. State of Texas-Workforce Commission (In re Renaissance
    Hospital-Grand Prairie, Inc.),
    2009 WL 398963, *3 (Bankr. N.D. Tex. Feb. 17, 2009).......................................27

Granfinanciera S.A. v. Nordberg,
    492 U.S. 33 (1989)...........................................................................................26, 27

Great-West Life & Annuity Ins. Co. v. Knudson,
    534 U.S. 204 (2002)..............................................................................................26

Hannahs v. New York State Teachers' Retirement Sys.,
    1981 U.S. Dist. LEXIS 13424  (S.D.N.Y. 1981)...................................................13

In re Bradlees Stores, Inc.,
    311 B.R. 29 (Bankr. S.D.N.Y. 2004).....................................................................27

In re General Motors Corp.,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009)....................................................................8

In re Portrait Corp. of America, Inc.,
    406 B.R. 637 (Bankr. S.D.N.Y. 2009)........................................................21, 22, 25

Jamaica Shipping Co. Ltd. v. Orient Shipping Rotterdam, B.V. (In re Millenium
    Seacarriers, Inc.),
    458 F.3d 92 (2d Cir. 2006).....................................................................................24

# TABLE OF AUTHORITIES
(continued)

Kolstad v. Am. Dental Ass'n,
  527 U.S. 526 (1999)..................................................................................................18

LTV Corp. v. Back (In re Chateaugay Corp.),
  201 B.R. 48 (Bankr. S.D.N.Y.), aff'd in part, 213 B.R. 633 (S.D.N.Y 1997) ........................24

Mansfield v. Air Line Pilots Association International,
  2007 WL 2048664 (N.D. Ill. July 9, 2007).............................................................19

Nat'l Commc'ns Ass'n v. AT&T,
  1998 U.S. Dist. LEXIS 19067 (S.D.N.Y. 1998).....................................................18

Official Committee of Unsecured Creditors of VWE Group, Inc. v. Amlicke (In re The
  VWE Group, Inc.),
  359 B.R. 441 (Bankr. S.D.N.Y. 2007)......................................................................28

Pekelis v. Transcontinental & Western Air,
  187 F.2d 122 (2d Cir. 1951).....................................................................................18

Republic Nat'l Bank v. Eastern Airlines, Inc.,
  815 F.2d 232, 238-39 (2d Cir. 1987) .......................................................................18

Rosetta Resources Operating LP v. Pogo Producing Co. (In re Calpine Corp.),
  361 B.R. 665 (Bankr. S.D.N.Y. 2007).......................................................................27

Sabella v. Scantek Medical, Inc.,
  2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009).........................................................19

Texaco Inc. v. Sanders (In re Texaco Inc.),
  182 B.R. 937 (Bankr. S.D.N.Y. 1995)......................................................20, 21, 24

Travelers Indemnity Co. v. Bailey,
  129 S. Ct. 2195 (2009)..............................................................................................23

United Air Lines, Inc. v. Evans,
  431 U.S. 553 (1977)..................................................................................................13

U.S. Home Corp. v. Los Prados Community Assoc., Inc. (In re U.S.H. Corp. of New
  York),
  280 B.R. 330 (Bankr. S.D.N.Y. 2002)......................................................................24

# TABLE OF AUTHORITIES
(continued)

**Page**

STATUTES

11 U.S. C. § 363 ........................................................................................................................8

28 U.S.C. § 157 ............................................................................................................24, 25, 27

28 U.S.C. § 1334 ....................................................................................................19, 20, 23, 24

OTHER AUTHORITIES

United States Constitution .........................................................................................................27

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC f/k/a General Motors Company ("New GM") hereby replies to the objection (Docket No. 19492) (the "Objection") of Dennis Black, Charles Cunningham, Kenneth Hollis and the Delphi Salaried Retiree Association (collectively, the "Salaried Plaintiffs") to New GM's Motion to Enforce Modified Plan and Plan Modification Order (Docket No. 19361) (the "Plan Enforcement Motion").[1]  In support of this Reply, New GM respectfully represents as follows:

## **Preliminary Statement**

1.      Old GM and New GM were integral participants in these chapter 11 cases and contributed substantial value to the Debtors' estates.  In connection with those efforts, Old GM and New GM bargained for, and received, comprehensive releases in the Modified Plan and this Court's Plan Modification Order.  By the Plan Enforcement Motion, New GM seeks to enforce those releases against the Salaried Plaintiffs in respect of the Michigan Civil Action, which was filed in clear violation of the express provisions of the releases.  As of the Effective Date of the Modified Plan and pursuant to the Plan Modification Order, all claims by current and former Delphi employees against New GM were released.  New GM's contribution to the Modified Plan was substantial, and, as part of the complex negotiations that created it, as this Court found, New GM was reasonably entitled to require that those contributions be fixed and finite.

2.      The Salaried Plaintiffs do not challenge the validity of the releases set forth in the Modified Plan and Plan Modification Order.  Objection n.15.  Rather, the Salaried

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan Enforcement Motion or the Modified Plan.

Plaintiffs mistakenly claim that New GM's decisions to "top up" certain union employees' pensions (UAW, USW and IUE-CWA), but not those of the Salaried Employees, fall outside of the releases, either because the decisions occurred after the releases' effective date or New GM's conduct amounted to "willful misconduct."

3.    The Salaried Plaintiffs are wrong.  New GM's top-up decisions and commitments predated the Effective Date of the Modified Plan, and, even if they did not, fall within the terms of releases set forth in the Modified Plan regardless of when they occurred.  The pension top-up decisions had their roots in the 1999 spin-off of the Debtors from Old GM, when Old GM provided written pension guarantees to only three of several unions (and to no other unions or employees).  The pension top-up decisions were reaffirmed in 2007 in three separate memoranda of understanding among the Debtors, Old GM and the three unions (collectively, the "2007 MOUs").  This Court approved the 2007 MOUs at that time, and again in 2008, when this Court approved a settlement agreement between the Debtors and Old GM regarding (among other things) the terms of the pension guarantees for the three unions.  This Court again expressly approved these top-up pension benefits by the terms of the Modified Plan and Plan Modification Order in 2009.

4.    The bankruptcy court overseeing Old GM's chapter 11 case also approved New GM's assumption of the pension top-up obligation for the UAW in July 2009 in connection with the sale of Old GM's assets to New GM.  Then, no later than September 10, 2009, New GM entered into a settlement agreement with the USW and IUE-CWA and agreed to top-up benefits for those two unions in order to gain their consent to New GM's purchase of the Debtors' steering business and certain other plants as contemplated in the Master Disposition Agreement (the

"MDA"), the Modified Plan and the Plan Modification Order.  Such consent was required as a condition precedent to close the MDA transactions and consummate the Modified Plan.

