**7.5.3.**    The Company Buyer represents to the Company Sellers that Company Buyer understands that the acquisition of the Company ~~Sale~~**Sales** Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  The Company Buyer represents to the Company Sellers that Company Buyer and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**7.5.4.**    Company Buyer further understands and acknowledges to Company Sellers that the Company ~~Sale~~**Sales** Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees with Company Sellers that the Company ~~Sale~~**Sales** Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, pursuant to an applicable exemption therefrom.

**7.5.5.**    Company Buyer acknowledges to Company Seller that the offer and sale of the Sale Securities has not been accomplished by the publication of any advertisement.

**7.6**    ~~Equity Commitment Letter.~~**Company Financing Agreements.**

**7.6.1.**    The Company Buyer has provided to Sellers a ~~true~~, complete and correct ~~copy~~**copies** of the executed ~~Equity Commitment Letter~~**Company Financing Agreements**.  The execution and delivery of the ~~PE~~**Company** Financing Agreements ~~and the Equity Commitment Letter~~ by the Company Buyer and ~~its affiliated parent(s) party~~**the Backstop Parties which are parties** thereto and the performance by each of them of their respective obligations thereunder have been duly authorized by each such party thereto and no other corporate, shareholder, partner or similar proceedings or actions are necessary to authorize or consummate the transactions contemplated by the ~~Equity Commitment Letter.  Each of the Equity Commitment Letter and the Securities Purchase Agreement has been~~**Company Financing Agreements.  Each of the Company Financing Agreements has been or will be** duly executed and delivered by the Company Buyer ~~and its Affiliated Parents' Party thereto~~, is in full force and effect on the date hereof ~~and constitutes (and at the Closing, the Buyer Loan Documents will have been duly executed and delivered by the Company Buyer and its affiliated Parent(s) Party thereto and, assuming due authorization, execution and delivery by GM,~~**or will be in full force and effect on the Closing Date and constitutes or** will constitute) a valid and binding agreement of such parties, enforceable against each of them in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).  The ~~Equity Commitment Letter and the PE~~**Company** Financing ~~Agreement~~**Agreements** are subject to no contingencies or conditions other than those set forth in the copies of the execution versions thereof delivered to Delphi~~, the Securities Purchase Agreement or (if the Buyer Loan Documents were in effect) the Buyer Loan Documents~~.

**7.6.2.**    The execution, delivery and performance by the Company Buyer and ~~its affiliated parent(s)~~**the Backstop Parties** party thereto of the ~~Equity Commitment Letter and the PE~~**Company** Financing Agreements to which they are a party **do not**: (i) violate, conflict with or result in a breach by any of the parties thereto of their organizational documents; (ii) violate, conflict with or result in a breach of, or constitute a default by any of the parties thereto (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination,

cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which such party or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to any party thereto or any of its properties or assets; or (iv) require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of such party to consummate the transactions contemplated by the ~~Equity Commitment Letter and the PE~~**Company** Financing Agreements.

**7.6.3.**    Upon the closing of the transactions contemplated by the ~~Securities Purchase Agreement, the Buyer Loan Documents and the Equity Commitment Letter~~**Company Financing Agreements**, Company Buyer (i) will have sufficient funds available to pay the Company Purchase Price, any fees and expenses incurred by Company Buyer in connection with this Agreement and any other amounts necessary under this Agreement and (ii) has not incurred any obligation, commitment, restriction or Liability of any kind that would materially impair or materially adversely affect such resources and capabilities.

## 7.7    Adequate Assurance of Future Performance.

The Company Buyer represents to the Company Sellers that Company Buyer will be able to provide, at or prior to Closing, adequate assurance of its future performance (or future performance of any applicable subsidiary of Buyer) under each applicable Assumed and Assigned Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract. Company Buyer acknowledges to Company Seller and agrees with Seller that if it is necessary to provide a contract counter-party with additional assurances to satisfy Company Buyer's obligations to provide adequate assurance in accordance with this Section 7.7, all such costs and expenses or other actions required will be borne and performed by Buyer without recourse to Sellers.

## 7.8    No Brokers' Fees.

The Company Buyer represents to the Company Sellers that Company Buyer has not employed any finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

## 7.9    Anti-Money Laundering.

The Company Buyer represents to the Company Sellers that Company Buyer is in compliance with: (i) all applicable provisions of the USA PATRIOT Act as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Company Buyer operates or does business. Neither any Company Buyer nor any of its directors, officers or affiliates is identified on the SDN List or otherwise the target of an economic sanctions

program administered by OFAC, and no Company Buyer is affiliated in any way with, or
providing financial or material support to, any such persons or entities. Company Buyer agrees
that should it or any Company Buyer, or any of their directors, officers or affiliates be named at
any time prior to Closing on the SDN List, or any other similar list maintained by the U.S.
Government, will inform Delphi in writing immediately.

### 7.10    Compliance with Laws.

The Company Buyer represents to the Company ~~Seller~~Sellers that Company Buyer is in
compliance with all Laws applicable to Company Buyer, except with respect to those violations
that would not reasonably be expected to result in the issuance of an order restraining, enjoining
or otherwise prohibiting Company Buyer from consummating the transactions contemplated by
this Agreement.

### 7.11    No Undisclosed Contracts.

Company Buyer has disclosed and will disclose all written agreements between it and the
GM Buyers relating to the subject matter of this Agreement or Delphi.

### 7.12    DIP Direction.

The Company Buyer has provided to Sellers a true, complete and correct copy of
the executed DIP Direction which has been duly executed by the Required Lenders. The
execution and delivery of the DIP Direction by the Required Lenders which are parties
thereto and the performance by each of them of their respective obligations thereunder
have been duly authorized by each such party thereto. The DIP Direction is (and at
Closing will be) a valid and binding agreement of the Required Lenders which are parties
thereto, enforceable against each of them in accordance with its terms, except as may be
limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization,
moratorium and other similar Laws relating to or affecting creditors' rights generally and
general equitable principles (whether considered in a proceeding in equity or at law). The
DIP Direction is subject to no contingencies or conditions other than those set forth in the
copies of the execution versions thereof delivered to GM Buyer and Delphi.

### ARTICLE 8.
### ~~INTENTIONALLY OMITTED~~
### REPRESENTATIONS AND WARRANTIES OF OLD GM

Old GM represents and warrants to the Sellers and to the Company Buyer as
follows:

### 8.1    Authorization, Enforceability.

Old GM has the requisite corporate power and authority to execute and deliver this
Agreement and perform its obligations hereunder, and that such execution, delivery, and
performance are authorized pursuant to that certain Order Approving (I) Master
Disposition Agreement for Purchase of Certain Assets of Delphi Corporation, (II) Related
Agreements, (III) Assumption and Assignment of Executory Contracts, (IV) Agreement
with Pension Benefit Guaranty Corporation, and (V) Entry into Alternative Transaction in

Lieu Thereof, entered by the Bankruptcy Court on July 14, 2009. The execution and delivery of this Agreement and the performance by Old GM of its obligations hereunder have been duly authorized by all necessary corporate action on the part of Old GM, and no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, or the transactions contemplated hereby. This Agreement has been duly executed and delivered by Old GM, and, assuming due authorization, execution and delivery by the other parties hereto and thereto (other than Old GM), constitutes, a valid and binding agreement of Old GM, enforceable against Old GM in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

## ARTICLE 9.
## COVENANTS AND AGREEMENTS.

### 9.1   Conduct of Business between Signing and Closing.

**9.1.1.**   Except as: (a) contemplated by this Agreement; (b) disclosed on Schedule 9.1.1 with respect to the Steering Business and in a business plan previously provided to Buyers with respect to the UAW Sites or the Company Business; (c) required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller); or (d) required by or resulting from any changes of applicable Laws, from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to reasonably conduct the operations of the GM Business and the Company Business, as applicable, in **the Ordinary Course of Business and in** a manner reasonably intended to preserve the value of the GM ~~Sale~~**Sales** Securities, Company ~~Sale~~**Sales** Securities, GM Acquired Assets and Company Acquired Assets, as the case may be, taking into account the current state of the auto industry and Delphi's liquidity.

**9.1.2.**   Except (a) as contemplated by this Agreement or as disclosed on Schedule 9.1.1; or (b) as required by a Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller), from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies **and their respective Affiliates** to refrain from doing, **directly or indirectly,** any of the following with respect to the GM Business or the Company Business without the prior written consent of the applicable Buyers (which consent will not be unreasonably withheld or delayed, or conditioned) in each case **(other than (C) below)** only to the extent Delphi can comply by acting reasonably to preserve the value of the GM ~~Sale~~**Sales** Securities, Company ~~Sale~~**Sales** Securities, GM Acquired Assets and Company Acquired Assets taking into account the current state of the auto industry and Delphi's liquidity:

A.   In the case of any applicable Sale Company, acquire assets or commit to capital expenditures (or in the case of any applicable Asset Seller, acquire assets or commit to capital expenditures with respect to assets that would become Acquired Assets) with an aggregate value exceeding $5,000,000, in each case excluding acquisitions of ~~Assets~~**assets** or capital expenditures made in the Ordinary Course of Business in accordance with the applicable Business' budgeted capital expenditures;

B.    Except in each case, for $50,000,000 secured financing facility with respect to Delphi's Mexican operations and €125,000,000 secured financing facility with respect to Delphi's operations in Germany (the proceeds of which financing shall not be used outside of Germany), (i) in the case of any applicable Sale Company, incur, assume or guarantee any Debt Obligations in excess of $1,000,000 or voluntarily purchase, cancel, prepay or otherwise provide for a complete or partial discharge in advance of a scheduled payment date with respect to any material Debt Obligations (in each case, other than intercompany Debt Obligations that are repaid on or before Closing); and (ii) in the case of any applicable Seller with respect to an applicable Business, incur, assume or guarantee any Debt Obligation that would become an applicable Assumed Liability;

C.    (i) With respect to any applicable Sale Company, declare or pay dividends from such Sale Company to any Person other than ~~another Sale Company, other than transfers of up to $104 million~~**(A) a distribution by a Company Sale Company to another Company Sale Company, (B) a distribution by a GM Sale Company to another GM Sale Company, (C) distributions of up to $104,000,000 from Non-Filing Affiliates which are Company Sale Companies and (D) distributions from Non-Filing Affiliates which are Company Sale Companies which will not result in the operational cash held by such Non-Filing Affiliates to be reduced below $820,000,000**; (ii) with respect to any applicable Sale Company incorporated or organized in the U.S. enter into any loan agreement **with** or provide any loan to another Sale Company incorporated or organized outside the U.S., or (iii) with respect to any applicable Sale Company incorporated or organized outside the U.S., enter into any loan agreement with or provide any loan to another Sale Company incorporated or organized in the U.S.; **provided, however, that amounts under clause (i)(D) shall only be permitted after Delphi has borrowed $250,000,000 under the GM-Delphi Agreement which shall only be available after Delphi has complied with the terms of the GM-Delphi Agreement and used its best efforts to receive the full amount of the $104,000,000 in distributions referred to in clause (i)(C) above;**

D.    Incur any Encumbrance on any assets of any applicable Sale Company or any applicable Acquired Assets, in each case, other than Permitted Encumbrances or in the Ordinary Course of Business;

E.    Settle or compromise any Proceeding in excess of $2,500,000 with respect to an Assumed Liability;

F.    Hire any individual with a base salary in excess of $200,000 per annum;

G.    With respect to any applicable Sale Company, other than in the Ordinary Course of Business, make any material election relating to Taxes (except such that are consistent with past practice) or settle or compromise any material Tax liability or amend any material Tax return;

H.    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are: (i) required by Law; or (ii) made in conformance with GAAP);

I.    Enter into any partnership or joint venture agreement between any applicable Sale Company and any other Person or modify any organizational agreement with

respect to an applicable JV Company in a manner which is materially adverse to a GM Buyer or Company Buyer, as the case may be;

      J.    Enter into, terminate or make any material amendment to a Material Contract other than in the Ordinary Course of Business;

      K.    Amend any Organizational Document of any applicable Sale Company or applicable JV Company unless required under applicable law;

      L.    Make any material change in its methods of management, marketing, accounting or operating or practices relating to payments;

      M.    Fail to maintain insurance in a manner consistent with the applicable Seller's past practice;

      N.    Accelerate the collection of Accounts Receivable in any Sale Company incorporated or organized in the U.S. in a manner not consistent with the Ordinary Course of Business;

      O.    Pay trade payables more slowly than has been the Ordinary Course of Business;

      P.    Take or permit to be taken any action outside the Ordinary Course of Business which results in a material increase in deferred revenue obligations; or

      Q.    Agree or commit to do any of the foregoing.

      **9.1.3.**    Except (a) as contemplated by this Agreement or as disclosed on <u>Schedule 9.1.1</u>; or (b) as required by **a** Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller), from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies **and their respective Affiliates** to refrain from doing**, directly or indirectly,** any of the following with respect to the GM Business or the Company Business without the prior written consent of the applicable Buyers (which consent will not be unreasonably withheld or delayed, or conditioned):

      A.    Split, combine or reclassify any capital stock or other equity interests or purchase or sell any capital stock or other equity interests of any Sale Company or JV Company or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such capital stock or other equity interests;

      B.    Sell or otherwise dispose of any applicable Acquired Assets and assets of any applicable Sale Company having an aggregate value exceeding $1,000,000, excluding sales of Inventory and sales of receivables to financial institutions or credit collection agencies **by the Sale Companies**, in each case other than in the Ordinary Course of Business and the Pending Transactions;

      C.    Merge or consolidate any applicable Sale Company or JV Company with or into any other Person or enter into any agreement requiring any such merger or consolidation;

D.    Increase the cash compensation **of,** or grant the right to receive any severance, termination or retention pay ~~of~~**or equity based compensation to,** the Transferred Employees other than:   (i) in the Ordinary Course of Business; or (ii) as required by any agreement in effect as of the date hereof or as required by Law; or

E.    Except as required by Law, enter into or amend any applicable Seller Employee Benefit Plan, the consequence of which would be to materially increase any Liability to be assumed by applicable Buyers.

### 9.2    ~~Bankruptcy Actions~~363 Implementation Terms.

**9.2.1.**    ~~On or before June 1, 2009, Delphi will, and will cause the other Sellers that are Filing Affiliates to file this Agreement as an exhibit to its modified Plan of Reorganization and seek approval for, among other things, the Filing Affiliates to enter into and perform their obligations under this Agreement and the Ancillary Agreements in connection with the resolicitation of votes on the modified Plan of Reorganization, and to seek alternative relief in such motion under section~~

**If this Agreement is approved pursuant to Section** 363 of the Bankruptcy Code ~~to enter into and perform their obligations under the Agreement and the Ancillary Agreements independently of and not pursuant to, any Plan of Reorganization (the "**Plan Modification Motion**") and any order entered by the Bankruptcy Court granting relief under the Plan Modification Motion pursuant to either section 363 or section 1127 of the Bankruptcy Code shall be referred to herein as the "**Plan Modification Order**").~~

**9.2.2.**    ~~Delphi shall obtain a hearing date for the Plan Modification Motion, which date shall be no later than July 23, 2009 (the "**Hearing Date**"), and such scheduling order shall affirmatively state that the Court will conduct on the Hearing Date an asset sale hearing under section 363 of the Bankruptcy Code if the Bankruptcy Court does not otherwise conduct a plan modification hearing and approve such modifications under section 1127 of the Bankruptcy Code on the Hearing Date.  The scheduling order shall also include dates that are reasonably acceptable to the Buyers for the filing of the agreement discussed below in Section 9.2.3 (the "**Section 363 Implementation Agreement**") (which shall be filed on the exhibit filing deadline for the Modified Plan), the deadline for any objections to be filed in opposition to the section 363 sale and/or the Section 363 Implementation Agreement (which shall be the same day as objections to the proposed modifications to the Confirmed Plan shall be due), and the deadline for filing a proposed form of section 363 sale order (which shall be the same day as proposed revisions to the Plan Modification order shall be due).~~

**9.2.3.**    ~~Delphi and Buyers agree that the transaction pursuant to section 363 of the Bankruptcy Code will be on terms which result in (a) Buyers purchasing the same assets, and assuming the same liabilities, as provided in Article 2 hereof, and (b) Delphi receiving the same consideration, including the financial support for Delphi estates' wind-down requirements, as provided in Article 3 hereof; provided, however, that the amounts payable under Section 3.2.3 of this Agreement shall not be included in the consideration paid under the section 363 sale transaction.  Delphi and Buyers acknowledge and recognize that certain amendments to this Agreement and the Ancillary Agreements will be required to implement the agreement in this Section 9.2.3 and agree that they will negotiate and enter into the Section 363 Implementation Agreement to document such amendments and implementation understandings as are required to~~

~~give effect hereto.~~ and consummated outside of a Plan of Reorganization, the terms of this Agreement shall automatically be modified by the Section 363 implementation terms set forth in Exhibit 9.2 attached hereto (the "Section 363 Implementation Terms") to document such amendments and implementation understandings as are required to give effect hereto and the order approving such transaction shall be in form and substance satisfactory to GM, the DIP Agent and the Company Buyer and shall include, among others, terms and provisions substantially similar to those set forth on Schedule 10.1.1 and the exhibit thereto.

### 9.3    Assumed Contracts; Cure Amounts.

As part of the Plan of Reorganization Documents, Delphi will move to assume and assign to the applicable Buyers the Pre-Petition Contracts listed on Schedule 9.3 and assign the Post-Petition Contracts to the applicable Buyer (collectively, the "**Assumed and Assigned Contracts**") and will provide notice thereof to the Contract counterparties and all other parties in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. With respect to ~~contracts~~**Assumed and Assigned Contracts** assumed by such Buyer, each Buyer shall pay all Cure Amounts ~~as have already been established~~**(subject to the terms of Section 2.2.1 and 2.2.2)**: (i) through prior orders of the Bankruptcy Court that were entered in 2008 in connection with the Sale to Steering Solutions Corporation that was terminated on March 3, 2009; (ii) pursuant to **the Modification Procedures Order or** the procedures established by the Bankruptcy Court in connection with Delphi's Plan of Reorganization that was confirmed by the Bankruptcy Court in January 2008, as such plan may be amended from time to time; or (iii) as otherwise agreed to by such Buyer, Delphi, and the Contract counter-party or, absent an already established amount or such agreement, by order of the Bankruptcy Court in the time and manner specified by the Plan Modification Order; provided, however, within five days after entry of a final, non-appealable order of the Bankruptcy Court establishing a Cure Amount for which the applicable Buyer is responsible or adequate assurance on terms not reasonably acceptable to the relevant Buyer, such Buyer may direct Delphi to, and Delphi shall, reject such Assumed and Assigned Contract. Such motion or subsequent notice shall identify the specific Cure Amount established (or otherwise agreed) for each Pre-Petition Contract and state that such Cure Amount shall be the only cure required to assume such Contract pursuant to Section 365 of the Bankruptcy Code and/or assign it to such Buyer and that such counter-party shall be barred and enjoined from asserting against any Buyer, the Acquired Assets and Sellers that any additional prepetition defaults, breaches, or claims of pecuniary loss ~~exists~~**exist** with respect to such Contract. The applicable Buyer shall have the ability to add or delete Contracts to, or from, Schedule 9.3 up **to** and through the time of the Final Plan Modification Hearing in its sole and absolute discretion so long as the appropriate notice is provided to the Contract counter-party and any delay in approval of the assignability of and Cure Amount for such additional Contracts shall not affect the Closing. With respect to any Assumed and Assigned Contracts that are "shared" and relate to the business, assets or entity acquired hereunder by more than one Buyer, then the applicable Buyers will agree that one of the Buyers will become the assignee of the shared Assumed and Assigned Contract and will also agree to an equitable allocation of Cure Amounts between them; however, if one Buyer elects not to pay its share pursuant to this sentence, then the other Buyer can pay the entire Cure Amount and will have no liability or other obligation with respect to the Assumed and Assigned Contracts to the Buyer refusing to so pay, notwithstanding anything to the contrary in this Agreement. In the Plan of Reorganization Documents, Delphi shall provide for a mechanism reasonably satisfactory to the applicable

Buyer to ensure that those Contracts to be assumed and assigned to such Buyer at Closing are actually assigned to such Buyer at Closing notwithstanding any contested Cure Amounts; provided that the applicable Buyer shall establish an escrow account funded with cash sufficient to pay the face amount of the disputed Cure Amounts asserted, the excess funds of which shall be returned to such Buyer as Cure Amounts are resolved.

