UNITED STATES BANKRUPTCY COURT          Hearing Date:  March 28, 2010
SOUTHERN DISTRICT OF NEW YORK           Hearing Time:  10:00 a.m.
------------------------------------------------------- x
                                              :
In re                                         :    Case No. 05-44481 (RDD)
                                              :
DPH HOLDINGS CORP., *et al.*,                 :    Chapter 11
                                              :
                        Reorganized Debtors.  :    (Jointly Administered)
------------------------------------------------------- x

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE FINAL FEE
APPLICATIONS OF THE RETAINED PROFESSIONALS**

**TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE**:

        The United States Trustee for Region 2 (the "United States Trustee"), respectfully

submits this objection (the "Objection") to the final applications for fees and expenses (the

"Applications") of forty retained professionals (the "Professionals") in the jointly administered

cases of Delphi Corporation ("Delphi" or the "Debtors").[1]  In support of her Objection, the

United States Trustee represents and alleges as follows:

I.      **INTRODUCTION**

        The Professionals seek the final award of fees and reimbursement of expenses of over

$398 million for just over three years of work.[2]  Despite the review of the Professionals' fees and

expenses by a fee auditor and committee, negotiated reductions and voluntary write-offs totaled

only 4% in the aggregate.  While the cases were complicated, they were not a success.  The

Debtors were unable to consummate their original plan of reorganization which the court

confirmed on January 25, 2008.  On July 30, 2009, the Debtors confirmed a modified plan,

which became effective on October 9, 2009, only after the United States Treasury authorized

---

        [1]        A list of the Professionals and their final fee requests is attached as Exhibit A.
The Notice of Hearing on the Applications listed an additional Professional, Dickinson Wright,
but it does not appear that Dickinson Wright filed an Application.  *See* ECF Doc. No. 19394.

        [2]        This amount only includes fees for services rendered from October 8, 2005
through January 25, 2008, the date that the Debtors confirmed their original plan of
reorganization. The Debtors have not disclosed the amount of fees incurred since that date and it
is impossible to discern the amount from public records.

General Motors ("GM"), the Debtors' former parent, to use government money to partially fund the modified plan. Every stakeholder was forced to make extreme sacrifices. Unsecured creditors will receive a distribution under the modified plan only after the members of Delphi's new privately held owner receive $7.2 billion in profits, which, for all practical purposes, means that unsecured creditors will receive nothing under the modified plan. The hourly wages of union workers were cut to between $10.00 and $22.00 per hour. Retirees lost their health and life insurance benefits.

The United States Trustee has reviewed the Applications and time and expense records submitted by the Professionals, under the standards set forth in 11 U.S.C. § 330, for the period from October 8, 2005 through January 25, 2008, the date that the Debtors confirmed their original plan. Based on this review, the United States Trustee requests that the court disallow fees in the total amount of $16,092,345.36, as follows:

A.    **Skadden Arps Slate Meagher & Flom, LLP ("Skadden").**  The court should reduce Skadden's fee request by $436,530.19. Skadden billed the Debtors for clerical time incurred by paraprofessionals, which is not compensable, and charged excessive fees for the work of unadmitted personnel.

B.    **Rothschild, Inc. ("Rothschild").**  Rothschild did not meet its burden of proving that it is entitled to a Completion Fee of $15 million. The court should disallow this amount in its entirety.

C.    **Wilmer Cutler Pickering Hale & Dorr, LLP ("Wilmer Hale").**  Wilmer Hale seeks final approval of the reimbursement of fees in the amount of $174,049.57 incurred by PriceWaterhouseCoopers LLP ("PriceWaterhouse") which assisted Wilmer Hale in its representation of the Debtors' audit committee. Professionals retained under Section 327 may not retain other professionals and claim the fees as expenses in applications for compensation. The court should, therefore, deduct this amount from either Wilmer Hale's or PriceWaterhouse's final fee award. In addition, Wilmer Hale did not disclose the arrangement with

2

PriceWaterhouse in the affidavits under Fed. R. Bankr. P. 2014 that it filed with the court. Bankruptcy professionals have a continuing duty to disclose connections under Section 327 and Rule 2014 and a breach of that duty warrants disgorgement of fees.  The court should, therefore, order Wilmer Hale to disgorge $179,398.06, which represents total fees incurred and paid during the third interim fee period.

D.    **PriceWaterhouse**.  PriceWaterhouse's work for Wilmer Hale was not within the scope of its retention in the cases and it did not make proper application to the court for the award of these fees.  The court should, therefore, deduct $174,049.57 from PriceWaterhouse's final fee award if it was paid, or from Wilmer Hale's award, if not

E.    **Latham & Watkins, LLP ("Latham & Watkins").**  The court should reduce the final fee award to Latham and Watkins in the amount of $132,330.77 because it charged excessive fees for the work of unadmitted personnel.

F.    **Fried Frank Harris Shriver & Jacobson, LLP ("Fried Frank").**  The court should disallow fees and expenses in the total amount of $151,836.77.  Fried Frank billed the Debtors for time incurred by summer associates, which is overhead and not compensable, and charged excessive fees for unadmitted personnel.  Fried Frank also seeks the reimbursement of expenses totaling $31,151.88 for secretarial services and a temporary paralegal.  Secretarial services are overhead and cannot be billed to a client.  Paralegal time must be billed as fees and documented with time records.  Without time records, it is impossible to determine whether the services provided were legal or clerical.

G.    **Warner Stevens, LLP ("Warner Stevens").**  Warner Stevens seeks the award of future fees in the amount of $12,000.00.  The court should deny the award of future fees unless Warner Stevens settles a supplemental fee order along with contemporaneous time records documenting the request.  The United States Trustee has no other objections to Warner Stevens' Application.

3

**H.    Howard & Howard Attorneys, PC ("Howard & Howard").**  Howard & Howard seeks the award of future fees and the reimbursement of future expenses in the amount of $6,200.00.  The court should deny this request unless Howard & Howard settles a supplemental fee order along with contemporaneous time and expense records documenting the request.  The United States Trustee has no other objections to Howard & Howard's Application.

The United States Trustee has no objection to the final award of fees and reimbursement of expenses to the Professionals listed in Exhibit B.

## II.    FACTS

### A.    The Debtors

Delphi Corporation and thirty-eight subsidiaries filed their chapter 11 cases on October 8, 2005 (the "Petition Date").  On the Petition Date, the court entered an order approving the joint administration of the cases   *See* ECF Doc. No. 28.  On October 14, 2005, three additional affiliates filed chapter 11 cases, and, on October 19, 2005, the court entered a second order authorizing the joint administration of all forty-two cases. *See* ECF Doc. No. 404. The Debtors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of Bankruptcy Code.

### B.    Statutory Committees

On October 20, 2005, the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  *See* ECF Doc. No. 469.  The United States Trustee amended the appointment of the Creditors' Committee on March 6, 2006 due to the resignation of a member.  *See* ECF Doc. No. 2685.

On December 22, 2005, Appaloosa Management, L.P. ("Appaloosa") and an *ad hoc* committee of equity security holders filed a motion for an order directing the United States Trustee to appoint an official committee of equity security holders (the "Equity Committee Motion").  *See* ECF Doc. No. 1604.  After a trial, the court entered an order granting the Equity Committee Motion on March 30, 2006.  *See* ECF Doc. No. 3024.  The United States Trustee

4

appointed an Official Committee of Equity Security Holders (the "Equity Committee") on April 28, 2006 and filed an amended appointment on May 11, 2006. *See* ECF Doc. Nos. 3503 and 3726. On April 24, 2008, United States Trustee filed a notice of disbandment of the Equity Committee, effective April 23, 2009. *See* ECF Doc. No. 16578.

C.      **The Fee Committee**

On May 5, 2006, the Court entered its Third Supplemental Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Fee Committee Order"), establishing a Joint Fee Review Committee (the "Fee Committee"), comprised of representatives of the United States Trustee, the Debtors and the Creditors' Committee, and approving a protocol for the review of Fees. *See* ECF Doc. No. 3630. On August 17, 2006, the court approved the Fee Committee's retention of Legal Cost Control ("LCC") as its fee and expense analyst. *See* ECF Doc. No. 4959. During the pendency of the cases, the Fee Committee reviewed interim fee applications for the first through sixth interim fee periods and negotiated reductions in fees and expenses with the professionals. Overall, the Professionals reduced their fee and expense requests by 4% through negotiations with the Fee Committee and voluntary write offs. *See* Exhibit A.

