1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-RDD

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DPH HOLDINGS CORP., et al.,


       Debtors.

- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         300 Quarropas Street

         White Plains, New York


         February 25, 2010

         10:07 AM



B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Notice of Fifty-Second Omnibus Hearing.  Agenda

3    Filed by John Wm. Butler, Jr. on Behalf of DPH Holdings Corp.,

4    et al.

5

6    HEARING re Notice of Thirtieth Claims Hearing.  Agenda Filed by

7    John Wm. Butler, Jr., on Behalf of DPH Holdings Corp., et al.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Pnina Eilberg

25

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

3

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4         Attorneys for DPH Holdings Corp.

5         155 North Wacker Drive

6         Chicago, IL 60606

7

8    BY:   RON E. MEISLER, ESQ.

9         JOHN K. LYONS, ESQ. (TELEPHONICALLY)

10        JOSEPH N. WHARTON, ESQ. (TELEPHONICALLY)

11

12

13   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

14        Attorneys for DPH Holdings Corp.

15        Four Times Square

16        New York, NY 10036

17

18   BY:   KAYALYN A. MARAFIOTI, ESQ. (TELEPHONICALLY)

19        JOSEPH N. WHARTON, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

4

1

2    JACOB & WEINGARTEN

3          Attorneys for Dennis Black, Charles Cunningham,

4               Kenneth Hollis, Delphi Salaried Retirees Association

5          2301 W. Beaver Road

6          Suite 777

7          Troy, MI 48084

8

9    BY:   HOWARD S. SHER, ESQ.

10          ALAN J. SCHWARTZ, ESQ.

11

12

13   MILLER & CHEVALIER CHARTERED

14          Attorneys for Dennis Black, Charles Cunningham,

15               Kenneth Hollis, Delphi Salaries Retirees Association

16          655 Fifteenth Street, N.W.

17          Suite 900

18          Washington, DC 20002

19

20   BY:   ANTHONY F. SHELLEY, ESQ.

21

22

23

24

25

5

1

2    JONES DAY

3          Attorneys for New GM

4          North Point

5          901 Lakeside Avenue

6          Cleveland, OH 44114

7

8    BY:   HEATHER LENNOX, ESQ.

9

10

11   DUANE MORRIS LLP

12         Attorneys for Ace American Insurance

13         30 South 17th Street

14         Philadelphia, PA 19103

15

16   BY:   WENDY M. SIMKULKA, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

6

1                        P R O C E E D I N G S

2          THE CLERK:  All rise.

3      (Pause)

4          THE CLERK:  Please be seated.

5          THE COURT:  Okay.  Good morning.  DPH Holdings.

6          MR. MEISLER:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. MEISLER:  Ron Meisler of Skadden Arps on behalf of

9  DPH Holdings Corp. and its affiliated reorganized debtors.

10         Your Honor, yesterday at about noon we filed a

11  proposed fifty-second omnibus hearing agenda.  And Your Honor,

12  with your permission we'd like to proceed in that order.

13         THE COURT:  That's fine.

14         MR. MEISLER:  Your Honor, the first item on the agenda

15  is the forty-second omnibus claims objection and, Your Honor,

16  the second item on the agenda is the forty-third omnibus

17  objection.  If it pleases the Court, we'll take those two

18  together.

19         THE COURT:  That's fine.

20         MR. MEISLER:  Your Honor, we filed these objections on

21  January 22nd of this year and served them on the affected

22  claimants with personalized notice as required under the claims

23  procedure.

24         Your Honor, the forty-second omnibus claims objection

25  is at Docket No. 19357 and the forty-third omnibus claims

7

1    objection is at Docket No. 19356.  Your Honor, the forty-second

2    omnibus objection deals with prepetition claims primarily

3    prepetition claims that have been fully or partially satisfied

4    by cure payments that were made following the debtor's

5    emergence from Chapter 11 this past fall.  Your Honor, the

6    forty-third omnibus claims objection covers postpetition claims

7    for administrative expenses.

8           Your Honor, consistent with our past practices we have

9    filed a reply for each of the omnibus objections, we filed

10   those yesterday Your Honor.  And the reply list, those

11   claimants who have filed responses and those who have filed

12   responses will be adjourned to a future hearing in accordance

13   with the claims procedures.

14          Your Honor, specifically with respect to the forty-

15   second claims objection, there were seventeen claims on that

16   forty-second objection and two responses were filed covering

17   four distinct claims.  As mentioned and as provided in the

18   claims procedure, those four contested claims are to be

19   adjourned to a future date.

20          Of those thirteen remaining claims that are subject to

21   an order, Your Honor, four claims -- we're seeking the

22   disallowance of four claims and in nine claims we're seeking

23   the modification and allowance of those claims in the amounts

24   set forth on the proposed order.

25          THE COURT:  And there have been no changes from the

8

1    relief requested in the motion, the objection with regard to

2    those claims?

3            MR. MEISLER:  That is correct on the forty-second

4    specifically.

5            THE COURT:  Okay.

6            MR. MEISLER:  And we attached the order to the reply.

7            THE COURT:  All right.  In light of the fact that the

8    debtors or DPH is proceeding only on those objections where

9    there's been no opposition and based on the averments in the

10   forty-third omnibus -- sorry, forty-second omnibus objection,

11   I'll grant that relief.

12           MR. MEISLER:  Thank you, Your Honor.  Your Honor, with

13   respect to the forty-third omnibus objection, again this

14   objection addresses postpetition claims, the administrative

15   expense claims.  There were 876 postpetition claims in this

16   objection and sixty-eight responses were filed cover 140

17   claims.

18           Your Honor, again, pursuant to the claims procedure

19   those 140 claims we're seeking an adjournment to a future

20   hearing in accordance with the procedures leaving 736 claims to

21   be adjourned -- sorry, leaving 736 claims to be ordered.

22           Your Honor, with respect to this particular omnibus

23   claims objection in the order there is one change that was

24   reflected on the reply and that change reflects severance

25   claims that are to be paid in accordance with the settlement

9

1    agreement.  And as set forth in the MDA, those severance claims

2    are the responsibility of, as set forth in the MDA, the company

3    buyer which in plain English means New Delphi.

4            THE COURT:  Okay.  Was that the result of consultation

5    with the severance claimants or simply based on an

6    understanding that you wanted to clarify the order?

7            MR. MEISLER:  The latter, Your Honor.

8            THE COURT:  Okay.  Again, there being no opposition to

9    the aspect of the forty-third omnibus objection that's going

10   forward and based on the averments in that objection, I'll

11   grant the objection as modified on the record.

12           MR. MEISLER:  Thank you, Your Honor.

13           Your Honor, the last matter on today's agenda with

14   respect to the omnibus hearing is a motion filed by GM in

15   connection with the enforcement of certain provisions of the

16   modified plan.

17           THE COURT:  Before we -- this will take some time, we

18   also have the thirtieth claims hearing agenda, maybe we should

19   just deal with that one.

20           MR. MEISLER:  Terrific, Your Honor.  Thank you.

21           THE COURT:  Okay.  Since I understand that the relief

22   there is unopposed as well.

23           MR. MEISLER:  That's correct.

24           THE COURT:  Okay.

25           MR. MEISLER:  Your Honor, again, with your permission

1    we'll proceed in the order of the agenda.

2         THE COURT:  Fine.

3         MR. MEISLER:  Your Honor, the first matter on the

4    agenda is the CSX Transportation motion to compel.  Your Honor,

5    with respect to that motion we're still in the midst of

6    negotiations.  We hope to reach settlement soon but in the

7    interim, Your Honor, we'd like to adjourn this to the March

8    omnibus hearing.

9         THE COURT:  That's fine.

10        MR. MEISLER:  Thank you, Your Honor.

11        Your Honor, with respect to matters 2, 3 and 4, Your

12   Honor it's the same issue with respect to all three of those

13   matters.  Specifically, those claims were filed late; they were

14   filed after the July 15, 2009 bar date, but note that they were

15   filed before the November 2009 bar date.

16        Pursuant to the procedures, we sent a notice seeking a

17   motion to the extent the claimant wished to file a motion to

18   seek the allowance of a late claim.  No motion was filed and

19   therefore, Your Honor, we're seeking the expungement of those

20   claims.

21        THE COURT:  Okay.  I will grant that.  I note here,

22   though, that each of the claimants was an individual and given

23   the season of the year I'd like you to settle the order on

24   fourteen days notice on them saying that it'll be entered,

25   listed as any objection by the objection date.

11

1          MR. MEISLER:  Thank you, Your Honor.

2          THE COURT:  Okay.  Thank you.  Okay.  So why don't we

3     turn, then, to the GM motion.

4          MR. MEISLER:  Thank you, Your Honor.  On that note,

5     Your Honor, I'm going to cede the podium to Ms. Lennox.

6          THE COURT:  Okay.  And I understand we have a number

7     of people on the phone for this also so I'll ask the people in

8     the courtroom to try to remember to speak fairly close to the

9     microphone, although not right into it because that actually

10    hurts the sound, so that the people on the phone can hear.

11         MS. LENNOX:  Good morning, Your Honor.  For the record

12    Heather Lennox of Jones Day on behalf of General Motors LLC or

13    what we refer to in the papers as New GM which would be the

14    buyer of substantially all the assets of Old GM.

15         Your Honor, while there are a lot of provisions in the

16    plan and the plan modification order and the amended Delphi/GM

17    global settlement agreement, which I think we can shorthand as

18    GSA, that affect this matter.  The key provisions that we run

19    through in our pleadings are sections 11.8 and 11.11 of the

20    modified plan and section 4.08(c) of the GSA.

21         Specifically, Your Honor, under section 11.8 of the

22    modified plan New GM was entitled to all of the releases given

23    to Old GM under section 4.01 of the GSA.  Section 4.01(a) of

24    the GSA specifically releases all claims and causes of action

25    basically in any way, shape or form related to the Delphi

12

1   Chapter 11 cases, the MOUs or anything else that happened

2   therein that are held by the Delphi related parties.

3       That defined term, Delphi related parties, is defined

4   to include the debtors and all of the debtors current or former

5   employees.  The salaried plaintiffs in the action that had been

6   filed in Michigan, and perhaps I should back up Your Honor, the

7   reason we're before you is because some of the former salaried

8   retirees of these debtors have commenced an action, not only

9   against the PBGC, it was initially against the PBGC, but they

10  commenced an action as of November of last year against New GM

11  and certain individuals from the government.  And the action

12  against New GM, specifically Count V of the complaint, which

13  was attached as Exhibit C to the motion, allege constitutional

14  discrimination on behalf of New GM against these folks, against

15  the salaried retirees.  And they allege that New GM was acting

16  as a government actor when that discrimination happened.

17      Given that that is the nature of the complaint, we do

18  believe that this action is within the release that was granted

19  to us because the salaried plaintiffs are in fact former

20  employees of the debtors and it does relate to actions that

21  happened in this case and were blessed by this Court and the GM

22  court, as I'll get to in a minute.

23      Under the terms of the GSA, Your Honor, the release

24  that is set forth in section 4.01(a) applies not only as of the

25  effective date of that particular settlement agreement, which

13

1    was in September of 2008, but also it applies as of the

2    effective date of the modified plan, which is October 6, 2009.

3    And that's because section 4.01(d) has a bring-down.  And it

4    basically says that no matter what -- a Delphi plan of

5    reorganization has to bring these releases down to its emergent

6    state.  And the emergent state, of course, is defined in that

7    document as the effective date of the plan.

8         And we believe and we set forth in some detail in the

9    papers that all of these decisions, what they're complaining

10   about is New GM's top-up decisions, arise from actions that

11   proceeded these bankruptcy cases, that happened within these

12   bankruptcy cases and that were approved not only by this Court

13   but by Old GM's bankruptcy court.  Specifically, and to briefly

14   state the history, in 1999 when the Delphi companies were spun

15   off from GM, GM entered into three different benefit

16   guaranties; one for the UAW, one for the USW and one for the

17   IUE.  And the purpose of those benefit guarantees were to

18   basically top up, under certain circumstances and if certain

19   events happened, pension benefits for these unions.

20        After Delphi filed in 2005 there obviously, as Your

21   Honor's well aware of, significant negotiations between Old GM,

22   these debtors and these unions that resulted in the 2007 MOUs.

23   And in the 2007 MOUs, for each of these unions, the pension

24   top-up guarantees carried through.  They were part of the MOUs

25   and they were approved by this Court by its orders entered in

1   the summer of 2007.

2            In 2008, again, they made their way into the amended

3   GSA and the implementation agreements and in 2008, again

4   approved by orders of this Court.  Old GM's bankruptcy case

5   intervened on June 1st of 2009 and the sale occurred and was

6   approved by Judge Gerber on July 5th of 2009.

7            So while all of Old GM's decisions with respect to

8   continuing this disparate treatment for these three unions, and

9   only these three unions with respect to pension top-ups,

10  started in '99, continued through these cases, were approved

11  twice by these Courts.  When New GM filed its bankruptcy it had

12  to make decisions about what it was going to do with respect to

13  honoring those obligations that had been negotiated in this

14  court.

15           Specifically -- it specifically assumed the 2007 UAW

16  MOU that had the pension top-up benefits.  And that was

17  approved by this Court in the plan modification and in -- as

18  part of the MDA sale in July of 2009.

19           New GM did not specifically assume the 2007 MOUs for

20  either the USW or the IUE and this caused these two unions to

21  do two things.  First, they objected to the sale in the Old GM

22  case but they also withheld their consent for New GM's purchase

23  of Delphi's steering business and some of the other plants that

24  was contemplated in the MDA.

25           In order to break that log jam, New GM had been

15

1   negotiating and continued to negotiate a settlement with both

2   of those unions, the USW and the IUE and that was signed up on

3   September 10th of 2009, again before Delphi's plan effective

4   date.  And that decision and commitment by New GM had to be

5   made before Delphi's plan effective date because in order to

6   close the GM buyer MDA so the plan could go effective in these

7   cases, New Gm had to have, and the debtors had to have, the

8   UAW, the USW and the IUE consent, that's at section 10.2.6 of

9   the MDA.

10          The UAW consent was gained because, among other

11  things, New GM decided to assume that MOU including the top-up

12  decision.  But for the USW and the IUE, New GM had to continue

13  negotiating with them.  They negotiated, they reached an

14  agreement and they made a commitment in September of 2009 that

15  they would grant the pension top-up decisions to the IUE and to

16  the USW.

17          Those consents were made specifically so this plan,

18  the modified plan, could go effective.

19          THE COURT:  And I'm sorry; where does that agreement

20  appear in the record?  Is that in the record?

21          MS. LENNOX:  That is.  Other than -- well, we attached

22  the agreement as Exhibit D to our reply that we filed

23  yesterday, Your Honor.  It is also --

24          THE COURT:  I'm sorry; when you say the agreement

25  you're talking about the agreement to assume the MOUs or what

16

1    agreement are you referring to?