5.    New GM's commitments to assume or otherwise grant these pension "top-up" commitments to the UAW, USW and IUE-CWA were all made before the Effective Date of the Modified Plan, October 6, 2009.  In fact, according to their own pleadings, the Salaried Plaintiffs' claims of "government action" and "constitutional discrimination" arose in July 2009 when New GM assumed the UAW pension top-up obligation as part of the Modified Plan (approved in the Plan Modification Order) and early September 2009 when New GM committed to top up the USW and IUE-CWA pensions, before the October 6, 2009 Effective Date of the Modified Plan.  Complaint ¶¶ 36-37.

6.    Moreover, the Salaried Plaintiffs' emphasis on the Effective Date of the Modified Plan is a red herring because New GM's top-up decisions fall within the express terms of the releases in the Modified Plan.  For example, Section 11.11 of the Modified Plan exculpates New GM for any acts taken in furtherance of the MDA and the Modified Plan or consistent with the various Union Settlement Agreements (including the 2007 MOUs with the UAW, USW and IUE-CWA to top up their pension benefits).  Importantly, Section 11.11 includes no time limit on when the exculpated acts had to have occurred; accordingly, it encompasses acts taking place before and after the Effective Date of the Modified Plan. New GM's actions in respect of these pension top-up obligations were undertaken to implement the Modified Plan and are consistent with the Union Settlement Agreements approved on multiple occasions by this Court.  Thus, New GM's top-up decisions are covered by the exculpation provision in Section 11.11 of the Modified Plan, as well as the release in Section 11.8 of the Modified Plan.

7.      The Salaried Plaintiffs also request that the Court exercise its discretion to permissively abstain from deciding the Plan Enforcement Motion because the Michigan Civil Action is already pending.  This Court, however, is the most appropriate forum to interpret and enforce its own orders and, thus, it should not abstain.  This Court is most familiar with the complex union and employee negotiations and the sale and financing transactions that were required during the four-plus years of the Debtors' chapter 11 cases, which ultimately led to the Modified Plan and the releases set forth therein.  This Court is the forum where the Plan Enforcement Motion should be determined.

### Facts Relating to the Top-Up Decisions

8.      The Salaried Plaintiffs' entire case against New GM in the Michigan Civil Action is based on New GM's obligation to top-up the pension benefits for employees in three unions — the UAW, the USW and the IUE-CWA.  The Salaried Plaintiffs would have this Court believe that New GM made these pension top-up decisions completely independent of the Modified Plan in these chapter 11 cases and well after the Effective Date of the Modified Plan, in order to argue that the decisions are not protected by the comprehensive releases in the Modified Plan and Plan Modification Order.  As set forth below, however, the pension top-up obligations have existed for over ten years, were approved by this Court and another court on numerous occasions and were centrally important in negotiating, implementing and consummating the Modified Plan.  New GM's pension top-up obligations to the three unions fall squarely within the releases set forth in the Modified Plan and Plan Modification Order, and the Court should enforce those provisions.

### *The 1999 Benefit Guarantees*

9.      As described in the Plan Enforcement Motion, the Debtors were owned and operated by Old GM until the Debtors were spun off in 1999.  In connection with that

separation, Old GM provided benefit guarantee agreements to certain unions, including the

UAW Benefit Guarantee, the USW Guarantee and the IUE-CWA Benefit Guarantee

(collectively, the "1999 Benefit Guarantees").  Copies of the 1999 Benefit Guarantees are

attached hereto collectively as Exhibit A and are incorporated herein by reference.  Pursuant to

the 1999 Benefit Guarantees, Old GM agreed, among other things, to top up pension benefits

under certain circumstances for covered employees of the Debtors in the UAW, USW and IUE-

CWA unions, but not for employees in other unions or salaried workers.[2]

### *The 2007 MOUs*

10.    After the Debtors filed these chapter 11 cases in 2005, Old GM engaged in

extensive negotiations with the Debtors and their unions regarding numerous employment issues,

including the Debtors' substantial legacy costs and the 1999 Benefit Guarantees.  In 2007,

Old GM entered into a series of Union Settlement Agreements with the Debtors and certain

unions, including the 2007 MOUs, specifically:  (a) the UAW-Delphi-GM Memorandum of

Understanding; (b) the USW-Delphi-GM Memorandum of Understanding; and (c) the IUE-

CWA-Delphi-GM Memorandum of Understanding.[3]  The 2007 MOUs were specifically

approved upon notice and hearing by separate orders of this Court, including the UAW

1113/1114 Settlement Approval Order on July 19, 2007 (Docket No. 8693), the USW 1113/1114

Settlement Approval Order on August 29, 2007 (Docket No. 9169) and the IUE-CWA

1113/1114 Settlement Approval Order on August 16, 2007 (Docket No. 9106).

---

[2]    Old GM did not enter into pension guarantee agreements, for example, with unions representing operating
engineers (IUOE), machinists and patternmakers (IAM), carpenters (MRC of C), truck drivers (Teamsters),
electrical workers (IBEW) and painters (IBPA), among others.

[3]    Old GM entered into MOUs with other unions as well; however, none of those MOUs contained pension
guarantees.  See, e.g., IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order, dated August 16,
2007 (Docket No. 9107).

11.     Pursuant to the 2007 MOUs, among other things, Old GM recognized its

obligations under the 1999 Benefit Guarantees to top up the pension plans for covered employees

in the UAW, USW and IUE-CWA unions under certain circumstances.  There is no evidence

(nor could there be) that, under any of the 2007 MOUs or other Union Settlement Agreements,

any other employees received any rights to topped-up pension benefits, including any other

unionized or non-unionized hourly worker or any salaried worker.

### *The 2008 Delphi-GM Global Settlement Agreement*

12.     In 2008, after the Debtors were unable to consummate their original plan

of reorganization and these chapter 11 cases were unexpectedly extended, the Debtors again

approached Old GM concerning the Debtors' continuing financial difficulties regarding their

labor and legacy costs.  As a result of those negotiations, Delphi and Old GM entered into the

Delphi-GM Global Settlement Agreement, which this Court approved by order dated

September 26, 2008 (Docket No. 14287) ("Delphi-GM Global Settlement Order").  A copy of

the Delphi-GM Global Settlement Agreement is attached to the Plan Enforcement Motion as

Exhibit B.

13.     Pursuant to the Delphi-GM Global Settlement Agreement, among other

things, Old GM again acknowledged its obligations to top up the pension plans of the UAW,

USW and IUE-CWA unions and agreed to the elimination of certain significant conditions

precedent to those obligations.  Delphi-GM Global Settlement Agreement ¶ 2.03.

14.     The Delphi-GM Global Settlement Order authorized the Debtors to

implement certain provisions of the Delphi-GM Global Settlement Agreement pursuant to

implementation agreements with the unions (the "Implementation Agreements").  Delphi-GM

Global Settlement Order ¶ 9.  Accordingly, in September 2008, the Debtors, the three unions and

Old GM entered into the Implementation Agreements and agreed to certain extensions of and modifications to the triggering events for, among other things, the pension top-up guarantees.