**9.4      Tax Matters; Cooperation; Preparation of Returns; Tax Elections.**

**9.4.1.    The** Asset Sellers will be responsible for the preparation and filing of all Tax Returns of **the** Asset Sellers for all tax periods ending on or prior to the Closing, including without limitation amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Buyers will make available to **the** Asset Sellers during normal business hours (and to **the** Asset Sellers' accountants and attorneys) any and all books and records and other documents and information in its**their** possession or control reasonably requested by the Asset Sellers to prepare these Tax Returns. **The** Asset Sellers will be responsible for and will make all payments required with respect to any such Tax Returns.

**9.4.2.    For Sale Companies and JV Companies, the applicable** Seller will be responsible for the preparation and filing of all Tax Returns for all tax periods that are due on or prior to the Closing, including without limitation amended returns, applications for loss carryback refunds and applications for estimated tax refunds.

**9.4.3.    For Sale Companies and JV Companies, ~~Buyers~~the applicable Buyer** will be responsible for the preparation and filing of all Tax Returns for all periods that are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and combined Tax Returns of Delphi will include the operations of the Business), including any IRS Forms 5471, 8858 and 8865 relating to the Sale Companies and the JV Companies transferred, directly or indirectly, in the transactions contemplated by this Agreement (the "**Information Tax Returns**") (which IRS Forms 5471, 8858 and 8865 Delphi will also be required to file under applicable Law). ~~Buyers~~**The Buyer** shall provide to ~~Sellers~~**the Seller** a copy of any Information Tax ~~Returns~~**Return** at least sixty (60) days prior to ~~their~~**the** due date ~~which shall be extended~~**thereof**. For the avoidance of doubt, ~~Buyers~~**the applicable Buyer** shall indemnify, defend and hold harmless the Sellers and their Affiliates for any and all Losses which are imposed on, sustained, incurred or suffered by ~~or against~~ the Sellers or their Affiliates resulting from any failure to timely file the Information Tax Returns.

**9.4.4.    The** Sellers shall be responsible for the customs filings for goods released from the border prior to Closing and Buyers shall be responsible for the customs filings for goods in-transit as of and after the Closing.

**9.4.5.    The** Sellers and the Buyers will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, ~~assignments, transfers and deliveries~~**assignment, transfer and delivery of any Assets and Securities** to be made to the Buyers hereunder from, or **to** minimize, any transfer, documentary, sales, use, registration, recording, value-added and other ~~such~~**similar** taxes (including all applicable real estate transfer taxes) and related fees (including notarial fees**)** as well as any penalties, interest and additions to tax**)**, together with any foreign income Taxes attributable to any gain realized by any Seller (but excludes any U.S. Income Taxes **relating to any of the foregoing**) ("**Transfer Taxes**") payable in connection with such sale, conveyance, ~~assignments, transfers and, deliveries~~**assignment, transfer and, delivery**, to the extent provided in the Plan Modification Order, in accordance with Section 1146 of the Bankruptcy Code. If

Bankruptcy Court approval is granted for such exemption, then any instrument transferring the Acquired Assets to the Buyers will contain the following or similar endorsement; provided that in no case will the Sellers be liable for such Transfer Taxes or the Tax due on Tax Returns related thereto:

> Because this {instrument} has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of {Seller}, it is exempt from transfer taxes, stamp taxes, or similar taxes pursuant to 11 U.S.C. § 1146.

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Plan Modification Order, such Transfer Taxes and costs arising out of or incurred in connection with this Agreement will be borne solely by the relevant Buyer. The party that is legally required to file a Tax Return relating to Transfer Taxes shall be responsible for preparing and timely filing the Tax Returns relating to such Transfer Taxes. In the event VAT (or GST) is levied on an asset transfer, Seller must provide the relevant Buyer with a VAT (or GST) compliant invoice and assist in the recovery of the VAT (or GST), if possible.

   9.4.6.    Delphi and the applicable Buyer will cooperate in connection with: (i) the preparation and filing of any Tax Return (including any Information Tax Returns Return), Tax election, Tax consent or certification or any claim for a Tax refund including any duty drawback claims; (ii) any determination of liability for Taxes of any of them or of any Sale Company or JV Company; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes shall include the provision of direct access to accounting and finance personnel.

   9.4.7.    Sellers will, in their sole discretion, cooperate in good faith with Buyers and Buyers' agents to minimize any U.S. federal and state payroll tax liabilities that either party may bear, including that the payroll taxes of the U.S. Transferred Employees will be treated in accordance with the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53, to which treatment Buyers hereby consent.

   9.4.8.    Sellers will provide Buyers with such certifications as are necessary to exempt all payments made hereunder from withholding under Internal Revenue Code Section 1445.

   9.4.9.    Sellers will assign to the applicable Buyers, and will cooperate with the applicable Buyers to obtain any necessary approvals or consents to effect such assignment, any and all interests in, or rights to, any property tax abatements, incentive agreements, or other similar arrangements with any Taxing Authority primarily related to the Business or the Acquired Assets to the extent allowed under applicable Law. If, after the transfer occurs, a repayment of all or a portion of any such property tax abatement, incentive agreements, or other similar arrangements with any Taxing Authority is required because of any action taken by a Buyer or such Buyer's Affiliates (other than any actions contemplated by this Agreement), then such Buyer will be responsible for such repayment.

   9.4.10.    Sellers will provide Buyers with all information and documentation reasonably available and requested, to permit Buyers to apply for and receive a Research and Experimentation tax credit under Code Section 41 with respect to the Business, including gross receipts and qualified research expenses for the 1984-1988 base period, plus the amount of gross receipts for the immediately preceding four years.

**9.4.11.**    Neither Buyers nor any Affiliate of Buyers shall take any action which could increase any of the Sellers' liability for Taxes. Neither Buyers nor any of their Affiliates shall make any election under Section 338(g) of the Code (or any analogous provision of state, local or non-United States Tax Law) with respect to the purchase of the Sale Securities pursuant to this Agreement without the prior written consent of Delphi, which consent may not be unreasonably conditioned, delayed or withheld.

**9.4.12.**    Liabilities for Taxes related to the debonding or other change in customs status of the Acquired Assets resulting from Buyers not establishing the required legal entities and obtaining the necessary authorizations from the relevant Governmental Authority to receive the Acquired Assets in their customs status shall be borne by the Buyers. Sellers and Buyers agree to cooperate in good faith to obtain such authorizations.

**9.5**    **Employees; Benefit Plans; Labor Matters.**

**9.5.1.**    Transferred Non-U.S. Employees. Effective as of the Closing, the relevant Buyer will assume the existing employment Contracts of all Non-U.S. Employees (including entering into replacement, or novation of, existing employment Contract, their terms, or substitution of employer, where applicable) if and to the extent required by applicable Transfer Regulations or the applicable Transfer Agreement, and will take all necessary steps to assume the employment Contracts of all employees employed **by** the Sale Companies immediately prior to Closing if and to the extent that their employment is governed by any Transfer Regulation.

**9.5.2.**    Transfer of U.S. Salaried Employees. Effective as of the Closing, the relevant **(i) GM** Buyer will offer employment to the U.S. Salaried Employees of the relevant**GM** Business whom the respective **GM** Buyer elects to employ in its sole discretion **and (ii) the relevant Company Buyer will offer employment to all other U.S. Salaried Employees.** U.S. Salaried Employees who accept Buyers**'** offer of employment (by reporting to work or otherwise) are referred to herein as (**"Transferred U.S. Salaried Employees"**)**. Immediately after Closing, Company Buyer may sever such of the Transferred U.S. Salaried Employees whom the Company Buyer elects to sever in its sole discretion, subject to Company Buyer's obligations under Section 9.5.11.**

A.    For all Transferred U.S. Salaried Employees, the relevant Buyer's offer of employment will be on terms established in Buyer's sole discretion. The applicable Buyers shall use reasonable efforts to tender such offers to employees no later than ten (10) days prior to Closing.

B.    Subject to applicable Law, Transferred U.S. Salaried Employees will be regarded as newly hired regular employees of the relevant Buyer at a level/classification determined by Buyers, except that Buyers will recognize length of service with Sellers and Buyer with respect to participation in any Buyer severance program, and for vacation eligibility, and with respect to Company Buyer, participation in any Company Buyer Non-Qualified Retirement Program.

C.    Buyers will waive application of any new-hire waiting period with respect to Transferred U.S. Salaried Employee participation in and eligibility for benefits under any applicable Buyer Employee Benefit Plan for salaried employees.

D.     Buyers reserve the right to amend, modify, suspend or terminate all terms and conditions of employment, including all benefit plans and programs at Buyers' discretion.

E.     The relevant**GM** Buyers will assume all salaried Seller U.S. CBAs applicable at the Rochester and Lockport sites.

F.     The GM Buyers shall have the right to hire any U.S. Salaried Employees currently employed at any facility of GM or its Affiliates or any of the technical centers included within the definition of the UAW Sites.

**9.5.3.**     Transfer of U.S. Hourly Employees.  Effective as of the Closing, the relevant Buyers will **offer to** employ all active and inactive U.S. Hourly Employees (e.g., currently on the**employment** rolls **of Sellers**, whether on temporary layoff, indefinite layoff, workers' compensation, disability, or other leaves of absence), including without limitation pre-retirement program participants ("**PRPs**")) of the relevant Business.  U.S. Hourly Employees who accept Buyers' offer of employment (by reporting to work or otherwise) are referred to herein as "**Transferred U.S. Hourly Employees**".

A.     The relevant Buyers will assume the terms and conditions of all applicable Seller U.S. CBAs in effect at the relevant Business **and solely with respect to Transferred U.S. Employees at the relevant Business**.  Assumption of the terms and conditions of applicable Seller U.S. CBAs pursuant to this Section 9.5.3A shall not constitute assumption of Sellers's pre-Closing Liabilities under Seller U.S. CBAs (including, without limitation, any Liabilities related to the Retained Plans which shall be retained by Sellers);  provided however, that nothing in Section 9.5.3A shall be deemed to impair, nullify or cancel the relevant Buyer's assumption of liabilities elsewhere in this Agreement, if any.

B.     Buyers will recognize the seniority status of all Transferred U.S. Hourly Employees who are employed in accordance with a Collective Bargaining Agreement for all purposes of continued employment with Buyers.

C.     Buyers will waive application of any new-hire waiting period with respect to participation in any applicable Buyer Employee Benefit Plan for U.S. Hourly Employees.

**9.5.4.**     Employee Benefit Plans.

A.     From and after the Closing (i)  each Sale Company will continue to be responsible for all accrued pension liabilities **under non-U.S. pension plans** and assets for all of its Transferred Non-U.S. Employees and all current **and former** employees **of such Sale Company**, and (ii)  in the case of Delphi Electronics Overseas Corporation ("**DEOC**"), the entity specified by Company Buyer (in its sole discretion) to be the purchaser of the DEOC assets, will assume all accrued pension liabilities and assets for all of DEOC's Transferred Non-U.S. Employees and all current **and former** employees **of the DEOC**.  The Parties will comply with the specific mechanism for transfer of applicable pension liabilities and assets of Non-U.S. Transferred Employees as specifically set out in the relevant Transfer Agreement (the form and substance of which shall be reasonably acceptable to each of the Parties).

B.     Subject to the applicable **GM** Buyer's assumption of the Seller U.S. CBAs pursuant to Section 9.5.3, nothing contained in this Agreement requires Buyers to establish an

employee benefit pension plan with respect to any Transferred U.S. **Employees or Transferred
Non-U.S.** Employees.

C.    Where required by law, the relevant Buyer must continue to provide
employee benefit plans to Transferred Employees or former employees of Sellers.    The
Company Buyer will administer for Buyers, employee benefit plans applicable to Transferred
Employees or former employees of Sellers in accordance with the terms of the Transition
Services Agreement.

D.    Transferred U.S. Employees' and their dependents' and beneficiaries'
active participation in and eligibility for benefits under the Seller Employee Benefit Plans (other
than vested pension benefits) will cease at Closing.

E.    The parties will explore plan sponsorship alternatives including GM Buyer
and Company Buyer assumption if deemed to be in the best interests of the plan participants and
beneficiaries. As of the Closing Date, the GM Buyer will assume sponsorship of the following
Seller tax qualified defined contribution plans: Seller's Delphi Salaried Retirement Savings
Program (formerly the Delphi Saving-Stock Purchase Program), the Delphi Personal Savings
Plan for Hourly-Rate Employees, and the Delphi Income Security Plan for Hourly-Rate
Employees if deemed to be in the best interests of the plan participants and beneficiaries. As of
the Closing Date, the Company Buyer will assume sponsorship of the following Seller tax
qualified defined contribution plans if deemed to be in the best interests of plan participants and
beneficiaries: the Packard Hughes Interconnect Retirement Savings Plan, the Delphi Diesel
401(k) plan, and the Delphi Medical 401(k) Savings Plan.

**9.5.5.**    COBRA.    Sellers will retain all obligations relating to compliance with the
continuation health care coverage requirements of Section 4980B and Sections 601 through 608 of
ERISA regarding qualifying events in regard to Transferred U.S. Employees arising from or prior to the
transactions contemplated under this Agreement.

**9.5.6.**    WARN Act.    The relevant Buyers will assume all WARN Act Liabilities, if
any, arising at the relevant Business from any employment loss or layoff of U.S. Salaried Employees,
U.S. Hourly Employees, and/or U.S. Transferred Employees occurring ~~on or~~ after the Closing Date. On
or before the Closing Date, Sellers shall provide Buyers with a list of employee layoffs, by location,
implemented by Sellers in the ninety (90) day period preceding the Closing Date. Sellers will retain all
WARN Act obligations and liabilities relating to layoff of U.S. Salaried Employees, U.S. Hourly
Employees, and/or Transferred Asset Seller Employees by Sellers on or prior to the Closing Date.

**9.5.7.**    Grievances.    The relevant Buyers will assume responsibility to administer all
labor grievances and arbitration proceedings based on events occurring after the Closing Date.

**9.5.8.**    Cooperation.    Sellers and Buyers will provide each other with such records and
information as may be reasonably necessary, appropriate and permitted under applicable Law to carry
out their obligations under this Section 9.5.

**9.5.9.**    Union and Works Council Notifications.    Sellers and Buyers will reasonably
cooperate in connection with any notification required by Law to, or any required consultation with, or
the provision of documents and information to, the employees, employee representatives, work councils,

unions, labor boards and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

**9.5.10.**    No Third Party Rights. Nothing in this Section 9.5 and its subparts, express or implied, shall create a third party beneficiary relationship or otherwise confer any benefit, entitlement, or right upon any person or entity other than the parties hereto or serve to amend or create any employee benefit plan or arrangement.

**9.5.11.**    Severance.

A.    With respect to any former U.S. Salaried Employees of any Seller whose employment has been terminated prior to ~~the date hereof~~**June 1, 2009 ("Previously Severed Employees")** and are or may be entitled to severance or termination payments or similar benefits, Sellers shall use their commercially reasonable efforts to cause any obligation to pay such severance or termination payments to cease as of the Closing **by offering to pay the Previously Severed Employees a lump sum payment (less applicable deductions) of 75% of their outstanding severance payments immediately before the Closing**, and neither Company Buyer nor GM Buyers shall have any Liability relating to any such payments or benefits**; provided that with respect to any such former employees who do not accept the lump sum payment discount offered by Sellers, Company Buyer shall pay directly to such former employees any severance or termination payments which become due to such former employees after the Closing**.

B.    With respect to (i) any U.S. Salaried Employees of any Seller whose employment is terminated on or after ~~the date hereof~~**June 1, 2009** but at or before Closing or (ii) any U.S. Salaried Employees ~~working at Automotive Holdings Group or Athens as of the Closing and~~ whose employment is terminated after the Closing~~, each of Company Buyer and GM Buyer shall make the following payments on and after the Closing:~~ **(collectively "Post-June 1, 2009 Severed Employees"), Company Buyer will be responsible for paying all severance owed to the Post-June 1, 2009 Severed Employees in accordance with the terms of the Delphi severance program in effect as of May 1, 2009 and GM will pay Company Buyer $16,800,000 at Closing in consideration of such assumption of severance obligations by Company Buyer.**

~~(i)        at the Closing, Company Buyer shall pay to GM Buyer an amount equal to 50% of the amount of any cash payments made by Delphi on or after the date hereof and prior to Closing; and~~

~~(ii)        from and after the Closing, each of Company Buyer and GM Buyer agree to pay Delphi 50% of the amount of any cash payments made by a Seller to any such terminated U.S. Employees but in no event more than would be payable under the Delphi severance program in effect as of May 1, 2009;~~

~~provided that the aggregate amount of any payments made by each of GM Buyer or Company Buyers pursuant to this Section 9.5.11 shall not exceed $12,500,000 (which in the case of GM Buyer shall include an amount payable by Company Buyer pursuant to clause (i) above).~~

**9.5.12.    No Amendment to Employee Benefit Plans.    No provision of this Agreement shall be deemed to be the adoption of, or an amendment to, any employee benefit plan,**

as that term is defined in Section 3(3) of ERISA, or otherwise limit the right of the Buyers to amend, modify or terminate any such employee benefit plan.

### 9.6    Pre-Closing Cooperation; Contact with Customers and Suppliers.

For purposes of Buyers' transition efforts, each applicable Seller shall provide the applicable Buyers or their representatives upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of any Seller or Sale Company, reasonable access during normal business hours to the employees, facilities, books and records of the Business. Each applicable Seller will cooperate, and cause their employees to cooperate, with the applicable Buyer's efforts to transition the ownership and operation of the applicable Business. Each Buyer may meet with the applicable suppliers, customers, and service providers of and to the applicable Business in order to discuss transitional matters and post closing business arrangements and to take actions necessary such that such Buyer may begin operating the applicable Business immediately upon Closing.

### 9.7    Technical Documentation; Trade Secrets.

Each Seller has delivered, or will deliver on or before the Closing Date, to the applicable Buyer, a copy of all Technical Documentation (including, but not limited to, documented Know-How and Trade Secrets) included in the Acquired Assets and Other Technical Documentation being acquired by such Buyer.

### 9.8    Corporate Names.

9.8.1.    The GM Buyers will have the right (including the right to authorize their relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the GM Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith.

9.8.2.    The GM Buyers will promptly, and in any event within one (1) year of the Closing Date, cease all use and cause the GM Sale Companies to cease all trademark and trade name use of the name "Delphi" and any trademarks, trade names, brand names or logos relating thereto as used by GM Sellers or the GM Sale Companies as of the Closing Date (including on any signs, billboards, advertising materials, telephone listings, labels, stationery, office forms, packaging or other materials of the GM Sale Companies) in connection with the businesses of the GM Sale Companies or otherwise. Notwithstanding the foregoing, the GM Buyers and the GM Sale Companies shall not be required to repackage existing finished goods and any existing inventories or service materials of the GM Business in existence at the Closing and may use up or sell off the same in the Ordinary Course of Business.

9.8.3.    Promptly following the Closing, the GM Buyers will cause each of the **GM** Sale Companies, and will use commercially reasonable efforts to cause each **Steering** JV Company, to amend its certificate of incorporation, partnership agreement, limited liability company agreement and other applicable documents, in order to change the names of such companies to a name not containing the word "Delphi", with such changes to take effect pursuant to the terms of the respective transfer deed governing the sale of each GM Sale Company and applicable **Steering** JV Company. The GM Buyers will make all required filings with Governmental Authorities to effect such amendments. If any preceding change is not permissible by law or commercially reasonable within one (1) year of the

Closing Date, the GM Sale Companies or applicable **Steering** JV Company shall operate under a "d/b/a" or other similar business name.

**9.8.4.**    If the Company Buyer believes that the GM Buyers have breached or failed to perform in any material respect any of the GM Buyer's obligations contained in Sections 9.8.2 and 9.8.3, the Company Buyer shall provide the GM Buyer with written notice of the alleged breach.

**9.8.5.**    Nothing herein shall prevent or limit the rights of the GM Buyers to use the name "Saginaw Steering" or the like.