D.      **The Debtors' Transformation Plan and Labor and Pension Issues**

The Debtors' stated goal in chapter 11 was to implement their "Transformation Plan." *See, e.g.*, Affidavit of Robert S. Miller, at 71, ¶ 142, ECF Doc. No. 7. Elements of the Transformation Plan included, among other things, obtaining "significant labor and retiree cost savings and other modifications from the unions representing the employees of the Debtors," including seeking to reject collective bargaining agreements and eliminating retiree benefits for existing retirees who were members of the union. *Id.*

On March 31, 2006, the Debtors filed a motion, under 11 U.S.C. §§ 1113 and 1114, for an order rejecting collective bargaining agreements and modifying retiree benefits (the "1113/1114 Motion"). *See* ECF Doc. No. 3035. Trial was held for four days in May 2006

during which the Debtors and the unions held negotiations regarding a resolution.  *See* Transcript of Hearing Held on May 26 2006, at 133, Lines 1-23, ECF Doc. No. 4346.

On March 31, 2006, the Debtors also filed a motion seeking approval of an agreement between the UAW, GM and the Debtors (the "UAW Attrition Program"), under which UAW members were offered early retirement or buyouts.  See ECF Doc. No. 2933.  On May 8, 2006, the court approved UAW Attrition Program and, on May 12, 2006 entered an amended order approving the UAW Attrition Program.  *See* ECF Doc. Nos. 3648 and 3754.  On July 7, 2006, the court approved a supplement to the UAW Attrition Program and a similar program for IUE-CWA union employees (the "IUE-CWA Attrition Agreement").  *See* ECF Doc. No. 4461.  On January 31, 2007, the court entered an order staying further proceedings on the 1113/1114 Motion in light of the Debtors' pending disclosure statement and plan and related agreements. *See* ECF Doc. No.  6779.

On August 6, 2007, the Debtors filed motions to approve memoranda of understanding (the "MOUs") between the Debtors, the AUW, the IUE-CWA and other unions regarding modification of collective bargaining agreements and retiree benefit plans.  *See* ECF Doc. Nos. 8906 and 8907.  Terms of the MOUs included attrition options, buy downs and severance options for laid off employees, the transfer of retiree benefit obligations to GM, and the reduction of health and disability benefits.  *See* ECF Doc. No. 8907, Exhibit 4.

The unions also made significant wage concessions under the MOUs.  Production workers' hourly rates were cut to between $10.50 for entry level positions to $16.50 for legacy workers.  *Id*. at 24-25.  New hourly rates for skilled workers ranged from $20.00 to $26.00.  *Id.* at 25.  The court entered orders approving the MOUs on August 16, 2007.  *See* ECF Doc. Nos. 9106 and 9107.

On September 12, 2008, the Debtors filed a motion to freeze the pension plan for hourly and salaried workers.  *See* ECF Doc. No. 14162.  The court granted the motion on September 23,

2008. *See* ECF Doc. No. 14258. The salaried workers' plan was frozen on September 30, 2008

and the hourly workers' plan was frozen on November 30, 2008. *See* ECF Doc. No. 18559.

On February 4, 2009, the Debtor filed a motion to terminate employer paid healthcare

and life insurance benefits for retirees and their spouses. *See* ECF Doc. No. 14705. On February

25, 2009, the Court provisionally granted the motion and on March 11, 2009, it entered a final

order granting the motion. *See* ECF Doc. Nos. 16380 and 16448. On June 21, 2009, the Debtors

entered into a settlement agreement with the Pension Benefit Guaranty Corporation ("PBGC")

terminating the Debtors' hourly and salaried workers' pension plan and appointing the PBGC

trustee of the plan. *See* ECF Doc. No. 18559.

### E.     The EPCA and the PSA

On December 18, 2006, the Debtors filed a motion (the "EPCA Motion") for an order

approving an equity purchase and commitment agreement ( the "EPCA") and a plan framework

support agreement (the "PSA"). *See* ECF Doc. No. 6179. The EPCA and the PSA were the

product of negotiations between the Debtors, GM, the unions representing the Debtors' workers,

the statutory committees and other stakeholders. *See* EPCA Motion, at 15-18. The PSA and the

EPCA were meant to implement the Debtors' Transformation Plan and fund a plan of

reorganization. *Id*. at 6.

The PSA set forth terms of a plan of reorganization. *Id*. at 24. Negotiated terms included

the treatment of GM's claim, the resolution of pension funding issues, and the terms of the

preferred stock to be issued though the Debtors' plan of reorganization. *Id*. The PSA was

subject to the Debtors and GM reaching a resolution of issues prior to January 31, 2007. *Id*. at

25.

Under the EPCA, the Debtors proposed to make a rights offering to their equity security

holders to purchase *pro rata* shares of common stock in the reorganized debtors. *Id*. at 19. The

EPCA also set forth the terms and conditions under which Appaloosa, through its affiliate

A-D Acquisition Holdings, LLC, Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch,

Pierce, Fenner & Smith Incorporated, UBS Securities LLC ("UBS"), and others (the "Plan

Investors") would commit to invest up to $3.4 billion through the purchase of common and

preferred stock in the reorganized debtors and any unsubscribed shares from the rights offering.

*Id.*   Under the EPCA, the Debtors agreed to pay the Plan Investors commitment fees of over $68

million and to reimburse their expenses.  *Id.* at 20.

Numerous stakeholders, including the Creditors' Committee, the Equity Committee, and

the unions objected to the EPCA Motion.  *See, e.g.*, ECF Doc. Nos. 6242, and 6247.  After

discovery and a trial, the court approved the EPCA and PSA on January 12, 2007.  *See* ECF Doc.

No. 6589.

In July 2007, the Debtors terminated the EPCA because they could not come to a final

agreement with the Plan Investors and other parties.  Termination of the EPCA also terminated

the PSA.  Therefore, on July 18, 2007, the Debtors filed a motion (the "Amended EPCA

Motion") to approve an amended EPCA (the "Amended EPCA") and an amended PSA (the

"Amended PSA").  *See* ECF Doc. No.  8673.  The court granted the Amended EPCA Motion on

August 2, 2007.  *See* ECF Doc. No. 8856.

### F.    The Debtors' Disclosure Statement and Original Plan of Reorganization

The Debtors filed a disclosure statement and plan of reorganization on September 6,

2007.  *See* ECF Doc Nos. 9263 and 9264.  On December 10, 2007, the Debtors filed an amended

disclosure statement (the "Disclosure Statement") and plan (the "Original Plan") after receiving

objections from numerous parties.  *See* ECF Doc Nos. 11386 and 11388.

The Debtors intended to implement the Original Plan through funding received from the

Amended EPCA.  *See* Original Plan, Article VII, § 7.11, at 38, and Exhibit 7.11 to the Original

Plan.  The Debtors also proposed to fund the Original Plan through exit financing, which would

repay debtor in possession facilities, make payments due on the effective date, and satisfy other

claims under the Original Plan.  *Id.,* Article VII, § 7.14, at 39, and Exhibit 7.14.  Under the

8

Original Plan, the Debtors proposed to seek exit financing after confirmation, and the closing of an exit financing agreement was a condition precedent to the Original Plan becoming effective. *Id.*, Article XII, § 12.2(a).

The Original Plan provided, among other things, that general unsecured creditors (Classes 1C through 12C) would receive common stock in the reorganized debtors, with a value of 78.4% of the face amount of their claims. *See* Original Plan, Article V, § 5.3(a), at 30. With respect to the balance of their claims, general unsecured creditors in Classes 1C through 12C would receive the right to participate in a discount rights offering up to their *pro rata* share, or if they chose not to participate, a *pro rata* share of any cash from oversubscription to the rights offering. *Id.*, § 5.3(b), at 30-31. Equity security holders were to receive discount rights to purchase pro *rata* shares in the stock of the reorganized debtors. *Id.*, § 5.8, at 32.

On December 10, 2007, the Court approved the Disclosure Statement. *See* ECF Doc. No. 11389. On January 25, 2008, after a two day trial, the Court entered findings of fact and conclusions of law and an order confirming the Original Plan. *See* ECF Doc. No. 12359.

### G.    Implementation of the Original Plan

After confirmation of the Original Plan, the Plan Investors took issue with the terms of the Debtors' proposed exit financing and refused to perform under the EPCA until their objections were resolved. Therefore, on March 5, 2008, the Debtors filed an expedited motion for Implementation of the Original Plan under 11 U.S.C. § 1142 (the "Implementation Motion"). *See* ECF Doc. No. 12978. In the Implementation Motion, the Debtors alleged that, during the syndication of the exit financing, they and the arrangers determined that it would be beneficial to increase GM's participation. *Id.* at 11. After the Debtors re-launched the syndication efforts with GM's increased participation, the Plan Investors alleged that seeking exit financing with GM's participation was inconsistent with the terms of the Amended EPCA and refused to perform under the Amended EPCA. *Id.* at 13, and Exhibit B to the Implementation Motion. The Debtors sought an order implementing the Original Plan, finding that the exit financing terms

9

were consistent with the Amended EPCA and the Original Plan and that the Debtors had met

their obligations under the Amended EPCA and the Original Plan, and directing the Plan

Investors to perform under the Amended EPCA. *Id.* at 23-24. At a hearing on the

Implementation Motion on March 7, 2008, the court ruled that it was appropriate for the Debtors

to seek relief by motion under Section 1142. *See* Transcript of Hearing Held on March 7, 2008

("Tr.") at 124, Lines 3-11. The court also ruled, among other things, that certain issues of

interpretation of the Amended EPCA, including whether GM's participation would have a

material impact on the Plan Investors' investment, required an evidentiary hearing. *See* Tr. at

127, Lines 1-14.