2            MS. LENNOX:  The -- well, there's two different

3    things.  The UAW MOU was assumed --

4            THE COURT:  It's separate, I understand.

5            MS. LENNOX:  It's a separate thing.

6            THE COURT:  Right.

7            MS. LENNOX:  The USW and IUE agreement was attached as

8    it applied to our reply here.  It was also a public document,

9    Your Honor, because it was approved by Judge Gerber publicly

10   and it was attached to the motion that Old GM filed in October

11   2009 to approve that agreement.  So it is a matter of public

12   record, Your Honor.

13           THE COURT:  But it's Exhibit D --

14           MS. LENNOX:  Correct, Your Honor.

15           THE COURT:  -- the settlement agreement?

16           MS. LENNOX:  Correct.

17           THE COURT:  Okay.

18           MS. LENNOX:  And I would specifically point you, Your

19   Honor, to the first page of that settlement agreement, the last

20   full paragraph in that settlement agreement.  The dispute about

21   the Pension top-up agreements and whether New GM had to comply

22   with the 2007 MOUs that were approved by this Court is

23   specifically laid out in that last full paragraph.

24   Specifically five lines down it states that GM Co, which is New

25   GM, maintains that it is not obligated to assume or continue to

17

1    abide by the MLC collective bargaining agreements with the IUE,

2    CWA or the USW.  The comb settlement or the Delphi

3    restructuring memorandums of understanding.

4         THE COURT:  Where in the settlement does the consent

5    to the MDA --

6         MS. LENNOX:  It follows immediately thereafter, Your

7    Honor, in paragraph 1 which immediately follows that paragraph.

8    And if you look at the next page, on page 2, 1(c) down at the

9    bottom of page 2 --

10         THE COURT:  Right.

11         MS. LENNOX:  -- specifically says that in

12   consideration of the commitments described in this paragraph 1

13   in the Chapter 11 bankruptcy case of In re Delphi Corporation,

14   the IUE and USW agree to withdraw their objections and waive

15   any further objections to the first amended joint plan of

16   reorganization, etcetera, etcetera.

17         THE COURT:  And that is the last sentence?

18         MS. LENNOX:  Correct.

19         THE COURT:  Further the IUE; CWA and USW agree to

20   waive any seller USCBA restrictions on the proposed sale of

21   operations including document 63 and document 53, to the extent

22   necessary to accomplish the modified plan.

23         MS. LENNOX:  Correct, Your Honor.

24         THE COURT:  And you're saying the sale of operations

25   is the MDA?

1          MS. LENNOX:  Yes.

2          THE COURT:  Transfers of the, colloquially referred to

3     as the GM plants to GM?

4          MS. LENNOX:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MS. LENNOX:  So because section 11.8 granted releases

7     for everything related to this Chapter 11 plan and the

8     documents in connection with this Chapter 11 plan, including

9     the MDA and the union settlement agreements, we believe that

10    section 4.01(a) of the amended GSA has -- applies to new GM and

11    has caused the release of any causes of action that the

12    salaried plaintiffs would have complaining about the top-up

13    decisions that were part of those agreement and were part of

14    these cases all throughout these cases and in order to allow

15    this plan to go effective and close.

16          So that, we believe, section 11.8 is one independent

17    basis on which New GM argues that it has been released from the

18    causes of action brought by the salaried plaintiffs in their

19    Michigan action.  But we have another, independent, basis for

20    relief and that is section -- the exculpations provisions of

21    section 11.11 of the modified plan.

22          Again, similar to the releases that are part of the

23    amended GSA in section 4.01, section 11.11 of the plan

24    encompasses a broad range of conduct, including actions taken

25    under and in furtherance of the modified plan and all of the

1    documents entered that were part of that plan, including the

2    GSA, including the MDA, including the union settlement

3    agreements.

4         As I stated before, Your Honor, the record establishes

5    that New GM's pension top-up decisions were in fact made in

6    connection with the modified plan.  They were made in

7    connection with the documents that were part of the modified

8    plan and they were made in connection with the decisions that

9    were made to permit this plan to go effective.

10        Obviously the pension top-up guarantees carried

11   through from 1999 to 2007 to 2008 to the agreements that Your

12   Honor and I just discussed.  And because the consent of the

13   unions were required in order to allow the Delphi plan to go

14   effective, we believe that New GM's granting of the pension

15   top-up obligations, not only to the UAW but to the USW and the

16   IEU, in order to close this transaction fell squarely within

17   the terms of Section 11.11's exculpation provisions.

18        And while there is much made in the plaintiff's

19   objection to our motion about the effective date of the plan,

20   and we do absolutely believe, as we've set forth, that all of

21   our actions and our decisions and our commitments to make these

22   top-up payments were made well before the effective date of

23   this plan.  Section 11.11 doesn't have a date restriction.  It

24   doesn't say that they are exculpated for all actions that took

25   place before the effective date of Delphi's plan.  It says they

20

1   are exculpated for all actions that are released in that

2   particular section of the plan.

3        And finally, Your Honor, there is another issue raised

4   with respect to both sections 11.8 and 11.11 of the modified

5   plan that I'd like to address because the plaintiffs raised it

6   in their objection.

7        As I understand it, being relatively new to this case

8   and all of the complexities that is this case, the whole point

9   of section 11.8 of the modified plan is to pull through the

10  releases that were granted to the GM entities in GSA and pull

11  them through into the modified plan and the plan modification

12  order.  In fact, paragraph 7 of Your Honor's plan -- paragraph

13  57 of Your Honor's plan modification order recognizes that

14  because it says if there is any conflict between the plan or

15  the plan modification order on the one hand and the amended GSA

16  on the other hand, the amended GSA is going to govern.

17       And this, Your Honor, is important because it bears on

18  the plaintiff's assertions in their objection that New GM is

19  not released from willful misconduct and that this Court has to

20  determine that New GM did not engage in willful misconduct in

21  order to find that New GM is released.

22       But because the provisions of the amended GSA trump

23  the provisions of the plan modification order, in fact New GM

24  is released for willful misconduct because there is no willful

25  misconduct carve out or limiter in the provisions of the

1    amended GSA.

2         THE COURT:  But that would only be limited to the

3    releases that are in the GSA.

4         MS. LENNOX:  Correct, Your Honor.

5         THE COURT:  As updated under 11.8.

6         MS. LENNOX:  Correct, Your Honor.

7         THE COURT:  So I guess if you're looking for something

8    beyond that, and I guess the only place it would show up, I

9    think, is that the GSA release does seem to be limited to up

10    through the effective date.  I'm not sure 57 helps.

11         MS. LENNOX:  Well, it only helps -- I don't reference

12    57 in respect of whether it's an effective date or a non-

13    effective date release.  I referenced 57 in terms of whether

14    willful misconduct is even at issue here.  And I would argue,

15    Your Honor, that it's not.  Because the release in Section 4.01

16    of the GSA does not carve out willful misconduct, it carves out

17    nothing.  It is a full-blown release.

18         THE COURT:  Right.

19         MS. LENNOX:  But even if it weren't, Your Honor, I

20    would argue to Your Honor that there's no willful misconduct

21    here anyway.  As we set forth in both the motion and the reply,

22    the decisions of Old GM and the decisions of New GM to top up

23    the pension benefits for these three unions, and only these

24    three unions, there were other unions that didn't get this

25    either, were approved in six or seven different court orders,

1    both in this court and in Old GM's bankruptcy court.  This

2    Court approved this, these decisions, when they were Old GM's

3    decisions with respect to all three of the 2007 MOUs.  It

4    approved them in respect of the 2008 amended GSA and the 2008

5    implementation agreements.

6         This Court also found, in paragraph 61 of the plan

7    modification order, that New GM's assumption of the UAW 2007

8    MOU "Shall not be in conflict with any federal or state law."

9         Old GM's court, bankruptcy court, when it went to

10   approve the IUE/USW settlement agreement that we attach as

11   Exhibit D to the reply, found that it was in the best interest

12   of all parties in interest and it approved that agreement.

13        THE COURT:  And at that time was it clear in the GM

14   case that -- in the GM bankruptcy case, that GM wasn't assuming

15   the salaried retirees claim?

16        MS. LENNOX:  Yes, because this post-dated the sale,

17   Your Honor.  And so any assumption decisions with respect to

18   any salaried decisions for the GM salaried employees, remember

19   these are different employees we're talking about.  These are

20   Delphi, New GM's decisions would have been made with respect to

21   New GM's employees or if they chose to bring in the Delphi

22   salaried folks that would have been made as part of the sale

23   order that Judge Gerber entered on July 5th of 2009.  And in

24   fact, they had reached agreement with the UAW that they would

25   do that and in fact they did do that because they came to this

23

1    Court and they assumed the UAW 2000 MOU.

2         With respect to the USW and the IUE, they said no

3    we're not willing to do that.  We're not willing to assume the

4    Delphi 2007 MOU, which caused objections in that case which

5    were overruled by Judge Gerber that caused nonconsent to the

6    MDA in this case and therefore GM kept negotiating.

7         THE COURT:  Okay.

8         MS. LENNOX:  So it is inconceivable to us, Your Honor,

9    that even if willful misconduct were at issue here and we

10   don't' think it is because of the specific language of the GSA,

11   it's inconceivable to us that New GM's top-up decisions

12   constituted willful misconduct when they were blessed, on

13   numerous occasions by separate courts.  It can't be misconduct

14   at all if they are complying with court orders.

15        And in further support of these releases, Your Honor,

16   Your Honor also entered, in the plan modification order, an

17   injunction provision that prohibits the parties from commencing

18   or asserting any claim or cause of action that's been released

19   or exculpated.

20        So taken together, Your Honor, we believe that these

21   provisions absolve New GM from any liability under the salaried

22   plan, any liability to the salaried retirees and any liability

23   relating to any differing treatment by New GM of the pension

24   plans for the Delphi hourly retirees, or some of them, and for

25   the Delphi salaried retirees.

24

1          But the Michigan civil action, Your Honor, states a

2     cause of action against New GM for -- in respect of the top-up

3     decisions.  It complains that they're constitutionally

4     discriminatory in Count V of the civil action.

5          We believe that not only, and we pointed this out to

6     the plaintiffs before we filed this motion in the hopes that

7     they would voluntarily dismiss us, we pointed out to them that

8     not only does that action against New GM, and only New GM,

9     violate the modified plan in the plan modification order but

10    upon further review, Your Honor, of further orders of this

11    Court, we also believe that they violate the stipulation that

12    the plaintiffs and these debtors entered into on September

13    11th, 2009, where the automatic stay was lifted so that these

14    folks could sue the PBGC and only the PBGC.  But they also

15    promised in that stipulation that they wouldn't use that action

16    as a collateral attack against any order of this Court,

17    including but not limited to the plan modification order or

18    Your Honor's order approving the settlement with the PBGC.  And

19    we believe it does exactly that.  We believe that they violated

20    their own stipulation by commencing this action against New GM

21    as a collateral attack on the plan and the plan modification

22    order.

23          The other thing that the salaried plaintiffs would ask

24    Your Honor to do is to abstain from deciding this matter.  Now

25    I want to make crystal clear on the record that New GM is not

VERITEXT REPORTING COMPANY

25

1    asking this Court to decide anything with respect to the merits

2    of the Michigan civil action.  We're also not asking that this

3    Court enforce its own orders against any other defendant other

4    than New GM.  Because in fact, we don't believe that any other

5    defendant enjoys the releases that New GM does under this

6    Court's plan and this Court's plan modification order.

7         The plaintiffs can continue to sue every other

8    defendant.  They're free to assert and pursue all their causes

9    of action against every other defendant in an action other than

10   New GM.

11        All we're asking the Court to do by this motion is to

12   interpret and enforce its own past orders because those were

13   the orders that approved New GM's actions and those were the

14   orders that released New GM from liability.  And so since this

15   Court doesn't need to interpret any other law, it only has to

16   interpret its own orders to grant the relief requested in the

17   motion.  We don't believe that there's any reason fro this

18   Court to abstain from doing so.  And we lay out -- we go

19   through the twelve factors and we lay them out in our reply in

20   great detail.  I know Your Honor has read them and so I won't

21   belabor them in great detail here.  All I would say is that we

22   believe that it's not even a close call that this Court is the

23   proper court to determine the motion.

24        THE COURT:  Has anything happened in the Michigan

25   District Court action that bears on the abstention decision

1    since the briefing here?

2          MS. LENNOX:  No, Your Honor.

3          THE COURT:  I understand that there was a motion to

4    dismiss filed February 16th.

5          MS. LENNOX:  Correct, Your Honor.

6          THE COURT:  No ruling on that?

7          MS. LENNOX:  No ruling on the motion.  The plaintiff's

8    reply isn't even due -- plaintiff's objection to that, should

9    they file one, is not even due yet.  There's been no discovery

10   taken between the plaintiffs and New GM.  It is at the very,

11   very beginning stages of that action with respect to New GM.

12   There's been a little bit more activity with respect to the

13   PBGC, but the PBGC was sued two months before New GM was.

14          So based on all the foregoing, Your Honor, we're

15   asking this Court to enforce the modified plan, enforce the

16   plan modification order, enforce the releases that were given

17   in those documents and the GSA by ordering the plaintiffs to

18   dismiss New GM from the Michigan District Court action with

19   prejudice.

20          THE COURT:  Okay.

21          MS. LENNOX:  Thank you.

22      (Pause)

23          MR. SHER:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. SHER:  Howard Sher from Jacob & Weingarten in

27

1    Troy, Michigan, on behalf of Dennis Black, Charles Cunningham,

2    Kenneth Hollis and the Delphi Salaried Retirees Association,

3    the parties who've objected to the motion.

4        I'm here today with Alan Schwartz, an attorney from my

5    office, and Anthony Shelley from the Miller and Chevalier firm

6    and Mr. Shelley is lead counsel -- I'd like to point out to the

7    Court, is lead counsel in connection with the action before the

8    Michigan District Court, before Judge Tarneau (ph.).

9        Your Honor, before I get into my argument at the

10   outset I'd simply like to note for the record that yesterday,

11   while I was on an airplane coming to New York for this hearing,

12   New GM filed a very, very, very lengthy reply brief.  I believe

13   it was thirty-five pages plus some 500 pages of exhibits in

14   which they raise arguments that they haven't raised originally

15   in connection with the motion.

16       We are prepared to move forward with the hearing today

17   but I'd simply like the Court to keep in mind that like the

18   Court, assuming the Court hasn't had an opportunity to fully

19   digest everything in that reply, I guess I'd just like the

20   Court to bear in mind that we haven't had a full opportunity to

21   really digest everything in that reply.

22       THE COURT:  Okay.

23       MR. SHER:  Your Honor, as opposing counsel indicated,

24   and it's clear from the papers, there are only two place from

25   which New GM received any sort of a release.  Section 11.8 of

28

1    Delphi's modified plan and section 11.11 of Delphi's modified

2    plan.