15.     The Delphi-GM Settlement Agreement also provides for a broad release of Old GM and related parties "from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever" in consideration for these concessions.  See Delphi-GM Global Settlement Agreement ¶¶ 1.29, 4.01(a).  Moreover, this release is made not only as of the effective date of the Delphi-GM Global Settlement Agreement (*i.e.*, September 29, 2008), but also as of the Effective Date of the Modified Plan  (*i.e.*, October 6, 2009).  See Delphi-GM Global Settlement Agreement ¶ 4.01(d).

### *The 2009 Modified Plan and Plan Modification Order*

16.     In the Plan Modification Order, entered on July 30, 2009, this Court approved the assumption and assignment of the UAW 2007 MOU to the GM Buyer (New GM) and expressly found that the UAW 2007 MOU "shall not be in conflict with any federal or state law."  Plan Modification Order ¶ 61.

17.     Moreover, as described in greater detail in the Plan Enforcement Motion, Section 11.11 of the Modified Plan exculpated Old GM and New GM, among others, for all claims relating to the negotiation, implementation and consummation of, among others, the Modified Plan, the Delphi-GM Definitive Documents (including the Delphi-GM Global Settlement Agreement), the MDA, the Union Settlement Agreements (including the 2007 MOUs) and any act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases.  Modified Plan ¶ 11.11.  There are no time limits on the application of Section 11.11 for any of the acts described therein.  Thus, the exculpation provision covers any act taken in connection with the implementation of the Modified Plan and related transactions, whether before or after the Effective Date of the Modified Plan.

18.     Similarly, Section 11.8 of the Modified Plan granted to New GM as of the Effective Date of the Modified Plan the same releases that were given to Old GM and certain related parties pursuant to Section 4.01 of the Delphi-GM Global Settlement Agreement, as described above.

### *Old GM's 2009 Bankruptcy*

19.     On June 1, 2009, Old GM and certain affiliates filed their own chapter 11 cases in this district.  Pursuant to an order entered in those cases on July 5, 2009 (Case No. 09-50026; Docket No. 2968) (the "<u>GM Sale Order</u>"), Old GM sold substantially all of its assets to New GM, pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances.  A copy of the GM Sale Order is attached hereto as <u>Exhibit B</u> and is incorporated herein by reference.  Pursuant to the GM Sale Order, New GM assumed the UAW 2007 MOU (which is included as a "UAW Collective Bargaining Agreement" as that term is used in the GM Sale Order), and thus agreed, among other things, to top up the pension benefits of the covered UAW employees of the Debtors.  GM Sale Order ¶ 22.

20.     Unlike the UAW 2007 MOU, New GM did not assume either the USW 2007 MOU or the IUE-CWA 2007 MOU pursuant to the GM Sale Order.  As a result, the USW and IUE-CWA objected to the Old GM/New GM sale.  Those objections were not successful and were overruled in the GM Sale Order.  GM Sale Order ¶ 2; <u>see</u> <u>also</u> <u>In re General Motors Corp.</u>, 407 B.R. 463, 509-12 (Bankr. S.D.N.Y. 2009) (overruling USW and IUE-CWA objections to sale).  However, the two unions also refused to consent to the transfer of the Delphi Debtors' steering business and certain other plants to New GM under the MDA in these cases.  (<u>See</u> Docket Nos. 17793 and 18258 for the Delphi objections.)  These objections were a significant obstacle to the consummation of the Modified Plan because the consents of the USW and IUE-CWA were a condition to close the MDA and consummate the Modified Plan.  Specifically,

Section 10.2.6 of the MDA required the UAW, USW and IUE-CWA to waive the collective

bargaining agreement ("CBA") restrictions upon the sale of the Debtors' assets pursuant to the

MDA.  A copy of the MDA is attached hereto as Exhibit C and is incorporated herein by

reference.

   21. New GM entered into discussions with the USW and IUE-CWA to resolve

the open issues.  Those comprehensive negotiations were ultimately successful, and, as of

September 10, 2009, Old GM, New GM, the USW and the IUE-CWA entered into a Settlement

Agreement (the "USW-IUE-CWA Settlement Agreement") by which New GM agreed to, among

other things, provide the pension top-up guarantees derived from the 1999 Benefit Guarantees

and the 2007 MOUs for the applicable USW and IUE-CWA members.  See USW-IUE-CWA

Settlement Agreement ¶ 1.  In return, the USW and IUE-CWA agreed, among other things, to

consent to the closing of the MDA by waiving any CBA restrictions to the Debtors' proposed

sale of certain operations to New GM under the MDA and the Modified Plan.  See USW-IUE-

CWA Settlement Agreement ¶ 1.c.  A copy of the USW-IUE-CWA Settlement Agreement is

attached hereto as Exhibit D and is incorporated herein by reference.  The parties, acting in

reliance on this agreement, closed the transactions under the MDA, and the Debtors' Modified

Plan became effective on October 6, 2009.

   22. On October 14, 2009, Old GM filed a motion in its chapter 11 case

seeking authority to enter into the USW-IUE-CWA Settlement Agreement (Case No. 09-50026;

Docket No. 4241) (the "USW-IUE-CWA Settlement Motion"), which was approved by an order

of the bankruptcy court in Old GM's chapter 11 case on November 12, 2009 (Case No. 09-

50026; Docket No. 4433) (the "USW-IUE-CWA Settlement Order").  Although the Old GM

bankruptcy court did not enter an order approving the USW-IUE-CWA Settlement Agreement

until November 12, 2009, New GM had committed to the agreement no later than September 10, 2009, and the parties performed under the agreement prior to final bankruptcy court approval by allowing the MDA to close (and, thus, the Modified Plan to be consummated).

23.     Contrary to the Salaried Plaintiffs' conclusory assertions, New GM's commitments to top up the USW and IUE-CWA pension benefits pursuant to the USW-IUE-CWA Settlement Agreement were not isolated acts that New GM decided to take independent of the Modified Plan.  Although Old GM's obligations with respect to these benefits went back to 1999, New GM did not initially assume them and had defeated the unions' objections to that decision in the context of the Old GM bankruptcy and the approval of New GM's acquisition of Old GM's assets.  It was only in the context of the need to secure the unions' consent *to the Delphi transaction* that New GM agreed to honor some of those obligations from Old GM.

24.     Notwithstanding the clear commitments to provide pension top-up benefits to the former employees represented by the UAW, USW and IUE-CWA unions (but not any other employees) that were set forth in the various documents described above, the Salaried Plaintiffs never took the opportunity in this Court to object to any such actions on grounds of unlawful discrimination, including with respect to the 2007 MOUs, the Delphi-GM Global Settlement Agreement, the Implementation Agreements, the Modified Plan, the Plan Modification Order or any other circumstance when this alleged "discriminatory" conduct was contemplated and approved by this Court.

### The Exculpation and Release Provisions of the Modified Plan and the Plan Modification Order Apply to the Michigan Civil Action

#### *The Exculpation Clause in Section 11.11 of the Modified Plan Covers the Top-Up Decisions*

25.     Section 11.11 of the Modified Plan contains a broad exculpation and limitation of liability for a number of parties, including Old GM and New GM, relating to their

actions taken in connection with the Modified Plan and certain other documents. The Salaried

Plaintiffs argue incorrectly that Section 11.11 of Modified Plan is a typical exculpation clause

and does not cover New GM's pension top-up decisions because such decisions were not made in

connection with the Modified Plan. Objection ¶ 36.