### 9.9    Information Technology; Intellectual Property Rights and Licenses.

**9.9.1.**    Steering Licenses.  Each **of** Seller and Company Buyer, hereby grants, on behalf of itself and its Affiliates, to GM Buyers, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on Schedule 9.9.1.A) with the right to sublicense to GM Buyers' Affiliates, successors, assigns and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by the Steering Business prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of Exhibit 9.9.1 ("**GM IP License Agreement**").  Further, each of Seller and Company Buyer, on behalf of itself and its Affiliates, hereby grants to GM Buyers, as of the Closing Date with respect to the Steering Business, a sublicense to the extent permitted by and subject to the terms and conditions of Seller's existing agreements (including any such agreements acquired hereunder by Company Buyer's) to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the GM IP License Agreement.  The licenses and sublicenses granted to GM Buyers under this Section 9.9.1 do not extend to the Steering Excluded Products identified on Schedule 9.9.1.B **(the "Steering Excluded Products")**.  Further, the license and sublicense granted pursuant to the GM IP License Agreement and this Section 9.9.1 are not assignable in whole or in part except to a purchaser of all or substantially all of the Steering Business to which the **respective** license pertains.

**9.9.2.**    UAW Site Licenses.  Each Seller hereby grants, on behalf of itself and its Affiliates, as of the Closing Date, to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' Affiliates to:

      A.    make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute UAW Site Products and any derivatives and/or re-use/extension thereof, necessary to service contracts with existing non-GM customers include with the Acquired Assets; and

      B.    to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute UAW Site Products and any derivatives and/or re-use/extension thereof, for GM Buyer's (and GM Buyer's ~~affiliates~~**Affiliates**') original equipment (OE) and original equipment–sales (OE-S) distribution

channels for vehicles and vehicle parts and aftermarket requirements of GM Buyer's products produced by the Business.

Any system developed by or with GM shall be considered a GM OE system under this license.

**9.9.3.**    <u>Company Licenses</u>.  Seller hereby grants, on behalf of itself and its Affiliates, to Company Buyer, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on <u>Schedule 9.9.1.A</u>) with the right to sublicense to Company Buyer Affiliates, successors, assigns, customers and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by the Company Business prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of <u>Exhibit 9.9.3</u> ("**Company IP License Agreement**").  Further, Seller, on behalf of itself and its Affiliates, hereby grants to Company Buyer, as of the Closing Date with respect to the Company Business, a sublicense to the extent permitted by and subject to the terms and conditions of Seller's existing agreements, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the Company IP License Agreement. The licenses and sublicenses granted to Company Buyer under this <u>Section 9.9.3</u> do not extend to the Steering Excluded Products identified on <u>Schedule 9.9.1.B</u>.  Further, the license and sublicense granted pursuant to the Company IP License Agreement and this <u>Section 9.9.3</u> are not assignable in whole or in part except to a purchaser of all or substantially all of the business to which the respective license(s) relate.

**9.9.4.**    <u>Pending Transaction Licenses</u>.  Company Buyer hereby grants, on behalf of itself and its Affiliates, to Seller, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on <u>Schedule 9.9.1.A</u>) with the right to sublicense to Seller Affiliates, successors, assigns, customers and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by Seller in connection with the business of a Pending Transaction prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of <u>Exhibit 9.9.4</u> ("**Pending Transactions IP License Agreement**").  Further, Company Buyer, on behalf of itself and its Affiliates, hereby grants to Seller, as of the Closing Date with respect to the business of a Pending Transaction, a sublicense to the extent permitted by and subject to the terms and conditions of any existing agreements included within the Acquired Assets, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the Pending Transactions IP License Agreement.  The licenses and sublicenses granted to Seller under this <u>Section 9.9.4</u> do not extend to the Steering Excluded Products identified on <u>Schedule 9.9.1.B</u>.  Further, the license and sublicense granted pursuant to the Pending Transactions IP License Agreement and this <u>Section 9.9.4</u> are not assignable in whole or in part except to a purchaser of all or substantially all of the business to which the respective license(s) relate.

A.    In the event that a Pending Transaction fails to be completed and is terminated, and subject to any rights granted under any existing court approved contract with any Seller, each of Seller and Company Buyer agrees to make Intellectual Property owned by Sellers and Sellers' affiliates**Affiliates** used in the business subject to the failed Pending Transaction available for sale or paid-up license to any purchaser of the assets subject to the failed Pending Transaction.

B.    In the event that a Pending Transaction fails to be completed and is terminated and Seller decides that it will not seek a new purchaser of the assets subject to such Pending Transactions, subject to any rights granted under any existing court approved contract with any Seller, and contingent upon closing of this Agreement, each Seller grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to affiliates**Affiliates** and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' Affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products sold to GM Buyers by the business subject to the failed Pending Transaction.

C.    In the event that, in connection with the operation of the business of a Pending Transaction, there is a breach of a current supply commitment to GM or any of its Affiliates under circumstances where such breach threatens to interrupt supply to GM or any GM Affiliate, then, subject to any Seller obligations under any existing court approved contract with any Seller and contingent upon closing of this Agreement, each Seller grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products subject to the threatened interruption of supply.  The rights set forth in this paragraph shall lapse if a Pending Transaction is consummated according to an existing court approved agreement related to the Pending Transaction or a party that is or becomes an approved supplier of GM acquires the business of the Pending Transaction.

**9.9.5.**    Licenses Generally.

(i)    Each Party shall make all Shared Intellectual Property available to each other Party and to the Seller by delivering to such other Party all Other Technical Documentation and other technical information in its possession reasonably necessary to continue the other Party's Business or of a Pending Transaction.

(ii)    Each Party may assign or otherwise transfer this license and its rights or obligations under this license to any affiliated or successor company or to any purchaser of a substantial part of such Party's business to which this license relates.  In addition, each Party may sublicense or otherwise delegate, in whole or in part, this license and its rights or obligations to any such affiliate, successor or purchaser.

(iii)    This license is binding upon successors, heirs and assigns of the Sellers and Buyers and any and all future owners of the Shared Intellectual Property.

(iv)    This Agreement governs over any inconsistent or otherwise different terms contained in the IP License Agreements.

79

9.9.6.    Further Understandings.  It is further understood and agreed that the licenses granted above in this Section 9.9 do not include any right to use any Trademark Rights.

9.9.7.    Shared Intellectual Property.  Each of the Sellers, GM Buyer and Company Buyer agree that it will not transfer or assign its rights to the Shared Intellectual Property to any third party unless such third party:  (i) is informed of and agrees to accept such transfer or assignment subject to the license granted herein; and (ii) agrees that any subsequent transfer or assignment will be subject to a similar restriction on future transfers and assignments.

9.9.8.    Shared Licensed Intellectual Property.  Sellers and the applicable Buyers, as the case may be, extend and hereby grant to each other Party its rights under the Shared Licensed Intellectual Property to the extent that such licenses can be extended to such other Parties, including a right to other Parties to sublicense to any entity that is a successor or assignee of any portion of the Business or the business of a Pending Transaction operated by such other Parties.

9.9.9.    Transfer of Shared Software Licenses.  For those Shared Software Licenses of the Steering Business set forth on Schedule 9.9.9, Sellers and the applicable GM Buyers and Company Buyer shall transfer to the applicable GM Buyers the number of license seats or other license rights specified for each applicable license.  The Parties will cooperate to develop a similar list for the UAW Sites.  Sellers shall be responsible for any obligations under any Shared Software Licenses or Software licenses primarily used in the Business that are due and payable prior to the Closing Date, for maintenance payments, license fees and any other fees due to applicable third party licensors of the Shared Software Licenses or Software licenses.  Buyers acknowledge that they shall be responsible for all license transfer fees and the costs of obtaining and making payments under any post-Closing maintenance agreements required in order to use the foregoing license rights.

9.9.10.    Separation Activities.  Buyers will be solely responsible for their respective and their allocable share of Sellers' costs, of all separation, relocation, start-up costs and other related activities related to the separation of the GM Business (the "Separation & Relocation Activities"), including:  (i) all Day 1 and Day 2 separation activities, including any activities performed by Delphi personnel or its informational technology suppliers; (ii) modification of the Buyers payroll system in preparation for Day 1 and transitional services; (iii) segregation of the manufacturing facilities and technical centers to be co-located following Closing; (iv) relocation from any technical center or sales offices as identified in the Facilities Separation & Relocation Plan; and (v) any setup fees required by third party service providers.  Buyers acknowledge and agree that it is necessary to promptly begin the Separation & Relocation Activities and that the execution of the foregoing Separation & Relocation Activities are their sole responsibility.  The parties shall reasonably cooperate with each other to implement such activities, separations and relocations in an effort to complete the activities contemplated by this Section 9.9.10 in a reasonable, expeditious and cost-effective manner which in the case of the Steering Business shall be in accordance with the facilities separation and relocation plan set forth in Schedule 9.9.10 relating to the Steering Business (the "Facilities Separation & Relocation Plan").  Other than the costs to be borne by the Buyers with respect to Separation & Relocation Activities, as described above, no Buyer will have any further obligation to provide information technology services, or to pay costs with respect thereto, except as may be provided in the applicable Transition Services Agreements to be entered into by the Buyers (as contemplated by this Agreement).  Following completion of the Separation & Relocation Activities, the Buyers will have no further obligation with respect to IT services or related costs except as set forth in the Transition Services Agreement.

**9.9.11.**    <u>Assignments</u>.    Sellers shall assist Buyers in obtaining assignments from predecessors in interest to the Purchased Intellectual Property, or in obtaining other recordable instruments to reflect the applicable Buyers' ownership of the Purchased Intellectual Property.

**9.9.12.**    <u>Outsourced Service Providers</u>.    Sellers, without having to incur additional costs, shall cooperate with GM with respect to GM entering into new agreements with Sellers' outsourced service providers and software license providers, including Electronic Data Systems Corporation, EDS Information Systems, LLC and its affiliates (collectively, "**EDS**"), Computer Sciences Corporation and its affiliates (collectively, "**CSC**"), and the Hewlett Packard Company and its affiliates (collectively, "**HP**"); <u>provided</u> that there is no material out-of-pocket cost or other material adverse financial impact to Sellers or their Affiliates.

## 9.10    <u>Shared Items Transferred to Buyers.</u>

With respect to any contracts with goods or services included in the Acquired Assets and that are used by both the GM Business and Company Business, including with respect to the Steering Business ~~contracts~~**Contracts** that are set forth on <u>Schedule 9.10</u>, and that will be transferred to one of the Buyers at Closing, the applicable ~~Buyers~~**Buyer(s)** will provide the other applicable Buyer**(s)** with the benefits of such ~~contracts~~**Contracts** in substantially the same manner described in <u>Section 2.5</u> above regarding Deferred Items, and ~~other~~**the** applicable Buyer who does not receive such contract will reimburse the Buyer who did receive such contract for such benefits in substantially the manner described in <u>Section 2.5</u>, until the earlier of such time as separate ~~contracts~~**Contracts** for such goods or services have been agreed between the applicable Buyer and the other party or parties to such ~~contract~~**Contract** or ~~contracts~~**Contracts**, or until the termination of such ~~contract~~**Contract** or ~~contracts~~**Contracts**.

## 9.11    <u>Buyer Guarantee and Acknowledgment of Pure Credit Bid.</u>

**9.11.1.**    GM guarantees the full and timely performance of all of GM Buyer's obligations hereunder arising prior to or at the Closing; <u>provided</u> that GM shall have no Liability or responsibility for any obligations of any GM Buyer arising after the Closing.  This is a guarantee of payment and performance and not of collection.

**9.11.2.**    ~~Company Buyer has delivered to Sellers an equity commitment letter, dated the date hereof, and the affiliated parent(s) of Company Buyer's obligations shall be limited to those set forth in such equity commitment letter.~~**Each of the Parties to this Agreement acknowledges and agrees that this Agreement constitutes a Pure Credit Bid within the meaning of the Supplemental Modification Procedures Order, dated June 29, 2009.  This provision shall survive termination of this Agreement.**

## 9.12    <u>Letters of Credit.</u>

**A.**    Each applicable Buyer agrees to use its commercially reasonable efforts to cause Delphi and its Affiliates to be absolutely and unconditionally relieved by no later than 360 days following the Closing of all Liabilities and obligations arising out of the letters of credit **(other than DIP Letters of Credit or as otherwise provided in Sections 9.23 and 9.34)**, performance bonds and other similar items issued and outstanding in connection with the Business, to the extent set forth on <u>Schedule 9.12(**A**)</u> hereof or to the extent Delphi or its Affiliates later inform the applicable Buyer of such an item, and the applicable Buyers will

indemnify Delphi and its Affiliates against any Losses of any kind whatsoever with respect to such Liabilities and obligations.

**B.     On or prior to the Closing, a GM Buyer shall assume all of Sellers' obligations under the DIP Letters of Credit set forth on Schedule 9.12(B), and the DIP Letters of Credit Cash Collateral associated with each such DIP Letter of Credit shall be transferred to the applicable GM Buyer, and shall continue to be held as cash collateral for such obligations.**

**C.     On or prior to the Closing, Company Buyer shall assume all of Sellers' obligations under the DIP Letters of Credit set forth on Schedule 9.12(C), and the DIP Letters of Credit Cash Collateral associated with each such DIP Letter of Credit shall be transferred to Company Buyer, and shall continue to be held as cash collateral for such obligations.**

**D.     On or prior to the Closing, Company Buyer and GM Buyer will agree on a reasonable mechanism for splitting the DIP Letters of Credit set forth on Schedule 9.12.D and the DIP Letters of Credit Cash Collateral associated with each such DIP Letter of Credit shall be transferred to whichever Buyer assumes the obligations and receives the benefit of such DIP Letters of Credit, and shall continue to be held as cash collateral for such obligations.**

**E.     Schedule 9.12.E lists DIP Letters of Credit that will remain with Sellers and the DIP Letters of Credit Cash Collateral associated with each such DIP Letter of Credit shall remain with Sellers and shall continue to be held as cash collateral for such obligations; provided, however, that any remaining cash collateral associated with any expiring DIP Letter of Credit (regardless of whether it was drawn upon) shall be transferred to GM Buyer.**

### 9.13    Competition Clearance.

**9.13.1.**     Subject to the terms hereof, Buyers and Sellers agree to cooperate and to use commercially reasonable efforts to obtain, as promptly as practicable following the date hereof, any Governmental Approvals required for the Closing under the HSR Act, EC Merger Regulation and any other applicable Competition/Investment Law, to respond to any government requests for information thereunder, to contest and resist in good faith any action thereunder, and to have lifted or overturned any Governmental Order that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement. The Parties will use commercially reasonable efforts to complete Schedule 9.13.1,**9.13.1 and Schedule 10.1.2,** no later than three (3) Business Days after the date hereof which will include a list of all countries in which competition filings may be required or are appropriate. In this respect, each applicable Buyer will make (or continue to prosecute, if made previously) all the competition filings set forth in Schedule 9.13.1 promptly, but in no event later than thirty (30) days after the date hereof, and such Buyers will:   (i) promptly inform Delphi of all oral and written communications with any Governmental Authority in respect of any required Governmental Approval; (ii) give Delphi the opportunity to comment on all filings and any response prepared by such Buyer prior to Buyers' submitting such response to the relevant Governmental Authority; and (iii) afford Delphi or any Seller designated by Delphi the opportunity to attend any meetings, telephone conferences or video conferences organized with the Governmental Authorities in relation to any required Governmental Approval. Notwithstanding the foregoing, the Parties agree that none of them will make any voluntary

filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect (including on the ability of a Party to consummate the transactions contemplated by this Agreement and the Ancillary Agreements) or otherwise be in violation of applicable Law. Each Party hereto will promptly inform the other of any oral or other communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements. If the competition authority in any such country: (i) imposes conditions upon its approval of the transactions contemplated by this Agreement; or (ii) files a Proceeding before a Governmental Agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement, the Parties will take commercially reasonable steps to negotiate with the competition authority regarding, and comply with, any conditions or modifications requested by such competition authority, consistent with the general intention of this Agreement (that ownership of the Business will be vested in the Buyers). Such compliance may require modifications in structure, economic and other relationships. The applicable Buyers will be solely responsible for all costs and expenses incurred by such Party in negotiating and agreeing to the required conditions or modifications with the competition authorities. Notwithstanding anything herein to the contrary, in no event shall GM or its Affiliates be obligated to dispose of, or divest themselves of, any line of business or restrict themselves from engaging in a line of business in which they are currently engaged, in order to obtain any regulatory approvals.

       **9.13.2.**    From the date of this Agreement until Closing, each Buyer will not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the GM Transfer Agreements or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the GM Transfer Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement or the GM Transfer Agreements; provided, however the foregoing shall not restrict Buyers or their respective Affiliates from acquiring an interest in any entity (or any Affiliate of any entity) to which they convey any of their assets or rights.

       **9.14**    **Further Actions.**

       **9.14.1.**    The Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby and by the GM Transfer Agreements. In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any ~~party~~**Party** hereto in connection with the transactions contemplated by this Agreement. To the extent the form of any of the agreements or instruments required to effectuate the transactions contemplated by this Agreement have not yet been agreed upon the ~~parties~~**Parties** will act reasonably in finalizing the forms of such agreements or instruments.

**9.14.2.**    At all times prior to the Closing, each Party will notify the other Parties in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in ARTICLE 10 to be satisfied, promptly upon any of them becoming aware of the same.

**9.14.3.**    Nothing in this Agreement or the Ancillary Agreements will prevent or restrict GM, the GM Buyers, or their respective Affiliates and representatives from taking any action that is in accordance with paragraph 46 of the Modification Procedures Order.

**9.15    Further Assurances.**

Subject to the terms and conditions herein provided, the Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements. If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement or the Ancillary Agreements, the Parties shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other Party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that the cost of such action or of such instruments and documents related thereto shall be borne by the relevant Buyer.   The foregoing covenant will survive the Closing of the transactions contemplated herein.

**9.16    Customs Duties.**

Each Party expressly agrees to reimburse the other Party for customs-related duties, fees and associated costs incurred by one Party on behalf of another Party after Closing.   Taxes, except those which are not assessed on an ad valorem basis, incurred in connection with goods co-loaded on containers that clear customs intentionally or unintentionally under one Party's importer/exporter identification numbers and bonds/guarantees post-Closing, shall be borne by the owner of the co-loaded goods; other Taxes (those which are not assessed on an ad valorem basis) on such co-loaded goods shall be shared pro-rata based on value.

**9.17    Enterprise Contracts.**

The Parties acknowledge that: (i) the Business currently benefits from certain services or receives certain products of the type listed on Schedule 9.17 ("**Other Services**") provided by third parties ("**Enterprise Providers**") under enterprise contracts with Delphi and/or one of its Affiliates ("**Enterprise Contracts**"); and (ii) it may not be practical for GM Buyers to enter into replacement contracts with all of such Enterprise Providers as of the Closing Date.   After signing this Agreement and prior to Closing, GM Buyers will use commercially reasonable efforts to enter into replacement contracts covering such Other Services.   In the event that GM Buyers are unable to secure such replacement contracts, after having used commercially reasonable efforts as required by the preceding sentence, Sellers will use commercially reasonable efforts to make available to GM Buyers the Other Services provided under such Enterprise Contracts of the type described on Schedule 9.17.   GM Buyers will pay Sellers the cost (including the cost of any internal resources) of providing such Other Services.   The obligations in this Section 9.17 shall not apply to: (i) any Contracts that are Acquired Assets; (ii) any service provided under the **Buyer** Transition Services Agreement; (iii) any services or products identified in Schedule 9.17

under the heading "Products/Services excluded from Section 9.17" in the Transition Services Agreement as an "Excluded Service"; or (iv) products or services which the applicable Sellers are prohibited from providing to Buyers pursuant to applicable Law. For avoidance of doubt, GM Buyers will not be restricted in any way from engaging directly with the current outsourced service providers with respect to current direct and shared services, Day 1 separation activities and Day 2 preparation. GM will have access to the current statements of work, service level agreements and other agreements etc. with outsourced service providers.