On May 16, 2008, the Debtor filed an adversary proceeding (Adv. Pro. No. 08-1282)

against Appaloosa and other Plan Investors seeking a decree of specific performance of their

obligations under the Amended EPCA or an award of damages. *See* ECF Doc. No. 1. On

February 22, 2010, the court approved a stipulation dismissing the adversary proceeding with

prejudice. *See* ECF Doc. No. 249.

On May 16, 2008, the Debtor also sued UBS seeking specific performance of UBS's

agreement to provide equity financing to consummate the Original Plan or an award of

damanges (Adv. Pro. No. 08-01233). *See* ECF Doc. No. 1. On January 1, 2010, the Court

approved a stipulation dismissing the adversary proceeding with prejudice. *See* ECF Doc. No.

77.

### H.    The Modified Plan

The Plan Investors did not perform under the Amended EPCA and the Debtors did not

obtain exit financing and, as a result, the Original Plan never became effective. Therefore, on

October 3, 2008, the Debtors filed a motion to modify the plan (the "Plan Modification

Motion"). *See* ECF Doc. No. 14311. After several adjournments of the hearing on the Plan

Modification Motion, the Debtors filed a supplemental motion to modify the plan on June 1,

2009. *See* ECF Doc. No. 16646.

The Debtors' proposed modified plan (the "Modified Plan") was to be funded by an agreement between GM, Parnassus Holding II, LLC ("Parnassus"), and others (the "Master Disposition Agreement"). *Id*., Exhibits 1-A and 1-A-1. The Debtors were able to propose the Master Distribution Agreement after the United States Treasury agreed to allow GM to provide $250 million of government funds to implement the Modified Plan. *See* Motion to Modify Plan, at 7, ¶ 6.

Under the Master Disposition Agreement, GM purchased certain of the Debtors' business operations that provide parts for GM products. *Id.* at 8, ¶ 7. Parnassus purchased other businesses and assets. *See* Master Distribution Agreement, Article II, §2.1.4, at 2. GM agreed to satisfy the Debtors' obligations to the Debtors' DIP lenders, waive its prepetition claims, pay $291,020,079 in cash and satisfy fifty percent of administrative claims, including $15 million in professional fees, up to $148 million. *Id.*, Article 3, § 3.1.1, at 26. Among other things, Parnassus agreed to assume the liabilities and cure amounts of the businesses it purchased, pay $1.00, transfer Parnassus Class C membership interests to Delphi or a trust for the benefit of the DIP lenders, and pay fifty percent of administrative claims, including $15 million in professional fees. *Id.*, §§ 3.2.1 - 3.2.4, at 37, and Article 7, § 7,8(e), at 40.

Under the Modified Plan, general unsecured creditors are entitled to distributions from the "General Unsecured MDA Distribution," under which

> if and to the extent Parnassus makes distributions to its members (which for the avoidance of doubt do not include the 8% preferred return payable to holders of Parnassus Class C Interests) in excess of $7.2 billion, an amount equal to $3 dollars for every $97 dollars so distributed in excess of $7.2 billion; provided, however, that in no event shall the General Unsecured MDA Distribution exceed $180,000,000 in the aggregate.

*See* Modified Plan, Article I, § 1.95, at 14, and Article V, § 5.3, at 33. Based on estimated unsecured claims totaling $3.1 billion, unsecured creditors will receive, at most, a 6% dividend. *See* Supplement to Disclosure Statement, at S-xxviii, ECF Doc. No. 16646. However, unless the reorganized debtor distributes $7.2 billion to its members, unsecured creditors will receive

nothing.  Equity security holders will receive no distribution under the Modified Plan.  *Id*.,

Article V, § 5.8, at 7.

On July 30, 2009, the Court approved the Master Distribution Agreement and confirmed

the Modified Plan.  *See* ECF Doc. No. 18707.  On October 6, 2009, the Master Distribution

Agreement transactions closed and the Modified Plan became effective.  *See* ECF Doc. No.

18958.

## III.    LEGAL STANDARDS

Section 330(a)(1) of the Bankruptcy Code provides that:

> After notice to the parties in interest and the United States trustee and a hearing, and
> subject to sections 326, 328, and 329, the court may award to a trustee, . . . an examiner,
> . . . or a professional person employed under section 327 or 1103-
>
> > (A)  reasonable compensation for actual, necessary services
> > rendered by the trustee, examiner, professional person, . . . or
> > attorney and by any paraprofessional person employed by any
> > such person; and
> >
> > (B)  reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1)(A) and (B).

### A.    Burden of Proof

Each applicant bears the burden of proof in all fee matters.  *In re Recycling Indus., Inc.*,

243 B.R. 396, 402 (Bankr. D. Colo. 2000); *In re Keene Corp*., 205 B.R. 690, 695 (Bankr.

S.D.N.Y. 1997); *In re JLM, Inc.*, 210 B.R. 19, 24 (B.A.P. 2d Cir. 1997).  *Accord In Re Sounds*

*Distrib. Corp*., 122 B.R. 952, 956 (Bankr. W.D. Pa. 1991) ("the burden of proof as to the

reasonableness of the requested compensation lies with the applicant").  The burden of proof to

show entitlement to fees should "not be taken lightly, especially given that every dollar

expended on legal fees results in a dollar less that is available for distribution to the creditors."

*In re Spanjer Bros., Inc.*, 191 B.R. 738, 747 (Bankr. N. D. Ill. 1996), *quoting In re Pettibone*

*Corp*., 74 B.R. 293, 299 (Bankr. N. D. Ill. 1987).  Therefore, any uncertainties are resolved

against the applicant.  *In re Poseidon Pools of America*, 216 B.R. 98, 100-101 (E.D.N.Y. 1997).

Interim awards under Section 331 are payments on account of the final award of fees. *In re Regan*, 135 B.R. 216, 218 (Bankr. E.D.N.Y. 1992). Interim awards are, therefore, subject to re-examination and adjustment in connection with approval of final fee applications. *Specker Motor Sales v. Eisen*, 395 F.3d 659, 663 (6th Cir. 2004).

### B.    Reasonableness of Fees

Under Section 330, the court may award a professional reasonable fees for services that benefitted the estate. *In re Lederman Enter., Inc.*, 997 F.2d 1321, 1323 (10th Cir. 1993). Accordingly, an application for compensation and reimbursement of expenses must demonstrate that the professional's services were necessary and conferred a benefit to the estate or its creditors. *In re Engel*, 124 F.3d 567, 573 (3d Cir. 1997), *citing In re Arkansas Co., Inc.*, 798 F.2d 645, 650 (3d Cir. 1986) (other citation omitted).

The court has an independent burden to review fee applications "lest overreaching . . . professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997), *quoting In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 844 (3d Cir. 1994). Under Section 330, the bankruptcy court has the authority to reduce fees or expenses when they are disproportionate to the benefit to the estate, even if it has already approved the professional's retention under Sections 327 and 328 of the Bankruptcy Code. *In re Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995). *See also Zolfo, Cooper & Co. V. Sunbeam-Oster Co., Inc.*, 50 F.3d at 262, 263 (3d Cir. 1995) (affirming lower courts' denial of improperly documented and inadequately detailed expenses)

### 1.    Summer Associates and Unadmitted Personnel

Time billed by summer associates is not compensable. *In re New Boston Coke Corp.*, 299 B.R. 432, 442 (Bankr. D. Mich. 2003). Summer associates' compensation should be viewed as part of the firm's overhead which should not be charged to the estate. *In re ACT Mfg.*, 281 B.R. 468, 485 (Bankr. D. Mass. 2002). Likewise, a law firm's partners should exercise billing judgment with respect to personnel not yet admitted to the bar so that the estate does not bear the

cost of educating new lawyers with little experience. *See In re Maruko, Inc.*, 160 B.R. 633, 641 (Bankr. S. D. Cal. 1993) (court reduced by one-half the fees of an attorney who was admitted to the bar half way through the fee period because significant time was spent on routine matters and education of the attorney).