3            Section 11.8 of the modified plan talks about

4    providing New GM with the releases that the GM related parties

5    received in section 4.01 of the amended and restated global

6    settlement agreement, and I'll refer to that, in some

7    instances, as the GSA.

8            Your Honor, new GM was not a party to the GSA when it

9    was entered into in September of 2008.  In fact, New GM did not

10   even exist at that time.  Section 11.8 of the modified plan

11   itself does not carve out willful misconduct and section 4.01

12   of the GSA does not carve out willful misconduct.  It's

13   undisputed that section 11.11 of the modified plan does carve

14   out willful misconduct.

15           Your Honor, as it was not a party to the GSA when it

16   was executed in September of 2008, New GM only received the

17   releases provided for in the GSA because of the modified plan

18   and the modified confirmation order.

19           Your Honor, paragraph 20 of the confirmation order,

20   which deals with releases, makes it crystal clear that any

21   release New GM was receiving, under section 11.8 or section

22   11.11 of the modified plan, did not include a release for any

23   willful misconduct.

24           Now Your Honor, I'd just like to read, briefly, the

25   critical language out of paragraph 20 from the confirmation

29

1   order that's found on page 53 of the confirmation order.  Your

2   Honor, it says, "Notwithstanding anything in this order, the

3   exculpation provisions or releases provided pursuant to article

4   11 of the modified plan," and Your Honor that includes section

5   11.8 the release section.  It includes section 11.11 the

6   exculpation --

7           THE COURT:  Well, you're not quoting from paragraph

8   20.

9           MR. SHER:  I am quoting -- I was just -- I went out of

10  the quote for a second, Your Honor, to tell you that that would

11  include --

12          THE COURT:  Okay.

13          MR. SHER:  -- 11.8 and 11.11 --

14          THE COURT:  All right.

15          MR. SHER:  -- because it talks about provisions

16  pursuant to article 11 and they fall within our --

17          THE COURT:  I see what you're saying.  Right.  Fine.

18          MR. SHER:  So I'll just read it again quickly, Your

19  Honor.  "Notwithstanding anything in this order, the

20  exculpation provisions or releases provided pursuant to article

21  11 of the modified plan shall have no effect on the liability

22  of any entity that otherwise would result from any action or

23  omission to the extent that such action or omission is

24  determined in a final order to have constituted intentional

25  fraud or willful misconduct."

30

1          Thus Your Honor, to the extent New GM was getting any

2     release under section 4.01 of the GSA, which was through and

3     only through section 11.8 of the modified plan, such release

4     did not include a release of any liability of New GM for acts

5     or omissions to the extent such acts or omissions are

6     determined by a final order to constitute willful misconduct.

7          Thus Your Honor, New GM's argument, asserted in its

8     reply brief filed yesterday for the first time, that the

9     release it got pursuant to section 11.8 of the modified plan,

10    as modified by the confirmation order in paragraph 20, included

11    a release for claims constituting willful misconduct is wrong.

12         THE COURT:  How do you deal with paragraph 57 then?

13         MR. SHER:  Your Honor, the language in the last

14    sentence of paragraph 57 of the confirmation order does not

15    change that reasoning for the following reasons:  First, as I

16    previously indicated, New GM was not a party to the GSA and it

17    only got the release it got pursuant to section 11.8 and such

18    release is subject to the limitations in paragraph 20 of the

19    confirmation order.

20         Second, paragraph 20 says "Notwithstanding anything in

21    this order," and that would include anything in paragraph 57 or

22    any other provision of the order.  It says notwithstanding

23    anything in this order, willful misconduct claims are carved

24    out of the section 11.8 release.

25         And further, Your Honor, section 57 of the

31

1    confirmation order makes it clear that it there's any

2    inconsistency between the modified plan, and again the modified

3    plan didn't have that carve out language, that if there's any

4    inconsistency between the modified plan and the confirmation

5    order, the confirmation order controls.  And Your Honor, that

6    language specifically says -- it says, "If there is determined

7    to be any inconsistency between any modified plan provision and

8    any provision of this order that cannot be so reconciled then,

9    solely to the extent of such inconsistency, the provisions of

10   this order shall govern and any such provision of this order

11   shall be deemed a modification of the modified plan and shall

12   control and take precedence."

13        Thus Your Honor, the fact that section 11.8 of the

14   modified plan did not carve out willful misconduct is

15   irrelevant and was superseded and modified by the language in

16   paragraph 20 of the confirmation order.  According Your Honor,

17   what GM -- what New GM received was a 4.01 release under the

18   GSA as modified by the carve out in paragraph 20.

19        Further, even just looking at the last sentence of

20   that paragraph 57, there is nothing.  There is no conflict

21   between the terms of this order, the modified plan of this

22   order, and the GSA.  There is no conflict.  New GM was not a

23   party to that agreement.  It only got a release pursuant to the

24   reorganization plan.  And the confirmed plan said the release

25   New GM will get will be the 4.01 release with the carve out for

32

1    willful misconduct.

2         So there is nothing inconsistent between the GSA and

3    the confirmation order in any event.  But the point is that --

4         THE COURT:  In other words, you're saying that 11.8

5    doesn't make New GM a party to the GSA, it just extends their

6    release to New GM?

7         MR. SHER:  It gives them the release provided as if it

8    was a party to that agreement, with the proviso that you have

9    the carve out for willful misconduct.

10        THE COURT:  Well 11.8 doesn't do that but I follow

11   your logic on the other provisions.

12        MR. SHER:  Paragraph 20 does that.

13        THE COURT:  Of the confirmation order.

14        MR. SHER:  Correct, Your Honor.  Thus, Your Honor, and

15   this is critical, as a result of that willful misconduct claims

16   are excluded from any release New GM obtained under the Delphi

17   confirmed plan, whether pursuant to section 11.8 or section

18   11.11.

19        (Pause)

20        MR. SHER:  Your Honor, whether or not the claims

21   asserted by New GM in the amended -- asserted against New GM in

22   the amended complaint fall within the exculpation and the

23   release provisions to begin with, which I will discuss shortly,

24   as we've indicated in our objection the claim against New GM

25   for violation of the equal protection component of the Fifth

1    Amendment is predicated upon intentional or willful misconduct

2    and, as I've just discussed, paragraph 20 of the plan

3    modification order makes it crystal clear that such claims are

4    excluded from the exculpation and release provisions.

5         Thus Your Honor, under any circumstances, before this

6    Court or any other court could determine whether the Fifth

7    Amendment claim was released pursuant to the modified plan,

8    there would need to be a final order entered by an appropriate

9    court ruling on the merits of such claim.  Unless and until

10   that happens, the Court could not grant the relief requested in

11   New GM's motion.  And because the appropriate court to try that

12   claim is the Michigan District Court, this Court should abstain

13   from ruling on New GM's motion.

14        Your Honor, there's a case that we cited in our

15   objection that I think is just directly on point in this

16   regard.  It's a 2007 decision of the United States District

17   Court for the Northern District of Illinois in the case of

18   Mansfield vs. Airline Pilots Association International.  It's

19   discussed on pages 28 and 29 of our objection.  Your Honor,

20   with the Court's permission, I'd like to hand the Court a copy

21   of that case.

22        THE COURT:  No, I have a copy.

23        MR. SHER:  Okay.  Your Honor, in that case two groups

24   of current and former United Airlines pilots filed complaints

25   in the Illinois District Court against their union, the Airline

34

1    Pilots' Association.  The complaints were filed subsequent to

2    the confirmation of United's Chapter 11 plan which contained an

3    exculpation clause similar to the exculpation clause in

4    Delphi's modified plan.

5         The court stated the following with respect to the

6    exculpation provision in United's Chapter 11 plan.  Your Honor,

7    I'm looking at page 2 or the second page of the case.  I don't

8    know if the Court's would be the same form but what they said

9    is, "United's plan of reorganization includes an exculpation

10   clause which provides that no exculpated party shall have or

11   incur and each exculpated party is hereby released and

12   exculpated from any exculpated claim except for gross

13   negligence or willful misconduct."

14        An exculpated claim is "Any claim related to any act

15   or omission in connection with, relating to or arising out of

16   United's restructuring."  And they referenced plan of

17   reorganization seven.  And they then go on to say, the term

18   excul (ph.) party includes ALPA, which was the union.

19        Your Honor, the claim brought by the pilots against

20   the union were for breach of the union's duty of fair

21   representation and related to the union's distribution of

22   roughly 545 million dollars which the union received from

23   United to be distributed by the union, in its discretion, to

24   pilots in order to help make up the shortfall in the pilots'

25   pension plan after the pension plan was terminated and taken

1    over by the PBGC.

2         The plaintiff pilots didn't like the way in which the

3    union had decided to distribute the 545 million dollars.

4    United intervened in the cases and filed a motion with the

5    district court, didn't file it with Judge Wedoff in the

6    bankruptcy court, filed it with the district court seeking to

7    dismiss one of the complaints on the grounds that the claim

8    fell within the exculpation provided for in United's Chapter 11

9    plan.

10        The court held that in order for the plaintiffs to

11   prevail on their claim against the union they would have to

12   show that the union's actions were arbitrary, discriminatory or

13   in bad faith and noted that in order to prevail on such a claim

14   they needed to prove intentional union misconduct.

15        The plaintiffs argued that such claim was excepted

16   from the exculpation provision, United, not surprisingly,

17   disagreed.  And the plaintiffs had argued that it was excepted

18   from that provision because it was a claim predicated upon

19   willful misconduct.

20        The court denied United's motion to dismiss and stated

21   the following, and this is extremely critical language, Your

22   Honor.  On the third page, just before you get to the number 2

23   where there's a caption that says motions for class

24   certification.  The court said, and this is the last paragraph

25   before that section, the court said the words intentional and

36

1    willful are synonyms for all practical purposes, citing

2    Webster's dictionary.  But then here's the critical part of the

3    case.  The court said, "If plaintiffs are able to sustain their

4    claim, a determination the court cannot yet make, they will

5    fall within the exception to the exculpation clause.  The court

6    therefore denies United's motion to dismiss."

7         The court also held that since there was not yet any

8    determination on the merits of the underlying claim, the court

9    did not yet need to decide whether the exculpation clause

10   otherwise encompassed the cause of action.

11        Likewise, Your Honor, if our clients are able to

12   sustain their Fifth Amendment claim which, as discussed on

13   pages 26 and 27 of our objection, is predicated upon proving

14   intentional or purposeful discrimination in violation of the

15   equal protection component of the Fifth Amendment, which would

16   constitute willful misconduct, then it will fall within the

17   exception to the exculpation and release provisions.

18        And since we don't know that until the claims are

19   tried, something clearly contemplated in the plan modification

20   order as paragraph 20 talks about the exculpation and release

21   provisions having no effect on actions or omissions determined

22   in a final order.  It didn't say final order of this court it

23   said determined in a final order to have constituted willful

24   misconduct, New GM's motion would have to be denied whether or

25   not the exculpation or release provisions were otherwise

1       applicable, until the Fifth Amendment claim is actually

2       litigated and determined.

3               And Your Honor, for all of the reasons set forth in

4       our objection, this Court, with all due respect, is not the

5       appropriate court to litigate and determine the merits of the

6       Fifth Amendment claim.  Those reasons include, but are not

7       limited to the following:  One, the claim is already being

8       determined by the Michigan District Court.

9               Second, Delphi is not a party to the litigation and

10      the ruling on the Fifth Amendment claim will not impact

11      Delphi's bankruptcy estate.

12              THE COURT:  Let me interrupt you for a second.  Are

13      you taking the position that the only way you can succeed on

14      your Fifth Amendment claim is to show an intent or reckless

15      disregard to cause the wrongful discrimination?

16              MR. SHER:  There would have to be willful misconduct.

17              THE COURT:  No, that's --

18              MR. SHER:  I'm sorry; you asked -- maybe I didn't

19      understand the question.

20              THE COURT:  Maybe I'm not being clear in my question.

21      Something's intentional when you know you're going to do it.

22      And you can discriminate knowing you're discriminating without

23      knowing that the discrimination is wrongful.  There's some

24      discrimination that's not wrongful.

25              MR. SHER:  Correct.

38

1          THE COURT:  Are you talking the position that to

2     prevail in the Michigan action on Count V --

3          MR. SHER:  Yes.

4          THE COURT:  -- that you must show not only an intent

5     to discriminate but also an intent to wrongfully discriminate?

6          MR. SHER:  Well, we believe that part of our element

7     is that -- not just that there was discrimination but that yes,

8     the discrimination was wrongful or unlawful.

9          THE COURT:  No, but was the intent -- is it necessary

10    to show that the intent was to discriminate wrongfully or that

11    there was reckless disregard in the discrimination so that it

12    would be wrongful.

13         MR. SHER:  Yes.

14         THE COURT:  Maybe you want to -- if you want to

15    consult with your lead counsel, I mean, because you're here on

16    the bankruptcy aspect, you can.  I don't want to pin you down

17    to something you're unsure about.

18         MR. SHELLEY:  Your Honor, we would say that.  We would

19    say that we, in the Detroit action, must show purposeful

20    discrimination, purposeful effort to evade the constitution.

21    And in that sense we would say it's a knowing violation of the

22    constitution.

23         THE COURT:  I.e. the intent is to violate it or to act

24    in reckless disregard of it.

25         MR. SHELLEY:  The intent would be to act as a

39

1    government agency and disparately treat persons protected by

2    the constitution.

3         THE COURT:  That's a different issue.  Again, as I

4    read willful, and I see this in all sorts of contexts,

5    including orders for contempt where the case law says you have

6    to willfully disobey a court order, it doesn't apply to actions

7    where, you know, you take the action but you're not aware of

8    the court order.  In that sense it's different than breaching

9    the automatic stay.

10        A government can take an action and it could have

11   gotten, you know, AG opinion saying that this is within the

12   realms of the constitution.  On the other hand, the government

13   can take an action if it's discriminatory knowing or in

14   reckless disregard that it's discriminatory.  Is it your

15   position that only the latter is a basis for liability?

16        MR. SHELLEY:  Your Honor, I think, if I could demur on

17   the issue, I think I'd have to study the case law.  But I think

18   our -- I don't know that I absolutely have to prove that but

19   our position would be that we could prove that if necessary.

20        THE COURT:  All right.  Okay.

21        MR. SHER:  All right, Your Honor.  I was in the middle

22   of arguing to the Court the reasons why we believe that this

23   Court is not the appropriate court to adjudicate those claims.

24        THE COURT:  Right.

25        MR. SHER:  And I had gone through two reasons.  The

40

1      third reason, Your Honor, our clients are entitled to a jury

2      trial and they will not consent to this Court conducting such

3      trial.  And fourth, Your Honor --

4           THE COURT:  Let's stop there.  Your clients aren't

5      entitled to a jury trial on breach of an injunction, right,

6      which is what GM is asserting here.