26.      The Salaried Plaintiffs are wrong on two fronts. First, Section 11.11

encompasses a broad range of conduct and documents beyond just the Modified Plan. Indeed,

Section 11.11 covers acts taken in furtherance of, among others, the Delphi-Definitive

Documents (including the Delphi-GM Global Settlement Agreement), the Delphi-PBGC

Settlement Agreement, the MDA, the Union Settlement Agreements (including the 2007 MOUs)

and any agreement or document entered into in connection with either the Modified Plan or any

agreement with the Unions, including the Union Settlement Agreements. Modified Plan ¶ 11.11.

This is, of course, consistent with the breadth of the release in the Delphi-GM Global Settlement

Agreement, which unambiguously covers all claims against New GM by current and former

Delphi employees. Delphi-GM Global Settlement Agreement ¶¶ 4.01(a), 4.01(c) and 4.01(d).

27.      In addition, the record establishes that New GM's pension top-up decisions

were, in fact, made in connection with the Modified Plan as well as with numerous other

documents identified in Section 11.11 of the Modified Plan. As described above, the UAW,

USW and IUE-CWA unions had pension top-up guarantees pursuant to the Union Settlement

Agreements, including the 2007 MOUs; thus, New GM's pension top-up decisions were made in

connection with those agreements. In addition, New GM assumed the UAW 2007 MOU in

connection with its asset purchase from the Debtors under the MDA. Further, the consent of

these three unions was required to close the MDA and, thus, to consummate the Modified Plan.

Because two of the unions (the USW and the IUE-CWA) would not consent to the closing of the

MDA without New GM's granting of the pension top-up obligations, New GM's pension top-up commitment to the USW and IUE-CWA was necessary to close the sale transactions under the MDA and to consummate the Modified Plan. Accordingly, New GM's pension top-up decisions fall squarely within the express the terms of Section 11.11's exculpation provision.

28.    It is also important to note that Section 11.11 contains no reference to the Effective Date of the Modified Plan. Rather, it covers all acts identified therein whether they are taken before or after the Effective Date. Accordingly, the Salaried Plaintiffs' assertion that New GM's top up decisions are outside the scope of the exculpation because they occurred after the October 6, 2009 Effective Date is irrelevant and completely without merit.

29.    Even if the Effective Date of the Modified Plan were relevant for purposes of the release of New GM in Section 11.11, the top-up decisions predate October 6, 2009 and would be covered in any event. As described, the pension top-up commitments by New GM were made in July 2009 for the UAW and, at the latest, on September 10, 2009, when all parties agreed to the terms of the USW-IUE-CWA Settlement Agreement to top up the pensions related to the USW and IUE-CWA unions.

30.    The Salaried Plaintiffs suggest that their constitutional claims did not exist until New GM actually made its first top-up payment sometime in early 2010 and, thus, they occurred after the Effective Date of the Modified Plan and fell outside the scope of the release. Objection ¶ 42. That suggestion is meritless. The pension top-up payments were simply the consequence of agreements entered into prior to the Effective Date of the Modified Plan. Each individual payment cannot present a new instance of allegedly unconstitutional discrimination. Instead, the appropriate reference is New GM's *agreements* to provide such benefits; New GM's agreements are the only acts that could possibly have been done with the alleged discriminatory

intent. Thus, the agreements necessarily constitute the acts at the heart of the Salaried Plaintiffs' claim. See Delaware State College v. Ricks, 449 U.S. 250, 258 (1980) (the "proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful") (emphasis in original; internal citation and quotation marks omitted); United Air Lines, Inc. v. Evans, 431 U.S. 553, 560 (1977) (declining to find actionable a consequence of "a past event which has no present legal significance"); Hannahs v. New York State Teachers' Retirement Sys., 1981 U.S. Dist. LEXIS 13424, at *15-17 (S.D.N.Y. 1981) ("Rather than constitute a separate or continuing violation, each monthly [pension] check merely reflects the effects of the discriminatory act which occurred" earlier when the employer calculated the plaintiff's pension benefits based on sex-differentiated mortality tables). Indeed, in their own pleading allegations, the Salaried Plaintiffs concede that the individual payments are not the conduct subject to challenge; they instead refer expressly to the top-up *agreements* made in 2009, and do not raise any issue with any individual top-up *payments*. Complaint ¶¶ 36-37, 58-60.

### *The Release in Section 11.8 of the Modified Plan Covers the Top-Up Decisions*

31.    In addition to the exculpation clause in Section 11.11 of the Modified Plan, Section 11.8 provides a completely independent and alternative release for New GM with respect to its pension top-up decisions. Section 11.8 gives New GM the same releases as given to Old GM in the Delphi-GM Global Settlement Agreement. As described, the Delphi-GM Global Settlement Agreement gives Old GM a release for, among other things, any acts taken in connection with the 2007 MOUs, the Delphi-GM Global Settlement Agreement, the Modified Plan or any other documents entered in connection with the foregoing. Again, because New GM's pension top-up commitments were necessary to implement the Modified Plan due to the unions' consent rights under the MDA and were made in connection with the obligations

under the MDA, the UAW 2007 MOU and the GM-Delphi Global Settlement Agreement, the

release in the GM-Delphi Global Settlement Agreement, made applicable to New GM pursuant

to Section 11.8 of the Modified Plan, applies to New GM's pension top-up decisions.

32.    The Salaried Plaintiffs argue that the release in Section 11.8 of the

Modified Plan does not apply to New GM's pension top-up decisions because the effective date

of the release in Section 11.8 is the same as the effective date for the release in Section 4.01(c) of

the Delphi-GM Global Settlement Agreement, September 29, 2008.  The Salaried Plaintiffs then

argue that New GM's pension top-up decisions were made after September 29, 2008, so the

release does not apply.

33.    Once again, the Salaried Plaintiffs are wrong.  Under Section 11.8 of the

Modified Plan, New GM was entitled to all of the releases given to Old GM under Section 4.01

of the Delphi-GM Global Settlement Agreement, not just the release in Section 4.01(c).

New GM is also released under Section 4.01(a) of the Delphi-GM Global Settlement Agreement,

which releases all of the same types of claims described in section 4.01(c), but applies to claims

held by the "Delphi-Related Parties."  That term is defined to include the Debtors and all of the

Debtors' current and former employees.  Delphi-GM Global Settlement Agreement ¶ 1.29.

Because the Salaried Plaintiffs are, in fact, former employees of the Debtors, they are "Delphi-

Related Parties," and their actual or potential claims against New GM have been released

pursuant to Section 4.01(a).