### 9.18    Confidentiality.

After the Closing, Sellers shall, and shall cause their Affiliates to, maintain as confidential and shall not use or disclose (except as required by law, as necessary to defend against a Claim or as authorized in writing by the applicable Buyer) any confidential information (including any confidential Environmental Records and any confidential GM Environmental Records) concerning the businesses and affairs of the Business, except to the extent such confidential information; (i) was used by Delphi's divisions other than the Business prior to the Closing Date; (ii) becomes generally available to the public other than as a result of a disclosure by Delphi or its representatives in violation of the terms hereof; (iii) becomes available to Delphi on a non-confidential basis from a source other than the Buyers or their representatives; or (iv) is covered by the licenses granted pursuant to the IP License Agreements (provided that confidential information excepted from the obligations of this Section 9.18 only by this subsection**subsections (i) or** (iv) will be treated in the same manner as Sellers treat their own confidential information). In the event any Seller or any of their Affiliates is required by law to disclose any confidential information, such Party shall promptly notify the applicable Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with such Buyer to preserve the confidentiality of such information consistent with applicable law. GM shall be the beneficiaries**beneficiary** of any confidentiality or nondisclosure agreement entered into with respect to a potential acquisition of **any portion of** the steering assets**Steering Business** of Delphi before the Closing between Delphi or its Affiliates, on the one hand, and any Person, on the other, and shall be entitled to enforce such agreement after the Closing Date.

### 9.19    Termination of Certain Agreements.

**9.19.1.**    Effective on the Closing Date, without further action by the Parties, the following agreements shall be terminated in their respective entireties and the Parties thereto shall have no further obligations thereunder:

A.    the Option Exercise Agreement;

B.    the Connector Penetration Agreement dated August 7, 2001 (which Buyers do not hereby admit exists);

C.    the Environmental Matters Agreement between Delphi Automotive Systems Corporation (n/k/a Delphi) and **Old** GM, dated as of October 1998;

D.    the Amended and Restated Agreement for the Allocation of U.S. Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and **Old** GM;

E.    the Agreement for Indemnification of United States Federal, State and Local Non-Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and **Old** GM, provided that Delphi's obligations shall be limited amounts received by Delphi after the date of this Agreement;

F.    the Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002;

G.    the Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000;

H.    the Administrative Services Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000;

I.    the Trademark and Trade Name Agreement dated as of January 1, 1999 between Delphi Automotive Systems Corporation (n/k/a Delphi), DAS, and **Old** GM;

J.    the Intellectual Property Contracts Transfer Agreement dated as of December 4, 1998, between DTI and **Old** GM, as amended October 31, 2001;

K.    the Intellectual Property License Agreement dated as of December 4, 1998, between DTI and **Old** GM;

L.    the Intellectual Property Transfer Agreement dated as of December 4, 1998 between DTI and **Old** GM;

M.    the GM-Delphi Technology Transfer Agreement between Delphi Technologies, Inc. and **Old** GM dated December 4, 1998;

N.    the Battery Facilitation Agreement – Transaction Summary dated as of March 21, 2005 between Delphi and **Old** GM;

O.    the Letter Agreement dated August 10, 2004 regarding potential changes in Delphi's battery operations signed by Mary Boland (**Old** GM) and John Blahnik (Delphi);

P.    the Letter Agreement dated June 30, 2005 regarding the sale by Delphi of its global battery business to JCI signed by Bo ~~Andersson~~**Anderson** (**Old** GM) and Steve Olsen (Delphi);

Q.    the Letter Agreement dated June 30, 2005 regarding the potential subsidy to be paid by Delphi to JCI for employees at the New Brunswick battery plant; and

R.    the GM-Delphi Liquidity Agreements.

The Parties will execute and deliver such further instruments or agreements as may be reasonably requested by the other Parties in order to further evidence the foregoing terminations. Notwithstanding any provision to the contrary herein, to the extent that any agreement listed in this section contains a license under any form of Intellectual Property to ~~any~~**Old GM,** GM Buyer or ~~affiliate thereof~~**their respective Affiliates**, or any option to purchase any patent or other intellectual property, or any commitment not to challenge or claim ownership in any Trademark

of any **Old GM,** GM Buyer **or their respective Affiliate**, such license(s), option(s) and commitment(s) shall survive and remain in full force and effect.

**9.19.2.** Effective on the Closing Date, without further action by the Parties the MRA shall (except as specifically set forth below) be terminated in its entirety and the parties thereto shall have no further obligations thereunder (other than as specifically set forth in this Section 9.19.2), including, without limitation, any obligations of Delphi for payments with respect to flowbacks under Section 5.11 of the MRA or otherwise. Notwithstanding the foregoing, **Old** GM agrees to pay any and all amounts due to Delphi which accrue under the MRA for periods prior to Closing regardless of the date on which such amounts become due under the terms of the MRA. In addition, **Old** GM shall continue to be responsible for the payment of all costs and amounts due to Delphi under the MRA with respect to the Athens Facility (as defined in the MRA).

**9.19.3.** Effective on the Closing Date, without further action by the Parties, Sellers shall be deemed to have waived any and all Claims (past and future) against **Old GM,** GM or ~~its~~**their** Affiliates pursuant to the GSA and the GM-Delphi Liquidity Agreements.

**9.20   Certain Mexican Matters.**

Delphi and the applicable Sellers commit to the following with respect to the GM Buyers:

**9.20.1.   Mexico LTAs.** Immediately before Closing, Delphi will cause the asset sale transactions contemplated in the local transfer agreements **substantially in the form** set forth in Schedules 9.20.1(i)-(iii) **(with such limited changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date)** ("**Mexico LTAs**") (consolidation of assets of the Steering Business currently operated by Rio Bravo Electricos, S.A. de C.V., Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V. and ~~Delphi Automotive Systems~~**Alambrados y Circuitos Electricos**, S.A. de C.V. into Steeringmex) to be completed in accordance with the terms and conditions set forth in the Mexico LTAs. The Mexico LTAs set forth the terms under which the assets described therein are transferred by various Delphi Affiliates to Steeringmex, S. de R.L. de C.V., a Mexican limited liability company ("**Steeringmex**"). Under Section 5B of certain of the Mexico LTAs, a second installment payment of purchase price is required to be made (the "**Purchase Price Assumed Debt**"). Notwithstanding anything to the contrary in ARTICLE 3 of this Agreement, neither of the following items will be included in any determination of the GM Purchase Price: (i) the Purchase Price Assumed Debt; and (ii) the Mexican VAT aggregating $1,324,408 USD (the "**Mexican VAT Amount**") under certain of the Mexico LTAs that is recoverable by Steeringmex, with respect to the payment required to be made under Section 5A of such Mexico LTAs. At GM Buyer's request, immediately before Closing, Sellers will, at GM Buyers' sole cost and expense, cause Delphi Ensamble de Cables y Components, S. de R.L. de C.V. to file an action in the nature of a claim for declaratory judgment regarding the validity of the title to the GM Owned Real Property and to continue the proceeding at GM Buyers' sole cost and expense until its conclusion. In this case, transfer of title to the GM Owned Real Property in Mexico will not be carried out to Steeringmex prior to closing, but promptly following the conclusion of the aforementioned declaratory judgment, as set forth in the corresponding Mexico LTA.

**9.20.2.   Utility Contracts.** A Seller Affiliate will allow Steeringmex, until thirty (30) days after Closing, to continue to receive electricity ("**Post-Closing Mexico Utilities**") under certain mutually agreed utility contracts listed in Schedule 9.20.2 to this Agreement from the applicable utility service provider(s), including keeping that certain $180,000.00 deposit (the "**Mexico Deposit**") in place.

Steeringmex will enter into separate utility contracts with the applicable utility service provider(s). Within ten (10) days after receipt of an invoice for the Post-Closing Mexico Utilities, Steeringmex will pay the applicable Seller Affiliate for the Post-Closing Mexico Utilities.

**9.20.3.    Certain GM Acquired Assets Located in Mexico.** The GM Acquired Assets that are located in Mexico and subject to a temporary importation customs regime shall be transferred by the applicable GM Asset Sellers to the applicable GM Asset Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant GM Acquired Assets' temporary importation customs status. Specifically, the applicable GM Asset Sellers shall transfer temporary imported Acquired Assets of the Steering Business through the so-called "virtual export pedimentos" and the applicable GM Asset Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation. The applicable GM Asset Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

**9.20.4.    Certain Company Acquired Assets Located in Mexico.** The Company Acquired Assets of the Company Business that are located in Mexico and subject to a temporary importation customs regime shall be transferred by the applicable Company Asset Sellers to the applicable Company Asset Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant Acquired Assets' temporary importation customs status. Specifically, the applicable Company Sellers · shall transfer temporary imported Company Acquired Assets through the so-called "virtual export pedimentos" and the applicable Company Asset Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation. The applicable Company Asset Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

**9.21    Transfer of Certain Sale Securities.**

In order to effectuate the sale of the Sale Securities pursuant to Section 2.1.1 **or Section 2.1.2** hereof, Sellers may, prior to Closing and after consultation with the applicable Buyers, transfer certain of the Sale Securities to special purpose vehicles in the form of intermediate holding companies **provided that such transfer does not adversely affect the applicable Buyers or their interests in such Sale Securities**. In the event of any such transfer, the shares of the intermediate holding company will become the Sale Securities transferred hereunder.

**9.22    Certain Bank Accounts.**

Parent will duly execute and deliver to Delphi ~~Corporation~~, the Novation Letter in the form attached hereto as Exhibit 9.22 in order to transfer certain lock box bank accounts at ~~J.P.~~**JP** Morgan Chase **Bank**, N.A. to Buyers (the **"Transferred Account(s)"**) with an effective date as of the Closing Date. On or before the Closing Date, Delphi will counter-sign such Novation Letter and deliver the same to ~~J.P.~~**JP** Morgan Chase **Bank**, N.A. In the event any Party receives any payments which are not included among such Party's Acquired Assets, such receiving Party will remit such payment to the appropriate other party within five (5) Business Days of receipt.

### 9.23    Certain China Matters.

**9.23.1.**    An Affiliate of the China Sellers has established a letter of credit (the "**China L/C**") in support of Saginaw Steering (Suzhou) Co., Ltd., a Sale Company ("**Steering (Suzhou)**"). Delphi will cause such Affiliate to keep the China L/C in place for no more than three hundred sixty (360) days following Closing (the "**China L/C Period**"). Parent will cause Steering (Suzhou) to establish, in no event later than three hundred sixty (360) days following Closing, a replacement for the China L/C. Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause Steering (Suzhou) to pay to the relevant Seller Affiliate all costs incurred by such Seller Affiliate in connection with keeping the China L/C open during the China L/C Period.

**9.23.2.**    The GM Buyers acknowledge Sellers' beneficial ownership of the China Entities until the Closing Date and agree that, until the Closing, it shall have no rights other than to hold legal title with respect to the China Entities. The GM Buyers agree not to encumber the China Entities or interfere with the operation of the business conducted by the China Entities until the Closing. Upon Closing, all of GM Sellers' beneficial ownership and/or other interests in the China Entities shall automatically transfer to Steering Holding Pte. Ltd; provided, however, that in the event this Agreement does not become effective or this Agreement is terminated pursuant to ARTICLE 12, the GM Buyers shall, upon Delphi's request, take all steps and actions necessary to promptly transfer to Delphi or its designee any and all legal ownership rights the GM Buyers may have with respect to the China Entities or, at Delphi's election, Steering Holding Pte. Ltd or Rhodes Holding II Sarl, as applicable.

### 9.24    Certain Poland Matters.

Delphi will ~~use commercially reasonable efforts to~~ transfer all of its shares in Delphi Polska to ~~a Dutch BV (created or purchased off the shelf between the signing of this Agreement and Closing) which, following the transfer, will own all the shares in Delphi Polska. Sellers will use commercially reasonable efforts to create or purchase such Dutch BV following the execution of this Agreement. In the event Sellers are unable to register such Dutch BV with the relevant Governmental Authorities within fifteen (15) days following the date of this Agreement, upon request, Parent agrees to create or purchase a Dutch BV to be used to purchase the shares of Delphi Polska.~~ **Fidass II, B.V. and complete all necessary registrations to effect such transfer prior to Closing.** GM Buyers will reimburse Sellers **on Closing** for all costs incurred in ~~creating,~~ acquiring ~~or transferring the Dutch BV~~**Fidass II, B.V.** as such costs are incurred by Sellers or their Affiliates. Delphi will not indemnify GM Buyer for any Tax or other Liabilities of ~~the Dutch BV~~**Fidass II, B.V.**

### 9.25    Non-GM Customers.

Each Buyer may consult with any customers of the Business that such Buyer is acquiring hereunder to discuss the potential impact of the transactions contemplated hereunder on the ongoing commercial relationship between such Business and any such customers.

### 9.26    Transfer of Quotas in Saginaw Brazil.

Prior to Closing, the applicable GM Sellers will take all actions required to cause Delphi Brazil to acquire the one (1) quota of the capital of Saginaw Brazil held by Jefferson Felix de Oliveira, a Brazilian citizen, married, mechanic engineer, resident and domiciled in the City of Porto Alegre, State of Rio Grande do Sul, with office at Rua Giuseppe Mandelli, No. 118, Bairro

São João, in the City of Porto Alegre, State of Rio Grande do Sul, Zip Code, bearer of the Identity Card R.G. No. No. 5.004.573.671 SSP/RG, enrolled with the Brazilian Individual Taxpayers' Register (CPF/MF) under No. 491.466.290-68. As a result of such transfer, Delphi Brazil will become the lawful owner of one hundred percent (100%) of the quotas of Saginaw Brazil.

      A.    Simultaneously with the transfer of the sole quota mentioned in this Section 9.26, the applicable GM Sellers will cause Delphi Brazil to execute an amendment to the articles of organization of Saginaw Brazil in accordance with applicable Brazilian Law, pursuant to which the applicable GM Sellers shall become the new owners of one hundred percent (100%) of the quotas in Saginaw Brazil representing 54,639,116 (fifty-four million six hundred and thirty-nine thousand one hundred and sixteen) quotas. As a result, the applicable GM Sellers will become the lawful owners of all, but not less than all, of one hundred percent (100%) of the quotas of Saginaw Brazil. The ~~Applicable~~**applicable** GM Sellers will cause Saginaw Brazil to file the amendment to the articles of organization mentioned above for registration with the competent commercial registry and perform all actions that may be required to obtain such registration as soon as practicable, but in any event no later than thirty (30) days from the date of the execution of the amendment to the articles of organization of Saginaw Brazil, in compliance with applicable Brazilian Law.

      B.    Prior to Closing, the applicable GM Sellers intend all the quotas of Saginaw Brazil to be dividended from Delphi Brazil to the applicable GM Sellers. Prior to Closing, Delphi Brazil will take all actions required to register the dividend from Delphi Brazil to the applicable GM Sellers and the foreign investment of the applicable GM Sellers in the capital of Saginaw Brazil before the Brazilian Central Bank in accordance with applicable Brazilian Law.

### 9.27    Transfer of the Brazilian Real Estate.

    Delphi Brazil acquired the Brazilian Real Estate on March 3, 1999 and contributed the Brazilian Real Estate to the capital of Saginaw Brazil, on April 1, 2008 as payment-in of its equity interest in the capital of Saginaw Brazil. Notwithstanding the above, Delphi Brazil has not registered the transfer of the Brazilian Real Estate to Saginaw Brazil in the real estate enrollment certificate (matrícula) of the competent real estate register to officer. Promptly following the Closing, the Brazil Sellers will, and will cause Delphi Brazil to (i) perform any and all actions that may be required to transfer the Brazilian Real Estate owned by Delphi Brazil to Saginaw Brazil, free and clear of any Encumbrance, other than Permitted Encumbrances, in accordance with applicable Law; and (ii) execute any and all documents that may be required to perfect the transfer of the Brazilian Real Estate to Saginaw Brazil in accordance with applicable Law, including but not limited to executing and registering a Public Deed for Transfer of Real Property for Corporate Capital Payment (Escritura de Conferência de Bens para Integralização de Capital Social) in the real estate enrollment certificate (matrícula) of the Brazilian Real Estate before the competent real estate register office of the City of Porto Alegre, State of Rio Grande do Sul, Brazil. GM Buyers will be solely responsible for all taxes, costs and expenses in connection with such transfer, in accordance with all applicable Brazilian legal requirements.

### 9.28     Environmental Permits.

On the date of the execution of this Agreement or as soon as reasonably possible thereafter, and following the Closing, Sellers shall cooperate with Buyers in taking all reasonable steps to facilitate the transfer, assignment or procurement of the reissuance of any Environmental Permit necessary to operate the Business.

### 9.29     Conflict and Privilege Waivers.

A.     Effective as of the execution date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates, successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Environmental Law related matter for which any Buyer may be required to respond, involving in each case the applicable Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Facility.  In addition, effective on the execution date of this Agreement, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Environmental Law related matter for which any Buyer may be required to respond, in each case involving the applicable Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Facility.  **Sellers hereby reaffirm the privilege waiver they signed in connection with the June 1 MDA and agree that such waiver remains in full force and effect.** Within fifteen (15) days after the execution date of this Agreement, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form ~~attached as~~**of** Exhibit 9.29.A together with a list of their consultants and advisors.

B.     Effective on the Closing Date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Liability (other than as addressed in subsection (A) above) for which any Buyer may be required to respond, involving in each case the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.  In addition, effective on the Closing Date, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Liability for which any Buyer may be required to respond, in each case involving the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.  At Closing, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form ~~attached as~~**of** Exhibit 9.29.B together with a list of their consultants and advisors.  To the extent that any Liability that is the subject of this Section relates both to any ~~Purchased~~**Acquired** Asset, Business, Sale Company and/or its assets on the one hand, and an

Excluded Asset and/or Retained Liability on the other hand then the applicable Seller and Buyer agree that the waiver set forth herein will be effective only upon execution of a mutually acceptable joint defense agreement which the Parties agree to execute on or before Closing.

### 9.30    Preservation of Environmental Records.

Prior to Closing, Sellers and their respective Affiliates will preserve all Environmental Records and GM Environmental Records and will not damage, destroy or alter any Environmental Records or GM Environmental Records.

### ~~9.31    DIP Transfer Matters.~~

~~Subject to the terms and conditions herein provided and if required by applicable Law or the DIP Agreement (or the DIP Agent at the direction of the requisite DIP Lenders), upon request of any of the Sellers, the Parties shall permit the Sellers to implement a transaction pursuant to which the Sellers transfer, or cause to be transferred, to the DIP Agent on behalf of the DIP Lenders assets secured under the DIP Agreement in satisfaction of the obligations under the DIP Agreement, and the Sellers or the DIP Agent on behalf of the DIP Lenders, as applicable, simultaneously transfers, or causes to be transferred, all of the GM Acquired Assets to the GM Buyers and all of the Company Acquired Assets to the Company Asset Buyers on terms consistent with this Agreement; provided, that in no event shall any such transaction result in a material economic cost to or material adverse effect on the Business, the Acquired Assets, the Buyers or their respective subsidiaries, or increase the Assumed Liabilities.~~

### 9.31    ~~9.32~~ Reorganization and Restructuring.

Prior to the Closing, the Sellers, the Sale Companies and Buyers shall consider in good faith any and all internal restructuring steps and consider any transactions and elections as may be requested by the Buyers or Sellers in their respective sole discretion (including capital contributions, cross-chain sales, dividend distributions, spin-offs, mergers, redemptions, tax elections, conversions and reincorporations).  Notwithstanding the foregoing, (a) the failure of any such reorganization or restructuring steps to occur shall in no way delay the Closing of the transactions contemplated by this agreement, (b) the applicable Buyers or Sellers, as the case may be, shall bear all costs related to any such reorganization or restructuring including any costs incurred by any the other Parties, ~~and~~ (c) the other Parties shall have no liability for the failure of any such reorganization or restructuring steps to occur**, (d) no Company Buyer shall have any Liability for any such reorganization or restructuring proposed by any GM Buyer and (e) no GM Buyer shall have any Liability for any such reorganization or restructuring proposed by the Company Buyer**.