### 2.    Paraprofessionals/Overtime

Professionals may not bill the estate for time spent by paraprofessionals on administrative activities. *In re Fibermark*, 349 B.R. 385, 396 (Bankr. D. Vt. 2006).  Noncompensable time includes photocopying, word processing, scanning and saving files into the firm's computer system, printing, organizing files, maintaining an internal calendar, checking the court docket, updating a master service list, and preparing binders. *Id.*  These duties are considered part of a professional's overhead expenses and may not be billed to the estate. *Id.  See also In re CF&I Fabricators of Utah, Inc.*, 131 B.R. 474, 492-93 (Bankr. D. Utah 1991) (clerical work such as data entry, updating lists, manually assembling, collating, marking, processing, photocopying, or mailing documents, organizing or updating databases, or other work which requires no singular education or experience, is traditionally charged to overhead and included in a professional's hourly rate, not charged to the client).

### 3.    Word Processing and Proofreading

Word processing is "a clerical service regardless of who performs it." *In re Bennett Funding, Inc.*, 213 B.R. 234, 248 (Bankr. N.D.N.Y. 1997).  As an overhead expense, word processing cannot be billed to the client. *Id.  See also CF&I*, 131 B.R. at 492-493 (secretarial work is overhead and not compensable).

### 4.    Voluntary Write-Offs

Voluntary write-offs of fees and expenses by bankruptcy professionals do not necessarily obviate the need for further reductions.  Bankruptcy professionals have an ethical obligation to write off fees that are excessive, redundant, or otherwise unnecessary. *In re Vu*, 366 B.R. 511,

14

520 (D. Md. 2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).  "[B]illing

judgment is an absolute requirement of fee applications in bankruptcy."  *Id.*

### B.    Actual and Necessary Expenses

Under Section 330(a)(1)(B), only documented expenses that are actual and necessary are

reimbursable.  *Id.* at 398.  Professionals must "furnish enough specificity for the Court to

establish whether a given expense was both actual and necessary."  *In re Korea Chosun Daily*

*Times, Inc.*, 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005), *quoting In re S.T.N. Enterprises, Inc.*, 70

B.R. 823, 834 (Bankr. D. Vt. 1987).  Expenses are "actual" if they are incurred and not based on

a formula or *pro rata* calculation.  *Bennett Funding*, 213 B.R. at 398.  Expenses are "necessary"

if they were "reasonably needed to accomplish proper representation of the client."  *In re*

*American Preferred Prescription, Inc.*, 218 B.R. 680, 686-87 (Bankr. E.D.N.Y. 1998).

### 1.    Legal Fees

Legal fees incurred by a professional are not reimbursable as expenses.  *In re Crafts*

*Retail Holding Corp.*, 378 B.R. 44, 48 (Bankr. E.D.N.Y. 2007).  The bankruptcy court may not

award fees to a professional unless it has authorized the professional's employment under 11

U.S.C. § 327.  *Id.*  Prior to awarding fees, the court must make

> an independent, detached determination that the applicant satisfied the
> requirements under § 327(a) that he is disinterested and does not have an adverse
> interest, and also that, among other things, the nature and extent of the proposed
> services are necessary under the circumstances.

*Id.*  A professional not employed under section 327 "is simply not included within the class of

persons eligible for compensation."  *Id.* at 49, *citing Lamie v. United States Trustee*, 540 U.S.

526, 538 (2004).  The Bankruptcy Code contains no provision that authorizes a retained

professional to employ another professional.  *Id.* at 49.  *See also In re EWI, Inc.*, 208 B.R. 885,

894 (Bankr. N. D. Ohio 1997) (allowing fees as out of pocket expenses circumvents the

requirements of 11 U.S.C. § 327 and Fed. R. Bankr. P. 2014 and "would allow professionals to

render services to an estate without making disclosure of their interests and connections to the

debtor that may otherwise prohibit their retention").

15

### 2. Overhead Expenses

Overhead expense reimbursement will be "categorically denied." *Fibermark*, 349 B.R. at 400. Overhead includes secretarial and clerical pay, library costs, and office supplies. *Id.*

## IV. OBJECTIONS

### A. Skadden

#### 1. The Application

The court entered interim and final orders approving the retention of Skadden as the Debtors' bankruptcy counsel on October 14, 2005 and November 4, 2005, respectively. *See* ECF Doc. Nos. 274 and 876. In the Application, Skadden seeks a final award of fees, incurred between the Petition Date and January 25, 2008, in the total amount of $90,556,938.00, and reimbursement of expenses in the amount $5,756,849.00, for a total award of $96,312,887.00. *See* Application, at 2. This request is net of $10,152,272.00 in negotiated reductions and voluntary write offs. *Id.* The Debtors have paid Skadden 100% of accrued expenses and all fees except for $3,571,800.00 held back with respect to fees incurred in the seventh interim fee period. *Id.*

#### 2. Objection

Skadden requests approval of fees incurred by paraprofessionals for the seventh interim fee period in the amount of $800,598.00, for 3,865.20 hours. *Id.*, Time Summary for Seven and Final Interim Fee Application. A review of the time records of the paraprofessionals showed that at least one half of paraprofessional time billed was for clerical tasks, such as organizing materials, preparing binders, delivering documents to Skadden lawyers and the court, proofreading, project management and assisting at hearings. *Id.*, Exhibits D-1 through D-33. Clerical time is not compensable. *See, e.g.*, *Fibermark*, 349 B.R. at 396 (clerical duties are in the nature of overhead and not compensable). The Court should, therefore, disallow fees for paraprofessional time in the amount of $400,000.00

16

In addition, Skadden seeks an award of $78,764.00 for 203.9 hours billed by unadmitted personnel. The blended hourly rate of $386.29 is excessive and should be reduced to $207.13, the blended hourly rate for paraprofessionals. The court should reduce this fee request by $36,530.19.

**B.    Rothschild**

**1.    The Terms of Rothschild's Retention**

On October 14, 2005 and November 30, 2005, respectively, the bankruptcy court approved the interim and final retention of Rothschild as the Debtors' investment bankers. *See* ECF Doc. Nos. 272 and 1363. The final retention order (the "Final Order"), which incorporates by reference the engagement letter between Rothschild and the Debtors (the "Engagement Letter") provides, in part, that:

> 4.    Subject to the following paragraph, the compensation and reimbursement of expenses to be paid to Rothschild shall be in accordance with the terms of the Engagement Letter, which fees and expenses shall not hereafter be subject to challenge except under the standard of review under section 328(a) of the Bankruptcy Code.
>
> 5.    The Office of the United States Trustee retains all rights to object to Rothschild's fee applications (including expense reimbursements) in respect of fees and expenses accruing during Rothschild's engagement pursuant to this Final Order, on all grounds, including, but not limited to, the reasonableness standard provided for in section 330 of the Bankruptcy Code.

Final Order, at 3-4, ¶¶ 4 and 5.

The Engagement Letter provides that, as compensation for services rendered, the Debtors agree to pay Rothschild

(a)    A retainer of $250,000 . . . .

(b)    A monthly cash advisory fee of $250,000 . . . .

(c)    A fee (the "Completion Fee") of $15 million, due and payable in cash upon the earlier of (i) the Effective Date of a Plan that provides for, pursuant to the terms of a binding written agreement, the consummation of a Transaction or (ii) the closing of another Transaction.

(d)    In the case of any M&A Transaction for which Rothschild is designated by the Company as the Company's primary advisor and investment banker, and which does not arise out of a Transaction for which a Completion Fee is due under

17

Section 4(c) above, a fee (the "M&A Fee") equal to the product of (i) the Aggregate Consideration or Consolidated Aggregate Consideration, as applicable, as provided in Exhibit D hereto, times (ii) the applicable M&A Fee Percentage, each as specified in Exhibit D hereto, which M&A Fee shall be due and payable in cash upon the closing of such M&A Transaction. . . .

Engagement Letter, at 6, § 4.

The Engagement Letter defines a "Transaction" for which a Completion Fee is due as

(a) any transaction or series of related transactions that effects material amendments to or other material changes in the Company's outstanding indebtedness, trade claims, leases (both on and off balance sheet) or other liabilities, taken as a whole, pursuant to a plan of reorganization (a "Plan") confirmed in connection with the Chapter 11 cases (the "Chapter 11 Case") commenced on October 8, 2005 and October 14, 2005 by the Debtors listed on Exhibit A hereto (the "Debtors"); (b) whether pursuant to a Plan or Section 363 Title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy Code") (i) any merger, consolidation, reorganization, recapitalization, financing, refinancing, business combination or other transaction pursuant to which the Company (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquirer") or (ii) any acquisition, directly or indirectly, by an Acquirer (or by one or more persons acting in concert together with an Acquirer pursuant to a written agreement or otherwise), whether in a single transaction, multiple related transactions or a series of related transactions, of (A) a majority of the assets or operations of the Company or (B) any outstanding or newly-issued shares of the Company's capital stock or any securities convertible into, or options, warrants or other rights to acquire such capital stock or other equity securities of the Company, for the purpose of effecting a recapitalization or change of control of the Company; (c) any restructuring, reorganization or similar transaction involving a majority of the assets or operations of the Company, whether or not pursuant to a Plan; or (d) any transaction similar to any of the foregoing; provided, that in the case of (a), (c) and (d), such Transaction shall immediately effect, or will effect over time (as evidenced by a binding agreement), a material reduction of the Legacy Liabilities, taken as a whole.