7           MR. SHER:  I don't disagree with that, Your Honor.

8           THE COURT:  Okay.

9           MR. SHER:  I'm talking about entitled to a trial by

10     jury with respect to the underlying Fifth Amendment claim.

11          THE COURT:  Right.  Okay.

12          MR. SHER:  Your Honor, and fourth and a very important

13     factor, the Michigan District Court will be determining the

14     Fifth Amendment claim against New GM's codefendants in Count V,

15     which include the U.S. Treasury Department, the Presidential

16     Task Force on the Auto Industry, Timothy Geithner and others.

17     And there is no reason for a different court to determine the

18     Fifth Amendment claim against New GM.  In addition, the claims

19     overlap and beyond the obvious judicial economy concerns there

20     would be a real chance for inconsistent rulings.

21          Your Honor, these are a lot of the factors that this

22     Court took into account when it abstained in the Portrait

23     Corporation of America case in 2006.

24          Thus Your Honor, the Court should exercise its

25     discretion under 28 U.S.C. Section 1334 and abstain from ruling

41

1    on the motion.  Just as in -- just as United Airlines did in

2    the Mansfield case, New GM can assert the exculpation release

3    argument before the Michigan District Court.  And Your Honor,

4    it's -- I'd really like the Court to spend time looking at the

5    first few pages of the Mansfield case that dealt with this

6    issue.  It's really -- when there's a carve out for willful

7    misconduct and there's no dispute that there is that carve out

8    verbatim in section 11.11, the exculpation provision.  And for

9    the reasons I have discussed, it's also applicable to the 11.8

10   which ties in 4.01 because paragraph 20 of the confirmation

11   order covers that and says notwithstanding anything in this

12   order, the releases and exculpation provisions in article 11

13   are subject to a carve out for willful misconduct.  And we've

14   alleged a willful misconduct claim.  So I don't know how any

15   court could determine whether or not our claims fell within

16   either 11.8 or 11.11 when the claim itself is for something

17   that constitutes willful misconduct.  You have to determine

18   that.

19         THE COURT:  Well, I don't see how you -- I guess

20   that's where I'm having a hard problem with this argument.

21         MR. SHER:  Which part of it, Your Honor?

22         THE COURT:  You say you've alleged a willful

23   misconduct claim and I'm not sure you have.  In fact, I don't

24   think you necessarily have.

25         Secondly, is that all it takes to divest -- to have

42

1    the Court abuse its discretion in not permissively abstaining?

2    I mean, if that were the case then you'd have a complete -- the

3    aspect of the injunction that prevents lawsuits in the first

4    place is meaningless.  You have to go through the whole thing

5    as the protected party.  Just because the plaintiff says that

6    an element of its claim that is allegedly not part of the

7    injunction is carved out of the injunction, that therefore that

8    should divest the court that issued the injunction of

9    interpreting its order?  I don't follow that.

10          MR. SHER:  Your Honor, with all due respect I'm having

11   trouble following.

12          THE COURT:  All right.  An order is issued that says

13   you shall not pursue a claim against --

14          MR. SHER:  Certain types of claims.

15          THE COURT:  Right.  Well, we all agree here that this

16   claim is covered unless there's willful misconduct, right?

17          MR. SHER:  No.

18          THE COURT:  We don't agree that?

19          MR. SHER:  No.

20          THE COURT:  How?  Oh, because of the time element?

21          MR. SHER:  That's one of the issues.

22          THE COURT:  All right.

23          MR. SHER:  And I'll address them.

24          THE COURT:  Well that's not before the District Court

25   -- so that's now before me, right?  That issue is not

1    necessarily one that the district court has to decide.  It's

2    completely irrelevant to his decision.

3            MR. SHER:  I don't know that the district court has to

4    decide it for purposes of the claim.

5            THE COURT:  Right.

6            MR. SHER:  It's an issue that's relevant before this

7    Court.

8            THE COURT:  So that's an issue -- it's an element for

9    this Court.  So the district court can go through the entire

10   analysis and not have covered one of the key elements of your

11   argument that the injunction doesn't apply.

12           But leaving that aside, you go to the willfulness

13   point.  There's a carve out in the injunction, as there is

14   under the case law, required to be, for fraud and willful

15   misconduct.

16           I take it that your argument is that as long as an

17   ostensibly enjoined party alleges in its complaint that there

18   was willful misconduct, it's free to proceed notwithstanding

19   the injunction through determination of the merits of the

20   underlying claim.

21           MR. SHER:  Absolutely.

22           THE COURT:  And doesn't that totally vitiate the

23   injunction, because it leaves out of the purview of the court

24   that issued the injunction any say as to whether it agrees that

25   under the terms of the order, there was willful misconduct or

44

1    not?

2            MR. SHER:  Not at all, Your Honor.  But this Court --

3            THE COURT:  But you're just saying I would be abusing

4    my discretion not to abstain, because the merits of the

5    underlying action, where you're alleging willful misconduct,

6    have to be decided by the court where you've brought the

7    action.

8            MR. SHER:  What I'm saying is that in order to

9    determine, just on this argument, based on the carve-out,

10   whether or not our claim is excluded under that willful

11   misconduct provision, some court has to try that claim.  This

12   is the United States of America.

13           THE COURT:  Right.

14           MR. SHER:  We're entitled to file a lawsuit.  Our

15   clients are entitled to pursue claims.  It's subject to Rule 11

16   sanctions and things of that nature --

17           THE COURT:  Well, it's also subject to --

18           MR. SHER:  -- when you fail a new claim --

19           THE COURT:  -- an injunction.

20           MR. SHER:  It's only subject to the injunction if it

21   wasn't a claim for willful misconduct.  We've brought a claim.

22           THE COURT:  But how do you deal with the reams of case

23   law, including Supreme Court cases, that say that the court

24   that issued the injunction is generally the proper party to

25   determine whether it applies or not?

45

1          MR. SHER:  Because in order to determine whether or

2     not it applies -- it's putting the cart before the horse, Your

3     Honor.  We have asserted a claim, the nature of which and the

4     elements of which constitute willful misconduct.

5          THE COURT:  Doesn't the putting the cart before the

6     horse occur when you bring the claim, taking the risk that you

7     are breaching the injunction?  Isn't that putting the cart

8     before the horse?

9          MR. SHER:  I don't think so at all.

10          THE COURT:  You don't think you need to --

11          MR. SHER:  Well, how could you --

12          THE COURT:  -- worry about whether you've reached the

13     injunction?  You just go ahead willy-nilly and file the claim.

14     And then you say, well, you can't decide this issue in court

15     because we assert in the merits of our claim that it's not

16     covered by the injunction.

17          MR. SHER:  Isn't that a decision for the plaintiffs to

18     make with advice of counsel, whether or not something fell

19     within the injunction to begin with and what the nature of the

20     claim is?

21          THE COURT:  But we're talking about putting the cart

22     before the horse.  It --

23          MR. SHER:  Yes.

24          THE COURT:  -- seems to me the plaintiffs are -- if I

25     were to adopt that principle, the principle you're asserting --

1          MR. SHER:  Yes.

2          THE COURT:  -- then the -- except for in cases where

3     Rule 11 is violated, the court that issues the injunction would

4     always be abusing its discretion not to abstain.  And that

5     can't be right.

6          MR. SHER:  But, no.  I haven't suggested that at all.

7          THE COURT:  Well, why?

8          MR. SHER:  I'm suggesting it based on the factors in

9     this case, including the fact that the claim is -- for all the

10    reasons I just said, including the fact that we are already

11    litigating that claim against codefendants, and there's

12    overlap --

13         THE COURT:  Well, you could go ahead and litigate

14    against them.  That's fine.

15         MR. SHER:  Right, but does it make sense to try those

16    claims there and try the very same claim against New GM here?

17         THE COURT:  Well, I -- you know, what, I'm not

18    satisfied that that's the case, frankly.  But anyway, you can

19    go ahead.

20         MR. SHER:  I mean, Your Honor, it's exactly what the

21    Illinois District Court said --

22         THE COURT:  It wasn't an abstention decision.  That

23    was not an abstention decision.

24         MR. SHER:  It was a decision by a court -- the

25    district court there, whether it was the district court or it

1    could have been the bankruptcy court --

2         THE COURT:  But it wasn't --

3         MR. SHER:  -- asking whether or not the claims that

4    were brought that constituted willful misconduct against the

5    union, whether or not those -- the issue was that there was no

6    violation of the injunction by pursuing those claims, because

7    there was a carve-out for claims for willful misconduct, and

8    the underlying claim included the fact that it met this test of

9    willful misconduct.  And so the Court essentially -- not

10   essentially -- the Court said, how can we determine whether or

11   not the claims fall within the exception of willful misconduct

12   when the claim for willful misconduct, until we have a trial

13   and a determination of whether it is willful misconduct.

14   That's exactly the point.

15        THE COURT:  Well --

16        MR. SHER:  That's the cart before the horse.  You

17   can't decide whether it falls within the carve-out until the

18   claim itself is determined, because if it's -- if the claim is

19   proved, it does fall within the carve-out.

20        THE COURT:  Okay.  You should go on.

21        MR. SHER:  Your Honor, if the Court does not abstain,

22   then the Court should deny the motion for the reasons set forth

23   in our objection, which I will briefly summarize.  First, Your

24   Honor, the exculpation provision, Section 11.11, provided New

25   GM a release of acts taken by New GM in connection with

48

1    Delphi's bankruptcy case.  And notwithstanding a number of new

2    arguments raised by New GM in the reply it filed yesterday on

3    this topic, we still strongly believe that our clients' claims

4    are not predicated upon acts taken by New GM in connection with

5    Delphi's bankruptcy case.

6            Therefore, Your Honor, the exculpation provision would

7    not provide New GM with a release relating to the claims

8    asserted in the amended complaint.  You know, there's a lot of

9    information to really try and digest on this issue, where in

10   the thirty-five-page brief that New GM filed yesterday, they

11   start talking about arguments that things were done by this

12   Court that blessed these top-ups.  And I'm fairly new to the

13   case.  I've read certain documents, not others.  Certain things

14   weren't even relied upon.  I certainly didn't have them before.

15   But they talk about things that were done by Old GM.  They talk

16   about agreements to provide benefits back in 1999 when Delphi

17   was spun off.  They talk about memorandums of understanding in

18   2007.  Your Honor, these were all things that didn't even

19   involve New GM.  That's who --

20           THE COURT:  Well, let's focus on the approval of the

21   MDA and the revised GSA, and the approval by the GM bankruptcy

22   court of the stipulation with the other two unions.  I accept

23   that the original benefit guarantee issues and perhaps even the

24   2007 GSA, are not necessarily relevant, except by giving

25   context to why GM did what it did to your discrimination point,

49

1    since at that time, the issue of discrimination wasn't

2    necessarily raised, i.e., your clients were being paid their

3    pension obligations.  And as late as 2007, Delphi was going to

4    assume those obligations in a plan of reorganization.

5         But it seems to me, that changed when the transaction

6    that that plan was premised upon didn't close, and thereafter,

7    in the summer of 2009, the plan was modified to reflect the

8    three -- well, the severing of Delphi into three parts that was

9    implemented through the GM transactions in the plan.

10        MR. SHER:  Your Honor, let me respond this way.  To

11   begin with, it's important to understand that our claim is not

12   predicated upon the fact that New GM did a top-off for the UAW.

13   It's not predicated on the fact that they did a top-up for the

14   electrical workers.  It's not predicated on the fact that did a

15   top-up for the salaried (sic) employees.  It's predicated upon

16   the fact that they topped all three of them up, then coupled

17   with the fact that they refused to top-up the salaried

18   employees.

19        THE COURT:  That's just what I said.  But it seems to

20   me, when it was clear that they were not topping up the

21   salaried workers, we should focus on that period.

22        MR. SHER:  Okay.  But, Your Honor, you have to

23   appreciate the context.  It wasn't when they agreed to top-up

24   just the UAW.  It was later when they agreed to top-up the

25   salaried people (sic) and the electrical people, and then

50

1   refused to top us up.  So the salaried --

2          THE COURT:  What -- I'm sorry.  Let me make sure I

3   understand what you're saying.

4          MR. SHER:  Steel workers.  Maybe I misspoke one of the

5   words.

6          THE COURT:  Yes, the --

7          MR. SHER:  These people are not --

8          THE COURT:  -- are you saying your claim is premised

9   on topping up parties other than the unions?

10         MR. SHER:  No, no, no.

11         THE COURT:  All right.  So you keep saying "salaried".

12         MR. SHER:  Then I misspoke.

13         THE COURT:  Okay.

14         MR. SHER:  Okay.  The point I'm trying to make is the

15   claim doesn't arise until after they've topped up A, which was

16   the UAW, then they've topped up B and C, which was the

17   electrical workers and the steel workers, and then refused to

18   top up D.  That's what the discrimination is about and that's

19   what the claim is about.

20         Now, the agreement to top up the electrical and the

21   steel workers was done pursuant, apparently, to this agreement

22   in September of 2009.  And that's apparently -- although I

23   haven't gone through the exhibits because I haven't had time,

24   but opposing counsel indicated that that's Exhibit D to the

25   reply.  Now, I would point out a couple of things in that

51

1    agreement.  The first is, in the third paragraph on page 1 of

2    that agreement dealing with recitals, it specifically says that

3    GM Co., New GM, denies that it was even required to provide

4    these very benefits.

5              THE COURT:  I agree.  There's no issue there.

6              MR. SHER:  Inconsistent with arguments that they've

7    made that they were obligated.  They were obligated under

8    two --

9              THE COURT:  No, they've -- I mean, it's in their

10   brief.  They won in front of Judge Gerber that they didn't have

11   to assume those things.

12             MR. SHER:  And then they did.  And when they did, it

13   was done pursuant to an agreement in September of '09 that did

14   not get approved by the GM Bankruptcy Court.  I would point out

15   it was not this Court.  They didn't come to this Court, and now

16   they apparently want to argue that everything was done in

17   connection with this Court, which isn't true.  This was

18   something -- a critical part of the claim that we have is when

19   they agreed to top off the electrical workers and the steel

20   workers.  And that didn't get approved by Judge Gerber, until I

21   believe November of 2009.

22             So the argument that these things were done in

23   connection with this bankruptcy case, with the Delphi

24   bankruptcy case, we disagree with.  This Court --

25             THE COURT:  But what about --

52

1          MR. SHER:  -- may have approved --

2          THE COURT:  -- I'm sorry.  What about the recitation

3     in the agreement that as -- which we went through just now at

4     oral argument, that the consideration for that agreement by New

5     GM's was the consent of the two unions to let the MDA go

6     through?

7          MR. SHER:  Well, that may go to their ultimate

8     argument in front of an appropriate judge who tries the

9     discrimination claims.  For them to raise a defense and say

10    there wasn't unlawful discrimination --

11         THE COURT:  No, no.  How --

12         MR. SHER:  -- because we get it here, here and here.

13         THE COURT:  -- wait.  But how do you deal with the

14    language of 11.11 --

15         MR. SHER:  Yes.

16         THE COURT:  -- which refers to implementation of,

17    among other things, the MDA?