34.    Under the terms of the Delphi-GM Global Settlement Agreement, the

release in Section 4.01(a) applies not only as of the effective date of the settlement agreement

(*i.e.*, September 29, 2008), but also as of the Effective Date of the Modified Plan (*i.e.*, October 6,

2009).  In particular, Section 4.01(d) of the Delphi-GM Global Settlement Agreement provides

that "[a]ny Delphi Plan shall extend . . . the releases set forth in section 4.01(a) and (b) of this

Agreement through the Emergence Date."  The term "Emergence Date" means the Effective Date

of the Modified Plan, or October 6, 2009.  Delphi-GM Global Settlement Agreement ¶ 1.37.

35.    As a result, pursuant to Section 11.8 of the Modified Plan, New GM is

entitled to the release set forth in Section 4.01 of the Delphi-GM Global Settlement Agreement

for any acts taken on or before the Effective Date of the Modified Plan.  Because New GM's

commitments to top up the unions' pension plans were all made prior to that date, as described in

the previous section regarding Section 11.11, the release in Section 11.8 provides a separate

basis for the release of the claims asserted by the Salaried Plaintiffs.

### *The Top-Up Decisions Do Not Constitute Willful Misconduct*

36.    The Salaried Plaintiffs also claim that New GM's pension top-up decisions

were not released pursuant to the Modified Plan and the Plan Modification Order because such

decisions were discriminatory in nature, and this amounted to "willful misconduct" that is carved

out of the releases.

37.    As an initial matter, the carve out for "willful misconduct" does not even

apply to the release that New GM received pursuant to Section 11.8 of the Modified Plan, which

incorporated the releases set forth in Section 4.01 of the Delphi-GM Global Settlement

Agreement.  Section 4.01 of the Delphi-GM Global Settlement Agreement grants an absolute

release to the "GM-Related Parties" without any qualifier for willful misconduct.  Accordingly,

New GM's release in Section 11.8 likewise is not limited by willful misconduct.  The Salaried

Plaintiffs assert that paragraph 20 of the Plan Modification Order imposes a willful misconduct

restriction on the release in Section 11.8 because that paragraph provides that no release in

Article 11 of the Modified Plan shall release liability from any act or omission that is determined

to have constituted intentional fraud or willful misconduct.  The Salaried Plaintiffs, however,

ignore paragraph 57 of the Plan Modification Order, which specifically states that "in the event

there are any conflicts between the terms and provisions of the Modified Plan or this [Plan

Modification Order] and the Delphi-GM Global Settlement Agreement, the terms of the Delphi-

GM Global Settlement Agreement shall govern."  Plan Modification Order ¶ 57.  Because there

is indeed a conflict between the terms of the Plan Modification Order (which carves out willful

misconduct from the release in Section 11.8) and the Delphi-GM Global Settlement Agreement

(which provides an absolute release without a carve-out for willful misconduct), the terms of the

Delphi-GM Global Settlement Agreement govern, and New GM is absolutely released for all

acts, including willful misconduct.

        38.      Even if the "willful misconduct" qualifier did apply to the release that

New GM received under the Modified Plan, New GM's pension top-up decisions were not (and

could not be) the result of any willful misconduct.  The alleged "discriminatory" decisions to

allow the three unions to receive pension top-up benefits while no other union or employees

received such benefits was approved in six separate orders from this Court as well as two orders

of the bankruptcy court overseeing the Old GM chapter 11 case.  Specifically, this Court

approved the 2007 MOUs that provided for pension top-up benefits and found that such approval

was "in the best interests of Debtors their estates, their creditors, and other parties-in-interest."

See, e.g., UAW 1113/114 Settlement Approval Order p. 2.  Similarly, in the Delphi-GM Global

Settlement Order, this Court found that the Delphi-GM Global Settlement Agreement, in which

the pension top-up obligations to the three unions were confirmed, was the "product of good

faith negotiations and arm's length bargaining by the parties" and "essential to the Debtors'

restructuring and provides material and substantial consideration to Delphi."  Delphi-GM Global

Settlement Order ¶¶ C and C(iv).  Likewise, in the Plan Modification Order, this Court approved

the assumption and assignment of the UAW 2007 MOU to New GM and found that such

2007 MOU "shall not be in conflict with any federal or state law."  Plan Modification Order ¶ 61.

As well, the bankruptcy court in Old GM's chapter 11 case found that the "[a]ssumption and

assignment of the UAW Collective Bargaining Agreement [which defined term includes the

2007 MOU with the UAW and the pension top-up benefits therein] is integral to the

363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors,

employees, and retirees, and represent the exercise of the Debtors' sound business judgment,

enhances the value of the Debtors' estates, *and does not constitute unfair discrimination*."

GM Sale Order ¶ FF (emphasis added).  That court also stated that the USW-IUE-CWA

Settlement Agreement, in which the USW and IUE-CWA were given pension top-up benefits

without a corresponding benefit to other unions or employees, was "in the best interests of the

[Old GM] Debtors, their estates, creditors, and all parties in interest."  USW-IUE-CWA

Settlement Order p. 2.  It simply cannot be "willful misconduct" to implement agreements and

arrangements with express court approval.

       39.    Given that the disparate treatment of the pension benefits for the UAW,

USW and IUE-CWA has existed for over ten years, has been fully vetted and approved in this

Court and another court on numerous occasions and was necessary for the union consents to

close the MDA transactions, there is no conceivable way a court could find that New GM

committed "willful misconduct" in taking on these obligations so that the Modified Plan could be

consummated.  Thus, regardless how the Michigan District Court may rule on Plaintiffs' claims

of constitutional discrimination, the public record more than establishes the lack of willful

misconduct for this Court to decide that the Salaried Plaintiffs' claims do not fall within the

asserted exception to the release.

40.     In addition, even though the Salaried Plaintiffs do not allege "willful" misconduct" in their Complaint, the Salaried Plaintiffs urge an equivalence between "willful misconduct" and "intentional discrimination" in their Objection.  That is wrong as a matter of law.  The term "willful" refers to New GM's awareness that it may be engaging in "misconduct," that is, New GM's awareness that it may be acting in violation of law — or an awareness that any "discriminatory" decisions will result in constitutional injury, or at least act with reckless disregard of such a consequence.  See Republic Nat'l Bank v. Eastern Airlines, Inc., 815 F.2d 232, 238-39 (2d Cir. 1987) ("Willful misconduct requires either 'the intentional performance of an act with knowledge that the performance of that act will probably result in injury' or 'the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences.'") (quoting Pekelis v. Transcontinental & Western Air, 187 F.2d 122, 124 (2d Cir. 1951)); Nat'l Commc'ns Ass'n v. AT&T, 1998 U.S. Dist. LEXIS 19067, at *18 (S.D.N.Y. 1998) ("Willful misconduct is either, one, the intentional performance of an act or the intentional omission of some act with knowledge that the performance of that act will probably result in injury or damage, or, two, the intentional performance of some act or the intentional omission of some act in such a manner as to imply a reckless disregard of the probable consequences of the act.").  The term "willful" does not refer to New GM's awareness that it was engaging in discrimination (i.e., differential treatment), which may or may not be unlawful.  See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999) (distinguishing "intentional discrimination" from a requirement that an employer "act with 'malice or with reckless indifference to [the plaintiff's] federally protected rights,'" and explaining that "the terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination").  A showing of "intentional discrimination"

alone cannot establish a party's awareness of the lawfulness of its conduct—the party "may be unaware of the relevant federal prohibition" or it may "discriminate[] with the distinct belief that its discrimination is lawful." Id. at 536-37. Thus, intentional discrimination does not equate with "willful misconduct," and the claims before the Michigan District Court do not ask that court to decide whether there was willful misconduct.[4]

41.     Simply put, the Salaried Plaintiffs have not alleged, and cannot allege, "willful misconduct" to try to shoehorn their claims into that exception to the release, which, in any event, does not apply to New GM. Accordingly, the Salaried Plaintiffs' argument that the pension top-up obligations are not released because they constitute willful misconduct has no merit.