### 9.32    ~~9.33~~ Certain Other Actions.

Sellers agree to use commercially reasonable efforts to (a) ~~prior to June 30, 2009, reduce any pledge of the stock of the Sale Companies organized outside the United States owned by Filing Affiliates from one hundred percent (100%) to sixty-five percent (65%) and to assure that no assets of the Sale Companies organized outside the United States are pledged, (b)~~ if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of Delphi Technologies, Inc., a Delaware corporation, in order to permit the unencumbered sale of the shares of such corporation instead of the sale of the assets

of such corporation and (e~~b~~) if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of certain Filing Affiliates that are Company Sellers of Company ~~Sale~~**Sales** Securities in order to permit the unencumbered sale of the shares of such Filing Affiliates instead of the sale of such Company ~~Sale~~**Sales** Securities.    At Company Buyer's sole option, the Company Buyer may elect to purchase the shares of one or more Filing Affiliates instead of purchasing the assets or Company ~~Sale~~**Sales** Securities held directly by such Filing Affiliate.

### 9.33    ~~9.34~~ Retained Plans.

The Parties acknowledge that Delphi may, at its sole election, terminate any or all of the Retained Plans . .

### 9.34    ~~9.35~~ Certain India Matters.

Delphi Automotive Systems Pvt. Ltd. ("**Delphi India**") has established a letter of credit (the "**India L/C**") in support of its Steering Business.  Delphi will cause Delphi India to keep the India L/C in place for no more than ninety (90) days following Closing (the "**India L/C Period**").  Parent will cause the applicable GM Buyer to establish, as soon as possible after Closing and in no event later than ninety (90) days following Closing, a replacement for the India L/C.  Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause the applicable GM Buyer to pay to Delphi India all costs incurred by Delphi India in connection with keeping the India L/C open during the India L/C Period.

### 9.35    ~~9.36~~ Pending Transactions.

**9.35.1.**    In the event that any of the Pending Transactions are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the Pending Transactions under the applicable sale and related agreements, including the **Seller** Transition Services Agreement (subject to Delphi's reimbursement of Company Buyer's actual costs in accordance with the terms of the **Seller** Transition Services Agreement), and pay to Delphi, in U.S. Dollars, ~~the entire purchase price~~**an amount equal to net proceeds** received from the respective buyers under the Pending Transactions, within ten (10) Business Days after receipt, except that funds paid to a non-U.S. Sale Company will be paid to Delphi **(or Parent, as applicable)** as soon as legally permitted under applicable Law, and in advance of amounts paid to other Company Affiliates.

**9.35.2.    In the event that the sales of the brake and suspension business and the exhaust business are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the such transactions under the applicable sale and related agreements, including the Seller Transition Services Agreement (subject to Delphi's reimbursement of Company Buyer's actual costs in accordance with the terms of the Seller Transition Services Agreement), and pay to Parent or its designee, in U.S. Dollars, an amount equal to the Net Proceeds received from the respective buyers in connection with such transactions, within ten (10) Business Days after receipt.  Delphi will deposit into an escrow account pursuant to an escrow agreement reasonably acceptable to the GM Buyer and Company Buyer any Net Proceeds received by Delphi or any of its Affiliates in connection with the sales the brake and suspension business or the exhaust business between date hereof and the Closing Date, and such amount will be paid to Parent at Closing.**

### 9.36   ~~9.37~~ Delphi FICA Litigation.

Delphi shall timely file any FICA refund claims arising in connection with the collective bargaining agreements in 2007.   GM Buyer and Company Buyer shall cooperate in the prosecution of the Delphi FICA Litigation.

### 9.37   ~~9.38~~ ~~GM~~ Financing.

**9.37.1.**   ~~9.38.1.~~ Prior to the Closing or the **earlier** termination of this Agreement, GM shall not (x) terminate the GM Financing Agreements or (y) amend or otherwise modify the terms of the GM Financing Agreements (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the GM Financing Agreements or otherwise in a manner that would ~~materially~~ adversely impact **in a material respect** the ability of GM or the Company Buyer to consummate~~,~~ the transactions contemplated by the GM Financing Agreements (including in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.37.2.**   ~~9.38.2.~~ GM shall, prior to or concurrently with the Closing, execute and deliver the Buyer Loan Documents, provide the financing contemplated by the GM Financing **Agreements** on the terms and subject to the conditions described in the GM Financing Agreements and otherwise perform and comply on a timely basis with all of its obligations under the GM Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions and other requirements to the consummation of the financing contemplated by the GM Financing ~~Agreement~~**Agreements**.

**9.37.3.**   ~~9.38.3.~~ Prior to the Closing or the **earlier** termination of this Agreement, the Company Buyer shall not (x) terminate the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** or (y) amend or otherwise modify the terms of the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** or otherwise in a manner that would ~~materially~~ adversely impact **in a material respect** the ability of the Company Buyer to consummate the transactions contemplated by the ~~Equity Commitment Letter or the PE~~**Company** Financing ~~Arrangements~~**Agreements** or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.37.4.**   ~~9.38.4.~~ The Company Buyer shall, prior to or concurrently with the Closing, execute and deliver the ~~Buyer Loan Documents~~**Company Financing Agreements** and otherwise perform and comply on a timely basis with all of its obligations under the ~~PE~~**Company** Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions and other requirements to the consummation of the financing contemplated by the ~~PE~~**Company** Financing Agreements.

## 9.38    ~~9.39~~ Environmental Matters.

Notwithstanding anything in this Agreement to the contrary, neither Sellers and their Affiliates, on the one hand, nor any Buyer, on the other hand, assumes any Liability under Environmental Laws of the other. Nothing in this Agreement is intended to nullify any Liability to any federal, state or local environmental agency under Environmental Laws that either Seller and/or their Affiliates or any Buyer may have as a result of their status as an owner or operator of any property or facility, or as an arranger for disposal of any Hazardous Materials generated at any property or facility. At Closing, Seller and its Affiliates shall discharge in the pending Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have. After the Closing neither Sellers and their Affiliates, on the one hand, nor any Buyers, on the other hand, shall assert or pursue any Claim against the other under any Environmental Law for any Liability for Hazardous Materials contamination located on a GM Real Property ~~or,~~ a Company Real Property **or any real property relating to the Excluded Assets**.

## 9.39    ~~9.40~~ Non-Solicitation.

Each of Delphi and the Sellers agree, severally, that until the earlier of (i) when this Agreement is terminated under the terms hereof and (ii) the Closing (the "**Non-Solicitation Period**"), Delphi and the Sellers, as applicable, shall not, and shall not knowingly permit Delphi, the Seller or any of their respective officers, directors, agents or Affiliates to solicit or initiate any inquiries or the making of any proposal with respect to the sale (whether by sale of stock, merger, consolidation, sale of assets or other disposition) of all or any part of the GM Business and the Company Business or any significant portion of their consolidated assets or issued or unissued capital stock; provided, however, that nothing in this Agreement shall prevent or restrict Delphi's Board of Directors from taking actions (or directing management to take actions) which (i) the Board reasonably believes are required by their fiduciary duties (taking into account the advice of counsel in appropriate circumstances) or (ii) are in accordance with paragraph 46 of the Modification Procedures Order**, as amended**. From and after the execution of this Agreement, Delphi and the Sellers shall immediately advise the Buyers of the receipt, directly or indirectly, of any inquiries, discussions, negotiations, or proposals relating to a ~~Competing Transaction~~**transaction described in this Section 9.39** (including the specific terms thereof and the identity of the other individual or entity or individuals or entities involved) and promptly furnish to the Buyers a copy of any such written proposal in addition to a copy of any information provided to or by any third party relating thereto, in each case only to the extent discussed or provided to Delphi's Board of Directors.

## 9.40    ~~9.41~~ Employment, Retirement, Indemnification, and Other Agreements, and Incentive Compensation Programs.

Prior to Closing, the Company Asset Buyers shall take all actions necessary to enter into or assume (at the Company Asset Buyer's sole discretion) the agreements, obtain insurance coverage and undertake or assume the obligations, in connection with the Specified Director, Officer and Employee Related Liabilities that in the aggregate provide substantially similar economic benefits to the applicable directors, officers and employees as currently exist under existing agreements and policies **in effect on the date of this Agreement** with respect to Delphi's directors, officers and employees other than with respect to change in control agreements. "**Specified Director, Officer and Employee Related Liabilities**" means (i)

employment and incentive agreements and policies (which shall ~~includes~~**include** equity, supplemental retirement benefits, bonus and other incentive plans and policies to be paid to executives after the ~~effective date of the Plan of Reorganization~~**Closing Date**) with substantially all of Delphi's current, eligible executives who continue to be employed after the ~~effective date of the Plan of Reorganization~~**Closing Date**, (ii) the obligation to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of a director, officer, or employee pursuant to the applicable Delphi and Affiliate of Delphi certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against any director, officer, or employee of the debtors who were in that role as of the date of October 3, 2007 based upon any act or omission related to a director's, officer's or employee's service with, for, or on behalf of Delphi or an Affiliate of Delphi, (iii) the obligation to maintain directors' and officers' insurance providing coverage for those directors, officers, and employees currently covered by such policies for the remaining term of such policy and to maintain tail coverage under policies in existence as of the ~~effective date of the Plan of Reorganization~~**Closing Date** for a period of six years after the ~~effective date of the Plan of Reorganization~~**Closing Date**, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such persons based upon any act or omission related to such person's service with, for, or on behalf of the debtors in at least the scope and amount as currently maintained by Delphi and Affiliates of Delphi, and (iv) the obligation to indemnify current or former directors, officers, and employees who were not employed in such capacity by Delphi or an Affiliate of Delphi as of October 3, 2007, solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the insurance coverage referred to in section (~~iii~~**ii**) or any prior similar policy in an aggregate amount not to exceed $10 million.

## **9.41**   ~~9.42~~ India Matters.

The applicable Delphi Asset Seller in India shall use commercially reasonable efforts to prior to Closing (A) procure a "no objection letter" from the appropriate authority pursuant to section 281(1) of the Income Tax Act, 1961 of India to the proposed transfer of the Acquired Assets of the GM Business conducted in India from the Seller to the Buyer with no conditions included in such objection letter, other than those as are reasonably acceptable to the applicable Seller and applicable GM Buyer and (B) establish proper, clear and valid leasehold rights in favor of the applicable GM Buyer to the premises forming part of the lease for the premises situated in the State of Haryana, India and subject to the Seller furnishing all necessary permission(s) and authorization(s) obtained by AJS Associates and/or individual allottees of the premises forming part of the leases from the Haryana Urban Development Authority for the purpose of creating valid leasehold rights in favor of the GM Buyer.

## **9.42**   ~~9.43~~ Prosecution and Settlement of Appaloosa Claim.

Prior to the Closing, Delphi shall continue to control the prosecution and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution and, subject to applicable law, shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer which shall not be unreasonably withheld. Following the Closing, (i) GM, GM Buyer and Delphi agree to take appropriate actions and enter into appropriate agreements such that subject to applicable law, GM or GM Buyer shall control the prosecution

and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution, and Delphi shall cooperate with GM and GM Buyer in any such prosecution; provided, however, if requested by GM or GM Buyer in writing, Delphi shall prosecute such Claim at the direction of GM or GM Buyer, as applicable, and GM or GM Buyer, as applicable, shall reimburse Delphi for any reasonable, external, out-of-pocket costs and expenses incurred by Delphi in connection with any such prosecution; provided, further, however, that if GM or GM Buyer has requested that Delphi prosecute such Claim as provided above, Delphi shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer; (ii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto, in each case for an amount that would be less than ~~the maximum distribution to the C Lenders provided by Article 7.8(e)(iii) of the Plan~~**$145.5 million** (the "**Threshold**"), without the prior written consent of ~~Delphi~~**Company Buyer** which shall not be unreasonably withheld; provided, that ~~Delphi~~**Company Buyer** may not withhold its consent unless it agrees within 20 days of the request for consent to pay all costs and expenses associated with of the continuing prosecution of the Appaloosa Claim and demonstrates to GM's and GM Buyer's reasonable satisfaction the ability to fund such costs and expenses; provided, further, that ~~Delphi~~**Company Buyer** shall not have any right to consent to the entry of any judgment with respect to the Appaloosa Claim or any settlement with respect thereto if the ~~C Lenders would receive an~~ amount ~~from~~**of** such **judgment or** settlement **would result in proceeds** equal to or greater than the Threshold; (iii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto unless such judgment or settlement (A) contains a full release of all counter, cross or similar claims by the defendants and (B) does not contain non-economic relief detrimental to Delphi's current or former officers, directors, or employees; and (iv) GM and GM Buyer shall consult with Delphi regarding any request by Delphi for GM or GM Buyer to consent to the entry of any judgment with respect to the Appaloosa Claim or entry into any settlement. Delphi and GM and/or the GM Buyer will enter into an agreement in mutually acceptable form for the purpose of facilitating communications regarding the Appaloosa Claim and, to the maximum extent permissible, protecting confidential and privileged information shared in connection therewith.

## 9.43    PBGC Settlement Agreements.

**Delphi shall not amend, modify, or terminate the Delphi-PBGC Settlement Agreement without the prior written consent of each of GM and the Company Buyer, which consents shall not be unreasonably withheld; provided, however, that Delphi shall not amend the Delphi-PBGC Settlement Agreement in any manner that (i) will cause GM or the Company Buyer to pay any amounts, incur any Liabilities or transfer any assets or (ii) modify in any manner any releases of any claims or liens for the benefit of GM or the Company Buyer. GM shall not amend, modify, or terminate the GM-PBGC Settlement Agreement without the prior written consent of each of Delphi and the Company Buyer, which consents shall not be unreasonably withheld; provided, however, that GM shall not amend the GM-PBGC Settlement Agreement in any manner that (i) will cause Delphi or the Company Buyer to pay any amounts, incur any Liabilities or transfer any assets or (ii) modify in any manner any releases of any claims or liens for the benefit of Delphi or the Company Buyer.**

## 9.44    DIP Priority Payment.

9.44.1.    Not more than 20 Business Days but not less than 15 Business Days prior to the date on which Delphi and the Buyers shall have agreed in good faith is the anticipated Closing Date, Delphi shall notify the DIP Agent in writing (with a copy to the Buyers) of such anticipated Closing Date.  If, at any time subsequent to the delivery of such notification, Delphi and the Buyers determine in good faith that they anticipate that the Closing Date will be different from the one set forth in such notification, Delphi shall notify the DIP Agent in writing (with a copy to the Buyers) of the updated anticipated Closing Date.

9.44.2.    At least 15 Business Days prior to the Closing Date, (I) the DIP Agent will prepare in good faith and deliver to Delphi and the Buyers (a) the aggregate amount of all invoices received by DIP Agent at such time to be paid at the Closing pursuant to clause (i) of the definition of DIP Priority Payment and (b) a categorized estimate of the DIP Priority Payment under clauses (ii) and (iii) of the definition thereof as of the Closing Date and (II) Delphi will provide to the Buyers the mark-to-market exposure under the Hedging Agreements as of such date, calculated in accordance with the relevant Hedging Agreements.  At least 4 Business Days prior to the Closing Date, the DIP Agent will deliver to Delphi and the Buyers the calculations of the obligations owing under the Hedging Agreements as of the Closing Date that have been provided to the DIP Agent by the counterparties to the Hedge Counterparties as of such date.  On or prior to the Closing Date, the DIP Agent will deliver to Delphi and the Buyers a letter (the "DIP Priority Payment Letter") setting forth in reasonable detail the calculation of the amount of the DIP Priority Payment to be paid on the Closing Date.

9.44.3.    If a GM Buyer disputes any amount or calculation under clause (i) of the DIP Priority Payment or the estimate of such amount, to the extent such dispute cannot be resolved by consent or by order of the Bankruptcy Court prior to Closing, at its option in its sole discretion, the GM Buyers may elect to either (i) delay the Closing for a period not to exceed 15 days in order to seek to resolve such dispute, or (ii) proceed with the Closing and pay such disputed amount, subject to the following procedures if applicable:

A.    if the portion of the DIP Priority Payment in dispute is owed to a Backstop Party, GM Buyer will pay the disputed amount to the DIP Agent who will deposit such disputed amount in a non-interest bearing escrow account pursuant to an escrow agreement in form and substance reasonably acceptable to the DIP Agent, GM Buyer and the applicable Backstop Party, which escrow agreement shall authorize the DIP Agent to distribute the escrowed amount as specified in a joint notice by a GM Buyer and the applicable Backstop Party or as ordered by the Bankruptcy Court;

B.    if the portion of the DIP Priority Payment in dispute is owed to any third party other than a Backstop Party, GM Buyer shall pay such amount to the DIP Agent and the DIP Agent will distribute such disputed amount to the applicable third party; provided that in providing such payment, GM Buyer does not waive any rights it may have to dispute the amount paid to such third party hereunder; or

C.    if the portion of the DIP Priority Payment in dispute is owed to any third party other than a Backstop Party, and such third party agrees to permit such disputed amount to be retained by the DIP Agent subject to an escrow, GM Buyer will pay the disputed amount to the DIP Agent who will deposit such disputed amount in a non-

interest bearing escrow account pursuant to an escrow agreement in form and substance reasonably acceptable to the DIP Agent, which escrow agreement shall authorize the DIP Agent to distribute the escrowed amount as specified in a joint notice by a GM Buyer and the applicable third party or as ordered by the Bankruptcy Court.

9.44.4.    If a GM Buyer disputes any amount or calculation under clause (iv) of the DIP Priority Payment, to the extent such dispute cannot be resolved by consent or by order of the Bankruptcy Court prior to Closing, the GM Buyers shall so notify Delphi and the counterparty to the relevant Hedging Agreement of such dispute, proceed with the Closing and pay such disputed amount to such counterparty at the Closing, and, upon the making of such payment at the Closing, Delphi shall assign to the GM Buyers the right to enforce against the counterparty (subject to all defenses that could be asserted by the counterparty against Delphi) any right Delphi may have to reimbursement of the disputed amount under the relevant Hedging Agreement. If the DIP Agent does not perform the provisions of this Section 9.44 applicable to it, the Parties will use their respective commercially reasonable efforts to enter into an alternative arrangement which provides GM Buyers protections and rights equivalent to those provided by this Section 9.44.

9.44.5.    At Closing, Company Buyer shall reimburse Parent an amount equal to 50% of aggregate amount of success fees included in the DIP Priority Payment incurred after June 1, 2009 and paid by Parent or a GM Buyer.  Alternatively, Parent may assign its rights to such payment to one of its Affiliates and Parent or such Affiliate may offset such right to such payment against the GM Buyers' obligations under Section 9.5.11.B.

## ARTICLE 10.
## CONDITIONS TO CLOSING.

**10.1**    **Conditions to Obligations of Sellers and Buyers.**

The respective obligations of each Party to effect the **Sales and the other** transactions contemplated by this Agreement will be subject to the satisfaction or waiver by each Party at or prior to the Closing Date of the following conditions precedent.

**10.1.1.**    Plan of Reorganization. The**, Plan Modification Order. If the transactions contemplated by this Agreement are consummated pursuant to the Plan of Reorganization, the** conditions to the effectiveness of the Plan of Reorganization**thereof** shall have been satisfied or waived pursuant to the terms of the Plan of Reorganization**thereof**, and the Plan of Reorganization does not contain any changes from the draft version delivered to GM and the Buyers**filed with the Bankruptcy Court** on June 1,**16,** 2009 that would have a material adverse impact on the Sale**Sales (except as contemplated under Section 3.2.3 of this Agreement)** without the consent of GM and the Company Buyer or an adverse impact on**, an adverse impact on** GM without the consent of GM. Any **or an adverse impact on Company Buyer without the consent of Company Buyer. If the transactions contemplated by this Agreement are consummated pursuant to the Plan of Reorganization, any** exhibits and schedules to the Plan of Reorganization**thereto** not delivered to the Buyers prior to the date of this Agreement, must not have a material adverse impact on the Sale**Sales** without the consent of GM and the Company Buyer, a material adverse impact on GM without the consent of GM or a material adverse impact on Company Buyer without the consent of Company Buyer.  The Plan Modification Order shall have been entered and become a Final Order in form and substance satisfactory to GM**, the**

DIP Agent and the Company Buyer and shall include, among others, the terms set forth on Schedule 10.1.1, and shall be an Unstayed Order.