Engagement Letter, at 3.

The Engagement Letter also provides that

Rothschild shall credit against the Completion Fee (a) 50% of any M&A Fees indefeasibly paid (the "M&A Fee Credit"); (b) 50% of any New Capital Fees indefeasibly paid (the "New Capital Fee Credit") and (c) to the extent not otherwise applied against the fees and expenses of Rothschild under the terms of this Agreement, the Retainer; provided that the sum of the M&A Fee Credit and the New Capital Fee Credit shall not exceed the Completion Fee.

Engagement Letter, at 7, § 5.

## 2.    The Application

18

### a.    Services Rendered

According to the Application, Rothschild provided the following services to the Debtors:

1.    Obtaining DIP financing at the beginning of the Cases, post petition DIP financing to refinance the original DIP facility, and an extension of the maturity date of the post petition DIP facility to June 30, 2008; Application, at 16, ¶¶ 22-23;

2.    Preparing financial analyses; *id*. at 16-17, ¶¶ 24-25;

3.    Developing the "Steady State" business plan and model; *id*. at 17-18, ¶¶ 26-28;

4.    Developing the Transformation Model to assist in the analysis of variables, such as revenue assumptions and labor cost savings, on the Debtors' business plan; *id*. at 18, ¶ 29;

5.    Conducting financial and operational due diligence; *id*. at 18-19, ¶ 30;

6.    Developing a detailed recapitalization model to, among other things, assess plan framework scenarios; *id*. at 19-20 *id*. at 16-17, ¶¶ 24-25; , ¶¶ 32-34;

7.    Coordinating the due diligence process of the Creditors' Committee and the Equity Committee; *id*. at 20-21, ¶¶ 35-36

8.    Analyzing the financial impact of labor proposals and acting as a witness with respect to the Debtors' motion to reject collective bargaining agreements; *id*. at 21-22, ¶¶ 37-39;

9.    Assessing pension alternatives; *id*. at 22-23, ¶ 40;

10.    Participating in negotiations with GM over financial support, analyzing the financial impact of various levels of support and assisting in the development of the Plan framework; *id*. at 23-24, ¶¶ 41-44;

19

11.     Coordinating the due diligence processes of the Plan Investors; *id.* at 24-25, ¶¶ 45-46;

12.     Participating in framework negotiations between the Debtors, the statutory committees and the Plan Investors, which resulted in the PSA and the EPCA; *id.* at 25-26, ¶¶ 47-51;

13.     Evaluating a Plan funding proposal and commitment letter from Highland Capital made in response to the EPCA; *id.* at 26, ¶¶ 52-54;

14.     Providing testimony for the hearings on approval of the EPCA and the DIP refinancing; *id.* at 27-28, ¶ 55;

15.     Assisting the Debtors in reviewing and negotiating the Amended EPCA and modifications of the Amended EPCA and the PSA required due to the declining auto industry and capital markets, which formed the basis of the Plan; *id.* at 28-29, ¶¶ 56-59;

16.     Formulating the process to obtain exit financing, reviewing preliminary proposals from lenders; and negotiating with potential lenders; *id.* at 29-30, ¶¶ 60-62;

17.     Developing a going concern valuation model for the Debtors' divisions based on the Debtors' budget for 2007-2011, and analyzing the Debtors' debt capacity to assess recapitalization alternatives; *id.* at 30-31, ¶¶ 63-65;

18.     Assisting the Debtors in preparing the Original Plan and Disclosure Statement and proving expert testimony with respect to the Original Plan; *id.* at 32, ¶¶ 66-67;

19.     Conducting the processes to market and sell the Debtors' steering businesses and obtain third party financing for the sale, which closed with a sale to GM on October 6, 2009; *id.* at 32-35, ¶¶ 68-75;

20.    Conducting the sale of the Debtors' Interior Business which was approved by the court on December 21, 2007; *id*. at 35-36, ¶¶ 76-80; and

21.    Meeting with the Debtors' board and the statutory committees and "miscellaneous" matters; *id*. at 37, ¶¶ 81-82.

### b.    Compensation and Reimbursement of Expenses

Rothschild seeks approval of final fees and expenses for the period from October 8, 2005 through January 25, 2008, as follows:

| | |
|---|---|
| Monthly Cash Advisory Fees | $6,895,161.29 |
| M & A Fees | |
| Interior Division | $4,000,000.00 |
| Steering Division | $2,000,000.00 |
| Completion Fee | $15,000,000.00 |
| Total Fees | $27,895,161.29 |
| Expenses | $857,653.84 |
| Total Fees and Expenses | $28,752,815.13 |

### 3.    Objection

The United States Trustee objects to the award of the Completion Fee of $15 million. Rothschild has provided no justification for the payment of the Completion Fee, and based on the language in the Engagement Letter, Rothschild does not appear to be entitled to it.

Under the Engagement Letter, Rothschild is entitled to a Completion Fee

due and payable in cash upon the earlier of (i) **the Effective Date of a plan** that provides for, pursuant to the terms of a binding written agreement, the consummation of a Transaction or (ii) the **closing of another Transaction**.

*See* Engagement Letter, at 6, § 4(c) (emphasis added).

A Transaction is defined as

(a)    Any transaction or series of transactions that effects material amendments or other material changes in Delphi's outstanding indebtedness, trade claims, leases or other liabilities, taken as whole under a confirmed plan of reorganization, which will result in a material reduction of Delphi's legacy liabilities, taken as a whole;

21

(b)    Any merger, consolidation, reorganization, recapitalization, business combination or other transaction under which an entity acquires or obtains control of a majority of the assets or operations of Delphi or any outstanding or newly issues shares of Delphi's stock or other equity securities, for the purpose of effecting recapitalization or change of control of Delphi;

(c)    Any restructuring, reorganization or similar transaction involving a majority of Delphi's assets or operations, whether or not under a plan, which will result in a material reduction of Delphi's legacy liabilities, taken as a whole; or

(d)    Any similar transaction, which will result in a material reduction of Delphi's legacy liabilities taken as a whole.

Engagement Letter, at 3.

The invoices attached to the Application show that Rothschild billed the Debtors $7.5 million, or one-half of the Completion Fee, on December 2, 2008, and an additional $7.5 million on September 9, 2009.  *See* Exhibit C to the Application.  However, the Amended EPCA did not close, the Debtors did not consummate exit financing, there was no sale of substantially all of the Debtors' assets or a transfer of control, and the Original Plan never became effective.  Thus, none of the services that Rothschild rendered to the Debtors prior to the confirmation of the Original Plan resulted in a Transaction that closed which, under the Engagement Letter, is a condition precedent to Rothschild's entitlement to a Completion Fee.  Rothschild has not met its burden of proof of entitlement to the Completion Fee under Section 330.  Unless Rothschild can show that it is entitled to the Completion Fee, the court should disallow it.

Alternatively, the Court should disallow Rothschild's fees in the amount of $3 million or one-half of the M&A Fees paid at the closing of the sales of the Steering Division and the Interior Division.  Under § 5 of the Engagement Letter, Rothschild is required to offset fifty percent of the M&A Fees against the Completion Fee, but there is no evidence of any offset in the Application..

### C.    Wilmer Hale

#### 1.    The Application

On December 2, 2005, the court entered an order approving the retention of Wilmer Hale, as special regulatory counsel to the audit committee of the Debtors' board of directors.  See ECF Doc. No. 1430.  Wilmer Hale seeks the final award of fees in the amount of $999,898.75 and reimbursement of expenses totaling $199,335.52, for a total award of $1,199,234.52.  *See* Application, at 5.  The final award takes into account voluntary reductions in fees and expenses in the amount of $22,530.00.  *Id*.  Wilmer Hale also seeks payment of $843.30 held back with respect to the seventh interim fee period.  *Id.*

#### 2.    Objection

Wilmer Hale's expense request includes fees, in the amount of $174,049.57, and expenses of $300.38, incurred by PriceWaterhouse which, according to the Application, assisted Wilmer Hale in providing services to the audit committee during the third interim fee period (from June 1, 2006 through September 30, 2006).  *Id*. at 8, n.4.  The court should disallow this expense request in the total amount of $174,349.95.  Bankruptcy professionals retained under Section 327 may not claim professional fees as expenses because it circumvents the requirements of Section 327 and Fed. R. Bankr. P. 2014.  *In re EWI, Inc.*, 208 B.R. at 893-894.  It is unclear from the record whether Price Waterhouse received these fees.  If it did, then the court should deduct this amount from its final award.  If not, the court should reduce Wilmer Hale's award.