18         MR. SHER:  Your Honor, my belief is that an

19    exculpation provision by its very nature relates to things that

20    took place in connection with a particular bankruptcy case.

21    And I do not believe that New GM's decision to top up in

22    September or November of 2009, the electrical workers and the

23    steel workers, was done as part of anything in connection with

24    the Delphi case.  And certainly --

25         THE COURT:  But what is the premise --

53

1        MR. SHER:  -- it wasn't approved by this Court --

2        THE COURT:  -- but what is the premise of your belief?

3        MR. SHER:  Those are the facts.

4        THE COURT:  But I just read to you the language from

5  the plan.  It doesn't limit it to actions approved by the

6  bankruptcy court.

7        MR. SHER:  It limits it to actions taken in connection

8  with the case.  I think this is something that is not in

9  connection --

10        THE COURT:  And the implementation -- and the

11  implementation of the MDA.

12        MR. SHER:  And I believe this was something done --

13        THE COURT:  But --

14        MR. SHER:  -- in connection --

15        THE COURT:  -- doesn't it say that, "implementation of

16  the MDA"?

17        MR. SHER:  If you say it says that, I'm sure it does.

18        THE COURT:  Well, it does, right?

19        MR. SHER:  Okay.

20        THE COURT:  So why doesn't that govern?

21        MR. SHER:  Because our claim relates to topping up

22  those three, and then not topping us up.

23        THE COURT:  Well --

24        MR. SHER:  That's not something this Court every ruled

25  upon.

54

1          THE COURT:  -- let --

2          MR. SHER:  This Court never said --

3          THE COURT:  -- let me back up, okay?  Wasn't, at the

4    time of the confirmation, it an element of the release that GM

5    had no obligation to pay anything to your clients?

6          MR. SHER:  No one's disputed that.

7          THE COURT:  So that was done, clearly, through the

8    order itself --

9          MR. SHER:  No, it was not.

10         THE COURT:  -- and the effective date, right?

11         MR. SHER:  No, it was not.

12         THE COURT:  Well --

13         MR. SHER:  New GM didn't even take on the

14   obligation --

15         THE COURT:  No, no.  You just said that GM is -- I

16   thought I heard you say this, but --

17         MR. SHER:  I said they didn't have an obligation to do

18   something --

19         THE COURT:  -- well, more than that.  Let me ask you,

20   then.  Doesn't the -- doesn't both the 11.8 and 11.11 release

21   GM and New GM from any claims of your clients?

22         MR. SHER:  No.  Apparently I haven't done a good job

23   of --

24         THE COURT:  Why doesn't it do -- why doesn't it do

25   that?

55

1          MR. SHER:  Because our claim is predicated upon --

2          THE COURT:  No, no, no, I'm not talking --

3          MR. SHER:  -- willful misconduct.

4          THE COURT:  -- no, no.  I'm talking about an existing

5     claim -- an existing claim at that time.

6          MR. SHER:  An existing claim --

7          THE COURT:  Right.

8          MR. SHER:  -- of willful misconduct, that falls within

9     the --

10         THE COURT:  No, no, no, no --

11         MR. SHER:  -- not willful -- not willful misconduct,

12    that falls within the parameters of those sections --

13         THE COURT:  All right.  So GM has --

14         MR. SHER:  -- would be released.

15         THE COURT:  -- so GM has no obligation, as of the

16    issuance of the confirmation order, certainly as of the

17    effective date, to your clients, right?

18         MR. SHER:  I disagree with that.  And the reason I

19    disagree with that --

20         THE COURT:  But there was a release.  It has no

21    obligation, because there was a release.

22         MR. SHER:  But you're -- you are just talking about

23    the time of the release.  And the issue was when --

24         THE COURT:  Well, I'm trying to --

25         MR. SHER:  -- the claim arose.

56

1          THE COURT:  -- figure out.  Yes.  As of that date.

2    You're saying that there's an obligation that arose later

3    because of discrimination?

4          MR. SHER:  Correct.

5          THE COURT:  All right.  And what is the basis for the

6    discrimination?

7          MR. SHER:  The basis for the discrimination was that

8    New GM -- that the government, acting through New GM --

9          THE COURT:  Right.

10         MR. SHER:  -- okay -- violated the Fifth Amendment of

11   the Constitution after it decided to top up the UAW and top up

12   the other two unions, and then said, we won't top you up.

13         THE COURT:  And what is the -- I'm sorry, what is the

14   discrimination there?

15         MR. SHER:  The discrimination is that they're treating

16   certain people -- giving them top-ups, because they're union-

17   affiliated --

18         THE COURT:  Right.

19         MR. SHER:  -- and discriminating against our people

20   because they're not union-affiliated, and that the government

21   chose to pay some people versus others on that basis, and that

22   that's unlawful.

23         THE COURT:  And what is the willfulness involved in

24   that?

25         MR. SHER:  The willfulness involved is that they'd

57

1    done that -- they did that intentionally or willfully.

2            THE COURT:  But I guess --

3            MR. SHER:  In violation of the law --

4            THE COURT:  -- where's the dis -- where is the

5    wrongfulness in the discrimination.

6            MR. SHER:  Well, I would respectfully submit that

7    that's the decision for the court who tries the case --

8            THE COURT:  No, no.  You're going to have to go beyond

9    that, because you've lost on that point already.

10           MR. SHER:  So --

11           THE COURT:  All right?  Your argument on abstention

12   just flies in the face of about 5,000 decisions, so you

13   can't -- you've got to go beyond that.  Tell me now, why is it

14   willful?

15           MR. SHER:  Your Honor, willful misconduct, the term

16   that Delphi uses in its plan, is not defined in the plan.

17           THE COURT:  No, no.  Tell me why the discrimination

18   that you allege is knowingly and wrongfully contrary to the

19   Constitution.

20           MR. SHER:  Well, I think that would probably be a

21   better question for --

22           THE COURT:  Okay.

23           MR. SHER:  -- Mr. Shelley.

24           MR. SHELLEY:  Your Honor, our allegation is that the

25   government decided to help the politically-favored, and not

58

1    help the politically-disfavored.  That the unions were

2    politically powerful, we were not, and as a result, a lot of

3    back-room deals were made that helped the politically powerful

4    who were unionized, and basically sent down the river salaried

5    workers, such as ourselves.  It was purposeful, it was willful,

6    because the government believed it wanted to save itself money,

7    as it was funneling money into GM, and the cheapest way to do

8    all this was shove the plan over to the PBGC, leave us half

9    paid, and top up everybody else, even though those plans were

10   also in the PBGC.  And it had little to do with these

11   agreements in 1999, which weren't valid, but had everything to

12   do with union status and political power.

13        THE COURT:  Well, what about the unions' consent right

14   with regard to the MDA?

15        MR. SHELLEY:  Well, there were -- you know, there are

16   a lot of, I think, facts that are relevant to the claim.  And I

17   don't think that that was the real reason that this was done.

18   I think that, in fact, there were other unions that weren't

19   topped up, and I'm not sure whether they --

20        THE COURT:  That didn't have the consent right.

21        MR. SHELLEY:  Yes.  Well, I think the point of our --

22   there may be some element of that.  There may be some element

23   of that, and I'm sure the government's going to argue in

24   response that the rational basis for this was that they had to

25   deal with this consent right.  But our belief is that once all

59

1    the facts are shown in the other action, or in this Court, if

2    that's what we have to get into, that it won't be that consent

3    right that motivated the government and GM, but these other

4    issues.

5             THE COURT:  Okay.

6             MR. SHER:  Your Honor, can I pick up where I was, Your

7    Honor?

8             THE COURT:  Sure.

9             MR. SHER:  Thank you.  Second, Your Honor, the release

10   provided to New GM in Section 11.8 of the modified plan, as

11   modified by paragraph 20 of the confirmation order, providing

12   New GM with a release of claims which accrued prior to the time

13   the Fifth Amendment accrued.

14            THE COURT:  What about 4.1(d)?

15            MR. SHER:  4.1(d), to the extent it ties in --

16   4.01(a), 4.01(d), at best, gives a release of claims -- again,

17   not the willful misconduct claims -- but gives a release of

18   claims as of the effective or emergence date of the plan,

19   which, I believe was October 6th of 2009.  And we believe that

20   the claim accrued after that, subsequent to that.

21            THE COURT:  And why is that, given the agreement in

22   September to top up the plan?

23            MR. SHER:  Because to the extent there was an

24   agreement entered into between New GM and the electrical

25   workers and the steel workers, that agreement was subject to

60

1   bankruptcy court approval from Judge Gerber in the New GM

2   bankruptcy case, and that approval did not come until, I

3   believe, November 12th, which was subsequent to the emergence

4   date in the Delphi case.

5           THE COURT:  But he approved the agreement, right?  It

6   was effective as of the date of the agreement?

7           MR. SHER:  I don't believe -- I don't know the answer

8   to that.  I believe that the agreement itself said that it

9   would not be effective unless court approval was obtained.

10          THE COURT:  But that's -- well, we should probably

11  look at it.

12          MR. SHER:  Your Honor, it's paragraph 13 at --

13          THE COURT:  Right -- I see it.

14          MR. SHER:  It talks about the effective date.  And it

15  specifically says, "This settlement" -- it says, "This

16  settlement agreement is expressly conditioned upon approval of

17  the bankruptcy court in the MLC Chapter 11 case."

18          THE COURT:  But the next sentence is the key one.

19          MR. SHER:  Right.

20          THE COURT:  "The effective date of this settlement

21  agreement should be the date upon which the order approving it

22  is entered."

23          MR. SHER:  Correct.

24          THE COURT:  Okay.

25          MR. SHER:  Third, Your Honor, and most importantly, as

61

1    I previously indicated, claims for willful misconduct are

2    specifically excluded from the exculpation and release

3    provisions, and our clients' claim against New GM is predicated

4    upon willful misconduct; and therefore, even if the claims fell

5    within the exculpation and/or release provisions, the motion

6    would still have to be denied.  New GM's argument that no court

7    needs to determine the merits of the Fifth Amendment claim is

8    wrong.  Without such a determination, neither this Court nor

9    any other court could determine whether the claim falls within

10   the willful misconduct exclusion.

11       THE COURT:  Well, wait a minute.  If the merits of the

12   Fifth Amendment claim are not necessarily predicated upon

13   willful misconduct, then I don't understand your argument.  And

14   I think you just told me they are not necessarily predicated on

15   willful misconduct.

16       MR. SHER:  That's not what I said.

17       THE COURT:  Well, that's what your colleague said.

18       MR. SHER:  I don't believe that's what he said.

19       THE COURT:  It is what he said.  He said he couldn't

20   tell me today.

21       MR. SHELLEY:  Well, it's intentional discrimination.

22   And whether that constitu -- and I believe intention means

23   willful, discrimination would be misconduct.

24       THE COURT:  We've been through this.

25       MR. SHELLEY:  We have.

62

1          THE COURT:  I'm going to give you one more chance.

2     When you say intentional, do you mean in the sense that it's

3     volitional or that you know or have reckless disregard that the

4     intentional act you're taking violates the Constitution?

5          MR. SHELLEY:  I will link myself to the latter.

6          THE COURT:  Okay.

7          MR. SHER:  Your Honor, New GM is essentially seeking a

8     summary judgment ruling in its favor from this Court, with

9     respect to the Fifth Amendment claim pending before the

10    Michigan District Court.  And obviously, that would be

11    inappropriate.  In the circumstances, Your Honor, we

12    respectfully request the Court to exercise its discretion to

13    abstain from determining the motion, or in the alternative, to

14    deny the motion.

15         Finally, Your Honor, if the Court is not inclined to

16    do either, then we would like the opportunity to submit a

17    response to the thirty-five page reply and exhibits that was

18    filed yesterday morning or yesterday afternoon, which raised

19    new arguments by New GM.  Thank you.

20         MS. LENNOX:  May I respond, Your Honor?

21         THE COURT:  Sure.

22         MS. LENNOX:  Thank you, Your Honor.  I will try to

23    keep this brief.

24         Your Honor, the salaried plaintiff shouldn't be

25    surprised by the arguments in the reply, because they raised a

1    whole host of new issues in the objection to which the reply

2    responded.   So -- and that's sort of the usual progression of

3    happenings in bankruptcy court.   There's a motion, an objection

4    and a reply.   But I'll move past that.

5          With respect to the first colloquy that this Court and

6    Mr. Sher had with respect to which provision of the

7    confirmation order governs the willful misconduct carve-out,

8    and the colloquy as between the efficacy of paragraph 57 and

9    the efficacy of paragraph 20 of the plan modification order.

10   If you're going to give effect to the canon of interpretation

11   that you say you should try to read the provisions so they're

12   consonant, so you can give effect to all of them; and if you

13   also take those provisions in the context of interpretation

14   that the specific prevails over the general; I would have to

15   say that paragraph 57 trumps, because paragraph 57 pretty

16   clearly says, and I'll quote it, and it applies to one

17   agreement and one agreement only, "That notwithstanding the

18   foregoing, in the event there are any conflicts between the

19   terms and provisions of the modified plan or this order, and

20   the Delphi-GM global settlement agreement, the terms of the

21   Delphi-GM global settlement agreement govern."   That's pretty

22   specific to one agreement.

23         Paragraph 20 is sort of the general carve-out that one

24   sees in all of these orders.   So I would argue, Your Honor,

25   that if we have to try to read both provisions and give effect

1    to both provisions of Your Honor's order, that I believe

2    paragraph 57 trumps.

3         But even if Your Honor would have to make a finding of

4    willful misconduct, I think Your Honor can do it based on the

5    record of the case, based on my prior argument, and based on

6    the fact that there's no misconduct.  We read very carefully

7    the Mansfield case that the plaintiff cited in their objection.

8    And while it's not binding on this Court, the facts certainly

9    are different.  The Seventh Circuit held in that case that the

10   union had committed intentional misconduct, or would have to

11   prove intentional misconduct.  As Your Honor points out,

12   intentional misconduct is not the same as intentional

13   discrimination.

14        And in paragraph 15 of the objection, Your Honor, the

15   plaintiffs claim, and I quote, "In order to prevail on its

16   equal protection claim against New GM, the salaried retirees

17   will need to prove that New GM acted with a discriminatory

18   purpose or intent," i.e., intentional discrimination, not

19   intentional misconduct.

20        Companies intentionally discriminate without it being

21   misconduct, all the time.  They treat their unions differently

22   from their salaried folk.  They treat their unions differently

23   from their other unions.  It happens all the time.  And while

24   that's discrimination, as Your Honor points out, it's not

25   necessarily unlawful.

65

1          Paragraph 61 of the plan modification order, Your

2     Honor, found that the UAW MOU and the top-up decisions in that,

3     as part of that -- they were part of that -- that were assumed

4     by New GM, was not contrary to federal or state law.  And if

5     that's true for the UAW, Your Honor, it has to be true for the

6     USW and the IUE, because it's the same thing.  It's the same

7     pension top-up decision.