**The Court Should Not Abstain from
Enforcing Its Plan Confirmation Order**

42.     The Salaried Plaintiffs also have requested that this Court abstain from hearing the Plan Enforcement Motion. As described below, the relevant considerations overwhelmingly favor this Court interpreting and enforcing its own Plan Modification Order. The Court should not abstain from hearing the Plan Enforcement Motion.

*Permissive Abstention Should be Used Sparingly by the Court*

43.     Section 1334(c)(1) of the Judicial Code allows a court to abstain from hearing certain matters "in the interest of justice, or in the interest of comity with State courts or

---

[4]     Plaintiffs' citations are not to the contrary. In Sabella v. Scantek Medical, Inc., 2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009), the court, in addressing whether certain conduct fell within a clause holding the defendant liable for "its willful misconduct," was considering claims for fraud, see id. at *32, which is not at issue here or in the Michigan District Court.

And in Mansfield v. Air Line Pilots Association International, 2007 WL 2048664 (N.D. Ill. July 9, 2007) — a decision from outside this circuit — the court held that plaintiffs' claims against a union, for breach of the duty of fair representation, alleged "willful misconduct" because the Seventh Circuit had ruled that such claims require intentional misconduct. Id. at *3. As indicated above, constitutional claims of intentional discrimination do not require the separate showing of willful misconduct.

respect for State law . . . ."  28 U.S.C. § 1334(c)(1).  This permissive abstention, however, is the

rare exception rather than the rule.  Courts should abstain sparingly and err in favor of exercising

jurisdiction.  See, e.g., CCM Pathfinder Pompano Bay, LLC v. Compass Financial Partners LLC,

396 B.R. 602, 607 (S.D.N.Y. 2008) ("Courts must be 'sparing' in their exercise of permissive

abstention . . . and 'may abstain only for a few 'extraordinary and narrow exceptions.'") (citations

omitted); Eastern Air Lines, Inc. v. International Assoc. of Machinists & Aerospace Workers

(In re Ionosphere Clubs, Inc.), 108 B.R. 951, 954 (Bankr. S.D.N.Y. 1989) ("Abstention is an

'extraordinary and narrow exception' to the federal court's duty to adjudicate a controversy

properly before it."); Texaco Inc. v. Sanders (In re Texaco Inc.), 182 B.R. 937, 946 (Bankr.

S.D.N.Y. 1995) ("Relevant Supreme Court precedent suggests that the federal courts should be

sparing in the exercise of discretionary abstention.").

### *The Relevant Factors Greatly Favor the Denial of Permissive Abstention in this Case*

44.     This Court recently recognized the following factors to consider when

determining whether to abstain from hearing a particular matter:

> (1) the effect or lack thereof on the efficient administration of the
> estate if a Court recommends abstention, (2) the extent to which
> [non-bankruptcy] law issues predominate over bankruptcy issues,
> (3) the difficulty or unsettled nature of the applicable [non-
> bankruptcy] law, (4) the presence of a related proceeding
> commenced in state court or other non-bankruptcy court, (5) the
> jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the
> degree of relatedness or remoteness of the proceeding to the main
> bankruptcy case, (7) the substance rather than form of an asserted
> "core" proceeding, (8) the feasibility of severing [non-bankruptcy]
> law claims from core bankruptcy matters to allow judgments to be
> entered in [non-bankruptcy] court with enforcement left to the
> bankruptcy court, (9) the burden of [the bankruptcy court's] docket,
> (10) the likelihood that the commencement of the proceeding in a
> bankruptcy court involves forum shopping by one of the parties,
> (11) the existence of a right to a jury trial, and (12) the presence in
> the proceeding of non-debtor parties.

In re Portrait Corp. of America, Inc., 406 B.R. 637, 641-42 (Bankr. S.D.N.Y. 2009) (citations

omitted).  The Court noted that not all factors need be considered.  Id. at 642 ("Not all of these

factors need be applied, however, . . . although the balance should be weighted in favor of

exercise of jurisdiction.'") (citations omitted).

>    45.    Analysis of these factors demonstrates that this Court is best suited to

determine this matter and should not abstain from deciding the Plan Enforcement Motion.

>    46.    Degree of Relatedness to the Main Bankruptcy Case.  One of the most

significant abstention factors is the degree of relatedness of the Plan Enforcement Motion to the

Debtors' main chapter 11 case.  As the Court is acutely aware, there is much history and

complexity in the over four year life span of these cases, complicated by the complexity

triggered by Old GM's separate bankruptcy filing towards the end of these cases and the effect

that such bankruptcy had on the resolution of these Debtors' cases.  Having presided over all of

such history and being intimately familiar with the details and facts, this Court is in the best

position to decide the scope of releases that this Court had approved and entered.  See, e.g.,

Texaco, 182 B.R. at 947 ("A bankruptcy court is undoubtedly the best qualified to interpret and

enforce its own orders including those providing for discharge and injunction and, therefore,

should not abstain from doing so.").

>    47.    Deciding the Plan Enforcement Motion would be a daunting task for

another judge to undertake, especially one without any knowledge of the relevant history of these

chapter 11 cases.  In this respect, this situation is completely different from the Portrait Corp.

case that the Salaried Plaintiffs heavily rely upon in their Objection.  In that case, this Court was

assigned to the case after the sale was consummated and after the bankruptcy judge who had

presided over the case and the sale retired.  Portrait Corp., 406 B.R. at 640, 643.  Thus, this Court

was not nearly as familiar with the underlying facts and circumstances of the Portrait Corp. sale as this Court is of the facts in this case.

48.    In the <u>Portrait Corp.</u> case, the Court also abstained, <u>inter</u> <u>alia</u>, because the dispute was truly tangential to the main bankruptcy case. <u>Id.</u> at 643. It involved a trademark that may or may not have been sold to a purchaser of the debtor's assets. <u>Id.</u> at 642. In this case, by contrast, the heart of this dispute directly relates to New GM's assumption or honoring, as applicable, of the pension top-up obligations set forth in the 2007 MOUs and MDA in order to close the MDA transactions and consummate the Modified Plan. The Plan Enforcement Motion is intimately tied to (a) New GM's ultimate decisions to purchase the Debtors' steering business and certain other plants and to relieve the Debtors of many of their union legacy obligations and (b) the releases that Old GM and New GM negotiated for, and received, in return for their support of Delphi and its restructuring efforts.