10.1.2.   Governmental Approvals:  Plan Modification Order.   All required Governmental Approvals (including approvals under any Competition/Investment Law, as identified on Schedule 10.1.2) regarding the SaleSales will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated; provided that to the extent such consent, approval, order, authorization, registration, declaration or filing has not been obtained or completed with respect to an immaterial Acquired Asset, Parent or Company Buyer may elect in its sole discretion to cause the applicable Buyer to consummate the acquisition of those Acquired Assets for which such consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and defer the acquisition of all remaining Acquired Assets until such remaining consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and provided further that the full Purchase Price for such assets is paid.

10.1.3.   No Order.   There shall not be in effect any Governmental Order by a Governmental BodyAuthority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consumption of the transactions contemplated hereby.

10.1.4.   DIP Amendment.

The DIP Agreement shall have been amended or otherwise modified to the extent necessary to permit the consummation of the transactions contemplated hereby, and such amendment or other modification shall be in full force and effect and not be subject to any unsatisfied condition precedent or condition subsequent not otherwise waived by the DIP Lenders.

10.2   Conditions to Obligations of Sellers.

The obligation of Sellers to consummate the Sales and the other transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

10.2.1.   Accuracy of Warranties.   The representations and warranties of the GM Buyers contained in Articles 4 and 7 and of GM in Article 6in ARTICLE 5 of this Agreement, of GM in ARTICLE 6 of this Agreement and of the Company Buyer in ARTICLE 7 of this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of date of the Agreement and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer'sBuyers' ability to consummate the transactions contemplated by this Agreement.

10.2.2.   Performance of Covenants.   Each of the Buyers and their Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by them at or prior to the Closing.

**10.2.3.**    Delivery of Ancillary Agreements.  Buyers will have delivered duly executed copies of each of the applicable Ancillary Agreements.

**10.2.4.**    Collective Bargaining Agreements.  ~~GM  Buyer~~**Parent** and Company Buyer will assume **the terms and conditions of** their respective Seller U.S. CBAs, including all amendments and supplements thereto, **in each case, as contemplated by this Agreement**.

**10.2.5.**    ~~Hourly Pension Plan.  Delphi and its Affiliates shall be satisfied that the Delphi HRP will not be an obligation of Delphi following the Closing and Delphi shall have been relieved of all obligations with respect thereto.~~**PBGC Settlement Agreements.  The PBGC Settlement Agreements shall have gone effective and be in full force and effect.**

**10.2.6.**    Consents.  The UAW, IUE- CWA and the USW will have waived **(to the extent such waiver is required)** Seller U.S. CBA restrictions upon the ~~sale of operations~~**Sale** in a form reasonably satisfactory to Seller.

**10.3    Conditions to Obligations of GM Buyers.**

The obligation of GM Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by GM Buyers):

**10.3.1.**    Accuracy of Warranties.  The representations and warranties of Sellers made to all Buyers or the GM Buyers, but, for the avoidance of doubt, not the representations and warranties of Sellers made exclusively to the Company Buyer, contained in this Agreement (without taking into account any materiality**, material adverse effect** or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a ~~Material Adverse Effect on any Seller's~~**material adverse effect on Sellers'** ability to consummate the transactions contemplated by this Agreement.

**10.3.2.**    Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the GM Buyers.

**10.3.3.**    Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the GM Ancillary Agreements. **Company Buyer will have delivered duly executed copies of the GM/Company Ancillary Agreements to which they are a party.**

**10.3.4.**    ~~Release of Certain Liens.  The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the GM Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the GM Sales Securities.~~**PBGC Settlement Agreements.  The PBGC Settlement Agreements shall have gone effective and be in full force and effect.**

**10.3.5.**    Financing.  The Company Buyer shall have **(or shall receive concurrently with the Closing)** received the ~~Class B Purchase Price under the Securities Purchase Agreement; PE~~

and its Affiliates**debt and equity financing contemplated by the Company Financing Agreements (unless the failure to receive such financing is a result of an actual or threatened breach of the Company Financing Agreements by any GM Buyer).  The Backstop Parties** shall not be in breach or default of any material obligations it has**they have** under the PE**Company** Financing Agreements and PE and its Affiliates shall have executed and delivered the Buyer Loan Documents**Company Financing Agreements to which they are a party** and the Operating Agreement, which Buyer Loan Documents**Company Financing Agreements and Operating Agreement** shall be in full force and effect.

      **10.3.6.**   Transfer of Environmental Permits and Approvals.  All material Environmental Permits shall have been transferred, assigned or reissued to **GM** Buyers or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, **GM** Buyers have received written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by **GM** Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

      **10.3.7.**   Property Transfer Obligations.   All obligations required under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3 shall have been satisfied.

      **10.3.8.**  DIP Payoff Letters.  The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to GM.

**10.4**   **Conditions to Obligations of Company Buyer.**

      The obligation of Company Buyer to consummate the **Sales and the other** transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by the Company Buyer):

      **10.4.1.**   Accuracy of Warranties.  The representations and warranties of Sellers made to all Buyers or the Company Buyer, but, for the avoidance of doubt, not the representations and warranties of Sellers made exclusively to the GM Buyers, contained in this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on any Seller's**material adverse effect on Sellers'** ability to consummate the transactions contemplated by this Agreement.

      **10.4.2.**   Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the Company Buyer.

      **10.4.3.**   Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the GM/Company Ancillary Agreements, which shall be in full force and effect. **GM Buyers will have delivered duly executed copies of the GM/Company Ancillary Agreements to which they are a party.**

10.4.4.   ~~Release of Certain Liens.   The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the Company Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the Company Sales Securities.~~**PBGC Settlement Agreements.   The PBGC Settlement Agreements shall have gone effective and be in full force and effect.**

10.4.5.   **Transfer of Environmental Permits and Approvals.   All material Environmental Permits relating to Company Purchased Assets located in the United States shall have been transferred, assigned or reissued to Company Buyer or, with respect to any such material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, Company Buyer shall have received written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Company Buyer pending transfer, assignment or reissuance of any such material Environmental Permit is permissible, and Sellers shall have used their respective commercially reasonable efforts to have transferred, assigned or reissued to Company Buyer all material Environmental Permits relating to Company Purchased Assets located outside of the United States, or to receive written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Company Buyer pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.**

**10.4.6.**   ~~10.4.5.~~ Financing.   The Company Buyer shall have received ~~the Class A Purchase Price under the Securities Purchase Agreement and the amount of Loans (as defined in the Buyer Loan Documents) requested by the Company Buyer to be made by GM under the Buyer Loan Documents on the Closing Date, GM and its Affiliates~~**(or shall receive concurrently with the Closing) the debt and equity financing contemplated by the Company Financing Agreements (unless the failure to receive such financing is a result of an actual or threatened breach of the Company Financing Agreements by any Company Buyer or any of the Backstop Parties).  GM** shall not be in breach or default of any material obligations it has under the ~~GM~~**Company** Financing Agreements and ~~GM and its Affiliates~~ shall have executed and delivered the ~~Buyer Loan Documents~~**Company Financing Agreements to which it is a party** and the Operating Agreement, which ~~Buyer Loan Documents~~**Company Financing Agreements and Operating Agreement** shall be in full force and effect.

~~10.4.6.   DIP Payoff Letters.   The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to Company Buyer.~~

10.4.7.   **LLC Agreement.   The Amended and Restated Operating Agreement of Company Buyer in the form included as an Exhibit to the Securities Purchase Agreement as of the date hereof shall have been implemented consistent with Section 8(a) of the Securities Purchase Agreement.**

## ARTICLE 11.
## CLOSING.

### 11.1   Closing Time and Date.

11.1.1.   Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of all of the transactions contemplated by this Agreement to occur at Closing will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New

103

York, 10036, at 10:00 a.m. at~~on~~ the ~~month-end following~~date which is two (2) Business Days ~~of~~after the date that all of the conditions set forth in ARTICLE 10 have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may otherwise agree (the "**Closing Date**"). For Tax and accounting purposes, the parties shall use their commercially reasonable efforts to cause the effective time of the transaction to be 11:59 p.m., local time, on the accounting month end following the Closing Date. The Closing of the ~~GM~~ Transfer Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

   **11.1.2.**  In the event any condition to Closing contained in Section 10.1.2 or 10.3 has not been satisfied with respect to an immaterial Acquired Asset, GM Buyer may elect to delay the Closing with respect to such immaterial Acquired Asset or Sale Company (a~~the~~ "**Temporarily Excluded Assets**"), and shall be required to proceed to Closing with respect to the rest of the transactions contemplated by this Agreement. In such event, (i) GM Buyers will not be deemed to have assumed any Liabilities which relate to the Temporarily Excluded Assets, (ii) the full Purchase Price will be paid at Closing notwithstanding that the Temporarily Excluded Assets have not been transferred, and (iii) Sellers will continue to operate the Temporarily Excluded Assets and will supply GM Buyers and the Sale Companies and perform the other obligations in the same manner as prior to the Closing, except that GM Buyers will be responsible for paying Sellers, in advance, for all of their direct and indirect costs and expenses reasonably incurred in operating the Temporarily Excluded Assets to the extent they exceed revenues generated from operating such Temporarily Excluded Assets until they can be transferred to GM Buyers. Sellers and GM Buyers will continue to use their respective commercially reasonable best efforts to cause the satisfaction of all unsatisfied conditions precedent to the transfer of the Temporarily Excluded Assets as soon as practicable. The GM Buyers may elect to close on the transfer of the Temporarily Excluded Assets at any time upon notice to Delphi ~~and~~. **Until any such closing on the transfer of the Temporarily Excluded Assets,** the provisions of this Agreement will continue to apply to the Temporarily Excluded Assets as if no Closing under this Agreement had yet taken place.

   **11.2**  **GM Ancillary Agreements.**

   At or prior to the Closing, the applicable Sellers **and/or Company Buyer** will duly execute and deliver to the **applicable** GM Buyers, and the **applicable** GM Buyers will duly execute and deliver to ~~GM~~**the applicable** Sellers **and/or the Company Buyer**, each of the following agreements to which they are to be a party:

   **11.2.1.**  The following lease agreements:

     A.  Assignment and Assumption Agreement regarding Building 1 at the Somerton, Australia Real Property, substantially in the form of ~~Exhibit 11.2.1.A~~**the Previously Filed Version Exhibit 11.2.1.A (with such changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date).**

     B.  Sublease regarding the **Paris** Technical Center ~~located at Paris, France~~, substantially in the form of ~~Exhibit 11.2.1.B~~**the Previously Filed Version Exhibit 11.2.1.B (with such changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date).**

C.    Sublease regarding the lease located at 1230 West Gila Bend Highway, Valley Industrial Park, Casa Grande, Arizona, substantially in the form of ~~Exhibit 11.2.1.C~~**the Previously Filed Version Exhibit 11.2.1.C (with such changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date)**.

D.    The applicable GM Buyer and applicable Company Buyer will enter into a lease for a portion of the Lockport, New York technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things, for Company **Buyer** to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years, providing for a mutually acceptable allocation of use of ~~personal property~~**Personal Property** during the term of such lease. **During the term of such lease, the applicable GM Buyer shall not sell or otherwise dispose of any of such Personal Property. The applicable GM Buyer and applicable Company Buyer will use commercially reasonable efforts to develop and implement a reasonable, mutually agreed upon, cost effective separation plan for their respective businesses conducted at Lockport, New York and following such separation during the remainder of the term of the lease, the applicable Company Buyer shall have an option to purchase the real property and the related Personal Property for the price of $1.00 and the assumption by such Company Buyer of all Liabilities directly relating to such technical center and not the remainder of the facility retained by GM Buyer, it being understood that Company Buyer shall not assume liabilities relating to UAW employees, subject to a lease back to the applicable GM Buyer of the portion of the real property that will continue to be occupied by the applicable GM Buyer and the provision for the use by the applicable GM Buyer of the relevant related Personal Property. Company Buyer must exercise its option to acquire the real property in order to purchase the Personal Property. The lease back to the GM Buyer shall provide for the applicable GM Buyer to pay its pro rata share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by such parties. Company Buyer will pay all costs associated with the separation of the Lockport, New York technical center and all capital investment needed in connection with separation of the Lockport, New York technical center and other capital expenditures; provided that any shared capital expenditures required with respect to any shared Personal Property or Real Property shall be equitably allocated between the parties as mutually agreed to between the parties.**

E.    The applicable GM Buyer and applicable Company Buyer will enter into a lease for **a portion of** the Kokomo, Indiana technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for Company **Buyer** to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years**, providing for a mutually acceptable allocation of use of Personal Property during the term of such lease**. During the term of such lease, the applicable GM Buyer shall not sell or otherwise dispose of any of such Personal Property. The applicable GM Buyer and applicable Company Buyer will use commercially reasonable efforts to develop and implement **a reasonable, mutually agreed upon, cost effective** separation plan for their respective businesses conducted at Kokomo, Indiana and following such separation **during remainder of the term of the lease**, the applicable Company Buyer shall have an option to purchase the real property and~~/or~~ related Personal Property for the price of $~~1.00.~~**1.00 and the assumption by such Company Buyer of all Liabilities directly relating to such**

**technical center and not the remainder of the facility retained by GM Buyers, it being understood that Company Buyer shall not assume liabilities relating to UAW employees,** subject to a lease back to the applicable GM Buyer of the portion **of the real property** that will continue to be occupied by the applicable GM Buyer and the provision for the use by the applicable GM Buyer of the relevant related Personal Property. **Company Buyer must exercise its option to acquire the real property in order to purchase the Personal Property.** The lease back to the GM buyer shall provide for the applicable GM Buyer to pay its pro ~~rate~~**rata** share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by such parties. **Company Buyer will pay all costs associated with the separation of the Kokomo, Indiana technical center and all capital investment needed in connection with separation of the Kokomo, Indiana technical center and other capital expenditures; provided that any shared capital expenditures required with respect to any shared Personal Property or Real Property shall be equitably allocated between the parties as mutually agreed to between the parties.**

      **11.2.2.**    Patent Rights assignments by the applicable GM Sellers to the applicable GM Buyer substantially in the form of Exhibits 11.2.2.A.1 through 11.2.2.A.16, a Trademark Assignment by the applicable GM Seller to the applicable GM Buyer substantially in the form of Exhibit 11.2.2.B, and a Copyright Assignment by the applicable GM Seller to the applicable GM Buyers substantially in the form of Exhibit 11.2.2.C, whereby recorded title to the Purchased Intellectual Property may be recorded as being transferred from the applicable GM Seller to the applicable GM Buyers, as well as any other deeds, bills of sale, endorsements, assignments, affidavits and other instruments of sale, conveyance, transfer and assignment relating to the Purchased Intellectual Property, including an assignment to the applicable GM Sellers' rights in and to the "Saginaw Steering" name and trademark, any assignment of rights to Intellectual Property under any employment or independent contractor agreements and any necessary releases of security interest in forms appropriate for releasing any security interests filed in any patent offices.

      **11.2.3.**    The following agreements (collectively the "**GM Transfer Agreements**"):

      A.    France Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.A.

      B.    Australia Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.B.

      C.    India Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.C.

      D.    Germany Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.D.

      E.    Italy Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.E.

      F.    Korea Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.F.

G.    Japan Asset Sale Agreement, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.G.

H.    Share Transfer Agreement with respect to ~~Delphi Polska~~**Fidass II, B.V**, substantially in the form set forth in **the Previously Filed Version of** Exhibit 11.2.3.H.

**11.2.4.**    The ~~Bill~~**bill** of ~~Sale~~**sale**, substantially in the form set forth in Exhibit 11.2.4.

**11.2.5.**    The Assignment and Assumption Agreement, substantially in the form set forth in Exhibit 11.2.5.

**11.2.6.**    The GM IP License Agreement.

**11.2.7.**    The applicable Seller Transition Services Agreement between Delphi and GM substantially in the form set forth in Exhibit 11.2.7.

**11.2.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3    Company Ancillary Agreements.**

At or prior to the Closing, the applicable ~~Company~~ Sellers **and/or GM Buyers** will duly execute and deliver to the **applicable** Company Buyer, and the **applicable** Company Buyer will duly execute and deliver to the applicable ~~Company~~ Sellers **and/or the GM Buyers**, each of the following agreements to which they are to be a party:

**11.3.1.**    Assignments, in recordable form, with respect to each of the Copyrights, Patent Rights, Trademark Rights included within the Purchased Intellectual Property, duly executed by each Seller, as applicable, and in form and substance reasonably satisfactory to Buyer.

**11.3.2.**    The Buyer Transition Services Agreement substantially in the form set forth in Exhibit ~~11.3.2;~~**11.3.2.**

**11.3.3.**    The transition services agreement between Delphi and the Company Buyer, substantially in the form set forth in Exhibit 11.3.3 (the **"Seller Transition Services Agreement"**).

**11.3.4.**    The bills of sale, substantially in the form set forth in Exhibit 11.3.4.

**11.3.5.**    The assignment and assumption agreements, substantially in the form set forth in Exhibit 11.3.5.

**11.3.6.**    The Company IP License Agreements.

**11.3.7.**    Lease by GM to Company Buyer of technical centers at ~~Kokomo, Indiana and~~ Lockport, New York **and Kokomo, Indiana** pursuant to Sections 11.2.1.D and 11.2.1.E~~,~~ **, respectively.**

**11.3.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3.9.** ~~The Operating Agreement.~~**Delphi, as lessor, and the applicable Company Buyer, as tenant, will enter into a month-to-month lease for a minimum term of three months and a maximum term of three years for the Rootstown, Ohio and Plant 43 in Flint, Michigan manufacturing facilities (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for the Company Buyer to pay its pro rata share of costs on a triple net basis, plus $41,666.67 per month in the case of Rootstown and $125,884 per month in the case of Plant 43 in Flint, Michigan. During the term of such lease, the applicable Company Buyer shall not sell or otherwise dispose of any of such Personal Property.**

**11.3.10.**   ~~Other Ancillary Agreements.~~

**11.4**   **Sellers' Deliveries at Closing.**

At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the applicable Buyer:

**11.4.1.**   To the extent that equity interests of Sale Companies or the JV Companies are represented by stock certificates, original certificates evidencing the Sale Securities (to the extent applicable in the respective jurisdiction), which certificates will be duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of the relevant Buyer or its permitted assigns.

**11.4.2.**   Quitclaim deeds (or non U.S. equivalent) for the GM Owned Real Property and the Company ~~Owned~~ Real Property **which is owned**, substantially in the form **of the Previously Filed Version** of Exhibit 11.4.2 or such other form of conveyance in substance equivalent to such form of deed.

**11.4.3.**   Copies of the resolutions (or local equivalent) of the boards of directors **or similar governing body** of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby.

**11.4.4.**   Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Plan Modification Order.

**11.4.5.**   The minutes and other partnership or limited liability company record books of the Sale Companies and all stock transfer ledgers and other records evidencing the equity ownership of the Sale Companies.

**11.4.6.**   Resignations of all directors (or equivalent) and officers of the Sale Companies and of any Seller representatives in similar positions with the JV Companies, except as otherwise requested by ~~Parent~~**the applicable Buyer** no less than ten (10) Business Days prior to the Closing Date.

**11.4.7.**   A non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445(b) of the ~~Internal Revenue~~ Code so that Buyers are exempt from withholding any portion of the Purchase Price thereunder.

**11.4.8.**   All other documents and papers reasonably requested by Buyers to transfer title to the Acquired Assets or Sale Securities in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**11.4.9.**   A certificate signed by ~~each Seller~~**Delphi**, dated the date of the Closing Date (in form and substance reasonably satisfactory to **Parent and Company** Buyer), certifying that the conditions specified in Section 10.3 **and Section 10.4** have been satisfied as of the Closing.

**11.4.10.**   Written acknowledgements from the applicable Governmental Authorities that all material Environmental Permits have been transferred, assigned or reissued to Buyer or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

**11.4.11.**   Environmental Records and GM Environmental Records without redaction or deletion.   Environmental Records and GM Environmental Records located at the **applicable** Real Property immediately following the Closing will be deemed to be delivered for purposes of this Section 11.4.

**11.4.12.**   Copies of all documents required to effect the transfer of ownership and possession of any Real Property under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3.

**11.4.13.**   The ~~applicable~~**Buyer** Transition Services Agreements **and the Seller Transition Services Agreement** substantially set forth ~~in~~ Exhibits ~~11.2.7 and 11.3.3~~**11.2.7, 11.3.2 and 11.3.3, respectively (with such limited changes as the Parties shall negotiate in good faith and reasonably agree upon between the date of this Agreement and the Closing Date).**

**11.4.14.**   Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (A) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (B) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

**11.4.15.**   Amendments to the Rhodes I and Rhodes II Operating Agreements in the forms previously provided to Sellers.