In addition, based on a  review of the docket and Wilmer Hale's declarations under Fed. R. Bankr. P. 2014, Wilmer Hale did not disclose the arrangement with PriceWaterhouse except when it sought reimbursement of the fees.  This failure to disclose a connection in the cases violates Fed. R. Bankr. P. 2014(a) and warrants disgorgement of the fees paid to Wilmer Hale for the third interim fee period in the amount of $179,398.06.

Under Fed. R. Bankr. P. 2014(a), applications to employ professionals under 11 U.S.C. § 327

23

shall be accompanied by a verified statement setting forth the person's connections with the debtor, creditors and any other party in interest, **their respective attorneys and accountants**, the United States trustee and any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a) (emphasis added).

Although Rule 2014(a) does not explicitly require continuing disclosure, "section 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention." *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998). The duty to disclose connections throughout a case preserves the integrity of the bankruptcy system because it ensures that professionals remain free from adverse interests. *Id.* The duty to disclose under Rule 2014(a) is strictly construed, and the [f]ailure to disclose relevant connections is an independent basis for the disallowance of fees or disqualification from the case." *In re Worldcom*, 311 B.R. 151, 164 (Bankr. S.D.N.Y. 2004), *citing In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). *See also In re Mercury*, 280 B.R. 35, 56 (Bankr. S.D.N.Y. 2002) (violation of the disclosure rule, standing alone, is enough to deny compensation, even if the professional provided valuable services to the estate) (citation omitted).

Wilmer Hale did not disclose any relationship with PriceWaterhouse in the affidavit filed with its application for retention. *See* ECF Doc. No. 999, Exhibit 2. It filed Rule 2014(a) affidavits during the cases but none of them disclosed the arrangement with PriceWaterhouse or that it would seek reimbursement of PriceWaterhouse's fees as an expense. See ECF Doc. Nos. 6301 and 7190. Based on this failure to disclose, which only came to light when Wilmer Hale sought reimbursement of the fees that it paid to PriceWaterhouse, the court should order Wilmer Hale to disgorge all of the fees that it received for the third interim fee period in the amount of $179,398.06.

### D.    PriceWaterhouse

#### 1.    The Application

PriceWaterhouse seeks a final award of fees in the amount of $36,025,791.65 and reimbursement of $3,233,384.17 in expenses, for a total award of 39,259,175.82. *See* Summary of Application, at 18. PriceWaterhouse was originally an ordinary course professional under the Order Authorizing the Retention of Professionals Utilized by the Debtors in the Ordinary Course of Business. *See* ECF Doc. Nos. 211 and 883. The Debtors retained PriceWaterhouse under Section 327(a), by order dated June 21, 2006, to provide Sarbanes-Oxley compliance and tax consulting services. *See* ECF Doc. No. 4310. On January 22, 2007, the court entered an order expanding the scope of PriceWaterhouse's retention to include due diligence services. *See* ECF Doc. No. 6677.

#### 2.    Objection

In addition to its work for the Debtors with respect to Sarbanes-Oxley and tax issues, Price Waterhouse also assisted Wilmer Hale in its work for the audit committee during the third interim fee period, as set forth in Wilmer Hale's Application. *See* Wilmer Hale Application, at 8 n.4. The Debtors, however, never retained PriceWaterhouse for this purpose. Unlike Wilmer Hale, PriceWaterhouse disclosed the arrangement in the affidavit filed with its retention application. *See* ECF Doc. No. 4028, Exhibit 3. However, the affidavit, although ambigious, seems to indicate that the Debtors paid PriceWaterhouse directly for its services to the audit committee. The affidavit provides, in part, that:

> 16. In addition to the services provided by the Debtors, PricewaterhouseCoopers provides continued assistance to the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale"), the special regulatory counsel to the Audit Committee of the Debtors' Board of Directors (the "Audit Committee"), in its representation of the Audit Committee in an SEC investigation into certain accounting transactions and contracted entered into by the Debtors. PricewaterhouseCoopers will continue to be compensated for its assistance to Wilmer Hale in accordance with the fee statements and fee applications submitted by Wilmer Hale in these chapter 11 cases.[4]

*See* Declaration of Brian Decker, ¶ 16, ECF Doc. No. 4028.

Note 4 to paragraph 16 provides that

> [4]Subsequent to the Petition Date, PricewaterhouseCoopers have invoiced the Debtors, $442,914 for services rendered through March 31, 2006 and the Debtors have paid PricewaterhouseCoopers, $294,341, associated with the services through January 31, 2006.  PricewaterhouseCoopers provides a narrative summary of the services provided to Wilmer Hale and the Debtors.

*Id.*

As a professional retained under Section 327, PriceWaterhouse is only entitled to the award of fees for work within the scope of its retention on proper application to the court under Section 330 and 331.  *See* Fed. R. Bankr. P. 2016(a) (an entity seeking interim or final compensation shall file an application with the court).  Because it is unclear whether PriceWaterhouse received these funds, the court should either reduce PriceWaterhouse's or Wilmer Hale's award by $174,349.95.

### E.    Latham & Watkins

#### 1.    The Application

On November 30, 2005 and January 6, 2006, respectively, the court entered interim and final orders approving the retention of Latham & Watkins counsel to the Creditors' Committee *nunc pro tunc* to October 17, 2005.  *See* ECF Doc. Nos. 1346 and 1750.  Latham & Watkins seeks a final award of fees, totaling $19, 817,103.75 and reimbursement of expenses in the amount of $1,113,098, for a total award of $20,930,201.75.  *See* Application, at 3. The request includes voluntary reductions of $215,640.91.  *Id.*  Latham & Watkins also seeks payment of a hold back in the amount of $421,184.95.  *Id.*

#### 2.    Objection

Latham & Watkins seeks the final award of fees in the amount of $171,955.00 (404.60 hours at $425.00 per hour) and $116,575.50 (337.9 hours at $345 per hour) for time incurred by unadmitted personnel during the seventh interim fee period.  *See* Application, at 13-14.  By comparison, most attorneys at Latham & Watkins admitted in 2007 had hourly rates of $395.00 during the same period.  *Id.*  The billing rates for unadmitted personnel are excessive and the

court should reduce the fee award by $132,330.77 to $156,199.73 (742.50 hours at the blended hourly rate for paraprofessionals of $210.37).

### F.    Fried Frank

#### 1.    The Application

On June 19, 2006, the court entered an order approving the retention of Fried Frank as counsel to the Equity Committee effective May 8, 2006.  See ECF Doc. No. 4267.  Fried Frank seeks the final award of fees in the amount of $11,066,482.50 and reimbursement of expenses totaling $505,892.97 incurred between May 8, 2006 and January 25, 2008.  *See* Application, at 5.  This amount is net of voluntary reductions totaling $233,238.00.  *Id*.  Fried Frank also seeks payment of the hold back in the amount of $583,779.80.  *Id*.

#### 2.    Objection

Fried Frank seeks approval of fees in the amount of $16,459.50 for time incurred by summer associates.  *See* Exhibit C to the Application.  Time billed by summer associates is in the nature of overhead and is not compensable.  *ACT Mfg.*, 281 B.R. at 485.  The court should, therefore, disallow fees in the amount of $16,459.50 billed for summer associate hours.

Fried Frank also seeks the final award of fees for unadmitted personnel in the amount of $277,578.00 for 847.40 hours, at a blended hourly rate of $327.56.  *See* Exhibit C to the Application.  The hourly rates of the unadmitted personnel ranged from $245.00 to $360.00.  *Id*.  The court should reduce the fee award for unadmitted personnel, by $104,225.38, to $173,352.62, at an hourly rate of $204.57, which is the blended hourly rate of Fried Frank's paraprofessionals.

Fried Frank also seeks reimbursement of expenses in the amount of $15,582.30 for secretarial services and $15,569.59 for a paralegal temp.  *See* Exhibit D to the Application.  The court should disallow both expenses.  Secretarial services are overhead and cannot be billed to a firm's client.  *Bennett Funding, Inc.*, 213 B.R. at 248.  Paralegal time must be billed as fees and documented with time records.  Without time records, it is impossible to determine whether the

services provided by the temporary paralegal were clerical or legal.  The court should, therefore, disallow these expenses.