8          Your Honor, if they thought -- if the plaintiffs

9     thought that this was willful misconduct, they should have

10    brought it out in their objection to confirmation of the plan.

11    They didn't.  They've waived it.  And I say this because I went

12    back and looked at the transcript -- since I wasn't here -- of

13    the plan modification hearing.  And Mr. Shelley participated in

14    that hearing and argued the plaintiff's objection in that

15    hearing.  And Mr. Shelley referenced, at page 183 of the July

16    29 transcript, and I will quote for Your Honor; Mr. Shelley

17    says, "We suspect there's discrimination against our

18    nonunionized workers in favor of the unionized plans.  They

19    focused at PBGC at the time.  PBGC will have to explain that."

20    But they clearly knew at the time that there was some

21    discrimination going on.  They weren't being treated the same.

22    Mr. Shelley raised that.  If he wanted to make an argument that

23    that was unlawful or willful misconduct, he could have and

24    should have at the confirmation hearing.

25          Also at the confirmation hearing, Mr. Kennedy, who I

66

1    believe is counsel for the IUE, at page 119 of the transcript

2    of July 29th, gives a report to Your Honor about the fact that

3    there is still some negotiating going on with respect to GM and

4    the IUE.  He says, "Your Honor, just as a report to the Court,

5    as you know, we've had many sessions concerning post-retirement

6    health obligation and the pension obligations, which have been

7    involved both in this proceeding and others that are payable to

8    the IUE-represented employees.  And obviously, there has been

9    substantial changes in those benefits because of the bankruptcy

10   of General Motors.  Just to report to you, that we are in

11   discussions with General Motors about steps to ameliorate the

12   losses that have been sustained.  We are making progress, but

13   we've not yet completed doing that."  And that's essentially in

14   the context of the GM proceeding.  That was on the record at

15   this plan modification confirmation hearing, Your Honor.  And

16   Mr. Shelley was there.

17          As Your Honor points out, we are not asking the Court

18   to determine any merits of the Michigan action.  We're just

19   asking Your Honor to enforce your own injunction.  There's no

20   jury trial required.  There's no abstention needed.

21          I'd like to address the final point that Mr. Sher

22   raised with respect to when the claim arises.  He's claiming

23   that the claim arises sometime either in November, or in his

24   papers he said in February 2010 when the actual payments start

25   being made.  But the cases say that the claim arises -- and the

67

1       cases we cite in our reply say the claim arises when the

2       decisions that are allegedly discriminatory are made, not when

3       the consequences of those decisions occur.  And the decision

4       was made with respect to the UAW in July of 2009.  It was

5       clearly before the Court at the plan modification hearing.  And

6       the decision was made, the commitment to GM -- that GM made for

7       the USW and IUE was made in September.

8              And I'd like to address the issue of well, but that's

9       really not effective until November, until the GM Court

10      approved it.  Your Honor, the parties to that particular

11      provision of that settlement agreement -- New GM wasn't subject

12      to Old GM's bankruptcy court, neither were the unions, for

13      their agreements vis-a-vis each other.  That agreement didn't

14      have to be approved by this Court, because the debtors weren't

15      party to that agreement.

16             So what happened?  You had all the nondebtor parties

17      acting in reliance on that provision of that agreement, because

18      they closed this case.  If they aren't going to act in alliance

19      and honor their agreement with each other, this case wouldn't

20      have closed until after the GM Court approved that document in

21      November.  But they acted in reliance; they closed this case.

22      That provision is directly related to how this plan could go

23      effective.

24             THE COURT:  Let me go back.  I don't quite follow your

25      argument on paragraph -- well, I do follow your argument on

1    paragraph 57.  But I'm not sure it deals with the plaintiff's

2    argument that New GM gets its rights under the GSA only

3    pursuant to the confirmation order.  I'm sorry -- confirming

4    Section 11.8, and therefore the reference to the GSA governing

5    doesn't really govern the release, because that's only given to

6    New GM through the plan and the confirmation.

7         MS. LENNOX:  Well, you know, I beg to differ on that,

8    Your Honor, because if you go -- if you go through the GSA that

9    was attached as an exhibit to the plan, the GSA puts New GM in

10   that agreement in a variety of places.  It defines New GM Co.

11   It interlineates -- I've got a black-line that interlineates

12   this document called "GM-Related Parties" and interlineates

13   those folks throughout.  There was certain modifications made

14   to this agreement besides the releases, to acknowledge the fact

15   that, you know, New GM was new to the party -- New GM was

16   recently new to the party.

17        THE COURT:  But it wasn't made a party -- it wasn't

18   made the assignee of that agreement, though, right?  I mean, I

19   think the parties were pretty careful not to do that because of

20   the GM bankruptcy, weren't they?

21        MS. LENNOX:  You know what, Your Honor, I'm looking at

22   the wrong agreement.  Give me a minute, please.  Sorry about

23   that.

24        (Pause)

25        MS. LENNOX:  Yes, I think Your Honor is correct about

69

1    that.  However, what I would say is that I don't understand the

2    difference between -- if the GSA -- if the purpose of the plan

3    confirmation order was to bring the GSA and its release

4    provisions -- and by the way, the GSA was approved as part of

5    the plan.  It is part of the plan that was confirmed, so that

6    whole agreement was approved.  And it was approved in the

7    confirmation order.  And particular provisions of that were

8    made applicable to New GM, because New GM was new to the party.

9    And frankly, if the obligations -- whatever obligations --

10         THE COURT:  But was the release provision made

11   applicable to New GM in the agreement itself?  I don't -- well,

12   I may be wrong.  I don't think it was, but.

13         MS. LENNOX:  Well, you know what, Your Honor, let me

14   look at the definition of GM-related parties.

15       (Pause)

16         MS. LENNOX:  Okay, that's interesting.  It's not in

17   the defined terms.

18         Because the release, Your Honor, is given to the GM-

19   related parties, not just to Old GM.  And I'm pretty sure,

20   certainly in the plan context, GM-related parties was defined

21   as all of the GM entities, including New GM.

22         THE COURT:  Well, it's on GSA-9, GM-related parties

23   should mean GM, which is GM -- Old GM, each of its affiliates,

24   GM HRP, GM Health Care Program for hourly employees, the GM

25   Life and Disability Benefits Program for hourly employees, and

70

1    any other GM pension and welfare benefit plan, and each of

2    their current and former principals.  So I don't think it

3    covers New GM, unless I'm missing something.

4           MS. LENNOX:  Yes.  The section -- Section 11.8 of the

5    plan, Your Honor, says that New GM gets the releases in the GSA

6    as if it were a party thereto.

7           The confirmation order has a different definition of

8    GM-related parties.  So it's clearly making --

9           THE COURT:  As though it were.  Well, that's an

10   interesting issue.  All right.

11          MS. LENNOX:  So I --

12          THE COURT:  I tend to think the plaintiffs have the

13   better one on this, but.

14          MS. LENNOX:  Well, in any event, Your Honor, even if

15   they did, and even if they win, you know, and I'm not going to

16   reiterate all my arguments, but I don't see how there's any

17   willful misconduct here anyway, and that there's any exception

18   from it.  And certainly this Court, as Your Honor pointed out,

19   can determine, certainly from the record -- from all the Court

20   approvals of what New GM did, that there was no willful

21   misconduct.

22          So, Your Honor, I don't think that they've proven the

23   case.  I think the discrimination between -- if discrimination

24   exists between -- let's call it the difference of treatment

25   between the three unions and all of Delphi's other unions --

71

1    because a whole bunch of other unions didn't get this

2    benefit -- and the salaried plaintiffs, was crystal clear at

3    the time of the plan modification hearing.  And if the salaried

4    plaintiffs had a problem with the discriminatory treatment,

5    they should have raised it then.  They didn't raise it then.

6    They're barred.

7            THE COURT:  Okay.  Let me just focus on that last

8    point with the plaintiffs.  If the evidence you would show me

9    that this falls within the exception of the injunction is that

10   what happened happened, I don't think I can see that there's

11   any willful misconduct.  What evidence do you believe beyond

12   that exists?  And when I say what happened happened, I think

13   the record is clear that I approved the assumption and

14   assignment of the UAW MOU to New GM, shortly before the

15   confirmation order.  And the basis for both that and the

16   subsequent assumption by New GM of the IUE and United Steel

17   Workers topped-off liability appears quite clear to me to be

18   based, as far as the documents are concerned and my

19   understanding of the case, on their unique rights in respect of

20   the right to consent to the transfer of the plants that GM was

21   getting under the MDA.  I have an extremely hard time seeing

22   how New GM, in doing those two things, was wrongfully

23   discriminating, under the Fifth Amendment, against people who

24   didn't have those rights.

25           MR. SHELLEY:  First of all, Your Honor, I don't think

72

1    all of the facts are clear.  For instance, I don't know for

2    fact that no other union has not -- that all other unions have

3    not been topped up.  That's not --  I don't think that's been a

4    fact --

5              THE COURT:  But that's not -- I mean, that's not -- we

6    don't know a lot of things.  But I don't think that matters.

7              MR. SHELLEY:  It would matter.  Because our

8    point --

9              THE COURT:  It's not alleged.  That's what I'm saying.

10   I --

11             MR. SHELLEY:  It's alleged in our Michigan action.  It

12   is alleged in our Michigan action that unionized plans,

13   including these three, have been topped up.  We don't have --

14   we don't limit ourselves to just these three plans of

15   potentially being topped up.  But I don't think that

16   necessarily has to be our main point.

17             The reality, as well -- for instance, though, if other

18   unions were topped up as well, and didn't have the right you

19   mentioned, then the -- it can't be simply defended by the fact

20   that they had the right to stop things in their tracks.

21             But in addition, the fact that they got a full top-up,

22   a full one hundred percent top-up, when they didn't have --

23   when they were simply in a negotiating position, also can

24   necessarily mean well, the fact that they could hold up some of

25   the agreements or the emergence from bankruptcy, the fact that

73

1    they got the full top-up can show that that's -- it's not just

2    the authority that they might have to stop things in their

3    tracks that was at issue here.

4         We think that if we got into the fact -- we think that

5    if we got into the facts, and given what we've heard from

6    Delphi individuals who are in contact with our people, that

7    what was going on in reality was that the government was really

8    concerned about union workers, and was not concerned about the

9    salaried workers, and therefore did what it did and used GM as

10   their benefactor -- because the government was the benefactor

11   at the time -- and used GM as the conduit for this.

12        And the reality is, we fought hard with the gov -- for

13   the -- with the government and with Delphi and with GM, and

14   were doing so at the time of the confirmation hearing back in

15   July when I was here, to try to get the same kind of treatment.

16   We thought we -- we feared we wouldn't get it.  It wasn't all

17   solid when we were there who was going to get it and who wasn't

18   going to get it.  It only became clear that we weren't going to

19   get it and three unions, at least, were going to get it, in

20   November.  And it may be that others are getting the top-up as

21   well.  And it wasn't clear that we were even going to be --

22   that our benefits were even going to be cut until February when

23   the PBGC started to do that.  And the district judge in

24   Michigan has indicated he might not allow them to do that,

25   even.

74

1          THE COURT:  But in -- I still have a hard time seeing

2     how that's a basis to proceed in the face of this injunction.

3          MR. SHELLEY:  Well, I'm willing, then -- if the Court

4     is pushing in that direction, I'm willing to say, we will limit

5     our claim against GM in the Constitutional setting, to proving

6     a Constitutional claim that would also constitute willful

7     misconduct.

8          THE COURT:  But that --

9          MR. SHELLEY:  And I'll do it here if necessary, as

10    opposed to --

11         THE COURT:  -- but that's what I'm asking you right

12    now.  I mean, look, everything I'm seeing suggests that you're

13    in violation of the injunction.  Now maybe you should -- you

14    could seek relief from the injunction to show me why that's not

15    the case, but I think you flipped the burden here by moving

16    ahead in the district court, hoping to prove a case, as opposed

17    to seeking relief from the injunction to prove your case.

18         And I'm not seeing -- even giving you the benefit of

19    the doubt on that, and I'm not forgetting, by the way, the

20    stipulation that was entered into after the lift-stay

21    litigation, so I think there was clearly some knowledge here

22    when the complaint was amended, about the history of this case,

23    and particularly the history of your clients' claims.  But

24    leaving that aside, just giving you the benefit of the doubt

25    that you're not trying to flip the burden by proceeding in

75

1    Michigan as opposed to asking me whether the injunction's

2    breached or not, I don't see how you are even setting forth a

3    prima facie case on it.  I mean, that's my problem here.

4           Based on the context of the assumption and assignment

5    of the UAW MOU, and the willingness of GM -- Old GM, throughout

6    the case, to recognize the GM guarantee with regard to the

7    other two unions, which I think it only backed off on because

8    it was now in bankruptcy, and of course any guarantee in

9    bankruptcy is not worth the paper it's written on.  But then

10   the very practical understanding that their consent was

11   necessary for the transfer of those plants where they had

12   workers, it just seems to me to be just almost inconceivable

13   that there could be willful discrimination here in violation of

14   the Fifth Amendment.

15          I mean, it just -- but look, I understand that the

16   consequences of that decision appear unfair.  I understand that

17   completely.  And I understand that politically there may be

18   some hay to make over the roles of unions versus nonunion

19   workers.  But everything in this case, to me, showed the

20   unions' leverage.  And I found that if they had the leverage,

21   the assumption and assignment, when there was no other

22   liability owed by GM to your clients, was appropriate, was fair

23   and reasonable.  And I confirmed the plan knowing that that

24   would happen.

25          It just seems to me that at that point, you've got to

1    show something else.  I mean, for example, and this goes to the

2    abstention analysis too, if your argument was that it wasn't

3    the assumption of these documents -- of these agreements at a

4    time when it was crystal clear that your clients were not also

5    going to have their liabilities assumed by GM or paid by the

6    debtor, if it was something other than that -- for example, if

7    you were alleging in the district court or in Michigan State

8    Court that the reason for the assumption was that, you know,

9    the UAW or the steel workers were bribing people, and so it was

10   really a bribery trial, I'd probably abstain, because that was

11   going to go forward anyway.  But that's not what's going on

12   here.  You're basically just saying the fact of the assumption

13   is willful misconduct.  It just doesn't compute.

14        MR. SHELLEY:  The last thing I'd say is the fact of a

15   full assumption when we got nothing in these negotiations, that

16   to us -- if for instance, let's say the government had the

17   money to give but it said, you know what, let's give it all to

18   the three unions to just get rid of them, even though we don't

19   have to, let's give it to the three unions, let's not give a

20   cent to the salaried workers because, in fact, what we really

21   want to do is help these unions, and we don't care about the

22   salaried workers, which is in fact, what we think happened

23   here --

24        THE COURT:  But none of that comes through.  There's

25   nothing -- that doesn't appear anywhere here.  I mean, it seems

1    to me that before I basically ignore this release, which was

2    truly central to the plan -- if it wasn't, then New GM would

3    have done the same thing that it did in the GM case, which is

4    simply buy the assets.  It was always the case that they wanted

5    a plan with a plan order and releases and injunctions, because

6    they wanted more protection than just a 363(f).