49.    <u>The predominance of bankruptcy issues</u>. The Plan Enforcement Motion requires the interpretation and application of the releases set forth in Modified Plan and Plan Modification Order. The proceeding, however, does not require the Court to decide the merits of the underlying Michigan Civil Action, nor, as described in paragraphs 36-41 above, does it require the Court to decide whether New GM's pension top-up decisions constituted "willful misconduct." Accordingly, bankruptcy law issues predominate over non-bankruptcy law issues.[5]

50.    <u>Presence of related proceedings</u>. The Salaried Plaintiffs allege that the Michigan Civil Action has progressed substantially with respect to the claims against New GM.

---

[5]    The Salaried Plaintiffs claim that the Michigan District Court is the better forum to decide the issue of New GM's "willful misconduct" because the Michigan District Court will be examining the constitutional conduct of New GM's co-defendants in the Michigan Civil Action even if this Court refuses to abstain on the Plan Enforcement Motion. Objection n.12. But the Michigan District Court's actions with respect to New GM's co-defendants are irrelevant to this Court's abstention analysis, since those co-defendants are not parties to the Plan Enforcement Motion, nor did they receive releases under the Modified Plan or the Plan Modification Order.

Not so.  Most of the activity to date in the Michigan Civil Action has occurred with the original

defendant in the lawsuit, the PBGC.  The claims asserted by the Salaried Plaintiffs in the

Michigan Civil Action against the PBGC relate to the termination of the Salaried Plan, and thus

are factually and legally distinct from the claims against New GM, which arise from the pension

top-up decisions for the UAW, USW and IUE-CWA unions.  With respect to New GM, there has

been no discovery and no preliminary injunction motion filed (as there was for the PBGC).  New

GM's motion to dismiss the Michigan Civil Action was filed only a few days ago, on

February 16, 2010.  The Salaried Plaintiffs have not yet responded to this motion.  The fact is

that New GM brought the Plan Enforcement Motion as quickly as possible after it was named as

a co-defendant in the Michigan Civil Action, and delayed filing the motion only to give the

Salaried Plaintiffs time to respond to a letter from New GM's counsel to the Salaried Plaintiff's

counsel demanding that New GM be dismissed from the action in light of the releases in the

Modified Plan and Plan Modification Order.  That brief forbearance in bringing the Plan

Enforcement Motion to give the Salaried Plaintiffs time to comply with the releases did not

cause them any prejudice, did not cause the courts to waste judicial resources and should not be

used against New GM now.

       51.     _Difficulty or unsettled nature of applicable non-bankruptcy law_.  As

explained above, the Plan Enforcement Motion involves this Court interpreting and enforcing its

own Plan Modification Order and the releases set forth therein.  It does not require interpretation

of non-bankruptcy law.

       52.     _Jurisdictional basis other than 28 U.S.C. § 1334_.  Courts have consistently

held that they have jurisdiction to enforce their own orders, separate and apart from the

jurisdiction set forth in 28 U.S.C. § 1334.  _See_, _e.g._, _Travelers Indemnity Co. v. Bailey_,

129 S. Ct. 2195, 2205 (2009) ("[A]s the Second Circuit recognized, . . . the Bankruptcy Court

plainly had jurisdiction to interpret and enforce its own prior orders."); LTV Corp. v. Back (In re

Chateaugay Corp.), 201 B.R. 48, 62 (Bankr. S.D.N.Y.) ("Bankruptcy courts have inherent or

ancillary jurisdiction to interpret and enforce their own orders wholly independent of the

statutory grant of jurisdiction under 28 U.S.C. § 1334.") (citations omitted), aff'd in part,

213 B.R. 633 (S.D.N.Y 1997).  In addition, this Court retained exclusive jurisdiction in the

Modified Plan over disputes involving the interpretation, implementation or enforcement of,

among others, the Modified Plan, the Plan Modification Order, the Delphi-GM Global

Settlement Agreement, the MDA, the Delphi-PBGC Settlement Agreement and all orders

previously entered by the Court.  Modified Plan ¶ XIII(k), (r), (u) and (v).  That is exactly what

the Plan Enforcement Motion is asking this Court to do.[6]

        53.    Core proceeding.  Courts also have consistently held that the enforcement

of their own orders, and plan confirmation orders in particular, are core proceedings pursuant to

28 U.S.C. § 157(b)(2).  See, e.g., Jamaica Shipping Co. Ltd. v. Orient Shipping Rotterdam, B.V.

(In re Millenium Seacarriers, Inc.), 458 F.3d 92, 95 (2d Cir. 2006) (finding proceeding to enforce

a bankruptcy court sale order is a core proceeding); Texaco, 182 B.R. at 944 ("There can be no

question that a proceeding such as this, to enforce and construe a confirmation order issued by

this Court in this case, constitutes a proceeding 'arising in or related to a case under title 11.'  I

agree with the authority cited above and hold that this is a core proceeding under

section 157(b)(2)."); U.S. Home Corp. v. Los Prados Community Assoc., Inc. (In re U.S.H.

---

[6]    The Salaried Plaintiffs argue that the releases should be brought as an affirmative defense in the Michigan
Civil Action rather than through the Plan Enforcement Motion in this Court, yet they cite no case law in
support of this proposition.  Objection ¶ 4.  Given this Court's undisputed jurisdiction to enforce its own
orders and the great interest it has in doing so, this Court is the better forum to enforce the releases in the
Modified Plan and Plan Modification Order.

Corp. of New York), 280 B.R. 330, 335 (Bankr. S.D.N.Y. 2002) ("a proceeding to enforce a

Chapter 11 discharge is a core proceeding under 28 U.S.C. § 157(b)(2)").

54.    Feasibility of severing nonbankruptcy law matters from core matters.  The

Plan Enforcement Motion involves the interpretation and enforcement of releases in this Court's

prior order, which is a core matter.  In addition, as described above, there is no need for the

Court to decide the underlying merits of the Michigan Civil Action; accordingly, severing

nonbankruptcy law matters from the Plan Enforcement Motion will not be necessary.

55.    Burden on bankruptcy court docket.  This Court is the forum most familiar

with the releases set forth in the Modified Plan and the Plan Modification Order and, thus, is the

most efficient forum to resolve the Plan Enforcement Motion.  The motion has been fully briefed

in this Court and is ready for a decision.

56.    Forum shopping.  There is no basis for any charge of forum shopping by

New GM.  This Court is the obvious forum in which to bring the Plan Enforcement Motion since

it is this Court that entered the Plan Modification Order and confirmed the Modified Plan that

contain the releases that New GM is seeking to enforce.  As explained above, New GM brought

the Plan Enforcement Motion as quickly as it could after being named a defendant in the

Michigan Civil Action and after informing the Salaried Plaintiffs of the releases and giving them

an opportunity to dismiss New GM from the Michigan Civil Action.  This is in stark contrast to

the Portrait Corp. case, cited by the Salaried Plaintiffs, in which this Court found evidence that

the defendant was forum shopping because it waited over 17 months from the commencement of

the proceeding until it sought the enforcement of a sale order.  Portrait Corp., 406 B.R. at 643.