~~**11.4.16.**   DIP Agreement payoff letter in customary form or reasonably acceptable to Buyers.~~

**11.5**   **Buyers' Deliveries at Closing.**

**11.5.1.**   At or prior to the Closing, GM Buyers **and Old GM (solely with respect to Clause A below)** will deliver or cause to be delivered the following:

A.   The waiver by **Old GM, and** GM of ~~its~~**their respective** pre-petition Claims, Administrative Claims, and future Claims in the Bankruptcy Cases including without limitation any such Claims pursuant to the Global Settlement Agreement, as amended, effective

as of September 29, 2008, between Delphi and ~~GM and~~**Old GM and the waiver by GM and Old GM of their respective Claims with under** each of the GM-Delphi Liquidity Agreements;

    B.    The payment to ~~Delphi~~**the DIP Agent** of the DIP ~~Priority~~ Payment;

    C.    The ~~payment to Delphi of $291,020,079 in cash;~~

    ~~D.   The~~ assumption or payment of the applicable Cure Amounts for the GM Business~~:~~ **that are GM Assumed Liabilities;**

    **D.**  ~~E.~~The payment to Delphi of certain expenses of Delphi and its Filing Affiliates following the Closing as set forth on Exhibit 3.1.1.~~F~~**E**.

    **E.**  ~~F.~~Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors **or similar governing body** of each **GM** Buyer and, where required, the stockholders/owners of each **GM** Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

    **F.**  ~~G.~~An officer's certificate, dated as of the Closing Date, executed on behalf of ~~each of the Buyers~~**Parent**, certifying that the conditions specified in Section 10.2 have been fulfilled;

    **G.**  ~~H.~~Each GM/Company Ancillary Agreement to which a GM ~~Buyers~~**Buyer** is a party **and which was not executed and delivered contemporaneously with the execution of this Agreement**; and

    **H.**  ~~I.~~50% of professional fees (not to exceed $15,000,000 as the payment ~~from~~**by** the GM Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation of approval for the Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to ~~this~~ Section 3.1.1.~~G~~**E**, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

    **11.5.2.**    At or prior to the Closing, Company Buyer will deliver or cause to be delivered the following;

    ~~A.   $1.00 (one dollar);~~

    ~~B.   The payment to Delphi of the Parnassus Class C Interest of Company Buyer, either directly or indirectly through one or more intermediaries, which shall be held either by Sellers, a trust or an agent, as determined by Sellers.~~

    **A.**  ~~C.~~50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization)~~;~~**;**

**B.**   D.—The assumption or payment of the **applicable** Cure Amounts for the Company Business **that are Company Assumed Liabilities**;

**C.**   E.—Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors **or similar governing body** of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

**D.**   F.—Each GM/Company Ancillary Agreement to which a Company Buyer is a party **and which was not executed and delivered contemporaneously with the execution of this Agreement**;

**E.**   G.—An officer's certificate, dated as of the Closing Date, executed on behalf of each of the Buyers**Company Buyer**, certifying that the conditions specified in Section 10.2 have been fulfilled; and

**F.**   H.—Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (i) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (ii) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

### 11.6   Post-Closing Deliveries.

Promptly following the Closing, the Sale Companies will deliver to the applicable Buyer signature cards from all banks or financial institutions with which the Sale Companies have any account, designating signatures approved by the applicable Buyer.

### 11.7   Post-Closing Transfer of Intellectual Property Rights.

**11.7.1.**   If, after the Closing, either**any** Party identifies any Intellectual Property right, including any application or registration for the Intellectual Property that such Party believes should have been included in its Purchased Intellectual Property, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in such party Purchased Intellectual Property and assigned to such Buyer.  If the Parties agree that such Intellectual Property right should have been included in the Purchased Intellectual Property and assigned to another Buyer, Sellers or Buyer or their respective Affiliate, as applicable, shall assign or cause to be assigned such Intellectual Property right to Buyers at no additional cost to Buyers.  The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute at no additional cost to Buyers all documents reasonably requested by the other Party to effect such transfer and/or assignment.

**11.7.2.**   If, after Closing, a Buyer identifies any Intellectual Property right, including any patent or patent application that it believes should have been included in the Shared Intellectual Property licensed under the GM IP License Agreement or the Company IP License Agreement, as applicable, but which is reasonably within the scope of Excepted Shared Intellectual Property identified in the GM IP License Agreement or the Company IP License Agreement, as applicable, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in the Shared Intellectual Property licensed to Buyers hereunder.  If the Parties agree that such Intellectual Property right should have been included in the Shared Intellectual Property licensed to

Buyers hereunder, the Parties shall amend <u>Schedule 9.9.1.A</u> to specifically exclude such Intellectual Property right from the Excepted Shared Intellectual Property, and Buyers shall receive, via amendment to this Agreement, a license under such Intellectual Property right with terms identical to those of the license granted in <u>Section 9.9.1</u>. The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute all documents reasonably requested by the other Party to effect such license. All amendments, covenants and agreements to be provided under this Section shall be at no additional cost to Buyers.

**<u>11.7.3.</u>    If, after the Closing, any Buyer identifies any property, asset, right, title or interest owned by an Affiliate of Delphi that such Buyer believes should have been included in the Acquired Assets, the Parties shall cooperate to determine in good faith whether such property, asset, right, title or interest should have been included in the Acquired Assets and assigned, transferred and delivered to Company Buyer or any other Buyer. If the Parties agree that such property, asset, right, title or interest should have been included in the Acquired Assets and assigned, transferred and delivered to Company Buyer or any other Buyer, Delphi shall cause the Filing Affiliates and/or their subsidiaries, as applicable, to assign, transfer and deliver such property, asset, right, title or interest to such Buyer at no additional cost to any Buyer. The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute at no additional cost to any Buyer all documents reasonably requested by the other Party to effect such.**

## ARTICLE 12.
## TERMINATION.

### 12.1    <u>Termination</u>.

This Agreement may be terminated at any time prior to the Closing:

**12.1.1.**    By the mutual written consent of Delphi, ~~Parent~~**GM** and Company Buyer.

**12.1.2.**    By any Party if the Closing has not occurred by ~~September 30,~~**October 2,** 2009, <u>provided</u> such date shall be extended until November 30, 2009 in the event that all conditions to Closing are satisfied or capable of being satisfied on the Closing Date, other than the condition set forth in Section 10.1.2**; provided further, that if a GM Buyer makes the election set forth in Section 9.44.3, each of the above dates will be extended by the period specified by such GM Buyer up to 15 days;** and provided <u>further</u> that the terminating party will not have the right to terminate this Agreement if it is in material default hereunder.

**12.1.3.**    By Delphi if (a) the ~~Interim Financing Amendment shall not have been executed and delivered by GM on or prior to June 1, 2009, (b) the Interim Financing Amendment have not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders in form and substance reasonably satisfactory to Delphi, (c) the~~ GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after ~~June 10,~~**July 26,** 2009 or (~~d~~**b**) GM breaches any of its material covenants, obligations or agreements under either of the GM-Liquidity Agreements (as modified by the Interim Financing Amendment).

~~**12.1.4.**    By GM if (a) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders; (b) the~~

~~GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after June 10, 2009; or (c) Delphi breaches any of its material covenants, obligations or agreements under the GM Liquidity Agreements (as modified by the Interim Financing Amendment), or an event of default has occurred and is continuing under the Interim Financing Amendment; or (d) the Interim Financing Amendment has otherwise been terminated in accordance with its terms.~~

**12.1.4.**    ~~12.1.5.~~ This Agreement may be terminated by either of GM or Company Buyer if ~~(x)~~ the Plan Modification Order in form and substance satisfactory to GM ~~or~~**and** Company Buyer, as applicable, has not been entered by the Bankruptcy Court on or prior to ~~July 23, 2009, or (y) such Plan Modification Order in form and substance satisfactory to GM or Company Buyer, as applicable, has not become a Final Order within ten (10) days of such order's entry.~~ **August 7, 2009.**

~~**12.1.6.**    This Agreement will automatically terminate, without any further action by any party hereto, on July 15, 2009 (or such later date as may be mutually agreed upon by GM, Company Buyer and Delphi in writing) if GM is the subject of a case under the Bankruptcy Code and (a) federal court approval of GM's entry into, and performance under, this Agreement and all Ancillary Agreements to which GM is or is to be a party has not been obtained, (b) federal court authority to assume all purchase orders and commercial agreements between Sellers and GM the Ancillary Agreement to which GM is or is to be a party and the Securities Purchase Agreement, (the **"GM Assumed Contracts"**), upon the closing of this Agreement has not been obtained, (c) if GM has received federal court authorization to transfer assets (including the stock of subsidiaries) related to the GM Assumed Contracts to any other person that will then hold substantially all of the Existing GM Assets, GM has not received authority to assign such contracts to such transferee, or (d) GM, or if substantially all of the existing GM Assets have been transferred, the entity that then holds substantially all of the Existing GM Assets, has not agreed in writing to assume the GM Assumed Contracts upon the closing of this Agreement. For purposes of this Section 12.1.6, **"Existing GM Assets"** means the assets of GM as of the time immediately prior to one of the events set forth in clauses (a), (b), (c) or (d) of the preceding sentence, as applicable.~~

## 12.2    Procedure and Effect of Termination.

In the event of the termination of this Agreement pursuant to Section 12.1, written notice thereof will forthwith be given to all other Parties. If this Agreement is terminated:

**12.2.1.**    Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**12.2.2.**    The provisions of the GM ~~or Company~~ Confidentiality Agreement~~, as applicable,~~ will continue in full force and effect; and

**12.2.3.**    The following Sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: **Section 9.11.2,** ARTICLE 12 (Termination)**; Section 13.1 (Limitations of Liability)** and; Sections 14.1 (Fees and Expenses), 14.5 (Assignment), 14.7 (Waiver), 14.8 (Notices), 14.9 (Entire Agreement), 14.11 (Publicity), **14.14 (Third Parties),** 14.15 (Governing Law) and 14.16 (Venue and Retention of Jurisdiction).

**12.2.4.**   No party to this Agreement will have any Liability under this Agreement to any other except: (a) as provided in Section 12.2.3 above and Section 12.2.6 below and (b) that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and no Party waives any Claim with respect thereto.

**12.2.5.**   The MRA, including Section 4.06(c) and related provisions, shall be unaffected by such termination. For avoidance of doubt, under no circumstances shall a default under this Agreement constitute a default under the MRA.

**12.2.6.**   In the event this Agreement is terminated under Sections 12.1.2 or 12.1.3 at a time when either (a) any GM Buyer or an affiliate of a GM Buyer is in material breach of this Agreement or the Securities Purchase Agreement and, at such time, no other Party (other than GM, Parent or any other GM Buyer) to this Agreement is in material breach of this Agreement and no Backstop Party is in material breach of the Securities Purchase Agreement, or (b) the condition contained in Section 10.2.6 or Section 10.4.7 has not been satisfied, and the DIP Lenders have released to Delphi any amounts (the "Released Funds") from the Borrowing Base Cash Collateral Account or the Incremental Borrowing Base Cash Collateral Account (as such terms are defined in the DIP Documents), then GM shall deposit an amount equal to the Released Funds into the applicable cash collateral account within five (5) Business Days of such termination; provided however, with respect to clause (b) only, if GM Buyers have materially complied with their obligations under Section 9.13, but any of the Competition/Investment Law Governmental Approvals listed on Schedule 9.13.1 (as it may be amended to add any additional required Competition/Investment Law Governmental Approvals identified in writing by any of the Parties) have not been obtained as of the date of termination of this Agreement, GM will not be required to deposit the Released Funds as provided herein. Such deposited funds shall be deemed to be additional advances by GM to Delphi pursuant to the Interim Financing Amendment.

# ARTICLE 13.
## LIABILITY, SURVIVAL.

## 13.1   LIMITATIONS OF LIABILITY.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL HAVE ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT. OR PUNITIVE DAMAGES. IN NO EVENT WILL THE COMPANY BUYER OR ANY OF ITS AFFILIATES HAVE ANY LIABILITY PRIOR TO THE CLOSING FOR DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ACTUAL, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, TO ANY PARTY OR ANY OF THE PARTIES' RESPECTIVE AFFILIATES OR TO ANY OTHER PERSON WITH RESPECT TO THIS AGREEMENT EXCEPT TO THE EXTENT OF THE TERMINATION FEE SET FORTH IN THE EQUITY COMMITMENT LETTER AND THEN SOLELY TO THE PARTIES THERETO TO THE EXTENT PROVIDED THEREIN.

13.2    Termination Fee.

In the event that a Termination Fee (as defined in the Securities Purchase Agreement) is payable under the Equity Commitment Letter or the Securities Purchase Agreement to GM, and GM receives such termination fee in full, then GM shall either (i) agree to consummate all of the transactions under this Agreement in accordance with the terms thereof, including fulfilling the obligations of Company Buyer hereunder, as if this Agreement were not terminated if applicable, or (ii) if GM elects not to so consummate such transactions, then GM shall pay to Delphi an amount equal to the positive difference, if any, equal to (a) the total amount of such Termination Fee less (b) the amount advanced under the Interim Financing Amendment after the date of this Agreement as Tranche C Advances.

Nothing in **this** Section 13.1 or 13.2 shall limit a Party's rights under Section 14.18 of this Agreement.

**13.2**    13.3 Survival.

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability**Liability** to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder until fully performed, and each party hereto shall be liable to the other **Parties** after the Closing for any breach thereof.

# ARTICLE 14.
# MISCELLANEOUS.

### 14.1    Fees and Expenses.

Except as may otherwise be specifically provided in this Agreement, each of the Parties will be responsible for its own costs and expenses related to this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby.

### 14.2    Bulk Sales Laws.

Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

### 14.3    Payments in Dollars.

Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. dollars in same day or immediately available funds.

### 14.4    Amendment.

This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties**each of the Parties and, with respect to any of the provisions affecting the DIP Agent, the DIP Loans, the DIP Letters of Credit, the Hedging Agreements and any**

115

**of the DIP Documents, the duly authorized representative or officer of the DIP Agent**. The Parties acknowledge and agree, however, that the **following** Schedules and the Exhibits, other than ~~Schedule 1.1.A "Assumed Administrative Liabilities", Schedule 2.1.5.F "Excluded Facilities", Schedule 2.1.5.J "Pending Transactions", and Exhibit 3.1.1.F "Wind Up Costs", the IP License Agreements and the GM Company Ancillary Agreements, which are not executed on the date hereof,~~ are in draft form and will be revised and finalized in a manner consistent with this Agreement to the mutual satisfaction of the Parties each acting reasonably, prior to Closing: **Schedules 4.5, 4.13.2, 9.9.1.A, 9.9.9, 9.12A, 9.12B, 9.12C, 9.12D and 9.12E. The following Schedules are being filed with the Bankruptcy Court with this Agreement: Schedules 1.1.A, 1.1.B, 2.1.5.F, 4.4, 9.1.1, 9.13.1, 10.1.1. The remaining Schedules to this Agreement not referred to herein are in the form most recently filed with the Bankruptcy Court in Connection with the June 1 MDA**.

14.5    **Assignment.**

This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party and their Affiliates, provided, that except as otherwise provided in this Section 14.5, no assignment of any rights or obligations hereunder will be made by any Buyer without the written consent of Delphi, or by any Seller hereto without the written consent of one or both of GM and Company Buyer based on which Buyer is impacted by the request, except in connection with a Pending Transaction. Any GM Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) (i) to GM or any of its Affiliates (including any Affiliate formed after the date hereof that may be a corporation or limited liability company), (ii) to the applicable Buyer's lenders or (iii) in connection with the direct or indirect sale, merger, consolidation or similar reorganization of all or a substantial portion of GM's business; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no ~~party~~**Party** is released from its obligations hereunder. Upon any such permitted assignment, the references in this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires. Any Company Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) to any Affiliate or other designee of Company Buyer; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party is released from its obligations hereunder. Upon any such permitted assignment, the references in this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires.

14.6    **No Successor Liability.**

Except where expressly prohibited under applicable law , upon the Closing, the Buyers shall not be deemed to:  (a) be the successor of the Filing Affiliates; (b) have, de facto, or otherwise, merged with or into the Filing Affiliates; (c) be a mere continuation or substantial continuation of the Filing Affiliates or the enterprise(s) of the Filing Affiliates; or (d) be liable for any acts or omissions of the Filing Affiliates in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Buyers shall not be liable for any Claims against the Filing Affiliates or any of their predecessors or affiliates,

and the Buyers shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Filing Affiliates arising prior to the Closing Date, including, but not limited to, Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date, except as expressly provided in this Agreement. The Buyers acknowledge and agree that this <u>Section 14.6</u> shall not in any be deemed to expand or modify Sellers' indemnification obligations under this Agreement or any Ancillary Agreement. Nothing in this provision shall preclude the application of the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53.

### 14.7   Waiver.

Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

### 14.8   Notices.

Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

If to any GM Buyer **or Old GM**:   c/o General Motors Corporation**Company**
767 Fifth Avenue
14th Floor
New York, NY 10153
Attn: Director of Business Development
Fax: (212) 418-3623

and

General Motors Corporation**Company**
300 GM Renaissance Center
Detroit, MI 48265

Attn:  General Counsel
Fax:  313-665-4960

With a copy to:          Honigman Miller Schwartz and Cohn LLP
                         2290 First National Building
                         660 Woodward Ave.
                         Detroit, MI 48226
                         Attn:  Robert B. Weiss
                         Tel.:  (313) 465-7596
                         Fax.:  (313) 465-7597

If to ~~any~~ Company    ~~Parnassus Holdings II,~~ **DIP Holdco 3,** LLC
Buyer:                   c/o ~~Platinum Equity~~
                         ~~360 North Crescent Drive~~
                         ~~South Building~~
                         ~~Beverly Hills, CA 90210~~
                         ~~Attn:~~
                         ~~Tel.:~~
                         ~~Fax:~~
                         **Elliott Management Corporation**
                         **712 Fifth Avenue**
                         **New York, NY 10019**

With a copy to:          ~~Schulte Roth & Zabel LLP~~
                         ~~919 Third Avenue~~
                         ~~New York, NY 10022~~
                         ~~Adam Harris, Marc Weingarten~~
                         ~~and David E. Rosewater;~~
                         ~~Tel.: (212) 756-2000~~
                         ~~Fax: (212) 593-5955~~ **Silver Point Capital, L.P.**
                         **Two Greenwich Plaza**
                         **Greenwich, Connecticut 06830**
                         **Attn:  Michael Gatto**
                         **Tel:  203-542-4031**
                         **Fax:   203-542-4131**

**With a copy to:**       **Dechert LLP**
                         **1095 Avenue of the Americas**
                         **New York, NY 10036**
                         **Attn:  Glenn E. Siegel, Esq.**
                         **Charles I. Weissman, Esq.**
                         **Scott M. Zimmerman , Esq.**
                         **Tel:     (212) 698-3500**
                         **Fax:    (212) 698-3599**

<u>**With a copy to:**</u>          **Willkie Farr & Gallagher LLP**
                                    **787 Seventh Avenue**
                                    **New York, NY 10019**
                                    **Attn:  Marc A. Abrams, Esq.**
                                    **      Maurice M. Lefkort, Esq.**
                                    **Tel.: (212) 728-8000**
                                    **Fax:  (212) 728-8111**


If to Delphi:               DELPHI CORPORATION
                            5725 Delphi Drive
                            Troy, Michigan 48098
                            Attn:  Executive Director of Restructuring
                            Fax:  (248) 813-2612


With a copy to:             DELPHI CORPORATION
                            5725 Delphi Drive
                            Troy, Michigan 48098
                            Attn:  Deputy General Counsel -
                                  Transactional & Restructuring
                            Fax:  (248) 813-2491


With a copy to:             SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                            4 Times Square
                            New York, New York 10036
                            Attn:  Eric Cochran
                                  Marie Gibson
                            Fax:  (212) 735-2000


provided, however, if ~~either~~**any** Party will have designated a different addressee by notice **to all of the other Parties**, then to the last addressee so designated.