### G.    Warner Stevens

#### 1.    The Application

Warner Stevens was retained as conflicts counsel to the Creditors' Committee, effective November 6, 2005, by order of the court entered on January 6, 2006.  *See* ECF Doc. No. 1751. Warner Stevens seeks a final award of fees in the amount of $1,393,939.00 and reimbursement of expenses totaling $75,557.44.  *See* Application, at 9.  Warner Stevens voluntarily reduced its fees and expenses by $43,139.00.  *Id*.  It also seeks payment of the hold back of $33,085.60 and $12,000.00 in fees incurred and to be incurred with respect to the Application.  *Id.* at 2.

#### 2.    Objection

The United States Trustee has no objection to the final award of fees and reimbursement of expenses to Warner Stevens.  However, the court should not approve any future fees unless Warner Stevens settles a supplemental order approving the additional fees along with contemporaneous time records documenting the request.

### H.    Howard & Howard

#### 1.    The Application

The court approved Howard & Howard's retention as the Debtors' intellectual property counsel on January 3, 2006 nunc pro tunc to the Petition Date.  *See* ECF Doc. No. 1706. Howard & Howard seeks a final award of fees totaling $1,079,044.00 and the reimbursement of expenses in the amount of $104,696.92, for a total award of $1,183,650.92.  *See* Application, at 3.  The request is net of voluntary reductions totaling $13,768.00.  *Id.*  Howard and Howard also requests payment of the $26,142.90 held back from the seventh interim fee period. Id.  In addition, Howard and Howard seeks payment of estimated fees related to the Application in the amount of $6,200.00.  *Id.*

### 2.    Objection

The United States Trustee has no objection to the final award of fees and reimbursement of expenses to Howard and Howard.  However, the court should not approve any future fees or expenses unless Howard & Howard settles a supplemental order approving the additional fees and expenses along with time and expense records documenting the request.

## V.    NO OBJECTIONS

The United States Trustee has no objection to the final award of fees and reimbursement of expenses of the Professionals listed in Exhibit B.

## VI.    CONCLUSION

Based on the foregoing, the United States Trustee requests that the court sustain her objections and grant other relief as is just.

Dated: New York, NY
       March 1, 2010

Respectfully submitted,

DIANA G. ADAMS
UNITED STATES TRUSTEE

By:      */s/ Alicia M. Leonhard*
         Alicia M. Leonhard
         Assistant United States Trustee
         271 Cadman Plaza East, Suite 4529
         Brooklyn, New York 11201
         Phone: 718.422.4970
         Facsimile: 718.422.4990
         Alicia.M.Leonhard@usdoj.gov

## SUMMARY OF FINAL FEE APPLICATIONS
## IN RE DPH HOLDINGS CORP., et al., CASE NO 05-44481 (RDD)

| | Professional | Fees | Expenses | Total | Reductions | Holdback |
|---|---|---|---|---|---|---|
| | **Debtors' Professionals** | | | | | |
| 1. | Skadden, Arps | $90,556,038.00 | $5,756,849.00 | $96,312,887.00 | $10,117,859.00 | $3,571,800.00 |
| 2. | FTI Consulting | $44,018,853.16 | $3,645,695.07 | $47,664,548.23 | $0.00 | $736,503.86 |
| 3. | KPMG | $38,868,780.46 | $3,578,639.95 | $42,447,420.41 | $821,584.00 | $4,160,366.09 |
| 4. | PricewaterhouseCoopers | $36,025,791.65 | $3,233,384.17 | $39,259,175.82 | $668,771.20 | $474,057.35 |
| 5. | Rothschild | $27,895,161.29 | $857,653.84 | $28,752,815.13 | $22,196.19 | $2,190,322.58 |
| 6. | Ernst & Young | $27,549,300.89 | $584,199.00 | $28,133,499.89 | $176,319.41 | $672,940.20 |
| 7. | Deloitte & Touche | $13,377,565.80 | $4,660.98 | $13,382,226.78 | $3,463,454.99 | $23,999.00 |
| 8. | Togut, Segal & Segal | $6,683,548.00 | $250,481.84 | $6,934,029.84 | $42,727.00 | $334,224.90 |
| 9. | Shearman & Sterling | $6,020,871.59 | $283,744.28 | $6,304,615.87 | $101,906.21 | $254,351.20 |
| 10. | O'Melveny & Myers | $5,871,105.99 | $2,157,946.39 | $8,029,052.38 | $131,188.00 | $254,351.20 |
| 11. | Mayer Brown | $3,422,323.57 | $0.00 | $3,422,323.57 | $20,694.54 | $3,141.85 |
| 12. | Butzel Long | $2,311,910.72 | $126,838.40 | $2,438,749.12 | $0.00 | $59,839.00 |
| 13. | Covington & Burling | $1,883,390.41 | $60,324.00 | $1,943,714.41 | $65,743.21 | $6,576.40 |
| 14. | Jaeckle Fleischmann | $1,660,119.50 | $335,644.55 | $1,995,764.05 | $0.00 | $56,030.10 |
| 15. | Cantor Colburn | $1,566,547.51 | $344,262.29 | $1,910,809.80 | $34,407.50 | $22,959.10 |
| 16. | Jones Lang LaSalle | $1,295,301.09 | $61,316.27 | $1,356,617.36 | $0.00 | $0.00 |
| 17. | Price Heneveld Cooper | $1,226,920.00 | $73,751.56 | $1,300,671.56 | $0.00 | $47,492.40 |
| 18. | Rader, Fishman | $1,223,653.45 | $594,381.88 | $1,818,035.33 | $0.00 | $46,753.30 |
| 19. | Ivins Phillips | $1,201,943.75 | $19,669.62 | $1,221,613.37 | $12,639.00 | $92,677.50 |
| 20. | Howard & Howard | $1,079,044.00 | $104,606.92 | $1,198,996.79 | $13,768.00 | $26,142.90 |
| 21. | Wilmer Hale | $999,898.75 | $199,335.52 | $1,199,234.27 | $22,530.00 | $843.30 |
| 22. | W. Y. Campbell | $840,322.50 | $65,144.67 | $905,467.17 | $1,628.97 | $38,064.50 |
| 23. | Groom Law Group | $745,728.71 | $39,319.26 | $785,047.97 | $6,123.89 | $30,245.05 |
| 24. | Thompson Hines | $716,338.00 | $82,203.94 | $798,541.94 | $4,058.00 | $20,211.10 |
| 25. | Dykema Gossett | $647,287.10 | $52,747.62 | $700,034.7 | $1,099.50 | $53,104.13 |
| 26. | Blake Cassels | C$650,559.74 | C$13,513.99 | C$664,073.73 | $0.00 | $507.80 |

## EXHIBIT A

| | Professional | Fees | Expenses | Total | Reductions | Holdback |
|---|---|---|---|---|---|---|
| 27. | DLA Piper | $308,947.75 | $12,092.53 | $321,040.28 | $17,215.00 | $0.00 |
| 28. | Cadwalader | $249,351.05 | $14,877.18 | $264,228.23 | $7,179.50 | $0.00 |
| 29. | Banner Witcoff | $253,346.71 | $11,997.58 | $265,344.29 | $0.00 | $0.00 |
| 30. | Quinn Emanuel | $147,367.63 | $5,803.58 | $153,171.21 | $6,022.37 | $0.00 |
| | **Sub-Total Debtor** | $319,297,318.77 | $22,571,085.88 | $341,883,750.50 | $15,759,115.48 | $13,177,504.81 |
| | **Creditors' Committee Professionals** | | | | | |
| 31. | Latham & Watkins | $19,817,103.75 | $1,113,098.00 | $20,930,201.75 | $215,640.91 | $421,184.95 |
| 32. | Mesirow | $9,803,908.99 | $220,032.00 | $10,023,940.99 | $43,784.00 | $157,826.00 |
| 33. | Jefferies | $4,759,561.30 | $144,674.92 | $4,904,236.22 | $16,890.00 | $114,032.26 |
| 34. | Steven Hall & Partners | $1,648,071.00 | $0.00 | $1,648,071.00 | $17,854.00 | $92,975.00 |
| 35. | Warner Stevens | $1,406,439.00 | $74,322.44 | $1,468,261.44 | $43,139.00 | $41,385.60 |
| 36. | Buck Consultants | $248,074.00 | $0.00 | $248,074.00 | $1,497.00 | $0.00 |
| | **Sub-Total UCC** | $37,683,158.04 | $1,552,127.36 | $39,222,785.40 | $338,804.91 | $827,403.81 |
| | **Equity Committee Professionals** | | | | | |
| 37. | Fried Frank | $11,066,482.50 | $505,892.97 | $11,572,375.47 | $233,238.00 | $583,780.40 |
| 38. | Houlihan Lokey | $3,121,774.19 | $109,900.56 | $3,231,674.75 | $18,346.30 | $133,225.80 |
| 39. | Gregory P. Joseph | $148,725.00 | $5,490.78 | $154,215.78 | $0.00 | $29,745.00 |
| | **Sub-Total EC** | $14,336,981.69 | $621,284.31 | $14,958,266.00 | $251,584.30 | $746,751.20 |
| | **Fee Committee Professionals** | | | | | |
| 40. | Legal Cost Control | $2,708,812.00 | $0.00 | $2,708,812.00 | $0.00 | $129,471.69 |
| | **GRAND TOTAL** | **$374,026,270.40** | **$24,744,497.55** | **$398,770,767.95** | **$16,349,504.69** | **$14,885,934.51** |
| | **Percentage Reduction** | | | | **4%** | |