7        So it seems to me, that given the centrality of all of

8    that to this case, GM should not be subjected to having to go

9    through this analysis that you want to go through in another

10   forum.  It would seem to me, before that happens, you should

11   come here and ask for relief from the injunction.  I mean, it

12   really does seem to me to be putting the cart before the horse.

13       MR. SHELLEY:  Well, if Your Honor is ruling that way,

14   I think what we would like to ask then is that our Michigan

15   action will go forward against the other parties, and that at a

16   later date, if necessary, we'd come before the Court and

17   seek -- and present the evidence --

18       THE COURT:  People are always free to seek relief from

19   an injunction, you know.  But that's always the case.

20       MR. SHELLEY:  Your Honor, their order does though --

21   that they seek from you, seeks as dismissal with prejudice of

22   our claim in Michigan.  And it shouldn't be that.  It should be

23   with -- we should have opportunity to come back to the Court at

24   any point if we wish.  So there should be some proviso for

25   that.

78

1      MS. LENNOX:  Your Honor, may I respond?  If the

2  plaintiffs wanted that kind of relief, they should have done,

3  at the outset, exactly what Your Honor said, come here and say,

4  Your Honor, GM alleges that this release and injunction

5  applies, we don't think it is, you know, please grant us

6  relief.

7      THE COURT:  But let me cut through that.  If in

8  discovery, they take deposition of whoever, any of the

9  officials at the PBGC or the named people, and it turns out

10  that they uncover facts that substantiate the -- what now I

11  think are completely unsupported suggestions that this

12  discrimination was premised upon illegal or improper -- I'll

13  throw it out -- this was completely hypothetical.  But assume

14  they find out that there was a bribe, you know?  It would seem

15  to me that I shouldn't dismiss the action with prejudice to let

16  them -- to preclude them from coming back to this Court and

17  saying, you know, there was a bribe or there was a fraud.

18      MS. LENNOX:  I understand what you're saying, Your

19  Honor, so --

20      THE COURT:  I mean, obviously, if they basically come

21  back and say the same thing with sort of a light little veil

22  over it, they're not going to get --

23      MS. LENNOX:  No, I --

24      THE COURT:  -- it's going to be -- we've already done

25  that.  So that's not going to really work, so.

79

1        MS. LENNOX:  Right, Your Honor.  I guess I would say a

2   couple of things.  One is, then, I assume that Your Honor is

3   sort of agreeing with them that if there's willful misconduct,

4   then there would be an exception to the release.

5        THE COURT:  I don't -- you know, I don't know that I

6   need to get to that, because I believe, based upon my order

7   approving the assumption and assignment of the UAW MOU and the

8   agreement that's attached as an exhibit to the reply with the

9   other two unions, and of course, the underlying MDA, which gave

10  those unions the veto right, which was subsequently approved by

11  Judge Gerber, it seems to me that it's -- I don't need to have

12  a full-blown trial on willfulness.  It's -- I mean, I think

13  that ultimately here, the burden really is on the plaintiffs to

14  show willfulness, given all of the -- given the broad language

15  of the release and exculpation provisions.

16       Generally speaking, I don't give releases in plans --

17  any releases, unless there's a carve-out --

18       MS. LENNOX:  I understand, Your Honor.

19       THE COURT:  -- for willfulness and fraud.  So I

20  understand your argument about specifics and the like.  I think

21  if, in fact, I could be shown -- and I don't remember this

22  being shown to me, and I think I remember it pretty well -- but

23  if I could be shown that one of GM's lawyers stood up and said,

24  you know, this willfulness and fraud language that's in

25  paragraph 20, it doesn't apply to New GM, that would be a

80

1   different story.  I don't remember it that way.  And I think if

2   that had happened, someone would have stood up and said --

3   including the U.S. Trustee -- and said no, that's not right.

4   So, but again, I don't think I have to get to that here.

5          MS. LENNOX:  So, Your Honor --

6          THE COURT:  But I -- well, I'll give you all my

7   ruling.  I don't have to do this piecemeal.  But if you have a

8   question, that's fine.

9          MS. LENNOX:  No, no.  I guess, just as a point of

10  clarification, and I do believe that Your Honor clarified it,

11  that if the release is -- if the dismissal is without

12  prejudice, that the plaintiffs would truly have to come and

13  show some brand new facts that weren't part of this

14  presentation.

15         THE COURT:  Absolutely.  Absolutely.  They're not

16  going to --

17         MS. LENNOX:  And would have to come into this Court.

18         THE COURT:  -- be wasting their time in --

19         MS. LENNOX:  They'd have to come to this Court, Your

20  Honor?

21         THE COURT:  I would think they should, yes, because

22  it's my injunction.

23         MS. LENNOX:  Thank you.

24         THE COURT:  And we've already been here, and unlike

25  Portrait America, it's my order and I had the hearings on it so

81

1    I remember this stuff pretty well and know how I -- and know

2    what I require in confirmation orders.

3          So I have before me a motion by General Motors, LLC,

4    which I'll refer to as New GM, which purchased substantially

5    all of the assets of General Motor's Corporation in GM's

6    bankruptcy case.  That motion by New GM seeks to enforce the

7    modified plan of reorganization for Delphi Corporation and its

8    affiliated debtors and the order confirming the modified plan

9    dated July 30, 2009.  The plan subsequently went effective,

10   that is, the transfers upon which it was premised and the

11   distributions upon which it was premised occurred or were

12   substantially consummated on October 6, 2009.

13         The plan, like most aspects of Delphi's Chapter 11

14   case, was fairly complicated.  It involved the transfer of

15   substantially all of the debtors' global core businesses to an

16   entity called DIP Holdco 3, LLC, comprised of or owned by the

17   postpetition DIP lenders.  A GM affiliate or subsidiary

18   acquired the debtors' noncore steering business and certain

19   U.S. manufacturing plants very closely tied to doing work for

20   GM.  And then DPH Holdings, which is now the entity in the

21   caption of this case, retained certain other assets and is

22   responsible for implementing the executory aspects of the plan

23   and dealing with claims.

24         The issue of the treatment of the debtors' pension

25   plans as well as other legacy liabilities was a key issue in

82

1    the Chapter 11 case.  Also a key issue in the Chapter 11 case

2    was the debtors' complicated relationship with GM Corporation.

3    GM was the largest customer of the debtors.  Also it was,

4    arguably, the largest creditor of the debtors.  And moreover,

5    because of both its close relationship with the debtors as well

6    as express guarantees entered into by GM in connection with the

7    spinoff of the debtors from GM and subsequent agreements,

8    potentially responsible for substantial obligations of the

9    debtors to, contractually at least, three of the debtors'

10   unions:  the UAW, the IUE, and the USW.

11        It was always the case that GM and the debtors

12   intended to resolve those issues with an ultimate release of GM

13   in return for GM's contribution to the resolution of those

14   issues through a Chapter 11 plan.  That had to be tied into

15   agreements with those three unions among other constituents in

16   the case.

17        As it happened, Delphi's initial plan, pursuant to

18   which its legacy obligations, including the pension plans of

19   both the hourly employees represented by the unions as well as

20   the salaried employees, would be maintained intact.  That plan,

21   unfortunately failed; it did not get consummated.  The

22   investors upon whose investment the plan was premised

23   terminated their commitments to invest.

24        At the same time, there was a global downturn -- a

25   severe global downturn in the automotive business that

83

1    dramatically affected both GM and Delphi.  Nevertheless, GM,

2    Delphi, the unions, and other parties-in-interest continued to

3    pursue a resolution of the issues that I've described which

4    ultimately resulted in the modified plan that was confirmed by

5    the plan modification order on July 30, 2009 and that was

6    consummated on October 6, 2009.

7         Under that plan, GM and New GM received broad

8    releases and exculpations which were embodied in both paragraph

9    11.8 and 11.1 of the plan and supported by an injunction in the

10   plan modification order against actions that would violate

11   those release and exculpation provisions.

12        By the time of the entry of the confirmation order it

13   was clear that Delphi would not be able to assume the pension

14   plans of either the unions or the salaried retirees.  That left

15   the issue of whether GM, which by then was in its own Chapter

16   11 case, would be responsible for the difference between the

17   payments to the beneficiaries of those plans by the PBGC and

18   the amounts that the beneficiaries would be entitled to under

19   the plans themselves.

20        Under the -- or in connection with the plan, GM took

21   an assignment -- New GM, that is, took an assignment of the

22   debtors' memorandum of understand with their largest union, the

23   UAW, which provided for the topping up of the pension benefits

24   of those UAW retirees.  That is, it provided for the payment of

25   those benefits by New GM in excess of the amounts that were

1    guaranteed by the PBGC.

2            The plan was also confirmed in contemplation of and

3    providing for, as I said, the transfer of certain plants in the

4    steering business to GM, pursuant to the MDA or master

5    disposition agreement.  That agreement provided in paragraph

6    10.26 for a consent right by the other two unions that had the

7    benefit of an old GM benefit guarantee, the IUE and the United

8    Steelworkers.

9            The release under paragraph 11.11 of the plan clearly

10   provided for a release in connection with not only the conduct

11   of the Chapter 11 case but also implementation of the plan and

12   the MDA before the effective date of the plan.  The two unions

13   agreed in a settlement agreement, attached as Exhibit D to New

14   GM's reply brief in this matter, to the transfer under the MDA

15   in return for GM's providing the top-up payments.

16           This enabled the MDA to close and the plan to go

17   effective in October of 2009.  The actual agreement was not

18   approved in GM's bankruptcy case until November of 2009 but the

19   parties acted in reliance upon the agreement and the hearing

20   thereon in closing the MDA.

21           The Delphi Salaried Retirees Association is made up

22   of salaried retirees of Delphi who were beneficiaries of the

23   salaried retiree pension plan.  They appeared in the Chapter 11

24   case in opposition to confirmation of the plan.  They also

25   appeared thereafter because they had commenced an action in

1   district court in Michigan that the debtor contended violated

2   the automatic stay and/or the plan, and the subsequently agreed

3   to settle that dispute, i.e. the dispute with the debtor, by

4   agreeing to pursue only the PBGC at that time and not to

5   collaterally attack the modified plan or the confirmation

6   order.  That stipulation was entered into on September 11th of

7   2009.

8          The retirees pursued a complaint against the PBGC in

9   the U.S. District Court for the Eastern District of Michigan,

10  but in November of 2009 they amended that complaint to add a

11  fifth cause of action, which includes as a defendant New GM.

12  That count, Count V of the amended complaint, asserts that New

13  GM's decision to top up the pension benefits of union

14  affiliated Delphi retirees was made at the direction of the

15  United States government, and because it did not apply also to

16  nonunion retirees similarly situated, violated the equal

17  protection provision of the Fifth Amendment and the First

18  Amendment's association on speech guarantees.

19         New GM sought, through counsel, to have itself be

20  dismissed from the action, asserting that the amended complaint

21  violated the plan injunction and the release and exculpation

22  provisions of the plan upon which -- which the plan injunction

23  enforces.  That request was denied and New GM then brought this

24  motion.

25         The retirees, who include three individual retirees

1   who are plaintiffs as well as the Salaried Retirees

2   Association, has objected to New GM's motion, essentially on

3   two grounds.  The first ground is that it is contended this

4   Court should exercise its discretion under 28 U.S.C., Section

5   1334(c)(1) to abstain from deciding the motion, quote, "in the

6   interest of justice or in the interest of comity with state

7   courts or respect to state law".

8          The retiree plaintiffs contend that because of a

9   proper deference to the issues before the Michigan District

10  Court pertaining to Count V in  the complaint and their

11  interplay with whether the plan injunction applies or not, the

12  Court should abstain.  It should be noted before analyzing that

13  contention that there's no dispute that the confirmation order

14  is a final order and governs and therefore that it is not

15  subject to collateral attack.  See Celotex v. Edwards, 514 U.S.

16  300, 313.

17         Rather, the retiree plaintiffs contend that I should

18  defer to the Michigan District Court on the issue of whether

19  the injunction by its terms applies to their pursuit of the

20  Michigan District Court action.  The decision to abstain

21  permissibly under 28 U.S.C., Section 1334(c)(1) is within the

22  sound discretion of the bankruptcy court.  In re Dayton Title

23  Agency, 304 B.R. 323, 329 (Bankr. S.D. Ohio).

24         However, it is clear that the decision is an

25  extraordinary one and that the Court should weigh the factors

1    that I'm about to go through heavily in favor of exercising its

2    jurisdiction.  The Supreme Court has described the duty to

3    exercise its jurisdiction when properly invoked as a, quote,

4    "virtually unflagging obligation".

5              New Orleans Public Service, Inc. v. Council of the

6    City of New Orleans, 491, U.S. 350, 359 (1989).  See also

7    Texaco Inc. v. Sanders, 182 B.R. 937 (Bankr. S.D.N.Y. 1995),

8    946-947;  In re Ionosphere Clubs, Inc., 108 B.R. 951, 954

9    (Bankr. S.D.N.Y. 1989); and In re Portrait Corporation of

10   America 406 B.R., 637 (Bankr. S.D.N.Y. 2009), 641.

11             I believe that's particularly the case, whereas here

12   the matter before the Court is a core matter under 28 U.S.C.,

13   Section 157(b).  Clearly the Court's construction and

14   enforcement of the confirmation order in the case and the

15   Chapter 11 plan is a core matter.  And as I noted, that order

16   recognized the transfer of key assets of the debtors to New GM

17   as well.  See In re Millenium Seacarriers, Inc., 458 F.3d 92,

18   95 (2d Cir. 2006) as well as In re Texaco, Inc., 182 B.R., 944.

19             Clearly there's no issue as to the Court's

20   jurisdiction here, as a bankruptcy court retains post-

21   confirmation jurisdiction to interpret and enforce its own

22   order, particularly when the dispute arises over a bankruptcy

23   plan and the confirmation order.  See In re Petrie Retail,

24   Inc., 304 F.3d 223, 230 (2d Cir.2002) as well as Travelers

25   Indemnity Co. v. Bailey, 129 S. Ct. 2195, 2205 (2009).

1        Moreover, it's well-recognized that, quote, "a

2   bankruptcy court is undoubtedly the best qualified to interpret

3   and enforce its own orders, including those providing for

4   discharge and injunction and therefore should not abstain from

5   doing so."  Again In re Texaco, Inc., 182 B.R., 947.  See also

6   In re U.S.H. Corp. of N.Y., 280 B.R. 330, 338 (Bankr. S.D.N.Y.

7   2002), quote, "The policy of this district does not favor

8   abstention in matters involving a Court's interpretation of its

9   own orders."