57.    If anything, by suing New GM in the Michigan District Court, the Salaried

Plaintiffs engaged in forum shopping.  The Salaried Plaintiffs could have raised the issue of the

disparate pension treatment of union and salaried workers in this Court in connection with the

approval of 2007 MOUs, the Delphi-GM Global Settlement Agreement in 2008 or the

confirmation of the Modified Plan in 2009.  But rather than raise the issue in this Court, the

Salaried Plaintiffs chose to sue in Michigan District Court.

58.    Indeed, the Salaried Plaintiffs filed suit in Michigan despite their own

stipulation, entered in this Court on September 11, 2009 (Docket No. 18896) (the "Stipulation"),

permitting the automatic stay and Modified Plan injunction to be lifted for the Salaried Plaintiffs

to commence a lawsuit against the PBGC – *and only the PBGC* – in Michigan District Court on

account of the Salaried Plan termination.  In that Stipulation, the Salaried Plaintiffs agreed "not

[to] use the Action or the proceedings related thereto as a collateral attack against any order of

this Court, including but not limited to the Court's Order (Docket no. 18707) approving and

confirming the Debtors' Modified Plan of Reorganization and approving the Debtors' settlement

agreement with the PBGC."  The Salaried Plaintiffs violated the Stipulation by suing New GM in

November 2009.

59.    Existence of right to jury trial.  The Plan Enforcement Motion simply

involves a request by New GM for this Court to enforce a release in its Plan Modification Order

and the Modified Plan.  This is a core proceeding (as described above) that does not involve any

right to a jury trial despite the Salaried Plaintiff's tortured attempts to argue otherwise.[7]  In

---

[7]    The Salaried Plaintiffs' contention that a "right to jury trial" on their constitutional claims against New GM
favors abstention is wrong for another reason.  Objection ¶ 29(h).  To determine a right to a jury trial,
courts "examine the remedy sought" because legal, rather than equitable, remedies trigger entitlement to a
jury trial.  Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 42 (1989).  In claiming a jury-trial right for the
merits of the Michigan Civil Action (which this Court is not being asked to determine), the Salaried
Plaintiffs rely on their request for money damages based on Bivens v. Six Unknown Named Agents of the
Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Objection ¶ 29(h); Complaint ¶ 64.  Although
actionable Bivens claims permit a jury trial because "money damages are, of course, the classic form of
legal relief," Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210 (2002), the Salaried
Plaintiffs' Bivens claims against New GM are improper; as a result, no jury-trial right is implicated here.
The Supreme Court has held that the implied damages remedy authorized by Bivens for constitutional

addition, as described in paragraphs 36-41 above, there is no need for this Court to decide the

"willful misconduct" issue or rule on the merits of the underlying Michigan Civil Action.[8]

60.    <u>Presence of a related proceeding in state court</u>.  There is no related state

court proceeding.  The Salaried Plaintiffs commenced the Michigan Civil Action in another

federal court.  Accordingly, there are no state law issues for which a state court would be better

suited.  In fact, most of the cases that the Salaried Plaintiffs cite in favor of abstention involved

matters in which state law issues were at stake and, thus, are unpersuasive in this case.  <u>See</u>, <u>e.g.</u>,

<u>Rosetta Resources Operating LP v. Pogo Producing Co. (In re Calpine Corp.)</u>, 361 B.R. 665, 669

(Bankr. S.D.N.Y. 2007) ("The United States Supreme Court has found that permissive abstention

is most appropriate when a case is dominated by state law issues or raises unsettled issues of

state law."); <u>In re Bradlees Stores, Inc.</u>, 311 B.R. 29, 35 (Bankr. S.D.N.Y. 2004) (abstaining

where "claims are based primarily on state law" and the related bankruptcy case had been

closed); <u>First National Bank v. State of Texas-Workforce Commission (In re Renaissance</u>

_____

(continued…)

violations allegedly committed by individual federal officers is not available against private corporate
defendants alleged to be state actors.  <u>See</u> <u>Correctional Servs. Corp. v. Malesko</u>, 534 U.S. 61, 63, 66 n.2
(2001).  Thus, under <u>Malesko</u>, the Salaried Plaintiffs' <u>Bivens</u> claims against GM may not proceed at all,
mooting any jury-trial issue.

While the Salaried Plaintiffs also seek "specific relief" for their constitutional claims — asking the
Michigan District Court to direct New GM to provide benefits at the level set forth in their now-terminated
plan, or to distribute the funds allocated to the union-affiliated plans in equal measure with their plan — the
Salaried Plaintiffs do not contend that these claims entitle them to a jury trial.  Complaint ¶ 63.  Nor could
they.  To the extent their "specific relief" request seeks a court's injunctive or other equitable intervention to
provide the Salaried Plaintiffs exactly what they claim to which they are entitled, the request seeks
equitable relief to which a jury-trial right does not attach.  <u>See</u> <u>Granfinanciera</u>, 492 U.S. at 42.  And if
instead the request simply seeks compensation for the alleged injury, that legal claim for damages would be
a <u>Bivens</u> action entirely foreclosed by the Supreme Court's decision in <u>Malesko</u>.  Thus, none of the Salaried
Plaintiffs' constitutional claims against New GM implicate a jury-trial right, and that factor does not favor
abstention.

[8]    The Salaried Plaintiffs also suggest that mandatory withdrawal of the reference pursuant to 28 U.S.C.
§ 157(d) may be required because the application of the releases in the Modified Plan will require
consideration of the United States Constitution.  Objection n.14.  To the contrary, the Plan Enforcement
Motion does not require this Court to consider anything other than the enforcement of its own previous
orders, and thus a withdrawal of the reference is not mandated.

Hospital-Grand Prairie, Inc.), 2009 WL 398963, *3 (Bankr. N.D. Tex. Feb. 17, 2009) ("In this case, the causes of action and defenses which Plaintiff and TWC assert against one another arise solely under state law."); Official Committee of Unsecured Creditors of VWE Group, Inc. v. Amlicke (In re The VWE Group, Inc.), 359 B.R. 441, 448 (Bankr. S.D.N.Y. 2007) (district court withdrew the reference in a case in which "[t]he plaintiff's complaint asserts a state-law professional malpractice claim").

61.    After reviewing and analyzing the factors relevant to an abstention decision, it is clear that they weigh — and weigh heavily — in favor of this Court's denying abstention and interpreting and enforcing its own orders by ruling on the Plan Enforcement Motion.

## Conclusion

62.    For the foregoing reasons, New GM requests that the Court overrule the Objection and grant the relief requested in the Plan Enforcement Motion.

Dated: February 24, 2010
      New York, New York

Respectfully submitted,


  /s/ Lisa G. Laukitis
Lisa G. Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Andrew M. Kramer
JONES DAY
51 Louisiana Avenue NW
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Heather Lennox
Robert S. Walker
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR GENERAL
MOTORS LLC