### 14.9     <u>Entire Agreement.</u>

This Agreement, including all agreements incorporated by reference herein, the Ancillary Agreements and the GM Confidentiality Agreement ~~or the Company Confidentiality Agreement, as applicable~~, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, provided, however that existing commercial agreements between GM and Delphi **and the DIP Documents** which are otherwise addressed in this agreement shall not be ~~superceded~~**superseded**.  This Agreement is the product of negotiations between the Parties and represents the Parties' intentions.  In any action to enforce or interpret this Agreement, this Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, shall be construed more or less

favorably to any Party.  **In the event of a conflict between the terms of this Agreement and the terms of the Plan, the terms of this Agreement shall govern.**

### 14.10    Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

### 14.11    Publicity.

Except for statements by Delphi in connection with the Bankruptcy Cases or as otherwise required by Law, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without consulting with the other Party.

### 14.12    Headings.

The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

### 14.13    Severability.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable:  (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

### 14.14    Third Parties.

~~Nothing~~**Except as set forth in Section 3.2.3, nothing** expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.  **Notwithstanding the foregoing, the DIP Agent shall be a third party beneficiary of this Agreement and shall have the right to enforce any of the provisions affecting the DIP Agent, the DIP Loans, the DIP Letters of Credit (including in its capacity as issuing bank under DIP Letters of Credit that have replaced "Letters of Credit" as defined under (and issued pursuant to) the DIP Agreement), and any other obligations secured under the DIP Documents.**

### 14.15    Governing Law.

This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.

### 14.16   Venue and Retention of Jurisdiction.

By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; provided, however, that after the second (2nd) anniversary of the date of this Agreement, the Bankruptcy Court and the Supreme Court of New York, New York County and the United States District Court for the Southern District of New York (the "**New York Courts**") shall have non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; and, provided, further, that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement shall terminate upon the fourth (4th) anniversary of the date of this Agreement and the New York Courts shall have exclusive jurisdiction after the fourth (4th) anniversary of the date of this Agreement. Each Party further agrees to waive any objection based on forum non conveniens. **To the extent that the Bankruptcy Court no longer has jurisdiction on or before the fourth (4th) anniversary of the date of this Agreement, the New York Courts shall have exclusive jurisdiction over all matters related to this Agreement.**

### 14.17   Risk of Loss.

Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

### 14.18   Enforcement of Agreement.

The Parties acknowledge and agree that the covenants and undertakings contained in this Agreement and the Ancillary Agreements relate to matters which are of a special, unique and extraordinary character and that a violation of any of the terms of this Agreement or any Ancillary Agreement will cause irreparable injury to the other Parties and that the amount of such injury will be extremely difficult, if not impossible, to estimate or determine and may not be adequately compensated by monetary damages alone. Therefore, each Party acknowledges that the other Party will be entitled, in addition to all other rights and remedies available under this Agreement, and Ancillary Agreement, and applicable law, as a matter of course, to an injunction, order of specific performance, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation of any terms of this Agreement or any Ancillary Agreement without proof of actual damages and without any requirement for the securing or posting of any bond.

### 14.19   Sellers' Obligations.

Nothing contained in any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agreement and the Plan Modification Order. The Filing Affiliates' obligations under this Agreement (including all Exhibits and Ancillary Agreements) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Filing Affiliates, and the reorganized or reconstituted Filing Affiliates, as the case may be, after the effective date of the confirmed plan or plans in the Filing Affiliates' cases.

## 14.20   Bankruptcy Court Approval.

Notwithstanding anything to the contrary herein, the Parties' obligations **to consummate the Sales** under this Agreement are expressly subject to entry of the Plan Modification Order.

## 14.21   Reasonably Equivalent Value.

As set forth in the Recitals to this Agreement, consideration under the Agreement was provided by all Parties to the Agreement. This Agreement is not the product of collusion among the Parties and is the result of arms' length negotiations. Each of the Parties hereto acknowledge and agree that it received reasonably equivalent value for the consideration provided by such Party.

## 14.22   Identification of Exhibits and Schedules to be Filed Under Seal.

(i)    The parties agree that certain documents attached as Exhibits and Schedules hereto contain sensitive and confidential business terms which, if publicly disclosed, could detrimentally affect the parties. Certain of these documents contain detailed proprietary information describing certain aspects of the business relationship between the parties and the parties believe these documents contain sensitive and confidential information of a type not typically disclosed to the public or made available in the automotive industry. Moreover, certain of these documents contain confidentiality provisions which compel the parties to maintain the confidentiality of the terms of such agreements.

(ii)    The parties hereto agree to use commercially reasonable efforts to obtain approval by the Bankruptcy Court of an order authorizing the parties to file the following Exhibits and Schedules hereto under seal:

Schedules

| | |
|---|---|
| Schedule 1 | Detail of Sellers and GM Buyers |
| Schedule 1.1.A | Assumed Administrative Liabilities |
| Schedule 1.1.B | GM Buyers' Knowledge, Company ~~Buyers'~~ **Buyer's** Knowledge and Sellers' Knowledge |
| Schedule 1.1.C | Steering Products |
| Schedule 1.1.D | Excluded Insurance Policies |
| Schedule 1.1.D.1 | Patents **and Patent Applications** |
| Schedule 1.1.D.2 | Trademarks Rights |
| Schedule 1.1.D.3 | Copyrights |
| Schedule 1.1.E | Transferred Insurance Policies |
| Schedule 2 | Details of Sellers and Company Buyer |
| Schedule 2.1.5.F | Excluded Facilities |

Schedule 2.1.5.J        Pending Transactions
Schedule 2.1.5.K        Other Excluded Assets
Schedule 2.3.1          Administrative Claims
Schedule 4.3.1          Sale Companies and JV Companies
Schedule 4.3.2          Capital Stock
Schedule 4.4            No Conflicts or Approvals
Schedule 4.5            Sufficiency of Acquired Assets
Schedule 4.6.2          Licenses to Affiliates
Schedule 4.6.3          Infringement and Allegations of Infringement of Third Party
                        Intellectual Property
Schedule 4.6.4          Infringement of the Purchased Intellectual Property
Schedule 4.6.5          Intellectual Property Notices
Schedule 4.8.1          GM Leased Real Property
Schedule 4.8.2          GM Owned Real Property
Schedule 4.9.1~~4.9.1~~ **4.9.1**   Historical Financial Statements
Schedule 4.9.2          Financial Statement Exceptions
Schedule 4.10           Compliance with Laws
Schedule 4.12.1         Tax Returns
Schedule 4.12.3         Tax Deficiencies
Schedule 4.12.5         Tax Liens
Schedule 4.12.6         Tax Waivers or Extensions
Schedule 4.13.1         Employee List
Schedule 4.13.5         Proceedings  Relating to Employee Benefit Plan
Schedule 4.13.6         Employee Benefit Plan/No Material Liability or Encumbrance under
                        Title IV of ERISA
Schedule 4.13.8         Welfare Benefits
Schedule 4.13.9         Contributions to Seller Employee Benefit Plan
Schedule 4.13.12        No Threatened Labor Stoppage
Schedule 4.14.1         Material Contracts
Schedule 4.14.2         Default/Post-Petition Contracts
Schedule 4.15           Environmental Matters
Schedule 4.16           Insurance Policies
Schedule 9.1.1          Exceptions to Covenants Regarding Conduct of Business prior to the
                        Closing

| | |
|---|---|
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |
| Schedule 9.9.1.B | Steering Excluded Products |
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| Schedule 9.12**(A)** | **Delphi** Letters of Credit |
| Schedule ~~9.20.1(i~~**9.12(B)** | ~~Mexico LTA — Rio Bravo Electricos S.A. de C.V.~~**GM Buyer Assumed DIP Letters of Credit** |
| Schedule ~~9.20.1(ii~~**9.12(C)** | ~~Mexico LTA — Alambrados y Circuitos Electricos, S.A. de C.V.~~**Company Buyer Assumed DIP Letters of Credit** |
| Schedule ~~9.20.3(iii~~**9.12(D)** | ~~Mexico LTA — Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V.~~**Letters of Credit to be Allocated among Sellers and Buyers** |
| **Schedule 9.12(E)** | **Letters of Credit Retained by Delphi** |
| Schedule 9.20.2 | Post-Closing Mexico Utility Contracts |

Exhibits

| | |
|---|---|
| 1.2 | Operating Agreement |
| 3.1.1.~~F~~**E** | Wind ~~Up~~**Down** Costs |
| **3** | **GM-PBGC Agreement** |
| 9.9.1 | GM IP License Agreement |
| 9.9.3 | Company IP License Agreement |
| 9.9.4 | Pending Transaction IP License Agreement |
| 9.22 | Novation Letter |
| **9.29.A** | **Form of Environmental Privilege Waivers** |
| ~~9.29~~**9.29.B** | Form of Privilege Waivers |
| ~~11.2.1.A~~ | ~~Somerton, Australia Transfer and Variation of Lease (Assignment and Assumption Agreement)~~ |
| ~~11.2.1.B~~ | ~~Paris Technical Center Sublease~~ |
| ~~11.2.1.C~~ | ~~Casa Grande Sublease~~ |
| 11.2.2.A.1 | U.S. Patent Assignment (Delphi Technologies) |
| 11.2.2.A.2 | EP Jointly Held Patent Applications Assignment (Delphi Technologies) |
| 11.2.2.A.3 | EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies) |
| 11.2.2.A.4 | DE Patents Assignment (Delphi France) |

| | |
|---|---|
| 11.2.2.A.5 | ES Patents Assignment (Delphi France) |
| 11.2.2.A.6 | FR Patents Assignment (Delphi France) |
| 11.2.2.A.7 | GB Patents Assignment (Delphi France) |
| 11.2.2.A.8 | IT Patents Assignment (Delphi France) |
| 11.2.2.A.9 | U.S. Patent Assignment (Delphi France) |
| 11.2.2.A.10 | AU Patent Assignment (Delphi Technologies) |
| 11.2.2.A.11 | BR Patent Assignment (Delphi Technologies) |
| 11.2.2.A.12 | CN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.13 | HK Patent Assignment (Delphi Technologies) |
| 11.2.2.A.14 | IN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.15 | JP Patent Assignment (Delphi Technologies) |
| 11.2.2.A.16 | KP Patent Assignment (Delphi Technologies) |
| 11.2.2.B | Omnibus Trademark Assignment (Delphi Technologies) |
| 11.2.2.C | Copyright Assignment (Delphi Technologies) |
| ~~11.2.3.A~~ | ~~France Asset Sale Agreement*~~ |
| ~~11.2.3.B~~ | ~~Australia Asset Sale Agreement*~~ |
| ~~11.2.3.C~~ | ~~India Asset Sale Agreement*~~ |
| ~~11.2.3.D~~ | ~~Germany Asset Sale Agreement*~~ |
| ~~11.2.3.E~~ | ~~Italy Asset Sale Agreement*~~ |
| ~~11.2.3.F~~ | ~~Korea Asset Sale Agreement*~~ |
| ~~11.2.3.G~~ | ~~Japan Asset Sale Agreement*~~ |
| ~~11.2.3.H~~ | ~~Netherlands Asset Sale Agreement~~ |
| 11.2.7 | ~~GM/Delphi Seller~~ Transition Services Agreement **between Delphi and GM Buyers** |
| 11.3.2 | ~~Buyers~~**Buyer** Transition Services Agreement |
| **11.3.3** | **Seller Transition Services Agreement between Delphi and Company Buyer** |

[Remainder of the page left intentionally blank.]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION


By: _____
    Name:
    Title:

GM COMPONENTS HOLDINGS, LLC


By: _____
    Name:
    Title:

GENERAL MOTORS
~~CORPORATION~~**COMPANY** (solely with
respect to ARTICLE 6 and Sections
~~9.11.1,~~**3.1.1.C, 9.11,** 9.19,  **9.37.1, 9.37.2, 9.43,**
**11.5.1.A** AND ~~9.38~~**12.2.6**)


By: _____
    Name:
    Title:


~~PARNASSUS HOLDINGS II, LLC~~


~~By:~~ _____
~~Name:~~
~~Title:~~

**MOTORS LIQUIDATION COMPANY (fka GENERAL MOTORS CORPORATION) (solely with respect Sections 3.1.1.C 8.1, 9.19 and 11.5.1.A)**


**By:** _____
    **Name:**
    **Title:**

**DIP HOLDCO 3, LLC**


**By:** _____
_____**Name:**
_____**Title:**

# SCHEDULES

| | |
|---|---|
| Schedule 1 | Detail of Sellers and GM Buyers |
| Schedule 1.1.A | Assumed Administrative Liabilities |
| Schedule 1.1.B | GM Buyers' Knowledge, Company ~~Buyers'~~ **Buyer's** Knowledge and Sellers' Knowledge |
| Schedule 1.1.C | Steering Products |
| Schedule 1.1.D | Excluded Insurance Policies |
| Schedule 1.1.D.1 | Patents **and Patent Applications** |
| Schedule 1.1.D.2 | Trademark Rights |
| Schedule 1.1.D.3 | Copyrights |
| Schedule 1.1.E | Transferred Insurance Policies |
| Schedule 1.1. F | Filing Affiliates |
| Schedule 2 | Detail of Sellers and Company Buyer |
| Schedule 2.1.5.F | Excluded Facilities |
| Schedule 2.1.5.J | Pending Transactions |
| Schedule 2.1.5.K | Other Excluded Assets |
| Schedule 2.3.1 | Administrative Claims |
| Schedule 4.3.1 | Sale Companies and JV Companies |
| Schedule 4.3.2 | Capital Stock |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6.2 | Licenses to Affiliates |
| Schedule 4.6.3 | Infringement and Allegations of Infringement of Third Party Intellectual Property |
| Schedule 4.6.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.6.5 | Intellectual Property Notices |
| Schedule 4.8.1 | GM Leased Real Property |
| Schedule 4.8.2 | GM Owned Real Property |
| Schedule 4.9.1 | Historical Financial Statements |
| Schedule 4.9.2 | Financial Statement Exceptions |

| | |
|---|---|
| Schedule 4.10 | Compliance with Laws |
| Schedule 4.12.1 | Tax Returns |
| Schedule 4.12.3 | Tax Deficiencies |
| Schedule 4.12.5 | Tax Liens |
| Schedule 4.12.6 | Tax Waivers or Extensions |
| Schedule 4.13.1 | Employee List |
| Schedule 4.13.2 | Employee Benefit Plans |
| Schedule 4.13.4 | ERISA Compliance |
| Schedule 4.13.5 | Proceedings  Relating to Employee Benefit Plan |
| Schedule 4.13.6 | Employee Benefit Plan/No Material Liability or Encumbrance under Title IV of ERISA |
| Schedule 4.13.8 | Welfare Benefits |
| Schedule 4.13.9 | Contributions to Seller Employee Benefit Plan |
| Schedule 4.13.11 | Collective Bargaining Agreements |
| Schedule 4.13.12 | No Threatened Labor Stoppage |
| Schedule 4.14.1 | Material Contracts |
| Schedule 4.14.2 | Default/Post-Petition Contracts |
| Schedule 4.15 | Environmental Matters |
| Schedule 4.16 | Insurance Policies |
| Schedule 9.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 9.3 | Assumed and Assigned Contracts |
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |
| Schedule 9.9.1.B | Steering Excluded Products |
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| Schedule 9.12**(A)** | **Delphi** Letters of Credit |
| **Schedule 9.12(B)** | **GM Buyer Assumed DIP Letters of Credit** |
| **Schedule 9.12(C)** | **Company Buyer Assumed DIP Letters of Credit** |
| **Schedule 9.12(D)** | **Letters of Credit to be Allocated among Sellers and Buyers** |
| **Schedule 9.12(E)** | **Letters of Credit Retained by Delphi** |
| Schedule 9.13.1 | Competition Clearance/Governmental Approvals |

Schedule 9.17            Other Services

~~Schedule 9.20.1(i)      Mexico LTA – Rio Bravo Electricos S.A. de C.V.~~

~~Schedule 9.20.1(ii)     Mexico LTA – Alambrados y Circuitos Electricos, S.A. de C.V.~~

~~Schedule 9.20.1(iii)    México LTA – Delphi Ensamble de Cables y Componentes, S. de
R.L. de CV.~~

Schedule 9.20.2          Post-Closing Mexico Utility Contracts

**Schedule 10.1.1         Plan of Modification Order Terms**

Schedule 10.1.2          Approvals under Competition or Investment Law

**Schedule 10.2.4         Seller U.S. CBAs**

## EXHIBITS

| | |
|---|---|
| **Exhibit 1.2** | **Operating Agreement** |
| **Exhibit 3.1.1.~~F~~E** | **Wind ~~Up~~Down Costs** |
| ~~**Exhibit 3**~~ | ~~**GM-PBGC Agreement**~~ |
| ~~**Exhibit 9.2**~~ | ~~**Form of 363 Implementation Agreement**~~ |
| **Exhibit 9.9.1** | **GM IP License Agreement** |
| **Exhibit 9.9.3** | **Company IP License ~~Agreements~~Agreement** |
| **Exhibit 9.9.4** | **Pending Transactions IP License Agreement** |
| **Exhibit 9.22** | **Novation Letter** |
| **Exhibit 9.29.A** | **Form of Environmental Privilege Waivers** |
| **Exhibit 9.29.B** | **Form of Privilege Waivers** |
| ~~**Exhibit 11.2.1.A**~~ | ~~**Somerton, Australia Assignment and Assumption Agreement**~~ |
| ~~**Exhibit 11.2.1.B**~~ | ~~**Paris Technical Center Sublease**~~ |
| ~~**Exhibit 11.2.1.C**~~ | ~~**Casa Grande Sublease**~~ |
| **Exhibit 11.2.2.A.1** | **U.S. Patent Assignment (Delphi Technologies)** |
| **Exhibit 11.2.2.A.2** | **EP Jointly Held Patent Applications Assignment (Delphi Technologies)** |
| **Exhibit 11.2.2.A.3** | **EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies)** |
| **Exhibit 11.2.2.A.4** | **DE Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.5** | **ES Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.6** | **FR Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.7** | **GB Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.8** | **IT Patents Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.9** | **U.S. Patent Assignment (Delphi France)** |
| **Exhibit 11.2.2.A.10** | **AU Patent Assignment (Delphi Technologies)** |

**Exhibit 11.2.2.A.11**   BR Patent Assignment (Delphi Technologies)

**Exhibit 11.2.2.A.12**   CN Patent Assignment (Delphi Technologies)

**Exhibit 11.2.2.A.13**   HK Patent Assignment (Delphi Technologies)

**Exhibit 11.2.2.A.14**   IN Patent Assignment (Delphi Technologies)

**Exhibit 11.2.2.A.15**   JP Patent Assignment (Delphi Technologies)

**Exhibit 11.2.2.A.16**   KP Patent Assignment (Delphi Technologies)

**Exhibit 11.2.2.B**   Omnibus Trademark Assignment (Delphi Technologies)

**Exhibit 11.2.2.C**   Copyright Assignment (Delphi Technologies)

**Exhibit 11.2.3.A**   France Asset Sale Agreement

**Exhibit 11.2.3.B**   Australia Asset Sale Agreement

**Exhibit 11.2.3.C**   India Asset Sale Agreement

**Exhibit 11.2.3.D**   Germany Asset Sale Agreement

**Exhibit 11.2.3.E**   Italy Asset Sale Agreement

**Exhibit 11.2.3.F**   Korea Asset Sale Agreement

**Exhibit 11.2.3.G**   Japan Asset Sale Agreement

**Exhibit 11.2.3.H**   ~~Netherlands (Poland)~~ Share Transfer Agreement

**Exhibit 11.2.4**   GM Bill of Sale

**Exhibit 11.2.5**   GM Assignment and Assumption Agreement

**Exhibit 11.2.7**   GM ~~and /~~Delphi ~~Seller~~ Transition Services Agreement

**Exhibit 11.3.2**   Buyer Transition Services Agreement

**Exhibit 11.3.3**   Seller Transition Services Agreement

**Exhibit 11.3.4**   Company Bills of Sale

**Exhibit 11.3.5**   Company Assignment and Assumption Agreements

**Exhibit 11.4.2**   ~~Form of Quit Claim~~Quitclaim Deeds

<u>**DETROIT.3763067.18**</u>

<u>**E-2**</u>

**E-3**