**EXHIBIT A**

**In re DPH Holdings Corp., et al., Case No 05-44481 (RDD)**
**Chart of Applications to Which the United States Trustee Has No Objection**

| Professional | Fees | Expenses | Total | Reductions | Holdback |
|---|---|---|---|---|---|
| **Debtors' Professionals** | | | | | |
| FTI Consulting | $44,018,853.16 | $3,645,695.07 | $47,664,548.23 | $0.00 | $736,503.86 |
| KPMG | $38,868,780.46 | $3,578,639.95 | $42,447,420.41 | $821,584.00 | $4,160,366.09 |
| Ernst & Young | $27,549,300.89 | $584,199.00 | $28,133,499.89 | $176,319.41 | $672,940.20 |
| Deloitte & Touche | $13,377,565.80 | $4,660.98 | $13,382,226.78 | $3,463,454.99 | $23,999.00 |
| Togut, Segal & Segal | $6,683,548.00 | $250,481.84 | $6,934,029.84 | $42,727.00 | $334,224.90 |
| Shearman & Sterling | $6,020,871.59 | $283,744.28 | $6,304,615.87 | $101,906.21 | $254,351.20 |
| O'Melveny & Myers | $5,871,105.99 | $2,157,946.39 | $8,029,052.38 | $131,188.00 | $254,351.20 |
| Mayer Brown | $3,422,323.57 | $0.00 | $3,422,323.57 | $20,694.54 | $3,141.85 |
| Butzel Long | $2,311,910.72 | $126,838.40 | $2,438,749.12 | $0.00 | $59,839.00 |
| Covington & Burling | $1,883,390.41 | $60,324.00 | $1,943,714.41 | $65,743.21 | $6,576.40 |
| Jaeckle Fleischmann | $1,660,119.50 | $335,644.55 | $1,995,764.05 | $0.00 | $56,030.10 |
| Cantor Colburn | $1,566,547.51 | $344,262.29 | $1,910,809.80 | $34,407.50 | $22,959.10 |
| Jones Lang LaSalle | $1,295,301.09 | $61,316.27 | $1,356,617.36 | $0.00 | $0.00 |
| Price Heneveld Cooper | $1,226,920.00 | $73,751.56 | $1,300,671.56 | $0.00 | $47,492.40 |
| Rader, Fishman | $1,223,653.45 | $594,381.88 | $1,818,035.33 | $0.00 | $46,753.30 |
| Ivins Phillips | $1,201,943.75 | $19,669.62 | $1,221,613.37 | $12,639.00 | $92,677.50 |
| Howard & Howard | $1,079,044.00 | $104,606.92 | $1,183,650.92 | $13,768.00 | $26,745.90 |
| W. Y. Campbell | $840,322.50 | $65,144.67 | $905,467.17 | $1,628.97 | $38,064.50 |
| Groom Law Group | $745,728.71 | $39,319.26 | $785,047.97 | $6,123.89 | $30,245.05 |
| Thompson Hines | $716,338.00 | $82,203.94 | $798,541.94 | $4,058.00 | $20,211.10 |
| Dykema Gossett | $647,287.10 | $52,747.62 | $700,034.7 | $1,099.50 | $53,104.13 |
| Blake Cassels | C$650,559.74 | C$13,513.99 | C$664,073.73 | $0.00 | $507.80 |
| DLA Piper | $308,947.75 | $12,092.53 | $321,040.28 | $17,215.00 | $0.00 |
| Cadwalader | $249,351.05 | $14,877.18 | $264,228.23 | $7,179.50 | $0.00 |
| Banner Witcoff | $253,346.71 | $11,997.58 | $265,344.29 | $0.00 | $0.00 |
| Quinn Emanuel | $147,367.63 | $5,803.58 | $153,171.21 | $6,022.37 | $0.00 |

**EXHIBIT B**

| Professional | Fees | Expenses | Total | Reductions | Holdback |
|---|---|---|---|---|---|
| **Creditors' Committee Professionals** | | | | | |
| Mesirow | $9,803,908.99 | $220,032.00 | $10,023,940.99 | $43,784.00 | $157,826.00 |
| Jefferies | $4,759,561.30 | $144,674.92 | $4,904,236.22 | $16,890.00 | $114,032.26 |
| Steven Hall & Partners | $1,648,071.00 | $0.00 | $1,648,071.00 | $17,854.00 | $92,975.00 |
| Warner Stevens | $1,393,939.00 | $74,322.44 | $1,468,261.44 | $43,139.00 | $33,085.60 |
| Buck Consultants | $248,074.00 | $0.00 | $248,074.00 | $1,497.00 | $0.00 |
| **Equity Committee Professionals** | | | | | |
| Houlihan Lokey | $3,121,774.19 | $109,900.56 | $3,231,674.75 | $18,346.30 | $133,225.80 |
| Gregory P. Joseph | $148,725.00 | $5,490.78 | $154,215.78 | $0.00 | $29,745.00 |
| **Fee Committee Professionals** | | | | | |
| Legal Cost Control | $2,708,812.00 | $0.00 | $2,708,812.00 | $0.00 | $129,471.69 |

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT     Hearing Date:  March 28, 2010
SOUTHERN DISTRICT OF NEW YORK     Hearing Time:  10:00 a.m.
------------------------------------------------------- x
                                 :
In re                            :    Case No. 05-44481 (RDD)
                                 :
DPH HOLDINGS CORP., *et al.*,        :    Chapter 11
                                 :
                Reorganized Debtors.    :    (Jointly Administered)
------------------------------------------------------- x

## AFFIRMATION OF SERVICE

      I hereby declare under penalty of perjury that I caused a true and correct copy of the

Objection of the United States Trustee to Final Fee Applications of the Retained Professionals to

be served on the parties on the attached list, via e-mail or facsimile, as noted.

Dated: Brooklyn, New York
       March 1, 2010


                          */s/Alicia M. Leonhard*
                          Alicia M. Leonhard

**SERVICE LIST**

Mark Broude, Esq.
Robert Rosenberg, Esq.
Latham & Watkins
885 Third Avenue
New York, NY 10022
mark.broude@lw.com
robert.rosenberg@lw.com
via e-mail

David Sherbin
John Sheehan
John Brooks
DPH Holdings Corp.
5720 Delphi Drive
Troy, MI 48098
david.sherbin@delphi.com
john.sheehan@delphi.com
john.brooks@delphi.com
via e-mail

Kenneth S. Ziman, Esq.
Simpson Thatcher
425 Lexington Ave.
New York, NY 10017
kziman@stblaw.com
via e-mail

William R. Shaw
David Resnick
Rothschild, Inc.
1251 Avenue of the Americas
New York, NY 10020
William.Shaw@us.rothschild.com
David.Resnick@us.rothschild.com
via e-mail

Bonnie Steingart, Esq.
Fried Frank
One New York Plaza
New York, NY 10004
steinbo@ffhsj.com
via e-mail

Caroline Rogus, Esq.
Andrew Currie, Esq.
Wilmer Hale
1875 Pennsylvania Avenue, Washington,
DC 20006
Caroline.Rogus@Wilmerhale.com
Andrew.Currie@wilmerhale.com
via e-mail

Michael D. Warner
Warner Stevens
301 Commerce Street
Suite 1700
Fort Worth, TX 76102
bankruptcy@warnerstevens.com
via e-mail

Donald S Bernstein, Esq.
Brian M. Resnick, Esq.
Davis Polk
450 Lexington Ave.
New York, NY 10017
donald.bernstein@davispolk.com
brian.resnick@davispolk.com
via e-mail

Jack Butler, Esq.
Kayalyn Marafioti, Esq.
Skadden Arps, et al.
115 N. Wacker Drive
Chicago, IL 60606
jbutler@skadden.com
kmarafioti@skadden.com
via e-mail

Brian Decker
PriceWaterhouseCoopers, LLP
19 St. Antoine Street
Detroit, MI 48226
616-356-6988 (via facsimile)