10        It's in light of all of that case law, as well as the

11   Court's very great familiarity with the facts of these Chapter

12   11 cases, that I approach the analysis of whether I should

13   permissibly abstain.  In conducting such analysis, the courts

14   have developed twelve factors for consideration of whether

15   permissive abstention should be ordered under 28 U.S.C.,

16   Section 1334(c)(1).  As I noted, they're heavily weighted

17   against abstention and in favor of the exercise of

18   jurisdiction.

19        They are:  "The effect or lack thereof on the

20   efficient administration of the estate if a Court recommends

21   abstention; the extent to which nonbankruptcy law issues

22   predominate over bankruptcy issues; the difficulty or unsettled

23   nature of the applicable nonbankruptcy law; the presence of a

24   related proceeding commenced in state court or other

25   nonbankruptcy court; the jurisdictional basis, if any, other

1    than 28 U.S.C., Section 1334 for the underlying action; the

2    degree of relatedness or remoteness of the proceeding to the

3    main bankruptcy case; the substance rather than form of an

4    asserted "core" proceeding in front of a bankruptcy court; the

5    feasibility of severing nonbankruptcy law claims from core

6    bankruptcy matters to allow judgments to be entered in

7    nonbankruptcy court with enforcement left to the bankruptcy

8    court; the burden on the bankruptcy court's docket; the

9    likelihood that the commencement of the proceeding in

10   bankruptcy court involves forum shopping by one of the parties;

11   the existence of a right to a jury trial; and the presence in

12   the proceeding of nondebtor parties."

13          See, for example, In re Portrait America Corp., 406

14   B.R., 641, 642; In re Cody, Inc., 281 B.R. 182, 190 (S.D.N.Y.

15   2002); and In re Calpine Corporation, 361 B.R. 665, 669 (Bankr.

16   S.D.N.Y. 2007).

17          Here, as I noted, this is not only a core matter, but

18   the release and injunctive provisions as they pertain to GM or

19   New GM under the plan were absolutely central to confirmation

20   and implementation of the plan.  Moreover, as I noted, it

21   appears to me that ultimately here the applicability of the

22   injunction is and should be treated as a gate keeping issue.

23          Clearly, a plaintiff takes the risk when it acts

24   potentially in violation of an injunction without seeking

25   permission from the Court that issued the injunction.  That is

1    what happened here.  I do not believe that it is generally

2    appropriate for the Court that issues an injunction therefore

3    to ignore that fact in considering whether to defer to the

4    court in which the allegedly infringing action was commenced.

5         Moreover, as I noted, I am not unmindful of the

6    September 2009 stipulation entered into by the retiree

7    plaintiffs in which they undertook not to collaterally attack

8    the plan modification order which was entered into after

9    litigation in this court as to whether their original lawsuit,

10   which was contended violated the automatic stay and/or the

11   plan, and the lawsuit which was subsequently dismissed in

12   Michigan District Court violated the automatic stay and the

13   plan confirmation order.

14        I do not believe that, contrary to the assertion in

15   the retiree plaintiffs' objection to GM's motion, that GM was

16   forum shopping here.  I believe that it was appropriate for GM

17   to seek relief from the Court that issued the plan injunction.

18        The premise ultimately of the retiree plaintiffs'

19   argument is that it would be necessary to determine the

20   applicability of the plan injunction here to also determine the

21   issues before the District Court in Michigan, and therefore,

22   that based on considerations of judicial economy and the risk

23   of inconsistent decisions, the Court should defer to the

24   Michigan court where the issue was first raised.

25        I disagree with that premise for a few reasons.

1    First, I don't believe that the first-to-file rule should be --

2    or the first-filed rule should be applicable here given the

3    issuance of the injunction in the first place.  If anything, it

4    would seem to me that the commencement of the action in

5    Michigan against New GM put the cart before the horse rather

6    than GM's seeking to enforce the injunction.

7        Secondly, there is not a complete overlap between the

8    issues in the Michigan proceeding and the issues with regard to

9    whether the injunction or not applies -- I'm sorry, whether the

10   injunction applies to protect New GM.  Certain of the key

11   issues that were discussed today as to whether the injunction

12   applies or not are not before the Michigan court.  And namely,

13   whether the injunction extends to actions taken after the

14   effective date of the plan and the interpretation of the

15   underlying release and exculpation provisions themselves and

16   the provisions of the confirmation order that implement that

17   plan provisions.

18       Those issues are before the Michigan court only

19   because of the retiree plaintiffs' decision to commence the

20   litigation against GM in Michigan without first obtaining

21   relief from the injunction and thereby subjecting themselves to

22   the risk that they had violated the injunction.

23       Finally, it appears to me to be the case that there

24   is some real doubt as to whether the exception to the release

25   set forth in paragraph 20 of the plan modification order, i.e.

92

1    that the release does not apply to actions in fraud or willful

2    misconduct, that no release under paragraph 11 of the plan or

3    Section 11 of the plan would apply to such actions is

4    necessarily before the District Court in all circumstances or

5    on all fours.

6         There was a substantial colloquy at oral argument as

7    to whether it is necessary to prevail on the Count V in the

8    complaint to show that the discrimination by New GM was willful

9    in the sense of knowing or recklessly risking actual violation

10   of the constitution as opposed to a merely intentional act that

11   turned out to be in violation of the constitution.

12        Eventually, the counsel for the retiree plaintiffs

13   stated that they would limit their case to such a fact pattern,

14   but it is not clear that they would limit it to such a fact

15   pattern with regard to the other defendants.  And it appears to

16   me, therefore, that under the circumstances even that issue is

17   not necessarily on all fours with the issue before me as far as

18   enforcing the injunction is concerned.

19        I note that the retiree plaintiffs rely heavily on a

20   decision of mine issued last summer, In re Portrait America, in

21   which I determined to abstain under Section 1334(c)(1).

22   However, it's clear to me that the present facts are quite

23   different from the facts before me in that case.

24        First of all, this was highly relevant to that

25   decision.  The party wishing to enforce an order of the

93

1   bankruptcy court in that decision waited seventeen months to do

2   so, until after the case was highly developed in the

3   nonbankruptcy court.

4          Moreover, the order that was issued, upon which that

5   party was belatedly trying to rely, was issued by another judge

6   of this court.  That is, I did not have the background facts,

7   or obviously could not look into the head of that judge with

8   regard to construction of that order any more than could the

9   judge in the nonbankruptcy forum.

10          That obviously is in distinct contrast to the present

11   matter, where in addition to being intimately familiar with the

12   facts, I know what I would have permitted and not have

13   permitted in a confirmation order, which obviously bears on

14   certain of the arguments that the parties would raise as to

15   whether the injunction is applicable or not, including the

16   construction of paragraphs 20 and 57 of the order and whether

17   the willful misconduct carve-out would apply to any release

18   that New GM would be receiving under the plan in that order.

19          Moreover, the issues before the Court in the Portrait

20   Corporation of America case were factually complex patent and

21   intellectual property violation issues that were not at all

22   clear to this Court as far as their ultimate determination.

23   More specifically, as far as the equities of the case, it was

24   not at all clear to me in Portrait Corporation of America

25   whether the party relying on the sale order of the bankruptcy

1     court was in fact acting improperly in doing so in that it may

2     have been claiming rights that it did not purchase and was

3     strategically asserting those rights to short circuit the

4     protection of valid rights by the plaintiff in the

5     nonbankruptcy case.  Therefore, I won't exercise my discretion

6     to abstain in this matter.

7           That leaves the issue as to whether commencement and

8     pursuit of the claim in the Michigan District Court action

9     against New GM does in fact violate the plan injunction and the

10    release and exculpation provisions that the injunction

11    enforces.  The releases under the plan in paragraph 11.8 and

12    11.11 are very broadly worded.  Section 11.11 does not limit

13    the release of New GM to pre-confirmation or even pre-effective

14    date conduct, but rather includes, among other things: the

15    implementation or consummation of the plan, the Delphi/GM

16    definitive documents, the Delphi/PBGC settlement agreement, the

17    master disposition agreement, the union settlement agreements,

18    and any employee benefit plan instrument release or other

19    agreement or document created, modified, amended, or entered

20    into in connection with either this plan or any agreement with

21    the unions.

22          It's clear to me based on my review of the record of

23    this case which includes, as I noted, the debtors' assumption

24    and assignment of their MOU with the UAW, which was separately

25    approved under paragraph 61 of the confirmation to New GM,

1    that -- or to GM, that the release would cover that action.  I

2    believe it also clearly covers the action of New GM to enter

3    into the settlement agreement with the other two unions which

4    it agreed to top up their pension benefits in return for their

5    agreement to permit the MDA, the master disposition agreement

6    to close, and that enabled the consummation of the plans on

7    October 6th.

8         New GM also argues that because of Section 11.8 of

9    the plan it has a similar release, and I believe that is the

10   case.  It's also clear to me from those releases that up

11   through the date of the plan confirmation order at least, all

12   claims of the retirees -- or the salaried retirees against GM

13   and New GM were released.  That is, they had no rights or

14   claims as of that date that they could enforce against GM or

15   New GM.

16        The retiree plaintiffs therefore, I believe, have to

17   rely upon a carve-out from the releases and exculpation

18   provisions under paragraph -- I'm sorry, Article XI of the

19   plan, which is found in paragraph 20 of the plan modification

20   order which states that, "provided, however, notwithstanding

21   anything in this order, the exculpation provisions and releases

22   provided pursuant to Article XI of the modified plan shall have

23   no effect on the liability of any entity that otherwise would

24   result from any action or omission, to the extent that such

25   action or omission is determined in a final order to have

96

1    constituted intentional fraud or willful misconduct."

2         The retiree plaintiffs assert that their claim

3    against New GM and the Michigan District Court action is

4    premised upon New GM's alleged willful misconduct.  The alleged

5    willful misconduct is as I described when I read from

6    paragraphs of Count V of that complaint, i.e. that in agreeing

7    to top up the pension plan benefits of the unions the parties

8    doing so or causing such actions to happen, including New GM,

9    unconstitutionally discriminated against the nonunion salaried

10   retirees whose plans were not topped up.

11        New GM argues that paragraph 57 of the confirmation

12   order trumps the carve-out from the release and exculpation

13   language set forth in paragraph 20.  As I noted in oral

14   argument, I am skeptical of that contention, given the language

15   of the GSA that's referred to in paragraph 57 and the fact that

16   the GSA release was actually extended to New GM through not the

17   GSA itself but Section 11.8 of the plan which deemed New GM to

18   be one of the released parties under the GSA.

19        However, I don't need to decide that dispute between

20   the parties, I believe, because on this record I do not believe

21   there is a valid basis for asserting that the willful

22   misconduct carve-out, even if applicable under paragraph 11.8

23   and the GSA has been shown.  To the contrary, I believe that

24   the record does not show any willful misconduct by New GM in

25   assuming the UAW topping obligation or the similar agreement

1    with the other two unions.

2         I believe that the retiree plaintiffs need to allege

3    more than they have alleged up to this date before they can

4    subject New GM to the burdens of litigation in the face of the

5    plain language of the injunction.  Ultimately, I believe that

6    they have not shown enough to suggest that the injunction can

7    simply be ignored and that the litigation could simply proceed

8    in the hope that whatever that "enough" is to show willfulness

9    would at some point in the future be established.

10        I say this because I approved the assumption and

11   assignment of the UAW MOU at a time when it was clear that the

12   retiree group would not be having the same treatment, and

13   approved it as fair and reasonable in light of, among other

14   things, the different position of the UAW in respect of its

15   underlying rights and economic leverage over GM than the

16   salaried retirees.  The logic of that determination also

17   applies, I believe, to the settlement agreement between New GM

18   and the other two unions that was entered into before the

19   consummation of Delphi's plan.

20        Those are the only topping-up agreements that have

21   been brought to the Court's attention.  Each of those

22   agreements was approved on notice to, among others, the

23   retirees as being fair and reasonable.  I simply do not believe

24   that on that record GM could be said to have acted or to have

25   engaged in willful misconduct.

1          Therefore, I will issue an order declaring that the

2     continued prosecution of the Michigan District Court action by

3     the retirees against New GM violates the plan injunction and

4     may not proceed.

5          As we stated at oral argument, the foregoing

6     declaration obviously is without prejudice to the retirees'

7     right to come back to this court to show additional facts as to

8     willful misconduct.  I won't speculate further as to what those

9     facts would have to be, but I will note that if they're along

10    the same lines as to what I've just ruled on, such a request is

11    most likely to be denied.

12         So counsel for New GM should submit the order.  I

13    think you ought to take a look at it to -- I know it will have

14    to be revised at least in part.  You don't need to settle that

15    order on counsel for the retirees but you should, I think, run

16    it by them in advance and also copy them on your e-mail to

17    chambers when you submit the order.

18         And I won't enter it immediately when I get it.

19    They'll have a chance to -- you know, at least a few hours to

20    respond if they think it's not consistent with my ruling,

21    although I think it's pretty clear what it should say and I

22    doubt that there'll be an objection to it as far as whether it

23    reflects what I've actually ruled.

24         But pending the issuance of that order, retirees are

25    on notice of my view that the continued prosecution of the

99

1   action in Michigan against New GM does violate the plan

2   injunction, so they should stop doing that immediately.

3           I normally don't say this when I issue rulings, but I

4   will here.  I clearly regret the hardship that the retirees

5   undoubtedly have experienced and will experience because of the

6   effect of the termination of their pension plans or the pension

7   plan.  It was always Delphi's goal to assume those plans if

8   possible, and this case was prolonged two or three -- well, at

9   least two years, because of Delphi's desire to do that, I

10  think, among other things.  But I don't believe, as a legal

11  matter, as opposed to a matter of just simple sympathy, that

12  the retirees are entitled to relief from the injunction at this

13  point to pursue New GM.  Thank you.

14          MS. LENNOX:  Thank you, Your Honor.

15          MR. MEISLER:  Thank you, Judge.

16      (Proceedings concluded at 12:59 p.m.)

17

18

19

20

21

22

23

24

25

100

1

2                            I N D E X

3

4                            RULINGS

5                                          Page  Line

6     Relief Requested for            8     11

7     Forty-Second Omnibus

8     Objection, Granted

9     Forty-Third Omnibus             9     10

10    Objection, Granted as

11    Modified on the Record

12    Expungement of Claims          10     21

13    Filed After 7/15/09 and

14    Before 11/09 Bar Date,

15    Granted

16    The Court will Exercise        94      5

17    Its Jurisdiction and Not

18    Abstain from Deciding the Motion

19    Order issued that the Michigan  98      1

20    Court Action by the Retirees

21    Against New GM Violates the Plan

22    Injunction and May Not Proceed.

23

24

25

101

C E R T I F I C A T I O N

I, Pnina Eilberg, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

Pnina Eilberg (CET**D-488)

AAERT Certified Electronic Transcriber


Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  March 2, 2010